## SWORN DECLARATION OF GLENN L. WHITEHOUSE

I, Glenn L. Whitehouse, being first duly sworn under oath, depose and state that if I were called to testify in the APA Article VII arbitration hearing in *Patterson v. Whitehouse*, I would testify as follows:

### My Background, Credentials, and Union Experience

1.      I am employed by American Airlines ("AAL") as a pilot. I was hired by AAL on 21 August 1987 and have been continuously employed as a pilot at AAL ever since. I was upgraded to Captain in March 1999 and I currently fly as a Captain on the Boeing 757 and 767 in the International division based at Miami International Airport, a position I have held continuously since April 2012.

2.      In conjunction with my employment at AAL, I joined the Allied Pilots Association ("APA"), the labor union formed in 1963 and continuously recognized since then as the exclusive collective bargaining agent for the airline pilots in the service of American Airlines.

3.      While I have voted in union elections, attended various meetings, and participated in functions within the APA during my career, I have never pursued any elected office, have never received any committee appointments, have never been involved in coordinating or supporting any political campaigns within the union, nor have I ever sought or held any positions in management at AAL.

### Purpose and Scope of Statement

4.      This declaration is intended to support and substantiate my appeal of the decision of the APA Appeal Board in Patterson v. Whitehouse, dated 21 August 2017. [1]

# Attachment 13

---

[1] *See* APA Appeal Board Decision in *Patterson v. Whitehouse*, 21 August 2017, **GW 000255-000269**

## The Article VII Complaint Filed by Rodney Scott Patterson

5.      On or about 15 December 2016, I received a copy of an internal union complaint ("Article VII Complaint") made against me by First Officer Rodney "Scott" Patterson ("FO Patterson"), dated 4 December 2016, complaining that I had allegedly violated an actionable clause in Article VII. [2]

6.      Since the alleged act that FO Patterson cited in his Article VII Complaint occurred on 24 September 2015, I believe that APA's governing documents and policies in effect on that day should be the documents governing the handling of case, including at least:

   a.   APA Constitution and Bylaws ("C&B"), Amendment #82, Effective 26 December 2014. [3]

   b.   APA Policy Manual, Revision #161, Effective 6 June 2015. [4]

7.      The original version of the complaint had been sent to my APA address of record via USPS Priority Mail [5] and was apparently signed for by my landlord's spouse but, for reasons unknown, I never received that copy.

8.      A second copy was of FO Patterson's Article VII Complaint, the copy I ultimately received, was sent by regular mail on 9 December 2017. [6]

9.      Even though I did not actually receive the copy sent by Priority Mail, I am willing to stipulate that, on or about 15 December 2017, I had constructive knowledge of FO Patterson's Article VII Complaint.

---

[2] *See* *Article VII Charges Against APA Member Captain Glenn Whitehouse, 017957*, 4 December 2016. **GW 000002-000007**. Note: This copy of the complaint, provided with the envelope in which it was enclosed, bears FO Patterson's return address in Florida, but has a conspicuous postmark of Dallas, Texas on 9 December 2016.
[3] *See* APA Constitution & Bylaws, Amendment #82, Effective 26 December 2014, **GW 000441-000478**
[4] *See* APA Policy Manual, Revision #161, Effective 6 June 2015, **GW 000625-000710**
[5] *See* last two attached pages to Miami Domicile Decision, 13 March 2017, **GW 000185-000186**
[6] *See* *Article VII Charges Against APA Member Captain Glenn Whitehouse,* 4 December 2016, **GW 000002-000007**

WHITEHOUSE DECLARATION 002

10.     The basis of FO Patterson's Article VII Complaint is his allegation that my actions on 24 September 2015 had violated the APA C&B when I made a workplace harassment complaint to AAL management in an effort to get AAL to stop the harassment I had been enduring from FO Patterson for almost a year.

11.     My 24 September 2015 complaint to AAL was what I had hoped would be the last of a series of attempts on my part, for the better part of a year prior to 24 September 2015 using a number of union and other resources, to compel FO Patterson to discontinue his repeated acts of harassment against me that had created a hostile work environment. I wanted nothing more than for the harassment to stop.

12.     However, FO Patterson did not characterize my complaint to AAL in this manner in his Article VII Complaint. Specifically, FO Patterson's Article VII Complaint claimed that I "*acted in direct violation of the supreme law of the union*" by complaining to AAL and claimed that I "*engaged in this willfully malicious behavior on September 24, 2015*" (the date that I filed my complaint to AAL). That "*behavior*" was the sole act identified as supporting the "charges" in his Complaint. [7]

13.     Although various other unsubstantiated remarks are made within FO Patterson's Article VII Complaint, none are cited as basis for his Article VII "charges," and in any event, my alleged "*behavior*" on 24 September 2015 is the most recent date-specific alleged action on my part that FO Patterson claims forms the basis of his complaint.

14.     FO Patterson specifically sought my punishment because he alleged my actions on 24 September 2015 were "*motivated by malice or political animus that expose[d] another member to company discipline, up to and including termination.*" [8]

---

[7] *See* **GW 000004**
[8] *See* APA C&B Article VII, A.8, **GW 000465**

WHITEHOUSE DECLARATION 003

15.     Article VII contains a "statute of limitations" that, by default, requires complaints be

*"filed within one (1) year after the alleged offense."* The only <u>potential</u> exceptions are

allegations related to violations of the provisions of Article VII.A.1 and VII.A.8:

> *"Except for charges filed in accordance with Section A.1 and A.8. of this Article, charges must be filed within one (1) year after the alleged offense. Charges under Section A.1 may be applied retroactively to conduct which occurred prior to becoming an APA member. Absent extreme mitigating circumstances, expulsion is mandatory for a violation of Section A.1. Charges filed in accordance with Section A.8. of this Article must be filed within one (1) year, or one (1) year from the issuance of the Arbitrator's award in the related grievance, if applicable. The Appeal Board shall delay the hearing of charges filed under A.8. of this Section until the issuance of the Arbitrator's award in the related grievance, if applicable."* [9]

16.     Charges under Article VII.A.1, are those related to strikebreaking [10] and are not argued

even by FO Patterson to be applicable to this case in any way.

17.     FO Patterson claimed that I violated Article VII.A.8, which, under Article VII.B.2,

provides for a fixed one-year "statute of limitations" from the time of the alleged offense to file a

complaint. There *is* a provision within Article VII.B.2 allowing for hearing of charges to be

delayed under Article VII.A.8, but only in circumstances when there is a pending arbitration

decision regarding employer discipline or termination when it is alleged that the employer

discipline or termination occurred as the result of acts of malice or political animus by the

accused. In such cases, the one-year "statute of limitations" for hearing the matter tolls at one

year from the issuance of an arbitration decision that would have been submitted to, and heard

by, the System Board of Adjustment under the Railway Labor Act ("RLA," 45 USC §§ 151 et

seq.).

18.     Although FO Patterson laced his Article VII Complaint with claims that I was motivated

by "*political animus*," nothing in his allegations, or in fact, support the inference that there was

---

[9] *See* APA C&B Article VII, B.2, **GW 000465**
[10] *See* APA C&B Article VII, A.1, **GW 000464**

WHITEHOUSE DECLARATION 004

any union political dispute between us, so any reliance upon "*political animus*" being the basis for applying the provisions of Article VII.B.2 is improper and not applicable.

19.     Upon information and belief, FO Patterson's employment has not been "terminated" by AAL, so no arbitration contemplated by Article VII.B.2 has occurred nor is scheduled, so it would be improper for FO Patterson to try and avail himself a right to complain after exhaustion of the default "*one (1) year after the alleged offense*" deadline by using the alternative "*political animus*" tolling provision even if the circumstances supported it.

20.     Even though FO Patterson also alleges that *"malice"* was another motive for making my workplace harassment complaint, the facts already in the record demonstrate that whatever "malice" might be alleged to have existed, it had fully manifested itself no later than 24 September 2015, the date I submitted my workplace harassment complaint to AAL. FO Patterson did not make his Article VII complaint for 14 months after my workplace harassment complaint, so it is not cognizable, as the Miami Domicile determined by written opinion on 13 March 2017.

21.     Article VII provides that complaints shall be heard in the first instance by the Domicile Officer(s) (Chairman and/or Vice Chairman) of the Domicile (local labor organization) of the accused member:

> "*Unless otherwise provided for in this Article VII, the charges shall be considered by the accused member's Domicile Officers in the first instance.*" (<u>See</u> Article VII, C.1.). [11] "*In the event one of the Domicile Officers recuses him or herself, the remaining Domicile Officer shall act alone.*" [12]

22.     Article VII further provides that, before any hearing, the Domicile Officer(s) must first determine "*whether the charges as submitted set forth a claim cognizable under this Article VII*" and may make such determination based only on the charges, without holding a hearing. [13]

---

[11] <u>See</u> APA C&B Article VII, C.1, **GW 000465**
[12] <u>See</u> APA C&B Article VII, C.1, **GW 000465**
[13] <u>See</u> APA C&B Article VII, C.1, **GW 000465**

WHITEHOUSE DECLARATION 005

**Initial Communications Following Receipt of the Article VII Complaint**

23.     On 15 January 2017 at 11:16 AM, I emailed MIA Vice Chairman Ed Sicher ("SICHER") to request an appointment for me with the Miami Flight Office [14] to obtain information regarding two statements that FO Patterson made in his Article VII complaint:

    a.   *"The Miami Flight office has admitted that the subject is a weak captain and much of his behavior is motivated by jealousy and political animus toward the complainant."*

    b.   *"The subject [unlawfully] colluded with [Miami Chief Pilot CA James] Bonds and filed his complaint on 24 September to cover up the illegal actions by Bonds."*

24.     On 16 January 2017 at 8:44 AM, SICHER replied via email asking me to call him. [15]

25.     On 16 January 2017 at 4:12 PM, I sent an email to the Miami Director of Flight, Chief Pilot CA Brian Beach, relating to him the allegations that FO Patterson had made against me with respect to being a "weak Captain" and "colluding" with Miami Chief Pilot CA Bonds. I asked CA Beach to explain or refute these claims by FO Patterson that he attributed to the Miami Flight Office. [16]

26.     About an hour and a half later, on 16 January 2017 at 5:51 PM, CA Beach replied to me stating simply: *"I have never heard nor privy to anyone calling you a weak captain."* [17]

27.     Three minutes later, on 16 January 2017 at 5:54 PM, I replied to SICHER's 8:44 AM email, quoting from the APA C&B regarding the one-year deadline, and pointing out this meant the *"End of Case."* [18]

28.     On 18 January 2017 at 11:54 AM, SICHER replied via email stating that he *"believed"* that *"acts of malice are given a longer time period"* and suggested it would be appropriate for me to get a *"reading from the APA Appeals Board and legal."* [19]

---

[14] *See* Email from CA Whitehouse to MIA Vice Chair CA Sicher, 15 Jan 2017 at 11:15 AM ET, **GW 000010**
[15] *See* Email from MIA Vice Chair CA Sicher to CA Whitehouse, 16 Jan 2017 at 8:44 AM ET, **GW 000010**
[16] *See* Email from MIA Director of Flight, CA Beach, to CA Whitehouse, 16 Jan 2017 at 5:51 PM ET, **GW 000011**
[17] *See* Email from MIA Director of Flight, CA Beach, to CA Whitehouse, 16 Jan 2017 at 5:51 PM ET, **GW 000011**
[18] *See* Email from MIA Vice Chair CA Sicher to CA Whitehouse, 16 Jan 2017 at 5:54 PM ET, **GW 000008-000009**

WHITEHOUSE DECLARATION 006

29.     On 27 January 2017, FO Patterson sent an email to persons unknown in which he purportedly *"expressed a desire to waive any domicile hearing… and advance his charges to the APA Appeal Board."* [20]

30.     Upon information and belief, this inexplicable delay by the Miami Domicile in scheduling, let alone considering, the Complaint, and the apparent premature contact between the Domicile Officers and the Appeal Board is extraordinary within APA and without precedent.

### The Flurry of Attempts to Avoid a Domicile-Level Decision

31.     On 13 February 2017, FO Patterson sent another email to persons unknown in which he purportedly *"expressed a desire to waive any domicile hearing… and advance his charges to the APA Appeal Board."* [21]

32.     That same day, 13 February 2017 at 11:33 AM, SICHER sent an email letter to the Miami Domicile Chairman, Captain William Read ("READ"), and copied the Accuser and Accused, as well as the APA Secretary-Treasurer and the APA Appeal Board Chairman Captain Rob Sproc ("SPROC"). [22] In this email, SICHER:

   a.   Requested to be recused because he claimed he previously *"had extensive 'ex parte' communications with many APA members concerning [the Accuser] that would preclude [his] being an entirely objective evaluator in this Section VII hearing."*

   b.   Suggested that the parties *"waive the domicile level hearing up to the National APA Appeal Board."*

---

[19] *See* Email from MIA Vice Chair CA Sicher to CA Whitehouse, 16 Jan 2017 at 5:54 PM ET, **GW 000008-000009**
[20] This email is described in the fourth paragraph of page 1 of the 13 March 2017 READ Decision, **GW 000178**.
Note: I asked APA to provide a copy of this email from the Domicile Level, but APA did not provide it.
[21] This email is described in the fourth paragraph of page 1 of the 13 March 2017 READ Decision, **GW 000178**.
Note: I asked APA to provide a copy of this email from the Domicile Level, but APA did not provide it.
[22] *See* Email from MIA Vice Chair CA Sicher to six addressees, 13 Feb 2017 at 11:33 AM ET, **GW 000013**

WHITEHOUSE DECLARATION 007

33.     Less than 20 minutes later, on 13 February 2017 at 11:51 AM, READ sent an email to me with a copy <u>only</u> to SICHER, [23] stating that, "*after much deliberation, Ed [SICHER] and I agree that this Article 7 should go directly to the Appeal Board.*"

34.     I was, and remain, puzzled as to why SICHER would engage in "*much deliberation*" with READ in a case when he believed he could not be objective, and had now recused himself.

35.     I reviewed the explicit C&B provision that, "*in the event that one of the Domicile Officers recuses him or herself, the remaining Domicile Officer shall act alone,*" [24] and understood, at that point, that READ would then be solely responsible for considering this complaint in the first instance.

36.     On 16 February 2017 at 08:54 PM, READ sent me another email, [25] copying SICHER and APA staff attorney Mark Myers, in which he stated that he was "*still waiting to hear back from you about waiving the domicile hearing for the Article 7.  I think it would be in everyone's best interests for you to do so.*"

37.     On 17 February 2017 at 12:17 PM, I replied to READ, [26] copying the APA Secretary-Treasurer (but not SICHER, who had purportedly recused himself), informing him, among other things, of my belief that that the "statute of limitations" for FO Patterson's Article VII Complaint had expired, and that I had not been notified how any scheduled Domicile-level hearing could be waived, and also that I could not locate any provisions within Article VII purporting to allow any party to waive consideration of a complaint in the first instance at the Domicile.

---

[23] *See* Email from MIA Chair CA Read to CA Whitehouse, 13 Feb 2017 at 11:51 AM ET, **GW 000014**
[24] *See* APA C&B Article VII, C.1, **GW 000465**
[25] *See* Email from MIA Chair CA Read to CA Whitehouse, 16 Feb 2017 at 8:54 PM ET, **GW 000015**
[26] *See* Email from CA Whitehouse to MIA Chair CA Read, 17 Feb 2017 at 12:17 PM ET, **GW 000016-000018**

WHITEHOUSE DECLARATION 008

38.     On 17 February 2017 at 9:14 PM, READ replied via email solely to me. [27] READ ignored my concerns about the lack of provisions in the C&B for this waiver issue he was now promoting. Instead, he only claimed – without substantiation – that I was incorrect as to the expiration of the one-year "statute of limitations," implying he believed the complaint was cognizable, at least based on the "statute of limitations."

39.     On 18 February 2017 at 11:04 AM, I replied to solely to READ suggesting that he look into the actual content and meaning of the entire paragraph within Article VII.C.2. [28]

40.     Within an hour, on 18 February 2017 at 11:39 AM, READ replied to my email, [29] indicating he had engaged the APA Legal staff: *"I'll include an APA attorney on this email to get his opinion."* In his reply, copied to APA staff attorney Mark Myers, READ included the entire "thread" going back to READ's email to me on 16 February 2017 at 08:54 PM (mentioned in ¶ 36 of this declaration). In copying Mr. Myerson on his reply to me, it is clear that READ was seeking Mr. Myers' opinion as to my conclusions as to the proper disposition of the case.

41.     Over the next couple weeks, in spite of my 17 and 18 February 2017 emails stating that Article VII does not allow any parties to "waive" consideration at the Domicile level, both READ and SICHER (despite supposed recusal) continued to advocate their request - in emails, text messages, and voicemails - that I waive the hearing at the Domicile level.

42.     On the afternoon of 18 February 2017, I sent a 3-page letter with a packet of documents (65 pages in total) to the APA Secretary-Treasurer for consideration by the Domicile (sent Certified Mail). [30]

---

[27] *See* Email from MIA Chair CA Read to CA Whitehouse, 17 Feb 2017 at 9:14 PM ET, **GW 000019-000024**
[28] *See* Email from CA Whitehouse to MIA Chair CA Read, 18 Feb 2017 at 11:07 AM ET, **GW 000155**
[29] *See* Email from MIA Chair CA Read to CA Whitehouse, 18 Feb 2017 at 11:39 AM ET, **GW 000155-000159**
[30] *See* Letter from CA Whitehouse to the APA Secretary Treasurer, 18 Feb 2017 ET, **GW 000090-000154**

WHITEHOUSE DECLARATION 009

43.     At the same time, on 18 February 2017, I sent a similar letter by regular mail to READ and the same set of documents. [31]

44.     On 26 February 2017 at 20:05, READ left me a short voicemail after I returned his request to contact him but had to leave him a message because he did not answer when I called. In his voicemail, READ said he *"just want to talk to you about this Article VII business."* [32]

45.     One minute later, on 26 February 2017 at 20:06, READ sent me a text message asking me to call him when I got home. [33]

46.     One minute after that, on 26 February 2017 at 20:07, SICHER left me a longer voicemail in which he stated that he and READ *"were getting calls from"* SPROC, stating that SPROC was pressing them to compel me to email SPROC to request the complaint bypass the domicile level and go straight to the Appeal Board where he planned to preside. [34]

47.     I was alarmed by SICHER's continued involvement in a case from which he had supposedly recused himself two weeks earlier.

48.     I was also alarmed by SICHER's disclosure that SPROC was deeply involved, apparently had been involved for some time, was now openly advocating for unconstitutional handling of a complaint that was not even before his Appeal Board. I could not understand why SPROC was so aggressively attempting hear the complaint in the first instance. With no other rational explanation evident, I began to fear there was collusion between SPROC and FO Patterson.

49.     On 1 March 2017 at 09:58 AM, READ again sent me a text message consisting of what appeared to be a last-ditch effort to get me to waive Domicile consideration, now with a new

---

[31] *See* Letter from CA Whitehouse to MIA Chair CA Read, 18 Feb 2017, **GW 000025-000089**
[32] *See* Transcript of Voicemail from MIA Chair CA Read, 26 Feb 2017 at 8:05 PM ET, **GW 000175**, and source **GW 000175.amr** *(audio file)*
[33] *See* Text message from MIA Chair CA Read to CA Whitehouse, 26 Feb 2017 at 8:06 PM ET, **GW 000176**
[34] *See* Transcript of Voicemail from MIA Vice Chair CA Sicher, 26 Feb 2017 at 8:07 PM ET, **GW 000177**, and source **GW 000177.amr** *(audio file)*

WHITEHOUSE DECLARATION 010

rationale – cost savings. READ stated that the complaint *"will go to the appeal board anyway. A local hearing will only drive up APA cost and time."* [35]

50.     Less than a half hour later, at 10:20 AM, I replied to READ's text message with my own text message.[36]  I explained that the "statute of limitations" within Article VII had clearly expired relative to FO Patterson's Article VII Complaint and, therefore, READ needed only to dismiss the complaint on that basis. I added that there were no provisions within Article VII for the waiver READ and SPROC sought and added that, if they persisted, I would file my own Article VII complaint alleging that FO Patterson was prosecuting malicious or frivolous charges in bad faith, and THAT would increase the costs that READ had suddenly stated was a concern.

## The READ Decision

51.     Upon information and belief, in the two weeks subsequent to READ's engagement of APA attorney Mark Myers on 18 February 2017 (an engagement which could easily have begun in January based on SICHER's email of 18 January 2017 at 11:54 AM [37]), FO Patterson's Article VII Complaint was apparently "fast-tracked" for conclusion at the Domicile level.

52.     This apparently occurred following my repeated arguments that FO Patterson's Article VII Complaint was not cognizable due to expiration of Article VII "statute of limitations," as well as my repeated requests for citation of any constitutional authority granting me or anyone else the authority to waive the Domicile-level hearing, reiterating these arguments as recently as 1 March 2017.

53.     Upon information and belief, from at least 18 February 2017 (if not before) until 13 March 2017, one or more APA staff attorneys were writing a decision for READ and were doing this work isolated from any input from parties to the case, possibly even isolated from READ

---

[35] *See* Text message from MIA Chair CA Read to CA Whitehouse, 1 Mar 2017 at 9:58 AM ET, **GW 000176**
[36] *See* Text message from CA Whitehouse to MIA Chair CA Read, 1 Mar 2017 at 10:20 AM ET, **GW 000176**
[37] *See* Email from MIA Vice Chair CA Sicher to CA Whitehouse, 16 Jan 2017 at 5:54 PM ET, **GW 000008-000009**

WHITEHOUSE DECLARATION 011

and SPROC trying to craft a decision based purely upon the clear meaning of the language in the C&B applied to the actual content and context of FO Patterson's Article VII Complaint.

54.     On 13 March 2017, the READ Decision was issued,[38] dismissing FO Patterson's complaint (without any hearing, in accordance with Article VII) because it was not cognizable due to more than one year passing from the date of the alleged act to the date of complaint.

55.     The READ Decision exclusively addressed the administrative provisions and processes within Article VII, and explicitly stated that the decision was not based on evaluation of the merits or substance of the charges:

> *"No hearing was held and no decision is being made on the merits or substance of the charges. I should note however that the Domicile Representatives received several letters and other information from both FO Patterson and CA Whitehouse in anticipation of a hearing. These documents were not considered in reaching this decision."*[39]

56.     The READ Decision's conclusion that FO Patterson's Article VII Complaint was not cognizable is conspicuously divergent from READ's email expression of 17 February 2017 at 9:14 PM (*See* ¶ 38 in this declaration) where READ implied that *he* did not believe the "statute of limitations" had been exhausted.

57.     However, apparently after consultation and perhaps substantial editorial writing by APA's legal staff, the READ Decision correctly observed the obvious, that the sole date claimed for alleged transgression was more than one year prior to FO Patterson's Article VII Complaint and, therefore, the Complaint was not cognizable under the C&B.

**Patterson's Appeal of the READ Decision**

58.     FO Patterson appealed READ's dismissal in a letter dated 6 April 2017.[40] In his appeal, FO Patterson essentially amended and, in some cases, contradicted his original complaint.

---

[38] *See* Miami Domicile Decision, 13 March 2017, **GW 000178-000186**
[39] *See* Miami Domicile Decision, 13 March 2017, p.2, ¶ 5, **GW 000179**
[40] *See* Letter from FO Patterson to APA Secretary-Treasurer, 6 Apr 2017, **GW 000187**

WHITEHOUSE DECLARATION 012

Apparently attempting to end-run the READ Decision that his complaint was untimely and therefore not cognizable, in his appeal letter, FO Patterson attempted to amend his complaint by making new claims of other actionable offenses that occurred <u>after</u> the initially-claimed sole offending act of 24 September 2015 and were not cited in his 4 December 2016 complaint.

59.     In his 6 April 2017 appeal, FO Patterson amended his complaint to include a "*pattern of conduct… which began in September 2015 and was not isolated to that date… the accused engaged in conduct through January 2016 to harm the appellant.*" [41]

60.     This is a transparent amendment to his 4 December 2016 complaint that was indeed "*isolated*" to an alleged act by me on 24 September 2015 where FO Patterson had specifically stated this act alone gave him cause to make his Article VII Complaint.

61.     Apart from the judicial impropriety implicitly being sought by FO Patterson by amending complaint on appeal, it should be noted that, if FO Patterson actually believed that acts in which I engaged at any time in 2016 had violated the C&B, he would have been well aware of these alleged acts and could have described them, with dates, in his 4 December 2016 Article VII Complaint. But he did not.

62.     In his appeal, FO Patterson also complained about purported "ex-parte" communications:

> "*The accused conducted a number of ex-parte conversations with Captain Read and even went so far as having unknown person's [sic] provide written testimony which unfairly prejudiced the appellant's position and denied the appellant a right to cross examine said witnesses or to object to the witness testimony based on relevance to the issue at hand.*" [42]

63.     Whatever communications that I had with the APA and the Miami Domicile Officers prior to the READ Decision, they (a) are all disclosed herein, (b) were all relegated to questions and concerns about how the Miami Domicile Officers were administering the Complaint, (c) were to provide, in advance, information and documentation that I might be presenting at any

---

[41] Letter from FO Patterson to APA Secretary-Treasurer, 6 Apr 2017, p.1, ¶ 2, **GW 000187**
[42] Letter from FO Patterson to APA Secretary-Treasurer, 6 Apr 2017, p.1, ¶ 2, **GW 000187**

WHITEHOUSE DECLARATION 013

Domicile hearing that may be convened, and (d) were never intended to be withheld from FO Patterson.

64.     It is significant to observe that, in spite of the illicit purpose assigned by FO Patterson to my motives in such pre-hearing communications, FO Patterson does not disclose or complain about his own "ex-parte" communications. FO Patterson seems to assert that:

    a.  My submissions in preparation to defend myself against his Article VII Complaint at the Domicile level were somehow improper.

    b.  Only he was allowed to submit anything after his 4 December 2016 Article VII Complaint.

    c.  I had no entitlement to do or say anything in my defense.

    d.  My attempts to prepare to defend myself were a new violation of Article VII that he seeks to insert into his amended complaint.

It seems that FO Patterson seeks to manufacture anything he can in order to try to retroactively shoe-horn his too-late complaint into consideration despite the one-year statute of limitations applicable to his Article VII Complaint.

65.     Furthermore, FO Patterson ignored the fact that there was no Domicile hearing and thus *neither* party participated in a Domicile hearing where anyone could be examined or cross-examined or challenge the relevance of any evidence.

**Mid-April Communication to APA Regarding Patterson's Appeal**

66.     On 17 April 2017 at 9:36 AM, after learning that FO Patterson had appealed the READ Decision, I emailed both READ and the APA Secretary-Treasurer. [43]  I included a letter that I had originally drafted on 23 March 2017 (after the READ Decision but prior to FO Patterson's appeal), but did not send it, as explained in my email on 17 April 2017 at 9:36 AM, because I

---

[43] *See* Email from CA Whitehouse to MIA Chair CA Read, 17 Apr 2017 at 09:36 AM ET, **GW 000188-000189**

WHITEHOUSE DECLARATION 014

had just been diagnosed with a spinal tumor that may be cancerous, that surgery was imminent, and I was preoccupied in dealing with that. I included the expression of hope that the Appeal Board could see through FO Patterson's amended pleadings and reject by moving forward by validating and upholding the READ Decision.

67.     Minutes later, at 9:45 AM, I sent SPROC an email [44] in which I informed him of the email I had just to READ and added, *"I will be unavailable for anything going forward as I face a very difficult surgery this week. I appreciate your cooperation in keeping my medical status confidential."* I closed with an implicit request that he not contact me directly at that point: *"Feel free to contact my wife 715-584-0205. Or my Attorney Ms. Wagner."*

68.     Also in my 17 April 2017 at 9:36 AM email to READ and the APA Secretary-Treasurer, I complained about the fact that the READ Decision included to both parties my home address and that I was very upset about the improper release of my personal residence to FO Patterson [45] in spite of the fact I had intentionally established with APA as being solely for Official Use Only ("OUO"). [46]

69.     Within an hour, on 17 April 2017 at 9:14 AM, the APA Secretary-Treasurer replied to both myself and READ, ignoring the unwanted release of my home address, and stating simply, *"Please let me know if there's anything I can do. Thoughts and concerns for you and your illness. This will remain confidential."* [47]

70.     About 15 hours later, on 18 April 2017 at 12:36 AM, READ replied to my concerns about the release of my personal residence address to FO Patterson. [48] READ stated that, in

---

[44] *See* Email from CA Whitehouse to FO Sproc, 17 Apr 2017 at 09:45 AM ET, **GW 000190**
[45] *See* Email from CA Whitehouse to MIA Chair CA Read, 17 Apr 2017 at 09:36 AM ET, p.2, ¶ 4, **GW 000189**
[46] APA Policy Manual 2.06.A.1.b., which provides that such *"data may only be accessed and used by union officials for official union business." See* APA Policy Manual Revision 167, Effective 1 January 2017 (in effect in March 2017), **GW 001070**
[47] *See* Email from Secretary-Treasurer to CA Whitehouse, 17 Apr 2017 at 09:14 AM ET, **GW 000191**
[48] *See* Email from MIA Chair CA Read to CA Whitehouse, 18 Apr 2017 at 12:36 AM ET, **GW 000191-000193**

WHITEHOUSE DECLARATION 015

handling my complaint, he had acted upon the legal advice of APA. READ said he would ask the Secretary-Treasurer *"to find out if this was an oversight by the legal staff at APA."* To date, I have not received any further communication from READ or the Secretary-Treasurer addressing this issue.

71.     Upon information and belief, the APA Secretary-Treasurer and/or READ forwarded my email of 17 April 2017 at 9:36 AM to SPROC (or relayed to SPROC the additional information it contained regarding my illness and upcoming surgery). This belief is supported by the fact I had alerted SPROC at 9:45 AM that I had sent the 9:36 AM to READ. Previously discussed are records indicating that SPROC had *already* engaged in multiple and substantive prejudicial discussions with at *least* READ and SICHER, well prior to the Domicile decision of 13 March 2017. My 17 April 2017 at 9:36 AM email dealt with that matter which was then actually pending before the Appeal Board. In particular, my email of 17 April 2017 at 9:36 AM indicated that my near-term availability for any Appeal Board hearings would be non-existent due to my surgery, a fact I directly related to SPROC in my email to him of 17 April 2017 at 9:45 AM.

### APA Appeal Board Actions Regarding Patterson's Appeal

72.     On 5 May 2017 at 5:33 PM, APA Paralegal Mallory Gloria, sent an email to FO Patterson with a copy to me, the APA Secretary-Treasurer, and the Appeal Board. [49] The body of the email was addressed to FO Patterson and said, *"Please see attached Notice of APA Appeal Board Article VII Hearing for Patterson v. Whitehouse."* Attached to the email was a 2-page PDF consisting of a 5 May 2017 notice of hearing addressed only to FO Patterson with his home address listed and a second page titled "Domicile and Appeal Board Level Non-Judicial Hearing Procedure."

---

[49] *See* Email from Mallory Gloria to FO Patterson, 5 May 2017 at 5:33 PM ET, **GW 000194-000196**

WHITEHOUSE DECLARATION 016

73.     Two minutes later, on 5 May 2017 at 5:35 PM, Mallory Gloria, sent a second email to me with a copy to FO Patterson, the APA Secretary-Treasurer, and the Appeal Board. [50]  The body of the email was addressed to me and also said, *"Please see attached Notice of APA Appeal Board Article VII Hearing for Patterson v. Whitehouse."* Attached to the email was a nearly identical 2-page PDF that had been sent to FO Patterson, consisting of the 5 May 2017 notice of hearing, but was addressed only to me with my home address visible, and a second page titled "Domicile and Appeal Board Level Non-Judicial Hearing Procedure."

74.     The second letter, addressed to me, was copied in email to FO Patterson and was addressed to the same mailing address that had been included in the READ Decision of 13 March 2017, the inclusion of which I had previously and strenuously complained about in mid-April to APA officials (*See* ¶¶ 68-70 of this declaration), an address that was *still* identified to APA as limited exclusively to Official Use Only.

75.     This second violation of APA Policy Manual 2.06.A.1.b. occurred despite my strenuous and unanswered objections just two weeks earlier (*See* ¶¶ 68-70 of this declaration), to the Secretary-Treasurer and READ about the violation of APA policy on use and release of OUO information. This second violation of privacy was particularly egregious given the clear knowledge by both APA Legal and SPROC of the substance of my 24 September 2015 workplace harassment complaint to AAL. They knew I was concerned about my security.

76.     After this second violation of the APA Policy Manual, on 16 May 2017 at 1:13 PM, I sent an email to APA senior staff attorney Trish Kennedy, including the discussion thread described earlier in this declaration (*See* ¶¶ 68-70 of this declaration). [51] A minute later, I

---

[50] *See* Email from Mallory Gloria to CA Whitehouse, 5 May 2017 at 5:36 PM ET, **GW 000197-000199**
[51] *See* Email from CA Whitehouse to Trish Kennedy, 16 May 2017 at 1:13 PM ET, **GW 000202-000204**

WHITEHOUSE DECLARATION 017

forwarded to Ms. Kennedy the same email exchange with the full header of the most recent email from READ (April 18, 2017 12:36 AM). [52] In the first of these emails, I wrote,

> *"Attached is the APA response from Captain Read about the Article VII. Also attached is my email to Captain Read and his response. In his response he states it was APA legal who approved the letter! I'm am demanding to know why my personal information was released to Patterson when it is set to OUO."*

To date, I have not received any response from Ms. Kennedy on this issue.

77.     For these reasons, I believe that APA's persistence in disclosing my personal residential address to FO Patterson, particularly after I strenuously objected to such disclosure, constituted *at least* willful negligence and perhaps even malicious *intent* to provide the means for FO Patterson to continue to harass and threaten me, jeopardize my livelihood, and give him new access to intimidate and threaten my family.

78.     SPROC's 5 May 2017 notice of hearing advised me (and the other recipients) that an Appeal Board hearing had been scheduled for 8-9 June 2017 to be held near the Miami Domicile in Florida. In the last sentence SPROC states, "*Please contact me if you are unable to attend the hearing due to a scheduling conflict or if you have questions/concerns.*"

79.     I was surprised and disappointed to see the unilateral scheduling of this hearing. Only two weeks earlier (on 17 April 2017 at 9:45 AM), I had informed SPROC that "*I will be unavailable for anything going forward…*" and asking him to contact my wife or attorney if he needed to reach me regarding the case. However, prior to the 5 May 2017 notice of hearing, SPROC never contacted me, my wife, or my attorney to coordinate the scheduling of the hearing or to propose or solicit available dates.

80.     In fact, due to my ongoing medical issues, I was unaware of SPROC's 5 May 2017 notice of hearing until about 10 days later, on or about 15 May 2017.

---

[52] *See* Email from CA Whitehouse to Trish Kennedy, 16 May 2017 at 1:14 PM ET, **GW 000205-000207**

WHITEHOUSE DECLARATION 018

## Denial of My Good Faith Request for a Continuance

81.    On 16 May 2017, at 1:22 PM, I sent an email to the APA Secretary-Treasurer in which I expressed concerns about the handling of this case,[53] to include:

    a.    My concerns that FO Patterson was attempting to alter his 4 December 2016 Article VII Complaint and the Appeal Board was allowing it.

    b.    Notification that the Appeal Board would soon receive a letter from my attorney informing them I would unable to attend the 8-9 June 2017 hearing.

    c.    A request for disclosure of actual costs to the Association for representing FO Patterson in any proceedings convened by AAL regarding my complaint to AAL of 24 September 2015. This request arose from FO Patterson's claim, in his Article VII Complaint, that my complaint to AAL on 24 September 2015 was completely refuted by APA at the cost of "*tens of thousands of dollars in man-hours.*"[54]

    d.    Restating my strenuous objection over APA's continued release of OUO information in violation of APA policy and the fact that clearly no action had been taken to correct the misconduct or prevent future occurrence.

82.    On 16 May 2017, my personal attorney, Lindsey Wagner, signed a letter on my behalf to SPROC requesting a delay in the hearing. Her paralegal, Juanita Perez, mailed a hard copy to APA that morning. She also emailed the letter as a PDF file to *Rsproc@alliedpilots.org* at 9:48 AM.[55]  In the letter, Ms. Wagner informed SPROC that:

    a.    She was replying - on my behalf - to his 5 May 2017 notice of hearing,

    b.    I was not available on 8-9 June 2017 due to a personal conflict, and

    c.    She was seeking a continuance.

---

[53] *See* Email from CA Whitehouse to APA Secretary-Treasurer, 16 May 2017 at 1:22 PM ET, **GW 000208**
[54] *See* FO Patterson's Article VII Complaint, 4 December 2016, p. 3, ¶ 1, **GW 000182**
[55] *See* Email from Juanita Perez and Letter from Attorney Lindsey Wagner, 16 May 2017, **GW 000200-000201**

WHITEHOUSE DECLARATION 019

    d.   She was requesting alternative dates for the hearing.

83.     Ms. Perez told me that she addressed the email to *Rsproc@alliedpilots.org* based upon her observation of the formatting of email addresses for other APA officials such as APA attorney Mark Myers (*Mmyers@alliedpilots.org*).

84.     Ms. Perez told me she did not receive any "bounce" or "undeliverable" message in "reply" to her email of 16 May 2017 at 9:48 AM to *Rsproc@alliedpilots.org.*

85.     The Spring 2017 APA Board of Directors meeting minutes document the fact that the Spring 2017 APA Board of Directors meeting occurred from 16-19 May 2017. [56]

86.     These minutes reflect that, on 18 May 2017, SPROC was at APA Headquarters and presented his Appeal Board report to the APA Board of Directors. [57]

87.     These minutes reflect that, SPROC's report included consideration of the still-pending resolution, [58] R2016-27, [59] seeking formal adoption by the APA Board of Directors' of the proposed "Appeal Board Committee Manual, dated Spring 2016." [60]

88.     The minutes to the Spring 2016 meeting of the APA Board of Directors, from a year earlier, indicate the Appeal Board Committee Manual, dated Spring 2016, was presented to the APA Board of Directors by SPROC on 16 May 2016. [61]

89.     However, the Spring 2017 minutes reflect that, on 18 May 2017, R2016-27 was ruled out of order because it was determined the APA Appeal Board Committee Manual did not require explicit approval since such a manual was already required. [62]

---

[56] *See Minutes to Spring 2017 APA Board of Directors meeting*, 16-19 May 2017, p. 1, **GW 001330**
[57] *See Minutes to Spring 2017 APA Board of Directors meeting*, 16-19 May 2017, pp. 36-38, **GW 001332-001334**
[58] *See* Minutes to Spring 2017 APA Board of Directors meeting, 16-19 May 2017, pp. 36-37, **GW 001332-001333**
[59] *See* R2016–27, Appeal Board Committee Manual, **GW 000209**
[60] *See* Appeal Board Committee Manual, Spring 2016, **GW 000379-000415**
[61] *See* Minutes to 2016 Spring Board of Directors Meeting, May 16-20, 2016, p. 18, **GW 000416**
[62] *See Minutes to Spring 2017 APA Board of Directors meeting*, 16-19 May 2017, pp. 36-37, **GW 001332-001333**

WHITEHOUSE DECLARATION 020

90.     On the morning of 19 May 2017, having received no acknowledgment or reply from SPROC regarding the 16 May 2017 email and hard copy of the letter, Ms. Perez contacted the APA Legal office. She was told that SPROC had <u>not</u> received the email sent to *Rsproc@alliedpilots.org*. She was instructed to fax the letter to his attention at the APA Legal office at 817-302-2187.

91.     On 19 May 2017 at 11:49 AM, Ms. Perez retransmitted the 16 May 2017 letter via facsimile to 817-302-2187. [63]

92.     On the afternoon of 19 May 2017, SPROC called Ms. Wagner's law office and spoke with Ms. Perez regarding the 16 May 2017 letter. SPROC acknowledged receipt of the fax letter and claimed that *Rsproc@alliedpilots.org* was the "wrong address." He provided her with his personal AOL.com address that he was now using for APA business correspondence.

93.     On 19 May 2017, at 4:20 PM, Ms. Perez called me and told me that SPROC had asked for more information about my condition. Rather than immediately provide SPROC with information regarding my medical condition, Ms. Perez ended that initial call with SPROC and contacted me to first obtain my permission to disclose that type of personal medical information to SPROC. I told Ms. Perez that it would be acceptable for her to advise SPROC that I was not available due to recovery from my surgery for a spinal tumor (even though I had actually already informed SPROC and APA of this a month earlier).

94.     Ms. Perez later informed me that she did call SPROC back and provided the information I had authorized. Ms. Perez informed me that SPROC then stated that he needed to check the guidelines on how many days he could postpone the hearing to allow for medical clearance.

95.     To my knowledge, no further information was solicited from, or provided by, SPROC with respect to my medical condition or whatever guidelines he was referencing to determine

---

[63] *See* Facsimile transmission of 16 May 2017 letter to APA HQ, 19 May 2017 at 11:49 AM, **GW 000210-000212**

WHITEHOUSE DECLARATION 021

how much of a delay would be appropriate under the circumstances. Still, there can be no doubt that SPROC was fully informed as to the specifics of my medical incapacity on 19 May 2017. Based on his earlier level of inquiry and prejudicial involvement, SPROC almost certainly knew these details at least a month earlier pursuant to my 17 April 2017 emails to him and to APA.

96.     On 22 May 2017, I received three emails from Mallory Gloria with attached PDF files, with the recipients of all being myself, FO Patterson, the APA Appeal Board, and the APA Secretary-Treasurer:

   a.  The first email, sent at 3:07 PM, bore the subject of *"Update: Patterson v. Whitehouse Article VII Hearing"* and included a PDF of a letter addressed to FO Patterson with his street address. [64]

   b.  The second email, sent 38 minutes later at 3:45 PM, bore the subject of *"Availability and Attendance - Patterson v. Whitehouse Article VII Hearing"* and included a PDF of a letter to me from SPROC with a copy of the 16 May 2017 letter from my attorney. In his letter to me, SPROC stated he had spoken to the law office on 19 May 2017. [65]

   c.  The third email, sent one minute later at 3:46 PM bore the subject of *"Update: Patterson v. Whitehouse Article VII Hearing"* and included a PDF of a letter addressed to me with my street address redacted. [66]  The letter otherwise appears to have the same editorial content of the letter sent to FO Patterson 39 minutes earlier.

97.     In the letter attached to the second of these 22 May 2017 emails,[67] SPROC disclosed that he had spoken to Ms. Perez (not noting the date, nor did he indicate there had been more than

---

[64] *See* Email from Mallory Gloria to FO Patterson, 22 May 2017 at 3:07 PM, **GW 000213-000214**
[65] *See* Email from Mallory Gloria to CA Whitehouse, 22 May 2017 at 3:45 PM, **GW 000215-000217**
[66] *See* Email from Mallory Gloria to CA Whitehouse, 22 May 2017 at 3:46 PM, **GW 000218-000219**
[67] *See* Email from Mallory Gloria to CA Whitehouse, 22 May 2017 at 3:45 PM, **GW 000216**

WHITEHOUSE DECLARATION 022

one conversation). However, the differences and material omission of critical facts between his rendition of the nature of that exchange and what Ms. Perez reported to me are substantial:

   a. First, SPROC claimed that Ms. Perez was unable to provide a "*firm date*" that I could attend the hearing.

   b. Second, SPROC omitted any mention of his knowledge that my then-indefinite medical incapacity was the reason why I could not predict availability.

   c. Finally, SPROC concluded, without explanation or his thought process, that "*it would be futile to provide [me] with alternative hearing dates.*"

98.    In this 22 May 2017 letter, SPROC also observed that I could be represented at the hearing, now just 17 days away, by any APA member I chose and that he would "endeavor" to allow me to "attend" the hearing via remote video connection.

99.    The other 22 May 2017 emails/letters (separately sent to FO Patterson [68] and myself [69]), were both entitled "*Update: Patterson v. Whitehouse Article VII Hearing*" and:

   a. Announced the specific hearing location on 8-9 June 2017 and

   b. Announced the scheduling of a "pre-hearing conference call for 5 June 2017, asking each party for a telephone number they could be reached at for the call.

   c. Asked the parties to identify any member they intended to have represent them.

100.   On 30 May 2017 at 3:43 PM, I sent an email to SPROC [70] and attached three files reiterating the essence of my message to him almost six weeks earlier, on 17 April 2017 at 9:45 AM, and providing additional details in reply to his 22 May 2017 letters, explaining that:

   a. I was unable to prepare physically and mentally for the scheduled hearings.

---

[68] *See* Email from Mallory Gloria to FO Patterson, 22 May 2017 at 3:07 PM, **GW 000213-000214**
[69] *See* Email from Mallory Gloria to CA Whitehouse, 22 May 2017 at 3:46 PM, **GW 000218-000218**
[70] *See* Email CA Whitehouse to FO Sproc, 30 May 2017 at 3:43 PM, **GW 000220-000226**

WHITEHOUSE DECLARATION 023

b.  I provided a letter about my condition from my neurosurgeon substantiating my inability to participate and referring SPROC to a member of APA's Aeromedical staff for any additional information.

c.  I would not be available until after I was cleared by my neurosurgeon.

d.  I had sought representation from an APA member, First Officer Thomas Willard, but, after he contacted SPROC to confirm the schedule, he informed me that he was unable to attend. (*See* ¶ 306.c for information as to how SPROC later mischaracterized this case-administration contact by FO Willard).

e.  In response to SPROC's unprecedented proffer in his other 22 May 2017 letter (that a *party* to the case would be allowed to "attend" the hearing via remote video, *See* ¶ 98), I said that I would only be available to participate in an Article VII hearing via such means due to my well-founded belief that it could be dangerous for me to be in the same room with FO Patterson. However, even this consideration was not intended to negate my consistent statements that I was unable to prepare, physically and mentally, for the scheduled events, regardless of the method of participation.

101.   On 31 May 2017 at 3:33 PM, Mallory Gloria forwarded to the Appeal Board, Secretary-Treasurer, and the parties a redacted version of my email of 30 May 2017 at 3:43 PM to SPROC but Ms. Gloria did not include any of the documents I had attached to it nor did she give any indication the attachments had been removed nor did she provide any explanation to recipients as to what was redacted and why. [71]

102.   On 31 May 2017 at 5:03 PM, Mallory Gloria sent another email to the parties, the Appeal Board, and the Secretary-Treasurer with the subject of *"Patterson v. Whitehouse Pre-Hearing*

---

[71] *See* Email from Mallory Gloria to Parties, 31 May 2017 at 3:33 PM, **GW 000227-000230**

WHITEHOUSE DECLARATION 024

*Conference Reminder."* [72] Attached to the email was a single-page letter from SPROC in which he noted that neither party had provided telephone numbers for use in the pending pre-hearing conference call and, with bold underline emphasis, pleaded for the parties to provide a phone number as soon as possible.

103.    On 31 May 2017 at 6:06 PM, FO Patterson sent a reply to Ms. Gloria and the original recipients plus CA Danny Shellhouse, but <u>not CA Whitehouse</u>. [73]  FO Patterson complained about the redactions in the document Ms. Gloria sent at 3:33 PM and requested unredacted versions of this document as well as other materials he had purportedly previously requested regarding the case and had never received.

104.    On 1 June 2017 at 2:35 PM, I replied to Mallory Gloria's email of 31 May 2017 at 5:03 PM (*"Patterson v. Whitehouse Pre-Hearing Conference Reminder"*) and told her I would be sending a submission via FedEx and email and provided my telephone number.[74]

105.    About an hour later, on 1 June 2017 at 3:40 PM, Ms. Gloria forwarded to me (with a copy to the Appeal Board) FO Patterson's email of 31 May 2017 at 6:06 PM. [75] However Ms. Gloria did not acknowledge or address any of FO Patterson's requests.

106.    On 2 June 2017 at 2:04 PM, I sent an email to SPROC with a copy to Mallory Gloria containing an attached submission for the Pre-Hearing Conference.[76]  In the email and its attached document, I explained the following:

      a.    Reiterated my lacking physical condition, now due to two recent surgeries.

      b.    I was not fit to represent myself or aid in my defense by locating and properly briefing an advocate.

---

[72] *See* Email from Mallory Gloria to Parties, 31 May 2017 at 5:03 PM, **GW 000231-000231.5**
[73] *See* Email from FO Patterson to Mallory Gloria and others, 1 Jun 2017 at 3:40 PM, **GW 000233-000234**
[74] *See* Email from CA Whitehouse to Mallory Gloria, 1 Jun 2017 at 2:35 PM, **GW 000232**
[75] *See* Email from Mallory Gloria to CA Whitehouse/Appeal Board, 1 Jun 2017 at 3:40 PM, **GW 000233-000234**
[76] *See* Email from CA Whitehouse to Mallory Gloria, 2 Jun 2017 at 2:04 PM, **GW 000235-000238**

WHITEHOUSE DECLARATION 025

107.    After sending the email, my wife drove me to a FedEx agent so I could overnight a hard copy of my 2 June 2017 communication to SPROC/Mallory Gloria at APA HQ.[77] Included in the package sent to APA on 2 June 2017 were hard copies of:

    a.  My email of 2 June 2017 at 2:04 PM with attached file.[78]

    b.  A copy of the letter and documents (65 pages in total) I had sent on 18 February 2017 to CA Read and the APA Secretary-Treasurer.[79]

    c.  Three "character reference" letters from:

        i.  CA Andre Haith,

        ii.  FO Chris Dudzic, and

        iii.  Solomon Ocran (my son I adopted from Africa)

108.    On 5 June 2017 at 12:52 PM, only eight minutes before the announced start time of the Pre-Hearing conference call, SPROC sent an email in reply to my email of three days earlier.[80]

109.    SPROC's email contained three main points:

    a.  SPROC said he could not assure me that my submission would receive the consideration I desired.

    b.  SPROC said a motion to submit it as evidence was required during the hearing.

    c.  SPROC falsely stated that I had been asked twice to provide a phone number to participate in the pre-hearing conference and yet had not done so (in fact, most recently, I had provided my telephone number in an email to Mallory Gloria on 1 June 2017 at 2:35 PM, in reply to the letter requesting it), saying I could still participate if I submitted a phone number within 10 minutes.

---

[77] *See* FedEx of documents from CA Whitehouse to SPROC/Mallory Gloria, 2 Jun 2017, **GW 001466-001542**
[78] *See* Email from CA Whitehouse to Mallory Gloria, 2 Jun 2017 at 2:04 PM, **GW 000235-000238**
[79] *See* Letter from CA Whitehouse to the APA Secretary Treasurer, 18 Feb 2017 ET, **GW 000090-000154**
[80] *See* Email from FO Sproc to CA Whitehouse, 5 Jun 2017 at 12:52 PM, **GW 000239**

WHITEHOUSE DECLARATION 026

110.   Even though I had told SPROC that I would be unable to participate in the pre-hearing conference on 5 June 2017 at 1:00 PM, and even though I had provided my telephone number, no one ever called me at the number I had provided.

111.   Also, I never received any transcripts, minutes, or records of the pre-hearing conference.

112.   On 6 June 2017 at 2:57 PM, I sent an email to SPROC [81] and copied Mallory Gloria, with two attached files (my 2 June 2017 submission prior to the pre-hearing conference and my submission for the Appeal Board hearing itself), and a request that the submissions be sent to the Appeal Board. In the submission for the Appeal Board hearing, I expressed:

   a.   Concern that SPROC had conducted a pre-hearing conference in my absence despite my repeated notices about my medical condition and objections, mainly that there is no Article VII provision for such a pre-hearing conference and that his stated purpose was not sufficiently descriptive as to the agenda and precise purpose of the conference (*See* ¶¶ 113-120, below)

   b.   Fear that SPROC was ignoring his knowledge of my medical condition as opportunity to justify punitive action against me.

   c.   Admonishment of SPROC for his treatment of a union member recovering from life threatening circumstances in such an inconsiderate and hostile manner.

   d.   I had done my "*level best to explain, repetitively, my medical situation and request a postponement, but regretfully those pleas have fallen on deaf ears.*"

   e.   "*My sole priority should have been my own health and welfare*" and that "*the antagonism and stress from this process is inhibiting my recovery, and I simply cannot remain engaged any longer.*"

---

[81] *See* Email from CA Whitehouse to FO Sproc, 6 Jun 2017 at 2:57 PM, **GW 000242-000248**

WHITEHOUSE DECLARATION 027

f.  I did not "*have it in me at this time to deal with what is happening here*" and that I could not know when I would be "*recovered enough to deal with this, but right now my focus is on a successful and speedy recovery rather than being needlessly drawn in to a stressful environment that unquestionably will not best serve my health needs at hand.*"

### The "Pre-Hearing Conference"

113.  As previously noted (*See* ¶ 97), on 22 May 2017, the same day SPROC denied my request for a continuance because he claimed it would be "*futile*" to proffer any hearing dates other than 8-9 June 2017, SPROC directed Mallory Gloria to send a letter from him to each of the parties (a) affirming his previously announced hearing dates of 8-9 June 2017 and (b) announcing a scheduled pre-hearing conference. [82]

114.  SPROC's stated purpose of the pre-hearing conference was "*administrative issues*" and was being portrayed by SPROC as a normal part of the Article VII process, but there is no mention of any "*pre-hearing conferences*" within Article VII or the APA Policy Manual.

115.  After I observed the unilateral scheduling of the "*pre-hearing conference*" as announced by SPROC, and because there is nothing in Article VII about such a conference, I undertook a review of previous emails and letters regarding case administration to see if I had missed being solicited for available dates or provided a description of what this "*pre-hearing conference*" was all about.

116.  My review did not reveal any time when I was solicited for available dates for this "*pre-hearing conference*" or even comment on a proposed date and time.

---

[82] *See* Email from Mallory Gloria to FO Patterson, 22 May 2017 at 3:07 PM, **GW 000213-000214**, and Email from Mallory Gloria to CA Whitehouse, 22 May 2017 at 3:46 PM, **GW 000218-000219**

WHITEHOUSE DECLARATION 028

117.    However, my review did result in discovery of a prior reference to "*pre-hearing conference*" that I had missed because I had not noticed there was a second page attached to the hearing notice dated 5 May 2017. This second page was not referenced in the hearing notice as an attachment but, I discovered there was a generic reference to a *potential* for pre-hearing conference.

118.    Attached to the 5 May 2017 hearing notice was a single page titled "DOMICILE AND APPEAL BOARD LEVEL NON-JUDICIAL HEARING PROCEDURE." The last paragraph stated:

> *"Specific questions regarding procedures, scheduling, administrative issues, etc. may be addressed in a pre-hearing conference call provided that all parties have an opportunity to participate in the call. Any pre-hearing conference call does not affect the deadlines imposed by Article VII."*

119.    Since I was unaware of this attachment until after the conference call and even the Appeal Board hearing itself, I did not have time to research the propriety of what was stated in the 22 May 2017 "Hearing Update" letter from SPROC. I only knew that there was no provision in the C&B describing such a *"pre-hearing conference"* or its purpose. SPROC's 22 May 2017 "Hearing Update" letter also did not indicate that there was another page attached to his 5 May 2017 hearing notice, nor did SPROC provide an agenda in his letter describing what SPROC planned to discuss or hoped to achieve with such a pre-hearing conference, stating only that *"the call will address only administrative issues and is not a venue for evidence or arguments."*

120.    Upon further research into the source of the procedures with respect to the "pre-hearing conference," I discovered that, on 19 May 2016 (a year *earlier*) SPROC had presented a comprehensive *Appeal Board Committee Manual, Spring 2016,* [83] to the APA Board of Directors

---

[83] *See* Appeal Board Committee Manual, Spring 2016, **GW 000379-000415**

WHITEHOUSE DECLARATION 029

("APA BOD"), seeking approval of this document by the APA BOD (hereinafter, this document is described as the "*Appeal Board Committee Manual*" or "*Manual*").

### The Appeal Board Committee Manual

121.     I learned that, on 20 April 2016, SPROC submitted his complete draft of the proposed *Appeal Board Committee Manual* for distribution to the APA BOD prior to their planned meeting in May 2016. [84]

122.     In his 20 April 2016 written report to the APA BOD, SPROC characterized the *Appeal Board Committee Manual* that he was presenting as follows:

> "*This product has been compiled from extensive research into archives that are not being made readily accessible by APA Legal, personal conversations with past Appeal Board Chairs, National Officers, accusers, accused parties and other sources.*" [85]

123.     I had been unaware of SPROC's *Appeal Board Committee Manual* until after the Appeal Board decision of 21 August 2017. [86]

124.     Unlike the APA Constitution and Bylaws and APA Policy Manual which are available for any APA member to download by just clicking on a conspicuous APA website link, I found no links available for any member to access this *Appeal Board Committee Manual.*

125.     There are only a few minutes to APA BOD meetings that refer to R2016-27 [87] or the *Appeal Board Committee Manual*, but such obscure records require someone to download each set of minutes and actively search for relevant text. [88] [89]

126.     Still, the minutes and the final disposition of R2016-27 reflect that, in the year since presentation, R2016-27 was never amended or revised, and that the APA BOD postponed and

---

[84] *See* Email from CA Thomas Copeland to CA Whitehouse, 2 Dec 2017 at 9:39 PM, **GW 000279-000325**
[85] *See* Appeal Board Report, 20 April 2016, p.1, ¶ 4, **GW 000281**
[86] *See* APA Appeal Board Decision in *Patterson v. Whitehouse*, 21 August 2017, **GW 000255-000269**
[87] *See* R2016–27, Appeal Board Committee Manual, **GW 000209**
[88] *See Minutes to 2016 Spring Board of Directors Meeting,* May 16-20, 2016, p. 18, **GW 000416**
[89] *See Minutes to 2016 Fall Board of Directors Meeting,* 14 December 2016, p. 65, **GW 000421**

WHITEHOUSE DECLARATION 030

otherwise avoided consideration of R2016-27, the legislation SPROC sought to have approved that would have codified his *Appeal Board Committee Manual, dated Spring 2016* as official APA Policy.

127.    What I discovered is that the *Appeal Board Committee Manual, dated Spring 2016* contains a "page 9"[90] that – at least superficially – *appears* to be the same as the "page 9" included with the 5 May 2017 hearing notice,[91] but I discovered there are substantive differences between the two versions of "page 9."[92]

128.    Of particular relevance to this discussion of the pre-hearing conference, there is a difference in the last section about the pre-hearing conference. The "2016 version" of the *Domicile and Appeal Board Level Non-Judicial Hearing Procedure* did *not* contain the loophole emphasized below in bold underline that is found (without emphasis) in the "2017 version" that was attached to the 5 May 2017 hearing notice:

> *"Specific questions regarding procedures, scheduling, administrative issues, etc. may be addressed in a pre-hearing conference call provided that all parties **have an opportunity to** participate in the call. Any pre-hearing conference call does not affect the deadlines imposed by Article VII."*

129.    Thus, in spite of the "extensive research" that SPROC allegedly put into his *Appeal Board Committee Manual*, within a year, he altered the policies, apparently specifically for this case, so that he could convene an ex-parte conference involving the participation of only one party as long as SPROC concluded, using whatever arbitrary subjectivity he might want to use, that any party not present had an "*opportunity to participate*."

130.    This subjective standard is particularly troublesome given that SPROC knows that almost all APA members spend a great deal of their time working on flights all over the world. While

---

[90] *See* Appeal Board Committee Manual, Spring 2016, p. 9, **GW 000387**
[91] *See* DOMICILE AND APPEAL BOARD LEVEL NON-JUDICIAL HEARING PROCEDURE, "p. 9," **GW 000199**
[92] *See* Electronic comparison between the two versions of "page 9," **GW 000378**

WHITEHOUSE DECLARATION 031

medical issues precluded my ability to participate, this loophole could disenfranchise many members. Our jobs cause us to be away from home for extended periods. Pilots who are in flight or perhaps in a foreign country or otherwise without reasonable internet or telephonic access, could easily find themselves unable to participate in a conference and therefore denied a full and fair hearing simply because SPROC unilaterally-scheduled the conference and then claimed they had an "*opportunity to participate.*"

131.    Upon information and belief, SPROC intentionally altered the contents of the *Appeal Board Committee Manual* prior to sending hearing notices on 5 May 2017, and made that alteration with his personal knowledge that I had already expressed my inability to participate in proceedings due to medical circumstances.

132.    It is important to note that R2016-27, which was still open and pending – unchanged – before the APA BOD on 5 May 2017 when SPROC sent his notice of hearing. If passed, R2016-27 would have enacted the unaltered *Appeal Board Committee Manual, dated Spring 2016.*

133.    As a result, I can reach no other belief other than SPROC purposely sent procedures to the parties in this case that were custom-written to deny me any true "*opportunity to participate*" in the pre-hearing conference, denying me access to a full and fair hearing.

134.    Another problematic aspect with respect to the *Appeal Board Committee Manual* is that SPROC told me he would "endeavor" to allow me to participate electronically when such methods were inferior compared to in-person testimony. The *Appeal Board Committee Manual* indicates that in-person testimony of parties is so important that the union will pay for any time off from work necessary so that "*accusers, accused, and their designated representative(s)*" can attend Domicile and/or Appeal Board hearings in person. [93]

---

[93] *See* Appeal Board Committee Manual, Spring 2016, p. 8, **GW 000386**

WHITEHOUSE DECLARATION 032

135. Additionally, although the *Appeal Board Committee Manual* does <u>not</u> prohibit written submissions from anyone for consideration of the Appeal Board, it instead states that *"witness testimony via electronic means is **preferred** over submission of an affidavit."* [94] (underline/bold added). A paragraph on the preceding page, explains the "why:"

> *"Testimony via electronic method(s) is preferred to depositions/affidavits due to the ability to be cross-examined. Should a witness be able to testify via electronic method only, he shall advise the Domicile Officer/Appeal Board Chairman no later than 5 business days before the hearing of the method of electronic communication to be used (Skype, Face Time, etc.)"* [95]

136. It is also important to note that, on 19 January 2018 at 9:32 AM, I sent an email to APA[96] with an attached document describing a number of documents that APA had not provided to the Arbitrator or parties as required by the APA C&B [97] from APA, specifically asking APA to provide *"all versions of the APA Appeal Board Committee Manual (or related policies/practices) in effect from October 2014 through August 2017."* [98]

137. Except for copies of versions of the APA C&B and Policy Manual in force the date they sent them (even though these are not the versions that should be used for this case), in an email sent on 29 January 2018 at 3:11 PM, APA refused to provide any of the missing documents I had identified and requested, stating that APA believed it had fulfilled its obligation. [99]

138. This shortfall was brought to the attention of the Arbitrator who, to the best of my knowledge thus far, has not requested that APA provide all the documents that APA is required to provide under APA C&B Article VII, E.3.

---

[94] *See* Appeal Board Committee Manual, Spring 2016, p. 9, **GW 000387**
[95] *See* Appeal Board Committee Manual, Spring 2016, p. 8, **GW 000386**
[96] *See* Email from CA Whitehouse to Mallory Gloria, 19 January 2018 at 9:32 AM, **GW 000326-000347**
[97] *See* APA C&B Article VII, E.3, **GW 000468**: *"The Association shall provide the Arbitrator will [sic] all materials from prior hearings, as well as an electronic copy of past Article VII filings, transcripts, and awards."*
[98] *See* MissingDocs.pdf, p. 1, **GW 000329**
[99] *See* Email from Mark Myers to CA Whitehouse, 29 January 2018 at 3:11 PM, **GW 001335-001465**

WHITEHOUSE DECLARATION 033

**My 2 June 2017 Submission to the "Pre-Hearing Conference"**

139.    Setting aside the fact that the *Appeal Board Committee Manual* describes a process

involving pre-trial *ex parte* contact between witnesses and the Domicile or Appeal Board

Chairman, the main problem with this provision in the context of the proceedings the Appeal

Board convened in this case is that SPROC failed to enter or cite even one of my written

submissions into the record but allowed FO Patterson to put numerous documents into the record

without a single sworn witness to introduce them, followed by a multi-part motion about the

punishment FO Patterson sought to be imposed on me (*See* ¶ 298).

140.    Furthermore, based on the hostile and discriminatory treatment I received from SPROC, I

have no confidence that the hearing would have been halted and rescheduled if SPROC was

unsuccessful in his "endeavor" to provide me with what he believed to be the ability for a "full

and fair hearing" using technology that is clearly inferior to in-person testimony.

141.    SPROC did not mention to me what would have happened if there were technical

problems in using whatever communication had been arranged in the event such methods proved

intermittent or ineffective such that the proceedings were disrupted or otherwise adversely

impacted.

142.    If it is argued that lack of success in SPROC's endeavor to provide a communication

connection, or some disruptive malfunction occurred upon use, would have caused postponement

of the hearing to some future date, I must point out that such a postponement was all that I had

been asking for all along. But SPROC made it clear that he was going to hold this Appeal Board

hearing on that date regardless.  Thus, I understood SPROC's statement to me (that he would

"endeavor") was empty; he may try to provide me with means to participate, but the hearing

would continue even if he was not successful in his "endeavor."

WHITEHOUSE DECLARATION 034

143.    As previously mentioned (*See* ¶ 106), three days before the Pre-Hearing Conference, on 2 June 2017 at 2:04 PM, even though SPROC made it clear he did not expect my participation in the "pre-hearing conference," I sent SPROC an email with an attached 3-page PDF submission for consideration of the Appeal Board at said conference. [100]   I began by explaining, again,

> *"that my physical condition due to recent major surgeries has left me without the ability to participate on the timeline you have invoked. In simplest terms, I am presently 'not fit' to represent myself or aid in my defense by locating and properly briefing an effective advocate member of APA."*

144.    My submission of 2 June 2017 also recapped what I understood to be the only proper administrative consideration for such a "pre-hearing conference," namely that the Appeal Board must establish that it was <u>exclusively</u> limited to consideration of FO Patterson's appeal of the READ Decision (which was that FO Patterson's Article VII Complaint was not cognizable due to exhaustion of the "statute of limitations"). I explained that, if the Appeal Board somehow concluded FO Patterson's Article VII Complaint *was* cognizable, the only proper action of the Appeal Board would be to remand back to the Miami Domicile with explanation and instructions for READ to hear the complaint in the first instance as required by the C&B.

145.    On 5 June 2017 at 12:52 PM, just eight minutes prior to commencement of the "pre-hearing conference," SPROC sent me an email stating that he was unwilling to entertain my submission of 2 June 2017 and admonished me that, while my submissions will be "carried to the hearing" (which I interpreted as meaning the Appeal Board hearing on 8-9 June 2017), that it would likely not "*receive the consideration*" that I "*would desire*." [101]

---

[100] *See* Email from CA Whitehouse to Mallory Gloria, 2 Jun 2017 at 2:04 PM, **GW 000235-000238**
[101] *See* Email from FO Sproc to CA Whitehouse, 5 Jun 2017 at 12:52 PM, **GW 000239**

WHITEHOUSE DECLARATION 035

## Other Substantive Changes to the Appeal Board Committee Manual

146.    In addition to the aforementioned *"opportunity to participate"* change that SPROC altered from the pre-hearing conference clause found in the *Appeal Board Committee Manual*, I discovered numerous other substantive changes to the hearing processes in the *Appeal Board Committee Manual, Spring 2016* compared to those he distributed to the parties in this case on 5 May 2017. [102]

147.    There is no doubt these are intentional and material changes of policy from that proposed to the APA BOD in May 2016 and under consideration by the APA BOD for 12 months until 18 May 2017, 13 days after SPROC had distributed his notice of hearing to the parties.

148.    Because there is no *Appeal Board Committee Manual* available for APA members to download, and APA has not provided me with any version of the manual despite my specific request, what I do know is that the *Appeal Board Committee Manual, Spring 2016* does contain the following with respect to *ex parte* communication:

> *"All pre-hearing communications (with the exception of a pre-hearing conference call in which all parties participate) shall be copied and distributed to all parties."* [103]

149.    If this clause has also been modified without notice to insert the *"have an opportunity to"* loophole, that would actually *institutionalize* the acceptance of *ex parte* communication in contravention to the *Appeal Board Committee Manual* and what should be common sense.

150.    However, if this clause remains as above, that means that SPROC has willfully violated his own *Appeal Board Committee Manual* because, to date, I have not received any minutes or transcript or records of documents discussed, or any communication at all from anyone documenting what transpired at the "pre-hearing conference."

---

[102] *See* Electronic comparison between the two versions of "page 9," **GW 000378**
[103] *See* Appeal Board Committee Manual, Spring 2016, p. 6, **GW 000384**

WHITEHOUSE DECLARATION 036

### *My 6 June 2017 Submission to the Appeal Board*

151.    On 6 June 2017 at 2:57 PM, I emailed to SPROC a 3-page submission for the Appeal

Board and included a copy of my 2 June 2017 submission, both intended for consideration by the

Appeal Board at the hearing scheduled to convene in two days time. [104]

152.    About 20 minutes later, on 6 June 2017 at 3:16 PM, I sent an email to APA Print Shop

Manager Don Pendergrass and attached the same submissions: 2 June 2017 and 6 June 2017.[105]

I asked Mr. Pendergrass if he would make six copies of these two documents (36 sheets of paper)

and provide them to Mallory Gloria for use by the Appeal Board at the pending hearing.

153.    On 6 June 2017 at 7:17 PM, Mallory Gloria wrote to me (and no other visible recipients),

including a forwarded copy of my request to Mr. Pendergrass. [106] Ms. Gloria wrote,

> *"I have been advised of your below request. The Appeal Board will distribute binders at
> the hearing which contain all correspondence between the parties and the Appeal Board
> since the Notice of Hearing was issued. Your letters dated 6/2/17 and 6/5/17 have been
> included in those binders."*

154.    I have never been provided with the binder that would have been assigned to me, so I

have no means to know if:

    a.    It included my 2 June 2017 hard copy correspondence (including the 18 February

        2017 email with 65 pages of documentation and three additional character reference

        letters) and my 6 June 2017 email and attached documents were actually included in

        the binders, and

    b.    These binders included *"**all** correspondence between the parties and the Appeal

        Board since the Notice of Hearing was issued"* (emphasis added), and

---

[104] *See* Email from CA Whitehouse to FO Sproc, 6 Jun 2017 at 2:57 PM, **GW 000242-000248**
[105] *See* Email from CA Whitehouse to Don Pendergrass, 6 Jun 2017 at 3:16 PM, **GW 000249-000250**
[106] *See* Email from Mallory Gloria to CA Whitehouse, 6 Jun 2017 at 7:17 PM, **GW 000249**

WHITEHOUSE DECLARATION 037

    c.   These binders included any correspondence between the parties and the Appeal Board (or its chairman) prior to the Notice of Hearing being issued.

155.    In the first paragraph of my submission on 6 June 2017, I asked, "*why hasn't the Pre-Hearing Conference been memorialized, in writing, to the parties?*" The "*APA Appeal Board Committee Manual, dated Spring 2016*" provides that,

> "*all pre-hearing communications (with the exception of a pre-hearing conference call in which all parties participate) shall be copied and distributed to all parties.*" [107]

156.    I never received records of the pre-hearing conference distributed to all parties or an explanation as to why records of the pre-hearing conference were never distributed. Likewise, citation of any substance of the pre-hearing conference is not reflected in the transcript of the Appeal Board Hearing of 8-9 June 2017. SPROC's violation of the prohibition of *ex parte* communication incorporated into the *Appeal Board Committee Manual*, let alone what should be common sense to any dispute resolution neutral, is inexplicable.

157.    I sent my 6 June 2017 submission to SPROC for the Appeal Board so that they would have "*as much aforethought as I could muster*" and I would at least not be tried *in absentia*.

158.    Other than the statement of Mallory Gloria that my submissions would be included in the binder, I received no further correspondence from the Appeal Board Chairman prior to the hearing.

---

[107] *See* Appeal Board Committee Manual, Spring 2016, p. 6, **GW 000384**

WHITEHOUSE DECLARATION 038

## The Appeal Board Hearing of 8-9 June 2017

159.    On 8 June 2017, the Appeal Board convened a 2-day hearing in the Miami area [108]

despite knowing that I was medically indisposed and unable to attend or enlist and prepare a

representative to aid in my defense.

160.    On 22 June 2017 at 6:39 PM, Mallory Gloria, the Paralegal providing administrative

support for the APA Appeal Board, sent me an email (copied to the three members of the Appeal

Board at the 8-9 June hearing, but not simultaneously copied to FO Patterson) with PDF copies

of the transcripts, transcript index, and exhibits from the 8-9 June Appeal Board hearing. [109]

### *Discriminatory Failure to Accept My Submissions Into the Record*

161.    SPROC stated that the Appeal Board hearing would employ *"relaxed rules of evidence"*

[Tr. Vol. 1, p. 6, ln. 8-9]. The transcript reflects that FO Patterson certainly took advantage of

those "relaxed rules" to make what amounts to a "data dump" into the record even though there

were no witnesses (sworn or unsworn) to introduce any such "exhibits," nor were there any

"formal motions" ever made to enter any of it into evidence, nor was any claim made by FO

Patterson or any of his representatives during the hearing that any of these so-called "exhibits"

were ever cited within FO Patterson's 4 December 2016 Article VII complaint so that they could

have been considered by READ.

162.    However, the Appeal Board hearing transcripts reflect that I was discriminated against

with respect to entering my submission into the record.

---

[108] *See* Transcripts of Allied Pilots Association, Article VII Hearing, Patterson vs. Whitehouse, 8-9 June 2017, Volumes 1 and 2, Indexes, and Exhibits. Note: It is expected that these documents will be submitted to arbitration as JOINT Exhibits.
[109] *See* Email from Mallory Gloria to CA Whitehouse, 22 Jun 2017 at 6:39 PM, **GW 000251**
Note: It is expected that the transcript files attached to this email will be submitted to arbitration as JOINT Exhibits.

WHITEHOUSE DECLARATION 039

163.    As previously noted, on 5 June 2017 at 12:52 PM, just 8 minutes before the "pre-hearing

conference" was to commence, SPROC sent me an email in which he acknowledged my 2 June

2017 submission for the "pre-hearing conference" but claimed:

> *"The Appeal Board only has jurisdiction to examine evidence when sitting as a body.*
> *While the Appeal Board operates an Administrative Hearing with relaxed rules of*
> *evidence, it is nevertheless a formal procedure. Your attachment will be carried to the*
> *hearing, however without a formal motion to enter it as evidence, I cannot assure that it*
> *will receive the consideration you desire."*

164.    Thus, in spite of the transcript reflecting the fact that SPROC allowed FO Patterson to

shovel multiple hearsay documents into the record without any witness to introduce them or even

a formal motion to introduce them, and in spite of the confirmation from Mallory Gloria that my

submissions were printed and included in the binders for all present, SPROC never mentioned

them nor were they cited by anyone else or provided as exhibits.

### *Transparent Attempt to Exclude Any Consideration of My Medical Infirmity From the Record*

165.    The transcript reveals a consistent and purposeful evasion by SPROC of any disclosure or

discussion in the record as to my inability to attend ("scheduling conflict") that he knew my

inability to attend was due to my medical condition. SPROC is on record as inhumanely avoiding

any mention of my medical condition being the reason I was that there:

> *"One party indicated early on that there was a scheduling conflict. When we began to*
> *address that, the party indicated that they could not provide a date certain. If we had*
> *been provided a date certain, then we would have approached the other party to see if it*
> *was mutually agreeable. However an indefinite delay serves in nobody's best interests, so*
> *we chose to move on with this day"* [Tr. Vol. 1, p. 7 ln. 5-13]

166.    As if to "foot-stomp" and eliminate all doubt as to his purpose of evasion, SPROC openly

declared that my medical condition was not relevant and was not to be spoken of:

> *"This board will not address the underlying reason for that scheduling conflict"*
> [Tr. Vol. 1, p. 8, ln. 2-3].

WHITEHOUSE DECLARATION 040

167.    In conjunction with these purposeful evasions, FO Patterson and his advocates made repeated efforts throughout the hearing, including through a formal motion, to try to hold me personally liable for the hearing cost and deny me any right for appeal due to my inability to attend this hearing even though they all knew that my medical condition prevented me from attending. Even FO Patterson knew because he stated:

> *"He was not ill when all of these actions were perpetrated, and any attempt to garner sympathy based on his current situation is futile and disingenuous."*
> [Tr. Vol. 2, p. 123, ln. 4-7].

168.    Theses types of passages in the transcript indicate that SPROC not only initiated this inhumane and discriminatory behavior himself, but he encouraged others to perpetuate it.

### *Patterson Used More Than One Member as Representative*

169.    The C&B Article VII, D.6. clearly states that, *"when the Appeal Board holds a formal hearing, both the accused and accuser shall have the right to be represented by a member in good standing"* (underline emphasis added to make clear the entitlement is for one person).

170.    However, the Appeal Board wrongfully allowed FO Patterson to have two representatives at this Appeal Board hearing: *"Appearing for Scott Patterson: Captain Guy Dalton Shellhouse; Captain Kathy E. Emery"* [Tr. Vol. 1, p. 2, ln. 15-21].

171.    The transcript reflects that these two representatives for FO Patterson, Captain Guy Dalton Shellhouse ("SHELLHOUSE") and "Captain" Kathy E. Emery ("EMERY"), were not just representatives in name only. SPROC allowed them to actively double-up their representation at least 10 times during the hearing, where both were making comments and/or arguing points at the same time.[110]

---

[110] *See* [Tr. Vol. 1, p. 16, ln. 19-25; p. 17, ln. 1-4], *and* [Tr. Vol. 1, p. 18, ln. 22-25; p. 19; p. 20, ln. 1-4], *and* [Tr. Vol. 1, p. 34, ln. 1-13], *and* [Tr. Vol. 1, p. 44, ln. 1-18], *and* [Tr. Vol. 1, pp. 58-61], *and* [Tr. Vol. 1, p. 82, ln. 8-24], *and* [Tr. Vol. 1, p. 84, ln. 19-25], *and* [Tr. Vol. 1, p. 91, ln. 2-12], *and* [Tr. Vol. 1, p. 91, ln. 2-12], *and* [Tr. Vol. 1, p. 93, ln. 9-14], *and* [Tr. Vol. 1, p. 101, ln. 4-23].

WHITEHOUSE DECLARATION 041

172.    The transcript reflects that SHELLHOUSE stated that EMERY was there, not as a witness, but to participate in prosecuting the case [Tr. Vol. 1, p 9, ln. 15-25; p. 10, ln. 1-16].

173.    SPROC's consistent toleration of such double-representation is just further evidence that I was denied a full and fair hearing because SPROC's conduct of the hearing was not compliant with the C&B. There is no record SPROC attempted to bring the hearing into compliance.

### *Use of Titles*

174.    Upon information and belief, EMERY is not now, nor has she ever been, a Captain at American Airlines, and yet the transcript reflects that she represented herself as such and made no attempt to correct the record, even after being addressed as "Captain" multiple times by a member of the Appeal Board as "Captain Emery." [Tr. Vol. 1, p. 10, ln. 24-25; p. 11, ln. 1-8].

175.    The use of "Captain" and "First Officer" titles within APA has always exclusively been used to denote the person's current rank as an American Airlines pilot; not a previous or existing military rank, not the rank held at other employers, and not even prior ranks at American Airlines. Although the testimony of a party or witness before the Appeal Board or an Arbitrator is arguably not "performing APA work," APA has a longstanding policy with regard to use of titles that makes clear the policy of the union with respect to use of titles or rank:

> *"Professional Titles in Correspondence: Pilots performing APA work will utilize their rank as an American Airlines pilot, as determined by their current four-part bid status, (i.e., Captain S.P. Smith, First Officer A.B. Jones) on all external correspondence and on all documents that may be disseminated outside of APA."* [111]

176.    In the case of FO Emery and FO Patterson, who are not actively flying at American Airlines, my understanding of past practice within APA is to address them with the title associated with their last rank as an American Airlines pilot.

---

[111] *See* APA Policy Manual, Revision 168, 19 May 2017, 2.02.B, p. 20, **GW 001154**

WHITEHOUSE DECLARATION 042

## **The Confusion Regarding "Bifurcation" and "Cognizable"**

177.    Early in the hearing, when SPROC asked whether EMERY was an intended witness and would need to be sequestered before the hearing began, SHELLHOUSE replied in a manner than indicated that he and SPROC (and almost certainly FO Patterson and others) had undisclosed *ex parte* communications prior to the hearing:

> "*I asked Kathy to be here as like a DDR to help me, because I had no clue, when you told me that we would be bifurcating this, all the procedures of Article VII and everything.*" (underline emphasis added). [Tr. Vol. 1, p. 9, ln. 21-25]

178.    Here, SHELLHOUSE stated that SPROC told him in advance of the hearing, that "*we would be bifurcating this.*" [*ibid.*]  SPROC's communication was sufficiently in advance to seek the aid of EMERY to attend and participate purportedly as some kind of "Duly Designated Representative" to provide FO Patterson with additional representation, with EMERY being a member who presumably knew what "bifurcation" was all about. FO Patterson then added EMERY as a representative, and SPROC tolerated her as such, in spite of the fact the C&B allows only one member to represent a party in the case.

179.    The transcript includes immediately-prior discussion that a procedural method known as "bifurcation" would be used by the Appeal Board in handling the case, as SPROC announced:

> "*We will bifurcate this hearing in that the appeal is based on Captain Read's decision that it wasn't filed in a timely manner. If we receive evidence that you-all are going to submit that says that -- that supports this in a timely manner, we will recess, discuss this, and at that point we will tell you that we are either in an indefinite recess or we will proceed with receiving evidence in the original charges.*" [Tr. Vol. 1, p. 8, ln. 16-24]

180.    SPROC's mischaracterization of the READ Decision seems intentional. He makes an improper differentiation between "untimely" and "not cognizable" that is not supported by the C&B or even in the READ Decision which stated:

> "*I find that the charges were filed outside of the one-year limitations period and **therefore are not cognizable under Article VII**. Charges that are not timely filed are not*

WHITEHOUSE DECLARATION 043

*capable of being heard at the Domicile level because **the charges are not filed in accordance with Article VII.**" (emphasis added)* [112]

181.    Here, READ is properly explaining that "cognizable" does not just mean that charges can be <u>understood</u> by the reader. READ made clear he understood that the court (the Miami Domicile) must also have the <u>right, power, and jurisdiction</u> to hear them.

182.    It seems relevant to note the definition of "cognizable" that SPROC included in the Appeal Board Committee Manual[113] has a citation of source to Black's Law Dictionary but inexplicably recites only the *generic* meaning of the word from Black's Law, not the meaning of the word in a judicial context as it is clearly intended within the APA C&B. The Appeal Board Committee Manual states that this is what "cognizable" means:

> *"Capable of being seen as a member of a unique group by the common characteristics shared with other members."* [114]

183.    However, READ's understanding of the application of the "cognizable" clause in APA's C&B is fully consistent with the relevant definition found next on the list of terms in Black's Law Dictionary online for "cognizable offense:"

> *"COGNIZABLE OFFENSE: Capable of being investigated and/or tried by a specific court having the right, the power, and jurisdiction of the law to do so."* [115]

184.    It is significant to note that this same meaning of "cognizable" has been embraced by FO Patterson as, during the Appeal Board Hearing on 8 June 2017, he cited another version of Black's Law Dictionary, but describes the same functional content as "cognizable offense:"

> *"Cognizable - Capable of being tried or examined before a designated tribunal within the jurisdiction of a court or power given to a court to adjudicate controversy."* [116]
> [Tr. Vol. 1, p. 15, ln. 15-22].

---

[112] <u>*See*</u> Miami Domicile Decision, 13 March 2017, p. 2, **GW 000179**
[113] <u>*See*</u> Appeal Board Committee Manual, Spring 2016, p. 10, **GW 000388**
[114] <u>*See*</u> Definition of "cognizable" from Black's Law Dictionary Online, **GW 000592**
[115] <u>*See*</u> Definition of "cognizable offense" from Black's Law Dictionary Online, **GW 000592**
[116] <u>*See*</u> Definition of "cognizable" from Black's Law Dictionary, **GW 000593**

WHITEHOUSE DECLARATION 044

185.    Additionally, even though SPROC recited a prerequisite procedural process to occur at the hearing in order to determine if FO Patterson's complaint was cognizable (involving the Appeal Board first entertaining evidence provided by FO Patterson supporting that his complaint was cognizable, then recessing to allow the Appeal Board to consider that evidence, then reconvening to announce their determination, [Tr. Vol. 1, p. 8, ln. 16-24]), the transcript reflects that none of this never happened. In fact, almost immediately after stating his prerequisite procedural process, and <u>without any evidence</u> being introduced, <u>without any recess and deliberation</u>, and <u>without any decision of the Appeal Board</u>, SPROC merely declared that FO Patterson's complaint was cognizable:

> CAPTAIN SHELLHOUSE: *All right. So what I'm understanding is you're saying that it is cognizable, correct?*
> FIRST OFFICER SPROC: *Correct. The original charges are cognizable --*
> CAPTAIN SHELLHOUSE: *Cognizable.*
> FIRST OFFICER SPROC: *-- under Article VII. Okay?*
> CAPTAIN SHELLHOUSE: *Okay.*
> FIRST OFFICER SPROC: *They were dismissed because of --*
> CAPTAIN BAZO: *Timeliness.*
> FIRST OFFICER SPROC: *-- timeliness. That is appealable.*
> [Tr. Vol 1., p. 13, ln. 23-25; p. 14, ln. 1-11]

186.    SPROC, in reaching his conclusion that "cognizable" was limited <u>exclusively</u> to consideration as to whether the alleged acts were one or more of the eight items in Article VII.A, appears to have been, at least in part, unduly influenced by the uninformed claim advanced by EMERY purporting this erroneously limited scope of "cognizable" when she stated that *"[the Appeal Board has] already deemed that the eight criteria for the hearing to go forward is -- that it is cognizable."* [Tr. Vol 1., p. 20, ln. 2-4]

WHITEHOUSE DECLARATION 045

187.   The lack of common understanding by those in attendance regarding what "bifurcation" meant in the context of the hearing and even what "cognizable" meant in the context of considering Article VII complaints is alarming. Of specific concern in this regard:

    a.   SPROC's willful negligence by failing to conform his actions to the applicable meaning of "cognizable" found in two versions of Black's Law Dictionary, one even quoted by FO Patterson at the hearing, and then SPROC's ensuing distortion about what he felt "cognizable" means and how it was applied in READ's decision,

    b.   The failure of SPROC to follow his own prerequisite process outlined at the outset, which led to a circumstance of confusion by all in attendance, where there seemed to be no common understanding of what was being bifurcated, why it was being bifurcated, what might be the effects of any outcome resulting from the bifurcation, and when the first section of the bifurcation was concluded.

188.   The confusion over these points was never conclusively resolved, certainly not by SPROC. [Tr. Vol. 1, p. 8, ln. 16-24; p. 9, ln. 20-25; p. 11, ln. 2-8; p. 15, ln. 13-22; p. 24, ln. 12-18].

189.   To be clear, nobody ever informed me at any time of any decision by the Appeal Board to bifurcate anything. Even after reading the transcript, I remain unclear about what was intended to be actually bifurcated, if for no other reason that it was clear SPROC did not comprehend what "cognizable" actually meant in the judicial context that READ used it (and that SPROC should also be using), and there is certainly evidence that SPROC did not follow his own just-stated prerequisite procedural process by having the Appeal Board take evidence, recess for the purpose of reviewing that evidence, and return from the recess to announce the decision of the Appeal Board and move forward based on the decision of the Appeal Board.

- 46 -

WHITEHOUSE DECLARATION 046

190.    The only thing that *is* clear to me is that SHELLHOUSE's statement that SPROC told him the hearing would be bifurcated exposes his participation in pre-trial *ex parte* discussions with at least SPROC that, considering the nature of the proceeding, implicates collusion between at least SHELLHOUSE, PATTERSON, and SPROC.

### **Appeal Board Chairman Engaging in Inexplicably Strange Behavior**

191.    At multiple times during the hearing, the transcripts reveal that SPROC engaged in the inexplicably strange behavior that created a record that presents a confusing and inaccurate portrayal of the hearing. Specifically, even though everyone in the room knew that I was not present and had informed SPROC weeks earlier that I would not be present, SPROC repeatedly called upon me to present a rebuttal or ask any questions, apparently trying to dupe an uninformed reader of the transcript into believing that I was present at some point. Some examples include:

> a.  SPROC: *"All right. Let me -- before you have objections, let me give the defense, the accused, the opportunity to present their case. Seeing as how they're not here, we don't have anything from them to present."* [Tr. Vol. 1, p 100, ln. 14-19]

> b.  SPROC: *"Okay. At this point, I'd like to give the accused the opportunity to cross-examine the witness. Let the record show that the accused is not present to cross-examine the witness."* [Tr. Vol. 2, p 128, ln. 10-14]

> c.  SPROC: *"We'll close your testimony and give the accused the opportunity to rebut or cross-examine you. If that doesn't happen and there's no other case to be presented by the accused, then we'll proceed with closing arguments."* It is then once again inferred the accused is not present, and the accuser proceeds by swearing in FO Patterson's primary representative, SHELLHOUSE. [Tr. Vol. 2, p 129, ln. 12-17]

> d.  SPROC: *"Okay, at this point, I would like to offer the accused the opportunity to cross-examine the witness. Seeing how the accused is not here, there's no opportunity to cross-examine the witness, so at this point I will ask Captain Shellhouse, are you done presenting evidence and witnesses?"* [Tr. Vol. 2, p 131, ln. 25, p 132, ln 1-6]

> e.  SPROC: *"Okay. At this point, I have to offer the opportunity for the accused to present their case in chief, to make any objections or to introduce witnesses or evidence. Seeing how the accused is not here and has been afforded the opportunity*

WHITEHOUSE DECLARATION 047

*up until at least 9:46 in the morning on the second day of the hearing for which there was no conflict declared, we will then move on."* [Tr. Vol. 2, p 132, ln. 9-17]

f.  SPROC:  *"All right. At this point, I would like to offer the accused the opportunity to make a closing argument. In seeing that the accused is not here, we will then move on with the closeout of this hearing here."* [Tr. Vol. 2, p 136, ln. 20-25]

### Appeal Board Chairman Acting as an Advocate for the Accuser

192.    Early in the Appeal Board hearing, the transcript reflects that SPROC solicited from FO

Patterson documents from his binder that were not in evidence (in fact no documents had been

introduced at that point): *"If you would now like to introduce evidence that supports those*

*contentions, then this will be the time to do so, or witnesses."* [Tr. Vol. 1, p. 30, ln. 19-21]

193.    Following that solicitation by SPROC, SHELLHOUSE said he was submitting three

exhibits, but identified only one. SPROC responded as if he himself was submitting this evidence

on behalf of the FO Patterson:

> CAPTAIN SHELLHOUSE: *I would like to pass to you these three exhibits. The first is a tab of -- on the side of it, 22. It is an email from Captain Brian Beach to First Officer Patterson, and it is dated – it's a subject line of PEH, which is Personal Employment History, for HR, Human Resource, Hearing, and it's dated February 1, 2016 at 11:47 a.m.*
> FIRST OFFICER SPROC: *Okay. Let's submit that one as Accuser's Exhibit 1.*
> [Tr. Vol. 1, p. 30, ln. 19-21]

194.    The transcript does not contain any references, at that point in the hearing, to the other

two exhibits that SHELLHOUSE said he was going to pass, and the transcript reflects that

"*Accuser's Exhibit 1*" was not admitted at that point.

195.    Instead, the transcript reflects that SPROC called for the first scheduled break after 50

minutes of the hearing had commenced (*"As I said, we expect to use a -- go for 50 minutes and*

*take a ten-minute break."* [Tr. Vol. 1, p. 8, ln. 25; p. 9, ln. 1]).

196.    Immediately <u>after</u> this scheduled break, the transcript reflects that *"(Accuser's Exhibit 1*

*was marked for identification and entered into evidence.)"* [Tr. Vol. 1, p. 32, ln. 7-8]

WHITEHOUSE DECLARATION 048

197.    SPROC then announced, without any recess or deliberation to consider this evidence, that FO Patterson could proceed with his case in chief. [Tr. Vol. 1, p. 32, ln. 19-22]

198.    Even if it is argued by anyone that, during the scheduled break, the Appeal Board reviewed a document that was later entered into evidence, two major defects exist:

    a.  The Appeal Board would have been considering facts not in evidence.

    b.  The Appeal Board did not announce their conclusions, after such recess, as to the relevance of this document, not yet in evidence, or its meaning or effect in the context of the bifurcation of the hearing or how they concluded it proved FO Patterson's complaint was "cognizable."

199.    FO Patterson's "Accuser's Exhibit 1" [117] (hereinafter, "*PEH entry*") was not mentioned in, and was not any part of, his 4 December 2016 complaint. It was an email to FO Patterson from AAL Miami Director of Flight, Captain Brian Beach, 1 February 2016 at 11:47 AM, Subject: *PEH entry for HR hearing*, which purports to reflect notes added to FO Patterson's Personnel Employee History ("PEH"):

> *"On November 23, 2015, a Section 21 hearing was held as a result of a work environment complaint. I have reminded FO Patterson of the Company's Work Environment Policy. I also informed him that it is important to maintain good working relationships with his coworkers. FO Patterson has received a copy of this PEH and is aware of his right for rebuttal."*

200.    In spite of the fact that FO Patterson *"received a copy of this PEH and is aware of his right for rebuttal,"* and had this *PEH entry* in his possession for 10 months afterwards, FO Patterson did not include or even refer to the *PEH entry* in his 4 December 2016 Article VII and, even when he produced this email at the Appeal Board hearing seven months later, he did not produce any evidence that he ever rebutted or grieved *the PEH entry* or what that rebuttal or grievance was.

---

[117] *See* Email from CA Beach to FO Patterson, 1 Feb 2016 at 11:47 AM, **ABHT DOCS P 0001**

WHITEHOUSE DECLARATION 049

201.     Additionally, because there is apparently some confusion about what acts I can be

charged with, it should be clear that whatever evidentiary value or relevance that FO Patterson

believes *the PEH entry* has, he did not and cannot credibly claim that *the PEH entry* from the

AAL Miami Director of Flight was an action by me, because clearly it was not.

202.     However, without any witness sworn in by which to submit this exhibit, and immediately

after *the PEH entry* was summarily entered as evidence at the Appeal Board hearing, and without

any motion or question before him, and without engaging in his own previously-stated

prerequisite procedurally-established recess to consider this particular evidence after it had been

entered into the record, SPROC spontaneously announced:

> "*At this point, based on Accuser's Exhibit 1, the Appeal Board recognizes that -- or*
> *acknowledges that the accuser may proceed to present his Case in Chief and that Captain*
> *Read issued his opinion on an incomplete record, that the hearing that was initiated on --*
> *the Section 21 hearing that was initiated on September -- the hearing that took place on*
> *November 23rd did not result in any discipline until February 1st of 2016 and that that*
> *should have been considered by Captain Read. So--*"
> [Tr. Vol. 1, p. 32, ln. 19-25; p. 33, ln. 1-3].

203.     SHELLHOUSE interrupted SPROC's unsolicited proclamation and said "*Thank you*,"

presumably thanking SPROC for making FO Patterson's case for him [Tr. Vol. 1, p. 33, ln. 4].

204.     This kind of steering FO Patterson's case by the supposed "neutral" not only exemplifies

SPROC's outright bias in favor of FO Patterson, but it also implicates pre-trial *ex parte*

communication between SPROC and FO Patterson and/or his advocates, and possibly even

collusion between these people as well, all of which further supports my claim that I was denied

a full and fair hearing.

205.     The cumulative evidence strongly suggests that illicit and undisclosed communication

and coordination had been occurring for some time between SPROC and FO Patterson, so I

believe the Appeal Board hearing was tainted by prejudicial bias, was all for show, and that the

WHITEHOUSE DECLARATION 050

outcome was pre-ordained and would have the same even if I had been able to participate in the Appeal Board hearing in person (or via video link).

206.    In addition to what should be evident in the judicial impropriety of a judge leading a party's presentation in the case, SPROC also violated one of the key provisions of the *Appeal Board Committee Manual* that he had presented for approval just a year earlier that described the narrow and neutral role of Domicile Officers and Appeal Board members in Article VII cases:

> "*The Constitution and Bylaws does not contemplate an investigative roll* (sic) *nor does it allow for statements to be made on behalf of accusers or accused, whether in attendance or not, but* (sic) *those conducting the hearing(s).*"
> (*See* Appeal Board Committee Manual, p. 6, ¶ 2.) [118]

207.    SPROC's unsolicited proclamation immediately after *the PEH entry* was entered into evidence (with no sworn witness, no testimony, and without any motion before the Appeal Board, that this document alone and without any explanation was sufficient basis to allow FO Patterson to present his "Case in Chief"), strongly implicates SPROC in improper involvement in a prejudicial "investigative role," as well as other improper activities prior to the hearing.

208.    The implication of SPROC's impropriety is further strengthened when considering SPROC's "summary judgment" at the beginning of the hearing when he effectively overruled the READ Decision that FO Patterson's Article VII Complaint was not cognizable before *the PEH entry* was even provided by FO Patterson and before it was entered into evidence:

> "*The appeal is based on First Officer Read's decision that it was -- not that the claim was not cognizable under the eight categories that Article VII allows. Okay? Clearly this was cognizable.*" [Tr. Vol. 1, p. 12, ln. 23-25, p. 13, ln. 1-2]

209.    This inexplicable proclamation, spontaneously overruling the READ Decision by SPROC, was made without any reference by SPROC to any prior meetings, discussion, or rulings by the Appeal Board, and there was certainly no discussion that preceded this ruling.

---

[118] *See* Appeal Board Committee Manual, Spring 2016, p. 6, ¶ 2, **GW 000384**

WHITEHOUSE DECLARATION 051

210.   SPROC also misrepresents READ's decision as limiting the constitutional scope of "*cognizable*" to consideration of only "*the eight categories that Article VII allows.*"

211.   What READ <u>actually</u> said in his decision was that he found "*that the charges were filed outside of the one-year limitations period and therefore are not cognizable under Article VII.*" [119]

212.   It is therefore necessary to point out that it seems Appeal Board Chairman SPROC abused his great influence over the conduct of this hearing to actively and negligently refuse to recognize the fact that "cognizable," in the context of APA's C&B, does not mean that someone can simply distinguish it from something else or that it is limited to determination whether an alleged act might fall "*under the eight categories that Article VII allows.*"

213.   Even after a direct quote of a relevant definition of "cognizable" by FO Patterson, SPROC persistently and prejudicially refused to acknowledge that "cognizable," in this context, besides stating a cause of action under Article VII.A, <u>also</u> means at least that (a) the <u>venue</u> is proper, and (b) the Accuser has <u>standing</u> to make the complaint, and (c) that the complaint is made within the "<u>statute of limitations</u>."

214.   It is relevant to note the provisions regarding determinations of "cognizable" are explicitly defined in the APA C&B and what happens if the charges are not cognizable:

> "*The Domicile Officers are first charged with determining whether the charges as submitted set forth a claim cognizable under this Article VII. If the Domicile Officers determine that the charges state a cognizable claim, the Domicile Officers shall hold a hearing, if either the accused or the accuser requests one, or at their discretion, if neither party requests a hearing.*" [120]

215.   This provision should make it clear to even a layman that the Domicile Officers may <u>dismiss the complaint without hearing</u> if the Domicile Officers conclude, after reading the complaint submitted, that it is not cognizable, which is <u>exactly</u> what READ did.

---

[119] *See* Miami Domicile Decision, 13 March 2017, p.2, ¶ 4, **GW 000179**
[120] *See* APA C&B Article VII, C.1, **GW 000465**

WHITEHOUSE DECLARATION 052

216.    Thus, contrary to claims by SPROC and EMERY that determination of "cognizable" is solely limited to consideration of whether the alleged act violates one or more of the eight causes of action listed under Article VII.A, this limitation is <u>not</u> established anywhere Article VII. The actual requirements to determine if a complaint is "cognizable" <u>are</u> included in numerous different sections of *"this Article VII"*:

    a.   The Accused must be a member of APA. [121]

    b.   The Accused must be alleged to have engaged in at least one of eight specific acts. [122]

    c.   The charges must be in writing and sent to the APA Secretary-Treasurer by Certified Mail, Return Receipt Requested. [123]

    d.   The charges must be specific as to the alleged act(s) that constitute the cause of action that is particularly identified in the A&B. [124]

    e.   The Accuser must be a member in good standing. [125]

    f.   Charges must be filed within one year after the alleged offense. * [126]

217.    Thus, what "*this Article VII*" states in Article VII.C.1 is that the failure of a complaint to meet **even one** of the above requirements makes it "not cognizable" under the APA C&B.

218.    The asterisk (*) in ¶ 216.f above reflects the existence of two potential procedural exceptions for charges under Article VII.A.1 and Article VII.A.8:

    a.   The potential procedural exception for charges under Article VII.A.1 are those related to strikebreaking (not argued by FO Patterson to be applicable to this case).

---

[121] *See* APA C&B Article VII.A, ¶ 1, **GW 000464**
[122] *See* APA C&B Article VII.A, ¶ 1, **GW 000464**
[123] *See* APA C&B Article VII.B, ¶ 1, **GW 000465**
[124] *See* APA C&B Article VII.B, ¶ 1, **GW 000465**
[125] *See* APA C&B Article VII.B.1, **GW 000465**
[126] *See* APA C&B Article VII.B.2, **GW 000465**

WHITEHOUSE DECLARATION 053

b.  The potential procedural exception for charges under Article VII.A.8 are those related to Article VII complaints that could be initiated following an arbitration decision after discipline or termination, an exception that READ correctly determined was not applicable to Patterson's 4 December 2016 complaint.

219.  Thus, as a matter of the plain reading of the "supreme law of APA," SPROC's claim (that "cognizable" solely intends a limitation to consideration of acts *"under the eight categories that Article VII allows"*) must be struck down, and so too must be stricken from the Appeal Board record and decision all of what ensued and resulted from SPROC's erroneous claim.

220.  As previously mentioned (*See* ¶ 185), in what appears to be an awkward "off-script" moment, immediately after SPROC spontaneously declared that FO Patterson's Article VII Complaint was cognizable, FO Patterson seemed perplexed and sought reassurance as to the state of his appeal.

221.  FO Patterson apparently sought clarification from SPROC as to the basis of his conclusion that his complaint was cognizable. FO Patterson appears to be attempting to educate and inform SPROC that "cognizable," in this judicial context, meant much more than just being one of the "eight items" but that it also invoked the "statute of limitations":

> *"Cognizable, that term, sir, includes timeliness; it includes jurisdiction; it includes status, and I would -- I would draw your attention to that, you know, from the Black's Law Dictionary, and it does say, 'Cognizable - Capable of being tried or examined before a designated tribunal within the jurisdiction of a court or power given to a court to adjudicate controversy.'"* [Tr. Vol. 1, p. 15, ln. 15-22]

222.  Expressing apparent frustration with FO Patterson, who seemed to have drifted off their planned script, SPROC tried to reel him back in, asking FO Patterson if he understood that SPROC had just ruled in FO Patterson's favor on the only issue that the Appeal Board was

WHITEHOUSE DECLARATION 054

considering at the moment, implicitly coaching FO Patterson that he needed to stop talking:

*"You understand that we are saying that the claims are cognizable?"* [Tr. Vol. 1, p. 16, ln. 1-2]

223.    The prejudicial and biased advocacy in favor FO Patterson evidenced in SPROC's conduct, in addition to violating his own *Appeal Board Committee Manual*, also denied me a full and fair hearing and almost certainly would have occurred even if I had been able to participate.

### The Profound Effect of Accuser's Exhibit 1, *the PEH Entry* [127]

224.    **Failure to Remand with Instruction**: While the transcript reflects that SPROC declared that READ's failure to entertain *the PEH entry* (which was never mentioned or included in FO Patterson's 4 December 2016 complaint so it would not have been possible for READ to consider it) was somehow conclusive proof that FO Patterson's case was now cognizable and that FO Patterson could proceed with his case in chief, and despite the fact that the Appeal Board was *supposedly* seeing the document for the first time when FO Patterson provided it at the hearing, the Appeal Board did not remand the case back to the Domicile with instructions and support for their conclusion that the complaint was cognizable.

225.    Instead, SPROC went on, without skipping a beat, so fast that he did not recognize (or ignored) the obvious logical defect that *the PEH entry* was known to FO Patterson over 10 months before he made his original Article VII Complaint on 4 December 2016.

226.    Even though *the PEH entry* was known to FO Patterson long before 4 December 2016, FO Patterson made no mention of *the PEH entry* or the date of 1 February 2016 at all in his 4 December 2016 original complaint or even in his 6 April 2017 request for appeal, much less claim anywhere that *the PEH entry* was an act I took that violated Article VII of the APA C&B.

227.    But *the PEH entry* also serves as interesting insight about the ongoing harassment this case is really about. *The PEH entry* reveals that, despite the sole allegedly actionable act

---

[127] *See* Email from CA Beach to FO Patterson, 1 Feb 2016 at 11:47 AM, **ABHT DOCS P 0001**

WHITEHOUSE DECLARATION 055

contained in FO Patterson original 4 December 2016 complaint (my 24 September 2015 complaint to AAL about FO Patterson's ongoing harassment), and for all of FO Patterson's subsequent unsubstantiated claims about how my complaint was some sort of catalyst leading to other AAL investigations into his conduct (military leave issues, pay withheld problems, aircraft diversion investigations, and whatever other adverse circumstances American Airlines' management sought to inquire about FO Patterson, all of which occurred prior to my harassment complaint), in reality, the sole outcome as contained in *the PEH entry* was nothing more than a brief and benign documentation about a meeting that had occurred. [128]

228.    FO Patterson's claim on appeal that *the PEH entry* constituted discipline upon him by AAL, and implicitly that discipline was somehow my "act," is in conflict with FO Patterson's own characterization of the outcome of AAL's investigation into my 24 September 2015 complaint, a characterization that he made in his Article VII Complaint on 4 December 2016:

> *"The Association has expended tens of thousands of dollars in man-hours refuting those same statements of [WHITEHOUSE].* ***The Section 21 hearing cleared [FO Patterson]****..."*(emphasis added). [129]

229.    While I did submit a harassment complaint to AAL on 24 September 2015, I cannot be held liable, under Article VII, for whatever schedule or acts the staff at AAL establishes or engages in as part of their investigations, hearings, or outcomes deemed appropriate by AAL management. Those are not my actions. My last "act" that could arguably be considered under Article VII was 24 September 2015.

230.    That said, and even accounting for the fact that *the PEH entry* was not made until over two months after the Section 21 hearing it documented, FO Patterson claims within his Article

---

[128] *See* Email from CA Beach to FO Patterson, 1 Feb 2016 at 11:47 AM, **ABHT DOCS P 0001**
[129] *See Article VII Charges Against APA Member Captain Glenn Whitehouse,* 4 Dec 2016, p. 4, ¶ 1, **GW 000005**

WHITEHOUSE DECLARATION 056

VII Complaint of 4 December 2016, that he was cleared of all allegations at that Section 21 hearing.

231.    Beyond the preceding discussion of *the PEH entry*, it important to note that AAL and APA have explicitly agreed, as part of the Joint Collective Bargaining Agreement ("JCBA"), that this type of PEH entry is, without question, non-disciplinary:

232.    Contractually, the 23 November 2015 hearing attended by FO Patterson relative to my workplace harassment complaint is defined as an "*initial discussion*," not discipline:

> "*The parties recognize that the initial discussion, as defined in 21.A.1.g below, with an employee does not constitute discipline or a step in the disciplinary procedure.*" [130]

233.    Section 21.A.1.g of the JCBA, in its entirety, states:

> "*The Company will not normally impose discipline upon any pilot until a step process effort has been made to correct a pilot's behavior and/or performance. An entry in the discussion record (currently a PEH entry) of a non-disciplinary verbal advisory will include a record of the pilot meeting and specific information concerning the behavior or performance in question, but not such detail as would constitute a written advisory. The Pilot or the Association may, at either's option, provide a written response, rebuttal or addendum. The discussion record and the pilot's or the Association's response, rebuttal, or addendum can be referred to for no more than two (2) years from the date of the issuance of said discussion record.*" (underline emphasis added) [131]

234.    Since the JCBA specifically states that the initial discussion on 23 November 2015 with FO Patterson's regarding my workplace harassment complaint was not discipline and that *the PEH entry* mentioning the meeting was also not disciplinary, and therefore could not be even the first step in the discipline program (a written advisory), I am at a loss to understand to how FO Patterson, SPROC, the Appeal Board, or anyone else could have possibly characterized *the PEH entry* as relevant to this case, let alone claim it was some kind of discipline.

---

[130] *See* AAL-APA JCBA 2015, Section 21.A.1.b
[131] *See* AAL-APA JCBA 2015, Section 21.A.1.g

WHITEHOUSE DECLARATION 057

235.    In spite of all the preceding, despite FO Patterson's possession and personal knowledge of the 1 February 2016 *PEH entry* for 10 months before he made his Article VII complaint, FO Patterson did not (a) describe it, or (b) identify it by date, or (c) claim that it was an action I took within his 4 December 2016 Article VII Complaint. [132]

236.    Likewise, READ did not cite *the PEH entry* at all in his 13 March 2017 decision. [133]

237.    Nor did FO Patterson raise *the PEH entry* in his 6 April 2017 letter of appeal. [134]

238.    The very first time FO Patterson brought forth *the PEH entry* and claimed it was relevant was on 8 June 2017 at the Appeal Board hearing, over 16 months after he received it. [135]

239.    In fact, FO Patterson's letter of appeal makes the revised, ambiguous, and unsubstantiated claim that my conduct continued past September 2015 "*through January 2016 to harm*" FO Patterson. [136]

240.    So even in letter of appeal on 6 April 2017, FO Patterson could not have been claiming that *the PEH entry* gave him any cause of action against me since *the PEH entry* was made by AAL management on 1 February 2016.

241.    Thus, even if *the PEH entry* was somehow construed to be an "act" I took (which it was not) or was discipline (which the JCBA clearly establishes that it is not) or "harmful" (which it cannot be because it is non-disciplinary in nature and even the language within it is extremely benign), it was <u>not</u> something that READ could ever have considered because it was not identified by FO Patterson as an issue until nearly three months after READ issued his decision and, even then, it was only brought forward during the actual hearing at the Appeal Board.

---

[132] <u>*See*</u> *Article VII Charges Against APA Member Captain Glenn Whitehouse,* 4 Dec 2016, **GW 000003-000007**
[133] <u>*See*</u> Miami Domicile Decision, 13 March 2017, **GW 000178-000186**
[134] <u>*See*</u> Letter from FO Patterson to APA Secretary-Treasurer, 6 Apr 2017, **GW 000187**
[135] <u>*See*</u> [Tr. Vol. 1, p. 31, ln. 4-11]. <u>*See*</u> also [Tr. Vol. 1, p. 12, ln. 6-8; p. 16, ln. 20-25; p. 19, ln. 16-25; p. 29, ln. 4-5]
[136] <u>*See*</u> Letter from FO Patterson to APA Secretary-Treasurer, ¶ 1, 6 Apr 2017, **GW 000187**

WHITEHOUSE DECLARATION 058

242.    READ should not and cannot be held responsible for FO Patterson's late attempt to amend his complaint, nor should the Appeal Board, or the Arbitrator be considering same.

243.    I believe that FO Patterson is engaging in a desperate "spaghetti on the wall" approach to pursue whatever personal goals he has, firing in every direction, internal and external to APA, with the hope that something will stick and pay out for him.

244.    FO Patterson has not flown as a pilot at AAL since 18 September 2015 and still appears to accept no responsibility for whatever his own conduct that led to his current situation (*"May of 2015"* was long before I filed my workplace harassment complaint, so I can't say what caused his current situation):

> *"Since May of 2015, I've been abandoned by American Airlines and, even more appalling, the Allied Pilots Association. The Section 20 process is extra contractual, and the APA clearly turns a blind eye to this abusive process to terminate pilots outside of Section 21. I have been left destitute without a paycheck..."* [Tr. Vol. 2, p. 120, ln. 6-12].

### The Appeal Board Ignored the Implications of Accuser's Exhibit 2, *the Vitale Statement*

245.    Accuser's Exhibit 2 ("*the Vitale Statement*") is a two-page statement from Captain Brian Vitale ("VITALE"), signed and notarized on 6 June 2017. [137]

246.    *The Vitale Statement* does not reflect a contemporaneous record of the events described. It is dated only two days before the Appeal Board hearing, apparently because VITALE was either unable or unwilling to be present to testify under oath.

247.    *The Vitale Statement* begins with a paragraph describing VITALE's professional background. The second paragraph is a single sentence briefly describing his relationship with FO Patterson.  The third, fourth, and fifth paragraphs recount his involvement with FO Patterson beginning on or about 21 September 2015 and concluding with discussions involving the Miami Director of Flight and a Miami Chief Pilot on 28 September 2015 on behalf of FO Patterson. The

---

[137] *See* Notarized letter from CA Brian Vitale to Whom It May Concern, 6 Jun 2017, **ABHT DOCS P 0002-0003**

WHITEHOUSE DECLARATION 059

sixth paragraph is a general character reference in which VITALE claims he flew with FO Patterson on a number of occasions both inside and outside AA. The seventh paragraph is primarily an *ad hominem* smear attack upon me including a number of unsubstantiated claims about which VITALE asserts no direct personal knowledge.

248.    In his *Statement,* VITALE states that FO Patterson called him on or about 22 September 2015, while FO Patterson was on military duty, to inform VITALE that he had been put on Paid Withheld ("PW") status by AAL while he was on military duty. [138]

249.    It is my understanding that PW is assigned to a pilot that AAL has been withheld from work at AAL pending outcome of an investigation involving the pilot and that the pilot is paid for any work missed while in such status (paid in full while being withheld from work at AAL).

250.    The Joint Collective Bargaining Agreement between APA and AAL ("JCBA") provides that *"all orders to pilots involving a change in status or leave of absence shall be stated in writing…"* [139]

251.    Upon information and belief, AAL's practice when placing a pilot on PW status is to:

    a.  Attempt to make personal or telephone contact to notify the pilot of their PW status.

    b.  After such conversation (or attempt), AAL will send notice by Certified Mail or FedEx and email to the pilot as well as the APA Legal Office.

    c.  AAL will include in such notification reference to the change in status to PW, the reason for the change to PW (often including notice of an investigative hearing date), in addition to describing any restrictions that AAL places upon the pilot during the PW period, such as travel restrictions.

---

[138] *See Vitale Statement*, p.1, ¶¶ 3-4, **ABHT DOCS P 0002**
[139] *See* AAL-APA JCBA 2015, Section 24.I.2

WHITEHOUSE DECLARATION 060

252.   To my knowledge, FO Patterson has never produced such notification letter anywhere in his Article VII case.

253.   Because FO Patterson was allegedly placed on PW on or before 22 September 2015, it would have been impossible for the notification letter assigning PW status to FO Patterson to cite my workplace harassment complaint as any part of the reason he was placed on PW because I did not make my workplace harassment complaint until two days later, on 24 September 2015.

254.   The absence of any "PW notification letter" within the Article VII record is conspicuous.

255.   It seems to me that the most probable reason that FO Patterson did not put into the Article VII record the PW notification letter (or for that matter, any other AAL documents or communications regarding his employment status after 22 September 2015) is that such documents would provide evidence regarding the _actual_ reason(s) for the changes in FO Patterson's employment status and do so in a manner that would contradict his claim that those changes were the result of anything I did.

256.   My complaint on 24 September 2015 was exclusively my sincere attempt to obtain assistance from AAL to compel FO Patterson to stop harassing me. Contrary to FO Patterson's theories, supported only by his imagination, my workplace harassment complaint was not any part of any collusion to provide "cover" for the Miami Director of Flight or any Miami Chief Pilots with respect to any ongoing investigations into FO Patterson's other alleged misconduct.

257.   In his _Statement,_ VITALE contends that he visited the Miami Flight Office on FO Patterson's behalf on or about 28 September 2015 with the intent of strongly protesting AAL's unlawful interference with FO Patterson's military duty by placing FO Patterson on PW when they knew he was away on military duty. [140]

---

[140] _See Vitale Statement,_ p.1, ¶ 4, **ABHT DOCS P 0002**

- 61 -

WHITEHOUSE DECLARATION 061

258.    VITALE states that he challenged two Chief Pilots, Captain Brian Beach (then the Miami

Director of Flight, supervisor to subordinate Chief Pilots) and Captain Jim Bonds on this point.

259.    VITALE states that, when he challenged the application of PW while FO Patterson was

on military duty, both Chief Pilots informed VITALE that the change to PW status on 22

September 2015 was unrelated to any problem with use of military leave:

> *"I advised both of them that the PW was inappropriate and a violation of Federal Lw on several counts. Both replied that it wasn't military…"* [141]

260.    VITALE states that CA Beach explained that the reason for the change to PW status was

the result of their investigation into FO Patterson's actions as a pilot on a flight to Bolivia that

diverted.[142]

261.    In his *Statement*, VITALE states that when he challenged CA Beach as to the validity of

such an investigation, CA Beach informed him that the investigation into the diversion issue

involved "*multiple captains and multiple departments.*" [143]

262.    Accuser's Exhibit 4 ("*the Eisenberg Letter*") was an undated and unsigned letter [144]

represented by FO Patterson as being from CA Terry Eisenberg.

263.    *The Eisenberg Letter* provides a rendition of the circumstances of an AAL flight from

Miami destined for La Paz, Bolivia, on or about 24 January 2014.

264.    The *Eisenberg Letter* states that, while CA Eisenberg was on his rest break in the

passenger cabin, FO Patterson maneuvered the aircraft to avoid an area weather such that, when

CA Eisenberg returned from break, the best course of action was to divert to the destination of

the second leg of the trip, VVI (Santa Cruz, Bolivia), rather than land at the scheduled

---

[141] *See Vitale Statement*, p.1, ¶ 4, **ABHT DOCS P 0002**
[142] In the context of aviation, "divert" or "diversion" are words used to describe the circumstance when a flight changes plans and lands at an airport other than their planned destination, either an airport enroute between departure and scheduled arrival airport, or an "alternate" airport closer to the scheduled destination.
[143] *See Vitale Statement*, p.1, ¶ 4, **ABHT DOCS P 0002**
[144] *See* unsigned, undated letter purportedly from CA Terry Eisenberg, **ABHT DOCS P 0016**

WHITEHOUSE DECLARATION 062

destination airport of LPB (La Paz, Bolivia), and informed AAL after landing in VVI that the crew was fatigued and unable to fly back to LPB.

265.   I have two reasons to question whether CA Eisenberg wrote or even saw this letter before FO Patterson submitted it for evidence on 8 June 2017 with CA Eisenberg's name on it:

    a.   One reason is that, whoever wrote the letter, they did not spell CA Eisenberg's first name correctly (he is "Terry," not "Terri"). It seems extremely far-fetched to believe that CA Eisenberg would misspell his own name in such a letter.

    b.   The second is that font and format of the *Eisenberg Letter* is remarkably similar to other documents written by FO Patterson and even documents submitted by FO Patterson but purportedly authored and expressing the views of others.

266.   I do not know if the events described in *the Eisenberg Letter* (which had occurred over a year and a half prior to 22 September 2015) were the sole basis for placing FO Patterson on PW status on 22 September 2015, but it seems unlikely given this was just one event and CA Beach purportedly stated there were *"multiple captains"* involved in their investigation (which was apparently still active if they put FO Patterson on PW as a result).

267.   This *"multiple captains… multiple departments"* characterization by CA Beach, if accurately related by VITALE, informs me that, by 22 September 2015, what may have begun as an inquiry into the circumstances of this single "divert" (described in *the Eisenberg Letter*) had expanded in scope to review other "diverts" or other irregularities or unusual operational conduct in which FO Patterson was a common denominator.

268.   It is also conspicuous to me that VITALE claimed he went in to protest interference with FO Patterson's military duty. The inference is that FO Patterson had informed VITALE that his use of military leave had been previously investigated by AAL management.

WHITEHOUSE DECLARATION 063

269.    But it is also conspicuous that, immediately after VITALE was told the issue was not military, but about a divert, VITALE did not pause in the least. Instead, VITALE quickly shifted into "offense" mode and seemed to be doing so from a well-informed standpoint. The implication is that, prior to this conversation on or about 28 September 2015, FO Patterson had also informed VITALE of previously investigations by AAL management into his involvement with aircraft diversions.

270.    Thus, it appears to me that both FO Patterson and VITALE were already well aware of what was almost certainly a months-long investigation by the Miami Flight Office seeking information regarding FO Patterson's involvement in divert-related activity, and that knowledge is why VITALE was so well-informed, and was "locked and loaded" to push back so hard and so quickly in such an argumentative manner, because he already knew "diverts" were an issue for FO Patterson and was "loaded for bear" in the event the "divert" issue was raised. I can see no other rational explanation as to why VITALE would so quickly become aggressive if this divert issue was really new news to him.

271.    In any case, the act of placing FO Patterson on PW occurred at least two days before I submitted my workplace harassment complaint on the afternoon of 24 September 2015.

272.    It seems to me that only an incompetent, corrupted, or biased "neutral" would be blind to the logical impossibility of FO Patterson's argument, without the least bit of corroborating evidence substantiating it, that my complaint of 24 September 2015 could somehow have been the catalyst for management action taken two days earlier (presumably after months-long investigations), particularly where FO Patterson's own advocate, VITALE, disclosed that the Miami Chief Pilots directly told him that the issue leading to the PW was FO Patterson's involvement in the "divert."

- 64 -

273.    The conversations recounted in *the Vitale Statement* strongly indicate there were a

number of pre-existing conditions of concern to AAL management with respect to FO Patterson.

274.    When the Appeal Board received *the PEH entry* and, especially combined with *the Vitale*

*Statement*, even if the Appeal Board was inclined to consider that FO Patterson's complaint was

somehow cognizable, SPROC and his fellow Appeal Board members should have realized

immediately that FO Patterson's own exhibits demonstrated conclusively that, whatever

investigation and discipline problems FO Patterson faced from AAL management, they were not

actions in which I engaged.

275.    If the conversations in *the Vitale Statement* carry that inference, then this sworn statement

by FO Patterson at the Appeal Board hearing on 9 June 2017 should drive the point home:

> *"In July 2015, I was informed by a fellow pilot that my career was about to be abruptly*
> *terminated. I had just returned from an eight-month sick leave of absence for a very*
> *serious life-threatening illness."*
> [Tr. Vol. 2, p. 118, ln. 9-13]

276.    The problem with this statement is that at least one part of it is demonstrably false. The

APA Operational Analysis Committee ("OAC") maintains comprehensive searchable records of

the flying of all AA pilots going back to around 1998, before FO Patterson was hired.

277.    The OAC web site maintains an archive including all historical flight sequences (now

called "pairings" and available with the "HSS" command in AAL's computer system) to which

any pilot was assigned. [145]

278.    A review of the archive of FO Patterson's flight history proves that, in July 2015, FO

Patterson could not have "*just returned from an eight-month sick leave of absence,*" because,

with the exception of a break in flying activity for four weeks in late 2014 (the reasons for which

---

[145] *See* HSS History for FO Patterson (most recent flights *last*), **GW 009158-009206**

WHITEHOUSE DECLARATION 065

are not known to me), he was working continuously through 14 February 2015 at which point a break in flying began, ending only _four_ months later on 18 June 2016. [146]

279.   Thus, the record is clear that, whatever the reasons that FO Patterson was away from work at AA prior to July 2015, he was never absent for eight months.

280.   It should also be noted that FO Patterson used these same OAC archives to obtain a document he produced at the Appeal Board hearing, a partially-concealed (concealing the line showing the unscheduled landing airport) crew list (commonly referred to at AAL as the "NS" from the computer command used to retrieve it) for AAL flight 922/24JAN 2014. [147]

281.   The complete NS for AA 922/24JAN 2014 can be found in the OAC archive of the NS showing that AA flight 922 from MIA to LPB actually landed at VVI, Santa Cruz, Bolivia.[148]

282.   The HSS historical archive, also maintained by OAC, reflects the complete flight sequence or pairing that included AA 922/24JAN 2014 from MIA, showing diversion ("DVTD") to VVI instead of landing at LPB as scheduled. [149]

283.   Thus, even though FO Patterson was away from work only four months when he testified he had been away for eight months, if the rest of what he said is true (that he was informed in July 2015, by some un-named pilot, that his career was about to be over), he must have believed the information he had been told to be credible because he did not discount what he had allegedly been told or disclose any lack of confidence to the Appeal Board.

284.   Therefore, it seems clear that he wanted the Appeal Board to believe what he was allegedly told.

---

[146] _See_ Sequences 16046/12FEB 2015 and 26602/18JUN 2015, second column – first and second HSS, **GW 009204**
[147] _See_ NS for AA 922/24JAN 2014, **ABHT DOCS P 0017**
[148] _See_ NS/922/24/MIA, first column – third NS, **GW 009026**
[149] _See_ Sequence 483/24MAR 2014, showing AA 922/24/MIA, first column – fourth HSS, **GW 009199**

WHITEHOUSE DECLARATION 066

285.    The obvious question for FO Patterson that needs to be asked, because nothing was introduced to substantiate his statement, is: *"What actions, if any, did you take after being informed by another pilot that your 'career was about to be abruptly terminated?'"*

286.    A rational person would not keep this kind of career-threatening information a secret. A rational person would contact the union, perhaps even contact the Miami Fight Office, to get to the truth of what was going on, so that an effective defense could be mounted.

287.    If FO Patterson did either of those things or more, there would almost certainly be underlined records of those activities. The fact that no records of such activities have been produced by FO Patterson in this Article VII case indicates either that (a) the entire story is a fabrication, or (b) that FO Patterson seeks sympathy in the same breath he conceals the true nature of one or more of the pre-existing employment problems he had with AAL management.

288.    If his story is not a fabrication, it implies that FO Patterson apparently seeks to conceal the fact that his employment problems he had with AAL management had been ongoing for months, perhaps even years, before I made my workplace harassment complaint. If that's the case, it seems virtually certain that FO Patterson knew what concerns AAL management had going on months earlier into 2014, before he left for his alleged *"eight-month sick leave of absence."*

289.    SPROC seemed to encourage FO Patterson to use these exhibits against me, rather than just reading them for what they were and not noticing the logical disconnect between what different people had purportedly written. SPROC's evident lack of critical thinking demonstrates either incompetence or bias or both, but in any case, SPROC's prejudicial conduct surely precluded me from receiving a full and fair hearing (and almost certainly would have even if I had been able to appear in person).

WHITEHOUSE DECLARATION 067

## Patterson's Motive: Retaliation

290.    FO Patterson's pursuit of this case is nothing more than retaliation for my filing of a

workplace harassment complaint with AAL to enlist their aid in addressing what became an

intolerable and oppressive work environment contaminated by FO Patterson's ongoing

harassment.

291.    The AAL-APA Joint Collective Bargaining Agreement contains the provisions for

handling investigations and contains specific provisions when the allegations giving rise to the

investigation are based on harassment:

> *"Prior to any investigation, the Company will notify the pilot and the Association of the*
> *purpose of the investigation, and make available relevant documentation including the*
> *specific charges and statements. The Company may in cases involving harassment*
> *allegations require employees of the Company to sign non-retaliatory confidentiality*
> *statements prior to reviewing statements. Further, the Company may redact names and*
> *other personal identifiers at the preliminary investigative proceeding. It is understood*
> *that should the matter proceed to the System Board, the Company will provide the*
> *Association such statements without redactions."* [150]

292.    Upon information and belief, pursuant to this provision, any pilot participating in an

investigation by AAL management into harassment allegations is required to sign a *"Statement*

*of Confidentiality"* or similar document before participating, with their signature indicating they

are aware of company policies related to the investigation, including the AAL policy prohibiting

retaliation against those who had made complaints.

293.    Upon information and belief, such a "Statement of Confidentiality" would include

language that is identical or similar to the following: *"I understand that it is against policy to*

*take any retaliatory action against any employee taking part in this official investigation."*

294.    Such a statement is consistent with both the AAL-APA JCBA and AAL policies

prohibiting retaliation against other employees who make harassment complaints:

---

[150] *See* AAL-APA JCBA 2015, Section 21.B.4

WHITEHOUSE DECLARATION 068

*"Your complaint will be investigated, appropriate corrective action will be taken to stop any inappropriate conduct and prevent it, and there will be no reprisals for making such reports in good faith or participating in an investigation of such a complaint. Remember, it is everyone's job to report discrimination and harassment and to cooperate in the company's investigation of such reports. Anyone found engaging in discrimination, harassment or retaliation will be subject to discipline, up to and including termination.*
151

*"Team members must cooperate with the Company in its investigation of harassment and discrimination complaints. There will be no retaliation against an [sic] team member who, in good faith, raises concerns or makes complaints of alleged, perceived or actual unlawful harassment or discrimination, or who cooperates in the investigation of such matters."* 152

295.    Since FO Patterson's consistent pattern is to attempt to tarnish me with outlandish allegations in his transparent attempts to distract, conceal, and deny his own misconduct, I provide the actual language of the AAL policies with respect to the long-standing and well-advised practice prohibiting retaliation against those, like me, who have make good faith claims of harassment to AAL, particularly after all other efforts at resolution have failed.

296.    As a matter of APA policy, after the arbitration ruling in this case, <u>all</u> records from this case will be published on the APA website for all members to see, publishing not only FO Patterson's unsubstantiated allegations and unsworn testimony and hearsay document, but publishing proof that FO Patterson retaliated against me for making a workplace harassment complaint:

*"Complete Appeal Board decisions shall be posted to the member side of the APA Website. The posting shall include: (06/12/2004)*
   *"1. The original Domicile decision and all available briefs, supporting documentation and transcripts presented by the parties to the Domicile case; and*
   *"2. The Appeal Board decision and all available briefs, supporting documentation and transcripts presented by the parties to the Appeal Board case; and*
   *"3. If a Neutral Determination is pursued, the decision of the neutral arbitrator and all available briefs, supporting documentation and transcripts presented by the parties to*

---

151 <u>See</u> American Airlines' Work Environment Policy, p.2, ¶ 1, **GW 000376**
152 <u>See</u> American Airlines' Work Environment Policy, p.3, ¶ 3, **GW 000377**

WHITEHOUSE DECLARATION 069

*the neutral arbitrator."* [153]

297.    The vast majority of the record in this case will only exist and be published because SPROC made the intentional decision to allow and even facilitate the retaliation by hearing a case that was never properly before the Appeal Board. Due to their flawed understanding of C&B, the Appeal Board erred in their finding the complaint was cognizable, but even if they came to that conclusion, they were obligated to explain their conclusion as part of a remand of the case back to Miami Domicile with a direction for hearing in the first instance.

### Patterson's Motion Near Closing of the Appeal Board Hearing

298.    As the hearing was nearing its close, FO Patterson made a series of requests in a motion asking the Appeal Board to:

a.  "*default*" me for "*willful non-appearance at this proceeding*" [Tr. Vol. 2, p. 113, ln. 4-5]. It is unclear what FO Patterson means by *"default,"* but he appears to be asking the Appeal Board to summarily rule in his favor; and

b.  "*Bar*" me from entering any submission or evidence after the close of the proceeding [Tr. Vol. 2, p. 113, ln. 6-8]. The only way that evidence could ever be received after the close of the hearing would be if the hearing was re-opened. Further, SPROC had already failed to enter into the record the two submissions I had made prior to the hearing, so the likelihood that he would accept submissions after the hearing seems so remote as to be incalculable; and

c.  "*Bar or deny*" me from submitting a closing brief after the close of this hearing" [Tr. Vol. 2, p. 113, ln. 9-11]. Consideration of post-hearing briefs would not occur absent an order or agreement by the parties to provide written briefs by a deadline, none of which was done in this case; and

---

[153] *See* APA Policy Manual, Revision #161, Effective 6 June 2015, Section 4.07.B, **GW 000666**

WHITEHOUSE DECLARATION 070

d. "*Impose all costs and fees of this proceeding… under Article VII(a)*" and "*all actions that the board deems to apply, and all other related section of the Article VII hearing and disciplinary procedures, as well as past practice that can or may apply.*" [Tr. Vol. 2, p. 113, ln. 12-18].

e. Hold me liable for "*all costs of these proceedings*" including the expenses of his representatives. [Tr. Vol. 2, p. 123, ln. 1-3].

299.    SPROC had earlier dictated a thorough "Code of Silence" to be imposed upon the hearing to prevent anyone from uttering anything or allow any discussion as to the <u>reason</u> for my inability to attend this hearing:

> "*This board will not address the underlying reason for that scheduling conflict*"
> [Tr. Vol. 1, p. 8, ln. 2-3].

300.    This edict was apparently pre-briefed *ex parte* because not a single member of the Appeal Board questioned it nor did FO Patterson or his representatives challenge it.

301.    However, after making the above motions, FO Patterson made clear that he was aware that my medical condition was the reason I was unable to be present or otherwise participate in my defense. FO Patterson stated, about me:

> "*He was not ill when all of these actions were perpetrated, and any attempt to garner sympathy based on his current situation is futile and disingenuous.*"
> [Tr. Vol. 2, p. 123, ln. 4-7]

302.    When FO Patterson made this statement, not one member of the Appeal Board made any inquiry as to what FO Patterson meant by implying that I was presently "*ill,*" so it seems clear they felt bound by SPROC's "Code of Silence" not to discuss that which must never be mentioned.

- 71 -

WHITEHOUSE DECLARATION 071

303.   The main purpose of FO Patterson's motions seems clearly intended to seek penalty upon me for being unable to attend in spite of the fact that both SPROC knew and FO Patterson knew that I was unable to prepare or attend or aid in my defense due to my medical circumstances.

## SPROC's Irregular, Improper, Incomplete, and Inaccurate

## Disclosure and Characterization of Alleged Ex Parte Communication

304.   At the very end of the hearing transcript, after two days of the 8-9 June 2017 Appeal Board hearing that consisted mainly of unstructured, irregular, and meandering activity, SPROC engaged in behavior that is so bizarre that it can only be viewed as a pre-scripted event that everyone present knew was coming because there was no reaction whatsoever.

305.   It seems all but certain that the following discussion was pre-briefed - off the record and/or *ex parte* - such that everyone knew their answers and also knew of the "disclosure" that would then be made from SPROC:

> FIRST OFFICER SPROC: *At this point, Captain Bazo, have you had any* ex parte *communications?*
> CAPTAIN BAZO: *No.*
> FIRST OFFICER SPROC: *Captain Koontz, have you had any* ex parte *communications?*
> CAPTAIN KOONTZ: *No.*
> FIRST OFFICER SPROC: *Regretfully, at this point I have to declare that I received two attempts at* ex parte *communications on behalf of the accused, one from a Captain Lloyd Hill and the other from an FO Tom Willard. And having said that, if there's no other business to conclude, then we will adjourn the hearing and the record is closed.*
> [Tr. Vol. 2, p. 140, ln. 9-22]

306.   There are three alarming aspects of this sudden disclosure that support my belief that this event was pre-coordinated with agreement and collusion of all persons present as to what would be put into the record at the end of the hearing.

> a.   First, this event occurred in the very last minute of the hearing; Literally the very last minute. Common sense would dictate that any honest judge would declare, at the commencement of any hearing, that he or she had some potentially improper

WHITEHOUSE DECLARATION 072

communication with a party to the case. Following such a disclosure, the body would appropriately solicit more detail and discuss the disclosure to determine the nature of the communication such as when it happened and what was discussed. Then the body would determine if they could proceed with the judge remaining in place. But none of that happened and common sense did not prevail. Additionally, the *Appeal Board Committee Manual* <u>mandates</u> that disclosure of any potential *ex parte* communication by members of the APA Appeal Board be made at the <u>beginning</u> of any Appeal Board hearing, not at the last minute like SPROC did:

> *"Every attempt should be made to provide a neutral environment. Ex parte communications with either party or their witnesses should be avoided at all costs. Any inadvertent **<u>ex parte communication must be reported at the beginning</u>** of the subsequent hearing or arbitration. Failure to do so jeopardizes the integrity of the hearing(s)."* (Bold underline emphasis added). [154]

b.  Second, SPROC provided absolutely no information with respect to this alleged *ex parte* communication other than to implicate two individuals as being engaged in some unspecified impropriety.

c.  As I previously described (*See* ¶ 100.d), one of the individuals that SPROC named, FO Tom Willard, had contacted SPROC as my potential representative to determine if his schedule would permit him to prepare and attend the hearing, so it's absurd and ignorant for any anyone to characterize this type of preliminary case-administration inquiry by FO Willard as *"ex parte"* communication.

d.  The other individual that SPROC implicated, Captain Lloyd Hill, will provide his own first-person account of all contacts he had with SPROC regarding the substance of this pending Article VII case. While I had sought procedural advice from CA Hill, he is not a party to this case nor is he my representative.

---

[154] *See* Appeal Board Committee Manual, Spring 2016, p. 6, ¶ 1, **GW 000384**

WHITEHOUSE DECLARATION 073

e. Finally, not only did SPROC fail to describe the substance and circumstance of the alleged *ex parte* communication attempts, but no one raised any objection, question, or concern, be that interjection coming from either of the other two members of the Appeal Board or even FO Patterson or either of his two representatives, SHELLHOUSE and EMERY.

307.   For these reasons, particularly since SPROC literally "wrote the book" on Appeal Board hearing procedures, this last minute "disclosure" was another example of more inexplicably strange behavior in attempts to smear my good name and slander the reputation of anyone I had contacted for assistance and create a chilling effect upon anyone who might dare to even try to assist me. This kind of inexplicably bizarre and prejudicial conduct by SPROC is just further evidence of a persistent pattern and practice of denying me a full and fair hearing, a <u>willful</u> action by SPROC that, according to his own *Appeal Board Manual*, fatally "*jeopardized the integrity of the hearing.*"

<u>**The Lack of a Full and Fair Hearing**</u>

308.   The following specific actions of APA in this case, related to the preceding, substantiate failure of APA to fulfill its legal obligations to provide a "full and fair hearing" before disciplining any member:

a. The Appeal Board violated the C&B by exceeding their appellate scope of authority that was properly restricted to considering an *"appeal of the decision of the Domicile Officer(s),"* and

b. During email exchanges leading up to the Appeal Board hearing, and during the Appeal Board hearing itself, the presiding Appeal Board Chairman repeatedly demonstrated an unusually coarse and even inhumane lack of consideration toward

WHITEHOUSE DECLARATION 074

my medical limitations, which further exposed his clear prejudice as he spoon-fed the accuser, in my absence (*ex parte*), as to how to best prosecute his case, and;

c.  Near the very beginning of the Appeal Board hearing, the APA Appeal Board Chairman spontaneously announced that the original complaint was "cognizable," thereby instantly overruling the READ decision that the complaint was not cognizable because it was untimely. [Tr. Vol 1, p.12, ln. 23-25 and p.13, ln. 1-5], and;

d.  The APA Appeal Board Chairman provided no record of this determination by the Appeal Board, no written citation or opinion or decision or even any justification for his proclamation, let alone having provided anything to the parties prior to the Appeal Board hearing that would have advised the parties as to its decision and justification regarding their evaluation as to whether "*the charges as set forth by the accuser fail to state a cognizable claim,*" which was the truly the only matter before it, and;

e.  Rather than remand the case back to READ for hearing on the allegations, the Appeal Board then entertained open-ended unsworn scatter-brained discussion of the allegations in the case, essentially hearing the case *de novo*, and allowed documents to be placed in evidence with no witness introducing them, at least some of these documents clearly constituting hearsay (at best), and allowing unsworn statements to be made by the accuser and his advocates alleging facts related to the case that were not in evidence.

f.  At the very end of the Appeal Board hearing, in an apparent attempt make certain the record he was creating disparaged me to his personal satisfaction, SPROC falsely accused two people that I had reached out to for assistance in the matter as having attempted to engage in improper *ex parte* communications with him. In fact, one of

WHITEHOUSE DECLARATION 075

the named individuals was only calling to find out what the hearing schedule was going to be in order to decide if he could represent me. The other had contacted SPROC to discuss the propriety of the union's administrative process in handling the case only after SPROC had first communicated to him, unsolicited, relating details of the case and the parties to it. SPROC offered no explanation during the hearing as to what these communications were about or why they were deemed to be *ex parte*. Equally conspicuous, not one person in the hearing room had a single comment or question about why this disclosure of communication that presumably could have resulted in improper judicial influence was blurted out in the very last minute of the hearing rather than at its beginning, and;

g.  The Appeal Board Chairman repeatedly rejected my reasonable requests for continuance due to my recovery-in-process from two recent surgeries, and later expressed further intolerance about the same during several instances of the Appeal Board hearing, going so far as to deliberately conceal and even mandate that there would be no discussion about my clearly stated reason for requesting continuance, and doing so to purposefully create an impression on the transcript that my absence was voluntary and that I was actually in a position to represent myself or arrange for adequate representation by another.

309.   In summary, through a series of actions constituting – *in toto* – gross malpractice by the APA judiciary, the union denied me my statutory right to a full and fair hearing during handling of a complaint from another APA member, and did so in a malicious manner that, if allowed to stand, will cause permanent harm to me and my reputation and will establish adverse precedent for all union members of APA who may be facing similar circumstances in the future.

WHITEHOUSE DECLARATION 076

310.    Even if the Appeal Board were compelled at some future point to alter their decision and remand to the Domicile for hearing, no such proper hearing could take place due to prior improper influence by SPROC during the course of the Domicile-level handling of the Article VII Complaint. Furthermore, even if a Domicile hearing was convened following remand, the Appeal Board has irreconcilably tainted the process and would be unable to objectively hear any appeal from the Domicile hearing.  The Appeal Board is irreconcilably excluded from hearing such appeals due to the reasons stated herein, including examples of their bias, *ex parte* discussions, violations of APA policy, violations of the *Appeal Board Committee Manual*, introduction of confusion and disorder during the course of the hearing, allowance of exhibits and hearsay evidence from no witness, violating my legal rights to a full and fair hearing, and so on. Unfortunately, the Appeal Board's actions have been so egregious that any further internal recourse on this case, such as returning to hear the case at a new proceeding, would be a futile farce. To use SPROC's and FO Patterson's own words, while a mandate to back up the judicial truck for a do-over might seem right-minded, the practical affect of internally trying to right the gross misconduct on so many levels internally would be unquestionably *"futile."*

WHITEHOUSE DECLARATION 077

I hereby certify under penalty of perjury, pursuant to 28 USC § 1746, that the foregoing, is true and correct.  Executed on 28 March 2018.

Glenn L. Whitehouse

State of Redact by GW

County of

Before me, Michele J. Norton (MJN)  Glenn Lee Whitehouse , on this day personally
*(insert the name of officer)*

appeared Glenn Lee Whitehouse proved to me through drivers license , to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 28th day of March, 2018.

Redact by GW

(Personalized Seal)
Notary Public's Signature
My Commission Expires: 4-11-2022

- 78 -

WHITEHOUSE DECLARATION 078