1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2             FORT LAUDERDALE DIVISION
3        CASE NO:  1:17-cv-60533-MARTINEZ/OTAZO-REYES
4

5    RODNEY SCOTT PATTERSON,
6           Plaintiff,
7    vs.
8    AMERICAN AIRLINES, INC., a
     Delaware  Corporation,
9

            Defendant.
10   _____/
11
12                        SHOOK, HARDY & BACON, L.L.P.
                          201 S. BISCAYNE BOULEVARD
13                        SUITE 3200
                          MIAMI, FL 33131
14                        Tuesday, March 6, 2018
                          10:09 a.m. - 7:42 p.m.
15
16
17

        VIDEOTAPED DEPOSITION OF RODNEY SCOTT PATTERSON
18
19
20        Taken on behalf of the Defendant before
21   Elizabeth Cordoba, RMR, CRR, FPR, Notary Public in
22   and for the State of Florida at Large, pursuant to
23   Defendant's Notice of Taking Deposition in the above
24   cause.
25

```
 1   APPEARANCES:
 2   ATTORNEYS FOR PLAINTIFFS
 3        WILLIAM R. AMLONG, ESQ.
          KAREN COOLMAN AMLONG, ESQ.
 4        AMLONG & AMLONG, P.A.
          500 NORTHEAST 4TH STREET
 5        FORT LAUDERDALE FL 33301
          954-462-1983
 6        Wramlong@theamlongfirm.com
 7
     ATTORNEYS FOR DEFENDANTS:
 8
          TRISTAN MORALES, ESQ.
 9        O'MELVENY & MYERS, LLP
          1625 EYE STREET, NORTHWEST
10        WASHINGTON DC 20006
           202-383-5300
11        Tmorales@omm.com
12        CAMERON CLOAR-ZAVALETA, ESQ.
          AMERICAN AIRLINES
13        4333 AMON CARTER BLVD.
          MD 5675
14        FORT WORTH TX 76155
          817-963-5213
15        Cameron.cloar@aa.com
16
17   ALSO PRESENT
          ALEJANDRO MONTALVO, VIDEOGRAPHER
18
19
20
21
22
23
24
25
```

1                         I N D E X
2    WITNESS                                        PAGE
3     RODNEY SCOTT PATTERSON
      Direct Examination by Mr. Morales            4
4
5
6                        E X H I B I T S
7    NUMBER                DESCRIPTION              PAGE
8     Exhibit 1, Bid Line Sheets                   12
      Exhibit 2, Log Entry Document                17
9     Exhibit 3, Letter From Physician             35
      Exhibit 4, FAA Airman Medical Certificate,   51
10    First Class
      Exhibit 5, FAA Form 8500                     55
11    Exhibit 6, Guide for Aviation Medical        68
      Examiners
12    Exhibit 7, E-mail, August 20, 2017           94
      Exhibit 8, Sky One List of Compliance Issues 108
13    Exhibit 9, E-mail, September 1, 2017         111
      Exhibit 10, Joint Collective Bargaining,     143
14    Agreement,
      Exhibit 11, Screenshot of Leaves of Absence, 160
15    Exhibit 12, Activity Pay Sheet 2/4/2016      232
      Exhibit 13, Notification of Military Leave of 257
16    Absence
      Exhibit 14, Defense Finance and Accounting   264
17    Service Military Leave and Earnings Statement
      Exhibit 15, Defense Finance and Accounting   268
18    Service Military Leave and Earnings Statement,
      Unredacted
19    Exhibit 16, E-mail                           281
      Exhibit 17, Statement to the                 284
20    Department of Labor Vets,
      Exhibit 18, Complaint                        292
21    Exhibit 19, Letter from Captain Bonds        298
      Exhibit 20, Article VII Charges Against      318
22    Captain Whitehouse
      Exhibit 21, E-mail                           345
23    Exhibit 22, Collective Bargaining Agreement, 355
      Section 20, A through E
24
25

1    Thereupon,

2              THE VIDEOGRAPHER:  All right.  Good morning.

3              We are now on the video record for the

4         videotaped deposition of Rodney Scott Patterson, in

5         the matter of the case of Rodney Scott Patterson

6         versus American Airlines, Inc.

7              Today is Wednesday, March 6th -- it's Tuesday,

8         March 6th of 2018, and the time is 10:09 a.m.

9              At this time, counsel please state your

10        appearance for the record, and after this, the court

11        reporter will swear in the witness.

12             MR. AMLONG:  William Amlong and Karen Amlong

13        for Captain Patterson.

14             MR. MORALES:  Tristan Morales, O'Melveny &

15        Myers, for American Airlines.

16             MR. CLOAR:  Cameron Cloar-Zavaleta for American

17        Airlines.

18   Thereupon,

19                  RODNEY SCOTT PATTERSON,

20   having been first duly sworn or affirmed and responded,

21   "I affirm," was examined and testified as follows:

22                  DIRECT EXAMINATION

23   BY MR. MORALES:

24        Q.   Good morning, Mr. Patterson.

25        A.   Good morning.

1    Q.    My name is Tristan Morales and I'll be taking

2  your deposition today.  Have you ever been deposed before?

3    A.    I have.

4    Q.    Okay.  I assume your attorney in that case gave

5  you some instructions about procedures and obligations

6  during that deposition; is that correct?

7    A.    She has.

8    Q.    Okay.  In the prior case, you also received

9  instructions regarding --

10   A.    I was a police officer.  I testified.

11   Q.    Okay.  And you received some instructions in

12 that case regarding your deposition --

13   A.    Of course.

14   Q.    -- testimony; is that correct?  Okay.

15         I would like to go over some of the rules

16 governing this deposition, just so we have the same

17 understanding.

18         Does that sound fair?

19   A.    It does.

20   Q.    Okay.  I will be asking you questions.  My

21 questions and your answers will be recorded by the court

22 reporter, by video.  You understand that you need to speak

23 up and to provide answers that can be heard by the court

24 reporter, rather than a nod or a gesture --

25   A.    I do.

1      Q.      -- is that fair?

2              For the court reporter, it's also important

3      that you wait until I finish my question before you begin

4      answering.  Is that okay?

5      A.      That's fine.

6      Q.      And I'll do the same with -- with your answers

7      and my questions.

8      A.      Mm-hmm.

9      Q.      The oath that you've just taken requires you to

10     tell the truth the whole truth and nothing but the truth.

11     Do you understand that?

12     A.      I do.

13     Q.      Okay.  And this is the same oath you would take

14     if you were to testify in court.  Do you understand that?

15     A.      Yes.

16     Q.      Okay.  The purpose of this deposition is to

17     find out everything you know about the events and facts

18     that underlie your lawsuit here.  For that reason, we're

19     looking for full and complete answers to the questions I

20     will ask.  We're looking for the whole truth.  Is that

21     understood?

22     A.      It is.

23     Q.      Okay.  And, occasionally, I may ask a question

24     that's unclear or that you don't understand.  If you -- if

25     you don't understand my question, please say that you

1  don't understand it and -- and then I will try to ask a

2  better question if that's appropriate.

3              Is that okay?

4      A.    That's correct.

5      Q.    Okay.  And if you need a break at any time,

6  please tell me or your attorney.  I'll finish my line of

7  questioning and -- if we are in the middle of it -- and

8  then we will see if we can take a break.

9              Is that okay?

10     A.    That's fine.

11     Q.    Okay?  We have water here and -- and various

12 snacks and other things.  Feel free to get what you need

13 during the deposition.  Is that okay?

14     A.    That's fine.

15     Q.    Okay.  If you want to talk to your attorney,

16 that's fine.  But if there's a question pending, I'd ask

17 that you please answer the question first unless you're

18 consulting your attorney about a matter of privilege.  Is

19 that okay?

20     A.    That's correct.

21     Q.    Okay.  You may give an answer during the

22 deposition and then remember that there's additional

23 information or dif- -- different information that comes to

24 mind later in the deposition.  If that happens, please

25 tell us that you'd like to add something and -- and we

1    will add it at that point.

2              Will you do that?

3         A.    Okay.

4         Q.    Okay.  And while responding to a question, you

5    may think of documents that would be helpful in giving an

6    accurate answer.  I'd ask that you let me know if that

7    occurs as we may then have those documents here to help

8    you answer completely and accurately.

9              Is that understood?

10        A.    That's fine.

11        Q.    Okay.  I want to ask a few questions just to

12   make sure that you'll be able to provide full, complete,

13   and accurate answers today.

14             Are you in good health today?

15        A.    I am.

16        Q.    Okay.  Are you at all sick?

17        A.    No.

18        Q.    Are you at all fatigued?

19        A.    No.

20        Q.    Is there any form of -- of duress or anything

21   of the sort that would complicate your ability to provide

22   full, complete, and accurate answers today?

23        A.    Not that I'm aware of.

24        Q.    Excuse -- excuse me?

25        A.    Not that I'm aware of.

1      Q.    Okay.  So as you sit here today, you're --

2   you're, in your view, fully capable of providing full,

3   accurate --

4      A.    Yes.

5      Q.    -- complete answers?  Okay.

6            How far did you have to travel to attend

7   today's deposition?

8      A.    Approximately 20 miles.

9      Q.    Okay.  Are you taking any medication or drugs

10  of any kind that might make it difficult for you to

11  understand and answer my questions today?

12     A.    No.

13     Q.    Okay.  Have you consumed anything containing

14  alcohol, drugs or any other substance that might make it

15  difficult for you to understand and answer my questions

16  today?

17     A.    I have not.

18     Q.    Okay.  Are you -- are you currently under a

19  doctor's care for any illness?

20           MR. AMLONG:  That's a yes or no.

21           THE WITNESS:  No.

22  BY MR. MORALES:

23     Q.    Is there any form of care from a doctor that

24  you're currently receiving that would complicate your

25  ability to provide full and accurate --

1     A.     No.

2     Q.     -- answers today?  Okay.

3            Is there any reason at all that -- that you

4     cannot give full, complete and accurate testimony today?

5     A.     No.

6     Q.     Okay.  Mr. Patterson, you're a pilot; is that

7     correct?

8     A.     That is correct.

9     Q.     Okay.  And are you currently flying for any

10    employer?

11    A.     I am.

12    Q.     Okay.  And what employer is that?

13    A.     I'm a captain for 21 AIR.

14    Q.     Okay.  And is -- where is 21 AIR located?

15    A.     Miami.

16    Q.     Okay.  The -- the headquarters is in Miami; is

17    that correct?

18    A.     Greensboro.

19    Q.     Okay.  So you're -- you're based in Miami for

20    your flying with 21 AIR; is that correct?

21    A.     Yes.

22    Q.     Okay.  And what kind of flying do you perform

23    as a captain for 21 AIR?

24    A.     We fly cargo for various clients.

25    Q.     Okay.  Any particular destination that you fly,

1    typically?

2         A.    It varies.  It can be South America or it can

3    be domestic in the United States, much similar to American

4    Airlines.

5         Q.    Okay.  When did you start flying for 21 AIR?

6         A.    In late August of 2017.

7         Q.    Okay.  So in August 2017, you began flying for

8    21 AIR.  And were you a captain for 21 AIR upon your start

9    date at 21 AIR?

10        A.    I was hired as a first officer for 21 AIR.

11        Q.    Okay.  And how long did you serve as a first

12   officer?

13        A.    I never served as a first officer.  I was

14   upgraded to captain in school.

15        Q.    Okay.  And so when did you first fly a trip for

16   21 AIR?

17        A.    It was approximately November of 2017.

18        Q.    Okay.  So in November 2017, you flew your first

19   trip for 21 AIR and that was as a captain for 21 AIR; is

20   that correct?

21        A.    That's correct.

22        Q.    Okay.  And do you recall where that trip took

23   you?

24        A.    It was to South America.

25        Q.    Okay.  And have you flown to South America for

1  21 AIR since that trip?

2      A.    I have.

3      Q.    Okay.  Is there any location you've gone sort

4  of most frequently in your travels for 21 AIR?

5      A.    Not that I recall.  My last trip was from

6  Rockford, Illinois, to Portland and then to Oakland --

7      Q.    Okay.

8      A.    -- California.

9      Q.    Okay.  And you mentioned some travel to South

10 America as well.  Is that any particular set of countries

11 in South America?

12     A.    Venezuela.

13     Q.    Okay.  And your travels from Venezuela have

14 been -- to Venezuela -- excuse me.

15           Your travels to Venezuela, have those trips

16 been from Miami?

17     A.    They have.

18     Q.    Okay.  If you would, I'd like you to just

19 explain or help me understand a few documents that counsel

20 has provided in this case.

21           MR. MORALES:  Could I -- can this be marked as

22      Exhibit 1.

23                (Exhibit 1, Bid Line Sheets, was marked for

24        Identification.)

25 BY MR. MORALES:

1      Q.    If you would just take a second to look at this

2   and I'd just like your help in understanding what I'm

3   looking at here.  If we take a look at the first page,

4   marked Patterson 00451, it's labelled at the top

5   "December 2017 Bid Lines" and it appears to have a monthly

6   calendar with some various color highlighting in there.

7   Under "Captains," it lists "Patterson, Number 1."

8            Is that a reference to you?

9      A.    That is.

10     Q.    Okay.  And then, if we could just maybe go

11  through the month here, quickly.  The Friday, looks like

12  December 1st through Sunday December 10th, it appears to

13  be marked in blue.

14           Is that correct?

15     A.    That is correct.

16     Q.    Okay.  And are you familiar with this document?

17     A.    I am.

18     Q.    Okay.  And can you just explain what this

19  document is.

20     A.    The "G" refers to golden days or days off.  The

21  "RA" refers to reserve assignment.  The blank days that

22  are referred to, Saturday the 16th, the 22nd, and the 28th

23  are reserve days of availability.  Also they are for one

24  in seven.

25     Q.    Sorry?

1     A.    They're for potential one-in-seven conflicts.

2     Q.    What is a one in seven conflict?

3     A.    It's a -- all airline pilots are required to be

4 given at least 24 hours off in a 7-day consecutive period.

5     Q.    So -- and you said a blank.  So, for example,

6 if we look at the 16th, December 16th, that's a blank for

7 your name; is that correct?

8     A.    That's correct.

9     Q.    And so is -- that's a one-in-seven day?

10    A.    That's a potential one-in-seven day.  Otherwise

11 I'm on call that day.

12    Q.    And what determines the -- what determines

13 whether that's, in fact, a one-in-seven day?

14    A.    I don't.  It's determined by crew scheduling.

15    Q.    And so, when this schedule is set, is crew

16 scheduling able to determine at that time whether this

17 will be a one-in-seven day?

18    A.    No.  Because the nature of the operation is

19 such that it is supplemental and it's an on-demand

20 schedule.

21    Q.    Okay.  And so it looks like, for your December,

22 there is G, golden days one through ten; is that correct?

23    A.    That's correct.

24    Q.    There are three blank days, 16, 22, and 28; is

25 that correct?

1        A.      That's correct.

2        Q.      And then the rest of the month is RA, and it

3    appears to be the same shade; is that correct?

4        A.      That's correct.

5        Q.      Okay.  So if I were to look at this

6    December 2017 bid line sheet, how would I determine which

7    of those days you were flying during the month of

8    December?

9        A.      I would have been on call from the 11th through

10   the 31st.  And, subject to the company's needs, I could

11   have volunteered from the first to the tenth to fly.

12       Q.      Okay.  So -- so on a golden day off, you can

13   volunteer, but you're not on reserve or on call; is that

14   correct?

15       A.      That's correct.

16       Q.      Okay.  Is it fair to say that, looking at

17   this -- this -- well, let me ask you this:  This sheet is

18   prepared before the month of December 2017; is that

19   correct?

20       A.      Yes, it is.

21       Q.      Okay.  And is it possible, from looking at this

22   sheet, then, to determine what days in December 2017 that

23   you did, in fact, fly?

24       A.      No.

25       Q.      Okay.  And if I could just have you flip to the

1  next page, marked at the bottom Patterson 00452.  And this

2  appears to be a January 2018 bid line sheet.  And again,

3  your -- "Patterson" is listed under "1 Captain."  Is that

4  also a reference to you?

5      A.    That's correct.

6      Q.    And am I correct that there are no codes for

7  your name here that did not appear on December 2017?

8  There are no new codes added here; is that correct?

9      A.    Well, the bid sheet is pretty much a standard

10 bid sheet, as it is at American.

11     Q.    And so G for one through ten, that's the golden

12 days off; is that correct?

13     A.    That's correct.

14     Q.    And then the RA, each day marked RA, is reserve

15 availability; is that correct?

16     A.    That's correct.

17     Q.    And then the blank days are either one-in-seven

18 days or reserve availability; is that correct?

19     A.    That's correct.

20     Q.    Okay.  And from looking at this January 2018

21 bid line sheet, would we be able to determine what days

22 you actually flew in 2018?

23     A.    Not from the sheet.

24     Q.    Okay.  And is there any document that we could

25 look at to determine what days you actually flew in

1   January 2018?

2       A.    I think we have provided you those.

3       Q.    Okay.  And what type of document would that be?

4       A.    A log entry.  It's that, basically, a logbook.

5             MR. MORALES:  If I could have this, please,

6       marked as Exhibit 2.

7                 (Exhibit 2, Log Entry Document, was marked

8           for Identification.)

9   BY MR. MORALES:

10      Q.    Are you familiar with this document?

11      A.    I am.

12      Q.    Okay.  And is this the log entry document you

13  were just referring to?

14      A.    It is.

15      Q.    Okay.  And who prepared this document?

16      A.    This is extrapolated from, you know, time sheet

17  entries.

18      Q.    When you say "extrapolated," extrapolated

19  where?

20      A.    Well, it's -- it -- it is a -- it is a copy of

21  log -- of times that I flew for 21 AIR as a captain, and

22  it has the block time entry there on -- to the right of

23  the document.

24      Q.    And you prepared this document; is that

25  correct?

1          A.     I did.

2          Q.     Okay.  And is it correct to say -- so let me,

3     if I could, point you to the top left corner, there's --

4     it says "Date, City, Pairs, Hours."

5                 Do you see that?

6          A.     I do.

7          Q.     And so then, if I look on the next line, it

8     says "18-OCT."  Is that October 18th?

9          A.     That's correct.

10         Q.     Is that October 18, 2017?

11         A.     2017.

12         Q.     Okay.  And then what's the last date that we

13    find on this sheet?

14         A.     The last date you find, it says "25 January."

15         Q.     Okay.  So this sheet covers 18 October to 25

16    January; is that correct?

17         A.     That's correct.

18         Q.     And is this -- does this capture all of the

19    flying that you performed for 21 AIR between those dates?

20         A.     To my best answer, yes, it does.  It would have

21    been a copy from the -- from the logbook entry.

22         Q.     Okay.  And how did you come up with this date

23    range, 18 October to January 25th, 2018, when creating

24    this document?

25         A.     How did I come up with it?

1    Q.    Let me ask it this way:  Why did this document

2    start with October 18, 2017, in -- in providing data?

3    A.    That was apparently the -- that was apparently

4    the first date I took a flight with them -- with them.

5    Q.    Okay.  And then why did it conclude with

6    January 25, 2018?

7    A.    This is the -- this is the final date that it

8    was prepared.  So whatever flights had accrued to that

9    point, that's the schedule that I had.

10    Q.    So this document was prepared on January 25th?

11    A.    I can't tell you when this document was

12    prepared.  There's no information to give me any

13    indication of that.  There's no date on the document.

14    Q.    Was there any other flying that you performed

15    for 21 AIR in the month of January 2018?

16    A.    Not that I recall.

17    Q.    Okay.  If there were any other flying that had

18    been performed -- let me ask this question.

19          Is there any other documentation available to

20    you that would show the flying that was, in fact,

21    performed by you for 21 AIR in the month of January 2018?

22    A.    I usually maintain, as all airline pilots do, a

23    small log of the date, the locations that I flew to, and

24    the block time.  And that's for currency with the FAA.

25    Q.    So you maintain records regarding your flight

1    time?

2        A.    I'm required to by the FAA.

3        Q.    And are there any other documents or databases

4    that the company maintains that track those flight times?

5        A.    Not that I'm aware of.

6        Q.    Okay.  And to your recollection, there was no

7    other flying that you performed in January 2018 for

8    21 AIR?

9        A.    To my recollection, I've -- I've produced a

10   document for you which shows the flights that I took.

11   There could be, you know, there could be subsequent

12   flights after January -- after January 25th, when this log

13   looks like it cut off.  But I'm not -- without my -- my

14   notes or my logbook, I -- it'd be hard to answer your

15   question affirmatively.

16       Q.    And has your logbook regarding those dates been

17   produced in response to the request for flight information

18   in this litigation?

19       A.    Well, to the extent that you requested a

20   schedule of my flights, I took that logbook and produced

21   that for my attorney, which is in your hands.

22       Q.    But only through January 25th, 2018?

23       A.    Only through January 25th, that's correct.

24   That was the date you requested.

25       Q.    Is there any other airline that you might have

1    been flying for in -- in January of 2018, other than

2    21 AIR?

3        A.    I'm prohibited from outside flying, same as

4    American.

5        Q.    Okay.  Have you had previously scheduled

6    depositions in this case, Mr. Patterson?

7        A.    We have.

8        Q.    Okay.  And do you recall about the time for any

9    previous scheduled depositions?

10       A.    I don't recall the specific date.

11       Q.    Okay.  And have there been multiple such

12   scheduled dates?

13       A.    There have been two.

14       Q.    Okay.  And do you recall about when the first

15   of those was?

16       A.    It would have been in January, I think, was the

17   first date.

18       Q.    Okay.  Early, late, do you recall?

19       A.    I don't recall the specific date, Counsel.

20       Q.    Okay.  And then -- and -- and what was -- did

21   that deposition go forward?

22       A.    That deposition did not.

23       Q.    And -- and for what reason?

24       A.    I think I reported to you that I was ill on

25   that date.  I had a fever and urticaria, which is a -- an

1  extreme rash.

2      Q.    Okay.  I would like to ask you about that in a

3  second.  But the -- was there a subsequent deposition that

4  was scheduled in this case?

5      A.    There was a subsequent deposition.

6      Q.    And do you recall about when that deposition

7  was scheduled?

8      A.    That was scheduled, I think, in the month of

9  February, and I think it was in the late February time

10  frame.  I'm not exactly a hundred percent of the date.

11      Q.    If I were to -- so your recollection is it was

12  late February, which was last week?

13      A.    It wouldn't be late February.  I'm just saying

14  it was -- correct -- it was mid month.  I'm not sure,

15  Counsel.

16      Q.    If -- if I were to propose to you that the

17  second deposition was scheduled for February 1st, 2018,

18  would that jog your memory?

19      A.    Are you saying that that was the correct --

20  that was the current date?

21      Q.    If I were to state for you that the -- the date

22  was February 1st -- subject to confirmation -- 2018, would

23  that sound about right to you?

24      A.    Are you saying that that's the correct date,

25  Counsel?  Okay.  So February 1st was the subsequent

1  deposition.

2      Q.    And if I were to state to you that we were

3  informed on January 29, 2018, that you were stuck in

4  Venezuela on a trip, an ongoing trip for 21 AIR, would

5  that ring a bell for you?

6      A.    That does ring a bell.

7      Q.    Okay.  And I -- is it correct that there's no

8  trip on this document you've provided us that would show

9  you travelling on January 29th; is that correct?

10     A.    Well, Counsel, the log --

11           MR. AMLONG:  The answer is a yes or no.

12           THE WITNESS:  He's saying that is the schedule.

13      Okay.  You can't answer that with a yes or no because

14       there are no schedules published here.

15 BY MR. MORALES:

16     Q.    Sorry.  If I were to look at Exhibit 2, which

17 you just stated provided the flying information that you

18 were aware of, in whole, is there any trip scheduled for

19 January 29, 2018?

20           MR. AMLONG:  The answer is yes or no, looking

21       at the schedule.

22           THE WITNESS:  Okay.  Bill, the -- the -- the

23       question is -- the -- the -- the --

24           MR. AMLONG:  Read the -- read the question

25       back.

1    BY MR. MORALES:

2        Q.    Mr. Patterson if you -- if you take a look back

3    at Exhibit 2 --

4        A.    By the way, could I mention one thing, sir?

5        Q.    Mr. Patterson, if you would, just take -- take

6    a look, please, first at Exhibit 2.

7        A.    I'm looking at Exhibit 2, Counsel, and

8    Exhibit 2 shows a day of reserved availability on

9    January --

10       Q.    Are you looking at this document --

11       A.    Okay.

12       Q.    -- Exhibit 2, the document Patterson 00454?

13       A.    Counsel, it shows a flight on the 25th of

14   January as being the last flight that was reported to you.

15       Q.    Okay.

16       A.    So your answer -- so the answer to your

17   question is no, there is not a flight posted on this

18   schedule.  However, to clarify your question, there was a

19   flight to Venezuela that did occur on that date.

20       Q.    And, again, my question was just this

21   document -- does this document show a flight that would

22   have had you in Venezuela on January 29, 2018?

23       A.    No.  Your -- the answer is no.

24       Q.    Okay.  It does not.

25             And you just pointed to the January 25 entry

1  which is the last entry on this sheet [as read]:  25 Jan

2  MIA MDE.

3         Would you identify MIA and MDE?

4      A.    The code -- the code is Miami to Medellin.

5      Q.    Okay.  So Miami to Medellin and that 25 January

6  date, what does that signify on this document?

7      A.    That signifies that, on the 25th of January,

8  there was a flight from -- let me take a look here.  On

9  the 24th of January, we show Miami to Medellin.  And then

10 on the 25th, we show Medellin to Miami -- or, excuse me.

11         The 24th of January -- see, this is truncated

12 as well.  This is not the original e-mail.  It shows --

13     Q.    And just to be clear:  This is the document

14 that you provided us in response to our request for your

15 flying schedule information; is that correct?

16     A.    That is correct.

17     Q.    Okay.  Please continue regarding the

18 January 25th trip.

19     A.    So the January 25th, it shows Medellin to Miami

20 on January 25th.

21     Q.    So would it be correct to say that this shows a

22 same-day trip from Miami to Medellin and back on

23 January 25th?

24     A.    What are you referring to?

25     Q.    On January 25th, did you return to Miami from

1    Medellin?

2         A.    Apparently, what I show is that Miami to

3    Medellin on January 25th and then Medellin to Miami.  It

4    appears to be a round trip on January 25th.

5         Q.    Okay.  And that's the last trip shown on this

6    document that you have provided?

7         A.    That's the last trip in -- in this log that was

8    provided to you, correct.

9         Q.    And is there any reason that this log, which

10   was requested in response to the cancellation of the

11   February 1st deposition, would not have included, for some

12   reason, a trip to Venezuela on January 29th?

13        A.    Without actually having the request, I cannot

14   answer the -- I can't answer your question.  I need the

15   request for information to verify the date that you

16   requested it and the date moving forward.

17        Q.    Does that information strike you as something

18   that we would have been interested in, given the basis for

19   your cancelling the deposition on January?

20        A.    Absolutely.  And we've provided -- we've

21   provided further information regarding the cancellation as

22   well.

23        Q.    And have -- have you provided any information

24   that refers to or demonstrates that January 29th trip?

25        A.    I provided you a logbook entry of the aircraft

1    writeup.

2        Q.    Have you provided any similar flight schedule

3    document, similar to Exhibit 2, showing that such a trip

4    occurred?

5        A.    Not subsequent to the production of this

6    document.

7        Q.    And do you have any similar document available

8    that you could produce to us?

9        A.    I could conceivably produce a document for you

10   showing a log of flights that I took subsequent to this

11   date.

12       Q.    Okay.  And -- and we would request that

13   document without a formal discovery request.

14       A.    I will be happy to provide that.

15       Q.    Okay.  Great.

16             Do you recall the trip that took place during

17   January 29, 2018?

18       A.    I do.

19       Q.    And where was that trip from and to?

20       A.    Well, all of our trips originate in Miami.

21   Okay?  And, usually, we do not lay over in Caracas,

22   Venezuela.  American Airlines doesn't lay over crews in

23   Caracas, Venezuela, due to the political unrest.

24             I recall that on the morning -- we usually fly

25   overnight trips, so the trip will usually originate in

1　Miami sometime late in the evening and then terminate

2　sometime the following day.  That's the nature of the

3　cargo industry.

4　　　　　When we arrived in Caracas, Venezuela, we -- I

5　was not the pilot in command of that particular flight.

6　Amer- -- the airline is short on captains, so they -- and

7　short on first officers, so they will usually dual-qualify

8　us.  So while I'm qualified to be a captain, sometimes I

9　will sit in the right seat and serve as an SIC.  In this

10　particular case, there was a --

11　　　　Q.　Can you just clarify:  An SIC?

12　　　　A.　Second in command --

13　　　　Q.　And --

14　　　　A.　-- a co-pilot.

15　　　　Q.　And is that a first officer?

16　　　　A.　That is a first officer.  Yes, correct.

17　　　　　So on this occasion, they paired two captains

18　together and we -- we swapped legs.  So he would serve as

19　PIC on one leg, I would serve as PIC on the other.  We

20　were working toward obtaining a hundred hours of

21　pilot-in-command time under the certificate to reduce our

22　minimums.

23　　　　　Okay.  So we landed in Venezuela.  The

24　situation --

25　　　　Q.　And what date was this?  Sorry.

1      A.    It would have been whenever we originated.  And

2    I don't have my logbook in front of me, but it shows -- it

3    shows the 29th when the trip would have originated.

4            The following morning, we were departing -- and

5    we're talking about an overflight-type operation.  So we

6    didn't go off duty.  We landed in Caracas.  We went to

7    push back the aircraft and we did not get any N2 rotation

8    on the engine.  To a pilot, that's -- that's a problem.

9    We're not going to start.

10            We continued to push back in the aircraft.  We

11   attempted to start the left engine, thinking that there

12   may have been a problem with the starter on the right

13   engine.  And we attempted to cross-bleed start the

14   aircraft.  And once we got the left engine started, the

15   right engine would give us no N1 or N2 rotation, which

16   means the engine is not turning over.

17            We asked the crew to pull back the airplane

18   to the -- to the gate and the mechanic got onboard the

19   aircraft.  We began to inquire, you know, we think we have

20   sheared a starter.  Based on our indications and our

21   training, we think we've sheared the starter shaft.  We

22   are not a hundred percent certain.  At that point, the

23   mechanic is in charge of the aircraft and we let him have

24   it.

25            The mechanics came onboard and notified us

1    sooner than later, "Hey, we've been outside.  We've pulled

2    the starter off the airplane."  I think you've those

3    pictures, as well, to show that.  They pulled the starter

4    off the aircraft.  And they notified us that there was not

5    a spare on the aircraft and that we were going to -- we

6    were basically stuck.  We're not going to start the

7    aircraft.

8            So, typically, what we do is, is we ask the --

9    we get in touch with the company and we say "Hey, we need

10   a -- we need you to take us to the hotel."  So they make

11   very specific arrangements to protect us and take us to a

12   hotel.  So they did take us to the hotel.

13           And just based on my previous experiences as to

14   what I have seen with the company, there's not a lot of

15   spare parts for a Boeing 767 aircraft.  I don't know what

16   the situation is going to turn out to be.  This trip was

17   planned to be a, basically, a round trip.  We were going

18   to go to Caracas and then go further down to Bogota.  We

19   had an augmented crew in doing that, so, in other words,

20   we were going to fly over eight hours, so the company had

21   three pilots onboard the aircraft.

22           In the interim, I elected to let my attorney

23   know that "Hey, I'm here.  I don't know what the situation

24   is going to be."  But, as a courtesy to you, I wanted to

25   let you know so that you wouldn't board an aircraft and

1   come down expecting to depose me and then not.  You know,

2   I wanted to be conscientious about that.  Okay.

3          So the following day -- and I don't have my

4   notes exactly, but the following day, late that night we

5   were notified -- and this goes into another day -- late

6   that night we were notified "Hey, they have a part and you

7   guys are going to go to Bogota."  So the mechanics put the

8   part on the airplane.  We started up the airplane the next

9   day and we flew approximately -- I do recall on this

10  flight, the weather was very bad in Bogota -- we flew --

11  it took four hours to get to Bogota.

12         So we landed in Bogota and we were on the

13  ground for quite some time, offloading cargo in Bogota.

14  You know, I -- I don't deal with the cargo issues.  Once

15  we land, we're done with the -- we're done with the

16  flight.

17         After taxiing out in Bogota, I do recall it

18  took us nearly an hour to taxi out in Bogota, it's typical

19  for Bogota.  And, shortly after takeoff, I noted we had a

20  problem with the aircraft.  So as the -- I was the

21  captain, I was the pilot in command of the flight.  I

22  climbed to 25,000 feet, levelled the aircraft off.  And

23  there was a check airman onboard the aircraft, I asked him

24  to come forward.  I said "Hey, here's the situation I got.

25  I want to take an assessment of what has occurred and

1    what, operationally, we -- we can do."

2            We put all three of us captains into the

3    scenario.  I'm the pilot in command, I'm ultimately going

4    to make the decision.  However, based on all of the input

5    and also a phone call, phone conversation with the

6    company, we determined that we could safely operate the

7    aircraft to Miami.  And then so we did.

8            I do recall that I landed in Miami.  I let my

9    attorney know that, you know, I was back.  I was very

10   tired.  You know, I'd been up all night long.  And I got a

11   message the next -- the following day that -- that you had

12   requested, by 9 o'clock, in the morning to know my status.

13   Of course, I showed up at my attorney's office around

14   3:00 p.m.

15       Q.    And you said -- a couple -- couple follow-up

16   questions.  You said that the trip was originally

17   scheduled as a round trip.  Was that a same -- scheduled

18   for a same day --

19       A.    In other words, we were going to depart Miami

20   and not stay in a hotel.  We were going to go to Caracas,

21   offload freight, onload freight.  Go to Bogota, offload,

22   onload, and then back to Miami.

23       Q.    And would that have gotten you back within

24   approximately 24 hours?

25       A.    Oh, I would have been back within the span of

1  24 hours, correct.

2      Q.    Okay.  And it sounds like a maintenance issue

3  made it so that it was perhaps an additional 24 hours on

4  the trip; is that correct?

5      A.    Appears to be.

6      Q.    Okay.  And then you arrived back in Miami, it

7  sounds like, two days prior to the scheduled deposition;

8  is that correct?

9      A.    I recall that I -- you were due to travel in

10  the day before.  And I --

11      Q.    The day before the deposition?

12      A.    The day before the deposition.  And I

13  arrived -- I arrived back in Miami in the evening of --

14  the evening prior to that.

15      Q.    Okay.  And then you said you went to your

16  attorney's office the next day, which was the scheduled

17  travel day for my travel; is that right?

18      A.    That's correct.

19      Q.    Okay.  One other question on this.  Do you

20  recall when you -- when you picked up this particular

21  trip?  Do you recall when you --

22      A.    There's no "pick up," Counsel.  It's an

23  assignment.

24      Q.    Okay.

25      A.    And I don't have any -- I don't have any

1    latitude, as we do at American Airlines, to pick up or

2    choose or drop a trip.  You either take it or you're --

3    you're not available.

4         Q.    Do you recall when you were assigned this

5    particular trip?

6         A.    Usually, these trips are -- I have been

7    assigned trips, I can't -- I can't specifically tell you

8    when I was assigned this trip.  But I can say that,

9    typically, the way things have gone with the company is,

10   is I've gotten a call in the early morning hours for a

11   departure in the evening.

12        Q.    And you said there's no latitude in terms of

13   whether you take that trip or not?

14        A.    No, there's not.

15        Q.    So, for example, if you'd received a call this

16   morning for a flight today, you would have had to go on

17   that trip?

18        A.    No, I would not have.  I'm off.

19        Q.    Are you on call today?

20        A.    No, I'm not.

21        Q.    One other question, if you would just look back

22   at Exhibit 2 again, the document that has "Dates, Cities,

23   Pairs, Hours" at the top left.  Is there any flying here

24   scheduled between January 1, 2018 and January 14, 2018?

25        A.    I don't see any flying scheduled here.

1    Q.    And that means that no flying occurred for you

2    at 21 AIR during that time period; is that correct?

3    A.    That's what it appears.

4         MR. MORALES:  Okay.  I would like to have this

5       marked as Exhibit 3.

6            (Exhibit 3, Letter From Physician, was

7         marked for Identification.)

8    BY MR. MORALES:

9    Q.    You'd mentioned a moment ago, Mr. Patterson, a

10   medical condition in connection with one of your earlier

11   scheduled depositions.  I'd just like to ask you a few

12   questions about that.  And if you would take a look for a

13   second at Exhibit 3 and let me know if you can identify

14   this document.

15   A.    I can.

16   Q.    And what is this document?

17   A.    This is a letter from my physician.

18   Q.    Is this letter related to the medical condition

19   you mentioned earlier in connection with the first

20   scheduled deposition?

21   A.    It is.

22   Q.    Okay.  And you'd made mention earlier, you used

23   a particular name for the medical condition.  Do you

24   recall what that was?

25   A.    Well, as the letter says here, it's chills,

1    fever, malaise and a -- and a rash.

2        Q.    And who is -- who is Mr. Dayton?

3        A.    Dr. Dayton?

4        Q.    Dr. Dayton.

5        A.    He is a -- he's my personal physician.

6        Q.    Okay.  And have -- have you received treatment

7    or had visits with Mr. Dayton prior to this --

8        A.    I have.

9        Q.    -- occasion?  Okay.

10            When did you contact Mr. Dayton regarding this

11    medical condition?

12       A.    I had a condition and I personally went to his

13   office about -- it was late in the afternoon.  And I was

14   advised that I could not see him until after he had

15   completed seeing all of his patients around 6:00 p.m.

16       Q.    So you first attempted to communicate with him

17   in the afternoon of January 9, 2018?

18       A.    I would say it was around 5:00 p.m.  I'm not

19   sure of the time, exactly, but it was around 5:00 p.m.

20       Q.    And what prompted your visit?

21       A.    Well, I had a -- I had a fever and I was very

22   uncomfortable, and I had a rash.  And, obviously, I'm not

23   a physician, so you know, I want to consult with my doctor

24   as to what's going on.

25       Q.    And when did those symptoms start for you?

1      A.     They appeared in the -- they appeared about

2    mid afternoon.

3      Q.     Okay.  At the time you decided to go to

4    Mr. Dayton's office, did you feel that you were unfit to

5    sit for a deposition at that time?

6      A.     I didn't know.

7      Q.     Okay.  And did you ultimately decide that you

8    were unfit to sit for the deposition because of these

9    symptoms?

10      A.     I didn't.  I actually had planned on attending

11    the deposition.  And I went home and then, later in the

12    evening, my fever spiked to about 103 degrees.  And I --

13    at that point, I called my attorney and I advised him I

14    didn't think I would be able to sit for the deposition the

15    following day.

16      Q.     And Mr. Dayton's note, if I could point you to

17    the last sentence there, it says [as read]:  He was to

18    rest with warm compresses while awake for two days, or

19    until better, and call in event his condition worsened.

20            Is that accurate to say that your condition

21    worsened after you left Mr. Dayton's office?

22      A.     It did.

23      Q.     And did you -- did you call Mr. Dayton,

24    Dr. Dayton?

25      A.     Well, I attempted to call him.  But, of course,

1    he doesn't hold office hours at 10:00 p.m. at night.  So

2    he contacted me the following day and asked me how my

3    condition was and I told him and he said, well, then it

4    was a problem.

5         Q.    So it sounds like your decision to cancel the

6    deposition was not made based on Dr. Dayton's note --

7         A.    Well, Dr. Dayton recommended that I -- that I

8    stay at home and rest.  And, ultimately -- you know,

9    ultimately, you know, I'm a soldier.  Okay?  We soldier

10   on.

11        Q.    But at the time you left Dr. Dayton's office,

12   you were still planning to proceed with your deposition?

13        A.    I wasn't sure.  Because Dr. Dayton had actually

14   had -- had sent me to do treatment.  He said I'm not

15   quite -- he wasn't sure what I had at that point.  And he

16   said "Look, we -- we need to deal with what you've got."

17             He described for me that I had a condition

18   known as phlebitis, which could be a very serious

19   infection.  And he said "This could be life-threatening.

20   So I'm going to recommend that you, you know -- my

21   recommendation is that you go home and get rest."

22   Ultimately, you know...

23        Q.    He said that your condition was

24   life-threatening?

25        A.    He said it could be life-threatening.

1      Q.     And if I would point you again to that last
2  sentence, his recommendation was that you rest for two
3  days; is that correct?
4      A.     That's correct.
5      Q.     And was his treatment plan communicated to you
6  as likely to resolve your symptoms?
7      A.     I don't recall.  He -- he said, you know, "This
8  could be a life-threatening situation.  Call me."  He said
9  "If it -- if it gets extremely bad, go to the emergency
10  room."
11      Q.     Do you -- do you have any residual symptoms
12  from this condition, Mr. Patterson?
13      A.     I do not.
14      Q.     Any symptoms that would prevent you from full
15  and accurate testimony today?
16      A.     No.
17      Q.     Okay.  As a pilot, is it correct that you have
18  to certify your fitness to fly at the time of flights?
19      A.     You do.
20      Q.     Okay.  At the time that you left Dr. Dayton's
21  office, is your view that you were fit to fly?
22      A.     I wasn't scheduled to fly, so, you know, that
23  didn't -- that didn't -- factor in to my -- that didn't
24  factor in to my equation.
25      Q.     Would you've felt comfortable certifying

1   yourself as fit to fly at the time you left Dr. Dayton's

2   office?

3       A.   I can't say.

4       Q.   And what about at the time that your fever

5   spiked later that evening?

6       A.   Well, obviously, you're not fit to fly with a

7   fever.

8       Q.   Okay.  At this time, you were -- you were

9   employed by 21 AIR; is that correct?

10      A.   That's correct.

11      Q.   And did you communicate with 21 AIR at all

12  regarding these symptoms or this condition?

13      A.   I was scheduled to fly with 21 AIR on the -- on

14  the 11th, and I made a telephone call to the chief pilot

15  and I told him that I was sick and I would not be able to

16  fly on the 11th.

17      Q.   Did you communicate to him that you had a

18  potentially life-threatening condition?

19      A.   I did not.

20      Q.   And you'd mentioned earlier that you typically

21  don't have any discretion on whether to accept trips.  Did

22  the officer you spoke with at 21 AIR accept your request

23  to not fly the scheduled trip?

24      A.   Well, I think you have to understand the FAA

25  regulations.  You -- you're -- the company is not going to

1  force you to fly when you're sick.  I mean, that's --

2  they're not going to ask me to fly when I'm sick.  You

3  report you're sick and that's it.  You're off the trip.

4      Q.    And why is -- why is that, that the company

5  wouldn't have you fly when you're sick?

6      A.    It's a violation of federal law.

7      Q.    What federal law?

8      A.    Federal Aviation Regulations.

9      Q.    Any particular regulations that you're aware

10  of?

11      A.    I think companies have a responsibility for

12  public safety.  You know, I can't quote you, specifically,

13  the regulation, but it is -- it's codified in Part 61 and

14  Part 121 of the Federal Aviation Regulations.

15      Q.    But if you were to tell the company that you

16  were fit to fly, does that obviate the responsibility with

17  respect to those regulations?

18          MR. AMLONG:  Objection.  Seeks speculation.

19  BY MR. MORALES:

20      Q.    You just re- -- you referred to a company's

21  responsibility to ensure compliance with -- with public

22  safety obligations.  Does -- does that responsibility

23  still apply if the pilot in charge of the aircraft says

24  that they're fit to fly?

25          MR. AMLONG:  Objection.  Seeks legal

1     conclusion.

2 BY MR. MORALES:

3     Q.    In your experience as a pilot, Mr. Patterson,

4 what measures does an airline or an air carrier take to

5 comply with the responsibility you just described with

6 respect to public safety?

7           MR. AMLONG:  Object as to form.

8           MR. MORALES:  You can answer the question.  You

9     can answer the question, Mr. Patterson.

10           THE WITNESS:  I hear an objection to form.

11           MR. MORALES:  Oh, you -- please answer the

12     question.

13           MR. AMLONG:  Read the question back, please.

14           THE WITNESS:  Read the question back.

15           (A portion of the record was read by the

16     reporter.)

17           MR. AMLONG:  Which airline?

18           MR. MORALES:  Please answer the question.

19           THE WITNESS:  Which airline?

20 BY MR. MORALES:

21     Q.    Does -- does an air carrier like 21 AIR

22 undertake measures to comply with the responsibility to

23 public safety that you just described?

24     A.    As a matter of fact, American Airlines

25 requires -- I'm answering your question.

1          As a matter of fact, American Airlines requires

2     pilots to certify fitness for duty by the entry in the

3     ACARS, which is a communications device in the airplane,

4     or in the computer at work, that they're fit for duty.

5          If you don't supply that, you won't get a

6     release.  You can't legally push the aircraft back.

7     21 AIR does the same thing, except I sign a paper document

8     which says I am fit for duty, I've familiarized myself

9     with the flight.

10     Q.     And you do that for each flight; is that

11     correct?

12     A.     Each flight.

13     Q.     And what would happen if you didn't sign that

14     form for a particular flight?

15     A.     The flight is not legal to depart.

16     Q.     What does that mean?

17     A.     It's not legal to depart, on paper.  You know,

18     we have a responsibility.  As a captain, I'm not going to

19     legally depart if that document is not signed.  And the

20     first officer signs the document as well.

21     Q.     Have you ever shown up for a flight and decided

22     you couldn't sign your certification of fitness for duty

23     for that flight?

24     A.     Not for 21 AIR.

25     Q.     For any other air carrier?

1      A.    I'm not sure as I haven't done that at

2   American.  I couldn't -- can't answer the question, I've

3   taken so many flights with American, so.

4      Q.    Okay.  And so when you called -- and I'm sorry.

5            You said it was an -- an official at 21 AIR who

6   took your call about the January 11th trip; is that

7   correct?

8      A.    It's.

9      Q.    And I -- I forget the particular official?

10     A.    I notified the chief pilot.

11     Q.    Chief pilot.  Okay.

12           And the chief pilot then granted your request

13  to not --

14     A.    I don't --

15     Q.    -- fly the trip?

16     A.    I don't say it's a grant my request.  It's not

17  a request.  It's a notification that I am not going to

18  take the flight because I'm sick.

19     Q.    But doesn't the chief pilot have the option to

20  decline your request?

21     A.    I would say the same at American:  Does a chief

22  pilot decline my request to fly if you call in sick?

23     Q.    In your experience, do they?

24     A.    I've never had them do that.  I've called up

25  crew scheduling and said, "I'm sick.  I can't -- I'm not

1 going to take a flight."  And I don't get -- usually,

2 American doesn't question you.  They say, "Okay.  You're

3 off the trip.  Call us when you get well."

4      Q.    And why is that?

5      A.    It's federal regulation.

6      Q.    Okay.  Do you recall when your next flight with

7 21 AIR was after your January 9th appointment with

8 Dr. Dayton?

9      A.    I don't.

10      Q.    Okay.  If I told you that it was shown as

11 January 15th, on Exhibit 2, would that sound correct to

12 you?

13      A.    If I put it on the paper, it sounds correct.

14      Q.    Okay.  Did you communicate at all with the FAA

15 about your condition described in Dr. Dayton's letter in

16 Exhibit 3?

17      A.    Yes, I've communicated with the FAA.

18      Q.    About this condition?

19      A.    I have.

20      Q.    Okay.  In what fashion?

21      A.    I've subsequently been examined by the FAA and

22 I reported my visit to the FAA.

23      Q.    Okay.  And who examined you from the FAA?

24      A.    An aviation medical examiner was appointed by

25 the FAA.

1    Q.    And do you recall the name of the examiner?

2    A.    I do.

3    Q.    Can you provide the name of the examiner?

4    A.    His name is Edward Antosek.

5    Q.    Edward Antosek.  Okay.

6    And was that examination done based on this

7 particular visit to Dr. Dayton?

8    A.    No, it was not.

9    Q.    What was the occasion for that visit?

10    A.    The occasion was my medical was going to expire

11 and I had to renew it.

12    Q.    Okay.  And when you say your medical was going

13 to expire, what do you mean by that?

14    A.    Simply what it says.  It was going to expire.

15 Medical is only valid for a certain term.  It's not valid

16 for an infinite term into the future.

17    Q.    Okay.  Well, just -- just to clarify:  When you

18 say "medical," what are you referring to?

19    A.    My airman medical, first class.

20    Q.    And is that the FAA's -- well, what is the

21 airman certification, first class?

22    A.    It's basically a document that I've to have

23 issued to me every six months based on an examination

24 which certifies my fitness to fly.

25    Q.    And why did you report this Dr. Dayton episode

1  to -- is it Dr. Antosek?

2      A.    Antosek.

3      Q.    Antosek.

4      A.    Why did I report that?

5      Q.    Mm-hmm.

6      A.    I'm required to by the FAA.

7      Q.    What -- what -- what at the FAA requires you to

8  report an episode like that?

9      A.    You log into the computer and it says -- it

10  says report all visits to the -- to physicians that you

11  have visited in the last, you know, in the last -- I don't

12  know -- there's a -- there's a time frame.  But it says

13  you need not report -- you need not report repeat visits

14  or if you've already reported them before, you need not go

15  any further.

16      Q.    And so this -- you're referring to, I guess,

17  there's a question that the FAA prompts you to answer

18  about visits to health professionals; is that correct?

19      A.    That's correct.

20      Q.    And do you recall the time period that it seeks

21  that health professional information for?

22      A.    I don't recall the specific time period, but

23  I -- I -- I know that we do the application on the

24  computer.  And when I'm done, it's electronically signed

25  and then transmitted to the FAA.

1     Q.    And what visits to health professionals do you

2  provide in response to that question?

3     A.    Generally, you provide visits to ones like

4  Dr. Dayton or you provide, you know, if you -- just a

5  different health care professional.  I think there's a

6  specific mention in there where you don't have to report a

7  visit to a dentist or, you know, something that's, you

8  know, routine health care like a -- like seeing a dentist

9  or different types of physicians that -- like, a massage

10  therapist, you wouldn't have to report that.

11     Q.    But you otherwise report all visits to health

12  professionals for the --

13     A.    Well, the FAA asks you to do that.

14     Q.    So you otherwise do report all visits to health

15  professionals?

16     A.    Of course.

17     Q.    Are there consequences for not reporting visits

18  to health professionals on that FAA form?

19     A.    I'm not aware of what the consequences are.

20     Q.    Okay.  Are you aware of any consequences to not

21  fully or accurately responding to requests for information

22  on that FAA form?

23     A.    Well, usually, the FAA will come back and ask

24  you for clarification if there's an issue that they're not

25  clear of.  They are -- they're -- they'll ask for

1   information.

2       Q.    And are you aware of consequences for not

3   responding in full or accurate fashion to their requests?

4       A.    Well, for example --

5           MR. AMLONG:  It's just a simple yes or no.  Are

6       you aware of the consequences?

7           THE WITNESS:  I'm not aware of the

8       consequences.  I know that --

9           MR. AMLONG:  That's it.  You've answered.

10  BY MR. MORALES:

11      Q.    You're not aware of any consequences for

12  failing to report requested information to the FAA?

13      A.    Well if you're asking me to -- if you're asking

14  me to suppose, I would suppose that the FAA would take

15  your certificates if you don't.

16      Q.    But you -- you don't have any --

17      A.    Well, I will give you an example.  I know of

18  a --

19          MR. AMLONG:  He is not asking you for an

20      example.

21          THE WITNESS:  Okay.

22  BY MR. MORALES:

23      Q.    You don't have any knowledge of consequences

24  for a pilot that does not report accurate information to

25  the FAA that has been requested by the FAA; is that your

1  testimony?

2       A.    I know of pilots at American that failed to

3  report their -- their DUI and the FAA has taken their

4  certificates as a result of doing that.

5       Q.    So is it fair to say that you're aware of one

6  consequence being the FAA taking your certificate?

7       A.    If you're asking me if I know of specifically

8  what the FAA would do?  No, I've never -- I've never had a

9  reason to -- to look at that information or experience

10  that.

11       Q.    Your testimony, though, is that you're aware

12  that the FAA has taken certificates for pilots that failed

13  to accurately report information requested by the FAA; is

14  that correct?

15            MR. AMLONG:  He's testifying that the FAA takes

16        certificates away from somebody with a DUI.

17            MR. MORALES:  If I could ask you to -- to

18        repeat his answer, if you got his answer.

19            THE REPORTER:  I didn't get his answer.

20            MR. MORALES:  Okay.

21            THE WITNESS:  My answer was I'm aware of

22        pilots, particularly at American, that have gotten

23        DUIs and they failed to report that.

24  BY MR. MORALES:

25       Q.    I'm just asking --

1     A.    That's my testimony.

2     Q.    -- a basic question, Mr. Patterson, which is:

3  When you're filling out an FAA form, are you aware of any

4  consequences from the FAA if you do not provide true and

5  accurate information on that form?

6          MR. AMLONG:  That's a yes-or-no answer.

7          MR. MORALES:  Correct.

8          THE WITNESS:  Am I aware?  Yes.

9  BY MR. MORALES:

10    Q.    Okay.  Are there any particular consequences

11  that you're aware of?

12    A.    As I stated to you, they took a pilot's

13  certificate for not reporting a DUI.

14    Q.    Okay.

15          MR. MORALES:  I will ask you to mark as

16      Exhibit 4, this document.

17              (Exhibit 4, FAA Airman Medical Certificate,

18          First Class, was marked for Identification.)

19  BY MR. MORALES:

20    Q.    Mr. Patterson, I would ask you to identify this

21  document, if you could.

22    A.    This is an FAA Airman Medical Certificate,

23  First Class.

24    Q.    And is this the certificate from the FAA that

25  you were referring to earlier?

1      A.    No, it is not.

2      Q.    Okay.  What are the differences between this

3  and the, I believe it was, the airman certification first

4  class?

5      A.    Well, you're asking me if this is the document

6  that I was referring to by Antosek.  It is not.  It's by

7  Dr. Tordella.

8      Q.    So is it accurate to say this is an earlier

9  medical certificate --

10      A.    That would be correct, sir.

11      Q.    -- that you referred to?  Okay.

12            And you mentioned Dr. Tordella.  Was that an

13  examiner that you had previously been examined by?

14      A.    It is.

15      Q.    Okay.  And had Dr. Tordella previously provided

16  you a medical certificate first class?

17      A.    He had.

18      Q.    Okay.  And is there a way -- looking at this

19  document, which is Patterson Tordella 00001, is there a

20  way to determine on this document the duration for the

21  medical certificate that we're looking at?

22      A.    Look at the limitations section.

23      Q.    And if I look at the limitations section, it

24  says [as read]:  Not valid for any class after 1-31-2018.

25            Is that what you are referring to?

1     A.    That's correct.

2     Q.    So this cert -- certificate is val- -- was

3  valid through January 31, 2018; is that correct?

4     A.    That's correct.

5     Q.    Okay.  And at that -- so let me ask you:  What

6  happens after January 31, 2018, with respect to your FAA

7  medical cert -- certification?  Do you have to receive

8  another certificate?

9     A.    You do.

10    Q.    Okay.  And do you recall when you went for your

11 examination to receive the medical certificate that

12 followed this Exhibit 4 that we are looking at?

13    A.    I do.  It was in February 2018.

14    Q.    Okay.  So in February 2018, you went to Dr. --

15    A.    Antosek.

16    Q.    -- Antosek for an examination for a certificate

17 that would follow Exhibit 4?

18    A.    That is correct.

19    Q.    Okay.  For purposes of this certificate from

20 Dr. Tordella, Exhibit 4, what steps did you have to take

21 in order to get this medical certificate?

22    A.    What steps?

23    Q.    Were you examined by Dr. Tordella?

24    A.    Absolutely.

25    Q.    Okay.  Did you submit a form to Dr. Tordella

1　answering questions regarding your medical status?

2　　　A.　　No.　As I've said before, the form is a -- it's

3　an online application.　All pilots do this.　It's been

4　done for several years now.　And I submit it to the FAA.

5　It goes into their database.　I'm issued a -- a unique

6　number that Dr. Tordella uses to extract that application

7　from their computer system.　And as he does his

8　examination and whatever it is that doctors do, he

9　completes the form online and then submits it to FAA.　And

10　what you get is a copy or you get a denial.

11　　　Q.　　So the form that you fill out goes the FAA,

12　generally, as opposed to a specific doctor for each

13　examination; is that correct?

14　　　A.　　The form you fill out, as I've said, is an

15　online application.　And the doctor -- the doctor pulls

16　the online application back out.　I -- I'm not --

17　　　Q.　　Right.

18　　　A.　　-- aware of the specifics of how that works.　I

19　do know that the doctor pulls it out.　He looks at the

20　application.　He questions you about facets of that app --

21　that application and it's determined.

22　　　Q.　　Do you submit the form that you're referring to

23　each time you go to an examiner like Dr. Tordella?

24　　　A.　　You're asking if there is a paper form?

25　　　Q.　　No.　My question is -- you've described this

1  online form.  Do you fill that form out each time you go

2  to a medical examiner?

3      A.    You do.

4      Q.    Okay.

5      A.    And it's not a form.  It's a -- it's an

6  application with, you know, radio buttons and whatever.

7      Q.    Okay.  And -- and if I look at Exhibit 4, it

8  says [as read]:  Date of examination, 7-18-2017.

9            Do you see that?

10     A.    I do.

11     Q.    And as you noted, the limitation period says

12  it's valid through 1-31-2018?

13     A.    That's correct.

14     Q.    So is it approximately a six-month duration for

15  these medical certificates?

16     A.    For an airman medical certificate, first class,

17  there is a six calendar month duration on that.

18     Q.    So twice a year you submit the online

19  application you just described; is that correct?

20     A.    That's correct.

21           MR. MORALES:  Okay.  I'd like to please mark as

22      Exhibit 5.

23              (Exhibit 5, FAA Form 8500, was marked for

24         Identification.)

25  BY MR. MORALES:

1    Q.    I'd ask you to take a second and then, if you

2    could, identify this document for us, Mr. Patterson.

3    A.    It says it's an FAA Form 8500.

4    Q.    And have you seen this document before?

5    A.    The last time I saw this document in its form

6    was about five years ago, when we used to complete them in

7    a paper form.

8    Q.    So if you look at the bottom of Page 1 there

9    and look at Patterson_Tordella 00002, is that your ink

10   signature at the bottom there?

11   A.    It is.

12   Q.    And if you look to the right of that, it has a

13   date of 7-18-2017; is that correct?

14   A.    That's correct.

15   Q.    So you would have seen this document on

16   7-18-2017?

17   A.    I did.  This was when Dr. Tordella asked me to

18   sign it.

19   Q.    Okay.  So what was the reference to five years

20   ago that you just testified about?

21   A.    As I said, the document -- the document is done

22   online.  So I haven't seen the form in quite some time.

23   Q.    Okay.  But you -- you filled out an online

24   version of this form; is that correct?

25   A.    That's correct.

1     Q.    If I could just direct your attention -- so,

2  for example, Item 12, you see on the right side, it says

3  "Sky One Holdings."

4     A.    Yes.

5     Q.    You see that?  I would like to ask you about

6  Sky One in a minute.  But, for now, am I correct in saying

7  that that's a handwritten response?  "Sky One Holdings" is

8  written by hand?

9     A.    That's correct.

10     Q.    So whose handwriting is that?

11     A.    That doesn't appear to be mine.

12     Q.    So whose handwriting is that?

13     A.    I don't know.

14     Q.    What about Item 14, Total Pilot Time?  Looks

15  like there was 12,000 typed in.  Would you agree with

16  that?  As a response to Total Pilot Time, typed in appears

17  to be 12,000?

18     A.    That's correct.

19     Q.    And then it's marked through, would you agree

20  with that?

21     A.    That's what I see here on the paper.

22     Q.    And then 12, 700 -- 12,700 appears to be

23  handwritten.  Would you agree with that?

24     A.    I would.

25     Q.    And so, again, is that your handwriting?

1      A.     That's not my handwriting.

2      Q.     Is that your handwritten signature at the

3  bottom of this page?

4      A.     It appears to be.

5      Q.     Okay.  Do you know whose handwriting might

6  appear on this form?

7      A.     I don't know whose handwriting that would be on

8  the form.

9      Q.     And if I could just direct you to the top of

10  Page 1, it says at the top [as read]:  Applicant must

11  complete all 20 items.  Please print.

12          Does "applicant" refer to you in this case?

13      A.     Well, and I think you've left out something

14  here.  It says [as read]:  Except for shaded areas.

15          Which, of course, looking at the form, there's

16  no shading.  And --

17      Q.     Mr. Patterson, my question is just:  Is the

18  applicant expected to fill out this form?

19      A.     The applicant would be expected to fill out the

20  form, yes.

21      Q.     Okay.

22      A.     I mean, I'm the one that's asking for the --

23  for the medical.

24      Q.     Okay.  But your testimony is that the

25  handwriting that appears on this form is not your

1  handwriting?

2      A.    That's exactly correct.

3      Q.    Other than the signature handwritten at the

4  bottom of the page; is that correct?

5      A.    That's correct.

6      Q.    Okay.  And if I could just have you look at,

7  for example, Page 2, you know, right at the top, it says

8  "Height" and there's what appears to be handwritten

9  information there; is that correct?

10      A.    That's correct.

11      Q.    And then, under that, there's a series of

12  columns.  25 is head, face, neck and scalp.  It goes

13  through 36, heart.  Each of those have a handwritten check

14  next to them; is that correct?

15      A.    That's correct.

16      Q.    Is that your handwritten check?

17      A.    Absolutely not.

18      Q.    Okay.  And if you would look at the right

19  column there, 37 through 48, 37 refers to vascular system.

20  Do you see that?

21      A.    Yes.

22      Q.    It says "Normal," and then under "Normal,"

23  there's a check mark there.

24      A.    Mm-hmm.

25      Q.    And that's not your check mark?

1    A.    Okay.  I'd direct your attention to the top of

2  the form --

3    Q.    I just -- if you would, just --

4    A.    I'm saying that's not my form.  But I'm saying

5  you're misleading because it says "Report of Medical

6  Examination."  Do you think I fill out my own medical

7  exam?

8    Q.    So, Mr. Patterson, my question was:  Item 37,

9  Vascular System, under "Normal," there's a handwritten

10  check mark.  Would you agree with that?

11    A.    Yes.

12    Q.    And is that your handwritten check mark?

13    A.    It is not.

14    Q.    Okay.

15    A.    I've never filled out this form.

16    Q.    When you say "this form" --

17    A.    I've never filled out this section of the form.

18  I've never seen -- I've never filled this out.  You're not

19  given the option of doing that on the computer.

20    Q.    So how -- how would the handwriting on this

21  form have appeared on this form?

22    A.    Dr. Tordella --

23          MR. AMLONG:  Objection to foundation.

24          THE WITNESS:  Yeah.  Dr. Tordella will fill out

25      the form.

1  BY MR. MORALES:

2      Q.    Okay.  So I believe your earlier testimony was

3  that you didn't know whose handwriting this was.  Is your

4  testimony now that the handwriting on this form is from

5  Dr. Tordella?

6      A.    My testimony was I'm not sure who wrote that.

7  I would assume Dr. Tordella wrote that on the top of the

8  form.  And I would also say that you're misleading because

9  you're -- you're -- you're making the assumptions that

10  I've completed the back of the form which says "A Report

11  of Medical Examination."

12      Q.    If you would take a look, Mr. Patterson, on --

13  back to first page.  Sorry to flip back and forth.

14  Item 19, it says [as read]:  Visits to health

15  professionals within last three years.

16          Do you see that?

17      A.    Yes.

18      Q.    And is that the FAA information request that

19  you were testifying about a few minutes ago regarding

20  visits to health professionals within a certain time

21  period?

22      A.    That is correct.

23      Q.    Okay.  And it appears to say within the last

24  three years.  Does that jog your memory about the duration

25  of information requested from the FAA?

1      A.    The question you're asking is?  Can you repeat

2  it.

3      Q.    Item 19 says [as read]:  Visits to health

4  professionals within last three years.

5      A.    Okay.

6      Q.    Is the last three years the period that the FAA

7  is requesting you to provide a list of visits to health

8  professionals?

9      A.    The FAA asks you for visits to the health

10  professionals within the last three years.  However --

11      Q.    And you would --

12      A.    However -- however, your question is

13  misleading.

14      Q.    If I could just ask you, Mr. Patterson, you

15  earlier testified that you didn't recall the time period

16  that the FAA asked you to visit -- list visits to health

17  professionals.

18      A.    Here it -- it clearly --

19      Q.    Do you recall --

20      A.    -- it clearly --

21      Q.    Do you recall that testimony?

22      A.    I do.  And I -- and I wasn't sure.

23      Q.    And let me just ask, Mr. Patterson:  Does the

24  text at Item 19 that says "last three years," does that

25  jog your memory --

1      A.    It does.

2      Q.    -- about the time period.  And you would agree

3  that the time period is the last three years?

4      A.    It is the last three years is what they

5  request.  However, do you have a copy of the instructions

6  for the form?

7      Q.    Are there particular instructions that you're

8  looking for?

9      A.    They're online.  Do you have the form, sir?

10     Q.    We can certainly get a copy of some --

11     A.    I think I --

12     Q.    -- of the instructions.  I would like to ask

13  you -- I'd like to ask you about what's listed here in

14  Item 19.

15           Item 19, visits to health professional within

16  last three years.  You would agree that the date of this

17  form, next to your signature at the bottom, is 7-18-2017;

18  is that correct?

19     A.    That is correct.

20     Q.    So am I correct that the FAA's request here is

21  to list visits to health professionals dating back to

22  July 18, 2014?

23     A.    It is.

24     Q.    Okay.

25     A.    And why don't we take a break and, sir, I'll

1  give you the opportunity to find the instruction form.

2      Q.    If you need a break for a restroom break or

3  something like that --

4      A.    We'll take a break.  That's correct.

5      Q.    -- Mr. Patterson, we'll be happy to --

6      A.    That's fine.

7      Q.    -- take a break.

8      A.    We'll take a break.

9            And by the way, sir, I'd like to say, you're --

10     Q.    Yeah.

11     A.    Excuse me, Counsel.  I think there's a certain

12 respect, and I'm displaying a certain respect, by

13 addressing you as "Counsel."  I have attained the rank of

14 Lieutenant Colonel in the United States Army.  And this is

15 a military matter, sir.  It does -- this lawsuit does

16 involve a military matter and I introduced you -- myself

17 to you as Colonel Patterson when I walked in the door and

18 I would appreciate the due respect.  It's a professional

19 courtesy.

20     Q.    Noted, sir.

21     A.    Thank you.

22     Q.    Would you like to take a break now?

23     A.    I would.

24     Q.    Great.

25            THE VIDEOGRAPHER:  All right.  Let's go off the

1          record.   The time is 11:21.

2                    (Thereupon, a recess was taken.)

3                THE VIDEOGRAPHER:   We are now back on the

4          record.   The time is 11:36, Media Number 2.

5    BY MR. MORALES:

6          Q.    Colonel Patterson, may I call you Colonel

7    Patterson?

8          A.    Yes, sir.   Thank you.

9          Q.    Please correct me or remind me if I don't refer

10   to you that -- as that.

11         A.    That's okay, sir.   I appreciate the courtesy.

12         Q.    Absolutely.

13               We were talking a moment ago about Exhibit 5.

14   And that's a FAA Form 8500; is that correct?

15         A.    That is correct.

16         Q.    Okay.   And we were looking at Question 19,

17   visits to health professional within last three years.

18   What is your understanding of the information that's being

19   requested by the FAA here?

20         A.    My understanding is they're looking for visits

21   within the last three years that have not been previously

22   reported to them.

23               For example, if you look in the instructions,

24   it talks about -- it talks in there about medical history.

25   And it's a common practice in the -- when they issue a

1  medical certificate, if you've previously reported a

2  condition to the FAA, they don't expect you to go through

3  there and list every medical doctor that you've seen for

4  the last three years because the FAA typically keeps a

5  record of that and they're typically aware of who they're

6  issuing a medical certificate to.

7          And the medical examiner is, you know, if

8  there -- if there's a condition that was previously

9  reported, he will ask you about it.

10     Q.    And so your testimony is that, when Question 19

11  says "Visits to health professional within last three

12  years," it doesn't actually expect you to list visits to

13  health professional within last three years?

14     A.    It has been my experience, and having gotten

15  some 54 medicals in my professional career, that what the

16  doctors are looking for, I go to a doctor every six months

17  for my medical and I report what I -- I report the changes

18  in my health condition for the last six months.

19          The FAA -- as I said, the FAA is aware of your

20  health condition and you report the changes to them.

21     Q.    Is there any place on the form that I could

22  look, other than your reference to medical history as a

23  term, that provides the limitation that you just described

24  to Question 19?

25          MR. AMLONG:  It's a yes-or-no answer.

1          THE WITNESS:  There's no place on the form.

2  BY MR. MORALES:

3      Q.    Okay.  And your practice in responding to

4  Question 19 on this FAA form and other forms is only to

5  list visits that have occurred since you last filled out

6  the form; is that correct?

7          MR. AMLONG:  It's a yes-or-no answer.

8          THE WITNESS:  That's correct.

9  BY MR. MORALES:

10     Q.    Okay.  And so your practice is, then, for

11  example, if you had a visit to a health professional two

12  years ago and you already listed it, you would not, in

13  your practice, list that in response to Question 19?

14     A.    That's generally the practice, yes.

15     Q.    Okay.  This examination for Exhibit 5 was done

16  by Dr. Tordella; is that correct?

17     A.    That's correct.

18     Q.    And your examination that followed this was

19  done by Dr. Antosek; is that correct?

20     A.    That's correct.

21     Q.    When you filled out this form for Dr. Antosek's

22  visit, did you maintain your practice of only listing

23  visits that had occurred since your last FAA medical

24  examination?

25     A.    I did.

1    Q.    And so, practically speaking, how would

2  Dr. Antosek, who's replacing Dr. Tordella as your

3  examiner, how would he know about visits that had occurred

4  two years prior that may have been previously reported?

5    A.    I'm not sure how they know.  I've never seen

6  what they look at in the computer to make that

7  determination.

8    Q.    But your testimony is that Dr. Antosek, for

9  example, wouldn't have expected you to list visits to

10  health professional within last three years as your full

11  set of visits to health professional within last three

12  years?

13    A.    That has been my understanding.

14         MR. MORALES:  Okay.  I think we will return to

15      that form in a bit.

16         I ask for Exhibit 6 to be attached to the

17      document I'm handing out now.

18              (Exhibit 6, Guide for Aviation Medical

19          Examiners, was marked for Identification.)

20  BY MR. MORALES:

21    Q.    If you want to take a second and if you could

22  identify this document.

23         MR. AMLONG:  That means do you know what this

24      is?  Not what does it say.

25         THE WITNESS:  I'm reading it.

1          MR. AMLONG:  Have you ever seen this?

2          THE WITNESS:  I have.  It appears to be the

3      instructions that I asked you for.

4    BY MR. MORALES:

5      Q.    The instructions for what?

6      A.    It says "Guide for Aviation Medical Examiners."

7    It appears to be instructions, where it says "Applicant

8    History."  However, I am not an aviation medical examiner,

9    so I don't have any reason to see that.

10     Q.    And if I could direct you to -- you noted

11   applicant history on the first page of this document.

12   Right under that, it says [as read]:  Item 19, Visits to

13   health professional within last three years.

14          Is that correct?

15     A.    That's correct.

16     Q.    Okay.  And is this -- this isn't the full guide

17   for aviation medical examiners, of course, correct?

18     A.    If you can --

19     Q.    Does this appear to be the full guide for

20   aviation medical examiners?

21     A.    Not beginning with Item 19.

22     Q.    Right.  So is this -- this is labelled at the

23   top "Guide for Aviation Medical Examiners," but it appears

24   to be specific to Item 19, Visits to health

25   professionals --

1      A.     It does.

2      Q.     -- within the last three years; is that

3  correct?  Okay.

4      A.     It does.

5      Q.     I would just like to direct you quickly to two

6  paragraphs here.  The first paragraph of text says

7  [as read]:  The applicant should list all visits in the

8  last three years to a physician, physician assistant,

9  nurse practitioner, psychologist, clinical social worker,

10  or substance abuse specialist for treatment, examination

11  or medical/mental evaluation.

12          My first question is:  Is your practice in

13  responding to Item 19 to list all visits to the health

14  professionals identified there, meaning physician,

15  physician assistant, psychologist, clinical social worker,

16  et cetera?

17      A.     I think you need to focus on the term "should."

18  The applicant should list all visits.  Should versus

19  shall.

20      Q.     So in your practice of filling out

21  FAA Form 8500, which you've testified you've done 50-plus

22  times, I believe, is your practice to list all visits

23  to -- and I'll read the list again -- "a physician,

24  physician assistant, nurse practitioner, psychologist,

25  clinical social worker, or substance abuse specialist for

1  treatment, examination or medical/mental evaluation,"
2  unquote?
3      A.    That's what it asked for.  It is my practice.
4      Q.    So if you are filling out Form 8500, for
5  example, and you visited a nurse practitioner within the
6  last three years, you will list that there in response to
7  Form 19?
8      A.    That's what it asks for.
9      Q.    And if you visited a psychologist within the
10  last three years, you would list that in response to
11  Item 19?
12      A.    That's what it asked for.
13      Q.    Is that what you respond with?
14      A.    I would -- I would -- I would list it.
15      Q.    And have you listed it --
16      A.    I have.
17      Q.    -- when you filled out this form in the past?
18          So if we were to look at your various
19  Form 8500s, it will it would be a full and complete list
20  of every nurse practitioner, psychologist, and clinical
21  social worker, for example, that you visited within the
22  relevant three-year period for each form?
23      A.    It would.
24      Q.    It -- it would?
25      A.    It would.

1      Q.     Okay.  And if I could direct your attention to

2   the sentence that follows there.  It says [as read]:  The

3   applicant should list visits for counseling only if

4   related to a personal substance abuse or psychiatric

5   condition.

6      A.     That's correct.

7      Q.     Have you ever not listed, for example, a

8   psychologist or clinical social worker in response to

9   Item 19 because you viewed it to be, quote, "counseling

10  related to a personal substance abuse or psychiatric

11  condition," unquote?

12     A.     No, I've not.

13     Q.     Okay.  And then if you look at the third

14  paragraph -- and I think you referenced this earlier -- it

15  says routine -- quote [as read]:  Routine dental, eye, and

16  FAA periodic medical examinations and consultations with

17  an employer-sponsored employee assistance program may be

18  excluded unless the consultations were for the applicant's

19  substance abuse or unless the consultations resulted in

20  referral for psychiatric evaluation or treatment.

21          Do you see that section?

22     A.     I do.

23     Q.     Have you ever excluded from your list of visits

24  an item, in response to Item 19, a visit to a psychologist

25  or a clinical social worker, for example, because you felt

1    that it fell under the routine examinations that are

2    exempt --

3         A.    I have not.

4         Q.    -- in Paragraph 3?

5         A.    I have not.

6         Q.    Okay.  And the last thing I would ask you to

7    look at on this document is at the bottom of Page 1.  It

8    says [as read]:  If an explanation has been given on a

9    previous report and there has been no change in the

10   condition, the applicant may enter "Previously reported,

11   no change."

12            Do you see that?

13        A.    I do.

14        Q.    What is your understanding of the directions

15   listed in that paragraph?

16        A.    What I understand is if you've -- if you have a

17   medical condition and you've previously reported it to the

18   FAA and there's been no change to that condition or the

19   FAA is aware of it, they don't expect you to, you know, go

20   in ad nauseam and complete the form each time you do a

21   medical.  They -- they want to track the changes to the

22   medical form.  And they're looking for, you know, they

23   manage by exception is what they do.

24        Q.    So it says [as read]:  If there has been no

25   change in the condition, the applicant may enter

1  "Previously reported, no change."

2          What is it that the applicant would be

3  referring to in entering "Previously reported, no change"?

4      A.    Well, there are certain conditions that are

5  listed here.  And, unfortunately, due to the limitations

6  of the -- the computer system, you can't -- you have to go

7  in and answer the radio buttons.  There's no choice to go

8  in and select "Previously reported, no change."  I think

9  this is probably a holdover from the written form.

10     Q.    So your testimony is that the FAA Guide for

11 Aviation Medical Examiners, when it says "The applicant

12 may enter 'Previously reported, no change'" is referring

13 to a button or entry option that does not, in fact, exist

14 on the FAA's Form 8500?

15     A.    I've not seen it.  I've looked for it.

16     Q.    Okay.  But you agree that that paragraph states

17 that the applicant should -- should enter "Previously

18 reported, no change" if there has been an explanation

19 given on a previous report and there has been no change in

20 the condition?

21     A.    It has been my practice to list visits to the

22 physician that have occurred that are new visits within

23 the previous six months.

24          In other words, there would have been a change

25 in the medical condition or a visit to a professional

1    that -- that changed.  And that would give the FAA the

2    opportunity to either issue the certificate or ask for

3    further information.

4        Q.    What about for visits where you've listed them,

5    quote, "on a previous report and there has been no change

6    in the condition," unquote?

7        A.    Well, I think that you're answering the

8    requirement to the FAA in that reporting that visit to

9    them, you're answering the mail.

10       Q.    I'm sorry.  I don't follow the answer.

11       A.    You're giving them what they require.  They're

12   asking you for visits --

13       Q.    So --

14       A.    -- to a health care professional.

15       Q.    So say you had a visit for Dr. Tordella.  Let's

16   just take an example.  If we could look back at Exhibit 5.

17   You see Item 19 there on Page 1?

18       A.    Mm-hmm.

19       Q.    So it lists -- the second entry is [as read]:

20   3-2017, Dr. Dan, Bozeman, MT, chiropractor, reasons

21   sprain/strain.

22            Do you see that?

23       A.    Yep.

24       Q.    So when you were filling out Dr. Antosek -- the

25   form submitted prior to the examination by Dr. Antosek, if

1  there had been no change in the condition of sprain --

2  sprain/strain from Dr. Bozeman, would you or did you

3  report that visit to Dr. Bozeman in March 2017 on the form

4  you submitted to Dr. Antosek?

5       A.    You're saying would I report the --

6       Q.    So -- just --

7       A.    Wait a minute.  Wait a minute.  Hold on.

8             Can you repeat your question?  Because there

9  was --

10      Q.    Sure.

11      A.    -- you --

12      Q.    Sure.  So you visited Dr. Bozeman in

13  March 2017, correct, listed as Item 2 on Entry 2 on Item

14  19, Page 1.

15            Colonel Patterson, if you --

16      A.    You're saying Page 1?

17      Q.    Yeah.

18      A.    Okay.  What line item?

19      Q.    It's -- you see Item 19, Visits to health

20  professional?

21      A.    Yes.

22      Q.    And it has "Date" under it.  And one down --

23  two down is 3-2017.

24      A.    Mm-hmm.  I do.

25      Q.    So it looks like you visited Dr. Bozeman in

1    March 2017 for a sprain/strain?

2        A.    Right.

3        Q.    Do you recall if there was any change in your

4    condition after this visit and prior to your form

5    submission for Dr. Antosek?

6        A.    Okay.  A couple of -- a couple of items here.

7    You're referring to the doctor as "Dr. Bozeman."  And

8    could you say the doctor's name correctly, please.

9        Q.    Are we talking about Entry 2, Dr. Dan Dutton

10   Bozeman?

11       A.    Okay.  I think that -- I think that there's a

12   comma missing there because it's Bozeman, Montana.

13       Q.    I see.  Dr. Dutton, then, is located in

14   Bozeman --

15       A.    Dr. Dutton is located in Bozeman, Montana.

16       Q.    Okay.  So you visited Dr. Dutton in Bozeman,

17   Montana, in March 2017; is that correct?

18       A.    That's correct.

19       Q.    All right.  That was for a sprain/strain?

20       A.    That is correct.

21       Q.    Okay.  And at the time that you filled out the

22   subsequent form prior to your visit to doctor --

23   Dr. Antosek, had there been any change in your condition

24   of sprain/strain?

25       A.    The condition was resolved.  I went to the

1    chiropractor for therapy in March of 2017 and the

2    condition resolved.  You know, several visits and

3    you're -- there's -- there's no condition that you need to

4    go report and see a medical doctor for.

5         Q.    So then, under your practice, you would not

6    have reported the visit to Dr. Dutton in response to

7    Item 19 on the form?

8         A.    No, you would not have.  Not to Dr. Antosek.

9         Q.    And is your understanding, then, that any time

10   a medical condition is no longer active or has been

11   resolved that you don't need to report it in response to

12   Item 19?

13        A.    I think -- would you repeat that, please.

14   Okay.

15        Q.    Is your understanding of Item 19 that, if the

16   medical condition that caused you to visit the health

17   professional has been resolved, then you no longer need to

18   list that visit to the health professional, even if it's

19   within the last three years?

20        A.    You asking me if it's my opinion?

21        Q.    When you're filling out this form every six

22   months --

23        A.    Okay.

24        Q.    -- do you list visits even if the medical

25   condition is no longer active, if the visit happened

1   within the last three years?

2       A.    I would list a condition.  In other words, if I

3   visit a doctor and the doctor says "The condition is

4   resolved.  Your sprain and strain is over.  You don't need

5   to see anybody else.  There's -- you're a normal human

6   being from this point on," I wouldn't list that on a

7   subsequent visit.  I would report it to the FAA at the

8   next scheduled visit.

9       Q.    What do you mean?  How would you report it to

10  the FAA?

11      A.    I would report it through MedXPress.

12      Q.    I'm not -- I'm not familiar with MedXPress.

13      A.    That's the computerized program that I'm

14  referring to that you enter in the medical information.

15      Q.    So you would enter, for example, Dr. Dutton's

16  visit on your next --

17      A.    No, I wouldn't --

18      Q.    -- FAA medical certification --

19      A.    No, no -- if -- if I --

20      Q.    -- even if the medical was resolved?

21      A.    If I continue seeing Dr. Dutton, then I would

22  report it on the next scheduled visit.  However, in this

23  case, Dr. Dutton just said "You got a sprain/strain.  I'm

24  going to give you therapy.  It'll help you -- it will help

25  you sleep at night and you will be fine."

1    Q.    Does -- does Question 19 ask you to list any

2    active medical conditions?  Let me restate that.

3         Is the guidance under or directive under

4    Item 19 to list active medical conditions that required a

5    visit to health professionals within the last three years?

6    A.    Guidance says list visits to health

7    professionals within three years.

8    Q.    Does it say only list them if the medical

9    condition is still active?

10   A.    No, it does not.

11   Q.    Okay.  If I could have you look back at

12   Exhibit 6 again and just one last item here.  It's on the

13   second page.  It's the last paragraph of the text.  It

14   says [as read]:  Of particular importance is the

15   reporting --

16        I'll give you a second to get there.

17   A.    Okay.

18   Q.    You're on Page 2 of 2 of the Exhibit 6?

19   A.    I do.

20   Q.    [As read]:  Of particular importance is the

21   reporting of conditions that have developed since the

22   applicant's last -- last FAA medical examination.  The

23   examiner is asked to comment on all entries, including

24   those -- and in capital, it capitalizes here in the

25   document -- previously reported, no change, period, end

1    caps.  These comments may be entered under Item 60.

2          When this guide says that the examiner is asked

3    to comment on all entries, including those previously

4    reported, no change, what is your understanding of the

5    directive there for the examination process?

6    A.    I'm not a doctor, so I can't -- I can't

7    speculate.

8    Q.    Is it fair to say that examiners are expected

9    to review entries that have been previously reported, even

10   if there's been no change in the condition that was

11   previously reported?

12   A.    Again, I'm not a doctor and I'm not an AME.  I

13   can't speculate.

14   Q.    Let me ask you:  Does report -- does reviewing

15   this guide for aviation medical examiners change the

16   approach that you will use in the future in responding to

17   Item 19?

18   A.    Again, I'm not an aviation medical examiner.  I

19   submit to a medical every six months, Counsel.  And I

20   report to the examiner, fully, the conditions that, you

21   know, things that have developed.  Dr. Tordella is -- is

22   very familiar with my medical history, and so is

23   Dr. Antosek.

24   Q.    I believe you testified earlier that the

25   FAA Form 8500 isn't directed to a particular examiner but

1    goes to the FAA; is that correct?

2        A.    Well, that is correct.

3        Q.    Okay.  And my question is:  When you're filling

4    out Form 8500 on -- on an ongoing basis now, will you

5    enter "Previously reported, no change" if you've listed,

6    on a previous report, a visit to a health professional and

7    there has been no change in the condition?

8        A.    Well, as I said, I don't -- there's -- I

9    haven't found a specific radio button inside that form.

10   So I have to continue reporting new doctor visits since

11   the last six months.

12       Q.    Okay.  And then one last question on this,

13   and -- and this goes back to the first paragraph.

14            So is it accurate to say that all visits that

15   you've had in the last three years, to a nurse

16   practitioner, for example, would be listed on one of the

17   Form 8500s that you have submitted to the FAA?

18       A.    Well, I've never had a visit to a nurse

19   practitioner, so I can't --

20       Q.    Okay.  So -- okay.  So let's say, is it

21   accurate to say that all visits you've had in the last

22   three years to a physician would be listed on one

23   Form 8500 or another?

24       A.    I would say that's fair.

25       Q.    Okay.  And the same is true of a physician

1  assistant?

2      A.    I would say that's fair.

3      Q.    Psychologist?

4      A.    That would be fair.

5      Q.    So any visit that you've had in the last three

6  years to a psychologist would be listed on one of the

7  Form 8500s that you've submitted to the FAA?

8      A.    That is correct.

9      Q.    Thank you.  I believe that you said you started

10  flying for 21 AIR in August 2017; is that correct?

11      A.    I believe so.

12      Q.    Were you flying for any other carrier

13  immediately prior to that time?

14      A.    I was flying for Sky One Holdings.

15      Q.    And what is Sky One Holdings?

16      A.    It is a charter company.

17      Q.    What does that mean?

18      A.    They hold themselves out to the public and they

19  provide flights for private individuals that desire to go

20  where that jet will take them.

21      Q.    And when did you start flying for Sky One?

22      A.    I don't recall, specifically.  I would -- I got

23  my type rating in December of 2016 so I would have flown,

24  subsequently, thereafter.

25      Q.    And what is a type rating?

1      A.    A type rating is a specific authorization from

2    the FAA which certifies that I'm competent to act as pilot

3    in command of a particular type turbojet, for this

4    example.  All turbojets require type rating.

5      Q.    And was this a type rating for a particular

6    type of turbojet?

7      A.    It was.

8      Q.    And what type was --

9      A.    A Beech 400.

10     Q.    Okay.  And so you -- you -- you received your

11   type rating in December 2016.  Do you recall when your

12   first flight for Sky One took place?

13     A.    I don't.  It would have been sometime

14   subsequent to December of 2016.

15     Q.    Okay.  So --

16     A.    In 2017, possibly.

17     Q.    Early part of the year, middle?

18     A.    I -- I don't know.

19     Q.    Were you based -- was your flying for Sky One

20   based in Miami?

21     A.    No.

22     Q.    Where was your flying based?

23     A.    The flying for -- for Sky One is not based at

24   any one particular airport.  We -- we could originate out

25   of a number of airports here in the local area.

1    Q.    All in Florida?

2    A.    Particularly in Florida, but I -- I mean,

3    Sky One is not limited to Florida.

4    Q.    And how were your flights scheduled at Sky One?

5    A.    Same as 21 AIR.

6    Q.    Okay.  And, well --

7    A.    On demand.  You get a phone call, "We need you

8    at the airport in two hours."

9    Q.    And how long were your trips, typically?

10   A.    It's hard to say.  I've had trips that go to

11   Tallahassee, drop off an attorney or a lobbyist, turn

12   around come back to Miami, and then pick up another trip

13   and fly somewhere else with another customer.

14   Q.    And are you currently flying for Sky One?

15   A.    No.

16   Q.    When did you stop flying for Sky One?

17   A.    I don't recall the specific date.

18   Q.    Do you have any general recollection?

19   A.    It would have been prior to going to work for

20   21 AIR.

21   Q.    So prior to August 2017; is that correct?

22   A.    I can't say specific dates, Counsel.

23   Q.    Around 2017, around?

24   A.    Again, I can't say, specifically.

25   Q.    And have -- have you flown on a regular

1   schedule for 21 AIR -- or for Sky One from the time you

2   started flying, approximately December 2016 through

3   August 2017, or were there any interruptions in your

4   flying commitments to Sky One?

5           MR. AMLONG:  Read that question back, please.

6           THE WITNESS:  Yeah.

7           MR. MORALES:  I can restate it.

8   BY MR. MORALES:

9       Q.    Did you fly on a regular schedule from

10  January 20- -- December 2016 to August 2017?

11      A.    Did I fly on a regular schedule from January?

12  Of course.  I mean, I -- I had a regular time schedule

13  where I had a list of flights.  But if you're asking me

14  for specific days, I can't.

15      Q.    Let me ask you this:  Your time at Sky One,

16  approximately how many average hours did you fly on a

17  weekly basis?

18      A.    Without having my logbook, it's hard to say.

19  But I -- I -- I do recall, at -- at Sky One, it was -- it

20  was pretty intensive flying.  We had days that would go

21  14 -- 14 hours duty day, which was the -- pretty much the

22  maximum.  And you know, we were -- the airplane was

23  encumbered during that period of time.  So I might fly

24  three hours to Pennsylvania and stay in a hotel for two or

25  three days and then pick up that same customer and bring

1    that customer back.

2          Sky One endeavored to schedule the airplane for

3    other flights.  They would call them -- they would call

4    them "popup trips."  And so they -- they entered into

5    their computer the availability of the airplane and

6    another charter company in Pennsylvania might see, "Hey,

7    we have a Beech 400 in this location and it's available.

8    Let's task that crew to move, you know, whatever customers

9    we had to move."

10         Q.    Did you've an average, monthly flight hours?

11    Did you fly about 70 hours a month? 80 hours a month?

12         A.    I don't recall the specific hours we flew, but

13    70 hours sounds about close to what we flew per month.

14         Q.    And so from the first time you flew for Sky One

15    through the time you ended, was that approximate 70 hours,

16    was that the average for each of those intervening months?

17         A.    Here again, I can't say.  Because I -- I do

18    recall some months we flew high and other months we, you

19    know, we'd -- we'd fly right up against the legal limits.

20         Q.    Did you -- did you ever have a time at Sky One

21    where you were unable to fly a schedule?

22         A.    I had a period where I -- I experienced -- I

23    experienced, you know, a sprain/strain injury and the -- I

24    ended up going and seeing a doctor.  I saw Dr. Dayton and

25    he recommended that I follow through with, you know,

1   getting some therapy done and -- and get -- get my issue

2   resolved.

3       Q.    And were you out of commission for flying

4   purposes for a period because of that condition?

5       A.    Well, per Dr. Dayton's recommendation, I was.

6       Q.    And do you recall about how long you were out

7   of commission?

8       A.    I think it was three to four weeks.

9       Q.    Three to four weeks.

10          And do you recall about what time period in

11  2017?

12      A.    I don't recall the specific time frame, but,

13  you know.

14      Q.    Okay.  And after that three- to four-week

15  period did you then, at some point, return to flying at

16  Sky One?

17      A.    I did.

18      Q.    Okay.  And did you resume a fairly regular

19  schedule in terms of flying?

20      A.    I did.

21      Q.    Okay.  And then, what prompted the end of your

22  time flying for Sky One?

23      A.    I started my professional flying career working

24  for an airline.  When I took my job with Sky One, I took

25  it as a -- as an opportunity to get into aviation.  They

1    were the first company that offered me employment.  And

2    21 AIR had been advertising that "We are a new company.

3    We have the Boeing 767 aircraft," which is what I flew at

4    American Airlines as a first officer.  I saw the

5    opportunity to go to 21 AIR as -- as an opportunity to

6    move up.  And, you know, perhaps, one, increase my salary

7    because, prior to me applying, they had advertised

8    captains positions.  And then the following month they

9    advertised FO positions.

10           So I ended up, you know, sending a resume to

11   them.  They called me for an interview and, of course, one

12   of the conditions in the interview was, is "Hey, you know,

13   I'm not here to be a first officer forever.  What is my

14   opp- -- opportunity to upgrade to captain?"

15           And they said, "That opportunity could come

16   very quickly, based on our needs."

17      Q.   And at the time that you decided to interview

18   with 21 AIR, was your expectation that you would continue

19   flying with Sky One indefinitely?

20      A.   No.  No, I didn't --

21      Q.   Did you've a plan to leave Sky One at the time?

22      A.   Until I got offered a job and a firm date, I --

23   I wasn't going to leave Sky One.  You know, you don't

24   leave one job until you've got a firm offer for another

25   job.  21 AIR was a very tenuous offer because there

1    were -- there were a lot of discussions about class dates

2    and when we began, when we end, different -- different

3    issues.

4            And so, as I said, you know, I don't quit a job

5    without some certainty.

6        Q.    And did you have a contract with Sky One for --

7        A.    I did not.

8        Q.    -- a certain duration of time?

9        A.    I did not.

10       Q.    And so how -- how was your sort of period of

11   employment at Sky One determined?  Was it a renewal of a

12   contract or?

13       A.    No.  When I was hired at Sky One, the director

14   of operations said "Usually we require -- we require you

15   to sign a training contract."  And I was advised that I

16   was not going to be required to sign a training contract

17   based on my experience.

18       Q.    So did you have just an indefinite expectation

19   of employment at Sky One?

20       A.    No.  I -- I -- I don't ever expect to work

21   somewhere indefinitely, except for American Airlines.  I

22   mean, that's -- that is a career that you work for and

23   that you achieve.

24       Q.    Did Sky One ever communicate to you at your

25   time flying there that they expected your employment with

1  them to cease?

2      A.    No, they did not.

3      Q.    Okay.  Did you ever have any disciplinary

4  issues at Sky One?

5      A.    No, I did not.

6      Q.    Did you ever have any issues with compliance

7  with Sky One's policies and procedures?

8      A.    No, I did not.  And --

9              MR. AMLONG:  That's the answer.

10             THE WITNESS:  No.

11  BY MR. MORALES:

12     Q.    Sky One never communicated to you that you were

13  not in compliance with policies and procedures at Sky One?

14     A.    Sky One communicated to me that I had not

15  answered a memo regarding snacks.  And I think I answered

16  back Sky One that "Hey, wait a minute.  If you've got me

17  out -- if I'm -- if I'm -- technically, I'm off the

18  payroll, you have an expectation for me to perform work

19  for you, but yet you're not paying me."  So.

20     Q.    Why were you off the payroll?

21     A.    Well, as I said -- let me clarify this:  I was

22  out sick.  And, therefore, I wasn't off the payroll as

23  being, you know, terminated in a position.  So I was out

24  sick.  And I communicated to them that, you know, you have

25  an expectation for me to perform my duties as a captain

1  while I'm out sick, I think that's -- I think that's

2  highly inappropriate.  And I did communicate that to them.

3      Q.    And so to clarify:  Your view is that the

4  policy and procedure that Sky One was concerned about was

5  regarding snacks.

6      A.    Well, they had a requirement that you were --

7  they had a read file.  And there was an issue that was

8  identified with the read file that, you know, they don't

9  equally apply that policy across the board.  They don't

10  have any way of -- of verifying that.  It -- it's

11  basically a return e-mail system to the chief pilot.

12  Yeah, I read the memo.

13          So they -- they make the assumption that you

14  get the e-mail, first.  And then, of course, there's an

15  expectation that, yeah, I read the memo about stocking the

16  airplanes with snacks.

17          They -- they forwarded another memo that was

18  completely irrelevant to the Beechjet to the effect of

19  someone had left a baby diaper on board one of the

20  Falcon 50 aircraft and that had developed maggots and one

21  of the ground personnel had to clean it.  Okay.  That's --

22  that's the nature of the memos that we are discussing

23  here.

24      Q.    And that's the only policy and procedure that

25  Sky One suggested you might not be in compliance with?

1      A.     Well, Sky One also asked me about my FAA first

2    class medical.  And I recall that I communicated with

3    Rodney Beeler on the 17th of July, I think it was the date

4    I -- I coordinated with him on.  And I advised Rodney,

5    "Hey, I'm -- I'm -- I'm up against my medical renewal and

6    I just want to let you know I've an appointment scheduled

7    with my AME on the 20th.  I don't expect any -- I'm not

8    anticipating that there would be any reason to deny my

9    medical."

10            In other words, "Hey I don't have anything

11   going on right now that's, you know, that's going to get

12   me, you know, declined and have the -- or have the FAA

13   come back and say 'No, we are not giving you a medical'

14   come back."

15      Q.     And that resolved the issue for Sky One?

16      A.     I communicated that to Rodney and that meet --

17   that meets the requirements.  And I also provided them

18   with my FAA first class medical that Dr. Tordella issued

19   me subsequent to that.

20      Q.     And was that the last you heard of the issue

21   from Sky One?

22      A.     That was the last I heard of it.

23      Q.     And Sky One never communicated to you that you

24   were not in compliance with medical certification or

25   fitness for duty certification --

1    A.    Well, they never --

2    Q.    -- procedures at Sky One?

3    A.    They -- they -- they never communicated that to

4  me because I was never not in compliance -- i.e.,

5  operating an aircraft without a medical certificate.

6    Q.    But they never communicated to you that you

7  weren't in compliance?

8    A.    No, they did not.  Not -- not in that fashion.

9         MR. MORALES:  I would like to mark Exhibit 7,

10        the following document.

11             (Exhibit 7, E-mail, August 20, 2017, was

12         marked for Identification.)

13  BY MR. MORALES:

14    Q.    I'd ask if you have seen this document before.

15    A.    Yes, I have.  I sent this to Rodney Beeler.

16    Q.    I just want to make sure we have the same.  One

17  second.  I just want to confirm:  Are you all looking at

18  this document?

19    A.    Well, this is listed as --

20         MR. AMLONG:  The Rodney Beeler, Sunday,

21        July 23rd memo.

22  BY MR. MORALES:

23    Q.    It's two -- it's two separate ones.  Let's do

24  the one we marked first and then we will do the other one.

25  The one we marked is that one.  So I will hand you this.

1    Sorry.

2            Mister -- Colonel Patterson, you were saying

3    you have seen this document before.  And if I could just

4    ask you --

5        A.    I have.

6        Q.    -- to continue identifying it.

7        A.    I have.  It's an e-mail that I sent to him on

8    Sunday, August the 20th, 2017, at 10:35 p.m.

9            MR. AMLONG:  We are doing Exhibit 8 first?

10            MR. MORALES:  Exhibit 7.

11    BY MR. MORALES:

12        Q.    So we are looking at Exhibit 7, which is an

13    August, appears to be an August 20, 2017, e-mail from

14    Scott Patterson to Rodney Beeler.

15            And what prompted the e-mail that you sent here

16    to Mr. Beeler and, it looks like, Mr. Devlin?

17        A.    You -- you asked me earlier about the timing of

18    my medical.  During that, you asked me did they notify me

19    at the time was I -- was my medical deficient or any of

20    these items.  At a later point in time, Sky One, the --

21    vis-à-vis Johnny Devlin, who was the director of

22    operations for Sky One, who no -- who is no longer an

23    employee of Sky One, presented me with a -- presented me

24    with a corrective action form.

25            I -- in there, he alleged that I had not

1    complied with the medical.  He advised that I -- that the

2    comp- -- wait a minute.  He advised that Comply 365 -- you

3    see the items there.  Okay.

4            And this was -- this was my answer or rebuttal

5    back to that corrective action form that I was given

6    several days prior.

7    Q.    If I could just have you look at the first

8    sentence of the e-mail, of the body.  It says I am -- and

9    this is written by you; is that correct?

10   A.    That's correct.

11   Q.    It says, quote, "I am writing this response to

12   your precompleted letter of correction on 10 August 2017.

13   You allege that I did not comply with three items.  I

14   offer the following professional rebuttal," unquote.

15   A.    That's correct.

16   Q.    And so the three items that Sky One -- let me

17   ask you this:  So Sky One was alleging that you, quote,

18   "did not comply with three items."

19           Is that correct?

20   A.    That's correct.

21   Q.    And you were writing a, quote, "professional

22   rebuttal."

23           Is that correct?

24   A.    That's correct.

25   Q.    And what were the three items that, as of

1   August 20, 2017, Sky One had alleged that you did not

2   comply with?

3       A.   1, 2, and 3.

4       Q.   And if I could just look at 1, can you describe

5   the nature of the medical compliance issue that Sky One

6   was alleging you did not comply with?

7       A.   Well, clarify this:  At American Airlines,

8   American has a -- hold on a minute --

9           MR. AMLONG:  Read the question back.  He's just

10      asking --

11          THE WITNESS:  Okay.  You asked me the question.

12          THE REPORTER:  Did you --

13  BY MR. MORALES:

14      Q.   What was the medical item that Sky One had

15  alleged you did not comply with?

16      A.   They said that I didn't present my medical

17  certificate to them on the 20th of July.

18      Q.   And what was that not in compliance with?

19      A.   Sky One requires pilots to obtain their FAA

20  first class medical and report that to the chief pilot by

21  the 20th of the month.  And in this case I reported to the

22  chief pilot that "Hey, I'm going to do my medical on the

23  day it's due."  I did that via -- did that via text

24  message.  And then, I later followed it up to the company

25  on that date.  When I got my medical, I took a picture of

1    it and I sent it to him via e-mail.

2        Q.    So on the date that your medical was due, your

3    assertion is that you sent them a text message showing

4    that you had received your medical?

5        A.    Mm-hmm.  That's correct.

6        Q.    And a month later, it looks like you say,

7    quote, "You later informed me that you could not return me

8    to my salaried position until approximately 21 August

9    2017," unquote.

10            Am I correct that Sky One was not satisfied

11    with the text message you had sent on July 20th with your

12    medical?

13       A.    No.  I think you're -- I think you're reading

14    into that.

15            What occurred with Sky One was I called them.

16    I let them know I was duly qualified.  Again, I had my

17    medical.  "Hey, my sprain/strain injury is over with, it's

18    done."

19            And Rodney Beeler informed me, "Hey, listen,

20    you know, I built the schedule and I kind of had to

21    proceed without you on the schedule.  So I'm -- I'm going

22    to build a schedule for you on August 21st of 2017."

23            That was -- that was the course of

24    conversation.

25       Q.    So what was it that they were alleging you

1    didn't comply with, then?  Because what you just described

2    sounds like it was just a clerical issue with setting the

3    schedule.

4         A.    It was a clerical issue with setting the

5    schedule.  I -- I notified --

6         Q.    So you -- if I could ask you then, when you say

7    "You allege that I did not comply with three items," what

8    is the medical item that you were professionally rebutting

9    there that they said you didn't comply with?

10        A.    Well, as I said, on the 18th of July, "I

11   informed you I was released by physician back to work.

12   You requested a doctor's note to be sent to Allie and

13   replied, 'Wonderful.  Perfect.'"

14             Okay.  So there -- there's a conversation that

15   I'm having with my chief pilot via text message and the

16   chief pilot is responding to me.  And, basically, what I'm

17   saying to him is "Hey, listen, you're saying that --

18   you're saying that I did not comply by sending you my

19   medical on the 20th of July.  I'm telling you that I did

20   send you my medical on the 20th of July."

21        Q.    Did you ever return to flying with Sky One

22   after this --

23        A.    I did.

24        Q.    -- e-mail was sent?  You did?

25        A.    I did.

1      Q.    At what -- at what time did you return to

2  flying?

3      A.    I recall that there was a -- they left me on

4  call for quite some time with Sky One.  And I'm not sure

5  about the sequence of the events, but I did fly a trip or

6  two with them after -- after this.  As a matter of fact,

7  the day -- the day that they issued the letter, 10 August

8  of 2017, I was given that letter in the office on the way

9  to a trip.

10      Q.    So the e-mail that we're looking at, Exhibit 7

11  here, is from August 20, 2017, it looks like; is that

12  correct?

13      A.    That's right.

14      Q.    Did you ever fly for Sky One after August 20,

15  2017?

16      A.    No.

17      Q.    Okay.  Comply 365 is Item 2 there.  Can you

18  just briefly describe what the compliance issue was with

19  Comply 365?

20      A.    Comply 6 -- 365 is a program that

21  American Airlines uses.  And they push -- they push items

22  to the pilots through Comply 365 which requires me just to

23  basically open the program, tap a button and it

24  automatically downloads all of the manuals and things for

25  a particular flight .

1        And my assertion to Mr. Beeler was that, before

2   taking the flight, when you gave me this memo, I updated

3   my iPad before flying any revenue flights with the

4   company, which is required.

5        Q.    What about Item 3, e-mails --

6        A.    Well, what I --

7        Q.    -- what was the compliance issue with e-mails?

8        A.    Well, this goes back to my discussion of the

9   read file.  When I went to work for Privaira, I had a

10  number of issues with getting e-mails set up and being

11  able to read e-mails --

12       Q.    I'm sorry, Privaira?

13       A.    Privaira is Sky One.

14       Q.    Okay.

15       A.    Okay.  The terms are used synonymous.  Privaira

16  is Sky One Holdings, Limited Liability Corporation, doing

17  business as Privaira.  Okay.

18            When I went to work for Privaira, I had a

19  number of issues trying to get my e-mail to activate,

20  trying to get my e-mail to work.  I went back and forth

21  with the training manager over that.  So this was

22  constantly a problem.  The only way that I could get

23  access to my e-mail through Privaira was to do it through

24  the company-issued iPad.  But I noticed that other

25  employees, they didn't have the same issues.  They asked

1    me, "Hey, how come you can't log on from your desktop at

2    home?"

3              And I said, "I would love to."  But, you know

4    what, I kept going back to Rodney Beeler and asking him

5    "Hey, I've got to get this fixed.  Can you have your IT

6    people set me up here so I can look at my company e-mails

7    from -- when I'm not working."

8        Q.    What was the item that they were alleging you

9    did not comply with?

10       A.    You remember the diaper read file and the

11   snacks read file?  That's what they're alleging that I did

12   not comply with.

13       Q.    If you would look at Item 5 on this e-mail, it

14   says, and I'm quoting, "I have worked in a number of

15   professional settings and managed personnel during my time

16   as a commander on active duty.  Relationships are built on

17   trust and integrity.  The corrective action form coming on

18   the heels of my absence is highly suspicious and, in light

19   of the irrefutable facts presented, gives me great pause,"

20   unquote.

21             Can you explain what you were referring to in

22   that last sentence?

23       A.    I sure can.

24             On one occasion when I worked for Sky One,

25   there was a presidential TFR that existed over the

1    Boca Raton airport.  It was for --

2        Q.    TFR?

3        A.    Temporary flight restrictions.

4        Q.    Thank you.

5        A.    After 9/11, the FAA determined that when the

6    President of the United States, the Vice President, or any

7    VIPs visit certain areas, such as when President Obama

8    visited Miami, they would throw up a big no-fly zone for

9    30 nautical miles around the airport.

10            On one occasion, and I -- I'm not -- I don't

11   remember the specific date, but it was in April of 2017,

12   Privaira had an aircraft that was in maintenance on this

13   particular day.  It had just come out of a very heavy

14   maintenance and inspection period where they basically

15   tear the airplane down and now they put it back together.

16            When they put the airplane back together, the

17   FAA says you've got to go get somebody -- i.e., Captain

18   Patterson and another pilot -- to go fly this airplane and

19   certify that it's safe to put this airplane back on the

20   line in revenue service.

21            So they contacted me, I think it was the day

22   before.  I went in and did due diligence and I looked and,

23   of course, one of my flight planning issues is, is I

24   looked on the iPad and I'm planning this flight, how I'm

25   going to conduct this flight to return this airplane to

1  service.

2          I spoke with the co-pilot, who was also a

3  captain, and said "Hey, look, I've asked maintenance for

4  what they did to the airplane and they did work on the

5  pressurization system.  So, I think, as a minimum, we need

6  to fly the thing to altitude and check the pressurization

7  system out.  If they worked on it, we need to -- we need

8  to verify it."

9          In my due diligence, I saw a big red circle

10  around the Palm Beach airport on an aviation map, which is

11  input by the FAA and it's interactive.  The red circle

12  means there's a temporary flight restriction, obviously

13  due to President Trump being at Mar-a -- Mar-a-Lago.

14          I started reading the textual description of

15  the TFR and, down at the bottom of the textual

16  description, it said clearly:  Thou shalt not fly an

17  airplane doing sightseeing, maintenance check, etc., etc.,

18  etc.

19          I mean, it was very specific about these

20  aircraft will not enter the TFR under these circumstances.

21          I then conveyed that information to

22  Mr. Robinson, which I refer to in Paragraph 4.  And I

23  said, "Mark, I'm very concerned.  Because there's a TFR

24  and the FAA says thou shalt not fly."

25          Mark said to me, "Well, listen.  All we want

1  you to do is take the airplane and fly it around the

2  pattern and put it back on the line."

3          And I said, "Mark, I can't do that.  I'm not

4  going to -- I'm not just going to just sign that off.

5  That's irresponsible."

6          "Well, I called the TSA in Washington, D.C.,

7  and -- and they said you could do it."

8          That immediately perked my interest.  The TSA

9  is not the controlling agency for a TFR.  It's the FAA,

10  they're the ones that publish the TFR.  So if you're going

11  to get permission you get it from them.

12          Now where I'm going with all of this is, is

13  Sky One asked me to conduct a flight which appeared at the

14  time to be contrary to FAA regulations.  I do know this,

15  that for pilots that violate that, they've been forced

16  down at gunpoint and they've been arrested.  And I

17  certainly don't want to be on the receiving end of that.

18          So I conveyed that to Mark Robinson, that we

19  had a problem.  Mark was intent that he had talked with

20  someone at the FAA -- or, excuse me -- the TSA.  And I

21  asked him, "Can you tell me who you talked with at the

22  TSA?  I'd like a telephone number that you called and the

23  initials of the person you spoke with, along with the

24  time."  Okay.  Because that's usually how the federal

25  government communicates a telephonic conversation.

1          Mark couldn't provide me that.  So at that

2     point, I'm now highly suspicious that I need to just

3     decline the flight altogether.  I went and I telephoned an

4     individual that is an AOPA attorney.

5          Q.    Is this getting to "the heels of my absence"?

6          A.    Well, this -- this gets to the heels of the

7     absence.  The bottom line is I talked to an

8     FAA-experienced attorney and he said "Look, you can fly

9     the airplane from point to point -- i.e., you can take off

10    and fly the airplane to Fort Myers and fly the airplane

11    back -- you can do your checks on the way and you're not

12    illegal.  However, do not take off and fly the airplane

13    like Privaira wants you to.  You're going to -- you're

14    going to be in violation of the TFR."

15          So on the heels of all this, that same day I

16    had a conversation with Mr. Beeler on the ramp and I

17    advised Mr. Beeler that I felt this was not an appropriate

18    act.  Mr. Beeler advised me that if I didn't take the

19    flight he was, you know, I was going to run afoul of

20    Privaira.  So I advised him "Look, if you want to take the

21    flight, you're a qualified Beech captain, I'd certainly

22    invite you to fly it in my absence.  I mean, I have no

23    problem letting you fly it."

24          So how we resolved the situation that day, and

25    this follows on the -- this follows on that giving me

1    great pause is, you know, we ended up taking the flight,

2    but did -- and I did report that to the FAA as a "Hey,

3    look, this -- this occurred and I want to make sure that,

4    you know, there's not a violation substantiated as a

5    result of it."  So I felt -- and this was --

6         Q.    And you took an absence because of that?

7         A.    No, did not take an absence from that.

8         Q.    So what is -- it says "The corrective action

9    form coming on the heels of my absence is highly

10   suspicious"?

11        A.    Well, what I felt the corrective action form

12   was is the corrective action form, I felt, was --

13        Q.    I'm asking what the absence was that the --

14        A.    I've already explained it to you.

15        Q.    So the absence that you were referring to here

16   was what?

17        A.    The absence -- I told you I was out for a

18   sprain/strain for about three weeks.

19        Q.    So the absence -- this sentence, then, is all

20   about the sprain/strain?

21        A.    It is.

22        Q.    Okay.  I think that's it.

23        A.    And my-- my -- my --

24        Q.    I'd like to ask you about -- I'm going to

25   hand -- hand you what should be marked as Exhibit 8 in

1  here.

2          MS. AMLONG:  I think we have an Exhibit 8.

3          MR. MORALES:  Yes, but he doesn't.

4              (Exhibit 8, Sky One List of Compliance

5          Issues, was marked for Identification.)

6  BY MR. MORALES:

7      Q.    And I'd just ask you if you've seen that

8  document before.

9      A.    I've read that.

10     Q.    Okay.  And is this -- would it be fair to

11 describe this as the Sky One list of compliance issues

12 that were referred to in Exhibit 7?

13     A.    It is.

14     Q.    And so Exhibit 8, for example, appears to

15 list --

16          MR. AMLONG:  I'm sorry.  What -- what date is

17      Exhibit 8 and what date is Exhibit 7?

18          MR. MORALES:  Yeah, so -- so Exhibit 8 is a Sky

19      -- the Bates number is Sky One-0000014 and it's an

20      e-mail from Rodney Beeler to Johnny Devlin and Allie

21      Ross --

22          MR. AMLONG:  Okay.

23          MR. MORALES:  -- dated July 23, 2017.  Do you

24      have a copy of that?

25          MR. AMLONG:  Yes.

1          MR. MORALES:  Okay.

2     BY MR. MORALES:

3          Q.    And, Colonel Patterson, it looks like the first

4     sentence here, it says "Good morning."  And then it says

5     "Scott Patterson has not or did not comply with the

6     following items."  And then it appears that the three

7     headers are "Flight Medical, Comply 365, and E-Mails."

8               Would you agree with that?

9          A.    Mm-hmm.  I do.

10         Q.    So is it fair to say that, in item seven --

11    Exhibit 7, when you note three items that you did not

12    comply with, or were alleged not to comply with, that

13    you're essentially cross-referencing these three items

14    from Exhibit 8?

15         A.    That's correct.

16         Q.    Okay.  Take a look at Page 2.  And this is

17    Mr. Beeler -- Beeler writing this e-mail; is that correct?

18         A.    Yep.

19         Q.    And what was his role at Sky One?

20         A.    Chief pilot.

21         Q.    If you look at the top paragraph on Page 2, it

22    says, quote, "In the end, I believe this is a focus

23    problem.  I've heard the commitments outside of work are

24    affected because he commits to many different things and

25    forgets to do them.  I've had very little problems with

1    him in the airplane.  Those problems that I had were

2    addressed and fixed on the spot.  And he does focus on the

3    task at hand.  He's as good as any pilot we have," end

4    quote.

5             Do you understand that paragraph to be

6    referring to you?

7        A.    I do.

8        Q.    Did Mr. Beeler ever communicate sentiments in

9    that paragraph to you, directly?

10       A.    No, he did not.

11       Q.    Did Mr. Beeler ever communicate to you a focus

12   problem, as he refers to it?

13       A.    No, he did not.

14       Q.    Did he ever compliment you on your command of

15   the aircraft, as he refers to it in this paragraph?

16       A.    Well, I would say he signed off on my

17   certifications to fly the aircraft.

18       Q.    But the sentiments expressed in this paragraph

19   that starts "In the end, I believe" were not communicated

20   to you directly by Mr. Beeler?

21       A.    They were not.

22       Q.    Were they communicated directly to you by

23   anyone else at Sky One during your tenure?

24       A.    No, they were not.

25       Q.    And if you look at the last paragraph there, it

1  says "If we do have to bring him back, I'm recommending

2  that we do not renew his training.  His training is due in

3  December, but he started in November and that is when I

4  recommend we exercise our option to not renew his

5  training."

6          Do you understand that paragraph to be

7  referring to you?

8      A.    Well, obviously, the -- the memo says "Scott

9  Patterson" on it.

10     Q.    And did Sky One communicate to you that they

11  were not renewing your training?

12     A.    No, they never did.

13     Q.    When was your last flight for Sky One?

14     A.    I don't recall.  It would have been in the

15  August time frame.

16          MR. MORALES:  If you could mark this as

17       Exhibit 9, please.

18              (Exhibit 9, E-mail, September 1, 2017, was

19          marked for Identification.)

20  BY MR. MORALES:

21     Q.    If you could take a quick look at this and I'd

22  ask -- it appears to be an e-mail that the From line is

23  Rodney Beeler, and it appears to be forwarding an e-mail

24  from Rodney Beeler to you on September 1, 2017.

25          Would you agree with that?

1      A.      It is.

2      Q.      Okay.  And it looks like the e-mail chain

3  includes an e-mail from you to Johnny Devlin on August 31,

4  2017; is that correct?

5      A.      That's correct.

6      Q.      Subject line, res- -- Subject, Resignation.

7              Is that correct?

8      A.      That is correct.

9      Q.      Did you write this e-mail?

10     A.      I did.

11     Q.      It says [as read]:  Due to unforeseen

12  circumstances, I regrettably must inform you that I'm

13  tendering my resignation.

14              Did you write that?

15     A.      I did.

16     Q.      And did this e-mail, in fact, resign your

17  tenure at Sky One?

18     A.      I had sent several e-mails prior to that

19  resigning my tenure.  And, unknown to me, Johnny Devlin

20  had been terminated from the company and was not getting

21  the e-mails.

22     Q.      And what were the unforeseen circumstances that

23  you refer to in your e-mail?

24     A.      I got a job with 21 AIR.

25     Q.      In your time at 21 AIR or Sky One, did you ever

1    take military leave?

2        A.    I have not.

3        Q.    Did Sky One provide an opportunity for pilots

4    to take military leave?

5        A.    21 AIR would -- excuse me.  Are you saying

6    21 AIR or Sky One?

7        Q.    Sky One, first.

8        A.    Sky One.

9        Q.    Yeah.

10       A.    Sky One would adjust your schedule for you

11   if -- if you had a -- if you had a military obligation or

12   you had an obligation that required time to be off.

13              But, usually, what I've endeavored to do is to

14   try to -- is to try to do like I've done in the

15   deposition, schedule my days off so I can be here.

16   Sometimes that doesn't happen with the military.  I mean.

17       Q.    So did you ever perform military duties

18   while --

19       A.    I don't --

20       Q.    -- you were employed with Sky One?

21       A.    I don't recall.

22       Q.    You don't -- you don't recall whether you

23   performed any active or inactive duty training?

24       A.    I -- I was -- I retired last June, from the

25   military, so I officially retired.  However, I'm still in

1  what's called the "Individual Ready Reserve" so I'm

2  subject to recall.

3      Q.    Is it accurate that you don't have the same

4  sort of reserve obligations from June 2017 forward as you

5  did prior to that?

6      A.    Well, that would be a correct statement, yes.

7      Q.    And you said you still serve in the

8  individual -- what was it called -- ready to reserve?

9      A.    Until I turn 65, I will be in the IRR, in the

10 Individual Ready Reserve.  And that's a requirement for

11 all military members.  And, as I said, I'm subject to

12 recall to active duty for the needs of the country.

13     Q.    Did Sky One have any military leave policies in

14 place?

15     A.    Not that I'm aware of.  I -- I'm -- I never saw

16 one.

17     Q.    What about at 21 AIR?  Have you performed any

18 military service?

19     A.    Well, I retired, so no.

20     Q.    Okay.  And does 21 AIR have any military leave

21 policies in place?

22     A.    I have not seen one.

23     Q.    At either Sky One or 21 AIR, when you are

24 assigned a trip, do you receive any electronic

25 confirmation of the trip?

1          MR. AMLONG:  Objection.  Compound.

2   BY MR. MORALES:

3     Q.    Does 21 AIR provide an electronic confirmation

4   of an assigned trip?

5     A.    Usually, the day before, I get an e-mail that

6   says -- gives me a crew position and a city pair and a

7   departure time.

8     Q.    And that's for each trip at 21 AIR?

9     A.    They will do that for the beginning of each

10  trip, that's correct.

11    Q.    Did Sky One have a similar confirmation

12  process?

13    A.    No.  It was a telephone call.  And I do

14  recall -- it's been a while, but I do recall, in some

15  cases they -- they would list -- they would list charters.

16  But, in many cases, they wouldn't assign a pilot to it

17  until the last minute due to duty or whatever.  So we

18  could see a trip was out there, and you may get a notice,

19  you may not.  They may not assign a flight crew to it.

20    Q.    One last question:  You had mentioned, for

21  Sky One, that you had raised a complaint regarding the

22  controlled air space flight with the FAA; is that correct?

23    A.    I did.

24    Q.    And what was the result of that complaint?

25    A.    I basically reported that using a NASA safety

1  form.  And that goes to the -- that goes to NASA and it's

2  similar to an ASAT program at American Airlines, that we

3  use.  And after I report that, it's deidentified as to --

4  as to who sent the report and the location, once -- once a

5  NASA analyst looks at it.

6          They then forward that to, you know, the

7  appropriate agencies within the US government for either

8  corrective action or whatever.  However, what it does for

9  me is, in the event, you know, we didn't act with what

10  we -- you know, we didn't act intentionally to violate the

11  regulations, which is a -- which is a problem.  So I

12  consulted with an attorney and he said you can take off

13  and fly from point to point, but you can't fly -- you --

14  you can't take off and fly around the pattern as -- as

15  Privaira is suggesting you do.

16     Q.    And in your view, was the filing of that

17  complaint at all related to the end of your tenure at

18  Sky One?

19     A.    The filing of the complaint was not related to

20  my tenure.  However, as a professional pilot, I want to

21  comply with the FARs.  That's -- that's my sole goal.  And

22  when a company asks me to do things that are clearly

23  not -- not legitimate or -- or they're -- they -- they run

24  a fine line of being, you know, could potentially be over

25  the line, that says something to me about a company.

1          And as I said before, going to work for 21 AIR

2    was kind of like going back home.  It's a 121 air carrier.

3    They -- they fly 767.  They fly cargo.  Yeah, the hours

4    are hard, but, you know, it's a -- it's an aviation job

5    and it's flying as a captain.

6          MR. MORALES:  Okay.  I think we can go off the

7       record.

8          THE VIDEOGRAPHER:  Going off the record.  The

9       time is 12:44.

10              (Thereupon, a recess was taken.)

11          THE VIDEOGRAPHER:  All right.  We are now back

12       on the record.  The time is 2:07.

13   BY MR. MORALES:

14       Q.    Good afternoon, Colonel Patterson.

15       A.    Good afternoon, sir.

16       Q.    Prior to your time flying at Sky One, were you

17   flying at American Airlines?

18       A.    I was.

19       Q.    Any -- any flying in between American and

20   Sky One?  Or was American the immediate preceding carrier?

21       A.    Okay.  You're saying was American immediately

22   preceding Sky One?

23       Q.    Yeah.  Correct.

24       A.    Well, wait a minute.  I flew for American

25   first.

1    Q.    Correct.  So -- sorry.

2         When you started at Sky One, the last air

3    carrier you had flown for was American Airlines; is that

4    correct?

5    A.    That's correct.

6    Q.    Okay.  And if you could just briefly describe

7    your employment history at American in terms of when you

8    started and positions that you flew during the relevant

9    time period at American.

10   A.    Well, I started June the 19th of 2000 with

11   American Airlines.  And I initially applied January 4th of

12   2000 and I was hired on June 19th.  I went to -- first

13   assignment with American was as a flight engineer on the

14   727.  I don't think we really got a choice.  That was just

15   by age and seniority position.

16        Shortly after -- after completing the 727

17   flight engineer, I stayed in that position for, I think it

18   was, 18 months I was as a flight engineer.  At the time,

19   the 727 was going -- was decreasing, the flying was

20   eventually going to go away.  So I bid for a position as a

21   first officer on the 737.  I did that position until about

22   2004.  We had the mother of all bids when, after 9/11,

23   American announced to the world that they were going to

24   reduce all the flying and reassign everybody and basically

25   turn the company upside down and, of course, eventually, I

1  would be furloughed.

2          At the time, that was about May of 2004.  My

3  daughter was being born, so that really kind of set our

4  family upside down and on an end because my wife was

5  imminently going to deliver our child and here American is

6  telling me "You're not going to be in Miami anymore.  Now

7  you've got to travel to New York."

8          In October of 2004, I was officially furloughed

9  with American Airlines.  And they flowed us back to

10 American Eagle at the time.  I had a captain's job at

11 American Eagle.  And during my time at American Eagle, I

12 was offered a full-time position with the Army.  And so I

13 accepted that full-time position with the Army and went on

14 active duty.

15         I returned in about, I would say it was about

16 2008 time frame, I returned to American Airlines -- 2007

17 or 2008, I'm not exactly sure of the date.  But I returned

18 to American Airlines and I was given a -- I was assigned

19 as a first officer again on the 737, got a type rating on

20 the aircraft.  And then, in about the 20 -- it was about

21 the 2010 time frame, 20 -- I think it was a little later,

22 2011, I went to the 757 and became a first officer on the

23 757, 767.

24     Q.    And you were in that position as a first

25 officer on the 757 through 2016 or 2015; is that correct?

1    A.    September of 2015.

2    Q.    And at that time, you were 757 first officer?

3    A.    That's correct.

4    Q.    Okay.  And you were based in Miami?

5    A.    Based in Miami.

6    Q.    Okay.  You mentioned an active duty position

7    with the Army.  Was that shortly after your furlough?  I

8    know you'd mentioned some time flying at Eagle as well.

9    A.    Well I didn't fly for Eagle.  Eagle put us in a

10   holding pattern because they couldn't train us.  So, you

11   know, but after that, I went on active duty with the

12   military.  So I never went to training with American

13   Eagle, except for ground school.

14   Q.    Okay.  And what was the active duty position

15   with the Army?

16   A.    I was a counter drug programs and resources

17   manager for the Army.  In other words, I had an

18   $80 million counter drug budget that I was responsible for

19   managing.

20   Q.    And where were you based at that time?

21   A.    In Miami.

22   Q.    At a base in Miami?

23   A.    No.  At United States Southern Command.

24   Q.    And what was the nature of your job

25   responsibilities in that position?

1      A.    Basically, I was responsible for the planning

2   and execution of the various projects that the United

3   States government does to combat illicit trafficking of

4   drugs.

5      Q.    And was that focussed domestically or

6   internationally?

7      A.    It's all international.

8      Q.    And you were in that position about three to

9   four years; is that correct?

10      A.    It was about four years.

11      Q.    Okay.  Were you part of the armed forces prior

12   to this active duty position with the Army?

13      A.    Of course I was.

14      Q.    In what capacity?

15      A.    I was a commissioned officer in the Army

16   Reserve.

17      Q.    Okay.  And when did your time in the armed

18   forces first begin?

19      A.    I went to basic training in 1987, shortly after

20   graduating from high school.

21      Q.    Okay.  And what branch of the --

22      A.    United States Army.

23      Q.    United States Army.

24            Where did you do your basic training?

25      A.    Fort Knox, Kentucky.

1    Q.   And after basic training, did you -- were you

2  active duty?

3    A.   No.  I went -- after -- after I went through my

4  basic, I received an Army ROTC scholarship.  And so I

5  immediately went to college and enrolled in Army ROTC.

6    Q.   And do you recall about when that would have

7  been?

8    A.   It would have been after 1987.  That's when I

9  initially went to -- went into the military.

10    Q.   And then, did you graduate from that ROTC

11  program?

12    A.   Of course I did.

13    Q.   And when was that?

14    A.   It would have been in 1989.

15    Q.   Okay.  And did you begin employment then?

16    A.   When you say did I begin employment?

17    Q.   Did you -- did you start a position with an

18  employer in 1989?

19    A.   No.  I had not yet graduated from college and

20  the Army had a program where they recognize exemplary

21  officers that have completed ROTC and they allow you to be

22  commissioned a year early.  So I was in college with

23  second lieutenant bars on.

24    Q.   And then did you graduate from college?

25    A.   Of course I did.

1     Q.    And when was that?

2     A.    1990.

3     Q.    And where did you go from there, in terms of

4  your career?

5     A.    My first job, I was a police officer.

6     Q.    Where was that?

7     A.    In North Carolina.

8     Q.    Where in North Carolina?

9     A.    Mecklenburg County.

10    Q.    Okay.  And that position started in 1990, you

11  said?

12    A.    It did.

13    Q.    Okay.  And what was your job responsibility as

14  a police officer?

15    A.    I, basically, you know, did criminal

16  investigations.  I did street drug interdiction, worked --

17  worked on the street, you know, taking drug dealers out of

18  the neighborhoods.  I did a lot of DUI traffic

19  enforcement.

20    Q.    And how long did you remain in that position?

21    A.    I did that for about three years.

22    Q.    And where did you go after that?

23    A.    Well, my goal coming out of college had always

24  been to be a pilot.  And so I got an opportunity coming

25  out of the police department to -- I basically got a

1   scholarship to go and pursue an education as a commercial
2   pilot.  So I took that opportunity.
3          And then, while working that opportunity -- you
4   know, the police department is not conducive to being a
5   professional pilot, just due to the hours and different
6   circumstances.  So I took a job with an advertising
7   company that would allow me to, you know, have the time
8   off I needed to go become a professional pilot.  And I
9   worked my way up and got my ratings and my tickets.  And
10  then, after I went to the school, I went back to a local
11  airport and I, you know, paid my dues and I did flight
12  instruction.
13     Q.    And was the position in 2000 at American the
14  first employment position as a pilot?
15     A.    No, it was not.
16     Q.    Was there anything between flight instruction
17  and that position?
18     A.    Yes, there was.
19     Q.    And what was that?
20     A.    It was with Mesa Airlines.
21     Q.    And when did you start with Mesa?
22     A.    In 1997.
23     Q.    Okay.  Were you based in Phoenix with Mesa?
24     A.    No, I was not.
25     Q.    Where were you based?

1      A.     I was based everywhere.  I mean I was literally

2   based everywhere they had an airline.  I've flown out of

3   every domicile.  The nature of that business is it's an

4   animal.  It's not like American where you're based in

5   Miami.  I mean, they put you where they need you.

6      Q.     Okay.  And were you flying a particular

7   aircraft at Mesa?

8      A.     Yeah.  I flew the Beech 1900.

9      Q.     And were you in that position until you started

10  at American in 2000?

11     A.     I was.

12     Q.     At the time you started at American, were you

13  part of the Army Reserves?

14     A.     I was.

15     Q.     And in what capacity?

16     A.     Commissioned officer.

17     Q.     And you were -- said you were a second

18  lieutenant.  Were you a second lieutenant in 2000?

19     A.     Oh, no.

20     Q.     What position did you hold in 2000?

21     A.     I think I was a captain at the time.

22     Q.     And once you started at American, did you

23  continue to participate in reserve activities?

24     A.     Of course I did.

25     Q.     And what sorts of activities would you

1    typically participate in, in that role?

2        A.    I've done jobs such as basic training company

3    commander.  I was a combat support -- combat support

4    hospital executive officer.  I had a thousand-bed hospital

5    that I was basically responsible for managing.  I've done

6    public affairs or public relations for the military.

7        Q.    So taking the example of the hospital, how does

8    it work to balance managing a thousand-bed hospital and

9    being an active full-time pilot for American?

10       A.    Well, it's reserve assignment.  So, you know,

11   typically, jobs in the reserve -- the best way I like to

12   explain it, it's a full-time job.  So you're managing your

13   military career and you're managing your civilian career

14   at the same time.

15            The Army -- Army has certain expectations.  In

16   other words, if we get a -- if we get a mobilization or

17   call-out to active duty, at the time, we had 72 days to go

18   to theatre.  I've been in other units that gave you

19   72 hours to be in the theatre.  And that is a pretty

20   stressful -- that's a stressful job because you're

21   maintaining the same qualifications as the active duty

22   soldiers do.

23       Q.    When you were participating in something like

24   the thousand-bed hospital activities, how did you

25   communicate, typically, to American Airlines about those

1  reserve activities?

2      A.    Typically, USERRA requires you to provide

3  notice and it can either be verbal or written.  American

4  also has a requirement that, if -- if -- if you knew about

5  the drill ahead of time -- and at the time I was -- I was

6  on reserve with American.  So they would give you a

7  reserve block of days off and, usually, you would bid for

8  the days off for the time that you needed military duty.

9          Now subsequent to that, American changed that

10  policy and they said if you bid the days, you're stuck

11  with the days.  And if those military assignment changes,

12  we gave you those days off.  We'll move the days off, but

13  we are also not going to credit you for the days as we did

14  in the past.

15      Q.    When you say "credit you," what do you mean?

16      A.    Well, I'm -- it would -- if I told American

17  that I was a pilot on reserve, if I told American I needed

18  to be off, they would not schedule me to be on a reserve

19  assignment during those days.  And they offered -- they

20  offered one day of travel, two days for being on reserve

21  and one day of travel back home.  And that's where you get

22  your four days from.

23      Q.    And when you say they offered that, do you mean

24  for pay purposes?

25      A.    Well, they would take you -- they would

1   basically take you off your -- they would -- they would

2   not deduct the amount from your reserve guarantee for the

3   month.  So if my guarantee was 70 hours for the month --

4   I'm just using that as a notational figure -- if it was

5   70 hours per month and I told them I needed a specific

6   block of military days, then they would give me that time

7   off.  They would not deduct that from my reserve

8   guarantee.

9        Q.    And who would you communicate to about those

10  reserve activities?

11       A.    Typically, that's with the base planner.

12       Q.    And how long were you -- how long were you in a

13  reserve position at American?

14       A.    I don't recall.  I know -- I know I spent a --

15  I spent a good number of time on the 73 on reserve.  I sat

16  every piece of equipment I have been on, I've sat reserve.

17       Q.    Do you recall being on reserve status at the

18  time prior to your furlough, for example?

19       A.    Actually, I was on reserve in New York.

20       Q.    And then when you returned from furlough in the

21  2007/2008 period, was that also in a reserve capacity?

22       A.    I can't say specifically, but I do recall

23  that -- I do recall being on reserve after I came back

24  from furlough for quite a bit of time.

25       Q.    And at some point, did you move out of a

1    reserve position into an active full-time position?

2        A.    Well, at some point -- well, I think you say an

3    "active full-time position."  That's a misnomer.  Okay.

4    It's does your seniority allow you to hold the line.  And,

5    yes, at some point in time, my seniority did allow me to

6    hold the line.

7        Q.    And do you recall about what time frame that

8    seniority --

9        A.    I don't.

10       Q.    2008?  2011?

11       A.    I don't recall specifically the date.  And then

12   when I went to the 757, you fall back to the bottom of the

13   seniority list on that airplane.  So you're going to sit

14   reserve.

15       Q.    Were there differences in how you communicated

16   to American about your military reserve activity based on

17   whether you were on reserve status at American or not?

18       A.    What do you mean?

19       Q.    So at one point you were -- at various points,

20   you were on reserve status with American, correct?

21       A.    Mm-hmm.

22       Q.    And at various other points later in your

23   career, your seniority permitted you to move out of that

24   reserve status; is that correct?

25       A.    I don't think you can equate being on reserve

1    with American and being in the military with American.

2        Q.    I'm not equating them.

3             I'm just asking you:  Was there a point in your

4    career where, purely speaking about your seniority at

5    American, your seniority allowed you to move out of

6    reserve status?

7        A.    There was a time when my seniority did allow me

8    to bid a line.

9        Q.    Okay.  And is that the best way to -- to -- to

10   describe the alternative to reserve status, that there was

11   a point where your seniority allowed you to bid a line?

12       A.    Well, of course.  That's -- that's a fact of

13   life at American.  When your seniority allows you to move

14   up, you can go where you choose.

15       Q.    Okay.  And so, if you were to compare the time

16   at American where you were on reserve status and the time

17   where your seniority allowed you to bid a line, were there

18   differences in how you would communicate with American

19   about your military reserve activities during those two

20   different periods of time?

21       A.    Well, here again, you're asking me how we

22   communicate versus being on reserve or receiving the line.

23   It doesn't matter.  It's irrelevant.  When you're on --

24   whether you're on reserve or whether you have a line, you

25   still bid.  And, usually -- there are circumstances where

1    it can change -- usually, you can communicate to American

2    in advance, "Hey, my unit has planned for me to have

3    military days in a certain time frame."

4        Q.    When you were on reserve at American, were

5    there ever times that you were called to military duty and

6    you had already been scheduled a flight at American?

7        A.    There was a time when I was at American when I

8    was assigned to Southcom and there was a very large

9    earthquake down in Haiti and I got a -- basically, I

10   was -- I was at Southcom.  I was scheduled to fly at

11   American.  And I got walked into an office and said "We

12   need you to go to Haiti.  It's now 10:00 o'clock in the

13   morning and you need to be on a C-130 out of homestead at

14   1400."

15        Okay.  That -- that created a scramble.  First

16   thing I did is I picked up the phone and I called the

17   flight office in Miami and I said, "Hey, I'm just letting

18   you know I'm scheduled to fly and I'm also going to

19   Haiti."

20        They said, "Call us when you get back.  Call us

21   and let us know."

22        I said, "I've no idea how long I'm going for.

23   I've to go home, pack, just pull my ready bag out of the

24   closet and I'm going to go get on an airplane."

25        Q.    And just for the record, you made a gesture, a

1  salute gesture, when you said "They said, 'Call us.'"

2          Does that indicate that they were approving and

3  supportive of your --

4      A.    Salute and move out.  Yeah, we are going to

5  approve you to go to duty.

6      Q.    And do you recall about how long you were out

7  of service with American during that set of reserve

8  activities?

9      A.    It was about -- it was approximately a month.

10  And I recall going to Haiti and I communicated with the

11  chief pilot at the time.  As a matter of fact,

12  American Airlines management was very concerned about the

13  employees in Haiti, one.  They were very concerned about

14  the ticket counter in Haiti and they were looking for an

15  employee to go down there and say "What does our situation

16  look like?"

17          So as a result of me being in Haiti, I told the

18  boss, I said, "Look, the ticket counter is completely

19  destroyed.  Here are the issues."  That then perpetuated

20  American management to come over in an -- I remember it

21  was ATR 72 -- they flew over in there, and I met them on

22  the ramp.  And I shared with them, you know, what we had

23  found and what we had done.

24          And I said, "Listen, we're -- we're taking care

25  of the American employees.  I've reached out to everybody

1   we can reach out to."  There were several employees, one

2   employee in particular didn't have a house.  Her house had

3   been destroyed.  So the chief pilot and I walked over into

4   a facility where they had tents stored and basically gave

5   her a tent to live in.  I mean, Haiti was a bad situation.

6   But you know, I felt -- I felt compelled and I felt a duty

7   to try to help American out because it, you know, that

8   Haitian operation, it really upset a lot of things.

9        Q.    And do you recall about what time period

10  that --

11       A.    It was 2010 --

12       Q.    2010.

13       A.    -- right after Christmas.

14       Q.    Had there been other time periods, I guess, in

15  the 2000 to 2010 time period where you were similarly

16  directed by the Army to appear for a set of military

17  reserve activities?

18       A.    I got a lot of opportunities to, you know,

19  travel for the military.  I mean, that was -- that was the

20  nature of the business.  When you're a planner, you've got

21  to go to where the -- you've got to go to where the action

22  is at.

23       Q.    And about -- about how often would those

24  directives from the Army come in, between 2000 and 2010,

25  directing you to report to a particular location within

1  48 hours?

2     A.    It depends.  It -- it's based on the needs of

3  the Army.  And I don't -- I don't set that or drive that

4  train.

5     Q.    But during that ten-year period, did that

6  happen five times, ten times?

7     A.    Well, Haiti, like I said, was the big -- Haiti

8  was the big event that I got directed to go to.

9     Q.    Were there -- were there other occasions where

10 the Army called you and said "We need you to be in X

11 location in 48 hours," during that 2010 to 2000 -- or 2000

12 to 2010 period?

13    A.    I don't recall, specifically, like within

14 48 hours.  I know Haiti sticks out in my mind as being the

15 real big -- the real big event.

16    Q.    What about any occasion after Haiti where the

17 Army called and said "We need you to be in X location

18 within, you know, 48 hours"?

19    A.    I've had other -- I've -- I've had other

20 occasions.  When they had the tsunami in the Philippines.

21 Because I went in -- went into a 72-hour notice period

22 with -- I was in a special unit that was assigned to the

23 joint staff.  And, of course, they're the first responders

24 in the military.  So, you know, there, I had to maintain

25 my qualifications to walk out the door in 72 hours.

1     Q.    And did you have flights scheduled with

2  American at the time?

3     A.    I don't recall.

4     Q.    Were you an active American pilot at the time?

5     A.    Pretty much from 2010, yeah, I've been -- I

6  have been an active pilot since, you know, 2000 with

7  American except for furloughed.

8     Q.    And you received the directive to go to the

9  Philippines; is that correct?

10     A.    That's correct.

11     Q.    Within 72 hours?

12     A.    Mm-hmm.

13     Q.    So did you communicate to American that you

14  were deploying to the Philippines?

15     A.    If I had a -- if I had problem that interfered

16  with my work, certainly.

17     Q.    And do you recall whether American approved

18  your request, denied your request?

19     A.    I can say, except for one occasion, I've never

20  been denied military leave with American.  It's been a

21  phone call to the flight office, which is required under

22  USERRA.  It says a verbal or a -- or an oral notice.

23     Q.    And you referenced one occasion where you were

24  denied?

25     A.    That's correct.

1      Q.     Is that the occasion that's the subject of your

2   lawsuit here?

3      A.     That is exactly correct.

4      Q.     You referenced the notice procedures.  Just for

5   the record, you referenced USERRA.  What is that a

6   reference to?

7      A.     Uniform Service Employment Reemployment Rights

8   Act.

9      Q.     And you reference some provisions of USERRA.

10   Does American Airlines also have procedures that address

11   the subject of military leave?

12      A.     American Airlines does have procedures that

13   address military leave.  And I -- I'm pretty sure that the

14   procedures are in accordance with federal law.

15      Q.     Certainly.  And -- but there are provisions

16   that American also sets out for -- for guidance for the

17   company's policies, for guidance for employees regarding

18   the subject of military leave --

19      A.     That's correct.

20      Q.     -- is that correct?

21      A.     And, as I said, American's policies don't

22   override federal law, which I think you agree with.

23      Q.     Certainly.  Did you have an opportunity to

24   become familiar with American's policies and procedures

25   regarding military leave during your time at American?

1    A.    Of course I did.

2    Q.    And where did you -- where did you look to find

3    those policies and procedures?

4    A.    The Allied Pilots Association publishes those

5    on their webpage.  And the -- I've participated with the

6    military affairs committee with the union.  And, in doing

7    so, we have -- we've held a number of conferences with

8    different airlines and we've discussed those airlines'

9    application of USERRA and some different issues with

10   USERRA and compliance.

11   Q.    What -- you mentioned the mili- -- the military

12   affairs committee; is that correct?

13   A.    That's correct.

14   Q.    What time period were you involved with that

15   committee?

16   A.    I'm still involved with it.

17   Q.    And in what capacity are you involved?

18   A.    I'm on the national military affairs committee

19   with the Allied Pilots Association.

20   Q.    And that committee is a committee of the Allied

21   Pilots Association --

22   A.    That's correct.

23   Q.    -- is that correct?

24         And what are your -- what are your

25   responsibilities as a committee member?

1      A.    Basically, we advise the president of the

2   Allied Pilots Association and the board members about

3   issues that impact the pilots of American Airlines and

4   impact American Airlines.  We address compliance with

5   USERRA.  We address the -- we address certain issues

6   that -- that come up from time to time.

7           For example, in the past I've been -- I've been

8   asked to provide input or information to a pilot that

9   American chose to do a Section 21 hearing on in Miami.  I

10  spoke to the chief pilot about his case and I said, "Hey,

11  listen, I'm just going to give you the -- I'm going to

12  give you the 20,000-foot view.  We have a problem with

13  USERRA and the application of it."

14          Chief pilot's reply to me was is, "Hey, listen,

15  I -- I just -- I want to kind of scare the guy."

16          And I said, "Well, you know, if you want to

17  scare the guy, that's not really the right way to do it.

18  Why don't we call him into the office and I'll be happy to

19  talk with him about the application of USERRA and certain

20  things."

21          Obviously, if you have a concern about

22  someone's military duty, then there needs to be an open

23  dialogue, not retaliation.

24      Q.    And what time period was this?

25      A.    I don't recall.  It was back in -- it would

1  have been back in 2010, maybe 2012 time frame.

2      Q.    And who was the chief pilot at the time?

3      A.    It was Robert Raleigh.

4      Q.    And this was in Miami?

5      A.    This was in Miami.

6      Q.    And who was the pilot at issue?

7      A.    I don't recall the pilot's name.  But the --

8  it -- it was a big issue.  And I know that -- that it went

9  to a Section 21 hearing and the pilot -- it -- it turned

10  out to be nothing.

11      Q.    And what was the military leave issue in

12  question in that hearing?

13      A.    The issue, I think, was related -- related to

14  him working -- there was an issue about him going on

15  military leave and that military leave fell between -- it

16  fell in between his training.  He had a training cycle and

17  he had gone to ground school.  And then, apparently,

18  during that time frame, he had gotten notice from the

19  military that they were going to pull him back onto active

20  duty and there were some -- there were some issues of

21  that.

22          And I said "Look, if he provides you notice, I

23  mean, he provides you notice."  I did -- I did tell the

24  pilot, I said "Hey, you're going to get a 737 type rating

25  out of it.  You know, if it would have been me, I would

1  have gone and gotten the type rating and gotten qualified.

2  But you know, I don't run your military unit and neither

3  do I run their desires or their needs."

4      Q.    And your role in this process was serving as an

5  advisor to the -- to the chief pilot or as a

6  representative to the --

7      A.    No.  I was a represent -- no, I was a

8  representative of the Allied Pilots Association.  And the

9  chief pilot had advised me "Hey, listen, I -- I -- I kind

10 of look at you like a trusted agent.  And I would

11 appreciate your help when we have questions from time to

12 time about military leave issues or whatever.  You're

13 actively involved.  Can you help us -- can you help us

14 work through the issues so that the operation just

15 continues and, you know, we have minimal disruption to,

16 you know, the passengers and the business of

17 American Airlines."

18     Q.    And the Allied Pilots Association is the

19 bargaining representative for the pilots at

20 American Airlines?

21     A.    Of course they are.

22     Q.    You referenced a Section 21 hearing.  What is

23 that?

24     A.    Section 21 is a -- is an investigation that's

25 covered in the collective bargaining agreement.

1    Q.    Okay.  It's an investigation of what?

2    A.    I mean, you know better than I do.  You're --

3  you represent American Airlines.

4    Q.    Do you recall what the subject of the

5  Section 21 investigation was here, in this case that you

6  reference with Mr. Raleigh?

7    A.    Well, as I said, there was an -- there was --

8  I -- I did not go to the Section 21 hearing.  But I did --

9  I did advise the chief pilot that my assessment of the

10  situation was that American could run afoul of USERRA if

11  they retaliated against the pilot.

12    Q.    And do you recall if Mr. Raleigh responded on

13  the subject of USERRA?

14    A.    I recall that Mr. Raleigh held a hearing and

15  the pilot wasn't -- wasn't terminated or punished.  So I

16  think it would be safe to say that he scared the guy.

17    Q.    You didn't attend the hearing; is that correct?

18    A.    No, I did not.

19    Q.    Did you read the report after the hearing?

20    A.    I did not.

21    Q.    Okay.  Did you review the factual record prior

22  to the hearing?

23    A.    I actually talked -- Bob Raleigh was the one

24  that gave me the factual record before the hearing and

25  just basically asked me for my opinion.  And I gave my

1  opinion and I told him, I said "Look, if it looks like a

2  duck, it probably is a duck."

3      Q.    And one -- just one last item.  You said you

4  communicated to him about the risks of USERRA.  Did he

5  respond directly to you when you raised the subject of

6  USERRA?

7      A.    I mean, we had a personal conversation in

8  the -- in the airport.

9      Q.    Did he respond on the subject of USERRA?

10     A.    He advised me "Hey, look, I appreciate your

11  advice.  And, you know, I'll -- I'll -- I'll certainly

12  take it."  And, obviously, he listened.  I mean, I know

13  they didn't have an issue with the pilot.

14     Q.    Is the subject of -- you mentioned the

15  collective bargaining agreement in the Allied Pilots

16  Association.  Is the subject of military leave of absence

17  a subject that's addressed in the collective bargaining

18  agreement?

19     A.    It is.

20     Q.    And do you recall, generally, what provision of

21  the contract or what section of the contract addresses

22  military leave?

23     A.    I don't recall the specific version, but it is

24  covered in the contract under "Leaves."  And from what I

25  recall by reading it, it -- it -- it deals specifically

1  with compliance with federal law.

2      Q.   And does that section set out other company

3  policies and procedures that have been bargained with the

4  Allied Pilots Association on the subject of military

5  leave?

6      A.   Well, you have to understand:  You can't

7  bargain military leave.  USERRA dictates how military

8  leave will be notified.

9      Q.   Are there items in the collective bargaining

10 agreement that address the subject of military leave of

11 absence, leaves of absence?

12     A.   I've read it and I'm sure there are.  I mean...

13          MR. MORALES:  I believe we are on Exhibit 10.

14    If you would please mark this.  Thank you.

15          (Exhibit 10, Joint Collective Bargaining,

16      Agreement, was marked for Identification.)

17 BY MR. MORALES:

18     Q.   I'd just ask you to take a look at the cover

19 page there first and ask if you could identify that

20 document, Colonel Patterson.

21     A.   Yes.  It's the Joint Collective Bargaining

22 Agreement.

23          MR. AMLONG:  Well, it's not all of it.

24          THE WITNESS:  It's not all of it, that's

25      correct.

1    BY MR. MORALES:

2         Q.    So the -- with the cover page to the Joint

3    Collective Bargaining Agreement, is it's between

4    American Airlines Inc. and the airline pilots in the

5    service of American Airlines Inc. and US Airways Inc. as

6    represented by the Allied Pilots Association, effective

7    January 30, 2015.

8              Is that correct?

9         A.    Yes.

10        Q.    And as you noted, the exhibit, Exhibit 10, the

11   second page there is Section 11.  You just referenced a

12   leave of absence section of the collective bargaining

13   agreement.  Is this that section?

14        A.    Mm-hmm.  It is.

15        Q.    Okay.  And if you look at Page 11-2,

16   Subsection E, it says "Military Service Leaves."

17        A.    Okay.

18        Q.    Is that the section you have been referencing

19   with respect to the subject of military service?

20        A.    It is.

21        Q.    Okay.  So, for example, if you were to look at

22   E5, Notice and Verification, are you familiar with that

23   section?

24        A.    I am.

25        Q.    What is the -- what is the function of this

1   Notice and Verification Section, the E5?

2       A.    Section E5 is a repeat of USERRA.

3       Q.    Just to be clear --

4       A.    It's a repeat of what USERRA says.  It --

5   USERRA says the comp- -- that it doesn't reference pilots,

6   but it says a military member must provide notice and that

7   can either be -- that can either be oral or -- or in

8   writing.  I think, in the contract, in -- under USERRA,

9   there is no -- there is no requirement or provision of a

10  time frame.  It just says you will provide advance notice.

11      Q.    And perhaps if we just look at E5(a) there, it

12  says -- and I'm quoting [as read]:  Pilots must provide

13  the company with reasonable notice of all military leaves

14  which conflict with their American Airlines work schedule

15  unless the giving of such notice is precluded by a

16  military necessity or, under all of the relevant

17  circumstances, the giving of such notice is otherwise

18  impossible or unreasonable.

19      A.    Okay.

20      Q.    Is that correct?

21      A.    Yes.  And that's in addition to what USERRA

22  says.

23      Q.    So the -- the rule of this, in your view, E5(a)

24  is as what?  A complement or an addition to the language

25  in USERRA?

1      A.    Well, you can't complement or in addition to

2   USERRA.  USERRA is very clear, sir.  USERRA says provide

3   notice.  And --

4      Q.    If I could, I -- I believe you just referred to

5   this paragraph as an addition to USERRA?

6      A.    I'm -- I'm repeating your words, sir.  You said

7   it's an addition or complement.

8      Q.    So what is your understanding of Section E5(a)?

9   It's just a repetition of USERRA?

10      A.    It is a repetition of USERRA.

11      Q.    Okay.

12      A.    And, you know, you're saying if -- you're

13   saying provide reasonable notice.  Okay.  You know,

14   reasonable notice.  Well, what is reasonable?  USERRA says

15   you need to provide notice in advance.  Okay.

16      Q.    Can I ask if you -- you would agree that --

17   first of all, this -- this section here has been bargained

18   and agreed to by the Allied Pilots Association; is that

19   correct?

20      A.    It's included in the contract and I'm aware

21   that there are many things that have been in the contract

22   for years and they don't necessarily keep up with federal

23   law or the restrictions in federal law.

24      Q.    But as a factual matter, this provision appears

25   in a collective bargaining agreement, signed and executed

1  by the Allied Pilots Association --

2       A.    It's in a excerpt of the collective

3  bargaining --

4       Q.    -- is that correct?

5       A.    That's correct.

6       Q.    Okay.  So would you agree E5(a), "Pilots must

7  provide the company with reasonable notice..." that that

8  provision governs, quote, "all military leaves taken by

9  pilots represented by the Allied Pilots Association"?

10      A.    Well, it does.  And I would also agree, you

11 know, the Allied Pilots Association nor American Airlines

12 can violate federal law.

13      Q.    If you look at E6, I'm quoting [as read]:

14 Verification of military duty will not normally be

15 required by the company, period.  When the company does

16 require verification, within a reasonable period of time,

17 the pilot must provide documentation substantiating

18 military duty in question, period, unquote.

19           That provision is also part of a collective

20 bargaining agreement signed and executed by the Allied

21 Pilots Association; is that correct?

22      A.    Okay.

23      Q.    That's correct?

24      A.    You're -- you're -- that's what it says here.

25      Q.    Okay.  Your time at American, were your

1   military leaves in compliance with the applicable notice

2   and verification procedures at American Airlines?

3        A.    I've always endeavored to provide advance

4   notice, which is required by USERRA, of duty.

5        Q.    Taking 2015 as a relevant timeline, did you

6   take military leave during the year 2015 pursuant to the

7   Section 11E that is the Military Service Leaves section of

8   the joint collective bargaining agreement?

9        A.    I'm afraid I don't have Section 11E.  Here it

10  is.  But it says "Questions and Answers."

11       Q.    So just the section we were looking at.  Sorry.

12  Military Service Leaves.  And my question is just:  During

13  2015, you know, there are military leaves being -- let me

14  say it this way.

15            So, for example, Section E5(a) refers to

16  reasonable notice of all military leaves.  And my question

17  is:  During the year 2015, did you take a military leave,

18  at any point, that was governed by Section E?

19       A.    I had other occasions when I took leave for the

20  military, when I had a requirement to participate and it

21  required advance notice, yes.

22       Q.    So do you recall any particular -- starting in

23  January of 2015 and moving forward, any particular

24  military leaves that you took?

25       A.    I've done a lot of military duty in 2015 and I

1    don't recall specific dates, except for this one that

2    stands out, the 20th of September.

3         Q.    Do you recall performing any military duties in

4    August of 2015?

5         A.    I may have performed -- I may have performed an

6    extended period of active duty during August.  I do -- I

7    do seem to recall it.  That -- that might have been a

8    period when I got assigned to the Pentagon for duty.

9         Q.    Okay.  So in August 2015, you said you had an

10   extended --

11        A.    I'm talking about more than two days where I

12   was on -- where I was on active duty orders.

13        Q.    And what does -- what does active duty orders

14   mean for a reserve?

15        A.    Well, there's a difference in the military

16   called Title 10 and Title 32.  One covers inactive duty,

17   for training.  And the other one covers -- the military

18   calls it "active duty for training."  They can call it

19   "active duty for special work."  It goes by a number of

20   terms.

21             However, what it entails is, is they're

22   paying -- it's the difference in pay and how they pay, and

23   do they pay for lodging or do they pay for hotels.

24        Q.    And under active, they do pay for lodging and

25   hotels; is that correct?

1      A.     That's correct.

2      Q.     And you said your August 2015 active duty --

3      A.     I think that covered an active duty order

4   because it's over -- it's over a certain period of time.

5   However -- however, absent orders, under the regulation,

6   you're entitled to perform -- you're entitled to perform

7   all of your inactive duty training at -- at one sitting

8   if -- if the unit needs you in that capacity.

9      Q.     And just staying with the August 2015 service

10  for a moment, that service, you said, was at the Pentagon?

11     A.     Yes.

12     Q.     And you said you received active duty orders

13  for that service?

14     A.     I did.

15     Q.     And so how does that work in terms of the

16  timeline?  Do you first hear from the Pentagon about your

17  orders and then -- well, let me ask it this way.

18         When did you first learn that you would be

19  performing active duty service at the Pentagon during

20  August 2015?

21     A.     I don't recall the date.  But when I was

22  notified with -- when I was notified, I gave the company

23  notice as I -- as I got notified I needed to go to the

24  Pentagon.

25     Q.     Do you recall how you were notified from the

1  Pentagon?

2      A.    Typically, it is a -- typically, it's a phone

3  call.

4      Q.    And who from the Pentagon called you about

5  August 2015?

6      A.    I don't recall.  But it would have, you know,

7  usually, it's someone in -- in the office that has purview

8  over the reserve soldiers that are assigned to the active

9  duty unit.  And, you know, they'll -- they'll tell you

10  "Hey, you're -- you're -- we need you to come to whatever

11  duty assignment we need you at.  And, you know, this is

12  the time frame we're looking at."

13      Q.    And you mentioned an office that has authority

14  over the reserves.  Is that typically the office that you

15  would coordinate --

16      A.    It's not a -- it's -- it's --

17      Q.    If I could just finish my question.

18            Is that typically the office that you would

19  coordinate your reserve duty at the Pentagon with?

20      A.    Well, and I think you're saying "coordinate."

21  So you're -- you're giving the implication that, you know,

22  I can pick and choose.  And a lot of times, it's not.  As

23  I said, it's dependant upon the service.

24      Q.    Who would be the -- who would be the point of

25  contact to tell you that you had active duty service at

1   the Pentagon?

2       A.    Well, usually it's an 06 or someone in the

3   office that will direct you.  Because you're -- you're

4   augmenting an active duty unit and they're using you to --

5   basically, I'm a part-timer that works in a full-time

6   environment.

7       Q.    So it would vary by the -- by the unit who

8   would call you to contact you about the --

9       A.    It varies by the unit.  It varies by the -- it

10  varies by the office.

11      Q.    So, for example, for August 2015, you may have

12  received a call from -- from someone you never

13  communicated with telling you that you had active duty

14  orders at the Pentagon --

15      A.    No.  It would --

16      Q.    -- is that correct?

17      A.    It would usually be someone in -- it would

18  usually be someone in the personnel office that would call

19  you and say "Hey, you've been identified and we, you know,

20  we've input your orders into the system and they have been

21  cut.  And, you know, we're going to -- we're going to book

22  you on a -- book you a ticket on American Airlines and

23  you're going to fly up here and you're going to perform

24  your duty."

25      Q.    And so they would contact you -- for the

1  August 2015 active duty orders, they contact you after

2  they've already issued your orders?

3      A.    No.  Usually, they -- sometimes I've had them

4  tell me "Hey, we're going to cut orders on you and we're

5  giving you a -- we're giving you a warning order that

6  you -- you should appear."

7          I have had them in the past say "We want you to

8  appear," and then that disappears.  Or they say "Hey, we

9  don't need you.  We're -- we're going to revoke the

10  orders."  I have had that happen, I can't recall the

11  specific time frame, but I have had them revoke orders and

12  say "We don't need you.  We'll put you back in the

13  pipeline for another time frame."

14      Q.    And have you ever told them that you were

15  unavailable for dates that they've issued or proposed

16  orders for?

17      A.    Usually, when you're assigned to a unit in the

18  military, your -- your days of availability are, you know,

19  your days of availability are very, very, very, very

20  restricted.  There's a -- an implication that if you're

21  assigned to the unit then you've to perform the duty when

22  they need you to perform it.

23          There's a very strong indication that if you

24  don't go and do the duty and you don't show up, it's going

25  to impact my promotion.  It's going to impact my schools.

1    It's -- and it could be a violation of the UCMJ, which is
2    Uniform Code of Military Justice, and, you know, you'd be
3    subject to being AWOL.
4         Q.    So is it accurate to say that you've never told
5    the Pentagon that you didn't intend to move forward with
6    dates that they had proposed --
7         A.    Why would I?
8         Q.    -- were going to be --
9         A.    Why would I?
10        Q.    I've asked a question.  Have you ever told the
11   Pentagon that you didn't -- not --
12        A.    I don't recall ever telling the Pentagon --
13        Q.    Let me ask my question.
14        A.    Again, I don't recall ever telling the Pentagon
15   I wasn't available.
16        Q.    Okay.  So there's never been a circumstance
17   where the Pentagon called you and said "We'd like for you
18   to serve on these dates," and you responded by saying that
19   you didn't want to serve on those dates or were
20   unavailable for those dates?  That's never happened?
21        A.    I've always been available when they call.
22        Q.    Okay.  So --
23        A.    You don't have that option.
24        Q.    So you've never told them no?
25        A.    No.  And American doesn't have that option

1    either.

2         Q.    And just to clarify:  Your answer regarding

3    whether you've ever told them no is that you have not ever

4    told them no?

5         A.    I've not ever told them no.

6         Q.    Okay.  What is it at the Pentagon that has

7    created reserve duties for you?  Are you assigned to the

8    Pentagon?

9         A.    Well, yes, of course I am.

10        Q.    Presently?

11        A.    No.  I'm retired.

12        Q.    Okay.  So you're --

13        A.    We discussed that earlier.

14        Q.    Okay.  So were you, at one time, assigned to

15   the Pentagon?

16        A.    Yes, I was.

17        Q.    Okay.  And when did that assignment occur?

18        A.    I don't recall the initial date, but it would

19   have been 2011, 2000 -- recently, 2016 time frame.  I

20   retired in June, so.

21        Q.    So 2011 to 2016, you were assigned --

22        A.    Or '17 I was assigned to the Pentagon.

23        Q.    Okay.

24        A.    Roughly.

25        Q.    In a particular office?  Were you assigned to a

1  particular office or unit of the Pentagon?

2      A.    I was assigned to the Army staff.

3      Q.    And that was as detailed as the description of

4  your unit or office was --

5      A.    Army staff, yep.

6      Q.    And what were your responsibilities as a member

7  of the Army staff?

8      A.    I worked with members of the press in the news

9  service, like Jim Miklaszewski with the National

10 Television and, you know, acted as a liaison between those

11 individuals and matters at the Pentagon or, particularly,

12 the Army.

13     Q.    And is there a physical office in the Pentagon

14 that you would go to and perform these duties?

15     A.    Usually, we would perform duty in the -- like,

16 in the Army staff headquarters, in the -- it was -- we

17 were on special staff in the Army.  So the Army special --

18 the Army has a special staff room in the headquarters.

19 Or, actually, it's a big annex to the building.

20     Q.    So it's -- it's -- is it on the Pentagon

21 property?

22     A.    It's not small.  Of course.  It's inside the

23 Pentagon.

24     Q.    And you -- is it fair to say these are

25 primarily public relations duties with the Army staff out

1  there?

2      A.    They would be public relations, correct.

3      Q.    Do you need a break or --

4      A.    No.  Well, you know what?  It might be a good

5  time to take a break.

6      Q.    I'd like to -- I'd like to continue.  If you

7  need a break, we can take one.

8      A.    I do.  I'd like a break, if you don't mind.

9            MR. MORALES:  Sure.

10           THE WITNESS:  Thank you.

11           THE VIDEOGRAPHER:  Going off the record.  The

12      time is 2:58.

13               (Thereupon, a recess was taken.)

14           THE VIDEOGRAPHER:  Okay.  We are now back on

15      the record.  The time is 3:21.  Media Number 4.

16  BY MR. MORALES:

17     Q.    Colonel Patterson, before the break, we were

18  talking about August 2015 service that you performed at

19  the Pentagon.

20           Was that August 2015 service public

21  relations-related?

22     A.    In 2015 it would have been, yes.

23     Q.    Okay.  And that was consistent with the duties

24  you've typically performed at the Pentagon --

25     A.    Yes.

1     Q.    -- as public relations duties?  Okay.

2            And you'd said, for the August 2015 trip, that

3     you had received active duty orders to the Pentagon; is

4     that correct?

5     A.    That's correct.

6     Q.    When you received those orders, how did you go

7     about communicating with American Airlines about the

8     duties that you were set to perform at the Pentagon?

9     A.    It has been a while back.  But, obviously,

10    there wasn't a -- there wasn't an issue as in the

11    September 24th.  So I'm assuming that -- I'm assuming I

12    gave notice --

13            MR. AMLONG:  Don't assume.

14            THE WITNESS:  Well, okay.  I gave flight or

15       gave notice to the company that I had -- that I had

16       active duty orders and I needed to go perform my

17       duty.  So, in other words, I -- I either provided

18       written or a verbal notice to the company.

19    BY MR. MORALES:

20    Q.    And do you recall who that communication was

21    made to?

22    A.    I don't.

23    Q.    We looked a moment ago at the military service

24    leaves section of the contract.  Is military service

25    leave, is that a formal employment status for pilots at

1   American?

2       A.    When you're -- can you explain what you --

3       Q.    So, for example, in August 2015, once you

4   communicated to the company about the active duty orders

5   you'd received for the Pentagon, were you then placed on

6   military service leave?

7               MR. AMLONG:  Objection.  Foundation.

8               MR. MORALES:  You can answer the question.

9               THE WITNESS:  I was obviously given the time

10          off from work.  So, you know, there was no

11          expectation for me to perform services for

12          American Airlines during the period of active duty.

13  BY MR. MORALES:

14      Q.    Is military service leave a formal employment

15  status at American Airlines for pilots?

16              MR. AMLONG:  Objection.  Foundation.

17              MR. MORALES:  You can answer.

18              THE WITNESS:  Military leave, I would say, is

19          not a status.  It is a -- it's -- it's a leave of

20          absence.  So, you know, there's -- there's a --

21          you're either on -- you're either work for

22          American Airlines or you don't work for

23          American Airlines.  And it's a status just like --

24          let me say, it's -- it's a situation like sick leave.

25          You know, when you're sick, you're not -- you're not

1      working.

2    BY MR. MORALES:

3       Q.    As a pilot at American Airlines, do you have a

4    means to check your current employment status?  For

5    example, if you're on sick leave, is there a way for you

6    to check to see if you're categorized as on sick leave at

7    the time?

8       A.    I think you know that.  It's called the "HI1."

9       Q.    What is the HI1?

10      A.    It's a -- basically is a -- a record of all of

11   your attendance for the month.  It's your flights that you

12   have taken.  It's your days of reserve availability.  It's

13   your schedule.

14      Q.    So it would show, for example, if you had

15   completed a trip, it would show the dates of the trip, the

16   cities as part of the trip; is that accurate?

17      A.    I don't recall.  I -- I think it shows a -- it

18   shows a sequence number and it shows some times and it may

19   show the city pairs.  I -- I don't -- I haven't looked at

20   it in a while, so.

21           MR. MORALES:  Let's see.  I'll pull it up and

22       see what -- if you would please mark this.  I think

23       it's Exhibit 11.

24           THE REPORTER:  Yes.

25               (Exhibit 11, Screenshot of Leaves of

1          Absence, was marked for Identification.)

2     BY MR. MORALES:

3          Q.    What we have here appears to be a screenshot of

4     a system similar to the one that you just described.

5               Does this appear to be the database you were

6     just describing?

7          A.    No.  This is not an HI1, sir.

8          Q.    Do you know what -- what it's that we are

9     looking at here?

10         A.    This appears to be all of the leaves of absence

11    that I've -- I've taken.

12         Q.    Okay.  And just -- at the top left there, the

13    second line where it says "Patterson, RS," and then

14    there's an "S-E-N 9754," does this document appear to

15    refer to you?

16         A.    Of course it does.

17         Q.    Okay.  And then, right under that, it says

18    "Type" and "From" and there are a series of dates there.

19    It looks like the last date is February 22, 2017.  And on

20    the bottom there, the first date appears to be June 6,

21    2015.

22              Does that appear correct to you?

23         A.    I can't say whether it's correct or not.  I'm

24    assuming that you pulled it out of American Airlines'

25    database.  However, I can't attest to the fact whether

1  it's correct or not.

2      Q.    Have you seen a -- a document like this before?

3      A.    I have seen these in the past, where it details

4  all -- where it details like -- well, apparently, I don't

5  know, 2Q, that must be qualification.  Sick.  MX for

6  removal.

7      Q.    If I could --

8      A.    Do you mind if I -- do you -- do you mind if we

9  take a break?  I need to consult with my attorneys for a

10  moment, please, before you ask your next question.

11          MR. MORALES:  Go off.

12          THE VIDEOGRAPHER:  Off the record, 3:27.

13              (Thereupon, a recess was taken.)

14          THE VIDEOGRAPHER:  We are now back on the

15      record.  The time is 3:30.

16  BY MR. MORALES:

17      Q.    Mister -- or Colonel Patterson --

18      A.    Thank you.

19      Q.    -- I note that we are returning after a brief

20  break where you requested a break and took the Exhibit 11

21  that we're looking at out of the room with your counsel;

22  is that correct?

23      A.    That is correct.

24      Q.    Is Exhibit 11, is this the type of document

25  that you would have reviewed during your tenure at

1    American Airlines?

2        A.    Not frequently.

3        Q.    Do the dates -- let me ask this:  On the right

4    side of this document, there's a category that appears to

5    say "Reason" and then under it has a variety of

6    indicators.

7              Do you see that column?

8        A.    I do.

9        Q.    And if we could, just walk through each of

10   those reasons, just to see if you're familiar with -- with

11   what they refer to.

12             So the first line which corresponds to

13   February 9, 2017, to February 22, '17 -- 2017, the reason

14   listed is "Vacation."  I assume you're familiar with --

15       A.    Mm-hmm.

16       Q.    -- vacation employment status at American for

17   pilots; is that correct?

18       A.    Yes.

19       Q.    And vacation is an employment status for a

20   pilot who is, at the time, on vacation; is that correct?

21       A.    Say again, now.

22       Q.    If a pilot is on vacation, is it accurate to

23   say that this system tracking pilots' employment status

24   lists them as on vacation?

25             MR. AMLONG:  Objection.  Foundation.

1  BY MR. MORALES:

2      Q.    What is it that you understand your employment

3  status to have been from February 9, 2017, to February 22,

4  2017?

5      A.    I was on an uncredited sick leave of absence.

6      Q.    And were you using vacation days for that sick

7  leave of absence?

8      A.    I didn't ask for them.  They were given to me.

9      Q.    So were you on a -- were you using vacation

10 days for that February 9th to February 22, 2017, period?

11     A.    You're asking me was I using them?  I wasn't

12 using them.  I was working for 21 AIR at the time.  You

13 paid me accrued vacation that you owed me.

14     Q.    Do you understand the -- the vacation reference

15 there to be tied to the use of vacation days for this time

16 period referenced in Line 1?

17     A.    I don't see how you can say I'm using vacation

18 days.  You're paying me for an accrued benefit that --

19 that -- that -- that I had.  I don't call them -- I don't

20 call them -- I don't call them vacation days at all.

21     Q.    Is it accurate to say that vacation is a status

22 for American Airlines pilots that are using vacation days?

23         MR. AMLONG:  Objection.  Foundation.

24 BY MR. MORALES:

25     Q.    You can answer.

1      A.     A status?  What are vacation days?  They're --

2   they're time off from American Airlines to go and enjoy

3   being with your family and take a trip and travel nonrev

4   and go to various places.

5          And I have been denied that benefit by American

6   since I've been out on uncredited sick.  And, you know,

7   that started, it appears, here on the 18th of May.  I

8   didn't ask to be put out sick.  American Airlines put me

9   out sick, involuntarily.

10     Q.     So if you look at Line 4, May 18, 2016, to

11  July 31, 2016, there's a reference to "U-N-P-D, blank,

12  S-K."  Is that unpaid sick?

13     A.     Unpaid sick, that's correct.

14     Q.     And is that an employment status for pilots at

15  American Airlines?

16     A.     An employment status?

17     Q.     Does this --

18          MR. AMLONG:  Objection.  Lack of foundation.

19  BY MR. MORALES:

20     Q.     For May 18, 2016, to July 31st, 2016, were you

21  on unpaid sick status with American Airlines?

22     A.     That's what it says.

23     Q.     Okay.  And then from January 3, 2017, to

24  January 9th, 2017, were you on vacation status at

25  American Airlines?

1          A.     That's what it says.

2          Q.     Is there any difference in the pay credit that

3     would have accrued to you based on whether you were on

4     vacation or unpaid sick?

5          A.     Unpaid sick, you're not paying me.  You've

6     retaliated against me for asserting my rights under

7     USERRA.  You put me out on unpaid sick.  And so you're not

8     paying me for that time frame.

9          Q.     Under "Vacation," if you're categorized as on

10    vacation, is that a paid?

11         A.     As I said -- as I said, you paid me an accrued

12    benefit which you owed to me, sir.

13         Q.     So the answer to that question is yes?

14         A.     So the -- the -- the answer to that question is

15    you're paying me for an accrued benefit, but you're

16    denying me the benefits of being an employee.

17         Q.     If we look at the line under the May 18th line,

18    it's March 24, 2016, to May 17, 2016, do you see that

19    line?

20         A.     I do.

21         Q.     And it says "Sick" under Reason.  Do you know

22    what the difference is between "Sick" and the "Unpaid

23    Sick" categorization that was above it?

24         A.     Yes, I do.  "Sick" is a benefit that's given to

25    a pilot that cannot perform his duties as a pilot.  And

1    it's -- it's an accrued benefit.  And, over time, the

2    more -- the longer time you have with the company, the

3    more sick time you accrue.  And it's credited to a bank.

4        Q.    If you look at the line under this, it's

5    February 17, 2016, to March 23, 2016, do you see that

6    line?

7        A.    I do.

8        Q.    And it says "P-D-W-I-T-H-L-D."  Do you know

9    what that refers to?

10       A.    I would say --

11            MR. AMLONG:  Objection.  Foundation.

12            THE WITNESS:  Okay.

13   BY MR. MORALES:

14       Q.    Do you know what P-D --

15       A.    It's paid withheld.

16       Q.    And what does "paid withheld" refer to?

17       A.    Paid withheld is you're withholding me from

18   service, but you're paying me.

19       Q.    And it looks like the next -- one, two, three,

20   four, five, six, seven -- the next seven lines the reasons

21   are reasons that we have discussed previously.  The line

22   21 August 2015 to August 23, 2015, do you see that?

23       A.    I do.

24       Q.    Is that the time period that we have been

25   discussing regarding your Pentagon duties?

1      A.    That's entirely possible that that could be

2   that time frame.

3      Q.    Okay.  Does it -- does it appear to be the time

4   that you were serving with the Pentagon?

5      A.    Well, if I was on MX and uncredited military

6   leave of absence, then I would have been at the Pentagon

7   during that time frame.

8      Q.    Okay.  And just to spell out what you just

9   said, so the MX is the Type line on the far left of this

10  document and an MX appears before the August 21st to

11  August 23, 2015, timeline we are referring to.

12           Is that correct?

13     A.    That's correct.

14     Q.    And -- and what does "MX" refer to?

15     A.    Well, it says over there to the side it's an

16  uncredited military leave of absence.

17     Q.    And when you say "over to the side," under

18  "Reason" it says "U-N-C-R," and then "M-L-O-A."  Is that

19  the uncredited military leave of absence that you're

20  referring to?

21     A.    That's correct.

22     Q.    This document shows August 21st to August 23rd

23  as the period for uncredited military leave during

24  August 2015.  Does that seem consistent with the duration

25  of the Pentagon duties that you recall during August 2015?

1    A.    I don't recall the specific amount of time that

2  I performed duty in August of 2015.  But if I would -- if

3  I asked for time off, it would have -- the time off I

4  would have asked for would have covered the time that I

5  had a responsibility to American Airlines.

6    Q.    So it sounds about right that you would have

7  finished your Pentagon duties --

8    A.    I can't say that I finished on the 23rd of

9  August.

10    Q.    Okay.  Did you again perform any military

11  duties later in 2015?

12    A.    I'm certain I did.

13    Q.    And do you recall when the --

14    A.    Well, I know for a fact that I -- I performed

15  military duty on September 22nd of 2015, and that military

16  duty took me through the 25th of September 2015.  And that

17  is the matter that brings us here today.

18    Q.    And you said that the military duty you're

19  referencing began on September 22nd, is that correct --

20    A.    That is correct.

21    Q.    -- of 2015?

22          And where was that military duty?

23    A.    In Washington, D.C.

24    Q.    Where in Washington, D.C.?

25    A.    In Washington, D.C., which is typically where

1  I -- where I performed my military duties.

2      Q.    Okay.  So when did you first determine that you

3  would be performing military duties in Washington, D.C.,

4  starting on September 22, 2015?

5      A.    I don't determine military duties, when I'm

6  going to perform them.  It's usually driven by the

7  requirements of the Army, sir.  I think I've been pretty

8  clear about that.  It's -- it's usually the Army's

9  requirements that -- that dictate when I'll show up and --

10  and the manner in which I'll show up and then the location

11  which I'll appear.

12      Q.    When did you first determine that you would

13  perform military duties in Washington, D.C., on

14  September 22, 2015?

15      A.    As I've said, I don't make the determination of

16  whether to perform duty or not.  It's -- it's -- you're --

17  you're -- you're asserting that it's voluntary and it's

18  not.

19      Q.    When was the first time that you became aware

20  that you might be performing duties for the military in

21  Washington, D.C., beginning on September 22, 2015?

22      A.    I recall receiving the phone call a few days

23  before the duty, in September of 2015, where I was advised

24  that I would possibly be required to go to Washington,

25  D.C.  And the duty involved -- the duty was involved in

1    the White House and getting clearances to the White House

2    and I didn't get a notice until late in the game.

3        Q.    Okay.  So you received a phone call from who?

4        A.    I received a phone call from the personnel

5    officer at the Pentagon, just basically advising me "Hey,

6    you're -- you -- you -- you've possibly have been tasked

7    and you're -- you should be prepared to execute."  They

8    call it a "warning order."

9        Q.    Do you recall who the personnel officer was?

10       A.    I don't recall the name of the person, but I --

11   I do know that it was -- that it was explicit that I would

12   travel to Washington, D.C., on the -- on the 21st -- or,

13   excuse me -- on the 22nd.  I stand corrected.  It would be

14   travel on the 22nd and, for the record, I was at the White

15   House on the 23rd.

16       Q.    The person- -- the personnel officer, were they

17   in the personnel office?

18       A.    Usually, it's in the -- usually, it's in the

19   office of public relations.

20       Q.    I'm asking for this personnel office.

21       A.    I'm just saying, the personnel officer is not a

22   central location.  Each office within the Pentagon has a

23   personnel officer that handles administrative actions.

24   They handle pay and such.

25       Q.    And which particular office was this personnel

1  officer in?

2      A.    It's in public relations.

3      Q.    So the personnel officer for the Pentagon

4  office of public relations called you on the phone?

5      A.    Yeah.  I got a telephone call saying "Hey,

6  you're -- you're -- you're -- we need you in Washington,

7  D.C., on -- on a certain date.  We are going to permit you

8  to perform duty."

9      Q.    And do you know the name of the personnel

10  officer in the public relations office --

11      A.    As I've said, I don't recall.

12      Q.    How big is the office of public relations in

13  the Pentagon?

14      A.    There are approximately 3- to 500 personnel in

15  that office.  I'm not sure of the exact number.  I never

16  talked to all of them at one time.

17      Q.    Had you ever spoken with this personnel officer

18  in the past?

19      A.    I have had a few conversations with the

20  personnel office.  And, usually, when I would go to the

21  Pentagon, I would be assigned to a particular section

22  because they have specific duties that they require --

23  they require assistance with.

24      Q.    So when this personnel -- this specific

25  personnel officer called you, was that the first time in

1    your life you had ever spoken --

2        A.    No.

3        Q.    -- with that particular individual?

4        A.    No, that -- no, that wasn't the first time I've

5    spoken with the personnel office.  I've had --

6        Q.    No, with this particular personnel officer.

7        A.    No, that -- that wasn't the first time.

8        Q.    So you would just -- just so I can ask:  You

9    had spoken previously with this public pers- -- this

10   public relations personnel officer --

11       A.    Yes.

12       Q.    -- prior --

13       A.    And I've spoken with multiple people in that

14   office that dealt with my appearance at the Pentagon or my

15   appearance at certain functions to do for the military.

16       Q.    On approximately how many occasions had you

17   previously had a phone call with this particular personnel

18   officer from the public relations office?

19       A.    I would say maybe three, four.

20       Q.    So on three to four occasions prior to the

21   September 21, 2015, call, you had received a phone call

22   from the personnel officer in the public relations

23   department --

24       A.    That's right.

25       Q.    -- that you spoke with on that date.  That's

1  correct?

2      A.    That's correct.

3      Q.    And you don't remember the name of that person?

4      A.    I don't recall.  It's been -- the people at the

5  Pentagon change.  They change positions and they leave

6  jobs and they go to different jobs.  And so I -- I don't

7  recall.  I dealt with so many people in the Pentagon.

8      Q.    Do you recall if that person identified

9  themselves when they called you about the September 22nd

10  military leave?

11      A.    Usually, I would get a phone call that would go

12  to the effect of "Hey, this is -- this is the department

13  of the Army and you've been identified and we'd like you

14  to -- we'd like you to appear."

15      Q.    You said this call happened a few days before

16  the duty.  Is that --

17      A.    I would say it possibly came in on -- I

18  notified -- I notified the Miami flight office on Monday

19  morning when they were first open.  And --

20      Q.    Do you have a date?

21      A.    Yeah.  It was on the 21st of Sept- -- it was on

22  the 21st of September.  I called early in the morning and

23  I provided notice.

24      Q.    Okay.  We'll -- we'll get to that in a second.

25  I'm -- I'm curious about your discussions with the -- the

1    Pentagon personnel officer.  And if you remember when --

2        A.    Well, see, I think --  I think it's

3    important --

4        Q.    If I could ask my question.

5        A.    Go ahead.

6        Q.    On what date was your phone call with the

7    Pentagon's personnel officer from the public relations

8    office?

9        A.    As I said, I'm not --

10        MR. AMLONG:  Asked and answered.

11        THE WITNESS:  Say again.  I'm not sure --

12        MR. AMLONG:  Asked and answered.

13    BY MR. MORALES:

14        Q.    Was it the same day that you contacted the

15    Miami flight office?

16        A.    No.

17        Q.    Was it the day before?

18        A.    No.

19        Q.    Was it two days before you contacted Miami

20    flight office?

21        A.    Absolutely not.

22        Q.    Was it three days before?

23        A.    No.  You get the phone call first, Counselor,

24    and then you call the Miami flight office and let them

25    know you have military duty.  You don't -- you don't

1    provide notice before you get the phone call tasking you

2    to do the job.

3        Q.    So just to be clear, my question is:  Was the

4    phone call you received from the Pentagon public relations

5    personnel officer made the same day that you spoke with

6    the Miami flight office --

7        A.    Absolutely not.  It was -- it was --

8        Q.    Was the --

9        A.    -- absolute -- I've -- I've -- I've answered

10   the question, sir.  My answer was I am not sure of the

11   specific date, but I do recall it would have possibly been

12   on the Friday prior to the 21st.

13       Q.    So your testimony is three days prior to the

14   date that you contacted the Miami flight office, you were

15   contacted by the Pentagon's personnel officer from the

16   public relations office?

17       A.    That's correct.

18       Q.    Did you contact the Miami flight office on

19   Friday about this military --

20       A.    I spoke to no one in Miami flight office on

21   Friday.  Miami flight office closes at 4:00, right around

22   4:00 p.m., promptly.

23       Q.    Is it your testimony that the reason that you

24   didn't reach out to the Miami flight office on Friday was

25   because the office was closed?

1    A.    Possibly.

2    Q.    Is your -- is your testimony that that's the

3  reason you didn't call the Miami flight office on Friday?

4    A.    I'm saying, for whatever reason I didn't

5  contact them, it was more likely than not that the flight

6  office was closed.

7    Q.    Did you contact anyone at American Airlines

8  about the Pentagon duties starting on September 22, 2015,

9  that particular Friday?

10    A.    I contacted the Miami flight office on the 21st

11  of September, 2015.  And I provided notice that I was

12  going on military leave the following day.  And, because

13  I'm a conscientious employee and followed -- and followed

14  up, I called again to the flight office to verify the

15  status.

16    Q.    On the Friday that you received the call from

17  the personnel officer, did you have any trips scheduled

18  with American Airlines?

19    A.    I don't recall if I had a trip scheduled over

20  the weekend or not.

21    Q.    Do you recall when the next trip you had

22  scheduled with American Airlines?

23    A.    I know that the trip I was calling in reference

24  to departed on the 22nd of September of 2015.  And in

25  accord --

1      Q.      The American Airlines trip?

2      A.      Yes.  And in accordance with USERRA, I provided

3  advance notice that I was going on military leave.  And

4  that's my estimation of what's required of me under the

5  federal law.

6      Q.      So I want to make sure I have this right.  On

7  September 19, 2015, you received a call from the

8  Pentagon's personnel officer giving you a, quote, "warning

9  order" about military duties to be performed

10 September 22nd to September 25, 2015; is that correct?

11     A.      That's correct.

12     Q.      And at the time you received that phone call,

13 you had a trip scheduled for American Airlines that began

14 on September 22, 2015; is that correct?

15     A.      That's correct.

16     Q.      Do you recall where that trip was scheduled to

17 take you for American Airlines?

18     A.      Santa Cruz, Bolivia.

19     Q.      Okay.  So, on September 19th, when you received

20 the warning order from the Pentagon, you had a

21 international trip scheduled to be flown by you for

22 American Airlines; is that correct?

23     A.      On the 22nd of September.

24     Q.      Correct.  And at the time you received the

25 warning order from the Pentagon's personnel officer,

1  September 19, 2015, you did not contact anyone at

2  American Airlines that day regarding the warning order; is

3  that correct?

4      A.    I did not.

5      Q.    Did you contact anyone on September 20, 2015,

6  at American Airlines --

7      A.    I made no --

8      Q.    -- regarding the warning order?

9      A.    I made no contact with anyone on September 20th

10 at American Airlines.  The flight office -- and I might

11 remind you, the flight office was closed on the 20th of

12 September.  It's a Sunday, sir.

13     Q.    Do pilots have any way to get in touch with

14 American Airlines on Saturday and Sunday, Mr. Patterson?

15     A.    They certainly do.

16     Q.    And what are the --

17     A.    It's called the "SOC duty chief" and it's who I

18 had to call on September 21st after Captain Bonds denied

19 me military leave.

20     Q.    So on September 19th -- and -- and just so I'm

21 clear:  The -- the SOC chief, is that who you referred to?

22     A.    System operations control duty chief.

23     Q.    And is it accurate to say that the systems

24 operation -- sorry -- systems operation chief?  Is that

25 proper term?

1    A.    SOC duty chief.

2    Q.    SOC.  Is it accurate to say that the SOC duty

3  chief has a phone line that's available 24/7/365?

4    A.    No, they do not.

5    Q.    And what -- and what days or hours does the SOC

6  duty chief became unavailable?

7    A.    Well, I called the SOC duty chief on the 21st

8  of September.  It was in the evening, about 5:00 o'clock,

9  6:00 o'clock possibly, because the Miami flight office had

10  closed.  And I got -- I got -- I got no notice from -- no

11  return call and I was very concerned about that.  As I

12  said, I'm a conscientious employee.

13        I provided you note -- listen.  I provided you

14  notice and I asked for time off.  And I complied with

15  USERRA.  And because I'm conscientious, I made a follow-up

16  phone call.  I even -- I think I went too far in trying to

17  provide you notice because I ended up getting David Tatum

18  in the evening and providing him notice that I had

19  military leave and I had no problem.

20        Then, later on in the evening, I get a notice

21  from Captain Bonds that was translated very late, because

22  of the telephone service, which said "I'll give you

23  military leave if you can produce a set of orders."

24    Q.    So we'll get to --

25    A.    And that doesn't sound like Captain Bonds

1  complied with federal law to me.

2    Q.   We will get to various items that you just

3  referred to.

4        But just so I'm clear:  If you, as an

5  American Airlines pilot, need to contact American Airlines

6  after 4:00 p.m. regarding a scheduled trip and a potential

7  cancellation, do you have a mechanism that you can reach

8  American Airlines?

9    A.   You can pick up the phone and call the SOC duty

10  chief for related issues.

11    Q.   So the SOC duty chief is generally available

12  even off hours; is that correct?

13    A.   Generally available.

14    Q.   So, for example, if a pilot becomes sick an

15  hour before a trip and it's 1:00 a.m., who does the pilot

16  typically contact at that hour?

17    A.   Not the SOC duty chief.

18    Q.   Who does the pilot typically contact --

19    A.   Crew scheduling.

20        MR. AMLONG:  Objection.  Foundation.

21        THE WITNESS:  Crew scheduling.

22  BY MR. MORALES:

23    Q.   Okay.  So a pilot -- is -- is crew scheduling

24  ever -- let me ask you this way:  Is crew scheduling

25  typically available 24 hours a day?

1      A.     Typically.

2      Q.     And crew scheduling, I take it, schedules crew

3  for flights --

4      A.     It has been my experience that crew scheduling

5  won't approve a military leave.  They will only handle a

6  sick call.  That's it.

7      Q.     But crew scheduling is available 24 hours a day

8  if you've an issue, as a pilot, to report regarding a

9  scheduled trip; is that correct?

10     A.     No.  There are certain -- there are certain

11  departments that you call regarding a scheduled trip.

12  Obviously, if you want an EO, you call -- crew scheduling

13  is not going to give that to you.  They're not authorized

14  to provide that to you.

15     Q.     So I guess I -- I'd return to a question I

16  asked a moment ago in slightly different form.

17            When you received the warning order call from

18  the Pentagon's personnel officer, was it your view, when

19  you hung up the phone with that personnel officer, that

20  American Airlines was unavailable for communication

21  regarding the warning order at the time?

22     A.     Well, as I've said to you before, Counselor, I

23  have been tasked with assignments before in the military

24  and I've had military come back and say "On second

25  thought, we don't need you."  And it's been my experience

1   with American Airlines that if I call and ask for military

2   leave without some type of confirmation then

3   American Airlines is not going to treat you the same.

4   "I'm sorry. We just removed you from your trip and now

5   you just notified American Airlines, and now you've

6   lost -- you've lost a load of income that, by the way,

7   American Airlines is going to prohibit you from going into

8   the computer and picking up further time to, you know,

9   make up for your -- your trip that you lost."

10        So, in other words, that trip is gone. So it's

11   a discriminatory practice within American Airlines that

12   I've seen done many, many times. And so, you know, until

13   the military says execute or "Hey, this is the real deal,"

14   you know, it's -- it's an unsure deal.

15        MR. MORALES: I'd request that we could have

16      the question repeated to Colonel Patterson.

17         (A portion of the record was read by the

18      reporter.)

19        THE WITNESS: I would say, Counselor, I

20      notified American Airlines on the 21st. I notified

21      you on the 21st, which is provided in accordance with

22      USERRA. I gave a verbal notification and I met the

23      requirements of the law. And there's nothing

24      codified in USERRA, sir, that defines reasonable

25      notice. It's not codified in the law.

1  BY MR. MORALES:

2      Q.     You said, on the call of September 19th with

3  the personnel officer, that the personnel officer told you

4  that you possibly could be required to go to Washington,

5  D.C.  What conditions did the personnel officer state

6  would determine whether you actually were to go to

7  Washington, D.C.?

8      A.     They usually don't state the conditions in --

9  in a warning order.  They tell you "Hey, you -- stand by,

10 be prepared."  And, usually, I pack -- I pack my uniforms

11 accordingly.  The fact that I work for the Pentagon means

12 I usually take a dress uniform because I don't know where

13 I'm going to wind up.  I don't know where I'm going to

14 appear.  There had been discussions about going to the

15 White House for the papal reception, and that was

16 contingent upon Secret Service approval to go.

17     Q.     Secret Service approval for you to attend?

18     A.     Yes, sir.  You don't walk up and just ring the

19 door of the White House and walk in.  I mean, there's

20 certain people that do -- do happen to sneak in, but, in

21 this occasion, I didn't do that.

22            The Secret Service obtains specific information

23 from you to determine if you're -- even if you're in the

24 military, even if you have a top secret clearance, they

25 don't care.  You're dealing with the -- with the most

1   powerful man in the United States.

2       Q.    And so did you go through a clearance process

3   with the Secret Service?

4       A.    I recall --

5           MR. AMLONG:  Objection.  Foundation.

6           THE WITNESS:  Okay.

7   BY MR. MORALES:

8       Q.    You can answer.

9       A.    I recall that I provided -- I provided

10  information to -- to the military about my Social Security

11  number and I was authorized a -- I was authorized to take

12  a guest with me to the White House.  So I took my wife

13  with me.  And I had to provide her Social Security number

14  and her date of birth.

15      Q.    Was the phone call you received from the

16  personnel officer a directive for you to report to

17  Washington, D.C.?

18      A.    Well, sir, as I've said, usually you don't say

19  no to the military.  You've asked me if I would say no and

20  my answer to you is no.

21      Q.    So was the phone call from the personnel

22  officer a directive to report to Washington, D.C.?

23      A.    It's pretty implicit that you need to be there.

24      Q.    So the answer is no?

25      A.    Excuse me.  Was it a directive?  It's pretty

1    implicit.  I would say, sir, that if you -- if you --

2    if -- if I give you a phone call and say "Hey, I need you

3    to go to a certain location.  If you don't comply, you're

4    not going to like the results."

5         Q.    Did you understand the personnel officer to be

6    directing you to arrive in Washington, D.C., for

7    September 22, 2015, duty?

8         A.    I did.

9         Q.    In the phone call that you said was

10   insufficient notice to inform American Airlines that you

11   would be going to Washington, D.C., on September 22nd?

12             MR. AMLONG:  Wait.  Read that back.

13             (A portion of the record was read by the

14        reporter.)

15             THE WITNESS:  Insufficient notice?

16             MR. AMLONG:  Is that a question?

17   BY MR. MORALES:

18        Q.    When you hung up the phone with the personnel

19   officer on September 19, 2015, did you believe that you

20   had been ordered to arrive in Washington, D.C., for

21   September 22, 2015?

22        A.    I believed that I had been identified to fill a

23   requirement at the Pentagon.  And, as I've said to you

24   before in previous conversation, that it was apparent to

25   me that, you know, stand by to execute or stand by.  The

1  military operates that way.  They send what's called a

2  "warning order" to a unit.  They tell the unit "Hey, stand

3  by to execute."  It doesn't necessarily mean you're going

4  to do that, but I'll tell you they -- they do say -- well,

5  if you come up at a later point and say, "Well, we didn't

6  do what you -- you told me to," they're going to say,

7  "Well, you know, we kind of gave you a heads-up that --

8  that that's the direction we were going."

9          And so, you know, lack of getting there or

10  whatever is not going to be an excuse.  You're expected to

11  go.

12      Q.    Did you tell the person office -- personnel

13  officer that you had a trip scheduled for American

14  international -- American Airlines to an international

15  destination for September 22nd --

16      A.    No, and I'm not required to, sir.  You got to

17  understand.

18      Q.    Why --

19      A.    No, you got to understand:  The military takes

20  precedence in this.  So are you telling me

21  American Airlines doesn't support its veterans?

22      Q.    Did you receive any orders associated with this

23  phone call regarding the duty that was scheduled for

24  September 22nd to September 25th?

25      A.    Okay.  You've asked this question about a

1    hundred times about orders.  And I'm going to clarify
2    something for you.  Okay?  I'm assigned as an individual
3    mobilization augmentee to the Pentagon.  That's a very
4    special position.  It is for senior military officers,
5    that's generally who fills that billet.  It's majors and
6    above.
7            As I said to you before, I am a part-timer and
8    I backfill an active duty requirement.  The active duty
9    does not eat, sleep, or breathe American Airlines.
10   They -- they operate on their own time frame.  And I would
11   certainly hope that American Airlines realizes that, with
12   an American flag plastered on the side of the airplane,
13   that there's a certain responsibility to support the
14   defense of the United States.  And whether I go into the
15   Pentagon and sweep the floor or answer the telephone for a
16   general officer, it is duty in support of the national
17   defense of the United States.
18       Q.    So just to repeat my question:  Did you receive
19   any orders to --
20       A.    As I said, I did not, sir.
21       Q.    Just to complete my question:  Did you receive
22   any orders to participate in any military duties between
23   September 22nd and September 25, 2015?
24       A.    Okay.  I'm going to clarify this for you.
25   You've asked this question several times and we are going

1   to clarify it.  The unit does not issue orders.  And I

2   would highly recommend, sir, that you get a copy of Army

3   Regulation 140-145 which talks about the individual

4   mobilization augmentee program and read it and familiarize

5   yourself with it.  I have.  Excuse me.  And it operates

6   off of direct direction from the unit.

7           I have orders assigned -- listen, sir.  I have

8   orders --

9       Q.   I'm just asking you:  Did you receive direct

10  direction from the unit, then, to attend military

11  duties --

12      A.   What do you think the phone -- what do -- what

13  do you think the phone call --

14      Q.   If I could -- if I could -- I'm going to ask

15  you to let me complete my question.

16          Did you receive a direct directive from the

17  personnel officer to report to Washington, D.C., for

18  September 22nd --

19      A.   That was direct direction.

20      Q.   Let me ask this:  What was -- so the answer was

21  that you did receive direct direction?

22      A.   As I've said, I receive a warning order.  And

23  in the course -- in the course of time, I would either get

24  an e-mail or I would get specific directions on where to

25  appear and how to appear and what times.

1      Q.     I'm asking about the phone call on

2    September 19, 2015.  Did you receive direct direction in

3    that phone call to appear in Washington, D.C.?

4      A.     I told you, it was explicit -- it's implicit

5    that, when you receive a call, that you're going to go.

6    You know, see, I think you need to understand, Counselor,

7    the one weekend a month --

8      Q.     I'd like to ask you what the ambiguity was at

9    the end of that September 19, 2015, phone call about

10   whether you would, in fact, appear in Washington, D.C., on

11   September 22, 2015, if you had received a direct directive

12   from your unit to appear in Washington, D.C., on those

13   days.

14     A.     See, you're playing with words.  The words

15   are -- I told you, I got a warning order.  It's implicit.

16   You go.  If you don't show up, they're going to look for

17   you on the 22nd.

18     Q.     And my question is:  It's clear that you were

19   going to Washington, D.C., at the conclusion of the

20   September 19th phone call.  So why did you not communicate

21   that fact to American Airlines at that time?

22     A.     I don't recall.  But I will say that, as I've

23   said to you before , American Airlines has a

24   discriminatory practice that, if I notify you that I'm

25   going to military leave and that military leave is somehow

1   cancelled or the military says "On second thought, we

2   don't need you.  We've -- we've overtasked people" or "No,

3   we want you to go to a different location at a different

4   time frame," American Airlines -- American Airlines is

5   happy to let me have the time off to do military leave but

6   they will not go back and fix it.

7           And, as in this document you've given me here,

8   I recall that that uncredited military leave of absence is

9   exactly that.  You allowed me to do military duty, but you

10  took me off the payroll.  And, therefore, you did not pay

11  me for those dates even if it covered a trip or whatever,

12  I didn't get paid for it.  And I was effectively locked

13  out of the system from trying to make up that time.

14      Q.    Let me ask you when you booked your plane

15  tickets from Miami to Washington, D.C.  Was that on

16  September 19, 2015?

17      A.    I didn't book plane tickets.

18      Q.    How did you make your way from Miami to

19  Washington, D.C.?

20      A.    I flew nonrev as I've always done.

21      Q.    And how did you reserve your nonrev status on

22  the flights that got you to Washington, D.C.?

23      A.    Well, it's usually done space available through

24  JETNET, sir.

25      Q.    So my question is:  In this particular case,

1   how did you book your nonrev ticket to Washington, D.C.?

2        A.    Well, there was no other way to do it but

3   JETNET.

4        Q.    Okay.  So is it correct that, for the trip from

5   Miami to Washington, D.C. -- you -- you did fly from Miami

6   to Washington, D.C. --

7        A.    I did.

8        Q.    -- for this visit?

9              And you booked your travel on JETNET?

10       A.    I did.

11       Q.    And did you book an American Airlines flight on

12  JETNET?

13       A.    Well, that's all you can book in JETNET, sir,

14  is American Airlines.

15       Q.    So you did book on American Airlines, then --

16       A.    Yes.

17       Q.    -- on JETNET?

18             And do you recall when you booked your JETNET

19  flight?

20       A.    I don't.

21       Q.    Was it September 19th?

22       A.    I don't recall that it was September the 19th.

23       Q.    Was it September 20th?

24       A.    Sir, I don't recall the date.

25       Q.    Do you recall whether you waited until

1  September 21st to book your JETNET flight itinerary?

2      A.    I don't know what the difference is as whether

3  I waited from the time of getting the notice until the

4  21st.  I will tell you, what I did, sir, was I provided

5  American Airlines written notice -- or, excuse me -- oral

6  notice via telephone and I went above and beyond the call.

7          And then Captain Bonds called, left a message

8  saying "I'll give you military leave."  So you denied me

9  military leave and then you turn around and you -- you

10 retaliate against me with other actions.

11     Q.    So, you're saying --

12     A.    So you keep focussing --

13     Q.    You --

14     A.    -- sir, you keep focussing on the 21st.

15     Q.    Colonel Patterson, if I could:  Your -- your

16 JETNET booking was not made on --

17     A.    Sir, I told you I am not sure --

18     Q.    If I can complete my question.

19     A.    -- the date I made it.

20     Q.    Your -- your JETNET booking was not made the

21 same day that you received the warning order from the

22 Pentagon's personnel officer?

23     A.    Sir, I don't recall when I made the JETNET

24 booking.  I've had cases --

25     Q.    And am I correct that you -- you said that your

1  wife attended, as a guest, to the trip to Washington --

2       A.    She did.

3       Q.    -- is that correct?

4             And did you book her itinerary on JETNET as

5  well?

6       A.    I'm certain I did.

7       Q.    Okay.  Do you recall if you booked her

8  itinerary on September 19th?

9       A.    Usually, sir, we would book it together.  It's

10  not separate.

11      Q.    And in this particular case, is that what you

12  did?

13      A.    I don't recall what we did.

14      Q.    Okay.  Did you wait to book the itinerary until

15  September 21st?

16      A.    I don't recall what date I booked it.

17      Q.    Let me ask you this:  Did you book your JETNET

18  itinerary before or after communicating to

19  American Airlines that you would be on military duties in

20  Washington, D.C., during your scheduled trip,

21  internationally?

22      A.    I don't recall.  But I do recall that I

23  travelled on the morning of September the 22nd to

24  Washington, D.C.

25      Q.    Okay.  So you don't recall if you --

1      A.    I don't recall when I book flights.  I don't

2    recall when I book flights for going on vacation.  Which,

3    by the way, all the vacation days you mentioned here, I

4    wasn't allowed to book flights on American Airlines.

5      Q.    So is it possible -- let me ask this,

6    Mr. Patterson.  At the time that you first spoke with

7    American Airlines about your scheduled duties to

8    Washington, D.C., on September 22, 2015, did you, at that

9    time, have a confirmed nonrev -- nonrev ticket itinerary

10   to Washington, D.C., for that trip?

11     A.    I love your terms, sir.  Confirmed nonrev

12   ticket.  Would you describe for me, sir, what the term

13   "nonrev" is?

14     Q.    At the time that you booked --

15     A.    You don't understand, do you, sir?

16     Q.    At the time that you first communicated to

17   American Airlines that you would be going to Washington,

18   D.C., on September 22, 2015, did you have any form of air

19   travel reserved?

20     A.    As I've said, I cannot confirm for you when we

21   booked the ticket to go to Washington, D.C.  I've

22   travelled to Washington, D.C., for military duties when

23   I -- when I have been assigned military duties and those

24   duties were not active duty.  So, in other words, the

25   military didn't pay for my travel.  Obviously --

1      Q.    When you use JETNET to establish an itinerary,

2   do you refer to that as a booking or a reservation or --

3      A.    It's not a reservation.

4      Q.    -- or confirmation.  What -- what term -- what

5   term would you use?

6      A.    It is absolutely not.  It is a listing --

7      Q.    I'm just asking what term you would use --

8      A.    Okay.  But you've just --

9           THE REPORTER:  I can only take one at a time.

10           THE WITNESS:  Okay.  You've just confused

11       confirmed, nonrevenue travel.  There is no --

12   BY MR. MORALES:

13      Q.    Colonel Patterson, my -- my question is --

14      A.    There's no -- no such thing.

15      Q.    My question is:  What term would you use for

16   reserving an itinerary on JETNET?

17      A.    You would make a listing.

18      Q.    Okay.  So a listing.

19      A.    And you would show up at the airport and,

20   assuming American Airlines has not oversold the flight, as

21   they typically do --

22      Q.    I'm going to --

23      A.    -- you would get on the airplane.

24      Q.    I'm going to ask you:  At the time that you

25   make the listing with JETNET, do you receive any e-mail

1  confirmation from JETNET?

2      A.    No.  You don't get e-mail confirmation from

3  JETNET.  You can go into JETNET and see your listing,

4  that, Oh, well, I've listed for a flight.  You can see the

5  listing appear.  And then, 24 hours before a flight, you

6  could conceivably check in for that flight or put yourself

7  on the priority list, which puts you in a pecking order

8  for various flights.

9           However, you're not -- you don't have

10 guaranteed travel to Washington, D.C.  There's nothing

11 guaranteed with space available.

12     Q.    Did you receive any confirmation from JETNET of

13 a listing for your September 22, 2015, trip to Washington,

14 D.C.?

15     A.    My wife would have printed a -- my wife would

16 have printed a boarding pass to go to Washington, D.C.

17 I'm a crew member, so I usually go through the known crew

18 member line.  I don't print a boarding pass.  It's not

19 required.

20     Q.    But you don't recall receiving any record

21 confirming the details of your itinerary?

22     A.    I don't recall receiving a record.  I have

23 booked other people on JETNET before and had the system

24 e-mail them a -- their listing.  But that's not a

25 confirmation.  There's nothing confirmed in the nonrev

1   world.  The only time I've ever been confirmed on

2   American Airlines is going to training or going to work.

3       Q.   Do you recall what American Airlines flight you

4   ended up taking --

5       A.   I don't recall the specific --

6       Q.   Excuse me, if I could get to ask my question.

7            Do you recall what American Airlines flight you

8   ended up taking to Washington, D.C., on the morning of

9   September 22, 2015?

10      A.   I don't recall the specific number, but I do

11  recall that it was very early in the morning.  It was

12  probably the first flight of the day out.

13      Q.   Between the time that you boarded that aircraft

14  on September 22nd and the time on September 19th when you

15  had spoken to the personnel officer from the public

16  relations office, did you have any other communications

17  with the Pentagon or anyone from the armed forces about

18  your scheduled trip to Washington, D.C.?

19      A.   I think I recalled sending an e-mail to -- I

20  think I recalled sending an e-mail to a lieutenant colonel

21  that was going to the White House with me that I was

22  boarding a plane in Miami and that I would let him know if

23  we got on the flight.

24      Q.   And do you know if that e-mail has been

25  produced as part of this litigation?

1    A.    I don't recall that I have the e-mail because

2  when I retired, my army.mil account was deactivated.

3    Q.    Have you looked for that e-mail?

4    A.    I'm not able to look for it.  I don't have

5  access to my army.mil account anymore.

6    Q.    You currently don't have any access to your

7  army.mil e-mail account?

8    A.    When you retire, you don't have access to

9  anything Army except benefits.

10    Q.    So you --

11    A.    And military installations.

12    Q.    So you're currently unable to access any

13  e-mails from your army.mil --

14    A.    I have no e-mails from my army.mil account and

15  mail.mil account.  I'll correct that.

16    Q.    And you had e-mailed a lieutenant colonel, you

17  said, at the time that you were boarding the aircraft to

18  Washington, D.C.?

19    A.    I do recall doing that.

20    Q.    All right.  And what was the name of that

21  lieutenant colonel?

22    A.    He is retired now.  I think his name was

23  Reynolds.

24    Q.    And was Lieutenant Colonel Reynolds part of the

25  Army staff at the Pentagon?

1    A.    He is.

2    Q.    Do you recall his first name?

3    A.    I do not.

4    Q.    You don't recall Lieutenant Colonel Reynolds'

5    first name?

6    A.    No.

7    Q.    In what capacity did he work in the Pentagon

8    office?

9    A.    He would have been a coworker that would have

10   been, you know, usually, the -- they pair an IMA with an

11   active duty personnel.

12   Q.    And were you scheduled to meet

13   Lieutenant Colonel Reynolds when you arrived in

14   Washington?

15   A.    I met him at the Pentagon.  And then he and his

16   wife and my wife, we travelled to the White House in the

17   very early morning hours.  We had to be up at 5:00 o'clock

18   in the morning.

19   Q.    Did you have any communications with the Secret

20   Service after your phone call with the personnel officer

21   from the public relations office?

22   A.    I don't interface with the Secret Service.

23   Q.    Okay.  Did you provide any -- let me ask this:

24   You said that one result of your phone call on

25   September 19th was that you provided your Social Security

1  number and your wife's Social Security number along with

2  other information in order to obtain White House

3  clearance.  Who did you send that information to?

4      A.    I think I provided that information -- I think

5  I would have provided that also to the -- I'm trying to

6  think.  There was another individual that made that

7  specific request.  I don't recall the individual's name.

8  But I did provide it to another individual that

9  specifically requested that.

10     Q.    Another individual at the Pentagon?

11     A.    Another individual in the office at the

12  Pentagon.

13     Q.    And that was after your phone call with the

14  personnel officer?

15     A.    I think so, correct.

16     Q.    Do you remember the name of the Pentagon --

17     A.    I -- I don't.

18     Q.    Do you remember -- just -- do you remember the

19  name of the Pentagon official who received your Social

20  Security number?

21     A.    I do not.

22     Q.    So you spoke with the personnel officer on

23  September 19th and that was a warning order.  Did you

24  speak with that personnel officer again prior to your

25  departure to Washington, D.C.?

1      A.    I don't recall having much conversations beyond

2    that.  I do -- I do recall -- I do recall my conversation,

3    my e-mail to Colonel Reynolds.  And, you know, to verify

4    certain things that -- that we were going to the

5    White House together.

6      Q.    So if you'd only received a warning order at

7    the time of your departure, why did you move forward with

8    your departure to Washington, D.C.?

9      A.    Because I received no counter -- I received no

10   counter -- no counter to -- rescinding the warning order.

11     Q.    Okay.  And your expect -- your -- your

12   conclusion was that the absence of any rescission of the

13   warning order was a direct directive continuing to require

14   you to report to Washington; is that correct?

15     A.    That's correct.

16     Q.    When you first testified about the

17   September 19th phone call, I believe you said that you had

18   a phone call a few days before duty, but that you then

19   didn't get notice until late in the game.

20           What was the subsequent notice late in the game

21   that you received?

22           MR. AMLONG:  Objection to form.

23   BY MR. MORALES:

24     Q.    You can answer the question.

25     A.    The -- the notice that you're referring to, I

1    believe, came on the 19th.  And that came very late --

2    that came very late in the day.  Usually, it's when things

3    close.  My -- my decision and my judgment was to -- was to

4    take a look at the flights over the weekend, see how they

5    looked.  Could I nonrev, conceivably?

6            Obviously, I'm assigned to the Pentagon and one

7    of the -- one of the key criteria for being assigned to

8    the Pentagon was is that they -- they require people to

9    physically -- they -- they want people to live in D.C.,

10   ideally.  The Army doesn't have enough people that live in

11   D.C., so as a contingent upon that, I -- I have the

12   ability to nonrev with American Airlines and the military

13   is obviously not reimbursing me for my travel.

14       Q.    So I've a question about that.  I believe you

15   testified that, for your August 2015 trip, the military

16   did pay for your airplane and hotel; is that correct?

17       A.    I think that's correct.

18       Q.    So why wouldn't the military have done the same

19   for your September 22nd trip?

20       A.    Well, because you have to understand, there's

21   two different type of duty, sir.  There's inactive duty

22   for training, which is what I performed at the

23   White House, and then there's active duty.  And I -- I

24   think -- I think kind of what brings us here today is

25   Captain Bonds' demand for producing orders in that he is

1   an Air Force Reserve officer.  I'm an Army Reserve

2   officer.  And that is two different worlds, two different

3   regulations.

4        Q.    So, again, my question is --

5        A.    The Air Force Reserve --

6        Q.    If I could --

7        A.    Okay.

8        Q.    -- Colonel Patterson.  The question is:  The --

9   the military paid for your air and hotel for August 2015.

10  Why did the military not do the same for your

11  September 22nd trip?

12       A.    The military will pay for active duty orders

13  because that's funded through the human resources command.

14  And an individual unit asking me to come do individual

15  inactive duty for training is -- they're not going to pay

16  for that out of their unit funds.  There's a -- there's an

17  expectation that, you know, soldiers travel.  And it

18  happens -- it happens routinely in the Army, that soldiers

19  travel to inactive duty for training.  I just so happen to

20  work for American Airlines and it's a benefit to me that I

21  can nonrev to my drill.  And it's also a benefit that

22  American Airlines has afforded many, many other

23  reservists.

24       Q.    Did you ask the personnel officer from the

25  public relations office to pay for your hotel and airfare?

1      A.    I wouldn't ask them to pay for it because I'm

2  under the understanding that it's inactive duty for

3  training.

4      Q.    So the answer is that you did not ask them?

5      A.    I'm not entitled to it.

6      Q.    Well, your August 2015 trip was paid for by the

7  military --

8      A.    Paid for --

9      Q.    -- is that correct?

10     A.    Paid for by the military, that's correct.

11     Q.    So you were entitled to it for your August 2015

12 trip --

13     A.    That's right.

14     Q.    -- but not your September 2015 trip?

15     A.    That's correct, sir.

16     Q.    Did you ask the Pentagon to allow you to attend

17 the September 22nd to September 25th military activities

18 in Washington, D.C.?

19     A.    Did I ask?

20     Q.    Did you make a request of the Pentagon to

21 permit you to appear during those activities?

22     A.    I don't recall making a request to them.  And

23 the military is -- can dictate.  And, you know, I find

24 that -- I find that particularly offensive:  Did you ask?

25 Because that says to me --

1     Q.    My question -- my question --

2     A.    -- that says to me, sir, you don't support the

3 national defense of the United States.

4     Q.    So my question to you is:  Did you make a

5 request to the personnel officer of the public relations

6 office to save a space for you or to issue inactive duty

7 orders for you for the September 22nd to 25th -- to -- to

8 -- to September 25th, 2015, duty activities --

9     A.    Save a space for me?

10    Q.    Did -- let me ask it this way:  Did you request

11 that the Pentagon issue a directive for you to appear on

12 inactive duty training in Washington, D.C., during the

13 September --

14    A.    Counselor --

15       MR. AMLONG:  That -- that is a yes or no.

16       THE WITNESS:  I didn't -- I don't recall making

17   a request.

18 BY MR. MORALES:

19    Q.    Did you ask to attend the ceremony at the

20 White House that you referred to earlier?

21    A.    Did I ask to attend?  Like I said, you don't go

22 up and ring the doorbell of the White House.

23    Q.    So did you ask the personnel officer to attend

24 the ceremony at the White House?

25    A.    I don't recall putting a specific request in to

1    go to the Pentagon.

2         Q.    Did the personnel officer direct you to appear

3    at the White House for the pope's ceremony?

4         A.    I was advised -- I was advised that, you know,

5    I was going to the Pentagon.  I was going to perform

6    duties.  I was told that I -- I was possibly going to go

7    to the White House and that, you know, when I got to

8    Washington, D.C., on the 22nd, I got the full details,

9    that I was going to the White House and I got -- I got a

10   pass to admit me to the White House.  And this was on the

11   22nd I was provided that.

12        Q.    Okay.  You didn't receive any orders to attend

13   the ceremony at the White House?

14        A.    As I've said, sir, the Army Reserve does not

15   cut paper orders.

16        Q.    Am I correct that your wife also attended the

17   ceremony at the White House?

18        A.    That's what I said.

19        Q.    And I assume she didn't receive any indirect or

20   direct orders to attend?

21        A.    My wife is a civilian.  She's not subject to

22   the military, sir.

23        Q.    Okay.  So you arrived in Washington on

24   September 22nd in the morning hours; is that correct?

25        A.    Approximately, correct.

1    Q.    And to the extent you can recall your itinerary

2    from the time that you arrived in Washington until you

3    departed Washington, I would ask you to walk us through

4    that itinerary.

5    A.    Well, I usually go to the Pentagon and I

6    would --

7    Q.    Just to be clear:  I'm asking you on this

8    specific trip.

9    A.    Well, on any trip, go to the Pentagon.  I check

10   in in the office.  I -- I usually will meet up with the

11   particular individual that I'm going to be paired with.

12   It varied from time to time.  I don't necessarily meet up

13   with the same person every time.  I don't necessarily work

14   with the same person every time.

15   Q.    So on September 22nd when you arrived in

16   Washington, D.C., you went directly to the Pentagon to

17   meet with the person that you would be paired with for the

18   trip?

19   A.    That's correct.  Which would have been

20   Lieutenant Colonel Reynolds.

21   Q.    Sorry.  What was that name again?

22   A.    Colonel Reynolds.

23   Q.    Lieutenant Colonel Reynolds.

24         And you went directly from Reagan National

25   Airport to the Pentagon?

1       A.      That's what I recall.

2       Q.      And your wife was with you at that time?

3       A.      She was.

4       Q.      Okay.  And where did you head when you arrived

5    at the Pentagon?

6       A.      Usually, I go to the public relations office.

7       Q.      And, again, I'm just going to ask you, you keep

8    saying "usually."  We're -- we're -- I'm only --

9       A.      Well --

10      Q.      -- interested in on this particular morning, if

11   you can recall.

12      A.      Well, I cert- --

13      Q.      If you can't recall, I would ask you to just

14   state that.

15      A.      I certainly don't go to the headquarters of the

16   Marine Corps, Counsel.  I'm not a Marine.  I go to the --

17   I go to the public relations office, is where I go.

18      Q.      Okay.  So on the morning of September 22nd, you

19   landed at Reagan National.  You and your wife immediately

20   went over to the Pentagon and you went to the office of

21   public relations at the Pentagon; is that correct?

22      A.      I know I went to public relations office.  I'm

23   not sure where my wife went.

24      Q.      Meaning from the airport you're not sure where

25   she went?  Or from the Pentagon --

1    A.    I may have -- I may have advised her to go to

2  the hotel.  I'm not sure where she went.  I don't recall.

3  Because, usually, I've to check my wife into the Pentagon

4  and get her a visitor's badge.

5    Q.    And do you recall checking her in on this trip

6  to the Pentagon on September 22nd?

7    A.    I don't recall.  I've done it on other

8  occasions when I took her with me.  But, usually, I have

9  to escort her throughout the building, so it's more of

10 a -- more of an issue that she can't be in the building

11 without an escort.

12   Q.    And you-all were staying at a hotel during this

13 trip to Washington, D.C.?

14   A.    We did.

15   Q.    What was the hotel?

16   A.    The Marriott, outside the Pentagon.

17   Q.    Is that the Marriott the Rosslyn, Virginia?

18   A.    I'm not sure.  I walk -- you can see the

19 Pentagon from the Marriott.

20   Q.    Is it walking distance from the Pentagon?

21   A.    Yes.

22   Q.    And how many nights did you stay at that

23 Marriott?

24   A.    I think we stayed there three nights.

25   Q.    And I -- if I just ask, Colonel Patterson, you

1    keep checking your watch.  I don't know if there's

2    something other than time that you're reviewing there.

3    Any messages or anything like that?

4         A.    No, there's no message.  I was reviewing time.

5         Q.    Okay.

6         A.    Because I need to take a break, sir.  I'm

7    sorry.  I need to use the restroom.

8         Q.    Okay.

9         A.    I'm trying to be polite to you, but, you know,

10   at certain time, I mean, I need to use the restroom.

11   Thank you.

12              MR. MORALES:  We are off.

13              THE VIDEOGRAPHER:  Off the record.  The time is

14        4:26.

15              (Thereupon, a recess was taken.)

16              THE VIDEOGRAPHER:  Okay.  We are now back on

17        the record.  The time is four -- time is 4:33.  Media

18        Number 5.

19   BY MR. MORALES:

20        Q.    Colonel Patterson, I believe we were discussing

21   the midmorning period or morning period of September 22,

22   2015, and your arrival at the Pentagon.

23              You testified that you arrived at the Pentagon,

24   perhaps by yourself, perhaps with your wife, and

25   immediately went to meet with Lieutenant Colonel Reynolds;

1    is that correct?

2          A.    That's correct.

3          Q.    And do you recall where in the Pentagon that

4    you met with Lieutenant Colonel Reynolds?

5          A.    It would have been in the public relations

6    office.

7          Q.    Okay.  And Lieutenant Colonel Reynolds is based

8    in the public relations office?

9          A.    He was.

10         Q.    And what was Lieutenant Colonel Reynolds'

11   position in that office?

12         A.    He worked as a public relations officer on the

13   Army staff.

14         Q.    And do you recall what duties, if any, you

15   performed at the Pentagon on that day, September 22, 2015?

16         A.    I got a briefing on what we were going to do at

17   the White House the following day.  And I usually get a

18   briefing on kind of what the -- what the expectations are

19   for the -- for the day and for my performances of duties.

20                I usually will follow up with what I did

21   previously.  In other words, close any kind of loops with

22   the -- with the military to make sure that, you know,

23   whatever duty I did before was complete.  Usually, we do

24   personnel activities which involve, you know, pay, involve

25   different -- different military requirements.

1    Q.    And so did the -- the Pentagon's public

2   relations office have a role in the pope's visit to the

3   White House?

4    A.    The public affairs office always has a role any

5   time the Army is going to show up at any event.

6    Q.    So did the public relations office at the

7   Pentagon have a role in the pope's visit to the

8   White House?

9    A.    I actually wrote a story about the pope's

10  visit, that -- that I submitted for publication, and

11  talked about a lot of initiatives that the pope had that

12  involved the Army.

13   Q.    So, again, for the third time:  Did the public

14  relations office at the Pentagon --

15   A.    I think I answered your question, sir.

16   Q.    Did -- did the public relations office have a

17  role in the pope's visit at the White House?

18   A.    Absolutely.

19   Q.    And what was the public relations office

20  specific role at the White House during the pope's visit?

21   A.    Okay.  Sir, any time the Army participates in

22  an event, for anything, the Army is usually, you know,

23  the -- is usually the group that does -- that does the

24  hosting of foreign visits, that does a -- a -- this was a

25  welcoming ceremony for the pope.  So the Army is there.

1  The Army is physically present.  The Army assigns public

2  relations officers to -- to be present if there are news

3  media there that have questions regarding the Army, you've

4  got a public relations officer there that can answer those

5  questions, that can speak on behalf of the Army.

6      Q.    And all of those things happened at the pope's

7  visit at the White House, is your testimony?

8      A.    All of those things, the Army -- I didn't

9  personally speak to any news reporters, but had -- had any

10  one of those guys availed themselves for questions, then I

11  would have been available to answer questions, as well as,

12  you know, Colonel Reynolds and anybody else standing there

13  that was in Army public relations.

14      Q.    So were you appearing in an official capacity,

15  then, for the public relations office at the pope's visit?

16      A.    As I said, the briefing I got was the "We would

17  like -- we would like to have public relations people

18  present at the -- at the pope's function."  And I did

19  appear at the White House.  And I took a picture of me on

20  the South Lawn of the White House, in full uniform.  I

21  think you've the picture, correct?

22      Q.    I don't believe we do.

23      A.    Okay.

24      Q.    We haven't seen that.  We certainly would

25  appreciate --

1      A.      I've submitted it.

2      Q.      -- receiving that without a formal discovery

3 request.

4              MR. MORALES:  Is that agreeable?

5              MR. AMLONG:  Oh, sure.

6              THE WITNESS:  That's fine.

7              MR. MORALES:  Thanks.

8 BY MR. MORALES:

9      Q.      And were there any other -- any

10 responsibilities -- let me ask -- let me -- let me start

11 again.

12             Were there any formal responsibilities that you

13 were assigned at the pope's visit at the White House?

14     A.      I was -- I was told to be there at the

15 White House.  I stayed through the remainder of the

16 ceremony.  I availed myself to the Army personnel that

17 were there.  As a matter of fact, I took a lot of photos

18 of the event.  Which I forwarded to, you know, Army public

19 affairs.  I --

20     Q.      And just for the record, we haven't seen any of

21 those photos as well.  So we would --

22     A.      Well, I don't -- sir, I don't have the photos.

23 I submit all of those to the Army.  They belong to the

24 Army.

25     Q.      So you don't have any photos of the pope's

1  visit to the White House?

2      A.    I've the pictures that -- I have my personal

3  pictures that I took, that were -- that involved me being

4  on the South Lawn of the White House.  It's not an event

5  you get to go to that, you know, many, many times.

6            Have you been to the White House?

7      Q.    So, just to be clear:  You were appearing in

8  your official capacity, but the photos you say you have in

9  your possession are purely personal photos?

10     A.    Purely personal.

11           MR. MORALES:  Okay.  We -- we would make the

12       same request for those photos, as well --

13           THE WITNESS:  Yeah, I can provide you what I

14       have.

15  BY MR. MORALES:

16     Q.    Did anyone else from the public relations

17  office at the Pentagon appear with you at the White House?

18     A.    I saw Colonel Reynolds.  I was there with him.

19  And there were other people from public relations that

20  were there.  But I did not speak to them.

21     Q.    Did you have to track your time or anything

22  like that for your appearance at the event?

23     A.    Track my time?

24     Q.    Yeah.  Did you have to -- did you have to do

25  anything with the public relations personnel officer to

 1    note your appearance on behalf of the office at the event?

 2         A.    At the conclusion of all duty, there's a --

 3    there's a form that is submitted, it's called a "record of

 4    performance."  And, generally, you -- you don't list --

 5    you list, generally, the duties you were performing.  The

 6    Army is mainly concerned that, as a senior officer, if I'm

 7    directed to be in a certain location that you were there,

 8    they can validate that you were -- that you were present.

 9    I think --

10         Q.    And you did create that form for this event?

11         A.    The form is usually generated for me after the

12    event.  And it's usually submitted to -- to the military.

13    And then there's a pay advice which I have submitted to

14    American Airlines, and I know Jim Bonds got a copy of it,

15    which substantiated my duty performance from the 22nd

16    through, I think, the 25th.

17         Q.    With -- with reference to first document that

18    you referred to, it's accurate to say that we have not

19    received that document, correct?

20         A.    What are you saying?

21         Q.    The -- the document that you said is

22    prepared --

23         A.    I don't -- I don't have a -- I don't -- I don't

24    have a copy of it.

25         Q.    Just to state the question on the record.

1        The document that you refer to as being created

2   by the Pentagon office, we do not have copy of that

3   document; is that correct?

4        A.    I do not have a copy of it.

5        Q.    You don't have copy of that document either?

6        A.    No.  And had I had it, I would have given it to

7   you.

8        Q.    Is your view that the Pentagon's personnel --

9   or, excuse me.  Let me start over.

10        Is your view that the Pentagon's public

11   relations performed official duties at the pope visit at

12   the White House?

13        A.    It's my view that the Army public relations

14   appears at all official events that the Army is involved

15   in.  So if the Army comes to -- comes to a football game

16   here in Miami, you're going to have somebody from Army

17   public relations that's going to be there and be present.

18        Q.    And is that formal duty from the public

19   relation --

20        A.    Absolutely.  Absolutely.

21        Q.    So then your answer is yes, in your view, the

22   public relations office did perform official duties at the

23   White House?

24        A.    Absolutely.

25        Q.    Okay.  When did you first become aware that the

1  public relations office was going to perform official

2  duties at the pope's visit at the White House?

3     A.    Well, that's kind of a loaded question because

4  the Army public affairs office will -- the Army public

5  affairs office will attend most events.  And, you know, I

6  think it's irrelevant whether the duty -- whether you say

7  the duty's official or not.  I provided you notice of

8  military leave.  And I was obviously there.  Excuse me,

9  sir.  I was obviously there.  And so, you know --

10    Q.    So I'm going to ask my question --

11    A.    You're asking me to spec- -- so you're asking

12  me to speculate.

13    Q.    -- Colonel -- Colonel Patterson, which is:

14  When did you first become aware that the public relations

15  office would be represented at the pope's visit --

16    A.    I became aware --

17    Q.    -- at the White House?

18    A.    I became aware that I was going about the 19th

19  of September.

20    Q.    And my question is:  When did you become aware

21  that the public relations office would be represented at

22  the pope's visit?  Was it prior to --

23    A.    I became aware -- I don't recall --

24    Q.    Was it prior --

25    A.    -- I don't --

1      Q.    -- to September 19th?

2      A.    -- I don't recall -- I don't recall being

3  specifically tasked.  We -- we -- we attend calendar calls

4  and the Army will talk about events that are events that

5  are coming up.  And, in particular, at this time of the

6  year, I have a year with which to perform duty.  In other

7  words, to get a -- a good retirement year.  So you have a

8  year with which to earn 50 points.  In that time frame,

9  I've notified the Army that "Hey, I'm running out of time

10  and I need -- I need you to, you know, I need you to find

11  me a job to do to, give me some work to do so that I

12  can" --

13      Q.    In this time frame, you were running out of

14  time?

15      A.    Well, it'd be -- it's in September.  I'm

16  running out of time for a good year.

17      Q.    So the end of the year is December 31st; is

18  that correct?

19      A.    No, it's not, sir.

20      Q.    When is the end of the year?

21      A.    The end of the fiscal year is September the

22  30th.

23      Q.    So you were -- you were eight days out of the

24  end of the fiscal year and you were short on points?

25      A.    I was short on points.

1    Q.    How many points short were you at the time?

2    A.    I don't recall.  But I know that, when I

3    finished up my duty on the 25th of September, I had -- I

4    had adequate points to -- for a good retirement year.

5    Q.    Did you have adequate points September 22nd?

6    A.    I didn't have adequate points on the 19th, I

7    can tell you that.

8    Q.    And so it's your testimony that, but for your

9    service on September 22nd to 25th, that you would not have

10   had sufficient points by the end of the September 30th

11   fiscal year?

12   A.    From the duty I performed, which was the --

13   Q.    It's just a yes or no question.

14   A.    -- performed -- from the duty I performed, I

15   got eight points.  Eight retirement points for the duty

16   that I performed.

17   Q.    And so the question is --

18   A.    So I could have been short -- I could have been

19   short a point, I could have been short two points.  It's

20   irrelevant.  The Army -- the Army is the one that dictates

21   the duty dates.  I pretty much have to negotiate with the

22   unit when I'm going to perform my duty to the -- to the

23   aspect of they drive the train and they will provide the

24   dates of availability.

25   Q.    Sorry.  You said it's irrelevant in part of the

1  last segment of testimony.  What were you referring to?

2      A.    Can you repeat the question?  What was -- what

3  was the question at the time you asked?

4          MR. MORALES:  If the court reporter would read

5       back Colonel Patterson's last answer, there's a

6       reference to "it's irrelevant."

7              (A portion of the record was read by the

8       reporter.)

9  BY MR. MORALES:

10     Q.    What was that testimony referring to?

11     A.    So I'm saying that I notified the Army that,

12 I -- I would say sometime -- sometime prior to the month,

13 that I -- I felt as I was going to be short on points.  I

14 didn't feel that I had performed enough duty do out --

15 throughout the year.  And that, based on my assignment,

16 the Army is the one that dictates when you appear and how

17 you appear.  And I told them I -- I needed them to assign

18 me, you know, you've got to find me some work at some

19 point to do.  So this is why --

20     Q.    When did you make that request?

21     A.    As I said, it was -- it would have been

22 sometime before the close of the fiscal year.

23     Q.    September 1?  September 10?  September 15?  Any

24 of those dates?

25     A.    It could have been.  It could have been in

1    August when I made that request.

2        Q.    Did you make that request in August?

3        A.    It could have been.  But I don't -- I don't

4    specifically remember the date that I made the request.

5    It would have more likely been when I was on duty in

6    August, I would have -- I would have told them "You -- you

7    need to find me a suitable assignment to either perform

8    duty in Washington or somewhere in the Army realm."

9        Q.    So it sounds like, in August 2015, you did ask

10   the Army to provide you a period of duty in Washington --

11       A.    No.  I didn't ask --

12       Q.    -- before September 30th, 2015; is that

13   correct?

14       A.    Okay.  You -- you just put words in my mouth.

15   Okay.  I didn't ask them to find me duty in Washington.

16   The Army is worldwide.  Okay?  Army public relations has

17   offices in Los Angeles.  They have offices all over the

18   country.  I asked them to provide me an assignment that

19   would fulfill my duty.

20       Q.    So I guess there are two pieces of that.  One

21   is, in August 2015, you asked -- was it the Pentagon or

22   the Army, generally?

23       A.    No.  It's the Pentagon that I asked.

24       Q.    So, in August 2015, you asked the Pentagon,

25   located in Washington, D.C., area to find you a military

1    duty prior to September 30, 2015; is that correct?

2        A.    That's correct.

3        Q.    Did that fact strike you as relevant when I had

4    asked you earlier today whether you had asked the Pentagon

5    for duty in Washington, D.C.?

6        A.    I didn't specifically request duty in

7    Washington, D.C.  As a matter of fact, I've had the Army

8    tell me I was going to Los Angeles and then I wound up in

9    Washington, D.C., for duty.  So, you know, it -- it's

10   based on their needs.

11       Q.    So when you received the call on September 19,

12   2015, your testimony is that you were at that time short

13   of the necessary points you needed to hit by September 30,

14   2015?

15       A.    That's correct.

16       Q.    And did you have any plan prior to that call

17   for obtaining the necessary points?

18       A.    Basically, as I said, I asked the Army to --

19   to -- to find the work and determine the work that they

20   wanted me to do and, you know, it's up to them.

21       Q.    Were you getting worried, by September 19th,

22   that you hadn't yet received an assignment from the

23   military prior to September 30, 2015?

24       A.    I was certainly concerned.

25       Q.    Did you express that concern to anyone?

1    A.    I had already expressed the concern and, you

2  know, the Army had -- when the Army provided me the

3  notification that I was going, that concern was now

4  belayed because, obviously, I was going to get enough time

5  to go perform the duty that I needed to perform.

6    Q.    And that was obvious to you on that

7  September 19th call?

8    A.    It was close, that I was going to go.  But, as

9  I've said, I've had the Army change their mind at the last

10  minute and pull me back off of an assignment.  And, of

11  course, that would have certainly generated, you know,

12  another call as to okay, now we're -- now we're -- now

13  you've created a -- another problem for me.

14    Q.    If you could explain what you were just talking

15  about --

16    A.    As I've said, sir --

17    Q.    -- hypothetical problem.

18    A.    As I've said, sir, I've had the Army pull back,

19  pull back assignments or say "No, we don't need you here,

20  we need you to go here.  We need you to go to Los Angeles

21  or."

22    Q.    Right.  But you said "Obviously, that would

23  have created another problem."  What problem would it have

24  created?

25    A.    Well, yeah, it would have -- it would have

1  meant that I wasn't going to get a good retirement year if
2  I didn't go perform duty.
3           MR. AMLONG:  I think he means that there's --
4       if he misses his cutoff -- that there's no such thing
5       as being a little bit pregnant.
6  BY MR. MORALES:
7       Q.    Let me ask you, Colonel Patterson, was the
8  problem you were referring to a problem with the Pentagon
9  or with American Airlines?
10      A.    You're saying was the prob- -- how would it be
11  American Airlines problem?
12      Q.    Well, my question is for you to clarify when
13  you say "Of course that would have created another
14  problem."
15      A.    The problem would have been -- the problem
16  would have been for the Army, because, as -- as Counsel
17  says, that, you know, you're either pregnant or you're
18  not.  It's I'm either going to make the deadline of the
19  30th or I'm not.
20      Q.    Did you communicate to anyone at
21  American Airlines that you had a deadline of
22  September 30th that would require you to perform multiple
23  days of military service?
24      A.    No, I did not and I'm not required to.
25      Q.    But you -- you didn't communicate that to

1  anyone?

2       A.    I did not communicate that to anyone.  I'm not

3  required to.

4       Q.    When you got the call on September 19th from

5  the public relations personnel officer, were you surprised

6  to receive the call providing for duty in Washington,

7  D.C., during the pope's visit?

8       A.    I was pretty relieved.

9       Q.    Were you surprised?

10      A.    I wasn't surprised.  I was relieved.

11      Q.    And why weren't you surprised?

12      A.    Well, on the 19th, I still had time till --

13 until the end of the month, to perform military duty.  So

14 if it -- if they hadn't -- if they hadn't generated

15 something by the 22nd, I was actually -- I would have

16 gotten back in touch with them and said "Hey, we're

17 getting danger close here and I need time.  And you're

18 going to have to find some time for me to do."

19      Q.    And just to be clear:  What was the scheduled

20 departure date for your American Airlines flight to

21 Bolivia?

22      A.    The 22nd of September.

23      Q.    And your testimony just now is if you hadn't

24 heard from the Army by September 22nd, that you would have

25 called the Army and requested a duty period prior to

1   September 30th, correct?

2       A.    I would have requested them to provide some

3   clarification on what they wanted me to do, certainly.

4       Q.    So September 22nd, you're at the Pentagon, you

5   receive a briefing.  Is that the end of your time that day

6   at the Pentagon?

7       A.    I don't recall.  I think I did -- I think I

8   followed on with some, like I've said, I followed on with

9   more of my work that I had done there previously.  The

10  Army usually will assign officers to do planning for

11  conferences and I think I had a conference that I was

12  following up on as well, that the Army hosts, a worldwide

13  conference for various services.  So I think I was

14  involved in that as well.

15      Q.    And do you recall about what time you departed

16  the Pentagon?

17      A.    Well I had to be there for eight hours and

18  account for eight hours of my time.  So it would have

19  been -- it would have been late in the evening.

20      Q.    So you were at the Pentagon for eight hours on

21  the 22nd of September?

22      A.    You have to be there eight hours for -- to --

23  for your credit.

24      Q.    And then the pope's visit to the White House

25  was the next day, September 23rd; is that correct?

1    A.    That's correct.

2    Q.    And what time -- first of all, did you attend

3  that ceremony?

4    A.    I did.

5    Q.    And what time did you depart your hotel,

6  approximately?

7    A.    Well, we had to be -- we had to be at the

8  White House about 5:00 o'clock in the morning, in line.

9  Because the TSA is there and they security screen anyone

10  going into the White House, even the military personnel

11  going in.  And I recall the ceremony concluded around --

12  it was around lunchtime.  I had lunch right outside the

13  White House.  And then, after that, I went back to the

14  Pentagon and concluded my day.

15    Q.    Did you consider the 1:00 p.m. departure time

16  the end of your official duties for that day?

17    A.    Absolutely not.  I went back to the Pentagon.

18    Q.    And did you perform any duties at the Pentagon?

19    A.    I did.

20    Q.    What duties?

21    A.    Basically my administrative duties that I have

22  to perform.

23    Q.    And were those related to the pope's visit?

24    A.    I think I wrote the story is what I did.  I put

25  my notes together and I wrote the story and I submitted

1    that to the Army publication.

2        Q.    And what time did you leave the Pentagon that

3    day?

4        A.    I left the Pentagon, it was after 7:00 p.m.

5        Q.    And that was the end of your duties for that

6    day?

7        A.    For that day, that's correct.

8        Q.    And so then the next day was September 24th.

9    Were you still in Washington that day?

10        A.    I do recall that -- yeah, I do recall that I

11    went back to the Pentagon on the 24th of September.

12        Q.    In the morning?

13        A.    Oh, of course.  Every -- every military duty

14    day starts in the morning unless you're on, you know, a

15    watch or some type of assignment.

16        Q.    And how did you spend that day?

17        A.    I did more administrative duties.

18        Q.    And, again, when you say "administrative

19    duties," you've mentioned the example of writing a story

20    about the White House visit, which, again --

21        A.    I can do that.  I can work for the conference.

22        Q.    Just for the record:  We haven't seen that

23    story either.  We'd appreciate receiving that story, if

24    you -- can we do it -- could we, without --

25        A.    I'll have to go -- I'll -- I'll -- I'll have to

1  go find it.

2      Q.    Okay.  Would you --

3      A.    The computer -- the computer that I -- the

4  computer that I wrote the story on was in the Pentagon

5  and, as I said, I don't -- I don't have access to -- I

6  don't have access to the Pentagon any longer.  When I

7  retired, your access is cut off.

8      Q.    So is your testimony that you don't have access

9  to the story that you wrote for the Pentagon about the

10  pope's visit --

11      A.    I e-mailed the story from my mail.mil account

12  and, as I said, I don't have access to that any longer.

13      Q.    But do you have access to the story?

14      A.    I will go do -- perform a diligent search for

15  the story, Counsel.

16      Q.    Do you have access to the story?

17            MR. AMLONG:  Was it in "Stars and Stripes"?

18            THE WITNESS:  No.  It would -- I would have

19       submitted it -- I would have submitted it to, not the

20       "Army Times," it would have been the "ARMY" magazine.

21  BY MR. MORALES:

22      Q.    Was the story published?

23      A.    It was not published.  But, of course, at

24  that -- when you submit stories, they -- they look at it

25  and the publisher determines the merits of the story or

1    whether or not it fits a particular motif or -- or

2    whatnot.

3        Q.    Okay.  Well, we appreciate your diligent search

4    for that story.

5              On the 24th, you said you performed some

6    administrative duties.  Anything else that comes to mind

7    in addition to working on this story?

8        A.    No.

9        Q.    Were you in the public relations office that

10   day?

11       A.    Of course I was.

12       Q.    Was -- was Lieutenant Colonel Reynolds there as

13   well?

14       A.    I don't recall seeing him.  You know, I'm a

15   lieutenant colonel, so I'm a senior staff officer.  I

16   mean, I'm not a -- I'm not a private.  I'm not -- I'm not

17   supervised intensively.

18       Q.    I'm sorry.  What does that have to do with

19   Lieutenant Colonel Reynolds?

20       A.    I'm just saying, usually we pair up with a --

21   with another officer.  But I'm not supervised by Colonel

22   Reynolds.

23              MR. MORALES:  I will have you take a look at

24         what I believe is Exhibit 12.

25              (Exhibit 12, Activity Pay Sheet 2/4/2016, was

1          marked for Identification.)

2     BY MR. MORALES:

3          Q.    This is a document that -- Bates stamp

4     Patterson_00021.  At the top, it says "Activity Pay Sheet

5     2/4/2016."

6               Are you familiar with this document?

7          A.    This is the HI1, is what it says.

8          Q.    If you could just point us to the reference of

9     the HI1?

10         A.    This is an HI1.  It's a pay sheet activity.

11    It's an HI1 that compares before the month and after the

12    month.

13         Q.    So I believe what you are referring to is, on

14    the left side, there's one column and, on the right side,

15    there's another column.  Is that the comparison you're --

16         A.    That's --

17         Q.    -- you're referencing?

18         A.    That's correct.

19         Q.    Okay.  And top left, right under "Activity

20    Sheet Detail," there's a reference to "Patterson, RS."

21    You understand that to be a reference to you; is that

22    correct?

23         A.    Of course it is.

24         Q.    Is there any way to tell, from this sheet, the

25    time period that's being referenced here?

1      A.     These reference the dates.

2      Q.     So at the top, it says "2/4/2016."  Is there a

3 reference to the --

4      A.     Where do you -- where do you see 2/4/2016?

5      Q.     So on the top left of the document, above

6 Activity Sheet Detail, you see the 2/4/2016?

7      A.     Yes.

8      Q.     Okay.

9      A.     That has nothing to do with the -- that has

10 nothing to do with the time frame of the report.

11      Q.     And my question is:  Where we would look if we

12 wanted to find out the timeline for the report?

13      A.     Let's try it with month starting 31 August '15

14 and ending 30 September of '15.

15      Q.     And you're directing us to the first line under

16 the "Activity Sheet Detail" header.  About halfway over,

17 it says "Month starting 31 Aug '15 and ending 30 Sept --

18 Sept '15."

19            Is that correct?

20      A.     That's what it appears to be.

21      Q.     It says "Process date 10/8/15."  So this was

22 created after the bid period was over and all flights had

23 been completed for this month; is that correct?

24      A.     That's correct.

25      Q.     And your testimony was that the column on the

1  left is the column that addresses the scheduled flying

2  prior to the bid period; is that right?

3      A.    That's correct.

4      Q.    So this was the flying that was anticipated

5  before the month started; is that correct?

6      A.    That's what's anticipated.

7      Q.    Okay.  And so if we look, when we see --

8  there's a line -- well, under your name, it says on the

9  far left, it says "Patterson, RS" and then about ten lines

10  or so down on the far left, there's a "D-E-D," an "S-T,"

11  an "R-M-V," an "A-D-D."

12          Do you see that?

13      A.    I do.

14      Q.    Okay.  And under "D-E-D," what does -- it says

15  "3-1."  What do you understand that to refer to?

16      A.    It appears to be a date.

17      Q.    And what date would that be here?

18      A.    Well, the form began 31 August of '15.

19      Q.    Okay.  So that is a reference to August 31st

20  and then the items that appear to the right of that 31

21  would be additional information about what happened on

22  August 31st; is that correct?

23      A.    Yes.

24      Q.    Okay.  So then the "0-1" that is directly under

25  that , is that September 1st, 2015?

1      A.    That's what it appears to be.

2      Q.    Okay.  So if we can go down to September 22nd,

3   so where the 2-2 appears, and I would like for you to --

4   to explain what we are looking at here next to

5   September 22nd on the left column.

6      A.    On the left column, it appears to be --

7            MR. AMLONG:  Hold on, y'all.  Have you seen

8       this?  Do you know what this is?

9            THE WITNESS:  Yeah, I do.

10           MR. AMLONG:  Okay.

11           THE WITNESS:  It appears to be Flight 922.  It

12       looks like it's scheduled for 7 hours and 59 minutes.

13       And looks like, on the 24th, coming back shows just

14       VVI as the destination.  And it looks like 14 hours

15       and 57 minutes.

16  BY MR. MORALES:

17     Q.    And where do you see the reference to VVI?

18     A.    It's down below that in the line.

19     Q.    And so, just so I'm clear here:  922 is the

20  flight number; is that correct?

21     A.    That's what it appears to be, yes.

22     Q.    And is that the flight from Miami to VVI?

23     A.    That's the flight from Miami to VVI.

24     Q.    And that flight is scheduled for 7 hours and

25  59 minutes; is that correct?

1      A.     That's correct.

2      Q.     And that's on September 22, 2015?

3      A.     That's what it shows.

4      Q.     And then September 24th also shows "D922."  Can

5      you explain to us what that refers to.

6      A.     Apparently, it's the same flight number

7      returning.

8      Q.     And what does the "D" stand for?

9      A.     I don't know.

10     Q.     But you would have -- but you would have been

11     flying this flight; is that correct?  You were scheduled

12     to fly this flight?

13     A.     I was scheduled to fly the flight, that's

14     correct.

15     Q.     Okay.  The D isn't a reference to deadhead or

16     anything like that?

17     A.     It could be.  That would make sense.

18     Q.     Okay.  And what is deadheading?

19     A.     Deadheading is basically where a crew member

20     is -- is assigned a duty on a flight, but they're --

21     they're a passenger.

22     Q.     To the right of that, it says "6.58."  That's

23     the scheduled flight time for -- is that VVI to Miami?

24     A.     That's correct.

25     Q.     And so then the total flight hours that you

1  would be credited for this pay sheet for that trip is

2  14.57; is that right?

3       A.   That's the minimum.

4       Q.   Okay.  That's the minimum.  And is it the case

5  that, if the flying time exceeds that, for example, that

6  could change?

7       A.   Well, for the flight to VVI, which always went

8  through La Paz, it could have been more based on a higher

9  flight time but it would never be less.

10           The -- the deadheading portion of the flight is

11  credited at the deadheading portion.  So if you fly less,

12  you're getting 658, if you fly more you're getting 658.

13       Q.   So that trip was set to begin on September 22nd

14  and conclude with your return back to Miami on

15  September 24th; is that correct?

16       A.   That's what it appears, yes.

17       Q.   That's what was scheduled prior to the bid

18  period?

19       A.   Mm-hmm.

20       Q.   Were there any other trips scheduled for

21  September 2015?

22       A.   Were there any other trips scheduled?

23       Q.   If you look at this document --

24       A.   Of course.  Of course.

25       Q.   Okay.  Where could you direct us, if we --

1     A.     Well, I mean, the schedule, as you've said, is
2  on the left-hand side of the paper.
3     Q.     Right.  And so where would we -- where would we
4  look to see other trips that were scheduled later in the
5  month?
6     A.     The same place you're looking for the current
7  trip.
8     Q.     Okay.  So September 25th, was there a trip
9  scheduled that day?
10     A.     No.
11     Q.     What is the 0000 refer to?
12     A.     It's a 24-hour period off.
13     Q.     Okay.  And the same is true for September 26th?
14     A.     That's correct.
15     Q.     What about September 27th?  It says "DO"?
16     A.     That's a day off.
17     Q.     Is that different in any manner from what you
18  had on the 25th and 26th?
19     A.     It appears to be.
20     Q.     Do you know how it might be?
21     A.     That appears to be a day that American Airlines
22  cannot infringe on.  Looks like a golden day, I think we
23  used to call that.
24     Q.     The DO?
25     A.     The DO is golden day is what it looks like.

1      Q.    That would have been for either contractual

2   or --

3      A.    Right.

4      Q.    -- duty and rest reasons; is that correct?

5      A.    That's right.

6      Q.    Okay.  If you look at 28th there, is this the

7   additional trip scheduled for September 2015?

8      A.    It is.

9      Q.    And it looks like it's the same itinerary that

10  we just looked at for the 22nd to 24th --

11     A.    That's correct.

12     Q.    -- is that correct?

13     A.    That is correct.

14     Q.    So this flight was scheduled to depart Miami on

15  September 28th, return on September 30th from VVI; is that

16  correct?

17     A.    That's correct.

18     Q.    So at the time that you received the phone call

19  from the Pentagon on September 19th, you were scheduled

20  for two international trips for American Airlines during

21  the next 11 days; is that correct?

22     A.    That's what it appears, yes.

23     Q.    Each trip was scheduled for a total of three

24  days; is that correct?

25     A.    When you say "three days," that's --

1     Q.    Including the day of departure and day of

2  arrival; is that correct?

3     A.    Well, including day of departure.  Trips to --

4  trips to Bolivia usually depart very late in the evening,

5  I mean, with basically an hour to go in the day.  So the

6  trip's technically -- it's technically two days and one

7  hour.

8     Q.    We then compare the column on the right, is

9  this the -- the actual flying that was performed during

10  the September 2015 bid period?

11     A.    I wouldn't say it's the actual flying.  I would

12  say that what's on the left is a plan and what's on the

13  right is a -- is a final plan or a final tally of what

14  actually was flown.

15     Q.    But if we wanted to determine what flying you

16  actually performed in September 2015, the right side would

17  give us that information; is that correct?

18     A.    The right side would give you that information.

19     Q.    So if we look at the 22nd, for example, it

20  shows Flight 922, but there is a PW in the RMV column.

21     A.    Mm-hmm.

22     Q.    Can you tell us what that stands for?

23     A.    Pay withheld.

24     Q.    And it appears that that PW designation shows

25  up in each of the dates for September that are listed on

1   this right column; is that correct?

2        A.    That's what it appears.

3        Q.    Okay.  And that's because -- well, and I should

4   ask then:  Did any of the -- did either of the scheduled

5   Flight 922 trips for September 22nd or September 28th, did

6   you actually fly either of those trips?

7        A.    Obviously, not.  Because I was PW'd.

8        Q.    Okay.  One question is, there's, on the right

9   column on -- on September 25th and 26th, there's a -- what

10  appears to be a reference that wasn't on the left column.

11  And it says "OT" under "add."  Can you tell us what we're

12  looking at there.

13       A.    Well, it appears that there was an open time

14  trip picked up at some point.

15       Q.    And an open time trip, can you describe to us

16  what that is?

17       A.    Yes.

18             American Airlines, they have a process called

19  the "trip trade service" or I think they call it

20  "T-T-O-T," trip trade with open time.  And as a line

21  holder, I had the ability to go in where I had days off.

22  So, obviously, it looks like I had the -- looks like I had

23  the 25th and 26th off.  And because I had those days off,

24  the computer allowed me to pick up flying for, you know,

25  to make up some time.  You're allowed to pick up and make

1  up time maybe that you lost or maybe, you know, now the

2  company cancels a trip and/or a scheduled trip gets

3  cancelled and then they'll allow you to pick up open time

4  to bring you up to, you know, to bring your -- your pay

5  proj or your greater time to date up.

6      Q.    And do you recall when you would have picked up

7  this open time trip for September 25th and 26?

8      A.    I don't know.  There's no indication here on

9  the form when I picked that time up, sir.

10     Q.    But that trip was added to your schedule and it

11 was just the same as any other trip once it was added, in

12 the sense that you were --

13     A.    Could be, yeah.

14     Q.    -- committed to flying that trip; is that

15 correct?

16     A.    That's correct.

17     Q.    So let me ask you:  If you look then --

18     A.    Not necessarily committed to fly it because I

19 could have turned around and dropped the trip again too.

20     Q.    So if you look at -- I would like to ask you a

21 separate question.  If you look at the right side column,

22 which is the -- the column we've just been discussing.  Am

23 I correct, based on that right column, that, as of

24 September 21st, 2015, you were scheduled to fly on eight

25 of the nine next days for American Airlines, concluding on

1    September 30th, 2015?

2         A.    That's what it appears.

3         Q.    So on September 21st, at the time that you

4    first contacted American Airlines to tell them that you

5    were going on a duty for the pope's visit to the

6    White House, at that moment, you were scheduled to fly for

7    American Airlines on eight of the remaining nine days in

8    September 2015; is that correct?

9         A.    That's correct.

10        Q.    Is there any way to tell from this right column

11   where the Flight 820 open time trip, where that was

12   scheduled to arrive?

13        A.    I don't see a specific time, but I think 917 is

14   a -- is a flight to Lima.  And I think that's a late night

15   departure with a -- there's -- there's several flights to

16   Lima, but this one in particular, I think, was a late

17   night departure with a -- a return coming back to --

18   coming back.

19        Q.    And the flight on September 22nd, that was to

20   VVI which is in Bolivia?

21        A.    That's correct.

22        Q.    And the same is true for the flight on

23   September 28th?

24        A.    Mm-hmm.

25        Q.    So as of September 21, 2015, you were scheduled

1    to fly three international trips consuming eight of the

2    next nine days in September 2015; is that correct?

3        A.    That's what it appears.

4        Q.    Okay.  At the time that you called American on

5    the 21st to let them know that you would be unavailable

6    for some upcoming flying, had you received any crew

7    pairings or crew assignments for any of the trips you had

8    remaining in September 28 -- or September 2015?

9        A.    I don't recall.  And I usually don't look at

10   the crew pairings.  There's only one captain that I will

11   not fly with at American Airlines and his name is Glenn

12   Whitehouse.  And so --

13       Q.    And so if we were taking a flight on

14   September 22nd, Flight 922, was Captain Whitehouse

15   assigned to that flight?

16       A.    I don't recall that Captain Whitehouse was

17   assigned to that flight.  I -- I think Captain Whitehouse

18   was on my do-not-pair list so he would not have been

19   assigned to the flight.

20       Q.    Do you recall gaining any knowledge about any

21   other pilot that was assigned to Flight 922 on

22   September 22, 2015?

23       A.    I don't.  And it would not have been a problem

24   to fly with any other pilot.

25       Q.    But you were not aware, as a factual matter,

1   the name of any other pilot that had been assigned to fly

2   that flight on September 22nd?

3       A.    I was not aware.

4       Q.    Okay.  To your knowledge, was anyone from the

5   Allied Pilots Association's professional standards

6   committee scheduled to fly on the trip on September 22,

7   2015?

8       A.    I don't recall.  And if they had been it would

9   have been fine with me.

10      Q.    But your answer is that --

11      A.    I don't recall.  I don't recall who the captain

12  was.  If you had the crew pairing, I might know, but --

13      Q.    But you have no recollection of any particular

14  pilot scheduled to fly that aircraft?

15      A.    No, I don't.

16      Q.    Okay.  When you contacted American Airlines on

17  September 21st, did you request the same type of military

18  leave that you had been granted for your August 2015

19  military service with the Pentagon?

20      A.    Do you have my August schedule?  I don't know

21  what I requested in August to cover the duty.

22      Q.    So if you would take a look, perhaps, at the

23  Exhibit 11, the screenshot document there that we had

24  reviewed earlier.  If you look at the entry we discussed

25  earlier that says [as read]:  M-X 21 Aug 15, 23 Aug 15,

1   U-N-C-R M-L-O-A.

2            And your testimony was that U-N-C-R M-L-O-A

3   referred to uncredited military leave of absence.  And my

4   question was whether you also requested an uncredited

5   military leave of absence for your September 22nd --

6        A.    I think I was --

7        Q.    -- trip to Washington, D.C.?

8        A.    I think I specifically requested an EO from the

9   flight office, which is an -- an -- like, an emergency

10  off.  It's a -- it's a -- it's an offset or a time off

11  where, under USERRA, I can, you know, ask

12  American Airlines "Hey, listen, I need you to let me off

13  on this date.  I've military leave.  And would you allow

14  me to take my future accrued vacation days and -- and

15  apply them to these days off."

16       Q.    So just to be clear:  What does "EO" stand for?

17       A.    It's -- I think it's employee off or emergency

18  off.  I think that's what the term "EO" applies to.

19       Q.    And was that term created under the military

20  leave section of the contract?

21       A.    The term is not created under the -- I didn't

22  see that under the military leave, but I do know that

23  American has provided EOs to pilots to allow them time off

24  to perform military duties.

25       Q.    So does it --

1    A.    So it didn't strike me as odd as -- at

2 requesting that.

3    Q.    So does -- a pilot that has no military service

4 commitments, can they request an EO?

5    A.    Absolutely.

6    Q.    And is there any limitation on the basis for an

7 EO request other than that it's an emergency?

8    A.    I think the -- the -- the chief pilot is

9 typically the one who provides that.  It's not crew

10 scheduling.  It's the chief pilot would give a person an

11 EO.  And there are -- there are a number of circumstances

12 that would -- would permit an EO being issued.

13    Q.    But a pilot does -- a pilot doesn't have to

14 have any military background or military leave commitment

15 to request an EO?

16    A.    No, they don't.  EO is not limited to military.

17 It's limited to -- it's really not limited.  It's -- it's

18 a -- it's a situation to allow a chief pilot latitude to

19 give a pilot time off.

20    Q.    And it can be for any reason as long as it

21 qualifies in the view of the chief pilot; is that correct?

22 Or in view of the contract?

23    A.    I think in -- I think the chief pilots have

24 latitude or discretion as to whether they're going to

25 grant an EO or not.  Obviously -- obviously, EOs are --

1    are -- are -- are discretionary.  I mean, crew scheduling,

2    I've never had them give me an EO.

3        Q.    And why does the EO exist, in your view -- let

4    me ask this question.  I'll start again.

5            What value does an EO provide to pilots above

6    and beyond the typical leaves of absence or vacation

7    provisions in the contract?

8        A.    Basic --

9            MR. AMLONG:  Objection.  Foundation.  Personal

10        knowledge.

11   BY MR. MORALES:

12       Q.    You can answer.

13       A.    From my understanding, an EO would give you the

14   requested time off.  It would allow you to offset your

15   future vacation accrual.  It's the next year's vacation

16   accrual.  And it wouldn't be an uncredited leave of

17   absence.  It would be a -- they would -- they would use

18   your vacation days to cover an assignment.

19       Q.    So when you're requesting an EO, you're

20   requesting credit from next year's vacation accrual?

21       A.    Right.  So the following year, my vacation bank

22   is going to be, you know, if I'm requesting three EOs, the

23   following year, my vacation bank, versus 28 days, is going

24   to be 25 days.

25       Q.    And does the chief pilot have discretion about

1    whether to let you use next year's vacation accrual for

2    the time off requested?

3         A.    I think that's contractual for an EO.

4         Q.    So, to your knowledge, does the chief pilot

5    have discretion on that?

6         A.    I mean, I think the chief pilot, if he says

7    "No, I'm not going to giver you an EO," it's pretty clear

8    that you're not getting the time off.

9         Q.    And why did you request an EO for this trip to

10   Washington?

11        A.    Well, very simple.  I had a trip that covered

12   22, 23 and 24.  And I wished to offset that trip due to a

13   military reason.  And I wanted it to come out of my next

14   month's vacation bank, which is a right guaranteed me

15   under USERRA.

16        Q.    And for that reason you decided to not request

17   a military leave of absence for your trip to Washington,

18   D.C.; isn't that correct?

19        A.    It's my understanding that the chief pilot

20   could have said "I'm going to code this as MX.  I'm going

21   to release you from duty."  And, you know, I would have

22   had to have accepted the decision.

23        Q.    Sorry.  I don't follow your -- your answer.

24             Did -- did -- did you request a military leave

25   of absence for purposes of your trip to Washington, D.C.?

1          A.    I requested, from the flight office, an EO, as

2     I've been granted in -- in -- in times past, to cover --

3     to cover military leave.  And I said "Hey, I -- I have

4     military leave.  I'm going to be going to the Pentagon.

5     And I would appreciate if I could get an EO."  And I spoke

6     with -- I -- I think I spoke with Trish in the flight

7     office.

8          Q.    Who is Trish?

9          A.    She is some employee.  Jim Bonds left a message

10    on my answering machine telling me I had spoken with Trish

11    in the flight office.

12               Excuse me.

13         Q.    Why had you requested a military leave of

14    absence for your August 2015 trip?

15         A.    Why would I do that?  I don't have the schedule

16    in front of me, but it's possible that my military duty

17    might have impinged on a trip with American Airlines, and

18    I was per- -- I was requesting the time off.  I can't

19    answer your question without more information.

20         Q.    So this is the August trip that we were just

21    looking at a moment ago in Exhibit 11.  August 21st, '15

22    to August 23rd, '15.  Do you remember that?

23         A.    Yeah.  But you've given me two separate

24    documents.  You haven't -- you haven't provided me with

25    this document for August.

1     Q.    And so -- so my question is:  For August 21 to

2  23, 2015, you requested and were granted a military leave

3  of absence.  Why did you not request the same military

4  leave of absence for September 22, 2015?

5     A.    Without looking at it, it's very possible

6  that -- it's very possible that I did request an EO to

7  cover that time and the chief pilot could have said "Hey,

8  I'm going to give you -- I'm going to give you an MX."

9     Q.    Because the chief pilot has discretion to

10  reject a request for an EO; is that correct?

11     A.    Chief pilot could -- could have discretion to

12  reject a request for an EO.  However, the chief pilot,

13  notified that I had duty at the Pentagon, has no

14  discretion to reject that.

15     Q.    And just so I'm clear --

16     A.    Absolutely none.

17     Q.    -- the testimony you just provided is that the

18  reason that you didn't -- let me start again.

19          Testimony you just provided is that the reason

20  that you requested an EO is because -- let me ask it this

21  way.

22          You just testified about a chief pilot making a

23  discretionary decision to reject a request for EO; is that

24  correct?

25     A.    I said that without having -- without having

1  the specifics of the trip in front of me, which you have

2  not provided, I don't know what the circumstances were for

3  the application of an MX.  I can tell you usually the MX

4  is applied after the -- after the close of the bid month.

5  And it's American Airlines' way of saying, yeah, we're

6  going to comply with USERRA.  Especially if you're on a

7  reserve assignment.  If you're on reserve with

8  American Airlines, and I happen to know a month ahead

9  and -- and as I've said, I'm in a different unit.  Some

10  units I've been in, they publish a schedule.  They publish

11  the schedule a month in advance, two months, a year in

12  advance and we know the dates.

13       Q.    And just -- just --

14       A.    We know the dates.  But I'm saying this is a

15  different circumstance.

16       Q.    The sequence you describe is?

17       A.    I don't know why there's --

18       Q.    So -- so -- so --

19       A.    I don't know -- I don't know why there's an MX.

20       Q.    I believe you testified that one sequence that

21  could occur, if you request an EO, is that the chief pilot

22  declines the EO and instead grants you a military leave of

23  absence.  Do you recall --

24       A.    I don't -- I -- I recall --

25       Q.    -- that testimony?

1    A.    -- that testimony.  And I cannot say that -- I

2  can't say that that's fact.  I don't know why there's an

3  MX there versus an EO versus vacation.

4    Q.    Why would an EO -- in that sequence, why would

5  it be preferable for you to obtain the EO as opposed to

6  the military leave of absence?

7    A.    Doesn't matter.  It's the time off, sir.

8  And --

9    Q.    So I'm asking you why you would request an EO

10  if you could -- if you know you're guaranteed a military

11  leave of absence.  And there's nothing for the document.

12  I'm just asking you a question.

13    A.    Why not request an EO?

14    Q.    Why would you request an EO instead of a

15  military leave of absence?

16    A.    It would be beneficial to American Airlines.

17    Q.    So my question is:  For a pilot like yourself,

18  in this case, why would you request an EO instead of a

19  military leave of absence?

20    A.    Because, if you look at the -- if you look at

21  the trip sequence, you told me, you said with your own

22  words, that it's 14 hours and 57 minutes of time.  If you

23  look at my -- if you look at my pay projection for the

24  month, that would have put my pay projection down

25  somewhere around 55 hours of pay.

1      Q.    So the answer is that there's a difference in

2   the pay treatment for an EO versus an MLOA; is that

3   correct?

4      A.    Absolutely.

5      Q.    Okay.  And in the scenario you outlined, the

6   worse case scenario from the pilot's perspective would be

7   that a chief pilot rejects the EO request and grants a

8   military leave of absence; is that correct?

9      A.    I think that's correct.  And I think, under the

10  rules --

11     Q.    I have one other -- I have one other follow-up

12  question on this.

13     A.    Go ahead.

14     Q.    Which is:  Were you, in fact, granted an EO by

15  the Miami flight office for the September 2015 trip to

16  Washington, D.C.?

17     A.    I was not.

18     Q.    It's just a simple yes or no question.

19     A.    I was not.

20     Q.    At no point were you granted an EO?

21     A.    Not by the Miami flight office.

22     Q.    Okay.  At any point, anyone in the system at

23  American Airlines, were you granted your request for an

24  EO?

25     A.    I was given an EO by David Tatum.

1      Q.     And is David Tatum an American --

2      A.     He's the chief -- is SOC duty chief on duty

3  when I called in on the evening of the 21st.

4      Q.     And was your understanding, when you spoke with

5  Mr. Tatum, that his communication to you had, in fact,

6  granted your EO request?

7      A.     Absolutely.

8      Q.     Okay.  And -- and is there any other -- anyone

9  other than Lieutenant Colonel Reynolds that you would

10 identify as qualified to testify about the military duties

11 you conducted in Washington, D.C., during the pope's

12 visit?

13     A.     Not that comes to mind readily.

14     Q.     Anyone, with some thought, might be a person of

15 interest?

16     A.     Not that comes to mind readily.  I haven't

17 spoken with anybody in the office since I retired.

18     Q.     Okay.  While you were in Washington for the

19 pope's visit, did you communicate with anyone at

20 American Airlines?

21     A.     Actually, I did.  I made contact with Louis

22 Rojas in the Miami flight office.  And Luis requested that

23 I substantiate the duty.  And at that time, I went and

24 pulled a form that's used by the employer support of the

25 guard and reserves, specifically --

1      Q.    When you say "at that time," just to be clear,

2   what time was that?

3      A.    It would have been -- it would have been

4   sometime after the 22nd.  I -- I think it might have

5   actually been on the morning of the 22nd.

6      Q.    So it was sometime no earlier than the 22nd of

7   September; is that correct?

8      A.    Well, of course.  I mean, I hadn't travelled to

9   Washington, D.C.  I remember I sent a fax to him from the

10  Pentagon.

11          MR. MORALES:  If I could ask for Exhibit 13 to

12      be marked, please.

13              (Exhibit 13, Notification of Military Leave

14          of Absence, was marked for Identification.)

15  BY MR. MORALES:

16      Q.    I just ask you, Mr. Patterson, it appears to

17  say "Notification of Military Leave of Absence," and I

18  know there's some hole punches in the top.

19          But is that your understanding of the title of

20  this document?

21      A.    That's correct.

22      Q.    And is this the document you were just

23  testifying about?

24      A.    This is not the document that I trans- --

25  transmitted to Luis Rojas.

1    Q.    So I note that there's some handwriting on this

2    document.  Is the underlying typed -- well, let me ask you

3    this:  Does this look anything like the document that you

4    sent to Mr. Rojas?

5    A.    It's the form, that's correct.

6    Q.    Okay.  So the -- the difference is -- is the

7    handwriting on the document; is that correct?

8    A.    That's correct.

9    Q.    Okay.  But the -- for example, if we were to

10   look at the -- there's a section called "Data Required By

11   the Privacy Act of 1974."

12         Do you see where that is, in the middle of --

13   A.    Mm-hmm.  Yeah, I do.

14   Q.    -- it has your name.  Is that your employee

15   number?

16   A.    That's correct.

17   Q.    And it has a date, September 21, 2015?

18   A.    That's correct.

19   Q.    Did you enter that date?

20   A.    I would have typed this form up and this is the

21   form that I submitted to Dr. Knippa.

22   Q.    Yeah, but the -- the question is:  Is this the

23   form that was submitted to Mr. Rojas?

24   A.    This form has been altered since I submitted it

25   to Luis Rojas.  And I can't say that, specifically, this

1   was the exact document.  I transmitted the document to

2   Rojas on -- via facsimile.

3       Q.    On the 22nd you testified?

4       A.    That's correct.

5       Q.    And so can you explain the reference to

6   September 21, 2015, on the signature line?

7       A.    Well, the date of my original request was on

8   the 21st.

9       Q.    Okay.  But this document wasn't sent on the

10  21st?

11      A.    It absolutely was not.  I'm not required to.  I

12  gave a verbal notice on the 21st.

13      Q.    And how --

14      A.    Sometime after the --

15      Q.    -- how had you been contacted by Mr. Rojas?

16      A.    How had I been contacted?

17      Q.    Did he reach out to you via phone or e-mail?

18      A.    No, I actually reached out to him.

19      Q.    And that was on the 22nd of September?

20      A.    That's correct.  Roughly, about on the 22nd.

21      Q.    Okay.  And the 22nd -- what did you communicate

22  to Mr. Rojas on that call?

23      A.    I think that I remember telling Mr. Rojas

24  that -- I asked him why -- I had called and left a message

25  for him.  And I said, "Look, I -- I didn't get a phone

1  call back from you and, you know, I needed to request

2  military leave."  It had not been a problem.  He -- I

3  communicated with him before I went to Haiti.  It wasn't

4  an issue.

5         And he said, "Hey, can you send me some

6  verification of your military duty?"

7         And I said, "I can.  What do you want?"

8         And he said, "I just need notification in

9  writing."

10        And I said, "I'll be glad to provide you the

11  notification in writing."

12  Q.    Were you asked, subsequently, by anyone at

13  American, for further documentation of your trip to

14  Washington, D.C.?

15  A.    As a matter of fact, I was asked by Jim Bonds

16  on -- on a number of occasions.  Namely, on October the

17  7th, Jim Bonds left a message for me saying there was a

18  good deal of confusion about orders, which he had been

19  advised, I'll be happy to substantiate the duty with you.

20        Mr. Bonds then began to threaten me about the

21  disciplinary actions if I failed to provide him with

22  orders.  I advised Mr. Bonds, and so did the Allied Pilots

23  Association, Trish Kennedy sent him an e-mail saying:

24  "Hey, listen.  We understand you want verification of the

25  duty.  We will be happy to provide it to you."

1          However, Bonds wanted to continue to, you know,

2      to start this hostile environment with me, which I

3      believed I was being subjected to, and requested --

4      requested copies of the -- the leave and earning

5      statement.

6          I advised Mr. Bonds that it was -- it was at

7      the end of the fiscal year and it was entirely reasonable

8      that that -- that was a normal delay.  He seemed to think

9      that I should have had an LES within two to three days of

10     performing military duty.  And I advised him "Look, as

11     soon as I've it, you'll have it."

12     Q.     So was your objection to his request that he

13     was asking for the documents too quickly or that he was

14     asking for them at all?

15     A.     My objection was he was being unreasonable.

16     Q.     And was that because of the documents being

17     requested or the time frame within --

18     A.     Well, that it was -- it wasn't the --

19     Q.     -- which he was requesting?

20     A.     It wasn't he was requesting duty.  I had no

21     problem providing him with LES.  I went to -- I went, I

22     performed duty with the military, and it was certified.

23     Q.     Great.  So the -- the -- the objection that you

24     had was that you viewed it to be too short of a time

25     frame?

1      A.    I just -- I -- I felt like it was -- I felt it

2   was retaliation.  And I also felt that it was

3   unreasonable.

4      Q.    And is that because of --

5      A.    And I think the Allied --

6      Q.    It was unreasonable because of the time frame

7   that he was requesting the documents, not because of the

8   documents being requested --

9      A.    He wanted --

10     Q.    -- is that correct?

11     A.    He -- he --

12           MR. AMLONG:  Yes or no.

13           THE WITNESS:  Yes.  He -- he wanted the

14      documents now.

15   BY MR. MORALES:

16     Q.    I believe you testified earlier that Mr. Bonds

17   is himself former military; is that correct?

18     A.    That's my understanding, he's Air Force

19   Reserve.

20     Q.    Okay.  I believe you've testified similarly,

21   earlier, about Mr. Beach also being former military; is

22   that correct?

23     A.    I never knew Mr. Beach to participate in the

24   military, but most pilots at American Airlines are

25   military.

1      Q.    Okay.  So you don't recall whether

2   Captain Beach had a military background or a history of

3   military service?

4      A.    I've never seen Mr. Beach in the military.

5   I -- I -- I do know that he was a -- he's given a history

6   of being a Marine Corps pilot, but I've never seen any --

7   any indication that he is a Marine.

8           Can we take a break?  I need to --

9           MR. MORALES:  We are off.  We still have quite

10      a bit of ground to cover, Mr. Patterson --

11           THE WITNESS:  That's fine.

12           THE VIDEOGRAPHER:  Off the record.  The time is

13      5:36.

14           (Thereupon, a recess was taken.)

15           THE VIDEOGRAPHER:  Okay.  We are now back on

16      the record.  The time is 5:49.  Media Number 6.

17   BY MR. MORALES:

18      Q.    Mr. Patterson, you'd ref- -- or Colonel

19   Patterson, you had referred a little while ago in your

20   testimony to a leave and earnings statement.  Do you

21   recall providing a leave and earnings statement for the

22   September 2015 month as part of your production of

23   documents in this case?

24      A.    I don't recall providing it in production.  I

25   do -- I -- I do recall seeing it.  I also recall providing

1   it to Mr. Bonds.

2       Q.    Okay.  If I could have you take a look at what

3   I believe is Exhibit 14.  And ask --

4           THE REPORTER:  One moment, please.

5           MR. MORALES:  I'm sorry.

6           THE REPORTER:  Okay.

7               (Exhibit 14, Defense Finance and Accounting

8           Service Military Leave and Earnings Statement, was

9           marked for Identification.)

10  BY MR. MORALES:

11      Q.    It says at the top "Defense Finance and

12  Accounting Service Military Leave and Earnings Statement."

13          Is this the version of the leave and earning

14  statement that you testified about earlier?

15      A.    It is.

16      Q.    And what time period does this leave and

17  earning statement cover?

18      A.    Well, if you look at the bottom, it says

19  "Inactive duty training, 22 September," 22 September,

20  which that leave and earning statement is divided into

21  four-hour periods.  So for every four-hour period of

22  inactive duty for training I perform, I'm credited one

23  retirement point.

24          And, thus, you'll see two retire -- two

25  retirement point that appear on the 22 of September.  And

1    then it reflects 23rd of September, 23rd of September;

2    24th, 24th; and, 25th, 25th.

3         Q.    And those were the dates that you were in

4    Washington, D.C.; is that correct?

5         A.    I may have come back -- I may have returned

6    from DC on the 24th.  I'd -- I'd have to look at my notes

7    to tell you.  But I may have come back on the 24th and

8    performed -- performed a -- an extension of duty in --

9    here in Miami.

10        Q.    So you can perform duty even after you've

11   returned back from the Pentagon?

12        A.    You can perform duty in any location that the

13   Army desires.  So for certain types of duty, the Army may

14   specifically tell you "Well, you need to come to the

15   Pentagon."

16             I've -- I've done duty at US Southern Command

17   before when they had requirements.  And that fit -- that

18   fit the Army's needs.

19        Q.    I'm going to ask if the handwriting on this

20   document is your handwriting.

21        A.    Well, there's two sets of handwriting on the

22   document.  So the -- the handwriting on the bottom is --

23   is -- is certainly my handwriting, when it says "Dates

24   Performing Duty."

25        Q.    What about the handwriting above it?

1    A.    I don't know whose handwriting that is.  Could

2  you tell me?

3    Q.    Can you read -- can you read what that

4  handwriting says?  I don't know who -- who wrote that.

5  I'm asking you if you know whose handwriting it is.

6    A.    I -- that -- believe me, I -- I -- I -- if I

7  knew, I would tell you.  I don't know whose handwriting

8  that is.

9    Q.    And you're aware this is a document that you

10 have produced as part of this litigation?

11   A.    This appears to be what I have -- this appears

12 to be what I've given -- what I've given to Bonds.

13   Q.    And was there any -- I know there's a list here

14 of inactive duty training as you noted from September 22nd

15 to September 25, 2015.  Did you have any earlier inactive

16 duty training in September 2015?

17   A.    It's -- it's quite possible that I might have

18 performed some days of inact- -- inactive duty training

19 at -- on my days off.

20   Q.    Would those have been in Miami?

21   A.    I'm not sure where I would have performed them,

22 without really going back and looking at my notes.  But

23 you know, it's really irrelevant, I mean, you know, where

24 I performed the duty.

25   Q.    Let me ask you:  There's a white space above

1    Inactive Duty Training and some various white spaces that

2    appear there.  Do you know what those white spaces are?

3            For example, looking --

4    A.    It could be -- it could be deletion of -- it

5    could be deletion of account information, such as a bank

6    account or personally identifiable --

7    Q.    So, for example, if you look at the inactive

8    duty training line for September 22nd, it would appear

9    that there is an equivalent text that's missing that

10   appears in the next two lines.  Are you aware of any

11   deletion or redaction of that line?

12   A.    Without the original, I -- I don't know what

13   that is.

14   Q.    Did you perform any redactions or deletions of

15   text on this document?

16   A.    Well, I performed redactions of -- of -- of

17   information in documents which would be personally

18   identifiable information.

19   Q.    Okay.  But you -- you didn't redact or delete

20   any substantive information?

21   A.    I don't recall that I would have done that.

22   That would -- I certainly wanted to show you that I had

23   performed duty on the 22nd through the -- through the

24   20- -- basically the 22nd through the 25th of September.

25   Q.    But you don't recall any of the deleted text

1  being substantively relevant text?

2      A.    What do you define as "substantive"?

3      Q.    How do you understand the term "substantive" in

4  this context?

5      A.    I'm asking you, sir.  How would you define it?

6      Q.    And my question is to you:  How do you

7  typically understand the term "substantive" with respect

8  to an issue like this?

9          Let me ask you this:  Did you delete any

10  information here that you think would be of interest to

11  American Airlines as part of this litigation?

12      A.    I would not have done that, no.

13          MR. MORALES:  Okay.  If I could have you take a

14      look at what I believe is Document Number 15.

15          She's going to mark it first.

16          THE WITNESS:  All right.

17          MR. MORALES:  Thank you very much.

18              (Exhibit 15, Defense Finance and Accounting

19          Service Military Leave and Earnings Statement,

20          Unredacted, was marked for Identification.)

21  BY MR. MORALES:

22      Q.    And I would ask you if this is the unredacted

23  version of the document we were just looking at.

24      A.    That's what it appears to be, yep.

25      Q.    And in the space that I was just describing,

1  which is, if you'd look, you see about 60 percent of the

2  way down in the Remarks section, there's the line

3  "Inactive Duty Training 23 September '15."

4         Do you see that line?

5     A.   Mm-hmm.

6     Q.   It looks like there is text that was deleted

7  there or redacted, 23 Sep '15.  And then the two lines

8  above it which show inactive duty training for

9  September 14th through September 22nd were also deleted.

10         Do you have any idea why those would have been

11  deleted from this document that was produced to us?

12     A.   Well, what it appears to be is that it's not

13  the 14th through the 22nd.  That's not a continuous block

14  of days.

15     Q.   So I'm asking you if -- it actually is, as a

16  matter of fact.

17         But I -- my question to you is:  Do you know

18  why you would have redacted those three lines that I just

19  referenced?

20         MR. AMLONG:  Well, this is assuming facts not

21     in evidence --

22  BY MR. MORALES:

23     Q.   So, Mr. Patterson --

24         MR. AMLONG:  -- that he actually redacted them.

25  BY MR. MORALES:

1    Q.    Mr. Patterson, did you perform the redactions

2  and deletions of the five boxes inactive duty -- marked

3  "Inactive Duty Training" about 60 percent -- let's --

4  let's do it this way.

5          Do you see the line that begins "Inactive Duty

6  Training 23 September '15"?

7    A.    Correct.

8    Q.    And did we see part of that line on Exhibit 14,

9  which we just reviewed?

10   A.    Well, in reviewing the notes here --

11   Q.    Just as a yes or no question.

12   A.    The answer is yes.  I did redact 14, 15

13  September.  And looking at the schedule, those were my

14  days off.

15   Q.    So you redacted September 23, '15 from the --

16   A.    No, I did not redact September 23.

17   Q.    Okay.  If I -- if I could just ask and we could

18  do a page turn comparison if you prefer.

19          But just to be clear:  We were just talking

20  about the line that's Inactive Duty Training 23 September.

21  Part of that document was redacted -- part of that line

22  was redacted on Exhibit 14; is that correct?

23   A.    Part of that line, correct, was redacted.

24   Q.    Okay.  And then the line above it starts

25  "Inactive Duty Training 15 September," that whole line was

1    redacted; is that correct?

2        A.    That's correct.

3        Q.    And that line says "Inactive Duty Training 15

4    September Through 22 September 2015."

5             Is that correct?

6        A.    That's not correct, sir.

7        Q.    That line doesn't read "15 September '15, 22

8    September '15"?

9        A.    Sir, you keep saying "15 September to 22

10   September."  So you're assuming that there's a block of

11   days --

12       Q.    So I'm just asking you if I'm reading that

13   correctly, that this --

14       A.    I'm saying no, you're not.

15       Q.    -- that this --

16       A.    I'm saying --

17             THE REPORTER:  Wait.  One at a time.  I'm not

18        going to do -- I can't deal with this.

19             THE WITNESS:  I'm saying no, sir, you're not.

20   BY MR. MORALES:

21       Q.    So I'm asking:  This line that is Inactive Duty

22   Training 15 September, is there any other date other than

23   15 September 2015 listed on that line?

24       A.    There are two dates of 15 September listed on

25   that line.

 1         Q.    And what's the other date?

 2         A.    The other date is 22 September.

 3         Q.    Okay.  And that line was redacted in

 4    Exhibit 14, correct?

 5         A.    15 September.

 6         Q.    That full line was redacted --

 7         A.    The full line, sir, was not redacted.

 8         Q.    If you take a look at Exhibit 14, and -- and

 9    feel free to take --

10         A.    What I see was redacted, sir, was 15 September.

11    The full line was not redacted.

12         Q.    So if you would just look -- I'm sorry.

13               Under -- on Exhibit 14, under "Unpaid Debt

14    Balance Total," what's the next line of text that's

15    visible?

16         A.    Where -- where are you looking?

17         Q.    If you'd look at --

18         A.    Unpaid Debt Balance?

19         Q.    -- Exhibit 14, do you see the line about midway

20    down --

21         A.    Yeah.

22         Q.    -- under remarks, it says "Unpaid Balance

23    Total"?

24         A.    Mm-hmm.

25         Q.    What's the next line that appears as visible

1   text on Exhibit 14?

2        A.     It says "Total Performance."

3        Q.     On Exhibit 14?  The redacted copy?

4        A.     On exhibit -- on exhibit -- it says "Unpaid

5   Debt Balance Total."

6        Q.     And then, what's the next line of visible text?

7        A.     The next line of visible text is "Inactive Duty

8   Training 22 September, 22 September, 23 September."

9        Q.     Okay.  And then, if you would look at the

10  unredacted version, Exhibit 15, do you see Unpaid Debt

11  Balance Total?

12       A.     I do.

13       Q.     And am I correct that there are -- one, two,

14  three, four -- five lines of text that are fully redacted

15  from Document Number 14 as they appear on Exhibit 15?

16       A.     That's correct.

17       Q.     Okay.  And then part of the next line, Inactive

18  Duty Training, the 23 September is -- is --

19       A.     No.  The -- the relevant --

20       Q.     -- excluded?

21       A.     The relevant dates that I substantiated

22  military leave were shown on the form.

23       Q.     Okay.  So is there any other items that appear

24  to you to have been redacted from the Exhibit 14 as

25  compared to Exhibit 15?

1      A.    Well, when you're talking about a redacted

2  copy, sir, these are -- these are -- these documents are

3  not the same.  You're -- you're alleging that they've been

4  redacted.

5      Q.    So --

6      A.    This document -- this document could have been

7  printed on a printer.  And this document, I don't know

8  where you got it from.  Did you -- who -- who --

9      Q.    Do you see at the bottom of each document --

10     A.    Who produced that?

11     Q.    -- it identifies the --

12     A.    I haven't seen that.

13     Q.    -- it identifies the Bates number that your

14  counsel produced this document as.

15     A.    Okay.

16     Q.    So Exhibit 14, at the bottom, reads [as read]:

17  Patterson, underscore, caddy, underscore, 00027.

18     A.    Yeah.

19     Q.    Exhibit 15 is --

20     A.    Okay.  Thank you.  Thank you.  So what I'll

21  say --

22     Q.    -- just to clarify:  Underscore, Patter --

23  sorry.

24           Exhibit 15 says [as read]:  Patterson,

25  underscore, 00018.

1      A.    That's correct.

2      Q.    So both of these documents were produced by

3  your counsel.  We just discussed the inactive duty

4  training lines that were redacted.

5      A.    Yes.

6      Q.    Is there any dispute that those documents do

7  not appear in Exhibit 14 and do appear in Exhibit 15?

8      A.    There's no dispute.

9      Q.    Okay.  And -- and my only question, subsequent

10  question, is:  What is the rationale for that redaction,

11  that led you to redact that and what you produced?

12      A.    You go back to my schedule, which you have --

13  which you have -- which you have keenly referred to --

14  excuse me.

15           If you go back to my schedule, which you've

16  referred to, this reflects -- this reflects that I was off

17  on the 14th and 15th of the month and that I performed

18  duty on my own time.

19      Q.    And so --

20      A.    When I had no obligation to American Airlines

21  whatsoever.

22      Q.    And so is the rationale, then, simply that you

23  didn't believe the information was responsive because it

24  covered a day off for you at American Airlines?

25      A.    Well, this was a response -- this was a

1  response to Captain Bonds.  And he wanted verification of

2  military duty.  And this is the verification that he got,

3  was the LES.

4      Q.    Okay.  I'd like to ask you, you had mentioned

5  earlier a voice mail from Captain Bonds and I believe you

6  described the voice mail as threatening or hostile.  Do

7  you remember that description?

8      A.    I've two voice mails from him.

9      Q.    Okay.  Are either of those voice mails voice

10 mails you would describe as threatening?

11     A.    I think both of them were -- were threatening

12 and intimidating.

13     Q.    Okay.  And if we could -- did you, at some

14 point, file a complaint with the Department of Labor

15 related to your employment status at American Airlines?

16     A.    I did.

17     Q.    Okay.  Was that complaint filed with any

18 particular department of the Department of Labor?

19     A.    It was filed with the Department of Labor

20 Veterans.

21     Q.    And what is their job responsibility, as you

22 understand it?

23     A.    They investigate complaints of discrimination

24 against veterans and, if necessary, they will forward that

25 to the Department of Justice.  Or they will, in my case,

1  issue a letter of right to sue, which they did.

2     Q.    And the results of the investigation in this

3  case your testimony -- let me start again.

4          Just to be clear:  Your testimony just now was

5  that the results of the Department of Labor's

6  investigation was that they provided you an authorization

7  to sue?

8     A.    They provided me a letter of right to sue.

9     Q.    And what does that, a letter of right, entail?

10    A.    It's what we are doing now.

11    Q.    Let me ask this:  Did the Department of Labor

12 provide any letter or communication indicating agreement

13 with you on the merits of your complaint?

14    A.    The dep- --

15    Q.    Just yes or no.

16    A.    Yes.  The Department of Labor verbally told me

17 that my complaint had merits.

18    Q.    So the answer is --

19          MR. AMLONG:  Listen to the question.

20 BY MR. MORALES:

21    Q.    -- provided?

22    A.    That -- I don't have a letter from them saying

23 that my compliant had merits.  I have a letter from them

24 saying I have a right to sue American Airlines.  They

25 didn't discuss the merits --

1    Q.    And just to be clear:  The -- the -- as you

2    described it, the role of the Department of Labor's vets

3    department is to undertake efforts to protect veterans in

4    employment settings; is that correct?

5    A.    That's correct.

6    Q.    And your testimony is that they agreed with you

7    on the merits of your lawsuit, but only communicated that

8    to you verse -- via a phone call that you don't have a

9    record of?

10    A.    No.  I have a letter of right to sue which, I

11    think, we've presented to you.

12    Q.    And my question was whether you have any

13    documentation showing that the Department of Labor viewed

14    your complaint as having merit.  And you pointed me to a

15    phone call; is that correct?

16    A.    Well, what's disturbing about the phone call

17    was the Department of Labor investigator advised me that

18    American Airlines had a number of problems with USERRA,

19    here, particularly, in the Miami flight office, and that

20    it had gotten so bad he was going to have to go to Dallas

21    to speak with American Airlines management about the

22    problems he was having in Miami.

23          Whether that was true or not, it -- it -- it's

24    irrelevant.  The --

25    Q.    And just to be clear:   Is there any

1    documentation you would point me to as an indication of
2    the Department of Labor's view that your complaint had
3    merit?
4        A.    I would say the letter of right to sue --
5        Q.    Other than the letter -- okay --
6        A.    I would say the letter of right to sue points
7    that there's some merit there.
8        Q.    As part of the Department of Labor's
9    investigation of your complaint, did you provide any
10   materials to the Department of Labor?
11       A.    I did.
12       Q.    Did you provide any materials related to the
13   voice mails, the two voice mails from Jim Bonds --
14       A.    I did.
15       Q.    -- that you referred to a moment ago?
16            Did the Department of Labor communicate with
17   you regarding their review of either of those voice mails?
18       A.    The Department of Labor informed me that they
19   were conducting an investigation.  And I advised them,
20   midway through the investigation, that I intended to stop
21   American Airlines from retaliatory actions and I -- and I
22   wished to sue them.
23            And so the Department of Labor said "Well,
24   we'll conclude the investigation and we'll issue a letter
25   of right to sue."

1     Q.    Did the Department of Labor ever communicate to

2  you a view that the voice mails you had provided them were

3  of a threatening tone to you?

4     A.    The Department of Labor asked me for a

5  transcript or a copy of the voice mails.  And the

6  Department of Labor investigator indicated to me that

7  the -- the threatening tone of the e-mails would be

8  decided by the Department of Justice and, ultimately, a

9  jury.

10    Q.    So did they indicate in the agreement that the

11 tone in the October 7th e-mail was threatening?

12    A.    It wasn't an e-mail on October 7th, it was a

13 voice message.  And it was very clear, sir, that, if I

14 didn't produce --

15           MR. AMLONG:  Listen to the question.

16           THE WITNESS:  Yeah, I did.  He said did they

17      indicate it was threatening.  It is threatening.

18 BY MR. MORALES:

19    Q.    And did the Department of Labor communicate in

20 the agreement that the voice mail on October 7th to you

21 was of a threatening tone?

22           MR. AMLONG:  That's yes or no.

23           THE WITNESS:  They did not.

24           MR. MORALES:  Okay.  I would like to have you

25      take a look at Exhibit 15.

1          THE REPORTER:  Exhibit 16.

2          MR. MORALES:  Oh, I'm sorry.  Exhibit 16.

3          THE WITNESS:  Exhibit 16, yep.

4              (Exhibit 16, E-mail, was marked for

5          Identification.)

6    BY MR. MORALES:

7      Q.    This is a document Bates-stamped at the bottom,

8    Patterson_DOL_00018.

9          Do you understand this to be a document that

10   you have produced as part of this litigation?

11     A.    I understand that this is the -- this is the

12   request for -- the Department of Labor was requesting me

13   to produce a written transcript of Jim Bonds' telephone

14   call and his conversation.

15     Q.    And I'm saying that the actual two-page

16   document we're looking at is a document that you produced

17   in this litigation; is that correct?

18     A.    You're saying it's a two-page document?  I

19   didn't produce this.  It's Oscar Fuentes DOL vets.

20          MR. AMLONG:  No.  We -- we produced it.

21          THE WITNESS:  Okay.  We produced it.  That's

22      fine.

23   BY MR. MORALES:

24     Q.    So I'd ask you to take a look at Page 2.  It

25   goes in reverse chronological order.  And it's a little --

1   the text is a little small.  But if you look at the -- the
2   bottom e-mail on Page 2, it says [as read]:  From Walsh
3   Bernadette vets to Billy Miller vets.
4           Do those names sound familiar to you?
5       A.    Well, mister -- Mr. Fuentes and Bernadette are
6   two names that ring a bell.  I don't know who Mr. Miller
7   is.
8       Q.    Okay.  But Mr. Fuentes and, you said, I
9   believe, Ms. Walsh, you did have occasion to interact with
10  from the vets group at DOL?
11      A.    Yes.  I spoke mainly with -- I never spoke with
12  Bernadette during the course of the investigation.
13  Mister -- Mr. Fuentes is who I spoke with.
14      Q.    Okay.  So it looks like it's February 9, 2016.
15  Was that during the time period of the vets investigation
16  of your complaint?
17      A.    It was.
18      Q.    And the subject line says [as read]:  Subject
19  forward voice message.
20           You see that?
21      A.    What page?
22      Q.    The -- Page 2, it's the bottom entry.
23      A.    Okay.
24      Q.    You see it says "Voice Message" as the subject?
25      A.    Yes.

1    Q.    And it says [as read]:  Oscar is requesting

2  guidance on utilizing the attached voice mail for his case

3  file.

4          If you look at the e-mail above that, and it

5  actually starts on Page 1, it appears to be a response

6  from Billy Miller to this e-mail.

7          Do you agree with that?

8    A.    Appears to be, yes.

9    Q.    And it starts, it says [as read]:  Need to have

10  claimant provide written transcript of recording to Oscar

11  for inclusion of case file.

12          Is that consistent with the request you recall

13  receiving regarding the transcript of Mr. Bonds' voice

14  mails?

15    A.    Yes.  That's correct.

16    Q.    Okay.  So then I'd ask you to look at the

17  e-mail above that, which is -- says [as read]:  From

18  Bernadette Walsh to Billy Miller, February 9, 2016.

19          You see it starts "Since it was left."  Do you

20  see that e-mail?

21    A.    Mm-hmm.  I do.

22    Q.    I'm just going to quote.  It says and it's

23  [as read]:  Subject re voice message.  Since it was left

24  on an answering machine, the answer would be yes, he knew

25  it was being recorded.

1        Do you know who that is referring to?

2    A.    Mr. Bonds.

3    Q.    Okay.  And then it says, and I'm continuing to

4    quote now [as read]:  I'm sure, at that point, he didn't

5    realize that someone would attempt to use it against him.

6    To be honest, there is nothing in the context other than a

7    pleasantly voiced request for orders on duty that had

8    scored three weeks previously.  Unquote.

9    A.    Okay.

10   Q.    Have you seen that document before, this e-mail

11   that we are reviewing?

12   A.    I'm sure I reviewed something at one point in

13   the past.  However --

14   Q.    And just to be clear:  Would you agree with --

15   you would agree that that e-mail is written from

16   Bernadette Walsh of the Department of Labor, the vets

17   department?

18        MR. AMLONG:  Objection.  Foundation.  Personal

19        knowledge.

20        MR. MORALES:  I think we're -- I think we're

21        okay on that.

22        Colonel Patterson, I would like you to look at

23        what I'm going to ask to be marked as Exhibit 17.

24             (Exhibit 17, Statement to the

25        Department of Labor Vets, was marked for

1          Identification.)

2   BY MR. MORALES:

3       Q.    And you had testified a minute ago about the

4   military -- military service history of Captain Bonds; is

5   that correct?

6       A.    Mm-hmm.

7       Q.    I would first like to, again, just ask you if

8   you're familiar with the document we're looking at.

9       A.    I am.

10      Q.    Okay.  And what is this document?

11      A.    This is a -- appears to be a statement to the

12  Department of Labor Vets.

13      Q.    Okay.  And at the top, it says [as read]:

14  Received by vets via fax on 1/25/2016.

15            I'm paraphrasing, but is that correct?

16      A.    I don't -- it says [as read]:  Scanned to PDF

17  when received by vets --

18      Q.    Okay.

19      A.    -- via fax.  I -- I don't recall faxing this to

20  them.

21      Q.    Okay.  My question is:  Do you recall generally

22  submitting this document to DOL Vets in --

23      A.    Yes, I do.

24      Q.    -- January 2016?

25            And that's your initials at the bottom, "RSP"?

1      A.    Of course.

2      Q.    Okay.  If you would look at the fifth paragraph

3  down, it's "On or about 9/21/2015, 1930 hours," do you see

4  that?

5      A.    I do.

6      Q.    The third sentence in that paragraph says

7  [as read]:  Captain Bonds is a lieutenant colonel in the

8  Air Force Reserve and is fully aware of my military

9  status.

10         That's consistent with your earlier testimony

11  that Captain Bonds was himself a lieutenant or served in

12  the reserves; is that correct?

13      A.    That's correct.

14      Q.    If you look at -- go a few paragraphs down, I

15  believe four paragraphs down, it says "I noted that

16  Captain Bonds."  See that paragraph?

17      A.    Mm-hmm.

18      Q.    And you submitted this paragraph, correct?

19      A.    That's correct.

20      Q.    Actually, I want you to go to the paragraph

21  after that.  Sorry.

22         It says "On or about 9/27/2015."  Do you see

23  that paragraph?

24      A.    Mm-hmm.

25      Q.    And the second sentence says [as read]:  Bonds

1    invited Captain Brian Beach, a retired Marine, in to

2    observe.

3           You had earlier said you weren't sure whether

4    Captain Beach had served in the armed forces.

5       A.    Well, I didn't say that.  I said -- I said

6    we -- I had heard that Beach was a Marine officer and I

7    never really saw any indication from -- from Beach to --

8    to -- to tell me that he was a Marine.  I -- you know,

9    like -- as I said --

10      Q.    So, I guess, my question is:  Is it -- is it

11   correct that you submitted this document to the

12   Department of Labor describing Captain Brian Beach as a

13   retired Marine?

14      A.    I did and --

15      Q.    Okay.

16      A.    -- that was because Captain Vitale told me he

17   was a retired Marine.

18      Q.    And I'd just like you to go back -- and I'm

19   sorry for jumping around on this document.  But the

20   paragraph we looked at earlier for -- for Captain Bonds in

21   this document, the one that starts "On or about 9/21/2015,

22   1930 hours."

23      A.    Okay.

24      Q.    Let me know when you're back there.

25           The last sentence of that paragraph says "I can

1  surmise" -- and I'm quoting.  It says [as read]:  I can

2  surmise that there is some interservice rivalry based on

3  his behavior since other reservists have reported he

4  releases them without any fanfare when they request.

5  Unquote.

6         Is that a reference to Captain Bonds?

7  A.    That is a reference to Captain Bonds.

8  Q.    What is the reference to an interservice

9  rivalry that you submitted there to the

10  Department of Labor?

11  A.    Well, I think it's a well-known fact that, at

12  American Airlines, I'm a first officer.  I'm also an Army

13  officer.  Captain Bonds is a Captain.  Typically,

14  American Airlines, you know, American Airlines has a

15  corporate culture that first officers are nobody and

16  captains are somebody and they all count on them and

17  they -- they rule the roost.  Okay?

18         First officers are considered to produce no --

19  no considerable contribution to American Airlines,

20  although American relies on them considerably for safety.

21         My reference is to I believed that there was

22  a -- a hostile work environment that existed with

23  Captain Bonds.  I don't see that Captain Bonds complied

24  with USERRA, submitting a notice.  If Captain Bonds would

25  have complied with it --

1      Q.    Just to be clear:  My question here is about

2   your reference to an interservice rivalry --

3            MR. AMLONG:  That's all -- that's all he's

4        asking you about.

5            THE WITNESS:  I know.  But I gave --

6            MR. AMLONG:  What did you mean by "interservice

7        rivalry"?

8            THE WITNESS:  Well, I gave it to him.  It's

9        Air Force and Army.

10  BY MR. MORALES:

11     Q.    So your understanding was that Captain Bonds

12  was discriminating against, I guess it would be, Army

13  officials based on an interservice rivalry?

14     A.    He wasn't discriminating against Army

15  officials.  He was discriminating against me because I'm

16  an Army officer.  Okay?

17     Q.    So what is the reference to an interservice

18  rivalry?

19            MR. AMLONG:  He just answered that.

20  BY MR. MORALES:

21     Q.    Okay.  Did you ever conclude that

22  Captain Brian Beach was involved in any sort of

23  interservice rivalry?

24     A.    I got no indication of that being an

25  interservice rivalry.

1      Q.    Okay.

2      A.    But Captain Vitale did tell me that he went on

3  my behalf and told them that they had violated USERRA in

4  three occasions.

5      Q.    And my question was just whether you came to

6  the conclusion that Captain Beach ever was part of an

7  interservice rivalry.

8      A.    He could have been.  I never saw any indication

9  of it from --

10     Q.    Okay.  So --

11     A.    -- I didn't -- I didn't speak with him.  He

12 didn't leave a message on my answering machine.

13     Q.    Was there any other communication that the

14 Department of Labor provided you when they concluded their

15 own investigation about the reason they were concluding

16 their investigation?

17     A.    They concluded their investigation because I

18 requested a letter of right to sue.

19     Q.    And so the -- the only reason the

20 Department of Labor concluded their investigation was

21 because you made a request to them for a letter of right

22 to sue?

23     A.    Specifically.  I asked for a letter of right to

24 sue.

25     Q.    Did the Department of Labor ever raise with you

1    any other concerns or complications regarding their own

2    investigation?

3         A.    They did not.

4         Q.    None at all?

5         A.    No.  They never -- they never raised any

6    concerns.

7         Q.    The Department of Labor ever inquire of you

8    regarding your legal representation?

9         A.    The department of -- I involved a -- an

10   attorney from a New York law firm and the

11   Department of Labor inquired as to whether that attorney

12   had been in contact with American Airlines and advised

13   American Airlines -- advised the attorney that, you know,

14   if -- if there was an attorney involved and -- and she was

15   communicating with American Airlines, that the

16   Department of Labor would -- would issue a letter of right

17   to sue.

18        Q.    And would conclude their own investigation; is

19   that correct?

20        A.    When you say "conclude the investigation,"

21   they -- they -- when you conclude it, they would have

22   actually -- if I would have gone back to them and said

23   "Hey, I want you to reopen it," they would have reopened

24   it.

25        Q.    Is there any basis for that testimony?

1      A.    There would have been a basis, depending on if

2   I -- if I would have --

3      Q.    I'm asking you if there's any basis for your

4   testimony just now, that the DOL would have reopened the

5   investigation if you requested them to do so.

6      A.    If I would have requested, I'm sure they would

7   have done that.  That wouldn't have been --

8      Q.    So the basis is that you're sure that it would

9   have happened?  Okay.

10     A.    I requested them --

11            MR. MORALES:  I'd like to ask you about what

12       I'm going to mark as Exhibit 17.

13            THE REPORTER:  Exhibit 18.

14            MR. MORALES:  Exhibit 18.

15                 (Exhibit 18, Complaint, was marked for

16            Identification.)

17                 (Counsel conferring.)

18   BY MR. MORALES:

19     Q.    Which is the -- I'm sorry.  What was that,

20   Mr. Patterson?  I didn't catch what you had just said.

21     A.    Well, I see you've a document there that

22   Lucretia Guia identified as HIPAA-protected information.

23   And I'm -- was that provided as part of --

24     Q.    Sorry?

25     A.    We'll get to it.

1        Q.    Okay.  I would like you to take a look at

2    Exhibit 18.  This is the complaint in this case.  This was

3    filed on your behalf; is that correct?

4        A.    That's correct.

5        Q.    I would just like to ask you a couple questions

6    about some allegations in the complaint.  If you would

7    turn to Page 10, Paragraph 24.  I would ask you to review

8    paragraphs 24 and 25 and let me know when you've completed

9    your review of those.

10        A.    I've reviewed them.

11        Q.    Okay.  The allegation in Paragraph 24 is that

12    Captain Mark Cronin, AA chief pilot, had advised AA

13    Captain Dan Carey, the president of the Allied Pilots

14    Association, that AA would put him back to work if he

15    successfully completed an assessment by Dr. Kay.

16            Is there any communication or documentation

17    that you're aware of that reflects any such statement or

18    commitment from Captain Cronin to Captain Carey?

19            MR. AMLONG:  Compound question.

20    BY MR. MORALES:

21        Q.    Are you aware of any communication or

22    documentation that supports the allegation in your

23    complaint at Paragraph 24 regarding the statement alleged

24    to have come from Captain Cronin?

25        A.    Captain Carey affirmed to me that he had had a

1    conversation with Captain Cronin about what appeared to be

2    retaliation through the Section 20 and 21 process.  And he

3    relayed to me that he wanted me to have an assessment by

4    Dr. Kay and that, if I cleared with Dr. Kay, that I would

5    be returned to the line.

6           Lucretia Guia, and I only have this verbally,

7    but on a phone call, Lucretia Guia told Trish Kennedy the

8    same thing, "Oh, have him go clear with Dr. Kay and we'll

9    get the situation resolved."

10   Q.    And is any of the testimony you just provided

11   regarding Paragraph 24 reflected in any written

12   communication or documentation that you can point us to?

13   A.    I'm not sure.  I think I had an e-mail from

14   either Dan Carey or maybe the union attorney that

15   reflected that Mark Cronin didn't recall the conversation.

16   Q.    So the only documentation is an e-mail from

17   Dan Carey saying that Captain Cronin didn't recall the

18   conversation?

19   A.    Correct.

20   Q.    Does the e-mail say anything else about the

21   assertion that Captain Cronin allegedly provided to

22   Captain Carey?

23   A.    I have it from the Allied Pilots Association

24   that that -- that was what Captain Cronin wanted.

25   Q.    Is that --

1     A.   And I'm aware -- and I'm aware of another

2  similarly situated pilot that was directed to go see

3  Dr. Kay and clear and subs- -- and subsequently, you know,

4  I had no reason to disbelieve that.

5     Q.   Okay.  But Paragraph 24, the only e-mail that

6  comes to mind is an e-mail from Captain Carey to you

7  saying that Captain Cronin didn't recall this alleged

8  conversation; is that correct?

9     A.   It may have been an e-mail from AA corporate --

10  or, excuse me -- APA corporate legal.  I -- I don't recall

11  specifically if it was from -- from --

12     Q.   And that -- but that's the only e-mail?

13     A.   That's correct.

14     Q.   Okay.  I'd ask you to look at Paragraph 29.

15  And there are a variety of subpoints here.  But

16  Paragraph 29 says [as read]:  Lieutenant Colonel

17  Patterson's going on active duty so that he could

18  represent the US Army at the White House reception for the

19  pope was a motivating factor for AA's.

20        Do you see that section?

21     A.   I do.

22     Q.   And I'd just direct you to subletter "G," which

23  is actually on the next page.  It says [as read]:

24  Conditioning his return to flight status on his abandoning

25  any union grievance or USERRA claim against AA.

1          What is the documentation or communications

2     that you would direct us to in support of that allegation?

3          A.    I think Lucretia Guia and Trish Kennedy had a

4     conversation with reference to my return to flight status.

5     And I think that was from Lucretia Guia, that my flight

6     status was conditioned upon me abandoning the union

7     grievance and/or -- and/or the USERRA claim and/or no

8     money.

9          Q.    Was that a part of settlement talks for your

10    grievance currently pending before a system board at

11    American Airlines?

12         A.    I think this was after -- after we presented

13    the document that's on the table which attested to my

14    fitness for duty.  And I think that came back from

15    Lucretia Guia to Trish Kennedy.

16         Q.    So what would be the occasion for Trish Kennedy

17    and Lucretia Guia to be discussing the terms for your

18    return to employment at American Airlines, other than

19    settlement discussions?

20              MR. AMLONG:  Objection to form.  Personal

21         knowledge.

22    BY MR. MORALES:

23         Q.    You can answer the question.

24         A.    Trish Kennedy is my representative with the

25    Allied Pilots Association.  She's the lawyer.

1      Q.     And she represents you in a currently pending

2   grievance before a system board at American Airlines,

3   correct?

4      A.     Trish is the grievance coordinator, and I'm not

5   sure who's going to represent me in that -- moving forward

6   in that case.

7      Q.     Is she -- Trish Kennedy currently part of a

8   team representing you before the system board at

9   American Airlines?

10     A.     Not that I'm aware of.  I've asked for a

11  different attorney.

12     Q.     Okay.  Just to be clear:  Is there anything

13  other than an e-mail between -- an alleged e-mail between

14  Trish Kennedy and Lucretia Guia that would support the

15  allegation in 29(g)?

16     A.     I think it would be -- I think it would be from

17  Trish Kennedy.  I -- I have no personal -- no personal

18  contact with Lucretia Guia.

19     Q.     But I'm saying that -- that one e-mail that you

20  just described, that's the only e-mail that you would

21  point us to on this particular allegation?

22     A.     That's correct.

23           MR. MORALES:  Okay.  Can we take a very brief

24      break.

25           THE VIDEOGRAPHER:  Going off the record.  The

1      time is 6:27.

2                    (Thereupon, a recess was taken.)

3            THE VIDEOGRAPHER:  We are now back on the

4      record.  The time is 6:35.

5   BY MR. MORALES:

6      Q.    Colonel Patterson, at some point in

7   September 2015, were you informed by American Airlines

8   that you were being withheld from service?

9      A.    I was.

10     Q.    And when was that notification provided?

11     A.    I was notified by Captain Bonds on the 25th, by

12  a -- by a voice message on my phone.

13     Q.    And did you receive any accompanying written

14  correspondence from Captain Bonds?

15     A.    I did, several days later via FedEx.

16           MR. MORALES:  I'll just put before you -- is it

17     Exhibit 19?

18           THE REPORTER:  Mm-hmm.

19                (Exhibit 19, Letter from Captain Bonds, was

20        marked for Identification.)

21  BY MR. MORALES:

22     Q.    Exhibit 19.  Is this the written documentation

23  that you received from Captain Bonds?

24     A.    Appears to be.

25     Q.    Okay.  And I note at the top, this is the date

1  of September 25, 2015.  You said that's the day that

2  Captain Bonds contacted you by phone?

3      A.    That's the day I got the telephone call.

4      Q.    Okay.  And I note, at the bottom of this

5  document, it says "CC APA Legal."  Is that the legal

6  department of the Allied Pilots Association?

7      A.    I would say that would be safe to assume so.

8      Q.    Okay.  This document, subject line withhold

9  from service, says [as read]:  As discussed on

10  September 24th, 2015, this letter confirms I'm withholding

11  you from service with pay pending the outcome of an

12  investigation into the circumstances surrounding a work

13  environment complaint that was reported by a coworker.

14          First, it looks like Captain Bonds' letter on

15  September 25th said there was a discussion on

16  September 24th.  Is that different than your recollection?

17      A.    I don't recall having a conversation with

18  Mr. Bonds on September the 24th.

19      Q.    Okay.  So in your view it was September 25th.

20  And in the view of Captain Bonds as of September 25th, the

21  discussion had occurred the day before; is that correct?

22      A.    I never had a conversation with Captain Bonds

23  reference to PW.  I --

24      Q.    Did you have a conversation with Captain Bonds

25  on September 24th?

1    A.    I had no conversation with him on the 24th

2    either.

3    Q.    Okay.  The paragraph I just read references, it

4    says the investigation is, quote, "into the circumstances

5    surrounding a work environment complaint that was reported

6    by a coworker."

7         What is the work environment complaint that was

8    reported by a coworker?

9    A.    Well, I think Bonds was referring to -- it's

10   supposed to be a workplace environment complaint that was

11   reported by a coworker.

12   Q.    Well --

13   A.    And, of course, I never had a conversation with

14   him on the 24th or the 25th.  Captain Vitale had a

15   conversation with him --

16   Q.    I'm sorry?

17   A.    -- on the following Monday.

18   Q.    Your testimony now is that you didn't have a

19   telephone conversation with Captain Bonds?

20        MR. AMLONG:  That's always been his testimony.

21        THE WITNESS:  That's always been.  I never had

22    a conversation with Mr. Bonds.

23   BY MR. MORALES:

24   Q.    You -- did you read --

25   A.    This is a lie.  This is a lie.  September 24th

1    is a lie.  I did not have a conversation with him.

2         Q.    Did you receive a phone call at any point in

3    September 2015 from Captain Bonds about this --

4         A.    Captain Bonds left a message on my recording

5    and it was very garbled.  And he basically said that there

6    was a workplace environment-related complaint.  And I

7    didn't get the whole crux of what he was saying.  The --

8    the only thing that came out very clear was, is that

9    "You're not allowed to use your flight privileges" --

10        Q.    And that voice mail was on September 24th?

11        A.    -5th.

12        Q.    Okay.  So September 20- -- your testimony is

13   that you received a voice mail -- you listened to the

14   voice mail on September 25, 2015?

15        A.    I didn't receive it on the 24th.  I received it

16   on the 25th.

17        Q.    Okay.  But you received a voice mail no later

18   than September 25, 2015, from Captain Bonds.

19             And my question was:  What is the work

20   environment complaint that was reported by a coworker?

21        A.    What is the work -- what is a work environment

22   complaint or what is it?

23             MR. AMLONG:  Do you -- do you know what he was

24        talking about --

25             THE WITNESS:  Well, I --

1          MR. AMLONG:  -- or are you just surmising?

2          THE WITNESS:  No.  It was obviously

3       Whitehouse's complaint.

4    BY MR. MORALES:

5       Q.    So if you would explain -- I'm asking you what

6    the work environment complaint was that was being

7    referenced here.

8       A.    It's obviously Whitehouse's complaint.

9          MR. AMLONG:  Do not guess.  Objection.  Lack of

10       personal knowledge.  You're guessing.

11          THE WITNESS:  All right.

12    BY MR. MORALES:

13       Q.    At the time you received this letter, did you

14    have any doubt who the coworker was that was referred to

15    in Paragraph 1?

16       A.    He didn't say.  I had no idea who the complaint

17    was from.

18       Q.    Your testimony just now is that you had no idea

19    who the coworker was that's being referenced in

20    paragraph --

21       A.    I got a message from Bond saying "I'm -- I'm --

22    I'm withholding you from service because of a workplace

23    environment-related complaint."

24       Q.    When did you find out who the coworker was?

25       A.    I did not find out who the coworker was

1   until -- until much later.  I got -- Captain Vitale went
2   and spoke with Bonds and Beach and he advised them that --
3   that it was suspicious.  He also ad- -- Beach and Bonds
4   said, "We have multiple complaints from multiple captains
5   and multiple departments."

6          And Vitale replied to him, "Multiple
7   departments?  He is a first officer.  He doesn't deal with
8   multiple departments.  And multiple captains?  Who are the
9   multiple captains?"

10         We didn't get any real good inclination of who
11  it was until American Airlines provided us with the
12  complaint, which was sometime later, later in the
13  investigation, which came through the Allied Pilot
14  Association.

15      Q.    Do you recall about when that was?  October?

16      A.    Probably was in October timeframe that we got
17  the --

18      Q.    So October 2015 was the first time that you
19  realized that the coworker referred to in Captain Bonds'
20  letter, Exhibit 19, was Captain Glenn Whitehouse?

21      A.    Correct, as we were preparing to go to a
22  Section 21 hearing.

23      Q.    How soon prior to the Section 21 hearing did
24  you learn the coworker was Captain Whitehouse?

25      A.    When we got the written documentation, we

1  confirmed it.

2      Q.    And before that moment, you didn't have any

3  idea that it was Captain Whitehouse?

4      A.    I had no idea who it was.

5      Q.    And what was the -- you just referenced

6  multiple complaints by multiple employees.  Was that part

7  of the work environment complaint that's being --

8      A.    No, it was not.

9      Q.    -- referred to?

10      A.    That was a statement that was made by

11  Captain Vitale --

12      Q.    No, no, no.  My question is:  Did the work --

13  let me state my question better.

14      Did the work environment complaint that's being

15  referenced here include what you described as multiple

16  complaints by multiple employees?

17      MR. AMLONG:  I believe -- and the court

18     reporter can read this back -- I think he said

19     multiple complaints by multiple captains and multiple

20     departments.

21      THE WITNESS:  That's correct.

22  BY MR. MORALES:

23      Q.    Did the work environment complaint that's being

24  referenced in the September 25th letter include multiple

25  employees' statements?

1      A.    I recall that there was probably -- there were

2    probably, I think, three to five supporting statements.

3      Q.    And when you say "supporting," they were in

4    support of the complaint that Mr. -- that

5    Captain Whitehouse was filing against you; is that

6    correct?

7      A.    That's correct.

8      Q.    Okay.  As of September 25, 2015, had you been

9    made aware of any -- any complaints at all by

10   Captain Whitehouse about your role in the work

11   environment?

12     A.    Okay.  Can you say the question again?  I want

13   to --

14     Q.    As of September 25, 2015, were you aware that

15   Captain Whitehouse had voiced complaints, whether

16   informally or formally, about your role in the

17   American Airlines work environment?

18     A.    Captain Whitehouse and I were involved in a

19   minor dispute in October of 2014.  There was a letter that

20   was generated by a flight attendant while we were on a

21   trip.  I received a call from professional standards

22   regarding that trip.  And, basically, that call concluded

23   with wanted to talk to me about the circumstances

24   surrounding a complaint that was levied by a flight

25   attendant .  And this complaint involved the stowage of

1  luggage for my wife and children on the airplane.

2      Q.    So my question was just:  As of September 25,

3  2015, were you aware of any complaints that

4  Captain Whitehouse had made, either informally or

5  formally, about your --

6      A.    As of October --

7      Q.    -- role in the work environment --

8      A.    As of -- as of -- as of October the 7th,

9  Captain Whitehouse contacted professional standards and

10  I'm aware of that conversation.

11      Q.    So I'm asking -- so yes.  So the answer is, as

12  of -- your -- your reference to October 7th there was

13  2014; is that correct?

14      A.    That's correct.

15      Q.    So September 25, 2015, you were aware at that

16  time that there had been complaints or at least a

17  complaint --

18      A.    I'm aware that --

19      Q.    -- made by Captain Whitehouse --

20      A.    I'm a --

21      Q.    -- is that correct?

22      A.    I'm aware that, in October --

23      Q.    Is that correct?

24      A.    I'm aware that, in October, professional

25  standards resolved the -- resolved the issue.  And I

1  basically committed to put Captain Whitehouse on the

2  do-not-pair list --

3       Q.    So when you say October --

4       A.    -- and I didn't want to hear from him again.

5       Q.    -- in October, professional standards had

6  revolved the issue --

7       A.    That's correct.

8       Q.    -- you're referring, again, to October 2014?

9       A.    October of 2014, that's correct.

10      Q.    Is it accurate to say, then, that, as of

11 October 2014, that was the end of the issue between you

12 and Captain Whitehouse regarding the trip that you just

13 described in October 2014 and there was no further dispute

14 or litigation between you and Captain Whitehouse?

15      A.    I was done with him.  I'm not going to fly with

16 him anymore.  That's it.  It's the end of the statement.

17      Q.    And, in your view, that means the issue was

18 resolved?

19      A.    In my view, it was resolved.  I didn't -- I

20 didn't want to deal with Captain Whitehouse any further.

21 I didn't want to speak to him.

22      Q.    From APA's perspective, was the issue resolved?

23      A.    I can't speculate.

24      Q.    Do you have an active proceeding lodged against

25 Captain Whitehouse with the APA currently?

1      A.     I've a -- an Article VII proceeding that I

2    filed against Captain Whitehouse to sanction his union

3    membership.  He appealed the -- it went to the appeals

4    board and the appeals board ruled that Captain Whitehouse

5    acted with malice, no just cause, and ill will.

6      Q.     And is that proceeding still currently pending?

7      A.     Captain Whitehouse has appealed that decision.

8      Q.     And is the operative set of facts in that

9    proceeding the October 2014 trip that you and

10   Captain Whitehouse were on?

11     A.     The procedure did discuss where

12   Captain Whitehouse made several -- several statements to

13   American Airlines.  We have classified that.

14     Q.     Fairly read, is the central issue in that APA

15   proceeding the October 2014 trip that you and

16   Captain Whitehouse were on?

17     A.     This was a -- this -- this stemmed from the

18   October '14 trip.

19     Q.     And when was the last appellate decision from

20   the APA proceeding that you just referred to?

21     A.     I think it was in October -- or, excuse me --

22   August of -- I think they issued a decision August of

23   2017.

24     Q.     Have you had any hearings with APA since then?

25     A.     No.

1      Q.    Okay.  Have you had any ongoing discussions
2   with APA?
3      A.    APA is not going to discuss -- they're not --
4      Q.    Is there any -- is there any -- is there any
5   active -- any -- any active component of the APA
6   proceedings?
7      A.    When you're saying "APA proceedings" --
8      Q.    Are you in touch with, for example -- let me
9   ask it this way:  Is there a appellate board that's been
10  established to review --
11     A.    There's not a board.  There's an arbitrator.
12     Q.    Okay.  So is there an arbitrator currently
13  assigned to reviewing Captain Whitehouse's appeal?
14     A.    There is.
15     Q.    Okay.  And that process is ongoing?
16     A.    That process has been set for a hearing, I
17  think, in May.
18     Q.    Okay.  And prior to that, there was an earlier
19  appellate ruling; is that correct?
20     A.    That was in January of -- no.  Excuse me.  That
21  was in June of 2017, I think, was -- it was when the --
22  when the appeals board met.
23     Q.    Was there -- were there briefs filed or
24  argument held prior to that decision?
25     A.    There were no briefs filed and Captain

1    Whitehouse refused to attend the hearing.

2        Q.    But there was a hearing conducted?

3        A.    Yes.

4        Q.    And APA conducted the hearing?

5        A.    It was done by three members of the appeals

6    board.

7        Q.    And was there an underlying trial or original

8    decision that had come up on appeal prior to the appellate

9    process?

10       A.    We had asked the --

11             MR. AMLONG:  Is any --

12   BY MR. MORALES:

13       Q.    Was there any --

14             MR. AMLONG:  -- of this confidential?

15   BY MR. MORALES:

16       Q.    -- was there --

17             THE WITNESS:  I don't know.  I'm not sure of

18        that.  It could be union.  I'm not sure that con- --

19        I'm not sure that the questions you're asking me

20        could be privileged between the union and...

21   BY MR. MORALES:

22       Q.    Was there any proceeding that occurred in the

23   APA Section 7 process prior to the appeal that you just

24   described?

25       A.    Okay.  It's an Article VII and there was --

1    there was no formal proceeding or hearing.

2       Q.    And so how did the original decision come

3    about?  Were there briefs filed or anything of the sort?

4       A.    We don't file briefs.

5       Q.    So there was just a complaint filed?

6       A.    I basically -- I basically sent

7    Captain Whitehouse, via certified mail, a letter alleging

8    that he had violated the APA constitution and bylaws by --

9    by, you know, lying in his complaint.

10       Q.    And -- and each of these various steps that you

11    have described, the -- the first stage and then the two

12    appellate processes, APA has been involved in those; is

13    that correct?

14       A.    APA is not involved in that in any way.  They

15    won't be involved.  You have an appeals board that's

16    appointed by the board that acts independently of the APA

17    board.

18       Q.    Let me ask you:  Is that board commissioned

19    under articles of the Allied Pilots Association?

20       A.    It is.

21       Q.    So when you said earlier in your testimony that

22    this issue was, quote, "resolved in October 2014" for the

23    Allied Pilots Association, is that an accurate set of

24    testimony?

25       A.    When you're saying it was resolved, it was

1    resolved --

2        Q.    From APA's perspective, do you think it's

3    accurate to say that the

4    Captain Whitehouse/First Officer Patterson matter was

5    resolved in October 2014?

6            MR. AMLONG:  He can't tell you what

7        Captain Whitehouse's perspective is -- or APA.

8            MR. MORALES:  For purposes of the Allied Pilots

9        Association.

10           THE WITNESS:  Well, APA doesn't issue any --

11       Counsel, there's nothing in writing from the APA --

12   BY MR. MORALES:

13       Q.    Well --

14       A.    -- in professional standards and anything is --

15   excuse me -- anything that --

16       Q.    Colonel Patterson, the -- the complaint that

17   you referenced that you said initiated the -- the

18   proceedings against Captain Whitehouse, you'd said that

19   there were allegations of, I think, bad faith and

20   malicious intent by Captain Whitehouse; is that --

21       A.    Well, basically, we presented

22   Captain Whitehouse's statement --

23           MR. AMLONG:  Answer yes or no.

24           THE WITNESS:  Yes.

25   BY MR. MORALES:

1     Q.    Is Captain Whitehouse the reason that you're

2  not an active pilot at American Airlines today?

3     A.    I think the reason that I'm not an active pilot

4  at American Airlines is that you retaliated against me for

5  asserting my rights under USERRA.

6     Q.    So Captain Whitehouse is not the reason that

7  you're not an active pilot?  Let me ask you again.

8          Is Captain Whitehouse the proximate cause of

9  you not being a line flight pilot at American Airlines

10  right now?

11          MR. AMLONG:  Objection as to --

12          MR. MORALES:  Let me redo --

13          MR. AMLONG:  -- legal conclusion.

14  BY MR. MORALES:

15     Q.    Is Captain Whitehouse the reason you're not

16  currently flying for American Airlines?

17     A.    I think the reason I'm not flying for

18  American Airlines is because Captain Bonds retaliated

19  against me and then you've asked Captain Whitehouse to

20  compromise his integrity, which has been -- which --

21  which -- which was questioned by the appeals board.  The

22  appeals board did note that his statement included many,

23  many, many inconsistencies.  And --

24     Q.    Let -- let me ask you this:  Would you expect

25  an employer that received Captain Whitehouse's work

1  environment complaint to withhold the subject of that

2  complaint from duty pending an investigation?

3      A.    You're asking me would I expect an employer to

4  do it?  No.  You know what I would expect an employer to

5  do?  I would expect an employer to, one, investigate the

6  complaint for fact, which Lou -- which Ms. Berkley advised

7  Captain Shellhouse at the -- at the initial Section 21

8  hearing that she hadn't even investigated the complaint

9  for fact.

10      Q.    So would you say it was not reasonable

11  foresee -- reasonably foreseeable for Captain Whitehouse,

12  when he filed his complaint, to expect that you would be

13  withheld from duty at American Airlines based on the

14  filing of that complaint?

15      A.    I think Captain Whitehouse knew about

16  American Airlines' zero tolerance policy and he

17  intentionally submitted his complaint to -- to effect my

18  termination.

19      Q.    What is the zero tolerance policy?

20      A.    Zero tolerance policy, you -- you know what it

21  is at American Airlines.  I'm sure you've -- I'm sure

22  you've seen plenty instances of it.

23      Q.    So what is the zero tolerance policy?

24      A.    It's basically codified into American Airlines'

25  rules of conduct, where they don't tolerate, you know --

1   in other words -- I -- I can give you an example.

2        American Airlines finds it particularly

3   offensive in using the -- the N-word to refer to an

4   African-American.  And you know, Mr. Whitehouse alleged

5   that I used the N-word, which turned out -- which turned

6   out to not be factual.

7        Q.   Why did Captain Whitehouse make that

8   allegation?

9             MR. AMLONG:  Objection.

10  BY MR. MORALES:

11       Q.   Sorry.  You just testified -- and we can read

12  it back if you want, but you just testified that you think

13  Captain Whitehouse used the zero tolerance policy in an

14  effort to get you terminated.  Is that essentially

15  accurate, as to --

16       A.   I think Mr. Whitehouse was -- was aware of the

17  zero tolerance policy --

18            MR. AMLONG:  No -- sorry.

19            Read the question back --

20  BY MR. MORALES:

21       Q.   In your view, did Captain Whitehouse -- and I'm

22  echoing your earlier testimony -- attempt to have you

23  terminated by American Airlines with the filing of his

24  complaint?

25       A.   I think, if you read his statement, it's very

1   clear.

2       Q.    Yes or no?

3       A.    I think he was attempting to help Captain Bonds

4   and that's why, I think, he made his complaint.

5       Q.    So Captain Whitehouse's motivation for filing

6   his complaint, in your view, was what?

7       A.    I think Captain Whitehouse wanted revenge.  He

8   wasn't happy with -- he wasn't happy with what occurred.

9   And in documents that you provided --

10      Q.    What occurred in October 2014?

11      A.    Well, what occurred in October of 2014.  You

12  know, I'm a captain.  I'm right.  I -- you know, I'm --

13  I'm reaching out to professional standards.  You -- you --

14  this first officer has -- has harmed me.

15            No, I haven't.  I've ignored you and I want you

16  the leave me alone and not bother me anymore.  I won't fly

17  with you.  I will particularly avoid you.

18            And I'll give you an example, I'll give you a

19  prime example.  In July of 2015, I was scheduled to take

20  a -- to take a flight on my days off, to a -- to an air

21  show.

22      Q.    I'm -- I'm sorry.  I have a limited amount of

23  time.  I'm going to ask you --

24      A.    That's great.  I'm glad you do.

25      Q.    I'm going to ask you a couple questions.

1          So you've just testified about

2    Captain Whitehouse being motivated by revenge.  In your

3    view, what was he seeking revenge for?

4        A.    Well, obviously he doesn't like me.  I mean you

5    don't -- you don't do things like that to people you --

6    you -- you don't like.  The fact is, is he's obviously

7    motivated.  He doesn't want to see me fly for

8    American Airlines.  However, I go back to my original

9    statement:  It resolved around Captain Bonds.

10       Q.    Would you expect an employer that received an

11   complaint that includes the allegations that were set

12   forth by Captain Whitehouse to withhold the subject of

13   that complaint?

14       A.    As a matter of fact --

15            MR. AMLONG:  Objection.  Asked and answered.

16            THE WITNESS:  It's asked and answered.

17            And as a matter of fact, at US Airways, which

18       is our sister company, the practice was, was to

19       suspend both parties pending the outcome of the

20       investigation.  So I think that --

21   BY MR. MORALES:

22       Q.    Let me ask you this --

23       A.    -- would have been fairer response.

24       Q.    If you had not requested military leave for the

25   weekend of September 22nd or the week of September 22nd,

1    2015, would Captain Whitehouse have filed his work

2    environment complaint?

3              MR. AMLONG:  Objection.  Speculation.

4              THE WITNESS:  I can't say.  It's speculation.

5         That's exactly my answer.  It's speculation.

6              MR. MORALES:  In your -- I believe this is

7         Exhibit 20.

8              THE REPORTER:  Yes.

9              MR. MORALES:  Is that correct?

10             THE REPORTER:  Mm-hmm.

11                 (Exhibit 20, Article VII Charges Against

12             Captain Whitehouse, was marked for

13             Identification.)

14   BY MR. MORALES:

15        Q.    Let's go ahead and have you look briefly at

16   this document.

17             THE REPORTER:  Hold on.  Wait.  Wait.

18             THE WITNESS:  That's the Article VII file.

19   BY MR. MORALES:

20        Q.    Is this the document that you filed --

21        A.    It is.

22        Q.    -- with the APA, the Article VII charges

23   against --

24        A.    It is.

25        Q.    -- Captain Whitehouse?

1          If I could just have you look at the first

2    paragraph, it starts "I am requesting."  And there's a

3    sentence, I believe it's the fourth sentence, starts

4    "Specifically, I am charging the subject," do you see

5    that?

6        A.    What page now?

7        Q.    Page 1, fourth sentence, "Specifically, I am

8    charging the subject."

9        A.    Let me count.

10            MR. AMLONG:  Fifth line.

11            THE WITNESS:  Fifth line.

12            MR. AMLONG:  Okay.

13            MR. MORALES:  Correct.  Thank you.

14            THE WITNESS:  Okay.

15    BY MR. MORALES:

16        Q.    I'm going to quote [as read]:  Specifically --

17    and you, just to -- first of all, you -- you prepared and

18    submitted this document; is that correct?

19        A.    That's correct.

20        Q.    And then this sentence says, quote [as read]:

21    Specifically, I'm charging the subject under Article VII,

22    A8, based on his unlawful actions relating to his filing a

23    false hostile work environment complaint, false

24    allegations of criminal activity and directing fellow

25    employee flight attendant to submit a written complaint

1    with willful malice and political animus, which a

2    reasonable person would expect to cause the loss of

3    employment of any person affected.

4        A.    Okay.

5        Q.    When you said that Captain Whitehouse's

6    complaint was filed with "willful malice and political

7    animus, which a reasonable person would expect to cause

8    the loss of employment of any person affected," did you

9    mean that the complaint was filed with willful malice and

10   political animus, which a reasonable person would expect

11   to cause the loss of employment of any person affected?

12       A.    That's exactly what I said.

13       Q.    Okay.

14       A.    I believe that he did --

15       Q.    Okay.

16       A.    -- intend to cause my loss of employment.

17       Q.    Let me ask you this:  If Captain Whitehouse had

18   not filed his complaint, is it your view that

19   American Airlines would have still withheld you starting

20   on September 25th, 2015?

21       A.    Well, considering that American Airlines

22   withheld me on the 22nd, I think the intent is pretty well

23   clear, sir.

24       Q.    Is your view that American Airlines would have

25   withheld you on paid withheld status in September of 2015

1  even if Captain Whitehouse had not filed his complaint?

2      A.    I think American Airlines was intent on

3  retaliating against me.  And I think American's answered

4  it.  Jim Bonds is no longer in the Miami flight office.

5      Q.    So the question is:  If Captain Whitehouse had

6  not filed his complaint, a complaint which you described

7  as something that a reasonable person would expect to

8  cause the loss of employment of any person affected, if

9  that complaint had not been filed, do you believe that

10  American Airlines would have placed you on paid withhold

11  status in September of 2015?

12      A.    I believe I was already on paid withheld status

13  September 22nd, sir.

14      Q.    And my question was about --

15      A.    It's clear --

16      Q.    -- the month of September 2015.

17      A.    -- it's clearly --

18      Q.    Do you believe --

19      A.    It's clear.

20      Q.    Do you believe that you would have been placed

21  on paid withheld status even if Captain Whitehouse had not

22  filed his claim?

23      A.    I believe I would have because that's exactly

24  what was done, sir.

25      Q.    And why would you have been placed on -- well,

1      just to be clear:  Your -- your qualifier there was

2      "that's exactly what was done."  But Captain Whitehouse

3      did, in fact, file a complaint with American Airlines

4      referenced in your pay withhold --

5          A.    Yes.  Which was later --

6          Q.    -- notification.

7          A.    Which was later determined to be false.

8          Q.    So just to be clear:  In the month of

9      September 2015, ignoring specific sequencing, if -- of

10     dates -- if Captain Whitehouse had not filed a complaint

11     with American Airlines regarding your work environment

12     activities, is your view that American Airlines would have

13     still placed you on paid withheld status in

14     September 2015?

15             MR. AMLONG:  Objection.  Speculation.

16     BY MR. MORALES:

17         Q.    You can answer.

18         A.    I was already there September 22nd, sir.

19         Q.    You testified a moment ago that you believe

20     that American would have still placed you on paid withheld

21     status because of a retaliatory motive.  In your view,

22     what -- what was the retaliatory motive for

23     American Airlines that caused you to be suspended or

24     placed on paid --

25         A.    It's obvious -- it's obvious -- it's obvious --

1     it's obviously clear, sir.  Captain Bonds demanded that I

2     produce orders, otherwise I was going to stay on a trip.

3     So you -- now you have a USERRA violation, a clear USERRA

4     violation.  USERRA -- USERRA requires notice.  In the

5     past, I've given notice, there's never been an issue.  In

6     the past, there's never been an issue.  Hey, go on your

7     military leave and let us know when you're ready to come

8     back or whatever.

9              So -- so --

10     Q.     What is the --

11     A.     -- I believe --

12     Q.     -- retaliatory motive that you believe

13     American Airlines had?

14     A.     So I believe -- I believe -- I believe that

15     there is a -- there was existing a hostile work

16     environment.

17     Q.     Based on what?  Any -- based on --

18     A.     Well, prior -- prior -- prior --

19     Q.     -- your military status?

20     A.     No.  Prior to this incident occurring in

21     October of 2014, I never had an off- -- I never had an

22     issue with the flight office.  As a matter of fact, I

23     volunteered on many, many occasions for American Airlines

24     to do certain things.  Captain Raleigh, when

25     American Airlines started hiring, came to me and said

1    "Hey, I realize you were doing the hiring for another

2    airline.  I want you to help me because I'm on an advisory

3    committee.  Would you help me."

4         Q.    I'm going to have to -- I'm going to have to

5    ask you -- because we have a limited amount of time here.

6              In your view, was Captain Bonds motivated to

7    retaliate against you based on an antimilitary animus?

8         A.    I think Captain Bonds was jealous.  Because he

9    mentions "Well, hey, I hear you got duty at the

10   White House or the Pentagon or something like that."  And,

11   you know, that came out in the call.  So there's a

12   jealousy there.  There is an animus.

13        Q.    What call?

14        A.    Well, when he called and left message on my

15   answering machine.  "Hey, I hear you got duty at the

16   Pentagon or something," and, you know, that came out.

17        Q.    Do you have copy of that voice message still

18   available?

19        A.    I've provided it to you, sir.

20        Q.    Okay.  We will double-check it.  If we don't

21   have it, would you --

22        A.    I'll be happy to provide it to you.

23   Absolutely.

24        Q.    So your view is that the reason that you were

25   withheld in September 2015 is because Captain Jim Bonds

1  had antimilitary animus towards you?

2      A.    I would say that it wasn't an anti- --

3            MR. AMLONG:  Objection.

4            THE WITNESS:  Yeah.

5            MR. AMLONG:  You're seeking his opinion about

6       Bonds' state of mind.

7  BY MR. MORALES:

8      Q.    Please answer the question.

9      A.    I think there was a -- I wouldn't say there was

10 an anti --

11           MR. AMLONG:  Well, no, don't --

12 BY MR. MORALES:

13     Q.    Please answer the question.

14           MR. AMLONG:  You're asking him to speculate

15      about somebody else's state of mind.

16           MR. MORALES:  Are you directing the witness not

17      to answer the question?

18           MR. AMLONG:  If you have any personal

19      knowledge, answer it.

20           MR. MORALES:  Are you directing the witness not

21      to answer it?

22           MR. AMLONG:  No.  I'm just telling him to

23      answer -- answer it from his own personal knowledge.

24           MR. MORALES:  So the -- if you would -- if we

25      could have the question read back.

1            And if you would, please answer the question.

2        Thank you very much.

3                (A portion of the record was read by the

4        reporter.)

5            THE WITNESS:  You're asking me to speculate.  I

6        think there was a hostile work environment that

7        existed.

8    BY MR. MORALES:

9        Q.    Hostile based on what characteristic or

10   category of employment?

11       A.    Well, I had seen -- I saw this treatment of my

12   request for military leave much markedly different from

13   others.  And --

14       Q.    "Others" meaning prior requests --

15       A.    Well, prior requests --

16       Q.    -- that you made or other individuals?

17       A.    I've never -- I never had an issue.  When I was

18   going to Haiti, I called and I said "Hey, I need to be

19   released.  I'm going to Haiti."  And, obviously, I got

20   released.  Okay.  So, you know, that, coupled with --

21   that, coupled with Bonds refusing to give me military

22   leave -- he didn't give it to me.  I had to call Dave

23   Tatum that night.  And I think I went way above and

24   beyond.  What I should have done is complied with USERRA

25   and just left and gone and done my military duty and then

1 come back to him and said "Hey, now you really violated

2 USERRA.  And you didn't give me military leave like I

3 requested to.  And also, sir, you know, now you've PW'd me

4 on a -- on a date that I went on military leave.  You've

5 changed my employment status.  And now you want to say oh

6 it's related to something else."

7          You know, it's clear retaliation.  It's clear.

8 And Bonds went in and stripped out the EOs that were

9 applied by Tatum and so there's a clear intent there.

10     Q.    Do you have access to a flight schedule that

11 Captain Whitehouse flies each month for American Airlines?

12     A.    Flight schedule that Captain Whitehouse flies,

13 and every airline pilot, is published on the APA website.

14     Q.    Is it published to public?  Can I look at it?

15     A.    You cannot.

16     Q.    It's publish to members of the APA?

17     A.    To members of the APA.

18     Q.    Okay.  Have you recently attained -- obtained

19 flight schedule information for Captain Whitehouse?

20     A.    I have.  And I've asked other APA members to do

21 it for me.

22     Q.    What other APA members?

23     A.    Captain Shellhouse.

24     Q.    Okay.  Did you ask Captain Shellhouse for the

25 flight schedule information that was used prior to the

1    service of a subpoena on Captain Whitehouse recently?

2        A.    I think I asked Captain Shellhouse to verify

3    that Whitehouse would be in the Miami airport because it

4    appeared that Whitehouse was dodging service of a

5    subpoena.

6        Q.    Okay.

7             MR. MORALES:  We could go off for just one

8         second.  I want to do a time check.

9             THE VIDEOGRAPHER:  Off the record.  The time is

10        7:06.

11             (Thereupon, a recess was taken.)

12             THE VIDEOGRAPHER:  Back on the record.  The

13        time is 7:07.

14    BY MR. MORALES:

15        Q.    Colonel Patterson, if I could just have you

16    look quickly back at the complaint, which is Exhibit 18,

17    I'm going to review -- use it to refer to a few items.

18             Let me know when you have that document.

19        A.    I have the document.

20        Q.    Okay.  If you would look to Page 6, there's a

21    paragraph that looks like it's 15B.  Paragraph 15 starts

22    on the -- on Page 5.

23        A.    I understand.

24        Q.    Paragraph B, 15B, starts "Chief Pilot Bonds, on

25    January 20th."  Do you see that?

1          A.    I do.

2          Q.    Chief -- and it reads [as read]:  Chief Pilot

3     Bonds, on January 20, 2016, ordered Lieutenant Colonel

4     Patterson to undergo a, quote, "Fitness for duty

5     examination, mental health," elaborating, in pertinent

6     part.

7               And then it appears to quote that [as read]:

8     The request is based upon this office's concerns about

9     First Officer Patterson's judgment and, specifically, his

10    mental health and/or emotional stability.  This office has

11    received multiple reports of atypical interactions with

12    coworkers and reports that suggest a pattern of

13    false/self-aggrandizing statements.

14              At the time that you received this -- first of

15    all, did you receive this January 20th, 2016, order from

16    Chief Pilot Bonds?

17         A.    I did.  I received it in the mail.

18         Q.    Okay.  And at the time that you received it,

19    were you aware of the multiple reports of atypical

20    interactions that are referred to in your complaint?

21         A.    I was not and I was never counselled as such.

22         Q.    Okay.  At some point, did you, in fact, undergo

23    a fitness for duty examination, mental health, as quoted

24    in the Paragraph 15B?

25         A.    I did in March 2016.

1        Q.    Was that -- first -- first of all, who was the

2    examiner for that fitness for duty examination?

3        A.    Well, it was Dr. John Knippa in California.

4        Q.    Okay.  And you said the appointment was in

5    March 2016.  Had you had any earlier scheduled dates --

6        A.    We had.

7        Q.    -- for the appointment?

8        A.    We did.

9        Q.    And why were those earlier dates not utilized?

10       A.    I had a dog bite me in the elbow and attack me

11   in my neighborhood and I was going through physical

12   therapy at the time.  And the doctor -- the doctor that I

13   was visiting said that he felt like I probably should not

14   fly.

15       Q.    Who was that doctor?

16       A.    It was Dr. Dayton.

17       Q.    And when did that elbow injury occur?

18       A.    It had happened -- it had happened, from what I

19   recall, it was -- it was a few weeks -- it was -- was more

20   than a few weeks prior to -- prior to me going out.  It

21   just -- my -- my arm had been -- my arm -- the dog bit me

22   in the arm and it had been bothering me.  And -- and I --

23   it had been catching.  And so I was going to Dr. Dayton

24   for physical therapy and that freed the arm up and I had

25   no problem after that.

1    Q.    And the dog bite was the -- the cause of the

2  elbow injury?

3    A.    In the elbow, yeah.

4    Q.    And Dr. Dayton said you shouldn't fly with the

5  elbow injury?

6    A.    Mm-hmm.  Not while I was -- not while I was

7  having issues.

8    Q.    Is it possible the elbow injury occurred in

9  October 2014?

10   A.    No.

11   Q.    Did you ever have an elbow injury that

12 Dr. Dayton looked at --

13   A.    No, I did not.  I did -- I --

14   Q.    -- in October 2014?

15   A.    -- I did not know Dr. Dayton in October 2014.

16   Q.    Did -- did the dog bite occur in October 2014?

17   A.    No, it did not.

18   Q.    Did you have any elbow issues in 2014?

19   A.    I had an issue with a broken foot in Bolivia.

20   Q.    So no elbow issues in 2014?

21   A.    You know, I tripped and fell and I don't -- I

22 don't attribute, you know, an elbow injury to that.  I

23 broke my -- I clearly broke my foot.

24   Q.    What is the earliest, in the 2016 moving

25 backward period, that you recall having the elbow injury

1    that caused you to reschedule the --

2         A.    The -- it --

3         Q.    -- the physical exam?

4         A.    The elbow injury occurred prior to being

5    scheduled for it and, you know, it just the dog bite

6    occurred prior to that.  And it created an issue.

7         Q.    Was the dog bite in January 2015?

8         A.    I don't recall specifically.

9         Q.    July 2015?

10        A.    I don't recall specifically --

11        Q.    Was it a new --

12        A.    -- what date it was.

13        Q.    Was it a new injury as of January 2016?

14        A.    Was it a new injury as of January?  No.  It was

15   an -- it was an older injury that -- that started creating

16   problems.

17        Q.    Was it -- would you say the elbow injury

18   started in June 2015?

19        A.    I would say it started before January of 2016,

20   when I was directed to go.  And I was undergoing -- I was

21   undergoing treatment with Dr. Dayton.  I was given no

22   notice of the -- for the Section 20 pending --

23        Q.    What's the -- what's the first time you recall

24   Dr. Dayton reviewing this particular elbow injury?

25        A.    I don't recall the specific date, but I know

1　that Dr. Dayton --

2　　　Q.　　Was it -- was it a week before January 20,

3　2016 --

4　　　A.　　I don't -- I don't -- sir, I don't recall the

5　specific date.　I realize -- I went to -- I went to him

6　for several -- several physical therapy appointments.

7　　　Q.　　Okay.　Did you, in fact, appear before

8　Dr. Knippa for an examination?

9　　　A.　　I did.

10　　　Q.　　Were you asked for information from Dr. Knippa

11　as part of his examination?

12　　　A.　　About?

13　　　Q.　　Did -- did Dr. Knippa ask you for information

14　as part of his examination, about your medical condition?

15　　　A.　　He didn't go in depth into my medical

16　condition.

17　　　Q.　　Did he -- did he make various requests of you

18　for information at his examination?　Did -- did Dr. Knippa

19　ask you things about yourself at his examination?

20　　　A.　　Yes, he did.　He actually asked me why I

21　thought I was there.　And I told him, I -- I said "I know

22　why I'm here.　American Airlines is using this to

23　retaliate against me."

24　　　Q.　　Would you describe yourself as -- let me start

25　again.

1          Would you describe yourself as having fully
2    cooperated with Dr. Knippa in addressing his information
3    requests at the examination?
4         A.    He says that I did.
5         Q.    Would you consider yourself to have fully
6    cooperated with Dr. Knippa?
7         A.    I went to visit Dr. Knippa.  I was directed to
8    do that.
9         Q.    Again, would you have consider -- would you --
10   would you characterize yourself as having fully cooperated
11   with Dr. Knippa?
12        A.    How would you characterize that I did not, sir?
13        Q.    Did you fully cooperate with Dr. Knippa in his
14   examination?
15        A.    I took his test that he asked me to take.
16        Q.    When he asked you for information, did you
17   withhold any information?
18        A.    What information would that have been?
19        Q.    Any information.  Did you -- did you
20   consciously withhold any information from Dr. Knippa that
21   he asked you about?
22        A.    Whatever Dr. Knippa asked me, I gave him.
23        Q.    Okay.  So there were no subjects where you held
24   back any information from Dr. Knippa that he had
25   requested?

1     A.    Dr. Knippa asked me specific questions and I

2  gave him answers.  Such as where did I go to school?  Was

3  I married?  Did I have children?  Which I answered.

4     Q.    Did you withhold any information from

5  Dr. Knippa at his examination?

6     A.    Not that I recall.

7     Q.    Were you directed by anyone, prior to

8  Dr. Knippa's examination, to withhold information --

9     A.    Absolutely not.

10    Q.    -- that was --

11       No one ever told you that you should withhold

12  certain information from Dr. Knippa at his examination?

13    A.    As a matter of fact --

14    Q.    Yes or no.

15    A.    As a matter of fact, no.

16    Q.    Okay.  Did -- did --

17    A.    I was not directed to withhold.

18    Q.    -- anyone direct you not to answer questions

19  from Dr. Knippa about Captain Whitehouse during

20  Dr. Knippa's examination?

21    A.    No one directed me to do that.  However, I

22  will -- I will direct you to American Airlines.

23    Q.    Did anyone advise you to not answer information

24  requests from Dr. Knippa about Captain Whitehouse prior to

25  Dr. Knippa's examination?

1          MR. AMLONG:  Asked and answered.

2          THE WITNESS:  We -- we didn't discuss

3      Captain Whitehouse at Dr. Knippa's investigation.

4  BY MR. MORALES:

5      Q.    Did anyone prior to Dr. Knippa's examination --

6      A.    No.

7      Q.    -- advise --

8      A.    No.

9      Q.    -- advise you --

10      A.    No one advised me.

11      Q.    -- to not provide information about

12  Captain Whitehouse at that examination?

13      A.    No.  And Captain Whitehouse --

14      Q.    No one ever --

15      A.    -- was not brought up.

16      Q.    No one ever advised --

17          THE REPORTER:  Wait.

18  BY MR. MORALES:

19      Q.    -- or directed you --

20          MR. AMLONG:  This is the third time you've

21      asked this question.

22          THE WITNESS:  I know.  It's just repetitive.

23  BY MR. MORALES:

24      Q.    Okay.  I'd like to ask you -- I'd just note a

25  few quick things.  You've identified four experts in this

1    case, they appear to be all medical individuals.  But I'm

2    just going to go through these names and, if you could,

3    just very briefly let me know who these individuals are.

4           Ibrahim Abi-Rafeh -- did I pronounce that

5    correctly -- what is --

6        A.    Yes.

7        Q.    -- the treatment history for that individual

8    for you?

9        A.    Ibrahim is a psychiatrist that I've known for a

10   long time, more than ten years.  And when I was notified

11   by American Airlines that there was a report out there, I

12   contacted Ibrahim and I asked him to receive the report

13   and to consult with me.

14       Q.    Okay.  Dr. Gary Kay?  Who is that?

15       A.    Dr. Gary Kay is a contractor for

16   American Airlines that's also a neuropsychologist.

17       Q.    And did Dr. Kay review Dr. Knippa's report?

18       A.    Yes, he did.

19       Q.    Did he provide his own report?

20       A.    There was a -- there was an issue with Dr. Kay

21   in that he had Dr. Knippa's report.  I didn't provide it

22   to him.

23       Q.    Okay.

24       A.    Where he got it from --

25       Q.    Did he provide his own report?

1       A.      He did and you have a copy of it in that book,

2    sir.

3       Q.      Okay.  Did Dr. Hast- -- Dr. John Hastings, did

4    he review -- he's designated as an expert in this case.

5    Did he review Dr. Knippa's report?

6       A.      Absolutely.  And he testifies to that in his

7    report.

8       Q.      And I just want to know -- we may disagree with

9    the expert characterization, but I'm just gathering some

10   information here.

11           And then the last expert you guys submitted is

12   Dr. Glenn Caddy.  If you could just describe Dr. Caddy's

13   role.

14      A.      Dr. Caddy is a -- is a forensic psychologist

15   who has extensive experience with United Airlines and

16   Delta Airlines as far as dealing with their crews and

17   pilots.

18      Q.      And did Dr. Caddy review Dr. Knippa's report?

19      A.      Yes, he did.

20      Q.      Did he prepare his own report?

21      A.      Yes, he did.

22      Q.      It appears that Dr. Caddy produced an

23   additional report that was submitted as part of this

24   litigation.  Is it your understanding that Dr. Caddy has

25   prepared two separate reports?

1      A.     Dr. Caddy did not prepare two separate reports.

2   Dr. Caddy prepared a report, which I'm sure you have.  And

3   then the report that you have in that document is an

4   extrapolation of pertinent facts showing fitness for duty.

5      Q.     And Dr. Caddy is extrapolating on pertinent

6   facts in that report?

7      A.     I don't know what Dr. Caddy did.  I'm not the

8   professional in that case.  I have to rely on the

9   professional to --

10     Q.     When you say -- so doctor -- did you provide

11  information to Dr. Caddy for the expert report that he

12  submitted in this case?

13     A.     I spent hundreds of hours with Dr. Caddy.

14     Q.     Okay.  And so the information in Dr. Caddy's

15  report is generally trustworthy and accurate, in your

16  view?

17     A.     Dr. Caddy has been aboveboard.  As a matter of

18  fact, Dr. Caddy has clearly identified, as Dr. Kay has,

19  that -- that he feels that this was a retaliatory action.

20     Q.     And on that point, there are areas of

21  Dr. Caddy's report -- I think it's near a hundred pages --

22  where it seems to go beyond just sort of, you know,

23  medical diagnostic information and opines on some of the

24  factual issues.

25             For what -- what basis does Dr. Caddy have to

1    weigh in on some of the factual items in his report?

2              MR. AMLONG:  Foundation.

3    BY MR. MORALES:

4         Q.    Does Dr. Caddy have a basis in his expert

5    report to opine on factual issues concerning, as you just

6    noted, for example, retaliation?

7         A.    Well, I think if you take a look at

8    Captain Whitehouse's report, it's clear that there are --

9         Q.    Dr. Caddy?

10        A.    Well, I'm saying, if you look at

11   Captain Whitehouse's report, which Dr. Caddy had a full

12   copy of, Dr. Caddy also mentions that he's spoken with

13   witnesses and done a -- done a more thorough investigation

14   than Dr. Knippa did.  And Dr. Caddy has basically looked

15   at Captain Whitehouse's report, and it's obvious, if you

16   read the man's report, that there are inconsistencies

17   which belie the truth.

18        Q.    And you said that Dr. Caddy had interviewed

19   witnesses as part of the preparation for his report?

20        A.    He did.

21        Q.    Okay.

22        A.    He talked to my wife.  He talked to

23   Dr. Hastings.  He's spoken to -- he's spoken to all of

24   these parties.

25        Q.    Has he spoken to you?

1    A.    I said I've spent over hundreds of hours with

2    him, sir.

3    Q.    Okay.  There's another reference in --

4          MR. AMLONG:  What is the time?

5          THE VIDEOGRAPHER:  6:40.

6    BY MR. MORALES:

7    Q.    There's a reference -- all right.

8          Let me ask you:  Is there anything in

9    Dr. Caddy's report that has been submitted here that you

10   disagree with or that you have a dispute with Dr. Caddy

11   about?

12   A.    I've no disputes with Dr. Caddy.

13   Q.    Okay.  There's a reference in some of the

14   documents to a -- a Bercaw report, B-E-R-C-A-W.

15         Does that jog your memory?

16   A.    Dr. Bercaw does not.

17   Q.    You never -- you're not familiar with the

18   Bercaw report?

19   A.    Dr. Bercaw -- Dr. Bercaw was -- was consulted

20   to basically draw forth -- draw forth conclusions or

21   whatnot.  And Dr. Bercaw --

22   Q.    Consulted by you?

23   A.    Well, consulted by me.  And doctor -- Dr. Caddy

24   contacted Dr. Bercaw and doctor -- Dr. Bercaw had -- had

25   insinuated that this was going to go to a lawsuit and he

1    was not interested in -- in -- in pursuing the lawsuit.

2        Q.    Let me ask you one quick question.  Do any of

3    the names that we just talked about -- Abi-Rafeh, Kay,

4    Hastings, Caddy, Bercaw -- would any of those individuals

5    not appear on an FAA Form 8500 for you listing health

6    professionals you visited in the last three years?

7        A.    I think -- I think as a -- as a -- I think, in

8    reporting the individuals to -- Abi-Rafeh -- Abi-Rafeh did

9    not process me as a patient.  It was more of a personal

10   contact.  And Abi-Rafeh's opinion was "There's nothing

11   wrong with you.  This doctor has not opined that there's

12   anything wrong with you."

13       Q.    Is Abi-Rafeh a health professional?

14       A.    He is a medical doctor.

15       Q.    Okay.  And you've visited him in the last three

16   years?

17       A.    I saw -- I -- I spoke with him briefly and I

18   asked him to receive the report.

19       Q.    He is an expert you've designated in this case,

20   isn't he?

21       A.    He is.

22       Q.    Dr. Kay, would Dr. Kay appear on your FAA form?

23       A.    Dr. Kay did.

24       Q.    Dr. Hastings?

25       A.    Dr. Hastings did.

1     Q.    Dr. Caddy?

2     A.    Dr. Caddy.

3     Q.    Dr. Bercaw?

4     A.    He did not.

5     Q.    And why is that?

6     A.    Dr. Bercaw said that he didn't want to be

7  involved in the lawsuit.

8     Q.    Is Dr. Bercaw a health professional?

9     A.    He is.

10    Q.    Have you visited him in the last three years?

11    A.    Not in the last three years.  I've spoken with

12 him.

13    Q.    Did Dr. Bercaw prepare a report about your

14 medical history?

15    A.    Dr. Bercaw, basically, in -- in -- in speaking

16 with him, Dr. Bercaw didn't want to be involved with

17 American Airlines as far as the procedure.

18    Q.    Did Dr. Bercaw prepare a report about your

19 medical history?

20    A.    If he did, I didn't see it.

21    Q.    So there may or may not be a report that

22 Dr. Bercaw created about your medical history?

23    A.    I'm pretty familiar -- if -- if he created a

24 report, I -- I should have seen it, but I have not seen

25 it.  And Dr. Bercaw advised Dr. Caddy that -- that he

1  didn't want to be involved in the lawsuit and, you know,

2  wanted a lot of money to participate and come onboard as a

3  witness.

4       Q.    Are there other doctors here that are receiving

5  money to come onboard as a witness?

6       A.    Dr. Caddy has been compensated for his time.

7  However, his opinion -- and he has been very clear -- his

8  opinion is not for sale.

9       Q.    Okay.  I would like you --

10      A.    Dr. Hastings, I compensated him for his time.

11  I have no influence over his opinion.

12      Q.    And are those compensation arrangements ongoing

13  or have you completed --

14      A.    I paid Dr. Hastings for his time and -- at the

15  conclusion of the report -- and Dr. Hastings told me

16  his -- his -- the visit with him was not a -- it -- it was

17  not as a medical doctor.  It was as a consultant to

18  review --

19      Q.    So you visited Dr. Hastings but not as a

20  medical doctor, but then you submitted --

21      A.    Dr. Hastings --

22      Q.    -- you submitted him as an expert regarding

23  your medical status in this case; is that correct?

24      A.    Dr. Hastings -- Dr. Hastings advised me that my

25  visit with him was not covered under my insurance.

1     Q.    Will Dr. Hastings testify regarding your

2   medical records and medical history?

3     A.    Absolutely.

4         MR. MORALES:  Okay.  I believe this is Exhibit

5      20.  Is that right?

6         THE REPORTER:  Exhibit 21.

7         MR. MORALES:  Exhibit 21.  I'm off one

8      document.

9             (Exhibit 21, E-mail, was marked for

10         Identification.)

11   BY MR. MORALES:

12     Q.    I'll have you look at this document,

13   Mr. Patterson.  Are you familiar with this document,

14   Colonel Patterson?

15     A.    Appears to be an e-mail.

16     Q.    Okay.  So is it -- is it accurate to say there

17   are two e-mails on document Exhibit 21, which is Bates

18   Patterson_00434?

19         Do you see an e-mail from Ed Bercaw --

20     A.    I do.

21     Q.    -- to A-A-7-3-7-D-R-V-R?

22     A.    Yes, I do.

23     Q.    Are you A-A-7-3-7- --

24     A.    I am.

25     Q.    -- D-R-V-R?

1      A.      Yeah.  That's correct.

2      Q.      And the e-mail shows Friday, April 22, 2016; is

3   that correct?

4      A.      That's correct.

5      Q.      And the subject is neuropsych evaluation?

6      A.      It is.

7      Q.      And it starts "Good morning, Mr. Patterson."

8   Do you see that?

9      A.      That's correct.

10     Q.      I'd just like to -- apologies for quoting at

11   length here, but I just want to see if I can jog your

12   memory on this Bercaw report.

13          It says [as read]:  Sorry for the delay on this

14   report.  We did get the medical records this week and

15   wrapped up the report just today.  A PDF is attached.  I

16   will be available to answer any questions you might have

17   after reviewing this.  I received this authorization to

18   send this to your attorney which I can do after you have

19   had a chance to read this.  Ultimately, the recommendation

20   is that this should go to review by the FAA, who has a

21   few, quote, "in-house," unquote, neuropsychologist

22   consultants who render opinions -- render an opinion.

23   They will have the data they need from us but we are

24   willing to do any follow-up or additional testing that may

25   be required later, which is sometimes the case.

1          Does this now jog your memory of an e-mail from

2     Dr. Bercaw?

3          A.    It does.

4          Q.    Does it jog your memory of a report from

5     Dr. Bercaw?

6          A.    I had not seen the report from Dr. Cow --

7     Bercaw.

8          Q.    When you received this e-mail from Dr. Bercaw,

9     did you not receive the PDF that was attached?

10         A.    I did not.

11         Q.    Did you -- did you respond to Dr. Bercaw asking

12    for the PDF report of your medical records that he had

13    just told you he was attaching?

14         A.    I asked Dr. Bercaw to consult with Dr. Caddy.

15    So doc --

16         Q.    Did you -- did you respond to this e-mail from

17    Dr. Bercaw?

18         A.    I did not respond to it.

19         Q.    Did you -- as far as the --

20         A.    I sent it to -- I sent it to Dr. Caddy, from my

21    best recollection.

22         Q.    Did Dr. Caddy or anyone else ask you to provide

23    the report?

24         A.    Dr. Caddy had conversations with Dr. Bercaw.

25         Q.    So have you ever seen a report from Dr. Bercaw?

1        A.    I have not.

2        Q.    Have you ever discussed with Dr. Caddy a report

3   from Dr. Bercaw?

4        A.    I would have sent it to Dr. Caddy and Dr. Caddy

5   was basically reviewing all of the documentation or

6   anything that came in, and also coordinating with my AME.

7        Q.    Have you ever had a discussion with Dr. Caddy

8   about a report prepared by Dr. Bercaw?

9        A.    I have asked Dr. Caddy to professionally deal

10  with this issue.  And, you know, I can't go back and --

11  and say what's occurred three years ago.

12       Q.    As -- as -- as part -- August -- April 2016 is

13  the date of the e-mail.

14             As part of this -- this litigation, have you

15  search your records for a PDF of the report from

16  Dr. Bercaw?

17       A.    If I had it, I would have produced it for you,

18  sir.

19       Q.    Have you searched your records?

20       A.    I have.

21       Q.    Have you asked Dr. Caddy for the Bercaw report?

22       A.    I was unaware of this e-mail, so, you know,

23  I -- I didn't --

24       Q.    So when you say you were unaware of it, I

25  guess, just to note, you first received it from Dr. Bercaw

1   on April 22, 2016?

2       A.    That's correct.

3       Q.    You then forwarded the e-mail to four e-mail

4   addresses, including Dr. Caddy.  And then, presumably, you

5   prepared or presented this document for production in this

6   case; is that all correct?

7       A.    Well, obviously, I gave this to -- obviously,

8   this came from my attorney, so, correct.  Or it came from

9   Dr. Caddy.

10      Q.    Did you ever follow up with Dr. Bercaw about

11  his, quote [as read]:  Recommendation that this should go

12  to review by the FAA, who has a few in-house

13  neuropsychologist consultants who render an opinion?

14      A.    I actually went to Dr. Kay who is the -- who is

15  the FAA's resident expert.  This is who this is referring

16  to.

17      Q.    So did you -- did you consult with Dr. Bercaw

18  about his recommendation?

19      A.    I did not.

20      Q.    I would like to ask:  Obviously, if there's a

21  PDF of this report, either in your records or Dr. Caddy's,

22  that we be provided with that report.  Could we make that

23  request --

24      A.    If it's available, I'll be happy to provide it.

25      Q.    Would you agree to ask Dr. Caddy for that

1   report --

2       A.    We can.

3       Q.    -- without us filing a formal discovery

4   request?

5       A.    Sure.

6       Q.    Okay.  Great.

7             In your view, when American Airlines received

8   the Knippa report, what was the appropriate course of

9   action with res- -- with respect to your employment

10  status?  Let me start again.

11            When American Airlines received the March 25,

12  2016, report that is referenced in Paragraph 16 of your

13  complaint, from Dr. Knippa, in your view, how should

14  American Airlines have moved forward with respect to your

15  employment?

16      A.    In my view, American Airlines should not have

17  sent me to a Section 20 evaluation in retaliation for

18  asserting my rights under USERRA.

19            When I read the complaint, or read Dr. Knippa's

20  report, I noted that Dr. Knippa's report did not list any

21  condition that disqualified me from holding a medical

22  certificate.  I then asked Dr. Tordella, my AME, to

23  provide me a -- a brief -- a brief overview of this.  And

24  Dr. Tordella's statement to me was, is "Look,

25  American Airlines is looking for a medical excuse to

1   terminate you."  And he said "This is just not going to

2   take place."

3      Q.   So just to be clear:  As Paragraph 17 said,

4   doctor -- of your complaint -- says [as read]:  Dr. Knippa

5   on March 21 declared Lieutenant Colonel Patterson, quote,

6   "not fit for duty as a first officer on the basis of

7   impaired performances on cognitive assessment."

8         Is your view that American Airlines should have

9   immediately put you back into an active line flying

10  position after receiving Dr. Knippa's report?

11     A.   It's my view that American Airlines should have

12  left me on paid withheld and not retaliated against me by

13  forcing me to draw sick --

14     Q.   So when Dr. Knippa told American Airlines that

15  you were, quote, "not fit for duty as first offer," should

16  American Airlines have placed you back in a cockpit to fly

17  an aircraft for American Airlines?

18     A.   I held a first class medical.  And based on

19  Dr. Knippa's report, Dr. Knippa opines cognitive

20  impairment.  And I'll note that American Airlines was

21  asked several times to not send me to California when, in

22  fact, there were four doctors here in the state of Florida

23  that could have performed the same testing, or doctors on

24  the East Coast that could have performed the same level of

25  testing that Dr. Knippa did.

1      Q.    In your -- in your view --

2      A.    I think it was a setup, is my view.

3      Q.    In your view, was American Airlines entitled to

4    require any further fitness or duty examination of you

5    after receiving this not fit for duty report from

6    Dr. Knippa?

7      A.    As a matter of fact, Dr. Knippa said that I

8    should be retested in 45 to 120 days.

9      Q.    So the question is:  In your view, was

10   American Airlines entitled to respond to Dr. Knippa's

11   report by requiring you to be examined by a different or

12   follow-up same medical examiner?

13     A.    In my view, and per the contract,

14   American Airlines has violated that.  There is a

15   stipulation in there that I can -- and as a matter of

16   fact, Cindy Contreras told me, from American Airlines,

17   that I could -- you know, "Dr. Autone has -- has reviewed

18   the report and Dr. Autone wants you to visit these

19   professionals.  And you can see any one of them you want."

20   And this came -- and this came in Cindy Contreras' message

21   and, of course, Captain Shellhouse --

22     Q.    This was a voice message from --

23     A.    This was a voice message from --

24     Q.    Do we have a copy of that --

25     A.    Excuse me.

1      Q.     -- voice message --

2      A.     Wait a minute.  This is not a voice message.

3   This is an actual telephone conversation that I had

4   Captain Shellhouse on the call with me.

5           And Cindy Contreras said "Look, Dr. Knippa's

6   found you not fit for duty.  I'm the one who returns

7   pilots to -- to duty.  And Dr. Knippa found some cognitive

8   impairment."

9           And, of course, the existence of the -- the

10  existence of the report, I gave her Dr. Abi-Rafeh's name.

11  At the time I didn't know any other psychological

12  personnel --

13     Q.     I'm sorry.  I just want to keep you on to the

14  question, which is:  When American Airlines received

15  Dr. Knippa's report declaring you, quote, "not fit for

16  duty as a first officer" -- and I'm quoting from your

17  complaint in this lawsuit there -- unquote, was

18  American Airlines entitled to require you to see

19  additional fitness for duty medical examiners before

20  returning you to line flying?

21     A.     Section 20 clearly says that when we have a

22  disagreement, there will be a second opinion and then we

23  will have a neutral third decide.  And that has not been

24  done to this day.

25     Q.     So is your view, then, that American Airlines

1 was not entitled to refer you --

2     A.    As I've said American Airlines retaliated --

3     Q.    I'm going to ask the question again.

4     So is -- when American Airlines received the

5 not fit for duty report identified in Paragraph 17 of your

6 complaint, is it your contention that American Airlines

7 had no authority or right to require you to see any

8 follow-up fitness for duty examiner before returning you

9 to line flying?

10     A.    It's my contention that American Airlines

11 shouldn't have sent me to a Section 20 in the first place.

12 It's based off of contrived information.  It's based off

13 of false allegations.  And --

14     Q.    American Airlines -- separate question.

15 American Airlines required you, per the -- per the

16 January 20, 2016, order, to -- to be examined by

17 Dr. Knippa.

18     A.    Dr. Knippa.

19     Q.    Did American Airlines require you to see any

20 other fitness for duty examiner in 2015 or 2016 that you

21 did, in fact, receive an examination from?

22     A.    Did American require me to --

23     Q.    Did American require -- is there any other

24 examiner, after Dr. Knippa, that examined you that you

25 were examined by because of a directive from

1    American Airlines?

2        A.    There was not.

3        Q.    Okay.  Give me one second.

4              If American Airlines receives a report that a

5    pilot is, quote, "not fit for duty" from a medical

6    professional, in your view, under the collective

7    bargaining agreement or otherwise in American Airlines, is

8    that pilot entitled to return to flying if a medical

9    professioner -- medical professional that the pilot has

10   selected deems them fit for duty?

11       A.    The contract is very clear, sir.  It doesn't

12   say a pilot has -- has -- it doesn't say that.  It says

13   that I have the right to select a second independent

14   physician.  And then, those two physicians -- i.e.,

15   Dr. Knippa and that physician -- would agree to a neutral

16   third.

17             MR. MORALES:  We are going to have one last

18        exhibit here.  It's Exhibit 22 --

19             THE REPORTER:  Yes.

20             MR. MORALES:  -- correct?

21             THE REPORTER:  Mm-hmm.

22             (Exhibit 22, Collective Bargaining

23        Agreement, Section 20, A through E, was marked for

24        Identification.)

25   BY MR. MORALES:

1    Q.    Mr. Patterson, just because you're describing

2    the language of Section 20, I just want to direct your

3    attention to the document I've just put in front of you.

4         Is this Section 20 that you were just

5    describing from the collective bargaining agreement?

6    A.    It is.  I don't believe it's a complete copy.

7    Q.    Correct.  But it -- it's Section 20, A through

8    E -- or at least part of E; is that correct?

9    A.    Yes, that's correct.  A through E.

10   Q.    And you were just describing -- can you point

11   me to the language that you were just referring to in

12   terms of --

13   A.    Well, I'll -- I'll point --

14   Q.    -- the company's ability to refer you to --

15   A.    I'll point --

16   Q.    -- a follow-up medical examination?

17   A.    Well, I'll point you to Paragraph B, which says

18   [as read]:  Physical standards for company physical

19   examinations will be those standards set forth in the FAA

20   regulations as being required to maintain an FAA first

21   class medical certificate.

22   Q.    Does that paragraph continue on?

23   A.    Yes, it does.  It says [as read]:  Physical

24   examination procedures will be determined by the company.

25   Q.    To be clear, it says [as read]:  Physical

1  examination procedures shall be determined by the company.

2          Is that correct?

3     A.    It does.

4     Q.    Okay.  And then you were referring, I believe,

5  to other language in Section 20.  Can you point us to the

6  language that you were referring to in your testimony a

7  moment ago?

8          Let me ask it this way:  You were referring to

9  a procedure for resolving disputes between medical

10 professionals.  Is that -- is that Section 20D that you

11 were referring to?

12    A.    Well, it does.  And under Section 20D(2), it

13 says [as read]:  Any pilot hereunder who, in the company's

14 opinion -- who, in the company's opinion, fails to pass a

15 company physical examination may, within 30 days, at his

16 option, have a review of his case in the following manner.

17    Q.    And I just want to be clear that the testimony

18 that you have provided about the restrictions on what the

19 company can do in referring you to follow up fitness for

20 duty examinations, those restrictions are, in your view,

21 contained exclusively in Section 20D of the contract; is

22 that correct?

23    A.    No.  20B determines physical standards for

24 company physical examinations will be those -- those

25 standards set forth in the FAA regulations as being

1    required to maintain an FAA first class medical.

2        Q.    Okay.  So --

3        A.    And so I'll draw your attention to Dr. Knippa's

4    report --

5        Q.    Sir, I just want to be clear --

6        A.    -- that said there was no condition that

7    disqualified me.

8        Q.    I just want to be clear here:  So the two

9    sections that you would point to in terms of the alleged

10   contractual restriction on the company, one is

11   Section 20D; is that correct?

12       A.    That's correct.

13       Q.    And then the other, and the second one is the,

14   I guess, first sentence of Section 20B; is that correct?

15       A.    Well, Section 20 -- 20D(2).

16       Q.    So, again, that's part of Section 20D.  So I

17   understand that you believe Section 20D applies here, and

18   that you understand, in your view, that Section 20B also

19   creates some restrictions on the company.

20              Is there any other part of Section 20 or the

21   contract that you view as restricting the company's

22   ability to refer you to a follow-up fitness for duty exam?

23       A.    The company's ability?  So the company is

24   saying they want to reretaliate against me and send me to

25   another Section 20, which they've done in the past?

1    Q.    Colonel Patterson, when you testified a moment

2    ago about the contract being very clear, all I'm seeking

3    to clarify is that the contractual provisions you were

4    referring to are limited to Section 20D, and then, also,

5    part of the first sentence of Section of 20B.

6              Is that correct?

7    A.    I'm referring to Section 20D, which says --

8    Q.    I understand Section 20D.  And I understand --

9    A.    Then why ask me the questions about it, sir, if

10   you understand?

11             MR. MORALES:  Thank you, Colonel Patterson.  No

12      further questions.

13             MR. AMLONG:  He will read.

14             THE WITNESS:  Thank you, sir.

15             THE VIDEOGRAPHER:  Going off the video record.

16      The time is 7:42.

17             (The deposition was concluded at 7:42 p.m.)

18

19

20

21

22

23

24

25

1   RE: RODNEY SCOTT PATTERSON v. AMERICAN AIRLINES, INC., a
     Delaware  Corporation
2   DEPO OF: RODNEY SCOTT PATTERSON
     TAKEN : March 6, 2018
3

4                               EXCEPT FOR ANY CORRECTIONS
                               MADE ON THE ERRATA SHEET BY
5                               ME, I CERTIFY THIS IS A TRUE
                              AND ACCURATE TRANSCRIPT.
6                               FURTHER DEPONENT SAITH NOT.

7                               _____
                              RODNEY SCOTT PATTERSON
8

9

10

   STATE OF FLORIDA        )
11                      ) SS:
   COUNTY OF               )
12   MIAMI-DADE
13         Sworn and subscribed to before me this
   _____ day of _____, 2018.
14   PERSONALLY KNOWN_____ OR I.D._____
15

16

                              _____
17                               Notary Public in and for
                              the State of Florida at
18                               Large.
19

  My commission expires:
20

21

22

23

24

25

```
 1                    ERRATA  SHEET
 2   IN RE:  RODNEY SCOTT PATTERSON v. AMERICAN AIRLINES,
     INC., a Delaware  Corporation
 3   DEPO OF :  RODNEY SCOTT PATTERSON
     TAKEN:  March 6, 2018
 4
        DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
 5
     PAGE #|   LINE #|   CHANGE              | REASON
 6   _____|_____|_____|_____
     _____|_____|_____|_____
 7   _____|_____|_____|_____
     _____|_____|_____|_____
 8   _____|_____|_____|_____
     _____|_____|_____|_____
 9   _____|_____|_____|_____
     _____|_____|_____|_____
10   _____|_____|_____|_____
     _____|_____|_____|_____
11   _____|_____|_____|_____
     _____|_____|_____|_____
12   _____|_____|_____|_____
     _____|_____|_____|_____
13
     State of Florida)
14   County of       )
15   Under penalties of perjury, I declare that I have read
16   by deposition transcript, and it is true and correct
17   subject to any changes in form or substance entered
18   here.
19   _____      _____
     Date                RODNEY SCOTT PATTERSON
20
21
22
23
24
25
```

1                    CERTIFICATE OF OATH OF WITNESS

2

3

   STATE OF FLORIDA          )

4                            )    SS:

   COUNTY OF MIAMI-DADE  )

5

6              I, ELIZABETH CORDOBA, RMR, CRR, FPR, Notary

7    Public in and for the State of Florida at Large, certify

8    that the witness, RODNEY SCOTT PATTERSON, personally

9    appeared before me on March 6, 2018 and was duly sworn by

10   me.

11             WITNESS my hand and official seal this

12   March 15, 2018.

13                            *E Cordoba*

14
                             _____

15                           ELIZABETH CORDOBA, RMR, CRR, FPR

                             Notary Public, State of Florida

16                           at Large

17   Notary #EE075383

18   My commission expires:  3/17/2019

19

20

21

22

23

24

25

1          REPORTER'S DEPOSITION CERTIFICATE

2

3          I, ELIZABETH CORDOBA, RMR, CRR, FPR,

4 certify that I was authorized to and did stenographically

5 report the deposition of RODNEY SCOTT PATTERSON, the

6 witness herein on March 6, 2018; that a review of the

7 transcript was requested; that the foregoing pages

8 numbered from 1 to 365 inclusive is a true and complete

9 record of my stenographic notes of the deposition by said

10 witness; and that this computer-assisted transcript was

11 prepared under my supervision.

12          I further certify that I am not a relative,

13 employee, attorney or counsel of any of the parties, nor

14 am I a relative or employee of any of the parties'

15 attorney or counsel connected with the action.

16          DATED this March 15, 2018.

17

18

19

                         E cordoba

20                _____

                ELIZABETH CORDOBA, RMR, CRR,

21                FPR

22

23

24

25