1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF FLORIDA
2              FORT LAUDERDALE DIVISION
                            §
3    RODNEY SCOTT PATTERSON,      §
                                  §
4           Plaintiff,            §        CASE NO.:
                                  §
5    Vs.                          §     1:17-cv-60533-JEM
                                  §
6    AMERICAN AIRLINES, INC.,     §
     a Delaware Corporation,      §
7                                 §
            Defendant.            §
8
9
     *************************************************
10

                    ORAL DEPOSITION OF
11

                   JERAL L. AHTONE, MD
12

                     March 14th, 2018
13

     *************************************************
14
15          ORAL DEPOSITION OF JERAL L. AHTONE, MD,
16   produced as a witness at the instance of the
17   Plaintiff, and duly sworn, was taken in the
18   above-styled and numbered cause on the 14th of
19   March, 2018, from 9:53 a.m. to 3:05 p.m., before
20   Daniel J. Skur, Notary Public and Certified
21   Shorthand Reporter in and for the State of Texas,
22   reported by stenographic means, at the offices of
23   Veritext Legal Services, 300 Throckmorton Street,
24   Suite 1600, Fort Worth, Texas, pursuant to the
25   Federal Rules of Civil Procedure.

1              A P P E A R A N C E S

2    FOR PLAINTIFF:

3         William R. Amlong, Esq.

4         (Via Teleconference)

5         Amlong & Amlong, PA

6         500 Northeast Fourth Street

7         Second Floor

8         Fort Lauderdale, Florida 33301

9         P 954.462.1983 | F 954.463.5008

10        wramlong@theamlongfirm.com

11

12   FOR DEFENDANT:

13        Cameron Cloar-Zavaleta, Esq.

14        American Airlines, Inc.

15        4333 Amon Carter Boulevard

16        MD5675

17        Fort Worth, Texas 76155

18        P 817.963.5213

19        cameron.cloar@aa.com

20

21

22   ALSO PRESENT:

23        Noel Pace, Esq., Via Teleconference

24        Mr. Rodney Scott Patterson, Via Teleconference

25

1                    I N D E X
2      1.  Appearances................................  2
3      2.  The Witness:JERAL L. AHTONE, MD
4          Examination by Mr. Amlong............. 5, 80
           Examination by Mr. Cloar-Zavaleta........ 79
5
       3.  Acknowledgement........................... 88
6
       4.  Reporter's Certificate.................... 89
7
       5.  Errata.................................... 90
8
                   DEPOSITION EXHIBITS
9                  JERAL L. AHTONE, MD
                    March 14th, 2018
10
       Number           Description           Page
11
       Exhibit 1    1/14/2016 Beach Letter to       20
12                  Patterson Regarding Fitness
                    For Duty Medical Examination
13                  Request
                    Bates No. Patterson_00144
14
       Exhibit 2    3/21/2016 Knippa Letter to      39
15                  Dr. Ahtone Regarding Rodney
                    Scott Patterson
16                  Bates No.
                    Patterson_Knippa_00001
17
       Exhibit 3    Neuropsychological              39
18                  Aeromedical Assessment
                    Fitness For Duty Summary
19                  Statement Regarding
                    Mr. Patterson
20                  Bates No.
                    Patterson_Knippa_00002
21                  through 00003
22     Exhibit 4    Neuropsychological              42
                    Aeromedical Assessment
23                  Fitness For Duty Report
                    Regarding Mr. Patterson
24                  Bates No.
                    Patterson_Knippa_00004
25                  through 00017

```
 1              DEPOSITION EXHIBITS
               JERAL L. AHTONE, MD
 2               March 14th, 2018
 3    Number            Description              Page
 4    Exhibit 5    March 2016 Email String        64
                   Regarding Section 20, Rodney
 5                 Patterson (567006)
                   Bates No.
 6                 AA-Patterson_0000770 through
                   0000771
 7
      Exhibit 8    8/23/2016 Email String         67
 8                 Regarding AA Medical
                   Submission
 9                 Bates No.
                   AA-Patterson_0000854 through
10                 0000855
11    Exhibit 10   August 2016 Email String       76
                   Regarding AA Medical
12                 Submission
                   Bates No.
13                 AA-Patterson_0000921 through
                   0000923
14
      Exhibit 11   Reports Regarding Flight       72
15                 Officer Rodney Scott
                   Patterson AA Employee Number
16                 567006
                   Bates No.
17                 AA-Patterson_0000856 through
                   0000879
18
19
20
21
22
23
24
25
```

1                  P R O C E E D I N G S

2                  JERAL L. AHTONE, MD,

3        having been duly sworn, testified as follows:

4                     (9:53 a.m.)

5                      EXAMINATION

6   BY MR. AMLONG:

7        Q.    Good morning, Dr. Ahtone.  My name is

8   Bill Amlong.  I'm one of Scott Patterson's lawyers.

9        A.    Good morning.

10       Q.    Give us your full name, tell us where

11  you live, and what you do for a living.

12       A.    My name is Jeral Lee Ahtone, I currently

13  live in Weatherford, Texas, and I am the corporate

14  medical director for American Airlines.

15       Q.    How long have you worked for American

16  Airlines?

17       A.    Seven years, eight months.

18       Q.    You were born in May 1948?

19       A.    Yes.

20       Q.    And you went to Dartmouth Medical

21  School?

22       A.    Yes.

23       Q.    Where did you do your undergrad?

24       A.    Southwestern State College, Weatherford,

25  Oklahoma.  That's not -- I don't live in

1    Weatherford, Oklahoma; I live in Weatherford,

2    Texas.  It's just a coincidence.  And also

3    Dartmouth College.

4         Q.    All right.  You did residencies in

5    anesthesiology and internal medicine.  Are you

6    board certified in either of those areas?

7         A.    No.

8         Q.    Did you take your boards in either of

9    those areas?

10        A.    Yes.

11        Q.    Did you pass?

12        A.    No.

13        Q.    Which ones did you take the boards in?

14        A.    Anesthesia and internal medicine.

15        Q.    Are you board certified in any

16   specialty?

17        A.    No.

18        Q.    Take us briefly through your post M.D.

19   employment history, please.

20        A.    Would you say that again?

21        Q.    Yeah.  You graduated from -- when did

22   you graduate from Dartmouth with your M.D.?

23        A.    1975.

24        Q.    Can you take us briefly through your

25   employment history subsequent to that?

1      A.     Are you talking about actual jobs or

2   including residency and training?

3      Q.     Both.

4      A.     In '75 to '76, I was an intern in

5   internal medicine at the University of Colorado

6   Denver.  I did a residency in internal

7   medicine, '76 to '78, at the University of

8   Colorado.

9           In 1978, I was selected to be an

10   epidemiology intelligence service officer with

11   Center for Disease Control.  I did that for two

12   years as an EIS officer.  I stayed there an

13   additional two years, '80 to '82, as a

14   epidemiologist for the hepatitis labs for CDC in

15   Phoenix.

16           '82 to '84, I was a resident in

17   anesthesia at the University of Colorado.  From --

18   a brief period of employment as a staff

19   anesthesiologist at Denver General Hospital, 1984

20   to April of '85.

21           I then worked for the World Health

22   Organization for about 17 -- 16 or 17 months as

23   their senior health coordinator for the Afghan

24   refugee project in Islamabad, Pakistan.

25           I returned to Denver.  I worked for

1    Kaiser, Kaiser Permanente, from '86 until '91 as a

2    staff anesthesiologist.

3             From '91 to '94, anesthesiologist at

4    Norton Community Hospital, Norton, Virginia.

5             From '94 until 2010, I worked as an

6    independent contractor as an emergency room

7    physician.  All but one of those years, the initial

8    one in '94, I worked for a contracting company

9    called Emergency Medical Consultants in Fort Worth,

10   and I stayed with them until 2010.

11            In 2010, I joined American Airlines,

12   where I am at the present time.

13        Q.    Has your license ever been sanctioned in

14   any jurisdiction?

15        A.    No.

16        Q.    Tell me what you do as the corporate

17   medical director for American Airlines, please.

18        A.    I -- there is a requirement for my

19   medical license to be able to put the automatic

20   defibrillators on airplanes, because they're a

21   medical device, and also for the emergency medical

22   kit that's on an aircraft.  I have prescription

23   drugs on them and they need my license to make sure

24   that they're -- they're legal.  In addition, I

25   serve as a consultant essentially for the

1  departments and various work groups within the

2  company.  If they have any medical question, I'll

3  be glad to assist them as best I can.  I'm the main

4  contact for the Center for Disease Control when

5  they have a manifest request regarding a quarantine

6  issue or any other issue of public health nature.

7  I -- you know, that -- the -- at this point,

8  whatever comes up, I assist with such as reviewing

9  the -- the surveillance, OSHA-mandated surveillance

10  for heavy metals that we have for our workers,

11  hearing conservation program.

12       Q.    I'm sorry.  What's the last thing you

13  said?

14       A.    Hearing conservation program.

15       Q.    Carry?

16       A.    Hearing, as in you cannot hear me very

17  well.

18       Q.    Ah.  Exact.  And what's the hearing

19  conservation program?

20       A.    It is a program that we use for all of

21  our employees that are in noisy work environments

22  to make sure that their hearing is not impacted by

23  the ambient noise, and if they're in a place where

24  the noise meets or exceeds OSHA guidelines, to make

25  sure they're wearing hearing protection when

1    they're within a distance of that noise that they
2    need protection.
3          Q.    Okay.
4          A.    And then if they're not wearing their
5    protection or they're having hearing loss, we
6    either remove them from that area of work or have
7    them wear their hearing protection or get
8    additional hearing protection for them.
9          Q.    Anything else?
10          A.    A lot of one-off things.  Nobody else
11    does them, so I do them, such as if TSA/Public
12    Health and the CDC say that someone is a no fly, I
13    let the security of the airlines know.  "No fly"
14    means that they likely have a contagious illness,
15    so they shouldn't be on an airplane.  I'm on 24
16    hour/7 call for -- in the event that there's an
17    aircraft incident that requires, you know, somebody
18    to go to kind of take care of our employees when
19    they're at an investigation site.  I review --
20    let's see.  Go team.  I review all the AED use.
21          Q.    You review all the what?
22          A.    Automatic external defibrillators, AEDs.
23    If they've been used, I review the tracings on them
24    to make sure there was not a problem with the
25    machine, or if there is a problem with anything in

1    regards to the machine, I check to see what it is.

2    If there's a complaint that the pads, for example,

3    can't stay on, I will inspect the pads.  If there's

4    a problem with the batteries, I will do that.  But

5    I, with the person in the AED workshop, make sure

6    that the equipment that we put on the planes is in

7    working condition.

8        Q.    Anything else?

9        A.    I'm sure there are.  I don't have the

10   list in front of me though.

11       Q.    Okay.  You say that you consult with

12   various departments.  What do you consult?

13       A.    Well, if there's a question about

14   blood-pressure cuffs, if there's a question about

15   procedures and processes.  I field advice and I

16   serve as a resource for somebody.  If they want

17   advice about training issues for resuscitation, if

18   they want to change their process or procedure,

19   they'll run it by me first to make sure that it's

20   consistent with best practices.  There are times

21   when there are issues from employees about, you

22   know, their work conditions and they ask me if I

23   have any knowledge or anything I can do to assist

24   them with that issue.  But, you know, none of these

25   are on a consistent or daily basis.  They just come

1  up intermittently.

2      Q.    Does American Airlines have testing

3  centers for its flying personnel?

4      A.    I don't understand what "testing

5  centers" means.

6      Q.    Do you test new hires when they're

7  coming in?

8          MR. CLOAR-ZAVALETA:  Object to the form.

9      A.    That -- I -- what new hires?

10  BY MR. AMLONG:

11      Q.    When somebody applies to be a pilot, do

12  they have to pass a medical examination by American

13  Airlines?

14      A.    No.  They have to have a medical

15  certificate, but we don't do an exam on them to say

16  that they have -- to give them a medical

17  certificate.  And I'm assuming you're talking about

18  current or recent anyway.  Yeah, the --

19      Q.    Yes.

20      A.    -- industry has changed over the -- and

21  this is just historically, the last 30, 40 years

22  has changed.  It's my understanding during

23  the '50s, '60s, and '70s -- I had nothing to do

24  with that, but at that time, American Airlines was

25  basically doing astronaut physicals on people

1  before they would hire them, and then '88 came, and

2  all that stopped.

3      Q.    When do you start -- when did you stop

4  doing those physicals?

5      A.    It's my -- I didn't stop.  I never did

6  them.

7      Q.    This was just -- this is before you got

8  there?

9           MR. CLOAR-ZAVALETA:  I'm sorry.  Object

10  to the form.  But can you repeat the question?

11  BY MR. AMLONG:

12      Q.    The physicals that American Airlines is

13  doing, that was before you became corporate medical

14  director?

15      A.    Yes.

16           MR. CLOAR-ZAVALETA:  Object to the form.

17      A.    But it was also before I was ever

18  employed at American Airlines, also.

19  BY MR. AMLONG:

20      Q.    Were you employed by American prior to

21  being corporate medical director?

22      A.    Yes.

23      Q.    And what was your job then?

24      A.    This was -- let me preface this by

25  saying this was pre-merger.  So when I started

1   employment in 2010, I was a medical review officer.

2   We had an internal drug and alcohol program with

3   internal medical review officers.  I was a -- I

4   helped -- I had a group of pilots that I followed

5   in their HIMS program, HIMS.

6       Q.   What's that?

7       A.   I'm sorry.  What?

8       Q.   What does HIMS mean?

9       A.   Human Interventional Motivation Study.

10      Q.   And what did that concern?

11      A.   It was a program set up for pilots who

12   had chemical or alcohol abuse.  It was a

13   rehabilitation program to have them return back to

14   work.  It's been in existence a number of years.  I

15   can't tell you when it started.  But more recently,

16   it also included pilots who were having -- were

17   placed on medication for depression.  That started

18   about 2011.  So it's a combination of alcohol,

19   substance abuse, and for pilots that had a history

20   of depression requiring medication and enabled them

21   to get back to work.

22      Q.   And is that still going on?

23          MR. CLOAR-ZAVALETA:  Object to the form.

24   BY MR. AMLONG:

25      Q.   Is the HIMS program continuing?

1      A.    Yes, it is, but not -- not --

2      Q.    Do you remain involved in it?

3      A.    I do not.  I am not involved in that

4  now.

5      Q.    How many physicians does American

6  Airlines employ?

7      A.    Currently?

8      Q.    Yes.

9      A.    One.

10     Q.    When you said "currently," did it used

11  to employ more?

12     A.    Yes.

13     Q.    Okay.  Until when?

14           MR. CLOAR-ZAVALETA:  Object to the form.

15     A.    I became the only physician left in May

16  of last year.

17  BY MR. AMLONG:

18     Q.    And before that, how many did it employ?

19     A.    It would depend on the year that you're

20  asking.

21     Q.    Let's start with 2015, going forward.

22     A.    There were one, two -- there were three,

23  going forward from 2015.

24     Q.    And who were the others, and what did

25  they do?

1      A.    They -- one --

2            MR. CLOAR-ZAVALETA:  I'm just going to

3  object to the form.

4      A.    They did the same type of work that I

5  did as a staff physician, and they -- MRO work,

6  HIMS work.  And one's name was Kevin Nelson.  He's

7  a D.O.  He was at headquarters.  The other was

8  Fanancy Anzalone, and he was in Miami.

9  BY MR. AMLONG:

10     Q.    What was his name?

11     A.    Fanancy Anzalone.

12     Q.    Can you spell those for me, please?

13     A.    Which one?

14     Q.    Fanancy Anzalone.

15     A.    Fanancy, F-A-N-A-N-C-Y, A-N-Z-A-L-O-N-E.

16     Q.    And he was a staff physician?

17     A.    Yes.

18     Q.    And were you his -- did he report to

19  you?

20     A.    Not in 2015.

21     Q.    When did he report?

22     A.    Probably start of 2016 until he left.

23     Q.    When Dr. Anzalone was there, to whom did

24  Dr. Anzalone report?

25     A.    Individual named Tom Bettes,

1    B-E-T-T-E-S, Thomas.

2         Q.    And what was Mr. Bettes?

3         A.    He was the corp -- it's Dr. Bettes.

4               MR. CLOAR-ZAVALETA:  Object to the form.

5         A.    It's Dr. Bettes.  He was the corporate

6    medical director.

7    BY MR. AMLONG:

8         Q.    When?

9         A.    By -- well, he left at the end of 2015,

10   and he had been there for 20 years; 10 of it as the

11   corporate medical director.

12        Q.    When did you become corporate medical

13   director?

14        A.    After he left.

15        Q.    Which months of 2015 or 2016 did he

16   leave?

17        A.    I don't --

18               MR. CLOAR-ZAVALETA:  Object to the form.

19        A.    I don't recall exactly.  It was in the

20   last quarter of the year.

21   BY MR. AMLONG:

22        Q.    Last quarter 2015?

23        A.    Yes, I believe.

24        Q.    Is that when you became corporate

25   medical director?

1      A.    Yes.

2      Q.    Did Drs. Nelson and Anzalone continue

3  working for American Airlines after Dr. Bettes

4  left?

5      A.    Yes.

6      Q.    And did you supervise them?

7      A.    Yes.

8      Q.    And how long did Dr. Anzalone work for

9  American Airlines?

10          MR. CLOAR-ZAVALETA:  Object to the form.

11      A.    I don't know how long he was employed by

12  American.

13  BY MR. AMLONG:

14      Q.    When did he cease being employed?

15          MR. CLOAR-ZAVALETA:  Object to the form.

16      A.    Midyear of -- of '15 or '16.  I don't

17  remember exactly.

18  BY MR. AMLONG:

19      Q.    What, if any, involvement did you have

20  in fitness-for-duty examinations?

21      A.    Regarding who?

22      Q.    Pilots.

23      A.    Only became involved with them after

24  Dr. Bettes left.  He handled that, all -- he

25  handled all of that before.  So there was --

1   virtually nothing before he left.  Afterwards,

2   the -- the involvement that I had was to assist the

3   business partners to identify physicians who do

4   evaluations, depending on what the -- what type of

5   evaluation was needed.  I did not do any exams.

6           MR. AMLONG:  Mr. Reporter, could you

7   read that answer back to me, please.

8           THE REPORTER:  Yes.

9           (Record read.)

10  BY MR. AMLONG:

11      Q.    How did you assist the -- your business

12  partners to identify physicians to do the exams?

13      A.    Well, like I -- I'll say it again.  They

14  would tell me that they had an individual who

15  needed to have a fitness-for-duty evaluation.  They

16  would give me a copy of a letter, which was sent to

17  the pilot, as I understand, and the copy of that

18  letter would tell me what the issue was in regards

19  to that pilot, and then we would help identify a

20  physician that could best help evaluate that person

21  based on the -- on the symptoms or complaints or

22  issues.

23      Q.    How, if at all, did you become aware

24  that there was a desire to have First Officer

25  Rodney Scott Patterson examined for fitness for

1   duty?

2       A.   I received a copy of a letter that

3   apparently was received -- he received also,

4   telling me that he was going to need additional

5   evaluation prior to his return to work.

6           MR. AMLONG:  Mr. Reporter, show

7   Dr. Ahtone, please, the document that's been marked

8   as Plaintiff's Exhibit 1.

9           THE REPORTER:  Okay.  There you go.

10          (Exhibit 1 introduced.)

11          THE REPORTER:  The witness is in

12  possession of Exhibit 1.

13  BY MR. AMLONG:

14      Q.   Tell me when you've finished reading

15  that, Doctor, please.

16          MR. CLOAR-ZAVALETA:  Can you repeat the

17  question?

18  BY MR. AMLONG:

19      Q.   Will you tell me when you have finished

20  reading that?

21          MR. CLOAR-ZAVALETA:  Oh, okay.

22      A.   I have finished reading that.

23  BY MR. AMLONG:

24      Q.   Is this the letter that you were saying

25  you were furnished?

1      A.    It appears to be, yes.

2      Q.    How did you get this letter?

3      A.    I don't recall.

4      Q.    What -- other than being forwarded a

5    copy of this letter, what, if any, other

6    information did you get about First Officer

7    Patterson?

8      A.    I don't recall receiving anything at the

9    time that I got this notice.

10     Q.    Well, you don't recall receiving

11   anything or you did not receive anything?

12     A.    I don't recall.

13     Q.    One way or the other?

14     A.    I don't recall.

15     Q.    In the now two and a half years or so

16   that you have been corporate medical director, just

17   how many fitness-for-duty situations have you been

18   involved?

19     A.    I don't know that number.

20     Q.    Approximately?

21     A.    I don't want to speculate.

22     Q.    More than ten?

23     A.    I don't want to speculate.

24     Q.    Have you been involved in any others

25   than First Officer Patterson?

1      A.    Have I been involved in any others

2  besides Mr. Patterson?

3      Q.    Yes.

4      A.    Yes.

5      Q.    Do you have a routine practice in which

6  you engage when a fitness-for-duty issue is brought

7  to your attention?

8           MR. CLOAR-ZAVALETA:  Object to the form.

9  BY MR. AMLONG:

10     Q.    Do you understand the question, Doctor?

11     A.    No, I don't.

12     Q.    When American Airlines comes to you and

13 says First Officer Jones or Captain Smith has a

14 fitness-for-duty issue, what do you typically do?

15     A.    I read the letter that I received.

16     Q.    Anything else?

17     A.    It would depend on the -- what the

18 letter says.

19     Q.    Do you contact the pilot in question?

20     A.    No.

21     Q.    Do you seek any collateral information

22 beyond the letter?

23          MR. CLOAR-ZAVALETA:  Object to the form.

24     A.    What we'll do is I will acknowledge

25 receipt of the letter, and -- and then depending on

1  the content of the letter, will help identify

2  individuals that would do the evaluation, and the

3  people doing the evaluation will receive additional

4  information if they agree to see somebody.  I don't

5  generally see the --

6      Q.    I'm sorry.  They receive additional

7  information if what?  I couldn't hear that.

8      A.    The -- let's take this letter that

9  you've given me as Exhibit 1.

10     Q.    Okay.

11     A.    I don't receive information regarding

12 his multiple reports of atypical interactions with

13 coworkers and reports that suggest a pattern of

14 false or self aggrandization statements.  I don't

15 receive those.  Those -- those are sent to the

16 evaluator, but they don't come to me.

17     Q.    How are they sent to the evaluator?

18     A.    I -- I would only speculate.  This is a

19 speculation.  It would be that once a provider is

20 identified, either flight or the business manager

21 would make sure that they have those reports prior

22 to their evaluation so they know why we were

23 sending him or her.

24     Q.    So do you know what flight or the

25 business manager sends?

1     A.    No.

2     Q.    Do you know if flight or the business

3  manager sends anything?

4     A.    No.

5     Q.    Was First Officer Patterson the first

6  fitness-for-duty situation that you handled as

7  corporate medical director?

8     A.    I don't recall.

9     Q.    How did you become -- well, are you

10  acquainted with Dr. John Knippa?

11     A.    Do I know his name?  Yes.

12     Q.    How do you know his name?

13     A.    It was -- one of our physician

14  consultants told us that Dr. Knippa did work with

15  individuals with behavioral problems.

16     Q.    Which physician consultant told you

17  that?

18     A.    I do not recall.

19     Q.    Have you ever met Dr. Knippa?

20     A.    No.

21     Q.    Have you ever spoken to him on the

22  telephone?

23     A.    Yes.

24     Q.    When, and about what?

25     A.    Well, likely, I spoke to him after he

1   was identified as an individual that would assist

2   us or could assist us with the evaluation of

3   Mr. Patterson, and my phone call would have been

4   explaining that we were in a fitness-for-duty

5   situation, that we asked if he had some experience

6   regarding individuals who have atypical

7   interactions with coworkers and patterns of false

8   self-aggrandization statements, if he was

9   comfortable doing those types of evaluations, and

10  he said yes.

11       Q.   Do you know whether Dr. Knippa has a

12  specialty?

13            MR. CLOAR-ZAVALETA:  Object to the form.

14       A.   Yeah, I'm not -- I'm not really all that

15  familiar with how a neuropsychologist identifies

16  himself other than that.  I think that he has been

17  identified as an individual who -- who is -- has an

18  interest in working with atypical behavior, and

19  that was how he was identified.  I don't know if

20  that's his specialty and so I can't answer beyond

21  that.

22  BY MR. AMLONG:

23       Q.   Tell me -- tell me how you sought out

24  someone to identify Dr. Knippa as someone to whom

25  you might want to send First Officer Patterson.

1      A.    We -- we have a list of physicians or

2   Ph.D.s primarily from the HIMS program that are

3   either psychiatrists or neuropsychologists.

4   Their -- their specialty is more slanted towards

5   abuse, but we like using this list because those

6   individuals are familiar with the FAA and what the

7   FAA requires in regards to evaluations.  I don't

8   remember who specifically recommended Dr. Knippa,

9   but I do remember contacting -- or the admin

10  assistant at least initiated a contact telling him

11  what we were interested in, since it was not a

12  chemical or substance abuse issue; and some of them

13  said they weren't comfortable doing that, and one

14  of them suggested Dr. Knippa from prior contact,

15  but I don't know which one that was since I didn't

16  make that -- I did not have that conversation.

17      Q.    What is neuropsychology?

18      A.    I think you need to ask Dr. Knippa that.

19  I'm not qualified to tell you what all that is.

20      Q.    What are the indications for sending

21  someone to a neuropsychologist as opposed to a

22  clinical psychologist?

23          MR. CLOAR-ZAVALETA:  Object to the form.

24  BY MR. AMLONG:

25      Q.    Do you know -- do you know, Dr. Ahtone,

1   what are the indications for a neuropsychological
2   examination?
3           A.    In the situation which we're dealing
4   with, it's if there's a -- a question of decreased
5   cognition and, you know, if there were cognitive
6   deficits that make an individual, a pilot, not able
7   to pass training, for example, we would want to see
8   if there's an issue going on with early development
9   of -- of dementia, for example, or if there was a
10  cognitive deficit identified to receive
11  recommendations from that evaluator saying, well,
12  where should we proceed next.  Do we need to send
13  him to a neurologist, do we need to send him to a
14  substance abuse professional, that we -- we leave
15  it to the -- to the consultant to suggest the next
16  step.  I don't make those decisions on their
17  behalf.
18          Q.    Please look at Exhibit 1 and tell me
19  what, if anything, in that Fitness-for-Duty Medical
20  Examination Request suggests a cognitive deficit.
21          A.    I would say that concerns about First
22  Officer Patterson's judgment and specifically his
23  mental and/or emotional stability.
24          Q.    So you're saying that judgment is a
25  neuropsychological issue?

1      A.    No, that's not what -- I'm not saying

2    that at all.  I answered your question about what

3    in that sentence made me think that it might be a

4    cognitive issue.

5      Q.    Well, what in this Fitness-For-Duty

6    Medical Examination Request made you think that

7    First Officer Patterson needed to be examined by a

8    neuropsychologist?

9      A.    I -- I don't think the -- I don't think

10   that the conclusion was neuropsychologist.  The

11   reason we went down the road of someone such as

12   Dr. Knippa is the next statement of "atypical

13   interactions with coworkers and reports that

14   suggest a pattern of false or self-aggrandization."

15          That was suggesting a behavioral

16   problem, and the fact that Dr. Knippa was the

17   person that did that work and was suggested to us,

18   that was the reason we went down that road, not

19   because he was a neuropsychologist, but it was

20   because of his interests in that field.

21     Q.    What were his interests in that field?

22     A.    What?

23          MR. AMLONG:  Mr. Reporter, read the

24   answer back to me, please.

25          (Record read.)

1  BY MR. AMLONG:

2     Q.    What, if anything, did you know about

3  Dr. Knippa's interest in the field of atypical

4  interaction with coworkers or false and

5  self-aggrandizing statements?

6     A.    We were told by the -- the person that

7  gave us his contact information that he had an

8  interest in patients with behavioral and/or

9  personality problems, and that he would be a -- a

10  person we should contact to see if he would be

11  interested in evaluating Mr. Patterson.

12     Q.    Are you familiar with psychological

13  testing?

14          MR. CLOAR-ZAVALETA:  Object to the form.

15     A.    I know -- I know that there is such a

16  thing as that.  It's a very general question.

17  I'm -- yeah.  In general, yes.

18  BY MR. AMLONG:

19     Q.    Are you familiar with neuropsychological

20  testing?

21          MR. CLOAR-ZAVALETA:  Object to the form.

22     A.    I can read the summaries of a person who

23  does that test.  I don't understand the -- how the

24  testing is done.  I don't understand the -- the

25  questions, but I can read a report from someone who

1  does that -- who does that as a profession.

2          THE WITNESS:  I need to put more time on

3  my car meter.

4          MR. CLOAR-ZAVALETA:  Is now a good time

5  for a break?  I think Dr. Ahtone needs to put more

6  money in his car meter.

7          MR. AMLONG:  Okay.  He needs to put a

8  lot in, because I think this is going to take a

9  while.

10          THE WITNESS:  That's fine.

11          MR. AMLONG:  So it's now a quarter till.

12  How much of a break do you want to take?

13          THE WITNESS:  15 minutes at most.

14          MR. AMLONG:  All right.  So we'll be

15  back at 11 o'clock your time.

16          THE WITNESS:  Okay.

17          (Recess held.)

18          MR. AMLONG:  Mr. Reporter, read me back

19  my last question and answer, please.

20          (Record read.)

21  BY MR. AMLONG:

22      Q.    Dr. Ahtone, what is the

23  CogScreen-Aeromedical Edition?

24      A.    It is a screening test that is developed

25  specifically for pilots.  It is a screening test

1   which is just a screen and, depending on the score,

2   may indicate issues with cognition, but it doesn't

3   determine why there are issues.  It just tells you

4   that the -- the score is out of the range of normal

5   and needs further evaluation.

6       Q.   Who developed that test?

7       A.   I believe Gary Kay did.

8       Q.   And does American Airlines use Dr. Kay

9   as a consultant?

10      A.   We use him as a -- we use his CogScreen.

11      Q.   Well, do you use him?

12      A.   I'm trying to think.  I personally

13  haven't recommended him.  I don't know about the

14  other individuals.  I -- I don't know about the

15  other physicians using him.  You know, he's -- his

16  CogScreen is -- we use very frequently, and -- but

17  in terms of him doing additional consultation, I

18  didn't use him.  I don't know about the others.

19      Q.   And for how long has there been -- has

20  there been no one but you?

21           MR. CLOAR-ZAVALETA:  Object to the form.

22      A.   I don't know the answer to that.

23  BY MR. AMLONG:

24      Q.   Well, when did Dr. Bettes leave?

25      A.   '15.

1          Q.    And when did Dr. Anzalone leave?

2          A.    '16.

3          Q.    Has there been any other physicians

4     since then?

5                MR. CLOAR-ZAVALETA:  Object to the form.

6          A.    Dr. Nelson was there.

7     BY MR. AMLONG:

8          Q.    Is Dr. Nelson still there?

9          A.    No.

10         Q.    All right.  He was the previous medical

11    director?

12         A.    No.  Dr. Bettes was the previous medical

13    director.

14         Q.    Okay.  When did Dr. Nelson leave?

15         A.    I believe a year ago May.

16         Q.    Was it your intention that Dr. Knippa

17    administer the CogScreen-Aeromedical Edition test

18    to First Officer Patterson?

19         A.    No.

20         Q.    Did you have any discussions whatsoever

21    with Dr. Knippa about which tests he might

22    administer?

23         A.    No.

24         Q.    Are you familiar with any guidelines

25    concerning how much time that someone needs to

1  acclimate if that person is going to undergo the

2  CogScreen test outside of his own time zone?

3           MR. CLOAR-ZAVALETA:  Object to the form.

4       A.    No.

5  BY MR. AMLONG:

6       Q.    Do you understand the question?

7       A.    Yes.

8       Q.    Do you have psychologists or

9  neuropsychologists within the Eastern Standard Time

10 time zone that you have used since you became

11 medical director?

12      A.    Yes.

13      Q.    Why did you not send First Officer

14 Patterson to someone within the Eastern Standard

15 Time zone?

16      A.    Because of the form that the letter came

17 to me saying that there were atypical interactions

18 with coworkers and patterns of false and

19 self-aggrandization statements indicated that there

20 may be a behavioral problem.  Dr. Knippa has

21 expressed an interest in working with behavioral

22 personality problems.  I felt that that was a

23 bigger bang for our buck in terms of trying to

24 determine if that was a significant issue or not.

25      Q.    Don't all psychologists work with

1    behavioral problems?

2              MR. CLOAR-ZAVALETA:  Object to the form.

3         A.    I can't answer that question because I

4    don't know all of them.

5    BY MR. AMLONG:

6         Q.    Do you know a psychologist by the name

7    of DaSilva?

8         A.    First name?

9         Q.    Dan?

10        A.    Yes.

11        Q.    And does Dr. DaSilva deal with

12   behavioral problems?

13        A.    I'm unaware that he does.

14        Q.    Have you ever sent anyone to

15   Dr. DaSilva?

16        A.    Yes.

17        Q.    Was it a behavioral problem?

18        A.    No.

19        Q.    How about Carlos Porges, does he do

20   behavioral problems?

21             MR. CLOAR-ZAVALETA:  Object to the form.

22        A.    I don't know.

23   BY MR. AMLONG:

24        Q.    Does Dr. Gary Kay do behavioral

25   problems?

1              MR. CLOAR-ZAVALETA:  Object to the form.

2       A.    I don't know.

3  BY MR. AMLONG:

4       Q.    Did you make any effort to locate a

5  psychologist or neuropsychologist on the East Coast

6  who dealt with behavioral issues for -- to see

7  First Officer Patterson?

8       A.    No.

9       Q.    Were you asked to find somebody closer

10  to First Officer Patterson's home?

11              MR. CLOAR-ZAVALETA:  Object to the form.

12       A.    I don't recall being asked that.

13  BY MR. AMLONG:

14       Q.    Do you recall anyone raising that as an

15  issue?

16              MR. CLOAR-ZAVALETA:  Object to the form.

17       A.    No.

18  BY MR. AMLONG:

19       Q.    What, if anything, did you do to check

20  out Dr. Knippa's background?

21       A.    In regards to background, we just

22  verified that he was licensed in the state that he

23  was -- said he was in, and that he expressed an

24  interest in assisting us with the evaluation, and

25  other than the recommendations from his peers, we

1  did not do any more validation than that.

2      Q.    Is there any record of which of his

3  peers recommended him to you?

4      A.    No.

5      Q.    Have you used Dr. Knippa for anyone

6  other than First Officer Patterson?

7              MR. CLOAR-ZAVALETA:  I'm going to object

8  to that.  You can ask generally, but there's a

9  court order on this issue, so...

10  BY MR. AMLONG:

11     Q.    You may answer.

12     A.    Yes.

13     Q.    How many times?

14             MR. CLOAR-ZAVALETA:  I'm going to object

15  again.  This is -- there's been a court order on

16  this.  You can ask generally, but there's a

17  stipulation on this.

18  BY MR. AMLONG:

19     Q.    How many times have you used Dr. Knippa?

20             MR. CLOAR-ZAVALETA:  I'm going to object

21  again.

22             THE WITNESS:  Should I answer?

23             MR. CLOAR-ZAVALETA:  You can answer

24  that.

25     A.    Two.

1  BY MR. AMLONG:

2      Q.    Two?

3      A.    Yes.

4      Q.    That's including First Officer

5  Patterson?

6      A.    Yes.

7      Q.    Was the other subject a pilot?

8      A.    Yes.

9      Q.    Was the other subject found fit for duty

10  or not fit for duty?

11          MR. CLOAR-ZAVALETA:  I'm going to

12  object.

13  BY MR. AMLONG:

14      Q.    You may answer.

15          MR. CLOAR-ZAVALETA:  Hold on a second.

16  Yeah.  Again, I'm going to object.

17          MR. AMLONG:  Has your counsel -- your

18  local counsel addressed this in court?

19          MR. CLOAR-ZAVALETA:  Yes, and there's a

20  stipulation on this.  He can answer this, but I'm

21  just putting the objection on the record.

22      A.    The evaluation was not completed.

23  BY MR. AMLONG:

24      Q.    The evaluation was not completed?

25      A.    Correct.

1      Q.    Why was it not completed?

2            MR. CLOAR-ZAVALETA:  Object --

3   objection.

4      A.    Apparently there was an issue with the

5   pilot.

6   BY MR. AMLONG:

7      Q.    And what was the issue with the pilot?

8            MR. CLOAR-ZAVALETA:  And that I'm going

9   to object to, and instruct the witness not to

10  answer.  We're not going to get into that.  There's

11  already a stipulation on this at the hearing, and

12  we agreed and the court --

13           MR. AMLONG:  Actually, your local

14  counsel misrepresented this to the court.

15  BY MR. AMLONG:

16     Q.    Did the other pilot walk out?

17     A.    I don't know the answer to that.

18     Q.    Because there was an issue with the

19  pilot.  What was the issue?

20     A.    I -- I just know that the evaluation was

21  not completed, and we were informed that there was

22  an issue with the pilot.  I did not get into

23  details.

24     Q.    Is the pilot flying?

25           MR. CLOAR-ZAVALETA:  Again, I'm going to

1    object.

2         A.    I -- I don't know.  I don't think so.

3    That's speculation, but I don't know for sure

4    because the evaluation was never completed by me.

5    BY MR. AMLONG:

6         Q.    When you got...

7              MR. AMLONG:  Show Dr. Knippa [sic]

8    Exhibits Number 2 and 3, please.

9              (Exhibit 2 introduced.)

10             (Exhibit 3 introduced.)

11             THE REPORTER:  I'll hand these to

12   Dr. Ahtone.  The witness has the exhibits.

13             THE WITNESS:  Thank you.

14   BY MR. AMLONG:

15        Q.    Tell me when you've finished reading

16   those, Dr. Ahtone.

17             (Witness reviews documents.)

18        A.    I have finished.

19   BY MR. AMLONG:

20        Q.    Okay.  Exhibit 2 is a cover letter for

21   both the summary report and the full report; is

22   that correct?

23        A.    Yes.

24        Q.    On the address there it refers to Jeral

25   Ahtone, M.D., AME, what's AME mean?

1     A.    Aviation Medical Examiner.

2     Q.    And what's the significance of that?

3     A.    That I am certified to do medical

4 eval -- medical exams on pilots and issue them a

5 medical certificate if they fulfill all the

6 criteria for the FAA, outlined by the FAA to have a

7 medical certificate.

8     Q.    Are you also qualified to say that

9 someone is not fit to fly?

10     A.    Yes.

11     Q.    You see that Dr. Knippa's letterhead

12 does not mention anything about AME.  Do you know

13 whether or not he is a aeronautical medical

14 examiner?

15     A.    He's not qualified to be a medical

16 examiner as a Ph.D.  Only physicians can be AMEs.

17     Q.    Exhibit Number 3 is the summary report,

18 correct?

19     A.    Yes.

20     Q.    And the second paragraph begins, "From a

21 neuropsychological perspective, he is," all caps,

22 underlined, "not fit for duty, stop underline, stop

23 all caps, "as a First Officer, at this time."

24     Correct?

25     A.    Are you asking me if that's what it

1  says?

2       Q.    Yes.

3       A.    That's what it says.

4       Q.    What's a neuropsychological perspective?

5       A.    Appears to be the opinion of the

6  neuropsychologist who did this evaluation.  In this

7  case, it's Dr. Knippa.

8       Q.    What does that mean?

9       A.    That means that Dr. Knippa felt like at

10  the time of his evaluation that Mr. Patterson was

11  not fit for duty.

12       Q.    Do you know what the components of that

13  opinion are?

14            MR. CLOAR-ZAVALETA:  Object to the form.

15       A.    I would refer to his full report.

16  BY MR. AMLONG:

17       Q.    Did you forward this report to the

18  Federal Aviation Administration?

19       A.    No.

20       Q.    Have you ever forwarded a

21  fitness-for-duty report to the Federal Aviation

22  Administration?

23       A.    No.

24       Q.    No?

25       A.    No.

1     Q.    Do you know if American Airlines through

2    someone other than yourself has ever forwarded a

3    fitness-for-duty report to the Federal Aviation

4    Administration?

5     A.    I do not know.

6     Q.    On page 2, Dr. Knippa says that, First

7    Officer Patterson exhibited, quote, substandard

8    performance testing related to skills associated

9    with flight operations, close quote.  Correct?

10     A.    Are you asking me if that's what the

11    paper says?

12     Q.    Yes.

13     A.    That is what it says.

14     Q.    Do you know what that means?

15     A.    I would refer to his final report.

16     Q.    Okay.  And that's Number 4.

17          MR. AMLONG:  Mr. Reporter, please give

18    Dr. Knippa -- I'm sorry.  Please give Dr. Ahtone

19    Dr. Knippa's report, which is Plaintiff's Exhibit

20    Number 4.

21          (Exhibit 4 introduced.)

22          THE REPORTER:  The witness has the

23    exhibit.

24    BY MR. AMLONG:

25     Q.    Tell me when you've finished reading

1   that.

2          A.    Okay.  I haven't read it in a while.  It

3   will be a minute or two.

4          Q.    Okay.

5                (Witness reviews document.)

6   BY MR. AMLONG:

7          Q.    Are you still reading, Doctor?

8          A.    Yes.

9          Q.    Okay.

10               (Witness reviews document.)

11         A.    I've completed reading.

12  BY MR. AMLONG:

13         Q.    Did you review this when Dr. Knippa

14  first sent it to you?

15         A.    Yes.

16         Q.    What, if anything, did you do following

17  your initial review of it?

18         A.    The report was sent to the -- to the

19  business partner.

20         Q.    Was it accompanied by any

21  recommendations by you?

22         A.    It was accompanied by a recommendation

23  quoting Dr. Knippa saying that he found him not fit

24  for duty as a first officer at this time.

25         Q.    But was your recommendation that First

1    Officer Patterson not be flying based on

2    Dr. Knippa's report?

3        A.    I don't believe I -- I made a

4    recommendation of that regard.  I merely said that

5    Dr. Knippa said he was not fit for duty, and that

6    there were recommendations from Dr. Knippa

7    regarding next steps, which involved, as stated in

8    his full discussion, that he would consider

9    personal counseling and discuss how his

10   interpersonal style may be perceived by others in a

11   manner different than what he perceives or intends.

12       Q.    My question to you is did you adopt

13   those recommendations as your own, or did you

14   simply forward what Dr. Knippa had said?

15       A.    I forwarded what he said.

16       Q.    Did you make any recommendations?

17       A.    The recommendation I made was that

18   should follow Dr. Knippa's recommendation.

19       Q.    In the first paragraph it states that,

20   "No medical records or personnel reporting

21   documents were made available, other than brief

22   correspondence dated 01/14/16, saying the

23   examination request in the context of Section 20

24   action."

25            Look at the second sentence, please.  It

1   states, quote, No medical records or personnel

2   reporting documents were made available, other than

3   brief correspondence dated 01/14/16, saying the

4   examination request in the context of Section 20

5   action, period, close quote.

6           Does that refer to Exhibit 1?

7       A.   Yes.

8       Q.   The fourth sentence says, quote, The

9   reporting office indicated receipt of multiple

10  reports of a difficult interaction with coworkers,

11  close quote.  In addition to, quote, reports that

12  suggest a pattern of false/self-aggrandizing

13  statements, period, close quote.

14          Was that indicated in any way other than

15  through Exhibit 1?

16      A.   No.

17      Q.   The next sentence says, However --

18  quote, However, it is understood that there was an

19  internal review, after which witnesses could not be

20  identified who would attest to these complaints

21  being present/accurate, period, close quote.

22          That is not contained in Exhibit 1,

23  correct?

24      A.   That's correct.

25      Q.   Do you know how that intelligence

1    reached Dr. Knippa?

2        A.    I don't know that it ever reached him.

3        Q.    Well, somehow he gained that knowledge

4    because he included it in the report, correct?

5            MR. CLOAR-ZAVALETA:  Object to the form.

6        A.    Speculation.

7    BY MR. AMLONG:

8        Q.    Does Dr. Knippa, to your knowledge,

9    speak to anyone other than you at American

10   Airlines?

11           MR. CLOAR-ZAVALETA:  Object to the form.

12       A.    I don't know.

13   BY MR. AMLONG:

14       Q.    Did you forward Dr. Knippa's contact

15   information to anyone at American Airlines?

16       A.    To the business manager so they knew who

17   we were referring him to.

18       Q.    Do you know who the business manager

19   was?

20       A.    Michelle Montgomery.

21       Q.    And who is Ms. Montgomery?

22       A.    Business -- the pilots' business

23   manager -- or it's -- their business partner is the

24   way it's actually referred to instead of business

25   manager.  It's business partner.  It's a -- it's a

1   way for other departments to interact with a
2   specific department through somebody that can
3   direct them to the proper person.  So she was
4   the -- she was that individual.
5          Q.    She's the labor relations manager,
6   correct?
7          A.    Yes.
8          Q.    Do you know whether she contacted
9   Dr. Knippa?
10               MR. CLOAR-ZAVALETA:  Object to the form.
11         A.    No.
12  BY MR. AMLONG:
13         Q.    No, you do not know, or, no, she did not
14  contact him?
15         A.    No, I don't know.
16         Q.    The next sentence reads, quote, It was
17  decided that no other information would be released
18  from human resources or supervisors, period, close
19  quote.
20               Do you know who communicated that to
21  Dr. Knippa, if anyone?
22               MR. CLOAR-ZAVALETA:  Object to the form.
23         A.    No, I do not know who that would have
24  been.
25  BY MR. AMLONG:

1    Q.    On page 7 towards the bottom under Test
2  Findings, the second sentence says -- I'm sorry --
3  the third sentence says, quote, Testing was
4  suspended in the early afternoon on day 1, as he
5  was understood to have indicated he was fatigued
6  while clinging to the time zone change from the
7  East Coast, period, close quote.
8    A.    Is it labeled page 7?
9    Q.    Yes.
10   A.    Which paragraph?
11   Q.    It's the -- under Test Findings.  It's
12 the second to the last bold heading.
13   A.    Okay.
14   Q.    Did I read that correctly?
15   A.    You did.
16   Q.    Did you ever speak with Lucretia Guia
17 concerning whether or not you could find somebody
18 on the East Coast?
19        MR. CLOAR-ZAVALETA:  I'm going to object
20 to the form -- or, actually, that would be
21 privileged.
22 BY MR. AMLONG:
23   Q.    Why -- Ms. Guia told Mr. Patterson's
24 lawyer that she was asked?
25        (Clarification by the reporter.)

1 BY MR. AMLONG:

2     Q.    Did Lucretia Guia ever relate to you a

3 request that Mr. Patterson be seen by someone on

4 the East Coast?

5           MR. CLOAR-ZAVALETA:  And, again, this

6 is -- that's a privileged communication.

7           MR. AMLONG:  So you're instructing him

8 not to answer?

9           MR. CLOAR-ZAVALETA:  Yes.

10 BY MR. AMLONG:

11     Q.    Did anyone ever relay to you a request

12 that Mr. Patterson be tested on the East Coast?

13           MR. CLOAR-ZAVALETA:  I mean, subject to

14 the prior objection, you can answer, aside from any

15 communications with Ms. Guia.

16 BY MR. AMLONG:

17     Q.    You may answer.

18           MR. CLOAR-ZAVALETA:  Aside from any

19 communications that you've had with an attorney for

20 the company.

21     A.    I -- I don't recall a question like that

22 from her.  I don't talk with her very often.

23           MR. CLOAR-ZAVALETA:  No, not with

24 Ms. Guia.

25     A.    No.

1          MR. CLOAR-ZAVALETA:  With anyone else?

2          THE WITNESS:  With anybody else?

3          MR. CLOAR-ZAVALETA:  Correct.

4     A.    I don't recall.

5  BY MR. AMLONG:

6     Q.    Do you know whether Dr. Knippa has ever

7  evaluated -- other than the -- other than the

8  second pilot whom you sent to Dr. Knippa, do you

9  know if he has ever evaluated any other airline

10 pilots?

11    A.    No.

12    Q.    No, you don't know, or, no, you haven't?

13    A.    No, I don't know.

14    Q.    What, if any, discussions did you have

15 with Dr. Knippa concerning his familiarity with the

16 CogScreen test, Aeromedical Edition?

17    A.    In the phone call that I had with him,

18 reading Exhibit 1 to him and asked him if he would

19 be willing to assist us, he indicated that he was

20 familiar with the FAA guidelines in their Aviation

21 Medical Examiner guide book that they published, so

22 I took that as him understanding that a core

23 battery of tests are -- are recommended by the FAA

24 as -- for someone that they're doing an evaluation

25 on.

1     Q.   Do you know whether he had -- had ever

2     administered the CogScreen test, Aeromedical

3     Edition --

4     A.   I do not --

5     Q.   -- prior to First Officer Patterson?

6     A.   I do not know.

7     Q.   Do you know whether the -- do you know

8     how the CogScreen test, Aeromedical Edition is

9     normed?

10          MR. CLOAR-ZAVALETA:  Object to the form.

11    BY MR. AMLONG:

12    Q.   Do you understand the question, Doctor?

13    A.   Not entirely, because it sounds like

14    you're asking me did I help develop that test, and,

15    no, I did not.

16    Q.   No.  What I'm asking you is -- well, do

17    you know whether or not there are different

18    standards for major airlines than there are for

19    regional airlines?

20    A.   To my knowledge, they're not different

21    standards.  There may be different findings, but

22    they're not different standards.

23    Q.   When you say "different findings," what

24    do you -- I don't know what you mean.

25    A.   This is a -- this is just a reflection

1  of the fact that many of the regional airlines have

2  much younger pilots than some of the commercial

3  pilots, and they score differently on some of the

4  manual tests, manual dexterity tests, either

5  because they're younger or they're more familiar

6  with playing computer games than some of the older

7  pilots.  So I know that as a class, younger pilots

8  score differently than older pilots on some of the

9  tests, but they're not different standards for the

10  two.

11      Q.    Well, did First Officer Patterson,

12  quote, fail, close quote, the tests that Dr. Knippa

13  gave him?

14      A.    Would you ask that question again?  I

15  didn't understand it.

16          MR. AMLONG:  Read it back, please.

17          (Record read.)

18      A.    No, he didn't fail.

19  BY MR. AMLONG:

20      Q.    Did the test results indicate any

21  neuropsychological deficits?

22      A.    No.

23      Q.    Is there anything in this report that

24  points to any psychopathology on the part of First

25  Officer Patterson?

1           MR. CLOAR-ZAVALETA:  I'm sorry.  Can I

2    have that read back?

3              (Record read.)

4           MR. CLOAR-ZAVALETA:  Okay.

5       A.   Well, I would refer to the summary from

6    Dr. Knippa to -- as an answer to that because he's

7    the person that put all the pieces of the puzzle

8    together to come up with his conclusions.

9    BY MR. AMLONG:

10      Q.   I want to know if there's anything that

11   you, as the corporate medical officer for American

12   Airlines, saw in this report, found anything

13   indicating psychopathology on the part of First

14   Officer Patterson?

15      A.   As I said before, I'll say it again,

16   Dr. Knippa is the person who administered the test.

17   There are many parts to the puzzle, and my -- my

18   review of his work mostly focused on his summary

19   where he said that he said he was not fit for duty

20   at this time.

21      Q.   Can you point to any reason why -- can

22   you point to any reason articulated by Dr. Knippa

23   as to why First Officer Patterson was not fit for

24   duty?

25      A.   Only the underlined statement by

1  Dr. Knippa on page 14, first paragraph.

2      Q.    Which reads, quote, To emphasize, the

3  primary concerns are:  Whether or not Mr. Patterson

4  has some medical cause for cognitive concerns,

5  (e.g., cancer care, residual effects evidenced in

6  attentional and executive changes) versus whether

7  or not these are chronic or from some alternative

8  cause that may require further consideration.

9  Pursuing these determinations are beyond the

10  referral scope of this examination.

11          Did I read that correctly?

12      A.    Yes, you did.

13      Q.    And can you tell me how that indicates

14  the presence of any psychopathology?

15      A.    That indicates that he doesn't have a

16  complete answer at this time.  There are

17  suggestions that that may be the -- maybe what's

18  going on, but that in a short evaluation like this,

19  it -- he did not come to -- down to that

20  conclusively.

21          In his next paragraph he says that, you

22  know, personal counseling may help further clarify

23  that issue.  That's his recommendation, and

24  that's -- that was the end of it.  I mean, that's

25  where it ended -- that's where it, yeah, ended his

1    report.

2        Q.    Is there anything -- did he send you all

3    of the underlying documents and test results?

4        A.    No.

5        Q.    Did he send you anything beyond Exhibits

6    2, 3, and 4?

7        A.    Not that I recall.

8        Q.    Is there anything in this report that

9    indicated that First Officer Patterson exhibited

10   any personality disorder?

11       A.    Only the paragraph which you quoted.  He

12   doesn't actually say "personality disorder."  What

13   he says is he would like a little more time for

14   someone -- or someone needs a little more time to

15   do additional evaluation.  It's...

16       Q.    Well, if there is -- I believe that you

17   told me that there is nothing here that points to

18   any neuropsychological deficit, correct?

19       A.    I did not say that.

20            MR. CLOAR-ZAVALETA:  Object to the form.

21   BY MR. ALONG:

22       Q.    Is there anything --

23       A.    You said that.

24       Q.    Is there anything in this report that

25   points to any neuropsychological deficit?

1      A.    I'm going to refer you to the next to

2   the last paragraph on page 14 regarding the summary

3   of Dr. Knippa.

4      Q.    Once again, to emphasize?

5      A.    Correct.

6      Q.    Tell me what in that paragraph points to

7   a neuropsychological deficit.

8      A.    I am saying that he says, "Pursuing

9   these determinations are beyond the referral scope

10   of this examination."

11          So that -- that -- from my

12   interpretation, that means that in a short one- or

13   two-day evaluation, the question could not be

14   answered.

15      Q.    So during his two-day examination, then,

16   Dr. Knippa did not discover any neuropsychological

17   deficits?

18          MR. CLOAR-ZAVALETA:  Object to the form.

19   BY MR. AMLONG:

20      Q.    Correct?

21      A.    I believe you're going to have to ask

22   Dr. Knippa that.  His report to me said that he was

23   not fit for duty.

24      Q.    Based on what?

25      A.    Based on his evaluation.

1      Q.    But he's pointing to no

2  neuropsychological deficit that he found, correct?

3                MR. CLOAR-ZAVALETA:  Object to the form.

4      A.    I'm going to refer you back to page

5  14 --

6  BY MR. AMLONG:

7      Q.    Yes or no, sir, and then you can

8  explain.

9                Did he point to any neurological -- did

10 Dr. Knippa point to any neuropsychological deficit,

11 yes or no?

12                MR. CLOAR-ZAVALETA:  Object to the form.

13     A.    I don't know.

14 BY MR. AMLONG:

15     Q.    Did Dr. Knippa point to any

16 psychopathology?

17                MR. CLOAR-ZAVALETA:  Object to the form.

18 BY MR. AMLONG:

19     Q.    Yes or no?

20     A.    He does -- he did not confirm one way or

21 the other.  That is why he said he thought

22 additional evaluation would be in order.

23     Q.    Did Dr. Knippa in his report point to

24 any recognized personality disorder, yes or no?

25                MR. CLOAR-ZAVALETA:  Object to the form.

1      A.    I did not see anything.  No.

2  BY MR. AMLONG:

3      Q.    In that case, what basis did you see in

4  his report for declaring First Officer Patterson

5  not fit for duty?

6            MR. CLOAR-ZAVALETA:  Object to the form.

7      A.    Exhibit 3.  "From a neuropsychological

8  perspective, he is not fit for duty as a First

9  Officer at this time."

10  BY MR. AMLONG:

11      Q.    That's simply a statement.  On -- what's

12  the basis of that statement?

13            MR. CLOAR-ZAVALETA:  Object to the form.

14      A.    I would -- I'm -- it was his evaluation.

15  BY MR. AMLONG:

16      Q.    What, if anything, did you do to explore

17  whether or not First Officer Patterson had either a

18  neuropsychological deficit, any discernible --

19  strike that.

20            What, if anything, did you do to further

21  pursue an answer of -- to the question of whether

22  First Officer Patterson had a neuropsychological

23  deficit?

24            MR. CLOAR-ZAVALETA:  Object to the form.

25      A.    I personally did not do anything other

1  than forward the conclusion of Dr. Knippa and

2  endorse the recommendations that Dr. Knippa made.

3  BY MR. AMLONG:

4      Q.    What, if anything, did you, as the

5  corporate medical director with American Airlines,

6  do to determine whether or not First Officer

7  Patterson suffered any psychopathology?

8          MR. CLOAR-ZAVALETA:  Object to the form.

9      A.    No, I -- what I did was forward his

10  conclusion and the recommendations made by him to

11  the business partner.

12  BY MR. AMLONG:

13      Q.    What, if anything, did you do -- as

14  American Airlines' corporate medical director do to

15  explore further whether First Officer Patterson

16  exhibited any recognized personality disorder?

17      A.    Nothing.  I had no data to go on other

18  than Exhibit 1.

19      Q.    You mean Exhibit 2?

20      A.    No.  Exhibit 1 was the one that said he

21  had judgment issues and concerns about his mental

22  and/or emotional stability.  There was no -- there

23  was no supporting documents that came with that.

24      Q.    By the way, a -- as an AME, a

25  personality order -- a personality disorder would

1    not be a basis for grounding someone, would it?

2              MR. CLOAR-ZAVALETA:  Object to the form.

3         A.    Actually, it is.  It's one of the

4    disqualifying conditions for a medical certificate.

5    BY MR. AMLONG:

6         Q.    Which personality disorder?

7         A.    It doesn't go much beyond that.  It just

8    says personality disorder with overt acts.

9         Q.    Personality disorder with overt acts?

10        A.    Correct.

11        Q.    Has anyone ever reported to you that

12   First Officer Patterson has engaged in any overt

13   acts indicative of a personality disorder?

14             MR. CLOAR-ZAVALETA:  I'm sorry.  Can I

15   have that read back, please.

16             (Record read.)

17             MR. CLOAR-ZAVALETA:  Okay.

18        A.    No.

19   BY MR. AMLONG:

20        Q.    And you do not consider the behavior

21   that is outlined in Exhibit 1 to be descriptive of

22   overt acts --

23             MR. CLOAR-ZAVALETA:  Object to the form.

24   BY MR. AMLONG:

25        Q.    -- indicative of a personality disorder,

1   correct?

2           MR. CLOAR-ZAVALETA:  Object to the form.

3       A.    No, I'm unable to determine that.

4   That's not enough information to give someone a

5   career-ending diagnosis.

6   BY MR. AMLONG:

7       Q.    Dr. Ahtone, have you, as the corporate

8   medical director of American Airlines, ever written

9   to the Federal Air Surgeon seeking a modification

10  of a pilot's first-class medical certificate?

11      A.    No.

12      Q.    Have you ever written to the Federal Air

13  Surgeon concerning Captain Brian Scott Ostrom?

14          MR. CLOAR-ZAVALETA:  Object to the form.

15      A.    Yes, I have written to him regarding

16  that pilot.

17  BY MR. AMLONG:

18      Q.    Seeking to have his first-class medical

19  certificate altered, correct?

20      A.    No, not that I recall.

21      Q.    Why did you write to the Federal Air

22  Surgeon about Captain Ostrom?

23          MR. CLOAR-ZAVALETA:  Object to the form.

24      A.    Can I just talk to Cameron one sec?

25          THE WITNESS:  Can meet with me for one

1    sec?

2              MR. CLOAR-ZAVALETA:  No, that's okay.

3              THE WITNESS:  Okay.  This is -- I

4    haven't been given permission to talk about this.

5              MR. CLOAR-ZAVALETA:  It's okay.  Object

6    to the form.

7         A.    Okay.  The letter was written to him to

8    ask the flight surgeon to make sure that -- that

9    Mr. Ostrom had disclosed all of the things that he

10   had done in the past in regards to evaluations or

11   acts, activities, or whatever.

12   BY MR. AMLONG:

13        Q.    Did the Federal Air Surgeon take any

14   adverse action towards Captain Ostrom?

15        A.    Not --

16             MR. CLOAR-ZAVALETA:  Object to the form.

17        A.    Not to my knowledge.

18   BY MR. AMLONG:

19        Q.    Did you personally write the letter to

20   Dr. Frazer?

21             MR. CLOAR-ZAVALETA:  Object to the form.

22        A.    I had assistance with legal.

23   BY MR. AMLONG:

24        Q.    Margaret Howell?

25             MR. CLOAR-ZAVALETA:  So, again, this

1    is -- I'm going to object on privilege.  Instruct

2    the witness not to answer.

3    BY MR. AMLONG:

4         Q.    Is Captain Ostrom still flying?

5               MR. CLOAR-ZAVALETA:  Object to the form.

6         A.    To my knowledge, he is.

7    BY MR. AMLONG:

8         Q.    Did you ever discuss First Officer

9    Patterson with Dr. Tordella?

10        A.    Yes.  I believe he called me.

11        Q.    And what -- what did Dr. Tordella say to

12   you, and how did you respond to him?

13              MR. CLOAR-ZAVALETA:  Object to the form.

14        A.    I don't remember the exact conversation.

15   It was a short conversation, but I do not remember

16   the details of the conversation other than that he

17   called me.  I wouldn't have remembered that if you

18   hadn't brought it up.

19   BY MR. AMLONG:

20        Q.    And this is Joseph R. Tordella, correct?

21        A.    Yes.  I just know him as "Joe."

22        Q.    And he's an AME?

23        A.    Yes.

24        Q.    Was he suggesting that First Officer

25   Patterson should be put back into the air?

1            MR. CLOAR-ZAVALETA:  Object to the form.

2       A.    I don't recall.

3   BY MR. AMLONG:

4       Q.    Do you recall telling him that it was

5   out of your hands and it was up to legal and HR?

6            MR. CLOAR-ZAVALETA:  Object to the form.

7       A.    I don't recall.

8   BY MR. AMLONG:

9       Q.    You don't recall one way or the other?

10       A.    That's correct.

11       Q.    Take a look at Exhibit Number 5, please,

12   and tell me when you've finished reading it.

13            (Exhibit 5 introduced.)

14            THE REPORTER:  The witness has

15   Exhibit 5.

16       A.    Okay.  I've read it.

17   BY MR. AMLONG:

18       Q.    Who is M. Magee?

19       A.    Michelle Magee has taken over for Cindy

20   Contreras.  Cindy Contreras is no longer with the

21   company.

22       Q.    And that still doesn't tell me what she

23   does.

24       A.    She's a -- a caseworker in our absence

25   and return center.  She tends to do most of the

1  pilot leave of absence and return-to-work notes.

2      Q.    She's a caseworker in your absence and

3  return center?

4      A.    Yes.  That's not part of medical; that's

5  part of benefits.

6      Q.    Did she eventually -- well,

7  Ms. Contreras was still there at the time of this

8  letter, correct?

9      A.    Yes.  But if I recall, that's about the

10  time she -- I think she left in April or May of

11  '16.

12      Q.    And did Ms. Magee replace her?

13      A.    Yes.

14      Q.    Is that in medical, or is that in

15  benefits?

16      A.    Benefits.

17      Q.    Is Ms. Magee a registered nurse?

18      A.    No.

19      Q.    After someone has been declared not fit

20  for duty, what's the next step for that person to

21  get back on duty?

22      A.    It would be to notify, in the past,

23  Cindy Contreras, currently, Michelle Magee, to

24  communicate what the next steps would be, and that

25  would usually be based on an evaluator's

1    recommendations; and then following completion of

2    those steps, there would be a reevaluation by the

3    initial evaluator to see if he could return to

4    work.

5         Q.    So are you saying that before First

6    Officer Patterson could begin flying again for

7    American, he would have to be reevaluated by

8    Dr. Knippa?

9         A.    I didn't say that specifically about

10   Mr. Patterson.  I just answered your question about

11   what's the usual steps.

12        Q.    Did -- did you tell Ms. Contreras what

13   steps Dr. Patterson -- what steps First Officer

14   Patterson would need to take?

15             MR. CLOAR-ZAVALETA:  Object to the form.

16        A.    I probably just showed her that page

17   concerning his recommendations and saying this is

18   what he's recommending that could happen.

19   BY MR. AMLONG:

20        Q.    Do you know if Ms. Contreras -- did

21   Ms. Contreras tell you that she had spoken to First

22   Officer Patterson?

23             MR. CLOAR-ZAVALETA:  Object to the form.

24        A.    I don't recall.  I believe she spoke

25   with him.  I don't recall if she spoke to him

1  specifically about this part though.

2  BY MR. AMLONG:

3      Q.    Did you discuss -- subsequent to --

4  well, did you ever discuss Scott Patterson with

5  Brian Beach?

6      A.    No.

7      Q.    Did you send the report from Dr. Knippa

8  to Brian Beach?

9      A.    No.

10     Q.    Did you send the report -- did you send

11 Exhibit 4 to anyone?

12     A.    Michelle Magee -- Michelle Montgomery.

13     Q.    So you sent her the full report and not

14 just the summary?

15     A.    That's correct.  I sent her both.

16     Q.    Do you know whether Ms. Montgomery

17 forwarded it to anyone else?

18     A.    No.

19     Q.    No, she did not, or, no, you don't know?

20     A.    No, I don't know.

21     Q.    Look at Exhibit 8, please.

22           (Exhibit 8 introduced.)

23           THE REPORTER:  The witness has

24 Exhibit 8.

25 BY MR. AMLONG:

1      Q.    Let me know when you've finished reading

2    it.

3            (Witness reviews document.)

4      A.    I have finished it.

5    BY MR. AMLONG:

6      Q.    Was the email from Ms. Reekie forwarded

7    to you?

8      A.    Based on what it looks like, yes.  I...

9      Q.    Do you recall it being forwarded to you?

10     A.    Not exactly.  I don't deny that it was.

11   I just don't remember reading all of this before.

12     Q.    Who is -- who is the person who declares

13   First Officer Patterson fit for duty?

14            MR. CLOAR-ZAVALETA:  Object to the form.

15   BY MR. AMLONG:

16     Q.    How would Dr. -- how would First Officer

17   Patterson be declared fit for duty?

18     A.    Well, his -- his results should have

19   been whatever the results were, forward to

20   Dr. Knippa for his review, and then Dr. Knippa

21   would reinterview him, retest him if necessary, and

22   make a decision based on the results from the

23   evaluators, consultants, and then weigh them into

24   his overall picture and make a decision.

25     Q.    So you're saying that Dr. Knippa holds

1    the key to whether or not First Officer Patterson
2    gets restored to duty?
3            MR. CLOAR-ZAVALETA:  Object to the form.
4        A.    We would be -- well, yes.
5    BY MR. AMLONG:
6        Q.    I'm sorry?
7        A.    Yes.
8        Q.    And no one can clear him for duty except
9    Dr. Knippa?
10           MR. CLOAR-ZAVALETA:  Object to the form.
11       A.    I think he could be cleared back to duty
12   by someone else, but in a fitness-for-duty
13   evaluation, our standard operating process is to
14   have them go back to the initial physician.
15   BY MR. AMLONG:
16       Q.    Aside from American Airlines' lawyers,
17   what conversations, if any, have you had with
18   anyone concerning restoring First Officer Patterson
19   to duty?
20       A.    It would have always been with -- with
21   an attorney present when I had the discussion, if I
22   had any.
23           MR. CLOAR-ZAVALETA:  Can we go off the
24   record for just a quick second?
25           MR. AMLONG:  Sure.

1          (Discussion held off the record.)

2          (Recess held.)

3          MR. AMLONG:  Read me back my last

4    question and answer, please.

5          (Record read.)

6    BY MR. AMLONG:

7    Q.    Dr. Ahtone, look at the email from First

8    Officer Patterson that is at the bottom of

9    Exhibit 8.

10   A.    Okay.

11   Q.    And on the second page he states that

12   he's visited with Dr. Joe Tordella.  He's an AME,

13   right?

14   A.    He's an AME, yes.

15   Q.    Okay.  And that Dr. Tordella referred

16   him to Dr. Gary Kay in Washington, correct?

17   A.    That's what it says.

18   Q.    And that he also saw Dr. Caddy.  Do you

19   recall that?

20   A.    Yeah.

21   Q.    What else -- now, both Tordella --

22   Tordella issued him a first-class medical, correct?

23          MR. CLOAR-ZAVALETA:  Object to the form.

24   A.    I don't -- I don't see that down there,

25   but if you say he did, then I'm not going to

1  disagree with you.

2  BY MR. AMLONG:

3      Q.   All right.  And could somebody who's not

4  fit to fly achieve a first-class medical?

5           MR. CLOAR-ZAVALETA:  Object to the form.

6      A.   Well, the -- it would depend on why

7  someone was considered not fit to fly.  If the AME

8  was evaluating the pilot and had the -- and had

9  information that somebody may have -- thought that

10 made him not fit to fly, then I would like to think

11 that AME would have a look at that to see if he

12 agreed or disagreed before he issued a medical

13 certificate.

14           An example for it would be a

15 cardiologist, for example, saying that if an

16 individual had a condition, you can fill in the

17 blank with whatever condition you have, but if the

18 AME doesn't know that he's seeing a cardiologist or

19 doesn't know what the cardiologist's report has, he

20 could get a medical certificate and -- even though

21 he wasn't fit to fly, as an example.

22 BY MR. AMLONG:

23     Q.   Well, in this case, First Officer

24 Patterson saw not only Dr. Tordella, but he also

25 saw Dr. Kay, and he saw Dr. Hastings, who is a

1  neurologist, correct?

2       A.    Dr. Hastings is a neurologist, yes.

3       Q.    Look at Exhibit 11, please.

4             (Exhibit 11 introduced.)

5             THE REPORTER:  The witness has

6  Exhibit 11.

7  BY MR. AMLONG:

8       Q.    And tell me if you recognize that

9  package.

10       A.    Yes, I believe I have seen this before.

11       Q.    And take a moment and look at the

12  reports of Dr. Kay and Dr. Hastings, please.

13             (Witness reviews document.)

14       A.    Okay.  I've read them.

15  BY MR. AMLONG:

16       Q.    Okay.  And Dr. Kay states that he has

17  read Dr. Knippa's report, correct?

18       A.    Read whose report?

19       Q.    Dr. Kay states that he has read Dr.

20  Knippa's report, correct?  Is it...

21       A.    Where does it say that?  He does, yes.

22       Q.    And Dr. Hastings likewise states that he

23  has read Dr. Knippa's report, correct?

24       A.    Yes.

25       Q.    And each of them find that First Officer

1    Patterson is fit for duty, correct?

2        A.    Within the scope of their practice, yes.

3        Q.    Well, Dr. Kay is a psychologist and

4    neuropsychologist, correct?

5        A.    He calls himself a clinical

6    neuropsychologist.

7        Q.    Well, this is the same Dr. Kay who

8    developed the Cog test, right?

9        A.    Yes.

10       Q.    So if Dr. Kay is classifying him as fit

11   for duty on a neuropsychological basis and

12   Dr. Hastings is classifying him as fit for duty on

13   a neurological basis and Dr. Tordella is issuing

14   him a first-class medical certificate, why is he

15   not fit for duty at this point?

16            MR. CLOAR-ZAVALETA:  Object to the form.

17       A.    I would -- it is my opinion only that

18   perhaps all of this should have been sent to

19   Dr. Knippa for him to take into consideration on

20   the second visit he had to him.

21   BY MR. AMLONG:

22       Q.    Well, it was sent to you, correct?

23       A.    It's not up to me.

24            MR. CLOAR-ZAVALETA:  Just a belated

25   object to the form.

1  BY MR. AMLONG:

2     Q.    Excuse me?

3     A.    It's not up to me.

4     Q.    Who is it up to?

5          MR. CLOAR-ZAVALETA:  Object to the form.

6     A.    The process was, or is, that the

7  evaluating physician or psychologist who has made

8  the declaration that he's -- declaration that he's

9  not fit for duty, if the individual followed up

10 with the recommended measures, would come back to

11 him with information that he's completed those

12 tasks, and then he could do his reevaluation and

13 clear him to return to work.

14 BY MR. AMLONG:

15    Q.    Where is that written?

16    A.    I don't know.

17    Q.    Is it in section 20 of the contract?

18         MR. CLOAR-ZAVALETA:  Object to the form.

19    A.    I don't know.

20 BY MR. AMLONG:

21    Q.    Have you ever seen it written down

22 anywhere?

23         MR. CLOAR-ZAVALETA:  Object to the form.

24    A.    I've never looked to see if it was

25 written down anywhere.

1   BY MR. AMLONG:

2        Q.    Do you know whether -- how does -- how

3   would First Officer Patterson get back to

4   Dr. Knippa?  Would you have to initiate that?

5             MR. CLOAR-ZAVALETA:  Object to the form.

6        A.    Since Cindy Contreras left, hopefully

7   Michelle Magee would have let her contact

8   information be available to him, and would inform

9   her that he's completed his tasks outlined by

10  Dr. Knippa and that he was ready for a

11  reevaluation.

12  BY MR. AMLONG:

13       Q.    So would American have to contact

14  Dr. Knippa?

15            MR. CLOAR-ZAVALETA:  Object to the form.

16       A.    Well, we -- yeah, that was the only way

17  Dr. Knippa would know that he was ready to be seen

18  again.

19  BY MR. AMLONG:

20       Q.    Did American contact Dr. Knippa?

21            MR. CLOAR-ZAVALETA:  I'm sorry.  What

22  was the question?

23  BY MR. AMLONG:

24       Q.    Did American contact Dr. Knippa?

25            MR. CLOAR-ZAVALETA:  Did?

1          MR. AMLONG:  Yes.

2     A.    Okay.  I don't know the answer to that

3  question.  I did not contact him.

4  BY MR. AMLONG:

5     Q.    Do you know if Dr. Kay contacted him?

6     A.    I do not know if Dr. Kay contacted him.

7     Q.    Do you pay in advance for these

8  consultations?

9     A.    No.

10          MR. CLOAR-ZAVALETA:  Object to the form.

11  BY MR. AMLONG:

12     Q.    Look at Exhibit Number 10, please.

13          (Exhibit 10 introduced.)

14          THE REPORTER:  The witness has

15  Exhibit 10.

16     A.    I have looked at Exhibit 10.

17  BY MR. AMLONG:

18     Q.    Did you write that?

19     A.    Yes.  Part of it, not the whole thing.

20  The part that I signed, I wrote.

21     Q.    The top part?

22     A.    Yes.

23     Q.    You asked to have a look at Dr. Knippa's

24  report again.  Was it given to you?

25     A.    No.

1      Q.    Do you know why not?

2      A.    I can't answer the question.  I don't

3   know.

4      Q.    Whom did you ask -- did you ask anyone

5   other than Ms. Montgomery?

6      A.    Michelle Magee.

7      Q.    Did she have a copy of it?

8      A.    Yes.

9      Q.    Does she work for you?

10      A.    She works for benefits.

11      Q.    Has it been your experience in the past

12   that when one doctor says a pilot is not fit for

13   duty and the pilot's doctor says, yes, he is, that

14   the two of those doctors then pick a third doctor

15   to reevaluate?

16      A.    It's been my experience that it's taken

17   on a case-by-case basis.  There's no standard for

18   what happens next.

19           MR. AMLONG:  Hold on just a minute,

20   please.

21   BY MR. AMLONG:

22      Q.    Dr. Ahtone, have you ever met Scott

23   Patterson?

24      A.    No.

25      Q.    Have you ever met Brian Ostrom?

1    A.    No.

2    Q.    And have you ever examined any of the

3    pilots that have been declared not fit for duty?

4    A.    No.

5    Q.    Is there a requirement that

6    Mr. Patterson ask you to contact Dr. Knippa to

7    reevaluate him?

8         MR. CLOAR-ZAVALETA:  Object to the form.

9    A.    No.

10   BY MR. AMLONG:

11   Q.    Well, then after he -- after he sees and

12   is cleared by a neuropsychologist and neurologist

13   and gets his first-class medical, what does he have

14   to do to get back in the air?

15        MR. CLOAR-ZAVALETA:  Object to the form.

16   A.    His contact person was either Michelle

17   Magee -- or it was probably Michelle Magee after

18   Cindy Contreras left, and he would contact her to

19   let him know that he has -- has accumulated this

20   information in support of his case and request that

21   he be reevaluated by Dr. Knippa.

22        MR. AMLONG:  All right.  Thank you.

23        MR. CLOAR-ZAVALETA:  Thank you as no

24   more questions?

25        MR. AMLONG:  No more questions.

1          MR. CLOAR-ZAVALETA:  Okay.  Let's go off

2     the record and take like -- I'm going to take like

3     five, another ten minutes.

4          MR. AMLONG:  Okay.

5          (Recess held.)

6          THE REPORTER:  Mr. Amlong, will you need

7     this transcribed?

8          MR. AMLONG:  Yes.

9          MR. CLOAR-ZAVALETA:  Bill?

10         MR. AMLONG:  Yes.

11         MR. CLOAR-ZAVALETA:  It's Cameron.  I've

12    just got a little bit of redirect.

13         MR. AMLONG:  Okay.

14                   EXAMINATION

15    BY MR. CLOAR-ZAVALETA:

16         Q.    Dr. Ahtone, this morning you were asked

17    some questions regarding a fitness-for-duty exam

18    performed by Dr. Knippa for an American Airlines'

19    employee other than Mr. Patterson.  Do you recall

20    that?

21         A.    Yes.

22         Q.    If I were to represent to you that

23    Dr. Knippa provided a fitness-for-duty report on

24    that -- for that other employee stating that that

25    individual was not fit for duty, would you have any

1    reason to disagree with that statement?

2         A.    No.

3         Q.    Sitting here today, do you trust

4    Dr. Knippa as a reliable examiner?

5         A.    Yes.

6         Q.    Would you be comfortable sending

7    individuals to Dr. Knippa in the future for

8    fitness-for-duty exams?

9         A.    Yes, if the -- if the issue was a

10   suggestion of a behavioral problem, I would do

11   that.

12        Q.    And do you trust Dr. Knippa to provide

13   an impartial exam of individuals sent to him for

14   fitness-for-duty exams?

15        A.    Yes.

16             MR. CLOAR-ZAVALETA:  I have no other

17   questions.

18                   FURTHER EXAMINATION

19   BY MR. AMLONG:

20        Q.    Dr. Ahtone, is Plaintiff's Exhibit 1

21   typical of the kind of introduction that you send

22   to an outside mental health professional when

23   you're asking for a fitness-for-duty assessment?

24        A.    Umm.

25        Q.    I'm sorry?

1          MR. CLOAR-ZAVALETA:  Object to the form.

2     A.    Did you mean mental health or just to an

3    outside physician?

4    BY MR. AMLONG:

5     Q.    No.

6          MR. AMLONG:  Read the question back,

7    please.

8          (Record read.)

9          MR. CLOAR-ZAVALETA:  I would object to

10   the form.

11    A.    This is the type of document I would

12   send to one of our outside consultants regardless

13   of whether it was a cognitive issue or a behavioral

14   issue or a substance abuse issue.  I would -- I

15   would send them a copy of the Section 20 telling

16   them why they're being sent out.

17   BY MR. AMLONG:

18    Q.    Do you know -- do you know why

19   additional materials were not sent?

20          MR. CLOAR-ZAVALETA:  I'm sorry.  Can you

21   read that back?

22   BY MR. AMLONG:

23    Q.    Do you know why the additional materials

24   that Dr. Knippa says were not sent, were not sent?

25          MR. CLOAR-ZAVALETA:  Object to the form.

1      A.   A lot of -- I -- the intent of the

2    evaluation is to be as objective as possible, and

3    so if it's material that's alluded to like in

4    Mr. Patterson's thing, the feeling by the business

5    management is that we shouldn't -- we shouldn't

6    give the evaluator an opportunity to have a biased

7    opinion before he does the evaluation.

8    BY MR. AMLONG:

9      Q.   Okay.  Hold on just one minute.

10     A.   Sure.

11          MR. AMLONG:  Okay.  I'm back now.

12          Read his answer back to me, please.

13          (Record read.)

14   BY MR. AMLONG:

15     Q.   Do you not think, Dr. Ahtone, that

16   informing the evaluator that American Airlines has

17   concerns about First Officer Patterson's judgment,

18   and specifically his mental and/or emotional

19   stability, coupled with references to multiple

20   reports of atypical interactions with coworkers and

21   reports that suggest a pattern of

22   false/self-aggrandizing statements would telegraph

23   to the evaluator what American Airlines was looking

24   for?

25          MR. CLOAR-ZAVALETA:  Object to the form.

1      A.    They're looking for an honest evaluation

2    of the -- of the employee, and that -- and this was

3    the information that -- that they were -- that was

4    sent to the evaluator to say, yeah, this is

5    why you're -- why you're being sent over.

6    BY MR. AMLONG:

7      Q.    And you don't believe that that biases

8    the evaluator?

9         MR. CLOAR-ZAVALETA:  Object to the form.

10     A.    No.

11   BY MR. AMLONG:

12     Q.    When you were asked on cross-examination

13   that you would have no reason to disbelieve that

14   Dr. Knippa had found the other pilot that was sent

15   to him to be not fit for duty, you said you would

16   have no reason to disbelieve that.  Why did you

17   earlier say that there had been a problem with the

18   pilot and that the examination had not been

19   completed?

20     A.    Apparently I'm not talking about the

21   same pilot.

22     Q.    How many pilots have you sent to

23   Dr. Knippa?

24     A.    Two, that I'm aware of.

25     Q.    Did Dr. Knippa -- did Dr. Knippa send

1   you a report on the second one?

2       A.    Yes.

3       Q.    Did the report say that the exam was not

4   completed?

5       A.    No.  It was completed.

6       Q.    Then why did you say before that it

7   wasn't?

8       A.    Apparently we're talking about another

9   pilot that didn't get -- I sent but never completed

10  the evaluation.

11      Q.    Well, I asked you how many you had sent

12  and you said two.

13      A.    That's correct.

14      Q.    And then I asked you what happened to

15  the second one, and you said that was never

16  completed, and now you're telling me it was

17  completed?

18      A.    Then the number that I told you that was

19  sent was -- or recommended to be sent were three,

20  and I didn't recall the third one that was

21  completed, but one did not get completed.

22      Q.    And do you know why that third one did

23  not get completed?

24      A.    Yes.

25      Q.    Why?

1      A.    Didn't want to be evaluated by

2  Dr. Knippa.

3      Q.    Did the pilot say why he or she did not

4  wish to be evaluated by Dr. Knippa?

5           MR. CLOAR-ZAVALETA:  Object to the form.

6      A.    No, not to me.

7  BY MR. AMLONG:

8      Q.    Did anyone else tell you that the pilot

9  had given a reason for not wanting to be evaluated

10  by Dr. Knippa?

11          MR. CLOAR-ZAVALETA:  Object to the form.

12     A.    Not that I recall.

13  BY MR. AMLONG:

14     Q.    How did you learn that the pilot did not

15  wish to be evaluated by Dr. Knippa?

16     A.    I asked whatever happened to this

17  person.

18     Q.    Whom did you ask?

19     A.    Michelle Magee.

20     Q.    And was this before or after First

21  Officer Patterson was evaluated by him?

22          MR. CLOAR-ZAVALETA:  Object to the form.

23     A.    They were near the same time.

24  Speculation is that it was after, but I'm not a

25  hundred percent sure.

1    BY MR. AMLONG:

2        Q.    Was First Officer Patterson the first

3    person that you sent to Dr. Knippa?

4        A.    I believe so, yes.

5        Q.    During the little over two years that

6    you've been chief medical officer -- or corporate

7    medical director, how many pilots have you sent for

8    psychological examinations?

9            MR. CLOAR-ZAVALETA:  Object to the form.

10        A.    I don't know an exact number.

11    BY MR. AMLONG:

12        Q.    Can you give me an estimate?

13        A.    More than three, less than ten, about

14    the best I can do.

15        Q.    Are any of them -- did any of them

16    return to duty?

17            MR. CLOAR-ZAVALETA:  Object to the form.

18        A.    Yes.

19    BY MR. AMLONG:

20        Q.    How many?

21        A.    I would have to go through my list of

22    people that are referred to give you an exact

23    number.

24        Q.    How many of those were for substance

25    problems?

1            MR. CLOAR-ZAVALETA:  Object to the form.

2       A.    Substance abuse.  Well, probably three

3  or four, but those were done when we were -- when I

4  was doing HIMS work in '16.  That's been since

5  outsourced to a vendor, so I don't do that anymore.

6  BY MR. AMLONG:

7       Q.    How many -- since you've become

8  corporate medical director, how many persons have

9  you sent for strictly psychological issues, not

10  involving substance abuse?

11       A.    I don't know that number.

12       Q.    Were the other two that you sent to

13  Dr. Knippa for substance abuse?

14       A.    No.

15       Q.    Okay.

16            MR. AMLONG:  Thank you.

17            THE WITNESS:  Sure.

18         (Deposition concluded at 3:05 p.m.)

19

20

21

22

23

24

25

1                    ACKNOWLEDGMENT

2                    I, JERAL L. AHTONE, MD, hereby

3    acknowledge that I have read the transcript of my

4    testimony taken under oath in my deposition on

5    March 14th, 2018; that the transcript is a true,

6    complete and correct record of my testimony; and

7    that the answers on the record as given by me are

8    true and correct.

9

10            _____

11            JERAL L. AHTONE, MD

12

13            Signed and subscribed to before me

14    this _____ day of _____, 2018

15

16    _____

17    Notary Public

18

19

20

21

22

23

24

25

1           REPORTER'S CERTIFICATION
2           I, DANIEL J. SKUR, CSR and Notary
Public in and for the State of Texas, hereby
3  certify that the witness was duly sworn and that
this transcript is a true record of the testimony
4  given by the witness;
5
        That pursuant to Rule 30 of the Federal
6  Rules of Civil Procedure, signature of the witness
was reserved by the witness or other party before
7  the conclusion of the deposition;
8           I further certify that I am neither counsel
for, related to, nor employed by any of the parties
9  or attorneys in the action in which this proceeding
was taken.  Further, I am not a relative or
10 employee of any attorney of record in this cause,
nor am I financially or otherwise interested in the
11 outcome
of the action.
12
13          Subscribed and sworn to by me this day, the
26th day of March, 2018.
14
15
16

17 _____
Daniel J. Skur
18 Notary Public, State of Texas
My Commission Expires 7/7/2018
19
20
21
22
23
24
25