1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2            FORT LAUDERDALE DIVISION
             CASE NO.:  1:17-cv-60533-JEM
3

4   RODNEY SCOTT PATTERSON,          )
                                     )
5              Plaintiff,            )
                                     )
6   v.                               )
                                     )
7   AMERICAN AIRLINES, INC., a       )
    Delaware Corporation,            )
8                                    )
               Defendant.            )
9   _____ )

10

11

12

13       Videotaped Deposition of JAMES N. BONDS

14               (Taken by Plaintiff)

15            Charlotte, North Carolina

16             Thursday, March 15, 2017

17

18

19

20

21

22             Reported in Stenotype by

23             Christine A. Taylor, RPR

24        Registered Professional Reporter

25

```
 1          APPEARANCES
 2   ON BEHALF OF PLAINTIFF: (via telephone)
 3          WILLIAM R. AMLONG, Esq.
            Amlong & Amlong, P.A.
 4          500 Northeast Fourth Street
            Second Floor
 5          Fort Lauderdale, Florida  33301
            954.462.1983
 6          wramlong@TheAmlongFirm.com
 7
     ON BEHALF OF DEFENDANT:
 8
            TRISTAN MORALES, Esq.
 9          O'MELVENY & MYERS, LLP
            1625 Eye Street, NW
10          Washington, DC  20006
            202.383.5300
11          tmorales@omm.com
12
     VIDEOGRAPHER:
13
            Roosevelt Harrison, III
14
15
     ALSO PRESENT:
16
            Noel Pace, Esq. (Via telephone)
17
18
19          VIDEOTAPED DEPOSITION OF JAMES N. BONDS, a
20   witness called on behalf of Plaintiff, before Christine
21   A. Taylor, Registered Professional Reporter and Notary
22   Public, in and for the State of North Carolina, at
23   CaseWorks, 6000 Fairview Road, Suite 1273, Charlotte,
24   North Carolina on Thursday, March 15, 2017, commencing
25   at 11:13 a.m.
```

1                    INDEX OF EXAMINATIONS

2                                                    PAGE

3    EXAMINATION BY MR. AMLONG                          6

4

5                      INDEX OF EXHIBITS

6    NUMBER            EXHIBIT                    MARKED

7              *EXHIBITS 1-25 PREVIOUSLY MARKED*

8    Exhibit 1    3/24/15 Beach/Garcia E-mails Re:     49

9                 Patterson

10   Exhibit 2    3/20/15 Whitehouse/Beach E-mails Re:  53

11                Patterson

12   Exhibit 3    5/26/15 Bates/Beach E-mail            56

13   Exhibit 4    9/6/15 Bonds/Cronin E-mail Re:        57

14                Patterson

15   Exhibit 5    9/22/15 Montgomery/Bonds E-mails      61

16   Exhibit 6    10/28/15 Montgomery/Bonds E-mail      69

17   Exhibit 7    Military Leave and Earnings           69

18                Statement

19   Exhibit 8    10/30/15 Beach/Bonds E-mails          80

20   Exhibit 9    10/30/15 Bonds/Scialfa E-mails        82

21   Exhibit 10   10/30/15 Scialfa/Cronin E-mails       83

22   Exhibit 11   10/30/15 Scialfa/Cronin E-mails       83

23   Exhibit 12   11/2/15 Cronin/Scialfa E-mails        85

24   Exhibit 13   11/4/15 Patterson/Bonds E-mail        87

25   Exhibit 14   9/24/15 Beach/Whitehouse E-mail       91

1    Exhibit 15    9/24/15 Letter to Captain Beach           91

2    Exhibit 16    9/24/15 Scialfa/Bonds E-mail              93

3    Exhibit 17    9/25/15 Letter to Patterson from          94

4                  Bonds

5

6    Exhibit 18    HI-10 Computer Screen Printout            98

7

8    Exhibit 19    10/28/15 Notice of Hearing Letter         99

9

10   Exhibit 20    11/13/15 Beach/Burke-Leon                 99

11

12                 E-mail/attachments

13

14   Exhibit 21    1/16/17 Bonds/Beach E-mail                102

15

16   Exhibit 22    1/17/17 Beach/Bonds E-mail                103

17

18   Exhibit 23    1/20/16 Letter to Scott Patterson         103

19

20   Exhibit 24    2/29/16 Letter to Fuentes and             116

21

22                 documentation

23

24   Exhibit 25    3/20/15 Beach/Whitehouse E-mail           115

25

1                 P R O C E E D I N G S

2          THE VIDEOGRAPHER:  Good morning.  We're going

3    on the record.  The time now is 11:13 a.m. and today's

4    date is March 15, 2018.  This is media 1 in the video

5    recorded deposition of Jim Bonds in the matter of

6    Rodney Scott Patterson versus American Airlines,

7    Incorporated, filed in the United States District

8    Court, Southern District of Florida, Fort Lauderdale

9    Division.

10          The deposition is being held at CaseWorks

11   office located in Charlotte, North Carolina.  My name

12   is Roosevelt Harrison, III, from the firm Veritext.

13   The court reporter today is Christine Taylor from

14   Veritext.  Counsel, please introduce yourselves

15   remotely and all that's present in the room after which

16   the court reporter will swear in the witness.

17          MR. AMLONG:  Good morning, my name is William

18   Amlong of Amlong & Amlong, P.A. representing the

19   plaintiff, Scott Patterson, who's here with me.

20          MR. PACE:  Good morning, this is Colonel Noel

21   Pace, I'm an attorney representing the plaintiff.

22          MR. MORALES:  Tristan Morales of O'Melveny &

23   Myers here in the room with Mr. Bonds.

24

25

1          JAMES N. BONDS,

2      having first been duly sworn, was examined

3            and testified as follows:

4                  EXAMINATION

5    BY MR. AMLONG:

6        Q.  Good morning, Mr. Bonds.

7        A.  Good morning.

8        Q.  Please give us your full name, tell us where

9    you live, and what you do for a living.

10       A.  James Neal Bonds.  I live in York, South

11   Carolina, and I'm a pilot for American Airlines

12   currently, a line check airman on the A320 Airbus.

13       Q.  And please take us briefly through your

14   educational and professional background.

15       A.  Went to high school in Georgia, went to Auburn

16   University.  From Auburn, I joined United States Air

17   Force, went to pilot training, flew F-16s, and joined

18   American Airlines in the beginning of 1992.  From

19   there, I was a pilot, just a normal line pilot, and

20   when I was transferred to the Dallas hub, I began work

21   with -- besides flying airplanes, I was -- volunteered

22   to work in the Allied Pilots Association Union.  I was

23   a member of the professional standards committee on

24   APA, and then I became the chief of professional

25   standards for APA and worked with grievance and

1    representation of pilots with APA.  While I was there,

2    I also volunteered and started a veteran's military

3    employment resource group in Dallas and was one of the

4    founding members of that group and have worked

5    extensively with the veteran's initiative program.

6          I left there and went to work in another

7    department while still flying.  I was the fleet

8    technical pilot for the 757, 67 fleet and worked with

9    the maintenance and engineering program with American

10   Airlines there.  From there, I was chosen to be a

11   flight test pilot for American Airlines and based at

12   our Tulsa maintenance engineering facility and -- but I

13   still lived in Dallas, never lived in Tulsa.  From

14   there I was chosen to be chief pilot for American

15   Airlines in Miami, Florida.  And approximately two

16   years ago I left there and became a line check airman

17   and living in Charlotte or York, South Carolina.

18        Q.  Tell me what the veteran -- what the veteran

19   and funding resource group was?

20        A.  It is a group that's within American Airlines

21   to promote the -- I guess it would be the inclusion of

22   military within American Airlines.  It's found within

23   the HR department under diversity, I think, is where

24   the tab on our JetNet pages for volunteers.  But

25   basically what we do is we just try to bring

1    acknowledgment to our military members that are

2    employed for American Airlines, such things as fallen

3    veterans when they are killed in action and their

4    bodies are being transferred from the Dover facility to

5    where their final resting place is, the veterans

6    resource group, organizes groups of employees to meet

7    the airplane and their families, and holds somewhat of

8    a moment and to acknowledge their sacrifice for us as

9    we send them to their final resting place.

10            And along with Snowball Express, I think

11   there's military presence with Snowball Express, which

12   is a -- I guess it would be an acknowledgment and

13   bringing children who have lost their parents in combat

14   and also the veterans initiative program works, which I

15   volunteered and worked with as well, take some our

16   wounded veterans to hospitals and R&R weeks in Las

17   Vegas and things like that.

18        Q.  What, if anything, does -- I'm sorry, I

19   didn't get the name, was the veterans --

20        A.  Military employment resource group.  I think

21   that's correct.

22        Q.  What, if anything --

23        A.  It could be written another way, but if you're

24   able to go on to the American Airlines JetNet tab, it's

25   under diversity and resource groups or something like

1    that.

2         Q.  And what was your position within that group?

3         A.  I first started the Dallas group and I was the

4    vice president.

5         Q.  What, if anything, does this group have to do

6    with employment of veterans on American Airlines?

7         A.  Has nothing to do with the employment.  It's

8    just a group of acknowledgment for veterans and their

9    families within American Airlines as best as I

10   understand it.  It was just to the acknowledgment.

11        Q.  Did you go to the Air Force through ROTC?

12        A.  I did.

13        Q.  And when did you graduate?

14        A.  I'm sorry, the question again?

15        Q.  When did you graduate from Auburn?

16        A.  I graduated 1984 from Auburn.

17        Q.  Were you commissioned that year?

18        A.  I was commissioned in June 6th, 1984.

19        Q.  And take me briefly through your Air Force

20   career.

21        A.  Left Auburn, went to pilot training at

22   Williams Air Force Base, Arizona.  From there, I

23   finished a distinguished graduate of pilot training.

24   Was asked to be retained in the training department to

25   train other pilots.  I was stationed in Enid, Oklahoma,

1  training new pilots in the T-37, and while I was there,

2  I worked in the scheduling for the entire wing, and

3  then also flew T-37s and T-38s at the same time in

4  their flight test program doing FCS, functional check

5  flights.  From there I went to Holloman Air Force Base,

6  New Mexico, and that was fighter lead-in training, Luke

7  Air Force Base --

8       Q.  I'm sorry, what is that training?

9       A.  Fighter lead-in training.

10       Q.  When you went to Holloman, that was what

11  training?

12       A.  I left -- went to Holloman Air Force Base in

13  New Mexico for fighter lead-in training.  From there I

14  went to Phoenix, Arizona, at Luke Air Force Base for

15  F-16 training, and then was transferred to Charlotte

16  Air Force Base in Sumter, South Carolina, flying F-16s.

17  From there I was deployed to the Middle East for

18  Operation Desert Shield and Desert Storm and returned

19  to Shaw joining American Airlines in early 1992.

20          After that, I flew for American Airlines for a

21  period of time, had a lengthy break in service from the

22  military and rejoined the Mississippi Air National

23  Guard as air liaison officer and worked in a JTAC,

24  Tactical Air Control Party 18 that works closely with

25  the Army and liaise between the Army and other branches

1    of service with the Air Force.  And that's while I was

2    in the Air National Guard and that was up until

3    approximately three years ago.

4         Q.  All right.  So you were on active duty in the

5    Air Force from 1984 through 1992?

6         A.  Correct.

7         Q.  And what rank did you achieve?

8         A.  Captain active duty and then as a major in the

9    Air National Guard.

10        Q.  Did you say that you took a break in service

11   from American Airlines to go into National Guard?

12        A.  No.  I took a break in service from the

13   military.  I had a lengthy break in service from the

14   military before I regained admittance into the Air

15   National Guard.  I never took a leave from American

16   Airlines.

17        Q.  All right.  So you -- you quit being in the

18   Air Force in 1992.  And when did you join the -- when

19   did you join the Mississippi Air National Guard?

20        A.  I'm going to have just guess.  The exact date,

21   I can't recall at this time, but it's approximately

22   2011.

23        Q.  And are you still active in the Mississippi

24   Air National Guard?

25        A.  No, I am not.

1     Q. And you were in as a major?

2     A. I went into the Air National Guard as a

3  captain.

4     Q. And you were promoted to major?

5     A. I was.

6     Q. And that was the rank at which you left?

7     A. That's correct.

8     Q. And when did you -- when did you leave the

9  Mississippi Air National Guard?

10     A. Approximately, two to three years ago. I have

11  received a letter from the Department of Defense saying

12  that I'm still in the IRR, the inactive reserve. So I

13  don't know the exact date. And I haven't had a

14  corrected DD-214 to show those dates.

15     Q. So was it two years or three years ago? Do

16  you remember the date of your separation?

17     A. I'm sorry. I don't. Approximately, three, I

18  would say.

19     Q. When did you become chief pilot in Miami?

20     A. After leaving Tulsa and, I'm sorry, I don't

21  know the exact date. I do remember that it was

22  January. So it was possibly -- I'm just guessing, I

23  really didn't have this -- didn't prepare this date.

24  So maybe 2014, maybe 2013, January though, I know that.

25  Because I left Texas and it was cold and ended up in

1  Miami where it was beautiful.

2      Q.  What did the chief pilot do?

3      A.  Well, I guess the chief pilot's responsibility

4  is to be a conduit from the line pilot and represent

5  the pilots with the management in the company.  You

6  know, there's things as leading pilots in directions to

7  be administrative purposes and also tend to the needs

8  of the pilots and their families and, obviously,

9  discipline, if necessary, in some cases.

10      Q.  Does a chief pilot fly?

11      A.  Absolutely.  And I like to fly.  So I try to

12  fly as much as possible.  But, yes, they still are

13  active pilots.

14      Q.  Tell me, you were chief pilot, what was your

15  relation to Brian Beach?

16      A.  Brian and I were assistant chief pilots.  The

17  director at the time when I was there was Captain Sean

18  Scialfa.  Brian and I were assistant chief pilots and

19  we both worked doing the same job in the flight office.

20      Q.  I'm sorry.  You worked doing the same job --

21  I didn't hear the last part of that answer?

22      A.  In the flight office.  The chief pilots -- the

23  area that we worked is called the flight offices, what

24  is commonly known to all pilots.

25      Q.  So there is more than one chief pilot?

1    A.   There is one director who is the main chief
2    pilot at each of our hubs and below the director is
3    just a chief pilot like myself and Brian Beach were.
4         Q.   But you and -- you and Mr. Beach were equals?
5         A.   Yes, we were.
6         Q.   And your boss was Mr. Scialfa?
7         A.   Sean Scialfa.
8         Q.   And what was he?
9         A.   He was the director of flying at our Miami
10   hub.
11        Q.   And was he -- in Miami?
12        A.   I'm sorry, say the question again.
13        Q.   Was he based in Miami?
14        A.   Yes, he is -- was.
15        Q.   Okay.  And who is Mark Cronin?
16        A.   Mark Cronin was the chief of all chief pilots
17   and he was based in Dallas.  The director is the -- he
18   is the direct report to the director for each base.
19        Q.   So he was Mr. Scialfa's boss?
20        A.   Mark -- exactly.
21        Q.   And Kim Stone, he was the direct report of --
22        A.   You asked -- was it Kimball Stone, is that
23   what you asked?
24        Q.   Yes.
25        A.   At the time, Captain John Hale was the vice

1  president of flight, and he would be Mark Cronin's

2  direct report.  And then I think after his departure

3  Kimball Stone was next to replace him.

4      Q.  And when did you cease being chief pilot?

5      A.  I couldn't understand you.  Ask the question

6  again, please.

7      Q.  When did you cease being chief pilot in

8  Miami?

9      A.  I think April.  So it's been two years this

10  April or May.

11     Q.  Would that be April 2016?

12     A.  It would be 2016, correct.

13     Q.  And how do you come to cease being chief

14  pilot?

15     A.  Brian Beach became the director of flying and

16  he asked me to resign.

17     Q.  Did he tell you why he was asking you to

18  resign?

19     A.  Just said that he wanted to move in a

20  different direction.

21     Q.  So this was involuntary on your part?

22     A.  Yes, it was.

23     Q.  Was this disciplinary?

24     A.  Not at all.

25     Q.  Was this after you had used your pass

1    privileges to claim a first-class seat in a flight?

2        A.  It was --

3            MR. MORALES:  Objection, form.  Assumes --

4        Q.  Tell me about that incident, please.

5            MR. MORALES:  Objection, foundation.

6        Q.  You may answer.

7        A.  Yes.

8        Q.  Can you describe the incident that involved

9    you and the first-class seat?

10       A.  I don't know exactly what incident you're

11   talking about.

12       Q.  I'm talking about the incident when you

13   insisted on taking a first-class seat and displaced a

14   paying customer?

15       A.  I don't know of that circumstance that what

16   you're talking about.

17       Q.  Were you disciplined for -- concerning the

18   use of your pass privileges?

19       A.  I was not disciplined.

20       Q.  Did -- were you investigated for the use of

21   your pass privileges?

22       A.  Yes.

23       Q.  And tell me about the incident during which

24   you were investigated.

25       A.  The HR department at American Airlines felt

1    that there was abuse of our pass privilege, not just me

2    but to include all the chief pilots.  And the

3    interpretation of the use of our pass privilege was

4    passed -- was -- was passed down from the director, my

5    supervisor, saying that we would use our pass

6    privileges as needed, and to the policy that American

7    Airlines had for chief pilots and other managers was

8    not applicable.  So we were -- had the discretion from

9    our supervisor to use those pass privileges as we see

10   fit.

11       Q.  Who was your -- who was the director that

12   gave you that permission?

13       A.  Sean Scialfa.

14       Q.  And so allow you to displace paying

15   customers?

16       A.  It's not displacing, it's a lower inventory.

17   So you could reserve a seat on the airplane at a lower

18   inventory.  It's much lower than what I have now.  I

19   have the ability now to displace paying passengers,

20   full paying passengers.  But at the time we would be

21   able to reserve a seat if there was inventory in a

22   lower category.  So to displace passengers that already

23   had seats was -- that wasn't the case.

24       Q.  So you could move a first-class passenger

25   back to coach?

1      A.  Absolutely not.

2      Q.  And take a first-class passenger seat;

3  correct?

4      A.  No, that's -- not to my knowledge, we couldn't

5  do that.

6      Q.  Well, explain to me the incident for which

7  you were investigated, please.

8      A.  I was -- from what I recall, our HR department

9  or legal -- maybe it wasn't legal, but it was labor

10  said that I, as well as all the other chief pilots,

11  were improperly using their pass -- ability to reserve

12  those seats improperly.  And we were told to cease and

13  desist, of which we did.

14      Q.  Did you use your pass privileges to displace

15  a revenue passenger in first class?

16      A.  No.

17      Q.  What was the incident concerning which you

18  were investigated?

19          MR. MORALES:  Objection, asked and answered.

20      Q.  It was asked but not answered.  Please

21  describe the incident for which you were investigated?

22      A.  I'm unaware of one single incident.  It was

23  general and there wasn't just one incident.  It's every

24  time that a chief pilot traveled or when I traveled.

25  So it's not one incident at all.

1      Q.  Is abuse of a pass privilege a termination

2   offense at American Airlines?

3      A.  I don't know that.

4      Q.  When did the investigation of your use of

5   your pass privileges occur?

6      A.  I don't remember.  At some point while I was

7   chief pilot.  I don't know the exact date.

8      Q.  How long after that investigation did --

9         MR. MORALES:  Bill, one second, apologies.  We

10  have another phone line ringing in the room here, so

11  we're going to try and turn this off.

12     A.  Would you repeat the question, please?

13     Q.  Ms. Reporter, tell me how I started that

14  question.

15        (The reporter read the last question.)

16     Q.  How long after that investigation did

17  Mr. Beach tell you that he wanted to go in another

18  direction?

19     A.  Eight months, nine months.  I'm not really

20  sure.  Maybe a year.

21     Q.  Were you presented with findings from the

22  investigation?

23     A.  Ask the question.  Was I presented with what?

24     Q.  Did human resources present you with any

25  findings of the investigation?

1      A.  I don't recall it if they did.

2      Q.  Were any other persons -- did any other

3  persons leave management positions as a result of your

4  investigation?

5      A.  I didn't leave management as a result of that

6  investigation, but not to my knowledge.

7      Q.  So you're saying that the investigation of

8  your use of pass privileges had nothing to do with

9  your moving from being chief pilot to becoming a check

10 airman?

11     A.  I would assume that was the case.  It wasn't,

12 you know -- no, I assume that was the case.

13     Q.  Do you earn less money as a check airman than

14 you did as chief pilot?

15     A.  Slightly less.

16     Q.  Did Mr. Scialfa leave his position about the

17 same time that you left yours?

18     A.  He left before me.

19     Q.  Did that also have to do with pass

20 privileges?

21     A.  I don't know that.  Not to my knowledge.

22     Q.  Did Mr. Scialfa leaving his position have to

23 do with falsification of records?

24     A.  I have no idea what that -- what you're

25 talking about.  I don't know.

1      Q.  What, if any, reason did Mr. Beach give you

2   for wishing you to leave?

3      A.  His words were that he was the director and he

4   wanted to move in a different direction.  That's all he

5   said to me.

6      Q.  You were equals; correct?

7      A.  But not what I left, no.  Captain Beach had

8   been promoted to the director position after Captain

9   Scialfa left.

10     Q.  Do you remember when Captain Scialfa left?

11     A.  I don't know the exact date, no.

12     Q.  Is Captain Scialfa still employed by American

13  Airlines?

14     A.  He is.

15     Q.  What's he doing?

16     A.  He has had a medical issue, but he is

17  returning to flying, from what I understand, in the

18  very near future.

19     Q.  As a line pilot or as a check airman?

20     A.  As a line pilot.

21     Q.  When you were chief pilot in Miami, where did

22  you fly?

23     A.  I'm sorry, where did I fly is the question?

24     Q.  Yes.  Were you domestic or internationally?

25     A.  I flew both domestic and internationally, and

1   I flew the 767 and 757 internationally, and then I
2   transitioned to the airbus and flew it domestic and
3   internationally as well.
4        Q.  Did you ever fly with Scott Patterson --
5        A.  No.
6        Q.  -- as your first officer?
7        A.  Never.
8        Q.  And when did you become chief pilot in Miami?
9        A.  Either January of 2014 or 2013, one of those
10  two.
11       Q.  How many times have you been in the physical
12  company of Mr. Patterson?
13       A.  One time, to my knowledge.
14       Q.  And what was the -- when was that?
15       A.  I don't know the exact time or date, but I
16  think I was fairly new to the flight office.  The Miami
17  hub was sponsoring an inter-department team building
18  and there was an airplane that was out by the
19  maintenance hangar, and each department assembled
20  able-bodied people to see who could pull the airplane
21  on the ground with a rope the fastest.  And the first
22  time I ever saw Scott Patterson was then and I was
23  completely unaware of who he was.
24       Q.  What sort of interaction, if any, did you
25  have with him on that occasion?

1       A.  I don't know that I had any interaction.  My

2  recollection is I remember some guy talking with

3  somewhat authority about issues that were going on

4  within the flying world.  And, quite frankly, my first

5  opinion was why don't I know this person because he

6  seems to know everything about everybody and everything

7  else within our department and I just assumed I didn't

8  know who he -- I didn't know or -- but I felt like I

9  should have known him but didn't.  And I asked one of

10  the pilots in the group, you know, and he said, well,

11  his name is Scott Patterson.  I'm like, oh, that

12  doesn't mean anything to me.  So ...

13       Q.  So did you have any conversation with

14  Mr. Patterson on that -- on that occasion?

15       A.  Not to my knowledge.

16       Q.  So have you ever had a face-to-face

17  conversation with Mr. Patterson?

18       A.  I don't recollect having one.

19       Q.  Do you know Glenn Whitehouse?

20       A.  I know of Glenn Whitehouse, yes.

21       Q.  Have you ever personally met Mr. Whitehouse?

22       A.  I met him one time by happenstance at the

23  Atlanta airport.

24       Q.  When was that and what was the happenstance?

25       A.  I was visiting my family in Atlanta returning

1   to Miami and in the departure lounge, and I was sitting

2   there and he approached me.  We were both going to

3   Miami, I assume.  He approached me and asked me who I

4   was.  He says he had recognized me.  And he told me his

5   name was Glenn Whitehouse and I'm like, "Oh, yeah, I've

6   heard your name."  But I didn't know to what reason.

7   And then he had mentioned to me something about Scott

8   Patterson, of which at that time I was unaware, and he

9   told -- Glenn Whitehouse told me then that he had been

10  talking to professional standards and Brian Beach.

11       Q.  Were you in uniform on that occasion?

12       A.  I don't recall.

13       Q.  Was Mr. Whitehouse in uniform?

14       A.  I don't recall that either.  The only way that

15  I do recall is seeing his bag and he had a bag tag with

16  his name on the bag tag.  And that's what I remember

17  about our first meeting.

18       Q.  So this result in professional standards, I'm

19  assuming this would have been subsequent to the flight

20  that he and Mr. Patterson took to Paraguay?

21       A.  I could only assume that would be the case.  I

22  can't say with certainty the timing of it.

23       Q.  Did -- what, if anything, of substance did

24  Mr. Whitehouse say during that meeting?

25       A.  I don't really remember any of substance.

1  What I do is the overall conversation was about -- was

2  the overall conversation about Scott Patterson's

3  emotionally being fit to fly our airplanes.

4         MR. MORALES:  And, Bill, I just want to note

5  for the record we had another phone call come in, so I

6  tried to end the call.  We're going to try and unplug

7  it at the next break.

8      Q.  What, if anything, was Mr. Whitehouse saying

9  about Mr. Patterson's being emotionally fit to fly

10  airplanes?

11      A.  He, from what I remember, was telling me about

12  his bizarre behavior in the airplane and on the layover

13  and things that he was saying.  And at the time I was

14  unaware of any of that.  Brian Beach was handling all

15  of that with, I guess, Captain Whitehouse and, from

16  what I know now, Captain Snelling and professional

17  standards.  So I wasn't privy to the details of all

18  those things that were going on.

19      Q.  You mentioned Captain Snelling.  What was --

20  this Tom Snelling?

21      A.  That's correct.

22      Q.  And what was his role in this?

23      A.  At the time I had no idea what his role was.

24  But, you know, as time has gone by, I have heard

25  different things that he had had an issue with Scott

1    Patterson as well.  The details, you know, I don't

2    remember and I wasn't involved with investigating any

3    of that at all.

4         Q.  All right.  You mentioned professional

5    standards and I believe you said that you had some

6    professional standards earlier.  What was that

7    involvement?

8         A.  You mean me personally, what was I doing?

9         Q.  Yes.

10        A.  Or with relation to Scott Patterson?

11        Q.  Well, two questions.  First of all, what was

12   your -- what was your involvement within the Allied

13   Pilots Association with professional standards?

14        A.  When I was in Dallas, I was a committee

15   member, and then I became the chief of the Dallas hub's

16   professional standards of which we handle outside of

17   formal chains issues and problems and concerns with our

18   pilots.

19        Q.  And what exactly is professional standards?

20        A.  I'm sorry, ask the question again, please.

21        Q.  What exactly is professional standards?

22        A.  It's a volunteer group of pilots that work

23   within the constraints of the Allied Pilots

24   Association.  Basically, if one pilot has a problem

25   with another pilot or situation, then they would go to

1  professional standards.  And the professional standards

2  would be the conduit who would attempt to resolve any

3  issues between pilots and other employees, and all

4  outside of formal chains of American Airlines

5  management.

6      Q.  And what, if anything, did Mr. Whitehouse

7  tell you about his involvement with professional

8  standards as it related to Scott Patterson?

9      A.  I don't recall that conversation, it was so

10  long ago.

11         I need to take about a ten-minute break.  Is

12  that okay?

13         MR. AMLONG:  Sure.

14         THE WITNESS:  Okay.

15         THE VIDEOGRAPHER:  The time on the monitor is

16  12:00 p.m. and we're going off the record.

17     (Recess taken from 12:00 p.m. until 12:07 p.m.)

18         THE VIDEOGRAPHER:  The time is 12:07 p.m.  We

19  are back on the record.

20         MR. AMLONG:  Ms. Reporter, please read me my

21  last question and answer.

22     (The reporter read the last question and answer.)

23         BY MR. AMLONG:

24      Q.  When did you cease being chief pilot?

25      A.  I think it was two years ago this April or

1    May, one of the two, two years ago.

2        Q.  April or May 2016?

3        A.  Correct.

4        Q.  And you said that -- you said that Captain

5    Beach had been -- you and Captain Beach had been

6    equals?

7        A.  We had been until he was promoted to director

8    at the departure of Sean Scialfa.

9        Q.  Do you remember when that was?

10       A.  I'm sorry, I don't.

11       Q.  Was the encounter in the Dallas airport --

12   I'm sorry.

13           Was the encounter in the Atlanta airport the

14   only face-to-face meeting that you ever had with

15   Captain Whitehouse?

16       A.  Yes.

17       Q.  What, if anything, did you do as a result of

18   what Captain Whitehouse had told you about the

19   incident at Paraguay?

20       A.  To be honest with you, I don't know the

21   specific incident in Paraguay.  I think there was a

22   broad encompassing issue with Patterson and with

23   Captain Snelling and Captain Whitehouse and, as far as

24   I know, others.  But I did nothing with it other than a

25   discussion with Captain Scialfa and Brian Beach, Sean

1    Scialfa and Brian Beach upon my return.  And then I
2    guess they were backfilling me on all the things that
3    were going on, which I really wasn't a part of.
4        Q.  Do you remember what the occasion was for
5    your visit to your parents in Atlanta?  And I'm asking
6    so I can try to -- like Thanksgiving or Christmas or
7    something, I'm trying to nail down a time.
8        A.  No, I'm sorry, I don't.  I was single at the
9    time and had no real ties to the Miami area.  So my
10   family living in Atlanta was my focus on visiting.  It
11   wasn't -- I don't remember the time, I'm sorry.
12       Q.  So when you had the discussion with
13   Mr. Scialfa and Beach, tell me as best you can
14   remember who said what to whom.
15       A.  I don't remember how the conversation started
16   and I'll have to just paraphrase from what my memory
17   is, is that I mentioned to them I met this guy,
18   Whitehouse, and they were like, yeah, they knew -- they
19   knew of him.  And Brian said, hey, I'm handling that,
20   and they said, yeah, he's crazy, speaking of Patterson.
21   At least that's what Whitehouse was saying, something
22   along those lines.
23            And I hope you can understand at the time
24   there are approximately 2,000 pilots or more at the
25   Miami base, and there were only three pilots -- chief

1    pilots at the time to manage those 2,000 plus pilots.

2    So it's completely understandable why Brian would

3    handle -- Brian Beach would handle that situation, him

4    being the guy who had been in the Miami base the

5    longest, and for me to say I wash my hands of it, I'm

6    moving on to other things because really didn't have

7    the time to get involved with every issue.  So one

8    pilot had it, then chief pilot had that situation, then

9    you move on.  It's just too much to do.

10        Q.  Who is the third chief pilot?

11        A.  Sean Scialfa -- at this time it was Sean

12   Scialfa was the director, myself, and Brian Beach.

13   Later Kevin Mase was added, but I think that is prior

14   to this issue with Captain Whitehouse and Snelling and

15   Scott Patterson.

16        Q.  And who was saying that Mr. Patterson was,

17   quote, crazy, quote/unquote?

18        A.  I think all of them were.  I don't know that

19   Captain Scialfa, Sean Scialfa knew the details, but

20   Brian Beach was heavily involved with and had heard

21   professional standards come to him on many occasions

22   from what I understand.  And Captain Snelling and

23   Whitehouse had gone to Captain Beach on those issues

24   that you're referring to.

25        Q.  What, if anything, did Captain Beach say he

1    was doing about the issues that Captain Whitehouse was

2    raising?

3          A.  I don't remember anything he told me

4    specifically other than he was working with

5    professional standards.  And professional standards were

6    frustrated that they weren't able to get Scott to

7    correct some of his bizarre behavior.  I don't know

8    exactly what Brian Beach said or did until later when

9    either Captain Snelling or Glenn Whitehouse gave him a

10   formal letter saying that he wanted him to investigate

11   the bizarre behavior of Scott Patterson.  And then I

12   just remember Brian mentioning that, you know, he had

13   to act because he had a formal -- had a letter written

14   to him formally.

15         Q.  Do you recall when this was?

16         A.  No, I don't.

17         Q.  You're discussing the, quote, bizarre

18   behavior, closed quote, of Scott Patterson.  Why are

19   you assuming that was Scott Patterson as opposed to

20   Glenn Whitehouse who was behaving bizarrely in

21   Paraguay?

22              MR. MORALES:  Objection, foundation.

23         A.  So maybe because other people had mentioned

24   Scott Patterson such as the chief of professional

25   standards.  And within the office, Scott Patterson's

1   name was coming up way too often, and Glenn Whitehouse

2   name was not.

3       Q.  How was Scott Patterson's name coming up

4   within the office -- within the flight office at Miami

5   International Airport?

6       A.  With working with professional standards on

7   issues, we would meet with professional standards in

8   passing or occasionally to deal with some

9   off-the-record issues with some of our pilots, and

10  Patterson's name was brought up, it seemed like, at

11  that point in time continuously about issues.

12      Q.  And with whom would you meet from

13  professional standards?

14      A.  The chief of professional standards, Sammy

15  Odeh, and then later Chip Harlow.

16      Q.  I'm sorry, can I have those two names again,

17  please?

18      A.  Sammy Odeh and Chip --

19      Q.  Sammy?

20      A.  Sammy Odeh.

21      Q.  Can you spell Odeh, please?

22      A.  O-h-d-e-h, hyphen, Torres, I think is his

23  official given name.  Sammy Odeh and --

24      Q.  Okay.

25      A.  -- Chip Harlow.

1      Q.  Okay.  And what, if anything, do you recall
2   Mr. Odeh saying about Mr. Patterson?
3      A.  That he had had some issues with other pilots.
4   I don't recall the details of what Sammy Odeh would
5   say, but I just -- the theme was that he was having
6   issues with other pilots within the Miami base.
7      Q.  So had you heard of Mr. Patterson prior to
8   your encounter in the Atlanta airport with
9   Mr. Whitehouse?
10     A.  I don't recall if I had or had not.
11     Q.  So the conversation with Mr. Odeh, you can't
12  place it in time?
13     A.  I'm sorry, I can't.  You have to understand
14  that we had many informal conversations.  Some just
15  passing in the hall and some afternoons they would come
16  into the flight office and sit down with the chiefs and
17  say, hey, we're having these issues with certain people
18  and certain things.  You know, basically letting us
19  know it was an affirmation from a management standpoint
20  that the pilots were handling issues within the pilot
21  ranks rather than making it formal to where we would
22  have to have formal counseling conversations
23  or discipline.  So it was a bit of an affirmation.
24     Q.  What, if anything, do you recall Chip Harlow
25  telling you about Mr. Patterson?

1    A.  Well, the one thing I recall most is when Chip

2    Harlow was a captain on the 757, the same equipment

3    that Scott was flying as a first officer, one afternoon

4    late in the afternoon around after lunchtime I got a

5    call from Chip Harlow, and he was saying that, well,

6    this should be an interesting flight because I had been

7    put on to Scott Patterson's flight as a reserved

8    captain.  And I said well -- I mentioned to him good

9    luck, you know, hope it goes, well something along

10   those lines.  And then later the phone call I got from

11   Chip Harlow is that Scott Patterson had dropped the

12   trip and was no longer on the trip.

13        And then that's when I found out that through

14   one of the staff administrators that Scott was -- had

15   called trying to get an EO to get off the trip with

16   Chip Harlow, of which I think I called him back or left

17   a message saying that we are really short of pilots and

18   we needed -- to grant an EO is an employee off, and we

19   really needed him to fly.  We didn't have the bodies.

20   That's what I recall about that.

21    Q.  All right.  Who was the -- who was the

22   administrator?

23    A.  I think it was Trish Grant who told me and

24   then it might have been Luis Rojas, one of those two.

25   I think Luis was in the office, but I think Trish was

1    the one who took the initial call.

2          Q.  And did you speak to Mr. Patterson that day?

3          A.  I did not.  I called and left a voicemail with

4    him.

5          Q.  And what -- what reason, if any, did either

6    Ms. Grant or Mr. Rojas quote Mr. Patterson as giving

7    for not wishing to fly on that trip?

8          A.  I don't remember why they asked that.

9          Q.  You mean you don't remember why -- you don't

10   remember what they told him -- told you about why

11   Mr. Patterson said he did not want to go on that trip?

12         A.  Correct.  All I know is he had requested an

13   EO.

14         Q.  When you and Mr. Beach were both chief

15   pilots, how did you divide the pilots whom you

16   supervised?

17         A.  It was at random.  It was whomever had a

18   moment to fix any issue or problem.  It wasn't any set

19   division of responsibilities.

20         Q.  So you, Mr. Scialfa, and Mr. Beach all

21   supervised all 2,000 pilots?

22         A.  That's correct.

23         Q.  As best you can?

24         A.  That's correct.

25         Q.  And you never spoke to -- you never spoke to

1   Mr. Patterson that day; correct?

2       A.  I left a voicemail on his phone.

3       Q.  How many days in advance of the flight with

4   Captain Harlow did you get this phone call?

5       A.  No days, just hours.

6       Q.  Do you recall where the flight was to?

7       A.  I do not.

8       Q.  Is Mr. Harlow an international captain?

9       A.  Yes.

10      Q.  And from Miami, does that mean temporarily

11  flying to Latin America?

12      A.  No, it doesn't necessarily mean that.  The

13  airplane is capable of going to Europe, Mexico, Canada.

14  It's just all over.

15      Q.  Do you know where this flight was going to?

16      A.  I have no idea.

17      Q.  What, if anything, do you recall Mr. Harlow

18  telling you about Mr. Patterson other than he was

19  going to fly with him?

20      A.  Nothing in that situation.  Nothing at all.

21      Q.  Do you remember anything that Mr. Odell -- or

22  Odeh told you about Mr. Patterson?

23      A.  On that flight or in general?

24      Q.  Anything whatsoever that Mr. Odeh told you

25  about Mr. Patterson?

1      A.  Without -- I'll have to paraphrase, but that

2   other pilots had called on him as the chief of

3   professional standards with concerns about his behavior

4   on the flight deck and on layovers and the things that

5   he was saying with regard of taking -- he was a conduit

6   between the CIA and the Bolivian government or

7   something like that.  So, you know, it was just --

8   that's what I remember.  But, specifically, I don't

9   remember any details, just generally speaking that

10  there were concerns.

11     Q.  If it came to your attention that one of your

12  pilots were flying with his family and had removed a

13  first class passenger's baggage from the overhead

14  racks to put his family's bags in there, is that

15  something you would have taken action on?

16          MR. MORALES:  Objection, speculation.

17     A.  What I would do if someone brought me

18  information like that, I would just involve

19  professional standards.  I would call the chief of

20  professional standards, say I heard this, you know, if

21  you need me to pursue it further, but it's in your

22  hands.  That's the agreement that the -- the unspoken

23  word between the flight office and professional

24  standards would have.  The chief pilots don't want to

25  discipline.  They want the pilots to take care of

1    pilots and to correct any behavior that is out of the

2    norm.  So I would go right to professional standards

3    and say, hey, you guys want to take a look at this; if

4    not, I'll have to deal with it.  So -- and their

5    response would be with no details, we got it taken care

6    of; okay, thanks.

7         Q.  Pat McGinn is part of professional standards

8    committee; correct?

9         A.  At the time he was a committee member.  I

10   think since, he's moved to a national position.

11        Q.  Was he in Auburn at the same time you were?

12        A.  It's possible, but I didn't know him until I

13   got to American Airlines.  I think he was there may be a

14   year before me, but first time I met Pat McGinn, we

15   both were employed at American.

16        Q.  In the aircraft that you used to fly from

17   Miami to Bolivia is a Boeing 767; correct?

18        A.  A 767 or 757, but, yes, you'll be qualified on

19   both aircraft.

20        Q.  Where -- tell me how the cockpit is

21   configured in a 757, especially where is the jump

22   seat?

23        A.  There are two jump seats on a 757.  One is

24   directly behind the pedestal and the other one is

25   directly behind the captain's seat on the left.

1     Q.  And how far behind the pedestal is the jump

2  seat?

3     A.  I don't know the exact dimensions, but I can

4  only assume -- I'm just guessing 3 feet.

5     Q.  So can somebody be sitting in the jump seat

6  in a 757, reach up and move overhead switches?

7     A.  Yes.  If they lean forward, they can do that.

8     Q.  With the seatbelt on?

9     A.  If it's loose, I would say they could.  The

10  overhead switches, I think by the way the aircraft is

11  configured, it slants back toward the jump seat area.

12  So the overhead switches would be a little easier to

13  use -- to reach, but it's quite possible to do that.  I

14  remember as a flight test pilot, we would have

15  maintenance personnel on the airplane with us and they

16  would sit in that seat and they would manipulate

17  certain systems on the airplane while we were testing

18  them.  So it's quite possible to do that.

19     Q.  Are those functional switches or are they

20  circuit breakers?

21     A.  Both.  There are circuit breakers immediately

22  above that center jump seat behind the pedestal and

23  functioning switches just within -- right next to those

24  as well.

25     Q.  And where are the functional switches?

1     A.  I really don't know what they are now.  I'm no

2     longer qualified on that 757 or 767.  So I don't

3     remember what they all are.

4         Q.  If a pilot who was not flying a captain or

5     first officer, were -- was reaching up from the jump

6     seat to flip switches when the aircraft was on the

7     runway, is that something that would concern you as

8     chief pilot?

9         A.  That would concern me as any pilot that

10    someone not directly at the controls or manipulating

11    systems while the airplane is in a very critical state.

12    So, yes, that would concern me in all areas.

13        Q.  Well, if it came to your attention as chief

14    pilot, what would you do with that?

15            MR. MORALES:  Objection, speculation.

16        A.  If there was more -- a situation that it

17    needed to be dealt with immediately, like there was an

18    incident or accident or a FOQA report, my first initial

19    reaction would probably be to address with professional

20    standards and ask the question, hey, would you guys

21    deal with this, ensure that we stay completely within

22    procedures.  That's what I would -- my first go-to

23    would be professional standards unless there was an

24    accident or incident.

25        Q.  If it came to your attention that a first

1   officer was telling your captain or any other

2   personnel on an aircraft that he was going to get them

3   fired, what, if anything, would you have done in your

4   role as chief pilot --

5          MR. MORALES:  Objection, speculation.

6       Q.  -- with that information?

7       A.  I can only assume that unless there was

8   grounds for that, I would once again defer to

9   professional standards and hopefully they would be able

10  to re-center that pilot and correct -- correct that.

11      Q.  What is American Airlines' policy concerning

12  the use as execrated as faggot or nigger?

13      A.  I can only assume that that is completely out

14  of bounds.  I mean, that's completely in direct

15  conflict with our diversity policy and procedures for

16  American Airlines.

17      Q.  Are you familiar with the term "zero

18  tolerance"?

19      A.  I am.

20      Q.  And within the confines of American Airlines,

21  what does zero tolerance mean?

22      A.  Probably just as verbatim as it is.  No

23  tolerance for whatever specific action that is going

24  on.  No tolerance at all, forbidden.

25      Q.  So is the use of a word such as faggot and

1  nigger a zero-tolerance situation?

2       A.  I can't speak exactly to that.  I do know that

3  there is a process to go through an investigation to

4  ensure that everyone at our company is compliant and

5  not engaging in that type, but there is a process.  And

6  the human resources department is the one who would be

7  running that investigation and to determine and make

8  findings.  So --

9       Q.  Well, in your role as chief pilot, were it

10  come to your attention that somebody was using that

11  language, is it the kind of thing that you would refer

12  to professional standards?

13      A.  I think in that case I would confer with my

14  direct reports, the director or the next line up, the

15  chief managing director of flight ops, which would be

16  at that time would be Mark Cronin.  I would defer to

17  them and probably ask them as well for guidance and to

18  have HR do the formal complaint.  But I wouldn't do the

19  investigation, that would be a human resources

20  investigation.

21      Q.  But would you do that sooner rather than

22  later?

23          MR. MORALES:  Objection, speculation.

24      A.  I could only assume with the circumstances

25  that I -- hopefully I wouldn't wait too long, but, you

1  know, I don't -- not having been put in that situation,

2  I don't know.

3      Q.  Can -- is it permissible for -- is it

4  permissible within American Airlines for a first

5  officer in the absence of the captain on a flight deck

6  to divert a flight to another airport?

7          MR. MORALES:  I'm just going to object to

8  extent it calls for a legal conclusion.

9      A.  There is guidance in our flight manual part

10 one which tells our pilots, gives them structure and

11 guidance on how to react and behave in situations like

12 that.  And the captain is responsible for the airplane,

13 the crew, and the contents.  To have a first officer

14 divert an airplane as me as a captain without my

15 knowledge would be egregious since the captain is

16 responsible for the airplane and the crew.

17     Q.  Is that something that you would -- were that

18 reported to you, is that something you would refer to

19 professional standards?

20     A.  That's one of those situations that I spoke of

21 earlier where it depends on if there's an accident,

22 incident, or some event.  I think a divert event would

23 probably warrant at least an investigation of what

24 happened and why because of -- a diversion event is an

25 event -- it's a company-reported situation.  So that

1     would have been some type of investigation done within

2     our IOC, integrational operations center.  But as a

3     chief pilot, that would be one of those things that I

4     would deal with after the fact.  What were the facts,

5     the situation, you know, what were the mitigating

6     circumstances along with that, and that those

7     circumstances of operationally why the airplane

8     diverted would come from our IOC and directly from our

9     required pilot reports.

10         Q.  Now, tell me how a divert would be reported?

11         A.  You would report it via the ACARS, which is

12    a -- if you don't know what that is, it's a data link

13    system within the airplane that reports back to our

14    IOC.  And in the case of a 757, if you have -- and a

15    767, if times were permitted, then you would use a

16    satellite phone to call the dispatcher at IOC to

17    discuss the situations.  I just --

18         Q.  What was IOC?

19         A.  Integrated operations center.

20         Q.  Okay.

21         A.  And that's how you would begin the divert.  I

22    guess, you would need -- they don't happen too often,

23    but usually they're mechanicals or medicals that cause

24    you to divert the airplane.  So -- and it's quite

25    costly to the airline as well, so it doesn't happen too

1  often.

2  Q.  But whenever there is a divert, I believe

3  you're telling me that the airplane reports it

4  automatically through its data system?

5  A.  Well, it has to be inputted from the pilots

6  that they are going to divert.  And you change the

7  computer systems in the airplane to give you the

8  ability to find other airports of which you would want

9  to go.

10  Q.  So the pilot has to -- the pilot has to tell

11  the airplane where he or she wants to go?

12  A.  Absolutely, yes.

13  Q.  And then registers on your home computer

14  system or just in the airplane's computer system?

15  A.  Just in the airplane's computer system.  You

16  change the destination which would have the airplane's

17  ability within the network of the memory of the

18  airplane to bring up arrivals and approaches that would

19  give you the information data to the diverting base.

20  Then the next step would be to send a message via voice

21  or through data link to the dispatcher and/or IOC, and

22  then they would, in turn, coordinate with the airport

23  of which you are arriving to.

24  Q.  And after this is done, is there paperwork

25  that follows up on this plane --

1    A.  There is.  It's a required report --

2    Q.  -- that a divert took place?

3    A.  A required report by the pilot to fill out for

4    the reason for the diversion.

5    Q.  And is that -- does that report have a name?

6    A.  It's a P2 report, pilot report -- pipeline

7    report, P2.

8    Q.  And does the P2 state -- well, does a P2

9    state which person on the flight deck made the divert

10   decision?

11   A.  Our flight manual part one states the captain

12   will ensure that the P2 is filed.

13   Q.  Does the P2 identify who made the decision to

14   divert?

15   A.  I can only assume that the captain made the

16   decision to divert because the captain is in charge of

17   the airplane, crew, and contents.

18   Q.  If the captain is on a rest break, can a

19   first officer diverts, or does he need to wake up the

20   captain?

21   A.  He needs to wake up the captain.  The captain

22   is still in charge of the airplane even when he's on a

23   rest break.

24   Q.  If a first officer were to divert an aircraft

25   without awaking the captain, is that the type of thing

1  that he would revert to professional standards or is

2  that the type of thing for which you would institute

3  an investigation?

4      A.  I would go to professional standards.  I just

5  can't imagine that scenario, though, because our

6  captains have control of their airplanes.  I can't

7  imagine me being in that situation and landing at

8  another place without me knowing it.

9      Q.  If a chief pilot was informed that a pilot

10  was smuggling firearms to South America, is that type

11  of intelligence that would be referred to professional

12  standards or would you immediately report that for an

13  investigation?

14      MR. MORALES:  Objection, speculation.

15      A.  I would hope that -- I would first contact our

16  professional standards people and ask them were they

17  aware of this, but if that were to happen, then

18  federal -- our laws in the United States don't pertain

19  to us when we're in other countries.  And I know

20  specifically there are other countries, Mexico for one,

21  even the carrying of ammunition is a federal offense in

22  their country.  So I think it's well-known knowledge

23  that pilots cannot have weapons or ammunition flying in

24  other countries.  We are vastly aware of that.

25          So I would -- if no one was arrested for that,

1  I would go to professional standards and say you've got

2  to stop this because I don't want to come to South

3  America or Europe or bail someone out of jail.  And I

4  wouldn't want to know who it did because just fix it,

5  don't put this on the lap of the chief pilots and

6  management, something that's a correctable behavior

7  amongst pilots.

8          MR. MORALES:  I might suggest a break right

9  now.  Bill, is that agreeable?

10          MR. AMLONG:  Sure.

11          THE VIDEOGRAPHER:  The time on the monitor is

12  12 --

13          MR. AMLONG:  A short break or a long break?

14          MR. MORALES:  Can we go off the record and

15  discuss?

16          MR. AMLONG:  Yes.

17          THE VIDEOGRAPHER:  The time on the monitor is

18  12:55 p.m. and we're going off the record.

19      (Recess taken from 12:55 p.m. until 1:45 p.m.)

20          THE VIDEOGRAPHER:  The time now is 1:45 p.m.

21  and we're back on the record.

22          MR. AMLONG:  We're back on the record now?

23          COURT REPORTER:  Yes.

24          MR. AMLONG:  Are we back on the record?

25          COURT REPORTER:  Yes.

1          BY MR. AMLONG:

2      Q.  And please hand the witness Plaintiff's

3   Exhibit 1.  Take a moment and read that, Mr. Bonds,

4   and tell me when you've finished.

5          MR. MORALES:  This is a four-page document.

6   Are you requesting the witness read the full document,

7   Bill?

8          MR. AMLONG:  Yes.  Please.

9          MR. PACE:  This is Noel.  I'm back on.  I got

10   knocked off there.

11          BY MR. AMLONG:

12      Q.  Is Mr. Bonds still reading the memo?

13      A.  Yes.

14      Q.  Okay.  Thank you.

15      A.  It's more of a book than a memo, I think.

16          All right.  I'm finished.

17      Q.  Mr. Bonds, have you ever seen Plaintiff's

18   Exhibit 1, which is an e-mail from Ricardo Garcia to

19   Brian Beach?

20      A.  I have not seen this.

21      Q.  Copied to --

22      A.  This is the first time I've read that.

23      Q.  And you recognize the fact pattern?

24      A.  I'm sorry.  What's the question again?

25      Q.  Do you recognize the fact pattern?

1    A.  I recognize some of the stories in this letter

2   as, you know, from what I've heard hearsay through the

3   front office, but I'd never read this.

4    Q.  Did Mr. Beach share with you information

5   concerning Mr. Whitehouse's complaints to him?

6    A.  We did speak, but I will defer back what I

7   said earlier, we were all so busy and for me to become

8   engaged in this.  Brian beach was handling this and

9   that was for him to handle and I would listen if he

10  spoke, but for the most part my interjections were just

11  shock and amazement, but I wasn't involved with any of

12  the players in this.

13   Q.  I'm sorry, you were not involved with any of

14  the players?

15   A.  I was not involved in any of the investigation

16  of any of these things I read in this letter.  The only

17  exception that I was involved with -- there is one

18  exception, is I recognize now a pattern where First

19  Officer Flannigan was brought in by human resources for

20  an HR complaint.  And I remember I was a witness in

21  that hearing and human resources were asking First

22  Officer Flannigan about the use of racial slurs and

23  I -- but until I reread this, I had completely

24  forgotten that it was Scott Patterson.

25   Q.  What did -- were you present when First

1    Officer Flannigan was questioned?

2         A.  I was.  I was a witness.

3         Q.  When you say you were a witness, you were a

4    witness to the questioning?

5         A.  Yes, I was.  I was not asking questions.  I

6    was just there as a witness.

7         Q.  Was this part of the investigation of

8    Mr. Patterson?

9         A.  To be honest, I don't -- I recall now that it

10   must have been about Patterson.  I specifically

11   remember being in the conference room with human

12   resources asking First Officer Flannigan about racial

13   slurs and now I remember it must have been about

14   Patterson.  Although, until I saw this letter, I was

15   unaware.  You know, I just thought that -- I remember

16   Flannigan's testimony.

17        Q.  And what was Flannigan's testimony?

18        A.  It was contrary to what he and other

19   statements were made.  He said --

20        Q.  I'm sorry, it was contrary to --

21        A.  To statements --

22        Q.  Contrary to this?

23        A.  Yes, contrary to this.  He was -- the

24   discussion that Brian Beach and the HR representative

25   that were -- that was running that investigation, I

1  remember specifically the words were the union had

2  gotten to him.

3      Q.  I'm sorry, that the union had gotten to him?

4      A.  Had gotten to him and he basically did not

5  corroborate any of these allegations.

6      Q.  And was Mr. -- the HR investigator was Anna

7  Burke-Leon?

8          And, Ms. Reporter, that's B-u-r-k-e hyphen

9  L-e-o-n?

10     A.  I don't remember her last name, but I think

11 her name was Anna.

12     Q.  And both she and Mr. Beach were present for

13 the interrogation?

14     A.  I -- I do think it was Brian Beach, myself,

15 and Anna were the ones present.

16     Q.  How many -- how many other interviews did you

17 sit in on?

18     A.  Pertaining to Scott Patterson?

19     Q.  Yes.

20     A.  I assume this was the only one.  I don't

21 recall any others.  As a matter of contractual

22 purposes, when a chief pilot has an interview or a

23 Section 21 hearing, there would be one chief pilot that

24 would basically conduct the interview and the other

25 chief pilot would just sit there without having the

1  ability to interject, and that's why there were two of
2  us in there.
3       Q.  Well -- were you present for Mr. Patterson's
4  Section 21 hearing?
5       A.  No.
6       Q.  Were you present for any other witness
7  interviews beyond First Officer Flannigan?
8       A.  Was I present for what?  What was the
9  question?
10      Q.  At any other interviews other than that of
11 First Officer Flannigan?
12      A.  Pertaining to this case, not to my knowledge.
13 But I've been witness to many others as a chief pilot.
14      Q.  Ms. Reporter, hand Mr. Bonds Exhibit 2,
15 please.
16      A.  Would you like me to read all of this or --
17      Q.  Yes.  It's just a page and a half.
18      A.  Okay.
19          Okay, I'm finished.
20      Q.  These are e-mails between Mr. Whitehouse and
21 Mr. Beach dated in March 2015.  Did Mr. Beach ever
22 share with you any of the information contained in
23 Plaintiff's Exhibit 2, which is a March 20, 2015,
24 e-mail from Glenn Whitehouse to him?
25      A.  No, I've never seen this e-mail, and if he

1  told me, it was in passing.  It wasn't a formal

2  meeting, sit down, I want to tell you what's going on

3  with this situation.  So not to my knowledge.  I don't

4  know of any conversation Brian Beach and I had about

5  this.

6       Q.  Are you familiar with any investigation into,

7  quote, a very scary divert into Bogotá, closed quote?

8  BOG is Bogotá; correct?

9       A.  Yes, it is.  I'm aware of it now and from

10 reading the last letter.  And your questionings about a

11 divert, I might have remembered something about it,

12 but -- in passing, but to be honest with you, I don't

13 remember details and this jogs my memory of hearing a

14 story, but I don't remember any details of it.

15      Q.  But just if you were talking before about

16 diverts, there would be a P2 concerning any divert?

17      A.  Should be, yes.

18      Q.  Could be or would be?

19      A.  Should be.  The pilot should fill the report

20 out and turn it in.  Pilots don't always, you know,

21 follow that protocol.  Pilots don't like paperwork.

22 So ...

23      Q.  Well -- but the chief pilots want paperwork

24 concerning something as significant as a divert;

25 right?

1      A.  Not necessarily.  I wouldn't say that the

2  chief pilots are concerned about diverts at all.  If it

3  was for something like diverting because there was a

4  bomb on board or allegations of such, yes, the chief

5  pilot would -- should be interested in that.

6      Q.  Prior to reading this e-mail today, did you

7  ever learn -- did anyone ever tell you that

8  Mr. Patterson was standing within earshot of

9  passengers that an airplane was like a time bomb?

10     A.  I don't recall that.

11     Q.  Or a bomb?

12     A.  I don't recall any of that.

13     Q.  Who is Ricardo Garcia, by the way?

14     A.  I don't know.

15     Q.  Do you know who Fred Ronda is?

16     A.  I think Fred -- Fred Ronda, I think, is the

17  corporate security in Miami.

18     Q.  What exactly is corporate security at

19  American Airlines?

20     A.  I'm not sure I'm qualified to answer that.

21     Q.  Do you deal with them as chief pilot?

22     A.  We would deal with them, but not too often.  I

23  do know that they deal with theft and things of

24  security nature within the hub, but I don't know

25  exactly what -- you know, what their scope is.  I do

1  know that they deal with ramp service personnel and any

2  security issues that go within the company, but their

3  entire scope, I'm unaware of.

4      Q.  Were you ever made aware of any allegations

5  that Mr. Patterson was smuggling guns into Bolivia?

6      A.  I had heard people speak of him having some --

7  being a conduit or something of the such for the CIA

8  into Bolivia.  I had heard that, but nothing of

9  directly reported to me, just hearsay.

10     Q.  Ms. Reporter, hand Mr. Bonds Exhibit 3,

11  please.

12     A.  Okay.

13     Q.  Does that refresh your recollection whether

14  or not anyone ever told you that Mr. Patterson was

15  taking guns into Bolivia?

16     A.  I still stick by what I said, probably in

17  passing.  I don't recall reading this e-mail and I see

18  that I am copied in on the cc, but I don't recall

19  reading it.  I received 200 e-mails a day as chief

20  pilot or plus.  So I don't remember -- recall reading

21  this.

22     Q.  Mr. Patterson was a federal flight deck

23  officer; correct?

24     A.  I don't know that.

25     Q.  What's a federal flight deck officer?

1      A.  He is a sworn deputy that is allowed to carry

2   a firearm on the flight deck in defense of the cockpit

3   against terrorism.

4      Q.  And are federal flight deck officers

5   permitted to carry weapons into foreign countries?

6      A.  No.

7      Q.  So that's only on domestic flights?

8      A.  That's correct.

9      Q.  But they can carry them into Haiti; correct?

10     A.  Carry them what?

11     Q.  They can carry weapons into Haiti?

12     A.  I don't know.

13     Q.  Are you a federal flight deck officer?

14     A.  I am not.

15     Q.  When you were in the Air Force, did you ever

16  command a unit or were you merely commanding your own

17  aircraft?

18     A.  Commanded my own aircraft.

19     Q.  Both in the Air Force and the Mississippi Air

20  National Guard?

21     A.  Yes, that's correct.

22     Q.  Please give Mr. Bonds Exhibit 4.

23     A.  Okay.

24     Q.  Does Exhibit 4, which is in part an e-mail

25  from you, refresh your recollection as to whether or

1  not anyone ever told you that Mr. Patterson had said

2  within hearing of passengers that an airplane was a

3  time bomb and could explode at any moment?

4      A.  Yeah, that does.  Obviously, that's something

5  Glenn Whitehouse had said to me.

6      Q.  Are you saying that merely because you see it

7  in the e-mail or did this refresh your memory?

8      A.  Just because I see it in the e-mail.

9      Q.  Who's John Thomas?

10     A.  John Thomas is a pilot for American Airlines

11 that is no longer with the company and was found unfit

12 for duty for mental reasons.

13     Q.  What did Mr. Thomas do?

14     A.  Bizarre behavior.  This is -- I was not

15 involved with this.  It's just I knew the story where

16 he had some physical contact with agents and other

17 people.  And best I can recall, there were issues of

18 seeing things in the airplane or something like that,

19 but it was quite well-known back in the middle '90s

20 that there was issues -- John Thomas had some emotional

21 issues.

22     Q.  In the 1990s?

23     A.  I think late '90s.

24     Q.  What, if anything, did you do to follow up on

25 the e-mail from Mr. Cronin saying, "Jim, we need to

1  know where he said it and if passengers heard it, then

2  employees heard it as well.  If Whitehouse witnessed

3  it, then he can submit a complaint/statement and we

4  can move forward."

5      A.  I don't know what I did.  Maybe in passing I

6  just passed this to Brian because Brian knew.  Brian

7  must have taken the ball because I don't know that I

8  did anything.

9      Q.  Now, Sean -- how is his last name pronounced?

10     A.  Scialfa.

11     Q.  Scialfa.  Sean Scialfa, he was still the

12 director of flight?

13     A.  Yes.

14     Q.  And what was Kevin Mase?

15     A.  Kevin Mase was a new chief pilot to the Miami

16 base.

17     Q.  Was Mr. Beach still just a chief pilot?

18     A.  Yes, he was.

19     Q.  So you and Mr. Mase and Mr. Beach were at

20 this point co-equals?

21     A.  Exactly.  Yes, that's correct.

22     Q.  Do you know if this conversation was the same

23 conversation that we referenced in Exhibit 2 that was

24 supposedly overheard by Maria Eugenia Valdez?

25     A.  So ask the question again, please.

1          MR. AMLONG:  Read it back please.

2          (The reporter read the last question.)

3      A.  I don't know that.

4      Q.  What, if anything, was done to initiate --

5  what is Section 20?

6      A.  Section 20 is a chapter in the bargaining

7  agreement between the Allied Pilot Association and

8  American Airlines.  Section 20 is an evaluation by a

9  qualified -- it's a hearing to determine if a qualified

10  medical person can determine fitness for duty either

11  physically or mentally.

12      Q.  And what's the threshold for -- who can

13  request a Section 20 examination?

14          MR. MORALES:  Just object to the extent it

15  requests a legal conclusion.

16      A.  I don't know the entire --

17      Q.  Do you understand -- in your understanding

18  from when you were a chief pilot, who could request a

19  Section 20 examination?

20      A.  The way the process would go is if there was

21  concerns in the field at the chief pilot level, they

22  would put those concerns to labor and legal, and labor

23  and legal would determine whether Section 20 would

24  proceed, and that would be in conjunction, I guess,

25  with APA as well.

1     Q.  And what, if anything, did you do at this

2  point in time to initiate a Section 20 examination of

3  Mr. Patterson?

4     A.  I don't know that I did anything.

5     Q.  Why would you have done nothing when you

6  state in the e-mail, quote, I think we all need to

7  confer and then convince labor that this dude needs a

8  Section 20 ASAP, closed quote?

9     A.  Because I did nothing because Brian Beach was

10  the guy that was handling that investigation.

11     Q.  Do you know whether or not Mr. Beach had done

12  anything at this point?

13     A.  I can only -- I do know at some point

14  something was done because I think he did go to a

15  Section 20, but I don't know what Brian did.  I don't

16  know the circumstance of where he took it from there.

17     Q.  Please hand the witness Exhibit 5.

18     A.  Okay.

19     Q.  Do you recall seeing this e-mail before?

20     A.  I recall the story and speaking with David

21  Tatum.

22     Q.  Okay.  Tell me what you recall about that.

23     A.  I was bothered that I never spoke with Scott

24  Patterson and that he requested an EO after the flight

25  office was closed, and I think -- I didn't leave at

1    4:00 like most people or a lot of people do, they close

2    the doors, but I stayed there late.  I never spoke with

3    him.  He never called to talk to me about it.  And this

4    is, quite frankly, people who play the system very well

5    that don't want to hear their chief pilot tell them no

6    for requesting EOs, they will wait until after the

7    flight office closes and then call the duty chief who

8    doesn't know the individuals and usually gives a

9    blanket grant of employee offs.

10        Q.  Had Mr. Patterson left you any voicemails

11   that day?

12        A.  Not to my knowledge.  I really found it odd

13   that he didn't call and say I'd like to speak with

14   Captain Bonds or any of the chief pilots to get this

15   day off.  He went through administrative people in the

16   office to get that, which I don't know is normal

17   protocol.  I would want talk to my supervisor and ask

18   them personally.

19        Q.  Did he tell the people in the office that he

20   was going on military duty?

21        A.  I'm not sure what he told them.

22        Q.  Did -- prior to Mr. Patterson's leaving, did

23   you leave a voicemail concerning taking the day off?

24        A.  I called him -- if I remember correctly, I did

25   call him.  I don't know the timing of it, but I had

1    heard that he had asked for an EO and I requested that

2    he not do that, our money was tight, and -- I might

3    have indicated that I wanted him to call me and talk to

4    me.

5         Q.  Do you recall telling him that you would give

6    him the day -- that you would give him the time off if

7    he would show you his orders?

8         A.  Not at that exact circumstance.  I don't

9    remember the exact wording.  But in later conversations

10   or maybe one then, I don't recall the timing, but I

11   find it quite odd why he would ask for an EO instead of

12   taking military.  I didn't understand that -- why he

13   was asking that.  And when I had put together what Chip

14   Harlow had just called and told me that Patterson was

15   on his flight with him, that it would be -- this should

16   be an interesting flight, then Patterson now was asking

17   off.  And if he was doing military, why didn't he have

18   his military orders.  Me being in the Guard and

19   Reserve, it was quite odd that he didn't have them

20   because I always had mine, and our orderly room

21   provided them for us at will for the transparency of

22   employers.

23        Q.  That was in the Air -- when you were in the

24   Air Force Reserve?

25        A.  Yes.  And the Air Force Reserve, Air National

1   Guard are pretty much the same.

2        Q.  Between the time that you got out in I

3   believe you said 1992 and when you joined the

4   Mississippi National Guard, were you in any Reserve

5   unit?

6        A.  No.

7        Q.  So your only Reserve experience was the

8   Mississippi Air National Guard?

9        A.  Yes.

10       Q.  And it provided you with written orders;

11  correct?

12       A.  They did provide those with me.  And it's my

13  experience that they're easily obtained by the member

14  just upon asking their admin officer or their

15  commanding officer.

16       Q.  Do you know if written orders are the norm in

17  the United States Army Reserve?

18       A.  I do not know that.

19       Q.  Are you familiar with the type of notice that

20  is required of a service man or service woman under

21  USERRA?

22       A.  You're going to have to rephrase that.  I'm

23  not sure I understand the question.

24       Q.  Do you know either as the chief pilot

25  employed by American Airlines or as a former member of

1 the Mississippi Air National Guard what sort of notice

2 a person is required to give the employer concerning

3 his going on military leave?

4     A.  I don't know that law; no, I do not.  As in

5 prior notice was your question; correct?

6     Q.  Yes.

7     A.  Okay.  I do not know the law.

8     Q.  What did you tell -- what did you tell

9 Mr. Tatum that would have led him to state, "According

10 to my conversation with Bonds this morning, sounds

11 like I was, quote, played, closed quote, exclamation

12 point"?

13     A.  Because I think I remember that I had called

14 Scott to call me back to concerning requesting of the

15 EO.  And then when I didn't get -- when I didn't hear

16 from Scott and heard he was off of it, I think he just

17 bypassed me and went to Dave Tatum.

18     Q.  What's a dashboard?

19     A.  It's a web tool that management uses for

20 looking at employees' files and employment histories

21 and requests for days off or any other basically notes

22 passing electronically throughout management system.

23     Q.  Would Mr. Patterson's contacts or attempted

24 contacts with you or the flight office on September

25 21st have been recorded in the dashboard?

1      A.  It might have been.  Unfortunately, the

2   documentation of every conversation is not always done.

3   Usually done for situations to where you think there

4   might be some circumstances or that you need to share

5   or to remember later.  We don't document everything,

6   but in some cases we do document in dashboard.

7      Q.  Are dashboards kept permanently?

8      A.  I don't know that.  That would be a management

9   IT question.

10      Q.  Was it your practice to print out at least

11   selective entries in the dashboard and keep them in a

12   file?

13      A.  I don't think that was my practice, to keep

14   anything in a written file.  I attempted to document

15   electronically whenever possible, but I don't recall

16   printing out a bunch of dashboard entries.  I don't

17   know that.

18      Q.  Well, if you had entered anything about

19   Mr. Patterson on September 21st or September 22nd,

20   would that -- would you have done so -- where would

21   that be and in what form?

22      A.  If he requested an EO and it was approved,

23   then we would put that in dashboard, you know, approved

24   EO under time off or something like that.  That way we

25   have electronic history of days off that he had taken.

1     Q.  Can a dashboard be -- can a dashboard that

2  you did yesterday be altered today?

3     A.  I don't know that.  You would have to ask

4  someone else in the IT department, I don't know.

5     Q.  When Mr. Patterson took off on

6  September 22nd, where did you think he was?

7     A.  I -- my only assumption now is that he went to

8  Washington.  That was my assumption.

9     Q.  The question is --

10     A.  I'm sorry?

11     Q.  -- when he took off on September 22nd, where

12  did you think he was?

13     A.  I don't know the exact date of September 22nd.

14  Is that the date that --

15     Q.  That's the date --

16     A.  Okay.

17     Q.  -- that he was in Washington.

18     A.  And then he was off for this trip.  I think he

19  went to Washington.

20     Q.  Did you believe at the time that he was on

21  military duty?

22     A.  I didn't think about it, whether he was on

23  military duty or not.  I just assumed that he -- he

24  knew that if he wasn't, that we could track that down

25  by looking at his travel history if he didn't go to

1    Washington.  I just assumed that he did go to his

2    military unit.  Whether he was called or requested to

3    go there by orders, then there's a different question.

4    But I do think he went to Washington to cover -- to

5    ensure that his tracks were covered.

6         Q.  Okay.  Well, to your understanding of USERRA,

7    would it have made any difference if he had gone

8    voluntarily or if he had been ordered?

9         MR. MORALES:  Objection, calls for a legal

10   conclusion.

11        A.  The reason I suspected that he went on his own

12   was because he did not want to fly with Chip Harlow,

13   the chief of professional standards.  And that he found

14   one way or another to get out of that trip and he used

15   his military status to get off of that trip.

16        Q.  Did Mr. Patterson ever tell you that he --

17   did Mr. Patterson ever tell you or anyone else, to

18   your knowledge --

19        A.  I've had no conversation --

20        Q.  -- that he was --

21        A.  You want to repeat the question?

22        MR. MORALES:  Is there a question pending?

23        Q.  Did Mr. Patterson ever tell you that he went

24   off that trip because he did not want to fly with

25   Mr. Harlow?

1    A.  No.

2    Q.  Did anybody in the flight office tell you

3    that Mr. Patterson had said he did not wish to fly

4    with Mr. Harlow?

5    A.  No.

6    Q.  Did anyone ever tell you that there was any

7    antagonism between Mr. Patterson and Mr. Harlow?

8    A.  Yes.  Mr. Harlow --

9    Q.  Who?

10    A.  -- had mentioned -- Captain Harlow, Chip

11   Harlow had mentioned that Patterson was not willing to

12   work with professional standards and didn't want to

13   hear from Chip Harlow.

14    Q.  When did Mr. Harlow say this?

15    A.  I can't give you the exact date, but it's

16   prior to the September 22nd or date of which

17   Mr. Patterson took military duty to Washington.

18    Q.  Please give Mr. Bonds Exhibits 6 and 7.

19    A.  Okay.

20    Q.  Do you recognize that as the e-mail from you

21   forwarding the LDS records that Mr. Patterson had

22   given to you?

23    A.  I do.  I don't recognize this exact one

24   because the copy that I saw was a copy of a copy and it

25   had a lot of information redacted.

1        Q.  It had more information redacted than

2    Exhibit 7?

3        A.  It looks familiar, but the copy that I saw and

4    I had was a copy of a copy and it had black marker

5    redacting a lot of the blanks and some of the

6    information on it.

7        Q.  Whose handwriting is that?

8        A.  I don't know.

9        Q.  Do you recognize it?

10       A.  No, I do not.

11       Q.  And on October 28th you're saying that this

12   appears to be legitimate?

13       A.  Yeah.  And I don't know what that e-mail is in

14   reference to because it could very well be that this

15   looks legitimate, but the Exhibit 7 you showed me is a

16   much better copy than I ever saw and, you know, it

17   looks like an LES, but the devil I guess would be in

18   the details.

19       Q.  Well, you said that you're going to look

20   further.  Where did you suspect he had been when he

21   went to the Pentagon?

22       A.  It wasn't where I expected him to have been.

23   My question was the LES that I received was a copy of a

24   copy and as far as I could have ascertained, I needed

25   to look further because he could have made a copy and

1  written over it or something.  I just needed to look

2  further because it just not -- my LESs that I was

3  receiving at the time had details that were redacted on

4  his part.  And I would have been able to get a copy and

5  electronically send it to my supervisor rather than

6  getting a copy of a copy.

7          And in Exhibit 6, I remember now that -- this

8  is after some time -- he sends to me the LES per your

9  request in Exhibit 6, here's the LES.  But I had asked

10  him previous to this to send it of which he never

11  responded and never sent me anything.

12          MR. MORALES:  Hey, Bill, we're going to take

13  an extremely brief break.  There sounds like there

14  might be an alarm or something going off in the

15  hallway.  Let us just check really quickly and make

16  sure.  Be very brief.

17          THE VIDEOGRAPHER:  The time is 2:49 p.m.  We

18  are going off the record.

19      (Recess taken from 2:49 p.m. until 3:07 p.m.)

20          THE VIDEOGRAPHER:  The time now is 3:07 p.m.

21  and we're back on the record.

22          BY MR. AMLONG:

23      Q.  Mr. Bonds, did you not believe that

24  Mr. Patterson was actually on military duty?

25      A.  That wasn't my concern.  I didn't think that

1    he was not on military duty.  My question was if he was

2    on military duty because he just wanted to go of his

3    own accord to get out of flying with Captain Harlow.

4         Q.  Well, how would his LES forms resolve that

5    one way or the other?

6         A.  His LES form, this obviously is after the

7    fact.  I requested it in September and this is in

8    October, I think, is when I received this.  And this is

9    just an LES showing that he was gone for inactive

10   training on those dates, that he had actually shown up

11   there.

12        Q.  Are you familiar with the term "individual

13   mobilization augmentee"?

14        A.  I've heard of it, yes.

15        Q.  What's it mean?

16        A.  That he can go fill in upon request to augment

17   certain units in certain situations.

18        Q.  And when you were in the Air National Guard,

19   did you have to put in X number of days each year to

20   receive credit --

21        A.  Yes.

22        Q.  -- for that?

23        A.  Yes, we did.

24        Q.  And was the Mississippi Air National Guard,

25   did that follow the same fiscal year as the federal

1   government?

2       A.  Yes, as far as I know.

3       Q.  And do you know whether or not USERRA makes

4   any distinction between compelled and voluntary

5   service?

6       A.  I don't know that answer.

7       Q.  So what I'm curious about is what you were

8   going to look further about, as you say in Exhibit 6.

9   What was the mystery here?

10      A.  The mystery, obviously, is to see -- look

11  further to see if this LES that he produced was

12  legitimate and look further to why there was such

13  obstruction on his part to provide any orders to me

14  when he went.

15      Q.  Do you know whether or not he had any written

16  orders?

17      A.  Do not.  I can assume that he didn't or he

18  would have provided them voluntarily.

19      Q.  Have you received any training from American

20  Airlines concerning whether or not a USERRA service

21  member needs to present written orders?

22      A.  Not any extensive training, no.  We rely

23  heavily upon labor and legal within American Airlines

24  as managers to help shepherd us through processes like

25  that.

1      Q.  What motive do you suspect that Mr. Patterson

2   would have for giving you a concocted LES?

3      A.  That I would hopefully just leave it alone and

4   go away or possibly not knowing the intricate details

5   of what an LES looks like.  There are many people that

6   aren't military who don't serve in the Air National

7   Guard or Reserve within American Airlines that don't

8   know what these things look like and know how to read

9   them or what they mean.

10     Q.  So were you suspicious that Mr. Patterson had

11  gone to the beach or something?

12     A.  Not at all.

13     Q.  Instead of military duty?

14     A.  I was not.  I was suspicious that he used his

15  military in Washington as an avenue to get out of

16  flying with Captain Harlow when he wasn't requested or

17  being asked to come to his military unit.

18     Q.  Well, under USERRA, do you know whether or

19  not that would have mattered?

20         MR. MORALES:  Objection, legal conclusion.

21     A.  The timing of it was quite suspect on my part

22  when just two hours -- three hours before Captain

23  Harlow called, he was on the trip with no mention of

24  any military duty and then Captain Harlow shows up as

25  his captain on his trip and then now Scott Patterson is

1  attempting, in my opinion, to find any way to get out

2  of that trip.

3       Q.  Did you suspect that you were going to catch

4  Mr. Patterson in a lie?

5       A.  I had no expectations other than him providing

6  me orders of why he was on military duty.  That's the

7  only expectation that I had.

8       Q.  If you had caught him lying about this, would

9  that have given you reason to fire him?

10          MR. MORALES:  Objection, speculation.

11      A.  It wouldn't be up to me whether him to be

12  terminated.  And it would be labor and legal that would

13  take it from there.

14      Q.  Do you know when Mr. Patterson had called the

15  flight office to notify you that he was going on duty?

16      A.  It was sometime in the afternoon.  From the

17  conversation I had with Chip Harlow, it was after Chip

18  Harlow was placed on the trip.

19      Q.  What time of day was this?

20      A.  It would be midafternoon, possibly anywhere

21  from 2:00 or maybe 1:00 to 3:00 Eastern Time.

22      Q.  Had you ever asked anybody else who was going

23  on Reserve or Guard duty to show you their orders?

24      A.  No.

25      Q.  When you went on Guard duty, did you furnish

1   American Airlines with your orders?

2       A.  I had them available upon request.

3       Q.  The question is, sir, did you show them to

4   anybody?

5       A.  At some point -- I can't recall.  I don't

6   recall.

7       Q.  Did you think that asking Mr. Patterson for

8   the records was a way to get him to hang himself on

9   providing false information?

10      A.  That might not have been my attempt, but it

11  could have been, but the idea that I wanted his

12  information was for him to provide the reason he didn't

13  want to fly that trip with Chip Harlow.  And if he had

14  provided the orders, then it would have been over and

15  done with.

16      Q.  Did he provide the orders that you don't know

17  that he had?

18      A.  I never saw any orders from him.  The only

19  thing I received from him was after a few requests a

20  redacted LES.

21      Q.  You had told Mr. Patterson you did not wish

22  him to go; correct?

23      A.  I didn't hear you.  Say the question again,

24  please.

25      Q.  You had told Mr. Patterson that you did not

1   wish him to go; correct?

2      A.  What I told him was he had requested an EO and

3   I told him in a voicemail -- I never spoke with

4   Patterson personally.  He never called me back.  I told

5   him that because requesting an EO, we were really short

6   on manning, and that -- that I needed him to fly.

7      Q.  And, instead, he went to Washington?

8      A.  I'm missing the first part of your question.

9   What was the first part of it?

10      Q.  And instead of flying as you wished him to

11   do, he went to Washington?

12      A.  Yes.  That's true.

13      Q.  To do his duty as a United States Army

14   lieutenant colonel?

15      A.  Yes.

16      Q.  And you were not happy that he went to

17   Washington that day, were you?

18      A.  I personally -- that wasn't my concern.  I

19   support all military people in the service of their

20   country, and that's not the issue.  The issue is that I

21   didn't feel that he was being forthright and honest by

22   getting off that trip with Captain Harlow.  That was my

23   concern.  And he could easily have been handled by --

24   and taken my phone call and not be an obstruction to my

25   questions, and, Captain Bonds, here's my orders coming

1  to you right away, sorry for the trouble.  That's not
2  what happened.  I felt that he was hiding something
3  and -- and, quite honestly, it bothered me tremendously
4  that he is a sworn officer in the military that -- the
5  pillars of honor and integrity, and I didn't feel he
6  was upholding those pillars.

7         Q.  Well, did you not on believe that he was on
8  duty that day?

9         A.  I'm sorry, it was a bit distorted.  Did I not
10  leave what?

11         Q.  Did you not believe that Mr. Patterson was on
12  duty that day and was then a colonel in United States
13  Army reserve?

14         A.  No, I did believe that he went to Washington
15  and served in some capacity with his military unit.
16  That was not ever a question in my mind that he was
17  there.

18         Q.  Well, if there was no question that he was
19  there, whether he was there because he did not wish to
20  fly with Captain Harlow or not, what does that matter?

21         A.  It mattered the process because he
22  circumnavigated the process, his supervisor, to begin
23  with.  He never called me.  He went through staff
24  assistance to get off what I appeared to be a trip that
25  he did not want to fly because of the person he was

1   flying with.  And he didn't want to talk to me about

2   it.  So he didn't call me and didn't return my phone

3   calls.  He knew that I was leaving, or the office would

4   be closed and I felt that he was being dishonest and

5   circumnavigated the system to call the chief pilot on

6   duty who knew nothing of him going through the office

7   or any other circumstance.  He presented it to David

8   Tatum as the chief pilot on duty, this just happened,

9   and let me go serve my country proudly and thank you

10  very much, in which I don't think was the case.

11      Q.  Did you not get a message from your office

12  staff that Mr. Patterson had called you?

13      A.  I did, and I called him, asked him to return my

14  call, which he did not.

15      Q.  So he had called you previously?

16      A.  He called the office.  He never asked to speak

17  with me, as far as I know.

18      Q.  Well, who in the office is authorized to

19  issue EOs?

20      A.  Technically, only the chief pilot is where the

21  seniors --

22      Q.  And how many chief pilots were on duty that

23  day?

24      A.  I'm not sure if the timing of it was such that

25  Kevin Mase was a chief pilot at that point.  But if so,

1    I don't know who was there.  One of the reasons that we

2    were very thin on chief pilots and chief pilots have

3    other duties and responsibilities in Dallas for

4    meetings within the hub and also flying to keep our

5    proficiency up.  So we were spread quite thin a lot of

6    the time.  So I don't know who was on duty.  It's not

7    like punching a time clock.  Whomever is there is

8    there.

9         Q.  Were you in the office that day when he

10   called?

11        A.  I was.

12        Q.  Do you know why he was not put through?

13        A.  I do not know.  I could have been on the phone

14   with someone else or in a meeting with someone else.

15        Q.  Give the witness Exhibit 9, please.

16             MR. MORALES:  Bill, are we skipping 8?

17             MR. AMLONG:  No.  Give him Exhibit 8, please.

18        A.  Okay.

19        Q.  So why did you say, quote, maybe hang himself

20   in providing false information, closed quote?

21        A.  Not looking for any reason other than maybe

22   he's not being truthful.

23        Q.  Well, what were you going to do if he hung

24   himself on providing false information?

25        A.  I can tell you what I would like to have done,

1  and that would be to have a conversation with him and

2  talk to him about officership and say this is not the

3  way that officers do, we are held to a higher standard.

4  Honesty and integrity is first and foremost, and

5  hopefully that -- I would have liked to have that

6  conversation with him.  And he makes all in being

7  dishonest or lack of integrity, it takes the image of

8  all officers and, hopefully, that I would be able to

9  re-center him, and that would be my goal to get him to

10  where we could get him re-centered and focused and fall

11  into the fold of how the rest of us were -- most of our

12  pilots and most of our chiefs are all military.  So we

13  understand those pillars and those premises.

14      Q.  Mr. Patterson outranked you, did he not?

15      A.  Yes, in the military.

16      Q.  So one could assume that Mr. Patterson was

17  more familiar with the quality required of an officer

18  and a general than you?

19          MR. MORALES:  Objection.

20      Q.  At least as --

21          MR. MORALES:  Objection, speculation.

22      A.  The basic entry requirements and commissioning

23  of an officer for a general to a first lieutenant or

24  second lieutenant are all the same.

25      Q.  Did you see this issue with the LES as a way

1  of getting rid of Mr. Patterson?

2      A.  That wasn't my intent at all.  The way I saw

3  this LES was -- to be honest with you, it's a lot of

4  drama.  I wanted him to produce orders and I'd say,

5  thank you, Scott, very much, and we'll be on our way.

6  But he didn't produce that.  And then when I saw that

7  his LES was a copy of a copy and -- it just concerned

8  me.  And when I asked Scott in September, please

9  provide those orders, it could have been over and done

10  with, and we would have never been speaking of this.

11      Q.  But isn't this the same Scott Patterson of

12  whom you had said on September 6th, "I think we all

13  need to confer and convince labor that this dude needs

14  a Section 20 ASAP"?

15      A.  Same person.  Completely different

16  circumstance.  These are two completely different

17  issues and the two -- the two are completely divergent

18  from the other.  They're two separate issues.

19      Q.  Look at Exhibit 9 please.  Do you recognize

20  that as an e-mail that Mr. Scialfa sent to you at 2:07

21  on October 30th?

22      A.  I see that.

23      Q.  And do you know what he was referring to when

24  he states, I would prefer to pursue this avenue rather

25  than Section 20 for now, closed quote?

1       A.  I can't speak for him.  I don't know what he's

2   referring to there.

3       Q.  But what did you understand it to mean?

4       A.  That he -- I understood this that he would

5   rather look at not going a Section 20 route and looking

6   at the LES and the lack of presenting orders.

7       Q.  For what purpose?

8       A.  I don't -- I don't know that.  You'd have to

9   ask him.

10      Q.  Look at Exhibit 10.

11      A.  Okay.

12      Q.  Do you recognize that as an e-mail to

13  Mr. Scialfa and to you --

14      A.  I do recognize it.

15      Q.  -- copied to --

16      A.  I do --

17      Q.  -- Brian Beach?

18      A.  I don't remember it, but I do recognize it as

19  such.

20      Q.  Were you aware that there was a USERRA issue

21  on the table there?

22      A.  Yes, I was.

23      Q.  Look at Exhibit 11.

24      A.  Okay.

25      Q.  Do you recognize that e-mail from Mr. Scialfa

1  to Mr. Cronin and copied to you and Mr. Beach?

2      A.  I recognize it.  I don't remember this, but I

3  do recognize it as such.

4      Q.  Do you know what this part refers to:  Well,

5  let's have Carver and legal take over this part,

6  closed quote?

7      A.  I don't know what that is in reference to.

8  It -- I don't know that.

9      Q.  Do you know what answers they should have by

10  now?

11      A.  I don't know what that is in reference to

12  either.

13      Q.  Did you have any verbal conversations with

14  Mr. Scialfa or Mr. Cronin concerning this issue?

15      A.  I'm sure we did.  I don't recall them, but I

16  would only assume that we attempted to communicate

17  openly amongst each other.  So I can only assume we had

18  conversations, but any timing and such details, I can't

19  help you.

20      Q.  Did you involve somebody named Vince in this

21  inquiry?

22      A.  Vince is AA legal.

23      Q.  What's Vince's last name?

24      A.  Carver.  Carter or Carver.

25      Q.  Do you know whether or not Mr. Carver is in

1    the Reserves or the Guard?

2         A.   I do not know that.

3         Q.   Who is Mitch Hanson?

4         A.   Mitch Hanson is a guy on the pilot

5    professional standards committee that is a reservist

6    and a commander of a unit in Florida.

7         Q.   In the Air Force?

8         A.   Yes, I -- yes.  Air Force, I think, yes.

9         Q.   And what does LES stand for?

10        A.   Leave and earning statement.

11        Q.   I'm sorry?

12        A.   Leave and earning statement.

13        Q.   And is there a different form for the Air

14   Force or the Mississippi Air National Guard than there

15   is for the Army?

16        A.   The LES that Patterson provided for me looks

17   identical to mine in the Air Force and the Air National

18   Guard.

19        Q.   Look at Exhibit 12.  Do you recognize the

20   e-mail from you to Mr. Carver?

21        A.   I'm not finished reading.  If you'll give me

22   just a second, please.

23             Okay.  What was your question?

24        Q.   Do you recognize the e-mail from you to

25   Vince?

1      A.  I do recognize that.

2      Q.  And is Mitch Hanson a -- is he a captain or a

3   first officer?

4          MR. MORALES:  And I'm going to object to the

5   extent this gets into the actual discussions with Vince

6   as privileged communications.

7      A.  He was a first officer at the time.  I don't

8   know if's he a captain now.

9      Q.  And you figure that Mitch Hanson has an LES

10  that, quote, looks exactly like my LES, closed quote.

11  Are you insinuating that Mr. Patterson's LES was

12  different than yours?

13     A.  Yes, it did.  It's a copy of a copy and there

14  were -- it looked like he made a copy and some things

15  were changed or something.  It just wasn't a clean copy

16  and -- and if I remember correctly too, on the top of

17  the LES, I don't know what exhibit it was, but what

18  struck me odd is that he had just one weekend of drill

19  period, but then he gets $4,000 of pay for that, which

20  I thought was exorbitant for his rank which is very

21  similar to mine, where I would be getting $800 for a

22  drill period, not 4,000.  So I kind of -- didn't seem

23  normal to me.

24     Q.  You were only asking him for the document,

25  his whereabouts --

1    A.   Right.

2    Q.   -- during the 22nd through the 25th; correct?

3    A.   But you asked me what my concerns about were

4    the authenticity of the document itself, and that's one

5    thing that stood out is that he was gone for that two

6    week -- that one 2-day drill period, and to be

7    compensated $4,000 for that just seemed out of the

8    ordinary.

9    Q.   Look at Exhibit 13.

10   A.   Okay.

11   Q.   Do you recognize that as an e-mail from you

12   to Mr. Patterson?

13   A.   I do recognize that.

14   Q.   Do you remember sending it?

15   A.   I don't.

16   Q.   Did you consider the issue closed --

17   A.   I did.

18   Q.   -- on November 4th?

19   A.   I did.

20   Q.   What made you finally decide that the issues

21   were closed?

22   A.   That there was -- he provided documentation,

23   although, it was quite tardy, but he provided what I

24   asked him for.  And the issue of him not having done

25   so, like I had asked him to, he did and the timeliness

1  of it was questioned.  And I think that I'm trying to

2  ease his mind that it's over and done with, not to

3  worry anymore, that it's closed.

4      Q.  You wanted to ease his mind?

5      A.  Yeah, I did.  Just he -- if my supervisor sent

6  me a letter saying I need you to do this, I need you to

7  do that, do this for me please, then there's a reason

8  for that.  And for some reason my supervisor wasn't

9  happy with something that I had said or done.  And as

10  human nature, I would want to know that I was in the

11  clear and that my supervisor was satisfied with the

12  things I provided and that I was once again in good

13  graces with my supervisor.  That's why I would do that.

14  I was just trying to be nice.

15      Q.  Why is Trish Kennedy copied on this?

16      A.  Who?  Oh, okay.  I see that, Trish Kennedy.

17  Maybe because she's in legal and it closes her books as

18  well for her not to have this pending.  And I don't

19  know if this is a reply or I created this, I don't know

20  that.

21          MR. MORALES:  It appears the top half of this

22  document is blank as well, potentially a redaction.  It

23  doesn't have a Bates number.

24      Q.  You said you wanted to ease his mind, but you

25  had -- you had put him on paid withheld status during

1    the time he was on duty; correct?

2         A.  I think I signed a letter, but it had nothing

3    to do with his military.  The pay withheld letter that

4    I wrote and signed was in conjunction with something

5    else, with the other issue that was going on with him.

6    He was never pay withheld status because of this

7    military issue that we're talking about.

8         Q.  How did he come to get into paid withheld

9    status?

10        A.  That's pretty broad.  I can tell you I know

11   that I signed a letter for being -- for putting him on

12   PW and that could easily be because I was the only one

13   in the office at the time.  And labor -- and legal

14   basically draft that form up and we send the letter

15   from the chief pilot's office to APA and to the

16   employee, but the chief pilots aren't operating

17   autonomously on pay withholds.

18        Q.  What prompted Mr. Patterson being put on paid

19   withheld?

20        A.  You know what, I apologize, I don't know

21   exactly which pay withheld you're talking about

22   specifically.  I know there was --

23        Q.  The one that started September -- the one

24   that started September 22nd?

25             MR. MORALES:  Objection.  It assumes facts not

1  in evidence.

2      A.  I can tell you I did -- as far as I know and

3  as far as I had anything to do with, he was not on pay

4  withhold status for the military question of providing

5  orders for his absence.  He never was put on pay

6  withhold for that.

7      Q.  You put him on pay withheld status during the

8  time that he was in Washington, D.C., on duty;

9  correct?

10      A.  I don't know the timing of that.

11      Q.  All right.  Well --

12      A.  We have -- we would have a pay withhold letter

13  that would have the date on it and the circumstance for

14  why he was being pay withheld.  I don't have those

15  documents.

16      Q.  Well, the date -- the date of his service was

17  September 22nd through September 25th; correct?  Take

18  a look at Exhibit 7.

19      A.  That is -- you're in reference to the date of

20  his military duty in Washington; correct?

21      Q.  Yes.

22      A.  Okay.

23      Q.  Yes.

24      A.  I'll look at LES.  I see that he -- his LES

25  says that he is doing military duty for the 22nd and

1   23rd or that he did military duty then.

2       Q.  His LES shows him on duty through

3   September 25th, does it not?

4       A.  It shows -- yes, it does.

5       Q.  Take a look, please, as Exhibit 14.

6       A.  Okay.

7       Q.  This is an e-mail that's addressed to

8   Mr. Beach from Mr. Whitehouse.  Have you ever seen a

9   copy of this before?

10      A.  I have not.

11      Q.  Take a look at Exhibit 15, please.

12      A.  Do you want me to read all of this?

13      Q.  Well, have you ever seen this letter before?

14      A.  I'm reading it further.  It looks very similar

15  to that first exhibit you gave me from Whitehouse, but

16  I'll have to read it further, but --

17      Q.  Well, the second paragraph says, "Below is a

18  rewritten statement of facts and opinion I wrote last

19  year after my trip on October 7, 2015, for APA

20  professional standards.  I cleaned up grammar and

21  spelling issues."

22      A.  It looks very familiar to what we read

23  earlier.

24      Q.  All right.  Prior to reading Exhibit 1

25  earlier, have you ever seen this letter before?

1    A.  I don't know if I've seen an exact letter like

2  this.  I have seen stories, I don't know if it's a

3  letter, but it's very possible.  I don't know if I have

4  or haven't.

5    Q.  Now, were you in Florida at the time?

6    A.  Question was, was I in Tulsa?

7    Q.  The 24th -- no were you in Florida?  Florida,

8  here, this state.

9    A.  Before this?

10   Q.  On September 24th.

11   A.  I don't know where I was on September 24th.  I

12 guess -- is this the date that Scott Patterson was

13 doing military duty?  I guess I was.  I don't know.

14   Q.  Yes.

15   A.  Okay.

16   Q.  The -- what is the time stamp on

17 Mr. Whitehouse's e-mail to Mr. Beach in closing the

18 letter?

19   A.  Give me a second.

20     MR. MORALES:  Is there a particular page we

21 should be looking at?

22     MR. AMLONG:  Yeah.  Exhibit 14, the very top.

23   A.  They're the same date.  At least --

24   Q.  What's the time?

25   A.  The time stamp is 8:34 p.m.

1      Q.  And look at Exhibit 16 and tell us what that
2   is.
3      A.  It says it's 10:17 on the 24th of September.
4      Q.  And it's from you to --
5      A.  The Miami chief pilots.
6      Q.  -- Mr. Scialfa, Beach, and Mase; correct?
7      A.  Correct.
8      Q.  And it's to --
9      A.  What was the question again?  What is --
10     Q.  What's the subject?
11     A.  Patterson is now on PW.
12     Q.  That refers to Scott Patterson?
13     A.  Yes.
14     Q.  And does this e-mail refresh your memory as
15  to whether or not you had seen Mr. Whitehouse's letter
16  to Mr. Beach --
17     A.  No, it doesn't.
18     Q.  -- that evening?
19     A.  Doesn't one way or the other refresh my
20  memory.
21     Q.  The first line says, "Jackie, Mark, and
22  Lucretia all have seen the letter and are taking
23  action."  Who's Jackie?
24     A.  Jackie is the managing director of HR at
25  American Airlines, Jackie Rios.

1      Q.  The managing director of what?

2      A.  Of HR, I think.  I'm sorry, I don't know her

3   title.  But her name is or was Jackie Rios.  And Mark

4   is Mark Cronin and Lucretia is AA legal.

5      Q.  And when you say all have seen the letter and

6   are taking action, what is the letter to which you

7   refer?

8      A.  I really don't know.  I really don't.  I don't

9   remember even writing this letter, so --

10      Q.  And then the -- this is written like an hour

11   and a half after Mr. Whitehouse transmitted Exhibit 15

12   to Mr. Beach; correct?

13      A.  I don't know when he transmitted it.  I just

14   see it was dated -- I mean, on the -- yeah, Exhibit 14,

15   yeah, but I'm not in on that letter.  I know nothing of

16   that.

17      Q.  So you don't think that -- you don't think

18   that letter has anything to do with your records to,

19   quote, the letter, closed quote, in Exhibit 16; is

20   that what you're saying?

21      A.  I really don't know what it's in reference to,

22   if it's this letter from Whitehouse or his HR complaint

23   or what it's to.  I really -- I don't know that.  It's

24   possible.  I don't know.

25      Q.  Well, let's look at Exhibit 17.  Do you

1    recognize that letter?

2            MR. MORALES:  Bill, can I ask if the

3    attachment document in Exhibit C, is that the

4    Exhibit 17?  Exhibit 16 shows attachments

5    Patterson.docx.  I'm just wondering if you will

6    represent 17 is this document.

7            MR. AMLONG:  Hold on a second.  All right.  14

8    and 15 are Bates stamped 568 and then 569.  The

9    Whitehouse letter goes through 580 is the last page of

10   that, and then Mr. Bonds e-mail to Scialfa, Beach, and

11   Mase is -- and CC to Whitehouse is 581.  This is 408.

12   So it wasn't -- these are your Bates numbers.

13           MR. MORALES:  Okay.

14           MR. AMLONG:  Let me see.

15           MR. MORALES:  So if you have 582 of our

16   production, it appears to be Exhibit 15, if that's

17   helpful.

18           MR. AMLONG:  Hold on.  Well, 582 or 15 is --

19   15 goes through 580 and then 581 is next.  Then the

20   next documents are -- the next documents are

21   privileged.

22           MR. MORALES:  So Bates stamp document 582 in

23   our production is the Exhibit 15, the Whitehouse

24   letter.

25           MR. AMLONG:  Yes.

1           MR. MORALES:  Right.

2           MR. AMLONG:  We sent you copies of these, did

3     we not.

4           MR. MORALES:  Of the exhibits?

5           MR. AMLONG:  Yes.

6           MR. MORALES:  No.  We just have paper copies,

7     I think.  But I just -- I didn't know if that was

8     helpful.  We saw Patterson.docx on Exhibit 16, so --

9           MR. AMLONG:  The -- this appears to be the

10    letter attached to the letter from -- the e-mail from

11    Rojas to Cronin, Bonds, Mase, and Scialfa; subject,

12    withhold from service, FO Rodney Scott Patterson; good

13    morning, please reference these documents where the

14    letter accepted this afternoon by Rodney Scott

15    Patterson.  So -- and I can't tell that's docx.

16          MR. MORALES:  I'm not sure, were you speaking

17    to me or to Mr. Bonds?  I'm not sure we followed your

18    last statement.

19          MR. AMLONG:  I was speaking to you.  The --

20    whatever comes after -- whatever comes after 16 or 17

21    is privileged, so I don't have that.

22          BY MR. AMLONG:

23      Q.  The -- do you recognize that letter,

24    Mr. Bonds?

25      A.  I do recognize Exhibit 17.

1    Q.  And do you remember sending it?

2    A.  I do not remember sending it, but it's a

3  standard form, PW, pay withhold letter that we sent.

4  We just changed -- just changed the names and the date

5  and the circumstance, and that's it.

6    Q.  And it refers to a work environment

7  complaint.  Is the work environment complaint the

8  letter from Mr. Whitehouse?

9    A.  I don't know that.  And if you'll allow me to

10  explain myself.  As chief pilots, we have the ability

11  to sign the letter to represent the flight office, and

12  I don't know if that's the letter.  And I was single at

13  the time living in Miami and the other chiefs were

14  married with families.  And quite often issues would

15  arise after hours or during hours, and I would get the

16  call by default because they knew that I was at home by

17  myself.  So this letter was signed by me and it looks

18  like the standard form letter that I sent to Luis or

19  had Luis prepare for my signature and sent out FedEx.

20    Q.  It states, "As discussed on September 24,

21  2015," what was discussed and with whom on

22  September 24th?

23    A.  I can't recall if the discussion was with me,

24  Scott Patterson or Brian Beach or what.  I can't recall

25  that.

1      Q.  When did you first inform Mr. Patterson that

2    he was on paid withheld status?

3      A.  I don't know that exact answer.  I do know

4    that we overnight these letters from the flight office

5    and we make a phone call to speak with the pilot to

6    advise them and, basically, we read this to them.  Most

7    of the time these pilots don't answer their phone and

8    we speak to the voicemail.  So I don't recall whether

9    I -- if I called, Brian Beach called.

10     Q.  Look at Exhibit 18, please, and tell me what

11   that is.

12     A.  I'm sorry, you asked me to do I know what

13   Exhibit 18 is?

14     Q.  Yes.

15     A.  This is referred to with management as a

16   display four or an HI-10 for line pilots that

17   references the computer for American Airlines to look

18   at your comments if you're on leaves, sick leave,

19   basically a history of accountability to where the

20   employee is.

21     Q.  What does UNCRML OA mean?

22     A.  That is uncredited military leave of absence.

23     Q.  What does uncredited mean?

24     A.  I'll have to go back and just back of my

25   memory banks for a long time ago, but I think it's

1   contractual language about pay.  And I think that when

2   you use that X code that you are unpaid and uncredited

3   for your month of work and, basically, you're on your

4   own to make that time back up in order to get paid.

5   The ML code is military leave and that is Title 10 time

6   or things that -- that where you are given that time

7   off for your two weeks or something like that, but

8   they're just pay codes of how they are paid differently

9   for military leave of absences.

10       Q.  What does pay withheld mean?

11       A.  That is a PW, pay withheld.  That means that

12   the employee is withheld from service with pay pending

13   discussion, notification, or hearing, or something

14   along those lines.

15       Q.  What is a Section 21 hearing?

16       A.  Section 21 hearing is the chapter of the APA

17   agreement with American Airlines.  It gives guidelines

18   for disciplinary inquiries, formal questioning, but

19   it's not dealing with any medical.  It's dealing with

20   other issues, fact-finding is the intent.  It's not

21   necessarily a hearing.  It's more of a formal

22   discussion.

23       Q.  Look at Exhibits 19 and 20.  Tell me if you

24   recognize them.

25       A.  I do recognize these.

1    Q.  What's 19 and what's 20?

2    A.  19 is a notice of a Section 21 hearing and 20

3  is a letter from the APA and everyone involved for

4  another hearing notice for a different date.

5    Q.  Did you attend the Section 21 hearing?

6    A.  I attended the second Section 21.  I don't

7  know if the first one happened on Exhibit 19, I don't

8  know if that actually happened or not, but the second

9  one, I did attend the hearing as a witness and that was

10 in the Miami flight office with Brian Beach and Anna

11 Burke-Leon.

12   Q.  What happened at the hearing?

13   A.  You know what, I'll have to retract that.  I

14 did not attend that hearing.  I attended the HR hearing

15 with First Officer Flannigan but not with Scott

16 Patterson.  I did not attend either one of those.

17   Q.  Well, was this hearing into Officer's

18 Flannigan's -- First Officer Flannigan's behavior?

19   A.  No, it was not.  It was in -- he was a witness

20 to the workplace environment issue of Patterson saying

21 racial slurs and some other issues that Scott had been

22 accused of.

23   Q.  Well, actually he was the witness to

24 Mr. Patterson not using racial slurs; correct?

25   A.  That's what he said.  He said he did not

1    personally see it or witness it is what he said in his

2    testimony.

3        Q.  Did -- why are all the names redacted in the

4    attachment to the hearing notice?

5        A.  Do you have an exhibit number for me?

6        Q.  Yes, 20.

7        A.  20?

8        Q.  Yes.

9        A.  I don't see names redacted in the hearing

10   notice.  All I see is Brian Beach's signature to Scott

11   Patterson.

12       Q.  I'm talking after the agreement, attachments

13   of the hearing notice, is there not?

14       A.  Is this where it says complaint and it's dated

15   24 September 2015, Captain Brian Beach?

16       Q.  Exhibit 20 should go from page 97

17   through 122.

18            MR. MORALES:  And just for your reference, our

19   copy doesn't have the Bates numbers on them.  So that's

20   one reason why that reference may be a little confusing

21   on our end.  I think we're looking at the same

22   document, but we don't have the Bates numbers.

23            MR. AMLONG:  What I'm looking at is an e-mail

24   from Brian Beach to Anna Burke-Leon attaching a

25   November 13th notice of hearing and then attaching a

1    redacted September 24th letter and several others.

2        A.  I don't have any idea who redacted them or

3    what they are because this is from Brian Beach to Anna

4    Burke-Leon, the HR representative for Miami.  So I'm

5    unaware of what this is.  I haven't -- I didn't see

6    these attachments.  As far as I know, Brian sent this

7    whole package to Anna.

8        Q.  Were you involved in any of the witness

9    interviews other than that of First Officer Flannigan?

10       A.  No.

11       Q.  Did anyone tell you whether or not any of the

12   witnesses named by Mr. Whitehouse corroborated

13   anything that Mr. Whitehouse said?

14       A.  I don't remember any of that.

15       Q.  Do you know what the conclusion of Section 21

16   hearing was?

17       A.  I do not.  I do not remember what the

18   conclusion was.

19       Q.  Let me ask you to take a look at Plaintiff's

20   Exhibit 21.

21       A.  Okay.

22       Q.  Do you recognize that?

23       A.  I don't -- I've never seen it before.

24       Q.  You've never seen an e-mail to you from Brian

25   Beach?

1    A.   It's not from me.  It's from -- to Brian.

2    Q.   It's from Brian Beach to James Bonds.

3    A.   Right.  And "Junk, can you call me please?

4  Brian."  But I've never seen this e-mail.

5    Q.   Do you recall discussing with Mr. Beach the

6  Article 7 allegations against Mr. Whitehouse?

7    A.   Possibly.  I don't recall any details of it.

8  It's very possible that we did talk about it at some

9  point, but the rest of it, I don't remember.

10    Q.   Look at Exhibit 22, the top message, and see

11  if that refreshes your memory.  First of all, do you

12  recognize this as an e-mail to you from Brian Beach --

13    A.   I haven't seen it.  Give me just a minute.

14    Q.   -- response --

15    A.   It's the same letter.  I just ask what time is

16  he available.

17    Q.   Do you recognize it as an e-mail that you

18  sent?

19    A.   I do recognize it.  I don't remember the

20  circumstances nor the outcome of our discussion.

21    Q.   Look at Exhibit 23 and tell me if you

22  recognize that.

23    A.   I recognize my signature, but this is a form

24  letter right from labor, Michelle Montgomery's office,

25  to us to fill in the blanks.  So I signed it.

1       Q.  Well, it says, "Due to my concerns regarding

2    your ability to safely operate an aircraft, I have

3    arranged for you to participate in medical evaluation

4    as provided in section 20 of the JCBA."  Does "my" and

5    "I" refer to you?

6       A.  I think it's semantics there.  Anyone in our

7    office could have signed that, and it probably would

8    have been the same exact opening paragraph.  Those are

9    kind of form letters that any of the chief pilots sign,

10   but, you know, yes, I signed it.

11      Q.  Tell me what concerns -- tell me what

12   concerns, if any, you had about Mr. Patterson's

13   ability to safely operate an aircraft?

14      A.  Well, if it was up to me and I had written

15   this personally, I would have said we and not my and I

16   because this is a collective -- a collective process

17   through labor, legal, and the flight office.  In this

18   case, we're just delivering the news.  That's all I'm

19   doing, delivering the message.

20      Q.  Well, what you're -- you are the person who

21   on September 6th -- you're the person who stated, "I

22   think we all need to confer and then convince labor

23   that this dude needs a Section 20 ASAP;" correct?

24      A.  I did say that in an e-mail, yes.

25      Q.  So whether it may have been collective or

1  not, I will let you know what concerns -- what

2  concerns you did to the collective considering that

3  there was a question that Mr. Patterson's ability to

4  safely operate an airplane?

5      A.  Well, I can only think that my concerns are

6  the same as everyone else.  And labor and legal and the

7  flight office with Mark Cronin all the way down to all

8  of us at the flight office, that with all the

9  circumstances and things surrounding the letters that

10 Brian Beach and others had received that there was an

11 issue, and let the evaluation process and the

12 Section 20 determine if there was an issue.

13         MR. AMLONG:  Read that answer back to me,

14 please.

15          (The reporter read the last answer.)

16         BY MR. AMLONG:

17     Q.  I want to know what facts and circumstances

18 you are saying gave rise to the concern regarding

19 Mr. Patterson's ability to safely operate an aircraft,

20 you personally?

21     A.  I obviously -- I missed the question.  I

22 apologize.

23         MR. AMLONG:  Read it back please.

24         (The reporter read the last question.)

25     A.  My personal are only what I have heard from

1  professional standards and from Brian Beach.  I did not

2  have personal contact with Scott Patterson concerning

3  any of those issues.

4      Q.  So you have no personal knowledge of any

5  facts or circumstances that would give rise to

6  concerns regarding Mr. Patterson's ability to safely

7  operate an aircraft; correct?

8      A.  None personally other than being told from

9  Brian Beach and APA professional standard members.

10     Q.  Which APA professional standards members --

11     A.  Chip Harlow.

12     Q.  -- told you these facts?

13     A.  Chip Harlow and Sammy Odeh.

14     Q.  And tell me what Chip Harlow told you and

15  tell me what Sammy Odeh told you?

16     A.  That he was unstable mentally and that a lot

17  of pilots had come to them requesting not to fly with

18  him and they had concerns about his fitness of duty.

19     Q.  Which pilots did not wish to fly with

20  Mr. Patterson?

21     A.  Obviously, Captain Whitehouse is one.

22     Q.  Okay.  Other than Captain Whitehouse, who is

23  also in Mr. Patterson's no pair list?

24     A.  I don't know who --

25     Q.  Anybody else?

1      A.   I do not know that.

2      Q.   What's a no pair list?

3      A.   It's a do not pair list and it's a request

4   through APA and the company that a first officer may

5   request not to fly with a certain captain due to

6   personality conflicts that may contribute to the safe

7   operation of the airplane.  The captains actually do

8   not have that ability.

9      Q.   Why do captains not have that ability?

10      A.   Because it's the captain's airplane and it

11   should be run the way he wants it to be run.

12      Q.   So a captain can't say I don't want First

13   Officer Smith to be on his flight?

14      A.   He -- that's correct.  It's incumbent upon

15   that captain to fix that situation himself within the

16   cockpit on a professional level or have himself

17   removed, and I have done that as a chief pilot before.

18   I've removed a captain without pay just so -- because

19   he had issues flying with certain first officers.

20      Q.   Well, if a first officer isn't flying on a

21   flight, he's not being paid either; correct?

22      A.   That's correct.

23      Q.   So both first officers and captains have the

24   ability to say I don't want to fly with this guy for

25   now?

1    A.  The first officer's process is made well-known

2    months in advance and upon bidding for your next

3    month's trips, you put in the remarks on your bid

4    preference as you submit it electronically and you

5    would put do not pair with captain whatever and his

6    employee number.  And when the bids run electronically,

7    it stops the person that looks -- will stop and looks,

8    who he's paired with, is the captain on this trip, yes

9    or no, and if he is, then he's passed to the next line

10   over.  So that's how the process works.  The captains

11   don't have that ability to do that.

12       Q.  Tell me any captain with whom you are aware

13   who did not -- other than Mr. Whitehouse, who did not

14   wish to fly with Mr. Patterson as his first officer?

15       A.  None of them told me personally, any of them.

16   But I can only assume there are a few and they've all

17   come out in this deposition.  Their names have all been

18   read in this deposition.

19       Q.  Other than what you say Mr. Odeh and

20   Mr. Harlow told you, what else do you have that gives

21   you concern about Mr. Patterson's ability to operate

22   an aircraft safely?

23           MR. MORALES:  Just object and ask if the

24   question is about the current state of mind of the

25   witness.

1      Q.  What he knew or knows or knew?

2      A.  I personally knew nothing other than what I

3  was told by those pilots, that there were concerns

4  about his mental capacity to operate airplanes.  His

5  behavior was --

6      Q.  And what have you told us?

7      A.  In passing with the professional standards

8  people.  But -- and I would often refer them to Brian

9  Beach because I knew Brian was well-versed in what was

10  going on with Scott Patterson.  And I'm only picking up

11  the sideline pieces of it.

12      Q.  When you had to replace Mr. Patterson on the

13  flight September 22nd, did that cost American money?

14      A.  I can't answer.  I don't know that.  The

15  process -- the ship is too big for me to become into

16  the details of how to replace him on that trip.

17  There's a process that in the IOC in Dallas that crew

18  schedulers get an alert when that trip is open and

19  there's not a pilot to fill it.  Then they go through a

20  protocol to fill it either short notice or in a longer

21  notice as later tonight or if it was tomorrow's trip.

22  So they deal with that.  We don't deal with the in and

23  out working of pairings for each individual flight.

24      Q.  Well, how did you know that you were short

25  pilots when you were suggesting that Mr. Patterson not

1  takeoff that day?

2      A.  We have a manning tool that we look every

3  night and every morning that shows the manning of our

4  reserve pilots, and it says it will give us a tool, an

5  idea of where our manning was at the time for a

6  particular seat, for first officers or captains or

7  particular airplane 7576, or a particular division,

8  domestic or international.

9      Q.  Well, you did find a pilot to substitute for

10  Mr. Patterson --

11      A.  I did not.  I did not find one.  Crew

12  scheduling, that's their responsibility.  And I can

13  only assume they found one because we didn't hear of a

14  cancelation because of not being able to fill it.

15      Q.  What information was developed during the

16  human resources investigation of Mr. Patterson that

17  gave rise to any concern regarding his ability to

18  safely operate an aircraft?

19      A.  I don't know what came out of that.  I was

20  only present as a witness with First Officer Flannigan

21  and I don't know what the circumstances were following

22  that or where we went from that.  So I don't have that

23  answer.

24      Q.  When did Mr. Harlow or Mr. Odeh tell you that

25  they were concerned about Mr. Patterson?

1          A.   I don't know the exact time or date, but that

2      is in passing.  Professional standards for APA is in

3      order to keep the integrity of professional standards

4      and to keep a good relationship with the pilots and the

5      flight office of which they are somewhat of a conduit

6      between the two, they do not keep any records, and it's

7      all voice.  And just to have deniable plausibility in

8      case of things for discipline.  So they never e-mail

9      me, give me anything in writing, but they would say

10     there would be concerns about a specific pilot, and

11     it's just in passing.  Say we'd have some issues with

12     this guy and that's all it is.

13         Q.   Well, were they telling you this in 2014?

14         A.   In concerns with Scott Patterson or other

15     pilots?

16         Q.   In concerns with Mr. Scott Patterson.

17         A.   I don't remember the dates nor times, but if

18     they had concerns, they would have mentioned it to one

19     of the chief pilots, not necessarily me.  More than

20     likely, the hierarchy of how the chief pilots worked as

21     the director is in charge and then there are the chiefs

22     like myself, Brian Beach.  Brian had a unique advantage

23     because he had been at the Miami base for a very, very

24     long time, 20 plus years.  And these pilots knew Brian

25     very well.  And I had been moving around the system and

1    I was somewhat new back to the base and most of these

2    pilots to include the professional standards reps knew

3    Brian and Brian was their go-to because they had known

4    Brian for so long.  So a lot of this wasn't shared with

5    me because they shared with Brian which they had along

6    lasting relationship with.

7        Q.  What are the differences between the

8    allegations that were made in Mr. Whitehouse's

9    September 24th letter and the allegations that were

10   made in his March 24th letter?

11       A.  I'm going to have to find those.  If you can

12   give me exhibits, I can read through those.  Off the

13   top of my head, I have no idea.

14       Q.  1 and --

15       A.  20, you said?

16       Q.  No.  The numbers are Number 1 and Number 15.

17       A.  So your question is for me to look and see

18   what the differences are in these letters; is that

19   correct?

20       Q.  Yes.  Yes.

21       A.  Okay.

22           MR. MORALES:  I would just object to the

23   extent that you're asking him to just compare what's

24   evident from the face of the documents, that any

25   differences between them.

1      Q.  Why I am -- why were the concerns greater at

2    the September 24th than they were March 24th?

3      A.  I don't know that they were any greater.  They

4    all seem, to me, to be the same relevance.

5      Q.  You did not see them on paid withheld in

6    March?

7      A.  Maybe he had more information.  I -- that

8    would be a question that you will need to ask Brian

9    Beach because Brian knew more the inner workings what

10   was going on with Captain Whitehouse and Captain

11   Snelling and these other players with Scott Patterson

12   concerning these issues.  I did know about them, but

13   the details for me are I wasn't a lead in this.  So I

14   can't compare and contrast these since -- I don't know

15   the circumstances at the time.

16     Q.  Why did you not put Mr. Patterson on paid

17   withheld on September 6th when Mr. Whitehouse is

18   telling you that he was saying in public that the

19   airplane was like a time bomb?

20     A.  There had to be more to the story, and it

21   might have been that he said she said, and there had to

22   be more to it.  And I wasn't privy to everything that

23   had happened with Captain Whitehouse and Tom Snelling

24   and these flight attendants that I read in all these

25   other letters.  And I was just late coming to that

1    party.  I didn't know all the details of which were

2    going on.  I didn't know the extent of what their

3    concerns were.  And it's not always up to me to pay

4    withhold somebody immediately.  The only time that I

5    would pay withhold anybody without asking is an

6    accident or an incident or failed drug test, of which I

7    pay withhold people immediately right then.  The others

8    take investigation to ensure that there's merit to the

9    pay withhold.

10        Q.  Did you begin on September 6th to try to

11   convince labor that this dude needs a Section 20?

12        A.  My convincing was no more than anyone else's.

13   There are, obviously, some issues that were going on

14   and rather than continually drag out the drama, it

15   could be easily exonerated with Section 20, and it

16   would be over and done with.  There's no concerns about

17   his business, but that necessarily wasn't my call.  And

18   as you saw in the e-mail, let's do a Section 20, let's

19   get to the bottom of it or let's quit talking about it.

20        Q.  Did you speak to anybody about a Section 20

21   in early September?

22        A.  As in verbal communication or other than

23   written or outside the chief pilots?

24        Q.  Yes.

25        A.  Outside the chief pilots, no, not at all.

1    Q.  Take a look at Exhibit 25.

2         MR. MORALES:  You said 25?

3         MR. AMLONG:  Yes.  It's out of order.  We'll

4    come back to 24 later.

5    Q.  Have you ever seen Exhibit 25 before?

6    A.  I'll have to read it.  Give me a moment.

7         I don't know that I've read this, but I've

8    heard a little bit about those e-mails.  I don't know

9    that I've actually read them, or they were sent to me.

10   Q.  What did you hear of them -- what did you

11   hear and from whom?

12   A.  I'm hearing -- I don't know who I heard them

13   from, possibly Brian Beach or any of the professional

14   standards employees for APA.  But this is a common tone

15   and theme that what we've been talking about with the

16   extent of intimidation and firearms and things like

17   that, but I don't think this ever came to me

18   personally.

19   Q.  The date on this is March 20th; correct?

20   A.  Yes, it is.

21   Q.  Do you know whether these allegations were

22   investigated by corporate security in March --

23   A.  I do not know that.

24   Q.  -- as it's alleged?

25   A.  I do not know.

1     Q.  Do you know of any source of allegations

2  about firearms intimidation other than Mr. Whitehouse?

3     A.  And professional standards, that's it.

4     Q.  Mr. Whitehouse, Mr. Odeh, and Mr. Harlow?

5     A.  Yes.

6     Q.  Correct?

7     A.  Yes.  And possibly Brian Beach and Sean

8  Scialfa.

9     Q.  Did Mr. Beach or Mr. -- did anybody -- any of

10  those people, other than Mr. Whitehouse, claim to have

11  firsthand knowledge of any adverse behavior by

12  Mr. Patterson?

13     A.  Not to my knowledge.

14     Q.  Look at Exhibit 24 please.  Let me just

15  direct you to the paragraph 2 where it states, "As I

16  indicated during our brief telephone conversation in

17  this matter, the company has not denied FO Patterson

18  military leave or discriminating against him in any

19  manner."  And then begins, "On or about

20  September 29th, the company requested FO Patterson

21  substantiate his request for military leave before

22  September 21, 2015.  It did so because FO Patterson's

23  request for leave raised questions.  Specifically on

24  the date before said trip, FO Patterson contacted one

25  of the chief pilots in Miami and asked for an EO,

1  which is effectively a code for unanticipated personal

2  absences.  He told Captain Bonds that he wanted the EO

3  because the captain on his trip the following day was

4  a representative from APA professional standards and

5  he and the captain did not get along."

6          Is that true?

7      A.  I don't remember any conversation with Scott

8  Patterson.

9      Q.  Did you ask Mr. Patterson to see his orders?

10     A.  I asked for his orders.  I did.  I said,

11 "Would you please provide a copy of your orders."

12     Q.  So in the next paragraph --

13         MR. MORALES:  I'm just going to ask, there's

14 some highlighting here, Bill, is that highlighting that

15 you placed on there?

16         MR. AMLONG:  Yes.

17         MR. MORALES:  Okay, to Exhibit 24.  Thanks.

18         MR. AMLONG:  Yeah.

19     Q.  "It did not specify the type of verification,

20 i.e., it did not demand military orders."  So that's

21 incorrect; right?

22     A.  I'm sorry, it's a little distorted.  The

23 question was -- one more time, please.

24     Q.  Did you -- you asked for military orders;

25 correct?

1     A.  I asked him, yes.

2     Q.  For military orders?

3     A.  I did.  I asked him would he please provide

4  orders for his absence.

5     Q.  In the next paragraph it refers, "On or about

6  September 24, 2015, however, a pilot's co-worker

7  lodged a formal complaint regarding FO Patterson's

8  conduct."  And is that the same complaint that

9  Mr. Whitehouse had made in Exhibit 1, correct, in

10  March?

11     A.  I'll have to go back, but I assume that's what

12  it's in reference to.

13     Q.  You've seen both of those complaints before;

14  correct?

15     A.  Both those complaints meaning the harassment

16  complaint and --

17     Q.  Yes.

18     A.  -- and the workplace environment?

19        I have seen those.  I've heard of those.

20     Q.  And they're basically the same; correct?

21     A.  I would -- yes, I think they are.

22     Q.  What's your date of birth?

23     A.  December 11, 1961.

24     Q.  Give us a moment.  Call me on --

25        THE REPORTER:  Do you want to go off the

1    record?

2              MR. AMLONG:  Yes.

3              THE VIDEOGRAPHER:  The time now is 5:08 p.m.

4    and we are going off the record.

5         (Recess taken from 5:08 p.m. until 5:17 p.m.)

6              THE VIDEOGRAPHER:  The time now is 5:17 p.m.

7    and we're back on the record.

8              BY MR. AMLONG:

9         Q.  Do you remember, Mr. Bonds, a conversation

10   between or amongst you and Mr. Beach and Brian Vitale

11   concerning the pay withhold status on which you had

12   placed Mr. Patterson?

13        A.  I don't remember that conversation.

14        Q.  You do?

15        A.  I do not.

16        Q.  Do you remember any conversation with

17   Mr. Vitale during which either of you stated that the

18   pay withheld status involved a diverted flight to

19   Bolivia?

20        A.  I'm sorry, I don't remember the details.  I

21   have had a few conversations with Brian Vitale, but I

22   don't remember the circumstance of those conversations.

23        Q.  Did you have any conversation with

24   Dr. Ahtone, the corporate medical director of American

25   Airlines, concerning Mr. Patterson?

1      A.  I'm sorry, it was a long time ago, I don't

2  remember the specific conversations.  I might have been

3  on a conference call with Dr. Ahtone and Mark Cronin

4  and others, but I don't remember any conversation

5  personally with Dr. Ahtone about that.

6      Q.  Was the conference call about Mr. Patterson?

7      A.  I don't remember.  I just remember Dr. Ahtone

8  being on a conference call with us.  I don't remember

9  in reference to whom it might have been.

10     Q.  Have you ever had any communication with

11 Dr. Knippa, John Knippa?

12     A.  I have not.

13     Q.  Have you ever seen either the summary or full

14 report that Dr. Knippa did on Mr. Patterson?

15     A.  I had not.  I did see in the -- this lawsuit

16 that I read yesterday the report that he was found

17 unfit, but I don't -- I never got a report from

18 Dr. Knippa.

19          MR. AMLONG:  Thank you very much.

20          MR. MORALES:  One note before we go off.  We

21 request the witness have the Rule 30 option to review

22 the transcript, but no questions otherwise.

23          MR. AMLONG:  Okay.  We'll take a copy.

24          THE VIDEOGRAPHER:  The time on the monitor is

25 5:21 p.m. and we're going off to record.

1          (DEPOSITION CONCLUDED AT 5:21 P.M.)

2                 (SIGNATURE RESERVED)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF NORTH CAROLINA    )

                             )   CERTIFICATE OF TRANSCRIPT

2  COUNTY OF UNION            )

3

4          I, Christine A. Taylor, RPR, and Notary Public

5  in and for the aforesaid county and state, do hereby

6  certify that the foregoing 121 pages are an accurate

7  transcript of the deposition of JAMES N. BONDS, which

8  was reported by me, on behalf of Plaintiff, in machine

9  shorthand and transcribed by computer-aided

10 transcription.

11         I further certify that I am not financially

12 interested in the outcome of this action, a relative,

13 employee, attorney or counsel of any of the parties,

14 nor am I a relative or employee of such attorney or

15 counsel.

16         This 26th day of March 2018.

17

18

19

20

21                  Christine A. Taylor

                    Registered Professional Reporter

22                  Notary Public 19960530077

23

24

25