UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case Number:  1:17-cv-60533-JEM

RODNEY SCOTT PATTERSON,

        Plaintiff,

vs.

AMERICAN AIRLINES, INC., a
Delaware Corporation,

        Defendant.
_____/

500 Northeast Fourth Street
Fort Lauderdale, Florida
Wednesday, March 21, 2018
10:09 a.m. - 2:27 p.m.

DEPOSITION

OF

BRIAN BEACH

1            Deposition of BRIAN BEACH,

2  a witness of lawful age, taken by the Plaintiff for the

3  purpose of discovery and for use as evidence in the

4  above-entitled cause, before HEATHER VIEIRA, Shorthand

5  Reporter and Notary Public in and for the State of

6  Florida at Large, at Amlong & Amlong, P.A., 500

7  Northeast Fourth Street, Fort Lauderdale, Broward

8  County, Florida on the 21st day of March, 2018

9  commencing at 10:09 a.m.

10                 - - -

11  COUNSEL PRESENT:

12  For the Plaintiff:

13     WILLIAM R. AMLONG, ESQ.
       NOEL PACE, ESQ. (Via Telephone)
14     AMLONG & AMLONG, P.A.
       500 Northeast Fourth Street
15     Second Floor
       Fort Lauderdale, Florida 33301
16     wramlong@theamlongfirm.com

17  For the Defendant:

18     TRISTAN MORALES, ESQ.
       O'MELVENY & MYERS, LLP
19     1625 Eye Street, Northwest
       Washington, DC 20006
20     tmorales@omm.com

21  ALSO PRESENT:
   (Via Telephone)
22
     RODNEY SCOTT PATTERSON, Plaintiff
23

24

25

1                    I N D E X

2                     - - - - -

3

4            WITNESS:  BRIAN BEACH

5

6  E X A M I N A T I O N :              PAGE

7

8  BY MR.  AMLONG                        4

9

10

11  E X H I B I T S :                   PAGE

12

13  PLAINTIFF'S NO. 2A                   43

14  PLAINTIFF'S NO. 2B                   44

15  PLAINTIFF'S NO. 2C                   45

16  PLAINTIFF'S NO. 2D                   50

17

18

19

20

21  (Exhibits Were Retained By Counsel.)

22

23

24

25

1          P R O C E E D I N G S

2               - - - - -

3               BRIAN BEACH,

4  a witness named in the notice heretofore filed, being of

5  lawful age and being first duly sworn in the above

6  cause, testified on his oath as follows:

7               EXAMINATION

8  BY MR. AMLONG:

9     Q.  Please give us your full name, tell us where you

10  live, and what you do for a living.

11    A.  Brian Otto Beach, 2624 Northeast 35th Drive, Fort

12  Lauderdale, Florida.  Currently I'm the chief operating

13  officer for Amerijet International Airlines.

14    Q.  And what is Amerijet?

15    A.  It's an -- we've got seven airplanes -- all-cargo

16  operation out of Miami.

17    Q.  What relation, if any, does it have to American

18  Airlines?

19    A.  I'm sorry?

20    Q.  What relation, if any, does it have to American

21  Airlines?

22    A.  I think we do some of their over -- whatever they

23  can't fly, we probably carry some of it down to the

24  Caribbean, but that's it.

25    Q.  What kind of aircraft do you have?

1   A.  We've got one 727 and six 767's.

2   Q.  And how long have you been chief operating

3   officer for Amerijet?

4   A.  Since June of 2017.

5   Q.  And before that, how long were you with American

6   Airlines?

7   A.  Twenty-six years.

8   Q.  Why did you leave?

9   A.  Why?

10  Q.  Yes.

11  A.  Because they offered me this opportunity to come

12  over and rebuild the company, so I took the opportunity

13  to do something different in life.

14  Q.  So Amerijet approached you?

15  A.  Yes.

16  Q.  Take me briefly through your career with American

17  Airlines, please.

18  A.  Well, I was a regular line pilot from 1991 until

19  roughly 2008 I believe, and then I went over and got

20  involved in the union on the safety department side.  I

21  eventually became the national safety chairman.

22      And then around 2011 I think it was, I was

23  approached to see if I was interested to be a chief

24  pilot in Miami of which I interviewed and took that, and

25  was down here until the end of -- middle of last year.

1   Q.  You said a chief pilot.  What does a chief pilot

2 do?  How many different kinds of chief pilots are there?

3   A.  Well, at certain bases they have like the base

4 manager or the director, and underneath him has regular

5 chief pilots.  So for example, Miami has a director of

6 flight and then --

7   Q.  Who's that?

8   A.  I'm sorry?

9   Q.  Who is that?

10   A.  Currently it's Jeff Price.

11   Q.  And who was it when you were there?

12   A.  It was me for a couple years.

13   Q.  From when to when?

14   A.  2015 -- no. Beginning of 2016 to the middle of

15 2017, so about 14 or 15 months.

16   Q.  And before that?

17   A.  I was a regular chief pilot for --

18   Q.  Who was the director of flight?

19   A.  Sean Scialfa.

20   Q.  Spell that for me, please.

21   A.  I'm sorry?

22   Q.  Spell Scialfa for me, please.

23   A.  S-c-i-a-l-f-a I believe.

24   Q.  And is Mr. Scialfa still with the airline?

25   A.  I have no idea.

1    Q.  And before -- and when was Mr. Scialfa director

2 of flight?

3    A.  He was there, I would say, 2014 to 2016.

4    Q.  And during 2015 through the time that you left in

5 2017, who reported to Mr. Scialfa?

6    A.  It would be myself, Jim Bonds, and Kevin Mase.

7    Q.  Is Mr. Mase still there?

8    A.  Yes, Kevin is still there.

9    Q.  As what?

10   A.  As chief pilot.

11   Q.  A chief pilot or --

12   A.  Yeah, a chief pilot.

13   Q.  How about Mr. Bonds?

14   A.  He is not.

15   Q.  What happened to Mr. Bonds?

16   A.  I believe he's a check airman now in Charlotte.

17   Q.  And how did he cease being chief pilot?

18   A.  I'm sorry?

19   Q.  How did he cease being a chief pilot?

20   A.  When I took over as the director, I wanted to go

21 in a different direction, and he went back to being a

22 check airman.

23   Q.  Why did you wish to go in a different direction?

24   A.  Why?

25   Q.  Yes.

1    A.  Well, new leaders bring in new members of their

2    team and I wanted to bring in some different folks and

3    that was the reason.  Nothing performance wise or

4    anything like that.

5    Q.  Was there an investigation of Mr. Bonds' use of

6    his pass?

7    A.  The travel?

8    Q.  Yes.

9    A.  Yes, there was.

10    Q.  When was that investigation?

11    A.  I would think it was a year, year and a half,

12    2015 I think.

13    Q.  And what prompted the investigation?

14    A.  I believe that there was numerous people in

15    management that were -- there's a certain travel that

16    you get business wise, and I think a lot of people were

17    under the impression it was allowed to do that for

18    personal, personal travel.  So I think that's the reason

19    why there was an investigation with many of us.

20    Q.  Did Mr. Bonds displace a revenue passenger in

21    first class?

22    A.  I have no idea.

23    Q.  Did that have anything to do with his departure

24    as a chief pilot?

25    A.  It did not.

1    Q.  Was Mr. Scialfa also part of that investigation?

2    A.  That's correct.

3    Q.  Do you know if that was the reason why he ceased

4 being director of flight?

5    A.  Yeah, there was -- actually, he was offered the

6 Los Angeles chief pilot job.  So he was moving out to

7 there, so there was a realignment of chief pilots or

8 directors.

9    Q.  Did he go to Los Angeles as a director of flight?

10   A.  He was supposed to, yes.

11   Q.  Did he?

12   A.  He did not.

13   Q.  What did he go out there as?

14   A.  He actually had a serious medical issue, so last

15 I know he was -- he hasn't flown and I don't know if

16 he's still with the company for the last -- since he

17 left Miami.

18   Q.  Who is Mark Cronin?

19   A.  Mark Cronin was my boss, who is the managing

20 director of line operations at the time.

21   Q.  Is Mr. Cronin also a pilot?

22   A.  Yes, he is.

23   Q.  A captain I'm assuming?

24   A.  Yes, he is.

25   Q.  Is he still with the airline?

1    A.  Yes, he is.

2    Q.  As what?

3    A.  I believe he's a check airman now.  I don't know.

4  I haven't talked to him in about a year and a half.

5    Q.  Do you know where he's based?

6    A.  He lives in Pennsylvania.  I'm just thinking it's

7  Philadelphia.  It has to be Philadelphia -- Charlotte I

8  guess.  I don't know.

9    Q.  Do you know how he went from being managing

10  director of operations to being a check airman?

11    A.  Yeah, I believe he got burnt out at the job, so

12  he wanted to go back and have a life.

13    Q.  When did Mr. Cronin cease being managing director

14  of line operations?

15    A.  I do not know that.

16    Q.  When did Mr. Scialfa cease being the director of

17  flight in Miami?

18    A.  I believe it was January-February 2016.

19    Q.  And when in 2016 did you become director of

20  flight?

21    A.  I think it was end of February, early March like

22  2016.

23    Q.  What does a director of flight do?

24    A.  You're basically in charge of the pilot

25  operations for your domicile.  You oversee operations,

1  safety, pretty much everything.

2    Q.  What does a chief pilot do?  A rank and file

3  chief pilot?

4    A.  Well, we always had it evolved where everybody

5  kind of just does everything, so basically every chief

6  pilot is able to do everything.

7       The director of flight is the one that

8  communicates with Dallas more than anything else at a

9  higher level, but you know, the chief pilots are usually

10  in charge of running the base, and you know, they just

11  pick up stuff that needs to be done and do it.

12    Q.  Do you have an office at Miami International

13  Airport?

14    A.  Currently?

15    Q.  Did you?

16    A.  Yes, sir.

17    Q.  And did the three chief pilots work in shifts?

18    A.  Well, not initially, but I implemented that, yes.

19    Q.  Starting in 2016?

20    A.  Yes.

21    Q.  And in 2015, were you working in shifts?

22    A.  We did not have the shift schedule at that time,

23  no.

24    Q.  How soon after you became managing director did

25  Mr. Bonds depart?

1    A.  Probably a couple months.

2    Q.  Who took his place?

3    A.  I believe Mike McClellan is his name.

4    Q.  What involvement, if any, did Sean Scialfa have

5  with the initial placement of Scott Patterson unpaid

6  with health status?

7    A.  I don't believe he was -- I mean I think there

8  was communication, but I don't think he had a whole lot

9  to do with it.  He was just apprised of what was going

10  on.

11    Q.  What, if anything, did he have to do with the

12  Section 20 that was issued to First Officer Patterson?

13    A.  The same.  He was just apprised of what was

14  happening.

15    Q.  How about Mark Cronin?  What did Mark Cronin have

16  to do with the initial PW?

17    A.  I believe that there was some discussion on the

18  situation, and as per all of American Airlines, whenever

19  there's an HR investigation, the pilot is automatically

20  put on pay withheld.  So he was just more apprised that

21  there's a complaint that's filed to HR, and as per the

22  policy for American, all pilots are put on PW.

23    Q.  So whenever there's an HR complaint and HR is

24  investigating it, the pilot is automatically on pay

25  withheld?

1   A.  That's correct.

2   Q.  How about when there's a corporate security

3 investigation?

4   A.  No.

5   Q.  In what discussions, if any, did you participate

6 with Mr. Cronin about putting Mr. Patterson on pay

7 withheld?

8   A.  Other than that there's been a formal complaint

9 to HR against Scott, and that the discussion was to put

10 him on pay withheld until the investigation is complete,

11 that was it.

12   Q.  Was there any thought process that Mr. Cronin had

13 to go through to approve this, or was it just automatic?

14   A.  It's automatic.

15   Q.  When did Mr. Cronin cease being director of

16 flight?  Forgive me if I've asked that before.

17   A.  Yes.  I don't know.  I'd left at the time.

18   Q.  So it was after you left?

19   A.  It was after I left, yes, sir.

20   Q.  And what involvement, if any, did Mr. Cronin have

21 to do with the issuance of the Section 20 to Scott

22 Patterson?

23   A.  I don't recall other than maybe consulting with

24 legal.  I'm not sure what his involvement was with that

25 aspect of the Section 20.

1    Q.  You said his involvement would maybe be

2  consulting with legal.  Would he be the person to

3  consult with legal as opposed to you?

4    A.  I think it's -- well, first of all, it would be

5  the director of flight, so it would have been Scialfa

6  probably, Cronin and legal with HR I guess.  That's how

7  it kind of usually --

8    Q.  Did you consult with HR in the issuance of the

9  Section 20?

10    A.  I did not.

11    Q.  Did you consult with HR?

12    A.  I sat in on the interview with Scott, yes.

13    Q.  Under Section 21?

14    A.  Yes.

15    Q.  That's what we're talking about when you say the

16  interview?

17    A.  Right.

18    Q.  Other than sitting in on the Section 21 with

19  Mr. Patterson, what involvement did you have in the

20  issuance of Section 20?

21    A.  None other than just these are the results of the

22  HR investigation, and as per the discussion with whoever

23  it is, it was decided to issue a Section 20.

24    Q.  That's the conversation you had with

25  Mr. Patterson, or that's the conversation you had with

1  HR?

2    A.  I didn't have any discussion with HR or anybody

3  about issuing the Section 20 for Scott.

4    Q.  So it was just you?

5    A.  I'm sorry?

6    Q.  That was just you?

7    A.  As far as?

8    Q.  Issuing the Section 20?

9    A.  No.  I was told to, you know, this is what we're

10  going to do and here's the letter.

11   Q.  Who told you that?

12   A.  It came from Cronin and legal.

13   Q.  So the statement this is the result of the HR

14  investigation and pursuant, and we're going to issue a

15  Section 20, that came from HR and Cronin?

16   A.  That's correct -- no, not HR.  Legal.  I believe

17  it was on the recommendation of HR.

18   Q.  Who in HR?

19   A.  I can't remember her name that was doing the

20  investigation.

21   Q.  Ana Burke-Leon?

22   A.  That's it.  That's it.

23           MR. AMLONG:  We're going to need to add that

24  to the list of people that we need to depose.

25   Q.  And what discussions, if any, did you have with

1  Ms. Burke-Leon?

2     A.  Nothing, that there is -- other than this is a --

3  had some pilots come in talking about some issues with

4  Scott, and that you know, the formal investigation has

5  started, and after that, there's no discussions with HR

6  as they do their investigation.

7     Q.  Tell me who the "some pilots" were.

8     A.  Glenn Whitehouse, Tom Snelling, Flanigan is his

9  last name, and one or two other guys.  I can't remember

10 their names.

11    Q.  Tell me what, if anything, you did to prepare for

12 this deposition?

13           MR. MORALES:  I just object to the extent we

14 start getting into attorney/client communications.

15    Q.  Other than speaking to Mr. Morales, what, if

16 anything, did you do to prepare for this deposition?

17    A.  Nothing.

18    Q.  Did you review any documents?

19    A.  Briefly some last night.  That's it.

20    Q.  Which ones?

21           MR. MORALES:  Again, I would object to the

22 extent we get into attorney/client communications.

23    Q.  We'll get back to Glenn Whitehouse, but tell me

24 what Tom Snelling complained about concerning

25 Mr. Patterson?

1    A.  He had mentioned a couple times of some

2  situations when they were flying together, and then he

3  had I think a past history with Scott that I think

4  was -- I think there's some documentation on it I think,

5  but he was interviewed by HR.

6    Q.  When you say when he was flying with Scott,

7  had -- Mr. Snelling was a first officer, correct?

8    A.  No.  He's a captain.

9    Q.  Were he and Scott Patterson ever on the flight

10 deck together?

11   A.  I don't know that, sir.

12   Q.  So the past incidents when he was flying with

13 Scott, to use your word, that means when he was a

14 passenger on a plane on which Mister --

15   A.  I presume that they had flown together.

16   Q.  You presumed what?  That they had flown together

17 on a flight deck?

18   A.  Yeah, they were on a trip together as working

19 crew members.

20   Q.  Do you remember anything that Mr. Snelling said?

21   A.  No.  Most of it was due to past history with

22 Scott from years ago.

23   Q.  How many years ago?

24   A.  I don't recall.  Maybe 12-13 years ago.

25   Q.  So there was nothing that Mr. Snelling had to add

1  concerning, for example, anything during 2014-2015?

2  A.  I don't know if they had flown together during

3  that period of time.  I don't know.  All he mentioned

4  that there were some issues with Scott in the airplane,

5  so that's it.  He didn't elaborate on it.  That's all I

6  know.

7  Q.  Was Mr. Snelling's -- were his comments solicited

8  or did he come forward voluntarily?

9  A.  He came forward.

10  Q.  Do you know what prompted him?  Did he say what

11  prompted him to come forward?

12  A.  No.  Just other -- the same as what the other

13  guys, that there was a concern about Scott's behavior.

14  Q.  Did he come forward at any time temporarily

15  proximate to, quote, "Scott's behavior," close quote?

16  A.  Not that I know of.

17  Q.  About what, if anything, did Mr. Flanigan

18  complain?

19  A.  Erratic behavior from Scott.

20  Q.  When did this take place?

21  A.  Probably late 2015.

22  Q.  And were Mr. Flanigan and Mr. Patterson on a

23  flight deck together when this erratic behavior took

24  place?

25  A.  I believe they had flown together many times, so

1  I'm not sure.

2    Q.  Is Mr. Flanigan a captain?

3    A.  He is not.  Well, he may be now.  I don't know.

4  He wasn't when I left.

5    Q.  And what was the erratic behavior on the flight

6  deck that First Officer Flanigan told you about?

7    A.  Not following procedures, judgmental calls, that

8  kind of stuff.

9    Q.  Let's go back to not following procedures.  Which

10 procedures did Mr. Patterson not follow in the eyes of

11 Mr. Flanigan?

12   A.  It would fall under standard operating

13 procedures.

14   Q.  Well, I know, but you have a bunch of them.

15 Which ones?

16   A.  I don't know.  He didn't state an example.

17 Standard operating procedures.

18   Q.  Did you ask him which ones?

19   A.  Nope.

20   Q.  Did he do this verbally or in writing?

21   A.  Verbally.

22   Q.  When was that?

23   A.  End of 2015.

24   Q.  Was there any record made of this?

25   A.  No.

1    Q.  You didn't -- did he make this comment to you?

2    A.  Yeah, he was part -- I said look, because this is

3  when the whole Glenn Whitehouse thing was going on, and

4  we had three or four people come into my office during

5  that time.

6        So I said:  Look, I think it's an HR

7  investigation, I'm not, you know, they're going to come

8  to you and you can say whatever you want, but I'm not

9  privy to that investigation, so they have it for action.

10    Q.  When you say "I'm not privy to that

11  investigation," did you participate in any communication

12  with the witnesses during the investigation?

13    A.  I did not.

14    Q.  Do you know whether or not First Officer Flanigan

15  was formally interviewed by anybody including

16  Ms. Burke-Leon?

17    A.  I believe that's the only person that

18  interviewed.

19    Q.  Do you know whether or not she interviewed First

20  Officer Flanigan?

21    A.  I believe she did.

22    Q.  What judgmental calls was he making, was

23  Mr. Patterson making?

24    A.  I believe that the comment was -- I don't really

25  recall exactly what he said, but he just said, you know,

1  I have serious judgment -- serious concerns about his

2  judgment for making decisions.

3      Q.  Did he give you any examples?

4      A.  Hotheaded and overaggressive.  Those were a

5  couple that I remember.

6      Q.  Is this interpersonally or in the cockpit?

7      A.  In the cockpit.

8      Q.  So he flew too aggressively?

9      A.  No, I don't know if that's the case.  He did use

10  those words.  All I know is that he said he was

11  overbearing, short-tempered and erratic.

12     Q.  And you say these instances took place in 2015?

13     A.  I'm not sure when they took place, but I think

14  they took place over a period of time as what the other

15  folks said.

16     Q.  You said one or two other guys.  Do you remember

17  who the one or two other guys were?

18     A.  I don't remember their names.

19     Q.  Other than Mr. Whitehouse, is there any American

20  Airlines captain who's ever complained about the conduct

21  or the behavior or flying abilities of Scott Patterson?

22     A.  Other captains?

23     Q.  Yes.

24     A.  Not to my knowledge.

25     Q.  Did you ever discuss Scott Whitehouse (sic) with

1  Danny Shellhouse?

2     A.  I believe there was some communications to get it

3  over to professional standards.  That was it.

4     Q.  I'm sorry, what do you mean there was some

5  communications to get it over to professional standards?

6     A.  When the first complaint comes in, usually

7  there's a process that the company and the union have

8  worked out that if there's an employee to employee,

9  pilot to pilot, pilot to flight attendant, that it gets

10 pushed over to professional standards, which is union

11 controlled, and the union members, who are local

12 domicile people, take the complaint and try to solve the

13 problem.

14    Q.  Did you ever refer to -- did you ever ask

15 Mr. Shellhouse if he'd ever had problems with

16 Mr. Patterson?

17    A.  I don't recall asking him that.

18    Q.  Did you ever discuss with Mr. Shellhouse that he

19 was a strong captain?

20    A.  That who?

21    Q.  That Danny Shellhouse was a strong captain?

22    A.  Yeah, he's a good captain.

23    Q.  Did you ever tell Mr. Shellhouse that

24 Mr. Whitehouse was a weak captain?

25    A.  I don't recall that ever.

1    Q.  Do you recall any conversation about why

2  Mr. Shellhouse might not have had problems with

3  Mr. Patterson while Mr. Whitehouse -- do you ever recall

4  a conversation about why Captain Shellhouse would not

5  have had problems with Mr. Patterson while

6  Mr. Whitehouse may have?

7    A.  No.

8         (Discussion held off the record.)

9    Q.  Tell me how the HR complaint that triggered the

10  reference of Mr. Patterson to human resources and caused

11  the automatic pay withheld status, how did that come

12  about?

13    A.  You mean the process leading up to that?

14    Q.  Yes.

15    A.  Well, I believe Captain Whitehouse came in with

16  his initial complaint, and I referred him to

17  professional standards, which is what we always do to

18  try to, one, keep it out of the flight office, and two,

19  keep it at its lowest level for resolution.

20         There's a lot of issues between a lot of people

21  in there and that's how it's usually handled, so that

22  was the avenue that was given.  So I gave him the

23  contact for the local professional standards folks and

24  left it at that.

25         Usually what happens is we usually call the

1 professional standards guys and say hey, this is what's

2 coming, and then the only thing we get back is either

3 it's resolved or it's not resolved.

4   Q.  And what, if anything, did you get back from

5 professional standards concerning --

6   A.  Was not resolved.

7   Q.  And who told you that?

8   A.  I believe Chip Harlowe.

9   Q.  Did he do this in writing?

10   A.  He did not.

11   Q.  And when was that?

12   A.  Late 2016, I don't know.  I don't recall the time

13 frame.  So when it comes to that process, if he says

14 it's not resolved, then you go to the individual making

15 the claim, which would have been Captain Whitehouse, and

16 say, of which I'm sure that's what they told him, that

17 his only other recourse is to go to human resources, and

18 that's what he did.

19   Q.  How did you find out that Captain Whitehouse had

20 gone to human resources?

21   A.  I believe he either sent an e-mail to me or

22 stopped by and said he was filing a complaint, and I

23 said okay.  I don't recall which one it was.

24   Q.  What, if anything, did you have to do with

25 transmitting the complaint to HR?

1    A.  Nothing.

2    Q.  Do you recall the initial complaint arose out of

3    an incident in Bolivia in 2014?

4    A.  Yes, sir.

5    Q.  And what, if anything, do you recall concerning

6    that incident?

7    A.  He came in with a complaint.  I said put it in

8    writing.  Let me take a look at it.  And that's when I

9    said hey, we need to take this to professional standards

10   is what was my recommendation.

11   Q.  When you do that, do you keep a copy of the

12   complaint?

13   A.  It's on the computer.  I don't print it out and

14   make a folder.

15   Q.  I'm sorry, was it Bolivia or Paraguay?

16   A.  I don't recall.  It might have been Asunción.  I

17   don't know.

18   Q.  It think it was Asunción.  That's ASU, right?

19   A.  That's correct.

20   Q.  And so when Mr. Whitehouse made his initial

21   complaint to you about Mr. Patterson, it would have been

22   by e-mail or did he have a form?

23   A.  No.  He came into the office and sat down and

24   said I got an issue.

25   Q.  But then you said you told him to put it in

1 writing?

2    A. Put it in writing because it was extensive, it

3 was long. I said put it in writing whatever, what you

4 think happened. Then I said look, at the end of the

5 day, it's a professional standards matter, right, so

6 that's what we tried to do, solve it there.

7    Q. How does one put it in writing? Is there a form?

8    A. No.

9    Q. Does he send you an e-mail?

10    A. E-mail.

11    Q. And this was near in time to when the incident

12 took place?

13    A. I believe so, yes, sir.

14    Q. And do you recall who was the head of the

15 professional standards committee at the time?

16    A. I think it was Chip Harlowe at that time, but I'm

17 not sure. I know he was on the committee, but I don't

18 know if he was the head of it.

19    Q. Do you know a captain by the name of Mort

20 Modrich?

21    A. Oh, Modrich? Yeah, I've met him before, but I

22 didn't -- I did not have a whole lot of contact with

23 him. It mostly was Chip Harlowe and a guy from Atlanta.

24 I'll think of his name, one other gentleman.

25    Q. Opdeh?

1    A.   Huh?

2    Q.   O-p-d-e-h?

3    A.   Oh, O'Day?

4    Q.   Yes.

5    A.   Yeah, we did do some work with him, but that was

6    before this incident.  I think he was taken off the

7    committee during that time.  I'll think of his name

8    before the end of the day.

9    Q.   Did you have any -- did you have any contact with

10   either of them concerning First Officer Patterson?

11   A.   Other than there's been a complaint against Scott

12   by Captain Whitehouse and I referred him to you guys,

13   and that's about it.  And usually how it goes is they

14   come back in and give us an update or it's solved, and

15   we move on.

16   Q.   Okay.  So how long after -- how long after the

17   initial reference to personal standards did you forward

18   this complaint to -- how long after the initial

19   reference to personal standards was the complaint

20   forwarded to human resources?

21   A.   Months, six seven months I believe.

22   Q.   Do you know how the complaint happened to be made

23   in September of 2015?

24   A.   Do I know how?  I'm sorry, can you --

25   Q.   What caused it to be made at that point in time?

1    A.  Do you mean to HR?

2    Q.  Yes.

3    A.  I believe that the process went through the

4  professional standards.  It was not resolved.  I believe

5  APA told Captain Whitehouse that the issue is not going

6  to be satisfactory to your needs, so your options are to

7  leave it as is, or file an HR complaint.

8    Q.  Between the time of the initial complaint and the

9  time it went to human resources, what contact, if any,

10  did you have with Captain Whitehouse concerning

11  Mr. Patterson?

12    A.  Very little, you know, other than I think he

13  mentioned a couple times that it was still continuing.

14    Q.  He, meaning Whitehouse?

15    A.  Yes, that he had instances where he thought that

16  Scott was harassing him, and I said, you know, it was

17  professional standards and everything know about this,

18  and that was about it.

19    Q.  Did you forward his complaints to corporate

20  security?

21    A.  Not -- I don't believe Whitehouse, but I don't

22  recall.

23    Q.  Do you know if Ms. Burke-Leon interviewed any of

24  the cabin attendants or flight deck personnel on the

25  Asunción flight?

1    A.  I do not know that.

2    Q.  Do you know if any of the flight attendants or

3   flight deck personnel on the Asunción flight from

4   October 2014 substantiated any of the allegations made

5   by Mr. Whitehouse?

6    A.  I do not know that.

7    Q.  How do Section 21 proceedings work?  For example,

8   is there a finding at the end of the proceeding as to

9   whether or not the pilot engaged in the behavior of

10  which he or she is accused?

11   A.  Sure, I think there's a determination on how

12  Section 21 outcomes.  It could be verbal.  It could be

13  written.  Most of the time it's always documented.

14  Anytime you have a Section 21, it has to be documented.

15   Q.  What was the conclusion of the Section 21 hearing

16  concerning Mr. Patterson?

17   A.  Honestly, I don't remember.

18   Q.  Who was there?

19   A.  I don't recall who was all there.  I know the

20  union had a ton of people there, but I'm not sure who

21  all was there.

22   Q.  How does one of these things work?  Does HR

23  present witnesses?

24   A.  No, no.  It's all done within the flight office.

25  It's not HR involved at all.  It's a respective domicile

1 office investigation into allegations.

2      It's a formal written letter and you work with

3 the union on a date that's suitable for everybody so he

4 can have representation there and then it's conducted on

5 a certain date and time.

6   Q.  Well, does the HR, if there's been an HR

7 investigation, is there a presentation by the HR

8 representative?

9   A.  At the Section 21?

10   Q.  Yes.

11   A.  I don't believe that HR was involved in the

12 Section 21 at all for Scott.  I don't recall any of

13 that.

14   Q.  Well, you participated in Section 21, correct?

15   A.  I'm sorry?

16   Q.  You participated in Section 21?

17   A.  In Section 21 hearings?

18   Q.  Yes.

19   A.  Oh, yes.

20   Q.  Do you recall anyone else who was there?

21   A.  I believe Tom Copland, I don't know who from the

22 union side was there.

23   Q.  Who's Tom Copland?

24   A.  I think he was the domicile chairman at the time.

25 Tom Gallagher maybe.  To be honest with you, I'm just

1  guessing.  I don't know.  I don't recall.

2     Q.  Is there a written record of the Section 21

3  hearing?

4     A.  Not that I recall, other than just maybe a letter

5  stating what the final outcome was and that was it.

6     Q.  Did the Section 21 hearing have anything to do

7  with the issuance of a Section 20 request?

8     A.  No.

9     Q.  Do you remember Captain Shellhouse being there?

10    A.  Possibly.  I don't know.

11    Q.  What, if anything, did labor relations have to do

12 with the issuance of the Section 20 request?

13    A.  None that I know of.

14    Q.  What, if anything, do you recall about

15 Mr. Patterson's requesting military leave in September

16 2015?

17    A.  To be honest with you, I had hardly any

18 involvement in any military leave request from anybody

19 inside the Miami domicile.  I just was not involved in

20 it.

21    Q.  Why was that?

22    A.  One, there was a process that was -- that, you

23 know, guys just did and it never got to be my desk,

24 quite frankly.  I don't know why, but it was just one of

25 those things that I never got involved in.

1   Q.  Well, was that a duty that was assigned to Chief

2   Pilot Bonds?

3   A.  No.  I mean if it came to anybody's desk, we did

4   everybody else's work.  If the military stuff would have

5   came to my desk, which it never did, then I would have

6   took care of it.

7   Q.  When were you in the marine corps?

8   A.  Oh, let's see '82 to '97.

9   Q.  So you were in the reserve after your active

10  duty?

11  A.  That's correct, yes, sir.

12  Q.  When the Marine Corps wanted you to report for

13  duty, did they give you written orders?

14  A.  That's correct, yes, sir.

15  Q.  Do you know whether or not the Army gives written

16  orders?

17  A.  I presume all the military is the same, but I do

18  not know.  I believe that's a requirement that we had is

19  to provide written orders.

20  Q.  You say, "that's a requirement that we had."  You

21  mean American Airlines?

22  A.  That's correct.

23  Q.  Were you aware that Mr. Patterson was on duty

24  with the Army Reserve at the time he was put on pay

25  withheld status?

1    A.  I did not.  I don't recall that, knowing that he

2    was on military leave during that time.

3    Q.  Do you recall a concern that Mr. Patterson was

4    not actually on military leave, but was only saying he

5    was on military leave?

6    A.  I have no idea, sir.

7    Q.  What, if any, discussions did you and Chief Pilot

8    Bonds have about Mr. Patterson being on military leave?

9    A.  Other than Jim had some concerns, and that was

10   about it.

11   Q.  What were Jim's concerns?

12   A.  I believe there was an instance where he tried to

13   get off or something, and Jim asked for orders, and then

14   I'm not sure of the whole circumstances, but maybe he

15   denied it, and then Scott called down to Dallas or

16   something and got off, so that's all I recall, but not a

17   whole lot.

18   Q.  Did you communicate with Dr. Ahtone, the

19   corporate medical director, about Mr. Patterson needing

20   a neuropsychological evaluation?

21   A.  I don't recall talking to Dr. Ahtone at all.  He

22   may have been on a conference call, but I don't recall

23   that.  I've never talked to him one-on-one about Scott

24   Patterson.

25   Q.  Do you recall receiving notification that a

1 neuropsychologist had declared Mr. Patterson not fit for

2 duty?

3    A. I'd heard that, yes, sir.

4    Q. Well, how did you hear it?

5    A. I believe it came through an e-mail from either

6 Cronin or Ahtone, or somebody from headquarters. It

7 might even have been legal. I don't know.

8    Q. What, if anything, did you have to do with

9 Mr. Patterson's attempts to get back into the air?

10    A. None.

11    Q. Were you shown the report by Dr. Knippa?

12    A. Not that I recall, no. I've never seen a

13 Section 20 report from a doctor of all the ones that

14 were issued.

15    Q. I'm sorry?

16    A. I said of all the Section 20's that were given

17 when I was in the office, I've never seen a doctor's

18 report on any individual.

19    Q. What if any efforts, to your knowledge, did

20 Mr. Patterson make to get off of being grounded?

21    A. I think he -- I think he tried extensively to try

22 to get off.

23    Q. Do you know why he has not been allowed to get

24 off?

25    A. I have no idea.

1    Q.  How many Section 20's have you seen?

2    A.  I've probably seen seven or eight.

3    Q.  Of those seven or eight, how many of those were

4  for substance abuse?

5    A.  Were substance abuse?

6    Q.  Yes.

7    A.  Maybe one.

8    Q.  What were the others?

9    A.  Erratic behavior, not showing up, I would say

10  just if I can find the right word, I would say just, you

11  know, personal behavior.

12    Q.  Have you ever personally witnessed any behavior

13  on the part of Mr. Patterson that would make you think

14  he was unfit to fly an airplane?

15    A.  I have not.

16    Q.  Let me ask you to take a look at Exhibit 1 and

17  tell me if you've ever seen that document before, which

18  is, for the record, an e-mail from -- an e-mail string,

19  the top of which is one from Glenn Whitehouse to Brian

20  Beach dated March 20, 2015.

21    A.  Yes, I believe I've seen this.

22    Q.  Did you discuss this with Mr. Whitehouse?

23    A.  I don't recall if I ever discussed this personal

24  one or not, this e-mail.

25    Q.  What, if anything, did you do to determine -- to

1  determine the accuracy of that report?

2    A.  I believe that it was, you know, above my

3  jurisdiction, so I believe I turned it over to corporate

4  security.

5    Q.  Why was it above your jurisdiction?

6    A.  Because it involved something that's customs

7  related, so --

8    Q.  What, if anything, do you recall about

9  Mr. Whitehouse making the allegation that Mr. Patterson

10 was smuggling guns into Bolivia?

11   A.  The best of my recollection is that an employee

12 down there thought he was doing that.

13   Q.  Which employee was that?

14   A.  He wouldn't say.

15   Q.  Who would not say?

16   A.  Captain Whitehouse.

17   Q.  So you don't recall that there was an employee in

18 Bolivia who said that Mr. Patterson was smuggling guns.

19 You recall that Captain Whitehouse said there was an

20 employee in Bolivia?

21   A.  That's correct.

22   Q.  Who is Fred Bates?

23   A.  Fred Bates at the time was the president of APA,

24 Allied Pilots Association.

25   Q.  Look at Exhibit 2, please.

1    A.  Oh, I apologize.  Fred Bates is not -- Fred Bates

2  was the head of security at headquarters for American

3  Airlines.  My apologies.

4    Q.  Head of corporate security headquarters?

5    A.  Correct.

6    Q.  Do you recognize that e-mail?

7    A.  I do.

8    Q.  And who's it to, from, when and about?

9    A.  It looks like May 26, 2015, giving a heads up,

10  Scott's coming back to work.

11    Q.  What's the reference to, quote, "possible gun

12  runner to Bolivia"?

13    A.  That's from the conversation with Glenn

14  Whitehouse that was relayed to me, so I informed

15  security that possibly that something could be

16  happening.

17    Q.  Your third sentence says, quote, "I have captain

18  in last week that said Patterson has been called a

19  certain CA" -- is that captain?

20    A.  That's correct.

21    Q.  To see if he would carry some items down to

22  Bolivia for him, which I am told that he said no.

23       Who is the captain that told you this and who is

24  the captain that Mr. Patterson is supposed to have asked

25  to do this?

1    A.  I don't know who he was supposed to ask him to do

2    it, but I believe the reference is from Captain

3    Whitehouse.

4    Q.  Did you ask Captain Whitehouse who the other

5    captain was?

6    A.  I did.

7    Q.  And he said?

8    A.  He would not tell me.

9    Q.  Is it typical for the union to inform you when a

10   pilot is returning from medical leave?

11   A.  Yeah.

12   Q.  And why is that?

13   A.  Because we work closely with the union air

14   medical to try to get everybody back flying as soon as

15   we can.

16   Q.  Let me ask you to look at Exhibit 3.

17   A.  This is the guy who I wanted to talk to, or I

18   mentioned.  Pat McGinn was the other professional

19   standards guy with Chip Harlowe, so that was the name I

20   couldn't remember.

21   Q.  Did Mr. McGinn say he had observed anything that

22   Mr. Patterson had done that was out of the ordinary?

23   A.  I don't recall.

24   Q.  Did Mr. Harlowe ever say that he had observed

25   anything that Mr. Patterson had done that was out of the

1 ordinary?

2    A.  I don't recall.

3    Q.  Did either of them ever say that anyone other

4 than Mr. Whitehouse had told them that he had done

5 anything out of the ordinary?

6    A.  No.  They were told -- there was numerous people

7 that told them.

8    Q.  Did they identify any of them?

9    A.  No.

10    Q.  Do you recall receiving this?

11    A.  What?

12    Q.  Do you recall receiving Exhibit 3?

13    A.  I don't recall receiving this.

14    Q.  Do you recall if anything that you -- well, if

15 you don't recall receiving it, would you recall what you

16 did with it?

17    A.  I don't believe I did anything with it, other

18 than I noticed that professional standards was on here,

19 and I didn't speak a whole lot with Pat McGinn; mostly

20 with Chip Harlowe.  All that we were told was the issue

21 with Scott Patterson was still ongoing and we'll let you

22 know what comes of it.

23    Q.  When you got an e-mail such as this, did you have

24 a file in which you kept such information about each

25 pilot?

1    A.  No.

2    Q.  Would this be anywhere on an American Airlines

3    computer?

4    A.  I have no idea.

5    Q.  Would you have put it anywhere?

6    A.  No, sir.

7    Q.  Would you have simply deleted it?

8    A.  Yes, sir.

9    Q.  Well, it's obviously somewhere because it was

10   produced in this litigation.  Do you know --

11   A.  I have no idea.

12   Q.  Do you know whether Captain McGinn actually flew

13   with First Officer Patterson to Santa Cruz on July 24,

14   2015?

15   A.  I believe they had flown together, but I don't

16   know if they did or not.  I think it's the same for the

17   other professional standards guy, too, but I don't know

18   if they'd flown together or not.  With Chip Harlowe I

19   don't know if they've flown together or not.

20   Q.  Look at Exhibit 4, which is Exhibit 3, but it's

21   been -- it appears at the end of an e-mail string

22   between Pat McGinn, and I'm assuming that gdhiii@aol.com

23   is Chip Harlowe?

24   A.  Yes, sir, I believe it is.

25   Q.  Did you forward the e-mail to professional

1  standards?

2     A.  Which e-mail?

3     Q.  Did you forward Exhibit 3?

4     A.  No, I wouldn't have because Pat McGinn was

5  already on it, so I would have no -- I might have.  I

6  don't know.  I don't believe I did.

7     Q.  Okay.  So Pat McGinn --

8     A.  I would have no reason to.

9     Q.  So Pat McGinn got this just by virtue of being

10 cc'd?

11    A.  That's correct.

12    Q.  Look at Exhibit 5.

13    A.  (Witness complied).

14    Q.  Did you forward Exhibit 3 to Sean Scialfa?

15    A.  Yes, sir.

16    Q.  Why?

17    A.  Because he's not a -- he was my boss and he needs

18 to be updated on what's going on so he doesn't get

19 blindsided.

20    Q.  And in forwarding it, you wrote:  We have more to

21 this guy.  We'll fill you both in person.  He is an

22 issue.

23    A.  Mm-hm.

24    Q.  Which guy are you talking about?  Whitehouse or

25 Patterson?

1    A.   Scott.

2    Q.   And what more did you have on him?

3    A.   Oh, just the Whitehouse stuff.

4    Q.   So you considered Mr. Patterson to be -- is July

5   the first time that you considered Mr. Patterson to be,

6   quote, "an issue"?

7    A.   July of 2015?

8    Q.   Yes.

9    A.   After numerous folks, he became an issue.

10    Q.   And in the normal way that American Airlines did

11   things when you were a chief pilot there, what would

12   American Airlines do with, quote, "an issue"?

13    A.   Give it to professional standards to fix, unless

14   it was obviously a, you know, a drug incident, alcohol

15   incident or whatever, then it was different.  But if

16   it's stuff like this, then it's professional standards.

17    Q.   And if it doesn't work with professional

18   standards, then what do you do with, quote, "an issue"?

19    A.   Then you have a Section 21.  There's a couple

20   ways you can do it.  You can actually bring him in with

21   the union representation and give him one last shot

22   before discipline begins.

23    Q.   Did you do that with Mr. Patterson?

24    A.   I don't believe we did that with Scott, no.

25    Q.   Did you do anything in response to this e-mail?

1    A.  Other than I believe it was still ongoing with

2  professional standards, so we were given that -- we were

3  given that process of the ability to try to make a

4  resolution that was happy for everybody.

5    Q.  You do recall turning over, what, there were

6  several complaints from Mr. Whitehouse you turned over

7  to corporate security concerning Mr. Patterson, were

8  there not, in about March?

9    A.  I don't recall.  I don't recall exactly what I

10  gave them all.

11           MR. AMLONG:  We've been going about an hour

12  and a half.  Let's take a break.

13           (Recess taken.)

14           MR. AMLONG:  Let me show you what's going to

15  be marked as -- change Exhibit 2 there to Exhibit 2A and

16  then these are going to be 2B.

17           (Plaintiff's Exhibit No. 2A was marked for

18  identification.)

19           (Discussion held off the record.)

20  BY MR. AMLONG:

21    Q.  Mr. Beach, please look at the e-mail that I've

22  handed you marked as Exhibits 2B, 2C and 2D.  Starting

23  with 2B, do you recall receiving the second e-mail in

24  the string?

25    A.  The one halfway down the first page?

1    Q.  Yes.

2    A.  I do.

3         (Plaintiff's Exhibit No. 2B was marked for

4    identification.)

5    Q.  And do you recall receiving previously the one on

6    the second page dated March 19?

7    A.  I do.

8    Q.  Assuming the truth of what Mr. Beach is quoting

9    the flight attendant as saying, that is, that

10   Mr. Patterson, quote, "was telling her and other flight

11   attendants while in the cabin within earshot, that

12   passengers of the aircraft was like a bomb and was going

13   to blow up if they did not get on the ground ASAP,"

14   close quote.  How serious of an infraction would that be

15   of American Airlines' rules?

16   A.  Well, it raises some concern.

17   Q.  Certainly not best practices?

18   A.  Certainly not best practices.  We hear a lot in

19   the office; let's put it that way.  So it's not best

20   practice by any means, yes, sir.

21   Q.  Would that be the kind of thing that would prompt

22   you to refer a pilot to human resources for you to give

23   any credence to it?

24   A.  Actually something like this would actually be a

25   start of an investigation to determine whether that

1   would be appropriate or not, so this is hearsay.

2       Q.  And in the second e-mail, which is on the first

3   page dated March 20 at 4:10 p.m., Mr. Whitehouse then

4   identifies the flight attendant as Maria Eugenia Valdez

5   from Lima, and you state later that day that you know

6   Ms. Valdez.  Did you ever speak to Ms. Valdez?

7       A.  I did not.

8       Q.  The first officer who's supposed to have heard

9   this was identified in Mr. Whitehouse's top e-mail to

10  you as Dave Atwater.  Did you speak to Mr. Atwater?

11      A.  I did not.

12      Q.  Do you know if anybody ever spoke to Mr. Atwater

13  about these allegations?

14      A.  I do not know that.

15      Q.  Do you recall what, if anything, you did

16  subsequent to receiving this e-mail string?

17      A.  I do not.

18      Q.  Look at Exhibit 2C.  Who is Ricardo Garcia?

19      A.  He is the Miami corporate security along with

20  Fred Ronda at the time.

21          (Plaintiff's Exhibit No. 2C was marked for

22  identification.)

23      Q.  Is one the boss and the other not?

24      A.  Don't know that for sure.

25      Q.  But they're both in corporate security?

1    A.   Yeah.  I believe both are gone now, but I don't

2    know.

3    Q.   Do you recognize the second e-mail in that string

4    as being from you to Mr. Garcia, subject Patterson or

5    forwarding Patterson?

6    A.   Yeah, I remember this e-mail.  I don't remember

7    sending it, but I remember the e-mail from Captain

8    Whitehouse.

9    Q.   Do you recall what the reference to, quote, "the

10   big one," close quote, is?

11   A.   It was just the length of the e-mail.

12   Q.   Did you have a discussion with Mr. Garcia prior

13   to sending this e-mail?

14   A.   Yes, sir, I did.

15   Q.   And during that conversation, who said what to

16   whom?

17   A.   I don't recall all the conversation; just said

18   that there's an allegation of a pilot that may have

19   maybe taken some things illegally and that was the

20   extent of it and he said send me what you got.

21   Q.   So your concern was on whether or not

22   Mr. Patterson was ingesting some substances?

23   A.   No.  Whether he was transferring illegal things

24   in his baggage through a known crew member.

25   Q.   So when they said that he may have been taking

1  things illegally, you don't mean taking drugs; you mean

2  taking weapons or --

3      A.  That's correct.

4      Q.  -- some such?

5      A.  Yes, sir.

6      Q.  Did you wish for corporate security to also

7  investigate whether or not he was talking about time

8  bombs and such in front of passengers?

9      A.  I did not.  I did not, to my recollection, speak

10 with corporate security about that.

11     Q.  Had he been doing that, would that have given

12 rise to a concern about his mental stability?

13     A.  Yeah, it was part of that process, sure.

14     Q.  So what, if anything, did you do about this in

15 March?

16     A.  The time bomb statement?

17     Q.  Yes.

18     A.  That was part of the whole process of -- when was

19 that?  Was it 2017 that was?

20     Q.  2015.

21     A.  2015, so that was part of the whole professional

22 standards investigation into, you know, what's going on

23 with this guy, you know.  A lot of people say a lot of

24 things.

25     Q.  When you sent something to professional

1  standards, is there any documentation that you have done

2  so?

3      A.  No.  That's kind of a code that the company and

4  the union have together that we handle it through

5  professional standards, who has the ability to make

6  decisions on whether a situation is complete or not.

7      Q.  Was anything done in March of 2015 to investigate

8  any of the allegations made in Exhibit 2C other than

9  that Mr. Patterson may have been illegally taking

10 firearms into Bolivia?

11     A.  I'm sorry, can you repeat that again?

12             MR. AMLONG:  Read it back, please.

13             (Question read back.)

14             THE WITNESS:  Okay, so we're talking about

15 the long e-mail?

16             MR. AMLONG:  Yes.

17             THE WITNESS:  I believe that was the start

18 of the process for professional standards and the

19 disagreement between Patterson and Whitehouse I believe.

20 BY MR. AMLONG:

21     Q.  I mean did American Airlines do anything other

22 than refer this to professional standards?

23     A.  No.

24     Q.  Mr. Garcia in his e-mail to you says, quote,

25 "Please be advised that today Fred Ronda and I discussed

1 the below case with Larry McLaughlin, director of AA

2 global investigations.  It was decided that corporate

3 security would look into this matter."  What matter is

4 that?

5    A.  The matter is the gun issue to Bolivia.

6    Q.  Where in -- perhaps I'm missing it, but where in

7 the March 19 e-mail does Mr. Beach mention anything

8 about gun smuggling?

9    A.  I think this was what Fred and Ricardo wanted was

10 the whole picture of the situation with Scott Patterson.

11    Q.  So you're saying that there are additional

12 communications that you had had with Misters Garcia and

13 Ronda?

14    A.  I believe it was -- I had talked to Fred Bates,

15 said hey, look, I think I got a situation down here.  I

16 have no idea, don't even know what to do with it.  So he

17 put me in contact with Ricardo and Fred Ronda, local

18 guys.  They said send me -- tell us what you got and I

19 said I got a long e-mail that I can send you, and they

20 said send me the e-mail.

21    Q.  When did you first hear about the possibility

22 that he was smuggling guns?

23    A.  Very soon after Whitehouse came into my office.

24    Q.  And did you hear that from Whitehouse?

25    A.  Yes, sir.

1    Q.  Look at Exhibit 2D.  Is this complaint from -- is

2  this verbal complaint from Captain Whitehouse to Captain

3  Bonds the same complaint that was contained in

4  Exhibit 2B, which is the March 20 -- I'm sorry -- the

5  March 18 -- March 19 rather -- e-mail from Whitehouse to

6  you?

7    A.  I don't know that, sir, if that's the same

8  scenario or not.  That, I don't know.

9          (Plaintiff's Exhibit No. 2D was marked for

10  identification.)

11    Q.  Well, were there two airplanes on which you were

12  supposedly saying that Patterson was telling the

13  passengers that the aircraft was like a time bomb?

14    A.  Could have been.  I don't know.

15    Q.  What, if anything, did you do in reaction to

16  receiving the information from Mr. Bonds about what

17  Mr. Whitehouse had told him September 6?

18    A.  Well, I think what happened is he sent an e-mail

19  to our boss and --

20    Q.  Who did?

21    A.  It looks like Bonds did.

22    Q.  Okay.

23    A.  Stating what Whitehouse had said, so I'm -- other

24  than Bonds maybe mentioning to us in the office, that's

25  about it.

1    Q.  Do you recall if any action was taken on that?

2    A.  Other than this e-mail, I don't know what

3  happened after that.  I'm sorry.

4    Q.  Did you invite Captain Beach -- I'm sorry -- did

5  you invite Mr. Whitehouse to repackage his complaints

6  about Mr. Patterson and send them to you?

7    A.  I don't recall asking that.  I don't know why I

8  would other than -- I don't know under any circumstance

9  why I would do that.  It might have been so much traffic

10  that I said put it all together because I didn't keep

11  any of it, so that would be the only case.

12    Q.  Let me ask you to look at Exhibits 6 and 7.

13    A.  Okay.

14    Q.  Do you know why Mr. Whitehouse was writing you

15  and forwarding the e-mail to you on the evening of

16  September 24 concerning, quote, "a letter for you to

17  turn over to the AA human resources for the work-related

18  harassment from FO Patterson," close quote?

19    A.  Yeah, I believe that professional standards had

20  told me that they were not able to come to a conclusion,

21  and that I had spoken with Captain Whitehouse to say

22  your choices are one of two.  Either you continue as it

23  is or you file a complaint.  If you're going to do that,

24  get all the documents together and I'll find out how we

25  do that.

1    Q.  Who in professional standards told you that?

2    A.  Chip Harlowe.

3    Q.  Would you agree that everything in Exhibit 7 is a

4  repackaging of -- essentially a repackaging of the

5  materials that you were sent before?

6    A.  Yes, sir.

7    Q.  What if anything did you do with this when you

8  got it at 8:34 p.m.?

9    A.  I would say that probably the following day, I

10  probably made contact with Ana Burke-Leon in HR and said

11  this guy wants to file a formal complaint, and I'm not

12  sure if I actually turned it over to her or not, or what

13  the process was.  I might have given it to her because I

14  said, you know, what's the process to go about doing

15  this?  I don't know if I turned this package over to her

16  at that time.

17    Q.  Were you aware of any -- were you aware at the

18  time of any inquiry that was being made by Mr. Bonds

19  into Mr. Patterson's having gone on military leave?

20    A.  I was not privy to that at all whatsoever.

21    Q.  Would you have had any reason to forward this to

22  Mr. Bonds?

23    A.  What?  This stuff?

24    Q.  Yes.

25    A.  No, sir, not that I know of.

1    Q.  Mr. Bonds is not copied on here, is he?

2    A.  I don't believe so.

3    Q.  Other than your -- do you generally work at or

4  are you at work at the airport at 8:34 p.m.?

5    A.  Unfortunately, this job you're on duty 24/7, but

6  I don't believe I was there at that point in time that

7  night, but I don't know.  I obviously do e-mails all

8  day, but --

9    Q.  You were what?

10    A.  I actually do e-mails all day, so I don't know if

11  I was actually present in the office at that time.

12    Q.  Who is Luis Rojas?

13    A.  He is the domicile assistant manager.

14    Q.  Is he a pilot?

15    A.  No, sir.  He's an admin.  It's an admin job.

16    Q.  Is he basically 9:00 to 5:00, 8:00 to 4:00?

17    A.  Correct.

18    Q.  Some daylight hour type job?

19    A.  Yes, sir, that's correct.

20    Q.  Does he have any obligation to be looking at

21  e-mails all night long?

22    A.  He doesn't have an obligation, and I'm not sure

23  if he would.  Off and on he does, yes, I know he

24  responds late at night.

25    Q.  What communication that evening did you have with

1 Mr. Bonds concerning Mr. Whitehouse's e-mails to you?

2    A. None.

3    Q. What communication did Mr. Bonds have to you

4 about the e-mails?

5    A. None that I know of. He wouldn't know that they

6 came to me.

7    Q. Look at Exhibit 8, please, and tell me if you

8 recognize that as an e-mail that you received?

9    A. Okay.

10    Q. Are you one of the addressees?

11    A. I am.

12    Q. And is that the same evening as Exhibit 6?

13    A. It looks like it.

14    Q. So if the e-mail comes to you on the evening of

15 September 24, how is it that James Bonds is putting

16 Mr. Patterson on pay withheld status within two hours?

17    A. I probably was out of reach or not able to do it

18 myself and that he probably talked to my boss and said

19 put him on pay withheld, and said I'm not able to do

20 that for some unknown reason. Maybe Bonds, or that's

21 how it works, one of the guys will call down there and

22 put him on pay withheld.

23    Q. What's the urgency of doing this?

24    A. Once an official complaint to HR is initiated,

25 it's an automatic PW for that pilot.

1    Q.  Well, the complaint had not gotten to HR yet, had

2  it?

3    A.  I believe that it was relayed to higher

4  headquarters and that was the decision made above, put

5  him on pay withheld pending the outcome.

6    Q.  Who's Jackie?

7    A.  Jackie?  I believe it's probably somebody in

8  legal.  I don't know.

9    Q.  Mark is Mark Cronin?

10    A.  That's correct.

11    Q.  And Lucretia is Lucretia Guia?

12    A.  That's correct.

13    Q.  Is it the flight office that puts somebody on pay

14  withheld or is it human resources?

15    A.  The flight office.

16    Q.  Look at Exhibit 9.

17    A.  (Witness complied).

18    Q.  Do you recall seeing that e-mail?

19    A.  I do, sir.

20    Q.  What if any assistance did you give

21  Ms. Burke-Leon?

22    A.  I request to either get the folks off of their

23  trips or find a date for them to be able to come in and

24  speak with HR concerning.

25    Q.  I know that Mr. Bonds participated as a witness

1  in at least one of the interviews.  Is it routine

2  practice for one of the chief pilots to sit in as a

3  witness on the interviews?

4     A.  Yes.  I did a couple times, too, with her.

5     Q.  Did you sit in on any of these interviews?

6     A.  I believe I did, yes, sir.

7     Q.  Which ones?

8     A.  I think Flanigan, I think Bullock I believe.

9  That's all I recollect.

10    Q.  Flanigan is the --

11    A.  Oh, and Snelling too.

12    Q.  And Snelling?

13    A.  Yeah.

14    Q.  Flanigan is the first officer whom Captain

15 Whitehouse had said had witnessed Mr. Patterson using

16 the words faggot and nigger, correct?

17    A.  That's correct.

18    Q.  Did Mr. Flanigan confirm that?

19    A.  Mr. Flanigan, he personally came into my office

20 and told me that, but then recanted it during the

21 interview.

22    Q.  So Mr. Flanigan told you that Scott Patterson

23 used the words nigger and faggot, but then told

24 Ms. Burke-Leon that he had not said those things?

25    A.  That's correct.

1    Q.  Did you, when you were in the interview, did you

2  say why are you saying this now when you told me

3  otherwise?

4    A.  I did not.  It was not my interview.

5    Q.  Did you ever ask Mr. Flanigan why he recanted

6  that?

7    A.  What I told him when he initially told me that, I

8  said if HR interviews you, are you going to tell them

9  that, and he goes yes.

10   Q.  Do you have any idea why he did not say the same

11  things at the HR interview?

12   A.  I do not.

13   Q.  Had you told Ms. Burke-Leon that he had told you

14  these things?

15   A.  I did.

16   Q.  Did she confront him with that inconsistency?

17   A.  I don't recall that question being asked.

18   Q.  Were the interviews tape recorded?

19   A.  I don't know if that was -- there might have been

20  a court reporter.  I don't know.

21   Q.  Well, do you know if --

22   A.  I don't recall.

23   Q.  Is it the routine practice to tape record the

24  interviews?

25   A.  No, sir.

1    Q.  Is it a routine practice to make notes of the

2   interviews?

3    A.  Yes, sir.

4    Q.  So for each interview, there should be other

5   handwritten or typed notes?

6    A.  I believe it should be in her notes, yes, or

7   questions and answers that she gets.  I believe that

8   would be the case.

9    Q.  Now, were Bullock and Snelling verbally

10   interviewed?

11    A.  I believe so, yes, sir.

12    Q.  And you sat through both of those?

13    A.  Snelling for sure.  I know Bullock had come into

14   my office, and I'll be honest with you, I don't recall

15   if it was -- I was in the HR interview with Bullock or

16   not.

17    Q.  Did Bullock come in of his own volition --

18    A.  Yes.

19    Q.  -- or was he asked to come in?

20    A.  Yes.

21    Q.  Did he say why he was coming in?

22    A.  Yeah, with concerns over the erratic behavior of

23   Scott.

24    Q.  When did he do this?

25    A.  I don't recall the date.  Sometime in 2015.

1    Q.  When I say of his own volition, I mean did he

2  initiate the visit to your office, or was he asked to

3  come in?

4    A.  He was not asked to come in.

5    Q.  So he did initiate it?

6    A.  That's correct.

7    Q.  Were you present at the interview of Chip

8  Worthington?

9    A.  I do not believe I was there.

10   Q.  Did you read the interview notes?

11   A.  No, sir.

12   Q.  Do you know what Mr. Worthington was supposed to

13  have observed?

14   A.  No.  I do recall Eric Harris coming into my

15  office.

16   Q.  I'm sorry?

17   A.  Eric Harris, the last person.

18   Q.  Okay.

19   A.  I do recall him coming into my office, and

20  Worthington, that might have been the other guy that

21  came into my office that had concerns.

22   Q.  And once again, on each of these gentlemen, did

23  they initiate the visit to your office?

24   A.  Yes, sir, they did.

25   Q.  And did you make any notation of when this was?

1    A.  No, sir.

2    Q.  Was it before or after Mr. Whitehouse complained?

3    A.  After.

4    Q.  Had they been informed there was an HR

5    investigation?

6    A.  No, sir.  I don't believe it had started then.

7    Q.  So this was prior to September 24?

8    A.  That's correct.

9    Q.  And what, if anything, did you do when they told

10   you that you had a pilot engaging in erratic behavior?

11   A.  I told them to contact professional standards.

12   That's where it is at the moment.

13   Q.  Did you ever speak to Mr. Tyner?

14   A.  I can't remember.

15   Q.  Do you know if Ms. Burke-Leon spoke to Mr. Tyner?

16   A.  I do not know that, sir.

17   Q.  Look at Exhibit 10 and let me know when you've

18   finished reading it.

19   A.  Okay.

20   Q.  Do you recall receiving that message?

21   A.  I do not.

22   Q.  Do you recall discussing with Mr. Cronin the

23   concerns raised by Danny Shellhouse?

24   A.  I do not.

25   Q.  Do you recall a discussion amongst you, Mr. Bonds

1    and Brian Vitale concerning the placement of Scott

2    Patterson on PW status?

3       A.  None other than I think Vitale came in asking

4    about it, and we just said he's on PW.

5       Q.  Do you recall telling Mr. Vitale why

6    Mr. Patterson was on PW?

7       A.  I did not.  It's not his business.

8       Q.  When you say you don't recall it, do you have --

9    you simply don't recall or you have a positive

10   recollection that you did not tell him anything about

11   it?

12      A.  Captain Vitale cannot be trusted with anything in

13   my opinion.

14      Q.  Why do you think Captain Vitale cannot be trusted

15   with anything?

16      A.  My past practice with him.

17      Q.  What do you mean he can't be trusted with

18   anything?

19      A.  Because he just can't be trusted.

20      Q.  You mean he's dishonest?

21      A.  That's correct.

22      Q.  So if he said that you told him that it was

23   because of First Officer Patterson's involvement in a

24   divert over Bolivia, you would not agree with that?

25      A.  I would not agree with that at all.

1    Q.  And why would Captain Vitale lie?

2    A.  Because he's lied to me multiple times during my

3  course of being a chief pilot that was validated.

4    Q.  Why is he still flying?

5    A.  Lying is not a downing requirement or that rises

6  to the level.

7    Q.  By downing requirement you're talking about

8  taking somebody off of flight status?

9    A.  That's correct.

10    Q.  Tell me what behaviors, if any, Mr. Patterson has

11  engaged that were, quote, "downing," close quote,

12  behaviors?

13    A.  All we do is collect the data and move it on to

14  wherever it's needed to make a decision by those who are

15  better suited to make a decision whether he's fit to fly

16  or not.

17    Q.  Who made that decision?

18    A.  Who made what decision?

19    Q.  Who made the decision that Scott Patterson for

20  the past two years and just three days shy of six

21  months --

22    A.  Somebody in Dallas did.

23    Q.  Who?

24    A.  I have no idea.

25    Q.  Take a look at what has been marked as

1  Plaintiff's Exhibit 11, please.

2    A.  Yes, sir.

3    Q.  Do you recall this e-mail string?

4    A.  I don't.

5    Q.  Is there a time limit on how long somebody can be

6  on pay withheld status?

7    A.  It can be unlimited.

8    Q.  Do you know to what Ms. Burke-Leon is referring

9  when she's asking you or asking Michelle Montgomery:

10  Does the VC break PW removal?

11    A.  Other than I think Scott maybe had vacation

12  during the time and they might have wanted to do an

13  interview.  That's the only thing.

14    Q.  Who is Michelle Montgomery?

15    A.  Michelle Montgomery worked for Lucretia.

16    Q.  She's a manager of labor relations; is she not?

17    A.  I believe she is.  I think she's changed jobs,

18  but I'm not totally sure on that.

19    Q.  What role did Ms. Montgomery play in the putting

20  of Mr. Patterson on PW status?

21    A.  I think she was just part of the group discussion

22  I believe.

23    Q.  What if any concerns did she express?

24    A.  I think she takes all the data and they talk

25  amongst themselves in Dallas, and make that

1 determination.

2    Q.  Were you part of that discussion?

3    A.  I believe I was part of the after discussion.

4    Q.  What was the after discussion?

5    A.  That it's been determined that we're going to put

6 him on pay withheld.

7    Q.  Who told you that?

8    A.  Cronin probably.  I think it was a conference

9 call probably.  That's the way it usually is.

10    Q.  You're saying there's a conference call

11 between -- when did the --

12            MR. AMLONG:  All right, read his answer back

13 to me please.

14            (Answer read back.)

15            MR. AMLONG:  And before that?  It was

16 determined something?

17            (Answer read back.)

18 BY MR. AMLONG:

19    Q.  When was it determined that you would put

20 Mr. Patterson on pay withheld?

21    A.  I believe there was discussion that came down

22 after the HR investigation was complete, or actually you

23 mean as far as before?

24    Q.  Well, how many discussions were there about

25 putting Mr. Patterson on pay withheld?

1    A.  None, other than just one because once the HR

2   investigation starts, he's automatically put on pay

3   withheld.

4    Q.  Then why was there any need for any other

5   discussion or determination?

6    A.  Just because when somebody gets put on pay

7   withheld, it's a big deal, so everybody needs to be in

8   the loop on exactly why people are put on pay withheld.

9    Q.  Well, I mean was there a discussion between

10  exactly your 8:34 p.m. receipt of Mr. Whitehouse's

11  letter and the 10:17 p.m. placement of Mr. Patterson on

12  pay withheld status on September 24?

13   A.  I'm sure I called Mark Cronin or somebody called

14  Mark Cronin and a determination was made.

15   Q.  At the top of this e-mail you have in bold,

16  quote, "I have no memory of any ghost writer

17  accusations.  In fact, this is the first I knew that

18  Patterson was checking on me.  Now I guess I have to

19  look over my shoulder."  What's that?

20   A.  I guess it looks like it's a comment from

21  Worthington.  I don't recall anything about it.  I'm not

22  sure who even Worthington is.  It looks like it's

23  from -- he's one of the guys that was interviewed by HR,

24  Chip Worthington.

25   Q.  Were you present for his interview?

1   A.  I don't believe I was.

2   Q.  Look at Exhibit 12.  You're copied on that e-mail

3   from -- or you're an addressee on that e-mail, correct?

4   A.  Yes.

5   Q.  What awareness did you have of Mr. Bonds' inquiry

6   into whether or not Mr. Patterson was legitimately on

7   military leave?

8   A.  Other than he thought there might be something

9   going on, but that's it.  I paid no attention to it.

10  Q.  Did you discuss it?

11  A.  No, sir.

12  Q.  Look at Exhibit 13.

13  A.  (Witness complied).

14  Q.  Do you recall being copied on this e-mail?

15  A.  Yes, sir.

16  Q.  When did you first learn of these remarks by

17  Mr. Snelling?

18  A.  (No response.)

19          MR. AMLONG:  While you're reading that, give

20  me a minute to grab my phone.

21          (Discussion held off the record.)

22  BY MR. AMLONG:

23  Q.  When did you first learn about Mr. Snelling's

24  concerns about Mr. Patterson?

25  A.  I believe it was probably the summer of 2015.

1  Q.  Before he was put on PW or after?

2  A.  Before.

3  Q.  And how did you learn about these?

4  A.  He came into my office.

5  Q.  Did he say why he was coming into your office?

6  A.  Yeah, with concerns about Scott Patterson.

7  Q.  But did he say why he was coming into your office

8  in the summer of 2015 about incidents that occurred in

9  2004 and July 2014?

10  A.  Other than the fact that he thinks that there's a

11  long history with Scott that he felt that he had the

12  obligation to come forward on.

13  Q.  Did he say what prompted him in the summer of

14  2015 to come forward with these allegations?

15  A.  Yeah.  I believe he's a messenger for many of the

16  first officers of Miami.

17  Q.  Do you know who suggested to him that he should

18  come forward?

19  A.  No, sir.

20  Q.  Did you ask him whether or not he'd spoken to

21  Whitehouse?

22  A.  I did not.

23  Q.  Was Mr. Snelling -- so Mr. Snelling you're

24  saying, one, came into your office; two, was interviewed

25  by Ms. Burke-Leon; and three, wrote the e-mail that's

1  Exhibit 13?

2    A.  Yeah, I believe that I think this e-mail was

3  after she'd spoken with him I guess.

4    Q.  Did you do anything to investigate any of these

5  assertions by Mr. Snelling?

6    A.  Did Ana?

7    Q.  Or did you?  The first question is:  Did you?

8    A.  No, sir.

9    Q.  Do you know whether or not -- did Ms. Burke-Leon

10 tell you whether or not she had done so?

11   A.  No.

12   Q.  Did you learn, otherwise than her telling you,

13 that she had done so?

14   A.  No, sir.

15   Q.  Was this considered part of the Section 21

16 investigation?

17   A.  Yes, sir.

18   Q.  And what's the relevance of what Mr. Snelling is

19 saying here to the Section 21 investigation?

20   A.  Part of the, you know, the data collection of the

21 investigation into Scott.

22   Q.  What's the relevance of behavior in 2004?

23   A.  Pattern.

24   Q.  All right.  Now, what's WI?

25   A.  Where's that?  Way down at the bottom there?

1    Q.  Yes.

2    A.  That's VVI.  That's Santa Cruz, Bolivia.

3    Q.  And LPB is La Paz, Bolivia?

4    A.  That's correct.

5    Q.  Is Snelling a first officer?

6    A.  No.  He's a senior captain.

7    Q.  Was he and his family removed from first class on

8  any of those flights?

9    A.  I have no idea, sir.

10    Q.  And then his next assertion is that the more

11  serious crime happened in July 2014 in which he says

12  he's researched and he believes the exact date was --

13  exact flight was 922 to Miami La Paz to Santa Cruz,

14  Bolivia on July 13, 2014, correct?

15    A.  That's correct.

16    Q.  So look at No. 14.  That's a notice of hearing

17  that is signed for Bonds by you.  Who was in charge of

18  the Patterson case?  You or Bonds?

19    A.  Well, I think I was more involved in the

20  Patterson issue.  Nothing -- like I said, everybody can

21  take a certain topic and run with it, so I think this

22  was actually set out that this was going to be done, a

23  notice of hearing in the work environment.  Bonds wasn't

24  there, but we can sign for him.

25    Q.  How did you learn about First Officer Bullock's

1  involvement with --

2    A.  He came into the office.

3    Q.  On his own initiation he just wanders in there?

4    A.  Yeah.

5    Q.  Had you contacted him first?

6    A.  I did not.

7    Q.  Did he say what prompted him to come in?

8    A.  A concern over Scott's behavior.

9    Q.  Well, how did he know that -- when did he come

10 in?

11    A.  I think sometime in the summer I believe of 2015

12 when everybody was coming into my office at that time.

13    Q.  Before Mr. Patterson was put on pay withheld

14 status?

15    A.  That's correct.

16    Q.  Are there any records of this?

17    A.  Just other than that they sent me e-mails, but

18 no.

19    Q.  When did you request that he provide details

20 about Mr. Patterson?

21    A.  I told him that when he came into my office.  I

22 explained it to him.  I said look, can you put it in

23 writing to me, and that's what he did.

24    Q.  Well, this is dated October 29.  Summer generally

25 ends about August.  September is in between and that's

1 when he was put on pay withheld, right?

2   A.  He might have came in afterwards and said hey,

3 look, I got concerns too, and I said well, put them

4 down.

5           MR. MORALES:  You're reference of "this,"

6 you're referencing Exhibit 15?

7           MR. AMLONG:  Yes.

8 BY MR. AMLONG:

9   Q.  It also states as you requested.  How is the

10 request made?

11   A.  After he came into my office, I asked him to put

12 it in writing.

13   Q.  Looking at Exhibit 16, an e-mail from

14 Ms. Burke-Leon to Mr. Bullock, which is cc'd to you?

15   A.  Yes, sir.

16   Q.  Which additional items did Ms. Burke-Leon wish --

17   A.  I don't know that.

18   Q.  Let me finish the question.  Which additional

19 items did Ms. Burke-Leon wish Mr. Bullock add to his

20 statement?

21   A.  I do not know that, sir.

22   Q.  And are you saying that in addition to these

23 e-mail statements, there was an interview where she took

24 notes?

25   A.  I believe so, yes, sir.

1    Q.  You were present?

2    A.  I believe I was present, but I don't -- again, I

3  can't remember which guys I was present with other than

4  Snelling.

5    Q.  Other than what?

6    A.  Other than Snelling interview.  I know I was in

7  on that one.

8    Q.  Do you know Bullock?

9    A.  I do.

10    Q.  How do you know him?

11    A.  I've flown with him many times.

12    Q.  During all the times that you were flying with

13  him, did he ever mention anything about Mr. Patterson?

14    A.  No, sir.

15    Q.  Look at 19, do you recognize that as an e-mail

16  from Bonds to you and Scialfa and Cronin?

17    A.  Number 19, is that from Scialfa?

18    Q.  Yes.

19    A.  To Bonds?

20    Q.  Eighteen I mean.

21    A.  Eighteen?

22    Q.  Yes.

23    A.  I believe I remember this, yes, sir.

24    Q.  Do you recall what the concern was over the pay

25  records?

1    A.  Other than reading this, I would -- it would only

2    be a guess, but I don't know what he's -- what he's

3    talking about.

4    Q.  Look at 19, which is the e-mail from Scialfa to

5    Bonds.

6    A.  Yes, sir.

7    Q.  It starts off from Scialfa to Bonds:  I would

8    prefer to pursue this avenue, meaning the military pay

9    investigation, rather than Section 20 for now?

10            MR. MORALES:  I would object to the extent

11   you've characterized the document.

12            MR. AMLONG:  Well, it states, quote, "I

13   would prefer to pursue this avenue rather than

14   Section 20 for now."  And that's above an e-mail talking

15   about -- from Bonds talking about the investigation of

16   the army pay records.

17   BY MR. AMLONG:

18   Q.  When had any discussion of a Section 20

19   investigation begun?

20   A.  I don't recall.

21   Q.  Do you know why you were being copied?

22   A.  Because I was in the office at that time.

23   Q.  Was it the custom to copy all the chief pilots?

24   A.  Yeah, most of the time when there's, you know,

25   needed to know.

1     Q.  Look at Exhibit 20, which is an e-mail from

2  Mr. Cronin to Scialfa and Bonds and cc'd to you.  It's

3  expressing concerns about how, quote, "USERRA issues can

4  get really tangled fast, and we need to make sure his

5  behavior remains the focus and not how we are handling

6  it," close quote.

7        Did you participate in any discussions in which

8  there were concerns expressed over USERRA?

9     A.  No.

10           MR. MORALES:  And I would just note an

11  objection to the extent we get into discussions with

12  Mr. Carver or other members of the legal department.

13  BY MR. AMLONG:

14     Q.  Did you participate in any discussion, outside of

15  Mr. Carver and anyone else from the legal department,

16  about USERRA?

17     A.  No, sir.

18     Q.  Look at Exhibit 21.  Mr. Scialfa is telling

19  Mr. Cronin that they should have Mr. Carver in legal

20  take a look at it and that they should have answers by

21  now.  Do you recognize that e-mail in which you are

22  copied?

23     A.  I do not.

24     Q.  Do you know if there was ever any determination,

25  one way or the other, if there is any validity to

1  Captain Bonds' concerns over the military pay issues?

2     A.  I do not.

3     Q.  Look at Exhibit 22.  It's probably best to start

4  reading from the bottom.

5     A.  Yes, sir.

6     Q.  Starting at the bottom there's a concern about,

7  and I believe this is being expressed by Mr. Bonds to

8  Ms. Burke-Leon about training is going to schedule him

9  Sunday.  When somebody's on pay withheld status, can

10 they train?

11    A.  No.

12    Q.  Does that create issues with remaining current in

13 your ratings?

14    A.  Yes, sir.  I guess it -- well, it depends.

15 Sometimes you can go to training a month early before

16 your expiration, so --

17    Q.  You write here to Bonds copying Montgomery,

18 Burke-Leon, Scialfa and Cronin, re Patterson:  All, it

19 is up to us to give a reason for the hearing and all

20 documentation we will use at the hearing.  We discussed

21 this for the statements I got from other pilots who are

22 in strict confidentiality that they would not get it out

23 if we did not get anything.  I don't think we did, and I

24 believe the only information would be Captain

25 Whitehouse's statement.  And then it says, the next

1 paragraph, APA is waiting on us IMO.  What's IMO mean?

2     A.  In my opinion.

3     Q.  And APA is the union?

4     A.  That's correct.

5     Q.  So is there a burden of proof in a Section 21

6 hearing?

7     A.  Not necessarily, but --

8     Q.  Well, did you have any evidence at the Section 21

9 hearing other than Captain Whitehouse's letters?

10     A.  Other than just the conversations with the

11 pilots, but no.

12     Q.  Well, did any of the pilots provide you

13 statements that you could use?

14     A.  No.

15     Q.  Did Snelling wish to go on the record with his

16 statement?

17     A.  Yes, sir, I believe he did.

18     Q.  Did you use that as evidence at the Section 21

19 hearing?

20     A.  I don't recall.  I believe so.

21     Q.  Was Mr. Bullock willing to go on the record with

22 his statement?

23     A.  No, sir.

24     Q.  Did he say why not?

25     A.  I just don't like turning other pilots in.

1    Q.  Did he give an interview to human resources?

2    A.  I believe he did, yes, sir.

3    Q.  Was the interview under oath?

4    A.  I believe so, yes, sir.

5    Q.  Was Worthington willing to go on the record with

6  his statements?

7    A.  I am not sure on that.  I have no recollection of

8  that.

9    Q.  How about McGinn?

10    A.  McGinn was part of professional standards, so I'm

11  not sure if he was even on the list to be interviewed or

12  not.

13    Q.  Well, did he give you a statement?

14    A.  No, sir, he did not.

15    Q.  So you had nothing at the Section 21 hearing

16  other than essentially the same accusations from Captain

17  Whitehouse that you had had since at least March?

18    A.  And the concerns from the other pilots.

19    Q.  None of whom were willing to articulate them?

20    A.  Not in a Section 21 environment or in writing,

21  that's correct.

22    Q.  Do you know if corporate security caused

23  Mr. Patterson to be stopped at customs as he was leaving

24  the country?

25    A.  I'm sorry?

1    Q.  Do you know whether or not corporate security

2  caused Mr. Patterson --

3    A.  I have no idea.

4    Q.  What, if anything, did corporate security report

5  to you about its investigation?

6    A.  There's nothing here.

7    Q.  That's what they said?

8    A.  Yes.

9    Q.  Did they tell you this in writing?

10   A.  No, sir.

11   Q.  Does American Airlines have any work rules about

12 making false allegations against their pilots?

13   A.  I believe there may be.  I'm sure there's some

14 kind of discipline somewhere, but if it's investigated,

15 but I don't know to be honest with you.

16   Q.  Well, based on the -- based on the investigation

17 by corporate security, did you consider Captain

18 Whitehouse to have made a false allegation about

19 Mr. Patterson's taking guns into Bolivia?

20   A.  Mm-hm.

21   Q.  Yes, you did believe him to have made a false

22 statement?

23   A.  No.  I considered the matter was closed out, so

24 it was an issue that was raised.  It was investigated by

25 corporate security.  They determined there was nothing

1 there, so --

2 Q. Well, if somebody says Scott Patterson is taking

3 guns into Bolivia, corporate security investigation says

4 no, he's not, why is that not a false statement by the

5 person who told you in the first place that he was?

6 A. I can't answer that. I don't know.

7 Q. Is the point of a Section 21 hearing to make a

8 decision as to whether or not the employee has done

9 anything that violates American Airlines work --

10 A. Yeah, it's a fact-finding -- it's not punitive in

11 nature. It's just a fact-finding tool to help us come

12 to certain conclusions on different situations.

13 Q. Well, what did you conclude as a result of the

14 November fact-finding into the allegations against --

15 A. I think as I recall, I believe at the end of the

16 day, I told Scott to treat people with respect is my

17 recollection.

18 Q. Well, other than what Captain Whitehouse was

19 saying, what did you have to base any judgment that he

20 was not treating people with respect?

21 A. The numerous pilots who walked into my office

22 without solicitation that caused concern over the

23 behavior of Scott.

24 Q. Now, how did they know to walk into your office?

25 This all happened spontaneously during the summer of

1 2015 you're saying?

2    A.  In 2015, that's right.  As I said, pilots don't

3 like turning other pilots in.

4    Q.  So Scott Patterson has worked for American

5 Airlines for how many years?

6    A.  I have no idea.

7    Q.  Well, since Mr. Snelling's first recollection was

8 an incident in 2004, we have at least 14 years, correct?

9    A.  Yeah.  I believe he was furloughed for a certain

10 period of time, but I'm not sure how long.

11    Q.  Okay, but a substantial time, correct?

12    A.  That's correct.

13    Q.  And the first time he blips on your radar is in

14 the summer of 2014?

15    A.  Yeah.  Like I said, I gave it over to

16 professional standards because people complain about

17 people all the time.  That's where it goes.

18    Q.  And did anybody give you any indication as to why

19 they were all deciding to come together in 2015 to come

20 into your office and complain about Scott Patterson?

21    A.  Just a guess by me?  My guess is that when word

22 gets out that somebody's finally come forward, you know,

23 I got something to say and I got concerns.  That's just

24 my guess.

25    Q.  Look at Exhibit 23.  It's an e-mail from Ana

1  Burke-Leon to Cronin cc'd to you saying that she's given

2  everything, given all statements and Whitehouse report

3  with redacting identifying information to Michelle.

4  That's Michelle Montgomery?

5      A.  Yes, sir.

6      Q.  The labor relations manager?

7      A.  Yes, sir.

8      Q.  Do you know if she's an attorney?

9      A.  I don't know that, sir.

10     Q.  Were there any statements other than

11  Mr. Patterson's that were given to the APA?

12     A.  I do not know that, sir.

13     Q.  Did Ms. Burke-Leon attend the Section 21 meeting?

14     A.  No, sir, not to my recollection.

15     Q.  Did anybody from HR?

16     A.  No, sir.

17     Q.  Well, is there a decision maker at the Section 21

18  hearing?

19     A.  As far as?

20     Q.  Well, is the Section 21 hearing to determine

21  whether or not a pilot has violated some rule?

22     A.  Yeah, it's a fact-finding.

23     Q.  So who finds the facts?

24     A.  It would be the flight office chief pilots who do

25  the investigation, background investigation, and give

1  all the documents as a -- you do your investigation, you

2  determine whether a Section 21 is appropriate or not, or

3  whether a discussion with the union is appropriate.

4      You set a date.  You give all the documentation

5  to the union.  You come in, you ask him about the

6  information that you've gathered.  You've got a list of

7  questions or whatever the case may be.

8      And a determination is made based on the

9  individual's answers and discussions with the union, how

10  we're going to do this, and usually a resolution is done

11  right then and there.

12    Q.  Why was not a resolution done right then and

13  there in this case?

14    A.  Some things are more complicated than others.  I

15  believe, best of my recollection, Section 21 was just

16  based on Captain Whitehouse's behavior -- or Scott's

17  behavior with Captain Whitehouse, and the discussion was

18  at the end of the day, treat everybody with respect,

19  Scott.  That was the end of the Section 21.

20    Q.  Okay.  So why didn't you put him back in the air?

21    A.  Why is that?

22    Q.  Why did you not -- why did you not put him back

23  in the air at the conclusion of the Section 21 hearing?

24    A.  That was not my decision.

25    Q.  Whose decision was it?

1    A.  Somebody from Dallas.

2    Q.  But you don't know who?

3    A.  I do not.

4    Q.  When did you first begin considering -- strike

5    that.  In how many Section 21 hearings have you

6    participated?

7    A.  Thirty to forty.

8    Q.  Other than First Officer Patterson, can you think

9    of any other pilot who has not been put back to work at

10   the end of -- either terminated, suspended, or put back

11   to work at the end of a Section 21 hearing?

12   A.  Yes.

13   Q.  How many?

14   A.  Five or six probably.

15   Q.  And on what grounds?  I mean why were they not

16   put back to work?

17   A.  Further investigation needed, not comfortable

18   with where we are at that point, that a determination is

19   made from the evidence that we gathered that was true,

20   so until further evaluation was done, that they were

21   still not put back into the air.

22   Q.  How many were later put back in the air?

23   A.  Probably a couple of them I would think after a

24   lengthy period of time.

25   Q.  When did you first begin the consideration of

1 doing a Section 20 on Mr. Patterson?

2  A.  I don't recall when the first conversations were

3 done.  I believe it was after -- I believe it was after

4 the HR investigation was complete.

5  Q.  You signed the notice of hearing October 28.

6 Would that have been the end of the HR investigation?

7  A.  Which exhibit are you looking?

8  Q.  Exhibit 14.

9  A.  I don't recall that was the end of it.

10  Q.  Well, on Exhibit 13, Ms. Burke-Leon was still

11 meeting with Snelling?

12  A.  Correct.

13  Q.  So the investigation would have been ongoing

14 through October 26?

15  A.  That's correct.

16  Q.  She's taking a statement from Bullock on the

17 29th, so the investigation would still have been open

18 then?

19  A.  I believe so, yes, sir.  I believe we were under

20 the impression that they would have been done by then.

21 That was my recollection.

22  Q.  Well, Mr. Scialfa is saying on October 30 that I

23 would prefer this avenue rather than a Section 20 for

24 now.  It's on Exhibit 19; do you see that?

25  A.  Yes, sir.

1    Q.  So had the discussion begun over Section 20 by

2  this time?

3    A.  I don't recall.

4    Q.  Take a look at Exhibits 25 and 26.

5    A.  Yes, sir.

6    Q.  Was 26 attached to 25?

7    A.  Yes, sir.

8    Q.  Do you know what prompted Ms. Montgomery to send

9  you a Section 20 draft letter on January 5, 2016?

10    A.  Other than I think a determination was made based

11  on all the evidence that deemed that Scott -- we were

12  going to request Scott to go to a Section 20.

13    Q.  Were you part of that discussion?

14    A.  I was not.

15    Q.  On Exhibit 27 do you recognize that e-mail?

16    A.  I do not.

17    Q.  Do you know why you would need the dates of the

18  pay withheld determination?

19    A.  Yeah, that's a good question.  I don't know.  I

20  don't know that.  Oh, I think it might have been based

21  on the previous e-mail down at the bottom, placed him on

22  pay withheld status on, you know, what date do you want

23  me to use?  Do you want me to use this date now or the

24  previous date that we initially put Scott on PW?  That's

25  what I assume that is.

1    Q.  Exhibit 29, was that attached to Exhibit 28?

2    A.  It might have been.  I think it might have been

3  the whole thing.

4    Q.  Well, this is Bates stamped 752.

5    A.  All right, the one fourteen, one fourteen.

6    Q.  Exhibit 28 is Bates stamped 751.

7    A.  Yeah, so it's almost nine days later.  That, I

8  don't know.

9    Q.  And it says:  If you are good with this (Lucretia

10  edits included already) you can go ahead and send this

11  to medical for Section 20 processing.

12    A.  Okay.

13    Q.  And then we have a Section 20 request.

14    A.  Right.

15    Q.  So was 29 attached to 28?

16    A.  Yes, sir.

17    Q.  Do you recognize Exhibit 30?

18    A.  I'm aware of it, yes, sir.

19    Q.  I take it that junk is your opinion of what

20  Mr. Patterson had done?

21    A.  No, no, no.  That's what Jim Bonds is called; a

22  nickname in the military.

23    Q.  So do you recall the discussion?  The next

24  e-mail, the next is Exhibit 31, asking what time you'd

25  be available for that phone call, right?

1    A.  Yes, sir.

2    Q.  Do you recall what was said during that phone

3    call?

4    A.  I don't, other than what do we even do with this?

5    We don't get involved in union Article 7 charges.  I

6    wouldn't.

7    Q.  Did you respond to the request for a statement

8    that you had never called him a weak captain?

9    A.  I don't ever recall that and I don't ever recall

10   writing any -- whether he was a weak captain, I've never

11   flown with Captain Whitehouse, so again, usually when

12   it's union stuff, it's held at the flight office.  We

13   don't even touch it.

14   Q.  What is the discussion that you had with -- on

15   Exhibit 22 you were telling Ms. Montgomery that you need

16   to discuss the Article 7.

17   A.  Yeah.  Again, you know I think my discussion with

18   Jim was probably:  Do we do anything with this?  And my

19   discussion with Michelle would have been:  What am I

20   supposed to do with this and how do I respond to it?

21   Q.  Exhibit 33 is an e-mail from Rojas to you, asking

22   how far should you go to assist Whitehouse with

23   defending the Article 7.  Did you do anything to assist

24   him?

25   A.  No.  He can get that information from APA.

1    Q.  Because the APA downloads all of the crew

2  schedules every day, correct?

3    A.  Yes, sir.

4    Q.  And saves them?

5    A.  Yes, sir.  You're talking about flight crews and

6  stuff, right?

7    Q.  Yes.

8    A.  Yes, sir.

9    Q.  So you can always tell who was on -- a union

10  member can always go back and find out who was on what

11  flight which day?

12    A.  Yeah.  American has a restriction that it's only

13  like 30 days you can go back, but the union can go back

14  much further than that.

15    Q.  Exhibit 35, is that your e-mail to Whitehouse?

16    A.  Yes, sir.

17    Q.  And you're saying, quote, "We have it for

18  action," close quote.  What's that mean?

19    A.  That would be call Michelle Montgomery and go:

20  What do I do with this?  Which I kind of already knew

21  that anything that involves a union member against a

22  union member, the company never touches that.

23    Q.  Are you still a union member, or were you still a

24  union member when you left?

25    A.  No.  Once I went over to be a chief pilot, they

1  kick you out of the union.

2     Q.  Exhibit 36 is your direction to Mr. Patterson to

3  go see Dr. Knippa?

4     A.  Yes, sir.

5     Q.  Did you ever have any discussions with

6  Dr. Knippa?

7     A.  No, sir.

8     Q.  Do you know what, if anything, was forwarded to

9  Dr. Knippa?

10    A.  I do not, no, sir.

11    Q.  Look at Exhibit 37.  That's your signature and

12 that's the request that you gave him back on January 14?

13    A.  Yes, sir.

14    Q.  Look at Exhibit 38.  Have you ever seen that

15 report?  Take a look at 38 and 39.  One's the summary

16 and one's the full report.

17    A.  I've not seen either one of these, sir.

18    Q.  All right, look at 40.  Do you recognize that?

19    A.  Yes, sir.

20    Q.  Who is Michelle Magee?

21    A.  I do not know who that is.

22    Q.  Exhibit 41 appears to be a duplicate.  Was 43

23 attached to Exhibit 40?

24          MR. MORALES:  Exhibit 42 may be different in

25 my book.

1    MR. AMLONG:  It was 42 attached to 40.

2    MR. MORALES:  Right.

3    THE WITNESS:  I do not -- I do not believe

4  so.

5  BY MR. AMLONG:

6    Q.  Forty is 770 and 771, and it says:  Here's the

7  letter to send him and 43 is a letter which is Bates

8  stamped 772.

9    A.  Oh, okay.  I'm sorry, yeah, you're right.  So 42

10  would be attached to 40.  Was it 40?  Yeah, it was 40.

11  That's correct.

12    Q.  Do you recognize Exhibit 43?

13    A.  Yes, sir.

14    Q.  Did Mr. Patterson ever contact you subsequent to

15  August 22?

16    A.  I do not believe so, no, sir.

17    Q.  Do you know what the process is for returning

18  from a Section 20 status?

19    A.  I do not know exactly what it states.

20    (Discussion held off the record.)

21    MR. MORALES:  Are we taking a break?

22    MR. AMLONG:  Yes.

23    (Recess taken.)

24  BY MR. AMLONG:

25    Q.  Mr. Beach, what was your start date with

1  Amerijet?

2      A.  It was June of 2017.

3      Q.  And when did you go off the payroll at American?

4      A.  I believe I went off in October of 2017.

5      Q.  How could you continue on both payrolls?

6      A.  I had foot surgery.

7      Q.  I'm sorry?

8      A.  I was on medical, sick.

9      Q.  Okay.  So you couldn't walk, but you could sit at

10 a desk?

11     A.  That's correct.

12             MR. AMLONG:  Okay, thank you.

13             MR. MORALES:  The witness will read the

14 transcript pursuant to Rule 30.  Thank you.

15             MR. AMLONG:  We'll take it.

16             COURT REPORTER:  You're ordering?

17             MR. AMLONG:  Yes.

18             COURT REPORTER:  Do you want a copy?

19             MR. MORALES:  Yes, please.

20             (Whereupon, the deposition was adjourned at

21 2:27 p.m.)

22             (Signature not waived.)

23             AND FURTHER DEPONENT SAITH NOT

24                     ------------

25

1                    CERTIFICATE OF OATH

2

3  STATE OF FLORIDA

4  COUNTY OF BROWARD

5

6          I, the undersigned authority, certify that

7  BRIAN BEACH, personally appeared before me and was duly

8  sworn.

9          WITNESS my hand and official seal this 16th

10 day of April 2018.

11

12

13        -------------------------------

14              HEATHER VIEIRA
           Notary Public - State of Florida
15             Commission FF236243
               Expires 07/16/2019

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE

2    STATE OF FLORIDA )
                     )  SS.
3    COUNTY OF BROWARD)

4           I, HEATHER VIEIRA, do hereby certify that
     pursuant to Notice of Taking Deposition in the
5    above-styled cause, that I was authorized to and did
     stenographically report the foregoing deposition as
6    hereinabove shown, and the testimony of said witness was
     reduced to computer transcription under my personal
7    supervision.
            I further certify I am not a relative,
8    employee, attorney or counsel of any of the parties, nor
     am I a relative or employee of any of the parties'
9    attorneys or counsel connected with this action, nor am
     I financially interested in the action.
10          The certification of this transcript does not
     apply to any reproduction of the same by any means
11   unless under the direct control and/or direction of the
     certifying reporter.
12          Witness my hand and official seal in the City
     of Fort Lauderdale, County of Broward, State of Florida
13   this 16th day of April 2018.

14

15

16          ----------------------------
                    HEATHER VIEIRA
17                  Court Reporter

18

19

20

21

22

23

24

25