1                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2
          CASE NO.:  1:17-cv-60533-MARTINEZ/OTAZO-REYES
3

4

5    RODNEY SCOTT PATTERSON,
6              Plaintiff,
7    vs.
8    AMERICAN AIRLINES, INC., a Delaware
     Corporation,
9
               Defendant.
10   _____/
11

12                        Amlong & Amlong, P.A.
                          500 Northeast 4th Street
13                        Second Floor
                          Fort Lauderdale, Florida 33301
14                        Thursday, June 7, 2018
                          1:19 p.m. - 3:48 p.m.
15

16

17       VIDEOTAPED DEPOSITION OF GLENN R. CADDY, Ph.D.

18

19

20

21           Taken on behalf of the Defendant before
22   Christine Savoureux-Mariner, Florida Professional
23   Reporter and Notary Public in and for the State
24   of Florida at Large, pursuant to Notice of Taking
25   Deposition in the above cause.

1  APPEARANCES:

2           WILLIAM R. AMLONG, ESQUIRE
            AMLONG & AMLONG, P.A.

3           500 Northeast 4th Street
            Second Floor

4           Fort Lauderdale, Florida 33301
            (954) 462-1983

5           THEAMLONGFIRM.COM
            ON BEHALF OF THE PLAINTIFF

6

7           MICHAEL A. HOLT, ESQUIRE
            SHOOK, HARDY & BACON, LLP

8           201 South Biscayne Boulevard
            Suite 3200

9           Miami, Florida 33131
            (305) 358-5171

10          mholt@shb.com
            ON BEHALF OF THE DEFENDANT

11

12 ALSO PRESENT:

13     Rodney Scott Patterson, Plaintiff

14     Stan Perez, Videographer

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS                                      PAGE

3    GLENN R. CADDY, Ph.D.

4       Direct Examination By MR. HOLT              5

5       Cross-Examination By MR. AMLONG             54

6       Redirect Examination By MR. HOLT            70

7       Recross Examination By MR. AMLONG           78

8    Certificate of Reporter                       87

9    Read and Sign Letter                          88

10

11                       E X H I B I T S

12   DEFENDANT'S           DESCRIPTION             PAGE

13   Exhibit 1             Notice of Deposition      6

14   Exhibit 2A            Expert Disclosure         8

15   Exhibit 2B            Confidential Communique   8

16   Exhibit 2C            Curriculum Vitae          8

17   Exhibit 2D            List of Testimony         8

18   Exhibit 2E            Financial Agreement       8

19   Exhibit 3             4/22/16 Email             37

20   Exhibit 4             Plaintiff's Privilege Log 39

21           (Exhibits retained by court reporter.)

22

23

24

25

1      VIDEOGRAPHER:  Good afternoon.  We are on the

2      record.  The time is 1:19 on June 7, 2018.

3           Please note the microphones are sensitive and

4      may pick up whispering, private conversations and

5      cellular interference.  Please turn off all cell

6      phones or place them away from the microphones, as

7      they can interfere with deposition audio.  Audio

8      and video recording will continue to take place

9      unless all parties agree to go off the record.

10          This is media unit one of the video recorded

11     deposition of Glenn R. Caddy, Ph.D. in the matter

12     of Rodney Scott Patterson versus American Airlines,

13     Inc.  Today's deposition is being held at 500

14     Northeast 4th Street, Fort Lauderdale, Florida.

15          My name is Stan Perez, I'm the videographer.

16     The court reporter is Christine Savoureux.  I'm not

17     authorized to administer the oath.  I'm not related

18     to any party in this action.  I'm not financially

19     interested in the outcome.

20          Counsel and all present in the room will now

21     state their appearance and affiliation for the

22     record.  If there are any objections to the

23     proceeding, please state them at the time of your

24     appearance.

25          MR. HOLT:  Michael Holt on behalf of American

1      Airlines.

2            MR. AMLONG:  William Amlong on behalf of Scott

3      Patterson.

4            MR. PACE:  Noel Pace on behalf of Scott

5      Patterson.

6            THE WITNESS:  I'm Dr. Glenn Caddy.

7            VIDEOGRAPHER:  At this time, the court

8      reporter will swear in the witness.

9  Thereupon:

10                 GLENN R. CADDY, Ph.D.

11            Was called as a witness and, having been first

12  duly sworn and responding "I do," was examined and

13  testified as follows:

14            THE WITNESS:  I do.

15  BY MR. HOLT:

16      Q    Good afternoon, Dr. Caddy.

17      A    Mr. Holt.

18      Q    My name is Michael Holt.  I represent American

19  Airlines.

20            We are going to ask you a few questions about

21  your involvement in the case today with Scott

22  Patterson -- Rodney Scott Patterson versus American

23  Airlines.

24      A    Sure.

25            MR. HOLT:  First, I'd like for the court

1      reporter to mark the Notice of Deposition as

2      Exhibit 1, and I'll hand a copy to counsel.

3           (The referred-to document was marked for

4  identification as Defendant's Exhibit 1.)

5  BY MR. HOLT:

6      Q    Dr. Caddy, have you seen Exhibit 1 before?

7      A    No.

8      Q    I'd like you to take a look page 3 of

9  Exhibit 1, which identifies documents to bring with you

10  to this deposition.  Have you brought any documents

11  today in response to page 3 of Exhibit 1?

12      A    "Any and all reports and opinions prepared by

13  you in this case."  Essentially, in my head, and there

14  are some documents that address that, but I haven't

15  prepared a specific forensic report.

16      Q    We do have a copy of the expert disclosures,

17  so just to be clear, I'm only looking for documents

18  outside of the expert disclosures.

19      A    Okay.  "Any and all materials relied on" -- I

20  brought materials.  "Any and all materials considered in

21  any manner, whether or not you relied on objective" --

22  yes, number 3.

23           Number 4, "all communications with Edwin

24  Bercaw, including any persons, and Dr. Bercaw's office

25  regarding Plaintiff Rodney Scott Patterson."  As to

1    number 4, there is no document that I have.  I do have a

2    memory of communicating with Dr. Bercaw.

3         Q    Okay.  And we will talk a little bit about

4    that --

5         A    Okay.

6         Q    -- a little bit later.

7         MR. HOLT:  For the documents that you did

8        bring with you, in addition to the experts

9        disclosures in this case, Counsel, can we arrange,

10        after this deposition is over, for me to get a copy

11        of those?

12        MR. AMLONG:  Sure.

13        MR. HOLT:  Rather than taking the deposition

14        time, and your valuable time, Dr. Caddy.

15        THE WITNESS:  Just for clarity's sake, are we

16        including this?

17        MR. HOLT:  I have a copy of that and I'm about

18        to show you a copy of that right now --

19        THE WITNESS:  Okay, fine.

20        MR. HOLT:  -- so I think you've --

21        THE WITNESS:  Yes.

22        MR. HOLT:  -- pre-anticipated -- that's

23        redundant.  You've anticipated my line of

24        questioning.

25        Madame Court Reporter, I would like to mark

1          these five exhibits as 1A, 2B, 2C, 2D and 2E, and

2          together, they will form Composite Exhibit 2.

3                    MR. AMLONG:  2A is the expert disclosure?

4                    MR. HOLT:  Yes.  We'll go through them.  I'm

5          just going to let her --

6                    (The referred-to document was marked for

7     identification as Defendant's Exhibit 2.)

8     BY MR. HOLT:

9          Q    Exhibit 2A is the Plaintiff's Notice of Expert

10    Disclosure filed in this case.  Have you ever seen this

11    document before, Dr. Caddy?

12         A    No.

13         Q    Okay.  I'm handing you Exhibit 2B --

14         A    Yes.

15         Q    -- which is a document entitled Confidential

16    Communique to William Amlong, Esquire regarding Rodney

17    Scott Patterson.  Do you recognize this document, sir?

18         A    I do.

19         Q    Is this a document you prepared?

20         A    It is.

21         Q    Did you prepare it entirely by yourself?

22         A    Yes.

23         Q    Nobody else typed this document for you, for

24    example?

25         A    No.  I'm not a really good typist, but I did

1    it.

2         Q     Okay.  Does this document, which is

3    Exhibit 2B, contain all of your opinions that you are

4    going to render in this case?

5         A     I would expect that it would contain the vast

6    number of opinions.  There may be some that come from a

7    question that is not included in here, but this is the

8    essential element of my opinions, yes.

9         Q     As we sit here today, are you aware of any

10   opinions you intend to render in this case that are not

11   reflected in Exhibit 2B?

12        A     Only to the extent that I have information on

13   Rodney Scott Patterson that was developed after this

14   document was prepared.

15        Q     And what are those opinions or information

16   that was developed after Exhibit 2B was prepared you

17   intend to offer in this case, sir?

18        A     Essentially, that despite the premise of

19   American Airlines, this man is not fit or airworthy as a

20   pilot, that as you can see, he is currently wearing a

21   captain's uniform and flying for another carrier.  And

22   in order to be able to do that, he has to have a first

23   class medical and he has to be considered to be capable

24   of conducting himself in the context of his work.  And

25   that sort of makes somewhat of an absurdity American

1   Airlines claim about his inappropriateness or lack of
2   fitness for duty, in my view.

3       Q    Any other opinions that are not reflected in
4   Exhibit 2B that you intend to offer in this case that
5   you are aware of as we sit here today?

6       A    Yes.  This was a -- this document was a little
7   different than what I would call a comprehensive
8   forensic study because it extended beyond the scope of
9   this particular man to take in larger data because it
10  was my view that what we have is a systems issue -- and
11  I'm not just talking about a systems issue with respect
12  to the company, but a systems issue with respect to his
13  adversary in terms of some of the actions and conduct of
14  that man in his efforts to malign and destroy the career
15  of Captain Patterson.

16           And although I make that point in here to some
17  degree, the fact is that this was done in 2016, this
18  work, and we still don't have a resolution to the
19  problems of Captain Patterson's return to work with
20  American Airlines.  So there seems to be sort of a
21  chronically unresolved recognition that American really
22  screwed up on this one.

23           And it seems to me that there are so much data
24  that their medical department should already know
25  about -- I'm sure does -- and that other people clearly

1    do in the company so that to deliberately play out this

2    legal game as if he is unfit for duty is to simply add

3    additional emotional stress that he has to deal with.

4         The other comment that I'm going to make is

5    that -- there are two fundamental ones.  The first one

6    is I don't go into the issues about why this gentleman

7    was sent for a neuropsychological examination, though I

8    think that it was inappropriate, given all of the data.

9    He may have been sent for psychological examination, but

10   if he was going to be, then so should have the captain

11   who is accusing him of all of this craziness.  Because a

12   lot of the captain's constructs themselves were bizarre,

13   and to spend nearly a year gathering a small crowd of

14   people to say mostly minor nasty things about him, many

15   of which were untrue, seems to reflect more on the

16   captain than it does on the flight officer at the time.

17        And yet, for whatever reason, from a systems

18   point of view, American hasn't resolved that, and that

19   seems, to me, to be, you know, unfortunate that they'll

20   hang on to a construct and run with it and not recognize

21   they've screwed up, or if they do, continue to fight as

22   if they didn't.  That's one point.

23        I think that the other thing is that --

24   probably that's the main thing that I can think of;

25   that, together with the fact that, in essence, what

1   really should have happened and didn't in the

2   psychological examination in the psychological

3   evaluation of this man is -- and we can talk about

4   Dr. Knippa more in detail later if you wish because I

5   have some perspective on that; I have from the first

6   time I read the report.  But the larger issue is that if

7   a comprehensive forensic examination had have been done

8   that looked at the constellation of events that were

9   taking place, that would have been a sensible thing to

10  do because it would have allowed the company to obtain a

11  level of data that had they had that available, they

12  would have had to take a quite different position in

13  regard to this case than they have done.

14          But what they had was a defective

15  neuropsychological examination by a man who has some

16  credibility problems, meaning Dr. Knippa, which

17  apparently they didn't know about, and further, we have

18  a result by Dr. Knippa who stretches the data on

19  testing -- and I'm not necessarily talking about the

20  aeromedical components of the testing right now, I'm

21  talking about the other elements of the testing -- to

22  the extreme, and then after basically almost asserting a

23  variety of different possible disorders, he slides away

24  from them, but not without leaving a mark on the paper,

25  if you like, a reflection of, yeah, these really are

1    issues or problems because he shows these sorts of

2    things, but I can't go all the way to diagnosing it.

3          That he's working too hard to give them

4    something, in my view, that he shouldn't be doing.  It's

5    not objective.  It's moved beyond objectivity.

6          So yes, what you haven't heard from me before

7    is -- and although I've talked to Counsel about it, I

8    certainly haven't detailed it in full and complete form,

9    and I'm happy to do so if you wish me to.

10       Q    Are there any other previously undisclosed

11   opinions that you intend to offer in this case?

12       A    Not that I can recall at the present time.

13       Q    Earlier when you were describing, I believe

14   you used the term a "systems issue," do you recall that?

15       A    Yes.

16       Q    You mentioned an adversary of Mr. Patterson.

17   Who do you understand that adversary to be?

18       A    The captain who was making the complaints

19   against him, Captain Whitehouse.  I mean, that process

20   continues through to the present day.

21       Q    Are you an expert in the Collective Bargaining

22   Agreement between American Airlines and its pilots?

23       A    Thankfully not.

24       Q    Does your report in Exhibit 2B reflect a

25   comprehensive forensic study of Mr. Patterson?

1      A    It does not.  It's more a systems issue

2  developed project because I thought that it was the most

3  appropriate thing to do, but it includes much of what I

4  would normally put into a comprehensive forensic

5  examination.

6           What is not in this particular document are my

7  findings regarding his detailed mental status study.

8  The reason for not putting it in has been one in which I

9  think eventually I was going to incorporate all of that,

10  but over the time that I've known Captain Patterson, his

11  circumstances have changed.  His medical circumstances

12  have changed, his emotional circumstances have changed,

13  his employment status has changed.

14           And so there was a time, for example, when --

15  while he was never mentally ill, or suffering from a

16  diagnoseable significant entity, he certainly was

17  experiencing an adjustment disorder connected to the

18  very hideous problems that he was facing in the

19  workplace.  His events were very upsetting to him.  And

20  they still are, but they don't bring the amount of hurt

21  that they once did.

22           The other thing that's different is that he is

23  now employed, and as a result, is able to begin to

24  reestablish the economic circumstances that were quite

25  devastating to him as a result of his loss of

1  employment.

2      Q    Is adjustment disorder a psychological

3  diagnosis that you might find in the DSM?

4      A    Yes.

5      Q    And do you recognize the DSM to be an

6  authoritative text in the practice of psychology?

7      A    Yes.

8      Q    And have you diagnosed Mr. Patterson with

9  adjustment disorder at any time?

10      A    There was a brief period where I considered

11  that he was suffering an adjustment disorder because the

12  stressors were so great.  He was a combination of angry,

13  disgusted, worried, uncertain about how he was going to

14  meet his obligations, going into debt.  There was a lot

15  of stress that he was experiencing, and so the

16  adjustment disorder was as a result of that stress.

17          Now, was it a profound diagnosis with longterm

18  consequences?  Absolutely not.  But it was something

19  that was compromising him.  People who lose their jobs

20  and worry about their careers often go through a

21  difficult time, and he did too.  And that construct,

22  that diagnosis, if you like, although short-term, was

23  designed to reflect the reality of that.

24      Q    Okay.  How long have you known Mr. Patterson?

25      A    Let's see, my first contact with Mr. Patterson

1    occurred on April the 6th of 2016, I think.  Yes,

2    April 6, 2016.

3        Q    How did you come to have that contact with

4    Mr. Patterson on April 6, 2016?

5        A    He was referred to me by his attorney,

6    Mr. Amlong.

7        Q    Did you meet him at your office on April the

8    6th, 2016?

9        A    I'm sure I did.  I don't have an independent

10   memory of it, but that's the only place I would have met

11   him, yes.

12       Q    Had you ever met Mr. Patterson before that

13   date?

14       A    No.

15       Q    Had you ever spoken with Mr. Patterson before

16   that date?

17       A    I don't have any independent memory of having

18   done so, but there may have been a call to set up the

19   appointment that I may have taken, but I have no memory

20   of that.  I don't know.

21       Q    I'm going to hand you Exhibit 2C.  Do you

22   recognize Exhibit 2C to your deposition?

23       A    Yes.

24       Q    Can you tell us just generally what that is.

25       A    That's my academic and subsequent CV,

1  curriculum vitae.

2      Q    Is Exhibit 2C a document that you prepared?

3      A    Yes.

4      Q    I'm going to hand you Exhibit 2D.

5      A    Uh-huh.

6      Q    Do you recognize Exhibit 2D?

7      A    I do.

8      Q    Can you tell us generally what Exhibit 2D is.

9      A    It is a listing of testimony that I have given

10 in state or federal court, in Florida and in other

11 jurisdictions, and it's prepared consistent with what

12 the federal rules for experts was, as promulgated in

13 about 1996.

14     Q    Is that a document you prepared yourself?

15     A    Yes.  This is approximately -- it's dated --

16 it's accurate up to October 25, 2017.

17     Q    Okay.  I'd like to talk very briefly about

18 your educational background, and I recognize that the CV

19 you've provided is about 97 pages, so I don't intend to

20 go line by line through that, if that's okay with you.

21     A    That's okay with me.

22     Q    But if you could just tell us generally where

23 you received your Ph.D. and perhaps your undergraduate

24 degree.

25     A    I was educated at the University of New South

1    Wales in Sydney, Australia.  I completed an

2    undergraduate degree with honors with a major in

3    psychology.  In Australia, they don't have minors as

4    well.  It was very focused.

5            And thereafter, I was awarded a Commonwealth

6    fellowship.  I was awarded a Commonwealth scholarship in

7    order to complete my undergraduate degrees.  I was then

8    awarded a Commonwealth fellowship, which funded all of

9    the research that I did and the coursework that I did to

10   complete the Ph.D. degree.  And that took four years.

11       Q    What was your Ph.D. degree in?

12       A    In psychology, and the research focus was in

13   the addictions field.

14       Q    Are you a psychologist licensed to practice in

15   Florida?

16       A    I am.

17       Q    Okay.  Are licensed psychologists in Florida

18   governed by the state Board of Psychology?

19       A    Yes.

20       Q    Okay.  Are you a lawyer?

21       A    No.

22       Q    You answered that one pretty quickly.  It

23   sounded like you were happy about that.

24       A    I am.

25       Q    Do you have any formal legal education?

1    A    No, I have a great deal of knowledge acquired

2  through many years of dealing with the legal system, but

3  I don't give legal advice.

4    Q    I'm going to hand you Exhibit 2E to your

5  deposition and ask you if you recognize this document.

6    A    I do.

7    Q    Can you tell us what this is.

8    A    That's a financial agreement and insurance

9  form that I use, and in this particular case, it

10  specifies the conditions of my involvement with

11  Mr. Patterson and it speaks to my rates, and issues like

12  that.  Though they have gone up since then, but.

13         And the attached document is an authorization

14  and assignment and it was recorded as TRICARE Select,

15  but I have not billed anything to TRICARE.

16    Q    Okay.  Part of the agreement that

17  Mr. Patterson made with you, as reflected in Exhibit 2E,

18  is an agreement to pay $400 per hour for your services;

19  is that correct?

20    A    Correct.

21    Q    And for --

22    A    I want to make the point that my rates did

23  change at one point, but yes.

24    Q    We are aware of that.

25    A    Good.

1       Q    And to pay $350 per hour for the time that you

2    spend testifying?

3       A    Yes.

4       Q    And you mentioned that your rates increase?

5       A    Yes.

6       Q    I assume they didn't decrease, correct?

7       A    No, they've gone up a little bit every time.

8       Q    And what are your rates today?

9       A    My rates are $500 an hour for testimony and

10   $400 an hour for other services.

11      Q    In total, how much have you been paid by

12   Mr. Patterson for your services in this case?

13      A    I didn't bring a bill with me because I wasn't

14   able to, but they are approximately -- he's paid me

15   approximately $40,000.

16      Q    And that's money you've already received,

17   correct, Doctor?

18      A    Yes, quite some time ago.  Yes.

19      Q    Since that time, has your bill essentially

20   gone up?

21      A    Yes.

22      Q    So there's some unpaid amount that is still

23   owed to you by Mr. Patterson, correct?

24      A    It's probably doubled.

25      Q    Let's go back to 2B for a second.  I believe

1 that's right in front of you, Doctor.

2     A     Yes.

3     Q     Would you agree that in preparing this report,

4 you spent quite a bit of time talking to Mr. Patterson?

5     A     And other people, yes.

6     Q     The things that, in particular, that

7 Mr. Patterson told you, did you take notes or record

8 those during your conversations?

9     A     In some instances, I did, and in some

10 instances, I, in preparing certain documents, certain

11 parts of that, I would review notes and text and clarify

12 issues so Mr. Patterson became -- he certainly didn't

13 become a co-editor, but he became a recurrent informer

14 of what I was completing in terms of me seeking to

15 clarify information from him or, also, from a variety of

16 collateral sources, like his wife and the various people

17 that you note that I spoke to in that document.

18     Q     So would it be fair to say that you relied

19 heavily on Mr. Patterson's reports in preparing your own

20 report?

21     A     I relied heavily on his story and I relied

22 heavily on my obtaining of information from a variety of

23 collateral sources, about a dozen.  I relied heavily on

24 looking at the other materials in this case, other

25 medical professionals' documents or opinions, the

1    various -- all of those, all of the people who I spoke

2    to are listed one way or another in that document.

3         Q    Did you believe that Mr. Patterson was telling

4    you the truth when he told you his account of the story?

5         A    I'll answer you by saying I came to believe

6    it.  I had no reason to specifically doubt it, but when

7    people tell me things, I take it in as data, and

8    eventually, there was enough collateral support for much

9    of what he said, such that I believed it.

10              For example, the events on that day down in

11   whatever it is, Ascension, I not only spoke to him about

12   it, but I spoke to his wife about her observations on

13   the bus, on the flight down there, on the flight back,

14   and when I compared, for example, some of the statements

15   made by Captain Whitehouse and the behavior that he

16   claimed occurred with the children and with the wife, I

17   found the wife very believable, and it was consistent

18   with what Captain Patterson had said and not consistent

19   with the statements, some of the statements that were

20   made by Captain Whitehouse.

21        Q    Have you ever spoken with Captain Whitehouse?

22        A    No.  I doubt that he would speak with me, but

23   no.

24        Q    So you don't have the benefit of judging his

25   credibility in a face-to-face conversation, correct?

1        A     Well, you can't always establish credibility

2    in a face-to-face conversation, depends on how

3    pathological the person is, but the answer is no, I

4    don't have the capacity to do that.

5        Q     Okay.  And so when you reference statements by

6    Captain Whitehouse, what statements -- withdrawn.

7              When you are referencing statements by Captain

8    Whitehouse, are you referring only to the written

9    statements that appear in your report?

10       A     No, I don't think that my report is entirely

11   comprehensive.  I don't think a report is ever totally

12   comprehensive, but what I'm referring to is some of his

13   actions, some of his statements to the airline, some of

14   his reports of -- for example, events that were claimed

15   to take place on the way down and back, but especially

16   on the way down where he makes statements about the

17   children sitting, he makes statements -- or others make

18   statements, for example, about behavior by the wife, and

19   there's two different universes.

20             It seems to me that the essential problem --

21   not with this case, but with this entire circumstance --

22   is that American never did what I was suggesting that

23   they should have done a long time ago, and that is do a

24   really comprehensive examination of the issues.

25       Q     Doctor, didn't you testify that your report is

1   also not a comprehensive forensic study?

2       A    It's -- no, I said that report is not a

3   comprehensive forensic study.  It contains a tremendous

4   amount of information, but there is more information

5   that I could put in.  And what it doesn't include, for

6   example, is it doesn't include aspects of Captain

7   Patterson's various elements of -- it doesn't involve

8   any results of the testing that was done because that's

9   not what this report was designed to do.

10          What this report was designed to do was

11  reflect on the facts, as best as I could determine them,

12  of a whole array of issues that took place here.  Now,

13  it doesn't take a whole lot of time to reformat some of

14  that and include all my test data and things like that,

15  but what I see in that report is more an effort to do a

16  systems analysis of the entire set of circumstances that

17  created this chaos.

18      Q    Do you have a degree in systems analyses?

19      A    You don't need a degree in systems analysis to

20  do what I'm doing.  Psychologists routinely do -- when I

21  talk about systems, I'm not talking about universal

22  systems, I'm talking about the elements of human

23  behavior that become a part of the sequencing of events

24  that created this situation.

25          And unfortunately, it's my view that United

1   Airlines -- excuse me, American Airlines -- just didn't

2   understand what was going on and so they went down a

3   wrong rabbit hole.

4         Q    I appreciate the explanation, sir, but my

5   question was merely whether you have a degree in systems

6   analysis.  And the answer to that is?

7         A    No.

8         Q    Thank you.

9              Earlier you referenced Captain Whitehouse's

10  actions as something that you considered -- what you

11  truly considered were his actions as reported by

12  Mr. Patterson, correct?

13        A    No, that was some of what I considered.  I

14  also considered his actions as reported by other

15  collateral sources.  I also considered his actions as

16  reflected in the behavior of spending, just on a year,

17  collecting data and opinion and perspective oriented

18  towards attacking and potentially decimating Captain

19  Patterson.  I mean, this just didn't go on for a few

20  weeks.  This was not an argument between two people that

21  ended when we got off the plane.

22             MR. HOLT:  Madame Court Reporter, would you

23        kindly reread me just the first part of that

24        answer?

25             (The portion referred to was read by the

1  reporter as above recorded.)

2        MR. HOLT:  Okay.  I just wanted to make sure I

3     got the first part.  Thank you.

4  BY MR. HOLT:

5     Q    Is it fair to say that you do not believe the

6  statements that Captain Whitehouse made in some of his

7  emails?

8     A    It would be more helpful if you gave me

9  specifics so that I could respond to them, but do I

10  believe that Captain Whitehouse was upset enough such

11  that he became outrageous?  Yeah.  Do I believe that he

12  went on a mission to destroy this man?  Yes.

13        Do I believe that such behavior reflects

14  potential emotional issues in the man?  Absolutely.

15  Revenge and vengeance for a petty dispute, it hardly

16  shows him to be a really well-balanced person, that he

17  is prepared to embark upon such an enterprise.

18     Q    So is it your opinion that Captain Whitehouse

19  is an unbalanced person?

20     A    In this particular context, yes.

21     Q    And you formed that opinion having never

22  spoken to Captain Whitehouse; isn't that correct?

23     A    You know, if somebody jumps off a bridge, you

24  don't need to have spoken to them to understand what

25  they are doing.  Now, you may not understand why they

1   are doing it, but you know that they are going to hit

2   the ground.

3          And in this particular case, I can't speak to

4   which of multiple different theories I could offer to

5   account for why Captain Whitehouse is doing that. I

6   have no idea why he chose to do it, I just know that he

7   did it and the behavior in itself is aberrant.

8      Q    Underlying your entire theory here is the

9   assumption that Captain Whitehouse was telling lies;

10  isn't that correct?

11     A    No, no, no. I don't know -- I'm not making an

12  argument about whether he is telling lies or telling the

13  truth. I'm making the argument that irrespective of

14  whether he's telling the truth or telling lies, to

15  engage in that sort of enterprise in itself is

16  pathological.

17     Q    But if he is telling the truth regarding

18  behavior that he's observed by Mr. Patterson, then he is

19  not doing anything to try to destroy Mr. Patterson's

20  career; what he is trying to do is preserve the safety

21  of American Airlines' passengers; isn't that correct?

22     A    I'm sorry, the idea that he is prepared to

23  solicit a small -- well, not so small crowd -- think

24  about the number of people that he would have had to

25  talk to in order to find people, or think about the

1  number of solicitations he might have to make to get

2  people who were willing to talk to him negatively about

3  Captain Patterson.  What about all of those people who

4  have really good relationships with Captain Patterson

5  and think very good things of him?

6          You know, what we are looking at is a

7  profoundly biased selected sampling of individuals who

8  have something negative to say about -- an opinion

9  that's negative.  As a simple example, one of the flight

10  attendants -- I think it was a male flight attendant on

11  that flight -- and others have complained that he says

12  he's the president of a homeowner's association.  Well,

13  he is.

14          Others have said, oh, he's a senior officer in

15  the military, as if they don't believe any of this.

16  Well, he is.  My report there speaks to examples of

17  that.

18          But just because you can get, or you can

19  encourage, or you've got the rank to be able to acquire

20  people to say some negative things about somebody, at

21  the end of the day, that's a highly selected sample.

22      Q    Isn't the same true of the sample of people

23  you interviewed?

24      A    I interviewed people who knew him, not --

25      Q    I'm sorry.  Go ahead, please.

1    A    Not people who -- I didn't scour through

2    dozens of people to find people who would say nice

3    things about him.  That would have been sampling bias.

4         Hang on.  What Captain Whitehouse did, you

5    would never do in any discipline or in the social

6    sciences because you are sampling from highly selected

7    data.

8    Q    How did you identify the people you were going

9    to speak to in preparing your report?

10   A    I asked Captain Whitehouse -- excuse me,

11   Captain Patterson -- to provide me with people who were

12   friends, family, and people who he knew well in the

13   industry, and in the military.

14   Q    And by asking for Mr. Patterson to provide you

15   a list of names, isn't that precisely the sampling bias

16   that you complain of with Captain Whitehouse?

17   A    Absolutely not.

18   Q    Did you speak to any person on the list of

19   names provided to you by Mr. Patterson who had anything

20   negative to say at all about him?

21   A    No.  No.  They were --

22   Q    Do --

23   A    Hang on, let me help with the distinction.

24        When you seek collateral sources, in my

25   discipline, you are seeking people who know the person

1   well because you want to understand their frame of

2   reference, what their attributions are with respect to

3   the person, and in an emotional damages case, for

4   example, how the issues have affected the person.

5           Now, you don't go out to his workplace

6   generally and say, I'm looking for people who have got

7   good things to say about him.  Or, I'm looking for

8   people who have got bad things to say about him.  The

9   only people that Captain Whitehouse presented were

10  people who had something either vaguely neutral

11  or vaguely negative, or more negative, or significantly

12  negative, and most of them really didn't know him very

13  well at all.  And yet, they had an opinion.

14          And the idea that you would use that and give

15  it any scientific credibility is stupid.  Really stupid.

16  And yet, that is exactly what seems to have happened

17  within American Airlines.

18      Q    How is the sampling selection error in one

19  direction any more, in your words, stupid than in the

20  other direction?

21      A    Because the people that were being solicited

22  basically don't know the gentleman.  They had some

23  information.  They had a sense of knowledge to the

24  extent that they had an opinion, but if their opinions

25  are wrong -- for example, some of them made comments

1    about, you know, his military thing, almost like it's
2    all lies.
3            Others were making comments about presuming he
4    had the power and influence to cause customs officials
5    in another country to give disproportionate search to
6    Captain Whitehouse or other people.  I mean, it's almost
7    paranoid to believe that this gentleman, who doesn't
8    have any more status than any other airline person going
9    through customs, can do that sort of thing.
10           But they created this small universe of
11   distorted beliefs.  And in my report, for example, I
12   think I give about half a dozen examples where people
13   say, well, he doesn't have the rank that he claims, the
14   military rank, and one thing after another, and they
15   just don't know the person, but they have an opinion.
16           Now, when I set about to interview people, I
17   interviewed more than a dozen people and I interviewed
18   them in different contexts.  I asked Captain Patterson
19   to give me people he knew in the military.  Now, he
20   could have given me 20 or 30.  I wasn't interested in
21   interviewing that many, but I did interview -- I think I
22   interviewed a brigadier general.  I've forgotten
23   because -- I know military ranks very well, but I've
24   forgotten.  It was the general staff officer, anyway.
25           I interviewed colonels.  I interviewed people

1    who had known him for many years, not people who were

2    incidental and were sought out by someone of significant

3    rank and influence to have something nasty to say.  So

4    the sampling is entirely different.

5             MR. HOLT:  Madame Court Reporter, could

6        you remind me of my question.

7             (The portion referred to was read by the

8    reporter as above recorded.)

9    BY MR. HOLT:

10       Q    Did you speak to any of the people that

11   Captain Whitehouse, according to you, solicited for

12   these opinions?

13       A    No, I didn't have access to them.  If I had, I

14   would have interviewed them in detail to find out

15   exactly how well they knew Captain Patterson and the

16   context of their belief, and whether that was their

17   whole opinion of him or whether this was an inference

18   that they had drawn.  I'd want to understand why they

19   agreed to do what they did.

20            I'd want to know whether they think, in

21   retrospect, whether they think it was a good idea or

22   not.  I'd want to understand them in fair detail on the

23   issue, as would any other forensic examiner.

24       Q    But to be clear, you did not interview any of

25   them, correct?  Yes or no.

1      A    I've already said that.  No.  The answer is
2   yes, I did not interview them.
3      Q    I forgot ask you earlier, you mentioned that
4   your rates increased.  When did they increase
5   approximately?
6      A    That's a secretary question.  Approximately a
7   year and a half ago, maybe two years ago.
8      Q    In connection with preparing Exhibit 2B, did
9   you review Dr. Knippa's report?
10     A    Yes.
11     Q    Did you review --
12     A    I reviewed all of the medical reports.
13     Q    Could you tell me what other doctors' reports
14  you reviewed?
15     A    Sure.
16     Q    And I'm really just looking for a list of the
17  names.
18     A    Okay.  Well, the neurological evaluation of
19  Dr. Hastings; the aeromedical neuropsychological report
20  of Dr. Gary Kay; Dr. Knippa; the psychiatric examination
21  of Dr. Abi-Rafeh -- that's A-B-I, R-A-F-E-H.  I think
22  there were some more, but these are the ones that are
23  listed on the outside -- on the front of my work here.
24     Q    If there were others, would they be listed in
25  the text of your --

1    A    They would be listed in the text, yeah.

2    Q    Let me just finish the question so we have a

3  clean record.

4    A    Okay.

5    Q    If there were other doctors' reports who you

6  had reviewed, they'd be listed in the text of

7  Exhibit 2B; is that correct?

8    A    Yes.  I have information on medical

9  specialties record reviews here, and they would likely

10  be located in the overview of documents reviewed on page

11  67.

12    Q    Okay.  In preparing your report, which is

13  Exhibit 2B, did you rely on any statements by

14  Mr. Patterson's counsel?

15    A    No.

16        By the way, if I may, I'd like to -- I know

17  you don't have a question pending, but I'd just like to

18  make a correction.

19    Q    Sure.

20    A    This particular version -- I had forgotten

21  that I'd done this, but this particular version of the

22  report does contain results of testing that I undertook

23  with this gentleman.

24    Q    Okay.  Thank you.

25        Are you familiar with a Dr. Edwin Bercaw?

1      A    I'm aware of his existence, yes.

2      Q    Have you ever spoken to him with regard to

3  Mr. Patterson?

4      A    Yes.

5      Q    What did you speak about with him regarding

6  Mr. Patterson?

7      A    About -- in general, about his findings, or

8  more to the point, I was told by Captain Whitehouse --

9  excuse me, by Captain Patterson -- that Dr. Bercaw, he

10  went to see Dr. Bercaw very soon after he'd been to see

11  Dr. Knippa, and he also indicated to me that the

12  assessment that was done, was done not by Dr. Bercaw,

13  but by a woman trainee.  And I called Dr. Bercaw to ask

14  him about that.

15      Q    And what did he say?

16      A    He said that was true, that she did do the

17  work.  And so I pretty much said thank you, and I

18  contacted Captain Patterson and I said, in essence, you

19  just wasted a couple thousand dollars.

20      Q    What were the findings from Dr. Bercaw's

21  office regarding Mr. Patterson?

22      A    I don't know.  I don't know the details.

23      Q    Well, you said that you called to discuss the

24  findings?

25      A    Well, yeah, but when I found out that -- when

1    I found out that he actually didn't do the testing, it

2    didn't really matter to me what the findings were going

3    to be because she wouldn't have been qualified to

4    administer the instruments.  And he went to see

5    Dr. Bercaw, not this lady who was in training.

6         Q    What instruments were administered?

7         A    I don't know.

8         Q    Then how do you know she wasn't qualified to

9    administer them?

10        A    Because she was not a licensed psychologist

11   and she was in training.

12        Q    Do you have to be a licensed psychologist to

13   administer every instrument that's available?

14        A    You have to be -- well, it would not be

15   appropriate for you to be doing this sort of work

16   without being licensed and without being thoroughly

17   knowledgeable, and also, without being closely

18   supervised.

19        Q    Do you know whether she was closely supervised

20   in the administration of these assessments?

21        A    The reason I raised the question was because

22   Captain Patterson told me that Dr. Bercaw was not in the

23   room during all of the testing that was done.  And that

24   was of concern to me.

25        Q    And Mr. Patterson tell you what testing was

1   done?

2      A    Well, he knew that some of it was a

3   duplication of what had been done by Dr. Knippa.

4      Q    Did Mr. Patterson ever tell you the results of

5   that testing?

6      A    He didn't know the results, to the best of my

7   knowledge.

8          MR. HOLT:  I'm going to show you an email

9        which was previously marked as Exhibit 21 to

10       Mr. Patterson's deposition, and we'll mark this as

11       Exhibit 3 here.

12         (The referred-to document was marked for

13   identification as Defendant's Exhibit 3.)

14   BY MR. HOLT:

15      Q    Do you recognize this as an email from

16   Mr. Patterson to edb@medpsych.net and then copied to

17   you?

18      A    (Sotto voce reading.)

19        No.

20         MR. HOLT:  Can you read the question back?

21         MR. PACE:  Excuse me, there is something going

22       on with the audio.  I'm not able to hear the

23       reading of whatever --

24         MR. AMLONG:  That's because he was muttering.

25         THE WITNESS:  I'll stop muttering.

1        MR. PACE:  Oh, okay.

2        (The portion referred to was read by the

3   reporter as above recorded.)

4        THE WITNESS:  Yes, I do.

5   BY MR. HOLT:

6        Q    And that email from Mr. Patterson responds to

7   an earlier email from Ed Bercaw, correct?

8        A    Yes.

9        Q    And in Dr. Bercaw's email, he references a

10  report, correct?

11       A    Yes.

12       Q    So at the time of this email, April 22, 2016,

13  you knew, in fact, that Mr. Patterson had been made

14  aware the results were available for that examination,

15  correct?

16       A    Well, I might have then, I don't remember it

17  now.  But yes, I presume that I would have known it

18  then.

19       Q    Did you ever ask Mr. Patterson what the

20  results were of that assessment?

21       A    You are asking me for a level of detail that I

22  just don't remember back then.  My recollection is that

23  when he told me -- "he" meaning Captain Patterson --

24  that the testing was not done by Dr. Bercaw, I told him

25  that he just wasted whatever the number of dollars was,

1  somewhere around two and-a-half thousand.

2        And my reason for saying that was under the

3  conditions of wanting, really, expert opinion, it

4  would've -- he couldn't have used the report that was

5  ready for him to receive.  And the reason that he

6  couldn't is because Dr. Bercaw would have been seriously

7  criticized for not actually doing the work himself.

8        The lady that he was using clearly did not

9  have the qualifications that was requisite.  She was a

10 trainee.  Now, that doesn't mean that she was incapable

11 of administering tests; what it means is she didn't have

12 standing to be an expert in the administration of those

13 tests.

14    Q    And fair enough, she had a doctorate in

15 psychology, didn't she?

16    A    I don't know.  What I know is that she was in

17 training.  Whether she had a doctorate or whether she

18 didn't, at the time, she was still an intern.  That's

19 why she would have been --

20        MR. HOLT:  Let's mark this as Exhibit 4.

21        (The referred-to document was marked for

22 identification as Defendant's Exhibit 4.)

23 BY MR. HOLT:

24    Q    I've handed you what we've marked as

25 Exhibit 4, which is a privilege -- purports to be a

1  privilege log prepared by Mr. Patterson's counsel.  And

2  in particular, I'd like you to take a look paragraph 2

3  of Exhibit 4 and tell me if the person identified there,

4  Francy Nathaly Fonseca, Psy.D. is the intern you are

5  referencing.

6      A    Yes, she is.

7      Q    Does this refresh your recollection --

8      A    Yes.

9      Q    -- as to whether she had a doctorate in

10 psychology?

11     A    Yes.  And she is still an intern.

12     Q    But she had a doctorate in psychology,

13 correct?

14     A    Yes.

15     Q    Okay.  Did you prepare at some point any

16 correspondence between you and Dr. Bercaw regarding the

17 reports?  His report.

18     A    Not that I recall.

19     Q    Did you ever receive any correspondence from

20 Dr. Bercaw regarding the March test results?

21     A    Not that I recall.

22     Q    Take a look paragraph 3 of Exhibit 4.

23     A    I've already read it, but if you're asking me

24 if I recall it, then the answer is no.

25     Q    No, I'm asking if you received it.

1          If there was a two-page letter dated May 6,

2     2016 from Dr. Bercaw to you discussing the March test

3     results, would that be something you would have

4     reviewed?

5          A     I don't have an independent recollection of

6     it.

7          Q     My question is:  If such a letter were sent to

8     you, would you have reviewed it?

9          A     I likely would have, but I'm not sure that I

10    did.

11         Q     Is there any reason you can recall why you

12    would not have reviewed that?

13         A     Well, you are asking me to recall a particular

14    event in May of 2016, so that is stretching the edge of

15    the envelope.  If I didn't, it would have been because I

16    had already decided that what he needed to do was to go

17    and see --

18              (Phone interruption.)

19              MR. PATTERSON:  I'm sorry, that is a

20         thunderstorm warning.

21              THE WITNESS:  Okay.

22              MR. PATTERSON:  For a tornado.

23              THE WITNESS:  What he would need to do is to

24         go and see Gary Kay.  Because it would have been

25         Gary Kay who I would have advised him to go and see

1       right from the outset after he saw Dr. Knippa.

2  BY MR. HOLT:

3       Q    I guess I'm a little confused because you are

4  telling me that you don't know if you would have looked

5  at this letter, but if you did look at the letter -- or

6  if you didn't look at the letter, then you would have

7  referred him to Dr. Kay; is that your testimony?

8       A    When -- I didn't know that he had gone to

9  Dr. Bercaw.  He did that on his sprite little self and I

10 knew that he had been calling around to several people

11 in the area thinking that he needed to get a second

12 evaluation.

13           I didn't know, a priori, that he went to see

14 Dr. Bercaw and -- hang on, let me just finish my

15 sentence -- and if I had known that he was going to go

16 and see somebody, I would have told him to go to Gary

17 Kay.  That's what I wanted to say.

18      Q    Could you explain for the jury what a priori

19 means?  A priori.  It's a term you used.  It's Latin.

20      A    Okay.

21      Q    It might be helpful if the folks in the jury

22 can understand that.

23      A    A priori simply means that earlier on, I would

24 have done this.  Had I known, I would have done this.

25      Q    But as of April 22nd, as reflected on

1  Exhibit 3, you knew that a report had been prepared,
2  correct, by Dr. Bercaw?
3       A    You are asking me from a memory that I don't
4  have.  It's reasonable that I would have known, but you
5  are asking me did I know that?  It's reasonable that I
6  would, but I don't have an independent memory of knowing
7  it.
8       Q    Okay.  Well, let's do it this way:  As you
9  look at Exhibit 3, this is a document you received,
10 correct?  Exhibit 3.
11      A    Yes.
12      Q    Was it your usual practice to read emails that
13 were sent to you by your clients?
14      A    In general, it is, yes.  Though sometimes I
15 can sit there for days because I get too many emails.
16      Q    Do you have any reason to doubt that you would
17 have read this email on or around April 22nd of 2016?
18      A    I think it's very likely that I would have.
19      Q    Okay.  So then on May 6, 2016, by the time
20 Dr. Bercaw writes this letter to you discussing the test
21 results, you already knew that a test had been
22 performed, correct?
23      A    I believe that by then, I knew that, yes.
24      Q    Okay.  And you received this letter from
25 Dr. Bercaw, according to the representation made by

1  Mr. Patterson's counsel, correct?  I mean, that's what
2  Exhibit 4 tells us.
3      A    It would seem so, yes.
4      Q    And having received that letter, would it be
5  your usual practice to open up a letter that you
6  received and see what it is?
7      A    It would be common practice, yes.
8      Q    Do you have any specific recollection of not
9  doing that in this case?  In other words, of shredding
10 the letter, never looking at it, never opening it?
11     A    No.  The only thing that I can tell you with
12 certainty is that I don't have that.  What would be my
13 standard practice if I wanted to keep something would be
14 to put it into my Dropbox.  That is, take it off the
15 email and put it into my Dropbox.
16          If I looked at it and decided it was not
17 something that I wanted to keep, or if I didn't look at
18 it because I didn't see myself wasting time on it, then
19 I would have deleted it.  And that would be true of any
20 document or any email that I get.
21     Q    I understand, sir, but in federal court, we
22 are entitled to review the documents that you received,
23 whether you relied on them.  And I understand -- I think
24 I understand -- you tell me if I'm wrong -- that
25 definitely if you are going to rely on something, that

1   gets saved every time, correct?

2         A    Sure, yeah.

3         Q    And there might be some things that you take a

4   quick glance at and you say, eh, I don't need this, and

5   it might not go into the Dropbox, correct?

6         A    Right.

7         Q    Okay.

8         A    And there's a large number of things that I

9   tend to be a bit compulsive about eliminating, deleting

10  documents that -- not just documents, but emails -- that

11  I'm just not going to keep.

12        Q    Okay.  So it's possible you read this letter

13  described in paragraph 3 of Exhibit 4 and deleted it?

14             MR. AMLONG:  Object as to form as to what's

15        possible.

16             THE WITNESS:  The answer is I don't know the

17        answer, okay?

18  BY MR. HOLT:

19        Q    But that would be consistent with your

20  practice; if there is something that you are not going

21  to use in the future, not going to rely on, you might

22  delete that, correct?

23        A    It would be quite likely that I would do that,

24  yes.

25        Q    Same thing with the report prepared by

1    Dr. Bercaw; if you received the report, you glance at

2    it, you decide I'm not going to rely on this, your

3    ordinary practice would be to just delete it, correct?

4        A    Yes.

5            MR. AMLONG:  Objection.  Assumes facts not in

6        evidence.  There is no testimony that he received

7        the report.

8            THE WITNESS:  I'm simply telling you I have no

9        recollection of receiving a report.  I certainly

10       don't believe I ever read a report from Dr. Bercaw,

11       and I know it's becoming a big issue now, but it

12       wasn't a big issue to me back at the time,

13       otherwise I probably would have a clearer memory of

14       exactly what was going on.

15   BY MR. HOLT:

16       Q    But you do recall discussing with Dr. Bercaw

17   his findings, correct?

18       A    I recall discussing briefly his findings, yes.

19       Q    But you don't recall what his findings were

20   in that report, correct?

21       A    No.

22       Q    No, not correct, or no, you don't recall?  I

23   apologize, that was a bad question.

24       A    I recall that he was generally positive in

25   regard to the findings.  Now, the reason that I said to

1  Captain Patterson -- I was actually irritated when I

2  found out about it, and the reason is that when I think

3  about things, I think about them within a forensic

4  framework, and I wanted him to go to somebody where

5  there would be no question of the qualifications and

6  where an assistant had not done the work.

7          Because it was clear to me that by going to

8  Dr. Bercaw, what he accomplished was having an assistant

9  do the work that would simply lead to more compromise.

10  He had already been very compromised in California, and

11  my view was if he was going to get compromised, let it

12  be by an expert.  Let it not be to get into a battle

13  that could cost him thousands of dollars because instead

14  of Dr. Bercaw doing the work, it was Doctor -- it was

15  the trainee, in essence.  That was the position that I

16  took.

17     Q    I believe you just testified that Dr. Bercaw's

18  findings were generally positive, correct?

19     A    That's what he told me.

20     Q    Did he tell you about any findings that were,

21  let's say, less than positive?

22     A    You are asking me for a memory going back --

23          MR. PACE:  Objection.  Asked and answered.

24          MR. HOLT:  It hasn't been answered, and only

25      one attorney should be objecting here.

1           THE WITNESS:  The answer that I gave
2       previously is that overall, the test results were
3       good, but I don't remember whether there was any
4       negative sign or not.  Overall, they were good.
5  BY MR. HOLT:
6       Q    So you considered the fact that they were
7  overall good; you didn't rely on it, but you considered
8  that, correct?
9       A    No, I didn't consider it.  What I considered
10 was that it was inappropriate for him to be getting an
11 evaluation done -- signed off by Bercaw, but done by a
12 trainee.  That's what I considered.
13      Q    But you are aware that his results were
14 overall positive, correct?
15      A    Yes.
16      Q    And you were made aware of that through a
17 conversation with him, correct?
18      A    Yes.
19      Q    And so once you knew that knowledge, I think
20 you would agree with me that you can't just unlearn that
21 information, right?  You might forget it later on, but
22 you can't unlearn it.
23      A    Yeah, it's not something I unlearned.  I
24 didn't specifically forget about it, but it's not until
25 you showed me this stuff that I'm actually remembering

1  some of it because it just vanished.

2  　　　　The bottom line is the argument that I made to

3  Captain Patterson was you need to get this done

4  properly.  If I had known you were going to do that and

5  that it was going to be done by a young trainee, I would

6  have told you you were an idiot.  And I told him he was

7  an idiot.  Not because it couldn't be right or wrong,

8  but because he needed to have a level of expertise that

9  was not negotiable, that wouldn't get him into

10  arguments.  That's what I was concerned about.

11  　　　Q　　I think I understand your concern.  I really

12  do think I understand it.  I hope you understand my

13  concern is we are just trying to figure out what you

14  have looked at through the course of this case and --

15  　　　A　　I --

16  　　　Q　　-- so that's why I'm asking these questions.

17  　　　A　　Yeah, I think we've gone about as far as I can

18  go in terms of, you know, look, if I had kept the

19  document, it would be in my file.

20  　　　Q　　Sure.

21  　　　A　　If I had printed it out, it would be in my

22  file.

23  　　　Q　　Sure.

24  　　　A　　It would be either in electronic form or -- in

25  fact, when this first came up, I actually looked on my

1    Dropbox to see if maybe I had kept it.  And I didn't.  I

2    looked to see if I had an email and I didn't.

3            But that may also be related to the fact that

4    I made a modification to my email system about a year

5    ago.  I changed my email address.  Not a lot, but a

6    little bit.

7        Q    Okay.  Can you tell us generally what you did

8    to prepare for today's deposition.

9        A    Sure.  You are sort of largely looking at it,

10   and I brought my computer just because it's got Dropbox

11   in it, which contains additional materials that are

12   reviewed as a preview to today.

13       Q    Are those additional materials that you also

14   have printed out here?

15       A    No.  No, I got sick of printing.  These have

16   been printed out for a while.

17       Q    Okay.

18            MR. HOLT:  Counsel, can we coordinate, after

19       this deposition, to get copies of those additional

20       materials that the witness reviewed in prep for

21       today's deposition?

22            MR. AMLONG:  Sure.

23            MR. HOLT:  Okay.

24            THE WITNESS:  Would you want me to read out

25       what they were?

1           MR. HOLT:  Doctor, I have no reason to
2      distrust --
3           THE WITNESS:  Okay.
4           MR. HOLT:  We trust that we can have an
5      agreement that we'll get copies of the materials --
6           THE WITNESS:  You will.  No problem.
7           MR. HOLT:  Okay.
8  BY MR. HOLT:
9      Q    At any time, has your license been suspended
10 by the Florida Board of Psychology?
11     A    No.
12     Q    Have you ever been investigated by the Florida
13 Board of Psychology to your knowledge?
14     A    Couple of times.
15     Q    Any of those allegations relate to your
16 methods or the way you are practicing psychology?
17     A    No.  No, the best way to get into trouble with
18 the Florida Bar is to take on divorce cases.  You can
19 imagine why.
20     Q    I think that might be true.
21     A    Oh, it's absolutely true.
22          MR. HOLT:  Can we go off the record for one
23     minute?
24          VIDEOGRAPHER:  The time is 2:42.  Off the
25     record.

1          (A recess was taken at 2:42 p.m. and the

2     proceedings resumed at 2:51 p.m.:)

3          VIDEOGRAPHER:  The time is 2:51.  This is the

4        beginning of media unit number two on the record.

5     BY MR. HOLT:

6     Q    I don't recall if I asked this or not earlier,

7     so forgive me if I did:  Do you know any of the

8     instruments that were -- or assessments that were

9     performed by Dr. Bercaw's office with respect to

10    Mr. Patterson?

11    A    Are you asking me do I know any -- I don't

12    know what he did, but I know what is relatively standard

13    to do when you are doing an aeromedical examination and

14    that, you know, different people do different things and

15    drop and change on certain instruments, but the

16    CogScreen seems to be the standard for a lot of the

17    assessment, and then many of the actual instruments that

18    were used by Dr. Knippa, I do not disagree with, but I

19    disagreed with his interpretation of some of the

20    results.

21          But all of those instruments would be

22    reasonably typical.

23    Q    Was it your understanding that Dr. Bercaw's

24    office performed the CogScreen test on Mr. Patterson?

25          MR. AMLONG:  Objection.  Foundation.

1          THE WITNESS:  The answer is yes, it's my

2      understanding that he did.

3  BY MR. HOLT:

4      Q    Okay.  Do you have any specific understanding

5  or knowledge about other specific tests that his office

6  performed?  And by "his," I mean Dr. Bercaw's office

7  performed --

8      A    Did you say Bercaw or did you say Knippa

9  before?

10     Q    I believe I said Bercaw.

11     A    Oh.

12         MR. HOLT:  Madame Court Reporter, could you --

13         THE WITNESS:  Because I thought I heard you

14     say Knippa.  Because I don't know what -- I can

15     presume what Dr. Bercaw's office would do because a

16     standard aeromedical examination would include

17     that, but if you are asking me:  Did I know that he

18     did that?  No, I don't know that he did that.

19     Would it be reasonable to expect that he did it?

20     Yes.

21         MR. HOLT:  Could you read back my prior

22     question just so I can make sure I asked --

23         MR. AMLONG:  I think it was your second prior

24     question.

25         MR. HOLT:  I think it might be.

1          (The portion referred to was read by the

2    reporter as above recorded.)

3          THE WITNESS:  Okay.  So now that we've got the

4          right doctor in place, the answer is I don't know

5          what he performed because I simply don't know.

6          Would I expect that if he was doing an aeromedical

7          examination, he would have almost definitely done

8          the CogScreen, my answer is yes.

9    BY MR. HOLT:

10         Q    Do you have any specific knowledge as to any

11   of the instruments or assessments that were performed by

12   Dr. Bercaw's office?

13         A    Well, I don't know what the instruments were,

14   but -- so the answer is no.  If you are asking me do I

15   know about instruments that are typically used in this

16   field, the answer is yes.

17         Q    My question was the first one.  Do you know

18   which specific ones --

19         A    No.

20         Q    -- were used?

21         A    No, I do not.

22         MR. HOLT:  Okay.  I have nothing further.

23                     CROSS-EXAMINATION

24   BY MR. AMLONG:

25         Q    Have you ever seen any report by Dr. Bercaw's

1    office?

2            MR. HOLT:  Object to form.  Asked and

3        answered.

4            THE WITNESS:  No.

5    BY MR. AMLONG:

6        Q    Have you ever seen the raw data of any tests

7    from Dr. Bercaw's office?

8        A    No.

9        Q    After you learned from Mr. Patterson and

10   confirmed with Dr. Bercaw that the tests had been

11   administered in Dr. Bercaw's absence by Dr. Fonseca, did

12   you have any interest whatsoever in the results or the

13   report?

14       A    No.  I was just annoyed that Captain Patterson

15   was not being more strategic in addressing the

16   seriousness of the Knippa opinion by going to somebody

17   around the corner as opposed to an international

18   authority.

19            I mean, I didn't get hired because I was

20   somebody just around the corner.  And I thought that it

21   was against reason for him to just try and get it done,

22   as if it was just like all I have to do is take a car

23   ride and save some money.  That was the position --

24   that's the position that I took with Captain Patterson.

25       Q    Having learned that whatever instruments had

1   been administered by Dr. Bercaw's office, would you have

2   had any interest in any letter discussing the results of

3   the findings from those instruments formed by

4   Dr. Fonseca?

5          MR. HOLT:  Objection to the form.

6          THE WITNESS:  Well, firstly, I have no

7             recollection of ever receiving a letter with any

8             report, but had I, I think that by the time that

9             that work would have been completed and returned

10            and turned into a report, I had already said to the

11            client that he needed to stop wasting time and

12            money and go to somebody whose reputation is

13            excellent and who doesn't use unlicensed trainees

14            to conduct the work.

15  BY MR. AMLONG:

16     Q    Well, even assuming that Dr. Fonseca may have

17  been licensed by the Board of Psychology as a Psy.D. in

18  January, would she have been qualified to administer the

19  test by herself --

20            MR. HOLT:  Objection to the form.

21            MR. AMLONG:  -- for a report being done by

22            Dr. Bercaw?

23            THE WITNESS:  Well, she would have also had to

24            have gone through the full training for aeromedical

25            and she would have to have been certified as an

1    aeromedical specialist in order to be in a position

2    to fully do that work.

3  BY MR. AMLONG:

4    Q    Is part of your background in academe?

5    A    A long part of it, yes.  I was a full

6  professor for something like 15 years, psych school.

7    Q    What is psychometrics?

8    A    Psychometrics is that part of psychology that

9  relates to measurement.

10    Q    And testing?

11    A    And testing.

12    Q    Did you ever teach it?

13    A    I taught it.

14    Q    On an undergraduate or a graduate level?

15    A    Both.

16    Q    How much experience, if any, do you have in

17  working with airline pilots?

18    A    Quite a lot.  Airline pilots and airline

19  people.  I was the psychologist that was used by United

20  Airlines for referral of their people.  I was not the

21  only one, but I was the principal one when they had the

22  base in Miami.

23         I sometimes saw males and sometimes saw

24  females, but I ran a group practice at that time and

25  some of the other people who worked with me, the men,

1    were always disgusted that I had all these pretty women

2    sitting in my waiting room.  But they were all, what

3    they used to call them, "stews" back then.  So I've had

4    a lot of experience.

5            I've also had a lot of experience -- that was

6    with United, and I also had a significant amount of

7    experience dealing with, in the forensic context, with

8    problem people in the workplace in aviation, and I've

9    also had experience outside of the airlines, or

10   independent of the airlines, dealing with the

11   consequences of trauma and crashes and things like that.

12           I was hired by Delta, for example, when 191

13   went down in Dallas.  And why was I hired?  Because they

14   knew I had a lot of airline experience and they wanted

15   me to help manage the emotional crisis that many of the

16   people who sold those people the tickets and wished them

17   on their way only to be dead several hours later.

18       Q    Have you had any experience doing fitness for

19   duty examinations on airline pilots?

20       A    No, I've never done fitness for duty, but I

21   have done substantial amounts of treatment to airline

22   personnel, including pilots.

23       Q    Have you seen the various emails by which

24   Captain Whitehouse accused Mr. Patterson of various

25   behaviors?

1     A    Yes.

2     Q    Have you seen the one from March as well as

3  the one from September?

4     A    I've seen almost all of them.  As I said to

5  you at the time, he is off leash, was my quote.

6     Q    Who?

7     A    Captain Whitehouse.

8     Q    If one were to assume that Captain Whitehouse

9  was accurately reporting to American Airlines in his

10  March emails about the behavior of then-First Officer

11  Patterson, would those allegations have justified an

12  immediate examination of one or both of the persons,

13  Captain Patterson and Captain Whitehouse?

14     A    Absolutely.

15          MR. HOLT:  Objection to the form.

16          THE WITNESS:  Absolutely.  The allegations

17     were such that -- we don't have to wait for an

18     event like the event that happened several years

19     ago in Europe where a pilot drove a plane

20     intentionally into the ground to recognize that

21     that flight safety is critical.  And I have said to

22     you more than once that I cannot imagine why

23     Captain Whitehouse is still flying based on all of

24     the stuff that's gone on in this case.

25

1   BY MR. AMLONG:

2       Q    Well, to the point, if one were going to

3   accept as true what Captain Whitehouse was saying in

4   March of 2015 --

5       A    Right.

6       Q    -- should Captain -- should First Officer

7   Patterson have immediately been sent for a fitness for

8   duty examination?

9            MR. HOLT:  Object to the form.

10           THE WITNESS:  The answer is of course he

11       should have.  Because one way or another, the array

12       of allegations was so broad and the presumption of

13       dishonesty so protracted, so deep, that the only

14       rational thing to do -- because it's not like they

15       didn't know what the allegations were -- and the

16       Union knew, and whatever the -- I've forgotten what

17       the name of the proceedings were that took place.

18            But yeah, if what was being stated was true, I

19       would have thought that this man should have been

20       whisked off for a very rapid evaluative workup.

21       But interestingly, the issue would have not

22       necessarily been his capacity to fly an aircraft,

23       because there is no basis to believe that he lacks

24       the skill to do that, and that his -- what is it,

25       close to 20,000 hours or something without damaging

1        an aircraft gives strong support for that.

2            But his -- the emotional instability and the

3        reactivity that is -- the emotional reactivity that

4        is being seen or inferred from those complaints

5        should have immediately attracted -- I mean, if a

6        police officer started doing that, he would -- I do

7        a lot of police screening, you know, evaluation of

8        police and FBI -- they would be there in a flash

9        because they are just -- they are not going to

10        stand for, you know, people who create a risk

11        because the economic costs of the lawsuits that

12        follow are just not acceptable.

13    BY MR. AMLONG:

14        Q    If there had been a crash of an American

15    Airlines aircraft with First Officer Patterson on the

16    flight deck subsequent to the March 2015 report, do you

17    believe that would have raised issues about his fitness

18    to be on that flight deck?

19            MR. HOLT:  Objection to the form.  It's an

20        absurd hypothetical.

21            THE WITNESS:  Of course it would, yes.

22        Because all of a sudden -- it's the same thing as,

23        you know, a policeman who ends up -- a policeman

24        who ends up beating somebody to death or killing

25        somebody and has a history of brutality that goes

1          untouched.  It tends to not happen these days, but

2          it used to happen a lot years ago.

3               I also did work for the Broward Sheriff's

4          Office for a number of years.  There, I did do

5          fitness for duty evaluations.

6     BY MR. AMLONG:

7          Q    Does the -- do you believe that the tenor of

8     both the March 2015 and September 2015 letters from

9     Captain Whitehouse are indicative, within a reasonable

10    degree of psychological probability, of mental

11    instability?

12               MR. HOLT:  Objection to the form.

13               THE WITNESS:  Yes.

14    BY MR. AMLONG:

15         Q    Why do you say that?

16         A    Because a mentally healthy person doesn't

17    persist in a recurrent vendetta against somebody whose

18    principal offense was some very minor altercation of

19    disrespect to the captain at Ascension.  And then on the

20    way back, then-Flight Officer Patterson's offense was he

21    bluntly told the captain he was going to put him on a

22    do-not-flight-together list, and apparently, the captain

23    was not impressed and he acted accordingly.  But his

24    actions were outrageous.

25         Q    Mr. Patterson told you a quite different story

1    than Mr. Whitehouse related in his March and September

2    allegations, correct?

3        A    Correct.  Different universe.

4        Q    And you believed what Mr. Patterson said?

5        A    I believed what Mr. Patterson said because his

6    story not only made sense, but it was collaterally

7    supported -- parts of it that his wife was involved in

8    were collaterally supported, and there are a large

9    number of people, both military people and neighbors and

10   people he has helped in Central America, in Haiti, for

11   example, where he's gone and actually done civil service

12   work, duty, where he's paid.  Captain Whitehouse

13   probably doesn't know that Captain Patterson and his

14   wife have been supporting a couple of children in Haiti

15   for more than the past decade in public service work.

16            So, you know, I think that what we've got here

17   is a man who is arrogant, and when --

18       Q    Who are we talking about here?

19       A    Well, we are talking about Captain Whitehouse.

20            And that when then-Flight Officer Patterson

21   told him in no uncertain terms that he didn't want to

22   have anything to do with him anymore on that flight back

23   and that he was going to put him on a do-not-match list,

24   then things started going wrong for Captain Patterson --

25   excuse me, then-Flight Officer Patterson.  And it even

1   impacted his -- it even impacted his ability to not be

2   hassled over doing military service.

3              (Phone interruption.)

4              VIDEOGRAPHER:  Do you want to go off the

5      record?

6              MR. AMLONG:  Yes.

7              VIDEOGRAPHER:  The time is 3:14 p.m.  Off the

8      record.

9              (A recess was taken at 3:14 p.m. and the

10  proceedings resumed at 3:16 p.m.:)

11             VIDEOGRAPHER:  The time is 3:16.  On the

12     record.

13             MR. PACE:  I'm going to call you back, okay?

14             MR. AMLONG:  Okay.

15             MR. PACE:  Call you right back.

16             VIDEOGRAPHER:  Are we going off?

17             MR. PATTERSON:  Standby.

18             MR. AMLONG:  Just standby.

19             THE WITNESS:  Do you have to fly tonight?

20             VIDEOGRAPHER:  We are still on the record.

21             MR. HOLT:  We can go off.

22             VIDEOGRAPHER:  The time is 3:16 p.m.  Off the

23     record.

24             (A recess was taken at 3:16 p.m. and the

25  proceedings resumed at 3:20 p.m.:)

1          VIDEOGRAPHER:  The time is 3:20.  On the

2     record.

3  BY MR. AMLONG:

4     Q    Dr. Kay, you said that during your -- over the

5  time that you've known Doctor -- or Mr. Patterson, that

6  you initially observed some adjustment disorder.  Do you

7  have any sense within any reasonable degree of

8  psychological probability what was the cause of that

9  adjustment disorder?

10          MR. HOLT:  Objection to form.

11          MR. AMLONG:  What's your objection?

12          MR. HOLT:  First, it's outside the scope of

13     the expert disclosures, and now you are asking him

14     to opine about something that has never been

15     disclosed.

16          MR. AMLONG:  Okay.

17          THE WITNESS:  The condition that we are

18     dealing with was some anxiousness and worry, and

19     not depression, but just an affinitive anger that

20     with all the effort that he's put in to learn to

21     fly and all the time that he spent, that -- I'll

22     use his words -- some asshole is setting about to

23     take that away from me and the company is buying it

24     hook, line and sinker.  And, you know, there were

25     issues about all the things that they had to cut

1    back on.

2         (Phone interruption.)

3         THE WITNESS:  And for a time, he was a pretty

4    angry guy.  He was just really -- he took it very

5    personally that this guy was trying to destroy his

6    career.

7         (Phone interruption.)

8         THE WITNESS:  And so there was problems with

9    sleeplessness, some depression, some worry, at

10   least sadness, some anger.  He was more testy with

11   his wife and things like that, but after a while,

12   things stabilized, especially once he started --

13        You know, he was getting -- the thing that

14   made a big difference was he knows a lot of people

15   and he's got a lot of friends, a disproportionately

16   large number of friends, because he's got airline

17   friends and he's got military friends and he's got

18   neighborhood friends, et cetera, et cetera, and

19   he's got friends from when he was growing up.  And

20   they pretty much all rallied around him.

21        I didn't -- when I went, for example, I set

22   about to ask him to give me the names of people

23   that I could talk to, you know, he gave me people

24   in his condo association.  He gave me probably 25

25   names of people in flight and working for the

1    company.

2         He gave me a large number of names of people

3    in the military.  One of them, a very senior

4    officer, I've forgotten what rank now, but I think

5    it was a general officer, as well as others.

6         And he sort of got on with it, but for a

7    while, he was really worried about how he's going

8    to make a living and support his family.

9  BY MR. AMLONG:

10    Q    Can you say within any reasonable degree of

11  psychological probability whether or not the adjustment

12  disorder was in place prior to his being put on pay

13  withheld status in September of 2016?  I'm sorry, in

14  September of 2015.

15         MR. HOLT:  Objection to form.

16         THE WITNESS:  I think that -- I don't think --

17    I don't think it came on quite, then when he was

18    put on pay withheld.  I think it didn't do any

19    good, but what I think he thought was going to

20    happen was that it was all going to get fixed.

21    This can't be.

22         He engaged in a happy delusion that the

23    company would fix this.  And when he wasn't

24    working, or he was working even before he got this

25    airline job, he was able to do some flight work, et

1      cetera, et cetera, and at one point, he was doing

2      some flying jets and then also just fixed wing

3      small aircraft, so he was making some money.

4           But it really impacted, you know.  And for a

5      while, he was pretty angry.  Now, all that

6      stabilized, as it does.  He's not a mentally

7      unhealthy man, he was simply put in a cruel

8      situation.

9  BY MR. AMLONG:

10     Q    You've seen the psychological testing that

11 Dr. Knippa did, right?

12     A    Yes.

13     Q    That testing, is that indicative of adjustment

14 disorder?

15          MR. HOLT:  Objection to form.

16          THE WITNESS:  It's consistent with adjustment

17     disorder, yeah.

18 BY MR. AMLONG:

19     Q    So the onset occurred before April?

20     A    Yeah, yeah.  The reality though is my

21 objection to Dr. Knippa's work was that, at every level,

22 if you really understand what he was doing, he kept on

23 trying to find something wrong and he'd make comments

24 about something wrong, but then he'd fall off and say,

25 well, it's not enough to offer a legitimate assertion of

1    that, after he made assertions about it.

2        Q    Do you know if Dr. Knippa is Board certified

3    in clinical psychology?

4        A    No, he is not.  Excuse me, yes, I know that he

5    is not.  In fact, I don't know that he is Board

6    certified in anything, but what I do know is that if the

7    airlines got any brains, they'll stop using him.

8    There's plenty of --

9            The other issue that's very important to

10   understand is that you simply don't do this sort of

11   assessment, CogScreen work, for example, at 2:00 in the

12   afternoon when the person has flown across three time

13   zones the night before and arrives at 9:00 to start

14   assessment.  The research is really clear about the

15   importance of adequate time to adjust to time zones when

16   you are taking relatively complex, skill set-type

17   testing.

18           You can take testing dealing with personality

19   and all that sort of stuff without too much trouble at

20   all, but when it's a skill set --

21       Q    What part of your background and training

22   gives you the expertise to opine on when a

23   neuropsychologist should administer tests such as the

24   CogScreen?

25       A    Well, for a starter, the issue about

1  assessment -- I told you that I used to teach

2  psychometrics, right?

3      Q    Yes.

4      A    Well, you have to establish the conditions of

5  the patient.  You may not decide to do testing on a

6  particular day if there are reasons to consider -- other

7  reasons to consider that it wouldn't give you the best

8  data.

9          You know, for example, if somebody's, you

10  know, child just died two days ago and you are asked to

11  do an assessment of that person for a job placement, you

12  might suggest that they need to come back, you know, a

13  month or so later when the intrusion of all of the

14  distress has passed.

15          In the case of an aeromedical evaluation, I

16  absolutely know that it just is not done, and yet he did

17  it.  And if you have any doubt about that, take Gary

18  Kay's deposition.  I've talked to him at length about it

19  and he is generally regarded as top in the field.

20              MR. AMLONG:  Thank you.

21              MR. HOLT:  Just a few quick follow-ups.

22                      REDIRECT EXAMINATION

23  BY MR. HOLT:

24      Q    I believe you testified earlier that based on

25  the allegations Captain Whitehouse was making in March

1    of 2015, if those were true, that would have been the

2    basis for American to refer Mr. Patterson to

3    psychological evaluation.  Do you remember that

4    testimony?

5         A    Yes, I do.

6         Q    So then your opinion in this case is not that

7    Mr. Patterson should never have been referred for

8    psychological testing; your opinion is that the

9    psychological testing was not good or performed at the

10   wrong time, correct?  Or both of those?

11        A    Well, my opinion is that -- my opinion is that

12   both of these men should have been thoroughly examined

13   because the idea that the only argument in favor of

14   sending Flight Officer Patterson to examination was if

15   Captain Whitehouse's claims had a reasonable foundation,

16   and in the context in which there was disagreement about

17   Captain Whitehouse just as significantly as there was

18   about First Officer Patterson, it shouldn't have been

19   that we favor the captain.

20        Q    But to be clear, Captain Whitehouse is not a

21   party to this lawsuit, correct, sir?

22        A    He is not a party to the lawsuit, but he is a

23   party to the problem.

24        Q    I understand.  My question is:  Is he a party

25   to the lawsuit?  Yes or no.

1    A    He is not.

2    Q    Okay.  And by suggesting that both pilots,

3   both Mr. Patterson and Captain Whitehouse, should have

4   been referred for psychological evaluation, implicit in

5   that suggestion is that it's not inappropriate to refer

6   Mr. Patterson; you just believe that Captain Whitehouse

7   should have been referred as well, correct?

8    A    No, what I actually think should have happened

9   was that human resources should have done a rather

10  comprehensive examination of the whole issue and managed

11  it properly.

12   Q    Then I don't understand your opinion that

13  Doctor -- excuse me, that Captain Whitehouse should have

14  been referred for psychological evaluation, because

15  that's what you just testified 30 seconds ago.

16   A    I know what I testified to, Counsel.  What I'm

17  saying is that when you've got a person making an array

18  of allegations about another person, and that person who

19  is being insulted by the allegations denies the

20  allegations, you do not have a basis to say, ah, let's

21  just send one of them somewhere.  Because one way or

22  another, somebody is either lying or misrepresenting and

23  one person is creating chaos and another person is being

24  impacted by it.

25        Now, in family systems theory, the person who

1  is doing the chaos, if it's the guy and the chaos is

2  violent, he is the one that we focus on.  But in this

3  instance, it was the junior officer who we were focusing

4  on because somebody decided to do something brilliantly

5  destructive, and in my view, absolutely dishonest.

6  Either that, or the captain really believed his own

7  rubbish.

8       Q    Do you believe that Mr. Patterson believed his

9  own story?

10      A    Mr. Patterson's story was that this is just

11  factually incorrect.

12      Q    That's not my question.  My question is:  Do

13  you believe that Mr. Patterson believed his own story?

14      A    Yes.

15      Q    And yet you will assign fault to Captain

16  Whitehouse for Captain Whitehouse believing his own

17  story, correct?  That's the testimony you just gave.

18      A    Captain Whitehouse set about to maliciously

19  harm another person.

20      Q    Unless the allegations were all true.

21      A    And how could he know?  The only thing that he

22  knew for a fact was that he was angry and he disagreed

23  with the way he was treated.  He didn't like -- he

24  didn't like his co-pilot by the end of that trip and

25  what he set out to do was to destroy him.

1          Now, would I, if I were running human

2    resources, vote in favor of Whitehouse when he was

3    running around doing all of that, collecting data?  I

4    would have thought that's pretty pathological.

5          Q    Were you retained in this case to render an

6    opinion about the appropriate human resources practice

7    at an airline?

8          A    No.

9          Q    Okay.

10         A    Doesn't mean I don't have an opinion though.

11         Q    I understand you might have an opinion, but my

12   question is trying to tease out your expert opinions

13   based on your years of psychological practice --

14         A    Right.

15         Q    -- as opposed to the conclusions that you

16   might have drawn from your observations.

17         A    Yeah, unfortunately, as we both know, often,

18   industries have human resources departments that don't

19   work very well.  And I've got a case against American

20   Airlines at the moment with regard to exactly that

21   issue.

22         Q    Aside from this case, sir?

23         A    Yeah.

24         Q    Okay.  Well, we are not going to discuss other

25   cases at this deposition.

1     A    Right.

2     Q    In the psychological community or the

3  community of licensed psychologists, is it acceptable to

4  form a diagnosis based on having reviewed documents, but

5  never met -- never having met a patient?

6     A    No.

7     Q    Okay.  Are you certified as an aeromedical

8  specialist?

9     A    No.

10     Q    Okay.

11     A    No, I would have to take a two-day course.

12  And guess what it's about?  Alcohol and drugs.

13     Q    But to be clear, you haven't taken that

14  course, correct?

15     A    No.  No.

16     Q    And you testified about having conducted

17  interviews to obtain collateral support --

18     A    No, I didn't say collateral support.

19     Q    I believe those were your words, but if they

20  weren't, what were they?

21     A    Collateral source.

22     Q    Collateral sources, I apologize.

23     A    Big difference.

24     Q    I apologize.  You are absolutely right.  I

25  apologize.  So let me start that question again.

1      A      That would have been exactly what Captain

2      Whitehouse was doing.

3      Q      There is no question pending, so I'm going to

4      move to strike that, but I appreciate you clarifying and

5      let me ask that again.

6      A      I'm just playing with you.

7      Q      Which is fine when we are not on the record.

8      A      Okay.

9      Q      You testified earlier about collateral source

10     interviews that you did --

11     A      Yes.

12     Q      -- do you recall that?

13     A      Yes.

14     Q      Did you rely on each of those collateral

15     source interviews that you did in coming to your

16     opinions in this case?

17     A      To some degree, yes.  Each one of them brought

18     their own unique perspective.  You know, if I'm looking

19     for a 360-degree view, I pretty much got it because they

20     range from family to long-term friends to military.  You

21     know, the usual suspects that one goes after.  And I'm

22     of the opinion that each of these people know this man

23     very well.

24     Q      And going back to the issue of Dr. Bercaw's

25     report, is it your testimony today that based on having

1  reflected on the methodology used by Dr. Bercaw with

2  respect to an intern conducting the test, that you

3  decided you would not rely on Dr. Bercaw's report?

4      A    I decided it wasn't something that we were

5  even going to consider, or that I was going to encourage

6  Captain Patterson to consider because I decided that

7  what he'd done is just wasted two and-a-half thousand

8  dollars because the person he needed to see was an

9  expert because we were dealing with a situation that I

10  was concerned was going to develop just the way this

11  has.

12      Q    And in reaching that conclusion that

13  Mr. Patterson should not have -- essentially should not

14  have gone to this guy --

15      A    Yeah.

16      Q    -- and let an intern do the evaluation, you

17  really reflected on what the procedure was there and

18  whether this --

19      A    You know, I always think -- because I do so

20  much forensic work and I'm Board certified and all that

21  rubbish, I always think about not simply the act, but

22  the impression surrounding the act.  And if you are

23  going to -- I wasn't --

24          You know, I could have done all this testing,

25  but because I'm not aeromedically certified, as I said,

1    I'd have to take my two-day course in California --

2    which I was invited to take, by the way, and decided not

3    to, but the bottom line is this:  If I were going to

4    advise, which I did, the client on how best to deal with

5    the Bercaw -- excuse me, the Knippa matter, you don't

6    take a slingshot to a gunfight.

7            And my view was that he needed to go, you

8    know, to somebody who is exceptional and, in fact, who

9    is the actual developer of the instrument, the

10   CogScreen.  And that's why I wanted him to go to Gary

11   Kay.  And Gary and I had several discussions about it

12   and we even talked -- we talked at length about Knippa

13   and what Gary thinks of Knippa and, you know, I was sort

14   of irritated with Scott for trying to be slightly

15   impulse control disorder in rushing to try and do

16   something quickly, you know.

17           I'm teasing about the impulse control issue,

18   but you know, you don't have to solve this problem

19   immediately, you have to solve it profoundly.  And

20   that's what I was referring to.

21           MR. HOLT:  Thank you.

22                   RECROSS EXAMINATION

23   BY MR. AMLONG:

24      Q    Did any reason exist in September 2015 to

25   remove Mr. Patterson for flying at American Airlines

1   that did not exist in March 2015?

2           MR. HOLT:  Objection to form.

3           THE WITNESS:  No, no, no, no.  Nothing --

4       nothing substantially was changing in his life

5       between those two periods, the only -- I mean,

6       there was this -- I mean, they were even -- they

7       were even giving him grief about going to the White

8       House.

9   BY MR. AMLONG:

10      Q    Is there anything substantially different

11  between the allegations that Captain Whitehouse made in

12  March of 2015 which did not lead to his immediately

13  being removed from flying for American Airlines and the

14  allegations that Captain Whitehouse made in

15  September 2015 which did?

16          MR. HOLT:  Objection to form.

17          THE WITNESS:  They were the same allegations.

18  BY MR. AMLONG:

19      Q    Was your testimony here a diagnosis of Captain

20  Whitehouse without having examined him?

21      A    I wouldn't call it a diagnosis, but I would

22  say that this is one angry man and I don't know, you

23  know, I've heard stories about excessive drinking and

24  things like that, but I really don't know anything about

25  him.

1          But, you know, I'm not religious, but I can

2     quote vengeance is mine, sayeth the Lord, and yet this

3     man has set about in a systematic manner to try and

4     destroy a fellow pilot.  And I don't know, the world in

5     which I live in -- and I'm former military too -- you

6     just don't do that.

7          Q    Well, but it wasn't Captain Whitehouse who

8     actually put -- who actually took Mr. Patterson off

9     flight status, was it?

10          A    No, no, no, no.

11               MR. HOLT:  Objection to the form.

12               THE WITNESS:  No, it was Captain -- I think

13          his name is Bonds.

14     BY MR. AMLONG:

15          Q    And are you aware of any disagreement between

16     Captain Bonds and Mr. Patterson that immediately

17     preceded Mr. Patterson being removed from flight status?

18               MR. HOLT:  Objection to the form.  This expert

19          witness wasn't involved in any of that and it's not

20          the area of his expertise.

21               THE WITNESS:  I'm trying to think.  I don't

22          remember what the rationale for trying to take him

23          off flight status could be, other than the

24          consequence of this entire array of events that we

25          are talking about.

1  BY MR. AMLONG:

2      Q    Are you aware that he went on active duty for

3  the U.S. Army Reserve --

4      A    Oh, yeah.

5      Q    -- immediately before he was being taken off?

6      A    Sure, yeah.

7           MR. HOLT:  Objection to form.

8           THE WITNESS:  Yeah, I was aware.  I certainly

9      was aware of that.

10 BY MR. AMLONG:

11     Q    Are you aware of a judge in Montana who

12 published an opinion determining that Dr. Knippa had

13 offered an expert opinion on a workers' compensation

14 claimant whom he had never seen?

15          MR. HOLT:  Objection to the form.

16          THE WITNESS:  I am aware of that, and that's

17     one of the reasons that I raised serious questions

18     about Dr. Knippa.  I've been before literally

19     hundreds of judges and I've never been told that I

20     lacked professionalism and competency.

21 BY MR. AMLONG:

22     Q    And would it have been ethical for Dr. Bercaw

23 to offer any opinion about test results that were --

24          Would it have been ethical, professionally,

25 for Dr. Bercaw to issue any opinion about the results of

1  tests that were performed in his absence by a resident

2  Psy.D.?

3      A    He should not have done that.  It is simply

4  not appropriate.  If the assistant, or the resident, or

5  the intern was doing the work and he was being or she

6  was being closely supervised -- that is, the doctor was

7  present in the room at the time all of this was going on

8  so that he could evaluate independently her work or his

9  work, whoever it was -- then there can be an argument in

10  favor of she may have been actually administering the

11  tests, but he knew everything that was occurring and he

12  was fully supportive of exactly what she was doing.

13          But to not be --

14          (Phone interruption.)

15          THE WITNESS:  But to not be present throughout

16      the testing at all --

17          (Phone interruption.)

18          MR. PATTERSON:  Noel, mute.  Attorney Pace,

19      mute your phone, please.

20          MR. PACE:  Yeah, unfortunately, I'm on a cell

21      here, and I've got -- I would prefer to call back

22      in to the main line.

23          MR. AMLONG:  We are almost through.

24          MR. PATTERSON:  We are almost through.  Stay

25      on the line.  Mute the phone, please.

1   BY MR. AMLONG:

2       Q    Would it have been professionally ethical for

3   you to rely on a report done by Dr. Fonseca in the

4   absence of Dr. Bercaw?

5       A    That was one of the reasons why I told your

6   client that he wasted his money.

7               MR. AMLONG:  Thank you.

8               MR. HOLT:  Nothing further.

9               THE WITNESS:  Are we done?

10              VIDEOGRAPHER:  The time is 3:48.  Off the

11      record.

12              (The taking of the deposition was concluded at

13  3:48 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   RE     : Patterson v. American Airlines
     DEPO OF: GLENN R. CADDY, Ph.D.
 2   TAKEN  : June 7, 2018

 3

 4                         EXCEPT FOR ANY CORRECTIONS
                           MADE ON THE ERRATA SHEET BY
 5                         ME, I CERTIFY THIS IS A TRUE
                           AND ACCURATE TRANSCRIPT.
 6                         FURTHER DEPONENT SAYETH NOT.

 7                         _____
                           GLENN R. CADDY, Ph.D.

 8

     STATE OF FLORIDA     )
 9                        )  SS:
     COUNTY OF BROWARD    )

10

11           Sworn and subscribed to before me this

12   _____ day of _____, 2018.

13   PERSONALLY KNOWN _____ OR I.D._____

14                         _____
                           Notary Public in and for
15                         the State of Florida at
                           Large.

16

17   Notary #FF236965

18   My commission expires: 06/03/2019

19

20

21

22

23

24

25
```

```
 1                    ERRATA SHEET
 2    RE    : Patterson v. American Airlines
      DEPO OF: GLENN R. CADDY, Ph.D.
 3    TAKEN : June 7, 2018
 4      DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
 5    Page #| Line #|  Change                 | Reason
 6    _____| _____| _____|_____
 7    _____| _____| _____|_____
 8    _____| _____| _____|_____
 9    _____| _____| _____|_____
10    _____| _____| _____|_____
11    _____| _____| _____|_____
12    _____| _____| _____|_____
13    _____| _____| _____|_____
14    _____| _____| _____|_____
15    _____| _____| _____|_____
16    _____| _____| _____|_____
17    _____| _____| _____|_____
18    _____| _____| _____|_____
19    _____| _____| _____|_____
20    _____| _____| _____|_____
21    State of Florida    )
      County of Broward   )
22
      Under penalties of perjury, I declare that I have
23    read by deposition transcript, and it is true and
      correct subject to any changes in form or
24    substance entered here.

      _____        _____
25    Date                   GLENN R. CADDY, Ph.D.
```

1              CERTIFICATE OF OATH OF WITNESS

2

3    STATE OF FLORIDA      )

                           ) SS:

4    COUNTY OF BROWARD     )

5

6              I, CHRISTINE SAVOUREUX-MARINER, Florida

7    Professional Reporter and Notary Public in and for

8    the State of Florida at Large, certify that the

9    witness, GLENN R. CADDY, PH.D., personally appeared

10   before me on June 7, 2018 and was duly sworn by me.

11             WITNESS my hand and official seal this 9th

12   day of June, 2018.

13

14

15

     _____

16             CHRISTINE SAVOUREUX-MARINER

               Notary Public, State of Florida

17             at Large

18   Notary #FF236965

19   My commission expires: 06/03/2019

20

21

22

23

24

25

1                REPORTER'S DEPOSITION CERTIFICATE

2

3              I, CHRISTINE SAVOUREUX-MARINER, Florida

4    Professional Reporter, certify that I was authorized

5    to and did stenographically report the deposition of

6    GLENN R. CADDY, PH.D., the witness herein on June 7,

7    2018; that a review of the transcript was requested;

8    that the foregoing pages numbered from 1 to 87

9    inclusive is a true and complete record of my

10   stenographic notes of the deposition by said

11   witness; and that this computer-assisted transcript

12   was prepared under my supervision.

13              I further certify that I am not a

14   relative, employee, attorney or counsel of any of

15   the parties, nor am I a relative or employee of any

16   of the parties' attorney or counsel connected with

17   the action.

18              DATED this 9th day of June, 2018.

19

20

21

22   _____

                CHRISTINE SAVOUREUX-MARINER

23              Florida Professional Reporter

24

25

1                    VERITEXT
                 One Biscayne Tower
2        2 South Biscayne Boulevard, Suite 2250
                  Miami, Florida 33131
3
4   June 11, 2018
5
6   Glenn R. Caddy, Ph.D.
    c/o WILLIAM R. AMLONG, ESQUIRE
7   AMLONG & AMLONG, P.A.
    500 Northeast 4th Street
8   Second Floor
    Fort Lauderdale, Florida 33301
9   wramlong@theamlongfirm.com
10  RE:       Patterson v. American Airlines
    DEPO OF:  Glenn R. Caddy, Ph.D.
11  TAKEN:    June 7, 2018
12  Dear Glenn R. Caddy, Ph.D.:
13  This letter is to advise you that the transcript of the
    deposition listed above is completed and is awaiting
14  reading and signing.
15  Please arrange to stop by our office in Suite 2250, 2
    South Biscayne Boulevard, Miami, Florida 33131 to read
16  the transcript.  Our office hours are from 8:30 a.m. to
    4:30 p.m. Monday through Friday.  Depending on the
17  length of the transcript, you should allow yourself
    sufficient time.
18
    If the reading and signing has not been completed prior
19  to the referenced date, we shall conclude that you have
    waived the reading and signing of the deposition
20  transcript.  Your prompt attention to this matter is
    appreciated.
21
22  Sincerely,
23
24  Christine Savoureux-Mariner, FPR
25

**&**

**&** 1:12 2:2,7 88:7

**0**

**06/03/2019** 84:18 86:19

**1**

**1** 3:13 6:2,4,6,9,11 87:8
**11** 88:4
**15** 57:6
**191** 58:12
**1996** 17:13
**1:17** 1:2
**1:19** 1:14 4:2
**1a** 8:1

**2**

**2** 8:2,7 40:2 88:2,15
**20** 31:20
**20,000** 60:25
**201** 2:8
**2015** 60:4 61:16 62:8,8 67:14 71:1 78:24 79:1,12,15
**2016** 10:17 16:1,2,4 16:8 38:12 41:2,14 43:17,19 67:13
**2017** 17:16
**2018** 1:14 4:2 84:2 84:12 85:3 86:10 86:12 87:7,18 88:4 88:11
**21** 37:9
**22** 38:12
**2250** 88:2,15
**22nd** 42:25 43:17
**25** 17:16 66:24
**2:00** 69:11
**2:42** 51:24 52:1
**2:51** 52:2,3

**2a** 3:14 8:3,9
**2b** 3:15 8:1,13 9:3 9:11,16 10:4 13:24 20:25 33:8 34:7,13
**2c** 3:16 8:1 16:21 16:22 17:2
**2d** 3:17 8:1 17:4,6,8
**2e** 3:18 8:1 19:4,17

**3**

**3** 3:19 6:8,11,22 37:11,13 40:22 43:1,9,10 45:13
**30** 31:20 72:15
**305** 2:9
**3200** 2:8
**33131** 2:9 88:2,15
**33301** 1:13 2:4 88:8
**350** 20:1
**358-5171** 2:9
**360** 76:19
**37** 3:19
**39** 3:20
**3:14** 64:7,9
**3:16** 64:10,11,22,24
**3:20** 64:25 65:1
**3:48** 1:14 83:10,13

**4**

**4** 3:20 6:23 7:1 39:20,22,25 40:3 40:22 44:2 45:13
**4/22/16** 3:19
**40,000** 20:15
**400** 19:18 20:10
**462-1983** 2:4
**4th** 1:12 2:3 4:14 88:7

**5**

**5** 3:4
**500** 1:12 2:3 4:13 20:9 88:7

**54** 3:5

**6**

**6** 3:13 16:2,4 41:1 43:19
**60533** 1:2
**67** 34:11
**6th** 16:1,8

**7**

**7** 1:14 4:2 84:2 85:3 86:10 87:6 88:11
**70** 3:6
**78** 3:7

**8**

**8** 3:14,15,16,17,18
**87** 3:8 87:8
**88** 3:9
**8:30** 88:16

**9**

**954** 2:4
**97** 17:19
**9:00** 69:13
**9th** 86:11 87:18

**a**

**a.m.** 88:16
**aberrant** 27:7
**abi** 33:21
**ability** 64:1
**able** 9:22 14:23 20:14 28:19 37:22 67:25
**absence** 55:11 82:1 83:4
**absolutely** 15:18 26:14 29:17 51:21 59:14,16 70:16 73:5 75:24
**absurd** 61:20
**absurdity** 9:25

**academe** 57:4
**academic** 16:25
**accept** 60:3
**acceptable** 61:12 75:3
**access** 32:13
**accomplished** 47:8
**account** 22:4 27:5
**accurate** 17:16 84:5
**accurately** 59:9
**accused** 58:24
**accusing** 11:11
**acquire** 28:19
**acquired** 19:1
**act** 77:21,22
**acted** 62:23
**action** 4:18 87:17
**actions** 10:13 23:13 25:10,11,14,15 62:24
**active** 81:2
**actual** 52:17 78:9
**add** 11:2
**addictions** 18:13
**addition** 7:8
**additional** 11:3 50:11,13,19
**address** 6:14 50:5
**addressing** 55:15
**adequate** 69:15
**adjust** 69:15
**adjustment** 14:17 15:2,9,11,16 65:6,9 67:11 68:13,16
**administer** 4:17 36:4,9,13 56:18 69:23
**administered** 36:6 55:11 56:1

**administering**
39:11 82:10
**administration**
36:20 39:12
**adversary** 10:13
13:16,17
**advice** 19:3
**advise** 78:4 88:13
**advised** 41:25
**aeromedical** 12:20
33:19 52:13 53:16
54:6 56:24 57:1
70:15 75:7
**aeromedically**
77:25
**affiliation** 4:21
**affinitive** 65:19
**afternoon** 4:1 5:16
69:12
**ago** 20:18 23:23
33:7,7 50:5 59:19
62:2 70:10 72:15
**agree** 4:9 21:3
48:20
**agreed** 32:19
**agreement** 3:18
13:22 19:8,16,18
51:5
**ah** 72:20
**ahead** 28:25
**aircraft** 60:22 61:1
61:15 68:3
**airline** 23:13 31:8
57:17,18,18 58:14
58:19,21 66:16
67:25 74:7
**airlines** 1:8 4:12
5:1,19,23 9:19 10:1
10:20 13:22 25:1,1
27:21 30:17 57:20
58:9,10 59:9 61:15

69:7 74:20 78:25
79:13 84:1 85:2
88:10
**airworthy** 9:19
**alcohol** 75:12
**allegations** 51:15
59:11,16 60:12,15
63:2 70:25 72:18
72:19,20 73:20
79:11,14,17
**allow** 88:17
**allowed** 12:10
**altercation** 62:18
**america** 63:10
**american** 1:8 4:12
4:25 5:18,22 9:19
9:25 10:20,21
11:18 13:22 23:22
25:1 27:21 30:17
59:9 61:14 71:2
74:19 78:25 79:13
84:1 85:2 88:10
**amlong** 1:12,12 2:2
2:2,2 3:5,7 5:2,2
7:12 8:3,16 16:6
37:24 45:14 46:5
50:22 52:25 53:23
54:24 55:5 56:15
56:21 57:3 60:1
61:13 62:6,14 64:6
64:14,18 65:3,11
65:16 67:9 68:9,18
70:20 78:23 79:9
79:18 80:14 81:1
81:10,21 82:23
83:1,7 88:6,7,7
**amount** 14:20
20:22 24:4 58:6
**amounts** 58:21
**analyses** 24:18

**analysis** 24:16,19
25:6
**anger** 65:19 66:10
**angry** 15:12 66:4
68:5 73:22 79:22
**annoyed** 55:14
**answer** 22:5 23:3
25:6,24 33:1 40:24
45:16,17 48:1 53:1
54:4,8,14,16 60:10
**answered** 18:22
47:23,24 55:3
**anticipated** 7:22,23
**anxiousness** 65:18
**anymore** 63:22
**anyway** 31:24
**apologize** 46:23
75:22,24,25
**apparently** 12:17
62:22
**appear** 23:9
**appearance** 4:21
4:24
**appearances** 2:1
**appeared** 86:9
**appointment** 16:19
**appreciate** 25:4
76:4
**appreciated** 88:20
**appropriate** 14:3
36:15 74:6 82:4
**approximately**
17:15 20:14,15
33:5,6
**april** 16:1,2,4,7
38:12 42:25 43:17
68:19
**area** 42:11 80:20
**argument** 25:20
27:12,13 49:2
71:13 82:9

**arguments** 49:10
**army** 81:3
**arrange** 7:9 88:15
**array** 24:12 60:11
72:17 80:24
**arrives** 69:13
**arrogant** 63:17
**ascension** 22:11
62:19
**aside** 74:22
**asked** 29:10 31:18
47:23 52:6 53:22
55:2 70:10
**asking** 29:14 38:21
40:23,25 41:13
43:3,5 47:22 49:16
52:11 53:17 54:14
65:13
**aspects** 24:6
**asserting** 12:22
**assertion** 68:25
**assertions** 69:1
**assessment** 35:12
38:20 52:17 69:11
69:14 70:1,11
**assessments** 36:20
52:8 54:11
**asshole** 65:22
**assign** 73:15
**assignment** 19:14
**assistant** 47:6,8
82:4
**assisted** 87:11
**association** 28:12
66:24
**assume** 20:6 59:8
**assumes** 46:5
**assuming** 56:16
**assumption** 27:9
**attached** 19:13

attacking 25:18
attendant 28:10
attendants 28:10
attention 88:20
attorney 16:5
47:25 82:18 87:14
87:16
attracted 61:5
attributions 30:2
audio 4:7,7 37:22
australia 18:1,3
authoritative 15:6
authority 55:18
authorization
19:13
authorized 4:17
87:4
available 12:11
36:13 38:14
aviation 58:8
awaiting 88:13
awarded 18:5,6,8
aware 9:9 10:5
19:24 35:1 38:14
48:13,16 80:15
81:2,8,9,11,16

**b**

b 3:11 33:21
back 20:25 22:13
23:15 37:20 38:22
46:12 47:22 53:21
58:3 62:20 63:22
64:13,15 66:1
70:12 76:24 82:21
background 17:18
57:4 69:21
bacon 2:7
bad 30:8 46:23
balanced 26:16
bar 51:18

bargaining 13:21
base 57:22
based 59:23 70:24
74:13 75:4 76:25
basically 12:22
30:22
basis 60:23 71:2
72:20
battle 47:12
beating 61:24
becoming 46:11
beginning 52:4
behalf 1:21 2:5,10
4:25 5:2,4
behavior 22:15
23:18 24:23 25:16
26:13 27:7,18
59:10
behaviors 58:25
belief 32:16
beliefs 31:11
believable 22:17
believe 13:13 20:25
22:3,5 26:5,10,11
26:13 28:15 31:7
43:23 46:10 47:17
53:10 60:23 61:17
62:7 70:24 72:6
73:8,13 75:19
believed 22:9 63:4
63:5 73:6,8,13
believing 73:16
benefit 22:24
bercaw 6:24 7:2
34:25 35:9,10,12
35:13 36:5,22 38:7
38:24 39:6 40:16
40:20 41:2 42:9,14
43:2,20,25 46:1,10
46:16 47:8,14
48:11 53:8,10

55:10 56:22 77:1
78:5 81:22,25 83:4
bercaw's 6:24
35:20 38:9 47:17
52:9,23 53:6,15
54:12,25 55:7,11
56:1 76:24 77:3
best 24:11 37:6
51:17 70:7 78:4
beyond 10:8 13:5
bias 29:3,15
biased 28:7
big 46:11,12 66:14
75:23
bill 20:13,19
billed 19:15
biscayne 2:8 88:1,2
88:15
bit 7:3,6 20:7 21:4
45:9 50:6
bizarre 11:12
bluntly 62:21
board 18:18 51:10
51:13 56:17 69:2,5
77:20
bonds 80:13,16
bottom 49:2 78:3
boulevard 2:8 88:2
88:15
brains 69:7
bridge 26:23
brief 15:10
briefly 17:17 46:18
brigadier 31:22
brilliantly 73:4
bring 6:9 7:8 14:20
20:13
broad 60:12
brought 6:10,20
50:10 76:17

broward 62:3 84:9
85:21 86:4
brutality 61:25
bus 22:13
buying 65:23

**c**

c 88:6
caddy 1:17 3:3 4:11
5:6,10,16 6:6 7:14
8:11 84:1,7 85:2,25
86:9 87:6 88:6,10
88:12
california 47:10
78:1
call 10:7 16:18 58:3
64:13,15 79:21
82:21
called 5:11 35:13
35:23
calling 42:10
capable 9:23
capacity 23:4 60:22
captain 10:15,19
11:10,16 13:18,19
14:10 22:15,18,20
22:21 23:6,7 24:6
25:9,18 26:6,10,18
26:22 27:5,9 28:3,4
29:4,10,11,16 30:9
31:6,18 32:11,15
35:8,9,18 36:22
38:23 47:1 49:3
55:14,24 58:24
59:7,8,13,13,23
60:3,6 62:9,19,21
62:22 63:12,13,19
63:24 70:25 71:15
71:17,19,20 72:3,6
72:13 73:6,15,16
73:18 76:1 77:6
79:11,14,19 80:7

80:12,16
**captain's** 9:21
  11:12
**car** 55:22
**career** 10:14 27:20
  66:6
**careers** 15:20
**carrier** 9:21
**case** 1:2 5:21 6:13
  7:9 8:10 9:4,10,17
  10:4 12:13 13:11
  19:9 20:12 21:24
  23:21 27:3 30:3
  44:9 49:14 59:24
  70:15 71:6 74:5,19
  74:22 76:16
**cases** 51:18 74:25
**cause** 1:25 31:4
  65:8
**cell** 4:5 82:20
**cellular** 4:5
**central** 63:10
**certain** 21:10,10
  52:15
**certainly** 13:8
  14:16 21:12 46:9
  81:8
**certainty** 44:12
**certificate** 3:8 86:1
  87:1
**certified** 56:25 69:2
  69:6 75:7 77:20,25
**certify** 84:5 86:8
  87:4,13
**cetera** 66:18,18
  68:1,1
**change** 19:23 52:15
  85:5
**changed** 14:11,12
  14:12,13 50:5

**changes** 85:4,23
**changing** 79:4
**chaos** 24:17 72:23
  73:1,1
**child** 70:10
**children** 22:16
  23:17 63:14
**chose** 27:6
**christine** 1:22 4:16
  86:6,16 87:3,22
  88:24
**chronically** 10:21
**circumstance**
  23:21
**circumstances**
  14:11,11,12,24
  24:16
**civil** 63:11
**claim** 10:1
**claimant** 81:14
**claimed** 22:16
  23:14
**claims** 31:13 71:15
**clarify** 21:11,15
**clarifying** 76:4
**clarity's** 7:15
**class** 9:23
**clean** 34:3
**clear** 6:17 32:24
  47:7 69:14 71:20
  75:13
**clearer** 46:13
**clearly** 10:25 39:8
**client** 56:11 78:4
  83:6
**clients** 43:13
**clinical** 69:3
**close** 60:25
**closely** 36:17,19
  82:6

**cogscreen** 52:16,24
  54:8 69:11,24
  78:10
**collateral** 21:16,23
  22:8 25:15 29:24
  75:17,18,21,22
  76:9,14
**collaterally** 63:6,8
**collecting** 25:17
  74:3
**collective** 13:21
**colonels** 31:25
**combination** 15:12
**come** 9:6 16:3
  70:12
**coming** 76:15
**comment** 11:4
**comments** 30:25
  31:3 68:23
**commission** 84:18
  86:19
**common** 44:7
**commonwealth**
  18:5,6,8
**communicating** 7:2
**communications**
  6:23
**communique** 3:15
  8:16
**community** 75:2,3
**company** 10:12
  11:1 12:10 65:23
  67:1,23
**compared** 22:14
**compensation**
  81:13
**competency** 81:20
**complain** 29:16
**complained** 28:11
**complaints** 13:18
  61:4

**complete** 13:8 18:7
  18:10 87:9
**completed** 18:1
  56:9 88:13,18
**completing** 21:14
**complex** 69:16
**components** 12:20
**composite** 8:2
**comprehensive**
  10:7 12:7 13:25
  14:4 23:11,12,24
  24:1,3 72:10
**compromise** 47:9
**compromised**
  47:10,11
**compromising**
  15:19
**compulsive** 45:9
**computer** 50:10
  87:11
**concern** 36:24
  49:11,13
**concerned** 49:10
  77:10
**conclude** 88:19
**concluded** 83:12
**conclusion** 77:12
**conclusions** 74:15
**condition** 65:17
**conditions** 19:10
  39:3 70:4
**condo** 66:24
**conduct** 10:13
  56:14
**conducted** 75:16
**conducting** 9:24
  77:2
**confidential** 3:15
  8:15
**confirmed** 55:10

**confused** 42:3
**connected** 14:17
　87:16
**connection** 33:8
**consequence** 80:24
**consequences**
　15:18 58:11
**consider** 48:9 70:6
　70:7 77:5,6
**considered** 6:20
　9:23 15:10 25:10
　25:11,13,14,15
　48:6,7,9,12
**consistent** 17:11
　22:17,18 45:19
　68:16
**constellation** 12:8
**construct** 11:20
　15:21
**constructs** 11:12
**contact** 15:25 16:3
**contacted** 35:18
**contain** 9:3,5 34:22
**contains** 24:3 50:11
**context** 9:24 26:20
　32:16 58:7 71:16
**contexts** 31:18
**continue** 4:8 11:21
**continues** 13:20
**control** 78:15,17
**conversation** 22:25
　23:2 48:17
**conversations** 4:4
　21:8
**coordinate** 50:18
**copied** 37:16
**copies** 50:19 51:5
**copy** 6:2,16 7:10,17
　7:18
**corner** 55:17,20

**corporation** 1:8
**correct** 19:19,20
　20:6,17,23 22:25
　25:12 26:22 27:10
　27:21 32:25 34:7
　38:7,10,15 40:13
　43:2,10,22 44:1
　45:1,5,22 46:3,17
　46:20,22 47:18
　48:8,14,17 63:2,3
　71:10,21 72:7
　73:17 75:14 85:23
**correction** 34:18
**corrections** 84:4
**correspondence**
　40:16,19
**cost** 47:13
**costs** 61:11
**counsel** 4:20 6:2
　7:9 13:7 34:14 40:1
　44:1 50:18 72:16
　87:14,16
**country** 31:5
**county** 84:9 85:21
　86:4
**couple** 35:19 51:14
　63:14
**course** 49:14 60:10
　61:21 75:11,14
　78:1
**coursework** 18:9
**court** 1:1 3:21 4:16
　5:7,25 7:25 17:10
　25:22 32:5 44:21
　53:12
**crash** 61:14
**crashes** 58:11
**craziness** 11:11
**create** 61:10
**created** 24:17,24
　31:10

**creating** 72:23
**credibility** 12:16
　22:25 23:1 30:15
**crisis** 58:15
**critical** 59:21
**criticized** 39:7
**cross** 3:5 54:23
**crowd** 11:13 27:23
**cruel** 68:7
**currently** 9:20
**curriculum** 3:16
　17:1
**customs** 31:4,9
**cut** 65:25
**cv** 1:2 16:25 17:18

**d**

**d** 3:1
**dallas** 58:13
**damages** 30:3
**damaging** 60:25
**data** 10:9,23 11:8
　12:11,18 22:7
　24:14 25:17 29:7
　55:6 70:8 74:3
**date** 16:13,16 85:25
　88:19
**dated** 17:15 41:1
　87:18
**day** 13:20 22:10
　28:21 70:6 75:11
　78:1 84:12 86:12
　87:18
**days** 43:15 62:1
　70:10
**dead** 58:17
**deal** 11:3 19:1 78:4
**dealing** 19:2 58:7
　58:10 65:18 69:18
　77:9
**dear** 88:12

**death** 61:24
**debt** 15:14
**decade** 63:15
**decide** 46:2 70:5
**decided** 41:16
　44:16 73:4 77:3,4,6
　78:2
**decimating** 25:18
**deck** 61:16,18
**declare** 85:22
**decrease** 20:6
**deep** 60:13
**defective** 12:14
**defendant** 1:9,21
　2:10
**defendant's** 3:12
　6:4 8:7 37:13 39:22
**definitely** 44:25
　54:7
**degree** 10:17 17:24
　18:2,10,11 24:18
　24:19 25:5 62:10
　65:7 67:10 76:17
　76:19
**degrees** 18:7
**delaware** 1:8
**delete** 45:22 46:3
**deleted** 44:19 45:13
**deleting** 45:9
**deliberately** 11:1
**delta** 58:12
**delusion** 67:22
**denies** 72:19
**department** 10:24
**departments** 74:18
**depending** 88:16
**depends** 23:2
**depo** 84:1 85:2
　88:10
**deponent** 84:6

**deposition** 1:17,25
3:13 4:7,11,13 6:1
6:10 7:10,13 16:22
19:5 37:10 50:8,19
50:21 70:18 74:25
83:12 85:23 87:1,5
87:10 88:13,19
**depression** 65:19
66:9
**described** 45:13
**describing** 13:13
**description** 3:12
**designed** 15:23
24:9,10
**despite** 9:18
**destroy** 10:14
26:12 27:19 66:5
73:25 80:4
**destructive** 73:5
**detail** 12:4 32:14
32:22 38:21
**detailed** 13:8 14:7
**details** 35:22
**determine** 24:11
**determining** 81:12
**devastating** 14:25
**develop** 77:10
**developed** 9:13,16
14:2
**developer** 78:9
**diagnoseable** 14:16
**diagnosed** 15:8
**diagnosing** 13:2
**diagnosis** 15:3,17
15:22 75:4 79:19
79:21
**died** 70:10
**difference** 66:14
75:23
**different** 10:7
12:12,23 14:22

23:19 27:4 31:18
32:4 52:14,14
62:25 63:3 79:10
**difficult** 15:21
**direct** 3:4
**direction** 30:19,20
**disagree** 52:18
**disagreed** 52:19
73:22
**disagreement**
71:16 80:15
**discipline** 29:5,25
**disclosed** 65:15
**disclosure** 3:14 8:3
8:10
**disclosures** 6:16,18
7:9 65:13
**discuss** 35:23 74:24
**discussing** 41:2
43:20 46:16,18
56:2
**discussions** 78:11
**disgusted** 15:13
58:1
**dishonest** 73:5
**dishonesty** 60:13
**disorder** 14:17
15:2,9,11,16 65:6,9
67:12 68:14,17
78:15
**disorders** 12:23
**disproportionate**
31:5
**disproportionately**
66:15
**dispute** 26:15
**disrespect** 62:19
**distinction** 29:23
**distorted** 31:11
**distress** 70:14

**district** 1:1,1
**distrust** 51:2
**divorce** 51:18
**doctor** 20:17 21:1
23:25 47:14 51:1
54:4 65:5 72:13
82:6
**doctorate** 39:14,17
40:9,12
**doctors** 33:13 34:5
**document** 6:3 7:1
8:6,11,15,17,19,23
9:2,14 10:6 14:6
17:2,14 19:5,13
21:17 22:2 37:12
39:21 43:9 44:20
49:19
**documents** 6:9,10
6:14,17 7:7 21:10
21:25 34:10 44:22
45:10,10 75:4
**doing** 13:4 24:20
26:25 27:1,5,19
36:15 39:7 44:9
47:14 52:13 54:6
58:18 61:6 64:2
68:1,22 73:1 74:3
76:2 82:5,12
**dollars** 35:19 38:25
47:13 77:8
**doubled** 20:24
**doubt** 22:6,22
43:16 70:17
**dozen** 21:23 31:12
31:17
**dozens** 29:2
**dr** 5:6,16 6:6,24 7:2
7:14 8:11 12:4,16
12:18 33:9,19,20
33:20,21 34:25
35:9,10,11,12,13

35:20 36:5,22 37:3
38:9,24 39:6 40:16
40:20 41:2 42:1,7,9
42:14 43:2,20,25
46:1,10,16 47:8,14
47:17 52:9,18,23
53:6,15 54:12,25
55:7,10,11,11 56:1
56:4,16,22 65:4
68:11,21 69:2
76:24 77:1,3 81:12
81:18,22,25 83:3,4
**drawn** 32:18 74:16
**drinking** 79:23
**drop** 52:15
**dropbox** 44:14,15
45:5 50:1,10
**drove** 59:19
**drugs** 75:12
**dsm** 15:3,5
**duly** 5:12 86:10
**duplication** 37:3
**duty** 10:2 11:2
58:19,20 60:8 62:5
63:12 81:2

**e**

**e** 3:1,11 33:21
**earlier** 13:13 25:9
33:3 38:7 42:23
52:6 70:24 76:9
**economic** 14:24
61:11
**ed** 38:7
**edb** 37:16
**edge** 41:14
**editor** 21:13
**educated** 17:25
**education** 18:25
**educational** 17:18
**edwin** 6:23 34:25

**effort** 24:15 65:20
**efforts** 10:14
**eh** 45:4
**either** 30:10 49:24
  72:22 73:6
**electronic** 49:24
**element** 9:8
**elements** 12:21
  24:7,22
**eliminating** 45:9
**email** 3:19 37:8,15
  38:6,7,9,12 43:17
  44:15,20 50:2,4,5
**emails** 26:7 43:12
  43:15 45:10 58:23
  59:10
**embark** 26:17
**emotional** 11:3
  14:12 26:14 30:3
  58:15 61:2,3
**employed** 14:23
**employee** 87:14,15
**employment** 14:13
  15:1
**encourage** 28:19
  77:5
**ended** 25:21
**ends** 61:23,24
**engage** 27:15
**engaged** 67:22
**enter** 85:4
**entered** 85:24
**enterprise** 26:17
  27:15
**entire** 23:21 24:16
  27:8 80:24
**entirely** 8:21 23:10
  32:4
**entitled** 8:15 44:22
**entity** 14:16

**envelope** 41:15
**errata** 84:4 85:1
**error** 30:18
**especially** 23:15
  66:12
**esquire** 2:2,7 8:16
  88:6
**essence** 11:25
  35:18 47:15
**essential** 9:8 23:20
**essentially** 6:13
  9:18 20:19 77:13
**establish** 23:1 70:4
**et** 66:18,18 67:25
  68:1
**ethical** 81:22,24
  83:2
**europe** 59:19
**evaluate** 82:8
**evaluation** 12:3
  33:18 42:12 48:11
  61:7 70:15 71:3
  72:4,14 77:16
**evaluations** 62:5
**evaluative** 60:20
**event** 41:14 59:18
  59:18
**events** 12:8 14:19
  22:10 23:14 24:23
  80:24
**eventually** 14:9
  22:8
**evidence** 46:6
**exactly** 30:16 32:15
  46:14 74:20 76:1
  82:12
**examination** 3:4,5
  3:6,7 11:7,9 12:2,7
  12:15 14:5 23:24
  33:20 38:14 52:13
  53:16 54:7,23

  59:12 60:8 70:22
  71:14 72:10 78:22
**examinations**
  58:19
**examined** 5:12
  71:12 79:20
**examiner** 32:23
**example** 8:24 14:14
  22:10,14 23:14,18
  24:6 28:9 30:4,25
  31:11 58:12 63:11
  66:21 69:11 70:9
**examples** 28:16
  31:12
**excellent** 56:13
**exceptional** 78:8
**excessive** 79:23
**excuse** 25:1 29:10
  35:9 37:21 63:25
  69:4 72:13 78:5
**exhibit** 3:13,14,15
  3:16,17,18,19,20
  6:2,4,6,9,11 8:2,7,9
  8:13 9:3,11,16 10:4
  13:24 16:21,22
  17:2,4,6,8 19:4,17
  33:8 34:7,13 37:9
  37:11,13 39:20,22
  39:25 40:3,22 43:1
  43:9,10 44:2 45:13
**exhibits** 3:21 8:1
**exist** 78:24 79:1
**existence** 35:1
**expect** 9:5 53:19
  54:6
**experience** 57:16
  58:4,5,7,9,14,18
**experiencing** 14:17
  15:15
**expert** 3:14 6:16,18
  8:3,9 13:21 39:3,12

  47:12 65:13 74:12
  77:9 80:18 81:13
**expertise** 49:8
  69:22 80:20
**experts** 7:8 17:12
**expires** 84:18 86:19
**explain** 42:18
**explanation** 25:4
**extended** 10:8
**extent** 9:12 30:24
**extreme** 12:22

**f**

**f** 33:21
**face** 22:25,25 23:2
  23:2
**facing** 14:18
**fact** 10:17 11:25
  38:13 48:6 49:25
  50:3 69:5 73:22
  78:8
**facts** 24:11 46:5
**factually** 73:11
**fair** 21:18 26:5
  32:22 39:14
**fall** 68:24
**familiar** 34:25
**family** 29:12 67:8
  72:25 76:20
**far** 49:17
**fault** 73:15
**favor** 71:13,19 74:2
  82:10
**fbi** 61:8
**federal** 17:10,12
  44:21
**fellow** 80:4
**fellowship** 18:6,8
**females** 57:24
**ff236965** 84:17
  86:18

field  18:13 54:16
  70:19
fight  11:21
figure  49:13
file  49:19,22
filed  8:10
financial  3:18 19:8
financially  4:18
find  15:3 27:25
  29:2 32:14 68:23
findings  14:7 35:7
  35:20,24 36:2
  46:17,18,19,25
  47:18,20 56:3
fine  7:19 76:7
finish  34:2 42:14
first  5:11,25 9:22
  11:5 12:5 15:25
  25:23 26:3 49:25
  54:17 59:10 60:6
  61:15 65:12 71:18
firstly  56:6
fit  9:19
fitness  10:2 58:18
  58:20 60:7 61:17
  62:5
five  8:1
fix  67:23
fixed  67:20 68:2
flash  61:8
flight  11:16 22:13
  22:13 28:9,10,11
  59:21 61:16,18
  62:20,22 63:20,22
  63:25 66:25 67:25
  71:14 80:9,17,23
floor  1:13 2:3 88:8
florida  1:1,13,22
  1:24 2:4,9 4:14
  17:10 18:15,17
  51:10,12,18 84:8

84:15 85:21 86:3,6
  86:8,16 87:3,23
  88:2,8,15
flown  69:12
fly  60:22 64:19
  65:21
flying  9:21 59:23
  68:2 78:25 79:13
focus  18:12 73:2
focused  18:4
focusing  73:3
folks  42:21
follow  61:12 70:21
follows  5:13
fonseca  40:4 55:11
  56:4,16 83:3
foregoing  87:8
forensic  6:15 10:8
  12:7 13:25 14:4
  24:1,3 32:23 47:3
  58:7 77:20
forget  48:21,24
forgive  52:7
forgot  33:3
forgotten  31:22,24
  34:20 60:16 67:4
form  8:2 13:8 19:9
  45:14 49:24 55:2
  56:5,20 59:15 60:9
  61:19 62:12 65:10
  67:15 68:15 75:4
  79:2,16 80:11,18
  81:7,15 85:23
formal  18:25
formed  26:21 56:3
former  80:5
fort  1:13 2:4 4:14
  88:8
found  22:17 35:25
  36:1 47:2

foundation  52:25
  71:15
four  18:10
fpr  88:24
frame  30:1
framework  47:4
francy  40:4
friday  88:16
friends  29:12 66:15
  66:16,17,17,18,19
  76:20
front  21:1 33:23
full  13:8 56:24 57:5
fully  57:2 82:12
fundamental  11:5
funded  18:8
further  12:17
  54:22 83:8 84:6
  87:13
future  45:21

## g

game  11:2
gary  33:20 41:24
  41:25 42:16 70:17
  78:10,11,13
gathering  11:13
general  31:22,24
  35:7 43:14 67:5
generally  16:24
  17:8,22 30:6 46:24
  47:18 50:7 70:19
gentleman  11:6
  30:22 31:7 34:23
getting  48:10 66:13
give  13:3 19:3
  30:14 31:5,12,19
  66:22 70:7
given  11:8 17:9
  31:20
gives  61:1 69:22

giving  79:7
glance  45:4 46:1
glenn  1:17 3:3 4:11
  5:6,10 84:1,7 85:2
  85:25 86:9 87:6
  88:6,10,12
go  4:9 8:4 11:6 13:2
  15:20 17:20 20:25
  25:19 28:25 30:5
  41:16,24,25 42:15
  42:16 45:5 47:4
  49:18 51:22 56:12
  64:4,21 78:7,10
goes  61:25 76:21
going  5:20 8:5 9:4
  11:4,10 14:9 15:13
  15:14 16:21 17:4
  19:4 25:2 27:1 29:8
  31:8 36:2 37:8,21
  42:15 44:25 45:11
  45:20,21 46:2,14
  47:7,11,22 49:4,5
  55:16 60:2 61:9
  62:21 63:23,24
  64:13,16 67:7,19
  67:20 74:24 76:3
  76:24 77:5,5,10,23
  78:3 79:7 82:7
good  4:1 5:16 8:25
  19:25 28:4,5 30:7
  32:21 48:3,4,7
  67:19 71:9
governed  18:18
graduate  57:14
great  15:12 19:1
grief  79:7
ground  27:2 59:20
group  57:24
growing  66:19
guess  42:3 75:12

**gunfight** 78:6
**guy** 66:4,5 73:1
  77:14

**h**

**h** 3:11 33:21
**haiti** 63:10,14
**half** 31:12 33:7
  39:1 77:7
**hand** 6:2 16:21
  17:4 19:4 86:11
**handed** 39:24
**handing** 8:13
**hang** 11:20 29:4,23
  42:14
**happen** 62:1,2
  67:20
**happened** 12:1
  30:16 59:18 72:8
**happy** 13:9 18:23
  67:22
**hard** 13:3
**hardy** 2:7
**harm** 73:19
**hassled** 64:2
**hastings** 33:19
**head** 6:13
**healthy** 62:16
**hear** 37:22
**heard** 13:6 53:13
  79:23
**heavily** 21:19,21,22
  21:23
**held** 4:13
**help** 29:23 58:15
**helped** 63:10
**helpful** 26:8 42:21
**hideous** 14:18
**highly** 28:21 29:6
**hired** 55:19 58:12
  58:13

**history** 61:25
**hit** 27:1
**hole** 25:3
**holt** 2:7 3:4,6 4:25
  4:25 5:15,17,18,25
  6:5 7:7,13,17,20,22
  8:4,8 25:22 26:2,4
  32:5,9 37:8,14,20
  38:5 39:20,23 42:2
  45:18 46:15 47:24
  48:5 50:18,23 51:1
  51:4,7,8,22 52:5
  53:3,12,21,25 54:9
  54:22 55:2 56:5,20
  59:15 60:9 61:19
  62:12 64:21 65:10
  65:12 67:15 68:15
  70:21,23 78:21
  79:2,16 80:11,18
  81:7,15 83:8
**homeowner's**
  28:12
**honors** 18:2
**hook** 65:24
**hope** 49:12
**hour** 19:18 20:1,9
  20:10
**hours** 58:17 60:25
  88:16
**house** 79:8
**huh** 17:5
**human** 24:22 72:9
  74:1,6,18
**hundreds** 81:19
**hurt** 14:20
**hypothetical** 61:20

**i**

**i.d.** 84:13
**idea** 27:6,22 30:14
  32:21 71:13

**identification** 6:4
  8:7 37:13 39:22
**identified** 40:3
**identifies** 6:9
**identify** 29:8
**idiot** 49:6,7
**imagine** 51:19
  59:22
**immediate** 59:12
**immediately** 60:7
  61:5 78:19 79:12
  80:16 81:5
**impacted** 64:1,1
  68:4 72:24
**implicit** 72:4
**importance** 69:15
**important** 69:9
**impressed** 62:23
**impression** 77:22
**impulse** 78:15,17
**inappropriate** 11:8
  48:10 72:5
**inappropriateness**
  10:1
**incapable** 39:10
**incidental** 32:2
**include** 24:5,6,14
  53:16
**included** 9:7
**includes** 14:3
**including** 6:24 7:16
  58:22
**inclusive** 87:9
**incorporate** 14:9
**incorrect** 73:11
**increase** 20:4 33:4
**increased** 33:4
**independent** 16:9
  16:17 41:5 43:6
  58:10

**independently** 82:8
**indicated** 35:11
**indicative** 62:9
  68:13
**individuals** 28:7
**industries** 74:18
**industry** 29:13
**inference** 32:17
**inferred** 61:4
**influence** 31:4 32:3
**information** 9:12
  9:15 21:15,22 24:4
  24:4 30:23 34:8
  48:21
**informer** 21:13
**initially** 65:6
**instability** 61:2
  62:11
**instance** 73:3
**instances** 21:9,10
**instrument** 36:13
  78:9
**instruments** 36:4,6
  52:8,15,17,21
  54:11,13,15 55:25
  56:3
**insulted** 72:19
**insurance** 19:8
**intend** 9:10,17 10:4
  13:11 17:19
**intentionally** 59:20
**interest** 55:12 56:2
**interested** 4:19
  31:20
**interestingly** 60:21
**interfere** 4:7
**interference** 4:5
**intern** 39:18 40:4
  40:11 77:2,16 82:5
**international** 55:17

**interpretation** 52:19

**interruption** 41:18 64:3 66:2,7 82:14 82:17

**interview** 31:16,21 32:24 33:2

**interviewed** 28:23 28:24 31:17,17,22 31:25,25 32:14

**interviewing** 31:21

**interviews** 75:17 76:10,15

**intrusion** 70:13

**investigated** 51:12

**invited** 78:2

**involve** 24:7

**involved** 63:7 80:19

**involvement** 5:21 19:10

**irrespective** 27:13

**irritated** 47:1 78:14

**issue** 10:10,11,12 12:6 13:14 14:1 32:23 46:11,12 60:21 69:9,25 72:10 74:21 76:24 78:17 81:25

**issues** 11:6 13:1 19:11 21:12 23:24 24:12 26:14 30:4 61:17 65:25

**j**

**january** 56:18

**jets** 68:2

**job** 67:25 70:11

**jobs** 15:19

**judge** 81:11

**judges** 81:19

**judging** 22:24

**jumps** 26:23

**june** 1:14 4:2 84:2 85:3 86:10,12 87:6 87:18 88:4,11

**junior** 73:3

**jurisdictions** 17:11

**jury** 42:18,21

**justified** 59:11

**k**

**kay** 33:20 41:24,25 42:7,17 65:4 78:11

**kay's** 70:18

**keep** 44:13,17 45:11

**kept** 49:18 50:1 68:22

**killing** 61:24

**kindly** 25:23

**knew** 28:24 29:12 31:19 32:15 37:2 38:13 42:10 43:1 43:21,23 48:19 58:14 60:16 73:22 82:11

**knippa** 12:4,16,18 33:20 35:11 37:3 42:1 52:18 53:8,14 55:16 68:11 69:2 78:5,12,13 81:12 81:18

**knippa's** 33:9 68:21

**know** 10:24 11:19 12:17 16:20 26:23 27:1,6,11 28:6 29:25 30:12,22 31:1,15,23 32:20 34:16 35:22,22 36:7,8,19 37:6

39:16,16 42:4,8,13 43:5 45:16 46:11 49:18 52:7,11,12 52:12,14 53:14,17 53:18 54:4,5,13,15 54:17 60:15 61:7 61:10,23 63:13,16 65:24 66:13,23 68:4 69:2,4,5,6 70:9,10,12,16 72:16 73:21 74:17 76:18,21,22 77:19 77:24 78:8,13,16 78:18 79:22,23,24 80:1,4

**knowing** 43:6

**knowledge** 19:1 30:23 37:7 48:19 51:13 53:5 54:10

**knowledgeable** 36:17

**known** 14:10 15:24 32:1 38:17 42:15 42:24 43:4 49:4 65:5 84:13

**knows** 66:14

**l**

**lack** 10:1

**lacked** 81:20

**lacks** 60:23

**lady** 36:5 39:8

**large** 1:24 45:8 63:8 66:16 67:2 84:15 86:8,17

**largely** 50:9

**larger** 10:9 12:6

**latin** 42:19

**lauderdale** 1:13 2:4 4:14 88:8

**lawsuit** 71:21,22,25

**lawsuits** 61:11

**lawyer** 18:20

**lead** 47:9 79:12

**learn** 65:20

**learned** 55:9,25

**leash** 59:5

**leaving** 12:24

**legal** 11:2 18:25 19:2,3

**legitimate** 68:25

**length** 70:18 78:12 88:17

**letter** 3:9 41:1,7 42:5,5,6 43:20,24 44:4,5,10 45:12 56:2,7 88:13

**letters** 62:8

**level** 12:11 38:21 49:8 57:14 68:21

**license** 51:9

**licensed** 18:14,17 36:10,12,16 56:17 75:3

**lies** 27:9,12,14 31:2

**life** 79:4

**line** 7:23 17:20,20 49:2 65:24 78:3 82:22,25 85:5

**list** 3:17 29:15,18 33:16 62:22 63:23

**listed** 22:2 33:23,24 34:1,6 88:13

**listing** 17:9

**literally** 81:18

**little** 7:3,6 10:6 20:7 42:3,9 50:6

**live** 80:5

**living** 67:8

**llp** 2:7

**located** 34:10

**log** 3:20 40:1
**long** 15:24 23:23
57:5 76:20
**longterm** 15:17
**look** 6:8 40:2,22
42:5,6 43:9 44:17
49:18
**looked** 12:8 42:4
44:16 49:14,25
50:2
**looking** 6:17 21:24
28:6 30:6,7 33:16
44:10 50:9 76:18
**lord** 80:2
**lose** 15:19
**loss** 14:25
**lot** 11:12 15:14
24:13 50:5 52:16
57:18 58:4,5,14
61:7 62:2 66:14,15
**lying** 72:22

**m**

**madame** 7:25
25:22 32:5 53:12
**main** 11:24 82:22
**major** 18:2
**making** 13:18
27:11,13 31:3 68:3
70:25 72:17
**male** 28:10
**males** 57:23
**maliciously** 73:18
**malign** 10:14
**man** 9:19 10:9,14
12:3,15 26:12,14
60:19 63:17 68:7
76:22 79:22 80:3
**manage** 58:15
**managed** 72:10
**manner** 6:21 80:3

**march** 40:20 41:2
59:2,10 60:4 61:16
62:8 63:1 70:25
79:1,12
**mariner** 1:22 86:6
86:16 87:3,22
88:24
**mark** 6:1 7:25
12:24 37:10 39:20
**marked** 6:3 8:6
37:9,12 39:21,24
**martinez** 1:2
**match** 63:23
**materials** 6:19,20
6:20 21:24 50:11
50:13,20 51:5
**matter** 4:11 36:2
78:5 88:20
**mean** 13:19 25:19
31:6 39:10 44:1
53:6 55:19 61:5
74:10 79:5,6
**meaning** 12:16
38:23
**means** 39:11 42:19
42:23
**measurement** 57:9
**media** 4:10 52:4
**medical** 9:23 10:24
14:11 21:25 33:12
34:8
**medpsych.net**
37:16
**meet** 15:14 16:7
**memory** 7:2 16:10
16:17,19 43:3,6
46:13 47:22
**men** 57:25 71:12
**mental** 14:7 62:10
**mentally** 14:15
62:16 68:6

**mentioned** 13:16
20:4 33:3
**merely** 25:5
**met** 16:10,12 75:5,5
**methodology** 77:1
**methods** 51:16
**mholt** 2:10
**miami** 2:9 57:22
88:2,15
**michael** 2:7 4:25
5:18
**microphones** 4:3,6
**military** 28:15
29:13 31:1,14,19
31:23 63:9 64:2
66:17 67:3 76:20
80:5
**mine** 80:2
**minor** 11:14 62:18
**minors** 18:3
**minute** 51:23
**misrepresenting**
72:22
**mission** 26:12
**modification** 50:4
**moment** 74:20
**monday** 88:16
**money** 20:16 55:23
56:12 68:3 83:6
**montana** 81:11
**month** 70:13
**move** 76:4
**moved** 13:5
**multiple** 27:4
**mute** 82:18,19,25
**muttering** 37:24,25

**n**

**n** 3:1
**name** 4:15 5:18
60:17 80:13

**names** 29:15,19
33:17 66:22,25
67:2
**nasty** 11:14 32:3
**nathaly** 40:4
**nearly** 11:13
**necessarily** 12:19
60:22
**need** 24:19 26:24
41:23 45:4 49:3
70:12
**needed** 41:16 42:11
49:8 56:11 77:8
78:7
**negative** 28:8,9,20
29:20 30:11,11,12
48:4
**negatively** 28:2
**negotiable** 49:9
**neighborhood**
66:18
**neighbors** 63:9
**neurological** 33:18
**neuropsychologi...**
11:7 12:15 33:19
**neuropsychologist**
69:23
**neutral** 30:10
**never** 14:15 23:22
26:21 29:5 44:10
44:10 58:20 65:14
71:7 75:5,5 81:14
81:19
**new** 17:25
**nice** 29:2
**night** 69:13
**noel** 5:4 82:18
**normally** 14:4
**northeast** 1:12 2:3
4:14 88:7

**notary** 1:23 84:14
84:17 86:7,16,18
**note** 4:3 21:17
**notes** 21:7,11 87:10
**notice** 1:24 3:13 6:1
8:9
**number** 6:22,23
7:1 9:6 27:24 28:1
38:25 45:8 52:4
62:4 63:9 66:16
67:2
**numbered** 87:8

**o**

**o** 88:6
**oath** 4:17 86:1
**object** 45:14 55:2
60:9
**objecting** 47:25
**objection** 46:5
47:23 52:25 56:5
56:20 59:15 61:19
62:12 65:10,11
67:15 68:15,21
79:2,16 80:11,18
81:7,15
**objections** 4:22
**objective** 6:21 13:5
**objectivity** 13:5
**obligations** 15:14
**observations** 22:12
74:16
**observed** 27:18
65:6
**obtain** 12:10 75:17
**obtaining** 21:22
**occurred** 16:1
22:16 68:19
**occurring** 82:11
**october** 17:16
**offense** 62:18,20

**offer** 9:17 10:4
13:11 27:4 68:25
81:23
**offered** 81:13
**office** 6:24 16:7
35:21 52:9,24 53:5
53:6,15 54:12 55:1
55:7 56:1 62:4
88:15,16
**officer** 11:16 28:14
31:24 59:10 60:6
61:6,15 62:20
63:20,25 67:4,5
71:14,18 73:3
**official** 86:11
**officials** 31:4
**oh** 28:14 38:1 51:21
53:11 81:4
**okay** 6:19 7:3,5,19
8:13 9:2 15:24
17:17,20,21 18:17
18:20 19:16 23:5
26:2 33:18 34:4,12
34:24 38:1 40:15
41:21 42:20 43:8
43:19,24 45:7,12
45:17 50:7,17,23
51:3,7 53:4 54:3,22
64:13,14 65:16
72:2 74:9,24 75:7
75:10 76:8
**once** 14:21 48:19
59:22 66:12
**ones** 11:5 33:22
54:18
**onset** 68:19
**open** 44:5
**opening** 44:10
**opine** 65:14 69:22
**opinion** 25:17
26:18,21 28:8

30:13,24 31:15
32:17 39:3 55:16
71:6,8,11,11 72:12
74:6,10,11 76:22
81:12,13,23,25
**opinions** 6:12 9:3,6
9:8,10,15 10:3
13:11 21:25 30:24
32:12 74:12 76:16
**opposed** 55:17
74:15
**order** 9:22 18:7
27:25 57:1
**ordinary** 46:3
**oriented** 25:17
**otazo** 1:2
**outcome** 4:19
**outrageous** 26:11
62:24
**outset** 42:1
**outside** 6:18 33:23
58:9 65:12
**overall** 48:2,4,7,14
**overview** 34:10
**owed** 20:23

**p**

**p.a.** 1:12 2:2 88:7
**p.m.** 1:14,14 52:1,2
64:7,9,10,22,24,25
83:13 88:16
**pace** 5:4,4 37:21
38:1 47:23 64:13
64:15 82:18,20
**page** 3:2,12 6:8,11
34:10 41:1 85:5
**pages** 17:19 87:8
**paid** 20:11,14
63:12
**paper** 12:24
**paragraph** 40:2,22
45:13

**paranoid** 31:7
**part** 19:16 24:23
25:23 26:3 57:4,5,8
69:21
**particular** 10:9
14:6 19:9 21:6
26:20 27:3 34:20
34:21 40:2 41:13
70:6
**parties** 4:9 87:15
87:16
**parts** 21:11 63:7
**party** 4:18 71:21,22
71:23,24
**passed** 70:14
**passengers** 27:21
**pathological** 23:3
27:16 74:4
**patient** 70:5 75:5
**patterson** 1:5 2:13
4:12 5:3,5,22,22
6:25 8:17 9:13
10:15 13:16,25
14:10 15:8,24,25
16:4,12,15 19:11
19:17 20:12,23
21:4,7,12 22:3,18
25:12,19 27:18
28:3,4 29:11,14,19
31:18 32:15 35:3,6
35:9,18,21 36:22
36:25 37:4,16 38:6
38:13,19,23 41:19
41:22 47:1 49:3
52:10,24 55:9,14
55:24 58:24 59:11
59:13 60:7 61:15
62:25 63:4,5,13,20
63:24,25 64:17
65:5 71:2,7,14,18
72:3,6 73:8,13 77:6

77:13 78:25 80:8
80:16,17 82:18,24
84:1 85:2 88:10
**patterson's** 10:19
21:19 24:7 27:19
34:14 37:10 40:1
44:1 62:20 73:10
**pay** 19:18 20:1
67:12,18
**penalties** 85:22
**pending** 34:17 76:3
**people** 10:25 11:14
15:19 21:5,16 22:1
22:7 25:20 27:24
27:25 28:2,3,20,22
28:24 29:1,2,2,8,11
29:12,25 30:6,8,9
30:10,21 31:6,12
31:16,17,19,25
32:1,10 42:10
52:14 57:19,20,25
58:8,16,16 61:10
63:9,9,10 66:14,22
66:23,25 67:2
76:22
**perez** 2:14 4:15
**performed** 43:22
52:9,24 53:6,7 54:5
54:11 71:9 82:1
**period** 15:10
**periods** 79:5
**perjury** 85:22
**persist** 62:17
**person** 23:3 26:16
26:19 29:18,25
30:3,4 31:8,15 40:3
62:16 69:12 70:11
72:17,18,18,23,23
72:25 73:19 77:8
**personality** 69:18

**personally** 66:5
84:13 86:9
**personnel** 58:22
**persons** 6:24 59:12
**perspective** 12:5
25:17 76:18
**petty** 26:15
**ph.d.** 1:17 3:3 4:11
5:10 17:23 18:10
18:11 84:1,7 85:2
85:25 86:9 87:6
88:6,10,12
**phone** 41:18 64:3
66:2,7 82:14,17,19
82:25
**phones** 4:6
**pick** 4:4
**pilot** 9:20 59:19
73:24 80:4
**pilots** 13:22 57:17
57:18 58:19,22
72:2
**place** 4:6,8 12:9
16:10 23:15 24:12
54:4 60:17 67:12
**placement** 70:11
**plaintiff** 1:6 2:5,13
6:25
**plaintiff's** 3:20 8:9
**plane** 25:21 59:19
**play** 11:1
**playing** 76:6
**please** 4:3,5,23
28:25 82:19,25
88:15
**plenty** 69:8
**point** 10:16 11:18
11:22 19:22,23
35:8 40:15 60:2
68:1

**police** 61:6,7,8
**policeman** 61:23,23
**portion** 25:25 32:7
38:2 54:1
**position** 12:12
47:15 55:23,24
57:1
**positive** 46:24
47:18,21 48:14
**possible** 12:23
45:12,15
**potential** 26:14
**potentially** 25:18
**power** 31:4
**practice** 15:6 18:14
43:12 44:5,7,13
45:20 46:3 57:24
74:6,13
**practicing** 51:16
**pre** 7:22
**preceded** 80:17
**precisely** 29:15
**prefer** 82:21
**premise** 9:18
**prep** 50:20
**prepare** 8:21 40:15
50:8
**prepared** 6:12,15
8:19 9:14,16 17:2
17:11,14 26:17
27:22 40:1 43:1
45:25 87:12
**preparing** 21:3,10
21:19 29:9 33:8
34:12
**present** 2:12 4:20
13:12,20 82:7,15
**presented** 30:9
**preserve** 27:20
**president** 28:12

**presume** 38:17
53:15
**presuming** 31:3
**presumption** 60:12
**pretty** 18:22 35:17
58:1 66:3,20 68:5
74:4 76:19
**preview** 50:12
**previously** 13:10
37:9 48:2
**principal** 57:21
62:18
**printed** 49:21
50:14,16
**printing** 50:15
**prior** 53:21,23
67:12 88:18
**priori** 42:13,18,19
42:23
**private** 4:4
**privilege** 3:20
39:25 40:1
**probability** 62:10
65:8 67:11
**probably** 11:24
20:24 46:13 63:13
66:24
**problem** 23:20 51:6
58:8 71:23 78:18
**problems** 10:19
12:16 13:1 14:18
66:8
**procedure** 77:17
**proceeding** 4:23
**proceedings** 52:2
60:17 64:10,25
**process** 13:19
**professional** 1:22
86:7 87:4,23
**professionalism**
81:20

**professionally** 81:24 83:2
**professionals** 21:25
**professor** 57:6
**profound** 15:17
**profoundly** 28:7 78:19
**project** 14:2
**prompt** 88:20
**promulgated** 17:12
**properly** 49:4 72:11
**protracted** 60:13
**provide** 60:13
**provided** 17:19 29:19
**psy.d.** 40:4 56:17 82:2
**psych** 57:6
**psychiatric** 33:20
**psychological** 11:9 12:2,2 15:2 62:10 65:8 67:11 68:10 71:3,8,9 72:4,14 74:13 75:2
**psychologist** 18:14 36:10,12 57:19
**psychologists** 18:17 24:20 75:3
**psychology** 15:6 18:3,12,18 39:15 40:10,12 51:10,13 51:16 56:17 57:8 69:3
**psychometrics** 57:7 57:8 70:2
**public** 1:23 63:15 84:14 86:7,16
**published** 81:12
**purports** 39:25

**pursuant** 1:24
**put** 14:4 24:5 44:14 44:15 62:21 63:23 65:20 67:12,18 68:7 80:8
**putting** 14:8

## q

**qualifications** 39:9 47:5
**qualified** 36:3,8 56:18
**question** 9:7 25:5 32:6 33:6 34:2,17 36:21 37:20 41:7 46:23 47:5 53:22 53:24 54:17 71:24 73:12,12 74:12 75:25 76:3
**questioning** 7:24
**questions** 5:20 49:16 81:17
**quick** 45:4 70:21
**quickly** 18:22 78:16
**quite** 12:12 14:24 20:18 21:4 45:23 57:18 62:25 67:17
**quote** 59:5 80:2

## r

**r** 1:17 2:2 3:3 4:11 5:10 33:21 84:1,7 85:2,25 86:9 87:6 88:6,6,10,12
**rabbit** 25:3
**rafeh** 33:21
**raised** 36:21 61:17 81:17
**rallied** 66:20
**ran** 57:24

**range** 76:20
**rank** 28:19 31:13 31:14 32:3 67:4
**ranks** 31:23
**rapid** 60:20
**rates** 19:11,22 20:4 20:8,9 33:4
**rational** 60:14
**rationale** 80:22
**raw** 55:6
**reaching** 77:12
**reactivity** 61:3,3
**read** 3:9 12:6 25:25 32:7 37:20 38:2 40:23 43:12,17 45:12 46:10 50:24 53:21 54:1 85:23 88:15
**reading** 37:18,23 88:14,18,19
**ready** 39:5
**reality** 15:23 68:20
**really** 8:25 10:21 12:1,25 23:24 26:16 28:4 30:12 30:15 33:16 36:2 39:3 49:11 66:4 67:7 68:4,22 69:14 73:6 77:17 79:24
**reason** 11:17 14:8 22:6 36:21 39:2,5 41:11 43:16 46:25 47:2 51:1 55:21 78:24 85:5
**reasonable** 43:4,5 53:19 62:9 65:7 67:10 71:15
**reasonably** 52:22
**reasons** 70:6,7 81:17 83:5

**recall** 13:12,14 40:18,21,24 41:11 41:13 46:16,18,19 46:22,24 52:6 76:12
**receive** 39:5 40:19
**received** 17:23 20:16 40:25 43:9 43:24 44:4,6,22 46:1,6
**receiving** 46:9 56:7
**recess** 52:1 64:9,24
**recognition** 10:21
**recognize** 8:17 11:20 15:5 16:22 17:6,18 19:5 37:15 59:20
**recollection** 38:22 40:7 41:5 44:8 46:9 56:7
**record** 4:2,9,22 21:7 34:3,9 51:22 51:25 52:4 64:5,8 64:12,20,23 65:2 76:7 83:11 87:9
**recorded** 4:10 19:14 26:1 32:8 38:3 54:2
**recording** 4:8
**recross** 3:7 78:22
**recurrent** 21:13 62:17
**redirect** 3:6 70:22
**redundant** 7:23
**reestablish** 14:24
**refer** 71:2 72:5
**reference** 23:5 30:2
**referenced** 25:9 88:19
**references** 38:9

referencing 23:7 40:5
referral 57:20
referred 6:3 8:6 16:5 25:25 32:7 37:12 38:2 39:21 42:7 54:1 71:7 72:4 72:7,14
referring 23:8,12 78:20
reflect 11:15 13:24 15:23 24:11
reflected 9:11 10:3 19:17 25:16 42:25 77:1,17
reflection 12:25
reflects 26:13
reformat 24:13
refresh 40:7
regard 12:13 35:2 46:25 74:20
regarded 70:19
regarding 6:25 8:16 14:7 27:17 35:5,21 40:16,20
relate 51:15
related 4:17 50:3 63:1
relates 57:9
relationships 28:4
relative 87:14,15
relatively 52:12 69:16
relied 6:19,21 21:18,21,21,23 44:23
religious 80:1
rely 34:13 44:25 45:21 46:2 48:7 76:14 77:3 83:3

remember 38:16 38:22 48:3 71:3 80:22
remembering 48:25
remind 32:6
remove 78:25
removed 79:13 80:17
render 9:4,10 74:5
report 6:15 12:6 13:24 21:3,20 23:9 23:10,11,25 24:2,9 24:10,15 28:16 29:9 31:11 33:9,19 34:12,22 38:10 39:4 40:17 43:1 45:25 46:1,7,9,10 46:20 54:25 55:13 56:8,10,21 61:16 76:25 77:3 83:3 87:5
reported 25:11,14
reporter 1:23 3:8 3:21 4:16 5:8 6:1 7:25 25:22 26:1 32:5,8 38:3 53:12 54:2 86:7 87:4,23
reporter's 87:1
reporting 59:9
reports 6:12 21:19 23:14 33:12,13 34:5 40:17
represent 5:18
representation 43:25
reputation 56:12
requested 87:7
requisite 39:9
reread 25:23

research 18:9,12 69:14
reserve 81:3
resident 82:1,4
resolution 10:18
resolved 11:18
resources 72:9 74:2 74:6,18
respect 10:11,12 30:2 52:9 77:2
respond 26:9
responding 5:12
responds 38:6
response 6:11
result 12:18 14:23 14:25 15:16
results 24:8 34:22 37:4,6 38:14,20 40:20 41:3 43:21 48:2,13 52:20 55:12 56:2 81:23 81:25
resumed 52:2 64:10,25
retained 3:21 74:5
retrospect 32:21
return 10:19
returned 56:9
revenge 26:15
review 21:11 33:9 33:11 44:22 87:7
reviewed 33:12,14 34:6,10 41:4,8,12 50:12,20 75:4
reviews 34:9
reyes 1:2
ride 55:23
right 7:18 12:20 21:1 42:1 45:6 48:21 49:7 54:4 60:5 64:15 68:11

70:2 74:14 75:1,24
risk 61:10
rodney 1:5 2:13 4:12 5:22 6:25 8:16 9:13
room 4:20 36:23 58:2 82:7
routinely 24:20
rubbish 73:7 77:21
rules 17:12
run 11:20
running 74:1,3
rushing 78:15

**s**

s 3:11
sadness 66:10
safety 27:20 59:21
sake 7:15
sample 28:21,22
sampling 28:7 29:3 29:6,15 30:18 32:4
save 55:23
saved 45:1
savoureux 1:22 4:16 86:6,16 87:3 87:22 88:24
saw 42:1 57:23,23
sayeth 80:2 84:6
saying 22:5 39:2 60:3 72:17
says 28:11
scholarship 18:6
school 57:6
sciences 29:6
scientific 30:15
scope 10:8 65:12
scott 1:5 2:13 4:12 5:2,4,21,22 6:25 8:17 9:13 78:14
scour 29:1

screening 61:7
screwed 10:22
  11:21
seal 86:11
search 31:5
second 1:13 2:3
  20:25 42:11 53:23
  88:8
seconds 72:15
secretary 33:6
see 9:20 15:25
  24:15 35:10,10
  36:4 41:17,24,25
  42:13,16 44:6,18
  50:1,2 77:8
seek 29:24
seeking 21:14
  29:25
seen 6:6 8:10 54:25
  55:6 58:23 59:2,4
  61:4 68:10 81:14
select 19:14
selected 28:7,21
  29:6
selection 30:18
self 42:9
send 72:21
sending 71:14
senior 28:14 67:3
sense 30:23 63:6
  65:7
sensible 12:9
sensitive 4:3
sent 11:7,9 41:7
  43:13 60:7
sentence 42:15
september 59:3
  62:8 63:1 67:13,14
  78:24 79:15
sequencing 24:23

serious 81:17
seriously 39:6
seriousness 55:16
service 63:11,15
  64:2
services 19:18
  20:10,12
set 16:18 24:16
  31:16 66:21 69:16
  69:20 73:18,25
  80:3
setting 65:22
shb.com 2:10
sheet 84:4 85:1
sheriff's 62:3
shook 2:7
short 15:22
show 7:18 37:8
showed 48:25
shows 13:1 26:16
shredding 44:9
sick 50:15
sign 3:9 48:4
signature 86:15
  87:21
signed 48:11
significant 14:16
  32:2 58:6
significantly 30:11
  71:17
signing 88:14,18,19
simple 28:9
simply 11:2 42:23
  46:8 47:9 54:5 68:7
  69:10 77:21 82:3
sincerely 88:22
sinker 65:24
sir 8:17 9:17 25:4
  44:21 71:21 74:22
sit 9:9 10:5 43:15

sitting 23:17 58:2
situation 24:24
  68:8 77:9
skill 60:24 69:16,20
sleeplessness 66:9
slides 12:23
slightly 78:14
slingshot 78:6
small 11:13 27:23
  27:23 31:10 68:3
social 29:5
sold 58:16
solicit 27:23
solicitations 28:1
solicited 30:21
  32:11
solve 78:18,19
somebody 26:23
  28:20 42:16 47:4
  55:16,20 56:12
  61:24,25 62:17
  72:22 73:4 78:8
somebody's 70:9
somewhat 9:25
soon 35:10
sorry 27:22 28:25
  41:19 67:13
sort 9:25 10:20
  27:15 31:9 36:15
  50:9 67:6 69:10,19
  78:13
sorts 13:1
sotto 37:18
sought 32:2
sounded 18:23
source 75:21 76:9
  76:15
sources 21:16,23
  25:15 29:24 75:22
south 2:8 17:25
  88:2,15

southern 1:1
speak 22:22 27:3
  29:9,18 32:10 35:5
speaks 19:11 28:16
specialist 57:1 75:8
specialties 34:9
specific 6:15 44:8
  53:4,5 54:10,18
specifically 22:6
  48:24
specifics 26:9
specifies 19:10
spend 11:13 20:2
spending 25:16
spent 21:4 65:21
spoke 21:17 22:1
  22:11,12
spoken 16:15 22:21
  26:22,24 35:2
sprite 42:9
ss 84:9 86:3
stabilized 66:12
  68:6
staff 31:24
stan 2:14 4:15
stand 61:10
standard 44:13
  52:12,16 53:16
standby 64:17,18
standing 39:12
start 69:13 75:25
started 61:6 63:24
  66:12
starter 69:25
state 1:23 4:21,23
  17:10 18:18 84:8
  84:15 85:21 86:3,8
  86:16
stated 60:18
statements 22:14
  22:19,19 23:5,6,7,9

23:13,16,17,18
26:6 34:13
**states** 1:1
**status** 14:7,13 31:8
67:13 80:9,17,23
**stay** 82:24
**stenographic** 87:10
**stenographically**
87:5
**stews** 58:3
**stop** 37:25 56:11
69:7 88:15
**stories** 79:23
**story** 21:21 22:4
62:25 63:6 73:9,10
73:13,17
**strategic** 55:15
**street** 1:12 2:3 4:14
88:7
**stress** 11:3 15:15
15:16
**stressors** 15:12
**stretches** 12:18
**stretching** 41:14
**strike** 76:4
**strong** 61:1
**study** 10:8 13:25
14:7 24:1,3
**stuff** 48:25 59:24
69:19
**stupid** 30:15,15,19
**subject** 85:23
**subscribed** 84:11
**subsequent** 16:25
61:16
**substance** 85:24
**substantial** 58:21
**substantially** 79:4
79:10
**sudden** 61:22

**suffering** 14:15
15:11
**sufficient** 88:17
**suggest** 70:12
**suggesting** 23:22
72:2
**suggestion** 72:5
**suite** 2:8 88:2,15
**supervised** 36:18
36:19 82:6
**supervision** 87:12
**support** 22:8 61:1
67:8 75:17,18
**supported** 63:7,8
**supporting** 63:14
**supportive** 82:12
**sure** 5:24 7:12
10:25 16:9 26:2
33:15 34:19 41:9
45:2 49:20,23 50:9
50:22 53:22 81:6
**surrounding** 77:22
**suspects** 76:21
**suspended** 51:9
**swear** 5:8
**sworn** 5:12 84:11
86:10
**sydney** 18:1
**system** 19:2 50:4
**systematic** 80:3
**systems** 10:10,11
10:12 11:17 13:14
14:1 24:16,18,19
24:21,22 25:5
72:25

**t**

**t** 3:11
**take** 4:8 6:8 10:9
12:12 21:7 22:7
23:15 24:13 40:2
40:22 44:14 45:3

51:18 55:22 65:23
69:18 70:17 75:11
78:1,2,6 80:22
**taken** 1:21 16:19
52:1 64:9,24 75:13
81:5 84:2 85:3
88:11
**talk** 7:3 12:3 17:17
24:21 27:25 28:2
66:23
**talked** 13:7 70:18
78:12,12
**talking** 10:11 12:19
12:21 21:4 24:21
24:22 63:18,19
80:25
**taught** 57:13
**teach** 57:12 70:1
**tease** 74:12
**teasing** 78:17
**tell** 16:24 17:8,22
19:7 22:7 33:13
36:25 37:4 40:3
44:11,24 47:20
50:7
**telling** 22:3 27:9,12
27:12,14,14,17
42:4 46:8
**tells** 44:2
**tend** 45:9
**tends** 62:1
**tenor** 62:7
**term** 13:14 15:22
42:19 76:20
**terms** 10:13 21:14
49:18 63:21
**test** 24:14 40:20
41:2 43:20,21 48:2
52:24 56:19 77:2
81:23

**testified** 5:13 47:17
70:24 72:15,16
75:16 76:9
**testify** 23:25
**testifying** 20:2
**testimony** 3:17
17:9 20:9 42:7 46:6
71:4 73:17 76:25
79:19
**testing** 12:19,20,21
24:8 34:22 36:1,23
36:25 37:5 38:24
57:10,11 68:10,13
69:17,18 70:5 71:8
71:9 77:24 82:16
**tests** 39:11,13 53:5
55:6,10 69:23 82:1
82:11
**testy** 66:10
**text** 15:6 21:11
33:25 34:1,6
**thank** 25:8 26:3
34:24 35:17 70:20
78:21 83:7
**thankfully** 13:23
**theamlongfirm.c...**
2:5 88:9
**theories** 27:4
**theory** 27:8 72:25
**thing** 11:23,24 12:9
14:3,22 31:1,9,14
44:11 45:25 60:14
61:22 66:13 73:21
**things** 11:14 13:2
21:6 22:7 24:14
28:5,20 29:3 30:7,8
45:3,8 47:3 52:14
58:11 63:24 65:25
66:11,12 79:24
**think** 7:20 11:8,23
11:24 14:9 16:1

23:10,11 27:23,25
28:5,10 31:12,21
32:20,21 33:21
43:18 44:23 47:2,3
48:19 49:11,12,17
51:20 53:23,25
56:8 63:16 67:4,16
67:16,17,18,19
72:8 77:19,21
80:12,21
**thinking** 42:11
**thinks** 78:13
**thoroughly** 36:16
71:12
**thought** 14:2 53:13
55:20 60:19 67:19
74:4
**thousand** 35:19
39:1 77:7
**thousands** 47:13
**three** 69:12
**thunderstorm**
41:20
**thursday** 1:14
**tickets** 58:16
**time** 4:2,23 5:7
7:14,14 11:16 12:6
13:12 14:10,14
15:9,21 20:1,7,18
20:19 21:4 23:23
24:13 38:12 39:18
43:19 44:18 45:1
46:12 51:9,24 52:3
56:8,11 57:24 59:5
64:7,11,22 65:1,5
65:21 66:3 69:12
69:15,15 71:10
82:7 83:10 88:17
**times** 51:14
**today** 5:21 6:11 9:9
10:5 20:8 50:12

76:25
**today's** 4:13 50:8
50:21
**told** 21:7 22:4 35:8
36:22 38:23,24
42:16 47:19 49:6,6
62:21,25 63:21
70:1 81:19 83:5
**tonight** 64:19
**top** 70:19
**tornado** 41:22
**total** 20:11
**totally** 23:11
**tower** 88:1
**trainee** 35:13 39:10
47:15 48:12 49:5
**trainees** 56:13
**training** 36:5,11
39:17 56:24 69:21
**transcript** 84:5
85:4,23 87:7,11
88:13,16,17,20
**trauma** 58:11
**treated** 73:23
**treatment** 58:21
**tremendous** 24:3
**tricare** 19:14,15
**trip** 73:24
**trouble** 51:17
69:19
**true** 28:22 35:16
44:19 51:20,21
60:3,18 71:1 73:20
84:5 85:23 87:9
**truly** 25:11
**trust** 51:4
**truth** 22:4 27:13,14
27:17
**try** 27:19 55:21
78:15 80:3

**trying** 27:20 49:13
66:5 68:23 74:12
78:14 80:21,22
**turn** 4:5
**turned** 56:10
**two** 11:5 23:19
25:20 33:7 39:1
41:1 52:4 70:10
75:11 77:7 78:1
79:5
**type** 69:16
**typed** 8:23
**typical** 52:22
**typically** 54:15
**typist** 8:25

**u**

**u.s.** 81:3
**uh** 17:5
**unbalanced** 26:19
**uncertain** 15:13
63:21
**undergraduate**
17:23 18:2,7 57:14
**underlying** 27:8
**understand** 13:17
25:2 26:24,25 30:1
32:18,22 42:22
44:21,23,24 49:11
49:12,12 68:22
69:10 71:24 72:12
74:11
**understanding**
52:23 53:2,4
**undertook** 34:22
**undisclosed** 13:10
**unfit** 11:2
**unfortunate** 11:19
**unfortunately**
24:25 74:17 82:20
**unhealthy** 68:7

**uniform** 9:21
**union** 60:16
**unique** 76:18
**unit** 4:10 52:4
**united** 1:1 24:25
57:19 58:6
**universal** 24:21
**universe** 31:10
63:3
**universes** 23:19
**university** 17:25
**unlearn** 48:20,22
**unlearned** 48:23
**unlicensed** 56:13
**unpaid** 20:22
**unresolved** 10:21
**untouched** 62:1
**untrue** 11:15
**ups** 70:21
**upset** 26:10
**upsetting** 14:19
**use** 19:9 30:14
45:21 56:13 65:22
**usual** 43:12 44:5
76:21

**v**

**v** 84:1 85:2 88:10
**vaguely** 30:10,11
**valuable** 7:14
**vanished** 49:1
**variety** 12:23 21:15
21:22
**various** 21:16 22:1
24:7 58:23,24
**vast** 9:5
**vendetta** 62:17
**vengeance** 26:15
80:2
**veritext** 88:1
**version** 34:20,21

**versus** 4:12 5:22
**video** 4:8,10
**videographer** 2:14
4:1,15 5:7 51:24
52:3 64:4,7,11,16
64:20,22 65:1
83:10
**videotaped** 1:17
**view** 10:2,10 11:18
13:4 24:25 47:11
73:5 76:19 78:7
**violent** 73:2
**vitae** 3:16 17:1
**voce** 37:18
**vote** 74:2
**vs** 1:7

## w

**wait** 59:17
**waiting** 58:2
**waived** 88:19
**wales** 18:1
**want** 19:22 30:1
32:18,20,22 50:24
63:21 64:4
**wanted** 26:2 42:17
44:13,17 47:4
58:14 78:10
**wanting** 39:3
**warning** 41:20
**wasted** 35:19 38:25
77:7 83:6
**wasting** 44:18
56:11
**way** 13:2 22:2
23:15,16 34:16
43:8 51:16,17
58:17 60:11 62:20
72:21 73:23 77:10
78:2
**we've** 39:24 49:17
54:3 63:16

**wearing** 9:20
**weeks** 25:20
**went** 25:2 26:12
35:10 36:4 42:13
58:13 66:21 81:2
**whatsoever** 55:12
**whisked** 60:20
**whispering** 4:4
**white** 79:7
**whitehouse** 13:19
22:15,20,21 23:6,8
26:6,10,18,22 27:5
27:9 29:4,10,16
30:9 31:6 32:11
35:8 58:24 59:7,8
59:13,23 60:3 62:9
63:1,12,19 70:25
71:17,20 72:3,6,13
73:16,16,18 74:2
76:2 79:11,14,20
80:7
**whitehouse's** 25:9
71:15
**wife** 21:16 22:12,16
22:17 23:18 63:7
63:14 66:11
**william** 2:2 5:2
8:16 88:6
**willing** 28:2
**wing** 68:2
**wish** 12:4 13:9
**wished** 58:16
**withdrawn** 23:6
**withheld** 67:13,18
**witness** 3:2 5:6,8
5:11,14 7:15,19,21
37:25 38:4 41:21
41:23 45:16 46:8
48:1 50:20,24 51:3
51:6 53:1,13 54:3
55:4 56:6,23 59:16

60:10 61:21 62:13
64:19 65:17 66:3,8
67:16 68:16 79:3
79:17 80:12,19,21
81:8,16 82:15 83:9
86:1,9,11 87:6,11
**woman** 35:13
**women** 58:1
**words** 30:19 44:9
65:22 75:19
**work** 9:24 10:18,19
33:23 35:17 36:15
39:7 47:6,9,14 56:9
56:14 57:2 62:3
63:12,15 67:25
68:21 69:11 74:19
77:20 82:5,8,9
**worked** 57:25
**workers** 81:13
**working** 13:3 57:17
66:25 67:24,24
**workplace** 14:19
30:5 58:8
**workup** 60:20
**world** 80:4
**worried** 15:13 67:7
**worry** 15:20 65:18
66:9
**would've** 39:4
**wramlong** 88:9
**write** 85:4
**writes** 43:20
**written** 23:8
**wrong** 25:3 30:25
44:24 49:7 63:24
68:23,24 71:10

## x

**x** 3:1,11

## y

**yeah** 12:25 26:11
34:1 35:25 45:2
48:23 49:17 60:18
68:17,20,20 74:17
74:23 77:15 81:4,6
81:8 82:20
**year** 11:13 25:16
33:7 50:4
**years** 18:10 19:2
32:1 33:7 57:6
59:18 62:2,4 74:13
**young** 49:5

## z

**zones** 69:13,15

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.