RODNEY SCOTT PATTERSON,

      Plaintiffs,

vs.

AMERICAN AIRLINES, INC., a Delaware
Corporation,

      Defendant.

_____/


## DEFENDANT AMERICAN AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND OVERVIEW OF ARGUMENT ............................................................ 1

STATEMENT OF UNDISPUTED FACTS ............................................................................ 3

    A.    American routinely grants military leave when requested by employees, including Plaintiff. .............................................................. 3

    B.    American approves Plaintiff's last-minute request for time off, despite suspicious circumstances. .............................................................. 4

    C.    Upon receiving the Employee Complaint, American temporarily withholds Plaintiff from duty with pay while American investigates. .............................................................. 6

    D.    An independent neuropsychologist concludes that Plaintiff is not fit for duty. .............................................................. 8

LEGAL STANDARD .............................................................................................................. 9

ARGUMENT ........................................................................................................................ 11

    I.    American has Never Denied Plaintiff Any Benefit of Employment Because of His Membership in the Military. ............................................. 11

    A.    Because Plaintiff concedes he did not go on active duty, his active duty status cannot possibly be a motivating factor for American's alleged actions. .............................................................. 11

    B.    Plaintiff never requested military leave and, in any event, American granted his request for time off. .............................................................. 12

    C.    Plaintiff has not (and cannot) establish a prima facie case that American denied him any employment benefit based on his military status. .............................................................. 12

    D.    Plaintiff's unsupported "jealousy" theory is no basis for a USERRA claim. .............................................................. 15

    E.    American had legitimate reasons for taking the actions it did, which do not relate in any way to Plaintiff's military service. ................ 16

    II.    American Took No Action as a Result of Plaintiff Filing a USERRA Complaint. .............................................................. 17

CONCLUSION ..................................................................................................................... 18

## <u>INTRODUCTION AND OVERVIEW OF ARGUMENT</u>

Plaintiff Rodney Scott Patterson ("Plaintiff") attempts to concoct a claim out of nothing more than American Airlines, Inc. ("American") complying with its obligations to ensure the safety of its passengers and crew—and seeks to force American to put him back at the controls of a passenger jet despite an independent neuropsychologist finding him not fit for duty.   As detailed below, American did exactly what it is required to do to ensure the safety of its crew and passengers and its actions had absolutely nothing to do with Plaintiff's former status as a member of the Army Reserves.  Accordingly, American is entitled to summary judgment.

This case arises out of American's withholding of Plaintiff from duty after receiving a formal written work environment complaint (the "Employee Complaint") from a long-time pilot that raised serious issues regarding Plaintiff's "honesty, integrity and his emotional stability and his fitness for duty."  The Employee Complaint also set forth several alleged violations of American's company policies—many of which directly relate to the safe operation of its passenger aircraft.  When American received the Employee Complaint, it immediately placed Plaintiff on "paid withheld" status so American could investigate the allegations.  During the investigation, multiple employees expressed serious concerns about Plaintiff's behavior that "led them to question his ability to operate the aircraft safely; it left them with an impression that 'he's not quite all there.'"

As a result—and in accordance with the collective bargaining agreement governing Plaintiff's employment and consistent with its obligation to ensure the public safety—American scheduled Plaintiff for a fitness for duty examination by an independent neuropsychologist. Following a two-day examination, the independent neuropsychologist found that Plaintiff's "overall profile of neuropsychological assessment was discrepant from that expected for Major Airline pilots of similar age."  Based on his examination, the neuropsychologist concluded that,

1

"[Plaintiff] is NOT FIT FOR DUTY as a First Officer"—thus validating American's concerns. Since that time, Plaintiff has refused to return to the independent examiner (or any comparable examiner approved by American) as required before he can be permitted to fly. Plaintiff thus remains on leave.

In this lawsuit, Plaintiff contends that American's actions in withholding him from flying when it received the Employee Complaint and continuing to withhold him after an independent neuropsychologist declared him unfit to operate passenger aircraft somehow violates the Uniformed Services Employment and Reemployment Rights Act ("USERRA"). Plaintiff's theory rests on the coincidence that he requested personal time off—to travel with his wife to attend Pope Francis' ceremonial visit to the White House in Washington D.C.—shortly before American received the Employee Complaint and withheld him from duty. Plaintiff's lawsuit is nonsense.

While Plaintiff falsely alleges in his Complaint that he was on active military duty for that trip (and relies on that active military status as the basis of his claims), Plaintiff now concedes he was not even on active military duty at the time. Plaintiff has also failed to identify even a shred of evidence that American had any anti-military motive in responding to the Employee Complaint. Instead, Plaintiff suggests (based on pure speculation) that one of the Chief Pilots in Miami (who himself has an extensive military background), was "jealous" of Plaintiff's visit to the White House or was resentful because Plaintiff served in the Army Reserves while the Chief Pilot served in the Air Force Reserves. While there is absolutely no evidence to support Plaintiff's fanciful theories, claims of garden-variety jealously and intra-military rivalry do not give rise to a claim under USERRA in any event.

The undisputed facts confirm that American's actions in withholding Plaintiff from duty

and sending him for a fitness for duty exam were wholly unrelated to Plaintiff's then membership in the military—and were (not surprisingly) based on the Employee Complaint and subsequent examination and findings of the independent neuropsychologist. Plaintiff's own statements establish that even Plaintiff does not believe he would have been withheld from duty "*but for*" the Employee Complaint. And for Plaintiff to suggest he should be returned to duty after being found unfit to operate a passenger aircraft is absurd. American is thus entitled to summary judgment.

## STATEMENT OF UNDISPUTED FACTS[1]

American is a commercial air carrier that operates a hub in Miami. (SMF at ¶ 1.) Plaintiff is a commercial airline pilot for American, who is based in Miami and was hired in 2000. (*Id.* at ¶ 2.) American employs approximately 2,000 pilots at its Miami hub, where American has a "flight office." (*Id.* at ¶ 1.) The Director of Flight leads the Miami flight office and several Chief Pilots manage the pilot base on a day-to-day basis. (*Id.* at ¶ 3.) In 2015, the Chief Pilots included Captains Brian Beach and Jim Bonds. (*Id.*)

A.   American routinely grants military leave when requested by employees, including Plaintiff.

Plaintiff retired from the Army Reserves in June 2017 as a Lieutenant Colonel. (*Id.* at ¶ 2.) Before September 2015, Plaintiff testified that, during his 15-plus years at American, American has never denied him military leave. (*Id.* at ¶ 6.) In his own words, Plaintiff participated in "a lot of military duty in 2015," for his reserve unit at the Pentagon office of

---

[1] Pursuant to Local Rule 56.1, American is separately filing a statement of undisputed material facts ("SMF") in support of this motion, which it hereby incorporates by reference. American sets forth these facts as undisputed solely for the purpose of this motion and according to the applicable legal standards. American reserves the right to challenge any of the "facts" asserted by Plaintiff at an appropriate time such as trial.

public affairs, and Plaintiff had previously requested military leaves of absence when he was performing duty.  (*Id.*)  Indeed, American granted Plaintiff military leave just a few weeks before the events at issue here.  (*Id.*)

Besides Plaintiff, in 2015 alone, American granted 122 Miami-based pilots more than 1,500 military leaves of absence.  (*Id.* at ¶ 5.)  American did not withhold a single one of those pilots from duty for an investigation nor require them to undergo a fitness for duty examination. (*Id.*)  While those pilots are all similar to Plaintiff in that they are members of the military, the critical difference between those pilots and Plaintiff is that American received the Employee Complaint raising serious concerns regarding Plaintiff, and an independent doctor subsequently found Plaintiff not fit for duty.

B.  American approves Plaintiff's last-minute request for time off, despite suspicious circumstances.

On September 21, 2015, Plaintiff called the Miami flight office around 10AM, making a last-minute request for American to remove him from flying an international flight the next day. (*Id.* at ¶ 7.)  He said that he wanted the time off for a visit to the Pentagon, but he did not request a Military Leave of Absence.[2]  (*Id.* at ¶ 8.)  Specifically, Plaintiff requested an "employee off" or "EO" beginning the next day, September 22, 2015.  (*Id.* at ¶ 8.)  An "EO" allows American pilots "to take . . . future accrued vacation days and apply them to these days off."  (*Id.* at ¶ 9.)[3]

In response, Captain Bonds called Plaintiff around 3PM that same day, September 21.

---

[2] There are different accounts of the reason Plaintiff initially proffered for his request.  Even accepting the Plaintiff's version of the facts for the purposes of this motion only, however, American is entitled to summary judgment.

[3] The EO that Plaintiff requested is a category of vacation unrelated to military leave and pilots can request it for any reason.  (SMF at ¶ 9.)  Plaintiff concedes that EOs are "discretionary." (*Id.*)

(*Id.* at ¶ 10.)  Captain Bonds left a voicemail stating that he had received Plaintiff's request for "an EO for tomorrow because of some military work at the Pentagon," and explained that although "we're really, really short . . . on manning," "obviously we are going to give you the time off, if you can produce some . . . orders." (*Id.*)  Captain Bonds did not reject the request; he asked for confirmation that Plaintiff was requesting the EO (which is vacation time) for military duties in D.C. (*Id.*)

Captain Bonds considered Plaintiff's EO request somewhat suspicious because earlier in the day on September 21, Captain Bonds learned that Plaintiff was scheduled to fly the flight at issue with a pilot who served as part of the APA Professional Standards group, which had recently investigated allegations made against Plaintiff. (*Id.* at ¶ 11.)[4]  Captain Bonds also found it "quite odd why he would ask for an EO instead of taking military [leave]" and that Plaintiff did not have "military orders" to provide. (*Id.* at ¶¶ 14–15.)  Despite specifically alleging in his Complaint that he was on "active duty," Plaintiff now concedes that he was not. (*Id.* at ¶ 18.)  But as Captain Bonds explained in his voicemail to Plaintiff, if Plaintiff needed time off for bona fide military service, the request would be approved. (*Id.* at ¶ 10.)

After Captain Bonds left the voicemail with Plaintiff on September 21, Plaintiff did not contact Captain Bonds or the Miami flight office again that day. (*Id.* at ¶ 15.)  Instead, Plaintiff waited until after normal business hours and called an after-hours system-wide Duty Chief Pilot in Dallas. (*Id.*)  The system-wide Duty Chief Pilot—unaware that Captain Bonds had already contacted Plaintiff in response to his request for an EO—granted the EO. (*Id.* at ¶ 16.)

Thus, within hours of Patterson requesting an EO on September 21, American granted his

---

[4] The Allied Pilots Association ("APA") Professional Standards is a group of pilots organized by the APA, the union that represents American's pilots, that works to "resolve any issues between pilots and other employees." (SMF at ¶ 12.)

5

request.  (*See id.* at ¶¶ 7, 15–16.)  On September 23, 2015, Plaintiff and his wife attended the

Pope's ceremonial visit to the White House.  (*Id.* at ¶ 17.)  Plaintiff received "inactive duty

training" credit for his visit to Washington D.C.; it was not "active duty" as he falsely alleges in

his Complaint.  (*Id.* at ¶ 18.)

Because of the suspicious circumstances around Plaintiff's last-minute request for time

off, Captain Bonds followed up with Plaintiff on October 7, 2015, to obtain verification of the

reason for Plaintiff's absence from work.  (*Id.* at ¶¶ 19–20.)  Finally, on October 28, 2015,

Plaintiff provided a heavily redacted "copy of a copy" of a Leave and Earnings Statement for

September 2015.  (*Id.* at ¶ 21.)  After Plaintiff provided this document, Captain Bonds

considered the matter closed and American took no further action with respect to Plaintiff's

request for time off.  (*Id.* at ¶ 22.)  The unrefuted testimony is that American never considered

this request for an EO (much less his membership in the military) as any part of the employment

action based on the Employee Complaint.  (*Id.* at ¶ 23.)

> C.     Upon receiving the Employee Complaint, American temporarily withholds Plaintiff from duty with pay while American investigates.

On September 24, 2015, American received the written Employee Complaint, which

included 11 pages of allegations concerning Plaintiff's behavior and statements from multiple

American employees that appeared to support the concerns raised by the complaining Captain.

(*Id.* at ¶ 24.)[5]

---

[5] On or around September 6, 2015, American became aware that an Employee Complaint may be forthcoming.  (SMF at ¶ 25.)  The complaining Captain previously raised allegations regarding Plaintiff in March 2015.  (*Id.*)  Because these allegations involved a dispute between two pilots, Captain Beach initially referred the complaining Captain to APA Professional Standards.  (*Id.*) In July 2015, the Captain informed American that unless the APA Professional Standards process led to a "resolution" within "a few months," the Captain believed he would "be left with no other option than to file harassment charges against Patterson."  (*Id.*)

The serious nature of the allegations in that Employee Complaint is beyond dispute. Plaintiff's

own retained expert witness, Dr. Glenn Caddy, explains that the Employee Complaint describes

Plaintiff "as being dishonest, or having a personality defect; . . . and even one who is perhaps

mentally unstable." (*Id.* at ¶ 26.) Dr. Caddy concedes that based on the allegations made by the

Captain, American should have referred Plaintiff for a mandatory fitness for duty evaluation.[6]

And Plaintiff himself has testified that, "a reasonable person would expect [the Employee

Complaint] to cause the loss of employment of any person affected." (*Id.* at ¶ 28.)

Once American received the Employee Complaint on September 24, 2015, and in view of

the serious nature of the allegations contained in it, American immediately withheld Plaintiff

from duty (with pay) while it investigated the allegations. (*Id.* at ¶ 29.) Captain Bonds, the

Chief Pilot on duty that evening, informed Plaintiff via voicemail "that he had been grounded

pending an investigation of a 'workplace environment' complaint." (*Id.* at ¶ 30.) American sent

a letter to Plaintiff via FedEx the next day confirming this. (*Id.*)

American's HR Department in Miami conducted the ensuing investigation, which

included interviews with nine American employees, including the complaining Captain, and a

meeting with Plaintiff conducted under the terms of the collective bargaining agreement between

American and APA (called a "Section 21" hearing). (*Id.* at ¶ 31.) In December 2015,

American's HR Department prepared a written report, which stated that, "the majority of the

employees interviewed described Patterson as a habitual liar/story teller." (*Id.* at ¶ 32.) The HR

Department concluded: "During our interviews, multiple employees expressed their concern with

Patterson's behavior . . . . They believed that Patterson's misrepresentations not only caused

---

[6] Dr. Caddy claims American should also have referred the Captain who made the complaint for
an evaluation as well. Of course, Dr. Caddy admits that he has never even met the Captain who
made the Employee Complaint. (SMF at ¶ 28.)

negativity amongst the crew but also led them to question his ability to operate the aircraft safely; it left them with an impression that 'he's not quite all there.'"  (*Id.* at ¶ 33.)[7]

Based on this HR investigation, American referred Plaintiff for a fitness for duty examination before allowing him to operate passenger aircraft.  (*Id.* at ¶ 34.)

### D. An independent neuropsychologist concludes that Plaintiff is not fit for duty.

On January 14, 2016, the Miami flight office formally requested, "a Fitness for Duty Medical Examination, pursuant to Section 20 of the AA-APA labor agreement . . . based upon this office's concerns about FO Patterson's judgment and, specifically, his mental and/or emotional stability.  This office has received multiple reports of atypical interactions with coworkers and reports that suggest a pattern of false/self-aggrandizing statements."  (*Id.* at ¶ 35.)

Dr. Jeral Ahtone, American's Corporate Medical Director, selected Dr. John Knippa to perform the examination because he had been recommended by another neuropsychologist for his experience with "behavioral and/or personality problems."  (*Id.* at ¶ 36.)  Dr. Knippa—a former member of the Marine Corps—has trained at the Federal Aviation Administration's Civil Aviation Medical Institute and performed dozens of pilot fitness for duty examinations in his more than 30-year career as a licensed neuropsychologist.  (*Id.*)

After two days of examination, Dr. Knippa sent Dr. Ahtone his findings on March 21, 2016, including his conclusion that: "From a neuropsychological perspective, he is <u>NOT FIT FOR DUTY</u> as a First Officer, at this time."  (*Id.* at ¶ 37.)  In his report, Dr. Knippa detailed a number of "performance abnormalities significant to flying," including "multiple examples of

---

[7] American's HR Department concluded that certain of the allegations in the Employee Complaint were "Substantiated"—for example, allegations that Plaintiff had improperly threatened disciplinary action against other employees.  The HR Department also concluded that certain of the allegations were "Unsubstantiated"—for example, allegations that Plaintiff used derogatory slurs while in the presence of other American employees.  (SMF at ¶ 33.)

impulsive-appearing or overconfident behavior," which are particularly significant for airline pilots in a "safety sensitive position in which they need to work with multiple crew members as well as the passengers." (*Id.*) Dr. Knippa noted that Plaintiff "tended to portray himself as being relatively free of common shortcomings to which most persons would admit" and his testing results were "consistent with concern for a highly defensive response bias" in which the individual has "a catastrophic lack of insight into their own presentation and motivations." (*Id.*) Dr. Knippa determined that Plaintiff's "overall profile of neuropsychological assessment was discrepant from that expected for Major Airline pilots of similar age." (*Id.*) Dr. Ahtone thereafter conveyed to the Miami flight office: "PATTERSON is currently unable to perform the essential job function of a PILOT." (*Id.*)

When an independent examiner finds a pilot not fit for duty as occurred here, American's practice, once that pilot indicates that he/she is ready to return to work, is to send the pilot back to the same practitioner who performed the original assessment. (*Id.* at ¶ 38.) Otherwise, an employee could simply "doctor shop" until he or she found a physician who is willing to state that they are fit for duty. Since Dr. Knippa made his determination in March 2016, Plaintiff has refused to return to Dr. Knippa for re-evaluation, and has likewise refused to attend a re-evaluation by a comparable examiner approved by American. (*Id.* at ¶ 39.) Thus, in accordance with the governing collective bargaining agreement and American's responsibility for public safety, American has not returned Plaintiff to duty. (*Id.* at ¶ 41.)

## LEGAL STANDARD

"Summary judgment is appropriate if the movant shows that no genuine issue of material fact exists, and that it is entitled to judgment as a matter of law." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 833 (11th Cir. 2013) (citing Fed. R. Civ. Proc. 56(a)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). "'[E]xistence of *some* alleged factual dispute

9

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there will be no *genuine* issue of *material* fact,'" meaning a

fact that "might affect the outcome of the case under the governing law." *Bagnall v. City of*

*Sunrise*, No. 10-cv-61299, 2011 WL 3715123, at *4 (S.D. Fla. Aug. 24, 2011) (Martinez, J.)

(quoting *Liberty Lobby*, 477 U.S. at 247–48).

Pursuant to Section 4311 of USERRA, a "person who is a member of . . . a uniformed

service shall not be denied . . . any benefit of employment by an employer on the basis of that

membership." 38 U.S.C. § 4311 (a). Section 4311 further provides that an "employer may not

discriminate in employment against or take any adverse employment action against any person

because such person . . . has taken an action to enforce a protection afforded any person under

this chapter . . . [or] has exercised a right provided for in this chapter." 38 U.S.C. § 4311(b). In

application, the factual allegations relevant to and legal framework for analyzing claims of

discrimination and retaliation under Section 4311 are the same.

To establish a prima facie case, an employee must show that he was "denied a benefit of

employment and that his protected status was a 'motivating factor' in the denial" and/or that his

action to enforce a protection or exercise a right under USERRA was "a motiving factor in an

adverse employment action." *Bagnall*, 2011 WL 3715123 at *9 (citing *Coffman v. Chugach*

*Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005)). Under Section 4311 of USERRA:

"A plaintiff's military status is a motivating factor where the employer relied upon, took into

account, considered, or conditioned its decision on that consideration." *See Landolfi*, 515 F.

App'x at 834.

If the employee establishes a prima facie case of discrimination or retaliation, "the burden

shifts to the employer to provide the affirmative defense that legitimate reasons, standing alone,

10

would have induced the employer to take the same adverse action." *Bagnall*, 2011 WL 3715123 at *9 (internal quotation marks omitted)  Thus, "in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the [employer's] action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status.'" *Id.*

## ARGUMENT

In Count I, Plaintiff asserts that the "motivating factor" for American sending him for a fitness for duty exam was his "going on active duty so that he could represent the U.S. Army at the White House reception for the Pope."  In Count II, Plaintiff asserts that the motivating factor was "filing a USERRA complaint with the DOL."  Plaintiff cannot establish even a prima facie case for either count.  Moreover, even assuming for the sake of argument that he could, American plainly had legitimate reasons, wholly unrelated to his military service that induced American to withhold Plaintiff from flying passenger aircraft and send him for a fitness for duty exam.  And based on Plaintiff's own testimony—and the testimony of Plaintiff's expert witness—those legitimate reasons cannot be considered pre-textual.

## I.   AMERICAN HAS NEVER DENIED PLAINTIFF ANY BENEFIT OF EMPLOYMENT BECAUSE OF HIS MEMBERSHIP IN THE MILITARY.

### A.   Because Plaintiff concedes he did not go on active duty, his active duty status cannot possibly be a motivating factor for American's alleged actions.

Although Plaintiff repeatedly references "going on active duty" in Count I as the centerpiece of his allegations, Plaintiff now expressly concedes that he did *not* go on active duty during his trip to D.C.  *Compare* Pl. Dep. 203:20–23, Mar. 6, 2018 ("there's two different types of duty, sir.  There's inactive duty for training, which is what I performed at the White House, and then there's active duty." *with*, *e.g.*, Compl. ¶ 29 ("[Plaintiff's] going on active duty so that he could represent the U.S. Army at the White House reception for the pope was a motivating

11

factor for [American]. . . ."))  Thus, Plaintiff's alleged "active duty" status—which he knew to be untrue when he filed his Complaint—cannot possibly form any basis for his USERRA claim against American.

B.     Plaintiff never requested military leave and, in any event, American granted his request for time off.

Contrary to the allegations in his Complaint, Plaintiff now concedes that he did not request a military leave from American—rather, he requested "EO" time off.  (SMF at ¶ 8.) Plaintiff also admits, as he must, that whether to grant a request for EO time off is a matter within the discretion of American's Chief Pilot and that American actually granted his request for time off.  Thus, Plaintiff cannot assert a USERRA claim based on the granted request for time off.

C.     Plaintiff has not (and cannot) establish a prima facie case that American denied him any employment benefit based on his military status.

Even aside from his demonstrably false allegations that American took action based on his "active duty" status or failed to grant him "military leave" that he never requested, Plaintiff's claim is insufficient to give rise to a prima facie case given the other undisputed facts.  Indeed, to avoid summary judgement on Count I, Plaintiff would have to demonstrate that American was somehow able to reach back in time to convince a long-time Captain to file a personnel complaint against Plaintiff before American knew Plaintiff would seek to use personal time off to attend the Pope's visit in Washington, D.C.  That, of course, is impossible.

There is no dispute that American withheld Plaintiff from duty on September 24, 2015, immediately after American received the Employee Complaint.  Nor is there any dispute that the Captain who filed the Employee Complaint had been seeking to resolve the alleged harassment by Plaintiff well before Plaintiff requested time off to visit the Pope.  Plaintiff also does not (and cannot) dispute the serious nature of the allegations set forth in that Employee Complaint, which

12

compiled statements from multiple American employees that call into question Plaintiff's honesty, mental stability, and fitness for duty. (SMF at ¶ 26.) Plaintiff himself has described the Employee Complaint as a document that "*a reasonable person would expect to cause the loss of employment of any person affected*." (*Id.* at ¶ 27) (emphasis added.)

Once American received that Employee Complaint, it determined that it must immediately place Plaintiff on paid withheld status, pending an investigation. As an airline, American has a "public obligation to ensure that Plaintiff was fit to fly." *Witter v. Delta Airlines, Inc.*, 966 F. Supp. 1193, 1201 (N.D. Ga. 1997); *see also Allmond v. Akal Sec., Inc.*, 2007 WL 2904023, at *14 (M.D. Ga. Sept. 28, 2007) ("'The public interest clearly lies in having the most highly qualified persons available to pilot airliners. The courts, therefore, should proceed with great caution before requiring an employer to lower his . . . standards for such a job.'" (quoting *Spurlock v. United Airlines, Inc.*, 475 F.2d 216, 219 (10th Cir. 1972)).

As part of that ensuing investigation, "multiple employees" told American that Plaintiff's behavior "led them to question his ability to operate the aircraft safely; it left them with an impression that 'he's not quite all there.'" (SMF at ¶ 33.) Because of that investigation, American's management determined that Plaintiff required an independent medical examination, "due to concerns about [his] ability to safely operate an aircraft." Based on the ensuing two-day examination in March 2016, the independent neuropsychologist identified "performance abnormalities significant to flying," including significant concerns that Plaintiff's behavioral patterns were incompatible with performing "safety sensitive" job responsibilities in a "complex, multi-crew aircraft"—thus validating American's concerns. This well-respected neuropsychologist—a former Marine with significant experience examining pilots—reported to American his determination that "[f]rom a neuropsychological perspective, [Plaintiff] is NOT

13

FIT FOR DUTY as a First Officer, at this time."

The undisputed material facts, including Plaintiff's own testimony, establish that Plaintiff's then status as a member of the Army Reserves is wholly unrelated to American's well-reasoned decision to withhold him from duty on September 24, 2015 because of the Employee Complaint. Plaintiff himself testified that he never once in his career at American faced anti-military animus prior to September 2015. (*See* SMF at ¶ 6.) Moreover, as stated in the Caddy Report, Plaintiff himself concedes that *but for* the Employee Complaint, American would not have withheld him from duty:

> It was after the September 24, 2015 complaint by [Employee] that Scott Patterson had the ***only problem that he has ever experienced in obtaining Military leave*** [previously ***no problem whatsoever*** from A.A. and in particular from the local Miami flight office]. . . . Scott questions whether the other problems he was facing within A.A, ***as a result of the [Employee] submission*** may have led to this hiccup. Right or wrong, Scott Patterson believes that ***this issue would not have arisen <u>but for</u> the fact that the [Employee] submission created an environment of mistrust about his integrity.*** He suspects that it was this mistrust that may have been ***the underlying reason*** why Captain Bonds initially sought to compromise his legal right to take military leave.

(Caddy Dep. Ex. 2.B at 30, ECF No. 57.28 (emphasis added); *see also id.* at 42) (Plaintiff concedes that it was his "alleged 'behavior in the workplace' around what was really a single issue [i.e. the complaints made by, and/or collated by, Captain (Employee)] that became the reason for the examination") (brackets in original; employee named removed.).[8]

Accordingly, Plaintiff has not demonstrated—and cannot demonstrate—that his military service was a motivating factor as required by USERRA. *See Weaver v. Madison City Bd. of*

---

[8] At his deposition, Plaintiff testified that he "spent hundreds of hours with Dr. Caddy." (Pl. Dep. at 339:10–16, ECF No. 57-1.) Plaintiff also testified that there is nothing in the Caddy Report that he disagrees with or disputes. (*Id.* at 339:14–19, 341:8–12.)

*Educ.*, No. 5:11-cv-03558-TMP, 2016 WL 7210447, at *17 (N.D. Ala. Dec. 13, 2016) (any

negative animus "was not due to his military service, but to the grievances filed against him");

*Hoback v. City of Chattanooga*, No. 1:10-cv-74, 2011 WL 3420664, at *5 (E.D. Tenn. Aug. 4,

2011 ) ("[N]othing in the record suggest[ed plaintiff] was terminated because of . . . animus

towards his military service, rather than the fitness for duty examination in which he was found

no longer qualified to perform as a police officer.").

The happenstance that American received the Employee Complaint on a day when

Plaintiff was taking time off with his wife to attend a ceremonial visit by Pope Francis in D.C.

does nothing to salvage his claim. Even if American "relied upon, took into account, [or]

considered" his *vacation request* in deciding to withhold Plaintiff from duty, which it did not and

which absolutely no evidence supports, that would not provide evidence of an anti-military

animus. *Coffman*, 411 F.3d at 1239 ("[N]o reasonable jury could find that [plaintiff's] military

status was a motivating factor in [employer's] decision . . . ."); *Dees v. Hyundai Motor Mfg. Ala.,*

*LLC*, 368 F. App'x 49, 51–52 (11th Cir. 2010) (affirming summary judgment for employer

because unsupported, conclusory statements by plaintiff "failed to establish through direct or

circumstantial evidence that [employer] relied on, took into account, considered, or conditions its

decision . . . on the basis of his military service." (internal quotation marks omitted)). Moreover,

American's unrefuted testimony is that Plaintiff's request for time off and military service played

no role whatsoever in the decision to withhold him from service or to request that he submit to a

fitness for duty evaluation. (SMF at ¶ 23.)

D.     Plaintiff's unsupported "jealousy" theory is no basis for a USERRA claim.

Unable to articulate any coherent theory of anti-military animus, Plaintiff creates a

fanciful theory regarding one of the Chief Pilots in American's Miami flight office, Captain Jim

Bonds. (*See* Pl. Dep. at 313:15–23, ECF No. 57-1) ("I think the reason I'm not flying for

American Airlines is because Captain Bonds retaliated against me.") Forced to acknowledge that Captain Bonds himself is a former longtime military service member, Plaintiff claims that Captain Bonds was either "jealous" of Plaintiff's military accolades or resentful because Plaintiff served in the Army while the Chief Pilot served in the Air Force. (*See id.* at 288:8–89:25, 324:4–12.) That is nothing but pure speculation. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.")[9] In any event, these are not theories of *anti-military* animus by American, but rather theories of garden-variety jealously and intra-military rivalry. *See, e.g.*, *Weaver*, 2016 WL 7210447, at *17.

E.   <u>American had legitimate reasons for taking the actions it did, which do not relate in any way to Plaintiff's military service.</u>

American indisputably had legitimate reasons, standing alone, that induced American to withhold Plaintiff from operating passenger aircraft. Plaintiff's own expert concedes that the allegations against Plaintiff would warrant American to take action, including referring him to a fitness for duty evaluation. (SMF at ¶ 28.) Further, given that Plaintiff concedes that withholding him from duty and referring for medical evaluation "would not have arisen *but for* the fact that the [Employee Complaint] created an environment of mistrust about his integrity," he cannot now reasonably argue that American taking such actions based on the Employee Complaint was pre-textual. (*Id.* at ¶ 40) (emphasis added.) Indeed, the finding by Dr. Knippa that Plaintiff is not fit for duty is conclusive evidence that American's concerns were well

---

[9] Plaintiff's speculation is not evidence. Nor can Plaintiff attempt to salvage his speculative testimony under the guise of a "reasonable" inference. This is particularly true where American's HR investigation of Plaintiff revealed that, "the majority of employees interviewed described Patterson as a habitual liar/story teller," and the independent neuropsychologist that evaluated Plaintiff noted a "highly defensive response bias" that suggests a "catastrophic lack of insight" and "a bias toward an overly favorable self-presentation." (SMF at ¶ 37.)

835060

founded.[10]

Accordingly, for all the reasons above, Count I fails as a matter of law under USERRA. *See Coffman*, 411 F.3d at 1238–39; *Bagnall*, 2011 WL 3715123, at *11; *Vega-Colón v. Wyeth Pharm.*, 625 F.3d 22, 29 (1st Cir. 2010) (granting summary judgment because employer "sufficiently established that it would have taken such action regardless of [plaintiff's] military membership").

## II. AMERICAN TOOK NO ACTION AS A RESULT OF PLAINTIFF FILING A USERRA COMPLAINT.

Count II simply restates the allegation that Plaintiff taking "active duty" in September 2015 was a "motivating factor" for his being withheld from duty in September 2015, and then adds a wholly conclusory allegation that "filing a USERRA complaint with the DOL" was also a "motivating factor." American is entitled to summary judgment on Count II for the same reasons as Count I.

As to his additional allegation regarding filing a USERRA complaint with the DOL, Plaintiff did not file his USERRA complaint with the DOL until January 25, 2016; months *after* American had withheld him from duty. (Compl. ¶ 6.) By that date, American had already concluded its HR investigation and referred Plaintiff to Dr. Knippa for his independent medical examination, which confirmed he was "not fit for duty." (SMF at ¶ 37.) Thus, it is impossible for Plaintiff's USERRA complaint to have formed any basis for American's previous alleged actions.

---

[10] Plaintiff and his hired expert apparently take issue with some of Dr. Knippa's findings. But notably, since Dr. Knippa's evaluation, Plaintiff has never requested that American refer him for a re-evaluation by Dr. Knippa or any other provider. (SMF at ¶ 39.) Plaintiff's expert opined that a "comprehensive forensic study" should have been performed, but concedes he did not perform such a study of Mr. Patterson. (Caddy Dep. at 13:24–14:5, ECF No. 57-27.)

## <u>CONCLUSION</u>

For these reasons, American respectfully requests that the Court enter summary judgment for American and dismiss Plaintiff's Complaint with prejudice.

Respectfully submitted,

By: /s/ Michael A. Holt

Michael A. Holt
mholt@shb.com
Florida Bar No.: 91156
**SHOOK, HARDY & BACON L.L.P.**
**Miami Center, Suite 3200**
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

Mark W. Robertson (*Pro Hac Vice*)
mrobertson@omm.com
**O'MELVENY & MYERS LLP**
Time Square Tower, 7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Tristan Morales, Esq. (*Pro Hac Vice*)
tmorales@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for American Airlines, Inc.*

18

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 11th day of June, 2018, the foregoing document

was filed with the Clerk of the Court using the CM/ECF system and a true and correct copy

was served on the counsel or parties of record listed below.

By: /s/ Michael A. Holt
MICHAEL A. HOLT

<u>**SERVICE LIST**</u>

William R. Amlong, Esq.
WRAmlong@TheAmlongFirm.com
Karen Coolman Amlong, Esq.
KAmlong@TheAmlongFirm.com
**AMLONG & AMLONG, P.A.**
500 Northeast Fourth Street
Fort Lauderdale, FL 33301
Telephone: (954) 462-1983
Facsimile: (954) 523-3192

Noel C. Pace, Esq.
(*Pro Hac Vice*)
noel.c.pace.esq@gmail.com
206 N.W. 91 Street
El Portal, Florida 33150
Telephone: (305) 710-3713

(Service via CM/ECF)

*Counsel for Plaintiff*

Michael A. Holt, Esq.
mholt@shb.com
**SHOOK, HARDY & BACON L.L.P.**
Miami Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

Mark W. Robertson, Esq.
mrobertson@omm.com
(*Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Tristan Morales, Esq.
tmorales@omm.com
(*Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

(Service via CM/ECF)

*Counsel for American Airlines, Inc.*

835060