UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 1:17-cv-60533-MARTINEZ-OTAZO-REYES

RODNEY SCOTT PATTERSON,

    Plaintiffs,

vs.

AMERICAN AIRLINES, INC., a Delaware
Corporation,

    Defendant.
_____/

**AMERICAN AIRLINES, INC.'S STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**[1]

Pursuant to Local Rule 56.1(a), Defendant American Airlines, Inc. ("American") submits this Statement of Undisputed Material Facts in support of American's Motion for Summary Judgment and states that there exists no genuine issues of fact to be tried regarding the following:

**Background**

1. American is a commercial air carrier that operates a hub in Miami. (Compl. ¶ 5, ECF No. 1.) American employs approximately 2,000 pilots at its Miami hub, where American has a "flight office." (Bonds Dep. 13:20–24, 29:23–30:1, ECF No. 57-7.)

2. Plaintiff is a commercial airline pilot for American, who is based in Miami and was hired in 2000. (Compl. ¶ 5, ECF No. 1; Pl. Dep. 118:6–15, 120:4–5, ECF No. 57-1.) He retired from the Army Reserves in June 2017 as a Lieutenant Colonel. (Compl. at ¶ 4.a; Pl. Dep. at 113:24–114:12.)

---

[1] American sets forth these facts as uncontroverted solely for purposes of its Motion for Summary Judgment given the standards applicable to that motion.

1

3. Three Chief Pilots, who report to the Director of Flight, manage the Miami pilot base on a day-to-day basis. (Beach Dep. 6:1–6, 10:23–11:11, ECF No. 57-13.) In 2015, the Chief Pilots included Captains Brian Beach and Jim Bonds. (*Id.* at 7:4–6.)

4. "[M]ost pilots at American Airlines are military," including Captain Bonds, who is a former longtime military service member. (Pl. Dep. 262:24–25, ECF No. 57-1; Bonds Dep. at 9:11–12:18, ECF No. 57-7.)

5. In 2015, 122 American pilots based in Miami were granted approximately 1,579 military leaves of absence by American. (Rojas Decl. ¶ 3, ECF No. 57-29.) None of the pilots that requested leave has ever been withheld from duty for an investigation nor required to undergo a fitness for duty examination based on their military service. (*Id.*)

6. Plaintiff participated in military duty at various times during 2015. (Pl. Dep. at 148:22–149:8, ECF No. 57-1) ("I've done a lot of military duty in 2015 . . . .") During these periods of service, Plaintiff requested and received military leaves of absence from American. (*See id.*; *see also* Pl. Dep. Ex. 11, ECF No. 57-2.) For example, in August 2015, American granted Plaintiff military from August 21 through 23, 2015. (Pl. Dep. Ex. 11.) Before September 21, 2015, in his 15-plus years at American, Plaintiff has "never been denied military leave with American." (Pl. Dep. at 135:17–136:3.)

### Plaintiff's September 21, 2015 Request for Time Off to Attend a Visit by Pope Francis in Washington, D.C.

7. On September 21, 2015, Plaintiff called the Miami flight office around 10AM, making a last-minute request for American to remove him from the international trip he was scheduled to fly beginning on September 22, 2015. (Compl. at ¶ 8, ECF No. 1; Pl. Dep. at 236:2–245:3, 250:24–251:11, ECF No. 57-1.)

8. Plaintiff told the Miami flight office that he wanted time to visit to the Pentagon, but he did not request a Military Leave of Absence. (Pl. Dep. at 246:16–251:7, ECF No. 57-1.) Instead, he told the administrative manager that he wanted to request an "employee off" or "EO" beginning the next day, September 22, 2015. (*Id.*)

9. An "EO" allows American pilots "to take … future accrued vacation days and apply them to these days off." (Pl. Dep. at 247:8–251:7, ECF No. 57-1.) The EO that Plaintiff requested is a category of vacation wholly unrelated to military leave that pilots can request for any reason. (*Id.*) Plaintiff admits that EO days off are "discretionary," and may be granted or denied in the discretion of the Chief Pilot. (*Id.*)

10. In response to Plaintiff's call, Chief Pilot Bonds called Plaintiff around 3PM that same day, September 21. (Compl. at ¶ 10, ECF No. 1; Pl. Dep. at 250:24–251:11, ECF No. 57-1; Pl. Aff. Bates No. Patterson_Caddy_00025, ECF No. 57-31.) Bonds left a voicemail message stating that he had received Plaintiff's request for "an EO for tomorrow because of some military work at the Pentagon," and further stating, "we're really, really short . . . on manning so . . . obviously we are going to give you the time off, if you can produce some . . . . orders." Pl. Aff. Bates No. Patterson_Caddy_00025, ECF No. 57-31.) He sought to confirm that Plaintiff was requesting the EO (which is vacation time) for military duties in Washington, D.C., as Plaintiff had suggested. (*Id.*; *see also* Bonds Dep. at 636:23–65:17, ECF No. 57-7.)

11. Captain Bonds considered Plaintiff's EO request suspicious because earlier in the day on September 21, Captain Bonds learned that Plaintiff was scheduled to fly with a pilot who served as part of the APA Professional Standards group, which had recently investigated allegations made against Plaintiff. (*See* Bonds Dep. at 34:1–20, 63:10–22, 69:6–17, 74:14–76:18, ECF No. 57-7.)

3

12. APA Professional Standards is a group of pilots organized by the APA, the union that represents American's pilots, "that works to "resolve any issues between pilots and other employees." (Bonds Dep. at 26:22–27:5, ECF No. 57-7.)

13. Given the proximity in time, Captain Bonds questioned whether Plaintiff was seeking an EO to avoid flying with a pilot who had recently investigated Plaintiff's conduct and was thus just attempting "to find any way to get out of that trip." (Bonds Dep. at 63:10–22, 74:14–76:18, ECF No. 57-7.)

14. Captain Bonds also found it "quite odd why [Plaintiff] would ask for an EO instead of taking military [leave]." (Bonds Dep. at 63:10–22, ECF No. 57-7.) Captain Bonds also considered it unusual that Plaintiff did not have any "military orders" to provide. (*Id.* at 63:10–22.) In Captain Bonds' experience, Reserve personnel "always had" orders available, in part "for the transparency of employers." (*Id.*)

15. Plaintiff did not contact Bonds or the Miami flight office again that day. (Compl. at ¶ 11, ECF No. 1; Pl. Dep. at 251:1–256:7, ECF No. 57-1; Bonds Dep. at 61:23–65:17, ECF No. 57-7.) Instead, after normal business hours, Plaintiff called an after-hours system-wide Duty Chief Pilot in Dallas, David Tatum. (Pl. Dep. at 255:22–256:7; Bonds Dep. at 61:23–65:17.)

16. Tatum, unaware that Bonds had already left a message with Plaintiff regarding the EO, granted the EO to Plaintiff upon request. (Pl. Dep. at 255:22–256:7, ECF No. 57-1; Bonds Dep. at 61:23–65:17, ECF No. 57-7.)

17. On September 23, 2015, Plaintiff and his wife attended the Pope's ceremonial visit to the White House. (Compl. at ¶ 8, ECF No. 1; Pl. Dep. at 207:2–25, ECF No. 57-1.)

835060

18. Although Plaintiff received "inactive duty training" credit for his visit to Washington D.C., the Pentagon did not classify the trip as "active duty" reserve duty. (Pl. Dep. at 203:20–204:23, ECF No. 57-1.) Plaintiff testified that he was not on active duty. (*Id.*)

19. Because of the suspicious circumstances of Plaintiff's last-minute request for time off Captain Bonds sought verification of Plaintiff's military orders or earning statements to confirm the reason for Plaintiff's absence from work (*See* Pl. Dep. at 260:12–262:14, ECF No. 57-1; Bonds Dep. at 117:9–118:4, ECF No. 57-7.)

20. On October 7, 2015, Bonds followed up with Plaintiff by phone and requested that Plaintiff provide "orders or the [Leave and Earnings Statement] or something" as there was "a lot of confusion on our part to . . . the circumstances around those orders." (Pl. Aff. Bates No. Patterson_Caddy_00024, ECF No. 57-30.)

21. On October 28, 2015, Plaintiff provided a "copy of a copy" of a Leave and Earnings Statement for September 2015 that "had a lot of information redacted." (Bonds Dep. at 69:20–71:11, 82:2–10, 86:13–87:9, ECF No. 57-7; Bonds Dep. Ex. 7, ECF No. 57-8.)

22. After Plaintiff provided the copy of his Leave and Earnings Statement for September of 2015, Captain Bonds considered the matter closed and American took no further action with respect to Plaintiff's request for time off. (Bonds Dep. at 87:11–88:20, ECF No. 57-7; Bonds Dep. Ex. 13, ECF No. 57-9.)

23. American never considered Plaintiff's request for leave (much less his membership in the military) as any part of the employment action taken based on the written work-related harassment claim filed against Plaintiff. (American Airlines Rule 30(b)(6) Dep. 118:16–119:16, ECF No. 57-25 [hereinafter, "AA Dep."].)

### American Receives Employee Complaint Concerning Plaintiff on September 24, 2015 and Immediately Places Plaintiff on Paid Withheld Status Pending Investigation

24.     On September 24, 2015, American received a written Employee Complaint, which included 11 pages of allegations concerning Plaintiff's behavior and statements from multiple American employees (which appeared to support the concerns raised by the complaining Captain). (Compl. at ¶¶ 1 & 14, ECF No. 1; Beach Dep. Ex. 6, ECF No. 57-16, Beach Dep. Ex. 7, ECF No. 57-17.) The complaining Captain described the Employee Complaint as seeking redress for "the work-related harassment from FO Patterson."(Beach Dep. Exs. 6 & 7.)

25.     The Miami flight office was aware by September 6, 2015 that an Employee Complaint might be forthcoming from the Captain, and that a fitness for duty examination might be required as a result of that Complaint. (Beach Dep. Ex. 2.D, ECF No. 57-14.) The Captain who submitted the Employee Complaint in September 2015 had previously raised allegations regarding Plaintiff in March 2015, and had contacted Captain Beach regarding the allegations. (Beach Dep. at 23:15–28:18, ECF No. 57-7.) Beach initially "referred him to [APA] Professional Standards" because it was a dispute between two pilots. (*Id.* at 23:15–19.) In July 2015, the Captain informed American that unless the APA Professional Standards process led to a "resolution" within "a few months," the Captain believed he would "be left with no other option than to file harassment charges against Patterson." (Beach Dep. Ex. 5, ECF No. 57-15.) After several months, APA Professional Standards informed the Captain who raised the allegations that it had been unable to resolve his concerns and that he could "leave it as is, or file an HR complaint" with American, which would result in American investigating the allegations. (Beach Dep. at 27:16–28:7.) By September 6, 2015, approximately two weeks before Plaintiff requested time off for the Pope's visit, American was discussing the fact that a fitness-for-duty

examination for Plaintiff may be required if the Captain filed his Employee Complaint against Plaintiff. (Beach Dep. Ex. 2.D, ECF No. 57-14.)

26. Plaintiff's retained expert witness, Dr. Glenn Caddy, characterizes the Employee Complaint as describing Plaintiff "as being dishonest, or having a personality defect; . . . and even one who is perhaps mentally unstable." (Caddy Dep. Ex. 2.B at 22, ECF No. 57-28.)

27. Plaintiff himself has testified that, "a reasonable person would expect [the Employee Complaint] to cause the loss of employment of any person affected." (Pl. Dep. at 318:20–320:12, ECF No. 57-1.)

28. Dr. Caddy testified that based on March 2015 allegations alone—which he described as identical to the September 2015 allegations—Plaintiff should have been required to submit to a fitness for duty examination. (Caddy Dep. 59:8–61:12, ECF No. 57-27.) Dr. Caddy also believes the complaining Captain should have been evaluated for fitness for duty; although Dr. Caddy admits he has never even met or spoken with the complaining Captain. (*Id.*; *see also id.* at 22:21–23:5.)

29. In view of the serious nature of the allegations contained in the Employee Complaint, American immediately placed Plaintiff on paid withheld status that evening. (Beach Dep. Ex. 16, ECF No. 57-18; Beach Dep. Ex. 17, ECF No. 57-19.)

30. Bonds, the Chief Pilot on duty that evening, informed Plaintiff via voicemail "that he had been grounded pending an investigation of a 'workplace environment' complaint." (Compl. at ¶ 14, ECF No. 1; Bonds Dep. at 98:1–9, ECF No. 57-7.) Bonds then sent a letter via FedEx the next day stating that Plaintiff was withheld "from service with pay pending the outcome of an investigation into the circumstances surrounding a Work Environment complaint that was reported by a coworker." (Bonds Dep. Ex. 17, ECF No. 57-10.)

### American's HR Department Conducts an Investigation

31. American's HR Department in Miami conducted the ensuing investigation, which included interviews with nine American employees, including the complaining Captain, and a meeting with Plaintiff conducted under the terms of the collective bargaining agreement between American and APA (called a "Section 21" hearing). (American Airlines Rule 30(b)(6) Dep. [hereinafter, "AA Dep."] Ex. 41, ECF No. 57-26; Bonds Dep. Ex. 19, ECF No. 57-11; Bonds Dep. Ex. 20, ECF No. 57-12.)

32. In December 2015, American's HR Department prepared a written report, which stated that, "the majority of the employees interviewed described Patterson as a habitual liar/story teller." (AA Dep. Ex. 41, ECF No. 57-26.)

33. American's HR Department concluded that certain of the allegations in the Employee Complaint were "Substantiated"—for example, allegations that Plaintiff had improperly threatened disciplinary action against other employees. (*See id.*) The HR Department also concluded that certain of the allegations were "Unsubstantiated"—for example, allegations that Plaintiff used derogatory slurs while in the presence of other American employees. (*See id.*) In the final section of the Report, the HR Department concluded: "During our interviews, multiple employees expressed their concern with Patterson's behavior. . . . They believed that Patterson's misrepresentations not only caused negativity amongst the crew but also led them to question his ability to operate the aircraft safely; it left them with an impression that 'he's not quite all there.'" (*Id.*)

34. Based on this HR investigation, American concluded that Plaintiff must be referred to a fitness for duty examination before returning to operate passenger aircraft. (AA Dep. at 51:1–13, ECF No. 57-25; Beach Dep. Ex. 25, ECF No. 57-20, Beach Dep. Ex. 26, ECF No. 57-21.)

### The Third-Party Medical Examiner Concludes Plaintiffs is Not Fit for Duty

35. On January 14, 2016, the Miami flight office formally requested, "a Fitness for Duty Medical Examination, pursuant to Section 20 of the AA-APA labor agreement . . . based upon this office's concerns about FO Patterson's judgment and, specifically, his mental and/or emotional stability. This office has received multiple reports of atypical interactions with coworkers and reports that suggest a pattern of false/self-aggrandizing statements." (Ahtone Dep. Ex. 1, ECF No. 57-4.)

36. Dr. Jeral Ahtone, American's Corporate Medical Director, selected Dr. John Knippa for the examination because he had been recommended for his experience with "behavioral and/or personality problems." (Ahtone Dep. Ex. 1, ECF No. 57-4; Ahtone Dep. 5:12–14, 24:9-29:11, 33:13-24, ECF No. 57-3.) Dr. Knippa—a former member of the Marine Corps—has trained at the Federal Aviation Administration's Civil Aviation Medical Institute and performed dozens of pilot fitness for duty examinations in his more than 30-year career as a licensed neuropsychologist. (Knippa Dep. 8:15–22:21, ECF No. 57-24.)

37. After two days of examination, Dr. Knippa sent Dr. Ahtone his findings on March 21, 2016, including his conclusion that: "From a neuropsychological perspective, he is <u>NOT FIT FOR DUTY</u> as a First Officer, at this time." (Compl. at ¶¶ 17–18, ECF No. 1; Ahtone Dep. Ex. 3, ECF No. 57-5; Ahtone Dep. Ex. 4, ECF No. 57-6.) In his report, Dr. Knippa detailed a number of "performance abnormalities significant to flying," including "multiple examples of impulsive-appearing or overconfident behavior," which are particularly significant for airline pilots in a "safety sensitive position in which they need to work with multiple crew members as well as the passengers." (Ahtone Dep. Ex. 4 at 11-13, ECF No. 57-6; Knippa Dep. 30:20–31:4, 39:10–41:4, ECF No. 57-24.) Dr. Knippa noted that Plaintiff "tended to portray himself as being relatively free of common shortcomings to which most persons would admit" and his testing

results were "consistent with concern for a highly defensive response bias" in which the individual has "a catastrophic lack of insight into their own presentation and motivations." (Ahtone Dep. Ex. 4 at 9–10, ECF No. 57-6; Knippa Dep. 56:25-58:1, ECF No. 57-24.) Dr. Knippa determined that Plaintiff's "overall profile of neuropsychological assessment was discrepant from that expected for Major Airline pilots of similar age." (Ahtone Dep. Ex. 4 at 12, ECF No. 57-6.) Dr. Ahtone thereafter conveyed to the Miami flight office: "PATTERSON is currently unable to perform the essential job function of a PILOT." (Beach Dep. Ex. 40, ECF No. 57-22.)

38. When an independent examiner finds a pilot not fit for duty, American's practice, once that pilot indicates that he/she is ready to return to work, is to send the pilot back to the same practitioner who performed the original assessment. (Ahtone Dep. at 68-69, ECF No. 57-3; AA Dep. at 93:4–10, ECF No. 57-25.)

39. Since Dr. Knippa's determination in March 2016, Plaintiff has refused to return to the doctor who found him unfit to fly for reevaluation or a comparable examiner approved by American. (Beach Dep. Ex. 43, ECF No. 57-23.) Nor has Plaintiff even requested that he be re-evaluated by a different doctor in order to return to duty. (AA Dep. at 115:15–18, ECF No. 57-25.)

40. Plaintiff told Dr. Caddy that "that this issue would not have arisen <u>but for</u> the fact that the [Employee] submission created an environment of mistrust about his integrity." (Caddy Dep. Ex. 2.B at 30, ECF No. 57-28.)

41. In accordance with the governing collective bargaining agreement and American's responsibility for public safety, American has not returned Plaintiff to duty. (*See* AA Dep. at 92:2–93:10, ECF No. 57-25.)

835060

Dated:  June 11, 2018

Respectfully submitted,

By: /s/ Michael A. Holt

Michael A. Holt
mholt@shb.com
Florida Bar No.: 91156
**SHOOK, HARDY & BACON L.L.P.**
**Miami Center, Suite 3200**
201 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

Mark W. Robertson (*Pro Hac Vice*)
mrobertson@omm.com
**O'MELVENY & MYERS LLP**
Time Square Tower, 7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Tristan Morales, Esq. (*Pro Hac Vice*)
tmorales@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for American Airlines, Inc.*

835060

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 11th day of June, 2018, the foregoing document was filed with the Clerk of the Court using the CM/ECF system and a true and correct copy was served on the counsel or parties of record listed below.

By: /s/ Michael A. Holt
    MICHAEL A. HOLT

**SERVICE LIST**

William R. Amlong, Esq.
WRAmlong@TheAmlongFirm.com
Karen Coolman Amlong, Esq.
KAmlong@TheAmlongFirm.com
**AMLONG & AMLONG, P.A.**
500 Northeast Fourth Street
Fort Lauderdale, FL 33301
Telephone: (954) 462-1983
Facsimile: (954) 523-3192

Noel C. Pace, Esq.
(*Pro Hac Vice*)
noel.c.pace.esq@gmail.com
206 N.W. 91 Street
El Portal, Florida 33150
Telephone: (305) 710-3713

(Service via CM/ECF)

*Counsel for Plaintiff*

Michael A. Holt, Esq.
mholt@shb.com
**SHOOK, HARDY & BACON L.L.P.**
Miami Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

Mark W. Robertson, Esq.
mrobertson@omm.com
(*Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Tristan Morales, Esq.
tmorales@omm.com
(*Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

(Service via CM/ECF)

*Counsel for American Airlines, Inc.*

835072