1

```
 1                    UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
 2                       FORT LAUDERDALE DIVISION

 3          CASE NO:  1:17-cv-60533-MARTINEZ/OTAZO-REYES

 4

 5     RODNEY SCOTT PATTERSON,

 6             Plaintiff,

 7   vs.

 8     AMERICAN AIRLINES, INC., a
       Delaware  Corpcration,
 9
               Defendant.
10   _____/

11

12                            SHOOK, HARDY & BACON, L.L.P.
                              201 S. BISCAYNE BOULEVARD
13                            SUITE 3200
                              MIAMI, FL 33131
14                            Tuesday, March 6, 2018
                              10:09 a.m. - 7:42 p.m.
15

16

17        VIDEOTAPED DEPOSITION OF RODNEY SCOTT PATTERSON

18

19

20          Taken on behalf of the Defendant before

21     Elizabeth Cordoba, RMR, CRR, FPR, Notary Public in

22     and for the State of Florida at Large, pursuant to

23     Defendant's Notice of Taking Deposition in the above

24     cause.

25
```

# ATTACHMENT 1

10

```
 1        A.    No.

 2        Q.    -- answers today?  Okay.

 3              Is there any reason at all that -- that you

 4    cannot give full, complete and accurate testimony today?

 5        A.    No.

 6        Q.    Okay.  Mr. Patterson, you're a pilot; is that

 7    correct?

 8        A.    That is correct.

 9        Q.    Okay.  And are you currently flying for any

10    employer?

11        A.    I am.

12        Q.    Okay.  And what employer is that?

13        A.    I'm a captain for 21 AIR.

14        Q.    Okay.  And is -- where is 21 AIR located?

15        A.    Miami.

16        Q.    Okay.  The -- the headquarters is in Miami; is

17    that correct?

18        A.    Greensboro.

19        Q.    Okay.  So you're -- you're based in Miami for

20    your flying with 21 AIR; is that correct?

21        A.    Yes.

22        Q.    Okay.  And what kind of flying do you perform

23    as a captain for 21 AIR?

24        A.    We fly cargo for various clients.

25        Q.    Okay.  Any particular destination that you fly,
```

49

```
 1    information.

 2         Q.    And are you aware of consequences for not

 3    responding in full or accurate fashion to their requests?

 4         A.    Well, for example --

 5              MR. AMLONG:  It's just a simple yes or no.  Are

 6         you aware cf the consequences?

 7              THE WITNESS:  I'm not aware of the

 8         consequences.  I know that --

 9              MR. AMLONG:  That's it.  You've answered.

10    BY MR. MORALES:

11         Q.    You're not aware of any consequences for

12    failing to report requested information to the FAA?

13         A.    Well if you're asking me to -- if you're asking

14    me to suppose, I would suppose that the FAA would take

15    your certificates if you don't.

16         Q.    But ycu -- you don't have any --

17         A.    Well, I will give you an example.  I know of

18    a --

19              MR. AMLONG:  He is not asking you for an

20         example.

21              THE WITNESS:  Okay.

22    BY MR. MORALES:

23         Q.    You dcn't have any knowledge of consequences

24    for a pilot that does not report accurate information to

25    the FAA that has been requested by the FAA; is that your
```

64

```
 1    give you the opportunity to find the instruction form.

 2         Q.    If you need a break for a restroom break or

 3    something like that --

 4         A.    We'll take a break.  That's correct.

 5         Q.    -- Mr. Patterson, we'll be happy to --

 6         A.    That's fine.

 7         Q.    -- take a break.

 8         A.    We'll take a break.

 9               And by the way, sir, I'd like to say, you're --

10         Q.    Yeah.

11         A.    Excuse me, Counsel.  I think there's a certain

12    respect, and I'm displaying a certain respect, by

13    addressing you as "Counsel."  I have attained the rank of

14    Lieutenant Colonel in the United States Army.  And this is

15    a military matter, sir.  It does -- this lawsuit does

16    involve a military matter and I introduced you -- myself

17    to you as Colonel Patterson when I walked in the door and

18    I would appreciate the due respect.  It's a professional

19    courtesy.

20         Q.    Noted, sir.

21         A.    Thank you.

22         Q.    Would you like to take a break now?

23         A.    I would.

24         Q.    Great.

25               THE VIDEOGRAPHER:  All right.  Let's go off the
```

51

1      A.     That's my testimony.

2      Q.     -- a basic question, Mr. Patterson, which is:

3   When you're filling out an FAA form, are you aware of any

4   consequences from the FAA if you do not provide true and

5   accurate information on that form?

6          MR. AMLONG:  That's a yes-or-no answer.

7          MR. MCRALES:  Correct.

8          THE WITNESS:  Am I aware?  Yes.

9   BY MR. MORALES:

10     Q.     Okay.  Are there any particular consequences

11  that you're aware of?

12     A.     As I stated to you, they took a pilot's

13  certificate for not reporting a DUI.

14     Q.     Okay.

15          MR. MCRALES:  I will ask you to mark as

16      Exhibit 4, this document.

17              (Exhibit 4, FAA Airman Medical Certificate,

18          First Class, was marked for Identification.)

19  BY MR. MORALES:

20     Q.     Mr. Patterson, I would ask you to identify this

21  document, if you could.

22     A.     This is an FAA Airman Medical Certificate,

23  First Class.

24     Q.     And is this the certificate from the FAA that

25  you were referring to earlier?

52

1     A.     No, it is not.

2     Q.     Okay.  What are the differences between this

3   and the, I believe it was, the airman certification first

4   class?

5     A.     Well, you're asking me if this is the document

6   that I was referring to by Antosek.  It is not.  It's by

7   Dr. Tordella.

8     Q.     So is it accurate to say this is an earlier

9   medical certificate --

10    A.     That would be correct, sir.

11    Q.     -- that you referred to?  Okay.

12           And you mentioned Dr. Tordella.  Was that an

13   examiner that you had previously been examined by?

14    A.     It is.

15    Q.     Okay.  And had Dr. Tordella previously provided

16   you a medical certificate first class?

17    A.     He had.

18    Q.     Okay.  And is there a way -- looking at this

19   document, which is Patterson Tordella 00001, is there a

20   way to determine on this document the duration for the

21   medical certificate that we're looking at?

22    A.     Look at the limitations section.

23    Q.     And if I look at the limitations section, it

24   says [as read]:  Not valid for any class after 1-31-2018.

25           Is that what you are referring to?

53

```
 1        A.    That's correct.

 2        Q.    So this cert -- certificate is val- -- was

 3   valid through January 31, 2018; is that correct?

 4        A.    That's correct.

 5        Q.    Okay.  And at that -- so let me ask you:  What

 6   happens after January 31, 2018, with respect to your FAA

 7   medical cert -- certification?  Do you have to receive

 8   another certificate?

 9        A.    You dc.

10        Q.    Okay.  And do you recall when you went for your

11   examination to receive the medical certificate that

12   followed this Exhibit 4 that we are looking at?

13        A.    I do.  It was in February 2018.

14        Q.    Okay.  So in February 2018, you went to Dr. --

15        A.    Antosek.

16        Q.    -- Antosek for an examination for a certificate

17   that would follow Exhibit 4?

18        A.    That is correct.

19        Q.    Okay.  For purposes of this certificate from

20   Dr. Tordella, Exhibit 4, what steps did you have to take

21   in order to get this medical certificate?

22        A.    What steps?

23        Q.    Were you examined by Dr. Tordella?

24        A.    Absolutely.

25        Q.    Okay.  Did you submit a form to Dr. Tordella
```

54

```
 1    answering questions regarding your medical status?

 2         A.    No.   As I've said before, the form is a -- it's

 3    an online application.   All pilots do this.   It's been

 4    done for several years now.   And I submit it to the FAA.

 5    It goes into their database.   I'm issued a -- a unique

 6    number that Dr. Tordella uses to extract that application

 7    from their computer system.   And as he does his

 8    examination and whatever it is that doctors do, he

 9    completes the form online and then submits it to FAA.   And

10    what you get is a copy or you get a denial.

11         Q.    So the form that you fill out goes the FAA,

12    generally, as opposed to a specific doctor for each

13    examination; is that correct?

14         A.    The form you fill out, as I've said, is an

15    online application.   And the doctor -- the doctor pulls

16    the online application back out.   I -- I'm not --

17         Q.    Right.

18         A.    -- aware of the specifics of how that works.   I

19    do know that the doctor pulls it out.   He looks at the

20    application.   He questions you about facets of that app --

21    that application and it's determined.

22         Q.    Do you submit the form that you're referring to

23    each time you go to an examiner like Dr. Tordella?

24         A.    You're asking if there is a paper form?

25         Q.    No.   My question is -- you've described this
```

55

```
 1    online form.  Dc you fill that form out each time you go

 2    to a medical examiner?

 3        A.    You dc.

 4        Q.    Okay.

 5        A.    And it's not a form.  It's a -- it's an

 6    application with, you know, radio buttons and whatever.

 7        Q.    Okay.  And -- and if I look at Exhibit 4, it

 8    says [as read]:  Date of examination, 7-18-2017.

 9              Do you see that?

10        A.    I do.

11        Q.    And as you noted, the limitation period says

12    it's valid through 1-31-2018?

13        A.    That's correct.

14        Q.    So is it approximately a six-month duration for

15    these medical certificates?

16        A.    For an airman medical certificate, first class,

17    there is a six calendar month duration on that.

18        Q.    So twice a year you submit the online

19    application you just described; is that correct?

20        A.    That's correct.

21              MR. MCRALES:  Okay.  I'd like to please mark as

22         Exhibit 5.

23                (Exhibit 5, FAA Form 8500, was marked for

24           Identification.)

25    BY MR. MORALES:
```

119

```
 1    would be furloughed.

 2            At the time, that was about May of 2004.  My

 3    daughter was being born, so that really kind of set our

 4    family upside down and on an end because my wife was

 5    imminently going to deliver our child and here American is

 6    telling me "You're not going to be in Miami anymore.  Now

 7    you've got to travel to New York."

 8            In October of 2004, I was officially furloughed

 9    with American Airlines.  And they flowed us back to

10    American Eagle at the time.  I had a captain's job at

11    American Eagle.  And during my time at American Eagle, I

12    was offered a full-time position with the Army.  And so I

13    accepted that full-time position with the Army and went on

14    active duty.

15            I returned in about, I would say it was about

16    2008 time frame, I returned to American Airlines -- 2007

17    or 2008, I'm not exactly sure of the date.  But I returned

18    to American Airlines and I was given a -- I was assigned

19    as a first officer again on the 737, got a type rating on

20    the aircraft.  And then, in about the 20 -- it was about

21    the 2010 time frame, 20 -- I think it was a little later,

22    2011, I went to the 757 and became a first officer on the

23    757, 767.

24    Q.    And you were in that position as a first

25    officer on the 757 through 2016 or 2015; is that correct?
```

120

```
 1        A.      September of 2015.

 2        Q.      And at that time, you were 757 first officer?

 3        A.      That's correct.

 4        Q.      Okay.  And you were based in Miami?

 5        A.      Based in Miami.

 6        Q.      Okay.  You mentioned an active duty position

 7   with the Army.  Was that shortly after your furlough?  I

 8   know you'd mentioned some time flying at Eagle as well.

 9        A.      Well I didn't fly for Eagle.  Eagle put us in a

10   holding pattern because they couldn't train us.  So, you

11   know, but after that, I went on active duty with the

12   military.  So I never went to training with American

13   Eagle, except for ground school.

14        Q.      Okay.  And what was the active duty position

15   with the Army?

16        A.      I was a counter drug programs and resources

17   manager for the Army.  In other words, I had an

18   $80 million counter drug budget that I was responsible for

19   managing.

20        Q.      And where were you based at that time?

21        A.      In Miami.

22        Q.      At a base in Miami?

23        A.      No.  At United States Southern Command.

24        Q.      And what was the nature of your job

25   responsibilities in that position?
```

171

```
 1    the White House and getting clearances to the White House

 2    and I didn't get a notice until late in the game.

 3         Q.    Okay.  So you received a phone call from who?

 4         A.    I received a phone call from the personnel

 5    officer at the Pentagon, just basically advising me "Hey,

 6    you're -- you -- you -- you've possibly have been tasked

 7    and you're -- you should be prepared to execute."  They

 8    call it a "warning order."

 9         Q.    Do you recall who the personnel officer was?

10         A.    I don't recall the name of the person, but I --

11    I do know that it was -- that it was explicit that I would

12    travel to Washington, D.C., on the -- on the 21st -- or,

13    excuse me -- on the 22nd.  I stand corrected.  It would be

14    travel on the 22nd and, for the record, I was at the White

15    House on the 23rd.

16         Q.    The person- -- the personnel officer, were they

17    in the personnel office?

18         A.    Usually, it's in the -- usually, it's in the

19    office of public relations.

20         Q.    I'm asking for this personnel office.

21         A.    I'm just saying, the personnel officer is not a

22    central location.  Each office within the Pentagon has a

23    personnel officer that handles administrative actions.

24    They handle pay and such.

25         Q.    And which particular office was this personnel
```

174

```
 1    correct?

 2        A.    That's correct.

 3        Q.    And you don't remember the name of that person?

 4        A.    I don't recall.  It's been -- the people at the

 5    Pentagon change.  They change positions and they leave

 6    jobs and they go to different jobs.  And so I -- I don't

 7    recall.  I dealt with so many people in the Pentagon.

 8        Q.    Do you recall if that person identified

 9    themselves when they called you about the September 22nd

10    military leave?

11        A.    Usually, I would get a phone call that would go

12    to the effect of "Hey, this is -- this is the department

13    of the Army and you've been identified and we'd like you

14    to -- we'd like you to appear."

15        Q.    You said this call happened a few days before

16    the duty.  Is that --

17        A.    I would say it possibly came in on -- I

18    notified -- I notified the Miami flight office on Monday

19    morning when they were first open.  And --

20        Q.    Do you have a date?

21        A.    Yeah.  It was on the 21st of Sept- -- it was on

22    the 21st of September.  I called early in the morning and

23    I provided notice.

24        Q.    Okay.  We'll -- we'll get to that in a second.

25    I'm -- I'm curious about your discussions with the -- the
```

177

```
 1        A.    Possibly.

 2        Q.    Is your -- is your testimony that that's the

 3   reason you didn't call the Miami flight office on Friday?

 4        A.    I'm saying, for whatever reason I didn't

 5   contact them, it was more likely than not that the flight

 6   office was closed.

 7        Q.    Did you contact anyone at American Airlines

 8   about the Pentagon duties starting on September 22, 2015,

 9   that particular Friday?

10        A.    I contacted the Miami flight office on the 21st

11   of September, 2015.  And I provided notice that I was

12   going on military leave the following day.  And, because

13   I'm a conscientious employee and followed -- and followed

14   up, I called again to the flight office to verify the

15   status.

16        Q.    On the Friday that you received the call from

17   the personnel officer, did you have any trips scheduled

18   with American Airlines?

19        A.    I don't recall if I had a trip scheduled over

20   the weekend or not.

21        Q.    Do you recall when the next trip you had

22   scheduled with American Airlines?

23        A.    I know that the trip I was calling in reference

24   to departed on the 22nd of September of 2015.  And in

25   accord --
```

178

1          Q.      The American Airlines trip?

2          A.      Yes.  And in accordance with USERRA, I provided

3     advance notice that I was going on military leave.  And

4     that's my estimation of what's required of me under the

5     federal law.

6          Q.      So I want to make sure I have this right.  On

7     September 19, 2015, you received a call from the

8     Pentagon's personnel officer giving you a, quote, "warning

9     order" about military duties to be performed

10    September 22nd to September 25, 2015; is that correct?

11         A.      That's correct.

12         Q.      And at the time you received that phone call,

13    you had a trip scheduled for American Airlines that began

14    on September 22, 2015; is that correct?

15         A.      That's correct.

16         Q.      Do you recall where that trip was scheduled to

17    take you for American Airlines?

18         A.      Santa Cruz, Bolivia.

19         Q.      Okay.  So, on September 19th, when you received

20    the warning order from the Pentagon, you had a

21    international trip scheduled to be flown by you for

22    American Airlines; is that correct?

23         A.      On the 22nd of September.

24         Q.      Correct.  And at the time you received the

25    warning order from the Pentagon's personnel officer,

1    September 19, 2015, you did not contact anyone at

2    American Airlines that day regarding the warning order; is

3    that correct?

4        A.    I did not.

5        Q.    Did you contact anyone on September 20, 2015,

6    at American Airlines --

7        A.    I made no --

8        Q.    -- regarding the warning order?

9        A.    I made no contact with anyone on September 20th

10   at American Airlines.  The flight office -- and I might

11   remind you, the flight office was closed on the 20th of

12   September.  It's a Sunday, sir.

13       Q.    Do pilots have any way to get in touch with

14   American Airlines on Saturday and Sunday, Mr. Patterson?

15       A.    They certainly do.

16       Q.    And what are the --

17       A.    It's called the "SOC duty chief" and it's who I

18   had to call on September 21st after Captain Bonds denied

19   me military leave.

20       Q.    So on September 19th -- and -- and just so I'm

21   clear:  The -- the SOC chief, is that who you referred to?

22       A.    System operations control duty chief.

23       Q.    And is it accurate to say that the systems

24   operation -- sorry -- systems operation chief?  Is that

25   proper term?

180

```
 1        A.     SOC duty chief.

 2        Q.     SOC.  Is it accurate to say that the SOC duty

 3   chief has a phone line that's available 24/7/365?

 4        A.     No, they do not.

 5        Q.     And what -- and what days or hours does the SOC

 6   duty chief became unavailable?

 7        A.     Well, I called the SOC duty chief on the 21st

 8   of September.  It was in the evening, about 5:00 o'clock,

 9   6:00 o'clock possibly, because the Miami flight office had

10   closed.  And I got -- I got -- I got no notice from -- no

11   return call and I was very concerned about that.  As I

12   said, I'm a conscientious employee.

13            I provided you note -- listen.  I provided you

14   notice and I asked for time off.  And I complied with

15   USERRA.  And because I'm conscientious, I made a follow-up

16   phone call.  I even -- I think I went too far in trying to

17   provide you notice because I ended up getting David Tatum

18   in the evening and providing him notice that I had

19   military leave and I had no problem.

20            Then, later on in the evening, I get a notice

21   from Captain Bonds that was translated very late, because

22   of the telephone service, which said "I'll give you

23   military leave if you can produce a set of orders."

24        Q.     So we'll get to --

25        A.     And that doesn't sound like Captain Bonds
```

```
 1    military operates that way.  They send what's called a

 2    "warning order" to a unit.  They tell the unit "Hey, stand

 3    by to execute."  It doesn't necessarily mean you're going

 4    to do that, but I'll tell you they -- they do say -- well,

 5    if you come up at a later point and say, "Well, we didn't

 6    do what you -- you told me to," they're going to say,

 7    "Well, you know, we kind of gave you a heads-up that --

 8    that that's the direction we were going."

 9           And sc, you know, lack of getting there or

10    whatever is not going to be an excuse.  You're expected to

11    go.

12    Q.    Did you tell the person office -- personnel

13    officer that you had a trip scheduled for American

14    international -- American Airlines to an international

15    destination for September 22nd --

16    A.    No, and I'm not required to, sir.  You got to

17    understand.

18    Q.    Why --

19    A.    No, ycu got to understand:  The military takes

20    precedence in this.  So are you telling me

21    American Airlines doesn't support its veterans?

22    Q.    Did you receive any orders associated with this

23    phone call regarding the duty that was scheduled for

24    September 22nd to September 25th?

25    A.    Okay.  You've asked this question about a
```

1    hundred times about orders.  And I'm going to clarify

2    something for you.  Okay?  I'm assigned as an individual

3    mobilization augmentee to the Pentagon.  That's a very

4    special position.  It is for senior military officers,

5    that's generally who fills that billet.  It's majors and

6    above.

7           As I said to you before, I am a part-timer and

8    I backfill an active duty requirement.  The active duty

9    does not eat, sleep, or breathe American Airlines.

10   They -- they operate on their own time frame.  And I would

11   certainly hope that American Airlines realizes that, with

12   an American flag plastered on the side of the airplane,

13   that there's a certain responsibility to support the

14   defense of the United States.  And whether I go into the

15   Pentagon and sweep the floor or answer the telephone for a

16   general officer, it is duty in support of the national

17   defense of the United States.

18        Q.    So just to repeat my question:  Did you receive

19   any orders to --

20        A.    As I said, I did not, sir.

21        Q.    Just to complete my question:  Did you receive

22   any orders to participate in any military duties between

23   September 22nd and September 25, 2015?

24        A.    Okay.  I'm going to clarify this for you.

25   You've asked this question several times and we are going

211

```
 1    keep checking your watch.  I don't know if there's
 2    something other than time that you're reviewing there.
 3    Any messages or anything like that?
 4        A.    No, there's no message.  I was reviewing time.
 5        Q.    Okay.
 6        A.    Because I need to take a break, sir.  I'm
 7    sorry.  I need to use the restroom.
 8        Q.    Okay.
 9        A.    I'm trying to be polite to you, but, you know,
10    at certain time, I mean, I need to use the restroom.
11    Thank you.
12            MR. MCRALES:  We are off.
13            THE VIDEOGRAPHER:  Off the record.  The time is
14        4:26.
15            (Thereupon, a recess was taken.)
16            THE VIDEOGRAPHER:  Okay.  We are now back on
17        the record.  The time is four -- time is 4:33.  Media
18        Number 5.
19    BY MR. MORALES:
20        Q.    Colonel Patterson, I believe we were discussing
21    the midmorning period or morning period of September 22,
22    2015, and your arrival at the Pentagon.
23            You testified that you arrived at the Pentagon,
24    perhaps by yourself, perhaps with your wife, and
25    immediately went to meet with Lieutenant Colonel Reynolds;
```

212

```
1    is that correct?

2         A.    That's correct.

3         Q.    And do you recall where in the Pentagon that

4    you met with Lieutenant Colonel Reynolds?

5         A.    It would have been in the public relations

6    office.

7         Q.    Okay.  And Lieutenant Colonel Reynolds is based

8    in the public relations office?

9         A.    He was.

10        Q.    And what was Lieutenant Colonel Reynolds'

11   position in that office?

12        A.    He worked as a public relations officer on the

13   Army staff.

14        Q.    And do you recall what duties, if any, you

15   performed at the Pentagon on that day, September 22, 2015?

16        A.    I got a briefing on what we were going to do at

17   the White House the following day.  And I usually get a

18   briefing on kind of what the -- what the expectations are

19   for the -- for the day and for my performances of duties.

20             I usually will follow up with what I did

21   previously.  In other words, close any kind of loops with

22   the -- with the military to make sure that, you know,

23   whatever duty I did before was complete.  Usually, we do

24   personnel activities which involve, you know, pay, involve

25   different -- different military requirements.
```

213

```
 1        Q.    And sc did the -- the Pentagon's public

 2    relations office have a role in the pope's visit to the

 3    White House?

 4        A.    The public affairs office always has a role any

 5    time the Army is going to show up at any event.

 6        Q.    So did the public relations office at the

 7    Pentagon have a role in the pope's visit to the

 8    White House?

 9        A.    I actually wrote a story about the pope's

10    visit, that -- that I submitted for publication, and

11    talked about a lot of initiatives that the pope had that

12    involved the Army.

13        Q.    So, again, for the third time:  Did the public

14    relations office at the Pentagon --

15        A.    I think I answered your question, sir.

16        Q.    Did -- did the public relations office have a

17    role in the pope's visit at the White House?

18        A.    Absolutely.

19        Q.    And what was the public relations office

20    specific role at the White House during the pope's visit?

21        A.    Okay.  Sir, any time the Army participates in

22    an event, for anything, the Army is usually, you know,

23    the -- is usually the group that does -- that does the

24    hosting of foreign visits, that does a -- a -- this was a

25    welcoming ceremcny for the pope.  So the Army is there.
```

```
 1    The Army is physically present.  The Army assigns public

 2    relations officers to -- to be present if there are news

 3    media there that have questions regarding the Army, you've

 4    got a public relations officer there that can answer those

 5    questions, that can speak on behalf of the Army.

 6         Q.    And all of those things happened at the pope's

 7    visit at the White House, is your testimony?

 8         A.    All of those things, the Army -- I didn't

 9    personally speak to any news reporters, but had -- had any

10    one of those guys availed themselves for questions, then I

11    would have been available to answer questions, as well as,

12    you know, Colonel Reynolds and anybody else standing there

13    that was in Army public relations.

14         Q.    So were you appearing in an official capacity,

15    then, for the public relations office at the pope's visit?

16         A.    As I said, the briefing I got was the "We would

17    like -- we would like to have public relations people

18    present at the -- at the pope's function."  And I did

19    appear at the White House.  And I took a picture of me on

20    the South Lawn of the White House, in full uniform.  I

21    think you've the picture, correct?

22         Q.    I don't believe we do.

23         A.    Okay.

24         Q.    We haven't seen that.  We certainly would

25    appreciate --
```

219

```
 1    public relations office was going to perform official

 2    duties at the pope's visit at the White House?

 3        A.    Well, that's kind of a loaded question because

 4    the Army public affairs office will -- the Army public

 5    affairs office will attend most events.  And, you know, I

 6    think it's irrelevant whether the duty -- whether you say

 7    the duty's official or not.  I provided you notice of

 8    military leave.  And I was obviously there.  Excuse me,

 9    sir.  I was obviously there.  And so, you know --

10        Q.    So I'm going to ask my question --

11        A.    You're asking me to spec- -- so you're asking

12    me to speculate.

13        Q.    -- Colonel -- Colonel Patterson, which is:

14    When did you first become aware that the public relations

15    office would be represented at the pope's visit --

16        A.    I became aware --

17        Q.    -- at the White House?

18        A.    I became aware that I was going about the 19th

19    of September.

20        Q.    And my question is:  When did you become aware

21    that the public relations office would be represented at

22    the pope's visit?  Was it prior to --

23        A.    I became aware -- I don't recall --

24        Q.    Was it prior --

25        A.    -- I don't --
```

220

```
 1        Q.     -- to September 19th?

 2        A.     -- I don't recall -- I don't recall being

 3   specifically tasked.  We -- we -- we attend calendar calls

 4   and the Army will talk about events that are events that

 5   are coming up.  And, in particular, at this time of the

 6   year, I have a year with which to perform duty.  In other

 7   words, to get a -- a good retirement year.  So you have a

 8   year with which to earn 50 points.  In that time frame,

 9   I've notified the Army that "Hey, I'm running out of time

10   and I need -- I need you to, you know, I need you to find

11   me a job to do to, give me some work to do so that I

12   can" --

13        Q.    In this time frame, you were running out of

14   time?

15        A.    Well, it'd be -- it's in September.  I'm

16   running out of time for a good year.

17        Q.    So the end of the year is December 31st; is

18   that correct?

19        A.    No, it's not, sir.

20        Q.    When is the end of the year?

21        A.    The end of the fiscal year is September the

22   30th.

23        Q.    So you were -- you were eight days out of the

24   end of the fiscal year and you were short on points?

25        A.    I was short on points.
```

221

```
 1        Q.    How many points short were you at the time?

 2        A.    I don't recall.  But I know that, when I

 3   finished up my duty on the 25th of September, I had -- I

 4   had adequate points to -- for a good retirement year.

 5        Q.    Did you have adequate points September 22nd?

 6        A.    I didn't have adequate points on the 19th, I

 7   can tell you that.

 8        Q.    And so it's your testimony that, but for your

 9   service on September 22nd to 25th, that you would not have

10   had sufficient points by the end of the September 30th

11   fiscal year?

12        A.    From the duty I performed, which was the --

13        Q.    It's just a yes or no question.

14        A.    -- performed -- from the duty I performed, I

15   got eight points.  Eight retirement points for the duty

16   that I performed.

17        Q.    And so the question is --

18        A.    So I could have been short -- I could have been

19   short a point, I could have been short two points.  It's

20   irrelevant.  The Army -- the Army is the one that dictates

21   the duty dates.  I pretty much have to negotiate with the

22   unit when I'm going to perform my duty to the -- to the

23   aspect of they drive the train and they will provide the

24   dates of availability.

25        Q.    Sorry.  You said it's irrelevant in part of the
```

227

1   anyone?

2        A.    I did not communicate that to anyone.  I'm not

3   required to.

4        Q.    When you got the call on September 19th from

5   the public relations personnel officer, were you surprised

6   to receive the call providing for duty in Washington,

7   D.C., during the pope's visit?

8        A.    I was pretty relieved.

9        Q.    Were you surprised?

10       A.    I wasn't surprised.  I was relieved.

11       Q.    And why weren't you surprised?

12       A.    Well, on the 19th, I still had time till --

13   until the end of the month, to perform military duty.  So

14   if it -- if they hadn't -- if they hadn't generated

15   something by the 22nd, I was actually -- I would have

16   gotten back in touch with them and said "Hey, we're

17   getting danger close here and I need time.  And you're

18   going to have to find some time for me to do."

19       Q.    And just to be clear:  What was the scheduled

20   departure date for your American Airlines flight to

21   Bolivia?

22       A.    The 22nd of September.

23       Q.    And your testimony just now is if you hadn't

24   heard from the Army by September 22nd, that you would have

25   called the Army and requested a duty period prior to

250

```
 1    whether to let you use next year's vacation accrual for

 2    the time off requested?

 3        A.    I think that's contractual for an EO.

 4        Q.    So, tc your knowledge, does the chief pilot

 5    have discretion on that?

 6        A.    I mean, I think the chief pilot, if he says

 7    "No, I'm not going to giver you an EO," it's pretty clear

 8    that you're not getting the time off.

 9        Q.    And why did you request an EO for this trip to

10    Washington?

11        A.    Well, very simple.  I had a trip that covered

12    22, 23 and 24.  And I wished to offset that trip due to a

13    military reason.  And I wanted it to come out of my next

14    month's vacation bank, which is a right guaranteed me

15    under USERRA.

16        Q.    And fcr that reason you decided to not request

17    a military leave of absence for your trip to Washington,

18    D.C.; isn't that correct?

19        A.    It's my understanding that the chief pilot

20    could have said "I'm going to code this as MX.  I'm going

21    to release you from duty."  And, you know, I would have

22    had to have accepted the decision.

23        Q.    Sorry.  I don't follow your -- your answer.

24              Did -- did -- did you request a military leave

25    of absence for purposes of your trip to Washington, D.C.?
```

251

```
 1        A.    I requested, from the flight office, an EO, as

 2   I've been granted in -- in -- in times past, to cover --

 3   to cover military leave.  And I said "Hey, I -- I have

 4   military leave.  I'm going to be going to the Pentagon.

 5   And I would appreciate if I could get an EO."  And I spoke

 6   with -- I -- I think I spoke with Trish in the flight

 7   office.

 8        Q.    Who is Trish?

 9        A.    She is some employee.  Jim Bonds left a message

10   on my answering machine telling me I had spoken with Trish

11   in the flight office.

12             Excuse me.

13        Q.    Why had you requested a military leave of

14   absence for your August 2015 trip?

15        A.    Why would I do that?  I don't have the schedule

16   in front of me, but it's possible that my military duty

17   might have impinged on a trip with American Airlines, and

18   I was per- -- I was requesting the time off.  I can't

19   answer your question without more information.

20        Q.    So this is the August trip that we were just

21   looking at a moment ago in Exhibit 11.  August 21st, '15

22   to August 23rd, '15.  Do you remember that?

23        A.    Yeah.  But you've given me two separate

24   documents.  You haven't -- you haven't provided me with

25   this document for August.
```

298

```
 1        time is 6:27.
 2                (Thereupon, a recess was taken.)
 3                THE VIDEOGRAPHER:  We are now back on the
 4         record.  The time is 6:35.
 5    BY MR. MORALES:
 6        Q.    Colonel Patterson, at some point in
 7    September 2015, were you informed by American Airlines
 8    that you were being withheld from service?
 9        A.    I was.
10        Q.    And when was that notification provided?
11        A.    I was notified by Captain Bonds on the 25th, by
12    a -- by a voice message on my phone.
13        Q.    And did you receive any accompanying written
14    correspondence from Captain Bonds?
15        A.    I did, several days later via FedEx.
16                MR. MCRALES:  I'll just put before you -- is it
17         Exhibit 19?
18                THE REPORTER:  Mm-hmm.
19                (Exhibit 19, Letter from Captain Bonds, was
20            marked for Identification.)
21    BY MR. MORALES:
22        Q.    Exhibit 19.  Is this the written documentation
23    that you received from Captain Bonds?
24        A.    Appears to be.
25        Q.    Okay.  And I note at the top, this is the date
```

```
1    of September 25, 2015.  You said that's the day that

2    Captain Bonds contacted you by phone?

3         A.    That's the day I got the telephone call.

4         Q.    Okay.  And I note, at the bottom of this

5    document, it says "CC APA Legal."  Is that the legal

6    department of the Allied Pilots Association?

7         A.    I would say that would be safe to assume so.

8         Q.    Okay.  This document, subject line withhold

9    from service, says [as read]:  As discussed on

10   September 24th, 2015, this letter confirms I'm withholding

11   you from service with pay pending the outcome of an

12   investigation into the circumstances surrounding a work

13   environment complaint that was reported by a coworker.

14             First, it looks like Captain Bonds' letter on

15   September 25th said there was a discussion on

16   September 24th.  Is that different than your recollection?

17        A.    I don't recall having a conversation with

18   Mr. Bonds on September the 24th.

19        Q.    Okay.  So in your view it was September 25th.

20   And in the view of Captain Bonds as of September 25th, the

21   discussion had occurred the day before; is that correct?

22        A.    I never had a conversation with Captain Bonds

23   reference to PW.  I --

24        Q.    Did you have a conversation with Captain Bonds

25   on September 24th?
```

```
 1        A.    I had no conversation with him on the 24th

 2   either.

 3        Q.    Okay.  The paragraph I just read references, it

 4   says the investigation is, quote, "into the circumstances

 5   surrounding a work environment complaint that was reported

 6   by a coworker."

 7              What is the work environment complaint that was

 8   reported by a coworker?

 9        A.    Well, I think Bonds was referring to -- it's

10   supposed to be a workplace environment complaint that was

11   reported by a coworker.

12        Q.    Well --

13        A.    And, of course, I never had a conversation with

14   him on the 24th or the 25th.  Captain Vitale had a

15   conversation with him --

16        Q.    I'm sorry?

17        A.    -- on the following Monday.

18        Q.    Your testimony now is that you didn't have a

19   telephone conversation with Captain Bonds?

20              MR. AMLONG:  That's always been his testimony.

21              THE WITNESS:  That's always been.  I never had

22         a conversation with Mr. Bonds.

23   BY MR. MORALES:

24        Q.    You -- did you read --

25        A.    This is a lie.  This is a lie.  September 24th
```

301

```
 1    is a lie.  I did not have a conversation with him.

 2        Q.    Did you receive a phone call at any point in

 3    September 2015 from Captain Bonds about this --

 4        A.    Captain Bonds left a message on my recording

 5    and it was very garbled.  And he basically said that there

 6    was a workplace environment-related complaint.  And I

 7    didn't get the whole crux of what he was saying.  The --

 8    the only thing that came out very clear was, is that

 9    "You're not allowed to use your flight privileges" --

10        Q.    And that voice mail was on September 24th?

11        A.    -5th.

12        Q.    Okay.  So September 20- -- your testimony is

13    that you received a voice mail -- you listened to the

14    voice mail on September 25, 2015?

15        A.    I didn't receive it on the 24th.  I received it

16    on the 25th.

17        Q.    Okay.  But you received a voice mail no later

18    than September 25, 2015, from Captain Bonds.

19              And my question was:  What is the work

20    environment complaint that was reported by a coworker?

21        A.    What is the work -- what is a work environment

22    complaint or what is it?

23              MR. AMLONG:  Do you -- do you know what he was

24        talking about --

25              THE WITNESS:  Well, I --
```

363

```
 1                REPCRTER'S DEPOSITION CERTIFICATE

 2

 3              I, ELIZABETH CORDOBA, RMR, CRR, FPR,

 4      certify that I was authorized to and did stenographically

 5      report the deposition of RODNEY SCOTT PATTERSON, the

 6      witness herein cn March 6, 2018; that a review of the

 7      transcript was requested; that the foregoing pages

 8      numbered from 1 to 365 inclusive is a true and complete

 9      record of my stenographic notes of the deposition by said

10      witness; and that this computer-assisted transcript was

11      prepared under my supervision.

12              I further certify that I am not a relative,

13      employee, attorney or counsel of any of the parties, nor

14      am I a relative or employee of any of the parties'

15      attorney or counsel connected with the action.

16              DATED this March 15, 2018.

17

18

19                        <%Signature%>

20              _____

                ELIZABETH CORDOBA, RMR, CRR,
21              FPR

22

23

24

25
```

364

```
 1                 VERITEXT FLORIDA REPORTING CO.
               2 South Biscayne Blvd., Suite 2250
 2                   Miami, Florida 33131
                       (305) 371-1884
 3

 4    March 15, 2018

 5

      RODNEY SCOTT PATTERSON
 6    c/o WILLIAM R. AMLONG, ESQ.
      AMLONG & AMLONG, P.A.
 7    500 NORTHEAST 4TH STREET
      FORT LAUDERDALE FL 33301
 8    wramlong@theamlongfirm.com
      RE: RODNEY SCOTT PATTERSON v. AMERICAN AIRLINES, INC., a
 9    Delaware  Corporation
      DEPO OF: RODNEY SCOTT PATTERSON
10    TAKEN  : March 6, 2018
      READ & SIGN BY:  Within 30 Days
11

12    Dear RODNEY SCOTT PATTERSON:

13    This letter is to advise you that the transcript of the
      deposition listed above is completed and is awaiting
14    reading and signing.

15    Please arrange to stop by our office in Suite 2250, 2
      South Biscayne Blvd., Miami, Florida to read and sign the
16    transcript.  Our office hours are from 8:00 a.m. to 4:00
      p.m. Monday through Friday.  Depending on the length of
17    the transcript, you should allow yourself sufficient
      time.
18
      If the reading and signing has not been completed prior
19    to the referenced date, we shall conclude that you have
      waived the reading and signing of the deposition
20    transcript.  Your prompt attention to this matter is
      appreciated.
21
      Sincerely,
22


23
      ELIZABETH CORDOBA, RMR, CRR, FPR
24


25
```

365

```
 1              VERITEXT FLORIDA REPORTING CO.
             2 Scuth Biscayne Blvd., Suite 2250
 2                 Miami, Florida 33131
                    (305) 371-1884
 3


 4   March 15, 2018


 5

     TRISTAN MORALES, ESQ.
 6   O'MELVENY & MYERS, LLP
     1625 EYE STREET, NORTHWEST
 7   WASHINGTON DC 20006


 8

     RE: RODNEY SCOTT PATTERSON v. AMERICAN AIRLINES, INC., a
 9   Delaware  Corporation
     DEPO OF: RODNEY SCOTT PATTERSON
10   TAKEN: March 6, 2018
     READ & SIGN BY:  Within 30 Days
11


12
     Dear Counsel:
13

14   The original transcript of the deposition listed above is
     enclosed for your file.  The witness did not waive
15   reading and signing and has been sent a letter notifying
     them to come in and read and sign their deposition
16   transcript.

17   The witness will be provided a copy of their deposition
     transcript for reading in our office should they come in
18   to review the transcript, and we will forward to you any
     corrections made by the witness at that time, along with
19   an original signature page which should be attached to
     the original transcript which is in your possession.

20


21
     Sincerely,
22


23   ELIZABETH CORDOBA, RMR, CRR, FPR


24


25
```