1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                FORT LAUDERDALE DIVISION
                CASE NO.:  1:17-cv-60533-JEM
 3

 4   RODNEY SCOTT PATTERSON,       )
                                   )
 5           Plaintiff,            )
                                   )
 6   v.                            )
                                   )
 7   AMERICAN AIRLINES, INC., a    )
     Delaware Corporation,         )
 8                                 )
             Defendant.            )
 9   _____)

10

11

12

13        Videotaped Deposition of JAMES N. BONDS

14              (Taken by Plaintiff)

15             Charlotte, North Carolina

16             Thursday, March 15, 2017

17

18

19

20

21

22            Reported in Stenotype by

23           Christine A. Taylor, RPR

24         Registered Professional Reporter

25
```

**ATTACHMENT 2**

1    A.  Well, the one thing I recall most is when Chip
2    Harlow was a captain on the 757, the same equipment
3    that Scott was flying as a first officer, one afternoon
4    late in the afternoon around after lunchtime I got a
5    call from Chip Harlow, and he was saying that, well,
6    this should be an interesting flight because I had been
7    put on to Scott Patterson's flight as a reserved
8    captain.  And I said well -- I mentioned to him good
9    luck, you know, hope it goes, well something along
10   those lines.  And then later the phone call I got from
11   Chip Harlow is that Scott Patterson had dropped the
12   trip and was no longer on the trip.
13       And then that's when I found out that through
14   one of the staff administrators that Scott was -- had
15   called trying to get an EO to get off the trip with
16   Chip Harlow, of which I think I called him back or left
17   a message saying that we are really short of pilots and
18   we needed -- to grant an EO is an employee off, and we
19   really needed him to fly.  We didn't have the bodies.
20   That's what I recall about that.
21       Q.  All right.  Who was the -- who was the
22   administrator?
23       A.  I think it was Trish Grant who told me and
24   then it might have been Luis Rojas, one of those two.
25   I think Luis was in the office, but I think Trish was

```
 1   to you right away, sorry for the trouble.  That's not
 2   what happened.  I felt that he was hiding something
 3   and -- and, quite honestly, it bothered me tremendously
 4   that he is a sworn officer in the military that -- the
 5   pillars of honor and integrity, and I didn't feel he
 6   was upholding those pillars.
 7        Q.   Well, did you not on believe that he was on
 8   duty that day?
 9        A.   I'm sorry, it was a bit distorted.  Did I not
10   leave what?
11        Q.   Did you not believe that Mr. Patterson was on
12   duty that day and was then a colonel in United States
13   Army reserve?
14        A.   No, I did believe that he went to Washington
15   and served in some capacity with his military unit.
16   That was not ever a question in my mind that he was
17   there.
18        Q.   Well, if there was no question that he was
19   there, whether he was there because he did not wish to
20   fly with Captain Harlow or not, what does that matter?
21        A.   It mattered the process because he
22   circumnavigated the process, his supervisor, to begin
23   with.  He never called me.  He went through staff
24   assistance to get off what I appeared to be a trip that
25   he did not want to fly because of the person he was
```

1  in evidence.
2      A. I can tell you I did -- as far as I know and
3  as far as I had anything to do with, he was not on pay
4  withhold status for the military question of providing
5  orders for his absence.  He never was put on pay
6  withhold for that.
7      Q. You put him on pay withheld status during the
8  time that he was in Washington, D.C., on duty;
9  correct?
10     A. I don't know the timing of that.
11     Q. All right.  Well --
12     A. We have -- we would have a pay withhold letter
13 that would have the date on it and the circumstance for
14 why he was being pay withheld.  I don't have those
15 documents.
16     Q. Well, the date -- the date of his service was
17 September 22nd through September 25th; correct?  Take
18 a look at Exhibit 7.
19     A. That is -- you're in reference to the date of
20 his military duty in Washington; correct?
21     Q. Yes.
22     A. Okay.
23     Q. Yes.
24     A. I'll look at LES.  I see that he -- his LES
25 says that he is doing military duty for the 22nd and

1    23rd or that he did military duty then.
2         Q.   His LES shows him on duty through
3    September 25th, does it not?
4         A.   It shows -- yes, it does.
5         Q.   Take a look, please, as Exhibit 14.
6         A.   Okay.
7         Q.   This is an e-mail that's addressed to
8    Mr. Beach from Mr. Whitehouse.  Have you ever seen a
9    copy of this before?
10        A.   I have not.
11        Q.   Take a look at Exhibit 15, please.
12        A.   Do you want me to read all of this?
13        Q.   Well, have you ever seen this letter before?
14        A.   I'm reading it further.  It looks very similar
15   to that first exhibit you gave me from Whitehouse, but
16   I'll have to read it further, but --
17        Q.   Well, the second paragraph says, "Below is a
18   rewritten statement of facts and opinion I wrote last
19   year after my trip on October 7, 2015, for APA
20   professional standards.  I cleaned up grammar and
21   spelling issues."
22        A.   It looks very familiar to what we read
23   earlier.
24        Q.   All right.  Prior to reading Exhibit 1
25   earlier, have you ever seen this letter before?

1     A.  I don't know if I've seen an exact letter like
2  this.  I have seen stories, I don't know if it's a
3  letter, but it's very possible.  I don't know if I have
4  or haven't.
5     Q.  Now, were you in Florida at the time?
6     A.  Question was, was I in Tulsa?
7     Q.  The 24th -- no were you in Florida?  Florida,
8  here, this state.
9     A.  Before this?
10    Q.  On September 24th.
11    A.  I don't know where I was on September 24th.  I
12 guess -- is this the date that Scott Patterson was
13 doing military duty?  I guess I was.  I don't know.
14    Q.  Yes.
15    A.  Okay.
16    Q.  The -- what is the time stamp on
17 Mr. Whitehouse's e-mail to Mr. Beach in closing the
18 letter?
19    A.  Give me a second.
20        MR. MORALES:  Is there a particular page we
21 should be looking at?
22        MR. AMLONG:  Yeah.  Exhibit 14, the very top.
23    A.  They're the same date.  At least --
24    Q.  What's the time?
25    A.  The time stamp is 8:34 p.m.

```
 1        Q.   And look at Exhibit 16 and tell us what that
 2   is.
 3        A.   It says it's 10:17 on the 24th of September.
 4        Q.   And it's from you to --
 5        A.   The Miami chief pilots.
 6        Q.   -- Mr. Scialfa, Beach, and Mase; correct?
 7        A.   Correct.
 8        Q.   And it's to --
 9        A.   What was the question again?  What is --
10        Q.   What's the subject?
11        A.   Patterson is now on PW.
12        Q.   That refers to Scott Patterson?
13        A.   Yes.
14        Q.   And does this e-mail refresh your memory as
15   to whether or not you had seen Mr. Whitehouse's letter
16   to Mr. Beach --
17        A.   No, it doesn't.
18        Q.   -- that evening?
19        A.   Doesn't one way or the other refresh my
20   memory.
21        Q.   The first line says, "Jackie, Mark, and
22   Lucretia all have seen the letter and are taking
23   action."  Who's Jackie?
24        A.   Jackie is the managing director of HR at
25   American Airlines, Jackie Rios.
```

```
 1        Q.   The managing director of what?
 2        A.   Of HR, I think.  I'm sorry, I don't know her
 3   title.  But her name is or was Jackie Rios.  And Mark
 4   is Mark Cronin and Lucretia is AA legal.
 5        Q.   And when you say all have seen the letter and
 6   are taking action, what is the letter to which you
 7   refer?
 8        A.   I really don't know.  I really don't.  I don't
 9   remember even writing this letter, so --
10        Q.   And then the -- this is written like an hour
11   and a half after Mr. Whitehouse transmitted Exhibit 15
12   to Mr. Beach; correct?
13        A.   I don't know when he transmitted it.  I just
14   see it was dated -- I mean, on the -- yeah, Exhibit 14,
15   yeah, but I'm not in on that letter.  I know nothing of
16   that.
17        Q.   So you don't think that -- you don't think
18   that letter has anything to do with your records to,
19   quote, the letter, closed quote, in Exhibit 16; is
20   that what you're saying?
21        A.   I really don't know what it's in reference to,
22   if it's this letter from Whitehouse or his HR complaint
23   or what it's to.  I really -- I don't know that.  It's
24   possible.  I don't know.
25        Q.   Well, let's look at Exhibit 17.  Do you
```

```
 1              MR. MORALES:  Right.
 2              MR. AMLONG:  We sent you copies of these, did
 3   we not.
 4              MR. MORALES:  Of the exhibits?
 5              MR. AMLONG:  Yes.
 6              MR. MORALES:  No.  We just have paper copies,
 7   I think.  But I just -- I didn't know if that was
 8   helpful.  We saw Patterson.docx on Exhibit 16, so --
 9              MR. AMLONG:  The -- this appears to be the
10   letter attached to the letter from -- the e-mail from
11   Rojas to Cronin, Bonds, Mase, and Scialfa; subject,
12   withhold from service, FO Rodney Scott Patterson; good
13   morning, please reference these documents where the
14   letter accepted this afternoon by Rodney Scott
15   Patterson.  So -- and I can't tell that's docx.
16              MR. MORALES:  I'm not sure, were you speaking
17   to me or to Mr. Bonds?  I'm not sure we followed your
18   last statement.
19              MR. AMLONG:  I was speaking to you.  The --
20   whatever comes after -- whatever comes after 16 or 17
21   is privileged, so I don't have that.
22              BY MR. AMLONG:
23       Q.  The -- do you recognize that letter,
24   Mr. Bonds?
25       A.  I do recognize Exhibit 17.
```

```
 1        Q.   And do you remember sending it?
 2        A.   I do not remember sending it, but it's a
 3   standard form, FW, pay withhold letter that we sent.
 4   We just changed -- just changed the names and the date
 5   and the circumstance, and that's it.
 6        Q.   And it refers to a work environment
 7   complaint.  Is the work environment complaint the
 8   letter from Mr. Whitehouse?
 9        A.   I don't know that.  And if you'll allow me to
10   explain myself.  As chief pilots, we have the ability
11   to sign the letter to represent the flight office, and
12   I don't know if that's the letter.  And I was single at
13   the time living in Miami and the other chiefs were
14   married with families.  And quite often issues would
15   arise after hours or during hours, and I would get the
16   call by default because they knew that I was at home by
17   myself.  So this letter was signed by me and it looks
18   like the standard form letter that I sent to Luis or
19   had Luis prepare for my signature and sent out FedEx.
20        Q.   It states, "As discussed on September 24,
21   2015," what was discussed and with whom on
22   September 24th?
23        A.   I can't recall if the discussion was with me,
24   Scott Patterson or Brian Beach or what.  I can't recall
25   that.
```

1  which is effectively a code for unanticipated personal
2  absences. He told Captain Bonds that he wanted the EO
3  because the captain on his trip the following day was
4  a representative from APA professional standards and
5  he and the captain did not get along."
6        Is that true?
7     A. I don't remember any conversation with Scott
8  Patterson.
9     Q. Did you ask Mr. Patterson to see his orders?
10    A. I asked for his orders. I did. I said,
11 "Would you please provide a copy of your orders."
12    Q. So in the next paragraph --
13       MR. MORALES: I'm just going to ask, there's
14 some highlighting here, Bill, is that highlighting that
15 you placed on there?
16       MR. AMLONG: Yes.
17       MR. MORALES: Okay, to Exhibit 24. Thanks.
18       MR. AMLONG: Yeah.
19    Q. "It did not specify the type of verification,
20 i.e., it did not demand military orders." So that's
21 incorrect; right?
22    A. I'm sorry, it's a little distorted. The
23 question was -- one more time, please.
24    Q. Did you -- you asked for military orders;
25 correct?

```
 1          A.   I asked him, yes.
 2          Q.   For military orders?
 3          A.   I did.  I asked him would he please provide
 4     orders for his absence.
 5          Q.   In the next paragraph it refers, "On or about
 6     September 24, 2015, however, a pilot's co-worker
 7     lodged a formal complaint regarding FO Patterson's
 8     conduct."  And is that the same complaint that
 9     Mr. Whitehouse had made in Exhibit 1, correct, in
10     March?
11          A.   I'll have to go back, but I assume that's what
12     it's in reference to.
13          Q.   You've seen both of those complaints before;
14     correct?
15          A.   Both those complaints meaning the harassment
16     complaint and --
17          Q.   Yes.
18          A.   -- and the workplace environment?
19               I have seen those.  I've heard of those.
20          Q.   And they're basically the same; correct?
21          A.   I would -- yes, I think they are.
22          Q.   What's your date of birth?
23          A.   December 11, 1961.
24          Q.   Give us a moment.  Call me on --
25               THE REPORTER:  Do you want to go off the
```

```
                                                                    124
 1
                                                    (Page 1 of 2)
 2

 3                        E R R A T A   S H E E T

 4      Re: Patterson, Rodney Scott vs. American Airlines, Inc

 5      Deposition of: JAMES N. BONDS

 6              Please read this transcript with care, and if
        you find any corrections or changes you wish made, list
 7      them by page and line number below.   DO NOT WRITE IN
        THE TRANSCRIPT ITSELF.  Return the
 8      Certificate and Errata Sheet to this office after
        it is signed.  We would appreciate your prompt
 9      attention to this matter.
                To assist you in making any such corrections,
10      please use the form below.  If supplemental or
        additional pages are necessary, please furnish same and
11      attach them to the errata sheet.

12      Page _____ Line _____ should

13      read:_____

14      Page _____ Line _____ should

15      read:_____

16      Page _____ Line _____ should

17      read:_____

18      Page _____ Line _____ should

19      read: _____

20      Page _____ Line _____ should

21      read:_____

22      Page _____ Line _____ should

23      read:_____

24      Page _____ Line _____ should

25      read:_____
```

[3/15/2017] Bonds, James N. (Vol. 01) - 03/15/2018 [2821980]


```
 1    Page _____ Line _____ should        (Page 2 of 2)
 2    read:_____
 3    Page _____ Line _____ should
 4    read:_____
 5    Page _____ Line _____ should
 6    read:_____
 7    Page _____ Line _____ should
 8    read:_____
 9    Page _____ Line _____ should
10    read:_____
11    Page _____ Line _____ should
12    read:_____
13    Page _____ Line _____ should
14    read:_____
15    Page _____ Line _____ should
16    read:_____
17    Page _____ Line _____ should
18    read:_____
19    Page _____ Line _____ should
20    read:_____
21    Page _____ Line _____ should
22    read:_____
23    Page _____ Line _____ should
24    read:_____
25
```

126

1          VERITEXT LEGAL SOLUTIONS
           One Biscayne Tower, Suite 2250
2            2 South Biscayne Boulevard
                Miami, Florida 33131
3                  305-376-8800

4     4/2/2018

5     Tristan Morales, Esq.
      O'Melveny & Myers, LLP.
6     1625 Eye Street, NW
      Washington, DC 20006-4061
7     tmorales@omm.com

8     RE: Patterson -vs- American Airlines, Inc.

9     Dear Mr. Morales,

10    With reference to the deposition of James Bonds
      taken on 3/15/2018 in connection with the above-captioned
11    case, please be advised that the transcript of the
      deposition has been completed and is awaiting
12    signature.

13    Please have your client read the transcript and complete
      the errata page. Upon completion, please send the signed
14    errata to our office at Two South Biscayne Blvd., Ste. 2250,
      Miami, FL, 33131, or email it to litsup-fla@veritext.com.
15
      If this is not taken care of, however, within the
16    next 30 days, we shall conclude that the reading
      and signing of the deposition has been waived and
17    the original, which has already been forwarded to
      the ordering attorney, may be filed with the Clerk
18    of the Court without further notice.

19    Sincerely,

20

21    Production Department
      Veritext Florida
22

23

24

25