1

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                      FORT LAUDERDALE DIVISION

               Case Number:   1:17-cv-60533-JEM

  RODNEY SCOTT PATTERSON,

         Plaintiff,

  vs.

  AMERICAN AIRLINES, INC., a
  Delaware Corporation,

         Defendant.
  _____/


                                  500 Northeast Fourth Street
                                  Fort Lauderdale, Florida
                                  Wednesday, March 21, 2018
                                  10:09 a.m. - 2:27 p.m.




                         DEPOSITION

                             OF

                         BRIAN BEACH
```

# ATTACHMENT 11

1   Q.  You said his involvement would maybe be
2   consulting with legal.  Would he be the person to
3   consult with legal as opposed to you?
4   A.  I think it's -- well, first of all, it would be
5   the director of flight, so it would have been Scialfa
6   probably, Cronin and legal with HR I guess.  That's how
7   it kind of usually --
8   Q.  Did you consult with HR in the issuance of the
9   Section 20?
10  A.  I did not.
11  Q.  Did you consult with HR?
12  A.  I sat in on the interview with Scott, yes.
13  Q.  Under Section 21?
14  A.  Yes.
15  Q.  That's what we're talking about when you say the
16  interview?
17  A.  Right.
18  Q.  Other than sitting in on the Section 21 with
19  Mr. Patterson, what involvement did you have in the
20  issuance of Section 20?
21  A.  None other than just these are the results of the
22  HR investigation, and as per the discussion with whoever
23  it is, it was decided to issue a Section 20.
24  Q.  That's the conversation you had with
25  Mr. Patterson, or that's the conversation you had with

15

1  HR?
2      A.  I didn't have any discussion with HR or anybody
3  about issuing the Section 20 for Scott.
4      Q.  So it was just you?
5      A.  I'm sorry?
6      Q.  That was just you?
7      A.  As far as?
8      Q.  Issuing the Section 20?
9      A.  No.  I was told to, you know, this is what we're
10 going to do and here's the letter.
11     Q.  Who told you that?
12     A.  It came from Cronin and legal.
13     Q.  So the statement this is the result of the HR
14 investigation and pursuant, and we're going to issue a
15 Section 20, that came from HR and Cronin?
16     A.  That's correct -- no, not HR.  Legal.  I believe
17 it was on the recommendation of HR.
18     Q.  Who in HR?
19     A.  I can't remember her name that was doing the
20 investigation.
21     Q.  Ana Burke-Leon?
22     A.  That's it.  That's it.
23         MR. AMLONG:  We're going to need to add that
24 to the list of people that we need to depose.
25     Q.  And what discussions, if any, did you have with

```
 1        Q.   How many Section 20's have you seen?
 2        A.   I've probably seen seven or eight.
 3        Q.   Of those seven or eight, how many of those were
 4   for substance abuse?
 5        A.   Were substance abuse?
 6        Q.   Yes.
 7        A.   Maybe one.
 8        Q.   What were the others?
 9        A.   Erratic behavior, not showing up, I would say
10   just if I can find the right word, I would say just, you
11   know, personal behavior.
12        Q.   Have you ever personally witnessed any behavior
13   on the part of Mr. Patterson that would make you think
14   he was unfit to fly an airplane?
15        A.   I have not.
16        Q.   Let me ask you to take a look at Exhibit 1 and
17   tell me if you've ever seen that document before, which
18   is, for the record, an e-mail from -- an e-mail string,
19   the top of which is one from Glenn Whitehouse to Brian
20   Beach dated March 20, 2015.
21        A.   Yes, I believe I've seen this.
22        Q.   Did you discuss this with Mr. Whitehouse?
23        A.   I don't recall if I ever discussed this personal
24   one or not, this e-mail.
25        Q.   What, if anything, did you do to determine -- to
```

48

1   standards, is there any documentation that you have done
2   so?
3       A.  No.  That's kind of a code that the company and
4   the union have together that we handle it through
5   professional standards, who has the ability to make
6   decisions on whether a situation is complete or not.
7       Q.  Was anything done in March of 2015 to investigate
8   any of the allegations made in Exhibit 2C other than
9   that Mr. Patterson may have been illegally taking
10  firearms into Bolivia?
11      A.  I'm sorry, can you repeat that again?
12              MR. AMLONG:  Read it back, please.
13              (Question read back.)
14              THE WITNESS:  Okay, so we're talking about
15  the long e-mail?
16              MR. AMLONG:  Yes.
17              THE WITNESS:  I believe that was the start
18  of the process for professional standards and the
19  disagreement between Patterson and Whitehouse I believe.
20  BY MR. AMLONG:
21      Q.  I mean did American Airlines do anything other
22  than refer this to professional standards?
23      A.  No.
24      Q.  Mr. Garcia in his e-mail to you says, quote,
25  "Please be advised that today Fred Ronda and I discussed

[3/21/2018] Beach, Brian - 180321

1   the below case with Larry McLaughlin, director of AA
2   global investigations.  It was decided that corporate
3   security would look into this matter."  What matter is
4   that?
5       A.  The matter is the gun issue to Bolivia.
6       Q.  Where in -- perhaps I'm missing it, but where in
7   the March 19 e-mail does Mr. Beach mention anything
8   about gun smuggling?
9       A.  I think this was what Fred and Ricardo wanted was
10  the whole picture of the situation with Scott Patterson.
11      Q.  So you're saying that there are additional
12  communications that you had had with Misters Garcia and
13  Ronda?
14      A.  I believe it was -- I had talked to Fred Bates,
15  said hey, look, I think I got a situation down here.  I
16  have no idea, don't even know what to do with it.  So he
17  put me in contact with Ricardo and Fred Ronda, local
18  guys.  They said send me -- tell us what you got and I
19  said I got a long e-mail that I can send you, and they
20  said send me the e-mail.
21      Q.  When did you first hear about the possibility
22  that he was smuggling guns?
23      A.  Very soon after Whitehouse came into my office.
24      Q.  And did you hear that from Whitehouse?
25      A.  Yes, sir.

1  Q. Do you know whether or not corporate security
2  caused Mr. Patterson --
3  A. I have no idea.
4  Q. What, if anything, did corporate security report
5  to you about its investigation?
6  A. There's nothing here.
7  Q. That's what they said?
8  A. Yes.
9  Q. Did they tell you this in writing?
10 A. No, sir.
11 Q. Does American Airlines have any work rules about
12 making false allegations against their pilots?
13 A. I believe there may be. I'm sure there's some
14 kind of discipline somewhere, but if it's investigated,
15 but I don't know to be honest with you.
16 Q. Well, based on the -- based on the investigation
17 by corporate security, did you consider Captain
18 Whitehouse to have made a false allegation about
19 Mr. Patterson's taking guns into Bolivia?
20 A. Mm-hm.
21 Q. Yes, you did believe him to have made a false
22 statement?
23 A. No. I considered the matter was closed out, so
24 it was an issue that was raised. It was investigated by
25 corporate security. They determined there was nothing

```
 1        Q.   So had the discussion begun over Section 20 by
 2   this time?
 3        A.   I don't recall.
 4        Q.   Take a look at Exhibits 25 and 26.
 5        A.   Yes, sir.
 6        Q.   Was 26 attached to 25?
 7        A.   Yes, sir.
 8        Q.   Do you know what prompted Ms. Montgomery to send
 9   you a Section 20 draft letter on January 5, 2016?
10        A.   Other than I think a determination was made based
11   on all the evidence that deemed that Scott -- we were
12   going to request Scott to go to a Section 20.
13        Q.   Were you part of that discussion?
14        A.   I was not.
15        Q.   On Exhibit 27 do you recognize that e-mail?
16        A.   I do not.
17        Q.   Do you know why you would need the dates of the
18   pay withheld determination?
19        A.   Yeah, that's a good question.  I don't know.  I
20   don't know that.  Oh, I think it might have been based
21   on the previous e-mail down at the bottom, placed him on
22   pay withheld status on, you know, what date do you want
23   me to use?  Do you want me to use this date now or the
24   previous date that we initially put Scott on PW?  That's
25   what I assume that is.
```

93

```
 1                      CERTIFICATE

 2    STATE OF FLORIDA )
                       )  SS.
 3    COUNTY OF BROWARD)

 4            I, HEATHER VIEIRA, do hereby certify that
      pursuant to Notice of Taking Deposition in the
 5    above-styled cause, that I was authorized to and did
      stenographically report the foregoing deposition as
 6    hereinabove shown, and the testimony of said witness was
      reduced to computer transcription under my personal
 7    supervision.
              I further certify I am not a relative,
 8    employee, attorney or counsel of any of the parties, nor
      am I a relative or employee of any of the parties'
 9    attorneys or counsel connected with this action, nor am
      I financially interested in the action.
10            The certification of this transcript does not
      apply to any reproduction of the same by any means
11    unless under the direct control and/or direction of the
      certifying reporter.
12            Witness my hand and official seal in the City
      of Fort Lauderdale, County of Broward, State of Florida
13    this 16th day of April 2018.

14


15


16                  ------------------------------
                            HEATHER VIEIRA
17                           Court Reporter

18

19

20

21

22

23

24

25
```

[3/21/2018]  Beach, Brian - 180321