# ATTACHMENT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division

Case Number: 17-cv-60533-MARTINEZ/OTAZO-REYES

RODNEY SCOTT PATTERSON,

   Plaintiff,

vs.

AMERICAN AIRLINES, INC.,

   Defendant.
_____/

**Plaintiff's CORRECTED Rule 56 Motion for Partial Summary Judgment**

Plaintiff, Rodney Scott Patterson, pursuant to Federal Rule of Civil Procedure 56, moves for summary judgment as to liability on the ground that, taking all of the evidence in the light most favorable to the defendant, American Airlines, Inc. ("American"), cannot meet its burden under USERRA[1] to prove that it would have taken the same actions against Patterson had Patterson not exercised his rights to, **One**, go on duty as a lieutenant colonel in the United States Army Reserve, notwithstanding that one of Miami's three chief pilots did not wish him to do so because of a shortage of pilots, and, **Two**, file a USERRA claim with the Department of Labor after being

---

[1] Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, et seq.

placed in a no-flying status and kept there even after an investigation into allegations against him produced no evidence of misconduct.  Id. at 1-2, ¶ 4.

## Introduction and Summary

Rodney Scott Patterson was on September 21, 2015, both a first officer employed by American Airlines and a lieutenant colonel in the United States Army Reserve.  Plaintiff's Local Rule 56.1(a) Statement of Material Facts In Support of Motion for Summary Judgment ("Plaintiff's Facts"), at ¶ 1,¶ 1.

Patterson wanted to go on duty September 22-25, **One**, to get enough time in before the end of the fiscal year so that it would count toward his retirement, and, **Two**, because it would give him the opportunity to represent the Army at a White House reception for Pope Francis.  Id. at ¶ 2.

James Bonds, one of American's Miami International Airport's three chief pilots, vociferously opposed Patterson going on duty, **First**, leaving a voice mail on his phone requesting that he fly as scheduled beginning Tuesday, September 22, and, **Second**, saying that he would approve military leave if Patterson showed him written orders.  Id. at 2, ¶¶ 4-5.

After Patterson nonetheless notified a duty officer at System Operations Control in Dallas that he would be absent from work to perform military service, which notification of absence was acknowledged as vacation time, he learned Wednesday while in Washington, D.C., that his status had been changed, retroactively to Tuesday, from using vacation time for his

reserve duty to being on Paid/Withheld status.  Id. at 2-3, ¶ 6.  A program on his cell phone alerted him whenever there was a change in his status in American's crew-scheduling computer.  Id.  Two days later, he got a voice mail from Bonds informing him that he was no longer flying, pending an investigation.  Id. at 3, ¶ 7.  Bonds has scant, confused memories of issuing the letter, or of the e-mails that he wrote to his fellow chief pilots, concerning how Patterson was now on PW pending an investigation into "the letter."  Id. at 3-4, ¶¶ 8-9.

The investigation was into allegations centering on a tumultuous, round-trip flight between Miami and Asuncion, Paraguay in October 2014, the uproar of which was so intense that Patterson put in a request to never again be paired with the captain on that flight, Glenn Whitehouse.

Whitehouse had complained to Brian Beach, another Chief Pilot, in February about the incident and other frictions that he alleged between himself and Patterson.  The allegations, which even included an assertion that Patterson was smuggling fire arms to Bolivia, were passed on to Corporate Security, Labor Relations and Human Resources in March.  No action was taken.  Patterson was not even questioned about them.  Id. at 4-5, ¶¶ 10-11.

After Patterson disobeyed Bonds's request that he fly as scheduled on September 22-25, rather than go on Army reserve duty, Whitehouse

e-mailed a repackaged version of the same complaints that had been forwarded to Corporate Security.  Id. at 3, ¶ 10.

Although Bonds claims to know nothing about how Patterson got onto Paid Withheld status, his signature appears on a letter informing Patterson about what was happening and there is an e-mail with his name on it to his fellow chief pilots on the evening of September 24 — about an hour and a half after Whitehouse's e-mail was sent to Beach and copied to Luis Ruis, a coordinator in the Miami Flight Office — "Subject: Patterson is now on PW." Id. at 3-4, ¶ 9.

Bonds launched into an investigation in early October into whether Patterson was misreporting his military pay, e-mailing other chief pilots and even the Managing Director of Flight/East, Mark Cronin, that "Maybe he hangs himself on providing false information." Id. at 6, ¶ 12.  Others in that e-mail chain hinted that such a tack could side-step USERRA.  Id.

After the investigation into Whitehouse's letters yielded nothing for which American could discipline Patterson, Bonds and Beach each signed identical letters, drafted by a senior manager of Labor Relations/Flight, stating that "[d]ue to my concerns regarding your ability to safely operate an aircraft, I have arranged for you to participate in a medical evaluaton as provided in Section 20 of the [Joint Collective Bargaining Agreement]…." Id. at 7, ¶ 13.

The senior manager said the request for the psychological exam originated with Bonds and Beach.  Bonds and Beach say no such thing happened, and that they were just told to sign the letters.  Id. at 7, ¶ 14.

At this point, Patterson filed a USERRA complaint with the Department of Labor in January, about which American learned and fired back in defense in February.   Id. at 9, ¶ 12.  In March, following an examination, the report of which American's Corporate Medical Director said contained no indication of neuropsychological deficit, psychopathology or personality disorder, but which nonetheless declared Patterson "NOT FIT FOR DUTY," American refused to allow him to return to work.  Id. at 7-8, ¶¶ 15, 16, 17 and 18.

Prior to his filing this action, however, it did say that it would allow the University of Texas Medical Branch to review the reports of several medical and psychological practitioners who have found him fit for duty and, if the UTMB disagrees, would have the reports reviewed by some other outside practitioners than the one who originally found him "NOT FIT FOR DUTY" notwithstanding any objective evidence.  Id. at 9-10, ¶ 24.

**The Applicable Legal Standards**

**For granting summary judgment**

"The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment."  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986)(citations omitted).  "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion,

which always remains on the moving party." Id. (Citations omitted.)

"The burden of persuasion imposed on a moving party by Rule 56 is a stringent one…. Summary judgment should not be granted unless it is clear that a trial is unnecessary, … and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party…" Id. at 331, n. 2 (citations omitted).

The Celotex court observed, particularly appropos to the case at bar, that

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a) . . . ."

477 U.S. 317, 322-23, quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

**For making out a case of USERRA retaliation**

USERRA, provides, in relevant part that:

> A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that

> membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. § 4311(a). It further provides, in relevant part, that:

> An employer shall be considered to have engaged in actions prohibited … under subsection (a), if the person's … service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such … service, application for service, or obligation for service.

38 U.S.C. § 4311(c)(1).

As the court explained in Coffman v. Chugach Support Services, Inc., 411 F.3d 1231 (11th Cir. 2005):

> A motivating factor does not mean that it had to be the sole cause of the employment action. Instead, "it is one of the factors that 'a truthful employer would list if asked for the reasons for its decision.'" Id. (citation omitted); see also Smith v. School Bd. of Polk County, Fla., 205 F.Supp.2d 1308, 1314 (M.D. Fla. 2002). "Indeed, [m]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." [Brandsasse v. City of Suffolk, Va., 72 F.Supp.2d 608, 617 (E.D. Va. 1999)] (citation omitted); see also Smith, 205 F.Supp.2d at 1314-15. Circumstantial evidence plays a critical part in these cases, "for discrimination is seldom open or notorious." [Sheehan v. Dep't of the Navy, 240 F.3d 1009, 1014 (Fed. Cir. 2001)]. The court can infer discriminatory motivation under the USERRA from a variety of considerations, such as:
>
>> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.
>
> Id. "When the employee has met this burden, the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same

> adverse action." Id. This burden-shifting framework "applies to both so-called 'dual motive' cases and so-called 'pretext' cases." id. "Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the agency action, upon which the agency must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." Id.

Id. at 1238-39.

### Applying the Law to the Facts in the Case at Bar

Lt. Col. Rodney Scott Patterson's going on duty at the Pentagon during the Pope's September 2015 visit to the White House was not merely a "motivating factor" for the rabid vigor with which Chief Pilot James Bonds and his cohorts pursued Patterson for having disobeyed Bonds's request that he forego Army Reserve duty that week: it was a fixation.

Not only is there evidence from which jurors reasonably could conclude that Bonds placed Patterson on a no-fly status Thursday **after** American got hold of Capt. Whitehouse's warmed over allegations, but Patterson's phone buzzed when he was on duty at the Pentagon, alerting him on Wednesday, **before** the evening arrival of Whitehouse's repackaged complaint, that someone had already put him on Paid Withheld, or PW, status.

If the allegations were serious enough to put Patterson on PW status immediately after he went on duty with the Army Reserve, getting in time that he needed for his pension and seizing an opportunity to attend a White House reception for Pope Francis as a representative of the United States Army, why were they not serious enough to do anything about in March or April when Chief Pilot Beach was sharing them with Corporate Security,

Labor Relations and Human Resources? The answer is because the allegations were as insufficient in March as they proved to be during the Human Resources investigation that ensued immediately after Patterson returned from duty. The investigation yielded nothing to warrant discipline, according to American's Rule 30(b)(6) designee, Michelle Montgomery.

Bonds's denials of remembering a Paid Withheld letter he signed, or having sent his fellow chief pilots an email about Patterson's now being on PW status are so incredible as make one question the credibility of his assertions that Patterson's military duties had absolutely nothing to do with his being put on PW status.

Lest there be any mistake about the level of Bonds's ardor for the hunt, one must not ignore his Plan B: letting Patterson "hang himself" for irregular reporting of his military income, which Miami Director of Flight Sean Scialfa seemed to prefer to requiring Patterson to undergo a mental examination, but appeared to make Mark Cronin, American's Managing Director of Flight/East, anxious about USERRA, issues concerning which "can get really tangled fast." If this was not about Patterson's military duties, then why the focus on his military pay? Why the concern about USERRA?

Then there is the circular firing squad that Bonds, Beach and Montgomery formed to address the issue of how Patterson got sent to a neuropsychologist in California. It was all Bonds and Beach's idea, said Montgomery, who admitted doing no more than drafting the identical form letters that each of them signed, professing profound personal concern for

Patterson's "ability to safely operate an aircraft."  Not me, said Bonds.  Nor me, said Beach:  "I was told to, you know, this is what we're going to do and here's the letter."

Then there is the neuropsychological examination that produced no evidence of any neuropsychological deficit, any psychopathology or even any personality disorder—but still was sufficient to support a finding of "NOT FIT FOR DUTY" after American sent the examining psychologist a note that spelled out that management had "concerns about FO Patterson's judgment and, specifically, his mental and/or emotional stability" after having "received multiple reports of atypical interactions with coworkers and reports that suggest a pattern of false/self-aggrandizing statements." Plaintiff's Facts, at 8, ¶ 17.

Completing the circle is American's refusal to return Patterson to flying after not only several other medical and psychological practitioners pronounced him fit not only to fly, but also to deploy for combat, see Plaintiff's Fact, at 8-9, ¶ 19, but its own corporate medical director cannot point to anything in the Section 20 report other than its baked-to-order conclusion to support keeping him grounded and unpaid.

But there is a way for Lt. Col. Patterson to get back in the air as an American pilot.  This suggestion came from Lucretia Guia, an American lawyer, who sharply contested Patterson's USERRA claim after it was filed in January 2016.  All that it would take to have Patterson looked at by some practitioner other than the one who deemed him "NOT FIT FOR DUTY"

notwithstanding the absence of objective findings would be for Patterson to release any claims concerning the Section 20 process.  In other words, to stop pursuing his USERRA claims.

Although the Coffman court cited Sheehan's observation about how "discrimination is seldom open or notorious," American appears in the case at bar to have used the quoted passage from Sheehan not so much as a training device on what not to do if one wants to avoid liability of violating USERRA, but as a recipe for retaliation for both Patterson's going on duty in September and then having filed a USERRA complaint in January:  all one needs to do bake a USERRA-violation cake is to mix equal parts of:

**One**, "proximity in time between the employee's military activity and the adverse employment action" — is the same day that Patterson goes on duty and goes on PW close enough?

**Two**, "inconsistencies between the proffered reason and other actions of the employer" — such as immediately putting Patterson on no-fly status when four to six months earlier, neither Corporate Security, Labor Relations or Human Resources appears to have broken a sweat about the exact same allegations;

**Three**, "an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity" —would Bonds and Scialfa's hoping that Patterson might "hang himself" concerning the way in which he reported his military pay for his reserve

duty, while Cronin fretted about how USERRA issues tend to get tangled quickly, qualify as that kind of "expressed hostility?"  and

**Four,** "disparate treatment of certain employees compared to other employees with similar work records or offenses," such as keeping a pilot who displays no neuropsychological deficits, no psychopathology and no personality disorder grounded on mental-health grounds—unless he would drop his USERRA claim—while permitting another pilot misdiagnosed by Dr. Knippa, Michael Dale, who had not filed a USSERA claim, to return to work.

Patterson has easily made his prima facie case.  American cannot prove that it would have taken the same actions against him if he had neither gone on duty in September nor filed his USERRA claim in January.

American's violation of Lt. Col. Patterson's rights is not only palpable, but so flagrant as to be willful.

## Conclusion

Based on the authorities cited and the arguments presented, plaintiff, Rodney Scott Patterson, respectfully requests this Court to:

- grant summary judgment on both counts for him, and against defendant, American Airlines;
- deem the violations to be willful;
- order his immediate reinstatement as a pilot, with the same seniority he would have enjoyed had he never been grounded;
- set a jury trial on damages, and
- grant such other and further relief as is just.

Respectfully Submitted,

/s/   William R. Amlong
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com
JENNIFER DALEY
Florida Bar No.: 856436
JDaley@TheAmlongFirm.com
AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301
Telephone: (954) 462-1983
Facsimile: (954) 463-5008

NOEL C. PACE
noel.c.pace.esq@gmail.com
*Admitted Pro Hac Vice*
206 NW 91st Street
El Portal, FL
(305) 710-3713

***Attorneys for Plaintiff,
Rodney Scott Patterson***

### Certificate of Service

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished/filed using the ECF System of the Southern District of Florida on all counsel or parties of record.

/s/   William R. Amlong
WILLIAM R. AMLONG

\\amlong3\cpshare\CPWin\HISTORY\180601_0001\1538.13F