UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:17-cv-60533-MARTINEZ/OTAZO-REYES

RODNEY SCOTT PATTERSON,
Plaintiff,
vs.
AMERICAN AIRLINES, INC., a Delaware Corporation,

Defendant.
_______________________________________/

Amlong & Amlong, P.A.
500 Northeast 4th Street
Second Floor
Fort Lauderdale, Florida 33301
Thursday, June 7, 2018
1:19 p.m. - 3:48 p.m.

VIDEOTAPED DEPOSITION OF GLENN R. CADDY, Ph.D.

Taken on behalf of the Defendant before Christine Savoureux-Mariner, Florida Professional Reporter and Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition in the above cause.

A They would be listed in the text, yeah.

Q Let me just finish the question so we have a clean record.

A Okay.

Q If there were other doctors' reports who you had reviewed, they'd be listed in the text of Exhibit 2B; is that correct?

A Yes. I have information on medical specialties record reviews here, and they would likely be located in the overview of documents reviewed on page 67.

Q Okay. In preparing your report, which is Exhibit 2B, did you rely on any statements by Mr. Patterson's counsel?

A No.

By the way, if I may, I'd like to -- I know you don't have a question pending, but I'd just like to make a correction.

Q Sure.

A This particular version -- I had forgotten that I'd done this, but this particular version of the report does contain results of testing that I undertook with this gentleman.

Q Okay. Thank you.

Are you familiar with a Dr. Edwin Bercaw?

A I'm aware of his existence, yes.

Q Have you ever spoken to him with regard to Mr. Patterson?

A Yes.

Q What did you speak about with him regarding Mr. Patterson?

A About -- in general, about his findings, or more to the point, I was told by Captain Whitehouse -- excuse me, by Captain Patterson -- that Dr. Bercaw, he went to see Dr. Bercaw very soon after he'd been to see Dr. Knippa, and he also indicated to me that the assessment that was done, was done not by Dr. Bercaw, but by a woman trainee. And I called Dr. Bercaw to ask him about that.

Q And what did he say?

A He said that was true, that she did do the work. And so I pretty much said thank you, and I contacted Captain Patterson and I said, in essence, you just wasted a couple thousand dollars.

Q What were the findings from Dr. Bercaw's office regarding Mr. Patterson?

A I don't know. I don't know the details.

Q Well, you said that you called to discuss the findings?

A Well, yeah, but when I found out that -- when

I found out that he actually didn't do the testing, it didn't really matter to me what the findings were going to be because she wouldn't have been qualified to administer the instruments. And he went to see Dr. Bercaw, not this lady who was in training.

Q What instruments were administered?

A I don't know.

Q Then how do you know she wasn't qualified to administer them?

A Because she was not a licensed psychologist and she was in training.

Q Do you have to be a licensed psychologist to administer every instrument that's available?

A You have to be -- well, it would not be appropriate for you to be doing this sort of work without being licensed and without being thoroughly knowledgeable, and also, without being closely supervised.

Q Do you know whether she was closely supervised in the administration of these assessments?

A The reason I raised the question was because Captain Patterson told me that Dr. Bercaw was not in the room during all of the testing that was done. And that was of concern to me.

Q And Mr. Patterson tell you what testing was

done?

A Well, he knew that some of it was a duplication of what had been done by Dr. Knippa.

Q Did Mr. Patterson ever tell you the results of that testing?

A He didn't know the results, to the best of my knowledge.

MR. HOLT: I'm going to show you an email which was previously marked as Exhibit 21 to Mr. Patterson's deposition, and we'll mark this as Exhibit 3 here.

(The referred-to document was marked for identification as Defendant's Exhibit 3.)

BY MR. HOLT:

Q Do you recognize this as an email from Mr. Patterson to edb@medpsych.net and then copied to you?

A (Sotto voce reading.)

No.

MR. HOLT: Can you read the question back?

MR. PACE: Excuse me, there is something going on with the audio. I'm not able to hear the reading of whatever --

MR. AMLONG: That's because he was muttering.

THE WITNESS: I'll stop muttering.

MR. PACE: Oh, okay.

(The portion referred to was read by the reporter as above recorded.)

THE WITNESS: Yes, I do.

BY MR. HOLT:

Q And that email from Mr. Patterson responds to an earlier email from Ed Bercaw, correct?

A Yes.

Q And in Dr. Bercaw's email, he references a report, correct?

A Yes.

Q So at the time of this email, April 22, 2016, you knew, in fact, that Mr. Patterson had been made aware the results were available for that examination, correct?

A Well, I might have then, I don't remember it now. But yes, I presume that I would have known it then.

Q Did you ever ask Mr. Patterson what the results were of that assessment?

A You are asking me for a level of detail that I just don't remember back then. My recollection is that when he told me -- "he" meaning Captain Patterson -- that the testing was not done by Dr. Bercaw, I told him that he just wasted whatever the number of dollars was,

somewhere around two and-a-half thousand.

And my reason for saying that was under the conditions of wanting, really, expert opinion, it would've -- he couldn't have used the report that was ready for him to receive. And the reason that he couldn't is because Dr. Bercaw would have been seriously criticized for not actually doing the work himself.

The lady that he was using clearly did not have the qualifications that was requisite. She was a trainee. Now, that doesn't mean that she was incapable of administering tests; what it means is she didn't have standing to be an expert in the administration of those tests.

Q And fair enough, she had a doctorate in psychology, didn't she?

A I don't know. What I know is that she was in training. Whether she had a doctorate or whether she didn't, at the time, she was still an intern. That's why she would have been --

MR. HOLT: Let's mark this as Exhibit 4.

(The referred-to document was marked for identification as Defendant's Exhibit 4.)

BY MR. HOLT:

Q I've handed you what we've marked as Exhibit 4, which is a privilege -- purports to be a

privilege log prepared by Mr. Patterson's counsel. And in particular, I'd like you to take a look paragraph 2 of Exhibit 4 and tell me if the person identified there, Francy Nathaly Fonseca, Psy.D. is the intern you are referencing.

A Yes, she is.

Q Does this refresh your recollection --

A Yes.

Q -- as to whether she had a doctorate in psychology?

A Yes. And she is still an intern.

Q But she had a doctorate in psychology, correct?

A Yes.

Q Okay. Did you prepare at some point any correspondence between you and Dr. Bercaw regarding the reports? His report.

A Not that I recall.

Q Did you ever receive any correspondence from Dr. Bercaw regarding the March test results?

A Not that I recall.

Q Take a look paragraph 3 of Exhibit 4.

A I've already read it, but if you're asking me if I recall it, then the answer is no.

Q No, I'm asking if you received it.

If there was a two-page letter dated May 6, 2016 from Dr. Bercaw to you discussing the March test results, would that be something you would have reviewed?

A I don't have an independent recollection of it.

Q My question is: If such a letter were sent to you, would you have reviewed it?

A I likely would have, but I'm not sure that I did.

Q Is there any reason you can recall why you would not have reviewed that?

A Well, you are asking me to recall a particular event in May of 2016, so that is stretching the edge of the envelope. If I didn't, it would have been because I had already decided that what he needed to do was to go and see --

(Phone interruption.)

MR. PATTERSON: I'm sorry, that is a thunderstorm warning.

THE WITNESS: Okay.

MR. PATTERSON: For a tornado.

THE WITNESS: What he would need to do is to go and see Gary Kay. Because it would have been Gary Kay who I would have advised him to go and see

right from the outset after he saw Dr. Knippa.

BY MR. HOLT:

Q I guess I'm a little confused because you are telling me that you don't know if you would have looked at this letter, but if you did look at the letter -- or if you didn't look at the letter, then you would have referred him to Dr. Kay; is that your testimony?

A When -- I didn't know that he had gone to Dr. Bercaw. He did that on his sprite little self and I knew that he had been calling around to several people in the area thinking that he needed to get a second evaluation.

I didn't know, a priori, that he went to see Dr. Bercaw and -- hang on, let me just finish my sentence -- and if I had known that he was going to go and see somebody, I would have told him to go to Gary Kay. That's what I wanted to say.

Q Could you explain for the jury what a priori means? A priori. It's a term you used. It's Latin.

A Okay.

Q It might be helpful if the folks in the jury can understand that.

A A priori simply means that earlier on, I would have done this. Had I known, I would have done this.

Q But as of April 22nd, as reflected on

Exhibit 3, you knew that a report had been prepared, correct, by Dr. Bercaw?

A You are asking me from a memory that I don't have. It's reasonable that I would have known, but you are asking me did I know that? It's reasonable that I would, but I don't have an independent memory of knowing it.

Q Okay. Well, let's do it this way: As you look at Exhibit 3, this is a document you received, correct? Exhibit 3.

A Yes.

Q Was it your usual practice to read emails that were sent to you by your clients?

A In general, it is, yes. Though sometimes I can sit there for days because I get too many emails.

Q Do you have any reason to doubt that you would have read this email on or around April 22nd of 2016?

A I think it's very likely that I would have.

Q Okay. So then on May 6, 2016, by the time Dr. Bercaw writes this letter to you discussing the test results, you already knew that a test had been performed, correct?

A I believe that by then, I knew that, yes.

Q Okay. And you received this letter from Dr. Bercaw, according to the representation made by

Mr. Patterson's counsel, correct? I mean, that's what Exhibit 4 tells us.

A It would seem so, yes.

Q And having received that letter, would it be your usual practice to open up a letter that you received and see what it is?

A It would be common practice, yes.

Q Do you have any specific recollection of not doing that in this case? In other words, of shredding the letter, never looking at it, never opening it?

A No. The only thing that I can tell you with certainty is that I don't have that. What would be my standard practice if I wanted to keep something would be to put it into my Dropbox. That is, take it off the email and put it into my Dropbox.

If I looked at it and decided it was not something that I wanted to keep, or if I didn't look at it because I didn't see myself wasting time on it, then I would have deleted it. And that would be true of any document or any email that I get.

Q I understand, sir, but in federal court, we are entitled to review the documents that you received, whether you relied on them. And I understand -- I think I understand -- you tell me if I'm wrong -- that definitely if you are going to rely on something, that

gets saved every time, correct?

A Sure, yeah.

Q And there might be some things that you take a quick glance at and you say, eh, I don't need this, and it might not go into the Dropbox, correct?

A Right.

Q Okay.

A And there's a large number of things that I tend to be a bit compulsive about eliminating, deleting documents that -- not just documents, but emails -- that I'm just not going to keep.

Q Okay. So it's possible you read this letter described in paragraph 3 of Exhibit 4 and deleted it?

MR. AMLONG: Object as to form as to what's possible.

THE WITNESS: The answer is I don't know the answer, okay?

BY MR. HOLT:

Q But that would be consistent with your practice; if there is something that you are not going to use in the future, not going to rely on, you might delete that, correct?

A It would be quite likely that I would do that, yes.

Q Same thing with the report prepared by

Dr. Bercaw; if you received the report, you glance at it, you decide I'm not going to rely on this, your ordinary practice would be to just delete it, correct?

A Yes.

MR. AMLONG: Objection. Assumes facts not in evidence. There is no testimony that he received the report.

THE WITNESS: I'm simply telling you I have no recollection of receiving a report. I certainly don't believe I ever read a report from Dr. Bercaw, and I know it's becoming a big issue now, but it wasn't a big issue to me back at the time, otherwise I probably would have a clearer memory of exactly what was going on.

BY MR. HOLT:

Q But you do recall discussing with Dr. Bercaw his findings, correct?

A I recall discussing briefly his findings, yes.

Q But you don't recall what his findings were in that report, correct?

A No.

Q No, not correct, or no, you don't recall? I apologize, that was a bad question.

A I recall that he was generally positive in regard to the findings. Now, the reason that I said to

Captain Patterson -- I was actually irritated when I found out about it, and the reason is that when I think about things, I think about them within a forensic framework, and I wanted him to go to somebody where there would be no question of the qualifications and where an assistant had not done the work.

Because it was clear to me that by going to Dr. Bercaw, what he accomplished was having an assistant do the work that would simply lead to more compromise. He had already been very compromised in California, and my view was if he was going to get compromised, let it be by an expert. Let it not be to get into a battle that could cost him thousands of dollars because instead of Dr. Bercaw doing the work, it was Doctor -- it was the trainee, in essence. That was the position that I took.

Q I believe you just testified that Dr. Bercaw's findings were generally positive, correct?

A That's what he told me.

Q Did he tell you about any findings that were, let's say, less than positive?

A You are asking me for a memory going back --

MR. PACE: Objection. Asked and answered.

MR. HOLT: It hasn't been answered, and only one attorney should be objecting here.

THE WITNESS: The answer that I gave previously is that overall, the test results were good, but I don't remember whether there was any negative sign or not. Overall, they were good.

BY MR. HOLT:

Q So you considered the fact that they were overall good; you didn't rely on it, but you considered that, correct?

A No, I didn't consider it. What I considered was that it was inappropriate for him to be getting an evaluation done -- signed off by Bercaw, but done by a trainee. That's what I considered.

Q But you are aware that his results were overall positive, correct?

A Yes.

Q And you were made aware of that through a conversation with him, correct?

A Yes.

Q And so once you knew that knowledge, I think you would agree with me that you can't just unlearn that information, right? You might forget it later on, but you can't unlearn it.

A Yeah, it's not something I unlearned. I didn't specifically forget about it, but it's not until you showed me this stuff that I'm actually remembering