IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 17-cv-60533-MARTINEZ/OTAZO-REYES

RODNEY SCOTT PATTERSON,

     Plaintiff,

vs.

AMERICAN AIRLINES, a Delaware
corporation,

     Defendant.

_____/

**Plaintiff's Response to Defendant's Motion for Summary Judgment**

Plaintiff, Rodney Scott Patterson, responds as follows to Defendant

American Airlines, Inc.'s Motion for Summary Judgment [DE 59]:

**Introduction and Summary of the Facts**

This is a USERRA[1] claim brought by Rodney Scott Patterson, a first

officer for American Airlines

***One***, whom a chief pilot, James N. Bonds, told September 21, 2015

that he did not wish him to go on duty the following day as a lieutenant

colonel in the Army Reserve, as Patterson had informed American under

_____

[1]Uniformed Services Employment and Reemployment Rights Act, 38
U.S.C. § 4301, et seq.

USERRA that he was going to do;[2,3]

*Two*, whom American put on no-flight status immediately after he disobeyed that request;[4]

*Three*, whose immediate placement on no-flight status has been claimed at various times by American to have been based on allegations of:

- bizarre behavior during a round-trip to Asuncion, Paraguay,[5] and

- Patterson's having taken it upon himself as a first officer, or co-pilot, to divert an American airliner to land in Bogota, which only a captain can do,[6]

about both of which allegations another chief pilot, Brian Beach, Labor Relations, Human Resources and Corporate Security had known for five to seven months, but had done nothing;[7]

---

[2]See Plaintiff's Local Rule 56.1(a) Statement of Material Facts In Support of Motion for Summary Judgment [DE 61] ("Plaintiff's Facts"), which plaintiff adopts and realleges as if fully set forth in Plaintiff's Response to Defendant's Local Rule 56.1(a) Statement of Material Facts In Support of Motion for Summary Judgment ("Plaintiff's Response"). See Plaintiff's Response, at ¶ 42.

[3]See Plaintiff's Facts, at 1-2, ¶¶ 1-6.

[4]See Plaintiff's Facts, at 2-3, ¶¶ 7-8.

[5]See Plaintiff's Facts, at 3-4, ¶¶ 9-10.

[6]See Plaintiff's Response, at 9, ¶ 43.

[7]See Plaintiff's Facts, at 5, ¶ 11; Plaintiff's Response, at 3-5, ¶¶ 24, (continued...)

*Four*, into whose behavior on the Asuncion trip a Human Resources investigation found nothing that would warrant employee discipline;[8]

*Five*, and concerning whose reporting to American of income from military duty Bonds told colleagues and superiors that he "smell[ed] a rat" and suggested that he wanted to keep investigating because "[m]aybe he hangs himself on providing false information,"[9]

*Five*, and whom—when neither the Human Resources investigation, the diverted flight to Bogota nor the reporting of his military income provided any evidence to "hang" him (borrowing Bonds' phase), American sent for a neuropsychological fitness-for-duty exam at the instigation of either:

- Miami International Airport chief pilots Bonds and Beach (who say it wasn't them) or

- Labor Relations, the senior Labor Relations manager of which for pilots, Michelle Montgomery, who was also the company's Rule 30(b)(6) designee testified that it was the two chief pilots);[10]

*Six*, whom American instructed to report to a Long Beach, California,

---

[7](...continued)
26.

[8]See Plaintiff's Facts, at 6, ¶ 13; Plaintiff's Response, at 6, ¶ 31.

[9]See Plaintiff's Facts, at 6, ¶ 12.

[10]See Plaintiff's Facts, at 6-7, ¶¶ 13-14.

neuropsychologist, which "independent" examiner:

- American primed by sending a note, over the signature of Chief Pilot Beach, informing the neuropsychologist that it wanted the examination "based on this office's concerns about FO Patterson's judgment and, specifically, his mental and/or emotional stability" because "[t]his office has received multiple reports of atypical interactions with coworkers and reports that suggest a pattern of false/self-aggrandizing statements";[11]

- irregularly performed a set of motor-skill tests during the first day after Patterson had arrived late a night on a cross-country flight from three time-zones away,[12] and

- found Patterson "NOT FIT FOR DUTY," despite a report that failed to document—even in the mind of Jeral Ahtone, American's corporate medical director—any findings of neuropsychological deficit, serious psychopathology or severe personality disorder.[13]

American has refused to permit Patterson to fly for it since he was grounded in March 2015, notwithstanding that he maintains a FAA First Class Medical certificate and has been cleared by author of the motor-skills test that the Long Beach neuropsychologist administered, the COGScreen Aeromedical Edition; by an Federal Aviation Administration-approved

---

[11]Plaintiff's Facts, at 7-8, ¶ 16.

[12]Plaintiff's Response, at 8, ¶ 39.

[13]Plaintiff's Facts, at 8, ¶ 17; Plaintiff's Response, at 8, ¶ 37.

neurologist and by a clinical psychologist as fit-for-duty, as well as being certified a fit for combat deployment by a Department of Defense physician.[14]

Although American insists that under its policies, the only way that Patterson could return to flying for it would be to be cleared by Knippa,[15] it did make an offer to him in December 2016 through its union to settle a grievance that the union had filed concerning the neuropsychological exam: American would permit practitioners at the University of Texas Medical Branch to review the reports done by Patterson's lawyers if he would, in essence, abandon the USERRA claim that he filed in January 2016 concerning the psychological exam.[16]

## The Applicable Legal Standards

## For granting summary judgment

"The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment."  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986)(citations omitted).  "This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion,

_____

[14]See Plaintiff's Facts, at 8-9, ¶¶ 19-20; Plaintiff's Response, at

[15]See Plaintiff's Facts, at 9, ¶ 21.

[16]See Plaintiff's Fact, at 9-10, ¶¶ 22-24; Plaintiff's Response, at 7-8, ¶ 38.

which always remains on the moving party." Id. (Citations omitted.)

"The burden of persuasion imposed on a moving party by Rule 56 is a

stringent one.... Summary judgment should not be granted unless it is clear

that a trial is unnecessary, ... and any doubt as to the existence of a

genuine

issue for trial should be resolved against the moving party..." Id. at 331, n.

2 (citations omitted).

As this Court observed in Bagnall v. City of Sunrise, Florida, Case

Number: 10-61299-CIV-MARTINEZ-MCALILEY. (S.D. Fla. Aug. 24, 2011):

> By its very terms, this standard provides that "the mere existence of
> some alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there will be no genuine issue of material fact."
> Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); see
> also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574
> (1986). An issue of fact is "genuine" if the record taken as a whole
> could lead a rational trier of fact to find for the non-moving party.
> Anderson, 477 U.S. at 248; Matsushita Electric Indus. Co., 475 U.S. at
> 586. It is "material" if it might affect the outcome of the case under
> the governing law. Anderson, 477 U.S. at 248. In addition, in
> considering a motion for summary judgment, the Court is required to
> view the evidence in the light most favorable to the non-moving
> party. Id. at 255.

**For making out a case of USERRA retaliation**

USERRA, provides, in relevant part that:

> A person who is a member of, applies to be a member of,
> performs, has performed, applies to perform, or has an obligation to
> perform service in a uniformed service shall not be denied initial
> employment, reemployment, retention in employment, promotion, or
> any benefit of employment by an employer on the basis of that
> membership, application for membership, performance of service,
> application for service, or obligation.

38 U.S.C. § 4311(a).  It further provides, in relevant part, that:

> An employer shall be considered to have engaged in actions prohibited ... under subsection (a), if the person's ... service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such ... service, application for service, or obligation for service.

38 U.S.C. § 4311(c)(1).

USERRA protects persons who perform "service in the uniformed services," which includes, without any differentiation "the performance of duty on a voluntary or involuntary basis in a uniformed service under competent authority and includes active duty, active duty for training, initial active duty for training [and] inactive duty training..."  § 4303(13).  And although "[n]o employer may require any such person to use vacation, annual, or similar leave during such period of service," § 4316(d),

> Any person whose employment with an employer is interrupted by a period of service in the uniformed services shall be permitted, upon request of that person, to use during such period of service any vacation, annual, or similar leave with pay accrued by the person before the commencement of such service....

Id.

"The term 'notice,'" meanwhile, includes "any ... verbal notification of an ... intention to perform service in the uniformed services provided to an employer by the employee who will perform such service...."  § 4303(8).

As the court explained in <u>Coffman v. Chugach Support Services, Inc.</u>,

411 F.3d 1231 (11th Cir. 2005):

> A motivating factor does not mean that it had to be the sole cause of the employment action. Instead, "it is one of the factors that 'a truthful employer would list if asked for the reasons for its decision.'" <u>Id</u>. (citation omitted); <u>see also</u> <u>Smith v. School Bd. of Polk County, Fla.</u>, 205 F.Supp.2d 1308, 1314 (M.D. Fla. 2002). "Indeed, [m]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." [<u>Brandsasse v. City of Suffolk, Va.</u>, 72 F.Supp.2d 608, 617 (E.D. Va. 1999)] (citation omitted); <u>see also</u> <u>Smith</u>, 205 F.Supp.2d at 1314-15. Circumstantial evidence plays a critical part in these cases, "for discrimination is seldom open or notorious." [<u>Sheehan v. Dep't of the Navy</u>, 240 F.3d 1009, 1014 (Fed. Cir. 2001)]. The court can infer discriminatory motivation under the USERRA from a variety of considerations, such as:
>
> > proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.
>
> <u>Id</u>.  "When the employee has met this burden, the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." <u>Id</u>. This burden-shifting framework "applies to both so-called 'dual motive' cases and so-called 'pretext' cases." id.  "Thus in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the agency action, upon which the agency must prove, by a preponderance of evidence, that the action would have been taken despite the protected status." <u>Id</u>.

<u>Id</u>. at 1238-39.

### Applying the Law to the Facts in the Case at Bar

When Congress enacted USERRA, it meant business for protecting the

rights of persons who choose to serve the United States in any of its uniformed services.  The pejorative tone of American Airlines's brief—categorizing Lt. Col. Patterson's notice to American that he was going on duty[17] at the Pentagon as a "last-minute request," DE 59, at 4, for "time off for a visit to the Pentagon," id., for he "and his wife [to] attend[] the ceremonial visit of the Pope," id. at 6—betrays a complete and antagonistic misunderstanding of the notion that USERRA is not like other employment laws.  It truly does say what it means, and means what it says, in very specific terms.

So the questions are, as regards defendant American's summary-judgment motion against plaintiff Patterson are:

**_First_**, could a reasonable jury determine from the evidence gathered that Brian Bonds put Rodney Scott Patterson on a no-fly status as of September 22 because he was angry that Patterson had decided  to take "vacation days" to take his wife to Washington, D.C., to attend the Pope's visit to the White House the day after Bonds asked him not to do so?

It certainly could find that Patterson's going on duty at that time period was a "motivating factor," in American's decision, considering:

- the tenor of Bonds's voice mail to Patterson the afternoon of September 21;

---

[17]Although plaintiff's counsel, who is not a reservist, used the term "active duty" colloquially in the complaint, that makes no difference. USERRA protects all stripes of duty.  § 4303(13).

•       the anger that Michelle Montgomery, a senior manager in Labor Relations, recalled Bonds expressing the morning of September 22 following Bonds's conversation with David Tatum, the duty pilot who authorized Patterson's leave, based on Bonds's suspicion that Patterson was not even on military duty;[18]

•       Someone at American changing Patterson's status to "Paid/Withheld" as early as September 22, according to a printout from American's Dispatch Environment Control System, see DE 61, at 2-3, ¶ 7;

•       Bonds's lickety-split processing of the seventh-month-old complaints from Glenn Whitehouse the night of September 24, capping his e-mail traffic with a 10:17 p.m. message, "Subject:  Patterson now on PW," DE 61 at 3, ¶ 9;

•       Bonds's expressing his desire to see Patterson "[m]aybe hang[] himself on providing false information" about his military earnings, or

•       Bonds's perhaps fabricating the purported September 6, 2015 e-mail in which he suggested a compulsory psychological exam for Patterson, based on a conversation he claimed to have with Whitehouse that Bonds now does not recall and that Whitehouse said never took place.

A reasonable jury could easily determine from that series of events—and particularly on Bonds's focus on both Patterson's going on duty

_____

[18]See Montgomery Deposition, DE 57-25, at 78:14-79:7, 80:9-19, 83:16-25.

at the Pentagon, and later on his military pay records—that Patterson's September 22-25 military duty was a "motivating factor."

**Second**, is American's claim that it would have put Patterson on no-fly status as of September 22 (and at the latest September 24) so airtight that a reasonable jury could decide nothing but that Whitehouse's complaints "standing alone, would have induced the employer to take the same adverse action," Coffman quoting Sheehan, and have set in motion the events that led to Patterson's not being allowed to fly to American since September 2014?

Hardly, considering that:

• Whitehouse's complaints had been known to Beach, a chief pilot, Labor Relations, Human Resources and Corporate Security, which deemed them unsubstantiated, for between five and seven months: so how did they become so urgent immediately after Patterson goes on duty in the Army Reserve?

• The Human Resources investigation that began in September or October produced no evidence of any behavior on Patterson's part warranting any employee discipline.

• Although Montgomery of Labor Relations, and American's Rule 30(b)(6) designee, says it was Bonds and Beach who initiated the mandatory neuropsychological examination for Patterson, Bonds testified that he witnessed none of the behaviors that were recited in the letter that

he signed and Beach testified that he was just told by someone higher up to sign it, so who made the decision and why?

- With all of the neuropsychologist along the eastern seaboard — including Gary Kay, Ph.D., the Georgetown University professor who designed the COGScreen Aeromedical Edition and who frequently examines pilots for American, why send Patterson out to California to have his motor skills tested the day after his late night arrival?

- Why did American send the "independent neuropsychologist" the "Fitness for Duty Medical Examination Request—Section 10," which essentially provided a menu for the report that it wanted back?

- With no objective evidence of any neuropsychological deficits, serious psychopathology or severe personality disorders, how can American ground a pilot who has been flying for as long as Patterson had and whom even the Department of Defense has certified as physically and mentally fit to deploy for combat as a lieutenant colonel?

As to the retaliation alleged in Count II, although the initial decision to order a neuropsychological exam appears to have been made prior to Patterson's filing his USERRA complaint, although there is no evidence from American about how it was made or why, it was not until after he did so that:

*First*, he was ground based on a neuropsychological report containing no objective findings. Indeed, Jeral Ahtone, M.D., American's Corporate

Medical Director, characterized the Knippa report as saying essentially

nothing:

> That indicates that he doesn't have a complete answer at this time.  There are suggestions that that may be the—maybe what's going on, but that in a short evaluation like this, it—he did not come to—down to that conclusively.
>
> In his next paragraph he says that, you know, personal counseling may help further clarify that issue.  That's his recommendation, and that's—that was the end of it.  I mean, that's where it ended—that's where it, yeah, ended his report.[19]

**Second**, that grounding was followed by an offer that American would

let Patterson be fairly evaluated—but only if he would abandon is statutorily

protected activity of pursuing a USERRA claim.  To withhold a fair

evaluation from someone unless that person agrees to forego the statutory

protection of USERRA is retaliatory.

## Conclusion

Based on the evidence marshaled, the authorities cited and the

arguments presented, plaintiff, Rodney Scott Patterson, respectfully

requests this Court to deny defendant American Airlines, Inc.'s motion for

summary judgment.

Respectfully submitted,

*s/ William R. Amlong*
WILLIAM R. AMLONG
WRAmlong@TheAmlongFirm.com
Florida Bar Number 470228
KAREN COOLMAN AMLONG

---

[19]Ahtone Depo, DE 57-3, 54:15-55:1.

KAmlong@TheAmlongFirm.com
Florida Bar Number 275565
JENNIFER DALEY
Florida Bar Number 856436
JDaley@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301
(954) 462-1983

NOEL C. PACE
noel.c.pace.esq@gmail.com
206 N.W. 91 Street
El Portal, Florida 33150
(305) 710-3713

***Attorneys for the Plaintiff,
Rodney Scott Patterson***

**Certificate of Service**

      I hereby certify that a true and correct copy of the this Statement was served this date via the Southern District of Florida's CM/ECF system on all parties and counsel of record.

<em>s/ William R. Amlong</em>