UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case Number: 17-cv-60533-MARTINEZ-OTAZO-REYES

RODNEY SCOTT PATTERSON,

    Plaintiff,

vs.

AMERICAN AIRLINES, INC., a
Delaware Corporation,

    Defendant.

_____/

**<u>Notice of Filing Transcript of
June 7, 2018 of Glenn R. Caddy,
Ph.D.,</u>**

      Plaintiff, Rodney Scott Patterson hereby files the Transcript of June 7,

2018 Deposition of Glenn R. Caddy, Ph.D., redacted to include only the

testimony concerning Edwin Bercaw, Ph.D., and highlighted.

### Certificate of Service

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing has

been furnished by CM/ECF this 26th day of June, 2018 on all counsel or

parties of record on the Service List below.

*/s/ William R. Amlong*       
William R. Amlong

## Service List

WILLIAM R. AMLONG
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
KAmlong@TheAmlongfirm.com


**AMLONG & AMLONG, P.A.**
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301
Telephone: (954) 462-1983
Facsimile: (954) 463-5008

***Attorneys for Plaintiff,***
***Rodney Scott Patterson***

MICHAEL A. HOLT
mholt@shb.com
**SHOOK, HARDY & BACON L.L.P.**
Miami Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

MARK W. ROBERTSON, ESQ.
mrobertson@omm.com
*(Pro hac vice)*
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

TRISTAN MORALES
tmorales@omm.com
*(Pro hac vice)*
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, District of Columbia
20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

***Attorneys for Defendant,***
***American Airlines, Inc.***

Page 1

1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
2
           CASE NO.:  1:17-cv-60533-MARTINEZ/OTAZO-REYES
3

4

5     RODNEY SCOTT PATTERSON,

6            Plaintiff,

7     vs.

8     AMERICAN AIRLINES, INC., a Delaware
      Corporation,
9
             Defendant.
10    _____/

11

12                        Amlong & Amlong, P.A.
                          500 Northeast 4th Street
13                        Second Floor
                          Fort Lauderdale, Florida 33301
14                        Thursday, June 7, 2018
                          1:19 p.m. - 3:48 p.m.
15

16

17        VIDEOTAPED DEPOSITION OF GLENN R. CADDY, Ph.D.

18

19

20

21            Taken on behalf of the Defendant before

22    Christine Savoureux-Mariner, Florida Professional

23    Reporter and Notary Public in and for the State

24    of Florida at Large, pursuant to Notice of Taking

25    Deposition in the above cause.

```
 5    BY MR. HOLT:

 6         Q    Dr. Caddy, have you seen Exhibit 1 before?

 7         A    No.

 8         Q    I'd like you to take a look page 3 of

 9    Exhibit 1, which identifies documents to bring with you

10    to this deposition.  Have you brought any documents

11    today in response to page 3 of Exhibit 1?




19         A    Okay.  "Any and all materials relied on" -- I

20    brought materials.  "Any and all materials considered in

21    any manner, whether or not you relied on objective" --

22    yes, number 3.

23              Number 4, "all communications with Edwin

24    Bercaw, including any persons, and Dr. Bercaw's office

25    regarding Plaintiff Rodney Scott Patterson."  As to
```

1    number 4, there is no document that I have.  I do have a

2    memory of communicating with Dr. Bercaw.

Page 34

25          Are you familiar with a Dr. Edwin Bercaw?

1        A     I'm aware of his existence, yes.

2        Q     Have you ever spoken to him with regard to

3    Mr. Patterson?

4        A     Yes.

5        Q     What did you speak about with him regarding

6    Mr. Patterson?

7        A     About -- in general, about his findings, or

8    more to the point, I was told by Captain Whitehouse --

9    excuse me, by Captain Patterson -- that Dr. Bercaw, he

10   went to see Dr. Bercaw very soon after he'd been to see

11   Dr. Knippa, and he also indicated to me that the

12   assessment that was done, was done not by Dr. Bercaw,

13   but by a woman trainee.  And I called Dr. Bercaw to ask

14   him about that.

15       Q     And what did he say?

16       A     He said that was true, that she did do the

17   work.  And so I pretty much said thank you, and I

18   contacted Captain Patterson and I said, in essence, you

19   just wasted a couple thousand dollars.

20       Q     What were the findings from Dr. Bercaw's

21   office regarding Mr. Patterson?

22       A     I don't know.  I don't know the details.

23       Q     Well, you said that you called to discuss the

24   findings?

25       A     Well, yeah, but when I found out that -- when

Page 36

1    I found out that he actually didn't do the testing, it

2    didn't really matter to me what the findings were going

3    to be because she wouldn't have been qualified to

4    administer the instruments.  And he went to see

5    Dr. Bercaw, not this lady who was in training.

6        Q    What instruments were administered?

7        A    I don't know.

8        Q    Then how do you know she wasn't qualified to

9    administer them?

10       A    Because she was not a licensed psychologist

11   and she was in training.

12       Q    Do you have to be a licensed psychologist to

13   administer every instrument that's available?

14       A    You have to be -- well, it would not be

15   appropriate for you to be doing this sort of work

16   without being licensed and without being thoroughly

17   knowledgeable, and also, without being closely

18   supervised.

19       Q    Do you know whether she was closely supervised

20   in the administration of these assessments?

21       A    The reason I raised the question was because

22   Captain Patterson told me that Dr. Bercaw was not in the

23   room during all of the testing that was done.  And that

24   was of concern to me.

25       Q    And Mr. Patterson tell you what testing was

Page 37

1   done?

2       A    Well, he knew that some of it was a

3   duplication of what had been done by Dr. Knippa.

4       Q    Did Mr. Patterson ever tell you the results of

5   that testing?

6       A    He didn't know the results, to the best of my

7   knowledge.

8            MR. HOLT:  I'm going to show you an email

9       which was previously marked as Exhibit 21 to

10      Mr. Patterson's deposition, and we'll mark this as

11      Exhibit 3 here.

12           (The referred-to document was marked for

13  identification as Defendant's Exhibit 3.)

14  BY MR. HOLT:

15      Q    Do you recognize this as an email from

16  Mr. Patterson to edb@medpsych.net and then copied to

17  you?

18      A    (Sotto voce reading.)

19           No.

20           MR. HOLT:  Can you read the question back?

Page 38

2              (The portion referred to was read by the
3    reporter as above recorded.)
4              THE WITNESS:  Yes, I do.
5    BY MR. HOLT:
6         Q    And that email from Mr. Patterson responds to
7    an earlier email from Ed Bercaw, correct?
8         A    Yes.
9         Q    And in Dr. Bercaw's email, he references a
10   report, correct?
11        A    Yes.
12        Q    So at the time of this email, April 22, 2016,
13   you knew, in fact, that Mr. Patterson had been made
14   aware the results were available for that examination,
15   correct?
16        A    Well, I might have then, I don't remember it
17   now.  But yes, I presume that I would have known it
18   then.
19        Q    Did you ever ask Mr. Patterson what the
20   results were of that assessment?
21        A    You are asking me for a level of detail that I
22   just don't remember back then.  My recollection is that
23   when he told me -- "he" meaning Captain Patterson --
24   that the testing was not done by Dr. Bercaw, I told him
25   that he just wasted whatever the number of dollars was,

1    somewhere around two and-a-half thousand.

2          And my reason for saying that was under the

3    conditions of wanting, really, expert opinion, it

4    would've -- he couldn't have used the report that was

5    ready for him to receive.  And the reason that he

6    couldn't is because Dr. Bercaw would have been seriously

7    criticized for not actually doing the work himself.

8          The lady that he was using clearly did not

9    have the qualifications that was requisite.  She was a

10   trainee.  Now, that doesn't mean that she was incapable

11   of administering tests; what it means is she didn't have

12   standing to be an expert in the administration of those

13   tests.

14       Q    And fair enough, she had a doctorate in

15   psychology, didn't she?

16       A    I don't know.  What I know is that she was in

17   training.  Whether she had a doctorate or whether she

18   didn't, at the time, she was still an intern.  That's

19   why she would have been --

20          MR. HOLT:  Let's mark this as Exhibit 4.

21          (The referred-to document was marked for

22   identification as Defendant's Exhibit 4.)

23   BY MR. HOLT:

24       Q    I've handed you what we've marked as

25   Exhibit 4, which is a privilege -- purports to be a

Page 40

```
 1    privilege log prepared by Mr. Patterson's counsel.  And
 2    in particular, I'd like you to take a look paragraph 2
 3    of Exhibit 4 and tell me if the person identified there,
 4    Francy Nathaly Fonseca, Psy.D. is the intern you are
 5    referencing.
 6         A    Yes, she is.
 7         Q    Does this refresh your recollection --
 8         A    Yes.
 9         Q    -- as to whether she had a doctorate in
10    psychology?
11         A    Yes.  And she is still an intern.
12         Q    But she had a doctorate in psychology,
13    correct?
14         A    Yes.
15         Q    Okay.  Did you prepare at some point any
16    correspondence between you and Dr. Bercaw regarding the
17    reports?  His report.
18         A    Not that I recall.
19         Q    Did you ever receive any correspondence from
20    Dr. Bercaw regarding the March test results?
21         A    Not that I recall.
22         Q    Take a look paragraph 3 of Exhibit 4.
23         A    I've already read it, but if you're asking me
24    if I recall it, then the answer is no.
25         Q    No, I'm asking if you received it.
```

Page 41

```
 1              If there was a two-page letter dated May 6,
 2    2016 from Dr. Bercaw to you discussing the March test
 3    results, would that be something you would have
 4    reviewed?
 5         A    I don't have an independent recollection of
 6    it.
 7         Q    My question is:  If such a letter were sent to
 8    you, would you have reviewed it?
 9         A    I likely would have, but I'm not sure that I
10    did.
11         Q    Is there any reason you can recall why you
12    would not have reviewed that?
13         A    Well, you are asking me to recall a particular
14    event in May of 2016, so that is stretching the edge of
15    the envelope.  If I didn't, it would have been because I
16    had already decided that what he needed to do was to go
17    and see --
23              THE WITNESS:  What he would need to do is to
24         go and see Gary Kay.  Because it would have been
25         Gary Kay who I would have advised him to go and see
```

1       right from the outset after he saw Dr. Knippa.

2   BY MR. HOLT:

3       Q    I guess I'm a little confused because you are

4   telling me that you don't know if you would have looked

5   at this letter, but if you did look at the letter -- or

6   if you didn't look at the letter, then you would have

7   referred him to Dr. Kay; is that your testimony?

8       A    When -- I didn't know that he had gone to

9   Dr. Bercaw.  He did that on his sprite little self and I

10  knew that he had been calling around to several people

11  in the area thinking that he needed to get a second

12  evaluation.

13           I didn't know, a priori, that he went to see

14  Dr. Bercaw and -- hang on, let me just finish my

15  sentence -- and if I had known that he was going to go

16  and see somebody, I would have told him to go to Gary

17  Kay.  That's what I wanted to say.

18      Q    Could you explain for the jury what a priori

19  means?  A priori.  It's a term you used.  It's Latin.

20      A    Okay.

21      Q    It might be helpful if the folks in the jury

22  can understand that.

23      A    A priori simply means that earlier on, I would

24  have done this.  Had I known, I would have done this.

25      Q    But as of April 22nd, as reflected on

1   Exhibit 3, you knew that a report had been prepared,

2   correct, by Dr. Bercaw?

3       A    You are asking me from a memory that I don't

4   have.  It's reasonable that I would have known, but you

5   are asking me did I know that?  It's reasonable that I

6   would, but I don't have an independent memory of knowing

7   it.

8       Q    Okay.  Well, let's do it this way:  As you

9   look at Exhibit 3, this is a document you received,

10  correct?  Exhibit 3.

11      A    Yes.

12      Q    Was it your usual practice to read emails that

13  were sent to you by your clients?

14      A    In general, it is, yes.  Though sometimes I

15  can sit there for days because I get too many emails.

16      Q    Do you have any reason to doubt that you would

17  have read this email on or around April 22nd of 2016?

18      A    I think it's very likely that I would have.

19      Q    Okay.  So then on May 6, 2016, by the time

20  Dr. Bercaw writes this letter to you discussing the test

21  results, you already knew that a test had been

22  performed, correct?

23      A    I believe that by then, I knew that, yes.

24      Q    Okay.  And you received this letter from

25  Dr. Bercaw, according to the representation made by

Page 44

1    Mr. Patterson's counsel, correct?  I mean, that's what

2    Exhibit 4 tells us.

3        A    It would seem so, yes.

4        Q    And having received that letter, would it be

5    your usual practice to open up a letter that you

6    received and see what it is?

7        A    It would be common practice, yes.

8        Q    Do you have any specific recollection of not

9    doing that in this case?  In other words, of shredding

10   the letter, never looking at it, never opening it?

11       A    No.  The only thing that I can tell you with

12   certainty is that I don't have that.  What would be my

13   standard practice if I wanted to keep something would be

14   to put it into my Dropbox.  That is, take it off the

15   email and put it into my Dropbox.

16            If I looked at it and decided it was not

17   something that I wanted to keep, or if I didn't look at

18   it because I didn't see myself wasting time on it, then

19   I would have deleted it.  And that would be true of any

20   document or any email that I get.

21       Q    I understand, sir, but in federal court, we

22   are entitled to review the documents that you received,

23   whether you relied on them.  And I understand -- I think

24   I understand -- you tell me if I'm wrong -- that

25   definitely if you are going to rely on something, that

1   gets saved every time, correct?

2        A    Sure, yeah.

3        Q    And there might be some things that you take a

4   quick glance at and you say, eh, I don't need this, and

5   it might not go into the Dropbox, correct?

6        A    Right.

7        Q    Okay.

8        A    And there's a large number of things that I

9   tend to be a bit compulsive about eliminating, deleting

10  documents that -- not just documents, but emails -- that

11  I'm just not going to keep.

12       Q    Okay.  So it's possible you read this letter

13  described in paragraph 3 of Exhibit 4 and deleted it?

14            MR. AMLONG:  Object as to form as to what's

15       possible.

16            THE WITNESS:  The answer is I don't know the

17       answer, okay?

18  BY MR. HOLT:

19       Q    But that would be consistent with your

20  practice; if there is something that you are not going

21  to use in the future, not going to rely on, you might

22  delete that, correct?

23       A    It would be quite likely that I would do that,

24  yes.

25       Q    Same thing with the report prepared by

1    Dr. Bercaw; if you received the report, you glance at

2    it, you decide I'm not going to rely on this, your

3    ordinary practice would be to just delete it, correct?

4        A    Yes.

5            MR. AMLONG:  Objection.  Assumes facts not in

6        evidence.  There is no testimony that he received

7        the report.

8            THE WITNESS:  I'm simply telling you I have no

9        recollection of receiving a report.  I certainly

10       don't believe I ever read a report from Dr. Bercaw,

11       and I know it's becoming a big issue now, but it

12       wasn't a big issue to me back at the time,

13       otherwise I probably would have a clearer memory of

14       exactly what was going on.

15   BY MR. HOLT:

16       Q    But you do recall discussing with Dr. Bercaw

17   his findings, correct?

18       A    I recall discussing briefly his findings, yes.

19       Q    But you don't recall what his findings were

20   in that report, correct?

21       A    No.

22       Q    No, not correct, or no, you don't recall?  I

23   apologize, that was a bad question.

24       A    I recall that he was generally positive in

25   regard to the findings.  Now, the reason that I said to

1    Captain Patterson -- I was actually irritated when I

2    found out about it, and the reason is that when I think

3    about things, I think about them within a forensic

4    framework, and I wanted him to go to somebody where

5    there would be no question of the qualifications and

6    where an assistant had not done the work.

7              Because it was clear to me that by going to

8    Dr. Bercaw, what he accomplished was having an assistant

9    do the work that would simply lead to more compromise.

10   He had already been very compromised in California, and

11   my view was if he was going to get compromised, let it

12   be by an expert.  Let it not be to get into a battle

13   that could cost him thousands of dollars because instead

14   of Dr. Bercaw doing the work, it was Doctor -- it was

15   the trainee, in essence.  That was the position that I

16   took.

17        Q    I believe you just testified that Dr. Bercaw's

18   findings were generally positive, correct?

19        A    That's what he told me.

20        Q    Did he tell you about any findings that were,

21   let's say, less than positive?

22        A    You are asking me for a memory going back --

23             MR. PACE:  Objection.  Asked and answered.

24             MR. HOLT:  It hasn't been answered, and only

25        one attorney should be objecting here.

```
 1            THE WITNESS:  The answer that I gave
 2       previously is that overall, the test results were
 3       good, but I don't remember whether there was any
 4       negative sign or not.  Overall, they were good.
 5  BY MR. HOLT:
 6       Q    So you considered the fact that they were
 7  overall good; you didn't rely on it, but you considered
 8  that, correct?
 9       A    No, I didn't consider it.  What I considered
10  was that it was inappropriate for him to be getting an
11  evaluation done -- signed off by Bercaw, but done by a
12  trainee.  That's what I considered.
13       Q    But you are aware that his results were
14  overall positive, correct?
15       A    Yes.
16       Q    And you were made aware of that through a
17  conversation with him, correct?
18       A    Yes.
19       Q    And so once you knew that knowledge, I think
20  you would agree with me that you can't just unlearn that
21  information, right?  You might forget it later on, but
22  you can't unlearn it.
23       A    Yeah, it's not something I unlearned.  I
24  didn't specifically forget about it, but it's not until
25  you showed me this stuff that I'm actually remembering
```

Page 49

1   some of it because it just vanished.

2           The bottom line is the argument that I made to

3   Captain Patterson was you need to get this done

4   properly.  If I had known you were going to do that and

5   that it was going to be done by a young trainee, I would

6   have told you you were an idiot.  And I told him he was

7   an idiot.  Not because it couldn't be right or wrong,

8   but because he needed to have a level of expertise that

9   was not negotiable, that wouldn't get him into

10  arguments.  That's what I was concerned about.

11      Q    I think I understand your concern.  I really

12  do think I understand it.  I hope you understand my

13  concern is we are just trying to figure out what you

14  have looked at through the course of this case and --

15      A    I --

16      Q    -- so that's why I'm asking these questions.

17      A    Yeah, I think we've gone about as far as I can

18  go in terms of, you know, look, if I had kept the

19  document, it would be in my file.

20      Q    Sure.

21      A    If I had printed it out, it would be in my

22  file.

23      Q    Sure.

24      A    It would be either in electronic form or -- in

25  fact, when this first came up, I actually looked on my

Page 50

1    Dropbox to see if maybe I had kept it.  And I didn't.  I

2    looked to see if I had an email and I didn't.

3              But that may also be related to the fact that

4    I made a modification to my email system about a year

5    ago.  I changed my email address.  Not a lot, but a

6    little bit.

7        Q    Okay.  Can you tell us generally what you did

8    to prepare for today's deposition.

Page 52

5    BY MR. HOLT:

6        Q    I don't recall if I asked this or not earlier,

7    so forgive me if I did:  Do you know any of the

8    instruments that were -- or assessments that were

9    performed by Dr. Bercaw's office with respect to

10   Mr. Patterson?

11       A    Are you asking me do I know any -- I don't

12   know what he did, but I know what is relatively standard

13   to do when you are doing an aeromedical examination and

14   that, you know, different people do different things and

15   drop and change on certain instruments, but the

16   CogScreen seems to be the standard for a lot of the

17   assessment, and then many of the actual instruments that

18   were used by Dr. Knippa, I do not disagree with, but I

19   disagreed with his interpretation of some of the

20   results.

21            But all of those instruments would be

22   reasonably typical.

23       Q    Was it your understanding that Dr. Bercaw's

24   office performed the CogScreen test on Mr. Patterson?

25            MR. AMLONG:  Objection.  Foundation.

```
 1              THE WITNESS:  The answer is yes, it's my
 2         understanding that he did.
 3    BY MR. HOLT:
 4         Q     Okay.  Do you have any specific understanding
 5    or knowledge about other specific tests that his office
 6    performed?  And by "his," I mean Dr. Bercaw's office
 7    performed --
 8         A     Did you say Bercaw or did you say Knippa
 9    before?
10         Q     I believe I said Bercaw.
11         A     Oh.
12              MR. HOLT:  Madame Court Reporter, could you --
13              THE WITNESS:  Because I thought I heard you
14         say Knippa.  Because I don't know what -- I can
15         presume what Dr. Bercaw's office would do because a
16         standard aeromedical examination would include
17         that, but if you are asking me:  Did I know that he
18         did that?  No, I don't know that he did that.
19         Would it be reasonable to expect that he did it?
20         Yes.
21              MR. HOLT:  Could you read back my prior
22         question just so I can make sure I asked --
23              MR. AMLONG:  I think it was your second prior
24         question.
25              MR. HOLT:  I think it might be.
```

1              (The portion referred to was read by the

2      reporter as above recorded.)

3              THE WITNESS:  Okay.  So now that we've got the

4      right doctor in place, the answer is I don't know

5      what he performed because I simply don't know.

6      Would I expect that if he was doing an aeromedical

7      examination, he would have almost definitely done

8      the CogScreen, my answer is yes.

9      BY MR. HOLT:

10          Q    Do you have any specific knowledge as to any

11     of the instruments or assessments that were performed by

12     Dr. Bercaw's office?

13          A    Well, I don't know what the instruments were,

14     but -- so the answer is no.  If you are asking me do I

15     know about instruments that are typically used in this

16     field, the answer is yes.

17          Q    My question was the first one.  Do you know

18     which specific ones --

19          A    No.

20          Q    -- were used?

21          A    No, I do not.

22              MR. HOLT:  Okay.  I have nothing further.

23                      CROSS-EXAMINATION

24     BY MR. AMLONG:

25          Q    Have you ever seen any report by Dr. Bercaw's

1    office?

2          MR. HOLT:  Object to form.  Asked and

3      answered.

4          THE WITNESS:  No.

5    BY MR. AMLONG:

6      Q    Have you ever seen the raw data of any tests

7    from Dr. Bercaw's office?

8      A    No.

9      Q    After you learned from Mr. Patterson and

10   confirmed with Dr. Bercaw that the tests had been

11   administered in Dr. Bercaw's absence by Dr. Fonseca, did

12   you have any interest whatsoever in the results or the

13   report?

14     A    No.  I was just annoyed that Captain Patterson

15   was not being more strategic in addressing the

16   seriousness of the Knippa opinion by going to somebody

17   around the corner as opposed to an international

18   authority.

19          I mean, I didn't get hired because I was

20   somebody just around the corner.  And I thought that it

21   was against reason for him to just try and get it done,

22   as if it was just like all I have to do is take a car

23   ride and save some money.  That was the position --

24   that's the position that I took with Captain Patterson.

25     Q    Having learned that whatever instruments had

Page 56

1  been administered by Dr. Bercaw's office, would you have

2  had any interest in any letter discussing the results of

3  the findings from those instruments formed by

4  Dr. Fonseca?

5         MR. HOLT:  Objection to the form.

6         THE WITNESS:  Well, firstly, I have no

7     recollection of ever receiving a letter with any

8     report, but had I, I think that by the time that

9     that work would have been completed and returned

10    and turned into a report, I had already said to the

11    client that he needed to stop wasting time and

12    money and go to somebody whose reputation is

13    excellent and who doesn't use unlicensed trainees

14    to conduct the work.

15 BY MR. AMLONG:

16    Q    Well, even assuming that Dr. Fonseca may have

17 been licensed by the Board of Psychology as a Psy.D. in

18 January, would she have been qualified to administer the

19 test by herself --

20         MR. HOLT:  Objection to the form.

21         MR. AMLONG:  -- for a report being done by

22    Dr. Bercaw?

23         THE WITNESS:  Well, she would have also had to

24    have gone through the full training for aeromedical

25    and she would have to have been certified as an

Page 57

1       aeromedical specialist in order to be in a position

2       to fully do that work.

Page 76

24        Q     And going back to the issue of Dr. Bercaw's

25    report, is it your testimony today that based on having

1   reflected on the methodology used by Dr. Bercaw with

2   respect to an intern conducting the test, that you

3   decided you would not rely on Dr. Bercaw's report?

4        A    I decided it wasn't something that we were

5   even going to consider, or that I was going to encourage

6   Captain Patterson to consider because I decided that

7   what he'd done is just wasted two and-a-half thousand

8   dollars because the person he needed to see was an

9   expert because we were dealing with a situation that I

10  was concerned was going to develop just the way this

11  has.

12       Q    And in reaching that conclusion that

13  Mr. Patterson should not have -- essentially should not

14  have gone to this guy --

15       A    Yeah.

16       Q    -- and let an intern do the evaluation, you

17  really reflected on what the procedure was there and

18  whether this --

19       A    You know, I always think -- because I do so

20  much forensic work and I'm Board certified and all that

21  rubbish, I always think about not simply the act, but

22  the impression surrounding the act.  And if you are

23  going to -- I wasn't --

24            You know, I could have done all this testing,

25  but because I'm not aeromedically certified, as I said,

1   I'd have to take my two-day course in California --

2   which I was invited to take, by the way, and decided not

3   to, but the bottom line is this:  If I were going to

4   advise, which I did, the client on how best to deal with

5   the Bercaw -- excuse me, the Knippa matter, you don't

6   take a slingshot to a gunfight.

7          And my view was that he needed to go, you

8   know, to somebody who is exceptional and, in fact, who

9   is the actual developer of the instrument, the

10   CogScreen.  And that's why I wanted him to go to Gary

11   Kay.  And Gary and I had several discussions about it

12   and we even talked -- we talked at length about Knippa

13   and what Gary thinks of Knippa and, you know, I was sort

14   of irritated with Scott for trying to be slightly

15   impulse control disorder in rushing to try and do

16   something quickly, you know.

17          I'm teasing about the impulse control issue,

18   but you know, you don't have to solve this problem

19   immediately, you have to solve it profoundly.  And

20   that's what I was referring to.

21          MR. HOLT:  Thank you.

22             RECROSS EXAMINATION

23   BY MR. AMLONG:

Page 81

22       Q    And would it have been ethical for Dr. Bercaw

23   to offer any opinion about test results that were --

24             Would it have been ethical, professionally,

25   for Dr. Bercaw to issue any opinion about the results of

Page 82

1    tests that were performed in his absence by a resident

2    Psy.D.?

3        A    He should not have done that.  It is simply

4    not appropriate.  If the assistant, or the resident, or

5    the intern was doing the work and he being or she

6    was being closely supervised -- that is, the doctor was

7    present in the room at the time all of this was going on

8    so that he could evaluate independently her work or his

9    work, whoever it was -- then there can be an argument in

10   favor of she may have been actually administering the

11   tests, but he knew everything that was occurring and he

12   was fully supportive of exactly what she was doing.

13              But to not be --

14              (Phone interruption.)

15              THE WITNESS:  But to not be present throughout

16        the testing at all --

17              (Phone interruption.)

Page 83

```
 1   BY MR. AMLONG:
 2        Q    Would it have been professionally ethical for
 3   you to rely on a report done by Dr. Fonseca in the
 4   absence of Dr. Bercaw?
 5        A    That was one of the reasons why I told your
 6   client that he wasted his money.
 7               MR. AMLONG:  Thank you.
 8               MR. HOLT:  Nothing further.
 9

12               (The taking of the deposition was concluded at
13   3:48 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```