UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 1:17-cv-60533-MARTINEZ-OTAZO-REYES

RODNEY SCOTT PATTERSON,
    Plaintiff,

vs.

AMERICAN AIRLINES, INC., a Delaware Corporation,

    Defendant.
                                                /

**REPLY IN SUPPORT OF
AMERICAN AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff does not currently fly passenger aircraft for American because an independent neuropsychologist determined in March 2016 that he is "NOT FIT FOR DUTY" as a pilot. Plaintiff, however, asks this Court to reject this finding and return him to the flight deck at American without the independent neuropsychologist who found him unfit (or a comparable examiner approved by American) clearing him for duty in accordance with American's standard practice and the governing collective bargaining agreement. In seeking this relief, Plaintiff fails to apprise the Court (and attempted to hide from American and the Court in violation of his discovery obligations) that even one of the doctors he hand-selected raised similar concerns about Plaintiff's fitness for duty. Dr. Bercaw, who refused to "play ball" (as Plaintiff puts it), never saw the report of American's independent neuropsychologist, but still was so concerned about Plaintiff's abilities that are "potentially critical to flight performance, particularly in non-routine situations" that he recommended further evaluation by the FAA.

Even in the face of this evidence—about which Plaintiff has known since well before filing suit—confirming not only that American has a legitimate basis to withhold Plaintiff, but is required to do so in order to ensure the safety of the flying public, Plaintiff clams that this Court should return him to flight. Plaintiff argues that this Court must do so—not because American withheld him from duty because he requested active duty military leave as he alleges in his Complaint—but because American withheld him because he requested vacation days to attend the Pope's visit at the White House with his wife (something that USERRA in no way even covers).

In its Motion for Summary Judgment, ECF No. 59, and Opposition to Plaintiff's Motion for Summary Judgment, ECF No. 76, American has set forth overwhelming record evidence confirming American is entitled to summary judgment. In his Opposition, ECF No. 74 ("Pl. Opp'n"), Plaintiff musters only unanswered questions musing as to whether a jury could reach

1

certain conclusions favorable to Plaintiff. No jury could, and American is entitled to summary judgment.

**I.     AMERICAN IS ENTITLED TO SUMMARY JUDGEMENT ON COUNT I**

Plaintiff raises two questions as to Count I—both have clear answers in the record and neither raises a genuine issue of material fact.

**A.     No Reasonable Jury Could Find Anti-Military Animus**

Plaintiff first asks "could a reasonable jury determine from the evidence gathered that Jim Bonds put [Plaintiff] on a no-fly status as of September 22 because he was angry that Patterson had decided to take 'vacation days' to take his wife to Washington, D.C., to attend the Pope's visit to the White House the day after Bonds asked him not to do so." (Pl. Opp'n at 9.) A reasonable jury could not, but even a "yes" answer would not matter.

i.     Plaintiff's Own Question Confirms The Absence of Anti-Military Animus

Initially, even if the answer to this question were "yes," it would not matter because being angry with someone for taking vacation days does not demonstrate the anti-military animus required for a USERRA claim. *See, e.g.*, *Rademacher v. HBE Corp.*, 645 F.3d 1005, 1011 (8th Cir. 2011) (even an employer's frustration by requests for military leave—which Plaintiff here did not even request—is insufficient to establish a motivating factor where time-off requests have been honored over a multi-year period). Thus, Plaintiff has not even alleged—much less presented evidence sufficient to create a disputed issue of fact—that his military service was a motivating factor for American's actions in withholding him from flying.

In any event, the undisputed record evidence is overwhelming that American withheld Plaintiff from duty because another Captain submitted a serious work environment complaint against Plaintiff. Plaintiff himself testified that the complaint is one that "a reasonable person would expect to cause the loss of employment of any person affected." (SMF at ¶ 27.) Moreover,

2

Plaintiff's own expert testified that the complaint warranted withholding Plaintiff and sending him for a fitness for duty examination, and in his report, concludes that "but for" the complaint, Plaintiff would not have been withheld from duty. (SMF at ¶ 40.)

    ii.    <u>Plaintiff's Question Is Based on Demonstrably False Assertions</u>

The fundamental premise of Plaintiff's question is also incorrect because it assumes that American withheld Plaintiff "as of September 22, 2015." This is flatly inaccurate and indisputably so: American placed Plaintiff on Paid Withheld ("PW") status on September 24, 2015, after receiving the formal complaint against Plaintiff. (SMF at ¶¶ 24–30; Pl. Dep. Ex. 11, ECF No. 57-2.) In a baseless attempt to salvage his claims—after Plaintiff's own expert testified that American was compelled to withhold Plaintiff from flying once it received the complaint (SMF at ¶ 28)—Plaintiff now suggests that American withheld him before it received the complaint. (Pl. Opp'n at 10.) American's business records, however, confirm exactly what each of American's witnesses have testified: American placed Plaintiff on PW status on September 24, 2015, only after American received the formal complaint against Plaintiff. (RSMF at ¶ 7, ECF No. 76-1.)

In his Opposition, Plaintiff asserts that there is a "printout" from American's computer system, but he does not cite to any such printout—indeed, the only record citation in his Opposition is to the *same unsupported assertion* in Plaintiff's Statement of Material Facts, which also does not cite a single piece of record evidence. (Pl. Opp'n at 10 citing ECF No. 61 at ¶ 7.) The records from American's computer system, however, confirm that American placed Plaintiff on PW status on September 24, 2015. (Pl. Dep. Ex. 11, ECF No. 57-2.)

Further, as detailed in the declaration of Michelle Ladkin, a Senior Manager - IT Applications at American, American's computer system records all status changes for pilots in a crew history report. (RSMF at ¶ 7, ECF No. 76-1; Ladkin Decl., ECF No. 76-2.) The system does

not allow status changes to be deleted after they are entered, and there is no record of any status change for Plaintiff on September 22 or 23, 2015. (*Id.*) The absence of any business record showing a change of status on September 22 or 23, 2015 is thus conclusive evidence that Plaintiff's unsupported assertion regarding his PW date is false. Thus, there is no genuine issue of material fact regarding the date American placed Plaintiff on PW status. *See, e.g.*, *City of Fort Lauderdale v. Scott*, 888 F. Supp. 2d 1279, 1284 n.2 (S.D. Fla. 2012) (demonstrably false affidavits submitted by plaintiffs in an attempt to avoid summary judgment do not provide evidence to counter defendants' summary judgment motions).

Plaintiff's question also falsely states that Captain Bonds "asked him not to" take the "vacation days" he requested. (Pl. Opp'n at 9.) On September 21, 2015, a Flight Office employee informed Captain Bonds that Plaintiff had requested personal time off—*not* a military leave of absence—to attend the Pope's visit to the White House. (SMF at ¶¶ 8–10.) Captain Bonds was also aware that Plaintiff was scheduled to fly the next day with another pilot who served as part of a union Professional Standards group that had recently investigated allegations made against Plaintiff. (SMF at ¶¶ 7, 11.) Even with this information, however, Captain Bonds did not reject Plaintiff's request for "vacation days"; to the contrary, he told Plaintiff, "obviously, we are going to give you the time off, if you can produce some uhhm, orders." (SMF at ¶ 10; Pl. Aff. Bates No. Patterson_Caddy_00025, ECF No. 57-31.) Captain Bonds' message was simple: even if this request was for "vacation days," if it were for military service then he would "obviously" grant the request. Plaintiff did not provide any such orders, but a system-wide Duty Chief nonetheless granted his request that same day. (SMF at ¶ 16.)

When Plaintiff provided American with a "copy of a copy" of a Leave and Earnings Statement ("LES") on October 28, 2015, purporting to provide written confirmation that Plaintiff

4

appeared at the Pope's visit on behalf of the Pentagon, someone had redacted much of the document. (SMF at ¶ 21.) Plaintiff suggests that the mere fact that Captain Bonds was initially "suspicious" concerning this heavily redacted copy of an LES (not written orders) shows anti-military animus by Captain Bonds. (*See* Pl. Opp'n at 11.) This assertion is preposterous, and any employer would have been suspicious under these facts. Moreover, Captain Bonds has testified that, based on his own experience in the armed forces, written orders for duty were "always" readily available. (SMF at ¶ 14.) Questioning a document based on one's own military experience in no way demonstrates an anti-military bias. *See Ayoub v. Bd. of Cty. Comm'rs ex rel. Cty. of Santa Fe*, 964 F. Supp. 2d 1288, 1299–1300 (D.N.M. 2013) (considering supervisors' former military service and determining plaintiff did not establish prima facie showing that military service was a motivating factor in adverse actions). In any event, on November 4, 2015, less than one week after Plaintiff provided the LES to American, Captain Bonds informed Plaintiff that he considered the military verification inquiry "closed." From the perspective of Captain Bonds and American, that was the end of the inquiry concerning Plaintiff's visit to Washington D.C.[1]

      iii.    <u>The Undisputed Evidence Confirms American Supports Military Leave</u>

In his 15-plus years working at American, American had never denied a request by Plaintiff for military leave nor has Plaintiff had any issue taking military leave at American. (SMF at ¶ 6.) Moreover, "[m]ost pilots at American" have a military service background and American has a robust commitment to the ongoing military service commitments of those pilots. (SMF at ¶ 4.) In

---

[1] Plaintiff highlights one sentence from an internal email Captain Bonds sent shortly after Plaintiff submitted the redacted LES: "Maybe he hangs himself on providing false information." (Pl. Opp'n at 10; *see also* Bonds Dep. Ex. 25, ECF No. 61-15.) This stray speculative comment from Captain Bonds does not reflect any undue scrutiny of Plaintiff by Captain Bonds nor an anti-military bias, and in any event, Captain Bonds sent it more than a month after American withheld Plaintiff from duty based on the employee complaint.

2015, for example, American granted 122 Miami-based pilots more than 1,500 military leaves of absence. (SMF at ¶ 5.) Under these facts, no reasonable jury could find that Plaintiff's military status was a motivating factor in American's decision to withhold him from duty beginning on September 24, 2015. *See Hickle v. Am. Mutli-Cinema, Inc.*, 296 F. Supp. 3d 879, 887 (S.D. Ohio 2017) (multi-year history of allowing military leave when requested must be considered when evaluating whether plaintiff has made showing sufficient to withstand summary judgment).

     **B.**    **The September 24, 2015 Employee Complaint Indisputably Induced American to Withhold Plaintiff from Flying**

Plaintiff next asks whether a reasonable jury must conclude that the September 24, 2015 complaint "standing alone, would have induced the employer to take the same adverse action" and "set in motion the events that led to [Plaintiff]'s not being allowed to fly to (sic.) American since September 2015?" (Pl. Opp'n at 11.) The record evidence on this point overwhelmingly establishes that the answer is yes. Plaintiff himself has testified that the complaint is a document that "a reasonable person would expect to cause the loss of employment of any person affected." (SMF at ¶ 27.) Plaintiff's testifying expert also concedes that, based on the allegations in the complaint, American should have referred Plaintiff to a mandatory fitness for duty evaluation. (SMF at ¶ 28; *see also* Caddy Dep. Ex. 2.B at 30, ECF No. 57-28 at 42.)

American also has a "public obligation to ensure that Plaintiff [i]s fit to fly." *Witter v. Delta Airlines, Inc.*, 966 F. Supp. 1193, 1201 (N.D. Ga. 1997). The employee complaint set forth detailed allegations that described Plaintiff "as being dishonest, or having a personality defect . . . and even one who is perhaps mentally unstable." (SMF at ¶ 26.) American's decision to withhold Plaintiff from duty while it investigated the allegations was particularly justified given that the Union representative (who represents both Plaintiff and the Captain who filed the employee complaint)

6

had determined that the allegations merited an investigation, but had been unable to resolve the matter. (SMF at ¶¶ 24–25.)[2]

Plaintiff argues that the Company's HR investigation of the complaint "produced no evidence of any behavior on Patterson's part warranting any employee discipline." (Pl. Opp'n at 11.)[3] But, Plaintiff simply ignores the written report prepared by the HR Department in December 2015, which stated that, "the majority of the employees interviewed described Patterson as a habitual liar/story teller" and that "Patterson's behavior" led "multiple employees . . . to question his ability to operate the aircraft safely; it left them with an impression that 'he's not quite all there.'" (SMF at ¶ 33.) While this may not have warranted discipline, it certainly warranted a fitness for duty examination. Notably, American's HR Department handled the subsequent investigation, and Plaintiff does not even allege that the investigator had an anti-military bias.

When American then turned to an independent neuropsychologist to assess Plaintiff's fitness for duty, he concluded that Plaintiff's "overall profile of neuropsychological assessment was discrepant from that expected for Major Airline pilots of similar age" and that he was "NOT FIT FOR DUTY as a [first officer], on the basis of impaired performances on cognitive

---

[2] Plaintiff argues that American's proffered reason for withholding Plaintiff from duty is inconsistent with the fact that American did not withhold Plaintiff from duty in March 2015, when the Captain who filed the formal complaint raised similar allegations with the union. (Opp'n at 11.) The undisputed evidence confirms that the union's Professional Standards group was attempting to resolve the matter—as is standard practice for disputes between pilots. (SMF at ¶ 25.) Ultimately, when that process did not resolve the issue, the Captain presented American with a formal written complaint seeking review and action by American's HR department. (SMF at ¶¶ 24–25.)

[3] As the court explained in *Quick v. Frontier Airlines, Inc.*, 544 F. Supp. 2d 1197, 1215 (D. Colo. 2008), the "absence of remedial action resulting from the investigation hardly supports an inference of retaliatory intent—and, indeed, may well stand as a vindication of the high standard of proof and overall fairness of the investigation."

7

assessment." (RSMF at ¶ 17.) Plaintiff does not allege that the independent neuropsychologist (a former Marine himself) had an anti-military basis. And American recently learned that at least one other doctor—whose paid opinion Plaintiff sought—came to similar conclusions.

Dr. Bercaw—a neuropsychologist selected by Plaintiff and his testifying expert (*see* ECF No. 54-1)—examined Plaintiff on March 21, 2016. (*See* Exhibit 1.)[4] Dr. Bercaw's report details several test results reflecting Plaintiff's cognitive speed and thruput (balance of speed and accuracy) are in the 15th percentile and others in the 5th percentile—the bottom 15% and 5% of the population, respectively. (*See id.* at 4.) The results also showed "mildly-to-moderately impaired deductive reasoning," "difficulty with sustained attention particularly to auditory stimuli," mild to moderate impairment in verbal memory performance, and "impaired problem-solving in response to feedback." (*Id.* at 4–6.) Dr. Bercaw summarized, "These findings raise concern about how adaptable or flexible he is to feedback about his performance. This quality is potentially critical to flight performance, particularly in non-routine situations." (*Id.* at 7.) After Dr. Bercaw completed his report, Plaintiff told his testifying expert, "If Dr. Bercaw won't play ball with you, fine. . . . If he won't play ball we will cut bait and go fish elsewhere." (ECF No. 79 at 2.) This statement—from an individual who multiple American employees described as "a habitual liar/story teller"—confirms exactly why, as explained in American's opening brief,

---

[4] For several months, American has been seeking a copy of Dr. Bercaw's report. Plaintiff refused to turn over the document even though Dr. Bercaw shared the results of his examination with Plaintiff's testifying expert, who testified that he routinely deletes materials that he reviews and decides not to rely upon. On June 29, 2018, the Court entered an Order allowing American to obtain Dr. Bercaw's report, which American now attaches to this reply.

American requires its pilots to be reevaluated by the same doctor who found the pilot unfit (or a comparable doctor approved by American) to avoid "doctor shopping."[5]

The record evidence indisputably establishes that American had legitimate reasons, standing alone, to withhold Plaintiff from flying passenger aircraft for American. To rebut American's legitimate reasons, Plaintiff would have to produce evidence that, at a minimum, shows that American somehow compelled the Captain to fabricate the complaint; somehow compelled multiple employees to make false statements against Plaintiff during the HR investigation; and somehow caused the independent neuropsychologist and Dr. Bercaw (whom Plaintiff hired for purposes of this lawsuit) to falsify their reports. There is, of course, zero evidence to support any of this, and thus American is entitled to summary judgment on Count I.

## II.    COUNT II FAILS FOR THE SAME REASONS AS COUNT I

In Count II of the Complaint, Plaintiff restates the allegations from Count I and then adds a conclusory allegation that American retaliated against Plaintiff for filing a complaint with the Department of Labor ("DOL"). Plaintiff, however, did not file his DOL complaint until January 25, 2016, *after* American had withheld him from duty, concluded its HR investigation, and referred Plaintiff for an independent fitness for duty examination. In his Opposition, Plaintiff makes two passing (but completely failing) arguments to save Count II from summary judgment.

First, he states that, although American had referred Plaintiff to the independent neuropsychologist in January 2016 *before* Plaintiff filed his complaint with the DOL, the independent neuropsychologist did not issue his report until March 2016 *after* Plaintiff filed his

---

[5] Plaintiff has attempted to manufacture a false issue of fact by claiming that a handful of medical officials have cleared him for duty—suggesting that Dr. Knippa's report was an outlier. *See, e.g.*, Pl.'s Resp. SMF at ¶ 38, ECF No. 73. Based on the newly disclosed information regarding Dr. Bercaw's report, it is clear that Plaintiff's assertion is inaccurate.

Complaint. Plaintiff does not even provide an argument (because there is not one) for why this sequence of events might support his USERRA claim. It is irrelevant, and reflects nothing more than the fact that it takes time to schedule and conduct an examination and prepare a report.

Second, Plaintiff asserts that in settlement negotiations, American offered a proposal that would have required Plaintiff to abandon his present USERRA claim. Settlement communications, however, are not admissible to prove liability or damages in a disputed claim. *See* Fed. R. Evid. 408. In any event, American has never suggested—in settlement negotiations or any other context—that Plaintiff would ever be permitted to return to work without first being cleared by the independent neuropsychologist or another comparable medical provider approved by American. (RSMF at ¶ 21; see also ECF No. 61-22.) There is, of course, also nothing whatsoever nefarious about the fact that a settlement would require Plaintiff to dismiss his litigation―that is inherent in any settlement.

## CONCLUSION

For these reasons, American respectfully requests that this Court enter summary judgment for American.

Respectfully submitted,

By: /s/ Michael A. Holt

Michael A. Holt
mholt@shb.com
Florida Bar No.: 91156
**SHOOK, HARDY & BACON L.L.P.**
Miami Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

Mark W. Robertson (*Pro Hac Vice*)
mrobertson@omm.com
**O'MELVENY & MYERS LLP**

10

Time Square Tower, 7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Tristan Morales, Esq. (*Pro Hac Vice*)
tmorales@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for American Airlines, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of July, 2018, the foregoing document was filed with the Clerk of the Court using the CM/ECF system and a true and correct copy was served on the counsel or parties of record listed below.

By: /s/ Michael A. Holt
MICHAEL A. HOLT

## SERVICE LIST

William R. Amlong, Esq.
WRAmlong@TheAmlongFirm.com
Karen Coolman Amlong, Esq.
KAmlong@TheAmlongFirm.com
**AMLONG & AMLONG, P.A.**
500 Northeast Fourth Street
Fort Lauderdale, FL 33301
Telephone: (954) 462-1983
Facsimile: (954) 523-3192

Noel C. Pace, Esq.
(*Pro Hac Vice*)
noel.c.pace.esq@gmail.com
206 N.W. 91 Street
El Portal, Florida 33150
Telephone: (305) 710-3713

(Service via CM/ECF)

*Counsel for Plaintiff*

Michael A. Holt, Esq.
mholt@shb.com
**SHOOK, HARDY & BACON L.L.P.**
Miami Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

Mark W. Robertson, Esq.
mrobertson@omm.com
(*Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
Times Square Tower 7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Tristan Morales, Esq.
tmorales@omm.com
(*Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

(Service via CM/ECF)

*Counsel for American Airlines, Inc.*