Lucretia D. Guia
Associate General Counsel
Legal



Via Email: fuentes.oscar@dol.gov

February 29, 2016

Oscar G. Fuentes
Assistant Director/Investigator
U.S. Department of Labor
Veterans Employment and Training Service
2550 West Oakland Park Boulevard – Room 133
Fort Lauderdale, Florida 33311

Re:     Patterson, Rodney S.
        File #: FL-2016-00016-10-R

Dear Mr. Fuentes:

        This letter and the enclosed information responds, on behalf of American Airlines, to First Officer Rodney Patterson's complaint to your office that he has been subjected to disparate treatment and that his rights under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 et seq. were violated. FO Patterson's complaint is specious. AA has not deprived him of any rights protected by USERRA and has not discriminated against him in any manner whatsoever.

I.      Introduction

        AA is a commercial air carrier that provides scheduled service to destinations throughout the United States and abroad. Many employees of the Company are military veterans, and many employees continue to serve in active, guard, or reserve status. The Company has the highest regard for those who serve (or served) our country in the armed services. AA is committed to providing military leave to its employees as required by USERRA, prohibits discrimination based on covered veteran status and uniformed military service, and affords all rights, privileges, and benefits to employees as required by USERRA. The Company's general military leave policies are available to employees on its intranet (Exh. A) and specific military leave procedures for pilots are set forth in Section 11 of the collective bargaining agreement between APA and AA. (Exh. B)

II.     Factual Background and Response to Requests for Information

        As I indicated during our brief telephone conversation regarding this matter, the Company has not denied FO Patterson military leave or discriminated against him in any manner. On or about September 29, 2015, the Company requested that FO Patterson substantiate his request for military leave for September 21, 2015. It did so because FO Patterson's request for the leave raised questions. Specifically, on the day before a scheduled trip, FO Patterson contacted one of the Chief Pilots in MIA and asked for an "EO" – which is effectively a code used for unanticipated personal absences. He told Captain Bonds

4333 Amon Carter Blvd., MD 5675
Fort Worth, TX 76155
817-931-3929 Office
817-963-4959 FAX
lucretia.guia@aa.com

that he wanted the EO because the captain on his trip the following day was a representative from APA's Professional Standards and that he and the captain did not get along. Captain Bond denied the EO for that purpose. Then, later in same day, after Captain Bond had left, FO Patterson called the duty chief and asked again for the EO. In this telephone call, he told the duty chief that he needed the day off because he had been assigned duty in relation to the "Pope's visit." The duty chief removed FO Patterson from his trip, as he requested.

Typically, AA does not require verification of military service and, specifically, pilots are not typically required to provide uniformed service orders to substantiate military service. AA requested verification of FO Patterson's service for September 22 in this case because of the specific circumstances. FO Patterson initially cited personal differences with the captain as the reason he wanted off the trip and later, after being denied an EO for that purposes, called a different person and indicated that he needed time off for military leave, the Company requested that FO Patterson substantiate his military leave. It did not specify the type of verification, i.e., it did not demand military orders. On or about October 28, 2015, FO Patterson provided his LES to the Company, which appeared to show that FO Patterson had been paid for military service for the relevant dates, September 22-24, 2015. (Exh. C) Upon receipt of that information, the Company took no further action relative to this military leave. It took no disciplinary action and no reprisals related to this leave.

In addition to inquiring about the circumstances that led AA to request verification of FO Patterson's military service, you asked whether there has been any "disciplinary actions" discussed with FO Patterson concerning "job performance issues/attendance problems." There has been no disciplinary action for "attendance problems." On or about September 24, 2015, however, a pilot co-worker lodged a formal complaint regarding FO Patterson's conduct. (Exh. D) Because of the serious nature of the complaint, the Company immediately removed FO Patterson from service and launched an investigation. (Exh. E) He was placed on "PW" status (which is the code used when the Company withholds a pilot from duty with pay). During the course of the investigation, which did not lead to discipline, the Company discovered information which placed in question FO Patterson's fitness for duty. And, consistent with its duty to ensure the safety of its employees and passengers, the Company initiated a fitness for duty examination, which is pending. Throughout this process, FO Patterson has remained on a paid status. He has not been placed on a "Leave Without Pay" status either before or after this Company launched this investigation.

Last, you requested that the Company provide a list of uniformed service members who work out of the South Florida airports who have "similar issues as Mr. Patterson." Although numerous pilots based in MIA frequently take military leave, none have demonstrated "similar issues." None have been the subject of a similar complaint by a co-worker and none have exhibited conduct during an investigation that cast concerns about his/her fitness to fly. Moreover, none have provided contradictory reasons for a last minute request for military leave.

In closing, AA has done nothing relative to FO Patterson which was discriminatory or in any manner violated his USERRA rights. It simply requested verification of his military service because of circumstances which raised legitimate questions regarding that service. Once he provided that verification, the issue was resolved.

2

Please let me know if you have further questions.

Sincerely,

Lucretia D. Guia

Enclosures:  Exhibits A-E

3

AA-Patterson-0000011

# Exhibit A

AA-Patterson-0000012

Bookmarks | History    Search

**My Quick Links**      **News**       **Pay & Benefits**       **Get Involved**        **Travel**       **Resources**

Home > All Places > Resources > Documents

**OFFICIAL**   Marked by Japheth ⬤⬤ Aug 31 2015 4:00 PM

# Workplace employment notices

created by Carol ⬤⬤ on Mar 14, 2014 4:53 PM, last modified by Japheth ⬤⬤ on Nov 4, 2015 1:35 PM

These workplace notices provide information regarding your rights and responsibilities under state or federal employment laws.

- California Fair Employment Notice: English | Español
- E-Verify Participation
- Equal Employment Opportunity
- Family and Medical Leave Act (FMLA)
- Federal Minimum Wage
- OSHA Job Safety and Health Protection
- Polygraph Protection Act
- Uniformed Services Employment and Reemployment Rights Act (USERRA)

7763 Views        Categories:
   Tags: health, family, job, safety, labor, law, protection, leave, services, medical, wage, fmla, act, federal, osha, commission,
equal, opportunity, eeoc, polygraph, uniformed, rights, minimum, everify, employment, career, hiring, practices, talent, poster,
government, dol, userra, disability, fair, ada, california

Average User Rating      My Rating:

(3 ratings)

© 2015 American Airlines, Inc. All Rights Reserved                    eworld from oneworld        Use Agreement        Expand Content

https://newjetnet.aa.com/docs/DOC-3647                                        11/13/2015

AA-Patterson-0000013



AA-Patterson-0000014



AA-Patterson-0000015

# Exhibit B

AA-Patterson-0000016

JOINT COLLECTIVE BARGAINING AGREEMENT (JCBA)

between

AMERICAN AIRLINES, INC.

and

THE AIRLINE PILOTS

in the service of

AMERICAN AIRLINES, INC.
and
US AIRWAYS, INC.

as represented by the

ALLIED PILOTS ASSOCIATION

EFFECTIVE: JANUARY 30, 2015

AA-Patterson-0000017

## SECTION 11

## LEAVES OF ABSENCE

### A. General

When the requirements of the Company will permit, a pilot may be granted a leave of absence. When such leave is granted, a pilot shall retain and continue to accrue seniority, provided that such pilot maintains at all times his required certificate or ratings. If such pilot shall permit his required certificate or ratings to lapse, he shall retain his seniority accrued at the time of such lapse. Length of service for longevity pay or salary purposes shall not accrue during leaves of absence, except leaves granted in the interest of the Company, leaves to permit attendance as representatives of the pilots at conferences with the Company, leaves granted due to sickness or injury, for duty with the military services of the United States, or for service with the Association.

### B. Personal Leaves of Absence

1. A pilot during the normal vacation selection period may submit a request for a leave of absence in conjunction with such vacation preference that shall not exceed a period of thirty (30) consecutive days.

2. The Company shall consider up to thirty (30) individual requests for leaves per calendar year, not including leaves related to maternity, but will not be required to consider more than nine (9) such leaves during any one (1) period of time on a system-wide basis.

3. The Company will respond, in writing, within a reasonable time as to whether or not the pilot's request for a leave can be honored.  Such requests will be honored in order of system seniority subject to availability of replacements in equipment and category at the base.

4. If the Company grants a leave, it may be canceled no later than thirty (30) days prior to the effective date of the leave or his vacation whichever occurs first, except that in cases of emergency, it may be canceled in less than thirty (30) days.

   If the pilot desires to cancel his request for leave, he shall notify the Company as soon as possible, but in no event later than thirty (30) days prior to the effective date of leave or his vacation, whichever occurs first.

5. The Company may, operational requirements permitting, consider the request for pilot's leave of absence in excess of the numbers stated above.

6. In the event of a furlough, the Company will notify all pilots that it will consider all requests for Leaves of Absence in order to mitigate the number of furloughs.

7. A pilot on leave shall not, without prior written permission of the Company, engage in aviation employment, and in no case shall engage in employment, the nature of which may bring discredit upon the Company.

### C. Bid Status During Leaves

1. Any pilot granted a leave of absence shall have the same bid status upon return to active flying duty.

2. A pilot who, upon return, is unable to hold the bid status held at the commencement of the leave will be placed in a lateral or lower bid status in accordance with that pilot's displacement preference list.

3. Reinstatement rights of any pilot on a leave of absence shall not be exercised while such pilot is on such leave of absence.

### D. Sickness or Injury Leaves

1. When leaves are granted on account of sickness or injury, a pilot shall retain and continue to accrue his seniority irrespective of whether or not he is able to maintain his required certificates or ratings, until he is able to return to duty or is found to be unfit for such duty.  A leave of absence for sickness or injury shall not commence until after a pilot has exhausted

AA-Patterson-0000018

accrued sick leave credits in accordance with Section 10.C.8 of this Agreement. Such leave of absence for sickness or injury may not exceed a total continuous period of three (3) years unless extended by mutual consent of the Company and the Association, in which case it may not exceed a total continuous period of five (5) years.  Length of service for pay purposes shall accrue during leaves granted because of injury on duty, and during the first ninety (90) days of any leave granted for sickness or injury sustained off duty.

2. A pilot returning from any leave due to sickness or injury shall assume a bid status to which entitled by seniority upon return to active flying duty.

## E. Military Service Leaves

1. A pilot ordered to, or who volunteers for, active duty with the military services of the United States in time of war shall be granted a leave of absence for the period of such duty and for ninety (90) days thereafter, during which time his seniority and length of service for pay purposes shall accrue.

2. A pilot who volunteers and is accepted for active duty with the military services of the United States in time of peace shall be granted a leave of absence for the period of such duty, but not to exceed a cumulative total of five (5) years, during which time his seniority and length of service for pay purposes shall accrue.

3. A pilot returning from any military leave of absence shall be permitted to return to that pilot's former bid status upon return to active flying duty.

4. A pilot who, upon return, is unable to hold the bid status held at the commencement of the leave will be placed in a lateral or lower bid status in accordance with that pilot's displacement preference list.

5. Notice And Verification
   a. Pilots must provide the Company with reasonable notice of all military leaves which conflict with their American Airlines work schedule, unless the giving of such notice is precluded by military necessity or, under all of the relevant circumstances, the giving of such notice is otherwise impossible or unreasonable.
      (1) Notice of military leave shall be submitted to the Company before bidding closes for the following month, unless precluded by one of the exceptions above.

6. Verification of military duty will not normally be required by the Company.
   When the Company does require verification, within a reasonable period of time the pilot must provide documentation substantiating the military duty in question.

7. Vacation
   a. A pilot may reschedule current fiscal year vacation days/hours to cover military duty provided the Company is given reasonable notice (i.e., notice must be given by the earlier of [1] the first of the month preceding the month in which the vacation is scheduled, or [2] the first of the month preceding the month in which the vacation is rescheduled).  The rescheduled vacation must be taken within the current vacation fiscal year.
      (1) The vacation being rescheduled must match, to the extent possible, the number of days of military leave; and
      (2) The vacation must be taken in blocks as originally scheduled or, if the vacation was not originally split, it may be split in accordance with the provisions of this Agreement.

   Examples of rescheduling vacation for military leave:

| Military Duty Dates | Scheduled VC | Rescheduled VC |
|---|---|---|
| Aug. 10 - 16 (7 days) | Jan. AB | Jan. AB to Aug. AB |
| | Jan. AB & Mar. A | Mar. A to Aug. B |
| | Jan. ABC | Jan. C to Aug. B |
| Aug. 10 - 21 (12 days) | Jan. AB | Jan. AB to Aug. BC |

AA-Patterson-0000019

| | Jan. AB & Mar. A | Jan. AB to Aug. BC |
|---|---|---|
| | Jan. ABC | Jan. AB or BC to Aug. BC |

   b. A pilot may use personal vacation days (PVD's) to cover military duty provided the total number of PVD's used, whether for military duty or not, is in compliance with the provisions of this Agreement. The pilot's vacation bank will be increased by the number of PVD's used times the daily conversion rate.

   c. For a military leave involving four (4) or more entire contractual months, current fiscal year vacation and vacation accrued but not yet credited will be paid at the beginning of such leave, unless the pilot requests not to be paid for such vacation. In no case may a pilot defer vacation into the next vacation fiscal year.

   d. A pilot who has vacation days remaining but no hours in the vacation bank may still move vacation days to coincide with military duty.

8. Guarantee

   a. A reserve pilot's guarantee will be reduced by 1/18th for each day of reserve availability missed as a result of military leave.

   b. A reserve pilot whose military leave request(s) (after bid closing and in compliance with paragraph 5.a.(1) above) increases days of reserve unavailability may move DFPs such that they cover the increased unavailable days. In such case, the Company may move remaining DFPs to alleviate illegalities or insufficient availability periods.

   c. A reserve pilot may elect to cover the unpaid reserve available days from the pilot's vacation bank provided there is sufficient time remaining in the pilot's vacation bank to cover any remaining scheduled vacation.

9. Crediting

Absences due to military leave (removal from a trip sequence or removal from days of reserve availability) in compliance with the Notice and Verification provisions will be uncredited, unpaid.

10. Bid Status Following Military Duty.

   a. For a leave which does not exceed three (3) entire contractual months, upon the pilot's return to active flying duty with the Company, reinstatement will normally be to the same bid status the pilot held before the leave.

      (1) A pilot with a different bid status pending at the time a military leave begins will assume the new bid status at the end of the leave if the effective date of the new bid status coincides with or is before the end of the leave.

      (2) For a pilot being withheld from a bid status at the beginning of a military leave, the Company may continue to withhold the pilot in accordance with the AA/APA Basic Agreement and the pilot will assume the same bid status held before the leave, or the pilot may be awarded the withheld bid status. In all cases, the period of the leave will be included in determining the maximum duration of a pilot's withholding, as provided in the AA/APA Basic Agreement.

      (3) During such leave, a pilot's bid and displacement preferences will be processed. Thus, the pilot may be awarded a different bid status during the military leave. At the end of the leave, a pilot will assume the bid status held before the leave, or be awarded the new bid status, depending on the effective date of the new status.

      (4) A pilot's lock-in and deferral of upgrade will continue to run during such a leave.

   b. During a military leave involving four (4) or more entire contractual months, a pilot's bid and displacement preferences will not be processed. Upon the pilot's return to active flying duty with the Company, the pilot will assume a bid status in accordance with the following:

      (1) A pilot returning from a leave who does not have a lock-in should, if possible, give the Company a minimum of forty-five (45) days notice of the bid status to which the pilot is entitled by seniority including reinstatement or entitlement rights. Any lock-in incurred will be in accordance with this Agreement.

AA-Patterson-0000020

(2) A pilot's lock in will run during the leave.

(3) If a pilot's lock-in has not been fulfilled, when the pilot returns to active flying duty with the Company, the pilot will assume the bid status to which the lock-in applies.

(4) A pilot returning from a leave who does not have a lock-in will assume a bid status to which the pilot is entitled by seniority, and any lock-in incurred will be in accordance with the AA/APA Basic Agreement.

(5) Deferral of upgrade will continue to run during such a leave, if the deferral began before the leave. If the deferral did not begin before the leave, the pilot may elect to begin the deferral following the leave.

(6) In order to assure that a pilot has the requisite experience for the bid status awarded following a leave, the Company may require training and flying at the same base and in the same equipment but in a different category than the bid status awarded. In such case, the pilot will be paid as if withheld from the bid status which is awarded.

(7) A pilot returning from a leave will be returned to payroll the earlier of such pilot's actual training start date or thirty (30) days from the date the pilot notifies the Company of his availability for training. In no case shall a pilot be returned to payroll earlier than such pilot's actual date of availability for training.

11. General

a. A pilot's probation period will be extended on a day for day basis for military absences exceeding sixty two (62) days.

b. A current and qualified pilot who will be available on the first day of the next contractual month will be eligible to bid for a trip selection.

c. A pilot may be withheld from a bid status at the end of a leave, provided such withholding is in accordance with the terms of this Agreement.

d. If a military leave begins in one month and extends into the following month, it will be treated under the provisions of this agreement as if it ended in the same month in which it began.

e. Nothing in this Section shall supersede, nullify or diminish any federal or state law that establishes a right or benefit which is more beneficial to, or is in addition to, a right or benefit provided for a pilot in this Section.

## F. Duty with the Association

A pilot covered by this Agreement, who is providing service for the Association on a full time basis, shall be granted a leave of absence for the duration of such tour of duty provided that the number of pilots on such leaves shall not at any time exceed three (3) in number. A pilot, who is granted any such leave of absence, shall continue to accrue seniority and length of service for pay purposes. Such a pilot will continue to participate in the Company's benefit plans available to active pilots, subject to provisions and regulations of said Plans. The Association shall reimburse the Company for the cost thereof. A pilot returning to active service with the Company, from a full time tour of duty with the Association, shall assume a bid status to which entitled by seniority. In lieu of a full time leave of absence, such pilot may elect to remain on the Company's payroll, in which case the Association will reimburse the Company for all items such as salary, pensions, insurance, sick time and vacations.

## G. Physical Fitness

Any dispute arising under this Section concerning physical fitness of any pilot shall be settled in accordance with the provisions of <u>Section 20</u> of this Agreement.

## H. Furlough While On Leave

Pilots on leave of absence whose seniority is such that they would have been furloughed had they not been on leave of absence shall be promptly notified that their rights under the Agreement have been changed to those of furloughed pilots. If there is a subsequent expansion in service, such pilots, if seniority warrants, shall again revert to leave of absence status with accompanying rights, and shall be so notified.

AA-Patterson-0000021

# Exhibit C

AA-Patterson-0000022

10/27/2015                                    MyPay

| Text Version | myPay | | | | Help | Main | Exit |

Printer Friendly Version                View other LESs  CHK DT 151104 ▼  Go

### DEFENSE FINANCE AND ACCOUNTING SERVICE MILITARY LEAVE AND EARNINGS STATEMENT

| ID | NAME (Last, First, MI)<br>PATTERSON RODNEY SCOTT | SOC. SEC. NO.<br>*****9922 | GRADE<br>OO | PAY DATE<br>871030 | YRS SVC<br>28 | ETS<br>000000 | BRANCH<br>USAR | ADSN/DSSN | PERIOD COVERED<br>CHK DT 151104 |

| ENTITLEMENTS | | DEDUCTIONS | | ALLOTMENTS | | SUMMARY | |
|---|---|---|---|---|---|---|---|
| Type | Amount | Type | Amount | Type | Amount | +Amt Fwd | |
| A BASIC PAY | 4089.12 | FED INC TAX | | | | +Tot Ent | 4089.12 |
| B | | FICA TAX | | | | -Tot Ded | |
| C | | SGLI | | | | -Tot Allt | |
| D | | DEBT PAYMENT | | | | =Net Amt | |
| E | | SGLI FAM/SPOUSE | | | | -Cr Fwd | |
| F | | | | | | =EOM Pay | |
| G | | | | | | | |
| H | | | | | | | |
| I | | | | | | | |
| J | | | | | | | |
| K | | | | | | | |
| L | | | | | | | |
| M | | | | | | | |
| N | | | | | | | |
| O | | | | | | | |
| TOTAL | 4089.12 | | | | | | |

| LEAVE | BF Bal<br>.0 | Ernd<br>.0 | Used<br>.0 | Cr Bal<br>.0 | ETS Bal<br>.0 | Lv Lost<br>.0 | Lv Paid<br>.0 | Use/Lose<br>.0 | FED<br>TAXES | Wage Period | Wage YTD | M/S | Ex | Add'l Tax | Tax YTD |
| FICA<br>TAXES | Wage Period | | Soc Wage YTD | | Soc Tax YTD | | Med Wage YTD | | Med Tax YTD | STATE<br>TAXES | St<br>FL | Wage Period | Wage YTD | M/S<br>M | Ex | Tax YTD<br>.00 |
| PAY<br>DATA | BAQ Type<br>W DEP | BAQ Depn<br>SPOUSE | VHA Zip<br>00000 | Rent Amt | | Share | | Stat | | JFTR | Depns | 2D JFTR | BAS Type | Charity YTD | TPC | PACIDN |
| TRADITIONAL<br>PLAN (TSP) | Base Pay Rate<br>0 | | Base Pay Current<br>.00 | | Spec Pay Rate<br>0 | | Spec Pay Current<br>.00 | | Inc Pay Rate<br>0 | | Inc Pay Current<br>.00 | | Bonus Pay Rate<br>0 | | Bonus Pay Current<br>.00 |
| ROTH PLAN | Base Pay Rate<br>0 | | Base Pay Current<br>.00 | | Spec Pay Rate<br>0 | | Spec Pay Current<br>.00 | | Inc Pay Rate<br>0 | | Inc Pay Current<br>.00 | | Bonus Pay Rate<br>0 | | Bonus Pay Current<br>.00 |
| CONTRIBUTION<br>TOTALS | | YTD Deductions<br>.00 | | | YTD TSP Deferred<br>.00 | | | | YTD TSP Exempt<br>.00 | | | | YTD ROTH<br>.00 | | | |

**REMARKS:**                          YTD ENTITLE _____          YTD DEDUCT _____

YOUR CHECK WAS SENT TO: USAA FEDERAL SAVINGS BANK
DIRECT DEPOSIT DATE: 11/04/15 AMOUNT
*AS OF 22 SEP 05    HIGH TEMPO DEPLOYMENT DAYS ACCRUED
SINCE 1 OCT 00 (OR SINCE ENTERING MILITARY SERVICE)
SERV GP LIFE INSURANCE DEBT BALANCE $.

FAM SER GROUP LIFE INSUR DEBT BALANCE $

FAM SER GROUP LIFE INSUR DEBT BALANCE $
ORIGINAL DEBT F    SEP 15 01 SEP 15
FAM SER GROUP LIFE INSUR DEBT BALANCE $
ORIGINAL DEBT    OCT 15 01 OCT 15
UNPAID DEBT BALANCE *TOTAL*: $

DATES PERFORMING duty ←

| | | |
|---|---|---|
| INACTIVE DUTY TRAINING | 22 SEP 15 1 22 SEP 15 2 | 22   24 |
| INACTIVE DUTY TRAINING 23 SEP 15 1 23 SEP 15 2 24 SEP 15 1 | | 22   24 |
| INACTIVE DUTY TRAINING 24 SEP 15 2 25 SEP 15 1 25 SEP 15 2 | | 23   25 |
| | | 23   25 |

YOUR CURRENT STATE CLAIMED IS: FLORIDA
SERVICEMEMBER GROUP LIFE INSURANCE COVERAGE:.
YOUR SGLI DEDUCTION INCLUDES TRAUMATIC INJURY PROTECTION (TSGLI)
SPOUSE SGLI COVERAGE:

AA-Patterson-0000023

# Exhibit D

AA-Patterson-0000024

September 24th, 2015

Captain Brian Beach,

After numerous calls to APA professional standards without any relief,
I am formally asking you to help me declare that I have been a target of workplace harassment
by First Officer Scott Patterson. I am asking for your assistance in filing this as a hostile work
environment. I ask that you take the below statements to American airlines corporate human
resources for review and action.

Below is a rewritten statement of facts and opinion I wrote last year after my trip on October 7th,
2015 for APA professional Standards. I cleaned up grammar and spelling issues.

I was contacted by First officer Patterson days prior to the trip about going to the Iguazu falls via
what's app. I told him I would consider it. He asked me if his family could ride the crew van. I
told him I had no issue with this and it would be ok. At this time, I had no knowledge I had a
dead head crew riding with us.

On the morning of October 8th, 2014 I was informed after the arrival in ASU by the ▉▉▉ ▉▉▉
that FB Patterson was rude to her and ▉▉▉ and never introduced himself to the crew. She told me
he took the pillows from the 2EF seats in business class for his family. She also informed me of
an issue during boarding with his wife and children with carryon bag storage. He apparently took
passengers bags out of the overhead near door 2L, set them on the jet bridged to be checked and
put his family bags there.

FB Patterson complained often during flight about the dead head flight attendants in business
class. He said it was not fair his family had to sit in coach. He said flight attendants should not be
allowed DH in business only pilots.
Prior to taxi in Miami after pushback, FB Patterson was moving overhead switches and reached
forward to move the flap lever from the jump seat. He is not the first officer. He was interfering
with the FO normal flow of duties and not following SOP.
I told him if he wants to be FO, then bid it, otherwise keep your hands off.

During the entire trip, he constantly acts as if he is the captain and wants to make the decisions.

After his crew break when he returned to the flight deck, he informed me his daughter would be
watching a video in the rest seat next to me. I told him no. I told him this was not acceptable
under 117 rules and he needed to move her back to coach.
He was not happy about my decision. Told me if he was captain he would allow it. I told him it's
against FARS to have a person in the seat. I never allow anyone next to us during rest.

Upon arrival in ASU, I was informed by my FA crew his wife was rude and demanding during
flight.
When I arrived at the hotel van for pickup at the airport, Patterson told the FAs on the van to
double up. He told his kids and wife to take a seat. The FAs refused to double up ( sit 3-4 in 2

1

seats) and this left no seats available for his wife and children. He then told his wife to take a seat and told his children to sit on the floor at the front of the van. I got off the van and told him there was no room on the van and he needed to take a taxi. I informed Patterson it was not safe for his children to sit on the floor of the van and to take a taxi. I offered to pay for the taxi. He refused my offer. He got mad at me telling me the bus driver said it was ok for his children to sit on the floor. I once again told him "NO, in the interest of safety for his children and my crew I would not allow it". I told him I was in a few crew van accidents already and I wanted them in a seat or there would be no van ride. He then demanded his bags be removed from the van. I told him not to worry about his bags. I would have them looked after when we arrived at the hotel. He said no. Because of this delay, the crew had to wait another 10-15 minutes as the driver had to unload almost all the bags to find his bags. His wife and kids had put theirs on first.

During the ride to the hotel, ███████ said he was writing First Officer Patterson up. I told the FAs if they felt he needed to do this then to call APA professional standards.
FB Patterson arrived at the hotel about 10 minutes after we did. I was standing with four FAs waiting for our room keys. He ran over to me and said, "dude we were robbed by street people in the taxi", I looked at him and said "Scott you are full of BS". I looked at his child and asked the young boy if this was true. His child just looked away as if he knew his dad was lying and did not say a word. The four FAs standing with me heard this claim of being robbed also.

Later that night while I was at dinner with the crew, FB Patterson searched the city for us and found us at a restaurant. He clearly made a great effort to search and find us.
 He walked up to me and said he wanted to speak with me. I got up and went to the restroom. He followed me there. He informed me he had been written up by the flight attendants. He then went on a tirade about how he was going to have the entire crew fired. I asked why, he said he had video evidence from the hotel showing all the crew drinking on the bus with stolen alcohol. He then told me he paid the van driver $100 to take video evidence of the crew drinking on the van. I informed Patterson no one was drinking to my knowledge. He said "the entire crew is your responsibility captain and if one crew member is drinking then I deserve to be terminated". I told Patterson I'm not a baby sitter for the entire crew.
He then threatened me and said "my mother is the corporate counsel with US airways, and captain since you are in charge of the crew you will be fired." I told him do not threaten me. He then said "I have friends in management and you and the FO and all the flight attendants will lose your job. " I told him again to stop threatening me. He then informed me FAs we're smuggling food into the country and because he has a diplomatic passport he would see to it that the crew was banned from coming to ASU for 3-5 years.
I told him to get lost and stop making threats.

The next day, I arranged to meet with the hotel manager. When I asked to see the manager, he asked who I was. I told him I was the captain from yesterday's inbound flight.
 I told him my first officer Scott Patterson was telling me the hotel manager gave him video of the crew drinking alcohol while exiting the crew van. The hotel manager informed me this is not true. He said Patterson never met him. The manager told me he would have never given him any video had he asked.
I later found out FB Paterson told the front desk in ASU he was the captain of the trip and not myself. Flight attendants also heard him say this to the front desk at the hotel.

2

At breakfast the next morning, Patterson walked over to me and Captain ███████ , ██. was the captain from the inbound crew. He informed Captain █████████ of the presence of a ghost rider on the inbound flight that Captain ████████ had flown in. He told us he arranged with AA corporate security to have this ghost rider observe the crew tonight. He told me we were all on notice and we had better watch ourselves. I again told me BS and informed him I did not believe him and he lacked of any credibility.
He again started threatening me about termination because his mom is head counsel at USAir and told me our jobs will be terminated.
Capt ████████ was a witness to this exchange.

After breakfast, I called Capt. ███████████ APA professional.
Captain ██████████ said he had spoken with Patterson already but his story was far different from what the flight attendants had written. I asked Capt. ████████ to read the FA write up to me. I informed him the FA write up was factually correct.
Captain █████████ told me the FA write up had reached Captain ██████ desk. He said the report was kicked back to APA professional standards.
Captain ████████ stated FB Patterson made allegations against me. He told Captain ████████ I had the purser sit next to me during my crew rest. He also told him I had sexual relations in the rest seat with the purser during my crew break. This is a flat out lie and I don't like it. No one slept next to me and broke 117 rules.

That afternoon I called all the flight attendants I could reach by phone. I informed them of the allegations he was saying and to please keep record of anything he says to them
.
During the bus ride back to the airport for our night departure, the Spanish speaking FA talked with the van driver and asked him about the $100 for video and pictures. The driver informed the FA this was not true and he was never paid to take photos.

That evening before departure, FB Patterson came on the flight deck and said "dude! My corporate intelligence tells me the FA ████ has had 3 termination hearings this year and I will have his ass fired."
I told FB Patterson he was digging himself a hole and to stop making things up. I informed Patterson not only could he be terminated for illegally using ones personal file against them, but whomever gave him this information will also lose their job for disclosing it if this is true. I just did not find this to be factual statement and dismissed it as more rhetoric.
I was informed by the station personal in ASU the paper work was delayed due to a bad printer. The station told me they were working on it and I would receive my flight plan shortly. When FB Patterson came onto the flight deck about 30 minutes prior to departure, he asked where the paperwork was. I informed him it was coming and to not worry about it. Once again FB Patterson sprang into action. He went storming out of the flight deck. I asked FO ██████ to follow him. First officer ████████ said Patterson was yelling at the agent. Patterson told the agent he would have them fired for not getting the flight plan. Patterson also told the agent to get a good attorney. FO ████████ said he witnessed this entire conversation. FO ████████ informed me Patterson was acting very bad and seemed delusional, and was way over the top. FB Patterson then threatened to have the flight cancelled if I did not support him in this matter about the paperwork as if he is the captain and it's his responsibility.

3

During the 2.5 hours in flight while FO ██████ was on break, I heard FB Patterson say numerous times about FA ██████ "I will get that faggot fired" I heard him say the N word on many occasions about African American FOs I had flown with to VVI.

He then out of the blue thanks me for paying for his taxi cab ride to the hotel. I told FB Patterson," I had offered, but you declined "he said "oh no Captain, you paid my taxi bill, I have a hotel receipt showing you put a $30 credit to my room." I said "Scott you're full of shit and what are you insinuating?" He said "looks like bribe to me captain." I then asked him to show me all the evidence he claimed to have. And he said, "AA corporate security and his mom at US Airways told him he can't show it and it will be used at the hearing when I fired. I told him he was lying. He then told me he was friends of the flight office in MIA and would get me, the FO, and all of the crew fired.

I told him he needed to back off and stop threatening me.

I told Patterson there was no way he will be able to destroy the careers of many over a stupid bus ride issue that he started.

I then told him he has no concern for his children's safety and it was his fault for being an ungracious ass in the first place.

I asked him why he was concerned about his bags on the crew bus, he said the crew van gets robbed all the time and did not want his bags robbed without himself being there to defend the crew. I said "then if this is true Scott and the hotel van gets robbed often, are you not safer in a taxi, he contradicted himself with that statement.

He then went on and on in the flight nonstop for 2 hours assaulting me with termination. At one point I wanted to kick him out of the cockpit but FO ██████ needed his rest.

He eventually stopped just prior to my break.

When I went back on my break, he told my FO ██████ he had me shaking in my boots.

He then told FO ██████ he wanted him.(the FO) to support him, or he would be terminated due to his association with the crew.

Now this sounds like a comment to create fear and intimidation. Is this not a violation of company rules or company policy?

When I went back on my break, I asked FA ██████ if he was ever in trouble with the company. He said no just a few late sign ins. So once again FB Patterson was making stuff up.

When leaving the aircraft, FB Patterson stopped at the 2Ldoor, turned around and started taking pictures of the FAs and told them "I got you!, I got your picture." I witnessed his actions from the middle of the business class cabin but could not hear him say those words.

I was later waiting for my commuter flight to Chicago and 2 FAs from the flight looked for and found me to inform me they were behind FB Patterson in the line at customs. FB Patterson looked back at the FAs and told the customs inspector to check the crew for illegal stuff and was pointing at them.

This I did not witness.

I called professional standards the next day and told Capt ██████ I thought I had diffused the situation with Patterson but FB Patterson decided to go nuclear on the crew at the end of the trip.

4

I asked him to please find out how I can avoid flying with Patterson, Professional Standards told me he would tell FB Paterson to put me on his do not pair list.
Capt. █████ said he knows Patterson and also said he knows how he can act. I did not like this statement because it appears to me he is covering for him. This behavior is totally uncalled for, against company policy and should not be brushed under the rug. What the hell is a person of this character doing in an AA cockpit? I would hate to ever have anyone I know on his flights. Below are other comments FB Patterson has said to me that makes me believe he is in need of serious physiological help.

Patterson was telling me he is the popular "go to guy" the Miami flight office calls anytime someone is in trouble and a hearing is called. I asked him if he works for Professional Standards. He said no. Somehow I find the hard to believe he is the Miami go to guy the union calls. I know of many captains who will not fly with him, so I'm assured that FB is the problem. He does seem delusional, making up his own facts and telling many stories. I think he really believes his own stories but to many they are obviously not true.

I asked him about the rumor of the first officer led diversion into Santa Cruz he was a part of. Instead of telling me the facts, he went on an instant rampage. He said he was going to get the captain and first officer terminated for spreading false rumors. I informed him I did not hear it from the crew and he needed to calm down. He then said his mom is the corporate counsel at US airways and could have anyone he chooses fired.
On November 7th 2014, I was in Rio with a gate delay due to maintenance. While standing near the 1L door, I overheard the flight attendants speaking about the asshole captain who kicked crew member families off hotel crew vans. I let the conversation continue then chimed in telling them I was the ass hole and maybe they need to know the facts before believing what they heard. I asked the FAs where they heard this and they told me a first officer got on the parking lot bus in MIA and was telling everyone on the bus in a loud voice my last name and what an ass hole I was for kicking his family off the van. I consider this slanderous. I called APA professional standards and they said they would counsel him about his behavior.

He has been telling the hotel staff in Santa Cruz he is a captain for AA. He told Los Tojibos personal he works for AA corporate security looking to bust crew members but dresses as a first officer.
He tells many he flies with he is a police officer, but I found out from Capt █████ this not true.
On my trip to VVI back in august of 2014, I was complaining about my back being sore. Patterson jumped out of his seat, tells me he is a chiropractor and wanted to adjust me. I told him don't touch me.
He tells many stories about owning a Saber jet and is flying government missions on the side. I thought this is not allowed unless it's official military flying? Does he have company permission?
He informed the crew AA called him to make sure he has his standing bid list ready because they wanted him to be captain soon.
Looking at his seniority number, 7100+ it just seems to be another delusional lie.
He said when he is captain, things will be different. He will demand respect and FAs will fear him.

5

I told him many times you cannot demand respect, you earn it, and he tells me I'm wrong, because in the military he is a king. I don't see it this way and god help AA when he does make captain, just my opinion.

On or about the morning of January 26th 2015 I was standing on the curb at VVI airport. I had just exited the crew van from the hotel. While waiting for my crew bags, the hotel van with the inbound crew drove by. First officer Scott Patterson was pointing at me as he drove by like his finger was gun. He looked as if he was saying I'm going to get you. My first officers witnessed this and thought he was some kind of friend joking around with me. I did not tell them what happened in the past
When I got back to Miami, I received a text message from ███████ flight attendant ███████ . He said the first officer was talking bad about me and was an embarrassment in front of the other FAs whom know me. Again, Patterson was making slanderous statements. You should have a written statement from ███████ from ███ ███ . I called APA professional standards about his behavior. They said they would counsel him again.

On February 16th I was also the target of an intense search by VVI customs, but did not suspect anything unusual at this time.
On February 22nd, 2015 I was the target on a more intense search by customs in VVI. I have flown to this station for over 2 years and have known the customs personal to be courteous, friendly and non threatening. In front of my entire crew, I was subjected to what is not considered a normal VVI bag check. They wanted to take all my personal belonging, my company I pad, personal I pad, phone and all. After I proved to these customs people I was not hiding anything they let me go. My crew behind me was stood in awe as to the treatment the captain was given. They all were given a pass. I decided to look into the past and see who has flown into VVI before me. As I had suspected, the Spanish speaking first officer Scott Patterson was in VVI just before me. I thought he may have said something to the customs personal tin VVI to harass me. The next morning while setting up for departure, an employee of Santa Cruz whom wishes to remain confidential said they heard first officer Patterson was smuggling firearms into Santa Cruz for the narcotic cops. This statement was also heard by first officer ███████ . I looked at the employee and asked if they had told ███ what they had heard. Their response was they were afraid if they came forward the cops would kill them.

When I returned to Miami, I sent a Letter to ███████████ manager. Below is the letter I sent.

6

Hello ████,

I hope you are well and I look forward to meeting with you Wednesday morning,
I am writing to inform you about the way I was treated in customs Sunday
morning.
On February 16th I was also treated differently but I thought it was just a one
time thing. I have been flying to Santa Cruz now for a few years, and I am fully
aware of the baggage searches and have always been treated respectfully and
politely.
On Sunday morning, I was singled out for intense scrutiny. My crew whom
witnessed this were in awe. I have never been treated like this ever anywhere.
The customs girl was questioning my company iPad, my personal iPad and my lap
top. They also tore apart my things and she was disrespectful.
As of last October 2014, I was on a trip to ASU and had a difficult time with a
first officer Scott Patterson. As you know he frequently flies to VVI. Although
it's a long story, in a nut shell he is threatening me and the entire crew with
termination because there was not room on the hotel van for his family and I
made him take a taxi.
He even went as far as telling customs in Miami to search the entire crew. The
story is long, but as recent as January 27th, Lima based flight attendants while
on layover in Santa Cruz notified me that first officer Patterson was taking bad
about me in the van and making false malicious threats.
I contacted the Allied Pilots Association professional standards personal about
this and they counseled him.
On February 13th first Patterson was in Santa Cruz a few days before a seen a
change in the behavior in the customs personal towards me.
I have flown with first officer Patterson, and he is not stable person. I
suspect he is responsible for this treatment.
I am requesting you as the station manager please find out if there was a pilot
who falsely informed the customs personal to target me.
If this indeed found to be true, then I need you to assist me in dealing with
this issue with the company and my supervisor at the Miami flight office.
Also this morning, one of the Santa Cruz employees told me first Patterson is
smuggling Police hardware into Santa Cruz for the narcotics officers. He also
said he has heard first officer Patterson has brought in firearms. If this is
indeed true, then this isn't serious security violation and Patterson is using
his credentials as an FFDO to avoid TSA security in Miami.
I asked the unnamed employee if he would report this to you. He looked scared
and said nothing.
What I'm asking of you is to use your authority as the station manager and see
if you can find out if he is responsible for this.
I look forward to speaking with you,

Sincerely,

████████████

7

After I sent this letter, I sat on this information for some time I was quite distressed having knowledge of this. I did not know what to do. While getting a European re-qual, the check airmen convinced me I need to talk with the flight office and bypass APA with such a serious security issue. For weeks I stopped in the office and there was never any chief available. I finally made an appointment to see Captain ▇▇▇. He also brought in Captain ▇▇▇. We had a good discussion about what had occurred to me and they said they would look into this and talk with APA professional standards.

On June 27th, 2015 I became ill in flight on a flight to FRA, I was extremely ill and I was hospitalized with food poisoning in FRA. After 4 days in the hospital, I returned as a dead head to MIA. The Captain of this flight was ▇▇▇▇▇. I found out ▇▇ was an APA pro standards ▇▇▇▇▇▇▇▇. I decided to have a discussion with ▇ concerning the issue I had gone through and the lack of success APA was having dealing with first officer Patterson. ▇ said he would look into it. ▇ kept in touch and said he would take action.

In early July, 2015 I was flying to VCP. While walking the halls in Miami operation, I was approached by first officer ▇▇▇▇. This in one of the First officers Scott Patterson used the N word about the night I flew with him on October 10, 2015. ▇▇ pulled me aside and said Scott Patterson called him at home and was on a fishing expedition looking to dig up dirt on me to trying to get me fired. First offer ▇▇ told me he told Patterson to knock it off and he was digging himself into a dangerous hole. He apparently is calling many other FOs I have flown with looking for dirt. I had just seen Captain ▇▇▇▇ in the hall, so I immediately told him what I heard. Apparently ▇ said he was flying with Scott Patterson later that month and was going to discuss with him the issue and tell him to back off. I will let ▇▇▇ tell you what was talked about. Pat said he would contact me after they flew.

Below is the email exchange with ▇▇▇ and a letter I sent to Capt ▇▇▇

Hi ▇,

By now you have done your trip with Patterson.

I was looking at future crews to VVI, and I see you are flying with ▇▇▇. He was the FO on the trip I had with Patterson to ASU, He can tell you and back me up on what happened on this trip.

I will talk with you when you return.

I really appreciate your help with the situation.

▇▇

**From:** ▇▇▇

8

**Sent:** Friday, July 24, 2015 1:56 PM
**To:** ███████████
**Subject:** Re: Your next trip to VVI

Hey ███,
Yes - I made it to the hotel here in VVI. I listened to FB "P" while the FO was on the 3rd break.

Without getting 'into the weeds' I told him this "all has to stop". Do not have any contact with you and don't ask other FO's for information on you. I said, this needs to be a "clean cut" and you guys both move on and act like adults.

There was a little more conversation but he did finally agree. I left it on good terms and explained this would work out for us all if it stopped at this level. If it continues and escalates - it will be out of APA PS hands and then get ugly.

I think I got through and we can turn the page to the next chapter.
Please keep me in the loop if it continues. I will re-emphasize my suggestions tomorrow and hope we can move forward.

Hang in there,
██

Hi ,

Thank you for talking with Patterson. I would like to respond to your comments we both need to act like adults. I have been the adult! I have acted above level here. Patterson has had this talk and been counseled before with professional standards and continues to engage.
It is Patterson who needs to grow up and move on. I hope you were able to get through this time, but I'm really not all that optimistic he will stop. I just don't think this guy can move on. I'm also sure he told you many lies and miss truths about me and he has a habit of being a pathological liar.
Most of what I told you and wrote in my brief can be substantiated by others, so I'm confident my facts will prevail if necessary.
This being said, I will continue on and if this come about again, I will call you.
I appreciate you trying and we will see where things go from here.

Take care,

██████

9

AA-Patterson-0000033

Dear █████████,

I'm writing to inform you the Scott Patterson issue has come to surface again.

Saturday evening in operations, First Officer ████████████ stopped me in the hallway near ops and informed me he received a phone call from Patterson. Apparently Patterson is calling many First officers I have flown with and is on a fishing expedition to try to dig up anything he can to undermine me and my reputation.

First officer █████ told me Patterson is on a war path against me and will stop at nothing to get revenge. First officer █████ told me he informed Patterson this was not a good idea,

After speaking with First officer █████, I immediately spoke with Captain ██ █████. I got the pleasure of meeting █████ when I fell ill in FRA. We spoke about the situation I'm having since he is on the Professional Standards Committee. ██ was in ops and heading out that evening to VVI.

I informed █████ I would be contacting you and he ask me to keep him updated. █████ told me he is scheduled to fly to Santa Cruz VVI with Patterson on July 24th. I hope you can discuss with Captain ███████ this situation before he flies with Patterson.

Once again, I'm feeling anxious, pissed off and threatened by this situation. Having to come to work under these threats not only weighs heavily on my mind, it is causing me to lose sleep, not stay focused and adding a large amount of stress in my life when I am already over burdened and stressed with my move from one state to another.

I will not and cannot work under this situation. I will not allow or continue to allow these threats to go unanswered. This person is effecting my life, my well being, my reputation my profession and the financial security of my family.

I trust you are working on this to the best of your ability. If I see no resolution with this in a few months, I will be left with no other option than to file harassment charges against Patterson.
It is not where I want to go, but I will be left with no other alternative.

I look forward to your reply,
I
████████████████

c/c
████████████████

10

AA-Patterson-0000034

On July 21st 2015, I was D2 to ORD and Patterson showed up on the standby list for the jump seat at the last minute but was a no show. I had seen this happen 2 times but I took a screen shot of the second time. I feel this was just trying to intimidate me. See attachment.

Shortly after this exchange a first officer in ops told me he heard First Officer Patterson was going to have his buddies in the NSA and CIA F*&% up my life.
On August 28th, 2015 I received an unsolicited call from ███████████. ███ is a law enforcement officer in Florida. ███ attended the police academy with Scott Patterson and said he was kicked out. He said he was calling me because he was genuinely concerned for my personal safety. ███ told me he has personal knowledge of dealing with Scott Paterson. ███ said Patterson needs to be evaluated for physiological evaluation. He said in light of the work place shooting in VA, he was concerned Scott was capable of this type of behavior. ███ told me a first officer ████████ was commuting through CLT. Scott Patterson approached ███ and told ███ he was out to mess up my life and get me fired. ███ passed along what he heard to ████████ what he heard. ███ thought it was important to call me.
I asked ███████████ to please call ████████ and ███████████. He agreed.

I sent the following to ███████████.

Hi ██,

The saga continues! Please talk with ███████████
He called me today unsolicited.

███████████

He is very concerned for my safety. He is a law enforcement officer and called because he is concerned about my personal safety.
Patterson has not stopped.

████

I was contacted by ███████████████ ████████. I felt he did not like I involved the flight office.. He told me I should have run this through APA. I told him I did and nothing was taken care of.

After this latest news from ███████, I have struggled with so much stress that I threw my back out and could not sleep. I missed 2 trips due to this. This was late August and early September. I came back to work, was displaced from a trip and now have developed pneumonia which I have been battling for over 1 week now. I'm stressed out and not sleeping well. This

11

issue weighs heavily on my mind. My wife and I are concerned for our personal safety. I am, asking this issue be taken care of and I am protected. If I have any personal threats from Patterson, I will get law enforcement involved and get a personal restraining order. I will also hire a work harassment attorney if this is allowed to continue. I will not allow this person to destroy the good professional reputation I have developed here at American Airlines for over 28 years. I will try to remain optimist this will end soon, but again as I told Capt. ████████, this guy will never stop or let go. I feel this is not over and will get uglier from here.

Sincerely,



12

AA-Patterson-0000036

# Exhibit E

AA-Patterson-0000037



American Airlines

September 25, 2015

FO Rodney Scott Patterson (576006)
1092 NW 139th Terrace
Pembroke Pines, FL 33028-2340
954-499 0873

      Re:   Withhold from Service

Dear FO Patterson,

     As discussed on September 24, 2015, this letter confirms that I am withholding you from service with pay pending the outcome of an investigation into the circumstances surrounding a Work Environment complaint that was reported by a coworker.

     While on withhold status, you are directed to remain available at the phone number and address of record listed above.  You are not allowed to use any of the flight privileges that are provided to you or your family as an American Airlines employee. This means you or your dependents are not allowed to fly either on American Airlines or any other carrier as a "non-revenue" pass traveler.

     Sincerely,

     Captain Jim Bonds
     Chief Pilot, MIA

cc:   APA Legal

Miami International Airport
P.O. Box 527300 MD 2030
Miami, FL 33152
305 526 1200 Office
305 526 1294 Fax



AA-Patterson-0000038