UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division

Case Number: 17-cv-60533-MARTINEZ/OTAZO-REYES

RODNEY SCOTT PATTERSON,

 Plaintiff,

vs.

AMERICAN AIRLINES, INC.,

 Defendant.

_____/

**Plaintiff's Response to American Airlines, Inc.'s Motion for
Extension of Time to Take Depositions and File Daubert Motion and
To Continue Trial And Request for Expedited Briefing**

**Introduction and Summary**

 Defendant American Airlines, Inc.'s motion to delay the trial of a case, which it must realize by now that it has no chance of winning on summary judgment, is desperate and disingenuous.  It seeks, ***First***, to depose a plaintiff's former non-testifying expert, whose unethical, illegal and too-sloppy-to-use work produced a report actually favorable to plaintiff; ***Second***, to attempt belatedly to eliminate plaintiff's testifying expert subsequent to hearing him testify about the results-oriented "NOT FIT FOR DUTY" report issued by American's "independent neuropsychologist," which even American's Corporate Medical Director has acknowledged cited no objective findings suggesting that plaintiff, Lt. Col. Rodney Scott Patterson,

was not qualified to pilot a passenger aircraft,[1] and, **Third**, to set the stage to call as an expert witness for the defendant the non-testifying psychologist whom plaintiff fired after he attempted to pawn off as his expert report a document based on sophisticated psychological testing done by a psychologist, licensed 70 days, who was working as a resident without direct supervision—which violates Florida's Psychological Services Act, the Florida Board of Psychology's Rules and the Ethical Rules of the American Psychological Association.

Defendant's level of candor in filing this motion—which seizes upon the resident's test results "evidenc[ing] mildly-to-moderately impaired deductive reasoning in comparison to aviators," which could be "potentially critical to flight performance, particularly in non-routine situations," for which it recommended "further review of these data by an FAA neuropsychologist … to determine the aeromedical significance to piloting skills"—is best illumined by its failures, **One**, to append to any of its filings a letter from the non-testifying expert, which was produced to defendant last Monday, July 9, in which the expert and his resident reported that "[t]he findings in our evaluation were generally positive, with a passing CogScreen (which is a validated battery of tests specifically designed to evaluate cognitive functioning in pilots),"[2] and, **Two**, to disclose to the Court that the FAA neuropsychologist who actually authored the CogScreen

---

[1]Deposition of Jeral Ahtone, M.D., DE 57-3, 54:15-55:1.

[2]The letter, which was produced to defendant Monday, July 9, is appended as Attachment 1.

Aeromedical Edition test, whose report has been furnished to defendant, shortly thereafter debunked this concern.

Defendant goes on to accuse plaintiff of "flouting the basic rules of discovery," Defendant's Motion, DE 91, at 4, ¶ 13, for asserting a legitimate objection to producing materials, ***One***, obtained from a non-testifying expert, whose identity and work-product plaintiff had no obligation to disclose; ***Two***, which plaintiff's testifying expert has testified that he did not consider in formulating his opinion;[3] ***Three***, further discovery concerning which, e.g., depositions, are generally forbidden by Rule 26(b)(4)(D); ***Four***, about which report the former non-testifying expert could not testify as a defense witness because he did not supervise his brand new resident as she administered the tests, and, ***Five***, about which the resident cannot give expert testimony about because one cannot become an "expert" after only 70 days of being licensed.

Finally, defendant American cannot prevent Dr. Caddy from testifying because he engaged in "unreliable methodology" by refusing to consider a report after questioning its author, based on complaints from Lt. Col. Patterson, and confirming that the non-testifying expert had used a methodology illegal under Florida law and unethical under APA standards.

_____

[3]Plaintiff recognizes the magistrate judge ruled to the contrary. However, a magistrate judge's ruling on a discovery issue is hardly "law of the case," and there is a large gulf between "discoverable" and "admissible."  Lt. Col. Patterson did not appeal the magistrate judge's ruling because, as discussed later, there is nothing in the Bercaw/Fonseca documents either negative about him or admissible against him.

## Statement of the Facts

Defendant, which did virtually no discovery, deposed no one other than plaintiff until June 7, when it deposed Glenn R. Caddy, Ph.D., after getting permission to do so beyond the June 6 discovery cutoff from Hon. Alicia Otazo-Reyes, U.S. Magistrate Judge.  It made no Daubert motion based on Dr. Caddy's lengthy report and the deposition by the June 11 deadline for such motions.  American knew Lt. Col. Patterson had seen Edwin L. Bercaw, Ph.D., since early on in the case, when an former associate at plaintiff's counsel's firm accidentally provided a copy of a e-mail from Dr. Bercaw to Lt. Col. Patterson, about which he was questioned at his March 6, 2018 deposition.[4]  See DE 57-1, at 341-342:1, 343:3-349:18.

During his deposition Dr. Caddy testified that he did not consider the report or any information sent to him by Edwin L. Bercaw, Ph.D., because all of that information originated from psychological testing done not by Dr.

---

[4]Plaintiff served a privilege log May 24, 2018, listing:

1. April 22, 2016 e-mail to Rodney Scott Lt. Col. Patterson, "Subject: Neuropsych Evaluation," from Edward Bercaw, Ph.D., a consulting expert, that was inadvertently disclosed by a former associate.

2.      Any tests or analysis of test results by either Edward L. Bercaw, Ph.D., and Francy Nathaly Fonseca, Psy.D. March 21, 2016.

3.      A two-page letter dated May 6, 2016, from Dr. Bercaw to Glenn Ross Caddy, Ph.D., plaintiff's testifying expert, discussing the March test results.

Bercaw, who is an authorized CogScreen Provider and is HIMS[5] trained, see

Attachment 1, at 2 (signature block), but rather by Francy Nathaly Fonseca,

Psy.D., a resident in Dr. Bercaw's practice who only became licensed

January 11, 2016[6]—70 days prior to administering the tests.

Lt. Col. Patterson wrote Caddy an e-mail May 3, 2016, in which he

stated that

> [I] want to be clear with Dr. Bercaw moving forward, his testing was
> not what I paid for.  I spoke with Dr. Kantor and was referred to Dr.
> Bercaw.  I showed up in the morning and the receptionist promptly
> asked me for the funds to undergo testing.  Dr. Bercaw was not
> available and I asked to speak to him.
>
> When I went into Dr. Bercaw's office to meet him I was introduced to
> Dr. Fonseca.  He asked me if I minded her observing the testing.  She
> also showed up in his office with a copy of Dr. Gary Kay's book
> Aviation Psychology. I did not realize until after leaving that his tests
> would not be accepted by the FAA.  She administered the tests and
> although she is a post doctoral graduate student, I didn't pay for
> that....

DE 79, at 4.  Dr. Caddy telephoned Dr. Bercaw and confirmed what Lt. Col.

Patterson had informed him.  See Deposition of Glenn R. Caddy, Ph.D., DE

57-27, at 35:5-36:5, 38:19-39:19.

It was illegal and ethically inappropriate for Dr. Bercaw to issue any

opinion about Lt. Col. Patterson based on the testing done, unsupervised,

by Dr. Fonseca.  Id. at 81:24-82:16, 83:2-6.[7]  She was an inexperienced

_____

[5]Human Intervention Motivation Study, a substance abuse program
designed for airline pilots.  See http://www.himsprogram.com/Home/About,
last visited Monday, July 15, 2018,

[6]A PDF of Dr. Fonseca's licensure information, obtained from the
Florida Department of Health's web site, is appended as Attachment 2.  It
shows her initially being licensed as a psychologist January 11, 2016.

[7]See American Psychological Association's Ethical Principles of

(continued...)

resident whose 70 days of licensed practice came nowhere near meeting the

requirement that

> Neuropsychological evaluations must be conducted by a licensed
> clinical psychologist who is either board certified or board eligible in
> clinical neuropsychology. Board eligible means that the clinical
> neuropsychologist has the education, training, and clinical practice
> experience that would qualify him or her to sit for board certification

---

[7](...continued)
Psychologists and Code of Conduct, http://www.apa.org/ethics/code/, last
visited Monday, July 16, Rules 2.05 (**Delegation of Work to Others**):

> Psychologists who delegate work to employees, supervisees, or
> research or teaching assistants ... take reasonable steps to ... (2)
> authorize only those responsibilities that such persons can be
> expected to perform competently on the basis of their education,
> training, or experience, either independently or with the level of
> supervision being provided; and (3) see that such persons perform
> these services competently[,]

and 9.01 **Bases for Assessments**:

> (a) Psychologists base the opinions contained in their
> recommendations, reports, and diagnostic or evaluative statements,
> including forensic testimony, on information and techniques sufficient
> to substantiate their findings....

> (b) Except as noted in 9.01c, psychologists provide opinions of the
> psychological characteristics of individuals only after they have
> conducted an examination of the individuals adequate to support their
> statements or conclusions.... When, despite reasonable efforts, such
> an examination is not practical, psychologists ... clarify the probable
> impact of their limited information on the reliability and validity of
> their opinions, and appropriately limit the nature and extent of their
> conclusions or recommendations....

> (c) When psychologists conduct a record review or provide
> consultation or supervision and an individual examination is not
> warranted or necessary for the opinion, psychologists explain this and
> the sources of information on which they based their conclusions and
> recommendations.

with the American Board of Clinical Neuropsychology, the American
Board of Professional Neuropsychology, and/or the American Board of
Pediatric Neuropsychology.

Federal Aviation Administration Guide for Aviation Medical Examiners,
Specifications for Neuropsychological Evaluations for Potential
Neurocognitive Impairement.[8]  It also violated the Psychological Services
Act, § 790.009(1)(s), FLA. STAT.,[9] and the Board of Psychology's Rule
64B19-18.004(5), FLA. ADMIN. CODE ("Use of Test Instruments").[10]

Although Dr. Caddy recalls a brief telephone conversation during
which Dr. Bercaw said, consistently with his statements in Attachment 1,
that his findings about Lt. Col. Patterson were "overall positive," DE 57-27,
at  46:16-48:18, Dr. Caddy not only did not rely upon it, but did not
consider the information from Dr. Bercaw because of the inappropriate

---

[8]https://www.faa.gov/about/office_org/headquarters_offices/avs/offic
es/aam/ame/guide/media/npevalspecs.pdf, last visited July 17.

[9]The statute provides that "[t]he following acts constitute grounds for
denial of a license or disciplinary action, as specified in § 456.072(2): ... (s)
Delegating professional responsibilities to a person whom the licensee
knows or has reason to know is not qualified by training or experience to
perform such responsibilities."

[10]The rule provides that:

It shall be a violation of this rule for a psychologist to sign any
evaluation or assessment unless the psychologist has had an active
role in the evaluation or assessment of the subject as required by
subsection (4) of this rule. A psychologist may not sign any evaluation
or assessment that is signed by any other person unless the
psychologist is signing as a supervisor in conjunction with an
evaluation or assessment performed by a psychological intern,
psychological trainee or psychological resident.

manner it had been gathered by a trainee, rather than by Dr. Bercaw himself.  Id. at 48:6-12, 55:9-57:2 and 76:24-78:20.

Dr. Caddy also testified that if one were to take seriously (as opposed to pretextually seizing upon them) the allegations that Captain Glenn Whitehouse made against Lt. Col. Patterson, then Lt. Col. Patterson, as a matter of passenger safety, "should have been whisked off for a very rapid evaluative workup"—*in March*.  That was when the same allegations as those for which Lt. Col. Patterson was grounded in September were made to one of American's chief pilots at Miami International Airport, to Corporate Security (which found the allegations "unfounded"), to Labor Relations and to Human Resources.[11] Instead, American waited until September, immediately after Lt. Col. Patterson took time off to go on duty with the Army Reserve against the clearly expressed desire of another chief pilot. DE 57-27, at 60:6-62:5.  No reason to remove Lt. Col. Patterson from flying existed in September 2015 that did not also exist in March.  DE 57-27, at 78:24-79:17.

Dr. Caddy, a former academic who taught psychometrics, i.e., psychological testing, to both undergraduates and graduate students, also criticized the technically "defective," bought-and-paid-for opinion of John Knippa, Ph.D., a Long Beach neuropsychologist as "stretch[ing] the data ...

_____

[11]Deposition of Brian Beach, DE 57-13, 45:18-46:14, 48:24-49:20, and Exhibit 2C (e-mail from corporate security to Brian Beach, a copy of which is appended as Attachment 3 to this Response), discussing his having turned over to Corporate Security Whitehouse's complaints; Oral and Videotaped Deposition of the Corporate Representative of American Airlines Michelle A. Montgomery, DE 57-25, at 16:19-21, 21:22-24:2, and 35:21-36:1 and Exhibit 74 (e-mail from Brian Beach to Michelle Montgomery and Rhonda Theuer, a copy of which is appended as Attachment 4).

to the extreme" in seeking to support his opinion that Lt. Col. Patterson was

"NOT FIT FOR DUTY" as a pilot.  DE 57-27, at 12:14-22.  Dr. Caddy

continued his assessment of Dr. Knippa's report:

> [A]nd then after basically almost asserting a variety of different possible disorders, he slides away from them, but not without leaving a mark on the paper, if you like, a reflection of, yeah, these really are issues or problems because he shows these sorts of things, but I can't go all the way to diagnosing it.
>
> That he's working too hard to give them something, in my view, that he shouldn't be doing.  It's not objective. It's moved beyond objectivity.
>
> *      *      *
>
> [T]he reality though is my objection to Dr. Knippa's work was that, at every level, if you really understand what he was doing, he kept on trying to find something wrong and he'd make comments about something wrong, but then he'd fall off and say, well, it's not enough to offer a legitimate assertion of that, after he made assertions about it.

DE 57-27, at 12:22-13:5; 58:20-59:1.[12]

————————————————

[12]Lest Dr. Knippa have any question what American was looking for when it sent Lt. Col. Patterson to him for an evaluation, American sent to Dr. Ahune, who relayed it telephonically to Dr. Knippa, an internal communication that spelled out what American wanted (and got) Dr. Knippa to find:

> Flight requests that a Fitness for Duty Medical Evaluation, pursuant to Section 20 of the AA-APA labor agreement be scheduled and conducted for First Officer Rodney "Scott" Lt. Col. Patterson. The request is based upon this office's concerns about FO Lt. Col. Patterson's judgment and, specifically, his mental and/or emotional stability.  This office has received multiple reports of atypical interactions with coworkers and reports that suggest a pattern of false/self-aggrandizing statements.

Ahtone Deposition, DE 57-3 at 23:8-16, and Exhibit 1, a copy of which is appended to this response as Attachment 5; Deposition of John Knippa, 57-

(continued...)

The CogScreen test Dr. Knippa administered—and which Lt. Col. Patterson passed when even Dr. Bercaw's resident, Dr. Fonseca, administered it—was done so irregularly it produced invalid results, Dr. Caddy testified:

> The other issue that's very important to understand is that you simply don't do this sort of assessment, CogScreen work, for example, at 2:00 in the afternoon when the person has flown across three time zones the night before and arrives at 9:00 to start assessment. The research is really clear about the importance of adequate time to adjust to time zones when you are taking relatively complex, skill set-type testing.
>
> You can take testing dealing with personality and all that sort of stuff without too much trouble at all, but when it's a skill set—
>
> *       *       *
>
> In the case of an aeromedical evaluation, I absolutely know that it just is not done, and yet he did it. And if you have any doubt about that, take Gary Kay's deposition.  I've talked to him at length about it and he is generally regarded as top in the field.

DE 57-27, 69:9:20, 70:15-19.

Defendant, meanwhile, which used ¶ 3 of its "Relevant Background" section, DE 91, at 2, to channel to this Court an anonymous ad hominem attack on Lt. Col. Patterson, attempted in ¶ 8, id. at 3, to suggest some corrupt motive on Lt. Col. Patterson's part by quoting out of context his comment about Dr. Bercaw's failure to "play ball" with Dr. Caddy, when what the e-mail string was about was Dr. Bercaw's bait-and-switch substitution of Dr. Fonseca for himself and the worthlessness of Dr. Fonseca's examination for submission to the FAA, see supra, at 5, quoting DE 79, at 4, and then requesting an additional fee to confer with Dr. Caddy.

---

[12](...continued)
24 at 26:19-27:25.

Plaintiff revealed these e-mail at the hearing before the magistrate judge, notwithstanding that they would appear to fall under the protection of the work-product doctrine, which protects not only attorney communication, but also, overlaying Rule 26(b)(4)(D) on Rule 26(b)(3)(B), "against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney *or other representative* concerning the litigation," and Lt. Col. Patterson was representing himself in dealing with the two experts.

The part of the report American is seizing on, <u>see</u> Defendant's Motion, DE 91, at 3, ¶ 8, is that Dr. Bercaw wrote of the CogScreen test performed by his resident, Dr. Fonseca, that

> With respect to his airman medical certification, there are several positive cognitive and psychological attributes identified by the testing, as indicated above. His overall performance on the CogScreen was within normal limits, which is favorable; however, his scores evidenced mildly-to-moderately impaired deductive reasoning in comparison to aviators. The deductive reasoning finding was later replicated with the WCST, a similar task. These findings raise concern about how adaptable or flexible he is to feedback about his performance. This quality is potentially critical to flight performance, particularly in non-routine situations. Therefore, further review of these data by an FAA neuropsychologist is recommended to determine the aeromedical significance to piloting skills. A comparison of these results with his previous fitness-for-duty neuropsychological evaluation may also be helpful, as this was not available to us.

DE 87-1, at 7. However, Gary G. Kay, Ph.D., the author of the CogScreen Aeromedical Edition, whose report was furnished to defendant both in discovery and later as an attachment to Lt. Col. Patterson's summary judgment response, <u>see</u> DE 61-20, at 11-17, summarized his June 29, 2016 examination of Lt. Col. Patterson:

> Based upon my review of records, including evaluations by Dr. Caddy and Dr. Knippa, along with results from testing conducted on 6/29/16, and a clinical interview, Mr. Lt. Col. Patterson appears to be

psychologically and neuropsychologically fit-for-duty as an American Airlines pilot.  There is no evidence of aeromedically significant neurocognitive deficits.  Follow-up testing with CogScreenAE and measures of attention (including vigilance) reveal normal functioning. A mild weakness was seen on one (isolated) measure of vigilance. Performance was normal on all other measures of sustained attention. I agree with Dr. Caddy that poor performance on vigilance testing when evaluated by Dr. Knippa was likely due to jet-lag related fatigue. ***When previously evaluated by Dr. Knippa, Mr. Lt. Col. Patterson had also performed poorly on a measure of deductive reasoning under time pressure.  On follow-up testing he performed well on this measure.***

DE 61-20, at 17 (emphasis supplied).

## Governing Legal Principles

- **__Daubert__ demands orthodoxy, trustworthiness for admissibility**

    __Daubert v. Merrell Dow Pharmaceuticals, Inc.__, 509 U.S. 579 (1993), __Kumho Tire Co. v. Carmichael__, 526 U.S. 137 (1999), and Federal Rules of Evidence 401, 402, 403, and 702 require of an expert witness that:

    ***One***, the witness be "qualified" to offer an opinion by "qualified as an expert by knowledge, skill, experience, training, or education," __id__.,

    ***Two***, that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," __id__. at (a),

    ***Three***, that "the testimony is the product of reliable principles and methods," __id__. at (c), and

    ***Four***, that "the expert has reliably applied the principles and methods to the facts of the case."  __Id__. at (d).

    To be helpful to the jury, the opinion testimony must also be relevant, i.e., the testimony must have a "tendency to make a fact more or less probable than it would be without the evidence," Rule 401(a), and that "fact" must be "of consequence in determining the action."  And that

relevance cannot be outweighed by "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Rule 403.

> The proponent of the expert testimony carries a substantial burden under Rule 702. "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1306 (11th Cir. 1999) (<u>citing</u> <u>Daubert</u>, 509 U.S. at 592). Thus, the proponent must demonstrate that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact....

<u>United States v. Masferrer</u>, 367 F. Supp. 2d 1365, 1371-1372 (S. D. Fla. 2005).

- **What is discoverable and must be disclosed**

Rule 26(a)(1)(A)(i) and (ii), respectively, require the disclosure of "the name and, if known, the address and telephone number of each individual likely to have *discoverable* information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses," (emphasis supplied) and "all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control *and may use* to support its claims or defenses," (emphasis supplied).

Additionally, experts either "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," Rule 26(a)(2)(B) must file a report that discloses, among other things, (i) "a complete statement of all opinions the witness will express and the basis and reasons for them," and (ii) "the facts or data *considered* by the witness in forming them."

(Emphasis supplied.)  Other experts, e.g., treating psychologists or physicians, file more abbreviated reports.  Rule 26(a)(2)(C).

An opposing party, however, generally cannot do discovery about non-testifying experts.

> Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial.

Rule 26(b)(4)(D).  That would place the facts such non-testifying experts know and the opinions they hold outside of the definition of Rule 26(a)(1)(A)(i), i.e., "discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses."  Id.

A party may withhold even the identity of his non-testifying experts, without filing a privilege log under Rule 26(b)(5)(a), because the information is not "otherwise discoverable."  See Kendall Lakes Towers Condo. Ass'n, Inc. v. Pac. Ins. Co., Case No. 10-24310-cv-Graham/Goodman, *3 (S.D. Fla. Nov. 8, 2011) ("Because Rule 26(b)(4)(D) is explicit that non-testifying experts' opinions are not ordinarily discoverable, it follows that no privilege log is required for information that they withhold. Accordingly, the Court will not require the third party experts to produce privilege logs.")

- **Defendant must show good cause, exceptional circumstances for the relief it seeks**

Federal Rule of Civil Procedure 6(b)(1) states:

> In General.  When an act may or must be done within a specified time, the court may, for good cause shown, extend time:

(A)   with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or

(B)   on motion made after the time has expired if the party failed to act because of excusable neglect.

Regarding an enlargement of time that affects a pretrial scheduling order, which order "controls the course of the action unless the court modifies it," Rule 16(d), "good cause" is required.  Rule 16(b)(4).  "This good cause standard precludes modification unless the schedule cannot be met despite the diligence of the party seeking the extension." Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1418 (11th Cir. 1998) (per curiam) (internal quotation marks omitted), quoting Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992) ("If [a] party was not diligent, the [good cause] inquiry should end.").

To depose a adversary's non-testifying expert, other than in connection with a Rule 35 mental or physical examination, a party must "show[] exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." Rule 26(b)(4)(D)(ii).

The party seeking disclosure under Rule 26(b)(4)(D)(ii) has the burden of demonstrating exceptional circumstances. Hoover v. U.S. Dept. of the Interior, 611 F.2d 1132, 1142 n.13 (5th Cir. 1980) (interpreting former Rule 26(b)(4)(B), the predecessor to Rule 26(b)(4)(D)). Courts have generally found that exceptional circumstances may be demonstrated by showing that (1) "the object or condition observed by the non-testifying expert is no longer observable by an expert of the party seeking discovery," or (2) "it is possible to replicate expert discovery on a contested issue, but the costs would be judicially prohibitive." Bank Brussels Lambert v. Chase Manhattan Bank, N.A., 175 F.R.D. 34, 44 (S.D.N.Y. 1997); see also Cooper v. Meridian Yachts, Ltd., No. 06-61630, 2008 U.S. Dist. LEXIS 41902 (S.D. Fla. May 28, 2008) (exceptional circumstances found where the movant would never have the opportunity to examine the

condition because the non-movant's experts deconstructed it as part of their examination).

Kendall Lakes Towers Condo. Ass'n, Inc., at *2 (denying discovery of opponents' consultants' work product).

### Applying the Law to the Facts in the Case at Bar

**Point 1:**    **Dr. Caddy's methodology is solid, and was not challenged until defendant grasped at the straw of the unethical, illegal report done by Dr. Bercaw.**

The only challenge to Dr. Caddy's "methodology" is American's assertion that Dr. Caddy did not factor into his expert opinion Dr. Bercaw's report—or was it 70-day-Psy.D. Dr. Fonseca's report?—that although Lt. Col. Patterson had overall exhibited "performance on the CogScreen [that] was well within normal limits, which is favorable, Lt. Col. Patterson had exhibited," DE 87-1, at 7, "mildly-to-moderately impaired deductive reasoning in comparison to aviators," which "raise[s] concern about how adaptable or flexible he is to feedback about his performance," which "quality is potentially critical to flight performance, particularly in non-routine situations."  Defendant's Motion, DE 91, at 3, ¶ 8.

What either Dr. Bercaw or Dr. Fonseca recommended was "further review of these data by an FAA neuropsychologist is recommended to determine the aeromedical significance to piloting skills," DE 87-1, at 7—which is precisely what Dr. Caddy obtained (even paying no heed to Dr. Bercaw's ethically/legally-flawed report) by referring Lt. Col. Patterson to Dr. Kay, the author of the test instrument—whose report said there was no problem.

To argue that Dr. Caddy's methodology should be considered unreliable because he refused to adopt a report that violated a FAA

standard, a Florida statute, a Florida Board-of-Psychology rule and several APA ethical guidelines is absurd.  So is it to propose that expert testimony of a fired, non-testifying psychologist who engaged in illegal and unethical behavior be admitted into evidence.

The sole authority that American cites for excluding Dr. Caddy's opinion is an incomplete quote from a footnote in a 103-page order in an groundwater- and air-pollution case.  The court denied, subject to a motion to strike at trial if a proper foundation could not be laid, a <u>Daubert</u> motion to exclude the evidence offered by a groundwater expert notwithstanding that, among other things, there was (as the footnoted sentence stated) a "lack of clarity or justification why [the expert] calibrated the 'flow' component of the groundwater model but not the 'transport' component." <u>Abarca v. Franklin County Water District</u>, 761 F. Supp. 2d 1007, 105 (E.D. Cal. 2011).  It is inapposite to the situation at bar.

Besides being illegally and unethically produced, the report—perhaps because it was written by a Ph.D. based on testing performed by a 70-day Psy.D. without any direct supervision—was also quite tentative.  For example, it suggests near the end that while "there were a few areas of lower than expected performance that may be of aeromedical significance, in the areas of deductive reasoning and sustained attention," Lt. Col. Patterson's "scores may have also been affected by fatigue," since Lt. Col. Patterson had "specifically noted feeling tired when this test was administered towards the end of the long evaluation day."

While Dr. Caddy did not use that tentativeness to exclude the report's findings—which he never read, just because of how they were reached and

reported, and by whom—that indecisiveness further robs Dr. Bercaw or Dr. Fonseca's opinion of the trustworthiness and relevance that <u>Daubert</u> demands.

<u>Daubert</u>, <u>Kumho Tire</u> and the Federal Rules of Evidence on relevancy and expert testimony permit the testimony of Dr. Caddy, but would not permit the testimony of Drs. Bercaw or Fonseca.

Thus, there is no need to re-open either discovery or motion practice.

**<u>Point 2</u>:** **Lt. Col. Patterson was justified in withholding as non-discoverable an illegal, unethical report by a non-testifying expert, of whose report his testifying expert rejected any consideration after learning how he had broken the law and violated APA ethics.**

Although Drs. Bercaw's report would have been considered by Dr. Caddy, and therefore both disclosable and discoverable, had Dr. Bercaw administered the tests himself, Dr. Caddy disregarded Dr. Bercaw after a single phone call in which he verified Lt. Col. Patterson's assertions it was the 70-day Psy.D., Dr. Fonseca, who administered the psychological tests that Dr. Bercaw purported to interpret.

Dr. Bercaw's blurting out during the phone call that the results were generally positive, and sending a follow-up letter to the same effect, does not transform his report of what conclusions were propelled by psychological tests administered by his resident, outside of his supervision, as something that Dr. Caddy "considered"—or even should have considered—in formulating his expert opinion.

**Point 3:**      **An eve-of-trial continuance and a request to depose a party's non-testifying expert requires more than a 'the-sky-is-falling' realization that one should have done more discovery and should have made a timely <u>Daubert</u> motion.**

A movant to amend a scheduling order so he can do something before trial needs to demonstrate that he has been "diligent," <u>Sosa</u>, quoting <u>Johnson</u>.  American cannot show this:

*One*, it has had Dr. Caddy's expert report since November 1, 2017, but did not:

-     seek to depose him until after the close of discovery, or

-     even suggest challenging him under <u>Daubert</u> until more than a month after the <u>Daubert</u> deadline.  <u>See</u> DE 49.

*Two*, it has known of Dr. Bercaw since prior to Lt. Col. Patterson's March 8, 2017 deposition, and

*Three*, it not only had the "NOT FIT FOR DUTY" report of Dr. Knippa, but could hire its own testifying expert for trial.

It could have, but has done, none of the things it now says, in a Henny-Penny panic, it wants to do, which would delay the trial.

American, however, can demonstrate neither "good cause" to amend the scheduling order nor "exceptional circumstances" to depose either Dr. Bercaw or Dr. Fonseca.

And deposing either Dr. Bercaw or Dr. Fonseca would be futile. Because of the facts set forth above, neither of them would satisfy <u>Daubert</u>. Dr. Bercaw did not perform the psychological tests, so he cannot testify about what they say—about which he and Dr. Fonseca expressed uncertainty in the report.  The report he did was unethical and illegal.  Dr. Fonseca, who had been licensed as a Psy.D. for 70 days when she

administered the tests, hardly can claim to have been an expert at an aeromedical testing instrument the FAA would not even allow her to administer.

There is no "good cause" to amend the scheduling order. There are no "exceptional circumstances" justifying deposing Drs. Bercaw and Fonseca.

## Conclusion

Based on the evidence marshaled, the authorities cited and the arguments presented, plaintiff, Rodney Scott Lt. Col. Patterson, respectfully requests this court to deny the defendant, American Airlines, Inc.'s Motion for Extension of Time to Take Depositions and File Daubert Motion and to Continue Trial And Request for Expedited Briefing.

Respectfully Submitted,

*/s/ William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

NOEL C. PACE
noel.c.pace.esq@gmail.com
*Admitted Pro Hac Vice*
206 NW 91st Street
El Portal, FL
(305) 710-3713

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301
Telephone: (954) 462-1983
Facsimile: (954) 463-5008

**Attorneys for Plaintiff,**
**Rodney Scott Patterson**

## Certificate of Service

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed using the ECF System of the United States District Court of the Southern District of Florida and has been distributed to all counsel of record.

/s/     *William R. Amlong*
WILLIAM R. AMLONG

\\amlong3\cpshare\CPWin\HISTORY\180601_0001\1538.197