UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division

Case Number: 1:17-cv-60533-JEM

RODNEY SCOTT PATTERSON,

    Plaintiff,

vs.

AMERICAN AIRLINES, INC.
a Delaware Corporation,

    Defendant.

_____/

### Plaintiff's Notice of Expert Disclosure

Plaintiff, Rodney Scott Patterson, pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), discloses that he intends to call as an expert witness his treating clinical psychologist, Glenn R. Caddy, Ph.D., as follows:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them: <u>See</u> appended report;

(ii) the facts or data considered by the witness in forming that: <u>See</u> appended report;

(iii) any exhibits that will be used to summarize or support them: <u>See</u> appended report at p. 67-75;

(iv) the witness's qualifications, including a list of all publications authored in the previous ten years: <u>See</u> Exhibit A; and



**The Amlong Firm** ● 500 Northeast Fourth Street ● Fort Lauderdale, FL  33301 ● 954.462.1983

(v) a statement of the compensation to be paid for the study and testimony in the case:  <u>See</u> Exhibit B.

Respectfully submitted,

*/s/ Isha Kochhar*
WILLIAM R. AMLONG
Florida Bar Number 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar Number 275565
KAmlong@TheAmlongFirm.com
ISHA KOCHHAR
Florida Bar Number 105294
IKochhar@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth St., Second Floor
Fort Lauderdale, Florida 33301
(954)462-1983

***Attorneys for Plaintiff,***
***Rodney Scott Patterson***

## Certificate of Service

I hereby certify that a true and correct copy of the above was served via the Southern District of Florida's CM/ECF system on this 1st day of November, 2017 to the individuals listed below.

*/s/ Isha Kochhar*
ISHA KOCHHAR

### Service List

WILLIAM R. AMLONG
WRAmlong@TheAmlongFirm.com
Florida Bar Number 470228
KAREN COOLMAN AMLONG
KAmlong@TheAmlongFirm.com
Florida Bar Number 275565
ISHA KOCHHAR
Florida Bar Number 105294
IKochhar@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street,
Second Floor
Fort Lauderdale, Florida 33301
Tel: (954) 462-1983

**Attorneys for Plaintiff,**
   ***Rodney Scott Patterson***

MICHAEL A. HOLT
mholt@shb.com
**SHOOK, HARDY & BACON L.L.P.**
Miami Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

MARK W. ROBERTSON, ESQ.
mrobertson@omm.com
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

TRISTAN MORALES
tmorales@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, District of Columbia
20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

**Counsel for Defendant**,
   ***American Airlines, Inc.***

Date of Submission: August 14, 2016

**Confidential Communiqué to William Amlong, Esquire**
**RE: Rodney Scott Patterson**

Table of Contents

| | |
|---|---|
| Introduction | Page 2 |
| Timeline of Significant Events | Page 4 |
| Overview of the Issues of this Case | Page 15 |
| Perspectives Regarding the Paraguay Trip | Page 16 |
| An Alternate Perspective | Page 26 |
| Facts Regarding These Claims and Assertions | Page 28 |
| Further Matters at American Airlines | Page 32 |
| The Military Leave Matter | Page 33 |
| The Examination of Scott Patterson By Dr. John Knippa | Page 34 |
| Argument and Functional Considerations | Page 47 |
| The Psychiatric Examination by Ibrahim Abi-Rafeh M.D. | Page 53 |
| The Neurological Examination of Dr. John D. Hastings | Page 54 |
| The Aeromedical Neuropsychological Report of Dr. Gary G. Kay | Page 55 |
| My Work in this Case | Page 57 |
| The Events at Asuncion that Set the Stage for Scott's Problems | Page 59 |
| Overview of My Examination Process | Page 65 |
| Overview of Documents Reviewed | Page 67 |
| Medical Specialties Record Reviews | Page 79 |
| Review of Collateral Sources | Page 80 |
| Disability and the FAA Policy for Airmen | Page 86 |
| Scott's Background History and Present Functioning | Page 87 |
| My Overall Clinical Observations and Findings | Page 89 |
| The Formal Testing Results | Page 90 |
| Diagnostic Opinions | Page 94 |
| The Takeaway | Page 95 |
| Certification | Page 96 |

1

**CONFIDENTIAL COMMUNIQUE**

This is privileged and confidential expert forensic patient information report. Individuals or entities granted permission to review this report through written release by Rodney Scott Patterson, and/or Mr. Patterson's his attorney, and/or Dr. Glenn Ross Caddy must be professionals capable of ethically and professionally interpreting, understanding and communicating the information this report contains. Any duplication, transmittal, re-disclosure or transfer of this report is expressly prohibited. [The confidentiality of this report is protected under The United States Health Insurance and Portability Act, 1996, as amended].

**Introduction to this Forensic Investigation**

A fundamental tenet of the behavioral sciences is that all human behavior makes sense, even the profoundly aberrant and or pathological, if only one can come to understand the dynamics underlying or driving that behavior. The above tenet surely applies to the present matter in which First Officer Rodney Scott Patterson [hereinafter referred to as "Scott" Patterson or FO Patterson] is embroiled, as it does to any other.

Likewise, in psychometrics, the behavioral scientist must deploy valid measuring systems that offer the best prospects for construct and predictive validity. Yet we also need to understand that the best predictor of an outcome or a performance cannot be determined by a second order estimate of that performance, but only by the direct operationalizing [the direct testing] of that performance. It must be understood that the best measure of an operation is not a statistically based predictor, but a measure that validly demonstrates that performance. Hence, for example, the most reliable and valid measure of a skill is the level of excellence in the demonstration of that skill. That best measure cannot be achieved by employing a second order measure, unless it can be shown that the second-order measure has exceptional predictive validity of that skill and that the assessment process was done in a valid and reliable manner. Unfortunately, in the case to be presented below the approach to assessing the pilot's flying skill and his personality characteristics that American Airlines [hereinafter referred to as "A.A"] were seriously flawed, and thus invalid.

In the course of my comprehensive forensic investigation of this case it became my opinion that the A.A. process in dealing with the investigation of the concerns being raised were flawed in a number of respects. At the time that Scott Patterson was withheld from service as a Flight Officer, a letter to him from Captain James Bond, Chief Pilot, MIA, dated September 25, 2015, stated: "I am withholding you from service with pay pending the outcome of an investigation into the circumstances surrounding a "Work Environment Complaint" that was reported by a coworker". And yet, without in any meaningful way conducting an appropriate comprehensive examination of this so-

2

called "Work Environment Complaint", what A.A. did was to send FO Patterson to undergo a comprehensive clinical and neuropsychological assessment, [a so-called "Independent Aero-Medical Clinical and Neuropsychological Examination]. This course of action was based on a paradigm and protocol, which in its application, in the present case, was fundamentally misguided. Moreover, in its execution [as conducted by the IME Clinical and Neuropsychologist] Dr. John Knippa] this procedure would prove operationally flawed, and for multiple reasons. And yet, it was this very process, and the erroneous conclusions that flowed therefrom, that have resulted in the potential for an inappropriate termination of FO Patterson, a sixteen-year career pilot with A.A. to take place.

Following my own investigation of this entire process conducted by A.A. in the course of dealing with this entire matter, I came to perceive the multiple flaws in the logic, assumptions, and the operational approach of A.A. in this matter. The company failed to do an appropriate investigation of all the issues involved. [Read that as perhaps a combination of incompetence and perhaps too the presence of bias in A.A. [perhaps based on the rank of the complainant]. This in turn led A.A. to fail to conduct an appropriate and rational Human Resources Investigation [in fact, it appears that no meaningful fact finding enterprise was conducted].

Following a thorough review of all of the matters in this case, and my own comprehensive review and psychological assessment of FO Patterson, I recommended that FO Patterson undergo a further testing by a nationally recognized Aero-Medical Expert, Dr. Gary D. Kay. I recommended such a process solely for the purpose of definitively demonstrating the errors of elements and inferences both in the A.A. procedure in sending FO Patterson across the country for an inadequately implemented Clinical Psychological Examination and a somewhat similarly flawed Neuropsychological Examination. [Such an examinations should not have been used as a substitute for a thorough Human Resources Investigation of this entire matter [for it surely was beyond the scope and ability of the so-called California IME examiner], and in fact no such examination of the events in the workplace was ever objectively conducted! Moreover, the examiner chosen by A.A. to undertake what became a failed fact-finding enterprise did not have access to the data necessary for him to even begin such a fact-finding venture [he was simply not equipped to do so]. It is hardly surprising, therefore, that his efforts further compromised the situation and ultimately also himself.

The process and the conclusions of this earlier examination were compromised in part by lack of information by Dr. Knippa, and also the processes of the examination were in fact operationally flawed [that is, some of the inferences from the examination and some of procedures, and thus also some of the findings, were flawed].

The further aeromedical examination that I recommended be conducted [by Dr Gary Kay, confirmed some of the some errors made in the former A.A. directed "Independent Examination" process. Further, these second findings were consistent with my own

3

findings, yet using quite a different investigative paradigm. The ultimate conclusion is that there was no basis from within the discipline of psychology to contemplate the termination of the employment of Scott Patterson.

### Timeline of Significant Events in this Case

There are multiple events of significance in this case. Providing a timeline of these major events, front and center as it were, is of use for reference and to facilitate clarity. Hence, I place the timeline for reference here, at the beginning of this report. It should be noted from the outset that at the time that "Scott" Patterson began having a problem at A.A. he was an A319 First Officer with over 12,000 logged flight hours. He had begun working in aviation in 1993, and in 1997 he began with Mesa Airlines, being promoted to Captain the following year, flying a Beech 1900. He was hired by American Airlines in 2,000 as a B727 Flight Engineer and then transitioned to fly B737's as First Officer. He was furloughed from American from October 2004 to 2007 and when he returned to work at A.A. he became a B737 First Officer and he then transitioned to the B757, also as First Officer. While during the period of furlough, Scott worked as a United States Army Officer. Thus, except for a period of furlough, Scott Patterson had been a commercial carrier pilot since 1993.

Throughout his developmental years and to the present time, Scott Patterson reports that he has always been a physically fit and an emotionally healthy person. He has a stable family life and reports never experiencing any problems of an emotional nature [except for the inordinate stress he has been under as a result of his present difficulties at American Airlines]. He has no history of substance misuse and in fact he does not drink alcohol at all. He also denies taking any prescribed psychoactive medications.

October 7 to 10, 2014:  First Officer [FO] Rodney "Scott" Patterson flew a trip to Paraguay with Captain Glenn Whitehouse. The events of this trip triggered much [all] of what has happened since. I will discuss the details of this trip subsequently.

Soon after that trip however, FO Patterson was advised that a Flight Attendant had made a complaint regarding him and he was required to meet with A.A. Professional Standards. At that meeting FO Patterson reports that he was advised that Captain Whitehouse had made the [strange] complaint against him, namely that Scott Patterson was alleged to be pointing of people to U.S. Customs for extra screening. [Scott Patterson reported to me that he strongly denied what he called this "bizarre accusation"].

October 25, 2014: Scott was involved in a worker's compensation accident in Bolivia.  He suffered a fracture to his left foot and was out of work until January 7, 2015.

February 14, 2015: FO Patterson was diagnosed with a sarcoma [cancerous tumor] in the muscle of the left breast and on February 27, 2015 he underwent a two-hour

4

surgery to remove the tumor. Thereafter, Scott undertook additional treatment in Mexico in an effort to reduce the risks of any return of the cancer. He was determined to be cancer free as of May 31, 2015 and he returned to work on June 6, 2015.

May 31, 2015:  FO Patterson presents to Dr. Charles R. Mummery, an F.A.A, Aviation Medical Examiner. Mummery examines Scott and Issues a First Class Medical Certificate.

Immediately thereafter Scott again began flying for A.A until September22, 2015, when A.A suspended him from flying.

June 14, 2015: FO Patterson successfully completes R9, [a program of simulator practice and checking that involves qualifying pilots to fly the line].

July 17, 2015:  FO Patterson and Captain Robert Swanson are accosted by US Customs and Border Protection on departure from Miami.  A.A FLT 922, MIA to VVI [Santa Cruz]. A Female pilot, FO Caughey, advises that she was not searched as the Customs Officers claimed were looking for a male.

July 20, 2015: Federal Aviation Administration grants Authorization for Special Issuance of a Medical Certificate Valid through May 31, 2017. [These certificates are issued biannually].

July 21, 2015: Patterson is scheduled to fly "non-rev" to Wisconsin for the Annual Oshkosh Air Show.  It is discovered that Captain Glenn Whitehouse is on the flight to Chicago, the first portion of this commute.  The flight is full and this situation might result in a jump seat accommodation for Scott situation with Whitehouse.  Scott changes the travel plans immediate in order to avoid any contact. This results in a 6-hour delay.

July 22, 2015:  Captain Chip Harlowe, APA Professional Standards for the Miami Domicile phones Patterson.  The course of the conversation is interrogatory and levels a number of accusations namely involving Whitehouse.  Scott reported that Captain Whitehouse was complaining that FO Patterson was harassing him whereas Patterson advised that he was seeking just the opposite, to avoid him.

Harlowe thereafter asked Patterson in a rather toned down manner.  "Now Scott, we are friends, we have flown together, I want you to be honest with me, are you smuggling guns and ammunition to Bolivia?  You can tell me, I am your friend". Patterson ended the call at that point.

[Scott Patterson considered this call predatory and professionally inappropriate for the APA Professional Standards.  It was Scott's opinion at this point that Captain Glenn Whitehouse had started, or had been a party to a rumor mill that now had come to include Scott's alleged involvement in Federal Criminal activity].

5

July 22, 2015:  Patterson contacted APA National Professional Standards Chair, Captain Doug Woods, to report the issue with Captain Harlowe and to request assistance with resolving the Whitehouse issue once and for all.  Patterson also contacted Captain Mike Karn with the APA Security Committee, reference the allegations made by Harlowe/Whitehouse and involving Customs.

[It should be noted that upon follow up with these two persons, Captain Thomas Copeland was involved with the issue.  Copeland is known as a "big wig" within the APA. He is referred to as the number 2 man in the Union.  The situation led Scott Patterson to consider the possibility that Captain Copeland was running interference for Captain Whitehouse, as Woods and Karn should have put a stop to the issue at that point but they did not].

July 23, 2015:  Patterson reported for A.A Flight 922 departing Miami to VVI.  He was again thoroughly searched by U.S. Customs and Border Protection.  This time, however, with a completely different tact and the sensitivity of a brick. This was clearly not a "random occasional visit".  In fact, Scott had never experienced or even seen such a searching in all his years in the airline industry.

The Customs Officers were stationed by the jet bridge entry and they were examining all passports.  Patterson's passport was checked and a conversation ensued about Patterson's Official Passport.  Patterson advised the officer he often travelled on official business for the government, and hence the two passports [military and civilian] the officer let him pass.  A while later that same officer showed up in the aircraft and requested to specifically search Patterson's belongings, while offering apologies for doing so in front of the passengers. The incident led Scott to believe that he was being given very focused attention.

[In Scott Patterson's 15- year career, and Captain Robert Swanson's 28-year career, both men discussed the fact that they had never been searched or even questioned by Customs on an outbound flight. This was more than highly unusual. Inbound searches are not uncommon and are to be expected. Later, Scott would be told of a rumor that was circulating. That rumor was that he was smuggling weapons into South America].

During that [July 23, 2015] flight also Patterson had a cordial conversation with the Captain, Pat McGinn. McGinn advised Scott that he was on the National Pro Standards Committee and he would contact Glenn Whitehouse to resolve the issues between Scott and Captain Whitehouse. [Unbeknownst to Scott, in fact McGinn had already spoken to Whitehouse on a previous occasion about the events. In fact, McGinn generated an email to Whitehouse advising of the results of his conversation with Scott. The end result as far as McGinn was concerned was [and he said] that both men "should grow up and act like adults".

6

Captain Whitehouse apparently was not happy with this proposed resolution however, and he is alleged to have fired back to Captain McGinn that he [Whitehouse] was acting like and adult the whole time.

August 17, 2015:  Patterson is ordered to Active Duty in Washington, D.C, and he purchased a full fare ticket on American Airlines for travel on Sunday, August 16, 2015.

August 28, 2015: Patterson is released from Active Duty.

September 21, 2015: Scott Patterson Contacted the Miami Flight Office to request military leave for an obligation commencing on 22 September, 2015 at the Pentagon in Washington, D.C.  He spoke to Carolina in the Flight Office and asked for her to pass a message to Luis Rojas requesting leave. Scott made several calls to Carolina that same day to check on the status of the leave request as he had not been relieved from flying the next day in the DECS [Dispatch Environmental Control System]. At approximately 1510 hours on that same day, Captain James Bonds left a message on Scott's cell phone denying that leave, unless Scott could produce a set of leave related military orders. [Scott Patterson reports that Captain Bonds is a reserve Lt. Colonel in the US Air Force and that he must have known that Scott was not required, or was he able, to provide such evidence of duty until he returned from that duty]. That message was as follows:

"Hey Scott, Jim Bonds it is three ten. Trish gave me the message saying you [unintelligible], an EO for tomorrow because of some military work at the Pentagon. Dude we're really, really, really short and I see that you, you probably see that by your trip that's going out tomorrow. Everybody is on reserve and we are really tight on manning so, obviously we are going to give you the time off, if you can produce some orders. Can you have them fax us the orders and the fax number is 305-526-1294. We're leaving you on the trip till we get that fax. Thanks."

FO Patterson did not receive this voice to text message from Captain Bonds, until approximately 1930 on the same day [September 21, 2015].

Scott reported that he had first called the Miami Flight Office around 1545 on that day to inquire [before the office closed] regarding the question of why he had not automatically been given the leave. He then contacted Captain Brian Vitale [because Scott knows Brian Vitale to be a knowledgeable person regarding these issues, since in fact it was he who started the Military Affairs Committee for the American Airlines Allied Pilots Association, in Miami]. Scott reached Captain Vitale at approximately 1700 hours, and he explained his situation to Vitale, who advised him to contact the System Operations Control (SOC) Chief Pilot on duty. Scott did that and spoke to Captain Dave Tatum. He notified Captain Tatum of his military obligation and Captain Tatum released Scott to attend to his military duty with an EO [Employee Off status]. The EO simply meant that Scott was being granted Vacation Time to cover his time during his military obligation.  It was noted that Tatum did not put Scott through the level of scrutiny that

7

Bonds had done. Nor was there any discussion, or excuse, for any claim of A.A. being shorthanded. Audio recording of this call is available.

September 22, 2015: Scott departed for Washington, D. C.

September 22, 2015: Scott reports that he contacted Luis Rojas in the Miami flight office, reference the military leave. Luis advised Scott that he would need to provide documentation for the file, which, of course, was standard practice.  Scott sent a notice of "Military Leave of Absence" form to Luis from the offices of Military Headquarters at the Pentagon.

September 22, 2015: Captain James Bonds, Chief Pilot in the Miami Flight Office removed the EO from Patterson's HI-1 [Each Pilot's work schedule for the month], and inserted the PW code instead.  PW is the code for "Paid but Withheld from Service" as a pilot.

[The above action meant that Scott Patterson was not permitted to fly yet he had no idea why this adverse action was taking place, he just knew that whatever was occurring it was not good. Scott noted that usually this type of action is done only for disciplinary purposes. It is Scott's view that this was an improper change of status while Patterson was, in fact, attending his military duty].

September 24, 2015: Lt. Colonel Patterson continued to perform military duties in Miami until he was released on September 25, 2015.

September 24, 2015: Captain Whitehouse filed a multi-page complaint against FO Patterson with the A.A Office of Human Resources.

September 25, 2015: Patterson receives a voice message from Captain Bonds advising him that he had been place on PW Status and was not to travel "non revenue" any longer, nor were any of his pass riders [i.e. family] to travel in that status as well.

Scott Patterson also received a letter dated on that same day from Captain James Bonds regarding: "An Investigation surrounding a Work Environment Complaint from a co-worker. While on withhold status, you are directed to remain available at the phone number and address of record listed above.  You are not allowed to use any of the flight privileges that are provided to your or your family as an American Airlines employee. This means you or you dependents are not allowed to fly either on American Airlines or any other carrier as a non-revenue pass traveler".

September 28, 2015: Captain James Bonds contacted Patterson at his "home of record", regarding the military leave. He asked Scott to provide him copies of military orders for the September 22, 2015 duty in Washington. D.C. Scott advised Captain Bonds that the duty was performed under Title 32, or Inactive Duty for Training Status.

8

Scott indicated that he did not know precisely the time frame involved within the Defense Financial and Accounting Service before he would receive his Leave and Earnings Statement. He advised Captain Bonds that his pay stub should be forthcoming in approximately two weeks.

October 5, 2015: Tricia E. Kennedy Esquire agrees to represent Scott Patterson on behalf of the A.P.A.

October 7, 2015: Captain Bonds left the following message on Scott's Answering Machine at his residence:

"Captain Jim Bonds from the flight office calling, 4 o'clock on the 7th, hope all is well with you guys. Hey I was hoping to have gotten those orders or the LES or something. Little bit, you know, it's just a lot of confusion on our part, you know the circumstances around those order. So how bout, doing this if you will. Would you please, you know, if you can provide those to us, by the 13th, then we'll be good, but you know anything after that then we may have to get a little more formal in asking you to provide those in the form of a Section 21 or something.  So if you can, if you can get those to us, we would really appreciate it. You know our number here in the First Officer and take care and hope to hear from you soon".

Scott reported that he considered this communication both socially inappropriate and threatening, especially from a man who he knows well.  He also wondered if the tone of this letter was in any way linked to the Captain Whitehouse matter.

October 13, 2015: Scott's A.P.A. counsel, Ms. Tricia Kennedy, sent the following email communication to Lucretia Guia, the A.A General Counsel.

Dear Lucretia,
I understand that the Company has asked FO Scott Patterson [576006] to provide verification of his September 2015 military duty.  Although verification is not normally required by the Company [11.E.6], FO Patterson is in the process of providing same.  Meanwhile, the Company has withheld FO Patterson from service regarding an unidentified "Work Environment complaint."  The timing of these events makes us pause and we request that the Company explain why it needs military verification in this instance.  Further, we request that the Company state whether the request for military verification is related to the unidentified "Work Environment Complaint" and we have yet to receive any detail about the complaint beyond the foregoing description.

That said, FO Patterson advised CA Bonds that he is in the process of complying with Chief Pilot Bonds military verification request. Toward that end, the pilot is given a "reasonable period of time to provide documentation substantiating the military duty in question" (11.E.6).

9

Nonetheless, CA Bonds threatened FO Patterson, stating that if he [Patterson] does not comply within the time frame demanded, the Company will initiate a Section 21 investigation. Such an unreasonable demand only fueled Scott Patterson's concerns about the entire situation.

FO Patterson's APA Attorney, Trisha Kennedy responded to Captain Bond's demand of FO Patterson on behalf of her client by writing:

"Perhaps this is just a matter of miss-communication but we wanted to bring this to your attention. Rest assured that FO Patterson is working on getting the verification but he needs a reasonable amount of time to do so. Your assistance in this matter is appreciated".

October 28, 2015: FO Patterson received a letter signed by Captain Brian Beach advising of a Section 21 Hearing that was to be scheduled on November 2, 2015. The A.P.A. [the Allied Pilots Association] canceled this hearing due to insufficient notice.

October 28, 2015: FO Patterson sent the following email to Captain Bonds.

"Captain Bonds

Per your request of 29 Sept, please find the attached leave and earnings (LES) DFAS Form 702. The LES verifies performance of military duty, which is covered under USERRA, 22 SEP through 25 SEP, 2015. Should you have any further questions please feel free to contact me otherwise, I will show this as a closed out issue and request".

November 13, 2015: Scott received another notice, signed again by Captain Beach, this time advising of a Section 21 Hearing to be held on November 23, 2015 in Miami, in the Human Resource Conference Room.

November 23, 2015: American Airline Allied Pilots Association arranged what is referred to as a Section 21 Hearing to address Captain Whitehouse's complaints.

December 14, 2015: FO Patterson, consistent with a request that came out of the so-called "Section 21 Hearing", wrote a letter to HR Partners, American Airlines, about his view of the events that were the focus of the above hearing. He denied that he conducted himself in an unprofessional manner. More specifically, he made a total of thirteen denials against conduct that he was alleged to have enacted according to the Whitehouse allegations. Representative denials included but are not limited to: "I did not take photos of a Flight Attendant without permission"; "I have not asked or requested or suggested that Customs check crewmembers for illegal contraband"; "I did not divert and aircraft"; "I did not point my fingers as a gun in front of crew passing the hotel bus"; "I have not conducted myself in an erratic, explosive, or unprofessional

10

manner"; and he denies "using the N word".

In that above noted correspondence, FO Patterson also questions the rationale for bringing forth the array of complaints [he lists 13 in this letter but in fact there were several dozen complaints in this format and nearly a year after the timeline of the vast number of the alleged happening of these "events" rather than taking the complaints to A.A. Management immediately upon them being brought forward.

January 12, 2016: Dr. Martin Dayton determined Scott Patterson to be in clinical remission from the chest cancer and on March 2, 2016, FO Scott Patterson was granted authorization for special issuance of a Medical Certificate, which would expire on January 31, 2017.

January 14, 2016: Captain Brian Beach, the Chief Pilot [Miami] wrote an unaddressed letter requesting that:

"FO Patterson is required to undergo a Fitness for Duty Evaluation ([Mental Health]. Flight requests that a Fitness for Duty Medical Evaluation, pursuant to Section 20 of the American Airlines A.P.A. labor agreement, be scheduled and conducted for First Officer Rodney "Scott" Patterson. The request is based upon this office's concerns about FO Patterson's judgment and specifically his mental health and/or emotional stability. This office has received multiple reports of atypical interactions with co-workers and reports that suggest a pattern of false/self-aggrandizing statements".  The letter goes on…

"Based on the information above, I removed First Officer Patterson from active duty and placed him on a paid withheld status on September 24, 2015. Please let me know if you need any additional information".

[Dr. John Knippa quoted this letter to Scott Patterson during his consultation with the psychologist on March 16, 2016].

January 20, 2016: Captain James Bonds sent FO Patterson a directive to report for a Section 20 Evaluation.   It states in part: "due to my concerns regarding your ability to safely operate an aircraft, I have arranged for you to participate in a medical evaluation as provided in Section 20 of the JCBA. You have been scheduled for a Neuropsychiatric evaluation with Dr. John Knippa on January 16 and 17, 2016. Appointments on both days begin at 9:30 a.m."

[Note this is an incorrect use of the term "Neuropsychiatric". What is meant, it seems, is a "Neuropsychological Examination" or as it happened in this instance, "A Neuropsychological and Clinical Psychological Examination". Of course, why a "Neuropsychological Examination" was considered necessary and not simply the much more logical [and professionally routine] "Clinical Psychological Examination", given the nature of the alleged complaints, hardly makes any sense at all. It would appear far

11

more rational to request "A comprehensive Clinical Psychological" or "A Psychiatric Examination" given the supposed allegations. That is, there would appear no rationale to believe from any of this single interpersonal conflict that one of the parties [the younger one] may be evidencing the consequence of a brain injury or other organic brain condition. [after all, there were no complaints about FO Patterson's memory, or co-ordination, nor any indications of aberrant personality change]conduct]. Every time two people have an interpersonal dispute in the workplace we do not run them through a comprehensive neuropsychological battery, without substantial indication of any neuropsychological symptoms, or else the discipline of neuropsychology would soon by overrun. Of course, it is equally the case that if two employees are experiencing a dispute which the senior one continues on, the potential claimant is seeking out innuendo, rumor, inference, fact, and fancy, all about the other, and from other employees, and that person continues to do so for 11 months, and then files a complaint, the question might be raised: Why would we not question the emotional stability or the judgment of that person? Could it be because of his higher rank?].

On January 25, 2016 Rodney Scott Patterson filed a complaint with the United States Department of Labor [file # FL-2016-00016-10-R]. He claimed a violation by American Airlines of his rights under the Uniform Services Employment and Reemployment Act [USERRA]. The case related to the difficulties that Scott had faced in being released from duty through the A.A. Miami Flight Office, and his subsequent suspension from his flight duties as a pilot by A.A.

January 31, 2016. Dr. Dayton prescribed an evaluation and treatment relating to an injury Scott experienced [to the right elbow that occurred back in October 2014, but still had not fully resolved]. Dr. Dayton noted: "In my opinion he should not fly until the specialist renders a diagnosis/care and clearance". [Which in fact occurred soon thereafter].

February 1, 2016. Captain Brian Beach, the A.A Chief Pilot, Miami, sent a Memo to FO Patterson confirming that at the November 23, 2015 Section 21 hearing that was held "as a result of a work environment complaint" the following was resolved: "that Captain Beach has reminded Scott Patterson of the Company's Work Environment Policy and of the importance of maintain good working relationships". It further stated: "that FO Patterson has received a copy of the PEH and is aware of his right for rebuttal".

February 12, 2016 Tricia Kennedy telephoned Patterson on his cell phone to inform him that she had been in contact with Lucretia Guia, the A.A Corporate Counsel.  A.A was going to answer the USERRA Complaint with the innuendo that Patterson was being sent for a mental health examination. Patterson informed Kennedy to advise Lucretia to "knock herself out". A Department of Labor Investigator had already spoken to Patterson specifically about those allegations and the investigator informed A.A that the A.A suggestion that Scott had "some mental issues" was outside the scope of his investigation.  In other words, A.A.'s assertion questioning Scott's mental health was not

12

a defense in the USERRA matter, though it may have been a strategy to be considered in the defense of such a complaint! This information, of course, would be readily ascertainable in a Freedom of Information Act Request from the Department of Labor. In this case such assertions of mental health issues, or the implication of a mental illness in FO Patterson, could be seen as libelous.

March 16 and 17, 2016: FO Patterson underwent a clinical and neuropsychological aero-psychological examination in California, conducted by John Knippa Ph.D., ABN and ordered by American Airlines.

March 21, 2016: Dr. Knippa published his <u>Neuropsychological Aeromedical Assessment Fitness for Duty Evaluation.</u> Dr. Knippa did not consider Scott Patterson to be unfit on the basis of the general clinical psychological component of the evaluation [that is, that related to what was the presumed reason for the examination]. However, Dr. Knippa did find Scott overall to be NOT FIT FOR DUTY on the basis of several of the tests results from the quite numerous  "neuropsychological" components of the overall assessment.

So, just to summarize! Scott Patterson had passed his most recent Flight Simulator Examination in June 13, 2015, and every such examination previously. He was cleared to fly by the FA.A, on May 31, 2015 [subsequent to his cancer surgery] and by A.A on June 2, 2015. In fact, there appears to have been no indication in the record anywhere over the past fourteen years of Scott's service to A.A. that he was anything other than broadly competent to conduct his duties as a First Officer. Not even Captain Whitehouse appeared to suggest that there were as problems with Scott Patterson's flight skills.

Yet, on March 16 and 17, 2016, FO Patterson would find himself attending a aeromedical clinical and neuropsychological examination that employed several tests out of a comprehensive battery, the results of which led Dr. Knippa to question Scott's ability to function skillfully as a pilot [and yet there was no indication in Scott's flight record of some 12,000 hours in the air that he suffered any skills deficits not that at no time had any pilot or any flight simulator study identify any such a problem in Scott's flight skill sets.

On the face of it, does it not seem just a bit strange, even incongruous, that the only person in the world to suggest that Scott Patterson was not capable of serving as a A.A. pilot was Dr. John Knippa?
.
On March 28, 2016 Scott Patterson contacted the psychiatrist, Ibrahim Abi-Rafeh, M.D. and requested a consultation, seeking advice on the content of Dr. Knippa's report and for guidance in dealing with this matter. [Dr. Abi-Rafeh provided an authorized Release of Medical Records documents to A.A. Medical and the document was faxed to Dr. Abi-Rafeh that afternoon, and before Scott's appointment with his psychiatrist].

On March 31, 2016 Martin Dayton D.O. wrote a further note regarding FO Patterson's

13

Fitness as an Airline Pilot and again he reiterated that the medical care that Scott Patterson has been receiving from him "does not adversely affect his cognitive, mental or physical performance. He is able to fly as a commercial airline pilot without restrictions. He appears to be in clinical remission".

The findings of Dr. Dayton notwithstanding, based on Dr. Knippa's findings, on March 25, 2016 FO Patterson received a call from Captain Brian Beach telling him that he was considered "not fit for duty" and that he should call A.A Medical for advice. The message here was that Scott Patterson's employment with A.A. was to be terminated [his salary payments were ended on May 15, 2016].

On April 11, 2016 John Knippa Ph.D. sent a fax transmission to Trisha E. Kennedy in response to her request for copies of the records of Rodney Scott Patterson. Dr. Knippa wrote:

"Please note that the service was performed only upon his verbal and written agreement specifically that Mr. Patterson would not request reporting from this office [i.e. as no doctor-patient service was offered], rather that he would request information through the referring party [i.e. his employer's occupational health service], as was the written agreement when he was seen. If reporting information is not made promptly available from that source, please advise and I will inquire and facilitate as may be appropriate".

On April 11, 2016 I [Dr. Glenn Caddy] submitted a formally authorized HIPAA compliant Records Release Request, to Dr. Knippa, who the following day responded to my duly authorized request and refused to provide me with these records.

On April 13, 2016 I forwarded a further letter to Dr. Knippa tersely making the point that: "It does not matter what Mr. Patterson agreed to do in your office or did not agree to do. Things have changed and he now wishes to change his mind…. as a matter of ethics this man's file is maintained by you and not owned by the entity employing you. You have an ethical obligation to release a copy of the entire file, testing, raw data, and all to me irrespective of whether you had a doctor patient relationship with Mr. Patterson or not". I also copied Scott Patterson's attorney, William R. Amlong, Esquire [Amlong and Amlong P.A., 500 N.E. Forth Street, Suite 200, Fort Lauderdale, Florida 33301] on this correspondence.

After substantial discussion with Scott Patterson regarding the most compelling way to seek to convince A.A. that they were wrong in accepting what Dr. Caddy regarded as the flawed clinical and neuropsychological opinions of Dr. Knippa, and after discussion with Scott's attorney, William Amlong, Esquire, Dr. Caddy recommended that Scott make an appointment with the nationally recognized Aviation Expert Neuropsychologist, Gary G. Kay Ph.D., in order to undergo a second opinion neuropsychological examination from this nationally recognized expert.

14

I had essentially completed my clinical and forensic examination of FO Patterson by that time [and from that investigation I knew that there was nothing clinically or neuropsychologically wrong with Scott Patterson]. But because I was not a certified aeromedical examiner, I recommended that Scott go to one of the most well respected Aviation Neuropsychologists in the country, and hence, Dr. Kay.

May 24, 2016 Scott Patterson consulted with John Hastings M.D. in Tulsa, Oklahoma, to undertake a comprehensive aeromedical neurological examination.

On June 28, 2016 Scott Patterson flew to Washington, D.C. [that is, within his same time zone]. He had a good night's sleep, and on June 29, 2016 he underwent a full day aeromedically focused neuropsychological examination with Dr. Gary Kay.

Significantly, at the appointment with Dr. Kay, FO Patterson was advised that Dr. Kay, knowing from Scott that he had seen Dr. John Knippa, had requested from Dr. Knippa, [and was freely given], a complete copy of both Dr. Knippa's confidential Aeromedical Neuropsychological Examination Report of Scott Patterson, and all the raw test data related to that examination. That is, without the knowledge, consent, or any written authority from Scott Patterson, and without regard to the Confidentiality Requirements of the Health Insurance Portability and Accountability Act of 1996, Dr. Knippa had freely released to Dr. Kay the very documents that, despite being sent a HIPAA compliant Authorization to Release to Dr. Caddy a copy of Scott Patterson's entire file, Dr. Knippa had initially refused to do so. In fact, Dr. Kay was provided these records without the knowledge or consent of Scott Patterson [and perhaps also without the knowledge of American Airlines].

On June 26, 2016 Dr. John Knippa finally released to Dr. Caddy his Aeromedical Neuropsychological Report on FO Scott Patterson. On the disc containing the report was included a significant amount of raw testing data.

On July 1, 2016 Rodney Scott Patterson was issued A Medical Certificate First Class by the Aerospace Medical Certification Division of the FAA Civil Aerospace Medical Institute in Oklahoma City, OK.

On July 11, 2015 I received notice of the findings of Independent Aeromedical Neuropsychological Examination undertaken on Scott Patterson by Dr. Gary G. Kay. This report indicated that Scott Patterson was functioning within normal limits and was not in any way neuropsychologically impaired.

It is my understanding that subsequent to the testing undertaken by Dr. Kay, Dr. Kay contacted Dr. Joseph Tordella, an Aviation Medical Examiner for the FAA. Dr. Kay advised Dr. Tordella that there were no conditions present from a neuropsychological

15

perspective that would recommend other than that FO Patterson was: **"Fit for Duty".** Hence, on July 1, 2016, as noted above, that certification was issued.

On August 3, 2016 I received the final copy from Dr. Kay of his "Report of Neuropsychological Assessment" of Rodney "Scott" Patterson.

### Overview of the Issues of this Case

There is no one in American Airlines other than First Officer Scott Patterson and Captain Glenn Whitehouse who has a 360-degree view of all of the events that occurred between these two men during that trip to and from Asuncion. Equally, no-one has an understanding of what was occurring within each of their thinking during the trip that they both worked on American Airlines Flight 217 from Miami to Asunción, Paraguay, and then back [over the period October 7 to 10, 2014]. In fact, it would seem that while both these two men were participants to an unpleasant set of events, they both appear to have viewed some of these events in quite different ways. These two men had flown together on two previous occasions and without incident. Yet the events of this trip became the genesis of the problems that would develop all the way beyond anything that Scott Patterson could ever have imagined.

**Perspectives Regarding The Paraguay Trip**

Captain Whitehouse had contacted FO Patterson two weeks before the scheduled trip, via the "What's App" application and advised that: "You and me and Flannigan are going to Asuncion together. Imagine what we three misfits are going to get into".

Despite the above pleasant interchange, it was several events that occurred on this trip that became the basis for FO Scott Patterson's present employment difficulties. [And, there were two instances of some unpleasantness that occurred between these two men on that trip that led FO Scott Patterson intentionally to have nothing to do with Captain Whitehouse thereafter].

However, the unpleasantness that occurred between Scott Patterson and Glenn Whitehouse did not stop at the end of that trip, as evidenced by the fact that nearly a year later Captain Whitehouse submitted a formal complaint against Scott Patterson to A.A. This complaint contained a set of serious assertions, opinions, impressions, speculations, and allegations regarding First Officer Patterson.

It was largely the events of this trip that set the stage for the more recent complaints about Scott Patterson's functioning. Basically, what has happened is that Captain Whitehouse has, in one way or another, developed his own perspective about Scott Patterson, and he has subsequently sought out or otherwise obtained [collected] perspective and opinion from several of the flight attendants on that flight, and from other A.A employees, and this story collection appears to have occurred over a number

16

of months after that Asuncion trip, with all these collected opinions reflecting negatively on Scott Patterson [or perhaps in some cases on the contributor]. Captain Whitehouse collated these various observation, remembrances, and largely hearsay perspectives, into the package of complaints and commentary that he submitted to A.A on or about September 24, 2015. [I will discuss Scott Patterson's views of what happened on that Asuncion trip, and also the views of his wife, later in this report].

The other pilot on that flight, First Officer John Flannigan, has offered only a very brief written comment on that trip, and this was offered about a year later, writing:

"The only specific incidents out of the norm with Scott that I recall were an issue trying to get his family on the van to the hotel, and regarding the paperwork when we arrived at the airport for departure. In both cases what was a minor inconvenience was initially met with a stressed response by FO Patterson, but it was eventually resolved without further incident".

It should be noted that FO Flannigan's assessment of the flight differs greatly from that of Captain Whitehouse. Also significant, apparently the American Airlines Human Resources Department failed to corroborate many [any] of the statements made about an entire variety of allegations about FO Patterson's conduct, including the claim made by Glenn Whitehouse that Scott Patterson was "moving the flaps while taxiing out" an assertion Scott Patterson says is "blatantly untrue".

It appears that FO Flannigan was never asked anything about this particular issue at any point in the A.A "Human Resources non-investigation". [This is a significant matter because it is my understanding that Captain Danny Shellhouse provided pictorial evidence at an investigative hearing on this matter. Captain Shellhouse also told this examiner, that Captain Whitehouse's assertions regarding this particular "moving of the flaps" matter is impossible to be true [presuming that Scott was seated in the jump seat with the appropriate seat belt and shoulder harness attached].

A flight attendant, Mr. Caesar Bojeda, on A.A Flight 217, on October 7, 2014, [that is during the course of the Asuncion trip], also wrote an email to a supervisor about his views of the events of that flight. More specifically, Mr. Bojeda's, email reflected concern about how he would be paid for a lost trip if his current trip "fell apart" [A.A. 217-218, 7-10 OCT 2014]. [This would seem a rather dramatic, perhaps even a hysterical email, but it is whatever it is, and it may say more about the writer than about Scott Patterson or about Glenn Whitehouse].

It is certainly the case that when eventually Scott Patterson saw this email, he interpreted it as a bizarre, self interested, and a quite absurd mischaracterization of almost all of what actually had happened on the ground in Asuncion. Likewise, Scott acknowledges that he was briefly upset regarding the approximately three to four minutes of the so-called "bus incident" that occurred at the airport in Asuncion.

17

However, Scott told this examiner that he had no idea whatsoever that there was anything for anyone to complain about regarding his "conduct" in Miami, or on the flight down to Paraguay. He acknowledged that he was somewhat annoyed by the events at the bus but he did not consider it all that big of a deal at the time.

Yet, starting while the aircraft they were to fly was still on the ground in Miami, Captain Whitehouse writes in his extended series of complains about FO Patterson:

"On the morning of October 8, 2014 I was informed after the arrival at ASU by a crew member that FO Patterson was rude to her and never introduced himself to the crew. She told me that he took the pillows from the 2EF seats in business class for his family. She also informed me of an issue during the boarding with his wife and children with carry-on bag storage. He apparently took passengers bags out of the overhead near the door 2L, set them on the jet bridge to be checked, and put his family bags there."

FO Patterson told this examiner that this assumption was simply untrue. Firstly, while he cannot be sure about introducing himself to the crew in the rush of getting that flight out on that day, however, he does not believe for a moment that he would have been rude to anyone. He does however recall the matter of the baggage. He reported that the overhead bins are always full on South American flights. "We know the drill and plan ahead.  In this case we were only going for a couple of days so they packed into two small backpacks that would fit under the seat". Scott reported that when he saw that his wife was coming forward to check the children's carry on backpacks, he simply walked towards her, took the two backpacks from her, and placed them in the overhead bins above the seats in row 4AC in Business Class. [These were the seats that were reserved for flight crew rest on the long trip down to Paraguay. Scott said that placing the two backpacks in this overhead in no way compromise access for passenger storage].

Also on page 1 of Captain Whitehouse's complaint he states the following regarding the flight to Paraguay: "After his [Scott's] crew break, when he returned to the flight deck, he informed me his daughter would be watching a video in the rest seat next to me. I told him no. I told him that this was not acceptable under 117 rules, and he needed to move her back to coach. He was not happy about my decision. He told me if he were captain he would allow it. I told him it's against Federal Aviation Regulations to have a person in the seat. I never allow anybody next to us during seat during rest".

[Scott Patterson indicated to this author that this immediately above statement by Captain Whitehouse was not the case, and was a misinterpretation of what he had meant, and what had happened. FO Patterson said that it is not an FAA regulation but contractual restrictions agreed upon with the APA that restricts the use of these seats. Yet while Scott was taking a break, certainly he did not object to his daughter coming up to sit next to him].

Scott Patterson's response to me about the above statement was as follows: "Captain

18

Whitehouse approached me before pushback and asked if I minded the flight attendants sitting in the seat beside me on the rest break.  I told Whitehouse that I was going to talk to my daughter on my break.  At the completion of my break, I told Whitehouse my daughter had been seated next to me and I told her to go back to her mother." [The child was seated with her mother towards the back of the aircraft].

"I simply asked the Captain if he would mind my daughter sitting in the seat and he said he would. It was no big deal and I certainly did not persist with him on this issue. Captain Whitehouse is making a big deal out of nothing and he has been doing so for much more than a year subsequent to the event."

There is also a criticism of Scott Patterson's wife's conduct on the flight on the first page of the complaint letter: …" Upon arrival at ASU, I was informed by my FA crew that his wife was rude and demanding during the flight." I asked Roxana Patterson if she had any idea what this assertion was about and she simply advised that: "I am never rude to anyone. The only thing I recall of any interactions I had with any of the crew was that I was asked several times if I wished to have an alcohol beverage and I simply said "No thank-you".

Then there were the allegations of the so-called "bus incident" [Scott acknowledges that he was briefly irritated at the bus, and I will comment more on that later.  However, for Scott, and especially in the context of him being a military officer of significant rank, the essential aspect of this matter as far as he was concerned was the fact that Captain Whitehouse tolerated the whining of one particular crew member during the incident and showed, what Scott considered to be lack of respect to him and his role as First Officer in front of the crew].

Then there was an array of other allegations made by either one or several crew members, or by the Captain, of alleged incidents that were supposed to have taken place at the hotel that supposedly further reflected poorly on FO Scott Patterson, all of which he either denies, or views differently, or considers to be lies or distortions.

Scott considers the rest of the claims about his conduct in Asuncion to be just plain untruths. He reported that he spent virtually all his time with his family on that trip and he did not associate much with the Captain or the crew at all. But the issues between these two men did not end there, for on the return flight there was a further interpersonal disagreement. Scott reported to this examiner that following this second altercation he told Captain Whitehouse that this trip has not been a pleasant experience for either of them and that he would place the two of them on the "do not pair" list for future flights.  It was Scott's opinion that this "do not pair" statement to Captain Whitehouse was not well received, but at this point Scott was fed up and really wanted to make it clear that he did not wish to have to deal any further with Captain Whitehouse.

19

These [above] statements and the statements of other unidentified A.A employees] offered perspective and opinion that went far beyond anything to do with the Asuncion trip. These statements were collected by Captain Whitehouse over the next number of months and also included in the package was the above named "Complaint" which was submitted by Captain Whitehouse some eleven [11] months after the Asuncion trip. [The copy of the complaint I have has a number of names redacted]. It would seem that Captain Whitehouse or someone else solicited a number of these comments about Scott Patterson over a period of time from the various people who ultimately offered them for this document.

Captain Whitehouse's document reflects his perspective on both the aforementioned flight and the hearsay events that he says others saw or claimed about the broader functioning of Scott Patterson that almost definitely had nothing to do with American Airlines, unless of course, this functioning was seen as evidence of extremely poor judgment and/or perhaps mental impairment in the workplace. A significant part of the problem in reading Captain Whitehouse's complaint is that it is not written with much precision and it is impossible to decipher in many instances when he is stating his own observation[s] of the events on the ground and in the air and/or his opinions, versus when he is presenting the hearsay observations and/or the opinions of others. Certainly, it seems, the other pilot on that flight, First Officer John Flannigan, based on the very limited note he wrote regarding his observations of FO Patterson over the Asuncion trip, either does not have the same perspective as Captain Whitehouse, and/or in the alternative, he does not wish to be further involved in this matter.

Up until now, no-one other than myself has interviewed Scott Patterson about these matters in detail, nor has anyone asked Scott Patterson's wife, Roxana Patterson, who was knowledgeable about her husband's state of mind throughout the period of the trip, and who was a witness to various of his behaviors on the flight to Asuncion that have been commented upon, including the so-called "bus incident" and more [that is, her husband's behavior and demeanor and that of others at the time of the bus pick-up on their arrival in Asuncion, Paraguay] and subsequently. Nor has anyone [including the company hired IME Independent Psychologist, Dr. John Knippa] looked into Scott's mental status later on that day and/or throughout the rest of the trip. Mrs. Patterson's observations of the events and of her husbands alleged distress over their stay in Asuncion and on the return flight are certainly not irrelevant in these matters, and who but she would know best her husband's state of mind over those three days in Asuncion, and yet no one other than this examiner has asked for her perspective.

I have memorialized the information [both FO Patterson's perspective regarding that trip and his wife's observations and opinions of that trip]. I will present these data later in this report. And even more fundamentally, no one has investigated the accuracy or credibility of many or any of the presumptions of possible dishonesty or exaggeration that is claimed in the Whitehouse submission to characterize Scott Patterson's functioning at the time. In the course of my investigation of this matter I have made an

20

effort to search out and interview collateral parties or witnesses, and even obtain public record information, in an effort to as fully as was reasonably possible examine the accuracy of a number of the claims made in the Whitehouse submission against Scott Patterson.

Captain Whitehouse's statement contains further comments made by various other [unnamed] individuals. These people have offered stories either claimed to be told by Scott Patterson, or hearsay told by other third parties, about Scott Patterson, that may have led them and Captain Whitehouse [who included these letters in his submission package], and now perhaps some others in A.A, to question Scott Patterson's character [his honesty, integrity, and his personality attributes] and/or even to question his mental stability.

In fact, it would seem that the only purpose for the inclusion of these, what must be considered relatively inflammatory statements, in Captain Whitehouse's submission was to attempt to build a questioning and/or an assertion of Scott Patterson's possible broad personality dysfunction or mental instability, irrespective of the lack of vetting or the credibility of these statements or the assertions or claims. If the purpose here was to be fair-minded, precise, and minimize the prospect of future backlash litigation, this submission, as presented, must be seen as little beyond an incredibly foolish incident, legal and otherwise, just waiting to happen.  Objectively, it is hard to read these various claims and not ask oneself, does Captain Whitehouse not considered that this action is placing himself at some legal risk in undertaking this vendetta?

One unidentified writer, wrote that he considered Scott Patterson fanciful for claiming that: "… he is an active Colonel at Southern Command and that he often works with the Joint Chiefs' of Staff in Washington D.C.; and that he has two fighter jets and trains foreign pilots from other countries; and that he is the President of his Homeowner's Association".

Another unidentified writer submitted a note dated October 17, 2015, addressed to Ms. Burke-Leon [the A.A, Human Resources Investigator on this matter]. That writer, apparently an A.A, Flight Attendant, stated, in part: "We all heard his G.I. Joe story of him being a hero and having contact within Columbia about the guerillas". This flight attendant further made statements about Patterson yelling out the window of a bus and calling out to a man [an apparent friend] he called: "Captain Casablanca" and making comments to this man in Spanish about "senoritas at the Jacuzzi".

There is also another anonymous letter in the Whitehouse package, dated October 29, 2015, and directed to Captain Brian Beach, Chief Pilot [Miami]. The unknown author started the letter with: "It is my understanding that this statement will be kept in total confidence and I will do the same". The author is apparently an A.A Pilot [but this person's identity is not known to Scott]. The content of the letter deals with a couple of minutes of discussion allegedly between the complainant and an A.A pilot who the

21

complainant identified as Rodney Scott Patterson [based on his nametag]. This man claimed that: "Scott Patterson asked me what I thought of the union leadership in Miami and the flight office. He tells me about a captain in Miami. He said he had an incident In ASU with this Captain. He then said that he was going to get this guy, get an attorney. The total conversation lasted less than three minutes... While he did not threaten any violence I thought his comments were out of line. Whatever happened between these two men it was obvious to me that First Officer Patterson was very upset about it and wanted some kind of retaliation".

Captain Whitehouse in his complaint states: "On February 16th I also was the target of an intense search by VVI Customs, but did not suspect anything unusual at this time. On February 22, 2015 I was the target on a more intense search by customs at VVI. I have flown to this station for over two years and have known the customs personnel to be courteous, friendly, and non-threatening. In front of my entire crew I was subjected to what is not considered a normal VVI bag check. They wanted to take all my personal belongings, my company I-Pad, personal I-Pad, phone and all. [Scott says just note the number of electronics that Whitehouse admits to carrying into Bolivia, which would get the attention of any customs officer]. After I proved to the customs people I was not hiding anything, they let me go. My crew behind me stood in awe as to the treatment the captain was given. I decided to look into the past and see who has flown into VVI before me. As I had suspected, the Spanish speaking first officer, Scott Patterson, was in VVI before me. I thought he might have said something to the customs personnel in VVI to harass me. The next morning while setting up for departure, an employee of Santa Cruz, whom wishes to remain confidential, said that they heard First Officer Patterson was smuggling firearms into Santa Cruz for the narcotic cops".

The above are simply representative notes. All of the notes submitted, are of course available to be reviewed in the Whitehouse submission. Some [many] of these notes appear problematic, some quite outrageous, and especially so, if they are untrue, which FO Patterson asserts to be so.  I will have more to say about a number of the other specific assertions or claims made in Captain Whitehouse's submission to A.A, later in this report. By any standard, however, many of the assertions made by the various letter writers range between concerning to questionable, some hard to believe, some are absurd [for example, the assertion that Scott Patterson was smuggling guns into Bolivia; or that he was behind foreign customs officials who apparently had very closely searched an A.A crew].

Each of these communications [statements] made by the various parties that have been sought out by Captain Whitehouse were incorporated into his submission. They were used solely for the purpose of presenting Scott Patterson in a negative light; as being dishonest, or having a personality defect; perhaps being a person who "inflates who he is"; or one who has the power "to manipulate customs actions in other countries"; and even one who is perhaps mentally unstable. Such recurrent inferences about FO Patterson's honesty or personality or mental stability that found their way into the

22

Whitehouse submission can only be seen to be inflammatory. It is clear that that were used for the purpose of building a case to question Scott Patterson's honesty, integrity and/or his emotional stability and his fitness for duty. In the present climate where there is such concern over a pilot's "emotional stability" the impact of such questioning can result in profound career consequences for a pilot's future, as is now occurring here.

It is clear that Scott Patterson considers the vast number of these statements or opinions to be at best wrong, misguided and inaccurate, and most to be libelous, and the entire enterprise to be slanderous. The claims in this "vendetta" by Captain Whitehouse [as Scott Patterson sees it] must be placed against FO Patterson's otherwise unblemished history of functioning over more than sixteen [16] years in the service of A.A, and for more than twenty-five years in total in the airline industry, as well as his twenty-eight [28] years of commendable military service, and at significant rank.

Again, as I noted at the beginning of this presentation, all human behavior makes sense, if only one can come to understand the dynamics underlying or driving that behavior. The question is pretty basic: does FO Scott Patterson have an otherwise long-term hidden mental impairment manifested as behavioral problems? Or is Captain Whitehouse tragically misguided and also emotionally flawed? Certainly, if Captain Whitehouse is misguided, his conduct towards another pilot must be viewed as outrageous and likely reflective of, at a minimum extremely arrogance.

Other than the multiple additional assertions made in the Whitehouse submission, all of which are of the same flavor, as the above examples indicate, the only other matter of tension that seems to have <u>ever</u> occurred between Scott Patterson and A.A, [taking into account his 16 years of service with the company] occurred briefly on September 21, 2015, when in his military role Lieutenant Colonel Scott Patterson <u>requested military leave from his flight duties</u> with A.A. That leave was for the dates of September 22, 23, and 24, 2015. [Scott had been assigned to duties in Washington, D.C., due to the Pope's visit to the President and Mrs. Obama]. Apparently, in all of his years of service in the Army, his commanders and colleagues of rank had not detected the psychopathology that Captain Whitehouse had sought to point out! Certainly, the military colleagues I interviewed had not seen these behaviors or personality features in Lt. Colonel Patterson, in fact, to the contrary, he was very well respected!

Returning to the matter of the leave, initially that leave was denied by the Miami Chief Pilot, Captain Jim Bonds, who apparently asserted that the Miami base was at the time short staffed and that Scott needed to have proof of his "Order for Duty" in order to obtain the leave. Such a statement might be considered as a matter of trust or of doubting the legitimacy of Scott Patterson's call to duty. [I am told that this failure to grant Lieutenant Colonel Patterson immediate leave for duty is a violation of the <u>Uniformed Services Employment and Reemployment Rights Act</u>, that is, the Federal Law that governs these matters. Apparently a service member is not legally required to provide such documentation to an employer in this sort of situation, and in fact he/she

23

does not receive such documentation until after the military duty is completed]. On this occasion Scott reports that he had to call Captain David Tatum, the A.A Chief Pilot on duty in Dallas, Texas, [i.e. the acting Chief Pilot of entire company], at which time Scott was granted the leave without further ado or questioning.

While I will go into substantially greater detail on some of these various claims made against FO Patterson later in this report, when I track the entire history of these matters, the above noted presentation, which appears to include some fact, some fantasy, some exaggeration, much hearsay, a lot of opinions, and possibly even inaccuracy, the basic backstory that Captain Whitehouse put forward in his September 24, 2015 submission to Captain Brian Beach reflects his views and opinions, and the opinions of some others, about the personality and conduct of FO Patterson. But Captain Whitehouse's submission does not just cover those several days in Paraguay; rather, his opinions are far more broadly drawn, and at least in part [even primarily] developed through the solicitation of the opinions or assumptions of others. In fact, Captain Whitehouse's submission appears to quite a warlock hunt!

American Airlines, in their illogical bid to search out what had happened here, even extended their search and [illogically] even sought out the possibility of organic brain impairment in Scott Patterson. [What other reason would there be for a neuropsychological assessment of Scott Patterson to be deemed warranted?] [I would suspect that such a silly approach would not have been recommended by the A.A. Medical Department, but of course I cannot know of the origin of the thinking that led to this bizarre approach].

The point is: Was FO Patterson having new and severe headaches? Had he suffered a head injury? Was he having seizures? Was he showing problems of balance? Did he appear to be showing lapses of memory? Was he showing one eye or part of his face drooping? Was he showing some speech dysfluency? Had he lost strength on one side of his body? Was he showing extreme mood swings that may have an organic basis? Did he appear to be confused? Is there any indication that he was drug involved?

I could go on, but the answer is No! There was no identifiable medical reason to believe that FO Patterson had suffered any head or brain insult and certainly Scott Patterson thought the idea of him being either psychologically or neuropsychologically evaluated to be "Nuts".  Scott joked to me about being "crazy as a fox" and having more than just some idea of what A.A. was using this two day examination for; he made the point that he had no intention of opening up to Dr. Knippa any meaningful discussion about his present circumstances and that he had been told by his union not to. Scott's view was basically the company is playing games looking for something wrong with him instead of looking at the outrageous dishonest vendetta against him brought by Captain Whitehouse.

From the psychological point of view, such an approach [a neuropsychological

24

examination does not make much sense, for if Scott Patterson were to be demonstrating many of the assertions being made of him, the condition we might search for would almost definitely be found in the domain of a functional mental disorder [for example, in the personality domain], rather than in the organic arena, especially given that there appeared no reason to believe that physically or mentally, FO Patterson was in any way impaired, different, compromised, or incapable of undertaking his duties in the cockpit, any more than was true the day before he took the trip with Captain Whitehouse to Asuncion [as has also now been confirmed]. In fact of all the criticisms raised about FO Patterson in the Captain Whitehouse submission, at no point is it inferred that Scott Patterson was not a skilled pilot, nor were any of the complaints raised as matter so concern, in what may be considered the domain of neurology or of the neuropsychological domain.

During the course of my time in this case, FO Patterson made the point to me that there have also been some significant issues with several A.A pilots, who had held important roles in the company and recently these men have faced their own difficulties within A.A. Scott reported a story about Captain Sean Scialfa, the Managing Director of Flight [the Chief Pilot] in Miami. It was he who was running A.A's Miami operations at the time Scott Patterson filed his Uniformed Services Employment and Reemployment Rights Act of 1994 [USERRA} Complaint against A.A. Scott told me that he was advised that Captain Scialfa, who was a Boeing 777 qualified captain, is believed to have taken two different aircraft on two separate occasions and flow them while these aircraft had mechanical issues. Scott advised me of the following:

"Aircraft have a minimum equipment list published which says exactly what must be working on the plane for a flight to take place. Scialfa apparently flew contrary to this list. The F.A.A will investigate this and may take action against his F.A.A, Airman Certificate. Sean was transferred to Los Angeles as the Director of Flight and never took the job.  A.A announced the transfer and then announced the job opening in LAX.  Scialfa is currently on sick leave. At American, when a Chief Pilot is fired, the company demotes him to a Check Airman status, doing proficiency line checks on the aircraft.  It is pretty embarrassing".

Scott Patterson told me that he had been advised of the following [though let me note that this information is hearsay and there is already way too much hearsay in this entire matter, so caution is recommended]:

"Scialfa was Brian Beach's and James Bonds' boss at the time of the incidents I was involved in. American seeks to demote me to disability status without valid grounds while also seeking to protect the Chief Pilot, who in essence broke the rules and potentially endangered passengers.

James Bonds also is reported to have been terminated from the Miami Flight Office as well.  It is reported he was let go for travel pass abuse. Captain Bonds was transferred

25

back to the line as a line check airman.  Pass abuse is a termination offense for most people, yet again the Chief is allowed to go back to work".

FO Patterson also advised this examiner that Captain Greg Smith is another management pilot who has been plagued by flight judgment issues.  In January 2011, the Wall Street Journal ran a story on Captain Smith's involvement with an unusually low speed takeoff, which damaged a Boeing 757 bound for Hawaii. Scott Patterson further has alleged that on July 27, 2015, Captain Smith was the Pilot in Charge of an American Airlines Boeing 787, and the aircraft encountered [that is, did not divert around] a hailstorm near Beijing, China.

What Scott considered particularly interesting here, is that Captain Smith had been involved in two very serious aircraft damage events within a four-year period, and yet no one has suggested he undergo an "aeromedical neuropsychological evaluation" [or any other psychological examination] as Patterson was required to do. Scott further made the point that it is widely recognized and well understood in the Airline Industry that: "American is known as a Captain's airline and they that they go to great lengths to protect their Captains". Some employees at A.A. have even coined the term "the Captain's Protection Society" to highlight the aforementioned issue.

### An Alternate Perspective

Before I present the detailed findings of my work in this case, given that I have presented an overview of the perspective gathered by Captain Whitehouse above, in balance I will now, offer an alternative perspective consistent with the data I have developed in my own work in this case.

I will present a perspective that has not previously been introduced. In part I will reflect upon the assumptions and limitations of the Independent Neuropsychological Examination conducted by Dr. John Knippa. I will also note that FO Patterson did not give Dr. Knippa meaningful perspective about what I will call "The Whitehouse Matter" nor did [apparently] A.A provide Dr. Knippa with such perspective, as far as Scott was able to determine. From Scott Patterson's point of view, his silence [refusal to discuss the matter of the Whitehouse assertions with Dr. Knippa] was simple! Firstly, he had been told by his Union not to further discuss these matters. In fact, Scott reported that believed by the time he flew to California to do the Dr. Knippa examination that these matters had been resolved in the course of the Section 21 investigative process; and that this process was now completed.

The fact is that any examination of this type can only be as good as the data presented for review. The fact is that there was an array of data simply not considered by, and not made available to, Dr. Knippa, and Scott Patterson had no intention off laying out all these issues to Dr. Knippa. So, the prospect of Dr. Knippa really understanding what had really taken place here, from FO Patterson's perspective was zero. [Or putting the

26

matter another way, the enterprise was a waste of time, if the aim was to achieve a real understanding of the issues as Scott saw them].

I will subsequently offer perspective on the credibility and relevance, or lack thereof, of some and perhaps much of the non-vetted opinion and hearsay that Captain Whitehouse chose to accept for inclusion into his submission, and specifically, those data that so broadly questioned the integrity, and or the mental functioning and stability, of Scott Patterson. Doing so early in this report will help the reader in exploring what Dr. Knippa apparently did not know, and also I will highlight the misperceptions and/or the lack of credibility of many of the non-vetted claims and/or inferences and/or assumptions, that were so freely accepted for inclusion into the Whitehouse submission.

A significant problem in the "investigation and submission" undertaken in vetting the complaints made by Captain Whitehouse is that of independently assessing the validity and reliability of these claims when so many of them were based on non-vetted opinion and involved, at a minimum, extreme sampling bias. Likewise, in his submission, Captain Whitehouse's so-called "witnesses" were mostly people who were not, in fact, "witnesses". Rather many of these people offered perspective or opinion based on speculation, or hearsay. Only a very few of them claimed to have perspective based on actual personal knowledge or observation.

By way of example here! It is stated in the Whitehouse submission that Scott Patterson was seen standing on the Jet Bridge outside the aircraft in Miami, taking photos of the Flight Attendant Caesar Bojeda. FO Patterson advised that such a claim was simply wrong and that what he was doing was speaking by phone to his wife who was way back in the plane. This was simply one of many examples of erroneous reporting and/or of distortions of inference or perception in the Whitehouse submission. Scott Patterson sees these as irresponsible and asserts that they extend all the way to downright dishonesties. It is also the case that many of these hearsay "stories" that were offered by Captain Whitehouse were submitted based on the identity of the storyteller[s] remaining anonymous. Thus, of course, these stories simply cannot be vetted nor can they be afforded any real credibility.

The fact is that Captain Whitehouse's polling only included people who he had selected or who had volunteered to be included in his submission and who had something questionable or negative or some judgmental statement to make about Scott Patterson. But these witnesses also appear not to know Scott Patterson well, and at best only very tangentially. Several appear to view information they have on FO Patterson suggesting that he may engage in exaggerations or present himself as larger than life, especially regarding his military service. That is, not only is there a serious risk of a sampling bias in the Whitehouse submission, but the data that he has included, and may be believed to be known by those sampled, are extremely lite on knowledge and more substantial on opinion, and certainly in most cases not willing to be identified. This would not be

27

considered good science nor is it the basis of good law. In science [or in law] such data would be afforded very little, if any, credibility whatsoever. Yet, for A.A., without a meaningful investigation, it is enough to warrant sending Scott across the country for a psychologically focused IME.

Had Captain Whitehouse considered ensuring the integrity of his opinion poll, rather than submitting any and all negative information or inference that he could solicit or that otherwise came to him regarding FO Patterson, perhaps any concern he had about Scott Patterson could have been presented in at least some form of balance and allow an appropriate investigation to take place. My point here is simply that while I cannot know the motives of Captain Whitehouse, his dislike for Scott Patterson appears palpable.

An important question of is the following: "Is Captain Whitehouse's witnesses perspective, as presented, valid? How would we know? And if so, is there actually something wrong with Scott Patterson? And if so what is it?" Or rather: "Is there something wrong with Captain Whitehouse and/or the process by which he set out to gather his "evidence" to build or expand upon his personal experiences and claims against FO Patterson?" And if this is so, what does that say about the conduct of Captain Whitehouse? And what is his purpose in all of this? And does A.A. have any HR Policies to protect an employee against such a vendetta against another employee?

Surely the use of sometime vitriolic assertions and the gross hearsay seen here almost certainly must compromise the quality of any of Captain Whitehouse's claims. Likewise, Captain Whitehouse's presumptive desire for a fair-minded review of the concerns he was raising also would seem completely compromised given the means by which he chose to bring his dispute forward.

A number of the claims or statements in the Whitehouse submission raise question about the scope and truthfulness of the assertions or comments that were claimed to have been be made by Scott Patterson, in particular, about assertions of his possible grandiosity and what he does outside of his role in A.A. For example, several anonymous people made statements [in the Whitehouse submission] suggesting or asserting the belief that Scott Patterson was exaggerating or lying about what he does, and who he is, outside him duties as a First Officer with A.A. I have already addressed several of these [what should be] irrelevant and extraneous matters above. [Such as Scott's possible exaggerations or deceptions regarding his other work matters].

Some of the matters that have been questioned as if untrue, through rumor and innuendo in the Whitehouse presentation, include Scott's role in his homeowner's association, his duties in military service, his jet fighter flying experience, and his police work involvements.

**Facts Regarding These Various Claims and Assertions**

28

For the record, here [below] are the facts regarding at least some of the most substantial presumptive claims about Scott Patterson that are included in the Whitehouse submission [as I have established them].

The bulk of these various claims as presented, suggest that Scott Patterson is a braggart, or that he is not honest, or that he overstates his roles or his experiences and duties outside of his work in A.A.

[1] It was claimed that Scott Patterson was not a police officer:  The facts are that Scott Patterson served as a sworn Police Officer in the City of Charlotte, North Carolina, for just on four years [1990 to 1993]. Subsequently, in 2004 Scott served as an Auxiliary Officer with the Florida Highway Patrol [in 2004]. This has been confirmed in my discussion with FHP Sergeant Walter Rodgers, who holds Scott Patterson in the highest esteem, and is a good friend of Scott.

[2] Another claim involves the disbelief about Scott Patterson having flown fighter jets. Scott Patterson offered me the following written statement on this matter:

"Because of my experience with the military, I am a consultant for a Defense Contractor. Within that consultancy a company named Aerogroup used my services to acquire defense contracts for the training of the Iraqi and Afghan Air Forces. Aerogroup currently owns a number of F-5 Fighters. At one time Aerogroup was the premiere trainer for F-16s with the Dutch Air Force.  You don't have to be a "fighter pilot" to train people to fly an airplane". [Both Captain Modrich and Mr. Robert Wilson have seen the fighter jet aircraft].

 [3] There is a further note in the Whitehouse submission on the petty issue of the disbelief in Scott's statement of his Presidency of his Community Homeowner's Association: I have spoken to one man who lives in Scott's community [Mr. Robert Wilson]. Robert is also a pilot and he knows Scott very well. Mr. Wilson reports that Scott Patterson is extremely well liked and energetic in the work that he does within and for his community.

It is also true that Scott Patterson is the President of his Homeowners Association. [Go to www.sunbiz.org and look up the "Pembroke Falls Phase Five Homeowner's Association". This public record shows that: "Scott Patterson" has been recorded as the President of that Association in 2013, 2014 and 2015].

[4] There are various letters in the Whitehouse submission that question, or derogatorily comment on the military service and functioning of Lt. Colonel Patterson, or perhaps these comments are more about Scott speaking about his military involvement.

29

One note, dated 10/17/215 is addressed to Ms. Burke-Leon [the A.A, Human Resources "Investigator" on this matter, though it would appear that Ms. Burke-Leon did very little in the way of genuinely investigating much of anything]. Again, in this letter the author was unidentified, but it may be an A.A. Flight Attendant. The letter stated, in part [in a derogatory manner]: "We all heard his G.I. Joe story of him being a hero and having contact within Columbia about the guerillas".

In fact, as will be noted below, in his military duties Lt. Colonel Patterson was involved with the US Military's anti-drug operations throughout South America.

There were also notes questioning Scott Patterson's integrity in stating what he did in the military.

It was after the September 24, 2015 complaint by Captain Whitehouse that Scott Patterson had the only problem that he has ever experienced in obtaining Military leave [previously no problem whatsoever from A.A. and in particular from the local Miami flight office]. On this occasion the Miami Chief Pilot, James Bonds, initially created a problem around that leave. Scott questions whether the other problems he was facing within A.A, as a result of the Whitehouse submission may have led to this hiccup. Right or wrong, Scott Patterson believes that this issue would not have arisen but for the fact that the Whitehouse submission created an environment of mistrust about his integrity. He suspects that it was this mistrust that may have been the underlying reason why Captain Bonds initially sought to compromise his legal right to take military leave.

Over Scott Patterson's more than 16 years of service with A.A. the only time his military leave request was questioned and/or not immediately granted occurred on September 21, 2015, when Lieutenant Colonel Scott Patterson requested military leave from his flight duties with A.A for the dates of September 22, 23, and 24, 2015. [Scott had been assigned to liaison duties at the Whitehouse in Washington, D.C., due to the Pope's visit to the President and Mrs. Obama].

Initially the Miami Chief Pilot, Captain Bonds, who asserted that the Miami base was at the time too short staffed, and thus he denied that leave. But more significantly he stated that Scott needed to have proof of the "Order for Duty" in order to obtain the leave.

[I am told that this failure to grant Lieutenant Colonel Patterson immediate leave for duty is a violation of the Uniformed Services Employment and Reemployment Rights Act, USERRA]. On this occasion Scott reports that he had to call Captain David Tatum, the A.A, Chief Pilot on duty in Dallas, Texas, [i.e. the Chief Pilot for the entire company], at which time Scott was granted the leave without further ado or questioning. Scott believes that the refusal to immediately authorize his release for military service through the Miami base was linked to all this Whitehouse matter.  Such a release had never before been an issue.

30

I have asked Scott Patterson to prepare a statement about his relevant military service and duties over the time of his employment at A.A. with the intention of providing a comprehensive overview of his work, seeing that this work also became a matter of questioning and negative commentary in the Whitehouse submission. Below is that statement, beginning in 2004, after he was furloughed from American Airlines and after he was promoted in the Army to the rank of Major [both of which events occurred in 2002].

Here is that statement:

"I worked at US Southcom [Southern Command Headquarters], as a Major while furloughed from American Airlines in 2004. I was on active duty until 2009. I was a Counter Drug/Counter Terrorism Program Manager with approximately $80 million dollars of government funding. This job required extensive knowledge in planning, programming and budgeting funds to accomplish objectives of the National Command Authority. I consistently received high ratings while assigned to my position and I was retained on active duty until I reached the maximum number of years on active duty, which then required me to take a break. My level of performance and job was critical. When I was promoted to Lt. Colonel, I received the "Defense Meritorious Service Medal" for my service. I also received the "Joint Achievement Medal" for my work in 2004 in discovering a $1M Anti Deficiency Act over spending by the command. In other words the government wrote more than $1M in bad checks that they could not cash. We found the mistakes and removed the overspending which saved an officer at a high staff level his job.

US Southcom is a Joint Combatant Command assigned to the Joint Chiefs of Staff. In my capacity I regularly planned and executed commander's conferences, hosted the Deputy Assistant Secretary of Defense for Counter Narcotics, and various US Ambassadors to foreign countries. I regularly presented my program to very senior officers and senior executive service members and I authored several documents, which, although classified, are still used by the Joint Services today. I am also Joint Qualified, which not many Officers are, unless they go to school, and have had experience in a combatant command, or work on the Joint Staff.

Our main thrust or focus was on the nation of Colombia and I spent a good deal of time in the country and I am very proud of being a part of what we accomplished. I also did a very large acquisition project and purchased millions of dollars of equipment for counterdrug use throughout the Caribbean and South America.

While at Southcom I was also deployed to Haiti in support of US Forces there responding to the severe earthquake. There was a letter of thanks written by a Congressman to General Keene thanking me for what I did in Haiti. I also helped American Airlines

31

secure its property and the equipment on the ramp in Haiti since there were no employees on the ground in Port Au Prince to secure the facility.

I have also worked other duties in my reserve capacity, which has demanded that I maintain a state of readiness to deploy within 72 hours of call up for any national emergency. There is a push in the Department of Defense to save money and operationalize the reserve to an equal capacity as the active component, which means that these days a reserve soldier has to balance his civilian career as well as his military readiness. You no longer have the luxury of getting a phone call and going off to some base to train for six weeks before going to war.

I currently am assigned to Army Headquarters at the Pentagon.

To someone outside the military who has no idea what we do, it might seem grandiose if spoken about. To me it is just a job that I have spent years training to do and only a very few are qualified to do. I like it that way, because it puts you in high demand".

END OF SCOTT PATTERSON'S QUOTED STATEMENT

So, it would seem that the assertions and inferences that, at least a few people, none of whom know apparently Scott Patterson beyond remotely, but whose comments Captain Whitehouse has chosen to include in his "presentation", may need a lesson in the art of inference, and making assumptions, and being judgmental, and perhaps also courtesy for others. They may also need a lesson in being involved in being sucked into or involved other people's business.

**Further Matters at American Airlines**

Perhaps also relevant to the larger picture of Scott Patterson's matters with A.A are some of the politics that may have taken place between A.A. as represented by the Chief Pilot [MIA], the Union [the Allied Pilots Association], and the forces in support of Captain Whitehouse, namely in this latter case, Captain Thomas Copeland and Captain Edward Sicher [the Chair and Vice Chair respectively of the Miami domicile], in the handling of this matter [the complaint] against FO Patterson. Scott Patterson has asserted to me that there is a culture in A.A. that Captain Brian Vitale has referred to as the CPS [the "Captain Protection Society"], in which Captains routinely protect other Captains.

There is also another perspective here: I [this author] had a discussion with a very senior A.A. Captain, Guy Dolton "Danny" Shellhouse, whose perspective regarding Scott Patterson I will present in detail. Captain Shellhouse advised me that Captain Brian Beach [the Managing Director of Flight, MIA] had told him, that they [the Miami Flight Office] wanted to get this matter [the dispute between FO Scott Patterson and Captain Glenn Whitehouse] out of the hands of the A.A. Human Resources Department and put

it back into the Miami Flight Office, which, in turn, intended to push the matter back into the hands of the Allied Pilots Association [APA] for a "Professional Standards" resolve. Professional Standards then would have a conference with Captain Shellhouse and the National Professional Standards Chairman [Captain Douglas Woods] and Captain Whitehouse, the complainant, and the APA would thus resolve this issue on an internal basis.  Thus, the incident, whatever it was or was not, would be handled, resolved, and closed within the APA.

Obviously this common dispute resolution process did not happen in this case.  Captain Shellhouse has no explanation to account for this beyond offering one word: "politics". Captain Shellhouse further advised in conversations with Ana Burke Leon that: "She stated [to Shellhouse] in a passing conversation that she was confused and could not sort out this issue between Whitehouse and Patterson".

So, is sending Scott Patterson to a Clinical and Neuropsychologist supposed to sort out this dispute and get to the bottom of it? Hardly, especially when Scott's Union had told him not to discuss any of his union the matters with the Psychologist.

### The Military Leave Matter

It was three days before the Glenn Whitehouse submission that Scott Patterson had the only problem that he has ever experienced in <u>obtaining Military Leave</u> without any problems whatsoever from A.A. In particular, this problem involved the Miami flight office.

On this occasion the Miami Chief Pilot, Captain James Bonds, initially created a problem around the leave. Scott questioned to himself whether the other problems he was facing within A.A. as a result of the Whitehouse submission, may have led to this serious hiccup. Right or wrong, Scott Patterson believes that this issue of his compulsory Military Leave would not have arisen, but for the fact that the Whitehouse submission created an environment of mistrust about his integrity. He suspects that it was this mistrust that may have been the underlying reason why Captain James Bonds initially sought <u>to refuse the leave and thus compromise Lt. Colonel Patterson's legal right to take the leave he was requesting</u>.

Over Scott Patterson's more than 16 years of service with A.A. the only time his military leave request was questioned and/or not immediately granted occurred on September 21, 2015 when in his military role Lieutenant Colonel Scott Patterson requested military leave from his flight duties with A.A, for the dates of September 22, 23, and 24, 2015. [Scott had been assigned to liaison duties at the Whitehouse in Washington, D.C., due to the Pope's visit to the President and Mrs. Obama]. Initially that leave was denied by the Miami Chief Pilot, Captain James Bonds, who apparently asserted that the Miami base was at the time short staffed but more significantly that <u>Scott needed to have proof of the "Order for Duty"</u> in order to obtain the leave.

33

I am told that this [above] failure to grant Lieutenant Colonel Patterson's right for immediate leave for duty upon request, and in fact to actively resist it, is a violation of the Uniformed Services Employment and Reemployment Rights Act, the Federal Law that governs these matters. On this occasion Scott reports that he had to call Captain David Tatum, the A.A. Chief Pilot on duty in Dallas, Texas, [i.e. for the Chief Pilot of entire company], in order to further seek such leave. With this call Scott was granted leave without further ado or questioning.

Yet, as will be discussed later, no sooner had Scott returned from his brief military leave, that he was grounded from flying and ultimately placed in a set of circumstances that questioned his mental fitness for flight duty.  And the issues here led to the requirement that Scott was to undergo a compulsive clinical and neuropsychological examination.

**Dr. John Knippa's Examination of Scott Patterson**

There was a compulsory "Independent Clinical and Neuropsychological Examination conducted on Scott Patterson by Dr. John Knippa. This exam was conducted at the request of A.A., over two full days in California [that is, at three time zones out of Scott Patterson's regular circadian rhythm]. Below is a summary of the opinions and conclusions of Dr. Knippa, as far as Scott's Fitness for Duty was concerned.

I reviewed the "Neuropsychological Aeromedical Fitness for Duty Report" work of Dr. John Knippa [published on March 21, 2016]. I also noted the total disagreement that Scott Patterson had with a number of the many inferences and certainly the final conclusions contained herein.

Dr. Knippa gave little focus to Scott's February 14, 2015 cancer scare and his recovery from the surgery related thereto. Dr. Knippa sought to explore in some detail issues surrounding Scott's fitness for duty within the context surrounding his relatively brief relationship [less than 24 hours of actual contact] with Captain Glenn Whitehouse, and the claims made by Captain Whitehouse against Scott, some eleven months thereafter. However, as noted above, and as Dr. Knippa noted, Scott was resistant to discussing these matters, claiming that they had been fully investigated and resolved through an APA Union review process completed some months previously.

Dr. Knippa noted in his interactions with Scott that he observed an interpersonal style that he considered to include: [and I quote] "forwardness that appeared to exceed that expected of good self-esteem" in some of their interactions. Dr. Knippa noted this "might well be interpreted by others as elitist or erudite, at times pedantic in a manner inappropriate when being seen by a professional for FFD examination…Regardless, however, it should be made clear and emphasized that Mr. Patterson appeared well-meaning and with a pleasant appearing mood, frequently extending courteous comments, and maintaining a pleasant demeanor at all times". Dr. Knippa also noted

34

that Scott's mood appeared "pleasant, comfortable, affable, and socially well poised". [I agree with many, but not all, of these comments by Dr. Knippa. I see FO Patterson as a "pleasant take charge and get it done sort of person", features that are very much appreciated in career military officers].

Dr. Knippa noted that on one of the computerized tests, the MMPI, the results were consistent with "those who take a particularly cautious and deliberate approach, endorsing few psychological symptoms…scores are compared to those of persons whose responses likely reflect a pattern of defensiveness, such that the problems that may exist may not be accurately represented in this profile". [Of course, such defensiveness may also reflect the results from a person who sees himself as not having any significant issues of a psychological nature; and/or an examinee who is not motivated in the context of a Fitness For Duty Evaluation to be unduly open or revealing].  In such Fitness for Duty contexts, psychologists see this very frequently.

Additionally, and again based on the MMPI scoring, Dr. Knippa also suggested: "Overall, the data suggest a bias towards an overly favorable self-presentation emphasizing freedom from symptoms and distress. This is not uncommon in persons who may be aware of and cautious regarding the purposes of the evaluation. Certainly, it is often seen in people presenting for "assessment for duty fitness". Defensiveness may limit the interpretive utility of the data for some purposes.

Dr. Knippa's data from the MMPI subscale scores were consistent with, as he indicated, "persons who may present as trusting, having high moral standards, and not having hostile or negative impulses, who may also present as having unrealistically optimistic attitudes about others. However, it should be noted that the above interpretations are not offered as proof of this man's personality but hypotheses to be further explored and examined". And, of course, a particularly reasonable way to further explore and determine the best interpretation of such data is to interview people who know Scott well, and in a variety of contexts. But this direct collateral investigative work was apparently considered beyond the scope of the examination [which, of course, is unfortunate, given the importance of a comprehensive review and analysis, and especially so when the claims that led to the consultation request were almost exclusively of an "inferred interpersonal problems" dimension].

It should be noted, as a general principle, that all too often psychologists take the data from these so called "tests of personality", or "tests of psychopathology", and treat the data as if they reflects definitive indices of the functioning of the examinee. While this may be more likely true than not when the instruments reflect significant or gross psychopathology [which is not the case here], one can risk over-interpreting such everyday non-revealing data. [Dr. Caddy has seen this often when an overreliance on these test data is noted]. And yet often these over-interpretations and the related inferences of possible aberrations that may be inferred, or even asserted by everyday citizens, and sometimes even by professional examiners, may miss the mark with these

35

inferences not being seen in real life [that is, by those who know the examinee well in the real world]. Thus, the presumption of predictive validity of these impressions may collapse completely. Nothing beats knowing the person well and collateral source data from people who know the examinee well can be incredibly valuable in really getting to the bottom of a test based inference, as does extensive time with the examinee. This additional work permits the ruling in or ruling out of various hypotheses that may emerge from these computerized tests of personality functioning.

It is noteworthy that when finally I was able to get to see the results of Dr. Knippa's work with Scott Patterson I noted that on the computerized MMPI the following critical items: Under "Acute Anxiety State" there were only two items ["I work under a great deal of tension" and "I am a highly stressed person"]; there was also one indication of Persecutory Ideation ["Someone has it in for me"]; there was only one index of Antisocial Ideas ["Sometimes when I was young I stole things"]; there was one index of Somatic Symptoms ["I worry about my health"]; one index of Anxiety and Tension ["I work under a great deal of tension"]; one measure of Deviant Thinking ["At times my thoughts have raced ahead faster than I could speak them"]; and one index of Deviant Beliefs ["Someone has it in for me"]. If one considers the circumstances of Scott Patterson's life and present work related issues and his cancer scare and his upsets in the workplace, these statements appear both very honest and very reasonable.  They make sense and reflect nothing pathological at all!

Likewise, on the Personality Assessment Inventory conducted by Dr. Knippa, Scott Patterson's responding presented as valid and reasonable given his circumstances; and again, no evidence of clinical psychopathology was noted.

A slight detour here for just a moment! The fact is that in Industrial Organizational Psychology a matter of serious concern involves how to assist both employees and employers on how to validly interpret and weigh the hypotheses potentially being generated from a number of these various testing instruments; and especially so when those receiving the information are not clinically or empirically trained to be capable of interpreting the real meaning and/or balance from the various inferences [hypotheses] derived from these instruments. As is often noted in psychometric analyses, it is particularly important when one considers the numerous complex limitations of these measures to recognize that such awareness can only be achieved through highly specialized professional training. The fact is that many of these measures, even those coming from tests with long pedigrees, do a poor job at predicting specific human behavior. And yet, there is really no such disclaimer anywhere in the multiple inferences that are being presented/offered throughout Dr. Knippa's numerous findings, nor impressions of his cognizance of these limitations, even though at the end of his analysis he does acknowledge an inability to identify any meaningful personality aberration in his examinee.

What we can take from Dr. Knippa's testing and his overall examination more broadly, is

36

that, as far as Dr. Knippa could determine, as he says:

"Both by observation of behavior in the office setting and a review of psychological testing, it is opined that Mr. Patterson's behavior and testing related findings are consistent with risks of being perceived or interpreted by others at times as being self-aggrandizing and reflecting of some limitations in social judgment [i.e., as it appears to have parallel to the concerns expressed in the January 16, 2016 letter by Captain Beach]. If perceived in this manner by other crewmembers, concerns for teamwork and CRM effectiveness would reasonably be raised. Yet absent a mental disorder, [i.e. as specified in Federal Aviation Regulations], such a Personality Disorder or other behavior-related health problem that is severe enough to correspond to repeatedly manifested acts inconsistent with acceptable performance of aviation duties, lapses of interpersonal interactions and effective communications would be subject matters for performance counseling evaluation [i.e. Human Resources and Supervision Matters] rather than representing mental illness/disorder to be addressed as such" [page 12].

Significantly, in a relatively lengthy 17-line paragraph [also on page 12], Dr. Knippa appropriately discussed aspects of what had been raised by inference to perhaps include features of a narcissistic and/or immature aspect to Scott Patterson's personality, and also the notion that disinhibition can sometimes be seen in AD/HD spectrum aspects of such personalities. However, and finally, in summary, Dr. Knippa concluded [for he did not have the data to assert otherwise, his various meandering inferences and/or conjectures notwithstanding] the following:

"While some personality characteristics identified at assessment raise concern for workplace performance challenges, a personality disorder is not identified with the limited data available at this time. Other than the unspecified complaints outlined by Captain Beach, no concrete examples of performance problems are identified. Corresponding recommendations, tentative at this point and pending any additional information, would be that complaints be handled according to appropriate supervisory judgment and through the personal process as may be judged appropriate".

Regarding Scott Patterson's interpersonal skills, Dr. Knippa does make the point that with the exception of the present complaint: "Advice from the employer was given that no examples of overt acts have been identified for review". That is, FO Scott Patterson has never previously shown up on the Corporate Human Resources radar at any time in his 16 years of employment with A.A. as having any work related or interpersonal problems in the workplace, or elsewhere, until this instance with Captain Whitehouse.

So, it would seem that Dr. Knippa, after he explores around the issue of "personality disorder" for quite a while, finally puts the matter of Scott Patterson's inferred "mental illness" or at least his inferred "personality disorder", to rest, or almost so, but not really!

37

I say "almost so" because in fact Dr. Knippa then goes on to propose a "possible linkage" [in the second paragraph of his page 12] between "the possibility" of "certain narcissistic and immature features" of Scott's alleged personality, that if true could be raised as evidence of, and consistent with, the coping styles that can sometimes be seen in the "disinhibition from AD/HD" and also "subtle spectrum features". [By AD/HD Dr. Knippa means Attention Deficit Disorder/Hyperactivity Disorder].

Bluntly, at this point Dr. Knippa's speculations are way beyond the bounds of science and into fantasy. Such weak and unsupportable inferences [vague data void speculation] have no place in a scientifically based investigation, and especially so, when this report is being read and comprehended by non-specialists whose workplace political agenda may play a role in the decision making process. Such speculation by a psychologist who really does not know this man at all, risks compromising his own ethical obligation to speak only the truth and not to speculate in a manner to compromise his professional responsibilities; and certainly, not to suck up [throw a bone to] the people who hired him.

Dr. Knippa could have conducted a comprehensive collateral source investigation [interviewing people who know Scott Patterson really well in his workplace and beyond], if he had requested to do so, and if he determined that he really wanted to get to the bottom of [make sense of] all these inferences that he was speculating about. But he did not undertake any such an investigation! And yet he leaves these possible inferences [of personality impairment] hanging, yet without valid data support. I do not consider this an appropriate application within the discipline of psychology!

Further, when Dr. Knippa remarks [as noted above] on what he calls subtle "Spectrum" features I can only presume that he is referring to either the "Attention Deficit Disorder" spectrum or the "Autistic Disorder" spectrum. And though I presume the former, this speculation appears to have been presented to offer or infer a theoretical mechanism [a bridge if you like] to get the naïve reader back into the notion that there is something wrong with Scott Patterson. [That is, the creation of an inference that although it may not be a real "personality disorder" and Dr. Knippa cannot "find it", there is otherwise, or still maybe, something wrong with FO Patterson]. Dr. Knippa persists with the speculation, of the possibility, of the inference, that just such a "personality problem" could exist; and just below the surface. The inference from these speculations is that while this is not "evidence" for a personality disorder, it might, [and I emphasize "might"] still reflect a low grade personality limitation, or it may even be indirect evidence of a limitation of an organic nature in Scott Patterson's brain functioning. I consider this level of speculation beyond lacking any scientific basis and to have no place in this work, or in any other! It is building a fragile structure without foundation and the lack of a scientific base make the exercise <u>unethical</u>.

It is significant that while Dr. Knippa did review the personal testimony support letters in Scott Patterson's case [he advised he saw some eight such letters] he made no real

38

comment about these essentially "glowing" letters, and as I noted previously, he made no effort to undertake any collateral review of Scott by seeking to actually interview some of the many people who know Scott very well and for many years, including people who know him very well in A.A. If you are going to do any job that can impact a person's life, do it properly, or don't do it alt all.

This type of comprehensive investigation I am proposing would have been of great value in exploring many aspects of Scott Patterson's personality functioning and the way he is seen by others, especially given the assertions being raised against him by Captain Whitehouse. Had Dr. Knippa done so, he would have gained a much more comprehensive view of Scott's interpersonal relationships than is possible from solely personality testing procedures, and reviewing some select letters of endorsement. He would have learned that FO Patterson is a very well known and very much liked and respected person in a wide variety of social and vocational contexts. He would have learned from pilot colleagues what a skilled pilot he is. He would have learned about Scott's generosity of his time to his family, to his friends, to causes involving strangers. And he would have overcome Scott Patterson's distrust of him and his agenda and been much more likely to be able to obtain a valid analysis.

So much for the lingering personality disorder hypothesis!

Dr. Knippa next goes into the results of his neuropsychological testing. This writer [Dr. Caddy] does neuropsychological assessment and I am a member a group that uses a particularly sophisticated Neuropsychological Testing Laboratory in North Miami Beach managed by a neuropsychologist whose knowledge in the field is truly remarkable. I am however, given my forensic focus, intent on remaining forensically focused and so I have recommended to Scott [and his attorney] that he undertake a second independent clinical and neuropsychological examination not by me or through my resources, but by a certified and highly experienced Aeromedical Clinical and Neuropsychologist; and that he also undertake a comprehensive neurological examination, equally provided by an equally experienced and highly expert Aeromedical Neurologist.

What I will say, based on the testing results being reported by Dr. Knippa, is that there is some significant variability in the neuropsychological testing results reported by Dr. Knippa, with a large number of the scores on multiple tests being within the normal ranges and a much smaller number being outside that range. [That is, based on Dr. Knippa's results, there were a few test scores that were low in relation to the cut off points established for airline pilots, as interpreted by Dr. Knippa].

However, the critical questions here of course are: [i] are these findings [scores] valid and reliable? And, [ii] what are the bases for these below criterion findings? And [iii] what really do these scores mean as far as validly predicting the flying skills of Scott Patterson? This last question is especially critical to know, of course, and we must also consider Scott's many years of expert work and his repetitive "overlearning" as a pilot of

39

numerous aircraft in this entire evaluation.

Taking both the averages, the high, and low scores reported by Dr. Knippa into account, do these overall performance scores, as asserted by Dr. Knippa, taken together with all the other data under observation from multiple other sources [for example, the observations of fellow pilots, and the annual results from the flight simulation studies], validly lead to the conclusion being reached by Dr. Knippa? Do these mixed neuropsychological findings provide "credible, valid, and valid predictive evidence" that allows one to reach the conclusion being proposed by Dr. Knippa; namely, that FO Scott Patterson shows neuropsychological indices of impairment on some measures such that he should not be permitted to fly for A.A, And, there are other questions that relate to the entire testing circumstances, and hence that raise issues about the validity of Dr. Knippa's conclusions [including as I will note later, that he used the wrong norms on one test, the CogScreen-AE, as will be discussed subsequently].

Further, why was FO Patterson sent all the way through three times zones for this testing to take place?  What impact did acclimation and tiredness [being jet lagged] have on the performance that led to these scores, as Scott flew from Fort Lauderdale, Florida to Los Angeles, California the day before the scheduled examination? Dr. Knippa states in his report that Scott Patterson did not report being tired yet realistically, we are all somewhat disoriented and tired facing the next several days after a nearly six hour flight [across three-hour time zone] change, and especially so if we are stressed about not really trusting the process at the end. Certainly, FO Patterson was concerned about trusting this examination process, based in part on everything that had happened to him in the prior A.A. investigative process, which seemed to focus not at all on the inappropriate conduct of Captain Whitehouse and what I have termed his ten month "Warlock Hunt". Rather, the focus was solely on Scott Patterson. So, in not trusting the maneuverings of his employer, Scott was unsure if he could trust the objectivity of Dr. Knippa. And being shipped across the country to do this examination rather than doing so much more locally did little to increased Scott's sense of the convenience or trust in the integrity of this process.

When FO Patterson advised me that A.A. had decided to send him to California to do his Independent Aeromedical Examination, I immediately considered that an inappropriate course of action by A.A., and a poor decision by Dr. Knippa to conduct such an extensive examination under conditions where inevitably jet lag would have been a factor in Scott's performance; or in the alternative, where its impact could not have been ruled out. After all, Scott Patterson was not doing a physical examination but a relatively grueling two-day clinical and neuropsychological examination.

Under Federal Aviation Regulations CFR 117, "Acclimated" is defined as: "A condition in which a flight crew member has been in a theater for 72 hours or has been given at least 36 consecutive hours free from duty".

Dr. Knippa indicated that Scott Patterson did not complain of being tired. Yet clearly, as Scott said when I asked him, he did not land in Los Angeles until 1600 hours PST. He ate dinner at the hotel restaurant at 2000 hours PST, went to bed at around 2100 hours PST and he arouse very early [at 0200 hours PST]. At 0600 hours he worked out at the hotel gym, ate breakfast at around 0715 hours, showered and dressed about 0800 hours, and drove to Dr. Knippa's office to arrive at 0920 hours [for the scheduled 0930 hours]. This is hardly what would be considered an ideal way to begin two days of testing. In fact as I have said elsewhere in this report, the idea of sending a pilot across three time zones to undertake such an assessment makes no sense at all and surely Dr. Knippa would have been cognizant of this fact.

To illustrate further the significance of alertness and lack of tiredness to certain aspects of the neuropsychological testing process I refer the reader to the Professional Manual of the "Test of Variables of Attention Continuous Performance Test" [the "T.O.V.A"].

Under the heading "Test Administration" [pages 9 and 10 of the Manual] the following is stated: "The T.O.V.A. was normed with test administrations performed in the morning before 1 p.m. to avoid possible diurnal variations. It was the first test administered to the norming subjects".

Yet according to FO Patterson, in the morning of the first day Dr. Knippa interviewed him and also administered the MMPI to him. I cannot judge how long the interview was conducted on that morning and Scott did not record the exact time it took. But, according to Scott it was after the interview that the MMPI was administered [and the MMPI typically takes close to 90 minutes. What with several breaks and Scott making phone calls back to his Union Representative, and then with a break for lunch, the neuropsychological testing almost definitely did not begin until sometime significantly after 1300 hours. As for just when the T.O.V.A. was administered Scott, he says he just does not know, but it very likely was not before 1300 hours.

On the CogScreen-AE, Scott's scores were within a range that did not predict brain impairment. Yet there was also quite significant variability in some of the scores in this sequence, ranging from superior to average to below average. Measures of general cognition, Dr. Knippa noted to be as follows: verbal reasoning was average; visual reasoning was average; on most measures of 2-D visual analysis Scott's performance was high average, yet low average on a pencil-paper copy task, and on measures requiring thoughtful analysis.

On the WAIS-IV [an intelligence test] Scott's overall performance was in the high average range, but so-called working memory scores [that require one to keep multiple sets of information in mind] were not consistently as good. Scott's performance on measures of processing speed was seen to range from high average to what Dr. Knippa considered defective. Processing speed on the WAIS-IV was seen to be in the high average range.

41

Likewise, on the PASAT-100, measures of processing speed were in the high average range. On a continuous performance test, the T.O.V.A.-V, Dr. Knippa found Scott's scores to be variable, and on this test inattention issues were reported. Verbal Memory measures were overall at the low average range. Visual memory was assessed at the average range. Motor and Sensory Performance measures were within the average to high average range. A measure of olfactory function was in the normal range. What Dr. Knippa referred to as Selected Executive Performances he considered to be in the average range, however there was significant variability and some of the scores here Dr. Knippa asserted to be in the low average range.

On several occasions, Dr. Knippa raised the issue of FO Patterson's cancer surgery [of February 27, 2015]. Yet he clearly had no basis to see the surgery as relevant to the reason[s] that Scott was involved in this conflict with Captain Whitehouse, as the timeline of these two events would make no sense. The dispute with Captain Glenn Whitehouse occurred on October 7, 2014 and the cancer surgery did not occur until February 2015. Dr. Knippa appears to have considered [speculated] the notion that perhaps it was the consequence of Scott Patterson's cancer surgery that may account for some of the lower cognitive scores that he was reporting, as he assessed them. However, of course, the initial A.A. referral question was one of "clinical psychology relevance" and not about Scott Patterson's intellect or his "neuropsychological functioning" or anything to do with, or related to the skills, of flying an aircraft for A.A.

It was Scott's alleged "behavior in the workplace" around what was really a single issue [i.e. the complaints made by, and/or collated by, Captain Whitehouse] that became the reason for the examination. Yet now we have the opinion of Dr. Knippa, who has proposed, his inferences notwithstanding, that he really cannot find any functional psychological disorder [that is, on personality or interpersonal style grounds] to account for Scott Patterson not being "fit for duty". [Though, I will repeat, Dr. Knippa surely does try to go there, through his definitely over-weighted focus and his ongoing inference made from some of the personality testing results].

Likewise, Dr. Knippa raised the possible question that Scott Patterson may suffer from an Attention Deficit Disorder. And yet, given the absence of any such history or evidence in support thereof, he does not stand by that inference either; and he basically drops the notion. Yet here again, Dr. Knippa does not reject the assertion outright and the construct still hangs there! Rather, Dr. Knippa finally posits an alternative reason for seeing Scott Patterson as being impaired. He offers a premise that would not rationally have been contemplated by anyone, and certainly not by Scott Patterson. In fact, the allegations made by Captain Whitehouse, if they were to exist, would be seen as existent solely in the functional personality disorder arena, and not to be reasonably linked to any impairment in Scott's piloting ability, or based on any inference from within the organic brain functioning domain. And yet that [neuropsychological impairment] is precisely where Dr. Knippa ends up hanging his hat!

42

I do not believe that there are any data whatsoever that reasonably could argue for Scott Patterson suffering a brain impact or change of brain functioning as a result of the surgery he underwent on February 27, 2015. Certainly, his doctors do not consider such to be the case. And Scott says that he did and does not note any difference in his memory or his ability to process information subsequent to the surgery. Scott further states that when he was flying subsequent to his return to work on June 14, 2015 [that is, when he completed his R-9, flight simulation training], he considered everything about his functioning during the simulator testing, and in the air for A.A., and in his role as a Civil Aviation pilot, and in his everyday like to be normal and unremarkable. Scott claims that it is his view that his memory, his everyday thinking, and his overall cognitive functioning is just the same today as it has been over the past years; and that he has no evidence or indication whatsoever that he has that any problems in his thinking or mentally functioning exists.

So let us assume that FO Patterson's perspective here is true and valid! If so, on the one hand we have the opinion of Dr. Knippa, suggesting [based on certain elements of his overall neuropsychological testing results] that some [not a lot but some] of his findings indicate that Scott Patterson should not be flying for A.A.

Yet, against this, there is a total of twenty-seven years that Scott has been practicing and developing his craft, and without mishap, and while also routinely successfully completing his obligatory flight simulator testing and this annual medical examinations, and further, flying privately, and even serving as a consultant for a company selling fighter jet aircraft. I argue that flying, like playing the piano, is a skill that advances with practice, unless one has a defect in the capacity to learn and/or maintain that skill. Moreover, there is an array of very experienced pilots who know Scott well, and who have flown with him in both his commercial capacity with A.A, [and before that with Mesa Airlines], and in a vast number of private and/or Civil Aviation involvements. I have spoken to some of these people, including senior Captains within A.A., and all of those who I have spoken to consider FO Patterson to be a highly skilled and expert pilot.

So, do we believe Dr. Knippa's interpretation of his [variable and inconsistent] findings, together with his use of inappropriate norms used with his CogScreen-AE testing, which offer an array of possible personality and flight skill presumptions? [The issues of these norms on the CogScreen-AE are especially significant when we note, as did Dr. Gary G. Kay, the developer of the CogScreen-AE, that <u>Dr. Knippa, used "Regional Pilot norms in his examination of FO Patterson and not the age-group norms that are used for Major Airline Pilots"</u>. Further, Dr. Knippa's opinions are derived solely via a series of correlational presumptions taken from the variable testing of a man who had flown across three time zone hours to do what is a stressful testing over the next two relatively days with a man who he believed he could not trust?

Or perhaps we might consider the fact that none of Dr. Knippa's data directly tests flight

43

skills, though the CogScreen offers the closest approximation of those skills, when used correctly. And even the results of this test were potentially compromised by the impact of jet lag. So, do we go along with Dr. Knippa? Or do we believe actual behavioral studies undertaken by Scott Patterson, year after year [i.e. data from thousands of hours of safe expert flying in multiple aircraft and, of course, also his passing of his every annual flight simulation review]. And what about the opinions of those many other experts [pilots] who have observed Scott Patterson's actual flying skills and performance over many years? What weight do we afford these data? Even in Captain Whitehouse's variable claims against Scott Patterson, nowhere is it asserted that FO Patterson's flight skills were viewed to be defective.

I will have more to say about this matter later. However, it is the case that the United States Department of Transportation, Federal Aviation Administration, has a policy of employing variable neuropsychological data that may offer inconsistent [depending on who is doing the testing, as we will see here subsequently], as well as indirect, that is, inferred evidence of strengths and weaknesses of flight skills. There is presently in the system the questioning of whether this could be a flawed policy, and it appears that the process of much of this testing is [or is proposed to be] under review. The Department of Transportation permits and accepts data that are set against a complex set of tasks and performances that may be inferred to be, and are correlated with, skilled flight performance. But these data do not directly measure such performance. There are risks of error here. If the assertions of Dr. Knippa were held to apply, these criteria would appear [in the case of Scott Patterson] to be inconsistent with alternative evidence from actual criterion behavioral performance [that is, the act of flying].  The bottom line from Dr. John Knippa's perspective of FO Patterson is that:

"Mr. Patterson is opined to be identified by the current assessment as NOT FIT FOR DUTY as a FO, on the basis of his impaired performances on cognitive assessment".

I would assert that what we have here is a compromised process that affords inordinate weight to indirect correlational inferences of a limited number of subtests of instruments that should be viewed as relevant but not in themselves, necessarily, definitive. And as I have noted above, even the best of these instruments [the CogScreen], as it was developed specifically to test piloting performance, can be compromised by its inappropriate administration or by inappropriate interpretation [which in this case included the application of inappropriate normative data]. In fact, Scott did well on many performance correlates with Dr. Knippa and there were only a limited number of these correlational where performance limitations were inferred. [That is, a small number of correlational indices of indirect flight performance were being given substantial and, even if accurate, inordinate weight, but in the case of the CogScreen, the norms Dr. Knippa used, were inappropriate].

The fact is that the basis of Dr. Knippa's opinions emerged from selective correlational inference, versus other positive findings on and across the array of tests administered;

and much more importantly, these results are in conflict with actual demonstrated performance in the air, and for many years. Further, the examination process was compromised from the very beginning because none of these tests were normed on the basis of the examinee being jet lagged. And as I will note later, Dr. Gary G. Kay, the developer of the CogScreen, on later administration of this test under conditions of no jet lag, found Scott Patterson to be functioning within normal limited for an Airline Pilot of Scott's age.

There are three likely interpretations to account for Scott Patterson's allegedly low performance on several of these sub-tests in this overall battery of tests:

[i] Scott was tired and/or frustrated during some or much of this testing due to jet lag and not sleeping well the night before, or simply not wanting to be there and being unable to fully motivate himself to sustain constant focus and effort, given his overall disgust at having to play what he consider a A.A.'s "bullshit game". Certainly, he was three hours out on his circadian rhythm]; and/or;
[ii] Scott was showing variable performance as a function of legitimate performance limitations and he was also being influenced by other external factors [jetlag, tiredness, irritation, disgust; and/or;
iii] if [ii] above, Scott may well have always had these specific test identified limitations of functioning, but they had never been previously assessed, in which case the possible impact of any such limitations were overcome by the skill and experience he had acquired over some two decades of flying.
And of course, the other possibilities are that Dr. Knippa substantially overrated the misinterpretations he offered and their relevance to predicting Scott's flying abilities.

There is, of course, the possibility, that Dr. Knippa simply is not all that talented here. After all, as Dr. Kay pointed out, Dr. Knippa used the wrong normative tables in the evaluation Scott's performance on the CogScreen-AE].

Certainly, Dr. Knippa's meanderings across the personality domain in his report were anything but clear or impressive, and they offered the possibility of negative inference almost all the way, until ultimately they did not [because the data did not support such inferences]. Any expert reading of this report would not be impressed by such meanderings, which appeared more like efforts in search of a problem that is not quite there, rather than simply making a clear straightforward statement indicating a null findings.

So, again, with this additional perspective now available to us, do we believe Dr. Knippa's interpretation of his variable findings, which offer inconsistent presumptions, and are largely derived via correlational analyses from some of the tests he administered, but not from others, that also look at snapshots of statistically relevant data not precisely the skill itself? This is especially the case when the most highly predictive of all of these tests, the CogScreen Battery, was inappropriately scored. Or do

45

we believe actual behavioral observations [skilled functioning] with no indication of impairment undertaken over the years, and now with some twelve thousand [12,000] hours of safe expert flying, in multiple aircraft; and further, what weight do we put on the opinions of those other experts [pilots] who have observed Scott's actual flying skills and performance over many years?

As I will say several times throughout this report, the best measure of a person's specific ability is not determined by data that may, at best, correlate with the skill sets that are deemed, a priori, to be relevant to a task, skill, or ability. Rather the most valid measure of a skill is to measure the performance of that skill directly. To test the actual skill by undertaking the tasks and elements of and knowledge related to the skill in a test environment, where that skill can be absolutely determined. In this case, that means in an aircraft or in a simulator! You would not use neuropsychological testing to determine the ability of a person to play the piano, nor to kick a football, even though there may be statistical correlations existent between the two and the equivalent thereof should not be done as the criterion measure of flight skills in the present context. Again, good as some test predictors may be [like the CogScreen], and unlike much of the array of other neuropsychological instruments that Dr. Knippa used [which were not designed specifically to evaluate performances that predict flight skills in pilots], the use of a number of other such instruments may only risk compromising the validity [that is, the legitimacy] of the larger evaluative process.

Again, the best measure of a person's flying ability [or any other ability] is not determined by data that may correlate in some way with the skill sets relevant to the task, but to procedures that test the skills of that task directly. At least in this case, to give these variable test data such influence, especially under tiredness and jetlag [circadian rhythm impaired] conditions, is to overstate their significance. Rather, the most valid analysis results come from undertaking of the task in a valid test environment, and in this instance that means in flight, and best over many hours of flight [in Scott Patterson's case, some 12,000 hours without ever a mishap]. However, if a neuropsychological testing is to be undertaken, then the CogScreen-AE is the best psychometric predictor of success in flight training, and its scores are well correlated with both simulated and actual flight performance in airline pilots. Yet, again, in this case [as will become clear when I review the findings of Dr. Gary Kay, there are no indications that Scott Patterson was or is in any manner flight skill or otherwise neurologically impaired.

I wish to further invite the reader to examine the below set of arguments and the below perspective of scientific and pragmatic relevance to further appreciate [and understand] the complexity of what has occurred here and to question the scientific basis of some of what [apparently] is perhaps all to often being done in cases such as this, under what may well often be invalid claims of scientific rigor and predictive validity.

Finally, pragmatically, if such a finding by Dr. Knippa is to be given standing, would it not

be appropriate to further examine Scott Patterson via a second opinion analysis undertaken under circumstances where Scott Patterson had not travelled across the country the day before the exam, and then undergone a very lengthy comprehensive neuropsychological examination. Would it not have been better also to include evidence from a clinical neurological examination? And further, would it not have been a good idea to take into account the application of the most extremely valid predictor: his real life day to day flying record and the word of those who fly with him? It would appear that in their rush to terminate FO Patterson that A.A. has made not only an error, but a foolish one involving a rush to judgment based on one examination, irrespective of multiple other contradictory point of evidence.

The very notion that there is a formal testing system such as what I am seeing here, that has the capacity to potentially terminate the career of any pilot based essentially [solely] on one neuropsychological examination that has showed some substantial variability across various sub-tests [even if administered and normed properly] would seem very compromised, even just straight out wrong, especially when the testing was compromised from the outset and there are other data regarding the flight skill of FO Paterson that are absolutely inconsistent with these very limited and compromised test data findings.

And yet, that is exactly what has happened here!

## ARGUMENT AND FUNCTIONAL CONSIDERATIONS

BEFORE I PRESENT MY FINDINGS AND CONCLUSIONS IN THIS CASE, IT IS APPROPRIATE FOR ME TO MAKE SOME BROAD STATEMENTS ABOUT THE CLAIMS OR ACCUSATIONS THAT WERE MADE, OR WERE INFERRED, ABOUT SCOTT PATTERSON'S CONDUCT AND HIS SO-CALLED QUESTIONABLE PSYCHOLOGICAL STATUS. I UNDERSTAND THAT IN THE PRESENT CLIMATE, IN PARTICULAR, THE AIRLINE INDUSTRY HAS AN OBLIGATION TO BE VERY SENSITIVE TO OBJECTIVELY INVESTIGATE ANY INFERENCE OF EMOTIONAL INSTABILITY IN ITS EMPLOYEES. AND IF THERE IS A HISTORY OF SIGNIFICANT DYSFUNCTIONAL BEHAVIOR, WHERE THERE EXISTS THE POSSIBILITY OF A PERSONALITY DISORDER, OR AN ADDICTION, OR A MOOD DISORDER, ETC. THAT MAY COMPROMISE THE SAFE AND APPROPRIATE OPERATION OF A PILOT'S JOB FUNCTIONING, CERTAINLY A CLINICAL PSYCHOLOGICAL EXAMINATION IS IN ORDER, AND, IF THE BEHAVIOR [SYMPTOMS] OF THE PILOT WOULD APPEAR TO RECOMMEND IT, A NEUROPSYCHOLOGICAL EXAMINATION ALSO MAY BE IN ORDER. LIKEWISE, IF IT IS SHOWN THAT THERE IS EVIDENCE OF A PROBLEM OF ALCOHOL OR OTHER DRUG ABUSE, THEN SURELY TOO, A COMPREHENSIVE PSYCHOLOGICAL EXAMINATION, AND, THEN PERHAPS TOO, UNDER CERTAIN CIRCUMSTANCES, A NEUROPSYCHOLOGICAL EXAMINATION AND OTHER MEDICALSPECIALTY EXAMINATIONS ALSO MAY BE IN ORDER, ESPECIALLY GIVEN THE POTENTIAL FOR AN ORGANIC CONSEQUENCE FROM THE IMPACT OF PROTRACTED SUBSTANCE ABUSE.

AS THE AVIATION EXPERT GARY G. KAY PH.D. WRITES IN HIS "GUIDELINES FOR THE EVALUATION OF AIR CREW PERSONNEL" THERE ARE VARIOUS "AIR CREW STRESSORS": DERIVED FROM PASSENDER ACTION, PHYSIOLOGICAL STRESSORS, THE DEMANDS OF FLYING, AND ALSO WHAT HE REFERS TO AS "INTERPERSONAL DEMANDS" THAT CAN IMPACT A PILOT.

IT WOULD APPEAR THAT WHAT THIS CASE IS ALL ABOUT INVOLVES THESE INTERPERSONAL DEMANDS, FOR THE CLAIMS MADE ABOUT SCOTT PATTERSON'S FUNCTIONING RELATE TO HIS CLAIMED

47

INTERPERSONAL FUNCTIONING, OR MORE ACCURATELY THE INTERPERSONAL FUNCTIONING OF BOTH CAPTAIN WHITEHOUSE AND FO PATTERSON, THOUGH CAPTAIN WHITRHOUSE APPEARS TO HAVE SOUGHT TO MAKE A MUCH LARGER MOUNTAIN OUT OF A MOLEHILL AND IN SO DOING GREATLY RISKS COMPROMISING HIS OWN INTEGRITY AND MAKING HIMSELF A TARGET.

THE TIME LIMITED CONFLICT HERE WOULD APPEAR TO HAVE NOTHING TO DO WITH SCOTT PATTERSON'S TECHNICAL SKILLS OR PILOTING TALLENT, BUT ABOUT EVENTS THAT HAPPENED BETWEEN THESE TWO MEN LARGELY OVER A SMALL MATTER ON THE GROUND ON A SINGLE FLIGHT, AND A SUBSEQUENT DISAGREEMENT ON THE FLIGHT BACK AND WHICH THEN CAPTAIN WHITEHOUSE CHOSE TO CREATE INTO AN EVENT THAT ULTIMELY HAS GREATLY COMPROMISED HIMSELF, EVEN IF HE STILL DOES NOT REALIZE IT.  THIS ACTION HAS NOW TAKEN ON A LIFE OF ITS OWN AND IS VERY MUCH STILL IN PLAY.

COMMON SENSE, CRITICAL THINKING, AND A COMPREHENSIVE INVESTIGATION OF THE FACTS SHOULD BE OF SUPERORDINATE SIGNIFICANCE IN THE INVESTIGATION AND HANDLING OF CASES SUCH AS THIS. THE INTERPERSONAL POLITICS BETWEEN THESE TWO MEN, AND NOISE FROM OTHER LARGELY INCIDENTAL PARTIES, UNLESS THESE MATTERS DEMONSTRATE OR INDICATE IMPAIRED FUNCTIONING IN SCOTT PATTERSON, SHOULD NOT BE CONSIDERED TO HOLD SWAY. LIKEWISE, THIS SAME ASSERTION APPLIES TO THE ACTIONS OF CAPTAIN WHITEHOUSE IN THIS MATTER, FOR SURELY HIS ACTIONS TOO ARE FROM FREE OF CRITICISM, AND ARE MOST COMPROMISING.

THERE IS NO CLAIM, NOR ANY EVIDENCE, THAT INFERS THAT SCOTT PATTERSON HAS EXHIBITED A SUBSTANCE ABUSE PROBLEM. EVEN IN ALL THE CLAIMS MADE BY CAPTAIN WHITEHOUSE, THERE ARE NO DATA THAT MIGHT INDICATE THE POSSIBILITY OF SUCH A PROBLEM. LIKEWISE, IN ALL HIS YEARS OF EMPLOYMENT WITH A.A, AND BEFORE, THERE HAS NEVER BEEN ANY INCIDENT OR EXAMPLE OF AN EVENT THAT MIGHT LEAD TO ANY PRESUMPTION THAT SCOTT PATTERSON HAS A "PERSONALITY DISORDER" OR OTHER "MENTAL PROBLEM". IF THAT HAD BEEN THE CASE, IT WOULD HAVE COME TO THE ATTENTION OF MANY PEOPLE IN THE COMPANY AND LIKELY TO THE A.A, HUMAN RESOURCES DEPARTMENT, OR TO OTHER UNITS WITHIN THE COMPANY LONG AGO. SUCH A PROBLEM WOULD ALSO HAVE BEEN IDENTIFIED IN SCOTT'S MILITARY LIFE., AND HIS HOME LIFE, BUT THERE AGAIN, IN NEITHER ISTANCE,  ARE THERE ANY QUALITY DATA OR LEGITIMATE EVIDENCE SUGGESTING SUCH A CONDITION [OUTSIDE THIS ONE DISAGREEMENT WITH CAPTAIN WHITEHOUSE].

AS I WILL NOTE LATER IN THIS REPORT, I CONSIDER THAT FO PATTERSON IS RATHER LOQUACIOUS [AS DR. KNIPPA HAS NOTED] AND HE CAN ALSO BE SOCIALLY A BIT INTENSE AND EVEN ACCASIONALLY PUSHY, HE ALSO TENDS TO BE SOMEWHAT BLUNT AND DEFINITELY VERY STRAIGHFORWARD [AS DR KNIPPA INFERRED]. BUT SCOTT PATTERSON IS ALSO VERY CONSIDERATE OF THE NEEDS OF OTHERS, AND HE APPEARS ALWAYS TO BE WILLING TO HELP A PERSON IN NEED, EVEN A STRANGER. THERE ARE MANY EXAMPLES OF THIS IN HIS HISTORY, AS I HAVE ESTABLISHED IT. A GOOD EXAMPLE OF THIS IS HIS WORK IN HAITI AND HIS SUPPORT OF A HAITIAN TEEN THERE [WHO HE CALLS HIS SON]. IN MY WORK IN THIS CASE, I HAVE SPENT THE TIME AND EFFORT TO SEE THE MANY SIDES OF SCOTT PATTERSON. CERTAINLY, I SEE A MUCH MORE COMPLEX AND SENSITIVE MAN THAN DR. KNIPPA APPEARS TO HAVE IDENTIFIED.

PERSONALITY DISORDERS ARE ENDURING DISORDERS OF INTERPERSONAL DYSFUNCTION. IF SCOTT PATTERSON HAD A DIAGNOSABLE PERSONALITY DISORDER, IT IS EXCEITIONALLY LIKELY THAT THE CONDITION WOULD HAVE COME TO THE ATTENTION OF AMERICAN AIRLINES YEARS AGO, AND LIKELY ALSO TO HIS PRIOR EMPLOYER, MESA AIRLINES. SCOTT PATTERSON HAS FLOWN LITERALLY THOUSANDS OF TRIPS AND CLOCKED OVER 8,000 HOURS IN THE AIR IN HIS SIXTEEN YEARS WITH AMERICAN AIRLINES, HE HAS WORKED AS A COMMERCIAL PILOT FOR SEVEN UNEVENTFUL YEARS BEFORE THAT. HE HAS FURTHER FLOWN MANY HUNDREDS OF MORE HOURS IN SUPPORT OF THE CIVIL AIR PATROL SERVICE, AND HE HAS SPENT A GREAT DEAL OF TIME DURING THAT PERIOD PRIVATELY FLYING, AS WELL AS PROVIDING SKILLED TRAINING TO THOSE SEEKING TO LEARN TO FLY. OVERALL, SCOTT PATTERSON REPORTS HAVING FLOWN OVER 12,000 HOURS, WITHOUT INCIDENT.

48

HE HAS FURTHER SPENT 28 YEARS SERVING HIS COUNTY WHILE EMPLOYED IN HIS MILITARY DUTIES, AND AT SIGNIFICANT RANK. IN THAT CAPACITY, AND ESPECIALLY GIVEN HIS STILL RELATIVELY YOUNG AGE, HE HAS FUNCTIONED IN SOME IMPRESSIVELY SIGNIFICANT ROLES, AND MOST RECENTLY WITHIN THE PENTAGON. IN HIS MILITARY ROLE LIEUTENANT COLONEL PATTERSON CARRIES A VERY HIGH SECURITY CLEARANCE, AND HE HAS ALSO HAD TO UNDERGO A SERIES OF PSYCHOLOGIAL EVALUATIONS AND RECURRENT REVIEWS TO BE PERMITED TO DO THE PARTICULAR WORK THAT HE DOES.

IN ADDITION, HE HAS DONE A SIGNIFICANT AMOUNT OF PUBLIC SERVICE OVER THE YEARS, WITH ROLES ALL THE WAY FROM WORK DURING THE HURRICANE IN HAITI TO HIS INVOLVEMENT IN SUPPORT OF HIS LOCAL COMMUNITY HOME ASSOCIATION.

MY POINT HERE IS THAT GIVEN ALL THE ABOVE, AND THE CIRCUMSTANCES OF THIS PRESENT UNFORTUNATE MATTER, MAKING THE INFERENCE OF A PERSONALITY DISORDER IN SCOTT PATTERSON, BASED ON HIS OVERALL SKILLED AND SUCCESSFUL FUNCTIONING THROUGHOUT HIS ADULT WORK AND CONSIDERING ALSO HIS FAMILY AND FRIENDSHIP LIFE, THE POSSIBILITY OF HIM HAVING A PERSONALITY DISORDER WOULD HAVE A PROBABILITY APPROACHING ZERO. AND YET, INSTEAD OF CAPTUTING THE DETAILS OF HIS LIFE THROUGH VIA A VERY DETAILED HISTORY TAKING, AND LOOKING TO CONFIRM OR COMPROMISE THESE DATA AS A FIRST STEP, THROUGH COLLATERAL SOURCE DISCOVERY, WHAT HAPPENED IN FO PATTERSON'S EXAMINATION BY DR KNIPPA DID NOT SEEK TO CAPTURE THESE DETAILS MUCH AT ALL [BECAUSE THE PROCESS OF THIS EXAMINATION DID NOT PERMIT SUCH DATA CAPTURE]. IT COULD HAVE, BUT IT DID NOT, BECAUSE THE AGENDA WAS FOCUSED ON A MUCH NARROWER TESTING SAMPLE,

WITH THE EXCEPTION OF THE PRESENT PACKAGE OF COMPLAINTS ORGANISED BY CAPTAIN WHITEHOUSE AGAINST FIRST OFFICER PATTERSON, AND THE VARIOUS LARGELY SOLICITED COLLATERAL COMMENTS LINKED THERETO, AND OTHER COMMENTS CLAIMED TO BE MADE IN THE STORIES OF SEVERAL PEOPLE WHO SEEM TO VIEW SCOTT PATTERSON'S COMMENTS ABOUT HIS MILITARY OR OTHER WORK OUTSIDE A.A, TO BE SOMEWHAT LARGER THAN LIFE, EVEN DISINGENUOUS, THE FACT IS THAT SCOTT PATTERSON HAS FLOWN SOME 16 YEARS FOR AMERICAN AIRLINES. AND NEVER HAS HIS RECORD SHOWN THAT HE HAS EXPERIENCED ANY SIGNIFICANT ERROR IN FLYING, NOR HAS HE PREVIOUSLY EXPERIENCED ANY INTERPERSONALLY CONFLICTS IN A WORKPLACE. ALL THIS, WHEN ACCORDING TO RAYMOND: "THE JOB OF AN AIRLINE PILOT IS RANKED ONLY SECOND IN STRESS TO POLICE SERVICE AMONG ALL UNIFORMED OCCUPATIONS". [RAYMOND, C. A. <u>MENTAL STRESS: OCCUPATIONAL INJURY THAT EVEN PILOTS CAN'T RISE ABOVE</u>. [JAMA, 259:3097-3098, 1988].

WITH THE EXCEPTION OF WHAT WAS A LOW GRADE CONFLICT WITH CAPTAIN WHITEHOUSE, IN ALL HIS TIME IN THE AIRLINE INDUSTRY OR IN THE MILITARY, SCOTT PATTERSON SAYS THAT HE HAS NEVER PREVIOUSLY EXPERIENCED A COMPLAINT ABOUT ANY ASPECT OF HIS WORK PERFORMANCE, OR OTHERWISE. SPECIFICALLY, AT NO OTHER TIME HAS ANY A.A, PILOT OR OTHER A.A, EMPLOYEE MADE ANY NEGATIVE CLAIMS] ABOUT HIS FLYING SKILLS, OR HIS GENERAL EVERYDAY FUNCTIONING IN THE WORKPLACE. NOR HAS HIS CHARACTER, OR HIS PERSONALITY, OR OF HIS MENTAL STATUS, PREVIOUSLY BEEN CALLED INTO QUESTION. MOREOVER, IN HIS MILITARY SERVICE, COLONEL PATTERSON HAS RECEIVED A NUMBER OF COMMENDATIONS AND MILITARY AWARDS FOR A JOB WELL DONE, AND THERE TOO HE ASSERTS THAT HE HAS NEVER EXPERIENCED ANY WORK RELATED COMPLAINT.

THUS, IT IS RATIONAL TO BELIEVE THAT SCOTT PATTERSON MIGHT HAVE A "PERSONALITY DISORDER" OR A "MENTAL ILLNESS" THAT HAS GONE UNNOTICED AND UNDETECTED BY A.A? BY THE MILITARY? BY HIS FAMILY? BY HIS WIDE RANGE OF FRIENDS, MANY OF WHOM ARE PILOTS? BY THOSE HE WORKS WITH IN HIS CONCULTANCIES? BY HIS NEIGHBORS? BY THE BOARD MEMBERS OF THE HOMEOWNER'S ASSOCIATION OVER WHICH HE PRESIDES? AND BY ALL THE OTHER PILOTS, COWORKERS, AND COLLEAGUES, AND ALL THE OTHERS HE KNOWS AT A.A? AND MORE BROADLY IN THE AIRLINE INDUSTRY? NOR, AS WILL BE SEEN BELOW, DO SCOTT PATTERSON'S FRIENDS AND FLYING COLLEAGUES HAVE ANYTHING BUT PRAISE FOR HIS FUNCTIONING BROADLY? THE ANSWRS APPEAR TO BE NO!

49

EQUALLY, IS IT RATIONAL TO BELIEVE THAT SCOTT PATTERSON EXPERIENCES A "PERSONALITY DISORDER OR IMPAIRMENT" THAT HAS LAIN DORMANT FOR ALL THESE YEARS AND HAS ONLY NOW EMERGED? LIKEWISE, IS IT EVEN REMOTELY LIKELY [AS OPPOSED TO PROBABLE] THAT SCOTT PATTERSON'S FLYING SKILLS AND TALENT ARE SUB-STANDARD OR DEFECTIVE?  THERE ARE NO DATA FROM WITHIN AMERICAN AIRLINES OR ELSEWHERE THAT SHOW, OR WOULD SUPPORT ANY CONTENTION, THAT FO PATTERSON'S FLYING ABILITY IS DEFECTIVE. NO CRASHES, NO AIRCRAFT DAMAGE, NO NEAR MISSES, AND NO PERFORMANCE COMPLAINTS REGARDING HIS FLYING KNOWLEDGE AND SKILL. IN FACT, THE EVIDENCE IS TO THE TO CONTRARY. FURTHER, CAPTAIN WHITEHOUSE DID NOT OFFER ANY ASSERTION TO SUGGEST HE HAD ANY EVIDENCE TO QUESTION FO PATTERSON'S FLYING KNOWLEDGE OR SKILLS.

TURNING NOW TO OVERVIEW THE WORK OF DR. JOHN KNIPPA. HE MAKES AN INFERENCE THAT SCOTT PATTERSON MAY SHOW PERSONALITY ASPECTS THAT "ARE IMPAIRED," AND MAY SHOW "IMMATURE, NARCIISSISTIC FEATURES …AND A COPING STYLE "THAT CAN BE SEEN WITH DISINHIBITION FROM AD/HD, AND ALSO SPECTRUM FEATURES" [PERHAPS HE IS HERE REFERRING TO "AUTISTIC SPECTRUM"]. THIS STATEMENT WOULD APPEAR TO BE NOTHING MORE THAN A TOKEN INFERENCE FOR REASONS THAT DO NOT APPEAR RATIONAL.

THE FACT IS THAT BOTH OF THE COMPUTERIZED "PERSONALITY" TESTING PROCEDURES USED BY DR. KNIPPA COMMONLY OFFER STATISTICAL CORRELATES THAT MAY INFER THE POSSIBILITY OF VARIOUS PERSONALITY ELEMENTS AND EVEN DISORDERS. BUT TO ESTABLISH THESE POSSIBLE "INFERENCES" AS "DISORDERS" TAKES A SIGNIFICANT AMOUNT OF BEHAVIORAL EVIDENCE AND THAT EVIDENCE SIMPLY IS NOT SEEN IN THIS CASE. SO DESPITE DR. KNIPPA'S EARLY INFERENCES, THE BOTTOM LINE OF HIS "PERSONALITY TESTING", WITH BOTH THE MMPI AND THE PAI, WAS THAT THERE WAS NO PERSONALITY DISORDER WAS IDENTIFIED; AND AS HE SAID FINALLY: "THE BASIC PROFILE IS ENTIRELY WITHIN NORMAL LIMITS"

YET STILL DR KNIPPA CONTINUED WITH WHAT I CONSIDER TO APPEAR AT RISK OF BEING AN INTELLECTUALLY DISHONEST ONGOING INFERENCE, NAMELY, THAT THERE WAS SOMETHING WRONG WITH SCOTT PATTERSON'S PERSONALITY OR MENTAL HEALTH. DR. KNIPPA GOES ON TO EXPLORE THE NOTION THAT PERHAPS SCOTT SUFFERS FROM AN "UNDETECTED ATTENTIONAL DEFICIT CONDITION" OR PERHAPS THERE HAS BEEN A CHANGE IN HIS PERSONALITY FUNCTIONING SUBSEQUENT TO HIS CANCER TREATMENT. DR. KNIPPA MAY NOT BE DISINGENOUS HERE, BUT CERTAINLY HE HAS NO LEGITIMATE BASIS TO MAKE THE INFERENCES THAT HE HAS CHOSEN TO DO. NOR HAS HE EMBARKED ON ANY COLLATERAL INVESTIGATION THAT WOULD HAVE CLARIFIED ANY OF THESE VAGUE INFERENCES.  MY POINT HERE IS THAT DR. KNIPPA LEAVES THIS INFERENCE IN PLACE IN THE ABSENCE OF ANY LEGITIMATE DATA THAT HE HAS TO SUPPORT SUCH AN INFERENCE. THAT IS SIMPLY NOT PROFESSIONALLY APPROPRIATE. IF FACT, IT GREATLY COMPROMISES HIM!

DR. JOHN KNIPPA'S REPORT, [PAGES 11 AND 12] NOTES THAT WHILE IT IS OPINED THAT SOME OF FO PATTERSON'S PAST PATTERNS OF BEHAVIOR AND THE TESTING RELATED FINDINGS ARE CONSISTENT WITH RISKS OF HIM BEING PERCEIVED OR INTERPRETED BY OTHERS AT TIMES AS SELF-AGGRANDIZING, AND REFLECTING SOME LIMITS OF SOCIAL JUDGEMENT, THAT PARALLELS THE CONCERNS EXPERESSED IN THE LETTER BY CAPTAIN BEACH, IF FO PATTERSON IS PERCEIVED IN THIS MANNER BY CREW MEMBERS, CONCERNS FOR TEAMWORK AND CREW RESOURCE MANAGEMENT EFFECTIVENESS WOULD REASONABLY BE RAISED. I AGREE WITH THAT STATEMENT, IF SELF-AGGRANDIZING WAS A PROBLEM. YET ALL THE COLLATERAL SOURCE REVIEW I HAVE UNDERTAKEN, THAT IS, OF ALL PEOPLE WHO I HAVE SPOKEN TO WHO KNOW SCOTT PATTERSON WELL, NONE OF THEM SEE SCOTT AS ONE WHO "SELF-MARKETS" OR SELF-AGGRANDIZES. YET, AS I HAVE NOTED PREVIOUSLY, DR. KNIPPA DID NOT SEEK OUT OR UNDERTAKE ANY SUCH A COLLATERAL REVIEW.

DR KNIPPA EVENTUALLY CEASED THE DIALOGUE OF ANY INFERENCE OF POSSIBLE "PSYCHOPATHOLOGY" AND HE CHANGED THE TONE AND [AS I SEE IT] HE MORE OBJECTIVELY ASSERTS: "YET ABSENT A MENTAL

50

HEALTH DISORDER [THAT IS SPECIFIED IN FEDERAL AVIATION REGULATIONS] SUCH AS PERSONALITY DISORDER OR OTHER BEHAVIOR RELATED HEALTH PROBLEMS THAT ARE SEVERE ENOUGH TO CORRESPOND TO REPEATED OVERT ACTS INCONSISTENT WITH ACCEPTABLE PERFORMANCE IN AVIATION, LAPSES OF INTERPERSONAL INTERACTIONS, AND [IN] EFFECTIVE COMMUNICATIONS, HE WOULD BE SUBJECT TO PERFORMANCE COUNSELING OR EVALUATION [I.E. HUMAN RESOURCES AND SUPERVISION MATTERS], RATHER THAN REPRESENTING MENTAL ILLNESS/DISORDERS TO BE ADDRESSED AS SUCH". [ALTHOUGH DR. KNIPPA DOES NOT SPECIFICALLY SAY IT, HE WOULD PERHAPS RECOMMEND THE PROVISION OF SOME DEBRIEFING AND COUNSELING TO BE PROVIDED TO SCOTT PATTERSON IN DEALING WITH HIS REASONABLE UPSET IN ALL THAT HAS HAPPENED TO HIM OF LATE TO ENSURE THAT SCOTT "EASES BACK' TO AVOID ANY POSSIBLE WORK RELATED CONFLICT IN THE FUTURE].

I AGREE WITH DR KNIPPA IN THAT PERSPECTIVE. SCOTT PATTERSON DOES NOT HAVE ISSUES OF PERSONALITY DYSFUNCTION. NOR DOES HE NEED MENTAL HEALTH CARE THAT REQUIRES HIM TO SEEK PROFESSIONAL MENTAL HEALTH ATTENTION, OR THAT POTENTIOUSLY COMPROMISES HIS ABILITY OR TALENT TO FLY COMMERCIAL AURCRAFT. THE SORT OF COMPLAINTS THAT HAVE BEEN DIRECTED AGAINST FO PATTERSON ARE LARGELY ABOUT A SINGLE SET OF ALTERCATIONS WITH A SINGLE CAPTAIN, WHO THEREAFTER CREATED A DOSSIER OF OTHER ALLEDGED [HEARSAY] ISSUES TO BUILD A CASE. PERHAPS THERE ARE SOME LEGITIMATE FACTS IN THIS DOSSIER, FOR SURELY FROM THAT POINT ON SCOTT PATTERSON HAD NO TIME WHATSOEVER FOR CAPTAIN PATTERSON, AND IT WOULD SEEM, VICE VERSA, AND HE MAY WELL HAVE MADE HIS POINT OF VIEW CLEAR TO SEVERAL PEOPLE. BUT STILL, CAPTAIN WHITEHOUSE'S PRESENTATION MOSTLY CONTAINS UNVETTED INNUENDO.

I AGREE THAT SCOTT PATTERSON HAS A STRONG PERSONALITY. HE CAN BE SOMEWHAT PUSHY, VERY STRAIGHTFORWARD AND CLEAR, SOMETIMES EVEN BLUNT, FORTHRIGHT, AND BOTTOMLINE. IN FACT HE IS CERTAINLY "RATHER MILITARY". I SUSPECT THAT HE DID OVERREACT ON THE GROUND AT THE BUS IN ASUNCION, PARAGUAY, AND THAT A "MAN TO MAN" MATTER OF DISLIKE EMERGED THEREFROM. YET THERE ARE MANY LONGTERM COWORKERS IN A.A, WHO SCOTT HAS GARNERED WHO ARE SUPPORTING HIM AND SOME OF WHOM, AND OTHER FRIENDS, I HAVE SPOKEN TO. ALL THESE PEOPLE, AND OF COURSE SCOTT'S WIFE, SEE HIM AS AN EXCEPTIONAL PERSON, IN INTEGRITY, IN FRIENDSHIP, AND IN HIS ASSISTANCE TO HIS FELLOW MAN. I HAVE NOT SEEN ANY DATA OR INDICATION OF PSYCHOPATHOLOGY HERE. DR. KNIPPA DID NOT AFFORD HIMSELF THE OPPORTUNITY TO DO THIS IMPORTANT COLLATERAL REVIEW WORK, AND YET HE COULD HAVE!

AS FOR SCOTT PATTERSON'S PILOTING SKILLS, IN THE CONTEXT OF DR. KNIPPA'S NEUROPSYCHOLOGICAL TESTING PROTOCALS, AGAIN, DR KNIPPA DID NOT SPEAK WITH ANY OF THE PILOTS WHO FLY WITH SCOTT, HE DID NOT EXPLORE SCOTT'S PERFORMANCE IN WHAT IS A PROFOUNDLY OVERLEARNED SET OF TASKS. DR.KNIPPA HAD NOT EXAMINED ANY DATA FROM ANY FLIGHT SIMULATOR ANALYSIS, NOR DID HE HAVE DATA ABOUT SCOTT PATTERSON'S ABILITY TO FLY A VARIETY OF AIRCRAFT UNDER A VARIETY OF EVERYDAY AS WELL AS HIGHLY STRESSED WEATHER OR AIRCRAFT CIRCUMSTANCES. WHAT DR KNIPPA HAS IS A SET OF CORRELATION BASED ASSERTIONS DERIVED FROM TESTS THAT DO NOT AND CANNOT DIRECTLY MEASURE A PILOT'S FLYING KNOWLEDGE, SKILLS, OR TALENT. NOR, OF COURSE, DO THE TEST MANUFACTURES OF THESE INSTRUMENTS ASSERT THAT THEY DO. APPARENTLY NOT EVEN CAPTAIN WHITEHOUSE HAD ANYTHING TO SAY OF A NEGATIVE NATURE ABOUT FO PATTERSON'S FLYING KNOWLEDGE OR ABILITY.

I DISAGREE WITH SOME OF DR. KNIPPA'S PRESUMPTIONS, EVEN HIS CONCEPTUALIZATION ABOUT WHAT HIS VARIOUS NEUROPSYCHOLOGICAL TESTING REALLY SHOWS. AS WAS NOTED IN HIS NEUROPHOLOGICAL ASSESSMENT, DR. KNIPPA FOUND SCOTT PATTERSON TO BE FUNCTIONING WITHIN NORMAL LIMITS ON SOME OF HIS ASSESSMENT PROCEDURES AND HE SAW HIM TO BE FUNCTIONING BELOW THOSE STATISTICALLY SET LIMITS ON CERTAIN OTHERS. I WOULD PROPOSE THAT IF YOU EVALUATED EVERY PILOT WITHIN THE A.A, SYSTEM WITH THESE SAME PROTOCALS, A SIGNFICANT NUMBER OF THEM WOULD SHOW SUBSTANDARD FUNCTIONING ON AT LEAST SOME OF THESE INDICES, AND THIS WOULD BE ESPECIALLY SO AS THE SAMPLE APPROACHES AND PASSES FIFTY YEARS OF AGE. IN

51

FACT, MANY INSTRUMENTS [LIKE THE COGSCREEN-AE] ARE "NORMED" TO ACKNOWLEDGE THIS AGE RELATED REALITY.

THIS GETS US BACK TO THE CAUTION AT THE TOP OF MY REPORT, REGARDING THE VALID MEANS OF PREDICTIVE MEASURING. INTERSTINGLY, WE DO NOT USE NEUROPSYCHOLOGICAL TESTING TO SELECT AIRLINE PILOTS. AS I STATED AT THE BEGINNING OF THIS REPORT, THE BEST PREDICTOR OF AN OUTCOME OR A PERFORMANCE CANNOT BE A SECOND ORDER ESTIMATE OF THAT PERFORMANCE. YET OFTEN WE TRY TO DO EXACTLY THAT WHEN WE DO NOT OTHERWISE HAVE A MEANS OF BETTER ESTIMATING OR ESTABLISHING SUCH PERFORMANCE.

WE DO HAVE ONE PARTICULAR INDIRECT MEASURE [A VALIDATED NEUROPSYCHOLOGICAL MEASURE], CALLED THE COGSCREEN-AE, WHICH WHEN ADMINISTERED PROPERLY DOES OFFER SIGNIFICANT PREDICTIVE VALIDITY OF ACTUAL FLIGHT PERFORMANCE [BUT AGAIN, LIKE ANY SUCH INSTRUMENT, ONLY IF IT IS USED CONSISTENT WITH THE TEST ADMINISTRATION INSTRUCTIONS]. THIS TEST DOES OFFER RESULTS THAT ARE HIGHLY CORRELATED WITH BOTH SIMULATED AND ACTUAL FLIGHT PERFORMANCE. BUT WE MUST BE CAUTIOUS FOR IF WE THEN ADD A FURTHER BATTERY OF TESTS [AND THIS IS OFTEN DONE] AND YET THESE OTHER TESTS ARE NOT SO HIGHLY PREDICTIVE OF, IN THIS CASE, FLIGHT SKILLS, THE RESULTS OF THE COMBINED OVERALL ASSESSMENT MAY LEED TO COMPROMISE. THERE ARE TIMES WHEN LESS IS MORE, BUT ALLL TOO OFTEN PSYCHOLOGISTS DO NOT APPEAR TO IDENTIFY THIS REALITY.

THE BEST MEASURE OF AN OPERATION IS NOT A STASTICALLY DERIVED CORRELATE OF AN ELEMENT OF BRAIN FUNCTION, THAT MAY BE RELEVANT ONLY AS AN INFERENTIAL PREDICTOR OF THAT BEHAVIOR. AND NOT EVEN SEVERAL OR MORE OF THESE SO-CALLED COLLELATED PREDICTORS LINKED TOGETHER NECESSARILY OFFER US VALID PREDICTIVE DATA HERE. WHAT ONE NEEDS IS A MEASURE THAT VALIDLY DIRECTLY DEMONSTRATES THE FUNCTIONAL CAPACITY OF THE PERFORMANCE OF THAT SKILL OR, WHEN INTEGRATED, THE TESTING OF MULTIPLE SETS OF THE VARIOUS SKILLS [THAT COLLECTIVELY DEFINE THE PERFORMANCE].

ANOTHER APPROACH IS THE USE OF A FLIGHT SIMULATOR. BUT NOTHING CAN PREDICT FLIGHT PERFORMANCE AS WELL AS ACTUAL FLIGHT PERFORMANCE BUT THE SIMULATOR DOES A GOOD JOB. WHEN AN EXAMINEE HAS ACTUALLY CONDUCTED AN OVERLEARNED A SKILL MANY THOUSANDS OF TIMES, AND HAS DONE SO ROUTINELY WITHOUT ERROR, THE BEST PREDICTIVE MEASURE OF THAT SKILL IS SEEN IN THE LEVEL OF HIS/HER EXCELLENCE [AND THAT IS ESTABLISHED IN THE PERFORMING, THE ACTUAL EXECUTION, OF THAT SKILL, AND NOT IN A SECOND ORDER TEST THAT CORRELATES, EVEN HIGHLY, WITH THAT SKILL.

THE READER IS CAUTIONED HERE TO EXAMINE THE ARGUMENTS IN THE BEHAVIORAL SCIENCES METHODOLOGY LITERATURE RELATED TO CONCERNS IN THE TESTING LITERATURE ABOUT THE PROBLEMS OF CONSTRUCT VALIDITY [HOW WELL THE TEST MEASURES THE INTENDED CONSTRUCT] AND ALSO AROUND THE CONCEPT OF PREDICTIVE VALIDITY [THE EXTENT TO WHICH A SCORE ON A TEST OR SCALE PREDICTS PERFORMANCE ON SOME CRITERION MEASURE].

LET ME ILLUSTRATE THIS ARGUMENT IN AN ABSURDLY EXTREME MANNER, BY ANALOGY, TO MAKE THE ARGUMENT REALLY CLEAR. WE KNOW THAT STATISTICALLY, ALL PEOPLE SHOW A SLOW BUT STEADY DECLINE IN THE RAW POWER OF THEIR INTELLECTUAL, AND NEUROPSYCHOLOGICAL, AND PHYSICAL FUNCTIONING, AS THEY AGE. AND SOME PEOPLE SHOW MORE RAPID AND SOME A MUCH SLOWER SUCH DECLINE. UNTIL SHE DIED AT AGE 107 YEARS SEVERAL YEARS AGO, THERE WAS A WOMAN IN NEW YORK WHO HAD BEEN A CONCERT PIANIST UNTIL SHE RETIRED AT AGE 70. BUT THEN SHE CONTINUED PLAYING THE PIANO FOR SEVERAL HOURS DAILY, AND AT SUCH AN AMAZING STANDARD OF EXCELLENCE THAT IN HER 104 YEAR HER PLAYING SKILLS WERE FEATURED ON THE TELEVISION SHOW "60 MINUTES". IN FACT, SHE PLAYED WITH EXCEPTIONAL SKILL, ALMOST ALL THE WAY UP UNTIL THE TIME OF HER DEATH AT AGE 107. IF WE UNDERTOOK A COMPREHENSIVE NEUROPSYCHOLOGICAL EXAMINATION OF THIS WOMAN WE WOULD SEE SUBSTANTIAL INDICES OF AGE RELATED NEUROPSYCHOLOGICAL DETERIORATION. AND

52

BASED ON THESE RESULTS, WE WOULD NEVER EXPECT THAT THIS ELDERLY WOMAN WOULD BE CAPABLE OF THE SOPHISTICATED BRAIN FUNCTIONING THAT WAS IDENTIFIED IN HER PERFORMANCE. BUT WE WOULD BE WRONG! BECAUSE EVERY DAY SHE PLAYED, SHE SUSTAINED AND PRACTICED THAT UNIQUE SKILL AND ENGAGED THAT OVERLEARNING CONTINUOUSLY. THE VARIOUS FORMS OF PSYCHOLOGICAL TESTING WE USE ARE VERY IMPORTANT INDICES OF PREDICTION. BUT THESE MEASURES MOSTLY INFER STATISTICALLY LINKED CONNECTIONS THAT ARE NOT NECESSARILY OPERATIONALLY VALID. YET ALL TOO OFTEN THIS FACT IS NOT WELL UNDERSTOOD AND SADLY, SOMETIMES NOT EVEN FULLY REALIZED, EVEN BY SOME PSYCHOLOGISTS.

WHAT DR KNIPPA [OR ANY NEUROPSYCHOLOGIST] HAS PROVIDED TO A.A OR ANY OTHER CLIENT IS NOT ALWAYS "FACT" BUT OFTEN "INFERENCE" FROM THE USE OF CERTAIN PSYCHOLOGICAL TESTS, THAT IN THEMSELVES DO NOT CORRELATE WITH EACH OTHER ANYWHERE NEAR ONE HUNDRED PERCENT. MOREOVER, MANY OF THESE TESTS [EXCEPT FOR THE COGSCREEN-AEROMEDICAL EDITION] WERE NOT DEVELOPED TO PREDICT PILOTING PERFORMANCE BUT TO INFER MULTIPLE ASPECT OF BRAIN EFFICIENCY AND DYSFUNCTION. THAT IS, BRAIN FUNCTIONS THAT ARE PRESUMED TO CORRELATE WITH THE MENTAL FUNCTIONING THAT IS ASSERTED TO PREDICT IDEAL FUNCTIONING ACROSS CERTAIN DIMENSIONS. BUT AGAIN, THE MOST VALID MEASURE OF ANY PERFORMANCE IS THE DIRECT MEASUREMENT OF THAT PERFORMANCE NOT THE USE OF A TEST BATTERY THAT GIVES VARIABLE INDICES OF INDIRECT MEASURES AND COMPROMISED CORRELATES OF THE TARGET PERFORMANCE.

TO USE PSYCHOLOGICAL TESTING FOR THE SCREENING OF CANDIDATES FOR FLIGHT TRAINING AND EMPLOYMENT CAN BE HELPFUL AND IT MAKES SENSE TO EXCLUDE THOSE WHO REASONABLY CAN BE PREDICTED TO BE UNABLE TO MASTER SUCH TASKS AT AN EXPERT LEVEL, AT THE KNOWLEDGE AND SKILL REQUIRED TO FLY A COMMERCIAL AIRCRAFT. THE USE OF THE COGSCREEN-AE AND PERHAPS A PERSONALITY SCREENING TOOL MAY BE OF GREAT VALUE HERE. SURELY, NONE OF US WOULD WANT TO FLY WITH A PILOT WHO WAS MENTALLY OR BEHAVIORALLY LIMITED. YET, WE MUST BE CLEAR, THAT IN THE PERSONALITY DOMAIN, IT IS OFTEN NOT POSSIBLE TO DETECT SUCH IMPAIRMENTS FROM SIMPLY TESTING THESE SUBJECT, AND A COMPREHENSIVE EXAMINATION IS CRITICAL.

WHEN AN OTHERWISE MULTI-TALLENTED PERSON WHO HAS SHOWN GREAT MASTERY OF THE SKILL OF FLYING MANY THOUSANDS OF TIMES, IT SHOULD BE IN THE AIR THAT HIS/HER PERFORMANCE SHOULD BE BEST DETERMINED. THINK ABOUT IT! AS NOTED PREVIOUSLY, AS WE AGE EVERYONE [I REPEAT EVERYONE] SHOWS A SLOW BUT STEADY REDUCTION IN HIS/HER RAW PERFORMANCE ON BOTH INTELLECTUAL AND ON NEUROPSYCHOLOGICAL MEASURES. THIS IS JUST THE SAME AS THE REALITY THAT WE CANNOT RUN AS FAST AT AGE 50 AS WE CAN AT AGE 20. THAT IS WHY IN INTELLECTUAL AND MEMORY ASSESSMENT THE TESTS ARE SCORED NOT ONLY ON THE BASIS OF THE ANSWERS GIVEN AND THE TIMES TAKEN IN PERFORMANCE, BUT AGAINST AN AGE INTERGRATED REGRESSION CRITERION. IF WE WERE TO ADMINISTER INTELLECTUAL, MEMORY, AND NEUROPSYCHOLOGICAL TESTING TO ALL A.A PILOTS OVER THE AGE 50 WE MIGHT END UP, BASED ON THESE CRITERIA, RECOMMENDING THAT A LARGE PERCENTAGE OF THEM SHOULD BE REPLACED BY TWENTY-FIVE YEAR OLDS. YET THE EXPERIENCE AND KNOWLEDGE THAT COMES WITH THOUSANDS OF HOURS OF PRACTICE AND KNOWLEDGE SIMPLY CANNOT BE MEASURED BY NEUROPSYCHOLOGICAL TESTING. I AM NOT ARGUING AGINST THE USE OF SUCH TESTING, BUT THERE SHOULD BE A RATIONAL REASON TO USE THEM AND TO DO WHATEVER IS NECESSATY WHEN THERE IS SOME CONCERN ABOUT A PILOT'S FLIGHT SKILLS. THAT SIMPLY DID NOT HAPPEN DURING THE DR. KNIPPA EVALUATION OF FO PATTERSON.


**The Psychiatric Examination conducted by Ibrahim Abi-Rafeh M.D.**


I [Dr. Caddy] consulted with a local psychiatrist, Ibrahim Abi-Rafeh M.D., who has known Scott personally for well for over ten years in the context of the Civil Air Patrol work that

53

they both do. When all of these claims from Captain Whitehouse surfaced, Scott consulted with Dr. Ibrahim [that is, long prior to my involvement in this matter] because of the stress of the difficulties he had been facing within his employment at A.A.

Scott told me that Dr. Abi-Rafeh conducted an overall examination of him and he concluded that Scott was suffering a reactive stress state [an Adjustment matter] caused by what was really a great deal of stress occasioned by "all the out of nowhere" attacks on Scott.

I interviewed Dr. Abi-Rafeh and he told me that while he and Scott discussed the possible use of a minor tranquilizer to assist with all the work related stress Scott was experiencing, Scott decided that he did not want to be taking any medication other than natural nutritional agents that he may take to facilitate calm and sleeping [for it was Scott's sleeping that was being most compromised].

Dr. Abi-Refeh's professional opinion regarding Scott was that he was experiencing stress induced adjustment issues but that Scott was a very well adjusted and mentally strong person and that he really did not need any therapeutic support or medication.

**The Aeromedical Neurological Examination of John D. Hastings M.D.**

It was my opinion that in the context and political climate of Scott Patterson's issues in his workplace it would be appropriate for him to seek out the opinion of an extremely experienced and well-respected Aeromedical Neurologist in order to bring a neurological perspective to the issues in his case with A.A. Hence, based on my recommendation, Scott sought out and consulted with the extremely experienced Aeromedical Neurologist, John D. Hastings M.D. This consultation occurred on May 28, 2016 with Dr. Hastings at that time conducting his Independent Aeromedical Neurological Evaluation. [This examination included a history taking, a comprehensive neurological examination, and also a review of Dr. John Knippa's psychological report and conclusions].

Dr. Hastings indicates FO Patterson's history of excellent health, but for the removal of the spindle cell carcinoma from the left chest wall. He also notes Scott's use of food supplements but otherwise no use of medication. After recovery from the chest surgery, it is noted that the FA.A. Aerospace Medical Certification Division issued Scott Patterson a medical clearance and that he returned to work on June 2, 2015.

Dr. Hastings indicated that Scott showed no history of neurological insult or compromise at any point in his life. Observation of gait, motion, head and neck, ocular motion, hearing, and neck and head review, coordination, muscle strength, and a sensory examination were all unremarkable. Likewise, the Montreal Cognitive Assessment [reviews visuospacial, executive, memory, attention, language, abstraction, delayed recall, and orientation functions showed a normal 29/30 score.

54

Dr. Hastings thoroughly reviewed the report of Dr. John Knippa and his [the latter's] opinion that some test scores on test instruments were not commensurate with typical pilot normative data. From this detailed review, Dr. Hastings reported that: "I do not find evidence to suggest neurologically based impairment in neuropsychological function including personality, behavior, intellect, or memory".

Dr. Hastings concluded that: "Mr. Patterson poses no risk to aviation safety and that he is fit to fly from a neurological standpoint".  I called Dr. Hastings after his findings in Scott's matter were concluded and we had a very pleasant 30-minute discussion. Dr. Hastings and I spoke on some of the philosophical issues of assessment in these contexts and the ease of the making of the sort of errors that have characterized the findings of Dr. Knippa when a comprehensive 360-degree examination was not undertaken and also when there is such an inordinate emphasis given to the compromised predictive validity asserted for some of the neuropsychological subtests that Dr. Knippa placed such significance upon.

**The Aeromedical Neuropsychological Report of Gary G. Kay Ph.D.**

Firstly, to put Dr. Gary Kay's work within a timeline related to my work, he examined Scott Patterson over one full day in his Washington D.C. office on June 29, 2016. Scott reported to me that he had flown to Washington the day before, arrived in the mid afternoon, and that he slept well the night before getting a full night's rest.

By the time of Dr. Kay's examination I had all but completed my work in this case. In fact it was I who advised Scott to go and be further aeromedically re-examined by a man recognized as truly expert [and even often the final authority] in the Aeromedical Neuropsychology arena, Dr. Gary G. Kay. I was confident that the findings of Dr Knippa were inaccurate [compromised] and I considered it sensible to undergo this further evaluation rather than for Scott to simply rely on my work and the attendant subsequent litigation he would bring in search of his relief.

In his overview of Dr. Knippa's report, Dr. Kay noted that A.A. had made the claim to Dr. Knippa that Scott Patterson was reported to have "multiple atypical interactions with coworkers and showing a pattern of false/self-aggrandizing statements". Apparently, no other information was provided to Dr. Knippa regarding these allegations. Dr Gary Kay noted that Dr. Knippa viewed FO Patterson as somewhat lacking in the use of appropriate social distancing, but otherwise he saw him as well meaning with a pleasant mood and a courteous demeanor.

Dr. Kay noted that Dr. Knippa had compared FO Patterson on the CogScreen-AE to Regional Airline Pilot norms rather than to the age-group norms available for pilots of

55

the Major Airlines.    Clearly, this error compromises Dr. Knippa's findings on this instrument, and the opinions related thereto.

Dr. Kay noted FO Patterson to be somewhat, as Dr. Knippa had presented him, and surely too as I saw him to be. He was Prompt for his appointments, well groomed and dressed, fully alert, oriented and co-operative. He readily established good rapport, he was neither anxious nor depressed, and he sought to present himself in a favorable light. There were no signs of inattention or lack of concentration. His speech was normal in volume, rate and prosody.

On the CogScreen-AE, on measures of speed to respond, Scott Patterson functioned at the 60th percentile compared to U.S. Major Airline Pilot norms. On measures of accuracy, overall Scott functioned above the 85th percentile, as compared to those same norms. In fact, all the measures on this instrument were within the normal range for people in his field.

On the Connors Continuous Performance Test-II, all Scott's scores, with one exception, were in the expected range on this measure [of visual sustained attention]. FO Patterson was noted further to show good reaction time, sensitivity to target stimuli, and adaptability to inhibit responses to non-target. There was no other evidence on this test of a deficiency in vigilance or attention.

Likewise, on the Trail Making Test, Parts A, and B, and C, Scott also showed good performance and all within the range expected for pilots.

Dr. Kay concluded his overall findings of FO Patterson's examination as follows:

"Based upon my review of the records, including evaluations by Dr. Caddy and Dr. Knippa, along with results from testing conducted on 6/29/16, and a clinical interview, Mr. Patterson appears to be psychologically and neuropsychologically fit-for-duty as an American Airlines Pilot.

There is no evidence of aeromedically significant neurocognitive deficits. Follow-up testing with CogScreen AE and measures of attention [including vigilance] reveal normal functioning. A mild weakness was seen on one [isolated] measure of vigilance. Performance was normal on all other measures of sustained attention. I agree with Dr. Caddy that poor performance on vigilance testing when evaluated by Dr. Knippa was likely due to jet-lag related fatigue".

Finally, Dr. Kay notes that based on his review of records and his own interactions with FO Patterson, it appears that Scott may have some interpersonal characteristics, which at times may prove problematic. He writes: These appear "likely to be longstanding personality traits which have not caused significant social or occupational problems prior to the incident reported above. I see no evidence in the prior personality testing

56

conduced by Dr. Caddy and Dr. Knippa of a mental health condition that would cause Mr. Patterson to be unfit for duty, or which would be disqualifying for an Airman Medical Certificate".

## My Work in this Case

### Perspective and Overview

In my presentation of the data that I have developed and/or is presented above, including my commentary on the work of others, and in the work to be presented subsequently, I have sought to provide a detailed forensically oriented analysis along with my opinions and findings in this case. This work has been more multi-dimensional and vastly more time involved that the work of Dr. Knippa, or any other expert involved in this case. What I have sought to develop in this work is at a forensic procedural level of precise investigation, such that it represents a detailed and critical comprehensive analysis of the entire matter of FO Scott Patterson's functioning and his recent circumstances in his very unpleasant dealings with A.A.

Before proceeding, I wish to make the disclaimer that I have not participated in the two-day substance abuse training program that the F.A.A. refers to as the HIMS [Human Intervention Motivation Training Study]. While in dealing with these aviation matters HIMS course attendance provides information and perspective that is valuable, the fact is that I have more than 35 years of experiencing in dealing as an expert in the addictive behaviors field, and I also have evaluated and treated many airline employees over the years, especially given that I was the Principal Consulting Psychologist for United Airlines at their Miami Base for more than fifteen years from the late 1980's.

Ultimately, making sense of and weighing and evaluating all the data under observation, and employing a detailed investigative approach represents the most important processes to achieve a valid analysis in any case, clinical or otherwise. This is especially true when the matter is one of complexity and with many moving parts, as is true in the Scott Patterson matter.

Two Aerospace Psychologist Examiners [Dr. John Knippa and Dr. Gary G. Kay] and an Aerospace Neurologist [Dr. John D. Hastings], as noted above, have presented their various perspectives in this case. Additionally, other medical professionals have offered their perspective on the health and mental health status of Scott Patterson. Two neuropsychologically oriented examinations have been conducted and I am not intending to do any further neuropsychological assessment of Scott Patterson. I consider such work to be unnecessary and not particularly relevant at this point. Certainly, if I had done so, as I have indicated above, I would not have done so under conditions where a three-hour time zone change with jet lag and tiredness were present in the examinee [as was true but apparently not adequately considered in Dr. Knippa's examination in California]. I would also have liked to see Dr. Knippa undertake a much

57

more comprehensive analysis of the issues that emerged from the complaints of Captain Whitehouse, though in fact none of these claims rationally implied that Scott Patterson was experiencing any neuropsychological [that is, organic brain] impairment whatsoever. The reality is that Dr. Knippa was just not equipped to do, or able to do, such a detailed investigation [which if done well would actually been very helpful].

What I have done involves a vastly more detailed forensically framed and vetted cognitive behavioral and history based examination of Scott Patterson and an extensive collateral source based data analysis. Such work is routinely more comprehensive than simply the work of a clinical examiner; or in this case the limited in scope clinical and neuropsychological examination conducted by Dr. Knippa. As an example, Dr. Knippa did not seek out any knowledgeable collateral witnesses who could have offered him perspective on FO Patterson, whether that perspective is on issues of AD/HD, or on anything else. Such knowledge could have been obtained by asking questions to people who work with Scott and know of his flying skills, and others, who know Scott very well in other contexts, and know of his emotional functioning and stability. That would have been a good first step and very useful! But it was beyond the scope proposed for Scott's examination.

I will present my findings in some detail below, but as a "heads up" to what I will present in my concluding remarks, I am going to here make the point that over the history of Scott Patterson's employment with A.A. as noted above, it is my understanding that there has never been any questioning of his talent and proficiency to undertake all of the technical duties required of an A.A. pilot, not up until now. In fact, even with these various mostly disjointed and highly questionably negative remarks made almost exclusively by people who hardly know FO Patterson, it was only the opinion of Dr. Knippa, who pushed to the edge of the envelop to find some personality aberration in Scott only to finally have to back away. In fact, to the contrary, people who Scott has introduced me to at A.A, and who have known him very well and for many years, and are themselves extremely experienced commercial airline and/or Civil Aviation Pilots, all consider Scott to be an exceptionally skilled and safe pilot and an equally emotionally well balanced person.

In these various Captain Whitehouse based complaints that I have reviewed, there is no person who has stated that Scott Patterson is not a highly experienced and technically competent pilot. Moreover, the so-called "flight issues" involved in the complaint are those involved in one particular flight and do not speak to any technical inability or limitations on Scott's part to fly a commercial aircraft. In fact the central event here involved a less than a three [3] minute low-grade disagreement between Captain Whitehouse and FO Patterson regarding a bus ride, and partly in the presence of the flight crew and the Patterson family, and then a further brief [less than two or maybe three minute] unpleasant interaction between these two men on the flight back. One might be able to make an inference [as A.A. may have drawn] from all of the barrage directed a Scott Patterson from the multiple innuendo [largely solicited by Captain

58

Whitehouse] implying some personality issues within Scott Patterson, but rationally, not impairments in brain functioning.

Yet this dispute eventually would take on a life of its own, which ultimately led to the serious ramification now before Scott Patterson and also A.A. The fact is that this one trip would lead to allegations questioning Scott's emotional stability and/or judgment. These allegations also would appear to be, almost entirely, based in supposition, rumor and innuendo. My investigation simply does not lead to any data that would support a conclusion of functional or organic mental impairment in Scott Patterson. Scott's crime, it would seem was making the choice to be inadequately deferential to the agenda of Captain Whitehouse, at a bus, and then again quite straightforward in a remark to the Captain on the return leg of the same flight [regarding his desire to not be subsequently paired with the Captain].

### The Events at Asuncion that Set the Stage for Scott's Problems

FO Patterson advised me that what started off to be a potentially very pleasant experience on a trip to Asuncion, Paraguay [Scott had three weeks before the trip even called Captain Whitehouse and invited him and First Officer John Flannigan to join he and his family to go with him during the layover on a bus ride to the amazing Iguassu Falls]. But Scott was irked with the Captain and several of the crew as a result of his perspective of a brief set of their actions after they arrived in Asuncion. And then there was some unpleasant discourse, though again quite brief, between Captain Whitehouse and Scott in the cockpit towards the end of that trip [on the way back to Miami]. Scott was irked enough by the ongoing perspective and commentary by Captain Whitehouse on that return flight that he reports that he told Captain Whitehouse that he did not wish to fly any future trips with him; and that he would place Captain Whitehouse and himself on the "Do-Not-Pair list" for flights in the future.

The problems that set the stage here emerged over a three-day flight [and lay over] in Asuncion, Paraguay [during which Scott brought his wife and two young children along for the trip]. The problem started, as far as Scott knew, from a disagreement around who was going to be on the transit bus to the hotel in Asuncion. Scott reported that prior to going to the transit bus he had asked Captain Whitehouse if he could bring his wife and two children to the hotel on the bus and the Captain had agreed. But when Scott and his family arrived at the bus the crew was already on board and there was not enough seating [there was only one unused seat on the bus, and Scott proposed that his two kids would sit in a single seat and his wife and he would stand or sit on the floor].

However, several of the crew began to complain. That led to a brief discussion outside of the bus in which Captain Whitehouse told Scott that this will not work and that he and his family would have to take a taxi. The Captain even offered to pay for the taxi. However, while Scott saw the Captain's decision as unnecessary [the vehicle did not even have seat belts fitted and Scott's plan would have worked], having that discussion

59

immediately outside the bus within easy earshot of the other crew, [who were at that same time complaining about the delay in leaving] offended Scott. [Scott's upset was not so much about the decision that Captain Whitehouse made, though he considered it unnecessary, but rather by the conduct of the crew in the bus. He was also upset that the discussion between he and Captain Whitehouse on this matter was occurring within easy earshot of the crew, who were already complaining about getting going]. Scott did not like it. [Recall too that Scott is a military officer and military officers, by tradition, do not discuss sensitive matters in front of "Other Ranks"]. Scott thus got the children's two backpacks off the bus, as well as his crew bag, and his family took a taxi to the hotel. That was it.

Over the weekend Scott reported that he spent the time in Asuncion and beyond sightseeing and being with his family. The morning after the arrival FO John Flannigan spoke to Scott about the incident and apologized for not thinking to give up his seat on the bus for Scott's wife. But other than that, according to Scott, nothing of significance occurred. However, what was otherwise a minor irritant at the transit bus set the stage for a further discussion between Captain Whitehouse and FO Patterson in the cockpit on the way home and it was this discussion which led Scott to advise the Captain that he would put them both on the "do not pair list". Apparently, Captain Whitehouse had his own perspective on all of this.

Yet, this matter did not stop there, in large measure because a rumor mill developed, which in turn appears to have taken on a life of its own. Thus, Scott Patterson advised me that:

[i] On the very next flight he flew to Paraguay [that is, Flight 217 on October 16, 2014], he was speaking with a female flight attendant on the crew bus on the way to the flight. Scott had known this woman for a long time and she was working with him to Asuncion. He reported: "She advised me that some of her friends had called her to warn her about the flight they had taken last week and about FO Patterson". Scott reported that he advised this flight attendant that: "He had never had any problems before and she shouldn't expect any on this trip either".

[ii] There developed what Scott believes were rumors flying around about him such that on two occasions the United States Customs and Border Patrol searched him and the other male crew on outbound flights that he was working. That had never happened to Scott or the other men in all his years of commercial flying; and,

[iii] There were even rumors circulating of Scott smuggling weapons into South America which, Scott says, must have been the nexus of the above stated Customs contacts. In fact according to Scott Patterson, Captain Chip Harlowe, of Professional Standards, at the same time that he was "interrogating" Scott about Glenn Whitehouse [which in itself was not a friendly telephone call] asked Scott the rather bizarre question of: "Scott, are you smuggling guns into Bolivia?"

60

In fact, Scott reported to me that he was so disgusted in hearing this latest rumor [being just one more of a chain of rumors he was hearing about himself] that he contacted Captain Thomas Copeland, the Domicile Chairperson for APA in Miami. Scott said that he advised Captain Copeland that this, and all the other rumors were serious, and they had to be stopped.  Scott then asked Captain Copeland to contact Captain Chip Harlowe to determine the source of the rumors and when Copeland did just that; he reported that Captain Harlow replied that he could not remember the source.  Scott advised that for Captain Harlowe, a 757 captain, to have "amnesia over such issue" was not in his view, believable. Scott considered such a statement to be much more likely the A.P.A. [Allied Pilot's Association] covering up for Captain Whitehouse's behavior.

[iv] One of Scott's neighbors, and a friend who is also a flight instructor and serves in the Civil Air Patrol with Scott, Mr. Robert Wilson, told Scott that: "An American Airlines Captain [Matthew Romana] who he had met briefly at the Kendall-Tamiami Airport advised Mr. Wilson that: "Scott Patterson wasn't going to be with American much longer".

While Scott agrees that he was briefly upset by the actions both of Captain Whitehouse and several of the crew on the bus in Asuncion [around how the issue of his family travelling on the bus was handled], he expressed to me the view that what with FO John Flannigan [who was working on that flight to Asuncion] apologizing to him the next morning for not thinking to give up his seat on the bus to Scott's wife], he was quite happy to let the entire matter rest and for it to be a non-issue. Scott considered that none of this unpleasantness needed to have continued, but it did, on the way back, as I have indicated above.

As I will note further below, in fact I spoke to Scott's wife, Roxana Patterson, about her observations of the bus incident and of Scott's functioning then and throughout that weekend. Roxana said that she did not see what the big deal was that the flight attendants were griping about, beyond that they were tired and wanted to get to the hotel. She said that Scott too was tired and he went straight to bed when they arrived in the hotel. Scott spent the entire weekend sightseeing and having fun with his wife and their two kids. They really did not talk about it and given what they were doing they had little interaction with the Captain or the other crewmembers over that weekend.

Given the above, and even the many more claims made against FO Patterson that Captain Whitehouse has presented, I consider that these various claims fit into one of three categories: [i] the facts; [ii] the fanciful; and [iii] the impossible, [e.g. the rumor that Scott was smuggling weapons into Bolivia would seem more than fanciful and into the impossible category]. But a simple discussion with FO Patterson and the A.A, Human Resources Department or within the Allied Pilots Association Union could have eliminated almost all these issues; and left only the select dispute between Captain Whitehouse and FO Patterson to be resolved.

61

If American Airlines wanted to get to the bottom of the cause of FO Patterson's upset with Captain Whitehouse, and vice versa, and have this matter resolved, discussing the matter fully with both men and requiring both of them to a meeting to address and resolve this "dispute or personality conflict" would have made a great deal of sense. But that did not happen. Alternatively, sending them both men either to the A.A, Employee Assistance Program or to an experienced professional mediator to address their disagreements and resolve them, or agree to disagree, would have made a great deal of sense. But that also did not happen either! The "Intervention" of Captain Modrich within the Union did seem to result in a resolution, at least as far as the APA and A.A was concerned, or at least that is what Scott Patterson presumed to be the case. But that is not what happened either and the matter continued!

What appears to have happened, based on all the data, is that over a period of eleven months, Captain Whitehouse sought out and captured an array of rumor, inference, innuendo, and in the vast number of instances straight out lies about FO Patterson. This action would appear vastly more likely to be seen as arrogance and/or anger based, and a quite outrageous workplace vendetta than anything else. But even if we do not go that far, certainly, this action is not what could be seen as a well thought out fair minded workplace related action, and certainly not based on concern for a colleague. Nor was it an action of any functional integrity, in part because far from an effort to ensure a balanced reflection of concern for a fellow pilot, taken in its totality, the energy and persistence of this action, and the irresponsibility inherent in it [collecting an array of rumor and innuendo], and then presenting this manifesto to A.A., was both an incredibly wrong and equally arrogant and foolish action, very likely to result in an escalation. Which it did, but not for Captain Whitehouse!

It is one thing to dislike another co-worker, it is entirely another to seek to destroy his career by rumor. [In fact such an outrageous action should have resulted in an instant Human Resources Investigation, and a vetting of the entire matter, because at that point A.A. had no reason nor ability to know what was truth and what was fiction, nor could A.A. know the genuine motives of Captain Whitehouse [for surely he had placed himself out on a limb by this very serious action]. And yet, it appears that Captain Whitehouse received no sanctions for his extended vendetta investigation of FO Patterson.

There would appear to have been a failure within the A.A. Human Resources Department, and presumably also at higher administrative levels, in the entire handling [or non-handing] of this matter.

Without a genuinely balanced and rational investigation having taken place, the solution chosen was that Scott Patterson was ordered to California to undertake a psychological examination that focused, in large part on a neuropsychological investigation [that is, one that explores organic brain injury or other brain pathology].

62

Meanwhile, as best as I can determine from the limited perspective of a forensic examiner looking from the outside into A.A., it would seem that Captain Whitehouse's salacious claims and conduct and his apparent non-vetted vendetta directed against FO Patterson, led him to have no meaningful Human Resources or Administrative action taken against him, despite his conduct. For Scott Patterson, and a number of his supporters within A.A., this was not only a slap in the face, it was evidence of the operation of the "Captain's Protection Society" in operation.

In fact, there was no rational basis for doing such a neuropsychological examination. To investigate the issues that had occurred here should have involved, at best, a questioning and investigation of the actions of both men and then an administrative determination regarding how both would deal with any ongoing or future upsets that they may have with each other, [which should have been zero given that Scott Patterson had placed himself on a "do not fly list" with Captain Patterson. In fact, on one occasion, FO Patterson reported that he had gone out of his way on a flight where he otherwise would have come in contact with Captain Whitehouse. Human Resources also could have required both men to cease any such ongoing "noise" about the other. Meanwhile, Human Resources should have undertaken, or in the alternative, arranged the conduct of a comprehensive independent investigation of this entire serious matter. That would have been really intelligent, but it did not happen.

The fact appears to be that the basis for the problem that separated these two men, and which extended to other members of the crew during that trip to and from Asuncion, was the essential and only triggering problem. What happened later and what appears to have been largely, but not solely, created by Captain Whitehouse, involved [perhaps] some facts [but perhaps not]. But the vast amount of the Whitehouse submission involved rumor, innuendo, and noise, which took on the flavor, for some, of "a new rumor based reality".

The solution here hardly required an Independent Comprehensive Neuropsychological and Clinical Psychological Examination, which in fact, even after it was completed by Dr. Knippa, still did not result in a valid understanding of the underlying problem that existed between these two men on the ground in Asuncion or subsequently. Rather, the invalid findings of Dr. Knippa and the conclusion that flowed therefrom, and in his final recommendation, not only did this work risk destroying the career of a perfectly able pilot, it created a greater level of complexity, confusion, and added irrelevance, which was other than what actually was existent on the ground [or in the air], and it erroneously did so by a very large margin of error.

Surely, such an arrogant investigative approach by one employee of A.A., aimed to castigating, defaming, and harming a [lesser ranked] co-worker, could not possibly be considered an appropriate and approved means of filing a complaint. And yet that is exactly what has happened; and yet there appears to have been no corporate action

63

taken against Captain Whitehouse whatsoever. Surely, in a balanced fair-minded workplace, this Witch [Warlock] Hunt by Captain Whitehouse should have not been handled differently and with significant consequence.

What was done was to presume the need to explore "both a clinical and a neuropsychological explanation" for what was in fact, if anything a "software problem" [a dispute in perspective] between two men; it was not a "hardware" or "software" problem within Scott Patterson [i.e., as seen in the search for brain dysfunction]. But sadly, even Dr. John Knippa, the A.A chosen examiner, with sixteen hours of consultation under his belt in this case, did not "get" what was really occurring.

Dr. Knippa approached the problem with an inadequate understanding of much [virtually all] of the complexity but very time limited to the history between these two men [and a reticence by FO Patterson to discuss it]. And in the course of his examination, Dr. Knippa obtained virtually no detail from FO Patterson about the Whitehouse disagreement or the issues that followed. FO Patterson did not offer to detail this matter because he believed that the Section 21 Hearing had ended any claim that A.A might have had against him on these issues. Moreover, Scott had been told by the Allied Pilots Association specifically not to go into these matters again in the Dr. Knippa examination [as these matters had been settled and closed in the Union]. And so Scott simply chose not to discuss these matters. Thus, Dr. Knippa prepared a report that did not get a handle on the reason that Scott Patterson was sent to see him, nor did his report address the matters of the dispute with any detailed analysis whatsoever.

Thus, as all too often occurs, as the saying goes, "When all one has is a hammer, then everything becomes a nail". And so, ultimately, Dr. Knippa unfortunately and inaccurately, chose to establish a finding that "pathologized" Scott Patterson's functioning, both inside and outside the situation of his work dispute and indicated that Scott Patterson should not be permitted to return to his flying career with A.A.

Dr. Knippa had absolutely no objective valid evidence [none] to suggest that Scott was not an excellent pilot nor did he search out any through collateral review. In fact, had Dr. Knippa looked [searched] he would have found a great deal of evidence to the contrary. But he did not seek to look, perhaps because it was seen as being beyond the scope of his investigation. Rather, using inconsistent and mostly questionable neuropsychologically based test data, and perhaps with further related presumptions, but certainly without taking into adequate consideration the impact of jet lag on the very performances he was seeking to measure, Dr. Knippa invalidly [and I consider irresponsibly] used certain inappropriate neuropsychological date to concluded that Scott Patterson was Not Fit to Fly.

Dr. Knippa never came to an understanding of what really was the basis for the triggering of this totally unneeded search for Scott Patterson's non-existent but questioned organic brain impairment or personality pathology. Tragically, the only real

accomplishment that Dr. Knippa achieved in his persistent endeavor to find dysfunction in Scott, of either a functional or organic nature, was to risk compromising his own career and his integrity.

**Overview of My Examination Process**

In addition to my review of all of the documents listed above [and additional documents presented below], I also undertook my own comprehensive examination of the multiple issues in this case in a formal forensically focused examination of Scott Patterson.

My examination and the collateral source review undertaken therewith occurred over the course of some sixty hours of direct interviewing and testing of Scott Patterson [yes, that many], then additional time interviewing all the collateral sources I examined, and then well over that amount of time again checking data and perspective and facts as I put all of this analysis together and preparing this report.

It took this amount of time to fully undertake the investigation of this examinee, and especially so, given the complexity and all the moving parts associated with the multiple complaints and claims being presented against FO Patterson by Captain Whitehouse, and those other people who were collected by the captain. Such an amount of time was needed to learn about Scott Patterson and ultimately evaluate his perspective on all of the matters that I needed to understand to make sense of what really took place as far as Scott Patterson's thinking and functioning was concerned (and to frame this thinking in the context of Captain Whitehouse's claims and his related agenda. I spent some six hours of telephone or video contact with Scott's collateral witnesses as embarked on a comprehensive collateral source review by interviewing people across various contexts, all of whom Scott knows well. And finally, there were many hours involved in preparing this comprehensive report.

From the clinical perspective this examination involved a comprehensive history taking and the conduct of a cognitive and behavioral analysis of Scott's everyday life functioning and mentation, his personality structure, his coping systems, his family life, and his employment history and functioning [both within American Airlines, as a pilot, and concurrently within the United States Army, as a Reserve Officer at the rank of Lieutenant Colonel]. A comprehensive mental status examination was also undertaken together with the use of some selective psychological testing.

During the course of this series of examinations and the rigorous collection of collateral source data, I sought to specify the extent of any ongoing problems that Scott Patterson was [or was not] experiencing or asserting [or that others were claiming] through both clinical analysis and formal structured testing, and also through the collateral examination of others who know him well, both at home and at work, and in his various capacities and roles, and especially in his role as a First Officer with American Airlines. Thus, I spoke to all of the collateral sources noted below to take their perspectives. I

65

also read a total of about a dozen letters of support that were sent to American Airlines by Scott's friends and colleagues [see under the heading "Review of Collateral Sources"].

While I considered it critical that I have enough data regarding Scott's functioning to formulate my ultimate conclusions about what really was going on with him as far as his troubles with his employer were concerned, I looked also at possible changes in his everyday psychological functioning in response to what became another quite severe stressor, the finding in early February, 2015 of a relatively rare cancer [spindle cell carcinoma] in Scott's left breast muscle. Surgery was undertaken in mid-February, 2015 and thereafter Scott underwent a one-month treatment program. However, the matters that were raised by the complaint filed by Captain Whitehouse involved specification of an alleged array of events, or interpretations of those alleged events, that largely, though not fully, took place over a single flight to Paraguay [that occurred in October, 2014].

It was clear to me from my first meetings with Scott Patterson that he was experiencing inordinate stress both initially in, and later beyond, the workplace [because by the time I examined him he was already running out of what might be called, the funds for a "defacto medical leave"].

This stress began once Scott realized that he was being targeted for allegedly having psychological or emotional or other related "problems" in the workplace. Hence, I did some multi-dimensional clinical psychological testing. The procedures and/or the instruments used in this process included: A Mental Status Examination, the Minnesota Multiphasic Personality Inventory [2nd Edition], The Personality Assessment Inventory, the Symptom Checklist 90-R, the Incomplete Sentences Blank [Adult Form], the Presenting Problems Checklist, the Beck Depression Inventory II, the Impact of Events Scale, and the Dissociative Experiences Questionnaire.

In addition, as noted above, I consulted with a psychiatrist, Ibrahim Abi-Rafeh M.D., who has known Scott personally and well for over ten years in the context of the Civil Air Patrol work that they both do. When all of these claims surfaced, Scott consulted Dr. Ibrahim [that is, long prior to my involvement in this matter]. Scott had consulted Dr. Ibrahim because of the stress of the difficulties he had been facing with his employment at A.A, [see my comments regarding Dr. Abi-Refeh's professional opinions regarding Scott Patterson which are presented in this report].   Further, I consulted the Aeromedical Neurologist Examiner, John D. Hastings M.D., and I reviewed his findings as presented in his report in this matter. I also communicated with Dr. Hastings by telephone; and finally, I examined the report and interviewed the very experienced Aeromedical Neuropsychologist, Gary G. Kay, Ph. D following his IAME work in this case. Dr Kay conducted a comprehensive Aeromedical Neuropsychological Examination of Scott was on June 29, 2016.

The integration of the data from all these sources proved critical and ultimately offered a cohesive comprehensive perspective on multiple aspects of Scott's functioning from a clinical and statistical perspective in relationship to normative psychological data. But most critically, what came to the fore was really a description and understanding of the everyday life of this man. No such testing can supplant data reflecting precisely how this or any unique person actually functions in the context of his or her everyday life. There is uniqueness in all of us, and even to some degree in all of our circumstances. The caution is that statistical probability statements, as useful as they are, must not be seen to override what may be actually the reality on the ground; the everyday observable functional behavior of a person and the reality related thereto. It is ultimately that reality that this comprehensive analysis sought to determine; and in so doing I sought to make sense of what really had occurred in the context of, as well as the basis for, FO Patterson's present, and still also now very compromised, circumstances [until A.A. corrects their error and make it right for FO Patterson.

It became my opinion that the work of Dr. Knippa was flawed both in the limitations of the methodology and the compromises of some of the interpretations. This in turn, in my view, led Dr. Knippa to rely heavily on too may indirect measures of some of Scott Patterson's functioning and that led to an invalid interpretation and a conclusion that flies [yes, pun intended] in the face of data derived from a significantly more valuable direct [not mixed correlational] measure of Scott Patterson's functioning; namely, the data of this man's talent and ability to pilot commercial and smaller aircraft [as routinely he has done for many years]. It was those skills were re-validated by direct skill measurements in a Flight Simulator on June 13, 2015, and by the reporting of other pilots who have routinely flown with Scott over many year without accident or serious incident in the air or on the ground. [Thus, by direct observation, rather than via a mixed correlational set of indirect measures and the distorted assumptions that were linked thereto in a psychologists office in California. It is obvious from looking at all the effort that Dr. Knippa made to find and infer something wrong with Scott's personality functioning that he was trying too hard only to not quite be able to get there, while nevertheless leaving a trail of inference.

**Overview of Documents Reviewed**

Presented generally in date order, I reviewed the following documents:

[1] Scott Patterson's Flight Instructor's Certificate with a [relatively rare] Gold Seal [issued by the FAA]

[2] The Allied Pilots Association Professional Standards Manual and the related Code of Conduct

[3] A partially redacted complaint document addressed to Captain Brian Beach, American Airlines Chief Pilot, MIA, and dated September 24, 2015. American Airlines Captain Glenn Whitehouse apparently drafted the document [though again the name on the copy I have is redacted]. The draft complaint is directed against First Officer Rodney

67

"Scott" Patterson and contains a number of redacted statements. The essential claim made in this document [or actually package of documents] is that <u>Captain Whitehouse believes that he has been the target of workplace harassment by First Officer Scott Patterson over the past year, and he is seeking formal corporate Human Resources action to resolve the matter</u>. The author of the document notes that the document "is a rewritten statement of facts and opinions I wrote after my trip on October 7, 2015 for APA Professional Standards".

The so-called "Whitehouse" document makes a number of claims or assertions some of which would seem to be first hand in nature. But there also appear numerous claims or assertions or beliefs that go far beyond first hand, to hearsay to perhaps even hearsay upon hearsay, over events that are alleged to have happened, or are being questioned, most of these alleged events or circumstances or perspectives being claimed to have been identified over the year or so prior to the Whitehouse "complaint" being filed.

The apparent first hand elements all appear to have dealt with alleged events related to a single flight, a flight that had a crew of three, the Captain being Glenn Whitehouse, the First Officer B being Scott Patterson, and the third crewmember being First Officer John Flannigan. It is unclear from the documents I reviewed if Officer Flannigan has any involvement in any of this correspondence [in fact it appears not], nor anything else, or just what knowledge FO Flannigan has of any of this, if any. [Later it would become clear that FO Flannigan did not have anything to do with the development of this package of complaints against FO Patterson, and similarly, he had very little knowledge of almost all of it, beyond his specific knowledge as described later in this report].

In the beginning section of the document, apparently written by Captain Whitehouse, there are also stories, about Scott Patterson owning a Sabre jet and flying government missions on the side and other matters that seem fanciful.

[In reviewing the documents in that package I have listed them below as 4, then 4A, 4B, 4C, etcetera].

[4] In the package [of 3 above] were also notes written by Captain Whitehouse and other perhaps solicited by him.

These attached notes include statements and/or inferences about FO Patterson doing inappropriate behaviors that would seem extremely bizarre, if true: like telling customs at VVI to do a very detailed search of a crew member the next day. Another letter inferred of Scott Patterson that: "he is threatening me and the entire crew with termination because there was not room on the hotel van and I made him take a taxi" and "that this might have provoked the actions of the local Customs Officials in their handling of a situation". Such a comment, and the others, if true, is clearly of significant concern. Yet these statements seem more than just a little drama filled, and certainly the alleged prospective action never materialized.

68

[4A] Another note from Captain Whitehouse indicated that: "One of the Santa Cruz employees told me that First Officer Patterson is smuggling Police hardware for the narcotics officers. He also heard that Patterson brought in firearms". It would seem that at this point these statements appear beyond drama, and may be moving towards the criminal, or perhaps the absurd.

[4B] There was a letter [or note] in the package that indicated that the unknown author felt that First Officer Patterson was attempting to intimidate him; and elsewhere, that Patterson "was going to have his buddies in the NSA and CIA fuck up my life".

[4C] There is also a report in the package of an unsolicited call from [redacted] who was claiming to be a law enforcement officer who reported attending the police academy with Scott Patterson. "This man was calling me because he was genuinely concerned about my personal safety"…"and "in the light of the work place shootings in Virginia, he was concerned that Scott was capable of this type of behavior".

[4D] There are also other letters in this package: one is from an a Pilot who missed a plane and alleges that "he began chatting with FO Patterson who also was waiting for a flight and in the course of a few minutes Patterson told him about the actions of a certain Captain and that he [Patterson] was going to get this guy, file a suit, get attorneys, and "make his life miserable" and "get the guy fired". The total conversation apparently lasted less than three minutes and he [Patterson] was claimed to be "raging out of the blue with a total stranger"…And further: "While he did not threaten any physical violence I thought his comments were way out of line" [unidentified observer whose perspective was presented in the Patterson complaint document].

[This examiner would consider that such incidental banter, if it occurred, even without identifying anyone, to be not appropriately professional in any workplace. Patterson's daughter was with him the entire time on this occasion, and the above complainant also mentions he had his own story to tell of how he was harassed by the TSA at the E Concourse Check Point.  It would seem that the reporter's short time frame [less than three minutes] puts his statement in the questionable and maybe even fanciful domain].

[4E] There is a letter in the package by a crewmember who claims to have flown into Asuncion the day after the van incident involving FO Patterson, and this crewperson's "only second hand information" includes the following: "I got various versions of what happened the day before and ….my impression was that FO Patterson was over-reacting, and if need be, all could be resolved by professional standards".

[4F] Captain Whitehouse alleges that Scott Patterson had used the "N" word and that he was also "on a fishing expedition looking to dig up dirt to get me fired".

[Scott Patterson denies this assertion saying that there is no evidence whatsoever that

69

Captain Whitehouse can possibly point to in support such a contention. In fact, Patterson finds this assertion of his use of the "N" word to be offensive to him. Moreover, when Scott was with Mesa Airlines, Scott says that he was involved in the recruitment there of a number of African-American Pilots. Moreover, he and his wife have even adopted a young Haitian boy [John Guerier]. Patterson does acknowledge that from the date of the Asuncion flight on he wanted nothing to do with Captain Whitehouse, and that he told various friends about his encounters with Captain Whitehouse on that trip, and just what he thought of Whitehouse. But that was it].

[4G] There is an email in the package dated July 24, 2015 and apparently written by Captain McGinn [who is a Member of APA National Professional Standards Committee], saying [apparently about Scott Patterson] that: "…without getting into the weeds I told him that this has to stop and that you guys need to both move on and act like adults". Captain Whitehouse is the recipient of this email and he responded by asserting that: "I have been above level here. Patterson has had this talk and been counseled before with professional standards and continues to engage. It is Patterson who needs to grow up".

[5] Moving on from what was in the so-called package of statements or documents, there is a statement dated October 29, 2015. FO John Flannigan prepared this written statement regarding his perspective on the events of A.A. Flight 217 on October 7, 2015 [which he flew with Captain Whitehouse and FO Scott Patterson, and which became the focus of so much of what has happened, or did not happen, then and subsequently].

FO Flannigan's statement reads as follows: "I was interviewed today by Ana Burke-Leon of A.A, Human Resources regarding a trip I flew with FO Scott Patterson about ten months ago. The only specific incidents out of the norm with Scott that I recall from that trip were an issue trying to get his family on the van to the hotel, and regarding the paperwork when we arrived at the airport for departure. In both cases, what was a minor inconvenience was initially met with a stressed response by FO Patterson, but was eventually resolved without any further incident. I was also asked if I ever heard Scott refer to any individual as a "faggot" or "nigger". I have no recollection of him saying anything like that. I find those terms sufficiently offensive that I would be sure to have recalled such a comment, and my negative response to any individual using such vulgar language.

[6] I [Dr. Caddy] was advised by FO Patterson that on November 23, 2015 [although there are no record data presently available to me regarding this event], that there was held what the American Allied Pilots Association refers to as a Section 21 Hearing. This hearing was chaired by American Human Resources Investigator, Anna Burk-Leon. Present in the meeting on behalf of the company was Captain Brian Beach [Chief Pilot, MIA] and on behalf of FO Scott Patterson were Captain Mark Modrich and Captain Danny Shellhouse. The outcome of the hearing was a really an innocuous entry into FO Patterson's "Personnel Employee History".

70

[And that hearing was, Scott presumed, to be the end of the matter, in accordance with the rules under Section 21 of the <u>Joint Collective Bargaining Agreement</u> between American Airlines and the Allied Pilots Association].

[7] On December 14, 2015 FO Scott Patterson followed up from the meeting of November 22, 2015 and he wrote a 2-page letter "pursuant to A.A's Instructions from Ms. Ana Burke-Leon, Senior Specialist Investigations, HR Partners, American Airlines Inc. at DFW Airport.

While the letter addresses various matters [e.g. the difference between a deviation and a diversion, acknowledging that he did address the issue of crews removing liquor and drinking with CA Whitehouse pursuant to FM PT 1, and finding an A.A market bag with food in it at his hotel room door on the October 9, 2014 5 at 3am [that had been removed from the airplane, and reporting this to CA Whitehouse as he believed it to be a violation of Paraguay Customs Regulations and A.A Policy], the bulk of the letter is basically a <u>denial of any wrongdoing, and a denial also that he has conducted himself in an "erratic, explosive or unprofessional manner</u>".

As for the situation with Captain Whitehouse, the above noted letter goes on to state: "I have avoided CA Whitehouse and placed him on my do not pair list. I was scheduled to fly nonrevenue to Wisconsin for an air show. When I learned that CA Whitehouse was on the aircraft, I delayed my plans for six hours to avoid him."

Finally in ending the letter FO Patterson states: "The events that serve as the basis for the complaint are a year-old. If in fact I had behaved in that manner, then a reasonable person would have reported them [especially the N-word allegation] to management immediately. I'm sorry that this investigation must be conducted and I take full responsibility for my actions. I have not breached any company rule or the allegation as asserted. I will continue to take steps to further myself from CA Whitehouse. I trust this will resolve this issue."

[8] What followed however was not the end of this matter but a letter dated January 14, 2016 written by Captain Brian Beach, Chief Pilot, MIA. This letter indicated that Scott was being required to undertake a <u>Fitness for Duty Medical Examination</u> pursuant to the A.A–APA labor agreement and "<u>Based on this officers concerns about FO Patterson's judgment and specifically his mental and/or emotional stability</u>".

The letter continues: "This office has received multiple reports of atypical interactions with coworkers and reports that suggest a pattern of false self-aggrandizing statements. Based on the information above, I removed First Officer Patterson from active duty and placed him on a paid withhold status on September 24, 2015. [That is, although the Section 21 Hearing presumably addressed the matters of the Whitehouse complaint, American Airlines were not satisfied and so they now wanted Scott Patterson examined on mental health grounds]. Thus, Captain Whitehouse's various inferences were

71

continuing to be given credibility within A.A.

[9] There is an email that was sent from A.A Chief Pilot {Miami} Brian Beach to Rodney Patterson dated February 1, 2016 [1147 hours] Subject: <u>PEH entry for HR hearing</u>. The text of the email was as follows: "On November 23, 2015, a section 21 Hearing was held as a result of a work environment complaint. I have reminded FO Patterson of the company's work environment policy. I also informed him that it is important to maintain good working relationships with his coworkers. FO Patterson has received a copy of this PEH and is aware of his right for rebuttal" There is no other recipient copied on this email.

[10] Next in the document timeline came the release of the s-called: "Independent Neuropsychological Aeromedical Assessment Fitness for Duty Report" prepared by John Knippa, Ph.D., ABN, and dated March 21, 2016. I [Dr. Caddy] thoroughly reviewed this document and asked Scott Patterson about numerous aspects of this report and the circumstances surrounding it.

One aspect of my interrogation of Scott regarding his examination by Dr. Knippa [that I particularly focused] on was to seek any details about any intentional withholding or unwillingness to address anything that Dr. Knippa attempted to explore in the two-day examination. I was interested in this particular matter because it was clear from the report that Dr. Knippa had paid very little attention to, or he had failed to get much information about, what was obviously the principal reason that the company was so interested in having Scott psychologically evaluated [namely, the claims made or inferred in the "Whitehouse" documents that implied that there was something wrong with Scott Patterson's mental functioning].

Dr. Knippa's report indicates that he enquired into FO Patterson's understanding of the reasons why he was sent to undergo the examination. On page 1 of Dr. Knippa's report it is stated that FO Patterson offered two possible explanations of why he was sent to Dr. Knippa: [1] involved the problem about how his military leave was mishandled; and [2] was Scott's thoughts about the impact of his recent diagnosis of "carcinoma".

As for the claims made against Scott Patterson by Captain Whitehouse and thereafter by American Airlines, as noted on page 2, paragraph 2 of the report, this matter is mentioned only briefly by Scott but as Dr. Knippa noted in that paragraph, "Mr. Patterson was asked repeatedly about specifics to these complaints, offering none. He noted repeatedly that this matter was determined to have been "unfounded"…"Those issues are closed. It's a closed matter".

While it is clear that Dr. Knippa attempted to engage Scott in a greater discussion of these issues he was, bluntly, completely unsuccessful. The bottom line is that there was no presentation whatsoever in Dr. Knippa's report about his understanding of the company's reason for sending FO Patterson to this examination.

72

As for Scott Patterson, I asked him why he chose not to discuss the entire history of his perceptions of the Whitehouse matter with Dr. Knippa. His answer was simple: The claims that were filed against him he considered invalid, even absurd and offensive, and he had already been cleared on these issues by the Section 21 Hearing, which he considered had thoroughly investigated the claims made by Captain Whitehouse. Moreover, he was advised [under threat of termination] not to discuss these matters any further, with anyone, and so he did not.

[Understand, of course, that given all that Scott Patterson had been through in his dealings with American Airlines by this time, he wanted all these matters about his alleged "conduct" to be over and done with. As he saw it, and his perception was neither unreasonable nor irrational, after many years of dedicated and highly competent service in the airline industry [and to the military, and at a senior rank] with never a problem or a questioning of his mental status, suddenly a year after an event that Scott considered upsetting but insignificant, he had had to deal with what he considered "the absurdity of the Whitehouse package".

FO Patterson told this examiner [Dr. Caddy] that he considered the "Whitehouse package to contain statements and stories that ranged between distortions to straight out lies. Scott had undergone an investigation and had been cleared of any wrongdoing in the Section 21 hearing. He had just resolved a serious cancer scare, and no body at A.A. apparently had considered questioning or investigating Captain Whitehouse's rationality or judgment in this matter. Yet now Scott was being required by the company to go across the country to be evaluated by Dr. Knippa for two days and do testing, while his circadian rhythm was three hours out of synchrony]. [By the way, there is also more than a half a dozen FAA approved clinical neuropsychologists in the South Florida Region who could have examined FO Patterson in his time zone]. And finally, there were the warnings of a number of Scott's co-workers in the company about not trusting the American Airlines selected examiner. To say that Scott was distrusting of the company and of their chosen examiner by this time, was not to make an understatement by this point in time].

So, it is hardly surprising that FO Patterson was not going to talk further about claims that had greatly upset him and that had already been investigated in the A.P.A. hearing and done. As I have often stated, all human behavior, even the most bizarre behavior, makes perfect sense, if only one can come to understand the dynamics driving it.

So, as far as FO Patterson was concerned, if the purpose of this examination was to determine his mental competence it was going to have to be done outside the context of a single unpleasant event that in his mind had already been investigated and resolved. Thus, it would seem that if Scott were to be viewed as having any "mental illness" Dr. Knippa would have to look beyond the Whitehouse assertions and find that "mental illness" for himself.

73

[11] On April 11, 2016 this examiner [Dr. Caddy] sent a HIPAA compliant Release of Records Request to Dr. Knippa to obtain a copy of his entire file on Scott Patterson.

[12] On April 12, 2016 Dr. Knippa responded to this [above] request with a response that stated, in part, that: "…the service was performed only upon his verbal and written agreement specifically that Mr. Patterson would not request reporting from this office and that no doctor patient service was rendered".

[13] On April 13, 2016 I responded to Dr. Knippa advising him that I was seeking all of the records, his entire clinical file [including the testing records that in accordance with professional protocol he is not permitted to forward to American Airlines]. I again made a request for a copy of the entire file and advised Dr. Knippa that his refusal to release the records was "a violation of his professional responsibility and ethics" and I advised him to consult with the American Psychological Association Insurance Trust [a malpractice insurance entity] and see what they have to say about the position he has taken on this matter. I also asked Dr. Knippa rhetorically, if he intended to respond to a Subpoena for Records in the same manner. [The issue here of course is that my review of these records [was] is of substantial significance to my work and I am professionally entitled to them and if this matter ends up in litigation, of course I will be given these data upon subpoena power].

[14] I have reviewed a six page American Airlines document dated January 30, 2015 entitled "Section 21: Discipline, Grievances, Hearings, and Appeals" of the Joint Collective Bargain Agreement between the Allied Pilots Association and American Airlines.

[15] I have reviewed the Joint Collective Bargaining Agreement, American Airlines document entitled "Section 20 Physical Examinations". The document reads, in part, as follows:

A. The purpose and object of any Company physical examination for a pilot shall be to diagnose the true and actual physical condition of the pilot, and the pilot or his duly designated personal physician will be furnished with an exact duplicate copy of all medical examiner's reports affecting him.

B. Physical standards for Company physical examinations will be those that are set for in the FAA Regulations as being required to maintain a First-Class FA.A, Medical Certificate with statements of demonstrated ability for airline pilots. The Company shall determine physical examination procedures.

C. Any information obtained by, or as a result of, a Company physical examination shall be strictly confidential between the Company, the Company's doctor, and the pilot, and shall not be devolved to any other person without the written permission of the pilot.

74

[It is an issue for Scott Patterson that Dr. John Knippa provided a copy of his examination results and report on Scott to Dr. Gary Kay without Scott's knowledge or authority. Scott did not so much mind that Dr. Kay should be provided with Dr. Knippa's reports and his test results. He objected to this happening without his formal approval and written authority].

D. A pilot shall not be required to submit to any physical examination in excess of two [2] in any 12 month period without the pilot's consent, unless it is the Company's opinion that his health or physical condition is appreciably impaired, in which case the following procedures shall apply: [and the documents then presents the procedures to be followed, which includes the pilot's right to hire a doctor of his choosing, may, within thirty days, at his option, have a review of his case and the document goes on to list the procedures and terms to be followed in such an instance].

[16] I have also reviewed letters of reference and support for FO Scott Patterson, only some of which are included below. The significance of the array [diversity] of the people and the relationships of those who are supporting FO Patterson is significant because the essential claims being made by Captain Whitehouse regarding FO Patterson are not that he lacks the technical skill and knowledge to function as a pilot, but that there is something that is interpersonally or mentally impaired in his personality functioning.

Against that claim include a variety of people who know Scott Patterson very well, within American Airlines, and outside it in his military, and also in his everyday life. The following people, among others, wrote letters to the Company on behalf of FO Patterson and I have also interviewed additional people who know him in various other walks of life, including his wife. In one way or another these observations, many of them made by people who know Scott Patterson really well, not only support him, but their perspectives must be seen to raise questions about the legitimacy of any of the claims or inferences being made against FO Patterson, beyond the fact that Captain Whitehouse and FO Patterson simply had an unfortunate run in and that conflict subsequently took on a life of its own in the eyes of Captain Whitehouse.

Immediately below are a listing of the people who wrote letters on behalf of Scott Patterson and a summary of the contents of these letters. These letters reflect on the experience of the authors with Scott, his personality and other attributes. These opinions stand in stark contrast with the perspective and claims that have been made by Captain Glenn Whitehouse, and others who he has garnered, subsequent to a limited, though obviously mutually unpleasant first hand experience which Captain Whitehouse had with FO Patterson shared. [Later, in the section dealing with my own examination of Scott Patterson, I will also report the observations of a number of collateral sources, all of whom I interviewed in the course of my work in this case.  Endorsing letters were reviewed from:

[16 A] **Captain David Bridges**, an African-American Pilot who flies a B747-400 for Kalita

75

Air [has known Scott since 1999, and considers Scott as always interested in his fellow man and mentoring junior officers]. Bridges met Scott Patterson through the Professional Pilot Development Program of the Organization of Black Airline Pilots [now The Organization of Black Aerospace Professionals]. "He invited me to Parkesburg and even sent me an airline ticket on US Airways so I could get to the interview. I met him at the airport following the flight and he invited me out to dinner. Little did I suspect I was actually being interviewed for a job at Air Midwest [Mesa Airlines]. Following dinner he asked me if I would like to take a written test and I passed the test with flying colors. Following the test he informed that I was successful and that Air Midwest would be tendering me an offer of employment. After being stigmatized by a check airman, Patterson really brought my faith up in the industry and people in general. Had it not been for his concern and willingness to listen, I probably would have had difficulties finding work as an airline pilot. Once I finished training with Air Midwest, I had a number of opportunities to interact with Scott on a professional level as well as socially outside. He was genuinely concerned for his fellow man and always mentored the junior first offices, who would later become captains. Six months later I upgraded to Captain on the 1900. Patterson saw the value I brought to the company and based on his diversity efforts we were able to bring many OBAP members to Air Midwest". Captain Bridges went on to say: "I am grateful to have known Scott Patterson these many years. He is an esteemed colleague and a genuine person. I place complete confidence in his piloting skills and abilities".

[16 B] **Patrick Casimir**, Operational Supervisor at MIA, [who knows Scott and was very impressed with him, especially in his work after the tragedy of the earthquake in Haiti];

[16 C] **William J. Nealey, Sr**., Associate Director, Mission to Haiti [who knows Scott in his military role for the work he did during the disaster of the earthquake in Haiti];

[16 D] **Michael Desousa**, American Airlines Captain, A320 [has flown with Scott and considers him a very competent pilot and always very courteous and polite to all people];

[16 E] **Robert "Bobby" Burgess**, American Airlines Captain [considers Scott a very competent pilot, caring and professional, a true gentleman];

[16 F] **Terri Eisenberg**, American Airlines Captain, 767, International [has flown with Scott and considers him very competent];

Significantly, in Captain Whitehouse's complaint, he alleges that FO Scott Patterson diverted an aircraft without the permission of the Captain. It was Captain Eisenberg who was the Captain of record on this particular flight that diverted to Santa Cruz, Bolivia. Captain Eisenberg stated that he made the decision to divert and not FO Patterson.

[16 G] **Robert C. Gaylord**, American Airlines Captain, 767 [has flown with Scott and

76

considers him very competent and professional];

[16 H] **Mark Redelsheimer**, American Airlines Captain, B767 [has flown with Scott and considers him very competent, and always has kind words for the agents, mechanics, and ground crew alike. Never seen him place his needs above those of the other crew];

[16 I] **Keith T. Allison** is a resident of Pembroke Pines, who has known Scott and his family for over 15 years. Scott serves on the Board of Directors as President of their Home Owners Association. Mr. Alison is in the gay lifestyle and he wrote about how Scott "accepted us and worked to build a consensus and improve our way of life" at a time when "many in the community would ostracize gay and lesbian people";

[16 J] **Captain Robert Swanson**, American Airlines. [Captain Swanson wrote that: "First Officer Patterson is a pleasant crew member and very proficient in his job. He shows up for work on time and performs his duties in accordance with FM PT 1 and the 767 Operating Manual. I've observed him in a number of situations both in and out of the cockpit. He is a proficient and courteous employee to crew and customers. I hold him in the highest regard. When it is his turn I have no doubt he will make a great captain for American".

Captain Swanson went on to say further that: "On or about July 18, 2015 I was the Captain of A.A 922 from Miami to La Paz. In 28 years at American, Customs and Border Protection have never subjected me to a search on an outbound leg. However, First Officer Patterson and I were subject to an unusually extensive and far ranging search of our belongings. We also noted American Airlines corporate security on the jet bridge during the search. The First Officer, a female, later advised us that she was not searched, as they were looking for a male subject. I questioned the crew and they advised that customs also searched them in view of the passengers on the aircraft. CBP [Customs and Boarder Protection] was banging on the cockpit door with passengers looking and advised the flight attendants we were hiding from them in the cockpit. This unwanted and malicious search delayed our flight and inconvenienced the passengers for well over an hour. This certainly did not lend a positive experience to the passengers who watched custom search us and then walk away disappointed they did not get their man. I have a good deal of contact with the station personnel in Bolivia, and I have never once heard them complain about first officer Patterson's behavior or make such ludicrous accusations about him. Further we have never heard any reports of the police in Bolivia threatening our personnel. I have also had the opportunity to meet his acquaintances in Bolivia. They are upstanding citizens of Santa Cruz. American is held in highest regards in this small city. I'm totally confident that if there were something negative about my crew they would tell me. In this case, I was personally embarrassed and harassed by the Company and Customs and Border Protection over a completely baseless issue, which apparently originated by false information within American Airlines".

77

[This examiner, Dr. Caddy, as well as reviewing the above letter from Captain Swanson also interviewed Captain Swanson to further take his perspective on FO Patterson's present difficulties]

[16 K**] Guy Dalton "Danny" Shellhouse** has been an American Airlines Captain for some 25 years and he flies both the 757s and 767s. He reports he flies a lot [often 21 to 26 days a month] and his total hours flying time is around 27,000 hours. Captain Shellhouse knows FO Patterson "relatively well" given the number of times they have flown together [he estimates 10 to 12 times over the years] and certainly they have had dinners together while on layovers. But he does not have a relationship with Scott outside the workplace. When Danny found out that Scott was going through a Section 21 Hearing, he volunteered [actually, he said, a personal friend asked him to step in to help Scott] and so he was assigned as the APA Representative appointed to represent FO Patterson at the so-called Section 21 Hearing. [At that hearing was also the American Airlines Ana Burke-Leon and their Chief Pilot in Miami, Captain Brian Beach].

Captain Shellhouse offered Dr. Caddy the following perspective on Scott Patterson:

"Scott is a very skilled pilot and an excellent co-pilot. I do not have to sit and keep an eye on him. He is very accomplished". Danny said that he did not know Glenn Whitehouse prior to the hearing. He also said that after he agreed to become involved in Scott's representation and he reviewed all the documents that were available, and he did some of his own research, it became clear to him that the complaint raised more questions than the hearing could even begin to answer. He further stated that it was equally clear that if the company was really interested in getting to the bottom of all this, they should have been investigating Captain Whitehouse. He went on to assert that from the outset he saw many holes in the Complaint and that Ana Burke-Leon had made no effort whatsoever to interview anyone or investigate anything".

Danny Shellhouse is clearly a no-nonsense person and he appears not to tolerate incompetence or dishonest work politics. He made it clear that he has seen way too much politics and incompetence at American Airlines over the years and he does not mind being blunt about it. About the claims being made about Scott Patterson he said: "They were mostly based on hearsay and when you start drilling down as I did, by speaking to other Captains, it all falls apart. I felt Scott was being railroaded".

Captain Shellhouse told this examiner that: "Brian Beach told me that they did not have enough evidence to send Scott to a Section 20 Hearing but they did it anyway. The idea is to force him out on disability and then, when they can, terminate him". [A Section 20 Hearing involves sending a pilot to a physician of the company's choosing for a "Physical Examination". Captain Shellhouse has also argued that sending Scott Patterson to a mental examination by a Clinical and Neuropsychologist is not consistent with the language laid down in the APA Contract].   Captain Shellhouse went on to say that: "Unfortunately, as all too often occurs, the events that have taken place here have

78

already actually compromised the reputation of First Officer Patterson in ways that have proved quite distressing for him, in part because what has happened is even known to people who he does not know who have been caught up, one way or another, in this very unpleasant matter. There now exists, to at least some extent, a rumor mill that is compromising to Scott Patterson's reputation within American Airlines and beyond".

NOTE: This matter of having pilot's go out on "disability" has come up on a number of occasions in my discussions with Scott Patterson and with others beyond Captain Shellhouse, with the implication that this occurs with some frequency. If a pilot is impaired and legitimately "temporarily or permanently disabled", then the exercising of one's rights under a disability insurance policy is entirely appropriate. But if the pilot is not legitimately disabled, then any attempt to use such a strategy involves insurance fraud.

[16 L] This matter is illustrated in the Affidavit of a civilian Flight Instructor and Civil Air Patrol Officer, **Robert G. "Bob" Wilson**. This Affidavit, dated November 20, 2015, tells of a conversation Mr. Wilson had with Mr. Matthew Romano at the Miami Executive Airport concerning Scott Patterson. In the course of this conversation it seems that Mr. Romano told Mr. Wilson that he flew for American Airlines to which Mr. Wilson responded that: "My next door neighbor flew for American. He asked: Who? I replied Scott Patterson, to which he said, "Oh, he may not be with us much longer".... What struck me as odd about this conversation what inside information did he have and what was his motive to disclose it to a total stranger whose probable alliance was with his neighbor? I have known Mr. Patterson to be an honest person for over nine years and he is a respected pilot the aviation community. I said nothing to Mr. Patterson about this until he told me about a flight he had with American which involve the US Customs and Border Protection."

### Medical Specialties Record Reviews

I reviewed the Federal Aviation Administration Airman Medical Records of Rodney Scott Patterson from the United States Department of Transportation, Federal Aviation Administration. These records are for the period September 29, 1989 to Jan 31, 2016. These records indicate that FO Patterson was in good health throughout the period.

**Martin Dayton D.O.** is Scott's physician. On March 31, 2015 Dr. Dayton wrote a note entitled "Rodney Patterson: Status Fitness for Duty". The note stated: "Mr. Patterson had a resection of a malignant tumor on February 27, 2015. He has been receiving medical care since. Such care does not adversely affect cognitive, mental or physical performance. He is able to fly as a commercial airline pilot without restrictions. He appears to be in clinical remission.

On November 20, 2015 Dr. Dayton wrote another note and asserted that following regular visits for follow up care "he continues to be in complete clinical remission"

79

On January 12, 2016 Dr. Dayton generated a further note regarding Scott's health status subsequent to his cancer surgery and advised that: [1] on physical examination no evidence of any malignant process is evident and an MRI on September 25, 2015 reveals no malignant process.

I reviewed the Neuropsychological Aeromedical Assessment Fitness for Duty Report on Scott Patterson dated March 21, 2016, and conducted by **John Knippa Ph.D., ABN**. [I have made an authorized requested to Dr. Knippa for these records but he has declined to provide the records to me].

I have also reviewed the report of the Independent Neurological Examination of **John D. Hastings M.D.**, dated May 28, 2016. And I have also spoken with Dr. Hastings about his findings in this case and what he sees as some of the shortfall that he considers to be significant in how Scott Patterson has been dealt with as far as the referral to Dr. Knippa was concerned, and the discrepancy between his findings and conclusions and those of Dr. Knippa.

Finally, while I have not reviewed the medical record of Ibrahim Abi-Rafeh M.D., the psychiatrist who Scott first consulted regarding the stress he was under because of the Whitehouse accusations, I nevertheless did speak with Dr. Abi-Rafeh in detail and I have presented his opinions on this entire matter elsewhere [see page 47].

### Review of Collateral Sources

In any comprehensive psychological examination, where the issue of a person's mental status and health is in question, and where the establishment of the facts around certain circumstances is critical, inevitably the examination should involve taking perspective on the examinee from collateral sources who know that person well, and from different perspectives. Commonly too, a review of as much record data as are available also is very important. It is significant that Dr. John Knippa attempted no such comprehensive undertaking in his independent aeromedical examination of Scott [at Coast psychiatric Associates in Long Beach California].

Below are the observations I have been given through the eyes of the various collateral sources I have contacted as a result of their names and contact details being provided me to me by Scott Patterson.  [In fact, Scott provided me with a number of additional names, but I did not consider it necessary to interview all of these people]. And of course, above I have listed information/perspective on Scott Patterson that was provided by about a dozen people who wrote letters of support of Scott that were sent to American Airlines. A copy of each of these letters is attached in Appendix A to this report. The people I spoke to and the perspective they offered me is presented as follows:

**Philip Bailey**

80

Mr. Philip Bailey lives in Charlotte, North Carolina. He reports that he has known Scott since Scott was 12 years of age and they have kept in contact through to the present time. Mr. Bailey first met Scott as a result of him being a mentor in the big Brothers Big Sisters program. Philip reported that Scott's parents were divorced and he was living with his grandmother at the time and she it was she thought that it would be good for Scott to be involved with a "big brother". Thus, what started off as a big brother or mentor relationship morphed into a friendship as Scott matured into adulthood and that friendship has continued through to the present time. It is Scott's view as expressed to this examiner that perhaps Philip Bailey knows him better than almost any other person alive, with the exception of his immediate family.

Mr. Bailey is now 63-years-old and a financial advisor. He reports that these days he and Scott keep in touch every month or two and that over the years they have often visited each other and that they routinely maintain close personal contact. Mr. Bailey considers Scott to be a very stable and emotionally well-balanced person. He considers Scott to be thoughtful and very analytical and he has: "substantial brainpower and his intelligence is pliable and across many areas".

Philip says that he has never seen anything that would cause him to view Scott in any way that was other than highly stable. "Scott is more a thinker than an emotional actor". He regards Scott as "a great guy and one with a great love of life". "He is has two kids, is a good provider and he is a great role model and extremely honest…very straightforward". As for Scott's wife, Roxana, and the mother of their two children, Philip regards her as a wonderful wife and mother.

"As Scott grew up he was a very normal boy and his grandmother had him very well grounded in church and in honesty and integrity". Philip makes the point that he "has never seen Scott take a drink of alcohol… and he is very much against drugs and cigarettes". Philip also says of Scott "that he is an extremely energetic person".

**Captain Brian Vitale**

Brian Vitale is a 55-year-old American Airlines pilot who presently flies an Airbus A320. He lives in Cape Coral, Florida with his wife. He is also a retired United States Army Warrant Officer. Brian says that Scott and he became friends because Brian and he worked together on the Military Affairs Committee that Brian spearheaded [as Base Administrator for the Miami local]. Brian also said that it was his impression that Scott Patterson was still on the National Military Affairs Committee, though he is not sure that this is still the case. Moreover, Captain Vitale told me that when he was running for the Vice Chairperson role at the Miami domicile of the Allied Pilots Association Union he asked Scott to serve as his Campaign Manager as he saw Scott as "particularly well organized and an especially good writer".

Captain Vitale also said that he had flown with Scott as copilot on a 767 and he perceived him to be extremely competent in all aspects of his job. He has also flown in private aircraft with Scott and he speaks of Scott as being an extremely skilled aviator: not only that but he is a highly experienced pilot but he is a flight instructor and one

81

with what is an extremely rare "Gold Seal" on his license. Overall, Captain Vitale considers Scott to be a particularly skilled pilot across a variety of aircraft.

Captain Vitale also listed Scott's further accomplishments and did so with respect: Former Police Officer, Decorated Military Officer and Lieutenant Colonel; Federal Flight Deck Officer with the Department of Homeland Security [authorized to carry a weapon within the United States which meant that he had to be Security Cleared by the Department of Homeland Security, undergo a Comprehensive Psychological Evaluation and attend a special firearms training program at the Federal Firearms Training Facility in Artesia, New Mexico]; and finally, Scott serves as a Volunteer with the Civil Air Patrol.

Having been retired from the military, Brian is clear about the distinction between a Federal Title 10 and 32 Order. He said that in the case of Title 10 you are given a written order to duty and in the case of a Title 32 you are simply given a verbal order and following the work you are given a "Leave and Earnings Statement" as proof of your duty. Captain Vitale is also clear that Captain Jim Bonds knew, or was obliged to operate on the idea, that Scott was on a 32 Order but still he attempted to deny Scott the leave and in doing so American violated two Federal Government Regulations in that: [i] they denied him the leave and [ii] they thereafter changed his employment status from flight status to paid and but duty withheld. Captain Vitale also considered it "crazy" for them to do so, for what they actually accomplished was to "spotlight their two Federal violations". Also regarding the matter of Military Leave, Captain Vitale made the point that: "I have dealt with lots of guys who in a situation such as this would use the whole four days they could take for their military duty and avoid doing work any airline trips during that time. But Scott would never do that".

Captain Vitale said that on the occasion that Scott was briefly ordered back into military service in September 2015, his duty was at the White House. [It was at the time of Pope Francis' visit with President and Mrs. Obama]. Captain Vitale spoke of knowing about Scott being selected by the military for multiple deployments, for example, subsequent to the tragic earthquake in Haiti in back in January 2010. In fact, as a result of that deployment Captain Vitale told me that Scott and his wife "adopted" a Haitian child who they continue to support in Haiti.

Captain Vitale also reported to me that he was in the Miami Flight Operations Center/Office speaking to both Captains Brian Beach and Jim Bonds several days after Scott was removed from service. He told me that: "Brian and Jim were talking about Scott having problems and when I asked what they were talking about they said that Scott "high-jacked an aircraft" and also mentioned that Scott "diverted another aircraft with all three crew in the cockpit". Captain Vitale's view of this discussion was that the entire set of statements was inappropriate and absurd.

Captain Vitale summarized his view about these matters of Scott Patterson's difficulties with American as follows: "This is nothing more than a misguided personal vendetta that started with one of the male flight attendants on a flight, led to a disagreement between Scott and the Captain, and got blown out of all proportion thereafter. It even

extended to questioning if Scott was smuggling guns into South America. It was that stupid".

**Captain Mark Modrich**

Mark Modrich is a senior American Airlines Captain. He has worked for the airline for 24 years. Prior to joining American he spent 16 years in the US Air Force and he continued on in the Reserves for another six years after joining American. As well as his flying duties Mark works as the Domicile Professional Standards for the Union [American Pilots Association] out of their Miami base.

Captain Modrich told me that he first met Scott in about 2012. They were introduced through a mutual friend.]. Mark told me that when he first heard of the issue between Scott and Captain Glenn Whitehouse it was in the context of his role in the Union and the matter came up in Professional Standards. He said: "I chewed his ass about it and he said that he was simply was not going to fly with that Captain anymore and we did not hear anything more about it for a long time. It was not to go to corporate and that is what Professional Standards is for…to work it out. There was an issue with a Flight Attendant and Scott apparently apologized. I was working that case and I thought it was over. I had spoken to the Captain [Whitehouse] initially before I spoke to Scott and they agreed to disagree".  Captain Modrich described Scott as "a type A.A,+ personality with a lot of self-confidence".

The next time that either Scott or Captain Modrich heard anything about the matter with Captain Whitehouse occurred when he and Scott were actually together at an airshow in Oshkosh, Wisconsin in July 21-22. Captain Modrich told me:

"Scott received a phone call from Captain Chip Harlowe, the Miami Domicile Professional Standards Chairperson. He asked Scott if he was smuggling weapons to Bolivia. Scott was astounded by the stupidity of this questioning but after that it all started to snowball with more complaints coming from Captain Whitehouse. It seemed to me that the Union was not trying to help Scott. The next thing I remember was that Scott was supposed to go to Washington while the Pope was visiting and he was not getting a response from the Miami Flight Office regarding his military leave so he called the Chief Pilot in Dallas who approved his time off. Apparently the flight office in Miami was then furious with Scott for he did not have his authorization documents [that is, he did not have a proof of the duty requirement]. However, Scott Patterson makes the point that he would not have had written orders because it was "Inactive Duty for Training" that he was required to attend.

Then they had a disciplinary hearing and I was there for the first part of it and they tried to get Scott to sign a Non-Disclosure Agreement. American loves the NDA system but Scott refused to sign it. So they had the Section 21 Hearing and there were no findings. But then American escalated it. Counseling should have come before any hearing. So then the doctor was hired to get him fired.

Scott is a very stable person and I would never question his ability or his stability to operate an aircraft, commercial or otherwise." Captain Modrich made the point

83

regarding "Scott being messed around at Miami regarding his military leave request" that: "It is my understanding that under the law [USERRA] an employer is required to give an employee time off to perform his/her military obligations. The employee is required only to serve the employer with either oral of written notice".

**Roxana Patterson**

Roxana Patterson is Scott's wife.  She is from Peru and the couple met in college where she was on a tennis scholarship. After dating for a significant time they married on November 15, 1990. Roxana and Scott have two children, a boy nine years old and a girl 11. In the years after they married most of Roxana's family also moved to the United States, although her parents moved to Canada.

 Roxana describes Scott as always being very sweet, friendly, an outgoing and very caring person. While at university he was in the National Guard and then he stayed on in the military and today she says that he still serves in the reserves.

Roxana describes her husband's personality as very friendly very and caring. He always tries to help people no matter what. If there was a car stopped on the side of the road and he had the time Scott is the sort of person who will stop a try and help the driver if he can.

Roxana says that Scott has always been a happy a very energetic person. There have, however, been several points in his life when he was very upset and very hurt. One of those was when his grandmother [who raised him] died three years ago at age 102. Roxana noted how very often Scott would travel to Charlotte, N.C. to go and see his grandmother, and "we would all go and see her". Roxana made the point that his grandmother was very proud of Scott, and that she was really like his mother. Roxana also told me that Scott was also very sad when in 2004 his father passed away from cancer in 2004.

Roxana also noted her thoughts about what her husband has been going through as a result of the claims make by Captain Whitehouse. She reported:

"My husband is extremely honest and extremely principled and that makes all this so much more difficult for it really is hard when people lie.  The most painful of all of this is the fact that he cannot do what he loves to do [flying] and is totally out of his control. He is a man who loves his work and to do this to him is cruel. It has affected his sleep a great deal but I have not really noticed mood swings. Has been relying on prayer and God to help us through this. He is far more hurt and angry very much. He is very intelligent and he knows how to handle things. He has good self-control and he has responded very well in the situation. But his feelings are very hurt. In the beginning he was very angry but now not so much so".

Roxana works as a physical therapist at an outpatient physical therapy clinic and she talks about how she to loves her job and what it means to her.

**Sergeant Walter Rogers, Florida Highway Patrol**

84

Walter Rogers lives in Homestead, Florida, and he has been in the Florida Highway Patrol for more than 27 years. He is also a Staff Sergeant in the United States Army Reserve. He is a single father of three girls.

Walter reported that he first met Scott Patterson in the Army when Scott was the Commander of the unit Walter was in. He has known Scott Patterson for some 18 years. His bottom line on Scott is that: "Scott is the most honest, straightforward, and upstanding person you could hope to meet".

In an effort to serve the community Scott became involved in the FHP as an Auxiliary Officer and he handled mainly traffic support roles. Sergeant Rogers made the point that: "Scott is a very precise and detailed person and did an excellent job as a volunteer officer. I would trust him with my family and my life". Walter also spoke of Scott being a "very precise and detailed person".

**Colonel Noel Pace, U.S. Army Reserve**

Noel Pace serves presently as a United States Army Reserve officer. He is also a board certified hospital administrator who is scheduled to take command of an Army field hospital in Jacksonville Florida later this year. He lives in the small town of El Portal in South Florida and he reports that he knows Scott Patterson well. He first met Lt. Colonel Patterson when they were both attending the Command and General Staff College at the Southern Command Headquarters in 2006. That program takes a year of full-time training to complete, but it can be done part-time and that is how both Colonel Pace and Lt. Colonel Patterson completed the program.

Colonel Pace noted that at that time Scott Patterson was full-time in the Army and he was working as a Major coordinating administration policies dealing with drug interdiction in South America. Colonel Pace indicated that both Scott's good command of the Spanish language and his background in police work was very helpful in his military duties during his role coordinating those services.  Colonel Pace is considering bringing Scott into his command since Lt. Col Patterson has served in a Combat Support Hospital as the Executive Officer. He feels Patterson would do well for his unit and the Army by making such a move.

**Keith T. Allison**

Keith Allison reported that he has known Scott Patterson and his family for well over 15 years. Scott served on the Board of Directors of their community's Home Owners Association representing nearly 10,000 residents for over 12 years.

Keith made the point that from the outset when he and Scott met his gay lifestyle did not represent a problem or bother Scott in the slightest, yet back then there were many people who stereotyped the lesbian and gay community but Scott accepted them and worked to build a consensus and in so doing improved their way of life. Keith said that there were even the some members of the Homeowner's Association actually ostracized

85

Scott for associating with Keith and his partner. He further went on to say that Scott has supported many of the diversity efforts in the local community thus bringing Keith and his partner a more peaceful life as a result.

### Disability and the FAA Policy for Airmen with Mental Health Conditions

Clearly, over the course of the above collateral source review [in which I sought to explore any indication of any limitations in Scott Patterson's mental status or his flight skills status] I found no perspective whatsoever that FO Patterson was in any way compromised in his capacity to function as an A.A. pilot. [In fact, I do not believe that even Captain Whitehouse had any data suggesting that Scott Patterson was not a skilled and knowledgeable pilot, for had he had such evidence, one can only assume he would have included this evidence in his submission].

I examined the Guideline Requirements For Mental Health as stated in FAA Policy. I reviewed this policy in part in the light of Scott Patterson's statement to me that the Allied Pilot's Association had indicated to him, given the findings of Dr. Knippa, that he would be terminated on the basis of a mental disability, and hence, that he should apply for a disability retirement from the company based on mental health grounds.

In reviewing the Mental Standards for a First-Class Airman Medical Certification. I noted the requirement that there be no established medical history or clinical diagnosis of any of the following: [i] A personality disorder that is severe enough to have repeatedly manifested itself by overt acts; [ii] Psychoses, which refers to mental disorder in which the individual has manifested delusions, hallucinations, grossly bizarre or disorganized behavior, or other commonly accepted symptoms of this condition; or the individual may reasonably be expected to manifest delusions, hallucinations, is bizarre or disorganized behavior, or other commonly accepted symptoms of this condition; [iii] Bipolar Disorder; [iv] Substance dependence, except where there is established clinical evidence satisfactory to the Federal Air Surgeon, of recovering, including sustained total absence from the substance[s] for not less than the preceding two years. And, [v] Any other personality disorder, neuroses, or other mental conditions that the federal air surgeon, based on case history and appropriate, qualified medical judgment related to the condition involved, finds a person unable to safely perform the duties and exercise the privileges of the airman certificate applied for or held, or may reasonably be expected for the maximum duration of the medical certificate applied for or held, to make the person unable to perform those duties or exercise those privileges.

Based on this review it was [and is] my opinion that Scott Patterson did not, and does not, suffer from any of the above disqualifying conditions.

Hence, paradoxically, the only possible basis for FO Patterson applying for a work related disability would be for him to do so based on Dr. Knippa's findings which were as follows:

86

"Mr. Patterson is NOT FIT FOR DUTY. At the time of the examination he was not considered to be "affirmatively identified as capable of reliably performing the essential functions of his job description" and there was no identified basis to warrant restrictions or accommodations that would otherwise permit a return at this time to his customary duties. Further, this opinion was based on a "neuropsychological" perspective".

### Scott's Background History and Present Functioning

Scott was born on November 8, 1967 in Charlotte, North Carolina in November 8, 1967 to Bobby and Barbara Patterson. Scott's father was an electrical engineer for a very large construction company based in Texas. Prior to his father's death [when Scott was 36 years old], Scott reported with some pride that the firm was going to make his dad a full partner of what had become a very large entity, but his dad died. Scott's father apparently was a particularly intelligent person and according to Scott his dad was invited to join and did join Mensa.

Scott's mother also grew up in Charlotte, and eventually she would become an attorney. However, Scott's parents separated when he was two years old and they divorced soon thereafter and his mother relocated to live with her parents [and of course Scott]. Scott also continued to stay with his maternal grandparents after his mother married Scott's stepfather, Wayne. He was a chemical engineer and he constantly relocated for his work. Scott made the point that after their marriage Scott's mother moved [with his step-father] some 12 times in 8 years. Hence, through much of Scott's rearing years he was based with his maternal grandparents, with whom he was always exceeding close. Scott's mother is still living but his much-loved maternal grandparents are both deceased. Scott's paternal grandparents are both living and are very much cherished by Scott. I get the sense that all of Scott's caretakers over the years were very dutiful and provided him the best environment that they could.

Scott told me that from an early age he had the dream of becoming a airline pilot. His grandmother introduced him to the airlines very early via air travel and it stuck with him.  Scott told me that as a child he was basically a good compliant boy. In Junior High, Scott was inducted into the National Junior Honor Society and he was later featured in Who's Who Among American High School Students several years in a row. His grandmother also elected to put Scott into a private military school in Camden, South Carolina based on her "wanting me to have a better education than the free one I was getting in public school".  While in that school Scott was also promoted to Cadet Captain in his senior year, and during the entire time he noted: "I was never given demerits". Scott apparently also has maintained an ongoing involvement with his school. He reports that he still speaks, on occasion, to parent groups who are contemplating sending their kids to school there.

Scott went to Appalachian State University with a two year Army ROTC Scholarship and he studied business and psychology. He continued on and was awarded a Bachelor of Science degree in 1990. Scott reported some low-grade use of alcohol in college, mostly beer, but he has never been interested in drinking to excess or using other intoxicating

87

substances. Overall, he has been a very straight and upright person who has lived a very respectful life, and in many ways he has sought to serve, whether it be in his police or military service, or in his community or church service work.

[Recall that one of Dr. Knippa hypotheses was that Scott may have been suffering an undiagnosed Attention Deficit-Hyperactivity Disorder and/or also some undefined personality aberration. Well, show me the evidence! Dr. Knippa's testing did not permit him to reach any such a conclusion, his inference notwithstanding. There also is nothing in Scott's schooling or his university grades, or from any other background data that I have been able to capture, including from those people who know Scott well, to suggest the presence of any ADHD. Nor is there any such evidence from his employment history. Relative to Dr. Knippa inference of possible ADHD issues, Scott decided that he would do his own testing of his mental functioning by taking a Luminosity Challenge [see www.luminosity.com]. Scott forwarded to me the results after taking the Luminosity challenge against the 45-49 year old standard scores. His scores in Speed games placed him in the 68th percentile; his scores in Memory games also placed him at the 68th percentile, and his Attentional scores were at the 83rd percentile]. And finally, both in his recurrent Flight Simulator studies and in his everyday flight duties, there appear no indications that Scott Patterson has any problems with inattention. Again, Dr. Knippa sought out and inferred the prospect of a condition the presence of which makes no sense whatsoever.

While in college, Scott met the girl who became his wife, Roxanna Giselle. The couple married on November 13, 1990 and they returned to live in Charlotte, NC [near where he had grown up] and he found work as a police officer.  Despite being in the top of his ROTC class, the Graham-Rudman Act had just been passed into law and so the Army was not assessing officers for active duty or regular Army positions. But then Operation Desert Storm occurred [it began in August, 1990] and "the war changed all of that". Scott was ordered to Fort Sill, Oklahoma, to attend the very challenging School of Field Artillery. Scott reported that he finished the school, which he considered to be very technically demanding, at the top of his class.

Desert Storm concluded and Scott returned to civilian life where he obtained work as a police officer and he continued in his role as a young reserve army officer. Scott reported that: "I never much considered making a police career. I only did it for the money and as a bridge to becoming a pilot".

While working as a police officer, Scott purchased a share in a 1962 Cessna and he continued to work on his pilot's ratings.  He then left the police department to pursue aviation.  He was given a scholarship to complete his training as a commercial pilot and he did so in 1993, at a flight school in Macon, Georgia. Following the completion of his commercial pilot certification, Scott then went on to become a Certified Flight Instructor, which would allow him to instruct students while making money and building flight time to advance his prospects to get into the airlines.

88

Scott reported that in 1995 he was awarded the Gold Seal Instructor rating, which meant he had met the strictest of training standards for the FA.A.  Scott then worked as a flight instructor and he also worked mapping Cable Television for Cox and Time Warner through a sub-contract with a company called Cable Resources, in Monroe, NC. Scott said of that work: "Mapping the systems was a fun job.  I would go out and walk four or five miles or more per day, and get paid for it".

Finally, in January 1997, Scott secured employment with Mesa Airlines [which later became Air Midwest, due to a merger of the two companies]. Scott reported that he advanced within Mesa to become a Captain [on the Beech 1900].  He also became a Captain on the Embraer Regional Jet. He reports that he was also actively involved in pilot recruiting for Air Midwest. It was while recruiting for Air Midwest, that Scott became friends with Aaron Gould, a captain for UPS.  Captain Gould was the chairperson of the Professional Pilot Development Program for the Organization of Black Airline Pilots [OBAP], now named the Organization of Black Aerospace Professionals. At that time also Scott reported, "that the market was on fire to hire pilots I was able to get on with American".

In 2001 Scott and Roxana relocated to Pembroke Pines, Florida and he has worked uneventfully for American Airlines up until the present difficulties he has been facing with them. Likewise, he has continued to serve in the military and he is now at the rank of Lieutenant Colonel, and only a few years away from his army retirement.

At a more personal and local level, Scott has two children with Roxana. Abby is now 12 and Philip is 10. I have met both children and they present as being quite bright and very polite. Scott and Roxana tell me that the kids are both doing exceptionally well in school.

Scott is also actively involved in his church and in his community. He serves as a volunteer on his community homeowner's association [he serves as President] and he participated with his church to help the people of Haiti after the Earthquake there in 2010. Also in terms of helping people, Scott reports that following his cancer scare in February 2015, he began an intensive program of study and he reports having become absorbed in reading on health care and cancer treatment issues. Scott reports that he now routinely volunteers to assist as a support coach for people diagnosed with cancer and he encourages them in strategies to get healthy in the hope that they can stay healthy.

It is my view that Scott has done a good job and has shown emotional strength in facing all that has emerged following what Scott has called the "Whitehouse fiasco". Scott reports that he has experienced quite a deal of stress with each of the fits and turns in the entire investigative process. But he has had no intension to quit and "let lies, exaggerations, distortions, manipulations and biased sampling created by the efforts of Captain Whitehouse force me out". Nor will Scott accept the suggestion of those who have recommended that he go out on disability based on the "findings" of Dr. Knippa. Given all the stressors Scott has experienced of late, in fact I [Dr. Caddy] consider that he has held up really quite well and has never given up, believing that eventually he will

89

be back at work, and he has significant support from many of his pilot friends related thereto.

### My Overall Clinical Observations and Findings

There are so much data about Scott Patterson already presented in this documents that I will only overview my findings regarding this man's present emotional functioning. And in that regard, there is really not all that much to tell.

Scott presented at all of his appointments appropriately and casually dressed. His hygiene always appeared good. His gait was non-remarkable and his posture good and upright. He presents as a fit, healthy, energetic, forthright, and a no-nonsense person. He is clearly military. His level of responsiveness was alert and focused. I do not consider that there was anything that was negatively effecting or impairing his level of responsiveness during any of my multiple dates of contact during the examination, or during the several dozen of phone or video contacts I had with him in examining all of the data related to the multiple aspects of this case.

Scott's own evaluation of his present daily distress was noted in the examination and in his testing results that are presented below.

Scott's eye contact was appropriately focused. His speech quality was normal and he showed no impairment of speech. His mood was mainly calm yet there were times when upset and irritation and also concern for his future and the wellbeing of his family were identified. Scott is confident that his issues with his employer will be resolved in his favor, but he cannot be sure at this point what the outcome of his battle to return to work with A.A. ultimately will be. Scott sees himself as an emotionally strong person but the matter the attack on him by Captain Whitehouse and how A.A. has handled this entire matter has been very upsetting to Scott [and equally so to his wife who is very upset by what has happened]. This is not a man who will give up and just lie down when he believes he is in the right, and he is determined to right the wrong inferred against him by the actions of Captain Whitehouse, and by how A.A. has handled the entire matter subsequently.

### Formal Psychological Testing

**The Symptom Checklist 90-R** explores the subjective sense of the presence and intensity of 90 separate symptom sequences that are often linked to mental or emotional disorder. Scott is overall a very emotionally health man. His distress responses on this instrument were very limited and include: "having repeated unpleasant thoughts that will not leave his mind", "experiencing soreness in his muscles", and "having trouble falling asleep". Given the stress that he is under regarding his employment future, Scott presents and functions emotionally as a very robust and healthy person. He demonstrates excellent coping skills, based on the results from this instrument.

90

**The BAI [Beck Anxiety Inventory]** is a 21-item index of largely physiologically oriented measures of anxiety related arousal that have been a matter of concern in the past week. The patient is asked to rate the relative severity of each of these indices from "Not at All", to "Mildly", to "Moderately", to "Severely".  Scott showed very little actual anxiety but he did report trouble with an "inability to relax".

**The Presenting Problems Checklist** is an instrument used typically at the beginning of therapy with patients to review their areas of clinical concern. The instrument is divided into four categories: thoughts, feeling, behavior, and other.

Scott reported no real problems with his thinking but as far as his feelings were concerned he reported some "irritability", "intense frustration", "anger', "tension", "being under pressure"[financial], and having some "anxiety/apprehension" regarding his future and the outcome of his conflict with his employer [though he is optimistic that he will ultimately win in this dispute. He noted no behavior problems or other matters.

**The BDI [Beck Depression Inventory]** is a 21-item measure reflecting a range of different symptoms of depression as assessed by the patient based on his interpretation of his feelings surrounding a series of experiences. Scott showed no indication of depression whatsoever with a zero score. [Impressive, given what Scott has been going through].

**The MMPI-2 [Minnesota Multiphasic Personality Inventory, Second Edition]** is a comprehensive 567-item inventory designed to explore the present functioning of an individual in terms of psychological pathology and strength. Despite Dr. Knippa's inference about possible emotional issues on this instrument, I found Scott to have responded validly and he simply did not have any of the primary scores on this instrument showing any abnormality whatsoever. There are numerous secondary scales on this inventory, yet when they presented without a thorough appreciation of their real legitimacy, that is when they show some possible correlation with other possible elements but there is not objective evidence for their application, we end up with lowly correlated indices that are without real meaning. [Dr. Knippa meandered around such indices for quite some time, as I have noted previously].

**The Trauma History Questionnaire** is a 24-item index of commonly experienced trauma. Scott reported having a total of nine such events in his life: He experienced a mugging when he was 22 years old; having experienced several natural disasters [several hurricanes, and the earthquake in Haiti]; several incidents while he was in the police service during which they were potentially were life threatening; seeing someone killed [also in the police service]; having received news of the death of a loved one; having engaged in personal combat [while in Colombia in the military]; and finally he experienced the extraordinarily stressful death of his much loved grandmother at her age of 103 in 2013.

91

While many of these incidents were very upsetting there is no indication that these events left him with any long-term symptomology of trauma.

**The IES [Impact of Events Scale]** is an instrument designed to rate the frequency of occurrence of experiencing upsetting elements related to a traumatic event. In this case I required Scott to respond in relationship only to the conflict that emerged between he and Captain Whitehouse and the events that flowed therefrom.

Scott reported that this set of two incidents upset him at the time of the altercations, but the real upset came after Captain Whitehouse published what I will call his "Submission". Scott reported that for a time after the release of the document: he had "a slight problem with sleeping", that "other things reminded him of the events", that "he thought about it when he did not mean to", that "he tried not to think about it", that "over time he has had some trouble falling asleep", and that it caused him to be "somewhat watchful and on guard". More frequently, Scott also reported that he: "tries to avoid letting himself get upset when he thinks about it or is reminded of it"; that "he has stayed away from reminders about it"; that he "tried to remove it from his memory"; and "that he has tried not to speak about of it" [though of course with everything that has been happening since the publication of Captain Whitehouse's document, that has been very difficult].

### Overview of Recent Events

Significantly, Scott reported that he has been always confident that the process at American Airlines will work out in his favor because, as he said very firmly, "it is really all bullshit". Although some of his friends at work had warned Scott not to underestimate the influence of the supposed "Captain's Protection Society", he now recognizes that perhaps his friends were right, and he was wrong. However, after the investigation by APA he considered the matter largely resolved. He was even advised that this was so, and now [having to deal with the Dr. Knippa matter, he is realizing that this was wrong].

Looking back, Scott told this examiner that when he was told that the company was sending him all the way to California to be evaluated by Dr. John Knippa, he saw this "psychological evaluation" to be both "suspect" and "a complete waste of time". As he said: "I knew that I was an excellent pilot and there was nothing mentally wrong with me. My record in flight was impeccable, and anyway, I had passed my annual flight simulator testing, and the medical testing, both with flying colors". So, although he did not trust the process of this further examination in California, Scott had every confidence that all would be well. And in fact he reported that he felt that way when he left Dr. Knippa's office.

However, when Dr. John Knippa's results came back and he reported that he found Scott to be unfit to fly, all of a sudden Scott's worst fears of distrust in the process became fully realized, front and center! That result hit him out of left field, and for the

92

first time since all of this extensive negative enterprise by Captain Whitehouse began, this otherwise very confident and secure man began to genuinely fear that the company, or members of it in senior places at the Miami base, must have really wanted him gone. Scott now recognized that if he did not do something serious to counter this out of left field action by Dr. Knippa, he really was going to be terminated. And thus Scott recognized that "bullshit" or not, his much loved flying career would be over, because once he was terminated based on "neuropsychological/medical grounds" he would never be able to get work anywhere within the airline industry.

It was at that point that I saw Scott Patterson really worried that he could actually be beaten in his persistent determination to return to his role as an A.A. pilot. And yet, Scott knew that this opinion by Dr. Knippa was, to again use his term "bullshit". But now Scott was both worried and really angry. It was also clear to me that there were a number of things wrong with the entire matter of A.A. sending Scott to California, and when I reviewed the procedures, findings and opinions of Dr. Knippa, those findings just did not make sense to me. I knew that many of Dr. Knippa's inferences were misjudged. It was also my opinion that Dr. Knippa's conclusion inferring neuropsychological limitations of functioning such that Scott was incapable of handling the skill set related to his much overlearned flying skill, was equally misguided.

Hence, as may be inferred from the above, I did some investigation of the best person from whom Scott should seek a second aeromedical neuropsychological assessment. I considered that this second opinion might be best sought from the extremely experienced Dr. Gary G. Kay, whose office was in the Eastern Time Zone, [Washington, D.C. Dr. Kay was also the developer of the CogScreen Assessment Battery. Thus, I suggested that Scott call Dr. Kay and determine Dr. Kay's availability and willingness to see him, which he did. I then called Dr. Kay and I advised him of my concerns regarding the findings of Dr. Knippa, who Dr. Kay said he knew. I asked him if he would be willing to offer a second independent opinion subsequent to the work of Dr. Knippa, and he indicated that he would be willing to do so.

As I have noted above, Dr. Kay offered a very different conclusion about Scott Patterson's capacity to successfully complete all of the testing that Dr. Kay required. Interestingly, I also found out from Scott that Dr. Knippa readily provided Dr. Kay with his entire file on Scott Patterson, and that he did so without any formal or informal release authorization from Scott Patterson. That is, Dr. Knippa violated the Federal HIPAA regulations regarding the confidentiality and security of Scott's Protected Healthcare Information. And yet, he had initially refused to provide me with the same information, despite me having provided him with a HIPAA compliant authorization to release Scott's Protected Healthcare data, and of course, his recognition that I would end up getting it anyway.

My job throughout this entire process was to conduct a comprehensive forensically oriented clinical evaluation of Scott Patterson, and to explore in depth and with

93

precision the events surrounding the claims made against FO Patterson by Captain Whitehouse. I was also notified about the events surrounding Scott's USERRA Complaint, and I understood the reason for filing such a complaint. However, my focus was not on this matter but on the impact on Scott of the Patterson's complaint and more broadly the establishment of my opinion about Scott's psychological functioning from the Whitehouse Compliant and Scott's capacity to appropriately conduct the duties of a First Officer within American Airlines. And finally, it became my job to monitor Scott's coping as the process of the investigation took place.

At the time I was hired, my role was that of a forensic behavioral science analyst and a monitor of Scott Patterson's functioning. That role has not changed and I have not provided any treatment services to Scott [and realistically he has not needed them]. Nevertheless, because of my findings and opinions in this regard, it would be idiotic to assert that my work in this case did not result in a lowering of Scott's potential to be far more stressed and anxious than in fact he has proved to be. In the final analysis, my opinions were very supportive of Scott's agenda to return to his duties as a First officer with American Airlines. I suspect that as a result of the work I [and others] have done, the chances are now much better that Scott Patterson will be able to return to his duties as a First Officer for American Airlines.

**Diagnostic Opinions**

Consistent with the diagnostic protocol established in the <u>Diagnostic and Statistical Manual of mental Disorders [Volume 5]</u> I am reporting I offer the following:

I have said previously, that Scott Patterson has been experiencing and suffering from the stress associated with the instability and lack of clarity that has surrounded his present work related difficulties. While his coping has been about as well as might be considered possible, still the stress is very significant. I consider that the ambiguity, and the stress that Scott Patterson has faced for ten [10] months now, and with still no resolution as of the time of my submission of this report, there must be viewed a failure within A.A. This failure to timely resolve the matter of Scott Patterson, and also to address the impropriety of the nature and methodology of the Whitehouse submission [unless something has happened here that I cannot know], stands in stark contrast with what I would regard as a skilled Human Resource methodology.

In the Diagnostic and Statistical Manual of Mental Disorders [Fifth Edition] there is a category that applies regarding the protracted emotional suffering [stress] that Scott Patterson has experienced. The diagnostic category is within the **Occupational Problems** category and specifically under the "**Other Problems Related to Employment category [code V62.29].** I quote:

"This category should be used when an occupational problem is the focus of clinical attention or has impact on the individual's treatment or prognosis. Areas to be considered include problems with employment or the work environment, including unemployment, recent change of job, threat of job loss, job dissatisfaction, stressful work schedule, un-

94

certainty about career choices, sexual harassment on the job, other discord with boss, supervisor, or coworkers, or others in the work environment, uncongenial or hostile work environment, other psychological stresses is related to work, and other problems related to employment and/or occupation" [page 723].

The bottom line is that I have spent more than ninety hours evaluating Scott Patterson, speaking to his family, interviewing his multiple more remote collateral sources, reviewing his medical records and interviewing and or reviewing the work of the various experts involved in this matter, and examining other records related to this matter. It is my final opinion that there is no evidence that FO Patterson is now experiencing any Medical or other condition, including any cognitive or related impairment, as inferred by Dr. Knippa.

### Where This Matter Should Go From Here: The Takeaway

I have spoken at length with Scott about information that his attorney has shared with him about discussions she has had with the A.A. attorneys and about where things regarding his case are, or should be, going from here. Clearly, I am not in the middle of this matter and so I cannot have a valid or meaningful view at this time of the thinking of A.A. as far as resolution of this situation is concerned. At this time, any clarity on these events is no doubt still existent as a moving target. Yet I trust that now, with the final release of the report of Dr. Gary G. Kay, the inference or presumption that FO Patterson has something significantly wrong with him from a mental "software" [i.e., functional] or from a "hardware" [neuro-psychophysiological] perspective, can be put to rest. Scott Patterson does not have any mental impairment!

So what is the takeaway? Of course it is always easy to be brilliant in retrospect but the bottom line of the takeaway for Scott Patterson is obvious. Don't become ruffled about the incidental decision of a Captain around something as meaningless as a trip to a hotel, even if it occurs in the presence of your wife, children, and the crew. And do not allow anything about that Captain's conduct to upset you, irrespective of your reason or your justification for being upset! And do not allow that upset to persist!

As for Captain Glenn Whitehouse, his handling of this matter smacks of arrogance, or at least incredibly poor judgment, in that he set out to systematically collect rumor, innuendo, misinformation [even to the point of the absurd], and the occasional legitimate fact, against a coworker, for reasons that no doubt he understands, but in themselves seem, beyond vengeance and very compromising.

While there may be some truth in some of the data Glenn Whitehouse collected over the nearly eleven [11] months of his efforts, his basic methodology was clearly inappropriate, flawed, and discrediting of him. If Captain Whitehouse had legitimate reason to question the judgment or mental stability of Scott Patterson, he certainly did not have such perspective before the disagreement that occurred between these two men prior to the trip to Paraguay. Moreover, "his investigation" after that trip was anything but an objective fair-minded investigation. Rather it involved an accumulation of rumor, innuendo, fact and fancy, all thrown into a submission that by any standard was outrageous

95

in its lack of fact or balance. It even included notions of the possibility of FO Patterson gunrunning and influencing of customs and other officials.

If there was an investigation to be conducted, that investigation should have been conducted under the auspices of the Human Resources Department, or another authorized body, and not by an A.A. Captain, whose indiscriminate mishmash of accusations only opens himself, and perhaps even A.A., up to the risk of litigation that surely no-one would want.

**Certification**

I, Glenn Ross Caddy Ph.D., hereby certify that I personally conducted an examination of FO Rodney Scott Patterson and explored to the extent possible every means reasonably available to me to reach a valid and balanced conclusion in the conduct of my work. I prepared this report and that all the conclusions reflected herein are those of this expert and not of any other third party. I further certify that the preparation of this evaluation was performed consistent with Florida Chapter 490, F.S., as well as with the rules and regulations promulgated thereto.

In the event this matter is not resolved short of litigation, I also extend my thanks to the Officers of the Court for allowing me to be of assistance In this case.

Respectfully submitted,

Glenn Ross Caddy, Ph.D., A.B.P.P., F.A.A.C.P., F.I.A.B.M., F.A.P.A.
Clinical, Health and Forensic Psychology

96

97

October 9, 2017

**Curriculum Vitae**

| | |
|---|---|
| **Name:** | Glenn Ross Caddy |

**Address:   (Practice)**   Glenn Ross Caddy Ph. D. P.A.
One Financial Plaza, Suite 2010
100 S.E. Third Avenue
Fort Lauderdale, Florida 33394 and also

196 Aspen Drive, Bondurant, Wyoming 82922

**Neuropsychology**   17251 N.E. Nineteenth Avenue
**Laboratory**   North Miami Beach, Florida 33162

**Telephone:**   Personal Cell USA: (954) 547-5100
Practice Office USA: (954) 565-8850
Practice Fax USA: (954) 759-0020
Personal Cell AUST: 0414 062 361
Google Phone Worldwide: (281) 845-3660

**Skype:**   Skype Name: glenncaddy
Skype Phone Worldwide:   954 357 2508
Google Phone Worldwide: 954 951 0207
9543572508

**Practice E-Mail:**   drglenncaddy@gmail.com

**Corporate E-Mail:**   drglenncaddy@mind-experts.com
glenncaddy@eventus-investments.com

**Website:**   www.mind-experts.com

**Citizenship:**   Australia and United States of America

**Education:** Ph. D   University of New South Wales
Sydney, Australia (1973)

B.A. (Honors)   University of New South Wales
Sydney, Australia (1969)

**Appointment:**   Justice of the Peace, State of New South Wales, Australia.  Government Gazette 24th December 1970.

1

| | |
|---|---|
| **Military Award:** | Australian Defense Medal |
| **Licenses:** | Licensed Psychologist, Virginia Board of Psychological Examiners (License # 347; January 16, 1978-1986) Licensed Clinical Psychologist, Virginia Board of Medicine (License # 865; May 11, 1979-1986) |

Licensed Psychologist, Florida Board of Psychology
(License # 002093; 1982 - present).

Registered Psychologist, New South Wales, Australia
(License # PS11585; 1991- 2011)

Licensed Psychologist
The Psychology Board of Australia
Australian Health Practitioners Regulation Agency
(License # 0001137404; 2010 – Present)
AHPRA user ID: 3341637098

Certified Worker's Compensation Rehabilitation Specialist,
State of Florida (License # 646)

Special Certification, Human Sexually: Assessment and
Treatment, American Board of Sexology.

I have also held a number of temporary licenses for
consultations in various jurisdictions. Most recently,
in 2015, I held a Visitor's License [2184T] issued by the
College of Psychologists of British Columbia, Canada.

**Additional Specialty Clinical Training and Credentialing History**

Given that I was educated in Australia, in order to meet the different and in some respects additional requirements for clinical licensure in the United States, I was required to provide proof of my general coursework knowledge or equivalency and also my clinical coursework knowledge and equivalency. I also had to establish my experience and skill in clinical practice. Given my faculty status at the University of California at Los Angeles, at the University of California at Riverside, and also at Thomas Jefferson University Medical School, I audited [with permission] several general [breadth] psychology courses, and a number of additional clinically related advanced doctoral seminars and courses. These courses included "History and Systems of Psychology", two advanced "Psychological Testing" courses, an advanced "Social Psychology" course an "Advanced Issues in Psychopathology", and a "Professional Issues and Ethics" course.

2

I was able to demonstrate competency to meet the Human Development course requirements, the Statistics and Experimental Design requirements, and the Clinical Psychology knowledge content requirements by showing the licensing bodies within the Commonwealth of Virginia that I had taught courses that covered these [and other] various topic areas. Courses that I had taught by that time [1976] included undergraduate courses like: Introduction to Psychology, Human Development, Abnormal Psychology, History and Systems of Psychology, Social Psychology, Human Learning, Psychological Statistics, Experimental Design, Psychological Assessment, and Issues and Ethics.

In addition, by then I also had taught graduate courses in Experimental Methodology, Human Learning, Addictive Behavior, Human Sexuality, Clinical Research, Psychopathology, Behavioral and Cognitive Therapies, Clinical Practicum, Issues and Ethics, and conducted Clinical Supervision and conducted numerous seminars some of which are listed elsewhere in this document.

As my experience and my academic rank advanced, I further taught doctoral level courses and research and clinical seminars at the institutions wherein I was appointed. I also further undertook a course on Neuropsychological Testing conducted by the famous pioneer, Ralph Reitan, and I audited a two semester course series on Advanced Neuropsychological Testing conducted by Professor Frank DePiano at Nova Southeastern University. In the mid 1980's I also undertook advanced study in Human Sexuality via attendance at a series of seminars conducted through the Masters and Johnson Institute.

In the course of my licensure adventures I had to show clinical practical knowledge and experience in the United States as none of my three years of clinical research work in Australia was credited in the United States as directly treatment equivalent. The American Licensing Boards had no means of evaluating this experience. Thus, over the period 1974 to 1976, inclusively, I took the equivalent of four semesters of Clinical Supervision involving at least 2,000 certified hours. This requirement was mandatory for licensure. My two formal Clinical Supervisors were Professor Roger Vogler Ph.D., Claremont Graduate School, Pomona, California, and Professor Edward Gottheil M.D., Ph.D., Thomas Jefferson University Medical School, Philadelphia, Pennsylvania. Most of this additional clinical work under supervision was done within the mental health clinics of the Medical School and also at the Veterans Administration Medical Center, at Coatesville, Pennsylvania.

I first completed the General Psychology licensure requirement [license issued by the Commonwealth of Virginia Board of Psychology on January 16, 1978]. I then undertook the more difficult two-day written and oral examination for the Clinical Psychologist specialty. I completed the written and oral requirements for licensure as a Clinical Psychologist on May 11, 1979. Unlike in any other State in the United States, it was then by law that the Virginia Board of Medicine regulated the licensure of Clinical Psychology in that State. [It was not until the mid 1980's that the Virginia Board of Psychology took

3

over the licensing of Clinical Psychologists in Virginia]. Once licensed as a Clinical Psychologist in Virginia, I held the most difficult to obtain professional psychology license in the United States.

At the time I was licensed in the Commonwealth of Virginia I held a joint appointment as an Associate Professor, Department of Psychology, at Old Dominion University, and as Associate Professor, Department of Psychiatry and Human Behavior, Eastern Virginia Medical School [both in Norfolk, Virginia]. After a year at these institutions, I was appointed Chairperson of a four-member Institutional Program Development Committee that negotiated on behalf of each institution and prepared the curriculum and developed the faculty and clinical facility requirements for this first ever "Consortium Model Doctor of Clinical Psychology Program". Within eight months of the submission of the Program Proposal the Virginia Higher Education Authority, "The Virginia Consortium of Professional Psychology" became a reality. In 1978 the Consortium enrolled its first doctoral class. Today, that program continues as the only Consortium Model Clinical Psychology Program in the United States.

About this same time, in November 1979, I also sat for the examination and was awarded Board Certification in Clinical Psychology from the American Board of Professional Psychology. Likewise, after a further credentials review, I became Registered as a Clinical Psychologist by the National Register of Health Service Providers in Psychology. Thus, when I moved to Florida in 1980, I was not required to undertake any other licensure examination, and I was granted a license, by reciprocity, by the Florida Board of Psychology in that same year. The only ongoing educationally relevant requirement[s] for licensure thereafter were met by completing a course on the Florida Law as it relates to the practice of the discipline, and the ongoing continuing professional educational requirements. I have held this Florida license continuously since 1980.

At Eastern Virginia Medical School and within the Virginia Consortium for Professional Psychology, I taught clinical core and elective courses in the doctoral program and I provided advanced clinical supervision. The same was true when I took up the appointment of Professor and Director of Clinical Training within the Behavioral Sciences Center [subsequently renamed The School of Psychology] at Nova Southeastern University; by that time I was teaching specialty elective courses [e.g. Advanced Assessment, Human Sexuality, Behavioral Medicine, Addictive Behavior, and Issues and Ethics] and was supervising the Clinical Practicum Program and conducting both pre-doctoral and post-doctoral Clinical Supervision.

Over the years subsequent to my leaving the university, I have continued to offer, or been requested to offer, guest lectures from time to time on specialty topics [especially related to Addictive Behavior, Forensic Psychology, Behavioral Medicine, and Issues and Ethics in Psychology]. I also provide clinical supervision to psychologist as a condition of their board mandated continuing education requirements, and I have served the Florida Board of Psychology, and other professional entities, by undertaking the

Clinical Examination of Psychologists whose licenses were under review for possible mental health or drug and alcohol concerns, or other questionable actions. I have also conducted similar work for the Florida Bar, when attorneys have found themselves compromised. I have also done Independent Psychological Examinations for the United States Secret Service, the Broward Sheriff's Office, and numerous Police Departments throughout South Florida.

One quite unusual example of my work in Clinical Supervision is ongoing and it is done via international telepresence. The Clinical Psychologist, initially from Utah, USA, is now a resident and practicing in New Zealand, and yet he wishes to maintain both his Utah and New Zealand clinical licensure status. It that context, I applied for and was granted approval by the New Zealand Board of Psychology to provide such clinical supervision.

[See below for my various Fellowships; Board Certifications, and other advanced credentials].

**United States National Provider (NPPES) Enumerator and Other Identifiers:**

> Glenn R. Caddy Ph.D., P.A. EIN: 65-0054953
> National Plan & Provider Enumeration System
> National Provider Identifier (NPI): glenncaddy
> NPI # 1497926687; Taxonomy # 261QM0850X
> Glenn R. Caddy Ph.D. P.A. NPI #1871755579
> Blue Cross/Blue Shield Provider (# 00075151)
> Tri-Care [Military Healthcare] Provider (# 0075151)
>
> Council on Affordable Quality Healthcare [CAQH]
> Universal Provider Data Source Credentialing
> Provider Name: Glenn Caddy CP
> CAQH Provider ID: 10745537
> Medicare PTAN #BC640 [effective November 10, 2011]
> Medicare # 75151Z: Medicare NPI: 1871755579;
> Medicare CCN: 921131484613-002

**Australian Healthcare National Provider Identifier:**

> Glenn Ross Caddy Ph.D. ID # 8003613341637098

**Fellowships, Board Certifications and Other Credentials:**
(The Diplomate is the credential reflecting certification by a professional sub-specialty Board. The credential of Fellow typically involves election by the sub-specialty Board or a specialty division of a National or International Professional Organization in recognition of providing a major contribution to a sub-specialty or to the discipline as a whole. The following credentials are presented in date order).

5

Registered in the United States National Register of Health Service Providers in Psychology (Certificate # 23046, October, 1979).

Diplomate in Clinical Psychology. American Board of Professional Psychology. (Certificate # 3158, November 1979).

Clinical Fellow, Behavior Therapy & Research Society (1980). Renamed the Association for the Behavioral and Cognitive Therapies.

Diplomate in Behavioral Medicine. The International Academy of Behavioral Medicine, Counseling and Psychotherapy, Inc. (Certificate # 366, December 1982).

Fellow in Behavioral Medicine. The International Academy of Behavioral Medicine, Counseling and Psychotherapy, Inc. (Elected December 1985).

Clinical Fellow, The International Academy of Eclectic Psychotherapists (January 1983).

Fellow, International Academy of Behavioral Medicine, Counseling and Psychotherapy, Inc. (Certificate # 288, January 1990).

Fellow, Professional Academy of Custody Evaluators. (Certificate # 10157, December 1993).

Diplomate in Human Sexuality. The American Board of Sexology (Certificate # 2320, June 1993).

Fellow, American Academy of Clinical Psychology (Certificate # 98, January 1994).

Fellow, International Academy of Behavioral Medicine, 1995.

Listed in the National Registry of Forensic Examiners, (January 1995).

Diplomate in Forensic Psychology.  American Academy of Forensic Examiners (Certificate # 3293, January, 1995).

Board Certified Custody Evaluator, Register of the Academy of Custody Evaluators (Certificate # 10157, June 1995).

Elected Member, the College of Clinical Psychology, the Australian Psychological Society (Member # 016518).

Elected Member, the College of Forensic Psychology, the Australian Psychological Society.

Life Status Member of the following Specialty Divisions of the American Psychological Association: (Member # 12712758): Division 12 (Clinical Psychology); Division 40 (Clinical Neuropsychology); and Division 41 (Psychology and the Law)

Member, Society of Clinical Neuropsychology

Nationally Certified Custody Evaluator, Professional Academy of Custody Evaluators, (Certificate # 130055)

Nationally Certified Parenting Coordinator, Professional Academy of Custody Evaluators, (Certificate # 130055)

Fellow and awarded Life Membership, The American Psychological Association. Elected in the Division of Clinical Psychology, in July 2010. (Awarded in recognition of "an outstanding lifetime contribution to the discipline of Clinical Psychology")

Foundation Member, Advisory Board, The North American Group of Alienation Specialists, January 2009 to the present.

Foundational Scientific Advisor, Alienated Grandparents Anonymous Inc. AGA is a Non-Profit Florida Corporation, headquartered in Naples, Florida. Its goal is to advise and support grandparents who have been abusively and/or unjustly alienated from their grandchildren. This support and advising enterprise was founded in January 2011. Speaking to the seriousness of the problem, today AGA has Chapters throughout the United States and in more than twenty countries worldwide.

Member, PsychCoalition: This is an organization of psychologists focused in applied scientific psychology and concerned about the course and sometimes compromised politics and issues within the American Psychological Association [www.psychcoalition.org].

**Summary of Practice and Other Professional Activities**

Broadly experienced in Clinical Psychology, Forensic Psychology, Neuropsychology, Human Sexuality, and Behavioral Medicine [Health Psychology].

In the clinical arena I provide state of the art assessment, consultation and best evidence based treatment services. Particular focus is given to the cognitive-behavioral therapy of adolescents and adults addressing issues from everyday life issues [marital, child-parent, workplace problems], to a broad range of mental health, sexual health, behavioral medicine problems, and wellness concerns. I also provide performance enhancement coaching to sports stars and executives seeking to improve their effectiveness and focus.

Regarding this latter matter, my father was a world-class surf and pool swimmer in Australia and he became the swimming coach to the Australian Olympic Team throughout my teen years. Additionally, he trained a man named Des Renford, whose title became "King of the Channel" in that he swam the English Channel on 26 out of 27 times [this feat has never done subsequently]. He also trained John Koorey, who swam the Cook Straight [from the South to North Islands of New Zealand on February 1, 1981] in a time of 5 hours and 37 minutes. [This time continues to be the World Record]. [Later, in my thirties, for more than a decade my father dominated a series of competitions in the World Masters Swimming Competition and consistently won the 100 and 200 metres freestyle.

So watching or perhaps by osmosis, I learned a great deal about coaching and bringing out the best in athletics. I have coached many people to swim at the Fort Lauderdale Hall of Fame Swimming Complex, a number of them patients who came to me with serious injuries and/or health compromises including gross obesity and people suffering debilitating arthritis. I have also trained several Ice Hockey Professionals from the Florida Panthers Team and the Toronto Maple Leaf Teams who were experiencing intermittent self-confidence and other problems like showing extreme anger when making errors. Finally, one of my clients is a world-class Florida based female golfer who in 2010 was having difficulties managing her psychological functioning when her performance was less than exceptional and this psychological barrier was preventing her success. Over less than six years this client has moved from in the sixties to now be in the top five women golfers on the women's PGA Tour.

Long distance and international clients are seen in part via a proprietary secure [HIPAA compliant] high definition video-conferencing platform [http://www.Mind-Experts.com]. In

8

the interface between clinical and forensic practice, I am nationally and internationally known, especially for my clinical work on deprogramming and reconciliation following mind control and manipulation is cases of long-term kidnapping, in serious parental or related alienation cases, and in the treatment of the very difficult work in deprogramming multiple personality disorder.

In the forensic area I have been hired in a broad array of criminal cases [including post conviction death cases], personal injury cases, including brain trauma, war crimes and crimes against humanity cases, international terrorism cases, Stockholm Syndrome and other mind control cases [including in the dimensions of parental estrangement and alienation], workplace abuse and discrimination cases, civil sexual abuse cases, and family law cases, the latter sometimes including complex matters of parental alienation and sometimes in Hague Convention cases dealing with international child movement and/or kidnapping.

I also serve on the Parental Alienation Study Group, Inc., which is a collection of mental health and legal professionals and child advocates with an interest in parental alienation. PASG presently consists of 160 members from 30 countries, and climbing. In that role I have contributed input for the DSM-V and the ICD-10 of international experts identified in the specialization of parental alienation in preparing the proposal to the DSM and the ICD committees respectively in the diagnosis of Parental Alienation Disorder to be included in DSM 5 and ICD 11. The purpose of the PASG Inc. is to support practice development, research and funding and pilot program evaluation in this sub-specialty.

In the forensic arena I served as the sole damages expert in the largest federal award for a non-class action case in U.S. history. This case involved the civil prosecution of a series of war crimes defendants in litigation sponsored by the United Nations Agency on War Crimes. I worked on that case for over three years. I have served as the sole emotional damages expert in the largest racial discrimination case in Florida, and the largest sexual harassment case in Florida. I have served on numerous extreme trauma cases [involving profound complex body and brain injuries], including plane crashes like the Delta 191 crash in Dallas, Texas; and train crashes like the Sunset Limited crash into the Louisiana Bayou; and other high trauma vehicular crashes like the crash and subsequent explosion of a Shell Company oil tanker whose speeding driver turned his truck and trailer over on a curve in South Florida incinerating two other vehicles, killing several people and injuring others; and more recently the crash of a United Airlines aircraft whose medication impaired captain made a serious error in his flap settings in an attempted take off that at the last moment [and while in the air] had to abort the take off. Then there were matters like the Postal Anthrax Terrorism cases, and a more recently [in 2014] I worked on a United States Federal criminal case dealing with the exporting of domestic terrorism. More recently, I have given testimony in a highly traumatic medical malpractice case that lasted over six years. The case involved a psychiatric hospital and a total of five psychiatrists who irresponsibly authorized and/or then administered bilateral electroconvulsive therapy [ECT] that began initially four days after the admission [and for a total of 8 applications thereafter] of a 50-year old patient [a cardiologist] who

9

was situationally depressed after he was discharged from a large group practice. Instead of beginning a conservative course of antidepressant medication and psychotherapy, the appropriate conservative course of conduct, the inappropriate use of the bilateral ECT left the patient seriously brain injured and incapable of ever working again or independently functioning in the future. And in 2015 I served as an expert in a personal injury case in which a traumatic beating in an elevation led to a young woman to become disabled by developing a profound yet very unusual mental condition, namely, a Dissociative Identity Disorder.

I have been involved in over 3,000 legal cases in State and Federal Courts throughout the United States, and in the Bahamas, Canada, Australia, England, Columbia, Argentina, and El Salvador. In several of these international cases I was have hired by attorneys employed by multinational law firms, in fact at the time the two largest United States based law firms. [Baker McKenzie, hired me from their New York office in a case of international kidnapping of a Kodak executive in Columbia. This same firm hired me out of their Miami office in a multi-fatality executive aircraft case in Argentina. Morrison & Foerster hired me out of their San Francisco office in a case that required my participation for over three years. This case involved the civil prosecution in the United States of three senior El Salvadorian Governmental officials in an international war crimes case.

I have also been hired in several United States Federal cases dealing with international child abduction under the International Child Abduction Remedies Act. This Act was passed at The Hague on October 25, 1980. [The Hague Convention]. The purpose of this Convention and the Act is to secure the safe return of children wrongly removed or retained outside the country of their habitual residence, and to ensure that the contracting countries respect each other's sovereignty under the Convention. One element of this Act is that foreign Courts do not have jurisdiction to hear underlying custody disputes. These courts can determine only where the child custody action can be tried, unless returning the child to their country would reasonably lead to great harm. I will describe in more detail some of my most significant forensic cases subsequently.

I am Founder and Chief Executive of MindExperts International [into which I have integrated my practice]. MindExperts International [www.mind-experts.com] is a new technology telemedicine portal offering access to exceptional mental health and behavioral science experts that provides an online scheduling calendar, a state-of-the-art secure, HIPAA compliant high definition proprietary telepresence portal, and an encrypted email and document sharing system. This network serves the needs of a variety of patients, clients and experts via a worldwide network. The company is a leader in telemedicine in the behavioral sciences and affords a convenience and sophistication that is transformative in the delivery of mental and behavioral health and other consulting.

I also serve on the board of several companies that are focused in what is referred to as the alternative financing investment [not the convention equities] strategies space.

**Specialty Links to My Practice**

My practice is listed on sites including: TherapyNext.com; National Register of Health Service Providers in Psychology; the American Psychological Association; the American Board of Professional Psychology; the Association of Cognitive and Behavioral Therapies; the Society for the Exploration of Psychotherapy Integration; Psychology Today; the Therapy Directory; Doximity [www.doximity.com]; the Professional Academy of Custody Evaluators; Linkedin; Google [https://profiles.google.com/glenn.caddy]; the Australian Clinical Psychology Association; the Australian Psychological Society, and various other professional sites.

I am also a member of and/or linked to mental health professional and business professionals internationally through the site "Internations: Connecting Global Minds" [www.internations.org]. My forensic practice is listed as part of the Round Table Group with Thomson Reuters Westlaw [www.thomsonreuters.com]. Finally, search my name via the telemedicine portal, MindExperts International LLC [www.mind-experts.com].

**Professional and Other Positions and Employment:**

| | |
|---|---|
| 2011-Present | Founder and Chairman<br>**MindExperts International LLC**<br>MindExperts is a telehealth company that provides the Infrastructure to support the services of a highly selected national and international network of expert Psychologists, Psychiatrists, and other behavioral health consultants. |
| 1989-Present | President and Clinical Director<br>**Glenn Ross Caddy, Ph. D., P.A. and Associates**.<br>A comprehensive psychology practice based in Florida. |
| 1995-2008 | Co-Director<br>**The Forensic and Clinical Behavioral Sciences Center**, Boca Raton and Fort Lauderdale, Florida. A small group practice specializing in multiple areas of forensic and clinical psychology practice. |
| 1980 -1989 | Director<br>**Clinical Psychology Institute**<br>A multi-specialty practice group located in Fort Lauderdale and Coral Springs, Florida |
| 1982 -2004 | Consultant in Industrial/Organizational Psychology<br>**Coyne Didsbury PDI (Australia) Pty. Ltd.**<br>Sydney and Melbourne, Australia |

11

| | |
|---|---|
| 1982-1994 | Professor of Behavioral Sciences (Adjunct) **School of Medicine and Health Sciences Nova Southeastern University** Fort Lauderdale, Florida |
| 1983-1990 | President and Clinical Director **Academy of Medicine and Psychology** Fort Lauderdale and Coral Springs, Florida |
| 1982-1992 | Professor and Director of Clinical Training **School of Psychology, Center for Behavioral Sciences Nova Southeastern University,** Fort Lauderdale, Florida |
| 1977-1982 | Associate Professor of Psychology and **Director, Addiction Research and Treatment Center Old Dominion University** Norfolk, Virginia |
| 1977-1982 | Founding Director, Doctor of Psychology Program, **The Virginia Consortium for Professional Psychology** (This is the first professional psychology consortium program in the U.S. It comprises the College of William and Mary, Eastern Virginia Medical School, Old Dominion University, and Norfolk State University). |
| 1977-1982 | Associate Professor **Department of Psychiatry and Behavioral Sciences Eastern Virginia Medical School** Norfolk, Virginia |
| 1975-1977 | Director, Drug and Alcohol Abuse Services, and Associate Director, Jefferson Mental Health Center, and Assistant Professor, **Department of Psychiatry and Behavioral Sciences Thomas Jefferson University Medical School** Philadelphia, Pennsylvania, and Consultant Clinical Psychologist, **Veterans Administration Medical Center** Coatesville, Pennsylvania |
| 1975 | Visiting Assistant Professor **Department of Psychology University of California at Riverside, California** |

| 1975 | Adjunct Assistant Professor<br>**Department of Psychology**<br>**California State University at Fullerton, California** |
| 1974-1975 | Post-Doctoral Research Fellow, Research Scientist II and Project Director of an NIAAA sponsored research study.<br>**Neuropsychiatric Institute**<br>**University of California at Los Angeles, California** |
| 1973-1974 | Senior Intelligence Specialist [Foreign Service Officer]<br>**Department of Foreign Affairs, Canberra, Australia**<br>[In this role I was security classified at "Top Secret"]. |
| 1969-1974 | Commissioned Officer, Australian Infantry,<br>**Second Division, Royal Australian Regiment** |
| 1965-1968 | Non-Commissioned Officer, **Australian Defense Forces** |

## Business and Professional Involvements

As well as holding the various professional positions listed above, there are professional and non-professional business involvements in which I have participated, or in which I continue to be involved, either as a consultant or as a Board Member, Partner, or Principal. In the spirit of comprehensive disclosure, these additional involvements are listed under the heading "Administrative and/or Business Experience". Given my focus on professional matters, without working with some very able partners I could not have been involved in, let alone played a pivotal role, in many of these ventures.

**Consultant, PsychPress Pty Ltd** [1988 to present]. This company is a Melbourne (Australia) based international psychological assessment and testing development and book publishing company. Of particular significance has been my work in contributing to the development of computerized testing products for both personnel selection and clinical psychological screening that are now available from the company on-line.

**Director, Informatic Healthcare Solutions Inc** [1998 to 2004]. This Nevada Public Company was involved in the early development and delivery of a variety of telemedicine applications, primarily for home health. I was invited to sit on the Board because of my knowledge of technology, behavioral medicine, and health psychology. Thereafter, and based on my performance in Informatic Healthcare Solutions Inc, I was elected to serve on the board of IHS's parent company, Peninsula Holdings Group.

**Chairman, Mind-Experts International** [January, 2011 to present]. This is a Florida corporation but is an internationally focused telemedicine consulting company. The U.S.

13

Patent and Trademark Office approved a worldwide trademark [application # 85440231] for the name "Mind Experts International" on February 2, 2012.

MindExperts International [www.mind-experts.com] aims to be the premier worldwide telemedicine portal for services in the behavioral sciences. The portal offers proprietary state of the art HIPAA compliant high definition telepresence, secured email, online scheduling, secured business systems and document transfer, and practice marketing services to a network of highly selected psychologists, psychiatrists, and behavioral medicine specialists worldwide. The portal delivers a broad range of clinical, forensic, and business consultation services, together with online assessment products, professional continuing education, and peer-to-peer consultation, all rendered by world-class professionals.

**Involvements from a [non-professional] business perspective have included the following:**

**Director, Landvest Pty. Ltd. [1967 to 1974].** Landvest was a company established with two friends while we were all at the University of New South Wales. We all combined our funds and bought old homes and renovated them. This venture stopped when I moved to the United States.

**Director, Leading Edge Real Estate Inc.,** [2000 to present]. This is a Florida licensed Real Estate Sales Company.

**Board Member, The Lighthouse and Historic Building Preservation Society** [2000 to 2006]. This Florida Not-For-Profit Corporation supported the preservation of several lighthouses that were decommissioned by the United States Coast Guard. The work involved a range of public awareness and advocacy efforts and the raising of capital to support the maintenance requirements of these beautiful structures. Some of these funds were raised through the donation process of façade easements from other old classic buildings.

**Partner, Eventus Capital Group** [2007 to 2016]; Eventus is the Greek God of Prosperity. This Florida Corporation offers qualified investors partners access to a series of ultra high speed highly specialized market neutral programmed trading strategies. Our proprietary platforms support programmed trading strategies that have produced robust and consistent daily revenue generation, despite the vagaries of the markets, from their first month of operation. Eventus Capital Group provides qualified investors participation in a trading strategy referred to as Electronically Traded Funds Arbitrate. This strategy operates particularly well in high volatility trading environments and shows low returns in low volatility environments. To offset the low volatility periods the Group also provides qualified investors access to what is referred to as our Strategic Equities Options Trading Program. In July 2016 I sold my interests in this company to a New York Investment Group.

14

**Eventus Investment Partners LLC** [2008 to Present]. This Florida company provides the financing and the business strategy to facilitate a hard-money lending program. In this program, developers or other people seeking money to build, develop, or renovate real estate [especially the latter] who meet our lending criteria are funded up to fifty percent of the equity in the properties. They are required to transfer their properties into a Limited Liability Company of which our entity owns 25 percent. Loans are made typically for one year but may be recycled over up to two years. In the event of a default, by contract, we take full control of the LLC, without any foreclosure process being required. One of our real estate sourcing entities for this program is the Right Angle Fund.

**Military Experience**:

1965-1974: I was promoted through the ranks to the rank of First Lieutenant. I served as an Infantry Platoon Commander, the Administrative Staff Officer of an Infantry Company, and then as an Administrative Staff Officer, Second Division, Royal Australian Infantry. Prior to leaving the military I met the requirements for promotion to the rank of Captain. At that time I was seconded to serve in the position of a Senior Intelligence Officer, within the Department of Foreign Affairs, Canberra, A.C.T.

**Non-Professional Affiliations:**

University of New South Wales Sports Association (Life Member)

University of New South Wales Regiment Association (Life Member)

Maroubra Surf Life Saving Club, Maroubra, Australia (Life Member)

Swimming Hall of Fame (Fort Lauderdale, Florida) One Hundred Mile Team

Member, Elite Force USA (Fort Lauderdale, Florida). I began martial arts in my mid teens as a student of traditional Japanese Kodokan Judo at a Sydney dojo. Over the years and at various dojos I have expanded my training to include Karate, Jiu-Jitsu, and Muay Thai. The study of martial arts is always a work in progress.

**Hospital Staff:**

**Veterans Administration Hospital**, Coatesville, Pennsylvania: Consulting Staff (1974-1976)

**Tidewater Psychiatric Institute**, Virginia Beach, Virginia: Consulting Staff (1977-1980).

**Veterans Administration Medical Center**, Miami, Florida: Consulting Staff (1981-1998).

**The Care Unit** [an inpatient addictions facility], Coral Springs, Florida: Consulting Staff (1981-1992).

**Florida Medical Center**, Fort Lauderdale, Florida: Consulting Staff (1981-2001).

**University Pavilion**, Tamarac, Florida: Consulting Staff (1989-1999).

**Sunrise Regional Medical Center**, Sunrise, Florida: Consulting Staff (1989-2002).

**Fort Lauderdale Hospital**, Fort Lauderdale, Florida: Consulting Staff (1999-2006).

**Atlantic Shores Hospital**, Fort Lauderdale, Florida: Consulting Staff (2003-Present). In August 2009 I was appointed to co-ordinate the administration of Psychological Services at this facility. I ceased that duty in December 2012 because I was just too busy but I continued on the staff of this facility up to the present time.

**Independent Contractor: Health & Human Services Group**
I am Drug Enforcement Agency security cleared to provide professional services to DEA employees and their family members. This work is conducted under a contract with the Health and Human Services Group, Mission Viejo, California.

**Honors, Awards, and Citations:**

Alexander Mackie Teachers College Award (1964-1965)

Commonwealth Scholar (1965-1968)

Commonwealth University Fellow (1969-1972)

Justice of the Peace, New South Wales, Australia, (1970-present)

The Australian Defense Medal, Awarded by the Department of Defense, Canberra, Australia.

Listed in Marquis's Who's Who in the South and Southwest.
18th Edition, 1982-1983.

Selected as an Outstanding Young Man of America in 1981 by the United States Jaycees in recognition of outstanding professional achievement and for service to the community.

Listed in Men of Achievement, International Biographical Center, Inc., Cambridge, England, 1983.

Listed in Who's Who in the Bio-Behavioral Sciences, Research Institute of

16

Psychophysiology, Inc., New York, New York, 1983.

Listed in <u>The Directory of Distinguished Americans,</u> Second Edition, American Biographical Institute, Raleigh, North Carolina, 1983.

Listed in Marquis's <u>Who's Who in Frontier Science and Technology</u>, First Edition, 1983.

Listed in <u>The Directory of International Biography</u>, International Biographical Center, Inc., Cambridgeshire, England, 1984.

Listed in the <u>International Who's Who of Contemporary Achievement,</u> Biographical Publications, Cambridgeshire, England, 1984.

Listed in <u>Personalities of the South,</u> American Biographical Institute, Raleigh, North Carolina, 1986 (13th Edition).

Listed in <u>Who's Who in Society</u>, American Publishing, Fort Lauderdale, Florida 1986

Listed in <u>The Global Directory of Who's Who</u>, Eastern Seaboard Publishing, New York, New York, 2005.

And others:

**Areas of Special Professional Expertise:**

**Topics in Clinical Psychology, Neuropsychology, and Behavioral Medicine**

Assessment Psychology
Multiple areas in Psychopathology
The Cognitive Behavioral Strategies and Perspective
Family and Systems Psychology
Issues in the Training of Clinical Psychologists
The Clinical-Forensic Psychology Interface
Multiple areas of Behavioral Medicine and Wellness
The Spectrum of Eating Disorders
Human Sexuality and Dysfunction
Mind Control and Cult Deprogramming
Depression and the Affective Mood States
Discrimination: Its Impact and Management
Work Stress and Related Problems at Work
Post Traumatic Stress States
Terrorism, Torture, and Special Issues in Recovery
Delusional Disorders and Psychotic Process

The Mechanisms of Mind Control and Deprogramming
Human Growth and Development
Parent-Child Estrangement
Parental Alienation Syndrome
Multiple Personality and Dissociation
Stress and the Anxiety Disorders
Disability and Rehabilitation Psychology
Brain Trauma and Neuropsychological Assessment
Addictive Behavior [Alcohol, Tobacco, other Drug & Gambling]
The Spectrum of Eating Disorders
Mental Illness as Errors in Programming
Computerized Screening and Testing
Executive and Performance Coaching
The Application of Telehealth Networking and Services

**Topics in Forensic Psychology**

I have written on topics in forensic practice that include: Research on Eyewitness Testimony, Trial Story Analysis and Debriefing, Use of Mental Health Experts in Emotional Damages Claims, The Changing Face of Medico-Legal Practice, Defending Emotional Damages Claims at Work, Discrimination in the Workplace, Sexual Harassment and its Prevention, Prevention of Litigation: War at Work, Reasons Why Employee Assistance Programs Fail to Resolve Conflicts in the Workplace, Forensic Neuropsychology, Evaluating Mild Brain Injury, Issues in War Crimes and Torture, The Continuum of Parental Estrangement and Alienation, and likewise, strategies in Reunification Therapy, the processes of Mind Control and Deprogramming, and the Application of Mind Control and Induction of Insanity.

In most instances I am hired by attorney's to perform psychological evaluative or assessment services directly with their clients. Sometimes I am hired through appointment by the court to serve as an Independent Psychological Examiner and sometimes I am hired through intermediary referral companies like PsyBar and the Roundtable Group at Thomson Reuters Westlaw. I am also hired to consult on cases that involve a confidential critical analysis of the quality of work of another expert and occasionally even to provide a critical analysis of the trial story being proposed. Sometimes my work requires depositional testimony, sometimes in court testimony, and sometimes I find myself being asked to present my findings and opinions at mediation. Additionally I occasionally work under contract with agencies like the State of Florida Justice Administrative Commission [JAC] or the Office of the Collateral Representative for the State of Florida.

My experience is broad and hence the scope of my work is broad as seen in the array of topics in which I deal or have dealt across a variety of areas of

legal [forensic psychological] concern.

**Family Law**
Family Violence
Custody Evaluation and Parental Fitness
Relocation Issues, even Hague Convention matters
Sexual and Other Abuse Allegations
Parental Estrangement
Parental Alienation Issues and Reunification Therapy
Action to secure the safe return of children under the Hague Convention
Dependency Evaluations
Other Interests of children Issues
Deception and Malingering
Parenting Coordination

**Labor, Employment, and Related Law**
Gender, Race, Age, Disability, and Religious Discrimination at Work and in Academic Institutions
Sexual Harassment in the Workplace
Risk Mitigation through Effective Policy and Enforcement Practices
Objective Investigation of Workplace Complaints
Whistleblower and Retaliation
Fitness for Duty Evaluations
Working with Attorneys including In house Counsel and Human Resources and Employee Assistance Program Personnel to facilitate the Effective Management of Complaints to Achieve Resolution [and so mitigate the risk associated with failure to effectively manage complaints]
Deception and Malingering

**Personal Injury, Products Liability, Medical Malpractice or Mental Health Malpractice and Standard of Care Issues**
Battered Person Syndrome and Duress
Abuse in the care of the Mentally Retarded and Elderly
The Consequences of Torture [including war crimes cases]
Domestic Terrorism [including the Anthrax cases]
Consequences of Adult Rape and Sexual Abuse
Child Sexual Abuse [including Church and School cases]
Intimacies with Patients
Sexual Assault in Public Places
Elder Abuse and Standards of Care
Lawless and Mismanaged Prison Cases
Consequences of Single Event Trauma
Spiritual Abuse and Mind Control
Complicated Bereavement: Special Considerations
Medical and Mental Health Malpractice: Emotional Impact

19

High Trauma Personal Injury [aircraft, train, and major truck and other automobile and bike accidents] inducing serious physical and/or functional psychological trauma
Neuropsychological and consequences of following head trauma induced by Electro-Convulsive Therapy. [Research involving tragic outcomes and inappropriate applications].
Brain Trauma and Head Injury
Interactions between the Effects of Head Injury and Prior Mental Disorders
Personal Injury in Product Liability Cases
Toxic Drug Effects and Memory
Emotional Damages after Medical Procedures or Drug Administration
Emotional Damages after Psychological Care
Misdiagnosis and/or Standard of Care Issues in Mental Health Services
Age, Competence, and Testamentary Capacity
Addiction: Death and Quality of Life Issues [including tobacco cases]
Deception and Malingering

**Special Disability Cases**
Worker's Compensation
Social Security Disability and Appeals
National Association of Securities Dealers Mental Impairment Cases

**Multiple Issues in Criminal Forensic Cases**
Battered Person Syndrome
Mental Retardation Evaluations
Retardation or Immaturity and Suggestibility
Malingering and Deception
Juvenile Offender Transfers to Adult Court
Future Dangerousness
Competency to Stand Trial
Competency to Waive Miranda Rights
Competency to Plea
Competency to Die
Post Conviction Death Case Consultation
Analysis Requirements: The Insanity Defense
Religious Delusional Disorder and Insanity
Child Sexual Abuse and Child Pornography Cases
Effects of Medication Interactions on Intent
Mitigation and Aggravation Factors in Sentencing
Analysis in Death Penalty Sentencing
Deception, Malingering, and Mental Illness
Mind control and the induction of psychoses

**Immigration Cases**
Psychological issues of illegal immigrants, specially those who had been

20

brought to the United States as children, who lack legal status, have no contact with their country of origin, and yet are risking deportation. Evaluation of abused spouse and/or children claims related to the risk of deportation.

**Examples of Extraordinary Forensic Involvement**

I have had more than thirty years experience in consultation in a variety of Industrial/Organizational contexts. My experience here has included work involving organizational systems review, executive selection, and exploring human resource issues. My background knowledge in these areas led me to he hired to conduct a number of investigations into corporate discriminatory practices in matters including sexual harassment and disability discrimination. But I have also worked on the plaintiff side of such cases and in so doing was the expert on the largest Federal Court sexual harassment award in Florida history. I also served on a class action suit brought by 52 plaintiffs claiming racial and other discrimination practices in a case that resulted in a settlement far exceeding ten million dollars.

I have served the airline industry as a special consultant for mental health concerns with United Airlines and their Employee Assistance Program. I also served as a special consultant to Delta Airlines following the August 1985 crash in Dallas Texas of their Flight 191. Likewise I consulted in another transport industry case, involving the deadliest train accident in Amtrak history, the September, 22, 1993 Sunset Limited crash into the Big Bayou near Mobile, Alabama.

I have also consulted with the United States Postal Workers Union to address the psychological consequences that followed the Bioterrorism [Anthrax] attacks during the period of October 4 to November 20, 2001. This work followed the 22 cases of anthrax exposure to members of the union.

I have been hired to examine a number of victims in a series of war crimes cases from the civil war in El Salvador [1980-1992] during which an estimated 75,000 civilians were murdered. This litigation related to this work was sponsored by the United Nations Agency on War Crimes and Amnesty International. These cases did not come to trial until early this century. In one of these cases I was the sole emotional damages expert in a case that resulted in the largest Federal emotional damages award for a non-class action suit in United States judicial history [$54,000,000].

Dealing further with crimes against humanity, I was also hired in the criminal case of United States of America vs. Charles McArthur Emmanuel. Mr. Emmanuel is the son of the now convicted Charles McArthur Taylor, the former African Warlord and President of Liberia. The crimes of Mr. Emmanuel

were related to the murder and torture of a number of villagers during the Sierra Leone Civil War. Mr. Emmanuel is now serving a fifty-year sentence in The United States Department of Corrections.

I was hired in a post conviction case for a man who had been incarcerated on death row for seventeen years and was imminently facing death [State of Florida vs. Donald Gunsby, Case #CT88881-CFAX, Marion County, Florida]. My mitigation work in that case established that the prisoner was mentally retarded and at the end of my testimony the court found that Mr. Gunsby was mentally retarded and that he had made a confession of facts that were inconsistent with the facts of the crime. After an evidentiary hearing the prisoner was ultimately released as the State of Florida declined to retry the case.

I was hired as a consultant to an attorney in British Columbia, Canada in one of the first highly contentious cases there [involving two countries] that became a test case for the then evolving international recognition of the concepts of parental estrangement and the emergence of parental alienation syndrome. In this case the syndrome had impact all of the four children in the family and the mother, who in this case was the alienator, later proved to be a serial alienator across two husbands and six children.

I was hired by the then largest law firm in the world to work on a case of a Kodak executive who, with his family, had been kidnapped and held for a huge ransom in Columbia, South America. My role was one of the team who employed psychological and legal strategies to negotiate the release of the executive. Ultimately, the release was successfully accomplished.

I was hired on a case dealing with an Argentinian family who vacationed in Florida, during which time the mother took the children from the father and refused to return them to their home country, claiming that to do so would expose them to unacceptable ongoing abuse. This matter was heard in Federal Court in the Southern District of Florida and involved some very interesting legal issues related to the "Hague Convention". [The International Child Abduction Act, October 25, 1980]. The court ruled that the children's mother claim of abuse was not credible and ordered the children to be returned to their father in their home country. Ultimately, the mother also returned to her home country and the children were reunified with both parents in their country of origin.

**Doctoral Thesis and Early Related Research:**

Caddy, G.R. **Behavioral Modification in the Management of Alcoholism**. Thesis presented to the School of Psychology, Faculty of Science, University of New South

Wales, Sydney, Australia, 1972.

This clinical research program was supported by a grant from the Australian Commonwealth Government. I conducted a series of studies that first examined the ability of a sample of 120 human subjects to discriminate blood alcohol levels with various strategies of learning, including blind trials, and also a biofeedback strategy that I developed which became known as "Blood Alcohol Level Discrimination Training". This research led to a series of four clinical studies using another approximately one hundred volunteer patients suffering from significant alcohol abuse problems. In this second study some 90 clinical research subjects suffering from serious alcohol problems were administered various learning based educationally oriented self-regulation treatments, BAC discrimination procedures, and other cognitive therapy components to explore self-regulation in alcohol abusing patients. Also, in one study, an aversion therapy component was added. The aim was to modify the excessive drinking practices of both early stage alcoholics and problem drinkers.

In an entirely separate second study, we used a series of studies using Blood Alcohol Level Discrimination Training to explore parameters of the limits of two levels of skill in driver safety.

Regarding this second separate study, in 1971 the Ansvar Insurance Company sponsored a program that allowed me to study the track driving performance of a large sample of everyday drivers and compare this performance with that of highly experienced racing drivers. The comparisons were based on a series of tests looking at driver performance errors across three levels of evasive driver complexity at two speed levels. The study was conducted in a series of alcohol blind trials on a racing track and it involved five blood alcohol levels [0.0mg%, 0.05mg%, 0.08mg%, and 0.10mg%]. The results showed a deterioration of the performance of all drivers by 0.05mg% but with the everyday driver showing the greatest initial fall off in performance. Very serious driving errors were broadly noted at the lowest speed and easiest evasion tasks levels at blood alcohol concentrations of 0.08mg%. These studies were observed by the New South Wales Police Service and reported broadly around Australia.

These findings together with the results of a number of other studies were examined in a Report on Driver Safety to the Commonwealth of Australia and in collateral reports to the various State Governments of Australia. In the course of the Australian Government's review and contemplation of the new technology that permitted the actual blood alcohol determination from a fixed ratio of alveolar gas [breath alcohol] analysis, and my review of the literature in the field, my work here [integrated with other research] was given serious consideration by the Commonwealth and the various State Government committees as they formulated both State and Federal Government policies regarding the presumptive levels of driver impairment that would be deemed illegal. Our work and other studies were also cited in the decisions made by the various Scandinavian Governments in setting their alcohol related road safety policy limits. In New South Wales and all of the other Australia States, between 1971 and 1973 established the

23

presumptive Blood Alcohol Level for Driving Whilst Intoxicated was set either at 0.05% or 0.08%. My work here was the basis for the Ansvar produced documentary **Point Zero Eight**. [Ansvar is a Swedish Insurance Company].

Despite compelling evidence from multiple studies and the clear knowledge of scientists within the United States National Highway Traffic Safety Administration, it would take more than fifteen to twenty years subsequent to this work before most of the states throughout the United States of America [Nevada was especially late] would bring their presumptive impaired driver laws for alcohol use below 0.15 mg percent [more than twice the levels the research indicated]. By comparison, several of the Scandinavian Governments adopted their presumptive limits at 0.05% and then modified them down to 0.03 mg%. Today, virtually all of the U.S. States now set these presumptive limits at 0.08 mg%. This is one of many examples of the way politics, social policy, and science interfaces.

[The great Republican Kingmaker, Mark Hanna, is quoted as once saying: "There are two things important in politics. The first is money, and I can't remember what the second one is". In the period between 1970 and 1985 alone, in the United States more than half a million people died in road traffic accidents in which alcohol was a factor. While in many states, even if there were presumptive blood alcohol levels established, in fact, these levels were dangerously [stupidly] high. It took years to bring these levels down to 0.08 mg%. Likewise, the failure to promptly introduce full lap and shoulder restrains for front and rear seated passengers, and then mandate their use, and equally the failure to timely implement appropriate safe baby restrain systems for vehicles in the United States, all these policies reflect Governmental failure to timely act when the road safety science data was definitive and without question.

Publications and Presentations that linked directly to my doctoral research inc. and some further related research included the following:

Lovibond, S. H. & Caddy, G. R. Discriminated aversive control in the moderation of alcoholics' drinking behavior. <u>Behavior Therapy,</u> 1970, 1,437-441.

Also republished in D. Matheson & M. Davidson. <u>The Behavioral Effects of Drugs.</u> New York: Holt, Rhinehart & Winston, 1972.

Also in J. Stoyva, T. Barber, L. Dicara, J. Kamiya, N.E. Miller & D. Shapiro (Eds.), <u>Biofeedback and Self-Control</u>. New York: Aldine Atherton, 1972, 545-554.

Also republished in R. M. Suinn & R. G. Weigel (Eds.), <u>The Innovative Psychological Therapies: Critical and Creative Contributions.</u> New York: Harper & Row, 1974, 46-51.

Caddy G.R. & Lovibond, S. H. Self regulation and discriminated aversive conditioning in the modification of alcoholics' drinking behavior. <u>Behavior Therapy,</u> 1976, 7, 223-230.

A further linked study was Caddy, G. R., Addington, H.J. & Perkins D. Individualized behavior therapy for alcoholics: A third year independent double-blind follow-up. Behavior Research and Therapy, 1978, 16, 345-362

Caddy, G.R. An evaluation of behavioral inoculation and other approaches in reducing alcoholic relapse. Paper presented at the Association for the Advancement of Behavior Therapy Annual Convention, Toronto, Canada, November, 1981.

It was the success and publication of this groundbreaking research that led a United States Professor of Psychology at the University of California, Los Angeles, Dr. Roger Vogler, to begin a correspondence with me and that led to the joint writing of a National Institute of Mental Health Research Grant. That grant was funded in 1973 and with that support I moved to the United States as the Co-Principal Investigator of that Research.

**Professional Activities:**

**Lectures and Papers Presented:**

Caddy, G .R. Abstinence or cure: A re-evaluation of the nature of alcoholism and implications for treatment.  Paper presented at the 29th International Congress on Alcoholism and Drug Dependency, Sydney, Australia, February, 1970.

Lovibond, S. H. & Caddy, G .R. The reduction of alcohol consumption by aversive procedures.  Paper presented at the 29th International Congress on Alcoholism and Drug Dependency, Sydney, Australia, February, 1970.

Caddy, G. R. The importance of individual responsibility in the management of alcoholism.  Paper presented at the 80th Annual Convention of the American Psychological Association, Honolulu, Hawaii, September 7, 1972.

Caddy, G. R. A critique of the disease model of addictive behavior.  Invited lecture to the Claremont Graduate School, Claremont, California, March, 1973.

Caddy, G. R. A comparison of American and Australian systems of behavior therapy.  Invited address before the faculty of Thomas Jefferson University Medical College, Philadelphia, Pennsylvania, November 6, 1974.

Caddy, G. R. Training in blood alcohol concentration estimation: Procedure, results, and application.  Paper presented at the Behavioral Approaches to Alcoholism and Drug Dependencies Conference, University of Washington, Seattle, Washington, July 30, 1975.

Gottheil, E., Caddy, G. R. & Austin, D. L. Clinical significance of urine drug screens.  Paper presented at the Canadian Psychiatric Association Annual

Meeting, Banff, Alberta, Canada, September 25, 1975.

Caddy, G. R. Multi-dimensional approaches in substance abuse. Paper presented at the Forum meeting of the Center for Alcohol Studies, University of North Carolina, Chapel Hill, North Carolina, December 9, 1975.

Caddy, G. R. An experimental analysis of the role of self-regulation in an alcohol treatment program. Paper presented at the Second Annual Convention of the Mid-Western Association of Behavioral Analysis, Chicago, Illinois, May 4, 1976.

Caddy, G. R. Manipulation in Addicts. Invited lecture before the Institute on Sociopaths and Manipulators, Virginia Council on Social Welfare, Virginia Beach, Virginia, November 7, 1976.

Caddy, G. R. Implications of the field of the Rand Corporation Report of controlled drinking by recovered alcoholics. Invited address before the meeting of the National Institute of Alcohol Abuse and Alcoholism Career Teachers, Atlanta, Georgia, February 10, 1977.

Caddy, G. R. Individualized behavior therapy for alcoholics, third year follow-up: Advantages and disadvantages of conducting double-blind treatment outcome evaluation studies. Paper presented at the Southeast Psychological Association Convention, Hollywood, Florida, May 4, 1977.

Caddy, G. R. Toward a multivariate analysis of alcohol abuse. Invited paper presented at the NATO sponsored International Conference on Experimental and Behavioral Approaches to Alcoholism, Bergen, Norway, August 29, 1977.

Caddy, G. R. Conducting double-blind and independent treatment outcome evaluation studies. Paper presented at the National Alcohol and Drug Treatment Outcome Evaluation Conference, Nashville, Tennessee, September 26, 1977.

Caddy, G. R. A multivariate perspective on addictive behaviors. Paper presented at the Empirical Approaches to the Treatment of Alcohol Abuse Conference, Charleston, South Carolina, October 15, 1977.

Caddy, G. R. The relevance of research to recovery. Invited to lecture presented at the Conference on Alcoholism Awareness, Norfolk, Virginia, February 14, 1978.

Flynn, J. B. & Caddy, G. R. The effects of alcohol on the rate of gain of information. Paper presented at the Southeastern Psychological Association Annual Convention, Atlanta, Georgia, March 10, 1978.

26

Caddy, G. R. History and current developments of the Doctor of Psychology Degree. Invited lecture presented at the Virginia Psychological Association Convention, Williamsburg, Virginia, April 14, 1978.

Caddy, G. R. Emerging concepts in the identification and assessment of substance abuse. Invited lecture before the Mental Health and Mental Retardation Society of Virginia, Virginia Beach, Virginia, September 22, 1978.

Caddy, G. R. Emerging concepts of alcohol dependence: The multivariate approach. Invited paper presented at the Western Pennsylvania Institute of Alcohol Studies, University of Pittsburgh, Pittsburgh, Pennsylvania, December 8, 1978.

Maisto, S. & Caddy, G. R. Self management strategies and addictive behavior: Present Status and prospects for the practitioner. Paper presented at the Annual convention of the Tennessee Behavior Therapy Association, Nashville Tennessee, February, 1979.

Caddy, G. R. & Kretchmer, R. An evaluation of the alternate leaderless group in a military psychiatric hospital. Paper presented at the Southeastern Psychological Association Convention, New Orleans, Louisiana, March, 1979.

Caddy, G. R. Application of "State of the Art" intervention and evaluation technology: Prospects for the future of the alcohol and traffic safety countermeasures approach. Invited address before the Alcohol and Traffic Program of the National Alcoholism Forum, Washington, D. C., April 30, 1979.

Caddy, G. R. A comparative evaluation of aftercare technologies in the management of alcohol dependence. Invited presentation, Addiction Research Foundation, Toronto, Canada, July 17, 1979.

Caddy, G. R. Preventing alcohol relapse: A comparison of aftercare procedures. Paper presented at the American Psychological Association Annual Convention, New York, New York, September, 1979.

Caddy, G. R. Aftercare procedures applied to alcohol abusers: A component analysis. Paper presented at the Association for the Advancement of Behavior Therapy Annual Convention, San Francisco, California, December, 1979.

Caddy, G. R. Emerging concepts of addictive behavior and its treatment. Invited presentation before the School of Psychology, The University of Queensland, St. Lucia, Queensland, January, 1980.

Caddy, G. R. The efficacy of continuing contact and continuing care strategies

in reducing alcoholic relapse.   Paper presented at the Southeastern Psychological Association Annual Convention, Washington, D. C., March, 1980.

Caddy, G. R. Self-control and the addictive behaviors.   Paper presented before the South Carolina School of Alcohol and Drug Studies, Charleston, South Carolina, June 19, 1980.

Caddy, G. R. Present and future trends in alcoholism and treatment research. Invited presentation, Department of Psychiatry, University of South Carolina, Charleston, South Carolina, June 19, 1980.

Caddy, G. R. Aftercare and the prevention of alcoholic relapse.  Invited lecture sponsored jointly by the Medical College of Georgia and the Veterans Administration Medical Center, Augusta, Georgia, June, 1980.

Hamilton, R. A., Barone, D., Katell, A. & Caddy, G. R. The development, psychometric properties and application of the work stress inventory.  Paper presented to the Florida Association of Applied Behavior Analysis, Orlando, Florida, September, 1981.

Katell, A. D., Caddy, G. R., Pollack, D. R. & Hamilton, R. A. Health risk factor reduction: Relaxation training, assertiveness training and cognitive restructuring in reducing job stress.  Paper presented at the Association for the Advancement of Behavior Therapy Annual Convention, Toronto, Canada, November, 1981.

Caddy, G. R. & Douglas, M. A. An evaluation of behaviorally based mediation and other techniques in facilitating divorce resolution.  Paper presented at the Association for the Advancement of Behavior Therapy Annual Convention, Toronto, Canada, November, 1981.

Caddy, G. R. & Addington, H. J., Jr. An evaluation of behavioral inoculation and other approaches in reducing alcoholic relapse.  Paper presented at the Association for the Advancement of Behavior Therapy Annual Convention, Toronto, Canada, November, 1981.

Hamilton, R. A., Barone, D. F., Katell, A. D. & Caddy, G. R. A behavioral assessment inventory for measuring work stress: Its cross-validation and construct validity.  Paper presented at the Association for the Advancement of Behavior Therapy Annual Convention, Los Angeles, California, November, 1982.

Caddy, G. R. The use of computers in psychological assessment: development and status.  Invited presentation sponsored by Psych-Systems,

Inc., before the Texas Psychological Association Annual Convention, Dallas, Texas, November, 1982.

Caddy, G. R. Conditions that reinforce violence and crisis: The underlying interaction between anger and powerlessness. Invited presentation before the Women in Distress Conference sponsored by Broward County Board of Commissioners, Fort Lauderdale, Florida November, 1983.

Barone, D. F., Katell, A. D., Caddy, G. R. & Roselione, F. The development of the Work Stress Inventory of Job Aversiveness. Paper presented at the Association for the Advancement of Behavior Therapy Annual Convention, Washington, D. C., December,1983.

Barone, D. F., Katell, A.D., Caddy, G. R. & Roselione, F. Work Stress Inventory #2. Excessive Job Demands. Paper presented at the Association for the Advancement of Behavior Therapy Annual Convention, Washington, D. C., December, 1983.

Caddy, G. R. Professional Work Stress and its Remediation. Invited presentation before the National Association of Criminal Defense Lawyers. Mid-Winter Meeting, Fort Lauderdale, Florida, February, 1984.

Barone, D. F., Katell, A. D., Caddy, G. R & Roselione, F. Work Stress Inventory Scale #2. Threat of harm. Paper presented at the South Eastern Psychological Association Annual Convention, New Orleans, Louisiana, March, 1984.

Caddy, G. R., Trenschel, W. R. & Addington, H. J., Jr. Comparative evaluation of aftercare technologies. Paper presented at the South Eastern Psychological Association Annual Convention, New Orleans, Louisiana, March, 1984.

Caddy, G. R. The Cognition of Stress in the Workplace. Invited lecture before the Georgia Association of Criminal Defense Lawyers, Hilton Head Island, South Carolina, May, 1984.

Barone, D. F., Katell, A. D., Caddy, G. R. & Roselione, F. The Work Stress Inventory: Reliability and Concurrent Validity. Paper presented at the American Psychological Association Annual Convention, Los Angeles, California, August, 1985.

Caddy, G. R. Psychological Service as Cost Containment in a Health Maintenance Organization: A Model. Paper presented at the Annual Management Convention of Health America, Inc., Scottsdale, Arizona, May, 1985.

Caddy, G. R. & Barone, D. F. The Role of the Clinical Psychologist in Assisting the Personnel Professional.  Paper presented at the Florida Public Personnel Association, Hollywood, Florida, July, 1985.

Caddy, G. R. The Stress of Guaranteeing Failure in Relationships, both Personal and Professional.  Invited presentation before the Professional Insurance Agents of Florida Annual Convention, Boca Raton, Florida, August 22, 1986.

Caddy, G. R. The forensic psychologist in the workplace.  Invited lecture. Labor Law Seminar, American Institute of Banking, Miami, Florida, October 22, 1988.

Caddy, G. R. The professionalizing of psychology and implication for the mental health delivery system: Comparison between the U. S. and Australia. Invited presentation before the Department of Psychology, Westmead Hospital, Sydney, Australia, December, 1988.

Caddy, G. R. The Forensic Psychologist as Expert.  Invited address before the Broward County Criminal Defense Attorney's Association Annual Meeting, Fort Lauderdale, Florida, May 17, 1989.

Caddy, G. R. Sexism and sexual abuse in the workplace.  Invited lecture before the Greater Fort Lauderdale Chamber of Commerce, Fort Lauderdale, Florida, November 21, 1989.

Caddy, G. R. The Professionalizing of Forensic Psychology.  Invited lecture, Westmead Hospital, University of Sydney, Sydney, Australia, December 14, 1991.

Caddy, G. R. Trial story analysis: Everyone has a story.  Invited lecture before the National Association of Criminal Defense Lawyers, Orlando, Florida, February 19, 1993.

Amlong, K. C. and Caddy, G. R. The selection and use of expert witnesses: Strategies for calculating damages and employing psychological experts. Invited address before the Advanced Current Labor Topics Seminar.  The Labor and Employment Law Section of the Florida Bar Continuing Legal Education Program, Amelia Island Plantation, Florida, April 28-29, 1994.

Caddy, G. R. Trial story analysis.  Invited address before the Brave New World of Jury Trials in Employment Litigation Continuing Legal Education Program, Florida Bar Labor and Employment Law Section, Orlando, Florida, September 23, 1994.

Caddy, G. R. Expert witness testimony and emotional distress damages outcome. What a good plaintiff's expert witness does. Invited address before the Thirteenth annual Multi-State Labor and Employment Law Seminar, Southern Methodist University, Tucson, Arizona, May 19, 1995.

Caddy, G. R. The use of expert testimony in sexual harassment and similar cases involving emotional damages. Paper presented at the Employment law Section of the Orange County Bar Association Annual Meeting, Orlando, Florida, July 19, 1995.

Caddy, G. R. The changing face of medico-legal practice. Invited lecture Department of Psychiatry, University of Sydney, Sydney, Australia, August 7, 1995.

Byrne, D. A. and Caddy, G. R. Sex, race, age discrimination and ADA. What is an employer to do? Paper presented to the Community Bankers of Florida Fourteenth Annual Convention, Boca Raton, Florida, August 24, 1995.

Cohen, M. and Caddy, G. R. Sexual Harassment: War at Work. Invited presentation before the annual convention of the Florida Public Defenders Association, Hutchinson Island, Florida, July 31, 1998.

Caddy, G. R. Trends in the Change of Health Care Delivery and its Funding in America: Implications for the Clinical Professions. Invited lecture, School of Psychology, University of Sydney, August 3, 1999.

Caddy, G. R. Inside the Courtroom: Your EAP and the Legal System. Invited presentation at the annual convention of the Employee Assistance Professionals Association, Orlando, Florida, October 21, 1999.

Caddy, G. R. & Sauber, S.R. Establishing and Refuting Damage Claims in Employment Cases. Invited presentation coordinated by the Employment Law CLE Committee of the Palm Beach County Bar Association (Course # 81903), West Palm Beach, Florida, February 6, 2004.

Caddy, G.R. Parental Alienation and the Dynamics of Mind Control. Invited Presentation before the Canadian Symposium for Parental Alienation Syndrome, Toronto, Canada, September 5, 2008.

Caddy, G.R. PAS and Mind Control: Creating Mental Illness. Invited Presentation before the Second Canadian Symposium for Parental Alienation Syndrome: Past, Present and Future. Mount Sinai School of Medicine, New York, New York, October 2, 2010.

Caddy .G. R. and J. Michael Bone. What PAS and Grandparent Alienation is all about? What to do to limit its impact and advance solutions to these problems? Invited Presentation before the International Conference of Alienated Grandparents Anonymous, March 3, 2017, Naples, Florida.

**Invited Debates and Conference Panel Participation:**

Debate with Mark Keller, former Editor Emeritus, The Journal of Studies on Alcohol. Sponsored by the Medical College of Pennsylvania.  (February 4, 1975, and presented again on March 25 and November 25 1975). Topic: Abstinence versus Moderation in Alcoholism.  This debate was again repeated, by invitation, at the Rutgers University Summer School of Alcohol Studies, July 7, 1976, and on June 28, 1977.

Invited lecture sponsored by the Western Pennsylvania Institute of Alcohol Studies. University of Pittsburgh, Pittsburgh, Pennsylvania (December 8, 1978).   Topic: Abstinence and controlled drinking.

Coordinator, Virginia Beach Conference on Professional Psychology.  Virginia Beach, Virginia, April 19-27, 1978.

Chair, County Wide Training Program for the Office of Disability Determination, Vocation and Rehabilitation, Florida Department of Health and Rehabilitative Services, held at Fort Lauderdale, Florida, July 24, 1985.  Title: The Application of Behavioral Medicine in the Treatment of Rehabilitation Patients.

Invited Participant, Sexual Abuse in the Workplace Forum.  Sponsored by the College of Business, Florida Atlantic University, Boca Raton, Florida, February 9, 1995.

Workshop Leader (with Sara P. Feldman-Shorrig), Making Psychologists and Psychiatrists User Friendly for Attorneys.   Continuing Legal Education Workshop presented at the Thirteenth Annual Multi-State Labor and Employment Law Seminar, Southern Methodist University, Tucson, Arizona, May 19, 1995.

Invited Participant (with Barbara A. Moynihan, Roxanne Barton Conlin and L. Steven Platt) Debunking Mental Status Examinations. Presentation before the thirteenth Annual Convention of the National Employment Lawyers Association, Orlando, Florida, June 27, 2002.

Invited Participant, Analysis of the Police Interrogation of Leopold and Loeb: A Psychological Dialogue. Presentation before the Justice Major B. Harding American Inn of Court, Stuart, Florida, January 14, 2004.

Invited Presentation, The Role of the Mental Health Expert in Evaluating Emotional Damages Claims. Presentation before the seventeenth Annual Convention of the National Employment Lawyers Association, Fort Lauderdale, Florida, April 29, 2006.

Conference Moderator, The Montreal Conference on Parental Alienation Syndrome: Strategies in Therapeutic Resolution. Dawson College, Montreal, Quebec, Canada, May 29 and 30, 2011.

Invited Presentation, Deprogramming and the Resolution of Delusional Thought in Parental Alienation Syndrome. The Montreal Conference on Parental Alienation Syndrome: Strategies in Therapeutic Resolution. Dawson College, Montreal, Quebec, Canada, May 29 and 30, 2011.

**Study Group Participation:**

I served as an invited member of the International Parental Alienation Study Group for the revision of the World Health Organization International Classification of Diseases [11th Edition], 2009-2012. This study group was formed in order to seek to influence the leadership of the section of ICD-11 that deals with psychiatric and behavioral disorders to include Parental Alienation as an example of a condition that is found in several of the already existing ICD-10 categories: Caregiver-Child Relationship Problem [which is comparable to Parent-Child Relational Problem in the DSM-4]; Child Psychological Abuse [which is not in the DSM-4 although it should be], and Induced Delusional Disorder [which is comparable to the Shared Psychotic Disorder in the DSM-4].

**Symposia Chaired:**

Self-management Approaches in Alcoholism: Paradigms, Procedures, and Prospects. Symposium presented at the Southeastern Psychological Association Convention, New Orleans, Louisiana, March, 1976.

Biofeedback and Tension Reduction in Alcoholism. Symposium presented at the NATO sponsored International Conference on Experimental and Behavioral Approaches to Alcoholism, Bergen, Norway, August 19, 1977.

Symptomology of the Substance Abuser. Symposium presented before the Alcohol Education Program, City of Richmond, Division of Substance Abuse, Richmond, Virginia, February 22, 1978.

The Clinical Role of Follow-up in Substance Abuse Treatment. Symposium presented at the American Psychological Association Annual Convention, New York, New York, September, 1979.

**Conventions Chaired:**

Chairman for Substance Abuse Programs, Second Annual Convention of the Mental Retardation Society of Virginia, Williamsburg, Virginia, September 1980.

Local Arrangements Chairperson, Mid-winter Meeting of Divisions 29 and 42 of the

American Psychological Association, Miami, Florida, February 1985.

Co-Convener, The Montreal Conference on Parental Alienation Syndrome: Strategies in Therapeutic Resolution. Dawson College, Montreal, Quebec, Canada, May 29 and 30, 2011

**Business Presentations:**

Invited Presenter, the Center Point Presentation, "Selling Before You Break Ground: Supercharging the Presales Process". The Building Industry Association of Southern California Annual Convention. November 3, 2005, Long Beach, California.

Invited Presenter, "Exploring Alternative Marketing Channels". The Information Management Network's "Condo Conversion Conference", March 30, 2006, Pier Sixty, New York, New York.

Invited Panel Presenter, "Strategies & Technologies to Maximize Condo Hotel Sales". The Second Annual Florida Symposium on Financing, Developing, and Operating Condo Hotels. May 22-23, 2006.

**Non-Professional (Business) Publications**

Caddy, G.R. Preconstruction and Conversion: The New Way to Real Estate Investing. An e-publication © Madison International 2004.

Caddy, G.R. Development Failure and Implications for Globe-Allianz. An e-publication © Globe-Allianz, 2005.

Caddy, G.R. Advantages of a Two Phased Sell-Out. An e-publication © Globe-Allianz, 2006.

Caddy, G.R. & August, S. R. Land Sales: State of the Art Scope of Service. An e-publication © Globe-Allianz, 2006.

Caddy, G.R. Multi-family Marketing and Sales: State of the Art Scope of Services. An e-publication © Globe-Allianz, 2007

Caddy, G. R. Cost Segregation: A Summary of the Internal Revenue Service Guidelines. An e-publication © Globe-Allianz, 2007.

Caddy, G. R. Cost Segregation: Methods and Best Practice. An e-publication © Globe-Allianz, 2007.

Caddy G.R. The Eventus Paradigm: High Speed ETF Arbitrage. An e-publication © Eventus Capital Group, 2008.

Caddy, G.R. <u>The Emergence of Eventus Capital Group</u>. An e-publication © Eventus Capital Group, 2008.

Caddy G.R. Alternative <u>Investing the Eventus Way</u>. An e-publication © Eventus Investment Partners, 2009.

**Professional Publications (Published):**

Lovibond, S. H. & Caddy, G. R. Discriminated aversive control in the moderation of alcoholics' drinking behavior. <u>Behavior Therapy,</u> 1980, 1,437-441. Also in D. Matheson & M. Davidson. <u>The Behavioral Effects of Drugs.</u> New York: Holt, Rhinehart & Winston, 1972. Also in J. Stoyva, T. Barber, L. Dicara, J. Kamiya, N.E. Miller & D. Shapiro (Eds.), <u>Biofeedback and Self-Control</u>. New York: Aldine Atherton, 1972, 545-554. Also in R. M. Suinn & R. G. Weigel (Eds.), <u>The Innovative Psychological Therapies: Critical and Creative Contributions.</u> New York: Harper & Row, 1974, 46-51.

Lovibond, S. H. & Caddy, G. R. The reduction of alcohol consumption by aversive procedures. In L. G. Kiloh (Ed.), <u>Twenty-Ninth International Congress on Alcoholism and Drug Dependence.</u> Sydney, Australia: Butterworths, 1971.

Volger, R. E. & Caddy, G. R. Treatment and prevention of Alcoholism: The moderation approach. <u>Proceedings of the 81st Annual Convention of the American Psychological Association,</u> 1973, 8, 927-928.

Caddy, G. R. How not to replicate: A commentary. <u>Behavior Therapy</u>, 1975, 6(5), 710-711.

Caddy, G. R., Goldman, R. D. & Huebner, R. Relationships among different domains of attitudes toward alcoholism. Model, cost and treatment. <u>Addictive Behaviors,</u> 1976, 1, 281-286.

Caddy, G. R., Goldman, R. D. & Huebner, R. Group difference in attitudes toward alcoholism. <u>Addictive Behaviors,</u> 1976, 1, 281-286.

Caddy, G. R. & Lovibond, S. H. Self regulation and discriminated aversive conditioning in the modification of alcoholics' drinking behavior. <u>Behavior Therapy,</u> 1976, 7, 223-230.

Gottheil, E., Caddy, G. R. & Austin, D. L. Fallibility of urine drug screens in monitoring methadone programs. <u>Journal of American Medical Association,</u> 1976, 236,1035-1038.

Huebner, R., Slaughter, R. E., Goldman, R. D. & Caddy, G. R. Attitudes towards alcohol as a predicator of self-estimated alcohol consumption in college students. <u>International Journal of the Addictions,</u> 1976, 11, 377-388.

Miller, W. R. & Caddy, G. R.   Abstinence and controlled drinking in the treatment of problem drinkers.  Journal of Studies on Alcohol, 1977, 38, 986-1003.

Caddy, G. R.,   Blood alcohol concentration discrimination training.  Development and current status.   G. A. Marlatt & P. E. Nathan (Eds.), Behavioral Approaches to The Assessment and Treatment of Alcoholism.   New Brunswick, New Jersey, Center for Alcohol Studies, 1977.

Briddell, D. W., Rimm, D. C., Caddy, G. R., Krawitz, G. & Wunderlin, R.  The effects of experiences and alcohol on sexual arousal to deviant stimuli.   Journal of Abnormal Psychology, 1978, 89, 418-430.

Caddy, G. R., Addington, H. J., Jr. & Perkins, D.  Individualized behavior therapy for alcoholics: A third year independence double-blind follow-up.  Behaviour Research and Therapy, 1978, 16, 345-362.

Caddy, G. R., Sobell, M. B. & Sobell, L. C.   Criterion time intervals for avoiding contamination of alcohol breath test by "mouth alcohol" residuals.   Behavior Research Methods and Instrumentation, 1978, 10, 814-818.

Caddy, G. R.  Emerging concepts of alcohol dependence: the multivariate approach.  In J. Newman (Ed.), Time for Change in Alcoholism Treatment?  Traditional and Emerging Concepts.Western Pennsylvania Institute of Alcohol Studies, University of Pittsburgh Press, 1979.

Caddy, G. R.  Abstinence and controlled drinking.  In J. Newman (Ed.) Time for Change in Alcohol Treatment?  Treatment and Emerging Concepts.   Western Pennsylvania Institute of Alcohol Studies, University of Pittsburgh Press, 1979.

Caddy, G. R.   Application of "state of the art" intervention and evaluation technology: Prospects for the future of the alcohol and traffic safety countermeasures approach.  In E. Weinstein & J. Nichols (Eds.), Proceedings of the Alcohol and Safety Session of the 1979 Alcoholism Forum.   Washington, D. C., National Highway Traffic Safety Administration, 1979 (DOT HS-804-857).

Briddell, D. W., Rimm, D. C., Caddy, G. R. & Dunn, N. J.  Analogue assessment, affective arousal, and the smoking taste test.  Addictive Behaviors, 1979, 4, 287-295.

Caddy, G. R.  Problems in the field of alcoholism treatment outcome evaluation: A review with special reference to blind and independent research programs. In L. C. Sobell, M.B. Sobell & E. Ward (Eds.), Evaluating Alcohol and Drug Treatment Effectiveness: Recent Advances. New York: Pergamon Press, 1980.

Caddy, G. R. & Kretchmer, R.  Evaluation of the alternative leaderless group in a military

psychiatric hospital.  Group Psychotherapy, Psychodrama, and Sociometry, 1980, 33, 33-46.

Rimm, D. C., Briddell, D. W., Zimmerman, M. & Caddy, G. R.  Effects of alcohol and cognitive set on phobic avoidance.  Addictive Behaviors, 1981, 6, 47-52.

Maisto, S. A. & Caddy, G. R.  Self-management strategies and addictive behavior: Present status and prospects.  International Journal of the Addictions, 1981, 16, 109-133.

Watson, N., Caddy, G. R., Johnson, J. H. & Rimm, D. C.  Standards in the education of professional psychologists.  American Psychologist, 1981, 36, 514-519.

Caddy, G. R.  The development and current status of Professional Psychology.  Professional  Psychology, 1981, 12 (3), 357-364.

Caddy, G. R.  Review of Alcoholism: the facts by Donald W. Goodwin.  Journal of Behavior Therapy and Experimental Psychiatry, 1981, 12 (4), 363-364.

Caddy, G. R., Rimm, D. C., Watson, N., Johnson, J. H, Saafir, R. G., & Scarpetti, W.  Development of a consortial model for professional education in clinical psychology.  In G. R. Caddy, D.C. Rimm, N. Watson & J. H. Johnson (Eds.), The Education of Professional Psychologist.  Professional Psychology Review.  Volume I, New Brunswick, New Jersey: Transaction Press, 1982.

Johnson, J. H., Caddy, G. R., Saafir, R. & Watson, N.  Operation of a consortial model for professional training in clinical psychology.  In G. R. Caddy, D. C. Rimm, N. Watson & J. H. Johnson (Eds.), The Education of Professional Psychology, Professional Psychology Review.  Volume I, New Brunswick, New Jersey: Transaction Press, 1982.

Caddy, G. R.  The emergence of professional psychology: Background to the Virginia Beach Conference.  In G. R. Caddy, D. C. Rimm, N. Watson & J. H. Johnson (Eds.), The Education of Professional Psychologist, Professional Psychology Review.  Volume 1, New Brunswick, New Jersey: Transaction Press, 1982.

Caddy, G. R.  A multivariate approach to restricted drinking.  In P. E. Nathan & W. M. Hays (Eds.), Clinical Case Studies in The Behavioral Treatment of Alcoholism.  New York: Plenum Press, 1982.

Caddy, G. R. & Block, T. Behavioral treatment methods for alcoholism.  In M. Galanter & Associates (Eds.), Recent Advances in Alcoholism.  1, New York: Plenum Press, 1982.

Caddy, G. R. & Gottheil, E.  The role of programmed access to alcohol in alcoholism research and treatment.  In M. Glanter, M.A. Rothschild & J. Mason (Eds.), Recent Advances in  Alcoholism.  1, New York: Plenum Press, 1982.

Caddy, G. R.   Review of Schaffer & Burglass (Eds.) Classic contributions in the addictions.   Journal of Behavior Therapy and Experimental Psychiatry,   1982, 13 (2), 175.

Caddy, G. R.   Alcohol use and abuse: Definitions and historical perspective.   In B. Tabakoff, P. Sutker & C. Randall (Eds.), Medical and Psychological Aspects of Alcohol Abuse.  New York: Plenum Press, 1983.

Caddy G. R. & Block, T.  Individual differences in response to treatment.  In J. M. Galizio & S. A. Maisto (Eds.), Determinants of Substance Abuse: Biological, Psychological, and Environmental.  New York, Plenum Press, 1984.

Caddy, G. R.  Review of J. Wolpe: The practice of behavior therapy.  Psychotherapy in Private Practice,  1984, 2, 88-90.

Caddy, G. R.  Review of West, L. J.(Ed.), Alcoholism and related problems: Issues for the American public.  Journal of Studies on Alcohol,  1985,46 (3), 262.

Caddy, G. R. & LaPointe, L.   The training of professional psychologists: Historical developments and present trends.  In G. S. Tyron (Ed.), The Professional Practice of Psychology. Norwood, New Jersey: Ablex Publishing, 1985.

Caddy, G. R. & Loftus, E. F.  The Practice of Forensic Psychology.  In G. S. Tryon (Ed.), The Professional Practice of Psychology,  Norwood, New Jersey: Ablex Publishing, 1985.

Caddy, G. R. & Block, T.   Automated psychological assessment with alcohol abusing clients.   In K. Herman & R. M. Samuel's (eds.), Computers...an Extension of The Clinician's Mind. Norwood, New Jersey: Ablex Publishing, 1984.

Caddy, G. R.  Diagnostic interviewing in alcoholism.  In M. Hersen & A. S. Bellack (Eds.), Diagnostic Interviewing.  New York: Plenum Press, 1985.

Caddy, G. R.  Cognitive behavioral treatment of multiple personality.  In M. Hersen & C. G. Last (Eds.), Behavior Therapy Casebook.  New York: Springer, 1985.

Caddy, G. R. Cognitive Behavior Therapy in the Treatment of Multiple Personality. Behavior Modification,  1985,9 (3), 267-292.

Barone, D. F., Caddy, G. R., Katell A. D., & Roselione, F. G.   Work Stress Inventory, Scale 2: Job Risk.  (Eric Document Reproduction Service No. ED250606).

Caddy, G. R. & Bollard, R. J.   Enuresis.   In M. Hersen & C. G. Last (Eds.), Child Behavior Therapy Casebook.  New York: Plenum Press, 1987.

Barone, D. F., Caddy, G. R., Katell, A. D., & Roselione, F. B.   The work stress inventory: Organizational Stress and job risk.  Educational and Psychological Measurement, 1988, 48, 141-154.

Caddy, G. R.  Multiple Personality Disorder.  In C. G. Last & M. Hersen (Eds.), Adult Behavior Therapy Casebook.  New York: Plenum Press, 1991.

Caddy, G. R.  Definitions and constructs in behavioral medicine.  In D. G. Byrne & G. R. Caddy  (Eds.), Behavioral Medicine: International Perspectives.  Volume I, Norwood, New Jersey: Ablex Publishing, 1992.

Block, T. & Caddy, G. R.   Thermoregulation in the treatment of peripheral vascular disorders.  In D. G. Byrne & G. R. Caddy (Eds.), Behavioral Medicine: International Perspectives. Volume I, Norwood, New Jersey: Ablex Publishing, 1992.

Caddy, G. R. & Block, T.   Electromyographic biofeedback and musculoskeletal disorders.  In G. R. Caddy & D. G. Byrne (Eds.), Behavioral Medicine: International Perspectives.  Volume II, Norwood, New Jersey: Ablex Publishing, 1992.

Caddy, G. R. & Peterson, A.  Health promotion and preventative behavioral medicine.  In G. R. Caddy & D. G. Byrne (Eds.), Behavioral Medicine: International Perspectives. Volume II, Norwood, New Jersey: Ablex Publishing, 1992.

Freeman, R. & Caddy, G. R.  The Neuropsychologist in Court.  In S. Touyz, D. G. Byrne & A. Gilandas (Eds.), Neuropsychology in Clinical Practice. The Psychology Corporation, Sydney, 1993.

Caddy, G. R.  Letter to the Editor, Newsletter of the Australian Psychological Society, Volume 16, (6), 5, November, 1994.

Caddy, G. R. & Byrne, D. G.  Strategies of treatment in behavioral medicine.  In G. R. Caddy & D. G. Byrne (Eds.), Behavioral Medicine: International Perspectives.  Volume III, Norwood, New Jersey: Ablex Publishing, 1995.

Caddy, G.R.  Parental Alienation and the Dynamics of Mind Control. International Journal of Family Therapy: Special Edition from the Proceedings of the Canadian Symposium for Parental Alienation Syndrome, Toronto, Canada, September 5, 2008

Caddy G.R. The Continuum of Alienation and its Impact on the Child. Published in the Dash Foundation Newsletter, July, 2011.

Caddy, G.R. Family Pathology and the Creation of Madness: A Case Study of Mind Control. The American Journal of Family Therapy, 40, [4], July, 2012, 297-319.

Caddy, G. R. Review of "Working with Alienated Children and Families: A Clinical Guidebook" by Amy J.L. Baker and S. Richard Sauber (Eds). The American Journal of Family Therapy, 41, 1-2, 2013.

**Professional Publications (Books):**

Caddy, G. R., Rimm, D. C., Watson, N. & Johnson, J. (Eds.), The Education of Professional Psychologists. Professional Psychology Review. Volume I, New Brunswick Transaction Press, 1982

Byrne, D. G. & Caddy, G. R. (Eds.), Behavioral Medicine: International Perspectives. Volume I, Norwood, New Jersey: Ablex Publishing, 1992.

Caddy, G. R. & Byrne, D. G. (Eds.), Behavioral Medicine: International Perspectives. Volume II, Norwood, New Jersey: Ablex Publishing, 1992.

Caddy, G. R. & Byrne, D. G. (Eds.), Behavioral Medicine: International Perspectives. Volume III, Norwood, New Jersey: Ablex Publishing, 1995.

**Internet Based Publications:**

Caddy, G. R. & Byrne, D. A. Sexual Harassment. A distance learning program published by LearnSomething.com, Tallahassee, Florida, 2000. Through this course participants learned: Why sexual harassment and related workplace problems occur; What the law says about sexual harassment and gender discrimination; How legal and social concepts of sexual harassment have changed in recent years; What sexual harassment costs in personal and corporate terms; and How to implement effective prevention and intervention strategies.

Caddy, G.R. & Byrne, D.A. Sexual Harassment: A Model Policies and Procedures Approach to Prevention. In G.R. Caddy & D. A. Byrne (Eds), Human Behavior and Law. A program in the Internet based distance learning series produced by LearnSomething.com, Tallahassee, Florida.

Caddy, G.R., Byrne, D.A, & Dunn, M. Racism and Racial Discrimination. In G.R. Caddy & D.A. Byrne (Eds), Human Behavior and Law. A program in the Internet based distance learning series produced by LearnSomething.com, Tallahassee, Florida.

**Professional Publications (Series Editor):**

Series Editor: **Developments in Clinical Psychology**.  This is a series published by Ablex Publishing Corporation from 1982 to January 2,000; and then by Greenwood Publishing Inc. of Westport, Connecticut from 2,000 to 2,002; and thereafter by Praeger Publishing. Dr Caddy was the Founding Editor of the series. He stood down from the Editorship in 2,000. More than twenty books were published in this series. Examples of

the volumes in the series included: "Integrated Clinical and Fiscal Management in Mental Health: A Guidebook, by James Sorensen, 1986; The Professional Practice of Psychology, [Ed] by Georgianna Shick Tryon, 1986; Clinical Applications of Hypnosis, edited by Frank A. DePiano and Herman C. Saltzberg [1986]; Full Battery Codebook by Ken R. Vincent, 1987; Developments in the Assessment and Treatment of the Addictive Behaviors [Ed] by Ted D. Nirenberg, 1987; Feminist Psychotherapies [Ed] by Mary Ann Douglas and Lenore Walker, 1988; Child Multimodal Therapy by Donald B. Keat II, 1990; Psychophysiology for Clinical Psychologists by Walter W. Surwillo, 1990; Strategic Health Planning: Methods and Techniques Applied in Marketing and Management by Allen D. Spiegel and Herbert H. Hyman, 1991; Language and Psychopathology by Stephen Schwartz; The MMPI: A Contemporary Normative Study of Adolescents by Robert L. Colligan and Kenneth F. Offord, and others.

Series Editor, (with D. Andrew Byrne) for the Internet and Interactive CD-Rom based distance learning series, Human Behavior and the Law, produced by LearnSomething.com, Tallahassee, Florida.

**Publications (Articles in Press):**

Caddy, G.R. Parental Pathology, Alienation, and the Making of an Addict: A Forensic and Clinical Case Study. American Journal of Family Therapy, in Press.

**Publications (Articles in Progress):**

Caddy, G. R.  Cognitive Behavioral Treatment of a Transsexual Male.  Behavioral Modification.

**Publications (Books, Chapters or Products in Progress):**

Caddy, G. R. & Touyz, S.  The Practice of Forensic Psychology.

**Publications (Unpublished Reports):**

Caddy, G. R.  Nonfluency and The Development of Stuttering in Preschool Children. Unpublished thesis.  The University of New South Wales, Sydney, Australia, 1968.

Caddy, G. R.  Behavioral Modification in the Management of Alcoholism.  Unpublished doctoral dissertation. The University of New South Wales, Sydney, Australia, 1972.

Caddy, G. R., Sutton, M.S. & Lewis, J. R.  The Role of Feedback and Internal Cues in Blood Alcohol Concentration Estimation.  Unpublished manuscript, University of California at Riverside, 1974.

Krawitz, G., Caddy, G. R., Rimm, D. C. & Zimmerman, M.  The Efficacy of Stimulus Flooding Procedures With Acrophobia: A Test of Nonspecific Treatment Effects.

Unpublished document, Virginia Consortium for Professional Psychology, 1979.

Caddy, G. R., Johnson, J. H., Saafir, R., & Watson, N.   Rules of Procedure for Administration of the Doctor of Psychology Program in Clinical Psychology.   Unpublished document, Virginia Consortium for Professional Psychology, 1979.

Katell, A. D., Caddy, G. R., & Barone, D. F.   The Work Stress Inventory.   Nova University, Fort Lauderdale, Florida, Copyright, 1981.

Caddy, G. R. & Katell, A. D.   The Health Behavior Inventory.   Nova University, Fort Lauderdale, Florida, Copyright, 1981.

Caddy, G. R. & Douglas, M. A.   The Divorce Attitude Questionnaire.   Nova University, Fort Lauderdale, Florida, Copyright, 1981.

**Published Book Review**

Review of Being Fruitful without Multiplying by Patricia Yvette, Renee Ann, and Janice Lynne, Coffee House Press, Seattle, 2012.

**Service to Journals and Publishers:**

Founding Editor, The International Journal of Eclectic Psychotherapy (1981 to 1984). The name was changed to Journal of Integrative and Eclectic Psychotherapy (Bunner-Mazel), (1984-1991) and thereafter became a publication of the American Psychological Association.

Editor, Advances in Clinical Psychology. A book series published by Ablex Publishing Company (1976-1989).

Consultant in Clinical Psychology and Test Development to PsychPress Pty. Ltd. Melbourne, Australia, (1980 to present).

Consulting Editor, Addictive Behaviors.  (Pergamon Press), (1978-2001).

Consulting Editor, The American Journal of Family Therapy.  (Brunner - Mazel), (1990-present).

Consulting Editor, Psychotherapy in Private Practice: Innovations in Clinical Methodology and Assessment, Consultation, and Program management.  (Haworth Press). (1984-1989).

Member, Scientific Advisory Board, Psych System, Inc., Baltimore, Maryland, 1978-1985.)

Member, Advisory Board, Joint Commission for the Development of the <u>Treatment and Statistical Manual of Behavioral and Mental Disorders.</u> (1995-1999). Chair of the Anxiety Disorders Task Force and Member of the Addictive Disorders Task Force.

Member, Editorial Board, Journal of Psychiatry: Open Access (2013 - Present). See the link: www.omicsonline.com/open-access/journal-of-psychiatry.php

**Editorial Referee or Special Consultant:**

Alcoholism: Clinical and Experimental Research
Brooks/Cole Publishing Company
Journal of Behavior Therapy & Experimental Psychiatry
Journal of Consulting and Clinical Psychology
Journal of Studies on Alcohol
Behavior Modification
Behavior Research and Therapy
Professional Psychology
Clinical Psychology Review
Psychological Bulletin
The Forensic Examiner
American Journal of Family Therapy

**Television Series Consultancy**

The British Broadcasting Corporation, in association with the Discovery Channel, between 2005 and 2008 developed a series of one-hour long television presentations entitled "<u>Great Crimes of the Century</u>". One of the earliest of the programs in this series involved the case of Eileen Wournos, a former prostitute who during the late 1980's was found guilty of having brutally murdered seven men. Ms. Wournos was also suspected in multiple other murders of males as well. Ms. Wournos was convicted, sentenced to death, and eventually executed in the State of Florida in 2002, despite the fact that at the time of her death there was a serious concern raised by the defense that the client was not competent to die. [In fact, subsequent to the execution letters and notes from Ms. Wournos were found that gave credibility to the fact she was suffering a severe delusional disorder and even many of her guards considered her "crazy"].

I had been involved as a forensic expert in the Wournos case and the BBC initially hired me to consult with them on this case, and thereafter on the entire series. The case of Eileen Wournos was also the basis for the feature film "Monster" that was distributed by Newmarket Films. In the movie, Charlize Theron played Ms. Wournos and she received the Award for Best Actress for her portrayal at the 76th Academy Awards In February, 2004.

**Forensic Consultation Experience**

**General Overview**

Over the past more than thirty years in my professional role I have become increasingly involved in the practice and teaching of the interface between Clinical Psychology, Forensic Psychology and Forensic Behavioral Medicine. I have taught courses and/or lectured or otherwise consulted on issues in Forensic Psychology and Forensic Behavioral Medicine both in the United States and Australia, as well as in Canada, El Salvador, Argentina, and the Bahamas. Today my principal areas of intellectual professional interest in the forensic area include the consequences of profound trauma (specially as seen in human torture and war crimes cases and in vehicular terror such as plane and train crashes and other near death experiences), and the impact of various mind control processes (such as is applied in cults and in various pathological "religious' frameworks). However, as will be seen below, much of the work I have done is well and truly outside those domains of particular research interest.

My forensic practice began with a small number of cases throughout the 1970's and 1980's but this practice did not really become substantial until I left full time academia in the early 1990's. The record of cases in which I have actually testified that is provided later in this document is quite extensive but not comprehensive prior to the mid-1990. It is close to being comprehensive thereafter.

Immediately below are summarized examples a few of the most fascinating and/or outstanding cases [for any number of reasons] in which I have been involved. Many other also very important cases are listed thereafter. The cases presented immediately below are described to offer a flavor of the nature and complexity my work in forensic practice.

**The Anthony LaMarca Case**

In 1983 I was hired by the Fort Lauderdale, Florida attorney, William Amlong [Amlong & Amlong P.A. in a Federal Class Action lawsuit that in many tragic ways would tie me to the first named plaintiff over more than the next thirty years. The case was <u>Anthony LaMarca, Martin Saunders, and Edwin Johnson, individually, and on behalf of all others similarly situated vs. R.V. Turner, individually in his former official capacity as Superintendent of Glades Correctional Institution, and the State of Florida, Case # 82-8196-CIV-JCP, United States District Court, Southern District of Florida, West Palm Beach Division</u>. At the time the Belle Glade prison was a lawless facility. Some of the senior correctional officers were becoming wealthy, drugs were readily being brought into the facility, there was an alcohol distillery in the facility, young white men and some young black men were routinely being raped [and often using broomsticks if they did not comply] and on Saturday nights pornographic movies were played for the prisoner's entertainment. At the time Anthony LaMarca was 26 years of age and was half way through a twelve-year sentence [for robbery and aggravated battery]. He had entered prison with serious upbringing problems [he had the dubious distinction of being related to the infamous LaMarca crime family in New York] and the violence and rape he had

suffered as a victim in the Belle Glade facility had made him become a very dangerous and very hate filled young man. I examined a total of 22 of the plaintiff's in the case and gave testimony over almost one full week. In the end, the jury found in favor of the plaintiffs and Federal Judge Payne ordered relief and reform within the Belle Glade facility. He further ordered a review of all the Florida Prisons.

But the story does not end there. As a result of Anthony's additional violence in prison he ended up serving significantly more years than his initial sentence and in 1992 I got a reverse charge call at my office from Mr. LaMarca. I do not know how he got my number or accessed a phone but he was in the kitchen in a prison [not Belle Glade] and he appealed to me to: "Doc, get me out of this place before I kill this mother fucker". It was more than just an unexpected call! But I asked Anthony where he was [which facility he was in], and I promised him I would instantly act on his request. Hence, I called the medical department of the facility, gave them some quick background, and asked then to intervene and perhaps if they could pull it off, have Anthony transferred.

A few years later both Mr. Amlong [Anthony's former attorney] and I received urgent calls from what I believe was a Jacksonville field office of the Federal Bureau of Investigation. The agent advised that Mr. LaMarca had been released from prison several weeks before, that he had raped and murdered his adult daughter and killed her husband, and that the FBI had reason to believe that Mr. LaMarca was coming down to Florida to kill his attorney and myself. While I surely understood Anthony's propensity to kill, the fact was that I was perhaps one of only several people in the world that Anthony liked and respected. So, while I did not believe I was in danger, the information was a bit unnerving. In any regard, this information provided by the FBI proved to be Anthony's story to take the FBI off his tracks and in fact three years later Anthony was arrested in Washington State [where he had been living in the backwoods with a young woman].

Yet the story does not end there. Anthony was returned to Florida, tried for the murders of his daughter and her husband, and sentenced to death. Hence, the Florida Office of the Capital Collateral Representative Counsel [CCRC] represented him in a series of appeals against his death sentence. And in 2012 the CCRC attorney representing Mr. LaMarca contacted me, advised me that Anthony had refused to speak to any of the psychologist or psychiatrists they were thinking of hiring for his case, and that he would only see me. So, again I became involved with Anthony who, at our first meeting in many years, treated me like his best [and probably only] friend.

**The El Salvadorian War Crimes Case**

In the year 2000 Morrison and Foerster, then the second largest law firm in the world, hired me through their San Francisco, California office. After a national search involving some twenty candidates, I was hired as their plaintiffs' emotional damages expert to serve in a series of War Crimes cases. This work by Morrison and Foerster grew out of a contract with the United Nations Agency on War Crimes in New York and the Center for Justice and Accountability in Chicago, Illinois. The task was to conduct a number of civil

suits against multiple alleged war criminals and to focus initially on those who had served at the highest levels of the government of El Salvador during the civil war in that country from 1980 to 1992.

During that period an estimated 75,000 civilians were murdered while the United States of America sent billions of dollars in foreign aid to the government of El Salvador to quash the uprising believing that it represented the expansion of Communism in South America, whereas in fact it was the birth of liberation theology [sponsored by the now beatified former Archbishop, Saint Oscar Romero]. Between 2000 and 2003 I spent more than thirty-five percent of my time working on these various cases. I had the opportunity to examine a large number of proposed plaintiffs within the United States and beyond, to examine their collateral sources, and to undertake research on the social and political context of the lives of these plaintiffs as well as to explore broader issues about the context and consequence of this so called civil war. I was provided access to Department of State and Central Intelligence Agency documents and reports that only recently had been declassified regarding events in El Salvador during the period. I had access to Vatican documents of the period, and to United Nations Investigative Reports, as well as numerous other related publications. This entire matter involved a stunningly interesting yet often also very difficult opportunity to look at the events surrounding a country's torture of its own citizens from both the perpetrator justification side and from the side of a vast number of victims, their families, and their communities.

The first case taken up in this hiring was filed in the United States District Court in the Southern District of Florida. The trial ultimately lasted more than a month during which time I gave testimony for three full days. The outcome of the trial was a verdict for the plaintiffs in the amount of $54,000,000. I believe that up to today that verdict is still the largest individual plaintiff's verdict in the United States that was based heavily on an emotional damages claim.

**Terrorism and International Kidnapping**

In the mid 1990s Baker McKenzie, then the largest law firm in the world hired me in a number of cases out of their New York office and another case out of their Miami office. These cases involved terrorism directed to the clients of Baker McKenzie, these clients being multi-national corporations. The issues involved dealing with certain aspects of terrorism operating in foreign countries [murder, hostage taking, blackmail, torture, collateral murder] that resulted in these clients initiating civil litigation directed to corporations in these foreign countries.

**The Charles McArthur Emmanuel Case**

Also related to terrorism and crimes against humanity, I was hired in the criminal case of United States of American vs. Charles McArthur Emmanuel. Mr. Emmanuel is the son of Charles McArthur Taylor, the former African Warlord and the twenty-second President of Liberia. Charles McArthur Emmanuel was charged with the murder and torture of a vast

number of Liberian citizens during the period of his service in the Anti-Terrorism Unit in Liberia, during his father's presidency. In October 2008 Mr. Emmanuel was convicted on all three counts and sentence to 97 years in prison.

**The Marcus Dwayne Robertson Case**

More recently, in 2015, I was hired by the law firm of Daniel N. Broderson [in Orlando, Florida] in a Muslim Terrorist Federal Trial. The case involved a man named Marcus Dwayne Robertson who the United States Government alleged was the leader of a Muslim Terrorist Cell operating in Central Florida and recruiting and preparing a young man to commit violent jihad. My testimony was based on all of the evidence I had reviewed and of my findings regarding Mr. Robertson, and of his torture by the United States, given his placement in solitary confinement for literally months at a time. Mr. Robertson was found to be not guilty.

**Insanity: The Jennifer Johnson Case** [Name changed to ensure privacy]

In the year 2001 the Law Office of Richard B. Lubin hired me in the case of a 21 year old woman named Jennifer who was charged with killing her ten month baby by throwing the boy down to the ground multiple times and finally down a flight of stairs. I examined the defendant within 48 hours of her arrest and then multiple times [essentially weekly] over the next 18 months before her trial. We further arranged that a number of these examinations were video-recorded, as at the early appointments the defendant was obviously psychotic [though progressively she began to show marked improvement over time].

This fascinating case involved the induction of madness in a girl who at age 13 years entered into a sexual relationship with her then 22-year-old step-brother, a young man who himself was very disturbed. He was determined to never have Jennifer leave him. He convinced his exceptionally wealthy mother to permit Jennifer to come and live with them [and despite her natural mother's objections this happened]. Then, by progressively controlling Jennifer's mind and constantly seeking to advance her religiosity and his power, by convincing her that God routinely spoke to him, eventually Jennifer began to experience auditory hallucinations and she came to believe that God was speaking to her. It was in the context of her responding to auditory hallucinations that she must "throw her baby down on the stones" and that if she did what her God wanted, while also believing what her God had told her, not only would her son "be born again as was Lazarus" but she would come to be one of God's most chosen people.

Ultimately, my testimony proved critical and Jennifer was found to be not guilty by reason of insanity. She spent some five years in a state forensic hospital [during three years of which she was completely sane].

Today Jennifer is remarried and has two lovely children and both she and her natural mother keep in touch with me. She also brought a civil suit against her abuser and his

47

extremely rich family and she received a very substantial confidential settlement. As for me, I published this case in a paper entitled "Family Pathology and the Creation of Madness: A Case Study of Mind Control" in the American Journal of Family Therapy.

**Mind Control and the Psychological Elements of Manipulation and Deception**

I have studied the concept of mind control and I have been involved professionally in a number of "Mind Control" cases, and especially, though not exclusively, in the context of religious mind control and also in the arena of "parental alienation".

I have examined for historical perspective aspects of Hitler's rise to power in Germany, and China's Thought Reform Processes. And within my discipline more precisely, I have read extensively about the so-called Stockholm Syndrome; and many fascinating cases of mind control, including the 1974 Patty Hearst kidnapping by the Symbionese Liberation Army and tracing her life thereafter as "Tanya". I have interviewed Jaycee Lee Dugard [who was abducted at age 11 and imprisoned by the sex offender, Phillip Garrido, for 18 years.

In the context of religious delusion further, I have been involved with matters including the consequences of the Jamestown, Guyana massacre, the Waco, Texas standoff, and the murder of the Branch Davidian followers by David Koresh in 1993. I have also studied the 1994 Order of the Solar Temple mass suicides and murder in France, Switzerland, and Quebec, Canada; and the death of the 39 members of the Heaven's Gate cult followers at Rachco Santa Fe, California in 1997. I have given testimony in one case [noted above] in which a young woman murdered her baby while in an induced state of religious delusion. And I have been an expert in number of other cases of mind control, in particular those involving children who have been caught up in the reality of the "Parental Alienation" phenomenon.
.
Another, but often very subtle example of mind control is seen when everyday and often quite intelligent people engage in the unconscious construct of denial when they come to believe the essentially unlikely if not totally irrational. This construct is well illustrated in what is referred to by the term "Ponzi Scheme". This was a term coined following the arrest and conviction for mail fraud of the Boston Italian businessman, Charles Ponzi back in 1920. The essential feature of the Ponzi scheme involves publicizing an unrealistic yet believable investment program that promises returns to one group of investors but uses the investment funds of a second group to pay the returns to the first group. After fantastic returns are published, an even larger group is then recruited to pay off the earlier group. The intention is not to invest the capital but to defraud investors and eventually somehow escape the country.

Living and working in South Florida, I have seen the impact of the 65 billion dollar scheme masterminded by the former Nasdaq Chairman, Bernard Madoff, and in fact I have treated a number of people who suffered severe emotional consequences from the losses associated with the collapse of that scheme. Likewise, I have treated and also

been hired in my forensic capacity in dealing with several cases of <u>men caught up in the criminal prosecutions of elements of the 1.4 billion dollar Ponzi scheme developed by the now disgraced and incarcerated former attorney, Scott Rothstein.</u> In 2014 I was hired for opinion and support for one of the people who Mr. Rothstein conned into recruiting investors into his scheme [see <u>United States of America vs. Frank J. Preve, Case # 14-60159-CR-Cohn, United States District Court, Southern District of Florida, Fort Lauderdale, Division</u>].

In 2015 I was hired by Attorney Anthony J. Natale, of the Office of the Federal Public Defender in Palm Beach County, Florida, to undertake an examination of his client, Paul Schumack, in another very large Ponzi scheme case. I ultimately gave testimony in this case at the sentencing hearing of Paul Lewis Schumack [who himself was deceived by the principal offender and dragged into this scheme]. This time, in less than three years, investors lost in excess of 30 million dollars. [See <u>United States of America v. Joseph Signore, Paul Lewis Schumack, Laura Grande-Signore and Craig Allen Hipp, Case # 14-80081-CR-Hurley/Hopkins, United States District Court, Southern District of Florida</u>]. This was a case in which Mr. Schumack, who had many years of honest dealings in business, was manipulated by the profound sociopath, Joseph Signore, to begin a new joint business [that Mr. Schumack believed to be an honest and wonderful business opportunity, and into which he too was investing heavily and drew a large number of people into this new venture].

Finally, as indicated elsewhere in this document, increasingly over the past more than ten years I have been involved as the Foundational Scientific Advisor and Consultant to the Florida based [but today internationally prominent] <u>Alienated Grandparents Association</u> movement. This work aims to educate, assist, and reverse the impact and presence of misguided or delusional beliefs in the minds of some parents who hold a distorted and invalid believe that one set of the grandparent dyad is harmful or toxic to the wellbeing of their grandchildren. In such situations these grandparents are not permitted to be involved in the lives of their grandchildren. This is both a serious and substantial problem within our society and worldwide. Often this "alienation" is based on an invalid belief and when it is, it is often based on distorted, even delusional beliefs, on the part of at least one of the parents and this parent influences the other parent to support the agenda of "protecting" their child/children from their "abusive" grandparent[s] on one side. Beginning in 2016 AGA is seeking to influence a change in legislation around the United States [and beyond] to include the legalizing of the rights of grandparents to have a role in the lives of their grandchildren.

**Example of a Particularly Significant Death Case**

I consider the death sentence to be immoral and without merit. I have quite often been hired in death cases at the time of trial but also on post-conviction death cases. Much of my work in this arena is listed later in this document. [Using the heading "a particularly significant death case" seems to me to be oxymoronic].

I have been hired on a number of cases in which the matter of mental retardation has been raised both at trail and at post conviction relief hearings. I was the sole defense expert in the overturning of the post conviction death case of a mentally retarded black man named Donald Gunsby [see State of Florida vs. Donald Gunsby, Case # CT88881-CFAX, Marion County, Florida]. In this particular case Mr. Gunsby had been examined by two State Psychiatrists, both of whom determined at the time of trial that he was competent to stand trial. Tragically, the defendant had never been formally intellectually evaluated but had made a series of confessions to a murder. Though these confessions were inconsistent with the facts of the crime, still Mr. Gunsby was found guilty and sentenced to death. He was on death row for some thirteen years until this post-conviction case overturned his trial sentence and he was permitted to go free.

There are many stories of death cases that are tragic. I also served at the very end of the post conviction stage in the case of State of Florida vs. Aileen Wournos, in Pinellas County, Florida. [It was Ms. Wournos whose life was highlighted in the film "Monster"]. Tragically, I was hired to examine this woman two weeks before she was to be put to death and at that time I opined that Ms. Wournos was not competent to die as she was suffering a profound delusional [religiously based] disorder in which she was obsessed by the prospect of going to her maker and escaping the hideousness of her life on earth. Subsequent to Ms. Wournos's death, a significant number of her writings were found and several reports of her jailers also made it clear that there was in fact a great deal of evidence consistent with my findings of her ongoing profound mental illness.

**The Electro-Convulsive Medical Malpractice Case**

In 2009 a highly experienced nuclear cardiologist was terminated from his group for reasons that became the basis for litigation. I was not involved in that litigation. Subsequent to the termination the physician fell into a deep depression and he was treated with significant improvement by medication management and the state of the art cognitive based behavior therapy, involving only four sessions and he went away on vacation. On his return, without continuing his therapy, he began to slip back into the depression, and his wife, seeing indications that he was considering harming himself, took him to a psychiatric hospital in Palm Beach County. Once at that facility, over the next four days, and without any comprehensive evaluation of his functioning, nor the signing of an appropriate Consent to ECT Treatment the patient was persuaded to undergo a series of 8 ECT procedures. Subsequent to these treatments the patient was discharged into outpatient care but clearly he was not well. Over the next few months, two psychiatrists and then a psychologist treated him sequentially. Both psychiatrists were treating him based on an incorrect assessment of his functioning and he was considered by them to be showing Bipolar Disorder. The Clinical Psychologist considered the patient to be depressed but noted a lot of emotional lability and vagueness.

The patient's attorney referred the patient and his family to me for treatment and further evaluation. By the end of my first examination I concluded that the patient was seriously

organically brain impaired and I set out to conduct a comprehensive neuropsychological examination. After confirming the nature and extent of the neuropsychological limitations, and linking these serious deficits to the administration of the ECT, I continued to work with the family and deal with all of the complexities that emerged for all members given the fact that this brilliant man was now mentally disabled. In October 2016 I gave testimony in Palm Beach County Court after what became a nearly six year set of medical malpractice claims, against the doctors involved. [The hospital had already settled with the plaintiff for an undisclosed but very significant sum].

**My Forensic Work [indicating case names and courts]**

I have become involved in numerous aspects of the practice of Forensic Psychology and the forensic-clinical-behavioral medicine interface, often being an examiner but also taking other roles from clinical provider to offering perspective on numerous aspects of case consultation. Issues here have included matters requiring the need for integration between a micro–analysis of the evidence from a Behavioral Sciences Perspective, projections of the nature and scope of future care, trial story development, witness preparation, assistance to counsel in dealing with expert testimony, and even consulting on the strategy of trial story analysis. Trial story analysis may involve such things as an assessment of story believability and credibility, and the analysis of the most appropriate manner of presenting motivational or behavioral phenomenon or damages assessments in a manner to best account for all the evidence under study. I have also worked as part of a team employing the use of a mock jury in trial story analysis and for case assessment and damages purposes. I have been hired to serve solely as a records reviewer and planning consultant in an Insurance Defense context, or for the purpose of critical analysis of the work of an expert on the other side of a case. Such case consultations have been generally within the context of personal injury, medical malpractice, and labor relations and most commonly have been defense oriented, though I also have worked on case consultation doing a micro-analysis of evidence in criminal matters including some rather high profile Federal cases alleging conspiracy and racketeering.

I have also conducted well over three thousand comprehensive forensic examinations both in criminal cases (where sometimes I have been Court appointed) and in civil cases via direct hire from plaintiff or defense counsel (sometimes conducting independent clinical psychological and/or neuropsychological examinations). Virtually all my Court appointed work has been in the areas of criminal law or family law with an occasional dependency case. With the exception of death cases in criminal law, the other criminal matters today occupy only about twenty percent of my forensic work. Today I am more likely to be hired in civil tort matters either on behalf of Plaintiffs (some 65%) or Defendants (some 35%). Civil cases in which I have worked have included civil sexual battery or rape (sometimes involving assault by prominent figures and sports stars), other personal injury matters (especially in high trauma cases including plane, train and tractor trailer crashes), emotional damages subsequent to legal malpractice, the consequences of exposure to interpersonal and other induced trauma, wrongful death,

51

product liability, medical and mental health malpractice, nursing home abuse, standard of care issues in mental health, negligent hiring and retention (mainly related to workplace violence claims), discrimination in the workplace and retaliation, other civil rights matters like housing discrimination and whistleblower issues, police brutality, disability matters, competency in the elderly or the brain injured, issues of testamentary capacity, defamation, wrongful discharge, immigration and special political asylum matters, professional licensing, cases involving internal terrorism, and war crimes and crimes against humanity cases. I have also been hired on a number of the class action tobacco cases, and other class action discrimination litigation, and on cases involving sexual misconduct, in particular some of the Roman Catholic Church cases. I have given testimony in numerous State and Federal Court across multiple jurisdictions throughout the United States and occasionally also in Canada and Australia and less frequently in South America and the Caribbean. In one instance I even worked on a case within the African Nation of Senegal.

I have consulted in well over three thousand cases addressing topics as diverse as the following representative cases.

**Criminal Cases:**

In criminal cases, matters of competency (even competency to die), insanity, the effects of alcohol and/or drugs on human behavior, child sexual abuse, adult sexual abuse and rape cases, the internet transmission and possession of child pornography, the Battered Spouse Syndrome, research on perceptual distortion in eyewitness testimony, psychological and neuropsychological issues effecting intent, false confessions, mitigation and aggravation factors at sentencing including the effects of significant personality disorder, the effects of or low intelligence and mental retardation on decision making and on suggestibility, the impact of brain or neuropsychological injury, delusional disorders and insanity (even the extreme delusions sometimes created by pathological religiosity), "mind control" and cult involvement in criminal conduct, in conspiracy and racketeering cases, death cases, post-conviction death cases, even competency to die, and in both Federal and State sentencing and post conviction relief. Representative examples of such cases include the following: (**State of Florida vs. Arva Betts, Case # 89-7409CF, Circuit Court, Broward County, Florida; United States of America vs. William K. Taylor, Case # 89-58-T-17, United States District Court, Middle District of Florida; Hillsborough Division; State of Florida vs. Warren Aiken, Case # 9-4501CF10, Circuit Court, Broward County, Florida; State of Florida vs. William Henry Brunner, Case # 93-008750CFA02, Circuit Court, Palm Beach County, Florida; State of Florida vs. Ronnie Keith Williams, Case # 84-10364 CF, Circuit Court, Broward County, Florida; United States of America vs. Garland Hogan, Gary Pierce, CSI AG Ltd., Wanda Tirado, Alan Richard Lewis, Zane Balsam, and Juan Arroyo, United States District Court, Case # 99-8125-CR-HURLEY, Southern District of Florida, Fort Lauderdale, Florida; State of Florida vs. Stephen Fasano, Case # 95-7731-CF, Palm Beach County, Florida; State of Florida vs. Joel Steven Borinstein, Case # 91-118CFA, Okeechobee/St. Lucie County, Florida; United**

States of America vs. Jesse Leland Briggs, Case # 99-6036-CR-HURLEY, United Sates District Court, Southern District of Florida, Ft Lauderdale Division; State of Florida vs. Avery Craig Casler, Case # CR96-13147, Circuit Court, Orange County, Florida; State of Florida vs. Vito Federici, Case # 99-7856CF10A, Broward County, Florida; State of Florida vs. Lionel Miller, Case # 48-2006-CF-005222-0, Circuit Court, Orange County, Florida; State of Florida vs. Lionel Michael Miller, Case # CR06-5222, Circuit Court, Orange County, Florida; State of Florida vs. Roger D. Nash, Case # 96-5608MM10A [and also case #93-4002-CF-A02], Palm Beach, Florida; United States of America vs. James Scott Pendergraft, Case # 500 CR-21-OC-10, United States District Court, Middle District of Florida, Ocala Division; United States of America vs. Garland Hogan, Case # 99-8125-CR-HURLEY, United States District Court, Southern District of Florida, Palm Beach Division; and State of Florida vs. Jennifer Cisowski, Case # 01-1124-CFA, Circuit Court, Martin County, Florida and State of Florida vs. Wilner Altidor, Case #S00CF 012072 & 00CF 012084, Circuit Court, Palm Beach County, Florida; State of Florida vs. William Taylor a/k/a Dark Eagle, Case # 01-8692 Circuit Court, Hillsborough County, Florida; State of Florida vs. Asher Jones, Case # 02-867-CF, Circuit Court, Martin County, Florida; United States of America vs. Edwin William Young, Jr., Case # 03-80034-CR-Middlebrooks, United States District Court, Southern District of Florida, West Palm Beach Division; State of Florida vs. Caren Regan MacDonald, Case # 02-011402CF10A, Broward County, Florida; State of Florida vs. Tomar Higgs, Case #02-3585CF, Circuit Court, Broward County, Florida; State of Florida vs. Cyd Fender, Case # 05-003196CF A02, Palm Beach County, Florida; United States of America vs. Andrew Weiss, Case # 05-80138-CR-Hurley/Vitunac); State of Florida vs. Nicholas Armstrong, Case # 06CF010217AMB, Circuit Court, Palm Beach County, Florida; State of Florida vs. Robert Charles Brady, Case # 07-021340CF10A, Broward County, Florida; State of Florida vs. Charles Peterson, Case # CRC00-051007 CFANO-K,  Circuit Court, Pinellas County, Florida; State of Florida vs. Bernard Berkowitz, Case # 05-2942CF10A, Broward County, Florida; Precious Swinton and Deborah Bateman vs. Connail Johnson, Patricia Johnson, Wesley Martin and New Hope Missionary Baptist Church, Case # 03-016079 07, Broward County, Florida; United States of America vs. Ricky Pinsky, Case # 08-14004-CR-Graham/Lynch;  State of Florida vs. Brandon Bishop, Case # 06-013584CF, Broward County, Florida; State of Florida vs. Peter Ruma, Case # 2007-1469, Indian River County, Florida; State of Florida vs. Michael C. Knecht, Case # 2007CF001205-Belanger, St Lucie County, Florida; State of Florida vs. Ronnie K. Williams, Case # 9303005, Circuit Court, Broward County, Florida; United States of America vs. Osbaldo Farias and Geraldo Martinez, Case # 5:08-CR-43-OC-10GRJ, United States District Court, Middle District of Florida, Ocala Division: The Florida Bar vs. Daniel Newton Brodersen, Supreme Court of Florida Case # SC09-113; State of Florida vs. Anthony Siquier, Case # 04004463CF10B, Circuit Court, Broward County, Florida; State of Florida vs. Brock Mardis, Case # 2008CF0016329AMB, Circuit Court, Palm Beach County; State of Florida vs. Matthew Takahashi, Case # 2009CF008698AXX, Palm Beach County, Florida; State of Florida vs. Edward B. Mendel, Case # 2010MM020257AXX, Circuit Court, Palm

Beach County, Florida; and State of Florida vs. Joseph Martinez, Case # 1119695CF10, 2011, Circuit Court, Broward County, Florida; State of Florida vs. Jonathan Wright, Case #10-1972CF10A, Broward County, Florida; State of Florida vs. Guy Cherubin, Case # 08021620CF10A and Case # 080243001CF10A, Circuit Court, Palm Beach County, Florida; State of Florida vs. Michael Mazza, Case # 07-020537CF10A, Circuit Court, Broward County, Florida; State of Florida vs. William A. Martin, Case # 2011CF005897AXX, Palm Beach County, Florida; State of Florida vs. James Herald, Case # 08CF01-7526AMB, Circuit Court, Broward County, Florida; State of Florida vs. Semie Robinson, Case # 12001365CF10A, Circuit Court, Broward County, Florida; State of Florida vs. Guy Cherubin, Case # 08021620CF10A, Circuit Court, Broward County, Florida; Ronnie Keith Williams vs. State of Florida, Case #SC04-857, Supreme Court of Florida; State of Florida vs. Elton Walters, Case #09018637CF10A, Circuit Court, Broward County, Florida State of Florida vs. Joseph Martinez, Case # 12009864CF10A, 2012, Circuit Court, Broward County, Florida; United States of America vs. Timothy Dillon, Case # 2013-8407DLB, United States District Court, Southern District of Florida, Palm Beach Division; State of Florida vs. David Baier, Case #12-16055CF10A, Circuit Court, Broward County, Florida; United States of America vs. Craig Wiseberg, Case # 13-80217-CR-Marra, United States District Court, Southern District of Florida; State of Florida vs. Nicholas Sharas, Case # 13-4958CF10A, Broward County, Florida; State of Florida vs. Ian Naveira, Case #502013CF011909, 502013MM009342 and 502013CF013163, Circuit Court, Palm beach County, Florida; United States of America vs. Marcus Dwayne Robertson and Jonathan Paul Jimenez, Case #6:12 CR-63-ORL-28YJK, Middle District of Florida, Orland, Florida; State of Florida vs. John Farrell, Circuit Court, Case # 13007535CF10A, Circuit Court, Broward County, Florida; State of Florida vs. Roberto Amhed Boscio, Case #14013714CF10A, Circuit Court, Broward County, Florida; State of Florida vs. Vincent Campiglia, Case # 2014CF003985AMB, Circuit Court, Palm Beach County, Florida; State of Florida vs. Michael O'Mara, Case # 142754CF, Circuit Court, Broward County, Florida ); State of Florida vs. Andrew Perez, Case # 50-2014-CF-009818-AXXX-MB, Circuit Court, Broward County, Florida; State of Florida vs. Tamar Nicola Harris, Case # 15009527CF10A, Broward County, Florida; United States of America vs. Joseph Signore, Paul Lewis Schumach II, and Craig Allen Hipp, Case # 14-80081-CR-Hurley/Hopkins, United States District Court, Southern District of Florida; State of Florida vs. Roland Jadusingh, Case # 50-2015-CF-009739, Palm Beach County, Florida; State of Florida vs. Kevin Singh, Case # 12014222CF10A, Broward County, Florida. United States of America vs. Lamar Andrews, Jakaris Clemons and Roberick Norfus, Case # 16-8249-WM/Hurley, United States District Court, Southern District of Florida; State of Florida vs. Jacob Lyndon Donovan, Case # 2014CF 009008AMB, Palm Beach County, Florida. State of Florida vs. Harold Markowitz, Case # F16022602, Dade County, Florida; State of Florida vs. Jacob Lyndon Donovan, Case # 2014CF009088AXX, Circuit Court, Palm Beach County, Florida.

**The Death Penalty**

Regarding the death issue, I have served as an expert in literally dozens of pre-conviction and post conviction death cases that have included matters of competency to die, claims of mental retardation and other matters. (See for example, **State of Florida vs. Linroy Bottoson, Case # 79-4512, Orange County, Florida; Dana Ray Edmonds vs. Charles E. Thompson, Warden, Mecklenburg Correctional Center, Case # 92-4011, United States District Court, Western District of Virginia at Roanoke, Commonwealth of Virginia; State of Florida vs. William Melvin White, Case # CR78-1840, Orange County, Florida; State of Florida vs. William Duane Elledge, Case # 75-0087CF10A, Broward County, Florida; State of Florida vs. Linroy Bottoson, Case # CR79-4512, Orange County, Florida; State of Florida vs. Norberto Pietri, Case # 88-11366-CF A02 DIV 5, Palm Beach County; Joseph Timothy Musselwhite vs. Jeanne S. Woodford, Warden, San Quentin State Prison, Case #CIV-S-01-1443-LKK/GGH, United States District Court, Sacramento, California; State of Florida vs. Dwayne Irwin Parker, Case # 89-8897, Broward County, Florida; State of Florida vs. Anthony LaMarca, Case # CRC95- 20270CFANO-C, Pinellas County, Florida; State of Florida vs. Harry Lee Butler, Case # 97-04690-CFANO, Pinellas County, Florida; State of Florida vs. Aileen Wournos, Case # Pinellas County, Florida; State of Florida vs. Harry Franklin Phillips, Case # SC01-1460, Dade County, Florida; State of Florida vs. Harry Lee Butler, Case # 97-4690, Pinellas County, Florida**); **State of Florida versus Quawn M. Franklin, Case # 2002-CF-000217-A-02, Lake County, Florida; State of Florida vs. Charles Peterson, Case # 00-5107, Pinellas County, Florida; State of Alabama vs. David Eugene Davis, Case # CC96-91, Jefferson County, Alabama; State of Florida vs. Charles C. Peterson, Case # CRC00-05107CFANO, Pinellas County, Florida; State of Florida vs. Quawn M. Franklin, Case # 02-CF-217-A-02, Lake County, Florida; and State of Florida vs. Lionel Michael Miller, Case # 48-2006-CF-5222-0, Orange County, Florida; and Supreme Court of Florida, Lionel Michael Miller, Appellant vs. State of Florida, Appellee, Case #SC08-287, June 3, 2010; State of Florida vs. Andrew Allred, Case # 07-CFA-4890, Orange County, Florida; State of Florida vs. Joshua L. Altersberger, Case # 2007-CF-00041A, Highlands County, Florida; United States of America vs. Marcus Dwayne Robertson, Cast # 6:12-CR-63-ORL-31GJK, United States District Court, Middle District of Florida, Orlando Division; State of Florida vs. Mark Anthony Poole, Case # CF01-7078A-XX, Hillsborough County, Florida/Mark Anthony Poole vs. State of Florida, Case # SC05-1770, Supreme Court of Florida, 2008; State of Florida vs. John Kalisz, Case # 2010-CF-114, Hillsborough County, Florida).**

**Emotional Damages – High Trauma Cases**

I have been hired to explore the psychological effects of claimed **extreme trauma** provoked by near death experiences, or the death of a close relative, in plane, train and serious automobile collisions, in electrocutions, and in cases of domestic terrorism. I have been hired by plaintiff's counsel in cases such as the Delta 191 crash in Dallas, the Amtrak Sunset Limited crash in Louisiana, the Amtrak crash in South Carolina, the Mobile tanker trailer crash on I-595 in Ft Lauderdale, and numerous other high trauma

vehicular collision cases. (See for example **Laurie Gorsky vs. Commercial Carrier Corporation & Wesley Morgan, Case # 93-17173, Broward County, Florida; Jose Gresham. Joann Benton Ahmed, as Personal Representative of the Estate of Jose L. Gresham vs. National Railroad Passenger Corporation (AMTRAK) et al., Case # 92-02088 (08), Broward County, Florida; and Claude Renaud, as Personal Representative of the Estate of Marie J. Renaud vs. Penn Tank Lines, Inc., a foreign corporation, and Mobile Oil Corporation, a foreign corporation, Case # 99-03298 CACE 18, Broward County, Florida, and Annie Belle McKee vs. CSX Transportation, Inc.; National Railroad Passenger Corporation, d/b/a/ Amtrak; Warrior & Gulf Navigation Company; Andrew Stabler, individually; and Willie C. Odom, individually Case #94-551-CIV-ORL-12, United States District Court, Middle District of Florida, Orlando Division; Kenneth Stoll, as personal representative for the estate of Nongkran Stoll vs. Peter Ng and Tong Chen Ng, Case # 502008CA002263XXXXMB, Circuit Court, Palm Beach County, Florida; Bruna Menendez vs. Lakeview of the California Club, Case # 04-02548CA 15, Broward County, Florida; Lorenzo Belton vs. ABC Distributing Inc. and Chubb Group of Insurance Companies, Case # 02-047184HHH, Division of Administrative Hearings, Office of Compensation Claims, Miami, Florida; Linda DeCaro vs. Palm Sea Condominium Inc., Case # 50-2009-CC-012976-XXXX-MB-RL, Palm Beach County, Florida; Jim Morris and Gloria Morris, individually, and as Next Friend for Hillary Faith Morris, a Minor vs. Charlotte Hawkins Dearborne, et. Al., United States District Court, Eastern District of Texas, Marshall Division, Case # 2:96-CV-III; Garland Hogan vs. United States of America, Case # 09-CIV-81530, Southern District of Florida, Fort Lauderdale, Florida; Timothy Burke, Laura Burke-Stirling, Gregory Burke et. al., vs. The New Tribes Missionary School, the Village of Fanda, Senegal, in Mediation; and Garland Hogan vs. United States of America, Case 09-CIV-81530, United States of America, Southern District of Florida, Fort Lauderdale, Florida); Jazmin Velasco Anthony & Robert Anthony vs. Al Lamberti as Sheriff of the Broward County Sheriff's Office and Charles E. Grady, Case # CACE 11-10710 (03), Circuit Court, Broward County, Florida; Samantha Rankin, Selene Rankin and Helen Rankin vs. Park One Holdings LLC, a foreign limited liability company, Pelican Development LLC, Ocean Boulevard II, LLC, a foreign limited liability company, and Park One of Florida LLC, a Florida Limited Liability Company, Case # 10-62143 CA 20, Circuit Court, Miami-Dade County, Florida; Karen Zaldana, as Personal Representative of the Estate of Daniel Danilo Gonzales, deceased, for and on behalf of said Estate and the survivors thereof, and David Acuna, individually vs. Florida Power and Light Company, Case # 2015-016345, Circuit Court, Miami-Dade County, Florida; Enrique Gamez-Garcia vs. Caloosa Citrus Transport, LLC, Randolph O. Lawrence, Sun County Citrus Hauling, Inc., a Florida Corporation, and Harold R. Fleming, Case # 16000109CAXMX, Hendry County, Florida.**

Further, I have been hired on cases involving domestic terrorism: cases dealing with possible **Anthrax** contact through the mail and **Anthrax** poisoning in United States postal workers (see for example, **Miami Area Local, the American Postal Workers'**

**Union vs. The United States Postal Service, and the American Postal Workers' Union, Case # 01-4423-CIV-SEITZ, United States District Court, Southern District of Florida, Miami Division; Jonathan Adrabi vs. Allstate Insurance Company, Case # 04-17589CA 01, Miami-Dade County, Florida)**.

I have been hired by defense counsel in high trauma fatal or near fatal automobile crashes, weapons discharge cases, natural disaster tragedies, cases involving terrorism, and even a case of accidental carbon monoxide poisoning. (See for example **Kevin Cregan vs. Richard A. Caliuri, Blue and White Bus Lines, Inc., Case # 96-7102 CA, United States District Court, Southern District of Florida, Orlando Division; and Daniel P. Stoia vs. Security Life Insurance Company of America, Case # 3 95-10963-C10L, Volusia County, Florida; Duval Joseph, Ramonde Joseph, individually, as parents and next friend for minor children, Elizabeth Joseph and Erica Joseph vs. Bank of America N.A. B/D/A NationsBank and Sainovul Saintilus, Case # 00-002977 CACE (12), Broward County, Florida; and Kimberlin Nickles, as Personal Representative of the Estate of Chasity Glisson, deceased, for and on behalf of the Estate and Survivors thereof, and Timothy Maddock, individually, vs. Toyota Motor North America, et. al. v. Marbella Premium Apartments LLC, Case # 11-13565 (09), Circuit Court, Broward County, Florida)**.

Further related to **extreme trauma**, I have been hired on cases supported by Amnesty International and the United Nations Agency on War Crimes. This work has dealt with the psychological effects of War Crimes, Torture, and Crimes against Humanity. This work has also looked at the research examining the psychosocial context within which such crimes are more prone to occur. (See for example **Juan Romagoza Arce, Neris Gonzales, Carlos Mauricio and Jorge Montes vs. Jose Guillermo Garcia, an individual, Carlos Eugenio Vides Cassanova, an individual, and DOES 1 through 50, Inclusive, Case #98-8364 CIV-HURLEY, United States District Court, Southern District of Florida, Palm Beach Division).** Morrison & Foerster, [through the San Francisco Office] hired me and I served as the only emotional damages expert witness. I was on the stand for two full days in this case. The jury found for the plaintiffs and awarded damages in the amount of Fifty-Four Million Dollars. To date this is the largest judgment ever awarded in U.S. Federal Court for emotional damages in a non-class action suit.

The Psychological trauma and consequences of complicated bereavement suffered by survivors and the relatives of people killed or maimed in accidents such as vehicular collision, building collapse and natural disasters. In this regard I have been hired by plaintiff's counsel in cases such as, for example, **Carol Froess Roberto, as Personal Representative of the Estate of Jennifer Froess, deceased vs. Jeffrey J. Rosenberg, Karen Rosenberg, Rallye Roslyn Inc., d/b/a/ Rallye Acura, and American Honda Finance Corporation, Case # 96-13855 (03), Broward County, Florida).** Another example of an interesting case involved both a financial and emotional damages claim resulted from a foreclosure of a property in which the owner claimed there was no mortgage default and that the bank improperly initiated foreclosure and

removed all the contents from the home. See **Bank of America, N.A. vs. Diane N. Mills and Gerald Mills, Case # 2009-CA-1975, Circuit Court, St. Johns County, Florida.** In this case I was hired on behalf of the bank.

I have been hired by both plaintiff attorneys and on the defense side in cases of complicated bereavement and/or loss of quality of life, foreshortened life expectancy, or other severe emotional distress cases involving everything from the consequences of claimed medical malpractice, to failure to render care, to the claimed malpractice of mental health professionals, to legal malpractice cases, to products liability cases, to construction liability including asbestos and mould cases, to cases involving the spiritual and religious abuse of children, to legal malpractice, to the service of liquor to allegedly intoxicated individuals, to worker's compensation cases, to failure to provide proper security, to cases of school teacher abuse of highly vulnerable very young disabled children and failure of the school district to protect these children, to civil sexual abuse cases, to false arrest and wrongful prosecution. I have also been hired on cases brought under the Family Leave Act of 1993, and more (see for example, **Amelia Secord vs. Telemedia Investment Partnership, L.P., Case # 00-9400 CACE (25), Broward County, Florida; Kurk Koepke vs. James Byrnes, M.D., Premier Medical Group, P.A. Hanley Hazelden Center at St. Mary's, a Florida nonprofit Corporation, James Phillips, M.D., Family Practice Center, Inc., Thomas L. Purcell, M.D., Thomas L. Purcell, M.D. P.A. d/b/a/ The Purcell Institute, Jerome Werner, M. D., and Walk-In Medical Centers, Inc., a Florida Corporation, Case # CL96-4168 AJ, Palm Beach County, Florida; Susan Beseau, as Personal Representative of the Estate of James Beseau, Deceased, for and on behalf of said survivors thereof, and Lindsay Beseau, a minor, and Sydney Beseau, a minor, by their mother, and guardian, Susan Beseau and Susan Beseau individually, vs. Memorial Health Services, Inc. d/b/a Memorial Hospital Ormond Beach, Mark T. Labor, C.R.N.A., Kirit Bhalani, M.D., Kirit Bhalani, M.D., P.A., Anthony J. Conte, M.D., Anthony J. Conte, M.D.,P.A., et. al. Case # 98-32140 CICI, Volusia County, Florida; William D. Riccard vs. Parker, Landerman & Parker, P.A., Case # C10-01-3434, Orange County, Florida; Lynette Ruiz Saibic vs. 1015 South Inc d/b/a Crabby Jacks, Case # 2003 CA 009408-OCAN, Palm Beach County, Florida; Mark A. Smith vs. The Florida Department of Corrections, Case # 04-2007-CA-172, Miami Dade County, Florida; Jane Doe, a minor child, by and through parents and natural guardians, Joan Doe and John Doe, vs. Control Security Systems, Inc. a foreign corporation and Simon Properties Group Inc, d/b/a Coral Square Mall, Case # 0509116 CAC 11, Broward County, Florida; Kathyn Wood vs. K-Mart Corporation, Case # 05-60792 CIV Zloch, United States District Court, Southern District of Florida; Susan Smith vs. Festival Fun Parks, Case # 01 000627 (09), Broward County, Florida; and Keith Joseph Cruse and Rebecca Cruse vs. JPI Investment Company, LLP D/B/A Jefferson at Camino Real, Case # 2003 CA01=3376-XXON, Palm Beach County, Florida; Lisa Dietschy vs. Rockwell Collins, Inc., Case # 06-20590C CIV-GOLD, United States District Court, Southern District of Florida, Fort Lauderdale Division; Hector DeArmas vs. Brandy Salem, Case 308-43822CA04, Broward County, Florida; and Stephanie Hollingsworth vs. Holy Cross Hospital, Yvonne R. Sherrer M.D.,**

**University of Miami School of Medicine, Marcos E. Maldonado, M.D., Martha Hernandez-Illas, M.D. Case #11-002290 CA 13, Broward County, Florida; and Ariel Jirau and Lilian Jirau, individually and as legal guardian for Gabriel Jirau, a minor, vs. Anne Lanier, and the School Board of Broward County, Florida Case # 03-18198 9020, Broward County, Florida; Howard Cohen and Nancy Cohen, individually and as legal guardian for Spencer Cohen, a minor, vs. Anne Lanier, and the School Board of Broward County, Florida Case # 03-18201-03, Broward County, Florida; Joseph Anthony Milligan and Peggy Ann Milligan, individually and as legal guardian for Quinn Joseph Milligan, a minor, vs. Anne Lanier, and the School Board of Broward County, Florida Case # 03-18199-03, Broward County, Florida; Francisco Gravina and Lourdes Gravina, individually and as legal guardian for Tiziana Gravina, a minor, vs. Anne Lanier, and the School Board of Broward County, Florida Case # 03-18202-04, Broward County, Florida; and Iorios Fils-Aime, as the Natural parent and Legal Guardian of Wilgius Fils-Aime, a minor, and Alrene Ambrosio as the Natural Parent and Legal Guardian of David Strong, a minor vs. the School Board of Broward County and Adrian Valdez, individually, Case # 09031145(09), Broward County Circuit Court, Florida; Dalin Curtis vs. Julie Aitkin, Case # 09-022119-05, Broward County, Florida; Nicolla Pierre vs. First Baptist Church of Hollywood, a Florida Non-Profit Corporation d/b/a/ The Hollywood Christian Academy, Case # 12-001617-13, Broward County, Florida; Jeremy M. James vs. Apple Computer Inc., Case # CACE 13026523, Circuit Court, Broward County, Florida; B.A. and P.A., individually and on behalf of their minor child, I.A. vs. Antioch Missionary Baptist Church of Carol City Inc., Case # 12-47043 CA02, Miami-Dade County, Florida; Jeremy M. James vs. Apple Inc. and Melanie Kabinoff, Case # 13-026526 CACE [21], Broward County, Florida; and ane Doe #1 and Jane Doe #2 vs. Nur-Ul-Islam Academy, Inc. a Florida Corporation, Nur-Ul-Islam of South Florida, Inc., and Kem Hussain, an Individual, Case # 062014-CA-020618 CE, Broward County, Florida; Jessica A. Meister vs. USAA Casualty Insurance Company, Case # CACE 16.006170 [09], Broward County, Florida**).

I have been hired on cases involving loss of quality of life, foreshortened life expectancy, or other severe emotional distress cases. Because of my expertise in addictive behavior I was hired to review numerous cases in a variety of tobacco related litigation in the mid 1990's by Womble, Carlyle, Sandridge and Rice P.A., a major law firm representing the Tobacco Institute [the umbrella trade and lobbying association of the United States Tobacco Industry]. There were several dozen cases which I was asked to review including, as representative, **Howard A. Engle, M.D. et al. vs. R.J. Reynolds Tobacco Company, Phillip Morris Incorporated, Brown & Williamson Tobacco, case # 94-08273-CA 22, Dade County, Florida; Frimit Gardener, as Personal Representative of the Estate of Henry R. Gardener, deceased vs. Liggett Group, R.J. Reynolds Tobacco Company et. al.; Case # 96-2639-CIV-21B, United States District Court, Southern District of Florida, Miami Division; Claude Montgomery vs. R.J. Reynolds Tobacco Company, Case # 97-C 01822-CKK, United States District Court for the District of Columbia;  Hope Russ, as personal representative of the Estate of Roy**

**R. Russ, deceased vs. Randal Silbiger, M.D., Case # 01016577-22, Broward County, Florida).**

In each of these cases and others, I was never asked to testify because once I had thoroughly reviewed all the historical evidence of each of the plaintiffs and the nature and scope of their dependency on nicotine, and the behavioral dynamics related thereto, my findings of the level of addiction experienced by each plaintiffs led me not to be able to be of any assistance to the defendants. Not surprisingly, despite the work being both interesting and rewarding for me, given that my findings were never consistent with the agenda of the Tobacco Institute, my consultancy with Womble et. al. lasted less than eight months.

**Neuropsychology-Brain Injury Cases**

I have been hired to examine **neuropsychological** issues and other disabilities following head-trauma, other brain injuries including poisonings, and other injuries or disabling conditions, including neuropsychological injury caused by medical malpractice. I have also been hired in several negligence cases against pharmacies. My neuropsychology work has been done primarily in personal injury, medical malpractice, and products liability or worker's compensation (injury or toxic environment in the workplace) cases, though I have also given support in this area for social security appeal hearings, in cases of testamentary capacity, undue influence in the elderly, and in disability actions brought against insurance companies (see for example, **Joseph Conti & Carol Conti, his wife vs. Ryder Truck Rental Inc., A Florida Corporation, Gerald Roger DesMarias, & Maxon Industries, Inc., Case #88-8715(22), Broward County, Florida**; **Arthur B. Surloff and Sheri Surloff vs. Travelers Indemnity Company, a foreign corporation, Mike's Cyclery, and Cannondale Corporation, a foreign corporation, Case # 94-11061, Broward County, Florida; Monica Mazzo & Steven Mazzo, her husband vs. Ford Motor Company, Case # 95-1569, Broward County, Florida; Michael Mann and Cyndi Mann, individually, and as parents and natural guardians for Mathew Mann, a minor vs. Advocate Communications, Inc. d/b/a/ Cable Television of Coral Springs and Atlantic Cable Services, Inc., Case # 95-9373CACE(05), Broward County, Florida; and Brian Neiman vs. Provident Life and Accident Insurance Company, Case # 00-2140-CIV-MORENO, United States District Court, Southern District of Florida, Fort Lauderdale Division; Michael Azizi and Hali Azizi vs. Polo Ralph Lauren Factory Stores of Florida, Inc., Premises Providers, Inc. and Sawgrass Mills Phase II, Case # 99-17355(13), Broward County, Florida; Craig Donner vs. Equitable Assurance Society of the United States, a/k/a/ The Equitable, Case # 98-8973CA08, Dade County, Florida; John B. Turner vs. The Paul Revere Life Insurance Company, Case # 98-21256-CA (2), Miami-Dade County, Florida; Frank James Cosenza, an incompetent minor child, by and through his parents, Frank R. and Donna Cosenza, and Donna and Frank R. Cosenza, individually vs. Morton Plant Mease Health Care, Inc., Karen Sandoff, R.N., C. N. M., Sylvia Tatianna Goodwin, M. D., Steven E. Lesser, M. D., and Lesser & Kane, M. D. P. A., d/b/a Associates in Birth and Gynecology, Case # 98-6794-CI-007, Pinellas County,**

Florida; Diane Franco vs. The Home Depot, Inc., a Delaware Corporation, and MGA Assembly, a Foreign Corporation, Case # 99-15928 CACE 21, Broward County, Florida; Stacey J. Nelson vs. Drivers Management, Inc. dba Werner Enterprises Inc., Case # CI 0114, Hamilton County, Nebraska; Antonio Rodriquez and Hentriqueta Villega vs. Jeff S. Nudelman and Joyce Nudelman d/b/a Stuart Lumber Company, Case # 01-017876 CA 02, Broward County, Florida; Bridje Rangasammy vs. Lowe's Home Centers, Inc., Case # CFA 29256L, Broward County, Florida; Debora Reynolds and Robert Reynolds, her husband, vs. Toyota Motor Sales, U.S.A Inc., a foreign corporation, Pierre Gary Francois, and Geico General Insurance Company, Case # 01-020550 CACE 04, Broward County, Florida; In RE: Guardianship of Elizabeth Echevarria, Case # CG-01-759, Palm Beach County, Florida; Glen Urquhart, individually, as husband of Lisa Urquhart, and as parent and legal guardian of Nicholas Urquhart and Tiffany Urquhart; and Lisa Urquhart, individually, as wife of Glen Urquhart, and as parent and legal guardian of Nicholas Urquhart and Tiffany Urquart vs. Joseph M. Wolters, and Communications Southeast Enterprises, Inc., a Florida Corporation, Case # 02CA-10312, Orange County, Florida; Larry Feldman vs. Broward Fire Equipment & Service Inc. and Norman Benoit, Hartford Insurance Company Claim #YACAL23181, Hearing in Binding Arbitration, Ft. Lauderdale, Florida; Eva Meyerson vs. Walgreen Co., Astrazeneca, P.L.C., Astrazeneca, P.L., and Astrazeneca Pharmaceuticals, L.P., Case # 05-60025-CV-Altonaga/O''Sullivan, United States District Court, Southern District of Florida; Jane Doe vs. Sidelines Grill Inc, A Florida Corporation a/k/a Geronimo's Bar & Grill Inc, Case #05-010289, Broward County Florida; Thomas J. DeMaio vs. Social Security Administration; Ray Alton Smith vs. Sorrel Enterprises, Arnaldo Bernardo Caldern, and Julio A. Fleites, Case # 05-CA-019095-0000-01, Miami-Dade County, Florida; Mark A. Smith vs. Florida Department of Corrections, Case # 04-2007-CA-172, Bradford County, Florida; Thomas J. DeMaio vs. Social Security Administration, Case # 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, Broward County, Florida; Kelly Caisse vs. Nationwide Mutual Fire Insurance Company, Milton F. Larrea and Maria C. Larrea, and Marcus F. Larrea, Case # 07005355, Circuit Court, Broward County, Florida; Thomas J. DeMaio vs. Albert Lamberti, as Sheriff of Broward County, Florida, Case # 08-009148, Broward County, Florida; This case was then transferred into Federal Court as Thomas J. DeMaio vs. Al Lambert, as Sheriff of Broward County, Florida Case # 10-60758CIV-HUCK/OSULLIVAN, United States District Court, Southern District Court of Florida, Fort Lauderdale Division; Andrew Moore vs. Laura Alvarez, Case # 082765613, Broward County, Florida; Ryan Rick vs. Kenneth Wortman, Case # CACA09028557, Broward County, Florida; and Shaul Dadi and Adena Dadi vs. Louis D. Gold M.D., Praturi Sharma, M.D., and Tenet Health Care Corporation, d/b/a Delray Medical Center, a Florida Corporation, Case # 2011-CA-016027, Palm Beach County, Florida; Cheri Surloff, as Personal Representative of the Estate of Dr. Arthur Surloff, deceased, and on behalf of herself and all potential beneficiaries and heirs, vs. Regions Bank, an Alabama Corporation and Mark K. Anderson, Case # 12-010356 CA13, Circuit Court, Broward County, Florida; Richard & Mindy Hewitt vs. Pedro J. Gonzales & Cort Business Services Corporation, Case # CACE-12-

**002286, Circuit Court, Broward County. Florida; Shaul Dadi and Adena Dadi vs. Louis Gold, M.D. & Louis Gold, P.A., and Praturi Sharma M.D. and Delray Medical Center Inc. D/B/A/ Delray Medical Center, Case # 2011CA016027, Circuit Court, Palm Beach County, Florida; Michael O'Neal vs. CACE Beef Retail Inc., a Foreign Corporation and Western Beef of Florida, LLC, a Florida Limited Liability Company, Case #CACE 13-027868 (03), Circuit Court, Broward County, Florida); Geraldine Dineen Ellis vs. Le Pavilion Hotel et. al., Case #2:16-cv-15599-KDE-DEK, United States District Court, Eastern District of Louisiana.**

The Defense side of cases within the above categories also has hired me. (For example, see **JoAnne Doherty and Robin Doherty vs. Charles English and DiVorsta & Company, n/k/a Moduplex Corporation, Case # 92-2931AH, Palm Beach, Florida; John Harper and Robin Harper vs. Estelle Malkin Danziger, Case # 94-7034-05, Broward County, Florida; David Lipson vs. Board of Trustees, City of Sunrise Police Officer's Retirement Plan, Retirement Mediation Board, 2001, Broward County, Florida; Kimberly Nickles, as personal representative of the estate of Chasity Glisson, deceased, for and on behalf of the estate and survivors thereof, and Timothy Maddock, individually, vs. Toyota North America Inc., Toyota Motor Corporation, Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering and Manufacturing North America, Inc. Jim Auto Inc., D/B/A JM Lexus Certified Pre-owned Superstore, a Florida corporation, and Marbella Premium Apartments LLC, A Florida Limited Liability Company, Case # 11-13565 09, Circuit Court, Broward County, Florida; Kimberly Nickles, as personal representative of the estate of Chasity Glisson, deceased, for and on behalf of the Estate and survivors thereof, and Timothy Maddock, individually vs. Marbella Premium Apartments, LLC et al., Case # 12-014012 21, Broward County, Florida; Bank of America, N.A. vs. Diane N. Mills and Gerald Mills, Case #2009-CA-1975, St. Johns County, Florida).**

**Civil Rights and Employment Cases**

Civil rights issues such as sexual abuse, gender (including pregnancy) discrimination and sexual harassment and issues of hostile work environment, racial discrimination and affirmative action, racial profiling, national origin, age, religious, disability discrimination, terminations involving ADA violations, and other discrimination and/or abuse practices like matters of retaliation (with a focus on these issues in the workplace) and other tortuous workplace related events. See also racial discrimination in forced evictions, wrongful discharge and police brutality, and Whistleblower cases. I have given testimony on behalf of plaintiffs in the largest award sexual harassment as well as the largest award racial discrimination cases in Florida. (See, for example, **Michelle Ann Stockett vs. Frank Tolin et al., Case # 88-1550-CIV, United States District Court, Southern Division of Florida, Miami Division; Richard Forum and Patricia Forum, his wife vs. The City of Fort Lauderdale, a municipality, Robert Cox, Individually and as Mayor of the City of Fort Lauderdale, Case # 90-6011-CIV, Broward County, Florida; Cathy Howdyshell vs. Richard Wille, as Sheriff of Palm Beach County, Case # 90-6672 CIV, Palm Beach County, Florida; Pamela Lang, Barbara Brown & Mary Michelle**

Bartley vs. Reedy Creek Improvement District and Walt Disney World Company, a foreign Corporation, Case # 94-693-CIV-ORL-19; Bari-Sue Goldberg vs. Mordechai Golan, Case # 98-17783(04), Broward County, Florida; Carol W. Click vs. Tire Kingdom, Inc. and Robert Hibbard, Case # 94-1164-CIV-NESBITT, United States District Court, Southern District of Florida, Miami Division; Sandra Clifford vs. Easter Point Hospital, Inc., Case # 95-5093-CA-LG, Lee County, Florida; Joni Andal vs. Columbia HCA Healthcare Corporation, Lawnwood Medical Center, and Nicholas Ioannou, Case # 96-14195-CIV-PAYNE, United States District Court, Southern District of Florida, Palm Beach Division; Tyrus Bowers et. al. vs. The New Piper Aircraft Company, Case # 99-14354, United States District Court, Southern District of Florida, West Palm Beach Division; Charles & Dorian Brady vs. James L. Adams, Jr., individually, and in his official capacity as Sheriff of Sumter County, Florida and Sumter County, Florida, Case # 92-151-CIV-OC-10, United States District Court, Middle District of Florida, Ocala Division; Arlene F. Anderson vs. Darby Dental Supply Company, Inc., and Marty Farber, Case # 96-7452-CIV-MIDDLEBROOKS, United States District Court, Miami Division; William J. Bogle vs. Orange County Board of County Commissioners, as governing body of Orange County, Florida, Case # 95-847-CIV-ORL-22, United States District Court, Middle District of Florida, Orlando Division; Abert Arbuckle et. Al. vs. John McMillian, individually and d/b/a Green Star Mobile Home Park, Case # 91-20649CA20, Broward County, Florida; Bridgette Balboni vs. The Law Offices of David J. Stern, P.A., Case # 99-6009CIV-FERGUSON, United States District Court, Southern District of Florida, Miami Division; Mary Brown vs. City of Margate, et al., Case # 88-6105-CIV-HOEVELER, United States District Court, Southern District of Florida, Fort Lauderdale, Division; and John Robinson et al. vs. Caulkins Indiantown Citrus Company, Case # 83-8655-CIV, United States District Court, Southern District of Florida, Miami Division; Carlo V. D'Aragona vs. Bell South Communications Systems, Inc., Case # 98-0554-CIV-MORENO, United States District Court, Southern District of Florida, Miami Division; David Grossman vs. Ron Cochran as Sheriff of Broward County, Case # 93-12422 (18), Broward County, Florida; Walter Damon and Richard Kanafani vs. Fleming Supermarkets of Florida, case # 97-0230 CIV-LENARD, United States District Court, Southern District of Florida, Miami Division) and Clifton Dancy vs. Interstate Brands Corporation, Case # 6:01CV-289-ORL22 KRS, United States District Court, Middle District of Florida, Orlando Florida; and Lazaro Carrillo vs. Publix Super Markets, Inc, Case # 00-7362-DIMITROULEAS, United States District Court, Southern District of Florida, Fort Lauderdale Division; and Frank Jackson and Stephen Little vs. Interstate Brands Corporation, Case # 6:01CV-1034-ORL-28JGG, United States District Court, Middle District of Florida, Orlando Division: Robin Schafler vs. Achievers Unlimited Inc and Cornerstone Management, Inc, Case # 9800706 AF, Circuit Court, Palm Beach County, Florida; Deborah E. Brauer vs. Bloomingdales Inc., and Joseph Ciechanowski, Case # 03006764-02, Broward County, Florida; Bobbie O'Brien vs. Michael Chaparro, M.D., Case # 05-80342-CIV, United States District Court, Southern District of Florida, Fort Lauderdale Division; Karyn Wood vs. Kmart Corporation, Case # 05-60792-CIV-ZLOCH, Adolfo P. Zamora vs. Florida Atlantic

**University Board of Trustees, Case # 50-2004 CA 004311 MB, Palm Beach County, Florida, and Karyn Wood vs. Kmart Corporation, Case # 05-60792-CIV-ZLOCH, United States District Court, Southern District of Florida; Carlisle Wilson vs. Broward County, Case # 04-61068-CIV, United States District Court, Southern District of Florida, Fort Lauderdale Division); and Angelique S. Wong and Barbara Lin vs. World Imports International, a Florida Corporation; and Michael Krumholz, as personal representative of the Estate of Spencer R. Krumholz, Case # 0812689 (14), Circuit Court, Broward County, Florida; Linda DeCaro vs. Party Line Cruise Company et al., Case # 2007-CA001010, Palm Beach County, Florida.** Further, the case of **Beth Ann Faragher vs. City of Boca Raton, Case # 92-8010-CIV-HIGHSMITH, United States District Court, Southern District of Florida, Miami Division**, in which I testified for the plaintiff, was ultimately heard by the United States Supreme Court; **Linda A. DeCaro vs. Community Asphalt Corporation, Case # 502003CA007633XXOCPO, Palm Beach, Florida; and Jill Kaplan vs. The Palm Beach Pops, Inc. and Robert Lappin, Case # 9:10-80227-CIV-MARRA, United States District Court, Southern District of Florida; Angelina Magaldo vs. City County Credit Union of Fort Lauderdale, United States District Court, Southern District of Florida, Case # 11-62549-CV-Williams; and Anthony Chase vs. Nova Southeastern University, Inc., Case # 11-CV-61290-CIVKMW/WILLIAMS/SELTZER United States District Court, Southern District of Florida; Angelina Magaldo vs. City County Credit Union of Fort Lauderdale, Case # 11-62549-CV-Williams, United States District Court, Southern District of Florida; Michelle Corbett vs. Rick Beseler, in his official capacity as Sheriff of Clay County, Case #3:12-CV-728-J-025-JRK, United States District Court, Middle District of Florida, Jacksonville, Florida; Cheryl Clark M.D. vs. South Broward Hospital District d/b/a Memorial Healthcare System, Case #12-61164-CIV-Dimitrouleas-Snow, United States District Court, Southern District of Florida; Linda Whitman vs. South Broward Hospital District d/b/a/Memorial Healthcare System, Case # 13-61927-CIV-Dimitrouleas-Snow, United States District Court, Southern District of Florida; Kristin Anderson vs. City of Fort Pierce, Case # 2:14-CV-14095-JEM, United States District Court, Southern District of Florida, Fort Pierce Division); Holly Hargett vs. Florida Atlantic University Board of Trustees, Case # 15-CV-80349-Ryskam/Hopkins, United States District Court, Southern District of Florida; Samantha Haynes vs. Town of Indian River, Case # 2:14-cv-14434-KAM, United States District Court, Southern District of Florida, Fort Pierce Division; Theresa Smyack vs. JPMorgan Chase Bank N.A., Case #015-CV-62236-RLR-CIV, United States District Court, Southern District of Florida, Palm Beach Division; and Lourdes Rice vs. Plantation General Hospital, Case # 1:13-cv-21621-XXXX, United States District Court, Southern District of Florida, Miami Division.**

I have done significant work in areas including civil rights by aiding Corporate defendants either in testimony (see for example **Charles Nwagbara vs. Cabot Corporation, Case # 92-VS-60116-G, Fulton County, Georgia; Jennifer Fox vs. Donner Chiropractic Center, Inc., a Nevada Corporation, Jeffrey Scott Donner, D.C. Individually, & ROE Corporation, Case # A323174, Clark County, Nevada; John B Moore vs. Cabot Corporation, Case # 92VS-60343-D, State Court of Fulton County, Georgia;**

**Reginald Gagneron vs. Unisys Corporation, Case #90-1226, Broward County, Florida; Dean E. Mackey vs. Multiplan, Inc., Case # 98 CIV 8480-CIV-RYSKAMP, United States District Court, Southern District of Florida, Miami Division; Joseph Ferguson vs. Palm Beach County, Board of County Commissioners, Case # 95-8360-CIV-Marcus, United States District Court, Southern District of Florida, Palm Beach Division; Ellen Swanson vs. Palm Beach County, Board of County Commissioners, Case # 94-8183-CIV-HIGHSMITH, United States District Court, Southern District of Florida, Palm Beach Division; Kenneth Weiss, Ginger Weiss and Terry Yosef Klein vs. Ren Laboratories of Florida, and Mary Piccola, Case # 94-6333CIV, United States District Court, Southern District of Florida, Fort Lauderdale Division; Robin Mirjah & Joel Pironti vs. Agency for Health Care Administration, an agency of the State of Florida, Gloria Henderson, in her individual capacity, Thomas Wallace, in his individual capacity, and Douglas Cook, in his individual capacity, Case # 96-264443CA(09), Broward County, Florida; Tammy Crabeels vs. Sunrise Ice Skating Center, Arvin Grabil, Owner, and Rosstyn Guidino, General Manager, Case # 97-000314, Broward County, Florida; Fatima Sherif & Lucia Novoa vs. Service First Mortgage, L.L.C., A Florida Limited Liability Corporation, and Trans-Act Mortgage, Inc., A Florida Corporation, Case # 03002732, Broward County, Florida)** or by conducting an Independent Psychological Examinations and/or collateral consultation without testimony (for example, **Dianne Carico vs. Capitol Police, Case # 93-40383, Leon County, Florida; Amy Peters vs. Coastal Recovery Centers Inc., Case # 93-333-CIV-FTM 21, United States District Court, Middle District of Florida, Orlando Division; William R. Mills vs. Gaylord Container Corporation, Case # 95-973-CIV-T-24C, United States District Court, Middle District of Florida, Tampa Division; Betty J. Freeman vs. Cabot Safety Corporation, Case # 95-CIV-8-JTC, United States District Court, Northern District of Georgia, Atlanta Division; Lois J. Gorman vs. Restaurant Management Services Inc., d/b/a/ Shoney's, Case # 95-611-CIV-T-21A, United States District Court, Middle District of Florida, Tampa Division; Denise DiFeliciantonio vs. American Airlines, Daniel L. Borg and Larry W. Metter, Case # 92-922-CIV-ORL-18, United States District Court, Middle District of Florida, Orlando Division; Ingrid R. Nandal vs. Johnson Control World Services Inc., Case # 93-2442- CIV-KING, United States District Court, Southern District of Florida, Jacksonville Division; Mary Poindexter vs. The Housing Authority of the City of Fort Pierce, and Clarence Brown, Case # 95-14312-CIV-Davis, United States District Court, Southern District of Florida, Fort Pierce Division; Linda Auer vs. Vencor Hospital South Inc., a Foreign Corporation, Case # 96-23937 CA 21, Palm Beach County, Florida; Robin Wolfer vs. Morris Engelberg, Case # 97-03697, Broward County, Florida; and Frank Yon vs. The Riverside Hotel Inc., Case # 99-017502CACA-07, Broward County, Florida; and Carol Fletcher Hudson vs. Worldwide Institute, Inc., a Florida Corporation and Worldwide Institute, Inc., a Canadian Corporation, and Smiley Sansoni, individually, Case # 99-009287 CACE 05-Broward County, Florida; Audra Perez vs. Avente at Lake Worth & Avante Group Inc., Case # 2003-CA 009408-OCAN, Palm Beach County, Florida; Frank Jon vs. Riverside Hotel, Inc., Case # 99-017502 CACE 07, Broward County, Florida; Aponte Cruz vs. C7M Cutting Inc., Case #**

**99003784 (13), Broward County, Florida; and Alyssa Murray D.V.M. vs. VCA Incorporated, Case #----------, Broward County, Florida).**

Occasionally, there are cases wherein I aid by facilitating a resolution of the matter or offer other consultation, sometimes even putting in place sensitivity training and prevention programming as part of the resolution. In this regard please note the web based training program on **The Prevention of Sexual Harassment** that I have developed (with Andrew Byrne, Esquire).

**Various Other Tort Cases**

Cases involving a variety of other tort claims such as serious but not fatal or near fatal motor vehicle injury claims, serious injury slip and fall matters involving complex medical consequences, unlawful confinement claims, the psychological consequences of medical and other professional malpractice [ranging from problems in the birthing process to poor plastic surgery outcomes to the sexual abuse of patients] (by professional care givers ranging from nursing home employees to physicians to mental health providers), to medical errors during the administration of Electroconvulsive Therapy, to matters of product liability, issues of contract disputes and bad faith claims in insurance disability, or health matters, defamation, issues of duty to protect in contexts ranging from sexual battery against a minor to negligent hiring and retention, including such hiring and retention in a very high profile prison rape case, to cases involving the intentional infliction of emotional distress. I have also been hired in a variety of sexual abuse cases brought against the Catholic and other Churches, some of which have involved issues of repressed memory. (See for example plaintiff cases such as: **Sherri Lynn & Charles Hilsman vs. Winn Dixie Stores, Inc., Case # 91-33747 (Burnstein) 21, Broward County, Florida; Onnalee Lacombe vs. Allstate Insurance Company Case # 88-32454CN (10), Broward County, Florida; Betty Easton vs. The Miami Herald Publishing Company et al., Case # 91-42348-CA03, Dade County, Florida; Laurence Capone vs. Florida Board of Regents and Van Waddill, Case # CL98-2110-AB, Palm Beach County, Florida; Bonnie Rosen vs. The Law Offices of David H. Zoberg, P.A., David H. Zoberg, individually, and Barbara Zoberg, a/k/a/ Bobbie Zoberg, individually, Case # 93-03960CA11, Dade County, Florida; Maria Califano vs. Arthur Carl Haspel, D.P.M. and Susan Solman-Starpoli, D.P.M., Case # 94-01489(08), Broward County, Florida; Lori Erwin vs. Camille D. Chavez & Florida Center for Cosmetic Surgery, Case # 99-14128(12), Broward County, Florida; Yolanda Goldman, as legal guardian of Javier Arias, a minor child; and Yolanda Goldman, individually vs. Emmanuel Dameus & The Evangelical Lutheran Church of America, a Florida Corporation, Case # 95-02486(21), Broward County, Florida; and Anthony LaMarca, Martin Saunders, and Edwin Johnson, individually and on behalf of all others similarly situated, vs. R.V. Turner, individually and in his former official capacity as Superintendent of Glades Correctional Institution, and the State of Florida, Case # 82-8196-CIV-JCP, United States District Court, Southern District of Florida, Palm Beach Division; Maria Teresa Diaz vs. Pol Miguel Diaz Martinez, et. al., Case # 94-2184(HL), United States District Court, District of**

Puerto Rico; Elle Furlong individually and as parent and natural guardian of Jason Furlong, a minor vs. Nova Southeastern University, Inc., d/b/a Ralph J. Baudhuin Oral School, Case # 98-005450(05), Broward County, Florida; John B. Turner vs. The Paul Revere Life Insurance Company, Case # 98-21256CA-01, Dade County, Florida; and C.K.A., Individually, a Minor, and C.K.A. by and through his Parent and Next Friend, Connie Allen vs. Venator Group Retail, Inc. d/b/a/ The Foot Locker, and Louis J. Strianese, Case 3 01-4666-CA-1A, Lee County, Florida; and Stacey J. Nelson vs. Drivers Management, Inc. d/b/a Werner Enterprises, Inc., Case # CI-0114, Hamilton County, Nebraska; Mark Caruso vs. Walmart Stores Inc.,d/b/a/ Walmart, Case # 00004281, Broward County, Florida; Karen Exterkamp individually and as mother and natural guardian of "John Doe", a minor child, vs. William Paul Edelman and the School Board of Broward County, Case # blank, Broward County, Florida; Thomas Murphy vs. Archdiocese of Miami, Inc, a Corporation Sole and Father Ronald John Luka, Case # 02-13643 CA22, Miami-Dade County, Florida; and Hector DeArmes vs. Brandy Salem, Case # 08-43822CA04, Dade County, Florida; and Angelique Wong and Barbara Lin vs. World Imports International Inc., a Florida Corporation, and Michael Krumholz, as personal representative of the estate of Spencer C. Krumholz, Case # 0812689, Broward County, Florida; Exius Noel, as the Personal Representative of The Estate of Paulette Noel, and Patrick Chery vs. Ford Motor Company, a Foreign Corporation, Case #6:1-CV-370-ORL-28DAB, United States District Court, Middle District of Florida, Orlando Division; Nickella Pierre vs. First Baptist Church of Hollywood, a Florida Corporation, d/b/a/ The Hollywood Christian School, Case # 12-001617-13, Broward County, Florida; Peter Thompson vs. Paul Suave Jr., Circuit Court, Case # 14-020029-18, Broward County, Florida; Timothy Dillon and Jessica Dillon vs. Jenna E. Basilone, Leonard Maxwell, Audrey McCrary, and State Farm Mutual Automobile Insurance Company Case # 50-2012-CA 004668-XXXX-MB, Circuit Court, Palm Beach County, Florida; and Jeremy M. James vs. Apple Inc., and Melanie Kabinoff, Case # 13-9265526 CACE-{21}, Circuit Court, Broward County, Florida. Odalys Herrera vs. Jarden Corporation, a Delaware corporation qualified to do business in the State of Florida. Tonya Jarvis, an individual, and John Capps, an individual, Case # 13-005342 [05], Circuit Court, Broward County, Florida.

I have also served the defense in the above topic areas (see for example, **Theo Cunningham vs. Wal-Mart Stores, Inc., Case # 98-8878CA-01-09, Dade County, Florida; Solange DuPuis and Rene Dupuis, her husband vs. Wal-Mart Stores, Inc., Case # 98-11121-04, Broward County, Florida; George L. Reinhardt vs. Molly Murray, Psy. D and Accord Comprehensive Therapeutic Services Inc., Case # 97-2435 CA, Lake County, Florida; and Reginald Gagneron vs. Unisys Corporation, Case # 90-21226(09), Broward County, Florida; Bridget Hester, as natural parent and natural guardian of B.B. vs. Talisha M. Reddick, in her official and individual capacity as a staff member at Broward Girls Academy, Latarsha Reddick, in her official capacities as an Assistant Director at Broward Girls Academy, Pamela Rollins, in her official capacity and individual capacities as Facility Director at Broward Girls Academy, Youth Services International, Inc., d/b/a Broward Girls**

**Academy, a foreign for profit corporation [Maryland]; Steven Ashford and Susan Ashford, as personal representatives of the Estate of Isaac Steven Ashford, deceased vs. American Addiction Centers, Inc., a Tennessee Corporation, Singer Island Recovery Center, LLC., a Florida Limited Liability Company, and Tiffany Francesco, individually, Case # ----------, Circuit Court, Palm Beach County, Florida.**

## Family Law and the Interests of Children

I have served in child and/or family evaluation cases and cases focused on the interests of children. These cases have included custody matters, dependency issues, relocation, parental estrangement, alienation, extreme alienation as in parental alienation syndrome, and also parental fitness, and also parental reunification therapy and deprogramming treatment where sexual or other abuse or profound mind-control has been established. These consultations usually, though not always, have been done in the context of Court appointments and also sometimes I have helped the lawyers resolve these matters during the course of my consultations in a case. (Examples of cases that have gone to trial include: **Patricia G. Babik vs. Edward J. Babik, Case # 88-27045DA, Circuit Court, Broward County, Florida; Peggy Roberts vs. Steven Roberts, Case # 89-33809, Circuit Court, Broward County, Florida; Angela Frazier vs. Donovan "Razor" Ruddock, Case # 90-21226, Broward County, Florida; In the Interests of Catherine Kirkiles, a Minor Child, State of Florida, Case # 91-11966CJDP, Broward County, Florida; Reid Bracken vs. Jeraldine Bracken, Case # 94-946-FMCE-43, Broward County, Florida; David DePorter vs. Cindy DePorter, Case # 99-005342(35), Broward County, Florida; Steven R. Newman vs. Gladys A. Newman, Case # 04-4081, Broward County, Florida; Phillip John Hardwick vs. Amy Hardwick, Case # 97-613FS, Martin County, Florida; Margaret Capiole vs. Scott Martin, Case # 92-24676(39), Broward County, Florida; In the Interests of Sherry L. Crowe, A Minor Child, Case # CJ-93-300321-JL-PC, Palm Beach County, Florida; Rose Marie Spano vs. Dennis Bruce, Case # 93-3711FC(18), Dade County, Florida; State of Florida vs. Danny Hash, Case # CD-7680 FY, Broward County, Florida; Marshall G. Brant vs. Kimberly L. Brant, Case # CD-2000-DR-5129-FB, Palm Beach County, Florida; Whitney Charlton vs. Darryl G. Davidson, Case # 98-4532-23, Pinellas County, Florida; In the Interests of Ratner, Jeffrey Scott, a Child, Case # 01-CJ0034-73A02; Joseph G. Phillips and Cynthia Ream-Phillips, Case # 01-0925-FR-01, Indian River County, Florida; and Charles McDonald vs. Caren Regan MacDonald, Case # 97-008706-42/93, Broward County, Florida; and Carri Schiff Goldberg vs. Bernard Joseph Goldberg, Case # 2003 DR 512FZ, Palm Beach County, Florida; Alicia Weiner-Hollender and Jeffrey Alan Hollender, Case # 03-19352FMCE 42/91, Broward County, Florida; In the Interest of Samantha Bonnin, Case #2007-2714 CJ-DP, Broward County, Florida; David Polen and Rosa Polen, Case # 50-2004 DR004924XXXXSB-FY, Palm Beach County, Florida; Frederick Rowe Riley and Cindy Sue Riley, Case # 2004DR 0011886FD, Palm Beach County, Florida; David Polen vs. Rosa Polen, Case # 50 2004, Palm Beach County, Florida; Gail L. Valenti vs. Michael A. Valenti, Case # 50 2006 DR 001711XSB FZ, Palm**

Beach County, Florida, Darren Debrino vs. Vanessa Debrino, Case # 01-013911, Broward County, Florida; Michael J. Liss vs. Ann Marie Liss, Case # 50-2006 DR 013140, Palm Beach County, Florida; Kimberly Rae Kinsella vs. David Kinsella, Case # 08-13793 38/90, Broward County, Florida; Elizabeth Zilinsky and Alan Zilinsky, Case # 502002DR003848XXDIFZ, Palm Beach County, Florida; Dorian Neal Stoodley vs. Heidi Jane Stoodley, Case #10-0782, Victoria Registry, Supreme Court of British Columbia, Canada [trial consultant and did not testify]; and David Daily and Stacy Sarnoff, Case # 08-000883 (37), Broward County, Florida; Julia Anne Sands vs. Ivan Kenneth Saltz, Case # 09-012627, Broward County, Florida; Heather M. Fischthal and Bennett S. Fischthal, Case # 502009DR04592MB, Palm Beach County; James W. Wardner vs. Carol Stillwagon, Case #2002-33537-FMCI, Volusia County, Florida; Derek Green vs. Marianne Perz, Case # FC-08-63-00, Superior Court of Justice-Family Court Branch, Whitby, Ontario, Canada; Rhonda R. McGuire vs. Michael M. McGuire, Case # CDCV 2474, Henry County, Iowa; Michele Armstrong vs. David Armstrong, Case # 50200DR013378XXXXSB, Palm Beach County, Florida; and David J. Armstrong vs. Michele Armstrong, Mary Jacka and Larry Jacka, Case #50-2010lCA021235XXXXMB, Palm Beach County, Florida; Allison Liotti and Paul Liotti, Case # FMCE 100076944097, Broward County, Florida; and Laura Meyerson vs. David Meyerson, Case # 502011DR0020-32XXXXSBFY, Palm Beach County, Florida; Spencer Bouhadir and Brittany Lindsay, Case # 502009DR3221MB, Palm Beach County, Florida; Peter Athas and Shawna Lynn Athas, Case # 502010DR01209XXXXMBFA, Palm Beach County, Florida; Dominique Posk vs. Peter Posk, Case # 502010DR012021SBFX, Palm Beach County, Florida; Virginia Rahn vs. Duncan Whitehead, Case # DR08-1736-FR, Superior Court of Chatham County, Savannah, Georgia; Michelle A. Larkin and Andrew J. Larkin, Case # 502005DR013690XXXXSB, Circuit Court, Palm Beach County, Florida; The Guardianship of Connor J. Piegaro, Case #50 2012GA436XXXXMB1B, Palm Beach County, Florida; The Matter of Angelo Abbenante and Jessica Strange, Case # 50-2010-DR-006725-XXXX-MD-FD, Palm Beach County, Florida; John N. Butler and Kristin Louise Shealy f/k/a Kristin Louise Butler, Case # FMCE 10015959-44/97, Circuit Court, Broward County, Florida; Perri E. Teitelbaum and Kassi Ann Khadr, Case # 2011DR001833XXXXSBFY, Circuit Court, Palm Beach County, Florida; Richard T. Burns vs. Jennifer L. Campos, Case # 2009-30851-FMCI, Circuit Court, Volusia County, Florida; Renato Santos and Ivan Hunt, Case #F MCE07-11212, Circuit Court, Broward County; Jonathan Spindel vs. Judy Ann Spindel, Case # 02-003722 (93), Circuit Court, Broward County, Florida; Perri Teitelbaum vs. Kassi Khadr, Case # 502011DR001833, Circuit Court, Palm Beach County, Florida; Stacy D. Jaeger vs. Robert D. Jaeger, Case # 502009DR013546NBFJ, Family Division, Circuit Court, Palm Beach County, Florida; Melanie D. Musone and John P. Musone, Case # 2012-DR-1436-0, Circuit Court, Orange County, Florida; Richard T. Burns vs. Jennifer Campos [f/k/a Burns] Case # 2009-3088851-FMCI, Circuit Court, Volusia County, Florida; Edward Dibeler and Lisa Michelle Dibeler, Case # FMCE 11-2281 41/93, Circuit Court, Broward County, Florida; and Melanie D. Masone and John P. Masone, Case # 2012-DR-001436-0, Circuit Court, Orange County, Florida;

**Barry Siegel and Racquel Siegel n/k/a Racquel Vera, Case #502011DR012538XXXXSBFX, Circuit Court, Palm Beach County, Florida; Nancy Cole vs. Geoffrey A. Cole, Case #02-8394, Dade County, Florida; Edmund G. Kary vs. Kate A. McVay, Case # 502013SC010571XXXXSB, County Court, Palm Beach County, Florida; Ali Seyfettin Erbay vs. Stacy Mildred Erbay, Case # FMCE 13-006953 44, County Court, Broward County, Florida; Melanie D. Musone vs. John P. Masone, Case # 2012-DR-001436-0, Circuit Court, Orange County, Florida; In the Interests of Mia Faith Hemming, Case # 2013DP300699-JK, Juvenile Dependency Court, West Palm Beach, Florida; Marcus Tanner and Erin Bailey, Case # FMCE11-017793 [41/90]), Circuit Court, Broward County, Florida; Jonathan Spindel vs. Judy Ann Spindel, a/k/a Judy Ann Becker, Case # 02-003722[35/91], Circuit Court, Broward County, Florida; Daniel G. Sweigard vs. Alexandra, Case # FMCE 10-09045, Circuit Court, Broward County, Florida; Marcus Tanner and Erin Bailey, Case # 11-17793 [41] [90], Circuit Court, Broward County, Florida; Vincent M. Gendusa and Dena S. Gendusa, Case # 2003DR975FC, Palm Beach County, Florida) and Stephanie Bouquo and Lee Bouquo, Case # DVCE 14-7932 [36], Broward County, Florida; Marcus Tanner vs. Erin Bailey, Case # FMCE 11-17793 [41], Circuit Court, Broward County, Florida; Homer Edwin McAbee III vs. Alicia Marie McAbee, Case # CL-2014-5663, Circuit Court, Fairfax County, Virginia; Pamela Kim McCord vs. Jeffrey David McCord, Case # E-140936, Superior Court of British Columbia, Vancouver Registry, Canada; Susan Robertson and Michael F. Robertson, Case # DR03-0548, Circuit Court, St. Johns County, Florida; Colleen Avenaim and Maurice Avenaim, Case # 06-14749 (38/91), Family Division, Circuit Court, Broward County, Florida; Iehuda Tzynder and Csilla Mezei, Case # 2014-21439FC04, Circuit Court, Broward County, Florida; Forrest Simpson Wells vs. Reyna Corridori Wells [Freeman], Case # 2004-0830-JB, the Chancery Court of Jackson County, Mississippi; Pamela K. Winchie and Geoffrey W. Colino, Case # 502014DR007258XXXSB, Family Division, Palm Beach County, Florida; and Susan Robertson and Michael Robertson, Case # DR03-548, Saint Johns County, Florida; J. Mark Grosvenor and Melissa Pileggi Grosvenor, Case # FMCE-14-012755 [40/93], Circuit Court, Broward County, Florida; and In the Interests of: Trinity Jefferson, Messiah Licencier and Markeyno Licencier, Case # 2013-1320 CJ-DP[A-C], Judge Stacey Schulman, Broward County, Florida; Kelsey Hangstorfer and William Thomas Hangstorfer, Case #FMCE 17-009037 [38], Judge Horowitz, Broward County, Florida**

**I have been involved in an increasing number of family law matters since 2005 dealing with the interests of children in matters where either one of the parents reveals his/her gender preference as homosexual or where two homosexual partners wish to adopt a child. A recent example of the former, which also involved a claim of parental alienation, is Christy Jones Gressett vs. James Kevin Gressett, Case # 2015:NO152, Chancery Court of Newton County, Mississippi. Further to the interests of children in the Parental Alienation arena, because of my special knowledge and experience in dealing with the difficult matter of reuniting alienated family members, on April 10, 2017 I was appointed by Circuit Judge**

**Anna Marie Anzalone to reconcile three children with their father in: Suzanne [Dalberg] Lopez vs. Chad Dalberg, Case # 10-35567-DM, Circuit Court, Lenawee County, Michigan. The reconciliation was successfully conducted in part via in person contact and in part via teleconferencing within ten weeks. In this matter, the attorney for the father [Lowry M. Rains] and the mother [Phillip A. Schaedler] worked co-operatively to facilitate my work.   Another such case [that included both gender issues and claims of alienation] was Marzia L. and Oliver R. Di Pietro, Case # 2016-23211-FC-202, Miami-Dade County, Florida.**

**In another case involved the interest of a child, but one that was not simply a child custody case, and was particularly interesting. This case involved a matter brought under the Hague Convention [The International Child Abduction Remedies Act of October 25, 1980]. The case, Hernan Diego Paniagua Rodriguez vs. Cinta Soledad Romero, Case #2014, 14-80885-CIV-Cohn/Seltzer, filed in the United States District Court, Southern District of Florida, Fort Lauderdale Division, involved the mother of a family who was visiting the United States on vacation from Argentina. The mother refused to return with her child to the family residence in Argentina. Her claim was that the father was abusive and to return the child would result in the child experiencing extreme and enduring abuse. The court ruled that the evidence did not support the mother's claim and the court ordered that the child was to be returned to Argentina.**

Further to the interests of children and young adults, in the case of such persons with profound special disabilities requiring residential care, habilitation, special behavioral services, intense programming, or institutionalization, I have provided testimony dealing with level of care needs and the matter of medical necessity review (see for example **In the Interests of Jonathan Mompoint, Case # 05-15384-D002, Dade County, Florida; D.R vs. Agency for Persons with Disabilities, State of Florida, Division of Administrative Hearings, Case # 06-004281APD, Dade County, Florida).** Likewise, I have provided testimony on the impact of a serious progressive disabling state [Parkinson's Disease] on an elderly persons competence to enter into a contract to transfer real property (see in **the Guardianship of Stella Stamitia Rylander, Case # 2016 CP145-K and Case # 2016 MH144-K, in the Probate Division, the Circuit Court for Monroe County, Florida).**

I have also provided testimony at **Arbitration Hearings of the National Association of Securities Dealers, Inc. (**see for example**, William Riccard vs. The Prudential Insurance Company of America, NASD Case # 98-02143).** And I have attended several hundred mediation sessions involving a variety of tort claims. Almost always these mediations are court ordered, but occasionally, especially in very provocative and potentially very disturbing and/or embarrassing matters where public exposure of the matter could have quite profound repercussions, some of these mediations have been voluntary and sometimes they have occurred after a case has been filed using fictitious names but prior to the filing of an amended complaint that would reveal the correct identity of one or both parties (see for example, **Nora Green, A Fictitious Name for a**

**Natural Person vs. Sam Maroon, a Fictitious Name for a Natural Person, in a Complaint for Rape/Sexual Assault, Case # 04-08016 CA20, Miami-Dade County, Florida).**

Further, I have done a limited amount of work on various matters of immigration, **(see for example, United States of America vs. Jorge Potesta, Case # 75431725, United States Immigration Court, Miami, Florida.**

Please note that the above listed cases are far from being all the cases in which I have been hired, but they are examples of cases in which I have given testimony over the years. I also have available a more than 140-page comprehensive listing of all of the cases in which I have given testimony (after 1993, the date that the Federal Rules of Civil Procedure required that all experts maintain a comprehensive listing of all cases in which they had given testimony), together with a number of the cases in which I have given testimony prior to that date. This listing does not include the cases in which I have been hired but in which I did not give testimony. Actually more than half the legal cases in which I am engaged end up with me not giving testimony, either at deposition or at trial, but require other consultative services. This is especially true in a number of criminal cases.

**Attendance at Alternative Dispute Resolution Sessions**

As well as the numerous cases in which I have testified in deposition and at trial, I have also attended a substantial number of mediation sessions on behalf of plaintiffs. During these meetings I have offered the defense an overview of the nature and scope of the emotional or mental or neuropsychological difficulties of the plaintiff and the prognosis for the plaintiff. When requested I have also answered any questions directed to me by the defense or by the mediator.

**Sampling of Law Firms that have retained me (presented in no particular order):**

Adorno & Yoss P.A., Fort Lauderdale, Florida
United States Attorney's Office, Various Jurisdictions
National Trial Group, Fort Lauderdale, Florida
Baker McKenzie, New York (the largest law firm in the world)
Baker McKenzie, Miami, Florida
The Law Offices of Lorne MacLean, Vancouver, B.C. Canada
Bogenschutz & Dutko P.A., Fort Lauderdale, Florida
Robert S. Stone, P. A., Fort Pierce, Florida
Law Office of Joseph L. Green, St. Louis, Missouri
The Center for Justice and Accountability, San Francisco, California
Carlton Fields, Miami, Florida
Shutts & Bowen, LLP, Fort Lauderdale, Florida
Law Office of Stephen D. Fromand, Vero Beach, Florida
Didier Law Firm P.A., Orlando, Florida

The Schroeder Law Firm, Burlington, Iowa
Law Office of Brett Bressler, Winter Park, Florida
Law Office of Brian Ludmer, Toronto, Canada
Lawrence W. Livoti, Fort Lauderdale, Florida
Law Offices of Theodore F. Greene III, Esquire, Orlando, Florida
Constantine & D'Agostino, Margate, Florida
Andrews & Sanders Law Offices, Savannah, Georgia
Popham Haik, Minneapolis, Minnesota
Law Offices of Christopher Mancini, Fort Lauderdale, Florida
Fenster, Cohen & Sobol, Sunrise, Florida
Southern Poverty Law Center, Montgomery, Alabama
Doumar, Allsworth & Curtis, P.A., Fort Lauderdale, Florida
Searcy, Denney, Scarola, Barnhart & Shipley P.A., West Palm Beach, Florida
Atterbury, Goldberger & Richardson, P.A., West Palm Beach, Florida
Morrison & Foerster LLP, San Francisco, California
Leritz, Plunkert & Bruning, P.C., St. Louis, Missouri
Phillips & Ziskinder, Fort Pierce, Florida
Law Offices of Bradley Bole, Tampa, Florida
Law Offices of Michael Bernstein, Fort Lauderdale, Florida
Roberto, Roldan, Burgos P.A., Rio Piedras, Puerto Rico
Colliander, Field & Brown, P.A., Portsmouth, New Hampshire
Florida Attorney General, Fort Lauderdale, Florida
Rush & Manoogian P.A., Boynton Beach, Florida
Jaeger & Blankner, Orlando, Florida
Law Offices of Siegel, Siegel & Wright, Boca Raton, Florida
Florida Rural Legal Services, West Palm Beach, Florida
Joel Hirshchorn P.A., Miami, Florida
Mager Lawyers LLC, Fort Lauderdale, Florida
Latham, Shuker, Eden & Beaudine, LLP, Orlando, Florida
Mintz Truppman, P. A., North Miami, Florida
Burman, Critton, Luttier & Coleman, LLP, West Palm Beach, Florida
Keith C. Tischler, P.A., Tallahassee, Florida
Office of the Public Defender, Broward County, Florida
Kay, Gronek & Latham, LLP, Orlando, Florida
Center for Justice and Accountability, San Francisco, California
Fenster, Cohen & Sobol, P.A., Sunrise, Florida
Haynworth, Baldwin, Johnson & Harper P.A., Tampa, Florida
George, Hartz, Lundeen, Flagg & Fulmer P.A., Fort Lauderdale, Florida
Hirschhorn & Bieber, P.A., Miami, Florida
Office of the Public Defender, Palm Beach County, Florida
Dempsey & Sasso P.A., Orlando, Florida
Maxine Long, Esquire, Shutts & Bowen LLP, Miami, Florida
Kutak Rock, Atlanta, Georgia
United States Public Defenders Office, Miami, Florida
Broward County Public Defender's Office, Fort Lauderdale, Florida

Green, Murphy, Wilke & Murphy P.A., Fort Lauderdale, Florida
Office of the Public Defender, Martin County, Florida
DeSantis, Cook, Ferraro & McCarthy P.A., Fort Lauderdale, Florida
Gunster, Yoakley & Stewart, P.A., Fort Lauderdale, Florida
Office of the Public Defender, Dade County, Florida
Center for Constitutional Rights, New York, New York
Strickland & Sedule P.A., Fort Lauderdale, Florida
Weiner & Weiss, LLC, Boca Raton, Florida
Office of the Public Defender, St. Lucie County, Florida
State Attorney's Office, West Palm Beach, Florida
Bridger & Gill P.A., Pensacola, Florida
Mark Chinn & Associates, PLLC, Jackson, Mississippi
Loumis and Loumis P.A., Boca Raton, Florida
Hinshaw & Culbertson P.A., Fort Lauderdale, Florida
Martin L. Haines III, Lake Park, Florida
Schmidt & Pheterson P.A., Boca Raton, Florida
Law Offices of William N. Swift, Palm City, Florida
Law Offices of Jeffrey J. Walker P.A., Fort Lauderdale, Florida
Pearson & Patton, Las Vegas, Nevada
Mager Law Group, Fort Lauderdale, Florida
Genet & Milner P.A., North Miami Beach, Florida
Jackson, Lewis, Schnitzer & Krupman P.A., Atlanta, Georgia
Jackson, Lewis, Schnitzer & Krupman P.A., Orlando, Florida
Becker & Polliakoff P.A., Hollywood, Florida
Jackson, Lewis, Schnitzer & Krupman P.A., Orlando, Florida
Krusnick & Rothstein P.A., Fort Lauderdale, Florida
Womble, Carlyle, Sanridge & Rice P.A., Winston-Salem, North Carolina
William C. Ruggerio P.A., Miami, Florida
Law Office of Steven Pesso, Boca Raton, Florida
Weiner and Associates, Boca Raton, Florida
Pennington & Haben P.A., Tallahassee, Florida
Patrick E. Farrell P.A., Fort Lauderdale, Florida
Stephens, Lynn, Klein & McNicholas P.A., Miami, Florida
Lubin & Gano P.A., West Palm Beach, Florida
Law Offices of Richard F. Hussey P.A., Fort Lauderdale, Florida
The Ellsley Sobol Firm, Plantation, Florida
Cobb, Cole & Bell, Daytona Beach, Florida
Williams, Mullen, Christian & Dobbins P.A., Richmond, Virginia
Edwards & Angel P.A., Palm Beach, Florida
Bondurant, Mixson & Elmore P.A., Atlanta, Georgia
Law Office of Mark O'Mara, Orlando, Florida
Greenspoon Marder, P.A. Fort Lauderdale, Florida
Mannikko & Baris P.A., Stuart, Florida
Jackson, Lewis, Schnitzer & Krupman P.A., Miami, Florida
Wartelle, McCurdy & Weaver, San Francisco, California

Haliczer, Pettis & Schwamm, Fort Lauderdale, Florida
Adorno & Zeder P.A., Fort Lauderdale, Florida
Parker, Burke, Landerman & Parker P.A., Orlando, Florida
Schultz, Roth & Zabel LLP, New York, New York
Fisher & Bendeck, P.A., West Palm Beach, Florida
Fenster, Cohen & Sobol, Sunrise, Florida
Beusse, Wolter, Sanks, Mora & Maire, P.A., Orlando, Florida
Rissman, Weisberg, Barrett, Hurt, Donohue & McLain P.A. Orlando, Florida
Lyons & Sanders Chartered, Fort Lauderdale, Florida
Fechter & Dickson P.A., Tampa, Florida
The Amlong Firm, Fort Lauderdale, Florida
Center for Constitutional Rights, New York, New York
Colliander, Field, & Brown P.A., Portsmouth, New Hampshire
Lubin & Metz, West Palm Beach, Florida
Eglet & Prince LLP, Las Vegas, Nevada
Dirk Lorenzen, Lorenzen Law P.A., Miami, Florida
Krupnick, Campbell, Malone, Roselli, Slama & Hancock P.A., Fort Lauderdale, Florida
Foley & Lardener P.A., Jacksonville, Florida
Law Office of Michael Trent P.A., Pompano Beach, Florida
The Law Office of Southern Center for Human Rights, Atlanta, Georgia
Charles Nugent P.A., Moorestown, New Jersey
Hunt, Cook, Riggs & Mehr P.A., West Palm Beach, Florida
Law Offices of Mark Fleming, San Diego, California
Gary, Williams, Parenti & Finney, P.A., Stuart, Florida
Law Offices of Daniel M. Grissom, Miami, Florida
Black, Srebnick & Kronspan P.A., Miami, Florida
Leeds & Colby P.A., Miami, Florida
Kirschbaum, Birnbaum, Lippman & Gregoire, PLLC, Fort Lauderdale, Florida
Cooper, Byrne, Blue & Schwartz, LLC, Tallahassee, Florida
Cohen & Keyes, P.A., Tampa, Florida
State of Florida Office of Criminal Conflict, Fort Lauderdale, Florida
August, Kulunas & Dawson, P.A., West Palm Beach, Florida
Hopkins, Barvie & Hopkins, PLLC, Gulfport, Mississippi
Atterbury, Goldberger & Weiss, P.A., West Palm beach, Florida
Christiansen & Dehner, P.A., Sarasota, Florida
Brian Frey, P.A. 1893 Maumee Street, Adrian, Michigan 49221
Greenberg Trauig, Fort Lauderdale, Florida
Buckner, Shifrin, Etter, Dugan, Bradfute and Kohlman, P.A., Miami, Florida
Fenster, Cohen & Sobol, Sunrise, Florida
Rissman, Weisberg, Barrett & Hunt P.A., Orlando, Florida
Shapiro, Blasi & Wasserman, P.A., Boca Raton, Florida
Carlton Fields, Tampa, Florida
Fisher & Bendeck, West Palm Beach, Florida
Law Offices of Carey Linde, Vancouver, B.C., Canada
Glantz & Glantz, Plantation, Florida

Reid & Zobel, P.A., Palm Beach, Florida
Law Offices of Raoul Schonemann, Atlanta, Georgia
Moskowitz & Dennis, P.A., Fort Lauderdale, Florida
Fazio, Dawson, DiSilva & Cannon, Fort Lauderdale, Florida
Law Office of Peter E. Itzler, Fort Lauderdale, Florida
Becker & Poliakoff, West Palm Beach, Florida
Florida Rural Legal Services, West Palm Beach, Florida
Pennington & Haben P.A., Tallahassee, Florida
Ward Damon, West Palm Beach, Florida
Law Offices of John T. Christiansen, Palm Beach Gardens, Florida
Arnstein & Lehr, LLP, Miami, Florida
Wilson Elser, Miami, Florida
Elkin & Dimento P.A., Cherry Hill, New Jersey
Law Offices of Loreen I Kreizinger, Fort Lauderdale, Florida
Roderick F. Coleman, Esquire P.A., Boca Raton, Florida
Cottrell, Fletcher, Schinstock, Bartol & Cottrell, P.A., Alexandria, Virginia
Law Office of Richard A. Ivers, Corals Springs, Florida
The Kelley Uustal Law Firm, Fort Lauderdale, Florida
Stabinski & Funt, P.A., Miami, Florida
Jeannie M. Etter, Buckner Shifrin, Miami, Florida
Chris Kleppin, Esquire, Glasser & Kleppin, P.A., Plantation, Florida
Roland E. Schwartz, Esquire, Gray Robinson, P.A., Fort Lauderdale, Florida
Norris Hopkins, Esquire, Hopkins, Barvie & Hopkins PLLC, Gulfport, Mississippi
Clark, Fountain, LaVista, Prather, Keen & Littky-Rubin, LLP, West Palm Beach, Florida
Kristie Miliitello, Esquire, Federal Assistant Public Defender, Southern District of Florida
John Fiddes Q.C., Fiddes Van de Flyer, Vancouver, B.C. Canada
Law Offices of Peter M. Commette P.A., Fort Lauderdale, Florida
Douglas H. Reynolds, Tripp Scott, P.A., Fort Lauderdale, Florida
Mager Paruas, LLC Hollywood, Florida
And hundreds of others:

**Service to Governmental, Educational, Health and Community Agencies:**

Consultant to Office of Alcohol Program Management, State of California, Department of Mental Hygiene. Sacramento, California, 1973-1974.

Consultant to Creative Socio-Medics Corporation, 130 East 59th Street, New York, New York, 1975-1976: Functions (1) to develop goal oriented performance criteria to evaluate drug programs in various parts of the U. S. A., (2) to design instruments that are appropriate to measure relative attainment of program goals, and (3) to evaluate the utility and cost effectiveness of urine testing in methadone programs (under National Institute of Drug Abuse contract, 1974-1976).

Member, Alcoholism Task Force of the City of Philadelphia, (1974-1976). Participated in developing a Comprehensive Alcoholism Treatment Plan for the City of Philadelphia.

Consultant on Drug-Alcohol Awareness and Management. United States Air Force, Electronic Systems Division, Boston, Massachusetts, 1975.

Consultant, Research Department, Veterans Administration Hospital, Coatesville, Pennsylvania, 1976-1977.

Consultant, Research Department, Delaware State Hospital, February through July, 1976.

Research and Training Consultant, Veterans Administration Hospital, Hampton, Virginia, April, 1977-1980.

Research Consultant, Tidewater Psychiatric Institute, Virginia Beach, Virginia, April, 1977 to 1980.

Appointed Member, City of Norfolk Drug Focus Committee, 1976-1977.

Appointed Member, City of Norfolk, Mental Health and Mental Retardation Services Advisory Board, April, 1977 to April, 1979.

Consultant for Program Evaluation (Grant Review Site Visitor), Commonwealth of Virginia, Department of Mental Health and Mental Retardation, February, 1978 to September, 1980.

Scientific Advisor, Governor's Substance Abuse Advisory Board, Commonwealth of Virginia (provided testimony before the Board on January 19 and March 27, 1978).

Executive Board Member, Virginia Council on Alcoholism and Drug Dependency. Appointed April, 1978 to September, 1980.  (This Council is an affiliate of the National Council of Alcoholism).

Member of the Executive Board, Mental Health and Mental Retardation Society of Virginia, 1977- 1981.

Invited Participant, The Regional Graduate Faculty Institute for Health Programs in Eastern Virginia. Sponsored by the Eastern Virginia Health Education Consortium, May, 1978, Norfolk, Virginia.

Consultant for Program Evaluation (site visitor) to the City of Harrisonburg, Virginia. June 28-29, 1978.

Consultant for Program Evaluation and Development, City of Richmond, Virginia, Alcohol Safety Action Program, July, 1978 to September, 1980.

Appointed Member, Commonwealth of Virginia Drug Counselor Certification Educational Advisory Committee, July, 1978 to September, 1980.

Research Advisor, Institute for Advanced Studies, Walden University, Naples, Florida, January, 1978 to 1990.

Lecturer in Psychiatry (Psychology), United States Navy Medical Corps., Naval Regional Medical Center, Portsmouth, Virginia, January 1, 1977 to September, 1980

Member, Norfolk Substance Abuse Prevention Task Force, May, 1979 to September, 1980.

Research Program Reviewer, Program in Behavioral Medicine, Veterans Administration Hospital, Miami, Florida, 1980-1981.

Consultant, Division of Psychology, Veterans Administration Hospital, Miami, Florida, 1980 to 2008. My work here has ranged from facilitating and/or evaluating programs in substance abuse and addictive behavior, to programs in behavioral and rehabilitation medicine, to the advancement of services in post traumatic stress disorder.

Consultant for Program Evaluation, Nova University Clinic, Inc., Coral Springs, Florida. December, 1980.

Consultant for Program Development, Mailman Family Center, Nova University, Fort Lauderdale, Florida, December, 1980 to May, 1981.

Member, Panel of Clinical Psychologists Consultants, Department of Vocational Rehabilitation, State of Florida, July, 1981 to January, 1990.

Member, Scientific Advisory Board, Psychology Systems, Inc. My functions included conceptualizing, reviewing and contributing to the development of computer based clinical diagnostic and other instruments in the Psychology System computerized assessment packages, and developing and evaluating prospective software for future products, 1981 to 1987.

Consultant for Program Accreditation, American Psychological Association, 1981 to 1989.

Consultant for Program Development, Department of Psychology, Illinois Institute of Technology, Chicago, Illinois, November, 1981.

Technical Reviewer, Sobell, L.C. and Sobell, M.B.  Alcohol Abuse Education Curriculum Guide for Psychology Faculty.  Prepared for the National Clearinghouse for Alcohol Information, under contract to the National Institute of Alcohol Abuse and Alcoholism, December, 1981.

Consultant, Center for Health Resources, Bennett Hospital, Plantation, Florida 1982 to 1989.

Consultant Psychologist to the Director of the Miami Regional Center, United States Secret Service, 1989 to 1996. This consultation involved providing opinions or second opinions on fitness for duty in Special Agents who had experienced traumatic events, suffered work related emotional stress or were involved in alcohol excess difficulties in the conduct of their work.

Consultant Clinical Psychologist, United Airlines Employee Assistance Program, Miami Base, February, 1982 to 1998.

Member, National Advisory Board, Post-Doctoral Institute for Psychoanalysis and Psychotherapy, Nova University, Fort Lauderdale, Florida, 1982-1989.

Consultant for Internship Program Development, Veterans Administration Medical Center, Bay Pines, Florida, 1983-1984.

Consultant to various Broward County City's Police Departments for police personnel selection and problem employee purposes, 1982-1990.

Consultant for Accreditation by the American Psychological Association, Hahnemann Medical Center, Philadelphia, Pennsylvania, November, 1983-1984.

Advisory Board Member, The Youthful Sex Offender Treatment Program, the Institute for Social Services to Families, Nova University, Fort Lauderdale, Florida 1983 to 1989.

Consultant/Trauma Specialist, Delta Airlines, 1985 to 1988. This consultancy was initiated after the crash of Delta's Flight 191 in Dallas, Texas on August 2, 1985. This accident led to the second highest loss of life of any aviation accident involving the Lockheed L-1011 with 134 of the 163 people on board dying as a result of the crash. A significant element of my role continued in this case after a lengthy investigation led the National Transportation Safety Board to conclude that the cause of the crash was attributable to pilot error combined with an extreme weather phenomena associated with microburst-induced wind shear. It was an interesting fact that at the time of this crash a very large number of Delta employees considered that their company would never make a mistake. Thus, when the cause of this crash implicated pilot error there was a second wave of distress that went through the company and impacted a number of Delta employees, especially those who had been involved in one way or another with this particular flight. Subsequent to completing my work regarding the matters surrounding Flight 191 I continue to be listed by Delta Air Lines as one of their Consultant Trauma Specialist.

Served as Local Arrangements Chair for the 1985 Mid-Winter Convention sponsored by

APA divisions 29 and 42 held at the Doral-on-the-Ocean Hotel, Miami Beach, Florida, February 27, 1985 to March 2, 1985.

Routinely involved in psychology related topics of WGBS (AM710) Radio, Miami, Florida, 1982 to Present.

Consultant for Research Grant Program Review, Division of Research, Veterans Administration Medical Center, Miami, Florida, 1982-1990.

External Chairman, Doctoral Dissertation Committee for Dr. John La Pointe, California School of Professional Psychology, Fresno, California, 1984-1985.

Consultant to the Personnel Office and the Internal Affairs Unit, Broward Sheriff's Office, 1985-1999 together with occasional subsequent requests. This work primarily involved examining police personnel who were facing disciplinary action or providing brief treatment services to officers who had been exposed to work related stress including debriefing and sometimes treatment after fatal shootings.

Consultant to the Personnel Office, City of Tamarac, Florida 1986-1996. These services involved assessing and making recommendations regarding the disposition of multiple employee related problems.

Consultant to the Personnel Office, City of Pembroke Pines, Florida, 1988-2004. These services involved addressing personnel issues in the police and fire services.

Developed (with D. Barone) and conducted the course in Psychological Advances in Police Personnel Administration.  The Police Sciences Institute, Davie, Florida, 1988 and 1990.

Consultant, Volunteer Lawyers Resource Group, Tallahassee, Florida, 1990 - present.

Consultant, The Office of the Capital Collateral Representative, Tallahassee, Florida 1992 - present. These services have involved multiple issues involving post conviction death case matters.

Consultant to the Chief of Police, North Miami Beach Police Department. This work involved making recommendations regarding various personnel matters, 1991 and 1995.

Consultant, Coyne Didsbury PDI Pty. Ltd., Sydney and Melbourne, Australia, regarding various Industrial/Organizational and Assessment Psychology matters, 1984-present.

Consultant, the Virginia Capital Representative Resource Center, Richmond, Virginia, 1994-1999. This work dealt with multiple matters in post conviction death cases.

Consultant, the California Appellate Project, San Francisco, California, 1995-1997. This

work also dealt with the same sorts of issues as noted immediately above.

Member, Board of Directors, Addictive Behavioral Care, Inc., a Florida Corporation, 1997- 2003.

Member, Board of Review, www.ValidSites.com, Inc., a Florida Corporation, 2000 – 2005. This consultation involved reviewing websites dealing with mental health services and making recommendations accordingly.

Member, Board of Review, www.InspectedSites.com, a Florida Corporation, 2001 – 2006. The work here was essentially identical to that immediately above.

Human Resources Consultant, CableOrganizer.com, Fort Lauderdale, Florida, 2004 – 2007. This work involved aiding the company in developing and implementing their personnel evaluation and selection procedures.

Consultant in Behavioral Medicine, East by West Spa Holdings, Denver, Colorado, 2008 to the present.

Consultant to the Planning Group that founded the newly evolved organization "Alienated Grandparents Anonymous" headquartered in Tampa, Florida 2010-2011. AGA has attracted and continues to attract individuals and groups throughout the United States, Canada, England, Australia, and beyond who are setting up their own self-help groups based on the AGA model. Today I continue to serve as the Honorary Scientific Advisor to AGA. I conduct lectures to grandparents experiencing alienation and to attorneys involved in this evolving work and I facilitate referrals to appropriately credentialed psychological specialists where appropriate.

Anchor of the series "Parental Alienation Syndrome and its Effects on Children". The series was presented over September and October 2010 on Syndicated News.Net (www.syndicatednews.net). An example of one of these interviews may be found at the following site: http://www.blogtalkradio.com/syndicatednews/2010/09/23/dr-glenn-caddy--free-tickets-to-the-pas-conference.

Invited presentation on "Parental Alienation Syndrome and Mind Control". Presented in the "Dads on the Air" Show (www.dadsontheair.net). This show was aired on 2GLF Radio, 89.3 FM, in Sydney, Australia, on October 19, 2010.

Presenter on the Jill Egizii and Judge Michele Lowrance Show "Family Matters" on Blog Talk Radio. This show was initially aired on November 4, 2010 and is available at the site: http://www.blogtalkradio.com/syndicatednews/2010/11/03/dr-glenn-caddy-and-jill-egizii

Presenter on the "Dr. Abbey Strauss Show" sponsored by the Florida Psychiatric Association November 15, 2010. Discussed similarities and differences between mental health issues and treatment access in the Australia and the United States. Available:

www.katenagroup.org/expertsspeak/GLENN_CADDY_PHD_AUSTRALIA_NOVEMBER2 010.mp3 This interview is also posted on iTunes at www.floridapsych.org/podcasts.htm, and for non-iTunes at www.interviewlibrary.info   Multiple pod catchers have also picked it up as well.

Consultant, Town of Tequesta, Florida. The Town Council hired my services to advise them on a proposal by a foreign corporation to develop a site within the Township to house a state of the art comprehensive behavioral health care facility. The proposing entity had inadequately developed their own business plan for the facility which meant that the Town ended up asking me to liaise closely with the foreign entity to ensure that what they were proposing would have the best chance of being successful. January to June, 2011.

Guest presenter [with Christopher Mancini, Esquire] on the topic of "Mental Health and the Law" on the Guy Richards Show on Clear Channel Talk Radio, WBZT, Palm Beach, Florida, February 7, 2011. (www.wbzt.com)

Consultant to MES Solutions. MES Solutions is a National Peer Review Service that provides experts to undertake Independent Medical and Mental Health Examinations and Second Opinions Reviews (www.messolutions.com).

Presenter on the Jill Egizii and Judge Michele Lowrance Show "Family Matters" on Blog Talk Radio. The Topic was about Reintegration Therapy following Parental Alienation. This show was initially aired on March 21, 2012 and may be found at the following site: http://www.blogtalkradio.com/syndicatednews/2012/03/21/dr-glenn-caddy-on-family-matters--syndicatednewsnet#.T2nRdlvWvy8.email

Presenter on the Jill Egizii and Judge Michele Lowrance Show "Family Matters" on Blog Talk Radio. The Topic was about the role or and impact on Grandparents of High Conflict Divorce and Parental Alienation. This show was initially aired on May 16, 2012.

**Professional Society Affiliations:**

American Psychological Association (Member, Divisions 12 (Clinical); 40 (Clinical Neuropsychology) and 41 (American Psychology Law Society). Elected a Fellow of the American Psychological Association through Division 12, September 2010. [Less than one percent of the membership holds fellowship status].

Member, Australian Psychological Society. Admitted to the Boards of Forensic Psychology and Clinical Psychology.

Behavior Therapy and Research Society (Clinical Fellow).

Association for the Advancement of Behavior Therapy (Member).

American Academy of Behavioral Medicine (Fellow).

Society for the Exploration of Psychotherapy (Fellow).

Academy of Clinical Psychology (Fellow).

Professional Academy of Custody Evaluators (Fellow).

National Association of Criminal Defense Lawyers (Member, 1984-1998).

International Academy of Eclectic Psychotherapists (Fellow and Member, Board of Directors).

American Board of Forensic Examiners (Fellow).

Australian Clinical Psychology Association (Affiliate Member)

North American Board of Alienation Specialists (Advisory Board Member).

**Continuing Research Interests:**

Broadly interested in various topics within Behavioral Medicine and Forensic Psychology. Presently writing on matters of Parental Alienation and its impact.

**Industrial/Organizational Consultation Experience:**

1.      Consultation involving personnel selection procedures in various industrial contexts, especially in areas of executive and upper management recruitment.

2.      Experience in investigating/evaluating the basis of disputes in the workplace (involving claims of hostile environment, sexual, racial, religious, age, and disability discrimination), personnel systems analyses and organizational diagnosis.

3.      Experience in the development and conduct of Employee Assistance Programs, preferred Provider Models in the delivery of Mental Health Services, and in Peer Review based cost containment approaches of Mental Health service delivery for the Insurance Industry.

4.      Experience in providing training directed to litigation prevention and minimization. This work has covered various areas of human resources management (issues of disability, sexual abuse, hostile work environment, sexism, racism, age and religious related matters, affirmative action and violence in the workplace.). In this regard, I developed (with Andrew Byrne) a series of web based training programs aimed to assist corporations manage

and minimize these human resource problems.

5.      Consultant for Coyne Didsbury Pty Ltd (Australia) over more than thirty years. This company is the major Human Resources Consulting Company in Australia. I have been involved as a consultant and/or advisor in issues involving systems analysis, corporate development and planning, and facilitating programming in support of the future personnel needs of numerous corporations in Australia, Asia and the Middle East.

6.      From 2003 to 2006 I also served as a Consultant to Global Diagnostics Holding Company, LLC, Boca Raton, Florida (A closely held Delaware Limited Liability Company).

7.      Consultant to PsychPress Pty. Ltd, Melbourne, Australia from 1988 to the present. I have worked with this psychological test development company supporting the introduction of new on-line testing products.

**Grants and Contracts:**

1.      Principal Investigator, The Jefferson MH/MR Center Alcoholism Services Program.  Funding awarded by the City of Philadelphia, Coordinating office of Drug and Alcohol Abuse Programs: Approved June 1, 1975.  (Total direct cost $1,520,000; July 1 1975 to June 30 1978).

2.      Co-Investigator, The Jefferson MH/MR Center Comprehensive Alcoholism Program.  Proposal submitted to the National Institute in Alcohol Abuse and Alcoholism, August 1975.  (Total direct cost $302,000).

3.      Principal Investigator, Development and Evaluation of a Standardized Statewide Alcohol Education Program.  Submitted to the Commonwealth of Virginia, Highway Safety Division.  Approved January 1978, and forwarded to the National Highway Safety Administration for Federal funding consideration: Approved by NHTSA, October 1979.  (Total direct cost $506,600).

4.      Principal Investigator, An evaluation of the differential effectiveness of two intensities of both behavioral inoculation and traditional aftercare procedures in the management of alcohol relapse.  Proposal submitted to Tidewater Psychiatric Institute: Approved January 1978.  (Total direct cost $168,000.00 for two years).

5.      Principal Investigator, Replication and evaluation of the University of Massachusetts alcohol education prevention program.  Submitted to the division of Substance Abuse, Virginia Department of Mental Health and Mental Retardation: Approved at the State level, Abuse and Alcoholism: Approved by NIAAA, June 1978.  (Total direct cost $149,401.00; September 1 1978 -

84

August 31, 1981).

6.       Principal Investigator, <u>Alcohol abuse clinical training program.</u>  Submitted to the National Institute of Alcohol Abuse and Alcoholism, June 1, 1978: Approved January 1978.  (Total direct cost $216,554.00; September 1, 1979 - August 31, 1982.)

7.       Principal Investigator, <u>Health Psychology Training Program.</u>  Submitted to and then approved by the National Institute of Health, February, 1983. (Total Direct costs $340,600; August 19, 1983 – July 31, 1986).

**Teaching:**

The following courses reflect the range of content expertise I have shown at both the undergraduate and doctoral level over my nearly twenty years of academic employment:

| **Undergraduate** | **Graduate** |
|---|---|
| Introduction to Psychology | Psychopathology |
| Abnormal Psychology | Behavior Therapy & Assessment |
| Theories of Learning | Addictive Behavior |
| Behavior Therapy | Human Sexual Disorders |
| Social Psychology | Community Psychology |
| Human Sexuality | Psychological Assessment |
| Human Development | Mental Health Program Evaluation |
| Assessment & Treatment of Addiction | Clinical Practicum |
| Clinical Practicum | Research Supervision |
| Research Supervision | Professional Issues and Ethics |
| Theories of Personality | Behavioral Medicine |
| | Theory of Personality |
| | Forensic Psychology |

**Systematic Efforts Undertaken To Improve Training and/or Instruction:**

1.       Participated in a course in "Community Psychiatry" conducted by the Center for Training in Community Psychiatry, Department of Mental Hygiene, State of California, April -June, 1973.

2.       Developed, in collaboration with Dr. J. Compton of the Behavior Research Center, Pomona, California, a curriculum for training alcoholism counselors. This curriculum was modified for use by the CARD (Certificate on Alcoholism and Related Disorders) program conducted by the University of California, Extension.

3.   Undertook the professional program in <u>Clinical Behavior Therapy</u> conducted by Dr. Joseph Wolpe at the Eastern Pennsylvania Psychiatric Institute of Temple University, November, 1974 to March, 1975.

4.   Developed the first program in the Commonwealth of Virginia to meet the state requirements for the <u>Certificate and licensure of Alcoholism and Drug Abuse Counselors.</u>

5.   Developed the political support and the Program Proposal for the first academic institutional consortium for the <u>Doctor of Psychology Degree</u> (Psy. D.) in the United States. The Virginia Consortium for Professional Psychology involves four institutions: Old Dominion University, The College of William and Mary, Eastern Virginia Medical School, and Norfolk State University. This Proposal was submitted to the Commonwealth of Virginia Higher Education Council on February 28, 1978 and the program was approved on May 2, 1978. Thereafter I served as the first Director of the Virginia Consortium for Professional Psychology until I moved to take up the appointment of Director of Clinical Training at Nova Southeastern University.

6.   Participated in the Psychodrama Workshop conducted by Zerka Moreno at the Naval Regional Medical Center, Portsmouth, Virginia, December 6 -7, 1978.

7.   Participated in the "Neuropsychological Assessment in Clinical Practice" workshop conducted by Ralph Reitan, Fort Lauderdale, Florida, October 22 - 23, 1983.

8.   Participated in the conference on "Rational Emotive Treatment of Mood Disorders," conducted by Albert Ellis, Fort Lauderdale, Florida, January, 1984.

9.   Participated in the "Character Disorders: Tactics and Techniques for Treatment" workshop conducted by Peter Giovacchini, Fort Lauderdale, Florida, March 17, 1984.

10.   Participated in the "Sex between Therapist and Client" workshop conducted by Annetta Bodsky, Fort Lauderdale, Florida, May 25, 1984.

11.   Participated in the "Advanced Workshop in Neuropsychological Assessment" conducted by Ralph Reitan, Fort Lauderdale, Florida, December 8-9, 1984.

12.   Participated in the workshop on "Evaluation and Treatment of Sexual Problems in Clinical Practice" conducted by Sandra Leiblum and Raymond Rosen, Fort Lauderdale, Florida, December 8-9, 1984.

13.   Participated in the "Advanced Workshop on the MMPI" conducted by Ray Fowler, Fort Lauderdale, Florida, February 9-10, 1985.

86

14.     Participated in the "Advanced Behavior Therapy for Complex Problems" workshop conducted by Joseph Wolpe, Nova University, Fort Lauderdale, Florida, October 19-20, 1985.

15.     Completed the 1983 Psychology and Health Master Lecture Series self study program of the American Psychological Association.

16.     Completed the 1984 Psychology and Law Master Lecture Series self study program of the American Psychological Association.

17.     Participated in the "Hypnosis in Clinical Practice" workshop conducted by Shirley Sanders, Fort Lauderdale, Florida, December 14-15, 1985.

18.     Participated in the "Overcoming Resistance in Therapy" workshop conducted by Albert Ellis, Fort Lauderdale, Florida, February 8-9, 1986.

19.     Developed (with Dr. Barone) a two day program entitled Psychological Advances in Police Personnel Administration.  This course has been approved by the State of Florida for inclusion in the Institute for Advanced Training of Police Administrators.

20.     Participated in "New Perspectives on Sexual Disorders" workshop conducted by Ray Rosen and Sandra Leiblum, Fort Lauderdale, Florida, December 13-14, 1986.

21.     Participated in the "Mental Health Profession and the Law" workshop conducted by Thomas S. Szasz, Fort Lauderdale, Florida, January 23-24, 1988.

22.     Participated in the "Suicide Prevention" workshop conducted by Norman Farberow, Fort Lauderdale, Florida, October 22-23, 1988.

23.     Participated in the "Understanding Personality Disorders" seminar conducted by Theodore Millon et.al., December 3-4, 1988.

24.     Participated in the "Cognitive Behavior Therapy" seminar conducted by Donald Meichenbaum, January 21-22, 1989.

25.     Participated in the "AIDS Education for Mental Health Professionals" workshop conducted by E. Ross Seligson et. al., February 25-26, 1989.

26.     Participated in "The Neuropsychology of Traumatic Brain Injury" course conducted by Thomas Hammeke, Nova University, Fort Lauderdale, Florida, March, 1991.

27.     Participated in "The Clinical and Forensic Assessment of Malingering and Deception National Symposium" Nova University Law School, Fort Lauderdale, Florida, April 26-28, 1991.

28.     Participated in "Neuropsychology Assessment: Recent Developments and their Applications" workshop conducted by Elbert Russell, Veterans Administration Medical Center, Miami, Florida, October 1, 1993.

29.     Participated in "Ecobehavioral Interventions for Serious Family Disorders", course conducted by John Lutzker, Nova University, Fort Lauderdale, Florida, January, 1994.

30.     Participated in the "Advanced Mediation Training Program" conducted by the Florida Psychological Association and the Florida Couples and Family Institute, June 13-17, 1994.  This program met the eligibility requirement for certification by the Florida Supreme Court.

31.     Participated in the program on "Anxiety/Anger Management Training" conducted by Richard M. Suinn, Nova Southeastern University, Fort Lauderdale, Florida, April 19, 1997.

32.     Participated in the "Time-Limited Dynamic Psychotherapy Program" conducted by Hans H. Strupp, Nova Southeastern University, Fort Lauderdale, Florida, May 17 and 18, 1997.

33.     Participated in "Trauma Memory and Treatment.  What is state of the art?" program conducted course by Laura S. Brown, Nova Southeastern University, Fort Lauderdale, Florida October 18-18, 1997.

34.     Participated in the program on "Forensic Neuropsychology" conducted by Glenn I. Larrabee, Nova Southeastern University, Fort Lauderdale, Florida, September 29, 1997.

35.     Participated in the program on "Psycho-legal issues confronting mental health professionals," conducted by Robert H. Woody, Florida Psychological Association, Hollywood, Florida, October 9, 1998.

36.     Participated in the Annual Institute on Law, Psychiatry and Psychology, conducted jointly by the University of Miami Schools of Law and Medicine, and the Department of Psychology, University of Nebraska Lincoln, Fort Lauderdale, Florida, November 13 & 14, 1998.

37.     Participated in the "Cognitive Processing Therapy for Traumatic Stress Reactions" workshop conducted by Patricia Resick, Nova Southeastern

University, Fort Lauderdale, Florida, March 26 & 27, 1999.

38.     Participated in the "State of the Art Custody Evaluations" workshop conducted by Barry Bricklin and Gail Elliot, Nova Southeastern University, Fort Lauderdale, Florida, May 1, 1999.

39.     Participated in the "Risk Management in the Evolving Health Care Market" program conducted by Eric A. Harris, the APA Insurance Trust and Nova Southeastern University, Fort Lauderdale, Florida, June 5, 1999.

40.     Participated in the "Effective Group Psychotherapy: Directive Facilitation" program conducted by Robert and Kathryn Dies, Nova Southeastern University, Fort Lauderdale, Florida, October 21, 2001.

41.     Participated in the four-part seminar on Legal Issues in Stalking (James Meyer), Legal and Ethical Issues in Psychology (Linda Sobell), Domestic Violence (Jill Ricke), and Suicide Risk Assessment (Ernest Bordini), sponsored by the Florida Psychological Association, Fort Lauderdale, Florida, November 2, 2001.

42.     Participated in the third Annual Assessment Psychology Conference including Personality Assessment in Employment Settings (Robin Inwald, Ph. D), Methodological Issues in Neuropsychological Assessment (Robert Heaton, Ph. D), Improving the Quality of Legal Evaluations (David Faust, Ph. D), and The MCMI, MACI and MBMD in Personality Assessment (Theodore Millon, Ph. D), Nova Southeastern University, Fort Lauderdale, Florida, November 30-December 2, 2001.

43.     Participated in the Foundations for the Responding to Crisis and Trauma program presented by Barbara Waintrib, Ph.D. and sponsored by Nova Southeastern University, Fort Lauderdale, Florida, February 1-2, 2002.

44.     Participated in the Terrorism as Chronic Stress; Homeland Insecurity program presented by William Kelleher, Ph.D. and Ana Fins, Ph.D. and sponsored by Nova Southeastern University, Fort Lauderdale, Florida, April 28, 2002.

45.     Participated in the Understanding and Responding to Ongoing Trauma and Terrorism program presented by Steven N. Gold, Ph. D. and Jan Faust, Ph. D. and sponsored by Nova Southeastern University, June 8, 2002.

46.     Participated in the Profiling and Crime Analysis: Homicides, Sex Crimes, and other Crimes of Violence. Presented by Gregg McCarary, FBI Special Agent (Retired) and sponsored by Nova Southeastern University, November 8-9, 2002.

47.     Participated in the program Tailoring the Therapeutic Relationship and Psychological Treatment to the Individual Patient: Evidence-Based Practices. Presented by John C. Norcross, Ph.D. and sponsored by Nova Southeastern University, January 22, 2005.

48.     Participated in the program Socially Anxious Clients: Changing Lives through Cognitive Behavioral Therapy. Presented by Richard G. Heimberg, Ph.D. and sponsored by Nova Southeastern University, March 5, 2005.

49.     Participated in the program One Bell Curve Fits All? Assessment with Culturally and Socially Diverse Clients. Presented by Ronald J. Samuda, Ph.D. and sponsored by Nova Southeastern University, April 8, 2005.

50.     Participated in the conference "Working with Children with Auditory Processing Disorders", sponsored by MEDSPDN, Eau Claire, Wisconsin, January 25, 2006.

51.     Completed the course "Domestic Violence II: Intimate Partner Violence", sponsored by Professional Development Resources, Inc., Jacksonville, Florida, March 17, 2006.

52.     Participated in the program Child Custody Evaluations and Family Assessments. Presented by Philip M. Stahl, Ph.D. and sponsored by Nova Southeastern University, Fort Lauderdale, Florida, March 18, 2006.

53.     Completed the course "Domestic Violence I: Child Abuse", sponsored by Professional Development Resources, Inc., Jacksonville, Florida, March 22, 2006.

54.     Completed the course "Preventing Medical Errors", sponsored by Professional Development Resources, Inc., Jacksonville, Florida, March 31, 2006.

55.     Participated in the program Foundations in Disaster Mental Health. Presented by Marti Ellis Psy.D. and Ron Ellis, Psy.D., sponsored by Nova Southeastern University, Fort Lauderdale, Florida, September 8, 2007.

56.     Participated in the program IDEA, RTI, SLD, and Cognitive Assessments: A Rational Solution. Presented by Jack A. Naglieri Ph.D., sponsored by Nova Southeastern University, Fort Lauderdale, Florida, September 28, 2007.

57.     Participated in the program Violence in the Workplace: Prevention, Intervention, and response. Presented by Stephen J. Romano & Vincent Van Hasselt, Ph.D., sponsored by Nova Southeastern University, Fort Lauderdale, Florida, October 6-7, 2007.

58.     Participated in Theory and Practice of Hypnosis: A Workshop regarding Hypnosis. Presented by Guy H. Montgomery, Ph.D., sponsored by Nova Southeastern University, Fort Lauderdale, Florida, January 18, 2008.

59.     Participated in Ethics, Domestic Violence, and Medical Errors. A Symposium presented by David Shapiro, Ph.D., Lenore Walker, Ph.D., and Andrew Nott Ph.D., sponsored by Nova Southeastern University, Fort Lauderdale, Florida, March 14, 2008.

60.     Participated in the program Using Motivational Interviewing to Help People Change Risky/Problem Behaviors. Symposium presented by Linda Carter Sobell Ph.D., sponsored by Nova Southeastern University and the Area Health Education Centers Program, Fort Lauderdale, Florida, June 12, 2009.

61.     Assessment for a New Generation: The Wechsler Adult Intelligence Scale - Fourth Edition and the Wechsler Memory Scale - Fourth Edition. Symposium presented by David M. Schwartz, Ph.D., and sponsored by Nova Southeastern University, September 11, 2009.

62.     Evidence Based Practice and Implications for Culturally Sensitive Treatment. The Ninth Annual EMAGS Multicultural Conference. Presented by Gargi Roysicar Ph.D., and sponsored by Nova Southeastern University, September 26, 2009.

63.     Making Private Psychological Reports Relevant in a Response to Intervention (RTI) World. Presented by David M. Schwartz Ph.D., and sponsored by Nova Southeastern University, October 2, 3, and 4, 2009.

64.     Participated in Ethics, Domestic Violence, and Medical Errors. A Symposium presented by David Shapiro, Ph.D., Lenore Walker, Ph.D., and Andrew Nott Ph.D., sponsored by Nova Southeastern University, Fort Lauderdale, Florida, March 12, 2010.

65.     Participated in the "I have a New Attitude" Parkinson Educational Conference. Presented by the South Palm Beach Chapter of the National Parkinson Foundation, Palm Beach State College, Palm Beach Gardens, Florida, March 18, 2011.

66.     Completed the following online programs in Continuing Education developed by Professional Development Resources [www.pdresources.org]:

Domestic Violence: Child Abuse and Intimate Partner Violence I [March 18, 2012 for 2 credits]

Domestic Violence: Child Abuse and Intimate Partner Violence II [March 18,

2012 for 2 credits]

Ethics and Law In Florida Psychology [April 9, 2012 for 3 credits]

Preventing Medical Errors in Behavioral Health [March 18,2012 for 2 credits]

Aging: The Unraveling Self [April 15, 2012 for 3 credits]

The APA Report on the Sexualizing of Girls [April 15, 2012 for 3 credits]

Brain Injury Treatment: A Neuropsychological Approach [May 18, 2012 for 3 credits].

67.     I completed the following online programs in continuing education developed by The Zur Institute [www.zurinstitute.com]:

Parental Alienation Syndrome: A Synthesis of Available Evidence on PAS and its Critique [May 18, 2012 for 5 credits]

Internet Addiction: How to Access and Treat the Disorder [May 19, 20012 for 4 credits]

Cybersex Addiction [May 19, 2012 for 4 credits]

68.     I completed the following lecture programs in continuing education offered by the Florida Psychological Association on March 14,2014 [8 hours]:

Prevention of Psychological Medical Errors. Presented by William Samek Ph.D.

Treating Minors, Couples, and Families: Consent to Treatment, Maintaining Confidentiality and Records Disclosure. Presented by Bruce Borkosky Psy.D.

Intimate Partner Violence: Domestic Violence. Presented by Franklin F. Foote Ph.D.

69.     I completed the following continuing education courses online via Professional Development Resources in 2014:

HIV AIDS III by Catherine Christie and Susan Mitchell [3 hours]

Ethics in Psychotherapy: Practical Tips II: Articles from The National Psychologist [2 hours]

Alzheimer's Disease: Overview by The Alzheimer's Association [I hour]

Ethics and Law In Florida Psychology by Leo Christie Ph.D. [3 hours]

College Drinking Prevention Curriculum by Michael Fleming M.D., MPH [3 hours]

Nutrition in Mental Health and Substance Abuse by Joyce Donahue M.A., RD., LD/N [3 hours]

Alcohol and Intimate Partner Violence by National Institute of Alcohol Abuse and Alcoholism [2 hours]

Rick Management: Quick Tips 1 by Ofer Zur Ph.D., Jeffrey N. Younggren Ph.D., Eric A. Harris JD, Ed.D., Ph.D., Stuart Benas CIC, Bruce E. Bennett Ph.D., et. al. [1 hours].

70.    I completed the following continuing education courses online via The Zur Institute in 2014.

Forensic Dual Relationships: Treating Psychotherapists as Expert Witness by Donald A. Eisner Ph.D., J.D. [l hour]

False Memories and Trauma: Forensic and Methodological Errors by Donald A. Eisner Ph.D., J.D. and Courtney Eisner [3 hours]

Internet and Adolescence by Kimberly S. Young Ph.D. [4 hours]

71.    Symposia on the Relationship of Complex Trauma, to Adult Intimacy, to Addictions, and Mood Disorders. Sponsored by Elements Behavioral Health, Fort Lauderdale, Florida, April 25, 2014, with Continuing Education Credits [7 hours] being certified by the Ben Franklin Institute, P.O. Box 27946, Scottsdale, Arizona, 85255. The symposia comprised:

Treatment of Complex Trauma: A Sequenced Relationship Based Approach by Christine Courtois Ph.D.

Mood Disorders and Addiction: New Tools for the Clinician by Christopher La Tourette La Riche M.D.

Closer Together, Further Apart: The Effect of Digital Technology on Relationships, Addiction, and Parenting.

Case Studies Panel presented by Christopher La Tourette La Riche M.D., Christine Courtois Ph.D. and Robert Weiss LCSW.

93

72.     I completed the following continuing education courses on line via Zur Institite subsequent to May 1, 2014:

.
        Digital Ethics, Security & Privacy: In Psychotherapy Practice Management. July 25, 2014 [4 Credit Hours]

        In completed the following courses online:

73.     Ethics for Florida Psychologists. Prepared by Wade T. Lijewski Ph.D. Online course sponsored by Elite Continuing Education, October 28, 2015 [3 Credit Hours]

74.     Preventing Medical Errors for Psychologists. Prepared by Kathryn Brohl M.A., LMFT, Rene Ledford LCSW, and Wade T Lijewski Ph.D. Online course sponsored by Elite Continuing Education [2 Credit Hours]

75.     Domestic Violence. Prepared by Kathryn Brohl M.A., LMFT, Rene Ledford LCSW, and Wade T Lijewski Ph.D. Online course sponsored by Elite Continuing Education [2 Credit Hours]

76.     Bullying in Children and Youth. Prepared by Kathryn Brohl M.A., LMFT, Rene Ledford LCSW, and Wade T Lijewski Ph.D. Online course sponsored by Elite Continuing Education [4 Credit Hours]

77.     Couples Counseling. Prepared by Leah Kulakowski LMHT, Kathryn Brohl M.A., LMFT, Rene Ledford LCSW, and Wade T Lijewski Ph.D. Online course sponsored by Elite Continuing Education [4 Credit Hours]

78.     Eating Disorders in Children and Adults. Prepared by Leah Kulakowski LMHT, Kathryn Brohl M.A., and Wade T Lijewski Ph.D. Online course sponsored by Elite Continuing Education [4 Credit Hours]

79.     Elderly Mental Health: Depression and Dementia. Prepared by Leah Kulakowski LMHT, Kathryn Brohl M.A., and Wade T Lijewski Ph.D. Online course sponsored by Elite Continuing Education [7 Credit Hours]

80.     Healthy Living Psychology. Prepared by Wade T Lijewski Ph.D. Online course sponsored by Elite Continuing Education [4 Credit Hours]

81.     Industrial/Organizational Psychology. Prepared by Wade T Lijewski Ph.D. Online course sponsored by Elite Continuing Education [10 Credit Hours]

**Academic/Professional Administrative Experience:**

The appointment of Project Director, Behavior Research Center Pacific State Hospital,

Pomona, California, involved responsibility for the establishment, development, and conduct of the research protocol, the hiring and training of the staff, and the coordination and administration of the research endeavor.

The appointments of the Associate Director, Division of Drug and Alcohol Abuse, and Director, Day Treatment Center, Thomas Jefferson University Medical School, involved the administrative responsibility for the operation of the Jefferson Methadone Clinic, the Day Treatment Clinic, and the Alcoholism Program. Relevant duties here included working with agencies throughout the City of Philadelphia and developing external clinic supports, grant writing, and also the general administrative responsibility for two major Federal grants.

The appointment of Director, Addiction Research Center, at Old Dominion University involved the administrative responsibilities for developing the Center to become the major addiction education, training, and research facility in the Commonwealth of Virginia.

As the Old Dominion University Representative to the Doctor or Psychology Planning Committee I was responsible for developing the political support and the Program Proposal for the first academic institutional consortium for the Doctor of Psychology Degree (Psy. D.) in the United States. The Virginia Consortium for Professional Psychology involves four institutions: Old Dominion University, The College of William and Mary, Eastern Virginia Medical School, and Norfolk State University. I submitted this Proposal of the Planning Committee to each institution and it was then approved and submitted to the Commonwealth of Virginia Higher Education Council on February 28, 1978. The program was approved by the Higher Education Council on May 2, 1978. Thereafter I served as the first Director of the Virginia Consortium for Professional Psychology. I served in that role for nearly three years until I moved to take up the appointment of Director of Clinical Training at Nova Southeastern University.

As Chairman of the Fourth Annual Convention of the Mental Health and Mental Retardation Society of Virginia, I was responsible for developing the format, structure, and all aspects of the planning and implementation of a convention program involving some 700 participants.

As Professor and Director of Clinical Training at Nova Southeastern University, I had administrative responsibility for the development and conduct of both the Doctor of Philosophy and the Doctor of Psychology Programs in Clinical Psychology. The charge of this administrative role also demanded that I prepare these programs for Accreditation by the American Psychological Association. (The Ph.D. Program was accredited by the American Psychological Association on October 2, 1981). I also played a major role in the negotiations that led to the incorporation of the Florida School of Professional Psychology within Nova Southeastern University and the subsequent emergence of the School of Professional Psychology within the Faculty of Behavioral Sciences of Nova Southeastern University.

I have a wealth of experience in administering the various practice business in which I have been involved [and are listed under my employment]. As for the present time, today I serve as the Chairman and Chief Executive of a technology company and professional international mental health network, Mind-Experts International. As noted earlier, I also serve as a General Partner of Eventus Investment Partners LLC, and Eventus Capital Group LLC, and Eventus Capital Group Management LLC. The Eventus companies have implemented a series of high-speed software driven alternative investment strategies and introduced an Electronically Traded Funds Arbitrage Trading Fund and a Strategic Equities Options Trading Fund.

I further have served as a Director of Octogon Capital, a real estate investment company funding commercial development projects in Germany. I also continue to serve on the Board of Directors of the public company Thinking Craft Inc. And finally, I served for two years [2013 and 2014] on the Board of Directors, and as a Scientific Advisor, for the New York Not-For-Profit Corporation, National Coalition Against Baby Trafficking.

**University Departmental and Other Committees:**

This is a partial listing of my University Committee duties from 1973 to 2001:

| | |
|---|---|
| 1973-1974 | Member, Human Development Major Steering Committee, University of California, Riverside, California |
| 1973-1974 | Member, Comprehensive Examination Committee for the Graduate Program in Learning and Motivation, University of California, Riverside, California |
| 1975 | Chairman, Professional Affairs Committee, Jeffersonian Association for the Advancement of University Psychologists, Philadelphia, Pennsylvania. |
| 1976-1980 | Member, Research Grants Review Committee, Old Dominion University, Norfolk, Virginia. |
| 1977 | Chairman, Old Dominion University Substance Abuse Training Task Force, Old Dominion University, Norfolk, Virginia. |
| 1976-1977 | Chairman, Doctor of Psychology Program Development Task Force, Old Dominion University, Norfolk, Virginia. |
| 1977-1980 | Director, Virginia Consortium for Professional Psychology, Norfolk, Virginia. |

| 1978 | Chairman, Review Committee for the Proposed Doctor of Philosophy Program in Ecological Science, School of Graduate Studies, Old Dominion University, Norfolk, Virginia. |
|------|------|
| 1977-1980 | Member, Graduate Studies Committee, Old Dominion University, Norfolk, Virginia. |
| 1980-1989 | Chairman, Practicum Training and Clinical Services Committee, Nova Southeastern University, Fort Lauderdale, Florida |
| 1980-1987 | Member, Faculty Review Committee, Nova Southeastern University, Fort Lauderdale, Florida. |
| 1981-1989 | Chairman, Institutional Research Review Board, Nova Southeastern University, Fort Lauderdale, Florida. |
| 1984-1989 | Chairman, Behavioral Sciences Center Doctoral Programs Curriculum Coordinating Committee. |
| 1985-1989 | Chairman, Doctoral Program Admissions Committee, Behavioral Sciences Center, Nova Southeastern University, Fort Lauderdale, Florida |
| 2001 | External (International) Consultant, National Advisory Committee for the Doctorate in Clinical Psychology, Sydney University, New South Wales, Australia |

In addition to the above sampling of University Committees roles, I have chaired or served on close to one hundred formal research committees supervising graduate student research programs at the doctoral level.

**Academic, Professional, and Business References:**

William R. Amlong J.D.
Amlong & Amlong, P. A.
500 N. E. 4th Street, Suite 200
Fort Lauderdale, Florida 33301
UNITED STATES OF AMERICA
Phone: (954) 462-1983
Fax: (954) 523-3192
E-mail: wramlong@sprynet.com

Donald G. Byrne Ph. D.
Professor of Clinical and Health Psychology and Deputy Dean
Faculty of Science
Australian National University
Canberra, ACT 2600
AUSTRALIA
Phone: (612) 6125-3974
Fax: (612) 6125-8204
E-mail: don.byrne@anu.edu.au

David M. Clifford, M. D., F.R.A.C.G.P., D.A.B.F.P.
1375 Northcliff Trace
Roswell, Georgia 30076
UNITED STATES OF AMERICA
Phone: (770) 422-3232
Fax: (770) 714-2664
E-mail: dmcmd@bellsouth.net

Douglas Darnell Ph.D.
President, PsyCare Inc.
2980 Belmont Avenue
Youngstown, Ohio 44505
UNITED STATES OF AMERICA
Phone: (330) 759-2310
E-mail: douglas900@aol.com

Gavin B. Didsbury B. S. (Hons), Ph. D.
Managing Director,
PsychPress Pty. Ltd.
Level 1, 224 Queen Street
Melbourne, Victoria 3000
AUSTRALIA
Phone: (613) 9670-3833
Fax: (613) 9600-4001
E-mail: gavin.didsbury@tpg.com.au

Roman G. Fisher, M.S., LL.B
Managing Partner
Eventus Capital Group Management LLC
One Financial Plaza, Suite 2010
Fort Lauderdale, Florida 33301
UNITED STATES OF AMERICA
Phone: (954) 309-2000
Fax: (954) 565-9860
E-mail: romanfisher@gmail.com

Edward G. Gottheil M. D., Ph. D.
Emeritus Professor of Psychiatry
Thomas Jefferson University
1025 Walnut Street
Philadelphia, Pennsylvania 19107
UNITED STATES OF AMERICA
Now retired, mail only

David S. Heidtman B.A., L. L. M.
Principal, Macpherson & Kelley
Level 21, 20 Bond Street
Sydney, N. S. W. 2000
AUSTRALIA
Phone: (612) 8298-9586
Fax: (612) 8298-9599
E-mail: david.heidtman@mk.com.au

Mark B. Sobell Ph. D. A.B.P.P.
Professor of Psychology
Nova Southeastern University
3301 College Avenue
Fort Lauderdale, Florida 33314
UNITED STATES OF AMERICA
Phone: (954) 262-5730
Fax: (954) 262-2712
E-mail: sobellm@cps.nova.edu

Abbey Strauss, M.D.
Clinical and Research Psychiatrist
1050 N.W. 15th Street, Suite # 207A
Boca Raton, Florida 33486
UNITED STATES OF AMERICA
Phone: (561) 394-6110
Fax: (561) 394-6544
E-mail: astrauss@gate.net

Cheri Surloff Psy.D, Ph.D.
17251 Northeast Nineteenth Avenue
North Miami Beach, Florida 33162
UNITED STATES OF AMERICA
Phone: (800) 746-9145
Fax: (954) 456-0949
E-Mail: cherineuro@aol.com

Stephen Touyz Ph. D.
Professor of Psychology
Faculty of Science
Sydney University
Sydney, N. S. W. 2066
AUSTRALIA
Phone: (612) 9531-2646
Fax: (612) 9449-6844
E-mail: wwddspty@bigpond.net.au

Pamela R. Williams-Smith
Corporate and Consulting Psychologist
Level 1, 193 Macquarie Street
Sydney, N.S.W. 2000
AUSTRALIA
Phone: (612) 9235-3880
Fax: (612) 9328-7464
E-mail: prwilliamssmith@iprimus.com.au

Abraham Worenklein Ph.D.
806 Avenue Antonine Maillet
Montreal, Quebec H2V2Y7
CANADA
Phone: (514) 345-9465
Cell: (514) 862-5825
E-mail: abew@videotron.ca

October 25, 2017

## TESTIMONY LISTING- GLENN ROSS CADDY, PH.D.

This listing contains most of the cases [a small number have been missed] in which I have given expert testimony since 1993, at which time changes in the Federal Rules of Civil Procedure required that an expert provide a comprehensive listing of cases in which he/she has given testimony.

This listing also contains some of the cases in which I have testified prior to 1993, but back then I had not maintained records in a manner that allowed me to develop a comprehensive listing of all the cases in which I have given testimony prior to that date.

This listing of cases of course does not include the many hundreds of cases in which I have been retained but was never requested to offer testimony.

## ABBENANTE, ANGELO — *FAMILY LAW*
vs. Jessica Strange
      Case # 50-2010-DR-006725-XXXX-MB-FD
      Judge Lisa Small, Palm Beach County, Florida
          Andrew E.Pastor, Esquire
          11380 Prosperity Farms Road, Suite 118
          Palm Beach Gardens, Florida 33410
          **11/19/2012 — Court Appearance**

## ADRABI, JONATHON — *PERSONAL INJURY*
vs. Allstate Insurance Company, a Foreign Insurance Company
      Case # 04-17589 CA 01 Dade County, Florida
          Richard B. Adams, Esquire
          Adams & Adams LLP
          155 South Miami Avenue, Suite 900
          Miami, Florida 33130
          **06/19/09 — Deposition**

          Cheryl L. Reiss, Esquire
          Mintz, Truppman, Clein & Higer, P.A.
          1700 Sans Souci Blvd.
          North Miami, Florida 33181
          **04/08/10 — Court Appearance**

**AIKEN, WARREN** - *CRIMINAL*
State of Florida vs.
     Case # 91-4501CF10
     Judge LeRoy Moe, Broward County, Florida
        Sam Halpern, Esquire
        Public Defender's Office
        201 S.E. Sixth Street
        Ft. Lauderdale, Florida 33301
        **09/19/91 - Court Appearance**


**ALFANO, JOSEPH** - *CRIMINAL*
State of Florida vs.
     Case # 94-8706CF
     Broward County, Florida
        Robert Ullman, Esquire
        521 South Andrews Avenue, Suite 430
        Fort Lauderdale, Florida 33301
        **05/03/96 - Deposition**
        **05/13/96 - Court Appearance**

**ALLOWAY, EDGAR** - *CRIMINAL*
State of Florida vs.
     Case # 88-21244CF
     Judge Richard Eade, Broward County, Florida
        Public Defender's Office
        201 S.E. Sixth Street
        Ft. Lauderdale, Florida 33301
        **12/04/89 - Court Appearance**

**ALLRED, ANDREW** - *CRIMINAL*
State of Florida vs.
     Case # 07-048990-CFA
     Judge Jessica Recksiedler, Seminole County, Florida
        Mitchell D. Bishop, Esquire
        Assistant Attorney General
        444 Breeze Boulevard, Suite 500
        Daytona Beach, Florida 32118
        **07/23/13 – Deposition**
        Mark Gruber, Esquire
        Office of the Capital Collateral Representative

Regional Counsel –Middle District
3801 Corporex Park Drive, Suite 210
Tampa, Florida 33619
**08/1/13 — Court Appearance**

## ALTERSBERGER, JOSHUA LEE — *CRIMINAL*
State of Florida vs.
Case #2007-CF-00041-A
Highlands County, Florida
Julia A. Morley, Esquire
Office of the Capital Collateral Regional Counsel-Middle
3801 Corporex Park Drive, Suite 210
Tampa, Florida 33169
**11/29/14-Court Appearance**

## ALTIDOR, WILNER — *CRIMINAL*
State of Florida vs.
Case # 00CF012072 & 00CF012084
Palm Beach County, Florida
Carey Haughwout, Esquire
Office of the Public Defender
421 Third Street
West Palm Beach, Florida 33401
**07/08/02 — Court Appearance**

Angela Miller, Esquire
State Attorney's Office
401 North Dixie Highway
West Palm Beach, Florida 33401
**07/15/02 - Deposition**

## ALTIZER, TIMOTHY — *FAMILY LAW*
Julia Wade vs.
Case # FMCE=01-005058 (37/91)
Judge Greenhaut, Broward County, Florida
Melody Ridgley Fortunato, Esquire
Fortunado & Associates, P.A.
One financial Plaza, Suite 2024
Fort Lauderdale, Florida 33394
**11/05/04 — Court Appearance**
.

## ANDAL, JONI - *SEXUAL HARASSMENT*

vs. Columbia/HCA Healthcare Corp., Lawnwood Medical Center, Inc., and
Nicholas Ioannou
>    Case # 96-14195-CIV-PAYNE
>    United States District Court, Southern District of Florida, Palm Beach
>        Division
>        Joseph Mannikko, Esquire
>        Mannikko & Baris, P.A.
>        215 South Federal Highway, Suite 100
>        Stuart, Florida 34994
>        **11/15/98 - Court Appearance**
>        **11/20/98 - Court Appearance**
>        **11/30/98 - Court Appearance**

**ANDERSON, ARLENE F. - *RACIAL / PREGNANCY DISCRIMINATION***
vs. Darby Dental Supply, Co. Inc., a New York corp., and Marty Farber,
>    Case # 96-7452-CIV-MIDDLEBROOKS
>    United States District Court, Southern District of Florida, Miami
>    Division
>        Marcus L. Snow, Esquire
>        Jackson, Lewis, Schnitzler & Krupman, P. A.
>        200 South Biscayne Boulevard, Suite 2600
>        Miami, Florida 33131
>        **05/13/98 – Deposition**


**ANDERSON, KRISTIN – *SEXUAL DISCRIMININATION***
vs. City of Fort Pierce
>    Case # 2:14-CV-14095-JEM
>    United States District Court, Southern District of Florida, Fort Pierce
>    Division
>        Douglas T. Noah, Esquire and
>        Gail C. Bradford, Esquire
>        Dean, Ringers, Morgan & Lawton, P.A.
>        P.O. Box 2928
>        Orlando, Florida 32802-2928
>        01/20/2015 – Deposition
>        20/08/2015 – Court Appearance

**ANDREWS, SAM – *RACIAL DISCRIMINATION***
vs. The New Piper Aircraft, Inc.
>    Case # 01-14228-CIV-GRAHAM
>    United States District Court, Southern District of Florida, West Palm

4

Beach Division
Tracey L. Ellerson, Esquire
Ackerman, Senterfitt & Eidison, P.A.
255 South Orange Avenue, 17th Floor
Orlando, Florida 32802
**06/05/02 – Deposition**

**ARBUCKLE, ABERT et al** - ***CIVIL RIGHT / DEALING WITH FORCED EVICTIONS***
vs. John McMillian, individually and d/b/a Green Star Mobile Home Park, et al.
Case # 91-20649CA20
Broward County, Florida
Paul Wartelle, Esquire
Wartelle, McCurdy & Weaver
582 Market Street, Suite 1215
San Francisco, California 94104

Janet Eaton Sherr, Esquire
Legal Aid Service of Broward County
609 Southwest First Avenue
Fort Lauderdale, Florida 33301
**12/06/93 - Deposition**

**ARIAS, JAVIER** - ***SEXUAL BATTERY / AGAINST A MINOR***
YOLANDA GOLDMAN, as legal guardian of Javier Arias, a minor child; and Yolanda Goldman, individually
vs. Emmanuel Dameus, a/k/a Emmanuel Vikes Dameus; The Evangelical Lutheran Church in America, Inc. a Minnesota Corp.; and The Florida Bahamas Synod of the Evangelical Lutheran Church in America, a Florida corporation
Case # 95-02486 (21)
Broward County, Florida
William S. Reese, Esquire
Lane, Reese, Aulick, Summers & Field, P.A.
Suite 304 Douglas Road
Coral Gables, Florida 33134
**03/04/97 - Deposition**

**ARMSTRONG, NICHOLAS C.** – ***CRIMINAL***
State of Florida vs.

Case # 06CF010217AMB
Palm Beach County, Florida
   Andrew R. Slater, Esquire
   Office of the State Attorney
   401 North Dixie Highway
   West Palm Beach, Florida 33401
   **09/25/07 — Deposition**

### ATHAS, PETER AND SWAWNA ATHAS - *FAMILY*
   Case # 502010DR011209XXXXmb
   Palm Beach County, Florida
     Denise Rappaport Isaacs, Esquire
     2300 Glades Road, Suite 203-E
     Boca Raton, Florida 33431
     **07/14/2011- Deposition**
     Kerry Loomis, Esquire
     Loomis & Loomis P.A.
     4800 North Federal Highway, Suite B-305
     Boca Raton, Florida 33431
     07/15/2010

### AZIZI, MICHAEL and HALI AZIZI — *PERSONAL INJURY*
vs. Polo Ralph Lauren Factory Stores of Florida, Inc., a New Jersey corporation, Premises Providers, Inc., a Virginia corporation: and Sawgrass Mills Phase II Limited Partnership
   Case # 99-17355 (13),
   Broward County, Florida
     Robert D. McIntosh, Esquire
     Adorno & Zeder, P.A.
     888 Southeast Third Avenue, Suite 500
     Ft. Lauderdale, Florida 33335
     **05/31/01 - Deposition**

### B.A. and P.A., on behalf of their minor child, I.A. — *FAMILY LAW*
vs. Antioch Missionary Baptist Church of Carol City Inc.,
   Case # 12-47043 CA02,
   Miami-Dade County, Florida
   Christopher Speed, Esquire
   2139 Palm Beach Lakes Blvd.

West Palm Beach, Florida 33409
**09/25/2015 - Deposition**

**BABCOCK, JOYCE - *FAMILY LAW***
In re: the Marriage of Babcock vs. Babcock
    Case # 88-31158 (14)
    Broward County, Florida
        Ryna E. Meyer, Esquire
        1900 Corporate Blvd, N.W.
        West Bldg, Suite 400
        Boca Raton, Florida 33431
        **11/16/90 - Deposition**

**BABIK, PATRICIA - *FAMILY LAW***
In Re: The Marriage of:  Patricia G. Babik vs. Edward J. Babik
    Case # 88-27045DA
    Broward County, Florida
        Terrence P. O'Connor, Esquire
        Morgan, Carratt & O'Connor, P.A.
        Adams Building- Suite 500
        2601 East Oakland Park Blvd.
        Fort Lauderdale, Florida 33306
        **08/21/89 - Deposition**

**BAIER, DAVID - *CRIMINAL***
State of Florida vs.
    Case # 12-16055CF10A, Judge Rosenthal
    Broward County, Florida
        Christine Bolger, Esquire
        State Attorney's Office
        201 S.E. Sixth Street
        Fort Lauderdale, Florida 33301
        **09/26/2013 - Deposition**

**BAIRD, MYLIEN - *FAMILY LAW***
In Re: The Former Marriage of Myliene Becker, a/k/a Mylien Baird vs. William L. Becker
    Case # 84-021900 CR
    Broward County, Florida
        Keith Krasnove, Esquire
        330 University Drive, Suite 610
        Coral Springs, Florida 33065

**10/19/91 - Court Appearance**

**BALBONI, BRIDGETTE - *SEXUAL HARASSMENT***
vs. Law Offices of David J. Stern, P.A.
    Case # 99-6009-CIV-Ferguson
    Judge Snow, United States District Court, Southern District of
    Florida, Miami Division
        Lisa R. Askowitz, Esquire
        Steel, Hector & Davis, LLP
        200 South Biscayne Boulevard, Suite 4000
        Miami, Florida 33131-2398
        **09/15/99 - Deposition**

**BALDWIN, EDWARD - *CRIMINAL***
State of Florida vs.
    Case # 00-005131 CF 10A
    Judge Stanton Kaplan, Broward County, Florida
        Michael Trent, Esquire
        1500 East Atlantic Boulevard, Suite B
        Pompano Beach, Florida 33060
        **06/06/00 - Court Appearance**

**BALZ, RANDOLPH - *DISABILITY***
vs. Royal Jeep Eagle Chrysler Plymouth
    Case # 98-230-CIV-ORL-18A
    Judge D. Kendall Sharp, US District Court, Middle District of Florida,
    Orlando Division
        John V. Baum, Esquire
        213 South Swoope Avenue
        Maitland, Florida 32751
        **04/15/99 - Deposition**

        Daniel N. Brodersen, Esquire
        Parker, Burke, Landerman & Parker, P. A.
        P. O. Box 2867
        Orlando, Florida 32802
        **08/16/99 - Court Appearance**

**BANDRES, ANNEMARIE - *SEXUAL HARASSMENT***
vs. Stacey's Buffet, Inc.
    Case # 96-05408CAF
    Brevard County, Florida

John M. Breckenridge Jr., Esquire
7019 Pelican Island Drive
Tampa, Florida 33634-7422
**04/29/97 - Deposition**

## BARSKY, MITCH - *CRIMINAL*
Case # 97-10245-CF10
Judge Mark Spiezer, Broward County, Florida
Maurice Graham, Esquire
331 East Prospect Road
Oakland Park, Florida 33334
**05/01/98 - Court Appearance**

## BARTON, NANCY - *SEXUAL HARASSMENT*
vs. Universal Map Enterprises, Inc. and Monty Birdsey
Case # 93-8679-CIV-KING
United States District Court, Southern District of Florida, West Palm
Beach Division
William R. Amlong, Esquire
Amlong & Amlong, P.A.
500 Southeast Forth Street, Suite 200
Fort Lauderdale, Florida 33301
**08/24/95 - Court Appearance**

## BEATRICE, CATHERINE - *FAMILY LAW*
vs. Louis J. Beatrice
Case # 95-403 (36)
Judge Renee Goldenberg, Broward County, Florida
Michael J. Trent, Esquire
1500 east Atlantic Blvd., Suite B
Pompano Beach, Florida 33060
**10/03/00 - Court Appearance**

## BELTON, LORENZO — *WORKERS COMPESATION*
vs. ABC Distributing, Inc. and Chubb Group of Insurance
Case # 02-047184HHH
Judge Henry H. Harnage, Division of Administrative Hearings
Office of the Judge of Compensation Claim, Miami Division, Florida
Henry J. Hearns, Esquire
Henry J. Hearns, P.A.
3121 Fairlane Farms Road, Suite 5
Wellington, Florida 33134

**02/05/09 — Deposition**

**<u>BERKOWITZ, BERNARD</u> —** *CRIMINAL LAW*
State of Florida vs.
      Case # 05-2942 CF10A
      Judge Michelle Tobin Singer, Broward County, Florida
          Joel Hirschhorn, Esquire
          Hirschhorn & Bieber, P.A.
          550 Biltmore Way
          Coral Gables, Florida 33134
          **02/19/02 — Court Appearance**

**<u>BERNSTEIN, RICHARD</u> -** *FAMILY LAW*
In re: Marriage of Richard Bernstein and Carol Bernstein
      Case # 89-22534-01
      Broward County, Florida
          E. Ross Zimmerman, Esquire
          7880 N. University Drive, Suite 300
          Tamarac, Florida
          **04/11/91- Court Appearance**

**<u>BETTS, ARVA</u> -** *CRIMINAL*
State of Florida vs.
      Case # 89-7409CF
      Judge Melvin Grossman, Broward County, Florida
          Johnny L. McCray, Jr., Esquire
          400 East Atlantic Blvd.
          Pompano Beach, Florida 33060
          **10/16/89 - Court Appearance**
          **06/22/90 - Court Appearance**

**<u>BIELSKI, MICHELE A.</u> -** *SEXUAL HARASSMENT*
vs. Publix Super Markets, Inc., a Florida corporation, and Jose Guzman, an individual,
      Case # 98 12755(CA21)
      Broward County, Florida
          William S. Reese, Esquire
          Lane, Reese, Aulick, Summers & Field, P. A.
          2600 Douglas Road, Suite 304
          Coral Gables, Florida 33134
          **04/27/99 - Deposition**

**BILLINGSLY, IRENE** - *MEDICAL MALPRACTICE*
vs. Donner Chiropractic Center, Inc.; a Nevada Corporation licensed in the
State of Nevada; Jeffrey Scott Donner, D. C. , individually ; ROE Corp.
     Case # A323174
          Robert T. Eglet, Esquire
          Eglet & Prince, LLP
          600 Whitney Ranch, Bldg C, Suite 14-15
          Henderson, Nevada 89014
          &
          Kenneth L. Hall, Esquire
          633 S. Fourth Street, Suite 1
          Las Vegas, NV 89101
          **01/26/98 - Deposition**

**BISHOP, BRANDON — *CRIMINAL***
State of Florida vs.
     Case # 06-013584CF-10A-Lazarus
     Broward County, Florida
          Sarahnell Murphy, Esquire
          Office of the State Attorney
          Broward County Courthouse
          201 S.E Sixth Street
          Fort Lauderdale, Florida 33301
          **10/22/08 — Deposition**

          Joel Hirshhorn, Esquire
          Hirschhorn & Bieber, P.A.
          550 Biltmore Way, Penthouse Three A
          Coral Gables, Florida 33134
          **06/2/09 — Court Appearance**

**BOGAR, JAYEN & STEVEN BOGAR** - *PERSONAL INJURY*
vs. Aryana Chadi & Jacqueline Chadi
     Case # 93-24546 (14)
     Broward County, Florida
          Walter "Skip" Campbell, Esquire
          700 Southeast Third Avenue, Suite 100
          Fort Lauderdale, Florida 33316
          **08/01/94 - Court Appearance**

**BOGLE, WILLIAM J.** - *AGE DISCRIMINATION*
vs. Orange County Board of County Commissioners, as governing body of

Orange County, Florida
> Case # 95-847-CIV-ORL-22
> United States District Court, Middle District of Florida, Orlando Division
>> Jeffrey G. Slater, Esquire
>> Eubanks, Hilyard, Rumbley, Meier & Lengauer
>> Suite 1700, Gateway Center
>> 1000 Legion Place
>> Orlando, Florida 32802
>> **09/06/96 - Deposition**

**BOHL, MARILYN E. - *SEXUAL HARASSMENT***
vs. Columbia/HCA Healthcare Corp. Lawnwood Medical Center, Inc., and Nicholas Ioannou.
> Case # 96-14195-CIV-PAYNE
> United States District Court, Southern District of Florida Palm Beach Division
>> Joseph Mannikko, Esquire
>> Mannikko & Baris, P.A.
>> 215 South Federal Highway, Suite 100
>> Stuart, Florida 34994
>> **11/15/98 - Court Appearance**
>> **11/20/98 - Court Appearance**
>> **11/30/98 - Court Appearance**

**IN THE INTERESTS OF: - *DEPENDENCY***
**BOOTHE, DAVE; JR., BOOTHE, DEVA & BOOTHE, DAVENIA**
State of Florida vs.
> Case # 2002-12069 CJ-CP
> Judge Andrew Siegel - Broward County, Florida
>> Laurie Beloff- Marks, Esquire
>> Assistant Attorney General
>> 110 Southeast Sixth Street, Floor 12
>> Fort Lauderdale, Florida 33301
>> **4/17/03 - Deposition**

**BORINSTEIN, JOEL STEVEN - *CRIMINAL***
State of Florida vs.
> Case # 91-118CFA
> Judge Robert R. Makemson  - Okeechobee / St Lucie County, Florida
>> Russell J. Ferraro, Esquire
>> DeSantis, Cook, Ferraro & McCarthy

1115 East Ocean Blvd.
Stuart, Florida 34995-0107
**04/27/92 - Court Appearance**

## BOSCIO, ROBERTO AHMED — *CRIMINAL*
State of Florida vs.
Case # 14-013714CF10A
Judge Bernard Bober —Broward County, Florida
Gabriela C. Novo, Esquire
200 S.E. Sixth Street, Suite, 102
Fort Lauderdale, Florida 33301
**10/28/14- Court Appearance**
Judge Ari Poth — Broward County, Florida
Michael Trent Esquire [relocated to Georgia]

**07/23/15 — Court Appearance [Mental Health Court]**

## BOSSE, JOSEPH - *CRIMINAL*
State of Florida vs.
Case #
Broward County, Florida
Melinda Brown, Esquire
600 S. Andrews Avenue, Suite 600
Fort Lauderdale, Florida 33301
**08/24/94 - Court Appearance**
**05/17/96 - Court Appearance**
**06/05/96 - Court Appearance**

## BOWERS, MARLEEN - *SEXUAL HARASSMENT*
vs. Milgray/Florida, Inc., a Florida Corp., Milgray Electronics, Inc., a foreign
corporation licensed to do business in the State of Florida, Bell of Florida,
Inc., a Florida corporation, and Bell Industries, Inc., a foreign corporation
licensed to do business in the State of Florida
Case # 97-1083-CIV-ORL-19
United States District Court, Middle District of Florida, Orlando
Division
Arnold Cohen, Esquire
1 Riverfront Plaza
Newark, New Jersey 07102
**07/29/98 - Deposition**

## BOWERS, TYRUS, ET AL., - *RACIAL DISCRIMINATION*

vs. The New Piper Aircraft, Inc.
    Case #99-14354-Civ-Paine
    United States District Court, Southern District, West Palm Beach
    Division
        Ellen D'Arcangelo, Esquire
        Ackerman, Senterfitt & Eidson, P.A.
        Phillips Point East Tower
        777 South Flagler Drive, Suite 900
        West Palm Beach, Florida 33401
        **12/12/00 - Deposition**
        **12/15/00 - Deposition**
        **02/14/01 - Deposition**

**BOWMAN, JOHN L.** - *AGE DISCRIMINATION*
vs. Orange County, a political subdivision of the State of Florida,
    Case # 96-1316-CIV-ORL-22
    United States District Court, Middle District of Florida, Orlando
    Division
        John Dempsey, Esquire
        Ackerman & Senterfitt, P. A.
        255 South Orange Avenue, 17th Floor
        Orlando, Florida 32802
        **07/23/98 - Deposition**

**BRACKEN, REID** - *FAMILY LAW*
vs. Jeraldine Bracken
    Case # 94-946-FMCE-43
    Broward County, Florida
        Evelyn M. Merchant, Esquire
        Becker & Poliakoff, P.A.
        Emerald Lake Corporate Park
        3111 Sterling Road
        Fort Lauderdale, Florida 33312
        **10/31/94 - Court Appearance**
        **03/03/95 - Deposition**
        **06/01/95 - Court Appearance**
        **07/10/95 - Deposition**
        **08/16/95 - Court Appearance**

**BRADY, CHARLES & DORIAN** - *CIVIL RIGHTS, WRONGFUL DISCHARGE*
vs. James L. Adams, Jr. , individually and in his official capacity as Sheriff

14

of Sumter County, Florida; and Sumter County, Florida.
        Case # 92-151-CIV-OC-10
        United States District Court, Middle District of Florida, Ocala Division
            Thomas W. Dickson, Esquire
            Fechter & Dickson, P.A.
            102 West Whiting Street, Suite 502
            Tampa, Florida 33602
            **05/04/95 - Court Appearance**

**BRADY, ROBERT CHARLES — *CRIMINAL***
State of Florida vs.
        Case #07-021340CF
        Judge Siegel, Broward County, Florida
            Lawrence W. Livoti, Esquire
            600 South Andrews Avenue, Sixth Floor
            Fort Lauderdale, Florida 33301
            **12/03/07 - Court Appearance**

**BRANCACCIO, VICTOR ANTHONY - *CRIMINAL***
State of Florida vs.
        Case # 93-1592-CF
        Judge Dwight I. Geiger St. Lucie County State of Florida
            Tim Schulz, Esquire
            201 South Biscayne Blvd., Suite 1300
            Miami, Florida 33131
            **09/09/98 - Deposition**

**BRANSFIELD, MARK - *PERSONAL INJURY***
vs. Upchurch Management Corp.
        Case # 91-15536 (20)
        Broward County, Florida
            Ryna Mehr, Esquire
            Hunt, Cook, Riggs & Mehr, P.A.
            1900 Corporate Blvd., Suite 400
            Boca Raton, Florida 33431
            **12/05/91 - Deposition**

**BRANT, MARSHALL G. - *FAMILY LAW***
vs. Kimberly L. Brant
        Case # CD-2000-DR-5129-FB
        Judge Mary Lupo, Palm Beach County, Florida
            Doreen M. Varela, Esquire

224 Datura Street, Suite 1010
West Palm Beach, Florida 33401
**06/29/00 - Court Appearance**

Judge Kathleen J. Kroll – Palm Beach County, Florida
Kathryn M. Beamer, Esquire
1675 Palm Beach Lakes Boulevard, Suite 700
West Palm Beach, Florida 33401
**06/27/01 - Court Appearance**

## BRAUER, DEBORAH E. – *CIVIL RIGHTS*
vs. Bloomingdale's Inc. and Joseph Ciechanowski
Case # 03006764-02
Broward County, Florida
Michael Clarkson, Esquire
Morgan, Brown & Joy, LLP
One Boston Place
Boston, Massachusetts 02108
**4/27/04 - Deposition**

## BRIGGS, JESSE LELAND - *CRIMINAL*
United States of America vs.
Case # 99-6036-CR-HURLEY
United States District Court, Southern District of Florida, Fort
Lauderdale Division
John P. Contini, Esquire
1209 S.E. Third Avenue
Ft Lauderdale, Florida 33301
**12/30/99 - Court Appearance**

## BRODERSEN, DANIEL NEWTON – *BAR COMPLAINT*
The Florida Bar vs.
Case # SC09-113
Judge Schack: Supreme Court of Florida
Mark M. O'Mara, Esquire
Mark M. O'Mara, P.A.
1416 East Concord Street
Orlando, Florida 32803
**07/28/09 – Court Appearance**

## BROWN, LARRY JR. - *CIVIL RIGHTS*
vs. R. R. Music

Case # 85-8626CIV
Judge Zloch: United States District Court, Southern District of
Florida, Miami Division
>    Thomas F. Almon, Esquire
>    Almon & Brodsky, P. A.
>    100 North Biscayne Blvd. Suite 1717
>    Miami, Florida 33132
>    **12/06/90 - Deposition**

## BROWN, MARY - *CIVIL RIGHTS / POLICE BRUTALITY*
vs. City of Margate et al
>    Case # 88-6105-CIV-HOEVELER
>    United States District Court, Southern District of Florida, Fort
>    Lauderdale Division
>>        Barbara Heyer, Esquire
>>        Gold & Heyer
>>        1311 Southeast Forth Avenue
>>        Fort Lauderdale, Florida 33316
>>        **12/08/88 - Deposition**
>>        **12/12/88 - Deposition**

## BROWN, PAULA - *MEDICAL MALPRACTICE*
vs. Donner Chiropractic Center, Inc.; a Nevada Corporation licensed in the
State of Nevada; Jeffrey Scott Donner, D. C. , individually ; ROE Corp.
>    Case # A323174
>>        Robert T. Eglet, Esquire
>>        Eglet & Prince, LLP
>>        600 Whitney Ranch, Bldg C, Suite 14-15
>>        Henderson, Nevada 89014
>>        &
>>        Kenneth L. Hall, Esquire
>>        633 S. Fourth Street, Suite 1
>>        Las Vegas, NV 89101
>>        **01/26/98 - Deposition**

## BRUNNER, WILLIAM HENRY - *CRIMINAL*
State of Florida vs.
>    Case # 93-008750-CFA-02
>    Palm Beach County Court, Florida
>>        Robert S. Gersham, Esquire
>>        Office of the State Attorney
>>        401 North Dixie Highway

West Palm Beach, Florida 33401
**03/28/95 - Deposition**

**BUQUO, STEPHANIE — FAMILY LAW**
Vs Lee Buquo
Case # DVCE 14-7932 [36]
Broward County County Court, Florida
Michael J. Trent, Esquire
1701 East Atlantic Boulevard, Suite 4
Fort Lauderdale, Florida 33060
**12/04/2014 — Court Appearance**

**BURKE GREGORY et all — *PERSONAL INJURY***
Vs. New Tribes Mission
Brett M. Bressler, Esquire
2707 West Fairbank Avenue
Winter Park, Florida 32789
**05/09/11 — Mediation**

**BUSTER, LEONARD - *CRIMINAL***
State of Florida vs.
Case # 97-7835-CFA-02
Palm Beach County Court, Florida
Mark Asta, Esquire
401 North Dixie Highway
Felony Division X
West Palm Beach, Florida 33401
**11/19/98 - Telephonic Deposition**
**12/01/98 - Deposition**

**BUTLER, HARRY LEE - *CRIMINAL***
State of Florida vs.
Case # 97-4690
Judge Frank Quesada, Circuit Court Pinellas County, Florida
Maria Perinetti, Esquire
Law Office of the Capital Collateral Regional Counsel
3801 Corporex Park Drive, Suite 210
Tampa, Florida 33619
**11/06/08 — Court Appeareance**

**CALANDRA, JOSEPH - *CRIMINAL***
State of Florida vs.

18

Case # 92-025987
Palm Beach County, Florida
    Steve Malone, Esquire
    Public Defender's Office
    421 Third Street
    West Palm Beach, Florida 33401
    **12/03/93 - Court Appearance**
    **12/07/93 - Deposition**
    **11/17/94 - Court Appearance**

**CALIFANO, MARIA BETH - *SEXUAL HARASSMENT***
vs Hollywood Resorts, Inc. et al
    Case # 89-6533CIV
    Judge Gonzalez, Broward County, Florida
        Douglas Reynolds, Esquire
        4875 North Federal Highway
        Fort Lauderdale, Florida 33308
        **09/24/90 - Deposition**
        **09/26/90 - Deposition**

**CALIFANO, MARIA - *MEDICAL MALPRACTICE***
vs. Arthur Carl Haspel, D.P.M., and Susan Solman-Staropoli, D.P.M.
    Case # 94-01489 (08)
    Broward County, Florida
        Glenn P. Falk, Esquire
        Parenti, Falk, Waas & Frazier, P.A.
        113 Almeria Avenue
        Coral Gables, Florida 33134
        **05/09/95 - Deposition**

**CAMBRIDGE, ELIZABETH, FLORA — *RACIAL/SEXUAL***
***DISCRIMINATION***
**GREEN & BEVERLY REID**
vs. EMSA Correctional Care, Inc., a Florida Corporation
    Case # 99-08570-Civ-Jordan, Broward County, Florida
        Robert Rigrish, Esquire
        Ford & Harrison LLP
        516 Ingraham Building
        25 Southeast Second Avenue
        Miami, Florida 33131
        **02/22/01- Deposition**

**<u>CAMPBELL, PERCY</u> - *CRIMINAL***
State of Florida vs.
    Case # 93-3403CJ
    Judge Melanie May, Broward County, Florida
        Deborah Carpenter Wheeler, Esquire
        600 S. Andrews Avenue, Suite 600
        Fort Lauderdale, Florida 33301
        **09/15/93 - Court Appearance**

**<u>CAMPIGLIA, VINCENT</u>- *CRIMINAL***
State of Florida vs.
    Case # 2014CF003985AMB
    Judge Glenn Kelley, Palm Beach County
        Chris Mancini, Esquire
        100 S.E. Third Avenue, Suite 2010A
        Fort Lauderdale, Florida 33394
        **02/13/15 —Court Appearance**

**<u>CANADAY, JAKOB P.</u> - *CRIMINAL***
State of Florida vs.
    Case # 96-8682CF10A
        Timothy W. Schulz, Esquire
        Black, Srebnick & Kornspan
        201 S. Biscayne Blvd., Suite 1300
        Miami, Florida 33131
        **12/11/96 - Deposition**

**<u>CAPIOLE, MARGARET</u> - *FAMILY LAW***
vs.  Scott Martin
    Case # 92-24676(39)
    General Master Phillip Schlissel, Broward County, Florida
        Michael Trent, Esquire
        1500 East Atlantic Blvd., Suite B
        Pompano Beach, Florida 33060
        **03/24/00 - Court Appearance**

**<u>CAPONE, LAURENE</u> - *SEXUAL HARASSMENT***
vs. Florida Board of Regents and Van Waddill
    Case # 86-8876-CIV-RYSKMAP
    Judge Ryskamp —US District Court, Southern District of Florida, Palm Beach Division
        Carri S. Leininger, Esquire

Williams & Leininger, P.A.
One Clearlake Centre, Suite 1102
West Palm Beach, Florida 33401
**02/18/98 - Deposition**
**04/30/98 - Deposition**

**CAPONE, LAURENE — *CIVIL BATTERY***
vs. Florida Board of Regents, and Van Waddill
      Case # CL98-2110-AB
      Fifteenth Judicial Circuit, Palm Beach County, Florida
         Isidro M. Garcia, Esquire
         712 North Olive Avenue
         West Palm Beach, Florida 33401
         **09/19/00 - Deposition**
         **10/09/00 - Deposition**

**CARILLO, LAZARO — *SEXUAL HARASSMENT***
vs. Publix Super Markets, Inc.
      Case # 00-7362 DIMITROULEAS United States District Court,
      Southern District of Florida, Fort Lauderdale Division
         Richard Reyes, Esquire
         Tobin & Reyes, P.A.
         7251 West Palmetto Park Road, Suite 205
         Boca Raton, Florida 33433 and

         Peter R. Siegel, Esquire
         Abrams Anton, P.A.
         2021 Tyler Street
         Hollywood, Florida 33022
         **11/22/01- Court Appearance**

**CARLOCK, TRACY - *CRIMINAL***
State of Florida vs.
      Case # 90-11243CF
      Judge J. Leonard Fleet, Broward County, Florida
         Arna Cortazzo, Esquire
         Public Defender's Office
         201 SE Sixth Street, Room 730
         Fort Lauderdale, Florida 33301
         **03/11/91 - Court Appearance**
         **05/25/90 - Court Appearance**
         **08/12/93 - Court Appearance**

**CARUSO, MARK - *PERSONAL INJURY***
vs. Walmart Stores, Inc. d/b/a Walmart, a Delaware Corporation
    Case # 00004281 Broward County, Florida
        Richard E. Retamar, Esquire
        Peninsular Plaza, Suite 460
        2424 North Federal Highway
        Boca Raton, Florida 33431
        **04/12/02 - Deposition**

**CASLER, AVERY CRAIG - *CRIMINAL***
State of Florida vs.
    Case # CR96-13147
    Judge Belvin Perry, Jr., Orange County, Florida
        F. Wesley Blankner Jr., Esquire
        217 East Ivanhoe Blvd. North
        Orlando, Florida 32804
        **10/18/97 - Court Appearance**
        **02/10/98 - Court Appearance**
        **05/13/98 - Court Appearance**

**CAVANAUGH, KIMBERLY - *PERSONAL INJURY***
vs. Mac's Towing, Inc. & Paul Befger
    Case # 89-31983
    Broward County, Florida
        Robert J. McFann, Esquire
        110 SE Sixth Street, Suite 1900
        Fort Lauderdale, Florida 33301
        **11/20/90 - Deposition**

**CHARLTON, WHITNEY - *FAMILY LAW***
vs Darryl G. Davidson
    Case # 98-4532-FD-23
    Judge Nelly Khouzam, Pinellas County, Florida
        Gerald Kuchinsky, Esquire
        210 University Drive, Suite 410
        Coral Springs, Florida 33071
        **10/30/00 - Court Appearance**

**CHASE, ANTHONY – *CIVIL RIGHTS***
vs. Nova Southeastern University, Inc.
    Case #11-cv-61290-CIV-KMW/WILLIAMS/SNOW

United States District Court, Southern District of Florida
Richard Beauchamp, Esquire
Panza, Maurer, & Maynard, P.A.
Bank of America Building, Third Floor
3600 North Federal Highway
Fort Lauderdale, Florida 33308
**06/08/2012 -Deposition**

**CHASE, LYNN - *PERSONAL INJURY***
vs. BeeSafe Margone
Case # 97009665
Broward County, Florida
Jonathan Colby, Esquire
Leeds & Colby, Esquire
2950 S. W. 27th Avenue, Suite 300
Miami, Florida 33133
**04/28/98 - Deposition**
**11/19/98 - Deposition**
**CHERUBIN, GUY — *CRIMINAL***
State of Florida vs.
Case # 08021620CF10A
Judge Levinson, Broward County
Yael Gamm, Esquire
Office of the State Attorney
201 S.E. Sixth Street
Fort Lauderdale, Florida 33301
**08/17/12 — Deposition**
**10/17/12 — Deposition**
Utpal Dighe, Esquire
Office of the Regional Counsel
301 East Las Olas Boulevard, Suite 200
Fort Lauderdale, Florida 33304
**01/09/2013 - Court Appearance**

**CHIESA, JOSEPH - *FAMILY LAW***
In Re: The Marriage of Joseph Chiesa vs. Susan Chiesa
Case # 88-25743 (15)
Judge Birken, Broward County
Renee Goldenberg, Esquire
Goldenberg & Goldenberg, P.A.
One Financial Plaza, Suite 1300
Fort Lauderdale, Florida 33394

**09/20/89 - Court Appearance**
**10/05/89 - Court Appearance**
**10/16/89 - Court Appearance**

### CHILDS, KATHLEEN - *SEXUAL HARASSMENT*
vs. Columbia/HCA Healthcare Corp., Lawnwood Medical Center, Inc. and Nicholas Ioannou
    Case # 96-14195-CIV-PAYNE
    United States District Court, Southern District of Florida
        Joseph Mannikko, Esquire
        Mannikko & Baris P. A.
        215 South Federal Highway, Suite 1000
        Stuart, Florida 34994
        **11/15/98 - Court Appearance**
        **11/20/98 - Court Appearance**
        **11/30/98 - Court Appearance**

### CHOBANIAN, HARRY - *MEDICAL MALPRACTICE*
vs. Glen Suterland, M.D., Salvatore DiGiorgi, M.D., Salem Habal, M.D. , Irving David, M.D., Amisub, Inc., d/b/a North Ridge Medical Center
    Case # 94-007469 (06)
    Broward County, Florida
        William C. Ruggiero, Esquire
        9130 S. Dadeland Blvd., Suite 1902
        Miami, Florida 33156
        Jeff Wolfson, Esquire
        644 SE Fifth Avenue
        Fort Lauderdale, Florida 33156
        **06/29/95 - Deposition**
        **07/10/95 - Deposition**

### CHOPOURIAN, SANA — *FAMILY LAW*
vs. Armenak Chopourian
    Case # 02-011401 (35) (93)
    Judge Arthur Berkin, Broward County, Florida
        Maurice Graham, Esquire
        1020 Northeast 45th Street
        Oakland Park, Florida 33342
        **04/15/03 — Deposition**

### CIFFO, TRISHA and ALFRED CIFFO, her husband- *PERSONAL INJURY*

24

vs. Marvin Neuman and Christina Neuman
Case # 02-021840 CACE (03)
Broward County , Florida
Rand Ackerman
315 South East 7th Street
Fort Lauderdale, FL 33301
**6/5/03 - Deposition**

**CISOWSKI, JENNIFER** — *CRIMINAL*
State of Florida vs.
Case # 01-1124-CFA
Martin County, Florida
Robert Belanger, Esquire
State Attorney's Office
100 East Ocean Blvd, Suite 400
Stuart, Florida 34994
**06/06/02- Deposition**
**06/25/02- Deposition**

**C.K.A., Individually, a Minor, and C.K.A. by and through his Parent and Next Friend, Connie Allen** — *SEXUAL ABUSE*
vs. Venator Group Retail, Inc. d/b/a/ The Foot Locker, and Louis J. Strianese
Case # 01-4666-CA-1A
Lee County, Florida
Alan Gerlack, Esquire
Ford & Harrison LLP
300 South Orange Avenue, Suite 1300
Orlando, Florida 32801
**03/19/02- Deposition**

**CLARK, CHERYL L.** — *CIVIL RIGHTS/GENDER DISCRIMINATION*
vs. South Broward Hospital District /d/b/a Memorial Healthcare System
Case # 12-61164-CIV- DIMITROULAS-SNOW
United States District Court, Southern District of Florida
Kelly D. Gemelli, Esquire
Jackson Lewis LLP
2 South Biscayne Boulevard, Suite 3500
Miami, Florida 33131
**05/09/2013 - Deposition**

**CLICK, CAROL W.** - *SEXUAL HARASSMENT*

25

vs. Tire Kingdom, Inc. and Robert Hibbard
>Case # 94-1164-CIV-NESBITT
>Judge Lenore Nesbitt, US District Court, Southern District of Florida, Miami Division
>>Don Hayden, Esquire
>>Baker & McKenzie, P.A.
>>701 Brickell Avenue, Suite 1600
>>Miami, Florida 33131
>>**11/30/98 - Court Appearance**
>>**12/01/98 - Court Appearance**
>>**12/02/98 - Court Appearance**

>>Peter R. Goldman, Esquire
>>Gillespie, Goldman & Kronengold, P.A.
>>6550 North Federal Highway, Suite 511
>>Fort Lauderdale, Florida 33308
>>**09/11/96 - Deposition**
>>**01/30/97 - Deposition**

**CLIFFORD, SANDRA - *CIVIL RIGHTS/WHISTLE BLOWER***
vs. Easte Point Hospital, Inc.
>Case # 95-5093-CA-LG
>Lee County, Florida
>>John E. Johnson, Esquire
>>Treman, Kemker, Scharf et. al.
>>2700 Barnett Plaza
>>Tampa, Florida 33602
>>**05/06/97 - Deposition**

**COCHRAN, ANGELA & MICHAEL CHOCHRAN et. al. - *MEDICAL MALPRACTICE***
vs. Department of Health & Rehabilitative Services and Broward County
>Case # 90-112-7CJDP
>Broward County, Florida
>>Douglas H. Reynolds, Esquire
>>4875 N. Federal Highway, 10th Floor
>>Fort Lauderdale, Florida 33308
>>**01/29/91 - Court Appearance**

**COLE, NANCY — *FAMILY LAW***
vs. Geoffrey A. Cole
>Case # 02-8394

Judge George Sarduy, Dade County, Florida
    Andrew M. Leinoff, Esquire
    7301 S.W. 57th Court, Suite 545
    South Miami, Florida 33143
    **09/03/2013 — Court Appearance**
    **10/20/2013 — Court Appearance**

**COLEMAN, WAYNE A.** *- CRIMINAL*
State of Florida vs.
    Case # 905417CF10A
    Judge Coker, Broward County, Florida
        Victor Tobin, Esquire
        1001 S. Andrews Avenue, Suite 100
        Fort Lauderdale, Florida 33316
        **10/05/90 - Court Appearance**
        **02/19/91 - Court Appearance**

**COLLINS-KIDWELL, DEBORAH** *- SEXUAL HARASSMENT*
vs. City of Hialeah Gardens
    Case # 97-2847-CIV HIGHSMITH
    Judge Garber, US District Court, Southern District of Florida, Miami Division
        William R. Amlong, Esquire
        Amlong & Amlong, P.A.
        500 S.E. Forth Street, Suite 200
        Ft. Lauderdale, Florida 33301
        **02/17/99 - Court Appearance**

**CONLEY, MICHAEL** *- CRIMINAL*
State of Florida vs.
    Case # B-8-053439
    Broward County, Florida
        Robert Wills, Esquire
        Public Defender's Office
        201 SE Sixth Street, Room 740B
        Fort Lauderdale, Florida 33301
        **03/20/90 - Court Appearance**
        **03/21/90 - Court Appearance**

**CONTI, JODY** *— SEXUAL HARASSMENT*
vs. Elite Protective Services, Inc., a Florida Corporation, George Mahoney, and Alan Galer.

Case # 97-002778 AH
Judge Catherine Brunson, Palm Beach County, Florida
    Christopher J. Rush, Esquire
    Rush & Manoogian, P.A.
    Woolbright Corporate Center, Suite 320
    1903 South Congress Avenue
    Boynton Beach, Florida 33426
    **03/08/01 — Court Appearance**
    **03/12/01 — Court Appearance**

**CONTI, JOSEPH AND CAROL, his wife** - *PERSONAL INJURY*
vs. Ryder Truck Rental, Inc. a Florida Corporation, Gerard Roger
DesMarias, and Maxon Industries, Inc.
    Case # 88-8715 (22)
    Broward County, Florida
    Richard J. Roselli, Esquire
    Krupnick, Campbell, Malone, Roselli, Buser & Slama, P.A.
    700 SE Third Avenue, Suite 100
    Fort Lauderdale, Florida 33316
    **06/05/89 - Deposition**
    **09/09/92 - Deposition**
    **10/20/92 - Deposition**

**COPPOLA, SAMUEL A.** - *CRIMINAL*
State of Florida vs.
    Case # 97-274 CF
    Hernando County, Florida
    Donald Scaglione, Esquire
    State Attorney's Office
    Hernando County Courthouse
    20 North Main Street, Room # 400
    Brooksville, Florida 34601
    **06/15/98 - Deposition**

    F. Wesley Blankner, Esquire
    Jaeger & Blankner P.A.
    217 East Ivanhoe Blvd. North
    Orlando, Florida 32804
    **06/19/98 - Court Appearance**

**CORBETT, MICHELLE** — *SEXUAL DISCRIMINATION*
vs. Rick Beseler, in his official capacity as Sheriff of Clay County

Case # 3:12-cv-728-J-25-JRK United States District Court, Middle
District of Florida, Jacksonville Division
    Mark E. Levitt, Esquire
    Allen, Norton & Blue, P.A.
    477 Fairbanks Avenue, Suite 100
    Winter Park, Florida 32789
    **04/29/2013 - Deposition**

**CORBETT, MICHELLE – *SEXUAL DISCRIMINATION***
vs. Rick Beseler, in his official capacity as Sheriff of Clay County
    Case # 3:12-cv-728-3025 -JRK United States District Court, Middle
District of Florida, Jacksonville Division
    Shannon L. Kelly, Esquire
    Allen, Norton & Blue, P.A.
    477 Fairbanks Avenue, Suite 100
    Winter Park, Florida 32789
    **01/27/2016 - Deposition**

**COSENZA, FRANK JAMES, an incompetent - *MEDICAL MALPRACTICE*
minor child, by and through his parents and
natural guardians, FRANK R. AND DONNA COSENZA,
and FRANK R. AND DONNA COSENZA, individually**
vs. Morton Plant Mease Health Care, Inc., d/b/a Trustees of Mease
Hospital, Inc., Karen Sandoff, R. N., C. N.M., Sylvia Tatianna Goodwin, M.
D., Steven E. Lesser, M. D., and Lesser & Kane, M.D., P.A., d.b.a.
Associates in Birth and Gynecology
    Case 3 98-6794-CI-007
    Pinellas County, Florida
    David S. Nelson, Esquire
    Smith & Fuller, P.A.
    Post Office Box 3288
    Tampa, Florida 33601-3288
    **04/05/02 - Deposition**

**COURY, BRIAN - *FAMILY LAW***
vs. Maria Coury
    Case # 98-12536-42
    Judge Richard Eade, Broward County, Florida
    William Gardner III, Esquire
    English, McCaughan & O'Bryan, P. A.
    100 N. E. Third Avenue, Suite 1100
    Fort Lauderdale, Florida 33301

**06/04/99 - Deposition**

Michael J. Trent, Esquire
1500 East Atlantic Blvd., Suite B
Pompano Beach, Florida 33060
**06/23/99 - Court Appearance**

**CRAMER, RACHAEL - *MEDICAL MALPRACTICE***
vs. Donner Chiropractic Center, Inc.; a Nevada Corporation licensed in the
State of Nevada; Jeffrey Scott Donner, D. C. , individually ; ROE Corp.
Case # A323174
Robert T. Eglet, Esquire
Eglet & Prince, LLP
600 Whitney Ranch, Bldg C, Suite 14-15
Henderson, Nevada 89014
&
Kenneth L. Hall, Esquire
633 S. Fourth Street, Suite 1
Las Vegas, NV 89101
**01/26/98 - Deposition**

**CROWE, TIM - *CRIMINAL***
State of Florida vs.
Case # 93-09538 CF A02 "U"
Judge Rapp, Palm Beach County, Florida
Richard G. Lubin, Esquire
Lubin & Gano, P.A.
1817 S. Flagler Drive, Second Floor
West Palm Beach, Florida 33401
**10/04/94 - Court Appearance**
**06/05/95 - Court Appearance**

In the Interest of: **CROWE, SHERRY L.** A Minor Child **- *DEPENDENCY***
Case # CJ-93-300321-JL-PC
Moria Rozenson, Esquire
Department of HRS - CWLS
111 Georgia Avenue, Room #204
West Palm Beach, Florida 33401
**05/23/95 - Deposition**

**CRUSE, KEITH JOSEPH and REBECCA CRUSE — *PERSONAL INJURY***
vs. JPI Investment Company, LLP. D/B/A/ Jefferson at Camino Real

Case # 20C3 CA 01-3373-XXON, Palm Beach County, Florida
Maureen M. Deskins, Esquire
Butler Pappas
Bayport Plaza, Suite 1100
6200 Courtney Campbell Causeway
Tampa, Florida 33607
**10/28/04 – Deposition**

## CURTIS, DALIN – *PERSONAL INJURY*
vs. Julie Aitkin
Case # 09-022119-05, Broward County, Florida
Bruce Trybus, Esquire
Cooney, Trybus, Kwavnick, Peets
1600 West Commercial Blvd, Suite 200
Fort Lauderdale, Florida 33309
**06/18/2012 – Deposition**
Kevin B. Dennis, Esquire
Anidjar & Levine, P.A.
12 S.E. Seventh Street, Suite 604
Fort Lauderale, Florida 33301
**10/23/12 –Court Appareance**

## DADI, SHAUL & ADENA DADI – MEDICAL MALPRACTICE
vs. Louis Gold M.D. & Louis Gold M.D. P.A. and Praturi Sharma M.D. &
Pattumi Sharma M.D. P.A., and Delray Medical Center inc. D/B/A Delray
Medical Center
Case # 2011CA016027, Judge, Meenu Sasser
Palm Beach County, Florida
Ian Miller, Esquire
Michaud, Mittelmark & Marowitz
621 N.W. 53rd Street, Suite 260
Boca Raton, Florida 333487
**06/18/13 – Deposition**

Jami L. Gursky, Esquire
Cole, Scott & Kissane, P.A.
Lakeside Office Center, Suite 110
600 North Pine Island Road
Plantation, Florida 33324

Lawrence E. Brownstein, Esquire
Forum Building, Suite 402

1655 Palm Beach Lakes Boulevard,
West Palm Beach, Florida 33401

Evan T. Marowitz, Esquire
Michaud, Mittelmark, Marowitz & Asrani, PLLC
621 N.W. 53rd Street, Suite 260
Boca Raton, Florida 33487
**02/10/2014 — Deposition**
**06/20/2014 — Deposition**

Jeffrey Fenster, Esquire
Jenster & Cohen P.A.
111 South Pine Island Road, Suite 202
Plantation, Florida 33324
**10/13/2016 — Court Appearance**

**D. R.   — DISABILITY MEDICAL NECESSITY APPEAL**
vs. Agency for Persons with Disabilities, State of Florida, Division of
Administrative Hearings
    Case # 06-004281APD
    Dade County, Florida
        William N. Swift, Esquire
        William N. Swift, P.A.
        901 Martin Downs Blvd.
        Palm City, Florida 34990
        **01/26/07 - Court Appearance**

**DAMON, WALTER and KANAFANI, RICHARD -** *AGE*
*DISCRIMINATION*
vs. Fleming Supermarkets of Florida
    Case # 97-0230 CIV-LENARD
    United States District Court, Southern District of Florida, Miami
    Division
        Melanie Emmons Damian, Esquire
        Tew, Cardenas, Rebak, Kellogg, Lehman, DeMaria & Tague,
        L.L.P.
        Miami Center, 26th Floor
        201 South Biscayne Boulevard
        Miami, Florida 33131-1112
        **04/14/00 - Deposition**

**DANCY, CLIFTON -** *RACIAL DISCRIMINATION*

vs. Interstate Brands Corporation
>    Case # 6:01-cv-289-Orl22KRS
>    United States District Court, Middle District of Florida, Orlando
>    Division
>    >    Gregory D. Ballew, Esquire
>    >    Bioff, Finucane, Coffey & Holland, LLP
>    >    The Stillwell Building, Suite 400
>    >    104 West Ninth Street
>    >    Kansas City, MI 64105
>    >    **9/26/01- Deposition**

**D'ARAGONA, CARLO  V. - *RETALIATION***
vs. Bell South Communication Systems, Inc.
>    Case # 98-0554-CIV-Moreno
>    United States District Court, Southern District of Florida, Miami
>    Division
>    >    Steven T. Breaux, Esquire
>    >    Legal Department, BellSouth
>    >    675 West Peachtree Street, N.E., Suite 4300
>    >    Atlanta, Georgia 30375-0001
>    >    **08/13/00 - Deposition**

**DAVID, PETER WILLIAM - *CRIMINAL***
State of Florida vs
>    Case # 91-1711CFA02
>    Palm Beach County, Florida
>    >    Richard G. Lubin, Esquire
>    >    Lubin & Gano P.A.
>    >    1217 S. Flagler Drive, Second Floor
>    >    West Palm Beach, Florida 33401
>    >    **03/12/91 - Court Appearance**
>    >    **09/29/92 - Court Appearance**

**DAVIS, LORI L. - *SEXUAL HARASSMENT***
vs. ANIXTER, INC., a Delaware Corporation, Richard Hillman and Michael
Littleton
>    Case # 95-7002-CIV-ZLOCH
>    United States District Court, Southern District of Florida, Fort
>    Lauderdale Division
>    >    Scott Rothstein, Esquire
>    >    Kusnick & Rothstein, P.A.
>    >    8211 W. Broward Blvd., Suite 420

Fort Lauderdale, Florida 33322
**07/03/97 - Deposition**
**07/11/97 – Deposition**

**<u>DEARMAS, HECTOR</u> – *PERSONAL INJURY***
vs.Brandy Salem
Case # 08-43822CA04
Dade County, Florida
Thomas A. Dinan, Esquire
Bernstein, Chackman & Liss
1909 Tyler Street, Seventh Floor
Hollywood, Florida 33022
**10/23/09 - Deposition**
Mager Law Group
2300 East Oakland Park Blvd., Suite 206
Fort Lauderdale, Florida 33306
**8/13/2010 – Court Appearance**

**<u>DEBLOIS, SANDRA</u> - *PERSONAL INJURY***
vs. Cardinal, et al
Case # 91-1711CFA02
Palm Beach County, Florida
Wilton Strickland, Esquire
Strickland & Seidule
707 SE Third Avenue, Suite 400
Fort Lauderdale, Florida 33316
**05/03/93 - Deposition**

**<u>DEBRINO, DARREN</u>- *FAMILY LAW***
vs. Vanessa Debrino
Case # 01-013911
Palm Beach County, Florida
Wolfson and Konisburg, P.A.
4491 South State Road, Suite 314
Davie, Florida 33314
**07/11/06 – Deposition**
**07/12/07 - Court Appearance**

**<u>DECKER-TRINIDAD, DENNIS</u> - *FAMILY LAW***
vs. Evelyn Trinidad, In Re: The Marriage of
Case # CD94-5300FZ
Palm Beach County, Florida

Martin L. Haines, III, Esquire
501 North Federal Highway
Lake Park, Florida 33403
**11/10/97 - Deposition**
**11/25/97 - Deposition**

## DeHART, VICKI - *SEXUAL HARASSMENT*
vs. Columbia Bartow Regional Memorial Healthcare Systems, LTD., d/b/a
Columbia Bartow Memorial Hospital, Inc., and Transcend Services, Inc.
Case # 97-1300-CIV-T-23C
United States District Court, Middle District of Florida, Tampa Division
Jason Bell, Esquire
**02/03/99 - Deposition**

## DEMAIO THOMAS J - *DISABILITY*
vs. Social Security Administration
Case # 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
Robert M. Guitierrez, Esquire
Lieberman & Gutierrez, P.A.
66 West Flagler Street
Miami, Florida 33130
**10/03/07 — Deposition**

## DEMAIO THOMAS J — *PERSONAL INJURY*
vs. Albert Lamberti as Sheriff of Broward County, Florida
Case # 08009148
Christopher W. Royer, Esquire
Law Office Bunnell Woulfe
Kirschbaum Keller & Gregoire, P.A.
One Financial Plaza, 9th Floor
100 Southeast 3rd Avenue
Fort Lauderdale, Florida 33394
**04/02/09 — Deposition**

## DEMAIO THOMAS J — *PERSONAL INJURY*
vs. Albert Lamberti as Sheriff of Broward County, Florida
Case # 10-60758-CIV-HUCK/O'SULLIVAN
Judge Barry S. Seltzer, US Courthouse, Broward County, Florida
Peter N. Feld, Esquire
Glantz Law
7951 SW 6th Street, Suite 200

Plantation, Florida 33324
**03/15/11 — Court Appearance**

**DENBO, KAREN - *SEXUAL HARASSMENT***
vs. Jerry P. Copeland etc., et al.,
        Case # 91-381-CIV-ORL-18
        Brevard County, Florida
                Ware Cornell, Esquire
                1401 East Broward Blvd.
                Fort Lauderdale, Florida 33301
                **02/15/93 - Deposition**

**DePORTER, DAVID - *FAMILY LAW***
vs. Cindy DePorter
        Case # 99-005342 (35)
        Judge Arthur Birkin, Broward County, Florida
                Beverly L. Vesel, Esquire
                100 West Cypress Creek Road, Suite 930
                Fort Lauderdale, Florida 33309
                **09/27/99 - Deposition**

**DIAZ, DENISE L. - *RACIAL DISCRIMINATION***
vs. Glen Evelyn, individually, and United HealthCare Corporation, a Corp.
        Case # 97-2105-CIV-GRAHAM
        United States District Court, Southern District of Florida, Miami
        Division
                Steel, Hector & Davis, P.A.
                200 South Biscayne Boulevard, Suite 3100
                Miami, Florida 33131
                **05/29/98 - Deposition**

**DIAZ, MARIA TERESA - *CRIMINAL***
vs. Pol Miguel Diaz Martinez, et. al.
        Case # 94-2184 (HL)
        United States District Court for the District of Puerto Rico
                Roberto Roldan Burgos, Esquire
                206 Las Marias Street
                Hyde Park
                Rio Piedras, Puerto Rico, 00927
                **04/18/96 - Deposition**

**DIAZ, MICHELLE - *FAMILY LAW***

36

In Re: The Marriage of: Roberto Diaz vs. Jolene Chism Diaz
 Case # 82-1214 (21)
 Judge Myette Burnstein, Broward County, Florida
  Keith Krasnove, Esquire
  3300 University Drive, Suite 610
  Coral Springs, Florida 33065
  **10/15/91 ─ Deposition**

## DIBELER, EDWARD ─ *FAMILY LAW*
vs. Lisa Michelle Dibeler
 Case # FMCE 11-2281[41/93]
  Circuit Court, Broward County, Florida
  Michael Trent, Esquire
  1500 East Atlantic Blvd., Suite B
  Pompano Beach, Florida 33060
  **06/24/13 - Deposition**

## DILALLO, JENNIFER - *SEXUAL HARASSMENT*
vs. Holman Imports, Inc. et al
 Case # 97-7425 (09)
 Broward County, Florida
  Kenneth p. Carman, Esquire
  600 W. Hillsboro Blvd.,
  Deerfield Beach, Florida 33441
  **02/03/98 - Deposition**

## DILLON, TIMOTHY - *CRIMINAL*
United States of America vs
 Case # 113C9:13CR80211
 United States Federal Court, Palm Beach County, Florida
 Senior Judge Kenneth L. Ryskamp
  Jonathan Russell Kaplan, Esquire
  515 South Flagler Drive, Suite 801
  West Palm Beach, Florida 33401
  **02/5/16 ─ Court Appearance**

## DILLON, TIMOTHY & JESSICA DILLON ─ *PERSONAL INJURY*
vs. Jenna E. Basilone, Leonard Maxwell, Audrey McCrary, and State Farm
Mutual Automobile Insurance Company
 Case # 50 2012 CA 004668XXXXMB
 Palm Beach County, Florida
  Julie Lewis Hauf, Esquire

Tania A. Canterbury, Esquire
Gibelle G. Salmon, Esquire
Law Offices of Julie Lewis Hauf, L.P.
15880 Summerlin Road, #300 PMB 315
Fort Myers, Florida 33908
**06/16/16 — Deposition**

## DIVEN, LOUIS Jr. - *CRIMINAL*
State of Florida vs.
    Case # 95-1770-CF
    St. Lucie County, Florida
        Robert Stone, Esquire
        115 South Second Street
        Fort Pierce, Florida
        **06/20/96 - Telephonic Deposition**

## DOBIS, PATRICIA - *SEXUAL HARASSMENT*
vs. Columbia/HCA Healthcare Corp., Lawnwood Medical Center, Inc., and
Nicholas Ioannou
    Case # 96-14195-CIV-PAYNE
    United States District Court, Southern District of Florida
        Joseph Mannikko, Esquire
        Mannikko & Baris, P.A.
        215 South Federal Highway, Suite 100
        Stuart, Florida 34994
        **11/15/98 - Court Appearance**
        **11/20/98 - Court Appearance**
        **11/30/98 - Court Appearance**

## DOE, JANE, AS PARENT AND NATURAL GUARDIAN OF JOHN DOE, A MINOR - *SEXUAL ABUSE*
vs. Mark Schroder
    Case # 00-20660CACE (07)
    Broward County, Florida
        Stuart J. MacIver, Esquire
        Doumar, Allsworth, Curtis, et. al.
        1177 Southeast Third Avenue
        Fort Lauderdale, Florida 33316
        **10/11/01 - Deposition**

## DONNER, CRAIG DR. - *MEDICAL MALPRACTICE*
vs. Equitable Assurance Society of the United States, a/k/a The Equitable

Life Assurance Society of The United States, a/k/a Equitable, a/k/a The Equitable
    Case # 98-8973CA08
    Dade County, Florida
        Leonor M. Lagomasino, Esquire
        799 Brickell Plaza, Suite 700
        Miami, Florida 33131
        **03/18/99 - Deposition**
        **04/19/99 - Deposition**

**DONOVAN, JACOB LYNDON - *CRIMINAL***
State of Florida vs.
    Case # 2014CF009088AMB DIV R
        Danielle A. Sherriff
        Assistant State Attorney
        205 N. Dixie Highway, Room 5.1500
        West Palm Beach, Florida 33401
        **04/10/17 — Deposition**
        **10/17/17 - Deposition**

**DRUCKER, RON - *CRIMINAL***
United States of America vs.
    Case # 94-8085-CR-HURLEY
        Jack A. Golderger, Esquire
        Atterbury, Goldberger & Richardson, P.A.
        One Clearlake Centre
        230 Australian Avenue South, Suite 1400
        West Palm Beach, Florida 33401-5012
        **08/25/95 - Court Appearance**

**DRYBURGH, WILLIAM J. - *AGE DISCRIMINATION***
vs. Orange County, a political subdivision of the State of Florida.   - United States District
    Case # 96-1316-CIV-ORL-22
    Court, Middle District of Florida, Orlando Division
        John Dempsey, Esquire
        Ackerman & Senterfitt P.A.
        255 South Orange Avenue, 17th Floor
        Orlando, Florida 32802
        **07/23/98 - Deposition**

**DUPLESSIS, CHARMAINE - *FAMILY LAW***

vs. Raymond H. Davies
> Case # FCME 97-013091(40) (93)
> Judge Howard Zeidwig, Broward County, Florida
>> Donald J. Vestal, Esquire
>> 3440 Hollywood Blvd., Suite 450
>> Hollywood, Florida 33021
>> **04/21/99 - Court Appearance**

## EASON, BETTY - *DEFAMATION*
vs. Miami Herald Publishing Co. et al
> Case # 91-42348-CA 03
> Dade County, Florida
>> Susan April, Esquire
>> Bohrer & April, P.A.
>> 2601 South Bayshore Drive, Suite 1250
>> Miami, Florida 33133
>> **02/09/94 - Deposition**
>> **03/15/94 - Deposition**

## ELLEDGE, WILLIAM DUANE - *CRIMINAL*
State of Florida vs.
> Case # 75-0087CF10A
> Judge: M. Daniel Futch, Jr., Broward County, Florida
>> Peter J. Giacoma, Jr., Esquire
>> 1 Financial Plaza, Suite 1910
>> Fort Lauderdale, Florida 33394-0019
>> **08/02/89 - Deposition**
>> **08/10/89 - Court Appearance**
>> **10/09/93 - Court Appearance**
>> **10/15/93 - Court Appearance**

## ERWIN, LORI - *MEDICAL MALPRACTICE*
vs. Camille D. Chavez, M.D. and Florida Center for Cosmetic Surgery
> Case # 99-14128 (12)
> Broward County, Florida
>> Jason Weisser, Esquire
>> Wicker, Smith, Tutan et. al.
>> Southtrust Tower, 5th Floor
>> 1 East Broward Boulevard
>> Fort Lauderdale, Florida 33301
>> **07/ 11/ 00 - Deposition**

Margaret A. Benenati, Esquire
Conroy, Simberg & Ganon, P.A.
Venture Corporate Center 1, 2nd Floor
3440 Hollywood Boulevard
Hollywood, Florida 33021
**07/17/00 - Deposition**

Barbra G. Wohrle, Esquire
Wicker, Smith, O'Hara, McCoy, Graham & Ford, P.A.
Southtrust Tower, 5th Floor
1 East Broward Boulevard
Fort Lauderdale, Florida 33301
**04/11/02 – Deposition**

**ESPOSITO, CAROL - *SEXUAL HARASSMENT***
vs. Al Hendrickson Toyota, Inc., Florida, a corporation
Case # 96-7298 CIV-MIDDLEBROOKS
United States District Court, Southern District of Florida, Fort
Lauderdale Division
Stephanie Deutsch, Esquire
Adorno & Zeder P.A.
888 S. E. Third Avenue, Suite 500
Fort Lauderdale, Florida 33335
**07/30/98 - Deposition**

**ERWIN, NANCY E. - *FAMILY LAW***
vs. Lawrence Gordon, Jr.
Case # 94-020606(40) (91)
Broward County, Florida
Dale R. Sanders, Esquire
Lyons and Sanders
600 Northeast Third Avenue
Fort Lauderdale, Fl 33304
**10/02/95 - Deposition**
**12/08/95 - Video Deposition**

**FARAGHER, BETH & EWANCHEW, NANCY - *SEXUAL HARASSMENT***
vs. City of Boca Raton
Case # 92-8010-CIV-HIGHSMITH
United States District Court, Southern District of Florida, Miami
Division
William R. Amlong, Esquire

41

Amlong & Amlong, P.A.
500 N.E. Fourth Street, Suite 200
Ft. Lauderdale, Fl 33301
**04/11/94 - Deposition**
**06/24/94 - Court Appearance**


**FARIAS, OSVALDO & MARTINEZ, GERARDO — *CRIMINAL***
United States of America vs.
Case # 5:08-C5-43-OC-10GRJ
Judge Gary R. Jones
United States District Court, Middle District Florida, Ocala Division
Daniel N. Brodersen, Esquire
13350 W. Colonial Drive, Suite 320
Winter Garden, Fl 34787
&
Joseph Green, Esquire
Leritz, Plumkert & Bruning, P.C.
One City Centre, Suite 2001
St. Louis, Mo 63101
**06/03/09 — Court Appearance**


**FARRELL, JOHN -*CRIMINAL***
State of Flotrida vs.
Case # 13007535CF10A
Judge Rothchild
Broward County, Florida
Carl H. Lida, Esquire
7805 S.W. 6th Court
Plantation, Florida 33324
08/06/2014- Court Appearance


**FEDERICI, VITO - *CRIMINAL***
State of Florida vs.
Case # 99-7856CF 10A
Judge Peter Weinstein, Broward County, Florida
James S. Benjamin, Esquire
Benjamin & Aaronson, P.A.
1 Financial Plaza, Suite 1615
Ft. Lauderdale, Florida 33394

**12/10/99 - Court Appearance**

**FEINGOLD, JAY, AND SHARON -** *PERSONAL INJURY*
vs.  Samuel Pavlow
      Case # CL 96 4752 AH
      Palm Beach County, Florida
            George P Supran, Esquire
            Sellers, Supran, Cole, Marion & Bachi, P.A.
            811 North Olive Avenue
            West Palm Beach, Florida 33402
            **02/06/97 - Deposition**

**FELDMAN, LARRY-** *PERSONAL INJURY*
vs. Broward Fine Equipment Inc. and Norman Benoit
      Hartford Insurance Company Claim # YACAL23181
      Binding Arbitration at Presuit, Fort Lauderdale, Florida
            Kim Sherman, Esquire
            1000 Corporate Drive, Suite 310
            Fort Lauderdale, Florida  33334
            **07/25/05 — Arbitration Panel Testimony**

**FENDER, CYD -** *CRIMINAL*
State of Florida vs.
      Case # 05-003196CF A02, Judge Burton
      Palm Beach County, Florida
            Richard Lubin, Esquire
            1217 South Flagler Plaza, 2nd Floor
            West Palm Beach, Florida
            **01/27/06 — Court Appearance**

**FIOCCO,  DAVID -** *FAMILY LAW*
vs  Joyce Cifarelli
      Case #90-31314 (04)
      Broward County, Florida
            Karen Coolman Amlong, Esquire
            Amlong & Amlong, P.A.
            500 N.E. Forth Street, Suite 200
            Ft. Lauderdale, Florida 33301
            **11/13/91 - Court Appearance**

**FISHER, LISA -** *GENDER DISCRIMINATION*
vs. Orange County Housing Finance Authority

43

Case # 97-914-CV-ORL-18C
Judge G Kendall Sharp, US District Court, Middle District of Florida,
Orlando Division
      Darryl L. Gavin, Esquire
      Rumberger, Kirk & Caldwell
      Signature Plaza, Suite 300
      201 South Orange Avenue
      Orlando, Florida 32802
      **01/21/99 - Deposition**

      Vasilis "Bill" Katsafanas, Esquire
      Akerman, Senterfitt & Eidson, P. A.
      255 South Orange Avenue
      Post Office Box 231
      Orlando, Florida 32802-0231
      **06/30/99 - Deposition**

      Michael J. Beaudine, Esquire
      Kay, Gronek & Latham, LLP
      390 N. Orange Avenue, Suite 600
      Orlando, Florida 32801
      **07/15/99 - Court Appearance**

**FITZGERALD-LANGOLF, KAREN - *GENDER DISCRIMINATION***
vs. Franklin Covey Co., f/k/a Franklin Quest Co., a Utah Corp.
      Case # 98-6548-CIV-Nesbitt
      United States District Court, Southern District of Florida
         William R.Amlong, Esquire
         Amlong & Amlong, P.A.
         500 NE Forth Street, Second Floor
         Fort Lauderdale, Florida 33301
         **09/22/99 - Court Appearance**

In the Interest of: **FLAMM, JOSHUA - *PERSONAL INJURY***
vs. Build to Suite,  Inc.  et al
      Case # 94-001249 (11)
      Palm Beach County, Florida
         Arthur B. D'Alemdia, P.A.
         105 East Palmetto Park Road
         Boca Raton, Fl 33432
         **01/30/95 - Deposition**
         **09/15/95 - Court Appearance**

**FORUM,  RICHARD & PATICIAL** - *CIVIL RIGHTS/POLICE BRUTALITY*
vs.  City of Fort Lauderdale, a municipality, Robert Cox, Individually and as Mayor of the City of Fort Lauderdale, et al.,
     Case # 90-6011-CIV
     Judge Marcus - Broward County, Florida
         Mark H. Gold, Esquire
         Gold & Heyer, P.A.
         1311 S.E. Forth Avenue
         Fort Lauderdale, Fl 33316
         **03/26/92 - Deposition**

**FOX, JENNIFER** - *MEDICAL MALPRACTICE*
vs. Donner Chiropractic Center, Inc.; a Nevada Corporation licensed in the State of Nevada; Jeffrey Scott Donner, D. C. , individually ; ROE Corp.
     Case # A323174
         Robert T. Eglet, Esquire
         Eglet & Prince, LLP
         600 Whitney Ranch, Bldg C, Suite 14-15
         Henderson, Nevada 89014
         &
         Kenneth L. Hall, Esquire
         633 S. Fourth Street, Suite 1
         Las Vegas, NV 89101
         **01/26/98 - Deposition**

**FRANCO, DIANE** — *PERSONAL INJURY*
vs. The Home Depot, Inc., a Delaware Corporation, and MGA Assembly, a foreign corporation.
     Case #99-15928 CACE 21
     Broward County, Florida
         Aldo Bartolone, Jr., Esquire
         Wicker, Smith, O'Hara, McCoy, Graham & Ford, P.A.
         Southtrust Tower, Fifth Floor
         One East Broward Boulevard
         Fort Lauderdale, FL 33301
         **10/30/02 - Deposition**
         **12/06/02 - Deposition**

**FRANKLIN, Quawn M.** — *CRIMINAL*
State of Florida  vs.
     Case # 202-CF-000217-A-02

Judge Mark J. Hill – Tavares, Florida
    Mark S. Gruber, Esquire
    Capital Collateral Regional Counsel – Middle
    3801 Corporex Park Drive, Suite 210
    Tampa, FL 33619
    **01/20/10 – Court Appearance**
    William Gross, Assistant State Attorney
    **06/21/11 – Deposition**
    **Maria Perinetti**
    Capital Collateral Regional Counsel – Middle
    3801 Corporex Park Drive, Suite 210
    Tampa, FL 33619
    **07/11/11 – Court Appearance**

**<u>FRANSCHETTI, PAUL ALAN</u> - *FAMILY LAW***
vs.  Franschetti,  Suzanne
    Case # 93-19641 (37)
    Judge Reesback - Broward County, Florida
        Karen Coolman Amlong, Esquire
        Amlong & Amlong, P.A.
        500 N.E. Forth Street, Suite 200
        Ft. Lauderdale, FL 33301
        **11/29/94 - Court Appearance**
        **07/11/11 – Court Appearance**

**<u>FRAZIER,  ANGELA</u> - *FAMILY LAW***
Donovan "Razor" Ruddock vs. Angela Watley (Frazier)
    Case # 9021226
    Broward County, Florida
        Michael J. Trent, Esquire
        1620 S. Federal Highway, Suite 1101
        Pompano Beach, Fl 33062
        **07/01/92 - Court Appearance**
        **09/24/93 - Court Appearance**
        **09/30/93 - Court Appearance**
        **10/22/93 - Court Appearance**

**<u>FROESS-ROBERTO, CAROL</u> – *PERSONAL INJURY***
As Personal Representative of the Estate of Jennifer Froess, deceased,
And Susan Killion, as Personal Representative of the Estate of Jennifer
Cuccinelli, deceased
vs. Jeffrey L. Rosenberg, Caren Rosenberg, Rallye Roslyn Inc. d/b/a

RALLYE ACURA
Case # 96-13855 (03), Broward County, Florida
Gregory M. Cesarano, Esquire
Carlton Fields
International Place, Suite 4000
100 S.E. Second Street
Miami, Florida 33131
**02/27/01- Deposition**

**FROMM-VANE, LINDA - *DISABILITY***
vs. Columbia Lawnwood Medical Center
Case # 96-14244-CIV-MOORE
Judge Frank Lynch, US District Court, Southern District of Florida, Ft. Pierce Division
John F. Mariani, Esquire
Levy, Kneen, Marian, et.al.
1400 Centre Park Blvd. Suite 1000
West Palm Beach, Florida 33401
**11/17/97 - Deposition**
**12/10/97 - Deposition**

**FURLONG, JASON - *NEGLIGENCE / SEXUAL ABUSE***
Elle Furlong individually and as parent and natural guardian of Jason Furlong, a minor
vs. Nova Southeastern University, Inc., d/b/a Ralph J. Baudhuin Oral School.
Case # 98-005450 (07)
Theodore A. Deckert, Esquire
Panza, Maurer, Maynard & Neel P. A.
Nationsbank Bldg., Third Floor
3600 North Federal Highway
Fort Lauderdale, Florida 33308
**08/12/99 - Deposition**

**GALANIS, GREGORY — *HAGUE CONVENTION FAMILY LAW***
*vs. Ana Francela Lodi Galanis*
Case # 1:16-cv-20312-DPG
Darrin P. Gayles, United States District Judge
United States District Court
Southern District of Florida, Miami Division
Maxine M. Long, Esquire
Shutts & Bowen LLP

200 South Biscayne Boulevard, Suite 1400
Miami, Florida 33131
**08/15/16 —Court Appearance**


## GANERON, REGINAL - *DISABILITY*
vs. Unisys Corporation et al
    Case # 90-222221226- Broward County. Florida
        William F. Clark, Esquire
        Jackson, Lewis, Schnitzler & Krupman
        120 E. Robinson Street
        Orlando, Fl 32801
        **12/03/92 - Court Appearance**
        **12/07/92 - Court Appearance**
        **12/10/92 - Court Appearance**
        **12/11/92 - Court Appearance**

## GARCIA, JUAN - *RACIAL DISCRIMINATION*
vs. Cemetery management Inc., a Florida Corporation, Robert McKay, individually and Peter O'Connor, Individually
    Case # 98-2760-CIV-LENARD/TURNOFF
    United States District Court, Southern District of Florida, Miami Division
        Peter Prieto, Esquire
        Holland & Knight, LLP
        701 Brickell Avenue, Suite 3000
        Miami, Florida 33131 and

        H. Dillon Graham, III
        Bankers Savings Bank, Suite 210
        2222 Ponce De Leon Blvd.,
        Coral Gables, Florida 33134
        **03/03/00 - Deposition**

## GALL, PHYLLIS - *SEXUAL HARASSMENT*
vs, Mitchell J. Farr, DMD, PA et al
    Case # 93-05820 (05)
    Broward County, Florida
        Jeffrey J. Walker, Esquire
        110 S.E. 6th Street, Suite 1870
        Ft Lauderdale, Florida 33301
        **03/22/94 — Deposition**

**GAMEZ-GARCIA, ENRIQUE — *PERSONAL INJURY***
*vs. Caloos*
*a Citrus Transport LLC, a Limited Liability Company, Randolf O. Lawrence,*
*Sun Country Citrus Hauling, Inc., A Florida Corporation, and Harold R.*
*Flemming Caloosa Citrus.*
> Case #160001019CAXMX
> *Circuit Court — Hendry County, Florida*
>> Kaitlin E. Cupp, Esquire
>> John B. Marion, Esquire
>> Sellars, Marion & Bachi, P.A.
>> 811 North Olive Avenue
>> West Palm Beach, Florida 33401
>> **03/30/2017 - Deposition**

**GENDUSA, VINCENT M. — *FAMILY LAW***
<u>vs</u>. Dena S. Gendusa
> Case # 2003 DR 975 FC
> Judge Charles E. Burton —Palm Beach County, Florida
>> Charles D. Jamieson, Esquire
>> 1615 Forum Place, Suite 500
>> West Palm Beach, Florida 33401
>> **09/08/2014 — Court Appearance**
>> **10/27/2014 -  Court Appearance**

**GERONEMOUS,  HEATHER - *FAMILY LAW***
The marriage of Robert P. Geronemus and Diann F. Geronemus
> Case # 84-17862CN (Vitale)
> Judge Robert Abel - Broward County, Florida
>> Sandor F. Genet, Esquire
>> Genet & Milner
>> 99 N.E. 167th Street
>> North Miami Beach, Florida 33162
>> **01/10/89 - Deposition**

**GILES,  RUSSELL &  JOYCE - *CIVIL RIGHTS / WRONGFUL DISCHARGE***
vs  Computer Products Inc.
> Case # 88-6447-CIV
> Judge Robert Scott - Broward County, Florida
>> William R.Amlong, Esquire
>> Amlong & Amlong, P.A.
>> 500 N.E. Forth Street, Suite 200

Ft Lauderdale, Florida 33301
**03/03/89 - Deposition**

**GLADIS,  SUSAN - *FAMILY LAW***
vs.  Scott  Brock
>Case # 92-08172 (41) (91)
>General Master Zeller - Broward County, Florida
>>Stuart House, Esquire
>>2189 S. E. Ninth Street
>>Pompano Beach, Florida 33302
>>**02/27/95 - Court Appearance**

**GLASER, STEFANI - *SEXUAL HARASSMENT***
vs. Michael Dawson and Phoenix Business Systems,  Inc.
>Case # 93-3185-AB
>Palm Beach County, Florida
>>Jeffrey J. Walker, Esquire
>>110 SE Sixth Street, Suite 1870
>>Ft Lauderdale, Florida 33301
>>**04/11/94 - Deposition**

**GOLDBERG, BARI-SUE — *SEXUAL HARASSMENT***
vs. Lens Express, Inc., a Florida Corporation and Mordechai Golan
>Case # 98-17783-04
>Judge Patricia Cocalis — Broward County, Florida
>>Douglas H. Reynolds, Esquire
>>4875 North Federal Highway, Tenth Floor
>>Ft. Lauderdale, Florida 33308
>>**04/30/01 — Court Appearance**

**GOLDENSTEIN,  DENISE - *CRIMINAL***
State of Florida  vs.
>Case # 90-32794MM10
>Judge Feiner - Broward County, Florida
>>Hillard E. Moldoff, Esquire
>>1311 S.E. Second Avenue
>>Ft Lauderdale, Florida 33301
>>**09/19/91 - Court Appearance**

**GOLDBERG, CARRI SCHIFF — *FAMILY LAW***
vs. Bernard Joseph Goldberg
>Case # 2003 DR 512FZ

Judge Jeffrey Coldbath - Palm Beach County, Florida
    Steven R. Brenners, Esquire
    2525 University Drive
    Coral Springs, Florida 33065
    **11/22/04 – Court Appearance**
    **09/19/05 – Court Appearance**
    **04/28/06 –Court Appearance**

**GOLDSMITH,  LEE – *CRIMINAL***
State of Florida vs.
    Case # 90-00898
    Case # 89-3930CF10
    Judge Arthur Franza - Broward County, Florida
        Joel Hirshchhorn, Esquire
        Douglas Centre, Penthouse One
        2600 Douglas Road
        Coral Gables, Florida 33134
        **03/23/90 - Court Appearance**

**GOLDSTEIN, JAMIE H. - *SEXUAL HARASSMENT***
vs. Priority Communications, Inc., a Florida Corporation Sheldon Hill,
Joseph Anthony Gordon, II, David Garland and Gary Pretner
    Case # 97-08988 CIV-HURLEY
    United States District Court, Southern District of Florida, Miami
    Division
        Barry I. Slotnick, Esquire
        100 Park Avenue, 35th Floor
        New York, New York, 10017
        **03/17/99 - Deposition**

**GONZALEZ,  ADDYS - *SEXUAL HARASSMENT***
vs.  Tandy Corporation d/b/a Incredible Universe
    Case # 95-2077-CIV-DAVIS
    United States District Court, Southern District of Florida, Miami
    Division
        Mark R. Boyd, Esquire
        Heinrich, Gordon, Hargrove, Weithe & James P.A.
        500 E. Broward Blvd., Suite 1000
        Ft Lauderdale, Florida 33394
        **10/18/96 - Deposition**
        **11/07/96 - Deposition**

51

William Amlong, Esquire
Amlong & Amlong, P.A.
500 N. E. Forth Street, Suite # 200
Fort Lauderdale, Florida 33301
**09/11/97 - Court Appearance**
**09/15/97 - Court Appearance**

**GOODSTEIN,  MARIA - *SEXUAL HARASSMENT***
vs.  Gunther Motor Company, Inc. and Robert Hodo
Case # 95-6678-CIV-UNGARO-BENAGES
United States District Court, Southern District of Florida, Miami
Division
Kate Northrup, Esquire
Amlong & Amlong, P.A.
500 NE Forth Street, Suite 200
Ft Lauderdale, Florida 33301
**05/22/96 - Deposition**
**09/10/96 - Deposition**

**GORDON,  MARK - *CRIMINAL***
State of Florida  vs.
Case # 89-13016CF
Judge Stanton Kaplan - Broward County, Florida
Brad Lolus, Esquire
Office of the Public Defender
201 S.E. Sixth Street
Ft. Lauderdale, Florida 33301
**03/02/90 - Court Appearance**

**GORDON,  PERCIVAL - *CRIMINAL***
State of Florida  vs.
Case # 87-5512CF
Judge Leonard Fleet - Broward County, Florida
Arna D. Cortazzo, Esquire
Office of the Public Defender
201 S.E. Sixth Street
Ft. Lauderdale, Florida 33301
**09/28/89 - Court Appearance**

**GORSKI,  LAURIE - *PERSONAL INJURY***
vs.  Commercial Carrier Corp. & Wesley Morgan
Case # 93-17173

Broward County, Florida
    Eric L. Ansel, Esquire
    601 South Ocean Drive
    Hollywood, Florida 33019
    **04/28/94 - Deposition**

**GRAVINA, FRANCISCO – *PERSONAL INJURY***
AND LOURDIES GRAVINA, individually and as legal guardian and next
friend of TIZIANA GRAVINA, a minor
vs. Anne Lanier, and the Broward County School Board of Broward County,
Florida
    Case # 03-18202 (04)
    Broward County, Florida
        Eugene K.Pettis, Esquire
        Haliczer, Pettis & Schwamm, P.A.
        One Financial Plaza, Seventh Floor
        Fort Lauderdale, Florida 33394
        **01/29/2007 - Deposition**

**GREEN, DONALD - *FAMILY LAW***
Adrienne Green vs.
    Case # 89-13813 CO
    Judge Coker - Broward County, Florida
        Norliza Batts, Esquire
        1906 E. Oakland Park Blvd.
        Ft Lauderdale, Florida 33306
        **12/01/89 - Court Appearance**
        **04/23/90 - Court Appearance**

**GREEN,  JUDITH A. - *SEXUAL HARASSMENT***
vs.  American Orthodontic Corp. & Edward Craig
    Case # 93-6979-CIV-ZLOCH
    United States District Court, Southern District of Florida, Miami
    Division
        Jeffery J. Walker, Esquire
        110 S.E. Sixth Street, Suite 1870
        Ft Lauderdale, Florida 33301
        **05/24/94 - Deposition**
        **06/03/94 - Deposition**

**GREENFIELD,  ASTLEY – *CRIMINAL***
    Case # 90-26216CF10A

Judge Backman - Broward County, Florida
Bradley Collins, Esquire
600 S. Andrews Ave., Suite 600
Ft Lauderdale, Florida 33309
**05/20/93 - Court Appearance**
**05/24/93 - Court Appearance**

### GREFF, BARRY S. - *PERSONAL INJURY*
vs.  State Farm Mutual Automobile Insurance Co., et al
Case # 88-49963 CA (04)
Dade County, Florida
Stephen J. Cohen, Esquire
800 NW Sixty Second Street, Suite 200
Ft Lauderdale, Florida 33309
**01/21/93 - Court Appearance**

### GREGG, KELLY  &  MATTHEW - *PERSONAL INJURY*
vs.  William Salsburg
Case # 95-001651-07
Broward County, Florida
Gloria Seidule, Esquire
Strickland & Seidule, Esquire
P.O. Box 14246
Ft Lauderdale, Fl 33302
**05/14/97 - Deposition**
**05/23/97 - Deposition**

### GRESHAM, JOSE - *PERSONAL INJURY/WRONGFUL DEATH*
Joann Benton Ahmed, as personal Representative of the Estate of Jose L.
Gresham vs. National Railroad Passenger Corporation (AMTRAK), et al
Case # 92-02088 (08)
Broward County, Florida
Wilton L. Strickland, Esquire
Strickland & Seidule
Suite# 400 Blackstone Building
707 Southeast Third Avenue
Fort Lauderdale, Florida 33316
**03/4/93 - Deposition**

### GRIFFIN, MARIANNE - *AGE DISCRIMINATION*
vs. Service America Corp.
Claim # 061-340563

Broward County, Florida
Bradley Goodman, Esquire
109 S.E. Ninth Street
Fort Lauderdale, Florida 33316
**07/19/89 - Deposition**

**GROSSMAN, DAVID et al - *CIVIL RIGHTS/POLICE BRUTALITY***
vs. Ron Cochran as Sheriff of Broward County
Case # 93-12422(18)
Broward County, Florida
Jeffrey J. Walker, Esquire
110 S.E. Sixth Street, Suite 1870
Fort Lauderdale, Florida 33301
**01/19/94 — Deposition**

**GROSVENOR, J. MARK — *FAMILY LAW***
vs. Melissa Pileggi Grosvenor
Case # FMCE-14-012755
Judge Horowitz, Broward County, Florida
Douglas Reynolds, Esquire
Tripp Scott, P.A.
110 S.E. Sixth Street, Suite 1500
Fort Lauderdale, Florida 33301
**06/25/2017 — Court Appearance**
**08/21/2017 — Court Appearance**

**GUNSBY, DONALD - *CRIMINAL***
State of Florida vs.
Case # CT88881CFAX
Marion County, Florida
Bruce Peterson, Esquire
Popham Haik
222 S. Ninth Street, Suite 3300
Minneapolis, Minnesota 55402
**03/07/94 - Deposition**
**03/17/94 - Court Appearance**

**HAINES, CHRISTINE - *SEXUAL HARASSMENT***
vs. Columbia/HCA Healthcare Corp., Lawnwood Medical Center,Inc., and
Nicholas Ioannou
Case # 96-14195-CIV-PAYNE
United States District Court, Southern District of Florida, Palm Beach

County Division
>Joseph Mannikko, Esquire
>Mannikko & Baris, P.A.
>215 South Federal Highway, Suite 100
>Stuart, Florida 34994
>**11/15/98 - Court Appearance**
>**11/20/98 - Court Appearance**
>**11/30/98 - Court Appearance**

## HANDEL, KELLY - *MEDICAL MALPRACTICE*
vs. Donner Chiropractic Center, Inc.; a Nevada Corporation licensed in the State of Nevada; Jeffrey Scott Donner, D. C. , individually ; ROE Corp.
>Case # A323174
>>Robert T. Eglet, Esquire
>>Eglet & Prince, LLP
>>600 Whitney Ranch, Bldg C, Suite# 14-15
>>Henderson, Nevada 89014
>>&
>>Kenneth L. Hall, Esquire
>>633 S. Fourth Street, Suite 1
>>Las Vegas, NV 89101
>>**01/26/98 — Deposition**

## HARBAUGH, YVETTE — *SEXUAL HARASSMENT*
vs. Wellcraft Marine Corporation
>Case # 99-1544-CIV-T-24B
>US District Court, Middle District of Florida, Tampa Division
>>Lydia M. Nicosia
>>Haynsworth, Baldwin, Johnson & Greaves LLC
>>600 N. Westshore Blvd. Suite 200
>>Tampa, Florida 33609
>>**09/20/00 - Deposition**
>>**10/06/00 - Deposition**

## HARDEN, CAROLYN - *RACIAL DISCRIMINATION*
vs. Glen Evelyn, individually, and United HealthCare Corporation, a Corp.
>Case # 97-2105-CIV-GRAHAM
>Magistrate Judge Garber — US District Court, Southern District of Florida, Miami Division
>>Steel, Hector & Davis, P.A.
>>200 South Biscayne Blvd., Suite # 3100
>>Miami, Florida 33131

**05/29/98 - Deposition**

**HARDWICK, AMY** *- FAMILY LAW*
Philip John Hardwick vs.
  Case # 97-613FS
  Judge Robert Makemson, Martin County, Florida
    Russell J. Ferraro, Jr., Esquire
    3601 Southeast Ocean Blvd., Suite 210
    Stuart, Florida 34996
    **04/12/99 - Court Appearance**

    Charles J. Dorfman, Esquire
    6556 South US 1
    Port St. Lucie, Florida 34952
    **03/12/99 - Deposition**

**HARGETT, HOLLY** *— DISABILITY DISCRIMINATION*
vs. Florida Atlantic University Board of Trustees
  Case #15-CV-80349-Ryskamp/Hopkins
  United States District Court, Southern District of Florida,
  West Palm Beach, Florida
    Sarah Camp Weber, Esquire
    Laufer and Laufer, P.A.
    1900 Glades Road, Suite 301
    West Palm Beach, Florida 33431
    **11/16/2015 - Deposition**

**HARRIS, TAMAR NICOLA -***CRIMINAL*
State of Florida vs.
  Case # 15009527CF10A
  Judge Raag Singal, Broward County, Florida
    Sebastian Cotrone, Esquire
    509 S.E. Ninth Street
    Fort Lauderdale, Florida 33316
    **02/19/2016 — Court Appearance**

**HAYNES, SAMANTHA** *— GENDER DISCRIMINATION*
vs. Town of Indian River Shores
  Case # 2:14-cv-14434-KAM
  United States District Court, Southern District of Florida,
  Fort Pierce Division
    Douglas T. Noah, Esquire and Gail Bradford, Esquire

Dean, Ringers, Morgan & Lawton, P.A.
P.O. Box 2928 Orlando, Florida 32802
**2/9/2016 —Deposition**
**2/26/2016 -Deposition**

## HASH, DANNY - *DEPENDENCY*
State of Florida vs.
Case # CD-7680 FY
Judge Fogan - Juvenile Division, Broward County, Florida
Robert L. Shearin, Esquire
Quorum Business Center
736 South Military Trail
Deerfield Beach, Florida 33442
**05/05/97 - Dependency Hearing**

## HAZARD, RAHSAAN - *CRIMINAL*
State of Florida vs.
Case # 92-2649-JK
Palm Beach County, Florida
Sue Forman, Esquire
Office of Public Defender
421 Third Street
West Palm Beach, Florida 33401
**05/11/92 - Court Appearance**
**06/05/92 - Court Appearance**

## HEMMING, MIA FAITH — *DEPENDENCY COURT*
In the Interests of:
Case # 2013DP300669-JK — Judge Ronald Alvarez,
Juvenile Deprendency Court,
Palm Beach County, Florida
Andrew D. Stine, Esquire
120 South Olive Avenue, Suite 402
West Palm Beach, Florida 33401
**03/05/14 —Court Appearance**

## HEPWORTH, ROSE - *AGE DISCRIMINATION*
vs. Robert Gold, MD., individually and Claude Hepworth, her husband
Case # CL90-14222AN - Palm Beach County
Moses Baker, Jr., Esquire
Searcy, Denney, Scarola, Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Blvd.

West Palm Beach, Florida 33409
**08/05/91 - Deposition**
**10/05/93 - Deposition**

**HERNANDEZ, JOSEPH** - *CRIMINAL*
State of Florida vs.
>Case # 90-12327CF
>Judge Leonard Fleet - Broward County, Florida
>>Marshall Geisser, Esquire
>>Assistant Public Defender
>>201 S.E. Sixth Street
>>Fort Lauderdale, Florida 33301
>>**10/11/90 - Court Appearance**

**HEST, BRUCE ─ *CRIMINAL***
State of Florida vs.
>Case #'s 039841-CFAO2, 0214061-CFA02, 0214058-CFA02,
>02007112CFA02
>Judge John Hoy, Palm Beach County, Florida
>>Bert Winkler, Esquire
>>105 South Narcissus Avenue, Suite 508
>>West Palm Beach, Florida 33401
`  >>**08/28/03 ─ Court Appearance**

**HICKS, GLORIA - *SEXUAL HARASSMENT***
vs. Palm Beach County School Board and Leonard Goforth
>Case # 91-8757-CIV-HIGHSMIT
>United States District Court, Southern District of Florida, Fort
>Lauderdale Division
>>Walter Campbell, Esquire
>>Krupnick, Campbell, et al.
>>700 S.E. Third Avenue
>>Fort Lauderdale, Florida 33316
>>**10/06/93 - Deposition**

**HIGGS, TOMAR ─ *CRIMINAL***
State of Florida vs.
>Case # 02-3585CF
>Judge Michael J. Gates, Broward County, Florida
>>Michael Shein, Esquire
>>Poltorack, Shafran & Falzone, LLC
>>700 S.E. Third Avenue, Third Floor

Fort Lauderdale, Florida 33316
**06/17/04 — Court Appearance**

**HIGGINS, PAMELA - *SEXUAL HARASSMENT***
vs. Richard Roth, etc.
Case # 95-10019-CIV-PAINE
United States District Court, Southern District of Florida, Monroe County Division
Keith C. Tischler, Esquire
P.O. Box 12186
Tallahassee, Florida 32317
**10/03/96 - Deposition**
**10/29/96 - Court Appearance**

**HILSMAN, SHERRI LYNN & CHARLES - *PERSONAL INJURY***
vs. Winn Dixie Stores, Inc.
Case # 91-33747(Burnstein) 21
Broward County, Florida
Jeffrey Wolfson, Esquire
644 S.E. Fifth Avenue
Fort Lauderdale, Florida 33301
**02/09/93 - Deposition**
**03/16/93 - Court Appearance**

**HILTON, LYNN & HERBERT- *FAMILY LAW***
Thomas I Davis vs.
Case # 94-11910 (14)
Judge Jeffrey Streitfeld - Broward County, Florida
Broward County Courthouse
201 S. E. Sixth Street
Fort Lauderdale, Florida 33301
**06/24/99 - Court Appearance**

**HOGAN, GARLAND — *CRIMINAL***
United States of America vs.
Case # 99-8125-CR-HURLEY
Judge Daniel T. K. Hurley, United States District Court, Southern District of Florida, Palm Beach Division
Benson Weintraub, Esquire
1 East Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33301
**O3/11/02 - Court Appearance**

60

**03/12/02 - Court Appearance**

**HOGAN, GARLAND — *LEGAL MALPRACTICE***
vs. United States of America
Case # 09-CIV-81530
Judge Robin S. Rosenbaum, United States District Court, Southern
District of Florida, Broward Division
Richard C. Klug, Esquire
25 S.E. 2nd Avenue, Suite 1105
Miami, Florida 33131
**O3/01/11 - Court Appearance**

**HOLLINGSWORTH, CARA - *SEXUAL HARASSMENT***
vs. Telcom Services, Inc., a Florida Corporation and Don Ray
Case # 94-7022-CIV-MOORE/BANDSTRA
United States District Court, Southern Division of Florida, Miami
Division
Scott Rothstein, Esquire
8211 West Broward Blvd., Suite 420
Fort Lauderdale, Florida 33322
**09/22/95 — Deposition**

**HOLLINGSWORTH, STEPHANIE — *MEDICAL MALPRACTICE***
vs. Holy Cross Hospital, Yvonne R. Sherrer M.D., University of Miami
School of Medicine, Marcos E. Maldonado, M.D., Martha Hernandez-Illas,
M.D. and Ricardo Ramon Reyes, M.D.
Case #11-002290 CA 13, Broward County, Florida
Scott E. Solomon, Esquire
Falk, Waas, Hernandez, Cortina, Solomon & Bonner, P.A.
135 San Lorenzo Avenue, Suite 500
Coral Gables, Florida 33146
and
Lori B. Lewellen, Esquire
Heath & Carcioppolo
888 Southeast Third Avenue, Suite 202
Fort Lauderdale, Florida 33316

**10/17/12 -Deposition**

**HOLT, LISA - *PERSONAL INJURY***
vs. City of Miami
Case # 88-54118

61

Dade County, Florida
　　Dale Redlick, Esquire
　　2888 E. Oakland Park Blvd.
　　Fort Lauderdale, Florida 33306
　　**12/06/90 - Deposition**

## HOOPER, GARY ALLEN - *PERSONAL INJURY*
vs. St. John's County School Board, St. Augustine Technical Center, City of Reen Cove Springs vs. Shawn Fussell vs. City of Green Cove Springs
　　Case # 92-1908CA & #92-2485CA
　　Broward County, Florida
　　　　John George, Esquire
　　　　315 S.E. Seventh Street
　　　　Fort Lauderdale, Florida 33301
　　　　**12/02/93 - Deposition**

## HOWDYSHELL, CATHY - *CIVIL RIGHTS/ POLICE BRUTALITY*
vs. Richard Willie
　　Case # 90-6672 CIV
　　Palm Beach County, Florida
　　　　Barbara Heyer, Esquire
　　　　Gold & Heyer, P.A.
　　　　1311 S.E. Forth Avenue
　　　　Fort Lauderdale, Florida 33316
　　　　**06/30/91 - Deposition**

## HUBLER, JEFFREY - *CRIMINAL*
State of Florida vs.
　　Case #'s 89-6829CF, 88-5659CF, 87-15227F, 87-21765CF
　　Judge Richard Eade - Broward County, Florida
　　　　Arthur Marchetta, Esquire
　　　　Public Defender's Office
　　　　Broward County Courthouse
　　　　201 S.E. Sixth Street, Room 740
　　　　Fort Lauderdale, Florida
　　　　**11/03/89 - Court Appearance**

## HULL, CRAIG - *AGE DISCRIMINATION*
vs. Cash America Internation, Inc.
　　Case # 98-607 CIV-ORL-19A
　　Judge Jack Weinstein - US District Court, Middle District of Florida, Orlando Division

Benton N. Wood, Esquire
Muller, Mintz et al
255 South Orange Avenue, Suite# 1525
Orlando, Florida 32802
**06/28/99 - Deposition**

Jeffrey K. Grant, Esquire
Dempsey & Sasso
Suite 2700, 390 North Orange
Orlando, Florida 32801
**02/16/20 - Court Appearance**

## HUMPHREYS, LISA MARIE - *CRIMINAL*
State of Florida vs.
Case # 90-6800CF
Judge Leonard Fleet - Broward County, Florida
Arna D. Cortazzo, Esquire
Assistant Public Defender
Broward County Courthouse
201 S.E. Sixth Street, Room 740
Fort Lauderdale, Florida 33301
**11/09/90 - Court Appearance**

## JACKSON, FRANK & STEPHEN LITTLE — *RACIAL DISCRIMINATION*
vs. Interstate Brands Corporation
Case # 601-CV-1034-Orl-28JGG
United States District Court, Middle District of Florida, Orlando
Division
Gregory D. Ballew, Esquire
Bioff, Finucano, Coffey, Holland & Hosler, LLP
101 West Ninth Street, Suite 400
Kansas City, Missouri 64105-1718
**05/31/02 - Deposition**

## JAEGER, STACY D. — *FAMILY LAW*
and Robert M. Jaeger M.D
Case # 502009DR013546NBFJ
Judge John L. Phillips — Palm Beach County, Florida
John F. Schutz, Esquire
Schutz & White P.A.
1001 North Dixie Highway
West Palm beach, Florida 33401

**05/13/2013 —Deposition**
John T. Christiansen, Esquire
1555 Palm Beach Lakes Blvd, Suite 1010
West Palm Beach, Florida 33401
**05/24/13-Court Appearance**
**06/19/13 —Court Appearance**

## JAMES, JEREMY M. — *FAMILY LAW*
*vs. Apple Inc. and Melanie Kabinoff*
Case # CACE 13-026526
Christopher Prusaski, Esquire
Shutts & Bowen LLPP
1500 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
**10/20/15 -Deposition**

## JAMNICKI, KATHRYN - *CRIMINAL*
State of Florida vs.
Case # 87-18487CF
Judge Coker - Broward County, Florida
Public Defender's Office
201 S.E. 6th Street, Room 740
Fort Lauderdale, Florida 33301
**10/25/88 - Court Appearance**

## JEFFERS, RONALD PETE - *CRIMINAL*
State of Florida vs.
Case # 89-11337CF10B
Judge Leroy Moe - Broward County, Florida
Dennis D. Bailey, Esquire
Sullivan, Bailey, Wick & Bailey
Suite 301, Glendale Federal Building
2335 E. Atlantic Blvd.
Pompano Beach, Florida 33062
**06/18/90 - Court Appearance**

## JENSEN, HEIDI D. - *SEXUAL HARASSMENT*
vs. Fisherman's Wharf of Pompano Beach, Inc., A Florida Corp.
Case # 97-6218-CIV-DAVIS
Judge Davis - US District Court, Southern District of Florida, Fort
Lauderdale Division

J. Clifton Cox, Esquire
Cox & Reynolds
4875 North Federal Highway, Tenth Floor
Fort Lauderdale, Florida 33308
**07/13/98 - Court Appearance**

**JOHNSON, CHRISTIE A. - *SEXUAL HARASSMENT***
vs. Columbia/HCA Healthcare Co., Lawn wood Medical Center, Inc., &
Nicholas Ionone
Case # 96-14195CIV-PAYNE
United States District, Court Southern District of Florida, Palm Beach
County Division
Joseph Man Nikko, Esquire
Man Nikko & Bares, P.A.
215 South Federal Highway, Suite# 100
Stuart, Florida 34994
**11/15/98 - Court Appearance**
**11/20/98 - Court Appearance**
**11/30/98 - Court Appearance**

**JOHNSON, NEIL - *FAMILY LAW***
Karen M. Johnson vs.
Case # 88-05062-10
Broward County, Florida
Frank J. Heston, Esquire
Heston & Slatkin, P.A.
Suite 400 - Hanover Bank Plaza
9900 West Sample Road
Coral Springs, Florida 33065
**11/29/89 - Court Appearance**

**JOHNSTON, JAMES R. - *AGE DISCRIMINATION***
vs. Orange County, a political subdivision of the State of Florida
Case # 96-1316-CIV-ORL-22
United States District Court, Middle District of Florida, Orlando
Division
John Dempsey, Esquire
Ackerman & Senterfitt, P. A.
255 South Orange Avenue, 17th Floor
Orlando, Florida 32802
**07/23/98 - Deposition**

**JONES, ASHER ─ *CRIMINAL***
State of Florida vs
      Case # 02-867CF, Martin County Circuit Court, Florida
          Kathleen H. Roberts, Esquire
          Office of the State Attorney
          100 East Ocean Boulevard
          Stuart, Florida 34994
          **01/06/04 ─ Deposition**
          **08/17/05 ─ Court Appearance**
          **09/09/05 ─ Court Appearance**
          **10/07/05 ─ Court Appearance**

**JONES, JOSEPH E. - *AGE DISCRIMINATION***
vs. Orange County, a political subdivision of the State of Florida,
      Case # 96-1316-CIV-ORL-22
      United States District Court, Middle District of Florida, Orlando
      Division
          John Dempsey, Esquire
          Ackerman & Senterfitt, P. A.
          255 South Orange Avenue, 17th Floor
          Orlando, Florida 32802
          **07/23/98 - Deposition**

**JOSEPH, DUVAL & RAMONDE JOSEPH ─ *PERSONAL INJURY***
individually and as parents and minor children, Elizabeth & Erica Joseph
vs. Bank of America, N.A. D/B/A Nationsbank & Sainovul Saintillus
      Case # 002977 CACE (12) ─ Broward County, Florida
          Manuel A. Gurdian, Esquire
          Thornton, Davis & Fein, P.A.
          Brickell Bayview Center, Suite 2900
          80 Southwest 8th Street
          Miami, Florida 33130
          **10/15/02 - Deposition**

**K. C.   ─ *DISABILITY MEDICAL NECESSITY APPEAL***
vs. Agency for Persons with Disabilities, State of Florida, Division of
Administrative Hearings
      Case # 06-4457APD
      Dade County, Florida
          William N. Swift, Esquire

William N. Swift, P.A.
901 Martin Downs Blvd.
Palm City, Florida 34990
**01/30/07 - Court Appearance**

**KAPLAN, JILL — *SEXUAL HARRASMENT***
vs. Robert Lappin and Palm Beach Pops, Inc.
Case # 9:10-80227-CIV-MARRA
United States District Court, Southern District of Florida, Palm Beach Division
G. Joseph Curley, Esquire
Keith E. Sonderling, Esquire
Gunster, Yoakley & Stewart, P.A.
777 South Flagler Drive, Suite 500 East
West Palm Beach, Florida 33401-6194
**03/30/11 - Deposition**

**KARY, Edmund G. — *FAMILY***
vs. Kate A. McVay
Case # 502013SC010571XXXXSB
Palm Beach County, Judge Reginald Corlew
Donald R. McCoy, Esquire
111 S.E. 12th Street
Fort Lauderdale, Florida 33316
**28/10/2013 —Court Appearance**

**KARNS, GLORIA - *RACIAL DISCRIMINATION***
vs. Barron Chase Securities, Inc.
Case # 98-8462-CIV-HURLEY
United States District Court, Southern District of Florida, Palm Beach Division
Arlene K. Kline, Esquire
Jennifer L. Augspurger, P.A.
1900 Corporate Blvd., N.W., Suite 400 East
Boca Raton, Florida 33431
**04/20/99 - Deposition**

Charles L. Curtis, Esquire
Doumar, Allsworth, Curtis et.al.
1177 Southeast Third Avenue
Ft. Lauderdale, Florida, 33316

**02/18/20 - Court Appearance**
**02/22/20 - Court Appearance**

**KEMP, DON - *DISABILITY***
vs. Geoffrey Monge, as Sheriff of Sarasota County, Florida and Sarasota County, Florida
 Case # 93-2205-CIV-T-23C
 United States District Court, Middle District of Florida, Tampa Division
  Robert Taylor, Esquire
  Fechter & Dickson, P.A.
  102 W. Whiting Street, Suite 502
  Tampa, Florida 33602
  **11/03/95 - Deposition**
  **12/08/95 - Court Appearance**

**KIDWELL, JACQUELINE HENRY (CURTIS) - *FAMILY LAW***
vs. Richard Arthur Curtis
 Case # 82-24500 03
 Judge Cail Lee - Broward County, Florida
  William S. Cross, Esquire
  Allsworth, Doumar, Cazel, Curtis & Cross
  1177 S.E. Third Avenue
  Fort Lauderdale, Florida 33316
  **03/21/90 - Court Appearance**

**KING, JACK & STEPHANIE - *PERSONAL INJURY***
vs. John L. Danes, Elsa Haupt, Lemos and Jon L. Davis, Jr.
 Case # 92-04110 (08)
 Broward County, Florida
  Jack T. Frost, Esquire
  Gunter & Whitaker, P.A.
  P.O. Box 14608
  Fort Lauderdale, Florida 33302
  **01/25/94 — Deposition**

**KINSELLA, KIMBERLY RAE — *FAMILY LAW***
vs.David Kinsella
 Case # 08-13793 (38/90)
 Judge Alfred J. Horowitz, Broward County, Florida
  Douglas Reynolds, Esquire
  Adorno & Yoss
  350 East Las Olas Boulevard, Suite 1700

Fort Lauderdale, Florida 33301
10/22/ 09 – Court Appearance

**KIPP, VICTORIA (Isaacs)** - *WRONGFUL DISCHARGE*
vs. Gannett Co., Inc. d/b/a Florida Offset, a Delaware corporation, and Edward White
Case # 94-04973 (03)
Broward County, Florida
Douglas Reynolds, Esquire
Cox & Reynolds, P.A.
4875 North Federal Highway, 10th Floor
Fort Lauderdale, Florida 33308
**09/14/95 - Deposition**
**09/21/95 - Deposition**

In the Interest of: **KIRKILES, CATHERINE** A Minor Child **-** *PERSONAL INJURY*
vs. Coral Ridge Shopping Plaza Merchants Assoc., & K.B.I. Security Service, Inc.
Case # 93-2273 (09)
Broward County, Florida
E. Hugh Chappell, Jr.
420 N.E. Third Street
Fort Lauderdale, Florida 33301
**01/18/95 - Deposition**
**04/10/95 - Deposition**
**04/27/95 - Deposition**

In the Interest of: **KIRKILES, CATHERINE** A Minor Child **–** *DEPENDENCY*
State of Florida
Case # 91-11966 CJDP
Judge Kate Kearney
Broward County, Florida
Stephen P. Lange, Esquire
7 S.E. 13th Street
Fort Lauderdale, Florida 33316
**05/09/91 - Court Appearance**
**12/04/91 - Court Appearance**
**12/13/91 - Court Appearance**

**KLIEN, LAURA R.** - *SEXUAL HARASSMENT*
vs. Miami Dade Community College, a subdivision of the State of Florida,

69

and Robert Blood
>Case # 96-0860-CIV-FERGUSON
>United States District Court, Southern District of Florida,
>>Karen A. Brimmer, Esquire
>>Stephens, Lynn, Klein & McNicholas, P.A.
>>Two Datran Center, PH-2
>>9130 South Dadeland Blvd.
>>Miami, Florida 33156
>>**08/11/97 - Deposition**

## KNECHT, MICHAEL C. -*CRIMINAL*

State of Florida vs.
>Case No. 2007CF001205 Judge Robert Belanger, St Lucie County
>>Richard G. Lubin, Esquire
>>Lubin & Metz P.A.
>>1217 South Flagler, Second Floor
>>West Palm Beach, Florida 33401
>>**03/04/09 — Court Appearance**

## KULHMEYER, ALISON - *SEXUAL HARASSMENT*

Vs. Columbia/HCA Healthcare Corporation, Lawn wood Medical Center, Inc., and Nicholas Ionone
>Case # 96-14195CIV-PAYNE
>United States District Court, Southern District of Florida, Palm Beach Division
>>Joseph Man Nikko, Esquire
>>Man Nikko & Bares, P.A.
>>215 South Federal Highway, Suite # 100
>>Stuart, Florida 34994
>>**11/15/98 - Court Appearance**
>>**11/20/98 - Court Appearance**
>>**11/30/98 - Court Appearance**

## KOEPKE, KURT - *WRONGFUL DEATH*

Vs. James Byrnes, M. D., Premier Medical Group, P.A., Hanley - Hazel den Center at St. Mary's, a Florida non profit Corp., James Phillips, M. D., Family Practice Center, Inc., Thomas L. Purcell, M. D., Thomas L. Purcell, M. D., P. A.  D/b/a the Purcell Institute, Jerome Werner, M. D.; and Walk-In Family Medicine Centers, Inc., a Florida Corp.
>Case # CL 96-4168 AJ
>Palm Beach County, Florida
>>Brian J. Glick, Esquire

Glick & Retamar, P. A.
Lake Wyman Plaza
2424 N. Federal Highway, Suite 460
Boca Raton, Florida 33431
**11/18/97 - Deposition**

**KRACHT, GEORGIANNA** - *SEXUAL HARASSMENT*
vs. Am-Pak Management, Inc., a Florida Corporation d/b/a McDonald's:
Gerald A. Goodwin, d/b/a McDonald's, and George Merritt
Case # 96-14260-CIV-MOORE
United States District Court, Southern District of Florida, Palm Beach
Division
Joseph L. Mannikko, Esquire
Mannikko & Baris, P. A.
215 South Federal Highway, Suite 100
Stuart, Florida 34994
**12/10/97 - Deposition**

**LACOMBE, ONNALEE** - *PERSONAL INJURY*
vs. Allstate Insurance Company
Case # 88-32454CN(10)
Broward County, Florida
Bradley Goodman, Esquire
109 S.E. Ninth Street
Fort Lauderdale, Florida 33316
**01/30/90 - Court Appearance**

**LAINO, DAPHINE HAVEN** - *FAMILY LAW*
vs. Vincent J. Laino
Case # 92-15069 (37)
Judge Charles Green - Broward County, Florida
Andrew Salvage, Esquire
420 N. E. Third Street
Fort Lauderdale, Florida 33301
**09/08/97 - Deposition**

**LAMARCA, ANTHONY** - *CLASS ACTION CIVIL RIGHTS / PRISON RAPE*
Martin Saunders, and Edwin Johnson, individually and on behalf of all
others similarly situated, and David Aldred, Steve H. Bronson, Jr., Eddie
Cobb, Ron Durrance, Wayne Epprecht, Michael Gordon, and Billy Joe
Harper, individually, plaintiffs,

71

vs. R.V. Turner, individually in his former official capacity as Superintendent of Glades Correctional Institution, Chester Lambdin, in his official capacity as Superintendent of Glades Correctional Institution, and the State of Florida

Case # 82-8196-CIV-JCP

United States District Court, Southern District of Florida, West Palm Beach Division

William Amlong, Esquire
Amlong & Amlong, P.A.
500 N.E. 4th Street
Fort Lauderdale, Florida 33301
**12/04/85 - Deposition**
**12/10/85 - Deposition**
**01/10/90 - Court Appearance**

Case # 82-8196-CIV-PAINE

Judge James Paine, US District Court, Southern District of Florida, WPB Division

David M. Lipman, Esquire
Lipman & Weisberg
Miami, Florida
**12/12/94 - Court Appearance**
**12/13/94 - Court Appearance**

Case # CRC95-20270CFANO-I

Circuit Court, Pinellas County, Florida

Nora T. McClure, Esquire
Office of the Public Defender
Pinellas County, Florida 33762
**10/31/97 — Deposition**

Case # CRC95-20270-CFANO

Circuit Court, Pinellas County, Florida

Glenn L. Martin, Esquire
State Attorneys Office
P.O. Box 5028
Clearwater, Florida 33758
**5/19/03 — Deposition**

Peter J. Cannon, Esquire
Capital Collateral Regional Counsel, Middle District
3801 Corporex Park Drive, Suite 210

Tampa, Florida 33619
**5/29/03 — Court Appearance**

**<u>LAMBERT, CHRISTOPHER</u> - *CRIMINAL***
In Re: The Interest of Lambert, Christopher Bruce and Bonnie Lambert, parents
    Case # 90-0031CJCP
    Broward County, Florida
        Lorna Spivak, Esquire
        Guardian Ad Litem Program Attorney on behalf of the child
        **05/18/92 - Deposition**
        **05/19/92 - Court Appearance**
        **06/25/92 - Court Appearance**
        **06/26/92 - Court Appearance**

**<u>LANG, PAMELA, BARBARA BROWN & MARY MICHELLE BARTLEY</u> - *SEXUAL HARASSMENT***
vs. Reedy Creek Improvement District and Walt Disney World, Co., a foreign corporation.
    Case # 94-693-CIV-ORL-19
    United States District Court, Middle District of Florida, Orlando Division
        Bernard H. Dempsey, Jr.
        M. Susan Sacco, Esquire
        Dempsey & Associates, P.A.
        1031 W. Morse Blvd., Suite 200
        Winter Park, Florida 32789
        **11/01/95 - Deposition**

**<u>LANG, SHONELLE</u> - *SEXUAL HARASSMENT***
vs. Manuel Iribar, et al
    Case # 98-7216-CIV-DIMITROULEAS
    United States District Court, Southern District of Florida, Fort Lauderdale Division
        Manners & Manners, P.A.
        328 Minorca Avenue, Second Floor
        Coral Gables, Florida 33134
        **05/17/99 - Deposition**

**<u>LASKY, PATRICIA</u> - *FAMILY LAW***
vs. Edward Lasky
    Case # 81-16445 (41)

Broward County, Florida
      Gregory F. Esposito, Esquire
      8016 Wiles Road, Suite 9
      Coral Springs, Florida 33067
      **09/17/97 - Court Appearance**

## LEDFORD, DWIGHT - *CRIMINAL*

State of Florida vs.
      Case # 91-9526CF10A
      Judge Dimitrouleas - Broward County, Florida
            Victor Tobin, Esquire
            524 S. Andrews Avenue, Suite 201
            Fort Lauderdale, Florida 33301
            **02/04/92 - Court Appearance**

## LEHRER, RANDEE - *FAMILY LAW*

The marriage of Randee Lehrer and David Gregg Wright
      Case # FMCE 98-017461 (42)
      Broward County, Florida
            Vesel & Siegel, P.A.
            Trade Centre South, Suite# 930
            100 West Cypress Creek Road
            Fort Lauderdale, Florida 33309
            **10/04/99 - Court Appearance**
            **06/10/00 - Court Appearance**

            Joan B. Tucker, Esquire
            Sned, Pruitt, D'Angelo & Tucker
            218 Datura Street
            West Palm Beach, Florida 33402
            **06/06/00 - Deposition**

## LESLIE, SUZANNE - *FAMILY LAW*

In the Interest of: LESLIE, Joshua (dob 4/29/84), LESLIE, Samantha (dob 11/9/90), a Minor Child
      Case # CJ-94-300173-JK
      Judge Berman - Palm Beach County, Florida
            Judy Migdal-Mack, Esquire
            75 N.E. Sixth Avenue
            Delray Beach, Florida 33483
            **05/06/94 - Court Appearance**
            **10/03/94 - Court Appearance (Telephonically)**

**LEVINSON, RICHARD A.** *- FAMILY LAW*
In Re: The Marriage of Sylvia K. Levinson a/k/a Sylvia K. Knowlton
    Case # 93-8284 (36) CD    -
    Judge Lance Andrews - Broward County, Florida
        Gill S. Freeman, Esquire
        Ruden, Barnett, McClosky Smith, Schuster & Russell, P.A.
        701 Brickell Avenue, Suite 1900
        Miami, Florida 33131
        **10/17/94 - Court Appearance**

**LIKES, ROBERT V.** *- CRIMINAL*
State of Florida vs.
    Case # 94-1405-CF
    Martin County, Florida
        Robert E. Stone, Esquire
        115 South Second Street
        Fort Pierce, Florida 34950
        **05/10/96 - Court Appearance**
        **06/06/96 - Court Appearance**

**LIOTTI, ALLISON** *— FAMILY LAW*
vs. Paul Liotti
    Case # FMCE 10007694 40 97
    Judge Richard Yale Feder — Broward County, Florida
        Alan Braverman, Esquire
        625 Northeast Third Avenue
        Fort Lauderdale, Florida 33304-2617
        **02/03/11 — Court Appearance**
        **03/15/11 — Deposition**
        Melody Fortunato, Esquire
        625 Northeast Third Avenue
        Fort Lauderdale, Florida 33304-2617
        **03/30/11 — Court Appearance**

**LIS, JANET CHAPMAN** *- FAMILY LAW*
Andre  Lis vs.
    Case # 91-17287-23
    Judge C. Lavon Ward - Broward County, Florida
        Robert M. Curtis, Esquire
        Saunders, Curtis, et al
        Bank Atlantic Building

1750 East Sunrise Boulevard
Fort Lauderdale, Florida
**03/17/92 — Deposition**

**LISS, MICHAEL** - *FAMILY LAW*
vs. Ann Marie Liss
Case # 50 2006 DR 013140
Judge Charles Burton — Palm Beach County
Steven M. Pesso, Esquire
370 West Camino Gardens Boulevard,
Plaza 7, Suite 300
Boca Raton, Florida 33432
**11/07/06 — Court Appearance**

**LIVINGSTON, KIM L.** - *SEXUAL HARASSMENT*
vs. Stacey's Buffet, Inc.
Case # 96-05409-CA-F
Circuit Court, Brevard County, Florida
John M. Beckenridge, Jr. Esquire
7019 Pelican Island Drive
Tampa, Florida 33634
**04/29/97 - Deposition**

**LOCKWOOD, DANIEL G.** - *FAMILY LAW*
Former husband, vs. Darlene A. Lockwood, Former Wife.
Case # 92-25734 (36)
Judge Lance Andrews - Broward County, Florida
Michael J. Trent, Esquire
1620 S. Federal Highway, Suite 1101
Pompano Beach, Florida 33062
**11/29/94 - Court Appearance**

**LOGUIDICE, PASQUALE** - *CRIMINAL*
United States of America vs.
Case # 95-6135-CR-ZLOCH
United States District Court, Southern District of Florida, Fort
Lauderdale Division
C. Craig Stella, Esquire
110 S. E. Sixth Street, Suite 1710
Fort Lauderdale, Florida 33301
**10/31/96 - Court Appearance**

**LOMBARDI, RENATO - *FAMILY LAW***
vs. Lombardi
    Case # 93-25976 (39)
    Broward County, Florida
        Michael J. Trent, Esquire
        1620 S. Federal Highway, Suite 1101
        Pompano Beach, Florida 33062
        **09/27/94 - Deposition**

**LOPEZ, JOSEPH ALAN - *CRIMINAL LAW***
State of Florida vs.
    Case # 94-09046-CF
    Palm Beach County, Florida
        Kenneth W. Lipman, Esquire
        Siegel & Lipman, P.A.
        5355 Town Center Road, Suite 801
        Boca Raton, Florida 33486
        **04/26/95 - Court Appearance**

**LOUIS, MELVYN M. - *AGE DISCRIMINATION***
vs. Encore Computer Corporation
    Case # 95-7056-CIV-KING
    United States District Court, Southern District of Florida, Fort
    Lauderdale Division
        Annette Torres, Esquire
        Sterns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A.
        Suite# 2200, Museum Tower
        150 West Flagler Street
        Miami, Florida 33130
        **10/22/96 - Deposition**

**LOWENTHAL, RONALD & CONNIE - *PERSONAL INJURY***
vs. Cleonice Donegal & United Services Automobile Assn.
    Case # 91-10431-02
    Broward County, Florida
        Walter G. Campbell, Jr. Esquire
        Krupnick, Campbell, Malone & Roselli
        700 S. E. 3rd Avenue Suite# 2650
        Fort Lauderdale, Florida 33316
        **09/15/92 - Deposition**

**LUCERO, KAREN - *MEDICAL MALPRACTICE***

vs. Donner Chiropractic Center, Inc.; a Nevada Corporation licensed in the State of Nevada; Jeffrey Scott Donner, D. C. , individually ; ROE Corp.

> Case # A323174 - Judge Mark Denton
>> Robert T. Eglet, Esquire
>> Eglet & Prince, LLP
>> 600 Whitney Ranch, Bldg C, Suite# 14-15
>> Henderson, Nevada 89014
>> &
>> Kenneth L. Hall, Esquire
>> 633 S. Fourth Street, Suite# 1
>> Las Vegas, NV 89101
>> **01/26/98 - Deposition**
>> &
>> Niels L. Pearson, Esquire
>> Pearson, Patton, Shea, Foley & Kurtz, P.C.
>> 6900 Westcliff Drive, Suite 800
>> Las Vegas, Nevada 89128
>> **12/10/98 - Court Appearance**
>> **12/11/98 - Court Appearance**

**LUCIDO, CAROL - *SEXUAL HARASSMENT***

vs. Clinicorp, Inc., Back & Neck Pain Clinic, Inc. et al

> Case # 94-8216-CIV-HURLEY
> Palm Beach County, Florida
>> Scott DiSalvo, Esquire
>> Fazio, Dawson, DiSalvo, P.A.
>> P.O. Box 14519
>> Fort Lauderdale, Florida 33302
>> **08/10/94 - Deposition**

**LYLES, TALA - *CRIMINAL***

State of Florida vs.

> Case # 90-18887CF
> Judge Mel Grossman - Broward County, Florida
>> Michael Rocque, Esquire
>> Public Defender's Office
>> Broward County Courthouse
>> 201 S. E. Sixth Street Room #740
>> Fort Lauderdale, Florida
>> **02/25/91 - Court Appearance**

**MACDONALD, CAREN REGAN – *CRIMINAL***

State of Florida vs.
      Case # 02-011402CF10A
      Broward County, Florida
            Christine Wagey, Esquire
            State Attorneys Office, Broward Courthouse
            201 S.E. Sixth Street
            Fort Lauderdale, Florida 33301
            **04/29/04 - Deposition**

## MACDONALD, CHARLES – *FAMILY LAW*

vs. Caren Macdonald
      Case # 97-008706 (42/93)
      Broward County, Florida
            Gordon C. Brydger, Esquire
            600 Andrews Ave., Suite 601
            Fort Lauderdale, Florida
            **02/27/04 – Deposition**
            Karen Coolman Amlong, Esquire
            Amlong & Amlong, P.A.
            500 S.E. 4th Street, Suite 200
            Fort Lauderdale, Florida 33301
            **03/02/04 – Court Appearance**
            **06/02/04 – Court Appearance**
            **12/08/04 – Court Appearance**

## MACDONALD, CAREN – *CRIMINAL*

State of Florida vs.
      Case # 02011402C-10A
      Judge Michael Kaplan, Broward County, Florida
            C.K. Wagy, Esquire
            State Attorney's Office
            201 S.E. Sixth Street, Felony Division
            Fort Lauderdale, Florida 33301
            **06/17/04 - Deposition**

            Thomas Crowder, Esquire
            State Attorney's Office
            201 S.E. Sixth Street, Felony Division
            Fort Lauderdale, Florida 33301
            **10/11/04 - Deposition**

## MACGREGOR, ALISON - *FAMILY LAW*

In Re: The Former Marriage of: Alison MacGregor vs. Larry Worthington
  Case # 88-10124FC
  Palm Beach County, Florida
    Keith Krasnove, Esquire
    3300 University Drive, Suite# 610
    Coral Springs, Florida 33065
    **11/20/90 - Court Appearance**

**MADDIE, GEORGE JR.** - *PERSONAL INJURY*
by and through George Maddie Sr. as natural and legal guardian and
Barneka Maddie, by and through George Maddie Sr., as natural father and
as legal guardian vs. Al Packer, Inc. d/b/a Al Packer Ford West et al
  Case # CL-92-9438 AI
  Palm Beach County, Florida
    Jeffrey Orseck, Esquire
    1111 East Broward Blvd.
    Fort Lauderdale, Florida 33301
    **04/21/93 - Deposition**
    **06/15/93 - Court Appearance**

**MAJAUSKAS,LINDA** - *SEXUAL HARASSMENT*
vs. Fahlgren, et al
  Case # 97-7311-CIV-DIMITROULEAS
  United States District Court, Southern District of Florida, Ft.
  Lauderdale Division
    Carol A. Field, Assistant Attorney General
    Office of the Attorney General
    Republic Tower, 110 S. E. Sixth Street
    Fort Lauderdale, Florida 33301
    **03/01/99 - Deposition**

**MALKIN (NYKANEN), MICHELLE** - *SEXUAL HARASSMENT*
vs. City of Coral Gables and Paul Walker
  Case # 93-2415-CIV-FERGUSON
  United States District Court, Southern District of Florida, Miami
  Division
    Karen Amlong, Esquire
    Amlong & Amlong, P.A.
    500 N. E. Forth Street
    Fort Lauderdale, Florida 33301
    **09/29/94 - Deposition**

**MANGIS, MARY ANN - *AGE DISCRIMINATION***
vs. Nations Bank, N. A.
    Case # 97-7076-CIV-DIMITROULEAS
    Judge Seltzer – US District Court, Southern District of Florida, Ft. Lauderdale Division
        Charles Whitelock, Esquire
        316 Northeast Forth Street
        Fort Lauderdale, Florida 33301
        **07/30/98 - Deposition**
        **08/06/98 - Court Appearance**

**MANKAMYER, DAVID - *CRIMINAL***
State of Florida vs.
    Case # 92-6962 CF A 02 U
    Palm Beach County, Florida
        Public Defender's Office
        421 Third Street
        West Palm Beach, Florida 33401
        **06/04/92 - Court Appearance**
        **06/05/92 - Court Appearance**

**MANN, MICHAEL - *PERSONAL INJURY***
and Cyndi Mann, individually, and as parents and natural Guardians of Matthew Mann, a minor
vs. Advocate Communications, Inc. d/b/a Cable Television of Coral Springs and Atlantic Cable Services, Inc.
    Case # 95-9373CACE (05)
    Broward County, Florida
        Arthur L. LaPlante, Esquire
        Hinshaw Culbertson
        One E. Broward Blvd., Suite # 1010
        Fort Lauderdale, Florida 33301
        **10/24/96 - Deposition**

**MARDIS, BROCK – *CRIMINAL***
State of Florida vs.
    Case # 2008CF0016329AMB
    Judge Rapp, 1st Judicial Circuit, Palm Beach County, Florida
        Chris Mancini, Esquire
        330 S.W. 2nd Street, Suite 214
        Ft. Lauderdale, FL 33312

**08/30/10 — Court Appearance**

**<u>MARSTON, CAROL</u> - *DISABILITY***
vs. Hernando County, Florida, a political subdivision,
    Case # 97-124-CIV-T-99B
    United States District Court, Middle District of Florida, Tampa Division
        Thomas W. Dickson, Esquire
        Adrienne Fechter, Esquire
        Fechter & Dickson, P.A.
        1201 Swann Avenue
        Tampa, Florida 33606
        **09/02/98 - Court Appearance**
        **09/03/98 - Court Appearance**

**<u>MARTIN, WILLIAM A.</u> — *CRIMINAL***
State of Florida vs.
    Case # 2011CF005879AXX
    Judge Charles Burton, 1st Judicial Ciircuit, Palm Beach County,
Florida
        William Wallshein, Esquire
        2475 Mercer Avenue, Suite 302
        West Palm Beach, Florida 33401
        **05/09/2012 — Court Appearance**

**<u>MARTINEZ, JOSEPH</u> — *CRIMINAL***
State of Florida vs.
    Case # 12009864CF10A
    Judge David A. Haimes, Broward County, Florida
        Edward C. Pamintuan, Esquire
        Office of the Public Defender
        Broward County Courhouse
        Fourt Lauderdale, Florida 333301
        **3/27/2013 —Court Appearance**

**<u>MASDEU, ANA, & JUAN C. & NODAL, PABLO</u> - *RACIAL DISCRIMINATION***
vs. CEMETERY MANAGEMENT, INC., a Florida Corporation, Robert McKay,
individually and Peter O'Connor, individually
    Case # 98-2862-CIV-LENARD/TURNOFF
    United States District Court, Southern District of Florida, Miami
Division

Peter Prieto, Esquire
Holland & Knight, LLP
701 Brickell Avenue, Suite3000
Miami, Florida 33131
**03/03/00 - Deposition**

**<u>MASON, RUSSELL</u> - *FAMILY LAW***
Victoria Mason vs.
Case # 89-28347
Judge Susan Lebow
Broward County, Florida
John W. Steadman, Esquire
Suite# 750, The Gateway Centre
1150 North Federal Highway
Fort Lauderdale, Florida 33304
**10/30/89 - Court Appearance**

**<u>MATLEY-TOBIN, LYNN</u>** - *SEXUAL HARASSMENT*
vs.  Lens Express, Inc., a Florida Corporation, and Mordechai Golan
Case # 97-13792(25)
Broward County, Florida
Dorothy F. Green, Esquire
Brown & Green, P.A.
P.O. Box 3108
Orlando, Florida 32802
**3/22/99 - Deposition**

Patrick Knight, Esquire
25 Flagler Drive
Miami, Florida 33130
**1/25/01 — Deposition**

**<u>MATLEY- TOBIN, LYNN</u> — *SEXUAL HARASSMENT***
vs. Lens Express, Inc., a Florida Corporation and Mordechai Golan,
Hartford Casualty Insurance Company, Hartford Insurance Company of The
Southeast, Agricultural Insurance Company and St. Paul Fire and Marine
Insurance Company
Case # 97-13792(25)
Broward County, Florida
Judge George Brescher
Michael R. Tein, Esquire
Shook, Hardy & Bacon LLP

Miami Center, Suite 2400
201 South Biscayne Boulevard
Miami, Florida 33131
**1/12/02 – Deposition**


**MATTHEW, PAMELA N** - *GENDER DISCRIMINATION*
vs. City of Gulfport and G. Curt Willocks, in his individual and official
capacities
Case # 98-727-CIV-T-17A
United States District Court, Middle District of Florida, Tampa Division
Thomas M. Gonzalez
Thompson, Sizemore & Gonzalez, P.A.
109 North Brush Street, Suite 200
Tampa, Florida 33601
**09/23/99 - Deposition**


**MAZZA, MICHAEL —***CRIMINAL*
State of Florida vs.
Case # 07-020537CF10A, Broward County, Florida
Bradley Collins, Esquire
600 South Andrews Avenue
Fort Lauderdale, Florida 33301
**01/13/2011 -Deposition**


**MAZZO, MONICA** - *PERSONAL INJURY*
and Steven Mazzo, her husband, vs. Ford Motor Company
Case # 95-1569
Broward County, Florida
Jeffrey Wolfson, Esquire
644 S. E. Fifth Avenue
Fort Lauderdale, Florida 33301
**09/19/96 - Deposition**
**12/10/96 - Deposition**


**McALEER, STEPHEN** - *CRIMINAL*
State of Florida vs.
Case # 93007681MM A02
Palm Beach County, Florida
Keith M. Krasnove, Esquire
3300 University Drive, Suite# 610
Coral Springs, Florida 33065
**04/02/93 - Court Appearance**


84

**11/11/93 - Deposition**

**McCORD, PAMELA KIM — FAMILY**
vs. Jeffrey David McCord
  Case #E140936, Superior Court of British Columbia, Vancouver
  Reguistry, Canada. Judge Patrice Abrious
    John Fiddes Q.C.
    Fiddes Van Der Flyer Law Corporation
    808 Nelson Street, Suite 1600
    Vancouver Registry, V6Z2H2
    **06/16, 17, 18, 19/2015 —Court Appearance**

**McENDREE, JOYCE - *SEXUAL HARASSMENT***
vs. Host Marriott Corporation a foreign Corp; and Jerry Williams
  Case # 96-14150-DIV-MOORE
  Judge Dube   -US District Court, Southern District of Florida, Palm
  Beach Division
    E. Barbara Baris, Esquire
    Mannikko & Baris, P.A.
    218 Atlanta Avenue
    Stuart, Florida 34994
    **12/01/97 - Deposition**

**MCGUIRE, RHONDA RACHELLE —*FAMILY LAW***
and Michael Mcguire
    Case # CDCY 2427 — Henry County, Iowa
    Judge Michael J. Shilling
    Scott E. Schroeder, Esquire
    320 N. Third Street, Suite 200
    Burlington, Iowa 52601
    **09/07/2010 — Court Appearance**

**McHALE, SUSAN - *SEXUAL HARASSMENT***
vs. Stacey's Buffett
  Case # 96-05407-CA-F
  Brevard County, Florida
    John M. Breckenridge, Jr. Esquire
    7019 Pelican Island Drive
    Tampa, Florida 33634
    **04/29/97 - Deposition**

**McKEE, ANNIE BELLE - *PERSONAL INJURY***

vs. CSX Transportation, Inc.; National Railroad Passenger Corporation, b/d/a/ Amtrak; Warrior & Gulf Navigation Company; Andrew Stabler, individually; and Willie C. Odom, individually

    Case # 94-551-CIV-ORL-12

    United States District Court, Middle District of Florida, Orlando Division

        Joseph Dayton Foley, Jr., Esquire

        500 North Maitland Avenue, Suite 305

        Maitland, Florida 32751

        **07/21/95 - Deposition**

## MEISTER, JESSICA — PERSONAL INJURY

vs. 21ST Century Insurance Company and USAA Casualty Insurance Company.

    Judge Levinson, Case # CACE-16-006170 [09],

    Broward County, Florida

        Athena Thanos, Esquire

        Law Offices of Robert Tetreault

        100 South Ashley Drive

        Tampa, Florida 33602

        **07/27/17 —Deposition**

        John Phillip Fischer, Esquire

        Fischer Redavid LLC

        2888 East Oakland Park Blvd.

        Fort Lauderdale, Florida 33306

        **08/09/17 — Court Appearance**

## MELVIN, ERIC - *CRIMINAL*

State of Florida vs.

    Case # 89-19378CF

    Judge Henning - Broward County, Florida

        Brian Cavanaugh, Esquire

        Assistant State Attorney

        201 S. E. Sixth Street, 6th Floor

        Fort Lauderdale, Florida 33301

        **05/11/90 - Deposition**

        **06/13/90 - Court Appearance**

## MENENDEZ, BRUNA- *PERSONAL INJURY*

vs. Lakeview of the California Club

    Case # 04-02548CA 15,

    Broward County, Florida.

Sherri L. Bauer, Esquire
Green, Ackerman & Frost, P.A.
The Advocate Building, Second Floor
315 S.E. Seventh Street
Fort Lauderdale, Florida 33301
**06/28/07 - Deposition**

## MEYERSON, EVA - *MALPRACTICE*
vs Walgreen Co., Astrazeneca, P.L.C., Astrazeneca, P.L., and Astrazeneca
Pharmaceuticals, L.P.,
Case # 05-60025-CV-Altonaga/O"Sullivan,
United States District Court for the Southern District of Florida
Arthur J. Laplante, Esquire
Hinshaw & Culberton, LLP
One East Broward Boulevard, Suite 1010
Fort Lauderdale, Florida 33301
**02/10/06- Deposition**
Johathan C. Reiter, Esquire
Empire State Building, Suite 2811
350 Fifth Avenue
New York, N.Y., 10118
**05/12/06 - Court Appearance**

## MIAMI AREA LOCAL, AMERICAN — *LABOR LAW/TERRORISM*
## POSTAL WORKERS' UNION, AFL-CIO, on its behalf and behalf of the
## members
vs. United States Postal Service and the American Postal Workers Union
Case 01-4423 CIV-SEITZ
Neil Flaxman, Esquire
550 Biltmore Way, Suite 780
Coral Gables, Florida 33134
**5/11/01 - Court Appearance**

## MICHAELS, LINDA - *CRIMINAL*
State of Florida vs.
Case # 91-547CFA
Martin County, Florida
Anthony J. Natale, Esquire
1217 S. Flagler Drive, 2nd Floor
West Palm Beach, Florida 33402
**04/30/92 - Deposition**
**07/14/92 - Deposition**

**04/29/98 - Court Appearance**

**<u>MICHAELS, LINDA</u> - *CRIMINAL***
State of Florida vs.
    Case # 92-502-CF
    Judge Bryan - Martin County, Florida
        Anthony J. Natale, Esquire
        1217 S. Flagler Drive, 2nd Floor
        West Palm Beach, Florida 33402
        **04/29/98 - Court Appearance**

**<u>MILLER, JERAMIE</u> - *CRIMINAL***
State of Florida vs.
    Case # 98-1330CF10A
    Judge Ilona Holmes - Broward County, Florida
        Peter Giacoma, Esquire
        613 Southeast First Avenue
        Ft. Lauderdale, Florida 33301
        **06/28/00 - Court Appearance**

**<u>MILLER, JOHN (MAX) & DANIELLE B.</u> - *PERSONAL INJURY***
vs. State Farm Mutual Automobile Insurance Company
    Case # 90-15338 (24)
    Broward County, Florida
        E. Hugh Chappell, Jr. Esquire
        420 N. E. Third Street
        Fort Lauderdale, Florida 33301
        **10/31/90 - Deposition**

**<u>MILLER, LIONEL</u>- *CRIMINAL***
State of Florida vs.
    Case # CF 06-5222-0, Judge Belvin Perry
    Circuit Court, Orange County, Florida
        Lisa Marie Lerner, Esquire
        Assistant Attorney General
        1515 North Flagler Drive, Ninth Floor
        West Palm Beach, Florida 33401
        **11/26/2012 — Deposition**
        James L. Driscoll, Jr, Esquire
        Assistant Capital Collateral Counsel
        CCRC-Middle Region
        3801 Corporex Park Drive, Suite 210

Tampa, Florida 33619-1136
**12/18/2013 —Court Appearance**

**MIRJAH, ROBIN & JOEL PIRONTI** - *WHISTLE BLOWER*
vs. Agency for Health Care Administration, an agency of the State of
Florida, Gloria Henderson, in her individual capacity, Thomas Wallace, in
his individual capacity, and Douglas Cook, in his individual capacity
Case # 96-264443 CA(08)
Broward County, Florida
Bradley L. Mirkin, Esquire
Moscowitz, Starkman & Magolnick
Nationsbank Tower, 37th Floor
100 Southeast Second Street
Miami, Florida 33131
**05/24/00 - Deposition**

**MODY, SURESH C.** - *HOUSING DISCRIMINATION*
vs. Fisher Island Corporation, Fisher Island Communuty Association Inc.,
Fisher Island Holdings, LLC, Fisher Island Management Services, Inc., The
Continental Group , Ltd., Seaside at Fisher Island Condominium
Association, & John Doe Security Guard
Case # 99-901-CIV-SEITZ
United States District Court, Southern District of Florida Miami
Division
Alan T. Dimond, Esquire
Greenberg Traurig
1221 Brickell Avenue
Miami, Florida 33131
**08/03/00 - Deposition**

**MOMPOINT, JONATHAN —** *DISABILITY MEDICAL NECESSITY*
*APPEAL*
In The Interests of:
Case # 05-15384-D002 — Judge Cindy Lederman, Juvenile Justice
Center, Miami, Florida
Michael Hursey, Esquire
Law Offices of Michael Hursey
One Financial Plaza, Suite 1615
Fort Lauderdale, Florida 33394
**11/16/06 — Court Appearance**

**MOORE, Andrew** – *PERSONAL INJURY*

vs. Laura Alvarez et all
     Case # 08 27656 (13)
     In the Circuit Court of the 17th Judicial Circuit in and for Broward County
          Michael Robb, Esquire
          Clark, Robb, Mason, Coulombe & Bushman
          Wishpering Woods Center
          7501 Wiles Road, Suite 207
          Coral Springs, Florida 33067
          **06/21/10 - Deposition**

**MOORE, JOHN B.** - *RACIAL AND SEXUAL DISCRIMINATION*
vs. Cabot Corporation
     Case # 92VS-60343-D
     State Court of Fulton County, Georgia
          William F. Clark, Esquire
          Glass, McCullough, Sherrill
          1409 Peachtree Street, N.E.
          Atlanta, Georgia 30309
          **12/14/94 - Deposition**

**MORELLO, KELLY and ROSARIO MORELLO** - *PERSONAL INJURY*
as parents and guardians of Corey Morelo, a minor, and Kelly Morello and Rosario Morello, individually, vs. Theresa L. Schwab and K&K Wrecking Corporation
     Case # 94-14196CA22
     Dade County, Florida
          Andrew B. Yaffa, Esquire
          Grossman & Roth
          2665 S. Bayshore Drive, Penthouse1
          Miami, Florida 33133
          **02/27/95 - Deposition**

**MORNEAU, RONALD GERARD** - *CRIMINAL*
State of Florida vs.
     Case # 90-25593CF10
     Judge Leroy Moe - Broward County, Florida
          Samuel R. Halpern, Esquire
          Assistant Public Denfender
          Broward County Courthouse
          201 S. E. Sixth Street, Room 740
          Fort Lauderdale, Florida 33061

**06/17/91 - Court Appearance**

**MORO VIRGINIA f/k/a/ VIRGINIA FOGLIA** *— FAMILY LAW*
and Joseph Anthony Foglia
 Case # FMCE 91008210 (35)
 Judge Arthur M. Birkin, Broward County, Florida
  Douglas H. Reynolds, Esquire
  350 East Las Olas Boulevard, Suite 1700
  Fort Lauderdale, Florida
  **09/08/03 — Court Appearance**

**MOVITZ, HARRY -** *CIVIL RIGHTS/WRONGFUL DISCHARGE*
vs. Pratt & Whitney Co, etc. et al
 Case # 90-8245-CIV-KING
 United States District Court, Southern District of Florida, Palm Beach Division
  David Sales, Esquire
  Searcy, Denny, Scarola, Barnhart & Shipley, P.A.
  2139 Palm Beach Lakes Blvd.
  West Palm Beach, Florida 33409
  **10/10/91 - Deposition**
  **11/07/91 - Deposition**

**MULLIKIN, DENISE -** *SEXUAL HARASSMENT*
vs. Home Depot USA, Inc., a Delaware corporation, and Leonard Smith, individually,
 Case # 98-6944-CIV-FERGUSON
 United States District Court, Southern District of Florida, Miami Division
  Patricia E. Lowry, Esquire
  Steel, Hector & Davis, LLP
  1900 Phillips Point West
  777 South Flagler Drive
  West Palm Beach, Florida 33401
  **09/23/99 - Deposition**
  **10/13/99 — Deposition**

**MUSONE, MELANIIE D**. *— FAMILY LAW*
vs John P. Musone
 Case # 2012-DR-001436-0
 Judge Sally Kest, Orange County Circuit Court, Florida
  Caryn M.Green, Esquire

801 North Orange Avenue
Orlando, Florida 32801
**08/30/13 — Deposition**
James Cheney Mason, Esquire
250 South Park Avenue, Suite 200
Winter Park, Florida 32789
**01/28/14 - Court Appearance**

## MUTCHLER, MICHELLE - *SEXUAL HARASSMENT*
vs. Columbia/HCA Healthcare Corporation, Lawnwood Medical Center, Inc.,
and Nicholas Ioannou
Case # 96-14195CIV-PAYNE
United States District Court, Southern District of Florida, Palm Beach
Division
Joseph Mannikko, Esquire
Mannikko & Baris, P.A.
215 South Federal Highway, Suite 100
Stuart, Florida 34994
**11/15/98 - Court Appearance**
**11/20/98 - Court Appearance**
**11/30/98 - Court Appearance**

## NASH, ROGER - *CRIMINAL*
State of Florida vs.
Case # 96-5608MM10A / Case# 93-4002-CF-A02 (VOP)
Judge Karen Martin - Palm Beach County, Florida
Thomas Gano, Esquire
Lubin & Gano, P.A.
Second Floor, Flagler Plaza
1217 S. Flagler Drive
West Palm Beach, Florida 33401
**05/14/97 - Court Appearance**

## NEBRASKY, JENNIFER - *SEXUAL HARASSMENT*
vs. Anixter, Inc., a Delaware Corporation, Richard Hillman and Michael
Littleton,
Case # 95-7079-LOCH
United States District Court, Southern District of Florida, Fort
Lauderdale Division
Scott Rothstein, Esquire
Kusnick & Rothstein P. A.
8211 W. Broward Blvd., Suite 420

Fort Lauderdale, Florida 33322
**07/03/97 - Deposition**
**07/11/97 - Deposition**

## NEEL, SHARON - *SEXUAL HARASSMENT*
vs. Pitney Bowes, Inc.
　　　Case # 94-548-CIV-ORL-22
　　　United States District Court, Middle District of Florida, Orlando
　　　Division
　　　　　Tobe Lev, Esquire
　　　　　Egan, Lev & Siwica, P.A.
　　　　　P.O. Box 2231
　　　　　Orlando, Florida 32802
　　　　　**06/08/95 - Deposition**

## NEIMAN, BRIAN - *LICENSING*
The Florida Bar vs.
　　　Case # 94,738
　　　Judge Robert Lee - The Supreme Court of Florida
　　　　　Harris Solomon, Esquire
　　　　　Brinkley, McNerney, Morgan, Solomon & Tatum
　　　　　200 East Las Olas Boulevard, Suite 1800
　　　　　Ft. Lauderdale, Florida 33301
　　　　　**05/30/00 - Court Appearance**

## NEIMAN, BRIAN — *BANKRUPTCY*
Debtor
　　　Case # 00-24232-BKC-PGH
　　　United States Bankruptcy Court, Southern District of Florida
　　　　　Kevin Gleason, Esquire
　　　　　2699 Sterling Road, Suite A201
　　　　　Ft. Lauderdale, Florida 33312
　　　　　**01/03/01 — Deposition**
　　　　　**05/25/01 — Court Appearance**

## NEIMAN, BRIAN — *DISABILITY*
Vs. Provident Accident and Life Insurance Company, a foreign corporation
　　　Case # 00-2140-CIV-Moreno/Dube
　　　United States District Court, Southern District of Florida, Miami
　　　Division
　　　　　John Kolinski, Esquire
　　　　　Shutts & Bowen LLP

1500 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
**03/22/01- Deposition**
**05/01/01- Deposition**


**NELSON, BRITTANY LEE - *MEDICAL MALPRACTICE***
vs. South Broward Hospital District
Case # 88-24397CZ
Broward County, Florida
William Thompson, Esquire
888 S. E. Third Avenue, Suite 300
Fort Lauderdale, Florida 33316
**05/30/90 - Deposition**
**03/11/92 - Court Appearance**


**NELSON, STACEY J. — *PERSONAL INJURY***
vs. Drivers Management, Inc. d/b/a Werner Enterprises, Inc.
Case # CI-0114 Hamilton County, Nebraska
John P. Inserra, Esquire
Inserra & Kelley
6790 Grover Street, Suite 200
Omaha, Nebraska, 68106-3612
**01/23/03 - Deposition**


**NELSON, STEPHEN - *CRIMINAL***
State of Florida vs.
Case #93-209-CIV-FTM-17 (D)
Judge Tyson - Broward County, Florida
Ray Russell, Esquire
200 S. E. Sixth Street
Fort Lauderdale, Florida 33301

Mark A. Howoritz, Esquire
Humphrey & Knott
1625 Hendry Street
Fort Meyers, Florida 33902
**08/30/95 - Deposition**


**NEXIUS NOEL — *PERSONAL INJURY***
as the Personal Representative of The Estate of Paulette Noel, Deceased,

94

and Patrick Chery vs. Ford Motor Company, a Foreign Corporation
    Case#6:1-CV-370-ORL-28DAB, United States District Court,
    Middle District of Florida, Orlando Division)
        David T. Bright, Esquire
        Sico, White, Hoelscher & Braugh L.L.P.
        900 Frost Bank Plaza
        802 North Carancahua
        Corpus Christi, Texas 78401
        **10/17/12 - Deposition**

**NICKLES, KIMBERLIN —*PERSONAL INJURY***
As Personal Representatice of the Estate of Chasity Glisson, deceased, for and on behalf of the Estate and Survivors thereof, and TIMOTHY MADDOCK, individually
vs. Toyota North America, Inc, Toyota Motor Corporation, Toyota Motor Sales U.S.A. Inc., Toyota Motoe Engineering & Manufacturing North America, Inc., Jim Auto, Inc. D/B/A JM Lexus Certified Pre-Owned Superstore, A Florida Corporation, and Marabella Premium Apartments, LLC, A Florida Limited Liability Company
    Case#11-13565 09, Broward County, Florida
        Eric Scott Rosen, Esquire
        Kelly UUstal, PLC
        700 S.E. Third Avenue, Suite 300
        Fort Lauderdale, Florida 33316
        **08/06/2014 - Deposition**

**NOLAN, SHERRY - *SEXUAL HARASSMENT***
Vs. Columbia/HCA Healthcare Corporation, Lawn wood Medical Center, Inc., and Nicholas Ionone
    Case # 96-14195CIV-PAYNE -United States District Court, Southern District of Florida, Palm Beach Division
        Joseph Mannikko, Esquire
        Mannikko & Baris, P.A.
        215 South Federal Highway, Suite 100
        Stuart, Florida 34994
        **11/15/98 - Court Appearance**
        **11/20/98 - Court Appearance**
        **11/30/98 - Court Appearance**

**NOLIN, IRA STEVEN - *RACE DISCRIMINATION***
vs. Orange County, a political subdivision of The State of Florida, and Orange County Fire and Rescue Division, a Division of Orange County,

Florida
 Case # 94-620-CIV-ORL-18 -
 United States District Court, The Middle District of Florida, Orlando
 Division
  John Dempsey, Esquire
  Ackerman & Senterfitt, P. A.
  255 South Orange Avenue
  Citrus Center, 17th Floor
  Orlando, Florida 32801
  **09/09/98 - Deposition**

**NWAGBARA, CHARLES- *RACIAL AND SEXUAL DISCRIMINATION***
vs. Cabot Corporation, Bob McCaig and Jack Ingraham
 Case # 92VS-60116-G
 State Court of Fulton County, Georgia
  William F. Clark, Esquire
  Glass, McCullough & Sherrill
  1409 Peachtree Street, N.E.
  Atlanta, Georgia 30309
  **12/14/94 - Deposition**

**O'BRIEN, BOBBIE — *SEXUAL HARASSMENT***
vs. Michael Chaparro, M.D., individually, and Columbia Palms West Hospital
Limited Partnership
 Case # 05-80342-CIV
 Southern District of Florida, Palm Beach Division
  Alexander del Russo
  Carlton Fields, P.A.
  P.O. Box 150
  West Palm Beach, Florida 33402-0150
  **11/21/05 — Deposition**

 Case # 05-80342-CIV
 Southern District of Florida, Fort Lauderdale Division
 Judge Cohn — Broward County, Florida
  Robyn S. Hankins, Esquire
  Robyn S. Hankins, P.A.
  250 South Central Boulevard, Suite 104A
  Jupiter, Florida 33458
  **12/14/05 — Court Appearance**

**OLSEN, MICHAEL D. - *FAMILY LAW***

In Re: The Marriage of Michael D. Olsen vs. Sharon Leigh Jackson
  Case # 92-1236-FR-01
  Judge Fennelly - St. Lucie County, Florida
   Russell J. Ferraro, Jr., Esquire
   Lewis Berger & Ferraro
   1115 East Ocean Blvd.
   Stuart, Florida 34996
   **09/10/92 - Court Appearance**

**O'MARA, MICHAEL** **-** *CRIMINAL*
State of Florida vs.
  Case # 14-27554CF 10A
  Judge Matthew Destry — Broward County
   Broward County, Florida
   Christopher J. Mancini, Esquire
   100 S.E. Third Avenue, Suite 2010
   Fort Lauderdale, Florida 33394
   **04/10/15 — Court Appearance**
   **05/05/15 — Court Appearance**

**O'NEAL, MICHAEL** **- PERSONAL INJURY**
vs. CACE Beef Retail Inc., a Foreign Corporation and Western Beef of Florida, LLC, a
Florida Limited Liability Company
  Case # CACE 13-027868 (03) Circuit Court
   Broward County, Florida

**OSBORN, JOSEPH & LESLEY** **-** *MEDICAL MALPRACTICE*
vs. Rick A. Harris et al
  Case # 89-14022(CV)
  Broward County, Florida
   C. Daniel Petrie, Esquire
   Esler & Petrie, P. A.
   315 S. E. Seventh Street, Suite 300
   Fort Lauderdale, Florida
   **09/11/92 - Deposition**
   **11/17/92 - Court Appearance**

**PALEY, ALAN - CRIMINAL**
State of Florida vs.
  Case # 89-17439CF
  Judge Seay - Broward County, Florida
   Howard M. Zeidwig, Esquire
   Trial Lawyers Bldg, Suite 4-F

633 S. E. 3rd Avenue
Fort Lauderdale, Florida 33301
**07/03/90 - Deposition**
**09/13/90 - Court Appearance**

**PANGBURN, MICHAEL - *CRIMINAL***
State of Florida vs.
Case # 91-14442CF10A & 89-11-9694
Judge Paul L. Backman - Broward County, Florida
Hilliard Moldof, Esquire
1311 S. E. Second Avenue
Fort Lauderdale, Florida 33301
**02/10/92 - Court Appearance**

**PARKER, DWAYNE IRWIN - *CRIMINAL***
State of Florida vs.
Case # 89-8897CFA
Judge Leroy H. Moe - Broward County, Florida
Public Defender's Office
201 S. E. Sixth Street , Room 740
Fort Lauderdale, Florida 33301
**05/25/90 - Court Appearance**
**07/18/91 - Court Appearance**
Suzanne Meyers Keffer, Esquire
Office of the Capital Collateral Regional Counsel
101 N.E. Third Avenue, Suite 400
Fort Lauderdale, Florida 33301
**02/22/06 – Court Appearance**

**PARTON, ANGELA et al - *FAMILY LAW***
vs. Phyllis E. Parton
Case # 89-25334(14)
Broward County, Florida
Victor Tobin, Esquire
1222 S. E. Third Avenue
Fort Lauderdale, Florida 33316
**03/25/91 - Deposition**

**PATEL, JAYKUMAR - *CIVIL RIGHTS / RACE DISCRIMINATION***
vs. Edward Goscicki et al
Case # 88-6448-CIV
Judge Paine – US District Court, Southern District of Florida, Fort

98

Lauderdale Division
William R. Amlong, Esquire
Amlong & Amlong, P. A.
500 N. E. Forth Street, Second Floor
Fort Lauderdale, Florida 33301
**06/24/91 - Deposition**
**03/15/92 - Court Appearance**

## PATTERSON, ROBERT **- *CRIMINAL***

State of Florida vs.
Case # 87-15217CF10
Judge Polen - Broward County, Florida
Carlos A. Rodriguez, Esquire
524 S. Andrews Avenue, Suite 303N
Fort Lauderdale, Florida 33302
**04/12/89 - Deposition**

## PAYNE, DONALD D. **- *AGE DISCRIMINATION***

vs. Orange County, a political subdivision of the State of Florida
Case # 96-1316-CIV-ORL-22
United States District Court, Middle District of Florida, Orlando
Division
John Dempsey, Esquire
Ackerman & Senterfitt, P. A.
255 South Orange Avenue, 17th Floor
Orlando, Florida 32802
**07/23/98 - Deposition**
**09/09/98 -Deposition**

## PENA, SHARON **- *FAMILY LAW***

In Re: The Matter of: Arron Anthony Pena, The Father and Sharon Pena,
The Grandmother
vs. Daisy Velazquez
Case # 93-04555 (41)
Judge Schlissel - Broward County, Florida
Keith M. Krasnove, Esquire
3300 University Drive, Suite# 610
Coral Springs, Florida 33065
**03/17/93 - Court Appearance**
**04/23/93 - Court Appearance**

## PENDERGRAFT, JAMES SCOTT **- *CRIMINAL***

United States of America vs.
    Case # 500 CR-21-OC –10
    Judge W. Terrell Hodges, United States District Court, Middle District of Florida, Ocala Division
        Daniel Brodersen, Esquire
        37 North Orange Avenue, Suite 500
        Orlando, Florida 32801
        **08/08/00 – Court Appearance**
        **01/24/01 – Court Appearance**

**PENTE, CATHERINE - *GENDER DISCRIMINATION***
vs. City of Daytona Beach
    Case # 98-618-CIV-ORL-22B
    United States District Court, Middle District of Florida, Orlando Division
        Teresa Herman, Esquire
        Muller, Mintz et. al.
        Citrus Center, Suite 1525
        255 South Orange Avenue
        Orlando, Florida 32801
        **06/29/99 – Deposition**

**PETERSON, CHARLES -*CRIMINAL***
Vs. State of Florida
    Case # CRC00-05107CFANO
    Circuit Court, Pinellas County, Florida
        David. D. Hendry
        Capital Colateral Regional Counsel –Middle District
        3801 Corporex Park Drive, Suite 210
        Tampa, Florida 33619
        **12/20/2011 –Court Appearance**

**PHILHOWER, KIM - *SEXUAL HARASSMENT***
vs. ANIXTER, INC., a Delaware Corporation, Richard Hillman and Michael Littleton,
    Case # 95-7126-CIV-LOCH
    United States District Court, Southern District of Florida, Fort Lauderdale Division
        Scott Rothstein, Esquire
        Kusnick & Rothstein, P.A.
        8211 W. Broward Blvd., Suite 420
        Fort Lauderdale, Florida 33322

**07/03/97 - Deposition**
**07/11/97 - Deposition**

**<u>PHILLIPS, HARRY FRANKLIN</u> - *CRIMINAL***
State of Florida vs
    Case #SC01-1460
    Judge Israel Reyes, Dade County, Florida
        Kin Hennis, Esquire
        Law Office of the Capital Collateral Regional Counsel
        101 N.E. Third Avenue, Suite 400
        Fort Lauderdale, Florida 33301
        **02/13/06 — Court Appearance**

**<u>PHILLIPS, JOSEPH G.</u> — *FAMILY***
vs. Cynthia Ream-Phillips
    Case # 01-0925-FR-01
    Judge Paul B. Kanarek, Indian River County
        Noel A. Bobko, Esquire
        McCarthy, Summers, Bobko, Wood, Sawyer & Perry, P.A.
        2400 S.E. Federal Highway, 4th Floor
        Stuart, Florida 34994
        **06/17/02 — Deposition**

**<u>PIETRI, NOBERTO</u> - *CRIMINAL***
State of Florida vs.
    Case # 88-11366CF
    Palm Beach County, Florida
        Peter Birch, Esquire
        319 Clematis Street, Suite 400
        West Palm Beach, Florida 33401
        **02/22/90 - Court Appearance**
        Patricia Hogan, Esquire
        Office of The Capital Collateral Counsel-South
        101 N.E. Third Avenue, Suite 400
        Fort Lauderdale, Florida 33301
        **02/05/02 and 02/06/02 - Court Appearance**

**<u>PINDER, RANDAL D.</u> - *CRIMINAL***
State of Florida vs.
    Case # 94-7991-CP-A02
    Palm Beach County, Florida
        David W. Olson, Esquire

250 Australian Avenue South, Suite 1504
West Palm Beach, Florida 33401
**02/21/97 - Deposition**

## PINSKY, RICKY LEE - *CRIMINAL*
United States of America vs.
Case # 08-14004-CR-Graham/LYNCH
Southern District of Florida
Richard G.Lubin, Esquire
1217 South Flagler Drive, Second Floor
West Palm Beach, Florida 33401
**05/12/08 — Court Appearance**

## PITTS, JOHNNIE - *CRIMINAL*
State of Florida vs.
Case # 97-14385 CF 10
Broward County, Florida
Jennifer Faerber, Esquire
State Attorney's Office
201 S. E. Sixth Street, Room 640
Fort Lauderdale, Florida 33301
**05/27/99 - Deposition**

Michael Trent, Esquire
1 Financial Plaza, Suite 1615
Fort Lauderdale, Florida 33394
**09/9/99 - Court Appearance**

## POLEN, DAVID – *FAMILY LAW*
vs. Rosa Polen
Case # 50 2004 DR 004924XXXXSB-FY
Judge Berger, Palm Beach County, Florida
Jeffery D. Fisher, Esquire
Fisher & Bendeck, P.A.
501 S. Flagler Drive, Suite 450
West Palm Beach, Florida 33401
**03/30/05 — Court Appearance**
Joel Weissman, Esquire
515 North Flagler Drive, Suite 1100
West Palm Beach, Florida 333401
**07/01/06 - Deposition**

**POLLARD, SAMUEL LOUIS - *CRIMINAL***
State of Florida vs.
    Case # 89-8353CF10
    Judge Richard Eade - Broward County, Florida
        Michael J. Hittleman, Esquire
        Public Defender's Office
        201 S. E. Sixth Street, Room 740
        Fort Lauderdale, Florida 33301
        **10/11/89 - Court Appearance**

**POMBERANZ, STUART - *CRIMINAL***
State of Florida vs.
    Case # 92-938CFA
    St. Lucie County, Florida
        Keith Krasnove, Esquire
        3300 University Drive, Suite 610
        Coral Springs, Florida 33065
        **07/01/93 - Court Appearance**

**POMANIO, BETTY - *CIVIL RIGHTS / PRIVACY***
vs. Federated Department Stores Inc. d/b/a Burdines et al
    Case # 89-6378CD
    Broward County, Florida
        J. Frank Beauchamp, III., Esquire
        Carman, Beauchamp & Sang, P. A.
        600 W. Hillsboro Blvd., Suite400
        Deerfield Beach, Florida 33441
        **04/23/92 - Deposition**
        **07/23/92 - Court Appearance**

**POSK, DOMINIQUE – FAMILY LAW**
vs. Peter Posk
    Case # 502010DR012021SBFX
    Palm Beach County, Florida
        Gary D. Weiner, Esquire
        1900 Glades Road, Suite 441
        Boca Raton, Florida 33431
        **10/9/2011 -Deposition**

**POTESTA, JORGE - *IMMIGRATION / NATURALIZATION***
United States of America vs.
    Case # 75431725

103

Judge Mander - Miami, Florida
Robert Sheldon, Esquire
2718 West Atlantic Blvd.
Pompano, Florida 33069
**04/22/98 -Court Appearance**

**PROSPERE, IRENE S. - *RACIAL DISCRIMINATION***
vs State of Florida Department of Health and Rehabilitative Services
Case # 98-1047-CV-18-C
United States District Court, Middle District of Florida, Orlando Division
John L. Morrow, Esquire
Conroy, Simberg & Ganon, P.A.
111 North Orange Avenue, Suite 1285
Orlando, Florida 32801
**11/10/99 - Deposition**

**POWELL, JR., AARON - *CRIMINAL***
State of Florida vs.
Case # 89-19543CF10A & 89-20838CF10A
Judge Leroy Moe - Broward County, Florida
Public Defender's Office
Broward County Courthouse
201 S. E. Sixth Street, Room 740
Fort Lauderdale, Florida 33301
**11/09/90 - Court Appearance**

**RABASSA, JOSE - *RACIAL DISCRIMINATION***
vs. Glen Evelyn, individually, and United HealthCare Corporation
Case # 97-2105-CIV-GRAHAM
Judge Garber United States District Court, Southern District of Florida, Miami Division
Steel, Hector & Davis, P.A.
200 South Biscayne Boulevard, Suite 3100
Miami, Florida 33131
**05/29/98 - Deposition**

**RAINEY, STANLEY W. - *CRIMINAL***
State of Florida vs.
Case # 90-13608CF10
Judge Leonard Fleet - Broward County, Florida
Arna Cortazzo, Esquire

Public Defender's Office
201 S. E. Sixth Street, Room 740
Fort Lauderdale, Florida 33301
**11/09/90 - Court Appearance**

**RAINIER, TERRY J** .- *FAMILY LAW*
and Kim Rainier
Case # 98-003237 (35) (91)
Judge Julie Koenig, Broward County, Florida
Robert W. Sidweber, Esquire
SunTrust Center, Suite 1150
515 East Las Olas Boulevard
Ft. Lauderdale, Florida 33301
**1/30/01 — Court Appearance**

**RANGASAMMY, BRIDJE — *PERSONAL INJURY***
vs. Lowe's Home Centers, Inc.
Case # CFA 29256L
Judge Leonard Fleet, Broward County, Florida
Mario E. Lopez, Esquire
Vernis & Bowling of Miami, P.A.
1680 N.E. 135th Street
North Miami, Florida 33181
**08/25/03 - Deposition**
**10/08/03 - Deposition**

Jeffrey J. Walker, Esquire
901 South Federal Highway, Suite 300
Fort Lauderdale, Florida 33308
**11/06/03 — Court Appearance**

**RANKIN, SAMANTHA, SELENE RANKIN, - *PERSONAL INJURY*
& HELEN RANKIN**
vs. Ocean Boulevard II, LLC, and Park One of Florida LLC
Case # 10-62143CA20, Circuit Court
Judge William Thomas, Miami-Dade County, Florida
Brian S. Keif, Esquire
Law Offices of Hugh Behan
Two Datran Center, Suite 1903
9130 South Dadeland Boulevard,
Miami, Florida 33156
**7/23/15 — Deposition**

105

**RANKIN, SAMANTHA, SELENE RANKIN, -** *PERSONAL INJURY*
**& HELEN RANKIN**
vs. Ocean Boulevard II, LLC, and Park One of Florida LLC
    Case # 10-62143CA20, Circuit Court
    Judge William Thomas, Miami-Dade County, Florida
    Daniel Caine, Esquire
    Law Offices of Stabinski & Funt P.A.
    757 N.W. 27th Avenue, Third Floor
    Miami, Florida 33324
    **2/3/16 — Court Appearance**

**RATNER, JEFFREY SCOTT —** *DEPENDENCY*
In The Interests of:
    Case # 01-CJ003473-A02
    Judge Roger B. Colton, Juvenile and Family Division, Palm Beach
    County, Florida
        Richard G. Lubin, Esquire
        Second Floor, Flagler Plaza
        1217 South Flagler Drive,
        West Palm Beach, Florida 33401
        **1/23/02 — Court Appearance**

**RENAUD, CLAUD as Personal Representative** -*WRONGFUL DEATH*
**of the Estate of Marie J. Renaud, and Jackie Renaud**
vs. Penn Tank Lines, Inc., a foreign corporation, RICHARD RATZELL,
individually, and Mobile Oil Corporation, a foreign corporation
    Case # 99-03298 CACE 18
    Judge W. Herbert Moriarty, Broward County, Florida
        Walter G. Latimer, Esquire
        Marlow, Connell, Valerius, Abrams, Adler and Newman
        2950 Southwest 27th Avenue, Suite 200
        Miami, Florida 33233-9075
        **10/13/00 - Deposition**
        **11/15/00 - Deposition**

**RESTAURANT MGMT. SERVICES, INC -** *DISCRIMINATION*
**(RELIGIOUS)**
Lois Gorman vs.
    Case # 95-611-CIVT21A
    Judge Ralph Nimmons - US District Court, Middle District of Florida,

Tampa Division
Donna M. Griffin, Esquire
Haynesworth, Bladwin, Johnson and Harper
600 North Westshore Boulevard, Suite 200
Tampa, Florida 33609
**09/04/96 - Court Appearance**

## RICCARD, WILLIAM - *AGE DISCRIMINATION & RETALIATION*
vs. The Prudential Insurance Company of America
NASD Case # 98-02143
National Association of Securities Dealers, Inc.
Robert W. Rasch, Esquire
201 Live Oak Lane
Altamonte Springs, Florida 32714
**07/13/00 - Hearing Appearanc**

**10/04/00 - Hearing Appearance**

## RICE, LOURDES – *DISABILITY/RETALIATION*
vs. Plantation General Hospital
Case #1:13-cv-21621-XXXX
United States District Court, Southern District of Florida,
Miami Division
Alexander D. del Russo, Esquire
Carlton Fields Jorden Burt P.A.
City Place Tower, Suite 1200
525 Okeechobee Boulevard
West Palm Beach, Florida 33401-7070
**09/06/16 –Deposition**
**01/18/17 – Court Appearance**

## RICK, RYAN – *PERSONAL INJURY*
vs. Kenneth Wortman
Case # CACE09028557
Broward County, Florida
Thomas J. Morgan, Sr., Esquire
Morgan Law Group
3850 Bird Road, Ste. 903
Coral Gables, Florida 33146
**03/01/10 – Deposition**

## RICKARD, WILLIAM – *LEGAL MALPRACTICE*

vs. Parker, Landerman & Parker, P.A.
    Case # C10-01-3434
    Orange County, Florida
        Donald L. O'Dell, Esquire
        Meier, Lengauer, Bonner, Muszynski & Doyle, P.A.
        37 North Orange Avenue, Suite 1100
        Orlando, Florida 32801
        **03/26/03 - Deposition**

## RILES, RALPH T. & DONNA RILES - *PERSONAL INJURY*
vs. King Metal Products, Inc.
    Case # 90-33657 (14)
    Broward County, Florida
vs. Mel Fishman et al
    Case # 91-32963 (10)
        Rand Ackerman, Esquire
        Green, Haverman & Ackerman, P. A.
        315 S. E. Seventh Street, Suite 200
        Fort Lauderdale, Florida
        **09/11/91 - Deposition**

## RILEY, FREDRICK ROWE — *FAMILY LAW*
vs Cindy Sue Riley
    Case # 2004 DR 0011886 FD
    Palm Beach County, Florida
        Michael P. Walsh, Esquire
        501 South Flagler, Suite 306
        West Palm Beach, Florida 33401
        **10/13/05 - Deposition**

## RILEY, LYNN - *FAMILY LAW*
vs David Frank Childers
    Case # 99-11446(36)
    Judge Renee Goldenberg - Broward County, Florida
        Jonathan S. Root, Esquire
        Northern Trust Tower, Suite 4199
        301 Yamato Road,
        Boca Raton, Florida 33431
        **03/16/00 - Court Appearance**
        **04/10/00 - Court Appearance**
        **04/17/00 - Court Appearance**

**RITTER, LORI TYLER [In the interests of] — *CHILD ABUSE***
a minor, by and through her mother, Lori Crawford
    Case # 2013DP300025 – Judge Donald Hafele
    Palm Beach County, Flotida
        Michael T. Dolce, Esquire
        324 Datura Street, Suite 223
        West Palm Beach, Florida 33401
        **03/26/2013 —Court Appearance**

**RIVERA, VASTHI** - *SEXUAL HARASSMENT*
a minor, by and through her mother and next of friend, Edith Rivera
Plaintiff
vs. Stacey's Buffet, Inc.
    Case # 96-05403-CA-F
    Brevard County, Florida
        John M. Breckenridge, Jr., Esquire
        7019 Pelican Island Drive
        Tampa, Florida 33634
        **04/29/97 - Deposition**

**ROBERTS, STEVEN - *FAMILY LAW***
vs. Peggy Roberts
    Case # 89-33809 (01)
    Broward County, Florida
        Sherman Crawford, Esquire
        2801 Ponce De Leon Blvd., Suite 400
        Coral Gables, Florida
        **04/26/90 - Court Appearance**
        **07/13/90 - Court Appearance**
        **07/24/90 - Court Appearance**

**ROBERTSON, MARCUS DWAYNE — *CRIMINAL***
United States of America vs.
    Case # 6:12-CR-63-ORL-31GJK
        Daniel N. Broderson, Esquire
        13350 West Colonial Drive, Suite 320
        Fort Lauderdale, Florida 34787
        **04/30/05 — Court Appearance**

**ROBERTSON, Susan- *FAMILY***
vs. Michael Roberston

Case # DR030548
Judge John M. Alexander- St. Johns County, Florida
Date; July 5, 2016
     David A. Garfinkel
     Gray Robinsin P.A.
     50 North Laura Steet, Suite 1100
     Jacksonville, Florida 32202-3611
     **07/27/16 - Court Appearance**
     **08/03/16 - Court Appearance**
     **09/16/16 - Court Appearance**

**<u>ROBINSON, JOHN et. al.</u> - *SEXUAL AND RACIAL DISCRIMINATION***
vs. Caulkins Indiantown Citrus Company, et al
     Case # 83-8655-CIV
     Judge Hoeveler - US District Court, Southern District of Florida, Dade
County Division
     John Bussian, Esquire
     200 Biscayne Blvd., Suite 5300
     Miami, Florida 33313
     **11/08/90 - Deposition**
     **11/28/90 - Deposition**
     **12/05/90 - Deposition**
     **01/30/91 - Deposition**
     **03/20/91 - Deposition**
     **03/21/91 - Deposition**
     **03/22/91 - Deposition**
     **04/10/91 - Deposition**
     **05/08/91 - Deposition**
     **06/04/91 - Deposition**
     **09/17/91 - Deposition**
     **09/19/91 - Deposition**

**<u>ROBINSON, WILLIAM</u> - *CRIMINAL***
State of Florida vs.
     Case # 88-22650CF
     Judge Russell Sealy - Broward County, Florida
     Mindy Solomon, Esquire
     201 S. E. Sixth Street, 6th Floor
     Fort Lauderdale, Florida 33301
     **07/26/90 - Deposition**
     **08/07/90 - Court Appearance**
     **08/08/90 - Court Appearance**

**RODRIQUEZ, ANTONIO & HENRIQUETA VILLEGA** — *PERSONAL INJURY*
vs. Jeff S. Nudelman and Joyce Nudelman d/b/a Stuart Lumber Company
    Case # 01-017876 CA 02
    Broward County, Florida
        Bruce M. Trybus, Esquire
        Cooney, Mattson, Lance, Blackburn, Richards & O'Connor, P.A.
        2312 Wilton Drive
        Fort Lauderdale, Florida 33302
        **02/13/03 — Deposition**

**RODRIGUEZ, HERNAN DIEGO PANIAGUA** — **FAMILY [HAGUE CASE]**
vs. Cinta Soledad Romero
    Case # 14-80885-CIV-COHN
    United States District Court, Southern District of Florida Fort Lauderdale, Florida
        Rachel LeBlanc, Esquire
        Shutts and Bowen LLP
        200 S.E. Third Avenue, Suite 2100
        Fort Lauderdale, Florida 33301
        08/07/2014 — Court Appearance

**ROGATZ, GARY** — *AGE DISCRIMINATION*
vs. State of Florida Department of Corrections
    Case # 02-004669-07
    Broward County, Florida
        Charles T. Whitelock, Esquire
        Whitelock & Associates P.A.
        300 Southeast 13th Street
        Fort Lauderdale, Florida 33316
        **01/20/05 — Deposition**

**ROMAGOZA ARCE, JUAN, NERIS GONZALES** — *WAR CRIMES* **CARLOS MAURICIO & JORGE MONTES**
vs. Jose Guillermo Garcia, an individual,
Carlos Eugenio Vides Casanova, an individual,
And Does 1 through 50, inclusive
    Case # 99-8364 CIV-HURLEY
    Judge Hurley — United States District Court, Southern District of Florida, Palm Beach Division
        Elizabeth Van Schaack, Esquire

Morrison & Foerster, LLP
755 Page Mill Road
Palo Alto, California 94304
**07/09/02 — Court Appearance**

**ROMANOFF, JUDY - *FAMILY LAW***
vs. Richard Romanoff
Case # 8417376 (10) - Broward County, Florida
Robert B. Resnick, Esquire
7777 Glades Road, Suite 207
Boca Raton, Florida 33434
**09/23/91 - Deposition**

**ROSEN, BONNIE - *LEGAL MALPRACTICE***
vs. The Law Office of David H. Zoberg, P.A., David H. Zoberg, individually, and Barbara Zoberg, a/k/a Bobbi or Bobbie Zoberg, individually
Case # 93-03960CA11
Dade County, Florida
Mark Vieth, Esquire
**08/31/95 - Deposition**

**ROSS, COGLAN & ALICE ROSS - *PERSONAL INJURY***
vs. William Smith
Case # 91-30449 (18)
Broward County, Florida
Ira Hatch, Esquire
1600 S. E. 17th Street Causeway, Suite 300
Fort Lauderdale, Florida 33316
**03/31/93 - Deposition**

**ROSS, ROBERT J. — *AGE DISCRIMINATION***
vs. Wal-Mart Stores, Inc., d/b/a Sam's Club Membership Warehouse, a foreign corporation
Case # 00-8319-CIV-HURLEY/LYNCH
United States District Court, Southern District of Florida, Northern Division
Karen N. Brackbill, Esquire
Vernis & Bowling, P.A.
517 Northlake Boulevard
North Palm Beach, Florida 33408
**05/10/01 - Deposition**

112

**ROQUE, ELIZABETH** - *FAMILY LAW*
In Re: The Marriage of Roy Paskow and
    Case # 95-000681 (37) (92)
    Broward County, Florida
        Gary T. Lazarus, Esquire
        One East Broward Boulevard, Suite 700
        Fort Lauderdale, Florida 33301
        **05/10/96 - Deposition**
        **05/13/96 - Deposition**
        **05/14/96 - Court Appearance**
        **05/16/97 - Court Appearance**

**ROWAN, DAVID** - *CRIMINAL*
**State of Florida vs.**
    Case # 99-17928CF
    Judge Mark Gold, Broward County, Florida
        Maurice Graham, Esquire
        339 East Prospect Road
        Oakland Park, Florida 33334
        **11/17/00 — Court Appearance**

**ROWLAND, DEBRA** - *SEXUAL HARASSMENT*
vs. Malcolm Cohen, etc. et al.
    Case # 88-6649 CIV ZLOCH
    United States District Court, Southern District of Florida, Broward
    County Division
        William R. Amlong, Esquire
        Amlong & Amlong, P.A.
        500 N. E. Forth Street, Suite 200
        Fort Lauderdale, Florida 33301
        **01/03/90 - Court Appearance**

**RUSS, HOPE — MEDICAL MALPRACTICE**
vs. Randal Silbiger, M.D.
    Case # 01016577-25
    Broward County, Florida
        Linda A. McCullough, Esquire
        Wicker, Smith, O'Hara, McCoy, Graham & Ford, P.A.
        515 E. Las Olas Boulevard
        SunTrust Center, Suite 1400
        P.O. Box 14460

Fort Lauderdale, Florida 33302
**05/11/05 – Deposition**
**06/28/05 – Deposition**
Jeffrey R. Lawley, Esquire
Wicker, Smith, O'Hara, McCoy, Graham & Ford, P.A.
Same address as above
**11/10/05 – Deposition**

**RUSSELL, CHERYL H. -** *FAMILY LAW*
In Re: The Marriage of Stephen N. Russell, and
Case # 95-0381 (36) (90)
Broward County, Florida
Douglas H. Reynolds, Esquire
Cox & Reynolds
4875 N. Federal Highway, Tenth Floor
Fort Lauderdale, Florida 33308
**06/28/95 - Deposition**

**RYBOVICH, DEBRA -** *FAMILY LAW*
vs. Anthony Stanley
Case # 98-9813FB
Judge Mary Lupo - Palm Beach County, Florida
Patricia Marin, Esquire
636 U. S. Highway One, Suite 105
North Palm Beach, Florida 33408
**03/01/99 - Court Appearance**
**04/19/99 - Court Appearance**
**06/17/99 - Court Appearance**
**08/18/99 - Court Appearance**

**RYLANDER, STELLA STAMITIA-** *GUARDIANSHIP*
Case #: 2016-CP-145K and 2016 MH144-K
Probate Division, Monroe Country, Florida
Chris Mancini, Esq.
224 East Commerical Blvd, Suite 300
Lauderdale By The Sea, Florida 33308
**06/21/16- Court Apperance**

**SANDERS, STACY** as parent and natural guardian of T.K. Romano, a
minor, and on behalf of herself **-** *SEXUAL ASSAULT*
vs. DI Hotel Management Corp.
Case # 02-18460 CA 9

Miami-Dade County, Florida
 Michael Mattson, Esquire
 Cooney, Mattson, Lance, Blackburn, Richards & O'Connor, P.A.
 2312 Wilton Drive
 Fort Lauderdale, Florida 33302
 **07/08/03 — Deposition**

## SANDS, JULIA A. — *FAMILY LAW*

vs. Ivan Kenneth Saltz, husband
 Case # 09-012627 (42/93)
 Judge Rothchild, In the Circuit Court of the 17th Judicial Circuit
 Broward County, Florida
  Michael Trent, Esquire
  1500 East Atlantic Blvd., Suite B
  Pompano Beach, Florida 33060
  **07/08/10 — Court Appearance**
  **09/02/10 — Court Appearance**

## SARDINE, RUPERT - *WRONGFUL DEATH*

vs. Calder Race Course, Inc. et al
 Case # 89-22786CA08
 Dade County, Florida
  Barbara Heyer, Esquire
  1311 S. E. Forth Avenue
  Fort Lauderdale, Florida 33316
  **08/13/92 - Deposition**

## SAUGER, CHINA - *PREGNANCY DISCRIMINATION*

vs. Lock Towns Community Mental Health Center, Inc.,
 Case # 97-4387-CIV-GOLD
 United States District Court, Southern District of Florida, Miami Division
  Gregory Palmer, Esquire
  Wicker, Smith, Tutan, O'Hara, McCoy, Graham & Ford, P..A.
  1 East Broward Blvd.
  Fort Lauderdale, Florida 33301
  **10/22/98 - Deposition**
  **04/13/99 - Deposition**
  **11/23/99 - Deposition**

## SAUNDERS, TODD MICHAEL - *PERSONAL INJURY*

vs. USAA Casualty Insurance Co, a Texas Corp.

Case # 89-35888 (20)
Broward County, Florida
    Jeffrey Walker, Esquire
    110 S. E. 6th Street, 14th Floor
    Fort Lauderdale, Florida 33301
    **06/13/91 - Deposition**

**SCHAFLER, ROBIN, -** *PREGNANCY DISCRIMINATION*
vs. Achievers Unlimited, Inc. and cornerstone Management Inc.
    Case # 98-00706:AF
    Judge Alvarez, Palm Beach County, Florida
        H. Ware Cornell, Esquire
        1401 E. Broward Boulevard, Suite 204
        Fort Lauderdale, Florida 33011
        **11/5/02 — Court Appearance**

**SCHOLZ, GEORGE W.** **-** *RACIAL DISCRIMINATION*
vs. RDV Sports, Inc., Individually, and as a General Partner of Orlando
Magic, Ltd., D/B/A The Orlando Magic
    Case # CI 92-7508
    Orange County, Florida
        John A. Reed, Jr., Esquire and
        Natalie, Jackvony, Esquire
        Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
        215 North Eola Drive
        Orlando, Florida 32802
        **05/25/95 - Deposition**
        **11/29/95 - Deposition**
        **02/06/96 - Court Appearance**

        James Tosana, Esquire
        Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
        **06/14/00 - Deposition**

        Daniel N. Brodersen, Esquire
        18 Wall Street,
        Orlando, Florida 32860
        **06/15/00 - Court Appearance**
        **06/16/00 - Court Appearance**

**SCHUMAN, ROBERT H.** **-** *FAMILY LAW*
vs. Shirley A. Schuman

Case # 89-25796 (17)
Broward County, Florida
    Sheldon T. Slatkin, Esquire
    **01/25/90 - Court Appearance**

**SCHUMAN, SHIRLEY - *CRIMINAL***
State of Florida vs.
    Case # 89-190803CF
    Judge Moe - Broward County, Florida
        Public Defender's Office
        Broward County Courthouse
        201 S. E. Sixth Street, Room 740
        Fort Lauderdale, Florida 33301
        **09/17/90 - Deposition**

**SCHWERDT, SALLEY H. - *FAMILY LAW***
vs. Gary E. Schwerdt
    Case # 95-004503
    Judge Rothschild - Broward County, Florida
        Douglas E. Reynolds, Esquire
        4875 N. Federal Hwy, 10th Floor
        Fort Lauderdale, Florida 33308
        **04/19/95 - Court Appearance**

**SECADA, DOLORES C. - *SEXUAL HARASSMENT***
vs. Coulter Corporation and Warren Randy Pechin
    Case # 95-2782-CIV-GRAHM
    Judge Shelby Heismith-US District Court, Southern District of Florida,
    Miami Division
        Paul Haroldson, Esquire
        Rasco & Reininger, P.A.
        5200 Blue Lagoon Dr., Suite 700
        Miami, Florida 33126
        **01/22/97 - Court Appearance**

**SECORD, AMELIA — *PERSONAL INJURY***
vs. Telemedia Investment Partnership, L.P.
    Case # 00-9400 CACE (25)
    Judge George A. Brescher — Broward County, Florida
        Susan P.Sistare, Esquire
        Sistare & Associates
        600 South Andrews Avenue, Suite 600

Ft. Lauderdale, Florida 33301
**04/02/01 - Deposition**

**SHERWOOD, MARK D.** - *FAMILY LAW*
vs. Anquelique Sherwood
Case # 90-32639
Judge Moriarity - Broward County, Florida
Renee Goldenberg, Esquire
Goldenberg & Goldenberg, P. A.
One Financial Plaza, Suite 2626
Fort Lauderdale, Florida 33394
**10/04/91 - Deposition**

**SHANNON, MARK ANTHONY -** *CRIMINAL*
State of Florida vs.
Case # 96-04008-CF
Judge John L. Phillips - Palm Beach County, Florida
David W. Olson, Esquire
250 Australian Avenue, Suite 1504
West Palm Beach, Florida 33401
**11/13/97 - Court Appearance**

**SINGH, KEVIN — CRIMINAL**
State of Florida vs.
Case # 12014222CF10A
Judge Timothy Bailey — Broward County. Florida
Chris Mancini, Esquire
213 Commercial Boulevard
Lauderdale-By-The-Sea
Florida, 33308
**10/24/2016 —Court Appearance**

**SIGNORE, JOSEPH, SCHUMACK, PAUL LEWIS, GRANDE-SIGNORE,
LAURA AND CRAIG ALLEN HIPP - CRIMINAL**
United States of America vs.
Case # 14-80081-CR-HURLEY/HOPKIND
United States District Court, Southern District of Florida
Anthony Natalie, Esquire
Office of the Federal Public Defender
150 West Flagler Street, Suite 1700
Miami, Florida 33130
**3/7/2016 —Court Appearance**

118

**SIMCOX, PAUL DiBERNARDO - *SEXUAL HARASSMENT***
vs. Waste Management, Inc. of Florida, a Florida Corporation; Douglas
Lukens; Ed Jeltema; and Tony Masuilus
      Case # 93-1243-CIV-T-17A
      United States District Court, Middle District of Florida, Tampa Division
            Thomas Dickson, Esquire
            Fechter & Dickson, P.A.
            102 West Whiting Street, Suite 502
            Tampa, Florida 33602
            **06/27/95 - Deposition**
            **08/31/95 - Deposition**

**SIMONS, SHAUNA - *PERSONAL INJURY***
      Case # 95-016743 04
      Broward County, Florida
            Philip J. Feldman, Esquire
            11900 Biscayne Boulevard, Suite 808
            North Miami Beach, Florida 33181
            **04/03/98 - Deposition**

**SIMS, WALTER - *CRIMINAL***
State of Florida vs.
      Case # 89-16460CF10
      Judge Carney - Broward County, Florida
            Suzanne Marie White, Esquire
            Assistant State Attorney
            201 S. E. Sixth Street / Sex Crimes Unit
            Fort Lauderdale, Florida 33301
            **03/13/90 - Court Appearance**

**SKARVELES, FRED - *CRIMINAL***
State of Florida vs.
      Case # 89-16460CF10
      Judge Carney - Broward County, Florida
            Michael Trent, Esquire
            1500 East Atlantic Blvd., Suite B
            Pompano Beach, Florida 33060
            **03/06/98 - Court Appearance**

**SLAUGHTER, THOMAS EDWARD - *AGE DISCRIMINATION***
vs. City of Melbourne, Florida

119

Case # 97-946-CIV-ORL-19C
Judge Warren Eginton, US District Court, Middle District of Florida,
Orlando Division
     Brian D. Solomon, Esquire
     Dempsey & Sasso, P.A.
     Barnett Bank Center
     390 North Orange Avenue, Suite 2700
     Orlando, Florida 32801
     **03/29/99 - Court Appearance**
     **03/30/99 - Court Appearance**

     Michael J. Roper, Esquire
     P. O. Box 3669
     Orlando, Florida 32802
     **11/12/98 - Deposition**

**SMITH, CONNIE J. - *SEXUAL HARASSMENT***
vs. United Parcel Service, Inc. and Steve Saunders
     Case # 92-10081-CIV-KING
     United States District Court, Southern District of Florida, Miami
     Division
          David T. Azrin, Esquire
          Courthouse Tower
          44 W. Flagler Street, Suite 2550
          Miami, Florida 33130
          **11/17/95 - Court Appearance**

**SMITH, MARK A.  - *PERSONAL INJURY***
vs. Florida Department of Corrections
     Case # 04-2007-CA-172
     Bradford County, Florida
          Catherine A. Riggins, Esquire
          Law Offices of Catherine A. Riggins, P.A.
          18521 N.W. 28th Place
          Miami Garden, Florida 33056

          Michael L. Glass, Esquire
          Fulmer, LeRoy, Albee, Baumann & Glass
          4720 Salisbury Road
          Jacksonville, Florida 32256
          **10/22/08 - Deposition**

<u>**SMITH, MICHAEL & BARBARA SMITH**</u> **-** *PERSONAL INJURY*
vs. Helen Papast Courtesy Car Rental & Sales, Inc.
      Case # 91-08024 (02)
      Broward County, Florida
           Michael R. Kaufman, Esquire
           Malove & Kaufman, P. A.
           48 East Flagler Street
           Penthouse - Flagler Station
           Miami, Florida 33131
           **08/24/93 - Deposition**
           **02/25/94 - Deposition**

<u>**SMITH, STEPHEN**</u> **-** *CRIMINAL*
State of Florida vs.
      Case # 90-22473CF10A
      Judge Backman - Broward County, Florida
           Hilliard Moldof, Esquire
           Whitelock & Moldof
           1311 S. E. Second Avenue
           Fort Lauderdale, Florida 33316
           **07/23/92 - Deposition**
           **08/08/92 - Deposition**
           **08/23/92 - Court Appearance**
           **09/28/92 - Court Appearance**
           **10/28/93 - Court Appearance**

<u>**SMITH, SUSAN**</u> – *PERSONAL INJURY*
vs. Festival Fun Parks
      Case # 01000627 (09)
      Judge Andrews, Broward County, Florida
           Mandi Stephenson, Esquire
           Johnson, Leiter & Belsky
           707 Southeast Third Avenue, 3rd Floor
           Fort Lauderdale, Florida 33316
           **08/04/04- Deposition**

<u>**SMYACK, THERESA –**</u><u>**CIVIL RIGHTS**</u>
vs. JPMorgan Chase Bank N.A.
           Case #0:15-CV-62236-RLR-CIV
           United States District Court, Palm Beach County
           Lori Y. Baggett, esquire
           Carlton Field

4221 West Boy Scout Boulevard, Suite 1000
Tampa, Florida 33609
**05/19/2016 - Deposition**

## SOTO, JOSE - *CIVIL RIGHTS*
vs. Video Take Out Inc.,
Case # 92-0428-(05)
Judge Estella Moriarty - Broward County, Florida
**12/09/97 - Court Appearance**
vs. Video Take Out, Inc.
Case # 89-6435 CIV-MOORE
Judge Moore
Kenneth P. Carman, Esquire
Carman, Beauchamp, Sang & Rothwell, P.A.
600 W. Hillsboro Blvd., Suite 400
Deerfield Beach, Florida 33441
**03/26/93 - Deposition**

## SOVEL-BONADEO, LAWRENCE DAVID - *FAMILY LAW*
and Elizabeth Ann Sovell-Bonadeo, n/k/a Elizabeth Lovins
Case # 98-332FS
Judge Robert Makimson - Martin County, Florida
Kathy A. Metzger, Esquire
789 South Federal Highway, Suite 206
Stuart, Florida 34994
**11/18/99 - Deposition**
Russell J. Ferraro, Esquire
3601 S.E. Ocean Blvd., Suite 201
Stuart, Florida 34996
**11/20/99 - Court Appearance**
**02/23/20 - Deposition**

## SPANO, ROSE MARIE - *FAMILY LAW*
vs. Dennis Bruce
Case # 93-3711FC(18)
Judge Sandy Karlin — Dade County, Florida
Leon Margules, Esquire
200 East Broward Blvd.
Fort Lauderdale, Florida 33301
**09/20/00 — Court Appearance**
Edward Cahart, Esquire
201 Alhambra Circle, Suite 711

122

Coral Gables, Florida 33134
**10/03/01- Court Appearance**
**10/24/01- Court Appearance**

## SPIELVOGEL, MICHAEL — *CRIMINAL*

United States of America vs.
Case # 500-CR-21-OC-10 Judge W. Terrell Hodges
United States District Court, Middle District of Florida, Ocala Division
Daniel N. Brodersen, Esquire
37 North Orange Avenue, Suite 500
Orlando, Florida 32801
**02/02/01 - Court Appearance**
**05/24/01 - Court Appearance**

## SPINDEL, SPINDEL - *FAMILY*

vs. Judy Ann Spindel
Case # 02-003722[35/91] Judge Arthur Birkin
Michael J. Trent, Esquire
1500 East Atlantic Boulevard, Suite B
Pompano Beach, Florida 33060
**08/07/2014 - Court Appearance**

## SPOERRI, TOMMY MARTIN - *CRIMINAL*

State of Florida vs.
Case # 87-34811
Dade County, Florida
Stephen Lange, Esquire
7 S. E. Thirteenth Street
Fort Lauderdale, Florida 33316
**09/22/88 - Deposition**
**09/30/88 - Court Appearance**

## STAMOS, GEORGE D. - *DISABILITY*

vs. Investors of WCI, Inc, et. al.
Case # 98-6857-CIV-Seitz
United States District Court, Southern District of Florida, Miami Division
Raul Valles, Jr., Esquire
Annis, Mitchell, Cockey, Edwards & Roehn, P.A.
1 Tampa City Center Bldg., Suite 2100
Tampa, Florida 33601
**09/10/99 - Deposition**

William R. Amlong, Esquire
500 N.E. Fourth Street, Suite 200
Fort Lauderdale, Florida 33301
**02/17/20 - Court Appearance**

## STEWART, DONNA RAE - *CRIMINAL*
State of Florida vs.
Case # 99-3670 CF10A
Judge Ilona Holmes - Broward County, Florida
Michael Trent, Esquire
1500 East Atlantic Boulevard, Suite B
Pompano Beach, Florida 33060
**02/15/00 - Court Appearance**
**05/05/00 - Court Appearance**

## STOCKETT, MICHELLE ANN - *SEXUAL HARASSMENT*
vs. Frank Tolin, et. al.
Case # 88-1550-CIV
Judge Marcus — US District Court, Southern District of Florida, Miami
Division
William R. Amlong, Esquire
500 N. E. Fourth Street, Suite 200
Fort Lauderdale, Florida 33301
**10/23/89 - Deposition**
**02/14/90 - Court Appearance**
**02/15/90 - Court Appearance**

## SECURITY LIFE INSURANCE COMPANY OF AMERICA - *CIVIL*
a foreign corporation authorized to do business in the State of Florida
Stoia, Daniel P. vs.
Case # 96-54-CIV-ORL-19
United States District Court, Middle District of Florida, Orlando
Division
Michael C. Sasso, Esquire
Dempsey & Associates, P.A.
1031 W. Morse Blvd., Suite 200
Winter Park, Florida 32789
**01/27/97 - Deposition**

## SEQUIER, Anthony — *CRIMINAL*
State of Florida vs.

Case # 04004463CF10B
Judge Levinson, Broward County, Florida
 Anthony M. Livoti, Esquire
 721 N.E. Third Avenue, Suite 1
 Fort Lauderdale, Florida 33304
 **8/12/2010- Court Appearance**

**SULLIVAN, MELLISSA - *SEXUAL HARASSMENT***
vs. Lake Region Yacht and Country Club
 Case # 97-1464-CIV-T17A
 United States District Court, Middle District of Florida, Tampa Division
 John Campbell, Esquire
 Malfitano, Campbell & Dickinson, P.A.
 101 East Kennedy Blvd., Suite 1840
 Tampa, Florida
 **01/23/98 - Deposition**

**SURLOFF, ARTHUR B. AND CHERI SURLOFF - *PERSONAL INJURY***
vs. Travelers Indemnity Co, a foreign corporation
 Case # 94-11061 (18)
 Broward County, Florida
 John H. Richards, Esquire
 Cooney, Mattson, Lance, ET. Al.
 P. O. Box 14546
 Fort Lauderdale, Florida 33302
 **10/23/96 - Deposition**
 **01/21/97 - Deposition**

**SUSKEY, KAROL - *SEXUAL HARASSMENT***
vs. Morrison's Restaurants, Inc., Morrison's Health Care
Division, and Ira Clark, as President of the Public Health
Trust of Dade County Florida d/b/a Jackson Memorial Hospital
 Case # 96-471-Civ- Nesbitt
 Judge Fred Moreno, United States District Court, Southern District,
 Miami Division
 Lee Kraft Chick, Esquire
 Assistant County Attorney
 111 N.W. First Street, Suite 2600
 Miami, Florida 33128
 **08/22/00 - Deposition**

 William R. Amlong, Esquire

125

500 N.E. Fourth Street, Second Floor
Fort Lauderdale, Florida 33301
**08/07/00 - Court Appearance**

## SWEIGARD, DANIEL G. — *FAMILY LAW*
*vs. Alexandra Beckers*
 *Case # FMCE 10-09045*
 Judge Alfred Horowitz, Broward County, Florida
  Scott J. Brook, Esquire
  2855 N.University Drive, Suite 510
  Coral Springs, Florida 33065
  **08/14/14 —Court Appearance**


## SWINTON, PRECIOUS & BATEMAN, DEBORAH — *SEXUAL ABUSE*
vs. Connail Johnson, Patricia Johnson and New Hope Missionary Baptist Church
 Case # 03-016079 (07), Broward County, Florida
  Michelle A. Delancy, Esquire
  200 South Biscayne Blvd., Suite 2680
  Miami, Florida 33131
  **03/06/08 - Deposition**

## TAKAHASHI, MATTHEW — *CIVIL*
State of Florida vs.
 Case # 2009CF008698AXX
 Judge Stephen Rapp, 15th Judicial Circuit, Palm Beach County, Florida
  Jonathan Kaplan, Esquire
  Lubin & Metz, P.A.
  1217 South Flagler Drive
  2nd Floor, Flagler Plaza
  West Palm Beach, Florida 33401
  **03/09/11 — Court Appearance**

## TANNER, MARCUS —FAMILY LAW
and Erin Bailey
 Case # 11-017793 [41/90], Circuit Court, Broward County, Florida
  Terri Fixel, Esquire
  Fixel & La Rocco
  3850 Hollywood Boulevard, Suite 300
  Hollywood, Florida 33021
  **02/23/15 - Deposition**

**04/27/15 - Deposition**
**05/06/15 - Deposition**

**TEITLEBAUM, PERRI E — *FAMILY LAW***
vs. Kassi Ann Khadr
    Case #502011DR001833XXXXSB
    Judge Martin H. Colin —Palm Beach County, Florida
        Charles D. Jamieson, Esquire
        1615 Forum Place, Suite 500
        West Palm Beach, Florida 33401
        **02/11/13- Court Appearance**
        **04/11/13- Court Appearance**

**TELAMACHOS, KATHERINE - *CRIMINAL***
State of Florida vs.
    Case # 90-15384CF10C
    Judge Charles Greene - Broward County, Florida
        Howard M. Zeidwig, Esquire
        633 S. E. Third Avenue, Suite 4F
        Fort Lauderdale, Florida 33301
        **12/04/91 - Court Appearance**

**TESTAGROSSA, MICHAEL - *FAMILY LAW***
Kelly Ann Testagrossa vs.
    Case # FMCE 96-6751 (90)
    Judge Lynch - Broward County, Florida
        Karen Coolman Amlong, Esquire
        Sheryl T. Simon, Esquire
        500 N. E. Fourth Street, Second Floor
        Fort Lauderdale, Florida 33301
        **04/30/97 - Court Appearance**

**THEOLET, CARL - *CRIMINAL***
State of Florida vs.
    Case # 94-301-CF
    St. Lucie County, Florida
        Mark V. Harlee, Esquire
        Chief Assistant Public Defender
        200 South Second Street
        Fort Pierce, Florida 34950
        **08/28/95 - Deposition**
        **11/27/95 - Court Appearance**

**12/06/95 - Court Appearance**

**THOMPSON, PRECIOUS** - *CRIMINAL*
State of Florida vs.
      Case # 92-2125 -CF-10A
      Judge Susan Lebow - Broward County, Florida
          Peter J. Giacoma, Jr., Esquire
          One Financial Plaza, Suite 1910
          Fort Lauderdale, Florida 33394
          **11/12/93 - Court Appearance**

**THURSTON, MAE** - *CRIMINAL*
State of Florida vs.
      Case # 88-2338CF10A
      Judge Tyson - Broward County, Florida
          William R. Amlong, Esquire
          Amlong & Amlong, P.A.
          500 N. E. Fourth Street, Second Floor
          Fort Lauderdale, Florida 33301
          **04/13/89 - Court Appearance**
          **06/02/89 - Deposition**
          **06/05/89 - Court Appearance**

**TODD, GILES, BURCH** - *SEXUAL HARASSMENT*
vs. Elks et. al.
      Case # 93-2592CA11B
      United States District Court, Middle District of Florida, Orlando
      Division
          Rick Kolodinsky, Esquire
          707 East Third Avenue
          New Smyra Beach, Florida 32169
          **12/07/95 - Deposition**

**TOTI, JAMI** - *CRIMINAL*
State of Florida vs.
      Case # 91-14516CF10B
      Judge Tyson - Broward County, Florida
          Jeffrey M. Harris, Esquire
          Penthouse Suite - Barnett Bank
          One East Broward Blvd.
          Fort Lauderdale, Florida 33301
          **06/09/93 - Deposition**

**08/10/93 - Deposition**

**TOWNSEND, ROSALIE - *SEXUAL DISCRIMINATION***
vs. Sears, Roebuck and Co.
    Case # 95-502-CIV-ORL-22
    United States District Court, Middle District of Florida, Orlando
    Division
        Jill S. Schwartz, Esquire
        Jill S. Schwartz & Associates, P.A.
        180 Park Avenue North, Suite 200
        Winter Park, Florida 32789
        **05/17/96 - Deposition**

**TRICARICO, ROCCO - *CRIMINAL***
State of Florida vs.
    Case # 91-8232CF10A
    Judge Julian - Broward County, Florida
        Hale M. Schantz, Esquire
        1900 N. University Drive, Suite 208
        Pembroke Pines, Florida 33024
        **09/03/98 - Deposition**

**TURNER, JOHN B. — *DISABILITY***
vs. The Paul Revere Life Insurance Company
    Case # 98-21256-CA 01- Judge Ronald M. Friedman
    Dade County, Florida
        Leonor M. Lagomasino, Esquire
        Greenberg & Lagomasino, P.A.
        799 Brickell Plaza, Suite 700
        Miami, Florida 33131
        **10/30/01 — Deposition**

        Neil Flaxman, Esquire
        550 Biltmore Way, Suite 780
        Coral Gables, Florida 33134
        **2/9/02 — Court Appearance**
        **2/12/02 — Court Appearance**

**UROQUIOLA, SHERRI LYNN - *SEXUAL HARASSMENT***
vs. Linen Supermarket, Inc, and Shahram Ziba
    Case # 94-14-CIV-ORL-19
    United States District Court, Middle District of Florida, Orlando

Division
       M. Susan Sasso, Esquire
       Dempsey & Associates
       1031 W. Morse Blvd., Suite 200
       Winter Park, Florida 32789
       **01/30/95 - Deposition**

## VALENTI, MICHAEL — *FAMILY LAW*

In Re: The Marriage of Gail L. Valenti and
    Case #: 50 2006 DR 001711XXXXSB FZ
    Palm Beach County, Florida
       Gary D. Weiner, Esquire
       Weiner & Associates, P.A.
       2000 Glades Road, Suite 210
       Boca Raton, Florida 33431
       **08/07/06 — Court Appearance**

## VALENTI, VIRGINIA - *PERSONAL INJURY*

vs. Shadowood Condominium Association, Inc., Community Advantage, Inc. and Arlene Pittman
    Case # 95-2873 09
    Judge Lance Andrews - Broward County, Florida
       Rand Ackerman, Esquire
       315 S. E. Seventh Street
       Fort Lauderdale, Florida 33301
       **02/04/98 - Deposition**
       **10/07/98 - Court Appearance**

## VAN DERMOLEN, JUSTIN - *CHILD SEXUAL ABUSE / DEPENDENCY*

State of Florida, in the Interests of
    Case # 98-44 DP
    Judge Robert Makemson - Okeechobee County, Florida
       Russell J. Ferraro, Esquire
       3601 South East Ocean Blvd., Suite 201
       Stuart, Florida 34996
       **11/04/98 - Court Appearance (Hearing)**

## VELAZQUEZ, AMILKAR - *RACE DISCRIMINATION*

vs. Shoney's, Inc./TPI RESTAURANTS, Inc., a Tennessee corporation
    Case # 97-1540-CIV-ORL-22C
    United States District Court, Middle District of Florida, Orlando Division

Kathryn Lake, Esquire
Fowler & White, P.A.
501 East Kennedy Blvd., Suite 1700
Tampa, Florida 33602
**02/11/99 - Deposition**


## VELEZ, INGRID - *WRONGFUL DISCHARGE*
vs. Florida Department of Transportation
File # A6-436277
United States District Court, Southern District of Florida, Palm Beach
Division
Mark A. Cohen, Esquire
Box 907354
931 Village Blvd.
West Palm Beach, Florida 33409
**04/26/89 - Deposition**


## VILLALOBOS, ALI - *CRIMINAL*
State of Florida vs.
Case # 97-012505CF10A
Judge Ronald Rothchild - Broward County, Florida
Michael Trent, Esquire
1500 East Atlantic Blvd., Suite # B
Pompano Beach, Florida 33060
**03/15/99 - Court Appearance**
**07/08/99 - Court Appearance**
**08/07/01 - Court Appearance**


## VISCOMI, NANCY,f/k/a NANCY PHENIX - *SEXUAL HARASSMENT*
vs. Federal Land Title Corporation, Richard H. Richardson, Carole A.
Richardson, and Jay Fiore
Case # 95-08558 (14)
Judge Ruvin - Broward County, Florida
Gregg R. Schwartz, Esquire
44 W. Flagler Street, Suite 200
Miami, Florida 33130
**08/22/96 - Deposition**
**08/26/96 - Deposition**
**12/06/96 - Deposition**


## WACHTEL, RENEE - *FAMILY LAW*
In Re: The Marriage of Samuel Wachtel and

131

Case # 84-05098 (01)
Broward County. Florida
    Philip Landsman, Esquire
    Platt, Hasas & Landsman, P. A.
    500 E. Broward Blvd., Suite 1850
    Fort Lauderdale, Florida 33394
    **01/28/91 - Deposition**

## WACTLAR, LAWRENCE - *CRIMINAL*
State of Florida vs.
    Case # 98-21141CF10A
    Judge Ronald J. Rothschild, Broward County, Florida
        Michael J. Trent, Esquire
        1500 East Atlantic Boulevard, Suite B
        Pompano Beach, Florida 33060
        **06/07/00 - Court Appearance**

## WADE, JULIA — *FAMILY*
vs. Robert Timothy Altizer
    Case # 015058, Judge Patricia Cocalis
    Broward County, Florida
        Jerry Riggs, Esquire
        Fortunato & Riggs
        100 South East Third Avenue, Suite 2024
        Fort Lauderdale, Florida 33394
        **01/117/03- Court Appearance**

## WARDNER, JAMES - *FAMILY LAW*
In Re: The Marriage of Carol Stillwagon and
    Case # 2002 33537 FMDL- Judge Randall Rowe III
    Volusia County. Florida
        Tammy Jaques, Esquire
        121 W. Wisconsin Ave., Suite B
        DeLand, Florida 32720
        **11/15/10 — Deposition**
        **04/08/11 — Court Appearance**

## WARDNER, JAMES - *FAMILY LAW*
In Re: The Marriage of Carol Stillwagon and
    Case # 2002 33537 FMDL —Judge Randall Rowe III
    Volusia County. Florida
        Theodore Greene, Esquire
        P.O. Box 720157

Orlando, Florida 32872
**6/3/11 - Court Appearance**

**WAJER, JOAN - *SEXUAL HARASSMENT***
vs. Altas Pen & Pencil Co., a Florida Corporation, and Harold Schneider
Case # 94-01419121
Broward County, Florida
Scott Rothstein, Esquire
8211 West Broward Blvd., Suite 420
Fort Lauderdale, Florida 33322
**04/09/96 - Deposition**

**WALTER, NORMA - *SEXUAL HARASSMENT***
vs. Palm Beach Community College
Case # 92-8384-CIV-FERGUSON
United States District Court, Southern District of Florida, Palm Beach
Division
Isidro M. Garcia, Esquire
Vassallo, Garcia & Garcia, P.A.
3501 S. Congress Avenue
Lake Worth, Florida 33461
**03/16/94 - Deposition**

**WARREN, SHERRY E. - *SEXUAL HARASSMENT***
vs. Medical Services of America Inc. d/b/a Medi-World, and d/b/a
Community Home Health, Leon Hendley, and Leon Hendley, P.A.
Case # 95-14288-CIV-DAVIS
United States District Court, Southern District of Florida, Palm Beach
Division
Raymond M. Christian, Esquire
580 Willage Blvd., Suite 160
West Palm Beach, Florida 33409
**11/25/96 - Deposition**

**WATSON, JAMES - *CRIMINAL***
State of Florida vs.
Arrest # 90000813
Palm Beach County, Florida
Gary Caldwell, Esquire
Office of the Public Defender
Capital Crimes Division
421 Third Street

West Palm Beach, Florida 33401
**06/11/90 - Court Appearance**

**WATSON, ROBERT JOHN** — *CRIMINAL*
United States of America vs.
Case # 02-CR-600097-Dimitrouleas
United States District Court, Southern District of Florida, Fort Lauderdale Division
Rhonda A. Anderson, Esquire
2222 Ponce de Leon Blvd., Suite 500
Coral Gables, Florida 33134
**11/29/02 - Court Appearance**

**WEINER-HOLLANDER** — *DISABILITY*
and Jeffrey Alan Hollander
Case # 03-19352FMCE (42/91)
Judge Rothschild, Broward County
Roger J. Schindler, Esquire
Simon, Schindler, and Sandberg, LLC
2650 Biscayne Boulevard
Miami, Florida 33137
**12/21/04 — Court Appearance**

**WEISS, ANDREW** - *CRIMINAL*
United States of America vs.
Case # 05-80138-CR-Hurley/Vitunac
United states District Court, Southern Division of Florida, Palm Beach Division
Richard G. Lubin, Esquire
1217 South Flagler, Flagler Plaza
West Palm Beach, Florida 33401
**04/28/06 — Court Appearance**

**WHITE, CAROL** - *FAMILY LAW*
Timothy Joe White vs.
Case # 93-29125 (37)
Louisville, Kentucky
E. Ross Zimmerman, Esquire
7797 N. University Drive, Suite 108
Tamarac, Florida 33321
**05/16/94 - Court Appearance**

<u>**WHITE, WILLIAM MELVIN**</u> **— *CRIMINAL / POST CONVICTION***
State of Florida vs.
    Case # 78-1840/C
    Orange County, Florida
        Steve Malone, Esquire
        Office of the Public Defender
        Governmental Center, 9th Floor
        301 North Olive Avenue
        West Palm Beach, Florida 33401
        **04/12/92 - Court Appearance**

    Case # CR78-1840
    Judge Margaret Waller - Orange County, Florida
        Christopher Lerner, Esquire
        State Attorney's Office
        415 Orange Avenue
        Orlando, Florida 32801
        **11/18/99 - Deposition**
        **11/21/99 - Deposition**

        Chandler R. Muller, Esquire
        1150 Louisiana Avenue, Suite 2
        Winter Park, Florida 32790
        **11/22/99 - Court Appearance**

<u>**WHITMAN, LINDA**</u> **— *DISABILITY DISCRIMINATION***
vs. South Broward Hospital District d/b/a Memorial Healthcare System
    Case # 13-61927-CIV-DIMITROULEAS-SNOW
    United States District Court-Southern Disterict of Florida
        Jenna Rinehart Rassif, Esquire
        Jackson Lewis
        2 Biscayne Boulevard, Suite 1500
        Miami, Florida 33131
        **10/1/2014 — Court Appearance**
        **12/10/14 - Deposition**

<u>**WIDMANN, KAREN**</u> **- *WHISTLE BLOWER***
vs. East Point Hospital, Inc.
    Case # 95-5093-CA-LG
    Lee County, Florida
        John E. Johnson, Esquire
        Trenam, Kemker, Scharf  et. al.

2700 Barnett Plaza
Tampa, Florida 33602
**05/06/97 - Court Appearance**

## WILLIAMS, GLENDA - *CRIMINAL*
United States of America vs.
Case # 943601-CF 10A - Zloch
United States District Court, Southern District of Florida, Fort Lauderdale Division
C. Craig Stella, Esquire
110 S. E. Sixth Street, Suite 1710
Fort Lauderdale, Florida 33301
**11/18/94 - Court Appearance**
**01/27/95 - Court Appearance**
**03/03/95 - Court Appearance**

## WILLIAMS, RONALD J. - *AGE DISCRIMINATION*
vs. Orange County, a political subdivision of the State of Florida
Case # 96-1316-CIV-ORL-22
United States District Court, Middle District of Florida, Orlando Division
John Dempsey, Esquire
Ackerman & Senterfitt, P. A.
255 South Orange Avenue, 17th Floor
Orlando, Florida 32802
**07/23/98 - Deposition**
**09/09/98 - Deposition**

## WILLIAMS, RONNIE KEITH — *CRIMINAL LAW*
State of Florida vs.
Case # 84-10364CR
Broward County, Florida
Jeffrey M.Harris, Esquire
1 East Broward Boulevard, Suite 925
Fort Lauderdale, Florida 33301
**05/10/1985 — Deposition**

## WILLIAMS, RONNIE KEITH — *POST DEATH CONVICTION*
State of Florida vs.
Case # 9303005
Broward County, Florida
Roseanne Eckert, Esquire

136

Capital Collateral Regional Counsel-South
101 N.E. Third Avenue, Suite 400
Fort Lauderdale, Florida 33301
**09/24/2012 —Court Appearance**


**WILLNER, MARK - *FAMILY LAW***
In Re: The Marriage of Mark and Sherry Christa Willner, Respondent
Case # 93-02659 40
Broward County, Florida
Dale R. Sanders, Esquire
Lyons & Sanders, P.A.
P.O. Box 1778
Fort Lauderdale, Florida 33302
**08/29/94 - Court Appearance**


**WILSON, CARLISLE - *DISABILITY DISCRIMINATION***
vs. Broward County, a political subdivision of the State of Florida.
Case # 04-61068-CIV
Judge Kenneth Marra
Southern District of Florida
William Tucker, Esquire
William D. Tucker, P.A.
718 Northeast Second Avenue
Fort Lauderdale, Florida 33304
**12/12/06 — Court Appearance**

**WILSON, JOHN EDGAR - *CRIMINAL***
State of Florida vs.
Case # 86-12918CF10
Judge Leroy Moe - Broward County, Florida
W. Hobson, Esquire
Public Defender's Office
201 S. E. Sixth Street, Room 740
Fort Lauderdale, Florida 33301
**10/06/87 - Court Appearance**

**WINEPOL, BETH - *GENDER DISCRIMINATION***
vs. David's Bridal Wearhouse, Inc.
Case # 98-6570-CIV-HURLEY
United States District Court, Southern District of Florida, Fort

137

Lauderdale Division
Donner Waters Romero, Esquire
Hinshaw & Culbertson, P.A.
1 East Broward Blvd., Suite # 1010
Fort Lauderdale, Florida 33301
**07/08/99 - Deposition**

**WINTERMEYER, CHARLOTTE & KEITH** - *PERSONAL INJURY*
vs. General Cinema of Florida
Case # 90-19789 (04)
Broward County, Florida
Jeffrey J. Walker, Esquire
110 S. E. Sixth Street, 4th Floor
Fort Lauderdale, Florida 33301
**01/24/91 - Deposition**

**WISEBERG, CRAIG — *CRIMINAL***
United States of America vs.
Case # 13-80217-CR-Marra/Matthewman
United States District Court, Southern District of Florida
Dave Lee Brannon, U.S. Magistrate Judge
Jonathan Kaplan, Esquire
Law Offices of Richard Lubin P.A.
1217 South Flagler Plaza
West Palm Beach, Florida 33401
**11/7/13 — Court Appearance**
**12/13/13 — Court Appearance**

Chris Mancini, Esquire
Law Offices of Chris Mancini, P.A.
100 S.E. Third Anenue, Suite 2010
Fort Lauderdale, Florida 33394
**11/21/14 — Court Appearance**

**WISNIEWSKI, PATRICIA** - *SEXUAL HARASSMENT*
vs. Columbia HCA Healthcare Corporation, Lawnwood Medical Center, Inc.,
and Nicholas Ioannou
Case # 96-14195CIV-PAYNE
United States District Court, Southern District of Florida, Palm Beach
Division
Joseph Mannikko, Esquire
Mannikko & Baris, P.A.

138

215 South Federal Highway, Suite 100
Stuart, Florida 34994
**11/15/98 - Court Appearance**
**11/20/98 - Court Appearance**
**11/30/98 - Court Appearance**

**WONG, ANGELIQUE S. and BARBARA LIN — *PERSONAL INJURY***
vs. World Imports International, Inc., a Florida Corporation; and Michael
Krumholz, as personal representitive of the Estate of Spenser R. Krumholz
Case #0812689 (14)
Broward County, Florida
Samuel Tyler Hill, Esquire
Hill & Lemongello, P.A.
800 S.E. 3rd Avenue, Suite 200
Fort Lauderdale, Florida 33301
**11/12/09 — Deposition**
**11/20/09 — Deposition**
**2/18/10 -  Deposition**
William M. Julien, Esquire
The Milan — Suite 550
1675 North Military Trail
Boca Raton, Florida 33486
**11/29/10 - Testimony**

**WOOD, KARYN — *DISCRIMINATION***
vs. Kmart Corporation
Case # 05-60792-CIV-ZLOCH
United States District Court, Southern District of Florida, Miami
Division
Michael Tricarico
Ogletree, Deakins, Nash, Smoak, & Stewart, P.C.
701 Brickell Avenue, Suite 2020
Miami, Florida 33131
**06/15/06 - Deposition**
**07/07/02 — Deposition**

**WOODS, JOYCE - *FAMILY LAW***
vs. Jonny W. Woods
Case # 90-34439 (17)
Broward County, Florida
Donald K. Corbin, Esquire
727 N. E. Third Avenue, Suite 301

139

Fort Lauderdale, Florida 33304
**05/20/91 - Deposition**
**09/27/91 - Deposition**
**10/01/91 - Court Appearance**

### WRIGHT, LYNDA WOLFE - *SEXUAL HARASSMENT*
vs. City of Winter Park
Case # 94-435-CIV-ORL-18
United States District Court, Middle District of Florida, Orlando Division
M. Susan Sasso, Esquire
Dempsey & Associates, P.A.
1031 W. Morse Boulevard, Suite 200
Winter Park, Florida 32789
**06/23/95 - Deposition**

### WYSCOKI, DOV & WYSOCKI, GALIT - *PERSONAL INJURY*
vs. Traylor Electric Co., & Rodney Robinson
Case # 91-05129-04 (File # 30829-7TAG)
Broward County, Florida
Thomas T. Grimmett, Esquire
P.O. Box 14218
Fort Lauderdale, Florida 33302
**08/06/92 - Deposition**

### YOUNG, EDWIN WILLIAM JR. - *CRIMINAL*
United States of America vs.
Case # 03-80034-CR-Middlebrooks
United States District Court, Southern District of Florida, Palm Beach Division
Bruce Zimet, Esquire
1 Financial Plaza, Suite 2612
Fort Lauderdale, Florida 33394
**01/12/04 — Court Appearance**

### ZAMORA, ADOLFO P. — *AGE DISCRIMINATION*
vs. Florida Atlantic University Board of Trustees
Case # 50 2004 CA 004311 MBAO, Palm Beach County, Florida
Judge David Crow
Karen Coolman Amlong, Esquire
Amlong & Amlong, P.A.
500 N.E. Fourth Street, Suite 200

Fort Laudersale, Florida 33301
**01/24/06 – Court Appearance**

## ZIEGLER, JONNA - *MEDICAL MALPRACTICE*
vs. Donner Chiropractic Center, Inc.; a Nevada Corporation licensed in the State of Nevada; Jeffrey Scott Donner, D. C. , individually ; ROE Corp.
 Case # A323174, Clark County, Nevada
 Judge Mark Denton
  Robert T. Eglet, Esquire
  Eglet & Prince, LLP
  600 Whitney Ranch, Bldg C, Suite 14-15
  Henderson, Nevada 89014
  &
  Kenneth L. Hall, Esquire
  633 S. Fourth Street, Suite 1
  Las Vegas, NV 89101
  **01/26/98 - Deposition**

  Niels L. Pearson, Esquire
  Pearson, Patton, Shea, Foley & Kurtz, P.C.
  6900 Westcliff  Drive, Suite 800
  Las Vegas, Nevada 89128
  **10/13/98 - Court Appearance**

## ZIEGLER, RANDALL CLARK - *CRIMINAL*
State of Florida vs.
 Case # 91-16010CF10A
 Judge Susan Lebow - Broward County, Florida
  Anthony C. Vitale, Esquire
  Anthony Vitale & Associates, P.A.
  2400 S. Dixie Hwy, Suite 105
  Miami, Florida 33133
  **08/15/94 - Deposition**

## ZILINSKY, ALAN –*FAMILY LAW*
vs. Zilinsky, Elizabeth
 Case # 2002 DR 3848 FZ
 Judge Kenneth D. Stern – Palm Beach County, Florida
  Gabrielle D'Agostino, Esquire
  Constantino & D'Agostino, P.A.
  2000 Banks Road, Suite 209
  Margate, Florida 33063

**02/12/10 -  Court Appearance**
**02/24/10 – Court Appearance**


**ZITMAN, LUCIA N. - *RACIAL DISCRIMINATION***
vs. Glen Evelyn, individually, and United HealthCare Corporation
    Case # 97-2105-CIV-GRAHAM
    Judge Garber – US District Court, Southern District of Florida, Miami
    Division
        Steel, Hector & Davis, P.A.
        200 South Biscayne Boulevard, Suite 3100
        Miami, Florida 33131
        **05/29/98 - Deposition**

### GLENN R. CADDY, Ph.D., P.A.

## FINANCIAL AGREEMENT AND INSURANCE INFORMATION

**I.  Standard, Reasonable, and Customary Fee:** The fees for professional services by Glenn R. Caddy, Ph.D., P.A. are payable at the time services are rendered.  The standard reasonable and customary fee for psychotherapeutic and clinical evaluative services is based on a **45-55** minute session and is three hundred **($400)** per session. The fee for in-hospital services is the same. Forensic evaluative and therapeutic services and other forensic services such as telephone and other consultations with attorney, record review and report preparation, are billed at four hundred **($400)** per hour. Deposition or in court testimony is charged at an hourly portal-to-portal fee of four hundred and fifty **($450)** per hour. Travel and all other expenses incurred in regard to a case are billed separately as they are incurred. These fees are consistent with the customary rates of similarly highly qualified professionals in this region of the country.

Telephone consultation, which exceed five (5) minutes, shall be billed to the client (on a pro-rated basis) at the agreed upon total client obligation. In forensic cases, telephone and/or personal consultation with the client's attorney shall be billed to the client at the forensic rate (pro-rated based upon the time spent). All clinical and in-hospital hourly fees include non-billed services of our staff in providing administrative support services associated with your treatment.

**II. Carrying of Outstanding Balances:** In those instances in which Glenn R. Caddy, Ph.D., P.A. carries part of the balance of a client's account, whether due to insurance assignment or a payment of less than the per session obligation, for more than 45 days after the billing date, interest will be charged at the rate of 18% per annum to cover the increased costs incurred in carrying the outstanding amount. After 45 days following a demand for payment, if the payment is not received the account may be turned over to a collection agency and/or attorney and his/her fees added to the balance if arrangements for payment are not made.

**III. Insurance:** The staff will assist you in obtaining the full allowable benefits of whatever insurance you may have available. In the event that the insurance company refuses payment or pays less that they indicate at verification, the client is responsible for the entire outstanding allowable charges.  Benefits will be paid directly to our office. Insurance is filed as a courtesy to the patient. Dr. Caddy makes no claim that the insurance amount expected following verification of the insurance will be paid by the carrier. Finally, except in quite special circumstances, insurance will not be billed in the case of Forensic Services.

**IV. Cancellations:** <u>**Please note that if an appointment is canceled with in less than 24 hours notice, the client will be billed as if the service had been rendered**</u>. There may be valid reasons for occasional cancellations (e.g., illness); however, there will be a charge for cancellations unless another client is willing on short notice to switch to your appointment time. The purpose of the 24-hour cancellation notice is to maximize the chances of the office filling your appointment time. Always call even if less than 24-hour notice can be given.

I have read the above statements, and all of my questions have been answered. I hereby agree to render payment in accordance with the terms set forth, and I agree to pay collection agency, court and/or attorney's fees incurred in the collection of any outstanding balance. Further, I understand that in the event I fail to make payment in accordance with the terms set forth in the agreement my name and account may be turned over to an attorney or other collection agent.  In the event that such action is taken, I understand that clinical material about my case will continue to be maintained as confidential.

Date: _4-6-2016_   Patient/Guardian Signature: _Rodney S. Patterson_

_Rodney S. Patterson_
**Print Name of Patient**

# EXHIBIT B

# AUTHORIZATION AND ASSIGNMENT

To: Glenn R. Caddy, Ph.D., P.A.

In consideration to your undertaking to provide clinical/forensic services to me, I agree to the following:

## AUTHORIZATION TO RELEASE INFORMATION

You are authorized to release any information you deem appropriate concerning my physical, mental or emotional condition to any Insurance Company, Attorney, or adjuster in order to process any claim for reimbursement of charges incurred by me as a result of professional services rendered by you, and I hereby release you of any consequences thereof.

## ASSIGNMENT OF CAUSE OF ACTION

In the event any insurance company is obligated by contractual agreement to make payment to me or to you for the demand by you, I hereby assign and transfer to you the cause of action that exists in my favor against any such company (the name (s) of which is/are believed to be correctly set forth under pertinent data below) and authorize you to prosecute said action either in my name or your name as you see fit and further authorize you to compromise, settle or otherwise resolve said claim as you see fit. However, it is understood that until all reasonable efforts have been made to collect the sums due from the insurance company (or companies) contractually obligated, you will refrain from attempts and efforts to collect the amounts owed directly from me. I understand that whatever amounts you do not collect from insurance proceeds (whether is be all or part of what is due), I personally owe you, and agree to pay in a current manner.

## AUTHORIZATION TO PAY DIRECTLY TO GLENN R. CADDY, Ph.D., P.A.

To: _TRICARE  Reserve Select_
#### (Name of Attorney and/or Insurance Company)
In consideration of the service rendered and to be rendered by Dr. Glenn R. Caddy, I authorize and direct the payment to Glenn R. Caddy, Ph.D., P.A. by you, out of the proceeds of any settlement of my case, and/or by any insurance company obligated to reimburse me for the charges for services or otherwise obligated to make payment to me or Glenn R. Caddy, Ph.D., P.A. in whole or in part upon the charges made for psychological services.

## ACKNOWLEDGMENT AND UNDERSTANDING

I hereby acknowledge that I am receiving (or about to receive) psychological services from Dr. Glenn R. Caddy and that I have been advised that Glenn R. Caddy, Ph.D., P.A. is willing to wait for payment for these services for up to three (3) months provided that there continues to be a reasonable chance that payment will be made either by insurance proceeds or out of the settlement of a liability claim. I understand, if it is determined either: (a) That there is no insurance company obligated to pay for the services, or if the insurance company involved refuses to acknowledge an assignment to Glenn R. Caddy, Ph.D., P.A. or make other provisions for the protection of the interest of Glenn R. Caddy, Ph.D., P.A.; or (b) If a liability claim exists, and my attorney refuses to agree to protect the interest of Glenn R. Caddy, Ph.D., P.A. or if I have not engaged the services of an attorney; then payment for services rendered by Glenn R. Caddy, Ph.D., P.A. will be made on a current basis and my bill paid in full as soon as my liability claim is settled or the passage of three (3) months from my last treatment has passed, whichever occurs first.

DATED THIS _6_ DAY OF _APRIL_, 20_16_

_____
**(Patient/Guardian's Signature)**