1

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
                  FORT LAUDERDALE DIVISION
                CASE NO.:  1:17-cv-60533-JEM


RODNEY SCOTT PATTERSON,        )
                               )
          Plaintiff,           )
                               )
v.                             )
                               )
AMERICAN AIRLINES, INC., a     )
Delaware Corporation,          )
                               )
          Defendant.           )
_____)



          Videotaped Deposition of JAMES N. BONDS

                   (Taken by Plaintiff)

                  Charlotte, North Carolina

                   Thursday, March 15, 2017








                  Reported in Stenotype by

                  Christine A. Taylor, RPR

                Registered Professional Reporter
```

# ATTACHMENT 3

1      A.   Well, the one thing I recall most is when Chip
2  Harlow was a captain on the 757, the same equipment
3  that Scott was flying as a first officer, one afternoon
4  late in the afternoon around after lunchtime I got a
5  call from Chip Harlow, and he was saying that, well,
6  this should be an interesting flight because I had been
7  put on to Scott Patterson's flight as a reserved
8  captain.  And I said well -- I mentioned to him good
9  luck, you know, hope it goes, well something along
10 those lines.  And then later the phone call I got from
11 Chip Harlow is that Scott Patterson had dropped the
12 trip and was no longer on the trip.
13      And then that's when I found out that through
14 one of the staff administrators that Scott was -- had
15 called trying to get an EO to get off the trip with
16 Chip Harlow, of which I think I called him back or left
17 a message saying that we are really short of pilots and
18 we needed -- to grant an EO is an employee off, and we
19 really needed him to fly.  We didn't have the bodies.
20 That's what I recall about that.
21      Q.   All right.  Who was the -- who was the
22 administrator?
23      A.   I think it was Trish Grant who told me and
24 then it might have been Luis Rojas, one of those two.
25 I think Luis was in the office, but I think Trish was

1    4:00 like most people or a lot of people do, they close
2    the doors, but I stayed there late.  I never spoke with
3    him.  He never called to talk to me about it.  And this
4    is, quite frankly, people who play the system very well
5    that don't want to hear their chief pilot tell them no
6    for requesting EOs, they will wait until after the
7    flight office closes and then call the duty chief who
8    doesn't know the individuals and usually gives a
9    blanket grant of employee offs.
10        Q.  Had Mr. Patterson left you any voicemails
11   that day?
12        A.  Not to my knowledge.  I really found it odd
13   that he didn't call and say I'd like to speak with
14   Captain Bonds or any of the chief pilots to get this
15   day off.  He went through administrative people in the
16   office to get that, which I don't know is normal
17   protocol.  I would want talk to my supervisor and ask
18   them personally.
19        Q.  Did he tell the people in the office that he
20   was going on military duty?
21        A.  I'm not sure what he told them.
22        Q.  Did -- prior to Mr. Patterson's leaving, did
23   you leave a voicemail concerning taking the day off?
24        A.  I called him -- if I remember correctly, I did
25   call him.  I don't know the timing of it, but I had

1   heard that he had asked for an EO and I requested that
2   he not do that, our money was tight, and -- I might
3   have indicated that I wanted him to call me and talk to
4   me.
5       Q.  Do you recall telling him that you would give
6   him the day -- that you would give him the time off if
7   he would show you his orders?
8       A.  Not at that exact circumstance.  I don't
9   remember the exact wording.  But in later conversations
10  or maybe one then, I don't recall the timing, but I
11  find it quite odd why he would ask for an EO instead of
12  taking military.  I didn't understand that -- why he
13  was asking that.  And when I had put together what Chip
14  Harlow had just called and told me that Patterson was
15  on his flight with him, that it would be -- this should
16  be an interesting flight, then Patterson now was asking
17  off.  And if he was doing military, why didn't he have
18  his military orders.  Me being in the Guard and
19  Reserve, it was quite odd that he didn't have them
20  because I always had mine, and our orderly room
21  provided them for us at will for the transparency of
22  employers.
23      Q.  That was in the Air -- when you were in the
24  Air Force Reserve?
25      A.  Yes.  And the Air Force Reserve, Air National

1   American Airlines with your orders?
2       A.  I had them available upon request.
3       Q.  The question is, sir, did you show them to
4   anybody?
5       A.  At some point -- I can't recall.  I don't
6   recall.
7       Q.  Did you think that asking Mr. Patterson for
8   the records was a way to get him to hang himself on
9   providing false information?
10      A.  That might not have been my attempt, but it
11  could have been, but the idea that I wanted his
12  information was for him to provide the reason he didn't
13  want to fly that trip with Chip Harlow.  And if he had
14  provided the orders, then it would have been over and
15  done with.
16      Q.  Did he provide the orders that you don't know
17  that he had?
18      A.  I never saw any orders from him.  The only
19  thing I received from him was after a few requests a
20  redacted LES.
21      Q.  You had told Mr. Patterson you did not wish
22  him to go; correct?
23      A.  I didn't hear you.  Say the question again,
24  please.
25      Q.  You had told Mr. Patterson that you did not

```
 1    wish him to go; correct?
 2         A.   What I told him was he had requested an EO and
 3    I told him in a voicemail -- I never spoke with
 4    Patterson personally.  He never called me back.  I told
 5    him that because requesting an EO, we were really short
 6    on manning, and that -- that I needed him to fly.
 7         Q.   And, instead, he went to Washington?
 8         A.   I'm missing the first part of your question.
 9    What was the first part of it?
10         Q.   And instead of flying as you wished him to
11    do, he went to Washington?
12         A.   Yes.  That's true.
13         Q.   To do his duty as a United States Army
14    lieutenant colonel?
15         A.   Yes.
16         Q.   And you were not happy that he went to
17    Washington that day, were you?
18         A.   I personally -- that wasn't my concern.  I
19    support all military people in the service of their
20    country, and that's not the issue.  The issue is that I
21    didn't feel that he was being forthright and honest by
22    getting off that trip with Captain Harlow.  That was my
23    concern.  And he could easily have been handled by --
24    and taken my phone call and not be an obstruction to my
25    questions, and, Captain Bonds, here's my orders coming
```

```
 1        A.   It's not from me.  It's from -- to Brian.
 2        Q.   It's from Brian Beach to James Bonds.
 3        A.   Right.  And "Junk, can you call me please?
 4   Brian."  But I've never seen this e-mail.
 5        Q.   Do you recall discussing with Mr. Beach the
 6   Article 7 allegations against Mr. Whitehouse?
 7        A.   Possibly.  I don't recall any details of it.
 8   It's very possible that we did talk about it at some
 9   point, but the rest of it, I don't remember.
10        Q.   Look at Exhibit 22, the top message, and see
11   if that refreshes your memory.  First of all, do you
12   recognize this as an e-mail to you from Brian Beach --
13        A.   I haven't seen it.  Give me just a minute.
14        Q.   -- response --
15        A.   It's the same letter.  I just ask what time is
16   he available.
17        Q.   Do you recognize it as an e-mail that you
18   sent?
19        A.   I do recognize it.  I don't remember the
20   circumstances nor the outcome of our discussion.
21        Q.   Look at Exhibit 23 and tell me if you
22   recognize that.
23        A.   I recognize my signature, but this is a form
24   letter right from labor, Michelle Montgomery's office,
25   to us to fill in the blanks.  So I signed it.
```

[3/15/2017] Bonds, James N. (Vol. 01) - 03/15/2018 [2821980]

122

1  STATE OF NORTH CAROLINA    )
                              )  CERTIFICATE OF TRANSCRIPT
2  COUNTY OF UNION            )

3

4          I, Christine A. Taylor, RPR, and Notary Public

5  in and for the aforesaid county and state, do hereby

6  certify that the foregoing 121 pages are an accurate

7  transcript of the deposition of JAMES N. BONDS, which

8  was reported by me, on behalf of Plaintiff, in machine

9  shorthand and transcribed by computer-aided

10 transcription.

11         I further certify that I am not financially

12 interested in the outcome of this action, a relative,

13 employee, attorney or counsel of any of the parties,

14 nor am I a relative or employee of such attorney or

15 counsel.

16         This 26th day of March 2018.

17

18

19

20

21                     Christine A. Taylor
                       Registered Professional Reporter
22                     Notary Public 19960530077

23

24

25