# John Knippa, Ph.D., ABN

## Coast Psychiatric Associates

CA PSY8833 - UT  93-261633-2501
1650 Ximeno Ave #230, Long Beach, CA 90803
562-494-3633 - Fax: 562-498-0917

### NEUROPSYCHOLOGICAL AEROMEDICAL ASSESSMENT[1]
### FITNESS FOR DUTY (FFD) REPORT

#### CONFIDENTIAL - SEE THE ADMONITION BELOW

**NAME:** Rodney "Scott" Patterson
**OCCUPATION:** First Officer
**BIRTHDATE:** 11/08/1967

**EVALUATION DATE:** March 16-17, 2016
**REPORT DATE:** March 21, 2016.
**PI#:** Not Identified

## REASON FOR REFERRAL

Mr. Patterson is a 48-year-old, right-handed, Caucasian, married man who is referred by his employer's medical section for a Fitness for Duty examination. No medical records or personnel reporting documents were made available, other than brief correspondence dated 01/14/16 citing the examination request in the context of Section 20 action. Unspecified "concerns" are noted regarding his "judgment," appearing clarified as "his mental and/or emotional stability." The reporting office indicated receipt of "multiple reports of atypical interactions with coworkers" in addition to "reports that suggest a pattern of false/self-aggrandizing statements. However, it is understood that there was an internal review, after which witnesses could not be identified who would attest to these complaints being present/accurate. It was decided that no other information would be released from Human Resources or supervisors.

*Please see the footnote. Neither this report nor its contents should be released directly to Mr. Patterson. The information contained could be misinterpreted, resulting in otherwise unnecessary distress or actual harm. With appropriate authorization or other contractual or legal basis, it may be released to a qualified treating health professional who can assume responsibility for reviewing findings with the examinee in a manner to permit appropriate disclosure and facilitate any indicated care. The recipient should be aware of laws (e.g., California, other states) and ethical obligations restricting release of a mental health report/findings directly to an examinee, when the examiner has given notice that the report is not to be released directly. Additionally, this report is to remain in confidential medical files, not to be included in personnel files or others to which administrative and supervisory staff have access. A separate FFD statement is appended for administrative distribution, as can also be provided to Mr. Patterson at the employer's discretion.*

## CURRENT STATUS

Per documentation above, Mr. Patterson has been removed from his active duty position as First Officer, placed on "paid withhold status" as of 09/24/15. He reports that he has not returned to work since that time. Mr. Patterson was asked what he thinks brought him to the current performance scrutiny and the request for a Fitness for Duty Evaluation. He indicated he felt like it could have been 2 issues. On 09/21/15, he requested medical leave, made several phone calls during a short period of time to the office of the Chief Pilot. He understands that individual was on duty, but unavailable to speak, so that messages were left with an office worker. He reported he continued to try to contact the Chief Pilot's office which closes about 4:00 p.m., so that his last and still unsuccessful call into the office was at 3:45 p.m. Sometime during the latter part of the day, Mr. Patterson called the Systems Operation Duty Chief with the same inquiry, was given permission to leave immediately on military duty. Mr. Patterson explained that the Uniform Services Employment and Reemployment Rights Act and his particular military status do not allow him to decline to assume active duty status when he is notified by the military. He was expected to be on a plane to report for duty 09/22/15. Later in the day on 09/21/15, Mr. Patterson noticed a cell phone message that he had not received earlier. It had been left earlier in the day by the chief pilot. He was understood to indicate the message was that he did not have permission to not report for work duties, that the Chief Pilot had indicated they were shortened pilots and had a busy schedule. The next day, 09/22/15, he logged on to his computer and saw that his employment status with American Airlines had been changed from the 22nd forward to indicate he was on base-paid status but withheld from service because of complaints. He indicated this time frame started "while I was in the military." "I'm a Colonel" in the Army, assigned to an active duty unit from which he can get calls at any time to report to duty. (Note. Later clarified that Mr. Patterson is a lieutenant colonel in the reserves.) He had been notified earlier in the week that he was on "standby" for reporting for duty. To

[1] This report is made available to the referring party and their representatives, per written authorization or other legal authority. The report should be considered confidential and protected by federal law (42 CFR, part 2). Further release cannot be made without written permission or other contractual or legal basis. A general authorization for release of information is not sufficient

# ATTACHMENT 4

**Coast Psychiatric Associates**
RE: Rodney "Scott" Patterson                                     2                                     March 21, 2016

not show up when ordered could result in "severe repercussions." Only 4-5 times over his career has he had the sudden calls to report to duty. The last time was "when North Korea started" 'acting up.' In 2015 he reported to duty for about 12 days, having had no problems with his employment coordination. In 2010, he served 4-5 weeks in Haiti.

Later, Mr. Patterson indicated that he thinks he was considered a "model employee" before 09/2015, also regarded as such in the military, having had "superior assessments." 09/22/15 was the start of problems.

The 2nd possible reason Mr. Patterson considers that he might have been referred for FFD had to do with his relatively recent diagnosis of "carcinoma" and current posttreatment status. He was diagnosed with a chest wall tumor, at that point and about 02/14/15, was designated as not flying. He was medically on a no-fly status from February 2015-May 2015, reporting he had surgery 05/27/15. He indicated he "…could see" that the company might have questioned whether or not he was "wired correctly" and capable of returning to work post treatment. "Just a question in my mind…only a theory." He identified no indication that the company has questioned his medical status related to that leave interim, after which he did return to flying status.

Additionally discussed were complaints noted in correspondence 01/14/16. Mr. Patterson acknowledged having responded to complaints relevant to duty performance and status. He referred to a Section 21 Hearing 11/23/15. "It's an interrogatory." He met with a Human Resources representative ("Anna"), his immediate supervisor, "Captain Beach" and a pilot who sat in and wrote a transcription. Discussed work "allegations." Mr. Patterson was asked repeatedly about specifics to these complaints, offering none. He noted repeatedly that this matter was determined to have been "unfounded." He reported he got an email in that regard. "Those issues are closed. It's a closed matter." He was understood to acknowledge there had been complaints of "atypical interactions with coworkers" and "false, self-aggrandizing statements" by him, though offered no examples. He indicated he could not give any examples, as the names of any complainant(s) was redacted from paperwork. He indicated the complaints were reviewed and found baseless. "If they can't adjudicated," then it is a closed matter.

Later discussed, he indicated there were lots of allegations, all names redacted from paperwork. "The matter was closed…it's unfounded." He indicated, "there is a neck cyst here…it all stems from a complainant,' a single person whose name was redacted. Regarding any specifics of the complaints, Mr. Patterson repeatedly declined to offer any concrete examples. "I don't want to speculate." He said that 1 person who was asked to give information as a witness had stated in some capacity that the problematic behavior had never been seen.

Mr. Patterson was asked whether there is any grievance or lawsuit at the current time. He was understood to indicate he has an attorney, has filed a complaint with the USDOL. "I have an open issue with USERRA." He was understood to indicate he hopes to help the employer understand this matter which he sees as serious. He provided paperwork that he explained documents employer obligations regarding reservists' being called for active duty.

"Let me educate you just a little bit…" Mr. Patterson explained that federal law protects reservists. His understanding is that employers have an obligation to give him time off if he requests that time off for service, stating that he can give notice either verbally or in writing, further indicating the employer cannot retaliate or discriminate, must return him to his usual duties status when he returns for work at any time post hiatus up to 5 years. If the employer does retaliate, the employer can be charged in federal court for which awards can include return to employment service, back pay and "anything you have missed…" Other than this complaint, there is no other lawsuit filed. Mr. Patterson indicated his objective is for the employer to reinstate him, pay for lost vacation time, lost employment time and "make me whole." He otherwise would like to transition to a different aircraft, Air bus.

Other Issues. Mr. Patterson was understood to deny any other issues/problems of which he is aware. He commented that about 2-3 years ago, a news reporter "poked" a microphone in his face and said something like "Pilots say (these) planes are so unsafe," as if expecting a comment. He considered that perhaps he should make 'no comment,' but decided it would be better to speak. He told the reporter that the airline would take a plane out of service if it was unsafe. Asked whether this generated any complaint, whatever, Mr. Patterson stated, "As a matter of fact," he called the chief pilot after the incident, was told that the chief pilot was already aware of that and that it was no problem.

Mr. Patterson was asked, given the nature of earlier statements, whether or not he believes that the request for FFD was in some manner seen by him as retaliation. "Appears it could be a retaliatory measure," that perhaps his boss/chief pilot thinks that Mr. Patterson lied to him in some manner. Otherwise, "I look at this exam as an opportunity to show you that I'm fit for duty."

Mr. Patterson said that over the course of his many years of flying, he has never had any citations, no FAA complaints, no employment write-ups or negative performance reviews. He estimated more than 12,000 hours flying time.

Patterson_Knippa_00005

Coast Psychiatric Associates
RE: Rodney "Scott" Patterson

3

March 21, 2016

He recalled only a single incident relating to his response to what he saw as a pilot's error. He said that he "ran out" of the cockpit of a 737 in 2004 when the pilot almost hit a truck as the truck approached rapidly.

Mr. Patterson denied awareness of any prior conflicts with the chief pilot. He added that he once had asked to take a "line" to Paris. A crew scheduler called and said that he was "not qualified" for international flight. He indicated he was, in fact, qualified. Therefore, Mr. Patterson called the company and asked to be paid the difference between the flight line he took and the one he could have taken. The chief pilot okayed this. No problem was perceived from this event.

He has never been referred for any cognitive or psychological assessment, with the exception of assuming but not remembering that he likely had some psychological testing when he applied for police work in about 2004, also thinks he might have had some cognitive screening as part of his employment application with American Airlines. He did have psychological screening later on, noting "I am a federal flight deck officer," authorized to carry a firearm. "You have law enforcement authority" in the cockpit. Application for that status required that he talked to a psychologist. He doesn't recall the name of that examiner.

## BRIEF HISTORY

**Education.** Mr. Patterson graduated high school in Camden, NC, in 1986 with a GPA of 3.25. He explained that he had earlier attended public school, grades less adequate than after his grandmother transferred him to an all boys private boarding school where his grades excelled.

Central Piedmont Community College, six-month POST training completed 11/1990.
Central Piedmont Community College, 1986-1987.
Appellation State University, 3 years, completed in 2009. He was understood to indicate he had a BS degree from the "College of Arts," emphasizing Business and Psychology.
National Defense University, "Strategic Studies." He explained this as a military program. "He teaches you to be a planner so you can plan things on a national level and an international level...at my level, you are working with divisional and Army-level planning...it's very complex." He indicated having earned an MS degree, thought it was not specified if this was from NDU (i.e., which this examiner understands currently offers an MA degree for a 10-month curriculum).

Mr. Patterson was asked about early school grades, reporting that in public school, he made A grades "when I studied," otherwise a C in algebra that improved to A when moving to the private school. He thinks he got more help from teachers at the private school. He thinks he was less interested in some public school classes, such as home economics. He explained that his grandmother, with whom he was living transferred him to the boarding school where she thought he would have "positive male influence," also with his note that he was in Jr. ROTC and would benefit from the added "structure." He never had any behavioral troubles in school, no problems paying attention. He thought he had less teacher attention in public school, as most tended to focus on sports-involved students. At the boarding school, he said that he got straight A's the 1st year, not indicating his grades in the 2nd year when "I was in a position of leadership...400 students...I was up in that top tier." He said that he still visits that school, was recently invited to give a talk. His grandparents live about 25 miles away; he sees them frequently and also visits regularly at his former boarding school which is nearby.

## Early Work.

American Airlines. Title, "Pilot." He currently serves as a B-727 International First Officer. Early on for 1½ years, he flew 727s as a Flight Engineer, from about 2002-2004 flew the 737.

> He was furloughed for about 5 years during a time of "economic reduction," 2004-2009  For interim work, he spoke to a neighbor who invited him to a nearby reserve office. He said he was hired to "J-8" or "Resource Management," a full-time reservist overseeing a several million dollar project. He reported he had multiple assignments. During the first year, he "...went through the books" and found $1 million overspending error. He referred to an $80 million budget, to operations and expenditures planning. He then got a call to return to American Airlines.

U.S. Army, Lt. Col. Early on, he was assigned to field artillery, a transportation office, subsequently resource management. He said that he is reserve-assigned to Army HQ Pentagon for the past 2 years, with his active Army service having begun 05/14/89 (i.e., unclear, elsewhere and paperwork noted as 10/87). He expects to retire at 29 years in 06/2017. He reported that, during his service, he has had deployment to South America, noting the U.S. Embassy in Columbia, 2004-2009, Haiti, 2010. His last promotion was in 2009. He was passed over in 2012 during a time when there was a large downgrade for "economic reasons." He explained that he is assigned as "IMA," to active duty units who can be called up at any time as needs dictate.

Patterson_Knippa_00006

**Coast Psychiatric Associates**
RE:  Rodney "Scott" Patterson

4

March 21, 2016

Mesa Airlines.  He reported he served as "PIC in 121 operations," eventually been promoted to "Director Pilot Recruitment - Manager."  He reported he actually worked for a subsidiary of this airline, that his boss asked him to help hire 400 pilots in the next year.  That person "said, 'You or doing really…good recruiting for the military," so could recruit for the airline.  He said that for 2 years, "I was the director of pilot recruitment."  He explained he had recruitment school training when he was a 2nd lieutenant in the Army, adding that reserve officers are expected to recruit.  He left Mesa Airlines because it had been his goal to use it as a stepping stone, to go from a regional to a major airline.

Aviation work.  Mr. Patterson said that family had told him that aviation was hard and took time and money, though he maintained this dream and goal.  He said that he got a competitive scholarship.  Most of his training was at a flight school in Georgia; he doesn't recall the name of that school where he had attended 3 months.  He said he subsequently came home and "did flight instruction."  He did this by "hanging out at" an airport 8-9 hours a day and getting customers, also sometimes hiring on as a copilot where he accumulated experience and hours.  With further inquiry (i.e., as his identified training appeared limited for doing flight instruction), he elaborated on earlier training.  He was understood to have indicated that he had first started flying professionally in 1988.  He had taken some flight related classes at Appellation State, got his 3rd class in 1990.  During the time of Desert Storm, he was in Oklahoma with the Army where he was offered a program at Shepherd military base where he got his "private" and started on instrument rating training.

He was a Certified Flight Instructor and self-employed from 1993 forward.  During the early unspecified time frame post 1993, he said this was "basically" all he did, "pretty much," in addition to some for-hire piloting.  Regarding CFI, "I still do it," would like to do more of this.  He emphasized, however, "you're responsible" for people, so he chooses to only work with people who are looking to increase the rating, not green pilots.  He has had only one recent client, a woman whom he does not charge.

State of North Carolina.  Police officer.  07/1989-04/1992.  He reported leaving this job because he had always wanted to be in aviation, got a scholarship.  He had enjoyed police work.  "They were incredible…they had me doing investigations," street drugs, traffic and "I had to play counselor."

## CURRENT & RECENT TREATMENT

Mr. Patterson indicated he has been healthy, has not needed medical services since relocating from Rhode Island in 2012.

Martin Dayton, M.D., D.O.  Oncology.  04/2015-current, next appointment 03/2016.  The provider monitors oncology status, also provides primary care.  Earlier, Mr. Patterson had primary care by a provider who had seen his wife.  He said he rarely saw that person and doesn't remember the person's name.

Joe Tordella, M.D., AME.  Atlantic City/Fort Lauderdale.  He was last seen 01/2016, next appointment scheduled for 07/2016.  The impression was that this service has been relatively recent.  The prior provider was on vacation, had only been seen once, the AME before that had died.  Mr. Patterson referred to diagnosis of cancer in remission, reporting that he "had" a special issuance.

Hodish, D.C.  Chiropractic examination 03/2016, in Texas.  "I just see him for maintenance…the doctors say, if your body is tuned up…"  He takes his wife and children who all get chiropractic maintenance care.  He indicated his insurance pays for this. (Note.  No active diagnosis was identified by Mr. Patterson.)  He goes for these visits 1-2 times per month or as needed for adjustments to his neck, T6 and lumbar area.  No injury was reported.

Military physician, annual health checkup.  Last seen 10/2015 next appointment 10/16.

Melba Romero, M.D.  Oncologist.  03/2015-10/2015, next 03/2016.  He said he was treated at "Biocare," reporting "I went to a support group" in plantation, Florida.  Dr. Rodriguez, who operates an alternative cancer treatment program, presented.  He opined that one needs to treat the whole patient.  Dr. Rodriguez had advised Mr. Patterson that chemotherapy was not for him.  He recommended surgery and then care at his clinic which Mr. Patterson indicated was "South of San Diego."  On inquiry, it was clarified that this is a program in Mexico, "International Biocare."  Dr. Rodriguez had said, "We'll clean you up," did "weeks of detox" at the facility by a prescribing organic food, IV injections and nutrients.  "Improved my health 100 fold…I thank God I'm alive."  He recalled that a physician in Miami earlier on had told him, "You're gonna die with this."  Mr. Patterson was determined that was not going to be the case.  At a recent visit, he said that he was told that he was "doing great" and that he should keep with the protocol, was told, "Your cancer won't ever come back again."  He has monitoring from a physician in Miami.

**Coast Psychiatric Associates**
RE: Rodney "Scott" Patterson

5

March 21, 2016

**Medications.**
- Supplements prescribed by Dr. Dayton, 3 times daily: Glutathione, selenium, curcumin, vitamin D3, Artemisinin, "Enzymes." He has otherwise no current pharmaceutical prescriptions.

**Current Medical & General Health Status.** Mr. Patterson identified the following.
- <u>Physical health</u>. Mr. Patterson denied having any physical body complaints. He denied having any headache, or vision problems other than sometimes using glasses in a dark room. He denied any problems with hearing, reports no tinnitus, no dizziness, balance or neck or spine problems. He indicated he worked out the morning before this examination and sometimes might have soreness that he considers "normal." He denied having any bowel or bladder, lower extremity problems, no skin problems, no excessive fatigue or sleep problems. He was asked about a lesion on his 2nd knuckle of the right frontal forefinger, reporting that he changed a tire for a lady and scuffed his skin. He was noted to cough and clear his throat several times over the course of assessment, reporting it was "probably" from staying on the Queen Mary boat where there was lots of dust. He commented about smelling secondhand smoke, apparently after a smoker came into this no smoking office. Mr. Patterson denied having any sleep problems, reporting typical sleep time of 8 hours with 15 minutes onset, good sleep maintenance. He may nap for 30 minutes occasionally on a weekend. He denied any history of excessive snoring, reports no history of sleep apnea.
- <u>Cognitive status</u>. Mr. Patterson denied having any problems with attention, concentration or memory. "No." He reported his status has actually gotten better from "when I started cleaning my body out...it's amazing." He referred to vitamin, nutrient and other treatments provided post cancer diagnosis.
- <u>Psychological status</u>. He denied having "noticed anything" that would correspond to depression, sadness, anxiety or irritability. With cancer treatment, he said he has "felt better" and has "a lot more temperance for other people." Asked about any prior issues with temper, he appeared to respond without specifics. He reported that in the military one must "temper things." He explained that subordinates look for "guidance" and demonstration of leadership attributes. He must show "'Be, Know, Do' attributes." He referred to responsibilities to provide "selfless service" and put others ahead of himself in order to get the mission done. (Note. Mr. Patterson did not identify any examples of irritability-type problems that were otherwise raised for question by his responses on the self-report rating form on which he indicated it is 'fairly easy' but not 'easy' for him to control his temper when something upsets him.) He denied any of the MDQ criteria for bipolar disorder. He denied any history at any time in his life of having thoughts or actions of harming himself or anyone else.

Mr. Patterson indicated he has no other current medical conditions. He reports his weight has been stable. He denied any problems with vision and hearing, reports his senses of smell and taste are intact, with no deficiencies of upper or lower extremity function, reporting no other health problems than those noted. He denied being aware of any cognitive impairments. Mr. Patterson denied being aware of any early life history of educational problems or needs for support services, denied any history of known developmental disorder or ever having been held back or advanced any grade in school.

**Medical History.** Mr. Patterson was understood to describe good general health, with the following history.
- Left ankle sprain during military service when he slipped while running, remote.
- 10/2014, 5th right metatarsal fracture. He was on a layover in Bolivia. At an intersection, a car hit his foot. He returned to the hotel room. A physician was summoned. He told the Captain that he would be okay, then noticed his foot swelling. His Captain took him to the hospital. He was out of duty from 10/2014 until 01/2015, treated in the interim.
- Cancer diagnosis, 2014, tumor in the left upper chest. He said that he had a whole body PET, was declared tumor free as of 09/2015. Dr. Dayton monitors.
- Right elbow swelling, about 6 months ago. He was seen by an unspecified orthopedic specialist, had description of "effusion" in the right elbow, swelling. He had PT, also apparently EMG/NCV that were read as normal. Treated with antibiotics, felt better, resolved.

He denied any history of head injury. He reports no history of hypertension or hyperlipidemia, no history of headache or other identifiable CNS problem. He has never smoked cigarettes. Alcohol consumption was described as only occasional before 02/2015, then with meals, none after 2015. He denied any history of recreational drug use other than twice experimenting with marijuana at age 16.

**Mental Health.** Mr. Patterson denied any history of ADD/ADHD, learning disability, denied any history of mental health diagnosis or treatment at any time in his life.

**Coast Psychiatric Associates**
RE:  Rodney "Scott" Patterson

6

March 21, 2016

<u>Family & Social History</u>.  Mr. Patterson was understood to have been born and raised in the Charlotte, NC area, with English as his only language.  He was raised by his natural parents until age 2.  Omitting some details here, his parents divorced, after which he and his mother went to live with maternal grandparents.  His mother remarried; he made positive reports regarding a stepfather during his age 9-12, after which his mother and father moved from the area and he remained with his grandmother/grandparents.  His mother had 2 additional children with whom he was never raised.  In addition to the maternal grandparents, he had regular contact with his fraternal grandparents, recalling having been taken boating and on outings.  He was 1st introduced to airline travel, including Europe, Hong Kong and "all over the world."  His natural parents moved many times.  He recalled visiting his parents during the summers and when school was out, but remained with grandparents and then with his boarding school.  Mr. Patterson denied recalling any history of trauma, abuse or neglect at any time in his life.

He has 2 half siblings by his father and 2 half siblings by his mother, all younger than him.

Family medical history was reviewed with caution regarding relevance to and caution given prohibitive employment considerations.  There were no indications of any history of relevance to this examination.

Social contacts were reviewed.  "I have quite a few best friends," attorneys, pilots with whom he goes general aviation flying.  He said he has access to a plane in Florida.  He and his wife regularly participate in church activity.  He told of crediting his faith in a higher power as getting him through the strain of cancer.  He told of an occasion when he asked to speak in front of the church, told of his diagnosis of cancer and that he had been advised that it was "very serious."  However, he told the congregation that he is not a "quitter" and asked for their support.  "I had like 40 or 50 men…put their arms around me."  He reports a highly supportive social network.

<u>Legal</u>.  Mr. Patterson reported no history of arrests or legal problems.  He was never cited for DUI/DWI or any substance-related offense.

<u>Stresses</u>.  He denied having any current special stresses of mental health significance.  The Life Events Checklist was completed and reviewed.  Mr. Patterson endorsed multiple items, but denied that any had any negative mental health significance.

Among experiences, he referred to having been "in Columbia a lot," and saw brutality that had been caused by FARC.  "I don't let things bother me."  He also referred to an individual who had died 1½ years ago following heart attack, referring to him having done missionary work in Haiti with the military.  "'Mission to Haiti.'"  He saw a video presented by a physician "friend of mine," was inspired to do volunteer work.  "I started work with some different organizations…"  He said that he went out and solicited old medical equipment from physicians in the States.  "Kind of like a…I told the doctor" that the physician should stabilize people in the clinic on-site," suggesting changes in the approach to care.

<u>Interests & Activities</u>.  Mr. Patterson indicated having numerous outlets.  He enjoys building things and showing his children how to do that.  He likes church activities.  He said he likes to take family fishing and for outings in the Everglades.  He indicated that he does "Lumosity" activity and has his children do the same, believing this is better than video games.

## MENTAL STATUS EXAMINATION/TEST BEHAVIOR

Mr. Patterson arrived on time, was exuberant in a manner that appeared lacking of some of the usual social distance when meeting a professional for the first time.  Staff commented that, though the sign on the window to the reception area states that individual should not open the window, but should ring the bell, he opened the window.  Staff also commented that Mr. Patterson freely walked in/out between the lobby and professional suites without stopping to check in.  While this is clearly atypical and unexpected, staff are asked to allow him this option.

Upon being greeted, there were no immediate observed indications of discomfort or disability.  He was very well-dressed and groomed, wearing a suit and tie, well-maintained shoes.  Quite different from the usual out-of-town examinee, he carried with him 2 canvas cases and a large tabbed notebook filled with pages.  On inquiry, he indicated he did not feel comfortable leaving these in the car trunk as his computer or belongings could be stolen.

During interview, on several occasions, he appeared to demonstrate less of the usually expected social boundaries in a professional setting (e.g., asking if this examiner was married, had children, giving advice such as about the use of a supplement), telling the examiner the name of a neurological phenomenon in a constructive manner (i.e., which he mispronounced), commenting that 2 motor tests must be new because he had not encountered them when he was doing "research" as a student (i.e., with note that those tests are older than either of us and would not be available to an undergraduate

Patterson_Knippa_00009

student).  A similar observation included Mr. Patterson's enthusiastic-appearing suggestion.  "I take digestive enzymes…if you ever talk to somebody that's had cancer…"  He showed a bottle of his supplements.  (Note.  This information is included as a splinter-like example of unexpected behaviors in similar examination settings.  It may be not unusual for a non-healthcare trained examinee to express enthusiasm for treatment approach, but to suggest treatment approaches to a healthcare provider may appear as an example of presumptuous and socially inappropriate while also reflecting some deficit in personal insight.  While this note should not be overinterpreted, describing a more benign than pathological interaction, it was seen as a relevant example in the context of the referral inquiry and findings discussed later in this report.  Further, this was not an isolated example.  While assessing cranial nerves in the context of eye-movements, Mr. Patterson commented, "Do you know what we call that?  Gaze 'neye-sig-mus,'" offering a friendly instruction like manner, mispronouncing the word while either attempting to show his knowledge versus while suggesting lack of insight that the examiner was quite familiar with the procedure being administered.  Also see his comments regarding motor testing instruments, below.)

To summarize the above, Mr. Patterson's social manner or 'forwardness' appeared to exceed that expected for good self-esteem and to appear as that which might well be interpreted by others as elitist or erudite, at times pedantic in a manner inappropriate when being seen by a professional for FFD examination, as well as showing reduced interpersonal insight as suggested above.  Regardless, however, it should be made clear and emphasized that Mr. Patterson appeared well-meaning and with a pleasant-appearing mood as noted, frequently extending of courteous comments, maintaining a pleasant demeanor at all times.

Later on both days, Mr. Patterson appeared to have some slight and occasional sinus discomfort, very brief coughing on the morning of day 2.  He appeared to be approximately his stated height and weight (i.e., 76 inches, 215 pounds).  Gait and overall motor speed were brisk, unremarkable in form.  He was oriented X 4.  Speech was fluent, responsive, appropriately productive and well-organized.  On several occasions, he appeared to use words that exceeded his active vocabulary.  For example, he used "luminous" in place of 'looming,' Mood appeared pleasant, comfortable and affable, socially well poised.  Affect was comparable, with appropriate range, variability and intensity.  There was no report or indication of suicidal thoughts or thoughts of harming anyone else, nor any reported history.  He frequently expressed the importance for upholding responsibilities for public safety.  There was no indication of thought disorder.

### RECORDS REVIEWED

None were available at this dictation, with the exception of documents provided by Mr. Patterson.  Those included personal testimony and support of Mr. Patterson, including the following:  [Capt. David Bridges 11/30/15, Capt. Mark Redelsheimer 11/17/15, Capt. Robert Gaylord undated, Capt. Terri Isenberg undated, Robert Burgess 11/19/15, Capt. Michael Desousa 11/20/15, Mr. William Neely, Sr. 11/18/15 and Patrick Casimir 11/25/15.]  In addition, Mr. Patterson provided copies of several documents including:  Notification of Military Leave of Absence 09/21/15 giving notice/request for leave 09/22/15-09/24/15, also a 02/02/16 letter from Oscar Fuentes, investigator for USDOL acknowledging receipt of a complaint against the employer with file number FL-2016-00016-10-R, correspondence from Mallory Gloria, legal assistant from Allied Pilot Association 01/21/16 indicating copy of a Section 20 directive to APA legal, additionally a single page posterior/notice regarding rights under USERRA (US DOL publication date 10/2008).

### TESTING PARAMETERS

Examination procedures were in compliance with standard guides for administering:  *CogScreen AE*, TOVA-V, also the following:  WAIS-IV, NAART, STROOP, Victoria Category, 1- min Est., Forced Choice, Animal Naming, COWA, PASAT, AVLT, Rey CFT, Judgment of Line Orientation, Dichotic Listening, Sentence Repetition, Token Test, TMT, Sensory Perceptual and Tactile Finger Localization tasks, Grooved Pegboard, Tapping, Boston NT, MMPI-2 and PAI.  The battery consisted of the FAA core battery, together with a small number of supplemental procedures indicated by findings.

### TEST FINDINGS

Mr. Patterson appeared very attentive during test instructions.  He was provided the usual opportunities for daytime rest breaks, midday lunch break, completing the assessment in the standard and usual format.  Testing was suspended in the early afternoon on Day 1, as he was understood to have indicated he was fatigued while pointing to the time zone change from the East coast.

**Neurocognitive Screening.**  On *CogScreen AE*, Mr. Patterson's LRPV score was 0.0124 (e.g., T = 58 as compared to similar-age general aviation pilots).  The logistic regression model score used to predict the presence of brain dysfunction was in a range not associated with impairment on these measures.  This summary score is well above that expected for the young and nonneurological pilot applicant.  However, reviewing individual scores, there were 5/9 scores in the average range or higher,

**Coast Psychiatric Associates**
RE: Rodney "Scott" Patterson

8

March 21, 2016

low average performance on 2 measures of divided attention and a marginal low average score on a measure of shifting attention on a task designed to assess visual attributes and develop problem-solving concepts.

On the *Base Rate Analysis*, compared to a sample of regional carrier pilots across all ages, Mr. Patterson had 8 scores at or below the 5th percentile and 20 scores below the 15th percentile. Summary T-scores ranged from borderline (5th percentile Process and 15th percentile Throughput), to 3 low average scores and 2 average-range scores. This profile was considered atypical as compared to expectation with active duty Major Airlines pilots.

On measures of *Speed*, there were 5 scores at or below the 15th percentile ( T = 37, 9th percentile and low average range) and 2 at or below the 5th percentiles (T = 41, about the 18th-19th percentile and low average range).

On measures of *Accuracy*, there were 3 scores at or below the 15th percentile (T = 48) and 1 at or below the 5th percentile (T = 48). Thus, overall accuracy performance was average. He may have favored accuracy by sacrificing speed.

Scores for *Thruput* were 7 at the 15th percentile (T = 35, above the 7th percentile and borderline range) and 2 at the 5th percentiles (T = 41 about the 18th-19th percentile low average range). As Thruput (correct responses/minute) reflect cognitive style and approach to novel problem-solving, lower than expected scores appear to reflect much greater than expected reduced speed in service of achieving average accuracy.

*Process* performance scores included 3 below the 15th percentile (T = 40, 16th percentile and below average) and 3 scores below the 5th percentile (T = 30, approximately the 2nd percentile and in the borderline range). Scores appear to reflect low performance on novel problem-solving that was marked by perseverative errors and more than expected challenge on difficulty identifying and applying efficient problem-solving rules.

Also reviewed were the *Taylor Aviation Factor Scores*, for which scores ranged from defective to superior, including: Measures of deductive reasoning (T = 20.84, defective), speeded motor coordination (T = 67.50, superior), visual learning and recall (T = 38.32, low average), measures of visual scanning, perceptual speed and working memory (T = 44.08, average) and measures of visual/psychomotor tracking accuracy (T = 59.13, high average).

Most notable was the Defective-range score on tasks intended to assess novel problem-solving, perceptual/attribute identification speed and executive function. Of the factors identified as predictive of flight simulator performance, visual association memory was low average), other scores average or better.

**General Cognition.** Verbal reasoning, overall, was average (T = 52) and marginally below predicted premorbid status, with good consistency among scores on various measures. Visual reasoning was average (T = 50) and significantly below predicted premorbid status. Compared to high average performance on most measures of 2-D visual analysis and synthesis, performance was low average on a pencil-paper copy task and on a measure requiring thoughtful analysis, generation of problem-solving and efficient trial and error learning. On the WAIS-IV, major indices were average to high average, with no statistically significant differences between pairs. The Full Scale score was in the high average range (T = ~57.5).

**Attention & Working Memory.** Overall performance was in the high average range (T = 60), not significantly different from premorbid prediction, and with good consistency among measures/scores. The WAIS-IV Working Memory Index was comparable (T = ~61). However, noted were discrepancies between measures of simple attention span versus comparatively less adequate performance when performances involve working memory, transformation of information, mental manipulation and visuospatial imaging. Note that 'working memory' refers to the ability to keep multiple pieces of information in mind while they are needed for mental operations.

**Processing Speed.** Performance on 5 measures was overall average (T = 50), with scores ranging from high average to defective. On simple visual motor/scanning and pencil-paper tasks, performance was consistently average to high average. However, on a measure requiring speeded working memory and alternating mental sequencing, performance was defective range, at the 2nd percentile. He repeatedly recited the alphabet incorrectly, then slowed down and proceeded correctly.

Processing Speed per the WAIS-IV index was high average (T = 61). PASAT-100 performance, a measure of speeded mental processing and mental flexibility under short-sustained demand for a simple math task, was high average (T = 57).

**Continuous Performance Test.** The TOVA-V was administered per the FAA protocol, as part of the required core battery. For interpretive purposes, baseline scores are considered within the context of estimated and assessed general cognition levels, above. Prior to proceeding, a practice session was completed. He was offered additional practice and declined. Instructions

**Coast Psychiatric Associates**
RE:  Rodney "Scott" Patterson

9

March 21, 2016

were given as usual for balancing speed and accuracy.  After completing the task, Mr. Patterson indicated that he did not notice any problems over the course of this testing, indicating it "seems like it went well."  There were no distractions observable, other than isolated single coughs during Q3 that did not appear to distract his gaze from the screen or observably interrupt ongoing responding.

Summary scores were highly variable from a very defective range to average range.  First reviewed were indications of response time variability.  Performance began in the average range (SS 97), though over time declined to <1st percentile  (SS 18).  During the later high demand condition, variability improved but remained but within the defective range (SS 67-66, 1st percentile).

There were no commission errors during the low demand condition and only a single error during high demand (i.e., average to high average performance).  However commission errors which are rare to unexpected in adults without attention deficit were notable.  During the low-demand condition, performance was low average (86), defective during the high demand and fast-paced condition (SS 56).

Reviewing validity data, there were no identified performance validity failures.  Overall, scores are not within normal limits and may suggest an attentional problem.  The pattern of scores is more comparable to the AD/HD study group than to the normal subjects sample.  The pattern of data suggest consideration of a limited attention span of about 5 minutes for such tasks. Persons with similar scores may show less adequate response time and consistency especially conditions.  Also noted, despite being instructed to balance speed and accuracy, he may have adopted a cautious strategy, slowing response speed in order to minimize errors.  While this may have effectively limited commission errors (i.e., indications of impulsivity), it was ineffective for limiting errors of omission (i.e., raising concern for inattention under speeded conditions).

**Verbal Memory.**  Overall performance was at the lowest portion of the average range (T = 44), significantly below predicted premorbid performance and statistically below all other major cognitive domain scores reviewed.  There was good consistency between scores assessed.  On learning trials, the impression was of some weak performance at devising and using a consistent and effective learning strategy (LOT T = 43, low average, 24th percentile).  Data also appeared to indicate possible subtly less stronger than expected ability to resist retroactive interference (i.e., retaining information after an interruption by other information, IM T = 43, RI index T = 39), but good retention of learned information.

**Visual Memory.**  Overall performance was in the average range (T = 56).  Notably, despite marginal performance on the trial requiring copying of a complex figure (i.e., which can in some cases reduce memory scores, T = 40), memory for that material after short and long delay was average (T = 52, 55, respectively).  He showed high average recognition and superior short and long term retention.

**Motor & Sensory Performances.**  Collectively considering finger tapping and fine motor speeded dexterity (GPT) as well as tactile finger localization, performances were consistent with premorbid expectation and within the average to high average ranges (Right hand T = 56; Left hand T = 54), comparable between the 2 hands.  A measure of olfactory function was administered (i.e., as can be sensitive to many neurological conditions as well as medications and therapy for cancer treatment), performance within the normal range.

**Selected Executive Performances.**  Overall performance was in the average range (T = 44), significantly below predicted premorbid performance.  However, scores were variable from defective to high average.  A defective-range score was noted on a measure of performance of an alternating cognitive task under speeded demand (T = 30).  (On *CogScreen*, low average speed and thruput were noted in contrast to high accuracy on a measure of similar skills.)  Low average and below predicted performance was noted on an untimed measure of logical abstract problem solving and efficient learning by trial and error. Despite being reminded multiple times that there was no time limit for completing the task, there appeared to have been notable occasions of hasty-appearing responses/errors that raised question of impulsivity or overconfident-like responding on this measure (T = 42).  Low average letter fluency (T = 42) was also noted.

These were contrasted by high average 2-D block assemblies and verbal abilities to explain word similarities.  Overall, performance was below predicted performance on tasks requiring pacing of contemplation versus performance speed, also comparatively less adequate than expected on tasks that require or can benefit from efficient preplanning (e.g., tasks noted here, also on *CogScreen*).

**Psychological Testing.**  The MMPI-2 validity scores are compared to those of persons likely to have taken a particularly cautious and deliberate approach to responding to test items, endorsing few psychological symptoms, in some cases at levels less than and others at levels comparable to the normal standardization sample.  Scores are compared to those of persons whose

Patterson_Knippa_00012

**Coast Psychiatric Associates**
RE:  Rodney "Scott" Patterson                                          10                                          March 21, 2016

responses likely reflect a pattern of defensiveness, such that problems that may exist may not be accurately represented in this profile.  The profile may be invalid for standard interpretation.  This score pattern is consistent with concern for a highly defensive response bias in which, absent serious mental illness or paranoia, corresponding concerns include a "catastrophic lack of insight."  Overall, the data suggest a bias toward an overly favorable self-presentation emphasizing freedom from symptoms and distress.  This is not uncommon in persons who may be aware of and cautious regarding the purposes of the evaluation as they pursue a specific goal, as sometimes seen with pilots and others presenting for assessment of duty fitness.  Defensiveness may limit the interpretive utility of the data for some purposes.

The basic scales profile includes no elevations above the usual interpretive level.  Men with similar scores may be described in mixed terms.  First viewed as cheerful, balanced, self-confident and independent, they may also be seen as stereotyped and unoriginal, persons for whom contemplation and self-examination may be given less attention than preference toward action.  Scores compare to those of persons who may present themselves as extroverted, sociable, gregarious and friendly.

Subscale scores are viewed with caution, given validity concerns noted above.  Those data compare to scores of persons who may present as trusting, having high moral standards and not having hostile or negative impulses, who may also present as having unrealistically optimistic attitudes about others.

Supplementary Scores are compared to those of persons who may have rigid inhibitions against any form of aggression, who may tend to not express aggression regularly and who may occasionally display exaggerated aggressive responses, otherwise may be described as showing infrequent expression of angry feelings.

Noting that individual item responses may not be valid for face value interpretation, several responses were noted.  He endorsed that he is a "high-strung person" who works under a great deal of tension, who has at times had thoughts racing had faster than he can speak them.

The PAI was administered as a supplementary measure, noting Mr. Patterson's MMPI-2 validity scores representing a defensive pattern that may not reveal psychological issues of concern.  On this measure as well, he tended to portray himself as being relatively free of common shortcomings to which most persons would admit, such that considerations include whether or not he shows reluctance to recognize faults or problems in himself.  Concern for a tendency to repress undesirable characteristics raises caution that the data may underrepresent the extent and degree of difficulties that might be present.  Consideration of inflated self-esteem is otherwise raised for consideration.

The basic profile is entirely within normal limits.  There was no endorsement identified of significance to clinical concern for mood, anxiety, impulsiveness or problematic behaviors.  However, persons with similar response patterns may show interpersonal and social characteristics as follows.  They may present as showing strong needs for affiliation and positive regard from others.  This may correspond to a rather uninhibited social behavior style that may be seen by others as attention seeking and dramatic.  Needs for attention and affiliation may be so strong that the quality of social interactions may appear as relatively unimportant.  These behaviors, perhaps intended as friendly and sociable, may be viewed by others as overbearing.  Data otherwise suggest that he endorses very few stressful events in the recent past, endorses having a large number of individuals available for support.

## SUMMARY & RECOMMENDATIONS

Referral Inquiries.  An initial task in outlining conclusions was to first review the referring questions, then after initial interviews with Mr. Patterson, to pair these with an appropriate examination outline.  Inquiries/concerns emphasized psychological/mental health and personality considerations, but, by implication/necessity, also cognitive correlates to those factors.  Therefore, the objective assessment tools selected began with psychological measures and the FAA-stipulated screening measure (CogScreen).  Given several areas of low performance on the cognitive screening tools, as were seen as not readily accountable-for or dismissible as insignificant, and with those test scores judged as having been below the usual standard for clearing a pilot for a flight certificate, the FAA core battery and supplements were administered.

Specific inquires to be addressed in this FFD examination are significantly confined to those which have relevance to essential job functions, in this case being those relevant to the First Officer position, as may overlap and/or be independent from the PIC position.

The 01/16/16 correspondence from Captain Brian Beach, Chief Pilot, MIA, outlines general but not specific performance-relevant concerns for:  Mental and/or emotional stability, unspecified *"multiple reports of atypical interactions with coworkers"* and unspecified reports *"that suggest a patten of false/self-aggrandizing statements."*

**Coast Psychiatric Associates**
RE: Rodney "Scott" Patterson                                        11                                        March 21, 2016

Mr. Patterson has not served as FO since some time on or before 09/21/15. He is understood to indicate that he had regular duty status after late May 2015 or in early June 2015, earlier having been relived of duty for treatment of cancer from about 02/14/2015 through an unspecified time after 05/27/2015. He reports that he is not aware of any workplace performance complaints prior to 09/22/15. This raises question of whether employer-perceived adverse performances occurred between about 06/2015-09/21/15 (i.e., after he returned to work post cancer treatment) or if these were at some other time frame that may have been prior to his cancer diagnosis.

For the current purposes, it is noted as Mr. Patterson's report that he was unaware of his employer perceiving him to have had substandard performance prior to those complaints that were then reviewed with him at the 11/23/2015 Section 21 hearing. Overall, barring some clarification of the time line of alleged performance variances, it is assumed that these are relatively recent in the course of his long flying career. This could then suggest consideration that there was some change in behavior and/or some change in the work setting for tolerance of behavior as he performed his usual and customary work duties.

<u>Standards of Assessment</u>. First, reports or allegations of substandard work performance are to be assessed against identified standards, with determinations made at the level of a reasonable probability. Workplace standards for comparison include the specific job description and general duties inherent in all or many employments, including that here considered. A formal job description was not available. Mr. Patterson described his duties, as were understood as common to those of persons in comparable positions in the industry.

<u>Areas of Performance Concern</u>.

*Technical Lapses of Performance*:  None are know to have been alleged. Noted above is the understanding that duties as a FO have for the past 12-13 months been limited to a timeframe of perhaps 3½-4 months.

*Behavioral, including Crew Resource Management (CRM), including inherent duties of personnel in a management-level position with a public safety sensitive role*. This is understood to have been the area of expressed employer concern.

CRM can be defined as a management system which makes optimum use of all available resources - equipment, procedures and <u>people</u> - to promote safety and enhance the efficiency of flight operations. CRM is concerned not so much with the technical knowledge and skills required to fly and operate an aircraft (i.e., which are otherwise a baseline requirement for competent performance of duties), rather with the <u>interpersonal skills and cognitive skills</u> needed to manage the flight within an organized aviation system. In this context, cognitive skills are defined as the mental processes used for gaining and maintaining situational awareness, for solving problems and for making decisions. Interpersonal skills are regarded key, entailing communications and a range of behavioral activities associated with teamwork which may be especially critical in complex, multi-crew aircraft.

As further preface to evaluation standards or 'yardsticks,' reference is made to the Americans with Disabilities Act, through which federal courts have ruled that employers can be liable for hostile work environments. The latter may include non-overt threats, such as intimidation and perceived insult that compromises crew effectiveness, communication and coordination in safety-sensitive positions. It can also relate to situations in which employees engage in behaviors that make for unacceptable discomfort in coworkers, compromising effective teamwork. Thus, FOs are understood to have *Usual and Customary duties* to maintain effective verbal and nonverbal communication, presenting themselves and communicating in manners that promote necessary effective communication and teamwork and which does not represent reasonable perception of a hostile environment.

<u>Findings Regarding Interpersonal Skills</u>. First, advice from the employer was given that no examples of overt acts have been identified for review. Only the general complaints noted above were supplied for consideration at this examination. Mr. Patterson states that these complaints are historical/old and were 'second hand' by person(s) whose name was redacted from his view on documents, also that an investigation failed to identify any evidence to confirm/support the allegations. He is understood to suggest that anonymous and unverified hearsay cannot be seen as evidence.

However, in the course of assessment, both by observation of behavior in the office setting and a review of psychological testing, it is opined that Mr. Patterson's behaviors and testing-related findings are consistent with risks of being perceived or interpreted by others at times as self-aggrandizing and reflecting of some limitations to social judgment (i.e., as appears to have parallel to the concerns expressed in the 01/16/16 letter by Captain Beach). If perceived in this manner by other crew members, concerns for teamwork and CRM effectiveness would be reasonably raised. Yet, absent a mental disorder (i.e., as specified in Federal Aviation Regulations) such as a Personality Disorder

Patterson_Knippa_00014

or other behavior-related health problem that is severe enough to correspond to repeatedly manifested overt acts inconsistent with acceptable performance of aviation duties, lapses of interpersonal interactions and effective communications would be subject matters for performance counseling/evaluation (i.e., Human Resources and supervision matters) rather than representing mental illness/disorder to be addressed as such.

In this case, a Personality Disorder with narcissistic and immature features is raised for consideration, as are coping styles that can sometimes be seen with disinhibition from AD/HD, also subtle spectrum features. However, Mr. Patterson denies any compromises in his performance as a result of his behaviors, further reporting no workplace performance counseling other than the Sections 20 and 21 actions. To substantiate Personality Disorder in FAA matters, it is widely considered that behavioral evidence of such a condition must correspond to significant compromises in functioning in at least 2 major life activities. Here, there are nonspecific complaints from the employer. There is no evidence available at this time of non-employment compromise, though this is noted with the caution that Mr. Patterson's psychological testing was highly defensive, as appeared to have been a reasonable concern when viewing other self reported history as well, such that compromised behavior/coping corresponding to Personality Disorder may exist and not be disclosed. Yet, "may" or speculation is not evidence for supporting a diagnosis. Thus, and to emphasize here, there is no identified and reliable reasonable-certainty evidence to conclude such a condition is present (i.e., separate from considering behavioral 'traits' that cannot be seen as sufficient for making a full diagnosis). To consider any workplace compromises further, detailed examples of significant lapses would be needed. Arguing to the contrary regarding his employment activity as well as nonemployment pursuits, Mr. Patterson submits 8 letters of testimony from persons including aviation professionals and other personal contacts, all making positive statements about Mr. Patterson, with none reporting any lapses relevant to flying. Of course, these are self-selected and weighed as such. The above-noted observations of atypical behaviors in the context of this assessment are weighted in the direction of concern, but are not sufficient to conclude Personality Disorder significantly affecting major life functions.

In summary, while some personality characteristics identified at assessment raise concern for workplace performance challenges, a Personality Disorder is not identified with the limited data available at this time. Other than the unspecified complaints outlined by Captain Beach, no concrete examples of performance problems are identified. Corresponding recommendations, tentative at this point and pending any additional information, would be that complaints be handled according to appropriate supervisory judgment and through the personnel process as may be judged appropriate. Other, related recommendations are below.

Findings Regarding Cognitive Skills. Assessment data are outlined above. Data are consistent with an attention deficit disorder together with mild impaired range performance on multiple measures of complex speeded problem solving with novel information (i.e., aspects of executive skills). While reliably low performances were not observed on simple tasks, those requiring speeded performance in the context of working memory demands and visual input were significantly below expectation for working commercial pilots. As a simple example, on 2 of several measures of shifting attention and efficient problem-solving, performance was in the borderline to low average range even as compared to general aviation pilots between ages 71-86. Data included several performances suggesting compensatory slowing of speed in order to maintain accuracy, but then with accuracy only at an average level. Through the course of testing, there were multiple examples of impulsive-appearing or over-confident behavior that can compromise performance. The overall profile of neuropsychological assessment was discrepant from that expected for Major Airline pilots of similar age.

Thus, question is raised as to whether or not these findings represent:
  1) a change in function that may correspond to complaints regarding interpersonal skills,
  2) a change in medical or mental health status that may have precipitated reduced cognitive skills
      performances (e.g., effects of recent cancer care or status),
  3) a combination of the 2 versus
  4) long-standing low skills in these areas which have been compensated for in some manner or not been
      recognized in the work setting or
  5) unreliable findings.

First, there is no basis identified for considering assessment findings unreliable due to identifiable anxiety, fatigue or misunderstanding of instructions or expectations. Mr. Patterson reported having had a good night's rest prior to major testing and reported no problems of significance on the 2nd day. He was afforded 2 days and multiple breaks at his choice throughout testing, also ample time for interview/discussion, as would reasonably correspond to appropriate testing conditions. Certainly, some apprehension for testing is not uncommon; if present, that was not identified to

Coast Psychiatric Associates
RE: Rodney "Scott" Patterson                                    13                                    March 21, 2016

have been relevant to reducing performances for interpretive purposes. Data are considered reliable for the current purposes.

Secondly, if mild AD/HD (i.e., and common corresponding behavioral characteristics, also some impulsivity) have been long-standing, these may well have been gone undetected at work in the context of a highly motivated individual with high average intellectual functioning working according to prescribed/structured standards and "flow." This does not indicate that risks of performance lapses from cognitive deficiencies were/are not present, but that no performance lapses have been brought to attention at this examination when reviewing limited reporting for the time frame of a fairly extended flying career.

AD/HD with impulsivity (i.e., as a hypothesis) is most often seen as developmental, present since early life and not 'adult-onset.' Though Mr. Patterson indicated that his family/grandmother placed him in a boarding school for positive male influence, also reporting that he benefitted from having had more individual contact and structure, the noted benefits of such planning are quite common to expect with children with AD/HD. Again, this does not confirm the diagnosis; but assessment findings here in raise such concern, noting the clear pattern of impaired-range performances that would be consistent with a developmental condition. The core battery data appear more consistent with either chronic status, longstanding versus mild and reasonably well compensated for general function.

Lastly, question is raised as to whether or not the evidence for some fairly generalized complex cognitive impairments and complex attention lapses do not arise from recent healthcare concerns (i.e., cancer diagnosis and/or treatment). Mr. Patterson disclosed limited information regarding his cancer care, other than indicating he had fairly extensive IV and supplement treatment and that this included no standard chemotherapy treatment. It remains an unanswered question as to whether or not some incremental and significant CNS impairment (i.e., represented by low test performances and behavioral matters cited) may correspond to his cancer care treatment.

In short, some diagnostic questions remain unanswered, given limited information (e.g., below), but performance abnormalities significant to flying status remain none the less.

Recommendations.

    Work Status. Mr. Patterson is opined to be identified by the current assessment as <u>NOT FIT FOR DUTY</u> as a FO, on the basis of impaired performances on cognitive assessment.

    Healthcare Implications. The FFD assessment is not intended as a healthcare tool. However, if in the course of FFD assessment it is discovered that there are reasonable healthcare implications in the assessment findings, it is important to communicate those (i.e., as all providers have responsibilities to the persons with whom we work, including the employee), as findings may have relevance to addressing performance concerns, limitations or barriers.

    1)    Mr. Patterson should be provided with feedback to assist him at his choice to pursue determining the bases for deficiencies seen on cognitive testing. He would be urged to consider seeing the physician of his choice, first to address medical considerations. When appropriate (i.e., below), repeat neuropsychological review/examination may be among his considerations.

        These efforts may include careful review of medical records (e.g., recent medical records and cancer care, in addition to prior records), review of early schooling records, also additional developmental history that may not have been disclosed, as well as information that may be available from interviews with family and close associates as well as his immediate supervisor and others in the workplace or elsewhere who may offer relevant information. Upon completion of an adequate review of a more satisfactory scope of information than was available at this dictation, and based upon findings from that review, reassessment by an aviation experienced neuropsychologist in not less than 45 days for highly targeted testing and preferably after about 90-180 days or more with more comprehensive/repeated testing (i.e., to limit and caution regarding test-retest effects that could unreliably shift scores toward a normal range) might be considered. It is possible but not identifiably determined that repeat testing at future times as indicated could result in comparatively normalized scores. Additional testing at this time was considered not warranted.

**Coast Psychiatric Associates**
RE: Rodney "Scott" Patterson                                    14                                    March 21, 2016

To emphasize, the primary concerns are:  Whether or not Mr. Patterson has some medical cause for cognitive concerns (e.g., cancer care residual effects evidenced in attentional and executive changes) versus whether or not these are chronic or from some alternative cause that may require further consideration.  Pursuing these determinations are beyond the referral scope of this examination.

2)      At his choice, Mr. Patterson might consider personal counseling to discuss how his interpersonal style may be perceived by others in a manner different from what he perceives or intends.  When others may perceive well intended and benign behavior as presumptuous, arrogant or narcissistic, communication can suffer in a manner that may be potentially unacceptable in safety sensitive positions.  He appears to pride himself in his knowledge of and educational activities in leadership development, such that he might be a good candidate for such assistance.

—————————————

Please note that the above evaluation was completed as a Fitness for Duty type of assessment according to understanding of FAA guidelines and otherwise limited to those areas addressed in referral question and corresponding protocols. Opinions are offered on a reasonable certainty basis.  There is no guarantee that fitness or a finding of non-fitness for performance at any given time translates into comparable status at all future times.  Further, assessment accuracy is based upon the accuracy and completeness of information that was provided.  To the extent that any information of relevance may not have been provided or otherwise understood as such, findings may be reduced in accuracy.  It was my pleasure to see this courteous aviator for assessment.

Respectfully Submitted,

John Knippa, Ph.D., FACPN
Diplomate, American Board of Professional Neuropsychology

Patterson_Knippa_00017