UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division

Case Number: 17-cv-60533-MARTINEZ/OTAZO-REYES

RODNEY SCOTT PATTERSON,

　　Plaintiff,

vs.

AMERICAN AIRLINES, INC.,

　　Defendant.
_____/

**Plaintiff's Response to American Airlines, Inc.'s
Motion in Limine To Exclude Evidence of Subsequent Medical Reports**

　　Plaintiff, Rodney Scott Patterson, pursuant to Local Rule 7.1(c), responds as follows to American Airlines, Inc.'s Motion in Limine To Exclude Evidence of Subsequent Medical Reports (DE 96):

**Introduction and Summary**

　　At the risk of appearing to reargue the summary judgment motion (as American has largely done in the opening to its motion), Lt. Col. Patterson provides necessary context to demonstrate the tendency of the medical, psychological and neuropsychological reports generated subsequent to that of John Knippa, Ph.D.—none of which shared Dr. Knippa's conclusion that Lt. Col. Patterson was "not fit for duty" as an American pilot—to make it more probable than not that, ***First***, Dr. Knippa's report was a pretext rather than

a justification for grounding the plaintiff as punishment for disobeying a chief pilot who did not want him to go on military duty September 22, 2015, and, **Second**, that American was aware when it sought in December 2016 to tie any chance of his being fairly reevaluated to his giving up his claim under USERRA[1] that he actually was entitled to more than it was offering, which transforms the offer into retaliation.

What American is seeking to have this Court do is to keep the jury from hearing that no other practitioner agrees with Dr. Knippa, and therefore to accept his no-objective-findings report as a routine and legitimate effort on American's part to ensure the safety of its passengers—instead of as a backdoor way to punish a pilot for exercising USERRA rights.

Particularly telling is an overlay of the chronology of how Section 20 of the Joint Collective Bargaining Agreement came to be invoked on, **One**, the lack of both criteria for mandating a neuropsychological or psychological examination; **Two**, contradictions amongst American's witnesses on who could and did make the decision to mandate such an examination for Lt. Col. Patterson, and, **Three**, the characterization of Dr. Knippa's not-fit-for-duty report by American's corporate medical director as containing no factual findings on which to base such a conclusion.

---

[1]The Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301, et seq.

## Statement of the Facts

The mandating of a neuropsychological and psychological examination of Lt. Col. Rodney Scott Patterson by John Knippa, Ph.D., grew out of a disciplinary process that began September 24, 2015—two days after Lt. Col. Patterson went on duty at the Pentagon. Montgomery Deposition,[2] at 31:25-32:5, 53:5-54:3. Chief Pilot James Bonds had told Lt. Col. Patterson September 21 that he preferred for him to fly a scheduled trip September 22 rather than go on duty. Bonds Deposition,[3] at 76:25-77:6. Within two days, American had serendipitously opened a disciplinary investigation into repackaged allegations that had been brought to the attention four-to-six months earlier of another chief pilot, Corporate Security, Labor Relations and Human Resources, none of which took any adverse action against Lt. Col. Patterson at the time. Montgomery Deposition, at 14:7-15:24, 16:19-21, 17:22-18:1, 20:2-5, 20:24-21:10, 21:22-24:11, 27:2-28:8, 29:3-30:14, 31:25-32:9, 35:18-36:1 and Exhibits 3 and 25.[4] Further, the subsequent investigation— during which American claims to have learned things about Lt. Col. Patterson that justified sending him for a neuropsychological

---

[2]The cover page and relevant testimonial pages of the deposition of Michelle Montgomery are appended as Attachment 1.

[3]The cover page and relevant testimonial pages of the Deposition of James Bonds are appended as Attachment 2.

[4]Montgomery Deposition Exhibit 3 is appended as Attachment 3; Exhibit 25 is appended as Attachment 4.

examination—also produced no findings justifying employee discipline. Id. at 35:18-36:7, 46:1-4. However, notwithstanding that American was unable to produce any live witnesses willing to testify at the Section 21 hearing, see, e.g., Montgomery Deposition at 76:11-19, American management contented itself with anonymous backbiting as all that it needed to punish Lt. Col. Patterson. See Montgomery Deposition Exhibit 30[5] (November 6 e-mail string in which Montgomery acknowledges that "[w]ithout those other statements, we really don't have much of a case," but goes on to state that "[t]hose statements may better support a section 20, too").

That USERRA issues were both at play and recognized as being so is clear from an e-mail string generated during the early stages of the investigation, as well as from Capt. Bonds's admitting it during his deposition. See, e.g., Montgomery Deposition, at 48:1-16 and Exhibit 25;[6]

---

[5]Exhibit 30 to the Montgomery Deposition is appended as Attachment 5.

[6]Exhibit 25 to the Montgomery Deposition, a September-October e-mail string in which begins with Lt. Col. Patterson reminding Capt. Bonds that the Leave and Earnings ("LES") statement that Capt. Bonds had requested he provide "verifies performance of military duty which is covered under USERRA, 22 SEP through 25 SEP, 2015"; contains an expression of hope by Capt. Bonds that "[m]aybe [Lt. Col. Patterson] hangs himself on providing false information"; includes Sean Scialfa, the Miami managing director of flight, stating that he "would prefer to pursue this avenue rather than Sec. 20 for now"; contains a warning from Mark S. Cronin, the Managing Director Line Operations-East, that "USERRA issues can get really tangled fast, and we need to make sure his behavior remains the focus and not how we are handling it," and concludes with Capt. Scialfa suggesting, "[w]ell lets have Carver and legal take over this part….," is appended as

(continued…)

Bonds Deposition, at 80:20-23 ("Q. Were you aware that there was a USERRA issue on the table there? A. Yes, I was.")

The mental examination, according to Ms. Montgomery, American's Rule 30(b)(6) designee, was pushed by the two chief pilots, Captains Bonds and Brian Beach, who had initiated and presided over the September-November investigation, id. at 54:13-25, although Bonds and Beach each deny that. See Bonds Deposition, at 61:1-10, 103:21-104:19, 110:15-23; Beach Deposition,[7] at 14:18-15:12.

Jeral Ahtone, M.D., American's corporate medical director, had nothing to do with the decision that Lt. Col. Patterson should be sent for a Section 20 neuropsychological exam. Montgomery Deposition, at 59:13-16. Nor did anyone with any background in medicine, neuropsychology or psychology. Id. at 72:10-24. Nor does American have any written guidelines for selecting a pilot for such an examination. Id. at 75:8-13.

Lest there be any doubt as to what American was looking for from Dr. Knippa, Ms. Montgomery forwarded to him a copy of a "Fitness for Duty Medical Examination Request—Section 20," that stated in pertinent part that "[t]he request is based upon this office's concerns about FO Patterson's judgment and, specifically, his mental and/or emotional stability. This office

---

[6](…continued)
Attachment 6.

[7]The cover page and relevant testimonial pages of the Deposition of Brian Beach is appended as Attachment 7

has received multiple reports of atypical interactions with coworkers and reports that suggest a pattern of false/self-aggrandizing statements." Id. at 60:11-16 and Exhibit 49.

Once Lt. Col. Patterson actually filed his USERRA complaint January 25, 2016, American began to weaponize its contractual ability to compel a mental examination in defense against the claim: its Associate General Counsel, Lucretia Guia, informed the Department of Labor's Veteran's Employment and Training Service in a February 29, 2016 letter that

> During the course of the investigation, which did not lead to discipline, the Company discovered information which placed in question FO Patterson's fitness for duty. And, consistent with its duty to ensure the safety of its employees and passengers, the Company initiated a fitness for duty examination, which is pending.

A copy of Ms. Guia's letter, accompanied by a package of exhibits that included the allegations by Captain Whitehouse that Ms. Guia had acknowledged in her letter had "not [led] to discipline," is appended as Attachment 8.

Following tests that included a skills-set measurement upon which Dr. Knippa embarked during the afternoon following Lt. Col. Patterson's late-evening arrival from three time zones away, Dr. Knippa subsequently (on March 21, 2016) produced to Dr. Athone, American's corporate medical director, a "NOT FIT FOR DUTY" report on Lt. Col. Patterson, which Dr. Ahtone passed along to Ms. Montgomery with the recommendation that she follow its recommendation —notwithstanding that it, **One**, did not show that

Lt. Col. Patterson failed any test; *Two*, contained no finding of neuropsychological deficit, psychopathology or personality disorder, and, *Three*, "indicate[d] that [Dr. Knippa did]n't have a complete answer at [that] time." Ahtone Deposition,[8] at 42:17-44:18, 52:11-22, 54:13-55:1 and 57:15-58:1 and Exhibit 4.

Notwithstanding that the report contained no actual findings that would have justified withholding Lt. Col. Patterson from duty, American used it as a basis to ground him March 24 as being unfit for duty—less than two months after he had filed his USERRA claim with the Department of Labor January 25, which claim American's lawyer had attacked in her February 29 letter.

Glenn R. Caddy, Ph.D., Lt. Col. Patterson's testifying expert, characterized Dr. Knippa's neuropsychological test results as being invalid because the tests were administered to Patterson the day after Patterson arrived in California, three time zones away from his home. Caddy Deposition,[9] at 69:9-20. Dr. Caddy is a clinical psychologist and former professor of psychology who has taught psychometrics, or psychological

---

[8]The cover page and the relevant testimonial pages of the Deposition of Jeral Ahtone, M.D. is appended as Attachment 9. The Ahtone Deposition Exhibit 4 is appended as Attachment 10.

[9]The cover page and the relevant testimonial pages of the Deposition of Glenn R. Caddy, Ph.D., are appended as Attachment 11.

testing, at the undergraduate and graduate levels.  Id. at 57:4-15.  Caddy also characterized Knippa's overall approach as being

> that, at every level, if you really understand what he was doing, he kept on trying to find something wrong and he'd make comments about something wrong, but then he'd fall off and say, well, it's not enough to offer a legitimate assertion of that, after he made assertions about it.

Id. at 68:20-69:1.

Patterson in August 2016 furnished American reports from, among others, John Hastings, M.D., an FAA-qualified neurologist; Gary Kay, Ph.D., the Georgetown University neuropsychologist who designed the testing instrument, CogScreen AeroMedical Edition, used by Dr. Knippa to disqualify Patterson and whom American frequently uses for fitness-for-duty examinations, and Dr. Caddy, as well as the military physician who had cleared Patterson as being fit for combat deployment.[10]  Drs. Hastings, Kay and Caddy respectively found Patterson fit-for-duty neurologically, neuropsychologically  and psychologically.  Id.[11]

---

[10]The August 16, 2016 cover letter and the reports are appended to Plaintiff's Local Rule 56.1(a) Statement of Material Facts In Support of Motion for Summary Judgment as DE 61-19.

[11]American's suggestion that Patterson was "doctor shopping," DE 96 at 3, n. 1, takes out of context an e-mail discussion concerning the refusal by Edwin Bercaw, Ph.D., about payment of an additional fee to confer with Dr. Caddy concerning Dr. Bercaw's consultation with Lt. Col. Patterson, which had evolved into a bait-and-switch substitution of a resident for himself and the worthlessness of Francy Nathaly Fonseca, Psy.D.'s examination for submission to the Federal Aviation Administration.  See DE 79, at 4 (Pla. Exh. 1).

American offered to the Allied Pilots Association, Lt. Col. Patterson's union, in December 2015 to permit the University of Texas Medical Branch ("UTMB") to review the reports and either clear him for a return to duty based on the reports, or refer him out for evaluation by some other practitioner(s) other than Dr. Knippa—conditioned on Lt. Col. Patterson's abandoning any claim (which would include the claim that American knew was then pending before the Department of Labor for a USERRA violation) having to do with Section 20 issue.  See Montgomery Deposition Exhibit 68.[12]

## Governing Legal Principles

- **The substantive law**

Lt. Col. Patterson brought this action pursuant to USERRA, which "supersedes any … contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit."  38 U.S.C. § 4302(b).

As this Court noted in Bagnall v. City of Sunrise, Florida, Case No. 10-61299-cv-Martinez/McAliley (S.D. Fla. 2011), "[i]n order to establish a prima facie case of discrimination under 38 U.S.C. § 4311(a), Plaintiffs must

---

[12]Montgomery Deposition Exhibit 68, a December 2016 e-mail string, is appended as Attachment 12.

show with regard to Mr. Bagnall that he was denied a benefit of employment and that his protected status was a 'motivating factor' in the denial." Id. at 18-19, citing Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1238 (11th Cir. 2005).

Following such a showing—which plaintiff will assume, for purposes of this motion, since without having made it, American would need to put on no defense, and plaintiff would have nothing to challenge—"'the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action.'" Id. at 19, quoting Coffman. at 1238-39. "'[T]he agency must prove, by a preponderance of evidence, that the action would have been taken despite the protected status.'" Id., quoting Coffman, at 1239.

Retaliation, pursuant to 38 U.S.C. 4311(b), can take the form of an offer to reinstate an employee whom the employer recognizes is legitimately pursuing his USERRA rights to a protection to which he is, indeed, entitled, but conditioning that reinstatement on the employee's abandoning any greater rights he might have than to simply instatement on the terms that the employer is offering. See United States v. Nevada, 817 F. Supp. 2d 1230, 1249 (D. Nev. 2011).

> [W]here an employer has made an offer of reemployment not solely as an offer of compromise but at least in part because the employer believes the person is entitled to at least some reemployment benefits under USERRA, it would constitute retaliation for the employer to deny those benefits in response to the person's reservation of rights and pursuit of a claim for greater benefits.

Id. (denying summary judgment on retaliation claim based on USERRA claimant's wishing to pursue statutory rights while taking a lower position to that which he felt entitled).

- **The evidentiary rules**

    Evidence is relevant if:

    > (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

    > (b) the fact is of consequence in determining the action.

Federal Rule of Evidence 401.  "Relevant evidence is admissible…. Irrelevant evidence is not admissible." Rule 402.

Although even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Rule 403, the prejudice must be undue.  For as the former Fifth Circuit pithily observed in dealing with a Rule 403 issue, "'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party.  Virtually all evidence is prejudicial or it isn't material.  The prejudice must be 'unfair.'" Dollar v. Long Mfg., N. C., Inc., 561 F.2d 613, 618 (5th Cir. 1977)[13] (reversible error to disallow use of letter from design engineer,

---

[13] In Bonner v. Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to October 1,
(continued…)

the defendant's expert witness, "warning [dealers] about the death dealing propensities of the Long backhoe when used in the fashion employed here," to impeach his testimony that "that the backhoe was safe to operate while affixed to a rollbar-equipped tractor").

**Applying the Law to the Facts in the Case at Bar**

<u>Point 1</u>: **The subsequent reports are relevant, and are not more prejudicial than probative.**

American confuses the issue of what is relevant by referring repeatedly to how the subsequent doctors' reports have nothing to do with the issue of whether Lt. Col. Patterson's having gone on duty with the Army Reserve Sept. 22, 2016, or his filing a USERRA complaint with the Department of Labor January 25, 2016, was a "motivating factor" for American to, **First**, put him on Paid Withheld status September 24; **Second**, ground him March 24 as neuropsychologically and psychologically "NOT FIT FOR DUTY," and, **Third**, to refuse to permit him to be reevaluated by anyone other than Dr. Knippa unless he would agree to give up his congressionally-created right to pursue greater remedies under USERRA than merely no-back-pay reinstatement.

That issue—the only non-damages issue on which Lt. Col. Patterson has the burden of proof—is not what is at issue concerning the subsequent

---

[13](…continued)
1981.

medical, neuropsychological and psychological reports: rather, it is whether American would have behaved the same way toward Lt. Col. Patterson had he not, **One**, gone on duty that day; **Two**, filed his USERRA complaint in January, and, **Three**, refused in December 2016 to enforce all of the rights that Congress has granted him through the passage of USERRA. That is an element on which American bears the burden of proof—and on which, testimony about the subsequent doctors' findings undercuts it badly.

Thus, the first material fact of consequence to this litigation that is "more or less probable than it would be without the evidence [concerning the subsequent medical reports]," see Rules 401(a) and (b), is whether the "not-fit-for-duty" report of John Knippa, Ph.D., is a justification or a pretext for either or both:

- the original neuropsychological and psychological grounding of Lt. Col. Patterson, or

- American's continuation of that grounding in the face of Lt. Col. Patterson's refusal to abandon his USERRA claim.

Jurors who learn that none of the other practitioners agreed with Dr. Knippa's "not-fit-for-duty" assessment could reasonably determine that American realized that it was bogus from the start, particularly in light of:

**One**, American's having sent Dr. Knippa, in the guise of a copy of the Fitness for Duty Medical Examination Request—Section 20, Attachment 13, a virtual check list of what it wanted him to find, after beginning to plan for

the examination as early as November when it realized that the Section 21 investigation would not lead to any discipline and having been contemplating it as far back as October when Capt. Scialfa stated he would prefer to move against Lt. Col. Patterson for misrepresentation of his military-duty time rather than go through Section 20, see Attachment 14;

 **Two**, Dr. Knippa's having engaged in such irregular testing behavior as having administered a skill-set test to Lt. Col. Patterson on the afternoon after he had arrived the night before from three time-zones away, which caused Lt. Col. Patterson to have to break off the testing because of fatigue, and

 **Three**, Dr. Ahtone, American's corporate medical director, conceding that the report contained no findings that Lt. Col. Patterson had failed any test, nor that he had displayed any objective signs of neuropsychological deficit, psychopathology or personality disorder.

 The second issue on which the reports are relevant is whether American, when it in December 2016, conditioned Lt. Col. Patterson's having a fair, non-Knippa evaluation, on his dropping his USERRA claim, realized at the time that Lt. Col. Patterson was pursuing "a claim for greater benefits," e.g., backpay, in which he was likely to prevail.

 Assuming that American did not know when they got the "not-fit-for-duty" opinion from Dr. Knippa in March (notwithstanding its necessary self-awareness of the three factors outlined above), a reasonable jury could

believe that American had to have realized the weakness of its position after it got the various medical reports that Lt. Col. Patterson forwarded in August stating that he never had been not-fit-for-duty. One of those fit-for-duty reports came from Dr. Gary Kay, the author of the CogScreen AE,[14] and a practitioner whom American has used in the past. Montgomery Deposition, at 109:11-21.

These are issues on which American bears the burden of proof.

The various practitioners' reports subsequent to the one done by Dr. Knippa, therefore, have a tendency to make it more probable than it would be without those reports that:

*First*, American knew from the beginning that it was getting a bought-and-paid for report from a practitioner who would give them just what they outlined on the copy of the request for the Section 20 exam that it sent him, and

*Second*, if, by any chance, it did not realize that in March when it first grounded him as psychologically and neuropsychologically unfit for duty, that it certainly knew it after it received those reports in August and before it conditioned a fair reevaluation of him on his abandoning his USERRA claim for back pay and other relief.

---

[14]See http://www.cogres.com/About/LeadershipTeam, last visited August 2, 2018.

American's efforts to wrap itself in the flag of "American's obligation to ensure the safety of its passengers"[15] founders on the history of its relationship with Lt. Col. Patterson: not only was he determined during the September-November Section 21 inquiry to have engaged in no behavior justifying employee discipline, but all of the allegations made against him by Capt. Whitehouse had been known to Chief Pilot Beach, Corporate Security, Labor Relations and Human Resources in March and April 2015, but nothing was done about it until after he disobeyed Chief Pilot Bonds's request that he fly his assigned flight September 22.

**Point 2:   The Railway Labor Act has nothing to do with this case.**

American's attempt to suggest that Lt. Col. Patterson's claim to discrimination and retaliation under USERRA should be referred to a board of adjustment pursuant to the Railway Labor Act makes no sense. Nor does any case support that argument.[16]

---

[15]The selected bon mot ("public obligation to ensure that Plaintiff was fit to fly") comes from that part of the court's summary judgment order in Witter v. Delta Airlines, Inc., 966 F. Supp. 1193, 1201 (N.D. Ga. 1997) discussing (and dismissing) a Georgia common-law claim for intentional infliction of emotional distress brought by a pilot who had been arrested and psychiatrically hospitalized after a domestic dispute in which he threatened suicide. Id. at 1195. Not only does the case not pertain to USERRA, but it is factually inapposite. That plaintiff was subsequently diagnosed as suffering a Narcissistic Personality Disorder. Id. at 1197. Lt. Col. Patterson has no such history or diagnosis.

[16]None of the four cases cited by American, see DE 96, at 6-7, pertain to USERRA.

As the court in Duffer v. United Continental Holdings, Inc., Case No. 13 C 3756 (E.D. Ill. March 29, 2016) reasoned when the defendants in that case suggested that the Railway Labor Act deprived the court of jurisdiction over a USERRA claim:

> Decades ago, the Supreme Court found that the Universal Military Training and Service Act trumps the Railway Labor Act, see McKinney v. Missouri-Kansas-Texas Railroad Co., 357 U.S. 265, 268-70 (1958), and this Court sees no reason to depart from that analysis in light of the continuity of the body of case law interpreting USERRA and its predecessor statutes. 20 C.F.R. § 1002.2; S. Rep. 103-158, at 40 (1993); 70 Fed. Reg. 75,246 (Dec. 19, 2005) (citing Section 1002.2); Gross v. PPG Industries, Inc., 636 F.3d 884, 888 (7th Cir. 2011) (same); Crews [v. City of Mt. Vernon], 567 F.3d [860,] 864-65 (same). Indeed, the House Report to USERRA cited McKinney (and Kidder v. Eastern Air Lines, Inc., 469 F. Supp. 1060, 1063 (S.D. Fla. 1978)]) to "reaffirm that additional resort to mechanisms such as grievance procedures or arbitration or similar administrative appeals is not required." H.R. Rep. 103-65(I), at 20 (1993).

Id. at 39-40.

What the Court is dealing with here is a statutory right of a member of the nation's uniformed services—not a "minor dispute."

## Conclusion

Based on the evidence marshaled, the authorities cited and the arguments presented, Plaintiff respectfully requests the Court to deny American Airlines, Inc.'s Motion in Limine To Exclude Evidence of Subsequent Medical Reports (DE 96), and to grant such other and further relief as is just.

Respectfully Submitted,

*/s/   William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301
(954) 462-1983 / 463-5008 (fax)

NOEL C. PACE
noel.c.pace.esq@gmail.com
*Admitted Pro Hac Vice*
206 NW 91st Street
El Portal, FL
(305) 710-3713

**Attorneys for Plaintiff,**
**Rodney Scott Patterson**

**Certificate of Service**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed using the Southern District of Florida's ECF system and thereby has been served on all counsel or parties of record.

*/s/   William R. Amlong*
WILLIAM R. AMLONG

\\amlong3\cpshare\CPWin\HISTORY\180724_0001\1538.1ca