```
                                                                    1

                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                      FORT LAUDERDALE DIVISION
                    CASE NO.:  1:17-cv-60533-JEM


   RODNEY SCOTT PATTERSON,           )
                                     )
              Plaintiff,             )
                                     )
   v.                                )
                                     )
   AMERICAN AIRLINES, INC., a        )
   Delaware Corporation,             )
                                     )
              Defendant.             )
   _____)




             Videotaped Deposition of JAMES N. BONDS

                       (Taken by Plaintiff)

                     Charlotte, North Carolina

                      Thursday, March 15, 2017








                     Reported in Stenotype by

                     Christine A. Taylor, RPR

                   Registered Professional Reporter
```

# ATTACHMENT 2

 1  American Airlines with your orders?
 2      A.  I had them available upon request.
 3      Q.  The question is, sir, did you show them to
 4  anybody?
 5      A.  At some point -- I can't recall.  I don't
 6  recall.
 7      Q.  Did you think that asking Mr. Patterson for
 8  the records was a way to get him to hang himself on
 9  providing false information?
10      A.  That might not have been my attempt, but it
11  could have been, but the idea that I wanted his
12  information was for him to provide the reason he didn't
13  want to fly that trip with Chip Harlow.  And if he had
14  provided the orders, then it would have been over and
15  done with.
16      Q.  Did he provide the orders that you don't know
17  that he had?
18      A.  I never saw any orders from him.  The only
19  thing I received from him was after a few requests a
20  redacted LES.
21      Q.  You had told Mr. Patterson you did not wish
22  him to go; correct?
23      A.  I didn't hear you.  Say the question again,
24  please.
25      Q.  You had told Mr. Patterson that you did not

1  wish him to go; correct?
2      A.  What I told him was he had requested an EO and
3  I told him in a voicemail -- I never spoke with
4  Patterson personally.  He never called me back.  I told
5  him that because requesting an EO, we were really short
6  on manning, and that -- that I needed him to fly.
7      Q.  And, instead, he went to Washington?
8      A.  I'm missing the first part of your question.
9  What was the first part of it?
10     Q.  And instead of flying as you wished him to
11 do, he went to Washington?
12     A.  Yes.  That's true.
13     Q.  To do his duty as a United States Army
14 lieutenant colonel?
15     A.  Yes.
16     Q.  And you were not happy that he went to
17 Washington that day, were you?
18     A.  I personally -- that wasn't my concern.  I
19 support all military people in the service of their
20 country, and that's not the issue.  The issue is that I
21 didn't feel that he was being forthright and honest by
22 getting off that trip with Captain Harlow.  That was my
23 concern.  And he could easily have been handled by --
24 and taken my phone call and not be an obstruction to my
25 questions, and, Captain Bonds, here's my orders coming

1  told me, it was in passing.  It wasn't a formal
2  meeting, sit down, I want to tell you what's going on
3  with this situation.  So not to my knowledge.  I don't
4  know of any conversation Brian Beach and I had about
5  this.
6     Q.  Are you familiar with any investigation into,
7  quote, a very scary divert into Bogota, closed quote?
8  BOG is Bogota; correct?
9     A.  Yes, it is.  I'm aware of it now and from
10 reading the last letter.  And your questionings about a
11 divert, I might have remembered something about it,
12 but -- in passing, but to be honest with you, I don't
13 remember details and this jogs my memory of hearing a
14 story, but I don't remember any details of it.
15    Q.  But just if you were talking before about
16 diverts, there would be a P2 concerning any divert?
17    A.  Should be, yes.
18    Q.  Could be or would be?
19    A.  Should be.  The pilot should fill the report
20 out and turn it in.  Pilots don't always, you know,
21 follow that protocol.  Pilots don't like paperwork.
22 So ...
23    Q.  Well -- but the chief pilots want paperwork
24 concerning something as significant as a divert;
25 right?

1       Q.   And what, if anything, did you do at this
2    point in time to initiate a Section 20 examination of
3    Mr. Patterson?
4       A.   I don't know that I did anything.
5       Q.   Why would you have done nothing when you
6    state in the e-mail, quote, I think we all need to
7    confer and then convince labor that this dude needs a
8    Section 20 ASAP, closed quote?
9       A.   Because I did nothing because Brian Beach was
10   the guy that was handling that investigation.
11      Q.   Do you know whether or not Mr. Beach had done
12   anything at this point?
13      A.   I can only -- I do know at some point
14   something was done because I think he did go to a
15   Section 20, but I don't know what Brian did.  I don't
16   know the circumstance of where he took it from there.
17      Q.   Please hand the witness Exhibit 5.
18      A.   Okay.
19      Q.   Do you recall seeing this e-mail before?
20      A.   I recall the story and speaking with David
21   Tatum.
22      Q.   Okay.  Tell me what you recall about that.
23      A.   I was bothered that I never spoke with Scott
24   Patterson and that he requested an EO after the flight
25   office was closed, and I think -- I didn't leave at

```
 1    I don't know who was there.  One of the reasons that we
 2    were very thin on chief pilots and chief pilots have
 3    other duties and responsibilities in Dallas for
 4    meetings within the hub and also flying to keep our
 5    proficiency up.  So we were spread quite thin a lot of
 6    the time.  So I don't know who was on duty.  It's not
 7    like punching a time clock.  Whomever is there is
 8    there.
 9        Q.   Were you in the office that day when he
10    called?
11        A.   I was.
12        Q.   Do you know why he was not put through?
13        A.   I do not know.  I could have been on the phone
14    with someone else or in a meeting with someone else.
15        Q.   Give the witness Exhibit 9, please.
16             MR. MORALES:  Bill, are we skipping 8?
17             MR. AMLONG:  No.  Give him Exhibit 8, please.
18        A.   Okay.
19        Q.   So why did you say, quote, maybe hang himself
20    in providing false information, closed quote?
21        A.   Not looking for any reason other than maybe
22    he's not being truthful.
23        Q.   Well, what were you going to do if he hung
24    himself on providing false information?
25        A.   I can tell you what I would like to have done,
```

1   A.  It's not from me.  It's from -- to Brian.
2   Q.  It's from Brian Beach to James Bonds.
3   A.  Right.  And "Junk, can you call me please?
4   Brian."  But I've never seen this e-mail.
5   Q.  Do you recall discussing with Mr. Beach the
6   Article 7 allegations against Mr. Whitehouse?
7   A.  Possibly.  I don't recall any details of it.
8   It's very possible that we did talk about it at some
9   point, but the rest of it, I don't remember.
10  Q.  Look at Exhibit 22, the top message, and see
11  if that refreshes your memory.  First of all, do you
12  recognize this as an e-mail to you from Brian Beach --
13  A.  I haven't seen it.  Give me just a minute.
14  Q.  -- response --
15  A.  It's the same letter.  I just ask what time is
16  he available.
17  Q.  Do you recognize it as an e-mail that you
18  sent?
19  A.  I do recognize it.  I don't remember the
20  circumstances nor the outcome of our discussion.
21  Q.  Look at Exhibit 23 and tell me if you
22  recognize that.
23  A.  I recognize my signature, but this is a form
24  letter right from labor, Michelle Montgomery's office,
25  to us to fill in the blanks.  So I signed it.

[3/15/2017] Bonds, James N. (Vol. 01) - 03/15/2018 [2821980]

```
 1       Q.   Well, it says, "Due to my concerns regarding
 2   your ability to safely operate an aircraft, I have
 3   arranged for you to participate in medical evaluation
 4   as provided in section 20 of the JCBA."  Does "my" and
 5   "I" refer to you?
 6       A.   I think it's semantics there.  Anyone in our
 7   office could have signed that, and it probably would
 8   have been the same exact opening paragraph.  Those are
 9   kind of form letters that any of the chief pilots sign,
10   but, you know, yes, I signed it.
11       Q.   Tell me what concerns -- tell me what
12   concerns, if any, you had about Mr. Patterson's
13   ability to safely operate an aircraft?
14       A.   Well, if it was up to me and I had written
15   this personally, I would have said we and not my and I
16   because this is a collective -- a collective process
17   through labor, legal, and the flight office.  In this
18   case, we're just delivering the news.  That's all I'm
19   doing, delivering the message.
20       Q.   Well, what you're -- you are the person who
21   on September 6th -- you're the person who stated, "I
22   think we all need to confer and then convince labor
23   that this dude needs a Section 20 ASAP;" correct?
24       A.   I did say that in an e-mail, yes.
25       Q.   So whether it may have been collective or
```

1  takeoff that day?
2      A.  We have a manning tool that we look every
3  night and every morning that shows the manning of our
4  reserve pilots, and it says it will give us a tool, an
5  idea of where our manning was at the time for a
6  particular seat, for first officers or captains or
7  particular airplane 7576, or a particular division,
8  domestic or international.
9      Q.  Well, you did find a pilot to substitute for
10 Mr. Patterson --
11     A.  I did not.  I did not find one.  Crew
12 scheduling, that's their responsibility.  And I can
13 only assume they found one because we didn't hear of a
14 cancelation because of not being able to fill it.
15     Q.  What information was developed during the
16 human resources investigation of Mr. Patterson that
17 gave rise to any concern regarding his ability to
18 safely operate an aircraft?
19     A.  I don't know what came out of that.  I was
20 only present as a witness with First Officer Flannigan
21 and I don't know what the circumstances were following
22 that or where we went from that.  So I don't have that
23 answer.
24     Q.  When did Mr. Harlow or Mr. Odeh tell you that
25 they were concerned about Mr. Patterson?