UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 1:17-cv-60533-MARTINEZ-OTAZO-REYES

RODNEY SCOTT PATTERSON,
    Plaintiff,

vs.

AMERICAN AIRLINES, INC., a Delaware
Corporation,

    Defendant.
_____/

## AMERICAN AIRLINES, INC.'S MOTION TO EXCLUDE OPINION TESTIMONY BY DR. CADDY

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), American Airlines, Inc. ("American") respectfully moves to exclude the opinions of Dr. Glenn R. Caddy because they are inherently unreliable and thus inadmissible.

## INTRODUCTION

As detailed below, following the additional discovery that this Court permitted, American has now confirmed that, in developing his opinions, Dr. Caddy relied only on data that supports his opinions—and simply ignored directly contrary data that does not support his opinions. The additional discovery has also confirmed that Dr. Caddy was well aware of this contrary data, and attempted to "deep six" it. Such an approach is inherently unscientific and unreliable, and likely unethical.

Under these facts, Plaintiff has not and cannot demonstrate that Dr. Caddy's opinions are "the product of reliable principles and methods" that have been "reliably applied . . . to the facts

of the case" as required for Dr. Caddy's opinions to be admissible. *See* Fed. R. Evid. 702. Accordingly, this Court should exclude Dr. Caddy's opinions.[1]

## BACKGROUND

In this USERRA action, Plaintiff claims that a "motivating factor" for American withholding him from duty as a First Officer of a 767 aircraft in September 2015, and continuing to withhold him from duty since that time, was a request by Plaintiff for time off to serve in the military. (Compl. ¶ 29, ECF No. 1.) As demonstrated in its summary judgment motion, American withheld Plaintiff from duty on September 24, 2015 because another long-time pilot filed a formal workplace harassment complaint on that day that raised serious concerns regarding Plaintiff. (*See* ECF No. 59.) Plaintiff himself testified that "a reasonable person would expect [that workplace harassment complaint] to cause the loss of employment of any person affected." (ECF No. 59-1 at ¶ 27.)

Following an investigation of the workplace harassment complaint against Plaintiff, American's HR Department in Miami prepared a written report in December 2015. In that report, American's HR Department concluded that, "the majority of the employees interviewed described [Plaintiff] as a habitual liar/story teller" whose conduct led "multiple employees . . . to question his ability to operate the aircraft safely; it left them with an impression that 'he's not quite all there.'" (ECF No. 57-26.) Based on this information, the Miami flight office formally requested, "a Fitness for Duty Medical Examination, pursuant to Section 20 of the [American/Allied Pilots

---

[1] In addition to being inherently unreliable, this Court should also exclude Dr. Caddy's opinions as irrelevant, as detailed in American's Motion in Limine to Exclude Evidence of Subsequent Medical Reports. (ECF No. 96).

Association Collective Bargaining Agreement (the "CBA")] . . . based upon this office's concerns about FO Patterson's judgment and specifically, his mental and/or emotional stability.  This office has received multiple reports of atypical interactions with coworkers and reports that suggest a pattern of false/self-aggrandizing statements." (ECF No. 59-1 at ¶ 35.)  The Miami flight office then sent notice to Plaintiff that, pursuant to Section 20 of the CBA, American was referring him to a fitness-for-duty examination by an independent neuropsychologist, Dr. John Knippa. (*Id.* at ¶¶ 36–37; ECF No. 76-1 at ¶¶ 13–14.)

On March 21, 2016, following a two-day examination, Dr. Knippa reported to American that Plaintiff is "NOT FIT FOR DUTY as a [pilot] on the basis of impaired performances on cognitive assessment." (ECF No. 57-6 at 13.)  Since that time, American has withheld Plaintiff from duty and informed him that it will continue to withhold him until he returns to the same independent neuropsychologist (or a comparable examiner approved by American) for reevaluation in accordance with Section 20 of the CBA—the same as would be required for any pilot found unfit for duty. (ECF No. 59-1 at ¶¶ 38–39; ECF No. 76-1 at ¶¶ 13–14.)

### A. Dr. Knippa's Evaluation

Dr. Knippa is a neuropsychologist with more than 30 years' experience. (*See* Knippa Dep. 5:12–9:14, ECF No. 57-24.)  The field of neuropsychology is broad and includes "cognition, thinking, and behavior." (*Id*. at 30:6–31:4.)  According to Dr. Knippa, "an individual [like Plaintiff] who has been an experienced pilot and who is only now sometime later in the career being brought up as a subject of having judgment, mental and emotional stability problems, self-aggrandizing statements raises a concern from a neuropsychological or fitness perspective." (*Id.*)  Dr. Knippa's evaluation of Plaintiff took place on March 16 to 17, 2016. (Knippa Report 1, ECF No. 57-24.)

Among other tests, Dr. Knippa administered the CogScreen-AE—a computer-based neurocognitive test that the Federal Aviation Administration ("FAA") considers part of the "FAA core battery" for neuropsychological testing. (*See id.* at 7.)[2] While many of Plaintiff's scores were in the normal range, Dr. Knippa noted that several scores showed evidence of impairment. Notably, Dr. Knippa reported that the Taylor Aviation Factor Scores indicated that Plaintiff's deductive reasoning was "defective," and his visual learning and recall was "low average." (*Id.* at 8.)[3]

Plaintiff's "process" scores also "appear[ed] to reflect low performance on novel problem-solving that was marked by perseverative errors and more than expected challenge on difficulty identifying and applying efficient problem-solving rules." (*Id.*) Summarizing the CogScreen results, Dr. Knippa explained: "Most notable was the Defective-range score on tasks intended to assess novel problem-solving, perceptual/attribute identification speed and executive function. Of the factors identified as predictive of flight simulator performance, visual association memory was low average, other scores average or better." (*Id.*) Dr. Knippa also described poor performance on a continuous attention test and low-average performance on verbal memory tests. (*Id.* at 8–9.)

In his final findings, Dr. Knippa described Plaintiff's cognitive abilities as follows:

> Data are consistent with an attention deficit disorder together with mild impaired range performance on multiple measures of complex speeded problem solving with novel information (i.e., aspects of

---

[2] Plaintiff and Dr. Caddy have repeatedly stated that Dr. Knippa performed the CogScreen test in the afternoon, when Plaintiff was purportedly tired. As Dr. Knippa explained, however, the time stamp on the score sheet proves that Plaintiff completed the CogScreen in the morning. (Knippa Dep. 47:19–49:1, ECF No. 57-24.)

[3] The Taylor Aviation Factor are parts of the CogScreen test that "have been determined to be related to piloting skills." (Ex. 1, Bercaw Dep. at 95:24–96:3.)

> executive skills). While reliably low performances were not observed on simple tasks, those requiring speeded performance in the context of working memory demands and visual input were significantly below expectation for working commercial pilots. . . . The overall profile of a neuropsychological assessment was discrepant from that expected for Major Airline pilots of similar age. . . . In short, some diagnostic questions remain unanswered, given limited information . . . , but performance abnormalities significant to flying status remain none the less.

(*Id.* at 12–13.) Dr. Knippa thus reported to American that he "could not based on the report identify that [Plaintiff] is affirmatively identified as capable of reliably performing essential functions of his job description." (Knippa Dep. at 34:7–18, ECF No. 57-24.) Specifically, Dr. Knippa's interpretation of the entire battery of neuropsychological tests performed revealed that Plaintiff "did not meet current criteria based on impaired performances on cognitive assessment." (*Id.* at 35:17–36:3.)[4]

### B. Dr. Bercaw's Evaluation

Before Dr. Knippa's report was finalized, Dr. Caddy had already located Dr. Bercaw—a neuropsychologist in Florida who administers CogScreen testing. (*See* Pl.'s Am. Interrog. Answers, ECF No. 54-1.) Plaintiff contacted Dr. Bercaw to request an "impartial evaluation." (Bercaw Dep. 10:2–11:18, attached as Exhibit 1.) Dr. Bercaw met with Plaintiff on March 21, 2016—four days after Dr. Knippa' evaluation. (*Id.* at 8:25–9:3, 68:9–20.) Dr. Bercaw conducted a clinical interview and then performed several additional tests, including the CogScreen test. (*Id.*

---

[4] Plaintiff has repeatedly attempted to mischaracterize Dr. Knippa's report by wrongly suggesting there is no single criterion that would render Plaintiff ineligible for a medical certificate. As Dr. Knippa testified, however, his report must be considered "as a whole, not two lines here or there or one or two little points." (*Id.* at 34:1–6.) "[I]t's not any specific score, but a combination of scores and factors that are important to evaluate, and no one score is necessarily going to disqualify or qualify anyone." (*Id.* at 36:25–37:12.)

5

at 20:18–26:1.) Because Plaintiff had already taken the CogScreen test, Dr. Bercaw administered "Session 2" to reduce the possibility of a "practice effect." (Bercaw Report 4, ECF No. 87-1.)[5]

Even without reviewing Dr. Knippa's report, Dr. Bercaw found similar results. For example, on the Taylor Aviation Factor Scores, Dr. Bercaw also found that Plaintiff had "mildly-to-moderately impaired deductive reasoning" and "severely impaired" results on tests of perseverative errors. (*Id.* at 4–5.) Dr. Bercaw also reported below average and mildly impaired scores on a continuous attention test. (*Id.* at 5.) Much like Dr. Knippa (whose report Dr. Bercaw did not see until much later), Dr. Bercaw summarized Plaintiff's cognitive abilities as follows:

> Although [Plaintiff's] cognitive profile was predominantly within normal limits, there were a few areas of lower than expected performance that may be of aeromedical significance, in the areas of deductive reasoning and sustained attention. His scores also suggested insufficient learning and poor recall of information presented verbally. . . . His overall performance on the CogScreen was within normal limits, which is favorable; however, his scores evidenced mildly-to-moderately impaired deductive reasoning in comparison to aviators. The deductive reasoning finding was later replicated with the WCST, a similar task. These findings raise concern about how adaptable or flexible he is to feedback about his performance. This quality is potentially critical to flight performance, particularly in non-routine situations. Therefore, further review of these data by an FAA neuropsychologist is

---

[5] Plaintiff has previously represented in briefs and in a sworn interrogatory answer, that Dr. Bercaw did not administer any of the testing. *See, e.g.,* ECF No. 92 at 19 ("Dr. Bercaw did not perform the psychological tests, so he cannot testify about what they say . . . ."); ECF No. 128 at 6 ("The problem with 'Dr. Bercaw's report as impeachment evidence' . . . is simply that it is not Dr. Bercaw's report. . . . [A]ll of that information originated from psychological testing done not by Dr. Bercaw.") Those representations are patently untrue. Dr. Bercaw testified that he personally administered the clinical interview, CogScreen, Boston Naming Test, finger-tapping test, Grooved Pegboard, PASAT, and Stroop test. (Ex. 1, Bercaw Dep. at 20:18–26:1.) Dr. Bercaw's handwriting on these tests confirms his testimony. (*See, e.g.*, *id.* at 89:11–91:1.) In accordance with his standard practice, Dr. Bercaw also supervised testing performed by Nathaly Fonseca, Psy. D., a post-doctoral fellow that was fully qualified and trained for the tests she administered. (*Id.* at 18:4–19:24.)

6

>> recommended to determine the aeromedical significance to piloting skills. A comparison of these results with his previous fitness-for-duty neuropsychological evaluation may also be helpful, as this was available to us.

(*Id.* at 6–7.)

At his deposition, Dr. Bercaw testified—just like Dr. Knippa reported—that based on his March 21, 2016 evaluation, Dr. Bercaw could not definitively say that Plaintiff was capable of reliably performing the essential functions of his job as a commercial pilot. (Ex. 1, Bercaw Dep. 77:11–78:5.) One of the reasons Dr. Bercaw requested Dr. Knippa's data was to determine whether the results of the two tests were consistent, which would cause him to place more weight on repeated findings. (*Id.* at 60:22–61:13.) For those reasons, Dr. Bercaw recommended that Plaintiff provide the FAA with his report for further review. (*Id.* at 81:9–20.)

Dr. Bercaw faxed copies of his report to Dr. Caddy and discussed the results with Dr. Caddy in a 30-minute telephone call. (*Id.* at 33:5–35:2.) During that call, Dr. Caddy criticized Dr. Bercaw's report on the basis that Dr. Bercaw did not interview Plaintiff's family and friends or consider other sources of information. (*Id.*) Dr. Bercaw explained that the scope of the neuropsychological evaluation was limited to the qualities that are important for the medical certificate. (*Id.*)

But, as Plaintiff previously instructed Dr. Caddy, if Dr. Bercaw "won't play ball with you . . . we will cut bait and go fish elsewhere." (ECF No. 79 at 2.) That is precisely what Plaintiff and Dr. Caddy did.[6]

---

[6] In addition to looking for doctors who were willing to "play ball," it was only because American pursued a hearing before Magistrate Judge Otazo-Reyes that it was able to obtain a copy of Dr. Bercaw's report. Magistrate Judge Otazo-Reyes ordered Plaintiff to produce Dr. Bercaw's report

### C. Dr. Kay's Evaluation

Rather than forwarding Dr. Bercaw's report to the FAA, Plaintiff saw Dr. Kay—another neuropsychologist—in June of 2016. (*See* Kay Report, ECF No. 96-4.) Dr. Kay reviewed a "Forensic Investigation Report" prepared by Dr. Caddy, a neurological examination report by Dr. Hastings, and Dr. Knippa's report. (*Id.* at 3.) Dr. Caddy did not provide Dr. Kay with Dr. Bercaw's report. (*Id.*; *see also* Ex. 1, Bercaw Dep. at 112:19–114:2.) Nor does it appear that Dr. Kay was ever told that Plaintiff had already taken Session 2 of the CogScreen because Dr. Kay—an expert on the CogScreen—administered Session 2 to Plaintiff. (*See* Bercaw Dep. Ex. 12, attached hereto as Exhibit 2.)

As Dr. Bercaw explained, given the "practice effects," it is not surprising that Plaintiff scored better when Dr. Kay unknowingly administered the same version of the test. (*Id.* at 115:24–117:3 ("And by omission of my evaluation, he's done session number two, which means that three months later, he got the same exact items from that test. So that would strengthen the practice effect."); *see also id.* at 27:1–10 (explaining that repeated evaluation can lead to "practice effects" in which "scores can improve with repeated test sessions")).

### D. Dr. Caddy's Opinions

In a vitriolic 96-page report, Dr. Caddy offers at least 30 pages of purported "facts" reported to him by Plaintiff and that Dr. Caddy allegedly discerned though documents or interviews with Plaintiff's friends and family. (*See generally* Caddy Report at 2–33, ECF No. 57-28.) He then comments on his beliefs about the neuropsychological examination performed by

---

and any communications between Drs. Bercaw and Caddy by July 9, 2018, and authorized American to obtain copies of this information directly from Dr. Bercaw. (*See* ECF No. 80.)

Dr. Knippa—many of which are set forth in a series of argumentative questions with no answers. (*See id.* at 34–47.) Dr. Caddy also describes his review of reports from Drs. Abi-Refeh and Hastings (neither of whom are neuropsychologists) and Dr. Kay, who administered a duplicate version of a test because he was not advised that Dr. Bercaw previously gave it. (*See id.* at 53–57.)

Approximately 90-pages into his report, Dr. Caddy finally provides a description of the testing he performed himself—none of which would address Plaintiff's cognitive abilities or neuropsychological fitness for duty. (*See id.* at 90–92.) Despite this lack of testing, Dr. Caddy nevertheless posits that, "there is no evidence that FO Patterson is now experiencing any Medical or other condition, including any cognitive or related impairment, as inferred by Dr. Knippa." (*Id.* at 95.)[7]

## **LEGAL STANDARD**

The proponent of an expert opinion has the burden to show the relevance and reliability of that opinion under Federal Rule of Evidence 702 and *Daubert*. *See, e.g.*, *In re Prempro Prods. Liab. Litig.*, 738 F. Supp. 2d 887, 890 (E.D. Ark. 2010); *see also Wilson v. Taser Int'l, Inc.*, 303 F. App'x 708, 711 (11th Cir. 2008) (As to both relevance and reliability, "[t]he burden of laying

---

[7] Throughout his report, Dr. Caddy makes passing comments suggesting the investigation conducted by American HR department was flawed. For purposes of this motion only, American assumes that Dr. Caddy might be qualified as an expert in psychology. Dr. Caddy, however, is indisputably not an expert in HR investigations: he has no formalized or other special experience in this area. *See* Fed. R. Evid. 702. Thus, if Dr. Caddy intends his offhanded remarks about American's investigation to be additional "opinions," they are inadmissible because Dr. Caddy is not qualified to offer them. At least one other court has granted a *Daubert* motion to exclude Dr. Caddy's attempts to offer opinions about human resources investigations. *See Rice v. Plantation Gen. Hosp. Ltd. P'ship*, No. 2013-CA-29850, 2016 WL 8539160, at *1 (Fla. 11th Cir. Ct. Nov. 17, 2016).

9

the proper foundation for the admission of expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence."). The Supreme Court has charged district courts with a "gatekeeping role" to ensure that speculative and unreliable opinions do not reach the jury. *Daubert*, 509 U.S. at 594–95.

Expert testimony is only appropriate if it is "based upon sufficient facts or data," rests on "reliable principles and methods," and the expert's methods reliably "fit" the facts of the case. Fed. R. Evid. 702. In determining reliability, courts consider, among other things, (1) whether the methodology has been tested; (2) whether it is subject to peer review or publication; (3) whether it has a known rate of error; and (4) whether the theory is generally accepted by the relevant scientific community. *See Daubert*, 509 U.S. at 593–94; *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014). These factors, however, are non-exhaustive and others may be considered. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). For example, courts may properly consider whether the expert's methodology has been "contrived to reach a particular result." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005).

The Eleventh Circuit has established a three-part test to determine whether expert testimony should be admitted under *Daubert*:

> (1) The expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

400 F.3d 1286, 1291–92 (11th Cir. 2005); *see also Hughes*, 766 F.3d at 1329. Even if a witness is qualified as an expert regarding a particular issue, the process used by the witness in forming his expert opinion must be sufficiently reliable under *Daubert* and its progeny. *See Quiet Tech.*

*DC-9 Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir. 2003) (stating that "one may be considered an expert but still offer unreliable testimony). As the Eleventh Circuit observed, "it remains a basic foundation for admissibility that [p]roposed [expert] testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *United States v. Frazier*, 398 F.3d 1244, 1261 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 590).

## ARGUMENT

### Dr. Caddy's Method Is Inherently Unreliable Because He Merely Repeats Dr. Kay's Findings Based on Incomplete Information While Ignoring Contrary Data.

Dr. Caddy bases his opinion that Plaintiff is currently fit for duty solely on Dr. Kay's evaluation of Plaintiff three months after Drs. Knippa and Bercaw evaluated Plaintiff's cognitive functioning. Dr. Knippa found that Plaintiff was "NOT FIT FOR DUTY as a [pilot] on the basis of impaired performances on cognitive assessment." (ECF No. 57-6 at 13.) Dr. Bercaw's test results were generally consistent with Dr. Knippa's. (Ex. 1, Bercaw Dep. at 61:22–25.) Later Dr. Kay, who was unaware of Dr. Bercaw's testing, repeated the same exact test that Dr. Bercaw administered to Plaintiff rather than using an alternative form.

Dr. Caddy did not perform any tests of Plaintiff's cognitive ability. (*See* Caddy Report at 90–92, ECF No. 57-28.) (listing tests performed by Dr. Caddy). Instead, Dr. Caddy referred Plaintiff first to Dr. Bercaw, and then when he did not like those results, to Dr. Kay for this evaluation.

> This writer [Dr. Caddy] does neuropsychological assessment and I am a member a (sic.) group that uses a particularly sophisticated Neuropsychological Testing Laboratory in North Miami Beach managed by a neuropsychologist whose knowledge in the field is truly remarkable. <u>I am however, given my forensic focus, intent on remaining forensically focused and so I have recommended</u> to Scott [and his attorney] <u>that he undertake a second independent clinical and neuropsychological examination not by me or through my</u>

11

>> resources, but by a certified and highly experienced Aeromedical Clinical and Neuropsychologist . . . .

(*Id.* at 39) (emphasis added, brackets in original). Thus, the only doctors (known to American) to have performed a neuropsychological examination of Plaintiff's cognitive abilities—the reason Dr. Knippa found Plaintiff not fit for duty—were Drs. Knippa, Bercaw, and Kay. Dr. Caddy summarily dismisses Dr. Knippa's findings, ignores entirely Dr. Bercaw's findings, and simply repeats Dr. Kay's findings. This unreliable method does not satisfy the basic evidence rules or the *Daubert* standard.[8]

First, that Dr. Caddy has cherry-picked only the data that supports his pre-ordained conclusion while omitting contrary data renders his methodology and opinion inherently unreliable. *See, e.g.*, *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (holding that where an expert considers only some "cherry-picked" data that support his opinion, the expert's methodology "fails to satisfy the scientific method and *Daubert*"); *see also E.E.O.C. v. Freeman*, 778 F.3d 463, 470–71 (4th Cir. 2015) (Agee, J., concurring) (collecting authority and explaining that omitting data, like cherry-picking, distorts the results and renders opinions inadmissible under *Daubert*).

The standard practice among psychologists does not permit simply ignoring known data. (*See* Ex. 1, Bercaw Dep. at 81:21–82:5.) Ignoring data that suggest a contrary conclusion and

---

[8] Of course, given Plaintiff's attempts to hide Dr. Bercaw's evaluation that was unfavorable for Plaintiff, American must assume it is at least possible that Plaintiff underwent additional neuropsychological testing and has likewise withheld that information from American, Dr. Kay, and the Court. Preventing this type of doctor shopping is one of the primary reasons why, under Section 20 of the CBA, the same doctor or a comparable doctor approved by American must reevaluate the pilot in order for American to return a pilot to work after failing a fitness-for-duty evaluation.

focusing only on hand-selected data that support an opinion is inherently an unreliable method. *See PODS Enters., Inc. v. U-Haul Int'l, Inc.*, No. 8:12-cv-01479-T-27MAP, 2014 WL 12628664, at * 3–4 (M.D. Fla. June 27, 2014); *see also Finestone v. Fla. Power & Light Co.*, No. 03-cv-14040, 2006 WL 267330, at * 13 (S.D. Fla. Jan. 6, 2006) (excluding opinion testimony where expert selected only samples that contained a chemical, while removing samples that did not, in order to calculate the average amount of the chemical present and explaining that false assumptions and a methodology "contrived to reach a particular result" made the opinions unreliable), *aff'd* 272 F. App'x 761. That is precisely what Dr. Caddy has done here.

Second, even if Dr. Caddy could selectively ignore data that show Plaintiff was not fit for duty at the time of Dr. Knippa's and Dr. Bercaw's evaluations in March of 2016, Dr. Caddy cannot take the stand and then read Dr. Kay's report to the jury. An expert "may not merely regurgitate another expert's opinion." *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009). Dr. Caddy has done nothing to test Mr. Patterson's cognitive ability. Thus, he cannot now simply read and summarize Dr. Kay's report for the jury. *See id.*

While Dr. Kay is an expert in neuropsychology, the fact that he was unaware that Dr. Bercaw had recently administered the same test taints his findings. Dr. Kay's report omits any mention of Dr. Bercaw's evaluation. As a leading expert in the CogScreen test (indeed as the person who developed it), Dr. Kay would know not to administer the same exact version of the test that was previously given. Instead, to minimize the risk of the practice effects described by Dr. Bercaw, Plaintiff should have been administered an alternative form of the test. In light of this abnormality (which Plaintiff caused by hiding unfavorable data), Dr. Kay's results in this particular case are unreliable and therefore Dr. Caddy cannot testify about them for this reason. *See, e.g.*,

*Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1294 (11th Cir. 2005) (affirming exclusion of expert testimony that relied on findings that were unreliable).

What Dr. Caddy has done is the antithesis of science. He has hidden critical data from Dr. Kay in order to obtain a favorable report upon which Dr. Caddy bases his entire opinion. He has failed to account for the fact that two out of three doctors that evaluated Plaintiff's cognitive abilities have found problems that are potentially critical to flight. Instead, he seeks to offer an "expert" opinion that Plaintiff is safe to fly a passenger airplane. This comes nowhere near meeting the demanding standard under *Daubert*.

## CONCLUSION

For these reasons, American respectfully requests that this Court exclude any opinion testimony by Dr. Caddy.

Respectfully submitted,

By: /s/ Michael A. Holt

Michael A. Holt
mholt@shb.com
Florida Bar No.: 91156
**SHOOK, HARDY & BACON L.L.P.**
Miami Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

Mark W. Robertson (*Pro Hac Vice*)
mrobertson@omm.com
**O'MELVENY & MYERS LLP**
Time Square Tower, 7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Tristan Morales, Esq. (*Pro Hac Vice*)

tmorales@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for American Airlines, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of August, 2018, the foregoing document was filed with the Clerk of the Court using the CM/ECF system and a true and correct copy was served on the counsel or parties of record listed below.

By: /s/ Michael A. Holt
      MICHAEL A. HOLT

**SERVICE LIST**

William R. Amlong, Esq.
WRAmlong@TheAmlongFirm.com
Karen Coolman Amlong, Esq.
KAmlong@TheAmlongFirm.com
**AMLONG & AMLONG, P.A.**
500 Northeast Fourth Street
Fort Lauderdale, FL 33301
Telephone: (954) 462-1983
Facsimile: (954) 523-3192

Noel C. Pace, Esq.
(*Pro Hac Vice*)
noel.c.pace.esq@gmail.com
206 N.W. 91 Street
El Portal, Florida 33150
Telephone: (305) 710-3713

(Service via CM/ECF)

*Counsel for Plaintiff*

Michael A. Holt, Esq.
mholt@shb.com
**SHOOK, HARDY & BACON L.L.P.**
Miami Center, Suite 3200
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-5171
Facsimile: (305) 358-7470

Mark W. Robertson, Esq.
mrobertson@omm.com
(*Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
Times Square Tower 7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Tristan Morales, Esq.
tmorales@omm.com
(*Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

(Service via CM/ECF)

*Counsel for American Airlines, Inc.*