Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                       FORT LAUDERDALE DIVISION
3          Case No.:  1:17-cv-60533-MARTINEZ/OTAZO-REYES
4     RODNEY SCOTT PATTERSON,
5          Plaintiffs,
6     vs.
7     AMERICAN AIRLINES, INC., a Delaware
      Corporation,
8
           Defendant.
9     _____
10              V I D E O   D E P O S I T I O N
11                           o f
12                 EDWIN L. BERCAW, Ph.D.
13              taken on behalf of Defendant
14

           DATE:            August 16, 2018
15

           TIME:            1:48 p.m. to 5:53 p.m.
16

           PLACE:           Shook, Hardy & Bacon, LLP
17                          100 North Tampa Street, Suite 2900
                            Tampa, Florida  33602
18

           BEFORE:          Dawn A. Hillier, RMR, CRR, CLR
19                          Notary Public - State of
                            Florida, at Large
20

           JOB NO:          2983057
21
22
23
24
25

Page 2

```
 1   APPEARANCES:
 2
 3   ATTORNEYS FOR PLAINTIFF
 4        WILLIAM R. AMLONG, ESQUIRE
          AMLONG & AMLONG, P.A.
 5        500 Northeast Fourth Street
          Fort Lauderdale, Florida  33301
 6        954.462.1983
          wramlong@theamlongfirm.com
 7
               - and -
 8
          NOEL C. PACE, ESQUIRE (via telephone)
 9        206 N.W. 91st Street
          El Portal, Florida  33150
10        305.710.3713
          noel.c.pace.esq@gmail.com
11
12   ATTORNEY FOR DEFENDANT
13        MICHAEL A. HOLT, ESQUIRE
          SHOOK, HARDY & BACON, LLP
14        201 South Biscayne Boulevard, Suite 3200
          Miami, Florida  33131
15        305.358.5171
          mholt@shb.com
16
17
18
19
     ALSO PRESENT:
20
          Rodney Scott Patterson, Plaintiff
21        Dave Fuhrmann, Videographer
22
23
24
25
```

Page 3

1                          INDEX
2                                              PAGE
3    WITNESS - EDWIN L. BERCAW, Ph.D.            6
     DIRECT EXAMINATION BY MR. HOLT              6
4    CROSS EXAMINATION BY MR. AMLONG            83
     CERTIFICATE OF OATH                       128
5    REPORTER'S CERTIFICATE                    129
6                          EXHIBITS
7    Exhibit 1    Dr. Bercaw's interview notes of     9
                  March 21, 2016

8
     Exhibit 2    Dr. Bercaw's evaluation report     17
9                 of Mr. Patterson dated March 21, 2016
10   Exhibit 3    Plaintiff's Response to American    27
                  Airlines, Inc.'s Motion for Extension of
11                Time to Take Depositions and File
                  Daubert Motion and to Continue Trial and
12                Request for Expedited Briefing
13   Exhibit 4    Email chain between Dr. Bercaw,     35
                  Dr. Caddy and Mr. Patterson date May 4,
14                2016
15   Exhibit 5    Fax Transmission and               37
                  Authorization for Release Confidential
16                Information
17   Exhibit 6    Mr. Patterson's Test Results,       48
                  CogScreen-Aeromedical Edition
18
     Exhibit 7    Meyers Neuropsychological Test      62
19                Summary
20   Exhibit 8    Dr. Knippa's Neuropsychological     67
                  Aeromedical Assessment Fitness for Duty
21                Report
22   Exhibit 9    Dr. Knippa's letter to Dr. Jeral    78
                  Ahtone dated March 21, 2016
23
     Exhibit 10   Dr. Bercaw's letter to Dr. Glenn    79
24                Ross Caddy dated May 6, 2016
25   Exhibit 11   Dr. Gary Kay's Report of           112
                  Neuropsychological Assessment

Page 4

1

Exhibit 12    Test Results,                        112
              CogScreen-Aeromedical Edition by Dr.
              Gary Kay

3

Exhibit 13    American Airlines Pilot              117
              Credentials

5

6              REPORTER'S KEY TO PUNCTUATION:

7     --  At end of question or answer references

8         interruption.

9     ...  References a trail-off by the speaker.

10         No testimony omitted.

11     "Uh-huh" "Um-hum" References affirmative sound.

12     "Huh-uh" "Um-um"  References negative sound.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          THE VIDEOGRAPHER:  Good afternoon.  We are
 2      going on the record at 1:48 p.m. on August 16,
 3      2018.  This is media unit one of the video recorded
 4      deposition of Dr. Edwin L. Bercaw, Ph.D., taken by
 5      counsel for the defendant in the matter of Rodney
 6      Scott Patterson versus American Airlines, Inc., a
 7      Delaware Corporation, filed in the United States
 8      District Court, Southern District of Florida, Fort
 9      Lauderdale Division, Case
10      No. 1:17-cv-60533-MARTINEZ/OTAZO-REYES.
11          This deposition is being held at Shook, Hardy
12      & Bacon, LLP, 100 North Tampa Street, Tampa,
13      Florida.  My name is David Fuhrmann from the firm
14      Veritext Legal Solutions.  The court reporter is
15      Dawn Hillier from the firm Veritext Legal
16      Solutions.
17          Will counsel please now state their
18      appearances and affiliations for the record?
19          MR. AMLONG:  William Amlong and Noel C. Pace
20      attending by telephone on behalf of the plaintiff,
21      Rodney Scott Patterson.
22          MR. HOLT:  Michael Holt on behalf of American
23      Airlines.
24          THE VIDEOGRAPHER:  Will the court reporter
25      swear in the witness and we will proceed.
```

Page 6

1           EDWIN L. BERCAW, Ph.D.,

2   was called as a witness, and having first been duly

3   sworn, was examined and testified as follows:

4           THE WITNESS:  Yes, I do.

5           COURT REPORTER:  Thank you.

6                   DIRECT EXAMINATION

7   BY MR. HOLT:

8       Q    Good afternoon.

9       A    Good afternoon.

10      Q    My name's Michael Holt.  I represent American

11  Airlines.  Would you kindly introduce yourself to the

12  jury and tell them about your educational background.

13      A    Sure.  My name is Edwin Bercaw.  I'm a

14  licensed psychologist in Florida and a clinical

15  neuropsychologist.  I'm board-certified by the American

16  board of professional psychology in clinical

17  neuropsychology.

18           And as far as my educational background, I did

19  my doctorate master's degree and Ph.D. at the University

20  of Maryland, College Park.  And then I did a fellowship

21  at the Rehab Institute of Michigan at the Detroit

22  Medical Center.

23      Q    How long have you been a clinical

24  neuropsychologist?

25      A    Well, from the end of my fellowship, which was

Page 7

1    in 2009, so that would be the time, I think, you could

2    say that I was a neuropsychologist after finishing my

3    post-doc.

4        Q    You mentioned you're a licensed psychologist.

5    In what state are you licensed?

6        A    Florida.

7        Q    Are you licensed in any other states?

8        A    No.

9        Q    When did you become first licensed as a

10   psychologist in Florida?

11       A    2009.

12       Q    Since 2009, have you consistently maintained a

13   license to practice psychology in the State of Florida?

14       A    Yes, I have.

15       Q    Is your practice in the State of Florida

16   regulated by the Board of Psychology?

17       A    The Board of Psychology?  It's regulated by

18   the Department of Health.  And the Board of Psychology

19   doesn't directly regulate practitioners.

20       Q    Okay.  What does the Board of Psychology do,

21   generally, to your knowledge?

22       A    Are you talking about the American Board of

23   Professional Psychology?

24       Q    That's the one I'm talking about.  Yes.

25       A    Because there are different boards.

1        That is a credentialing board.  It's designed

2   to establish competence in the field of clinical

3   neuropsychology, in this case.  But there are other

4   divisions, depending on the specialization of

5   psychology.

6        So, their -- I think their mission is to

7   establish competence through examination, peer review.

8   And it's a way of protecting the public and is

9   establishing a basic level of expertise in the field.

10  It's not required in order to be a psychologist, but

11  it's an additional credential that people seek.

12      Q    As part of your psychology training, did you

13  complete any internships or residencies?

14      A    Yes.  Internship was at the Baltimore VA

15  Medical Center in 2006, 2007.  And -- so that was a

16  year-long internship.  And then following my doctorate

17  is when I went to the Rehabilitation Institute of

18  Michigan where I did my post-doc for two years.

19      Q    Have you met the plaintiff in this case,

20  Mr. Patterson, before today?

21      A    Yes, I have.

22      Q    How did you come to meet Mr. Patterson?

23      A    Through an evaluation that he scheduled at my

24  previous office, Comprehensive MedPsych Systems.

25      Q    When did you first meet Mr. Patterson?

Page 9

1      A    It was on the day of the evaluation,

2   March 21st, 2016.  I believe I did talk with him on the

3   phone prior to that date.

4            MR. AMLONG:  Can you read that last answer

5       back, please?

6            (The Court Reporter is directed to read back

7   the previous question and/or answer.)

8            MR. HOLT:  I would like to mark this as

9       Exhibit 1.

10           (Exhibit 1 was marked.)

11  BY MR. HOLT:

12     Q    Dr. Bercaw, you've been handed what's been

13  marked as Exhibit 1 to your deposition which has Bates

14  numbers in the bottom right corner,

15  PATTERSON-BERCAW_00020 through --

16     A    Yes.

17     Q    -- 00028, if you look on the last page.

18     A    Yes.

19     Q    Okay.  Do you recognize these materials?

20     A    Yes.  These are my interview notes from the

21  clinical interview on the day of the evaluation,

22  March 21st, followed by notes that I believe I took

23  during a phone call prior to the evaluation, page 00027

24  and 28.

25     Q    Okay.

Page 10

1      A    To be exact.

2      Q    So, pages 27 and 28 of Exhibit 1 are notes

3   from a phone call prior to the examination; is that

4   correct?

5      A    Yes.

6      Q    Let's talk about those for a second.

7           Looking at page 27, do you know the date of

8   your phone conversation with Mr. Patterson?

9      A    I do not.

10     Q    But this would have taken place sometime

11   before March 21st; correct?

12     A    Yes.

13     Q    Looking on page 28, the very last handwritten

14   line on this page, could you read that for me?

15     A    It says [as read]:  Wants impartial eval.

16     Q    Is that something Mr. Patterson told you?

17     A    I presume so, yes.  Maybe that was -- it could

18   have been that, or it could have been just what my

19   synopsis was from talking with him.  I don't know if

20   that is a quotation.

21     Q    But your understanding from that conversation

22   was that Mr. Patterson wanted an impartial evaluation;

23   is that correct?

24     A    Yes.

25     Q    And did you understand what type of evaluation

Page 11

1    he was seeking from you, sir?

2         A    Well, he had undergone or was about to undergo

3    a fitness-for-duty evaluation.  So I understood my role

4    to be -- to do a -- an independent neuropsychological

5    evaluation for the purpose of his medical certificate.

6         Q    You understood that he would be providing your

7    report to his employer; correct?

8         A    Yes, I assumed so.

9         Q    Okay.  And that he would be relying on your

10   report for purposes of his medical certificate --

11        A    Yes.

12        Q    -- to fly; correct?

13        A    That's correct.

14        Q    Did you agree to provide an impartial

15   evaluation for Mr. Patterson?

16        A    I don't recall if I explicitly said that, but

17   I certainly try to give an objective evaluation for all

18   of my clients and patients.

19        Q    Okay.  Okay.  Looking at page 20 of Exhibit 1,

20   so the first page of Exhibit 1 -- I hate to do this, but

21   I have a little difficulty with the handwriting, so I'm

22   going to ask you to read a couple things just so I make

23   sure I understand them.  Is that okay with you?

24        A    Yes.

25        Q    If you look a little more than two-thirds of

Page 12

1    the way down, there's a note that appears to start with

2    "15th."  I got that part.

3        A    Um-hum.

4        Q    Do you see the note I'm referring to?

5        A    Yes.

6        Q    Could you read that for us just so I can

7    understand.

8        A    [As read]:  15th, March, went to see

9    Dr. Knippa.  Chose not to fight, didn't do injunction.

10       Q    What did Mr. Patterson tell you about his

11   decision not to fight?

12       A    I believe that meant he was not trying to

13   fight the fitness-for-duty evaluation.  But he had

14   concerns about John Knippa being a hired gun and wanted

15   another evaluation.

16       Q    Okay.  Looking at the next page of Exhibit 1,

17   which is Bates number PATTERSON-BERCAW_21, can you tell

18   me what those last two lines say down at the very bottom

19   of the page?

20       A    I believe it says [as read]:  Broke foot in

21   Bolivia.  Car.  Out until January '15.

22       Q    Did Mr. Patterson tell you during your --

23   withdrawn.  Let me back up and ask a different question.

24            Pages 20 through 26 of Exhibit 1.  Are these

25   notes from your clinical interview with Mr. Patterson?

Page 13

1      A    Yes.

2      Q    Now, looking at page 21, and that note that we

3   just spoke about, broke foot in Bolivia, out until

4   January '15, did Mr. Patterson tell you during the

5   clinical interview that he was not flying prior to

6   January '15 -- of 2015?

7           That's going to be messy.  I can re-ask that

8   one.  Looking at page 21 of Exhibit 1, and the note at

9   the bottom that says broke foot in Bolivia, out until

10  January '15.  Did Mr. Patterson tell you during the

11  clinical interview that he had been out of flying, in

12  other words, not flying until January 2015, based on

13  this fracture?

14     A    That's what I understand it to mean.

15     Q    Looking at the next page of Exhibit 1, which

16  is Bates number PATTERSON-BERCAW_22, about a little more

17  than halfway down the page, in the left margin, it says

18  "Knippa."

19          Do you see that?

20     A    Yes.

21     Q    And then next to that on the right, there

22  appear to be a list of what might be psychological

23  tests.  Can you tell me what those items are?

24     A    Yes.  These are items that Mr. Patterson told

25  us he had been administered.  He wrote down the names.

Page 14

1   So I was just jotting those down.

2       Q    Okay.

3       A    Do you want me to read the tests?

4       Q    Let's do them one at a time.  And if you could

5   briefly tell me what each of them is, I think that would

6   be helpful.

7       A    Okay.

8       Q    Have a layperson's explanation of what type of

9   test we're talking about.

10      A    Okay.  So, the first one is CogScreen, which

11  is the computerized battery of tests that is favored by

12  the FAA, which, you know, is one of the mandated tests.

13          Also is listed here is the MMPI, which is a

14  standard of psychological inventory for assessing

15  psychopathology.

16          And then it says other computer inventory.

17  And I have in parentheses, with a question mark, PAI,

18  which is the personality assessment inventory, which is

19  an alternative type of test to the MMPI.

20          And then with the TOVA, which is the Test of

21  Variables of Attention.  That's a sustained attention

22  continuous performance test.

23          Dichotic listening is a auditor processing

24  test where the examinee has to pick out words that are

25  presented in headphones.  The Wechsler Adult

Page 15

1      Intelligence Scale-IV, that is an intelligence scale

2      that is a standard test.

3          Q    Is that what's commonly referred to as an IQ

4      test?

5          A    Yes.

6          Q    Okay.  What about BNT?

7          A    BNT is Boston Naming Test.  It's a test of

8      word retrieval, object naming.

9              PASAT is the Paced Auditory Serial Addition

10     Test.

11             That's a test of concentration, being able to

12     keep something in mind.  And it's paced because the

13     numbers come at a predetermined rate and you have to

14     keep up with the test.  So it requires processing and

15     working memory.

16             "Garden hat," what he's telling us here is

17     that these are words from a verbal learning test, which

18     I recognized as Form A of the Rey Auditory Verbal

19     Learning Test.

20             And then finger localization is a test of

21     sensory discrimination.

22             And then JLO is Judgment Of Line Orientation.

23     That's a visual spatial test.

24         Q    So, these tests that you just described are

25     things that Mr. Patterson told you Dr. Knippa performed;

1    correct?

2        A    Yes.

3        Q    Okay.  Was it, then, your understanding that

4    Mr. Patterson wanted you to repeat each of these tests?

5        A    I don't know that that was my understanding.

6        Q    What was your understanding, then, with

7    respect to what tests Mr. Patterson wanted you to

8    conduct?

9        A    Well, the tests that were to be conducted were

10   predetermined by the FAA specifications.  So I may have

11   asked him what the tests were that he took, if he could

12   recognize or remember any of them.  Because in some

13   cases, if there's an alternate form, I would want to

14   give that.

15       Q    Okay.

16       A    So, for instance, with the AVLT, I did give

17   him an alternate form, so he didn't get the same word

18   list.

19       Q    And when you say "alternate form," what does

20   that mean?

21       A    It's the same test, but just different items.

22       Q    And why would you give an alternate form of

23   the test as opposed to the same one that he was given by

24   Dr. Knippa?

25       A    Well, because right here, he's telling me

Page 17

1    "garden hat," these are words from the list.  So he

2    remembers those words.  If I were to give him the test

3    again, there could be a strong practice effect.

4        Q    What do you mean by "practice effect"?

5        A    Well, his score would be inflated.  It would

6    be higher than expected if he was -- if the test was

7    novel.  So, having prior exposure -- even just having

8    prior exposure to the test itself, he's familiar with

9    the procedure.  But if you give him the same words, then

10   he's familiar with the material, and then that makes him

11   presumably do better on the test.

12       Q    Okay.

13            (Exhibit 2 was marked.)

14   BY MR. HOLT:

15       Q    You've been handed a document that's been

16   marked Exhibit 2.  Do you recognize this document?

17       A    Yes.  This is my report.

18       Q    This is your report based on the evaluation of

19   Mr. Patterson on March 21st, 2016; is that correct?

20       A    That's correct.

21       Q    Let's just, for the record, the Bates numbers

22   from this document are PATTERSON-BERCAW_4 through 10.

23            Do you see that?

24       A    Yes.

25       Q    And looking at -- I'm going to refer to the

Page 18

1    Bates numbers, just for clarity, even though the page

2    numbers are a little different.

3         A    That's okay.

4         Q    Looking at the page Bates number 10, there

5    appear to be two signatures on this document.  Can you

6    tell me who Nathaly Fonseca, Psy.D. is?

7         A    Yes.  She was our post-doctoral resident or

8    fellow at that time.  I was involved in training the

9    post-doctoral fellows at the company.

10        Q    She was already a licensed psychologist;

11   correct?

12        A    Yes.  She was licensed and she was in her

13   second year of the fellowship.

14        Q    Did -- withdrawn.

15             Why do both your signature and Dr. Fonseca's

16   signature appear on page ten of Exhibit 2?

17        A    Because we were both involved in the

18   evaluation.  I, of course, was a supervising

19   psychologist.

20        Q    And in what ways was Dr. Fonseca involved in

21   the evaluation?

22        A    She sat in on the interview.  She took her own

23   notes.  I led the interview.  I administered the

24   CogScreen.  She administered some tests, many of them.

25   I also administered a few tests.  She -- after the

1  appointment, she put together a rough draft of the

2  background history and results.  And then I edited it

3  from there.  And we had supervision meetings to talk

4  about cases, including this one.

5          So, we had a lot of back and forth in terms of

6  discussing the tests and his performance and

7  presentation and making conclusions.

8      Q    Is that your standard practice when

9  supervising residents or fellows --

10     A    Yes.

11     Q    -- to have supervision meetings?

12     A    Oh, yes.  Yes.  That's required, actually, by

13  the program of the fellowship.

14         The guideline is to have two hours of

15  supervision a week.  So typically, what you do -- at

16  least what I did in that case was an hour of a meeting

17  where we would discuss the cases in our office.  And

18  then the other hour is just broken up throughout the

19  week when you're talking about cases as they're going on

20  during the day.

21     Q    Okay.  For the test performed or administered

22  by Dr. Fonseca, was she -- did she have the appropriate

23  qualifications and training to administer those tests?

24     A    Yes.

25     Q    Do you know which test -- withdrawn.  Let's do

Page 20

```
 1    it this way.
 2            If you take a look at Bates number 5 of
 3    Exhibit 2, which is -- I'm sorry, Bates number 6, which
 4    is the third page.
 5        A    Okay.
 6        Q    There's a section here that is titled
 7    Procedures Administered.  Do you see that section?
 8        A    Yes.
 9        Q    I'd like to go through each of these
10    procedures and ask you who administered them.
11        A    Okay.
12        Q    Okay.
13            MR. AMLONG:  I'm sorry.  Where are we?
14            MR. HOLT:  Bates number 6.
15    BY MR. HOLT:
16        Q    Let me ask my question again, so we'll have a
17    clear video record as well.
18            Looking at Bates number 6 of Exhibit 2, the
19    section entitled "Procedures administered," do you see
20    that section?
21        A    Yes, I do.
22        Q    I'd like to go through each of these
23    procedures and ask you to tell me who administered them.
24    Okay?
25        A    Okay.
```

Page 21

1      Q     Clinical Interview, was that administered, by
2   whom?
3      A     By myself.
4      Q     Was Dr. Fonseca present for that?
5      A     She was probably present for that, yes.  But I
6   would have administered the instructions, read the
7   standardized instructions.  The test itself is
8   administered on the computer, but there are some
9   instructions that you start off with.
10      Q     Okay.
11      A     Yes.
12           MR. AMLONG:  I'm sorry.  Are we asking about
13      the clinical interview?
14           MR. HOLT:  Yes.
15           THE WITNESS:  Oh, you're asking me about the
16      clinical interview?
17   BY MR. HOLT:
18      Q     Yes.
19      A     Oh, yes.
20      Q     Okay.  Let me go back and ask that again.  Who
21   administered the clinical interview?
22      A     Okay.  The clinical interview was myself.  I
23   led the interview.
24      Q     Was Dr. Fonseca present for the clinical
25   interview?

Page 22

1        A     Yes, she was.

2        Q     Who administered the CogScreen?

3        A     That was myself.  And I thought that's what

4    you were referring to.  Sorry.

5              So, there are some instructions that you read

6    prior to starting the CogScreen that are standardized

7    instructions.

8              After that, the test is basically -- it's

9    self-paced.  I mean, there's no real intervention

10   required by the examiner except there's one point where

11   you have to place the keyboard for the examiner -- for

12   the examinee.

13       Q     Okay.  The Integrated Visual and Auditory

14   Continuous Performance Test, who administered that?

15       A     That, I don't recall.  It's also a

16   computerized test.  So once you get the person set up at

17   the station, there's instructions.  There's a warm-up

18   with instructions.  And then the test is automatic.

19   It's administered via computer.

20       Q     Is Dr. Fonseca qualified to administer that

21   test?

22       A     Yes.

23       Q     The Wechsler Adult Intelligence Scale-IV, who

24   administered that?

25       A     Dr. Fonseca did.

Page 23

```
1        Q     Is she qualified to administer that test?

2              MR. AMLONG:  Foundation.

3              THE WITNESS:  Yes.

4   BY MR. HOLT:

5        Q     What's your basis for saying that Dr. Fonseca

6   is qualified to administer an IQ test?

7        A     Based on her prior training and experience

8   with that.

9        Q     Had you supervised her administering IQ tests

10  in the past?

11       A     I supervised all the scoring.  I double-check

12  all the scoring on -- in any case when I'm supervising.

13  So I verify the scores are correct.  She had a great

14  deal of experience with that test through her graduate

15  school and internship and first year of post-doc.

16             MR. AMLONG:  Object.  Objection, foundation,

17        personal knowledge.

18  BY MR. HOLT:

19       Q     The Meyers Neuropsychological Battery Selected

20  Test, who administered those?

21       A     I administered a few.  And she administered

22  the rest.

23       Q     Which ones did you administer, if you know?

24       A     Boston Naming Test, which actually I'm seeing

25  doesn't appear on that list; the finger-tapping test.
```

Page 24

1   And that would be it, from the Meyers specifically.

2         She administered the others.

3         Q    The Wisconsin Card Sorting Test, who

4   administered that?

5         A    Dr. Fonseca.

6         Q    Have you provided Dr. Fonseca any training or

7   supervision with respect to the administration of the

8   Wisconsin Card Sorting Test?

9         A    Yes.  She was also familiar, very well trained

10  to do that test.

11        MR. AMLONG:  Objection, foundation, personal

12     knowledge.

13        THE WITNESS:  It also has standard

14     instructions.  And then it's administered via

15     computer.

16  BY MR. HOLT:

17        Q    So that's --

18        A    And the scoring is automated.

19        Q    So it's a computer-based test?

20        A    Yes.  The original is not, but the version

21  that we used is computer-based.

22        Q    Okay.  The Grooved Pegboard Test, who

23  administered that?

24        A    I did.

25        Q    The Paced Auditory Serial Addition Test, who

Page 25

1    administered that?

2         A    I did.

3         Q    The Stroop test, who administered that?

4         A    I did.

5         Q    Who administered the MMPI?

6         A    I don't recall who administered that.  Again,

7    there are standardized instructions that are read.  And

8    the examinee completes that on his own.

9         Q    Have you ever supervised Dr. Fonseca

10   administering the MMPI before?

11        A    Do you mean actually handing the person the

12   test and reading the instructions?

13        Q    Let me ask a better question.

14             To your knowledge, is Dr. Fonseca qualified to

15   administer the MMPI?

16        A    Yes.

17             MR. AMLONG:  Objection, foundation, personal

18        knowledge.

19             THE WITNESS:  Yes.

20             MR. HOLT:  The question was "to your

21        knowledge."

22             MR. AMLONG:  Well, what's his knowledge?

23             MR. HOLT:  Okay.  Well, your objection is

24        noted.  Let me ask that question again, subject to

25        your objection.

1  BY MR. HOLT:

2      Q    To your knowledge, is Dr. Fonseca qualified to

3  administer the MMPI?

4      A    Yes.

5          MR. HOLT:  And, Counsel, we got your objection

6      on that question.

7          MR. AMLONG:   Okay.

8  BY MR. HOLT:

9      Q    On page six of exhibit -- and by page six, I

10  mean Bates number 6 of Exhibit 2, under Behavioral

11  Observations, the first sentence is [as read]:

12  Mr. Patterson arrived 45 minutes late to the

13  appointment.

14          Why did you make a note of that?

15      A    I always make notes about whether a person was

16  on time, whether there were any issues or barriers, what

17  the mental status was like, appearance.  That was

18  notable, that he was that late.  And he had a reason.

19      Q    Okay.  Turning to the next page, which is page

20  seven -- Bates number 7 of Exhibit 2.

21      A    Okay.

22      Q    Under the section entitled Effort and

23  Validity, the fourth line begins with "additionally."

24          Do you see that sentence?

25      A    Yes.

Page 27

 1      Q    Could you read that for the jury?

 2      A    [As read]:  Additionally, it should be noted

 3   that Mr. Patterson completed a similar

 4   neuropsychological evaluation within a week of this

 5   evaluation.  Hence, there is the possibility of practice

 6   effects on some of the tests administered.

 7      Q    What did you mean by that?

 8      A    Well, we know that with at least some of these

 9   tests, the scores can improve with repeated test

10   sessions.

11      Q    Set this aside for now, but we'll come back to

12   this in a minute.

13           I forgot to mention, if you need a break at

14   any time, just let me know and we can take a break.

15      A    Okay.  Thank you.

16      Q    I think you've done a deposition or two

17   before; correct?

18      A    Yeah.

19      Q    Okay.

20           (Exhibit 3 was marked.)

21   BY MR. HOLT:

22      Q    You've been handed what's been marked

23   Exhibit 3 to your deposition which is, I'll represent to

24   you, a document that the plaintiff, through his counsel,

25   filed with the court in this case.  I would like you to

Page 28

1   turn to page five of Exhibit 3.

2        A    Okay.

3        Q    The last paragraph on page five begins with

4   the sentence [as read]:  It was illegal and ethically

5   inappropriate for Dr. Bercaw to issue any opinion about

6   Lieutenant Colonel Patterson based on the testing done,

7   unsupervised, by Dr. Fonseca.

8             Do you see that?

9        A    Yes, I do.

10       Q    What testing was done unsupervised by

11  Dr. Fonseca?

12       A    In my opinion, none of it was unsupervised

13  because I reviewed all of her work.

14       Q    The next sentence states that [as read]:

15  Dr. Fonseca, she was, quote, an inexperienced resident

16  whose 70 days of licensed practice came nowhere near

17  meeting the requirement, that -- then it goes on,

18  neuropsychological evaluations must be conducted by a

19  licensed clinical psychologist who is either

20  board-certified or board-eligible in clinical

21  neuropsychology.

22             Do you see that?

23       A    Yes.

24       Q    Do you agree with that statement?

25       A    No.  I performed the evaluation and she

Page 29

1    assisted.

2         Q    Was Dr. Fonseca board-eligible at the time

3    that she assisted with the evaluation?

4         A    To be board-eligible, she would have to

5    complete the two-year post-doc.  So she was not, at that

6    time.

7         Q    But she was licensed as a psychologist?

8         A    She was licensed and she was competent to

9    administer the tests.

10             In fact, a recent practice survey shows that

11   55 percent of neuropsychologists use an assistant to

12   collect test data to administer tests.  And many of them

13   do not even have a post -- have a doctorate.

14        Q    So, is it consistent with the ordinary

15   practice of neuropsychology to use an assistant to help

16   administer tests?

17             MR. AMLONG:  Objection, foundation, personal

18        knowledge.

19             THE WITNESS:  Yes.  So, many

20        neuropsychologists use what's called a

21        psychometrician which is someone who's trained to

22        give tests.  And then the neuropsychologist takes

23        that data and interprets it and writes the report.

24   BY MR. HOLT:

25        Q    Okay.  Page seven of Exhibit 3, near the end

Page 30

1   of the first full paragraph, there's a sentence that

2   says [as read]:  It also violated -- "it" here,

3   referring to your report, I believe -- it also violated

4   the Psychological Services Act, Section 790.009(1)(s)

5   Florida Statute and the Board of Psychology's Rule

6   64B19-18.004, (5), Florida Administrative Code, ("Use of

7   Test Instruments").

8           To your knowledge, did your evaluation of

9   Mr. Patterson in this case violate the Psychological

10  Services Act?

11          MR. PATTERSON:  Objection.

12          MR. AMLONG:  Objection, asks for legal

13      opinion.  Asks for a legal opinion.

14          THE WITNESS:  No.

15  BY MR. HOLT:

16      Q    According to what the plaintiff in this case

17  told the court, in footnote 9, [as read]:  The statute

18  provides that the following acts constitute grounds for

19  denial of a license or disciplinary action as specified.

20          It goes on [as read]:  Delegating professional

21  responsibilities to a person whom the licensee knows or

22  has reason to know is not qualified by training or

23  experience to perform such responsibilities.

24          Did you have any knowledge that Dr. Fonseca

25  was not qualified by training or experience to perform

```
1    her responsibilities assisting you in the evaluation of

2    Mr. Patterson?

3         A    No.

4         Q    Okay.  And, in fact, it was your understanding

5    that she was qualified by training and experience to

6    perform those duties; correct?

7         A    Yes.  Her duties were quite appropriate for

8    her level of training.

9              MR. AMLONG:  Objection, foundation, personal

10        knowledge and experience.

11             MR. HOLT:  There's no question pending.

12             MR. AMLONG:  I'm objecting to the last

13        question.

14             MR. HOLT:  And what did you think was wrong

15        with the form of the question?

16             MR. AMLONG:  You're asking for his opinion

17        about whether or not she's qualified to do it

18        without establishing any basis for that opinion.

19   BY MR. HOLT:

20        Q    How long did you supervise Dr. Fonseca?

21        A    She had worked with a previous supervisor for

22   the first year.  So, at that point, I had supervised her

23   for about six months.

24        Q    Okay.

25        A    And I worked with her every day.
```

Page 32

1       Q    Was she working full-time?

2       A    Yes.

3       Q    So, you were working with her full-time every

4   day for six months at this point; correct?

5       A    I believe so.

6       Q    And you were supervising all of her

7   activities; correct?

8       A    That's correct, yes.

9       Q    In any of that time, six months, full-time,

10  every day, was there any -- anything that gave you

11  concerns about her ability to assist you in performing

12  an evaluation of Mr. Patterson?

13      A    No, not at all.

14           MR. PATTERSON:  Excuse me.  Lieutenant Colonel

15      Patterson, please, or Colonel.  I've asked for that

16      before.

17           MR. HOLT:  Sir, I'm taking this deposition.

18           MR. PATTERSON:  Okay.

19           MR. HOLT:  I'm going to ask my questions.

20           MR. PATTERSON:  You may ask your questions.

21           MR. HOLT:  Respectfully, I appreciate it, but

22      I don't need your permission to take a deposition.

23  BY MR. HOLT:

24      Q    Do you know Dr. Glenn Caddy?

25      A    Not personally.

Page 33

1    Q    Do you know of Dr. Glenn Caddy?

2    A    Yes.

3    Q    Have you ever spoken with him?

4    A    Yes.

5    Q    How many times have you spoken with Dr. Caddy?

6    A    We had one prearranged phone call.  And then

7    there -- I believe that was it.

8    Q    How long did that phone call last?

9    A    It may have been about a half an hour.

10    Q    What was the substance of the phone call you

11    had with Dr. Caddy?

12    A    Well, the substance, I believe, was to discuss

13    the history, things that were going on.  He asked me for

14    some information.  I believe I told him a summary of the

15    evaluation.  I followed that up with a letter that

16    basically reexpressed my thoughts about the evaluation

17    in writing.

18         I recall him saying that my evaluation was

19    either inadequate or insufficient.  And, by that, I

20    think he meant that I didn't talk to all the people that

21    knew him, and I didn't write a very long detailed report

22    about all of his history.

23         And I tried to remind him that my scope of

24    the -- the evaluation was to look at neurocognitive and

25    psychological qualities that are important for the

Page 34

1    medical certificate.

2              MR. AMLONG:   Object and move to strike on what

3         he thinks Dr. Caddy's motivation was.

4    BY MR. HOLT:

5         Q    Did Dr. Caddy ever tell you why he thought

6    your evaluation was insufficient?

7         A    Maybe not specifically, no.

8         Q    Did he tell you anything to suggest what he --

9    what you could have done to make your evaluation

10   sufficient, in his view?

11        A    Based on what I recall from that conversation,

12   I felt that he was critiquing my evaluation, as not

13   looking at the whole picture, as Lieutenant Colonel

14   Patterson as a pilot, and all the sources of information

15   that I could have reviewed.  That was my impression from

16   talking with him.

17        Q    Did you talk to Dr. Caddy about who, as

18   between you and Dr. Fonseca, performed each of the

19   tests?

20        A    I don't recall.  I don't recall that coming

21   up.

22        Q    Did he express to you in that phone call

23   anything suggesting that it was inappropriate for

24   Dr. Fonseca to assist you with the evaluation?

25        A    No, I don't recall that being said.

1      Q     Do you recall anything of that nature being

2    said?

3      A     No.

4      Q     Looking again at Exhibit 2, which I believe

5    you have in front of you.  Does Exhibit 2 reflect your

6    report of the evaluation of the plaintiff in this case?

7      A     Yes.  Yes, it does.

8      Q     And at least some of the information --

9    withdrawn.

10          And the phone call you had with Dr. Caddy, did

11   you ever discuss at all who administered the test to the

12   plaintiff in this case?

13     A     No, I do not recall that coming up.

14          (Exhibit 4 was marked.)

15   BY MR. HOLT:

16     Q     You've been handed Exhibit 4 to your

17   deposition which contains an email chain.  And the top

18   email appears to be from you to the plaintiff and to

19   Dr. Caddy; is that correct?

20     A     Yes, that's correct.

21     Q     Okay.  Were you responding to a longer email

22   chain in this email on Exhibit 4?

23     A     Yes.

24     Q     And your email, the one at the top of the

25   first page of Exhibit 4, what was the date of that

Page 36

```
 1   email?
 2       A    May 4th, 2016.
 3       Q    So, this is after you administered --
 4       A    Yes.
 5       Q    -- the test?
 6            And had you completed your report at the time
 7   of this email?
 8       A    Yes.
 9       Q    Okay.  Looking at the second page -- this is
10   part of the email chain down at the bottom, there's a
11   April 29th, 2016, email that was cc'd to you.
12            Do you see that?
13       A    Yes.
14       Q    If you read the -- could you read the first
15   two sentences of that email, please?
16       A    [As read]:  Scott, I have already sent
17   Dr. Bercaw an authorization to release in order for me
18   to speak to me regarding the report he prepared.  My
19   sense is that it is inadequate for your purposes and it
20   does not contain a lot of critical history and thus
21   perspective.
22       Q    This was information that had been forwarded
23   to you in an email before your call with Dr. Caddy;
24   correct?
25       A    Um-hum.  Yes, because the call, I think, took
```

```
 1    place later that month.

 2         Q    At this time -- withdrawn.

 3              As of April 29th, the date of Dr. Caddy's

 4    email which was cc'd to you, had you already provided

 5    Dr. Caddy a copy of your report?

 6         A    I don't know.

 7              (Exhibit 5 was marked.)

 8    BY MR. HOLT:

 9         Q    You've been handed Exhibit 4 [sic] to your

10    deposition.

11              MR. AMLONG:  You mean 5?

12              MR. HOLT:  I'm sorry.  I knew that would

13         happen.  I apologize.

14    BY MR. HOLT:

15         Q    You've been handed Exhibit 5 to your

16    deposition.

17         A    Okay.  Yes.

18         Q    If you take a look at the second page of

19    Exhibit 5, what does that appear to be?

20         A    It's a fax cover sheet from our medical

21    records person dated April 25th.  And it's a -- it's a

22    cover sheet for the report to be sent to Dr. Caddy.

23         Q    And who is Lisa Golden?

24         A    She's the medical records person at CMPS.

25         Q    Was she responsible for maintaining medical
```

Page 38

 1    records?

 2         A    Yes.

 3         Q    And for transmitting those to other doctors

 4    such as Dr. Caddy, assuming appropriate authorizations?

 5         A    Yes.

 6         Q    Was it the usual and customary practice for a

 7    Comprehensive MedPsych Systems to fax records to other

 8    doctors, assuming, again, the proper authorization?

 9         A    Yes.

10         Q    If you look at the third page of Exhibit 5, is

11    this a confirmation that the fax was successfully sent

12    to Dr. Caddy on April 25th?

13         A    Yes.

14         Q    So, then, the report would have been

15    presumably on Dr. Caddy's fax machine or in his email,

16    depending on how his system's set up; correct?

17         A    Yes.

18         Q    So, as of April 25th, Dr. Caddy had a copy of

19    your report; correct?

20         A    It appears that way, yes.

21         Q    So, now, when we go back to Exhibit 4 for a

22    moment, on that second page in that email, the

23    April 29th email, when Dr. Caddy wrote that email,

24    he'd -- the -- your report had already been sent to him;

25    correct?

Page 39

1      A     Yes.

2      Q     Okay.  The next page of Exhibit 4 has yet

3   another prior email in the chain.  It appears to be 459.

4            Do you see that?

5      A     Yes.

6      Q     This one looks like an email from plaintiff to

7   Dr. Caddy saying [as read]:  If Dr. Bercaw will play

8   ball with you, fine.  I have no issues with spending the

9   money.

10           Do you have any understanding as to what that

11  means?

12     A     This is in reference to the fee that was

13  required by my company to have a phone consultation.

14     Q     Okay.  Then he goes on to say [as read]:  I

15  personally feel he took my money, and then when I showed

16  up, had the intern do the work, which is not what I paid

17  for.

18           Do you see that?

19     A     Yes.

20     Q     I mean, did you -- withdrawn.

21           In this email, the plaintiff is saying that

22  you essentially took his money and didn't provide him

23  the service you agreed to provide.  Do you agree?

24     A     I disagree with that statement.

25     Q     Why do you disagree?

Page 40

1      A     Because I performed the evaluation that was

2    requested and that was required.

3      Q     Do you know how it is that plaintiff came to

4    locate or find you in order to get a independent

5    evaluation from you?

6      A     I don't know.  I seem to remember him perhaps

7    contacting Dr. Kanter, my boss at that company.  But I

8    do not know the exact method to which, you know, he used

9    to find us.

10     Q     Okay.  So, you have no reasons to dispute his

11   statement that -- that you were located by Dr. Caddy,

12   his testifying expert; correct?

13     A     That I was located by Dr. Caddy?  No.  I don't

14   think -- I don't know about that.

15     Q     You have no basis to dispute that statement;

16   correct?

17     A     Correct.  I first heard about Dr. Caddy after

18   the evaluation had been completed.

19     Q     Okay.  Plaintiff has stated in this case that,

20   quote [as read]:  After briefly meeting with me,

21   Dr. Bercaw handed me off to a resident, Francy Nathaly

22   Fonseca, Psy.D. to administer test.

23           Is that a correct statement?

24     A     I don't believe that's correct, the way that

25   is phrased.  The interview would have lasted more than

Page 41

```
1    an hour, I'm sure.  They usually do.

2            And she did do testing, and then I did some

3    testing later in the afternoon.  And, you know, the -- I

4    was there, available, the whole day.

5        Q    Okay.  I think this is probably a good time to

6    take a break, if you would like one.  Counsel, are you

7    okay with that?

8            MR. AMLONG:  Sure.  That's fine.

9            THE WITNESS:  Sure.

10           MR. HOLT:  Let's take a five-minute break.

11           THE VIDEOGRAPHER:  At 2:47 p.m., we are going

12       off the record.

13           (A brief recess is had from 2:47 p.m. to 2:54

14   p.m.)

15           THE VIDEOGRAPHER:  At 2:54 p.m., we are on the

16       record.

17   BY MR. HOLT:

18       Q    Turning back to Exhibit 2, which is your

19   report in this case.

20           MR. HOLT:  Can we silence phones, perhaps, for

21       the video?

22   BY MR. HOLT:

23       Q    Taking a look at Exhibit 2, the fourth page,

24   which is Bates number PATTERSON-BERCAW_7.

25           Are you on page four?
```

Page 42

1      A     Sorry.  I was on page four.  Your page four,

2   not my page four.

3            MR. AMLONG:  Are you talking Bates numbers

4      or...

5   BY MR. HOLT:

6      Q     Bates number 7, it's page four of the printed

7   document.  There's a section entitled CogScreen.  Can

8   you tell us generally what's reported in this section?

9      A     Yes.  So, CogScreen is a collection of

10  computerized tests.  Takes about an hour to complete.

11  The first statement is about the LRPV.

12     Q     What does that mean?

13     A     Which is -- it's Logistic Regression Estimated

14  Probability of Brain Dysfunction.  So, essentially what

15  was done is there are nine different tests that are used

16  to predict yes or no, is there a problem.  And it's only

17  based on nine variables, which the CogScreen includes a

18  lot more than that.  But these were selected, I imagine,

19  because they were powerful.

20            So it gives you a number between zero and one.

21  The closer you are to one, the more likely it is you

22  have a problem.  So, his score of .04 is a good score.

23     Q     Okay.  On those nine factors?

24     A     Yes.  On those nine variables, yeah.

25     Q     Okay.  In the next paragraph, you say, in

Page 43

1   comparison to major US carrier pilot group ages 45 to

2   49, his speed of performance appeared average with three

3   scores falling at or below the 15th percentile, and two

4   scores falling at or below the 5th percentile.

5           Did I read that correctly?

6       A    Yes.

7       Q    Let's just start with the basics.  What does

8   it mean to be at or below the 15th percentile?

9       A    So, this refers to a score that is below the

10  mean of what's expected.  This -- the next couple of

11  paragraphs here are dealing with base rates.  So it's

12  saying that there were three scores that fell more than

13  a standard deviation below the mean.  But you can have a

14  couple low scores and still look pretty normal.

15          So the statement that his performance appeared

16  average means that even though there were these scores

17  falling below the expected range, it was not

18  significantly different from the base rate that you

19  would expect for that pilot group.

20      Q    The 15th percentile, does that mean that

21  you're performing better than 15 percent of the --

22  better or equal to 15 percent of the population?

23      A    It's the opposite of that.  So -- what that

24  means that that score is -- that 15 -- well, 15 percent

25  or lower, or less, of people scored -- had that score or

1    lower.

2        Q    So, the flip side of that is 85 percent of

3    people had a score that was better; correct?

4        A    Yeah.  Um-hum.  Yes.

5        Q    And the same with the 5th percentile, that

6    means that 95 percent of people in this comparison group

7    had better scores; correct?

8        A    Yes.

9        Q    Okay.

10       A    But that is not unusual for that pilot group.

11            So that's important to remember.

12       Q    What do you mean by that?

13       A    That having a few low scores is not, in

14   itself, important when the CogScreen gives you an

15   overall T-score to tell you how -- how common that is

16   with that sample.

17       Q    What does a T-score mean?

18       A    A T-score is a standard score.  So it

19   corresponds to percentile.  So, a percentile of 16 or

20   15, it corresponds to a T-score of 40.

21       Q    Okay.

22       A    So, it's just another metric that's used to

23   describe a distribution of scores.

24       Q    Okay.

25       A    50 -- 50 is average.

Page 45

1      Q    But it's a similar concept, 50 being average.

2      A    Yeah.

3      Q    And then it corresponds roughly with

4   percentile; correct?

5      A    Yes.

6      Q    Okay.  So, regarding the plaintiff's speed of

7   performance, there were three scores that were at or

8   below the 15 percentile and two at or below the 5th;

9   correct?

10     A    That's correct.

11     Q    So, does that -- if we want to figure out --

12  withdrawn.

13          Does that mean there are a total of three that

14  were below the 15th percentile?  Or were there

15  essentially three between 5 and 15 and two additional

16  scores below 5?

17     A    What it means is that there were three scores

18  that fell below the 15th percentile.  And of those, two

19  of them were below the 5th percentile.

20     Q    Okay.  So you don't have to add them up?

21     A    Right.  So it's not five altogether.  It's

22  only three --

23     Q    Okay.

24     A    -- that we're talking about.  But two of those

25  were below the 5th percentile.

1      Q    Okay.  The next paragraph [as read]:  In terms

2  of accuracy, his performance was average with two scores

3  falling at or below the 15th percentile and none below

4  the 5th percentile.

5           What does that mean?

6      A    So, in this case, two of the scores were

7  mildly below expectations.  They were at or below the

8  15th percentile.  None of them were at or below the

9  5th percentile.

10     Q    Okay.

11     A    So that just gives you an indication that

12  those two scores were mild.

13     Q    The next paragraph talks about throughput

14  scores.  What does "throughput" mean?

15     A    So, throughput is just another way of looking

16  at efficiency.  So, here, we're talking about a number

17  of items correct over a certain amount of time.  So, in

18  this case, it's correct responses per minute.

19          So, it gives you an example -- it combines

20  speed and accuracy to say how efficient a person is,

21  taking into account -- taking into account their speed

22  and accuracy.

23     Q    So, for example, I can have a very high speed

24  and a low accuracy.

25     A    Um-hum.

1      Q    But my throughput score would be low for that;

2    correct?

3      A    That's correct.

4      Q    And the converse would also be true?

5      A    Right.

6      Q    I might have really high accuracy, but I'm

7    just taking a long, long time to do it?

8      A    You could potentially have the same throughput

9    score if, you know, in one instance, accuracy's high and

10   speed is low.  And then it's the reverse.  It could be

11   the same throughput score.

12     Q    Okay.

13     A    Yeah.

14     Q    What are -- what are process scores?

15     A    Process scores are the scores that don't

16   neatly fit into the categories of speed or accuracy.

17   So, these are the variables that might be a little more

18   qualitative.  So, there are a few of those.  Just to

19   give you an idea, the --

20     Q    Would it be helpful if I --

21     A    There's nine -- ten of them.  There's ten

22   process scores.

23     Q    Would it be helpful if I hand you the actual

24   CogScreen so you can --

25     A    Yeah.  I'm looking at it on the phone right

Page 48

1    now.

2         Q    Okay.  We can do better than that.  This is

3    going to be Exhibit 6.

4              (Exhibit 6 was marked.)

5    BY MR. HOLT:

6         Q    Do you recognize Exhibit 6?

7         A    Oh, yes.  This is Lieutenant Colonel

8    Patterson's CogScreen report.

9         Q    Okay.  I was asking you before what process

10   scores were.  Does this help you to kind of better

11   explain what process scores are?

12        A    Yes.

13        Q    Could you tell us?

14        A    So, here, the indicator dual premature

15   response -- this is on the divided attention test.  This

16   is where the examinee has to control a cursor from --

17   and they have to recenter it, but they can't do it too

18   soon.  They have to wait until it gets into a certain

19   zone.  So they have to monitor that with attention to

20   monitor that.

21             And then the dual means that this is when the

22   subject also has to do a visual comparison task at the

23   same time.  So that's why it's a dual task at that

24   point.  So, it gives you a stat for dual and alone.

25             Below that, there's the tracking test.  Which

```
1   refers to boundary hits.  So, this is the -- the person
2   is using a keyboard to keep a cursor in the midpoint.
3   And if he loses control of that, it hits the boundary at
4   the edge of the screen, and that's considered a -- you
5   know, it's a bad score to do that.
6            Below that, you have combined coordination.
7   This is from the pathfinder test.  This is how
8   coordinated the person is in hitting the center of the
9   box for the numbers and letters.  So, you can see,
10  that's not really an accuracy or speed.  It's more of a
11  coordination, how good they are at hitting the center.
12           And then below that, you have the discovery
13  and the shifting attention test.  So, this looks at --
14  well, the shifting attention test has a couple different
15  conditions.  But this is referring to the discovery
16  condition, whereas what happens here is that the subject
17  has learned a couple of different rules for what's the
18  correct response.  And in a discovery condition, they're
19  not told what the right rule is.  They have to figure it
20  out through, you know, trial and error.  And this looks
21  at how adaptable -- how adaptive they are in figuring
22  out quickly what's the operative rule at that point.
23       Q    Was that test one that the plaintiff scored
24  below the 15th percentile on?
25       A    Yes.
```

Page 50

1      Q     What are perseverative errors?

2      A     A perseverative error means that it's a --

3   you're making the same mistake.  So instead of getting

4   it wrong and then correcting it and finding the best

5   solution or the new solution that works, it's doing the

6   same thing wrong again.

7      Q     Was that another area that the plaintiff

8   scored low on?

9      A     He did have a low score on that part of the

10  test, yes.

11     Q     What was his score on that part of the test?

12     A     Percentile is two and a half.  That

13  corresponds to a T-score of 31.

14     Q     If you look at page five of Exhibit 6, which

15  is Bates number 42.

16     A     Yes.

17     Q     There appears to be an asterisk next to the

18  first factor all the way to the right, Attribute

19  Identification.

20            Do you see that?

21     A     Yes.

22     Q     What does -- what does that factor measure?

23     A     That is comprised of the discovery condition.

24  That's why the score we previously talked about, that's

25  why that score is low.

1        Q      Okay.

2        A      Because of the trouble with perseverative

3    errors and a lower-than-expected number of rule shifts.

4    So it's referring to that test.

5        Q      What are the Taylor aviation factors?

6        A      These are factors that are -- were

7    independently developed by a psychologist named Joy

8    Taylor.  These are factors that have been determined to

9    be related to piloting skills.

10            So, in terms of simulator and actual

11   performance, they've done studies to show that this --

12   that these factors -- so, a factor means that you're

13   distilling it down to the essential construct.  And

14   through statistics, they're able to figure out, okay,

15   well, these are the component abilities that are being

16   measured by these tests that are important for flight

17   performance.

18       Q      And having a Z-score of minus 1.70, does that

19   mean 1.70 standard deviations below the average?

20       A      That's right.

21       Q      And from that, we could compute a rough

22   percentile ranking; correct?

23       A      You could, yes.  I prefer to look at the

24   T-scores.  I think they are a little easier.

25       Q      What makes a T-score easier to interpret?

1        A     They have a wider range.

2        Q     Okay.

3        A     So, the percentiles bottom out at one -- the

4   1st percentile.  And then you're talking about the, you

5   know, below the 1st percentile.  But there was extra

6   T-score ranges there.  And percentiles can be

7   misinterpreted.  So, you know, being told that you have

8   a percentile of 21 is actually okay, but it sounds bad.

9   You know, it's -- people think it's percent correct or,

10  you know, you -- there's a misconception about what the

11  percentiles actually mean.

12              So, the T-scores I think are a little more

13  transparent and easier to understand.

14       Q     On the next page of Exhibit 6, which is Bates

15  number 43, there are a couple scores here with asterisks

16  in the right margin.  I was hoping you could tell me

17  what those --

18       A     Yes.

19       Q     -- tests are about, starting with the first

20  one.

21       A     So, these are just noted because they were low

22  scores --

23       Q     Okay.

24       A     -- appearing in that base rate analysis we

25  discussed.  So, for speed, he was just a little slow

Page 53

1    with the previous number alone, which is a working

2    memory test.  That's where you have a number on the

3    screen and then it disappears, and then another number

4    comes up, and you have to indicate what the previous

5    number was.  So you have to keep that into your -- in

6    your mind while you're also paying attention to the new

7    number.

8           So, you have to look at accuracy to see how he

9    did.  He scored in the average range with accuracy, but

10   he was just a little slow.  So, you know, in that case,

11   you might not be too concerned about that because his

12   accuracy was good.

13        Q    Sure.  The next one?

14        A    Math was also a T-score of 34.  That was a bit

15   low.  But, again, with a good accuracy.  Actually,

16   100 percent accuracy.

17          Pathfinder letter is speed in hitting these

18   letters that appear on the screen and doing that in

19   serial -- in order.

20        Q    Let's take a look at the next page, which is

21   Bates number 44.  What is backward digit span?

22        A    That's simply being presented with a sequence

23   of digits.  It's visual.  So there might be three, four,

24   six -- I think it was up to six -- digits.  And then you

25   have to select the correct answer for what they are

Page 54

1    backwards.  So you have to hold that information in your

2    mind and rearrange the numbers in backward order.

3         Q    So, if the numbers are one, two, three, four,

4    you have to -- the correct answer is four, three, two,

5    one, for example?

6         A    Exactly.

7         Q    And how did the plaintiff score on that

8    particular measure?

9         A    Mildly below expectations in terms of

10   accuracy.

11        Q    Okay.  Looking at the next page, which is

12   Bates number 45, pathfinder letter.  Did you already

13   tell us about that one?

14        A    Yes.  So, pathfinder is you have to select the

15   next number.  It's a sequencing task.  But the numbers

16   are across the screen, so you have to move quickly and

17   not make any mistakes.

18        Q    How did the plaintiff score on that?

19        A    Well, throughput, the balance of speed and

20   accuracy, correct responses per minute, was mildly below

21   expectations.

22        Q    Is the CogScreen test, standing alone, enough

23   for you to make a determination about whether somebody

24   is fit to operate an aircraft?

25        A    I don't think it's enough by itself.  You

Page 55

1    certainly have to consider other information; clinical

2    information, observer information.  When you do have a

3    poor CogScreen, the recommendation is always to do the

4    core neuropsychological battery, which we did here.

5    Sometimes they want all of it anyways.  But in some

6    cases, if the CogScreen is fine, then the FAA is

7    satisfied.

8         Q    Okay.

9         A    It depends on the case.

10        Q    But, here, you didn't do just the CogScreen.

11   You did the entire core battery; correct?

12        A    That's correct, yes.

13        Q    Looking back at Exhibit 2, which is your

14   report, on the fifth page.

15        A    Okay.

16        Q    Bates number 8 at the bottom.

17        A    Yes.

18        Q    There's a section about attention and working

19   memory.  And I want to ask about the third paragraph

20   there, starting with "sustained attention."

21             Do you see that?

22        A    Yes.

23        Q    Could you read us the first two sentences of

24   that paragraph?

25        A    [As read]:  Sustained attention on the IVA+

Page 56

1    continuous performance test was below average for

2    auditory attention to auditory targets and mildly

3    impaired for visual targets.  He displayed difficulty

4    with sustained attention, particularly to auditory

5    stimuli and distractibility for both visual and auditory

6    modalities.

7        Q    Can you tell us what that means?

8        A    So, in that case -- this is a very boring test

9    where the person has to respond to ones that flash on

10   the screen or are heard and has to ignore twos that

11   flash on the screen.  So it looks at your response

12   consistency, how quickly you're responding to the ones.

13   And if you make any mistakes by responding to a two

14   accidentally, or if you let a one slip by.

15           So, he did have a few low scores dealing with

16   his response consistency, so how consistent his reaction

17   time was.  And there were some times where he responded

18   to a two when he shouldn't have.

19           Vigilance for auditory targets was a little

20   low as well.  In general, there just seemed to be some

21   variability in reaction time and his response -- his

22   vigilance and prudence in responding was not quite as

23   what you would expect.  So, that was an area of concern.

24       Q    On the top of page six of Exhibit 2, which is

25   Bates number 9, there's a section that says "verbal

Page 57

1    memory."

2              Do you see that?

3         A    Yes.

4         Q    [As read]:  Verbal memory performance was

5    mildly to moderately impaired.

6              What does that mean?

7         A    So, that means we're dealing with a T-score

8    that is falling between 30 and 35.  So, it's more than

9    one and a half standard deviations below the mean.  This

10   refers to his learning of a word list.  And as I

11   indicated here, he recalled six words, six words, six

12   words, seven words, and then seven words the final time

13   it was read.  So each time it's read, he has to repeat

14   back the words.

15             So, in this case, his learning was below

16   expectations.  He did not advance as quickly with the

17   word list as you would expect.

18        Q    Okay.  And then what about after a brief

19   delay, how did that affect his learning?

20        A    So, there's another word list read, a second

21   word list.  And then you're asked, once again, about the

22   first word list.  And he was able to recall five words.

23   Which isn't terrible, considering the original learning.

24   But five words is mildly to moderately impaired for his

25   age.

Page 58

1      Q    Now, looking at the bottom of that same page,

2  there's a section entitled Interpretation and

3  Recommendations.

4           Do you see that?

5      A    Yes.

6      Q    And that continues on to the next page;

7  correct?

8      A    Yes.

9      Q    The sentence begins at the very bottom of page

10 six, which is Bates number 9 [as read]:  Although his

11 cognitive profile --

12          Do you see that sentence?

13     A    Yes.

14     Q    -- [as read]:  Was predominantly within normal

15 limits, there were a few areas of lower than expected

16 performance that may be of aeromedical significance --

17     A    Yes.

18     Q    -- in the areas of deductive reasoning and

19 sustained attention.

20          What did you mean that?

21     A    So, here, I'm referring to the attribute

22 identification and the CogScreen where he had a low

23 score there.  And then also the Wisconsin Card Sorting

24 Test which also showed perseveration.

25     Q    Can you tell us what "perseveration" means?

Page 59

1      A    So that's making perseverative errors, getting

2  feedback that you're doing it wrong, but not finding the

3  correct solution and still doing it wrong.

4      Q    Okay.

5      A    And then sustained attention refers to that

6  continuous performance test which I do believe he had

7  mildly impaired performance on that test.

8      Q    Okay.

9           You go on to say [as read]:  His scores also

10  suggested insufficient learning and poor recall of

11  information presented verbally.

12           Do you see that?

13      A    Yes.

14      Q    What did you mean by that?

15      A    The auditory verbal learning test where he

16  only learned seven out of the 15 words and could only

17  recall four after a delay of time.

18      Q    And the next paragraph -- withdrawn.

19           Do you make a recommendation in your report

20  regarding follow-up testing for the plaintiff?

21      A    I do.

22      Q    And what was your recommendation?

23      A    Well, in this case, I do present that there

24  are several positive cognitive and psychological

25  attributes here, but there were a couple of areas of

 1   concern because of what we saw with the Taylor aviation

 2   factor score, that one being low, and with the sustained

 3   attention being a bit low and verbal memory being low.

 4   Those are potentially important for piloting skills.

 5        Q    How so?

 6        A    Well, those are -- would be considered

 7   component cognitive abilities that are important.

 8   Sustained attention, being able to respond consistently,

 9   being able to adapt to changes quickly, being able to

10   remember what has been said or new information that

11   you're receiving, being able to retain that over time.

12   Those are important.

13             So, the recommendation was that, first,

14   further review might be helpful.  So I did recommend

15   that he seek consultation from one of the FAA

16   consultants.  And through that, it might be recommended,

17   as is often the case, that there is a retesting.  And

18   the purpose of that is to see how reliable these

19   findings are.

20             You wouldn't do it next week, but maybe in six

21   months, do a retesting.

22        Q    Okay.  And at the time of your report, which

23   is Exhibit 2, had you been provided with a copy of

24   Dr. Knippa's evaluation?

25        A    No.  I requested it, but it was not provided

Page 61

 1  until later.

 2      Q    Okay.  Why did you request it?

 3      A    We wanted to -- Dr. Fonseca and I would have

 4  liked to have had additional data to review together.  I

 5  wanted to see if these findings were consistent with

 6  what he had previously done.  So that would cause me to

 7  place more weight on something.  Something would have

 8  more weight to me if it was a repeated finding.  It also

 9  would help to gauge practice effects.

10           If it's a test that we know can be improved

11  with repeated exposure, you know, that might be

12  important to consider.  So, for those reasons, it would

13  have been helpful to have the previous data.

14      Q    Okay.  Were you ever provided with a copy of

15  Dr. Knippa's report?

16      A    Yes.  Sometime later.  I don't recall how much

17  later, but it was long after this case had been sort of

18  off my desk.

19      Q    Did you review Dr. Knippa's report when you

20  were provided with it?

21      A    I did.

22      Q    Okay.  Do you have any recollection of whether

23  Dr. Knippa's findings were similar to yours?

24      A    There were a few similarities and some things

25  that were different.

Page 62

1       Q     Okay.  Just one second.

2             (Exhibit 7 was marked.)

3    BY MR. HOLT:

4       Q     Do you recognize Exhibit 7 that's just been

5    handed to you?

6       A     Yes.

7       Q     Can you tell us what Exhibit 7 is?

8       A     This is a summary printout from the Meyers

9    neuropsychological battery, which we have used here to

10   enter data.  And it just provides a summary table,

11   essentially, of scores.

12      Q     Does this include some of the scores that

13   we've already talked about?  Or are these all separate

14   tests that we have not?

15      A     These are not separate.  These are tests that

16   we've already discussed.  It does not include CogScreen,

17   but it includes the other neuropsychological tests.

18      Q     Okay.  So, looking on the first page of

19   Exhibit 7, for example, there's a line five that says

20   "verbal memory."

21      A     Yes.

22      Q     Do you see that?

23      A     Yes.

24      Q     And then in the range, I think it says "mild

25   to moderately impaired."

Page 63

1        A     Yes.

2        Q     Did I get that correct?

3              What does that mean?

4        A     That's referring to the auditory verbal

5    learning test which we reviewed where he did have

6    overall mildly -- mild to moderate impairment on that

7    test.  So it's an average of the four variables.

8        Q     Okay.  And the auditory visual learning test

9    is also reported on page two of this exhibit; correct?

10       A     Yes.

11       Q     And, again, there's a number of scores there,

12   some mildly impaired, some mild to moderately impaired,

13   and one --

14             MR. AMLONG:  Object to form, leading.

15             MR. HOLT:  Can you wait until I finish my

16       question, please?

17             THE WITNESS:  Yes.

18   BY MR. HOLT:

19       Q     Let me start again.

20       A     Okay.

21       Q     Looking at the scores on the page that's

22   Bates-numbered 12 for the AVLT at the bottom, there's

23   some that appear to say "mildly impaired; moderately to

24   mildly impaired," and one that says "severely impaired."

25             Did I read that correctly?

Page 64

1          A     Yes.

2          Q     What does it mean that there's a score that

3     says severely impaired?

4          A     That means that the T-score corresponding to

5     that raw score, which is a one, is in the severely

6     impaired range.

7                However, it is important to take into account

8     the true positive, recognition true positives along with

9     the false positives.

10               So, what the false positives are, are the ones

11    where he said yes to a word that was not actually in the

12    word list when he was asked about the word list.  But he

13    still recognized 13 out of the 15.

14               So, the best score to look at is on the

15    following page, discriminability index.  That takes into

16    account his hits or true positives and his false alarms

17    or false positives.  It takes into account both.

18         Q     Okay.

19         A     So, the T-score of 44 is a better

20    representation of his recognition memory.

21         Q     And that score is still below average;

22    correct?

23         A     Yes.

24         Q     Okay.

25         A     That would be considered within the normal

1    range, but at the lower end of the average range, yes.

2        Q    Okay.  On that same page, Bates number 13, the

3    Wisconsin Card Sorting Test.  I think you mentioned that

4    earlier, briefly.  Can you tell us what that is?

5        A    So, this is a classic test in our field.  The

6    subject is presented with a deck of cards.  And there

7    are four key cards that vary according to how many

8    shapes are on them, what color they are, what shapes

9    they are.  And the examinee is told to match the cards

10   but not told how to do it.  He's just given feedback of

11   whether he's right or wrong.

12           So, in this case, he has to figure out the

13   right way to sort the cards.  And then once that's done,

14   the examiner changes the rule without telling him.  And

15   through trial and error, through figuring out what is

16   important, what's operative at that time, the examinee

17   is supposed to figure out the next way to sort the

18   cards.  And then from there, it changes again.

19           So, it looks at how flexible you are in your

20   problem solving.  Do you get hung up and still keep

21   doing the same thing wrong, or can you quickly figure

22   out a new solution?

23       Q    And what were the plaintiff's scores on the

24   Wisconsin Card Sorting Test?

25       A    Well, he made a mildly to moderately impaired

1   number of errors, which means that his errors -- the

2   times he got incorrect responses was more than expected.

3   He still figured out the six sorting categories, which

4   is all there is.  But after doing the first category, it

5   took him a while to get to the second.  And then once

6   that -- once he got the second category, he caught on to

7   the rest of it.  It took him a lot of errors to get to

8   that second category completed.

9        Q    Is this testing a similar ability as in the

10  CogScreen process test regarding discovery and

11  perseverative errors?

12       A    Yes.  It's very similar.  I believe that the

13  discovery condition of the shifting attention test was

14  modeled after the Wisconsin.

15       Q    So, if you're seeing scores that are low on

16  both of those tests, those would be consistent with --

17       A    Yes.

18       Q    Okay.  They would be consistent with one

19  another, and that would support potentially more of a

20  conclusion that there might be a -- something that we

21  need to investigate further here?

22            MR. AMLONG:  Objection, foundation.

23            THE WITNESS:  Yes.

24            MR. AMLONG:  I'm sorry.  Objection, leading.

25  BY MR. HOLT:

1      Q     Did you draw any conclusions from --

2    withdrawn.

3           Comparing the plaintiff's scores on the

4    CogScreen discovery process test and the Wisconsin Card

5    Sorting Test, are there any similarities that you can

6    discern?

7      A     Yeah.  The degree of perseverative errors, the

8    number of perseverative errors, I should say, was

9    similar.

10     Q     There was also one failure to maintain set,

11   which meant that he figured out the way and didn't stay

12   with it.  And he also failed to maintain set on the

13   CogScreen three times.

14           So, when you figure out the right way to

15   circle the -- when you figure out the right way to do

16   it, you're supposed to stay with it until the rule

17   changes.  If you break that, then it's considered a

18   failure to maintain set.

19           (Exhibit 8 was marked.)

20   BY MR. HOLT:

21     Q     I've handed you what's been marked as

22   Exhibit 8 to your deposition.  Do you recognize this

23   document?

24     A     Yes.

25     Q     What is this?

Page 68

```
1        A    This is the fitness-for-duty report from John

2   Knippa that was done ten days prior to my evaluation.

3        Q    Incidentally --

4        A    I'm sorry.  It wasn't ten days.  I'm looking

5   at the report date.  Or not.  I'm looking at something

6   else here.  It was actually only about four days.  Four

7   days after -- or four days before my evaluation.  So

8   very close in proximity.

9        Q    So, his evaluation was done four days before

10  yours; correct?

11       A    Yes.

12       Q    Okay.  And his report date is actually the

13  same date --

14       A    Yes, it is.

15       Q    -- as your evaluation?

16       A    Yeah.

17            Normally, you wouldn't space evaluations that

18  close together.

19       Q    Why not?

20       A    Again, primarily because of practice effects.

21       Q    One second.

22            Taking a look at labeled page seven at the

23  top, and Bates number 10 at the bottom of Dr. Knippa's

24  report.

25       A    Yes.
```

Page 69

1       Q    At the bottom, there's a section that starts

2    "test findings," and then under that, "neurocognitive

3    screening."

4            Do you see that?

5       A    Yes.

6       Q    Here --

7            MR. AMLONG:  I'm sorry, which page is this?

8            MR. HOLT:  Page seven.  It's Bates number 10.

9    BY MR. HOLT:

10      Q    Dr. Knippa reports that on the CogScreen AE,

11   Mr. Patterson's LRPV score was 0.0124.

12           Do you see that?

13      A    Yes.

14      Q    Is that similar to yours, a very low score?

15      A    Similar, yes.

16      Q    The last sentence that starts on the same page

17   begins with "however."  You see that in the bottom line?

18      A    Yes, I do.

19      Q    [As read]:  However, reviewing individual

20   scores, there were five out of nine scores in the

21   average range or higher -- sorry -- or higher, low

22   average performance on two measures of divided

23   attention, and a marginal low average score on a measure

24   of shifting attention on a task designed to assess

25   visual attributes and develop problem-solving concepts.

Page 70

1           Do you see that?

2      A    Yes.

3      Q    Is that similar to what you observed when you

4  retested Mr. Patterson four days later?

5           MR. AMLONG:  Objection, leading.

6           THE WITNESS:  The low score -- well, he says

7      it's low average, or marginal.  So I don't know if

8      that's necessarily impaired.  But it is a

9      relatively low score, I suppose.

10          That is referring to the shifting attention

11     test.  So that is similar to what I found, yes.

12     Although it seems that he may have done -- well, I

13     don't know -- without having the actual scores, I

14     don't want to comment on that, if it was better or

15     worse than what I have.

16  BY MR. HOLT:

17     Q    Okay.

18     A    We can compare the Taylor aviation scores

19  because those are listed.

20     Q    Okay.  In addition -- well, the base rate

21  analysis also talks about scores being at or below the

22  5th percentile and at or below the 15th percentile.

23     A    Right.

24     Q    Do you see that?

25     A    Yes.

1      Q    And you also found that the plaintiff had

2   scores at or below the 15th and 5th percentiles for this

3   kind of speed analysis; correct?

4      A    Right.  Right.  These base rate scores we're

5   looking at are not exactly comparable, though.

6      Q    Okay.  Why so?

7      A    Because he's reporting a different comparison

8   group than I used.

9      Q    What comparison group is he reporting?

10     A    Regional carrier pilots across all ages.

11     Q    Okay.  And you're using?

12     A    US major airline pilots of his age.

13     Q    Even if the -- so, maybe we can't count them

14  up, but fair to say that he found or he reported, at

15  minimum, that overall, the scores were average or above

16  average, but there were some scores that he observed to

17  be below average.

18          MR. AMLONG:  Object to the form.

19  BY MR. HOLT:

20     Q    Is that a fair assessment?

21          MR. AMLONG:  Object to the form as leading.

22          MR. HOLT:  That's not leading.  And you can

23     just object to the form.

24          MR. AMLONG:  No.  You can't just object to the

25     form.  You need to say what it is.  And I'm saying

Page 72

1          it's leading.

2              MR. HOLT:  You really don't need to say what

3          it is.  But I'll ask you if I want it.  We've done

4          this at every deposition.  But --

5              MR. AMLONG:  I will say it because the case

6          law says that you have to.

7              MR. HOLT:  Well, it surely doesn't.  But, can

8          you read back the question subject to the improper

9          speaking objection?

10             (The Court Reporter is directed to read back

11     the previous question and/or answer.)

12     BY MR. HOLT:

13         Q    Let me re-ask it.

14             Does Dr. Knippa report that while, overall,

15     the plaintiff scores were average or above average,

16     there were some that were below average on the measures

17     on the CogScreen?

18         A    So, you're referring to the base rate

19     analysis?

20         Q    Sure.

21         A    Okay.  What he's saying is that the scores

22     ranged from borderline to low average and average.  So

23     that -- that paragraph, it seems to be just saying that

24     there was a range of variability.

25             And then he goes on to say that it was

Page 73

1    considered atypical as compared to expectations with an

2    active-duty, major airline pilot.

3         Q    Okay.  On measures of accuracy -- withdrawn.

4    Let me do it this way.

5              Earlier, I believe you testified that there

6    were some similarities and some differences between

7    Dr. Knippa's findings and yours?

8         A    Yes.

9         Q    Correct?

10             Does having his report in front of you help

11   you to kind of identify those differences and

12   similarities?

13        A    Yes.

14        Q    Could you?

15        A    For the CogScreen, what is notable to me,

16   looking at this, is that --

17             MR. AMLONG:  Objection.  There's no question.

18             MR. HOLT:  Yes, there was.

19             THE WITNESS:  Should I go ahead?

20   BY MR. HOLT:

21        Q    Yes, please.

22        A    The Taylor aviation factor scores, there is a

23   similarity here on the attribute identification factor.

24   There's a low score, an impaired range score reported

25   here.  And we also had that with my CogScreen.

Page 74

1          Motor coordination is above average or

2     superior, as he says, in both cases.

3          Visual learning and memory was a difference.

4     There was actually lower performance here compared to

5     mine.

6          Q    Is that something you would expect, that there

7     might be improvement having just taken the test four

8     days earlier?

9          A    Possibly.  If it was a different session,

10    which I believe it was, he should have gotten different

11    items.  So, this is -- the visual memory test in this is

12    a pairing of symbols and digits.  So that pairing should

13    be different if it's a different session.  But because

14    he was familiar with the task, he might have been more

15    cognizant of -- even though you're told you have to

16    remember them, he knew what to expect.

17          But, that is not a definitive memory test

18    either.  So, because there's some variability there, I

19    would want to follow up with looking at the other

20    memory -- visual memory test.

21          But that was one difference.

22          The other factor scores seem pretty similar.

23    Let's see.  Yeah.  So, other than the visual memory one,

24    the other ones seemed to be similar.

25          Q    So, earlier when you testified that -- I

Page 75

 1    believe you testified that one of your recommendations

 2    is there might need to be some follow-up or kind of

 3    comparison with other test results.  Did I --

 4         A    Yes.

 5         Q    -- get that correct?

 6         A    Yes, that's correct.

 7         Q    Is this the type of information that you could

 8    then consider along with your results?  And would that

 9    give you kind of more comfort in making a recommendation

10    or prediction?

11         A    It does strengthen confidence in making a

12    recommendation when you have more data points to look

13    at, yes.

14         Q    What is the TOVA test?  TOVA five?

15         A    The test of variables of attention.  It's a

16    similar test to the IVA, the integrated visual

17    auditory -- visual and auditory continuous performance

18    test.

19              In the TOVA, the T-O-V-A, the person has to --

20    has a clicker.  And he has to click when he sees a

21    stimulus with a box on the top and not click when

22    there's a box on the bottom.  And the pacing of the test

23    changes.  Sometimes the targets are more frequent.

24    Sometimes they're less frequent.  So you have to stay

25    with the test.  It requires a lot of vigilance.  It's

```
 1    very boring.  It's, like, 25 minutes long.  It's a very

 2    boring test.

 3            So the idea is that it could capture any

 4    distractibility, trouble sustaining that vigilance over

 5    time.

 6        Q    Starting on the page Bates number 15, there's

 7    a section called "Findings regarding cognitive skills."

 8    Had you previously reviewed this section?

 9        A    Yes.

10        Q    The final sentence of that section, which is

11    on the next page, states [as read]:  In short, some

12    diagnostic questions remain unanswered, given limited

13    information, for example, below, but performance

14    abnormalities significant to flying status remain

15    nonetheless.

16            Do you see that sentence?

17        A    Could you direct me to that one more time?

18        Q    It's on -- this one's flipping over --

19        A    Um-hum.

20        Q    -- I think to the next page.

21        A    Okay.

22        Q    The last one in that section right before

23    recommendations.

24        A    Oh, okay.  Yes.

25            MR. AMLONG:  I'm sorry.  What's the Bates
```

```
 1        number and the page number?
 2             MR. HOLT:  Now, we're on Bates number 16.
 3             MR. AMLONG:  Starting where on the page?
 4             MR. HOLT:  Right above the word
 5        "recommendations."
 6   BY MR. HOLT:
 7        Q    Okay.  Let me go back.
 8             Do you see the paragraph right above the word
 9   recommendations on page Bates number 16?
10        A    Yes.
11        Q    Okay.  Do you agree that some diagnostic
12   questions likely remained unanswered at this point?
13        A    Yes.
14        Q    And given limited information, there might be
15   a need to follow up or to do further evaluation?
16             MR. AMLONG:  Object as to form, leading.
17   BY MR. HOLT:
18        Q    You can answer.
19        A    Yes.
20        Q    Okay.  And there are some performance
21   abnormalities that may or may not be significant to
22   flying?
23             MR. AMLONG:  Objection, leading.
24             THE WITNESS:  Yes.
25   BY MR. HOLT:
```

Page 78

1       Q    As of the date that you evaluated the

2    plaintiff, could you definitively say that he was

3    capable of reliably performing the essential functions

4    of his job description?

5       A    No, I could not, or I would have.

6            (Exhibit 9 was marked.)

7    BY MR. HOLT:

8       Q    Have you seen Exhibit 9 before?

9       A    Yes.

10      Q    Okay.  The second paragraph that starts "from

11   a neurological perspective," have you read that

12   paragraph before?

13      A    Yes.

14      Q    Do you agree -- withdrawn.

15           You came to a similar conclusion as Dr. Knippa

16   in this paragraph; correct?

17           MR. AMLONG:  Objection, form.

18           MR. HOLT:  All right.  Withdrawn.  That's a

19      good point.  Let me ask it differently.

20           THE WITNESS:  Okay.

21   BY MR. HOLT:

22      Q    Dr. Knippa says in this paragraph, [as read]:

23   That is, as of the time of this examination, he has not

24   affirmatively identified as capable of reliably

25   performing the essential functions of his job

Page 79

1    description, i.e., as the job was represented by

2    Mr. Patterson and otherwise understood on a consistent

3    and sustained basis.

4         Did I read that correctly?

5    A    Yes.

6    Q    Do you agree that as of the time you evaluated

7    the plaintiff in this case, you could not affirmatively

8    identify him as being capable of operating an aircraft?

9    A    Well, operating an aircraft is a different

10   question.  But in my -- my conclusion was similar in

11   that I could not affirmly state that he could perform

12   the essential job functions, yeah.

13        MR. HOLT:  I've probably got about seven

14        minutes to go, so we can switch media.

15        THE VIDEOGRAPHER:  At 3:50 p.m., we are going

16        off the record.

17        (A brief recess is had from 3:50 p.m. to 3:59

18   p.m.)

19        (Exhibit 10 was marked.)

20        THE VIDEOGRAPHER:  At 3:59 p.m., we are on the

21        record.

22   BY MR. HOLT:

23   Q    Dr. Bercaw, you've been handed Exhibit 10 to

24   your deposition.  Do you recognize this document?

25   A    Yes, I do.

Page 80

1        Q    Can you tell us, generally, what this is?

2        A    This is a letter to Dr. Caddy following our

3    phone conversation.

4        Q    Is this -- withdrawn.

5             Does this letter, Exhibit 10, in any way

6    refute any of your opinions in Exhibit 2?

7        A    No.

8        Q    Okay.  Taking a look at the second page of

9    Exhibit 10, the second line at the top starts with

10   "however."

11            Do you see that?

12       A    Yes.

13       Q    Could you read us those two sentences,

14   starting there?

15       A    Okay.  [As read]:  However, there were two

16   particular areas of concern that do not necessarily

17   disqualify him, but warrant further review and possibly

18   retesting.  Specifically, his verbal learning and memory

19   was below expectations, and there was an indication of

20   impairment in an aspect of executive functioning.

21       Q    Is that generally consistent with your report,

22   which was Exhibit 2?

23       A    Yes.  I don't mention the sustained attention

24   finding here, but otherwise, yes, that's consistent.

25       Q    Okay.  And then you go on to say that

Page 81

1    [as read]:  Aeromedical significance of these findings

2    was uncertain in the context of the larger evaluation

3    and his professional -- professional and military

4    history.

5              What do you mean by that?

6        A    Well, here, I'm saying that considering what I

7    know about his history, and his record, the significance

8    of the findings was not entirely clear.

9        Q    And then what do you recommend, based on that?

10       A    The recommendation was that these results be

11   reviewed by an FAA consultant who could provide perhaps

12   further recommendations moving forward.

13       Q    When you say that "these results be reviewed,"

14   you mean that your results actually be forwarded on --

15       A    Yes.

16       Q    -- to an FAA consultant; correct?

17       A    Yes.  It's a standard of practice to either

18   fax or mail the report with all the supporting documents

19   so that can be reviewed by the medical certification

20   division in Oklahoma.

21       Q    Does the standard of care -- or standard of

22   practice allow you to ignore data that are contrary to

23   the data you're observing, or that are favorable to an

24   opinion?

25       A    No.  I would not ignore data.

Page 82

1     Q    So, there might be reasons that you could

2   evaluate data and say, you know, that it doesn't

3   necessarily carry the data, but you wouldn't ignore any

4   data; correct?

5     A    That's correct.

6          MR. AMLONG:  Objection, leading.

7   BY MR. HOLT:

8     Q    You also recommend that there be a comparison

9   with the concurrent fitness-for-duty evaluation ordered

10  by American Airlines.  That's referring to the

11  Dr. Knippa report that we just looked at; correct?

12         MR. AMLONG:  I'm sorry.  Read that back,

13     please.

14  BY MR. HOLT:

15     Q    You want me to re-ask the question?

16     A    Oh.

17     Q    I'll re-ask the question.

18     A    Yeah.  What was the question?

19     Q    You recommend, on page two of Exhibit 10, that

20  there be a comparison with the concurrent fitness for

21  duty evaluation ordered by American Airlines to help

22  determine the reliability of these results.

23     A    Yes.

24     Q    By that, are you referring to Dr. Knippa's

25  report?

Page 83

1      A     Yes.

2            Sorry.  I thought I already answered that.

3      Q     If -- withdrawn.

4            Nothing further.

5            MR. PATTERSON:  Need to take a break.

6            MR. AMLONG:  Give us a brief break, please.

7            THE VIDEOGRAPHER:  At 4:05 p.m., we are going

8      off the record.

9            (A brief recess is had from 4:05 p.m. to 4:20

10     p.m.)

11           THE VIDEOGRAPHER:  At 4:20 p.m., we are on the

12     record.

13                   CROSS EXAMINATION

14     BY MR. AMLONG:

15     Q     Good afternoon, Dr. Bercaw.  Do you still work

16     at the Comprehensive MedPsych Systems, Inc.?

17     A     No, I do not.

18     Q     When did you leave and why?

19     A     January of this year.  I left just to pursue

20     my career.  I felt it was time to move on.

21     Q     Are you a sole practitioner now?

22     A     Yes.

23     Q     Okay.  Who initiated your leaving?

24     A     Myself.

25     Q     Do you know where Dr. Fonseca is these days?

Page 84

1          A     She lives and works in the Fort Lauderdale

2     area.

3          Q     Okay.  Do you know what she's doing?

4          A     She works for a hospital system.  I don't

5     recall the one.

6                Yes.  I don't know the name of her company.  I

7     don't really keep in touch with her.

8          Q     Do you know whether or not -- is she a fully

9     practicing psychologist yet?

10         A     Yes.

11         Q     Or is she still a resident?

12         A     No.  No.  She's a fully licensed, independent

13    psychologist.

14         Q     And how long did she stay at MedPsych Systems?

15         A     She was there two years.

16         Q     Did you bill by the hour at MedPsych Systems?

17         A     For this type of evaluation, they have a flat

18    fee, which includes just everything.

19         Q     What did your practice -- what was your

20    practice primarily comprised?  Doing this sort of

21    evaluation, or doing one-on-one therapy?

22                MR. HOLT:  Objection to form.

23    BY MR. AMLONG:

24         Q     What was -- tell me what your typical day

25    would be at MedPsych Systems.

Page 85

1      A    Sure.  I was strictly doing neuropsychological

2   evaluations and feedback appointments with patients to

3   go over results.  My typical referrals would be

4   neurologists who are sending patients for cognitive

5   evaluations regarding dementia or brain injury, or other

6   kinds of medical illnesses that cause an impact on

7   thinking and emotions.

8            I also did a lot of interoffice referrals.  So

9   I saw patients from psychiatrists or psychotherapists

10  within our company, patients who needed evaluations for

11  diagnosis or treatment planning.

12           And then I did a little bit of workers' comp,

13  and also the FAA neuropsych evaluations.  Those are the

14  primary practice areas.

15           I also did some presurgical evaluations.  That

16  is, psychological evaluations in anticipation of doing a

17  procedure like deep brain stimulation, that type of

18  thing, spinal cord stimulators.

19      Q    Did you keep hourly time records?

20      A    No.

21      Q    Would MedPsych Systems have records of which

22  other patients you were seeing on -- what was the day --

23  March 21st, 2016?

24      A    They may.

25           MR. HOLT:  Objection to form.

Page 86

1          You can answer.

2          THE WITNESS:  I don't have access to that

3      calendar anymore, so I couldn't tell you if I saw

4      other patients that day.

5  BY MR. AMLONG:

6      Q    Do you remember anything else that you did do

7  that day?

8      A    No.

9      Q    How much time do you recall spending with

10 Colonel Patterson?

11     A    Well, there was the interview, which I said

12 takes approximately an hour, sometimes longer if there's

13 a lot of history.  Then I believe I took over the

14 testing at some point in the afternoon.  And I did those

15 few tests.

16          Altogether, I may have spent two hours with

17 him.  I would say that's approximate.

18     Q    Okay.  So, he came in at -- you say he arrived

19 45 minutes late because there was, I think he said, a

20 traffic jam in the airport.

21     A    Yeah.  Apparently, yeah.

22     Q    Do you recall what time he got there?

23     A    Well, the appointment, I'm assuming, started

24 at 9:00, because that's my customary time to start.  So

25 my guess would be 9:45.

Page 87

1      Q    Okay.  And you were with him until about

2    10:45 or 11:00, then?

3      A    Probably 11:00, yeah.

4      Q    Okay.  The -- and when did you come back to

5    begin the -- begin the tests that you performed?

6      A    I don't recall specifically, but I can guess

7    that it was in the afternoon.  I think Dr. Fonseca might

8    have seen another patient for a follow-up or something,

9    and then I took over for a while.

10      Q    Well, Dr. Fonseca began testing Lieutenant

11    Colonel Patterson at about 11:00; right?

12      A    After the -- yeah.  After the interview.

13      Q    Okay.  And, again, what were the -- what were

14    the tests that you -- that you performed?

15          MR. HOLT:  Objection to form, asked and

16          answered.

17          THE WITNESS:  I read the instructions and set

18          him up to take CogScreen on the computer.  I also

19          did Boston Naming Test, finger-tapping test,

20          Grooved Pegboard, PASAT, or paced serial addition

21          test, and the Stroop color word test.

22    BY MR. AMLONG:

23      Q    Now, you did the CogScreen, the Boston Naming

24    Test, the finger-tapping test --

25      A    Yes.

Page 88

1      Q     -- the paced -- what was it?

2      A     Paced Auditory Serial Addition Test.

3            MR. PATTERSON:   Serial.

4  BY MR. AMLONG:

5      Q     And the --

6      A     Stroop, S-t-r-o-o-p.

7      Q     And there was one in between, I thought.

8      A     Grooved Pegboard.

9      Q     What time do you believe that you began the

10 CogScreen?

11     A     Well, that's customarily done right after the

12 interview.

13     Q     Why is it customarily done right after the

14 interview?

15     A     Doesn't have to be.  In some cases, you just

16 want to know what the CogScreen performance is before

17 you go ahead with the rest of it.  In this case, I had

18 already planned on doing the whole battery.  But

19 sometimes I change that up.  It depends on what's

20 happening.

21            In this case, where I was working there, I had

22 to actually physically set up a computer.  So we may not

23 have done it right after the interview.  I really don't

24 recall.  But I typically do it first, after meeting with

25 the patient.

1       Q    Well, did you do it first, or did you do it in

2    the afternoon?

3       A    I do not recall, specifically.  Sometimes the

4    procedures change based on what I need to do to set up

5    the computer.  But I'm telling you, that's the way that

6    I usually do it, but I don't recall in this specific

7    case.  It was two and a half years ago.

8            We may have actually -- in that case, we may

9    have done the Wechsler Adult Intelligence Scale first,

10   and then done the CogScreen in the afternoon.

11      Q    I only have one copy of this, so I'll just ask

12   you if you recognize the documents that have been

13   Bates-stamped PATTERSON-BERCAW_00029 through 00032 as

14   being in the handwriting of Dr. Fonseca.

15      A    Yes, that's her handwriting.  She was present

16   in the interview.

17      Q    Look at 00037 and tell me if that is also

18   Dr. Fonseca's handwriting, please.

19      A    Yes, that is.

20      Q    The record form of the WAIS, hyphen, Roman

21   numeral four, which is Bates-stamped 00056 through 00070

22   says -- has Dr. Fonseca's name at the top; correct?  Is

23   that in her handwriting?

24      A    That's right.  Yes.

25      Q    Okay.  So, why is her name on this test?

Page 90

1      A     She's indicating that she was the examiner.

2      Q     Okay.  Do the other tests that were performed

3  that day have the names of the examiner?

4      A     No.  That's not something we usually do.  I

5  can recognize my handwriting on the ones that I

6  administered.

7      Q     Well, the tests seem to start at about 00080.

8  Could you tell me -- you want to just look through your

9  file?  That's your file; right?

10      A     I don't have that printed out.

11      Q     Oh, okay.  If you can look through there and

12  tell me which of those are in your handwriting.

13      A     Okay.

14            The Boston Naming Test, finger-tapping test.

15      Q     Oh, and tell me the numbers, please.

16      A     The numbers of?

17      Q     Of the Boston Naming Test.  The bottom.

18      A     Oh, okay.  82.

19      Q     Okay.

20      A     Finger tapping test, 84.

21            Now, her handwriting is at the bottom.  She

22  added up the numbers.  Okay?  But I administered the

23  test.

24            Grooved pegboard, 101.  I wrote in the raw

25  scores.  She looked up the T-scores.  I checked it, as I

```
 1    always do.

 2              PASAT, 103 is in my handwriting.

 3              Stroop color word test, 104.  The raw score's

 4    in my handwriting, the T-scores are in her handwriting.

 5              Okay.  That's it.

 6        Q    What is your current hourly rate?

 7        A    My current hourly rate for -- it's $189.

 8        Q    Okay.  Are you being paid for your time today?

 9        A    Yes.

10        Q    And when were you contacted about being an

11    expert witness in this case?

12              MR. HOLT:  Objection to the form, assumes

13        facts not --

14    BY MR. AMLONG:

15        Q    When were you contacted about being a witness

16    in this case?

17        A    It was by phone, by a paralegal.  I don't

18    recall the exact date.  I would have to check my phone

19    for that, I guess.  I was issued the subpoena on the 7th

20    of August.  It was maybe a week before that when I was

21    contacted about this.

22        Q    Okay.

23        A    So, sometime in late July.

24        Q    And is there a written agreement to pay you

25    $189 an hour?
```

Page 92

1      A     I submitted an invoice, yes.  So that was the

2     agreement that I wanted.

3      Q     Okay.  And how much have you invoiced so far?

4            Do you have a copy of the invoice?

5      A     I do.

6      Q     May I see it?

7            And the -- you're obviously going to charge

8     more than three hours for this deposition?

9      A     Yes.

10     Q     Okay.

11     A     That's what I was quoted, three hours.

12           MR. AMLONG:  Did we get a copy of this?

13           MR. HOLT:  Not from me.

14           MR. AMLONG:  Hmm?

15           MR. HOLT:  Not from me.

16    BY MR. AMLONG:

17     Q     Is this your only copy?

18     A     No.  You can keep that.

19     Q     Thank you.

20           What, if any, agreement do you have with

21    American Airlines about testifying at trial?

22     A     I don't have any agreement with them.

23     Q     Have you been asked to testify at trial?

24     A     I was asked, initially, to keep, I believe,

25    August 20th open for a trial date by this law firm.

Page 93

1        Q    Has anybody else asked you --

2        A    No.  Other than that, and then being asked to

3   do the deposition, that was it.  That was the extent of

4   the agreement.

5        Q    For the record, since I don't want to give my

6   only copy, you've billed three hours for today's

7   deposition, an hour for preparation for the deposition,

8   and an hour for travel time?

9        A    Yes.

10       Q    For a total of 945 so far?

11       A    Yes.

12       Q    Do you know if Dr. Fonseca kept time sheets

13   when she was employed at -- is "employed" the right

14   word?

15       A    Yeah, I suppose that you could say employed.

16   She would have an employment contract with the company

17   for the post-doc fellowship, yes.

18       Q    And do you know if she billed by the hour?

19       A    She was given a stipend.  So she got the same

20   amount each week, or each month.  It's a predetermined

21   stipend.  But that's customary.

22       Q    But my associates get the same salary every

23   week too, and they get billed by the hour.

24            MR. HOLT:  Objection to form.

25            THE WITNESS:  Right.  Yeah.

Page 94

1  BY MR. AMLONG:

2     Q    Is she billed -- does MedPsych -- did MedPsych

3  bill her by the hour?

4            MR. HOLT:  Objection to form.

5            THE WITNESS:  Yes, we would -- she billed

6       under me, so I would bill insurance companies for

7       the time required to do evaluations.

8  BY MR. AMLONG:

9     Q    Okay.  Was there any hourly billing done

10  concerning Mr. Patterson?

11     A    No.  It was -- well, yeah, it was just a set

12  fee.  I believe it was $3,250.  And that was set by my

13  company for doing a full neuropsych evaluation with

14  pilots.

15     Q    Have you ever been in the room when

16  Dr. Fonseca has given an MMPI?

17     A    No.

18     Q    You've never heard her explain the test to

19  anybody?

20     A    The test instructions are printed in the

21  booklet.  You can either read them or you can have the

22  examinee read them.

23     Q    Is it your practice to hand-score or

24  machine-score the MMPIs?

25     A    The scoring is done by using Pearson's online

1    scoring system.  So you go into a website, you enter in

2    the scores, and then it prints out a report.

3         Q    You enter in the scores, or you scan in the

4    sheets?

5         A    You enter them in by hand.

6         Q    You go down each question?

7         A    Yeah.

8              And you do it a second time to verify.  So,

9    567 questions times two.  Takes a little bit of time.

10        Q    Have you ever been in the room when

11   Dr. Fonseca administered the WAIS-4?

12        A    No.

13        Q    Have you ever been in the room when Ms. --

14   when Dr. Fonseca administered the Meyers neurological

15   battery selected test?

16        A    When she first started with me, I did observe

17   her giving tests to make sure that the tests that she

18   was less familiar with, she was trained-up on.

19        Q    Okay.  And you were not in the room when she

20   gave the Meyers Neuropsychological Battery to Colonel

21   Patterson; correct?

22        A    That's correct.  I wouldn't have been in the

23   room for that.

24        Q    Okay.  Is the Taylor aviation factor scores,

25   is that part of CogScreen or is that part of the Meyers

Page 96

1    Neuropsychological Battery?

2        A    The Taylor aviation scores are part of

3    CogScreen.

4            The Taylor complex figure test has nothing to

5    do with the Taylor aviation scores.  It's a completely

6    different Taylor.

7        Q    That's why I was asking.

8            The -- have you ever been in the room when

9    Dr. Fonseca administered the Wisconsin Card Sorting

10   Test?

11       A    No.  There are instructions that are read, and

12   then it's administered on a computer.

13       Q    But you have no knowledge as to whether or not

14   Dr. Fonseca read the instructions to Colonel Patterson

15   or simply handed him the test, had him read, and then

16   start?

17           MR. HOLT:  Objection to form.

18   BY MR. AMLONG:

19       Q    Correct?

20       A    That's correct.  I didn't supervise that part

21   of it, I'm sure, because I would have been doing other

22   things at that point.

23       Q    Do you remember what you were doing that day,

24   what other things?

25           MR. HOLT:  Objection to form, asked and

Page 97

1        answered.

2              THE WITNESS:  Working on reports, I presume.

3        Probably writing up history for this case or

4        working on something else.  I stay pretty busy.

5    BY MR. AMLONG:

6        Q    Okay.  How did you explain the CogScreen test

7    to Colonel Patterson before he began taking it?

8        A    There are standard instructions.  They're

9    bolded in the manual.  You read those.  You provide any

10   clarification as necessary.  And then it's automatic on

11   the computer.  There's instructions that he reads at the

12   beginning of each subtest.

13       Q    What, if anything, did you tell him about the

14   keyboard?

15       A    The keyboard is placed for the examinee and

16   you tell them to use their index and middle finger for

17   the tracking test, with their non-dominant hand.

18       Q    And how long -- how long does the CogScreen

19   take?

20       A    Approximately an hour.

21       Q    You testified on direct that the use of

22   psychometricians is growing in your field.

23       A    Yes.

24       Q    For the administration of tests.

25       A    It's been relatively consistent for the last

Page 98

1   several years.  Practice surveys have seen -- show that

2   about half of neuropsychologists use an assistant for

3   test administration.

4        Q    Did MedPsych Systems use psychometricians?

5        A    Yes.  On occasion, when we had one.  Not

6   always.  I've had a few in the past.

7        Q    Did you have any in 2016?

8        A     No.  At that time, I was working just with

9   Dr. Fonseca.  She was doing a couple cases a week with

10  me.  And I would do some myself, but we would work

11  together on the cases.

12       Q    I see in the 2016 letterhead, that Dr. Kanter,

13  the president of Comprehensive MedPsych Systems listed

14  himself as ABN and ABPNN [sic].

15       A    Yeah.

16       Q    You don't.  Were you board-certified at that

17  time?

18       A    I was not board-certified at that time, no.

19       Q    Were you board-eligible at that time?

20       A    Yes.

21       Q    Okay.  And when did you become

22  board-certified?

23       A    March 2017.

24       Q    Had you taken the test before?

25       A    The board certification test?

Page 99

1      Q     Yes.

2      A     At that time, I may have -- I may have passed

3   the written test at that point.  I don't recall.  I

4   would have to check to see when I took the written test.

5            There's three stages to it, so it's a process

6   that takes a couple years, usually.

7      Q     Have you ever failed any of the --any of those

8   tests?

9      A     No.

10     Q     You first saw parts of defense Exhibit 4 -- do

11  you have that in front of you?  Well, you saw on

12  April 29th that Lieutenant Colonel Patterson was

13  complaining because you were copied on this, or at least

14  on a forwarding -- forwarded version of this.

15           [As read]:  I personally feel he took my

16  money, and then when I showed up, had the intern do the

17  work, which is not what I paid for.

18           What, if anything, did you do to address that

19  with Lieutenant Colonel Patterson?

20     A     He didn't raise that concern on the day of.

21  He consented to services.

22     Q     Well --

23     A     This was brought up after the fact.

24     Q     Okay.  After the fact, what, if anything, did

25  you do to discuss that with Lieutenant Colonel

Page 100

1   Patterson?

2       A    This message wasn't directed to me.  It was

3   directed to Dr. Caddy.

4       Q    It was forwarded to you.

5       A    I don't know that I addressed it, then.

6       Q    Dr. Caddy's response was April 29th at

7   7:38 p.m., and cc'd to you.  And it contains that 4:59

8   email from Lieutenant Colonel Patterson.

9       A    Um-hum.  I didn't feel the need to respond to

10  it because it wasn't addressed to me.

11      Q    Did you discuss this with Dr. Caddy?

12      A    Not that I recall.

13      Q    In defendant's Exhibit 2, your and

14  Dr. Fonseca's report -- and is there a date here saying

15  where it was -- when it was written?

16      A    No, there's not a date when it was written.

17  It gets written over several days.  And, in this case,

18  we were waiting for records, so, you know, the report

19  got written to a certain extent, and then we waited

20  before we finished it because we were waiting for FAA

21  records.

22      Q    Did you report your findings to the FAA?

23      A    In this case, I do not believe I did.  I

24  could -- I would have to check with the medical records

25  person at Comprehensive MedPsych to be sure.

Page 101

1      Q     Okay.  Do you routinely report your findings
2  to the FAA?
3      A     Yes.  The way that I do it is that the -- I
4  give the pilot the report and then I get a final
5  go-ahead, do you want me to send this.  Because the
6  evaluation is not being done at the request of the FAA.
7  It's a self-referral.  So out of respect for that
8  person's wishes, I would make sure that he's okay with
9  me sending it.
10     Q     Did you understand that this was, because of
11  concern by Lieutenant Colonel Patterson about his
12  first-class medical certificate, or did you understand
13  that it was in anticipation of litigation?
14           MR. HOLT:  Objection to form.
15  BY MR. AMLONG:
16     Q     Did you understand that this had anything to
17  do with his first-class medical certificate?
18     A     Yes.  I believe that's what the question at
19  hand was, was the medical certificate.  He was being
20  sent for a fitness-for-duty evaluation which directly
21  pertains to the medical certificate because that covers
22  neurological and mental health.
23     Q     Did you also understand that it was being --
24  that your consultation was being sought in anticipation
25  of litigation?

Page 102

1      A    I could have assumed that, but at that point

2  it wasn't clear to me.  He presented himself as wanting

3  a second opinion, already anticipating that the first

4  evaluation was not going to be in his favor.

5      Q    Did he articulate why he thought that?

6      A    He used the term "hired gun," indicating

7  that -- that there were complaints against him and he

8  was being sent for this evaluation, he was complying,

9  but he indicated that he thought the evaluation would be

10  biased, that he wanted a second opinion.

11           I remember consulting with my boss,

12  Dr. Kanter, about this, because of the close proximity

13  of the evaluations.  And he gave me the go ahead.  He

14  said, "If Lieutenant Colonel Patterson wants the

15  evaluation, he can have it.  It's his right."  So I went

16  ahead with it.

17      Q    What, if anything, did Lieutenant Colonel

18  Patterson share with you concerning his experience with

19  Dr. Knippa?

20      A    Well, he did give me test names or a

21  description of test, as we talked about earlier.  Other

22  than that, I don't recall any specific details that were

23  discussed about the interaction or the evaluation

24  itself.

25      Q    Did he -- do you recall his saying anything

Page 103

1   about arriving late one day -- arriving in California

2   late one day from the East Coast, and being given the

3   CogScreen test the following afternoon?

4       A    No, I don't -- I don't recall those details

5   about it.  Not to say that he didn't say it, but it's

6   not sticking out of my memory right now.

7       Q    What familiarity, if any, do you have with the

8   need for someone to acclimate to a time zone prior to

9   taking the CogScreen?

10          MR. HOLT:  Objection to form.

11          THE WITNESS:  Well, we do know that crossing

12      time zones can interfere with the circadian

13      rhythms, and especially on a chronic basis.  I

14      don't know -- I don't know specifically any

15      literature about CogScreen, specifically.

16          The recommendation, perhaps, should have been

17      that he get there early and acclimate.  But I don't

18      have a firm guideline as far as how long that

19      should be.  It would just make sense.  It would be

20      prudent to arrive early, at least a day before.

21  BY MR. AMLONG:

22      Q    By the day before, you mean, like, during

23  daylight?

24          MR. HOLT:  Objection to form.

25          THE WITNESS:  I don't know when he got to

Page 104

1          Dr. Knippa's evaluation.  But if it was the day of,

2          I would think that would be a mistake.

3     BY MR. AMLONG:

4          Q    No.  He got there the evening before.

5               MR. PATTERSON:  9:00 p.m. California standard

6          time.

7               THE WITNESS:  Okay.

8     BY MR. AMLONG:

9          Q    And then he began MMPIs and such --

10         A    Okay.

11         Q    -- in the morning.  And then he began taking

12    the CogScreen in the afternoon.

13         A    All right.

14         Q    Now, would being tired on the CogScreen --

15    would being weary, when you're taking the CogScreen,

16    within a reasonable degree of technological probability,

17    impact one's performance?

18              MR. HOLT:  Objection to the form.

19              THE WITNESS:  That may impact performance.  It

20         is a sensitive test.  It requires a lot of

21         attention and processing capabilities.  So quick

22         reaction times and accuracy are very important to

23         that test.

24    BY MR. AMLONG:

25         Q    And Lieutenant Colonel Patterson expressed to

1   either you or Dr. Fonseca that by the time he was taking

2   the CogScreen test in your office, he was weary;

3   correct?

4           MR. HOLT:  Objection to form.

5           THE WITNESS:  I don't recall that.  I do have

6       notes that he reported feeling a little tired by

7       the time he was doing the auditory verbal learning

8       test, which is noted in my report.

9   BY MR. AMLONG:

10      Q    Did you do that after the CogScreen test?

11      A    Yes.

12      Q    Do you know what Lieutenant Colonel

13   Patterson's sleep had been the previous night?

14          MR. HOLT:  Objection to form.

15          THE WITNESS:  I don't know that I have a

16      specific note about his sleep the night before.  He

17      did say he was sleeping about seven hours instead

18      of eight.  He didn't indicate he was having any --

19      any chronic sleep problems, but perhaps he's

20      sleeping just a little less than normal.

21  BY MR. AMLONG:

22      Q    Do you remember what time of day you began the

23   CogScreen test?

24          MR. HOLT:  Objection to form.  You've asked

25      this about three times.

Page 106

```
1            THE WITNESS:  I do not recall specifically.  I
2       was looking to see if there was any kind of a time
3       stamp on it, but I don't see that.  So I'm afraid I
4       cannot answer that question.
5  BY MR. AMLONG:
6       Q    Well, MedPsych Systems, Inc., still has your
7  computerized records; right?
8       A    Yes.
9            MR. HOLT:  Objection to form.
10 BY MR. AMLONG:
11      Q    Do you know whether or not whatever program in
12 which those records are saved has a time stamp on it
13 that would --
14      A    It may.  I've never looked for it before, but
15 it may be there.  I don't have access to that computer
16 anymore so I can't check for you.
17      Q    When you tested Lieutenant Colonel Patterson
18 on the CogScreen, you and Dr. Fonseca normed him against
19 major airline pilots; correct?
20      A    That's correct.
21      Q    And Dr. Knippa may normed him against regional
22 airline pilots?
23      A    That's correct.
24      Q    Who are typically younger.
25      A    Well, the regional pilot sample is all ages.
```

Page 107

1   It's not broken down by age level.  I don't know if

2   Dr. Knippa looked at multiple groups.  But for whatever

3   reason, he didn't report the major US airline group.

4   But you're able to look at multiple different groups.

5   You don't have to commit to just one.

6       Q    But he only put one in his report?

7       A    That's correct.

8            I will say that the Taylor aviation scores and

9   the LRPV are not dependent on the selected normative

10  group.  So those scores wouldn't change; only the base

11  rate analysis.

12      Q    The test on which Mr. -- the test on which

13  Lieutenant Colonel Patterson was showing to be in a

14  lower percentile, or being moderately impaired, were

15  they generally measurements of speed?

16      A    No, I wouldn't say that.  He did well on most

17  aspects of speed.

18      Q    Do you believe that those results were

19  impacted by his being weary?

20           MR. HOLT:  Objection to the form.

21           THE WITNESS:  No, I don't believe so.

22           The only evidence that I have that maybe he

23      was weary, and that might have affected his

24      performance, was with the AVLT, as previously

25      noted.

```
                                              Page 108
```

1   BY MR. AMLONG:

2       Q    And the AVLT, I believe you said he had slower

3   speed but higher accuracy?

4            MR. HOLT:  Objection to form.

5            THE WITNESS:  Pardon me.  You said AVLT?

6   BY MR. AMLONG:

7       Q    I think that's what you said.

8       A    The AVLT was one test where his performance

9   might have been affected by fatigue because we had some

10  indication from him at the time.  And he did score low

11  on that, as I mentioned.

12           He scored well on other tests of attention and

13  processing.  There wasn't a consistent pattern of him

14  being weary or sleepy and that affecting the

15  performance.

16      Q    In summing up your report, you began by saying

17  [as read]:  With respect to his airman medical

18  certification, there's several positive cognitive and

19  psychological attributes identified by the testing as

20  indicated above.  His overall performance on the

21  CogScreen was within normal limits, which is favorable.

22           And you testified at one point, on direct,

23  that if the CogScreen is fine, the FAA is satisfied --

24  is satisfied with it.

25      A    In some cases.

Page 109

1           MR. HOLT:  Objection to the form.

2    BY MR. AMLONG:

3        Q    Did you find -- did you find anything about

4    Lieutenant Colonel Patterson, in March 2016, that would

5    make you question whether or not he should have a

6    first-class airman's certificate?

7           MR. HOLT:  Objection to the form.

8           THE WITNESS:  Based on the CogScreen alone?

9    BY MR. AMLONG:

10       Q    Based on the whole thing.

11       A    On the whole thing?  There were a few

12   concerns, yes.  As mentioned with the verbal learning

13   and memory, which I find may not be entirely reliable.

14   But the sustained attention and the executive, the

15   attribute identification part of it, that did raise a

16   concern.

17           As I said in my report, it wasn't enough to

18   completely dismiss his candidacy for it.  But it

19   required further investigation.

20       Q    Well, are you saying he was -- are you saying

21   definitively that he was not fit for duty in March 2016?

22       A    I didn't say that definitively.  When I can

23   make a definitive statement, I do.  But in this case, I

24   did not.

25       Q    You have a copy of Aeromedical Psychology in

Page 110

1   your office, don't you?

2       A    Yes.  Uh-huh.

3       Q    Do you consider it authoritative?

4       A    Yes.

5       Q    Do you consider Dr. Kay to be an expert in the

6   field of CogScreen testing?

7       A    Yes.

8       Q    Because he wrote it?

9       A    Yeah.  He developed it over many years, put a

10  lot of work into it.  And he knows everything there is

11  to know about it.

12      Q    And you recommended that further review of

13  these data by an FAA -- let me read the whole thing.

14           [As read]:  With respect to the airman medical

15  certification, there's several positive cognitive and

16  psychological attributes identified by the testing as

17  indicated above.  His overall performance on the

18  CogScreen was within normal limits, which is favorable.

19  However, his scores evidenced mildly to moderately

20  impaired deductive reasoning in comparison to aviators.

21           [As read:]  The deductive reasoning finding

22  was later replicated with the WCST, a similar task.

23  These findings raise concern about how adaptable or

24  flexible he is to feedback about his performance.  This

25  quality is potentially critical to flight performance,

Page 111

1    particularly in non-routine situations.

2              [As read:]  Therefore, further review of these

3    data by an FAA neuropsychologist is recommended to

4    determine the aeromedical significance to piloting

5    skills.  A comparison of these results with his previous

6    fitness for duty neuropsychological evaluation may also

7    be helpful, as this is not available to us.

8              Did I read that correctly?

9       A    Yes.

10      Q    Are you aware that Lieutenant Colonel

11   Patterson visited in June --

12              MR. PATTERSON:  July.

13              MR. AMLONG:  Hmm?

14              MR. PATTERSON:  July 1st.

15   BY MR. AMLONG:

16      Q    July 1st of 2016 with Dr. Kay?

17      A    I'm aware of it, but I don't know any details.

18      Q    Okay.  Let me mark -- let me mark the report

19   as Defendant's 1 and the CogScreen table as

20   Defendant's 2.

21              MR. HOLT:  I don't think you should mark it as

22        Defendant's 1 and 2.

23              MR. AMLONG:  I'm sorry.

24              MR. HOLT:  But do you want to use 11 and 12 to

25        be consistent?

Page 112

```
 1            MR. AMLONG:  Sure.  Sure.

 2            (Exhibit 11 was marked.)

 3            (Exhibit 12 was marked.)

 4            MR. HOLT:  So, you want the report and the

 5        CogScreen as 11 and 12, respectively.

 6   BY MR. AMLONG:

 7        Q    Why don't you take a moment.  And we'll go off

 8   in order to not have dead air.

 9            THE WITNESS:  All right.  I would like to take

10        a break, then, before I review this.

11            MR. PATTERSON:  Yeah.  That's fine.

12            THE VIDEOGRAPHER:  At 5:17 p.m., we are going

13        off the record.

14            (A brief recess is had from 5:17 p.m. to 5:28

15   p.m.)

16            THE VIDEOGRAPHER:  We are on the record at

17        5:28 p.m.

18   BY MR. AMLONG:

19        Q    Dr. Bercaw, have you had a chance to review

20   the report and CogScreen-Aeromedical Edition Test

21   Results done by Dr. Gary Kay?

22        A    Yes.  I read the report.  I'm glancing through

23   this CogScreen right now, yes.

24        Q    Before we get to that, I just wanted to make

25   sure.  As far as your March -- based on your March 21st
```

Page 113

1    examination, you cannot say one way or the other whether

2    or not Lieutenant Colonel Patterson was fit for duty as

3    an American Airlines pilot; correct?

4           MR. HOLT:  Object.  Objection to form.

5           THE WITNESS:  That is correct.  I did not say

6        one way or the other.

7    BY MR. AMLONG:

8        Q    And based on your review of the objective

9    results in Dr. Knippa's report, can you say whether that

10   justifies one way or another a finding of his being not

11   fit for duty?

12          MR. HOLT:  Objection to form.

13          THE WITNESS:  I see that Dr. Knippa raised

14       some important concerns.  Whether that was

15       sufficient for determining that he was not fit for

16       duty, I don't know.  I think it's a little hard for

17       me to say, having not done the evaluation myself.

18       But, you know, he did raise some concerns.

19           I feel that his evaluation and mine shared

20       some consistencies there.  So, in looking at both

21       reports, I would say there are concerns that need

22       to be further evaluated.  I would have preferred

23       that these evaluations didn't take place so close

24       together.  And in Gary Kay's evaluation, I see that

25       he was not aware of my evaluation.  So, there was

1      some -- he didn't have all the information

2      available to him.

3  BY MR. AMLONG:

4      Q    Is there anything in Dr. Knippa's report that

5  would suggest to you that Lieutenant Colonel Patterson

6  was not fit for duty?

7      A    Well, he found that there were some problems

8  with sustained attention.  He found that there were some

9  problems with the attribute identification.  And he

10  didn't perform quite as well as expected on the category

11  test, which is another test of conceptual reasoning.

12          There was low performance on Trail Making B,

13  which suggests some difficulty with mental flexibility,

14  again.  So, I think he did have some evidence that

15  should have raised concern, yes.

16      Q    The question was, is do you believe that,

17  quote, he classified him as being fit for duty.

18          MR. HOLT:  Objection.

19  BY MR. AMLONG:

20      Q    You're aware of that; correct?

21      A    Who?

22      Q    Dr. Kay.

23      A    Dr. Kay did, yes.  I see that, yes.

24          MR. HOLT:  I'm sorry.  Did you say classified

25      him as fit or not fit?

Page 115

1              MR. AMLONG:  Fit.

2              THE WITNESS:  Yeah.  I thought we were talking

3         about Dr. Knippa's report.

4              MR. HOLT:  Oh, I'm sorry.

5              MR. AMLONG:  No, no, no.

6              MR. HOLT:  Me too.  I was on the wrong doctor.

7         I apologize.

8              MR. AMLONG:  Did I say -- did I say Knippa

9         before?

10             MR. HOLT:  You didn't.

11             MR. AMLONG:  Read that -- let's start over

12        again.

13   BY MR. AMLONG:

14        Q     Having read Dr. Gary Kay's report, do you see

15   anything in there that would indicate that Lieutenant

16   Colonel Patterson was, at the end of June, beginning of

17   July 2016, unfit for duty?

18        A     No.

19        Q     You said that you did not believe that

20   Lieutenant Colonel Patterson could perform the essential

21   functions of the job as an American Airlines pilot.

22             Do you recall that testimony?

23        A     Yes.

24        Q     How are you familiar with the essential

25   functions of the job of an American Airlines pilot?

                                                    Page 116

1        A    I made that statement in regard to the

2    cognitive features that I saw in both my evaluation and

3    John Knippa's evaluation that are believed to be

4    important for pilot-relating skills.

5             I do not specifically know his job duties

6    as -- at American Airlines.  So I'm commenting more on

7    the neurocognitive pattern that we saw with the testing,

8    which could represent a potentially disqualifying

9    medical condition as stated by the Federal Aviation

10   Regulations.

11       Q    What could -- what could constitute?

12       A    The problems we noted with executive

13   functioning, sustained attention, and verbal memory.

14       Q    But Dr. Kay did not find those problems.

15       A    Well, Dr. Kay didn't do the same evaluation.

16   And by omission of my evaluation, he's done session

17   number two, which means that three months later, he got

18   the exact same items from that test.  So that would

19   strengthen the practice effect.

20             He also didn't do any tests of verbal memory.

21   So we don't know, again, how reliable that finding is.

22             He did do a test of sustained attention, which

23   did show some variability, seemed like it was better

24   than what we had before.  But he didn't do as many

25   tests.  But he does report that the attribute

Page 117

1    identification, the deductive reasoning finding was

2    normal in his case, when it wasn't in the previous

3    evaluations.

4        Q    Have you ever seen the -- and let's mark this

5    as 13 --

6             (Exhibit 13 was marked.)

7    BY MR. AMLONG:

8        Q    -- the job functions that American Airlines

9    list?

10            MR. HOLT:  Counsel, I'm going make an

11        objection to the authenticity of this exhibit.  I

12        know nothing about it.  Never seen it before.  It

13        looks like it's not from any official source.  We

14        might withdraw that objection later.  I just have

15        to have the opportunity to compare it with an

16        official --

17            MR. AMLONG:  It's --

18            MR. PATTERSON:  AA pilot credentials.  It's a

19        public website.

20            MR. HOLT:  Well -- I mean, lots of things are

21        public websites.  The Onion has a public website.

22        We don't trust that for the truth of its assertions

23        either.

24            MR. PATTERSON:  It's published by American

25        Airlines.

Page 118

1          MR. AMLONG:  All right.  Your objection is
2     noted.
3          MR. HOLT:  And like I said, we might withdraw
4     that later.  I just want to be able to compare it.
5          THE WITNESS:  Okay.  Do you have a question?
6  BY MR. AMLONG:
7     Q    Yes.  What -- which, if any, of the job duties
8  listed in Exhibit 13 do you think that Lieutenant
9  Colonel Patterson could not have performed in March?
10    A    Well --
11         MR. HOLT:  Are you through with your question?
12         MR. AMLONG:  In March of 2016.
13         MR. HOLT:  Objection to the form.
14         THE WITNESS:  Okay.  These are all very
15     general, but perhaps with responding to a variety
16     of emergency situations, quick and accurate
17     decision making, that could possibly be one.
18         I'm basing my statement, though, more on what
19     I've learned from going to the aviation psychology
20     conference and how it's presented with the types of
21     cognitive abilities that we're talking about that
22     are important for flying.  So this is based on my
23     knowledge of presentations and training I've had;
24     not a list of qualifications for a job description,
25     which are very, very general.

Page 119

1    BY MR. AMLONG:

2         Q    How many FAA pilot examinations have you done?

3         A    A couple of dozen.

4         Q    Meaning approximately 24?

5         A    Yeah.  Yes.

6         Q    How many of those have you found to be fit for

7    duty?

8         A    I don't know offhand.  I would have to count

9    that.

10        Q    Have you found any of them unfit for duty?

11        A    Yes.

12        Q    Do you know how many?

13        A    No.

14        Q    Were they unfit for duty because of substance

15   abuse?

16        A    No.

17        Q    Did you find -- did you question Lieutenant

18   Colonel Patterson's fitness for duty based on

19   neuropsychological concerns or on psychological

20   concerns?

21        A    Neuropsych -- neuropsychological concerns,

22   cognitive testing.

23        Q    So, no personality disorder or

24   psychopathology?

25        A    Right.

1              MR. HOLT:  Objection to form.

2              THE WITNESS:  He was noted to be defensive on

3         a personality inventory, which takes away from the

4         validity of those results.  I didn't find there was

5         any basis for diagnosing a personality disorder,

6         though.

7    BY MR. AMLONG:

8         Q    Well, defensive is not necessarily

9    psychopathology, is it?

10        A    No.

11        Q    Okay.  When you have done -- when you have

12   done -- have you ever done fitness-for-duty examinations

13   at the request of an airline carrier?

14        A    No, I have not.

15        Q    At whose request have you done them?

16        A    At the pilot's request, pilots coming --

17   seeking either recertification or initial certification.

18   So, first class, third class, done some air traffic

19   control specialist initial evaluations.  So these are

20   the pilots are coming to me.  I'm not getting referrals

21   from the airlines.

22        Q    Have you -- have you ever done

23   fitness-for-duty evaluations for any other employer?

24        A    Yes.

25        Q    Do the -- do these evaluations typically begin

Page 121

1   with your being given a plain vanilla request?  You

2   know, we would like you to -- we would like you --

3       A    No.  Usually, you talk to the employer and

4   find out the specific concerns, so you have a history

5   from the employer's perspective, complaints, job

6   performance evaluations, yes.  You have those kind of

7   things.

8       Q    So, it would be typical for a employer to say,

9   "We have a lot of people saying bad things about

10  Mr. Smith"?

11           MR. HOLT:  Objection to form.

12           THE WITNESS:  You would want to know what's

13           substantiating the complaints.  And, you know, is

14           there a medical issue?  Is there an interpersonal

15           work-related issue?  What are the details?  So you

16           would try to get that information from the

17           employer.

18  BY MR. AMLONG:

19      Q    So you would not want merely the accusations?

20  You would want the backup?

21           MR. HOLT:  Objection to form.

22           THE WITNESS:  Correct.  Written documentation

23           would be good.  But a lot of times, you might be

24           just talking to an HR person who's relaying

25           information.

Page 122

```
 1   BY MR. AMLONG:

 2        Q    And is that acceptable?

 3        A    Well, you try to get what you can.  Certainly

 4   I -- there might not be a lot of documented information

 5   about it.  The concern might be very basic and you might

 6   not have a long history of things.  But you try to

 7   ascertain what you can so you have all the available

 8   information.

 9        Q    Did you ever work with a carrier?

10        A    An airline carrier?

11        Q    Yeah.

12        A    No, I have not.

13        Q    Okay.  Do you know of any Federal Aviation

14   Regulations that Lieutenant Colonel Patterson doesn't

15   meet?

16             MR. HOLT:  Objection to form.

17             THE WITNESS:  No, I do -- I do not know

18        specifically any that he doesn't meet.

19   BY MR. AMLONG:

20        Q    Do you know if Dr. Fonseca, at the time of the

21   examination, was familiar with any of the literature on

22   aviation psychology or aviation neuropsychology?

23             MR. HOLT:  Objection to form.

24             THE WITNESS:  I gave her some reading

25        materials.  And we talked in supervision about
```

Page 123

1        things, yes.

2    BY MR. AMLONG:

3        Q    How --

4        A    She was in training.  I don't dismiss that.

5    But she was supervised.

6        Q    Did she have sufficient preparation to serve

7    as an expert witness?

8            MR. HOLT:  Objection to form.

9            You can answer if you understand that.

10           THE WITNESS:  She could be an expert witness.

11   BY MR. AMLONG:

12       Q    With below over two months of being licensed?

13           MR. HOLT:  Objection to form.

14           THE WITNESS:  An expert in what matter?

15   BY MR. AMLONG:

16       Q    In the --

17       A    In this particular case?

18       Q    Yes.

19       A    Well, I would be the expert in this matter

20   because I was the supervising psychologist.

21           Could she be an expert witness in her own

22   right for other cases?  Sure.

23       Q    When did you get a copy of Dr. Knippa's report

24   from him?

25       A    He sent it from his office sometime later.  I

Page 124

1    don't recall exactly.  It was several weeks later, maybe

2    months later.  Long after I had finished working on the

3    case.

4         Q    Do you know why?

5         A    I think he withheld it because of the fact

6    that he was doing a fitness for duty for American

7    Airlines and he did not want to release it at the time,

8    out of concern for his -- for his referral on this.  I

9    don't know specifically.

10        Q    How did you get a copy of Lieutenant Colonel

11   Patterson's response to American's motion to extend time

12   to take depositions?

13             MR. HOLT:  I hand -- I handed it to him today.

14   BY MR. AMLONG:

15        Q    I thought you said you had seen this before.

16             MR. HOLT:  No.  I represented to him what it

17        was.

18             You can answer.  I'm just trying to save time

19        on that one.

20             MR. AMLONG:  Was this Exhibit 2 or 3?

21             MR. HOLT:  It was 3.

22   BY MR. AMLONG:

23        Q    Did you ever see Exhibit 3 prior to today?

24        A    Okay.  Let me see.

25             Yes, I have.

1       Q     When and where?

2       A     When I was preparing for today.  I looked up

3    some documents on CourtListener, which some of these are

4    available on the internet.

5       Q     Okay.  How did you know to look this up?

6       A     I do my homework; do a Google search.

7       Q     Okay.

8       A     I wanted to -- it's been two and a half years,

9    so I wanted to see what was available out in the

10   internet about this case.  So I did my homework.

11      Q     With whom -- with whom, if anyone, did you

12   speak with about this deposition before today?

13      A     No one.  Just my wife.

14      Q     Okay.

15            MR. AMLONG:  Go off for a minute.

16            THE VIDEOGRAPHER:  At 5:47 p.m., we're going

17       off the record.

18            (A brief recess is had from 5:47 p.m. to 5:52

19   p.m.)

20            THE VIDEOGRAPHER:  At 5:52 p.m., we are on the

21       record.

22   BY MR. AMLONG:

23      Q     Dr. Bercaw, do you have any more -- do you

24   have any notes about Lieutenant Colonel Patterson that

25   were not in the possession -- that were not left in the

Page 126

1    possession of MedPsych Systems?

2        A    No, I do not.  Other than the report and the

3    data, I don't have any records.

4        Q    Okay.

5        A    I left that all with Comprehensive MedPsych

6    Systems.

7        Q    Okay.  Thank you.

8        A    Okay.  Thank you.

9            MR. HOLT:  You have the right to read the

10           transcript of this deposition once it's prepared to

11           review it for any errors or changes and to note

12           those --

13           THE WITNESS:  Okay.

14           MR. HOLT:  This deposition has been

15           video-recorded.  You can either exercise your right

16           to read or you can waive.  If you decide that you

17           want to waive, now would be a good time to let our

18           fantastic court reporter know about that.  If not,

19           you're certainly welcome to read.  It's up to you.

20           THE WITNESS:  Okay.  I waive.

21           THE VIDEOGRAPHER:  At 5:53 p.m., this

22           concludes the deposition of Dr. Edwin Bercaw.  And

23           we are going off the record.

24           COURT REPORTER:  Mr. Amlong, did you want to

25           order a copy of the transcript?

Page 127

1              MR. AMLONG:  Did you order it?

2              MR. HOLT:  Yes.

3              MR. AMLONG:  Yes.

4              (Off the stenographic record.)

5              COURT REPORTER:  Did you need it expedited?

6              MR. AMLONG:  No.

7              (The reading and signing of this deposition is

8      waived.)

9              (At 5:53 p.m. the deposition was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 128

1                        CERTIFICATE OF OATH

2

3     STATE OF FLORIDA   )

4     COUNTY OF HILLSBOROUGH )

5

6          I, the undersigned authority, certify that

7     EDWIN L. BERCAW, PH.D. personally appeared before me and

8     was duly sworn.

9          WITNESS my hand and official seal this

10    19th day of August, 2018.

11

12

13    _____

            DAWN A. HILLIER, RMR, CRR, CLR

14          Notary Public - State of Florida

            My Commission No.:  FF 170625

15          Expires:  12-15-18

16

17

18

19

20

21

22

23

24

25

Page 129

```
 1                        CERTIFICATE

 2

 3    STATE OF FLORIDA   )

 4    COUNTY OF HILLSBOROUGH )

 5         I, DAWN A. HILLIER, RMR, CRR, CLR certify that I

 6    was authorized to and did stenographically report the

 7    deposition of EDWIN L. BERCAW, PH.D.; that a review of

 8    the transcript was not requested; and that the

 9    transcript is a true and complete record of my

10    stenographic notes.

11

12         I further certify that I am not a relative,

13    employee, attorney, or counsel of any of the parties,

14    nor am I a relative or employee of any of the parties'

15    attorney or counsel connected with the action, nor am I

16    financially interested in the action.

17

18         DATED this 19th day of August, 2018.

19

20

21    _____

                   DAWN A. HILLIER, RMR, CRR, CLR

22

23

24

25
```

## &

**&**   1:16 2:4,13 5:12

## 0

**0.0124.**   69:11
**00020**   9:15
**00027**   9:23
**00028**   9:17
**00029**   89:13
**00032**   89:13
**00037**   89:17
**00056**   89:21
**00070**   89:21
**00080**   90:7
**04**   42:22

## 1

**1**   3:7 9:9,10,13 10:2
  11:19,20 12:16,24
  13:8,15 30:4
  111:19,22
**1.70**   51:18,19
**10**   3:23 17:22 18:4
  68:23 69:8 79:19
  79:23 80:5,9 82:19
**100**   1:17 5:12 53:16
**101**   90:24
**103**   91:2
**104**   91:3
**10:45**   87:2
**11**   3:25 111:24
  112:2,5
**112**   3:25 4:1
**117**   4:3
**11:00**   87:2,3,11
**12**   4:1 63:22 111:24
  112:3,5
**12-15-18**   128:15
**128**   3:4
**129**   3:5
**13**   4:3 64:13 65:2
  117:5,6 118:8

**15**   12:21 13:4,6,10
  43:21,22,24,24
  44:20 45:8,15
  59:16 64:13 76:6
**15th**   12:2,8 43:3,8
  43:20 45:14,18
  46:3,8 49:24 70:22
  71:2
**16**   1:14 5:2 44:19
  77:2,9
**17**   3:8
**170625**   128:14
**189**   91:7,25
**19th**   128:10 129:18
**1:17**   1:3 5:10
**1:48**   1:15 5:2
**1st**   52:4,5 111:14
  111:16

## 2

**2**   3:8 17:13,16
  18:16 20:3,18
  26:10,20 35:4,5
  41:18,23 55:13
  56:24 60:23 80:6
  80:22 100:13
  111:20,22 124:20
**20**   11:19 12:24
**2006**   8:15
**2007**   8:15
**2009**   7:1,11,12
**201**   2:14
**2015**   13:6,12
**2016**   3:7,9,14,22,24
  9:2 17:19 36:2,11
  85:23 98:7,12
  109:4,21 111:16
  115:17 118:12
**2017**   98:23
**2018**   1:14 5:3
  128:10 129:18

**206**   2:9
**20th**   92:25
**21**   3:7,9,22 12:17
  13:2,8 52:8
**21st**   9:2,22 10:11
  17:19 85:23 112:25
**22**   13:16
**24**   119:4
**25**   76:1
**25th**   37:21 38:12
  38:18
**26**   12:24
**27**   3:10 10:2,7
**28**   9:24 10:2,13
**2900**   1:17
**2983057**   1:20
**29th**   36:11 37:3
  38:23 99:12 100:6
**2:47**   41:11,13

## 3

**3**   3:10 27:20,23
  28:1 29:25 124:20
  124:21,23
**3,250**   94:12
**30**   57:8
**305.358.5171**   2:15
**305.710.3713**   2:10
**31**   50:13
**3200**   2:14
**33131**   2:14
**33150**   2:9
**33301**   2:5
**33602**   1:17
**34**   53:14
**35**   3:13 57:8
**3530**   128:12 129:20
**37**   3:15
**3:50**   79:15,17

## 4

**4**   3:13,13 17:22
  35:14,16,22,25
  37:9 38:21 39:2
  95:11 99:10
**40**   44:20
**42**   50:15
**43**   52:15
**44**   53:21 64:19
**45**   26:12 43:1 54:12
  86:19
**459**   39:3
**48**   3:17
**49**   43:2
**4:05**   83:7,9
**4th**   36:2

## 5

**5**   3:15 20:2 30:6
  37:7,11,15,19
  38:10 45:15,16
**50**   44:25,25 45:1
**500**   2:5
**55**   29:11
**567**   95:9
**5:17**   112:12,14
**5:47**   125:16,18
**5:53**   1:15 126:21
  127:9
**5th**   43:4 44:5 45:8
  45:19,25 46:4,9
  70:22 71:2

## 6

**6**   3:3,3,17,24 20:3
  20:14,18 26:10
  48:3,4,6 50:14
  52:14
**60533**   1:3 5:10
**62**   3:18
**64b19-18.004**   30:6

| | | | |
|---|---|---|---|
| **67**  3:20 | **abuse**  119:15 | **administered**  13:25 | 79:6 |
| **7** | **acceptable**  122:2 | 18:23,24,25 19:21 | **agreed**  39:23 |
| **7**  3:18 26:20 41:24 | **access**  86:2 106:15 | 20:7,10,19,23 21:1 | **agreement**  91:24 |
| 42:6 62:2,4,7,19 | **accidentally**  56:14 | 21:6,8,21 22:2,14 | 92:2,20,22 93:4 |
| **70**  28:16 | **acclimate**  103:8,17 | 22:19,24 23:20,21 | **ahead**  73:19 88:17 |
| **78**  3:22 | **account**  46:21,21 | 23:21 24:2,4,14,23 | 101:5 102:13,16 |
| **79**  3:23 | 64:7,16,17 | 25:1,3,5,6 27:6 | **ahtone**  3:22 |
| **790.009**  30:4 | **accuracy**  46:2,20 | 35:11 36:3 90:6,22 | **air**  112:8 120:18 |
| **7:38**  100:7 | 46:22,24 47:6,16 | 95:11,14 96:9,12 | **aircraft**  54:24 79:8 |
| **7th**  91:19 | 49:10 53:8,9,12,15 | **administering**  23:9 | 79:9 |
| **8** | 53:16 54:10,20 | 25:10 | **airline**  71:12 73:2 |
| **8**  3:20 55:16 67:19 | 73:3 104:22 108:3 | **administration** | 106:19,22 107:3 |
| 67:22 | **accuracy's**  47:9 | 24:7 97:24 98:3 | 120:13 122:10 |
| **82**  90:18 | **accurate**  118:16 | **administrative** | **airlines**  1:7 3:10 |
| **83**  3:4 | **accusations**  121:19 | 30:6 | 4:3 5:6,23 6:11 |
| **84**  90:20 | **act**  30:4,10 | **adult**  14:25 22:23 | 82:10,21 92:21 |
| **85**  44:2 | **action**  30:19 | 89:9 | 113:3 115:21,25 |
| **9** | 129:15,16 | **advance**  57:16 | 116:6 117:8,25 |
| **9**  3:7,22 30:17 | **active**  73:2 | **ae**  69:10 | 120:21 124:7 |
| 56:25 58:10 78:6,8 | **activities**  32:7 | **aeromedical**  3:17 | **airman**  108:17 |
| **91st**  2:9 | **acts**  30:18 | 3:20 4:2 58:16 81:1 | 110:14 |
| **945**  93:10 | **actual**  47:23 51:10 | 109:25 111:4 | **airman's**  109:6 |
| **95**  44:6 | 70:13 | 112:20 | **airport**  86:20 |
| **954.462.1983**  2:6 | **adapt**  60:9 | **affect**  57:19 | **alarms**  64:16 |
| **9:00**  86:24 104:5 | **adaptable**  49:21 | **affiliations**  5:18 | **allow**  81:22 |
| **9:45**  86:25 | 110:23 | **affirmative**  4:11 | **alternate**  16:13,17 |
| **a** | **adaptive**  49:21 | **affirmatively**  78:24 | 16:19,22 |
| **aa**  117:18 | **add**  45:20 | 79:7 | **alternative**  14:19 |
| **abilities**  51:15 60:7 | **added**  90:22 | **affirmly**  79:11 | **altogether**  45:21 |
| 118:21 | **addition**  15:9 24:25 | **afraid**  106:3 | 86:16 |
| **ability**  32:11 66:9 | 70:20 87:20 88:2 | **afternoon**  5:1 6:8,9 | **american**  1:7 3:10 |
| **able**  15:11 51:14 | **additional**  8:11 | 41:3 83:15 86:14 | 4:3 5:6,22 6:10,15 |
| 57:22 60:8,9,9,11 | 45:15 61:4 | 87:7 89:2,10 103:3 | 7:22 82:10,21 |
| 107:4 118:4 | **additionally**  26:23 | 104:12 | 92:21 113:3 115:21 |
| **abn**  98:14 | 27:2 | **age**  57:25 71:12 | 115:25 116:6 117:8 |
| **abnormalities** | **address**  99:18 | 107:1 | 117:24 124:6 |
| 76:14 77:21 | **addressed**  100:5,10 | **ages**  43:1 71:10 | **american's**  124:11 |
| **abpnn**  98:14 | **administer**  19:23 | 106:25 | **amlong**  2:4,4,4 3:4 |
| | 22:20 23:1,6,23 | **ago**  89:7 | 5:19,19 9:4 20:13 |
| | 25:15 26:3 29:9,12 | **agree**  11:14 28:24 | 21:12 23:2,16 |
| | 29:16 40:22 | 39:23 77:11 78:14 | 24:11 25:17,22 |

26:7 29:17 30:12
31:9,12,16 34:2
37:11 41:8 42:3
63:14 66:22,24
69:7 70:5 71:18,21
71:24 72:5 73:17
76:25 77:3,16,23
78:17 82:6,12 83:6
83:14 84:23 86:5
87:22 88:4 91:14
92:12,14,16 94:1,8
96:18 97:5 101:15
103:21 104:3,8,24
105:9,21 106:5,10
108:1,6 109:2,9
111:13,15,23 112:1
112:6,18 113:7
114:3,19 115:1,5,8
115:11,13 117:7,17
118:1,6,12 119:1
120:7 121:18 122:1
122:19 123:2,11,15
124:14,20,22
125:15,22 126:24
127:1,3,6
**amount** 46:17
93:20
**analysis** 52:24
70:21 71:3 72:19
107:11
**answer** 4:7 9:4,7
53:25 54:4 72:11
77:18 86:1 106:4
123:9 124:18
**answered** 83:2
87:16 97:1
**anticipating** 102:3
**anticipation** 85:16
101:13,24
**anybody** 93:1
94:19

**anymore** 86:3
106:16
**anyways** 55:5
**apologize** 37:13
115:7
**apparently** 86:21
**appear** 13:22 18:5
18:16 23:25 37:19
53:18 63:23
**appearance** 26:17
**appearances** 2:1
5:18
**appeared** 43:2,15
128:7
**appearing** 52:24
**appears** 12:1 35:18
38:20 39:3 50:17
**appointment** 19:1
26:13 86:23
**appointments** 85:2
**appreciate** 32:21
**appropriate** 19:22
31:7 38:4
**approximate** 86:17
**approximately**
86:12 97:20 119:4
**april** 36:11 37:3,21
38:12,18,23 99:12
100:6
**area** 50:7 56:23
84:2
**areas** 58:15,18
59:25 80:16 85:14
**arrive** 103:20
**arrived** 26:12
86:18
**arriving** 103:1,1
**articulate** 102:5
**ascertain** 122:7
**aside** 27:11

**asked** 16:11 32:15
33:13 57:21 64:12
87:15 92:23,24
93:1,2 96:25
105:24
**asking** 21:12,15
31:16 48:9 96:7
**asks** 30:12,13
**aspect** 80:20
**aspects** 107:17
**assertions** 117:22
**assess** 69:24
**assessing** 14:14
**assessment** 3:20,25
14:18 71:20
**assist** 32:11 34:24
**assistant** 29:11,15
98:2
**assisted** 29:1,3
**assisting** 31:1
**associates** 93:22
**assumed** 11:8
102:1
**assumes** 91:12
**assuming** 38:4,8
86:23
**asterisk** 50:17
**asterisks** 52:15
**attending** 5:20
**attention** 14:21,21
48:15,19 49:13,14
53:6 55:18,20,25
56:2,4 58:19 59:5
60:3,8 66:13 69:23
69:24 70:10 75:15
80:23 104:21
108:12 109:14
114:8 116:13,22
**attorney** 2:12
129:13,15

**attorneys** 2:3
**attribute** 50:18
58:21 73:23 109:15
114:9 116:25
**attributes** 59:25
69:25 108:19
110:16
**atypical** 73:1
**auditor** 14:23
**auditory** 15:9,18
22:13 24:25 56:2,2
56:4,5,19 59:15
63:4,8 75:17,17
88:2 105:7
**august** 1:14 5:2
91:20 92:25 128:10
129:18
**authenticity** 117:11
**authoritative** 110:3
**authority** 128:6
**authorization** 3:15
36:17 38:8
**authorizations**
38:4
**authorized** 129:6
**automated** 24:18
**automatic** 22:18
97:10
**available** 41:4
111:7 114:2 122:7
125:4,9
**average** 43:2,16
44:25 45:1 46:2
51:19 53:9 56:1
63:7 64:21 65:1
69:21,22,23 70:7
71:15,16,17 72:15
72:15,16,22,22
74:1
**aviation** 51:5 60:1
70:18 73:22 95:24

96:2,5 107:8 116:9
118:19 122:13,22
122:22
**aviators** 110:20
**avlt** 16:16 63:22
107:24 108:2,5,8
**aware** 111:10,17
113:25 114:20

**b**

**b** 114:12
**back** 9:5,6 12:23
19:5 21:20 27:11
38:21 41:18 55:13
57:14 72:8,10 77:7
82:12 87:4
**background** 6:12
6:18 19:2
**backup** 121:20
**backward** 53:21
54:2
**backwards** 54:1
**bacon** 1:16 2:13
5:12
**bad** 49:5 52:8
121:9
**balance** 54:19
**ball** 39:8
**baltimore** 8:14
**barriers** 26:16
**base** 43:11,18
52:24 70:20 71:4
72:18 107:10
**based** 13:12 17:18
23:7 24:19,21 28:6
34:11 42:17 81:9
89:4 109:8,10
112:25 113:8
118:22 119:18
**basic** 8:9 122:5
**basically** 22:8
33:16

**basics** 43:7
**basing** 118:18
**basis** 23:5 31:18
40:15 79:3 103:13
120:5
**bates** 9:13 12:17
13:16 17:21 18:1,4
20:2,3,14,18 26:10
26:20 41:24 42:3,6
50:15 52:14 53:21
54:12 55:16 56:25
58:10 63:22 65:2
68:23 69:8 76:6,25
77:2,9 89:13,21
**battery** 14:11
23:19 55:4,11 62:9
88:18 95:15,20
96:1
**began** 87:10 88:9
97:7 104:9,11
105:22 108:16
**beginning** 97:12
115:16
**begins** 26:23 28:3
58:9 69:17
**behalf** 1:13 5:20,22
**behavioral** 26:10
**believe** 9:2,22
12:12,20 30:3 32:5
33:7,12,14 35:4
40:24 59:6 66:12
73:5 74:10 75:1
86:13 88:9 92:24
94:12 100:23
101:18 107:18,21
108:2 114:16
115:19
**believed** 116:3
**bercaw** 1:12 3:3,13
5:4 6:1,13 9:12,15
12:17 13:16 17:22

28:5 36:17 39:7
40:21 41:24 79:23
83:15 89:13 112:19
125:23 126:22
128:7 129:7
**bercaw's** 3:7,8,23
**best** 50:4 64:14
**better** 17:11 25:13
43:21,22 44:3,7
48:2,10 64:19
70:14 116:23
**biased** 102:10
**bill** 84:16 94:3,6
**billed** 93:6,18,23
94:2,5
**billing** 94:9
**biscayne** 2:14
**bit** 53:14 60:3
85:12 95:9
**bnt** 15:6,7
**board** 6:15,16 7:16
7:17,18,20,22 8:1
28:20,20 29:2,4
30:5 98:16,18,19
98:22,25
**boards** 7:25
**bolded** 97:9
**bolivia** 12:21 13:3
13:9
**booklet** 94:21
**borderline** 72:22
**boring** 56:8 76:1,2
**boss** 40:7 102:11
**boston** 15:7 23:24
87:19,23 90:14,17
**bottom** 9:14 12:18
13:9 36:10 52:3
55:16 58:1,9 63:22
68:23 69:1,17
75:22 90:17,21

**boulevard** 2:14
**boundary** 49:1,3
**box** 49:9 75:21,22
**brain** 42:14 85:5,17
**break** 27:13,14
41:6,10 67:17 83:5
83:6 112:10
**brief** 41:13 57:18
79:17 83:6,9
112:14 125:18
**briefing** 3:12
**briefly** 14:5 40:20
65:4
**broke** 12:20 13:3,9
**broken** 19:18 107:1
**brought** 99:23
**busy** 97:4

**c**

**c** 2:8 5:19
**caddy** 3:13,24
32:24 33:1,5,11
34:5,17 35:10,19
36:23 37:5,22 38:4
38:12,18,23 39:7
40:11,13,17 80:2
100:3,11
**caddy's** 34:3 37:3
38:15 100:6
**calendar** 86:3
**california** 103:1
104:5
**call** 9:23 10:3 33:6
33:8,10 34:22
35:10 36:23,25
**called** 6:2 29:20
76:7
**candidacy** 109:18
**capabilities** 104:21
**capable** 78:3,24
79:8

**capture**  76:3
**car**  12:21
**card**  24:3,8 58:23
  65:3,24 67:4 96:9
**cards**  65:6,7,9,13
  65:18
**care**  81:21
**career**  83:20
**carrier**  43:1 71:10
  120:13 122:9,10
**carry**  82:3
**case**  1:3 5:9 8:3,19
  19:16 23:12 27:25
  30:9,16 35:6,12
  40:19 41:19 46:6
  46:18 53:10 55:9
  56:8 57:15 59:23
  60:17 61:17 65:12
  72:5 79:7 88:17,21
  89:7,8 91:11,16
  97:3 100:17,23
  109:23 117:2
  123:17 124:3
  125:10
**cases**  16:13 19:4,17
  19:19 55:6 74:2
  88:15 98:9,11
  108:25 123:22
**categories**  47:16
  66:3
**category**  66:4,6,8
  114:10
**caught**  66:6
**cause**  61:6 85:6
**cc'd**  36:11 37:4
  100:7
**center**  6:22 8:15
  49:8,11
**certain**  46:17 48:18
  100:19

**certainly**  11:17
  55:1 122:3 126:19
**certificate**  3:4,5
  11:5,10 34:1
  101:12,17,19,21
  109:6 128:1 129:1
**certification**  81:19
  98:25 108:18
  110:15 120:17
**certified**  6:15 28:20
  98:16,18,22
**certify**  128:6 129:5
  129:12
**chain**  3:13 35:17,22
  36:10 39:3
**chance**  112:19
**change**  88:19 89:4
  107:10
**changes**  60:9 65:14
  65:18 67:17 75:23
  126:11
**charge**  92:7
**check**  23:11 91:18
  99:4 100:24 106:16
**checked**  90:25
**chose**  12:9
**chronic**  103:13
  105:19
**circadian**  103:12
**circle**  67:15
**clarification**  97:10
**clarity**  18:1
**class**  101:12,17
  109:6 120:18,18
**classic**  65:5
**classified**  114:17
  114:24
**clear**  20:17 81:8
  102:2
**click**  75:20,21

**clicker**  75:20
**clients**  11:18
**clinical**  6:14,16,23
  8:2 9:21 12:25 13:5
  13:11 21:1,13,16
  21:21,22,24 28:19
  28:20 55:1
**close**  68:8,18
  102:12 113:23
**closer**  42:21
**clr**  1:18 128:13
  129:5,21
**cmps**  37:24
**coast**  103:2
**code**  30:6
**cognitive**  58:11
  59:24 60:7 76:7
  85:4 108:18 110:15
  116:2 118:21
  119:22
**cognizant**  74:15
**cogscreen**  3:17 4:2
  14:10 18:24 22:2,6
  42:7,9,17 44:14
  47:24 48:8 54:22
  55:3,6,10 58:22
  62:16 66:10 67:4
  67:13 69:10 72:17
  73:15,25 87:18,23
  88:10,16 89:10
  95:25 96:3 97:6,18
  103:3,9,15 104:12
  104:14,15 105:2,10
  105:23 106:18
  108:21,23 109:8
  110:6,18 111:19
  112:5,20,23
**collect**  29:12
**collection**  42:9
**college**  6:20

**colonel**  28:6 32:14
  32:15 34:13 48:7
  86:10 87:11 95:20
  96:14 97:7 99:12
  99:19,25 100:8
  101:11 102:14,17
  104:25 105:12
  106:17 107:13
  109:4 111:10 113:2
  114:5 115:16,20
  118:9 119:18
  122:14 124:10
  125:24
**color**  65:8 87:21
  91:3
**combined**  49:6
**combines**  46:19
**come**  8:22 15:13
  27:11 87:4
**comes**  53:4
**comfort**  75:9
**coming**  34:20 35:13
  120:16,20
**comment**  70:14
**commenting**  116:6
**commission**  128:14
**commit**  107:5
**common**  44:15
**commonly**  15:3
**comp**  85:12
**companies**  94:6
**company**  18:9
  39:13 40:7 84:6
  85:10 93:16 94:13
**comparable**  71:5
**compare**  70:18
  117:15 118:4
**compared**  73:1
  74:4
**comparing**  67:3

[comparison - couple]                                                    Page 135

**comparison** 43:1 44:6 48:22 71:7,9 75:3 82:8,20 110:20 111:5
**competence** 8:2,7
**competent** 29:8
**complaining** 99:13
**complaints** 102:7 121:5,13
**complete** 8:13 29:5 42:10 129:9
**completed** 27:3 36:6 40:18 66:8
**completely** 96:5 109:18
**completes** 25:8
**complex** 96:4
**complying** 102:8
**component** 51:15 60:7
**comprehensive** 8:24 38:7 83:16 98:13 100:25 126:5
**comprised** 50:23 84:20
**compute** 51:21
**computer** 14:16 21:8 22:19 24:15 24:19,21 87:18 88:22 89:5 96:12 97:11 106:15
**computerized** 14:11 22:16 42:10 106:7
**concentration** 15:11
**concept** 45:1
**concepts** 69:25
**conceptual** 114:11
**concern** 56:23 60:1 80:16 99:20 101:11

109:16 110:23 114:15 122:5 124:8
**concerned** 53:11
**concerning** 94:10 102:18
**concerns** 12:14 32:11 109:12 113:14,18,21 119:19,20,21 121:4
**concluded** 127:9
**concludes** 126:22
**conclusion** 66:20 78:15 79:10
**conclusions** 19:7 67:1
**concurrent** 82:9,20
**condition** 49:16,18 50:23 66:13 116:9
**conditions** 49:15
**conduct** 16:8
**conducted** 16:9 28:18
**conference** 118:20
**confidence** 75:11
**confidential** 3:15
**confirmation** 38:11
**connected** 129:15
**consented** 99:21
**consider** 55:1 61:12 75:8 110:3,5
**considered** 49:4 60:6 64:25 67:17 73:1
**considering** 57:23 81:6
**consistencies** 113:20
**consistency** 56:12 56:16
**consistent** 29:14 56:16 61:5 66:16

66:18 79:2 80:21 80:24 97:25 108:13 111:25
**consistently** 7:12 60:8
**constitute** 30:18 116:11
**construct** 51:13
**consultant** 81:11 81:16
**consultants** 60:16
**consultation** 39:13 60:15 101:24
**consulting** 102:11
**contacted** 91:10,15 91:21
**contacting** 40:7
**contain** 36:20
**contains** 35:17 100:7
**context** 81:2
**continue** 3:11
**continues** 58:6
**continuous** 14:22 22:14 56:1 59:6 75:17
**contract** 93:16
**contrary** 81:22
**control** 48:16 49:3 120:19
**conversation** 10:8 10:21 34:11 80:3
**converse** 47:4
**coordinated** 49:8
**coordination** 49:6 49:11 74:1
**copied** 99:13
**copy** 37:5 38:18 60:23 61:14 89:11 92:4,12,17 93:6 109:25 123:23

124:10 126:25
**cord** 85:18
**core** 55:4,11
**corner** 9:14
**corporation** 1:7 5:7
**correct** 10:4,11,23 11:7,12,13 16:1 17:19,20 18:11 23:13 27:17 31:6 32:4,7,8 35:19,20 36:24 38:16,19,25 40:12,16,17,23,24 44:3,7 45:4,9,10 46:17,18 47:2,3 49:18 51:22 52:9 53:25 54:4,20 55:11,12 58:7 59:3 63:2,9 64:22 68:10 71:3 73:9 75:5,6 78:16 81:16 82:4,5 82:11 89:22 95:21 95:22 96:19,20 105:3 106:19,20,23 107:7 113:3,5 114:20 121:22
**correcting** 50:4
**correctly** 43:5 63:25 79:4 111:8
**corresponding** 64:4
**corresponds** 44:19 44:20 45:3 50:13
**counsel** 5:5,17 26:5 27:24 41:6 117:10 129:13,15
**count** 71:13 119:8
**county** 128:4 129:4
**couple** 11:22 43:10 43:14 49:14,17 52:15 59:25 98:9 99:6 119:3

**course** 18:18
**court** 1:1 5:8,14,24
6:5 9:6 27:25 30:17
72:10 126:18,24
127:5
**courtlistener** 125:3
**cover** 37:20,22
**covers** 101:21
**credential** 8:11
**credentialing** 8:1
**credentials** 4:4
117:18
**critical** 36:20
110:25
**critiquing** 34:12
**cross** 3:4 83:13
**crossing** 103:11
**crr** 1:18 128:13
129:5,21
**current** 91:6,7
**cursor** 48:16 49:2
**customarily** 88:11
88:13
**customary** 38:6
86:24 93:21
**cv** 1:3 5:10

**d**

**d** 1:10,10
**data** 29:12,23 61:4
61:13 62:10 75:12
81:22,23,25 82:2,3
82:4 110:13 111:3
126:3
**date** 1:14 3:13 9:3
10:7 35:25 37:3
68:5,12,13 78:1
91:18 92:25 100:14
100:16
**dated** 3:9,22,24
37:21 129:18

**daubert** 3:11
**dave** 2:21
**david** 5:13
**dawn** 1:18 5:15
128:13 129:5,21
**day** 9:1,21 19:20
31:25 32:4,10 41:4
84:24 85:22 86:4,7
90:3 96:23 99:20
103:1,2,20,22
104:1 105:22
128:10 129:18
**daylight** 103:23
**days** 28:16 68:2,4,6
68:7,7,9 70:4 74:8
83:25 100:17
**dead** 112:8
**deal** 23:14
**dealing** 43:11
56:15 57:7
**decide** 126:16
**decision** 12:11
118:17
**deck** 65:6
**deductive** 58:18
110:20,21 117:1
**deep** 85:17
**defendant** 1:8,13
2:12 5:5
**defendant's** 100:13
111:19,20,22
**defense** 99:10
**defensive** 120:2,8
**definitive** 74:17
109:23
**definitively** 78:2
109:21,22
**degree** 6:19 67:7
104:16
**delaware** 1:7 5:7

**delay** 57:19 59:17
**delegating** 30:20
**dementia** 85:5
**denial** 30:19
**department** 7:18
**dependent** 107:9
**depending** 8:4
38:16
**depends** 55:9 88:19
**deposition** 5:4,11
9:13 27:16,23
32:17,22 35:17
37:10,16 67:22
72:4 79:24 92:8
93:3,7,7 125:12
126:10,14,22 127:7
127:9 129:7
**depositions** 3:11
124:12
**describe** 44:23
**described** 15:24
**description** 78:4
79:1 102:21 118:24
**designed** 8:1 69:24
**desk** 61:18
**detailed** 33:21
**details** 102:22
103:4 111:17
121:15
**determination**
54:23
**determine** 82:22
111:4
**determined** 51:8
**determining**
113:15
**detroit** 6:21
**develop** 69:25
**developed** 51:7
110:9

**deviation** 43:13
**deviations** 51:19
57:9
**diagnosing** 120:5
**diagnosis** 85:11
**diagnostic** 76:12
77:11
**dichotic** 14:23
**difference** 74:3,21
**differences** 73:6,11
**different** 7:25
12:23 16:21 18:2
42:15 43:18 49:14
49:17 61:25 71:7
74:9,10,13,13 79:9
96:6 107:4
**differently** 78:19
**difficulty** 11:21
56:3 114:13
**digit** 53:21
**digits** 53:23,24
74:12
**direct** 3:3 6:6 76:17
97:21 108:22
**directed** 9:6 72:10
100:2,3
**directly** 7:19
101:20
**disagree** 39:24,25
**disappears** 53:3
**discern** 67:6
**disciplinary** 30:19
**discovery** 49:12,15
49:18 50:23 66:10
66:13 67:4
**discriminability**
64:15
**discrimination**
15:21
**discuss** 19:17 33:12
35:11 99:25 100:11

discussed 52:25 62:16 102:23
discussing 19:6
dismiss 109:18 123:4
disorder 119:23 120:5
displayed 56:3
dispute 40:10,15
disqualify 80:17
disqualifying 116:8
distilling 51:13
distractibility 56:5 76:4
distribution 44:23
district 1:1,1 5:8,8
divided 48:15 69:22
division 1:2 5:9 81:20
divisions 8:4
doc 7:3 8:18 23:15 29:5 93:17
doctor 115:6
doctoral 18:7,9
doctorate 6:19 8:16 29:13
doctors 38:3,8
document 17:15,16 17:22 18:5 27:24 42:7 67:23 79:24
documentation 121:22
documented 122:4
documents 81:18 89:12 125:3
doing 50:5 53:18 59:2,3 65:21 66:4 84:3,20,21 85:1,16 88:18 94:13 96:21 96:23 98:9 105:7

124:6
dominant 97:17
double 23:11
dozen 119:3
dr 3:7,8,13,13,20 3:22,22,23,23,25 4:2 5:4 9:12 12:9 15:25 16:24 18:15 18:20 19:22 21:4 21:24 22:20,25 23:5 24:5,6 25:9,14 26:2 28:5,7,11,15 29:2 30:24 31:20 32:24 33:1,5,11 34:3,5,17,18,24 35:10,19 36:17,23 37:3,5,22 38:4,12 38:15,18,23 39:7,7 40:7,11,13,17,21 60:24 61:3,15,19 61:23 68:23 69:10 72:14 73:7 78:15 78:22 79:23 80:2 82:11,24 83:15,25 87:7,10 89:14,18 89:22 93:12 94:16 95:11,14 96:9,14 98:9,12 100:3,6,11 100:14 102:12,19 104:1 105:1 106:18 106:21 107:2 110:5 111:16 112:19,21 113:9,13 114:4,22 114:23 115:3,14 116:14,15 122:20 123:23 125:23 126:22
draft 19:1
draw 67:1
dual 48:14,21,23 48:24

duly 6:2 128:8
duties 31:6,7 116:5 118:7
duty 3:20 11:3 12:13 68:1 73:2 82:9,21 101:20 109:21 111:6 113:2 113:11,16 114:6,17 115:17 119:7,10,14 119:18 120:12,23 124:6
dysfunction 42:14

**e**

e 1:10,10
earlier 65:4 73:5 74:8,25 102:21
early 103:17,20
easier 51:24,25 52:13
east 103:2
edge 49:4
edited 19:2
edition 3:17 4:2 112:20
educational 6:12 6:18
edwin 1:12 3:3 5:4 6:1,13 126:22 128:7 129:7
effect 17:3,4 116:19
effects 27:6 61:9 68:20
efficiency 46:16
efficient 46:20
effort 26:22
eight 105:18
either 28:19 33:19 74:18 81:17 94:21 105:1 117:23 120:17 126:15

el 2:9
eligible 28:20 29:2 29:4 98:19
email 3:13 35:17,18 35:21,22,24 36:1,7 36:10,11,15,23 37:4 38:15,22,23 38:23 39:3,6,21 100:8
emergency 118:16
emotions 85:7
employed 93:13,13 93:15
employee 129:13 129:14
employer 11:7 120:23 121:3,8,17
employer's 121:5
employment 93:16
enter 62:10 95:1,3 95:5
entire 55:11
entirely 81:8 109:13
entitled 20:19 26:22 42:7 58:2
equal 43:22
error 49:20 50:2 65:15
errors 50:1 51:3 59:1 66:1,1,7,11 67:7,8 126:11
especially 103:13
esquire 2:4,8,13
essential 51:13 78:3,25 79:12 115:20,24
essentially 39:22 42:14 45:15 62:11
establish 8:2,7

**establishing** 8:9
  31:18
**estimated** 42:13
**ethically** 28:4
**eval** 10:15
**evaluate** 82:2
**evaluated** 78:1
  79:6 113:22
**evaluation** 3:8 8:23
  9:1,21,23 10:22,25
  11:3,5,15,17 12:13
  12:15 17:18 18:18
  18:21 27:4,5 28:25
  29:3 30:8 31:1
  32:12 33:15,16,18
  33:24 34:6,9,12,24
  35:6 40:1,5,18
  60:24 68:2,7,9,15
  77:15 81:2 82:9,21
  84:17,21 94:13
  101:6,20 102:4,8,9
  102:15,23 104:1
  111:6 113:17,19,24
  113:25 116:2,3,15
  116:16
**evaluations** 28:18
  68:17 85:2,5,10,13
  85:15,16 94:7
  102:13 113:23
  117:3 120:19,23,25
  121:6
**evening** 104:4
**evidence** 107:22
  114:14
**evidenced** 110:19
**exact** 10:1 40:8
  91:18 116:18
**exactly** 54:6 71:5
  124:1
**examination** 3:3,4
  6:6 8:7 10:3 78:23

83:13 113:1 122:21
**examinations**
  119:2 120:12
**examined** 6:3
**examinee** 14:24
  22:12 25:8 48:16
  65:9,16 94:22
  97:15
**examiner** 22:10,11
  65:14 90:1,3
**example** 46:19,23
  54:5 62:19 76:13
**excuse** 32:14
**executive** 80:20
  109:14 116:12
**exercise** 126:15
**exhibit** 3:7,8,10,13
  3:15,17,18,20,22
  3:23,25 4:1,3 9:9
  9:10,13 10:2 11:19
  11:20 12:16,24
  13:8,15 17:13,16
  18:16 20:3,18 26:9
  26:10,20 27:20,23
  28:1 29:25 35:4,5
  35:14,16,22,25
  37:7,9,15,19 38:10
  38:21 39:2 41:18
  41:23 48:3,4,6
  50:14 52:14 55:13
  56:24 60:23 62:2,4
  62:7,19 63:9 67:19
  67:22 78:6,8 79:19
  79:23 80:5,6,9,22
  82:19 99:10 100:13
  112:2,3 117:6,11
  118:8 124:20,23
**exhibits** 3:6
**expect** 43:19 56:23
  57:17 74:6,16

**expectations** 46:7
  54:9,21 57:16 73:1
  80:19
**expected** 17:6
  43:10,17 51:3
  58:15 66:2 114:10
**expedited** 3:12
  127:5
**experience** 23:7,14
  30:23,25 31:5,10
  102:18
**expert** 40:12 91:11
  110:5 123:7,10,14
  123:19,21
**expertise** 8:9
**expires** 128:15
**explain** 48:11
  94:18 97:6
**explanation** 14:8
**explicitly** 11:16
**exposure** 17:7,8
  61:11
**express** 34:22
**expressed** 104:25
**extend** 124:11
**extension** 3:10
**extent** 93:3 100:19
**extra** 52:5

**f**

**f** 1:11
**faa** 14:12 16:10
  55:6 60:15 81:11
  81:16 85:13 100:20
  100:22 101:2,6
  108:23 110:13
  111:3 119:2
**fact** 29:10 31:4
  99:23,24 124:5
**factor** 50:18,22
  51:12 60:2 73:22
  73:23 74:22 95:24

**factors** 42:23 51:5
  51:6,8,12
**facts** 91:13
**failed** 67:12 99:7
**failure** 67:10,18
**fair** 71:14,20
**falling** 43:3,4,17
  46:3 57:8
**false** 64:9,10,16,17
**familiar** 17:8,10
  24:9 74:14 95:18
  115:24 122:21
**familiarity** 103:7
**fantastic** 126:18
**far** 6:18 92:3 93:10
  103:18 112:25
**fatigue** 108:9
**favor** 102:4
**favorable** 81:23
  108:21 110:18
**favored** 14:11
**fax** 3:15 37:20 38:7
  38:11,15 81:18
**features** 116:2
**federal** 116:9
  122:13
**fee** 39:12 84:18
  94:12
**feedback** 59:2
  65:10 85:2 110:24
**feel** 39:15 99:15
  100:9 113:19
**feeling** 105:6
**fell** 43:12 45:18
**fellow** 18:8
**fellows** 18:9 19:9
**fellowship** 6:20,25
  18:13 19:13 93:17
**felt** 34:12 83:20
**ff** 128:14

**field** 8:2,9 65:5
97:22 110:6
**fifth** 55:14
**fight** 12:9,11,13
**figure** 45:11 49:19
51:14 65:12,17,21
67:14,15 96:4
**figured** 66:3 67:11
**figuring** 49:21
65:15
**file** 3:11 90:9,9
**filed** 5:7 27:25
**final** 57:12 76:10
101:4
**financially** 129:16
**find** 40:4,9 109:3,3
109:13 116:14
119:17 120:4 121:4
**finding** 50:4 59:2
61:8 80:24 110:21
113:10 116:21
117:1
**findings** 60:19 61:5
61:23 69:2 73:7
76:7 81:1,8 100:22
101:1 110:23
**fine** 39:8 41:8 55:6
108:23 112:11
**finger** 15:20 23:25
87:19,24 90:14,20
97:16
**finish** 63:15
**finished** 100:20
124:2
**finishing** 7:2
**firm** 5:13,15 92:25
103:18
**first** 6:2 7:9 8:25
11:20 14:10 23:15
26:11 30:1 31:22
35:25 36:14 40:17

42:11 50:18 52:19
55:23 57:22 60:13
62:18 66:4 88:24
89:1,9 95:16 99:10
101:12,17 102:3
109:6 120:18
**fit** 47:16 54:24
109:21 113:2,11,15
114:6,17,25,25
115:1 119:6
**fitness** 3:20 11:3
12:13 68:1 82:9,20
101:20 111:6
119:18 120:12,23
124:6
**five** 28:1,3 41:10
45:21 50:14 57:22
57:24 62:19 69:20
75:14
**flash** 56:9,11
**flat** 84:17
**flexibility** 114:13
**flexible** 65:19
110:24
**flight** 51:16 110:25
**flip** 44:2
**flipping** 76:18
**florida** 1:1,17,19
2:5,9,14 5:8,13
6:14 7:6,10,13,15
30:5,6 128:3,14
129:3
**fly** 11:12
**flying** 13:5,11,12
76:14 77:22 118:22
**follow** 59:20 74:19
75:2 77:15 87:8
**followed** 9:22
33:15
**following** 8:16
30:18 64:15 80:2

103:3
**follows** 6:3
**fonseca** 18:6,20
19:22 21:4,24
22:20,25 23:5 24:5
24:6 25:9,14 26:2
28:7,11,15 29:2
30:24 31:20 34:18
34:24 40:22 61:3
83:25 87:7,10
89:14 93:12 94:16
95:11,14 96:9,14
98:9 105:1 106:18
122:20
**fonseca's** 18:15
89:18,22 100:14
**foot** 12:20 13:3,9
**footnote** 30:17
**forgot** 27:13
**form** 15:18 16:13
16:17,19,22 31:15
63:14 71:18,21,23
71:25 77:16 78:17
84:22 85:25 87:15
89:20 91:12 93:24
94:4 96:17,25
101:14 103:10,24
104:18 105:4,14,24
106:9 107:20 108:4
109:1,7 113:4,12
118:13 120:1
121:11,21 122:16
122:23 123:8,13
**fort** 1:2 2:5 5:8
84:1
**forth** 19:5
**forward** 81:12
**forwarded** 36:22
81:14 99:14 100:4
**forwarding** 99:14

**found** 70:11 71:1
71:14 114:7,8
119:6,10
**foundation** 23:2,16
24:11 25:17 29:17
31:9 66:22
**four** 41:25 42:1,1,2
42:6 53:23 54:3,4
59:17 63:7 65:7
68:6,6,7,9 70:4
74:7 89:21
**fourth** 2:5 26:23
41:23
**fracture** 13:13
**francy** 40:21
**frequent** 75:23,24
**front** 35:5 73:10
99:11
**fuhrmann** 2:21
5:13
**full** 30:1 32:1,3,9
94:13
**fully** 84:8,12
**functioning** 80:20
116:13
**functions** 78:3,25
79:12 115:21,25
117:8
**further** 60:14
66:21 77:15 80:17
81:12 83:4 109:19
110:12 111:2
113:22 129:12

|  | g |  |
|---|---|---|

**garden** 15:16 17:1
**gary** 3:25 4:2
112:21 113:24
115:14
**gauge** 61:9
**general** 56:20
118:15,25

**generally** 7:21 42:8 80:1,21 107:15
**getting** 50:3 59:1 120:20
**give** 11:17 16:14,16 16:22 17:2,9 29:22 47:19 75:9 83:6 93:5 101:4 102:20
**given** 16:23 65:10 76:12 77:14 93:19 94:16 103:2 121:1
**gives** 42:20 44:14 46:11,19 48:24
**giving** 95:17
**glancing** 112:22
**glenn** 3:23 32:24 33:1
**gmail.com** 2:10
**go** 20:9,22 21:20 38:21 59:9 73:19 77:7 79:14 80:25 85:3 88:17 95:1,6 101:5 102:13 112:7 125:15
**goes** 28:17 30:20 39:14 72:25
**going** 5:2 11:22 13:7 17:25 19:19 32:19 33:13 41:11 48:3 79:15 83:7 92:7 102:4 112:12 117:10 118:19 125:16 126:23
**golden** 37:23
**good** 5:1 6:8,9 41:5 42:22 49:11 53:12 53:15 78:19 83:15 121:23 126:17
**google** 125:6
**gotten** 74:10

**graduate** 23:14
**great** 23:13
**grooved** 24:22 87:20 88:8 90:24
**grounds** 30:18
**group** 43:1,19 44:6 44:10 71:8,9 107:3 107:10
**groups** 107:2,4
**growing** 97:22
**guess** 86:25 87:6 91:19
**guideline** 19:14 103:18
**gun** 12:14 102:6

## h

**half** 33:9 50:12 57:9 89:7 98:2 125:8
**halfway** 13:17
**hand** 47:23 94:23 95:5 97:17 101:19 124:13 128:9
**handed** 9:12 17:15 27:22 35:16 37:9 37:15 40:21 62:5 67:21 79:23 96:15 124:13
**handing** 25:11
**handwriting** 11:21 89:14,15,18,23 90:5,12,21 91:2,4,4
**handwritten** 10:13
**happen** 37:13
**happening** 88:20
**happens** 49:16
**hard** 113:16
**hardy** 1:16 2:13 5:11
**hat** 15:16 17:1

**hate** 11:20
**headphones** 14:25
**health** 7:18 101:22
**heard** 40:17 56:10 94:18
**held** 5:11
**help** 29:15 48:10 61:9 73:10 82:21
**helpful** 14:6 47:20 47:23 60:14 61:13 111:7
**high** 46:23 47:6,9
**higher** 17:6 69:21 69:21 108:3
**hillier** 1:18 5:15 128:13 129:5,21
**hillsborough** 128:4 129:4
**hired** 12:14 102:6
**history** 19:2 33:13 33:22 36:20 81:4,7 86:13 97:3 121:4 122:6
**hits** 49:1,3 64:16
**hitting** 49:8,11 53:17
**hmm** 92:14 111:13
**hold** 54:1
**holt** 2:13 3:3 5:22 5:22 6:7,10 9:8,11 17:14 20:14,15 21:14,17 23:4,18 24:16 25:20,23 26:1,5,8 27:21 29:24 30:15 31:11 31:14,19 32:17,19 32:21,23 34:4 35:15 37:8,12,14 41:10,17,20,22 42:5 48:5 62:3 63:15,18 66:25

67:20 69:8,9 70:16 71:19,22 72:2,7,12 73:18,20 77:2,4,6 77:17,25 78:7,18 78:21 79:13,22 82:7,14 84:22 85:25 87:15 91:12 92:13,15 93:24 94:4 96:17,25 101:14 103:10,24 104:18 105:4,14,24 106:9 107:20 108:4 109:1,7 111:21,24 112:4 113:4,12 114:18,24 115:4,6 115:10 117:10,20 118:3,11,13 120:1 121:11,21 122:16 122:23 123:8,13 124:13,16,21 126:9 126:14 127:2
**homework** 125:6 125:10
**hoping** 52:16
**hospital** 84:4
**hour** 19:16,18 33:9 41:1 42:10 84:16 86:12 91:25 93:7,8 93:18,23 94:3 97:20
**hourly** 85:19 91:6,7 94:9
**hours** 19:14 86:16 92:8,11 93:6 105:17
**hr** 121:24
**huh** 4:11,12 110:2
**hum** 4:11 12:3 36:25 44:4 46:25 76:19 100:9

hung  65:20
hyphen  89:20

**i**

i.e.  79:1
idea  47:19 76:3
identification
  50:19 58:22 73:23
  109:15 114:9 117:1
identified  78:24
  108:19 110:16
identify  73:11 79:8
ignore  56:10 81:22
  81:25 82:3
illegal  28:4
illnesses  85:6
imagine  42:18
impact  85:6 104:17
  104:19
impacted  107:19
impaired  56:3 57:5
  57:24 59:7 62:25
  63:12,12,23,24,24
  64:3,6 65:25 70:8
  73:24 107:14
  110:20
impairment  63:6
  80:20
impartial  10:15,22
  11:14
important  33:25
  44:11,14 51:16
  60:4,7,12 61:12
  64:7 65:16 104:22
  113:14 116:4
  118:22
impression  34:15
improper  72:8
improve  27:9
improved  61:10
improvement  74:7

inadequate  33:19
  36:19
inappropriate  28:5
  34:23
inc.'s  3:10
incidentally  68:3
include  62:12,16
includes  42:17
  62:17 84:18
including  19:4
incorrect  66:2
independent  11:4
  40:4 84:12
independently  51:7
index  3:1 64:15
  97:16
indicate  53:4
  105:18 115:15
indicated  57:11
  102:9 108:20
  110:17
indicating  90:1
  102:6
indication  46:11
  80:19 108:10
indicator  48:14
individual  69:19
inexperienced
  28:15
inflated  17:5
information  3:16
  33:14 34:14 35:8
  36:22 54:1 55:1,2,2
  59:11 60:10 75:7
  76:13 77:14 114:1
  121:16,25 122:4,8
initial  120:17,19
initially  92:24
initiated  83:23
injunction  12:9

injury  85:5
instance  16:16 47:9
institute  6:21 8:17
instructions  21:6,7
  21:9 22:5,7,17,18
  24:14 25:7,12
  87:17 94:20 96:11
  96:14 97:8,11
instruments  30:7
insufficient  33:19
  34:6 59:10
insurance  94:6
integrated  22:13
  75:16
intelligence  15:1,1
  22:23 89:9
interaction  102:23
interested  129:16
interfere  103:12
intern  39:16 99:16
internet  125:4,10
internship  8:14,16
  23:15
internships  8:13
interoffice  85:8
interpersonal
  121:14
interpret  51:25
interpretation  58:2
interprets  29:23
interruption  4:8
intervention  22:9
interview  3:7 9:20
  9:21 12:25 13:5,11
  18:22,23 21:1,13
  21:16,21,22,23,25
  40:25 86:11 87:12
  88:12,14,23 89:16
introduce  6:11
inventory  14:14,16
  14:18 120:3

investigate  66:21
investigation
  109:19
invoice  92:1,4
invoiced  92:3
involved  18:8,17,20
iq  15:3 23:6,9
issue  28:5 121:14
  121:15
issued  91:19
issues  26:16 39:8
items  13:23,24
  16:21 46:17 74:11
  116:18
iv  15:1 22:23
iva  55:25 75:16

**j**

jam  86:20
january  12:21 13:4
  13:6,10,12 83:19
jeral  3:22
jlo  15:22
job  1:20 78:4,25
  79:1,12 115:21,25
  116:5 117:8 118:7
  118:24 121:5
john  12:14 68:1
  116:3
jotting  14:1
joy  51:7
judgment  15:22
july  91:23 111:12
  111:14,16 115:17
june  111:11 115:16
jury  6:12 27:1
justifies  113:10

**k**

kanter  40:7 98:12
  102:12

**kay** 4:2 110:5
  111:16 112:21
  114:22,23 116:14
  116:15
**kay's** 3:25 113:24
  115:14
**keep** 15:12,14 49:2
  53:5 65:20 84:7
  85:19 92:18,24
**kept** 93:12
**key** 4:6 65:7
**keyboard** 22:11
  49:2 97:14,15
**kind** 44:10 71:3
  73:11 75:2,9 106:2
  121:6
**kindly** 6:11
**kinds** 85:6
**knew** 33:21 37:12
  74:16
**knippa** 12:9,14
  13:18 15:25 16:24
  68:2 69:10 72:14
  78:15,22 82:11
  102:19 106:21
  107:2 113:13 115:8
**knippa's** 3:20,22
  60:24 61:15,19,23
  68:23 73:7 82:24
  104:1 113:9 114:4
  115:3 116:3 123:23
**know** 10:7,19 14:12
  16:5 19:25 23:23
  27:8,14 30:22
  32:24 33:1 37:6
  40:3,6,8,14 41:3
  47:9 49:5,20 52:5,7
  52:9,10 53:10
  61:10,11 70:7,13
  81:7 82:2 83:25
  84:3,6,8 88:16

93:12,18 100:5,18
  103:11,14,14,25
  105:12,15 106:11
  107:1 110:11
  111:17 113:16,18
  116:5,21 117:12
  119:8,12 121:2,12
  121:13 122:13,17
  122:20 124:4,9
  125:5 126:18
**knowledge** 7:21
  23:17 24:12 25:14
  25:18,21,22 26:2
  29:18 30:8,24
  31:10 96:13 118:23
**knows** 30:21
  110:10

**l**

**l** 1:12 3:3 5:4 6:1
  128:7 129:7
**labeled** 68:22
**large** 1:19
**larger** 81:2
**lasted** 40:25
**late** 26:12,18 86:19
  91:23 103:1,2
**lauderdale** 1:2 2:5
  5:9 84:1
**law** 72:6 92:25
**layperson's** 14:8
**leading** 63:14
  66:24 70:5 71:21
  71:22 72:1 77:16
  77:23 82:6
**learned** 49:17
  59:16 118:19
**learning** 15:17,19
  57:10,15,19,23
  59:10,15 63:5,8
  74:3 80:18 105:7
  109:12

**leave** 83:18
**leaving** 83:23
**led** 18:23 21:23
**left** 13:17 83:19
  125:25 126:5
**legal** 5:14,15 30:12
  30:13
**letter** 3:22,23 33:15
  53:17 54:12 80:2,5
**letterhead** 98:12
**letters** 49:9 53:18
**level** 8:9 31:8 107:1
**license** 7:13 30:19
**licensed** 6:14 7:4,5
  7:7,9 18:10,12
  28:16,19 29:7,8
  84:12 123:12
**licensee** 30:21
**lieutenant** 28:6
  32:14 34:13 48:7
  87:10 99:12,19,25
  100:8 101:11
  102:14,17 104:25
  105:12 106:17
  107:13 109:4
  111:10 113:2 114:5
  115:15,20 118:8
  119:17 122:14
  124:10 125:24
**liked** 61:4
**limited** 76:12 77:14
**limits** 58:15 108:21
  110:18
**line** 10:14 15:22
  26:23 62:19 69:17
  80:9
**lines** 12:18
**lisa** 37:23
**list** 13:22 16:18
  17:1 23:25 57:10
  57:17,20,21,22

64:12,12 117:9
  118:24
**listed** 14:13 70:19
  98:13 118:8
**listening** 14:23
**literature** 103:15
  122:21
**litigation** 101:13,25
**little** 11:21,25
  13:16 18:2 47:17
  51:24 52:12,25
  53:10 56:19 85:12
  95:9 105:6,20
  113:16
**lives** 84:1
**llp** 1:16 2:13 5:12
**localization** 15:20
**locate** 40:4
**located** 40:11,13
**logistic** 42:13
**long** 6:23 8:16
  31:20 33:8,21 47:7
  47:7 61:17 76:1
  84:14 97:18,18
  103:18 122:6 124:2
**longer** 35:21 86:12
**look** 9:17 11:25
  20:2 33:24 37:18
  38:10 41:23 43:14
  50:14 51:23 53:8
  53:20 64:14 68:22
  75:12 80:8 89:17
  90:8,11 107:4
  125:5
**looked** 82:11 90:25
  106:14 107:2 125:2
**looking** 10:7,13
  11:19 12:16 13:2,8
  13:15 17:25 18:4
  20:18 34:13 35:4
  36:9 46:15 47:25

54:11 55:13 58:1
62:18 63:21 68:4,5
71:5 73:16 74:19
106:2 113:20
**looks** 39:6 49:13,20
56:11 65:19 117:13
**loses** 49:3
**lot** 19:5 36:20
42:18 66:7 75:25
85:8 86:13 104:20
110:10 121:9,23
122:4
**lots** 117:20
**low** 3:14 44:13
46:24 47:1,10 50:8
50:9,25 52:21
53:15 56:15,20
58:22 60:2,3,3
66:15 69:14,21,23
70:6,7,9 72:22
73:24 108:10
114:12
**lower** 43:25 44:1
51:3 58:15 65:1
74:4 107:14
**lrpv** 42:11 69:11
107:9

**m**

**machine** 38:15
94:24
**mail** 81:18
**maintain** 67:10,12
67:18
**maintained** 7:12
**maintaining** 37:25
**major** 43:1 71:12
73:2 106:19 107:3
**making** 19:7 50:3
59:1 75:9,11
114:12 118:17

**mandated** 14:12
**manual** 97:9
**march** 3:7,9,22 9:2
9:22 10:11 12:8
17:19 85:23 98:23
109:4,21 112:25,25
118:9,12
**margin** 13:17 52:16
**marginal** 69:23
70:7
**mark** 9:8 14:17
111:18,18,21 117:4
**marked** 9:10,13
17:13,16 27:20,22
35:14 37:7 48:4
62:2 67:19,21 78:6
79:19 112:2,3
117:6
**martinez** 1:3 5:10
**maryland** 6:20
**master's** 6:19
**match** 65:9
**material** 17:10
**materials** 9:19
122:25
**math** 53:14
**matter** 5:5 123:14
123:19
**mean** 13:14 16:20
17:4 22:9 25:11
26:10 27:7 37:11
39:20 42:12 43:8
43:10,13,20 44:12
44:17 45:13 46:5
46:14 51:19 52:11
57:6,9 58:20 59:14
63:3 64:2 81:5,14
103:22 117:20
**meaning** 119:4
**means** 39:11 43:16
43:24 44:6 45:17

48:21 50:2 51:12
56:7 57:7 58:25
64:4 66:1 116:17
**meant** 12:12 33:20
67:11
**measure** 50:22 54:8
69:23
**measured** 51:16
**measurements**
107:15
**measures** 69:22
72:16 73:3
**media** 5:3 79:14
**medical** 6:22 8:15
11:5,10 34:1 37:20
37:24,25 81:19
85:6 100:24 101:12
101:17,19,21
108:17 110:14
116:9 121:14
**medpsych** 8:24
38:7 83:16 84:14
84:16,25 85:21
94:2,2 98:4,13
100:25 106:6 126:1
126:5
**meet** 8:22,25
122:15,18
**meeting** 19:16
28:17 40:20 88:24
**meetings** 19:3,11
**memory** 15:15 53:2
55:19 57:1,4 60:3
62:20 64:20 74:3
74:11,17,20,20,23
80:18 103:6 109:13
116:13,20
**mental** 26:17
101:22 114:13
**mention** 27:13
80:23

**mentioned** 7:4 65:3
108:11 109:12
**merely** 121:19
**message** 100:2
**messy** 13:7
**met** 8:19
**method** 40:8
**metric** 44:22
**meyers** 3:18 23:19
24:1 62:8 95:14,20
95:25
**mholt** 2:15
**miami** 2:14
**michael** 2:13 5:22
6:10
**michigan** 6:21 8:18
**middle** 97:16
**midpoint** 49:2
**mild** 46:12 62:24
63:6,12
**mildly** 46:7 54:9,20
56:2 57:5,24 59:7
63:6,12,23,24
65:25 110:19
**military** 81:3
**mind** 15:12 53:6
54:2
**mine** 74:5 113:19
**minimum** 71:15
**minus** 51:18
**minute** 27:12 41:10
46:18 54:20 125:15
**minutes** 26:12 76:1
79:14 86:19
**misconception**
52:10
**misinterpreted**
52:7
**mission** 8:6
**mistake** 50:3 104:2

**mistakes** 54:17 56:13
**mmpi** 14:13,19 25:5,10,15 26:3 94:16
**mmpis** 94:24 104:9
**modalities** 56:6
**modeled** 66:14
**moderate** 63:6
**moderately** 57:5,24 62:25 63:12,23 65:25 107:14 110:19
**moment** 38:22 112:7
**money** 39:9,15,22 99:16
**monitor** 48:19,20
**month** 37:1 93:20
**months** 31:23 32:4 32:9 60:21 116:17 123:12 124:2
**morning** 104:11
**motion** 3:10,11 124:11
**motivation** 34:3
**motor** 74:1
**move** 34:2 54:16 83:20
**moving** 81:12
**multiple** 107:2,4

**n**

**n** 1:10
**n.w.** 2:9
**name** 5:13 6:13 84:6 89:22,25
**name's** 6:10
**named** 51:7
**names** 13:25 90:3 102:20

**naming** 15:7,8 23:24 87:19,23 90:14,17
**nathaly** 18:6 40:21
**nature** 35:1
**near** 28:16 29:25
**neatly** 47:16
**necessarily** 70:8 80:16 82:3 120:8
**necessary** 97:10
**need** 27:13 32:22 66:21 71:25 72:2 75:2 77:15 83:5 89:4 100:9 103:8 113:21 127:5
**needed** 85:10
**negative** 4:12
**neurocognitive** 33:24 69:2 116:7
**neurological** 78:11 95:14 101:22
**neurologists** 85:4
**neuropsych** 85:13 94:13 119:21
**neuropsychologi...** 3:18,20,25 11:4 23:19 27:4 28:18 55:4 62:9,17 85:1 95:20 96:1 111:6 119:19,21
**neuropsychologist** 6:15,24 7:2 29:22 111:3
**neuropsychologists** 29:11,20 98:2
**neuropsychology** 6:17 8:3 28:11 29:15 122:22
**never** 94:18 106:14 117:12

**new** 50:5 53:6 60:10 65:22
**night** 105:13,16
**nine** 42:15,17,23,24 47:21 69:20
**noel** 2:8 5:19
**noel.c.pace.esq** 2:10
**non** 97:17 111:1
**normal** 43:14 58:14 64:25 105:20 108:21 110:18 117:2
**normally** 68:17
**normative** 107:9
**normed** 106:18,21
**north** 1:17 5:12
**northeast** 2:5
**notable** 26:18 73:15
**notary** 1:19 128:14
**note** 12:1,4 13:2,8 26:14 105:16 126:11
**noted** 25:24 27:2 52:21 105:8 107:25 116:12 118:2 120:2
**notes** 3:7 9:20,22 10:2 12:25 18:23 26:15 105:6 125:24 129:10
**novel** 17:7
**number** 12:17 13:16 18:4 20:2,3 20:14,18 26:10,20 41:24 42:6,20 46:16 50:15 51:3 52:15 53:1,2,3,5,7 53:21 54:12,15 55:16 56:25 58:10 63:11 65:2 66:1

67:8 68:23 69:8 76:6 77:1,1,2,9 116:17
**numbered** 63:22
**numbers** 9:14 15:13 17:21 18:1,2 42:3 49:9 54:2,3,15 90:15,16,22
**numeral** 89:21

**o**

**o** 1:10,10,10,11 75:19 88:6,6
**oath** 3:4 128:1
**object** 15:8 23:16 34:2 63:14 71:18 71:21,23,24 77:16 113:4
**objecting** 31:12
**objection** 23:16 24:11 25:17,23,25 26:5 29:17 30:11 30:12 31:9 66:22 66:24 70:5 72:9 73:17 77:23 78:17 82:6 84:22 85:25 87:15 91:12 93:24 94:4 96:17,25 101:14 103:10,24 104:18 105:4,14,24 106:9 107:20 108:4 109:1,7 113:4,12 114:18 117:11,14 118:1,13 120:1 121:11,21 122:16 122:23 123:8,13
**objective** 11:17 113:8
**observations** 26:11
**observe** 95:16
**observed** 70:3 71:16

observer 55:2
observing 81:23
obviously 92:7
occasion 98:5
offhand 119:8
office 8:24 19:17
  105:2 110:1 123:25
official 117:13,16
  128:9
oh 19:12 21:15,19
  48:7 76:24 82:16
  90:11,15,18 115:4
okay 7:20 9:19,25
  11:9,19,19,23
  12:16 14:2,7,10
  15:6 16:3,15 17:12
  18:3 19:21 20:5,11
  20:12,24,25 21:10
  21:20,22 22:13
  24:22 25:23 26:7
  26:19,21 27:15,19
  28:2 29:25 31:4,24
  32:18 35:21 36:9
  37:17 39:2,14
  40:10,19 41:5,7
  42:23,25 44:9,21
  44:24 45:6,20,23
  46:1,10 47:12 48:2
  48:9 51:1,14 52:2,8
  52:23 54:11 55:8
  55:15 57:18 59:4,8
  60:22 61:2,14,22
  62:1,18 63:8,20
  64:18,24 65:2
  66:18 68:12 70:17
  70:20 71:6,11
  72:21 73:3 76:21
  76:24 77:7,11,20
  78:10,20 80:8,15
  80:25 83:23 84:3
  86:18 87:1,4,13

89:25 90:2,11,13
  90:18,19,22 91:5,8
  91:22 92:3,10 94:9
  95:19,24 97:6
  98:21 99:24 101:1
  101:8 104:7,10
  111:18 118:5,14
  120:11 122:13
  124:24 125:5,7,14
  126:4,7,8,13,20
oklahoma 81:20
omission 116:16
omitted 4:10
once 22:16 57:21
  65:13 66:5,6
  126:10
one's 76:18 104:17
ones 23:23 56:9,12
  64:10 74:24 90:5
onion 117:21
online 94:25
open 92:25
operate 54:24
operating 79:8,9
operative 49:22
  65:16
opinion 28:5,12
  30:13,13 31:16,18
  81:24 102:3,10
opinions 80:6
opportunity 117:15
opposed 16:23
opposite 43:23
order 8:10 36:17
  40:4 53:19 54:2
  112:8 126:25 127:1
ordered 82:9,21
ordinary 29:14
orientation 15:22
original 24:20
  57:23

otazo 1:3 5:10
overall 44:15 63:6
  71:15 72:14 108:20
  110:17

**p**

p 1:10 88:6
p.a. 2:4
p.m. 1:15,15 5:2
  41:11,13,14,15
  79:15,17,18,20
  83:7,9,10,11 100:7
  104:5 112:12,14,15
  112:17 125:16,18
  125:19,20 126:21
  127:9
pace 2:8 5:19
paced 15:9,12 22:9
  24:25 87:20 88:1,2
pacing 75:22
page 3:2 9:17,23
  10:7,13,14 11:19
  11:20 12:16,19
  13:2,8,15,17 18:1,4
  18:16 20:4 26:9,9
  26:19,19 28:1,3
  29:25 35:25 36:9
  37:18 38:10,22
  39:2 41:23,25 42:1
  42:1,2,6 50:14
  52:14 53:20 54:11
  55:14 56:24 58:1,6
  58:9 62:18 63:9,21
  64:15 65:2 68:22
  69:7,8,16 76:6,11
  76:20 77:1,3,9 80:8
  82:19
pages 10:2 12:24
pai 14:17
paid 39:16 91:8
  99:17

pairing 74:12,12
paragraph 28:3
  30:1 42:25 46:1,13
  55:19,24 59:18
  72:23 77:8 78:10
  78:12,16,22
paragraphs 43:11
paralegal 91:17
pardon 108:5
parentheses 14:17
park 6:20
part 8:12 12:2
  36:10 50:9,11
  95:25,25 96:2,20
  109:15
particular 54:8
  80:16 123:17
particularly 56:4
  111:1
parties 129:13,14
parts 99:10
pasat 15:9 87:20
  91:2
passed 99:2
pathfinder 49:7
  53:17 54:12,14
patient 87:8 88:25
patients 11:18 85:2
  85:4,9,10,22 86:4
pattern 108:13
  116:7
patterson 1:4 2:20
  3:9,13 5:6,21 8:20
  8:22,25 9:15 10:8
  10:16,22 11:15
  12:10,17,22,25
  13:4,10,16,24
  15:25 16:4,7 17:19
  17:22 26:12 27:3
  28:6 30:9,11 31:2
  32:12,14,15,18,20

34:14 41:24 70:4
79:2 83:5 86:10
87:11 88:3 89:13
94:10 95:21 96:14
97:7 99:12,19
100:1,8 101:11
102:14,18 104:5,25
106:17 107:13
109:4 111:11,12,14
112:11 113:2 114:5
115:16,20 117:18
117:24 118:9
122:14 125:24
**patterson's** 3:17
48:8 69:11 105:13
119:18 124:11
**pay** 91:24
**paying** 53:6
**pearson's** 94:25
**peer** 8:7
**pegboard** 24:22
87:20 88:8 90:24
**pending** 31:11
**people** 8:11 33:20
43:25 44:3,6 52:9
121:9
**percent** 29:11
43:21,22,24 44:2,6
52:9 53:16
**percentile** 43:3,4,8
43:20 44:5,19,19
45:4,8,14,18,19,25
46:3,4,8,9 49:24
50:12 51:22 52:4,5
52:8 70:22,22
107:14
**percentiles** 52:3,6
52:11 71:2
**perform** 30:23,25
31:6 79:11 114:10
115:20

**performance** 14:22
19:6 22:14 43:2,15
45:7 46:2 51:11,17
56:1 57:4 58:16
59:6,7 69:22 74:4
75:17 76:13 77:20
88:16 104:17,19
107:24 108:8,15,20
110:17,24,25
114:12 121:6
**performed** 15:25
19:21 28:25 34:18
40:1 87:5,14 90:2
118:9
**performing** 32:11
43:21 78:3,25
**permission** 32:22
**perseveration**
58:24,25
**perseverative** 50:1
50:2 51:2 59:1
66:11 67:7,8
**person** 22:16 25:11
26:15 30:21 37:21
37:24 46:20 49:1,8
56:9 75:19 100:25
121:24
**person's** 101:8
**personal** 23:17
24:11 25:17 29:17
31:9
**personality** 14:18
119:23 120:3,5
**personally** 32:25
39:15 99:15 128:7
**perspective** 36:21
78:11 121:5
**pertains** 101:21
**ph.d.** 1:12 3:3 5:4
6:1,19 128:7 129:7

**phone** 9:3,23 10:3
10:8 33:6,8,10
34:22 35:10 39:13
47:25 80:3 91:17
91:18
**phones** 41:20
**phrased** 40:25
**physically** 88:22
**pick** 14:24
**picture** 34:13
**pilot** 4:3 34:14 43:1
43:19 44:10 73:2
101:4 106:25 113:3
115:21,25 116:4
117:18 119:2
**pilot's** 120:16
**piloting** 51:9 60:4
111:4
**pilots** 71:10,12
94:14 106:19,22
120:16,20
**place** 1:16 10:10
22:11 37:1 61:7
113:23
**placed** 97:15
**plain** 121:1
**plaintiff** 2:3,20
5:20 8:19 27:24
30:16 35:6,12,18
39:6,21 40:3,19
49:23 50:7 54:7,18
59:20 71:1 72:15
78:2 79:7
**plaintiff's** 3:10
45:6 65:23 67:3
**plaintiffs** 1:5
**planned** 88:18
**planning** 85:11
**play** 39:7
**please** 5:17 9:5
32:15 36:15 63:16

73:21 82:13 83:6
89:18 90:15
**point** 22:10 31:22
32:4 48:24 49:22
77:12 78:19 86:14
96:22 99:3 102:1
108:22
**points** 75:12
**poor** 55:3 59:10
**population** 43:22
**portal** 2:9
**positive** 59:24 64:8
108:18 110:15
**positives** 64:8,9,10
64:16,17
**possession** 125:25
126:1
**possibility** 27:5
**possibly** 74:9 80:17
118:17
**post** 7:3 8:18 18:7,9
23:15 29:5,13
93:17
**potentially** 47:8
60:4 66:19 110:25
116:8
**powerful** 42:19
**practice** 7:13,15
17:3,4 19:8 27:5
28:16 29:10,15
38:6 61:9 68:20
81:17,22 84:19,20
85:14 94:23 98:1
116:19
**practicing** 84:9
**practitioner** 83:21
**practitioners** 7:19
**prearranged** 33:6
**predetermined**
15:13 16:10 93:20

predict  42:16
prediction  75:10
predominantly
  58:14
prefer  51:23
preferred  113:22
premature  48:14
preparation  93:7
  123:6
prepared  36:18
  126:10
preparing  125:2
present  2:19 21:4,5
  21:24 59:23 89:15
presentation  19:7
presentations
  118:23
presented  14:25
  53:22 59:11 65:6
  102:2 118:20
president  98:13
presumably  17:11
  38:15
presume  10:17
  97:2
presurgical  85:15
pretty  43:14 74:22
  97:4
previous  8:24 9:7
  31:21 53:1,4 61:13
  72:11 105:13 111:5
  117:2
previously  50:24
  61:6 76:8 107:24
primarily  68:20
  84:20
primary  85:14
printed  42:6 90:10
  94:20
printout  62:8

prints  95:2
prior  9:3,23 10:3
  13:5 17:7,8 22:6
  23:7 39:3 68:2
  103:8 124:23
probability  42:14
  104:16
probably  21:5 41:5
  79:13 87:3 97:3
problem  42:16,22
  65:20 69:25
problems  105:19
  114:7,9 116:12,14
procedure  17:9
  85:17
procedures  20:7,10
  20:19,23 89:4
proceed  5:25
process  47:14,15
  47:22 48:9,11
  66:10 67:4 99:5
processing  14:23
  15:14 104:21
  108:13
professional  6:16
  7:23 30:20 81:3,3
profile  58:11
program  19:13
  106:11
proper  38:8
protecting  8:8
provide  11:14
  39:22,23 81:11
  97:9
provided  24:6 37:4
  60:23,25 61:14,20
provides  30:18
  62:10
providing  11:6
proximity  68:8
  102:12

prudence  56:22
prudent  103:20
psy.d.  18:6 40:22
psychiatrists  85:9
psychological
  13:22 14:14 30:4,9
  33:25 59:24 85:16
  108:19 110:16
  119:19
psychologist  6:14
  7:4,10 8:10 18:10
  18:19 28:19 29:7
  51:7 84:9,13
  123:20
psychology  6:16
  7:13,16,17,18,20
  7:23 8:5,12 109:25
  118:19 122:22
psychology's  30:5
psychometrician
  29:21
psychometricians
  97:22 98:4
psychopathology
  14:15 119:24 120:9
psychotherapists
  85:9
public  1:19 8:8
  117:19,21,21
  128:14
published  117:24
punctuation  4:6
purpose  11:5 60:18
purposes  11:10
  36:19
pursue  83:19
put  19:1 107:6
  110:9

| q |
| --- |

qualifications
  19:23 118:24
qualified  22:20
  23:1,6 25:14 26:2
  30:22,25 31:5,17
qualitative  47:18
qualities  33:25
quality  110:25
question  4:7 9:7
  12:23 14:17 20:16
  25:13,20,24 26:6
  31:11,13,15 63:16
  72:8,11 73:17
  79:10 82:15,17,18
  95:6 101:18 106:4
  109:5 114:16 118:5
  118:11 119:17
questions  32:19,20
  76:12 77:12 95:9
quick  104:21
  118:16
quickly  49:22
  54:16 56:12 57:16
  60:9 65:21
quite  31:7 56:22
  114:10
quotation  10:20
quote  28:15 40:20
  114:17
quoted  92:11

| r |
| --- |

r  2:4 88:6
raise  99:20 109:15
  110:23 113:18
raised  113:13
  114:15
range  43:17 52:1
  53:9 62:24 64:6
  65:1,1 69:21 72:24

73:24
**ranged** 72:22
**ranges** 52:6
**ranking** 51:22
**rate** 15:13 43:18
  52:24 70:20 71:4
  72:18 91:6,7
  107:11
**rates** 43:11
**raw** 64:5 90:24
  91:3
**reaction** 56:16,21
  104:22
**read** 9:4,6 10:14,15
  11:22 12:6,8,20
  14:3 21:6 22:5 25:7
  26:11 27:1,2 28:4
  28:14 30:2,17,20
  36:14,14,16 39:7
  39:14 40:20 43:5
  46:1 55:23,25 57:4
  57:13,13,20 58:10
  58:14 59:9 63:25
  69:19 72:8,10
  76:11 78:11,22
  79:4 80:13,15 81:1
  82:12 87:17 94:21
  94:22 96:11,14,15
  97:9 99:15 108:17
  110:13,14,21 111:2
  111:8 112:22
  115:11,14 126:9,16
  126:19
**reading** 25:12
  122:24 127:7
**reads** 97:11
**real** 22:9
**really** 47:6 49:10
  72:2 84:7 88:23
**rearrange** 54:2

**reason** 26:18 30:22
  107:3
**reasonable** 104:16
**reasoning** 58:18
  110:20,21 114:11
  117:1
**reasons** 40:10
  61:12 82:1
**recall** 11:16 22:15
  25:6 33:18 34:11
  34:20,20,25 35:1
  35:13 57:22 59:10
  59:17 61:16 84:5
  86:9,22 87:6 88:24
  89:3,6 91:18 99:3
  100:12 102:22,25
  103:4 105:5 106:1
  115:22 124:1
**recalled** 57:11
**receiving** 60:11
**recenter** 48:17
**recertification**
  120:17
**recess** 41:13 79:17
  83:9 112:14 125:18
**recognition** 64:8,20
**recognize** 9:19
  16:12 17:16 48:6
  62:4 67:22 79:24
  89:12 90:5
**recognized** 15:18
  64:13
**recollection** 61:22
**recommend** 60:14
  81:9 82:8,19
**recommendation**
  55:3 59:19,22
  60:13 75:9,12
  81:10 103:16
**recommendations**
  58:3 75:1 76:23

77:5,9 81:12
**recommended**
  60:16 110:12 111:3
**record** 5:2,18 17:21
  20:17 41:12,16
  79:16,21 81:7 83:8
  83:12 89:20 93:5
  112:13,16 125:17
  125:21 126:23
  127:4 129:9
**recorded** 5:3
  126:15
**records** 37:21,24
  38:1,7 85:19,21
  100:18,21,24 106:7
  106:12 126:3
**reexpressed** 33:16
**refer** 17:25
**reference** 39:12
**references** 4:7,9,11
  4:12
**referral** 101:7
  124:8
**referrals** 85:3,8
  120:20
**referred** 15:3
**referring** 12:4 22:4
  30:3 49:15 51:4
  58:21 63:4 70:10
  72:18 82:10,24
**refers** 43:9 49:1
  57:10 59:5
**reflect** 35:5
**refute** 80:6
**regard** 116:1
**regarding** 36:18
  45:6 59:20 66:10
  76:7 85:5
**regional** 71:10
  106:21,25

**regression** 42:13
**regulate** 7:19
**regulated** 7:16,17
**regulations** 116:10
  122:14
**rehab** 6:21
**rehabilitation** 8:17
**related** 51:9 121:15
**relating** 116:4
**relative** 129:12,14
**relatively** 70:9
  97:25
**relaying** 121:24
**release** 3:15 36:17
  124:7
**reliability** 82:22
**reliable** 60:18
  109:13 116:21
**reliably** 78:3,24
**relying** 11:9
**remain** 76:12,14
**remained** 77:12
**remember** 16:12
  40:6 44:11 60:10
  74:16 86:6 96:23
  102:11 105:22
**remembers** 17:2
**remind** 33:23
**repeat** 16:4 57:13
**repeated** 27:9 61:8
  61:11
**replicated** 110:22
**report** 3:8,21,25
  11:7,10 17:17,18
  29:23 30:3 33:21
  35:6 36:6,18 37:5
  37:22 38:14,19,24
  41:19 48:8 55:14
  59:19 60:22 61:15
  61:19 68:1,5,12,24
  72:14 73:10 80:21

81:18 82:11,25
95:2 100:14,18,22
101:1,4 105:8
107:3,6 108:16
109:17 111:18
112:4,20,22 113:9
114:4 115:3,14
116:25 123:23
126:2 129:6
**reported** 42:8 63:9
71:14 73:24 105:6
**reporter** 5:14,24
6:5 9:6 72:10
126:18,24 127:5
**reporter's** 3:5 4:6
**reporting** 71:7,9
**reports** 69:10 97:2
113:21
**represent** 6:10
27:23 116:8
**representation**
64:20
**represented** 79:1
124:16
**request** 3:12 61:2
101:6 120:13,15,16
121:1
**requested** 40:2
60:25 129:8
**required** 8:10
19:12 22:10 39:13
40:2 94:7 109:19
**requirement** 28:17
**requires** 15:14
75:25 104:20
**residencies** 8:13
**resident** 18:7 28:15
40:21 84:11
**residents** 19:9
**respect** 16:7 24:7
101:7 108:17

110:14
**respectfully** 32:21
**respectively** 112:5
**respond** 56:9 60:8
100:9
**responded** 56:17
**responding** 35:21
56:12,13,22 118:15
**response** 3:10
48:15 49:18 56:11
56:16,21 100:6
124:11
**responses** 46:18
54:20 66:2
**responsibilities**
30:21,23 31:1
**responsible** 37:25
**rest** 23:22 66:7
88:17
**results** 3:17 4:1
19:2 75:3,8 81:10
81:13,14 82:22
85:3 107:18 111:5
112:21 113:9 120:4
**retain** 60:11
**retested** 70:4
**retesting** 60:17,21
80:18
**retrieval** 15:8
**reverse** 47:10
**review** 8:7 60:14
61:4,19 80:17
110:12 111:2
112:10,19 113:8
126:11 129:7
**reviewed** 28:13
34:15 63:5 76:8
81:11,13,19
**reviewing** 69:19
**rey** 15:18

**reyes** 1:3 5:10
**rhythms** 103:13
**right** 9:14 13:21
16:25 45:21 47:5
47:25 49:19 50:18
51:20 52:16 65:11
65:13 67:14,15
70:23 71:4,4 76:22
77:4,8 78:18 87:11
88:11,13,23 89:24
90:9 93:13,25
102:15 103:6
104:13 106:7 112:9
112:23 118:1
119:25 123:22
126:9,15
**rmr** 1:18 128:13
129:5,21
**rodney** 1:4 2:20 5:5
5:21
**role** 11:3
**roman** 89:20
**room** 94:15 95:10
95:13,19,23 96:8
**ross** 3:24
**rough** 19:1 51:21
**roughly** 45:3
**routine** 111:1
**routinely** 101:1
**rule** 30:5 49:19,22
51:3 65:14 67:16
**rules** 49:17

| s |
| --- |

**s** 1:10 30:4 88:6
**salary** 93:22
**sample** 44:16
106:25
**sat** 18:22
**satisfied** 55:7
108:23,24

**save** 124:18
**saved** 106:12
**saw** 60:1 85:9 86:3
99:10,11 116:2,7
**saying** 23:5 33:18
39:7,21 43:12
71:25 72:21,23
81:6 100:14 102:25
108:16 109:20,20
121:9
**says** 10:15 12:20
13:9,17 14:16 30:2
56:25 62:19,24
63:24 64:3 70:6
72:6 74:2 78:22
89:22
**scale** 15:1,1 22:23
89:9
**scan** 95:3
**scheduled** 8:23
**school** 23:15
**scope** 33:23
**score** 17:5 42:22,22
43:9,24,25 44:3,15
44:17,18,18,20
47:1,9,11 49:5 50:9
50:11,13,24,25
51:18,25 52:6
53:14 54:7,18 57:7
58:23 60:2 64:2,4,5
64:14,19,21 69:11
69:14,23 70:6,9
73:24,24 94:23,24
108:10
**score's** 91:3
**scored** 43:25 49:23
50:8 53:9 108:12
**scores** 23:13 27:9
43:3,4,12,14,16
44:7,13,23 45:7,16
45:17 46:2,6,12,14

47:14,15,15,22
48:10,11 51:24
52:12,15,22 56:15
59:9 62:11,12
63:11,21 65:23
66:15 67:3 69:20
69:20 70:13,18,21
71:2,4,15,16 72:15
72:21 73:22 74:22
90:25,25 91:4 95:2
95:3,24 96:2,5
107:8,10 110:19
**scoring**  23:11,12
24:18 94:25 95:1
**scott**  1:4 2:20 5:6
5:21 36:16
**screen**  49:4 53:3,18
54:16 56:10,11
**screening**  69:3
**seal**  128:9
**search**  125:6
**second**  10:6 18:13
36:9 37:18 38:22
57:20 62:1 66:5,6,8
68:21 78:10 80:8,9
95:8 102:3,10
**section**  20:6,7,19
20:20 26:22 30:4
42:7,8 55:18 56:25
58:2 69:1 76:7,8,10
76:22
**see**  12:4,8 13:19
17:23 20:7,19
26:24 28:8,22
36:12 39:4,18 49:9
50:20 53:8 55:21
57:2 58:4,12 59:12
60:18 61:5 62:22
69:4,12,17 70:1,24
74:23 76:16 77:8
80:11 92:6 98:12

99:4 106:2,3
113:13,24 114:23
115:14 124:23,24
125:9
**seeing**  23:24 66:15
85:22
**seek**  8:11 60:15
**seeking**  11:1
120:17
**seen**  78:8 87:8 98:1
117:4,12 124:15
**sees**  75:20
**select**  53:25 54:14
**selected**  23:19
42:18 95:15 107:9
**self**  22:9 101:7
**send**  101:5
**sending**  85:4 101:9
**sense**  36:19 103:19
**sensitive**  104:20
**sensory**  15:21
**sent**  36:16 37:22
38:11,24 101:20
102:8 123:25
**sentence**  26:11,24
28:4,14 30:1 58:9
58:12 69:16 76:10
76:16
**sentences**  36:15
55:23 80:13
**separate**  62:13,15
**sequence**  53:22
**sequencing**  54:15
**serial**  15:9 24:25
53:19 87:20 88:2,3
**serve**  123:6
**service**  39:23
**services**  30:4,10
99:21
**session**  74:9,13
116:16

**sessions**  27:10
**set**  22:16 27:11
38:16 67:10,12,18
87:17 88:22 89:4
94:11,12
**seven**  26:20 29:25
57:12,12 59:16
68:22 69:8 79:13
105:17
**severely**  63:24 64:3
64:5
**shapes**  65:8,8
**share**  102:18
**shared**  113:19
**shb.com**  2:15
**sheet**  37:20,22
**sheets**  93:12 95:4
**shifting**  49:13,14
66:13 69:24 70:10
**shifts**  51:3
**shook**  1:16 2:13
5:11
**short**  76:11
**show**  51:11 98:1
116:23
**showed**  39:15
58:24 99:16
**showing**  107:13
**shows**  29:10
**sic**  37:9 98:14
**side**  44:2
**signature**  18:15,16
128:12 129:20
**signatures**  18:5
**significance**  58:16
81:1,7 111:4
**significant**  76:14
77:21
**significantly**  43:18
**signing**  127:7

**silence**  41:20
**similar**  27:3 45:1
61:23 66:9,12 67:9
69:14,15 70:3,11
74:22,24 75:16
78:15 79:10 110:22
**similarities**  61:24
67:5 73:6,12
**similarity**  73:23
**simply**  53:22 96:15
**simulator**  51:10
**sir**  11:1 32:17
**situations**  111:1
118:16
**six**  26:9,9 31:23
32:4,9 53:24,24
56:24 57:11,11,11
58:10 60:20 66:3
**skills**  51:9 60:4
76:7 111:5 116:4
**sleep**  105:13,16,19
**sleeping**  105:17,20
**sleepy**  108:14
**slip**  56:14
**slow**  52:25 53:10
**slower**  108:2
**smith**  121:10
**sole**  83:21
**solution**  50:5,5
59:3 65:22
**solutions**  5:14,16
**solving**  65:20 69:25
**somebody**  54:23
**soon**  48:18
**sorry**  20:3,13 21:12
22:4 37:12 42:1
66:24 68:4 69:7,21
76:25 82:12 83:2
111:23 114:24
115:4

sort 61:17 65:13,17 84:20
sorting 24:3,8 58:23 65:3,24 66:3 67:5 96:9
sought 101:24
sound 4:11,12
sounds 52:8
source 117:13
sources 34:14
south 2:14
southern 1:1 5:8
space 68:17
span 53:21
spatial 15:23
speak 36:18 125:12
speaker 4:9
speaking 72:9
specialist 120:19
specialization 8:4
specific 89:6 102:22 105:16 121:4
specifically 24:1 34:7 80:18 87:6 89:3 103:14,15 106:1 116:5 122:18 124:9
specifications 16:10
specified 30:19
speed 43:2 45:6 46:20,21,23 47:10 47:16 49:10 52:25 53:17 54:19 71:3 107:15,17 108:3
spending 39:8 86:9
spent 86:16
spinal 85:18
spoke 13:3

spoken 33:3,5
stages 99:5
stamp 106:3,12
stamped 89:13,21
standard 14:14 15:2 19:8 24:13 43:13 44:18 51:19 57:9 81:17,21,21 97:8 104:5
standardized 21:7 22:6 25:7
standing 54:22
start 12:1 21:9 43:7 63:19 86:24 90:7 96:16 115:11
started 86:23 95:16
starting 22:6 52:19 55:20 76:6 77:3 80:14
starts 69:1,16 78:10 80:9
stat 48:24
state 1:19 5:17 7:5 7:13,15 79:11 128:3,14 129:3
stated 40:19 116:9
statement 28:24 39:24 40:11,15,23 42:11 43:15 109:23 116:1 118:18
states 1:1 5:7 7:7 28:14 76:11
station 22:17
statistics 51:14
status 26:17 76:14
statute 30:5,17
stay 67:11,16 75:24 84:14 97:4
stenographic 127:4 129:10

stenographically 129:6
sticking 103:6
stimulation 85:17
stimulators 85:18
stimuli 56:5
stimulus 75:21
stipend 93:19,21
street 1:17 2:5,9 5:12
strengthen 75:11 116:19
strictly 85:1
strike 34:2
strong 17:3
stroop 25:3 87:21 88:6 91:3
studies 51:11
subject 25:24 48:22 49:16 65:6 72:8
submitted 92:1
subpoena 91:19
substance 33:10,12 119:14
substantiating 121:13
subtest 97:12
successfully 38:11
sufficient 34:10 113:15 123:6
suggest 34:8 114:5
suggested 59:10
suggesting 34:23
suggests 114:13
suite 1:17 2:14
summary 3:19 33:14 62:8,10
summing 108:16
superior 74:2
supervise 31:20 96:20

supervised 23:9,11 25:9 31:22 123:5
supervising 18:18 19:9 23:12 32:6 123:20
supervision 19:3 19:11,15 24:7 122:25
supervisor 31:21
support 66:19
supporting 81:18
suppose 70:9 93:15
supposed 65:17 67:16
sure 6:13 11:23 41:1,8,9 53:13 72:20 85:1 95:17 96:21 100:25 101:8 112:1,1,25 123:22
surely 72:7
survey 29:10
surveys 98:1
sustained 14:21 55:20,25 56:4 58:19 59:5 60:2,8 79:3 80:23 109:14 114:8 116:13,22
sustaining 76:4
swear 5:25
switch 79:14
sworn 6:3 128:8
symbols 74:12
synopsis 10:19
system 84:4 95:1
system's 38:16
systems 8:24 38:7 83:16 84:14,16,25 85:21 98:4,13 106:6 126:1,6

**t**

**t**  1:10 44:15,17,18
44:20 50:13 51:24
51:25 52:6,12
53:14 57:7 64:4,19
75:19 88:6 90:25
91:4
**table**  62:10 111:19
**take**  3:11 20:2
27:14 32:22 37:18
41:6,10 53:20 64:7
83:5 87:18 97:19
112:7,9 113:23
124:12
**taken**  1:13 5:4
10:10 74:7 98:24
**takes**  29:22 42:10
64:15,17 86:12
95:9 99:6 120:3
**talk**  9:2 10:6 19:3
33:20 34:17 121:3
**talked**  50:24 62:13
102:21 122:25
**talking**  7:22,24
10:19 14:9 19:19
34:16 42:3 45:24
46:16 52:4 115:2
118:21 121:24
**talks**  46:13 70:21
**tampa**  1:17,17 5:12
5:12
**tapping**  23:25
87:19,24 90:14,20
**targets**  56:2,3,19
75:23
**task**  48:22,23 54:15
69:24 74:14 110:22
**taylor**  51:5,8 60:1
70:18 73:22 95:24
96:2,4,5,6 107:8

**technological**
104:16
**telephone**  2:8 5:20
**tell**  6:12 12:10,17
12:22 13:4,10,23
14:5 18:6 20:23
34:5,8 42:8 44:15
48:13 52:16 54:13
56:7 58:25 62:7
65:4 80:1 84:24
86:3 89:17 90:8,12
90:15 97:13,16
**telling**  15:16 16:25
65:14 89:5
**ten**  18:16 47:21,21
68:2,4
**term**  102:6
**terms**  19:5 46:1
51:10 54:9
**terrible**  57:23
**test**  3:17,18 4:1
14:9,19,20,22,24
15:2,4,7,7,10,11,14
15:17,19,20,23
16:21,23 17:2,6,8
17:11 19:21,25
21:7 22:8,14,16,18
22:21 23:1,6,14,20
23:24,25 24:3,8,10
24:19,22,25 25:3
25:12 27:9 29:12
30:7 35:11 36:5
40:22 48:15,25
49:7,13,14,23
50:10,11 51:4 53:2
54:22 56:1,8 58:24
59:6,7,15 61:10
63:5,7,8 65:3,5,24
66:10,13 67:4,5
69:2 70:11 74:7,11
74:17,20 75:3,14

75:15,16,18,22,25
76:2 87:19,19,21
87:21,24,24 88:2
89:25 90:14,14,17
90:20,23 91:3
94:18,20 95:15
96:4,10,15 97:6,17
98:3,24,25 99:3,4
102:20,21 103:3
104:20,23 105:2,8
105:10,23 107:12
107:12 108:8
112:20 114:11,11
116:18,22
**tested**  106:17
**testified**  6:3 73:5
74:25 75:1 97:21
108:22
**testify**  92:23
**testifying**  40:12
92:21
**testimony**  4:10
115:22
**testing**  28:6,10 41:2
41:3 59:20 66:9
86:14 87:10 108:19
110:6,16 116:7
119:22
**tests**  13:23 14:3,11
14:12 15:24 16:4,7
16:9,11 18:24,25
19:6,23 23:9 27:6,9
29:9,12,16,22
34:19 42:10,15
51:16 52:19 62:14
62:15,17 66:16
86:15 87:5,14 90:2
90:7 95:17,17
97:24 99:8 108:12
116:20,25

**thank**  6:5 27:15
92:19 126:7,8
**theamlongfirm.c...**
2:6
**therapy**  84:21
**thing**  50:6 65:21
85:18 109:10,11
110:13
**things**  11:22 15:25
33:13 61:24 96:22
96:24 117:20 121:7
121:9 122:6 123:1
**think**  7:1 8:6 14:5
27:16 31:14 33:20
36:25 40:14 41:5
51:24 52:9,12
53:24 54:25 62:24
65:3 76:20 86:19
87:7 104:2 108:7
111:21 113:16
114:14 118:8 124:5
**thinking**  85:7
**thinks**  34:3
**third**  20:4 38:10
55:19 120:18
**thirds**  11:25
**thought**  22:3 34:5
83:2 88:7 102:5,9
115:2 124:15
**thoughts**  33:16
**three**  43:2,12 45:7
45:13,15,17,22
53:23 54:3,4 67:13
92:8,11 93:6 99:5
105:25 116:17
**throughout**  46:13
46:14,15 47:1,8,11
54:19
**time**  1:15 3:11 7:1
14:4 18:8 26:16
27:14 29:2,6 32:1,3

32:9,9 36:6 37:2
41:5 46:17 47:7
48:23 56:17,21
57:12,13 59:17
60:11,22 65:16
76:5,17 78:23 79:6
83:20 85:19 86:9
86:22,24 88:9 91:8
93:8,12 94:7 95:8,9
98:8,17,18,19 99:2
103:8,12 104:6
105:1,7,22 106:2
106:12 108:10
122:20 124:7,11,18
126:17
times  33:5 56:17
66:2 67:13 95:9
104:22 105:25
121:23
tired  104:14 105:6
titled  20:6
today  8:20 91:8
124:13,23 125:2,12
today's  93:6
told  10:16 13:24
15:25 30:17 33:14
49:19 52:7 65:9,10
74:15
top  35:17,24 56:24
68:23 75:21 80:9
89:22
total  45:13 93:10
touch  84:7
tova  14:20 75:14,14
75:19
tracking  48:25
97:17
traffic  86:20
120:18
trail  4:9 114:12

trained  24:9 29:21
95:18
training  8:12 18:8
19:23 23:7 24:6
30:22,25 31:5,8
118:23 123:4
transcript  126:10
126:25 129:8,9
transmission  3:15
transmitting  38:3
transparent  52:13
travel  93:8
treatment  85:11
trial  3:11 49:20
65:15 92:21,23,25
tried  33:23
trouble  51:2 76:4
true  47:4 64:8,8,16
129:9
trust  117:22
truth  117:22
try  11:17 121:16
122:3,6
trying  12:12
124:18
turn  28:1
turning  26:19
41:18
two  8:18 11:25
12:18 18:5 19:14
27:16 29:5 36:15
43:3 45:8,15,18,24
46:2,6,12 50:12
54:3,4 55:23 56:13
56:18 63:9 69:22
80:13,15 82:19
84:15 86:16 89:7
95:9 116:17 123:12
125:8
twos  56:10

type  10:25 14:8,19
75:7 84:17 85:17
types  118:20
typical  84:24 85:3
121:8
typically  19:15
88:24 106:24
120:25

**u**

uh  4:11,12 110:2
um  4:11,12,12 12:3
36:25 44:4 46:25
76:19 100:9
unanswered  76:12
77:12
uncertain  81:2
undergo  11:2
undergone  11:2
undersigned  128:6
understand  10:25
11:23 12:7 13:14
52:13 101:10,12,16
101:23 123:9
understanding
10:21 16:3,5,6 31:4
39:10
understood  11:3,6
79:2
unfit  115:17 119:10
119:14
unit  5:3
united  1:1 5:7
university  6:19
unsupervised  28:7
28:10,12
unusual  44:10
use  29:11,15,20
30:6 97:16,21 98:2
98:4 111:24
usual  38:6

usually  41:1 89:6
90:4 99:6 121:3

**v**

v  1:10 75:19
va  8:14
validity  26:23
120:4
vanilla  121:1
variability  56:21
72:24 74:18 116:23
variables  14:21
42:17,24 47:17
63:7 75:15
variety  118:15
vary  65:7
verbal  15:17,18
56:25 57:4 59:15
60:3 62:20 63:4
80:18 105:7 109:12
116:13,20
verbally  59:11
verify  23:13 95:8
veritext  5:14,15
version  24:20
99:14
versus  5:6
video  5:3 20:17
41:21 126:15
videographer  2:21
5:1,24 41:11,15
79:15,20 83:7,11
112:12,16 125:16
125:20 126:21
view  34:10
vigilance  56:19,22
75:25 76:4
violate  30:9
violated  30:2,3
visited  111:11
visual  15:23 22:13
48:22 53:23 56:3,5

63:8 69:25 74:3,11
74:20,23 75:16,17
**vs** 1:6

**w**

**wais** 89:20 95:11
**wait** 48:18 63:15
**waited** 100:19
**waiting** 100:18,20
**waive** 126:16,17,20
**waived** 127:8
**want** 14:3 16:13
45:11 55:5,19
70:14 72:3 74:19
82:15 88:16 90:8
93:5 101:5 111:24
112:4 118:4 121:12
121:19,20 124:7
126:17,24
**wanted** 10:22
12:14 16:4,7 61:3,5
92:2 102:10 112:24
125:8,9
**wanting** 102:2
**wants** 10:15 102:14
**warm** 22:17
**warrant** 80:17
**way** 8:8 12:1 20:1
38:20 40:24 46:15
50:18 65:13,17
67:11,14,15 73:4
80:5 89:5 101:3
113:1,6,10
**ways** 18:20
**wcst** 110:22
**we've** 62:13,16
72:3
**weary** 104:15
105:2 107:19,23
108:14
**website** 95:1
117:19,21

**websites** 117:21
**wechsler** 14:25
22:23 89:9
**week** 19:15,19 27:4
60:20 91:20 93:20
93:23 98:9
**weeks** 124:1
**weight** 61:7,8
**welcome** 126:19
**went** 8:17 12:8
102:15
**wider** 52:1
**wife** 125:13
**william** 2:4 5:19
**wisconsin** 24:3,8
58:23 65:3,24
66:14 67:4 96:9
**wishes** 101:8
**withdraw** 117:14
118:3
**withdrawn** 12:23
18:14 19:25 35:9
37:2 39:20 45:12
59:18 67:2 73:3
78:14,18 80:4 83:3
**withheld** 124:5
**witness** 3:3 5:25
6:2,4 21:15 23:3
24:13 25:19 29:19
30:14 41:9 63:17
66:23 70:6 73:19
77:24 78:20 86:2
87:17 91:11,15
93:25 94:5 97:2
103:11,25 104:7,19
105:5,15 106:1
107:21 108:5 109:8
112:9 113:5,13
115:2 118:5,14
120:2 121:12,22
122:17,24 123:7,10

123:10,14,21
126:13,20 128:9
**word** 15:8 16:17
57:10,17,20,21,22
64:11,12,12 77:4,8
87:21 91:3 93:14
**words** 13:12 14:24
15:17 17:1,2,9
57:11,11,12,12,12
57:14,22,24 59:16
**work** 28:13 39:16
83:15 98:10 99:17
110:10 121:15
122:9
**worked** 31:21,25
**workers** 85:12
**working** 15:15 32:1
32:3 53:1 55:18
88:21 97:2,4 98:8
124:2
**works** 50:5 84:1,4
**worse** 70:15
**wramlong** 2:6
**write** 33:21
**writes** 29:23
**writing** 33:17 97:3
**written** 91:24 99:3
99:4 100:15,16,17
100:19 121:22
**wrong** 31:14 50:4,6
59:2,3 65:11,21
115:6
**wrote** 13:25 38:23
90:24 110:8

**y**

**yeah** 27:18 42:24
44:4 45:2 47:13,25
67:7 68:16 74:23
79:12 82:18 86:21
86:21 87:3,12
93:15,25 94:11

95:7 98:15 110:9
112:11 115:2 119:5
122:11
**year** 8:16 18:13
23:15 29:5 31:22
83:19
**years** 8:18 84:15
89:7 98:1 99:6
110:9 125:8
**younger** 106:24

**z**

**z** 51:18
**zero** 42:20
**zone** 48:19 103:8
**zones** 103:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.