Date of Submission: August 14, 2016

**Confidential Communiqué to William Amlong, Esquire**
**RE: Rodney Scott Patterson**

Table of Contents

| | |
|---|---|
| Introduction | Page 2 |
| Timeline of Significant Events | Page 4 |
| Overview of the Issues of this Case | Page 15 |
| Perspectives Regarding the Paraguay Trip | Page 16 |
| An Alternate Perspective | Page 26 |
| Facts Regarding These Claims and Assertions | Page 28 |
| Further Matters at American Airlines | Page 32 |
| The Military Leave Matter | Page 33 |
| The Examination of Scott Patterson By Dr. John Knippa | Page 34 |
| Argument and Functional Considerations | Page 47 |
| The Psychiatric Examination by Ibrahim Abi-Rafeh M.D. | Page 53 |
| The Neurological Examination of Dr. John D. Hastings | Page 54 |
| The Aeromedical Neuropsychological Report of Dr. Gary G. Kay | Page 55 |
| My Work in this Case | Page 57 |
| The Events at Asuncion that Set the Stage for Scott's Problems | Page 59 |
| Overview of My Examination Process | Page 65 |
| Overview of Documents Reviewed | Page 67 |
| Medical Specialties Record Reviews | Page 79 |
| Review of Collateral Sources | Page 80 |
| Disability and the FAA Policy for Airmen | Page 86 |
| Scott's Background History and Present Functioning | Page 87 |
| My Overall Clinical Observations and Findings | Page 89 |
| The Formal Testing Results | Page 90 |
| Diagnostic Opinions | Page 94 |
| The Takeaway | Page 95 |
| Certification | Page 96 |



PLAINTIFF'S
EXHIBIT

CASE
NO. 17-CV-60533

EXHIBIT
NO. 1

1

**CONFIDENTIAL COMMUNIQUE**

This is privileged and confidential expert forensic patient information report. Individuals or entities granted permission to review this report through written release by Rodney Scott Patterson, and/or Mr. Patterson's his attorney, and/or Dr. Glenn Ross Caddy must be professionals capable of ethically and professionally interpreting, understanding and communicating the information this report contains. Any duplication, transmittal, re-disclosure or transfer of this report is expressly prohibited. [The confidentiality of this report is protected under The United States Health Insurance and Portability Act, 1996, as amended].

**Introduction to this Forensic Investigation**

A fundamental tenet of the behavioral sciences is that all human behavior makes sense, even the profoundly aberrant and or pathological, if only one can come to understand the dynamics underlying or driving that behavior. The above tenet surely applies to the present matter in which First Officer Rodney Scott Patterson [hereinafter referred to as "Scott" Patterson or FO Patterson] is embroiled, as it does to any other.

Likewise, in psychometrics, the behavioral scientist must deploy valid measuring systems that offer the best prospects for construct and predictive validity. Yet we also need to understand that the best predictor of an outcome or a performance cannot be determined by a second order estimate of that performance, but only by the direct operationalizing [the direct testing] of that performance. It must be understood that the best measure of an operation is not a statistically based predictor, but a measure that validly demonstrates that performance. Hence, for example, the most reliable and valid measure of a skill is the level of excellence in the demonstration of that skill. That best measure cannot be achieved by employing a second order measure, unless it can be shown that the second-order measure has exceptional predictive validity of that skill and that the assessment process was done in a valid and reliable manner. Unfortunately, in the case to be presented below the approach to assessing the pilot's flying skill and his personality characteristics that American Airlines [hereinafter referred to as "A.A"] were seriously flawed, and thus invalid.

In the course of my comprehensive forensic investigation of this case it became my opinion that the A.A. process in dealing with the investigation of the concerns being raised were flawed in a number of respects. At the time that Scott Patterson was withheld from service as a Flight Officer, a letter to him from Captain James Bond, Chief Pilot, MIA, dated September 25, 2015, stated: "I am withholding you from service with pay pending the outcome of an investigation into the circumstances surrounding a "Work Environment Complaint" that was reported by a coworker". And yet, without in any meaningful way conducting an appropriate comprehensive examination of this so-

2

called "Work Environment Complaint", what A.A. did was to send FO Patterson to undergo a comprehensive clinical and neuropsychological assessment, [a so-called "Independent Aero-Medical Clinical and Neuropsychological Examination]. This course of action was based on a paradigm and protocol, which in its application, in the present case, was fundamentally misguided. Moreover, in its execution [as conducted by the IME Clinical and Neuropsychologist] Dr. John Knippa] this procedure would prove operationally flawed, and for multiple reasons. And yet, it was this very process, and the erroneous conclusions that flowed therefrom, that have resulted in the potential for an inappropriate termination of FO Patterson, a sixteen-year career pilot with A.A. to take place.

Following my own investigation of this entire process conducted by A.A. in the course of dealing with this entire matter, I came to perceive the multiple flaws in the logic, assumptions, and the operational approach of A.A. in this matter. The company failed to do an appropriate investigation of all the issues involved. [Read that as perhaps a combination of incompetence and perhaps too the presence of bias in A.A. [perhaps based on the rank of the complainant]. This in turn led A.A. to fail to conduct an appropriate and rational Human Resources Investigation [in fact, it appears that no meaningful fact finding enterprise was conducted].

Following a thorough review of all of the matters in this case, and my own comprehensive review and psychological assessment of FO Patterson, I recommended that FO Patterson undergo a further testing by a nationally recognized Aero-Medical Expert, Dr. Gary D. Kay. I recommended such a process solely for the purpose of definitively demonstrating the errors of elements and inferences both in the A.A. procedure in sending FO Patterson across the country for an inadequately implemented Clinical Psychological Examination and a somewhat similarly flawed Neuropsychological Examination. [Such an examinations should not have been used as a substitute for a thorough Human Resources Investigation of this entire matter [for it surely was beyond the scope and ability of the so-called California IME examiner], and in fact no such examination of the events in the workplace was ever objectively conducted! Moreover, the examiner chosen by A.A. to undertake what became a failed fact-finding enterprise did not have access to the data necessary for him to even begin such a fact-finding venture [he was simply not equipped to do so]. It is hardly surprising, therefore, that his efforts further compromised the situation and ultimately also himself.

The process and the conclusions of this earlier examination were compromised in part by lack of information by Dr. Knippa, and also the processes of the examination were in fact operationally flawed [that is, some of the inferences from the examination and some of procedures, and thus also some of the findings, were flawed].

The further aeromedical examination that I recommended be conducted [by Dr Gary Kay, confirmed some of the some errors made in the former A.A. directed "Independent Examination" process. Further, these second findings were consistent with my own

3

findings, yet using quite a different investigative paradigm. The ultimate conclusion is that there was no basis from within the discipline of psychology to contemplate the termination of the employment of Scott Patterson.

### Timeline of Significant Events in this Case

There are multiple events of significance in this case. Providing a timeline of these major events, front and center as it were, is of use for reference and to facilitate clarity. Hence, I place the timeline for reference here, at the beginning of this report. It should be noted from the outset that at the time that "Scott" Patterson began having a problem at A.A. he was an A319 First Officer with over 12,000 logged flight hours. He had begun working in aviation in 1993, and in 1997 he began with Mesa Airlines, being promoted to Captain the following year, flying a Beech 1900. He was hired by American Airlines in 2,000 as a B727 Flight Engineer and then transitioned to fly B737's as First Officer. He was furloughed from American from October 2004 to 2007 and when he returned to work at A.A. he became a B737 First Officer and he then transitioned to the B757, also as First Officer. While during the period of furlough, Scott worked as a United States Army Officer. Thus, except for a period of furlough, Scott Patterson had been a commercial carrier pilot since 1993.

Throughout his developmental years and to the present time, Scott Patterson reports that he has always been a physically fit and an emotionally healthy person. He has a stable family life and reports never experiencing any problems of an emotional nature [except for the inordinate stress he has been under as a result of his present difficulties at American Airlines]. He has no history of substance misuse and in fact he does not drink alcohol at all. He also denies taking any prescribed psychoactive medications.

October 7 to 10, 2014:  First Officer [FO] Rodney "Scott" Patterson flew a trip to Paraguay with Captain Glenn Whitehouse. The events of this trip triggered much [all] of what has happened since. I will discuss the details of this trip subsequently.

Soon after that trip however, FO Patterson was advised that a Flight Attendant had made a complaint regarding him and he was required to meet with A.A. Professional Standards. At that meeting FO Patterson reports that he was advised that Captain Whitehouse had made the [strange] complaint against him, namely that Scott Patterson was alleged to be pointing of people to U.S. Customs for extra screening. [Scott Patterson reported to me that he strongly denied what he called this "bizarre accusation"].

October 25, 2014: Scott was involved in a worker's compensation accident in Bolivia.  He suffered a fracture to his left foot and was out of work until January 7, 2015.

February 14, 2015: FO Patterson was diagnosed with a sarcoma [cancerous tumor] in the muscle of the left breast and on February 27, 2015 he underwent a two-hour surgery to

4

remove the tumor. Thereafter, Scott undertook additional treatment in Mexico in an effort to reduce the risks of any return of the cancer. He was determined to be cancer free as of May 31, 2015 and he returned to work on June 6, 2015.

May 31, 2015:  FO Patterson presents to Dr. Charles R. Mummery, an F.A.A, Aviation Medical Examiner. Mummery examines Scott and Issues a First Class Medical Certificate.

Immediately thereafter Scott again began flying for A.A until September22, 2015, when A.A suspended him from flying.

June 14, 2015: FO Patterson successfully completes R9, [a program of simulator practice and checking that involves qualifying pilots to fly the line].

July 17, 2015:  FO Patterson and Captain Robert Swanson are accosted by US Customs and Border Protection on departure from Miami.  A.A FLT 922, MIA to VVI [Santa Cruz]. A Female pilot, FO Caughey, advises that she was not searched as the Customs Officers claimed were looking for a male.

July 20, 2015: Federal Aviation Administration grants Authorization for Special Issuance of a Medical Certificate Valid through May 31, 2017. [These certificates are issued biannually].

July 21, 2015: Patterson is scheduled to fly "non-rev" to Wisconsin for the Annual Oshkosh Air Show.  It is discovered that Captain Glenn Whitehouse is on the flight to Chicago, the first portion of this commute.  The flight is full and this situation might result in a jump seat accommodation for Scott situation with Whitehouse.  Scott changes the travel plans immediate in order to avoid any contact. This results in a 6-hour delay.

July 22, 2015:  Captain Chip Harlowe, APA Professional Standards for the Miami Domicile phones Patterson.  The course of the conversation is interrogatory and levels a number of accusations namely involving Whitehouse.  Scott reported that Captain Whitehouse was complaining that FO Patterson was harassing him whereas Patterson advised that he was seeking just the opposite, to avoid him.

Harlowe thereafter asked Patterson in a rather toned down manner.  "Now Scott, we are friends, we have flown together, I want you to be honest with me, are you smuggling guns and ammunition to Bolivia?  You can tell me, I am your friend".  Patterson ended the call at that point.

[Scott Patterson considered this call predatory and professionally inappropriate for the APA Professional Standards.  It was Scott's opinion at this point that Captain Glenn Whitehouse had started, or had been a party to a rumor mill that now had come to include Scott's alleged involvement in Federal Criminal activity].

5

July 22, 2015:  Patterson contacted APA National Professional Standards Chair, Captain Doug Woods, to report the issue with Captain Harlowe and to request assistance with resolving the Whitehouse issue once and for all.  Patterson also contacted Captain Mike Karn with the APA Security Committee, reference the allegations made by Harlowe/Whitehouse and involving Customs.

[It should be noted that upon follow up with these two persons, Captain Thomas Copeland was involved with the issue.  Copeland is known as a "big wig" within the APA. He is referred to as the number 2 man in the Union.  The situation led Scott Patterson to consider the possibility that Captain Copeland was running interference for Captain Whitehouse, as Woods and Karn should have put a stop to the issue at that point but they did not].

July 23, 2015:  Patterson reported for A.A Flight 922 departing Miami to VVI.  He was again thoroughly searched by U.S. Customs and Border Protection.  This time, however, with a completely different tact and the sensitivity of a brick. This was clearly not a "random occasional visit". In fact, Scott had never experienced or even seen such a searching in all his years in the airline industry.

The Customs Officers were stationed by the jet bridge entry and they were examining all passports. Patterson's passport was checked and a conversation ensued about Patterson's Official Passport.  Patterson advised the officer he often travelled on official business for the government, and hence the two passports [military and civilian] the officer let him pass.  A while later that same officer showed up in the aircraft and requested to specifically search Patterson's belongings, while offering apologies for doing so in front of the passengers. The incident led Scott to believe that he was being given very focused attention.

[In Scott Patterson's 15- year career, and Captain Robert Swanson's 28-year career, both men discussed the fact that they had never been searched or even questioned by Customs on an outbound flight. This was more than highly unusual. Inbound searches are not uncommon and are to be expected. Later, Scott would be told of a rumor that was circulating. That rumor was that he was smuggling weapons into South America].

During that [July 23, 2015] flight also Patterson had a cordial conversation with the Captain, Pat McGinn. McGinn advised Scott that he was on the National Pro Standards Committee and he would contact Glenn Whitehouse to resolve the issues between Scott and Captain Whitehouse. [Unbeknownst to Scott, in fact McGinn had already spoken to Whitehouse on a previous occasion about the events. In fact, McGinn generated an email to Whitehouse advising of the results of his conversation with Scott. The end result as far as McGinn was concerned was [and he said] that both men "should grow up and act like adults".

Captain Whitehouse apparently was not happy with this proposed resolution however,

6

and he is alleged to have fired back to Captain McGinn that he [Whitehouse] was acting like and adult the whole time.

August 17, 2015:  Patterson is ordered to Active Duty in Washington, D.C, and he purchased a full fare ticket on American Airlines for travel on Sunday, August 16, 2015.

August 28, 2015: Patterson is released from Active Duty.

September 21, 2015: Scott Patterson Contacted the Miami Flight Office to request military leave for an obligation commencing on 22 September, 2015 at the Pentagon in Washington, D.C.  He spoke to Carolina in the Flight Office and asked for her to pass a message to Luis Rojas requesting leave. Scott made several calls to Carolina that same day to check on the status of the leave request as he had not been relieved from flying the next day in the DECS [Dispatch Environmental Control System]. At approximately 1510 hours on that same day, Captain James Bonds left a message on Scott's cell phone denying that leave, unless Scott could produce a set of leave related military orders. [Scott Patterson reports that Captain Bonds is a reserve Lt. Colonel in the US Air Force and that he must have known that Scott was not required, or was he able, to provide such evidence of duty until he returned from that duty]. That message was as follows:

"Hey Scott, Jim Bonds it is three ten. Trish gave me the message saying you [unintelligible], an EO for tomorrow because of some military work at the Pentagon. Dude we're really, really, really short and I see that you, you probably see that by your trip that's going out tomorrow. Everybody is on reserve and we are really tight on manning so, obviously we are going to give you the time off, if you can produce some orders. Can you have them fax us the orders and the fax number is 305-526-1294.  We're leaving you on the trip till we get that fax. Thanks."

FO Patterson did not receive this voice to text message from Captain Bonds, until approximately 1930 on the same day [September 21, 2015].

Scott reported that he had first called the Miami Flight Office around 1545 on that day to inquire [before the office closed] regarding the question of why he had not automatically been given the leave. He then contacted Captain Brian Vitale [because Scott knows Brian Vitale to be a knowledgeable person regarding these issues, since in fact it was he who started the Military Affairs Committee for the American Airlines Allied Pilots Association, in Miami]. Scott reached Captain Vitale at approximately 1700 hours, and he explained his situation to Vitale, who advised him to contact the System Operations Control (SOC) Chief Pilot on duty. Scott did that and spoke to Captain Dave Tatum. He notified Captain Tatum of his military obligation and Captain Tatum released Scott to attend to his military duty with an EO [Employee Off status]. The EO simply meant that Scott was being granted Vacation Time to cover his time during his military obligation.  It was noted that Tatum did not put Scott through the level of scrutiny that Bonds had done. Nor was there any discussion, or excuse, for any claim of A.A. being

shorthanded. Audio recording of this call is available.

September 22, 2015: Scott departed for Washington, D. C.

September 22, 2015: Scott reports that he contacted Luis Rojas in the Miami flight office, reference the military leave. Luis advised Scott that he would need to provide documentation for the file, which, of course, was standard practice.  Scott sent a notice of "Military Leave of Absence" form to Luis from the offices of Military Headquarters at the Pentagon.

September 22, 2015: Captain James Bonds, Chief Pilot in the Miami Flight Office removed the EO from Patterson's HI-1 [Each Pilot's work schedule for the month], and inserted the PW code instead.  PW is the code for "Paid but Withheld from Service" as a pilot.

[The above action meant that Scott Patterson was not permitted to fly yet he had no idea why this adverse action was taking place, he just knew that whatever was occurring it was not good. Scott noted that usually this type of action is done only for disciplinary purposes. It is Scott's view that this was an improper change of status while Patterson was, in fact, attending his military duty].

September 24, 2015: Lt. Colonel Patterson continued to perform military duties in Miami until he was released on September 25, 2015.

September 24, 2015: Captain Whitehouse filed a multi-page complaint against FO Patterson with the A.A Office of Human Resources.

September 25, 2015: Patterson receives a voice message from Captain Bonds advising him that he had been place on PW Status and was not to travel "non revenue" any longer, nor were any of his pass riders [i.e. family] to travel in that status as well.

Scott Patterson also received a letter dated on that same day from Captain James Bonds regarding: "An Investigation surrounding a Work Environment Complaint from a co-worker. While on withhold status, you are directed to remain available at the phone number and address of record listed above.  You are not allowed to use any of the flight privileges that are provided to your or your family as an American Airlines employee. This means you or you dependents are not allowed to fly either on American Airlines or any other carrier as a non-revenue pass traveler".

September 28, 2015: Captain James Bonds contacted Patterson at his "home of record", regarding the military leave. He asked Scott to provide him copies of military orders for the September 22, 2015 duty in Washington. D.C. Scott advised Captain Bonds that the duty was performed under Title 32, or Inactive Duty for Training Status.

8

Scott indicated that he did not know precisely the time frame involved within the Defense Financial and Accounting Service before he would receive his Leave and Earnings Statement. He advised Captain Bonds that his pay stub should be forthcoming in approximately two weeks.

October 5, 2015: Tricia E. Kennedy Esquire agrees to represent Scott Patterson on behalf of the A.P.A.

October 7, 2015: Captain Bonds left the following message on Scott's Answering Machine at his residence:

"Captain Jim Bonds from the flight office calling, 4 o'clock on the 7th, hope all is well with you guys. Hey I was hoping to have gotten those orders or the LES or something. Little bit, you know, it's just a lot of confusion on our part, you know the circumstances around those order. So how bout, doing this if you will. Would you please, you know, if you can provide those to us, by the 13th, then we'll be good, but you know anything after that then we may have to get a little more formal in asking you to provide those in the form of a Section 21 or something.  So if you can, if you can get those to us, we would really appreciate it. You know our number here in the First Officer and take care and hope to hear from you soon".

Scott reported that he considered this communication both socially inappropriate and threatening, especially from a man who he knows well.  He also wondered if the tone of this letter was in any way linked to the Captain Whitehouse matter.

October 13, 2015: Scott's A.P.A. counsel, Ms. Tricia Kennedy, sent the following email communication to Lucretia Guia, the A.A General Counsel.

Dear Lucretia,
I understand that the Company has asked FO Scott Patterson [576006] to provide verification of his September 2015 military duty.  Although verification is not normally required by the Company [11.E.6], FO Patterson is in the process of providing same.  Meanwhile, the Company has withheld FO Patterson from service regarding an unidentified "Work Environment complaint."  The timing of these events makes us pause and we request that the Company explain why it needs military verification in this instance.  Further, we request that the Company state whether the request for military verification is related to the unidentified "Work Environment Complaint" and we have yet to receive any detail about the complaint beyond the foregoing description.

That said, FO Patterson advised CA Bonds that he is in the process of complying with Chief Pilot Bonds military verification request. Toward that end, the pilot is given a "reasonable period of time to provide documentation substantiating the military duty in question" (11.E.6).

9

Nonetheless, CA Bonds threatened FO Patterson, stating that if he [Patterson] does not comply within the time frame demanded, the Company will initiate a Section 21 investigation. Such an unreasonable demand only fueled Scott Patterson's concerns about the entire situation.

FO Patterson's APA Attorney, Trisha Kennedy responded to Captain Bond's demand of FO Patterson on behalf of her client by writing:

"Perhaps this is just a matter of miss-communication but we wanted to bring this to your attention. Rest assured that FO Patterson is working on getting the verification but he needs a reasonable amount of time to do so. Your assistance in this matter is appreciated".

October 28, 2015: FO Patterson received a letter signed by Captain Brian Beach advising of a Section 21 Hearing that was to be scheduled on November 2, 2015. The A.P.A. [the Allied Pilots Association] canceled this hearing due to insufficient notice.

October 28, 2015: FO Patterson sent the following email to Captain Bonds.

"Captain Bonds

Per your request of 29 Sept, please find the attached leave and earnings (LES) DFAS Form 702. The LES verifies performance of military duty, which is covered under USERRA, 22 SEP through 25 SEP, 2015. Should you have any further questions please feel free to contact me otherwise, I will show this as a closed out issue and request".

November 13, 2015: Scott received another notice, signed again by Captain Beach, this time advising of a Section 21 Hearing to be held on November 23, 2015 in Miami, in the Human Resource Conference Room.

November 23, 2015: American Airline Allied Pilots Association arranged what is referred to as a Section 21 Hearing to address Captain Whitehouse's complaints.

December 14, 2015: FO Patterson, consistent with a request that came out of the so-called "Section 21 Hearing", wrote a letter to HR Partners, American Airlines, about his view of the events that were the focus of the above hearing. He denied that he conducted himself in an unprofessional manner. More specifically, he made a total of thirteen denials against conduct that he was alleged to have enacted according to the Whitehouse allegations. Representative denials included but are not limited to: "I did not take photos of a Flight Attendant without permission"; "I have not asked or requested or suggested that Customs check crewmembers for illegal contraband"; "I did not divert and aircraft"; "I did not point my fingers as a gun in front of crew passing the hotel bus"; "I have not conducted myself in an erratic, explosive, or unprofessional manner"; and he denies "using the N word".

10

In that above noted correspondence, FO Patterson also questions the rationale for bringing forth the array of complaints [he lists 13 in this letter but in fact there were several dozen complaints in this format and nearly a year after the timeline of the vast number of the alleged happening of these "events" rather than taking the complaints to A.A. Management immediately upon them being brought forward.

January 12, 2016: Dr. Martin Dayton determined Scott Patterson to be in clinical remission from the chest cancer and on March 2, 2016, FO Scott Patterson was granted authorization for special issuance of a Medical Certificate, which would expire on January 31, 2017.

January 14, 2016: Captain Brian Beach, the Chief Pilot [Miami] wrote an unaddressed letter requesting that:

"FO Patterson is required to undergo a Fitness for Duty Evaluation ([Mental Health]. Flight requests that a Fitness for Duty Medical Evaluation, pursuant to Section 20 of the American Airlines A.P.A. labor agreement, be scheduled and conducted for First Officer Rodney "Scott" Patterson. The request is based upon this office's concerns about FO Patterson's judgment and specifically his mental health and/or emotional stability. This office has received multiple reports of atypical interactions with co-workers and reports that suggest a pattern of false/self-aggrandizing statements". The letter goes on…

"Based on the information above, I removed First Officer Patterson from active duty and placed him on a paid withheld status on September 24, 2015. Please let me know if you need any additional information".

[Dr. John Knippa quoted this letter to Scott Patterson during his consultation with the psychologist on March 16, 2016].

January 20, 2016: Captain James Bonds sent FO Patterson a directive to report for a Section 20 Evaluation.   It states in part: "due to my concerns regarding your ability to safely operate an aircraft, I have arranged for you to participate in a medical evaluation as provided in Section 20 of the JCBA. You have been scheduled for a Neuropsychiatric evaluation with Dr. John Knippa on January 16 and 17, 2016. Appointments on both days begin at 9:30 a.m."

[Note this is an incorrect use of the term "Neuropsychiatric". What is meant, it seems, is a "Neuropsychological Examination" or as it happened in this instance, "A Neuropsychological and Clinical Psychological Examination". Of course, why a "Neuropsychological Examination" was considered necessary and not simply the much more logical [and professionally routine] "Clinical Psychological Examination", given the nature of the alleged complaints, hardly makes any sense at all. It would appear far more rational to request "A comprehensive Clinical Psychological" or "A Psychiatric

11

Examination" given the supposed allegations. That is, there would appear no rationale to believe from any of this single interpersonal conflict that one of the parties [the younger one] may be evidencing the consequence of a brain injury or other organic brain condition. [after all, there were no complaints about FO Patterson's memory, or co-ordination, nor any indications of aberrant personality change]conduct]. Every time two people have an interpersonal dispute in the workplace we do not run them through a comprehensive neuropsychological battery, without substantial indication of any neuropsychological symptoms, or else the discipline of neuropsychology would soon by overrun. Of course, it is equally the case that if two employees are experiencing a dispute which the senior one continues on, the potential claimant is seeking out innuendo, rumor, inference, fact, and fancy, all about the other, and from other employees, and that person continues to do so for 11 months, and then files a complaint, the question might be raised: Why would we not question the emotional stability or the judgment of that person? Could it be because of his higher rank?].

On January 25, 2016 Rodney Scott Patterson filed a complaint with the United States Department of Labor [file # FL-2016-00016-10-R]. He claimed a violation by American Airlines of his rights under the Uniform Services Employment and Reemployment Act [USERRA]. The case related to the difficulties that Scott had faced in being released from duty through the A.A. Miami Flight Office, and his subsequent suspension from his flight duties as a pilot by A.A.

January 31, 2016. Dr. Dayton prescribed an evaluation and treatment relating to an injury Scott experienced [to the right elbow that occurred back in October 2014, but still had not fully resolved]. Dr. Dayton noted: "In my opinion he should not fly until the specialist renders a diagnosis/care and clearance". [Which in fact occurred soon thereafter].

February 1, 2016. Captain Brian Beach, the A.A Chief Pilot, Miami, sent a Memo to FO Patterson confirming that at the November 23, 2015 Section 21 hearing that was held "as a result of a work environment complaint" the following was resolved: "that Captain Beach has reminded Scott Patterson of the Company's Work Environment Policy and of the importance of maintain good working relationships". It further stated: "that FO Patterson has received a copy of the PEH and is aware of his right for rebuttal".

February 12, 2016 Tricia Kennedy telephoned Patterson on his cell phone to inform him that she had been in contact with Lucretia Guia, the A.A Corporate Counsel.  A.A was going to answer the USERRA Complaint with the innuendo that Patterson was being sent for a mental health examination. Patterson informed Kennedy to advise Lucretia to "knock herself out". A Department of Labor Investigator had already spoken to Patterson specifically about those allegations and the investigator informed A.A that the A.A suggestion that Scott had "some mental issues" was outside the scope of his investigation.  In other words, A.A.'s assertion questioning Scott's mental health was not a defense in the USERRA matter, though it may have been a strategy to be considered in

12

the defense of such a complaint! This information, of course, would be readily ascertainable in a Freedom of Information Act Request from the Department of Labor. In this case such assertions of mental health issues, or the implication of a mental illness in FO Patterson, could be seen as libelous.

March 16 and 17, 2016: FO Patterson underwent a clinical and neuropsychological aero-psychological examination in California, conducted by John Knippa Ph.D., ABN and ordered by American Airlines.

March 21, 2016: Dr. Knippa published his <u>Neuropsychological Aeromedical Assessment Fitness for Duty Evaluation.</u> Dr. Knippa did not consider Scott Patterson to be unfit on the basis of the general clinical psychological component of the evaluation [that is, that related to what was the presumed reason for the examination]. However, Dr. Knippa did find Scott overall to be NOT FIT FOR DUTY on the basis of several of the tests results from the quite numerous "neuropsychological" components of the overall assessment.

So, just to summarize! Scott Patterson had passed his most recent Flight Simulator Examination in June 13, 2015, and every such examination previously. He was cleared to fly by the FA.A, on May 31, 2015 [subsequent to his cancer surgery] and by A.A on June 2, 2015. In fact, there appears to have been no indication in the record anywhere over the past fourteen years of Scott's service to A.A. that he was anything other than broadly competent to conduct his duties as a First Officer. Not even Captain Whitehouse appeared to suggest that there were as problems with Scott Patterson's flight skills.

Yet, on March 16 and 17, 2016, FO Patterson would find himself attending a aeromedical clinical and neuropsychological examination that employed several tests out of a comprehensive battery, the results of which led Dr. Knippa to question Scott's ability to function skillfully as a pilot [and yet there was no indication in Scott's flight record of some 12,000 hours in the air that he suffered any skills deficits not that at no time had any pilot or any flight simulator study identify any such a problem in Scott's flight skill sets.

On the face of it, does it not seem just a bit strange, even incongruous, that the only person in the world to suggest that Scott Patterson was not capable of serving as a A.A. pilot was Dr. John Knippa?
.
On March 28, 2016 Scott Patterson contacted the psychiatrist, Ibrahim Abi-Rafeh, M.D. and requested a consultation, seeking advice on the content of Dr. Knippa's report and for guidance in dealing with this matter. [Dr. Abi-Rafeh provided an authorized Release of Medical Records documents to A.A. Medical and the document was faxed to Dr. Abi-Rafeh that afternoon, and before Scott's appointment with his psychiatrist].

On March 31, 2016 Martin Dayton D.O. wrote a further note regarding FO Patterson's Fitness as an Airline Pilot and again he reiterated that the medical care that Scott

13

Patterson has been receiving from him "does not adversely affect his cognitive, mental or physical performance. He is able to fly as a commercial airline pilot without restrictions. He appears to be in clinical remission".

The findings of Dr. Dayton notwithstanding, based on Dr. Knippa's findings, on March 25, 2016 FO Patterson received a call from Captain Brian Beach telling him that he was considered "not fit for duty" and that he should call A.A Medical for advice.   The message here was that Scott Patterson's employment with A.A. was to be terminated [his salary payments were ended on May 15, 2016].

On April 11, 2016 John Knippa Ph.D. sent a fax transmission to Trisha E. Kennedy in response to her request for copies of the records of Rodney Scott Patterson. Dr. Knippa wrote:

"Please note that the service was performed only upon his verbal and written agreement specifically that Mr. Patterson would not request reporting from this office [i.e. as no doctor-patient service was offered], rather that he would request information through the referring party. He may consider requesting reporting from the referring party [i.e. his employer's occupational health service], as was the written agreement when he was seen. If reporting information is not made promptly available from that source, please advise and I will inquire and facilitate as may be appropriate".

On April 11, 2016 I [Dr. Glenn Caddy] submitted a formally authorized HIPAA compliant Records Release Request, to Dr. Knippa, who the following day responded to my duly authorized request and refused to provide me with these records.

On April 13, 2016 I forwarded a further letter to Dr. Knippa tersely making the point that: "It does not matter what Mr. Patterson agreed to do in your office or did not agree to do. Things have changed and he now wishes to change his mind…. as a matter of ethics this man's file is maintained by you and not owned by the entity employing you. You have an ethical obligation to release a copy of the entire file, testing, raw data, and all to me irrespective of whether you had a doctor patient relationship with Mr. Patterson or not".  I also copied Scott Patterson's attorney, William R. Amlong, Esquire [Amlong and Amlong P.A., 500 N.E. Forth Street, Suite 200, Fort Lauderdale, Florida 33301] on this correspondence.

After substantial discussion with Scott Patterson regarding the most compelling way to seek to convince A.A. that they were wrong in accepting what Dr. Caddy regarded as the flawed clinical and neuropsychological opinions of Dr. Knippa, and after discussion with Scott's attorney, William Amlong, Esquire, Dr. Caddy recommended that Scott make an appointment with the nationally recognized Aviation Expert Neuropsychologist, Gary G. Kay Ph.D., in order to undergo a second opinion neuropsychological examination from this nationally recognized expert.

14

I had essentially completed my clinical and forensic examination of FO Patterson by that time [and from that investigation I knew that there was nothing clinically or neuropsychologically wrong with Scott Patterson]. But because I was not a certified aeromedical examiner, I recommended that Scott go to one of the most well respected Aviation Neuropsychologists in the country, and hence, Dr. Kay.

May 24, 2016 Scott Patterson consulted with John Hastings M.D. in Tulsa, Oklahoma, to undertake a comprehensive aeromedical neurological examination.

On June 28, 2016 Scott Patterson flew to Washington, D.C. [that is, within his same time zone]. He had a good night's sleep, and on June 29, 2016 he underwent a full day aeromedically focused neuropsychological examination with Dr. Gary Kay.

Significantly, at the appointment with Dr. Kay, FO Patterson was advised that Dr. Kay, knowing from Scott that he had seen Dr. John Knippa, had requested from Dr. Knippa, [and was freely given], a complete copy of both Dr. Knippa's confidential Aeromedical Neuropsychological Examination Report of Scott Patterson, and all the raw test data related to that examination. That is, without the knowledge, consent, or any written authority from Scott Patterson, and without regard to the Confidentiality Requirements of the Health Insurance Portability and Accountability Act of 1996, Dr. Knippa had freely released to Dr. Kay the very documents that, despite being sent a HIPAA compliant Authorization to Release to Dr. Caddy a copy of Scott Patterson's entire file, Dr. Knippa had initially refused to do so. In fact, Dr. Kay was provided these records without the knowledge or consent of Scott Patterson [and perhaps also without the knowledge of American Airlines].

On June 26, 2016 Dr. John Knippa finally released to Dr. Caddy his Aeromedical Neuropsychological Report on FO Scott Patterson. On the disc containing the report was included a significant amount of raw testing data.

On July 1, 2016 Rodney Scott Patterson was issued A Medical Certificate First Class by the Aerospace Medical Certification Division of the FAA Civil Aerospace Medical Institute in Oklahoma City, OK.

On July 11, 2015 I received notice of the findings of Independent Aeromedical Neuropsychological Examination undertaken on Scott Patterson by Dr. Gary G. Kay. This report indicated that Scott Patterson was functioning within normal limits and was not in any way neuropsychologically impaired.

It is my understanding that subsequent to the testing undertaken by Dr. Kay, Dr. Kay contacted Dr. Joseph Tordella, an Aviation Medical Examiner for the FAA. Dr. Kay advised Dr. Tordella that there were no conditions present from a neuropsychological perspective that would recommend other than that FO Patterson was: **"Fit for Duty".** Hence, on July 1, 2016, as noted above, that certification was issued.

15

On August 3, 2016 I received the final copy from Dr. Kay of his "Report of Neuropsychological Assessment" of Rodney "Scott" Patterson.

## Overview of the Issues of this Case

There is no one in American Airlines other than First Officer Scott Patterson and Captain Glenn Whitehouse who has a 360-degree view of all of the events that occurred between these two men during that trip to and from Asuncion. Equally, no-one has an understanding of what was occurring within each of their thinking during the trip that they both worked on American Airlines Flight 217 from Miami to Asunción, Paraguay, and then back [over the period October 7 to 10, 2014]. In fact, it would seem that while both these two men were participants to an unpleasant set of events, they both appear to have viewed some of these events in quite different ways. These two men had flown together on two previous occasions and without incident. Yet the events of this trip became the genesis of the problems that would develop all the way beyond anything that Scott Patterson could ever have imagined.

**Perspectives Regarding The Paraguay Trip**

Captain Whitehouse had contacted FO Patterson two weeks before the scheduled trip, via the "What's App" application and advised that: "You and me and Flannigan are going to Asuncion together. Imagine what we three misfits are going to get into".

Despite the above pleasant interchange, it was several events that occurred on this trip that became the basis for FO Scott Patterson's present employment difficulties. [And, there were two instances of some unpleasantness that occurred between these two men on that trip that led FO Scott Patterson intentionally to have nothing to do with Captain Whitehouse thereafter].

However, the unpleasantness that occurred between Scott Patterson and Glenn Whitehouse did not stop at the end of that trip, as evidenced by the fact that nearly a year later Captain Whitehouse submitted a formal complaint against Scott Patterson to A.A. This complaint contained a set of serious assertions, opinions, impressions, speculations, and allegations regarding First Officer Patterson.

It was largely the events of this trip that set the stage for the more recent complaints about Scott Patterson's functioning. Basically, what has happened is that Captain Whitehouse has, in one way or another, developed his own perspective about Scott Patterson, and he has subsequently sought out or otherwise obtained [collected] perspective and opinion from several of the flight attendants on that flight, and from other A.A employees, and this story collection appears to have occurred over a number of months after that Asuncion trip, with all these collected opinions reflecting negatively on Scott Patterson [or perhaps in some cases on the contributor]. Captain Whitehouse

16

collated these various observation, remembrances, and largely hearsay perspectives, into the package of complaints and commentary that he submitted to A.A on or about September 24, 2015. [I will discuss Scott Patterson's views of what happened on that Asuncion trip, and also the views of his wife, later in this report].

The other pilot on that flight, First Officer John Flannigan, has offered only a very brief written comment on that trip, and this was offered about a year later, writing:

"The only specific incidents out of the norm with Scott that I recall were an issue trying to get his family on the van to the hotel, and regarding the paperwork when we arrived at the airport for departure. In both cases what was a minor inconvenience was initially met with a stressed response by FO Patterson, but it was eventually resolved without further incident".

It should be noted that FO Flannigan's assessment of the flight differs greatly from that of Captain Whitehouse. Also significant, apparently the American Airlines Human Resources Department failed to corroborate many [any] of the statements made about an entire variety of allegations about FO Patterson's conduct, including the claim made by Glenn Whitehouse that Scott Patterson was "moving the flaps while taxiing out" an assertion Scott Patterson says is "blatantly untrue".

It appears that FO Flannigan was never asked anything about this particular issue at any point in the A.A "Human Resources non-investigation". [This is a significant matter because it is my understanding that Captain Danny Shellhouse provided pictorial evidence at an investigative hearing on this matter. Captain Shellhouse also told this examiner, that Captain Whitehouse's assertions regarding this particular "moving of the flaps" matter is impossible to be true [presuming that Scott was seated in the jump seat with the appropriate seat belt and shoulder harness attached].

A flight attendant, Mr. Caesar Bojeda, on A.A Flight 217, on October 7, 2014, [that is during the course of the Asuncion trip], also wrote an email to a supervisor about his views of the events of that flight. More specifically, Mr. Bojeda's, email reflected concern about how he would be paid for a lost trip if his current trip "fell apart" [A.A. 217-218, 7-10 OCT 2014]. [This would seem a rather dramatic, perhaps even a hysterical email, but it is whatever it is, and it may say more about the writer than about Scott Patterson or about Glenn Whitehouse].

It is certainly the case that when eventually Scott Patterson saw this email, he interpreted it as a bizarre, self interested, and a quite absurd mischaracterization of almost all of what actually had happened on the ground in Asuncion. Likewise, Scott acknowledges that he was briefly upset regarding the approximately three to four minutes of the so-called "bus incident" that occurred at the airport in Asuncion. However, Scott told this examiner that he had no idea whatsoever that there was anything for anyone to complain about regarding his "conduct" in Miami, or on the flight

17

down to Paraguay. He acknowledged that he was somewhat annoyed by the events at the bus but he did not consider it all that big of a deal at the time.

Yet, starting while the aircraft they were to fly was still on the ground in Miami, Captain Whitehouse writes in his extended series of complains about FO Patterson:

"On the morning of October 8, 2014 I was informed after the arrival at ASU by a crew member that FO Patterson was rude to her and never introduced himself to the crew. She told me that he took the pillows from the 2EF seats in business class for his family. She also informed me of an issue during the boarding with his wife and children with carry-on bag storage. He apparently took passengers bags out of the overhead near the door 2L, set them on the jet bridge to be checked, and put his family bags there."

FO Patterson told this examiner that this assumption was simply untrue. Firstly, while he cannot be sure about introducing himself to the crew in the rush of getting that flight out on that day, however, he does not believe for a moment that he would have been rude to anyone. He does however recall the matter of the baggage. He reported that the overhead bins are always full on South American flights. "We know the drill and plan ahead.  In this case we were only going for a couple of days so they packed into two small backpacks that would fit under the seat". Scott reported that when he saw that his wife was coming forward to check the children's carry on backpacks, he simply walked towards her, took the two backpacks from her, and placed them in the overhead bins above the seats in row 4AC in Business Class. [These were the seats that were reserved for flight crew rest on the long trip down to Paraguay. Scott said that placing the two backpacks in this overhead in no way compromise access for passenger storage].

Also on page 1 of Captain Whitehouse's complaint he states the following regarding the flight to Paraguay: "After his [Scott's] crew break, when he returned to the flight deck, he informed me his daughter would be watching a video in the rest seat next to me. I told him no. I told him that this was not acceptable under 117 rules, and he needed to move her back to coach. He was not happy about my decision. He told me if he were captain he would allow it. I told him it's against Federal Aviation Regulations to have a person in the seat. I never allow anybody next to us during seat during rest".

[Scott Patterson indicated to this author that this immediately above statement by Captain Whitehouse was not the case, and was a misinterpretation of what he had meant, and what had happened. FO Patterson said that it is not an FAA regulation but contractual restrictions agreed upon with the APA that restricts the use of these seats. Yet while Scott was taking a break, certainly he did not object to his daughter coming up to sit next to him].

Scott Patterson's response to me about the above statement was as follows: "Captain Whitehouse approached me before pushback and asked if I minded the flight attendants sitting in the seat beside me on the rest break.  I told Whitehouse that I was going to talk

18

to my daughter on my break.  At the completion of my break, I told Whitehouse my daughter had been seated next to me and I told her to go back to her mother." [The child was seated with her mother towards the back of the aircraft].

"I simply asked the Captain if he would mind my daughter sitting in the seat and he said he would. It was no big deal and I certainly did not persist with him on this issue. Captain Whitehouse is making a big deal out of nothing and he has been doing so for much more than a year subsequent to the event."

There is also a criticism of Scott Patterson's wife's conduct on the flight on the first page of the complaint letter: ..." Upon arrival at ASU, I was informed by my FA crew that his wife was rude and demanding during the flight." I asked Roxana Patterson if she had any idea what this assertion was about and she simply advised that: "I am never rude to anyone. The only thing I recall of any interactions I had with any of the crew was that I was asked several times if I wished to have an alcohol beverage and I simply said "No thank-you".

Then there were the allegations of the so-called "bus incident" [Scott acknowledges that he was briefly irritated at the bus, and I will comment more on that later.  However, for Scott, and especially in the context of him being a military officer of significant rank, the essential aspect of this matter as far as he was concerned was the fact that Captain Whitehouse tolerated the whining of one particular crew member during the incident and showed, what Scott considered to be lack of respect to him and his role as First Officer in front of the crew].

Then there was an array of other allegations made by either one or several crew members, or by the Captain, of alleged incidents that were supposed to have taken place at the hotel that supposedly further reflected poorly on FO Scott Patterson, all of which he either denies, or views differently, or considers to be lies or distortions.

Scott considers the rest of the claims about his conduct in Asuncion to be just plain untruths. He reported that he spent virtually all his time with his family on that trip and he did not associate much with the Captain or the crew at all. But the issues between these two men did not end there, for on the return flight there was a further interpersonal disagreement. Scott reported to this examiner that following this second altercation he told Captain Whitehouse that this trip has not been a pleasant experience for either of them and that he would place the two of them on the "do not pair" list for future flights.  It was Scott's opinion that this "do not pair" statement to Captain Whitehouse was not well received, but at this point Scott was fed up and really wanted to make it clear that he did not wish to have to deal any further with Captain Whitehouse.

These [above] statements and the statements of other unidentified A.A employees] offered perspective and opinion that went far beyond anything to do with the Asuncion

19

trip. These statements were collected by Captain Whitehouse over the next number of months and also included in the package was the above named "Complaint" which was submitted by Captain Whitehouse some eleven [11] months after the Asuncion trip. [The copy of the complaint I have has a number of names redacted]. It would seem that Captain Whitehouse or someone else solicited a number of these comments about Scott Patterson over a period of time from the various people who ultimately offered them for this document.

Captain Whitehouse's document reflects his perspective on both the aforementioned flight and the hearsay events that he says others saw or claimed about the broader functioning of Scott Patterson that almost definitely had nothing to do with American Airlines, unless of course, this functioning was seen as evidence of extremely poor judgment and/or perhaps mental impairment in the workplace. A significant part of the problem in reading Captain Whitehouse's complaint is that it is not written with much precision and it is impossible to decipher in many instances when he is stating his own observation[s] of the events on the ground and in the air and/or his opinions, versus when he is presenting the hearsay observations and/or the opinions of others. Certainly, it seems, the other pilot on that flight, First Officer John Flannigan, based on the very limited note he wrote regarding his observations of FO Patterson over the Asuncion trip, either does not have the same perspective as Captain Whitehouse, and/or in the alternative, he does not wish to be further involved in this matter.

Up until now, no-one other than myself has interviewed Scott Patterson about these matters in detail, nor has anyone asked Scott Patterson's wife, Roxana Patterson, who was knowledgeable about her husband's state of mind throughout the period of the trip, and who was a witness to various of his behaviors on the flight to Asuncion that have been commented upon, including the so-called "bus incident" and more [that is, her husband's behavior and demeanor and that of others at the time of the bus pick-up on their arrival in Asuncion, Paraguay] and subsequently. Nor has anyone [including the company hired IME Independent Psychologist, Dr. John Knippa] looked into Scott's mental status later on that day and/or throughout the rest of the trip. Mrs. Patterson's observations of the events and of her husbands alleged distress over their stay in Asuncion and on the return flight are certainly not irrelevant in these matters, and who but she would know best her husband's state of mind over those three days in Asuncion, and yet no one other than this examiner has asked for her perspective.

I have memorialized the information [both FO Patterson's perspective regarding that trip and his wife's observations and opinions of that trip]. I will present these data later in this report. And even more fundamentally, no one has investigated the accuracy or credibility of many or any of the presumptions of possible dishonesty or exaggeration that is claimed in the Whitehouse submission to characterize Scott Patterson's functioning at the time. In the course of my investigation of this matter I have made an effort to search out and interview collateral parties or witnesses, and even obtain public record information, in an effort to as fully as was reasonably possible examine the

20

accuracy of a number of the claims made in the Whitehouse submission against Scott Patterson.

Captain Whitehouse's statement contains further comments made by various other [unnamed] individuals. These people have offered stories either claimed to be told by Scott Patterson, or hearsay told by other third parties, about Scott Patterson, that may have led them and Captain Whitehouse [who included these letters in his submission package], and now perhaps some others in A.A, to question Scott Patterson's character [his honesty, integrity, and his personality attributes] and/or even to question his mental stability.

In fact, it would seem that the only purpose for the inclusion of these, what must be considered relatively inflammatory statements, in Captain Whitehouse's submission was to attempt to build a questioning and/or an assertion of Scott Patterson's possible broad personality dysfunction or mental instability, irrespective of the lack of vetting or the credibility of these statements or the assertions or claims. If the purpose here was to be fair-minded, precise, and minimize the prospect of future backlash litigation, this submission, as presented, must be seen as little beyond an incredibly foolish incident, legal and otherwise, just waiting to happen. Objectively, it is hard to read these various claims and not ask oneself, does Captain Whitehouse not considered that this action is placing himself at some legal risk in undertaking this vendetta?

One unidentified writer, wrote that he considered Scott Patterson fanciful for claiming that: "… he is an active Colonel at Southern Command and that he often works with the Joint Chiefs' of Staff in Washington D.C.; and that he has two fighter jets and trains foreign pilots from other countries; and that he is the President of his Homeowner's Association".

Another unidentified writer submitted a note dated October 17, 2015, addressed to Ms. Burke-Leon [the A.A, Human Resources Investigator on this matter]. That writer, apparently an A.A, Flight Attendant, stated, in part: "We all heard his G.I. Joe story of him being a hero and having contact within Columbia about the guerillas". This flight attendant further made statements about Patterson yelling out the window of a bus and calling out to a man [an apparent friend] he called: "Captain Casablanca" and making comments to this man in Spanish about "senoritas at the Jacuzzi".

There is also another anonymous letter in the Whitehouse package, dated October 29, 2015, and directed to Captain Brian Beach, Chief Pilot [Miami]. The unknown author started the letter with: "It is my understanding that this statement will be kept in total confidence and I will do the same". The author is apparently an A.A Pilot [but this person's identity is not known to Scott]. The content of the letter deals with a couple of minutes of discussion allegedly between the complainant and an A.A pilot who the complainant identified as Rodney Scott Patterson [based on his nametag]. This man claimed that: "Scott Patterson asked me what I thought of the union leadership in Miami

21

and the flight office. He tells me about a captain in Miami. He said he had an incident In ASU with this Captain. He then said that he was going to get this guy, get an attorney. The total conversation lasted less than three minutes… While he did not threaten any violence I thought his comments were out of line. Whatever happened between these two men it was obvious to me that First Officer Patterson was very upset about it and wanted some kind of retaliation".

Captain Whitehouse in his complaint states: "On February 16th I also was the target of an intense search by VVI Customs, but did not suspect anything unusual at this time. On February 22, 2015 I was the target on a more intense search by customs at VVI. I have flown to this station for over two years and have known the customs personnel to be courteous, friendly, and non-threatening. In front of my entire crew I was subjected to what is not considered a normal VVI bag check. They wanted to take all my personal belongings, my company I-Pad, personal I-Pad, phone and all. [Scott says just note the number of electronics that Whitehouse admits to carrying into Bolivia, which would get the attention of any customs officer]. After I proved to the customs people I was not hiding anything, they let me go. My crew behind me stood in awe as to the treatment the captain was given. I decided to look into the past and see who has flown into VVI before me. As I had suspected, the Spanish speaking first officer, Scott Patterson, was in VVI before me. I thought he might have said something to the customs personnel in VVI to harass me. The next morning while setting up for departure, an employee of Santa Cruz, whom wishes to remain confidential, said that they heard First Officer Patterson was smuggling firearms into Santa Cruz for the narcotic cops".

The above are simply representative notes. All of the notes submitted, are of course available to be reviewed in the Whitehouse submission. Some [many] of these notes appear problematic, some quite outrageous, and especially so, if they are untrue, which FO Patterson asserts to be so.  I will have more to say about a number of the other specific assertions or claims made in Captain Whitehouse's submission to A.A, later in this report. By any standard, however, many of the assertions made by the various letter writers range between concerning to questionable, some hard to believe, some are absurd [for example, the assertion that Scott Patterson was smuggling guns into Bolivia; or that he was behind foreign customs officials who apparently had very closely searched an A.A crew].

Each of these communications [statements] made by the various parties that have been sought out by Captain Whitehouse were incorporated into his submission. They were used solely for the purpose of presenting Scott Patterson in a negative light; as being dishonest, or having a personality defect; perhaps being a person who "inflates who he is"; or one who has the power "to manipulate customs actions in other countries"; and even one who is perhaps mentally unstable. Such recurrent inferences about FO Patterson's honesty or personality or mental stability that found their way into the Whitehouse submission can only be seen to be inflammatory. It is clear that that were used for the purpose of building a case to question Scott Patterson's honesty, integrity

22

and/or his emotional stability and his fitness for duty. In the present climate where there is such concern over a pilot's "emotional stability" the impact of such questioning can result in profound career consequences for a pilot's future, as is now occurring here.

It is clear that Scott Patterson considers the vast number of these statements or opinions to be at best wrong, misguided and inaccurate, and most to be libelous, and the entire enterprise to be slanderous. The claims in this "vendetta" by Captain Whitehouse [as Scott Patterson sees it] must be placed against FO Patterson's otherwise unblemished history of functioning over more than sixteen [16] years in the service of A.A, and for more than twenty-five years in total in the airline industry, as well as his twenty-eight [28] years of commendable military service, and at significant rank.

Again, as I noted at the beginning of this presentation, all human behavior makes sense, if only one can come to understand the dynamics underlying or driving that behavior. The question is pretty basic: does FO Scott Patterson have an otherwise long-term hidden mental impairment manifested as behavioral problems? Or is Captain Whitehouse tragically misguided and also emotionally flawed? Certainly, if Captain Whitehouse is misguided, his conduct towards another pilot must be viewed as outrageous and likely reflective of, at a minimum extremely arrogance.

Other than the multiple additional assertions made in the Whitehouse submission, all of which are of the same flavor, as the above examples indicate, the only other matter of tension that seems to have <u>ever</u> occurred between Scott Patterson and A.A, [taking into account his 16 years of service with the company] occurred briefly on September 21, 2015, when in his military role Lieutenant Colonel Scott Patterson <u>requested military leave from his flight duties</u> with A.A. That leave was for the dates of September 22, 23, and 24, 2015. [Scott had been assigned to duties in Washington, D.C., due to the Pope's visit to the President and Mrs. Obama]. Apparently, in all of his years of service in the Army, his commanders and colleagues of rank had not detected the psychopathology that Captain Whitehouse had sought to point out! Certainly, the military colleagues I interviewed had not seen these behaviors or personality features in Lt. Colonel Patterson, in fact, to the contrary, he was very well respected!

Returning to the matter of the leave, initially that leave was denied by the Miami Chief Pilot, Captain Jim Bonds, who apparently asserted that the Miami base was at the time short staffed and that Scott needed to have proof of his "Order for Duty" in order to obtain the leave. Such a statement might be considered as a matter of trust or of doubting the legitimacy of Scott Patterson's call to duty. [I am told that this failure to grant Lieutenant Colonel Patterson immediate leave for duty is a violation of the <u>Uniformed Services Employment and Reemployment Rights Act</u>, that is, the Federal Law that governs these matters. Apparently a service member is not legally required to provide such documentation to an employer in this sort of situation, and in fact he/she does not receive such documentation until after the military duty is completed]. On this occasion Scott reports that he had to call Captain David Tatum, the A.A Chief Pilot on

23

duty in Dallas, Texas, [i.e. the acting Chief Pilot of entire company], at which time Scott was granted the leave without further ado or questioning.

While I will go into substantially greater detail on some of these various claims made against FO Patterson later in this report, when I track the entire history of these matters, the above noted presentation, which appears to include some fact, some fantasy, some exaggeration, much hearsay, a lot of opinions, and possibly even inaccuracy, the basic backstory that Captain Whitehouse put forward in his September 24, 2015 submission to Captain Brian Beach reflects his views and opinions, and the opinions of some others, about the personality and conduct of FO Patterson. But Captain Whitehouse's submission does not just cover those several days in Paraguay; rather, his opinions are far more broadly drawn, and at least in part [even primarily] developed through the solicitation of the opinions or assumptions of others. In fact, Captain Whitehouse's submission appears to quite a warlock hunt!

American Airlines, in their illogical bid to search out what had happened here, even extended their search and [illogically] even sought out the possibility of <u>organic brain impairment</u> in Scott Patterson. [What other reason would there be for a neuropsychological assessment of Scott Patterson to be deemed warranted?] [I would suspect that such a silly approach would not have been recommended by the A.A. Medical Department, but of course I cannot know of the origin of the thinking that led to this bizarre approach].

The point is: Was FO Patterson having new and severe headaches? Had he suffered a head injury? Was he having seizures? Was he showing problems of balance? Did he appear to be showing lapses of memory? Was he showing one eye or part of his face drooping? Was he showing some speech dysfluency? Had he lost strength on one side of his body? Was he showing extreme mood swings that may have an organic basis? Did he appear to be confused? Is there any indication that he was drug involved?

I could go on, but the answer is No! There was no identifiable medical reason to believe that FO Patterson had suffered any head or brain insult and certainly Scott Patterson thought the idea of him being either psychologically or neuropsychologically evaluated to be "Nuts". Scott joked to me about being "crazy as a fox" and having more than just some idea of what A.A. was using this two day examination for; he made the point that he had no intention of opening up to Dr. Knippa any meaningful discussion about his present circumstances and that he had been told by his union not to. Scott's view was basically the company is playing games looking for something wrong with him instead of looking at the outrageous dishonest vendetta against him brought by Captain Whitehouse.

From the psychological point of view, such an approach [a neuropsychological examination does not make much sense, for if Scott Patterson were to be demonstrating many of the assertions being made of him, the condition we might search for would

24

almost definitely be found in the domain of a functional mental disorder [for example, in the personality domain], rather than in the organic arena, especially given that there appeared no reason to believe that physically or mentally, FO Patterson was in any way impaired, different, compromised, or incapable of undertaking his duties in the cockpit, any more than was true the day before he took the trip with Captain Whitehouse to Asuncion [as has also now been confirmed]. In fact of all the criticisms raised about FO Patterson in the Captain Whitehouse submission, at no point is it inferred that Scott Patterson was not a skilled pilot, nor were any of the complaints raised as matter so concern, in what may be considered the domain of neurology or of the neuropsychological domain.

During the course of my time in this case, FO Patterson made the point to me that there have also been some significant issues with several A.A pilots, who had held important roles in the company and recently these men have faced their own difficulties within A.A. Scott reported a story about Captain Sean Scialfa, the Managing Director of Flight [the Chief Pilot] in Miami. It was he who was running A.A's Miami operations at the time Scott Patterson filed his Uniformed Services Employment and Reemployment Rights Act of 1994 [USERRA} Complaint against A.A. Scott told me that he was advised that Captain Scialfa, who was a Boeing 777 qualified captain, is believed to have taken two different aircraft on two separate occasions and flow them while these aircraft had mechanical issues. Scott advised me of the following:

"Aircraft have a minimum equipment list published which says exactly what must be working on the plane for a flight to take place. Scialfa apparently flew contrary to this list. The F.A.A will investigate this and may take action against his F.A.A, Airman Certificate. Sean was transferred to Los Angeles as the Director of Flight and never took the job. A.A announced the transfer and then announced the job opening in LAX. Scialfa is currently on sick leave. At American, when a Chief Pilot is fired, the company demotes him to a Check Airman status, doing proficiency line checks on the aircraft. It is pretty embarrassing".

Scott Patterson told me that he had been advised of the following [though let me note that this information is hearsay and there is already way too much hearsay in this entire matter, so caution is recommended]:

"Scialfa was Brian Beach's and James Bonds' boss at the time of the incidents I was involved in. American seeks to demote me to disability status without valid grounds while also seeking to protect the Chief Pilot, who in essence broke the rules and potentially endangered passengers.

James Bonds also is reported to have been terminated from the Miami Flight Office as well. It is reported he was let go for travel pass abuse. Captain Bonds was transferred back to the line as a line check airman. Pass abuse is a termination offense for most people, yet again the Chief is allowed to go back to work".

25

FO Patterson also advised this examiner that Captain Greg Smith is another management pilot who has been plagued by flight judgment issues.  In January 2011, the Wall Street Journal ran a story on Captain Smith's involvement with an unusually low speed takeoff, which damaged a Boeing 757 bound for Hawaii. Scott Patterson further has alleged that on July 27, 2015, Captain Smith was the Pilot in Charge of an American Airlines Boeing 787, and the aircraft encountered [that is, did not divert around] a hailstorm near Beijing, China.

What Scott considered particularly interesting here, is that Captain Smith had been involved in two very serious aircraft damage events within a four-year period, and yet no one has suggested he undergo an "aeromedical neuropsychological evaluation" [or any other psychological examination] as Patterson was required to do. Scott further made the point that it is widely recognized and well understood in the Airline Industry that: "American is known as a Captain's airline and they that they go to great lengths to protect their Captains". Some employees at A.A. have even coined the term "the Captain's Protection Society" to highlight the aforementioned issue.

### An Alternate Perspective

Before I present the detailed findings of my work in this case, given that I have presented an overview of the perspective gathered by Captain Whitehouse above, in balance I will now, offer an alternative perspective consistent with the data I have developed in my own work in this case.

I will present a perspective that has not previously been introduced. In part I will reflect upon the assumptions and limitations of the Independent Neuropsychological Examination conducted by Dr. John Knippa. I will also note that FO Patterson did not give Dr. Knippa meaningful perspective about what I will call "The Whitehouse Matter" nor did [apparently] A.A provide Dr. Knippa with such perspective, as far as Scott was able to determine. From Scott Patterson's point of view, his silence [refusal to discuss the matter of the Whitehouse assertions with Dr. Knippa] was simple! Firstly, he had been told by his Union not to further discuss these matters. In fact, Scott reported that believed by the time he flew to California to do the Dr. Knippa examination that these matters had been resolved in the course of the Section 21 investigative process; and that this process was now completed.

The fact is that any examination of this type can only be as good as the data presented for review. The fact is that there was an array of data simply not considered by, and not made available to, Dr. Knippa, and Scott Patterson had no intention off laying out all these issues to Dr. Knippa. So, the prospect of Dr. Knippa really understanding what had really taken place here, from FO Patterson's perspective was zero. [Or putting the matter another way, the enterprise was a waste of time, if the aim was to achieve a real understanding of the issues as Scott saw them].

26

I will subsequently offer perspective on the credibility and relevance, or lack thereof, of some and perhaps much of the non-vetted opinion and hearsay that Captain Whitehouse chose to accept for inclusion into his submission, and specifically, those data that so broadly questioned the integrity, and or the mental functioning and stability, of Scott Patterson. Doing so early in this report will help the reader in exploring what Dr. Knippa apparently did not know, and also I will highlight the misperceptions and/or the lack of credibility of many of the non-vetted claims and/or inferences and/or assumptions, that were so freely accepted for inclusion into the Whitehouse submission.

A significant problem in the "investigation and submission" undertaken in vetting the complaints made by Captain Whitehouse is that of independently assessing the validity and reliability of these claims when so many of them were based on non-vetted opinion and involved, at a minimum, extreme sampling bias. Likewise, in his submission, Captain Whitehouse's so-called "witnesses" were mostly people who were not, in fact, "witnesses". Rather many of these people offered perspective or opinion based on speculation, or hearsay. Only a very few of them claimed to have perspective based on actual personal knowledge or observation.

By way of example here! It is stated in the Whitehouse submission that Scott Patterson was seen standing on the Jet Bridge outside the aircraft in Miami, taking photos of the Flight Attendant Caesar Bojeda. FO Patterson advised that such a claim was simply wrong and that what he was doing was speaking by phone to his wife who was way back in the plane. This was simply one of many examples of erroneous reporting and/or of distortions of inference or perception in the Whitehouse submission. Scott Patterson sees these as irresponsible and asserts that they extend all the way to downright dishonesties. It is also the case that many of these hearsay "stories" that were offered by Captain Whitehouse were submitted based on the identity of the storyteller[s] remaining anonymous. Thus, of course, these stories simply cannot be vetted nor can they be afforded any real credibility.

The fact is that Captain Whitehouse's polling only included people who he had selected or who had volunteered to be included in his submission and who had something questionable or negative or some judgmental statement to make about Scott Patterson. But these witnesses also appear not to know Scott Patterson well, and at best only very tangentially. Several appear to view information they have on FO Patterson suggesting that he may engage in exaggerations or present himself as larger than life, especially regarding his military service. That is, not only is there a serious risk of a sampling bias in the Whitehouse submission, but the data that he has included, and may be believed to be known by those sampled, are extremely lite on knowledge and more substantial on opinion, and certainly in most cases not willing to be identified. This would not be considered good science nor is it the basis of good law. In science [or in law] such data would be afforded very little, if any, credibility whatsoever. Yet, for A.A., without a meaningful investigation, it is enough to warrant sending Scott across the country for a

27

psychologically focused IME.

Had Captain Whitehouse considered ensuring the integrity of his opinion poll, rather than submitting any and all negative information or inference that he could solicit or that otherwise came to him regarding FO Patterson, perhaps any concern he had about Scott Patterson could have been presented in at least some form of balance and allow an appropriate investigation to take place. My point here is simply that while I cannot know the motives of Captain Whitehouse, his dislike for Scott Patterson appears palpable.

An important question of is the following: "Is Captain Whitehouse's witnesses perspective, as presented, valid? How would we know? And if so, is there actually something wrong with Scott Patterson? And if so what is it?" Or rather: "Is there something wrong with Captain Whitehouse and/or the process by which he set out to gather his "evidence" to build or expand upon his personal experiences and claims against FO Patterson?" And if this is so, what does that say about the conduct of Captain Whitehouse? And what is his purpose in all of this? And does A.A. have any HR Policies to protect an employee against such a vendetta against another employee?

Surely the use of sometime vitriolic assertions and the gross hearsay seen here almost certainly must compromise the quality of any of Captain Whitehouse's claims. Likewise, Captain Whitehouse's presumptive desire for a fair-minded review of the concerns he was raising also would seem completely compromised given the means by which he chose to bring his dispute forward.

A number of the claims or statements in the Whitehouse submission raise question about the scope and truthfulness of the assertions or comments that were claimed to have been be made by Scott Patterson, in particular, about assertions of his possible grandiosity and what he does outside of his role in A.A. For example, several anonymous people made statements [in the Whitehouse submission] suggesting or asserting the belief that Scott Patterson was exaggerating or lying about what he does, and who he is, outside him duties as a First Officer with A.A. I have already addressed several of these [what should be] irrelevant and extraneous matters above. [Such as Scott's possible exaggerations or deceptions regarding his other work matters].

Some of the matters that have been questioned as if untrue, through rumor and innuendo in the Whitehouse presentation, include Scott's role in his homeowner's association, his duties in military service, his jet fighter flying experience, and his police work involvements.

**Facts Regarding These Various Claims and Assertions**

For the record, here [below] are the facts regarding at least some of the most substantial presumptive claims about Scott Patterson that are included in the Whitehouse submission [as I have established them].

28

The bulk of these various claims as presented, suggest that Scott Patterson is a braggart, or that he is not honest, or that he overstates his roles or his experiences and duties outside of his work in A.A.

[1] It was claimed that Scott Patterson was not a police officer:  The facts are that Scott Patterson served as a sworn Police Officer in the City of Charlotte, North Carolina, for just on four years [1990 to 1993]. Subsequently, in 2004 Scott served as an Auxiliary Officer with the Florida Highway Patrol [in 2004]. This has been confirmed in my discussion with FHP Sergeant Walter Rodgers, who holds Scott Patterson in the highest esteem, and is a good friend of Scott.

[2] Another claim involves the disbelief about Scott Patterson having flown fighter jets. Scott Patterson offered me the following written statement on this matter:

"Because of my experience with the military, I am a consultant for a Defense Contractor. Within that consultancy a company named Aerogroup used my services to acquire defense contracts for the training of the Iraqi and Afghan Air Forces. Aerogroup currently owns a number of F-5 Fighters. At one time Aerogroup was the premiere trainer for F-16s with the Dutch Air Force.  You don't have to be a "fighter pilot" to train people to fly an airplane". [Both Captain Modrich and Mr. Robert Wilson have seen the fighter jet aircraft].

 [3] There is a further note in the Whitehouse submission on the petty issue of the disbelief in Scott's statement of his Presidency of his Community Homeowner's Association: I have spoken to one man who lives in Scott's community [Mr. Robert Wilson]. Robert is also a pilot and he knows Scott very well. Mr. Wilson reports that Scott Patterson is extremely well liked and energetic in the work that he does within and for his community.

It is also true that Scott Patterson is the President of his Homeowners Association. [Go to www.sunbiz.org and look up the "Pembroke Falls Phase Five Homeowner's Association". This public record shows that: "Scott Patterson" has been recorded as the President of that Association in 2013, 2014 and 2015].

[4] There are various letters in the Whitehouse submission that question, or derogatorily comment on the military service and functioning of Lt. Colonel Patterson, or perhaps these comments are more about Scott speaking about his military involvement.

One note, dated 10/17/215 is addressed to Ms. Burke-Leon [the A.A, Human Resources "Investigator" on this matter, though it would appear that Ms. Burke-Leon did very little in the way of genuinely investigating much of anything]. Again, in this letter the author was unidentified, but it may be an A.A. Flight Attendant. The letter stated, in part [in a derogatory manner]: "We all heard his G.I. Joe story of him being a hero and having

29

<u>contact within Columbia about the guerillas</u>".

In fact, as will be noted below, in his military duties Lt. Colonel Patterson was involved with the US Military's anti-drug operations throughout South America.

There were also notes questioning Scott Patterson's integrity in stating what he did in the military.

It was after the September 24, 2015 complaint by Captain Whitehouse that Scott Patterson had the only problem that he has ever experienced in <u>obtaining Military leave</u> [previously no problem whatsoever from A.A. and in particular from the local Miami flight office]. On this occasion the Miami Chief Pilot, James Bonds, initially created a problem around that leave. Scott questions whether the other problems he was facing within A.A, as a result of the Whitehouse submission may have led to this hiccup. Right or wrong, Scott Patterson believes that this issue would not have arisen but for the fact that the Whitehouse submission created an environment of mistrust about his integrity. He suspects that it was this mistrust that may have been the underlying reason why Captain Bonds initially sought <u>to compromise his legal right to take military leave</u>.

Over Scott Patterson's more than 16 years of service with A.A. the only time his military leave request was questioned and/or not immediately granted occurred on September 21, 2015, when Lieutenant Colonel Scott Patterson requested military leave from his flight duties with A.A for the dates of September 22, 23, and 24, 2015. [Scott had been assigned to liaison duties at the Whitehouse in Washington, D.C., due to the Pope's visit to the President and Mrs. Obama].

Initially the Miami Chief Pilot, Captain Bonds, who asserted that the Miami base was at the time too short staffed, and thus he denied that leave. But more significantly he stated that <u>Scott needed to have proof of the "Order for Duty"</u> in order to obtain the leave.

[I am told that this failure to grant Lieutenant Colonel Patterson immediate leave for duty is a violation of the <u>Uniformed Services Employment and Reemployment Rights Act,</u> USERRA]. On this occasion Scott reports that he had to call Captain David Tatum, the A.A, Chief Pilot on duty in Dallas, Texas, [i.e. the Chief Pilot for the entire company], at which time Scott was granted the leave without further ado or questioning. Scott believes that the refusal to immediately authorize his release for military service through the Miami base was linked to all this Whitehouse matter.  Such a release had never before been an issue.

I have asked Scott Patterson to prepare a statement about his relevant military service and duties over the time of his employment at A.A. with the intention of providing a comprehensive overview of his work, seeing that this work also became a matter of questioning and negative commentary in the Whitehouse submission. Below is that

30

statement, beginning in 2004, after he was furloughed from American Airlines and after he was promoted in the Army to the rank of Major [both of which events occurred in 2002].

Here is that statement:

"I worked at US Southcom [Southern Command Headquarters], as a Major while furloughed from American Airlines in 2004. I was on active duty until 2009. I was a Counter Drug/Counter Terrorism Program Manager with approximately $80 million dollars of government funding. This job required extensive knowledge in planning, programming and budgeting funds to accomplish objectives of the National Command Authority. I consistently received high ratings while assigned to my position and I was retained on active duty until I reached the maximum number of years on active duty, which then required me to take a break.  My level of performance and job was critical.  When I was promoted to Lt. Colonel, I received the "Defense Meritorious Service Medal" for my service.  I also received the "Joint Achievement Medal" for my work in 2004 in discovering a $1M Anti Deficiency Act over spending by the command. In other words the government wrote more than $1M in bad checks that they could not cash.  We found the mistakes and removed the overspending which saved an officer at a high staff level his job.

US Southcom is a Joint Combatant Command assigned to the Joint Chiefs of Staff.  In my capacity I regularly planned and executed commander's conferences, hosted the Deputy Assistant Secretary of Defense for Counter Narcotics, and various US Ambassadors to foreign countries. I regularly presented my program to very senior officers and senior executive service members and I authored several documents, which, although classified, are still used by the Joint Services today.  I am also Joint Qualified, which not many Officers are, unless they go to school, and have had experience in a combatant command, or work on the Joint Staff.

Our main thrust or focus was on the nation of Colombia and I spent a good deal of time in the country and I am very proud of being a part of what we accomplished.  I also did a very large acquisition project and purchased millions of dollars of equipment for counterdrug use throughout the Caribbean and South America.

While at Southcom I was also deployed to Haiti in support of US Forces there responding to the severe earthquake.  There was a letter of thanks written by a Congressman to General Keene thanking me for what I did in Haiti.  I also helped American Airlines secure its property and the equipment on the ramp in Haiti since there were no employees on the ground in Port Au Prince to secure the facility.

I have also worked other duties in my reserve capacity, which has demanded that I maintain a state of readiness to deploy within 72 hours of call up for any national emergency.  There is a push in the Department of Defense to save money and

31

operationalize the reserve to an equal capacity as the active component, which means that these days a reserve soldier has to balance his civilian career as well as his military readiness.  You no longer have the luxury of getting a phone call and going off to some base to train for six weeks before going to war.

I currently am assigned to Army Headquarters at the Pentagon.

To someone outside the military who has no idea what we do, it might seem grandiose if spoken about. To me it is just a job that I have spent years training to do and only a very few are qualified to do.  I like it that way, because it puts you in high demand".

END OF SCOTT PATTERSON'S QUOTED STATEMENT

So, it would seem that the assertions and inferences that, at least a few people, none of whom know apparently Scott Patterson beyond remotely, but whose comments Captain Whitehouse has chosen to include in his "presentation", may need a lesson in the art of inference, and making assumptions, and being judgmental, and perhaps also courtesy for others. They may also need a lesson in being involved in being sucked into or involved other people's business.

### Further Matters at American Airlines

Perhaps also relevant to the larger picture of Scott Patterson's matters with A.A are some of the politics that may have taken place between A.A. as represented by the Chief Pilot [MIA], the Union [the Allied Pilots Association], and the forces in support of Captain Whitehouse, namely in this latter case, Captain Thomas Copeland and Captain Edward Sicher [the Chair and Vice Chair respectively of the Miami domicile], in the handling of this matter [the complaint] against FO Patterson. Scott Patterson has asserted to me that there is a culture in A.A. that Captain Brian Vitale has referred to as the CPS [the "Captain Protection Society"], in which Captains routinely protect other Captains.

There is also another perspective here: I [this author] had a discussion with a very senior A.A. Captain, Guy Dolton "Danny" Shellhouse, whose perspective regarding Scott Patterson I will present in detail. Captain Shellhouse advised me that Captain Brian Beach [the Managing Director of Flight, MIA] had told him, that they [the Miami Flight Office] wanted to get this matter [the dispute between FO Scott Patterson and Captain Glenn Whitehouse] out of the hands of the A.A. Human Resources Department and put it back into the Miami Flight Office, which, in turn, intended to push the matter back into the hands of the Allied Pilots Association [APA] for a "Professional Standards" resolve. Professional Standards then would have a conference with Captain Shellhouse and the National Professional Standards Chairman [Captain Douglas Woods] and Captain Whitehouse, the complainant, and the APA would thus resolve this issue on an internal basis.  Thus, the incident, whatever it was or was not, would be handled, resolved, and closed within the APA.

32

Obviously this common dispute resolution process did not happen in this case. Captain Shellhouse has no explanation to account for this beyond offering one word: "politics". Captain Shellhouse further advised in conversations with Ana Burke Leon that: "She stated [to Shellhouse] in a passing conversation that she was confused and could not sort out this issue between Whitehouse and Patterson".

So, is sending Scott Patterson to a Clinical and Neuropsychologist supposed to sort out this dispute and get to the bottom of it? Hardly, especially when Scott's Union had told him not to discuss any of his union the matters with the Psychologist.

**The Military Leave Matter**

It was three days before the Glenn Whitehouse submission that Scott Patterson had the only problem that he has ever experienced in <u>obtaining Military Leave</u> without any problems whatsoever from A.A. In particular, this problem involved the Miami flight office.

On this occasion the Miami Chief Pilot, Captain James Bonds, initially created a problem around the leave. Scott questioned to himself whether the other problems he was facing within A.A. as a result of the Whitehouse submission, may have led to this serious hiccup. Right or wrong, Scott Patterson believes that this issue of his compulsory Military Leave would not have arisen, but for the fact that the Whitehouse submission created an environment of mistrust about his integrity. He suspects that it was this mistrust that may have been the underlying reason why Captain James Bonds initially sought <u>to refuse the leave and thus compromise Lt. Colonel Patterson's legal right to take the leave he was requesting</u>.

Over Scott Patterson's more than 16 years of service with A.A. the only time his military leave request was questioned and/or not immediately granted occurred on September 21, 2015 when in his military role Lieutenant Colonel Scott Patterson requested military leave from his flight duties with A.A, for the dates of September 22, 23, and 24, 2015. [Scott had been assigned to liaison duties at the Whitehouse in Washington, D.C., due to the Pope's visit to the President and Mrs. Obama]. Initially that leave was denied by the Miami Chief Pilot, Captain James Bonds, who apparently asserted that the Miami base was at the time short staffed but more significantly that <u>Scott needed to have proof of the "Order for Duty"</u> in order to obtain the leave.

I am told that this [above] failure to grant Lieutenant Colonel Patterson's right for immediate leave for duty upon request, and in fact to actively resist it, is a violation of the <u>Uniformed Services Employment and Reemployment Rights Act</u>, the Federal Law that governs these matters. On this occasion Scott reports that he had to call Captain David Tatum, the A.A. Chief Pilot on duty in Dallas, Texas, [i.e. for the Chief Pilot of entire company], in order to further seek such leave. With this call Scott was granted leave

33

without further ado or questioning.

Yet, as will be discussed later, no sooner had Scott returned from his brief military leave, that he was grounded from flying and ultimately placed in a set of circumstances that questioned his mental fitness for flight duty.  And the issues here led to the requirement that Scott was to undergo a compulsive clinical and neuropsychological examination.

### Dr. John Knippa's Examination of Scott Patterson

There was a compulsory "Independent Clinical and Neuropsychological Examination conducted on Scott Patterson by Dr. John Knippa. This exam was conducted at the request of A.A., over two full days in California [that is, at three time zones out of Scott Patterson's regular circadian rhythm]. Below is a summary of the opinions and conclusions of Dr. Knippa, as far as Scott's Fitness for Duty was concerned.

I reviewed the "Neuropsychological Aeromedical Fitness for Duty Report" work of Dr. John Knippa [published on March 21, 2016]. I also noted the total disagreement that Scott Patterson had with a number of the many inferences and certainly the final conclusions contained herein.

Dr. Knippa gave little focus to Scott's February 14, 2015 cancer scare and his recovery from the surgery related thereto. Dr. Knippa sought to explore in some detail issues surrounding Scott's fitness for duty within the context surrounding his relatively brief relationship [less than 24 hours of actual contact] with Captain Glenn Whitehouse, and the claims made by Captain Whitehouse against Scott, some eleven months thereafter. However, as noted above, and as Dr. Knippa noted, Scott was resistant to discussing these matters, claiming that they had been fully investigated and resolved through an APA Union review process completed some months previously.

Dr. Knippa noted in his interactions with Scott that he observed an interpersonal style that he considered to include: [and I quote] "forwardness that appeared to exceed that expected of good self-esteem" in some of their interactions. Dr. Knippa noted this "might well be interpreted by others as elitist or erudite, at times pedantic in a manner inappropriate when being seen by a professional for FFD examination…Regardless, however, it should be made clear and emphasized that Mr. Patterson appeared well-meaning and with a pleasant appearing mood, frequently extending courteous comments, and maintaining a pleasant demeanor at all times". Dr. Knippa also noted that Scott's mood appeared "pleasant, comfortable, affable, and socially well poised". [I agree with many, but not all, of these comments by Dr. Knippa. I see FO Patterson as a "pleasant take charge and get it done sort of person", features that are very much appreciated in career military officers].

Dr. Knippa noted that on one of the computerized tests, the MMPI, the results were consistent with "those who take a particularly cautious and deliberate approach,

34

endorsing few psychological symptoms…scores are compared to those of persons whose responses likely reflect a pattern of defensiveness, such that the problems that may exist may not be accurately represented in this profile". [Of course, such defensiveness may also reflect the results from a person who sees himself as not having any significant issues of a psychological nature; and/or an examinee who is not motivated in the context of a Fitness For Duty Evaluation to be unduly open or revealing].  In such Fitness for Duty contexts, psychologists see this very frequently.

Additionally, and again based on the MMPI scoring, Dr. Knippa also suggested: "Overall, the data suggest a bias towards an overly favorable self-presentation emphasizing freedom from symptoms and distress. This is not uncommon in persons who may be aware of and cautious regarding the purposes of the evaluation. Certainly, it is often seen in people presenting for "assessment for duty fitness". Defensiveness may limit the interpretive utility of the data for some purposes.

Dr. Knippa's data from the MMPI subscale scores were consistent with, as he indicated, "persons who may present as trusting, having high moral standards, and not having hostile or negative impulses, who may also present as having unrealistically optimistic attitudes about others. However, it should be noted that the above interpretations are not offered as proof of this man's personality but hypotheses to be further explored and examined". And, of course, a particularly reasonable way to further explore and determine the best interpretation of such data is to interview people who know Scott well, and in a variety of contexts. But this direct collateral investigative work was apparently considered beyond the scope of the examination [which, of course, is unfortunate, given the importance of a comprehensive review and analysis, and especially so when the claims that led to the consultation request were almost exclusively of an "inferred interpersonal problems" dimension].

It should be noted, as a general principle, that all too often psychologists take the data from these so called "tests of personality", or "tests of psychopathology", and treat the data as if they reflects definitive indices of the functioning of the examinee. While this may be more likely true than not when the instruments reflect significant or gross psychopathology [which is not the case here], one can risk over-interpreting such everyday non-revealing data. [Dr. Caddy has seen this often when an overreliance on these test data is noted]. And yet often these over-interpretations and the related inferences of possible aberrations that may be inferred, or even asserted by everyday citizens, and sometimes even by professional examiners, may miss the mark with these inferences not being seen in real life [that is, by those who know the examinee well in the real world]. Thus, the presumption of predictive validity of these impressions may collapse completely. Nothing beats knowing the person well and collateral source data from people who know the examinee well can be incredibly valuable in really getting to the bottom of a test based inference, as does extensive time with the examinee. This additional work permits the ruling in or ruling out of various hypotheses that may emerge from these computerized tests of personality functioning.

35

It is noteworthy that when finally I was able to get to see the results of Dr. Knippa's work with Scott Patterson I noted that on the computerized MMPI the following critical items: Under "Acute Anxiety State" there were only two items ["I work under a great deal of tension" and "I am a highly stressed person"]; there was also one indication of Persecutory Ideation ["Someone has it in for me"]; there was only one index of Antisocial Ideas ["Sometimes when I was young I stole things"]; there was one index of Somatic Symptoms ["I worry about my health"]; one index of Anxiety and Tension ["I work under a great deal of tension"]; one measure of Deviant Thinking ["At times my thoughts have raced ahead faster than I could speak them"]; and one index of Deviant Beliefs ["Someone has it in for me"]. If one considers the circumstances of Scott Patterson's life and present work related issues and his cancer scare and his upsets in the workplace, these statements appear both very honest and very reasonable.  They make sense and reflect nothing pathological at all!

Likewise, on the Personality Assessment Inventory conducted by Dr. Knippa, Scott Patterson's responding presented as valid and reasonable given his circumstances; and again, no evidence of clinical psychopathology was noted.

A slight detour here for just a moment! The fact is that in Industrial Organizational Psychology a matter of serious concern involves how to assist both employees and employers on how to validly interpret and weigh the hypotheses potentially being generated from a number of these various testing instruments; and especially so when those receiving the information are not clinically or empirically trained to be capable of interpreting the real meaning and/or balance from the various inferences [hypotheses] derived from these instruments. As is often noted in psychometric analyses, it is particularly important when one considers the numerous complex limitations of these measures to recognize that such awareness can only be achieved through highly specialized professional training. The fact is that many of these measures, even those coming from tests with long pedigrees, do a poor job at predicting specific human behavior. And yet, there is really no such disclaimer anywhere in the multiple inferences that are being presented/offered throughout Dr. Knippa's numerous findings, nor impressions of his cognizance of these limitations, even though at the end of his analysis he does acknowledge an inability to identify any meaningful personality aberration in his examinee.

What we can take from Dr. Knippa's testing and his overall examination more broadly, is that, as far as Dr. Knippa could determine, as he says:

"Both by observation of behavior in the office setting and a review of psychological testing, it is opined that Mr. Patterson's behavior and testing related findings are consistent with risks of being perceived or interpreted by others at times as being self-aggrandizing and reflecting of some limitations in social judgment [i.e., as it appears to have parallel to the concerns expressed in the January 16, 2016 letter by Captain Beach].

36

If perceived in this manner by other crewmembers, concerns for teamwork and CRM effectiveness would reasonably be raised. Yet absent a mental disorder, [i.e. as specified in Federal Aviation Regulations], such a Personality Disorder or other behavior-related health problem that is severe enough to correspond to repeatedly manifested acts inconsistent with acceptable performance of aviation duties, lapses of interpersonal interactions and effective communications would be subject matters for performance counseling evaluation [i.e. Human Resources and Supervision Matters] rather than representing mental illness/disorder to be addressed as such" [page 12].

Significantly, in a relatively lengthy 17-line paragraph [also on page 12], Dr. Knippa appropriately discussed aspects of what had been raised by inference to perhaps include features of a narcissistic and/or immature aspect to Scott Patterson's personality, and also the notion that disinhibition can sometimes be seen in AD/HD spectrum aspects of such personalities. However, and finally, in summary, Dr. Knippa concluded [for he did not have the data to assert otherwise, his various meandering inferences and/or conjectures notwithstanding] the following:

"While some personality characteristics identified at assessment raise concern for workplace performance challenges, a personality disorder is not identified with the limited data available at this time. Other than the unspecified complaints outlined by Captain Beach, no concrete examples of performance problems are identified. Corresponding recommendations, tentative at this point and pending any additional information, would be that complaints be handled according to appropriate supervisory judgment and through the personal process as may be judged appropriate".

Regarding Scott Patterson's interpersonal skills, Dr. Knippa does make the point that with the exception of the present complaint: "Advice from the employer was given that no examples of overt acts have been identified for review". That is, FO Scott Patterson has never previously shown up on the Corporate Human Resources radar at any time in his 16 years of employment with A.A. as having any work related or interpersonal problems in the workplace, or elsewhere, until this instance with Captain Whitehouse.

So, it would seem that Dr. Knippa, after he explores around the issue of "personality disorder" for quite a while, finally puts the matter of Scott Patterson's inferred "mental illness" or at least his inferred "personality disorder", to rest, or almost so, but not really!

I say "almost so" because in fact Dr. Knippa then goes on to propose a "possible linkage" [in the second paragraph of his page 12] between "the possibility" of "certain narcissistic and immature features" of Scott's alleged personality, that if true could be raised as evidence of, and consistent with, the coping styles that can sometimes be seen in the "disinhibition from AD/HD" and also "subtle spectrum features". [By AD/HD Dr. Knippa means Attention Deficit Disorder/Hyperactivity Disorder].

Bluntly, at this point Dr. Knippa's speculations are way beyond the bounds of science and

37

into fantasy. Such weak and unsupportable inferences [vague data void speculation] have no place in a scientifically based investigation, and especially so, when this report is being read and comprehended by non-specialists whose workplace political agenda may play a role in the decision making process. Such speculation by a psychologist who really does not know this man at all, risks compromising his own ethical obligation to speak only the truth and not to speculate in a manner to compromise his professional responsibilities; and certainly, not to suck up [throw a bone to] the people who hired him.

Dr. Knippa could have conducted a comprehensive collateral source investigation [interviewing people who know Scott Patterson really well in his workplace and beyond], if he had requested to do so, and if he determined that he really wanted to get to the bottom of [make sense of] all these inferences that he was speculating about. But he did not undertake any such an investigation! And yet he leaves these possible inferences [of personality impairment] hanging, yet without valid data support. I do not consider this an appropriate application within the discipline of psychology!

Further, when Dr. Knippa remarks [as noted above] on what he calls subtle "Spectrum" features I can only presume that he is referring to either the "Attention Deficit Disorder" spectrum or the "Autistic Disorder" spectrum. And though I presume the former, this speculation appears to have been presented to offer or infer a theoretical mechanism [a bridge if you like] to get the naïve reader back into the notion that there is something wrong with Scott Patterson. [That is, the creation of an inference that although it may not be a real "personality disorder" and Dr. Knippa cannot "find it", there is otherwise, or still maybe, something wrong with FO Patterson]. Dr. Knippa persists with the speculation, of the possibility, of the inference, that just such a "personality problem" could exist; and just below the surface. The inference from these speculations is that while this is not "evidence" for a personality disorder, it might, [and I emphasize "might"] still reflect a low grade personality limitation, or it may even be indirect evidence of a limitation of an organic nature in Scott Patterson's brain functioning. I consider this level of speculation beyond lacking any scientific basis and to have no place in this work, or in any other! It is building a fragile structure without foundation and the lack of a scientific base make the exercise <u>unethical</u>.

 It is significant that while Dr. Knippa did review the personal testimony support letters in Scott Patterson's case [he advised he saw some eight such letters] he made no real comment about these essentially "glowing" letters, and as I noted previously, he made no effort to undertake any collateral review of Scott by seeking to actually interview some of the many people who know Scott very well and for many years, including people who know him very well in A.A. If you are going to do any job that can impact a person's life, do it properly, or don't do it alt all.

This type of comprehensive investigation I am proposing would have been of great value in exploring many aspects of Scott Patterson's personality functioning and the way he is

38

seen by others, especially given the assertions being raised against him by Captain Whitehouse. Had Dr. Knippa done so, he would have gained a much more comprehensive view of Scott's interpersonal relationships than is possible from solely personality testing procedures, and reviewing some select letters of endorsement. He would have learned that FO Patterson is a very well known and very much liked and respected person in a wide variety of social and vocational contexts. He would have learned from pilot colleagues what a skilled pilot he is. He would have learned about Scott's generosity of his time to his family, to his friends, to causes involving strangers. And he would have overcome Scott Patterson's distrust of him and his agenda and been much more likely to be able to obtain a valid analysis.

So much for the lingering personality disorder hypothesis!

Dr. Knippa next goes into the results of his neuropsychological testing. This writer [Dr. Caddy] does neuropsychological assessment and I am a member a group that uses a particularly sophisticated Neuropsychological Testing Laboratory in North Miami Beach managed by a neuropsychologist whose knowledge in the field is truly remarkable. I am however, given my forensic focus, intent on remaining forensically focused and so I have recommended to Scott [and his attorney] that he undertake a second independent clinical and neuropsychological examination not by me or through my resources, but by a certified and highly experienced Aeromedical Clinical and Neuropsychologist; and that he also undertake a comprehensive neurological examination, equally provided by an equally experienced and highly expert Aeromedical Neurologist.

What I will say, based on the testing results being reported by Dr. Knippa, is that there is some significant variability in the neuropsychological testing results reported by Dr. Knippa, with a large number of the scores on multiple tests being within the normal ranges and a much smaller number being outside that range. [That is, based on Dr. Knippa's results, there were a few test scores that were low in relation to the cut off points established for airline pilots, as interpreted by Dr. Knippa].

However, the critical questions here of course are: [i] are these findings [scores] valid and reliable? And, [ii] what are the bases for these below criterion findings? And [iii] what really do these scores mean as far as validly predicting the flying skills of Scott Patterson? This last question is especially critical to know, of course, and we must also consider Scott's many years of expert work and his repetitive "overlearning" as a pilot of numerous aircraft in this entire evaluation.

Taking both the averages, the high, and low scores reported by Dr. Knippa into account, do these overall performance scores, as asserted by Dr. Knippa, taken together with all the other data under observation from multiple other sources [for example, the observations of fellow pilots, and the annual results from the flight simulation studies], validly lead to the conclusion being reached by Dr. Knippa? Do these mixed neuropsychological findings provide "credible, valid, and valid predictive evidence" that

allows one to reach the conclusion being proposed by Dr. Knippa; namely, that FO Scott Patterson shows neuropsychological indices of impairment on some measures such that he should not be permitted to fly for A.A. And, there are other questions that relate to the entire testing circumstances, and hence that raise issues about the validity of Dr. Knippa's conclusions [including as I will note later, that he used the wrong norms on one test, the CogScreen-AE, as will be discussed subsequently].

Further, why was FO Patterson sent all the way through three times zones for this testing to take place?  What impact did acclimation and tiredness [being jet lagged] have on the performance that led to these scores, as Scott flew from Fort Lauderdale, Florida to Los Angeles, California the day before the scheduled examination? Dr. Knippa states in his report that Scott Patterson did not report being tired yet realistically, we are all somewhat disoriented and tired facing the next several days after a nearly six hour flight [across three-hour time zone] change, and especially so if we are stressed about not really trusting the process at the end. Certainly, FO Patterson was concerned about trusting this examination process, based in part on everything that had happened to him in the prior A.A. investigative process, which seemed to focus not at all on the inappropriate conduct of Captain Whitehouse and what I have termed his ten month "Warlock Hunt". Rather, the focus was solely on Scott Patterson. So, in not trusting the maneuverings of his employer, Scott was unsure if he could trust the objectivity of Dr. Knippa. And being shipped across the country to do this examination rather than doing so much more locally did little to increased Scott's sense of the convenience or trust in the integrity of this process.

When FO Patterson advised me that A.A. had decided to send him to California to do his Independent Aeromedical Examination, I immediately considered that an inappropriate course of action by A.A., and a poor decision by Dr. Knippa to conduct such an extensive examination under conditions where inevitably jet lag would have been a factor in Scott's performance; or in the alternative, where its impact could not have been ruled out. After all, Scott Patterson was not doing a physical examination but a relatively grueling two-day clinical and neuropsychological examination.

Under Federal Aviation Regulations CFR 117, "Acclimated" is defined as: "A condition in which a flight crew member has been in a theater for 72 hours or has been given at least 36 consecutive hours free from duty".

Dr. Knippa indicated that Scott Patterson did not complain of being tired. Yet clearly, as Scott said when I asked him, he did not land in Los Angeles until 1600 hours PST. He ate dinner at the hotel restaurant at 2000 hours PST, went to bed at around 2100 hours PST and he arouse very early [at 0200 hours PST]. At 0600 hours he worked out at the hotel gym, ate breakfast at around 0715 hours, showered and dressed about 0800 hours, and drove to Dr. Knippa's office to arrive at 0920 hours [for the scheduled 0930 hours]. This is hardly what would be considered an ideal way to begin two days of testing. In fact as I have said elsewhere in this report, the idea of sending a pilot across three time zones to

undertake such an assessment makes no sense at all and surely Dr. Knippa would have been cognizant of this fact.

To illustrate further the significance of alertness and lack of tiredness to certain aspects of the neuropsychological testing process I refer the reader to the Professional Manual of the "Test of Variables of Attention Continuous Performance Test" [the "T.O.V.A"].

Under the heading "Test Administration" [pages 9 and 10 of the Manual] the following is stated: "The T.O.V.A. was normed with test administrations performed in the morning before 1 p.m. to avoid possible diurnal variations. It was the first test administered to the norming subjects".

Yet according to FO Patterson, in the morning of the first day Dr. Knippa interviewed him and also administered the MMPI to him. I cannot judge how long the interview was conducted on that morning and Scott did not record the exact time it took. But, according to Scott it was after the interview that the MMPI was administered [and the MMPI typically takes close to 90 minutes. What with several breaks and Scott making phone calls back to his Union Representative, and then with a break for lunch, the neuropsychological testing almost definitely did not begin until sometime significantly after 1300 hours. As for just when the T.O.V.A. was administered Scott, he says he just does not know, but it very likely was not before 1300 hours.

On the CogScreen-AE, Scott's scores were within a range that did not predict brain impairment. Yet there was also quite significant variability in some of the scores in this sequence, ranging from superior to average to below average. Measures of general cognition, Dr. Knippa noted to be as follows: verbal reasoning was average; visual reasoning was average; on most measures of 2-D visual analysis Scott's performance was high average, yet low average on a pencil-paper copy task, and on measures requiring thoughtful analysis.

On the WAIS-IV [an intelligence test] Scott's overall performance was in the high average range, but so-called working memory scores [that require one to keep multiple sets of information in mind] were not consistently as good. Scott's performance on measures of processing speed was seen to range from high average to what Dr. Knippa considered defective. Processing speed on the WAIS-IV was seen to be in the high average range.

Likewise, on the PASAT-100, measures of processing speed were in the high average range. On a continuous performance test, the T.O.V.A.-V, Dr. Knippa found Scott's scores to be variable, and on this test inattention issues were reported. Verbal Memory measures were overall at the low average range. Visual memory was assessed at the average range. Motor and Sensory Performance measures were within the average to high average range. A measure of olfactory function was in the normal range. What Dr. Knippa referred to as Selected Executive Performances he considered to be in the average range, however there was significant variability and some of the scores here Dr.

41

Knippa asserted to be in the low average range.

On several occasions, Dr. Knippa raised the issue of FO Patterson's cancer surgery [of February 27, 2015]. Yet he clearly had no basis to see the surgery as relevant to the reason[s] that Scott was involved in this conflict with Captain Whitehouse, as the timeline of these two events would make no sense. The dispute with Captain Glenn Whitehouse occurred on October 7, 2014 and the cancer surgery did not occur until February 2015. Dr. Knippa appears to have considered [speculated] the notion that perhaps it was the consequence of Scott Patterson's cancer surgery that may account for some of the lower cognitive scores that he was reporting, as he assessed them. However, of course, the initial A.A. referral question was one of "clinical psychology relevance" and not about Scott Patterson's intellect or his "neuropsychological functioning" or anything to do with, or related to the skills, of flying an aircraft for A.A.

It was Scott's alleged "behavior in the workplace" around what was really a single issue [i.e. the complaints made by, and/or collated by, Captain Whitehouse] that became the reason for the examination. Yet now we have the opinion of Dr. Knippa, who has proposed, his inferences notwithstanding, that he really cannot find any functional psychological disorder [that is, on personality or interpersonal style grounds] to account for Scott Patterson not being "fit for duty". [Though, I will repeat, Dr. Knippa surely does try to go there, through his definitely over-weighted focus and his ongoing inference made from some of the personality testing results].

Likewise, Dr. Knippa raised the possible question that Scott Patterson may suffer from an Attention Deficit Disorder. And yet, given the absence of any such history or evidence in support thereof, he does not stand by that inference either; and he basically drops the notion. Yet here again, Dr. Knippa does not reject the assertion outright and the construct still hangs there! Rather, Dr. Knippa finally posits an alternative reason for seeing Scott Patterson as being impaired. He offers a premise that would not rationally have been contemplated by anyone, and certainly not by Scott Patterson. In fact, the allegations made by Captain Whitehouse, if they were to exist, would be seen as existent solely in the functional personality disorder arena, and not to be reasonably linked to any impairment in Scott's piloting ability, or based on any inference from within the organic brain functioning domain. And yet that [neuropsychological impairment] is precisely where Dr. Knippa ends up hanging his hat!

I do not believe that there are any data whatsoever that reasonably could argue for Scott Patterson suffering a brain impact or change of brain functioning as a result of the surgery he underwent on February 27, 2015. Certainly, his doctors do not consider such to be the case. And Scott says that he did and does not note any difference in his memory or his ability to process information subsequent to the surgery. Scott further states that when he was flying subsequent to his return to work on June 14, 2015 [that is, when he completed his R-9, flight simulation training], he considered everything about his functioning during the simulator testing, and in the air for A.A., and in his role

as a Civil Aviation pilot, and in his everyday like to be normal and unremarkable. Scott claims that it is his view that his memory, his everyday thinking, and his overall cognitive functioning is just the same today as it has been over the past years; and that he has no evidence or indication whatsoever that he has that any problems in his thinking or mentally functioning exists.

So let us assume that FO Patterson's perspective here is true and valid! If so, on the one hand we have the opinion of Dr. Knippa, suggesting [based on certain elements of his overall neuropsychological testing results] that some [not a lot but some] of his findings indicate that Scott Patterson should not be flying for A.A.

Yet, against this, there is a total of twenty-seven years that Scott has been practicing and developing his craft, and without mishap, and while also routinely successfully completing his obligatory flight simulator testing and this annual medical examinations, and further, flying privately, and even serving as a consultant for a company selling fighter jet aircraft. I argue that flying, like playing the piano, is a skill that advances with practice, unless one has a defect in the capacity to learn and/or maintain that skill. Moreover, there is an array of very experienced pilots who know Scott well, and who have flown with him in both his commercial capacity with A.A, [and before that with Mesa Airlines], and in a vast number of private and/or Civil Aviation involvements. I have spoken to some of these people, including senior Captains within A.A., and all of those who I have spoken to consider FO Patterson to be a highly skilled and expert pilot.

So, do we believe Dr. Knippa's interpretation of his [variable and inconsistent] findings, together with his use of inappropriate norms used with his CogScreen-AE testing, which offer an array of possible personality and flight skill presumptions? [The issues of these norms on the CogScreen-AE are especially significant when we note, as did Dr. Gary G. Kay, the developer of the CogScreen-AE, that Dr. Knippa, used "Regional Pilot norms in his examination of FO Patterson and not the age-group norms that are used for Major Airline Pilots". Further, Dr. Knippa's opinions are derived solely via a series of correlational presumptions taken from the variable testing of a man who had flown across three time zone hours to do what is a stressful testing over the next two relatively days with a man who he believed he could not trust?

Or perhaps we might consider the fact that none of Dr. Knippa's data directly tests flight skills, though the CogScreen offers the closest approximation of those skills, when used correctly. And even the results of this test were potentially compromised by the impact of jet lag. So, do we go along with Dr. Knippa? Or do we believe actual behavioral studies undertaken by Scott Patterson, year after year [i.e. data from thousands of hours of safe expert flying in multiple aircraft and, of course, also his passing of his every annual flight simulation review]. And what about the opinions of those many other experts [pilots] who have observed Scott Patterson's actual flying skills and performance over many years? What weight do we afford these data? Even in Captain Whitehouse's variable claims against Scott Patterson, nowhere is it asserted that FO Patterson's flight skills

43

were viewed to be defective.

I will have more to say about this matter later. However, it is the case that the United States Department of Transportation, Federal Aviation Administration, has a policy of employing variable neuropsychological data that may offer inconsistent [depending on who is doing the testing, as we will see here subsequently], as well as indirect, that is, inferred evidence of strengths and weaknesses of flight skills. There is presently in the system the questioning of whether this could be a flawed policy, and it appears that the process of much of this testing is [or is proposed to be] under review. The Department of Transportation permits and accepts data that are set against a complex set of tasks and performances that may be inferred to be, and are correlated with, skilled flight performance. But these data do not directly measure such performance. There are risks of error here. If the assertions of Dr. Knippa were held to apply, these criteria would appear [in the case of Scott Patterson] to be inconsistent with alternative evidence from actual criterion behavioral performance [that is, the act of flying].  The bottom line from Dr. John Knippa's perspective of FO Patterson is that:

"Mr. Patterson is opined to be identified by the current assessment as NOT FIT FOR DUTY as a FO, on the basis of his impaired performances on cognitive assessment".

I would assert that what we have here is a compromised process that affords inordinate weight to indirect correlational inferences of a limited number of subtests of instruments that should be viewed as relevant but not in themselves, necessarily, definitive. And as I have noted above, even the best of these instruments [the CogScreen], as it was developed specifically to test piloting performance, can be compromised by its inappropriate administration or by inappropriate interpretation [which in this case included the application of inappropriate normative data]. In fact, Scott did well on many performance correlates with Dr. Knippa and there were only a limited number of these correlational where performance limitations were inferred. [That is, a small number of correlational indices of indirect flight performance were being given substantial and, even if accurate, inordinate weight, but in the case of the CogScreen, the norms Dr. Knippa used, were inappropriate].

The fact is that the basis of Dr. Knippa's opinions emerged from selective correlational inference, versus other positive findings on and across the array of tests administered; and much more importantly, these results are in conflict with actual demonstrated performance in the air, and for many years. Further, the examination process was compromised from the very beginning because none of these tests were normed on the basis of the examinee being jet lagged. And as I will note later, Dr. Gary G. Kay, the developer of the CogScreen, on later administration of this test under conditions of no jet lag, found Scott Patterson to be functioning within normal limited for an Airline Pilot of Scott's age.

There are three likely interpretations to account for Scott Patterson's allegedly low

performance on several of these sub-tests in this overall battery of tests:

[i] Scott was tired and/or frustrated during some or much of this testing due to jet lag and not sleeping well the night before, or simply not wanting to be there and being unable to fully motivate himself to sustain constant focus and effort, given his overall disgust at having to play what he consider a A.A.'s "bullshit game". Certainly, he was three hours out on his circadian rhythm]; and/or;

[ii] Scott was showing variable performance as a function of legitimate performance limitations and he was also being influenced by other external factors [jetlag, tiredness, irritation, disgust; and/or;

iii] if [ii] above, Scott may well have always had these specific test identified limitations of functioning, but they had never been previously assessed, in which case the possible impact of any such limitations were overcome by the skill and experience he had acquired over some two decades of flying.

And of course, the other possibilities are that Dr. Knippa substantially overrated the misinterpretations he offered and their relevance to predicting Scott's flying abilities.

There is, of course, the possibility, that Dr. Knippa simply is not all that talented here. After all, as Dr. Kay pointed out, Dr. Knippa used the wrong normative tables in the evaluation Scott's performance on the CogScreen-AE].

Certainly, Dr. Knippa's meanderings across the personality domain in his report were anything but clear or impressive, and they offered the possibility of negative inference almost all the way, until ultimately they did not [because the data did not support such inferences]. Any expert reading of this report would not be impressed by such meanderings, which appeared more like efforts in search of a problem that is not quite there, rather than simply making a clear straightforward statement indicating a null findings.

So, again, with this additional perspective now available to us, do we believe Dr. Knippa's interpretation of his variable findings, which offer inconsistent presumptions, and are largely derived via correlational analyses from some of the tests he administered, but not from others, that also look at snapshots of statistically relevant data not precisely the skill itself? This is especially the case when the most highly predictive of all of these tests, the CogScreen Battery, was inappropriately scored. Or do we believe actual behavioral observations [skilled functioning] with no indication of impairment undertaken over the years, and now with some twelve thousand [12,000] hours of safe expert flying, in multiple aircraft; and further, what weight do we put on the opinions of those other experts [pilots] who have observed Scott's actual flying skills and performance over many years?

As I will say several times throughout this report, the best measure of a person's specific ability is not determined by data that may, at best, correlate with the skill sets that are deemed, a priori, to be relevant to a task, skill, or ability. Rather the most valid measure

45

of a skill is to measure the performance of that skill directly. To test the actual skill by undertaking the tasks and elements of and knowledge related to the skill in a test environment, where that skill can be absolutely determined. In this case, that means in an aircraft or in a simulator! You would not use neuropsychological testing to determine the ability of a person to play the piano, nor to kick a football, even though there may be statistical correlations existent between the two and the equivalent thereof should not be done as the criterion measure of flight skills in the present context. Again, good as some test predictors may be [like the CogScreen], and unlike much of the array of other neuropsychological instruments that Dr. Knippa used [which were not designed specifically to evaluate performances that predict flight skills in pilots], the use of a number of other such instruments may only risk compromising the validity [that is, the legitimacy] of the larger evaluative process.

Again, the best measure of a person's flying ability [or any other ability] is not determined by data that may correlate in some way with the skill sets relevant to the task, but to procedures that test the skills of that task directly. At least in this case, to give these variable test data such influence, especially under tiredness and jetlag [circadian rhythm impaired] conditions, is to overstate their significance. Rather, the most valid analysis results come from undertaking of the task in a valid test environment, and in this instance that means in flight, and best over many hours of flight [in Scott Patterson's case, some 12,000 hours without ever a mishap]. However, if a neuropsychological testing is to be undertaken, then the CogScreen-AE is the best psychometric predictor of success in flight training, and its scores are well correlated with both simulated and actual flight performance in airline pilots. Yet, again, in this case [as will become clear when I review the findings of Dr. Gary Kay, there are no indications that Scott Patterson was or is in any manner flight skill or otherwise neurologically impaired.

I wish to further invite the reader to examine the below set of arguments and the below perspective of scientific and pragmatic relevance to further appreciate [and understand] the complexity of what has occurred here and to question the scientific basis of some of what [apparently] is perhaps all to often being done in cases such as this, under what may well often be invalid claims of scientific rigor and predictive validity.

Finally, pragmatically, if such a finding by Dr. Knippa is to be given standing, would it not be appropriate to further examine Scott Patterson via a second opinion analysis undertaken under circumstances where Scott Patterson had not travelled across the country the day before the exam, and then undergone a very lengthy comprehensive neuropsychological examination. Would it not have been better also to include evidence from a clinical neurological examination? And further, would it not have been a good idea to take into account the application of the most extremely valid predictor: his real life day to day flying record and the word of those who fly with him? It would appear that in their rush to terminate FO Patterson that A.A. has made not only an error, but a foolish one involving a rush to judgment based on one examination, irrespective of

46

multiple other contradictory point of evidence.

The very notion that there is a formal testing system such as what I am seeing here, that has the capacity to potentially terminate the career of any pilot based essentially [solely] on one neuropsychological examination that has showed some substantial variability across various sub-tests [even if administered and normed properly] would seem very compromised, even just straight out wrong, especially when the testing was compromised from the outset and there are other data regarding the flight skill of FO Paterson that are absolutely inconsistent with these very limited and compromised test data findings.

And yet, that is exactly what has happened here!

## ARGUMENT AND FUNCTIONAL CONSIDERATIONS

BEFORE I PRESENT MY FINDINGS AND CONCLUSIONS IN THIS CASE, IT IS APPROPRIATE FOR ME TO MAKE SOME BROAD STATEMENTS ABOUT THE CLAIMS OR ACCUSATIONS THAT WERE MADE, OR WERE INFERRED, ABOUT SCOTT PATTERSON'S CONDUCT AND HIS SO-CALLED QUESTIONABLE PSYCHOLOGICAL STATUS. I UNDERSTAND THAT IN THE PRESENT CLIMATE, IN PARTICULAR, THE AIRLINE INDUSTRY HAS AN OBLIGATION TO BE VERY SENSITIVE TO OBJECTIVELY INVESTIGATE ANY INFERENCE OF EMOTIONAL INSTABILITY IN ITS EMPLOYEES. AND IF THERE IS A HISTORY OF SIGNIFICANT DYSFUNCTIONAL BEHAVIOR, WHERE THERE EXISTS THE POSSIBILITY OF A PERSONALITY DISORDER, OR AN ADDICTION, OR A MOOD DISORDER, ETC. THAT MAY COMPROMISE THE SAFE AND APPROPRIATE OPERATION OF A PILOT'S JOB FUNCTIONING, CERTAINLY A CLINICAL PSYCHOLOGICAL EXAMINATION IS IN ORDER, AND, IF THE BEHAVIOR [SYMPTOMS] OF THE PILOT WOULD APPEAR TO RECOMMEND IT, A NEUROPSYCHOLOGICAL EXAMINATION ALSO MAY BE IN ORDER. LIKEWISE, IF IT IS SHOWN THAT THERE IS EVIDENCE OF A PROBLEM OF ALCOHOL OR OTHER DRUG ABUSE, THEN SURELY TOO, A COMPREHENSIVE PSYCHOLOGICAL EXAMINATION, AND, THEN PERHAPS TOO, UNDER CERTAIN CIRCUMSTANCES, A NEUROPSYCHOLOGICAL EXAMINATION AND OTHER MEDICALSPECIALTY EXAMINATIONS ALSO MAY BE IN ORDER, ESPECIALLY GIVEN THE POTENTIAL FOR AN ORGANIC CONSEQUENCE FROM THE IMPACT OF PROTRACTED SUBSTANCE ABUSE.

AS THE AVIATION EXPERT GARY G. KAY PH.D. WRITES IN HIS "GUIDELINES FOR THE EVALUATION OF AIR CREW PERSONNEL" THERE ARE VARIOUS "AIR CREW STRESSORS": DERIVED FROM PASSENDER ACTION, PHYSIOLOGICAL STRESSORS, THE DEMANDS OF FLYING, AND ALSO WHAT HE REFERS TO AS "INTERPERSONAL DEMANDS" THAT CAN IMPACT A PILOT.

IT WOULD APPEAR THAT WHAT THIS CASE IS ALL ABOUT INVOLVES THESE INTERPERSONAL DEMANDS, FOR THE CLAIMS MADE ABOUT SCOTT PATTERSON'S FUNCTIONING RELATE TO HIS CLAIMED INTERPERSONAL FUNCTIONING, OR MORE ACCURATELY THE INTERPERSONAL FUNCTIONING OF BOTH CAPTAIN WHITEHOUSE AND FO PATTERSON, THOUGH CAPTAIN WHITRHOUSE APPEARS TO HAVE SOUGHT TO MAKE A MUCH LARGER MOUNTAIN OUT OF A MOLEHILL AND IN SO DOING GREATLY RISKS COMPROMISING HIS OWN INTEGRITY AND MAKING HIMSELF A TARGET.

THE TIME LIMITED CONFLICT HERE WOULD APPEAR TO HAVE NOTHING TO DO WITH SCOTT PATTERSON'S TECHNICAL SKILLS OR PILOTING TALLENT, BUT ABOUT EVENTS THAT HAPPENED BETWEEN THESE TWO MEN LARGELY OVER A SMALL MATTER ON THE GROUND ON A SINGLE FLIGHT, AND A SUBSEQUENT DISAGREEMENT ON THE FLIGHT BACK AND WHICH THEN CAPTAIN WHITEHOUSE CHOSE TO CREATE INTO AN EVENT THAT ULTIMELY HAS GREATLY COMPROMISED HIMSELF, EVEN IF HE STILL DOES NOT REALIZE IT. THIS ACTION HAS NOW TAKEN ON A LIFE OF ITS OWN AND IS VERY MUCH STILL IN PLAY.

COMMON SENSE, CRITICAL THINKING, AND A COMPREHENSIVE INVESTIGATION OF THE FACTS SHOULD BE OF SUPERORDINATE SIGNIFICANCE IN THE INVESTIGATION AND HANDLING OF CASES SUCH AS THIS. THE INTERPERSONAL POLITICS BETWEEN THESE TWO MEN, AND NOISE FROM OTHER LARGELY INCIDENTAL PARTIES, UNLESS THESE MATTERS DEMONSTRATE OR INDICATE IMPAIRED FUNCTIONING IN SCOTT PATTERSON, SHOULD NOT BE CONSIDERED TO HOLD SWAY. LIKEWISE, THIS SAME ASSERTION APPLIES TO THE ACTIONS OF CAPTAIN WHITEHOUSE IN THIS MATTER, FOR SURELY HIS ACTIONS TOO ARE FROM FREE OF CRITICISM, AND ARE MOST COMPROMISING.

THERE IS NO CLAIM, NOR ANY EVIDENCE, THAT INFERS THAT SCOTT PATTERSON HAS EXHIBITED A SUBSTANCE ABUSE PROBLEM. EVEN IN ALL THE CLAIMS MADE BY CAPTAIN WHITEHOUSE, THERE ARE NO DATA THAT MIGHT INDICATE THE POSSIBILITY OF SUCH A PROBLEM. LIKEWISE, IN ALL HIS YEARS OF EMPLOYMENT WITH A.A, AND BEFORE, THERE HAS NEVER BEEN ANY INCIDENT OR EXAMPLE OF AN EVENT THAT MIGHT LEAD TO ANY PRESUMPTION THAT SCOTT PATTERSON HAS A "PERSONALITY DISORDER" OR OTHER "MENTAL PROBLEM". IF THAT HAD BEEN THE CASE, IT WOULD HAVE COME TO THE ATTENTION OF MANY PEOPLE IN THE COMPANY AND LIKELY TO THE A.A, HUMAN RESOURCES DEPARTMENT, OR TO OTHER UNITS WITHIN THE COMPANY LONG AGO. SUCH A PROBLEM WOULD ALSO HAVE BEEN IDENTIFIED IN SCOTT'S MILITARY LIFE., AND HIS HOME LIFE, BUT THERE AGAIN, IN NEITHER ISTANCE, ARE THERE ANY QUALITY DATA OR LEGITIMATE EVIDENCE SUGGESTING SUCH A CONDITION [OUTSIDE THIS ONE DISAGREEMENT WITH CAPTAIN WHITEHOUSE].

AS I WILL NOTE LATER IN THIS REPORT, I CONSIDER THAT FO PATTERSON IS RATHER LOQUACIOUS [AS DR. KNIPPA HAS NOTED] AND HE CAN ALSO BE SOCIALLY A BIT INTENSE AND EVEN ACCASIONALLY PUSHY, HE ALSO TENDS TO BE SOMEWHAT BLUNT AND DEFINITELY VERY STRAIGHFORWARD [AS DR KNIPPA INFERRED]. BUT SCOTT PATTERSON IS ALSO VERY CONSIDERATE OF THE NEEDS OF OTHERS, AND HE APPEARS ALWAYS TO BE WILLING TO HELP A PERSON IN NEED, EVEN A STRANGER. THERE ARE MANY EXAMPLES OF THIS IN HIS HISTORY, AS I HAVE ESTABLISHED IT. A GOOD EXAMPLE OF THIS IS HIS WORK IN HAITI AND HIS SUPPORT OF A HAITIAN TEEN THERE [WHO HE CALLS HIS SON]. IN MY WORK IN THIS CASE, I HAVE SPENT THE TIME AND EFFORT TO SEE THE MANY SIDES OF SCOTT PATTERSON. CERTAINLY, I SEE A MUCH MORE COMPLEX AND SENSITIVE MAN THAN DR. KNIPPA APPEARS TO HAVE IDENTIFIED.

PERSONALITY DISORDERS ARE ENDURING DISORDERS OF INTERPERSONAL DYSFUNCTION. IF SCOTT PATTERSON HAD A DIAGNOSABLE PERSONALITY DISORDER, IT IS EXCETIONALLY LIKELY THAT THE CONDITION WOULD HAVE COME TO THE ATTENTION OF AMERICAN AIRLINES YEARS AGO, AND LIKELY ALSO TO HIS PRIOR EMPLOYER, MESA AIRLINES. SCOTT PATTERSON HAS FLOWN LITERALLY THOUSANDS OF TRIPS AND CLOCKED OVER 8,000 HOURS IN THE AIR IN HIS SIXTEEN YEARS WITH AMERICAN AIRLINES, HE HAS WORKED AS A COMMERCIAL PILOT FOR SEVEN UNEVENTFUL YEARS BEFORE THAT. HE HAS FURTHER FLOWN MANY HUNDREDS OF MORE HOURS IN SUPPORT OF THE CIVIL AIR PATROL SERVICE, AND HE HAS SPENT A GREAT DEAL OF TIME DURING THAT PERIOD PRIVATELY FLYING, AS WELL AS PROVIDING SKILLED TRAINING TO THOSE SEEKING TO LEARN TO FLY. OVERALL, SCOTT PATTERSON REPORTS HAVING FLOWN OVER 12,000 HOURS, WITHOUT INCIDENT.

HE HAS FURTHER SPENT 28 YEARS SERVING HIS COUNTY WHILE EMPLOYED IN HIS MILITARY DUTIES, AND AT SIGNIFICANT RANK. IN THAT CAPACITY, AND ESPECIALLY GIVEN HIS STILL RELATIVELY YOUNG AGE, HE HAS FUNCTIONED IN SOME IMPRESSIVELY SIGNIFICANT ROLES, AND MOST RECENTLY WITHIN THE PENTAGON. IN HIS MILITARY ROLE LIEUTENANT COLONEL PATTERSON CARRIES A VERY HIGH SECURITY CLEARANCE, AND HE HAS ALSO HAD TO UNDERGO A SERIES OF PSYCHOLOGIAL EVALUATIONS AND RECURRENT REVIEWS TO BE PERMITED TO DO THE PARTICULAR WORK THAT HE DOES.

IN ADDITION, HE HAS DONE A SIGNIFICANT AMOUNT OF PUBLIC SERVICE OVER THE YEARS, WITH ROLES ALL THE WAY FROM WORK DURING THE HURRICANE IN HAITI TO HIS INVOLVEMENT IN SUPPORT OF HIS LOCAL COMMUNITY HOME ASSOCIATION.

MY POINT HERE IS THAT GIVEN ALL THE ABOVE, AND THE CIRCUMSTANCES OF THIS PRESENT UNFORTUNATE MATTER, MAKING THE INFERENCE OF A PERSONALITY DISORDER IN SCOTT PATTERSON, BASED ON HIS OVERALL SKILLED AND SUCCESSFUL FUNCTIONING THROUGHOUT HIS ADULT WORK AND CONSIDERING ALSO HIS FAMILY AND FRIENDSHIP LIFE, THE POSSIBILITY OF HIM HAVING A PERSONALITY DISORDER WOULD HAVE A PROBABILITY APPROACHING ZERO. AND YET, INSTEAD OF CAPTUTING THE DETAILS OF HIS LIFE THROUGH VIA A VERY DETAILED HISTORY TAKING, AND LOOKING TO CONFIRM OR COMPROMISE THESE DATA AS A FIRST STEP, THROUGH COLLATERAL SOURCE DISCOVERY, WHAT HAPPENED IN FO PATTERSON'S EXAMINATION BY DR KNIPPA DID NOT SEEK TO CAPTURE THESE DETAILS MUCH AT ALL [BECAUSE THE PROCESS OF THIS EXAMINATION DID NOT PERMIT SUCH DATA CAPTURE]. IT COULD HAVE, BUT IT DID NOT, BECAUSE THE AGENDA WAS FOCUSED ON A MUCH NARROWER TESTING SAMPLE,

WITH THE EXCEPTION OF THE PRESENT PACKAGE OF COMPLAINTS ORGANISED BY CAPTAIN WHITEHOUSE AGAINST FIRST OFFICER PATTERSON, AND THE VARIOUS LARGELY SOLICITED COLLATERAL COMMENTS LINKED THERETO, AND OTHER COMMENTS CLAIMED TO BE MADE IN THE STORIES OF SEVERAL PEOPLE WHO SEEM TO VIEW SCOTT PATTERSON'S COMMENTS ABOUT HIS MILITARY OR OTHER WORK OUTSIDE A.A, TO BE SOMEWHAT LARGER THAN LIFE, EVEN DISINGENUOUS, THE FACT IS THAT SCOTT PATTERSON HAS FLOWN SOME 16 YEARS FOR AMERICAN AIRLINES. AND NEVER HAS HIS RECORD SHOWN THAT HE HAS EXPERIENCED ANY SIGNIFICANT ERROR IN FLYING, NOR HAS HE PREVIOUSLY EXPERIENCED ANY INTERPERSONALLY CONFLICTS IN A WORKPLACE. ALL THIS, WHEN ACCORDING TO RAYMOND: "THE JOB OF AN AIRLINE PILOT IS RANKED ONLY SECOND IN STRESS TO POLICE SERVICE AMONG ALL UNIFORMED OCCUPATIONS". [RAYMOND, C. A. <u>MENTAL STRESS: OCCUPATIONAL INJURY THAT EVEN PILOTS CAN'T RISE ABOVE</u>. [JAMA, 259:3097-3098, 1988].

WITH THE EXCEPTION OF WHAT WAS A LOW GRADE CONFLICT WITH CAPTAIN WHITEHOUSE, IN ALL HIS TIME IN THE AIRLINE INDUSTRY OR IN THE MILITARY, SCOTT PATTERSON SAYS THAT HE HAS NEVER PREVIOUSLY EXPERIENCED A COMPLAINT ABOUT ANY ASPECT OF HIS WORK PERFORMANCE, OR OTHERWISE. SPECIFICALLY, AT NO OTHER TIME HAS ANY A.A. PILOT OR OTHER A.A. EMPLOYEE MADE ANY NEGATIVE CLAIMS] ABOUT HIS FLYING SKILLS, OR HIS GENERAL EVERYDAY FUNCTIONING IN THE WORKPLACE. NOR HAS HIS CHARACTER, OR HIS PERSONALITY, OR OF HIS MENTAL STATUS, PREVIOUSLY BEEN CALLED INTO QUESTION. MOREOVER, IN HIS MILITARY SERVICE, COLONEL PATTERSON HAS RECEIVED A NUMBER OF COMMENDATIONS AND MILITARY AWARDS FOR A JOB WELL DONE, AND THERE TOO HE ASSERTS THAT HE HAS NEVER EXPERIENCED ANY WORK RELATED COMPLAINT.

THUS, IT IS RATIONAL TO BELIEVE THAT SCOTT PATTERSON MIGHT HAVE A "PERSONALITY DISORDER" OR A "MENTAL ILLNESS" THAT HAS GONE UNNOTICED AND UNDETECTED BY A.A? BY THE MILITARY? BY HIS FAMILY? BY HIS WIDE RANGE OF FRIENDS, MANY OF WHOM ARE PILOTS? BY THOSE HE WORKS WITH IN HIS CONCULTANCIES? BY HIS NEIGHBORS? BY THE BOARD MEMBERS OF THE HOMEOWNER'S ASSOCIATION OVER WHICH HE PRESIDES? AND BY ALL THE OTHER PILOTS, COWORKERS, AND COLLEAGUES, AND ALL THE OTHERS HE KNOWS AT A.A? AND MORE BROADLY IN THE AIRLINE INDUSTRY? NOR, AS WILL BE SEEN BELOW, DO SCOTT PATTERSON'S FRIENDS AND FLYING COLLEAGUES HAVE ANYTHING BUT PRAISE FOR HIS FUNCTIONING BROADLY? THE ANSWRS APPEAR TO BE NO!

EQUALLY, IS IT RATIONAL TO BELIEVE THAT SCOTT PATTERSON EXPERIENCES A "PERSONALITY DISORDER OR IMPAIRMENT" THAT HAS LAIN DORMANT FOR ALL THESE YEARS AND HAS ONLY NOW EMERGED? LIKEWISE, IS IT EVEN REMOTELY LIKELY [AS OPPOSED TO PROBABLE] THAT SCOTT PATTERSON'S FLYING SKILLS AND TALENT ARE SUB-STANDARD OR DEFECTIVE? THERE ARE NO DATA FROM WITHIN AMERICAN AIRLINES OR ELSEWHERE THAT SHOW, OR WOULD SUPPORT ANY CONTENTION, THAT FO PATTERSON'S FLYING ABILITY IS DEFECTIVE. NO CRASHES, NO AIRCRAFT DAMAGE, NO NEAR MISSES, AND NO PERFORMANCE COMPLAINTS REGARDING HIS FLYING KNOWLEDGE AND SKILL. IN FACT, THE EVIDENCE IS TO THE TO CONTRARY. FURTHER, CAPTAIN WHITEHOUSE DID NOT OFFER ANY ASSERTION TO SUGGEST HE HAD ANY EVIDENCE TO QUESTION FO PATTERSON'S FLYING KNOWLEDGE OR SKILLS.

49

TURNING NOW TO OVERVIEW THE WORK OF DR. JOHN KNIPPA. HE MAKES AN INFERENCE THAT SCOTT PATTERSON MAY SHOW PERSONALITY ASPECTS THAT "ARE IMPAIRED," AND MAY SHOW "IMMATURE, NARCIISSISTIC FEATURES …AND A COPING STYLE "THAT CAN BE SEEN WITH DISINHIBITION FROM AD/HD, AND ALSO SPECTRUM FEATURES" [PERHAPS HE IS HERE REFERRING TO "AUTISTIC SPECTRUM"]. THIS STATEMENT WOULD APPEAR TO BE NOTHING MORE THAN A TOKEN INFERENCE FOR REASONS THAT DO NOT APPEAR RATIONAL.

THE FACT IS THAT BOTH OF THE COMPUTERIZED "PERSONALITY" TESTING PROCEDURES USED BY DR. KNIPPA COMMONLY OFFER STATISTICAL CORRELATES THAT MAY INFER THE POSSIBILITY OF VARIOUS PERSONALITY ELEMENTS AND EVEN DISORDERS. BUT TO ESTABLISH THESE POSSIBLE "INFERENCES" AS "DISORDERS" TAKES A SIGNIFICANT AMOUNT OF BEHAVIORAL EVIDENCE AND THAT EVIDENCE SIMPLY IS NOT SEEN IN THIS CASE. SO DESPITE DR. KNIPPA'S EARLY INFERENCES, THE BOTTOM LINE OF HIS "PERSONALITY TESTING", WITH BOTH THE MMPI AND THE PAI, WAS THAT THERE WAS NO PERSONALITY DISORDER WAS IDENTIFIED; AND AS HE SAID FINALLY: "THE BASIC PROFILE IS ENTIRELY WITHIN NORMAL LIMITS"

YET STILL DR KNIPPA CONTINUED WITH WHAT I CONSIDER TO APPEAR AT RISK OF BEING AN INTELLECTUALLY DISHONEST ONGOING INFERENCE, NAMELY, THAT THERE WAS SOMETHING WRONG WITH SCOTT PATTERSON'S PERSONALITY OR MENTAL HEALTH. DR. KNIPPA GOES ON TO EXPLORE THE NOTION THAT PERHAPS SCOTT SUFFERS FROM AN "UNDETECTED ATTENTIONAL DEFICIT CONDITION" OR PERHAPS THERE HAS BEEN A CHANGE IN HIS PERSONALITY FUNCTIONING SUBSEQUENT TO HIS CANCER TREATMENT. DR. KNIPPA MAY NOT BE DISINGENOUS HERE, BUT CERTAINLY HE HAS NO LEGITIMATE BASIS TO MAKE THE INFERENCES THAT HE HAS CHOSEN TO DO. NOR HAS HE EMBARKED ON ANY COLLATERAL INVESTIGATION THAT WOULD HAVE CLARIFIED ANY OF THESE VAGUE INFERENCES.  MY POINT HERE IS THAT DR. KNIPPA LEAVES THIS INFERENCE IN PLACE IN THE ABSENCE OF ANY LEGITIMATE DATA THAT HE HAS TO SUPPORT SUCH AN INFERENCE. THAT IS SIMPLY NOT PROFESSIONALLY APPROPRIATE. IF FACT, IT GREATLY COMPROMISES HIM!

DR. JOHN KNIPPA'S REPORT, [PAGES 11 AND 12] NOTES THAT WHILE IT IS OPINED THAT SOME OF FO PATTERSON'S PAST PATTERNS OF BEHAVIOR AND THE TESTING RELATED FINDINGS ARE CONSISTENT WITH RISKS OF HIM BEING PERCEIVED OR INTERPRETED BY OTHERS AT TIMES AS SELF-AGGRANDIZING, AND REFLECTING SOME LIMITS OF SOCIAL JUDGEMENT, THAT PARALLELS THE CONCERNS EXPERESSED IN THE LETTER BY CAPTAIN BEACH, IF FO PATTERSON IS PERCEIVED IN THIS MANNER BY CREW MEMBERS, CONCERNS FOR TEAMWORK AND CREW RESOURCE MANAGEMENT EFFECTIVENESS WOULD REASONABLY BE RAISED. I AGREE WITH THAT STATEMENT, IF SELF-AGGRANDIZING WAS A PROBLEM. YET ALL THE COLLATERAL SOURCE REVIEW I HAVE UNDERTAKEN, THAT IS, OF ALL PEOPLE WHO I HAVE SPOKEN TO WHO KNOW SCOTT PATTERSON WELL, NONE OF THEM SEE SCOTT AS ONE WHO "SELF-MARKETS" OR SELF-AGGRANDIZES. YET, AS I HAVE NOTED PREVIOUSLY, DR. KNIPPA DID NOT SEEK OUT OR UNDERTAKE ANY SUCH A COLLATERAL REVIEW.

DR KNIPPA EVENTUALLY CEASED THE DIALOGUE OF ANY INFERENCE OF POSSIBLE "PSYCHOPATHOLOGY" AND HE CHANGED THE TONE AND [AS I SEE IT] HE MORE OBJECTIVELY ASSERTS: "YET ABSENT A MENTAL HEALTH DISORDER [THAT IS SPECIFIED IN FEDERAL AVIATION REGULATIONS] SUCH AS PERSONALITY DISORDER OR OTHER BEHAVIOR RELATED HEALTH PROBLEMS THAT ARE SEVERE ENOUGH TO CORRESPOND TO REPEATED OVERT ACTS INCONSISTENT WITH ACCEPTABLE PERFORMANCE IN AVIATION, LAPSES OF INTERPERSONAL INTERACTIONS, AND [IN] EFFECTIVE COMMUNICATIONS, HE WOULD BE SUBJECT TO PERFORMANCE COUNSELING OR EVALUATION [I.E. HUMAN RESOURCES AND SUPERVISION MATTERS], RATHER THAN REPRESENTING MENTAL ILLNESS/DISORDERS TO BE ADDRESSED AS SUCH". [ALTHOUGH DR. KNIPPA DOES NOT SPECIFICALLY SAY IT, HE WOULD PERHAPS RECOMMEND THE PROVISION OF SOME DEBRIEFING AND COUNSELING TO BE PROVIDED TO SCOTT PATTERSON IN DEALING WITH HIS REASONABLE UPSET IN ALL THAT HAS HAPPENED TO HIM OF LATE TO ENSURE THAT SCOTT "EASES BACK' TO AVOID ANY POSSIBLE WORK RELATED CONFLICT IN THE FUTURE].

50

I AGREE WITH DR KNIPPA IN THAT PERSPECTIVE. SCOTT PATTERSON DOES NOT HAVE ISSUES OF PERSONALITY DYSFUNCTION. NOR DOES HE NEED MENTAL HEALTH CARE THAT REQUIRES HIM TO SEEK PROFESSIONAL MENTAL HEALTH ATTENTION, OR THAT POTENTIONALLY COMPROMISES HIS ABILITY OR TALENT TO FLY COMMERCIAL AURCRAFT. THE SORT OF COMPLAINTS THAT HAVE BEEN DIRECTED AGAINST FO PATTERSON ARE LARGELY ABOUT A SINGLE SET OF ALTERCATIONS WITH A SINGLE CAPTAIN, WHO THEREAFTER CREATED A DOSSIER OF OTHER ALLEDGED [HEARSAY] ISSUES TO BUILD A CASE. PERHAPS THERE ARE SOME LEGITIMATE FACTS IN THIS DOSSIER, FOR SURELY FROM THAT POINT ON SCOTT PATTERSON HAD NO TIME WHATSOEVER FOR CAPTAIN PATTERSON, AND IT WOULD SEEM, VICE VERSA, AND HE MAY WELL HAVE MADE HIS POINT OF VIEW CLEAR TO SEVERAL PEOPLE. BUT STILL, CAPTAIN WHITEHOUSE'S PRESENTATION MOSTLY CONTAINS UNVETTED INNUENDO.

I AGREE THAT SCOTT PATTERSON HAS A STRONG PERSONALITY. HE CAN BE SOMEWHAT PUSHY, VERY STRAIGHTFORWARD AND CLEAR, SOMETIMES EVEN BLUNT, FORTHRIGHT, AND BOTTOMLINE. IN FACT HE IS CERTAINLY "RATHER MILITARY". I SUSPECT THAT HE DID OVERREACT ON THE GROUND AT THE BUS IN ASUNCION, PARAGUAY, AND THAT A "MAN TO MAN" MATTER OF DISLIKE EMERGED THEREFROM. YET THERE ARE MANY LONGTERM COWORKERS IN A.A. WHO SCOTT HAS GARNERED WHO ARE SUPPORTING HIM AND SOME OF WHOM, AND OTHER FRIENDS, I HAVE SPOKEN TO. ALL THESE PEOPLE, AND OF COURSE SCOTT'S WIFE, SEE HIM AS AN EXCEPTIONAL PERSON, IN INTEGRITY, IN FRIENDSHIP, AND IN HIS ASSISTANCE TO HIS FELLOW MAN. I HAVE NOT SEEN ANY DATA OR INDICATION OF PSYCHOPATHOLOGY HERE. DR. KNIPPA DID NOT AFFORD HIMSELF THE OPPORTUNITY TO DO THIS IMPORTANT COLLATERAL REVIEW WORK, AND YET HE COULD HAVE!

AS FOR SCOTT PATTERSON'S PILOTING SKILLS, IN THE CONTEXT OF DR. KNIPPA'S NEUROPSYCHOLOGICAL TESTING PROTOCALS, AGAIN, DR KNIPPA DID NOT SPEAK WITH ANY OF THE PILOTS WHO FLY WITH SCOTT, HE DID NOT EXPLORE SCOTT'S PERFORMANCE IN WHAT IS A PROFOUNDLY OVERLEARNED SET OF TASKS. DR.KNIPPA HAD NOT EXAMINED ANY DATA FROM ANY FLIGHT SIMULATOR ANALYSIS, NOR DID HE HAVE DATA ABOUT SCOTT PATTERSON'S ABILITY TO FLY A VARIETY OF AIRCRAFT UNDER A VARIETY OF EVERYDAY AS WELL AS HIGHLY STRESSED WEATHER OR AIRCRAFT CIRCUMSTANCES. WHAT DR KNIPPA HAS IS A SET OF CORRELATION BASED ASSERTIONS DERIVED FROM TESTS THAT DO NOT AND CANNOT DIRECTLY MEASURE A PILOT'S FLYING KNOWLEDGE, SKILLS, OR TALENT. NOR, OF COURSE, DO THE TEST MANUFACTURES OF THESE INSTRUMENTS ASSERT THAT THEY DO. APPARENTLY NOT EVEN CAPTAIN WHITEHOUSE HAD ANYTHING TO SAY OF A NEGATIVE NATURE ABOUT FO PATTERSON'S FLYING KNOWLEDGE OR ABILITY.

I DISAGREE WITH SOME OF DR. KNIPPA'S PRESUMPTIONS, EVEN HIS CONCEPTUALIZATION ABOUT WHAT HIS VARIOUS NEUROPSYCHOLOGICAL TESTING REALLY SHOWS. AS WAS NOTED IN HIS NEUROPHYCHOLOGICAL ASSESSMENT, DR. KNIPPA FOUND SCOTT PATTERSON TO BE FUNCTIONING WITHIN NORMAL LIMITS ON SOME OF HIS ASSESSMENT PROCEDURES AND HE SAW HIM TO BE FUNCTIONING BELOW THOSE STATISTICALLY SET LIMITS ON CERTAIN OTHERS. I WOULD PROPOSE THAT IF YOU EVALUATED EVERY PILOT WITHIN THE A.A. SYSTEM WITH THESE SAME PROTOCALS, A SIGNFICANT NUMBER OF THEM WOULD SHOW SUBSTANDARD FUNCTIONING ON AT LEAST SOME OF THESE INDICES, AND THIS WOULD BE ESPECIALLY SO AS THE SAMPLE APPROACHES AND PASSES FIFTY YEARS OF AGE. IN FACT, MANY INSTRUMENTS [LIKE THE COGSCREEN-AE] ARE "NORMED" TO ACKNOWLEDGE THIS AGE RELATED REALITY.

THIS GETS US BACK TO THE CAUTION AT THE TOP OF MY REPORT, REGARDING THE VALID MEANS OF PREDICTIVE MEASURING. INTERSTINGLY, WE DO NOT USE NEUROPSYCHOLOGICAL TESTING TO SELECT AIRLINE PILOTS. AS I STATED AT THE BEGINNING OF THIS REPORT, THE BEST PREDICTOR OF AN OUTCOME OR A PERFORMANCE CANNOT BE A SECOND ORDER ESTIMATE OF THAT PERFORMANCE. YET OFTEN WE TRY TO DO EXACTLY THAT WHEN WE DO NOT OTHERWISE HAVE A MEANS OF BETTER ESTIMATING OR ESTABLISHING SUCH PERFORMANCE.

WE DO HAVE ONE PARTICULAR INDIRECT MEASURE [A VALIDATED NEUROPSYCHOLOGICAL MEASURE], CALLED THE COGSCREEN-AE, WHICH WHEN ADMINISTERED PROPERLY DOES OFFER SIGNIFICANT PREDICTIVE VALIDITY OF ACTUAL FLIGHT PERFORMANCE [BUT AGAIN, LIKE ANY SUCH INSTRUMENT, ONLY IF IT IS USED CONSISTENT WITH THE TEST ADMINISTRATION INSTRUCTIONS]. THIS TEST DOES OFFER RESULTS THAT ARE HIGHLY CORRELATED WITH BOTH SIMULATED AND ACTUAL FLIGHT PERFORMANCE. BUT WE MUST BE CAUTIOUS FOR IF WE THEN ADD A FURTHER BATTERY OF TESTS [AND THIS IS OFTEN DONE] AND YET THESE OTHER TESTS ARE NOT SO HIGHLY PREDICTIVE OF, IN THIS CASE, FLIGHT SKILLS, THE RESULTS OF THE COMBINED OVERALL ASSESSMENT MAY LEED TO COMPROMISE. THERE ARE TIMES WHEN LESS IS MORE, BUT ALLL TOO OFTEN PSYCHOLOGISTS DO NOT APPEAR TO IDENTIFY THIS REALITY.

THE BEST MEASURE OF AN OPERATION IS NOT A STASTICALLY DERIVED CORRELATE OF AN ELEMENT OF BRAIN FUNCTION, THAT MAY BE RELEVANT ONLY AS AN INFERENTIAL PREDICTOR OF THAT BEHAVIOR. AND NOT EVEN SEVERAL OR MORE OF THESE SO-CALLED COLLELATED PREDICTORS LINKED TOGETHER NECESSARILY OFFER US VALID PREDICTIVE DATA HERE. WHAT ONE NEEDS IS A MEASURE THAT VALIDLY DIRECTLY DEMONSTRATES THE FUNCTIONAL CAPACITY OF THE PERFORMANCE OF THAT SKILL OR, WHEN INTEGRATED, THE TESTING OF MULTIPLE SETS OF THE VARIOUS SKILLS [THAT COLLECTIVELY DEFINE THE PERFORMANCE].

ANOTHER APPROACH IS THE USE OF A FLIGHT SIMULATOR. BUT NOTHING CAN PREDICT FLIGHT PERFORMANCE AS WELL AS ACTUAL FLIGHT PERFORMANCE BUT THE SIMULATOR DOES A GOOD JOB. WHEN AN EXAMINEE HAS ACTUALLY CONDUCTED AN OVERLEARNED A SKILL MANY THOUSANDS OF TIMES, AND HAS DONE SO ROUTINELY WITHOUT ERROR, THE BEST PREDICTIVE MEASURE OF THAT SKILL IS SEEN IN THE LEVEL OF HIS/HER EXCELLENCE [AND THAT IS ESTABLISHED IN THE PERFORMING, THE ACTUAL EXECUTION, OF THAT SKILL, AND NOT IN A SECOND ORDER TEST THAT CORRELATES, EVEN HIGHLY, WITH THAT SKILL.

THE READER IS CAUTIONED HERE TO EXAMINE THE ARGUMENTS IN THE BEHAVIORAL SCIENCES METHODOLOGY LITERATURE RELATED TO CONCERNS IN THE TESTING LITERATURE ABOUT THE PROBLEMS OF CONSTRUCT VALIDITY [HOW WELL THE TEST MEASURES THE INTENDED CONSTRUCT] AND ALSO AROUND THE CONCEPT OF PREDICTIVE VALIDITY [THE EXTENT TO WHICH A SCORE ON A TEST OR SCALE PREDICTS PERFORMANCE ON SOME CRITERION MEASURE].

LET ME ILLUSTRATE THIS ARGUMENT IN AN ABSURDLY EXTREME MANNER, BY ANALOGY, TO MAKE THE ARGUMENT REALLY CLEAR. WE KNOW THAT STATISTICALLY, ALL PEOPLE SHOW A SLOW BUT STEADY DECLINE IN THE RAW POWER OF THEIR INTELLECTUAL, AND NEUROPSYCHOLOGICAL, AND PHYSICAL FUNCTIONING, AS THEY AGE. AND SOME PEOPLE SHOW MORE RAPID AND SOME A MUCH SLOWER SUCH DECLINE. UNTIL SHE DIED AT AGE 107 YEARS SEVERAL YEARS AGO, THERE WAS A WOMAN IN NEW YORK WHO HAD BEEN A CONCERT PIANIST UNTIL SHE RETIRED AT AGE 70. BUT THEN SHE CONTINUED PLAYING THE PIANO FOR SEVERAL HOURS DAILY, AND AT SUCH AN AMAZING STANDARD OF EXCELLENCE THAT IN HER 104 YEAR HER PLAYING SKILLS WERE FEATURED ON THE TELEVISION SHOW "60 MINUTES". IN FACT, SHE PLAYED WITH EXCEPTIONAL SKILL, ALMOST ALL THE WAY UP UNTIL THE TIME OF HER DEATH AT AGE 107. IF WE UNDERTOOK A COMPREHENSIVE NEUROPSYCHOLOGICAL EXAMINATION OF THIS WOMAN WE WOULD SEE SUBSTIANTIAL INDICES OF AGE RELATED NEUROPSYCHOLOGICAL DETERIORATION. AND BASED ON THESE RESULTS, WE WOULD NEVER EXPECT THAT THIS ELDERLY WOMAN WOULD BE CAPABLE OF THE SOPHISTICATED BRAIN FUNCTIONING THAT WAS IDENTIFIED IN HER PERFORMANCE. BUT WE WOULD BE WRONG! BECAUSE EVERY DAY SHE PLAYED, SHE SUSTAINED AND PRACTICED THAT UNIQUE SKILL AND ENGAGED THAT OVERLEARNING CONTINUOUSLY. THE VARIOUS FORMS OF PSYCHOLOGICAL TESTING WE USE ARE VERY IMPORTANT INDICES OF PREDICTION. BUT THESE MEASURES MOSTLY INFER STATISTICALLY LINKED CONNECTIONS THAT ARE NOT NECESSARILY OPERATIONALLY VALID. YET ALL TOO OFTEN THIS FACT IS NOT WELL UNDERSTOOD AND SADLY, SOMETIMES NOT EVEN FULLY REALIZED, EVEN BY SOME PSYCHOLOGISTS.

WHAT DR KNIPPA [OR ANY NEUROPSYCHOLOGIST] HAS PROVIDED TO A.A OR ANY OTHER CLIENT IS NOT ALWAYS "FACT" BUT OFTEN "INFERENCE" FROM THE USE OF CERTAIN PSYCHOLOGICAL TESTS, THAT IN THEMSELVES DO NOT CORRELATE WITH EACH OTHER ANYWHERE NEAR ONE HUNDRED PERCENT. MOREOVER, MANY OF THESE TESTS [EXCEPT FOR THE COGSCREEN-AEROMEDICAL EDITION] WERE NOT DEVELOPED TO PREDICT PILOTING PERFORMANCE BUT TO INFER MULTIPLE ASPECT OF BRAIN EFFICIENCY AND DYSFUNCTION. THAT IS, BRAIN FUNCTIONS THAT ARE PRESUMED TO CORRELATE WITH THE MENTAL FUNCTIONING THAT IS ASSERTED TO PREDICT IDEAL FUNCTIONING ACROSS CERTAIN DIMENSIONS. BUT AGAIN, THE MOST VALID MEASURE OF ANY PERFORMANCE IS THE DIRECT MEASUREMENT OF THAT PERFORMANCE NOT THE USE OF A TEST BATTERY THAT GIVES VARIABLE INDICES OF INDIRECT MEASURES AND COMPROMISED CORRELATES OF THE TARGET PERFORMANCE.

TO USE PSYCHOLOGICAL TESTING FOR THE SCREENING OF CANDIDATES FOR FLIGHT TRAINING AND EMPLOYMENT CAN BE HELPFUL AND IT MAKES SENSE TO EXCLUDE THOSE WHO REASONABLY CAN BE PREDICTED TO BE UNABLE TO MASTER SUCH TASKS AT AN EXPERT LEVEL, AT THE KNOWLEDGE AND SKILL REQUIRED TO FLY A COMMERCIAL AIRCRAFT. THE USE OF THE COGSCREEN-AE AND PERHAPS A PERSONALITY SCREENING TOOL MAY BE OF GREAT VALUE HERE. SURELY, NONE OF US WOULD WANT TO FLY WITH A PILOT WHO WAS MENTALLY OR BEHAVIORALLY LIMITED. YET, WE MUST BE CLEAR, THAT IN THE PERSONALITY DOMAIN, IT IS OFTEN NOT POSSIBLE TO DETECT SUCH IMPAIRMENTS FROM SIMPLY TESTING THESE SUBJECT, AND A COMPREHENSIVE EXAMINATION IS CRITICAL.

WHEN AN OTHERWISE MULTI-TALLENTED PERSON WHO HAS SHOWN GREAT MASTERY OF THE SKILL OF FLYING MANY THOUSANDS OF TIMES, IT SHOULD BE IN THE AIR THAT HIS/HER PERFORMANCE SHOULD BE BEST DETERMINED. THINK ABOUT IT! AS NOTED PREVIOUSLY, AS WE AGE EVERYONE [I REPEAT EVERYONE] SHOWS A SLOW BUT STEADY REDUCTION IN HIS/HER RAW PERFORMANCE ON BOTH INTELLECTUAL AND ON NEUROPSYCHOLOGICAL MEASURES. THIS IS JUST THE SAME AS THE REALITY THAT WE CANNOT RUN AS FAST AT AGE 50 AS WE CAN AT AGE 20. THAT IS WHY IN INTELLECTUAL AND MEMORY ASSESSMENT THE TESTS ARE SCORED NOT ONLY ON THE BASIS OF THE ANSWERS GIVEN AND THE TIMES TAKEN IN PERFORMANCE, BUT AGAINST AN AGE INTERGRATED REGRESSION CRITERION. IF WE WERE TO ADMINISTER INTELLECTUAL, MEMORY, AND NEUROPSYCHOLOGICAL TESTING TO ALL A.A PILOTS OVER THE AGE 50 WE MIGHT END UP, BASED ON THESE CRITERIA, RECOMMENDING THAT A LARGE PERCENTAGE OF THEM SHOULD BE REPLACED BY TWENTY-FIVE YEAR OLDS. YET THE EXPERIENCE AND KNOWLEDGE THAT COMES WITH THOUSANDS OF HOURS OF PRACTICE AND KNOWLEDGE SIMPLY CANNOT BE MEASURED BY NEUROPSYCHOLOGICAL TESTING. I AM NOT ARGUING AGINST THE USE OF SUCH TESTING, BUT THERE SHOULD BE A RATIONAL REASON TO USE THEM AND TO DO WHATEVER IS NECESSATY WHEN THERE IS SOME CONCERN ABOUT A PILOT'S FLIGHT SKILLS. THAT SIMPLY DID NOT HAPPEN DURING THE DR. KNIPPA EVALUATION OF FO PATTERSON.

### The Psychiatric Examination conducted by Ibrahim Abi-Rafeh M.D.

I [Dr. Caddy] consulted with a local psychiatrist, Ibrahim Abi-Rafeh M.D., who has known Scott personally for well for over ten years in the context of the Civil Air Patrol work that they both do. When all of these claims from Captain Whitehouse surfaced, Scott consulted with Dr. Ibrahim [that is, long prior to my involvement in this matter] because of the stress of the difficulties he had been facing within his employment at A.A.

Scott told me that Dr. Abi-Rafeh conducted an overall examination of him and he concluded that Scott was suffering a reactive stress state [an Adjustment matter] caused by what was really a great deal of stress occasioned by "all the out of nowhere" attacks on Scott.

53

I interviewed Dr. Abi-Rafeh and he told me that while he and Scott discussed the possible use of a minor tranquilizer to assist with all the work related stress Scott was experiencing, Scott decided that he did not want to be taking any medication other than natural nutritional agents that he may take to facilitate calm and sleeping [for it was Scott's sleeping that was being most compromised].

Dr. Abi-Refeh's professional opinion regarding Scott was that he was experiencing stress induced adjustment issues but that Scott was a very well adjusted and mentally strong person and that he really did not need any therapeutic support or medication.

**The Aeromedical Neurological Examination of John D. Hastings M.D.**

It was my opinion that in the context and political climate of Scott Patterson's issues in his workplace it would be appropriate for him to seek out the opinion of an extremely experienced and well-respected Aeromedical Neurologist in order to bring a neurological perspective to the issues in his case with A.A. Hence, based on my recommendation, Scott sought out and consulted with the extremely experienced Aeromedical Neurologist, John D. Hastings M.D. This consultation occurred on May 28, 2016 with Dr. Hastings at that time conducting his Independent Aeromedical Neurological Evaluation. [This examination included a history taking, a comprehensive neurological examination, and also a review of Dr. John Knippa's psychological report and conclusions].

Dr. Hastings indicates FO Patterson's history of excellent health, but for the removal of the spindle cell carcinoma from the left chest wall. He also notes Scott's use of food supplements but otherwise no use of medication. After recovery from the chest surgery, it is noted that the FA.A. Aerospace Medical Certification Division issued Scott Patterson a medical clearance and that he returned to work on June 2, 2015.

Dr. Hastings indicated that Scott showed no history of neurological insult or compromise at any point in his life. Observation of gait, motion, head and neck, ocular motion, hearing, and neck and head review, coordination, muscle strength, and a sensory examination were all unremarkable. Likewise, the Montreal Cognitive Assessment [reviews visuospacial, executive, memory, attention, language, abstraction, delayed recall, and orientation functions showed a normal 29/30 score.

Dr. Hastings thoroughly reviewed the report of Dr. John Knippa and his [the latter's] opinion that some test scores on test instruments were not commensurate with typical pilot normative data. From this detailed review, Dr. Hastings reported that: "I do not find evidence to suggest neurologically based impairment in neuropsychological function including personality, behavior, intellect, or memory".

Dr. Hastings concluded that: "Mr. Patterson poses no risk to aviation safety and that he is fit to fly from a neurological standpoint".  I called Dr. Hastings after his findings in Scott's

54

matter were concluded and we had a very pleasant 30-minute discussion. Dr. Hastings and I spoke on some of the philosophical issues of assessment in these contexts and the ease of the making of the sort of errors that have characterized the findings of Dr. Knippa when a comprehensive 360-degree examination was not undertaken and also when there is such an inordinate emphasis given to the compromised predictive validity asserted for some of the neuropsychological subtests that Dr. Knippa placed such significance upon.

### The Aeromedical Neuropsychological Report of Gary G. Kay Ph.D.

Firstly, to put Dr. Gary Kay's work within a timeline related to my work, he examined Scott Patterson over one full day in his Washington D.C. office on June 29, 2016. Scott reported to me that he had flown to Washington the day before, arrived in the mid afternoon, and that he slept well the night before getting a full night's rest.

By the time of Dr. Kay's examination I had all but completed my work in this case. In fact it was I who advised Scott to go and be further aeromedically re-examined by a man recognized as truly expert [and even often the final authority] in the Aeromedical Neuropsychology arena, Dr. Gary G. Kay. I was confident that the findings of Dr Knippa were inaccurate [compromised] and I considered it sensible to undergo this further evaluation rather than for Scott to simply rely on my work and the attendant subsequent litigation he would bring in search of his relief.

In his overview of Dr. Knippa's report, Dr. Kay noted that A.A. had made the claim to Dr. Knippa that Scott Patterson was reported to have "multiple atypical interactions with coworkers and showing a pattern of false/self-aggrandizing statements". Apparently, no other information was provided to Dr. Knippa regarding these allegations. Dr Gary Kay noted that Dr. Knippa viewed FO Patterson as somewhat lacking in the use of appropriate social distancing, but otherwise he saw him as well meaning with a pleasant mood and a courteous demeanor.

Dr. Kay noted that Dr. Knippa had compared FO Patterson on the CogScreen-AE to Regional Airline Pilot norms rather than to the age-group norms available for pilots of the Major Airlines.   Clearly, this error compromises Dr. Knippa's findings on this instrument, and the opinions related thereto.

Dr. Kay noted FO Patterson to be somewhat, as Dr. Knippa had presented him, and surely too as I saw him to be. He was Prompt for his appointments, well groomed and dressed, fully alert, oriented and co-operative. He readily established good rapport, he was neither anxious nor depressed, and he sought to present himself in a favorable light. There were no signs of inattention or lack of concentration. His speech was normal in volume, rate and prosody.

55

On the CogScreen-AE, on measures of speed to respond, Scott Patterson functioned at the 60th percentile compared to U.S. Major Airline Pilot norms. On measures of accuracy, overall Scott functioned above the 85th percentile, as compared to those same norms. In fact, all the measures on this instrument were within the normal range for people in his field.

On the Connors Continuous Performance Test-II, all Scott's scores, with one exception, were in the expected range on this measure [of visual sustained attention]. FO Patterson was noted further to show good reaction time, sensitivity to target stimuli, and adaptability to inhibit responses to non-target. There was no other evidence on this test of a deficiency in vigilance or attention.

Likewise, on the Trail Making Test, Parts A, and B, and C, Scott also showed good performance and all within the range expected for pilots.

Dr. Kay concluded his overall findings of FO Patterson's examination as follows:

"Based upon my review of the records, including evaluations by Dr. Caddy and Dr. Knippa, along with results from testing conducted on 6/29/16, and a clinical interview, Mr. Patterson appears to be psychologically and neuropsychologically fit-for-duty as an American Airlines Pilot.

There is no evidence of aeromedically significant neurocognitive deficits. Follow-up testing with CogScreen AE and measures of attention [including vigilance] reveal normal functioning. A mild weakness was seen on one [isolated] measure of vigilance. Performance was normal on all other measures of sustained attention. I agree with Dr. Caddy that poor performance on vigilance testing when evaluated by Dr. Knippa was likely due to jet-lag related fatigue".

Finally, Dr. Kay notes that based on his review of records and his own interactions with FO Patterson, it appears that Scott may have some interpersonal characteristics, which at times may prove problematic. He writes: These appear "likely to be longstanding personality traits which have not caused significant social or occupational problems prior to the incident reported above. I see no evidence in the prior personality testing conduced by Dr. Caddy and Dr. Knippa of a mental health condition that would cause Mr. Patterson to be unfit for duty, or which would be disqualifying for an Airman Medical Certificate".

## My Work in this Case

### Perspective and Overview

In my presentation of the data that I have developed and/or is presented above, including my commentary on the work of others, and in the work to be presented

subsequently, I have sought to provide a detailed forensically oriented analysis along with my opinions and findings in this case. This work has been more multi-dimensional and vastly more time involved that the work of Dr. Knippa, or any other expert involved in this case. What I have sought to develop in this work is at a forensic procedural level of precise investigation, such that it represents a detailed and critical comprehensive analysis of the entire matter of FO Scott Patterson's functioning and his recent circumstances in his very unpleasant dealings with A.A.

Before proceeding, I wish to make the disclaimer that I have not participated in the two-day substance abuse training program that the F.A.A. refers to as the HIMS [Human Intervention Motivation Training Study]. While in dealing with these aviation matters HIMS course attendance provides information and perspective that is valuable, the fact is that I have more than 35 years of experiencing in dealing as an expert in the addictive behaviors field, and I also have evaluated and treated many airline employees over the years, especially given that I was the Principal Consulting Psychologist for United Airlines at their Miami Base for more than fifteen years from the late 1980's.

Ultimately, making sense of and weighing and evaluating all the data under observation, and employing a detailed investigative approach represents the most important processes to achieve a valid analysis in any case, clinical or otherwise. This is especially true when the matter is one of complexity and with many moving parts, as is true in the Scott Patterson matter.

Two Aerospace Psychologist Examiners [Dr. John Knippa and Dr. Gary G. Kay] and an Aerospace Neurologist [Dr. John D. Hastings], as noted above, have presented their various perspectives in this case. Additionally, other medical professionals have offered their perspective on the health and mental health status of Scott Patterson. Two neuropsychologically oriented examinations have been conducted and I am not intending to do any further neuropsychological assessment of Scott Patterson. I consider such work to be unnecessary and not particularly relevant at this point. Certainly, if I had done so, as I have indicated above, I would not have done so under conditions where a three-hour time zone change with jet lag and tiredness were present in the examinee [as was true but apparently not adequately considered in Dr. Knippa's examination in California]. I would also have liked to see Dr. Knippa undertake a much more comprehensive analysis of the issues that emerged from the complaints of Captain Whitehouse, though in fact none of these claims rationally implied that Scott Patterson was experiencing any neuropsychological [that is, organic brain] impairment whatsoever. The reality is that Dr. Knippa was just not equipped to do, or able to do, such a detailed investigation [which if done well would actually been very helpful].

What I have done involves a vastly more detailed forensically framed and vetted cognitive behavioral and history based examination of Scott Patterson and an extensive collateral source based data analysis. Such work is routinely more comprehensive than simply the work of a clinical examiner; or in this case the limited in scope clinical and

57

neuropsychological examination conducted by Dr. Knippa. As an example, Dr. Knippa did not seek out any knowledgeable collateral witnesses who could have offered him perspective on FO Patterson, whether that perspective is on issues of AD/HD, or on anything else. Such knowledge could have been obtained by asking questions to people who work with Scott and know of his flying skills, and others, who know Scott very well in other contexts, and know of his emotional functioning and stability. That would have been a good first step and very useful! But it was beyond the scope proposed for Scott's examination.

I will present my findings in some detail below, but as a "heads up" to what I will present in my concluding remarks, I am going to here make the point that over the history of Scott Patterson's employment with A.A. as noted above, it is my understanding that there has never been any questioning of his talent and proficiency to undertake all of the technical duties required of an A.A. pilot, not up until now. In fact, even with these various mostly disjointed and highly questionably negative remarks made almost exclusively by people who hardly know FO Patterson, it was only the opinion of Dr. Knippa, who pushed to the edge of the envelop to find some personality aberration in Scott only to finally have to back away. In fact, to the contrary, people who Scott has introduced me to at A.A, and who have known him very well and for many years, and are themselves extremely experienced commercial airline and/or Civil Aviation Pilots, all consider Scott to be an exceptionally skilled and safe pilot and an equally emotionally well balanced person.

In these various Captain Whitehouse based complaints that I have reviewed, there is no person who has stated that Scott Patterson is not a highly experienced and technically competent pilot. Moreover, the so-called "flight issues" involved in the complaint are those involved in one particular flight and do not speak to any technical inability or limitations on Scott's part to fly a commercial aircraft. In fact the central event here involved a less than a three [3] minute low-grade disagreement between Captain Whitehouse and FO Patterson regarding a bus ride, and partly in the presence of the flight crew and the Patterson family, and then a further brief [less than two or maybe three minute] unpleasant interaction between these two men on the flight back. One might be able to make an inference [as A.A. may have drawn] from all of the barrage directed a Scott Patterson from the multiple innuendo [largely solicited by Captain Whitehouse] implying some personality issues within Scott Patterson, but rationally, not impairments in brain functioning.

Yet this dispute eventually would take on a life of its own, which ultimately led to the serious ramification now before Scott Patterson and also A.A. The fact is that this one trip would lead to allegations questioning Scott's emotional stability and/or judgment. These allegations also would appear to be, almost entirely, based in supposition, rumor and innuendo. My investigation simply does not lead to any data that would support a conclusion of functional or organic mental impairment in Scott Patterson. Scott's crime, it would seem was making the choice to be inadequately deferential to the agenda of

Captain Whitehouse, at a bus, and then again quite straightforward in a remark to the Captain on the return leg of the same flight [regarding his desire to not be subsequently paired with the Captain].

**The Events at Asuncion that Set the Stage for Scott's Problems**

FO Patterson advised me that what started off to be a potentially very pleasant experience on a trip to Asuncion, Paraguay [Scott had three weeks before the trip even called Captain Whitehouse and invited him and First Officer John Flannigan to join he and his family to go with him during the layover on a bus ride to the amazing Iguassu Falls]. But Scott was irked with the Captain and several of the crew as a result of his perspective of a brief set of their actions after they arrived in Asuncion. And then there was some unpleasant discourse, though again quite brief, between Captain Whitehouse and Scott in the cockpit towards the end of that trip [on the way back to Miami]. Scott was irked enough by the ongoing perspective and commentary by Captain Whitehouse on that return flight that he reports that he told Captain Whitehouse that he did not wish to fly any future trips with him; and that he would place Captain Whitehouse and himself on the "Do-Not-Pair list" for flights in the future.

The problems that set the stage here emerged over a three-day flight [and lay over] in Asuncion, Paraguay [during which Scott brought his wife and two young children along for the trip]. The problem started, as far as Scott knew, from a disagreement around who was going to be on the transit bus to the hotel in Asuncion. Scott reported that prior to going to the transit bus he had asked Captain Whitehouse if he could bring his wife and two children to the hotel on the bus and the Captain had agreed. But when Scott and his family arrived at the bus the crew was already on board and there was not enough seating [there was only one unused seat on the bus, and Scott proposed that his two kids would sit in a single seat and his wife and he would stand or sit on the floor].

However, several of the crew began to complain. That led to a brief discussion outside of the bus in which Captain Whitehouse told Scott that this will not work and that he and his family would have to take a taxi. The Captain even offered to pay for the taxi. However, while Scott saw the Captain's decision as unnecessary [the vehicle did not even have seat belts fitted and Scott's plan would have worked], having that discussion immediately outside the bus within easy earshot of the other crew, [who were at that same time complaining about the delay in leaving] offended Scott. [Scott's upset was not so much about the decision that Captain Whitehouse made, though he considered it unnecessary, but rather by the conduct of the crew in the bus. He was also upset that the discussion between he and Captain Whitehouse on this matter was occurring within easy earshot of the crew, who were already complaining about getting going]. Scott did not like it. [Recall too that Scott is a military officer and military officers, by tradition, do not discuss sensitive matters in front of "Other Ranks"]. Scott thus got the children's two backpacks off the bus, as well as his crew bag, and his family took a taxi to the hotel. That was it.

59

Over the weekend Scott reported that he spent the time in Asuncion and beyond sightseeing and being with his family. The morning after the arrival FO John Flannigan spoke to Scott about the incident and apologized for not thinking to give up his seat on the bus for Scott's wife. But other than that, according to Scott, nothing of significance occurred. However, what was otherwise a minor irritant at the transit bus set the stage for a further discussion between Captain Whitehouse and FO Patterson in the cockpit on the way home and it was this discussion which led Scott to advise the Captain that he would put them both on the "do not pair list". Apparently, Captain Whitehouse had his own perspective on all of this.

Yet, this matter did not stop there, in large measure because a rumor mill developed, which in turn appears to have taken on a life of its own. Thus, Scott Patterson advised me that:

[i] On the very next flight he flew to Paraguay [that is, Flight 217 on October 16, 2014], he was speaking with a female flight attendant on the crew bus on the way to the flight. Scott had known this woman for a long time and she was working with him to Asuncion.  He reported: "She advised me that some of her friends had called her to warn her about the flight they had taken last week and about FO Patterson".  Scott reported that he advised this flight attendant that: "He had never had any problems before and she shouldn't expect any on this trip either".

[ii] There developed what Scott believes were rumors flying around about him such that on two occasions the United States Customs and Border Patrol searched him and the other male crew on outbound flights that he was working. That had never happened to Scott or the other men in all his years of commercial flying; and,

[iii] There were even rumors circulating of Scott smuggling weapons into South America which, Scott says, must have been the nexus of the above stated Customs contacts. In fact according to Scott Patterson, Captain Chip Harlowe, of Professional Standards, at the same time that he was "interrogating" Scott about Glenn Whitehouse [which in itself was not a friendly telephone call] asked Scott the rather bizarre question of: "Scott, are you smuggling guns into Bolivia?"

In fact, Scott reported to me that he was so disgusted in hearing this latest rumor [being just one more of a chain of rumors he was hearing about himself] that he contacted Captain Thomas Copeland, the Domicile Chairperson for APA in Miami. Scott said that he advised Captain Copeland that this, and all the other rumors were serious, and they had to be stopped.  Scott then asked Captain Copeland to contact Captain Chip Harlowe to determine the source of the rumors and when Copeland did just that; he reported that Captain Harlow replied that he could not remember the source.  Scott advised that for Captain Harlowe, a 757 captain, to have "amnesia over such issue" was not in his view, believable. Scott considered such a statement to be much more likely the A.P.A. [Allied

60

Pilot's Association] covering up for Captain Whitehouse's behavior.

[iv] One of Scott's neighbors, and a friend who is also a flight instructor and serves in the Civil Air Patrol with Scott, Mr. Robert Wilson, told Scott that: "An American Airlines Captain [Matthew Romana] who he had met briefly at the Kendall-Tamiami Airport advised Mr. Wilson that: "Scott Patterson wasn't going to be with American much longer".

While Scott agrees that he was briefly upset by the actions both of Captain Whitehouse and several of the crew on the bus in Asuncion [around how the issue of his family travelling on the bus was handled], he expressed to me the view that what with FO John Flannigan [who was working on that flight to Asuncion] apologizing to him the next morning for not thinking to give up his seat on the bus to Scott's wife], he was quite happy to let the entire matter rest and for it to be a non-issue. Scott considered that none of this unpleasantness needed to have continued, but it did, on the way back, as I have indicated above.

As I will note further below, in fact I spoke to Scott's wife, Roxana Patterson, about her observations of the bus incident and of Scott's functioning then and throughout that weekend. Roxana said that she did not see what the big deal was that the flight attendants were griping about, beyond that they were tired and wanted to get to the hotel. She said that Scott too was tired and he went straight to bed when they arrived in the hotel. Scott spent the entire weekend sightseeing and having fun with his wife and their two kids. They really did not talk about it and given what they were doing they had little interaction with the Captain or the other crewmembers over that weekend.

Given the above, and even the many more claims made against FO Patterson that Captain Whitehouse has presented, I consider that these various claims fit into one of three categories: [i] the facts; [ii] the fanciful; and [iii] the impossible, [e.g. the rumor that Scott was smuggling weapons into Bolivia would seem more than fanciful and into the impossible category]. But a simple discussion with FO Patterson and the A.A, Human Resources Department or within the Allied Pilots Association Union could have eliminated almost all these issues; and left only the select dispute between Captain Whitehouse and FO Patterson to be resolved.

If American Airlines wanted to get to the bottom of the cause of FO Patterson's upset with Captain Whitehouse, and vice versa, and have this matter resolved, discussing the matter fully with both men and requiring both of them to a meeting to address and resolve this "dispute or personality conflict" would have made a great deal of sense. But that did not happen. Alternatively, sending them both men either to the A.A, Employee Assistance Program or to an experienced professional mediator to address their disagreements and resolve them, or agree to disagree, would have made a great deal of sense. But that also did not happen either! The "Intervention" of Captain Modrich within the Union did seem to result in a resolution, at least as far as the APA and A.A was

61

concerned, or at least that is what Scott Patterson presumed to be the case. But that is not what happened either and the matter continued!

What appears to have happened, based on all the data, is that over a period of eleven months, Captain Whitehouse sought out and captured an array of rumor, inference, innuendo, and in the vast number of instances straight out lies about FO Patterson. This action would appear vastly more likely to be seen as arrogance and/or anger based, and a quite outrageous workplace vendetta than anything else. But even if we do not go that far, certainly, this action is not what could be seen as a well thought out fair minded workplace related action, and certainly not based on concern for a colleague. Nor was it an action of any functional integrity, in part because far from an effort to ensure a balanced reflection of concern for a fellow pilot, taken in its totality, the energy and persistence of this action, and the irresponsibility inherent in it [collecting an array of rumor and innuendo], and then presenting this manifesto to A.A., was both an incredibly wrong and equally arrogant and foolish action, very likely to result in an escalation. Which it did, but not for Captain Whitehouse!

It is one thing to dislike another co-worker, it is entirely another to seek to destroy his career by rumor. [In fact such an outrageous action should have resulted in an instant Human Resources Investigation, and a vetting of the entire matter, because at that point A.A. had no reason nor ability to know what was truth and what was fiction, nor could A.A. know the genuine motives of Captain Whitehouse [for surely he had placed himself out on a limb by this very serious action]. And yet, it appears that Captain Whitehouse received no sanctions for his extended vendetta investigation of FO Patterson.

There would appear to have been a failure within the A.A. Human Resources Department, and presumably also at higher administrative levels, in the entire handling [or non-handing] of this matter.

Without a genuinely balanced and rational investigation having taken place, the solution chosen was that Scott Patterson was ordered to California to undertake a psychological examination that focused, in large part on a neuropsychological investigation [that is, one that explores organic brain injury or other brain pathology].

Meanwhile, as best as I can determine from the limited perspective of a forensic examiner looking from the outside into A.A., it would seem that Captain Whitehouse's salacious claims and conduct and his apparent non-vetted vendetta directed against FO Patterson, led him to have no meaningful Human Resources or Administrative action taken against him, despite his conduct. For Scott Patterson, and a number of his supporters within A.A., this was not only a slap in the face, it was evidence of the operation of the "Captain's Protection Society" in operation.

In fact, there was no rational basis for doing such a neuropsychological examination. To investigate the issues that had occurred here should have involved, at best, a

62

questioning and investigation of the actions of both men and then an administrative determination regarding how both would deal with any ongoing or future upsets that they may have with each other, [which should have been zero given that Scott Patterson had placed himself on a "do not fly list" with Captain Patterson. In fact, on one occasion, FO Patterson reported that he had gone out of his way on a flight where he otherwise would have come in contact with Captain Whitehouse. Human Resources also could have required both men to cease any such ongoing "noise" about the other. Meanwhile, Human Resources should have undertaken, or in the alternative, arranged the conduct of a comprehensive independent investigation of this entire serious matter. That would have been really intelligent, but it did not happen.

The fact appears to be that the basis for the problem that separated these two men, and which extended to other members of the crew during that trip to and from Asuncion, was the essential and only triggering problem. What happened later and what appears to have been largely, but not solely, created by Captain Whitehouse, involved [perhaps] some facts [but perhaps not]. But the vast amount of the Whitehouse submission involved rumor, innuendo, and noise, which took on the flavor, for some, of "a new rumor based reality".

The solution here hardly required an Independent Comprehensive Neuropsychological and Clinical Psychological Examination, which in fact, even after it was completed by Dr. Knippa, still did not result in a valid understanding of the underlying problem that existed between these two men on the ground in Asuncion or subsequently. Rather, the invalid findings of Dr. Knippa and the conclusion that flowed therefrom, and in his final recommendation, not only did this work risk destroying the career of a perfectly able pilot, it created a greater level of complexity, confusion, and added irrelevance, which was other than what actually was existent on the ground [or in the air], and it erroneously did so by a very large margin of error.

Surely, such an arrogant investigative approach by one employee of A.A., aimed to castigating, defaming, and harming a [lesser ranked] co-worker, could not possibly be considered an appropriate and approved means of filing a complaint. And yet that is exactly what has happened; and yet there appears to have been no corporate action taken against Captain Whitehouse whatsoever. Surely, in a balanced fair-minded workplace, this Witch [Warlock] Hunt by Captain Whitehouse should have not been handled differently and with significant consequence.

What was done was to presume the need to explore "both a clinical and a neuropsychological explanation" for what was in fact, if anything a "software problem" [a dispute in perspective] between two men; it was not a "hardware" or "software" problem within Scott Patterson [i.e., as seen in the search for brain dysfunction]. But sadly, even Dr. John Knippa, the A.A chosen examiner, with sixteen hours of consultation under his belt in this case, did not "get" what was really occurring.

63

Dr. Knippa approached the problem with an inadequate understanding of much [virtually all] of the complexity but very time limited to the history between these two men [and a reticence by FO Patterson to discuss it]. And in the course of his examination, Dr. Knippa obtained virtually no detail from FO Patterson about the Whitehouse disagreement or the issues that followed. FO Patterson did not offer to detail this matter because he believed that the Section 21 Hearing had ended any claim that A.A might have had against him on these issues. Moreover, Scott had been told by the Allied Pilots Association specifically not to go into these matters again in the Dr. Knippa examination [as these matters had been settled and closed in the Union]. And so Scott simply chose not to discuss these matters. Thus, Dr. Knippa prepared a report that did not get a handle on the reason that Scott Patterson was sent to see him, nor did his report address the matters of the dispute with any detailed analysis whatsoever.

Thus, as all too often occurs, as the saying goes, "When all one has is a hammer, then everything becomes a nail". And so, ultimately, Dr. Knippa unfortunately and inaccurately, chose to establish a finding that "pathologized" Scott Patterson's functioning, both inside and outside the situation of his work dispute and indicated that Scott Patterson should not be permitted to return to his flying career with A.A.

Dr. Knippa had absolutely no objective valid evidence [none] to suggest that Scott was not an excellent pilot nor did he search out any through collateral review. In fact, had Dr. Knippa looked [searched] he would have found a great deal of evidence to the contrary. But he did not seek to look, perhaps because it was seen as being beyond the scope of his investigation. Rather, using inconsistent and mostly questionable neuropsychologically based test data, and perhaps with further related presumptions, but certainly without taking into adequate consideration the impact of jet lag on the very performances he was seeking to measure, Dr. Knippa invalidly [and I consider irresponsibly] used certain inappropriate neuropsychological date to concluded that Scott Patterson was Not Fit to Fly.

Dr. Knippa never came to an understanding of what really was the basis for the triggering of this totally unneeded search for Scott Patterson's non-existent but questioned organic brain impairment or personality pathology. Tragically, the only real accomplishment that Dr. Knippa achieved in his persistent endeavor to find dysfunction in Scott, of either a functional or organic nature, was to risk compromising his own career and his integrity.

### Overview of My Examination Process

In addition to my review of all of the documents listed above [and additional documents presented below], I also undertook my own comprehensive examination of the multiple issues in this case in a formal forensically focused examination of Scott Patterson.

My examination and the collateral source review undertaken therewith occurred over

64

the course of some sixty hours of direct interviewing and testing of Scott Patterson [yes, that many], then additional time interviewing all the collateral sources I examined, and then well over that amount of time again checking data and perspective and facts as I put all of this analysis together and preparing this report.

It took this amount of time to fully undertake the investigation of this examinee, and especially so, given the complexity and all the moving parts associated with the multiple complaints and claims being presented against FO Patterson by Captain Whitehouse, and those other people who were collected by the captain. Such an amount of time was needed to learn about Scott Patterson and ultimately evaluate his perspective on all of the matters that I needed to understand to make sense of what really took place as far as Scott Patterson's thinking and functioning was concerned (and to frame this thinking in the context of Captain Whitehouse's claims and his related agenda. I spent some six hours of telephone or video contact with Scott's collateral witnesses as embarked on a comprehensive collateral source review by interviewing people across various contexts, all of whom Scott knows well. And finally, there were many hours involved in preparing this comprehensive report.

From the clinical perspective this examination involved a comprehensive history taking and the conduct of a cognitive and behavioral analysis of Scott's everyday life functioning and mentation, his personality structure, his coping systems, his family life, and his employment history and functioning [both within American Airlines, as a pilot, and concurrently within the United States Army, as a Reserve Officer at the rank of Lieutenant Colonel]. A comprehensive mental status examination was also undertaken together with the use of some selective psychological testing.

During the course of this series of examinations and the rigorous collection of collateral source data, I sought to specify the extent of any ongoing problems that Scott Patterson was [or was not] experiencing or asserting [or that others were claiming] through both clinical analysis and formal structured testing, and also through the collateral examination of others who know him well, both at home and at work, and in his various capacities and roles, and especially in his role as a First Officer with American Airlines. Thus, I spoke to all of the collateral sources noted below to take their perspectives. I also read a total of about a dozen letters of support that were sent to American Airlines by Scott's friends and colleagues [see under the heading "Review of Collateral Sources"].

While I considered it critical that I have enough data regarding Scott's functioning to formulate my ultimate conclusions about what really was going on with him as far as his troubles with his employer were concerned, I looked also at possible changes in his everyday psychological functioning in response to what became another quite severe stressor, the finding in early February, 2015 of a relatively rare cancer [spindle cell carcinoma] in Scott's left breast muscle. Surgery was undertaken in mid-February, 2015 and thereafter Scott underwent a one-month treatment program. However, the matters that were raised by the complaint filed by Captain Whitehouse involved specification of

65

an alleged array of events, or interpretations of those alleged events, that largely, though not fully, took place over a single flight to Paraguay [that occurred in October, 2014].

It was clear to me from my first meetings with Scott Patterson that he was experiencing inordinate stress both initially in, and later beyond, the workplace [because by the time I examined him he was already running out of what might be called, the funds for a "defacto medical leave"].

This stress began once Scott realized that he was being targeted for allegedly having psychological or emotional or other related "problems" in the workplace. Hence, I did some multi-dimensional clinical psychological testing. The procedures and/or the instruments used in this process included: A Mental Status Examination, the Minnesota Multiphasic Personality Inventory [2nd Edition], The Personality Assessment Inventory, the Symptom Checklist 90-R, the Incomplete Sentences Blank [Adult Form], the Presenting Problems Checklist, the Beck Depression Inventory II, the Impact of Events Scale, and the Dissociative Experiences Questionnaire.

In addition, as noted above, I consulted with a psychiatrist, Ibrahim Abi-Rafeh M.D., who has known Scott personally and well for over ten years in the context of the Civil Air Patrol work that they both do. When all of these claims surfaced, Scott consulted Dr. Ibrahim [that is, long prior to my involvement in this matter]. Scott had consulted Dr. Ibrahim because of the stress of the difficulties he had been facing with his employment at A.A, [see my comments regarding Dr. Abi-Refeh's professional opinions regarding Scott Patterson which are presented in this report].  Further, I consulted the Aeromedical Neurologist Examiner, John D. Hastings M.D., and I reviewed his findings as presented in his report in this matter. I also communicated with Dr. Hastings by telephone; and finally, I examined the report and interviewed the very experienced Aeromedical Neuropsychologist, Gary G. Kay, Ph. D following his IAME work in this case. Dr Kay conducted a comprehensive Aeromedical Neuropsychological Examination of Scott was on June 29, 2016.

The integration of the data from all these sources proved critical and ultimately offered a cohesive comprehensive perspective on multiple aspects of Scott's functioning from a clinical and statistical perspective in relationship to normative psychological data. But most critically, what came to the fore was really a description and understanding of the everyday life of this man. No such testing can supplant data reflecting precisely how this or any unique person actually functions in the context of his or her everyday life. There is uniqueness in all of us, and even to some degree in all of our circumstances. The caution is that statistical probability statements, as useful as they are, must not be seen to override what may be actually the reality on the ground; the everyday observable functional behavior of a person and the reality related thereto. It is ultimately that reality that this comprehensive analysis sought to determine; and in so doing I sought to make sense of what really had occurred in the context of, as well as the basis for, FO

66

Patterson's present, and still also now very compromised, circumstances [until A.A. corrects their error and make it right for FO Patterson.

It became my opinion that the work of Dr. Knippa was flawed both in the limitations of the methodology and the compromises of some of the interpretations. This in turn, in my view, led Dr. Knippa to rely heavily on too may indirect measures of some of Scott Patterson's functioning and that led to an invalid interpretation and a conclusion that flies [yes, pun intended] in the face of data derived from a significantly more valuable direct [not mixed correlational] measure of Scott Patterson's functioning; namely, the data of this man's talent and ability to pilot commercial and smaller aircraft [as routinely he has done for many years]. It was those skills were re-validated by direct skill measurements in a Flight Simulator on June 13, 2015, and by the reporting of other pilots who have routinely flown with Scott over many year without accident or serious incident in the air or on the ground. [Thus, by direct observation, rather than via a mixed correlational set of indirect measures and the distorted assumptions that were linked thereto in a psychologists office in California. It is obvious from looking at all the effort that Dr. Knippa made to find and infer something wrong with Scott's personality functioning that he was trying too hard only to not quite be able to get there, while nevertheless leaving a trail of inference.

**Overview of Documents Reviewed**

Presented generally in date order, I reviewed the following documents:

[1] Scott Patterson's Flight Instructor's Certificate with a [relatively rare] Gold Seal [issued by the FAA]

[2] The Allied Pilots Association Professional Standards Manual and the related Code of Conduct

[3] A partially redacted complaint document addressed to Captain Brian Beach, American Airlines Chief Pilot, MIA, and dated September 24, 2015. American Airlines Captain Glenn Whitehouse apparently drafted the document [though again the name on the copy I have is redacted]. The draft complaint is directed against First Officer Rodney "Scott" Patterson and contains a number of redacted statements. The essential claim made in this document [or actually package of documents] is that Captain Whitehouse believes that he has been the target of workplace harassment by First Officer Scott Patterson over the past year, and he is seeking formal corporate Human Resources action to resolve the matter. The author of the document notes that the document "is a rewritten statement of facts and opinions I wrote after my trip on October 7, 2015 for APA Professional Standards".

The so-called "Whitehouse" document makes a number of claims or assertions some of which would seem to be first hand in nature. But there also appear numerous claims or assertions or beliefs that go far beyond first hand, to hearsay to perhaps even hearsay upon hearsay, over events that are alleged to have happened, or are being questioned,

most of these alleged events or circumstances or perspectives being claimed to have been identified over the year or so prior to the Whitehouse "complaint" being filed.

The apparent first hand elements all appear to have dealt with alleged events related to a single flight, a flight that had a crew of three, the Captain being Glenn Whitehouse, the First Officer B being Scott Patterson, and the third crewmember being First Officer John Flannigan. It is unclear from the documents I reviewed if Officer Flannigan has any involvement in any of this correspondence [in fact it appears not], nor anything else, or just what knowledge FO Flannigan has of any of this, if any. [Later it would become clear that FO Flannigan did not have anything to do with the development of this package of complaints against FO Patterson, and similarly, he had very little knowledge of almost all of it, beyond his specific knowledge as described later in this report].

In the beginning section of the document, apparently written by Captain Whitehouse, there are also stories, about Scott Patterson owning a Sabre jet and flying government missions on the side and other matters that seem fanciful.

[In reviewing the documents in that package I have listed them below as 4, then 4A, 4B, 4C, etcetera].

[4] In the package [of 3 above] were also notes written by Captain Whitehouse and other perhaps solicited by him.

These attached notes include statements and/or inferences about FO Patterson doing inappropriate behaviors that would seem extremely bizarre, if true: like telling customs at VVI to do a very detailed search of a crew member the next day. Another letter inferred of Scott Patterson that: "he is threatening me and the entire crew with termination because there was not room on the hotel van and I made him take a taxi" and "that this might have provoked the actions of the local Customs Officials in their handling of a situation". Such a comment, and the others, if true, is clearly of significant concern. Yet these statements seem more than just a little drama filled, and certainly the alleged prospective action never materialized.

[4A] Another note from Captain Whitehouse indicated that: "One of the Santa Cruz employees told me that First Officer Patterson is smuggling Police hardware for the narcotics officers. He also heard that Patterson brought in firearms". It would seem that at this point these statements appear beyond drama, and may be moving towards the criminal, or perhaps the absurd.

[4B] There was a letter [or note] in the package that indicated that the unknown author felt that First Officer Patterson was attempting to intimidate him; and elsewhere, that Patterson "was going to have his buddies in the NSA and CIA fuck up my life".

[4C] There is also a report in the package of an unsolicited call from [redacted] who was

68

claiming to be a law enforcement officer who reported attending the police academy with Scott Patterson. "This man was calling me because he was genuinely concerned about my personal safety"…"and "in the light of the work place shootings in Virginia, he was concerned that Scott was capable of this type of behavior".

[4D] There are also other letters in this package: one is from an a Pilot who missed a plane and alleges that "he began chatting with FO Patterson who also was waiting for a flight and in the course of a few minutes Patterson told him about the actions of a certain Captain and that he [Patterson] was going to get this guy, file a suit, get attorneys, and "make his life miserable" and "get the guy fired". The total conversation apparently lasted less than three minutes and he [Patterson] was claimed to be "raging out of the blue with a total stranger"…And further: "While he did not threaten any physical violence I thought his comments were way out of line" [unidentified observer whose perspective was presented in the Patterson complaint document].

[This examiner would consider that such incidental banter, if it occurred, even without identifying anyone, to be not appropriately professional in any workplace. Patterson's daughter was with him the entire time on this occasion, and the above complainant also mentions he had his own story to tell of how he was harassed by the TSA at the E Concourse Check Point.  It would seem that the reporter's short time frame [less than three minutes] puts his statement in the questionable and maybe even fanciful domain].

[4E] There is a letter in the package by a crewmember who claims to have flown into Asuncion the day after the van incident involving FO Patterson, and this crewperson's "only second hand information" includes the following: "I got various versions of what happened the day before and ….my impression was that FO Patterson was over-reacting, and if need be, all could be resolved by professional standards".

[4F] Captain Whitehouse alleges that Scott Patterson had used the "N" word and that he was also "on a fishing expedition looking to dig up dirt to get me fired".

[Scott Patterson denies this assertion saying that there is no evidence whatsoever that Captain Whitehouse can possibly point to in support such a contention. In fact, Patterson finds this assertion of his use of the "N" word to be offensive to him. Moreover, when Scott was with Mesa Airlines, Scott says that he was involved in the recruitment there of a number of African-American Pilots. Moreover, he and his wife have even adopted a young Haitian boy [John Guerier]. Patterson does acknowledge that from the date of the Asuncion flight on he wanted nothing to do with Captain Whitehouse, and that he told various friends about his encounters with Captain Whitehouse on that trip, and just what he thought of Whitehouse. But that was it].

[4G] There is an email in the package dated July 24, 2015 and apparently written by Captain McGinn [who is a Member of APA National Professional Standards Committee], saying [apparently about Scott Patterson] that: "…without getting into the weeds I told

69

him that this has to stop and that you guys need to both move on and act like adults". Captain Whitehouse is the recipient of this email and he responded by asserting that: "I have been above level here. Patterson has had this talk and been counseled before with professional standards and continues to engage. It is Patterson who needs to grow up".

[5] Moving on from what was in the so-called package of statements or documents, there is a statement dated October 29, 2015. FO John Flannigan prepared this written statement regarding his perspective on the events of A.A. Flight 217 on October 7, 2015 [which he flew with Captain Whitehouse and FO Scott Patterson, and which became the focus of so much of what has happened, or did not happen, then and subsequently].

FO Flannigan's statement reads as follows: "I was interviewed today by Ana Burke-Leon of A.A, Human Resources regarding a trip I flew with FO Scott Patterson about ten months ago. The only specific incidents out of the norm with Scott that I recall from that trip were an issue trying to get his family on the van to the hotel, and regarding the paperwork when we arrived at the airport for departure. In both cases, what was a minor inconvenience was initially met with a stressed response by FO Patterson, but was eventually resolved without any further incident. I was also asked if I ever heard Scott refer to any individual as a "faggot" or "nigger". I have no recollection of him saying anything like that. I find those terms sufficiently offensive that I would be sure to have recalled such a comment, and my negative response to any individual using such vulgar language.

[6] I [Dr. Caddy] was advised by FO Patterson that on November 23, 2015 [although there are no record data presently available to me regarding this event], that there was held what the American Allied Pilots Association refers to as a Section 21 Hearing. This hearing was chaired by American Human Resources Investigator, Anna Burk-Leon. Present in the meeting on behalf of the company was Captain Brian Beach [Chief Pilot, MIA] and on behalf of FO Scott Patterson were Captain Mark Modrich and Captain Danny Shellhouse. The outcome of the hearing was a really an innocuous entry into FO Patterson's "Personnel Employee History".

[And that hearing was, Scott presumed, to be the end of the matter, in accordance with the rules under Section 21 of the Joint Collective Bargaining Agreement between American Airlines and the Allied Pilots Association].

[7] On December 14, 2015 FO Scott Patterson followed up from the meeting of November 22, 2015 and he wrote a 2-page letter "pursuant to A.A's Instructions from Ms. Ana Burke-Leon, Senior Specialist Investigations, HR Partners, American Airlines Inc. at DFW Airport.

While the letter addresses various matters [e.g. the difference between a deviation and a diversion, acknowledging that he did address the issue of crews removing liquor and drinking with CA Whitehouse pursuant to FM PT 1, and finding an A.A market bag with

food in it at his hotel room door on the October 9, 2014 5 at 3am [that had been removed from the airplane, and reporting this to CA Whitehouse as he believed it to be a violation of Paraguay Customs Regulations and A.A Policy], the bulk of the letter is basically a <u>denial of any wrongdoing, and a denial also that he has conducted himself in an "erratic, explosive or unprofessional manner"</u>.

As for the situation with Captain Whitehouse, the above noted letter goes on to state: "I have avoided CA Whitehouse and placed him on my do not pair list. I was scheduled to fly nonrevenue to Wisconsin for an air show. When I learned that CA Whitehouse was on the aircraft, I delayed my plans for six hours to avoid him."

Finally in ending the letter FO Patterson states: "The events that serve as the basis for the complaint are a year-old. If in fact I had behaved in that manner, then a reasonable person would have reported them [especially the N-word allegation] to management immediately. I'm sorry that this investigation must be conducted and I take full responsibility for my actions. I have not breached any company rule or the allegation as asserted. I will continue to take steps to further myself from CA Whitehouse. I trust this will resolve this issue."

[8] What followed however was not the end of this matter but a letter dated January 14, 2016 written by Captain Brian Beach, Chief Pilot, MIA. This letter indicated that Scott was being required to undertake a <u>Fitness for Duty Medical Examination</u> pursuant to the A.A–APA labor agreement and "<u>Based on this officers concerns about FO Patterson's judgment and specifically his mental and/or emotional stability</u>".

The letter continues: "This office has received multiple reports of atypical interactions with coworkers and reports that suggest a pattern of false self-aggrandizing statements. Based on the information above, I removed First Officer Patterson from active duty and placed him on a paid withhold status on September 24, 2015. [That is, although the Section 21 Hearing presumably addressed the matters of the Whitehouse complaint, American Airlines were not satisfied and so they now wanted Scott Patterson examined on mental health grounds]. Thus, Captain Whitehouse's various inferences were continuing to be given credibility within A.A.

[9] There is an email that was sent from A.A Chief Pilot {Miami} Brian Beach to Rodney Patterson dated February 1, 2016 [1147 hours] Subject: <u>PEH entry for HR hearing</u>. The text of the email was as follows: "On November 23, 2015, a section 21 Hearing was held as a result of a work environment complaint. I have reminded FO Patterson of the company's work environment policy. I also informed him that it is important to maintain good working relationships with his coworkers. FO Patterson has received a copy of this PEH and is aware of his right for rebuttal" There is no other recipient copied on this email.

[10] Next in the document timeline came the release of the s-called: "Independent

Neuropsychological Aeromedical Assessment Fitness for Duty Report" prepared by John Knippa, Ph.D., ABN, and dated March 21, 2016. I [Dr. Caddy] thoroughly reviewed this document and asked Scott Patterson about numerous aspects of this report and the circumstances surrounding it.

One aspect of my interrogation of Scott regarding his examination by Dr. Knippa [that I particularly focused] on was to seek any details about any intentional withholding or unwillingness to address anything that Dr. Knippa attempted to explore in the two-day examination. I was interested in this particular matter because it was clear from the report that Dr. Knippa had paid very little attention to, or he had failed to get much information about, what was obviously the principal reason that the company was so interested in having Scott psychologically evaluated [namely, the claims made or inferred in the "Whitehouse" documents that implied that there was something wrong with Scott Patterson's mental functioning].

Dr. Knippa's report indicates that he enquired into FO Patterson's understanding of the reasons why he was sent to undergo the examination. On page 1 of Dr. Knippa's report it is stated that FO Patterson offered two possible explanations of why he was sent to Dr. Knippa: [1] involved the problem about how his military leave was mishandled; and [2] was Scott's thoughts about the impact of his recent diagnosis of "carcinoma".

As for the claims made against Scott Patterson by Captain Whitehouse and thereafter by American Airlines, as noted on page 2, paragraph 2 of the report, this matter is mentioned only briefly by Scott but as Dr. Knippa noted in that paragraph, "Mr. Patterson was asked repeatedly about specifics to these complaints, offering none. He noted repeatedly that this matter was determined to have been "unfounded"..."Those issues are closed. It's a closed matter".

While it is clear that Dr. Knippa attempted to engage Scott in a greater discussion of these issues he was, bluntly, completely unsuccessful. The bottom line is that there was no presentation whatsoever in Dr. Knippa's report about his understanding of the company's reason for sending FO Patterson to this examination.

As for Scott Patterson, I asked him why he chose not to discuss the entire history of his perceptions of the Whitehouse matter with Dr. Knippa. His answer was simple: The claims that were filed against him he considered invalid, even absurd and offensive, and he had already been cleared on these issues by the Section 21 Hearing, which he considered had thoroughly investigated the claims made by Captain Whitehouse. Moreover, he was advised [under threat of termination] not to discuss these matters any further, with anyone, and so he did not.

[Understand, of course, that given all that Scott Patterson had been through in his dealings with American Airlines by this time, he wanted all these matters about his alleged "conduct" to be over and done with. As he saw it, and his perception was neither

unreasonable nor irrational, after many years of dedicated and highly competent service in the airline industry [and to the military, and at a senior rank] with never a problem or a questioning of his mental status, suddenly a year after an event that Scott considered upsetting but insignificant, he had had to deal with what he considered "the absurdity of the Whitehouse package".

FO Patterson told this examiner [Dr. Caddy] that he considered the "Whitehouse package to contain statements and stories that ranged between distortions to straight out lies. Scott had undergone an investigation and had been cleared of any wrongdoing in the Section 21 hearing. He had just resolved a serious cancer scare, and no body at A.A. apparently had considered questioning or investigating Captain Whitehouse's rationality or judgment in this matter. Yet now Scott was being required by the company to go across the country to be evaluated by Dr. Knippa for two days and do testing, while his circadian rhythm was three hours out of synchrony]. [By the way, there is also more than a half a dozen FAA approved clinical neuropsychologists in the South Florida Region who could have examined FO Patterson in his time zone]. And finally, there were the warnings of a number of Scott's co-workers in the company about not trusting the American Airlines selected examiner. To say that Scott was distrusting of the company and of their chosen examiner by this time, was not to make an understatement by this point in time].

So, it is hardly surprising that FO Patterson was not going to talk further about claims that had greatly upset him and that had already been investigated in the A.P.A. hearing and done. As I have often stated, all human behavior, even the most bizarre behavior, makes perfect sense, if only one can come to understand the dynamics driving it.

So, as far as FO Patterson was concerned, if the purpose of this examination was to determine his mental competence it was going to have to be done outside the context of a single unpleasant event that in his mind had already been investigated and resolved. Thus, it would seem that if Scott were to be viewed as having any "mental illness" Dr. Knippa would have to look beyond the Whitehouse assertions and find that "mental illness" for himself.

[11] On April 11, 2016 this examiner [Dr. Caddy] sent a HIPAA compliant Release of Records Request to Dr. Knippa to obtain a copy of his entire file on Scott Patterson.

[12] On April 12, 2016 Dr. Knippa responded to this [above] request with a response that stated, in part, that: "…the service was performed only upon his verbal and written agreement specifically that Mr. Patterson would not request reporting from this office and that no doctor patient service was rendered".

[13] On April 13, 2016 I responded to Dr. Knippa advising him that I was seeking all of the records, his entire clinical file [including the testing records that in accordance with professional protocol he is not permitted to forward to American Airlines]. I again made

73

a request for a copy of the entire file and advised Dr. Knippa that his refusal to release the records was "a violation of his professional responsibility and ethics" and I advised him to consult with the American Psychological Association Insurance Trust [a malpractice insurance entity] and see what they have to say about the position he has taken on this matter. I also asked Dr. Knippa rhetorically, if he intended to respond to a Subpoena for Records in the same manner. [The issue here of course is that my review of these records [was] is of substantial significance to my work and I am professionally entitled to them and if this matter ends up in litigation, of course I will be given these data upon subpoena power].

[14] I have reviewed a six page American Airlines document dated January 30, 2015 entitled "Section 21: Discipline, Grievances, Hearings, and Appeals" of the Joint Collective Bargain Agreement between the Allied Pilots Association and American Airlines.

[15] I have reviewed the Joint Collective Bargaining Agreement, American Airlines document entitled "Section 20 Physical Examinations". The document reads, in part, as follows:

A. The purpose and object of any Company physical examination for a pilot shall be to diagnose the true and actual physical condition of the pilot, and the pilot or his duly designated personal physician will be furnished with an exact duplicate copy of all medical examiner's reports affecting him.

B. Physical standards for Company physical examinations will be those that are set for in the FAA Regulations as being required to maintain a First-Class FA.A, Medical Certificate with statements of demonstrated ability for airline pilots. The Company shall determine physical examination procedures.

C. Any information obtained by, or as a result of, a Company physical examination shall be strictly confidential between the Company, the Company's doctor, and the pilot, and shall not be devolved to any other person without the written permission of the pilot.
[It is an issue for Scott Patterson that Dr. John Knippa provided a copy of his examination results and report on Scott to Dr. Gary Kay without Scott's knowledge or authority. Scott did not so much mind that Dr. Kay should be provided with Dr. Knippa's reports and his test results. He objected to this happening without his formal approval and written authority].

D. A pilot shall not be required to submit to any physical examination in excess of two [2] in any 12 month period without the pilot's consent, unless it is the Company's opinion that his health or physical condition is appreciably impaired, in which case the following procedures shall apply: [and the documents then presents the procedures to be followed, which includes the pilot's right to hire a doctor of his choosing, may, within thirty days, at his option, have a review of his case and the document goes on to list the

74

procedures and terms to be followed in such an instance].

[16] I have also reviewed letters of reference and support for FO Scott Patterson, only some of which are included below. The significance of the array [diversity] of the people and the relationships of those who are supporting FO Patterson is significant because the essential claims being made by Captain Whitehouse regarding FO Patterson are not that he lacks the technical skill and knowledge to function as a pilot, but that there is something that is interpersonally or mentally impaired in his personality functioning.

Against that claim include a variety of people who know Scott Patterson very well, within American Airlines, and outside it in his military, and also in his everyday life. The following people, among others, wrote letters to the Company on behalf of FO Patterson and I have also interviewed additional people who know him in various other walks of life, including his wife. In one way or another these observations, many of them made by people who know Scott Patterson really well, not only support him, but their perspectives must be seen to raise questions about the legitimacy of any of the claims or inferences being made against FO Patterson, beyond the fact that Captain Whitehouse and FO Patterson simply had an unfortunate run in and that conflict subsequently took on a life of its own in the eyes of Captain Whitehouse.

Immediately below are a listing of the <u>people who wrote letters</u> on behalf of Scott Patterson and a summary of the contents of these letters. These letters reflect on the experience of the authors with Scott, his personality and other attributes. These opinions stand in stark contrast with the perspective and claims that have been made by Captain Glenn Whitehouse, and others who he has garnered, subsequent to a limited, though obviously mutually unpleasant first hand experience which Captain Whitehouse had with FO Patterson shared. [Later, in the section dealing with my own examination of Scott Patterson, I will also report the observations of a number of collateral sources, all of whom I interviewed in the course of my work in this case.  Endorsing letters were reviewed from:

[16 A] **Captain David Bridges**, an African-American Pilot who flies a B747-400 for Kalita Air [has known Scott since 1999, and considers Scott as always interested in his fellow man and mentoring junior officers]. Bridges met Scott Patterson through the Professional Pilot Development Program of the Organization of Black Airline Pilots [now The Organization of Black Aerospace Professionals]. "He invited me to Parkesburg and even sent me an airline ticket on US Airways so I could get to the interview. I met him at the airport following the flight and he invited me out to dinner. Little did I suspect I was actually being interviewed for a job at Air Midwest [Mesa Airlines]. Following dinner he asked me if I would like to take a written test and I passed the test with flying colors. Following the test he informed that I was successful and that Air Midwest would be tendering me an offer of employment. After being stigmatized by a check airman, Patterson really brought my faith up in the industry and people in general. Had it not been for his concern and willingness to listen, I probably would have had difficulties

finding work as an airline pilot. Once I finished training with Air Midwest, I had a number of opportunities to interact with Scott on a professional level as well as socially outside. He was genuinely concerned for his fellow man and always mentored the junior first offices, who would later become captains. Six months later I upgraded to Captain on the 1900. Patterson saw the value I brought to the company and based on his diversity efforts we were able to bring many OBAP members to Air Midwest". Captain Bridges went on to say: "I am grateful to have known Scott Patterson these many years. He is an esteemed colleague and a genuine person. I place complete confidence in his piloting skills and abilities".

[16 B] **Patrick Casimir**, Operational Supervisor at MIA, [who knows Scott and was very impressed with him, especially in his work after the tragedy of the earthquake in Haiti];

[16 C] **William J. Nealey, Sr**., Associate Director, Mission to Haiti [who knows Scott in his military role for the work he did during the disaster of the earthquake in Haiti];

[16 D] **Michael Desousa**, American Airlines Captain, A320 [has flown with Scott and considers him a very competent pilot and always very courteous and polite to all people];

[16 E] **Robert "Bobby" Burgess**, American Airlines Captain [considers Scott a very competent pilot, caring and professional, a true gentleman];

[16 F] **Terri Eisenberg**, American Airlines Captain, 767, International [has flown with Scott and considers him very competent];

Significantly, in Captain Whitehouse's complaint, he alleges that FO Scott Patterson diverted an aircraft without the permission of the Captain. It was Captain Eisenberg who was the Captain of record on this particular flight that diverted to Santa Cruz, Bolivia. Captain Eisenberg stated that he made the decision to divert and not FO Patterson.

[16 G] **Robert C. Gaylord**, American Airlines Captain, 767 [has flown with Scott and considers him very competent and professional];

[16 H] **Mark Redelsheimer**, American Airlines Captain, B767 [has flown with Scott and considers him very competent, and always has kind words for the agents, mechanics, and ground crew alike. Never seen him place his needs above those of the other crew];

[16 I] **Keith T. Allison** is a resident of Pembroke Pines, who has known Scott and his family for over 15 years. Scott serves on the Board of Directors as President of their Home Owners Association. Mr. Alison is in the gay lifestyle and he wrote about how Scott "accepted us and worked to build a consensus and improve our way of life" at a time when "many in the community would ostracize gay and lesbian people";

76

[16 J] **Captain Robert Swanson**, American Airlines. [Captain Swanson wrote that: "First Officer Patterson is a pleasant crew member and very proficient in his job. He shows up for work on time and performs his duties in accordance with FM PT 1 and the 767 Operating Manual. I've observed him in a number of situations both in and out of the cockpit. He is a proficient and courteous employee to crew and customers. I hold him in the highest regard. When it is his turn I have no doubt he will make a great captain for American".

Captain Swanson went on to say further that: "On or about July 18, 2015 I was the Captain of A.A 922 from Miami to La Paz. In 28 years at American, Customs and Border Protection have never subjected me to a search on an outbound leg. However, First Officer Patterson and I were subject to an unusually extensive and far ranging search of our belongings. We also noted American Airlines corporate security on the jet bridge during the search. The First Officer, a female, later advised us that she was not searched, as they were looking for a male subject. I questioned the crew and they advised that customs also searched them in view of the passengers on the aircraft. CBP [Customs and Boarder Protection] was banging on the cockpit door with passengers looking and advised the flight attendants we were hiding from them in the cockpit. This unwanted and malicious search delayed our flight and inconvenienced the passengers for well over an hour. This certainly did not lend a positive experience to the passengers who watched custom search us and then walk away disappointed they did not get their man. I have a good deal of contact with the station personnel in Bolivia, and I have never once heard them complain about first officer Patterson's behavior or make such ludicrous accusations about him. Further we have never heard any reports of the police in Bolivia threatening our personnel. I have also had the opportunity to meet his acquaintances in Bolivia. They are upstanding citizens of Santa Cruz. American is held in highest regards in this small city. I'm totally confident that if there were something negative about my crew they would tell me. In this case, I was personally embarrassed and harassed by the Company and Customs and Border Protection over a completely baseless issue, which apparently originated by false information within American Airlines".

[This examiner, Dr. Caddy, as well as reviewing the above letter from Captain Swanson also interviewed Captain Swanson to further take his perspective on FO Patterson's present difficulties]

[16 K] **Guy Dalton "Danny" Shellhouse** has been an American Airlines Captain for some 25 years and he flies both the 757s and 767s. He reports he flies a lot [often 21 to 26 days a month] and his total hours flying time is around 27,000 hours. Captain Shellhouse knows FO Patterson "relatively well" given the number of times they have flown together [he estimates 10 to 12 times over the years] and certainly they have had dinners together while on layovers. But he does not have a relationship with Scott outside the workplace. When Danny found out that Scott was going through a Section 21 Hearing, he volunteered [actually, he said, a personal friend asked him to step in to help Scott] and so he was assigned as the APA Representative appointed to represent FO

Patterson at the so-called Section 21 Hearing. [At that hearing was also the American Airlines Ana Burke-Leon and their Chief Pilot in Miami, Captain Brian Beach].

Captain Shellhouse offered Dr. Caddy the following perspective on Scott Patterson:

"Scott is a very skilled pilot and an excellent co-pilot. I do not have to sit and keep an eye on him. He is very accomplished". Danny said that he did not know Glenn Whitehouse prior to the hearing. He also said that after he agreed to become involved in Scott's representation and he reviewed all the documents that were available, and he did some of his own research, it became clear to him that the complaint raised more questions than the hearing could even begin to answer. He further stated that it was equally clear that if the company was really interested in getting to the bottom of all this, they should have been investigating Captain Whitehouse. He went on to assert that from the outset he saw many holes in the Complaint and that Ana Burke-Leon had made no effort whatsoever to interview anyone or investigate anything".

Danny Shellhouse is clearly a no-nonsense person and he appears not to tolerate incompetence or dishonest work politics. He made it clear that he has seen way too much politics and incompetence at American Airlines over the years and he does not mind being blunt about it. About the claims being made about Scott Patterson he said: "They were mostly based on hearsay and when you start drilling down as I did, by speaking to other Captains, it all falls apart. I felt Scott was being railroaded".

Captain Shellhouse told this examiner that: "Brian Beach told me that they did not have enough evidence to send Scott to a Section 20 Hearing but they did it anyway. The idea is to force him out on disability and then, when they can, terminate him". [A Section 20 Hearing involves sending a pilot to a physician of the company's choosing for a "Physical Examination". Captain Shellhouse has also argued that sending Scott Patterson to a mental examination by a Clinical and Neuropsychologist is not consistent with the language laid down in the APA Contract]. Captain Shellhouse went on to say that: "Unfortunately, as all too often occurs, the events that have taken place here have already actually compromised the reputation of First Officer Patterson in ways that have proved quite distressing for him, in part because what has happened is even known to people who he does not know who have been caught up, one way or another, in this very unpleasant matter. There now exists, to at least some extent, a rumor mill that is compromising to Scott Patterson's reputation within American Airlines and beyond".

NOTE: This matter of having pilot's go out on "disability" has come up on a number of occasions in my discussions with Scott Patterson and with others beyond Captain Shellhouse, with the implication that this occurs with some frequency. If a pilot is impaired and legitimately "temporarily or permanently disabled", then the exercising of one's rights under a disability insurance policy is entirely appropriate. But if the pilot is not legitimately disabled, then any attempt to use such a strategy involves insurance fraud.

78

[16 L] This matter is illustrated in the Affidavit of a civilian Flight Instructor and Civil Air Patrol Officer, **Robert G. "Bob" Wilson**. This Affidavit, dated November 20, 2015, tells of a conversation Mr. Wilson had with Mr. Matthew Romano at the Miami Executive Airport concerning Scott Patterson. In the course of this conversation it seems that Mr. Romano told Mr. Wilson that he flew for American Airlines to which Mr. Wilson responded that: "My next door neighbor flew for American. He asked: Who? I replied Scott Patterson, to which he said, "Oh, he may not be with us much longer".... What struck me as odd about this conversation what inside information did he have and what was his motive to disclose it to a total stranger whose probable alliance was with his neighbor? I have known Mr. Patterson to be an honest person for over nine years and he is a respected pilot the aviation community. I said nothing to Mr. Patterson about this until he told me about a flight he had with American which involve the US Customs and Border Protection."

### Medical Specialties Record Reviews

I reviewed the Federal Aviation Administration Airman Medical Records of Rodney Scott Patterson from the United States Department of Transportation, Federal Aviation Administration. These records are for the period September 29, 1989 to Jan 31, 2016. These records indicate that FO Patterson was in good health throughout the period.

**Martin Dayton D.O.** is Scott's physician. On March 31, 2015 Dr. Dayton wrote a note entitled "Rodney Patterson: Status Fitness for Duty". The note stated: "Mr. Patterson had a resection of a malignant tumor on February 27, 2015. He has been receiving medical care since. Such care does not adversely affect cognitive, mental or physical performance. He is able to fly as a commercial airline pilot without restrictions. He appears to be in clinical remission.

On November 20, 2015 Dr. Dayton wrote another note and asserted that following regular visits for follow up care "he continues to be in complete clinical remission"

On January 12, 2016 Dr. Dayton generated a further note regarding Scott's health status subsequent to his cancer surgery and advised that: [1] on physical examination no evidence of any malignant process is evident and an MRI on September 25, 2015 reveals no malignant process.

I reviewed the Neuropsychological Aeromedical Assessment Fitness for Duty Report on Scott Patterson dated March 21, 2016, and conducted by **John Knippa Ph.D., ABN**. [I have made an authorized requested to Dr. Knippa for these records but he has declined to provide the records to me].

I have also reviewed the report of the Independent Neurological Examination of **John D. Hastings M.D.**, dated May 28, 2016. And I have also spoken with Dr. Hastings about his

findings in this case and what he sees as some of the shortfall that he considers to be significant in how Scott Patterson has been dealt with as far as the referral to Dr. Knippa was concerned, and the discrepancy between his findings and conclusions and those of Dr. Knippa.

Finally, while I have not reviewed the medical record of Ibrahim Abi-Rafeh M.D., the psychiatrist who Scott first consulted regarding the stress he was under because of the Whitehouse accusations, I nevertheless did speak with Dr. Abi-Rafeh in detail and I have presented his opinions on this entire matter elsewhere [see page 47].

### Review of Collateral Sources

In any comprehensive psychological examination, where the issue of a person's mental status and health is in question, and where the establishment of the facts around certain circumstances is critical, inevitably the examination should involve taking perspective on the examinee from collateral sources who know that person well, and from different perspectives. Commonly too, a review of as much record data as are available also is very important. It is significant that Dr. John Knippa attempted no such comprehensive undertaking in his independent aeromedical examination of Scott [at Coast psychiatric Associates in Long Beach California].

Below are the observations I have been given through the eyes of the various collateral sources I have contacted as a result of their names and contact details being provided me to me by Scott Patterson.  [In fact, Scott provided me with a number of additional names, but I did not consider it necessary to interview all of these people]. And of course, above I have listed information/perspective on Scott Patterson that was provided by about a dozen people who wrote letters of support of Scott that were sent to American Airlines. A copy of each of these letters is attached in Appendix A to this report. The people I spoke to and the perspective they offered me is presented as follows:

**Philip Bailey**

Mr. Philip Bailey lives in Charlotte, North Carolina. He reports that he has known Scott since Scott was 12 years of age and they have kept in contact through to the present time. Mr. Bailey first met Scott as a result of him being a mentor in the big Brothers Big Sisters program. Philip reported that Scott's parents were divorced and he was living with his grandmother at the time and she it was she thought that it would be good for Scott to be involved with a "big brother". Thus, what started off as a big brother or mentor relationship morphed into a friendship as Scott matured into adulthood and that friendship has continued through to the present time. It is Scott's view as expressed to this examiner that perhaps Philip Bailey knows him better than almost any other person alive, with the exception of his immediate family.

Mr. Bailey is now 63-years-old and a financial advisor. He reports that these days he and Scott keep in touch every month or two and that over the years they have often visited

each other and that they routinely maintain close personal contact. Mr. Bailey considers Scott to be a very stable and emotionally well-balanced person. He considers Scott to be thoughtful and very analytical and he has: "substantial brainpower and his intelligence is pliable and across many areas".

Philip says that he has never seen anything that would cause him to view Scott in any way that was other than highly stable. "Scott is more a thinker than an emotional actor". He regards Scott as "a great guy and one with a great love of life". "He is has two kids, is a good provider and he is a great role model and extremely honest…very straightforward". As for Scott's wife, Roxana, and the mother of their two children, Philip regards her as a wonderful wife and mother.

"As Scott grew up he was a very normal boy and his grandmother had him very well grounded in church and in honesty and integrity". Philip makes the point that he "has never seen Scott take a drink of alcohol… and he is very much against drugs and cigarettes". Philip also says of Scott "that he is an extremely energetic person".

**Captain Brian Vitale**

Brian Vitale is a 55-year-old American Airlines pilot who presently flies an Airbus A320. He lives in Cape Coral, Florida with his wife. He is also a retired United States Army Warrant Officer. Brian says that Scott and he became friends because Brian and he worked together on the Military Affairs Committee that Brian spearheaded [as Base Administrator for the Miami local]. Brian also said that it was his impression that Scott Patterson was still on the National Military Affairs Committee, though he is not sure that this is still the case. Moreover, Captain Vitale told me that when he was running for the Vice Chairperson role at the Miami domicile of the Allied Pilots Association Union he asked Scott to serve as his Campaign Manager as he saw Scott as "particularly well organized and an especially good writer".

Captain Vitale also said that he had flown with Scott as copilot on a 767 and he perceived him to be extremely competent in all aspects of his job. He has also flown in private aircraft with Scott and he speaks of Scott as being an extremely skilled aviator: not only that but he is a highly experienced pilot but he is a flight instructor and one with what is an extremely rare "Gold Seal" on his license. Overall, Captain Vitale considers Scott to be a particularly skilled pilot across a variety of aircraft.

Captain Vitale also listed Scott's further accomplishments and did so with respect: Former Police Officer, Decorated Military Officer and Lieutenant Colonel; Federal Flight Deck Officer with the Department of Homeland Security [authorized to carry a weapon within the United States which meant that he had to be Security Cleared by the Department of Homeland Security, undergo a Comprehensive Psychological Evaluation and attend a special firearms training program at the Federal Firearms Training Facility in Artesia, New Mexico]; and finally, Scott serves as a Volunteer with the Civil Air Patrol.

Having been retired from the military, Brian is clear about the distinction between a Federal Title 10 and 32 Order. He said that in the case of Title 10 you are given a written order to duty and in the case of a Title 32 you are simply given a verbal order and

81

following the work you are given a "Leave and Earnings Statement" as proof of your duty. Captain Vitale is also clear that Captain Jim Bonds knew, or was obliged to operate on the idea, that Scott was on a 32 Order but still he attempted to deny Scott the leave and in doing so American violated two Federal Government Regulations in that: [i] they denied him the leave and [ii] they thereafter changed his employment status from flight status to paid and but duty withheld. Captain Vitale also considered it "crazy" for them to do so, for what they actually accomplished was to "spotlight their two Federal violations". Also regarding the matter of Military Leave, Captain Vitale made the point that: "I have dealt with lots of guys who in a situation such as this would use the whole four days they could take for their military duty and avoid doing work any airline trips during that time. But Scott would never do that".

Captain Vitale said that on the occasion that Scott was briefly ordered back into military service in September 2015, his duty was at the White House. [It was at the time of Pope Francis' visit with President and Mrs. Obama]. Captain Vitale spoke of knowing about Scott being selected by the military for multiple deployments, for example, subsequent to the tragic earthquake in Haiti in back in January 2010. In fact, as a result of that deployment Captain Vitale told me that Scott and his wife "adopted" a Haitian child who they continue to support in Haiti.

Captain Vitale also reported to me that he was in the Miami Flight Operations Center/Office speaking to both Captains Brian Beach and Jim Bonds several days after Scott was removed from service. He told me that: "Brian and Jim were talking about Scott having problems and when I asked what they were talking about they said that Scott "high-jacked an aircraft" and also mentioned that Scott "diverted another aircraft with all three crew in the cockpit". Captain Vitale's view of this discussion was that the entire set of statements was inappropriate and absurd.

Captain Vitale summarized his view about these matters of Scott Patterson's difficulties with American as follows: "This is nothing more than a misguided personal vendetta that started with one of the male flight attendants on a flight, led to a disagreement between Scott and the Captain, and got blown out of all proportion thereafter. It even extended to questioning if Scott was smuggling guns into South America. It was that stupid".

**Captain Mark Modrich**

Mark Modrich is a senior American Airlines Captain. He has worked for the airline for 24 years. Prior to joining American he spent 16 years in the US Air Force and he continued on in the Reserves for another six years after joining American. As well as his flying duties Mark works as the Domicile Professional Standards for the Union [American Pilots Association] out of their Miami base.

Captain Modrich told me that he first met Scott in about 2012. They were introduced through a mutual friend.]. Mark told me that when he first heard of the issue between Scott and Captain Glenn Whitehouse it was in the context of his role in the Union and the matter came up in Professional Standards. He said: "I chewed his ass about it and he said that he was simply was not going to fly with that Captain anymore and we did not

82

hear anything more about it for a long time. It was not to go to corporate and that is what Professional Standards is for…to work it out. There was an issue with a Flight Attendant and Scott apparently apologized. I was working that case and I thought it was over. I had spoken to the Captain [Whitehouse] initially before I spoke to Scott and they agreed to disagree".  Captain Modrich described Scott as "a type A.A,+ personality with a lot of self-confidence".

The next time that either Scott or Captain Modrich heard anything about the matter with Captain Whitehouse occurred when he and Scott were actually together at an airshow in Oshkosh, Wisconsin in July 21-22. Captain Modrich told me:

"Scott received a phone call from Captain Chip Harlowe, the Miami Domicile Professional Standards Chairperson. He asked Scott if he was smuggling weapons to Bolivia. Scott was astounded by the stupidity of this questioning but after that it all started to snowball with more complaints coming from Captain Whitehouse. It seemed to me that the Union was not trying to help Scott. The next thing I remember was that Scott was supposed to go to Washington while the Pope was visiting and he was not getting a response from the Miami Flight Office regarding his military leave so he called the Chief Pilot in Dallas who approved his time off. Apparently the flight office in Miami was then furious with Scott for he did not have his authorization documents [that is, he did not have a proof of the duty requirement]. However, Scott Patterson makes the point that he would not have had written orders because it was "Inactive Duty for Training" that he was required to attend.

Then they had a disciplinary hearing and I was there for the first part of it and they tried to get Scott to sign a Non-Disclosure Agreement. American loves the NDA system but Scott refused to sign it. So they had the Section 21 Hearing and there were no findings. But then American escalated it. Counseling should have come before any hearing. So then the doctor was hired to get him fired.

Scott is a very stable person and I would never question his ability or his stability to operate an aircraft, commercial or otherwise." Captain Modrich made the point regarding "Scott being messed around at Miami regarding his military leave request" that: "It is my understanding that under the law [USERRA] an employer is required to give an employee time off to perform his/her military obligations. The employee is required only to serve the employer with either oral of written notice".

**Roxana Patterson**

Roxana Patterson is Scott's wife.  She is from Peru and the couple met in college where she was on a tennis scholarship. After dating for a significant time they married on November 15, 1990. Roxana and Scott have two children, a boy nine years old and a girl 11. In the years after they married most of Roxana's family also moved to the United States, although her parents moved to Canada.

 Roxana describes Scott as always being very sweet, friendly, an outgoing and very caring person. While at university he was in the National Guard and then he stayed on in the military and today she says that he still serves in the reserves.

83

Roxana describes her husband's personality as very friendly very and caring. He always tries to help people no matter what. If there was a car stopped on the side of the road and he had the time Scott is the sort of person who will stop a try and help the driver if he can.

Roxana says that Scott has always been a happy a very energetic person. There have, however, been several points in his life when he was very upset and very hurt. One of those was when his grandmother [who raised him] died three years ago at age 102. Roxana noted how very often Scott would travel to Charlotte, N.C. to go and see his grandmother, and "we would all go and see her". Roxana made the point that his grandmother was very proud of Scott, and that she was really like his mother. Roxana also told me that Scott was also very sad when in 2004 his father passed away from cancer in 2004.

Roxana also noted her thoughts about what her husband has been going through as a result of the claims make by Captain Whitehouse. She reported:

"My husband is extremely honest and extremely principled and that makes all this so much more difficult for it really is hard when people lie.  The most painful of all of this is the fact that he cannot do what he loves to do [flying] and is totally out of his control. He is a man who loves his work and to do this to him is cruel. It has affected his sleep a great deal but I have not really noticed mood swings. Has been relying on prayer and God to help us through this. He is far more hurt and angry very much. He is very intelligent and he knows how to handle things. He has good self-control and he has responded very well in the situation. But his feelings are very hurt. In the beginning he was very angry but now not so much so".

Roxana works as a physical therapist at an outpatient physical therapy clinic and she talks about how she to loves her job and what it means to her.

**Sergeant Walter Rogers, Florida Highway Patrol**

Walter Rogers lives in Homestead, Florida, and he has been in the Florida Highway Patrol for more than 27 years. He is also a Staff Sergeant in the United States Army Reserve. He is a single father of three girls.

Walter reported that he first met Scott Patterson in the Army when Scott was the Commander of the unit Walter was in. He has known Scott Patterson for some 18 years. His bottom line on Scott is that: "Scott is the most honest, straightforward, and upstanding person you could hope to meet".

In an effort to serve the community Scott became involved in the FHP as an Auxiliary Officer and he handled mainly traffic support roles. Sergeant Rogers made the point that: "Scott is a very precise and detailed person and did an excellent job as a volunteer officer. I would trust him with my family and my life". Walter also spoke of Scott being a "very precise and detailed person".

**Colonel Noel Pace, U.S. Army Reserve**

Noel Pace serves presently as a United States Army Reserve officer. He is also a board certified hospital administrator who is scheduled to take command of an Army field hospital in Jacksonville Florida later this year. He lives in the small town of El Portal in South Florida and he reports that he knows Scott Patterson well. He first met Lt. Colonel Patterson when they were both attending the Command and General Staff College at the Southern Command Headquarters in 2006. That program takes a year of full-time training to complete, but it can be done part-time and that is how both Colonel Pace and Lt. Colonel Patterson completed the program.

Colonel Pace noted that at that time Scott Patterson was full-time in the Army and he was working as a Major coordinating administration policies dealing with drug interdiction in South America. Colonel Pace indicated that both Scott's good command of the Spanish language and his background in police work was very helpful in his military duties during his role coordinating those services.  Colonel Pace is considering bringing Scott into his command since Lt. Col Patterson has served in a Combat Support Hospital as the Executive Officer. He feels Patterson would do well for his unit and the Army by making such a move.

**Keith T. Allison**

Keith Allison reported that he has known Scott Patterson and his family for well over 15 years. Scott served on the Board of Directors of their community's Home Owners Association representing nearly 10,000 residents for over 12 years.

Keith made the point that from the outset when he and Scott met his gay lifestyle did not represent a problem or bother Scott in the slightest, yet back then there were many people who stereotyped the lesbian and gay community but Scott accepted them and worked to build a consensus and in so doing improved their way of life. Keith said that there were even the some members of the Homeowner's Association actually ostracized Scott for associating with Keith and his partner. He further went on to say that Scott has supported many of the diversity efforts in the local community thus bringing Keith and his partner a more peaceful life as a result.

### Disability and the FAA Policy for Airmen with Mental Health Conditions

Clearly, over the course of the above collateral source review [in which I sought to explore any indication of any limitations in Scott Patterson's mental status or his flight skills status] I found no perspective whatsoever that FO Patterson was in any way compromised in his capacity to function as an A.A. pilot. [In fact, I do not believe that even Captain Whitehouse had any data suggesting that Scott Patterson was not a skilled and knowledgeable pilot, for had he had such evidence, one can only assume he would have included this evidence in his submission].

I examined the Guideline Requirements For Mental Health as stated in FAA Policy. I reviewed this policy in part in the light of Scott Patterson's statement to me that the Allied Pilot's Association had indicated to him, given the findings of Dr. Knippa, that he would be terminated on the basis of a mental disability, and hence, that he should apply for a disability retirement from the company based on mental health grounds.

In reviewing the Mental Standards for a First-Class Airman Medical Certification. I noted the requirement that there be no established medical history or clinical diagnosis of any of the following: [i] A personality disorder that is severe enough to have repeatedly manifested itself by overt acts; [ii] Psychoses, which refers to mental disorder in which the individual has manifested delusions, hallucinations, grossly bizarre or disorganized behavior, or other commonly accepted symptoms of this condition; or the individual may reasonably be expected to manifest delusions, hallucinations, is bizarre or disorganized behavior, or other commonly accepted symptoms of this condition; [iii] Bipolar Disorder; [iv] Substance dependence, except where there is established clinical evidence satisfactory to the Federal Air Surgeon, of recovering, including sustained total absence from the substance[s] for not less than the preceding two years. And, [v] Any other personality disorder, neuroses, or other mental conditions that the federal air surgeon, based on case history and appropriate, qualified medical judgment related to the condition involved, finds a person unable to safely perform the duties and exercise the privileges of the airman certificate applied for or held, or may reasonably be expected for the maximum duration of the medical certificate applied for or held, to make the person unable to perform those duties or exercise those privileges.

Based on this review it was [and is] my opinion that Scott Patterson did not, and does not, suffer from any of the above disqualifying conditions.

Hence, paradoxically, the only possible basis for FO Patterson applying for a work related disability would be for him to do so based on Dr. Knippa's findings which were as follows:

"Mr. Patterson is NOT FIT FOR DUTY. At the time of the examination he was not considered to be "affirmatively identified as capable of reliably performing the essential functions of his job description" and there was no identified basis to warrant restrictions or accommodations that would otherwise permit a return at this time to his customary duties. Further, this opinion was based on a "neuropsychological" perspective".

### Scott's Background History and Present Functioning

Scott was born on November 8, 1967 in Charlotte, North Carolina in November 8, 1967 to Bobby and Barbara Patterson. Scott's father was an electrical engineer for a very large construction company based in Texas. Prior to his father's death [when Scott was 36 years old], Scott reported with some pride that the firm was going to make his dad a full partner of what had become a very large entity, but his dad died. Scott's father apparently was a particularly intelligent person and according to Scott his dad was invited to join and did join Mensa.

Scott's mother also grew up in Charlotte, and eventually she would become an attorney. However, Scott's parents separated when he was two years old and they divorced soon thereafter and his mother relocated to live with her parents [and of course Scott]. Scott also continued to stay with his maternal grandparents after his mother married Scott's stepfather, Wayne. He was a chemical engineer and he constantly relocated for his work. Scott made the point that after their marriage Scott's mother moved [with his step-father] some 12 times in 8 years. Hence, through much of Scott's rearing years he was based with his maternal grandparents, with whom he was always exceeding close. Scott's mother is still living but his much-loved maternal grandparents are both deceased. Scott's paternal grandparents are both living and are very much cherished by Scott. I get the sense that all of Scott's caretakers over the years were very dutiful and provided him the best environment that they could.

Scott told me that from an early age he had the dream of becoming a airline pilot. His grandmother introduced him to the airlines very early via air travel and it stuck with him. Scott told me that as a child he was basically a good compliant boy. In Junior High, Scott was inducted into the National Junior Honor Society and he was later featured in Who's Who Among American High School Students several years in a row. His grandmother also elected to put Scott into a private military school in Camden, South Carolina based on her "wanting me to have a better education than the free one I was getting in public school". While in that school Scott was also promoted to Cadet Captain in his senior year, and during the entire time he noted: "I was never given demerits". Scott apparently also has maintained an ongoing involvement with his school. He reports that he still speaks, on occasion, to parent groups who are contemplating sending their kids to school there.

Scott went to Appalachian State University with a two year Army ROTC Scholarship and he studied business and psychology. He continued on and was awarded a Bachelor of Science degree in 1990. Scott reported some low-grade use of alcohol in college, mostly beer, but he has never been interested in drinking to excess or using other intoxicating substances. Overall, he has been a very straight and upright person who has lived a very respectful life, and in many ways he has sought to serve, whether it be in his police or military service, or in his community or church service work.

[Recall that one of Dr. Knippa hypotheses was that Scott may have been suffering an undiagnosed Attention Deficit-Hyperactivity Disorder and/or also some undefined personality aberration. Well, show me the evidence! Dr. Knippa's testing did not permit him to reach any such a conclusion, his inference notwithstanding. There also is nothing in Scott's schooling or his university grades, or from any other background data that I have been able to capture, including from those people who know Scott well, to suggest the presence of any ADHD. Nor is there any such evidence from his employment history. Relative to Dr. Knippa inference of possible ADHD issues, Scott decided that he would do his own testing of his mental functioning by taking a Luminosity Challenge [see www.luminosity.com]. Scott forwarded to me the results after taking the Luminosity challenge against the 45-49 year old standard scores. His scores in Speed games placed him in the 68th percentile; his scores in Memory games also placed him at the 68th

percentile, and his Attentional scores were at the 83rd percentile].  And finally, both in his recurrent Flight Simulator studies and in his everyday flight duties, there appear no indications that Scott Patterson has any problems with inattention. Again, Dr. Knippa sought out and inferred the prospect of a condition the presence of which makes no sense whatsoever.

While in college, Scott met the girl who became his wife, Roxanna Giselle. The couple married on November 13, 1990 and they returned to live in Charlotte, NC [near where he had grown up] and he found work as a police officer.  Despite being in the top of his ROTC class, the Graham-Rudman Act had just been passed into law and so the Army was not assessing officers for active duty or regular Army positions. But then Operation Desert Storm occurred [it began in August, 1990] and "the war changed all of that". Scott was ordered to Fort Sill, Oklahoma, to attend the very challenging School of Field Artillery. Scott reported that he finished the school, which he considered to be very technically demanding, at the top of his class.

Desert Storm concluded and Scott returned to civilian life where he obtained work as a police officer and he continued in his role as a young reserve army officer. Scott reported that: "I never much considered making a police career. I only did it for the money and as a bridge to becoming a pilot".

While working as a police officer, Scott purchased a share in a 1962 Cessna and he continued to work on his pilot's ratings.  He then left the police department to pursue aviation.  He was given a scholarship to complete his training as a commercial pilot and he did so in 1993, at a flight school in Macon, Georgia. Following the completion of his commercial pilot certification, Scott then went on to become a Certified Flight Instructor, which would allow him to instruct students while making money and building flight time to advance his prospects to get into the airlines.

Scott reported that in 1995 he was awarded the Gold Seal Instructor rating, which meant he had met the strictest of training standards for the FA.A.  Scott then worked as a flight instructor and he also worked mapping Cable Television for Cox and Time Warner through a sub-contract with a company called Cable Resources, in Monroe, NC. Scott said of that work: "Mapping the systems was a fun job.  I would go out and walk four or five miles or more per day, and get paid for it".

Finally, in January 1997, Scott secured employment with Mesa Airlines [which later became Air Midwest, due to a merger of the two companies]. Scott reported that he advanced within Mesa to become a Captain [on the Beech 1900].  He also became a Captain on the Embraer Regional Jet. He reports that he was also actively involved in pilot recruiting for Air Midwest. It was while recruiting for Air Midwest, that Scott became friends with Aaron Gould, a captain for UPS.  Captain Gould was the chairperson of the Professional Pilot Development Program for the Organization of Black Airline Pilots [OBAP], now named the Organization of Black Aerospace Professionals. At that

time also Scott reported, "that the market was on fire to hire pilots I was able to get on with American".

In 2001 Scott and Roxana relocated to Pembroke Pines, Florida and he has worked uneventfully for American Airlines up until the present difficulties he has been facing with them. Likewise, he has continued to serve in the military and he is now at the rank of Lieutenant Colonel, and only a few years away from his army retirement.

At a more personal and local level, Scott has two children with Roxana. Abby is now 12 and Philip is 10. I have met both children and they present as being quite bright and very polite. Scott and Roxana tell me that the kids are both doing exceptionally well in school.

Scott is also actively involved in his church and in his community. He serves as a volunteer on his community homeowner's association [he serves as President] and he participated with his church to help the people of Haiti after the Earthquake there in 2010. Also in terms of helping people, Scott reports that following his cancer scare in February 2015, he began an intensive program of study and he reports having become absorbed in reading on health care and cancer treatment issues. Scott reports that he now routinely volunteers to assist as a support coach for people diagnosed with cancer and he encourages them in strategies to get healthy in the hope that they can stay healthy.

It is my view that Scott has done a good job and has shown emotional strength in facing all that has emerged following what Scott has called the "Whitehouse fiasco". Scott reports that he has experienced quite a deal of stress with each of the fits and turns in the entire investigative process. But he has had no intension to quit and "let lies, exaggerations, distortions, manipulations and biased sampling created by the efforts of Captain Whitehouse force me out". Nor will Scott accept the suggestion of those who have recommended that he go out on disability based on the "findings" of Dr. Knippa. Given all the stressors Scott has experienced of late, in fact I [Dr. Caddy] consider that he has held up really quite well and has never given up, believing that eventually he will be back at work, and he has significant support from many of his pilot friends related thereto.

### My Overall Clinical Observations and Findings

There are so much data about Scott Patterson already presented in this documents that I will only overview my findings regarding this man's present emotional functioning. And in that regard, there is really not all that much to tell.

Scott presented at all of his appointments appropriately and casually dressed. His hygiene always appeared good. His gait was non-remarkable and his posture good and upright. He presents as a fit, healthy, energetic, forthright, and a no-nonsense person. He is clearly military. His level of responsiveness was alert and focused. I do not consider that there was anything that was negatively effecting or impairing his level of responsiveness during any of my multiple dates of contact during the examination, or during the several dozen of phone or video contacts I had with him in examining all of

89

the data related to the multiple aspects of this case.

Scott's own evaluation of his present daily distress was noted in the examination and in his testing results that are presented below.

Scott's eye contact was appropriately focused. His speech quality was normal and he showed no impairment of speech. His mood was mainly calm yet there were times when upset and irritation and also concern for his future and the wellbeing of his family were identified. Scott is confident that his issues with his employer will be resolved in his favor, but he cannot be sure at this point what the outcome of his battle to return to work with A.A. ultimately will be. Scott sees himself as an emotionally strong person but the matter the attack on him by Captain Whitehouse and how A.A. has handled this entire matter has been very upsetting to Scott [and equally so to his wife who is very upset by what has happened]. This is not a man who will give up and just lie down when he believes he is in the right, and he is determined to right the wrong inferred against him by the actions of Captain Whitehouse, and by how A.A. has handled the entire matter subsequently.

**Formal Psychological Testing**

**The Symptom Checklist 90-R** explores the subjective sense of the presence and intensity of 90 separate symptom sequences that are often linked to mental or emotional disorder. Scott is overall a very emotionally health man. His distress responses on this instrument were very limited and include: "having repeated unpleasant thoughts that will not leave his mind", "experiencing soreness in his muscles", and "having trouble falling asleep". Given the stress that he is under regarding his employment future, Scott presents and functions emotionally as a very robust and healthy person. He demonstrates excellent coping skills, based on the results from this instrument.

**The BAI [Beck Anxiety Inventory]** is a 21-item index of largely physiologically oriented measures of anxiety related arousal that have been a matter of concern in the past week. The patient is asked to rate the relative severity of each of these indices from "Not at All", to "Mildly", to "Moderately", to "Severely".  Scott showed very little actual anxiety but he did report trouble with an "inability to relax".

**The Presenting Problems Checklist** is an instrument used typically at the beginning of therapy with patients to review their areas of clinical concern. The instrument is divided into four categories: thoughts, feeling, behavior, and other.

Scott reported no real problems with his thinking but as far as his feelings were concerned he reported some "irritability", "intense frustration", "anger', "tension", "being under pressure"[financial], and having some "anxiety/apprehension" regarding his future and the outcome of his conflict with his employer [though he is optimistic that he will ultimately win in this dispute. He noted no behavior problems or other matters.

**The BDI [Beck Depression Inventory]** is a 21-item measure reflecting a range of different symptoms of depression as assessed by the patient based on his interpretation of his feelings surrounding a series of experiences. Scott showed no indication of depression whatsoever with a zero score. [Impressive, given what Scott has been going through].

**The MMPI-2 [Minnesota Multiphasic Personality Inventory, Second Edition]** is a comprehensive 567-item inventory designed to explore the present functioning of an individual in terms of psychological pathology and strength. Despite Dr. Knippa's inference about possible emotional issues on this instrument, I found Scott to have responded validly and he simply did not have any of the primary scores on this instrument showing any abnormality whatsoever. There are numerous secondary scales on this inventory, yet when they presented without a thorough appreciation of their real legitimacy, that is when they show some possible correlation with other possible elements but there is not objective evidence for their application, we end up with lowly correlated indices that are without real meaning. [Dr. Knippa meandered around such indices for quite some time, as I have noted previously].

**The Trauma History Questionnaire** is a 24-item index of commonly experienced trauma. Scott reported having a total of nine such events in his life: He experienced a mugging when he was 22 years old; having experienced several natural disasters [several hurricanes, and the earthquake in Haiti]; several incidents while he was in the police service during which they were potentially were life threatening; seeing someone killed [also in the police service]; having received news of the death of a loved one; having engaged in personal combat [while in Colombia in the military]; and finally he experienced the extraordinarily stressful death of his much loved grandmother at her age of 103 in 2013.
While many of these incidents were very upsetting there is no indication that these events left him with any long-term symptomology of trauma.

**The IES [Impact of Events Scale]** is an instrument designed to rate the frequency of occurrence of experiencing upsetting elements related to a traumatic event. In this case I required Scott to respond in relationship only to the conflict that emerged between he and Captain Whitehouse and the events that flowed therefrom.

Scott reported that this set of two incidents upset him at the time of the altercations, but the real upset came after Captain Whitehouse published what I will call his "Submission". Scott reported that for a time after the release of the document: he had "a slight problem with sleeping", that "other things reminded him of the events", that "he thought about it when he did not mean to", that "he tried not to think about it", that "over time he has had some trouble falling asleep", and that it caused him to be "somewhat watchful and on guard". More frequently, Scott also reported that he: "tries to avoid letting himself get upset when he thinks about it or is reminded of it"; that "he has stayed away from reminders about it"; that he "tried to remove it from his

91

memory"; and "that he has tried not to speak about of it" [though of course with everything that has been happening since the publication of Captain Whitehouse's document, that has been very difficult.

## Overview of Recent Events

Significantly, Scott reported that he has been always confident that the process at American Airlines will work out in his favor because, as he said very firmly, "it is really all bullshit". Although some of his friends at work had warned Scott not to underestimate the influence of the supposed "Captain's Protection Society", he now recognizes that perhaps his friends were right, and he was wrong. However, after the investigation by APA he considered the matter largely resolved. He was even advised that this was so, and now [having to deal with the Dr. Knippa matter, he is realizing that this was wrong].

Looking back, Scott told this examiner that when he was told that the company was sending him all the way to California to be evaluated by Dr. John Knippa, he saw this "psychological evaluation" to be both "suspect" and "a complete waste of time". As he said: "I knew that I was an excellent pilot and there was nothing mentally wrong with me. My record in flight was impeccable, and anyway, I had passed my annual flight simulator testing, and the medical testing, both with flying colors". So, although he did not trust the process of this further examination in California, Scott had every confidence that all would be well. And in fact he reported that he felt that way when he left Dr. Knippa's office.

However, when Dr. John Knippa's results came back and he reported that he found Scott to be unfit to fly, all of a sudden Scott's worst fears of distrust in the process became fully realized, front and center! That result hit him out of left field, and for the first time since all of this extensive negative enterprise by Captain Whitehouse began, this otherwise very confident and secure man began to genuinely fear that the company, or members of it in senior places at the Miami base, must have really wanted him gone. Scott now recognized that if he did not do something serious to counter this out of left field action by Dr. Knippa, he really was going to be terminated. And thus Scott recognized that "bullshit" or not, his much loved flying career would be over, because once he was terminated based on "neuropsychological/medical grounds" he would never be able to get work anywhere within the airline industry.

It was at that point that I saw Scott Patterson really worried that he could actually be beaten in his persistent determination to return to his role as an A.A. pilot. And yet, Scott knew that this opinion by Dr. Knippa was, to again use his term "bullshit". But now Scott was both worried and really angry. It was also clear to me that there were a number of things wrong with the entire matter of A.A. sending Scott to California, and when I reviewed the procedures, findings and opinions of Dr. Knippa, those findings just did not make sense to me. I knew that many of Dr. Knippa's inferences were misjudged. It was also my opinion that Dr. Knippa's conclusion inferring neuropsychological

limitations of functioning such that Scott was incapable of handling the skill set related to his much overlearned flying skill, was equally misguided.

Hence, as may be inferred from the above, I did some investigation of the best person from whom Scott should seek a second aeromedical neuropsychological assessment. I considered that this second opinion might be best sought from the extremely experienced Dr. Gary G. Kay, whose office was in the Eastern Time Zone, [Washington, D.C. Dr. Kay was also the developer of the CogScreen Assessment Battery. Thus, I suggested that Scott call Dr. Kay and determine Dr. Kay's availability and willingness to see him, which he did. I then called Dr. Kay and I advised him of my concerns regarding the findings of Dr. Knippa, who Dr. Kay said he knew. I asked him if he would be willing to offer a second independent opinion subsequent to the work of Dr. Knippa, and he indicated that he would be willing to do so.

As I have noted above, Dr. Kay offered a very different conclusion about Scott Patterson's capacity to successfully complete all of the testing that Dr. Kay required. Interestingly, I also found out from Scott that Dr. Knippa readily provided Dr. Kay with his entire file on Scott Patterson, and that he did so without any formal or informal release authorization from Scott Patterson. That is, Dr. Knippa violated the Federal HIPAA regulations regarding the confidentiality and security of Scott's Protected Healthcare Information. And yet, he had initially refused to provide me with the same information, despite me having provided him with a HIPAA compliant authorization to release Scott's Protected Healthcare data, and of course, his recognition that I would end up getting it anyway.

My job throughout this entire process was to conduct a comprehensive forensically oriented clinical evaluation of Scott Patterson, and to explore in depth and with precision the events surrounding the claims made against FO Patterson by Captain Whitehouse. I was also notified about the events surrounding Scott's USERRA Complaint, and I understood the reason for filing such a complaint. However, my focus was not on this matter but on the impact on Scott of the Patterson's complaint and more broadly the establishment of my opinion about Scott's psychological functioning from the Whitehouse Compliant and Scott's capacity to appropriately conduct the duties of a First Officer within American Airlines. And finally, it became my job to monitor Scott's coping as the process of the investigation took place.

At the time I was hired, my role was that of a forensic behavioral science analyst and a monitor of Scott Patterson's functioning. That role has not changed and I have not provided any treatment services to Scott [and realistically he has not needed them]. Nevertheless, because of my findings and opinions in this regard, it would be idiotic to assert that my work in this case did not result in a lowering of Scott's potential to be far more stressed and anxious than in fact he has proved to be. In the final analysis, my opinions were very supportive of Scott's agenda to return to his duties as a First officer with American Airlines. I suspect that as a result of the work I [and others] have done, the chances are now much better that Scott Patterson will be able to return to his duties

as a First Officer for American Airlines.

**Diagnostic Opinions**

Consistent with the diagnostic protocol established in the <u>Diagnostic and Statistical Manual of mental Disorders [Volume 5]</u> I am reporting I offer the following:

I have said previously, that Scott Patterson has been experiencing and suffering from the stress associated with the instability and lack of clarity that has surrounded his present work related difficulties. While his coping has been about as well as might be considered possible, still the stress is very significant. I consider that the ambiguity, and the stress that Scott Patterson has faced for ten [10] months now, and with still no resolution as of the time of my submission of this report, there must be viewed a failure within A.A. This failure to timely resolve the matter of Scott Patterson, and also to address the impropriety of the nature and methodology of the Whitehouse submission [unless something has happened here that I cannot know], stands in stark contrast with what I would regard as a skilled Human Resource methodology.

In the Diagnostic and Statistical Manual of Mental Disorders [Fifth Edition] there is a category that applies regarding the protracted emotional suffering [stress] that Scott Patterson has experienced. The diagnostic category is within the **Occupational Problems** category and specifically under the "**Other Problems Related to Employment category [code V62.29].** I quote:

"This category should be used when an occupational problem is the focus of clinical attention or has impact on the individual's treatment or prognosis. Areas to be considered include problems with employment or the work environment, including unemployment, recent change of job, threat of job loss, job dissatisfaction, stressful work schedule, uncertainty about career choices, sexual harassment on the job, other discord with boss, supervisor, or coworkers, or others in the work environment, uncongenial or hostile work environment, other psychological stresses is related to work, and other problems related to employment and/or occupation" [page 723].

The bottom line is that I have spent more than ninety hours evaluating Scott Patterson, speaking to his family, interviewing his multiple more remote collateral sources, reviewing his medical records and interviewing and or reviewing the work of the various experts involved in this matter, and examining other records related to this matter. It is my final opinion that there is no evidence that FO Patterson is now experiencing any Medical or other condition, including any cognitive or related impairment, as inferred by Dr. Knippa.

### Where This Matter Should Go From Here: The Takeaway

I have spoken at length with Scott about information that his attorney has shared with him about discussions she has had with the A.A. attorneys and about where things regarding his case are, or should be, going from here. Clearly, I am not in the middle of this matter and so I cannot have a valid or meaningful view at this time of the thinking of A.A. as far as resolution of this situation is concerned. At this time, any clarity on these

events is no doubt still existent as a moving target. Yet I trust that now, with the final release of the report of Dr. Gary G. Kay, the inference or presumption that FO Patterson has something significantly wrong with him from a mental "software" [i.e., functional] or from a "hardware" [neuro-psychophysiological] perspective, can be put to rest. Scott Patterson does not have any mental impairment!

So what is the takeaway? Of course it is always easy to be brilliant in retrospect but the bottom line of the takeaway for Scott Patterson is obvious. Don't become ruffled about the incidental decision of a Captain around something as meaningless as a trip to a hotel, even if it occurs in the presence of his wife, children, and the crew. And do not allow anything about that Captain's conduct to upset you, irrespective of your reason or your justification for being upset! And do not allow that upset to persist!

As for Captain Glenn Whitehouse, his handling of this matter smacks of arrogance, or at least incredibly poor judgment, in that he set out to systematically collect rumor, innuendo, misinformation [even to the point of the absurd], and the occasional legitimate fact, against a coworker, for reasons that no doubt he understands, but in themselves seem, beyond vengeance and very compromising.

While there may be some truth in some of the data Glenn Whitehouse collected over the nearly eleven [11] months of his efforts, his basic methodology was clearly inappropriate, flawed, and discrediting of him. If Captain Whitehouse had legitimate reason to question the judgment or mental stability of Scott Patterson, he certainly did not have such perspective before the disagreement that occurred between these two men prior to the trip to Paraguay. Moreover, "his investigation" after that trip was anything but an objective fair-minded investigation. Rather it involved an accumulation of rumor, innuendo, fact and fancy, all thrown into a submission that by any standard was outrageous in its lack of fact or balance. It even included notions of the possibility of FO Patterson gunrunning and influencing of customs and other officials.

If there was an investigation to be conducted, that investigation should have been conducted under the auspices of the Human Resources Department, or another authorized body, and not by an A.A. Captain, whose indiscriminate mishmash of accusations only opens himself, and perhaps even A.A., up to the risk of litigation that surely no-one would want.

**Certification**

I, Glenn Ross Caddy Ph.D., hereby certify that I personally conducted an examination of FO Rodney Scott Patterson and explored to the extent possible every means reasonably available to me to reach a valid and balanced conclusion in the conduct of my work. I prepared this report and that all the conclusions reflected herein are those of this expert and not of any other third party. I further certify that the preparation of this evaluation was performed consistent with Florida Chapter 490, F.S., as well as with the rules and regulations promulgated thereto.

95

In the event this matter is not resolved short of litigation, I also extend my thanks to the Officers of the Court for allowing me to be of assistance In this case.

Respectfully submitted,

Glenn Ross Caddy, Ph.D., A.B.P.P., F.A.A.C.P., F.I.A.B.M., F.A.P.A.
Clinical, Health and Forensic Psychology