**PLAINTIFF'S EXHIBIT**

CASE NO. 17-CV-60533

EXHIBIT NO. 3

Comments on Dr. Knippa's Report dated 21 March, 2016

Page 1, Knippa is careful to detail events leading up to the exam, however he omits the California Medical Information Act from his information sheets. He did not advise Patterson of the act and that Patterson was not obligated to sign the documentation. Further Patterson advised him that he was not at the exam voluntarily. He further signed the forms presented to him as signed under compulsion which would indicate under duress. Knippa advised he was not permitted to examine Patterson under duress. Patterson was obviously in Knippa's office under the threat of termination by American Airlines if he failed to comply with the directive. Patterson's attorney of record Kelly Magnuson spoke with American's attorney Lucretia Gia prior to the exam and requested a change of venue to a location more favorable to Patterson's Circadian Rhythm and Body Clock. Knippa convinced Patterson to sign the documents stating he was not under duress even though it was evident if Patterson refused to cooperate he would be terminated by American. Knippa does acknowledge receipt of the Section 20 notice directing him to take the exam so the voluntary nature of the exam is questioned and thus Knippa's evaluation was not in compliance with the spirit of California laws.

Page 1 Line 7

Correspondence dated 1/14/2016. Captain Brian Beach references technical terms specific to practicing professionals. Beach is a fomer Marine Aviator and is not listed as a medical or healthcare professional in the Florida Department of Health. Dr. Ahtone AA Medical has not interviewed or examined the subject pilot and could only make observations or recommendations based off hearsay information. Section 21 Interrogatory conducted by Anna Burke-Leon AA Human Resources and Captain Brian Beach in response to complaints by Captain Glenn Whitehouse about an alleged altercation on 10/7/2015. Whitehouse recruited other pilots to make self-serving statements in support of his allegation. Some of the statements were well over a year old. See statements for plausibility and coherence.

Captain Brian Beach, Miami Flight reported to Captain Danny Shellhouse, Allied Pilots Representative to FO Patterson on or before 23 Nov 2015. AA would like to have sent Patterson to a Section 20 Mental Health Exam but they lacked enough evidence to do so. Beach reported to Shellhouse the existence of complaints lacking written proof to back up the complaints. Ana Burke Leon advised at the interrogatory that she had provided all of the statements the company had relating to the alleged altercation between Whitehouse and Patterson. It is important to determine whether these incidents occurred before FEB 2015 and were they in any way related to Patterson's health condition. Also, complainants allege safety sensitive concerns in some cases over a year later which gives rise to was it really a safety concern or was it self-serving in support of Captain Glenn Whitehouse.

It appears that from American's Issuance of a PEH entry to Patterson's file, there was insufficient grounds to terminate him for the alleged offenses and therefore insufficient grounds to continue with a follow up mental health exam.

There was an incident of harassment mentioned from Captain Brian Beach on Wednesday, Feb 18, 2015 at 2132. Beach sent the following text to Patterson

***WTFO (What the Fuck Over) Scott, Just got an email stating your doctor needs to see you tomorrow morning . I want a written statement from him stating this to be the case. I think you flat out lied to me and Captain Wyble***. American's Standards of Business Conduct states We provide a respectful

workplace.  We protect the health and safety of our colleagues and customers.  The American rules of conduct state Rule 24 Consider the welfare of the Company and your fellow employees.  Perform no act that is detrimental to either.  It could also be considered as threatening behavior covered under the Work Place Environment Policy of American Airlines.  Beach's language in the text is a violation of American's Value of Respect Policy.

It appears from the above text that as early as FEB 2015 Captain Beach had it in for Patterson.  Patterson on 27 FEB 2015 underwent surgery.  Beach also telephoned Patterson and the call was taken by his wife on the same day.

It is also noted the Captain Beach's predecessor as the Managing Director of Flight for Miami, Captain Sean Scialfa, was transferred to Los Angeles Crew base (LAX).  Less than a month later,  Scialfa is on medical leave pending termination.  According to sources this termination was for falsification of company documents.  See letter of advertisement for the position.

13-21 is a standard disclaimer although American Airlines Medical did send a copy directly to Patterson via Fed Ex.

Page 1 Line 26  Patterson requested to be excused for the performance of military duties at the Pentagon.  Uniformed Services Employment and Reemployment Rights Act requires American to provide leave for periods of military duty while voluntary or involuntary.

Page 1 Line 27,  Patterson never spoke to Bonds or Luis Rojas on 21 SEP 2015.  In each case he spoke with Carolina, an assistant who advised she would pass the message to Luis.

Page 1 Line 29,  At approximately 1730 after no contact or messages from the flight office.  Patterson contacted Captain Brian Vitale at 239-699-0432.  Vitale is a former base administrator for the Allied Pilots Association.  Patterson was advised to contact the System Operations Control Duty Chief Pilot on Duty.

Page 1 Line 30,  Patterson telephoned Captain Dave Tatum,  DFW Chief on duty in the SOC.  Tatum granted the leave without question and advised Patterson he would let the Miami Chief Pilot know.

Page 1 Line 30,  Patterson received a transcribed from voice to text message from Captain Jim Bonds, Miami Chief Pilot at 1510 on the 21st of Sept.  See Transcript.  Bonds advised he would give Patterson the time off only after Patterson produced orders.  It is understood orders are not produced for Inactive Duty for training.

Page 1 Line 32,  USERRA defines the obligations of employers and rights of workers when performing military obligations whether voluntary or involuntary.  Orders are not normally produced for Inactive Duty for Training.  American is permitted by the Joint Collective Bargaining Agreeement to request verification within a reasonable time frame.  The Military has up to 30days following the completion of duty to issue payment to the service member.  30 days would not be considered unreasonable time frame in that circumstance.

Page 1 Line 36.  Patterson travelled to D.C on the 22d performed his obligation 22 and 23 SEP.  23 SEP he returned to Miami and was permitted to continue his obligation in the Miami area at a Federal Facility.  He concluded duty on the 25th of SEP 2015.

Page 1 Line 37  After returning to Miami he noted a change in the removal codes on his HI-1 from EO to PW.  Captain Bonds spoke with him by phone on or about the 28th and was advised Bonds wanted Orders for the duty.

Page 1 Line 38,  Bonds later left a message on Patterson's answering machine threatening disciplinary action if Patterson failed to produce orders by 13 OCT, 2015.  Allied Pilot's Association Attorney Trisha Kennedy sent an email to AA Legal advising that Captain Bond's actions were not reasonable under the JCBA.  Bonds backed off.  Patterson provided the Leave and Earnings Statement to Bonds on or about 25 OCT via Email.  It is important to note the Federal Government End of Year Closeout is on SEP 30 of each year.  It is highly probable that the payment of the obligation was delayed due to fiscal year end close out.

Page 1 Line 39,  Captain Brian Vitale spoke to both Beach and Bonds in the Miami Flight Office.  Both Beach and Bonds were adamant that Patterson had signed his own orders for military obligation although they were aware no orders existed.  Beach and Bonds advised Vitale that numerous departments and numerous captains were involved In this issue.  Vitale advised Patterson is an FO,  how is he involved in numerous departments.  Only Captains interact with other departments.  This was not plausible.  Beach brought up an issue about Patterson having diverted a flight in the past.  Vitale said where, was the Captain when this flight diverted.  He was in the Captain's seat when the plane landed correct.  Patterson did not in fact divert a flight without the Captain's concurrence.  Vitale called Beach on the assertion which was hearsay.  The captain of the diverted flight later issued a statement which showed Beach's assertion as hearsay and not factual.

Page 1 Line 40, Knippa is not familiar with the military and not qualified to opine on it.  All personnel in the rank of Lieutenant Colonel or Colonel are addressed as "Colonel".  Knippa Notes this.  The statement appears to be a ding in the character of Patterson while it is of no consequence.  His status in the reserves is of no consequence either.  Patterson is a soldier in the Army as equally important as an active duty soldier.  Knippa is not aware of the operational nature of the Reserve component and comments are cheap and degrading to the service of Patterson.

Page 2 Line 4.  Patterson was requested prior to Oct 2014 to participate in an Aircraft Pull for charity event at the Miami Maintenance Hangar by Captain Kevin Mase, Miami Chief Pilot.  Prior to OCT 2014 Altercation Patterson had no disciplinary actions on file.

Page 2 Line 7  Post treatment Status,  Patterson is declared in Clinical Remission

Page 2 Line 10, In June 2015 American Airlines Medical Department cleared Patterson to resume normal flying duties after receiving his First Class Medical on May 31 2015.  Patterson also transmitted a letter from his physician clearing him to fly as a commercial airline pilot.  Patterson safely operated the Boeing 757 from June through SEP 2015.  There were no reported issues of cognitive or mental lapses during this time while operating as a crew member.  Dr Ahtone with AA medical has neither spoken to Patterson much less examined him, yet he has made recommendations for continued service based on hearsay information from untrained persons such as Captain Beach.

Page 2 Line 7 Reviewing the letter from Captain Beach to Dr Knippa.  Beach is not a licensed medical personnel in the State of Florida.  It is highly unlikely that Beach authored or originated this letter on his own to Knippa.  It was in all likelihood prepared for his signature based on hearsay and conjecture and not fact.

Page 2 Line 21  If they can't adjudicated then it is a closed matter is not a complete sentence or proper verbiage.  AA did not adjudicate the matter in Section 21 as sustained.  Beach issued a PEH to Patterson and the matter is now closed.  Patterson was issued a non disclosure statement and verbally advised by HR to comply with the terms of the document or face termination.  He advised Knippa of this fact who continued to badger him with questions about the Section 21 hearing.

Page 2 Line 25,  Knippa operates in a highly speculative environment.  Absent concrete examples Patterson was not going to release information to Knippa.  Patterson's military experience is in Public Information therefore one would expect a guarded behavior given the circumstances behind the evaluation.

Page 2 Line 26,  One witness advised he was questioned as to whether he had heard Patterson use the N word or Faggot.  The witness advised in the negative.  See Statement.

Page 2 Line 31, His understanding is not correct.  It is Federal Law,  Knippa acknowledges receipt of the notice to employees and employers from Department of Labor.

Page 3 Line 2.  Patterson was a crew member on the 737.  He observed a truck approaching the aircraft at high speed on the ramp.  The pilot did not almost hit the truck.  The driver of the truck was texting.

Page 3 Line 7.  The nature of Patterson's job in the military as well as other assignments in Law Enforcement have necessitated Psychological Screening.  He obviously was satisfactory at the time since he obtained the assignments for which he was screening.  It is understood that American Airlines performs the MMPI and Cogscreen AE on Pilots seeking employment.  Patterson reports to have had similar testing at American in 2000.

Page 3 Line 13,  There is no such place as Camden NC.

Page 3 Line 30,  Patterson was Valedictorian his Junior year of high school.   His Second year he was selected as the second in command of the cadet battalion.  Following his participation he won and Army ROTC Scholarship.

Page 3 Line 35,  American Airlines has not had the Boeing 727 in service since 2001.  Patterson is currently a 757/767 International First Officer.  His first assignment was as a 727 Flight Engineer and later 737 First Officer.

Page 3 Line 44,  Here again Knippa does not possess an understanding of the military.  While it is apparent he is bent on finding fault with Patterson.  It is possible for one to enter military service on 10/87 and later be commissioned as an officer on 05/89.

Page 3 Line 46,  Being passed over for promotion during economic downturns is not uncommon.  The military is current drawing down forces to save money.  It is logical to have less promotions.  However, one doesn't reach Patterson's rank in the Army without significant achievement and hard work.  Negative evaluations would have been a cause for removal from service well before this time.

Page 3 Line 47,  IMA is an Augmentee to an active duty unit.

Page 4 Line 12 (ie, as his identified flight training appeared limited for doing flight instruction)  Knippa has limited aviation experience.  He mentioned to Patterson the V Tail Bonanza as a doctor killer and further advised he knew nothing more about aviation.  Professional pilots begin a career path either civilian or through the military.  Civilian pilots begin with a goal of flying for an airline at some point in their career.  It is an expensive and tough career path but well defined usually pausing at some point for the pilot to do flight instruction while building the requisite experience to be hired as a professional.

Page 4 Line 24 I had to play counselor is a misstatement.  Police officers are often called to domestic disputes and as such have to mediate between parties for a peaceful resolution.

Page 4 Line 24,  Patterson has lived in Rhode Island.  He has resided in the State of Florida since 2012.

Page 4 Line 35,  Note No active Diagnosis was identified by Mr Patterson.  Many people go for Chiropractic Care as a maintenance program.  Health Insurance often covers these visits.

Page 4 Line 38-47  Patterson went to International Bio Care not for treatment but to improved his diet and immune system.

He is in Clinical Remission as declared by his physician who is an Oncologist.

Page 5,  Line 10  Knippa advised you have a place on your finger that appears to have not healed very well.  Photo taken of finger on return to Miami.  Correctly reported as a scrape while changing a tire.

Page 5 Line 11, Knippa mentions cough and cleared his throat.  Upon first introduction to his office staff.  A heavy set woman opened the window and immediately Patterson detected the odor of cigarette smoke on her person once the barrier window was opened.

Page 5 Line 13, This smoker was one of Dr Knippa's employees.  Although he mentions his office is Smoke Free, Secondhand smoke permeates the clothing and has the same effect as smoking in the office.  Knippa was advised this.

Page 5 Line 13, Of note, immediately after leaving Knippa's office,  Coughing ceased.  Note,  Knippa's office was very cluttered.  He had numerous books and papers shelved above his desk.  It is highly unlikely cleaning staff cleans or dusts each one of these items to improve indoor air quality.   The room for the Cogscreen was cluttered with numerous chairs and the chair offered to conduct the Cogscreen was inadequate for comfort and required adjustment of the back as it was inclined full forward.  The Cogscreen room was situated more like a maze with paths to a desk behind the cogscreen station with not much room to negotiate.  Knippa had a FAR/AIM ASA and FAR for Crews on a shelf adjacent to the Cogscreen.

Page 5 Line 42 Whole body PET in 9/2015 is incorrect.  PET Scan of 2/2015 showed no distant metasis.  MRI of 9/2015 shows no recurrence.

Page 6 Line 28  Patterson volunteered for Mission to Haiti in 2010 to present.  Mission to Haiti has built a clinic staffed by doctors in Haiti.  He advised the director of the mission who is not a doctor,  they should build a clinic that was staffed and equipped to handle minor trauma not just dispense aspirin.  Patterson has experience in the Army Combat Support Hospital.  Therefore such knowledge is common on patient treatment capabilities for field units as it applies to other clinics such as Mission to Haiti.

Page 6 Line 35.  What social protocol is Knippa referring to.  Exhuberant to be going to an involuntary exam that could result in the loss of income.  Knippa also did not cover any ground rules or procedures for his office during in brief.  Therefore to make assumptions or statements without the aforementioned are purely speculative and of no value.

Page 6 Line 35.  Patterson rang the bell and took a seat on day one Knippa later showed up in the waiting room with a clipboard of information to complete.  However on Day 2,  the key to the men's room turned up missing from the shelf in front of the window.  Patterson tapped on the glass and opened the window.  Advised excuse me, do you have a spare key to the men's room.  A staff member proceeded to a Dentist Office on the same floor and borrowed the key to the men's room.  Knippa's key to the men's room showed up about 4:30 when Patterson left the office.  It was felt the departure of the key was a ploy or trick by Knippa since he had no other patients in the office that were observed on day two.

Page 6 Line 37,  Patterson did not wander around the office suites as insinuated by Knippa.  He would ask to be excused for physiological reasons and proceed directly to the men's room and return to the place where Knippa was for further testing.  Knippa did not have or brief any of the rules of engagement at during the in brief on the morning of 16 MAR.

Page 6 Line 38,  Atypical behavior assertion is merely to support Beach's statement of Atypical behavior.  Absent laying down the ground rules,  a reasonable adult would return to the place where the examiner left off and not stand in the waiting room for the doctor.  For example in a medical office,  an adult would not wait in the waiting room but would return to the doctor.

Page 6 Line 40,  Quite different from an out of town examinee.  He carried 2 canvas bags.  One was a computer case,  the other a duffle bag with water and snacks.  Knippa advised in his paperwork to bring the latter items for the test.  Further,  the large tabbed notebook contained papers which Knippa requested copies of.  Removing items from the car is not unusual especially with someone who operates in a security sensitive environment or doesn't want an expensive laptop stolen from an automobile.

Page 6 Line 44,  Here again social boundaries,  Knippa is reported to be a social egg in literature.  He is a researcher.  How can he comment on social boundaries.  He is referred to as book smart lacking technical skill.

Page 6 Line 46,  Knippa advises that Patterson mispronounced a neurological phenomenon. Yet Knippa makes numerous errors throughout his report and document.  Not common for someone holding a Ph.d to make errors in a document or fail to proof read to correct errors before publication.

Page 7 Line 4,  Splinter like behaviors. Questionable assertion.

Page 7 Line 4,  Knippa advises he is a trained healthcare provider is a statement of self aggrandizing.  Knippa holds a Ph.d  He is neither a medical doctor and thus is not qualified to opine on such matters. A mental health exam is not a physical exam.

Page 7 Line 17,  Knippa mentions a cough and occasional sinus discomfort.  These resolved immediately after leaving Knippa's office which indicate that Knippa has an air quality issue or cleanliness issue in his office.

Page 7 Line 20, Looming versus Lumious. Knippa incorrectly applies the term Nexus for Neck Cyst. Page 2 Line 23. Nexus being a focus or center of gravity for an action.

Page 7 Line 25 Knippa acknowledges receipt of the documents yet he gives no weight to them in his later comments, yet he attempts to determine the merits of Beach's poorly substantiated document.

Page 7 Line 44 Knippa indicates testing was suspended on Day 1, at 1630 which was 1930 for Patterson. Patterson woke at 0500 EST which was 0200 PST. Patterson departed Miami at 1229 EST the day prior and arrived at the hotel on 15 MAR at 2030 PST. Fully 2330 EST. Patterson reports he normally goes to sleep at 2200 when home and awakens around 0500-0600 normally. The flight to California was stressful. Patterson reports he was in coach for a 6 hour flight to California. A passenger seated next to him talked almost the entire flight and prevented him from getting rest on the plane. Due to American removing him as a crew member, the TSA took his water and food from him for the flight to California. The flight was short on water for the trip and he was given a small bottle at the start of the trip. Dehydration was a factor. Patterson advised Knippa at 1500 EST that he needed to take a break for lunch. Patterson reports he had breakfast at 0700 EST and required nourishment. Knippa advised there was Burger King close by for lunch. Patterson advised through a cutting motion with the hand that Burger King was not acceptable. Patterson required a vegetable smoothie or some other more wholesome food.

Knippa gives no attention to the time zone change or the fatigue that pilots experience. Under normal circumstances a pilot would decline assignment to flying or other duty while fatigued. However under the circumstances, Patterson could be deemed non cooperative and terminated for refusing to cooperate. Knippa did not advise Patterson of the need to not be fatigued as well as a non retribution for refusing to take the test. In practice American should have flown Patterson to California a full 48 hours before testing to allow him to acclimate to the Circadian Rhythm and eating habits before taking two full days of neurocognitive examination which is draining itself. CFR 117 has some acclimation measures to prevent fatigue.

Page 11 Line 5 Concerns about time frame of occurrence. Post Cancer treatment in no way affected cognitive or mental abilities. Statements made were also not supported in fact.

Page 11 Line 20 This is a cut an paste. American Airlines has since begun using a principle of Threat and Error Management. Knippa's limited knowledge of aviation is apparent. Further Patterson was not sent to be examined for cognitive failures which could be manifested by lapses of performance.

Page 11 Line 42. Knippa relies on hearsay information in compiling his findings. Hearsay is not admissible in office proceedings of a court and it is likely that the FAA will not rely on hearsay information either. Knippa's opinion was given no weight in a worker's compensation case where Knippa provided his opinion based on hearsay and which was clearly false given the employment record of the claimant.

Page 11 Line 47  the letter was dated 01/14/2016 not 16.

Page 12 Line 45 Highly unlikely given Patterson has served in the military in a rigid environment for 27 years and at American for 15 years. No complaints prior to SEP 2015.

Page 13,  Line 18  Patterson is in clinical remission.  American has other pilots who fly actively and are in remission and experience far more radical treatments than surgical excision.

Page 13 Line 45 Knippa fails to account for fatigue as a limiting factor.  Cognitive testing is highly subjective to a number of environmental factors.

Page 14,  Line 5.  Patterson has not had issues with other crewmembers with the exception of Captain Glenn Whitehouse.  It appears that the issues stem from Captain Whitehouse's statement to American that he was the subject of Workplace Environmental Harassment when in fact,  Whitehouse was the aggressor in several situations.  Whitehouse alleged that he was the victim of harassment when he presented in Bolivia with numerous electronic items.  Whitehouse asserted paranoid behavior by asserting Patterson was responsible when in fact, it could not be determined by a reasonable doubt that Patterson had anything to do with Bolivian Customs merely doing its job and inspecting a crew member who was bringing in an unusually high number of electronic items.  On a separate occasion Whitehouse asserted to Captain Mark Modrich, APA Pro Standards, that Patterson had reported his fellow crewmembers to US Customs for extra screening upon re-entry to the US.  This was not supported by any other crewmembers statements.  This event occured on or about the OCT 7 2014 trip to Paraguay. It is doubtful this occurred since making false statements to a CBP is a crime and would have resulted in an arrest or at least the filing of a report which could be used to substantiate.  This behavior Is exhibited by persons wishing to intimidate or silence others.

It should be noted that after returning to work in JUN 2015.  Patterson was targeted along with Captain Robert Swanson by US CUSTOMS before departing to Bolivia.  Ironically this event appears to have been generated in retaliation by Whitehouse.  On 22 July,  Patterson was contacted by Captain Chip Harlowe, APA Professional Standards and questioned about smuggling to Bolivia and Captain Whitehouse in the same call.  Patterson then contacted the APA Professional Standards National Chairman and the APA Security Chair Mike Karn to request intervention at a national level.  Patterson contacted Captain Thomas Copeland the APA Domicile Representative and requested him to speak with Harlowe about the source of the allegation. Copeland advises Harlowe didn't remember although during the same conversation he was focused on Captain Glenn Whitehouse.   It should be noted that Whitehouse ceased contacting Captain Modrich the original moderator of OCT 2014 and contacted Chip Harlowe. This raises a concern that Whitehouse wasn't accepting the moderation of Modrich, sought to continue punishing Patterson for an incident, which occurred months past.  Patterson was also not in a do not pair status with Whitehouse.  On 21 July, Patterson was scheduled to Non Rev to Wisconsin for an airshow.  When it was revealed Whitehouse was on the flight, Patterson elected to take a different flight and no showed Whitehouse's flight.  Whitehouse reported this to AA as harassment.

Comment, AA Human Resources Investigator Ana Burke Leon advised Captain Danny Shellhouse during the Section 21 Interrogatory that she had not fully investigated the Workplace Environment Complaint for fact.  Shellhouse made many observations that Whitehouse was not factual or less than honest in his complaint.  Further Whitehouse filled his complaint almost a full year after the alleged incident which gives rise to its validity.  Thus AA failed to investigate the complaint for fact and Captain Beach made assertions to Knippa that were not supported by fact.