UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Fort Lauderdale Division

Case Number: 17-cv-60533-MARTINEZ/OTAZO-REYES

RODNEY SCOTT PATTERSON,

    Plaintiff,

vs.

AMERICAN AIRLINES, INC.,

    Defendant.

_____/

**Plaintiff's Objection to Magistrate Judge's Report and Recommendation on American Airlines, Inc.'s Motion to Exclude Opinion Testimony by Dr. Caddy and Request for <u>de novo</u> Review**

Plaintiff, Rodney Scott Patterson, objects as follows to that part of the Hon. Alicia Otazo-Reyes's Report and Recommendation (DE 149) concerning American Airlines, Inc.'s Motion to Exclude Opinion Testimony by Dr. Caddy (DE 132), and requests a <u>de novo</u> review or the R&R's:

***First***, limiting Dr. Caddy's testimony about Lt. Col. Patterson's mental wellness to being in rebuttal to John Knippa, Ph.D., but not to any other evidence that American Airlines might seek to introduce to portray Lt. Col. Patterson as

***Second***, prohibiting Dr. Caddy from testifying about the irregular interpretations that Dr. Knippa used to portray Lt. Col. Patterson someone



**The Amlong Firm** • 500 Northeast Fourth Street • Fort Lauderdale, FL 33301 • 954.462.1983

who is personality disordered, unable to communicate effectively with others, somewhere on "the spectrum" and in need of psychological counseling.

## Introduction and Summary

American Airlines, Inc. ("American") sought pursuant to Rule 702 and <u>Daubert v. Merrell Down Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) to prohibit Glenn Ross Caddy, Ph.D., plaintiff's testifying expert psychologist, from offering **any** opinions at trial "because they are inherently unreliable and thus inadmissible." Defendant's Motion, at 1.

The thrust of defendant's motion was that Dr. Caddy had disregarded findings made by Edwin Bercaw, Ph.D., a neuropsychologist who had examined Lt. Col. Patterson, which findings were at odds with Dr. Caddy's, without disclosing or distinguishing them, and that this rendered Dr. Caddy's opinion scientifically unsound.

Evidence at the hearing mooted American's objection—i.e., Dr. Caddy testified that although he did not give any weight to Dr. Bercaw's neuropsychological evaluation, and that he did not disclose any contact with Dr. Bercaw, he did not plan to offer any testimony about neuropsychology, since he is not a neuropsychologist and has no expertise from which to testify. Transcript, DE 148, at 8:5-12, 30:15-22, 44:13-25.

The magistrate judge recommended that Dr. Caddy be allowed to testify about Lt. Col. Patterson's psychological health, but not about

anything neuropsychological or involving cognitive assessment, DE 149, at 5—which is what Dr. Caddy said he planned to do. The magistrate judge also limited such testimony to being in rebuttal "if this issue is presented to the jury by Dr. Knippa." Id.

The magistrate judge also recommended that Dr. Caddy not be permitted to "opine regarding alleged irregularities in Dr. Knippa's psychological testing methods that reflect a pro-American bias." Id. at 6.

Lt. Col. Patterson specifically objects to the magistrate judge's recommendations that:

**One**, Dr. Caddy's testimony about Lt. Col. Patterson's mental health being admissible only if it is challenged by Dr. Knippa (as opposed to being raised by any other means), and

**Two**, Dr. Caddy not being allowed to testify concerning the irregularities in Dr. Knippa's clinical psychological testing that produced a character-assassinating portrait of Lt. Col. Patterson as someone who is most likely personality-disordered, lacking in interpersonal skills and hovering somewhere on the autism scale.

## Statement of the Facts

American Airlines placed Lt. Col. Patterson on no-fly status on September 24, 2015, two days after he disobeyed a chief pilot's request that he fly a scheduled trip to South American on September 22 rather than

going on duty in Washington, D.C., with the Army Reserve.[1] Lt. Col. Patterson's grounding was based on the opening of a Human Resources investigation into allegations of misconduct that were identical to those made known six months earlier, to a another chief pilot, to Corporate Security, to Labor Relations and to Human Resources; none of which initiated any action against Lt. Col. Patterson.[2]

Following September-November Human Resources Investigation that produced no evidence justifying discipline, Labor Relations mandated a fitness-for-duty exam by a Long Beach, California, neuropsychologist, John Knippa, Ph.D.[3]  Notwithstanding that the examination produced, according to American's corporate medical director, no evidence of neuropsychological deficit, psychopathology or personality disorder, the Long Beach practitioner pronounced Lt. Col. Patterson "NOT FIT FOR DUTY."

In addition to the neuropsychological issues asserted, Dr. Knippa also addressed a number of clinical psychological issues.  These inquiries were based on American's having forwarded to Dr. Knippa a memo purportedly written by former Captain Brian Beach—who at the time was a chief pilot, but said that he was simply ordered to sign the memo, which he did not

---

[1] Plaintiff's Local Rule 56.1(a) Statement of Material Facts In Support of Motion for Summary Judgment, DE 61, at 1-3, ¶¶ 1-8.

[2] Id. at 3-5, ¶¶ 9-11.

[3] Id. at 7-8, ¶ 15-16.

write[4]—asserting that Dr. Knippa characterized as "outlin[ing] general but not specific performance relevant concerns for: Mental and/or emotional stability, unspecified 'multiple reports of atypical interactions with coworkers' and unspecified reports 'that suggest a patten of false/self-aggrandizing statements.'"[5]

Dr. Knippa then went on to assess Lt. Col. Patterson's fitness for such functions as Crew Resource Management, including interpersonal and communication skills;[6] the possibility of a personality disorder with narcissistic and immature features and the benefits that Lt. Col. Patterson could reap from "personal counseling to discuss how his interpersonal style may be perceived by others in a manner different from what he perceives or intends" and how "others may perceive well intended and benign behavior as presumptuous, arrogant or narcissistic…"[7] Among the instruments Dr. Knippa used to arrive at these inferences were the MMPI-2[8] and the Personality Assessment Inventory ("PAI"), Lt. Col. Patterson's performance on which instruments Dr. Knippa characterized as "particularly cautious and deliberate," "reflect[ing] a pattern of defensiveness," "as

---

[4]Id. at 7, ¶ 14.

[5]See DE 57-6 ("Knippa report"), dated March 21, 2016, at 10.

[6]Id. at 11.

[7]Id. at 14.

[8]Minnesota Multiphasic Personality Inventory-2d Edition.

sometimes seen with pilots and others presenting for assessment of duty fitness"—but with "no elevations above the usual interpretive level" and "entirely within normal limits."[9]

Glenn Ross Caddy, Ph.D., is a board-certified psychologist licensed to practice in Florida.[10] He was a Professor of Clinical Psychology for some 15 years, teaching, among other things, psychometrics, which relates to testing and measuring, at both the undergraduate and graduate level.[11] He has extensive experience dealing with airline pilots from, among other things, having been the principal psychologist to whom United Airlines referred its personnel when it had a base in Miami.[12] He has experience doing fitness-for-duty examinations, albeit not for pilots but including police departments and the Secret Service.[13]

Dr. Caddy—to whose expertise in clinical psychology and whose clinical psychological conclusions no challenges have been raised —points out in his expert report that:

*One*, as to the standardized testing results on which Dr. Knippa relied:

> It should be noted, as a general principle, that all too often psychologists take the data from these so called "tests of personality",

---

[9]Id. at 9-10.

[10]Caddy Deposition, at 18:17-19.

[11]Id. at 57:4-17.

[12]Id. at 57:16-58:12.

[13]Id. at 58:18-22, 62:3-5.

> or "tests of psychopathology", and treat the data as if they reflects definitive indices of the functioning of the examinee. While this may be more likely true than not when the instruments reflect significant or gross psychopathology [which is not the case here], one can risk over-interpreting such everyday non-revealing data...,[14]

elaborating that "[i]t is noteworthy that when finally I was able to get to see the results of Dr. Knippa's work with Scott Patterson I noted that on the computerized MMPI...[Lt. Col. Patterson's] statements appear both very honest and very reasonable. They make sense and reflect nothing pathological at all."

Dr. Caddy's psychological assessment of how Dr. Knippa should have found Lt. Col. Patterson to be functioning psychologically, i.e., normally, is consistent with Dr. Caddy's conclusions after not only "the rigorous collection of collateral source data, ... through the collateral examination of others who know him well, both at home and at work, and in his various capacities and roles, and especially in his role as a First Officer with American Airlines,"[15] but also a mental status examination and "multi-dimensional clinical psychological testing."[16]

> The integration of the data from all these sources proved critical and ultimately offered a cohesive comprehensive perspective on multiple aspects of Scott's functioning from a clinical and statistical perspective in relationship to normative psychological data. But most

---

[14]Confidential Communiqué to William Amlong, Esquire RE: Rodney Scott Patterson ("Caddy Expert Report"), DE 57-28, at 36 (punctuation and brackets in original).

[15]Id. at 65.

[16]Id. at 66.

critically, what came to the fore was really a description and understanding of the everyday life of this man.[17]

**Two**, concerning the <u>soto voce</u>, but lengthy (17-line) suggestion that Lt. Col. Patterson may suffer a narcissistic or immature personality disorder, Dr. Caddy points out that, Dr. Knippa's "various meandering inferences and/or conjectures notwithstanding," Dr. Knippa concludes that "a personality disorder is not identified with the limited data available at this time" because "[o]ther than the unspecified complaints outlined by Captain Beach, no concrete examples of performance problems are identified…"[18] Dr. Caddy characterizes this as "put[ting] the matter of Scott Patterson's inferred 'mental illness' or at least his inferred 'personality disorder', to rest, or almost so, but not really!"[19]

**Three**, concerning Dr. Knippa's proposal of a "'possible linkage' … between the possibility of "certain narcissistic and immature features" and Attention Deficit Disorder/Hyperactivity Disorder and also "subtle spectrum features," Dr. Caddy opined in his Expert Report that:

> Bluntly, at this point Dr. Knippa's speculations are way beyond the bounds of science and into fantasy. Such weak and unsupportable inferences [vague data void speculation] have no place in a scientifically based investigation, and especially so, when this report is being read and comprehended by non-specialists whose workplace political agenda may play a role in the decision making process. Such

---

[17] <u>Id</u>. at 67.

[18] <u>Id</u>. at 37.

[19] <u>Id</u>. at 37.

speculation by a psychologist who really does not know this man at all, risks compromising his own ethical obligation to speak only the truth and not to speculate in a manner to compromise his professional responsibilities; and certainly, not to suck up [throw a bone to] the people who hired him.

Dr. Knippa could have conducted a comprehensive collateral source investigation [interviewing people who know Scott Patterson really well in his workplace and beyond], if he had requested to do so, and if he determined that he really wanted to get to the bottom of [make sense of] all these inferences that he was speculating about. But he did not undertake any such an investigation! And yet he leaves these possible inferences [of personality impairment] hanging, yet without valid data support. I do not consider this an appropriate application within the discipline of psychology![20]

***Four***, as to the Dr. Knippa's "subtle spectrum" allusion:

Further, when Dr. Knippa remarks [as noted above] on what he calls subtle "Spectrum" features I can only presume that he is referring to either the "Attention Deficit Disorder" spectrum or the "Autistic Disorder" spectrum.  And though I presume the former, this speculation appears to have been presented to offer or infer a theoretical mechanism [a bridge if you like] to get the naive reader back into the notion that there is something wrong with Scott Patterson. [That is, the creation of an inference that although it may not be a real "personality disorder" and Dr. Knippa cannot "find it", there is otherwise, or still maybe, something wrong with FO Patterson]. Dr. Knippa persists with the speculation, of the possibility, of the inference, that just such a "personality problem" could exist; and just below the surface. The inference from these speculations is that while this is not "evidence" for a personality disorder, it might, [and I emphasize "might"] still reflect a low grade personality limitation, or it may even be indirect evidence of a limitation of an organic nature in Scott Patterson's brain functioning. I consider this level of speculation beyond lacking any scientific basis and to have no place in this work, or in any other! It is building a fragile structure without foundation and the lack of a scientific base make the exercise unethical.

Dr. Caddy's conclusion as to the clinical psychological portion of Dr. Knippa's report is that:  "It is obvious from looking at all the effort that Dr. Knippa made to find and infer something wrong with Scott's personality

---

[20] Id. at 38 (brackets in original).

functioning that he was trying too hard only to not quite be able to get there, while nevertheless leaving a trail of inference."

## Applicable Legal Principles

In Daubert, the Supreme Court held that "[f]aced with a proffer of expert scientific testimony," a district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93.

In its role as "gatekeeper," the district court must enable the parties to develop the facts necessary to make a particularized determination of reliability of proffered evidence under Federal Rule of Evidence 702.[21] See Kumho Tire v. Carmichael, 526 U.S. 137, 150 (1999) (citing Daubert, 509 U.S. at 591).

Trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of

---

[21]Rule 702, which governs the admission of expert testimony, states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

> scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

U.S. v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004), quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) (citing Daubert, 509 U.S. at 589). "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion…" Id.

However, "[a] review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule." 2000 Committee Note to Rule 702, quoting U.S. v. 14.38 Acres of Land Situated in Leflore County, Mississippi, 80 F.3d 1074, 1078 (5th Cir. 1996), for the proposition that "Daubert did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system,'" and Daubert, 509 U.S. at 595, for its exhortation that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

Concerning such generalized testimony as an explanation of standardized psychological testing and its application to a particular case, to which the Committee Note refers as "the venerable practice of using expert testimony to educate the fact finder on general principles," Rule 702 "simply requires that: (1) the expert be qualified; (2) the testimony address a

subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case."

Rule 703 permits "[a]n expert [to] base an opinion on facts or data in the case that the expert has been made aware of or personally observed," he can only do so "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject…." See U.S. v. Scrima, 819 F.2d 996, 1002 (11th Cir. 1987).  However, "Rule 703 applies only when an expert witness testifies about matters within the scope of his expertise." U.S. v. Garcia, 447 F.3d 1327, 1336 (11th Cir. 2006).

**Point 1:** Dr. Caddy's psychological assessment of Lt. Col. Patterson should be admitted if American in any way challenges that he is mentally healthy—and not merely through Dr. Knippa.

Ever since Lt. Col. Patterson displayed the audacity to go on duty at the Pentagon Sept. 22, 2015, American Airlines has set about demonizing him as, to bar from the vernacular, "a whack job."

Although Lt. Col. Patterson has moved in limine to exclude such items of evidence, American is seeking to admit, among other things:

***One***, a Human Resources close-out memo concerning an investigation that revealed no behavior that would subject Lt. Col. Patterson to discipline, but concluded

> During our interviews multiple employees expressed their concern with Patterson's behavior.  Based on their interaction they believed that Patterson's misrepresentations not only caused negativity amongst the

crew but also led them to question his ability to operate the aircraft safely; it left them with an impression that "he's not quite all there," see DE 104, Plaintiff's Motion in Limine re: Human Resources Close-out Memo, at DE 104-1, at 3;

**Two**, a report from Dr. Knippa that suggests (but does not document) a lack of interpersonal skills, see DE 102-3, at 11, "a Personality Disorder with narcissistic and immature features," id. at 12, "coping styles that can sometimes be seen with disinhibition from AD/HD,"[22] id. and "subtle spectrum features," id., see DE 102, and

**Three**, letters to Lt. Col. Patterson from two former American chief pilots, James Bonds and Brian Beach, expressing "concerns regarding your ability to safely operate an aircraft…" See DE 101, Plaintiff's Motion in Limine re: § 20 Letters from Beach, Bond.

If such evidence, either documentary or tesimonial, were put before the jury, even if it did not come in through the testimony of Dr. Knippa, which is the only testimony that the magistrate judge's R&R would permit Dr. Caddy to rebut, the undue prejudice to Lt. Col. Patterson would be enormous.

**Point 2:** **Dr. Caddy should be allowed to inform the jury about the irregularities in Dr. Knippa's presentation of his finding based on clinical psychological interviewing and testing, from which information jurors could reasonably draw an inference that Dr. Knippa was engaging in biased, 'hired-gun' behavior towards Lt. Col. Patterson.**

---

[22] Attention deficit/hyperactivity disorder.

The magistrate judge seized upon Dr. Caddy's concession that he does "[n]ot particularly" have any expertise in bias, since "[i]t's not something that [he] stud[ies]" and "[he doesn't] do research in bias…," DE 148, at 26:1-4, to find that "Dr. Caddy is not qualified to render … conflated opinions" that "irregularities in Dr. Knippa's psychological testing methods reflect[] a pro-American bias," DE 149, at 5.

Dr. Caddy, however, is an expert in psychometrics, i.e., psychological testing, which he taught at both the undergraduate and graduate levels during a 15 year career in academe.  See Deposition of Glenn R. Caddy, Ph.D., DE 57-27, at 57:7-15; see also DE 148, at 48:7-25.  That qualifies him to testify about the irregularities in Dr. Knippa's presentation of Lt. Col. Patterson's test results.

Jeral Ahtone, M.D., American's Corporate Medical Director, made it clear what American was looking for during a phone call to Dr. Knippa January 15, 2016.  Dr. Ahtone told Dr. Knippa that Lt. Col. Patterson had been relieved from duty September 24, 2015, and that management had concerns about his judgment, mental and emotional stability, co-workers and self-aggrndizing statements.  See Deposition of John Knippa, Ph.D., DE 57-24, at 29:12-24.

Although frequently interrupted by both the magistrate judge and opposing counsel, Dr. Caddy's questions-and-answers at the Daubert hearing demonstrated how he could show the jury how Dr. Knippa's

couching of his findings was irregular— from which, in turn, the jurors could reasonably infer that Dr. Knippa was giving American what he perceived that it wanted, i.e., a not-fit-for-duty certificate for a Lt. Col. Patterson whom American had grounded three months earlier as lacking judgment, not getting along with co-workers, being mentally and emotionally unstable and engaging in self-aggrandizing behavior:

> THE COURT: I'm sorry. Mr. Amlong, there's three issues. There's irregularity in testing and there's bias. You're addressing bias, bias for American.
>
> MR. AMLONG: Yes.
>
> THE COURT: That's what you're addressing?
>
> MR. AMLONG: Yes.
>
> THE COURT: Okay. So how are you going about doing that?
>
> BY MR. AMLONG:
>
>   Q. Did you infer from Dr. Knippa's presentation of the clinical psychological portions of Mr. Patterson's examination that there was a bias there?
>
> MR. HOLT: Objection, Your Honor, relevance. Whether a particular witness has a bias is a matter for the jury to consider, not for one expert to opine on another. I would suggest that none of us have ever seen an expert in here saying that other expert is lying because it's improper.
>
> MR. AMLONG: I'm not—if I could finish my questioning, I will—
>
> THE COURT: I thought you were finished with the question.
> MR. AMLONG: No, I'm not.
>
> THE COURT: Why don't you try to phrase it in a more direct way, so we can move along?

BY MR. AMLONG:

Q. Did you find—

THE COURT: Will you let me ask him? What's the basis for your opinion that Dr. Knippa is biased is in favor of American? Can you give me a straight answer to that?

A. Certainly, Your Honor.

THE COURT: Okay, go ahead.

A. In each of the testing that is—each of the various tests that he does—

THE COURT: Are you including both neuropsychological testing and the tests that you do?

A. No. I'm going to focus on the clinical testing.

THE COURT: The ones that you know about?

A. Yep.

THE COURT: Okay. Telling me about how he reported those tests, right?

A. He—not just the test, but the integration between the tests and his clinical assessment is what's relevant. And in that presentation, he keeps on—he'll tackle one particular area like, for example, some psychological—possible psychological condition, and he'll go all the way up to the line and talk about it but then say, "but it doesn't quite reach." He can't -- he doesn't have enough data to make an ultimate opinion there so he backs away, and he keeps on doing that throughout the sequence.

THE COURT: And you interpret that as bias in favor of American?

A. I am saying that—yes.

THE COURT: Okay. Got it. All right. I got it.  Next question.

MR. AMLONG: I'm not going to ask him if he thinks it's bias, I'm going to ask him to describe the way that Dr. Knippa presented this and the jury can infer. It's up to the jury to decide Dr. Knippa's credibility.

THE COURT: And opinion seems to be pro American bias displayed by Dr. Knippa. Is this coming from your response?

MR. AMLONG: It is, and I'm going to introduce evidence—

THE COURT: So he's placing that bias on the way that Dr. Knippa comes up to the line and then retreats. That's how you interpret it. Right?

A. Correct, Your Honor.

THE COURT: All right. So I think I've heard enough about the bias issue. What about the irregularities in testing methods? Are you an expert in neuropsychological testing?

A. No, Your Honor.

THE COURT: How can you opine about irregularities in neuropsychological testing methods.

A. I wasn't planning on it, Your Honor.

THE COURT: All right. So this is a misstatement in the submission to the Court that says that you will testify about irregularities in testing methods employed by John Knippa, Ph.D.? That is not accurate?

A. No, I'm quite happy to opine on those testing methods. But I'm opining on the testing methods dealing with clinical psychology, not the neuropsychological component.

THE COURT: All right. So it's limited to—and limited to the tests that you know about.

A. The tests that he did that I know about, yes.

THE COURT: All right. So that's your other opinion that there were irregularities. Is that sort of like along the lines of coming up to the line and retreating back, so that same thing?

A. That's exactly what I meant, Your Honor. Yes.

THE COURT: All right. I got it. You can follow up anything else, but I think I understand Dr. Caddy's position.

Dr. Caddy's observations about Dr. Knippa's testing and presentation of the data is based on Dr. Caddy's long experience in clinical psychology. It would be helpful to the jury to understand Dr. Knippa's report, see Rule 702, which, without Dr. Caddy's testimony, would be unduly prejudicial to Lt. Col. Patterson. See Rule 403.

## Conclusion

Based on the facts marshaled, the authorities cited and the arguments presented, plaintiff, Rodney Scott Patterson, respectfully requests this Court to afford him a de novo review of the magistrate judge's report and recommendation, DE 149, and to permit Dr. Caddy to testify in rebuttal to any assertion (and not merely one by Dr. Knippa) that Lt. Col. Patterson is not mentally well and to explain to the jury the irregularities in Dr. Knippa's presentation of his clinical psychological testing of Lt. Col. Patterson.

Respectfully Submitted,

*/s/ William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street

> Second Floor
> Fort Lauderdale, Florida 33301
> Telephone: (954) 462-1983
> Facsimile: (954) 463-5008
>
> NOEL C. PACE
> noel.c.pace.esq@gmail.com
> Confidential Communiqué to
> William Amlong, Esquire
>
> *Admitted Pro Hac Vice*
> 206 NW 91st Street
> El Portal, FL
> (305) 710-3713
>
> ***Attorneys for Plaintiff,***
> ***Rodney Scott Patterson***

## Certificate of Service

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed using the ECF function of United States District Court for the Southern District of Florida and thereby has been distributed to all of the parties and counsel of record in this matter.

> */s/   William R. Amlong*
> WILLIAM R. AMLONG

C:\Users\wramlong\Documents\My Files\Patterson\181116 Ibhectuins ti Magistrate Judge R&R.wpd