Page 1

1

2                    UNITED STATES DISTRICT COURT

                  SOUTHERN DISTRICT OF FLORIDA

3                   FORT LAUDERDALE DIVISION

4       _____
                                        :
5       RODNEY SCOTT PATTERSON,         :
                                        :
6                  Plaintiff,           :
                                        :
7           vs.                         :  Case No.:
                                        :  10-CV-02034-RLW
8       AMERICAN AIRLINES, INC., a      :
        Delaware Corporation,           :
9                                       :
                   Defendant.           :
10      _____:

11

                     VIDEOTAPED DEPOSITION OF:
12

                     Dr. Gary G. Kay, Ph.D.,
13

14      DATE:           November 28, 2018

15      TIME:           4:39 p.m.

16      LOCATION:       1625 I Street Northwest
                        Washington, D.C. 20006
17

        REPORTED BY:    Trinity Pomar, Notary Public

18

19

20

21               Veritext Legal Solutions
             1250 I Street, NW, Suite 350
22               Washington, D.C. 20005

Page 2

1                A P P E A R A N C E S

2   On behalf of Plaintiff telephonically:

3        WILLIAM R. AMLONG, ESQUIRE

         Amlong & Amlong, P.A.

4        500 Northeast Fourth Street

         Fort Lauderdale, Florida 33301

5        (954) 462-1983

         wramlong@theamlongfirm.com

6

7   On behalf of Defendant:

8        TRISTAN MORALES, ESQUIRE

         O'Melveny & Myers LLP

9        1625 I Street Northwest

         Washington, D.C. 20006

10       (202) 383-5300

         tmorales@omm.com

11

12  Also present:

13       Solomon Francis, Videographer

14

15

16

17

18

19

20

21

22

Page 3

1                  C O N T E N T S

2    EXAMINATION BY:                              PAGE

3         Counsel for Defendant              6, 245

4         Counsel for Plaintiff          198, 248

5

6    KAY EXHIBITS:   *                            PAGE

7    1   Notice of Videotaped Deposition          7

8    2   Plaintiff's Notice of Expert Disclosure   11

9    3   Report of Neuropsychological Assessment   21

10   4   John Knippa, Ph.D., ABN Report           84

11   5   John Knippa, Ph.D., March 21, 2016 Letter   93

12   6   Deposition of John Knippa, Ph.D.         96

13   7   Glenn Ross Caddy, Ph.D., P.A. Document   111

14   8   Plaintiff's Objections                   117

15   9   Captain Brian Beach Letter               123

16   10  Edwin L. Bercaw, Ph.D. Report            127

17   11  Scott Patterson E-mail, April 22, 2016   142

18   12  Deposition of Edwin L. Bercaw, Ph.D.     157

19   13  Ed Bercaw E-mail, May 4, 2016            159

20   14  Scott Patterson E-mail, April 26, 2016   163

21   15  Deposition of Rodney Scott Patterson     164

22

Page 4

1          C O N T E N T S   C O N T I N U E D

2    16  FAA Form 8500, July 18, 2017              171

3    16A David M. O'Brien, MD, MPH Letter          176

4    17  William Amlong E-mail, September 12, 2018  186

5    18  Gary G. Kay, Ph.D., E-mail                 188

6    19  Gary G. Kay, Ph.D. Report                  189

7    20  Gary G. Kay, Ph.D., E-mail                 197

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    (*Exhibits attached to transcript.)

Page 5

1                 P R O C E E D I N G S

2          THE VIDEOGRAPHER:  Good evening.  We're

3     going on the record at 4:39 a.m. [sic] on November

4     28, 2018.  This begins Media Unit Number 1 of the

5     video-recorded deposition of Dr. Gary G. Kay taken

6     by counsel for the defendant in the matter of

7     Rodney Scott Patterson, plaintiff, versus American

8     Airlines, Inc., a Delaware Corporation, defendant,

9     filed in the United States District Court for the

10    District of Florida -- United States District Court

11    Southern District of Florida, Fort Lauderdale

12    Division.  Excuse me.  Case Number

13    1:17-cv-60533-JEM.

14          This deposition is being held at the law

15    offices of O'Melveny & Myers, LLP, located at 1625

16    I Street Northwest, Washington, D.C.

17          My name is Solomon Francis from the firm of

18    Veritext Legal Solutions and I'm the videographer.

19    The court reporter is Trinity Pomar of Veritext

20    Legal Solutions.

21          At this time, will counsel present in the

22    room and everyone attending remotely please state

Page 6

1    their appearances and affiliations for the record.

2         MR. AMLONG:  This is William R. Amlong on

3    behalf of Mr. Patterson, who's here with me.

4         MR. MORALES:  Tristan Morales on behalf of

5    American Airlines.

6         THE VIDEOGRAPHER:  At this time, will the

7    court reporter please swear in the witness and we

8    can proceed.

9    WHEREUPON,

10             Dr. Gary G. Kay, Ph.D.,

11   called as a witness, and having been sworn by the

12   notary public, was examined and testified as

13   follows:

14        EXAMINATION BY COUNSEL FOR DEFENDANT

15   BY MR. MORALES:

16     Q.  Good afternoon, Dr. Kay.

17     A.  Good afternoon.

18     Q.  And just to clarify, it's 4:41 p.m., not

19   the a.m.

20        My name is Tristan Morales and I represent

21   American Airlines.  Would you kindly introduce

22   yourself and give us a brief recap of your

Page 7

1  professional background?

2      A.  Sure.  My name is Gary G. Kay, Ph.D.  I'm a

3  clinical neuropsychologist.  President of

4  Washington Neuropsychological Institute, which is a

5  clinical practice based here in Washington, D.C.

6  And I have seen Mr. Scott Patterson for two

7  evaluations.

8      Q.  And you mentioned Mr. Patterson.  Is that

9  the -- that's the plaintiff in this case, is that

10 correct?

11     A.  Yes.

12     Q.  And if you recall, when did you first come

13 to meet Mr. Patterson?

14     A.  I can look -- I can reference back to my

15 materials.

16     Q.  Okay.

17     A.  First visit was on June 29, 2016.

18     Q.  Okay.  And you have some materials in front

19 of you.  While you're looking at those, I'd like to

20 hand you a document, which I'd like to ask to be

21 marked Exhibit 1.

22          (Kay Exhibit Number 1 marked for

Page 8

1    identification.)

2         A.   Thank you.

3         Q.   If you'd take a look at that document.

4    It's American Airline, Inc.'s, notice of taking

5    videotaped deposition.  Have you reviewed this or

6    seen this document before, Dr. Kay?

7         A.   Yes, I have.

8         Q.   Okay.  And what is this document?

9         A.   This is the notice of deposition, I

10   believe.

11        Q.   Okay.  And if you would flip to the third

12   page there --

13        A.   Yes.

14        Q.   -- labeled Attachment A at the top.  It

15   says, "Please have with you at the time of your

16   deposition the following."

17             Have you had a chance to review that?

18        A.   I did.

19        Q.   Okay.  And are there any materials that are

20   requested here that you have not thus far provided?

21        A.   No.  I don't believe so.

22        Q.   Okay.  The materials that you have in front

Page 9

1  of you today that -- it looks like a blue folder

2  with some materials -- are those materials that

3  have all been provided to American Airlines in this

4  case?

5       A.  All but the actual raw test data, which was

6  sent to -- to experts only.

7       Q.  Okay.  But other than that, what you have

8  in front of you has all been previously produced to

9  American Airlines in this case?

10      A.  I believe so.  I think I sent -- I couldn't

11 recall if I sent a copy of the e-mail.  There's

12 only correspondence between Dr. Edwin Bercaw and

13 myself related to Rodney Scott Patterson.  I think

14 I sent that to you guys.

15      Q.  I think so, yeah.

16      A.  Okay.

17      Q.  I think we'll -- I think we've included

18 that in our exhibits.

19      A.  All right.  I just brought an extra copy

20 just in case.

21      Q.  Okay.  And so all reports or opinions that

22 have been prepared by you in this case have been

Page 10

1   produced thus far, is that correct?

2        A.  That's correct.

3        Q.  Okay.  Are there any other materials that

4   you relied on in any manner in rendering your

5   opinions in this case that you have not provided to

6   American Airlines at this time?

7        A.  Not specific -- materials that are just for

8   this case.

9        Q.  Sure.  And we'll set aside -- you mentioned

10  the raw test data.  We understand that that is not

11  included in what you provided.  But other than

12  that, all materials that you relied on have been

13  provided thus far, is that correct?

14       A.  That's correct.

15       Q.  Okay.  Is there any materials that you

16  rejected in terms of rendering your opinion, but

17  that you reviewed and have not provided thus far in

18  this case?

19       A.  I don't believe so.

20       Q.  Okay.  Are there any communications with

21  Dr. Bercaw regarding the plaintiff, Rodney Scott

22  Patterson, that you have not provided thus far in

Page 11

1    this case?

2         A.  No.

3         Q.  Okay.  And are there any communications

4    regarding your examination or treatment of Mr.

5    Patterson -- I'm sorry.  Let me rephrase that.

6              Are there any communications regarding the

7    examination or treatment of plaintiff, Rodney Scott

8    Patterson, by Dr. Bercaw that you have in your

9    possession that you've not thus far provided to

10   American Airlines?

11        A.  No, sir.

12        Q.  Okay.  I'd like to have you look at what

13   I'd ask to be marked as Exhibit 2.  It's a document

14   that's labeled Plaintiff's Notice of Expert

15   Disclosure.  And I'd ask if you recall seeing this

16   document previously?

17             (Kay Exhibit Number 2 marked for

18   identification.)

19        A.  No.  I don't recall seeing this.

20        Q.  Okay.  Are you aware that you've been

21   noticed as an expert by plaintiff, Rodney Scott

22   Patterson, in this case?

Page 12

1      A.  Not that I can recall.

2      Q.  Okay.  And if you would just -- before we

3  go through this document, if you'd flip to Page 3.

4  The bottom there, it says, "Certificate of

5  Service."  And it looks like the date there is the

6  first day of November 2017; do you see that?

7      A.  Yes.

8      Q.  Okay.  So if you'd flip back

9  again -- sorry -- to Page 1 of this document.

10  "Plaintiff, Rodney Scott Patterson, pursuant to

11  Federal Rule of Civil Procedure 26(a)(2)(C)" -- are

12  you familiar, by chance, with Federal Rule of Civil

13  Procedure 26(a)(2)(C)?

14      A.  No.

15      Q.  Okay.  "hereby discloses he intends to call

16  Gary G. Kay, Ph.D., his treating neuropsychologist

17  as an expert witness."

18          Were you aware that plaintiff, Rodney Scott

19  Patterson, had disclosed his intent to call you as

20  an expert witness in this case?

21      A.  As we're doing this, I'm recalling that

22  there was -- I was supposed to call in for some

1    kind of a hearing at one time.  And I may have even

2    gotten a notice like this, which I don't seem to

3    have now until I've seen this.  And I think it was

4    to some court, Fort Lauderdale.  And then I was

5    told I wasn't needed.  Or that they weren't -- I

6    don't know.  But I ended up not being on the call.

7    So yeah, this may have been part of that.

8        Q.  And the call you just mentioned, do you

9    recall if that was in the last couple of months or

10   further before that?

11       A.  It seems like it's something that happened

12   in the last three to four months.

13       Q.  Okay.  And this document is from November

14   2017.  So some time period you would estimate after

15   this document was provided, is that correct?

16       A.  Oh, yeah.  That was much more -- it was

17   more recent than that.

18       Q.  Okay.  If you'd look at the second

19   paragraph there, it says, "As to the requirements

20   of Rule 26" -- and certain subparagraphs -- "the

21   subject matter on which the witness is expected to

22   present evidence under Federal Rule of Evidence

Page 14

1  702, 703, or 705, Dr. Kay is expected to testify

2  about" -- and I'd ask you to look at the first

3  paragraph there.  "His own examination

4  of" -- "his own examination of plaintiff over one

5  full day in his Washington, D.C., office and

6  observations thereto."

7      As of November 1, 2017, do you recall

8  having examined plaintiff over one full day in your

9  Washington, D.C., office?

10     A.  Correct.  That would be the June 29, 2016

11  evaluation.

12     Q.  Okay.  Paragraph 2 says, "his review and

13  assessment of the methods and findings of Doctors

14  Knippa and Caddy."

15     Do either of those names ring a bell for

16  you?

17     A.  Yes.

18     Q.  Okay.  And if you would just explain your

19  understanding of who Doctors Knippa and Caddy are.

20     A.  Dr. Knippa is a neuropsychologist who has

21  seen Scott Patterson for an evaluation.  And Dr.

22  Caddy, I understand, is a forensics psychologist

Page 15

1    who had also conducted an examination of Mr.

2    Patterson.

3        Q.  Okay.  And we'll talk more about them

4    later.

5        A.  Sure.

6        Q.  Three says -- and three, "his evaluation of

7    plaintiff's fitness for duty."

8            Do you have an understanding of what

9    evaluation of plaintiff's fitness for duty is being

10   referenced there in Paragraph 3?

11       A.  Well, I would assume that they're referring

12   to my report of June 29, 2016.

13       Q.  Okay.  And then if you'd look at Page 2

14   there.  It says at the top, "The facts and opinions

15   to which the witness is expected to testify."

16           And it, again, notes a certain provision of

17   Rule 26.  Did you prepare an expert -- a written

18   expert report for the plaintiff in this case?

19       A.  I wrote this report, Report of

20   Neuropsychological Assessment.

21       Q.  And was your understanding that that report

22   was a written expert disclosure report?  Let me ask

Page 16

1    you, have you ever provided a written expert report

2    in Federal Court before?

3        A.  Yes.

4        Q.  Okay.  And the document, which I believe

5    you're looking at now, is your June 2016

6    neuropsychology report, is that correct?

7        A.  Yes.

8        Q.  And is that a written expert report as

9    you've submitted previously in Federal Court?

10       A.  It's not really in the same kind of form.

11   It doesn't necessarily have the opinions stated as

12   I've stated them when I've done -- written forensic

13   reports primarily I've done for the Department of

14   Justice.

15       Q.  And, for example, does it list prior cases

16   that you've testified in?

17       A.  None of that is included in this.

18       Q.  And this is the 2016, June 2016, report, is

19   that correct?

20       A.  Yes.

21       Q.  Okay.  Just to look back again at Page 2

22   here, it says -- and -- it says, "First, that based

Page 17

1   upon his review of the records, including

2   evaluations of Dr. Caddy and Dr. Knippa, along with

3   results from testing conducted 6/29/16, and a

4   clinical interview, plaintiff appeared to be

5   psychologically and neuropsychologically

6   fit-for-duty as an American Airline pilot."

7            Do you have an understanding of what is

8   being described here in terms of what you're

9   expected to testify to?

10       A.  That statement is quite clear, yes.

11       Q.  Okay.  And do you understand this paragraph

12   to be referring to any testing conducted on a date

13   other than 6/29/16?

14       A.  No.

15       Q.  Okay.

16       A.  Well, including the evaluations of Caddy

17   and Knippa, their examinations.

18       Q.  Okay.  But other than those items, that's

19   the universe of what you understand to be

20   referenced in this first paragraph?

21       A.  Yes, sir.

22       Q.  Okay.  We're going to turn to your report

Page 18

1    in a second, so it may be easier to go through

2    these at that point.  But I'd ask -- the fifth

3    paragraph there, it says, "Fifth, that it appeared

4    that though plaintiff may have interpersonal

5    characteristics that may prove problematic" -- do

6    you have an understanding of what interpersonal

7    characteristics are being referenced in that fifth

8    paragraph?

9        A.  Since I wrote those words, yes.

10       Q.  And -- I'm sorry.  You wrote the words in

11   this document that we're looking at?

12       A.  No, no.  I wrote the word -- that's

13   basically kind of quoting from my report from the

14   June 29th exam.

15       Q.  Okay.  And what is your recollection of the

16   interpersonal characteristics that are being

17   referred to there?

18       A.  So I was referring to some of the boundary

19   violation, kind of, you know, issues.  And probably

20   the -- kind of the moral kind of nature that he

21   has.  And some people may have trouble and conflict

22   with that.

1    Q.  So just to break those apart --

2    A.  Yes.

3    Q.  -- you're referring to characteristics of

4  Mr. Patterson, is that correct?

5    A.  That's correct.

6    Q.  And on what basis are you opining on these

7  interpersonal characteristics?

8    A.  My clinical interactions and interview with

9  him.

10   Q.  Okay.  And you mentioned boundary violation

11  issues?

12   A.  Yes.  That was actually from Knippa.  I

13  didn't actually notice that.  So thank you for

14  clarifying that.

15       But Dr. Knippa, from his description,

16  described, you know, Mr. Patterson as kind of

17  stepping over boundaries, you could say, socially.

18   Q.  Okay.  And did you have an understanding of

19  why that characteristic may prove problematic?

20   A.  Oh, it just could be -- it can run you in

21  conflict with some people.

22   Q.  Okay.  And then I believe you'd mentioned a

1  second; moral nature.  Is that what you referred

2  to?

3      A.  He's a guy with very strong kind of moral

4  feelings.  And, you know, his judgments, he let's

5  it be known, so --

6      Q.  And why --

7      A.  And that can cause -- you know, be

8  offensive to some other people or cause a conflict.

9      Q.  And that observation is based on your own

10  observation, is that correct?

11      A.  My observation and his presentation of his

12  history.

13      Q.  Okay.  And is it accurate -- just looking

14  at that sixth paragraph there -- that as November

15  1, 2017 -- in your, you know --

16      A.  Where is this?

17      Q.  Sorry.  The sixth paragraph of Page 2.

18      A.  Sure.

19      Q.  It says that "There is no evidence of a

20  mental health condition that would cause plaintiff

21  to be unfit for duty."

22          Is that consistent with your understanding

```
                                            Page 21

 1   of plaintiff, Mr. Patterson, as of November 2017?

 2       A.  Yes.

 3       Q.  Okay.  And then it says, "or which would be

 4   disqualifying for an airman medical certificate."

 5           Is that also consistent with your

 6   understanding of Mr. Patterson as of November 1,

 7   2017?

 8       A.  It is.

 9       Q.  And that's based on your November -- or on

10   your June 2016 testing and review of the

11   accompanying evaluation of Dr. Knippa and Dr.

12   Caddy, is that correct?

13       A.  Correct.

14       Q.  Okay.  I'm now going to hand you what I'd

15   asked to be marked as Exhibit 3.  And I believe

16   this is the June 29, 2016 report that you have here

17   with you today, but if you'd just take a look at

18   that and confirm.

19           (Kay Exhibit Number 3 marked for

20   identification.)

21       A.  It is.

22       Q.  Okay.  How did Mr. Patterson come to be
```

Page 22

1   examined by you in June of 2016?

2       A.  He was referred to me by an aviation

3   medical -- a senior aviation medical examiner by

4   the name of Dr. Joseph Tordella who practices in

5   Florida and New Jersey.

6           MR. AMLONG:  Sorry.  Mr. Morales, Number 3

7   is Dr. Kay's report?

8           MR. MORALES:  Correct.

9   BY MR. MORALES:

10      Q.  Do you recall approximately when Dr.

11  Tordella reached out to you with this referral?

12      A.  No.  I can make an estimate in terms of my

13  schedule.  Typically people wait, you know, four to

14  eight weeks to get an appointment.

15      Q.  And do you recall the manner in which Dr.

16  Tordella reached out to you?  Was it by phone?

17      A.  Most often he gets me by phone.

18      Q.  And have you had prior referrals, patients,

19  by Dr. Tordella?

20      A.  Yes.

21      Q.  Okay.  And is Dr. Tordella an AME, an

22  examiner for the FAA, if you know?

Page 23

1      A.  He's an aviation -- a senior aviation

2   medical examiner.

3      Q.  Okay.  And what do you recall about the

4   conversation with Dr. Tordella referring Mr.

5   Patterson to you?

6      A.  I have -- I don't recall the conversation.

7      Q.  Okay.  So looking at the opening section

8   here, Relevant History, I'd just ask if you could

9   inform us the basis for this material in the

10  relevant history section?

11     A.  Well, a lot of it would come from -- or a

12  majority probably came from my interview with Mr.

13  Patterson.  And I also had at that point reviewed

14  his records; basically the report from Dr. Caddy

15  and the report from Dr. Knippa.  And so that's -- I

16  kind of pull that together in writing the relevant

17  history section.  But the majority of it would come

18  from my clinical interview.

19     Q.  Okay.  And so if we were to look, for

20  example, at the last paragraph on Page 1 that

21  starts, "Mr. Patterson continued to fly the

22  line" -- if you just take a look at that paragraph

Page 24

 1    for one second and let me know when you've had a

 2    chance to read it.

 3         A.  Yes.  I recall reading that.

 4         Q.  Okay.  And do you recall the basis for the

 5    information that's in this paragraph of the

 6    relevant history section?

 7         A.  That would from my history that I obtained.

 8         Q.  Okay.  And so do you have any -- or did you

 9    have any first-hand knowledge, for example, of the

10    "assignment to work at the White House during the

11    Pope's visit"?

12         A.  Yeah.  He told me about that.

13         Q.  So that information was relayed to you by

14    Mr. Patterson?

15         A.  That's correct.

16         Q.  Okay.  And was there any source of

17    knowledge you had about that pope visit referred to

18    in that sentence?

19         A.  No.  I kind of vaguely recall that maybe

20    there had been a visit.

21         Q.  Okay.  But that was based -- oh --

22         A.  By the Pope to the White House.

Page 25

1      Q.   Okay.  Right, right, right.  But not with

2    respect to Mr. Patterson in particular?

3      A.   No.

4      Q.   No other source of information?  If you'd

5    just flip to the second page there.  And just

6    briefly, the second paragraph says, "Mr. Patterson

7    successfully completed transition training."

8           Do you see that?

9      A.   Yes.

10     Q.   And the last sentence of that paragraph

11   says, "In March he was sent for a fitness for duty

12   evaluation to Dr. John Knippa."

13          Why was Mr. Patterson sent for a fitness

14   for duty evaluation to Dr. John Knippa?

15          MR. AMLONG:  Objection.  Foundation.

16     A.   Well, I think there's -- I'm not sure if

17   I'm using the right term.  Something like a Section

18   20, if that's what it's called by American Airlines

19   when they can send somebody for a fitness for duty.

20   And he was being sent to Dr. Knippa by American

21   Airlines.

22   BY MR. MORALES:

Page 26

1      Q.  And does that represent the full extent of

2   your understanding as to what went into that

3   sentence of your report?

4      A.  Well, he had explained and discovered in

5   prior paragraphs about the conflict between him and

6   Captain Whitehouse.  And then there was this second

7   issue of him not being available for duty where he

8   had not been excused on that Pope/White House

9   visit.

10      Q.  And did you have any knowledge of those

11   items you just described other than from Mr.

12   Patterson's communications to you?

13      A.  Yeah.  I had the report from -- I think, I

14   believe I had the report from Dr. Caddy.

15      Q.  Okay.  So you had two sources of

16   information; Mr. Patterson's communications and Dr.

17   Caddy's report, is that correct?

18      A.  Correct.

19      Q.  Did you have any first-hand knowledge of

20   those interactions, for example with Captain

21   Whitehouse?

22      A.  No, sir.

Page 27

1     Q.  Okay.  If you would, flip to the -- Page 3

2  there.  And there's a section called Records

3  Reviewed.  And I'd like to talk about that.  But

4  before we get into the details, if you could just

5  give some context on how you typically go about

6  gathering information for an examination, that

7  would be helpful.

8     A.  Certainly.  So in my role in aviation

9  neuropsychology, we, you know, have procedures we

10  like to follow and records that are important to

11  review.  So we like -- if I'm doing an FAA

12  evaluation, I get the airman's medical record from

13  the FAA directly from the FAA.  And that will

14  contain their various applications they've made for

15  medical certifications in your reports of

16  healthcare providers that are relevant to special

17  issuance that may have been granted by the FAA.  I

18  usually ask the airman to provide any other records

19  of -- you know, if it's a -- you know, we do -- we

20  see a lot of airman who have problems with alcohol

21  and drugs and who are in recovery, so we get their

22  arrest records, their treatment records, the

1  treatment facilities.  We get records from any

2  psychological, neuropsychological examinations that

3  have been previously conducted.  That's really

4  crucial.  And those -- we obtain -- if there's been

5  arrests, the actual arrest record is very important

6  to review.

7      Q.  Okay.  And I want to ask you about two

8  things that you just mentioned.  One, I believe you

9  said that the FAA has a role in gathering

10  information that you typically rely on in your

11  examinations, is that correct?

12      A.  Correct.

13      Q.  What exactly is the role of the FAA in

14  gathering information from pilots, for example?

15      A.  Well, when you make an application for

16  medical certification, if you indicate that you

17  have a disqualifying disorder -- and there's a

18  Block 18 on the Form 8500 where you would indicate

19  a range of different kinds of health conditions,

20  which would raise concern.  And so if you've marked

21  one of those, then there's an explanation.  You

22  would list the healthcare providers who provided

Page 29

1    care.  And the FAA would want to see those actual

2    records.

3           And so -- so, for example, if somebody

4    says, I was treated for depression, we would

5    actually get records from the treating doctor and

6    be able to look at what medications were

7    prescribed, the course of that treatment, and all

8    that.  All that would be under review.  That's

9    really critically important.

10        Q.  And you mentioned it was critically

11   important.  Why is that?

12        A.  Because we basically -- we don't get to

13   necessarily -- if I'm an FAA reviewer for cases,

14   which I do routinely, I don't get to meet face to

15   face with the airmen and conduct an examination.

16   We're basically doing a records review.  We're

17   making recommendations and determinations about

18   medical certifications based upon those records.

19   So the records need to be complete.  They need to

20   be the source documents where they've not

21   been -- there's not some selective choosing of what

22   things we're going to look at.  It's very crucial

Page 30

1    that we get -- for example, if the person has had

2    PTSD and been treated in the VA system, we want the

3    actual VA record.  We don't want the record to be

4    brought to us from a second source.

5        Q.  And is the -- you mentioned the Form 8500.

6    Is that part of that information-gathering process?

7        A.  That's included in the airman's medical

8    record.  And every time the airman applies to renew

9    their medical certificate, they complete this

10   medical history form.  And on that history form

11   they're required to indicate any kind of changes in

12   their medical condition, or any medical condition

13   that they have that may be disqualifying.  They're

14   required to indicate any healthcare providers

15   they've seen.

16       Q.  And is that Form 8500, is that optional for

17   pilots?

18       A.  No, sir.

19       Q.  Do you have an understanding as to how

20   frequently pilots are required to submit the Form

21   8500?

22       A.  I do.

```
                                            Page 31

 1        Q.   And how frequently is that?

 2        A.   So it depends on the type of medical

 3   certificate that you're applying for and your age.

 4        Q.   So a commercial aviation pilot, for

 5   example, how often would they apply or submit a

 6   Form 8500?

 7        A.   I think it's every six months.

 8        Q.   Okay.

 9        A.   But that might be age dependent.  I'm not

10   certain about that.

11        Q.   Are you aware of any consequences for

12   pilots that fail to submit a Form 8500?

13        A.   Your medical certificate would expire.  And

14   you can't fly without a medical certificate.

15        Q.   Are you aware of any consequences for

16   pilots that submit an incomplete Form 8500?

17        A.   Well, the Form 8500 is reviewed by an AME,

18   an aviation medical examiner, who signs off on it.

19   And he's actually the individual who issues,

20   denies, or defers action on your application for

21   medical certification.  So an incomplete 8500 is

22   not going to lead to a medical certificate.
```

Page 32

1      Q.  What about false information on a Form

2   8500?  Is there any consequence that you're aware

3   of for pilots that submit false information on a

4   Form 8500?

5      A.  Yes.

6      Q.  And what is the consequence?

7      A.  Well, the legal department within the FAA

8   will review the case and decide what they're going

9   to do about it.  And they kind of deal with those

10  on a case-by-case basis.  So it's a range of things

11  that they do.

12     Q.  And have you ever experienced a

13  circumstance where a pilot was determined to have

14  submitted false information on a Form 8500?

15     A.  Certainly.

16     Q.  And what range of consequence have you seen

17  in those cases?

18     A.  I've seen where the FAA has cancelled all

19  of their flight certificates, which is very

20  extreme.  And, I mean, I'm not sure if anybody has

21  been charged with criminal activity on those, but

22  they can go after them at that level.

1     Q.   They, meaning the FAA?

2     A.   The FAA.

3     Q.   Okay.  And I believe you mentioned that

4  health professionals are part of the information

5  requested on the Form 8500, is that correct?

6     A.   Yes.  A list of anybody you've seen who's a

7  healthcare professional.

8     Q.   Okay.  And what is a healthcare

9  professional in your understanding of that Form

10  8500?

11     A.   So that would be if you've seen a

12  psychologist, psychiatrist, any other physician.

13  It might include -- I'm not sure if it includes

14  chiropractors or eye doctors, but --

15     Q.   Are neuropsychologists healthcare

16  professionals, for example?

17     A.   Yes, sir.

18     Q.   So if someone visits you, typically they

19  would be required to submit your name as a health

20  professional on their Form 8500 --

21     A.   Absolutely.

22     Q.   -- is that correct?  Okay.  Do you recall

Page 34

1   any -- is there any time limitation for the

2   reporting period?  So, for example, if you saw a

3   health professional a year ago, are you typically

4   required to list them on your Form 8500?

5       A.  On the 8500 in the section where it says

6   Healthcare Professional, it says -- I think maybe

7   it says your last application for a medical

8   certification.  So if you were a general aviation

9   pilot, that would be a longer period of time.  So

10  it says -- I believe it's since your last

11  examination.

12      Q.  Okay.  And we'll take a look at an 8500 in

13  a second.

14      A.  Good.  Because otherwise it's a test of

15  memory.

16      Q.  It's a lot of information to recall

17  offhand, right?

18      A.  Yeah.

19      Q.  So turning back to the records reviewed

20  here.  Is any of the material in this section of

21  Records Reviewed something that was provided by the

22  FAA?

Page 35

1      A.   No, sir.

2      Q.   And where was this material gathered from?

3      A.   I don't recall at this point.  I don't know

4  if it was sent to me by Dr. Tordella.  I just

5  really don't know how I received it.

6      Q.   Okay.  Had you heard of Dr. Caddy before

7  the referral from Dr. Tordella?

8      A.   No.

9      Q.   Okay.  Had you recalled Dr. Tordella

10  introducing you to Dr. Caddy either by description

11  of Dr. Caddy or a formal introduction to Dr. Caddy?

12      A.   No.

13      Q.   What about Dr. Hastings?  Had you -- did

14  you know Dr. Hastings prior to this process?

15      A.   Quite well.

16      Q.   Okay.  And you worked with Dr. Hastings

17  prior to this case?

18      A.   Yes.

19      Q.   Okay.  What about Dr. Knippa?  Did you know

20  Dr. Knippa prior to this --

21      A.   Yes.

22      Q.   -- examination process?  And how did you

Page 36

1   know Dr. Knippa?

2       A.  He began doing aviation and

3   neuropsychological exams in the last tens years for

4   sure.  And so he had gone through -- attended some

5   of those seminars and symposia that I am

6   responsible for putting on for the FAA.

7       Q.  Is it fair to say you have overlapping,

8   sort of, professional roles and responsibilities

9   with Dr. Knippa?

10      A.  Yes.  We're both clinical

11  neuropsychologists.  And he is interested in this

12  specialty of aviation neuropsychology, so yes.

13      Q.  Okay.  The first item there under records

14  reviewed, it says, "Forensic Investigation Report,

15  Dr. Glenn Ross Caddy, June" -- I'm sorry -- "July

16  20, 2016."

17          Do you see that?

18      A.  Yes.

19      Q.  It looks like the test date for

20  doctor -- or for Mr. Patterson was June 29, 2016.

21  Am I correct that the report had -- must have come

22  out after July 20, 2016?

```
                                                    Page 37

 1      A.   Right.   It would have to had.

 2      Q.   Okay.

 3      A.   Because otherwise, it would have -- I was

 4  probably waiting for this report to arrive.   I

 5  think I asked for it and I was told that it was

 6  coming.

 7      Q.   Okay.   Do you recall who you asked for it?

 8      A.   I think it was an e-mail between Dr. Caddy

 9  and myself.   And Dr. Caddy telling me that he had a

10  report.   It was coming.

11      Q.   Okay.   Do we have that e-mail, do you know?

12      A.   No.   I don't think you asked for e-mails

13  between myself and Dr. Caddy, did you?

14      Q.   Is it an item you relied on at all in

15  your --

16      A.   No.

17      Q.   -- in your report?   Okay.   Yeah.   I think

18  if you have them available, we would request that

19  communications related to your report, including

20  with Dr. Caddy, would be provided.

21      A.   Not a problem.

22      Q.   Okay.   Great.   Do you -- just -- do you
```

Page 38

1    happen to know, is there a place that would have a

2    date of your report on here?  Or I guess we know

3    it's after July 20, 2016.

4        A.  Yeah.  I mean, I could look at my computer

5    and tell you the date that the report was done.

6        Q.  Okay.  I think that would be helpful if you

7    have that just so we have it for reference.

8        A.  If we have a break --

9        Q.  Sure.

10       A.  -- it would be a good time to get that for

11   you.

12       Q.  Yeah, yeah, yeah.  Sure.  Sure.  Of course.

13   Of course.  Of course.

14            And then there is -- it looks like a few

15   paragraphs there under the title of Dr. Caddy's

16   report.  Can you just describe what you're

17   describing here in this section about Dr. Caddy?

18       A.  You want me to read the first sentence?

19       Q.  Well, just generally.  I mean, is

20   this -- what is it that you're relaying here in

21   this Records Reviewed section with respect to Dr.

22   Caddy's forensic investigation report?

Page 39

1    A.  So Dr. Caddy basically spoke to a lot of

2    collateral sources prior; a psychiatrist who knew

3    Mr. Patterson.  He looked at Dr. Knippa's report.

4    And he offered an opinion about Mr. Patterson's

5    fitness.

6    Q.  And so this -- is it safe to say that this

7    is essentially a summary of Dr. Caddy's report from

8    your perspective?

9    A.  Yes.

10    Q.  Okay.  The second paragraph there says,

11    "Dr. Caddy stated that Dr. Knippa's conclusion that

12    Mr. Patterson was unfit for duty was based on the

13    neuropsychological components of the overall

14    assessment."

15        Is that your assessment of Dr. Knippa's

16    conclusion as well, that it was based on the

17    neuropsychological components of the overall

18    assessment?

19    A.  It seemed to me that Dr. Knippa's opinions,

20    if I recall correctly, were not based upon the

21    presence of a mental health disorder, but rather

22    his concerns about cognitive function.  I think

Page 40

1    that statement is correct.

2         Q.  Okay.  And does -- do you also agree then

3    with the second sentence that follows:

4    "He" -- meaning Dr. Knippa I

5    believe -- "indicates" -- or sorry.  When it says

6    "he indicates," is that a reference to Dr. Caddy or

7    Dr. Knippa?

8         A.  That's a good question.  Badly-written

9    sentence.  It must be Dr. Caddy.

10        Q.  Okay.  So Dr. Caddy "indicates that Mr.

11   Patterson was found" -- "was not found to be unfit

12   based upon the general psychological component of

13   the evaluation."

14             Is that correct?

15        A.  That's what I see there.  It makes sense.

16        Q.  Okay.  And is that consistent with your

17   understanding of Dr. Knippa's conclusion?

18        A.  That's my recollection.

19        Q.  Okay.  One other question on that section.

20   It says -- the last sentence before Dr. Hastings is

21   referenced.  It says, "Dr. Caddy's DSM-5 diagnosis

22   for Mr. Patterson is:  Other problems related to

Page 41

1   employment V62.29."

2           Do you know what that is a reference to?

3       A.   That references the American Psychiatric

4   Association Diagnostic and Statistical, 5th

5   Edition.  He offered a diagnosis.  And his

6   diagnosis was, as listed there, others problems

7   related to employment.

8           So V codes are not truly mental health

9   disorders.  They're a way of describing, for

10  example, administrative reasons for conducting an

11  exam.

12      Q.   Okay.  So is this -- this sentence, is that

13  a reference to a mental health condition or no?

14      A.   Basically, the way I would see it is Dr.

15  Caddy concluded that there is no psychiatric

16  disorder, but, in fact, just some problems related

17  to employment.

18      Q.   Okay.  And then the next section, it says,

19  Neurological Examination, John Hastings, M.D.

20          Is that similarly a summary of a report

21  from Dr. Hastings?

22      A.   Yes.

Page 42

1      Q.  And do you recall how you received the

2  report from Dr. Hastings?

3      A.  No, I don't.

4      Q.  Okay.  And then the next section,

5  Neuropsychological fitness for duty Examination,

6  John Knippa.  Do you recall receiving Dr. Knippa's

7  report?

8      A.  No.  But obviously I did.

9      Q.  Okay.  Looking at this Records Reviewed

10  section, are there any other reports other than

11  these three that you relied upon or reviewed as

12  part of this document we're looking at right now?

13      A.  No.  Or I would have listed them.

14      Q.  Okay.  If you would flip to the second

15  page.  I guess it's Page 4.  The second page of the

16  Records Reviewed section.

17      A.  Sure.

18      Q.  At the top it says, "Dr. Knippa compared

19  Mr. Patterson to regional pilot norms on CogScreen

20  rather than to the age-group norms for major

21  airline pilots."

22          Do you recall writing that sentence?

Page 43

1    A.  Yes.  Well, I don't recall writing that

2    sentence right now, but it sounds like a sentence I

3    would write.

4    Q.  Okay.  And can you describe what it is that

5    you were referring to there?

6    A.  So in CogScreen you basically will compare

7    the individual's test scores to a comparison group,

8    to a normative comparison group.  And the

9    appropriate comparison group, one could argue, for

10   Mr. Patterson, would be major airline pilots.  And

11   at the time that the testing was conducted, how it

12   was -- he was in his mid 40s, so it would have

13   been, you know, 45 to 49.  And it would have

14   compared him to other major airline pilots in his

15   age range.  You know, if he was still working for

16   Mesa, which is where he had once been employed, it

17   would make more sense to compare him to regional

18   airline pilots.

19        It's not an uncommon error that I see in

20   reviewing records.  I just saw one last week where

21   somebody used -- did the same thing.  They used

22   regional when they should have been using major.

Page 44

1    And the regional is actually more generous.  You

2    don't have to do as well to get a good score using

3    the regional norm.

4        Q.  When you say it's more generous, more

5    generous to whom?

6        A.   More generous to the -- to how you

7    performed on the test. You may get a higher score

8    than if you were compared to major airline pilots.

9    The major airline pilot group are guys who are

10   earning higher salaries, they tend to -- back in

11   the day when we collected the norms, more military

12   pilot backgrounds.

13           Oh, I don't want this to bother the

14   recording.  Let me turn it off.  There we go.

15           They basically have a higher education.

16   And so their group on -- even, like, on IQ testing,

17   they have a higher IQ.  So they're a tougher group

18   to be compared with as your norm.

19           But in this case, because he is a major

20   airline pilot, it would be the best normative group

21   to use.  Did I answer your question?

22       Q.  So -- I think so.  So if a pilot takes

Page 45

1    the -- I guess if a pilot takes CogScreen -- is

2    that the right way to describe it?

3        A.   Yeah.   That's right.

4        Q.   So if a pilot takes CogScreen, is the

5    regional pilot norm more favorable in terms of the

6    score they will receive on the CogScreen than the

7    major airline pilot norm?

8        A.   Generally.   It's somewhat age dependent.

9    Because the regional is across all ages, there

10   are -- if you are above age 55, it might be that

11   the major airline pilot above age 55 would be more

12   generous than the regional.   So there's an

13   age -- generally, it would be -- 90 percent of the

14   ways it would be true that regional would be more

15   generous.   But for your older pilot -- in fact, if

16   you see a regional pilot who's over 55, we

17   recommend that you actually use the major airline

18   pilot over 55 norm.

19       Q.   So is it possible that a pilot could

20   essentially fail the major airline pilot norm, but

21   pass the regional pilot norm?

22       A.   There's not that simple of a pass and

1  fail --

2       Q.  Sure.

3       A.  -- on CogScreen, but you could look

4  better --

5       Q.  Okay?

6       A.  -- on one than the other.

7       Q.  Is it possible, for example, that you might

8  look at CogScreen results for a pilot and say that

9  against the major airline pilot norm their

10 performance raised concerns, but against the

11 regional pilot norm they did not raise concerns?

12      A.  That could happen.  Unlikely, but it could

13 happen.

14      Q.  Okay.  What other implications for

15 evaluating the CogScreen results might it have to

16 use regional pilot norms instead of major airline

17 pilot norms?

18      A.  That's pretty much it.  I mean, there are

19 some particular areas that are interesting where

20 the major airline pilots really kind of outperform

21 the regional guys.  And so on those subtests, in

22 particular, you might miss something that would

1    otherwise get your attention.  That'd be about it.

2        Q.  And did you assign any significance in this

3    case to the -- essentially, the factual conclusion

4    you had reached that Dr. Knippa compared Mr.

5    Patterson to regional pilot norms on CogScreen?  To

6    quote your report on Page 4.  What

7    significant -- so if I were to read just that first

8    half of the sentence, "Dr. Knippa compared Mr.

9    Patterson to regional pilot norms on CogScreen

10   rather than to the age-group norms for major

11   airline pilots."

12       What significance did you assign to that in

13   evaluating Dr. Knippa's report?

14       A.  It's just a minor error.

15       Q.  Okay.  Would that -- what you referred to

16   as a minor error -- have a material impact on an

17   assessment of a pilot's fitness for duty?

18       A.  Well, because I'm going to look beyond the

19   norm and I'm actually -- you know, I'm very

20   experienced with CogScreen as the author of the

21   test. I would look simply beyond the norm and look

22   at a couple of subtests in particular that -- where

1    that could have an impact.

2        Q.  And one last question on this, which is,

3    what is the factual basis for this sentence, that

4    Mr. Knippa compared Mr. Patterson to regional pilot

5    norms?

6        A.  I have the printout that shows that he used

7    the regional norms for his comparison.

8        Q.  Did you speak to Dr. Knippa at all about

9    his examination or report?

10       A.  I'm not sure if I called Dr. Knippa and

11   asked for the records or not.

12       Q.  At the time that you had written this

13   sentence in --

14       A.  We never discussed the case.  I mean, I

15   know that.

16       Q.  Okay.

17       A.  But I may have -- if there's -- there's a

18   possibility that I may have called John Knippa and

19   said, hey, I'm evaluating this guy, he's given me a

20   release, can you send me the records?

21       Q.  Okay.  And then can you explain what you've

22   included in the rest of this summary of Dr.

Page 49

1  Knippa's report in the next -- essentially the

2  paragraph we were just on, the first paragraph, and

3  then the next three paragraphs, including the one

4  that starts, "based upon observations during the

5  observation."  Just at a broad level, what is it

6  that you're summarizing there?

7      A.  What I'm basically summarizing is his

8  description of -- or basically summarizing Dr.

9  Knippa's interpretation of the evaluation that he

10  conducted of Mr. Patterson.

11      Q.  And then the last paragraph there says,

12  "Dr. Knippa interpreted the cognitive test data as

13  consistent with an attention disorder and mild

14  impairment of novel problem solving.  He considered

15  these abnormalities to be aeromedically

16  significant.  He concluded that Mr. Patterson was

17  not fit-for-duty."

18          Was there any part of this paragraph that

19  you disagreed with in terms of conclusions?  And

20  when I say -- let me restate the question.  So this

21  last paragraph, the one that begins "Dr. Knippa

22  interpreted the cognitive test data," did your

Page 50

1    conclusions about Mr. Patterson's fitness for duty

2    in this report diverge from what you state to be

3    Dr. Knippa's conclusion that Mr. Patterson was not

4    fit-for-duty?

5        A.  I'm sorry.  If you could just restate

6    that --

7        Q.  Did you --

8        A.  -- last part of your question.

9        Q.  Sure.  The last sentence of that paragraph

10   says, "he concluded that Mr. Patterson was not

11   fit-for-duty."

12           That's a reference to Dr. Knippa and his

13   report --

14       A.  It is.

15       Q.  -- is that correct?  Okay.  Did you, in

16   this -- we'll say June 2016 report.  Did you

17   conclude that Mr. Patterson was not fit-for-duty?

18       A.  Well, no.  When I did my examination I did

19   not agree with that.

20       Q.  And on what basis did your conclusion

21   regarding Mr. Patterson's fitness for duty diverge

22   from Dr. Knippa?

Page 51

1      A.  I didn't find an aeromedically significant

2   problem with attention or novel problem solving.

3   So those are the two areas that Dr. Knippa was

4   concerned about, and no basis for his saying that

5   he didn't find Mr. Patterson fit for duty.

6      Q.  And in your view, did Dr. Knippa properly

7   administer the testing that he performed?

8      A.  Mr. Patterson had a lot of complaints about

9   how he was examined.  And was very concerned about,

10   you know, how fatigued he was, whether the results

11   were really valid.  He said that the administration

12   of CogScreen was not done the way that it was done

13   in my office, which would mean that it wasn't done

14   standard.  He contributed some of his poor

15   performance to that.  So that would raise concerns.

16      Q.  And I just want to stop you.  You had

17   mentioned something about that it wasn't standard.

18   Can you explain what you mean by that?

19      A.  Well, standard means that whether you see

20   me or another neuropsychologist, whatever state

21   you're in, whichever of, you know,

22   neuropsychologist who you're examined by, you're

1   given the same test, which means the same

2   materials, the same forms, the questions are

3   presented in an identical manner, that the scoring

4   is done using the same criteria.  And so there's no

5   impact of the examiner, to the best that that can

6   be controlled, on your test scores on your

7   performance on the test. Very important to testing.

8       Q.  And did Dr. Knippa administer the CogScreen

9   testing in accordance with the standardization as

10  you've just described it?

11      A.  Well, according to Mr. Patterson, he

12  claimed that it was not.  You know, I don't have

13  any other basis for knowing.

14      Q.  So you don't have any reason to conclude

15  that Dr. Knippa did not conduct these tests in

16  accordance standardization other than Mr.

17  Patterson's statement to you, is that correct?

18      A.  Correct.  And I had -- I probably am the

19  person responsible for Dr. Knippa's training.  And

20  so I trained him.  Now, the fact that I train

21  people to do things does not guarantee that they

22  will continue to do them properly.  I hope they do.

1     Q.  And do you recall when you administrated

2     training to Dr. Knippa?

3     A.  No.

4     Q.  Okay.

5     A.  Annually, I provide training.  And he had

6     attended some of the annual workshops.

7     Q.  And where are those workshops provided

8     typically?

9     A.  So we did the first couple in Oklahoma

10    City.  And after the last four or five years, we've

11    done them in Denver, Colorado.

12    Q.  And is Oklahoma City, is that in connection

13    with the FAA?

14    A.  The whole thing is in connection with the

15    FAA.  The Denver ones are as well because they just

16    are preceding the FAA's annual alcohol dependence

17    program called HIMS.

18    Q.  Okay.  Okay.  And is the training that

19    you're referring to with respect Dr. Knippa, is

20    that CogScreen only, or did that include other

21    testing as well?

22    A.  It includes -- it's aviation psychology.

Page 54

1    So it includes FAA regulations.  And basically,

2    applying those with what the issues are for

3    evaluating pilots, as well as there's a big focus

4    on CogScreen.

5        Q.  Okay.  And are there other trainers as

6    well, or are you the only --

7        A.  Yes.

8        Q.  Okay.

9        A.  There's usually a faculty of a dozen or so

10   presenters.

11       Q.  Okay.  And Dr. Knippa, as you understand

12   it, has participated in that training process with

13   the FAA?

14       A.  Yes.  And I think this last year he

15   actually was a presenter.

16       Q.  Okay.  Going back to this paragraph.  It

17   says, "Dr. Knippa interpreted the cognitive test

18   data."

19           Did you have any reason to conclude that

20   Dr. Knippa had wrongly interpreted the cognitive

21   test data from his own examination?

22       A.  Well, again, we have to go to what Mr.

Page 55

1    Patterson had said, that the attention test that

2    was the basis for Dr. Knippa's interpretation was

3    administered in the late afternoon and that he was

4    fatigued.  And so the test is sensitive to

5    sleepiness and drowsiness.  And, in fact, as I

6    think I mentioned with Dr. Caddy above, that there

7    was a concern that maybe this could really be due

8    just to his sleepiness.  It may not be a true

9    finding of an actual clinical attention disorder.

10         It may have been a true finding that, in

11   fact, he wasn't very attentive when you gave him a

12   measure of sustained attention, which we call

13   vigilance.  The test is sensitive.  It picked up

14   that he wasn't, you know, able to be vigilant.  But

15   it may not have been due to anything other than

16   being sleepy.

17     Q.  And what was your understanding of why Mr.

18   Patterson might have been sleepy during Dr.

19   Knippa's examination?

20     A.  According, again, to what Mr. Patterson

21   told me, the testing -- this test was administered

22   late in the day.  And he had also flown across the

Page 56

1    U.S. for this exam.  And so I think he was jet

2    lagged -- I think he said -- and it was late.

3           Actually, the specific instructions for

4    the -- I'm not sure if it's -- I think the TOVA has

5    the instruction.  Not to administer the test after

6    2:00.

7       Q.  Was it significant to your own report that

8    Mr. Patterson had represented to you that he had

9    taken the test in the afternoon?

10      A.  It would be something to explain in terms

11   of him explaining why he'd performed poorly on this

12   attention measure.

13      Q.  Was that fact, as you understood it,

14   significant to your own analysis of his fitness for

15   duty?

16      A.  In my evaluation and considering all of

17   what I read and my report and my data, yes.

18   Because basically when I tested him, I saw really

19   no evidence of an impairment of vigilance or

20   sustained attention.

21      Q.  Okay.  I'd like to talk about -- the next

22   section there says Tests Administered.  If you

1    would just very briefly --

2          A.   Yes.

3          Q.   -- sort of describe what the tests referred

4    to there are.

5          A.   So a CogScreen Aeromedical Edition is an

6    approximately 45-minute to one-hour

7    computer-administered test that measures many

8    different cognitive abilities, all of which are

9    considered essential and relevant for aviation, for

10   pilots.  And the test is very sensitive.

11         The criteria -- it was developed for the

12   FAA.  The criteria for the test was that it be

13   sensitive to the presence of brain dysfunction,

14   which would have operational significance in

15   aviation.  And it is sensitive to changes in brain

16   function, both improvement in brain function or

17   deterioration of brain function.

18         The Conners' Continuous Performance Test is

19   a measure of vigilance, so it's a fairly monotonous

20   boring test. And you're measuring kind of the

21   ability to maintain one's -- you know, ability to

22   respond and perform across time.  And you're

1    looking at consistency of performance across time.

2         The Trail Making Test is a measure of

3    visual scanning and tracking.  It's a measure of

4    visual perceptual speed and it's a measure of

5    mental flexibility.

6         Q.  Okay.  And you've conducted fitness for

7    duty examinations for major airline pilots

8    previously, is that correct?

9         A.  That's correct.

10        Q.  Are these typically the three tests that

11   you administer when an airline asks you determine

12   whether a pilot is fit-for-duty?

13        A.  They would be part of a much larger batch

14   of tests that I would administer.

15        Q.  How much larger typically would that

16   screening process be?

17        A.  It would be a full day.  It would be -- you

18   know, if you actually look at the FAA website,

19   there is a -- what we call a core FAA

20   neuropsychological test battery.  And it would

21   include that test battery.

22        Q.  And do you recall about how many tests are

1  included in that core battery?

2      A.  Well, the tests have parts to them.

3      Q.  Okay.

4      A.  It's hard to put an exact number on them.

5  But -- so I could give you the domains that are

6  included.  So there's the general intelligence

7  test, which would be a Wechsler Test.  There's

8  measures of verbal and visual spatial memory.

9  There is a measure of vigilance ones that you get,

10  which would be one of these on here.  There are

11  measures of, you know, executive function, so

12  measures of problem solving and reasoning.  There's

13  personality testing like -- an MMPI is often the

14  required test by the FAA, so -- and there are tests

15  of speed of information processing, such as the

16  Paced Auditory Serial Addition Test.  It's a big

17  test battery.

18      Q.  And so you said those typically would take

19  about one day to administer in full?

20      A.  Yes.

21      Q.  And just for reference, about how long

22  typically would these three tests take to

Page 60

1  administer?

2      A.  So the CogScreen takes about an hour.  The

3  CPT takes about 20 minutes.  And Trail takes about

4  six minutes.

5      Q.  Okay.  So is that ten percent of a full

6  battery or 20 -- do you have an estimate?

7      A.  30 percent.

8      Q.  30 percent.  Okay.  And were these the

9  three tests --

10     A.  Or 25 percent.

11     Q.  Okay.

12     A.  We'll go to 25.

13     Q.  Were these the three tests that Dr. Knippa

14  had administered?

15     A.  No.  Dr. Knippa administered a lot more

16  tests.

17     Q.  Did he administer the core battery of

18  tests?

19     A.  Without having his report in front of me,

20  I'm pretty sure he did, but I'm not certain.

21     Q.  Okay.  And we'll look at his report

22  shortly.

Page 61

1          Why did you decide to do just these three

2     tests for Mr. Patterson?

3          A.  I think that the concerns were that -- that

4     there was a problem with attention.  That there was

5     a problem with novel problem solving.  And so it

6     was very easy and expeditious and kind of a

7     cost-saving approach for Mr. Patterson to basically

8     address specifically those issues.

9          And so CogScreen has many different

10    measures of attention and processing speed.  It has

11    a measure of novel problem solving that's designed

12    to be repeated.  It's suitable for repeated

13    testing.  And the Conners was there because I think

14    Dr. Knippa's biggest concern was related to

15    sustained attention or vigilance.  So that's

16    another measure of vigilance.  And Trail Making

17    would add to -- particularly one part of the Trail

18    Making that looks at mental flexibility would

19    address concern about his ability to -- his

20    executive functioning, so --

21         Q.  Did you recommend to Mr. Patterson that you

22    administer the core battery of tests?

Page 62

1      A.  I don't recall that I made that

2    recommendation.

3      Q.  Do you recall how you ended up on the three

4    tests?  Was that his request that those three tests

5    be performed?

6      A.  Oh, I doubt that he would come in and ask

7    me for these three tests.  I can't recall when a

8    pilot has done that.

9          For a number of conditions that we do see

10   pilots for, if they do find on a CogScreen -- and

11   this would be conditions such as pilots who are

12   seeking special issuance under the SSRI, which are

13   antidepressant medication protocols, or pilots who

14   are HIV positive who are seeking medical

15   certification.  If they do fine on the CogScreen,

16   the exam ends there.  We don't have to proceed with

17   any further testing.

18         And so quite possibly I looked at what the

19   issues were from the examination by Dr. Knippa in

20   trying to save this gentleman some money and

21   thought this would be sufficient.

22     Q.  And what significance to your analysis did

Page 63

1  it have that Dr. Knippa had concluded that -- had

2  interpreted his own CogScreen data as he did?

3          Let me reask that?

4          You had said in your report on Page 4, "Dr.

5  Knippa interpreted the cognitive test data as

6  consistent with an attention disorder and mild

7  impairment of novel problem solving."

8          Did it impact your assessment at all that

9  Dr. Knippa had so interpreted the cognitive test

10  data from his own administration of the testing?

11      A.  Most certainly.  So the reason why I did

12  the CogScreen was to look at novel problem solving.

13  The reason why I did the Conners' Continuous

14  Performance Test is because it was specifically on

15  the Continuous Performance Test that Dr. Knippa had

16  concerns about Mr. Patterson.

17      Q.  And did Mr. Patterson voice to you any

18  understanding of the deficits that Dr. Knippa had

19  found in terms of the cognitive test data?

20      A.  I don't believe he did.  I don't think he

21  made any mention of feeling that there was a

22  cognitive issue.

Page 64

1      Q.  Okay.  Let me ask you to look at Page 6.

2   The same document here.  It says -- the Summary and

3   Recommendations page.  And the second paragraph

4   there says, "Dr. Caddy reported that vigilant

5   testing" -- "vigilance testing administered to Mr.

6   Patterson by Dr. Knippa was administered in the

7   afternoon."

8          I believe this is what we were just talking

9   about a second ago, is that correct?

10     A.  Correct.

11     Q.  And did you have any basis for that

12  conclusion other than what Mr. Patterson had told

13  you?

14     A.  Well -- or to state your question

15  differently, what Mr. Patterson told me and what he

16  had told Dr. Caddy.

17     Q.  Okay.

18     A.  So that could be -- you know, the afternoon

19  would be a factor and the jet lag could be a

20  factor.  Just two things could have affected his

21  ability to perform normally on the vigilance test.

22     Q.  And then the next sentence says, "If this

Page 65

1    is correct, it may have contributed to the airman's

2    poor performance on this measure of sustained

3    attention."

4          Am I correct that you weren't certain of

5    the fact you had just noted was correct at the time

6    of this report?

7          A.  I think that's correct.

8          Q.  Okay.

9          A.  If I had known for certain, I would not

10   have written "if this is correct."

11         Q.  And why did the assumption of that

12   fact -- why did it "contribute to the airman's poor

13   performance on this measure of sustained attention"

14   potentially?

15         A.  As I explained previously to you, the test

16   is very sensitive to sleepiness, drowsiness.  And

17   actually, they'll have a specific pattern of type

18   of performance people -- if they don't maintain the

19   same level of alertness or arousal, they begin to

20   be slower or less consistent in their responding to

21   the targets on the test.

22         Q.  Okay.  And it says, "if this is correct."

Page 66

1    If that was not correct, what impact would that

2    have had on your analysis?

3        A.  Well, I mean, could Mr. Patterson truly

4    have an actual attention problem?  That would be

5    another interpretation.  If there's no -- if it's

6    not due to fatigue, jet lag, sleepiness, time of

7    day, then he actually may have potentially a

8    deficiency in sustained attention or vigilance.

9        Q.  And would that be relevant to a pilot's

10   fitness for duty?

11       A.  Certainly.

12       Q.  And why is that?

13       A.  Because that's one of the most important

14   things you have to do as a pilot.  You're

15   monitoring systems and all of those people sitting

16   in the back are relying upon that person's

17   monitoring of those flight systems.

18       Q.  Okay.  The next sentence there says, "Mr.

19   Patterson's description of Dr. Knippa's CogScreen

20   administration, if correct, also raises concerns."

21           Do you recall what the administration-based

22   concerns were?

Page 67

1      A.  Well, my concern there would be that -- in

2   particular, there's one subtest that Mr. Patterson

3   really performed poorly on on CogScreen.  And for

4   that particular subtest, it's important that the

5   person had received prior to taking the test, the

6   standard oral instruction, which is that for this

7   subtest there are no practice items.  And so after

8   you've read the instructions, if you have any

9   questions, please let me know before you proceed.

10  And usually we make a very big point of that

11  particular oral instruction because otherwise the

12  guys goes ahead and figures, oh, I'll try and

13  figure it out once it starts.  You're not going to

14  figure it once it starts.  You're going to do very

15  poorly, as Mr. Patterson had done.  Mr. Patterson

16  claimed that he hadn't gotten that instruction.

17      Q.  And did you have --

18      A.  And he's not unique in that.  I will tell

19  you that even at American Airlines in the medical

20  clinic, people would say, oh, the nurse didn't tell

21  that to me.  The nurses would tell me, no, I did

22  tell that to them, and -- but the pilot wouldn't

Page 68

```
 1    remember.  I mean, the nurses would also tell them,

 2    don't start the Tracking Test until I come back in

 3    the room and show you how to do the Tracking.  And

 4    they would say, no.  The guy -- you know, actually,

 5    he just took the keyboard and starting doing it

 6    himself.  I told him that.

 7           So sometimes people tell me that the person

 8    administering the test didn't do it.  But, in fact,

 9    the person administering says, oh, I'm sure I did

10    it, so --

11      Q.  Have you ever administered a CogScreen test

12    and had a pilot raise a concern that the

13    standardization process wasn't followed when you

14    knew that it was?

15      A.  With me?

16      Q.  Yes.

17      A.  It's probably not ever going to happen.

18    You know, they're dealing with the author of the

19    test.

20      Q.  Right.  You're aware of other cases, it

21    sounds like, where a pilot has suggested that

22    the -- that there was a failure to follow standard
```

Page 69

1   administration procedures and the person that

2   administered the test, nurse or otherwise,

3   confirmed that that was inaccurate, is that

4   correct?

5        A.  Correct.

6        Q.  Okay.

7        A.  And I think that -- I'm recalling Mr.

8   Patterson kind of pointing out that -- like, I kind

9   of hung out -- I'm in the room sitting behind him,

10  which most neuropsychologists do.  They kind of

11  hang out while the person is doing the test.  It

12  gives me an opportunity to look through his records

13  and, you know, check things out and score things

14  from before.  And I'm kind of sitting there kind of

15  watching what's going on.  He said, ah, I was just

16  in the room by myself and there was nobody around

17  and nobody gave me these instructions.  And that's

18  what he said.

19       Q.  During Dr. Knippa's examination?

20       A.  Yes.

21       Q.  Okay.  And just to confirm, you didn't have

22  any independent basis to conclude that Dr. Knippa

Page 70

1    had failed to follow standard --

2         A.  No.

3         Q.  -- administration procedures?  Okay.

4              And the last question on this document, I

5    think.  The next paragraph, it says, "Based upon my

6    review of records" -- and the end of that sentence

7    refers to "interpersonal characteristics, which at

8    times may be problematic?"

9              Are those the characteristics we talked

10   about earlier today?

11        A.  Yes.

12        Q.  Okay.

13        A.  You know, it's basically saying this guy

14   may rub people the wrong way.  I guess a lot of us

15   may rub people the wrong.  And some people tolerate

16   us and some can't.  And clearly, you know, Scott

17   has some characteristics that could -- some people

18   would have a conflict with.

19        Q.  Okay.

20        A.  But they're not necessarily what we would

21   call a disorder in -- by what our criteria would be

22   for the presence of a personality disorder.

Page 71

1        For example, it's a very important

2   distinction because in the FAA, we actually -- it

3   is permanently medically disqualifying to have a

4   personality disorder.

5        Q.  And why is that?

6        A.  Because we consider that to be something

7   dangerous for the cockpit.

8        Q.  The last sentence there -- sorry.  Just one

9   last one.  It says, "Thank you for referring Mr.

10  Patterson."

11       Am I correct that this is addressed to Dr.

12  Tordella, or do you recall who this is --

13       A.  Totally to Dr. Tordella.  I don't know

14  anybody else who was involved in the case.

15       Q.  Okay.  And it says, "If you have any

16  further questions, please don't hesitate to contact

17  me."

18       Do you recall if Dr. Tordella contacted you

19  after this report?

20       A.  I'm pretty sure he did.

21       Q.  Okay.  And what do you recall of your

22  discussion with Dr. Tordella?

1    A.   I don't recall this discussion with him.

2    But we, almost always, kind of go over the case.

3    And basically I think I told him everything looked

4    good.

5         He was -- he was very -- here's what I kind

6    of remember.  This kind of got Dr. Tordella worked

7    up, if you depose him.  He got kind of worked up

8    on, like, you know, people are making -- and

9    actually Hastings got worked up.  People are

10   testing these pilots who aren't doing it right and

11   big decisions are made about their careers and, you

12   know, you all ought to be doing a better job of

13   training these psychologists.

14        And so I kind of took that -- that's kind

15   of memorable that the -- they were dissatisfied

16   with those of us responsible for training

17   psychologists and saying that was having an impact

18   on pilots' careers.  And it was very important that

19   we address it.

20   Q.   Okay.  The document we've been reviewing,

21   does this include the full universe of the test

22   results and test findings from your 2016

Page 73

1    examination of Mr. Patterson?

2         A.  Yes, it does.

3         Q.  Okay.  And just out of curiosity, we talked

4    earlier about raw data, is that -- how does that

5    differ from what follows, I guess, starting on the

6    page that's marked Patterson_00157?

7         A.  Well, we generally submit to the FAA the

8    CogScreen printout.  And if I had done the MMPI,

9    the MMPI printout.  And if I had done continuous

10   performance testing, which I did, that should have

11   been attached.  It's less likely because it's 11

12   pages.  That gets attached as well because the FAA

13   reviewers, like myself as a senior reviewer, we

14   want to see the actual -- the scores.

15            And these aren't -- so it's not showing you

16   the items, so to speak.  You can't -- this isn't

17   going to help you practice and, you know, won't

18   serve as what pilots call a gouge.  There's no

19   gouge here.  It's not going to help you pass the

20   test.

21            And so we don't feel that it violates test

22   security.  That's really key and important to us.

Page 74

1   There's no violation of test security.  In fact,

2   it's crucial that we get this data in order to

3   review a case.  I'm not going to accept records

4   from the FAA that don't included this CogScreen

5   printout.

6       Q.  Understood.  What benefit, if any, would a

7   pilot have from undergoing CogScreen testing within

8   a short time frame after another session of

9   CogScreen testing?

10      A.  Well, there would be a practice effect.

11  And that is a term that we use to refer

12  specifically to what you said, the benefit from

13  simple familiarity with the test and the test

14  procedure and the test content.  And that can lead

15  to higher scores, or what we call better scores,

16  for an individual.

17          Now, CogScreen was specifically designed to

18  be repeated.  And that was a very important

19  objective of the Federal Aviation Administration.

20  By that, it meant that if a pilot needed to be

21  seen, you know, after they had been through

22  alcohol-dependence recovery, they could be

Page 75

1   reevaluated and we could make an effective true

2   determination of how the pilot was functioning

3   compared to their prior time.  It could be used to

4   look at pilots who are HIV positive or get screened

5   every year.  Or pilots who are taking

6   antidepressants, they're seen every year.

7           And so our normative data that we collected

8   for CogScreen was based on an interval of six

9   months.  And so we have data on pilots at six

10  months, 12 months, and I think 24 months.  Those

11  were the intervals, at which we did -- primarily

12  six months and 12 months that we did the retesting

13  of CogScreen.

14          We tried to protect CogScreen from practice

15  effects in clinical use.  I actually used CogScreen

16  for other uses other than clinical.  I used it in

17  clinical drug research trials for submissions to

18  the Food and Drug Administration indicating the

19  safety of medications in foods.  And CogScreen in

20  those cases is repeated many, many times in short

21  intervals.  Okay.

22          But the way that we control for that is

Page 76

1    that we actually administer it two or three times

2    to get your baseline, so that you've already had

3    the benefit of the familiarity, your performance is

4    already leveled out.  The biggest improvement in

5    CogScreen is between the first and the second time

6    that it's administered.  And after that it's

7    incremental and also related -- kind of the

8    point -- if you think of your original question,

9    after a brief time internal, it's related to the

10   amount of time between the exams.  So there's less

11   of an impact if there's more time between the

12   exams.

13        When you take CogScreen a second time or a

14   third time or a fourth time, you don't see the same

15   items. You get different items each time.  And the

16   items for Session Number 2 are always going to

17   be -- everybody is going to get the same items for

18   Session 2, but they're different from Session 1.

19   Session 3 is different items again than Session 2

20   or Session 1.  But Session 3 is always the same.

21   That's how the test is designed.

22        Q.  And how do you know which session to

Page 77

1    administer?

2        A.  So the way you know is partly you have to

3    ask the pilot, when were you last -- how many times

4    have you taken CogScreen.  That's question number

5    one.  And when did you last take CogScreen,

6    question number two.

7        Q.  Okay.  And did you ask Mr. Patterson that?

8        A.  I may not have asked him.  I assumed that

9    the last time that he took it was the only time

10   that I knew that he had taken it, which was with

11   Dr. Knippa.  So he had taken it, according to what

12   I knew, on March 17, 2016.  So it had been three

13   months, which is okay.

14       Q.  And so --

15       A.  And that's why -- as you can see, if you

16   look at the printout that you just had, it says on

17   the title page of CogScreen what session number I

18   used.  I used Session Number 2.

19       Q.  And what -- just so I know which page

20   you're looking at.

21       A.  It's Patterson_00157.

22       Q.  Okay.  Oh, I see.  So the middle of the

Page 78

1    page there it says the subject name and then the

2    session number is 02?

3        A.  Yeah.  Because he had told me he had taken

4    it before.

5        Q.  Okay.  And why did you use a different

6    session number than Session Number 1?

7        A.  So he would get different items.  He

8    wouldn't get the same math problems.  So if he saw

9    the same question about a train leaving the

10   station, it would be -- it wouldn't be as good of a

11   question, would it?  So we actually change all the

12   questions that you're going to get.

13       Q.  And when you say it wouldn't be as good of

14   a question, would it impact the results if the

15   questions were the same that the pilot had already

16   seen?

17       A.  Fairly obviously the answer would be yes.

18       Q.  Okay.  And I take it, it would have a

19   material impact typically?

20       A.  It can.  You know, if somebody basically

21   has had that familiarity, there are certain

22   subtests that are affected more than others.

Page 79

1      Q.   And is that true even if it's been two

2   months or three months?

3      A.   I'm not sure how long it lasts.  We don't

4   actually have data on that.  The data that I do

5   have is at six months.  I have some other data from

6   a copyright case that we're just now settling where

7   a guy was offering a CogScreen gouge version

8   basically violating our copyright.

9           And so we were able to obtain data from an

10   airline that uses CogScreen for hiring.  And we did

11   show that pilots who've been customers of this

12   website actually showed improvement on CogScreen,

13   which is potentially dangerous for aviation safety

14   because somebody could get a higher -- get a better

15   score on CogScreen than they would actually be

16   truly entitled to.  And that would lead to

17   basically somebody getting certified that shouldn't

18   be.

19      Q.   So it looks like you administered Session 2

20   here on 6/29/2016.  How long would you have wanted

21   to wait if you were going to administer Session

22   Number 2 again in order to feel comfortable with

Page 80

1    the results?

2        A.  Oh, actually at that three months I felt

3    comfortable at that duration using the proper

4    different session number.  That was fine.

5        Q.  And I understand that.  But if you were

6    going to administer Session Number 2 again --

7        A.  I'm not going to administer Session 2

8    again, unless by accident.  I'm never going to give

9    him Session 2 again.  He doesn't have to take

10   Session 2 again.

11       Q.  I'm sorry.  What was the last --

12       A.  He'll never have to take Session 2 again.

13       Q.  Is there any time period to elapse where

14   you would feel comfortable giving Mr. Patterson,

15   for example, Session Number 2 again after having

16   given it to him in June of 2016?

17       A.  I would not intentionally give him Session

18   2 again.

19       Q.  Okay.

20       A.  I would give him Session 3, Session 4,

21   Session 5.  But why would I ever give him Session 2

22   again?  He's already taken it.  So you're supposed

```
                                          Page 81
```

1   to find out how many times the pilot has taken the

2   test --

3        Q.  Okay.

4        A.  -- and give the proper session number.

5        Q.  Would you feel comfortable in the results

6   if Mr. Patterson took Session Number 2 again after

7   you had already administered it to him in June

8   2016?

9        A.  Well, it happens.  Sometimes it happens by

10  accident.  Somebody doesn't know.  And it basically

11  makes it -- you can rely less upon the CogScreen

12  result if it's administered, you know, with a very

13  short time interval between.

14          I just reviewed a case for the FAA where a

15  psychologist said actually the pilot had flown

16  across country and insisted on taking the test. He

17  was completely fatigued.  And I told him I didn't

18  want to test him, but he insisted on doing it.  And

19  then that same psychologist had the pilot come back

20  11 days later and take CogScreen again.  It

21  immediately got kicked back by the FAA.  So the FAA

22  send it -- you know, basically said is this okay?

Page 82

1     Q.  And was that the same session number of

2     CogScreen that that pilot --

3     A.  No.  The guy gave a different session, but

4     he had left only 11 days in between testing.  So,

5     you know, 11 days, you're going -- we don't have

6     normative data to know how much of an improvement

7     just due to having familiarity would occur with

8     such a short time interval.

9     Q.  And it sounds like in that case the FAA was

10    uncomfortable that the results were accurate given

11    the short time period that had elapsed?

12    A.  Totally got red-flagged.

13    Q.  Okay.  And is that consistent with your

14    understanding of the FAA's interpretation of these

15    results typically?  Meaning, were you surprised

16    that the FAA determined that 11 days was an

17    insufficient period of time to have elapsed?

18    A.  I was impressed with the FAA's -- because

19    it wasn't done by psychologists, but it was done by

20    other medical docs in the FAA.  In fact, I was

21    impressed that they had picked it up and said,

22    wait, this doesn't look right.  There is a huge

Page 83

1    change in this guy's score between, you know, the

2    11 days.  Like, what's going on here?

3        Q.  And just as a practical matter, why is it

4    that a pilot's score would improve in that

5    circumstance?

6        A.  Well, I mean, if I give you a test question

7    right now and I throw the same test question at

8    you, you know, tomorrow, you're going to do better

9    with that test question.  You know, you can't take

10    the bar exam again in three months.  You have to

11    wait a certain period of time.

12        Q.  Okay.

13            MR. MORALES:  Why don't we go off the

14    record for a second.

15            THE VIDEOGRAPHER:  The time is 5:58 p.m.

16    This concludes Media Unit Number 1.  We are now off

17    the record.

18            (Brief recess.)

19            THE VIDEOGRAPHER:  The time is 6:08 p.m.

20    This begins Media Unit Number 2.  We're now on the

21    record.  Please proceed, Counsel.

22    BY MR. MORALES:

1     Q.  Okay.  Dr. Kay, we've been talking about

2   Dr. Knippa's report.  I'm going to pass you a copy

3   of this.  I believe it's Exhibit 4.  I'd just ask

4   you to confirm, is this -- have you reviewed this

5   report previously?

6          (Kay Exhibit Number 4 marked for

7   identification.)

8     A.  Yeah.  But not since I wrote that report,

9   so yes.

10    Q.  Okay.  And this is Dr. Knippa's report

11   that's referenced in your report, is that correct?

12    A.  I believe so, yes.

13    Q.  Okay.  You'd mentioned earlier -- we were

14   talking about the tests that Dr. Knippa had

15   administered.  Is there a section of this report

16   where we could identify the tests that he

17   administered?

18    A.  What he calls it, it's on Knippa Page 0010

19   [sic].

20    Q.  Okay.

21    A.  And he calls it testing parameters.

22    Q.  Okay.  And is this the equivalent of the

Page 85

1    list of three that we saw in your report in terms

2    of what he administered?

3        A.  It's a listing of what he administered.

4    It's a far more extensive list of tests than I

5    gave.

6        Q.  Right.

7        A.  Well, he actually said it consisted of the

8    FAA core battery.  It's one of his last lines.

9        Q.  Okay.

10       A.  With a small number of supplemental

11   procedures.

12       Q.  And CogScreen is the first one listed in

13   that testing parameter section, is that correct?

14       A.  So kind of him, yes.

15       Q.  Okay.  If you would look under there,

16   there's a section that's called Test Findings.

17       A.  Yes.

18       Q.  It says, "Mr. Patterson appeared very

19   attentive during test instructions.  He was

20   provided the usual opportunities for daytime rest

21   breaks, midday lunch break, completing the

22   assessment in the standard and usual format.

Page 86

1    Testing was suspended in the early afternoon on Day

2    1, as he was understood to have indicated he was

3    fatigued while pointing to the time zone change

4    from the East Coast."

5           Is that consistent with what Mr. Patterson

6    told you about the testing he received from Dr.

7    Knippa?

8        A.  I don't remember specifically what Mr.

9    Patterson reported about his fatigue.  So I don't

10   know specifically, no.

11       Q.  The reference in the second sentence there

12   says, "completing the assessment in the standard

13   and usual format."

14          What is your understanding, if any, of what

15   Dr. Knippa is referring to there?

16       A.  He is saying he followed standardization

17   administration in the administration of the test.

18       Q.  Okay.  And do you have any reason to

19   question that statement in his report?

20       A.  No.

21       Q.  Do you have any reason to question his

22   statement that "testing was suspended in the early

Page 87

1    afternoon on Day 1"?

2        A.  No.  I have no basis for that.

3        Q.  Okay.  The section under there is

4    subsection Neurocognitive Screening.  And there's a

5    reference in that section -- some numbers and

6    letters.  But it says, "as compared to similar-age

7    general aviation pilots."

8            Is that in the same sort of category as the

9    regional versus major sort of categorization, or is

10   that a different sort of point of reference?

11       A.  That's even a different norm group.  So we

12   have general aviation pilots from age 18 to, like,

13   78 -- or 87.  And so there's a group over the age

14   of 50-some-odd that is in that group.  I don't know

15   that he -- I don't think he -- that's not the

16   printout that I saw.  I saw a regional airline

17   printout.

18       Q.  So if you turn to the next page, which is

19   Page 11 on the Bates numbering there.  The first

20   paragraph where it says, "on the base rate

21   analysis" -- the first full paragraph.  Do you see

22   that?  On the base rate analysis.

Page 88

1      A.   That says regional carrier pilots.

2      Q.   So the first sentence there says, "compared

3  to a sample of regional carrier pilots across all

4  ages," is that correct?

5      A.   That's what he said, yes.

6      Q.   And is that the reference in your report to

7  regional norms?

8      A.   Yes.

9      Q.   Okay.

10     A.   That means he used regional norms.  You

11 can't get the base rate from the general aviation

12 because we don't actually have -- in the current

13 version of CogScreen that he has -- I mean, I could

14 generate them, but not these other guys.  There are

15 no base rates available currently for general

16 aviation.

17     Q.   If you would look at the last sentence of

18 that paragraph, it says, "This profile was

19 considered atypical as compared to expectation with

20 active duty major airline pilots."

21          What is your --

22     A.   Maybe he cut and pasted from some other

Page 89

1    report.  Maybe that's why he's got different norm

2    groups referred to in the same paragraph.  That's

3    my best explanation for, you know, how a

4    psychologist could make a mistake like that in a

5    report.  That sounds like an error.

6         Q.  Just to be -- just so I understand, this

7    paragraph, he's referring to both regional carrier

8    pilots and major airline pilots, is that correct?

9         A.  Yeah.

10        Q.  Okay.  And is there any way to determine

11   from that paragraph which of those two he's using,

12   if it's one or the other?

13        A.  That would suggest that he used one or the

14   other, but you can't figure out which one from

15   that.

16        Q.  Okay.  Flip to page -- it's Page 12 in his

17   document.  It's Bates stamp 15.

18        A.  Yes.

19        Q.  It says Findings Regarding Cognitive

20   Skills.  So it's Page 12 in his original document

21   numbered at the top, if you see that.

22        A.  Okay.  Yes.  I found that.

Page 90

1       Q.  The end of paragraph -- first of all, do

2  you have a general understanding of what Dr. Knippa

3  is setting out in this section that's labeled

4  Findings Regarding Cognitive Skills?

5       A.  Yes.

6       Q.  And what is that?

7       A.  He's basically kind of summarizing what he

8  is -- his interpretation of the cognitive test

9  data.

10      Q.  Okay.  And that's the -- what's known as

11  the neuropsychological component?

12      A.  The test of attention --

13      Q.  Okay.

14      A.  -- language, memory, problem solving.

15      Q.  And that's compared to -- I'm just going to

16  have you flip back really quickly to the page

17  before -- findings regarding interpersonal skills?

18  Do you see that?

19      A.  Yeah.  Yeah.

20      Q.  Is that -- is that a separate part of his

21  analysis?

22      A.  Yes.  He's separated the psychological from

Page 91

1   the neuropsychological --

2       Q.  Okay.  And the cognitive skills section

3   there on Page 12, that's the neuropsychological, is

4   that correct?

5       A.  Correct.

6       Q.  And at the end of the first paragraph

7   there, that section, it says, "The overall profile

8   of neuropsychological assessment was discrepant

9   from that expected for major airline pilots of

10  similar age."

11      A.  Okay.

12      Q.  Do you see that?  Does that provide any

13  clarity about which benchmark Dr. Knippa used in

14  his report?

15      A.  That suggests he actually used the major

16  airline pilot norm group and the one that was

17  specific for Mr. Patterson's age.

18      Q.  And was that your assumption for purposes

19  of your June 2016 analysis?

20      A.  Well, what I wrote -- what I wrote in my

21  report was that his base rates came from the

22  regional pilot norms.  So I assumed, at least for

Page 92

1  CogScreen, he had used regional pilot norms.

2      Q.  Okay.  The last full paragraph on that

3  section -- or on that page -- sorry.  It says,

4  "First, there is no basis identified for

5  considering assessment findings unreliable due to

6  identifiable anxiety, fatigue, or misunderstanding

7  of instructions or expectations.  Mr. Patterson

8  reported having had a good night's rest prior to

9  major testing and reported no problems of

10  significance on the second day.  He was afforded

11  two days and multiple breaks at his choice

12  throughout testing, also ample time for

13  interview/discussion, as would reasonably

14  correspond to appropriate testing conditions."

15        Does that align with Mr. Patterson's

16  description of his testing experience with Dr.

17  Knippa?

18      A.  No.  I think there' some real conflict

19  there.

20      Q.  Okay.  And do you have any basis to

21  conclude that Mr. Patterson's description of the

22  event is correct as compared to Dr. Knippa's?

Page 93

1     A.  No.

2     Q.  Okay.  We may come back to this.  But I'm

3  going to hand you what I'd asked to mark as Exhibit

4  5.

5          MR. MORALES:  And I'd just note, this has

6  an exhibit sticker from another -- I think probably

7  the Beach deposition as well.  But this is Kay 5

8  and it's so marked on the page that we're handing

9  to Dr. Kay.

10          (Kay Exhibit Number 5 marked for

11  identification.)

12  BY MR. MORALES:

13     Q.  And, Dr. Kay, if you'd just look very

14  quickly at this --

15     A.  Just putting all your exhibits in one spot

16  here.

17     Q.  Sure.  Please take your time.  And let me

18  know if you have an understanding of this document,

19  which is Bates-stamped Patterson_Knippa_00002.

20     A.  Yes.

21     Q.  And what is this?

22     A.  This is a letter from Dr. Knippa to Jeral

Page 94

1    Ahtone, who was the medical director at American

2    Airlines in the medical center there.  And it is

3    the summary statement -- it's called the

4    Fitness-For-Duty Summary Statement.

5        Q.  And is it -- is it accurate to say this is

6    essentially a summary of the longer report we just

7    looked at before, as you understand it?

8        A.  Right.  It's basically his conclusion.

9        Q.  Okay.  And then just one thing on the

10   second page of that summary document.  It says

11   Functional Limitation.  Do you see that?

12       A.  Yes.

13       Q.  And then it says, "substandard performance

14   testing related to skills associated with flight

15   operations."

16           Do you have any reason to question Dr.

17   Knippa's conclusion that the performance testing

18   was substandard with respect to skills associated

19   with flight operations?

20       A.  I probably wouldn't use the word "skills"

21   there.  I'd probably would use the word

22   "abilities."  Because skills are the acquired --

Page 95

1    he's not measuring Mr. Patterson's skills.

2        Q.  Do you have any reason to conclude that he

3    wrongly determined that the performance testing

4    reflected on Mr. Patterson's ability to carry out

5    flight operations?

6        A.  I'd probably want to hear that one more

7    time before I respond.

8        Q.  Let me ask it this way, what do you

9    understand Dr. Knippa to be communicating in that

10   sentence?

11       A.  He's saying performance, if he really means

12   abilities, which is what neuropsychologists

13   measure.  We're not measuring flight skills.  He's

14   not -- Dr. Knippa is not an expert in flight

15   skills.  So I'm making a correction for him --

16       Q.  Okay.

17       A.  -- assuming what a neuropsychologist knows.

18   So he's saying abilities related to flight

19   performance were substandard.  That's what I'm

20   understanding him to say.

21       Q.  Okay.  And do you have any reason to

22   question his interpretation of his own testing

Page 96

1  data?

2      A.  No.  I think that what he's saying is that

3  on -- specifically on vigilance testing, which is a

4  critical mental ability for pilots, and on a

5  measure of ability to solve novel problems,

6  deductive reasoning is a second area, he saw a

7  deficiency, which caused him to be concerned about

8  the airman's ability to function in the cockpit.

9      Q.  Okay.  I'm going to now ask that you take a

10  look at what will be Exhibit 6.  And this says, on

11  the front, Deposition of John Knippa.  I assume you

12  have not reviewed this document previously, is that

13  correct?

14          (Kay Exhibit Number 6 marked for

15  identification.)

16      A.  I don't think I have.

17      Q.  Okay.  I'd ask you to look at -- it's Page

18  47 in the quadrants.  So it's the thirteenth page

19  of the hard copy, but it's --

20      A.  Yeah.  I'm there.

21      Q.  -- Page 47.  And I'd ask you to just look

22  at -- at starting at Line 3.  And I'd represent to

Page 97

1   you that the A there is Dr. Knippa testifying at

2   his own deposition.

3       A.  Yes.

4       Q.  If you would just read from Line 3 to Line

5   12.

6       A.  I've read that.

7       Q.  Okay.  And what do you understand Dr.

8   Knippa to be communicating there?

9       A.  He's talking about how he tries to schedule

10  people for --

11          MR. AMLONG:  Objection.  Relevance.  What

12  he's communicating is what he said and Dr. Kay's

13  understanding of it.

14  BY MR. MORALES:

15      Q.  You can continue.

16      A.  Okay.  So what he's doing here is he's

17  talking -- answering -- I don't know what the

18  question is.  But what he's saying in 3 to 12 is

19  the way he schedules people who are from out of

20  town.  And so that -- you know, particularly those

21  who've traveled, to reduce the effects of fatigue

22  and time zone changes.

Page 98

1      Q.  Okay.  Line 16 says -- and I'm starting in

2   the middle there.  It says, "I'm not going to have

3   them when they're tired working on relevant -- so

4   fatigue relevant tasks."  And the question is,

5   "Would you consider taking the CogScreen test to be

6   relevant?"  It says, "Yes.  I wouldn't give it to

7   him in the afternoon when they're tired.  It was

8   given in the morning."

9          Is that consistent with your understanding

10   from Mr. Patterson about when the CogScreen test

11   was administered by Dr. Knippa?

12      A.  I don't recall if Mr. Patterson said about

13   when CogScreen was administered.

14      Q.  Do you recall Mr. Patterson telling you

15   "that it was given in the morning" with respect to

16   the CogScreen test by Dr. Knippa?

17      A.  I don't have a recollection of that.

18      Q.  Okay.  If you'd look at Page 48, the next

19   page there.  Line 3 says -- again, this is Dr.

20   Knippa.  "The CogScreen was given on Day 1.  It was

21   scored just after noon.  It takes about an hour to

22   do, so it would have been started midmorning."

Page 99

1          Is that consistent with what Mr. Patterson

2     told you about when he took the CogScreen test with

3     Dr. Knippa?

4          A.  I think I just testified that I don't know

5     when Mr. Patterson said he took CogScreen.

6          Q.  Okay.  You had testified earlier about Mr.

7     Mr. Patterson's communications to you about

8     fatigue.  And specifically that he may have been

9     fatigued because of the time that Dr. Knippa

10    administered certain tests.  Do you recall that

11    testimony?

12         A.  Yes.

13         Q.  And what was your understanding as to what

14    tests Mr. Patterson was referring to in that

15    communication to you?

16         A.  I think he was referring to the TOVA, which

17    is listed on Page 49 of this deposition transcript.

18         Q.  And that's -- if you'd look at Line 11,

19    Page 49, it says -- and this is Dr. Knippa again.

20    "The TOVA was given on the second in the morning."

21          Is that correct?

22         A.  That's what it says there.

1    Q.  And is that consistent with what Mr.

2  Patterson told you about the TOVA?

3    A.  It wasn't the impression that I had.  I'm

4  not sure exactly what Mr. Patterson said.

5    Q.  Okay.  And do you have any reason to

6  question Dr. Knippa's testimony regarding the

7  timing of the CogScreen TOVA tests?

8    A.  No. And in fact, both of those could be

9  absolutely determined because there's a time

10  associated with -- I mean, CogScreen

11  actually -- it's a hard date-time stamp suitable

12  for the FDA, so you could always find out when

13  CogScreen was given.

14      For the TOVA, it might be -- I don't know

15  if it's encrypted or not and if you can change the

16  date-time.  But it should be on -- it should be

17  printed on the TOVA.  And unless somebody modified

18  the TOVA, it would indicate the time that it was

19  administered.

20    Q.  And Page 48 there, Line 23 says -- this is

21  Dr. Knippa.  "It shows that I saved the report at

22  noon, and I wouldn't have been able to save the

1    report.  It was just after noon.  I wouldn't have

2    been able to save it without scoring it."

3          And I believe he's referring there to the

4    CogScreen.  Is that consistent with your reading of

5    that?  And feel free to take a minute to read it,

6    if you need.

7        A.  I don't know what that means.  He doesn't

8    score the CogScreen.  So CogScreen actually --

9        Q.  He says save the report, right?

10       A.  Ah, so he saved the report.  Yeah.  You

11   actually have to generate the report in order to

12   save it.  That -- I think -- is that what he's

13   saying?  I think that's what he's saying.

14       Q.  It looks like the question was, "But does

15   it show you scored it at noon?"  That's Line 22 of

16   Page 48.  And then the answer is, "It shows that I

17   saved the report at noon."

18       A.  Okay.  That's really well described.  So

19   what he's saying is, when you administer CogScreen,

20   you have to log back in.  And you -- you know, I'd

21   find the pilot and the session that he just took.

22   And then you would go to generate a report.  He

Page 102

1   generated the report at that time.  So he's saying,

2   I could not save it if I didn't generate it.  It

3   make sense.

4        Q.  Okay.  Flip to Page 50, please.  And I'd

5   ask you to look at Page -- or Line 9 there starting

6   at "we discussed."  And if you'd just read that

7   paragraph through Line 18.

8        A.  Yes.

9        Q.  What is Dr. -- what do you interpret Dr.

10  Knippa to be testifying to there?

11       A.  He's -- basically, the first thing you're

12  doing with the subject is you're obtaining their

13  consent for the exam.  And they -- you know, that

14  they understand why they're there, who's referred

15  them, what you're going to be doing.  And he also

16  has indicated that as part of the administration of

17  CogScreen, you get to a page where you're entering

18  demographics and then you ask the person how many

19  hours they slept the previous night.  And you're

20  also asking them to indicate on a -- basically it's

21  the Stanford Sleepiness Scale -- their level of

22  alertness at the time that they're taking the test.

Page 103

1   So if they're -- you know, fully alert would be a

2   one.  If they're not really at their peak, would be

3   a two.

4        I generally tell neuropsychologists if the

5   person is at a four, you might want to recommend

6   that you not do testing right now, that maybe you

7   wait until tomorrow or come back another time

8   because CogScreen is supper sensitive to your level

9   of rest.  And it's relied upon by the Food and Drug

10  Administration to make decisions about whether a

11  drug is causing next-day residual sleepiness, so

12  it's very sensitive to that.  So don't take the

13  test if you're sleepy.

14       Q.  And is that -- the discussion, as you've

15  just described it, is that part of the standard

16  procedure for the CogScreen?

17       A.  Obtaining the information about number of

18  hours slept and getting their rating of their

19  alertness is a part of standard administration.

20       Q.  And do you have any reason to conclude that

21  Mr. Patterson did not go through that standard

22  procedure here?

Page 104

1      A.   No.

2      Q.   Okay.  And I'd just point you to Page 51,

3  Line 21.  The sentence that starts, "and he signed

4  a document."  If you would read that paragraph

5  through the start of Page 52, please.

6      A.   I've read that.

7      Q.   Okay.  And what do you understand Dr.

8  Knippa to be testifying to there?

9      A.   So he does a written consent form to

10  document that he's covered the kind of potential

11  adverse events that could occur with taking the

12  exam.

13      Q.   Okay.  Page 52, Line 19 says, "Well, do you

14  consider Dr. Kay to be an expert in the area of

15  aeromedical psychological testing?"

16          Do you understand that to be you, Dr. Kay?

17      A.   That would be me.

18      Q.   And the answer at Line 21 is, "I consider

19  him to be a good neuropsychologist."

20          Do you consider Dr. Knippa a good

21  neuropsychologist?

22      A.   Yeah.  He's well recognized as being a good

Page 105

1   neuropsychologist.

2       Q.   Okay.  Page 53, Line 35.  It says, "Do you

3   agree with Dr. Knippa that that is the impact that

4   one experiences when going from the East Coast to

5   the West Coast?"

6            And it looks like there's a reference there

7   to a book I'm not going to put in front of you

8   right now.  But do you recall written opinions that

9   you've contributed to regarding traveling from the

10  East Coast to the West Coast?

11      A.   I've done studies of that.

12      Q.   And broadly speaking, what is the opinion

13  that you've provided on that subject?

14      A.   Well, it has a substantial impact on

15  performance.  We've actually measured with a

16  portable version of CogScreen that we've

17  administered to people and actually flown them

18  across the country.

19      Q.   And they then take the exam after being

20  flown across the country, is that right?

21      A.   Yeah.  But that was from -- east to west or

22  west to east?  We actually did -- our study was

Page 106

1    from the West Coast to the East Coast.

2        Q.  Okay.

3        A.  We tested them in my office here in D.C.

4        Q.  If you'd look at Page 53, then Line 10.

5    The paragraph that goes through Line 16, "Dr.

6    Knippa's testimony."  If you'd just read that and

7    let me know what you see Dr. Knippa to be

8    testifying to there.

9        A.  Okay.  I understand what he's saying.

10       Q.  And what is that?

11       A.  He's saying the circadian effects, which is

12   just basically where you're at within your

13   wakefulness kind of schedule that you have.  The

14   impact of that is going to be dependent upon many

15   different factors.  And he lists what some of those

16   factors are.

17       Q.  And are there any steps that a

18   neuropsychologist can take into account for the

19   circadian rhythm in their testing and evaluation?

20       A.  I think we do.  And whether with complete

21   intent or not, they do.  Because, for example, he

22   said he typically gives CogScreen in the morning.

Page 107

1    And we all do pretty much.  We give CogScreen

2    pretty much when the person is fresh.  We do that

3    not the moment they walk in the office because we

4    want to calm them down and do a little rapport and

5    then we kind of go to CogScreen.

6           Immediately after CogScreen -- as I just

7    did in my office before coming here today.  I gave

8    CogScreen.  Then I administered Continuous

9    Performance testing.  I want to get that done early

10   when the person is fresh because, again, it's very

11   sensitive.  And so we do it in the morning.  I

12   don't do it right after a meal.  I don't do it when

13   somebody is, you know, having kind of an afternoon

14   slump.  An afternoon slump can be kind of a real

15   thing.  I measured that before, in research that

16   we've done.

17          So I believe that we will give something

18   like the personality inventories, which are less

19   dependent upon processing speed.  And alertness,

20   we'll actually give in the afternoon because you

21   don't have to be so sharp to answer questions

22   about, if you like the work of a librarian.

Page 108

1      Q.  And the last thing here I'd ask you to

2   look -- same page, 53, Line 19.  And if you'd just

3   review that paragraph.  And I'd ask you whether

4   that paragraph reflects an understanding by Dr.

5   Knippa of the time zone change and its potential

6   implications for testing?

7      A.  It does show that.

8      Q.  And how is that?

9      A.  He's basically saying that, you know, they

10  talked about the time zone difference.  They

11  suspended testing to resume on the next day.

12        And again, my exam today, a guy who had

13  actually come to see me all the way from -- you

14  know, unfortunately Western Virginia, and had

15  driven all the way here to D.C. in the traffic.

16  And I said, we're done.  You're looking tired.  I'm

17  not going to go on with your testing.  So we

18  stopped earlier than we anticipated.  And I said,

19  you're going to have to come back and I'll schedule

20  you another appointment.

21        Neuropsychologists routinely are sensitive

22  to that.  They don't want to get bad data.  And we

Page 109

1    try to do that by basically suspending testing and

2    continuing when the person is more fresh.

3        Q.  Okay.  One last thing in this document.  If

4    you turn to Page 70, Line 17.  The question is, "In

5    evaluating Mr. Patterson, did you norm Mr.

6    Patterson with regional airline pilots or major

7    carrier pilots?"

8            And I would just ask you to read down to

9    Page 71, Line 18.

10       A.  I've read it over.

11       Q.  Okay.  And what do you understand Dr.

12   Knippa to be testifying to there?

13       A.  Well, I think if he looks at the CogScreen

14   printout, he can tell by looking -- I can show you

15   on what page.  He can tell what norm he used.  He

16   seems unclear.  He's saying that he looks at a

17   number of different norms and tries to use -- I use

18   the word "generous," he's saying "lenient," which

19   means the same thing.  He's trying to be lenient.

20   And he'll often look for a more lenient norm that

21   he can use for a particular pilot.

22       Q.  Okay.  And if you look -- the last thing.

Page 110

1    The bottom of that page, it looks like your name

2    comes up again there?

3        A.  Okay.

4        Q.  And it says, "As the name you brought up,

5    Dr. Kay."  If you would just review that paragraph

6    and let me know if you understand what Dr. Knippa

7    is testifying to there.

8        A.  Well, he's quoted my most famous

9    quote -- it'll probably be on my tombstone -- which

10   is, there's no such thing as an age-corrected

11   runway.  So, you know, if -- you don't get a longer

12   runway when you're an older pilot.

13        So it is important that we look at norms to

14   know you don't really look any different than

15   another pilot who's 60 years of age.  But is your

16   level of performance within the general range of 99

17   percent of functioning pilots independent of

18   age?

19        And really the question often that we truly

20   have to answer for the Federal Aviation

21   Administration is, is this pilot's performance

22   within -- not is it normal for a 75-year-old, but

Page 111

1    is this pilot normal for those people who are

2    functioning in a role of commercial pilot?

3         Q.  Okay.  I'm now going to hand you what

4    should be Exhibit 7.  And this document has a case

5    number for filing entry at the top.  And it says

6    Glenn Ross Caddy, Ph.D.  Do you see that?

7              (Kay Exhibit Number 7 marked for

8    identification.)

9         A.  Yeah.

10        Q.  And have you seen this document before?

11        A.  I don't know.  Was this the document that

12   was sent to me by Dr. Caddy?  Let's see.

13        Q.  And it's just --

14        A.  The Caddy report I have is from July 20,

15   2016.  I've never seen this.

16        Q.  Okay.  Okay.  And it says at the top, "Re:

17   FO Rodney Scott Patterson" --

18        A.  Yes.

19        Q.  -- "Executive Summary of Findings and

20   Assessment."  Do you have an understanding of what

21   this document might be?

22        A.  No.

Page 112

1      Q.  Okay.  The bottom of Page 1 there, middle

2   of the paragraph, your name comes up.  It says,

3   "Dr. Kay has performed a vast number of AA Section

4   20 medical evaluations."

5           Is that an accurate statement?

6      A.  I don't know what vast number is.  And I'm

7   not sure that I always knew that they were Section

8   20, but I've done plenty of exams for American

9   Airlines.

10      Q.  Okay.  Page 2 at the bottom -- and this is

11   Dr. Caddy writing, is that correct?

12      A.  This is Dr. Caddy's report.

13      Q.  Okay.  The bottom of Page 2, it says, "With

14   this professional compromise not cleanly done away

15   with, Dr. Knippa then turns the neuropsychological

16   realm and finally develops some very weak

17   compromised data [creating a rationale] for a

18   recommendation to terminate FO Patterson."

19           Do you agree with that interpretation of

20   Dr. Knippa's report?  And if you need to take a

21   second to review the preceding paragraphs, please

22   do.

1      A.  I kind of remember what Caddy's kind of

2  view was.  I think he's expressing it here.  He

3  felt that Mr. Patterson had been sent to Dr. Knippa

4  for a psychological evaluation, which Dr. Knippa

5  turned into a neuropsychological evaluation.  And

6  then he's saying "very weak and compromised data."

7  I think he's talking about the fatigue.  It was his

8  compromise for the recommendation determining FO

9  Patterson.

10     Q.  Okay.  And then the next sentence says,

11  "This is not right ethically.  And in my opinion,

12  it was more than just very poor science.  It was

13  sadly professionally compromising."

14          Do you agree with that statement?

15     A.  Not really.  I actually have written an

16  often-referenced article -- a document, which is

17  referenced frequently on fitness for duty

18  evaluations of pilots.  And in conducting a fitness

19  for duty evaluation of pilots, I don't think that I

20  would consider it to be unethical to do cognitive

21  screening as part of that evaluation for anybody

22  who's sent, including for psychological mental

Page 114

1    health disorders.

2         And, in fact, I think what we read in Dr.

3    Knippa's report -- I just saw it today, was Dr.

4    Knippa said that I start with CogScreen.  And if

5    the CogScreen was okay -- is what he was

6    testifying -- then I would -- I wouldn't have to go

7    on to other testing.  But he said CogScreen showed

8    problems, and therefore I did other testing.

9         So, in fact, as a responsible person doing

10   a fitness for duty exam, if you find a problem, you

11   need to evaluate further and see if you can find

12   evidence that supports, that confirms, or

13   disconfirms your concerns.

14      Q.  The next sentence there says, "In fact, Dr.

15   Knippa administered the test of sustained attention

16   at a time of day [given Scott's circadian status]

17   that appears to have been entirely inappropriate

18   for such testing."

19         In light of the materials we reviewed from

20   Dr. Knippa today, do you agree with that statement?

21      A.  Well, Dr. Knippa said he did it in the

22   morning.  Now, we could say, using Dr. Caddy's

Page 115

1    statement here, taken at the circadian time of day,

2    that if you administered it past 11:00 a.m. Long

3    Beach time -- I think Knippa is in, like, the

4    Southern California, L.A. area.  If you gave it at

5    that time of day, that would 2:00 Dr. Patterson

6    [sic] time.  And that would not be really a great

7    time for him to be taking it.  I'm not sure that

8    that's what -- I don't know what time Dr. Knippa

9    gave the test. I think that's what Dr. Caddy is

10   pointing out.  He's saying it was unfair because,

11   in fact, even if it was 11:00 a.m., that was 2:00

12   p.m. for Mr. Patterson, and that might be the basis

13   for why he did so poorly.

14         Now, I'm taking consideration -- this was

15   actually on Day 2.  And the results that I have of

16   not east to west, but west to east -- and even

17   applying to London -- the research that I've done

18   on jet lag shows that by 24 hours most of it is

19   gone.  It's pretty substantial, right, when you

20   first get there, believe it or not, but it does

21   dissipate.  And so this is actually more than 24

22   hours after he's landed.  I'm not so sure that it

Page 116

1    would be as much of a factor.

2        Q.  Okay.  And then the last sentence of that

3    paragraph says, "Much later, Dr. Gary Kay advised

4    FO Patterson during his testing session that Dr.

5    Knippa's examination appears not to have followed

6    Dr. Kay's protocols for the CogScreen."

7            Do you recall telling Dr. -- or Mr.

8    Patterson that?

9        A.  No.  I remember a conversation with Mr.

10   Patterson about, well, this is -- I'm telling

11   him -- he goes, well, that's not how it was given

12   when I took it with Dr. Knippa.  And I said, well,

13   that's how it was supposed to be given.  I said

14   there's only one way.  There's not, like, different

15   ways to give CogScreen.  There's one way to give

16   it, and this is the way CogScreen is given.  He

17   said, that's not how it was given.

18       Q.  And given what you know today, would you

19   say that Dr. Knippa's examination appears not to

20   have followed Dr. Kay's protocols for the

21   CogScreen?

22       A.  I'm saying that, you know, Scott is

Page 117

1    claiming that -- Mr. Patterson, that is -- that it

2    was not administered properly.  And so we

3    don't -- you know, basically Dr. -- we have a

4    different kind of recall of facts, I guess, here

5    between Dr. Knippa and Mr. Patterson.

6         Q.  Knowing what you know today, would you feel

7    comfortable independently stating as fact that Dr.

8    Knippa's examination did not follow your protocols

9    for the CogScreen?

10        A.  No.  I can't say that as fact.

11        Q.  Okay.  I'm going to hand you what I believe

12   is Exhibit 8.  And this is a court document.  At

13   the top it has the case number, Document 150.  I

14   assume you haven't seen this document before, is

15   that correct?

16             (Kay Exhibit Number 8 marked for

17   identification.)

18        A.  No.

19        Q.  Okay.  I just want to -- if you would flip

20   to Page 13.

21        A.  Okay.

22        Q.  And Point 2 is bolded there.  It says, "Dr.

Page 118

1   Caddy should be allowed to inform the jury about

2   the irregularities in Dr. Knippa's presentation of

3   his finding based on clinical psychological

4   interviewing and testing, from which information

5   jurors could reasonably draw an inference that Dr.

6   Knippa was engaging in biased, hired-gun behavior

7   towards Lieutenant Colonel Patterson."

8        Do you have any reason to conclude that Dr.

9   Knippa was engaging in biased, hired-gun behavior

10  towards Lieutenant Colonel Patterson?

11      A.  Well, I think Dr. -- you know, that Mr.

12  Patterson feels that that was the case.  And

13  certainly, he told me about things that made him

14  feel that way.

15      Q.  Do you have any reason to conclude that Dr.

16  Knippa was engaging in biased, hired-gun behavior?

17      A.  Well, we have -- no.  Other than the

18  comments made -- sorry about the cough.  Now I'm

19  coughing.  I should not have said anything.  That

20  based on Mr. Patterson's comments, I would have

21  that concern.  Based on what we see in the

22  testimony of Dr. Knippa, no.

1    Q.  Okay.  And in your experience prior or

2  aside from this case, have you ever known Dr.

3  Knippa to engage in biased, hired-gun behavior?

4    A.  I've heard that complaint before from other

5  American Airlines pilots who felt that they were

6  being railroaded and felt that this is -- it's just

7  a way for the company to get rid of them.  And so I

8  had heard that several times.  When I say

9  "several," like, maybe three times, four times.

10  Specifically, people were feeling that that was the

11  kiss of death, if you were an American Airlines

12  pilot and the folks in Dallas decided to send you

13  for a Section 20 to Knippa, you were going.

14    Q.  And have you ever independently concluded

15  that Dr. Knippa was engaging in biased, hired-gun

16  behavior towards a pilot?

17    A.  I have not had any basis for that other

18  than the complaints made by the pilots.

19    Q.  Okay.  Are you aware of other doctors who

20  have performed fitness for duty examinations and

21  then been alleged to have engaged in biased

22  hired-gun behavior by pilots?

Page 120

1      A.   I know that I am demeaned by -- with

2   frequency by -- particularly American Airlines

3   pilots in the HIMS program, that -- they think

4   very -- you know, that Dr. Kay is a really bad guy

5   and they don't particularly like me or my test,

6   so -- no.  They will demonize you if, in fact, they

7   feel that you're, you know, harming them and

8   not -- you know, their career, which is the

9   opposite of what I truly believe.  And I think what

10  most people in aviation believe is that I played a

11  role in making aviation safer and giving pilots a

12  better way to get their medical certificate back,

13  people who would never have a chance for getting a

14  medical certificate.  The SSRI Program -- sorry I'm

15  being defensive here, but it's completely unfair

16  and such a misrepresentation of reality.  But, in

17  fact, it's not uncommon that they will, you know,

18  really take a very hostile view towards those

19  people who might be involved in, they see,

20  interfering with their career.  When the bigger

21  role I played is actually helping pilots to get

22  their medical certificate and making way for pilots

Page 121

1  who are HIV positive to get their medical

2  certificate when the FAA was unwilling to consider

3  that.

4      Q.  And do airlines typically disregard your

5  report if a pilot accuses you of engaging in

6  biased, hired-gun behavior?

7      A.  I have not had that happen.  I've never

8  had -- I have not had an airline -- basically, I

9  don't know that I've ever -- I've never had a

10  hearing like this or any kind of legal case where

11  my reports have ever been -- I think one case with

12  American Airlines, where it got challenged, my

13  report didn't win.  But it went on to a challenge.

14  So no, you know, I think most people would agree

15  with my assessment of the pilot I'm thinking of.

16      Q.  Is it correct to say that your report spoke

17  for itself in those cases?

18      A.  I think my report fit very well with the

19  data we had from that case.  The training and

20  performance in the cockpit for that particular

21  aviator, in fact, showed a very good correlation

22  between what we were seeing in this guy in training

Page 122

1    and his performance and what we were seeing under

2    psychological testing.  And part of that would be

3    the basis for why the airman wasn't successful in

4    his appeal.

5        Q.  Have you ever administered a fitness for

6    duty exam and concluded that a pilot was not fit

7    for duty?

8        A.  Most certainly.

9        Q.  Okay.  And in any of those cases, has a

10   pilot then gotten a differing opinion from another

11   doctor?

12       A.  Yes.

13       Q.  And in your view, what is the appropriate

14   mechanism to resolve the difference of opinion in

15   those circumstances?

16       A.  Well, the cases I'm thinking of are cases

17   that went before the NTSB Administrative Law

18   Judges.  And I can't recall that I've ever been on

19   the losing side of any of those decisions.

20           So basically, my decision is based upon the

21   statutes that apply to how decisions are made

22   related to medical certification.  And if that's

Page 123

1    the basis and you can present those facts, you

2    know, to the trier of fact -- and I've had a case

3    go from there to the Court of Appeals, which

4    supported the presentations that were made.

5          And so as far as I'm concerned, the trier

6    of fact is the ultimate person who -- you know,

7    with authority here.

8        Q.   Okay.  I'm now going to hand you Exhibit 9.

9    And this is a document -- January 14, 2016.  It's

10   labeled fitness for duty Medical Examination

11   Request - Section 20.  Re:  FO Rodney Scott

12   Patterson.  Have you ever seen this document

13   before?

14         (Kay Exhibit Number 9 marked for

15   identification.)

16       A.   No.  No, sir.

17       Q.   Have you ever seen a document like this?

18       A.   Yes.

19       Q.   And what is -- and what is your experience

20   with seeing a document similar to this?

21       A.   Well, if you get a referral from the

22   airlines that's questioning a pilot's fitness for

Page 124

1   duty, which I do -- every year I do these -- then,

2   in fact, you're going to want to find out,

3   particularly from a chief pilot, what were the

4   particular issues.

5           And so more common in this would be cases

6   where a person has not performed well on

7   proficiency or transition training.  And so you get

8   training data as well.  So you would get a summary,

9   but then you would also get, like -- or if there's

10  been incidents that have occurred, such as when

11  they were traveling, you know, on a trip and

12  certain behaviors occurred.  I would get the

13  reports that were made about the airman, you know,

14  by hotel staff and, you know -- or TSA or whatever.

15  So I would get -- all of these records would come.

16  This would be part of it.

17      Q.  Okay.  And if you'd just review the first

18  paragraph there, "Flight requests that."

19      A.  I'm reading it.  I've read it.

20      Q.  And is that -- have you ever received a

21  similar description of a referral from American

22  Airlines?

Page 125

1      A.   That I can recall right now?  I can't

2   recall one.  But I might be wrong, but --

3      Q.   Does this fit the general category of

4   referrals that you've received from airlines in the

5   context of fitness for duty examinations?

6      A.   Most of my cases are related -- as I said

7   moments ago -- to training, proficiency, so it's

8   more related to their flight performance.

9           I have -- actually no.  There's one in the

10  last year that happened to be -- came to me for a

11  second opinion.  I think she was under this same

12  kind of thing.  She was being evaluated under a

13  Section 20.  And for more -- I would assume.  I

14  never saw the letter.  For more of these kinds of

15  issues.  Nobody was questioning her flying ability.

16  They were questioning the fact that she couldn't

17  get along with the other people in the cockpit.

18     Q.   The second sentence there says, "The

19  request is based upon this office's concerns about

20  FO Patterson's judgment, specifically his mental

21  and/or emotional stability."

22     A.   Yes.

Page 126

1     Q.  Is there anything in that sentence that

2  raises a concern for you about a

3  neuropsychologist's ability to conduct a fair

4  examination?

5     A.  None.  I mean, certainly when you -- I

6  think before I was focusing on emotional stability.

7  But when you say judgment, then you start to enter

8  the realm of what neuropsychologists are very good

9  at measuring.

10     Q.  And then the last sentence in that

11  paragraph, same question.  Anything in that

12  sentence, that starts "this office," that raises

13  concerns for you?

14     A.  Well, if you have a pattern of false

15  self-aggrandizing statements, one would want to

16  rule out things which cause that, either

17  pathological narcissim, which unless it's

18  manifested in maladaptive behavior, it's not an FAA

19  concern.  If you're just narcissistic, that's --

20  you can still fly.  We have a lot of narcissism in

21  the cockpit.  But -- which is a good thing if it's

22  healthy narcissism.

Page 127

1      Q.  Okay.

2      A.  Feeling you're confident to do things.  But

3   the part which would cause concern would be whether

4   there was mania because mania is something where

5   people exaggerate their -- you know, what they're

6   capable of doing.  They have unrealistic beliefs

7   about their capabilities.

8      Q.  Okay.  I'm now going to hand --

9          MR. MORALES:  Exhibit 10, is that correct?

10         THE COURT REPORTER:  Yes.

11  BY MR. MORALES:

12     Q.  And this at the top says Comprehensive

13  MedPsych Systems, Inc.

14         (Kay Exhibit Number 10 marked for

15  identification.)

16     A.  Yes.

17     Q.  I'm going to ask if you've ever seen this

18  document before?

19     A.  I have.

20     Q.  Okay.  And what is this document?

21     A.  This is the report of a neuropsychological

22  evaluation conducted by Dr. Edwin Bercaw on -- date

Page 128

1   of evaluation March 21, 2016.

2       Q.  And was this report referenced in your June

3   2016 report that we reviewed earlier?

4       A.  No, sir.

5       Q.  Why is that?

6       A.  I didn't know it existed.

7       Q.  It says at the top Neuropsychological

8   Evaluation.  Does this report contain information

9   that is relevant to the report from you that we

10  reviewed earlier?

11      A.  Yes.

12      Q.  Okay.  And in what manner is it relevant to

13  your report?

14      A.  Well, it's a neuropsychological evaluation.

15  It's data that goes over tests that I may or may

16  not administer if I'm going to see him

17  subsequently.  It would -- it completely applies to

18  how is the person performing on neuropsychological

19  testing.  If I'm seeing somebody for testing, I

20  want to see all their prior neuropsychological

21  evaluations.

22      Q.  And you had not seen this at the time of

Page 129

1    your June 2016 report, is that correct?

2         A.  Correct.

3         Q.  Okay.  If you look at Page 3, it says

4    Procedures Administered.  And I believe your name

5    is referenced there again.  Kay, 2002, is that

6    correct?

7         A.  Correct.

8         Q.  How does this list -- let me ask it this

9    way, under Procedures Administered, there are a

10   list of variety of, what appear to be, tests.  Some

11   that we've seen before.  Are there more tests here

12   then were included in your examination in 2016?

13        A.  Yes.

14        Q.  Okay.  Are each of the tests that you

15   performed in June 2016 also listed here?

16        A.  Two of the three.  There's a different

17   version of the Continuous Performance, but

18   otherwise the same.

19        Q.  Okay.  And CogScreen, it looks like it's

20   listed there, is that correct?

21        A.  Correct.

22        Q.  And that's the CogScreen that you

Page 130

1    administered as well?

2        A.  Yes.

3        Q.  And Dr. Knippa administered as well?

4        A.  Right.

5        Q.  And what is your understanding of

6    the -- you noted the date of March 21, 2016.  If

7    you need to flip back to Dr. Knippa's report --

8    I'll represent that the report date on that Exhibit

9    4 is also March 21, 2016, is that correct?

10       A.  Right.  And the date of exam March 17th.

11       Q.  Okay.  And so it looks like this evaluation

12   was conducted four days after Dr. Knippa's

13   evaluation, is that correct?

14       A.  Apparently.

15       Q.  Okay.  Does that time frame raise any

16   concerns with you in terms of the

17   neuropsychological examination that Dr. Bercaw

18   would have been able to perform?

19       A.  Yes.

20       Q.  Why is that?

21       A.  It's extraordinarily unusual that a

22   neuropsychological exam would be repeated after

Page 131

1    four days.  I mean, six months maybe.  A year.  But

2    not four days later.

3         I mean, about the earliest

4    sometimes -- like, for example, pilots who are in

5    the HIMS Program, at about Week 3 of their

6    in-patient treatment, they take CogScreen.  And

7    CogScreen is used to look and see how -- where

8    they're at in their recovery and the likelihood

9    that they're going to do okay when they have to

10   undergo the full FAA neuropsychological test

11   battery.  But they don't actually take CogScreen

12   again or undergo neuropsychological testing for the

13   FAA for four months, three to four months later.

14        So that would be an acceptable kind of

15   interval.  But repeating these tests after four

16   days, the norms don't necessarily apply.  So how do

17   you interpret the test results when there's that

18   short of an interval?  It basically would raise

19   questions as to the validity of the data from this

20   examination.

21   Q.  Would the short time frame tend to help the

22   pilot or hurt the pilot in terms of the results?

Page 132

1      A.  Help the pilot.

2      Q.  And why is that?

3      A.  Because of just over-familiarity and recent

4  practice of the test.

5      Q.  And that's even if they were to take a

6  different version, for example, of the CogScreen

7  test --

8      A.  Yes.

9      Q.  -- is that correct?  Okay.  What if the

10  test -- let me ask it this way, what if the

11  CogScreen test that the pilot took was the same

12  CogScreen session that they had taken four days

13  earlier?

14      A.  That would even add to the practice of that

15  test.

16      Q.  And why is that?

17      A.  Because they would be getting the same

18  items, particularly -- the math items and symbol

19  digit test would, in particular -- and the memory

20  test, would all be even less valid on repetition

21  because those are -- there's content that would be

22  recalled from those.

Page 133

1    Q.  And do you know what CogScreen session Dr.

2    Bercaw administered?  Let me ask it this way, if

3    you look at Page 4 of the report, _00007, do you

4    see Effort and Validity at the top?

5    A.  Yes.  CogScreen Session 2.

6    Q.  Is that the same CogScreen session that you

7    administered in June of 2016?

8    A.  Yes.

9    Q.  Did you know that Mr. Patterson had taken

10   CogScreen Session 2 at the time you administered

11   CogScreen --

12   A.  No, sir.

13   Q.  -- CogScreen Session 2?

14   A.  No, sir.

15   Q.  Would you have administered CogScreen

16   Session 2 if you had known he had taken Session 2?

17   A.  Not intentionally.

18   Q.  And why is that?

19   A.  Because I would give Session Number 3,

20   which is how we train people to give CogScreen.

21   Q.  And had Mr. Patterson informed you at the

22   time you administered your exam that he had taken

Page 134

1    CogScreen Session 2?

2         A.  No, sir.

3         Q.  Did he mention it after he took CogScreen

4    Session 2?

5         A.  When he came to see me for the examination

6    in October of 2018.

7         Q.  So prior to October of 2018, did you know

8    that Mr. Patterson had taken CogScreen Session 2

9    before you administered CogScreen Session 2?

10        A.  Yes.

11        Q.  You did?

12        A.  Before October 2018, yes.

13        Q.  Prior to October 2018?

14        A.  I just said yes.

15        Q.  When is that?  When did you learn of that

16    fact?

17        A.  I think that might be protected by

18    attorney/client privilege.

19        Q.  Well, I'll ask you, when did you learn of

20    that fact?

21        A.  Mr. Ambrose informed me.

22        Q.  Ambrose?  Amlong?

Page 135

1      A.  Amlong.  Sorry.  Sorry.

2      Q.  And when was that?

3      A.  I don't remember the date.

4      Q.  Was it in 2018?

5      A.  Yes.

6      Q.  Okay.

7      A.  I mean, should Mr. Amlong be objecting to

8  questions about my conversations with him?

9          MR. AMLONG:  No.  I'm not objecting to it.

10         THE WITNESS:  Okay.  Sorry.  I'm not a

11  lawyer, so I don't know.

12         MR. MORALES:  Sure.

13  BY MR. MORALES:

14     Q.  Would a pilot that took CogScreen Session 2

15  once know that they were taking the same session if

16  they took it again a few months later?

17     A.  Not that likely.

18     Q.  Okay.  Would there be similarities in terms

19  of what they would see during the exam?

20     A.  Well, I mean, there's similarities in

21  Session 1 and Session 2 and Session 3.  They are an

22  experienced CogScreen, you know, person.  We do

Page 136

1     administer CogScreen repeatedly to people who are

2     under various protocols with the FAA.  And our data

3     shows that that's a very stable and reliable test,

4     so it's designed to be repeated.

5          It would be more familiar and there would

6     be an advantage of taking it a third time, and

7     perhaps a tiny bit of extra advantage by repeating

8     the same items.  So he's getting the same math

9     problems that he took with Mr. -- with Dr. Bercaw.

10    The identical items.

11         Q.  When he takes your exam?

12         A.  When he took Number 2 with me he's getting

13    the same items.

14         Q.  Okay.  And if you'd just look at that

15    paragraph, the Effort & Validity paragraph.  Did

16    Dr. Bercaw note the possibility of practice effects

17    even as compared to Dr. Knippa's examination?

18         A.  You're saying he noted this somewhere?

19         Q.  Page 4, the top paragraph, Effort &

20    Validity --

21         A.  Sorry.

22         Q.  Yeah.  Sorry about that.

Page 137

1      A.  I was on the wrong page.

2      Q.  Is there any reference to practice effects

3  by Dr. Bercaw?

4      A.  He makes mention that "Mr. Patterson

5  completed a similar neuropsychological evaluation

6  within a week of this evaluation; hence, there is

7  the possibility of practice effects on some of the

8  tests administered.  However, alternate forms were

9  used when possible."

10      For example, on the Auditory Verbal

11  Learning Test, he gave a different list of words,

12  he gave a different figure for the complex figure

13  test, and he did Session 2 of CogScreen.

14      Q.  Okay.  If you look at Page 7, the last

15  paragraph.  It starts, "With respect to his airman

16  medical certificate."  If you would just take a

17  second to review that.  And I'd ask you what you

18  understand Dr. Bercaw's report to be communicating

19  there.

20      A.  Okay.

21      Q.  Are these Dr. Bercaw's conclusions as you

22  understand them in his report?

Page 138

1      A.   That's what I understand to be his

2   conclusions.

3      Q.   And what were his conclusions?

4      A.   Mostly it appeared that Mr. Patterson

5   performed well on neuropsychological testing, with

6   the exception of -- basically, he saw mild to

7   moderate impaired deductive reasoning.  And then he

8   basically raises a -- basically this is a concern

9   to Dr. Bercaw and he questions whether this would

10  impact flight -- potentially impact flight

11  performance.  And suggests that it be reviewed by a

12  FAA neuropsychologist.  He said that he didn't have

13  available the prior results from Dr. Knippa.

14     Q.   And do know why he didn't have those

15  available?

16     A.   No.

17     Q.   Okay.  For purposes of the report that you

18  issued in, I guess, June of 2016, would you have

19  expected a pilot to provide a report of this sort

20  from Dr. Bercaw to you for purposes of your

21  analysis?

22     A.   I would have demanded it.  I wouldn't have

Page 139

1    actually performed my evaluation or written my

2    report without it.

3        Q.  And knowing that you didn't -- knowing now

4    that did not receive Dr. Bercaw's report, would you

5    stand on the accuracy of your June 2016 report?

6        A.  I would.  I mean, what we found in June of

7    2016 is what we found.  And what we found was that

8    on the test that I gave, I didn't see any basis for

9    him to be not considered fit for duty, or to have

10   anything that would be disqualifying for an airman

11   medical certificate.

12        So it doesn't change what I found here.

13   However, I'm seeing results on other measures that

14   were not administered by me in June, which cause me

15   concern, and which, in fact, would have led to a

16   different opinion.

17       Q.  As we sit here today, is your June 2016

18   report complete and accurate with respect to Mr.

19   Patterson's neuropsychological evaluation?

20       A.  It is not complete in that it unfortunately

21   does not contain information about his March 2016

22   neuropsychological test findings.

Page 140

1      Q.   Would it be appropriate for the FAA to rely

2   on the June 2016 report from you in analyzing Mr.

3   Patterson's fitness for duty?

4      A.   No.

5      Q.   And why is that?

6      A.   Because there had been an evaluation which

7   include other neurocognitive findings that should

8   be part of his airman medical record and which

9   would be under consideration by an FAA

10  neuropsychology consultant in making a

11  determination about medical certification.

12     Q.   And would Mr. Patterson have been expected

13  to provide this report to the FAA?

14     A.   He would be required to.

15     Q.   Required by what?

16     A.   Required by FAA regulation.

17     Q.   Okay.  And do you know if Mr. Patterson did

18  provide Dr. Bercaw's report to the FAA in 2016?

19     A.   I don't know when or if he provided it to

20  the FAA.

21     Q.   Okay.  And do you know why you didn't

22  receive a copy of Dr. -- or Mr. Patterson's report

Page 141

1   from Dr. Bercaw in 2016?

2       A.  No.

3       Q.  Okay.  Has Mr. Patterson told you why you

4   didn't receive Dr. Bercaw's report in 2016?

5       A.  He may have.  I don't remember him telling

6   me.  But if I put it in this report in 2018 -- let

7   me see if he explained it.

8       Q.  Well, I think we'll get to that in a

9   second.

10      A.  Okay.

11      Q.  But as of --

12      A.  He may have explained it to me because I'm

13  sure I asked --

14      Q.  Okay.

15      A.  -- why didn't you give me the report?

16      Q.  Were you told a reason in 2016?

17      A.  No.

18      Q.  Okay.  In 2017?

19      A.  No. But I didn't see him in 2017.

20      Q.  Okay.  I'm going to hand you now Exhibit

21  11.  And this is another -- it has a case number at

22  the top.  It has Yasmin Harris's e-mail line at the

Page 142

1    top.  Do you see that?  Dated Friday, April 22,

2    2016.

3            (Kay Exhibit Number 11 marked for

4    identification.)

5        A.  Oh, okay.  Yes.

6        Q.  Have you ever seen this document before?

7        A.  No, sir.

8        Q.  Okay.  I'd actually ask you to look at the

9    bottom document there, so it's the underlying

10   e-mail first.

11       A.  Okay.

12       Q.  And it says from Ed Bercaw.

13       A.  It's Bercaw, by the way.

14       Q.  Oh, sorry.  Bercaw.

15       A.  Bercaw.

16       Q.  Thank you.  That's very helpful.  Bercaw to

17   aa737drvr.  Do you have any understanding of who

18   aa737 is?  It looks like the e-mail is addressed,

19   Good Morning, Mr. Patterson.

20       A.  So Mr. Patterson's --

21       Q.  Okay.

22       A.  I mean, I don't know that for sure.

Page 143

1    Q.  And then I guess --

2    A.  It makes sense that it would be Mr.

3  Patterson.

4    Q.  At then at the top there the e-mail is from

5  Scott signed Scott Patterson with that e-mail

6  address?

7    A.  Yes.

8    Q.  Okay.  Have you ever seen this e-mail, the

9  e-mail from Dr. Bercaw?

10    A.  Uh-huh.

11    Q.  You have seen this?

12    A.  No.  I have not seen it before.

13    Q.  Okay.  If you'd take a second to read that.

14    A.  Okay.  Should I read the top part?

15    Q.  Read the bottom part first, if you would.

16    A.  Okay.  This should go to review by the FAA.

17    Q.  And I believe you just noted it says, "this

18  should go to review by the FAA," is that correct?

19    A.  Yes.

20    Q.  Okay.  And the date on this is April 22,

21  2016, is that correct?

22    A.  Yes.

Page 144

1      Q.   And the subject is neuropsych evaluation?

2      A.   Yes.

3      Q.   And the first sentence is, "Sorry for the

4   delay on this report."   The third sentence is, "A

5   PDF is attached."

6           Is that correct?

7      A.   That's correct.

8      Q.   It looks like -- as you noted -- the sixth

9   sentence says, "Ultimately, the recommendation is

10  that this should go to review by the FAA, who has a

11  few in-house neuropsychologist consultants who

12  render an opinion."

13          Do you have any understanding of what Dr.

14  Bercaw -- and please correct me if I'm

15  mispronouncing it --

16     A.   Bercaw.

17     Q.   Bercaw -- was referring to there?

18     A.   Well, the FAA has neuropsychology

19  consultants.   We're not in-house.   I'm one of the

20  two most senior FAA neuropsychology consultants

21  they now have as of about a month ago or two months

22  ago.   They have an actual FAA neuropsychologist who

Page 145

1  has recently been hired.

2       But prior to that, a case like this would

3  have been sent to somebody like myself.  And there

4  are about a half dozen of these consultants.  And

5  I've played a role in training those consultants.

6  And they've been taught how to, you know,

7  understand the FAA regulations.  And they're

8  sufficiently expert to represent the FAA at

9  hearings, if necessary.  And they are the folks who

10 assist the Federal Air Surgeon in making a

11 determination about issuance of medical

12 certificates.  So that's what that means.

13     Q.  And would the FAA expect a pilot who

14 receives this e-mail to inform them of the e-mail?

15         MR. AMLONG:  Objection.  Foundation.

16 BY MR. MORALES:

17     Q.  You can answer.  Let me ask you, if a pilot

18 receives a neuropsych evaluation from Dr. Bercaw

19 and a recommendation that this should go to review

20 by the FAA, in your view, does the pilot have a

21 responsibility to inform the FAA of that

22 recommendation?

Page 146

1       A.  The pilot has a responsibility to list on

2    his Form 8500-8 that he was evaluated by -- he's

3    required by law to indicate that he was evaluated

4    by Ed Bercaw, in this case, and that the evaluation

5    took place.

6           Now, the FAA's responsibility would be to

7    say, gee, I don't see that here in our files.  And

8    before I issue you your next medical certificate,

9    please submit the data from that evaluation in a

10   format so required by the FAA for their

11   neuropsychology consultants.

12          So his responsibility -- I mean, he

13   would -- if -- Ed Bercaw, basically -- it would

14   have been helpful for him to let Mr. Patterson know

15   that, well, you know, whether you submit it now or

16   later, at some point the FAA is going to obtain

17   this.  And, you know, if you don't want to -- and

18   as Scott says at the top, you know, you can't

19   release information without my specific approval,

20   that's true.  And guess what?  If he doesn't want

21   to release the information to the FAA, and I'm

22   working as an FAA consultant, that's his

1 prerogative and he can just not get a medical

2 certificate.  That's his choice.  If he wants a

3 medical certificate, we're going to demand that he

4 submit that data.  He's not going to get a medical

5 certificate until we get that data.

6     Q.  And you said the FAA will get the

7 information one way or another, is that --

8     A.  Well, they don't know.  If you don't want

9 to give it to me and I'm working with the FAA and

10 you said, no, I'm not releasing that data to you,

11 well, fine.  We're not going to give you a medical

12 certificate.

13     Q.  What if the FAA didn't know about the data?

14     A.  They didn't apparently.  Well, I don't know

15 if they knew.  So let's say it that way.  I didn't

16 know.  I don't know to this moment if they know.  I

17 have no idea.

18     Q.  How would the FAA typically find out about

19 a report such as this?

20     A.  Well, generally pilots are referred to us

21 by an AME and the AME knows who they've seen.

22     Q.  And how does the AME know who they've seen?

Page 148

1      A.   The AME has referred them usually.

2      Q.   Okay.

3      A.   How did they get to a neuropsychologist?

4   The AME -- you know, basically the pilot reads the

5   Form 8500-8, which says list the healthcare

6   professionals that you've seen.  That's pretty

7   clear.  I mean, if you've seen anybody, list it

8   here.

9           The FAA, Aviation Medical Certificate

10  Division in Oklahoma City, would say there's a

11  psychologist listed here.  We need to know about

12  this.

13     Q.   So --

14     A.   Well, I underwent an evaluation.  Fine.

15  Send us the data.

16     Q.   Is it fair to say the FAA relies on Form

17  8500 to determine whether or not a pilot has seen a

18  neuropsychologist, for example?

19     A.   Not unless data has been submitted by the

20  airman.

21     Q.   Okay.  I'll now ask you to look at the

22  e-mail up top there.  And it looks like this one is

Page 149

1   from Mr. Patterson, is that correct?

2        A.  That appears to be correct.

3        Q.  And it says April 2016.  Is that the same

4   date as the e-mail we were just looking at?

5        A.  Yes.

6        Q.  And it looks like it's 12:49 p.m. The

7   earlier e-mail was 11:38 a.m. There's no time zone,

8   but those are the times listed, is that correct?

9        A.  That's correct.  That's what it says.

10       Q.  Okay.  And who is Mr. Patterson writing to,

11  if you can tell, in this e-mail?

12       A.  It's addressed to Dr. Bercaw.

13       Q.  Okay.  Is there anyone else included in the

14  cc?

15       A.  Yes.

16       Q.  And who is that?

17       A.  Dr. Fonseca, whoever that is.  Oh, that's

18  the doctor at MedPsych.net, so that's a

19  psychologist who works in that same practice as Dr.

20  Bercaw.  And then Glenn Caddy and Dr. -- Mr.

21  Amlong.

22       Q.  Okay.  And I'd ask you to look at the last

Page 150

1    sentence of that -- or I'm sorry.  The last

2    paragraph of that e-mail that starts "at the

3    moment."

4         A.   Yeah.  "I am rescinding any authorization

5    for you to send my records anywhere other than to

6    Dr. Caddy.  Specifically those authorizations

7    entitled FAA or Aviation Medical Examiner are at

8    this time rescinded."

9              And by the way, we train neuropsychologists

10   at our seminar -- and this may have been before Dr.

11   Bercaw had this training -- that one of the ways

12   they can kind of protect the air -- the national

13   airspace from this occurring is that upon the pilot

14   signing the consent for evaluation, which is one of

15   the first things you do when a pilot comes into

16   your office, you send a fax to the AME who has

17   referred them and say, just letting you know, I am

18   seeing such-and-such pilot for neuropsychological

19   evaluation.

20             Now the AME, who's going to be issuing that

21   guy a medical certificate and basically submitting

22   the 8500, knows that -- and this has been

Page 151

1  documented.  You know, at some point he rescinds

2  and says you can't send the report.  Well, at least

3  the AME is going to make sure that it does list the

4  person was seen by Ed Bercaw.

5      Q.  Is there any basis that you're aware of for

6  a pilot to rescind authorization for a

7  neuropsychologist to inform the FAA or an AME of

8  their findings?

9      A.  Is there any basis?  What do you mean by

10  that?

11     Q.  Is there any authorization that a pilot

12  might have to rescind the --

13     A.  Yes.  By the law here in the District of

14  Columbia, as a mental health practitioner, there's

15  a confidentiality law here.  And you grant me --

16  you grant me -- you grant me -- you know, you

17  basically give me permission to release your

18  records.  You can pull that at any time you want.

19  And that's what you can do with your health

20  records.  So that is completely appropriate and

21  that is anybody's right to their medical records.

22  You can say I don't give you permission to release

Page 152

1  this medical record.

2      Q.  Does that have any implication for your FAA

3  medical certificate?

4      A.  I'm not sure I know what that means.

5      Q.  If a pilot rescinds authorization for a

6  neuropsychologist to report their findings to the

7  FAA, does that at all impede the pilot's ability to

8  obtain a medical certificate from the FAA?

9      A.  It could slow it down if he or she then

10  completes an 8500 and -- accurately completes their

11  8500.  And if they include the name of the

12  psychologist and the person at the FAA reviewing

13  says, I don't see a report here from the

14  psychologist, then it will just be -- the delay

15  will be that the FAA will write to the pilot and

16  say, sir, we need a copy of all the records from

17  this psychologist, including any report of

18  psychological evaluation.  So the delay will just

19  be in getting that report sent to the FAA.

20      Q.  So so long as the pilot reports it on the

21  8500, it's just a delay typically?

22      A.  That would be the impact.

Page 153

1        Q.  And what if a pilot doesn't report it on

2   the 8500?

3        A.  Then they -- they failed to provide

4   information they're required to provide.

5        Q.  And what's the implication for the pilot?

6        A.  It depends on how the administrator general

7   counsel is dealing with cases at that time, how

8   many cases they have, and if they decide -- how

9   they decide they want to deal with it because they

10   have a number of different solutions that they

11   apply.

12        Q.  Would you typically expect a pilot in that

13   circumstance to lose their FAA certification?

14        A.  Not necessarily.  I think that the FAA

15   tries to be very lenient.  And they would basically

16   say, sir, you're required to notify us about this.

17   And that's very important.  Let's not let this

18   happen again.  I mean, I hate to be saying some of

19   this, but what I find in terms of whether they

20   adjudicate things, I find that they're very

21   understanding.  They know how important this is.

22   They understand.  But at the same time, they're

Page 154

1   going to have their eye on you after this.  And

2   they're not going to assume that you made

3   a -- they're going to assume that you made a

4   mistake.  And they're pretty open-minded. But if

5   it's flagrant, and they can find that it was

6   flagrant, then, in fact, they could take far more

7   serious action.

8       Q.  From an FAA perspective, what facts would

9   support a conclusion that it was flagrant?

10      A.  I think you'd have to --

11          MR. AMLONG:  Objection.  Foundation.

12      A.  And I think you'd actually have to talk to

13  the FAA counsel to -- they would be able to tell

14  you exactly what kind of cases they'd move forward

15  with.  Talk to somebody like Greg Winton here in

16  town.  He used to be with the FAA.  He's

17  now -- does what -- you know, kind of -- he's a

18  lawyer here doing -- he would know.  I wouldn't

19  know.

20  BY MR. MORALES:

21      Q.  Let me ask you, you have significant

22  experience with fitness for duty examinations, is

1    that correct?

2         A.   Correct.

3         Q.   You have significant experience with the

4    FAA medical examination process, is that correct?

5         A.   Yes.

6         Q.   From your perspective, what facts would

7    support a conclusion that a pilot had flagrantly

8    withheld information of visits to a health

9    professional or a medical condition from the FAA?

10             MR. AMLONG:  Objection.  Foundation.

11   BY MR. MORALES:

12        Q.   You can continue.

13        A.   Sure.  First of all, it's not my role.  I

14   actually have said in reports where I note that

15   there's been a problem of disclosure.  I've

16   actually in my reports to the Federal Air Surgeon

17   said, I think that this is something which needs to

18   be reviewed by the administrator's general counsel.

19   And that -- and so what we find often is somebody

20   not reporting medication that they took, which is a

21   disqualifying medication.  Or they've had some

22   other disqualifying condition, which they have

Page 156

1    failed to report.  Then, in fact, the failure to

2    report is significant.  That really undermines the

3    safety of national air space.  So I actually turn

4    that over to the people who can make those

5    decisions.

6         You're asking what actually would be

7    flagrant.  There are minor things you could, you

8    know, fail to indicate and there are very

9    meaningful things.  So if it's a medication that

10   would impair your ability to fly and you've not

11   indicated it.  If it's a condition which could

12   impact aviation safety, then I think that I raise

13   it up to those who will make a determination about

14   how they're going to adjudicate the case.

15        Q.  Do you view yourself to have a

16   responsibility to communicate that up to the FAA?

17        A.  I have a responsibility as a citizen and as

18   a neuropsychologist to let the Federal Air Surgeon

19   know that this is what I've seen.  They'll decide

20   how they want to proceed with it.

21        Q.  Do you believe that airlines have an

22   obligation to report such facts to the FAA if

Page 157

1   they're aware of them?

2        A.  I sure hope so.

3        Q.  Okay.  I'd like to hand you now what I

4   believe is Exhibit 12.  And this is another

5   deposition transcript.  You'll see on the front it

6   says Video Deposition of Dr. Bercaw.

7        A.  Bercaw.

8        Q.  Bercaw.  I'm going to keep trying to

9   pronounce that correctly.  Have you seen this

10  document before?

11       (Kay Exhibit Number 12 marked for

12  identification.)

13       A.  No, sir.

14       Q.  Just one item here.  If you'd go to Page

15  116.  It's hard copy --

16       MR. AMLONG:  I'm sorry.  Page 1 what?

17       MR. MORALES:  116.  1-1-6.

18       A.  Okay.

19  BY MR. MORALES:

20       Q.  It's hard copy 30, I think.  It starts, "I

21  made that statement" at the top of the page.  Do

22  you see that?

Page 158

1    A.  Yes.

2    Q.  And I'd ask you just to read basically

3  through Line 19 of that Page 116.

4    A.  Okay.

5    Q.  Line 15 says, "Well, Dr. Kay didn't do the

6  same evaluation.  And by omission of my evaluation,

7  he's done Session Number 2, which means that three

8  months later he got the exact same items from that

9  test, so that would strengthen the practice

10 effect."

11       Is that a reference to the CogScreen

12 Session 2?

13   A.  Yes, sir.

14   Q.  And do you agree that your evaluation

15 omitted a reference to Dr. Bercaw's evaluation?

16   A.  Yeah.

17   Q.  Did it intentionally omit a reference to

18 that evaluation?

19   A.  It omitted it because I didn't know about

20 it.

21   Q.  Okay.  And do you agree with Dr.

22 Bercaw's --

Page 159

1        A.   Bercaw.

2        Q.   -- Bercaw's statement regarding the

3   potential impact on the practice effect?

4        A.   Yes.

5        Q.   Okay.  All right.  I'm going to hand you

6   13.  This is an e-mail thread.  At the top is an

7   e-mail from Dr. Bercaw.

8             (Kay Exhibit Number 13 marked for

9   identification.)

10       A.   Yes.

11       Q.   Did I get that correct?

12       A.   Uh-huh.

13       Q.   And it looks like the date is May 4, 2016

14  addressed to Scott.  Is that Mr. Patterson?  And

15  Dr. Caddy?  Is that correct?

16       A.   Regarding consultation with Dr. Caddy.

17       Q.   Okay.

18       A.   Oh, Dr. Caddy is included on the e-mail.

19       Q.   And this is prior to your examination of

20  Mr. Patterson, is that correct, in June of 2016?

21       A.   Yes.

22       Q.   Okay.  I'd just ask you to look at the

```
                                              Page 160
 1   bottom -- the last e-mail in this chain.

 2          MR. AMLONG:  What day is that?

 3          MR. MORALES:  What date?  It's May 4, 2016.

 4   It was Bercaw Exhibit 4.  It's now our Exhibit 12.

 5          THE WITNESS:  13.

 6          MR. MORALES:  Or I'm sorry.  13.  Thank

 7   you.

 8      A.  And you're saying the last e-mail?

 9   BY MR. MORALES:

10      Q.  The last e-mail is Friday, April 29, 2016.

11      A.  Yes.

12      Q.  Do you see that?  I'd just ask you to read

13   that e-mail.  Do you have an understanding of who

14   that e-mail is from?

15      A.  I don't get it, but okay.

16      Q.  This is an e-mail from Mr. Patterson, is

17   that correct?

18      A.  Yes.

19      Q.  To Dr. Caddy?

20      A.  Yes.

21      Q.  Have you ever seen that -- the first line

22   there before, "If Dr. Bercaw will play ball with
```

Page 161

1    you, fine"?  Have you ever seen that reference

2    before?

3        A.  This e-mail?  No.  I've never seen this

4    e-mail.

5        Q.  And then the last sentence there says, "If

6    he won't play ball we will cut bait and go fish

7    elsewhere."

8            You ever seen that before?

9        A.  Have I ever seen that sentence?  No.

10       Q.  Okay.  Are you familiar with the concept of

11   doctor-shopping in the fitness for duty concept?

12       A.  It's frightening.  Yes.

13       Q.  And what is it?

14       A.  Well, a doctor doesn't -- I mean, a patient

15   doesn't like the result and they go elsewhere to

16   find an opinion that would be more to their liking.

17   And that's of concern to doctors.

18       Q.  In your experience, is that concept of

19   doctor-shopping a concern to air carriers?

20           MR. AMLONG:  Objection.  Foundation.

21       A.  I don't know about air carriers expressing

22   that concern.

Page 162

1    BY MR. MORALES:

2         Q.   Okay.

3         A.   I would hope that they would be concerned

4    about that.

5         Q.   And why is that?

6         A.   Because basically if you shop around, you

7    may get an opinion that may sound -- may not be

8    valid, but it sounds okay, giving you incorrect

9    information.  It may not be valid.

10        Q.   Does that raise any concerns for airline

11   pilots?

12        A.   Sure.

13        Q.   And what are those concerns broadly

14   speaking?

15        A.   That somebody who really has a

16   disqualifying --

17             MR. AMLONG:  Objection.  Foundation.

18             THE WITNESS:  Certainly.

19        A.   That somebody who has a disqualifying

20   condition is actually, you know, flying and has an

21   illicite medical certificate.

22   BY MR. MORALES:

Page 163

1      Q.  In your training and experience with the

2  FAA, are you trained to attempt to mitigate those

3  vulnerabilities and concerns?

4      A.  I'm trained as the reviewer of records to

5  be able to find where in the records I see areas of

6  concern that are raised, suspicious areas that I

7  suggest have further evaluation.

8      Q.  Okay.  I'm going to hand you now 14.  I'm

9  going to ask you to take a quick look at this.

10         (Kay Exhibit Number 14 marked for

11  identification.)

12         MR. AMLONG:  Can you tell me what 14 is?

13         MR. MORALES:  14 is an e-mail from Scott to

14  Glenn Caddy.  Date, April 26, 2016.

15  BY MR. MORALES:

16      Q.  Have you ever seen this e-mail before?

17      A.  No.

18      Q.  The second paragraph says, "I have asked a

19  couple of times when the report was going to be

20  complete.  And a couple more days was the answer.

21  I feel I have provided adequate information to

22  complete an evaluation, even putting it into copy

Page 164

1   so you could copy and paste."

2        Has Mr. Patterson ever provided you

3   copy-and-paste material for either of your reports

4   in this case?

5        A.  No, sir.

6        Q.  Okay.  I'm going to hand you 15.  And this

7   is a videotaped deposition transcript for Mr.

8   Patterson.  I'd ask you to take a look at that.

9   Have you reviewed this before?

10       (Kay Exhibit Number 15 marked for

11   identification.)

12       A.  No, sir.

13       Q.  Okay.  Look at Page 337.  The hard copy

14   Page 85 marked at the bottom, I believe.

15       A.  Yes.

16       Q.  Line 14.  There's a reference to Dr. Gary

17   Kay.  Do you see that?

18       A.  Yep.

19       Q.  And Line 17 says, "And did Dr. Kay review

20   Dr. Knippa's report?"  "Yes, he did."  "Did he

21   provide his own report?"  And then Mr. Patterson

22   says, "There was an issue with Dr. Kay in that he

Page 165

1     had Dr. Knippa's report.  I didn't provide it to

2     him."

3            Do you know what Mr. Patterson is referring

4     to there?

5        A.  No.

6        Q.  Page 341, Line 13.  The question is,

7     "There's a reference in some of the documents to a

8     Bercaw report.  Does that jog your memory?"  And

9     the answer from Mr. Patterson is, "Dr. Bercaw does

10    not."

11           The date on this is March 6, 2018.  Are you

12    surprised that the name Dr. Bercaw did not jog Mr.

13    Patterson's memory in March 2018?

14       A.  I'm not trying to be funny, but --

15           MR. AMLONG:  Objection.

16       A.  I'm not trying to be funny, but it's been

17    hard to pronounce Bercaw.  And maybe it was the

18    pronunciation that did not ring a bell.

19    BY MR. MORALES:

20       Q.  Okay.  Page 342, it says -- the question,

21    Line 2, "Do any of the names we just talked

22    about -- Abi-Rafeh, Kay, Hastings, Caddy,

Page 166

1    Bercaw -- would any of those individuals not appear

2    on FAA Form 8500 for you listing health

3    professionals you visited in the last three years?"

4         Are you familiar with all of those names?

5    A.  I am.

6    Q.  Okay.  And is this Form 8500, that's the

7    form we've been discussing today?

8    A.  Specifically it's the 8500-8 --

9    Q.  -8.

10   A.  -- but yeah.

11   Q.  Right.  Okay.  Line 22 says, "Dr. Kay,

12   would Dr. Kay appear on your FAA form?"  It says,

13   "Dr. Kay did."

14        Have you ever reviewed Mr. Patterson's FAA

15   Form 8500-8?

16   A.  I don't believe that I did.

17   Q.  Okay.

18   A.  I did see that Dr. Bercaw received a copy

19   of Mr. Patterson's FAA medical record.  He would

20   have had the 8500.

21   Q.  Okay.  And then line -- sorry.  Page 343,

22   Line 3.  It says, "Dr. Bercaw."  Question.  And

Page 167

1  then the answer is, "He did not."

2         Do you understand that to be a response to

3  whether Dr. Bercaw appeared on Mr. Patterson's FAA

4  form?  So -- sorry.  That's a confusing question.

5  Let me restate it.

6      A.  Yes.

7      Q.  So Line 22 on Page 342 says, "Dr. Kay,

8  would Dr. Kay appear on your FAA form?"  And then

9  it says -- "Dr. Kay did," is the answer.

10     A.  Right.  Yes.

11     Q.  "Dr. Hastings?" "Dr. Hastings did." "Dr.

12  Caddy?"  "Dr. Caddy did."  And then Line 3 of Page

13  343.  The question was "Dr. Bercaw?"  And the

14  answer is, "He did not."

15         What do you understand that answer to mean?

16     A.  That he did not write Dr. --

17         MR. AMLONG:  Objection.  It speaks for

18  itself.

19  BY MR. MORALES:

20     Q.  You can continue.

21     A.  He did not write Dr. Bercaw's name on the

22  FAA Form --

Page 168

1     Q.  Okay.

2     A.  -- 8500-8.

3     Q.  Line 8 there says, "Is Dr. Bercaw a health

4  professional?"  And the answer is, "He is."  And

5  Line 10.  The question is, "Have you visited him in

6  the last three years?"  Asked on March 6, 2018.

7  And the answer from Mr. Patterson is, "Not in the

8  last three years."

9        Is that consistent with your understanding

10  today?

11     A.  No, sir.

12        MR. AMLONG:  Objection.

13  BY MR. MORALES:

14     Q.  Page 343 still, Line 21 says, "So there may

15  or may not be a report that Dr. Bercaw created

16  about your medical history?"  And the answer from

17  Mr. Patterson is, "I'm pretty familiar.  If he

18  created a report, I should have seen it, but I have

19  not seen it."

20        Is that a credible answer from Mr.

21  Patterson in your view knowing what you know today?

22        MR. AMLONG:  Objection.  Foundation.

Page 169

1      A.  If we can look back at that e-mail

2  that -- between Dr. Bercaw and Mr. Patterson.  Did

3  Mr. Patterson indicate that he -- when he rescinded

4  the, you know, authorization to release records to

5  FAA, does Mr. Patterson indicate in that e-mail

6  that he's read the report?  He may have indicated.

7  Can I take a look at that?

8  BY MR. MORALES:

9      Q.  Sure.  You can take a look at that.

10     A.  Which of these --

11     Q.  Exhibit 11.

12     A.  Thank you.  Well, it says very clearly in

13  this e-mail on Exhibit 11 on the bottom that he

14  attached a copy of the PDF report in his e-mail at

15  11:38.  And now we're at 11 minutes later -- Dr.

16  Bercaw receives an e-mail from Mr. Patterson saying

17  that he rescinds authorization to send his records.

18        I can't say -- I can't testify that Scott

19  has read the report, Mr. Patterson has read the

20  report, but one could infer that.

21     Q.  While we have this Exhibit 11, the bottom

22  e-mail there, as we read earlier, says,

1    "Ultimately, the recommendation is that this should

2    go to review by the FAA who has a few in-house

3    neuropsychologist consultants who render an

4    opinion."

5           Do you recall that?

6       A.  Yes.  Yes.

7       Q.  And that's written on April 22, 2016?

8       A.  Yes.

9       Q.  If you'll keep that in mind.  Look at Page

10   349 of Mr. Patterson's deposition transcript, Line

11   10.  It says, "Did you ever follow up?"

12          Do you see that?

13      A.  Yes.

14      Q.  It says, "Did you ever follow up with Dr.

15   Bercaw about his" -- and then it says as

16   read -- "recommendation that this should go to

17   review by the FAA, who has a few in-house

18   neuropsychologist consultants who render an

19   opinion?"  And then the answer from Mr. Patterson

20   is, "I actually went to Dr. Kay, who is the -- who

21   is the FAA's resident expert.  This is who this is

22   referring to."

Page 171

1        Did you understand Dr. Bercaw's e-mail to

2    be referring to you?

3        A.  Well, when he says to one of the in-house

4    consultants -- although we're not really

5    in-house -- he's actually referring to the FAA

6    neuropsychology consultants, of which I'm one of

7    the two seniors members.  So it's a pretty good

8    interpretation by Mr. Patterson.

9        Q.  And did Mr. Patterson provide you Dr.

10   Bercaw's report at the time he reached out to you

11   in 2016?

12       A.  I think I testified to that.

13       Q.  He did not, correct?

14       A.  He did not.

15       Q.  Okay.  All right.  I now have 16.  This is

16   Patterson_Tordella_00002 is at the bottom here.

17   And it says FAA Form 8500 on the bottom left.  Are

18   you able to identify this document?

19            (Kay Exhibit Number 16 marked for

20   identification.)

21       A.  Yes.

22       Q.  What is this?

Page 172

1      A.   This is a Form 8500-8.  It was the version

2   of it signed by Mr. Patterson on July 18, 2017.

3      Q.   Okay.  Bottom of the page, Question 19

4   says, "Visits to Health Professionals Within the

5   Last 3 Years."

6           What is your understanding of what Mr.

7   Patterson was being asked to provide there as a

8   response to Question 19?

9      A.   Any health professionals he's seen, as

10   we've described earlier today.  Healthcare

11   professional within the last three years.

12      Q.   Okay.  Does that include

13   neuropsychologists?

14      A.   It certainly does.

15      Q.   Does that include psychologists?

16      A.   It certainly does.

17      Q.   Okay.  So if you'll help me, do you see any

18   names in response to Question 19?

19      A.   I do.  It continues on, by the way.  If you

20   look --

21           MR. AMLONG:  Objection.  The document

22   speaks for itself.

Page 173

1    BY MR. MORALES:

2        Q.  Okay.  It looks like there are three names

3    on the first page, is that correct?

4        A.  Right.  And then if you turn to Page 3 of

5    your document --

6        Q.  Okay.

7        A.  -- it says 19 visits to health

8    professionals in the last three years from Page 1.

9    It lists other people.

10       Q.  Do you see your name listed there?

11       A.  I don't see my name.

12       Q.  Do you see Dr. Bercaw's name listed there?

13       A.  No.

14       Q.  Do you see Dr. Caddy's name listed there?

15       A.  No.

16       Q.  Do you see Dr. Hastings' name listed there?

17       A.  No.

18       Q.  Okay.  Are any of those people that I just

19   mentioned not health professionals?  Let me ask it

20   this way --

21       A.  They are -- no.  They are all health

22   professionals.

Page 174

1      Q.  Okay.  Were each of them visited by Mr.

2  Patterson within the three years preceding July of

3  2017?

4      A.  Yes.

5      Q.  Okay.  Is there any basis that you're aware

6  of for not listing those individuals in response to

7  Item 19?

8      A.  Not that I'm aware of.

9          MR. AMLONG:  Objection.  Foundation.

10  BY MR. MORALES:

11     Q.  Okay.  Item 18 here back on the first page.

12  What is Item 18?  I believe we talked about this

13  earlier.

14         MR. AMLONG:  You're skipping 17 and going

15  to 18?

16         MR. MORALES:  Oh, I'm sorry.  I'm still on

17  the Form 8500.  I'm just on the Box 18, Medical

18  History.  That's -- my apologies.

19     A.  So Box 18 is medical history and you check

20  yes or no for the conditions from A through W.  And

21  he is -- what you do is you provide an explanation

22  for anything which has been checked.  And if it's

Page 175

1  something which has been previously checked and

2  explained, then you -- you're allowed to say

3  previously reported because -- like, when I get

4  your medical record, I have all of your 8500s that

5  you've submitted since the first one.  And I can

6  look and say, oh, okay, this is what -- this is

7  when it was first reported and this is what's it's

8  dealing with.

9        As you can see, 18 specifically says, "Have

10 you ever in your life been diagnosed with, had, or

11 do you presently have any of the following?"

12 BY MR. MORALES:

13    Q.  Let me ask you, your report from 2016, we

14 talked about a reference, Dr. Caddy's DSM-5

15 diagnosis.

16    A.  Yes.

17    Q.  Is that something that would be reported in

18 response to Item 18?

19    A.  No. This is not a disorder.  Those are

20 administrative codes.

21    Q.  Okay.

22        MR. MORALES:  I'm going to actually

Page 176

1   mark -- ask that this be marked 16.A.  Or 16A.

2   Let's do 16A.

3          And, Bill, this is -- I'm handing out the

4   Form 8500 materials that Yasmin sent this

5   afternoon.  Marking as 16B.

6          MR. MORALES:  So you're making 16 16A and

7   you're marking this new -- the new one as the

8   October 2018 one?

9          MR. MORALES:  Yes.  November '18, let's do

10  that one as 16A.

11         (Kay Exhibit Number 16A marked for

12  identification.)

13         MR. AMLONG:  I'm sorry.  What's 16A and

14  what's 16B?

15         MR. MORALES:  Okay.  So 16 is the July 18,

16  2017 Form 8500.

17         MR. AMLONG:  Right.

18         MR. MORALES:  And then 16 -- 16A is the

19  compilation from November 15, 2018.

20         MR. AMLONG:  Okay.

21         MR. MORALES:  Okay.  You got it?

22         MR. AMLONG:  Yes.

Page 177

1     A.  Do you guys understand why you have one

2  that's handwritten and one that's printed?

3  BY MR. MORALES:

4     Q.  Please explain.

5     A.  I was asking if you guys understood.  If

6  you already understand, I'm not going to testify to

7  why.

8     Q.  Dr. Kay, you've noted that Exhibit 16 has

9  handwritten material.  For example, in response to

10  Item 12, Employer, there's handwriting there.  Do

11  you know whose handwriting that would be?

12    A.  Most likely the airman.  But you can

13  complete a handwritten one.  But it all has to be

14  submitted electronically through MedExpress.  And

15  that actually is the one you should kind of be

16  relying on because that's the one that actually

17  goes to the FAA.  This one here.

18    Q.  And you're referring to 16A?

19    A.  I'm talking about 16A.

20    Q.  So 16A, you're saying is the one that goes

21  to the FAA?

22    A.  That's the important one.  Because that's

Page 178

1   kind of the official version of it.

2        Q.  So 16 -- 16 --

3        A.  They're basically from the same time --

4        Q.  I see.

5        A.  -- time frame.  So once it's dated when he

6   starts the exam and he goes to see Dr. Tordella in

7   July, and then, you know, five weeks later, maybe

8   six weeks later on -- oh, this is '18.  So you

9   don't have -- the 2017 one, you don't have the

10  computer printout.  Okay.  This is different.  This

11  is a totally different 8500.  I thought it was from

12  the same year.

13       Q.  So --

14       A.  These are different years.

15       Q.  Let me look and -- we just got these

16  materials this afternoon.  But I believe, if you

17  look at 16A --

18       A.  Oh, here we go.  Here's your 2017.

19       Q.  -- Item 13.

20       A.  Here's what I'm showing to you.

21       Q.  Yeah.  Yeah.

22       A.  If you turn to --

Page 179

1      Q.  Right.

2      A.  -- page --

3      Q.  Page 13?

4      A.  -- 8500 records, Page 11, then you're going

5   to see the 7/18/2017.

6      Q.  Right.  Page 11.

7      A.  The MedExpress version of it --

8      Q.  Right.

9      A.  -- is there.  Okay.  Sorry about that.

10   Sorry about the confusion.

11      Q.  No, no, no.  It's helpful.  Thank you.

12      A.  Like, I don't rely on this paper version.

13   That's kind of, like, maybe a draft where he's

14   talking to the doctor.

15      Q.  I see.  Okay.  So let's just -- to close

16   the loop on that Item 16, which is the July 18,

17   2017 Form 8500.  If you look at the response to

18   Item 19, would you agree that it looks like it's

19   the same on both the 16 and 16A copies?  In other

20   words, it doesn't look like there are any changes

21   in the doctors listed or health professionals

22   listed.

Page 180

1     A.  I'm checking that now.

2     Q.  Okay.

3     A.  So that one starts on Page 11 of what you

4  have as today's printout.  And under 19, yeah, I

5  don't see anybody else listed there.

6     Q.  Okay.  So it looks like if we go

7  back -- let's look at -- I guess it's Records Page

8  24, which is dated -- FAA Form 8500 dated 7/1/2016.

9  Do you see that?

10     A.  Yes.

11     Q.  Okay.  And there, response to Item 19 it

12  looks like Dr. Caddy and then Dr. Kay and then Dr.

13  Dayton are listed, is that correct?  And then there

14  are additional names on that.

15     A.  I see Caddy, Kay, Hastings.  Caddy, yeah.

16     Q.  Okay.  Do you see Dr. Bercaw?

17     A.  No.  He's listed the visit with Dr. Knippa

18  as AA IME FFD.

19     Q.  Where do you see that?

20     A.  I see it.  The next to the last doctor he's

21  listed where he says March 2016 AA IME FFD.

22     Q.  Oh, without the name?

Page 181

1      A.   Without the doctor's name.

2      Q.   So you're noting that on FAA Records_00026,

3  that there is a reference to 3/2016, Long Beach,

4  California, which is where Dr. Knippa is based, but

5  it doesn't list Dr. Knippa's name, is that correct?

6      A.   Or the kind of doctor.  It just says Ph.D.

7  It doesn't say psychologist or neuropsychologist.

8      Q.   Okay.  Would an FAA examiner have any way

9  of knowing if that was Dr. Knippa if you reviewed

10 this response?

11     A.   No.

12     Q.   Okay.  Is there any reason that you're

13 aware of that Dr. Bercaw would not be listed on

14 this report?

15          MR. AMLONG:  Objection.  Foundation.

16     A.   I'm not aware of the reason.

17 BY MR. MORALES:

18     Q.   Okay.  Is Dr. Bercaw a health professional

19 that Mr. Patterson had visited within the last

20 three years --

21     A.   Yes.

22     Q.   -- of July 2016?

Page 182

1     A.  Yes.

2     Q.  Okay.  Let me ask you, we see on this July

3  2016 report your name, for example, is listed.  On

4  the July 2017 report that we just reviewed, your

5  name was not listed.  Had the three-year time

6  period since Mr. Patterson's visit with you, had it

7  elapsed during that time period?

8     A.  No.

9     Q.  Okay.  So the 2017 July report, July 2017,

10  you had been visited by Mr. Patterson within three

11  years of that report?

12     A.  I had been, yes.

13     Q.  Okay.  And is there any reason you're aware

14  of that your name would be removed between the 2016

15  and 2017 report if your visit was within the last

16  three years?

17     A.  No.

18     Q.  Okay.  And maybe --

19     A.  Unless there's -- if you look at the

20  instructions page, it says something about if

21  you've already listed the doctor's visit.  I don't

22  know if there's some kind of exclusion that I'm not

Page 183

1   aware of.

2          I mean, I get all their visit and all

3   their -- when I do one of these, so I actually have

4   all of them like we have here.

5          Q.  When you say you get all of them, how do

6   you --

7          A.  When I'm doing a review for FAA, it comes

8   with all their 8500s since the very first one as a

9   student pilot.  So I see what they've listed

10  previously.  I'm probably not as concerned

11  with -- if that name is carried over from visit to

12  visit, but they have to list it, that they saw

13  somebody.

14         Now, I don't know if the instructions page

15  gives you some kind of waiver for not having to

16  re-list a doctor you saw in the last three years.

17  We could take a quick look at the --

18         Q.  And presumably --

19         A.  -- instructions list.

20         Q.  -- the instructions -- there would be

21  instructions that provide --

22         A.  There are.

Page 184

1      Q.  -- an answer to that?

2      A.  There are.

3      Q.  And do AMEs have instructions on the

4   answers that they're expecting to receive in

5   response to a question like Item 19?

6      A.  They get very specific training in the 8500

7   more so -- they're actually responsibile for it.

8   They're the one who has to sign it, not the

9   psychologist.

10         Just because I'm the reviewer, I'm fairly

11   familiar, but I'm not familiar with some details of

12   the rules, such as maybe there's some kind of an

13   exclusion or not having to write it over again.

14      Q.  Okay.  If you would -- the last one I

15   think -- look at FAA_4, if you would.  And I guess

16   actually it's 2, which is the August 27, 2018 --

17      A.  Yes.

18      Q.  -- report.

19      A.  Yes.

20      Q.  And it looks like Item 19 lists Dayton

21   twice and Quintana, is that accurate?

22      A.  He goes back to 2016.

Page 185

1      Q.  Right.  And then on Page 4, there are

2   additional names listed, is that correct?

3      A.  Yes.

4      Q.  And if you look near the bottom -- I guess

5   near the middle, your name appears again, Kay, is

6   that correct, for June 2016?

7      A.  Well, he does list Dr. --

8      Q.  Right.

9      A.  -- Bercaw as Dr. B-e-r-c.

10     Q.  Right.  Right.  So two below that, you note

11  that it says --

12     A.  Yes.

13     Q.  -- 3/2016, Berc, B-e-r-c, and /Fonsec --

14     A.  Right.

15     Q.  -- listed as an expert with pending

16  lawsuit?  Is that the first time you'd seen Dr.

17  Bercaw's name in this report?

18     A.  Yes.

19     Q.  And I'd just ask you -- it may take a

20  second.  But if you would just flip through these

21  records, and if you could, confirm whether you see

22  Dr. Bercaw's name in any of the other responses to

Page 186

1    Item 19.

2          MR. AMLONG:  Objection.  The document

3    speaks for itself.

4       A.  Apparently not.

5    BY MR. MORALES:

6       Q.  And what is the earliest date in this

7    packet of materials?  May -- I see one for May 28,

8    2015.  On Bates number 37, is that the earliest

9    date you see?

10      A.  May 27, 2015.

11      Q.  Okay.

12      A.  It's actually Page 35.

13      Q.  Okay.  Yeah.  It looks like the -- Page 36,

14   the date changes to May 28th, but I think we're

15   looking at the same one, so -- okay.

16          Now I'm going to hand you 17.  And if you

17   could identify -- this is an e-mail from William

18   Amlong to WNIMail.  Is that you?

19          (Kay Exhibit Number 17 marked for

20   identification.)

21      A.  Yes.

22      Q.  Okay.  And what is this?

Page 187

1      A.  It says that it's an excerpt from Dr.

2    Bercaw's deposition.

3      Q.  Okay.  And do you recall -- do you recall

4    receiving this?

5      A.  Right now, no.

6      Q.  Do you recall corresponding with Mr. Amlong

7    in September of 2018 about the Bercaw deposition?

8    Bercaw.

9      A.  We had a phone call back around that time.

10     Q.  And what was the context for that phone

11   call?

12     A.  He called to talk to me about Mr.

13   Patterson.

14     Q.  And is that where you learned of the Bercaw

15   report?

16     A.  That seems about right.

17     Q.  Okay.  Did you review the deposition

18   transcript that Mr. Amlong sent here?

19     A.  I'm sure I looked at it if he sent it to

20   me.

21     Q.  And I'll hand you 18.  If you could

22   identify this.  It looks like an e-mail from you to

Page 188

1    Mr. Amlong, is that correct?

2         (Kay Exhibit Number 18 marked for

3    identification.)

4        A.   Yeah.

5        Q.   Okay.  And what is this e-mail?

6        A.   This actually says that the -- "good luck

7    with your case."  This is an invoice for the time I

8    spoke to him, which would have been on September

9    12th, so that does narrow it down.

10       Q.   Spoke to --

11       A.   And the date is September 12th.  We talked

12   for an hour and a half.

13       Q.   Okay.  And do you recall the discussions,

14   what was said in those discussions with Mr. Amlong?

15       A.   No more than as it says here; review of

16   Bercaw, Knippa, and Kay reports.

17       Q.   Did you opine on the Bercaw report during

18   that phone call?

19       A.   Most likely.

20       Q.   Do you remember what you communicated to

21   Mr. Amlong?

22       A.   I don't remember exactly what I said.

Page 189

1      Q.  Were you -- did communicate surprised at

2   the existence of the Bercaw report?

3      A.  That would be easy to infer, yes.  Most

4   likely.

5      Q.  Okay.  At some point, did you determine

6   that you needed to update your 2016 report in light

7   of the Bercaw report?  Let me ask you this, at some

8   point in 2018, did you issue a follow-up

9   neuropsychological assessment of Mr. Patterson?

10      A.  I did.

11      Q.  And why did you do that?

12      A.  It was, I think, at the request of his

13   counsel.

14      Q.  And why did his counsel request the

15   follow-up report?  I'm handing you 19.

16          (Kay Exhibit Number 19 marked for

17   identification.)

18      A.  I assume it's part of his litigation.

19      Q.  In the absence of that request, would you

20   have -- scratch that.

21          From your perspective, did you see any need

22   to do a follow up of your 2016 report in light of

Page 190

1    the Bercaw report?

2        A.  I did.

3        Q.  And why is that?

4        A.  As I previously testified, there were areas

5    in Dr. Bercaw's evaluation that would raise concern

6    about Mr. Patterson's fitness, his suitability for

7    an aeromedical certificate, areas of

8    neuropsychological testing that I had not done in

9    my evaluation that if the case was to be reviewed

10   by the FAA, it would likely require further

11   evaluation.  And I think I let that be known and

12   Mr. Patterson called me for an appointment.

13       Q.  And did you conduct another round of

14   testing on Mr. Patterson?

15       A.  I did.

16       Q.  Okay.  And it looks like if you look at, I

17   guess, the first page of your test results section,

18   it says Session 4.

19       A.  Yes.

20       Q.  Am I correct that you administered

21   CogScreen Session 4?

22       A.  Yes.

Page 191

1      Q.  And why not Session 3?

2      A.  I wasn't sure --

3           MR. AMLONG:  Okay.  Which --

4           MR. MORALES:  Sorry.

5           MR. AMLONG:  -- exhibit is this?

6           MR. MORALES:  We're looking at 19.  Dr.

7    Kay's October -- October 10, 2018 report.

8           MR. AMLONG:  Okay.

9           MR. MORALES:  And then it's, you know, Page

10   5, I guess.  It's the test results of CogScreen.

11   And then in the middle of the page it says Session

12   Number 4.

13   BY MR. MORALES:

14     Q.  So, Dr. Kay, the question was, why you

15   administered Session Number 4 as opposed to Number

16   3?

17     A.  It was the fourth time he was taking

18   CogScreen.

19     Q.  To your understanding, has Mr. Patterson

20   ever taken Session 3?

21     A.  No.

22     Q.  Okay.  But he's taking Session 2 twice, is

Page 192

1    that correct?

2        A.  Correct.

3        Q.  Okay.  Is it your understanding that this

4    report was going to the FAA?  Let me ask it this

5    way, at the time that you prepared this follow-up

6    report, what was your understanding of the audience

7    for the report?

8        A.  I figured eventually it's going to get its

9    way to the FAA and be part of his medical record.

10   I mean, it has to be.

11       Q.  Why does it have to be?

12       A.  Because if he indicates that he's been seen

13   by me, some astute person's at the FAA job is to

14   say, I'd like to see Dr. Kay's record.

15       Q.  On the -- Page 4 of the Summary and

16   Recommendations, it says, "Based upon these

17   findings, Mr. Patterson would be considered to have

18   no aeromedically significant neurocognitive

19   deficits and would be recommended for a Class 1 FAA

20   airman medical certificate."

21       A.  Yes.

22       Q.  Can you discuss the manner in which you

Page 193

1   assessed Dr. Bercaw's report once you gained

2   knowledge of that report?  How that factored into

3   this conclusion?

4       A.  Oh, when I -- I think I've testified to

5   this.  But I believe that when I reviewed Dr.

6   Bercaw's report, I had -- would have significant

7   concerns.  We would probably not recommend issuance

8   of a medical certificate based upon performance

9   that I'm seeing.  So Dr. Bercaw was quite right,

10  that, in fact, if it was reviewed by one of the FAA

11  neuropsychology consultants we would probably not

12  issue.  We'd probably require additional testing to

13  see if we could confirm or disconfirm the presence

14  of an aeromedically significant deficit.

15          And so, in fact, I did specifically the

16  testing that -- if I had written a review for the

17  FAA based on Dr. Bercaw's report, I did the test

18  that would be so indicated.  And Mr. Patterson

19  performed quite well on the test that I

20  administered looking at issues such as his

21  reasoning abilities.  And I gave him a completely

22  novel test.

1    He had done miserably on those tests

2   previously.  But he did perfectly fine.  And these

3   are tests that he could not have -- there's no

4   pilot gouge he could have looked at or a discussion

5   with other guys who had been through evaluations to

6   pass these.  I gave him things he would not have

7   been familiar with.  And he did fine on measures of

8   executive functioning.  I gave him a test of

9   vigilance.  There was one -- just one score out of

10  all the scores that generate that was poor.  But

11  all the other scores were very good.  I think he's

12  a guy who, you know, on a very boring monotonous

13  task, will lose a little bit of his alertness and

14  arousal if you keep him on it for a long time.  But

15  he keeps himself occupied.  And so it doesn't seem

16  to be, and it's not manifested itself as a problem.

17    So that kind of showed up for him, that he

18  still had that one.  But I would not call that, nor

19  would my colleagues call that, aeromedically

20  significant.

21    He did surprisingly well compared to -- he

22  had done very poorly when tested by Dr. Bercaw on

Page 195

1    memory testing where it had actually concerned me

2    about him.  Fortunately, Dr. Hastings did not find

3    anything neurological.  So I'm not sure what the

4    basis was for why Mr. Patterson had so many

5    problems back in March 2016.  But I didn't know

6    about the memory problem.  But he did very poorly.

7    And we would not grant an airman a certificate who

8    had performed that poorly on memory testing.  When

9    I tested him, him memory was excellent on

10   every -- every criteria we would look at compared

11   to major pilots and the norms that I've developed

12   for major pilots.

13        Q.  And you're referring to October 2018, is

14   that correct --

15        A.  Yes, sir.

16        Q.  -- for your examination?

17        A.  October 2018.  His memory was solid.  So he

18   did very well on memory testing.  Very well on

19   novel problem solving.  And while he wasn't perfect

20   on vigilance, that might be kind of a

21   characteristic of him.  So he's not perfect on

22   that, but he would be okay.

Page 196

1      Q.  Let me ask you, setting aside the cognitive

2    testing components of Dr. Bercaw's report when

3    issuing your October 2018 analysis, what

4    significance, if any, did you assign to the

5    withholding of Dr. Bercaw's report from you in June

6    2016?

7      A.  Well, I don't think -- it wasn't something

8    which helps Mr. Patterson.  So it's kind of

9    self-defeating.  I think that -- I don't know what

10   counsel he received that told him that he should do

11   that or why he thought that was okay.  You'd have

12   to ask Mr. Patterson.  It obviously is not in his

13   interest to have done that.  He's not helping

14   himself by doing that.

15          He undermined, you know, my examination,

16   which if I had done further testing, maybe he would

17   have been found fine and we wouldn't be actually

18   asking these questions today about, you know, why

19   did you not give this report to Mr. Kay.  I don't

20   know why he didn't give it to me.  That was a

21   mistake, a terrible mistake.  You know, that's not

22   what we want pilots to do.  And it certainly

```
                                           Page 197
```

 1   doesn't look good.  But I don't know.  You'd have

 2   to ask Mr. Patterson.  I don't know what he

 3   testified to as to why he thought he didn't have to

 4   do it.

 5      Q.  Okay.  One last document for you here,

 6   which is Number 20.  And I believe you referred to

 7   this e-mail earlier today.  This appears to be an

 8   e-mail from you.

 9          (Kay Exhibit Number 20 marked for

10   identification.)

11      A.  Sure.

12      Q.  September 27, 2018 to Dr. Bercaw.  Can you

13   tell us what this e-mail is?

14      A.  So back in September of this year, Dr.

15   Bercaw wrote me.  He didn't mention the Patterson

16   case at all, but he goes -- he goes -- he asked a

17   question about the novel reasoning subtest in

18   CogScreen.  And he wondered about the extent to

19   which -- when you give a different session, is

20   there a difference in the way the test runs the

21   answer.  I let him know it was yes, that the number

22   of items per category differs by session.  So that,

Page 198

1    in fact, you know, you can't memorize kind of a

2    pattern of how to answer the questions.

3        Q.  And have you had any discussions with Dr.

4    Bercaw since about anything?

5        A.  Nothing.

6        Q.  Okay.  Nothing further.  Thank you very

7    much.

8        A.  Absolutely.

9            MR. AMLONG:  Can we take about five

10   minutes?

11           MR. MORALES:  Sure.

12           THE VIDEOGRAPHER:  The time is 8:09 p.m.

13   This completes Media Unit Number 2.  We are now off

14   the record.

15           (Brief recess.)

16           THE VIDEOGRAPHER:  The time is 8:23 p.m.

17   This begins Media Unit Number 3.  We are now on the

18   record.  Please proceed, Counsel.

19           EXAMINATION BY COUNSEL FOR PLAINTIFF

20   BY MR. AMLONG:

21       Q.  Hello, Dr. Kay.

22       A.  Hello, Mr. Amlong.

Page 199

1      Q.  You said that you don't know why Mr.

2   Patterson never gave you a copy of Dr. Bercaw's

3   report.  You have no personal knowledge, do you,

4   sir, that Mr. Patterson, Dr. Caddy, or I have ever

5   seen Dr. Bercaw's report until shortly before his

6   deposition, do you?

7      A.  You're correct.

8      Q.  And if none of us had it, none of us could

9   give it to you, right?

10     A.  That would be correct.

11     Q.  And as skilled of a pilot as Mr. Patterson

12  might be, do you think that he would be

13  sophisticated enough to seek the (unintelligible)

14  on the practice effect by taking Session 2 twice?

15     A.  I really don't know, you know, about the

16  extent to which he figured that taking the test

17  again might help him.  I don't think he would refer

18  to it as practice effect.  But, you know, people

19  like to take SATs over again and other tests, so he

20  may have -- it wouldn't be unreasonable for him to

21  presume that taking the test over again might be a

22  good thing.

Page 200

1    Q.  Well, he needed to take the test over again

2    because both Doctors Knippa and Bercaw had scored

3    him so poorly on it, correct?

4    A.  Oh, no. For him to come see me, yes.  There

5    was a need for him to kind of be evaluated further.

6    It made total sense.

7    Q.  And you said that he did really terrible on

8    the memory sections.  Can you look at Dr. Bercaw's

9    report, which I believe is Exhibit 10?  And can you

10   tell me which of the reports -- which of the tests

11   that are listed there were the ones on which Mr.

12   Patterson did really badly?

13   A.  Sure.  I suggest, Mr. Amlong, you take a

14   look at Exhibit 10, Page 6 of the report, which

15   is --

16   Q.  Okay.

17   A.  In terms -- it's _00009.  And if you turn

18   to verbal memory, which is the top of that page --

19   Q.  Okay.

20   A.  -- it's telling you that verbal memory

21   performance was mild to moderately impaired.  It's

22   below the 5th percentile.  It's what that T=33 is

Page 201

1    telling you.  And what he did with Mr. Patterson

2    was a 15-item word list.  And --

3        Q.  What's the name of that test?

4        A.  It's -- well, the actual name I would use

5    is the Rey, R-e-y, Auditory Verbal Learning Test.

6        Q.  R-e-y Auditory Verbal Learning Test?

7        A.  Yeah.  Yeah.  Rey.  But he calls it in his

8    list the Auditory Verbal Learning Test.  He didn't

9    use -- which a lot of people do call it that

10   sometimes.

11       Q.  Okay.

12       A.  The person who developed it was Mr. Rey.

13       Q.  Sorry?

14       A.  The person who developed it is Mr. Rey,

15   R-e-y.  But people can call it the Auditory Verbal

16   Learning Test.

17       Q.  Okay.  On which other test did Mr.

18   Patterson do really badly?

19       A.  So one is verbal memory.  And another he

20   did very poorly on was a test called the Wisconsin

21   Card Sorting Test. And I'm not sure -- he describes

22   it in the report.  I'll see if I can find where it

Page 202

1    is.

2        Q.  Were there any other tests that he did

3    really badly on?

4        A.  Yeah.  He talked about the Wisconsin Card

5    Sorting Test, Mr. Amlong, on Page 0010.  The last

6    page and the next to the last paragraph.

7        Q.  Okay.

8        A.  He goes, "The reasoning finding was later

9    replicated with the WCST, a similar task.  These

10   findings raise concern about how adaptable or

11   flexible he is to feedback about his performance."

12       Q.  Which paragraph is that on Page 10?

13       A.  It's next to the very final paragraph right

14   above where -- "It has been a pleasure."  "With

15   respect to his airman medical certification."  It's

16   about the middle of that paragraph.

17       Q.  So it's the WCST?

18       A.  Yes, sir.

19       Q.  Another one he did badly on?

20       A.  Yeah.  And then the third --

21       Q.  Now, are --

22       A.  Go ahead.

Page 203

1      Q.  I'm sorry.  No.  Please continue.

2      A.  Okay.  I thought that he also had trouble

3  with the IVA+.  And that would be on Bercaw_0008.

4  And it would be your fourth paragraph.  "Sustained

5  attention on the IVA+ Continuous Performance Test

6  was below average for auditory attention to

7  auditory targets and mildly impaired for visual

8  targets."

9      Q.  Okay.  Anything else?

10      A.  Sir, I think that was -- that was

11  everything.

12      Q.  All right.  Now, in his -- he states that

13  his overall -- he states on Page 7 or 00010 that

14  Mr. Patterson's overall performance on the

15  CogScreen was within normal limits.  And you --

16      A.  Yes, sir.  So, you know, CogScreen -- Mr.

17  Amlong, CogScreen is a very good screening test.

18  I'll support that.  It sounds like an endorsement

19  on my own test.  But the reality is, there's areas

20  that it doesn't -- it's not a comprehensive test,

21  so it -- in the area of memory, there's a single

22  item.  And this item in particular would be one

Page 204

1    where there would be a benefit of just having done

2    the test, you know, days before, so -- and it's

3    also -- it's also just limited to visual memory.

4    And as you know from his testing, he actually is

5    above average in visual memory.

6         So a couple of reasons why CogScreen

7    wouldn't pick it up.  CogScreen did find a problem

8    on one subtest that looks at novel reasoning.

9    Q.  Did Dr. Bercaw's CogScreen test -- and it

10   says here, "His overall performance on the

11   CogScreen was within normal limits, which is

12   favorable; however, his scores evidenced mild to

13   moderately impaired deductive reasoning in

14   comparison to aviators."

15        Is that -- was that from the CogScreen or

16   was that from the three tests that we just talked

17   about?

18   A.  No, sir.  That would be from CogScreen.  If

19   you look at Bercaw-0007.  And there's a little

20   table on that page toward the bottom.  It says

21   Factor.  And then the first line of that says

22   Attribute Identification.  And then you look to the

Page 205

1    right and the T-Score is 33.  Any T-Score below 40

2    is of concern to us.  And a T-Score below 35 is a

3    very serious concern to us.  So it's reflecting

4    difficulty at, you know, kind of flexible problem

5    solving, kind of novel problem solving.

6        Q.  Okay.

7        A.  That was what Dr. Bercaw was writing.

8    Maybe it wasn't clear in the way he wrote it in

9    that paragraph about the Wisconsin Card Sorting

10   Test.  He was saying it confirmed the finding from

11   CogScreen.  That's what he's trying to say.

12       Q.  Okay.  Would it matter who was

13   administering the Wisconsin Card Sorting Test?

14       A.  It's not supposed to.  I'm an author on the

15   manual of the Wisconsin Card Sorting Test. It has a

16   very simple instruction.  And we have -- I think

17   the instructions are pretty well written for the

18   Wisconsin Card Sorting Test.  They basically say

19   that I really can't tell you very much about how to

20   perform this test.  I mean, there's very few

21   instructions for that particular test.

22           So that one is not one that -- hopefully

1    the examiner says less and not more.  Hopefully if

2    the person is really struggling and all that

3    you -- you don't give away the way to perform the

4    task.

5          So the standard instructions are very

6    simple to present.  When the patient is having

7    difficulty, which is very atypical of pilots -- in

8    fact, when I collected the normative data on pilots

9    for the Wisconsin Card Sorting Test, I think they

10   pretty much all completed six category sorts, and

11   so they didn't struggle with it.  And so they never

12   really needed anything but the initial instruction.

13         I would say of the tests included in the

14   neuropsych test battery, it's one of the tests that

15   probably the examiner has little opportunity to

16   misadminister.

17         Q.  Was is the Rey Audible Visual Test?

18         A.  Learning Test.  So the Rey Auditory Verbal

19   Learning Test -- you know, an examiner who doesn't

20   read the words clearly at a -- the rate of

21   presentation as specified in the instructions, or

22   is not good at recording what the person is saying,

Page 207

1  they could definitely impact the RAVLT test.

2          And so, you know, that's a test where you

3  want to make sure that the person who's giving the

4  test doesn't have any particularly strong accent

5  that's hard for patients to understand, and that

6  they know to present the words at the proper rate,

7  and that they are capable of recording exactly what

8  the -- verbatim what the person says as they are

9  recalling the words from the list.

10     Q.  Would being tired when you were taking the

11 Auditory Verbal Learning Test impair your

12 performance?

13     A.  Being tired could affect your performance

14 on nearly any neuropsychological test. It's not

15 what I would consider the most vulnerable measure.

16 But if you're sufficiently tired, then your

17 performance could even be affected on such a test

18 as the AVLT.  The tests that are more sensitive are

19 things like the IVA test that was administered, the

20 continuous performance measure.

21          More common things that affect AVLT are

22 distractibility, anxiety, other distractions.  If

Page 208

1   somebody is preoccupied with other things.  Those

2   are factors that can impact their -- keep you from

3   really seeing their true memory level of

4   performance.

5        Q.  Do you know whether it was Dr. Bercaw or

6   Dr. Fonseca that administered either the Rey

7   Auditory Verbal Test or the IVA+?

8        A.  No, I don't.  But often you can tell when

9   you look, like, at the RAVLT, they would record it

10  so you can tell by looking at the -- if I had the

11  raw data, you could actually see who did it.  And

12  on most tests, you indicate who the examiner was,

13  so that should be part of the record you can find.

14       Q.  Okay.  On -- would it make any

15  difference -- you said that on the Audible Verbal

16  Learning Test it could make a difference?

17       A.  Yes.  It could if, for example, we knew

18  that Dr. Fonseca had difficulty with respect to,

19  like, a strong accent, something that Mr. Patterson

20  would find difficult to understand the words she

21  was saying if she didn't speak clearly.  If she

22  presented the items too quickly.  Those could be

Page 209

1   factors.

2       Q.  What about the IVA+?

3       A.  The IVA+ is very simple to administer in

4   terms of -- the reading of the standardized

5   instruction is really it, and the instructions are

6   pretty straightforward.

7       Q.  Now, when you tested -- when you tested Mr.

8   Patterson back in -- I think the first time was in

9   June?

10      A.  Yes.  June of 2016.

11      Q.  Okay.  How long did those tests take?

12      A.  I think I've already testified that it took

13  a couple of hours to go through those tests.  That

14  didn't include --

15      Q.  This is the shortened version that you

16  tackled?

17      A.  Right.  The short tests that I gave him was

18  a couple of hours.  And then, I believe, Mr.

19  Patterson and I spoke for a couple of hours before

20  we did testing.

21      Q.  Were you in the room during the entire time

22  of the test?

Page 210

1      A.   Knowing me, I was kind of one foot in the

2    room, one foot in my adjoining where I can kind of

3    hear what's going on.  So I go kind of back and

4    forth.  But I would say, the majority of the time

5    I'm -- if he's taking a -- I try to actually stay

6    out when they're doing the continuous performance

7    test once I get them started because I don't want

8    to bother them, make any noise, distract them

9    because it's really intended to be kind of a

10   solitary kind of task.

11           During CogScreen, I believe, there's a -- I

12   was probably sitting behind him about 90 percent of

13   the time.  And for Trailmaking, I'm sitting right

14   across the table from him.  So that would be kind

15   of the break down of the time.

16           If I was apart from him, the one time when

17   I would normally be apart from him would be during

18   that Conners' Continuous Performance Test because

19   actually I intentionally sit next door

20   behind -- it's got just this little doorway and I'm

21   sitting kind of behind him so that I don't distract

22   him.

Page 211

1      Q.  Would you permit a regionally-licensed

2  Psy-D resident to conduct the CogScreen?

3      A.  Well, oddly --

4          MR. MORALES:  Objection.  Speculation.

5      A.  Well, actually not because in D.C. we

6  actually have a law that doesn't let me

7  have -- actually, if the Psy-D is listed as

8  a -- like, if they're in a fellowship program, then

9  you can call -- we call a psychology associate.

10 You can list them with the District of Columbia to

11 do testing.  But I'm only here two days a week up

12 here in D.C. so I don't have any students anymore.

13 So I can't have any technicians give the tests in

14 my office.  I don't -- I think in Florida they

15 don't have such a rule.  And so I don't know if

16 you -- I don't know the laws in Florida, but I

17 think -- I mean, I couldn't tell you for sure.  I

18 don't think -- I think there are people who do use

19 technicians.  I don't know if they have to be

20 registered or in an academic program or what the

21 rules are.

22          But it's very common in neuropsychology to

Page 212

1  have tests administered by psychometrists or by

2  fellows and interns and students.

3  BY MR. AMLONG:

4      Q.  Is that a good practice with the CogScreen

5  test?

6      A.  It's totally fine if the person who's

7  giving it has been trained and supervised and you

8  basically have certified that they are doing the

9  test absolutely right.

10         It is the responsibility of the licensed

11  psychologist to whom we -- have a license for

12  CogScreen to make sure that the test is

13  administered according to standardized procedures.

14         If you looked at the disclaimer at

15  the -- on the very front of CogScreen, the

16  interpretation of CogScreen is entirely based upon

17  the test being administered in the standardized

18  manner.  So if it doesn't -- standardized, all bets

19  are off.

20         But we have, like, nurses giving the test

21  at American Airlines now by Premise Health.  Before

22  by the nurses who were employed by American.  And

Page 213

1   we actually -- I actually go to DFW and train those

2   individuals and certify them to give the test to

3   pilots according to standardized testing.

4        Q.  You have no idea what Dr. Fonseca's

5   qualifications are, do you?

6        A.  No, sir, I do not.

7        Q.  Is it common -- I believe that Dr. Bercaw

8   is a CogScreen provider?

9        A.  Yes, that's correct.

10       Q.  Is it common knowledge amongst CogScreen

11  providers that the FAA is not going to accept a

12  CogScreen test done four days after another one has

13  been done?

14       A.  I think if we surveyed, you know, the

15  CogScreen providers, most of them would say, oh,

16  yeah, that probably will not pass the FAA.

17       Q.  Would the FAA accept a report that had

18  been -- the draft which had been read by a licensed

19  Psy-D who had been licensed for, I think, less than

20  three months at the time?

21            MR. MORALES:  Objection.  Speculation.

22       A.  Well, there are criteria that are listed

Page 214

1    at -- if you go to the Guide for Aviation Medical

2    Examiners and you look under any condition for

3    which neuropsychological testing is required, and

4    it tells you the qualifications of a psychologist

5    for performing the examination for the FAA.  And it

6    would require a psychologist who is either board

7    certified or has documentation of board eligibility

8    and who's had training in aviation neuropsychology.

9         And so it's probably unlikely or impossible

10   for somebody who's just got their license to be

11   board certified or board eligible.

12   BY MR. AMLONG:

13       Q.  When we started, I heard you refer to

14   yourself -- and I can't tell if you were saying

15   you're a clinical neuropsychologist or a clinical

16   and a neuropsychologist?

17       A.  I'm sorry.  I was unclear.

18       Q.  Are you both?

19       A.  Well, I was -- the training that you have

20   is kind of in generic clinical psychology.  The

21   specialty program that I completed was in -- was

22   called at the time neuroclinical psychology, now

Page 215

1  better known as neuropsychology.  And so my actual

2  specialty program in the clinical psychology

3  graduate program that I completed was in the

4  neuro -- what we now call neuropsychology.

5          I am board certified as a neuropsychologist

6  and I'm board certified as well in assessment

7  psychology, which is an area of psychology.  We're

8  the folks who develop tests, who standardize them

9  and do research on testing.

10     Q.  The doubts that you have about the validity

11  of your June 2016 test, that does not automatically

12  translate into your conclusion that Mr. Patterson

13  was at the time unfit for duty, does it?

14     A.  No, it does not.  Basically, we had

15  insufficient information, we now know, in June to

16  indicate his -- whether, in fact, he was qualified

17  for a medical certificate.  That's what we know, is

18  that -- you know, looking at the data from the two

19  March exams in their entirety, particularly the one

20  from Dr. Bercaw, the exam that I gave him in June

21  was insufficient for making a qualified -- an

22  unqualified recommendation for medical

Page 216

1    certification.

2          Once we did the exam in October of 2018, I

3    could remove that qualification.  I can say, yes,

4    now we have examined those areas that appeared

5    deficient.  And we find, in fact, Mr. Patterson

6    performed quite well in the areas of memory, in

7    sustained attention/vigilance, and in deductive

8    reasoning.

9          Q.  Now, you were never hired to provide the

10   kind of forensic report for Mr. Patterson that you

11   provided, for instance, for the Justice Department,

12   correct?

13         A.  Absolutely correct.

14         Q.  You were simply hired because you were the

15   guy with the CogScreen --

16         A.  I hope I was hired --

17         Q.  -- and he needed to be tested?

18         A.  I hope I was hired because --

19         Q.  Pardon?

20         A.  I hope I was hired because I'm a very good

21   qualified clinical neuropsychologist -- or aviation

22   neuropsychologist whom people trust.  And people

Page 217

1    maybe know me because -- a lot of people know me

2    because I am the author of CogScreen.

3        Q.  But your job was as a practitioner and not

4    as an expert-expert, correct?

5        A.  Correct.  I did not -- I was -- got into

6    this case through Dr. Tordella, not through

7    yourself.  And I got into this case because an AME

8    who refers pilots to me all the time sent me this

9    nice gentleman to meet, Mr. Patterson.  And I was

10   not involved in his litigation from any side.  I

11   was simply seeing him as a clinical psychologist.

12           Then I got a call from -- I was answering,

13   like -- you know, I later was informed more about

14   Dr. Caddy once I got into the case.  And we got

15   that delay of waiting for Dr. Caddy's report.

16           But when I saw Mr. Patterson, I was seeing

17   him as a clinical neuropsychologist.  I think I

18   billed him as a clinical patient, not a forensic

19   patient.

20           And I didn't have -- if I was doing a

21   forensic report, I would have required his FAA

22   medical file and all the other kind of documents

Page 218

1    and I would have contacted collateral sources.  And

2    I would have done a complete investigation.

3          I can also -- I probably -- I would not

4    have taken any shortcuts with respect to his

5    testing either.  I basically only did the test that

6    I felt were absolutely necessary to answer the

7    questions raised by Dr. Knippa.  And that's what I

8    limited my exam to, again, in hope of saving Mr.

9    Patterson some money and helping him get back to

10   work.

11         Q.  How are you to assume that Mr. Patterson

12   got up, as his habit, about 5:00 a.m. the day

13   before he saw Dr. Knippa, caught an airplane to

14   L.A. at 3:00 p.m., arrived in L.A. about 8:00 East

15   Coast time, drove a couple of hours to get to Long

16   Beach, which is now about 10:00 East Coast time,

17   got something to eat, and then went to bed about

18   1:00 East Coast time, woke up about 3:00 East Coast

19   time, which would be midnight West Coast time -- so

20   given that, even if he had taken Dr. Knippa's test

21   during the morning of the first day, is it likely

22   that he would have been fatigued?

Page 219

1          MR. MORALES:  Objection.  Speculation and

2     foundation.

3          A.  So based on what you presented, if he only

4     had two hours of sleep, I think that --

5     BY MR. AMLONG:

6          Q.  Three.  I mean, let's be fair.

7          A.  I'm sorry.  If he had three hours of sleep,

8     I would assume that CogScreen is a sensitive enough

9     test -- proven to be sensitive enough in lots of

10    clinical studies -- to detect something like that.

11         So yes, even if he took it in the morning,

12    hopefully CogScreen would be picking up the fact

13    that he's not so sharp after that little bit of

14    sleep.

15         Q.  Would that fatigue have, within a

16    reasonable degree of CogScreen probability, have

17    produced the results that Dr. Knippa reported?

18         MR. MORALES:  Objection.  Speculation.

19         A.  First of all, I can't tell you that I have

20    a ton of data on people with two hours of sleep.  I

21    actually probably do from some studies we did of

22    truck drivers many years ago, but I'm not -- I

Page 220

```
 1   can't recall off the top of my head what their kind

 2   of scores looked like.

 3           Except that I can tell you that some of the

 4   patterns he had -- he actually -- if you remember,

 5   he was slower.  And I think that what Dr. -- I

 6   would have to pull the report.  Dr. Knippa's is

 7   Number --

 8           MR. MORALES:  4.

 9           THE WITNESS:  Number 4.  Thank you.

10      A.  Well, first of all, if you look at the

11   CogScreen performance, his overall CogScreen, you

12   could say, or his sensitivity to brain -- to

13   acquired brain dysfunction was very low.  He had a

14   completely normal LRPV score.

15   BY MR. AMLONG:

16      Q.  Which page are you on now?

17      A.  I'm on Knippa 0010.  The bottom paragraph.

18      Q.  Okay.

19      A.  So on the sensitive index that the FAA kind

20   of focuses on as to some of the airlines -- against

21   my better wishes, they love to see a single score.

22   They like this LRPV.  And his score, where 0 is
```

1  perfect and 1 is as bad as it gets, he's a .124,

2  which is excellent.  And so it's very unlikely he

3  has any acquired brain dysfunction.

4        And turning the page.  In terms of the base

5  rate, having eight scores below the 5th percentile,

6  and 20 scores below 15th is very, very, very poor.

7  And so, you know, that would tell me he's not

8  looking like a healthy pilot.  There's something

9  wrong here.  In fact, if that occurred in my

10  office, I might stop right there, because this

11  happened around noontime, and say, let's just stop

12  here for the day because this screening test is not

13  looking good.  We need to, you know, have you get

14  some rest and come back tomorrow.  This is a -- you

15  know, a very disconcerting kind of profile.

16        So he's saying that -- but when you look at

17  it in particular -- because on the next paragraph

18  on measures of speed, there were only two scores

19  below 5th percentile.  That's it.  And if you look

20  at accuracy, he's saying only one at or below 5th

21  percentile.  Again, that's good.

22        So now I'm looking at actually how he's

Page 222

1    listed it here and I'm not so concerned.  I mean,

2    he's -- the fact that he had five scores at or

3    below 15th percentile, that's only found in nine

4    percent of pilots.  91 percent are faster than

5    that.  And do we have any basis for believing that

6    Scott Patterson is in the bottom 10 percent of

7    pilots in his ability to process information

8    quickly?  He's very average with respect to

9    accuracy.  And, in fact, his overall accuracy is

10   very average.  And so basically, Dr. Knippa's last

11   statement in the accuracy paragraph, he may have

12   favored accuracy by sacrificing speed.

13        Now, the fact that he's tired, there's an

14   answer to your question on is this is a profile for

15   fatigue?  This kind of supports it.  He's

16   responding slowly, but accurately.  Pilots are

17   trained to basically slow down and it's -- you

18   don't want fast hands in the cockpit, is the word

19   that's used.  You basically want the pilot to slow

20   down to maintain their level of accuracy, and he's

21   done that.

22        And so I'm not finding a lot to be

Page 223

1    concerned.  Actually, now that I'm looking at it

2    like this, I'm not seeing a lot to be concerned.

3    We had a low LRPV.  We have a guy who's slowing

4    down, but having very good accuracy.  He had a lot

5    of trouble with the novel problem solving test,

6    which is one, two, three, four -- the fifth

7    paragraph down that begins with "process."  So he

8    really didn't get that task.

9         Now, if Scott is recalling correctly that

10   he wasn't given the proper instruction about there

11   being no practice items and asked questions, if he

12   wasn't clear on how to perform that task, that kind

13   of goes to where that could have come from.

14   Because you're not going to figure that -- it's

15   like taking off before you know how to land, and

16   it's not a good idea.  If he was listening and if

17   the instruction was given, he could have asked and

18   they would have explained further because he was

19   totally lost on that task.

20        And if you look at the Taylor Scores, what

21   you see -- which is the next paragraph.  Again, we

22   knew that he had this problem with the deductive

Page 224

1   reasoning.  Could have been due to instructions

2   being given wrong.  I don't know.  Did okay on

3   speed and working memory.  But did questionable --

4   he calls it low average, I call it questionable.

5   The T of 38 on memory.  So this is the first

6   finding we have of a memory -- potential memory

7   problem that would make you want to look further at

8   memory.  But the fact that his speed and working

9   memory are okay, that kind of doesn't really look

10  like so much fatigue, but the finding above it

11  about him being at the 9th percentile compared to

12  regional pilots on speed, that does suggest, well,

13  maybe he's really slowed down, and that's not

14  really like him.

15          But now he goes on -- so visual scanning,

16  perceptual speed, the 44, that goes along with

17  fatigue.  So could this be due to fatigue?  Yeah.

18  The answer is yes.  Does this look like it could be

19  a fairly normal profile where you'd want to look

20  further, in particular, at memory -- okay -- at

21  processing speed, and at deductive reasoning?  The

22  answer is, that's where I would go if I had

Page 225

1    performed this evaluation.  If I saw this CogScreen

2    result, I would want to look at deductive

3    reasoning, at memory, and processing speed.  And in

4    light of how well Scott performs on other measures

5    of processing speed that we've given him, and even

6    elsewhere, fatigue might be an explanation for what

7    was going on.  Fatigue is more likely --

8        Q.  Based --

9        A.  I'm sorry.  But I would say, fatigue is

10   more likely than acquired brain dysfunction.

11       Q.  Well, acquired brain dysfunction would not

12   have evaporated between March of 2016 and October

13   of 2018, would it have?

14       A.  Oh, yes.  In many times -- it could.

15   Because if you had traumatic brain injury, if you

16   basically had been taking medication for some

17   condition -- there's a lot of reasons why, what we

18   would call -- and also we see, you know, the HIMS

19   pilots, as you know, the pilots in alcohol

20   recovery.  They can look terrible after three weeks

21   of treatment and look phenomenal when we look at

22   them four months later.  They really recover.  So

1   the effects of the alcohol on the brain is

2   recovering over time.

3       Q.  But you have no indication or evidence that

4   alcohol played any part in this, correct?

5       A.  Absolutely not.  There's no evidence -- I

6   don't have evidence of traumatic brain injury,

7   alcohol.  I don't have an explanation.  You've

8   given me an explanation potentially of fatigue.

9       Q.  Assuming the absence of alcohol or a

10  traumatic brain injury, could both this profile be

11  valid and your October 2018 profile be valid?

12      A.  Yes.  This could be a -- this is a -- could

13  be an accurate picture of how Mr. Patterson was

14  functioning in March of 2016.  And it could have

15  been -- as you've indicated, it could be fatigue.

16  It could have been -- I don't remember how long

17  since Mr. Patterson had been treated for cancer

18  before this occurred because he had had that

19  treatment.  I don't know -- recall at this moment

20  if he had any chemotherapy.  There's other factors

21  that maybe one could look at as a possible

22  explanation.  He was fine by the time -- at least

Page 227

1    on CogScreen even by June of 2016 when I saw him.

2        Q.  And assume that his cancer treatment had

3    ended in approximately a year before this and that

4    he had never had any chemo.

5        A.  Okay.  Then it's extremely unlikely that

6    that would be a factor unless he had -- I don't

7    think he had any kind of brain, you know, nuclear

8    medicine treatment, you know, radiation therapy or

9    anything like that.

10       Q.  None.

11       A.  Because that can take a while to recover.

12   And we do see pilots and help them get their

13   medical certification after things like chemo and

14   radiation therapy.  But no, that was not a factor

15   for him.  And I don't remember him having the kind

16   of cancer where that would likely be a factor.

17       Q.  If you had administered -- if you had

18   administered -- if you had gotten these results

19   that Dr. Knippa got on March 16th and 17th, 2016,

20   would you have declared him unfit for duty?

21       A.  I would have -- if I had looked at this

22   result from March of 2016, I would have had a lot

Page 228

1    of concern about the performance on sustained

2    attention.  We're not going to give a pilot a

3    medical certificate if their vigilance is poor.  So

4    he'd be invited to come back in six weeks.

5          And the way I handle it and -- if you

6    check, for example, Dr. Tordella will verify this

7    for you.  And I'm under oath.  The way this is

8    handled is that we tell a pilot, you know, if I

9    submit this right now to the FAA, it's not going to

10   be beneficial.  Let's wait and get some -- you

11   know, get your rest.  Let's come back in six weeks

12   when I can get you rescheduled.  I know you want to

13   come back sooner, but let's wait.  And I'm going to

14   give you a vigilance testing.  Let's assume it's

15   going to be fine.  We'll present that result with

16   the rest of your data.  You're not going to have to

17   do all this other testing, but we're going to see

18   if we confirm or disconfirm that you have a problem

19   in this area and then submit -- and we're not going

20   to present any data from your evaluation to the

21   FAA, we're going to present all your data.  The

22   data from the exam that showed a problem and the

Page 229

1   data that we now have.  All of it will be presented

2   and that will -- if it's favorable, will lead to

3   you getting your medical certificate.

4           So the answer to your question is quite

5   simple.  No, I would not submit it.  If I was

6   seeing a pilot, had this data, I would say, I'm

7   going to see you again in six weeks because you

8   didn't do so well today.  You're telling me you're

9   fatigued.  You know, next time I want you to get

10  out here a day before, eat three meals, get your

11  rest, and I'll test you.

12          In reality, we're often dealing with very

13  impatient pilots who are, you know, really

14  pressuring to get the exam done, even when it's not

15  necessarily in their best interest.  We

16  really -- we psychologists, we tell them to really

17  push and make sure that the conditions are proper

18  for testing.

19      Q.  You were talking about the TOVA Test.  And

20  Mr. Patterson recalls you saying that one ought not

21  to give that test after 2:00.

22      A.  Right.  I think that might be right in the

Page 230

```
 1    instructions, Mr. Amlong.
 2         Q.  And when you're talking about -- when
 3    you're talking about somebody who's flown from
 4    South Florida, what 2:00 are you talking about?
 5    2:00 Florida time or 2:00 California time?
 6         A.  That's a good point.  I don't think it's
 7    considered all that frequently.  But I think
 8    unfortunately for somebody who's just flown across,
 9    they're on their own clock.  So that's a good
10    point.
11         Q.  So if he were instructed to show up at 9:45
12    Pacific time, that's 1:45 -- or 12:45 -- is it four
13    hours?  That's -- 9:45 Pacific time is 1:45 Eastern
14    Standard time, right?
15         A.  No.  12:45.
16         Q.  Okay.
17         A.  And if Mr. Patterson is there, he knows
18    military time.  He may be better than me.  09:45 to
19    12:45.
20         Q.  Do you recall when Dr. Knippa's report
21    indicates that he gave the TOVA Test?
22         A.  Not his report.  I don't remember in his
```

Page 231

1   report.  It might be in there.  We can take a look

2   if you want.  But in his testimony, he said that he

3   gave it on the morning of Day 2.  But I don't know

4   what time.  And I did indicate in my testimony that

5   we could look at that data if Dr. Knippa provided

6   it.  I don't think he did.  And it would actually

7   show the exact time the test was administered.

8          And while -- pilots will sometimes say, oh,

9   I didn't pass CogScreen, and therefore I didn't get

10  my certificate.  That's just untrue.  Nobody

11  doesn't get their certificate just because of

12  CogScreen.  But if you failed vigilance testing,

13  you're probably not going to get your certificate

14  until you can pass vigilance testing.  So that -- I

15  know that sounds strange, but that's actually very

16  much the case.

17      Q.  You were interpreting Dr. Knippa's report

18  in saying that he must have meant this.  But he

19  actually said something differently than you were

20  saying, correct?

21          MR. MORALES:  Objection.  It's unclear what

22  you're referring to.

1     A.  So what I believe you're referring to is

2    where I said which norms he was using.  And he kind

3    of said that he used two different sets or three

4    different norms in this one paragraph to the point

5    it's very confusing to know what he actually did.

6    Because, for example, there are no base rates for

7    general aviation.  He refers to the regional pilot

8    norms when he's talking about base rates.  He

9    refers to major airline pilots in the same

10   paragraph, so -- and then he refers again to major

11   airline pilots in another place in the report.

12         So which norms he was using or if he used

13   multiple norms, I can't tell.  Again, if we had the

14   raw data, I could, but Dr. Knippa didn't provide

15   that.

16   BY MR. AMLONG:

17     Q.  You also stated that -- you know, that

18   these were Dr. Knippa's -- that these were Dr.

19   Knippa's opinions.  But the opinions would not be

20   valid unless the tests were validly administered,

21   correct?

22         MR. MORALES:  Objection.  Vague.  Again,

Page 233

1  it's unclear what you're referring to.

2  BY MR. AMLONG:

3      Q.  Do you understand the question, Doctor?

4      A.  I do.  And that -- you're correct.  If the

5  tests are not administered properly, then you

6  cannot draw valid interpretations from those tests.

7          THE VIDEOGRAPHER:  The time is 9:25.  This

8  completes Media Unit Number 3.  We are now off the

9  record.

10         (Brief recess.)

11         THE VIDEOGRAPHER:  The time is 9:44 p.m.

12 This begins Media Unit Number 4.  We are now on the

13 record.  Please proceed, Counsel.

14 BY MR. AMLONG:

15     Q.  Dr. Kay, do you recall being read the

16 passage about Dr. Kay suggesting that Dr. Knippa

17 was a hired gun?

18     A.  Yes, sir.

19     Q.  And you read his report, did you not?

20     A.  I did.  And I reference it in my report.

21     Q.  Right.  And his criticisms of Dr. Knippa

22 were not neuropsychological, but they were of his

Page 234

1  interpretation of a psychological -- a clinical

2  psychological test, correct?

3       MR. MORALES:  Objection to the extent the

4  report speaks for itself.

5     A.  I kind of recall him saying that he felt

6  that his criticism was that Dr. Knippa was asked to

7  do a psychological evaluation and he went on and

8  gave a whole lot of neuropsychological tests to Mr.

9  Patterson.  And that was what he felt was kind of

10  like a witch hunt.  I think that's pretty much what

11  he was -- what I recall him saying.

12       But you're right, he was critical as well

13  of the psychological -- things about the

14  psychological part.  But I thought that his primary

15  complaint, at least one as a neuropsychologist I

16  was sensitive to, was the complaint that that's not

17  what he got sent to Dr. Knippa to have done.  He

18  was sent to Dr. Knippa to have a psychological

19  test.

20  BY MR. AMLONG:

21     Q.  Take a look at Defendant's Exhibit 9.

22     A.  Yes, sir.  I have it.

1    Q.  And I get the sense from your testimony

2    that you're someone who deals with -- that you sort

3    of deal with pilots who are displaying behavioral

4    abnormalities, but that you are more of a

5    neuropsychologist focusing on pilots?

6    A.  Correct.  I'm more often seeing pilots for

7    airlines who have problems in performance.  They've

8    failed proficiency checks repeatedly.  They failed

9    in transition training.  They failed in their

10   upgrades.  That's the majority.  Although, I

11   certainly have seen pilots who have been sent to me

12   for more psychological behavioral problems.

13   Q.  And I believe that you once told me that

14   the kind of behaviors that they were attributing to

15   Mr. Patterson in the letter that's Defendant's

16   Exhibit Number 9 --

17   A.  Yes.

18   Q.  -- could be an indication of

19   neuropsychological problems if they were sudden

20   onset, correct?

21   A.  I don't think I said that.  I felt that if

22   somebody -- it's actually a reasonable

Page 236

1   justification for a neuropsychological assessment

2   if a person who -- you know, a pilot is showing

3   problems in judgment or mental or emotional

4   stability, that, in fact, doing some

5   neuropsychological screening at a minimum would be

6   something which is essential to the evaluation.

7       Q.  But assume that the Scott Patterson that

8   you see today is the Scott Patterson that has been

9   there from the get-go, would that change your

10  opinion as to whether or not his behavior should

11  trigger a neuropsychological evaluation?

12          MR. MORALES:  Objection.  Speculation.

13      A.  So I would say that if I received this

14  letter and I had been asked to see him, and a chief

15  pilot was -- and whether it is justified or not to

16  have stated that he had raised concerns about

17  judgment, if I'm a neuropsychologist receiving

18  this, I am going to do at a minimum cognitive

19  screening.

20  BY MR. AMLONG:

21      Q.  Would you have -- would you have contacted

22  the chief pilot who told you this?

Page 237

1      A.   I think I mentioned that when I have done a

2   fitness for duty, I invariably will speak to the

3   chief pilot.  And I -- you know, typically in

4   instances such as training pilots reporting things,

5   I try to get permission to speak to others who are

6   involved so I can get first-hand, you know,

7   information.  I try to talk to the other sources.

8           And we do train the neuropsychologists.  In

9   a chapter I wrote about doing fitness for duty, I

10   indicate that that's a very, very critically

11   important source of data.

12           Typically, on the training-type cases that

13   I did for American, I can -- I recall right now.

14   They would only send me -- American, as part of

15   their normal package, they would send me -- this is

16   the pilot job -- what do you call it?  The list of

17   what you have to do in the job.  The job

18   requirements.

19      Q.   The essential function of the job.

20      A.   Yeah.  The job specification or whatever

21   it's called.  They would send me that.  They would

22   send me the guy's training records.  They would

Page 238

1   send me the letter from the chief pilot.  But yeah,

2   I would almost invariably speak to the chief pilot.

3       Q.  Did you ever receive a letter from American

4   suggesting that a pilot was engaging in multiple

5   reports -- in multiple instances of atypical

6   interaction with co-workers who report --  who

7   reports -- I'm sorry.  Let me restate that.

8           Have you ever received a letter from

9   American suggesting that a pilot that they wish you

10  to examine had engaged in multiple instances of

11  atypical interactions with co-workers, and that he

12  had a pattern of false/self-aggrandizing

13  statements?

14      A.  I don't know that I've seen that exactly.

15  I mean, one I did in the last year or two was of a

16  pilot who basically -- that was -- nobody wanted to

17  fly as a first officer with the pilot.  And they

18  were very concerned about reports they had had

19  about interactions with the chief pilot, assistant

20  chief pilot.  I don't remember them saying -- in

21  that case, there was no self-aggrandizing

22  statements, but a number of other kinds of

Page 239

1   behavioral complaints about that particular pilot.

2   That was a letter I got -- or saw.

3          Actually, I saw the person second.  They

4   had already been seen by another airline.  Not by

5   another airline.  By another psychologist who was

6   initially sent the letter by the airline.  I got

7   the case second.

8      Q.  Did you talk to the chief pilot?

9      A.  In that case -- did I talk to the chief

10  pilot?  I can't recall in that case.

11         But in the most recent case where I was

12  called in for a second opinion about fitness for

13  duty -- and I was called for a second opinion.  I

14  mean, it was -- it actually -- everybody kind of

15  agreed.  He saw one person who got the original

16  letter.  Then he went on his own to a second

17  person.  And then I actually totally worked with

18  the chief pilot to get information about that

19  particular airman.  And that was specifically -- I

20  remember that conversation very well.  I met with

21  the -- It was actually ten years ago because I was

22  at HIMS.  And several folks came to meet with me

Page 240

1    even while I was at HIMS about that particular

2    pilot.

3        Q.  Was this a substance-abuse issue?

4        A.  No.

5        Q.  It was just happenstance that you were at

6    HIMS?

7        A.  Yeah.  Well, I'm at HIMS twice a year, so

8    they kind of caught me.  They said, Dr. Kay, we

9    need to talk to you.  We found a room and they

10   pulled me off into a room.

11       Q.  Looking at this letter, would you have

12   assumed that it had been written by Captain Brian

13   Beach who signed it?

14       A.  I would assume that if he signed it, he

15   would be the one who wrote it.  But as you say,

16   that's an assumption.

17       Q.  Well, if I told you that Captain Beach has

18   testified that he did not write it and was simply

19   given it by management to sign, would that change

20   your opinion of the legitimacy of the referral to a

21   neuropsychologist?

22            MR. MORALES:  Objection.  Foundation.

1      A.  Well, that's -- it's unfortunate if Dr.

2   Knippa didn't follow up with a -- like I said, to

3   talk to the chief pilot who sent it and get more

4   information from the chief pilot about -- you

5   typically in these fitness letters, you include

6   incidents.  You talk to the pilot himself or

7   herself about the incidents that occurred, which

8   you know I did in my conversation with Scott.  You

9   actually are going to get the view of others who

10  were there hopefully, and that's important.

11         And so from -- it would be -- it's

12  absolutely imperative that you talk to the chief

13  pilot in a case like this.

14  BY MR. AMLONG:

15     Q.  Have you spoken to American concerning the

16  complaints that you've gotten from other pilots

17  about Dr. Knippa being a hired gun?

18         MR. MORALES:  Objection.

19  BY MR. AMLONG:

20     Q.  And if so, what was American's response

21  then?

22         MR. MORALES:  Objection, compound.  And

Page 242

1    objection, foundation.

2    BY MR. AMLONG:

3        Q.  Have you spoken to -- have you spoken to

4    any of the management personnel at American about

5    Dr. Knippa being regarded as a hired gun by pilots

6    who have spoken to you?

7              MR. MORALES:  Objection.  Foundation.

8        A.  I did voice a concern to a nurse, I think

9    it was, who seems to play a big role in how these

10   get referred out, telling her nothing about hired

11   gun, but I've said that I'd heard a lot of anger

12   and complaints about specifically Dr. Knippa from

13   airmen who had come to see me.  So I had heard, you

14   know, first-hand these complaints.  And I just let

15   them know that.  I know that that was received very

16   well, is my impression.  I wasn't necessarily

17   delivering what somebody wanted to hear.  But I

18   felt that I had heard, you know, like probably four

19   or so airmen making complaints.

20             If you look on the web, there are pilots

21   who say I'm a hired gun.  You know, they're

22   unhappy.  You know, he's -- he's the company guy.

Page 243

1    It's not true.  But if -- you know, people don't

2    get a -- you know, the response they were hoping

3    for, then they shoot the messenger.

4    BY MR. AMLONG:

5        Q.  The nurse that you spoke to, was Cindy

6    Contreras?

7        A.  I don't think it was Cindy.

8        Q.  Or her successor?

9        A.  I think it was -- you don't want me to

10   speculate, do you?

11       Q.  Well, if you're happy to speculate, yes,

12   then I can follow that up.

13       A.  I'm thinking that it was Marsha Reekie, but

14   I might be completely wrong.

15       Q.  Marsha Reekie has been working for the APA

16   for a couple of years.

17       A.  Yeah.  She has.  So maybe before she went

18   there.  I think she used -- didn't she used to be

19   at American?

20       Q.  Yeah.  But Dr. Knippa said that Scott

21   Patterson was the first pilot he did.

22       A.  Oh, okay.  So it's definitely not her.  For

Page 244

1   some reason that name was in my head.

2       Q.  I'm sorry.  I'm sorry.  Scott was the -- I

3   believe the second.  The first one was a guy by the

4   name of Michael Dale.  They were both in 2016.

5       A.  Okay.  Well, good.  I got the name wrong.

6   I couldn't tell you who it was.  All I know is it

7   was a nurse that I spoke to.

8       Q.  Have you ever spoken to anybody in

9   management?

10      A.  Nope.  I mean, in the old days I had a

11  pretty strong relationship with the medical

12  department and the medical director at American.  I

13  worked very closely with Dr. Bettes and with his

14  predecessors going back for a quarter of a century.

15  And I've worked with Dr. Ahtone quite a bit.

16          But no, at this point, there's

17  really -- for the last couple of years, you know,

18  they've closed down that medical department.  And

19  there's some kind of doctor there now who I just

20  met for the first time.  But they don't really have

21  a medical director that I talk to or anybody in

22  management that I talk to.

Page 245

1      Q.  Hold on just a minute, please.

2      A.  Sure.

3      Q.  So based on your -- based on your October

4   10th examination of Mr. Patterson, is there any

5   condition that currently would inhibit him from

6   obtaining a first class medical certificate from

7   the FAA?

8      A.  Not that -- not at all.

9      Q.  Thank you very much, Doctor.

10     A.  Absolutely.

11         MR. MORALES:  You done, Bill?

12         MR. AMLONG:  Yes.

13         MR. MORALES:  Okay.  Very, very quickly.

14         EXAMINATION BY COUNSEL FOR DEFENDANT

15   BY MR. MORALES:

16     Q.  In the context of Mr. Patterson's March

17   2016 trip to Long Beach, did you have any

18   understanding beyond the Knippa report of what time

19   Mr. Patterson had dinner or arrived at the hotel?

20     A.  No, sir.

21     Q.  Same question with respect to the Bercaw

22   examination.  Do you have any understanding of the

Page 246

1    timing for the itinerary; dinner, hotel arrival,

2    anything like that?

3         A.  For his Dr. Bercaw --

4         Q.  Bercaw.

5         A.  -- examination, I do not know when that

6    took place.

7         Q.  Okay.  And lastly, in your experience, do

8    commercial airline pilots ever conduct flying while

9    fatigued?

10        A.  Oh, that's a major issue that we are always

11   addressing in aviation.

12             MR. AMLONG:  Sorry.  I'm sorry.  I couldn't

13   hear that.

14             MR. MORALES:  I'll have it read back, if

15   that's okay.

16             (The reporter read the record as

17   requested.)

18   BY MR. AMLONG:

19        Q.  Do commercial airline pilots ever conduct

20   flying while fatigued?

21        A.  Absolutely.  And something we try to

22   mitigate against.  It's a tremendous concern

Page 247

1   because performance does decline as a function of

2   fatigue.

3       Q.  And there are rest rules and duty -- flight

4   duty rules and things of that nature, is that

5   correct?

6       A.  Absolutely.  And a lot of those -- more

7   importantly, there are mitigation strategies and

8   there's regulations that are set in place to try

9   and minimize and prevent fatigue from becoming a

10  safety hazard.

11      Q.  And is there anything in the CogScreen test

12  that's designed to ensure that pilots will be able

13  to fly while fatigued?

14      A.  We don't have the cure for pilot fatigue in

15  CogScreen, no.

16      Q.  Does the test at all take into account the

17  possibility that pilots will be put in a position

18  to fly while fatigued?

19      A.  No.

20      Q.  Okay.  Is it fair to say that cross-country

21  travel is a common feature of commercial airline

22  piloting responsibilities?

Page 248

1      A.  Well, it depends on which airline you're

2  working for and which routes you bid.  But there

3  are many pilots who are flying across country.

4  It's not uncommon to be flying across -- across

5  time zones is really the way I would put it, as

6  opposed to within time zone.

7      Q.  From an industry comparison perspective, is

8  it accurate to say pilots more than perhaps most

9  other industries are asked to frequently cross time

10  zones as part of their job responsibilities?

11      A.  Air crew in general, so including flight

12  attendants.  Yes.  That's a job hazard.  Part of

13  what they're out there doing.

14      Q.  Okay.  No further questions.  Thank you

15  very much.

16          MR. AMLONG:  One -- a follow up on that.

17          EXAMINATION BY COUNSEL FOR PLAINTIFF

18  BY MR. AMLONG:

19      Q.  Doctor, would Mr. Patterson have been

20  allowed to take command of the flight deck at 9:45

21  the morning that he started the testing with Dr.

22  Knippa if he had had sleep and travel that I just

Page 249

1   explained to you?

2          MR. MORALES:   Objection.   Speculation and

3   vague.

4      A.   The way those rules work -- and you

5   probably should check more with Scott than with

6   myself.   But there are duty rules that relate to

7   the time between, you know, events that occur for a

8   pilot.   And once you're outside that duty cycle,

9   you can't go.

10          And so I happened to be on a flight to

11  Phoenix two days ago where we were all taking our

12  seat and then we're told that because we were

13  delayed by an hour taking off out of Tampa to

14  Phoenix that the captain was past his duty time and

15  we had to wait for them to get somebody to come and

16  take the left seat, even though we had all sat

17  down, everybody was on the plane.

18          So yes, they're very strict about that.

19  And if Scott was past those hours, he would not be

20  permitted to sit in that left seat, or in that

21  right seat perhaps.

22  BY MR. AMLONG:

Page 250

1      Q.  Is psychoneurological testing for fitness

2   for duty supposed to be done under conditions

3   similar to what the pilots would be facing if

4   flying?

5      A.  No, sir.  We optimize the pilot's

6   performance, comfort, give them any kind of

7   bathroom breaks he needs, coffee whenever he wants

8   it, walk around, feed him a good lunch if he comes

9   to my office, as Mr. Patterson will tell you.  We

10  can go to that good delicatessen I told these guys

11  about.  As part -- part of coming to see Dr. Kay is

12  you get an incredibly good lunch, better than

13  you're going to get on an airplane.

14          So no, it's not flight conditions.  When

15  you come see me -- he's laughing.  But when you

16  come see me -- and Mr. Patterson will testify to

17  this, it's much better than flying.

18     Q.  Okay.  Thank you.

19     A.  Absolutely.

20          MR. MORALES:  Thank you.  Good night.

21          THE VIDEOGRAPHER:  Is that it?

22          THE WITNESS:  Good night.

Page 251

1          MR. AMLONG:  All right.  If Mr. Morales

2     orders it, I'll take a copy.

3          MR. MORALES:  Yes.  And we will.

4          THE VIDEOGRAPHER:  The time is 10:07 p.m.

5     This concludes today's deposition given by Dr. Gary

6     G. Kay.  We are now off the record.

7          (Whereupon, at 10:07 p.m., the videotaped

8     deposition of Dr. Gary G. Kay, Ph.D., was

9     concluded.)

10                    *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22