UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-60533-CIV-MARTINEZ-OTAZO-REYES

RODNEY SCOTT PATTERSON,

    Plaintiff,

v.

AMERICAN AIRLINES,

    Defendant.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Rodney Scott Patterson, a former first officer for American Airlines ("AA"), and a retired lieutenant colonel in the United States Army Reserve, brought this action against AA for violations of the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* ("USERRA"). For the following reasons, Lt. Col. Patterson's motion for partial summary judgment [D.E. 68] is DENIED, and AA's motion for summary judgment [D.E. 59] is GRANTED.

Lt. Col. Patterson contends that AA improperly placed him on leave with pay in retaliation for his taking time off to attend a White House ceremony in his capacity as a U.S. Army reservist. He asserts that anti-military animus prompted his change in status and points to the timing of that change, as well as the circumstances of AA's investigation to support his theory. AA, for its part, argues that it has a lengthy history of supporting former servicemembers, that Mr. Patterson's change in status and investigation were legitimately undertaken in response to the complaint of another AA employee, and that Lt. Col. Patterson has no evidence to support his claims.

I.      Background

The following facts are undisputed unless otherwise noted. Where the facts are in dispute, they are taken in the light most favorable to Lt. Col. Patterson.

AA hired Lt. Col. Patterson as a commercial airline pilot in 2000. *See* AA's Statement of Undisputed Facts [D.E. 59-1] ("Def. SUF") ¶ 2. In 2017, Lt. Col. Patterson retired from the Army Reserves. *See id.*

AA operates a hub in Miami, Florida, where it keeps a flight office and employs nearly 2,000 pilots. *See id.* ¶ 1. These pilots are, in turn, managed by three Chief Pilots, who report to the Director of Flight. *See id.* ¶ 3. During the period in question, two of the Chief Pilots were Captain Brian Beach and Captain James Bonds. *See id.* Capt. Bonds himself was a captain in the United States Air Force, and a major in the Mississippi Air National Guard. *See* Plaintiff's Corrected Resp. to Def.'s Statement of Material Facts [D.E. 86] ("Pl. SUF Resp.") ¶ 4.

In 2015, American Airlines granted 122 Miami-based pilots approximately 1,579 military leaves of absence. *See* Def. SUF ¶ 5.[1] Lt. Col. Patterson participated in military duty various

---

[1] Lt. Col. Patterson objects to this fact based on a lack of foundation and relevance, under Federal Rules of Evidence 602 and 404(a)(1). *See* Pl. SUF Resp. ¶ 5. Rule 602 requires that an affiant introduce evidence "sufficient to support a finding that the witness has personal knowledge of the matter," and states that "[e]vidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. The declaration of Luis Rojas contains such evidence. *See* Rojas Decl. [D.E. 57-29] ¶¶ 1–2 (explaining that, as the administrator for Miami flight administration, Mr. Rojas has personal knowledge of the facts set forth in the declaration.). The court is therefore "bound to accept [his] statements as true, unless the context demonstrate[s] otherwise," something Lt. Col. Patterson has not argued. *Martin v. Rumsfeld*, 137 F. App'x 324, 326 (11th Cir. June 29, 2005) (citing *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 850 (11th Cir. 2000)). And the relevance objection, which should have been brought under Rule 401, and not Rule 404(a)(1), also fails. Where it is alleged that an employer acted with anti-military animus, that employer's history of granting or denying requests for military leave "has [a] tendency to make" the fact of employer's animus "more or less probable than it would be without" the history. Fed. R. Evid. 401(a).

times in 2015, receiving military leaves of absence from AA to do so. *See* Def. SUF ¶ 6. AA never denied Lt. Col. Patterson military leave. *See id.*[2]

In March of 2015, Captain Glenn Whitehouse complained about Lt. Col. Patterson's behavior towards him and other crewmembers during a trip to Asunción, Paraguay, in October of 2014. *See* D.E. 61-7. This grievance was submitted in electronic mail form to Capt. Beach. *See id.* Capt. Beach referred part of the matter to the Allied Pilots Association's Professional Standards group ("APA PS")—a union group organized to resolve issues among pilots and employees—for resolution. *See* Def. SUF ¶ 25. At the summary judgment hearing on March 8, 2019, counsel indicated that the APA PS never entered any formal findings or conclusions, or resolved the matter, and Capt. Whitehouse eventually filed a formal complaint with AA's human resources department against Lt. Col. Patterson, as discussed below.

In a separate e-mail, in February of 2015, Capt. Whitehouse had also made allegations against Lt. Col. Patterson. These were of a more serious nature, and Capt. Beach referred them to AA's Corporate Security. *See* D.E. 61-13; Rule 30(b)(6) Deposition Transcript [D.E. 57-25] at 24:12–14; Pl. SUF Resp. ¶ 26. Lt. Col. Patterson contends that the Corporate Security investigation covered all of Capt. Whitehouse's allegations, while AA maintains the investigation's scope was limited to the more serious allegations. *See* Patterson's Statement of Material Facts [D.E. 61] ("Pl. SMF") ¶ 11. There are no records of the Corporate Security investigation. *See id.* Corporate Security ultimately concluded that the allegations it did investigate were "unsubstantiated." Rule 30(b)(6) Dep. Tr. at 14:4–16:21.

In September of 2015, while the APA PS investigation was still pending, Lt. Col. Patterson was told he could report to the Pentagon for duty on September 22 to represent the Army during

---

[2] Lt. Col. Patterson's objection on relevance grounds to this fact also fails for the reason described in note 1.

3

the Pope's visit to the White House. *See* Pl. SMF ¶ 2. The circumstances relating to this matter are discussed below.

Lt. Col. Patterson was, at the time, scheduled to fly internationally for AA on September 22. *See* Def. SUF ¶ 7. On September 21, Lt. Col. Patterson called into the Flight Office and left a message requesting the use of accrued leave time to go on military duty for four days. *See* Pl. SMF ¶ 3. Capt. Bonds returned his call later that day, at approximately 3 p.m., and left the following voicemail message:

> Dude, we're really, really, really short and I see that you, you probably see that by your trip that's going out tomorrow, everybody is on reserve and we are really tight on manning so, uhhm, obviously we are going to give you the time off, if you can produce some uhhm, orders. Can you have them fax us the uhh, the orders . . . . We're leaving you on the trip til [sic] we get that fax ok. Thanks.

D.E. 57-31. The parties dispute whether the Army Reserves issues written orders for reserve officers of Lt. Col. Patterson's rank. *Compare* Pl. SMF ¶ 5, *with* Def. SUF ¶ 14.

When he was unable to reach Capt. Bonds, Lt. Col. Patterson called American's Chief Pilot in Dallas, David Tatum, to notify him that he was reporting for military duty the following day and requested vacation time to do so. *See* Pl. SMF ¶ 6; Def. SUF ¶ 15. Capt. Tatum, unaware of Capt. Bonds' voicemail to Lt. Col. Patterson, granted the leave request. *See* Pl. SMF ¶ 6; Def. SUF ¶ 16. On September 23, 2015, Lt. Col. Patterson attended the Pope's ceremonial visit to the White House. *See* Def. SUF ¶ 17.

At this point, the APA PS group had yet to resolve Capt. Whitehouse's complaint. So, on September 24, 2015, Capt. Whitehouse filed a formal complaint with AA human resources, containing many of the same allegations against Lt. Col. Patterson as in his March 2015 email to Capt. Beach. *See generally* D.E. 61-9. He explained that "[a]fter numerous calls to APA professional standards without any relief, I am formally asking you to help me declare that I have

4

been a target of workplace harassment by First Officer Scott Patterson." *Id.* Along with his complaints about the October 2014 trip to Paraguay, Capt. Whitehouse also discussed Lt. Col. Patterson's alleged actions throughout 2015, which Capt. Whitehouse argued constituted harassment. *See generally id.*

The parties agree that, sometime after September 22, Lt. Col. Patterson was placed on leave without pay. But they disagree on the timing and reasons for the decision. *See* Pl. SUF Resp. ¶ 29. Lt. Col. Patterson asserts that he received a notification, on September 23, "through a program on his cell phone that tracks changes in his status with American's Dispatch Environment Control System, that his [vacation] status had been changed to [leave with pay] retroactively to . . . September 22." Pl. SMF ¶ 7. AA claims that it only placed Lt. Col. Patterson on leave on September 24 after receiving the Whitehouse complaint, which prompted an investigation, known as a Section 21 proceeding. *See* AA's Statement of Material Facts in Opposition [D.E. 76-1] ("AA SMF Resp.") ¶ 7; Def. SUF ¶¶ 24–30. AA explains that the change in status was made retroactive to September 22 because Lt. Col. Patterson had originally been scheduled to fly a trip from September 22–24, but the change of his employment status on the 24th caused his pay status for the entire trip period to be changed to leave with pay. *See* Def. MSJ Resp. [D.E. 76] at 6–7 n.2.

The parties agree that Capt. Bonds sent Lt. Col. Patterson a letter dated September 25, 2015, which read, in relevant part, as follows:

> As discussed on September 24, 2015, this letter confirms that I am withholding you from service with pay pending the outcome of an investigation into the circumstances surrounding a Work Environment complaint that was reported by a coworker.

D.E. 61-5. Prior to the completion of the Section 21 investigation, Capt. Bonds also initiated a separate investigation into the veracity of Lt. Col. Patterson's claim that he had taken leave for military duty in October of 2015.

5

Capt. Bonds testified that he was "suspicious" of the timing of Lt. Col. Patterson's request, because Lt. Col. Patterson was scheduled to fly on September 22 with another pilot who had previously investigated him. *See* Def. SUF ¶ 11. He also "found it . . . odd" because Lt. Col. Patterson had requested vacation time, rather than military leave, and he did not provide written military orders. *Id.* ¶ 14. So, in early October, Capt. Bonds requested a Leave and Earnings Statement ("LES") from Lt. Col. Patterson to prove he was on military duty from September 22 through 25. *See id.* ¶ 20. Following receipt of the LES, on October 30, 2015, Capt. Bonds contacted the other Chief Pilots and the Managing Director of Flight, to share his suspicions regarding Lt. Col. Patterson's LES. *See* D.E. 61-15. Specifically, Capt. Bonds pointed to the redactions in the document, and the rate received given Lt. Col. Patterson's rank. *See id.* Capt. Bonds stated that he "smell[ed] a rat but need[ed] to look and compare to [his] last LES and others[.]" *Id.* He suggested that Lt. Col. Patterson might "hang[ ] himself on providing false information." *Id.* In response, Captain Mark Cronin, AA's Managing Director noted that it was important to keep legal counsel "in the loop" as "USERRA issues can get really tangled fast, and we need to make sure his behavior remains the focus and not how we are handling it." *Id.* On November 4, 2015, however, Capt. Bonds e-mailed Lt. Col. Patterson to thank him for sending along the LES, and to tell him that he considered the matter "closed." *See* D.E. 57-9.

The Section 21 proceeding was, at that time, still ongoing. The investigation involved interviews with nine AA employees, including Capt. Whitehouse and Lt. Col. Patterson. *See* Def. SUF ¶ 31; D.E. 57-26 at 1. It concluded by December 9, 2015, when the HR report was submitted. *See id.* at 1. According to that report, certain of Capt. Whitehouse's allegations were corroborated during the investigation—including that Lt. Col. Patterson had improperly threatened disciplinary action against AA employees—and others were not, for example Capt. Whitehouse's assertion that

6

Lt. Col. Patterson had used derogatory slurs in front of other AA employees. *See* Def. SUF ¶ 33; D.E. 57-26. The report also stated that "multiple employees expressed their concern" with Lt. Col. Patterson's behavior, and that his behavior "not only caused negativity amongst the crew but also led them to question his ability to operate the aircraft safely[.]" D.E. 57-26 at 3. The investigation yielded "nothing that warranted discipline." Pl. SMF ¶ 13.[3]

Following completion of the investigation, Capt. Beach submitted a medical examination request based upon his "concerns about FO Patterson's judgment and, specifically, his mental and/or emotional stability." D.E. 61-16. Capt. Bonds sent Lt. Col. Patterson a letter dated January 20, 2016, explaining that, "due to [his] concerns regarding [Lt. Col. Patterson's] ability to safely operate an aircraft, [Capt. Bonds had] arranged for [him] to participate in a medical evaluation as provided in Section 20 of the [collective bargaining agreement]." D.E. 61-17.

On January 25, 2016, Lt. Col. Patterson filed a complaint with the Department of Labor, claiming that his placement on leave with pay was retaliation for having gone on military duty. *See* Pl. SUF ¶ 22. AA submitted its response to the complaint on February 29, 2016. *See* D.E. 61-21.

On March 15, 2016, Lt. Col. Patterson traveled from Miami to Long Beach, California, for his fitness for duty examination. *See* Pl. SMF ¶ 15. The following day he appeared before Dr. Knippa. *See id.* On March 21, 2016, Dr. Knippa submitted his findings, concluding that Lt. Col. Patterson was not fit for duty based on impaired performance during the cognitive assessment. *See*

---

[3] Lt. Col. Patterson objects to the report on the basis that it involves "[m]ultiple levels of inadmissible hearsay." Pl. SUF Resp. ¶ 33. But the report need not be offered for its truth (or the truth of its conclusions) to be properly considered at summary judgment. At issue is whether AA acted with anti-military animus. Because AA claims that it referred Lt. Col. Patterson to Dr. John Knippa based on the results of its investigation, the relevant question is not whether Lt. Col. Patterson actually behaved as the interviewees suggested, but whether AA had a reasonable basis to believe that he had and, therefore, to refer him for a fitness examination. *See, e.g., Velez v. Thermo King de P.R., Inc.*, 585 F.3d 441, 445 n.1 (1st Cir. 2009).

D.E. 57-6 at 13. Based on the report, Lt. Col. Patterson's status was changed from leave with pay to "sick." Pl. SMF ¶ 18.

Also on March 21, 2016, shortly after Dr. Knippa's examination, Lt. Col. Patterson voluntarily underwent a second assessment with Dr. Edwin Bercaw, whom he had sought and hired. *See* D.E. 87-1. The results of that assessment were not favorable to Lt. Col. Patterson. *See id.*

In June of 2016, Lt. Col. Patterson was again examined, this time by Dr. Gary Kay. *See* D.E. 61-20. Though Dr. Kay's findings were positive for Lt. Col. Patterson, the assessment was later withdrawn because Dr. Kay had not been provided a copy of Dr. Bercaw's report (which rendered Dr. Kay's report incomplete and therefore would have made it inappropriate for the FAA to rely on). *See* D.E. 160, 162; Kay Deposition Transcript [D.E. 154-4] at 138:17–140:16. Lt. Col. Patterson was also favorably evaluated by Dr. Glenn Caddy, and a number of other physicians, in late March, May, and July of 2016. *See* Pl. SMF ¶ 19; D.E. 61-20. None of those other physicians, however, were Dr. Knippa. Nor were they approved by AA. *See* Def. SUF ¶ 39.[4]

Since his placement on leave, Lt. Col. Patterson has maintained his FAA First Class Medical certification. He currently flies as a captain for 21 Air, a cargo operation. *See* Pl. SMF ¶ 20.

## II. LEGAL STANDARD

Under Rule 56, a court shall grant summary judgment if "the depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" on file "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a),

---

[4] To be eligible for reinstatement, AA requires all pilots previously found to be unfit to undergo assessment a second time by the physician who made the original, unfavorable fitness finding. *See* Def. SUF ¶ 38.

8

(c). Rule 56 requires entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When a moving party has carried its burden, the party opposing summary judgment must do more than show that there is "metaphysical doubt" as to any material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmovant, there is no genuine issue. *See id.* at 587.

At summary judgment, courts are required to view the evidence in the light most favorable to the nonmovant. *See Chapman v. Am. Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988). "All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant. However, an inference based on speculation and conjecture is not reasonable." *Id.* "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (emphasis in original).

### III. THE USERRA

The USERRA protects servicemembers from discrimination or retaliation based on their military status. It protects any "person who is a member of, . . . performs, has performed, . . . or has an obligation to perform service in a uniformed service" from denial of "any benefit of employment by an employer" on the basis of that membership or service. 38 U.S.C. § 4311(a) ("substantive provision"). A "benefit of employment" is defined as "the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or

9

interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement[.]" 28 U.S.C. § 4303(2). Further, under the USERRA

> [a]n employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter.

38 U.S.C. § 4311(b) ("anti-retaliation provision").

An employer violates the USERRA if the complaining person's membership or service in the uniformed services "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership" or, in the case of actions allegedly taken in retaliation for enforcement of USERRA rights, "that the action would have been taken in the absence of such person's enforcement action." 38 U.S.C. § 4311(c)(1)–2.

To establish a prima facie case under the USERRA, a complainant must show "by a preponderance of the evidence that his protected status was a motivating factor" in the employer's decision. *Coffman v. Chugach Support Servs., Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005). The motivating factor need not have been the sole cause of the adverse action. *See id.* But it must be "one of the factors that a truthful employer would list if asked for the reasons for its decision." *Id.* (citation and internal quotation marks omitted). If the employer "relied on, took into account, considered, or conditioned its decision on" the individual's military status or protected activity, then it constitutes a motivating factor. *Id.* Courts may infer discriminatory motive from several factors, including

> proximity in time between the . . . military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge

10

> of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Id.*

Once the employee has satisfied his burden, "the burden shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." *Id.* at 1238–39 (citation and internal quotation marks omitted). This burden-shifting framework applies to "dual-motive" cases, as well as "pretext" cases. *Id.* at 1239 (citation and internal quotation marks omitted). "Thus, in USERRA actions there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the . . . action, upon which the [employer] must prove, by a preponderance of the evidence, that the action would have been taken despite the protected status." *Id.* (citation and quotation marks omitted).

## IV. DISCUSSION

Lt. Col. Patterson's two-count complaint alleges multiple violations of the USERRA's employment and non-retaliation protections. He alleges, in Count One, that his going on duty was one motivating factor for these adverse employment actions and, in Count Two, that his filing of a Department of Labor complaint was another. Specifically, those adverse actions included: (1) placing him on leave with pay and removing him from flight status; (2) grounding him pending an investigation into a stale incident; (3) refusing to return him to flight status after a union management panel determined that he had not engaged in misconduct in Asunción in 2014; (4) referring him to a fitness-for-duty examination with Dr. Knippa; (5) keeping him grounded based on Dr. Knippa's findings which, themselves, were based on "a highly irregular examination"; (6) refusing to restore him to flight status after reports from additional physicians declared him fit for

11

duty; and (7) conditioning his return to flight status on his abandoning his USERRA claims. *See* D.E. 1. Lt. Col. Patterson does not divide the allegedly violative acts among his two claims, but instead appears to assert that each of these acts violated both the substantive and anti-retaliation provisions of the USERRA.

Because Lt. Col. Patterson did not file his USERRA complaint until January 25, the only actions which might conceivably qualify as retaliatory were those taken after that date. Those are limited to the fitness finding, keeping him grounded, and the settlement offer. Lt. Col. Patterson's claim fails because, even assuming he has established a prima facie case of retaliation, AA had a legitimate reason for keeping him grounded and referring him to Dr. Knippa even after he filed his USERRA complaint.

### A. Initial Grounding and Fitness for Duty Examination

*1. AA had a legitimate, non-discriminatory reason for placing Lt. Col. Patterson on leave with pay on September 24.*

Even assuming that he has established a prima facie case of retaliation—a contention the Court doubts—the Court proceeds to the analysis of AA's legitimate reason for grounding Lt. Col. Patterson, and for referring him to Dr. Knippa. *See, e.g., Collado v. United Parcel Serv.*, 419 F.3d 1143, 1150–51 (11th Cir. 2005) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, the focus should no longer be on the preliminary question of the prima facie case but on the ultimate question of discrimination *vel non*.") (internal quotation marks omitted) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713–15 (1983)); *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (assuming, without deciding, that plaintiff in race discrimination case had made out a prima facie case and addressing the next step of the analysis). The Court concludes that AA has shown that its reason, standing alone, would have induced it to take the same action and, therefore,

12

none of AA's actions in grounding or referring Lt. Col. Patterson constitutes a violation of the USERRA under the circumstances.

No one disputes the seriousness of the allegations in Capt. Whitehouse's complaint for workplace harassment, or the need for AA to investigate those allegations. Instead, Lt. Col. Patterson points to AA's purported failure to act appropriately in March of 2015 as evidence of its anti-military animus. But he ignores numerous key facts. First, in March of 2015, AA did refer the matter to Corporate Security and to APA PS—the latter referral being customary in cases involving intra-pilot disputes. *See* Beach Deposition Transcript [D.E. 57-13] at 22:6–13. Although AA received clearance regarding part of the allegations from Corporate Security, the APA process never came to a resolution. *See id.* at 24:4–6. In such cases, it is common practice for the APA to explain to the complainant that his option is to take his complaint to Human Resources, which Capt. Whitehouse did for the first time in September of 2015. *See id.* at 24:13–23. Lt. Col. Patterson does not contest that AA followed its normal practice in addressing Capt. Whitehouse's complaint. Nor has he explained how following an established practice under these circumstances can raise an inference of discrimination.

At his deposition, Dr. Caddy stated that Capt. Whitehouses's allegations, if true, would have justified sending Lt. Col. Patterson for a fitness-for-duty examination immediately. *See* Caddy Dep. Tr. [D.E. 57-27] at 60:2–61:12. As AA explains, and no party has contested, it was obligated to launch an investigation following receipt of the complaint. Once it is accepted that Capt. Whitehouse's complaint warranted investigation, it is difficult to conclude anything other than that AA's subsequent actions were motivated by legitimate safety concerns. Lt. Col. Patterson's contention that AA's failure to investigate until September is indicative of anti-military animus is not well-taken. AA received a formal harassment complaint after Capt. Whitehouse

became frustrated with the lack of action by APA PS. And the fact that Capt. Whitehouse had previously made similar complaints, through less formal channels, without definitive resolution is not probative, as his second complaint contained new grievances (e.g., that, in July of 2015, Lt. Col. Patterson had continued to reach out to other AA employees seeking to "dig up dirt" on Capt. Whitehouse). *See* D.E. 61-9 at 8. AA decided to undertake an investigation in response, and that decision was reasonable under the circumstances.[5]

That investigation, which involved interviews with a number of Lt. Col. Patterson's colleagues, yielded worrying results. These included concerns about Lt. Col. Patterson's tendency to fabricate stories and the sense that he was "not quite all there." *See* D.E. 57-26 at 3. Lt. Col. Patterson has not disputed that an investigation took place, or that those were the results. Accordingly, there is no fact or reasonable inference to be drawn to indicate that the subsequent decision to refer Lt. Col. Patterson for a fitness for duty examination was somehow motivated by discriminatory or retaliatory animus. As AA explains, it has a duty to protect the public and had to ensure that Lt. Col. Patterson was fit to fly. *See Witter v. Delta Airlines, Inc.*, 966 F. Supp. 1193, 1201 (N.D. Ga. 1997).

Lt. Col. Patterson says that the text of the fitness examination request and the location of his examination leads to an inference that AA conspired with Dr. Knippa to ensure that he failed the exam. There is not a single piece of evidence in the record, however, to support such a conspiracy. Although a court is bound to draw reasonable inferences in favor of the nonmovant,

---

[5] Indeed, in addressing other federal anti-discrimination laws, some circuits have concluded that placement of an employee on leave-with-pay status pending an investigation does not constitute adverse employment action. For example, the Second Circuit in *Joseph v. Leavitt*, 465 F.3d 87 (2d Cir. 2006), noted that the Eighth, Sixth, Fourth, and Fifth Circuits had all come to that conclusion. As it explained, "[t]hese circuits have reasoned that the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances." *Id.* at 90–91. The Court agrees with that principle here.

14

such an inference here would amount to conjecture, which will not suffice to create an issue of fact. *See Cordoba*, 419 F.3d at 1181. Indeed, Lt. Col. Patterson's argument is severely undercut by the fact that he underwent a second assessment, with a physician he chose voluntarily, less than a week later, and that physician also concluded that he was unfit.

On this record, there is nothing to support the claim that the investigation, referral, exam scheduling, or exam results were motivated by anti-military animus. Because AA has shown that the Whitehouse complaint, "standing alone, would have induced [AA] to take the same adverse action[s]," *Coffman*, 411 F.3d at 1239, the Court concludes that placing Lt. Col. Patterson on leave with pay and referring him for a fitness examination did not violate the USERRA.

### 2. *The September 22 status change, if true, is nonetheless insufficient to establish a USERRA violation.*

The Court understands and acknowledges that, according to Lt. Col. Patterson, his status changed on September 23, prior to Capt. Whitehouse's submission of his formal complaint on September 24. But this assertion, even if credited, does not create a material issue of fact because his placement on leave with pay for one day during his scheduled leave does not constitute an adverse action as required under the USERRA. As to this theory, he has not made out a prima facie case under the USERRA.

As discussed above, a plaintiff must show that he was "denied . . . any benefit of employment" to make out a USERRA violation. The Court has not come across any case law from the Eleventh Circuit outlining what constitutes a denial of a benefit of employment or adverse employment action in the context of the USERRA. In the context of a Title VII anti-discrimination suit, however, the Eleventh Circuit has explained that "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Webb-Edwards v. Orange Cty. Sheriff's Office*, 525 F.3d 1013, 1031 (11th Cir. 2008). Indeed, "to prove adverse employment

15

action," an employee "must show a *serious and material* change in the terms, conditions, or privileges of employment." *Id.* (emphasis in original). And an employee's "subjective view of the significance adversity of the . . . action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* Applying this standard, Lt. Col. Patterson's claim fails.[6]

Lt. Col. Patterson has failed to argue, much less show, that he was denied any benefit between September 23, when he claims his status was changed, and September 24 when, as discussed above, AA initiated a legitimate investigation into Capt. Whitehouse's complaint. First, Lt. Col. Patterson continued to be paid, even after the change in status. Second, his being placed on a "no-fly" status on the 23 could not have harmed him, given that he was scheduled to stay in Washington, D.C., on military leave until September 25. In short, Lt. Col. Patterson has not identified how his change in status had any material adverse effect on him between September 23 and September 24 and has therefore failed to make out a prima facie USERRA violation on that theory. *Cf. Dominguez v. Miami-Dade Cty.*, 669 F. Supp. 2d 1340, 1348 (S.D. Fla. 2009) (concluding that there was no adverse action because the denial of opportunity to sit for an exam was "not so prejudicial as to constitute the denial of a 'benefit of employment'").

### B. Settlement Offer

Lt. Col. Patterson's arguments regarding AA's settlement offer are also unavailing. Setting aside the question of whether it can be retaliatory to offer consideration in exchange for a release of claims, the circumstances surrounding AA's offer do not constitute retaliation. Lt. Col. Patterson contends that "[t]o withhold a fair evaluation from someone unless that person agrees to

---

[6] The Supreme Court has noted that the USERRA is very similar to Title VII. *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 n.8 (11th Cir. 2013) (acknowledging same).

forego the statutory protection of USERRA is retaliatory." D.E. 85 at 13. But this does not appear to be what AA offered or demanded.

Lt. Col. Patterson has not contested that AA's practice, when an independent examiner finds a pilot unfit, is to send that pilot back to the same practitioner for a second assessment once the pilot indicates that he is ready to return to work. *See* Def. SUF ¶ 38. Nor does he disagree that he has refused to return to Dr. Knippa for reevaluation or requested a reevaluation by a different doctor approved by AA. *See id.* ¶ 39. AA offered to have University of Texas Medical Branch physicians review the additional assessments provided by Lt. Col. Patterson's chosen physicians, without Lt. Col. Patterson submitting to another examination, unless UTMB's decision was unfavorable. *See* D.E. 61-22. In other words, AA offered to deviate from its usual requirements concerning a fitness for duty examination if Lt. Col. Patterson gave up his USERRA claims.

AA did not deny Lt. Col. Patterson any benefit of employment with AA, or take "adverse action" against him in extending the offer. Rather, it offered a tangible benefit (not having to take a second assessment with Dr. Knippa, or any physician immediately, as any other pilot would have to do), in exchange for a release of his USERRA claims. This is not retaliation, but standard negotiation. Lt. Col. Patterson has not cited any authorities suggesting, much less holding, that AA's settlement offer constituted retaliation under the circumstances.

## V. CONCLUSION

For the foregoing reasons, Lt. Col. Patterson's motion for partial summary judgment [D.E. 68] is **DENIED** and American Airlines' motion for summary judgment [D.E. 59] is **GRANTED**. Judgment will be entered by separate order.

DONE AND ORDERED in Chambers at Miami, Florida, this 29th day of March, 2019.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Otazo-Reyes
All Counsel of Record