```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                       MIAMI DIVISION
                   CASE NO.  17-60533-CIV-JEM
 3

 4
       RODNEY SCOTT PATTERSON,
 5
                   Plaintiff,
 6
          vs.
 7
                                        Miami, Florida
 8                                      March 8, 2019
       AMERICAN AIRLINES,               Pages 1-39
 9
                   Defendant.
10    _____

11            TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
              BEFORE THE HONORABLE JOSE E. MARTINEZ
12               UNITED STATES DISTRICT JUDGE
              HONORABLE ADALBERTO JORDAN PRESIDING
13
       APPEARANCES:
14
       FOR THE PLAINTIFF:
15                       The Amlong Firm, P.A.
                         BY:  WILLIAM R. AMLONG, ESQ.
16                       BY:  KAREN COOLMAN AMLONG, ESQ.
                         BY:  NOEL C. PACE, ESQ.
17                       500 Northeast Fourth Street
                         Second Floor
18                       Fort Lauderdale, Florida  33301

19     FOR THE DEFENDANT:
                         Fisher & Phillips, LLP
20                       BY:  MICHAEL A. HOLT, ESQ.
                         450 East Las Olas Boulevard
21                       Suite 800
                         Fort Lauderdale, Florida 33301
22
                         O'Melveny & Myers, LLP
23                       BY:  MARK W. ROBERTSON, ESQ.
                         Times Square Tower
24                       7 Times Square
                         New York, New York 10036
25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

|   |   |
|---|---|
| 1 | **REPORTED BY:**       **DAWN M. SAVINO, RPR** |
|   | **Official Court Stenographer** |
| 2 | **400 N. Miami Avenue, 10S03** |
|   | **Miami, Florida 33128** |
| 3 | **Telephone: 305-523-5598** |

4

10:39:30   5          (Court called to order)

10:39:32   6          THE COURT:  Good morning.  Please be seated.

10:39:38   7          COURTROOM DEPUTY:  Case number 17-60533-civil-Martinez,

10:39:40   8   Patterson versus American Airlines.

10:39:43   9          Counsel, please state your appearance starting with the

10:39:44  10   Plaintiff.

10:39:47  11          MR. AMLONG:  Good morning, Your Honor.  William Amlong,

10:39:52  12   Karen Coolman Amlong and Noel Pace on behalf of Mr. Patterson.

10:39:53  13          THE COURT:  Good morning to all of you.

10:39:55  14          MR. ROBERTSON:  Good morning, Your Honor.  Mark

10:39:57  15   Robertson for Defendant American Airlines.

10:39:59  16          MR. HOLT:  Good morning, Your Honor.  Michael Holt on

10:40:02  17   behalf of American Airlines.

10:40:02  18          THE COURT:  Good morning.

10:40:06  19          Okay.  You've got cross-motions for summary judgment

10:40:11  20   for full judgment on American Airlines' side; for partial on

10:40:14  21   Mr. Patterson's side, and American filed its motion a day before

10:40:16  22   Mr. Patterson did, so you get to go first.

10:40:17  23          MR. ROBERTSON:  Okay.  Thank you, Your Honor.

10:40:17  24          THE COURT:  Fire away.

10:40:25  25          MR. ROBERTSON:  Your Honor, in this matter, Plaintiff

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | |
|---|---|
| 10:40:31 | 1 |
| 10:40:35 | 2 |
| 10:40:39 | 3 |
| 10:40:43 | 4 |
| 10:40:46 | 5 |
| 10:40:49 | 6 |

alleges that American discriminated and retaliated against him in violation of USERRA.  Specifically, Plaintiff claims that American did so because he requested time off from work to travel with his wife to D.C. to attend Pope Francis' visit to the White House for which he claims he received inactive duty training credit from the military.

The purported adverse employment actions at issue are American's withholding him from duty with pay while it investigated a complaint made against him by another employee, and then continuing to withhold him from duty after a neuropsychologist found him not fit for duty.

Your Honor, let me set the stage by summarizing --

THE COURT:  Can I ask you one question?

MR. ROBERTSON:  Yes, Your Honor.

THE COURT:  It doesn't bear on summary judgment in any way, but I want to make sure I understand this part correctly and I'll ask Mr. Amlong or Ms. Amlong the same thing.

His status is still the same today?

MR. ROBERTSON:  His status, he's no longer in the military.

(Cross-talk between the Court and counsel)

THE COURT:  ...with American.

MR. ROBERTSON:  Yes.  That is exactly correct, Your Honor.

THE COURT:  Okay.  So he still is not able to fly, but

10:41:36  1    still being paid.

10:41:39  2        MR. ROBERTSON:  He is no longer being paid from -- when

10:41:44  3    he was found not fit for duty, while he was withheld during an

10:41:48  4    investigation, it was withheld with full pay.  He was then sent

10:41:52  5    for a fitness-for-duty examination, found not fit for duty.  At

10:41:55  6    that point in time, he was placed on his sick leave and when he

10:41:57  7    ran out of that, he was not -- he's been unpaid.

10:42:00  8        THE COURT:  So approximately, ballpark figure, when did

10:42:02  9    that take place?

10:42:04  10       MR. ROBERTSON:  I don't have an exact date, but we can

10:42:06  11   find you one or Mr. Amlong may know.

10:42:07  12       THE COURT:  Okay.

10:42:14  13       MR. ROBERTSON:  Okay.  So in terms of these five key

10:42:16  14   facts, which I'll summarize briefly.

10:42:23  15       Undisputed Fact Number 1:  During 2015 alone, American

10:42:29  16   granted more than 1,500 military leaves to pilots at its Miami

10:42:34  17   base alone.  During Plaintiff's more than 15 years of employment

10:42:39  18   at American, he never had a single issue taking military leave.

10:42:43  19   In the words of his own expert regarding Plaintiff's past

10:42:48  20   military leave, quote, previously no problem whatsoever from AA

10:42:53  21   and in particular, from the local Miami flight office.

10:42:59  22       Undisputed Fact Number 2:  On September 24, 2015,

10:43:03  23   Captain Glenn Whitehouse, a pilot at American, filed a formal

10:43:08  24   workplace harassment complaint against Plaintiff.

10:43:11  25       Undisputed Fact Number 3:  In response to that

| | | |
|---|---|---|
| 10:43:15 | 1 | complaint, American's HR department in Miami, and specifically |
| 10:43:20 | 2 | an HR investigator named Anna Burke Leon, conducted an |
| 10:43:24 | 3 | investigation.  She interviewed Plaintiff, Captain Whitehouse, |
| 10:43:31 | 4 | and seven other witness.  On December 9, 2015, she issued a |
| 10:43:36 | 5 | report in which she states, quote, the majority of the employees |
| 10:43:42 | 6 | interviewed describe Patterson as a habitual liar, storyteller, |
| 10:43:45 | 7 | closed quote.  Their interactions with Patterson, quote, led |
| 10:43:50 | 8 | them to question his ability to operate the aircraft safely.  It |
| 10:43:54 | 9 | left them with an impression that he's not quite all there. |
| 10:43:55 | 10 | THE COURT:  One of the arguments that Mr. Patterson |
| 10:44:04 | 11 | makes, I think, is that some of the allegations against him were |
| 10:44:06 | 12 | sort of stale. |
| 10:44:06 | 13 | MR. ROBERTSON:  Yes, Your Honor. |
| 10:44:09 | 14 | THE COURT:  And that American hadn't thought much of |
| 10:44:14 | 15 | them initially, and then all of a sudden, they come up at around |
| 10:44:20 | 16 | the time that he is taking that leave to go to Washington. |
| 10:44:20 | 17 | MR. ROBERTSON:  Yes, Your Honor. |
| 10:44:23 | 18 | THE COURT:  And that all seems too suspicious. |
| 10:44:24 | 19 | MR. ROBERTSON:  Let me make a couple of points about |
| 10:44:28 | 20 | that argument about Plaintiff, Your Honor.  First, I would say |
| 10:44:32 | 21 | it's important to step back and put into context that the Pilots |
| 10:44:37 | 22 | Union at American, known as the APA, plays a significant role at |
| 10:44:39 | 23 | the company.  Not only is there a collective bargaining |
| 10:44:42 | 24 | agreement that's several hundred pages long detailing the |
| 10:44:46 | 25 | employment relationship, but there are long-standing past |

10:44:52   1     practices that come into play in that relationship.  And one of

10:44:54   2     those long-standing past practices is that when there are

10:45:01   3     interpersonal conflicts between individual pilots, one option

10:45:04   4     for the complaining pilot is to take his complaint to what is

10:45:06   5     known as the Professional Standards group of the union rather

10:45:09   6     than the company's HR department.  Now, this certainly does not

10:45:14   7     mean that a pilot has to go to the Professional Standards group

10:45:17   8     first, but it's an option that allows a dispute to be resolved

10:45:20   9     without discipline against the other pilot.

10:45:23   10          Your Honor, I would say we could certainly debate

10:45:26   11    whether that's a good idea or a bad one, but what cannot be

10:45:29   12    debated is that it is standard practice for a pilot to have this

10:45:34   13    option.  What also cannot be debated is there is absolutely

10:45:38   14    nothing nefarious about the fact that here, Captain Whitehouse

10:45:42   15    first went to Professional Standards, and that American allowed

10:45:47   16    that process to first proceed.  Rather, the consistent testimony

10:45:53   17    by every witness indisputably establishes this is a standard

10:45:54   18    practice and option.

10:45:56   19          THE COURT:  That first option was taken before this

10:45:59   20    complaint was filed, or that was the same thing?

10:46:01   21          MR. ROBERTSON:  So before he filed his formal workplace

10:46:06   22    harassment complaint, Captain Whitehouse decided to go to APA

10:46:09   23    Professional Standards, and it was -- they attempted to work it

10:46:12   24    out between Captain Whitehouse and Plaintiff.  When that failed,

10:46:19   25    on September 24, 2015 Captain Whitehouse then files a formal

10:46:19  1    complaint.

10:46:22  2            THE COURT:  When did that first process end?

10:46:25  3            MR. ROBERTSON:  The first process -- well, they

10:46:28  4    investigated -- they were never -- it was actually kind of still

10:46:31  5    going on, and what Captain Whitehouse decided was he's had

10:46:35  6    enough, it's not resolving it, he wants to make a formal

10:46:35  7    complaint.

10:46:37  8            And Your Honor, if I could, let me read you his filing

10:46:42  9    of that formal complaint which is Docket Number 57-17, and it

10:46:46  10   states, quote, after numerous calls to APA professional

10:46:51  11   Standards without any relief, I am formally asking you to help

10:46:54  12   me declare that I have been a target of workplace harassment by

10:46:58  13   First Officer Scott Patterson.  I am asking for your assistance

10:47:02  14   in filing this as a hostile work environment.  I ask that you

10:47:05  15   take the below statements to American Airlines Corporate

10:47:07  16   Resources for review and action.

10:47:09  17           This is what takes this matter into the realm of

10:47:13  18   American's HR group and converts it into a formal investigation

10:47:18  19   resulting in him being withheld with pay.  And from American's

10:47:22  20   perspective, what we would argue, Your Honor, is the only way --

10:47:24  21   by the way, we don't dispute that some of these allegations are

10:47:27  22   the same ones he raised earlier with APA Professional Standards,

10:47:30  23   but the only fact that Whitehouse's allegations against

10:47:34  24   Plaintiff were not new could possibly be evidence of

10:47:40  25   inconsistency or suspicious or pretext, is if he had filed the

| | | |
|---|---|---|
| 10:47:45 | 1 | formal complaint months earlier and American did nothing until |
| 10:47:47 | 2 | he requested the time off; or if there was evidence that |
| 10:47:50 | 3 | American somehow compelled or coerced Whitehouse to file that |
| 10:47:53 | 4 | complaint on the 24th in response to Plaintiff's request for |
| 10:47:56 | 5 | time off.  That's the type of evidence they need to actually |
| 10:47:59 | 6 | undermine American's legitimate reason of withholding him with |
| 10:48:05 | 7 | pay in response to this formal complaint.  And Your Honor, let |
| 10:48:08 | 8 | me be clear, I'm not suggesting that would be sufficient to |
| 10:48:10 | 9 | defeat summary judgment, but that's the type of evidence they |
| 10:48:13 | 10 | would be required to give to give Plaintiff a fighting chance of |
| 10:48:16 | 11 | avoiding summary judgment, and there's absolutely no evidence in |
| 10:48:17 | 12 | the record of that. |
| 10:48:21 | 13 | And they repeatedly ask Whitehouse in his deposition |
| 10:48:24 | 14 | why he made the decision to file on the 24th looking to see if, |
| 10:48:28 | 15 | you know, American had any role or part in this, and he |
| 10:48:31 | 16 | testified absolutely not.  He made the decision on that date |
| 10:48:33 | 17 | because he had enough with APA Professional Standards trying to |
| 10:48:36 | 18 | resolve it, and he had heard from another pilot that |
| 10:48:40 | 19 | Mr. Patterson was going to come after him.  So we would take the |
| 10:48:49 | 20 | position, Your Honor, the formal complaint filed on the 24th is |
| 10:48:50 | 21 | what changed the matter. |
| 10:48:55 | 22 | Now, to go back to the point number three I was making |
| 10:49:00 | 23 | which is this investigation resulted in a finding or numerous |
| 10:49:04 | 24 | witnesses reporting that he was a habitual storyteller and liar, |
| 10:49:10 | 25 | just to give you one example, one witness in that investigation |

9

| | | |
|---|---|---|
| 10:49:12 | 1 | stated, quote, my concern is that Scott is unstable and I will |
| 10:49:16 | 2 | not fly with him again, nor will I ever let my family fly on a |
| 10:49:18 | 3 | plane he is piloting. |
| 10:49:25 | 4 |      Undisputed Fact Number 4:  On March 16th to 17th, 2016, |
| 10:49:30 | 5 | Dr. John Knippa, a neuropsychologist and former Marine, |
| 10:49:34 | 6 | conducted a two-day examination of Plaintiff.  On March 21, |
| 10:49:37 | 7 | 2015, Dr. Knippa issued a report finding Plaintiff not fit for |
| 10:49:39 | 8 | duty. |
| 10:49:43 | 9 |      Undisputed Fact Number 5:  Pursuant to the process set |
| 10:49:47 | 10 | forth in the collective bargaining agreement governing |
| 10:49:49 | 11 | Plaintiff's employment, American is only required to return him |
| 10:49:53 | 12 | to work if he is found fit for duty in a subsequent evaluation |
| 10:49:58 | 13 | by Dr. Knippa, or a comparable examiner approved by American. |
| 10:50:02 | 14 | To date, Plaintiff has refused to participate in that required |
| 10:50:03 | 15 | process. |
| 10:50:08 | 16 |      Let me now turn to the law and one of our key arguments |
| 10:50:12 | 17 | in our motion, Your Honor, which is that under USERRA, if |
| 10:50:16 | 18 | American can show that it would have taken the purported adverse |
| 10:50:19 | 19 | employment actions for legitimate reasons standing alone, it's |
| 10:50:25 | 20 | entitled to summary judgment.  And a formal workplace harassment |
| 10:50:29 | 21 | complaint is indisputably a legitimate reason to withhold an |
| 10:50:32 | 22 | employee from duty with pay while it investigates.  And a |
| 10:50:37 | 23 | finding by a neuropsychologist that an individual is not fit for |
| 10:50:41 | 24 | duty is likewise indisputably a legitimate basis to withhold an |
| 10:50:42 | 25 | employee from duty. |

10:50:46   1          Now, Plaintiff claims well, the motivating factor

10:50:51   2   behind all this was an anti-military animus that he purports to

10:50:55   3   link to his request for time off to travel to D.C., and he

10:50:58   4   argues American's stated reasons are not the actual reasons for

10:51:02   5   its actions.  Your Honor, I want to step back and put into

10:51:07   6   context the magnitude of the conspiracy this would require

10:51:10   7   Plaintiff to demonstrate.  Plaintiff would need to produce

10:51:15   8   evidence to show, or at least suggest, first that American

10:51:19   9   somehow caused Captain Whitehouse to file its formal complaint

10:51:22   10  against Plaintiff on September 24th when he did so as a pretext

10:51:27   11  for withholding Plaintiff from duty.  Second, that American

10:51:34   12  somehow controlled the HR investigator behind the scenes or that

10:51:38   13  she had an anti-military animus.  Third, that American somehow

10:51:42   14  compelled or coerced multiple witnesses to provide false

10:51:45   15  statements regarding Plaintiff during the investigation, and

10:51:49   16  fourth, that American somehow caused Dr. Knippa to falsify his

10:51:54   17  report.  Your Honor, there's not a single shred of evidence in

10:51:57   18  the record to suggest that any of that occurred in any way,

10:52:01   19  shape or form, and for these reasons, Plaintiff can't dispute

10:52:04   20  American's legitimate reasons or overcome them, and American's

10:52:05   21  entitled to summary judgment.

10:52:08   22          THE COURT:  With regards -- can I interrupt you for a

10:52:09   23  second?

10:52:10   24          MR. ROBERTSON:  Of course.

10:52:13   25          THE COURT:  With regards to the retaliation claim, your

| | | |
|---|---|---|
| 10:52:21 | 1 | argument is almost one of chronology; that at the time that |
| 10:52:26 | 2 | Mr. Patterson filed his complaint with the DOL, you had already |
| 10:52:31 | 3 | -- you, your client, had already taken the action based on his |
| 10:52:34 | 4 | being found not fit to fly. |
| 10:52:34 | 5 | MR. ROBERTSON:  That's correct, Your Honor. |
| 10:52:38 | 6 | THE COURT:  And so as a matter of both fact and law, |
| 10:52:43 | 7 | you could not have retaliated because the adverse action took |
| 10:52:50 | 8 | place before he filed the USERRA complaint. |
| 10:52:51 | 9 | MR. ROBERTSON:  That's right, Your Honor.  And I think, |
| 10:52:52 | 10 | you know, what they would argue in response, and what they do |
| 10:52:56 | 11 | claim as well, it was after he filed that Dr. Knippa issued his |
| 10:53:00 | 12 | actual findings and report, and then you continued to withhold |
| 10:53:02 | 13 | him from duty.  And again, for that, there's got to be |
| 10:53:05 | 14 | something, something in the record to at least suggest we're |
| 10:53:10 | 15 | somehow causing Dr. Knippa to fabricate a report that doesn't |
| 10:53:11 | 16 | exist. |
| 10:53:14 | 17 | And I would like to make an important point on that on |
| 10:53:14 | 18 | Dr. Knippa's report -- |
| 10:53:17 | 19 | THE COURT:  You've got about a minute so I can give you |
| 10:53:18 | 20 | some time for rebuttal. |
| 10:53:19 | 21 | MR. ROBERTSON:  Okay.  I'll just make it really quick |
| 10:53:26 | 22 | which is Dr. Knippa issues his report on March 21, 2016. |
| 10:53:28 | 23 | Unbeknownst to us until the middle of this litigation, after |
| 10:53:32 | 24 | fighting tooth and nail for it, we learned, after Magistrate |
| 10:53:38 | 25 | rulings on the issue entitling it to us, on that same day, March |

| | | |
|---|---|---|
| 10:53:39 | 1 | 21, four days after Dr. Knippa evaluated him, Plaintiff was |
| 10:53:43 | 2 | actually being seen by another doctor that he selected, Dr. |
| 10:53:46 | 3 | Bercaw.  And Dr. Bercaw issued a report in which he raised |
| 10:53:49 | 4 | concerns similar to Dr. Knippa that he said were, quote, |
| 10:53:53 | 5 | potentially critical to flight performance.  Dr. Bercaw also |
| 10:53:57 | 6 | recommended further review of his report and his examination by |
| 10:54:01 | 7 | the FAA, and in response, Plaintiff immediately revokes Dr. |
| 10:54:05 | 8 | Bercaw's authorization to send anything to the FAA, and then in |
| 10:54:08 | 9 | his deposition testifies he's never visited Dr. Bercaw. |
| 10:54:11 | 10 | So the point is is not only is there no evidence to |
| 10:54:15 | 11 | suggest that American somehow coerced or caused Dr. Knippa to |
| 10:54:18 | 12 | fabricate his report, but a different doctor that Plaintiff |
| 10:54:22 | 13 | himself selected, and that American had no idea about until this |
| 10:54:23 | 14 | litigation, raised similar concerns. |
| 10:54:26 | 15 | I'll stop there, Your Honor.  But our other main |
| 10:54:30 | 16 | argument is that he can't even establish a prima facie case |
| 10:54:34 | 17 | because his own expert wrote in a report that, quote, but for |
| 10:54:38 | 18 | the Whitehouse complaint, Scott Patterson believes American |
| 10:54:41 | 19 | would never have withheld him from duty, and Scott Patterson |
| 10:54:44 | 20 | testified in his deposition that he agrees with everything Dr. |
| 10:54:46 | 21 | Caddy wrote. |
| 10:54:46 | 22 | Thank you, Your Honor. |
| 10:54:50 | 23 | THE COURT:  All right.  Thank you very much. |
| 10:55:11 | 24 | MR. AMLONG:  Good morning, Your Honor. |
| 10:55:11 | 25 | THE COURT:  Good morning. |

```
10:55:16   1              MR. AMLONG:  I'd like to take ten minutes and then five
10:55:19   2     minutes for rebuttal, where I'd like to cede two minutes of my
10:55:28   3     ten minutes to Colonel Pace, my co-counsel.  And I'll take these
10:55:30   4     allegations in the --
10:55:33   5              THE COURT:  What you need to address for me,
10:55:44   6     Mr. Amlong, is how you get to a jury when a third party makes a
10:55:50   7     complaint against your client and that forms the basis of the
10:55:56   8     investigation and ultimately the adverse action.  If your expert
10:56:04   9     has said that that's the basis for the investigation and the
10:56:10  10     examination and the no fit to fly determination, how do you get
10:56:11  11     to a jury?
10:56:14  12              MR. AMLONG:  Because these are the exact same
10:56:21  13     allegations as -- they may have been looked at by Professional
10:56:25  14     Standards, but they are also the exact same allegations as were
10:56:30  15     addressed by corporate security; as were known to Captain Beach,
10:56:36  16     another chief pilot; as was made known to labor relations; as
10:56:40  17     was made known to human resources back in April.
10:56:43  18              THE COURT:  So the answer is so what?
10:56:45  19              MR. AMLONG:  Because they were unfounded.
10:56:48  20              THE COURT:  Captain Whitehouse decides to initiate a
10:56:54  21     different form of review procedure and that gets looked at.
10:56:56  22              MR. AMLONG:  And American Airlines, having investigated
10:56:59  23     these things thoroughly before --
10:57:01  24              THE COURT:  How do you know they investigated
10:57:03  25     thoroughly before?
```

| | | |
|---|---|---|
| 10:57:05 | 1 | MR. AMLONG:  Because Captain Beach testified that he |
| 10:57:08 | 2 | was told that there was nothing there. |
| 10:57:09 | 3 | THE COURT:  Told by whom? |
| 10:57:11 | 4 | MR. AMLONG:  By corporate security. |
| 10:57:13 | 5 | THE COURT:  And what did corporate security do to |
| 10:57:14 | 6 | investigate? |
| 10:57:15 | 7 | MR. AMLONG:  I don't know because there's no record of |
| 10:57:15 | 8 | it. |
| 10:57:18 | 9 | THE COURT:  Then that's a problem for you, is it not? |
| 10:57:21 | 10 | MR. AMLONG:  I think it's a problem for them because |
| 10:57:24 | 11 | can you imagine an investigation these days of which there is no |
| 10:57:28 | 12 | record.  We've asked for these records, and they said we don't |
| 10:57:28 | 13 | have any. |
| 10:57:30 | 14 | THE COURT:  Which may suggest that there isn't an |
| 10:57:34 | 15 | investigation, or somebody didn't look at it thoroughly. |
| 10:57:35 | 16 | MR. AMLONG:  Captain Beach said -- |
| 10:57:38 | 17 | THE COURT:  That's why Captain Whitehouse at least |
| 10:57:43 | 18 | testified that he was not satisfied with the process, wasn't |
| 10:57:48 | 19 | getting any results and decided to go the other route. |
| 10:57:52 | 20 | MR. AMLONG:  And I believe that under USERRA that is |
| 10:57:56 | 21 | their burden to prove, and I think that we raise a question of |
| 10:58:00 | 22 | fact because the exact same allegations were known to American |
| 10:58:05 | 23 | earlier and these are the kind -- they're talking about we were |
| 10:58:12 | 24 | so concerned with flight safety.  The allegations they made -- |
| 10:58:22 | 25 | the allegations that Captain Whitehouse is making were serious. |

| 10:58:28 | 1 | It's like a non delegable duty for the airline to investigate |
| 10:58:31 | 2 | these allegations, because I don't want to be on an airplane |
| 10:58:38 | 3 | with somebody who is, as Lieutenant Colonel Patterson was |
| 10:58:41 | 4 | described, on the flight deck.  And they -- |
| 10:58:43 | 5 | THE COURT:  But then they investigate, they talk to |
| 10:58:48 | 6 | witnesses, including your client, and they decide to send him to |
| 10:58:53 | 7 | a fitness evaluation which turns out to be not favorable for |
| 10:58:56 | 8 | him. |
| 10:58:57 | 9 | MR. AMLONG:  Everything that they -- everything for |
| 10:59:01 | 10 | which they sent -- everything that human resources found may |
| 10:59:06 | 11 | have suggested that Lieutenant Colonel Patterson is a jerk. |
| 10:59:09 | 12 | There's nothing there that suggested that he was not a good |
| 10:59:15 | 13 | pilot, that he was in any way neuropsychologically impaired. |
| 10:59:19 | 14 | THE COURT:  But you've got a fitness evaluation that |
| 10:59:21 | 15 | suggests otherwise. |
| 10:59:23 | 16 | MR. AMLONG:  I've got a fitness evaluation that Dr. |
| 10:59:26 | 17 | Atone *(ph)*, the corporate medical director, suggested that there |
| 10:59:27 | 18 | are questions, but it's inconclusive. |
| 10:59:30 | 19 | THE COURT:  He's not fit to fly, right?  Or else he |
| 10:59:31 | 20 | would be flying. |
| 10:59:34 | 21 | MR. AMLONG:  Even sending -- the examination that he |
| 10:59:40 | 22 | underwent was performed by somebody hired by American -- |
| 10:59:42 | 23 | THE COURT:  That's usually the case, yes. |
| 10:59:43 | 24 | MR. AMLONG:  -- three time zones away -- |
| 10:59:47 | 25 | THE COURT:  So? |

10:59:48   1          MR. AMLONG:  -- because that disrupted Lieutenant

10:59:54   2   Colonel Patterson's ability to perform on the neuropsychological

10:59:55   3   test.

10:59:58   4          THE COURT:  When did he arrive at three zones away, and

11:00:00   5   when was the test administered?

11:00:02   6          MR. AMLONG:  He arrived the evening before --

11:00:04   7          THE COURT:  Uh-huh.

11:00:07   8          MR. AMLONG:  -- and the test was administered the next

11:00:12   9   day.  And he -- the same thing happened with another American

11:00:16  10   pilot, Michael Dale, who was sent from Charlotte to Dr. Knippa

11:00:24  11   with the same result.  Mr. Dale asked for another examination

11:00:27  12   and because Dr. Knippa said he would not re-examine him because

11:00:31  13   he had, quote, learned the test, and the second examination

11:00:38  14   restored Captain Dale to duty.

11:00:40  15          THE COURT:  Has your client gone through a fitness

11:00:46  16   evaluation which has come out differently?

11:00:49  17          MR. AMLONG:  He has subsequently.  He had not by then,

11:00:50  18   but he was asking to and --

11:00:52  19          THE COURT:  Does he have one now?

11:00:52  20          MR. AMLONG:  Yes.

11:00:54  21          THE COURT:  By whom?

11:00:55  22          MR. AMLONG:  By Dr. Kay.

11:00:58  23          THE COURT:  Who is who?

11:01:00  24          MR. AMLONG:  Dr. Kay is the neuropsychologist who

11:01:05  25   designed the CogScreen which is the primary test for gauging

| | | |
|---|---|---|
| 11:01:07 | 1 | neuropsychology. |
| 11:01:09 | 2 | THE COURT:  And when did that take place? |
| 11:01:12 | 3 | MR. AMLONG:  About three or four months ago. |
| 11:01:15 | 4 | THE COURT:  If that didn't exist at the time of the |
| 11:01:20 | 5 | adverse action, how can you make out a claim? |
| 11:01:24 | 6 | MR. AMLONG:  Because sending him -- sending him to the |
| 11:01:31 | 7 | neuropsychological exam was an adverse action.  This is |
| 11:01:32 | 8 | different than the case -- |
| 11:01:34 | 9 | THE COURT:  Based on a complaint. |
| 11:01:36 | 10 | MR. AMLONG:  Based on a complaint that the -- based on |
| 11:01:41 | 11 | a complaint that American Airlines had investigated and had |
| 11:01:42 | 12 | rejected. |
| 11:01:46 | 13 | THE COURT:  So they re-investigated again.  That |
| 11:01:51 | 14 | doesn't show discriminatory animus.  Tell me what is American |
| 11:01:56 | 15 | supposed -- if you say that there's no evidence about what the |
| 11:02:00 | 16 | first investigation found out, what is American supposed to do |
| 11:02:04 | 17 | when Captain Whitehouse submits the second complaint? |
| 11:02:06 | 18 | MR. AMLONG:  Captain Beach said that -- the evidence |
| 11:02:09 | 19 | about the first investigation, Captain Beach said that it |
| 11:02:11 | 20 | determined that there was nothing there. |
| 11:02:13 | 21 | THE COURT:  So what is American supposed to do when |
| 11:02:19 | 22 | Captain Whitehouse decides to go the second route and file the |
| 11:02:20 | 23 | formal complaint? |
| 11:02:23 | 24 | MR. AMLONG:  Because the formal complaint was the exact |
| 11:02:23 | 25 | same complaint. |

```
11:02:26   1              THE COURT:  What is American supposed to do when
11:02:29   2      Captain Whitehouse files the second complaint?
11:02:31   3              MR. AMLONG:  Rely on the corporate security
11:02:31   4      investigation.
11:02:33   5              THE COURT:  Which you say there's no record of.
11:02:36   6              MR. AMLONG:  And I believe that, you know, goes against
11:02:39   7      them, not Lieutenant Colonel Patterson.
11:02:43   8              THE COURT:  So you think American should just say we
11:02:48   9      have previously determined -- we have no records to give you,
11:02:52  10      but we're going to reject your complaint because somebody at
11:02:56  11      corporate security said there's nothing to this, and that's it.
11:02:59  12              MR. AMLONG:  It is hard to imagine an investigation of
11:03:02  13      which there could be zero records.
11:03:07  14              THE COURT:  Even if you are correct and corporate
11:03:12  15      security went one way, what's to prevent human resources from
11:03:15  16      re-investigating it again?
11:03:17  17              MR. AMLONG:  And they found the same thing and --
11:03:19  18              THE COURT:  But they sent him to a fitness evaluation,
11:03:24  19      Mr. Amlong.  I don't see how you can get around that.  They
11:03:28  20      found a problem.  You may disagree with that diagnosed problem,
11:03:31  21      but they found a problem, did they not?
11:03:35  22              MR. AMLONG:  They sent him to a fitness examination by
11:03:39  23      someone not only whom they hired, but to whom they sent a letter
11:03:42  24      describing basically what they wanted him to find.
11:03:45  25              THE COURT:  You just told me that they've sent other
```

11:03:47  1    people to Dr. Knippa.

11:03:48  2              MR. AMLONG:  And he failed that person too.

11:03:50  3              THE COURT:  Those are the only two people that he's

11:03:53  4    ever seen from American Airlines?

11:03:55  5              MR. AMLONG:  Those are the only two people that I know

11:03:58  6    of, and I believe at the time of his deposition those were the

11:04:02  7    only two.

11:04:06  8              THE COURT:  So you're asking a jury to infer that all

11:04:13  9    of this was cooked up because he decided to take some days off

11:04:17 10    on military duty?  Take off may not be the right way to put it.

11:04:21 11    That he decided to take some leave that he labeled as vacation

11:04:26 12    time to go to Washington to the Whitehouse for a ceremony with

11:04:28 13    Pope Francis?

11:04:32 14              MR. AMLONG:  He opted to go on inactive training duty

11:04:38 15    to increase his pension for that year as USERRA entitles him to

11:04:42 16    do.  He used his vacation time rather than taking military leave

11:04:46 17    because vacation time pays him.  He had 30 days approved.

11:04:47 18              THE COURT:  That's fine.  That's fine.

11:04:49 19              MR. AMLONG:  And he's guaranteed the right --

11:04:52 20              THE COURT:  But because of that, American started this

11:04:57 21    investigation against him, improperly you think; improperly sent

11:05:02 22    him to a fitness evaluation despite interviewing witnesses; sent

11:05:08 23    him to an examiner who, in your view, was predisposed to come

11:05:14 24    out a certain way, set up the evaluation in a way that your

11:05:19 25    client was likely to not perform well?  Right?  That's the

11:05:20  1      sequence of events?

11:05:21  2              MR. AMLONG:  Yes.

11:05:25  3              THE COURT:  You're asking a jury to infer all of that

11:05:25  4      from these facts?

11:05:25  5              MR. AMLONG:  Yes, I am.

11:05:27  6              THE COURT:  What do you do with Captain Whitehouse's

11:05:30  7      complaint, Mr. Amlong?  I still haven't heard that.  All you're

11:05:32  8      saying is they had the complaint before and they didn't think

11:05:36  9      anything of it.  Corporations and the people who work for them

11:05:39  10     re-evaluate decisions all the time, and they're not

11:05:41  11     discriminatory all of the time.

11:05:44  12             MR. AMLONG:  Because the kind of allegations that were

11:05:50  13     made by Captain Whitehouse would have justified taking

11:05:56  14     Lieutenant Colonel Patterson and Captain Whitehouse away from

11:05:58  15     flying when they were first made.

11:06:00  16             THE COURT:  So they should have done it earlier.

11:06:01  17             MR. AMLONG:  Yes.

11:06:04  18             THE COURT:  They should have found him not fit for duty

11:06:05  19     earlier.

11:06:07  20             MR. AMLONG:  No, they should have not found him not fit

11:06:08  21     for duty.

11:06:11  22             THE COURT:  If they had done the same evaluation the

11:06:15  23     first time, and the way they did it the second time, wouldn't it

11:06:16  24     have come out the same way?

11:06:20  25             MR. AMLONG:  They did not put either one of them on

11:06:23   1    paid withheld status the first time.

11:06:27   2            THE COURT:  That's a different issue, Mr. Amlong.  I'm

11:06:33   3    talking about the result.  If they had done the examination the

11:06:35   4    first time the way they did it the second time, what would have

11:06:36   5    been the result?

11:06:39   6            MR. AMLONG:  The same as it was the second time.  There

11:06:39   7    were no findings.

11:06:41   8            THE COURT:  Which means your client would have been

11:06:42   9    found not fit for duty.

11:06:46  10            MR. AMLONG:  No.  My client would have been found by

11:06:51  11    human resources not to have committed anything giving rise to

11:06:53  12    discipline.

11:06:55  13            THE COURT:  How do you know that?

11:06:57  14            MR. AMLONG:  Because that's how he was found the second

11:06:57  15    time.

11:06:58  16            THE COURT:  No see, you're mixing apples -- that's not

11:07:00  17    my question to you.  You're avoiding the questions.  You're

11:07:04  18    saying that the first evaluation should have been conclusive.

11:07:07  19    And I'm asking you if the first evaluation had been conducted

11:07:10  20    the way the second one was, what would have been the result?

11:07:12  21            MR. AMLONG:  The first evaluation was conducted

11:07:14  22    properly, the second was not.

11:07:16  23            THE COURT:  That's not my question to you.

11:07:20  24            MR. AMLONG:  If he had been found -- I can't tell

11:07:23  25    because I don't know what the neuropsychologist would have found

```
11:07:27   1      if he had examined him during the first investigation.  I don't
11:07:30   2      know what the neuropsychologist would have found if he had
11:07:34   3      examined him on the East Coast, and not the morning after he had
11:07:36   4      flown three time zones away.  I don't know what the
11:07:40   5      neuropsychologist would have found if he had not been given the
11:07:45   6      letter that -- if he had not been given the letter supposedly
11:07:50   7      signed by -- well, signed by two chief pilots, each of whom say
11:07:55   8      they did not write it and it wasn't their idea.
11:08:01   9              THE COURT:  That's on the leave issue, right?
11:08:04   10             MR. AMLONG:  That's on the fitness for duty
11:08:06   11     examination.
11:08:10   12             THE COURT:  How do you get around pretext?  How do you
11:08:16   13     show pretext when there's a complaint, there's an investigation,
11:08:20   14     there's a fitness evaluation and a doctor finds Mr. Patterson
11:08:23   15     not fit to fly.
11:08:24   16             MR. AMLONG:  Because of the irregularities in the
11:08:34   17     investigation.  I'm sorry, the irregularities in the -- the
11:08:40   18     irregularities in the neuropsychological examination.  There is
11:08:41   19     nothing in his --
11:08:43   20             THE COURT:  So why didn't your client get tested by
11:08:47   21     somebody else?
11:08:50   22             MR. AMLONG:  He wanted to be tested by somebody else,
11:08:53   23     and American offered to let him be tested by somebody else if he
11:08:54   24     would drop his lawsuit.
11:08:57   25             THE COURT:  Why didn't he do it on his own without
```

| | | |
|---|---|---|
| 11:08:58 | 1 | agreeing to -- |
| 11:08:59 | 2 | MR. AMLONG:  He attempted to. |
| 11:09:00 | 3 | THE COURT:  And? |
| 11:09:03 | 4 | MR. AMLONG:  He attempted to see Dr. Bercaw.  Dr. |
| 11:09:08 | 5 | Bercaw saw him and had tests administered by a brand new PsyD as |
| 11:09:13 | 6 | opposed to a PhD.  The tests were inconclusive.  He then went to |
| 11:09:17 | 7 | Dr. Kay who, because Dr. Bercaw had just tested him, Dr. Kay |
| 11:09:22 | 8 | found him fit for duty but I withdrew that report because Dr. |
| 11:09:27 | 9 | Kay said that since he had been tested by Dr. Bercaw, you know, |
| 11:09:30 | 10 | the test was not valid that time. |
| 11:09:34 | 11 | We sent this to American saying, you know, let -- you |
| 11:09:39 | 12 | know, let me be tested by somebody other than Bercaw, and |
| 11:09:45 | 13 | American did not do that.  Would not do that.  The only way they |
| 11:09:48 | 14 | would permit him to be tested is if he would agree to drop his |
| 11:09:50 | 15 | lawsuit. |
| 11:09:53 | 16 | THE COURT:  Okay.  You wanted to cede a couple minutes |
| 11:09:55 | 17 | of your time? |
| 11:10:08 | 18 | MR. AMLONG:  Yes. |
| 11:10:12 | 19 | MR. PACE:  Your Honor, my name is Colonel Noel Pace, |
| 11:10:16 | 20 | and I have 26 years experience in both the active Army and Army |
| 11:10:21 | 21 | Reserve.  I served in Iraq, Korea and Colombia.  I've commanded |
| 11:10:25 | 22 | three different units, including a combat support hospital.  I |
| 11:10:26 | 23 | went back to the University of Miami Law School on the GI Bill |
| 11:10:28 | 24 | because I saw how military personnel and veterans were being |
| 11:10:30 | 25 | mistreated, and became involved in this case. |

11:10:34  1         Today's case is a major cause of concern because if you

11:10:37  2  look at the facts, this is the exact reason why Congress enacted

11:10:41  3  USERRA.  It is to protect military personnel while doing their

11:10:45  4  duty from civilian employers, while they're doing their duty in

11:10:46  5  defense of the nation.

11:10:48  6         THE COURT:  How do you get around the complaint by

11:10:50  7  Captain Whitehouse?

11:10:50  8         MR. PACE:  Your Honor, that complaint --

11:10:54  9         THE COURT:  If this case did not involve that

11:10:58  10  complaint, you would get to a jury in a heartbeat it seems to

11:11:00  11  me.  But you've got --

11:11:03  12         MR. PACE:  That complaint was resurrected, okay.  It

11:11:05  13  was settled by American Airlines and it was then resurrected.

11:11:08  14         THE COURT:  Wait.  Hold on.  Hold on.  Where is the

11:11:09  15  evidence of settlement in the record?

11:11:12  16         MR. PACE:  The -- first of all, American was aware of

11:11:12  17  the first complaint --

11:11:15  18         THE COURT:  No, no, no, no, no, no.  Answer the

11:11:18  19  question directly please.  Where is the evidence of settlement

11:11:20  20  in the record?

11:11:24  21         MR. PACE:  At the Section 21 hearing there was no

11:11:28  22  action taken.  In addition, the American Pilots Association, the

11:11:33  23  APA, the union, determined that Captain Whitehouse's allegations

11:11:39  24  were -- his complaint were malicious and vindictive.  They put

11:11:39  25  that in writing.

| | | |
|---|---|---|
| 11:11:42 | 1 | THE COURT:  But the union is not the airline. |
| 11:11:45 | 2 | MR. PACE:  They are not, but they handle professional |
| 11:11:45 | 3 | standards. |
| 11:11:46 | 4 | THE COURT:  It doesn't mean that the -- unless you |
| 11:11:48 | 5 | point to something in the collective bargaining agreement that |
| 11:11:55 | 6 | says that the airline is subject to the decision-making by the |
| 11:11:59 | 7 | union on an issue like that, it's not determinative.  It may be |
| 11:12:02 | 8 | relevant, but it's not determinative, right? |
| 11:12:05 | 9 | MR. PACE:  It seems that he then continued flying on |
| 11:12:08 | 10 | status without any issues until this pay withheld and the |
| 11:12:09 | 11 | military leave situation happened. |
| 11:12:11 | 12 | THE COURT:  Because that's when Captain Whitehouse's |
| 11:12:13 | 13 | complaint was filed. |
| 11:12:16 | 14 | MR. PACE:  It was -- right, because it was -- nothing |
| 11:12:18 | 15 | was done, then it was resurrected. |
| 11:12:22 | 16 | THE COURT:  It wasn't resurrected by American, it was |
| 11:12:25 | 17 | Captain Whitehouse who filed it.  What would you have expected |
| 11:12:28 | 18 | American -- same question I had for Mr. Amlong:  What would you |
| 11:12:32 | 19 | have expected American to do when Captain Whitehouse filed the |
| 11:12:33 | 20 | second formal complaint? |
| 11:12:36 | 21 | MR. PACE:  I would have looked at the history of this |
| 11:12:40 | 22 | and found that this was a vindictive and malicious complaint in |
| 11:12:43 | 23 | the first place.  American took no action regarding it in the |
| 11:12:47 | 24 | first place, and then now all of a sudden it's very congruous in |
| 11:12:49 | 25 | time where there's an issue with Captain Patterson's |

|           |    |                                                                      |
|-----------|----|----------------------------------------------------------------------|
| 11:12:53  | 1  | performance, and then all of a sudden now this becomes an issue       |
| 11:12:55  | 2  | again.                                                               |
| 11:12:57  | 3  | THE COURT:  But they investigated.  It's not like they               |
| 11:12:59  | 4  | accepted his allegations at face value.  People were interviewed     |
| 11:13:03  | 5  | including Mr. Patterson, American makes a preliminary                 |
| 11:13:09  | 6  | determination and sends him to a fitness examination.  How do        |
| 11:13:12  | 7  | you infer discrimination from that?                                  |
| 11:13:14  | 8  | MR. PACE:  The fitness examination only came after the               |
| 11:13:18  | 9  | complaint was filed by Mr. Patterson.  It was retaliation for        |
| 11:13:23  | 10 | this whole process.  There is a book that's coming out here          |
| 11:13:25  | 11 | called Weaponization of the Mental Health Industry and the           |
| 11:13:29  | 12 | Aviation Industry by another pilot from another airline, because     |
| 11:13:32  | 13 | it appears to me that they weaponized this whole thing against        |
| 11:13:34  | 14 | Captain Patterson.                                                   |
| 11:13:37  | 15 | THE COURT:  What do you do with a complaint like                     |
| 11:13:40  | 16 | Mr. Whitehouse's complaint, especially when there are witnesses      |
| 11:13:45  | 17 | who back up some of Mr. Whitehouse's allegations?  What is           |
| 11:13:47  | 18 | American supposed to do?                                             |
| 11:13:49  | 19 | MR. PACE:  Well, they didn't do anything with it to                  |
| 11:13:49  | 20 | begin with.                                                          |
| 11:13:52  | 21 | THE COURT:  That's not my question to you.  What is an               |
| 11:13:57  | 22 | airline supposed to do when it investigates and finds that there     |
| 11:14:01  | 23 | are some witnesses who back up some of the serious allegations?      |
| 11:14:03  | 24 | What is it supposed to do then?                                      |
| 11:14:05  | 25 | MR. PACE:  So then there's -- I would assume that                    |

| | |
|---|---|
| 11:14:09 | 1 |
| 11:14:11 | 2 |
| 11:14:16 | 3 |
| 11:14:18 | 4 |
| 11:14:20 | 5 |
| 11:14:24 | 6 |
| 11:14:26 | 7 |
| 11:14:27 | 8 |
| 11:14:29 | 9 |
| 11:14:35 | 10 |
| 11:14:38 | 11 |
| 11:14:40 | 12 |
| 11:14:45 | 13 |
| 11:14:47 | 14 |
| 11:14:52 | 15 |
| 11:14:56 | 16 |
| 11:14:57 | 17 |
| 11:14:58 | 18 |
| 11:15:00 | 19 |
| 11:15:01 | 20 |
| 11:15:04 | 21 |
| 11:15:04 | 22 |
| 11:15:07 | 23 |
| 11:15:11 | 24 |
| 11:15:13 | 25 |

there's progressive discipline or other things.  This is not --

THE COURT:  It's a fitness issue.  It's not a discipline issue.  What is American supposed to do?  I'm still waiting for an answer.

MR. PACE:  American is supposed to provide due process to the pilot under the union rules.

THE COURT:  What process did American not provide to Mr. Patterson?

MR. PACE:  Well, it appears that they doctor shopped him across the country to Dr. Knippa, who has only evaluated two pilots for American according to the depositions.  It was three time zones away.  There was not one doctor within Florida or even Georgia for him to go visit?  It just doesn't seem correct.

In addition, Mr. Patterson went for other evaluations from people who even actually authored the test, and he was found fit to fly and continued to fly for another airline afterward.

THE COURT:  When?

MR. PACE:  After it was found not fit by Dr. Knippa.

THE COURT:  How long did that take?

MR. PACE:  I believe that was about in a six month time frame.

THE COURT:  No, it couldn't have been.  If Mr. Amlong is right, that this happened three or four months ago, then what's the time lag?

11:15:15  1          MR. PACE:  Your Honor, I stand corrected.  I don't have

11:15:22  2  that exact timeline.

11:15:27  3          THE COURT:  Well, when did the events in this case take

11:15:31  4  place?  '15, right?

11:15:35  5          MR. PACE:  That's right.  So it was the fall of '15 and

11:15:36  6  then into the spring of '16.

11:15:37  7          THE COURT:  So you're talking three years.

11:15:38  8          MR. PACE:  Yes.

11:15:40  9          THE COURT:  Doesn't that seem significant to you?  That

11:15:45  10  it took three years for him to be able to have a doctor find him

11:15:47  11  fit to fly?

11:15:51  12          MR. PACE:  I believe that he went and was evaluated in

11:15:52  13  2016.

11:15:54  14          THE COURT:  And?

11:15:57  15          MR. PACE:  And he was still fit to fly and flew for

11:16:00  16  another airline during that time frame, and he has been flying

11:16:01  17  for another airline for years.

11:16:06  18          THE COURT:  Who found him fit to fly in 2016?

11:16:07  19          MR. PACE:  Let me check that for you.

11:16:12  20          THE COURT:  And why -- and if someone found him fit in

11:16:16  21  2016, why didn't he submit that fitness evaluation to American?

11:16:21  22          MR. PACE:  Dr. Kay found him fit to fly in 2016.

11:16:22  23          THE COURT:  Why didn't he submit that evaluation to

11:16:26  24  American?  I thought that's the one that Mr. Amlong said he

11:16:30  25  withdrew because the test had been administered before.

```
11:16:33   1          MR. PACE:  I'll have to defer to Mr. Amlong to answer
11:16:33   2     that question, Your Honor.
11:16:36   3          THE COURT:  See, that's the problem for me.  I can't
11:16:43   4     get past the complaint, the fitness evaluation and
11:16:48   5     Mr. Patterson's inability to obtain a different fitness
11:16:55   6     evaluation.  If you had a case where relatively soon after, or
11:16:59   7     even soon after Dr. Knippa finds him unfit to fly, he gets
11:17:03   8     evaluated by somebody else and somebody else says he's perfect,
11:17:09   9     he's ready to go, that puts a whole new light on this case.  But
11:17:13   10    if it takes him years to find or to be able to satisfy a fitness
11:17:18   11    evaluation, maybe that indicates that at least at the time,
11:17:24   12    American had a nondiscriminatory basis for not letting him run
11:17:27   13    an airplane.
11:17:31   14          You don't think that that's a good way of looking at
11:17:32   15    it?
11:17:35   16          MR. PACE:  Well, he still had a first class medical
11:17:41   17    during that time, and so Dr. Knippa had found him unfit to fly.
11:17:41   18          THE COURT:  Right.
11:17:44   19          MR. PACE:  And then he then went for further
11:17:47   20    evaluations.  And some of these times -- for instance, Dr. Kay
11:17:51   21    said because Dr. Bercaw had evaluated him so close in time,
11:17:55   22    there has to be a time lag between the different tests.  And so
11:17:58   23    that was what basically was the issue there.  And so then there
11:18:00   24    was basically a pause in all this.
11:18:03   25          You know, Colonel Patterson covered -- sought
```

11:18:07  1    employment elsewhere, realized that he was dealing with a
11:18:11  2    Goliath that was basically violating his rights, and tried to
11:18:14  3    solve the problem himself and then he couldn't.  So then he
11:18:17  4    retained counsel because he felt that his rights were violated;
11:18:22  5    that American has, you know, taken a reprisal action against him
11:18:26  6    for going on his military duty, and they weaponized mental
11:18:29  7    healthcare against him to do it.  So he ended up going to work
11:18:33  8    for another airline and has been flying for years now with no
11:18:36  9    issues and no complaints.
11:18:40  10              And so that sort of directs me back to how the sequence
11:18:43  11   of events of Captain Whitehouse's first complaint was
11:18:48  12   investigated, was found to be malicious by the union, no action
11:18:50  13   was taken by American, and then after that --
11:18:51  14              THE COURT:  I thought --
11:18:52  15              MR. PACE:  -- he went on his military duty --
11:18:56  16              THE COURT:  I thought Captain Whitehouse, at least from
11:18:59  17   his perspective, had said nothing had happened with the first
11:19:04  18   process.  You're telling me there was a no-action determination?
11:19:07  19              MR. PACE:  There was a Section 21 hearing which no
11:19:07  20   action was taken.
11:19:09  21              THE COURT:  What does that mean?
11:19:11  22              MR. PACE:  That means that his allegations were brought
11:19:16  23   forth and investigated and nothing was done against --
11:19:18  24              THE COURT:  Because there was a formal finding?
11:19:22  25              MR. PACE:  Yes, there was a formal finding by the

11:19:22  1    union, yes.

11:19:25  2         THE COURT:  By the union, not by American.

11:19:27  3         MR. PACE:  Right.  American and Captain Beach's

11:19:32  4    testimony said that he knew there was a corporate security

11:19:35  5    report that was done, but American never produced it and

11:19:38  6    American never took action against Colonel Patterson, really,

11:19:41  7    until right in the correlation time frame of when he went on

11:19:46  8    duty and then had this issue with both Captain Bonds and Captain

11:19:50  9    Beach.  Captain Bonds admitted in his testimony that he didn't

11:19:53 10    like how Colonel Patterson acted as a military officer.  That he

11:19:56 11    didn't like how he performed his duty, and he was going to

11:19:58 12    punish him for that.

11:20:00 13         THE COURT:  If Captain Whitehouse had filed his

11:20:04 14    complaint before Mr. Patterson sought to go to Washington, would

11:20:06 15    you have a case?

11:20:07 16         MR. PACE:  If he had filed it before?

11:20:09 17         THE COURT:  Yes.

11:20:10 18         MR. PACE:  I don't think so, no.

11:20:13 19         THE COURT:  So it's just a timing issue?

11:20:15 20         MR. PACE:  There's a correlation in terms of it appears

11:20:19 21    as a reprisal, and that's when USERRA is designed to do is to

11:20:26 22    stop entities that employers to stop them from doing that.

11:20:27 23         THE COURT:  I don't want to put words in your mouth,

11:20:33 24    but you're conceding that if Whitehouse had filed his formal

11:20:37 25    complaint before -- a week before your client had decided to try

```
11:20:39   1    to go to Washington, you would have no case?
11:20:41   2             MR. PACE:  I didn't say that, Your Honor.
11:20:43   3             THE COURT:  Okay.  What did you say?
11:20:47   4             MR. PACE:  What I said is is that the time is very
11:20:51   5    suspicious in terms of the issue that Captain Whitehouse had and
11:20:55   6    then the fact that Captain Bonds and Captain Beach, both chief
11:21:01   7    pilots; both have their bonuses tied to financial performance in
11:21:05   8    the Miami flight office; both had to bring in another pilot from
11:21:09   9    American for extra money when Colonel Patterson went on short
11:21:13  10    notice military duty.  There's motivation here to basically
11:21:17  11    resurrect Captain Whitehouse's issues, to use them as a weapon
11:21:22  12    against Colonel Patterson and then set him up for fitness for
11:21:24  13    duty, and weaponize the healthcare system against him then find
11:21:24  14    him not fit for duty.
11:21:26  15             THE COURT:  You use the word "weaponize" over and over
11:21:29  16    again.  You're suggesting that these other captains got
11:21:31  17    Mr. Whitehouse to file his complaint when he did?
11:21:33  18             MR. PACE:  I am suggesting that there is motivation
11:21:39  19    there for them to seek issue against Captain Patterson for how
11:21:43  20    he conducted himself and how much notice he gave for him to go
11:21:47  21    on leave.  It cost the company money, and that's the issue.
11:21:49  22             THE COURT:  Okay.  All right.  Thank you very much.
11:21:51  23             MR. PACE:  Yes, sir.
11:21:53  24             THE COURT:  You've got two minutes.
11:21:54  25             MR. ROBERTSON:  Two minutes?
```

```
11:21:55   1              THE COURT:  Yes.  Two.
11:21:56   2              MR. ROBERTSON:  Thank you, Your Honor.  And I'll be
11:21:57   3      brief.
11:22:02   4              Just quickly to talk about this, they talk a lot about
11:22:06   5      there was this first investigation.  Corporate security looked
11:22:10   6      into there were some gunrunning allegations and they concluded
11:22:14   7      they didn't find a basis for that.  Corporate security never
11:22:19   8      looked into the interpersonal complaint issues between the two
11:22:24   9      pilots.  That's what HR did.  The witnesses all said habitual
11:22:30  10      liar, story teller, I don't feel safe with him.  That's what, in
11:22:32  11      turn, led to the fitness for duty exam.
11:22:35  12              A lot of talk about -- and by the way, the corporate
11:22:38  13      security officer who was involved did pass away, and we do not
11:22:42  14      have a record of it.  But completely separate from the formal
11:22:47  15      complaint which HR investigated by interviewing seven witnesses
11:22:48  16      plus Captain Whitehouse, plus Patterson.
11:22:51  17              A lot of talk about Dr. Knippa --
11:22:53  18              THE COURT:  Was there a determination of any kind on
11:22:57  19      American's side, as your colleagues suggest, with regard to the
11:22:58  20      first process?
11:22:59  21              MR. ROBERTSON:  There was no determination.  There was
11:23:00  22      no --
11:23:02  23              THE COURT:  They say there was, that there was no
11:23:03  24      action.
11:23:07  25              MR. ROBERTSON:  We have no record of -- well, they've
```

11:23:11  1     never -- by the way, just to be clear, they've never taken a

11:23:13  2     disciplinary action against Colonel Patterson as a result of

11:23:17  3     that.  They decided to send him for a fitness for duty.  They

11:23:17  4     didn't find that he --

11:23:20  5          THE COURT:  I'm talking about the first process, for

11:23:24  6     lack of a better term.

11:23:24  7          MR. ROBERTSON:  Yeah, the first process was corporate

11:23:26  8     security looking into certain of those allegations.  They said

11:23:30  9     something to the effect of nothing there, and that's what they

11:23:35  10    were told in terms of the gunrunning allegations, which were an

11:23:38  11    allegation that Mr. Patterson was smuggling guns to South

11:23:39  12    America.

11:23:42  13         THE COURT:  Okay.  All right.  Thank you very much.

11:23:42  14         MR. ROBERTSON:  Thank you, Your Honor.

11:23:44  15         THE COURT:  You've got two minutes, Mr. Amlong.

11:23:54  16         MR. AMLONG:  Thank you.  Thank you, Your Honor.  The

11:23:57  17    investigation that cleared him -- he was cleared by union

11:24:00  18    investigation, but he was also cleared of any disciplinary

11:24:05  19    activity by the human resources investigation that began after

11:24:06  20    he went on duty.

11:24:09  21         THE COURT:  Were the allegations the same?

11:24:10  22         MR. AMLONG:  Yes.  Exactly.

11:24:12  23         THE COURT:  He was accused of gunrunning in the second

11:24:17  24    one too between here and Asunción, Paraguay?

11:24:18  25         MR. AMLONG:  I don't believe the gunrunning was

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

11:24:20  1    included, but everything else was.

11:24:21  2                THE COURT:  So they're not the same.

11:24:25  3                MR. AMLONG:  I can't say for sure the gunrunning was

11:24:27  4    included.  I can say for sure that all of the other allegations

11:24:30  5    were the same.

11:24:35  6                The investigation, the first re-evaluation by Dr. Gary

11:24:40  7    Kay took place in June 2016.  He forwarded that to American

11:24:47  8    Airlines.  I withdrew it because when Colonel Patterson went to

11:24:50  9    see Dr. Kay, he did not disclose that he had been to see Dr.

11:24:55  10   Bercaw.  Dr. Kay said that that invalidated that investigation.

11:25:00  11   That did, however -- he issued a report, which I'm not using as

11:25:04  12   positive evidence of his fitness, but he issued a report that

11:25:08  13   was forwarded to American saying that he was fit for duty.  They

11:25:14  14   sent reports to American saying that he was -- from Dr. Kay,

11:25:18  15   from a neurologist, from a clinical psychologist, all saying

11:25:21  16   that he was fit for duty.  They sent American a report from the

11:25:26  17   military physician who had cleared him for deployment for

11:25:30  18   combat.  American would not give him anybody except Dr. Kay, the

11:25:37  19   same guy who tested him and inconclusively -- there is nothing

11:25:44  20   in Dr. Kay's evaluation -- I'm sorry.  There is nothing in Dr.

11:25:47  21   Knippa's evaluation, Dr. Kay has testified, that shows

11:25:51  22   definitely that Lieutenant colonel Patterson was not fit for

11:25:52  23   duty.

11:25:56  24                THE COURT:  But then you're just disagreeing with how

11:25:59  25   it came out.  That doesn't show discrimination or infer

11:26:01  1    discrimination, does it?

11:26:03  2         MR. AMLONG:  I'm asking the jury to infer

11:26:07  3    discrimination from the irregularities in the testing procedures

11:26:17  4    that he was subjected to by Dr. Knippa.  Dr. Kay has testified

11:26:24  5    that testing somebody the morning after he flies three time

11:26:29  6    zones is not the way you should be doing the CogScreen test that

11:26:36  7    Dr. Kay designed.  It disrupts the Circadian rhythms.  Dr.

11:26:41  8    Atone, the corporate medical director, said there was nothing in

11:26:43  9    Dr. Knippa's test that was definitive.

11:26:45  10        THE COURT:  Well, you understand that there are issues

11:26:49  11   also as to why you -- Mr. Patterson couldn't get a fitness

11:26:56  12   evaluation to go his way for a significant period of time?

11:26:58  13        MR. AMLONG:  He went --

11:27:01  14        THE COURT:  He went to see the doctor, and then he gets

11:27:05  15   a favorable evaluation but it turns out that evaluation can't be

11:27:09  16   used formally because he doesn't disclose to that doctor that he

11:27:15  17   went to see a previous doctor and he had been exposed to some of

11:27:18  18   the testing.  You don't see that as a problem?

11:27:20  19        MR. AMLONG:  I would rather it not happened.

11:27:21  20        THE COURT:  What's that?

11:27:23  21        MR. AMLONG:  I would rather it had not happened.  He

11:27:30  22   went to Dr. Bercaw immediately upon returning to South Florida

11:27:33  23   from Dr. Knippa because he was concerned with the way the test

11:27:42  24   had been administered.  But they re-instituted these allegations

11:27:49  25   immediately after he goes on duty.  In their exhibits they say

| | | |
|---|---|---|
| 11:27:55 | 1 | that he had been teed up for -- that the management was |
| 11:28:00 | 2 | concerned with him as early as September 6th.  However, the |
| 11:28:07 | 3 | e-mails that they say evidence this are one from Captain bonds, |
| 11:28:11 | 4 | who says that the only thing he remembers about the e-mail now |
| 11:28:15 | 5 | that he reads it is that it has his name is it.  And it records |
| 11:28:23 | 6 | a conversation from Captain Whitehouse about Colonel Patterson |
| 11:28:28 | 7 | telling a flight attendant, within hearing of the passengers, |
| 11:28:36 | 8 | that the plane was like a flying bomb ready to go off.  Captain |
| 11:28:41 | 9 | Whitehouse, at his deposition, said that conversation never took |
| 11:28:45 | 10 | place.  He never told that to Captain Bonds. |
| 11:28:48 | 11 | THE COURT:  Okay.  But there were other things that |
| 11:28:50 | 12 | were -- |
| 11:28:51 | 13 | MR. AMLONG:  There was nothing -- |
| 11:28:54 | 14 | THE COURT:  There were things that were corroborated |
| 11:29:00 | 15 | about Captain Whitehouse's complaint; is that not correct? |
| 11:29:01 | 16 | MR. AMLONG:  That is incorrect. |
| 11:29:04 | 17 | THE COURT:  American didn't corroborate anything when |
| 11:29:11 | 18 | it interviewed people after Captain Whitehouse's formal |
| 11:29:12 | 19 | complaint. |
| 11:29:13 | 20 | MR. AMLONG:  No, it did not. |
| 11:29:14 | 21 | THE COURT:  Nothing at all. |
| 11:29:14 | 22 | MR. AMLONG:  No. |
| 11:29:16 | 23 | THE COURT:  Okay.  I'm going to find that in the |
| 11:29:19 | 24 | record.  They didn't find anything that Captain Whitehouse said |
| 11:29:20 | 25 | was corroborated by any other witness. |

```
11:29:23   1              MR. AMLONG:  They said we have to drop this because we
11:29:25   2    have nothing but --
11:29:25   3              THE COURT:  No.  The second time.
11:29:26   4              MR. AMLONG:  The second time, yes.
11:29:28   5              THE COURT:  Why did they send him to a fitness
11:29:31   6    evaluation then?
11:29:33   7              MR. AMLONG:  Because retaliation.
11:29:35   8              THE COURT:  You're telling me that -- okay.  If I look
11:29:39   9    at this record, every witness that human resources talked to
11:29:45  10    after Captain Whitehouse's second formal complaint, rejected
11:29:49  11    every allegation made by Captain Whitehouse.  That's what I'm
11:29:50  12    going to find.
11:29:53  13              MR. AMLONG:  They had no witnesses who were willing to
11:29:54  14    testify at a hearing.
11:29:56  15              THE COURT:  That's not my question, Mr. Amlong.  You
11:29:59  16    and I are going to have problems if you don't answer my
11:30:06  17    questions.  My question is very simple.  Did American
11:30:12  18    corroborate any of Captain Whitehouse's allegations through the
11:30:15  19    interview of other witnesses the second time around?
11:30:18  20              MR. AMLONG:  American corroborated that there was
11:30:22  21    friction between Colonel Patterson and Captain Whitehouse.
11:30:26  22              THE COURT:  Just friction.
11:30:31  23              MR. AMLONG:  That captain -- that Colonel Patterson was
11:30:38  24    suggesting an animus against Captain Whitehouse.
11:30:40  25              THE COURT:  What else?
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 11:30:43 | 1 | MR. AMLONG:  They corroborated none of the allegations |
| 11:30:45 | 2 | that he made in his original complaint. |
| 11:30:47 | 3 | THE COURT:  That's not my question to you. |
| 11:30:50 | 4 | Okay.  Thank you very much.  I'll try to get this done |
| 11:30:53 | 5 | as quickly as possible. |
| 11:30:53 | 6 | (PROCEEDINGS CONCLUDED) |
| 11:30:53 | 7 | C E R T I F I C A T E |
| 11:30:53 | 8 | I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. |
| 11:30:53 | 9 | 4/24/2019              /s/ Dawn M. Savino |
| 11:30:53 | 10 | Date                   DAWN M. SAVINO, RPR |
| 11:30:53 | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER