## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No: 17-cv-60533-Martinez/Otazo-Reyes

RODNEY SCOTT PATTERSON,

     Plaintiff,

v.

AMERICAN AIRLINES, INC

     Defendant.

_____/

FILED BY_____D.C.

APR 2 6 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## PLAINTIFF'S MOTION TO AMEND JUDGMENT UNDER RULE 59(e)
## AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, Rodney S. Patterson, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, hereby moves this Court to Alter its Final Summary Judgment Order issued March 29,2019. Pursuant to Rule 59, the Court may on motion, grant a new trial on all or some of the issues-and to any party. The Court may upon motion open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment in the interest of equity, or the Court on its own, may open the case for any reason that would justify granting one on a party's motion. Plaintiff seeks to alter judgment for reasons addressed herein and on new evidence which surfaced after the motion for summary judgment was fully briefed; evidence of Defendants inconsistent approach to safety and disparate treatment contrary to its testimony.

## I.    INTRODUCTION

By this action, Plaintiff challenges AA's multiple unlawful violations of the Uniformed Services Employment Re-Employment Rights Act, 1994 ("USERRA") [38 U.S.C. §§ 4301 et seq] and denial of rights and benefits afforded to veterans under the act. The stated purpose by the U.S. Congress to encourage non-career service..., while protecting veteran's rights...to prohibit discrimination..., all of which benefits the Nation as a whole. This legislation is to be liberally

1

construed for the benefit of those who left private life to serve their country. [1]

## II.    ARGUMENT

### A. STANDARDS ON A RULE 59(e) MOTION FOR RECONSIDERATION

Rule 59(e) of the Federal Rules of Civil Procedure authorizes the Court, upon timely motion, to alter or amend a judgment. District courts are necessarily afforded substantial discretion in ruling on motions for reconsideration. *Mackin v. City of Boston*, 969 F.2d 1273, 1279 (1st Cir. 1992); *Clark v. U.S. Postal Service*, No. 3:11–cv–899–J–32JBT, 2012 WL 2044812 at *1 (M.D. Fla. June 6, 2012).

> Since specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion. ... There are four basic grounds upon which a Rule 59(e) motion may be granted. First, the movant may demonstrate that the motion is necessary to correct manifest errors of law or fact upon which the judgment is based. Second, the motion may be granted so that the moving party may present newly discovered or previously unavailable evidence. Third, the motion will be granted if necessary, to prevent manifest injustice.... Fourth, a Rule 59(e) motion may be justified by an intervening change in controlling law.

11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2810.1 (2002). *See Frantz v. Walled*, 513 Fed. Appx. 815, 822 (11th Cir. 2013) (district court may grant reconsideration under Rule 59(e) based on newly discovered evidence or a manifest error of law or fact).

In its March 29, 2019 Order Granting Defendant's Motion for Summary Judgment on Plaintiff's USERRRA Claims and Denying Plaintiff's Motion for Summary Judgment ("Summary Judgment Order") [ECF 169] in the above-styled case, the Court concludes that:

> AA had a legitimate non-discriminatory reason for placing LTC Patterson on leave with pay on September 24. the Sept 22 status change if true, is nonetheless insufficient to establish a USERRA violation therefore, AA did not retaliate in exchange for a release of his USERRA claims. this is not retaliation but standard negotiation. Plaintiff's motion for summary judgment is denied and AA's motion for summary judgment is granted.

### B.    THIS COURT SHOULD GRANT PLAINTIFF'S MOTION TO AMEND JUDGMENT UNDER RULE 59(e)

---

[1] See *Fishgold v. Sullivan Drydock and Repair Corp.,* 328 U.S. 275, 285 (1946), cited in *Alabama Power Co. v. Davis,* 431 U.S. 581, 584-85 (1977); *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221 n.9 (1991).

**I.      The Court relied on AA's multiple admissions of USERRA violations and manifest errors of law or fact and disregarded the Plaintiff's substantive rights under USERRA, which clearly infer a discriminatory motive and animus.**

In overlooking Veteran's rights under USERRA, the Court appears to have assumed erroneously that the strict compliance provisions of USERRA are violable, so long as the motive for violating those rights was justifiable, AA now has unbridled discretion to disregard USERRA entirely and do as it will.  AA exercised unbridled discretion in Sept. 2015 and continues to this day to disregard the provisions of USERRA, unduly harming the Plaintiff and denying him benefits of employment.  AA's violations are palpable and on brilliant display discussed below and numbered as they appear in the Order's Background, for reference:

**1)** American Airlines granted 122 pilots military leaves in Miami—USERRA is a statutory obligation, AA doesn't grant or deny what the law requires (this is analogous to paying one's taxes, there is no credit for compliance with the law, but stiff penalties, for non-compliance. Complying with a portion of the law does not guarantee another section will not be violated.  American complies with USERRA, regarding leaves, however AA settled in Woodall v American Airlines 3:06-cv-00072 ( N.D. Tex.)  and agreed to come into compliance with the law for a short time.  Lt. Col Patterson was the APA military affairs committee in the Miami domicile and as such represented several pilots who found themselves under investigation for "suspicious" military leave which is contrary to AA's support of veteran's rights.

**2)** APA Professional Standards (PS) never entered any formal findings or conclusions, or resolved the matter—APA PS does not keep written records or communicate with management, an email from Patrick Mc Ginn to Whitehouse (WH) concludes the matter in July 2015 and tells WH to "grow up". (See Exhibit 1) (ECF 100-4, 9 ¶2).

**3)** The APA Appeals board did enter formal findings against WH— his complaint was malicious, ill-willed and no justifiable cause, intended to harm Plaintiff (animus). (See Exhibit 2)

**4)** Corporate Security Report, Unfounded—Beach submitted WH complaint for inclusion—AA argues they don't have it and refused to produce it, yet argues the content.  Beach advises "Unfounded" (ECF 57-19) Inferences can be drawn from this missing record, One, it exonerated the Plaintiff or Two, if it were unfavorable AA would have used it to terminate the Plaintiff

**5)** On September 21, LTC P called the Flight Office and asked for a chief pilot, was told

3

none available, left a message— This constitutes notice under USERRA. [20 CFR § 1002.5(g)]

*6)* Bonds reply message, "if you can produce some orders", I ''ll give you the leave— unlawful, Additional Prerequisites veto power [38 U.S.C. 4302(b)] [2]

**7)** The parties dispute whether the Army Reserve issues written orders – [38 U.S.C. 4311(c)] Orders are not required to obtain military leave under 30 days – Unlawful request.

*8)* Patterson called David Tatum—Verbal notice given— he wanted vacation accrual, his right [38 U.S.C. § 4316(d)] while AA has also argued this was a vacation request and not military service at all.  This belief constitutes inconsistent reason for its actions.

**9)** AA explains that the change in status was retroactive to 22 Sept.—Irrelevant, Changing the Plaintiff's status while on military leave is a violation of USERRA.  Plaintiff performed service from 22 Sept. thru 25 Sept., 2015.

*10)* Bonds investigated the veracity… that he had taken leave for military duty in October of 2015—Erroneous statement, duty performed in Sept. 2015 and although not required documented for Bonds.  [38 U.S.C. § 4312 (f)] Although the Plaintiff is not required to produce document under USERRA and the Collective Bargaining Agreement does not supersede USERRA

*11)* Capt. Bonds testified that he was "suspicious" of the timing – employers are not granted veto authority, or discretion over timing frequency and duration of leave [20 CFR § 1002.104]

*12)* So, in early October, Bonds requested a Leave and Earnings Statement (LES)— Although not required, Plaintiff produced as soon as it was available. [38 U.S.C. 4312 (f)93)(A)]

*13)* Bonds pointed to the redactions in the LES—although not required, extracts of Pay documents were provided in sufficient detail to show the Plaintiff's military service [20 CFR § 1002.123]

*14)* Bonds smell[ed] a rat but needed to look and compare [his] last LES—Bonds was a major and Plaintiff a Lt. Col.  This is pure speculation by the defendant and demonstrates an animus for the Plaintiff.  Although not required, Plaintiff has further substantiated his service.

*15) Bonds* suggested that Lt. Col Patterson might hang himself on providing false information—The LES wasn't false and Bonds comments indicate a clear "animus" that he was out to get the Plaintiff for defying his unlawful directives.

*16)* Bonds First message is clear, he exercised veto power over Plaintiff and established an

---

[2] *See 70 Fed. Reg. 75,246, 75256 (Dec, 19, 2005), available at 70 FR 75246-01, at \*75256 (noting that "[i]mposing a prior consent requirement would improperly grant the employer veto authority over the employee's ability to perform service in the uniformed services by forcing the employee to choose between service and potential loss of his or her employment position, if consent were withheld")*

unlawful prerequisite then issued a second unlawful directive, Demanding orders or an LES or be subjected to discipline – a clear disregard for veteran's rights and willful conduct. [38 U.S.C. 4312(f)(1)]

*17)* On November 4, 2015, Bonds e-mailed... and to tell him he considered the matter "closed"—The matter is in fact "not closed" according to American's management. American has contradicted itself before the court—because American intends to pursue the matter further.

*18)* The interview involved nine AA employees, including WH – Whitehouse participation clearly taints the investigation as there was animus, ill-will, malice and no just cause on his part and he likely orchestrated (dug up dirt) as an accomplice to Bonds who was an angry manager.

*19)* The report also stated that "multiple employees expressed their concern...-- This wasn't a personality contest complaint and relied on rumor and innuendo, which wasn't evaluated by or presented to this Court. There is no way any pilot at AA can defend against this type of abuse. AA began with a pre-determined conclusion as pretext for its USERRA violations well documented in the foregoing. The Defendant has presented no evidence in the record of these the qualifications of the maker or the statements

*20)* AA responded to the Department of Labor Complaint in Feb, 2016 -- In doing so its alleged conversations between Bonds and Patterson which never took place. American has never corrected the false statements to a Federal Investigator. (See Exhibit)

*21)* USERRA does not have a statute of limitations [20 CFR § 1002.311], however, Defendant was well aware of its USERRA violation when it occurred in Sept., 2015

*22)* On March 15, 2015 American scheduled Patterson to fly to Los Angeles, California a 5-hour flight across three time zones—American was requested to reschedule, Plaintiff to 1 of many doctors in the Eastern Time Zone and did not—Ahtone was never asked reschedule [See Exhibit]. Cognitive Testing requires a person to be well rested, obviously not so for the Plaintiff

*23)* The distance in Los Angeles may be only several miles—however John Knippa advised that it would take him several hours when Plaintiff scheduled him for a deposition.

*24)* Patterson underwent a second evaluation with Dr. Edwin Bercaw not 4 days later and the results were not favorable—This fact is disputed by a May 6, 2016 letter to Dr. Glenn Caddy which says the results were generally good and Dr. Kay's Oct 2018 report mentions the Bercaw report and states that his exam provided reassurances.

*25)* The March 2016 Bercaw results would not have been accepted by the FAA either—Kay advised 4 days was too soon.

*26)* Dr Ibrahim Abi Rafeh, M.D. received the Knippa report on 28 March, 2016 and opined that the Plaintiff was not cognitively impaired, but due to stress was likely sleep deprived and fatigued as reported. none the less the return flight generated the same sleep issues.

*27)* Plaintiff underwent a neurocognitive evaluation in July, 2014 with the U.S. Army for deployment—with no neuropsychological issues reported.

*28)* Plaintiff underwent another exam with Neurologist Dr. John Hastings in May, 2016— who reported Plaintiff was neurologically sound and not a risk to aviation safety, Hastings cognitive assessment reported no deficits (See Exhibit 4)

*29)* Plaintiff was examined by the U.S. Army in October, 2016 and there were no deficits physically or psychological.

*30)* Plaintiff is a Boeing 767 Captain and has an Airman Medical First Class. – Undermines the argument and speculation about cognitive deficiency (See Exhibit 5)

In Staub v. Proctor Hospital, (131 s.ct.1186) the U.S. supreme Court held that an employer can be held liable for employment discrimination, under USERRA based on the discriminatory animus of a supervisor who expressed anti-military sentiments and then influenced a higher-level decision maker to make and adverse action.  Bonds hostile attitude and sentiments toward the Plaintiff are on brilliant display and the court should infer that his actions influenced Michelle Montgomery and other management to take action which harmed Lt. Col Patterson and continues to this day.  The actions of the Defendant were not independent of each other, but more likely than not, an orchestration to deny the Plaintiff his rights and excuse its unlawful acts.  The Defendant has demonstrated repeatedly, that its actions were orchestrated by Michelle Montgomery in AA Labor (See Exhibit).

## 2.   Discriminatory Motive & Inferences Outlining a Motivating Factor:

Discrimination is seldom open or notorious. [3] The Court refers to discriminatory inferences. The Plaintiff was placed on Paid Withheld (PW) (administrative leave) in the midst of his military

---

[3] "[D]iscrimination is seldom open or notorious," *Sheehan*, 240 F.3d at 1014, and "employers rarely concede an improper motivation for their employment actions," *McMillan v. Dep't of Justice*, 812 F.3d 1364, 1372 (Fed. Cir. 2016). Rather, discrimination tends to be "inferred" from evidence of "hostility" or "disparate treatment of certain employees compared to other employees with similar work records or offenses." *Sheehan*, 240 F.3d at 1014.
[3] 20 CFR 1002.123(a)

service.  The Defendant erred by its actions, and again violated USERRA not even one week after the initial violation of Bonds denying Lt. Col Patterson proper notice of absence. [4] *The proximity in time is irrefutable.*  Placing the Plaintiff on administrative leave during military service was an adverse action. See also Petty V Metro (6th Circuit, No. 07-5649).

The defendant has *proffered a number of reasons which are inconsistent with its stated actions* for placing the Plaintiff on Administrative Leave.  AA has argued in numerous filings that the Plaintiff was not performing service in the uniformed services because he wasn't on active duty.  AA has offered that the Plaintiff was at a commercial venture with his wife at the Whitehouse, although the Plaintiff was in fact performing military service (a protected activity none the less).  Defendant argued that the Plaintiff was on vacation because he asserted his rights requesting vacation accrual.  All of these actions are demeaning to the service of the veteran, not well taken and are direct evidence of AA's multiple USERRA violations.  even going as far as to question the motive of the Plaintiff for his military duty is demeaning and unlawful.

### 3. American's Unlawful Actions in 2015 Constitutes Workplace Harassment and a Hostile Work Environment Thereby Violates USERRA

The Plaintiff has been subjected to the defendant's continuous pattern of harassment in which the defendant has repeatedly chided and derided the Plaintiff for his military service through the use of discriminatory actions or comments regarding that service and military leave obligations.  Even American's attorney has derided the Plaintiff's military service with comments such as "On Vacation".  This wide-ranging pattern of harassment not only violates USERRA but shows AA's company-wide policies of discrimination that are not limited to the acts of a few employees acting on their own and that shows that the defendants USERRA violations are intentional. This harassment establishes that the Plaintiff's service in the reserve is a motivating factor

---

[4] [4] **"While according a returning servicemember lower status than she or he had before leaving for military service can be a denial of a benefit of employment violative of § 4311 of USERRA [see e.g.,** *Reed v. City of Charleston***, D.S.C. 2012, inference of denial of benefit of employment raised by allegations that upon his return from military leave, city never restored veteran's former duties <u>but instead placed him under internal affairs investigation</u>, never reissued his service weapon or badge, and confiscated his identification cards.] [emphasis added], such reduced status may also constitute a failure to reemploy the servicemember in a reemployment position required under § 4313 of USERRA.""Unlike § 4311, neither § 4313 nor § 4316(c) require any showing of discriminatory intent to establish a violation."**

In its Fiscal Year 2010 report to Congress (published in July 2011), the Department of Labor clarified its interpretation, that a benefit of employment included a freedom from work place harassment and/or a hostile work environment.[5]

Harassing comments by the Defendant have been directed at the Plaintiff and include: "I'll give you leave if you can produce some orders", "Let's see if he hangs himself", "Smelled a rat" Even WH in his complaint derides the Plaintiff's military service, "in the military he is a king", Bonds continued to chide/deride the Plaintiff's service in 2017. "and talk to him about officership and say this is not the way that officers do" (referring to the Plaintiff's lawful assertion of his rights).

The Court should be aware that Congress amended USERRA and added to the definition of benefits of employment, "terms, conditions and privileges", which is the broadest protection congress can provide to veterans. Thus, the Plaintiff is a member of a protected class and the Court is requested to take judicial notice of this.

### 3. The Veracity of the Whitehouse Complaint did not give American Reasonable Grounds to Order a Fitness for Duty Exam.

The WH complaint is about a personality conflict between two pilots. The resolution of which hinges on shopping Professional Standards. A genuine fact, the Plaintiff had no contact with WH until his deposition in 2018 after the October 2014 flight to Paraguay. The complaint does not constitute reliable truthful facts which American can use to support its pretextual notions about the Plaintiff's mental condition and then order a fitness for duty exam. Summary judgment for the Defendant was not appropriate because there are genuine disputes as to the material facts asserted by American regarding WH complaint. Fed. R Civ. P. 56(a) An employer's belief has to be based on facts, not stereotypes or assumptions about the employee's condition. WH complaint supplies little fact and more hearsay and conjecture, which are not admissible. The Plaintiff was injured on duty in Oct. 2014 and did not return until Jan, 2015. Additionally, the Plaintiff had surgery in Feb 2015 and returned to work in June, 2015. Whitehouse alleged that in February he

---

[5] **The Department of Labor considers it a violation of USERRA for an employer to cause or permit workplace harassment, the creation of a hostile working environment, or to fail to take prompt and effective action to correct harassing conduct because of an individual's membership in the uniformed service or uniformed service obligations." Department of Labor (USERRA) Fiscal Year 2010 Report to Congress.**

was screened by Bolivian Customs on two occasions and that the "Spanish speaking" Plaintiff must have been the cause for that [ECF 61-9, 7]. He provided no evidence other than the Plaintiff had to be there before him. In another claim he alleges that Patterson rode by in a hotel van pointing his finger at him. *See id at 4.* Whitehouse claims he didn't see it but his co-pilot did. The above facts were noted by APA Appeals board as constituting harassment if true. He submitted no evidence to support his false claim and for which there was no basis for AA to rely on it. Whitehouse' complaint includes a preposterous allegation that Patterson was smuggling guns and ammunition to the Bolivian Counter Narcotics Police and using his status as an FFDO to accomplish this. *See id at 6.* He claimed he heard this tale from a mechanic, "Pepe", in Bolivia. American has provided no proof of this allegation, nor has American supplied any proof of the FFDO allegation, when a simple phone call to the TSA would resolve that question, as the TSA has a log of all entries by an FFDO to the sterile area. U.S. Immigration and Customs Enforcement (ICE) did issue a letter in response to a Plaintiff's FOIA request. Three inferences can be drawn from this letter. 1) The Plaintiff was not involved in any illegal acts as alleged by WH  2). Had the Plaintiff been involved then there would be a record of it or a redaction on the part of Homeland Security. 3) AA would certainly have a record of such offense if it were true. (See Exhibit 6) In fact, at the time, Bolivian Flights departed in the late evening at approximately 11:00 P.M. At earlier times, the Plaintiff could use the Known Crewmember line, however that line closed at approximately 9:30 P.M. which required the Plaintiff to use passenger screening lanes. American's records would show the Plaintiff signing in for work at approximately 10:00 P.M. long after KCM closing.  WH statement is less probative and when scrutinized gives rise to the notion that something might be wrong with Whitehouse. Whitehouse displays a certain paranoia which is evident from a statement, regarding Patterson on the same flight. *See id at 11.* Patterson appearing on the standby list... but was a no show do not indicate intimidation or the necessity for tin foil. In fact, Captain Mark Modrich was on the same stand-by flight to Chicago and called the Plaintiff to inform him the WH was also on the flight. Plaintiff wanting no contact with WH took another flight (See Exhibit 7). Several days later, the Plaintiff would be searched by U.S. Customs in Miami while boarding a flight to Bolivia in response to WH complaint which was potentially a violation of Federal Law and a waste of government resources. American knew allegations were previously investigated in March, 2015 and determined to be unfounded. Additionally, the Section 21 hearing dealt with the regurgitated allegations from March and no disciplinary action was warranted because the allegations were found to be baseless. The APA Appeals board noted in its

findings that WH actions were malicious, ill-willed and with no just cause. The board further noted that American was remiss in applying its own HR policies regarding two of the allegations which were later shown to be false. Whitehouse complaint was based on speculation and conjecture, did not create a genuine issue of fact; instead, created a false issue, the demolition of which is the primary goal of summary judgment. *Cordoba v. Dillard's, Inc., 419 Fed 1169, 1181 (11th Cir. 2005) (emphasis in original)*. The facts of Whitehouse complaint would lead a rational fact-finder to determine the complaint was false, stripping American of its rationale to proceed. The falsehood of the WH complaint is a genuine issue of fact in favor of the Plaintiff. The Defendant cannot show the complaint is "genuine". Given the fact the WH complaint is false on its face, Lt. Col Patterson submits to the Court that a reasonable jury could return a verdict for the non-moving party. Wright, 455 F.3d at 706 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). We "view all evidence in the light most favorable to the nonmoving party." *Id.* Appellate jurisdiction is proper in this case pursuant to 28 U.S.C. § 1291.

### 4.   AA's Lengthy History of Supporting Servicemembers does not Preclude a USERRA Violation and has no Probative Value.

American's obligations under USERRA are statutory obligations, guaranteed by Congress for the benefit of the servicemember. American supports veterans to the extent that they don't cost the company money. Bonds advised they were short of pilots and they didn't have the money to give Lt. Col Patterson an "EO" and release him for military service. [ECF 57-7 *at* 63:3] Yet AA purports Bonds to be knowledgeable of the Reserve System despite his multiple unlawful USERRA violations. Bonds was an angry manager as demonstrated by his comments to the Plaintiff and other management. American's lengthy history is tainted by several cases now proceeding through Federal Court, which the Plaintiff is also a member of the class in those suits.
 6   In Scanlan v American Airlines, Group, INC(2:18-cv-04040), American admitted that it views USERRA compliance as a debatable option strategic policy makers. (See Exhibit 8, pg 13) Mark Cronin, the managing director of line operations for AA, affirms American's attitude that USERRA is set of guidelines we adhere too (not a law requiring strict compliance) …beyond that

---

6  Harwood III v. American Airlines, Inc., (1:2017cv00484)
   Hoefert v. American Airlines Incorporated, (4:18-cv-00466-A)
   Scanlan *v.* American Airlines Group, INC. (2:18-cv-04040)

he doesn't know how it affects our pilots. [ECF 101-6, 5 at 7] These statements affirm how cavalier American is about its obligations under the law.

### 5. Changing a Veteran's Status While on Military Leave Constitutes An Adverse Action and Retaliation under USERRA Whether it was Sept 22, 2015 or Sept. 24, 2015

The timing of a USERRA violation and the complaint filing is irrelevant, as USERRA has no statute of limitations. [20 CFR § 1002,311]. However, it is not required to file a complaint with the Dept. of Labor before taking action under USERRA. [20 CFR § 1002.288]. In the Plaintiff's case, Allied Pilot's Association Attorney Trisha Kennedy on Oct. 13, 2015 advised AA's corporate general counsel Lucretia Guia, that Bonds had threatened Lt. Col Patterson with disciplinary action for not producing documentation of his military service another violation of USERRA. "Such an unreasonable demand fuels our concerns about the entire situation" (*See Exhibit 9*) AA has asserted or inferred numerous times in this matter, the collective bargaining agreement overrides USERRA and it does not. [20 CFR § 1002.7]  An individual must show one or more of the following to prove that the employer discriminated or retaliated against him or her. [20 CFR § 1002.23]

**(1)** Membership or application for membership in a uniformed service;
**(2)** Performance of service, application for service, or obligation for service in a uniformed service;
**(3)** Action taken to enforce a protection afforded any person under USERRA;
**(4)** Testimony or statement made in or in connection with a USERRA proceeding;
**(5)** Assistance or participation in a USERRA investigation; or,
**(6)** Exercise of a right provided for by USERRA.

Lt. Col Patterson exercised his rights and took action to enforce the protections afforded him under USERRA and that angered Bonds, which is clear from the record.  Bonds wanted the Plaintiff to fly on 22 Sept. 2015 and he admits that.  He did not want Patterson to fly after 24 Sept. However, the Court does acknowledge Lt. Col Patterson's status change, which has been clearly shown to be an adverse action and the Courts have ruled in that manner. The Plaintiff has been denied promotion and considerable pay for at least 3 years.  The Plaintiff cannot choose his work hours, location or work overtime. The Plaintiff lost rank and responsibility which meets the element of status. Finally, subjected to a hostile work environment because of that military service.  AA has not shown that the Whitehouse complaint was factual and there is not one scintilla of evidence presented by Whitehouse that rises to a business necessity requiring a fitness for duty examination. In fact, WH complaint should have caused AA concern and sent him to the same fitness for duty

evaluation. [ECF 61-9 at 12] AA did not because WH was useful in the context of the USERRA matter.

### 6. American made two settlement offers one with the Plaintiff and one with the Allied Pilot's Association following a hearing with Mark Cronin in on or about Oct 2016.

In August, 2016, Lt. Col Patterson emailed Captain Brian Beach asking him for the published return to work policy for pilots.  Beach never provided that policy. And ironically, AA does not have a published return to work policy for AA pilots, in the Return to work forms section of (NewJetnet.aa.com) which lists the essential job functions for each position. (See Exhibit 10) The Plaintiff declined the offer of settlement because it was a final and binding resolution on the opinion of one doctor which is ridiculous. The idea of no appeal and no due process is unamerican and violates constitutional premises of due process.  It was made clear to AA, at an October 2016 hearing by Patterson's APA attorney that Dr. Knippa was not an option. Def. SUF ¶ 38 is factually incorrect with this regard.  20 CFR 1002 Veteran's asserting their rights should not have to relinquish those rights to retain or return to a status they enjoyed.  This is demeaning to the veteran's service and such smart negotiations promote continued violations of the law.  Why comply if you are not held to a standard?

### 7. Newfound Evidence after Summary Judgment was Fully Briefed Contradict American's Testimony Regarding Safety Concerns

While American him explains, it has a duty to protect the public and had to ensure Lt. Col Patterson was fit to fly.  It was at the same time according to a U.S. Department of Transportation, Office of the Inspector General Report, July 10, 2018 giving FAA inspectors derogatory information about pilot whistleblowers in an effort to coerce and silence these complaining pilots rather than address their safety concerns. (See Exhibit, 11 pg. 3, ¶3) The APA raised serious concerns to the FAA regarding the unsafe operation and testing of American Airlines aircraft. The OIG is government a finder of fact, and the facts are indisputable.

More recently, on February 6, 2019, the TWU, which represents AA mechanics, sent a stern rebuke to Doug Parker, CEO regarding *retaliation over safety and maintenance concerns*. An FAA report determined: American Airlines "pressured [mechanics] to not record discrepancies, take shortcuts with maintenance activities, or improperly sign-off on *work which was not actually completed*". (See Exhibit 12)    The irony of these disclosures, including a bombshell CBS report, (See Exhibit), is that at the very same time that American was by every

objective measure taking shortcuts to programs required to keep the flying public safe, they were at the same time subjecting some pilots, like the Plaintiff to constructive termination on an invalid claim they posed a safety "risk". Two U.S. Senators voiced their concern to the FAA administrator demanding answers over these serious safety allegations. (See Exhibit 13). In April 2019 the APA Safety Committee sent a letter to all pilots regarding management direction/pressure to void their aircraft maintenance log entries of hail damage on aircraft after a recent storm in Dallas to save time/money on maintenance inspections of damaged aircraft. (See Exhibit 14) Hail Damaged aircraft are extremely dangerous and put the public and flight crews at risk.

Karlene Petitt, PhD. a Delta Airlines pilot was subjected to similar disparate treatment after participating in protected activity at Delta Airlines. Pettit authored a book, The Weaponization of Mental Health which details similar behavior at American Airlines. The unspoken truth of how airlines remove pilots for reporting safety, calling in fatigued, using too much sick leave, or suggesting improvements for safer operations. Calling a pilot crazy is easier than firing them (and less costly). (See Exhibit 15)

### 8. Plaintiffs Subsequent Evaluations Reveal no Diagnosis of a Disqualifying Condition for an Airman Medical Certificate First Class.

The veracity of the WH complaint severely undermines American's rationale for sending the Plaintiff to a Mental Health Exam. Multiple witnesses who were never identified, coming forward at the behest of WH don't constitute a genuine concern for safety. An Employer with genuine concerns would document those concerns. AA has never produced any evidence of the complaint or the witnesses' qualifications to make such statements. For example, finding a 21-year-old flight attendant to opine on a pilot's proficiency is not proper. AA reports it interviewed nine witnesses in response to the WH complaint, Plaintiff's union representative was not given the opportunity to cross examine any of the witnesses in the Section 21 hearing. AA presents this as a personality contest with the pilot receiving the most votes being declared the winner. Except that AA is only counting the votes for one candidate. American provided a 1 paragraph letter to Dr. John Knippa, PhD. and flew the Plaintiff to California across three time zones. Knippa examined the Plaintiff at around 12:45 P.M. EST each day. Dr. Gary G. Kay, PhD. later advised that such sensitive testing should be conducted in the morning to preclude false positives. Knippa diagnosed no personality disorder, no psychopathology or any condition which would disqualify him from an Airman Medical Certificate First Class. The Plaintiff spoke to Dr. Jeffrey Kanter, PhD on numerous occasions by phone before seeing Knippa. Kanter, not a HIMS

qualified doctor referred Plaintiff to another Doctor in his practice.  Plaintiff took a second evaluation within 4 days after Knippa, after flying back across three time zones,  the results of which were "generally favorable" and no condition which would disqualify him was identified. [ECF 136-1]. Dr Ibrahim Abi Rafeh and Dr. Kay have both raised the issue of fatigue and not a physical condition as the cause of low scoring.  The Plaintiff was neuropsychologically evaluated in 2014 by the Army and was cleared for deployment.  In October, 2106 the Plaintiff was further examined by the U.S. Army, who found no evidence of a physical or psychological condition. Dr. Kay admits that the Plaintiff had no physical conditions in 2016 or now which would contribute to cognitive deficiencies.  Dr. Kay in his Oct 2018 report was well aware of the testing at Dr. Kanter's office and in fact had that report to review well before he tested the Plaintiff.  In his report Kay advises:

> Follow-up neuropsychological assessment provides reassuring information regarding Mr. Patterson's neurocognitive functioning. He performed well on neuropsychological screening. CogScreen results suggest against the likelihood of acquired cerebral dysfunction. His performance on CogScreen measures of response speed and accuracy are largely consistent with the favorable results obtained in 2016. Aviation factor scores, validated predictors of flight performance, were all in the expected range. Additional testing of vigilance, memory, and executive functions also show intact neurocognitive functioning. Mr. Patterson performed at or above average compared to pilot norms on measures of verbal learning and memory. Performance on three measures of executive functioning demonstrate intact planning, abstract reasoning, impulse control, and novel problem-solving ability

> Based upon these findings Mr. Patterson would be considered to have no aeromedically significant neurocognitive deficits and would be recommended for a Class 1 FAA airman medical certificate.

According to Dr. Abi-Rafeh, he found no reason for the Plaintiff to seek mental health treatment, and found no evidence that he would pose a risk to aviation safety. He concurs with Dr. Kay that jet lag related fatigue was the likely cause and not acquired brain dysfunction. (See Exhibit 16)

### 9. Conclusion

Lt. Col. Patterson had no physical or psychological condition in 2014 and to this day as as demonstrated by multiple medical evaluations and multiple FAA proficiency checks.  He serves as a Boeing 767 captain for an airline based in Miami.  The events preceding the USERRA violations are not logically independent or happenstance of one another. The events post are also well-orchestrated by American's labor relations for a desired effect AA refuses to this day to

accept the fact that the Plaintiff performed military service despite the Plaintiff having provided substantial proof although not required by the statute. The Defendant continues to deride and chide Lt. Col Patterson regarding his military service and did so by sending the Plaintiff two derogatory letters and characterizing the Plaintiff's service as fraudulent. The Plaintiff is not of the Catholic faith and attending a state sponsored reception is in no way an endorsement. Congress passed USERRA to prevent Veteran's from being subjected to unlawful discrimination.

Until a competent authority compels American's strict compliance with the law, these actions will be perpetuated against other veterans. This notion harms the National Defense of the United States, due to the reliance on a strong reserve force in lieu of a large standing Army.

WHEREFORE, Plaintiff respectfully urges the Court to reconsider its earlier ruling, based on a manifest error of law or fact, newly discovered evidence, manifest injustice for Veteran's rights and enter summary judgment for Plaintiff and deny summary judgment to Defendant.

Dated this 24th day of April, 2019

Rodney S. Patterson, Pro Se
1092 N.W. 139th Terrace
Pembroke Pines, FL 33028
(704) 231-0909
Scottpatterson247@gmail.com

## NOTICE OF APPEARANCE

Lt. Col Rodney S. Patterson, hereby files this notice of appearance on behalf of himself to act as his own counsel.

Signed and dated this 25th day of April, 2014 by Lt. Col Rodney S. Patterson

Rodney S. Patterson
1092 NW 139th Terrace
Pembroke Pines, FL  33028

## **VERIFICATION**

I, Lt. Col. Rodney S. Patterson, declare as follows;

I am the Plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. With respect to the causes of action alleged by me, the same is true by my own knowledge, except as to those matters which are therein stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the state of Florida that the foregoing is true and correct.

Date:  April 25, 2019

Rodney S. Patterson, Pro Se
1092 N.W. 139th Terrace
Pembroke Pines, FL 33028
(704) 231-0909
Scottpatterson247@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY, that on this 25th day of April, 2019, the foregoing document was served by U.S. Mail and E-mail on all counsel or parties of record on the Service List below.

Rodney S. Patterson, Pro Se
1092 N.W. 139th Terrace
Pembroke Pines, FL 33028
(704) 231-0909
Scottpatterson247@gmail.com

## <u>SERVICE LIST</u>

Michael A. Holt
mholt@fisherphillips.com
Florida Bar No.: 91156
**FISHER & PHILLIPS LLP**
450 East Las Olas Boulevard
Suite 800
Fort Lauderdale, Florida 33301
Telephone: (954) 847-4709

Mark W. Robertson (*Pro Hac Vice*)
mrobertson@omm.com
**O'MELVENY & MYERS LLP**
Time Square Tower, 7 Times Square
New York, New York 10036
Telephone: (212) 326-2000

Tristan Morales (*Pro Hac Vice*)
tmorales@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, DC 20006
Telephone: (202) 383-5300

*Attorneys for American Airlines, Inc.*

# EXHIBIT 1





ALLIED PILOTS ASSOCIATION

# Professional Standards Manual

APRIL 1999



<<<<<<<<<<<<<◇>>>>>>>>>>>>

APA's NATIONAL OFFICERS, DOMICILE OFFICERS, STAFF, CONSULTANTS
AND NATIONAL COMMITTEES

## CODE OF ETHICS

I will faithfully discharge the duty I owe the Association which makes possible my way of life.

I will respect other officers, committee members, and employees of the Association remembering that respect does not entail subservience.

I will do all within my powers to discharge my duties efficiently and in a manner that will not cause unnecessary delays or expense.

I will faithfully adhere to the policies, directives, and resolutions of the Board of Directors.

I will realize that as a representative of the Association, I will at all times keep my personal appearance and conduct above reproach.

I will direct any criticism or proposed changes to the proper authorities within the Association.

I will hold the Association's business secrets in confidence, and will take care that they are not improperly revealed.

In dealing with others I will expect efficient performance, yet I will overlook small discrepancies and refrain from unnecessary and destructive criticism.

I will conduct my affairs with the Association in such a manner as to bring credit to the Association and to myself.

I will conduct my affairs with the Association and its members in accordance with the rules laid down in the Constitution and Bylaws of the Association and the interpretations promulgated therefrom.

I shall refrain from taking advantage of the confidence reposed in me by my fellow members. If I am called upon to represent the Association in any dispute, I will do so to the best of my ability, fairly and fearlessly, relying on the influence and power of the Association to protect me.

I will regard myself as a debtor to the Association and will dedicate myself to its advancement.

I will not publish articles, give interviews, or permit my name to be used in any manner likely to bring discredit to the Association.

I will continue to keep abreast of labor developments so that my skill and judgment, which heavily depend on such knowledge, may be of the highest order.

I will endeavor to my utmost to faithfully fulfill the obligations of the Allied Pilots Association Code of Ethics.

Ethics are not learned by teaching; they are inculcated by example and by experience. To a man of honor, ethics come as naturally as good table manners.



# TABLE OF CONTENTS

I. PREFACE ................................................................................................................... 1

II. ORGANIZATION AND RESPONSIBILITY ............................................................... 1

    A.   Organization ........................................................................................................ 1

    B.   Responsibilities ................................................................................................... 2

    C.   Professional Standards Cases - Jurisdiction ...................................................... 3

    D.   Relationship with Other Employee Groups ......................................................... 3

III. GENERAL PRINCIPLES .......................................................................................... 3

    A.   Fair Representation ............................................................................................. 3

    B.   Confidentiality ..................................................................................................... 3

    C.   Neutrality ............................................................................................................ 4

    D.   Authority ............................................................................................................. 4

    E.   Use of Friendly Persuasion, Facilitation and Mediation ..................................... 5

    F.   No Records Policy ............................................................................................... 5

IV. CASE PROCEDURES .............................................................................................. 5

    A.   Receiving an Allegation ...................................................................................... 5

    B.   Personal Contact ................................................................................................ 5

    C.   Advising the Reporting Party ............................................................................... 6

    D.   Coordinating with the National Committee .......................................................... 6

    E.   Gathering Information .......................................................................................... 6

    F.   Other Sources .................................................................................................... 6

    G.   Cases Referred by Management ......................................................................... 7

    H.   Interface with Management (Including Flight Department Managers) ................... 7

    I.   Cases Involving Parties Other Than Pilots .......................................................... 7

    J.   Resolution by Telephone .................................................................................... 7

    K.   Resolution by Meeting(s) .................................................................................... 7

    L.   Resolution or "No Assistance" ............................................................................ 8

V. PROMOTING PROFESSIONAL STANDARDS ......................................................... 8

    A.   Domicile Meetings .............................................................................................. 8

    B.   *Flightline* ............................................................................................................ 8

    C.   D & R and New-Hire Class Briefings ................................................................. 9

VI. REPORTS ................................................................................................................ 9

VII. ACKNOWLEDGEMENT FORM ............................................................................. 10

## I. PREFACE

### A.  Applicability of Manual

This document is APA's official Professional Standards Manual. It is for the exclusive use of the Allied Pilots Association (APA) and APA's Professional Standards Committee (PSC). All members of the National and Domicile Professional Standards Committees must be familiar with the policies and procedures in this manual and must comply with them at all times.

### B.  Purpose

The purpose of the Professional Standards Program is to provide a standardized means to promote and maintain the highest degree of professional conduct among the pilots represented by APA. The Professional Standards Program serves as an "in-house" means for APA to resolve disputes of a professional or personal nature between pilots, or between pilots and other employees.

### C.  Standards for Pilots

Standards of conduct for APA members are defined in the APA Code of Ethics, which has been reproduced on the inside cover of this manual. Standards of conduct for AA pilots are also found in American Airlines Flight Manual Part 1 and American Airlines Regulations. While APA encourages pilots to observe American Airlines' rules and regulations, the Association is not responsible for enforcing them.

### D.  Problem Solving Mission

APA and its Professional Standards Committee are dedicated to helping pilots resolve issues in a discrete, non-threatening and non-official way without involving management. This is not an enforcement effort, nor does it function as an arm of any AMR or any AA department.  It is important to remember that APA Professional Standards never functions on behalf of the Flight Department and that no files are kept, either at the local or national levels.

### E.  APA Appeal Board

APA's Appeal Board, in accordance with the APA Constitution and Bylaws Article VI, is empowered to decide disputes where intra-union charges have been filed between pilots. The Appeal Board decides cases involving formal allegations against a pilot regarding interpretation and/or application of the APA Code of Ethics, APA's Constitution and Bylaws, or APA policy, as well as election-related disputes. The Appeal Board is not a part of the Professional Standards Program.

## II. ORGANIZATION AND RESPONSIBILITY

## A. Organization

The APA Professional Standards effort is composed of a National Professional Standards Committee (NPSC) and Domicile Professional Standards Committees (DPSC).

1

1. <u>National Professional Standards Committee (NPSC)</u>: The National PSC is composed of a Chairman and five members. The Committee and its Chairman are appointed by the President of APA, and serve a term concurrent with the President. Committee members will normally be former Domicile PSC Chairmen, or have previous PSC experience on the Domicile level. They are nominated by their Domicile Officers, and appointed by the President.

2. <u>Domicile Professional Standards Committee(s) (DPSC)</u>: The Domicile PSC and its Chairman are appointed by the Domicile Chairman, and serve a term concurrent with the Domicile Chairman. Domicile Committee members may be nominated by the Domicile PSC Chairman and are appointed by the Domicile Chairman. The composition of the Domicile PSC should be representative of the pilot group at each base. The size and composition of the Domicile Committee is at the sole discretion of the Domicile Chairman.

**B. Responsibilities**

1. <u>National PSC</u>

   a) Support and advise the Domicile PSCs. The National PSC may become involved in major or broadened cases, or serious cases with institutional implications.
   b) Provide procedures and assistance to help Domicile PSC solve pilots' problems relating to professional standards.
   c) Provide individuals the opportunity to seek assistance from APA in solving problems confidentially through the Professional Standards program.
   d) Educate APA's membership on the role of Professional Standards and encourage pilots to use PSC resources to solve problems without involving management.
   e) Provide an official manual containing guidance for Committee members, and procedures to ensure standardization in the performance of NPSC and DPSC duties.
   f) Matters handled by the Professional Standards Committee shall be kept strictly confidential. Information about Professional Standards cases shall not be revealed to anyone except those persons within APA with a need to know and those immediately involved in the incident with whom it must be discussed.
   g) Domicile PS committees must take great care to ensure they do not jeopardize a member's rights in any subsequent management hearing or grievance, or FAA, or law enforcement proceeding.
   h) To protect the pilots involved, no files or other records (paper or electronic) shall be kept by the Domicile PSC or any member thereof.
   i) DPSC members shall be represented and indemnified by APA in litigation resulting from the performance of their duties when they have made a reasonable effort to comply with this manual and with direction from APA officials, and have exercised common sense and reasonable judgement.

2. <u>Domicile PSCs</u>

   a) The primary responsibility of the Domicile PSC is to provide a local means for pilots to achieve "in-house," low-key, non-threatening, confidential solutions to professional standards problems.

   b) Matters handled by the Professional Standards Committee shall be kept strictly confidential. Information about Professional Standards cases shall not be revealed to anyone except those persons within APA with a need to know and those immediately involved in the incident with whom it must be discussed.

   c) Domicile PS committees must take great care to ensure they do not jeopardize a member's rights in any subsequent management hearing or grievance, or FAA, or law enforcement proceeding.

   d) To protect the pilots involved, no files or other records (paper or electronic) shall be kept by the Domicile PSC or any member thereof.

   e) DPSC members shall be represented and indemnified by APA in litigation resulting from the performance of their duties when they have made a reasonable effort to comply with this manual and with direction from APA officials, and have exercised common sense and reasonable judgement.

   f) The DPSC shall establish programs to inform local pilots about the activities and responsibilities of Professional Standards, and about the advantages of using PSC to solve pilot issues without involving management.

## C. Professional Standards Cases - Jurisdiction

1. Professional Standards Committees shall attempt to resolve conflicts/problems at the lowest level possible and without involving management.

2. Routine cases will initially be handled by the Domicile PSC at the base of the pilot who is the subject of the complaint.

3. APA Legal and the NPSC Chairman shall be immediately notified of any case where action is likely to be taken by the FAA, management, a law enforcement agency, or where an official complaint has been made to a non-APA party.

## D. Relationship with Other Employee Groups

   To promote low-key, no-jeopardy resolution of problems between pilots and other employees, a concerted effort should be made to establish communications and to maintain a good working relationship between APA NPSC and DPSC(s) and their counterparts at the Association of Professional Flight Attendants (APFA) and the Transport Workers Union (TWU). Contacts with non-union employee groups should be handled with caution because AMR considers these groups to be "management" and because information discussed with non-union employees may be reported to senior managers.

## III. GENERAL PRINCIPLES

## A. Fair Representation

   It is the duty of the Allied Pilots Association and the NPSC and DPSC(s) to represent all AA pilots in professional standards cases and in other professional matters, whether or not they are APA members.

## B. Confidentiality

1. NPSC and DPSC members shall not discuss cases with management pilots or other management officials, or with law enforcement, the FAA or other third parties not

<u>directly involved in the case</u>. Exceptions may be made with the express prior approval of APA Legal and a National Officer when one of the parties listed above has already become involved in the case.

2. <u>It is required to keep the names of all individuals involved confidential</u>. It is recognized that the circumstances of some cases may make maintaining anonymity difficult.  If guidance or advice is needed on this point, please consult APA Legal and the NPSC Chairman.

3. <u>Confidentiality protects the rights of all involved and promotes maximum participation in the program</u>. Only those individuals inside APA with an absolute "need to know" will be advised of case particulars. This will normally include only the individuals directly involved in the incident and the Professional Standards Committee members working to resolve the issue. Complicated or serious cases may also require the assistance of the Domicile Chairman, a member of the National PSC, APA Legal, or a National Officer.

4. Whenever a question exists about how to handle a Professional Standards issue, APA Legal and the Chairman of the NPSC shall be notified immediately.

## C.  Neutrality

1. <u>Members of the NPSC and DPSC must remain strictly neutral and absolutely non-political at all times</u> to maintain the credibility of the Professional Standards program. Members and former members of a DPSC or the NPSC shall not use a Professional Standards title in a political mailing or campaign mailing of any kind other than the official APA candidate resume.

2. It is a serious violation of ethics and APA policy for a member or former member of NPSC or DPSC to disclose information about a Professional Standards case to management or to anyone else not authorized by this manual to have such information.

3. There are two sides to every allegation and the complete and accurate story often is hard to discern. When beginning work on a Professional Standards case, it is important to give equal credibility to the positions taken by both parties. A thorough and objective inquiry to gather all of the facts is required before making a recommendation to the parties involved.

## D.  Authority

It is the objective of the Professional Standards Committee to handle all Professional Standards cases involving an AA pilot without management involvement. Some cases may involve individuals or organizations outside of APA. There are some matters that Professional Standards does <u>not</u> handle and should refer to others within APA. Examples include:

1. <u>Proficiency/Training problems</u> require notification of and coordination with APA Legal and the Chairman of the National Training Committee.
2. <u>Substance abuse allegations</u> require notification of and coordination with APA Legal and the Chairman of the National Aeromedical Committee.

3. <u>Reserve availability, sick leave and other contractual issues</u> are normally not addressed by Professional Standards, except in cases of alleged flagrant abuse. Such cases require notification and coordination with the pilot's Domicile Representatives.

4. <u>Jumpseat travel issues</u> require notification and coordination with the Chairman of APA's Jumpseat/Non-Rev Committee.

5. <u>Personal appearance (uniforms, haircuts, shoeshines, etc.)</u>, is the responsibility of the individual pilot. These issues are not normally addressed by the NPSC or DPSC, except in cases of alleged repeated and flagrant abuse. Such cases require notification and coordination with the pilot's Domicile Representatives.

## E.  Use of Friendly Persuasion, Facilitation and Mediation

The NPSC and DPSCs resolve most cases by facilitating cooperative efforts by the parties involved. Occasionally a resolution cannot be reached, even after Professional Standards mediates the situation and offers suggestions and friendly persuasion. Cases where the DPSC or NPSC does not succeed shall be reported to the Chairman of the NPSC immediately.

If the National PSC Chairman determines that a resolution is not obtainable, APA Legal shall be informed immediately. After consultation with APA Legal, the NPSC Chairman shall notify the individuals involved that Professional Standards "CAN BE OF NO FURTHER ASSISTANCE IN THIS MATTER." This "no assistance" response means that the recourse remaining to the complainant is to use the "do not pair with" bid sheet option, to take the issue to an alternative forum, or to take no further action. The NPSC Chairman will suggest the "do not pair with" option, but will <u>never</u> recommend taking a problem to an alternative forum. That decision must be left to the sole discretion of the parties involved.

## F.  No Records Policy

To protect the pilots involved, <u>no notes, files or records of any kind (paper or electronic) shall be kept by NPSC or DPSC(s)</u>. The only records that should ever exist regarding any matter referred to APA Professional Standards are those produced and retained by APA Legal, because Legal Department records are protected by attorney/client privilege.

## IV.  CASE PROCEDURES

## A.  Receiving an Allegation

1. When you receive an allegation, either by phone, in person or in writing, be sure to notify the Chairman of your Committee, the DPSC or the NPSC, as appropriate.

2. Ask the reporter if he/she has made a report of any kind to anyone besides APA Professional Standards.

3. The NPSC Chairman or the DPSC Chairman shall notify APA Legal if required by this manual.

## B.  Personal Contact

1. The first step toward resolving any Professional Standards allegation is to ask the reporting party if he/she has tried to resolve the issue with the other party. If not,

encourage a "one-on-one" resolution before PSC involvement, if that is acceptable to the person making the allegation.

2. Be careful not to discourage the reporting party at this point and try to avoid losing the case to management. Assure the reporter that Professional Standards will become involved directly.

3. If the reporting party indicates this has already been tried, or if the PSC member believes direct contact is inappropriate for the situation, the NPSC or DPSC should become involved to the extent required to bring about a resolution.

4. The DPSC or NPSC shall function as a facilitator and an intermediary (mediator).

## C. Advising the Reporting Party

1. Tell the reporting party that you will investigate the allegation thoroughly, including discussions with the other involved parties.

2. Inform the reporter that the Committee will guard the confidentiality of the reporter and the other parties involved to the maximum extent possible, although confidentiality cannot guarantee anonymity in all cases.

3. In cases involving non-pilot employees, it may be appropriate to contact APA Legal, then APFA or TWU Professional Standards for assistance.

4. The reporter may be contacted again if needed to bring about a resolution of the case.

## D. Coordinating with the National Committee

1. Except as set out below or elsewhere in this manual, or when instructed to the contrary, the Domicile PSC will handle most cases concerning members of their domicile.

2. In unusual, complex or potentially serious cases, APA Legal, the Domicile Chairman and the Chairman of the National PSC should be notified immediately.

3. APA Professional Standards is not authorized to handle cases that may result in discipline, nor cases that are already known to management where discipline is likely, nor cases where reports have been made to management or the FAA or law enforcement agencies. Such cases must be reported to APA Legal and the Chairman of the National PSC immediately.

## E. Gathering Information

1. Take enough time to talk with all parties involved, if possible.

2. Be objective and do not offer opinions.

3. Respect the rights, dignity, and confidentiality of all parties.

4. Approach the parties with an attitude of concern for the individuals involved, as well as for safety and professional conduct.

5. In cases where specific behavior is alleged in a work context, it is a valid technique to consult other pilots who have flown with and stayed on a layover with the pilot(s) involved. Offer confidentiality to these pilots and ask for their confidentiality about your contact with them.

## F. Other Sources

1. The Professional Standards Committees may consult with APA Legal, APA's National Officers, and APA's Safety, Training, and Aeromedical Committees, as required by the circumstances of each case.

2. Cases that are likely to involve discipline or FAA action or law enforcement action are outside of the jurisdiction of the Professional Standards Committees (NPSC and DPSC), and must be referred to APA Legal immediately.

## G.  Cases Referred by Management

1. Management may ask APA Professional Standards to become involved in a case. Such cases are handled in the same manner as other cases unless the NPSC or DPSC believes that discipline or FAA action or law enforcement action are likely.
2. The NPSC and DPSC do not share information about cases with management (including Flight Department managers), other than to inform the manager who referred the case that it was or was not resolved by the NPSC or DPSC.

## H.  Interface with Management (Including Flight Department Managers)

1. Professional Standards Committee members do not meet with management without express prior approval of the NPSC Chairman or DPSC Chairman, as appropriate.
2. The role of the NPSC or DPSC is to listen to management regarding professional standards allegations. Do not provide management with information about the case that has been obtained from non-management sources.
3. Members of NPSC or DPSC do not discuss information related to the case that has not been provided by management, other than to inform them that the problem has been or has not been resolved.
4. Members of NPSC and DPSCs do not provide personal opinions about a case to management.
5. Cases where discipline or FAA action or law enforcement action is likely to result or is already under consideration are not handled by the NPSC or DPSC. Such cases must be immediately referred to APA Legal, or if they are not available, to a National Officer. Such notification shall be made as soon as the NPSC or DPSC becomes aware that discipline or third-party action is likely or is already under consideration.

## I.  Cases Involving Parties Other Than Pilots

1. Consultation with the NPSC Chairman is required in all cases involving non-pilots, even for seemingly minor allegations made by or against non-pilots.
2. In such cases involving an APFA- or TWU-represented employee, attempt to contact your PS counterpart at the other union to help resolve the issue (e.g. APFA or TWU Professional Standards, etc).
3. Getting the parties together may be difficult, so assistance from your APFA or TWU counterparts may be important to your resolution efforts.

## J.  Resolution by Telephone

Initial efforts should be made to resolve an issue by telephone. If a resolution cannot be reached via telephone or if the nature of the alleged problem dictates an alternative forum, resolution may necessitate a meeting (or separate meetings) with the parties involved.

## K.  Resolution by Meeting(s)

1. The next step in attempting a resolution is made at the local level—usually at a meeting or in separate meetings. These meetings should include the Domicile Professional

Standards Committee Chairman (or DPSC member(s) designated by the DPSC Chairman to handle the case and the parties involved.

2. Prepare an outline of the points to discuss before the meeting.
3. At the opening of the meeting, introduce yourself as a no-threat facilitator and mediator.
4. Remain neutral and maintain a low-key, professional manner.
5. State the desired outcome: a resolution without management involvement.
6. State that each party will be allowed equal time to state his/her point without interruption.
7. Maintain control of the discussion and insist on professional conduct during the meeting.
8. Ask the parties to avoid insults and personal attacks during the discussions.
9. Ask each party if there could have been other actions taken that might have avoided the conflict.
10. Attempt to have the parties resolve their issue in your presence, including a mutual agreement that management will not be asked to become involved.
11. Ask for a commitment from both parties to end the conflict and work together in the future, if possible. If they do not believe this is possible, suggest the "do not pair with" alternative.
12. Notify the DPSC Chairman (if he/she was not present) of the results of the meeting(s).

**L. Resolution or "No Assistance"**

1. If there has been no resolution by the DPSC, the National Professional Standards Committee Chairman will be notified and may discuss the case with the parties by phone or in a meeting(s). The NPSC Chairman shall notify APA Legal if he/she is unable to resolve the case.
2. After all reasonable efforts to effect a resolution have been made, the National Professional Standards Committee Chairman (after receiving the advice of the Domicile Professional Standards Committee Chairman and APA Legal as required) will declare the problem either resolved or not resolved.
3. In cases referred by management, the Domicile Chairman and Vice Chairman shall be notified of this decision before the parties involved are notified and before management is notified.
4. After consulting APA Legal, the NPSC Chairman will advise the parties that "APA PROFESSIONAL STANDARDS CAN BE OF NO FURTHER ASSISTANCE" in resolving this issue.

## V. PROMOTING PROFESSIONAL STANDARDS

**A. Domicile Meetings**

Domicile PSC Chairmen are encouraged to ask their Domicile Chairmen to allow them to use domicile meetings, meeting minutes and bulletin boards to encourage the use of APA's Professional Standards Program. The DPSC should promote the resolution of pilot problems in the workplace without involving management through the use of the DPSC.

**B. *Flightline***

The National PSC Chairman is encouraged to submit timely articles from members of the NPSC or DPSC(s) for consideration for publication in *Flightline*.

8

## C.  D & R and New-Hire Class Briefings

The NPSC Chairman shall ensure that a Professional Standards representative addresses all new-hire pilot classes and all Captain upgrade (D & R) classes.

## VI.  REPORTS

1. To protect the pilots involved, no notes, files or records of any kind (paper or electronic) shall be kept by APA Professional Standards at the local or national level. There are no exceptions to this policy.

2. Periodically, each Domicile Professional Standards Committee Chairman may be asked to forward to the National PSC Chairman a "Committee Report."
   a) This report should list only general de-identified information concerning the kinds of cases being handled at the domicile.
   b) The purpose of these reports is to identify general problem areas and general trends.
   c) These reports will be archived at APA Headquarters and may be reported to the APA Board of Directors at regular Board Meetings at the discretion of the NPSC Chairman and APA's President.

## VII. ACKNOWLEDGEMENT FORM

I, _____ , certify that I have read this manual, that
(Please print name)

I understand it, and that I will comply with the policies and procedures set forth in it. I understand

that compliance with the policies and procedures contained in this manual is a condition for my

participation in the APA Professional Standards program.

Signature: _____

Date: _____

Domicile: _____

**NOTE:  This form must be completed and returned by mail or fax to the National
Professional Standards Committee Chairman as a condition of your participation
in the NPSC or DPSC.**

Mail to:    Chairman, APA National Professional Standards Committee
Allied Pilots Association
14600 Trinity Boulevard, Suite 500
Fort Worth, Texas 76155-2512

Or fax to: 817.302.2369

# **EXHIBIT 2**

August 21, 2017

## ALLIED PILOTS ASSOCIATION APPEAL BOARD RULING

### IN RE:

### ARTICLE VII CHARGES

### FIRST OFFICER RODNEY "SCOTT" PATTERSON

v.

### CAPTAIN GLENN WHITEHOUSE

Attached is the APA Appeal Board ruling regarding the Article VII charges by First Officer Rodney "Scott" Patterson against Captain Glenn Whitehouse.

For the Appeal Board,

First Officer Rob Sproc
Appeal Board Chair

Captain Joe Bazo
Appeal Board Member

Captain Jeff Koontz
Appeal Board Member

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

DISCUSSION.........................................................................................................................3

CHARGES .............................................................................................................................5

DECISION............................................................................................................................10

# INTRODUCTION

The Allied Pilots Association's ("APA") Constitution and Bylaws ("C&B") Article VII sets forth the internal process and rules governing intra-union hearing and disciplinary procedures. Charges may be brought by a member in good standing against any other APA member under Article VII for:

1. Willfully acting as a strike-breaker pilot during any duly authorized pilot strike;
2. Willful violation of the APA Constitution and Bylaws;
3. Willful neglect in paying dues, assessments, or fines levied by the Association;
4. Misappropriating money or property of the Association;
5. Willful violation of the pilots' working agreement;
6. Initiating and/or prosecuting charges under this article in bad faith;
7. Any act contrary to the best interests of the APA as an institution or its membership as a whole;
8. Any act motivated by malice or political animus that exposes another member to company discipline, up to an including termination.

Article VII further directs that charges must be submitted to the APA Secretary-Treasurer by certified mail within one (1) year after the alleged offense. The Appeal Board is tasked with hearing or reviewing cases referred to it in accordance with Article VII.

First Officer Rodney "Scott" Patterson filed Article VII charges against Captain Glenn Whitehouse in December 2016.[1] In a letter dated March 13, 2017, Captain William Read, MIA Domicile Chair, denied First Officer Paterson's complaint, finding that the one-year statute of limitations had been exceeded and, therefore, First Officer Patterson's complaint was not cognizable.[2] First Officer Patterson filed an appeal of Captain Read's decision on April 6, 2017.[3] The APA Appeal Board convened a three-member panel (hereinafter, "Panel") to hear First Officer Patterson's appeal. Panel members were First Officer Robert Sproc, Captain Joe Bazo, and Captain Jeff Koontz. The hearing took place on June 8 and 9, 2017, in Miami, FL. First Officer Patterson,

---

[1] See Accuser's Complaint.
[2] Captain Read letter dated March 13, 2017.
[3] Patterson letter to Torell dated April 6, 2017.

through his pilot advocate Captain Danny Shellhouse, presented his case to the Panel, proffering 26 exhibits and one written motion. The Accused, Captain Glenn Whitehouse, declined to attend the hearing both in person and electronically via Skype, Facetime or other electronic means. He did not designate a pilot representative. Instead, Captain Whitehouse proffered emails dated June 2, 2017, and June 6, 2017, for consideration of this Panel.

## BACKGROUND

First Officer Scott Patterson is a pilot for American Airlines currently on medical disability.[4] The basis for First Officer Patterson's complaint originated from a MIA-ASU trip in October 2014. Captain Glenn Whitehouse ("Accused") was the Captain, and First Officer Scott Patterson ("Accuser") was one of two first officers. A dispute erupted between the Accuser and Accused, each alleging the other exhibited offensive conduct during the trip and well after the trip ended. It is unclear exactly how APA Professional Standards became involved, but it is clear from Exhibit 5 that APA Professional Standards member Captain Mark Modrich was directly involved in mediating the dispute. At some later point, at least one more unnamed APA Professional Standards member became involved. (See Exhibits 3 and 4.) Specifically, the unnamed APA Professional Standards captain presciently warned First Officer Patterson that both he and Captain Whitehouse need to "move on" because "...if it continues and escalates – it will be out of Professional Standards [sic] hands and then get ugly." [5]

Eventually, First Officer Patterson was subject to discipline under Section 21 of the APA-AA Joint Collective Bargaining Agreement. The Section 21 Hearing took place on November 23, 2015, and a PEH entry was made into First Officer Patterson's file on February 1, 2016. [6] The PEH entry admonished First Officer Patterson to "maintain good working relationships with his coworkers."[7] First Officer Patterson thereafter crafted a complaint against Captain Whitehouse under Article VII of the APA C&B, dated December 4th but mailed certified on December 5, 2016.[8] Eight allegations were leveled against Captain Whitehouse.

---

[4] Hearing Transcripts, June 8, 2017, pg. 17, lines 7-10.
[5] Exhibit 3, pg. 9.
[6] Exhibit 1.
[7] *Id.*
[8] Accuser's Complaint.

The chairman of the Miami domicile, Captain William Read, did not reach a determination on the merits of First Officer Patterson's Article VII complaint, but instead found that the complaint was "not cognizable" since more than one year had elapsed between the occurrence of the events upon which the complaint was based and the filing of the complaint.[9] Captain Read confuses timeliness as a cognizable issue. Whether or not charges are cognizable pertains to the eight enumerated actions listed in Article VII Section A, 1-8. Deadlines for filing of charges and appeals are covered separately and distinctly in Article VII. First Officer Patterson timely filed his appeal of the Miami Domicile Chairman's decision.[10]

As a threshold matter, the Panel must first resolve whether the Miami Domicile Chairman was correct in finding that First Officer Patterson's Article VII complaint (hereinafter "Complaint") was untimely. If the Panel finds that the Complaint is timely, then a determination would have to be made as to the disposition of the merits of the Complaint.

## DISCUSSION

### Jurisdiction

Before a Domicile Officer can hear the merits of a complaint under Article VII of the C&B, the officer must first determine whether jurisdiction exists. To establish jurisdiction, four elements must be satisfied:

    (1)     The accuser is a Member in Good Standing;

    (2)     The claim is filed within the Statute of Limitations period;

    (3)     The claim alleges liability under Article VII (cognizable charges);

    (4)     The accuser has suffered some level harm as a result of the accused's action(s).[11]

In this matter, Captain Read declared that the Complaint was not filed within the one-year period called for under Article VII.B.2, and therefore the Complaint was not cognizable. Captain Read identified the date of First Officer Patterson's Section 21 Hearing (November 23, 2015) as being the latest point in which the one-year limitations period commenced. The Panel finds this to be in error. Under the plain language of Section 21 of the APA – AA JCBA, the first step in the disciplinary process is a written advisory.[12] In this case, a PEH entered into First Officer

---

[9] Patterson v. Whitehouse Transcript, Vol. 1, pp. 32-33
[10] Patterson letter to Torell dated April 6, 2017.
[11] See *Meadows v. AAPSIC*
[12] APA-AA JCBA, Sec 21, A.1.h.(1).

Patterson's personnel file on February 1, 2016.[13] The Complaint was filed by First Officer Patterson on December 5, 2016, – 308 days after the PEH. Therefore, this Panel finds that First Officer Patterson's Article VII was timely.

## Merits Determination

Next, the Panel turned to adjudicating the merits of the Complaint. First Officer Patterson lodged 10 charges against Captain Whitehouse.[14] Charges 1 through 5 allege acts in violation of Article VII.A.8. Charges 6, 7 and 8 do not identify a particular section under Article VII.A that was violated by the alleged acts. Charges 9 and 10 do not allege specific acts or identify specific section(s) under Article VII.A that were violated. The second sentence in Paragraph B of Article VII reads: "The charges shall be specific as to the alleged acts that constitute the basis for the charges **with citations to the <u>particular</u> <u>provision</u> of the Constitution and Bylaws that have been violated**." (Emphasis added.) Since Charges 9 and 10 allege neither specific acts nor particular provision(s) of the C&B which were violated, Charges 9 and 10 fail. Charges 6, 7, and 8 do allege specific acts but lack identification of specific provision(s) of the C&B that were violated.[15] Hence, Charges 6, 7 and 8 likewise fail. This leaves Charges 1 through 5 for the Panel's consideration.

## Article VII.A.8

Article VII.A.8 reads: "Any act motivated by malice or political animus that exposes another member to company discipline, up to and including termination." Hence, there are two components which must be proven: an act plus the requisite intent, either malice or political animus. In this case, no acts have been alleged which correspond to a political endeavor or to achieving a political goal. Therefore, for his Complaint to be successful, First Officer Patterson must show that Captain Whitehouse's were committed with malicious intent and that Captain Whitehouse possessed the knowledge that his actions would lead to First Officer Patterson being subjected to company discipline. According to Black's Law Dictionary, "Malice does not simply mean ill will towards the person, but signifies a wrongful act, done intentionally, without just cause

---

[13] Exhibit 1.

[14] The Complaint labels each charge as "COUNT", numbered sequentially 1 through 10. The Panel will identify each allegation as a "Charge" and not as a "Count".

[15] Charges 7 and 8 do state that the alleged acts violated Article VII, but the Panel believes that the plain language of VII.B requires greater specificity.

or excuse."[16]  Thus, proof of a violation of Article VII.A.8 requires that First Officer Patterson show: (1) an act, which (2) knowingly would cause First Officer Patterson to be subjected to discipline, (3) done intentionally with ill will by Captain Whitehouse, and (4) without just cause or excuse.

## Exhibit 3

First Officer Patterson, through his pilot advocate Captain Shellhouse, offered into evidence a twelve-page document that was written by Captain Whitehouse and delivered to MIA Domicile Chief Pilot Captain Brian Beach.[17] The Panel later admitted the document into evidence as Exhibit 3. The document contained numerous redactions, and it was explained that the redactions were made by American Airlines to protect the privacy of its employees and that the redacted document was central to the company's Section 21 disciplinary against First Officer Patterson.[18] Throughout First Officer Patterson's case in chief, the Panel was urged to accept the statements made in Exhibit 3 for their plain meanings, albeit not necessarily for their truths. The Panel is the fact finder and hence it is solely up to the Panel to judge truthfulness. Nevertheless, Exhibit 3 is significant in that although Captain Whitehouse did not participate in the hearing and although two email communications from Captain Whitehouse have been considered by the Panel, Exhibit 3 essentially tells Captain Whitehouse's version of events.

## CHARGES

### Charge 1

First Officer Patterson alleges that Captain Whitehouse violated Article VII.A.8 by colluding with another employee to subject First Officer Patterson to company discipline.[19] The crux of this allegation is that a protracted dispute which originated with the MIA-ASU flight in October of 2014 and continued well into 2015, and because a resolution through APA Professional Standards could not be achieved, the company ultimately became involved by instigating a Section 21 disciplinary proceeding against First Officer Patterson. Much reliance was placed by First Officer Patterson on Exhibit 3, and the Panel agrees with him that it does establish a causal

---

[16] Black's Law Dictionary, 2nd Ed.
[17] Patterson v. Whitehouse Transcript, Vol. 1, pp 37-52.
[18] *Id.*
[19] See "Count 1" of Complaint.

5

connection between his Section 21 discipline and Captain Whitehouse's actions. To prevail under Article VII.A.8 requires more than just proving a causal connection; First Officer Patterson must show that Captain Whitehouse acted with ill will and without just cause. To demonstrate ill will, it would have to be shown that Captain Whitehouse "desired to see another experience pain, injury, or distress."[20]

**Ill Will:** The Panel believes that Exhibit 3, considered in its entirety, does support a finding that Captain Whitehouse desired to see First Officer Patterson "experience pain, injury or distress." The opening paragraph of Captain Whitehouse's letter to MIA Chief Pilot Captain Beach directly asks that American Airlines, through its manager Captain Beach, "...declare that I have been a target of **workplace harassment** by First Officer Scott Patterson." (Emphasis added.) American Airlines' policies regarding workplace harassment are clear:

> No one wants to work for a company where harassment, intimidation or violence lives. To be absolutely clear, American prohibits threats and workplace violence toward our employees, vendors, customers or property. In no shape or form will the following be tolerated:
> - Physically or verbally threatening or intimidating another individual while at work, including acts of bullying;
> - The intentional destruction or threat of destruction of company or another's property;
> - Harassing or threatening an employee while at work, including phone calls or written communications;
> - Stalking at work; and
> - Advocating illegal use of firearms, bombs, or weapons while at work.
>
> This applies to everyone working on behalf of the company, including, but not limited to, American employees, contract workers, temporary workers, and non-employees on American's property. If you witness or are aware of any violent or potentially violent conduct, do the right thing and report it to your local management as quickly as possible. They'll take it from there, making an initial assessment of the situation and contacting Human Resources.[21]

It is common knowledge that termination is a likely consequence for the employee who violates the company's "Zero Tolerance" workplace harassment policy. Captain Whitehouse, as a veteran captain at American Airlines, likely knew this when he drafted a twelve-page letter to the Company

---

[20] Black's Law Dictionary, 10th Ed., definition of the term "ill will".
[21] AA Policies, U.S. Domestic, "Keep It Fair".

and formally charged First Officer Patterson with workplace harassment.[22]   The Section 21 disciplinary process was initiated against First Officer Patterson following Captain Whitehouse's letter (Exhibit 3), and this letter was the centerpiece of the Company's case against First Officer Patterson. Discipline was issued against First Officer Patterson in the form of a PEH.[23]

**Just Cause:** It is ok to be wrong, provided a reasonable explanation exists for being wrong. Captain Whitehouse's letter (Exhibit 3) is single-spaced and twelve pages long. It makes numerous inferences that First Officer Patterson is a bad pilot, a bad person, a person of unsavory character, a person whose family is annoying, and overall is a person with whom Captain Whitehouse would not choose to associate. The Panel found two instances alleged by Captain Whitehouse which potentially could constitute harassment, and both were mentioned on page 6: the finger pointing in the second paragraph, and the extra scrutiny Captain Whitehouse experienced in VVI mentioned in the third paragraph. If either of these allegations had any credibility, the Company would have been remiss in not applying its own Harassment Policy against First Officer Patterson – something the Company clearly did not do in the Section 21 Hearing. Therefore, no just cause existed for Captain Whitehouse to file workplace harassment charges against First Officer Patterson. Specifically, in Captain Whitehouse's opening paragraph, he does not simply request Captain Beach resolve the dispute at his level as an immediate supervisor, but rather requests that Captain Beach "take the below statements to American airlines [sic] corporate human resources for review and action" clearly putting First Officer Patterson's employment at risk.  Additionally, Captain Whitehouse uses repeated inflammatory language questioning First Officer Patterson's employment status and questioning the mental health of First Officer Patterson, although no evidence was presented to the Board indicating that Captain Whitehouse is qualified to make such accusations: "What the hell is a person of this character doing in an AA cockpit?" (Exhibit 3, lines 164-165); "seemed delusional" (Exhibit 3, line 117); "delusional lie" (Exhibit 3, line 206); "he is not a stable person" (Exhibit 3, line 262); "pathological liar" (Exhibit 3, line 336); "Patterson needs to be evaluated for physiological (sic) evaluation." (Exhibit 3, line 387). These actions and statements are more than just anecdotal references. They are retaliatory in nature and, when taken as a whole, constitute malice.

---

[22] Exhibit 3, p.1.
[23] Exhibit 1.

Captain Whitehouse acted to intentionally expose First Officer Patterson to Company discipline, did so with malice, ill will and no justifiable reason; therefore, First Officer Patterson prevails on Charge 1.

## Charge 2

First Officer Patterson alleges in Charge 2 that Captain Whitehouse violated Article VII.8.A by lying to APA Professional Standards.[24] To prevail on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum.  As we stated above, the first element is the act and here, the act complained of was Captain Whitehouse's "lying" to APA Professional Standards member Captain Mark Modrich. Exhibit 5 is a sworn affidavit by Captain Mark Modrich that was admitted into evidence.[25] First Officer Patterson argues that the gist of Captain Modrich's affidavit supports a conclusion that Captain Whitehouse lied to APA Professional Standards. The Panel disagrees.

If the Panel were to take Captain Modrich's statements in the light most favorable to First Officer Patterson, the closest the Panel can come to First Officer Patterson's argument is that Captain Whitehouse perhaps made statements to Captain Modrich which were untrue. Making false statements, however, is not the same as lying.[26] Lying is making a statement known to be false, which is different from making a statement, which one believes to be true, but in fact is not. Contrary to First Officer Patterson's characterization that Exhibit 5 supports the conclusion that Captain Whitehouse lied, the Panel reads Captain Modrich's affidavit as offering an opinion as to the credibility of Captain Whitehouse versus First Officer Patterson. Ultimately, credibility is for the Panel to judge but we will note here our great discomfort in seeing a member of the APA Professional Standards Committee offering credibility opinions in an Article VII dispute. Since it cannot be shown that Captain Whitehouse's statements to Captain Modrich constituted lies, First Officer Patterson fails to prove that the act complained of had occurred. Charge 2 therefore fails.

---

[24] Charge 2 of Complaint, referred to as "COUNT 2" in Complaint.

[25] Patterson v. Whitehouse Transcript, Vol. 1, pp 53-54.

[26] The Panel IS NOT concluding or even inferring that Captain Whitehouse made false statements or lied to Captain Modrich. Rather, the Panel is engaging in a hypothetical assumption that even if the Panel were to assume that Captain Whitehouse did make statements that could perhaps be proven to be inaccurate, Claim 2 nevertheless fails.

**Charge 3**

First Officer Patterson alleges in Charge 3 that Captain Whitehouse violated Article VII.8.A by making false statements to American Airlines Human Resources.[27]  To prevail on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum, the first being that the act complained of actually occurred. Here, the only encounter the Panel knows of in which Captain Whitehouse could possibly be communicating to American Airlines Human Resources would be through the communication entered into evidence as Exhibit 3. The Panel notes that nowhere in Exhibit 3 does it appear that Captain Whitehouse is intending to speak to anyone at American Airlines management other than his Chief Pilot, Captain Brian Beach. Nevertheless, for the sake of evaluating Charge 3 in a light most favorable to First Officer Patterson, the Panel will hypothetically assume that when Captain Whitehouse proffered his communication to Captain Beach, he reasonably knew or should have known that his communication would also reach Human Resources. The Panel will also assume momentarily that First Officer Patterson identified factually incorrect statements in Exhibit 3. All this does for First Officer Patterson is hypothetically establish that a pilot made an incorrect statement or statements to Human Resources, to which First Officer Patterson had the opportunity to refute at his Section 21 Hearing. Charge 3 therefore fails.

It may seem contradictory that First Officer Patterson can prevail on Charge 1 and not Charge 3; however, Charge 1 focuses on what Captain Whitehouse knew he was doing by creating and submitting Exhibit 3 to the Company, and Charge 3 focuses on the truthfulness of the statements made in Exhibit 3. Charge 1 did not require a determination by the Panel on the veracity of the statements made in Exhibit 3 by Captain Whitehouse, but Charge 3 does require such a determination. Here, we find that First Officer Patterson fails to meet his burden of proof for Charge 3. Note, this does not mean that the Panel finds that the statements made by Captain Beach in Exhibit 3 are true – it only means that First Officer Patterson failed to prove Charge 3.

**Charge 4**

First Officer Patterson alleges in Charge 4 that Captain Whitehouse violated Article VII.8.A by making false statements to U.S. government agents and corporate security.[28]  To prevail

---

[27] Charge 3 of Complaint, referred to as "COUNT 3" in Complaint.
[28] Charge 4 of Complaint, referred to as "COUNT 4" in Complaint.

on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum, the first being that the act complained of actually occurred. From the record, the Panel is not aware of any statements which Captain Whitehouse made to "U.S. Government agents" or "Corporate Security". Charge 4 fails.

## Charge 5

First Officer Patterson alleges in Charge 5 that Captain Whitehouse violated Article VII.8.A by transmitting privileged APA communications to management for political animus reasons and that Captain Whitehouse's aim was the termination of First Officer Patterson's employment.[29] To prevail on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum, the first being that the act complained of actually occurred. From the record, the Panel is not aware of any communications from the APA, much less communications which could be construed as being "privileged", being in the possession of Captain Whitehouse or being transmitted by Captain Whitehouse. The Panel concludes that the act complained of has not been established by First Officer Patterson and therefore Charge 5 fails.

## Accuser Motion 1

First Officer Patterson, through his advocate Captain Shellhouse, proffered a motion for sanctions against Captain Whitehouse.[30] The Panel will not sanction Captain Whitehouse for nonappearance nor will the Panel assess any fees upon Captain Whitehouse. Although participation in the Article VII process is clearly favorable for the Association, its membership, and most especially for the accused, the C&B do not mandate participation by the accused. In this case, First Officer Patterson, did not claim to be prejudiced by the absence of Captain Whitehouse. Similarly, Captain Whitehouse's absence did not burden the Panel. Furthermore, the Panel will not assess any fees or costs on Captain Whitehouse. Accuser Motion 1 is denied.

<div align="center">

### DECISION

</div>

First Officer Patterson prevails on Charge 1. Captain Whitehouse is assessed a fine of one hundred dollars ($100.00). This fine is due on December 31, 2017, or immediately upon a concurring ruling by an arbitrator should this decision be appealed, whichever occurs first.

---

[29] Charge 5 of Complaint, referred to as "COUNT 5" in Complaint.
[30] Patterson v. Whitehouse Transcript, Vol. 2, pp 112.

# **EXHIBIT 3**

Lucretia D. Guia
Associate General Counsel
Legal

# American Airlines

Via Email: fuentes.oscar@dol.gov

February 29, 2016

Oscar G. Fuentes
Assistant Director/Investigator
U.S. Department of Labor
Veterans Employment and Training Service
2550 West Oakland Park Boulevard – Room 133
Fort Lauderdale, Florida 33311

Re:   Patterson, Rodney S.
      File #: FL-2016-00016-10-R

Dear Mr. Fuentes:

This letter and the enclosed information responds, on behalf of American Airlines, to First Officer Rodney Patterson's complaint to your office that he has been subjected to disparate treatment and that his rights under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 et seq. were violated. FO Patterson's complaint is specious. AA has not deprived him of any rights protected by USERRA and has not discriminated against him in any manner whatsoever.

I.     Introduction

AA is a commercial air carrier that provides scheduled service to destinations throughout the United States and abroad. Many employees of the Company are military veterans, and many employees continue to serve in active, guard, or reserve status. The Company has the highest regard for those who serve (or served) our country in the armed services. AA is committed to providing military leave to its employees as required by USERRA, prohibits discrimination based on covered veteran status and uniformed military service, and affords all rights, privileges, and benefits to employees as required by USERRA. The Company's general military leave policies are available to employees on its intranet (Exh. A) and specific military leave procedures for pilots are set forth in Section 11 of the collective bargaining agreement between APA and AA. (Exh. B)

II.    Factual Background and Response to Requests for Information

As I indicated during our brief telephone conversation regarding this matter, the Company has not denied FO Patterson military leave or discriminated against him in any manner. On or about September 29, 2015, the Company requested that FO Patterson substantiate his request for military leave for September 21, 2015. It did so because FO Patterson's request for the leave raised questions. Specifically, on the day before a scheduled trip, FO Patterson contacted one of the Chief Pilots in MIA and asked for an "EO" – which is effectively a code used for unanticipated personal absences. He told Captain Bonds

4333 Amon Carter Blvd., MD 5675
Fort Worth, TX 76155
817-931-3929 Office
817-963-4959 FAX
lucretia.guia@aa.com

# ATTACHMENT 7

that he wanted the EO because the captain on his trip the following day was a representative from APA's Professional Standards and that he and the captain did not get along. Captain Bond denied the EO for that purpose. Then, later in same day, after Captain Bond had left, FO Patterson called the duty chief and asked again for the EO. In this telephone call, he told the duty chief that he needed the day off because he had been assigned duty in relation to the "Pope's visit." The duty chief removed FO Patterson from his trip, as he requested.

Typically, AA does not require verification of military service and, specifically, pilots are not typically required to provide uniformed service orders to substantiate military service. AA requested verification of FO Patterson's service for September 22 in this case because of the specific circumstances. FO Patterson initially cited personal differences with the captain as the reason he wanted off the trip and later, after being denied an EO for that purposes, called a different person and indicated that he needed time off for military leave, the Company requested that FO Patterson substantiate his military leave. It did not specify the type of verification, i.e., it did not demand military orders. On or about October 28, 2015, FO Patterson provided his LES to the Company, which appeared to show that FO Patterson had been paid for military service for the relevant dates, September 22-24, 2015. (Exh. C) Upon receipt of that information, the Company took no further action relative to this military leave. It took no disciplinary action and no reprisals related to this leave.

In addition to inquiring about the circumstances that led AA to request verification of FO Patterson's military service, you asked whether there has been any "disciplinary actions" discussed with FO Patterson concerning "job performance issues/attendance problems." There has been no disciplinary action for "attendance problems." On or about September 24, 2015, however, a pilot co-worker lodged a formal complaint regarding FO Patterson's conduct. (Exh. D) Because of the serious nature of the complaint, the Company immediately removed FO Patterson from service and launched an investigation. (Exh. E) He was placed on "PW" status (which is the code used when the Company withholds a pilot from duty with pay). During the course of the investigation, which did not lead to discipline, the Company discovered information which placed in question FO Patterson's fitness for duty. And, consistent with its duty to ensure the safety of its employees and passengers, the Company initiated a fitness for duty examination, which is pending. Throughout this process, FO Patterson has remained on a paid status. He has not been placed on a "Leave Without Pay" status either before or after this Company launched this investigation.

Last, you requested that the Company provide a list of uniformed service members who work out of the South Florida airports who have "similar issues as Mr. Patterson." Although numerous pilots based in MIA frequently take military leave, none have demonstrated "similar issues." None have been the subject of a similar complaint by a co-worker and none have exhibited conduct during an investigation that cast concerns about his/her fitness to fly. Moreover, none have provided contradictory reasons for a last minute request for military leave.

In closing, AA has done nothing relative to FO Patterson which was discriminatory or in any manner violated his USERRA rights. It simply requested verification of his military service because of circumstances which raised legitimate questions regarding that service. Once he provided that verification, the issue was resolved.

AA-Patterson-0000010

Please let me know if you have further questions.

Sincerely,

Lucretia D. Guia

Enclosures:  Exhibits A-E

3

AA-Patterson-0000011

Page 1

1               UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
2                 FORT LAUDERDALE DIVISION
                CASE NO.:  1:17-cv-60533-JEM
3
4    RODNEY SCOTT PATTERSON,            )
                                        )
5               Plaintiff,              )
                                        )
6    v.                                 )
                                        )
7    AMERICAN AIRLINES, INC., a         )
     Delaware Corporation,              )
8                                       )
                Defendant.              )
9    _____)
10
11
12
13         Videotaped Deposition of JAMES N. BONDS
14                  (Taken by Plaintiff)
15              Charlotte, North Carolina
16              Thursday, March 15, 2017
17
18
19
20
21
22              Reported in Stenotype by
23              Christine A. Taylor, RPR
24          Registered Professional Reporter
25

Page 2

```
 1            APPEARANCES
 2    ON BEHALF OF PLAINTIFF: (via telephone)
 3            WILLIAM R. AMLONG, Esq.
              Amlong & Amlong, P.A.
 4            500 Northeast Fourth Street
              Second Floor
 5            Fort Lauderdale, Florida  33301
              954.462.1983
 6            wramlong@TheAmlongFirm.com
 7
      ON BEHALF OF DEFENDANT:
 8
              TRISTAN MORALES, Esq.
 9            O'MELVENY & MYERS, LLP
              1625 Eye Street, NW
10            Washington, DC  20006
              202.383.5300
11            tmorales@omm.com
12
      VIDEOGRAPHER:
13
              Roosevelt Harrison, III
14
15
      ALSO PRESENT:
16
              Noel Pace, Esq. (Via telephone)
17
18
19            VIDEOTAPED DEPOSITION OF JAMES N. BONDS, a
20    witness called on behalf of Plaintiff, before Christine
21    A. Taylor, Registered Professional Reporter and Notary
22    Public, in and for the State of North Carolina, at
23    CaseWorks, 6000 Fairview Road, Suite 1273, Charlotte,
24    North Carolina on Thursday, March 15, 2017, commencing
25    at 11:13 a.m.
```

Page 3

1                    INDEX OF EXAMINATIONS

2                                                  PAGE

3      EXAMINATION BY MR. AMLONG                      6

4

5                     INDEX OF EXHIBITS

6      NUMBER              EXHIBIT              MARKED

7              *EXHIBITS 1-25 PREVIOUSLY MARKED*

8      Exhibit 1      3/24/15 Beach/Garcia E-mails Re:      49

9                     Patterson

10     Exhibit 2      3/20/15 Whitehouse/Beach E-mails Re:  53

11                    Patterson

12     Exhibit 3      5/26/15 Bates/Beach E-mail            56

13     Exhibit 4      9/6/15 Bonds/Cronin E-mail Re:        57

14                    Patterson

15     Exhibit 5      9/22/15 Montgomery/Bonds E-mails      61

16     Exhibit 6      10/28/15 Montgomery/Bonds E-mail      69

17     Exhibit 7      Military Leave and Earnings           69

18                    Statement

19     Exhibit 8      10/30/15 Beach/Bonds E-mails          80

20     Exhibit 9      10/30/15 Bonds/Scialfa E-mails        82

21     Exhibit 10     10/30/15 Scialfa/Cronin E-mails       83

22     Exhibit 11     10/30/15 Scialfa/Cronin E-mails       83

23     Exhibit 12     11/2/15 Cronin/Scialfa E-mails        85

24     Exhibit 13     11/4/15 Patterson/Bonds E-mail        87

25     Exhibit 14     9/24/15 Beach/Whitehouse E-mail       91

1      Q.  And what, if anything, did you do at this

2   point in time to initiate a Section 20 examination of

3   Mr. Patterson?

4      A.  I don't know that I did anything.

5      Q.  Why would you have done nothing when you

6   state in the e-mail, quote, I think we all need to

7   confer and then convince labor that this dude needs a

8   Section 20 ASAP, closed quote?

9      A.  Because I did nothing because Brian Beach was

10  the guy that was handling that investigation.

11     Q.  Do you know whether or not Mr. Beach had done

12  anything at this point?

13     A.  I can only -- I do know at some point

14  something was done because I think he did go to a

15  Section 20, but I don't know what Brian did.  I don't

16  know the circumstance of where he took it from there.

17     Q.  Please hand the witness Exhibit 5.

18     A.  Okay.

19     Q.  Do you recall seeing this e-mail before?

20     A.  I recall the story and speaking with David

21  Tatum.

22     Q.  Okay.  Tell me what you recall about that.

23     A.  I was bothered that I never spoke with Scott

24  Patterson and that he requested an EO after the flight

25  office was closed, and I think -- I didn't leave at

Page 62

1    4:00 like most people or a lot of people do, they close

2    the doors, but I stayed there late.  I never spoke with

3    him.  He never called to talk to me about it.  And this

4    is, quite frankly, people who play the system very well

5    that don't want to hear their chief pilot tell them no

6    for requesting EOs, they will wait until after the

7    flight office closes and then call the duty chief who

8    doesn't know the individuals and usually gives a

9    blanket grant of employee offs.

10        Q.  Had Mr. Patterson left you any voicemails

11   that day?

12        A.  Not to my knowledge.  I really found it odd

13   that he didn't call and say I'd like to speak with

14   Captain Bonds or any of the chief pilots to get this

15   day off.  He went through administrative people in the

16   office to get that, which I don't know is normal

17   protocol.  I would want talk to my supervisor and ask

18   them personally.

19        Q.  Did he tell the people in the office that he

20   was going on military duty?

21        A.  I'm not sure what he told them.

22        Q.  Did -- prior to Mr. Patterson's leaving, did

23   you leave a voicemail concerning taking the day off?

24        A.  I called him -- if I remember correctly, I did

25   call him.  I don't know the timing of it, but I had

1   heard that he had asked for an EO and I requested that

2   he not do that, our money was tight, and -- I might

3   have indicated that I wanted him to call me and talk to

4   me.

5        Q.  Do you recall telling him that you would give

6   him the day -- that you would give him the time off if

7   he would show you his orders?

8        A.  Not at that exact circumstance.  I don't

9   remember the exact wording.  But in later conversations

10  or maybe one then, I don't recall the timing, but I

11  find it quite odd why he would ask for an EO instead of

12  taking military.  I didn't understand that -- why he

13  was asking that.  And when I had put together what Chip

14  Harlow had just called and told me that Patterson was

15  on his flight with him, that it would be -- this should

16  be an interesting flight, then Patterson now was asking

17  off.  And if he was doing military, why didn't he have

18  his military orders.  Me being in the Guard and

19  Reserve, it was quite odd that he didn't have them

20  because I always had mine, and our orderly room

21  provided them for us at will for the transparency of

22  employers.

23       Q.  That was in the Air -- when you were in the

24  Air Force Reserve?

25       A.  Yes.  And the Air Force Reserve, Air National

# MEMBER DIRECTORY

## MS. LUCRETIA D. GUIA

Back to Search Results

| | |
|---|---|
| **ID** | 17992 |
| **Name** | Ms. Lucretia D. Guia |
| **Address** | 4333 Amon Carter Blvd., MD 5675 |
| **City** | Fort Worth |
| **State** | TX |
| **ZIP Code** | 76155 |
| **Country** | USA |
| **Work Phone** | 817-931-3929 |
| **Email** | lucretia.guia@aa.com |
| **License Date** | 04/12/1991 |
| **Judicial District** | Out of State |
| **Status** | Active |
| **Status Definition** | The lawyer is presently eligible to practice law in North Carolina. |



# State Bar of Georgia

(/index.cfm)

# Ms. Lucretia Dolores Guia

American Airlines Inc

4333 Amon Carter Boulevard

Fort Worth, TX 76155

| | |
|---|---|
| **Email** | lucretia.guia@aa.com (mailto:lucretia.guia@aa.com) |
| **Phone** | (817) 931-3929 |
| **Fax** | |

| | |
|---|---|
| **Status** | Active Member in Good Standing |
| **Public Discipline** | None on Record |
| **Admit Date** | 11/13/1989 |

Law School                    Wake Forest University

# EXHIBIT 4

# Aerospace Neurology, LLC
## John D. Hastings, M.D.
5563 S. Lewis Avenue, Suite 100
Tulsa, Oklahoma 74105
Phone (918) 742-4100
Fax: 918-512-4846

Board Certified:  Neurology
Board Certified:  Aerospace Medicine

Neurological Consulting
Aerospace Medicine Consulting

May 28, 2016

Re:
Patterson Scott
D.O.B.: Nov.18.1967

### Independent Aeromedical Neurological Evaluation

I performed an office aeromedical neurological evaluation on Mr. Scott Patterson on May.24.2015. This report is based upon the history provided by Mr. Patterson and review of records, which include neuropsychological assessment by Dr. John Knippa. Mr. Patterson stated that a neurological evaluation was requested by his airline employer for assessment of his fitness to fly from a neurological perspective.

Mr. Patterson is a 48-year-old airline pilot who has served in the military for 28 years and nearing mandatory military retirement at 29 years at the rank of Lieutenant Colonel He has flown with American Airlines for 16 years. He reports excellent general health. He has no history of diabetes, hypertension or heart disease. His wisdom teeth were removed in the Army 28 years ago. He has not had an appendectomy or tonsillectomy. His only other surgical history is for removal of spindle cell sarcoma of the left chest wall, which will be discussed later in this report. He takes no prescription medication, only supplements. He has managed cholesterol successfully with dietary management. He has maintained first class FAA medical certification at six month intervals.

On Dec.06.2014 Mr. Patterson was bathing his usually timid cat when he was deeply clawed in the left pectoral area, causing significant bleeding. He cleansed the area and thought it was healing satisfactorily. On Dec.26.2014 his wife noted a small lump in the area of the cat claw. He saw his primary care physician on Dec.31.2014 and had serologic studies for cat scratch fever, which were unrevealing. He discussed the lump further with a friend, a cardiovascular surgeon from University of Miami. This led to referral and a punch biopsy that "looked like fat." However, permanent pathology sections indicated spindle cell sarcoma, and the lesion was treated with wide excision. Surgical margins were clear. MRI and PET studies were unrevealing with the exception of the PET scan showing uptake at the lesion site. No radiation or chemotherapy was felt indicated and none was instituted. The FAA Aerospace Medical Certification Division was informed, and Mr. Patterson received special issuance medical certification. He returned to work on May.31.2016. Mr. Patterson is followed at intervals of several months by his physician, Dr. Dayton.

In September 2015 Mr. Patterson stated he was called upon for military duty associated with the visit of Pope Francis to the United States. He called for permission to be relieved of airline duties related to military duty. He reported some communication difficulties in accomplishing

this, but stated he did receive approval. He states he was later notified of an issue related to problems with a flight attendant in October 2014 on a flight with his family to Paraguay. Eventually this involved a "Section 20" procedure. Mr. Patterson was referred for neuropsychological assessment to Dr. John Knippa in Long Beach, California. Dr. Knippa's report was sent to the airline, and Mr. Patterson was reported not fit for duty. Mr. Patterson stated that he was later directed to undergo repeat neuropsychological assessment, oncology evaluation and neurological evaluation. Though I do not have specific records requesting neurological evaluation, it appears that performance on neuropsychological assessment led to a recommendation for neurologic evaluation.

Mr. Patterson has no history of seizures, febrile or otherwise and there is no family history of seizures. He has no history of remote neurological insult such as significant head injury, skull fracture or traumatic brain injury. There is no history to suggest neurologic difficulty in perinatal period, infancy, childhood, adolescence or in adult life. Mr. Patterson denied any neurological symptoms on full neurologic inventory. Specifically, he denied a history of headache, nausea, vomiting, double vision, blurred vision, loss of vision, hearing loss, tinnitus, facial numbness, change in sense of smell or taste, problems with speech or swallowing, neck pain, difficulty with balance, coordination, or walking, numbness or tingling of the extremities, weakness of the extremities, or bladder or bowel symptoms. There is no history of difficulty with memory, thinking, or concentration.

Neurological examination revealed normal gait and station. Heel and toe walking, balance on either foot, and hop on either foot were normal. Alternate motion rate in the feet was normal. Arm swing was normal. Rhomberg was normal and there was no drift or pronation. Tandem walking was normal.

Cranial nerve examination revealed intact visual fields. Ocular movements were normal. The pupils were equal and reactive, and the fundi were normal. Hearing was intact and facial symmetry preserved. Uvula and tongue were midline and speech was normal. Neck motions were normal and there were no bruits.

Coordination and alternate motion rate was normal in all four extremities. The deep tendon reflexes were equal and symmetrical with no pathologic reflexes being elicited. Muscle strength was normal without atrophy or fasciculation. Sensory examination including two-point discrimination, position sense, and vibratory sensation was within normal limits.

A Montreal Cognitive Assessment (MoCA) test was performed. This includes assessment of visuospatial, executive, naming, memory, attention, language, abstraction, and delayed recall and orientation functions. Mr. Patterson scored a normal 29/30 points (normal $\geq$ 26-30 points). He recalled the word "daisy" with cued recall, with all other responses being correct.

I reviewed the Dr. Knippa's report of neuropsychological assessment, which included the FAA Core Test Battery items. CogScreen Aeromedical Edition and traditional pencil and paper assessment instruments were performed. Dr. Knippa opined that Mr. Patterson was not fit for duty. Dr. Knippa opined that some scores on test instruments were not commensurate with typical pilot normative data. I carefully reviewed Dr. Knippa's report, in which I do not find evidence to suggest neurologically based impairment in neuropsychological function including personality, behavior intellect or memory.

Based upon the history, neurologic examination and review of Dr. Knippa's report, my professional medical opinions are as follows:

- By history and neurological examination, there is no neurological disorder evident. I find him neurologically intact and whole.

2

- There is no indication by history, examination and review of medical records indicating a need for further neurological testing. There is no sound medical indication for studies such as brain imaging studies, electroencephalogram or other neurologic studies.
- It is my professional medical opinion that Mr. Patterson poses no risk to aviation safety and that he is fit to fly from a neurological standpoint.

I am prepared to answer any questions or discuss any aspect of Mr. Patterson's neurologic status and fitness to fly.

Sincerely,

John D. Hastings, M.D.

3

# **<u>EXHIBIT 5</u>**

# Record of Simulator Checks (STI 8410)

**NAME:** Mr. Scott Patterson
**COMPANY:**
**CATEGORY:** IC97

**COURSE#:** B400A-IC-

**TYPE OF CHECK:** ☐ PIC 135.293 & 297  ☒ PIC 135.297(only)  ☐ SIC 135.293

| Ground Operations | Sim 1 | T* | Sim | | Instrument Procedures | Sim 1 | T* | Sim |
|---|---|---|---|---|---|---|---|---|
| Preflight (Interior) | S | | | | Departure | S | | |
| Preflight Exterior | S | | | | Arrival (FMS) | S | | |
| Start Procedures | S | | | | Holding | S | | |
| Taxiing | S | | | | **ILS Approach (1800 RVR)** | **Sim 1** | **T*** | **Sim** |
| Pre-Takeoff Checks | S | | | | Normal ILS | S | | |
| **Takeoffs** | **Sim 1** | **T*** | **Sim** | | Engine-Out ILS | S | | |
| Normal | S | | | | Autopilot ILS | S | | |
| Crosswind | S | | | Simulator Type: | Raw Data (If Required) | NA | | |
| Instrument RVR ( 600 ) | S | | | BE-400A | **Nonprecision Approach** | **Sim 1** | **T*** | **Sim** |
| With Engine Failure | S | | | | VOR (Without Vertical Guidance) | S | | |
| Rejected | S | | | | RNAV (GPS) (With Vertical Guidance) | S | | |
| **In-Flight Maneuvers** | **Sim 1** | **T*** | **Sim** | Simulator Level: | Circling | S | | |
| Steep Turns | S | | | D | GPS (If Required) | S | | |
| Stall – Takeoff | S | | | | **Missed Approach** | **Sim 1** | **T*** | **Sim** |
| Stall – Clean | S | | | | From an ILS | S | | |
| Stall – Landing | S | | | | Engine Out | S | | |
| Engine Failure /Shutdown | S | | | | Second Missed Approach | S | | |
| Engine Restart | S | | | | **General** | **Sim 1** | **T*** | **Sim** |
| Unusual Attitudes | S | | | | Abnormal Procedures | S | | |
| Specific Flt. Characteristics | NA | | | | Emergency Procedures | S | | |
| **Landings** | **Sim 1** | **T*** | **Sim** | | Com / Nav Procedures | S | | |
| Normal | S | | | | Use of Autopilot | S | | |
| Crosswind | S | | | | Autopilot in Lieu of Required SIC | NA | | |
| From an ILS | S | | | | Judgment | S | | |
| From a Circle | S | | | | CRM | S | | |
| Rejected | S | | | | PIC Performance as SIC | S | | |
| No-Flap | S | | | | Adherence to Checklist | S | | |
| 1-Engine Out | S | | | | Adherence to Maneuver/SOP | S | | |
| 2-Engines Out (If Required) | NA | | | | Right Seat Takeoff/Landing | NA | | |

| CHECK RESULTS | S/U | DATE | CHECK AIRMAN NAME AND SIGNATURE |
|---|---|---|---|
| Oral 293(a)(1) | | | |
| Oral Base Aircraft ☐293(a)(2) ☒297 | S | 06/03/2017 | Electronically signed by: Ronald Lee Welch |
| Oral 293(a)(2)   Variant-Model: | | | |
| Oral 293(a)(3) Wt. & Balance | | | |
| Oral 293(a)(4 -8) Gen Subjects | | | |
| Sim Check 1    ☐293(b)    ☒297(c) | S | 06/03/2017 | Electronically signed by: Ronald Lee Welch |
| Sim Check 2    ☐293(b)    ☐297(c) | | | |
| Total Sim Check 1 & 2 Pilot Flying Time: | | 2.0 | |

| Base Month: _____ ** | Expires** |
|---|---|
| 12 mo 135.293(a)(2) | |
| 12 mo 135.293(b) | |
| 6 mo 135.297 | |

**FAA ONLY**

Meets requirements of 135.339 & 340 (a)(2)  ☐ Sat  ☐ Unsat

TCE Observation  ☐ Approved  ☐ Disapproved  ☐ Certification Authority

REMARKS: T* - Training to proficiency required
** - To be entered by certificate holder

| REGION | DISTRICT OFFICE |
|---|---|
| FAA INSPECTOR'S NAME AND SIGNATURE | |

Approved substitute for FAA 8410-3

Version 3 – 9/21/2015

Patterson_00414

| SKY ONE HOLDINGS, LLC – FAR 135 AIRMAN COMPETENCY / PROFICIENCY CHECK | Location: ORL | Date of Check: 2/20/2017 | 8410-3 | Rev. 3 | 11/2014 |

Name of Airman (last, first, middle initial):
**PATTERSON, RODNEY SCOTT**

Type of Check:
FAR 135.293 ☐   FAR 135.297 ☐   FAR 135.299 ☒

Pilot Certificate Information:
Grade: **ATP**
Number: **2590908**

Medical Information: 
Date of Birth: **11/8/1967**
Date of Exam: **1/5/2017**
Class: **1 ⊥ ⊥**

Employed by: SKY ONE HOLDINGS, LLC
Based at (City, State): **BOCA RATON, FL**

Type Airplane (Make/Model): **BE40**

Name of Check Airman: **BRUCE L. FARROW**
Sig. of Check Airman: 

Flight Time: **0.5**
Registration Number: **N615KZ**

### FLIGHT MANEUVERS GRADE (S = Satisfactory   U = Unsatisfactory)

| PILOT | Ch 1 | T | Ch 2 | PILOT | Ch 1 | T | Ch 2 |
|---|---|---|---|---|---|---|---|
| **PREFLIGHT** | | | | **EMERGENCIES** | | | |
| 1. Equipment Examination (oral / written) | N/A | | | 20. Normal and Abnormal Procedures | N/A | | |
| 2. Preflight Inspection | S | | | 21. Emergency Procedures | N/A | | |
| 3. Taxiing | S | | | **INSTRUMENT PROCEDURES** | | | |
| 4. Powerplant Checks | N/A | | | 22. Area Departures | S | | |
| **TAKEOFFS** | | | | 23. Holding | N/A | | |
| 5. Normal | S | | | 24. Area Arrival | S | | |
| 6. Instrument | S | | | 25. All Engine ILS Approach | S | | |
| 7. Crosswind | S | | | 26. Other Instrument Approaches | — | | |
| 8. With Simulated Powerplant Failure | N/A | | | Approaches: NDB / ADF | N/A | | |
| 9. Rejected Takeoff | N/A | | | VOR | | | |
| **INFLIGHT MANEUVERS** | | | | Single Engine ILS | | | |
| 10. Steep Turns | N/A | | | GPS | S | | |
| 11. Approaches to Stalls | | | | 27. Circling Approaches | N/A | | |
| 12. Specific Inflight Characteristics | | | | 28. Missed Approaches | N/A | | |
| 13. Powerplant Failure | | | | 29. Comm / Nav Procedures | S | | |
| **LANDINGS** | | | | 30. Use of Autopilot | S | | |
| 14. Normal | S | | | **GENERAL** | | | |
| 15. From an ILS | S | | | 31. Judgment | S | | |
| 16. Crosswind | S | | | 32. Crew Coordination | S | | |
| 17. With Simulated Powerplant Failure | N/A | | | **AIRMAN'S COMPETENCY INFORMATION** | | | |
| 18. Rejected Landing | | | | Demonstrated Current Knowledge FAR 135.293(a) Make / Model Expires | 12 Months | | |
| 19. From Circling Approach | | | | Demonstrated Current Knowledge FAR 135.293(b) Make / Model Expires | 12 Months | | |

| REMARKS: | Satisfactory Demonstrated Line Check FAR 135.299 Expires **FEB. 2018** | 12 Months |
| | Satisfactory Demonstrated IFR Proficiency FAR 123.297 Expires | 6 Months |
| | Use of Autopilot (is) (is not) Authorized | 12 Months |
| | Right Seat Demo: | |

| RESULT OF CHECK: | ☒ Approved  ☐ Disapproved | CHECK AIRMAN'S PERFORMANCE (FAA Only): | ☐ Satisfactory  ☐ Unsatisfactory |
| REGION: | DISTRICT OFFICE: | FAA INSPECTOR'S SIGNATURE: | |

Patterson_00412



21A-OF-014
REV: 2
07/17/2017

## PILOT PROFICIENCY CHECK

| PILOT'S NAME (Last, First, MI) Patterson, Rodney S | EMP# 21063 | POS CA | AIRCRAFT B767 |
|---|---|---|---|

| PILOT CERT #: 2590908 | CERTIFICATE TYPE ■ ATP ☐ COMM | MEDICAL EXPIRATION 02/28/2019 | MEDICAL CLASS ■ FIRST ☐ SECOND |
|---|---|---|---|

| SIM LOC PAIFA | SIM NO #4-031 | DATE 09/05/2018 | BLOCK TIME 02:00 |
|---|---|---|---|

| TYPE OF CHECK | ☐ INITIAL (No events can be waived)    ☐ RIGHT SEAT TASK ☒ RECURRENT    ☐ REQUALIFICATION ☐ TRANSITION    ☐ PROFICIENCY WATCH ☐ UPGRADE    ☐ QAP |
|---|---|

GRADING:   **S** = SATISFACTORY   **U** = UNSATISFACTORY (REQUIRES COMMENT)   **NA** = NOT APPLICABLE   **(W)** = CAN BE WAIVED   **W** = WAIVED

| PREFLIGHT | | | 17.  Missed Approach* (Other_____) | S |
|---|---|---|---|---|
| 1.  Oral Exam | | S | **INFLIGHT MANEUVERS** | |
| 2.  Preflight Inspection   ■ Pictorial | | S | 18.  Steep Turns (PIC) | S |
| 3.  Starts Normal / Abnormal | | S | 19.  Approaches To Stalls 2 of 3(**W**)(one must be in a turn) | — — |
| 4.  Taxiing / Runway Awareness | | S | ☐ Level Off | S |
| 5.  Power Plant Checks | | S | ■ Turning Base | S |
| **TAKEOFF** | | | ■ ILS Final Approach | S |
| 6.  Normal | | S | 20.  Flight Deck Communication Procedure | S |
| 7.  Instrument          (RVR 500 with 100' Ceiling) | | S | 21.  Engine Failure | S |
| 8.  Crosswind          (Note 6 & 8 May Be Combined) | | S | **LANDING** | |
| 9.  Engine Failure After V$_1$ | | S | 22.  Normal | S |
| 10. Rejected Take-Off | | S | 23.  From ILS | S |
| **INSTRUMENT PROCEDURES** | | | 24.  Crosswind (may be combined with 22 or 23) | S |
| 11.  Area Departure and Arrival (One Required) | | | 25.  Engine Out Landing | S |
| ■ Area Departure | | S | 26.  Rejected (50' AFE) | S |
| ☐ Area Arrival | | S | **PROCEDURES** | |
| 12.  Holding | | S | 27.  Normal | S |
| 13.  Precision Approaches | | | 28.  Non-normal | S |
| Normal ILS (100'& RVR 1800) | | S | 29.  Emergency | S |
| Engine Out ILS (Manual) | | S | **WINDSHEAR (Recurrent Only)** | |
| 14. Non-Precision Approaches (Two Required, one using   VNAV) | | | 30.  Takeoff Prior To V$_1$ | NA |
| ■ VOR | | S | 31.  Takeoff After V$_R$ | NA |
| ■ LOC | | S | 32.  On Approach | NA |
| ☐ NDB | | NA | **OTHER** | |
| 15.  Circling Approach | | NA | 33.  Judgment | S |
| 16.  Missed Approach (ILS)* | | S | 34.  Crew Resource Management | S |

REMARKS:

| Overall Performance   ■ Satisfactory   ☐ Unsatisfactory | Student Signature |
|---|---|

**I CERTIFY THAT THE ABOVE TRAINING WAS ADMINISTERED AS INDICATED AND THE OVERALL PERFORMANCE WAS AS SHOWN.**

| CHECK PILOT NAME Wilhoit, James R | EMP # 21005 | FAA OR COMPANY OBSERVER NAME | ID # |
|---|---|---|---|
| CHECK PILOT SIGNATURE | | FAA OR COMPANY OBSERVER SIGNATURE | |

### Completion Certified by the Chief Pilot / Director of Operations

| NAME (Last, First, Mi) | SIGNATURE | DATE |
|---|---|---|

*One complete approved missed approach procedure required

21A-OF-049
REV: 2
07/17/2017

## RIGHT SEAT DEPENDENT TRAINING

| PILOT'S NAME (Last, First, MI) **Patterson, Rodney S** | EMP # **21063** | POS **CA** | | AIRCRAFT **B767** |
|---|---|---|---|---|

| PILOT CERT # **2590908** | CERTIFICATE TYPE ☑ ATP  ☐ COMM | MEDICAL EXPIRATION **02/28/2019** | MEDICAL CLASS ☑ FIRST  ☐ SECOND |
|---|---|---|---|

| SIM LOC **PAIFA** | SIM NO **#4-031** | DATE **10/23/2018** | BLOCK TIME **00:25** |
|---|---|---|---|

GRADING:  **S** = SATISFACTORY   **U** = UNSATISFACTORY (REQUIRES COMMENT)   **NA** = NOT APPLICABLE   **(W)** = CAN BE WAIVED   **W** = WAIVED

| PREFLIGHT | |
|---|---|
| 1.   Preliminary Preflight Procedures | S |
| 2.   Amplified Preflight - First Officer | S |
| 3.   Normal and Abnormal engine starts | S |
| 4.   After start procedures | S |
| 5.   Taxi procedures | S |
| 6.   Before Takeoff procedures and checklist | S |
| 7.   Pre-takeoff procedures and checks | S |
| **TAKEOFF** | |
| 8.   Rejected takeoff | S |
| 9.   Normal takeoff | S |
| 10.  Loss of critical engine after V1 | S |
| **LANDING** | |
| 11.  1-engine ILS Approach and Landing | S |
| 12.  After landing procedure and checklist | S |
| 13.  Shutdown procedure and checklist | S |

REMARKS:

| Overall Performance  ☑ Satisfactory   ☐ Unsatisfactory | Student Signature |
|---|---|

**I CERTIFY THAT THE ABOVE TRAINING WAS ADMINISTERED AS INDICATED AND THE OVERALL PERFORMANCE WAS AS SHOWN.**

| CHECK PILOT NAME **Wilhoit, James R** | EMP # **21005** | FAA OBSERVER NAME | FAA ID # |
|---|---|---|---|
| CHECK PILOT SIGNATURE | | FAA OBSERVER SIGNATURE | |

## Completion Certified by the Chief Pilot/ Director of Operations

| NAME (Last, First, Mi) **Nunez Juan P.** | SIGNATURE | DATE |
|---|---|---|



21A-OF-017
REV: 2
07/17/2017

## PILOT LINE CHECK

| PILOT'S NAME: (Last, First, MI) Patterson, Rodney S | EMP #: 21063 | POSITION ☑CPT ☐FO | AIRCRAFT MODEL B767 | DATE: 11/01/2018 |
|---|---|---|---|---|

| PILOT CERT #: 2590908 | CERTIFICATE TYPE ☑ATP ☐COMM | MEDICAL EXPIRATION (M/Y): Feb2019 | MEDICAL CLASS ☑FIRST ☐SECOND |
|---|---|---|---|

| AIRCRAFT REG: N999YV | FROM: KPHL | TO: KMIA | NO OF LANDINGS: 1 | BLOCK TIME: 2:24 |
|---|---|---|---|---|

**TYPE OF CHECK:**  ☐ INITIAL  ☐UPGRADE ☐TRANSITION  ☑RECURRENT  ☐ROUTE  ☐QAP  ☐PWP

**GRADING:  S = SATISFACTORY    U = UNSATISFACTORY (REQUIRES COMMENT)    NA = NOT APPLICABLE  (W) = CAN BE WAIVED   W = WAIVED**

| PERSONAL ITEMS | | 21. Route Changes | S |
|---|---|---|---|
| 1. Uniform Appearance | S | - FMS Data Entry/Crosscheck | S |
| 2. Manuals / Flight Materials | S | -Verify Changes on Flt Plan | S |
| 3. License and Medical | S | **DESCENT/APPROACH /LDG** | |
| **PREFLIGHT** | | 22. Descent Planning | S |
| 4. Flight Planning | S | 23. Altitude/Speed Control | S |
| 5. Forms / Logbook | S | 24. Aircraft Configuration | S |
| 6. Exterior/Interior Inspection | S | 25. Altitude/Airspeed Control | S |
| 7. Performance Computations | S | 26. Holding Procedures | |
| 8. Weight & Balance | S | 27. Approach Compliance | S |
| 9. Computer Flight Plan Checked | S | 28. Stabilized Approach | S |
| **BEFORE TAKEOFF** | | 29. Pilot Flying  ☑PIC  ☐FO | S |
| 10. Engine Start / Taxi Procedures | S | 30. Type Appr.  ☑IFR  ☐VFR | S |
| 11. Clearance & Briefing | S | 31. Missed Approach | NA |
| 12. Taxi, Pre T/O, RWY Awareness | S | 32. Landing | S |
| **DEPARTURE** | | 33. Crew Coordination | S |
| 13. Takeoff Procedures | S | 34. Use of Checklists | S |
| 14. Takeoff Profile | S | 35. Flight Management / CRM | S |
| 15. Departure / SID Compliance | S | 36. Judgment | S |
| **ENROUTE / CRUISE** | | **MISCELLANEOUS** | |
| 16. Adherence to Clearance | S | 37. *Accuracy Checks / Recording | NA |
| 17. Use of NAV Aids | S | 38. International Flight Planning | NA |
| 18. En-route Radar Procedures | S | 39. HLA Operations | NA |
| 19. Cruise Procedures | S | 40. Overwater Operations | NA |
| - Manual Entries | S | 41. *Contingency Procedures in HLA Airspace | NA |
| - Fuel / Time Update | S | * Items may be briefed | |
| 20. Communication Procedures | s | | |

| OVERALL PERFORMANCE | ☑SATISFACTORY ☐UNSATISFACTORY | STUDENT SIGNATURE: | _RPR_ |
|---|---|---|---|

**I CERTIFY THAT THE ABOVE TRAINING WAS ADMINISTERED AS INDICATED AND THE OVERALL PERFORMANCE WAS AS SHOWN.**

| CHECK PILOT NAME (Print): Wilhoit, James R | EMP #: 21005 | FAA OR COMPANY OBSERVER NAME: | | ID #: |
|---|---|---|---|---|
| CHECK PILOT SIGNATURE: _JRWilhoit_ | | FAA OR COMPANY OBSERVER SIGNATURE: | | |

**Completion Certified by the Chief Pilot/ Director of Operations**

| NAME(PRINT): Nunez, Juan P | SIGNATURE _Juan_ | DATE: 11/02/2018 |
|---|---|---|

# **<u>EXHIBIT 8</u>**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES P. SCANLAN, on behalf of
himself and all others similarly situated,

            Plaintiff,

-vs.-

AMERICAN AIRLINES GROUP, INC.,
and AMERICAN AIRLINES, INC.,

            Defendants.

Civil Action No. 2:18-cv-04040-HB

## DEFENDANTS MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO TRANSFER VENUE

O'MELVENY & MYERS LLP
Mark Robertson, Esq. (*admitted pro hac vice*)
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
mrobertson@omm.com

DRINKER BIDDLE & REATH LLP
Kenneth A. Murphy
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
kenneth.murphy@dbr.com

*Attorneys for Defendants American Airlines*
*Group Inc. and American Airlines, Inc.*

Pursuant to 28 U.S.C. § 1404(a), Defendants American Airlines Group Inc. ("AAG") and American Airlines, Inc. ("American") (collectively "Defendants") respectfully request that this Court transfer this action to the United States District Court for the Northern District of Texas, Fort Worth Division ("N.D. Texas").

## **INTRODUCTION**

This is a putative class action against an airline and its parent corporation—both headquartered in Fort Worth, Texas.  The putative nationwide class members include all employees of American who have taken military leaves over the last several years and did not receive certain benefits and wages during those leaves, which Plaintiff alleges he and the putative class are entitled to under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA").

Multiple courts have recognized the appropriateness of transferring putative nationwide class actions asserting USERRA claims against airlines to the district where the airline's headquarters are located.  *See Carder v. Continental Airlines, Inc.*, No. 3:09-cv-01448-DMS-BLM [ECF 23] (S.D. Cal. Sept. 28, 2009); *Duffer v. United Continental Holdings, Inc.*, No. 3:13-cv-00318 [ECF No. 40] (S.D. Cal. May 2, 2013); *Hoefert v. American Airlines Inc.*, 2018 WL 2740276 (D. Ariz. June 7, 2018).  In each of these cases, the plaintiffs sued the defendant airline seeking to recover benefits under USERRA on behalf of pilots who had taken military leave.  And in each case, the court concluded that the convenience of the parties and witnesses and access to evidence relevant to the pilots' claims favored transfer to the district where the airline had its headquarters.

The facts and circumstances that favored transfer in the above cases, however—which only involved pilots—are magnified tenfold in this case because the proposed putative class here

includes not just pilots, but *all* employees at American—e.g., flight attendants, mechanics, baggage handlers, customer service representatives, administrative employees, and a myriad of other employee groups.

Defendants' headquarters in Fort Worth, Texas, are plainly the center of relevant events in this case. Plaintiff's claims involve the administration of a profit-sharing plan and military and other leaves for all American employees. All of the departments responsible for the administration of the profit-sharing plan and the relevant leaves are based in Fort Worth. Likewise, virtually all American employees (and at least one former American employee) responsible for overseeing the administration of the profit-sharing plan and leaves who have knowledge and information potentially relevant and necessary to resolve the dispute are located in Fort Worth. And the related documents necessary to resolve the dispute are also located in Fort Worth. Finally, the N.D. Texas is already handling the pending *Hoefert* action—transferred from the District of Arizona in 2018. *Hoefert*, a putative class action filed against American, involves similar USERRA claims on behalf of pilots and therefore involves certain of the same facts and issues regarding those pilots' military and other leaves—as well as some of the same putative class members.

When considered in light of the factors relevant to transfer under section 1404(a), these facts, as detailed below, demonstrate conclusively that this matter should be transferred to the N.D. Texas.

## STATEMENT OF RELEVANT FACTS

### The Parties

Both Defendants are incorporated in Delaware and maintain their headquarters in Fort

Worth, Texas.[1]  AAG is a holding company with no employees, and American (along with

certain other air carriers) is a wholly owned subsidiary of AAG.  *See* Annual Form 10-K.

Plaintiff James P. Scanlan is employed as an American pilot and has been based out of

LaGuardia Airport in New York, New York since 2009.  (Decl. of Todd F. Jewett in Support of

Defs. Mot. to Transfer Venue ("Decl.") ¶ 7.)  Plaintiff seeks to represent two putative classes:

- Current and former participants under the AAG Global Profit Sharing Plan (the "Plan") who did not receive credit for military service absences for awards under the Plan from January 1, 2016 through date of judgment of this action.  (Am. Compl. ¶ 13.)

- Current and former American employees who took "short term military leave" and were not paid the difference between the pay they received from the military and what they would have been paid by American for working from January 1, 2013 through the date of judgment of this action.  (*Id.* ¶ 14.)

### AAG Global Profit Sharing Plan

The Plan rewards eligible employees for their efforts in helping achieve AAG's strategic,

financial, and operating objectives by providing those employees with an opportunity to share in

AAG's profits for each Plan year.  (Decl. ¶ 4.)  American's Executive Compensation

Department, based in Fort Worth, currently administers the Plan.  (*Id.* ¶ 5.)  Employees in that

department have knowledge and information relevant to how the Plan calculates benefits and

how the Plan credits time away from work spent on military and other leaves—which forms the

basis of Plaintiff's claims related to the Plan.  (*See id.*; Am. Compl. ¶¶ 72-93.)

---

[1]  *See* Annual Form 10-K, American Airlines Group Inc. and American Airlines, Inc., at 1-2 (Feb. 16, 2018), https://www.sec.gov/Archives/edgar/data/4515/000119312517051216/d286458d10k.htm ("Annual Form 10-K").

### American's Workforce and Leave Policies

As of December 31, 2018, American employed approximately 112,700 employees—of those, only approximately 6.6% work in Philadelphia ("PHL") and 24.3% work in Dallas/Fort Worth ("DFW"). (Decl. ¶ 6.)  Based on Defendants' preliminary investigation, over 1,000 American employees have taken military leave since January 1, 2013. (*Id.* ¶ 10.)[2]

Over 70% of American's workforce is unionized, and those employees are covered by one of 13 collective bargaining agreements ("CBAs"). (*Id.* ¶ 11.)  These CBAs, as well as American's leave policies, govern military leaves as well as the jury duty, paid sick, and union service absences that are at issue based on Plaintiff's allegations.  The administration of American's CBAs and policies includes interpreting and applying them, which in turn requires knowledge of the union and/or company's past practices, which in certain instances may not be addressed by the plain language of a CBA or policy. (*Id.* ¶¶ 13, 16.)  The departments and employees responsible for administering American's CBAs and policies—which vary by employee group—are virtually all based in Fort Worth. (*See id.* ¶¶ 12-13, 16.)

### ARGUMENT

"In considering a motion to transfer a civil action to another federal district, the applicable legal standard is the convenience of the parties and witnesses, in the interest of justice." *WellPet, LLC v. Midwestern Pet Foods, Inc.*, 2009 WL 5111790, at *1 (M.D. Pa. Dec.

---

[2] While American maintains a hub in PHL, several of the employee groups included in Plaintiff's proposed class have no employees at all based in PHL.  For example, there are no dispatchers, plant maintenance mechanics, flight simulator instructors, technicians, or engineers in PHL. (Decl. ¶ 8.)  Moreover, based on a preliminary investigation, the largest number of most employee groups is in DFW.  For example, as of December 31, 2018, of American's 19,204 non-unionized management and support staff employees, 9,840 work in DFW and only 340 work in PHL. (*Id.* ¶ 9.)

16, 2009).[3]  In applying this standard, the Court must "consider all relevant factors to determine

whether on balance the litigation would more conveniently proceed, and the interests of justice

be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873,

879 (3d Cir. 1995).  The Court has discretion "to adjudicate motions for transfer according to an

individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v.*

*Ricoh Corp.*, 487 U.S. 22, 29 (1988).

Because it is indisputable that, under 28 U.S.C. § 1391, this action could have been

brought in the N.D. Texas where Defendants have their principal place of business, the only

issue is whether the convenience of the parties and witnesses and the interest of justice favor

transfer.

**I.    The Relevant Factors Favor Transferring This Action to the N.D. Texas.**

Courts in the Third Circuit typically consider several private and public interest factors

when determining whether transfer is appropriate. *Jumara*, 55 F.3d at 879.  However, "[n]ot all

factors will apply in a given case, and the court may address other considerations if

pertinent." *Wise v. Williams*, 2011 WL 2446303, at *10 (M.D. Pa. May 18, 2011).

The public interest factors include the (1) "enforceability of the judgment;" (2) "the

relative administrative difficulty in the two fora resulting from court congestion;" (3) "the local

interest in deciding local controversies at home;" (4) "the public policies of the fora;" and (5)

"the familiarity of the trial judge with the applicable state law in diversity cases." *Blanken v.*

*Kentucky Highlands Inv. Corp.*, 2014 WL 4988280, at *2 (M.D. Pa. Oct. 7, 2014).  Courts also

consider judicial economy in the public interest, including whether the case to be transferred

---

[3] Unless otherwise stated, Defendants have omitted all internal quotation marks and citations
from quoted material.

"involve[s] the same or similar issues and parties" as a case in the transferee district. *In re: Howmedica Osteonics Corp.*, 867 F.3d 390, 402 (3d Cir. 2017).[4]

The private interest factors that courts consider include the (1) "plaintiff's forum preference as manifested in the original choice;" (2) "the defendant's preference;" (3) "whether the claim arose elsewhere;" (4) "the convenience of the parties as indicated by their relative physical and financial condition;" (5) "the convenience of the witnesses;" and (6) "the location of books and records." *Id.* (citing 28 U.S.C. § 1404(a).) Courts are also "required to assess all practical considerations that could make the trial easy, expeditious, or inexpensive." *Blanken*, 2014 WL 4988280, at *3.

Transfer is appropriate here because, in a proposed nationwide class action, the plaintiff's choice of forum is entitled to minimal deference, and several other key factors favor transfer, including the convenience of the parties and witnesses and judicial economy and practical considerations. *See, e.g., Huang v. Sonus Networks, Inc.*, 2016 WL 1090436, at *3 (D.N.J. Mar.

---

[4] Because this action involves a USERRA claim under federal law, "most of the public factors are irrelevant or invalid." *See Robertson v. Pfizer Ret. Comm.*, 2018 WL 3618248, at *9 (E.D. Pa. July 27, 2018). First, "the enforceability of the judgment" is "largely irrelevant . . . because a federal statute is at issue and because the judgment would be enforceable in either district." *Id.* Second, because there is no "appreciable difference in docket congestion between the two districts," administrative difficulty due to court congestion is a neutral factor. *See Jumara*, 55 F.3d at 879, 883; Fed. Ct. Mgmt. Statistics–Profiles, U.S. Courts (June 30, 2017), http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0331.2017.pdf (reporting that, as of March 2017, the median time from filing to disposition of a civil case was 5.7 months in this Court and 7.1 months in N.D. Texas, and the median time from filing to civil trial was 20.7 months in this Court and 20.5 months in N.D. Texas). Third, there is no "local interest" in deciding this controversy because "[t]he allegations of this case . . . are national in character and involve conduct affecting [employees] in all states." *See Stephen L. LaFrance Holding Inc. v. Nat'l Milk Producers Fed'n*, 2012 WL 3104837, at *5 (E.D. Pa. July 31, 2012). Fourth, "since this is a [USERRA] case implicating federal law and policy . . . [the public policy] factor is largely irrelevant." *Mitek Sys., Inc. v. United Servs. Auto. Ass'n*, 2012 WL 3777423, at *8 (D. Del. Aug. 30, 2012). Fifth, for the same reasons, "judges in both districts should be familiar with the applicable law." *See Aetna Inc. v. People's Choice Hosp., LLC*, 2018 WL 1287491, at *4 (E.D. Pa. Mar. 13, 2018).

21, 2016) (granting transfer where "all of the private interest factors are either neutral or weigh

in favor of transfer"); *see also Carder*, No. 3:09-cv-01448 [ECF No. 24] (transferring nationwide

USERRA class action to airline's headquarters where plaintiff's choice of forum carried little

weight and convenience of parties and witnesses and ease of access to evidence favored

transfer); *Duffer*, No. 3:13-cv-00318 [ECF No. 40] (transferring nationwide USERRA class

action to district where airlines' headquarters, documentary evidence, and many witnesses

relevant to case were located); *Hoefert*, 2018 WL 2740276, at *3 (transferring nationwide

USERRA class action to district of American's headquarters where relevant witnesses and

documents were located in Texas and prior litigation meant N.D. Texas was familiar with legal

and factual background of case).

### A. Plaintiff's Choice of Forum Should Be Afforded Minimal Deference, While Defendants' Preference Favors Transfer.

"[A]s dictated by the United States Supreme Court, the choice of forum of a named

plaintiff in a class action suit should be given less deference since any member of the putative

class could potentially bring suit in his or her own forum." *Smith v. HireRight Sols., Inc.*, 2010

WL 2270541, at *3 (E.D. Pa. June 7, 2010); *see also Hoefert*, 2018 WL 2740276, at *1

(plaintiff's choice of forum given less deference when case is filed as a putative nationwide class

action). Affording Plaintiff's choice of forum minimal deference here is particularly appropriate

because this is an action on behalf of a nationwide class of potentially several thousand members

(the vast majority of whom are not based in Pennsylvania, while many are based in Texas), and

Plaintiff's relationship with American is in New York. (*See* Decl. ¶ 7.) Thus, any claim by

Plaintiff that this is the appropriate forum because it is his home state "is considerably

weakened." *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947) (finding

deference to plaintiff's chosen forum considerably weaken where there were "hundreds of

7

potential plaintiffs"); *see also Klingensmith v. Paradise Shops, Inc.*, 2007 WL 2071677, at *2

(W.D. Pa. July 17, 2007) ("[Plaintiffs'] choice of forum is entitled to even less deference here

where the [Defendant's businesses] are located nationwide.  There is every expectation that there

will be more plaintiffs residing outside of Pennsylvania than within and that more causes of

action will have arisen outside of Pennsylvania than within.").  "In contrast . . . Defendants'

preference to litigate in [Texas] weighs in favor of transfer, as all the Defendants are located in

that state."  *Huang*, 2016 WL 1090436, at *2.  Thus, in this case, the parties' preferences weigh

in favor of transfer.

### B.  The Convenience of the Parties Favors Transfer.

Defendants' headquarters are in Fort Worth.  Virtually all American employees with

knowledge and information relevant to this litigation who would potentially be needed for

discovery—as well as documentary evidence subject to discovery—are in Fort Worth.  (*See*

Decl. ¶¶ 13-17.)  As such, "the convenience of the parties and the witnesses, weigh . . . in favor

of transfer because [Defendants'] headquarters are located in the Northern District of [Texas]

and the majority of operative events occurred in that district."  *Jackson v. Equifax Info. Servs.,*

*LLC*, 2014 WL 808090, at *4 (M.D. Pa. Feb. 28, 2014).

In contrast, Plaintiff is only one person, and any inconvenience resulting from his

involvement in the litigation would be less than the inconvenience to Defendants.  *Maxtak*

*Capital Advisors LLC v. ParkerVision, Inc.*, 2012 WL 4673244, at *5 (D.N.J. Oct. 1, 2012)

(noting "although both parties would experience some level of inconvenience regardless of

which forum is ultimately chosen, the greater burden would fall upon Defendants, whose

directors, officers and employees with knowledge pertinent to this lawsuit are located in Florida

[headquarters]").

## C. The Convenience of the Witnesses Favors Transfer.

"[T]he convenience of witnesses, perhaps the most important factor, weighs heavily in favor of transfer." *Headon v. Colorado Boys Ranch*, 2005 WL 1126962, at *7 (E.D. Pa. May 5, 2005); *see also Hoefert*, 2018 WL 2740276, at *2 (same). Based on Defendants' preliminary investigation, virtually all American employees who are potential witnesses (other than Plaintiff)—including those whose testimony may be required to resolve this litigation—are based in Fort Worth.

Plaintiff seeks to represent all current and former Plan participants and all current and former American employees who took military leave. Plaintiff challenges policies under the Plan and American's policies governing military and other absences for all American employees. The Executive Compensation Department responsible for administering the Plan is based in Fort Worth. (Decl. ¶ 5.) With respect to administering military and other leaves of absence, American's workforce includes six general categories of unionized employees (i.e., Pilots, Flight Attendants, Customer Service, Mechanics/Maintenance Technicians, Fleet Service employees, and Dispatch) covered by one of 13 CBAs, as well as non-union management and support staff. (*See id.* ¶ 11.) The administration of military and other leaves across all of these groups involves several departments, including Labor Relations, Flight, Flight Service, Crew Planning, Workforce Administration, the Absence and Return Center, People, and Compensation. And every single one of these departments are based in Fort Worth. (*See id.* ¶¶ 13, 16.) Knowledge and information from several employees across these departments may therefore be necessary to resolve Plaintiff's claims involving military and other leave policies for the last six years. Based on a preliminary investigation, this includes Patricia Herrera (Director, Executive Compensation); Sue Kalosa (Manager, Flight Administration), Cheryl Scardis (Manager, Flight

Service Center & Field Support), Rick Carpenter (Manager, Flight Service Administration),

Sophie Nwaefulu (Senior Manager, Workforce Administration), and Anthony Giandiletti

(Manager, Absence and Return Center).  (*See* Decl. ¶ 5, 17.)

Moreover, knowledge and information from at least four employees in American's Labor

Relations Department may also be required because they are each involved in the administration

of a subset of the applicable CBAs. (*See id.* ¶ 14.)  Based on a preliminary investigation, this

includes Todd Jewett (Managing Director, Labor Relations – Flight), Cindi Simone (Managing

Director, Labor Relations – Inflight), Lynn Vaughn (Managing Director, Labor Relations –

Customer Service), James B. Weel (Managing Director, Labor Relations – Technical

Operations).  (*Id.*)

Additionally, Scott Hansen, American's former Director, Flight Administration, who is

no longer an employee, has essential knowledge on the administration of leaves of absence for

pilots over the past six years.  (*See id.* ¶ 18.)

All of these potential witnesses are located in the Fort Worth area and would be

inconvenienced by having to appear at trial in Philadelphia. *See Headon*, 2005 WL 1126962, at

*7 (convenience of witnesses favored transfer given "most, if not all, of the fact-witnesses

concerning the broad array of allegations in the complaint reside in [transferee] district.");

*Hoefert*, 2018 WL 2740276, at *3 (transferring action to Texas when American "identified

approximately four other witnesses who . . . are based in Fort Worth, Texas"); *Duffer*, No. 3:13-

cv-00318 [ECF No. 40] at 8 (location of "many of the witnesses whose testimony would be

relevant" favored transfer from California to Illinois, even though specific witnesses were not yet

identified).

Moreover, Plaintiff brings his claims on behalf of a nationwide class with potentially thousands of members, all of whom are also potential witnesses and have an interest in this litigation. (*See* Am. Compl. ¶¶ 1, 13, 14; Decl. ¶ 10.) While a small percentage of potential class members work in PHL, many more work in Fort Worth, making Fort Worth more easily accessible for more potential class members who may be called as witnesses. (*See* Decl. ¶¶ 6, 8-9.) The N.D. Texas is thus the more convenient forum for Plaintiff's putative class. *See Henderson v. HireRight Sols., Inc.*, 2010 WL 2349661, at *4 (E.D. Pa. June 7, 2010) ("Given that this case is brought as a nationwide class action, there could conceivably be similar local witnesses hailing from all fifty states, who could present relevant testimony. Nothing in the Complaint makes the testimony of the Pennsylvania witnesses of greater import than that of the other states' witnesses."); *Hoefert*, 2018 WL 2740276, at *3 (finding "the potential quantity and quality of the testimony of Texas-based witnesses outweighs that of the [transferor district]-based witnesses" warranted transfer).

### D.   The N.D. Texas Is Familiar with the Legal Claims and Relevant Facts, which Favors Transfer.

"[P]ublic interests . . . include judicial economy considerations, [that] support having the two actions in the same district (through transfer) when the two cases are in different courts but involve the same or similar issues and parties." *Howmedica*, 867 F.3d at 402. Although federal courts in both forums "should be familiar with the applicable law," the N.D. Texas is also familiar with certain relevant facts because they are the same or similar to certain facts at issue in *Hoefert v. American Airlines. See Aetna Inc.*, 2018 WL 1287491, at *4. *Hoefert* is a USERRA class action originally filed in the District of Arizona, which that court transferred on June 7, 2018 to the N.D. Texas where it is currently pending. *Hoefert*, 2018 WL 2740276, at *1. Similar to Plaintiff here, the *Hoefert* plaintiff alleges that, under USERRA section 4316(b),

11

American employees (specifically, pilots) are entitled to certain benefits (specifically, vacation and sick accrual and certain bonus payments) while on military leave because those benefits are allegedly provided to employees during jury duty, sick, and union service absences. *Id.* Certain of the CBAs and company policies relevant to litigating the *Hoefert* claims are thus the same or similar as those relevant to litigating Plaintiff's claims with respect to American pilots. Thus, "transferring this case to the Northern District of Texas will allow for courts that already have familiarity with similar matters to address this case efficiently." *Hoefert*, 2018 WL 2740276, at *3. Additionally, as the District of Arizona found, the N.D. Texas is familiar with certain legal claims and relevant facts because they are the same or similar as in a prior USERRA class action brought on behalf of American's pilots, *Woodall v. American Airlines, Inc*, No. 3:06-cv-00072-M (N.D. Tex.). *See Hoefert*, 2018 WL 2740276, at *3. The N.D. Texas's familiarity with issues and facts in this case based on the *Hoefert* and *Woodall* litigation thus supports transfer.

### E.  The Location of Books and Records.

The vast majority of relevant documents in this case are located at American's Fort Worth headquarters. For example, any hard copy notes or records related to collective bargaining negotiations are maintained by the Labor Relations Department in Fort Worth. (Decl. ¶ 15.) Moreover, even if documents can be "transmitted to the [Eastern] District of [Pennsylvania] with minimal expense . . . it will be less expensive to produce the relevant documents in the Northern District of Texas." *Hoefert*, 2018 WL 2740276, at *3. While technology has made it possible to store and transmit documents electronically, the location of American's documentary evidence is still relevant to the transfer analysis. *Id.* And "[s]ince the majority of relevant documents in this case are located at [American's] headquarters and facilities in the Northern District of [Texas], and it does not appear that such records cannot

be produced in [Pennsylvania], this factor weighs minimally in favor of transfer." *Illumina, Inc.*

*v. Complete Genomics, Inc.*, 2010 WL 4818083, at *5 (D. Del. Nov. 9, 2010).

### F.   Practical Considerations Related to Easy, Expeditious, and Inexpensive Trial Favor Transfer.

"[P]ractical considerations relating to efficiency support this action being transferred to

the Northern District of [Texas].  In particular, the witnesses and documents relevant to

[Plaintiff's] claim are likely to be located in [Texas].  As such, trial in the Northern District of

[Texas] would likely be significantly easier and less expensive." *Jackson*, 2014 WL 808090, at

*4; *see also Hoefert*, 2018 WL 2740276, at *3 (transferring action to the location of American's

headquarters in Texas because it would be less expensive to produce relevant documents there).

Here, Fort Worth is the center of discovery—all of American's witnesses, who will be the vast

majority of witnesses in this case, are in the N.D. Texas, as is documentary evidence that will be

subject to discovery and the personnel who will be responsible for collecting such evidence.

When "the bulk of the evidence and witnesses who would provide most relevant testimony are

located in [Texas], it would be more expensive and burdensome to direct Defendants to haul all

of their evidence and witnesses to [Pennsylvania], even if Defendants may have the resources to

do so.  Rather, under this public factor, it would be less expensive and time consuming,

generally, if Plaintiff were to litigate [his] case in [Texas]." *Goldstein v. MGM Grand Hotel &*

*Casino*, 2015 WL 9918414, at *5 (D.N.J. Nov. 5, 2015).

### G.   Fort Worth is the Location Where Relevant Claims Arose Relating to Plaintiff's Cause of Action.

"Where plaintiff's cause of action arises from strategic policy decisions of a defendant

corporation, the defendant's headquarters can be considered the place where events giving rise to

the claim occurred." *Theresa Ayling v. Travelers Prop. Cas. Corp.*, 1999 WL 994403, at *5

(E.D. Pa. Oct. 28, 1999).  The relevant events here are the administration of the Plan and the

13

administration of military and other leaves for all American employees under the applicable

CBAs and other policies.  Because American's Executive Compensation, Labor Relations,

Flight, Flight Service, Crew Planning, Workforce Administration, the Absence and Return

Center, People, and Compensation Department employees in Fort Worth are responsible for this

administration, Fort Worth is the center of events at issue and where Plaintiffs' claims arose.

(*See* Decl. ¶¶ 5, 13, 16.)

      For this same reason, and because Plaintiff does not allege any specific connection

between the claims and the current forum (and indeed does not even work for American in PHL

but in New York), American's contacts with the N.D. Texas through the administration of the

Plan and employee leaves are the predominant contacts related to Plaintiff's claims.  (*See*

*generally* Am. Compl.); *see also Smith*, 2010 WL 2270541, at *4 (transfer warranted where

"Plaintiff, in this case, alleges no facts that would place the situs of the material events within the

Eastern District of Pennsylvania," and all documents that "form the basis for this suit originated

from a singular source—Defendant's place of business in [the transferee district]").

## CONCLUSION

      For these reasons, Defendants respectfully request that this Court transfer this action to

the N.D. Texas.

                      By: */s/ Mark W. Robertson*

                      Mark W. Robertson (*admitted pro hac vice*)
                      O'MELVENY & MYERS LLP
                      7 Times Square
                      New York, NY 10036
                      Telephone:  (212) 326-2000
                      Facsimile:  (212) 326-2061
                      mrobertson@omm.com

                      Kenneth A. Murphy
                      DRINKER BIDDLE & REATH LLP
                      One Logan Square, Suite 2000

Philadelphia, PA 19103
Telephone: (215) 988-2700
kenneth.murphy@dbr.com

*Attorneys for Defendants American Airlines*
*Group Inc. and American Airlines, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES P. SCANLAN                 :           CIVIL ACTION
                                 :
        v.                       :
                                 :
AMERICAN AIRLINES GROUP, INC.,   :           NO. 18-4040
et al.                           :

ORDER

        AND NOW, this 2nd day of April, 2019, for the reasons

set forth in the accompanying memorandum, it is hereby ORDERED

that the motion of defendants to transfer this action to the

United States District Court for the Northern District of Texas,

Fort Worth Division, pursuant to 28 U.S.C. § 1404(a) (Doc. # 21)

is DENIED.


                              BY THE COURT:


                              /s/ Harvey Bartle III
                                                        J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES P. SCANLAN on his own          :          CIVIL ACTION
behalf and all others similarly      :
situated                             :
                                     :
        v.                           :
                                     :
AMERICAN AIRLINES GROUP, INC.,       :          NO. 18-4040
et al.                               :

MEMORANDUM

Bartle, J.                                       April 2, 2019

        Plaintiff James P. Scanlan has brought this putative
class action against American Airlines Group, Inc. and its
wholly owned subsidiary, American Airlines, Inc. under the
Uniform Services Employment and Reemployment Rights Act
("USERRA") 38 U.S.C. §§ 4301 et seq.  Scanlan is an American
Airlines pilot and a Major General in the United States Air
Force Reserve.  He claims that he and others similarly situated
have not received what is due under the American Airlines Group
One Global Profit Sharing Plan.

        Defendants have now filed a motion to transfer venue
of this action to the United States District Court for the
Northern District of Texas pursuant to 28 U.S.C. § 1404(a).
This statute provides in relevant part

        For the convenience of parties and witnesses, in
        the interest of justice, a district court may

> transfer any civil action to any other district
> or division where it might have been brought or
> to any district or division to which all parties
> have consented.

28 U.S.C. § 1404(a).

> The USERRA has its own venue provision which reads
> In the case of an action against a private
> employer, the action may proceed in the United
> States district court for any district in which
> the private employer of the person maintains a
> place of business.

38 U.S.C. § 4323(c).

The parties have submitted declarations relevant to the venue issues, and the court has permitted limited discovery. Scanlan is a resident of Doylestown, which is located in the Eastern District of Pennsylvania. He generally flies as a pilot for American Airlines based out of LaGuardia Airport in New York. Both defendants are Delaware Corporations with their headquarters in Fort Worth, which is in the Northern District of Texas. Philadelphia, where this court sits, is one of defendants' ten "hubs." American Airlines, as the country's largest domestic airline with over 100,000 employees, has over 7,474 employees in this city and has between 7 and 9 daily non-stop flights each way between Philadelphia and Forth Worth, Texas. The Global Profit Sharing Plan in issue is administered in Fort Worth.

I

We begin with the undisputed fact that venue under USERRA's special venue provision is proper in both the Eastern District of Pennsylvania and the Northern District of Texas. Defendants maintain places of business in both Philadelphia and Forth Worth.

Once the court determines that venue is proper, it must determine whether "on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). "The burden of establishing the need for transfer . . . rests with the movant," and generally, "the plaintiff's choice of venue should not lightly be disturbed". Id. "Transfer is not to be liberally granted and should not occur unless the balance of convenience of the parties is strongly in favor of defendant." Edwards v. Equifax Information Services, LLC, 313 F.Supp. 3d 618, 622 (E.D. Pa. 2018) (citing Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970)).

In the Third Circuit, the contours for our analysis under § 1404(a) are set forth in Jumara, 55 F.3d at 879. While there is no definitive formula or list of factors for courts to consider in ruling on § 1404(a) motions, courts consider

variants of public and private interests protected by § 1404(a).
Id.

Private interest factors that we may consider include:
(1) plaintiff's forum preference as manifested by his original
choice; (2) the defendants' forum preference; (3) whether the
claim arose elsewhere; (4) the convenience of the parties as
indicated by their relative physical and financial condition;
(5) the convenience of the witnesses but only to the extent that
they may actually be unavailable for trial in one of the fora;
(6) the location of the books and records similarly limited to
the extent that the files could not be produced in the
alternative forum; and (7) practical considerations that could
make the trial easy, expeditious, or inexpensive.  Id.; see also
In re: Howmedica Osteonics Corp, 867 F.3d 390, 402, n. 7
(3d Cir. 2017), cert. denied sub nom. Nordyke v. Howmedica
Osteonics Corp., 138 S. Ct. 1288 (2018).

Public interest factors that we may consider include:
(1) the enforceability of the judgment; (2) court congestion of
the different fora; (3) local interest in deciding local
controversies at home; (4) public policies of the fora; and
(5) familiarity of the trial judge with the applicable law in
state diversity cases.  Jumara, 55 F.3d at 879.  These
considerations also support transferring an action to a district

-4-

when there is another action involving "the same or similar
issues and parties."  In re: Howmedica, 867 F.3d at 402.

<div align="center">II</div>

We will examine each relevant factor in turn,
beginning with the private factors.  We first consider the
preferred forum of the parties.  Plaintiff, of course, prefers
this district where the action was filed.  Defendants prefer the
Northern District of Texas and bear the burden of demonstrating
the need for a transfer.

The parties disagree over how much weight we should
afford plaintiff's forum preference.  Plaintiff's choice would
typically "not be lightly disturbed," especially considering
that he has chosen his home forum.  Jumara, 55 F.3d at 879;
Edwards, 313 F.Supp. 3d at 622.  However, the Supreme Court in
Koster v. (Am.) Lumbermens Mut. Cas. Co. stated that "where
there are hundreds of potential plaintiffs . . . the claim of
any one plaintiff that a forum is appropriate merely because it
is his home forum is considerably weakened."  330 U.S. 518, 524
(1947).  Koster involved a shareholders' derivative action, but
courts have since applied this reasoning to class actions.  Id.
at 519; see Smith v. HireRight Sols., Inc., 2010 WL 2270541, at
*3 (E.D. Pa. June 7, 2010); Howell v. Shaw Indus., 1993 WL
387901, at *3 (E.D. Pa. Oct. 1, 1993); Impervious Paint Indus.,
Ltd. v. Ashland Oil, Inc., 444 F.Supp. 465, 467 (E.D. Pa. 1978).

<div align="center">-5-</div>

Defendants contend that we therefore should afford little weight to plaintiff's preference.

Plaintiff counters that the special venue provision in USERRA affords greater weight to his forum choice.  Courts have held that liberally allowing transfers in cases with special venue provisions would undermine Congressional intent to minimize the burden on plaintiffs.  In re Laidlaw Sec. Litig., 1991 WL 170837, at *2 (E.D. Pa. Aug. 27, 1991).

Special venue provisions and class actions therefore cut in opposite directions over how much weight to afford the choice of plaintiff's home forum.  Both parties have identified cases where the courts have given more or less weight to plaintiff's preference in light of these competing considerations.  In Wellens v. Daiichi Sankyo Co., for example, the court weighed plaintiff's preferred forum choice more heavily that it normally would in a class action brought under Title VII because it has a special venue provision.  2013 WL 3242294, at *3 (N.D. Cal. June 25, 2013).  Similarly in In re Laidlaw, the court granted plaintiff's preferred forum choice greater deference than it otherwise would because the securities statute that gave rise to the cause of action contained a special venue provision, even though the plaintiff brought the case as a class action.  1991 WL 170837, at *2.  By contrast, the courts in Duffer v. United Cont'l Holdings, Inc., 2013 WL

-6-

2147802, at *2 (S.D. Cal. May 16, 2013) and <u>Carder v. Continental Airlines, Inc.</u>, No. 3:09-cv-01448-DMS-BLM, at *3 (S.D. Cal. Sept. 28, 2009) granted plaintiffs' forum choices little deference in USERRA cases brought as class actions.

In light of these different approaches, we will afford plaintiff's choice of his home forum in the presence of a special venue provision some weight, but not as much as we otherwise would because he brings his complaint as a class action.  In order to warrant transfer, defendants still bear the burden of demonstrating that the other factors, on balance, outweigh plaintiff's choice.

### III

The second private factor, the convenience of the parties when considering their "relative physical and financial condition," does not help defendants meet their burden.  If anything, it weighs in favor of remaining in this district.  The court acknowledges that defendants are headquartered in Fort Worth and would be at least somewhat inconvenienced by sending their employees to Philadelphia for a trial or other court proceedings.  However, plaintiff would be similarly inconvenienced by having to travel to the Northern District of Texas.  While designated as a class representative, plaintiff of course also has a personal interest in the litigation.  Since a jury trial has been demanded, it will be imperative for the jury

to see in the courtroom someone representing the class other than the lawyers, just as defendants will assuredly have their representatives present.  Transfer is not warranted when the effect would be to shift inconvenience from defendants to plaintiff.  Edwards, 313 F.Supp. 3d at 622.

Defendants' financial condition, compared to that of plaintiff, clearly allows them to afford more easily the inconveniences associated with travel.  Defendants are the nation's largest domestic airline and a Fortune 500 company with billions of dollars in assets.  They maintain a "hub" in Philadelphia with thousands of employees and operate 7 to 9 daily flights from Fort Worth to Philadelphia.  Defendants simply cannot maintain that inconvenience would be greater to them than to an individual plaintiff, notwithstanding that they may need to fly a number of individuals to this district.

IV

The third factor, the convenience of the witnesses, does not weigh in favor of transfer.  We are only required to consider the convenience of witnesses "to the extent that they may actually be unavailable for trial in one of the fora." Jumara, 55 F.3d at 879.  Though more witnesses may be located in Fort Worth than Philadelphia, there is no indication that any would be unavailable in the Eastern District of Pennsylvania. This factor therefore is neutral.

-8-

V

Defendants' argument regarding the location of books and records is similarly unpersuasive. While the relevant documents may be located in the Fort Worth, defendants do not suggest that any documents cannot easily be produced in Philadelphia. Moreover, technological advancements significantly reduce the weight of this factor as files can be easily reproduced and provided in electronic format. Coppola v. Ferrellgas, Inc., 250 F.R.D. 195, 200 (E.D. Pa. 2008).

VI

We next consider whether the claims arose elsewhere. Defendants argue that the claim arose in Fort Worth because plaintiff's cause of action arose from strategic policy decisions of defendants made at their headquarters in Fort Worth. Theresa Alying v. Travelers Prop. Cas. Corp., 1999 WL 994403, at *5 (E.D. Pa. Oct. 28, 1999). Plaintiff counters that his home forum of the Eastern District of Pennsylvania is where the claim arose because "a breach that results from plaintiffs being denied benefits occurs where the benefits are to be received." Keating v. Whitmore Mfg. Co., 981 F.Supp. 890, 892-893 (E.D. Pa. 1997). Because plaintiff brought this suit as a class action, the class members would suffer harm wherever they are located. Accordingly, we do not give much weight to this factor and consider it to be neutral.

-9-

VII

We now turn to the last private factor, "practical considerations that could make the trial easy, expeditious, or inexpensive."  Defendants assert that this factor weighs in favor of transfer because Fort Worth is the center of discovery with witnesses and documents.  We must be careful to not interpret this factor so as to "double count" any considerations that we made in the context of other factors.  Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., 2009 WL 3055300, at *5 (W.D. Pa. Sept. 21, 2009).  Because defendants only reiterate facts that we have already considered, this factor is neutral.

VIII

We next consider the public factors, most of which do not weigh heavily in our analysis.  Courts throughout our circuit have routinely acknowledged that "factors such as the enforceability of the judgment, public policies, and the familiarity of the trial judge with the applicable law are neutral here because the causes of action at issue arise under federal law."  Samsung SDI Co. v. Matsushita Elec. Indus. Co., 524 F.Supp. 2d 628, 633 (W.D. Pa. 2006), see also Carnegie Mellon Univ. v. Marvell Tech. Group Ltd., 2009 WL 3055300, at *5 (W.D. Pa Sept 21, 2009).

Court congestion weighs in favor of remaining in this district.  It has a slightly faster median time from filing to

-10-

disposition and from filing to trial.  Moreover, our district
has no "judicial emergencies" resulting from vacancies while the
Northern District of Texas has five vacancies considered
"judicial emergencies," including three vacancies of over three
years.  Perhaps most relevant, the undersigned, to whom the
matter is assigned, is current in his work.  There will be no
undue delay here.

<div align="center">IX</div>

Defendants contend that transfer is warranted because
this claim has "the same or similar issues and parties" as the
case of Hoefert v. Am. Airlines Inc., No. 4:18-CV-00466 (N.D.
Tex.) which is pending in the Northern District of Texas.  The
Hoefert litigation is a USERRA class action against American
Airlines and American Airlines Group, Inc. initially brought in
the District of Arizona.  Plaintiff claimed that pilots who were
out on military leave were not given certain benefits to which
they were entitled under several Collective Bargaining
Agreements.  The benefits of which they were allegedly deprived
included vacation and sick time accrual and eligibility to
participate in a monthly bonus program while others who were out
on other forms of leave did enjoy these benefits.  The Arizona
court transferred the case to the Northern District of Texas in
part because of Woodall v. Am. Airlines, Inc., 3:06-CV-00072
(N.D. Tex.), a similar USERRA class action regarding vacation

<div align="center">-11-</div>

and sick time accrual that had reached a settlement in 2008.
Hoefert v. Am. Airlines Inc., 2018 WL 2740276, at *3 (D. Ariz.
June 7, 2018).  The Woodall and Hoefert lawsuits therefore have
significant overlap, with the same American Airlines Inc.
defendant,[1] nearly identical classes, and many of the same causes
of action.

The Hoefert lawsuit and the present lawsuit are less
similar.  We first consider the parties.  While the defendants
are the same in both cases, the plaintiff classes have notable
differences.  Plaintiff in the present case seeks to represent
fellow employees who took military leave while participating in
the Global Profit Sharing Plan whose award under the Plan did
not include imputed earnings for periods of military leave.  By
contrast, plaintiff in Hoefert sought to represent 3 classes:
(1) all current and former pilots who did not accrue sick time
due to military absence between July 2012 and trial, (2) all
current and former pilots who did not accrue vacation time due
to military absence, and (3) all current and former pilots who
took military absence during the time of a monthly bonus
program, all between July 2012 and trial.  While there could be
some overlap in these two classes, namely, pilots who did not

---

1.    The Hoefert litigation also named American Airlines Group,
Inc. as a defendant.  It has since been dismissed.  Hoefert v.
American Airlines Inc., No. 4:18-cv-00466, Doc. # 45 (N.D Tex.
June 12, 2018).

-12-

receive various benefits purportedly owed to them while on military leave, the present litigation class is not limited to pilots.

We next consider whether the issues in <u>Hoefert</u> and the present case are the same or similar.  Notably, both allege violations of § 4316(b)(1) of USERRA because defendants purportedly treat military leave differently than other types of leave.  Both involve interpretation of various Collective Bargaining Agreements.  However, the benefits at issue in <u>Hoefert</u>, leave accrual and a particular bonus program, are distinct from the benefits of the Global Profit Sharing Plan.  Plaintiff in this case also alleges additional allegations, including violations of § 4318 of USERRA because the Global Profit Sharing Plan qualifies as an employee benefit pension plan.

The present lawsuit involves class members and issues with notable differences from <u>Hoefert</u>.  Significantly, <u>Woodall</u> and <u>Hoefert</u> were not assigned to the same judge as related cases in the Northern District of Texas.[2]  This undermines any

_____

2.   Local Rule 3.3 of the Northern District of Texas describes the requirements for filing a related case.  A filing plaintiff or removing party must include a notice of a related case if one exists.  A "related case" includes a civil action that—to the best of the plaintiff's or removing party's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances—arises from a common nucleus of

-13-

contention that transfer to the Northern District of Texas would ensure that the present case would proceed more efficiently than if it remained here.  There would be no benefit to having this case in the Northern District of Texas if it were in front of a different judge.  We also note that we are dealing here with federal and not state claims for relief.  The presence of the Hoefert case in the Northern District of Texas is not a persuasive reason for transfer under § 1404(a).

<p style="text-align:center">X</p>

The defendants, as noted above, have the burden to establish the need for transfer "for the convenience of the parties and witnesses, in the interests of justice."  Most factors are neutral, while others weigh slightly in favor of plaintiff.  Defendants have not met their burden.

Accordingly, the defendants' motion to transfer this action to the United States District Court for the Northern District of Texas under § 1404(a) will be denied.

---

operative fact with the case being filed or removed, regardless whether the related case is a pending case.

# **<u>EXHIBIT 9</u>**

Dear Lucretia,

I understand that the Company has asked FO Scott Patterson (576006) to provide verification of his September 2015 military duty. Although verification is not normally required by the Company (11.E.6), FO Patterson is in the process of providing same. Meanwhile, the Company has withheld FO Patterson from service regarding an unidentified "Work Environment complaint." The timing of these events makes us pause and we request that the Company explain why it needs military verification in this instance. Further, we request that the Company state whether the request for military verification is related to the unidentified "Work Environment complaint" and we have yet to receive any detail about the complaint beyond the foregoing description.

That said, FO Patterson advised CA Bonds that he is in the process of complying with Chief Pilot Bonds military verification request. Toward that end, the pilot is given a "reasonable period of time to provide documentation substantiating the military duty in question" (11.E.6). Nonetheless, CA Bonds threatened FO Patterson that if he does not comply within an unreasonable time frame, the Company will initiate a Section 21 investigation. Such an unreasonable demand fuels our concerns about the entire situation.

Perhaps this is just a matter of mis-communication but we wanted to bring this to your attention. Rest assured that FO Patterson is working on getting the verification but he needs a reasonable amount of time to do so. Your assistance in this matter is appreciated.

Best regards,

Trish

Tricia E. Kennedy, Esq.



Allied Pilots Association

14600 Trinity Blvd. Suite 500

Fort Worth, Texas 76155

tkennedy@alliedpilots.org

(817) 302-2182 -- Direct Line

(817) 302-2187 -- APA Legal Fax

(214) 450-8745 -- APA Cell Phone

# **<u>EXHIBIT 10</u>**



**PILOT CREDENTIALS**

**American Airlines**

Sign Up!
Qualifications
Q & A
Contact Us
Recommendations
Home/Login
Qualifications

**Description**

At American, we're more than just an airline. We're a global company committed to driving change and innovation in an evolving industry. Our business allows us to connect people from different cultures and communities around the world – something our more than 100,000 employees take great pride in every day. With a competitive network and strong foundation, American is continuing to build on the momentum of our merger with US Airways, and we are looking for people who want to be part of something great – the new American.

Simply put, we're looking for the best!

Safe, professional, skilled – when you think of American Airlines pilots, those are the qualities that immediately come to mind. And at American, we understand that being a pilot is about more than just the technical aspect of flying an airplane... it's also about the joy of flying and the thrill of adventure.

But it's more than just flying skills. Our pilots are not only leaders on the aircraft – they're also leaders in our operation. That requires a special type of person, someone who can anticipate a need, develop a plan and draw all the necessary players together to make it happen.

Whether you're ready to be hired now or just figuring out where you want to land, look to American because flying is more than what we do... it's who we are.

We are looking for great people that can:

· Set a high standard for providing our customers safe and reliable travel
· Handle a wide variety of situations while working with other team members and our customers
· Work independently or as part of a team with limited supervision
· Ensure the safety and comfort of our customers
· Provide leadership by responding to a variety of emergency and non-emergency situations
· Work in climates and locations across the globe and work variable shifts

**Qualifications**

Here is what it takes to be a successful pilot at American:

· Excellent communication skills and quick and accurate decision making
· Close attention to detail
· Minimum age of 23
· Ability to work varying hours of the day or night, on weekends and holidays

·      Must be able to secure appropriate airport authority and/or Customs security badges

·      Fulfillment of FAA criminal background checks

       Ability to learn and work with PEDs

·      Distance vision corrected to 20/20 and near vision corrected to 20/40 or better in each eye

·      Current Unrestricted Airline Transport Pilot (ATP) rating (multi-engine)

·      Valid FCC Restricted Radio Telephone Operator permit

·      Valid First Class Medical Certificate

·      Flight time in accordance with all FAA requirements

·      Must be able to fluently speak and understand English

·      Must have the right to work in the United States

·      Additionally, we require all of our pilots to have a valid passport and documentation allowing for entry into

       the United States after an international flight.

If you are interested in joining our team, please make sure to complete an online profile.  If you already completed an online profile, you do not need to take any further action other than keeping your information updated.  If, however, you would like to withdraw your application, you can do so by clicking on the Profile Summary page and selecting the Draft Mode button - your profile will then be invisible.

*American Airlines is an* Equal Opportunity Employer/Disabled/Vets

Copyright © 2007 - 2019 PilotCredentials.com.
For best results, please use a version of your preferred internet browser that was released within the last year.
Powered by ◆**dataedge** | Austin

## AMERICAN AIRLINES RETURN TO WORK FORM

**Flight Crew Training Instructor/Flight Simulator Engineer /Flight Simulator Pilot Instructor**

| First Name | Last Name | AA Employee # | Base |
|---|---|---|---|

| Email Address | | Phone Number | |
|---|---|---|---|

**To the Health Care Provider:** We would like to thank you for your care and treatment of our colleague and ask that you partner with us by completing the information below in order for us to process our employee's request to return to work. This employee has job functions at our company that could affect the employee's safety and that of their co-workers. The safety of our employees and customers is a priority for our company, the Federal Aviation Administration (FAA), Department of Transportation (DOT) and Occupational Safety and Health Administration (OSHA).

The essential functions and required physical demands of a **Ground School/Flight Crew Training Instructor/Flight Simulator Engineer / Flight Simulator Pilot Instructor** below, although not a comprehensive inventory of all essential functions and required physical demands, indicate the general nature and level of work performed by employees within this job classification. The failure to perform these functions properly may result in serious injury to the employee, co-workers, or company training equipment.

In order to evaluate our employee's request to return to work, and/or safely return our employee back to work, please review each job function and physical demand listed below. If our employee has **any** restriction(s) applicable to any of the functions or demands listed, please explain the restriction(s) on page 2 of this form.

### All employees:

- Ability to stand, sit, stoop, crawl and walk
- Ability to override jammed and/or manually operates flight controls.
- Distinguish all colors. Visually discern cockpit instruments (analog and digital).
- Visual ability to determine the correct placement of switches, valves, handles, etc.
- Oral capabilities to speak clearly and be understood in a cockpit and high noise environment.
- Ability to hear and understand transmitted communications and acknowledge crew and operational personnel.
- Ability to detect odors such as burning substances, kerosene, gasoline, and hydraulic fluids as well as peculiar odors not normally found in an airplane or simulator cockpit.
- Ability to work and conduct training in a dimly lit simulator cockpit environment
- Ability to read, interpret and understand written, printed and computerized material.
- Ability to learn tablet and PC applications and apply knowledge.
- Possess cognitive skills to process paperwork, perform simple mathematical functions, understand physics and aeronautical engineering.
- Cognitive ability to understand methodical, analytical, and systematic decision making.
- Mental ability and agility to handle multiple tasks simultaneously and adapt to changes
- Ability to manually manipulate various controls such as control columns, control wheels, rudder pedals, valves, push buttons, switches and keyboards.
- This employee is subject to Department of Transportation (DOT) drug and alcohol testing. (/FCTI personnel are not subject to this DOT requirement)

### FCTI & FLIGHT SIMULATOR ENGINEERS ONLY:



- Ability to open and close hinged aircraft doors and hatches  (FCTI only)
- Ability to pull and reset emergency exit handles  (FCTI only)

### FLIGHT SIMULATOR ENGINEERS ONLY:



- Ability to reach, push and pull objects located in cramped quarters
- Ability to work in confined spaces and to climb and descend steep or narrow passageways.
- Ability to work at heights
- Ability to lift and move heavy objects such as life rafts and training devices.

**I understand the essential job functions and physical demands listed above. I certify that I am the treating healthcare provider for this employee's recent absence from work.**

**I confirm my patient has been under my care since _____ and is able to return to work <u>WITHOUT  RESTRICTIONS.</u>**
<span style="margin-left:4em">mm/dd/yyyy</span>

**Return To Work Date<u>: _____</u>**
<span style="margin-left:4em">mm/dd/yyyy</span>

Health Care Provider (print name): _____

Specialty/Type of Practice: _____

Phone Number: _____ Fax: _____

Health Care Provider Signature: _____ Date: _____

## Please fax the completed form to 1-855-895-3685  (ARC, Absence and Return Center)

### AA RTW Form (Page 1: No Restrictions)

## AMERICAN AIRLINES RETURN TO WORK FORM

### Return to Work Form *WITH Restrictions*

**Flight Crew Training Instructor/Flight Simulator Engineer /Flight Simulator Pilot Instructor**

_____     _____     _____     _____

First Name                              Last Name                                 AA Employee #            Base

_____     _____

Email Address                                                               Phone Number

**Treating Health Care Provider (continued):**

I understand the essential job functions and physical demands listed on page one. I confirm my patient is currently able to return to work **WITH RESTRICTIONS**.

Return To Work **WITH RESTRICTIONS**: Start Date: _____     End Date: _____
                                                                          mm/dd/yyyy                            mm/dd/yyyy

Please complete the following:

1. List the specific restrictions preventing or impacting the Employee's performance (attach additional sheets as necessary)

_____

_____

_____

_____

2. Full Duty release **WITHOUT RESTRICTIONS**: _____
                                                                         mm/dd/yyyy

**By signing this form, you are certifying you are the treating Health Care Provider (HCP) for this employee's recent absence from work.**

Health Care Provider (print name): _____

Specialty/Type of Practice: _____

Phone Number: _____     Fax: _____

Health Care Provider Signature: _____     Date: _____

**GINA Compliance Notice:**  The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

**Employee Notes:**
1. Your return to work status should be updated on Jetnet within 2 business days.
2. Depending on your position, base and time away from work, you may be required to undergo a fingerprint/background check prior to reporting back to work. Contact your manager to review your specific requirements.
3. If returning to work with job restrictions, you will need to speak with your supervisor, and review the Americans with Disabilities Act and Modified Duty policies located on Jetnet.
4. See your station/base manager/supervisor/lost time personnel upon returning to work.

**Please fax completed form to 1-855-895-3685  (ARC, Absence and Return Center)**

**AA RTW Form (Page 2: With Restrictions)**

# EXHIBIT 11



U.S. DEPARTMENT OF TRANSPORTATION
# OFFICE OF INSPECTOR GENERAL

# FAA Has Not Fully Addressed Safety Concerns Regarding the American Airlines Flight Test Program

**FAA**



Report No. AV2018060

July 10, 2018



U.S. DEPARTMENT OF TRANSPORTATION
**OFFICE OF INSPECTOR GENERAL**

## FAA Did Not Fully Addressed Safety Concerns Regarding the American Airlines Flight Test Program

*Self-initiated*

**Federal Aviation Administration | AV2018060 | July 10, 2018**

### What We Looked At

Federal regulations require U.S. air carriers to verify the airworthiness of aircraft following major repairs or maintenance. To perform these maintenance checks, American Airlines (AA), established a flight test program. In February 2017, Allied Pilots Association (APA)—which represents AA's pilots—contacted us about multiple safety issues at the AA flight test program, including the use of unqualified pilots. APA stated that concerns placed in an earlier letter to the Federal Aviation Administration (FAA) had remained "largely unaddressed for over 18 months." We initiated an audit to assess the effectiveness of FAA's actions in response to safety concerns about the AA flight test program. Specifically, we examined how (1) FAA's oversight office for American Airlines addressed concerns about the flight test program and (2) the Agency processed and responded to a letter to the Federal Aviation Administrator questioning the integrity of FAA's oversight of the flight test program.

### What We Found

FAA's oversight office for American Airlines lacked objectivity in its review. While FAA requires inspectors to provide impartial treatment, the inspector in this case seems to have been affected by his relationship with AA personnel and the 28 years he spent working with the carrier. While the Agency has a tool for assessing its relationships with carriers, the tool did not account for these risk factors. In addition, the Agency used a "best guess" method to determine who should respond to APA's written allegations, and ultimately routed the letter back to the target of the complaint for response. Due to a lack of oversight guidance, FAA also provided varying responses to APA and OIG regarding the requirements for the flight test program. As a result, APA received neither a comprehensive nor an accurate response to its concerns.

### What We Recommend

FAA concurred with our seven recommendations to improve its oversight of the flight test program, as well as its ability to respond to safety concerns.

All OIG audit reports are available on our website at www.oig.dot.gov.

For inquiries about this report, please contact our Office of Legal, Legislative, and External Affairs at (202) 366-8751.

# Contents

| | |
|---|---|
| Memorandum | 1 |
| Results in Brief | 3 |
| Background | 4 |
| FAA's Local Oversight Office Did Not Address Concerns About the AA Flight Test Program | 5 |
| Issues Brought to the Federal Aviation Administrator's Attention Remain Unresolved | 8 |
| Conclusion | 10 |
| Recommendations | 10 |
| Agency Comments and OIG Response | 11 |
| **Exhibit A.** Scope and Methodology | 12 |
| **Exhibit B.** Organizations Visited or Contacted | 13 |
| **Exhibit C.** List of Acronyms | 14 |
| **Exhibit D.** Major Contributors to This Report | 15 |
| **Appendix.** Agency Comments | 16 |



U.S. DEPARTMENT OF TRANSPORTATION
**OFFICE OF INSPECTOR GENERAL**

# Memorandum

Date: July 10, 2018

Subject: FAA Has Not Fully Addressed Safety Concerns Regarding the American Airlines Flight Test Program | Report No. AV2018060

From: Matthew E. Hampton
Assistant Inspector General for Aviation Audits

To: Federal Aviation Administrator

Federal regulations require U.S. air carriers to verify the airworthiness of aircraft following major repairs or maintenance.[1] To accomplish this, American Airlines (AA), established a flight test program to perform these maintenance checks. In February 2017, the Allied Pilots Association (APA)—which represents AA's pilots—contacted the Office of Inspector General (OIG), concerned about multiple safety issues pertaining to the flight test program, including AA's use of unqualified pilots and a culture of suppressing safety complaints. The association previously contacted the Federal Aviation Administration (FAA) but stated its concerns had remained "largely unaddressed for over 18 months." We obtained sufficient evidence during a preliminary meeting with APA and from our review of documentation to initiate an audit to examine these concerns in greater detail.

Our objective was to assess the effectiveness of FAA's actions in response to safety concerns about the AA flight test program. Specifically, we examined how (1) FAA's Certificate Management Office (referred to as the oversight office in this report) addressed concerns about the flight test program and (2) the Agency processed and responded to a letter to the Federal Aviation Administrator questioning the integrity of FAA's oversight of the flight test program.

We conducted this audit in accordance with generally accepted Government auditing standards. Exhibit A details our scope and methodology. Exhibit B lists the entities we visited or contacted.

We appreciate the courtesies and cooperation of Department of Transportation representatives during this audit. If you have any questions concerning this

---

[1] Title 14, Code of Federal Regulations (CFR) § 91.407(b).

report, please call me at (202) 366-0500, or Tina Nysted, Program Director, at (404) 562-3770.

cc:     The Secretary
        DOT Audit Liaison, M-1
        FAA Audit Liaison, AAE-100

# Results in Brief

FAA's oversight office for American Airlines lacked objectivity in its review and did not respond to concerns about unqualified pilots and unsafe conditions during maintenance verification flights. FAA, in line with Governmentwide standards, requires inspectors to provide impartial treatment and avoid actions that may create an appearance of preferential treatment. However, the inspector's oversight role in this case appears to have been affected by his relationship with the head of the AA flight test program and the length of time—28 years—he performed oversight of American Airlines. This potential loss of impartiality is particularly troubling considering the scope of his responsibilities, including oversight of voluntary safety programs, pilot training, and safety management systems. Additionally, as the only inspector overseeing the flight test program, he became a single point of failure for FAA. A new supervisor identified possible objectivity issues and recommended temporarily reassigning the inspector. However, Agency officials did not consider the request a priority and took nearly 4 months to reassign the individual. Additionally, FAA developed an evaluation tool that pulls data from multiple sources to assess its collaborative relationships with air carriers. However, that tool does not account for risk factors such as non-routine operations (e.g., flight test) or the length of time inspectors have been assigned to a carrier. Furthermore, the FAA oversight office lacks controls to ensure complaints are properly addressed. Neither the inspector nor office managers complied with FAA's requirements for processing complaints or provided a response to APA directly addressing the underlying issues that prompted the complaints. As a result, APA elevated its concerns to the Federal Aviation Administrator.

According to APA, the airline's managers and an FAA inspector warned AA's pilots that complaints could result in penalties and perhaps the end of the program. FAA, however, did not view these comments as a safety concern or consult the Agency's Office of Audit and Evaluation group, which was specifically established to address complaints. Instead, the Agency used a "best guess" method, which lacked criteria for identifying safety issues, to determine who should respond to APA's written allegations. The letter was routed through FAA Headquarters, then ultimately back to the target of the complaint, the FAA oversight office. Significantly, no one at FAA realized the Agency had not addressed APA's allegation that the oversight office was working with airline officials to suppress pilot safety concerns. In addition, representatives in the

oversight office asked the carrier to respond to many of APA's concerns and ultimately included those responses in the Agency's letter signed by the Administrator.

FAA also provided varying responses to APA and OIG regarding the requirements for the flight test program—such as whether or not the carrier must comply with established programs—due to a lack of oversight guidance. As a result, APA did not receive a comprehensive or accurate response. After we discussed our findings with FAA officials, the Agency completed an independent assessment of the program in October 2017 that verified many of APA's concerns. However, FAA's oversight office has not provided an updated response to APA or worked with the Agency's policy officials to clarify oversight responsibilities and develop corrective actions.

We made seven recommendations to help FAA improve its oversight of and address safety concerns about the flight test program.

# Background

The local FAA oversight office for American Airlines, based in Irving, TX, is responsible for overseeing AA's maintenance programs and flight operations, including the flight test program. Approximately 100 inspectors and managers within this office are responsible for certificating, surveilling, and inspecting the airline, which performs nearly 2.5 million domestic and international flights each year using more than 1,000 aircraft and 12 different fleet types.

Air carriers typically fly aircraft to test performance after major repairs or maintenance have been completed. While these flights are not performed with passengers or cargo onboard, it is important that carriers implement procedures to ensure the flights are operated safely. On December 22, 1996, three crewmembers and three technicians were killed when an Airborne Express DC-8 crashed during such a flight, which aimed to verify that recent maintenance and modifications had not changed how the aircraft operated. Following its investigation of the crash, the National Transportation Safety Board made a series of recommendations to FAA, including to establish guidance for air carriers performing non-routine operations, such as evaluation flights, and conduct appropriate surveillance of these programs.

As a result, FAA issued its Non-Routine Flight Operations (NRFO) guidance in August 2002 (updated May 2008), which recommended that carriers update manuals and develop training, reviewed and accepted by FAA, so that each NRFO is conducted with procedures consistent with safe flight. While these actions are not required, American Airlines used the recommendations to develop its flight

test program and train approximately 20 pilots to perform certain NRFO, such as maintenance verification flights and flying damaged aircraft to a repair facility.

# FAA's Local Oversight Office Did Not Address Concerns About the AA Flight Test Program

FAA staff overseeing American Airlines lacked objectivity and did not follow the Agency's guidance for addressing complaints when they received APA's letter. Specifically, the inspector, who had developed a personal relationship with the head of the AA flight test program, did not properly investigate safety complaints.

## FAA's Review of Complaints About the Flight Test Program Lacked Objectivity

The FAA inspector assigned to investigate the complaint had conversations with the head of the AA flight test program about "problem pilots," a reference to pilots who filed complaints. Rather than objectively review the basis for their complaints, as called for in FAA guidance, the inspector requested and received information from American Airlines that could have been used to discredit the pilots who voiced concerns. For example, the AA manager said of one of the pilots, "he seems more interested in litigating his way through life at AA versus doing work."

Governmentwide and FAA's ethical standards[2] require inspectors to act impartially and to avoid the appearance of preferential treatment when they perform their official duties. However, the inspector in this case had developed a personal relationship with the head of the AA flight test program, which created the appearance of diminished impartiality. For example, he made plans, using his Government-issued computer and email account, to travel abroad with the head of the program and introduce him to the inspector's family. The potential impact of the inspector's apparent lack of impartiality was compounded by the large scope of air carrier programs for which he was responsible. Managers at the FAA oversight office did not recognize the extent of his relationship with a senior airline employee or its potential impact on his oversight activities.

---

[2] 5 CFR § 2635.101, "Basic obligation of public service." *Ethical Conduct and Financial Disclosure* (FAA Order 3750.7A).

When we interviewed the inspector about the flight test program, he displayed little knowledge of it beyond describing how great it was. Instead, he stated that a few pilots had been causing problems for 15 years and advised us to "talk to the experts." Then, without our knowledge, he set up a meeting with us and airline officials—whom he called the "kings of the airline." Furthermore, during an interview about potential inspector impartiality, an FAA flight operations frontline manager referred to the AA flight test manager as "perfect" and someone who "could do no wrong," and to the airline as "golden." These comments raise concerns about the lack of objectivity at this FAA office.

In September 2016, a new supervisor was assigned to the office and determined that the inspector was not performing his oversight functions properly and objectively. The inspector had worked there for 28 years and was involved in many areas beyond the flight test program.  For example, he was involved in hotline complaints, multiple AA voluntary safety programs, and oversight of the carrier's safety management system, which is used to identify and mitigate safety risks across the airline. However, as the only inspector overseeing the flight test program, he became a single point of failure for FAA. The supervisor reassigned oversight of two programs to other staff, but did not adjust the inspector's role in the carrier's safety programs or the flight test group. In March 2017, the supervisor raised concerns about the inspector's role and possible lack of objectivity with local and regional office managers. However, the regional office did not see the issue as a priority and took nearly 4 months to reassign the inspector.

The supervisor's concerns regarding diminished objectivity and the lack of support from the regional office are similar to those we highlighted in our 2008 review of FAA's oversight office for Southwest Airlines.[3] In response to our recommendation, FAA developed a tool[4] to assess collaborative relationships between its oversight offices and assigned carriers; it utilizes data from multiple Agency sources to identify anomalies in inspector performance. However, the tool does not incorporate risk factors such as non-routine operations (e.g., maintenance verification flights) or the length of time an inspector has been assigned to a carrier—key factors in this review. As a result, FAA cannot be certain of the tool's ability to detect issues at other oversight offices.

FAA emphasizes the importance of a strong safety culture within the Agency and the industry. Guidance for FAA's Safety Management System—one of the programs the inspector was responsible for overseeing—identifies some

---

[3] *Review of FAA's Safety Oversight of Airlines and Use of Regulatory Partnership Programs* (OIG Report No. AV-2008-057), June 30, 2008. OIG reports are available on our website:　　　　　　　　.
[4] Certificate Management Data Evaluation Process (CMDEP).

AV2018060

characteristics of a positive safety culture as valuing individuals' opinions, encouraging personnel to identify safety threats, providing a non-punitive environment for reporting safety concerns, and displaying a willingness to recognize when basic assumptions should be challenged and changes are warranted. Because management did not recognize or mitigate threats to diminished staff objectivity, the FAA oversight office's ability to promote safety and adequately respond to complaints was compromised.

# FAA Staff Did Not Follow Agency Guidance When Addressing Complaints About the Flight Test Program

FAA's oversight office staff did not address APA's concerns[5] about unqualified pilots and unsafe conditions during maintenance verification flights. National and local FAA guidance[6] provide instructions and timeframes for processing complaints. In addition, the oversight office's complaint coordinator sent numerous emails reminding staff about specific requirements for handling complaints. However, the office lacked an effective control to ensure complainants were contacted, investigations were documented, and complaints were resolved. As a result, FAA did not respond to APA's questions about how pilots are trained to conduct flight tests and whether maintenance verification flights can be performed on damaged aircraft.

The oversight office developed local guidance stating that an inspector should contact the complainant to acknowledge receipt and obtain any additional information. Instead of contacting APA, the inspector provided airline management officials with information about the complaint and the individual who had signed it. Less than a month after the inspector notified the airline, AA management held a meeting with all flight test pilots to address the "level of noise." Pilots were told they "must stay off the radar," which APA interpreted as meaning the flight test program would be shut down if the complaints continued. Prior to the meeting, the inspector notified airline management via email that FAA's position was that the flight test program operated safely and professionally, and asked them to "lead me in the right direction." Furthermore, the local guidance gives the assigned FAA inspector 2 days to contact the complainant. In this case, however, the inspector waited more than 2 months and then asked the airline to set up a meeting for him and the complainant—a

---

[5] APA's specific complaints/concerns were extremely technical in nature; as such, we have summarized them here.
[6] *Flight Standards Information Management System* (FAA Order 8900.1), volume 7, chapter 5, section 1. *Aviation Safety Quality Management System* (AFS-SW-21-403-02), "Complaints."

process typically used for pilots under FAA investigation. Although APA asked the inspector multiple times to clarify the purpose of the meeting and state whether the individual was under investigation, the inspector did not respond, and the meeting never occurred.

In addition, the inspector did not document any of the work he performed to investigate the APA complaint. The guidance requires inspectors to document complaint-related work in FAA's surveillance tracking system. Instead, when FAA's new assistant manager for the oversight office asked for an update, the inspector sent an email stating he had traveled to the flight test center to investigate the concerns. According to travel records, he only visited the flight test center once for approximately 4 hours. The inspector reported that during this time he attended a meeting regarding flight test program safety reports, and reviewed the carrier's pilot training program and the specific qualifications maintained in at least three different systems for the flight test pilots. It would be extremely difficult, if not impossible, to adequately perform these tasks in a 4-hour period.

Finally, FAA Order 8900.1 states that Flight Standards personnel should attempt to provide a final written response within 10 business days from the time of receipt. The Agency received APA's complaint in December 2015. However, the inspector did not review any documentation until April 2016, and the FAA oversight office did not respond to the complaint. Due to the lack of a response, in July 2016, APA wrote to the Federal Aviation Administrator about the Agency's oversight of the AA flight test program.

# Issues Brought to the Federal Aviation Administrator's Attention Remain Unresolved

FAA missed key safety concerns APA raised in its letter to the Administrator and did not consult the Audit and Evaluation group about the Agency's response. Instead, the letter was routed to several offices before it was returned to the FAA oversight office—the specific target of the complaint.

While APA stated that "both the CMO [Certificate Management Office] and American Airlines managers warned that additional 'complaints' and 'noise' from ASAP [Aviation Safety Action Program] reports would possibly result in penalties … up to and including abandonment of the program," FAA Flight Standards managers at the FAA oversight office and Headquarters did not recognize this as a safety concern. When we discussed the allegation with FAA's Audit and Evaluation group, which handles complaints and internal audits, they immediately identified these concerns as a significant threat to safety. However, that group was not consulted about the response to the APA letter because FAA distributes

correspondence via a "best guess" method, which does not include criteria for identifying safety issues.

In the "best guess" method, letters are assigned to the Agency's subject matter experts, who review them and determine whether or not to respond. FAA officials defended this method by stating the experts are in the best position to evaluate correspondence. In this instance, APA's letter was routed to the Aviation Safety Division, then to Flight Standards, and ultimately back to the oversight office that was the target of the complaint. In addition, representatives in the oversight office asked the carrier to respond to many of APA's concerns and ultimately included those responses in the Agency's letter signed by the Administrator.

According to the FAA oversight office, the flight test program was "supplemental," and therefore the carrier did not have to follow written requirements even though FAA had formally accepted them. However, both APA and OIG received conflicting responses about the requirements from FAA. For example, an FAA maintenance policy official told us that the carrier was expected to comply with flight test policies and procedures because they supported the carrier's FAA-authorized maintenance program. We requested clarification from the Agency's Air Carrier Operations Branch but found that FAA does not have guidance on how to oversee these types of operations and programs. In addition, the FAA oversight office for American Airlines did not work with policy officials to verify the Agency's position.

Furthermore, during the complaint review process, no one at FAA realized that the allegation about the oversight office had not been addressed. After we discussed our concerns with FAA, the Agency used staff from the United Airlines oversight office to conduct a technical assessment of the flight test program, but did not review the objectivity of staff at the oversight office for American Airlines. The October 2017 assessment verified many of our and APA's technical concerns, including whether properly qualified pilots were performing maintenance verification flights and whether those flights can be performed on aircraft that have not been fully repaired. The FAA operations supervisor for American Airlines formally presented the findings to the carrier in December 2017, and established a safety analysis team with airline officials to resolve the issues. Furthermore, during our audit, the inspector at the center of the complaint retired, and the carrier began making changes to the flight test program. However, FAA has not provided an updated response to the complainant, and oversight office staff have not worked with FAA policy officials to clarify responsibilities and develop corrective actions. As a result, APA's safety concerns have yet to be fully addressed.

# Conclusion

Concerns about the impact of FAA inspector relationships with the airlines they oversee have been an issue since our 2008 review of the Agency's oversight office for Southwest Airlines. Our report spurred FAA to take a number of actions, including developing a tool that assesses its relationship with air carriers. However, the tool does not incorporate sufficient risk factors to identify diminished inspector impartiality. Additionally, weaknesses in FAA's process for identifying and handling safety complaints resulted in multiple missed opportunities to mitigate risks identified by an industry stakeholder. As a result, FAA is not in a position to respond to safety complaints about the flight test program and cannot be assured that its safety oversight is sufficient or comprehensive.

# Recommendations

To improve FAA's oversight of the American Airlines flight test program as well as its ability to respond to safety concerns, we recommend that the Federal Aviation Administrator:

1. Conduct an independent review of FAA's oversight of American Airlines' flight operations to determine whether controls are in place and effective in preventing single points of failure; develop and implement corrective actions, if necessary.

2. Modify the existing tool used to evaluate the objectivity of inspectors to incorporate risk factors such as non-routine operations and the length of time inspectors oversee the same air carrier.

3. Develop and implement controls requiring oversight office staff to resolve complaints and follow key policy requirements such as directly contacting complainants and documenting investigations.

4. Establish and implement criteria for evaluating correspondence to ensure safety complaints are routed to FAA's Office of Audit and Evaluation.

5. Develop and implement inspector guidance on FAA's oversight requirements for flight test operations.

6. Provide the Allied Pilots Association with a revised response to its complaint based on results from the October 2017 independent assessment of the American Airlines flight test program.

7. Develop and implement a corrective action plan to address the recommendations made by the October 2017 independent assessment of the American Airlines flight test program.

# Agency Comments and OIG Response

We provided FAA with our draft report on May 21, 2018, and received its formal response on June 20, 2018, which is included as an appendix to this report. FAA concurred with all seven of our recommendations and provided planned implementation dates for each. We consider these recommendations resolved but open pending completion of planned actions.

# Actions Required

We consider recommendations 1–7 resolved but open pending completion of planned actions.

## Exhibit A. Scope and Methodology

We conducted this performance audit between April 2017 and May 2018 in accordance with generally accepted Government auditing standards as prescribed by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

We met with APA officials to better understand their concerns and the potential safety impacts. Then, to assess how APA's concerns about the AA flight test program were addressed, we met with local, regional, and national FAA Flight Standards officials responsible for oversight of AA and policies relevant to the complaint. We reviewed surveillance and travel records, as well as emails from the inspector directly responsible for overseeing the program. We also interviewed AA personnel and reviewed its program documentation. To assess how the Agency processed and responded to APA's letter to the Federal Aviation Administrator, we reviewed tracking logs associated with the complaint and interviewed FAA officials responsible for processing correspondence within Flight Standards, Aviation Safety, and the Office of the Administrator. We also met with officials in FAA's Office of Audit and Evaluation, which is responsible for addressing complaints.

# Exhibit B. Organizations Visited or Contacted

## FAA Facilities

Headquarters

Office of the Administrator

Aviation Safety

Flight Standards Service

Office of Audit and Evaluation

Air Carrier Maintenance Branch

Air Carrier Operations Branch

Evaluations Program Branch

Policy Integration Branch

Field Offices

Southwest Region

American Airlines Certificate Management Office

United Airlines Certificate Management Office

## Other Organizations

American Airlines, Fort Worth, TX

Allied Pilots Association, Fort Worth, TX

# Exhibit C.  List of Acronyms

| | |
|---|---|
| AA | American Airlines |
| APA | Allied Pilots Association |
| ASAP | Aviation Safety Action Program |
| CMO | Certificate Management Office |
| DOT | Department of Transportation |
| FAA | Federal Aviation Administration |
| NRFO | Non-Routine Flight Operations |
| OIG | Office of Inspector General |

# ch bit D. Major Contributors to This Report

| | |
|---|---|
| TINA **NYSTED** | PROGRAM DIRECTOR |
| MARSHALL **ANDERSON** | PROJECT MANAGER |
| ANNE **LONGTIN** | SENIOR ANALYST |
| CURT **BOETTCHER** | SENIOR ANALYST |
| TIM **MCDOUGALL** | SENIOR AUDITOR |
| JANE **LUSAKA** | WRITER-EDITOR |
| SETH **KAUFMAN** | SENIOR COUNSEL |

# **<u>EXHIBIT 12</u>**



February 6, 2019

Doug Parker, CEO
American Airlines

Mr. Parker:

The Transport Workers Union of America ("TWU") has members that are
employed as Line Maintenance Aircraft Maintenance Technicians across the
country.  The recent series of CBS News stories has brought the nation's
attention to American Airlines' unsafe, illegal, and intimidating
management practices. The TWU stands with the and supports the courageous
aircraft technicians who participated in these news stories. We also stand ready
to defend them and any other TWU Aircraft Maintenance Technicians who suffer
retaliation for working in accordance with proper maintenance manual
standards. A debt of gratitude is owed to these individuals by the traveling public,
their fellow technicians, and the airlines themselves.

As CEO of American Airlines, you are responsible for the pervasive practice of
intimidation that exists. It is atrocious and immoral that, solely in order to improve
the company's profitability, you would allow and oversee a system that potentially
places air travelers at risk.  You must correct this deadly serious situation. The first
step in correcting these conditions is to first recognize that your company has a
problem, and thus far you've failed to do so.

American Airlines Senior Vice President David Seymour stated in the CBS report,
with respect to aircraft mechanic whistleblower cases, "almost all of them have
been dismissed."

That is a bold-faced lie. American Airlines has settled a mind-boggling number of whistleblower cases originating from their Miami, Dallas, and Chicago operations and, in each case, management has demanded that non-disclosure agreements be executed in order to hide the financial settlements you have entered into. These non-disclosure agreements are your tool to perpetuate the ongoing cycle of abuse.

With respect to the Chicago case involving six aircraft mechanic whistleblowers, the FAA report determined:

- American Airlines "…pressured [mechanics] to not record discrepancies, take shortcuts with maintenance activities, or improperly sign-off on work which was not actually completed."

- "An [FAA] investigation team … conducted an exemplary investigation, interviewing dozens of witnesses and gathering hundreds of documents, ultimately *substantiating all of the complainants' allegations.*"[1]

Among the specific allegations substantiated by the cited investigation was that Regional Maintenance Director Evita Rodriguez – now known as Evita Garces – instructed American Airlines technicians:

> "You need to strike a balance between safety and productivity.  When I was stationed in JFK, I signed for sumping [of aircraft fuel tanks on] the Airbus, yet I never did.  I am looking for that balance."[2]

Instead of terminating Ms. Garces, on November 13, 2018, American Airlines promoted her to the new position of American Airlines Director of Maintenance (DOM).  In this role, Ms. Garces will now be working hand-in-hand with the FAA. This action sends a horrific message to the Line Maintenance Aircraft Technicians.

It is long past time for you, as CEO, to start making the leadership changes necessary to stop this harassment of TWU members. The chilling atmosphere you

---

[1] *FAA Memorandum dated March 25, 2015, by Director, Office of Audit and Evaluation, H.Clayton Foushee*

[2] *ASO CMO-67 Investigation Team Report dated February 27, 2015 at 11*

oversee is disgraceful and constitutes a clear and present danger to American
Airlines' customers.

Sincerely,

John Samuelsen, President
Transport Workers Union of America

CBS News / CBS Evening News / CBS This Morning / 48 Hours / 60 Minutes / Sunday Morning / Face The Nation / CBSN Originals

Log In   Search

Today's Rundown    Politics & Power    Features    Pop Culture    CTM Saturday    More

CBS NEWS / *February 4, 2019, 7:39 AM*

# Airline mechanics feel pressured to overlook potential safety problems: "Accident waiting to happen"

f Share / 🐦 Tweet / 🔴 Reddit / 🔲 Flipboard / ✉ Email

**START YOUR FITNESS JOURNEY TODAY!**
ILoveKickboxing

Sign Up

Skip in 8

## Watch CBSN Live

 Why is Trump suing to stop the subpoena?

 Trump files lawsuit to try to block subpoena from the House Oversight Committee

 Search continues for missing Illinois boy

 Rep. Seth Moulton joins field of Democrats running for president in 2020

 SpaceX investigates capsule's engine malfunction

Follow Us

Airline mechanics say they feel pressured by management to look the other way when they see potential safety problems on airplanes, an eight-month-long CBS News investigation reveals. In some of the cases, the Federal Aviation Administration (FAA) agreed with those mechanics.

The U.S. aviation system is experiencing an unparalleled period of safety, with only one death involving a passenger airline in the last decade. But in our interviews with more than two dozen airline mechanics, they speak of the pressure to turn aircraft around faster that sometimes can be too much, reports CBS News correspondent Kris Van Cleave. They blame it on an economic reality of the airline business: a plane only makes an airline money when it's flying passengers.

Cell phone video captured a tense exchange between an American Airlines mechanic and a manager in 2017.

"We're an accident waiting to happen," the mechanic could be heard saying.

The FAA found reason to believe a Miami-based mechanic was retaliated against after reporting problems that pulled several planes out of service.

"You single out one guy because he's doing his job. What about all of us? What's going to happen to us when we do our jobs?" the mechanic can be heard saying.

Gary Santos, a long time American Airlines mechanic based in New York, described it as "a short-cut environment." He said he's risking his job by speaking on camera.

"They try to pressure the individual not to write it up," Santos said.

"They'd rather you not report a maintenance issue?" Van Cleave asked.

"Right," Santos responded.

While a sometimes tense relationship between management and mechanics is not uncommon, every one of the 26 airline mechanics we spoke to – two thirds from American and the rest from Southwest Airlines – described being pressured by managers to focus only on the work assigned.

"If you're working, say, on a landing gear, lubing it, and you notice that a flap three feet away is leaking, and you write up the flap leak, you're beyond your scope," one mechanic said.

Their claims are backed up by findings in several FAA whistleblower complaints about inappropriate pressure and retaliation since 2015 at the two airlines – and at least 32 other anonymous industry-wide reports between 2015 to 2018.

"I've seen people walked off the job, held on suspension for a month or more because they've reported problems that they supposedly were outside their scope for finding," the mechanic said.

Several American mechanics – all with decades on the job – spoke on the condition we not show their faces, saying they feared retaliation.

"You constantly have people over your shoulder questioning why it takes so long. 'Can't we skip a few steps?'" another mechanic said.

"Have you had managers use the words 'can't we skip some steps'?" Van Cleave asked.

"Absolutely," the mechanic responded. "The pressure is there and, you know, the threats of termination and walking you off the airfield, as they would say, are very real and common place."

The mechanics come from bases all over the country. One mechanic told CBS News the pressure was for "significant safety issues."

"Things that needed to be repaired. Worn tires, worn brakes, damage to the fuselage," he said.

CBS News obtained a transcript of a December 2017 Southwest employee conference call where senior VP of technical operations Landon Nitschke acknowledged: "We definitely need to repair some things with the FAA... there are some things there with... [mechanics] getting questioned. Supervisors certainly getting questioned...so again, compliance, compliance, compliance."

Capt. Dave Hunt is Southwest's senior director of safety management. "I think that is a good indicator of what our leadership tells our employees," Hunt said. "It is our highest priority."

## Newsroom

A Twitter list by @CBSThisMorning

The @CBSThisMorning Newsroom on CBSNews.com

 **CBS Evening News**
@CBSEveningNews

Sen. Richard Blumenthal (D-CT): "Boeing needs to be taken to the woodshed. The F.A.A. needs far-reaching reform, and whistleblowers need protection." cbsn.ws/2INanoZ



21m

 **CBS Evening News**
@CBSEveningNews

Boeing says the New York Times report "paints a skewed and inaccurate picture" of the 787 program with "distorted information, rehashing of old stories and rumors." adding "safety and

Embed                              View on Twitter



## Watch CBS News Live

*Watch CBS News anytime, anywhere with the our 24/7 digital news network. Stream CBSN live or on demand for FREE on your TV, computer, tablet, or smartphone.*

Watch Now

## Popular On CBS News

**01** Identities released of 6 people killed in Texas plane crash

**02** Kamala Harris vows to take executive action on guns as president

**03** Officials investigate measles outbreak in Southern California

**04** FDA approves 1st generic nasal spray to treat opioid overdose

"But you don't feel like your mechanics are being unduly pressured or threatened, chastised, criticized for finding issues that are out of scope?" Van Cleave asked.

"I think any issue that's brought forward to us is taken seriously, acted upon, investigated, and we act on those. So any way we hear about an instance, we carefully review those," Hunt said.

"But you're stopping short of saying that's not happening," Van Cleave pointed out.

"Whenever we become aware of a safety-related event, we take them all seriously and we act on all of them the same way," Hunt said.

Former National Transportation Safety Board member John Goglia said it's unusual for so many mechanics to speak out publicly.

"That's standing out on the top of the hill screaming at the top of your lungs," Goglia said, acknowledging "there's no question that there's a problem."

He believes the pressure to speed up repairs and get planes back in service faster is a problem for mechanics industry wide.

"You have two dozen. I've probably had over a hundred over the past three or four years that have called me with those kinds of complaints, and I'm talking about calls from every single airline," Goglia said.

David Seymour is a senior vice president at American.

"Safety is part of the culture and they know if they don't do it safely, they're not to do it at all," Seymour said.

"Does it concern you that we're hearing a different account from a number of mechanics?" Van Cleave asked.

"It's not a concern for me because I think we have programs in place to make sure that they can report them," Seymour said.

"You say it's not a concern, we talked to a former NTSB board member who said based on the number of people we have talked to... and that several went on camera isn't just a red flag, he called it a field of red flags," Van Cleave said.

"What I will tell you is allegations have been made, but almost all of them have been dismissed. There have been some issues we've had to address, but again, there's never been an allegation made that American Airlines flew an aircraft that was unsafe," Seymour said.

Both Southwest and American are locked in tense union negotiations with mechanics over pay and benefits.

"Should people be concerned about the planes they're getting on today?"

"I get on them every day so I am not concerned... it's like climbing a ladder where the top rung may be an accident or a serious incident," Goglia said. "Every time you don't do something the way it's supposed to be done, you're climbing another rung in the ladder... and it takes several rungs when you start getting up there the risk starts to get severe."

"Do you worry that pressure is going to result in an accident? Something is not going to get fixed?" Van Cleave asked Santos.

"Those things keep me up at night," Santos responded.

These mechanics tell us they worry how the pressure they describe will impact the overall safety culture over time. In the Miami situation, American said it does not believe it was a case of retaliation. That mechanic is on the job today.

05 PlayStation 5: Everything we know from Sony so far



50 PHOTOS
**Notable deaths in 2019**

## The Uplift — Stories That Inspire

Veteran finishes Boston Marathon crawling

History teacher a "hero" to the veterans he's honored

13-year-old buys his single mom a car

Teen robotics team makes wheelchair for toddler

Boy's lost stuffed animal found on mountain

One FAA official told us while they do see cases of undue pressure, they believe the vast majority of employees are trying to do the right thing.

*Watch more from our investigation Monday night on the "CBS Evening News."*

**Southwest Airline's full statement to CBS News:**

Therapy dog cheering on Boston Marathon runners

"Southwest is fully committed to ensuring the Safety of our Customers and Employees. We continuously work to create and foster a Culture of Safety that proactively identifies and manages risks to the operation and workplace. With a fleet of 750 planes and 4,000 flights a day, we have a rigorous and well-run program. Safety has always been our highest priority—from day one to today and always. We are absolutely confident that our maintenance policies, procedures, and programs ensure the Safety and airworthiness of our aircraft.

Maintaining a Culture of Safety Compliance is the most important thing we do and Southwest Employees are our most valuable asset in operating with the highest degree of Safety. Intimidation or bullying of any kind is not tolerated. If intimidation or bullying is reported, we have processes established to investigate and take action to address the matter. Southwest's unwavering commitment to a positive and stable work environment stretches across nearly five decades and flows across all levels of our workforce and leadership.

While we do expect our mechanics to work their assigned tasks, we do not prohibit employees from raising safety concerns at any time and, in fact, encourage the reporting of safety concerns through our 24-hour automated Safety Reporting System. Southwest is committed to promptly addressing any issues that might be raised. We work directly with our local FAA Certificate Management Office which oversees our FAA-approved maintenance program to assure that processes and procedures are followed in the interest of safety.

Southwest is hands down one of the best companies in the world to work for with an unprecedented safety record. Our friends, our families board these flights and not a single one of us would put anything above their safety – this mission unites us all.

Regarding Landon Nitschke reference during a Dec. 6, 2017 'It's Your Call' event where he references the FAA: We were continuing our work on aligning, both as a Company and as individuals, with the FAA Compliance Philosophy introduced in 2015 which shifted oversight from an enforcement-focused regulatory model to a more transparent, problem-solving approach that allows safety problems to be understood through an open exchange of information between the agency and the airline. This is a shift from how airlines have historically worked with the FAA, and it requires a mutual effort to build trust and a change in mindset. We applaud the refreshed Compliance Philosophy and agree that it's a more effective model of oversight for today's aviation system. Strengthening our relations with the FAA is a priority that, as with any valued relationship, requires dedication and an unwavering commitment by our People.

And in regards to his comment 'It's going to be our theme song for 2018': Nothing is more important in our business than Safety and, as such, compliance is always a theme. As we were continuing our work with the FAA to prepare for Extended Operations this year, sound implementation and execution of our operational policies and procedures will be as important as ever. We asked each Leader to underscore the importance of keeping compliance top of mind in everything our Employees do."

**Aircraft Mechanics Fraternal Association's statement to CBS News:**

"The Aircraft Mechanic Fraternal Association (AMFA) – representing more than 2400 Southwest Aircraft Maintenance Technicians releases the following statement:

The FAA has found, Southwest Airlines maintenance managers engage in coercive tactics that result in a 'capitulation of airworthiness and a culture of fear and retribution.'

American law, specifically the AIR 21 whistleblower statute, has provided the necessary means to resist management pressure to turn a blind eye to corrosion, gouges, and other significant aircraft damage.

Now, however, Southwest Airlines – already the major airline with the fewest mechanics per aircraft – is demanding the right to have its aircraft maintenance work performed in foreign countries that do not safeguard the professional integrity and compliance requirements of our profession.  The interests of American workers – many who are military veterans, and the security of the traveling public – demand that this safety sensitive work be performed in our own country."

**FAA statement to CBS News:**

"The nation's aviation system is safer than ever. Commercial aviation remains the safest form of travel because multiple and redundant levels of safety are built into the system.

Safety enforcement is never static. The FAA constantly works to improve consistency, safety data collection, and risk analysis. The U.S. has the largest, most diverse, and most complex airspace system in the world. Oversight is a dynamic process that requires the FAA and the airline industry to constantly strive for safety improvements. We welcome any opportunity to enhance what already is the safest aerospace system in the world.

The FAA's enforcement is designed to identify and mitigate potential risks before they affect safety. We investigate all allegations of safety standards violations, regardless of the source. We continue to be involved in investigations related to both American and Southwest Airlines. If those safety allegations are substantiated, we will take swift and appropriate action. We cannot discuss specific details until those investigations are complete."

© 2019 CBS Interactive Inc. All Rights Reserved.

f Share / 🐦 Tweet / ⚲ Reddit / ▢ Flipboard / ✉ Email

**Mya-Lecia Naylor, "Cloud Atlas" and "Almost Never" actress, dies at 16**
She appeared in the 2013 movie "Cloud Atlas," alongside Tom Hanks and Halle Berry
**CBS News**

**Try SHOWTIME & See Why Billions is the Show to Watch**
**Showtime** | Sponsored

CBSNews.com          CBS Interactive          Follow Us

| | | |
|---|---|---|
| Site Map | Privacy Policy | Facebook |
| Help | Ad Choice | Twitter |
| Contact Us | Terms of Use | RSS |
| CBS Bios | Mobile User Agreement | Email Newsletters |
| Careers | About CBS | YouTube |
| CBSi Careers | Advertise | CBS News Radio |
| Internships | Closed Captioning | CBS Local |
| Development Programs | CBS News Store | |

Search...

Copyright © 2019 CBS Interactive Inc.
All rights reserved.

# <u>EXHIBIT 13</u>

# United States Senate

February 12, 2019

Daniel K. Elwell
Acting Administrator
Federal Aviation Administration
800 Independence Avenue, SW
Washington, DC 20591

Dear Acting Administrator Elwell,

We write to inquire about steps the Federal Aviation Administration (FAA) is taking to investigate and address reports that airlines are pressuring their mechanics to ignore safety issues and short-cut the critical work they perform.

According to an eight-month investigation by CBS News, more than two dozen aircraft maintenance workers have come forward expressing concern that pressure from airlines to rapidly return aircraft to service may be endangering aviation safety.[1] Airlines naturally have an economic incentive to keep aircraft in service as long as possible; a plane only generates revenue if it is transporting passengers. But despite the need for safety to take precedence over airline profitability, mechanics have reported that managers have instructed them to "skip a few steps" in the maintenance process or to perform only the specific work assigned and ignore other safety defects they detect. Many of these safety-critical personnel fear retribution or even termination if they fail to comply with these dangerous directives or if they bring safety concerns to light. Since 2015, through whistleblower complaints, the FAA has documented several cases of inappropriate pressure and retaliation.

Congress has given the FAA the mandate to maintain the integrity and safety of our national airspace. As a part of that charter, the FAA certifies airlines' maintenance policies, procedures, and programs, which detail how mechanics will ensure that aircraft are meeting airworthiness standards. A critical component of any effective maintenance plan is an adherence to maintenance protocols and a safety-centric environment that encourages mechanics to both identify and report safety concerns. When safety standards are violated, the FAA has the obligation to investigate allegations and require corrective action.

To better understand how the FAA is investigating and responding to these troubling reports, we respectfully request answers to the following questions by March 5, 2019:

1. Since January 1, 2017, how many complaints has the FAA received about airlines' pressuring maintenance workers to ignore safety issues or short-cut safety-related work? For each complaint, please:

---

[1] *Airline mechanics feel pressured to overlook potential safety problems, "Accident waiting to happen,"* CBS News (Feb. 4, 2019),

    a.  Summarize the complaints, detailing the date, location, nature of the accusation, the type of maintenance work being performed, and the aircraft parts and systems involved. If the complaint was made or memorialized in writing, please provide a copy.

    b.  State whether the FAA investigated the accusation, and if not, why not. Describe the FAA's findings, any corrective action the FAA required, and whether the airline complied.

2.  In April 2018, we wrote to the FAA about reports of safety lapses at Allegiant Air. The FAA's response stated that "getting to the next level of safety requires finding and fixing hidden problems before they can cause an accident. Because everything starts with finding safety problems, compliance also requires the airline to have procedures that encourage open reporting." In light of this statement and the CBS News report, please:

    a.  Explain how the FAA ensures that airlines are not putting unnecessary pressure on mechanics to expedite maintenance work or otherwise ignore safety concerns.

    b.  Explain how the FAA ensures that mechanics have the unfettered ability to report safety concerns without fear of reprisal, including termination, from the airlines. Does the FAA expressly prohibit airlines from engaging in retaliatory action against employees who openly report safety concerns, or otherwise forbid the implementation of other disincentives to such reporting? If no, why not? If yes, how?

3.  Is the FAA investigating the disturbing reports uncovered by CBS News. If no, why not? If yes, please describe the nature and scope of the investigation.

Thank you for your attention to this important matter. If you have any questions, please contact Daniel Greene of Senator Markey's staff at (202) 224-2742.

<div align="center">Sincerely,</div>

Edward J. Markey
United States Senator

Richard Blumenthal
United States Senator

# EXHIBIT 14

**From:** APA Safety Committee <STSA@alliedpilots.org>
**To:** aa737drvr <aa737drvr@aol.com>
**Subject:** Hail Damage at DFW
**Date:** Wed, Apr 17, 2019 4:51 pm



## Hail Damage at DFW

On April 13, DFW experienced a major hail event. Several aircraft were damaged, and some were still out of service on April 15, pending inspections. This Safety blast applies to all pilots — regardless of base — who were advised by Maintenance Operations Control (MOC) to void a hail entry in the AML because the hail did not meet required inspection criteria.

If you were advised by MOC to void your AML entry, file an ASAP. Please remember: If you have a discrepancy, enter it into the AML. A qualified Aircraft Maintenance Technician will then determine whether the aircraft needs maintenance, not a person sitting behind a desk in IOC who cannot look at or see your aircraft.

Pertinent portion of Saturday's weather report:

```
LTGICCCCG ALQDS TS ALQDS MOV N P0029 T01330122
131555 131553Z 05022KT 1/2SM R17C/1600VP6000FT PLUSTSRAGR
SCT008
OVC011CB 13/12 A2957 RMK AO2 LTG DSNT ALQDS GRB50 TSB50
SLP009
OCNL LTGICCC OHD TS OHD MOV GR 1/2 P0019 T01280117.
```

"GR" means hail, and "1/2" means it was half an inch in diameter.

This is copied from the post-storm procedures in the General Procedures Manual:

Maintenance Manager/Supervisor/Crew Chiefs will tell the AMT in person to do hail inspections in the order that follows unless told differently by the MOD-MOC. Give all inspection findings to Maintenance Operations Control (MOC), who will give notification to Engineering as required for damage instruction.

NOTE: For flights scheduled to depart in 2 hours, inspect the surface of primary flight controls first to see if damage is there other than damage there before recorded in the

Aircraft Damage Log (ADL). Give notification to MOC if there is small or no damage. MOC will give notification to Engineering to see if it is possible to give an Engineering Authorization (EA).

At 1525 on April 13, DFW had 32 aircraft out of service (OTS) for hail inspection. At 0500 on April 14, DFW still had 25 OTS, with two having damage beyond limits. As of the morning of April 15, there were still five aircraft OTS in DFW for hail. <u>If this were a non-event, these aircraft would have never been taken OTS</u>.

Maintenance is not allowed to void or alter pilot discrepancies. Having the pilot void his own entry relieves maintenance from having to sign it off as within limits.

More hail is forecast at DFW today. Do not be influenced by a person who is not looking at the same aircraft that you are. If in doubt, make an entry in the AML and let a qualified Aircraft Maintenance Technician make the determination.

Dimples work great on golf balls, not on the lifting surfaces of an aircraft.

# **EXHIBIT 15**

# Weaponization of Mental Health



*In the Aviation Industry*

## Karlene K Petitt Ph.D.

Weaponization of Mental Health

in the Aviation Industry

# Weaponization of Mental Health



*In the Aviation Industry*

Karlene K Petitt Ph.D.

*Coming Soon!*

The unspoken truth of how airlines remove pilots for reporting safety, calling in fatigued, using too much sick leave, or suggesting improvements for safer operations... As it turns out calling a pilot crazy is more effective than firing them. If a pilot is terminated unjustly, they have legal rights to return. However, if they are deemed unfit to fly, they have no rights.

It doesn't matter if these pilots never lose their medical certificates. If the airline pays a doctor to create a diagnosis, then the airline will not allow the pilot to return to flight status. Some will get jobs at other airlines at half the pay and at the bottom of the seniority list. Others spend every

penny fighting for justice. Some are forced into an alcohol rehab program, whether they are an alcoholic or not.

One would ask why *anyone* would do such a thing? That is the million dollar question. The answer could be simple as, a sociopath in power.

This book, however, is on the medical side of this retaliation of how doctors are paid for creating a false diagnoses to remove an airline pilot. Many months ago I posted a passage from a medical report created by one of these doctors. Clearly extortion is written all over this page.

This doctor tells the pilot that if he contacts an attorney, files a complaint with the medical board, rescinds the releases he initially signed, or continues to allude to legal action that he would be found mentally unfit. However, if he drops legal action there might be a chance of a favorable diagnosis.

I also learned that the doctor who wrote the above report for one pilot, received close to $74,000 for a mental health examination of another. To put that in perspective, the average evaluation is closer to $3,300. This doctor went as far to tell pilot on Christmas Eve they would never fly again, despite notifying the company two months earlier. He has destroyed numerous lives over the course of his career. Sadly he is not alone, as there are other doctors just like him.

**Can we stop these doctors?**

Sometimes good news does prevail. After numerous calls to the medical board, and a half a dozen reports on the same doctor, a lengthy investigation prevailed. There was enough information identifying this doctor to have unethical behavior to send the investigatory report to the "controller."

The controller held this report for 9 months due to workload, but when he evaluated it, he too saw a problem and sent the doctor to the disciplinary board. Last week, the disciplinary board agreed with previous recommendations, and they sent him to the medical prosecution board. This next phase will take another two months, but the system is working.

While this will not get the lives back that this doctor has taken, it will prevent him from harming anyone again. The next question is, if a doctor loses his license and prosecuted for taking money with intent to do harm and fraud, what will they do with the organizations that paid these doctors for his false diagnoses? As this doctor, and others are officially prosecuted, I will post their names. If anyone has been harmed by one of them, these pilots may have recourse to open up their case to be revisited.

For those who have been subjected to a mental health evaluation for reporting safety, calling in fatigued, or being forced to fly unfit, you have rights under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, known as an Air 21, the whistle blower law. Please know that forcing someone into a mental health evaluation is considered an "adverse action" in the eyes of the law. If you need help, contact Lee Seham to learn the laws of protection, as you only have 90 days.

Stand by... this story is not over, and the book is in underway.

*Enjoy the journey!*
*XO Karlene*

# **<u>EXHIBIT 16</u>**

## Unsworn Declaration of Dr. Ibrahim Abi-Rafeh, MD, Pursuant to 28 U.S.C. § 1746

Dr. Ibrahim Abi-Rafeh deposes and says:

1.     I make this declaration of my own personal knowledge.

2.     I am board certified by the American Board of Neurology and Psychiatry in Psychiatry and Geriatric Psychiatry, practicing in Broward County, Florida.

> a. I have over 25 years experience with mental health, neuropsychiatric and cognitive disorders.
> b. I conduct psychiatric evaluations on a regular basis.
> c. I am a certificated pilot by the Federal Aviation Administration with advanced ratings.
> d. I hold a current Airman Medical Certificate issued by the FAA, and am familiar with the requirements for the issuance of a certificate.

3.     I have personally known Lt. Col. Scott Patterson for approximately 13 years and have flown with him in the context of the Civil Air Patrol/Air Force Auxiliary volunteer work as a mission pilot in search and rescue missions.  Patterson was a check pilot and mission check pilot and conducted mission pilot training and examinations.

4.     Patterson is an experienced and  well-respected pilot and flight instructor, whom other pilots sought for advice and counsel.

5.     I reviewed a copy of the complaint filed by  Captain Glenn Whitehouse dated September 24, 2015. It was addressed to Captain Brian Beach, Chief Pilot, MIA

6.     I reviewed a copy of the "Fitness for duty Medical Examination Request" made by Captain Brian Beach, Chief Pilot, MIA on January 14 2016 regarding "Patterson's judgment, and specifically, his mental and/or emotional stability". The request was made in response to allegations of

1

"atypical interactions with coworkers and reports that suggest a pattern of
false/self-aggrandizing statements". Patterson was removed from active
duty and place on paid withhold status on September 24, 2015.

      7.    I reviewed a copy of Patterson's FAA Medical Certificate First
Class with no limitations, completed by Dr. Joseph Tordella on January 29,
2016. Dr. Tordella is a retired Air Force and TWA pilot. Dr. Tordella is an
FAA Senior Aviation Medical Examiner with over 30 years of experience and
a certified Medical Review Officer registered with the US Coast Guard. He
certified that Patterson was fit to fly as per his First Class Medical
Certificate.

      8.    In March, 2016 I received the March 21st report of
Neuropsychological examination by Dr. John Knippa, Ph.D. on Rodney Scott
Patterson.

        a. It was peculiar to require Patterson to travel to California for
the Neuropsychological examination, when several are available in the
South Florida area and on the East Coast (see exhibit A).  He had to fly
nearly 2,700 miles across three time zones away to take cognitively
sensitive testing. It is well known that Travelers usually experience
symptoms after air travel across at least two time zones. Symptoms may
include disturbed sleep, daytime fatigue, decreased ability to perform
mental and physical tasks, reduced alertness, and headaches
(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3086113).(see exhibit B)
This likely affected his performance on the cognitive testing.

        b. As part of the psychological testing, Dr. Knippa conducted an
MMPI-2 and a PAI.  He stated in his report that the basic profile was entirely
within normal limits.  there was no endorsement identified of significance to
clinical concern for mood, anxiety, impulsiveness or problematic behavior.
A personality disorder was not identified with the limited data available at
that time.

        c. As far as cognitive skills assessment, Dr. Knippa stated that

2

the data are consistent with an attention deficit disorder with mild impaired range performance on multiple measures of complex speeded problem solving with novel information. The overall profile of neuropsychological assessment was discrepant from that expected for Major Airline pilots of similar age. However, in the section titled  Areas of Performance Concern, "No Technical Lapses of Performance were known to have been alleged".

        d. The evaluation was done the morning after a flight across three time zones, which did affect his performance on the cognitive tests, in addition to his stress about being removed from active duty. The time zone change meant that when the evaluation was started in the morning Pacific Time, it was early afternoon Eastern Time, which affects the circadian rhythm.

        e. In my opinion those findings do not correlate with his real life performance as a pilot, as there have not been any complaints about his flying skills during multiple flights and recurrent flight checks. The reason for the referral was to assess his mental and/or emotional stability and not his cognitive abilities, which there were no known issues with. In my opinion, there was no sound medical basis that he suffered from a disqualifying medical condition. In addition, Dr. Knippa has no authority to make that determination since he is not an FAA designated or trained medical examiner.

        f. I reviewed the Neuropsychological Evaluation conducted by Dr. Bercaw and Post-Doctoral Neuropsychology Resident Dr. Fonseca on March 21, 2016. It was done in Florida only a few days after Dr. Knippa's evaluation in California.  Again he traveled across three time zones and his performance on the cognitive testing may have been affected by fatigue as noted by the examiner. Patterson was still experiencing sleep disturbance due to jet lag and stress at the time which may take weeks to resolve.

        g. Patterson was fully qualified to hold a First Class FAA Airman Medical Certificate as certified by Dr. Tordella in January and July of 2016,

and he posed no risk to aviation safety. He returned to flying including Beech Jet and Boeing 767 as a Captain after successfully completing the required training and FAA flight check.  That disproves Dr. Knippa's determination that he was not fit for duty on the basis of impaired performance on cognitive assessment.

9.   To my knowledge and as per his medical record, he has no history of Traumatic Brain Injury, HIV, Alcoholism, Substance Abuse, Chemotherapy, Radiation or Cerebrovascular Accident.  He held a Top Secret clearance in the military and was the subject of multiple psychological screenings throughout his career and in order to become a Federal Flight Deck Officer, affirming no history of psychological problems then or now.

a. Patterson reported that his employer had investigated a complaint filed by a senior co-worker and determined the allegations were unfounded.

b. Anyone facing termination of employment and subsequent loss of their income would experience stress, which would impact other life functions, such as trouble sleeping and difficulty concentrating. Grounding is degrading to pilot's self-esteem and also increases anxiety levels for the pilot.

c. His employer required him under "threat of termination", to fly across country and be subject to a full battery of psychological testing, which certainly increased his anxiety level and affected his ability to sleep.

d. Based upon his departure time from Florida and arrival time in California, he was not given an adequate amount of rest to allow him to acclimate before testing.

10.   I attributed the low scores on the cognitive testing to stress and fatigue due to jet lag and lack of sleep, and not an underlying medical or neuropsychological issue which would disqualify him from holding an Airman Medical Certificate.

11.   Mr. Patterson did not require medical intervention or psychological care.  In my opinion he was medically and psychologically

intact.

12.   I have reviewed the reports written subsequent to Dr. Knippa's evaluation.  I concur with the neurological findings of John Hastings, MD, who conducted an Independent Aeromedical Neurological Evaluation on May 28, 2016 and concluded that Patterson was Neurologically intact and poses no risk to aviation safety.  I concur with the June 29,  2016 report written by Dr. Gary G. Kay, Ph.D. who concluded that "Mr. Patterson appears to be psychologically and neuropsychologically fit-for-duty as and American Airlines Pilot. There is no evidence of aeromedically significant neurocognitive deficit". He concurred that poor performance vigilance testing when evaluated by Dr. Knippa was likely due to jet-lag related fatigue, on follow up testing he performed well on this measure.

13.   Mr. Patterson sought my advice in 2016 as he felt he was being railroaded out of his job on a contrived medical issue. I was aware of the pending legal matter with his employer regarding military service.

14.   I reviewed Dr. Kay's neuropsychological testing done on October 10, 2018.  In summary, "He performed well on neuropsychological screening. CogScreen results suggest against the likelihood of acquired cerebral Dysfunction". "Aviation factor scores, validated predictors of flight performance, were all in the expected range. Additional testing of vigilance, memory, and executive functions also show intact neurocognitive functioning. Mr. Patterson performed at or above average compared to pilot norms on measures of verbal learning and memory. Performance on three measures of executive functioning demonstrate intact planning, abstract reasoning, impulse control, and novel problem solving ability".

15.   As a psychiatrist, I did not find a reason for him to seek mental health treatment, and I did not find any evidence that he would pose any risk to aviation safety. The fact that he completed his military service and retired as a Lieutenant Colonel in the army,  and returned to flying as a

Boeing 767 Captain is a testament to the lack of any cognitive deficit or psychological issues that would make him not fit for duty.

I declare under penalty of perjury that the foregoing is true and correct.  Executed at Cooper City, Florida, on April 10, 2019.

Ibrahim Abi-Rafeh, MD

# EXHIBIT A

## FAA HIMS NEUROPSYCHOLOGISTS

(Updated 03-21-2019)

| STATE | CITY | PRACTITIONER |
|-------|------|--------------|
| AK | Anchorage | CRAIG |
| AL | Birmingham | AZRIN |
| AL | Mobile | OGDEN |
| AR | Little Rock | FOWLER |
| AZ | Scottsdale | O'BRIEN |
| CA | Aptos | ALLOY |
| CA | Carlsbad | BASER |
| CA | Long Beach | KNIPPA |
| CA | Los Angeles | ELLIOTT |
| CA | Los Angeles | YOU |
| CA | Los Gatos | DRAG |
| CA | Los Gatos | YUTSIS |
| CA | Oceanside | BAILIE |
| CA | Pleasant Hill | IONASCU |
| CA | San Francisco | WATERWORTH |
| CA | San Diego | HAMILTON |
| CA | San Diego | SILVA |
| CO | Boulder | MANN |
| CO | Broomfield | DENISON |
| CO | Colorado Springs | RIPPETH |
| CO | Denver | GANT |
| CO | Denver | GINSBURG |
| CO | Denver | LAFOSSE |
| CO | Wheat Ridge | MIRICH |
| DC | Washington, DC | KAY |
| DE | Lewes | MAPOU |
| DE | Wilmington | KEAVENEY |
| FL | Brandon | BERCAW |
| FL | Davie | DEIDAN |
| FL | Ft. Lauderdale Palm Harbor Riverview | PECORARO |
| FL | Jacksonville | OVSON |
| FL | Orlando | PORGES |
| FL | Ormond Beach | VOIGHT |
| FL | Palm Beach Gardens | LEVINE |
| FL | Pensacola | HOLLIMON |
| FL | Sarasota | BAUM |
| FL | Sarasota | KANTER |
| FL | Tampa | DSURNEY |
| GA | Atlanta | KING |

| STATE | CITY | PRACTITIONER |
|-------|------|--------------|
| GA | Decatur | SHWARTZ |
| GA | Lawrenceville | LACY |
| ID | Boise | GAGE |
| IL | Northbrook | YOUNG |
| IL | Oak Park | HILL |
| IL | Skokie | BARRAS |
| IN | Fort Wayne | LUTZ |
| IN | Indianapolis | BUBP |
| KS | Manhattan | DURRETT |
| KS | Overland Park | ISAACSON |
| LA | New Orleans | CHAFETZ |
| LA | New Orleans | PEDERSEN |
| MA | Boston | KERVICK |
| MA | Boston Newton | SCHOENFIELD |
| MA | Brookline | STONE |
| MD | Chevy Chase | MAPOU |
| MI | Ann Arbor | MILANOVICH |
| MN | Golden Valley | ODLAND |
| NC | Wilmington | BERG |
| NE | Omaha | GARLINGHOUSE |
| NJ | Parsippany | DASILVA |
| NY | Albany | LITCHFORD |
| OH | Beachwood | SERNA |
| OH | Westerville | BEASON-HAZEN |
| OK | Tulsa | PELLA |
| OR | Bend | SCHOCK |
| OR | Portland | BRYAN |
| PA | Exton | KEAVENEY |
| PA | Malvern | GUAY |
| PA | Pittsburgh | BECKER |
| SC | Columbia | BERG |
| TN | Memphis | ATKINS |
| TN | Nashville | WALKER |
| TN | Nashville | KENNEDY |
| TX | Houston | LARGEN |
| TX | Lewisville | JOHNSON |
| TX | San Antonio and Houston | GLYWASKY |
| VA | Fairfax | KANE |
| VA | Richmond | DUKARM |
| WA | Seattle | ASGARIAN |
| WA | Seattle | BREEN |
| WA | Spokane | GUZZARDO |
| WI | Brookfield | KENNEDY |
| WI | West Allis | GLASSMAN |
| WY | Laramie | DENISON |

# Jet Lag

## Current and Potential Therapies

**Mary Choy, PharmD; and Rebecca L. Salbu, PharmD, CGP**

**Key words:** jet lag, melatonin, ramelteon, armodafinil

## INTRODUCTION

Jet lag, also known as circadian desynchrony, is a sleep disorder in which there is a mismatch with the body's natural circadian rhythm and the external environment as a result of rapid travel across multiple time zones. This common problem affects all age groups but may have more pronounced effects on the elderly, whose recovery rate is more prolonged than that in young adults.[1]

A multitude of factors, such as the number of time zones crossed and the direction and timing of flights, play a role in the severity of symptoms experienced by travelers. Individual variability accounts for the ability to adapt to a new time zone and the duration of the symptomatic period. Travelers usually experience symptoms after air travel across at least two time zones. Symptoms may include disturbed sleep, daytime fatigue, decreased ability to perform mental and physical tasks, reduced alertness, and headaches. Sleep disturbances typically last for a few days, but they can persist for as long as one week if the change in time zones is greater than eight hours. Eastward travel is associated with a longer duration of jet lag than westward travel. Although frequent desynchrony is a transient disorder, it carries the potential to lead to long-term consequences, as evidenced by epidemiological and animal studies.[2,3] Sequelae have included cognitive deficits, gastrointestinal (GI) disturbances, and an increased risk of cancer, infertility, and heart disease. As the body's internal circadian "clock" adapts to the new time zone, jet lag diminishes.

Strategies to minimize the effects of jet lag include adjusting the sleep schedule according to the new location during the days preceding the trip. This approach may be helpful for travel that lasts for more than a week, but it does not appear useful for short-term trips. Both alcohol and caffeine can adversely affect quality of sleep when they are consumed a few hours before bedtime; caffeine intake should be planned to enhance daytime alertness. When passengers are traveling, they are advised to avoid alcohol, especially while they are being treated for jet lag.

Treatment may include non-pharmacological therapy alone or non-pharmacological therapy combined with nutraceuticals or pharmacological therapy. A non-pharmacological approach, including adequate exercise, hydration, and appropriate timing of exposure to bright light, can aid in the adjustment to a new time zone. Nutraceuticals and pharmacological therapies include melatonin, melatonin receptor analogues (agonists), non-benzodiazepine hypnotic agents, caffeine, diphenhydramine (e.g., Benadryl, McNeil; Aler-Dryl, Reese), and armodafinil (Nuvigil, Cephalon).

A review of treatments and potential strategies follows.

## ROLE OF THE INTERNAL CIRCADIAN CLOCK

To appreciate the factors associated with jet lag, it is helpful to understand the basic properties of the body's internal clock. Our sleep–wake cycle is thought to be inherently determined, and the explanation for one's reactions to light and darkness lies with the suprachiasmatic nucleus (SCN). The central circadian clock is located in the SCN of the hypothalamus, where light signals from the retina are received. The SCN is responsible for adapting the circadian rhythm according to the light–dark cycles of the environment and for generating neuronal and hormonal activities that regulate various body functions in a 24-hour cycle.

The role of melatonin-mediated responses has been studied extensively in hopes of designing a novel therapeutic agent for circadian desynchrony. Some of the effects of activated melatonin type-2 receptors are phase-shift circadian rhythms of neuronal firing in the SCN, inhibiting dopamine release in the retina, inducing vasodilation and inhibition of leukocyte rolling (slowdown) in arterial beds, and enhancing immune responses.[4] It is hypothesized that neuronal clocks within the SCN form a heterogeneous network, wherein a majority of the neurons require periodic synchronization signals to be rhythmic and a small number of neurons or a low connectivity result in desynchrony.[5]

*Zeitgebers* (time-givers, or synchronizers) are rhythmic cues in the environment that synchronize the internal body clock to the earth's 24-hour light–dark cycle. Light is the strongest *Zeitgeber*; other non-photic *Zeitgebers* include temperature, social interaction, pharmacological manipulation, exercise, and meal timing.[6]

Blind people with no perception of light frequently show free-running endocrine, metabolic, behavioral, and sleep–wake cycles for their entire lifetime unless a synchronizing treatment is applied and is effective.[7] It is easiest to initiate sleep when the body temperature is at its lowest, coupled with an increase in melatonin secretion. When the body clock is inappropriately phased, sleep is difficult to initiate and maintain.

## PREVENTION AND MANAGEMENT OF JET LAG

The goal of prevention and treatment is to achieve circadian realignment in the most rapid and efficient way possible while minimizing the symptoms of jet lag. The treatment plan de-

*Dr. Choy is Assistant Professor at Touro College of Pharmacy and a Clinical Pharmacist at Metropolitan Hospital in New York, N.Y. Dr. Salbu is Assistant Professor at Touro College of Pharmacy in New York, N.Y., and an Internal Medicine Pharmacy Preceptor at North Central Bronx Hospital in Bronx, N.Y.*

*Accepted for publication January 18, 2011.*

**Disclosure:** The authors report no commercial or financial relationships in regard to this article.

# Jet Lag: Current and Potential Therapies

mean latency to persistent sleep (LPS) on days 2 to 4. These patients were able to achieve persistent sleep 10.64 minutes faster than the placebo group ($P = 0.030$). The additional treatment groups receiving 4 mg/day (n = 27) and 8 mg/day (n = 27) showed a tendency toward a reduction in mean LPS, but neither group reached statistical significance ($P = 0.106$ and $P = 0.067$, respectively).

Adverse effects of ramelteon are similar to those of melatonin. It does not appear that ramelteon leads to dependence or withdrawal effects after discontinuation.

## Tasimelteon

Tasimelteon (VEC-162, Vanda/BMS-214778, Bristol-Myers Squibb) is an investigational oral melatonin receptor agonist. In phase 2 and phase 3 studies, tasimelteon decreased transient insomnia that had been induced by an abrupt shift in the sleep–wake cycle.[26,27] Rajaratbam et al. conducted a double-blind, placebo-controlled phase 3 study (n = 411) in which it was concluded that tasimelteon, at doses of 20 mg/day (n = 100), 50 mg/day (n = 102), and 100 mg/day (n = 106), improved sleep latency, sleep quality, and sleep maintenance and provided a shift in circadian rhythms after an abrupt advance in sleep time ($P \le 0.05$ for all results).[26]

On January 19, 2010, the FDA granted an orphan drug designation status for tasimelteon in non–24-hour, sleep–wake cycle disorder for blind individuals without light perception.

## Non-benzodiazepine Hypnotic Agents
### Zolpidem (Ambien)

Non-benzodiazepine hypnotics, such as zolpidem (Ambien, Sanofi-Synthelabo), bind the benzodiazepine receptor subunit of the GABA-A receptor complex. This class of medications has a strong hypnotic effect, with weak anticonvulsant and muscle-relaxant properties.

In a multicenter, double-blind, randomized, placebo-controlled, parallel-group study, Jamieson et al.[28] described the use of non-benzodiazepine hypnotic medications in 130 experienced travelers during their regular eastward transatlantic assignments. Patients receiving zolpidem 10 mg/day (n = 68) reported longer total sleep times on the first night ($P < 0.005$); fewer awakenings on the first two nights ($P < 0.003$ for each); and improved quality of sleep on the first, second, and third nights ($P < 0.004$, $P < 0.004$, and $P < 0.056$, respectively).

Although the FDA has not approved this drug class for jet lag, the use of zolpidem as a way to cope with symptoms might be suitable for those who travel often for work and who are required to be active and alert as soon as they arrive in the new time zone. In this setting, these agents are attractive because of their rapid absorption, short half-life, and inactive metabolites.

When using non-benzodiazepines for the management of jet lag, patients are at risk for experiencing common adverse effects that include dizziness, somnolence, loss of memory, headache, and nausea. When low doses recommended for initiating sleep are used, carryover effects should be minimal the next day.[28] So far, little information is available regarding other non-benzodiazepine hypnotic drugs in the management of jet lag syndrome; however, their effects are likely to mimic those of zolpidem.

## Caffeine

In a systematic review of 13 randomized trials of persons with jet lag or shift-work disorder, caffeine improved concept formation, reasoning, memory, orientation, attention, and perception when compared with placebo.[29] For these reasons, caffeine is a common remedy for treating sleepiness induced by jet lag. Two studies have reviewed its effect after eastward transmeridian travel. Slow-release formulations of caffeine at a dose of 300 mg were used in both studies.[18,30] Pierard et al.[30] demonstrated that slow-release caffeine allowed a quicker resynchronization of hormonal rhythms as a result of mean saliva cortisol concentrations, which were significantly lower than in the placebo group.

A follow-up study by the same authors found that caffeine led to an objective decrease in daytime sleepiness compared with melatonin and placebo, as assessed by multiple sleep latency tests.[18]

## Diphenhydramine (Benadryl)

To date, no studies of diphenhydramine for use in jet lag syndrome have been conducted, even though this is the most common nonprescription antihistamine prescribed for insomnia. Side effects include daytime sleepiness, cognitive impairment, dizziness, blurred vision, and dry mouth and throat. Self-medication is a common problem that can result in adverse outcomes, especially in older adults. The use of diphenhydramine should be avoided in elderly persons, who are often sensitive to its anticholinergic properties.

## Armodafinil (Nuvigil)

Armodafinil, a central nervous system (CNS) stimulant, is designed to improve wakefulness in adults who experience excessive sleepiness because of obstructive sleep apnea, shift-work disorder, and narcolepsy.[31]

Rosenberg et al. conducted a phase 3, double-blind, randomized, placebo-controlled study to evaluate armodafinil 50 mg/day and 150 mg/day for the treatment of excessive sleepiness associated with jet lag disorder resulting from eastbound travel in travelers with a history of jet lag symptoms.[32] Patients receiving armodafinil 150 mg/day (n = 143) experienced a statistically significant benefit in sleep latency on the Multiple Sleep Latency Test (days 1 to 2: mean, 11.7 vs. 4.8 minutes for placebo; $P < 0.001$). Participants' perceptions of their overall condition in relation to jet lag symptoms on the Patient Global Impression of Severity (PGI–S) were also significant (days 1 to 2: mean, 1.6 vs 1.9 for placebo; $P < 0.05$).

Sleep latency was also significantly increased in the 142 patients receiving armodafinil 50 mg/day (days 1 to 2: mean, 7.7 vs. 4.85 minutes for placebo; $P < 0.001$). However, mean PGI–S scores did not differ in the placebo group (n = 142).

Most adverse events were mild to moderate. The most frequently reported events were headache, nausea, diarrhea, circadian rhythm sleep disorder, and palpitations.

In December 2010, Cephalon withdrew its effort to win the FDA's approval to market armodafinil for the treatment of jet lag after it received a second complete response letter from the agency.[33] The company believed that it had met all safety and efficacy endpoints in a clinical study but concluded that further communications with the FDA would not result in an approval

## Jet Lag: Current and Potential Therapies

*continued from page 224*

8. Srinivasan V, Spence DW, Pandi-Perumal SR, et al. Jet lag: Therapeutic use of melatonin and possible application of melatonin analogs. *Travel Med Infect Dis* 2008;6:17–28.

9. Parry BL. Jet lag: Minimizing its effects with clinically timed bright light and melatonin administration. *J Mol Microbiol Biotechnol* 2002;4(5):463–466.

10. Takahashi T, Sasaki M, Itoh H, et al. Melatonin alleviates jet lag symptoms caused by an 11-hour eastward flight. *Psychiatry Clin Neurosci* 2002;56:301–302.

11. Petrie K, Conaglen JV, Thompson L, et al. Effect of melatonin on jet lag after long haul flights. *Br Med J* 1989;298:705–707.

12. Claustrat B, Brun J. David M, et al. Melatonin and jet lag: Confirmatory result using a simplified protocol. *Biol Psychiatry* 1992; 32:705–711.

13. Lino A, Silvy S, Condorelli L, et al. Melatonin and jet lag: Treatment schedule. *Biol Psychiatry* 1993;34:587.

14. Czeisler CA. Commentary: Evidence for melatonin as a circadian phase-shifting agent. *J Biol Rhythms* 1997;12:618–623.

15. Arendt J. Jet lag and shift work: (2). Therapeutic use of melatonin. *J R Soc Med* 1999;4:402–405.

16. Samel A. Melatonin and jet lag. *Eur J Med Res* 1999;4:385–388.

17. Edwards BJ, Atkinson G, Waterhouse J, et al. Use of melatonin in recovery from jet lag following an eastward flight across 10 time zones. *Ergonomics* 2000;43:1501–1513.

18. Beaumont M, Batejat D, Pierard C, et al. Caffeine or melatonin effects on sleep and sleepiness after rapid eastward transmeridian travel. *J Appl Physiol* 2004;96:50–58.

19. Burgess HJ, Crowley SJ, Gazda CJ, et al. Preflight adjustment to eastward travel: 3 days of advancing sleep with and without morning bright light. *J Biol Rhythms* 2003;18:318–328.

20. Eastman CI, Gazda CJ, Burgess HJ, et al. Advancing circadian rhythms before eastward flight: A strategy to prevent or reduce jet lag. *Sleep* 2005;28:33–44.

21. Nicholson AN. Sleep and intercontinental flights. *Travel Med Infect Dis* 2006;4:336–339.

22. Arendt J, Alshous, M, Marks V. Alleviation of jet lag by melatonin: Preliminary results of controlled double-blind trial. *Br Med J* 1986;292:1170.

23. Herxheimer A, Petrie KJ. Melatonin for the prevention and treatment of jet lag. *Cochrane Database Syst Rev* 2002(2):CD001520.

24. Arendt J, Rajaratnam MW. Melatonin and its agonists: An update. *Br J Psychiatry* 2008;193:267–269.

25. Zee PC, Wang-Weigand S, Wright KP, et al. Effects of ramelteon on insomnia symptoms induced by rapid, eastward travel. *Sleep Med* 2010;11:525–533.

26. Rajaratnam SMW, Polymerous MH, Fisher DM, et al. Randomized controlled trials of the melatonin agonist tasimelteon (VEC 162) for transient insomnia after sleep time shift: Two randomized controlled multicentre trials. *Lancet* 2009;373:482–491.

27. Brown GM, Pandi-Perumal SR, Trakht, I, Cardinali D. Melatonin and its relevance to jet lag. *Travel Med Infect Dis* 2009;7:69–81.

28. Jamieson AO, Zammit GK, Rosenberg RS, et al. Zolpidem reduces the sleep disturbance of jet lag. *Sleep Med* 2001;2:423–430.

29. Ker K, Edwards PJ, Felix LM, et al. Caffeine for the prevention of injuries and errors in shift workers. *Cochrane Database Syst Rev* 2010;12(5):CD008508.

30. Pierard C, Beaumont M, Enslen M, et al. Resynchronization of hormonal rhythms after an eastbound flight in humans: Effects of slow-release caffeine and melatonin. *Eur J Appl Physiol* 2001; 85(1–2):144–150.

31. Nuvigil (armodafinil) tablets, product information. Frazer, Pa.: Cephalon, Inc.; 2010.

32. Rosenberg R, Bogan R, Tiller JM, et al. A phase 3, double-blind, randomized, placebo-controlled study of armodafinil for excessive sleepiness associated with jet lag disorder. *Mayo Clin Proc* 2010;85(7):630–638.

33. Cephalon drops bid for FDA approval of jet-lag drug. *The Wall Street Journal*, December 27, 2010.

34. Drug price inquiry. Available at http://drugstore.com/pharmacy. Accessed February 28, 2011 2010. ∎

# Jet Lag

## Current and Potential Therapies

Mary Choy, PharmD; and Rebecca L. Salbu, PharmD, CGP

Key words: jet lag, melatonin, ramelteon, armodafinil

## INTRODUCTION

Jet lag, also known as circadian desynchrony, is a sleep disorder in which there is a mismatch with the body's natural circadian rhythm and the external environment as a result of rapid travel across multiple time zones. This common problem affects all age groups but may have more pronounced effects on the elderly, whose recovery rate is more prolonged than that in young adults.[1]

A multitude of factors, such as the number of time zones crossed and the direction and timing of flights, play a role in the severity of symptoms experienced by travelers. Individual variability accounts for the ability to adapt to a new time zone and the duration of the symptomatic period. Travelers usually experience symptoms after air travel across at least two time zones. Symptoms may include disturbed sleep, daytime fatigue, decreased ability to perform mental and physical tasks, reduced alertness, and headaches. Sleep disturbances typically last for a few days, but they can persist for as long as one week if the change in time zones is greater than eight hours. Eastward travel is associated with a longer duration of jet lag than westward travel. Although frequent desynchrony is a transient disorder, it carries the potential to lead to long-term consequences, as evidenced by epidemiological and animal studies.[2,3] Sequelae have included cognitive deficits, gastrointestinal (GI) disturbances, and an increased risk of cancer, infertility, and heart disease. As the body's internal circadian "clock" adapts to the new time zone, jet lag diminishes.

Strategies to minimize the effects of jet lag include adjusting the sleep schedule according to the new location during the days preceding the trip. This approach may be helpful for travel that lasts for more than a week, but it does not appear useful for short-term trips. Both alcohol and caffeine can adversely affect quality of sleep when they are consumed a few hours before bedtime; caffeine intake should be planned to enhance daytime alertness. When passengers are traveling, they are advised to avoid alcohol, especially while they are being treated for jet lag.

Treatment may include non-pharmacological therapy alone or non-pharmacological therapy combined with nutraceuticals or pharmacological therapy. A non-pharmacological approach, including adequate exercise, hydration, and appropriate timing of exposure to bright light, can aid in the adjustment to a new time zone. Nutraceuticals and pharmacological therapies include melatonin, melatonin receptor analogues (agonists), non-benzodiazepine hypnotic agents, caffeine, diphenhydramine (e.g., Benadryl, McNeil; Aler-Dryl, Reese), and armodafinil (Nuvigil, Cephalon).

A review of treatments and potential strategies follows.

## ROLE OF THE INTERNAL CIRCADIAN CLOCK

To appreciate the factors associated with jet lag, it is helpful to understand the basic properties of the body's internal clock. Our sleep–wake cycle is thought to be inherently determined, and the explanation for one's reactions to light and darkness lies with the suprachiasmatic nucleus (SCN). The central circadian clock is located in the SCN of the hypothalamus, where light signals from the retina are received. The SCN is responsible for adapting the circadian rhythm according to the light–dark cycles of the environment and for generating neuronal and hormonal activities that regulate various body functions in a 24-hour cycle.

The role of melatonin-mediated responses has been studied extensively in hopes of designing a novel therapeutic agent for circadian desynchrony. Some of the effects of activated melatonin type-2 receptors are phase-shift circadian rhythms of neuronal firing in the SCN, inhibiting dopamine release in the retina, inducing vasodilation and inhibition of leukocyte rolling (slowdown) in arterial beds, and enhancing immune responses.[4] It is hypothesized that neuronal clocks within the SCN form a heterogeneous network, wherein a majority of the neurons require periodic synchronization signals to be rhythmic and a small number of neurons or a low connectivity result in desynchrony.[5]

Zeitgebers (time-givers, or synchronizers) are rhythmic cues in the environment that synchronize the internal body clock to the earth's 24-hour light–dark cycle. Light is the strongest Zeitgeber; other non-photic Zeitgebers include temperature, social interaction, pharmacological manipulation, exercise, and meal timing.[6]

Blind people with no perception of light frequently show free-running endocrine, metabolic, behavioral, and sleep–wake cycles for their entire lifetime unless a synchronizing treatment is applied and is effective.[7] It is easiest to initiate sleep when the body temperature is at its lowest, coupled with an increase in melatonin secretion. When the body clock is inappropriately phased, sleep is difficult to initiate and maintain.

## PREVENTION AND MANAGEMENT OF JET LAG

The goal of prevention and treatment is to achieve circadian realignment in the most rapid and efficient way possible while minimizing the symptoms of jet lag. The treatment plan de-

*Dr. Choy is Assistant Professor at Touro College of Pharmacy and a Clinical Pharmacist at Metropolitan Hospital in New York, N.Y. Dr. Salbu is Assistant Professor at Touro College of Pharmacy in New York, N.Y., and an Internal Medicine Pharmacy Preceptor at North Central Bronx Hospital in Bronx, N.Y.*

*Accepted for publication January 18, 2011.*

**Disclosure:** The authors report no commercial or financial relationships in regard to this article.

# **<u>EXHIBIT 17</u>**

OFFICE OF THE CHIEF PILOT

 **American Airlines**

3/7/2019

FO Rodney Scott Patterson
1092 NW 139TH TER
PMBK PINES
FL  33028

<u>Notice of Section 21</u>

Dear FO Patterson,

We recently learned of certain facts that suggest that you have engaged in a pattern of serious fraudulent conduct.  This fraudulent conduct includes: (1) making potentially false statements to obtain military leave; (2) submitting incomplete and false 8500 forms to the FAA; and (3) intentionally manipulating the Section 20 process by providing incomplete and misleading information to AA in the context of seeking to return to work, including hiding a medical examination that corroborated AA's fitness for duty examination.

When you are cleared to return to work through the Section 20 process, AA will convene a Section 21 hearing to investigate these serious concerns.

Please let me know if you have questions.

Sincerely,

Captain Jeffrey Price

Director of Flight, MIA

CC:   APA/Tricia Kennedy

Miami International Airport
P.O. BOX 527300 MD 2030
Miami, FL 33152
305 526 1200 Office
305 526 1294 Fax



**From:** Rojas, Luis [mailto:Luis.Rojas@aa.com]
**Sent:** Friday, March 08, 2019 2:48 PM
**To:** MIA-Chair <MIA-Chair@alliedpilots.org>; MIA-Vice <MIA-Vice@alliedpilots.org>;
apalegal <apalegal@alliedpilots.org>
**Cc:** Montgomery, Michelle <Michelle.Montgomery@aa.com>; Alfaro, Domingo
<Domingo.Alfaro@aa.com>; Egbert, Thomas <Thomas.Egbert@aa.com>; Mase, Kevin
<Kevin.Mase@aa.com>; Middlesworth, Raymond <Raymond.Middlesworth@aa.com>; Price,
Jeffrey <Jeffrey.Price@aa.com>
**Subject:** Section 21 - FO Scott Patterson (576006)


Good afternoon,

Please reference the attached document for a Section 21 hearing notice being sent to FO Scott
Patterson (576006).


Regards,


Luis Rojas

Administrator

MIA Flight Administration | 305.526.1295

Luis.Rojas@aa.com





**Fort Lauderdale**
450 East Las Olas Boulevard
Suite 800
Ft. Lauderdale, FL  33301

(954) 525-4800 Tel
(954) 525-8739 Fax

**Writer's Direct Dial:**
(954) 847-4709

**Writer's E-mail:**
mholt@fisherphillips.com

fisherphillips.com

March 4, 2019

**Via Email**

William R. Amlong, Esq.
Amlong & Amlong, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301
wramlong@theamlongfirm.com

    Re:    *Patterson v. American Airlines*, No. 17-cv-60533 (S.D. Fla.)

Dear Bill:

    Pursuant to Rule 11, we write to describe additional conduct by Mr. Patterson that violates Rule 11(b) and constitutes an extensive fraud upon the Court and American. Based on this misconduct, American intends to seek terminating sanctions and all of its attorneys' fees and costs incurred in this matter.

    In preparation for the hearing on American's Motion for Sanctions, we reviewed Mr. Patterson's deposition testimony regarding his purported trip to Washington D.C. on September 22–25, 2015, and American's travel records for Mr. Patterson.

    As you are aware, Mr. Patterson testified in his deposition that he and his wife traveled to D.C. in September 2015 to attend Pope Francis' visit to the White House. Indeed, Mr. Patterson's entire complaint rests on the premise that he requested time off from work in order to engage in military service in Washington D.C. in connection with the Pope's visit.

    Specifically, Mr. Patterson testified that he and his wife traveled on an American Airlines flight from Miami to Washington-DCA on September 22, 2015, and returned on September 25. He testified that he booked the travel on a non-revenue basis, using American's "Jetnet" system—a system that American employees use to book travel using their employee travel privileges. Mr. Patterson testified in significant detail regarding his D.C. trip, including the time of his flight from MIA to DCA (early morning), his schedule once he landed at the DCA airport, and his alleged subsequent work at the Pentagon and visit to the White House. (*See, e.g.*, Patterson Dep. at 191:14–232:22.)

    American's records, however, conclusively show that neither Mr. Patterson nor Mrs. Patterson traveled anywhere on any American flight nor any legacy US Airways flight between September 22–25, 2015. Despite Mr. Patterson's specific testimony that he flew on his travel

William R. Amlong, Esq.
March 4, 2019
Page 2

privileges, American also checked to determine if Mr. Patterson purchased tickets for himself and his wife. Based on its review, American confirmed that no one with the last name Patterson flew on American out of Miami (MIA) on September 22, or out of D.C. Reagan National (DCA) on September 25. Based on American's records and Mr. Patterson's failure to produce any documents establishing that he was in D.C.—despite American's specific requests for such documents in discovery—it appears that you and Mr. Patterson have based this entire lawsuit on a fabrication.

Given the magnitude of these misrepresentations and the enormous fraud on the Court and American that this would constitute, the only way to cure this would be to dismiss the complaint with prejudice and pay the entirety of American's fees and costs since the commencement of this litigation.

If you or Mr. Patterson has any evidence supporting Mr. Patterson's testimony regarding his alleged travel to Washington D.C. from September 22–25, 2015, or evidence supporting Mr. Patterson's claim that he was actually in D.C. during that time performing military duties at the Pentagon and White House, American demands that you produce those materials immediately. Similarly, if you or Mr. Patterson have any evidence confirming that Mr. Patterson lied regarding his alleged trip to D.C. and alleged performance of military duties at the Pentagon and White House, American demands that you produce those materials immediately.

We ask that you respond as soon as possible.

Sincerely,

Michael A. Holt
For FISHER & PHILLIPS LLP

MAH:mah

cc:     Counsel of Record (via email)