# <u>EXHIBIT 1</u>





ALLIED PILOTS ASSOCIATION

# PROFESSIONAL STANDARDS MANUAL

APRIL 1999



<<<<<<<<<<<<<<<>>>>>>>>>>>>

APA's NATIONAL OFFICERS, DOMICILE OFFICERS, STAFF, CONSULTANTS
AND NATIONAL COMMITTEES

## CODE OF ETHICS

I will faithfully discharge the duty I owe the Association which makes possible my way of life.

I will respect other officers, committee members, and employees of the Association remembering that respect does not entail subservience.

I will do all within my powers to discharge my duties efficiently and in a manner that will not cause unnecessary delays or expense.

I will faithfully adhere to the policies, directives, and resolutions of the Board of Directors.

I will realize that as a representative of the Association, I will at all times keep my personal appearance and conduct above reproach.

I will direct any criticism or proposed changes to the proper authorities within the Association.

I will hold the Association's business secrets in confidence, and will take care that they are not improperly revealed.

In dealing with others I will expect efficient performance, yet I will overlook small discrepancies and refrain from unnecessary and destructive criticism.

I will conduct my affairs with the Association in such a manner as to bring credit to the Association and to myself.

I will conduct my affairs with the Association and its members in accordance with the rules laid down in the Constitution and Bylaws of the Association and the interpretations promulgated therefrom.

I shall refrain from taking advantage of the confidence reposed in me by my fellow members.  If I am called upon to represent the Association in any dispute, I will do so to the best of my ability, fairly and fearlessly, relying on the influence and power of the Association to protect me.

I will regard myself as a debtor to the Association and will dedicate myself to its advancement.

I will not publish articles, give interviews, or permit my name to be used in any manner likely to bring discredit to the Association.

I will continue to keep abreast of labor developments so that my skill and judgment, which heavily depend on such knowledge, may be of the highest order.

I will endeavor to my utmost to faithfully fulfill the obligations of the Allied Pilots Association Code of Ethics.

Ethics are not learned by teaching; they are inculcated by example and by experience.  To a man of honor, ethics come as naturally as good table manners.

<<<<<<<<<<<<<<<>>>>>>>>>>>>

# TABLE OF CONTENTS

I.  PREFACE ....................................................................................................................... 1

II.  ORGANIZATION AND RESPONSIBILITY ............................................................... 1

    A.  Organization ........................................................................................................ 1

    B.  Responsibilities ................................................................................................... 2

    C.  Professional Standards Cases - Jurisdiction ................................................... 3

    D.  Relationship with Other Employee Groups ..................................................... 3

III.  GENERAL PRINCIPLES ............................................................................................ 3

    A.  Fair Representation ............................................................................................ 3

    B.  Confidentiality ..................................................................................................... 3

    C.  Neutrality ............................................................................................................. 4

    D.  Authority .............................................................................................................. 4

    E.  Use of Friendly Persuasion, Facilitation and Mediation ................................ 5

    F.  No Records Policy ............................................................................................... 5

IV.  CASE PROCEDURES ................................................................................................ 5

    A.  Receiving an Allegation ..................................................................................... 5

    B.  Personal Contact ................................................................................................ 5

    C.  Advising the Reporting Party ............................................................................ 6

    D.  Coordinating with the National Committee ...................................................... 6

    E.  Gathering Information ......................................................................................... 6

    F.  Other Sources ..................................................................................................... 6

    G.  Cases Referred by Management ........................................................................ 7

    H.  Interface with Management (Including Flight Department Managers) ............. 7

    I.  Cases Involving Parties Other Than Pilots ....................................................... 7

    J.  Resolution by Telephone ................................................................................... 7

    K.  Resolution by Meeting(s) ................................................................................... 7

    L.  Resolution or "No Assistance" .......................................................................... 8

V.  PROMOTING PROFESSIONAL STANDARDS .......................................................... 8

    A.  Domicile Meetings .............................................................................................. 8

    B.  *Flightline* ............................................................................................................. 8

    C.  D & R and New-Hire Class Briefings ................................................................. 9

VI.  REPORTS .................................................................................................................... 9

VII.  ACKNOWLEDGEMENT FORM ................................................................................ 10

## I. PREFACE

### A. Applicability of Manual

This document is APA's official Professional Standards Manual. It is for the exclusive use of the Allied Pilots Association (APA) and APA's Professional Standards Committee (PSC). All members of the National and Domicile Professional Standards Committees must be familiar with the policies and procedures in this manual and must comply with them at all times.

### B. Purpose

The purpose of the Professional Standards Program is to provide a standardized means to promote and maintain the highest degree of professional conduct among the pilots represented by APA. The Professional Standards Program serves as an "in-house" means for APA to resolve disputes of a professional or personal nature between pilots, or between pilots and other employees.

### C. Standards for Pilots

Standards of conduct for APA members are defined in the APA Code of Ethics, which has been reproduced on the inside cover of this manual. Standards of conduct for AA pilots are also found in American Airlines Flight Manual Part 1 and American Airlines Regulations. While APA encourages pilots to observe American Airlines' rules and regulations, the Association is not responsible for enforcing them.

### D. Problem Solving Mission

APA and its Professional Standards Committee are dedicated to helping pilots resolve issues in a discrete, non-threatening and non-official way without involving management. This is not an enforcement effort, nor does it function as an arm of any AMR or any AA department. It is important to remember that APA Professional Standards never functions on behalf of the Flight Department and that no files are kept, either at the local or national levels.

### E. APA Appeal Board

APA's Appeal Board, in accordance with the APA Constitution and Bylaws Article VI, is empowered to decide disputes where intra-union charges have been filed between pilots. The Appeal Board decides cases involving formal allegations against a pilot regarding interpretation and/or application of the APA Code of Ethics, APA's Constitution and Bylaws, or APA policy, as well as election-related disputes. The Appeal Board is not a part of the Professional Standards Program.

## II. ORGANIZATION AND RESPONSIBILITY

### A. Organization

The APA Professional Standards effort is composed of a National Professional Standards Committee (NPSC) and Domicile Professional Standards Committees (DPSC).

1. <u>National Professional Standards Committee (NPSC)</u>: The National PSC is composed of a Chairman and five members. The Committee and its Chairman are appointed by the President of APA, and serve a term concurrent with the President. Committee members will normally be former Domicile PSC Chairmen, or have previous PSC experience on the Domicile level. They are nominated by their Domicile Officers, and appointed by the President.

2. <u>Domicile Professional Standards Committee(s) (DPSC)</u>: The Domicile PSC and its Chairman are appointed by the Domicile Chairman, and serve a term concurrent with the Domicile Chairman. Domicile Committee members may be nominated by the Domicile PSC Chairman and are appointed by the Domicile Chairman. The composition of the Domicile PSC should be representative of the pilot group at each base. The size and composition of the Domicile Committee is at the sole discretion of the Domicile Chairman.

**B. Responsibilities**

1. <u>National PSC</u>

   a) Support and advise the Domicile PSCs. The National PSC may become involved in major or broadened cases, or serious cases with institutional implications.
   b) Provide procedures and assistance to help Domicile PSC solve pilots' problems relating to professional standards.
   c) Provide individuals the opportunity to seek assistance from APA in solving problems confidentially through the Professional Standards program.
   d) Educate APA's membership on the role of Professional Standards and encourage pilots to use PSC resources to solve problems without involving management.
   e) Provide an official manual containing guidance for Committee members, and procedures to ensure standardization in the performance of NPSC and DPSC duties.
   f) Matters handled by the Professional Standards Committee shall be kept strictly confidential. Information about Professional Standards cases shall not be revealed to anyone except those persons within APA with a need to know and those immediately involved in the incident with whom it must be discussed.
   g) Domicile PS committees must take great care to ensure they do not jeopardize a member's rights in any subsequent management hearing or grievance, or FAA, or law enforcement proceeding.
   h) To protect the pilots involved, no files or other records (paper or electronic) shall be kept by the Domicile PSC or any member thereof.
   i) DPSC members shall be represented and indemnified by APA in litigation resulting from the performance of their duties when they have made a reasonable effort to comply with this manual and with direction from APA officials, and have exercised common sense and reasonable judgement.

2. <u>Domicile PSCs</u>

   a) The primary responsibility of the Domicile PSC is to provide a local means for pilots to achieve "in-house," low-key, non-threatening, confidential solutions to professional standards problems.

2

b) Matters handled by the Professional Standards Committee shall be kept strictly confidential. Information about Professional Standards cases shall not be revealed to anyone except those persons within APA with a need to know and those immediately involved in the incident with whom it must be discussed.

c) Domicile PS committees must take great care to ensure they do not jeopardize a member's rights in any subsequent management hearing or grievance, or FAA, or law enforcement proceeding.

d) To protect the pilots involved, no files or other records (paper or electronic) shall be kept by the Domicile PSC or any member thereof.

e) DPSC members shall be represented and indemnified by APA in litigation resulting from the performance of their duties when they have made a reasonable effort to comply with this manual and with direction from APA officials, and have exercised common sense and reasonable judgement.

f) The DPSC shall establish programs to inform local pilots about the activities and responsibilities of Professional Standards, and about the advantages of using PSC to solve pilot issues without involving management.

## C. Professional Standards Cases - Jurisdiction

1. Professional Standards Committees shall attempt to resolve conflicts/problems at the lowest level possible and without involving management.

2. Routine cases will initially be handled by the Domicile PSC at the base of the pilot who is the subject of the complaint.

3. APA Legal and the NPSC Chairman shall be immediately notified of any case where action is likely to be taken by the FAA, management, a law enforcement agency, or where an official complaint has been made to a non-APA party.

## D. Relationship with Other Employee Groups

To promote low-key, no-jeopardy resolution of problems between pilots and other employees, a concerted effort should be made to establish communications and to maintain a good working relationship between APA NPSC and DPSC(s) and their counterparts at the Association of Professional Flight Attendants (APFA) and the Transport Workers Union (TWU). Contacts with non-union employee groups should be handled with caution because AMR considers these groups to be "management" and because information discussed with non-union employees may be reported to senior managers.

## III. GENERAL PRINCIPLES

## A. Fair Representation

It is the duty of the Allied Pilots Association and the NPSC and DPSC(s) to represent all AA pilots in professional standards cases and in other professional matters, whether or not they are APA members.

## B. Confidentiality

1. NPSC and DPSC members shall not discuss cases with management pilots or other management officials, or with law enforcement, the FAA or other third parties not

3

directly involved in the case. Exceptions may be made with the express prior approval of APA Legal and a National Officer when one of the parties listed above has already become involved in the case.

2. It is required to keep the names of all individuals involved confidential. It is recognized that the circumstances of some cases may make maintaining anonymity difficult.  If guidance or advice is needed on this point, please consult APA Legal and the NPSC Chairman.

3. Confidentiality protects the rights of all involved and promotes maximum participation in the program. Only those individuals inside APA with an absolute "need to know" will be advised of case particulars. This will normally include only the individuals directly involved in the incident and the Professional Standards Committee members working to resolve the issue. Complicated or serious cases may also require the assistance of the Domicile Chairman, a member of the National PSC, APA Legal, or a National Officer.

4. Whenever a question exists about how to handle a Professional Standards issue, APA Legal and the Chairman of the NPSC shall be notified immediately.

## C.  Neutrality

1. Members of the NPSC and DPSC must remain strictly neutral and absolutely non-political at all times to maintain the credibility of the Professional Standards program. Members and former members of a DPSC or the NPSC shall not use a Professional Standards title in a political mailing or campaign mailing of any kind other than the official APA candidate resume.

2. It is a serious violation of ethics and APA policy for a member or former member of NPSC or DPSC to disclose information about a Professional Standards case to management or to anyone else not authorized by this manual to have such information.

3. There are two sides to every allegation and the complete and accurate story often is hard to discern. When beginning work on a Professional Standards case, it is important to give equal credibility to the positions taken by both parties. A thorough and objective inquiry to gather all of the facts is required before making a recommendation to the parties involved.

## D.  Authority

It is the objective of the Professional Standards Committee to handle all Professional Standards cases involving an AA pilot without management involvement. Some cases may involve individuals or organizations outside of APA. There are some matters that Professional Standards does not handle and should refer to others within APA. Examples include:

1. Proficiency/Training problems require notification of and coordination with APA Legal and the Chairman of the National Training Committee.
2. Substance abuse allegations require notification of and coordination with APA Legal and the Chairman of the National Aeromedical Committee.

3. Reserve availability, sick leave and other contractual issues are normally not addressed by Professional Standards, except in cases of alleged flagrant abuse. Such cases require notification and coordination with the pilot's Domicile Representatives.
4. Jumpseat travel issues require notification and coordination with the Chairman of APA's Jumpseat/Non-Rev Committee.
5. Personal appearance (uniforms, haircuts, shoeshines, etc.), is the responsibility of the individual pilot. These issues are not normally addressed by the NPSC or DPSC, except in cases of alleged repeated and flagrant abuse. Such cases require notification and coordination with the pilot's Domicile Representatives.

## E. Use of Friendly Persuasion, Facilitation and Mediation

The NPSC and DPSCs resolve most cases by facilitating cooperative efforts by the parties involved. Occasionally a resolution cannot be reached, even after Professional Standards mediates the situation and offers suggestions and friendly persuasion. Cases where the DPSC or NPSC does not succeed shall be reported to the Chairman of the NPSC immediately.

If the National PSC Chairman determines that a resolution is not obtainable, APA Legal shall be informed immediately. After consultation with APA Legal, the NPSC Chairman shall notify the individuals involved that Professional Standards "CAN BE OF NO FURTHER ASSISTANCE IN THIS MATTER." This "no assistance" response means that the recourse remaining to the complainant is to use the "do not pair with" bid sheet option, to take the issue to an alternative forum, or to take no further action. The NPSC Chairman will suggest the "do not pair with" option, but will never recommend taking a problem to an alternative forum. That decision must be left to the sole discretion of the parties involved.

## F. No Records Policy

To protect the pilots involved, no notes, files or records of any kind (paper or electronic) shall be kept by NPSC or DPSC(s). The only records that should ever exist regarding any matter referred to APA Professional Standards are those produced and retained by APA Legal, because Legal Department records are protected by attorney/client privilege.

## IV. CASE PROCEDURES

### A. Receiving an Allegation

1. When you receive an allegation, either by phone, in person or in writing, be sure to notify the Chairman of your Committee, the DPSC or the NPSC, as appropriate.
2. Ask the reporter if he/she has made a report of any kind to anyone besides APA Professional Standards.
3. The NPSC Chairman or the DPSC Chairman shall notify APA Legal if required by this manual.

### B. Personal Contact

1. The first step toward resolving any Professional Standards allegation is to ask the reporting party if he/she has tried to resolve the issue with the other party. If not,

encourage a "one-on-one" resolution before PSC involvement, if that is acceptable to the person making the allegation.

2. Be careful not to discourage the reporting party at this point and try to avoid losing the case to management. Assure the reporter that Professional Standards will become involved directly.

3. If the reporting party indicates this has already been tried, or if the PSC member believes direct contact is inappropriate for the situation, the NPSC or DPSC should become involved to the extent required to bring about a resolution.

4. The DPSC or NPSC shall function as a facilitator and an intermediary (mediator).

## C. Advising the Reporting Party

1. Tell the reporting party that you will investigate the allegation thoroughly, including discussions with the other involved parties.

2. Inform the reporter that the Committee will guard the confidentiality of the reporter and the other parties involved to the maximum extent possible, although confidentiality cannot guarantee anonymity in all cases.

3. In cases involving non-pilot employees, it may be appropriate to contact APA Legal, then APFA or TWU Professional Standards for assistance.

4. The reporter may be contacted again if needed to bring about a resolution of the case.

## D. Coordinating with the National Committee

1. Except as set out below or elsewhere in this manual, or when instructed to the contrary, the Domicile PSC will handle most cases concerning members of their domicile.

2. In unusal, complex or potentially serious cases, APA Legal, the Domicile Chairman and the Chairman of the National PSC should be notified immediately.

3. APA Professional Standards is not authorized to handle cases that may result in discipline, nor cases that are already known to management where discipline is likely, nor cases where reports have been made to management or the FAA or law enforcement agencies. Such cases must be reported to APA Legal and the Chairman of the National PSC immediately.

## E. Gathering Information

1. Take enough time to talk with all parties involved, if possible.

2. Be objective and do not offer opinions.

3. Respect the rights, dignity, and confidentiality of all parties.

4. Approach the parties with an attitude of concern for the individuals involved, as well as for safety and professional conduct.

5. In cases where specific behavior is alleged in a work context, it is a valid technique to consult other pilots who have flown with and stayed on a layover with the pilot(s) involved. Offer confidentiality to these pilots and ask for their confidentiality about your contact with them.

## F. Other Sources

1. The Professional Standards Committees may consult with APA Legal, APA's National Officers, and APA's Safety, Training, and Aeromedical Committees, as required by the circumstances of each case.

2.  Cases that are likely to involve discipline or FAA action or law enforcement action are outside of the jurisdiction of the Professional Standards Committees (NPSC and DPSC), and must be referred to APA Legal immediately.

## G.  Cases Referred by Management

1.  Management may ask APA Professional Standards to become involved in a case. Such cases are handled in the same manner as other cases unless the NPSC or DPSC believes that discipline or FAA action or law enforcement action are likely.
2.  The NPSC and DPSC do not share information about cases with management (including Flight Department managers), other than to inform the manager who referred the case that it was or was not resolved by the NPSC or DPSC.

## H.  Interface with Management (Including Flight Department Managers)

1.  Professional Standards Committee members do not meet with management without express prior approval of the NPSC Chairman or DPSC Chairman, as appropriate.
2.  The role of the NPSC or DPSC is to listen to management regarding professional standards allegations. Do not provide management with information about the case that has been obtained from non-management sources.
3.  Members of NPSC or DPSC do not discuss information related to the case that has not been provided by management, other than to inform them that the problem has been or has not been resolved.
4.  Members of NPSC and DPSCs do not provide personal opinions about a case to management.
5.  Cases where discipline or FAA action or law enforcement action is likely to result or is already under consideration are not handled by the NPSC or DPSC. Such cases must be immediately referred to APA Legal, or if they are not available, to a National Officer. Such notification shall be made as soon as the NPSC or DPSC becomes aware that discipline or third-party action is likely or is already under consideration.

## I.  Cases Involving Parties Other Than Pilots

1.  Consultation with the NPSC Chairman is required in all cases involving non-pilots, even for seemingly minor allegations made by or against non-pilots.
2.  In such cases involving an APFA- or TWU-represented employee, attempt to contact your PS counterpart at the other union to help resolve the issue (e.g. APFA or TWU Professional Standards, etc).
3.  Getting the parties together may be difficult, so assistance from your APFA or TWU counterparts may be important to your resolution efforts.

## J.  Resolution by Telephone

Initial efforts should be made to resolve an issue by telephone. If a resolution cannot be reached via telephone or if the nature of the alleged problem dictates an alternative forum, resolution may necessitate a meeting (or separate meetings) with the parties involved.

## K.  Resolution by Meeting(s)

1.  The next step in attempting a resolution is made at the local level—usually at a meeting or in separate meetings. These meetings should include the Domicile Professional

Standards Committee Chairman (or DPSC member(s) designated by the DPSC Chairman to handle the case and the parties involved.

2. Prepare an outline of the points to discuss before the meeting.
3. At the opening of the meeting, introduce yourself as a no-threat facilitator and mediator.
4. Remain neutral and maintain a low-key, professional manner.
5. State the desired outcome: a resolution without management involvement.
6. State that each party will be allowed equal time to state his/her point without interruption.
7. Maintain control of the discussion and insist on professional conduct during the meeting.
8. Ask the parties to avoid insults and personal attacks during the discussions.
9. Ask each party if there could have been other actions taken that might have avoided the conflict.
10. Attempt to have the parties resolve their issue in your presence, including a mutual agreement that management will not be asked to become involved.
11. Ask for a commitment from both parties to end the conflict and work together in the future, if possible. If they do not believe this is possible, suggest the "do not pair with" alternative.
12. Notify the DPSC Chairman (if he/she was not present) of the results of the meeting(s).

## L. Resolution or "No Assistance"

1. If there has been no resolution by the DPSC, the National Professional Standards Committee Chairman will be notified and may discuss the case with the parties by phone or in a meeting(s). The NPSC Chairman shall notify APA Legal if he/she is unable to resolve the case.
2. After all reasonable efforts to effect a resolution have been made, the National Professional Standards Committee Chairman (after receiving the advice of the Domicile Professional Standards Committee Chairman and APA Legal as required) will declare the problem either resolved or not resolved.
3. In cases referred by management, the Domicile Chairman and Vice Chairman shall be notified of this decision before the parties involved are notified and before management is notified.
4. After consulting APA Legal, the NPSC Chairman will advise the parties that "APA PROFESSIONAL STANDARDS CAN BE OF NO FURTHER ASSISTANCE" in resolving this issue.

## V. PROMOTING PROFESSIONAL STANDARDS

## A. Domicile Meetings

Domicile PSC Chairmen are encouraged to ask their Domicile Chairmen to allow them to use domicile meetings, meeting minutes and bulletin boards to encourage the use of APA's Professional Standards Program. The DPSC should promote the resolution of pilot problems in the workplace without involving management through the use of the DPSC.

## B. *Flightline*

The National PSC Chairman is encouraged to submit timely articles from members of the NPSC or DPSC(s) for consideration for publication in *Flightline*.

## C.  D & R and New-Hire Class Briefings

The NPSC Chairman shall ensure that a Professional Standards representative addresses all new-hire pilot classes and all Captain upgrade (D & R) classes.

## VI. REPORTS

1. To protect the pilots involved, no notes, files or records of any kind (paper or electronic) shall be kept by APA Professional Standards at the local or national level. There are no exceptions to this policy.

2. Periodically, each Domicile Professional Standards Committee Chairman may be asked to forward to the National PSC Chairman a "Committee Report."
   a) This report should list only general de-identified information concerning the kinds of cases being handled at the domicile.
   b) The purpose of these reports is to identify general problem areas and general trends.
   c) These reports will be archived at APA Headquarters and may be reported to the APA Board of Directors at regular Board Meetings at the discretion of the NPSC Chairman and APA's President.

## VII.  ACKNOWLEDGEMENT FORM

I, _____, certify that I have read this manual, that
　　(Please print name)

I understand it, and that I will comply with the policies and procedures set forth in it. I understand

that compliance with the policies and procedures contained in this manual is a condition for my

participation in the APA Professional Standards program.


Signature: _____

Date: _____

Domicile: _____


**NOTE:  This form must be completed and returned by mail or fax to the National**

**Professional Standards Committee Chairman as a condition of your participation**

**in the NPSC or DPSC.**

Mail to:　　Chairman, APA National Professional Standards Committee
　　　　　　Allied Pilots Association
　　　　　　14600 Trinity Boulevard, Suite 500
　　　　　　Fort Worth, Texas 76155-2512

　　　　　　Or fax to: 817.302.2369

# **<u>EXHIBIT 2</u>**

August 21, 2017


**ALLIED PILOTS ASSOCIATION APPEAL BOARD RULING**

**IN RE:**

**ARTICLE VII CHARGES**

**FIRST OFFICER RODNEY "SCOTT" PATTERSON**

**v.**

**CAPTAIN GLENN WHITEHOUSE**


Attached is the APA Appeal Board ruling regarding the Article VII charges by First Officer Rodney "Scott" Patterson against Captain Glenn Whitehouse.



For the Appeal Board,


First Officer Rob Sproc
Appeal Board Chair


Captain Joe Bazo
Appeal Board Member


Captain Jeff Koontz
Appeal Board Member

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................2

DISCUSSION.....................................................................................................................3

CHARGES .........................................................................................................................5

DECISION.......................................................................................................................10

## INTRODUCTION

The Allied Pilots Association's ("APA") Constitution and Bylaws ("C&B") Article VII sets forth the internal process and rules governing intra-union hearing and disciplinary procedures. Charges may be brought by a member in good standing against any other APA member under Article VII for:

1. Willfully acting as a strike-breaker pilot during any duly authorized pilot strike;

2. Willful violation of the APA Constitution and Bylaws;

3. Willful neglect in paying dues, assessments, or fines levied by the Association;

4. Misappropriating money or property of the Association;

5. Willful violation of the pilots' working agreement;

6. Initiating and/or prosecuting charges under this article in bad faith;

7. Any act contrary to the best interests of the APA as an institution or its membership as a whole;

8. Any act motivated by malice or political animus that exposes another member to company discipline, up to an including termination.

Article VII further directs that charges must be submitted to the APA Secretary-Treasurer by certified mail within one (1) year after the alleged offense. The Appeal Board is tasked with hearing or reviewing cases referred to it in accordance with Article VII.

First Officer Rodney "Scott" Patterson filed Article VII charges against Captain Glenn Whitehouse in December 2016.[1] In a letter dated March 13, 2017, Captain William Read, MIA Domicile Chair, denied First Officer Paterson's complaint, finding that the one-year statute of limitations had been exceeded and, therefore, First Officer Patterson's complaint was not cognizable.[2] First Officer Patterson filed an appeal of Captain Read's decision on April 6, 2017.[3] The APA Appeal Board convened a three-member panel (hereinafter, "Panel") to hear First Officer Patterson's appeal. Panel members were First Officer Robert Sproc, Captain Joe Bazo, and Captain Jeff Koontz. The hearing took place on June 8 and 9, 2017, in Miami, FL. First Officer Patterson,

---

[1] See Accuser's Complaint.
[2] Captain Read letter dated March 13, 2017.
[3] Patterson letter to Torell dated April 6, 2017.

1

through his pilot advocate Captain Danny Shellhouse, presented his case to the Panel, proffering 26 exhibits and one written motion. The Accused, Captain Glenn Whitehouse, declined to attend the hearing both in person and electronically via Skype, Facetime or other electronic means. He did not designate a pilot representative. Instead, Captain Whitehouse proffered emails dated June 2, 2017, and June 6, 2017, for consideration of this Panel.

## BACKGROUND

First Officer Scott Patterson is a pilot for American Airlines currently on medical disability.[4] The basis for First Officer Patterson's complaint originated from a MIA-ASU trip in October 2014. Captain Glenn Whitehouse ("Accused") was the Captain, and First Officer Scott Patterson ("Accuser") was one of two first officers. A dispute erupted between the Accuser and Accused, each alleging the other exhibited offensive conduct during the trip and well after the trip ended. It is unclear exactly how APA Professional Standards became involved, but it is clear from Exhibit 5 that APA Professional Standards member Captain Mark Modrich was directly involved in mediating the dispute. At some later point, at least one more unnamed APA Professional Standards member became involved. (See Exhibits 3 and 4.) Specifically, the unnamed APA Professional Standards captain presciently warned First Officer Patterson that both he and Captain Whitehouse need to "move on" because "...if it continues and escalates – it will be out of Professional Standards [sic] hands and then get ugly."[5]

Eventually, First Officer Patterson was subject to discipline under Section 21 of the APA-AA Joint Collective Bargaining Agreement. The Section 21 Hearing took place on November 23, 2015, and a PEH entry was made into First Officer Patterson's file on February 1, 2016.[6] The PEH entry admonished First Officer Patterson to "maintain good working relationships with his coworkers."[7] First Officer Patterson thereafter crafted a complaint against Captain Whitehouse under Article VII of the APA C&B, dated December 4th but mailed certified on December 5, 2016.[8] Eight allegations were leveled against Captain Whitehouse.

---

[4] Hearing Transcripts, June 8, 2017, pg. 17, lines 7-10.
[5] Exhibit 3, pg. 9.
[6] Exhibit 1.
[7] Id.
[8] Accuser's Complaint.

2

The chairman of the Miami domicile, Captain William Read, did not reach a determination on the merits of First Officer Patterson's Article VII complaint, but instead found that the complaint was "not cognizable" since more than one year had elapsed between the occurrence of the events upon which the complaint was based and the filing of the complaint.[9] Captain Read confuses timeliness as a cognizable issue. Whether or not charges are cognizable pertains to the eight enumerated actions listed in Article VII Section A, 1-8. Deadlines for filing of charges and appeals are covered separately and distinctly in Article VII.  First Officer Patterson timely filed his appeal of the Miami Domicile Chairman's decision.[10]

As a threshold matter, the Panel must first resolve whether the Miami Domicile Chairman was correct in finding that First Officer Patterson's Article VII complaint (hereinafter "Complaint") was untimely. If the Panel finds that the Complaint is timely, then a determination would have to be made as to the disposition of the merits of the Complaint.

## DISCUSSION

### Jurisdiction

Before a Domicile Officer can hear the merits of a complaint under Article VII of the C&B, the officer must first determine whether jurisdiction exists. To establish jurisdiction, four elements must be satisfied:

    (1)    The accuser is a Member in Good Standing;

    (2)    The claim is filed within the Statute of Limitations period;

    (3)    The claim alleges liability under Article VII (cognizable charges);

    (4)    The accuser has suffered some level harm as a result of the accused's action(s).[11]

In this matter, Captain Read declared that the Complaint was not filed within the one-year period called for under Article VII.B.2, and therefore the Complaint was not cognizable. Captain Read identified the date of First Officer Patterson's Section 21 Hearing (November 23, 2015) as being the latest point in which the one-year limitations period commenced. The Panel finds this to be in error. Under the plain language of Section 21 of the APA – AA JCBA, the first step in the disciplinary process is a written advisory.[12] In this case, a PEH entered into First Officer

---

[9] Patterson v. Whitehouse Transcript, Vol. 1, pp. 32-33
[10] Patterson letter to Torell dated April 6, 2017.
[11] See *Meadows v. AAPSIC*.
[12] APA-AA JCBA, Sec 21, A.1.h.(1).

Patterson's personnel file on February 1, 2016.[13] The Complaint was filed by First Officer Patterson on December 5, 2016, – 308 days after the PEH. Therefore, this Panel finds that First Officer Patterson's Article VII was timely.

## Merits Determination

Next, the Panel turned to adjudicating the merits of the Complaint. First Officer Patterson lodged 10 charges against Captain Whitehouse.[14] Charges 1 through 5 allege acts in violation of Article VII.A.8. Charges 6, 7 and 8 do not identify a particular section under Article VII.A that was violated by the alleged acts. Charges 9 and 10 do not allege specific acts or identify specific section(s) under Article VII.A that were violated. The second sentence in Paragraph B of Article VII reads: "The charges shall be specific as to the alleged acts that constitute the basis for the charges **with citations to the particular provision of the Constitution and Bylaws that have been violated.**" (Emphasis added.) Since Charges 9 and 10 allege neither specific acts nor particular provision(s) of the C&B which were violated, Charges 9 and 10 fail. Charges 6, 7, and 8 do allege specific acts but lack identification of specific provision(s) of the C&B that were violated.[15] Hence, Charges 6, 7 and 8 likewise fail. This leaves Charges 1 through 5 for the Panel's consideration.

## Article VII.A.8

Article VII.A.8 reads: "Any act motivated by malice or political animus that exposes another member to company discipline, up to and including termination." Hence, there are two components which must be proven: an act plus the requisite intent, either malice or political animus. In this case, no acts have been alleged which correspond to a political endeavor or to achieving a political goal. Therefore, for his Complaint to be successful, First Officer Patterson must show that Captain Whitehouse's were committed with malicious intent and that Captain Whitehouse possessed the knowledge that his actions would lead to First Officer Patterson being subjected to company discipline. According to Black's Law Dictionary, "Malice does not simply mean ill will towards the person, but signifies a wrongful act, done intentionally, without just cause

---

[13] Exhibit 1.

[14] The Complaint labels each charge as "COUNT", numbered sequentially 1 through 10. The Panel will identify each allegation as a "Charge" and not as a "Count".

[15] Charges 7 and 8 do state that the alleged acts violated Article VII, but the Panel believes that the plain language of VII.B requires greater specificity.

or excuse."[16]  Thus, proof of a violation of Article VII.A.8 requires that First Officer Patterson show: (1) an act, which (2) knowingly would cause First Officer Patterson to be subjected to discipline, (3) done intentionally with ill will by Captain Whitehouse, and (4) without just cause or excuse.

## Exhibit 3

First Officer Patterson, through his pilot advocate Captain Shellhouse, offered into evidence a twelve-page document that was written by Captain Whitehouse and delivered to MIA Domicile Chief Pilot Captain Brian Beach.[17] The Panel later admitted the document into evidence as Exhibit 3. The document contained numerous redactions, and it was explained that the redactions were made by American Airlines to protect the privacy of its employees and that the redacted document was central to the company's Section 21 disciplinary against First Officer Patterson.[18] Throughout First Officer Patterson's case in chief, the Panel was urged to accept the statements made in Exhibit 3 for their plain meanings, albeit not necessarily for their truths. The Panel is the fact finder and hence it is solely up to the Panel to judge truthfulness. Nevertheless, Exhibit 3 is significant in that although Captain Whitehouse did not participate in the hearing and although two email communications from Captain Whitehouse have been considered by the Panel, Exhibit 3 essentially tells Captain Whitehouse's version of events.

## CHARGES

## Charge 1

First Officer Patterson alleges that Captain Whitehouse violated Article VII.A.8 by colluding with another employee to subject First Officer Patterson to company discipline. [19] The crux of this allegation is that a protracted dispute which originated with the MIA-ASU flight in October of 2014 and continued well into 2015, and because a resolution through APA Professional Standards could not be achieved, the company ultimately became involved by instigating a Section 21 disciplinary proceeding against First Officer Patterson.  Much reliance was placed by First Officer Patterson on Exhibit 3, and the Panel agrees with him that it does establish a causal

---

[16] Black's Law Dictionary, 2nd Ed.
[17] Patterson v. Whitehouse Transcript, Vol. 1, pp 37-52.
[18] *Id.*
[19] See "Count 1" of Complaint.

connection between his Section 21 discipline and Captain Whitehouse's actions. To prevail under Article VII.A.8 requires more than just proving a causal connection; First Officer Patterson must show that Captain Whitehouse acted with ill will and without just cause. To demonstrate ill will, it would have to be shown that Captain Whitehouse "desired to see another experience pain, injury, or distress."[20]

**Ill Will:** The Panel believes that Exhibit 3, considered in its entirety, does support a finding that Captain Whitehouse desired to see First Officer Patterson "experience pain, injury or distress." The opening paragraph of Captain Whitehouse's letter to MIA Chief Pilot Captain Beach directly asks that American Airlines, through its manager Captain Beach, "...declare that I have been a target of **workplace harassment** by First Officer Scott Patterson."   (Emphasis added.) American Airlines' policies regarding workplace harassment are clear:

> No one wants to work for a company where harassment, intimidation or violence lives. To be absolutely clear, American prohibits threats and workplace violence toward our employees, vendors, customers or property. In no shape or form will the following be tolerated:
> - Physically or verbally threatening or intimidating another individual while at work, including acts of bullying;
> - The intentional destruction or threat of destruction of company or another's property;
> - Harassing or threatening an employee while at work, including phone calls or written communications;
> - Stalking at work; and
> - Advocating illegal use of firearms, bombs, or weapons while at work.
>
> This applies to everyone working on behalf of the company, including, but not limited to, American employees, contract workers, temporary workers, and non-employees on American's property. If you witness or are aware of any violent or potentially violent conduct, do the right thing and report it to your local management as quickly as possible. They'll take it from there, making an initial assessment of the situation and contacting Human Resources.[21]

It is common knowledge that termination is a likely consequence for the employee who violates the company's "Zero Tolerance" workplace harassment policy. Captain Whitehouse, as a veteran captain at American Airlines, likely knew this when he drafted a twelve-page letter to the Company

---

[20] Black's Law Dictionary, 10th Ed., definition of the term "ill will".
[21] AA Policies, U.S. Domestic, "Keep It Fair".

and formally charged First Officer Patterson with workplace harassment.[22]   The Section 21 disciplinary process was initiated against First Officer Patterson following Captain Whitehouse's letter (Exhibit 3), and this letter was the centerpiece of the Company's case against First Officer Patterson. Discipline was issued against First Officer Patterson in the form of a PEH.[23]

**Just Cause:** It is ok to be wrong, provided a reasonable explanation exists for being wrong. Captain Whitehouse's letter (Exhibit 3) is single-spaced and twelve pages long. It makes numerous inferences that First Officer Patterson is a bad pilot, a bad person, a person of unsavory character, a person whose family is annoying, and overall is a person with whom Captain Whitehouse would not choose to associate. The Panel found two instances alleged by Captain Whitehouse which potentially could constitute harassment, and both were mentioned on page 6: the finger pointing in the second paragraph, and the extra scrutiny Captain Whitehouse experienced in VVI mentioned in the third paragraph. If either of these allegations had any credibility, the Company would have been remiss in not applying its own Harassment Policy against First Officer Patterson – something the Company clearly did not do in the Section 21 Hearing. Therefore, no just cause existed for Captain Whitehouse to file workplace harassment charges against First Officer Patterson. Specifically, in Captain Whitehouse's opening paragraph, he does not simply request Captain Beach resolve the dispute at his level as an immediate supervisor, but rather requests that Captain Beach "take the below statements to American airlines [sic] corporate human resources for review and action" clearly putting First Officer Patterson's employment at risk.  Additionally, Captain Whitehouse uses repeated inflammatory language questioning First Officer Patterson's employment status and questioning the mental health of First Officer Patterson, although no evidence was presented to the Board indicating that Captain Whitehouse is qualified to make such accusations: "What the hell is a person of this character doing in an AA cockpit?" (Exhibit 3, lines 164-165); "seemed delusional" (Exhibit 3, line 117); "delusional lie" (Exhibit 3, line 206); "he is not a stable person" (Exhibit 3, line 262); "pathological liar" (Exhibit 3, line 336); "Patterson needs to be evaluated for physiological (sic) evaluation." (Exhibit 3, line 387). These actions and statements are more than just anecdotal references. They are retaliatory in nature and, when taken as a whole, constitute malice.

---

[22] Exhibit 3, p.1.
[23] Exhibit 1.

Captain Whitehouse acted to intentionally expose First Officer Patterson to Company discipline, did so with malice, ill will and no justifiable reason; therefore, First Officer Patterson prevails on Charge 1.

## Charge 2

First Officer Patterson alleges in Charge 2 that Captain Whitehouse violated Article VII.8.A by lying to APA Professional Standards.[24] To prevail on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum.  As we stated above, the first element is the act and here, the act complained of was Captain Whitehouse's "lying" to APA Professional Standards member Captain Mark Modrich. Exhibit 5 is a sworn affidavit by Captain Mark Modrich that was admitted into evidence.[25] First Officer Patterson argues that the gist of Captain Modrich's affidavit supports a conclusion that Captain Whitehouse lied to APA Professional Standards. The Panel disagrees.

If the Panel were to take Captain Modrich's statements in the light most favorable to First Officer Patterson, the closest the Panel can come to First Officer Patterson's argument is that Captain Whitehouse perhaps made statements to Captain Modrich which were untrue. Making false statements, however, is not the same as lying.[26] Lying is making a statement known to be false, which is different from making a statement, which one believes to be true, but in fact is not. Contrary to First Officer Patterson's characterization that Exhibit 5 supports the conclusion that Captain Whitehouse lied, the Panel reads Captain Modrich's affidavit as offering an opinion as to the credibility of Captain Whitehouse versus First Officer Patterson. Ultimately, credibility is for the Panel to judge but we will note here our great discomfort in seeing a member of the APA Professional Standards Committee offering credibility opinions in an Article VII dispute. Since it cannot be shown that Captain Whitehouse's statements to Captain Modrich constituted lies, First Officer Patterson fails to prove that the act complained of had occurred. Charge 2 therefore fails.

---

[24] Charge 2 of Complaint, referred to as "COUNT 2" in Complaint.
[25] Patterson v. Whitehouse Transcript, Vol. 1, pp 53-54.
[26] The Panel IS NOT concluding or even inferring that Captain Whitehouse made false statements or lied to Captain Modrich. Rather, the Panel is engaging in a hypothetical assumption that even if the Panel were to assume that Captain Whitehouse did make statements that could perhaps be proven to be inaccurate, Claim 2 nevertheless fails.

**Charge 3**

First Officer Patterson alleges in Charge 3 that Captain Whitehouse violated Article VII.8.A by making false statements to American Airlines Human Resources.[27] To prevail on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum, the first being that the act complained of actually occurred. Here, the only encounter the Panel knows of in which Captain Whitehouse could possibly be communicating to American Airlines Human Resources would be through the communication entered into evidence as Exhibit 3. The Panel notes that nowhere in Exhibit 3 does it appear that Captain Whitehouse is intending to speak to anyone at American Airlines management other than his Chief Pilot, Captain Brian Beach. Nevertheless, for the sake of evaluating Charge 3 in a light most favorable to First Officer Patterson, the Panel will hypothetically assume that when Captain Whitehouse proffered his communication to Captain Beach, he reasonably knew or should have known that his communication would also reach Human Resources. The Panel will also assume momentarily that First Officer Patterson identified factually incorrect statements in Exhibit 3. All this does for First Officer Patterson is hypothetically establish that a pilot made an incorrect statement or statements to Human Resources, to which First Officer Patterson had the opportunity to refute at his Section 21 Hearing. Charge 3 therefore fails.

It may seem contradictory that First Officer Patterson can prevail on Charge 1 and not Charge 3; however, Charge 1 focuses on what Captain Whitehouse knew he was doing by creating and submitting Exhibit 3 to the Company, and Charge 3 focuses on the truthfulness of the statements made in Exhibit 3. Charge 1 did not require a determination by the Panel on the veracity of the statements made in Exhibit 3 by Captain Whitehouse, but Charge 3 does require such a determination. Here, we find that First Officer Patterson fails to meet his burden of proof for Charge 3. Note, this does not mean that the Panel finds that the statements made by Captain Beach in Exhibit 3 are true – it only means that First Officer Patterson failed to prove Charge 3.

**Charge 4**

First Officer Patterson alleges in Charge 4 that Captain Whitehouse violated Article VII.8.A by making false statements to U.S. government agents and corporate security.[28] To prevail

---

[27] Charge 3 of Complaint, referred to as "COUNT 3" in Complaint.
[28] Charge 4 of Complaint, referred to as "COUNT 4" in Complaint.

on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum, the first being that the act complained of actually occurred. From the record, the Panel is not aware of any statements which Captain Whitehouse made to "U.S. Government agents" or "Corporate Security". Charge 4 fails.

## Charge 5

First Officer Patterson alleges in Charge 5 that Captain Whitehouse violated Article VII.8.A by transmitting privileged APA communications to management for political animus reasons and that Captain Whitehouse's aim was the termination of First Officer Patterson's employment.[29] To prevail on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum, the first being that the act complained of actually occurred. From the record, the Panel is not aware of any communications from the APA, much less communications which could be construed as being "privileged", being in the possession of Captain Whitehouse or being transmitted by Captain Whitehouse. The Panel concludes that the act complained of has not been established by First Officer Patterson and therefore Charge 5 fails.

## Accuser Motion 1

First Officer Patterson, through his advocate Captain Shellhouse, proffered a motion for sanctions against Captain Whitehouse.[30] The Panel will not sanction Captain Whitehouse for nonappearance nor will the Panel assess any fees upon Captain Whitehouse. Although participation in the Article VII process is clearly favorable for the Association, its membership, and most especially for the accused, the C&B do not mandate participation by the accused. In this case, First Officer Patterson, did not claim to be prejudiced by the absence of Captain Whitehouse. Similarly, Captain Whitehouse's absence did not burden the Panel. Furthermore, the Panel will not assess any fees or costs on Captain Whitehouse. Accuser Motion 1 is denied.

## DECISION

First Officer Patterson prevails on Charge 1. Captain Whitehouse is assessed a fine of one hundred dollars ($100.00). This fine is due on December 31, 2017, or immediately upon a concurring ruling by an arbitrator should this decision be appealed, whichever occurs first.

---

[29] Charge 5 of Complaint, referred to as "COUNT 5" in Complaint.
[30] Patterson v. Whitehouse Transcript, Vol. 2, pp 112.

# **EXHIBIT 3**

OFFICE OF THE CHIEF PILOT

 **American Airlines**

3/7/2019

FO Rodney Scott Patterson
1092 NW 139TH TER
PMBK PINES
FL  33028

<u>Notice of Section 21</u>

Dear FO Patterson,

We recently learned of certain facts that suggest that you have engaged in a pattern of serious fraudulent conduct.  This fraudulent conduct includes: (1) making potentially false statements to obtain military leave; (2) submitting incomplete and false 8500 forms to the FAA; and (3) intentionally manipulating the Section 20 process by providing incomplete and misleading information to AA in the context of seeking to return to work, including hiding a medical examination that corroborated AA's fitness for duty examination.

When you are cleared to return to work through the Section 20 process, AA will convene a Section 21 hearing to investigate these serious concerns.

Please let me know if you have questions.

Sincerely,

Captain Jeffrey Price

Director of Flight, MIA

CC:   APA/Tricia Kennedy

Miami International Airport
P.O. BOX 527300 MD 2030
Miami, FL 33152
305 526 1200 Office
305 526 1294 Fax





fisherphillips.com

**Fort Lauderdale**
450 East Las Olas Boulevard
Suite 800
Ft. Lauderdale, FL  33301

(954) 525-4800 Tel
(954) 525-8739 Fax

**Writer's Direct Dial:**
(954) 847-4709
**Writer's E-mail:**
mholt@fisherphillips.com

March 4, 2019

**Via Email**

William R. Amlong, Esq.
Amlong & Amlong, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301
wramlong@theamlongfirm.com

      Re:    *Patterson v. American Airlines*, No. 17-cv-60533 (S.D. Fla.)

Dear Bill:

      Pursuant to Rule 11, we write to describe additional conduct by Mr. Patterson that violates Rule 11(b) and constitutes an extensive fraud upon the Court and American. Based on this misconduct, American intends to seek terminating sanctions and all of its attorneys' fees and costs incurred in this matter.

      In preparation for the hearing on American's Motion for Sanctions, we reviewed Mr. Patterson's deposition testimony regarding his purported trip to Washington D.C. on September 22–25, 2015, and American's travel records for Mr. Patterson.

      As you are aware, Mr. Patterson testified in his deposition that he and his wife traveled to D.C. in September 2015 to attend Pope Francis' visit to the White House. Indeed, Mr. Patterson's entire complaint rests on the premise that he requested time off from work in order to engage in military service in Washington D.C. in connection with the Pope's visit.

      Specifically, Mr. Patterson testified that he and his wife traveled on an American Airlines flight from Miami to Washington-DCA on September 22, 2015, and returned on September 25. He testified that he booked the travel on a non-revenue basis, using American's "Jetnet" system—a system that American employees use to book travel using their employee travel privileges. Mr. Patterson testified in significant detail regarding his D.C. trip, including the time of his flight from MIA to DCA (early morning), his schedule once he landed at the DCA airport, and his alleged subsequent work at the Pentagon and visit to the White House. (*See, e.g.*, Patterson Dep. at 191:14–232:22.)

      American's records, however, conclusively show that neither Mr. Patterson nor Mrs. Patterson traveled anywhere on any American flight nor any legacy US Airways flight between September 22–25, 2015. Despite Mr. Patterson's specific testimony that he flew on his travel

William R. Amlong, Esq.
March 4, 2019
Page 2

privileges, American also checked to determine if Mr. Patterson purchased tickets for himself and his wife. Based on its review, American confirmed that no one with the last name Patterson flew on American out of Miami (MIA) on September 22, or out of D.C. Reagan National (DCA) on September 25. Based on American's records and Mr. Patterson's failure to produce any documents establishing that he was in D.C.—despite American's specific requests for such documents in discovery—it appears that you and Mr. Patterson have based this entire lawsuit on a fabrication.

Given the magnitude of these misrepresentations and the enormous fraud on the Court and American that this would constitute, the only way to cure this would be to dismiss the complaint with prejudice and pay the entirety of American's fees and costs since the commencement of this litigation.

If you or Mr. Patterson has any evidence supporting Mr. Patterson's testimony regarding his alleged travel to Washington D.C. from September 22–25, 2015, or evidence supporting Mr. Patterson's claim that he was actually in D.C. during that time performing military duties at the Pentagon and White House, American demands that you produce those materials immediately. Similarly, if you or Mr. Patterson have any evidence confirming that Mr. Patterson lied regarding his alleged trip to D.C. and alleged performance of military duties at the Pentagon and White House, American demands that you produce those materials immediately.

We ask that you respond as soon as possible.

Sincerely,

Michael A. Holt
For FISHER & PHILLIPS LLP

MAH:mah

cc:     Counsel of Record (via email)

# **<u>EXHIBIT 4</u>**

Lucretia D. Guia
Associate General Counsel
Legal

**American Airlines** ✈

Via Email: fuentes.oscar@dol.gov

February 29, 2016

Oscar G. Fuentes
Assistant Director/Investigator
U.S. Department of Labor
Veterans Employment and Training Service
2550 West Oakland Park Boulevard – Room 133
Fort Lauderdale, Florida 33311

Re:   Patterson, Rodney S.
      File #: FL-2016-00016-10-R

Dear Mr. Fuentes:

This letter and the enclosed information responds, on behalf of American Airlines, to First Officer Rodney Patterson's complaint to your office that he has been subjected to disparate treatment and that his rights under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 et seq. were violated. FO Patterson's complaint is specious. AA has not deprived him of any rights protected by USERRA and has not discriminated against him in any manner whatsoever.

I.     Introduction

AA is a commercial air carrier that provides scheduled service to destinations throughout the United States and abroad. Many employees of the Company are military veterans, and many employees continue to serve in active, guard, or reserve status. The Company has the highest regard for those who serve (or served) our country in the armed services. AA is committed to providing military leave to its employees as required by USERRA, prohibits discrimination based on covered veteran status and uniformed military service, and affords all rights, privileges, and benefits to employees as required by USERRA. The Company's general military leave policies are available to employees on its intranet (Exh. A) and specific military leave procedures for pilots are set forth in Section 11 of the collective bargaining agreement between APA and AA. (Exh. B)

II.    Factual Background and Response to Requests for Information

As I indicated during our brief telephone conversation regarding this matter, the Company has not denied FO Patterson military leave or discriminated against him in any manner. On or about September 29, 2015, the Company requested that FO Patterson substantiate his request for military leave for September 21, 2015. It did so because FO Patterson's request for the leave raised questions. Specifically, on the day before a scheduled trip, FO Patterson contacted one of the Chief Pilots in MIA and asked for an "EO" – which is effectively a code used for unanticipated personal absences. He told Captain Bonds

4333 Amon Carter Blvd., MD 5675
Fort Worth, TX 76155
817-931-3929 Office
817-963-4959 FAX
lucretia.guia@aa.com

# ATTACHMENT 7

that he wanted the EO because the captain on his trip the following day was a representative from APA's Professional Standards and that he and the captain did not get along. Captain Bond denied the EO for that purpose. Then, later in same day, after Captain Bond had left, FO Patterson called the duty chief and asked again for the EO. In this telephone call, he told the duty chief that he needed the day off because he had been assigned duty in relation to the "Pope's visit." The duty chief removed FO Patterson from his trip, as he requested.

Typically, AA does not require verification of military service and, specifically, pilots are not typically required to provide uniformed service orders to substantiate military service. AA requested verification of FO Patterson's service for September 22 in this case because of the specific circumstances. FO Patterson initially cited personal differences with the captain as the reason he wanted off the trip and later, after being denied an EO for that purposes, called a different person and indicated that he needed time off for military leave, the Company requested that FO Patterson substantiate his military leave. It did not specify the type of verification, i.e., it did not demand military orders. On or about October 28, 2015, FO Patterson provided his LES to the Company, which appeared to show that FO Patterson had been paid for military service for the relevant dates, September "22-24, 2015. (Exh. C) Upon receipt of that information, the Company took no further action relative to this military leave. It took no disciplinary action and no reprisals related to this leave.

In addition to inquiring about the circumstances that led AA to request verification of FO Patterson's military service, you asked whether there has been any "disciplinary actions" discussed with FO Patterson concerning "job performance issues/attendance problems." There has been no disciplinary action for "attendance problems." On or about September 24, 2015, however, a pilot co-worker lodged a formal complaint regarding FO Patterson's conduct. (Exh. D) Because of the serious nature of the complaint, the Company immediately removed FO Patterson from service and launched an investigation. (Exh. E) He was placed on "PW" status (which is the code used when the Company withholds a pilot from duty with pay). During the course of the investigation, which did not lead to discipline, the Company discovered information which placed in question FO Patterson's fitness for duty. And, consistent with its duty to ensure the safety of its employees and passengers, the Company initiated a fitness for duty examination, which is pending. Throughout this process, FO Patterson has remained on a paid status. He has not been placed on a "Leave Without Pay" status either before or after this Company launched this investigation.

Last, you requested that the Company provide a list of uniformed service members who work out of the South Florida airports who have "similar issues as Mr. Patterson." Although numerous pilots based in MIA frequently take military leave, none have demonstrated "similar issues." None have been the subject of a similar complaint by a co-worker and none have exhibited conduct during an investigation that cast concerns about his/her fitness to fly. Moreover, none have provided contradictory reasons for a last minute request for military leave.

In closing, AA has done nothing relative to FO Patterson which was discriminatory or in any manner violated his USERRA rights. It simply requested verification of his military service because of circumstances which raised legitimate questions regarding that service. Once he provided that verification, the issue was resolved.

Please let me know if you have further questions.

Sincerely,

Lucretia D. Guia

Enclosures:  Exhibits A-E

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO.:  1:17-cv-60533-JEM

RODNEY SCOTT PATTERSON,            )
                                  )
            Plaintiff,            )
                                  )
v.                                )
                                  )
AMERICAN AIRLINES, INC., a        )
Delaware Corporation,             )
                                  )
            Defendant.            )
_____)

Videotaped Deposition of JAMES N. BONDS
(Taken by Plaintiff)
Charlotte, North Carolina
Thursday, March 15, 2017

Reported in Stenotype by
Christine A. Taylor, RPR
Registered Professional Reporter

Page 2

```
 1          APPEARANCES
 2   ON BEHALF OF PLAINTIFF: (via telephone)
 3          WILLIAM R. AMLONG, Esq.
            Amlong & Amlong, P.A.
 4          500 Northeast Fourth Street
            Second Floor
 5          Fort Lauderdale, Florida  33301
            954.462.1983
 6          wramlong@TheAmlongFirm.com
 7
     ON BEHALF OF DEFENDANT:
 8
            TRISTAN MORALES, Esq.
 9          O'MELVENY & MYERS, LLP
            1625 Eye Street, NW
10          Washington, DC  20006
            202.383.5300
11          tmorales@omm.com
12
     VIDEOGRAPHER:
13
            Roosevelt Harrison, III
14
15
     ALSO PRESENT:
16
            Noel Pace, Esq. (Via telephone)
17
18
19          VIDEOTAPED DEPOSITION OF JAMES N. BONDS, a
20   witness called on behalf of Plaintiff, before Christine
21   A. Taylor, Registered Professional Reporter and Notary
22   Public, in and for the State of North Carolina, at
23   CaseWorks, 6000 Fairview Road, Suite 1273, Charlotte,
24   North Carolina on Thursday, March 15, 2017, commencing
25   at 11:13 a.m.
```

1    the one who took the initial call.

2         Q.   And did you speak to Mr. Patterson that day?

3         A.   I did not.  I called and left a voicemail with

4    him.

5         Q.   And what -- what reason, if any, did either

6    Ms. Grant or Mr. Rojas quote Mr. Patterson as giving

7    for not wishing to fly on that trip?

8         A.   I don't remember why they asked that.

9         Q.   You mean you don't remember why -- you don't

10   remember what they told him -- told you about why

11   Mr. Patterson said he did not want to go on that trip?

12        A.   Correct.  All I know is he had requested an

13   EO.

14        Q.   When you and Mr. Beach were both chief

15   pilots, how did you divide the pilots whom you

16   supervised?

17        A.   It was at random.  It was whomever had a

18   moment to fix any issue or problem.  It wasn't any set

19   division of responsibilities.

20        Q.   So you, Mr. Scialfa, and Mr. Beach all

21   supervised all 2,000 pilots?

22        A.   That's correct.

23        Q.   As best you can?

24        A.   That's correct.

25        Q.   And you never spoke to -- you never spoke to

Page 36

1   Mr. Patterson that day; correct?

2        A.   I left a voicemail on his phone.

3        Q.   How many days in advance of the flight with

4   Captain Harlow did you get this phone call?

5        A.   No days, just hours.

6        Q.   Do you recall where the flight was to?

7        A.   I do not.

8        Q.   Is Mr. Harlow an international captain?

9        A.   Yes.

10        Q.   And from Miami, does that mean temporarily

11   flying to Latin America?

12        A.   No, it doesn't necessarily mean that.  The

13   airplane is capable of going to Europe, Mexico, Canada.

14   It's just all over.

15        Q.   Do you know where this flight was going to?

16        A.   I have no idea.

17        Q.   What, if anything, do you recall Mr. Harlow

18   telling you about Mr. Patterson other than he was

19   going to fly with him?

20        A.   Nothing in that situation.  Nothing at all.

21        Q.   Do you remember anything that Mr. Odell -- or

22   Odeh told you about Mr. Patterson?

23        A.   On that flight or in general?

24        Q.   Anything whatsoever that Mr. Odeh told you

25   about Mr. Patterson?



**State Bar of Georgia**

(/index.cfm)

# Ms. Lucretia Dolores Guia

American Airlines Inc

4333 Amon Carter Boulevard

Fort Worth, TX 76155

**Email**          lucretia.guia@aa.com (mailto:lucretia.guia@aa.com)

**Phone**          (817) 931-3929

**Fax**

| | |
|---|---|
| **Status** | Active Member in Good Standing |
| **Public Discipline** | None on Record |
| **Admit Date** | 11/13/1989 |
| **Law School** | Wake Forest University |

# MEMBER DIRECTORY

MS. LUCRETIA D. GUIA

Back to Search Results

| | |
|---|---|
| **ID** | 17992 |
| **Name** | Ms. Lucretia D. Guia |
| **Address** | 4333 Amon Carter Blvd., MD 5675 |
| | |
| **City** | Fort Worth |
| **State** | TX |
| **ZIP Code** | 76155 |
| **Country** | USA |
| **Work Phone** | 817-931-3929 |
| **Email** | lucretia.guia@aa.com |
| **License Date** | 04/12/1991 |
| **Judicial District** | Out of State |
| **Status** | Active |
| | |
| **Status Definition** | The lawyer is presently eligible to practice law in North Carolina. |

# **<u>EXHIBIT 5</u>**

**Aerospace Neurology, LLC**
John D. Hastings, M.D.
5563 S. Lewis Avenue, Suite 100
Tulsa, Oklahoma 74105
Phone (918) 742-4100
Fax: 918-512-4846

Board Certified: Neurology                         Neurological Consulting
Board Certified: Aerospace Medicine                Aerospace Medicine Consulting

May 28, 2016

Re:
Patterson Scott
D.O.B.: Nov.18.1967

Independent Aeromedical Neurological Evaluation

I performed an office aeromedical neurological evaluation on Mr. Scott Patterson on May.24.2015. This report is based upon the history provided by Mr. Patterson and review of records, which include neuropsychological assessment by Dr. John Knippa. Mr. Patterson stated that a neurological evaluation was requested by his airline employer for assessment of his fitness to fly from a neurological perspective.

Mr. Patterson is a 48-year-old airline pilot who has served in the military for 28 years and nearing mandatory military retirement at 29 years at the rank of Lieutenant Colonel He has flown with American Airlines for 16 years. He reports excellent general health. He has no history of diabetes, hypertension or heart disease. His wisdom teeth were removed in the Army 28 years ago. He has not had an appendectomy or tonsillectomy. His only other surgical history is for removal of spindle cell sarcoma of the left chest wall, which will be discussed later in this report. He takes no prescription medication, only supplements. He has managed cholesterol successfully with dietary management. He has maintained first class FAA medical certification at six month intervals.

On Dec.06.2014 Mr. Patterson was bathing his usually timid cat when he was deeply clawed in the left pectoral area, causing significant bleeding. He cleansed the area and thought it was healing satisfactorily. On Dec.26.2014 his wife noted a small lump in the area of the cat claw. He saw his primary care physician on Dec.31.2014 and had serologic studies for cat scratch fever, which were unrevealing. He discussed the lump further with a friend, a cardiovascular surgeon from University of Miami. This led to referral and a punch biopsy that "looked like fat." However, permanent pathology sections indicated spindle cell sarcoma, and the lesion was treated with wide excision. Surgical margins were clear. MRI and PET studies were unrevealing with the exception of the PET scan showing uptake at the lesion site. No radiation or chemotherapy was felt indicated and none was instituted. The FAA Aerospace Medical Certification Division was informed, and Mr. Patterson received special issuance medical certification. He returned to work on May.31.2016. Mr. Patterson is followed at intervals of several months by his physician, Dr. Dayton.

In September 2015 Mr. Patterson stated he was called upon for military duty associated with the visit of Pope Francis to the United States. He called for permission to be relieved of airline duties related to military duty. He reported some communication difficulties in accomplishing

this, but stated he did receive approval. He states he was later notified of an issue related to problems with a flight attendant in October 2014 on a flight with his family to Paraguay. Eventually this involved a "Section 20" procedure. Mr. Patterson was referred for neuropsychological assessment to Dr. John Knippa in Long Beach, California. Dr. Knippa's report was sent to the airline, and Mr. Patterson was reported not fit for duty. Mr. Patterson stated that he was later directed to undergo repeat neuropsychological assessment, oncology evaluation and neurological evaluation. Though I do not have specific records requesting neurological evaluation, it appears that performance on neuropsychological assessment led to a recommendation for neurologic evaluation.

Mr. Patterson has no history of seizures, febrile or otherwise and there is no family history of seizures. He has no history of remote neurological insult such as significant head injury, skull fracture or traumatic brain injury. There is no history to suggest neurologic difficulty in perinatal period, infancy, childhood, adolescence or in adult life. Mr. Patterson denied any neurological symptoms on full neurologic inventory. Specifically, he denied a history of headache, nausea, vomiting, double vision, blurred vision, loss of vision, hearing loss, tinnitus, facial numbness, change in sense of smell or taste, problems with speech or swallowing, neck pain, difficulty with balance, coordination, or walking, numbness or tingling of the extremities, weakness of the extremities, or bladder or bowel symptoms. There is no history of difficulty with memory, thinking, or concentration.

Neurological examination revealed normal gait and station. Heel and toe walking, balance on either foot, and hop on either foot were normal. Alternate motion rate in the feet was normal. Arm swing was normal. Rhomberg was normal and there was no drift or pronation. Tandem walking was normal.

Cranial nerve examination revealed intact visual fields. Ocular movements were normal. The pupils were equal and reactive, and the fundi were normal. Hearing was intact and facial symmetry preserved. Uvula and tongue were midline and speech was normal. Neck motions were normal and there were no bruits.

Coordination and alternate motion rate was normal in all four extremities. The deep tendon reflexes were equal and symmetrical with no pathologic reflexes being elicited. Muscle strength was normal without atrophy or fasciculation. Sensory examination including two-point discrimination, position sense, and vibratory sensation was within normal limits.

A Montreal Cognitive Assessment (MoCA) test was performed. This includes assessment of visuospatial, executive, naming, memory, attention, language, abstraction, and delayed recall and orientation functions. Mr. Patterson scored a normal 29/30 points (normal $\geq$ 26-30 points). He recalled the word "daisy" with cued recall, with all other responses being correct.

I reviewed the Dr. Knippa's report of neuropsychological assessment, which included the FAA Core Test Battery items. CogScreen Aeromedical Edition and traditional pencil and paper assessment instruments were performed. Dr. Knippa opined that Mr. Patterson was not fit for duty. Dr. Knippa opined that some scores on test instruments were not commensurate with typical pilot normative data. I carefully reviewed Dr. Knippa's report, in which I do not find evidence to suggest neurologically based impairment in neuropsychological function including personality, behavior intellect or memory.

Based upon the history, neurologic examination and review of Dr. Knippa's report, my professional medical opinions are as follows:

- By history and neurological examination, there is no neurological disorder evident. I find him neurologically intact and whole.

2

- There is no indication by history, examination and review of medical records indicating a need for further neurological testing.  There is no sound medical indication for studies such as brain imaging studies, electroencephalogram or other neurologic studies.
- It is my professional medical opinion that Mr. Patterson poses no risk to aviation safety and that he is fit to fly from a neurological standpoint.

I am prepared to answer any questions or discuss any aspect of Mr. Patterson's neurologic status and fitness to fly.

Sincerely,

John D. Hastings, M.D.

# **<u>EXHIBIT 6</u>**

| SKY ONE HOLDINGS, LLC – FAR 135<br>AIRMAN COMPETENCY / PROFICIENCY CHECK | | | | Location: *ORL* | Date of Check: *2/20/2017* | | 8410-3 | Rev. 3 | 11/2014 |
|---|---|---|---|---|---|---|---|---|---|

**Name of Airman (last, first, middle initial):** *PATTERSON, RODNEY SCOTT*

**Type of Check:**
FAR 135.293 ☐   FAR 135.297 ☐   FAR 135.299 ☒

**Pilot Certificate Information:** Grade: *ATP*   Number: *2590908*

**Medical Information:**   Date of Exam: *1/5/2017*
**Date of Birth:** *11/8/1967*   Class: *1 II*

**Employed by:** SKY ONE HOLDINGS, LLC
**Based at (City, State):** *BOCA RATON, FL*

**Type Airplane (Make/Model):** *BE 40*

**Name of Check Airman:** *BRUCE L. FARROW*   **Sig. of Check Airman:** *[signature]*
**Flight Time:** *0.5*   **Registration Number:** *N615KZ*

**FLIGHT MANEUVERS GRADE (S = Satisfactory   U = Unsatisfactory)**

| PILOT | Ch 1 | T | Ch 2 | PILOT | Ch 1 | T | Ch 2 |
|---|---|---|---|---|---|---|---|
| **PREFLIGHT** | | | | **EMERGENCIES** | | | |
| 1. Equipment Examination (oral / written) | N/A | | | 20. Normal and Abnormal Procedures | N/A | | |
| 2. Preflight Inspection | S | | | 21. Emergency Procedures | N/A | | |
| 3. Taxiing | S | | | **INSTRUMENT PROCEDURES** | | | |
| 4. Powerplant Checks | N/A | | | 22. Area Departures | S | | |
| **TAKEOFFS** | | | | 23. Holding | N/A | | |
| 5. Normal | S | | | 24. Area Arrival | S | | |
| 6. Instrument | S | | | 25. All Engine ILS Approach | S | | |
| 7. Crosswind | S | | | 26. Other Instrument Approaches | — | | |
| 8. With Simulated Powerplant Failure | N/A | | | Approaches: NDB / ADF | N/A | | |
| 9. Rejected Takeoff | N/A | | | VOR | | | |
| **INFLIGHT MANEUVERS** | | | | Single Engine ILS | | | |
| 10. Steep Turns | N/A | | | GPS | S | | |
| 11. Approaches to Stalls | | | | 27. Circling Approaches | N/A | | |
| 12. Specific Inflight Characteristics | | | | 28. Missed Approaches | N/A | | |
| 13. Powerplant Failure | | | | 29. Comm / Nav Procedures | S | | |
| **LANDINGS** | | | | 30. Use of Autopilot | S | | |
| 14. Normal | S | | | **GENERAL** | | | |
| 15. From an ILS | S | | | 31. Judgment | S | | |
| 16. Crosswind | S | | | 32. Crew Coordination | S | | |
| 17. With Simulated Powerplant Failure | N/A | | | **AIRMAN'S COMPETENCY INFORMATION** | | | |
| 18. Rejected Landing | | | | Demonstrated Current Knowledge FAR 135.293(a)<br>Make / Model Expires | 12 Months | | |
| 19. From Circling Approach | | | | Demonstrated Current Knowledge FAR 135.293(b)<br>Make / Model Expires | 12 Months | | |

**REMARKS:**

| | |
|---|---|
| Satisfactory Demonstrated Line Check<br>FAR 135.299 Expires *FEB. 2018* | 12 Months |
| Satisfactory Demonstrated IFR Proficiency<br>FAR 123.297 Expires | 6 Months |
| Use of Autopilot   (is)   (is not)   Authorized | 12 Months |
| Right Seat Demo: | |

**RESULT OF CHECK:** ☒ Approved   ☐ Disapproved

**CHECK AIRMAN'S PERFORMANCE (FAA Only):** ☐ Satisfactory   ☐ Unsatisfactory

**REGION:**   **DISTRICT OFFICE:**   **FAA INSPECTOR'S SIGNATURE:**

**WHITE COPY – PILOT**       **YELLOW COPY – OPERATIONS**       **PINK COPY – FLIGHT STANDARDS COPY**

Patterson_00412

# Record of Simulator Checks (STI 8410)

**NAME:** Mr. Scott Patterson  
**COMPANY:**  
**CATEGORY:** IC97  

**COURSE#:** B400A-IC-

**TYPE OF CHECK:** ☐ PIC 135.293 & 297  ☒ PIC 135.297(only)  ☐ SIC 135.293

| Ground Operations | Sim 1 | | Instrument Procedures | Sim 1 | |
|---|---|---|---|---|---|
| Preflight  (Interior) | S | | Departure | S | |
| Preflight Exterior | S | | Arrival (FMS) | S | |
| Start Procedures | S | | Holding | S | |
| Taxiing | S | | ILS Approach  (1800 RVR) | Sim 1 | |
| Pre-Takeoff Checks | S | | Normal ILS | S | |
| Takeoffs | Sim 1 | | Engine-Out ILS | S | |
| Normal | S | | Autopilot ILS | S | |
| Crosswind | S | Simulator Type: | Raw Data (If Required) | NA | |
| Instrument RVR ( 600 ) | S | BE-400A | Nonprecision Approach | Sim 1 | |
| With Engine Failure | S | | VOR (Without Vertical Guidance) | S | |
| Rejected | S | | RNAV (GPS) (With Vertical Guidance) | S | |
| In-Flight Maneuvers | Sim 1 | Simulator Level: | Circling | S | |
| Steep Turns | S | | GPS (If Required) | S | |
| Stall – Takeoff | S | D | Missed Approach | Sim 1 | |
| Stall – Clean | S | | From an ILS | S | |
| Stall – Landing | S | | Engine Out | S | |
| Engine Failure /Shutdown | S | | Second Missed Approach | S | |
| Engine Restart | S | | General | Sim 1 | |
| Unusual Attitudes | S | | Abnormal Procedures | S | |
| Specific Flt. Characteristics | NA | | Emergency Procedures | S | |
| Landings | Sim 1 | | Com / Nav Procedures | S | |
| Normal | S | | Use of Autopilot | S | |
| Crosswind | S | | Autopilot in Lieu of Required SIC | NA | |
| From an ILS | S | | Judgment | S | |
| From a Circle | S | | CRM | S | |
| Rejected | S | | PIC Performance as SIC | S | |
| No-Flap | S | | Adherence to Checklist | S | |
| 1-Engine Out | S | | Adherence to Maneuver/SOP | S | |
| 2-Engines Out (If Required) | NA | | Right Seat Takeoff/Landing | NA | |

| CHECK RESULTS | S/U | DATE | CHECK AIRMAN NAME AND SIGNATURE |
|---|---|---|---|
| Oral 293(a)(1) | | | |
| Oral Base Aircraft ☐293(a)(2) ☒297 | S | 06/03/2017 | Electronically signed by: Ronald Lee Welch |
| Oral 293(a)(2)    Variant-Model: | | | |
| Oral 293(a)(3) Wt. & Balance | | | |
| Oral 293(a)(4 -8) Gen Subjects | | | |
| Sim Check 1  ☐293(b) ☒297(c) | S | 06/03/2017 | Electronically signed by: Ronald Lee Welch |
| Sim Check 2  ☐293(b) ☐297(c) | | | |

| Total Sim Check 1 & 2 Pilot Flying Time: | 2.0 | Base Month: _____ ** | Expires** |
|---|---|---|---|

| **FAA ONLY** | | |
|---|---|---|
| Meets requirements of 135.339 & 340 (a)(2)  ☐ Sat  ☐ Unsat | 12 mo 135.293(a)(2) | |
| TCE Observation  ☐ Approved ☐ Disapproved ☐ Certification Authority | 12 mo 135.293(b) | |
| | 6 mo 135.297 | |

| REGION | DISTRICT OFFICE | REMARKS: T* – Training to proficiency required ** – To be entered by certificate  holder |
|---|---|---|
| FAA INSPECTOR'S  NAME AND SIGNATURE | | |

Approved substitute for FAA 8410-3

Version 3 – 9/21/2015

Patterson_00414



21A-OF-017
REV: 2
07/17/2017

## PILOT LINE CHECK

| PILOT'S NAME:<br>(Last, First, MI) Patterson, Rodney Scott | EMP #: **21063** | POSITION<br>■ CPT □ FO | AIRCRAFT MODEL<br>**B767** | DATE: 11/15/2017 |
|---|---|---|---|---|

| PILOT<br>CERT #: **2590908** | CERTIFICATE TYPE<br>■ ATP □ COMM | MEDICAL<br>EXPIRATION (M/Y): 01/2018 | MEDICAL CLASS<br>■ FIRST □ SECOND |
|---|---|---|---|

| AIRCRAFT<br>REG: **N999YV** | FROM: **KMCO** | TO: **KMIA** | NO OF<br>LANDINGS: 1 | BLOCK<br>TIME: **1:00** |
|---|---|---|---|---|

| TYPE OF CHECK: | ■ INITIAL | □ UPGRADE | □ TRANSITION | □ RECURRENT | □ ROUTE | □ QAP | □ PWP |
|---|---|---|---|---|---|---|---|

GRADING:    **S** = SATISFACTORY    **U** = UNSATISFACTORY (REQUIRES COMMENT)    **NA** = NOT APPLICABLE    **(W)** = CAN BE WAIVED    **W** = WAIVED

| PERSONAL ITEMS | | 21. Route Changes | —— |
|---|---|---|---|
| 1. Uniform Appearance | S | - FMS Data Entry/Crosscheck | S |
| 2. Manuals / Flight Materials | S | - Verify Changes on Flt Plan | S |
| 3. License and Medical | S | **DESCENT /APPROACH /LDG** | |
| **PREFLIGHT** | | 22. Descent Planning | S |
| 4. Flight Planning | S | 23. Altitude/Speed Control | S |
| 5. Forms / Logbook | S | 24. Aircraft Configuration | S |
| 6. Exterior/Interior Inspection | S | 25. Altitude/Airspeed Control | S |
| 7. Performance Computations | S | 26. Holding Procedures | S |
| 8. Weight & Balance | S | 27. Approach Compliance | S |
| 9. Computer Flight Plan Checked | S | 28. Stabilized Approach | S |
| **BEFORE TAKEOFF** | | 29. Pilot Flying   ■ PIC □ FO | —— |
| 10. Engine Start / Taxi Procedures | S | 30. Type Appr.   □ IFR ■ VFR | —— |
| 11. Clearance & Briefing | S | 31. Missed Approach | NA |
| 12. Taxi, Pre T/O, RWY Awareness | S | 32. Landing | S |
| **DEPARTURE** | | 33. Crew Coordination | S |
| 13. Takeoff Procedures | S | 34. Use of Checklists | S |
| 14. Takeoff Profile | S | 35. Flight Management / CRM | S |
| 15. Departure / SID Compliance | S | 36. Judgment | S |
| **ENROUTE / CRUISE** | | **MISCELLANEOUS** | |
| 16. Adherence to Clearance | S | 37. *Accuracy Checks / Recording | NA |
| 17. Use of NAV Aids | S | 38. International Flight Planning | NA |
| 18. En-route Radar Procedures | S | 39. HLA Operations | NA |
| 19. Cruise Procedures | —— | 40. Overwater Operations | NA |
| - Manual Entries | S | 41. *Contingency Procedures in HLA Airspace | NA |
| - Fuel / Time Update | S | * Items may be briefed | |
| 20. Communication Procedures | s | | |

| OVERALL PERFORMANCE | ■ SATISFACTORY<br>□ UNSATISFACTORY | STUDENT<br>SIGNATURE: | *[signature]* |
|---|---|---|---|

**I CERTIFY THAT THE ABOVE TRAINING WAS ADMINISTERED AS INDICATED AND THE OVERALL PERFORMANCE WAS AS SHOWN.**

| CHECK PILOT<br>NAME (Print): **Holbrook, V** | EMP #: **21042** | FAA OR COMPANY<br>OBSERVER NAME: **Bernhardt, T** | ID #: **5890** |
|---|---|---|---|
| CHECK PILOT<br>SIGNATURE: *[signature]* | | FAA OR COMPANY<br>OBSERVER SIGNATURE: *[signature]* | |

**Completion Certified by the Chief Pilot/ Director of Operations**

| NAME(PRINT) **Wilhoit, James R** | SIGNATURE *[signature]* | DATE: **11/15/2017** |
|---|---|---|



21A-OF-014
REV: 2
07/17/2017

## PILOT PROFICIENCY CHECK

| PILOT'S NAME (Last, First, MI) | **Patterson, Rodney S** | EMP# **21063** | POS **CA** | AIRCRAFT **B767** |
|---|---|---|---|---|

| PILOT CERT #: **2590908** | CERTIFICATE TYPE ☒ ATP ☐ COMM | MEDICAL EXPIRATION **02/28/2019** | MEDICAL CLASS ☒ FIRST ☐ SECOND |
|---|---|---|---|

| SIM LOC **PAIFA** | SIM NO **#4-031** | DATE **09/05/2018** | BLOCK TIME **02:00** |
|---|---|---|---|

| TYPE OF CHECK | ☐ INITIAL (No events can be waived) ☒ RECURRENT ☐ TRANSITION ☐ UPGRADE | ☐ RIGHT SEAT TASK ☐ REQUALIFICATION ☐ PROFICIENCY WATCH ☐ QAP |
|---|---|---|

GRADING:   **S** = SATISFACTORY   **U** = UNSATISFACTORY (REQUIRES COMMENT)   **NA** = NOT APPLICABLE   **(W)** = CAN BE WAIVED   **W** = WAIVED

| PREFLIGHT | | | INFLIGHT MANEUVERS | |
|---|---|---|---|---|
| 1. Oral Exam | | | 17. Missed Approach* (Other_____) | S |
| 2. Preflight Inspection ☒ Pictorial | S | | **INFLIGHT MANEUVERS** | |
| 3. Starts Normal / Abnormal | S | | 18. Steep Turns (PIC) | S |
| 4. Taxiing / Runway Awareness | S | | 19. Approaches To Stalls 2 of 3(W)(one must be in a turn) | — — |
| 5. Power Plant Checks | S | | ☒ Level Off | S |
| **TAKEOFF** | | | ☒ Turning Base | S |
| 6. Normal | S | | ☒ ILS Final Approach | S |
| 7. Instrument   (RVR 500 with 100' Ceiling) | S | | 20. Flight Deck Communication Procedure | S |
| 8. Crosswind   (Note 6 & 8 May Be Combined) | S | | 21. Engine Failure | S |
| 9. Engine Failure After V₁ | S | | **LANDING** | |
| 10. Rejected Take-Off | S | | 22. Normal | S |
| **INSTRUMENT PROCEDURES** | | | 23. From ILS | S |
| 11. Area Departure and Arrival (One Required) | | | 24. Crosswind (may be combined with 22 or 23) | S |
| ☒ Area Departure | S | | 25. Engine Out Landing | S |
| ☐ Area Arrival | S | | 26. Rejected (50' AFE) | S |
| 12. Holding | S | | **PROCEDURES** | |
| 13. Precision Approaches | | | 27. Normal | S |
| Normal ILS (100'& RVR 1800) | S | | 28. Non-normal | S |
| Engine Out ILS (Manual) | S | | 29. Emergency | S |
| 14. Non-Precision Approaches (Two Required, one using  VNAV) | | | **WINDSHEAR (Recurrent Only)** | |
| ☒ VOR | S | | 30. Takeoff Prior To V₁ | NA |
| ☒ LOC | S | | 31. Takeoff After V_R | NA |
| ☐ NDB | NA | | 32. On Approach | NA |
| 15. Circling Approach | NA | | **OTHER** | |
| 16. Missed Approach (ILS)* | S | | 33. Judgment | S |
| | | | 34. Crew Resource Management | S |

REMARKS:

| Overall Performance ☒ Satisfactory ☐ Unsatisfactory | Student Signature | |
|---|---|---|

**I CERTIFY THAT THE ABOVE TRAINING WAS ADMINISTERED AS INDICATED AND THE OVERALL PERFORMANCE WAS AS SHOWN.**

| CHECK PILOT NAME **Wilhoit, James R** | EMP # **21005** | FAA OR COMPANY OBSERVER NAME | ID # |
|---|---|---|---|
| CHECK PILOT SIGNATURE *JR Wilhoit* | | FAA OR COMPANY OBSERVER SIGNATURE | |

### Completion Certified by the Chief Pilot / Director of Operations

| NAME (Last, First, Mi) | SIGNATURE | DATE |
|---|---|---|

*One complete approved missed approach procedure required



21A-OF-049
REV: 2
07/17/2017

## RIGHT SEAT DEPENDENT TRAINING

| PILOT'S NAME (Last, First, MI) **Patterson, Rodney S** | EMP # **21063** | POS **CA** | AIRCRAFT **B767** |
|---|---|---|---|

| PILOT CERT # **2590908** | CERTIFICATE TYPE ■ ATP ☐ COMM | MEDICAL EXPIRATION **02/28/2019** | MEDICAL CLASS ■ FIRST ☐ SECOND |
|---|---|---|---|

| SIM LOC **PAIFA** | SIM NO **#4-031** | DATE **10/23/2018** | BLOCK TIME **00:25** |
|---|---|---|---|

GRADING:   **S** = SATISFACTORY   **U** = UNSATISFACTORY (REQUIRES COMMENT)   **NA** = NOT APPLICABLE   **(W)** = CAN BE WAIVED   **W** = WAIVED

| PREFLIGHT | |
|---|---|
| 1.  Preliminary Preflight Procedures | S |
| 2.  Amplified Preflight - First Officer | S |
| 3.  Normal and Abnormal engine starts | S |
| 4.  After start procedures | S |
| 5.  Taxi procedures | S |
| 6.  Before Takeoff procedures and checklist | S |
| 7.  Pre-takeoff procedures and checks | S |

| TAKEOFF | |
|---|---|
| 8.  Rejected takeoff | S |
| 9.  Normal takeoff | S |
| 10.  Loss of critical engine after V1 | S |

| LANDING | |
|---|---|
| 11.  1-engine ILS Approach and Landing | S |
| 12.  After landing procedure and checklist | S |
| 13.  Shutdown procedure and checklist | S |

REMARKS:

| Overall Performance   ■ Satisfactory   ☐ Unsatisfactory | Student Signature |
|---|---|

**I CERTIFY THAT THE ABOVE TRAINING WAS ADMINISTERED AS INDICATED AND THE OVERALL PERFORMANCE WAS AS SHOWN.**

| CHECK PILOT NAME **Wilhoit, James R** | EMP # **21005** | FAA OBSERVER NAME | FAA ID # |
|---|---|---|---|
| CHECK PILOT SIGNATURE | | FAA OBSERVER SIGNATURE | |

## Completion Certified by the Chief Pilot/ Director of Operations

| NAME (Last, First, Mi) **Nunez Juan P.** | SIGNATURE | DATE |
|---|---|---|



21A-OF-017
REV: 2
07/17/2017

## PILOT LINE CHECK

| PILOT'S NAME:<br>(Last, First, MI) Patterson, Rodney S | EMP #: 21063 | POSITION<br>■ CPT □ FO | AIRCRAFT MODEL<br>B767 | DATE: 11/01/2018 |
|---|---|---|---|---|

| PILOT<br>CERT #: 2590908 | CERTIFICATE TYPE<br>■ ATP □ COMM | MEDICAL<br>EXPIRATION (M/Y): Feb2019 | MEDICAL CLASS<br>■ FIRST □ SECOND |
|---|---|---|---|

| AIRCRAFT<br>REG: N999YV | FROM: KPHL | TO: KMIA | NO OF<br>LANDINGS: 1 | BLOCK<br>TIME: 2:24 |
|---|---|---|---|---|

**TYPE OF CHECK:**   □ INITIAL   □ UPGRADE   □ TRANSITION   ■ RECURRENT   □ ROUTE   □ QAP   □ PWP

GRADING:   **S** = SATISFACTORY   **U** = UNSATISFACTORY (REQUIRES COMMENT)   **NA** = NOT APPLICABLE   **(W)** = CAN BE WAIVED   **W** = WAIVED

| PERSONAL ITEMS | | 21. Route Changes | S |
|---|---|---|---|
| 1. Uniform Appearance | S | - FMS Data Entry/Crosscheck | S |
| 2. Manuals / Flight Materials | S | -Verify Changes on Flt Plan | S |
| 3. License and Medical | S | **DESCENT /APPROACH /LDG** | |
| **PREFLIGHT** | | 22. Descent Planning | S |
| 4. Flight Planning | S | 23. Altitude/Speed Control | S |
| 5. Forms / Logbook | S | 24. Aircraft Configuration | S |
| 6. Exterior/Interior Inspection | S | 25. Altitude/Airspeed Control | S |
| 7. Performance Computations | S | 26. Holding Procedures | S |
| 8. Weight & Balance | S | 27. Approach Compliance | S |
| 9. Computer Flight Plan Checked | S | 28. Stabilized Approach | S |
| **BEFORE TAKEOFF** | | 29. Pilot Flying ■ PIC □ FO | S |
| 10. Engine Start / Taxi Procedures | S | 30. Type Appr. ■ IFR □ VFR | S |
| 11. Clearance & Briefing | S | 31. Missed Approach | NA |
| 12. Taxi, Pre T/O, RWY Awareness | S | 32. Landing | S |
| **DEPARTURE** | | 33. Crew Coordination | S |
| 13. Takeoff Procedures | S | 34. Use of Checklists | S |
| 14. Takeoff Profile | S | 35. Flight Management / CRM | S |
| 15. Departure / SID Compliance | S | 36. Judgment | S |
| **ENROUTE / CRUISE** | | **MISCELLANEOUS** | |
| 16. Adherence to Clearance | S | 37. *Accuracy Checks / Recording | NA |
| 17. Use of NAV Aids | S | 38. International Flight Planning | NA |
| 18. En-route Radar Procedures | S | 39. HLA Operations | NA |
| 19. Cruise Procedures | S | 40. Overwater Operations | NA |
| - Manual Entries | S | 41. *Contingency Procedures in HLA Airspace | NA |
| - Fuel / Time Update | S | * Items may be briefed | |
| 20. Communication Procedures | s | | |

| OVERALL PERFORMANCE | ■ SATISFACTORY<br>□ UNSATISFACTORY | STUDENT<br>SIGNATURE: | *[signature]* |
|---|---|---|---|

**I CERTIFY THAT THE ABOVE TRAINING WAS ADMINISTERED AS INDICATED AND THE OVERALL PERFORMANCE WAS AS SHOWN.**

| CHECK PILOT<br>NAME (Print): Wilhoit, James R | EMP #: 21005 | FAA OR COMPANY<br>OBSERVER NAME: | ID #: |
|---|---|---|---|
| CHECK PILOT<br>SIGNATURE: *[signature] JR Wilhoit* | | FAA OR COMPANY<br>OBSERVER SIGNATURE: | |

**Completion Certified by the Chief Pilot/ Director of Operations**

| NAME(PRINT): Nunez, Juan P | SIGNATURE *[signature]* | DATE: 11/02/2018 |
|---|---|---|

# **<u>EXHIBIT 7</u>**

| From: | Beach, Brian |
|-------|--------------|
| To: | Rojas, Luis |
| Sent: | 3/25/2016 12:13:00 PM |
| Subject: | FW: Section 20: Rodney Patterson (576006) |
| Attachments: | Patterson Section 20 Results.doc |



**PLAINTIFF'S EXHIBIT**

5

**From:** Montgomery, Michelle
**Sent:** Thursday, March 24, 2016 5:32 PM
**To:** Beach, Brian
**Cc:** Bonds, James; Mase, Kevin; Contreras, Cindy; Magee, Michelle
**Subject:** FW: Section 20: Rodney Patterson (576006)

Brian-

Here's the letter to send to him.


**American Airlines**

Michelle Montgomery
Manager Labor Relations - Flight

817 963 7811 Office | 817 967 2287 Fax



**From:** "Magee, Michelle" <Michelle.Magee@aa.com>
**Date:** Thursday, March 24, 2016 at 12:51 PM
**To:** "Beach, Brian" <Brian.Beach@aa.com>, "Cronin, Mark" <Mark.Cronin@aa.com>, "Bonds, James" <James.Bonds@aa.com>, "Mase, Kevin" <Kevin.Mase@aa.com>, Michelle Montgomery <Michelle.Montgomery@aa.com>
**Cc:** "Contreras, Cindy" <Cindy.Contreras@aa.com>, "Magee, Michelle" <Michelle.Magee@aa.com>, "Ahtone, Jeral" <Jeral.Ahtone@aa.com>
**Subject:** Section 20: Rodney Patterson (576006)


To: Capt Brian Beach

Per your request, employee RODNEY PATTERSON has undergone a Fitness for Duty evaluation, and that assessment has now been completed.

It has been determined that RODNEY PATTERSON is currently unable to perform the essential job function of a PILOT. He is therefore assigned the following temporary restriction: "No flight duty"

Please notify the employee within 10 business days and in writing of this determination.

The employee should be directed to contact Cindy Contreras, R.N. at (817) 963-5031 for further treatment recommendations. If the employee cannot be accommodated with the above restrictions, then he would be medically approved for a Sick Leave of Absense.

Please do not hesitate to contact Cindy Contreras at 817-963-5031 or me if we can provide any additional assistance with this employee.

**From:** Montgomery, Michelle [mailto:Michelle.Montgomery@aa.com]
**Sent:** Thursday, March 07, 2019 3:55 PM
**To:** Kennedy, Tricia <tkennedy@alliedpilots.org>
**Cc:** Price, Jeffrey <Jeffrey.Price@aa.com>
**Subject:** Scott Patterson Section 21 Notice

Attached please find a Notice of Section 21 for Scott Patterson.

Michelle Montgomery

Senior Manager Labor Relations - Flight

817 963 7811 Office | 817 967 2287 Fax

NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this in error, please notify me immediately by return email and promptly delete this message and its attachments from your computer.

- This email shows orchestration

**From:** Montgomery, Michelle
**Sent:** Monday, July 9, 2018 3:49 PM
**To:** Price, Jeffrey
**Subject:** Shellhouse

Do you have a date for his hearing set up?  Attached is the hearing notice and the document from Patterson's deposition.


Michelle Montgomery
Senior Manager Labor Relations - Flight

817 963 7811 Office | 817 967 2287 Fax


NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this in error, please notify me immediately by return email and promptly delete this message and its attachments from your computer system.




- Email reference section 21 hearing for Captain Danny Shellhouse who was Lt. Col. Patterson's witness and designated union representative.  This email shows orchestration at a high level of management.

Case 0:17-cv-60533-JEM Document 46-19 Entered on FLSD Docket 04/22/2018 Page 2 of 2

Thank you,

M. Magee,
ARC Fitness for Duty

817-931-9554

# EXHIBIT 8

*Freedom of Information Act Office*

**U.S. Department of Homeland Security**
500 12th St SW, Stop 5009
Washington, DC  20536



**U.S. Immigration
and Customs
Enforcement**

October 28, 2015

RODNEY PATTERSON
1092 NW 139th TERRACE
PEMBROKE PINES, FL 33028-2340

**RE:    ICE FOIA Case Number 2015-ICFO-95879**

Dear Mr. PATTERSON:

This letter is the final response to your Freedom of Information Act (FOIA) request to U.S.
Immigration and Customs Enforcement (ICE), dated September 04, 2015.  You have requested
copies of the following records:

all records maintained by ICE pertaining to RODNEY S. PATTERSON (DOB 11/08/1967).

ICE has considered your request under both the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5
U.S.C. § 552a.  Information about an individual that is maintained in a Privacy Act system of
records may be accessed by that individual[1] unless the agency has exempted the system of
records from the access provisions of the Privacy Act.[2]

ICE has conducted a search of the ICE Enforcement and Removal Operations (ERO) and ICE
Homeland Security Investigations (HSI) for records responsive to your request and no records
responsive to your request were found.

You have the right to appeal ICE's determination and should you wish to do so, please send your
appeal following the procedures outlined in the DHS regulations at 6 Code of Federal
Regulations § 5.9 and a copy of this letter to:

U.S. Immigration and Customs Enforcement
Office of Principal Legal Advisor
U.S. Department of Homeland Security
Freedom of Information Act Office
500 12th Street, S.W., Stop 5900
Washington, D.C. 20536-5900

---

[1] 5 U.S.C. § 552a(d)(1).
[2] 5 U.S.C. §§ 552a(d)(5), (j), and (k).

Your appeal must be received within 60 days of the date of this letter.  Your envelope and letter should be marked "FOIA Appeal."  Copies of the FOIA and DHS regulations are available at www.dhs.gov/foia.

Provisions of the FOIA and Privacy Act allow us to recover part of the cost of complying with your request.  In this instance, because the cost is below the $14 minimum, there is no charge.[3]

If you need to contact the FOIA office about this matter, please call (866) 633-1182 and refer to FOIA case number **2015-ICFO-95879**.

Sincerely,

Catrina M. Pavlik-Keenan
FOIA Officer

---

[3] 6 CFR § 5.11(d)(4).

# **EXHIBIT 9**

**Unsworn Declaration of Mark Modrich, Pursuant to 28 U.S.C.§1746**

**Mark Modrich deposes and says:**

1.      I make this declaration of my own personal knowledge

2.      I am currently a retired Captain from American Airlines.

3.      I previously served as a member of the Professional Standards Committee at the American Airlines Miami domicile.

4.      I served in that position from approximately 2007 to 2016.

5.      A case was referred to me in approximately October 2014 when a flight attendant filed a complaint against FO Patterson on a trip to Paraguay. I spoke with Captain Glenn Whitehouse who worked the trip and also with FO Patterson. The issue was resolved to everyone's satisfaction. FO Patterson agreed not to fly any more trips with this Captain.

6.      In July of 2015, FO Patterson and I were traveling standby to Chicago. I noticed that Captain Whitehouse was also standing by for the flight. I advised FO Patterson of this fact and we agreed to take a different flight.   Shortly thereafter I was advised that Captain Whitehouse had made more complaints about FO Patterson. I thought it ironic that the Captain never called me back to resolve the additional complaints.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Southwest Ranches, Florida on April 25, 2019

_Mark Modrich_
Captain Mark Modrich
Mmodrich@aol.com

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| JAMES P. SCANLAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>-vs.-<br><br>AMERICAN AIRLINES GROUP, INC., and AMERICAN AIRLINES, INC.,<br><br>Defendants. | Civil Action No. 2:18-cv-04040-HB |

**DEFENDANTS MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO TRANSFER VENUE**

O'MELVENY & MYERS LLP
Mark Robertson, Esq. (*admitted pro hac vice*)
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
mrobertson@omm.com

DRINKER BIDDLE & REATH LLP
Kenneth A. Murphy
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
kenneth.murphy@dbr.com

*Attorneys for Defendants American Airlines Group Inc. and American Airlines, Inc.*

Pursuant to 28 U.S.C. § 1404(a), Defendants American Airlines Group Inc. ("AAG") and American Airlines, Inc. ("American") (collectively "Defendants") respectfully request that this Court transfer this action to the United States District Court for the Northern District of Texas, Fort Worth Division ("N.D. Texas").

## **INTRODUCTION**

This is a putative class action against an airline and its parent corporation—both headquartered in Fort Worth, Texas.  The putative nationwide class members include all employees of American who have taken military leaves over the last several years and did not receive certain benefits and wages during those leaves, which Plaintiff alleges he and the putative class are entitled to under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA").

Multiple courts have recognized the appropriateness of transferring putative nationwide class actions asserting USERRA claims against airlines to the district where the airline's headquarters are located.  *See Carder v. Continental Airlines, Inc.*, No. 3:09-cv-01448-DMS-BLM [ECF 23] (S.D. Cal. Sept. 28, 2009); *Duffer v. United Continental Holdings, Inc.*, No. 3:13-cv-00318 [ECF No. 40] (S.D. Cal. May 2, 2013); *Hoefert v. American Airlines Inc.*, 2018 WL 2740276 (D. Ariz. June 7, 2018).  In each of these cases, the plaintiffs sued the defendant airline seeking to recover benefits under USERRA on behalf of pilots who had taken military leave.  And in each case, the court concluded that the convenience of the parties and witnesses and access to evidence relevant to the pilots' claims favored transfer to the district where the airline had its headquarters.

The facts and circumstances that favored transfer in the above cases, however—which only involved pilots—are magnified tenfold in this case because the proposed putative class here

includes not just pilots, but *all* employees at American—e.g., flight attendants, mechanics, baggage handlers, customer service representatives, administrative employees, and a myriad of other employee groups.

Defendants' headquarters in Fort Worth, Texas, are plainly the center of relevant events in this case. Plaintiff's claims involve the administration of a profit-sharing plan and military and other leaves for all American employees. All of the departments responsible for the administration of the profit-sharing plan and the relevant leaves are based in Fort Worth. Likewise, virtually all American employees (and at least one former American employee) responsible for overseeing the administration of the profit-sharing plan and leaves who have knowledge and information potentially relevant and necessary to resolve the dispute are located in Fort Worth. And the related documents necessary to resolve the dispute are also located in Fort Worth. Finally, the N.D. Texas is already handling the pending *Hoefert* action—transferred from the District of Arizona in 2018. *Hoefert*, a putative class action filed against American, involves similar USERRA claims on behalf of pilots and therefore involves certain of the same facts and issues regarding those pilots' military and other leaves—as well as some of the same putative class members.

When considered in light of the factors relevant to transfer under section 1404(a), these facts, as detailed below, demonstrate conclusively that this matter should be transferred to the N.D. Texas.

## STATEMENT OF RELEVANT FACTS

### The Parties

Both Defendants are incorporated in Delaware and maintain their headquarters in Fort

2

Worth, Texas.[1]  AAG is a holding company with no employees, and American (along with certain other air carriers) is a wholly owned subsidiary of AAG.  *See* Annual Form 10-K.

Plaintiff James P. Scanlan is employed as an American pilot and has been based out of LaGuardia Airport in New York, New York since 2009.  (Decl. of Todd F. Jewett in Support of Defs. Mot. to Transfer Venue ("Decl.") ¶ 7.)  Plaintiff seeks to represent two putative classes:

- Current and former participants under the AAG Global Profit Sharing Plan (the "Plan") who did not receive credit for military service absences for awards under the Plan from January 1, 2016 through date of judgment of this action.  (Am. Compl. ¶ 13.)

- Current and former American employees who took "short term military leave" and were not paid the difference between the pay they received from the military and what they would have been paid by American for working from January 1, 2013 through the date of judgment of this action.  (*Id.* ¶ 14.)

**AAG Global Profit Sharing Plan**

The Plan rewards eligible employees for their efforts in helping achieve AAG's strategic, financial, and operating objectives by providing those employees with an opportunity to share in AAG's profits for each Plan year.  (Decl. ¶ 4.)  American's Executive Compensation Department, based in Fort Worth, currently administers the Plan.  (*Id.* ¶ 5.)  Employees in that department have knowledge and information relevant to how the Plan calculates benefits and how the Plan credits time away from work spent on military and other leaves—which forms the basis of Plaintiff's claims related to the Plan.  (*See id.*; Am. Compl. ¶¶ 72-93.)

---

[1]  *See* Annual Form 10-K, American Airlines Group Inc. and American Airlines, Inc., at 1-2 (Feb. 16, 2018), https://www.sec.gov/Archives/edgar/data/4515/000119312517051216/d286458d10k.htm ("Annual Form 10-K").

**American's Workforce and Leave Policies**

As of December 31, 2018, American employed approximately 112,700 employees—of those, only approximately 6.6% work in Philadelphia ("PHL") and 24.3% work in Dallas/Fort Worth ("DFW"). (Decl. ¶ 6.) Based on Defendants' preliminary investigation, over 1,000 American employees have taken military leave since January 1, 2013. (*Id.* ¶ 10.)[2]

Over 70% of American's workforce is unionized, and those employees are covered by one of 13 collective bargaining agreements ("CBAs"). (*Id.* ¶ 11.) These CBAs, as well as American's leave policies, govern military leaves as well as the jury duty, paid sick, and union service absences that are at issue based on Plaintiff's allegations. The administration of American's CBAs and policies includes interpreting and applying them, which in turn requires knowledge of the union and/or company's past practices, which in certain instances may not be addressed by the plain language of a CBA or policy. (*Id.* ¶¶ 13, 16.) The departments and employees responsible for administering American's CBAs and policies—which vary by employee group—are virtually all based in Fort Worth. (*See id.* ¶¶ 12-13, 16.)

## ARGUMENT

"In considering a motion to transfer a civil action to another federal district, the applicable legal standard is the convenience of the parties and witnesses, in the interest of justice." *WellPet, LLC v. Midwestern Pet Foods, Inc.*, 2009 WL 5111790, at *1 (M.D. Pa. Dec.

---

[2] While American maintains a hub in PHL, several of the employee groups included in Plaintiff's proposed class have no employees at all based in PHL. For example, there are no dispatchers, plant maintenance mechanics, flight simulator instructors, technicians, or engineers in PHL. (Decl. ¶ 8.) Moreover, based on a preliminary investigation, the largest number of most employee groups is in DFW. For example, as of December 31, 2018, of American's 19,204 non-unionized management and support staff employees, 9,840 work in DFW and only 340 work in PHL. (*Id.* ¶ 9.)

4

16, 2009).[3]  In applying this standard, the Court must "consider all relevant factors to determine

whether on balance the litigation would more conveniently proceed, and the interests of justice

be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873,

879 (3d Cir. 1995).  The Court has discretion "to adjudicate motions for transfer according to an

individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v.

Ricoh Corp.*, 487 U.S. 22, 29 (1988).

Because it is indisputable that, under 28 U.S.C. § 1391, this action could have been

brought in the N.D. Texas where Defendants have their principal place of business, the only

issue is whether the convenience of the parties and witnesses and the interest of justice favor

transfer.

I.      **The Relevant Factors Favor Transferring This Action to the N.D. Texas.**

Courts in the Third Circuit typically consider several private and public interest factors

when determining whether transfer is appropriate. *Jumara*, 55 F.3d at 879.  However, "[n]ot all

factors will apply in a given case, and the court may address other considerations if

pertinent." *Wise v. Williams*, 2011 WL 2446303, at *10 (M.D. Pa. May 18, 2011).

The public interest factors include the (1) "enforceability of the judgment;" (2) "the

relative administrative difficulty in the two fora resulting from court congestion;" (3) "the local

interest in deciding local controversies at home;" (4) "the public policies of the fora;" and (5)

"the familiarity of the trial judge with the applicable state law in diversity cases." *Blanken v.

Kentucky Highlands Inv. Corp.*, 2014 WL 4988280, at *2 (M.D. Pa. Oct. 7, 2014).  Courts also

consider judicial economy in the public interest, including whether the case to be transferred

---

[3] Unless otherwise stated, Defendants have omitted all internal quotation marks and citations
from quoted material.

Case 0:17-cv-60533-JEM   Document 185-1   Entered on FLSD Docket 05/03/2019   Page 70 of
150
Case 2:18-cv-04040-HB   Document 21-1   Filed 01/22/19   Page 7 of 16

"involve[s] the same or similar issues and parties" as a case in the transferee district. *In re:
Howmedica Osteonics Corp.*, 867 F.3d 390, 402 (3d Cir. 2017).[4]

The private interest factors that courts consider include the (1) "plaintiff's forum
preference as manifested in the original choice;" (2) "the defendant's preference;" (3) "whether
the claim arose elsewhere;" (4) "the convenience of the parties as indicated by their relative
physical and financial condition;" (5) "the convenience of the witnesses;" and (6) "the location
of books and records." *Id.* (citing 28 U.S.C. § 1404(a).) Courts are also "required to assess all
practical considerations that could make the trial easy, expeditious, or inexpensive." *Blanken*,
2014 WL 4988280, at *3.

Transfer is appropriate here because, in a proposed nationwide class action, the plaintiff's
choice of forum is entitled to minimal deference, and several other key factors favor transfer,
including the convenience of the parties and witnesses and judicial economy and practical
considerations. *See, e.g.*, *Huang v. Sonus Networks, Inc.*, 2016 WL 1090436, at *3 (D.N.J. Mar.

---

[4] Because this action involves a USERRA claim under federal law, "most of the public factors
are irrelevant or invalid." *See Robertson v. Pfizer Ret. Comm.*, 2018 WL 3618248, at *9 (E.D.
Pa. July 27, 2018). First, "the enforceability of the judgment" is "largely irrelevant . . . because a
federal statute is at issue and because the judgment would be enforceable in either district." *Id.*
Second, because there is no "appreciable difference in docket congestion between the two
districts," administrative difficulty due to court congestion is a neutral factor. *See Jumara*, 55
F.3d at 879, 883; Fed. Ct. Mgmt. Statistics–Profiles, U.S. Courts (June 30, 2017),
http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0331.2017.pdf
(reporting that, as of March 2017, the median time from filing to disposition of a civil case was
5.7 months in this Court and 7.1 months in N.D. Texas, and the median time from filing to civil
trial was 20.7 months in this Court and 20.5 months in N.D. Texas). Third, there is no "local
interest" in deciding this controversy because "[t]he allegations of this case . . . are national in
character and involve conduct affecting [employees] in all states." *See Stephen L. LaFrance
Holding Inc. v. Nat'l Milk Producers Fed'n*, 2012 WL 3104837, at *5 (E.D. Pa. July 31, 2012).
Fourth, "since this is a [USERRA] case implicating federal law and policy . . . [the public policy]
factor is largely irrelevant." *Mitek Sys., Inc. v. United Servs. Auto. Ass'n*, 2012 WL 3777423, at
*8 (D. Del. Aug. 30, 2012). Fifth, for the same reasons, "judges in both districts should be
familiar with the applicable law." *See Aetna Inc. v. People's Choice Hosp., LLC*, 2018 WL
1287491, at *4 (E.D. Pa. Mar. 13, 2018).

21, 2016) (granting transfer where "all of the private interest factors are either neutral or weigh in favor of transfer"); *see also Carder*, No. 3:09-cv-01448 [ECF No. 24] (transferring nationwide USERRA class action to airline's headquarters where plaintiff's choice of forum carried little weight and convenience of parties and witnesses and ease of access to evidence favored transfer); *Duffer*, No. 3:13-cv-00318 [ECF No. 40] (transferring nationwide USERRA class action to district where airlines' headquarters, documentary evidence, and many witnesses relevant to case were located); *Hoefert*, 2018 WL 2740276, at *3 (transferring nationwide USERRA class action to district of American's headquarters where relevant witnesses and documents were located in Texas and prior litigation meant N.D. Texas was familiar with legal and factual background of case).

### A. Plaintiff's Choice of Forum Should Be Afforded Minimal Deference, While Defendants' Preference Favors Transfer.

"[A]s dictated by the United States Supreme Court, the choice of forum of a named plaintiff in a class action suit should be given less deference since any member of the putative class could potentially bring suit in his or her own forum." *Smith v. HireRight Sols., Inc.*, 2010 WL 2270541, at *3 (E.D. Pa. June 7, 2010); *see also Hoefert*, 2018 WL 2740276, at *1 (plaintiff's choice of forum given less deference when case is filed as a putative nationwide class action). Affording Plaintiff's choice of forum minimal deference here is particularly appropriate because this is an action on behalf of a nationwide class of potentially several thousand members (the vast majority of whom are not based in Pennsylvania, while many are based in Texas), and Plaintiff's relationship with American is in New York. (*See* Decl. ¶ 7.) Thus, any claim by Plaintiff that this is the appropriate forum because it is his home state "is considerably weakened." *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947) (finding deference to plaintiff's chosen forum considerably weaken where there were "hundreds of

7

potential plaintiffs"); *see also Klingensmith v. Paradise Shops, Inc.*, 2007 WL 2071677, at \*2 (W.D. Pa. July 17, 2007) ("[Plaintiffs'] choice of forum is entitled to even less deference here where the [Defendant's businesses] are located nationwide.  There is every expectation that there will be more plaintiffs residing outside of Pennsylvania than within and that more causes of action will have arisen outside of Pennsylvania than within.").  "In contrast . . . Defendants' preference to litigate in [Texas] weighs in favor of transfer, as all the Defendants are located in that state." *Huang*, 2016 WL 1090436, at \*2.  Thus, in this case, the parties' preferences weigh in favor of transfer.

### B. The Convenience of the Parties Favors Transfer.

Defendants' headquarters are in Fort Worth.  Virtually all American employees with knowledge and information relevant to this litigation who would potentially be needed for discovery—as well as documentary evidence subject to discovery—are in Fort Worth.  (*See* Decl. ¶¶ 13-17.)  As such, "the convenience of the parties and the witnesses, weigh . . . in favor of transfer because [Defendants'] headquarters are located in the Northern District of [Texas] and the majority of operative events occurred in that district." *Jackson v. Equifax Info. Servs., LLC*, 2014 WL 808090, at \*4 (M.D. Pa. Feb. 28, 2014).

In contrast, Plaintiff is only one person, and any inconvenience resulting from his involvement in the litigation would be less than the inconvenience to Defendants. *Maxtak Capital Advisors LLC v. ParkerVision, Inc.*, 2012 WL 4673244, at \*5 (D.N.J. Oct. 1, 2012) (noting "although both parties would experience some level of inconvenience regardless of which forum is ultimately chosen, the greater burden would fall upon Defendants, whose directors, officers and employees with knowledge pertinent to this lawsuit are located in Florida [headquarters]").

8

## C.  The Convenience of the Witnesses Favors Transfer.

"[T]he convenience of witnesses, perhaps the most important factor, weighs heavily in favor of transfer." *Headon v. Colorado Boys Ranch*, 2005 WL 1126962, at *7 (E.D. Pa. May 5, 2005); *see also Hoefert*, 2018 WL 2740276, at *2 (same).  Based on Defendants' preliminary investigation, virtually all American employees who are potential witnesses (other than Plaintiff)—including those whose testimony may be required to resolve this litigation—are based in Fort Worth.

Plaintiff seeks to represent all current and former Plan participants and all current and former American employees who took military leave.  Plaintiff challenges policies under the Plan and American's policies governing military and other absences for all American employees. The Executive Compensation Department responsible for administering the Plan is based in Fort Worth.  (Decl. ¶ 5.)  With respect to administering military and other leaves of absence, American's workforce includes six general categories of unionized employees (i.e., Pilots, Flight Attendants, Customer Service, Mechanics/Maintenance Technicians, Fleet Service employees, and Dispatch) covered by one of 13 CBAs, as well as non-union management and support staff. (*See id.* ¶ 11.)  The administration of military and other leaves across all of these groups involves several departments, including Labor Relations, Flight, Flight Service, Crew Planning, Workforce Administration, the Absence and Return Center, People, and Compensation.  And every single one of these departments are based in Fort Worth.  (*See id.* ¶¶ 13, 16.)  Knowledge and information from several employees across these departments may therefore be necessary to resolve Plaintiff's claims involving military and other leave policies for the last six years.  Based on a preliminary investigation, this includes Patricia Herrera (Director, Executive Compensation); Sue Kalosa (Manager, Flight Administration), Cheryl Scardis (Manager, Flight

Service Center & Field Support), Rick Carpenter (Manager, Flight Service Administration),
Sophie Nwaefulu (Senior Manager, Workforce Administration), and Anthony Giandiletti
(Manager, Absence and Return Center).  (*See* Decl. ¶ 5, 17.)

Moreover, knowledge and information from at least four employees in American's Labor
Relations Department may also be required because they are each involved in the administration
of a subset of the applicable CBAs.  (*See id.* ¶ 14.)  Based on a preliminary investigation, this
includes Todd Jewett (Managing Director, Labor Relations – Flight), Cindi Simone (Managing
Director, Labor Relations – Inflight), Lynn Vaughn (Managing Director, Labor Relations –
Customer Service), James B. Weel (Managing Director, Labor Relations – Technical
Operations).  (*Id.*)

Additionally, Scott Hansen, American's former Director, Flight Administration, who is
no longer an employee, has essential knowledge on the administration of leaves of absence for
pilots over the past six years.  (*See id.* ¶ 18.)

All of these potential witnesses are located in the Fort Worth area and would be
inconvenienced by having to appear at trial in Philadelphia.  *See Headon*, 2005 WL 1126962, at
*7 (convenience of witnesses favored transfer given "most, if not all, of the fact-witnesses
concerning the broad array of allegations in the complaint reside in [transferee] district.");
*Hoefert*, 2018 WL 2740276, at *3 (transferring action to Texas when American "identified
approximately four other witnesses who . . . are based in Fort Worth, Texas"); *Duffer*, No. 3:13-
cv-00318 [ECF No. 40] at 8 (location of "many of the witnesses whose testimony would be
relevant" favored transfer from California to Illinois, even though specific witnesses were not yet
identified).

Moreover, Plaintiff brings his claims on behalf of a nationwide class with potentially thousands of members, all of whom are also potential witnesses and have an interest in this litigation. (*See* Am. Compl. ¶¶ 1, 13, 14; Decl. ¶ 10.) While a small percentage of potential class members work in PHL, many more work in Fort Worth, making Fort Worth more easily accessible for more potential class members who may be called as witnesses. (*See* Decl. ¶¶ 6, 8-9.) The N.D. Texas is thus the more convenient forum for Plaintiff's putative class. *See Henderson v. HireRight Sols., Inc.*, 2010 WL 2349661, at *4 (E.D. Pa. June 7, 2010) ("Given that this case is brought as a nationwide class action, there could conceivably be similar local witnesses hailing from all fifty states, who could present relevant testimony. Nothing in the Complaint makes the testimony of the Pennsylvania witnesses of greater import than that of the other states' witnesses."); *Hoefert*, 2018 WL 2740276, at *3 (finding "the potential quantity and quality of the testimony of Texas-based witnesses outweighs that of the [transferor district]-based witnesses" warranted transfer).

### D. The N.D. Texas Is Familiar with the Legal Claims and Relevant Facts, which Favors Transfer.

"[P]ublic interests . . . include judicial economy considerations, [that] support having the two actions in the same district (through transfer) when the two cases are in different courts but involve the same or similar issues and parties." *Howmedica*, 867 F.3d at 402. Although federal courts in both forums "should be familiar with the applicable law," the N.D. Texas is also familiar with certain relevant facts because they are the same or similar to certain facts at issue in *Hoefert v. American Airlines. See Aetna Inc.*, 2018 WL 1287491, at *4. *Hoefert* is a USERRA class action originally filed in the District of Arizona, which that court transferred on June 7, 2018 to the N.D. Texas where it is currently pending. *Hoefert*, 2018 WL 2740276, at *1. Similar to Plaintiff here, the *Hoefert* plaintiff alleges that, under USERRA section 4316(b),

11

American employees (specifically, pilots) are entitled to certain benefits (specifically, vacation

and sick accrual and certain bonus payments) while on military leave because those benefits are

allegedly provided to employees during jury duty, sick, and union service absences. *Id.* Certain

of the CBAs and company policies relevant to litigating the *Hoefert* claims are thus the same or

similar as those relevant to litigating Plaintiff's claims with respect to American pilots. Thus,

"transferring this case to the Northern District of Texas will allow for courts that already have

familiarity with similar matters to address this case efficiently." *Hoefert*, 2018 WL 2740276, at

*3. Additionally, as the District of Arizona found, the N.D. Texas is familiar with certain legal

claims and relevant facts because they are the same or similar as in a prior USERRA class action

brought on behalf of American's pilots, *Woodall v. American Airlines, Inc*, No. 3:06-cv-00072-

M (N.D. Tex.). *See Hoefert*, 2018 WL 2740276, at *3. The N.D. Texas's familiarity with issues

and facts in this case based on the *Hoefert* and *Woodall* litigation thus supports transfer.

### E.  The Location of Books and Records.

The vast majority of relevant documents in this case are located at American's Fort

Worth headquarters. For example, any hard copy notes or records related to collective

bargaining negotiations are maintained by the Labor Relations Department in Fort Worth. (Decl.

¶ 15.) Moreover, even if documents can be "transmitted to the [Eastern] District of

[Pennsylvania] with minimal expense . . . it will be less expensive to produce the relevant

documents in the Northern District of Texas." *Hoefert*, 2018 WL 2740276, at *3.

While technology has made it possible to store and transmit documents electronically, the

location of American's documentary evidence is still relevant to the transfer analysis. *Id.* And

"[s]ince the majority of relevant documents in this case are located at [American's] headquarters

and facilities in the Northern District of [Texas], and it does not appear that such records cannot

12

be produced in [Pennsylvania], this factor weighs minimally in favor of transfer." *Illumina, Inc. v. Complete Genomics, Inc.*, 2010 WL 4818083, at *5 (D. Del. Nov. 9, 2010).

### F. Practical Considerations Related to Easy, Expeditious, and Inexpensive Trial Favor Transfer.

"[P]ractical considerations relating to efficiency support this action being transferred to the Northern District of [Texas]. In particular, the witnesses and documents relevant to [Plaintiff's] claim are likely to be located in [Texas]. As such, trial in the Northern District of [Texas] would likely be significantly easier and less expensive." *Jackson*, 2014 WL 808090, at *4; *see also Hoefert*, 2018 WL 2740276, at *3 (transferring action to the location of American's headquarters in Texas because it would be less expensive to produce relevant documents there). Here, Fort Worth is the center of discovery—all of American's witnesses, who will be the vast majority of witnesses in this case, are in the N.D. Texas, as is documentary evidence that will be subject to discovery and the personnel who will be responsible for collecting such evidence. When "the bulk of the evidence and witnesses who would provide most relevant testimony are located in [Texas], it would be more expensive and burdensome to direct Defendants to haul all of their evidence and witnesses to [Pennsylvania], even if Defendants may have the resources to do so. Rather, under this public factor, it would be less expensive and time consuming, generally, if Plaintiff were to litigate [his] case in [Texas]." *Goldstein v. MGM Grand Hotel & Casino*, 2015 WL 9918414, at *5 (D.N.J. Nov. 5, 2015).

### G. Fort Worth is the Location Where Relevant Claims Arose Relating to Plaintiff's Cause of Action.

"Where plaintiff's cause of action arises from strategic policy decisions of a defendant corporation, the defendant's headquarters can be considered the place where events giving rise to the claim occurred." *Theresa Ayling v. Travelers Prop. Cas. Corp.*, 1999 WL 994403, at *5 (E.D. Pa. Oct. 28, 1999). The relevant events here are the administration of the Plan and the

13

administration of military and other leaves for all American employees under the applicable CBAs and other policies. Because American's Executive Compensation, Labor Relations, Flight, Flight Service, Crew Planning, Workforce Administration, the Absence and Return Center, People, and Compensation Department employees in Fort Worth are responsible for this administration, Fort Worth is the center of events at issue and where Plaintiffs' claims arose. (*See* Decl. ¶¶ 5, 13, 16.)

For this same reason, and because Plaintiff does not allege any specific connection between the claims and the current forum (and indeed does not even work for American in PHL but in New York), American's contacts with the N.D. Texas through the administration of the Plan and employee leaves are the predominant contacts related to Plaintiff's claims. (*See generally* Am. Compl.); *see also Smith*, 2010 WL 2270541, at *4 (transfer warranted where "Plaintiff, in this case, alleges no facts that would place the situs of the material events within the Eastern District of Pennsylvania," and all documents that "form the basis for this suit originated from a singular source—Defendant's place of business in [the transferee district]").

## **CONCLUSION**

For these reasons, Defendants respectfully request that this Court transfer this action to the N.D. Texas.

By: */s/ Mark W. Robertson*

Mark W. Robertson (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
mrobertson@omm.com

Kenneth A. Murphy
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000

14

Philadelphia, PA 19103
Telephone: (215) 988-2700
kenneth.murphy@dbr.com

*Attorneys for Defendants American Airlines
Group Inc. and American Airlines, Inc.*

# EXHIBIT 11

**From:** Kennedy, Tricia <tkennedy@alliedpilots.org>
**To:** Scott <aa737drvr@aol.com>
**Subject:** FW: Patterson
**Date:** Tue, Oct 13, 2015 7:11 pm
**Attachments:** Withhold from Service - Patterson 25Sep15.pdf (21K)

---

I sent the email below to AA's Associate General Counsel.  I also called her about this situation.  Thank you.


Best regards,


Trish


Tricia E. Kennedy, Esq.

 ALLIED PILOTS ASSOCIATION

Allied Pilots Association

14600 Trinity Blvd. Suite 500

Fort Worth, Texas 76155

tkennedy@alliedpilots.org

(817) 302-2182 -- Direct Line

(817) 302-2187 -- APA Legal Fax

(214) 450-8745 -- APA Cell Phone

Confidentiality Notice: This email is not encrypted.  However, the email is confidential and may be privileged, and it is for the sole use of the named and intended recipient.  Any review by or distribution to others is strictly prohibited and may be illegal.  If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it.  If you have received this message in error, please delete all copies received and notify the sender or the receptionist of APA Legal immediately at (817) 302-2170.

---

**From:** Kennedy, Tricia
**Sent:** Tuesday, October 13, 2015 6:10 PM
**To:** 'Guia, Lucretia'
**Subject:** Patterson
**Importance:** High

Dear Lucretia,

I understand that the Company has asked FO Scott Patterson (576006) to provide verification of his September 2015 military duty. Although verification is not normally required by the Company (11.E.6), FO Patterson is in the process of providing same. Meanwhile, the Company has withheld FO Patterson from service regarding an unidentified "Work Environment complaint." The timing of these events makes us pause and we request that the Company explain why it needs military verification in this instance. Further, we request that the Company state whether the request for military verification is related to the unidentified "Work Environment complaint" and we have yet to receive any detail about the complaint beyond the foregoing description.

That said, FO Patterson advised CA Bonds that he is in the process of complying with Chief Pilot Bonds military verification request. Toward that end, the pilot is given a "reasonable period of time to provide documentation substantiating the military duty in question" (11.E.6). Nonetheless, CA Bonds threatened FO Patterson that if he does not comply within an unreasonable time frame, the Company will initiate a Section 21 investigation. Such an unreasonable demand fuels our concerns about the entire situation.

Perhaps this is just a matter of mis-communication but we wanted to bring this to your attention. Rest assured that FO Patterson is working on getting the verification but he needs a reasonable amount of time to do so. Your assistance in this matter is appreciated.

Best regards,

Trish

Tricia E. Kennedy, Esq.

 ALLIED PILOTS ASSOCIATION

Allied Pilots Association

14600 Trinity Blvd. Suite 500

Fort Worth, Texas 76155

tkennedy@alliedpilots.org

(817) 302-2182 -- Direct Line

(817) 302-2187 -- APA Legal Fax

# **EXHIBIT 12**

 **PILOT CREDENTIALS**



**American Airlines**

- Sign Up!
- Qualifications
- Q & A
- Contact Us
- Recommendations
- Home/Login

## Qualifications

**Description**

At American, we're more than just an airline. We're a global company committed to driving change and innovation in an evolving industry. Our business allows us to connect people from different cultures and communities around the world – something our more than 100,000 employees take great pride in every day. With a competitive network and strong foundation, American is continuing to build on the momentum of our merger with US Airways, and we are looking for people who want to be part of something great – the new American.

Simply put, we're looking for the best!

Safe, professional, skilled – when you think of American Airlines pilots, those are the qualities that immediately come to mind. And at American, we understand that being a pilot is about more than just the technical aspect of flying an airplane... it's also about the joy of flying and the thrill of adventure.

But it's more than just flying skills. Our pilots are not only leaders on the aircraft – they're also leaders in our operation. That requires a special type of person, someone who can anticipate a need, develop a plan and draw all the necessary players together to make it happen.

Whether you're ready to be hired now or just figuring out where you want to land, look to American because flying is more than what we do... it's who we are.

We are looking for great people that can:

- Set a high standard for providing our customers safe and reliable travel
- Handle a wide variety of situations while working with other team members and our customers
- Work independently or as part of a team with limited supervision
- Ensure the safety and comfort of our customers
- Provide leadership by responding to a variety of emergency and non-emergency situations
- Work in climates and locations across the globe and work variable shifts

**Qualifications**

Here is what it takes to be a successful pilot at American:

- Excellent communication skills and quick and accurate decision making
- Close attention to detail
- Minimum age of 23
- Ability to work varying hours of the day or night, on weekends and holidays
- Must be able to secure appropriate airport authority and/or Customs security badges
- Fulfillment of FAA criminal background checks
- Ability to learn and work with PEDs
- Distance vision corrected to 20/20 and near vision corrected to 20/40 or better in each eye
- Current Unrestricted Airline Transport Pilot (ATP) rating (multi-engine)
- Valid FCC Restricted Radio Telephone Operator permit
- Valid First Class Medical Certificate
- Flight time in accordance with all FAA requirements
- Must be able to fluently speak and understand English
- Must have the right to work in the United States
- Additionally, we require all of our pilots to have a valid passport and documentation allowing for entry into the United States after an international flight.

If you are interested in joining our team, please make sure to complete an online profile.  If you already completed an online profile, you do not need to take any further action other than keeping your information updated.  If, however, you would like to withdraw your application, you can do so by clicking on the Profile Summary page and selecting the Draft Mode button - your profile will then be invisible.

*American Airlines is an Equal Opportunity Employer/Disabled/Vets*

https://AApilotcredentials.com/



MENU

A

# Return to work forms

Created by Kalen Kubik on Aug 8. 2016 4:42 PM

1 minute read

- Aircraft Maintenance (PDF)
- Airport Agent (PDF)
- Cleaner M&E (PDF)
- Dispatcher DOT (PDF)
- Facilities Maintenance (PDF)
- Fleet Service Clerk (PDF)
- Flight Attendant (PDF)
- Flight Crew Training Instructor/Flight Simulator Engineer/Flight Simulator Pilot Instructor (PDF)
- Inspector (PDF)
- Maintenance Support Person (Automotive Facilities) (PDF)
- Management and Support Staff (PDF)
- Management - DOT (PDF)
- Material Logistic Supply (PDF)
- Overhaul Support Mechanic (PDF)
- Reservations Agent, Home-Based (PDF)
- Reservations Agent, Office-Based (PDF)

45720 Views        Categories:        Tags:

Average User Rating        Your Rating:

(14 ratings)

**✳ NO RETURN TO WORK FOR PILOT**

**Source NewJetNet.AA.com**

↝ Follow

↪ Share

## AMERICAN AIRLINES RETURN TO WORK FORM

## Return to Work Form *WITH Restrictions*

### Flight Crew Training Instructor/Flight Simulator Engineer /Flight Simulator Pilot Instructor

_____     _____     _____     _____
First Name                    Last Name                     AA Employee #       Base

_____          _____
Email Address                                              Phone Number

**Treating Health Care Provider (continued):**

I understand the essential job functions and physical demands listed on page one. I confirm my patient is currently able to return to work **WITH RESTRICTIONS**.

Return To Work **WITH RESTRICTIONS**: Start Date: _____  End Date: _____
                                                 mm/dd/yyyy                    mm/dd/yyyy

Please complete the following:

1. List the specific restrictions preventing or impacting the Employee's performance (attach additional sheets as necessary)

_____

_____

_____

_____

2. Full Duty release **WITHOUT RESTRICTIONS**: _____
                                                 mm/dd/yyyy

By signing this form, you are certifying you are the treating Health Care Provider (HCP) for this employee's recent absence from work.

Health Care Provider (print name): _____

Specialty/Type of Practice: _____

Phone Number: _____  Fax: _____

Health Care Provider Signature: _____  Date: _____

**GINA Compliance Notice:**  The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

**Employee Notes:**
1. Your return to work status should be updated on Jetnet within 2 business days.
2. Depending on your position, base and time away from work, you may be required to undergo a fingerprint/background check prior to reporting back to work. Contact your manager to review your specific requirements.
3. If returning to work with job restrictions, you will need to speak with your supervisor, and review the Americans with Disabilities Act and Modified Duty policies located on Jetnet.
4. See your station/base manager/supervisor/lost time personnel upon returning to work.

### Please fax completed form to 1-855-895-3685  (ARC, Absence and Return Center)

**AA RTW Form (Page 2: With Restrictions)**

# AMERICAN AIRLINES RETURN TO WORK FORM

### Flight Crew Training Instructor/Flight Simulator Engineer /Flight Simulator Pilot Instructor

_____     _____     _____     _____
First Name                        Last Name                          AA Employee #            Base

_____     _____     _____
Email Address                                                        Phone Number

**To the Health Care Provider:** We would like to thank you for your care and treatment of our colleague and ask that you partner with us by completing the information below in order for us to process our employee's request to return to work. This employee has job functions at our company that could affect the employee's safety and that of their co-workers. The safety of our employees and customers is a priority for our company, the Federal Aviation Administration (FAA), Department of Transportation (DOT) and Occupational Safety and Health Administration (OSHA).

The essential functions and required physical demands of a **Ground School/Flight Crew Training Instructor/Flight Simulator Engineer / Flight Simulator Pilot Instructor** below, although not a comprehensive inventory of all essential functions and required physical demands, indicate the general nature and level of work performed by employees within this job classification. The failure to perform these functions properly may result in serious injury to the employee, co-workers, or company training equipment.

In order to evaluate our employee's request to return to work, and/or safely return our employee back to work, please review each job function and physical demand listed below. If our employee has **any** restriction(s) applicable to any of the functions or demands listed, please explain the restriction(s) on page 2 of this form.

**All employees:**

- Ability to stand, sit, stoop, crawl and walk
- Ability to override jammed and/or manually operates flight controls.
- Distinguish all colors. Visually discern cockpit instruments (analog and digital).
- Visual ability to determine the correct placement of switches, valves, handles, etc.
- Oral capabilities to speak clearly and be understood in a cockpit and high noise environment.
- Ability to hear and understand transmitted communications and acknowledge crew and operational personnel.
- Ability to detect odors such as burning substances, kerosene, gasoline, and hydraulic fluids as well as peculiar odors not normally found in an airplane or simulator cockpit.
- Ability to work and conduct training in a dimly lit simulator cockpit environment
- Ability to read, interpret and understand written, printed and computerized material.
- Ability to learn tablet and PC applications and apply knowledge.
- Possess cognitive skills to process paperwork, perform simple mathematical functions, understand physics and aeronautical engineering.
- Cognitive ability to understand methodical, analytical, and systematic decision making.
- Mental ability and agility to handle multiple tasks simultaneously and adapt to changes
- Ability to manually manipulate various controls such as control columns, control wheels, rudder pedals, valves, push buttons, switches and keyboards.
- This employee is subject to Department of Transportation (DOT) drug and alcohol testing. (/FCTI personnel are not subject to this DOT requirement)

**FCTI & FLIGHT SIMULATOR ENGINEERS ONLY:**



- Ability to open and close hinged aircraft doors and hatches (FCTI only)
- Ability to pull and reset emergency exit handles (FCTI only)

**FLIGHT SIMULATOR ENGINEERS ONLY:**

- Ability to reach, push and pull objects located in cramped quarters
- Ability to work in confined spaces and to climb and descend steep or narrow passageways.
- Ability to work at heights
- Ability to lift and move heavy objects such as life rafts and training devices.

**I understand the essential job functions and physical demands listed above. I certify that I am the treating healthcare provider for this employee's recent absence from work.**

**I confirm my patient has been under my care since _____ and is able to return to work <u>WITHOUT RESTRICTIONS.</u>**
                                                          mm/dd/yyyy

**Return To Work Date<u>:</u> _____**
                     mm/dd/yyyy
Health Care Provider (print name): _____

Specialty/Type of Practice: _____

Phone Number: _____     Fax: _____

Health Care Provider Signature: _____     Date: _____

## Please fax the completed form to 1-855-895-3685 (ARC, Absence and Return Center)

### AA RTW Form (Page 1: No Restrictions)

# **<u>EXHIBIT 13</u>**



U.S. DEPARTMENT OF TRANSPORTATION
# OFFICE OF INSPECTOR GENERAL

# FAA Has Not Fully Addressed Safety Concerns Regarding the American Airlines Flight Test Program



**FAA**

Report No. AV2018060

July 10, 2018

**U.S. DEPARTMENT OF TRANSPORTATION**
**OFFICE OF INSPECTOR GENERAL**

# FAA Has Not Fully Addressed Safety Concerns Regarding the American Airlines Flight Test Program

*Self-initiated*

**Federal Aviation Administration | AV2018060 | July 10, 2018**

## What We Looked At

Federal regulations require U.S. air carriers to verify the airworthiness of aircraft following major repairs or maintenance. To perform these maintenance checks, American Airlines (AA), established a flight test program. In February 2017, Allied Pilots Association (APA)—which represents AA's pilots—contacted us about multiple safety issues at the AA flight test program, including the use of unqualified pilots. APA stated that concerns placed in an earlier letter to the Federal Aviation Administration (FAA) had remained "largely unaddressed for over 18 months." We initiated an audit to assess the effectiveness of FAA's actions in response to safety concerns about the AA flight test program. Specifically, we examined how (1) FAA's oversight office for American Airlines addressed concerns about the flight test program and (2) the Agency processed and responded to a letter to the Federal Aviation Administrator questioning the integrity of FAA's oversight of the flight test program.

## What We Found

FAA's oversight office for American Airlines lacked objectivity in its review. While FAA requires inspectors to provide impartial treatment, the inspector in this case seems to have been affected by his relationship with AA personnel and the 28 years he spent working with the carrier. While the Agency has a tool for assessing its relationships with carriers, the tool did not account for these risk factors. In addition, the Agency used a "best guess" method to determine who should respond to APA's written allegations, and ultimately routed the letter back to the target of the complaint for response. Due to a lack of oversight guidance, FAA also provided varying responses to APA and OIG regarding the requirements for the flight test program. As a result, APA received neither a comprehensive nor an accurate response to its concerns.

## Our Recommendations

FAA concurred with our seven recommendations to improve its oversight of the flight test program, as well as its ability to respond to safety concerns.

---

All OIG audit reports are available on our website at www.oig.dot.gov.

For inquiries about this report, please contact our Office of Legal, Legislative, and External Affairs at (202) 366-8751.

# Contents

Memorandum                                                                                          1

Results in Brief                                                                                    3

Background                                                                                          4

FAA's Local Oversight Office Did Not Address Concerns About the AA
      Flight Test Program                                                                           5

Issues Brought to the Federal Aviation Administrator's Attention Remain
      Unresolved                                                                                    8

Conclusion                                                                                         10

Recommendations                                                                                    10

Agency Comments and OIG Response                                                                   11

**Exhibit A.** Scope and Methodology                                                               12

**Exhibit B.** Organizations Visited or Contacted                                                  13

**Exhibit C.** List of Acronyms                                                                    14

**Exhibit D.** Major Contributors to This Report                                                   15

**Appendix.** Agency Comments                                                                      16



**U.S. DEPARTMENT OF TRANSPORTATION**
**OFFICE OF INSPECTOR GENERAL**

# Memorandum

**Date:**   July 10, 2018

**Subject:**   FAA Has Not Fully Addressed Safety Concerns Regarding the American Airlines
Flight Test Program | Report No. AV2018060

**From:**   Matthew E. Hampton
Assistant Inspector General for Aviation Audits

**To:**   Federal Aviation Administrator

Federal regulations require U.S. air carriers to verify the airworthiness of aircraft
following major repairs or maintenance.[1] To accomplish this, American Airlines
(AA), established a flight test program to perform these maintenance checks. In
February 2017, the Allied Pilots Association (APA)—which represents AA's
pilots—contacted the Office of Inspector General (OIG), concerned about
multiple safety issues pertaining to the flight test program, including AA's use of
unqualified pilots and a culture of suppressing safety complaints. The association
previously contacted the Federal Aviation Administration (FAA) but stated its
concerns had remained "largely unaddressed for over 18 months." We obtained
sufficient evidence during a preliminary meeting with APA and from our review of
documentation to initiate an audit to examine these concerns in greater detail.

Our objective was to assess the effectiveness of FAA's actions in response to
safety concerns about the AA flight test program. Specifically, we examined how
(1) FAA's Certificate Management Office (referred to as the oversight office in this
report) addressed concerns about the flight test program and (2) the Agency
processed and responded to a letter to the Federal Aviation Administrator
questioning the integrity of FAA's oversight of the flight test program.

We conducted this audit in accordance with generally accepted Government
auditing standards. Exhibit A details our scope and methodology. Exhibit B lists
the entities we visited or contacted.

We appreciate the courtesies and cooperation of Department of Transportation
representatives during this audit. If you have any questions concerning this

---

[1] Title 14, Code of Federal Regulations (CFR) § 91.407(b).

report, please call me at (202) 366-0500, or Tina Nysted, Program Director, at (404) 562-3770.

cc:    The Secretary
       DOT Audit Liaison, M-1
       FAA Audit Liaison, AAE-100

# Results in Brief

**FAA's local oversight office did not address concerns about the AA Flight Test Program.**

FAA's oversight office for American Airlines lacked objectivity in its review and did not respond to concerns about unqualified pilots and unsafe conditions during maintenance verification flights. FAA, in line with Governmentwide standards, requires inspectors to provide impartial treatment and avoid actions that may create an appearance of preferential treatment. However, the inspector's oversight role in this case appears to have been affected by his relationship with the head of the AA flight test program and the length of time—28 years—he performed oversight of American Airlines. This potential loss of impartiality is particularly troubling considering the scope of his responsibilities, including oversight of voluntary safety programs, pilot training, and safety management systems. Additionally, as the only inspector overseeing the flight test program, he became a single point of failure for FAA. A new supervisor identified possible objectivity issues and recommended temporarily reassigning the inspector. However, Agency officials did not consider the request a priority and took nearly 4 months to reassign the individual. Additionally, FAA developed an evaluation tool that pulls data from multiple sources to assess its collaborative relationships with air carriers. However, that tool does not account for risk factors such as non-routine operations (e.g., flight test) or the length of time inspectors have been assigned to a carrier. Furthermore, the FAA oversight office lacks controls to ensure complaints are properly addressed. Neither the inspector nor office managers complied with FAA's requirements for processing complaints or provided a response to APA directly addressing the underlying issues that prompted the complaints. As a result, APA elevated its concerns to the Federal Aviation Administrator.

**Issues brought to the Federal Aviation Administrator's attention remain unresolved.**

According to APA, the airline's managers and an FAA inspector warned AA's pilots that complaints could result in penalties and perhaps the end of the program. FAA, however, did not view these comments as a safety concern or consult the Agency's Office of Audit and Evaluation group, which was specifically established to address complaints. Instead, the Agency used a "best guess" method, which lacked criteria for identifying safety issues, to determine who should respond to APA's written allegations. The letter was routed through FAA Headquarters, then ultimately back to the target of the complaint, the FAA oversight office. Significantly, no one at FAA realized the Agency had not addressed APA's allegation that the oversight office was working with airline officials to suppress pilot safety concerns. In addition, representatives in the

oversight office asked the carrier to respond to many of APA's concerns and ultimately included those responses in the Agency's letter signed by the Administrator.

FAA also provided varying responses to APA and OIG regarding the requirements for the flight test program—such as whether or not the carrier must comply with established programs—due to a lack of oversight guidance. As a result, APA did not receive a comprehensive or accurate response. After we discussed our findings with FAA officials, the Agency completed an independent assessment of the program in October 2017 that verified many of APA's concerns. However, FAA's oversight office has not provided an updated response to APA or worked with the Agency's policy officials to clarify oversight responsibilities and develop corrective actions.

We made seven recommendations to help FAA improve its oversight of and address safety concerns about the flight test program.

# Background

The local FAA oversight office for American Airlines, based in Irving, TX, is responsible for overseeing AA's maintenance programs and flight operations, including the flight test program. Approximately 100 inspectors and managers within this office are responsible for certificating, surveilling, and inspecting the airline, which performs nearly 2.5 million domestic and international flights each year using more than 1,000 aircraft and 12 different fleet types.

Air carriers typically fly aircraft to test performance after major repairs or maintenance have been completed. While these flights are not performed with passengers or cargo onboard, it is important that carriers implement procedures to ensure the flights are operated safely. On December 22, 1996, three crewmembers and three technicians were killed when an Airborne Express DC-8 crashed during such a flight, which aimed to verify that recent maintenance and modifications had not changed how the aircraft operated. Following its investigation of the crash, the National Transportation Safety Board made a series of recommendations to FAA, including to establish guidance for air carriers performing non-routine operations, such as evaluation flights, and conduct appropriate surveillance of these programs.

As a result, FAA issued its Non-Routine Flight Operations (NRFO) guidance in August 2002 (updated May 2008), which recommended that carriers update manuals and develop training, reviewed and accepted by FAA, so that each NRFO is conducted with procedures consistent with safe flight. While these actions are not required, American Airlines used the recommendations to develop its flight

test program and train approximately 20 pilots to perform certain NRFO, such as maintenance verification flights and flying damaged aircraft to a repair facility.

# FAA's Local Oversight Office Did Not Address Concerns About the AA Flight Test Program

FAA staff overseeing American Airlines lacked objectivity and did not follow the Agency's guidance for addressing complaints when they received APA's letter. Specifically, the inspector, who had developed a personal relationship with the head of the AA flight test program, did not properly investigate safety complaints.

## FAA's Review of Complaints About the Flight Test Program Lacked Objectivity

The FAA inspector assigned to investigate the complaint had conversations with the head of the AA flight test program about "problem pilots," a reference to pilots who filed complaints. Rather than objectively review the basis for their complaints, as called for in FAA guidance, the inspector requested and received information from American Airlines that could have been used to discredit the pilots who voiced concerns. For example, the AA manager said of one of the pilots, "he seems more interested in litigating his way through life at AA versus doing work."

Governmentwide and FAA's ethical standards[2] require inspectors to act impartially and to avoid the appearance of preferential treatment when they perform their official duties. However, the inspector in this case had developed a personal relationship with the head of the AA flight test program, which created the appearance of diminished impartiality. For example, he made plans, using his Government-issued computer and email account, to travel abroad with the head of the program and introduce him to the inspector's family. The potential impact of the inspector's apparent lack of impartiality was compounded by the large scope of air carrier programs for which he was responsible. Managers at the FAA oversight office did not recognize the extent of his relationship with a senior airline employee or its potential impact on his oversight activities.

---

[2] 5 CFR § 2635.101, "Basic obligation of public service." *Ethical Conduct and Financial Disclosure* (FAA Order 3750.7A).

When we interviewed the inspector about the flight test program, he displayed little knowledge of it beyond describing how great it was. Instead, he stated that a few pilots had been causing problems for 15 years and advised us to "talk to the experts." Then, without our knowledge, he set up a meeting with us and airline officials—whom he called the "kings of the airline." Furthermore, during an interview about potential inspector impartiality, an FAA flight operations frontline manager referred to the AA flight test manager as "perfect" and someone who "could do no wrong," and to the airline as "golden." These comments raise concerns about the lack of objectivity at this FAA office.

In September 2016, a new supervisor was assigned to the office and determined that the inspector was not performing his oversight functions properly and objectively. The inspector had worked there for 28 years and was involved in many areas beyond the flight test program.  For example, he was involved in hotline complaints, multiple AA voluntary safety programs, and oversight of the carrier's safety management system, which is used to identify and mitigate safety risks across the airline. However, as the only inspector overseeing the flight test program, he became a single point of failure for FAA. The supervisor reassigned oversight of two programs to other staff, but did not adjust the inspector's role in the carrier's safety programs or the flight test group. In March 2017, the supervisor raised concerns about the inspector's role and possible lack of objectivity with local and regional office managers. However, the regional office did not see the issue as a priority and took nearly 4 months to reassign the inspector.

The supervisor's concerns regarding diminished objectivity and the lack of support from the regional office are similar to those we highlighted in our 2008 review of FAA's oversight office for Southwest Airlines.[3] In response to our recommendation, FAA developed a tool[4] to assess collaborative relationships between its oversight offices and assigned carriers; it utilizes data from multiple Agency sources to identify anomalies in inspector performance. However, the tool does not incorporate risk factors such as non-routine operations (e.g., maintenance verification flights) or the length of time an inspector has been assigned to a carrier—key factors in this review. As a result, FAA cannot be certain of the tool's ability to detect issues at other oversight offices.

FAA emphasizes the importance of a strong safety culture within the Agency and the industry. Guidance for FAA's Safety Management System—one of the programs the inspector was responsible for overseeing—identifies some

---

[3] *Review of FAA's Safety Oversight of Airlines and Use of Regulatory Partnership Programs* (OIG Report No. AV-2008-057), June 30, 2008. OIG reports are available on our website: https://www.oig.dot.gov/.
[4] Certificate Management Data Evaluation Process (CMDEP).

characteristics of a positive safety culture as valuing individuals' opinions, encouraging personnel to identify safety threats, providing a non-punitive environment for reporting safety concerns, and displaying a willingness to recognize when basic assumptions should be challenged and changes are warranted. Because management did not recognize or mitigate threats to diminished staff objectivity, the FAA oversight office's ability to promote safety and adequately respond to complaints was compromised.

# FAA Staff Did Not Follow Agency Guidance When Addressing Complaints About the Flight Test Program

FAA's oversight office staff did not address APA's concerns[5] about unqualified pilots and unsafe conditions during maintenance verification flights. National and local FAA guidance[6] provide instructions and timeframes for processing complaints. In addition, the oversight office's complaint coordinator sent numerous emails reminding staff about specific requirements for handling complaints. However, the office lacked an effective control to ensure complainants were contacted, investigations were documented, and complaints were resolved. As a result, FAA did not respond to APA's questions about how pilots are trained to conduct flight tests and whether maintenance verification flights can be performed on damaged aircraft.

The oversight office developed local guidance stating that an inspector should contact the complainant to acknowledge receipt and obtain any additional information. Instead of contacting APA, the inspector provided airline management officials with information about the complaint and the individual who had signed it. Less than a month after the inspector notified the airline, AA management held a meeting with all flight test pilots to address the "level of noise." Pilots were told they "must stay off the radar," which APA interpreted as meaning the flight test program would be shut down if the complaints continued. Prior to the meeting, the inspector notified airline management via email that FAA's position was that the flight test program operated safely and professionally, and asked them to "lead me in the right direction." Furthermore, the local guidance gives the assigned FAA inspector 2 days to contact the complainant. In this case, however, the inspector waited more than 2 months and then asked the airline to set up a meeting for him and the complainant—a

---

[5] APA's specific complaints/concerns were extremely technical in nature; as such, we have summarized them here.
[6] *Flight Standards Information Management System* (FAA Order 8900.1), volume 7, chapter 5, section 1. *Aviation Safety Quality Management System* (AFS-SW-21-403-02), "Complaints."

process typically used for pilots under FAA investigation. Although APA asked the inspector multiple times to clarify the purpose of the meeting and state whether the individual was under investigation, the inspector did not respond, and the meeting never occurred.

In addition, the inspector did not document any of the work he performed to investigate the APA complaint. The guidance requires inspectors to document complaint-related work in FAA's surveillance tracking system. Instead, when FAA's new assistant manager for the oversight office asked for an update, the inspector sent an email stating he had traveled to the flight test center to investigate the concerns. According to travel records, he only visited the flight test center once for approximately 4 hours. The inspector reported that during this time he attended a meeting regarding flight test program safety reports, and reviewed the carrier's pilot training program and the specific qualifications maintained in at least three different systems for the flight test pilots. It would be extremely difficult, if not impossible, to adequately perform these tasks in a 4-hour period.

Finally, FAA Order 8900.1 states that Flight Standards personnel should attempt to provide a final written response within 10 business days from the time of receipt. The Agency received APA's complaint in December 2015. However, the inspector did not review any documentation until April 2016, and the FAA oversight office did not respond to the complaint. Due to the lack of a response, in July 2016, APA wrote to the Federal Aviation Administrator about the Agency's oversight of the AA flight test program.

# Issues Brought to the Federal Aviation Administrator's Attention Remain Unresolved

FAA missed key safety concerns APA raised in its letter to the Administrator and did not consult the Audit and Evaluation group about the Agency's response. Instead, the letter was routed to several offices before it was returned to the FAA oversight office—the specific target of the complaint.

While APA stated that "both the CMO [Certificate Management Office] and American Airlines managers warned that additional 'complaints' and 'noise' from ASAP [Aviation Safety Action Program] reports would possibly result in penalties … up to and including abandonment of the program," FAA Flight Standards managers at the FAA oversight office and Headquarters did not recognize this as a safety concern. When we discussed the allegation with FAA's Audit and Evaluation group, which handles complaints and internal audits, they immediately identified these concerns as a significant threat to safety. However, that group was not consulted about the response to the APA letter because FAA distributes

correspondence via a "best guess" method, which does not include criteria for identifying safety issues.

In the "best guess" method, letters are assigned to the Agency's subject matter experts, who review them and determine whether or not to respond. FAA officials defended this method by stating the experts are in the best position to evaluate correspondence. In this instance, APA's letter was routed to the Aviation Safety Division, then to Flight Standards, and ultimately back to the oversight office that was the target of the complaint. In addition, representatives in the oversight office asked the carrier to respond to many of APA's concerns and ultimately included those responses in the Agency's letter signed by the Administrator.

According to the FAA oversight office, the flight test program was "supplemental," and therefore the carrier did not have to follow written requirements even though FAA had formally accepted them. However, both APA and OIG received conflicting responses about the requirements from FAA. For example, an FAA maintenance policy official told us that the carrier was expected to comply with flight test policies and procedures because they supported the carrier's FAA-authorized maintenance program. We requested clarification from the Agency's Air Carrier Operations Branch but found that FAA does not have guidance on how to oversee these types of operations and programs. In addition, the FAA oversight office for American Airlines did not work with policy officials to verify the Agency's position.

Furthermore, during the complaint review process, no one at FAA realized that the allegation about the oversight office had not been addressed. After we discussed our concerns with FAA, the Agency used staff from the United Airlines oversight office to conduct a technical assessment of the flight test program, but did not review the objectivity of staff at the oversight office for American Airlines. The October 2017 assessment verified many of our and APA's technical concerns, including whether properly qualified pilots were performing maintenance verification flights and whether those flights can be performed on aircraft that have not been fully repaired. The FAA operations supervisor for American Airlines formally presented the findings to the carrier in December 2017, and established a safety analysis team with airline officials to resolve the issues. Furthermore, during our audit, the inspector at the center of the complaint retired, and the carrier began making changes to the flight test program. However, FAA has not provided an updated response to the complainant, and oversight office staff have not worked with FAA policy officials to clarify responsibilities and develop corrective actions. As a result, APA's safety concerns have yet to be fully addressed.

# Conclusion

Concerns about the impact of FAA inspector relationships with the airlines they oversee have been an issue since our 2008 review of the Agency's oversight office for Southwest Airlines. Our report spurred FAA to take a number of actions, including developing a tool that assesses its relationship with air carriers. However, the tool does not incorporate sufficient risk factors to identify diminished inspector impartiality. Additionally, weaknesses in FAA's process for identifying and handling safety complaints resulted in multiple missed opportunities to mitigate risks identified by an industry stakeholder. As a result, FAA is not in a position to respond to safety complaints about the flight test program and cannot be assured that its safety oversight is sufficient or comprehensive.

# Recommendations

To improve FAA's oversight of the American Airlines flight test program as well as its ability to respond to safety concerns, we recommend that the Federal Aviation Administrator:

1. Conduct an independent review of FAA's oversight of American Airlines' flight operations to determine whether controls are in place and effective in preventing single points of failure; develop and implement corrective actions, if necessary.

2. Modify the existing tool used to evaluate the objectivity of inspectors to incorporate risk factors such as non-routine operations and the length of time inspectors oversee the same air carrier.

3. Develop and implement controls requiring oversight office staff to resolve complaints and follow key policy requirements such as directly contacting complainants and documenting investigations.

4. Establish and implement criteria for evaluating correspondence to ensure safety complaints are routed to FAA's Office of Audit and Evaluation.

5. Develop and implement inspector guidance on FAA's oversight requirements for flight test operations.

6. Provide the Allied Pilots Association with a revised response to its complaint based on results from the October 2017 independent assessment of the American Airlines flight test program.

7. Develop and implement a corrective action plan to address the recommendations made by the October 2017 independent assessment of the American Airlines flight test program.

# Agency Comments and OIG Response

We provided FAA with our draft report on May 21, 2018, and received its formal response on June 20, 2018, which is included as an appendix to this report. FAA concurred with all seven of our recommendations and provided planned implementation dates for each. We consider these recommendations resolved but open pending completion of planned actions.

# Actions Required

We consider recommendations 1–7 resolved but open pending completion of planned actions.

# Exhibit A. Scope and Methodology

We conducted this performance audit between April 2017 and May 2018 in accordance with generally accepted Government auditing standards as prescribed by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

We met with APA officials to better understand their concerns and the potential safety impacts. Then, to assess how APA's concerns about the AA flight test program were addressed, we met with local, regional, and national FAA Flight Standards officials responsible for oversight of AA and policies relevant to the complaint. We reviewed surveillance and travel records, as well as emails from the inspector directly responsible for overseeing the program. We also interviewed AA personnel and reviewed its program documentation. To assess how the Agency processed and responded to APA's letter to the Federal Aviation Administrator, we reviewed tracking logs associated with the complaint and interviewed FAA officials responsible for processing correspondence within Flight Standards, Aviation Safety, and the Office of the Administrator. We also met with officials in FAA's Office of Audit and Evaluation, which is responsible for addressing complaints.

# Exhibit B. Organizations Visited or Contacted

## FAA Facilities

**Headquarters**

Office of the Administrator

Aviation Safety

Flight Standards Service

Office of Audit and Evaluation

Air Carrier Maintenance Branch

Air Carrier Operations Branch

Evaluations Program Branch

Policy Integration Branch

**Field Offices**

Southwest Region

American Airlines Certificate Management Office

United Airlines Certificate Management Office

## Other Organizations

American Airlines, Fort Worth, TX

Allied Pilots Association, Fort Worth, TX

# **Exhibit C.** List of Acronyms

| | |
|---|---|
| AA | American Airlines |
| APA | Allied Pilots Association |
| ASAP | Aviation Safety Action Program |
| CMO | Certificate Management Office |
| DOT | Department of Transportation |
| FAA | Federal Aviation Administration |
| NRFO | Non-Routine Flight Operations |
| OIG | Office of Inspector General |

**Exhibit C.** List of Acronyms

14

# **Exhibit D.** Major Contributors to This Report

| | |
|---|---|
| TINA **NYSTED** | PROGRAM DIRECTOR |
| MARSHALL **ANDERSON** | PROJECT MANAGER |
| ANNE **LONGTIN** | SENIOR ANALYST |
| CURT **BOETTCHER** | SENIOR ANALYST |
| TIM **MCDOUGALL** | SENIOR AUDITOR |
| JANE **LUSAKA** | WRITER-EDITOR |
| SETH **KAUFMAN** | SENIOR COUNSEL |

# Appendix. Agency Comments

 **Federal Aviation Administration**

# Memorandum

Date:      June 20, 2018

To:        Matthew E. Hampton, Assistant Inspector General for Aviation Audits

From:      H. Clayton Foushee, Director, Office of Audit and Evaluation, AAE-1

Subject:   Federal Aviation Administration's (FAA) Response to Office of Inspector General (OIG) Draft Report: Safety Concerns Regarding the American Airlines Flight Test Program

The FAA has initiated several safety enhancements to the American Airlines Flight Test Operations Program. The use of Risk-Based Decision Making and Compliance Oversight principles have facilitated a collaborative approach to resolving the issues identified in the report. New initiatives include the establishment of a Safety Analysis Team comprised of all relevant stakeholders, and the development of a new Risk Management Process. American Airlines has been fully cooperative in communicating information about identified hazards to the Agency, and all correctives actions are tracked in the carrier's Safety Management System.

The FAA offers the following comments to the OIG's findings:

- The draft report states that it took four months from the time a supervisor raised concerns about the Aviation Safety Inspector's (ASI) role and lack of objectivity until the regional office reassigned him. The report further states that the regional office did not see the issue as a priority. However, the FAA supports a robust ethics program that focuses on identifying conflicts of interest, training and advising on conflicts, and undertaking appropriate enforcement action. Once the issues were brought to the FAA's attention, it began the necessary review process to determine the appropriate action. This ultimately resulted in a change to the ASI's responsibilities along with the initiation of formal action once the allegations were substantiated.

- The FAA did complete an independent assessment of the American Airlines Flight Test Operations Program. That assessment identified several compliance issues and other hazards. The Allied Pilots Association is participating in the resulting Safety Analysis Team, which is working to evaluate and mitigate these issues.

We concur with the recommendations, as written. We plan to implement recommendations 2, 6 and 7 by October 31 2018, recommendations 1, 3 and 4 by March 31, 2019, and recommendation 5 by June 30, 2019.

**Appendix.** Agency Comments                                                    16

2

We appreciate this opportunity to respond to the OIG draft report. Please contact H. Clayton Foushee at (202) 267-9000 if you have any questions or require additional information about these comments.

# U.S. DOT OIG
# Fraud & Safety
# Hotline

hotline@oig.dot.gov | (800) 424-9071

https://www.oig.dot.gov/hotline

## Our Mission

OIG conducts audits and investigations on
behalf of the American public to improve the
performance and integrity of DOT's programs
to ensure a safe, efficient, and effective
national transportation system.

**OFFICE OF INSPECTOR GENERAL**
U.S. Department of Transportation
1200 New Jersey Ave SE
Washington, DC 20590



www.oig.dot.gov

# EXHIBIT 18

## Unsworn Declaration of Dr. Ibrahim Abi-Rafeh, MD, Pursuant to 28 U.S.C. § 1746

Dr. Ibrahim Abi-Rafeh deposes and says:

1.    I make this declaration of my own personal knowledge.

2.    I am board certified by the American Board of Neurology and Psychiatry in Psychiatry and Geriatric Psychiatry, practicing in Broward County, Florida.

   a. I have over 25 years experience with mental health, neuropsychiatric and cognitive disorders.
   b. I conduct psychiatric evaluations on a regular basis.
   c. I am a certificated pilot by the Federal Aviation Administration with advanced ratings.
   d. I hold a current Airman Medical Certificate issued by the FAA, and am familiar with the requirements for the issuance of a certificate.

3.    I have personally known Lt. Col. Scott Patterson for approximately 13 years and have flown with him in the context of the Civil Air Patrol/Air Force Auxiliary volunteer work as a mission pilot in search and rescue missions.  Patterson was a check pilot and mission check pilot and conducted mission pilot training and examinations.

4.    Patterson is an experienced and  well-respected pilot and flight instructor, whom other pilots sought for advice and counsel.

5.    I reviewed a copy of the complaint filed by  Captain Glenn Whitehouse dated September 24, 2015. It was addressed to Captain Brian Beach, Chief Pilot, MIA

6.    I reviewed a copy of the "Fitness for duty Medical Examination Request" made by Captain Brian Beach, Chief Pilot, MIA on January 14 2016 regarding "Patterson's judgment, and specifically, his mental and/or emotional stability". The request was made in response to allegations of

1

"atypical interactions with coworkers and reports that suggest a pattern of false/self-aggrandizing statements". Patterson was removed from active duty and place on paid withhold status on September 24, 2015.

7.    I reviewed a copy of Patterson's FAA Medical Certificate First Class with no limitations, completed by Dr. Joseph Tordella on January 29, 2016. Dr. Tordella is a retired Air Force and TWA pilot. Dr. Tordella is an FAA Senior Aviation Medical Examiner with over 30 years of experience and a certified Medical Review Officer registered with the US Coast Guard. He certified that Patterson was fit to fly as per his First Class Medical Certificate.

8.    In March, 2016 I received the March 21st report of Neuropsychological examination by Dr. John Knippa, Ph.D. on Rodney Scott Patterson.

a. It was peculiar to require Patterson to travel to California for the Neuropsychological examination, when several are available in the South Florida area and on the East Coast (see exhibit A). He had to fly nearly 2,700 miles across three time zones away to take cognitively sensitive testing. It is well known that Travelers usually experience symptoms after air travel across at least two time zones. Symptoms may include disturbed sleep, daytime fatigue, decreased ability to perform mental and physical tasks, reduced alertness, and headaches (https:/ www.ncbi.nlm.nih.gov/pmc/articles/PMC3086113).(see exhibit B) This likely affected his performance on the cognitive testing.

b. As part of the psychological testing, Dr. Knippa conducted an MMPI-2 and a PAI. He stated in his report that the basic profile was entirely within normal limits. there was no endorsement identified of significance to clinical concern for mood, anxiety, impulsiveness or problematic behavior. A personality disorder was not identified with the limited data available at that time.

c. As far as cognitive skills assessment, Dr. Knippa stated that

2

the data are consistent with an attention deficit disorder with mild impaired range performance on multiple measures of complex speeded problem solving with novel information. The overall profile of neuropsychological assessment was discrepant from that expected for Major Airline pilots of similar age. However, in the section titled  Areas of Performance Concern, "No Technical Lapses of Performance were known to have been alleged".

      d. The evaluation was done the morning after a flight across three time zones, which did affect his performance on the cognitive tests, in addition to his stress about being removed from active duty. The time zone change meant that when the evaluation was started in the morning Pacific Time, it was early afternoon Eastern Time, which affects the circadian rhythm.

      e. In my opinion those findings do not correlate with his real life performance as a pilot, as there have not been any complaints about his flying skills during multiple flights and recurrent flight checks. The reason for the referral was to assess his mental and/or emotional stability and not his cognitive abilities, which there were no known issues with. In my opinion, there was no sound medical basis that he suffered from a disqualifying medical condition. In addition, Dr. Knippa has no authority to make that determination since he is not an FAA designated or trained medical examiner.

      f. I reviewed the Neuropsychological Evaluation conducted by Dr. Bercaw and Post-Doctoral Neuropsychology Resident Dr. Fonseca on March 21, 2016. It was done in Florida only a few days after Dr. Knippa's evaluation in California.  Again he traveled across three time zones and his performance on the cognitive testing may have been affected by fatigue as noted by the examiner. Patterson was still experiencing sleep disturbance due to jet lag and stress at the time which may take weeks to resolve.

      g. Patterson was fully qualified to hold a First Class FAA Airman Medical Certificate as certified by Dr. Tordella in January and July of 2016,

3

and he posed no risk to aviation safety. He returned to flying including Beech Jet and Boeing 767 as a Captain after successfully completing the required training and FAA flight check.  That disproves Dr. Knippa's determination that he was not fit for duty on the basis of impaired performance on cognitive assessment.

9.    To my knowledge and as per his medical record, he has no history of Traumatic Brain Injury, HIV, Alcoholism, Substance Abuse, Chemotherapy, Radiation or Cerebrovascular Accident.  He held a Top Secret clearance in the military and was the subject of multiple psychological screenings throughout his career and in order to become a Federal Flight Deck Officer, affirming no history of psychological problems then or now.

a. Patterson reported that his employer had investigated a complaint filed by a senior co-worker and determined the allegations were unfounded.

b. Anyone facing termination of employment and subsequent loss of their income would experience stress, which would impact other life functions, such as trouble sleeping and difficulty concentrating. Grounding is degrading to pilot's self-esteem and also increases anxiety levels for the pilot.

c. His employer required him under "threat of termination", to fly across country and be subject to a full battery of psychological testing, which certainly increased his anxiety level and affected his ability to sleep.

d. Based upon his departure time from Florida and arrival time in California, he was not given an adequate amount of rest to allow him to acclimate before testing.

10.   I attributed the low scores on the cognitive testing to stress and fatigue due to jet lag and lack of sleep, and not an underlying medical or neuropsychological issue which would disqualify him from holding an Airman Medical Certificate.

11.   Mr. Patterson did not require medical intervention or psychological care.  In my opinion he was medically and psychologically

4

intact.

12.   I have reviewed the reports written subsequent to Dr. Knippa's evaluation.  I concur with the neurological findings of John Hastings, MD, who conducted an Independent Aeromedical Neurological Evaluation on May 28, 2016 and concluded that Patterson was Neurologically intact and poses no risk to aviation safety.  I concur with the June 29,  2016 report written by Dr. Gary G. Kay, Ph.D. who concluded that "Mr. Patterson appears to be psychologically and neuropsychologically fit-for-duty as and American Airlines Pilot. There is no evidence of aeromedically significant neurocognitive deficit". He concurred that poor performance vigilance testing when evaluated by Dr. Knippa was likely due to jet-lag related fatigue, on follow up testing he performed well on this measure.

13.   Mr. Patterson sought my advice in 2016 as he felt he was being railroaded out of his job on a contrived medical issue. I was aware of the pending legal matter with his employer regarding military service.

14.   I reviewed Dr. Kay's neuropsychological testing done on October 10, 2018.  In summary, "He performed well on neuropsychological screening. CogScreen results suggest against the likelihood of acquired cerebral Dysfunction". "Aviation factor scores, validated predictors of flight performance, were all in the expected range. Additional testing of vigilance, memory, and executive functions also show intact neurocognitive functioning. Mr. Patterson performed at or above average compared to pilot norms on measures of verbal learning and memory. Performance on three measures of executive functioning demonstrate intact planning, abstract reasoning, impulse control, and novel problem solving ability".

15.   As a psychiatrist, I did not find a reason for him to seek mental health treatment, and I did not find any evidence that he would pose any risk to aviation safety. The fact that he completed his military service and retired as a Lieutenant Colonel in the army,  and returned to flying as a

Boeing 767 Captain is a testament to the lack of any cognitive deficit or psychological issues that would make him not fit for duty.

I declare under penalty of perjury that the foregoing is true and correct.  Executed at Cooper City, Florida, on April 10, 2019.

Ibrahim Abi-Rafeh, MD

6

# **<u>EXHIBIT 14</u>**



February 6, 2019

Doug Parker, CEO
American Airlines

Mr. Parker:

The Transport Workers Union of America ("TWU") has members that are
employed as Line Maintenance Aircraft Maintenance Technicians across the
country.  The recent series of CBS News stories has brought the nation's
attention to American Airlines' unsafe, illegal, and intimidating
management practices. The TWU stands with the and supports the courageous
aircraft technicians who participated in these news stories. We also stand ready
to defend them and any other TWU Aircraft Maintenance Technicians who suffer
retaliation for working in accordance with proper maintenance manual
standards. A debt of gratitude is owed to these individuals by the traveling public,
their fellow technicians, and the airlines themselves.

As CEO of American Airlines, you are responsible for the pervasive practice of
intimidation that exists. It is atrocious and immoral that, solely in order to improve
the company's profitability, you would allow and oversee a system that potentially
places air travelers at risk.  You must correct this deadly serious situation. The first
step in correcting these conditions is to first recognize that your company has a
problem, and thus far you've failed to do so.

American Airlines Senior Vice President David Seymour stated in the CBS report,
with respect to aircraft mechanic whistleblower cases, "almost all of them have
been dismissed."

That is a bold-faced lie. American Airlines has settled a mind-boggling number of whistleblower cases originating from their Miami, Dallas, and Chicago operations and, in each case, management has demanded that non-disclosure agreements be executed in order to hide the financial settlements you have entered into. These non-disclosure agreements are your tool to perpetuate the ongoing cycle of abuse.

With respect to the Chicago case involving six aircraft mechanic whistleblowers, the FAA report determined:

- American Airlines "…pressured [mechanics] to not record discrepancies, take shortcuts with maintenance activities, or improperly sign-off on work which was not actually completed."

- "An [FAA] investigation team … conducted an exemplary investigation, interviewing dozens of witnesses and gathering hundreds of documents, ultimately *substantiating all of the complainants' allegations.*"[1]

Among the specific allegations substantiated by the cited investigation was that Regional Maintenance Director Evita Rodriguez – now known as Evita Garces – instructed American Airlines technicians:

"You need to strike a balance between safety and productivity.  When I was stationed in JFK, I signed for sumping [of aircraft fuel tanks on] the Airbus, yet I never did.  I am looking for that balance."[2]

Instead of terminating Ms. Garces, on November 13, 2018, American Airlines promoted her to the new position of American Airlines Director of Maintenance (DOM).  In this role, Ms. Garces will now be working hand-in-hand with the FAA. This action sends a horrific message to the Line Maintenance Aircraft Technicians.

It is long past time for you, as CEO, to start making the leadership changes necessary to stop this harassment of TWU members. The chilling atmosphere you

---

[1] *FAA Memorandum dated March 25, 2015, by Director, Office of Audit and Evaluation, H.Clayton Foushee*

[2] *ASO CMO-67 Investigation Team Report dated February 27, 2015 at 11*

oversee is disgraceful and constitutes a clear and present danger to American Airlines' customers.

Sincerely,

John Samuelsen, President
Transport Workers Union of America

# EXHIBIT 15

# United States Senate

WASHINGTON, DC 20510

February 12, 2019

Daniel K. Elwell
Acting Administrator
Federal Aviation Administration
800 Independence Avenue, SW
Washington, DC 20591

Dear Acting Administrator Elwell,

We write to inquire about steps the Federal Aviation Administration (FAA) is taking to investigate and address reports that airlines are pressuring their mechanics to ignore safety issues and short-cut the critical work they perform.

According to an eight-month investigation by CBS News, more than two dozen aircraft maintenance workers have come forward expressing concern that pressure from airlines to rapidly return aircraft to service may be endangering aviation safety.[1] Airlines naturally have an economic incentive to keep aircraft in service as long as possible; a plane only generates revenue if it is transporting passengers. But despite the need for safety to take precedence over airline profitability, mechanics have reported that managers have instructed them to "skip a few steps" in the maintenance process or to perform only the specific work assigned and ignore other safety defects they detect. Many of these safety-critical personnel fear retribution or even termination if they fail to comply with these dangerous directives or if they bring safety concerns to light. Since 2015, through whistleblower complaints, the FAA has documented several cases of inappropriate pressure and retaliation.

Congress has given the FAA the mandate to maintain the integrity and safety of our national airspace. As a part of that charter, the FAA certifies airlines' maintenance policies, procedures, and programs, which detail how mechanics will ensure that aircraft are meeting airworthiness standards. A critical component of any effective maintenance plan is an adherence to maintenance protocols and a safety-centric environment that encourages mechanics to both identify and report safety concerns. When safety standards are violated, the FAA has the obligation to investigate allegations and require corrective action.

To better understand how the FAA is investigating and responding to these troubling reports, we respectfully request answers to the following questions by March 5, 2019:

1. Since January 1, 2017, how many complaints has the FAA received about airlines' pressuring maintenance workers to ignore safety issues or short-cut safety-related work? For each complaint, please:

---

[1] *Airline mechanics feel pressured to overlook potential safety problems: "Accident waiting to happen,"* CBS News (Feb. 4, 2019), https://www.cbsnews.com/news/airline-mechanics-feel-pressured-by-managers-to-overlook-potential-safety-problems-cbs-news-investigation/.

a.  Summarize the complaints, detailing the date, location, nature of the accusation, the type of maintenance work being performed, and the aircraft parts and systems involved. If the complaint was made or memorialized in writing, please provide a copy.

b.  State whether the FAA investigated the accusation, and if not, why not. Describe the FAA's findings, any corrective action the FAA required, and whether the airline complied.

2.  In April 2018, we wrote to the FAA about reports of safety lapses at Allegiant Air. The FAA's response stated that "getting to the next level of safety requires finding and fixing hidden problems before they can cause an accident. Because everything starts with finding safety problems, compliance also requires the airline to have procedures that encourage open reporting." In light of this statement and the CBS News report, please:

a.  Explain how the FAA ensures that airlines are not putting unnecessary pressure on mechanics to expedite maintenance work or otherwise ignore safety concerns.

b.  Explain how the FAA ensures that mechanics have the unfettered ability to report safety concerns without fear of reprisal, including termination, from the airlines. Does the FAA expressly prohibit airlines from engaging in retaliatory action against employees who openly report safety concerns, or otherwise forbid the implementation of other disincentives to such reporting? If no, why not? If yes, how?

3.  Is the FAA investigating the disturbing reports uncovered by CBS News. If no, why not? If yes, please describe the nature and scope of the investigation.

Thank you for your attention to this important matter. If you have any questions, please contact Daniel Greene of Senator Markey's staff at (202) 224-2742.

Sincerely,

Edward J. Markey
United States Senator

Richard Blumenthal
United States Senator

2

# EXHIBIT 16

**From:** APA Safety Committee <STSA@alliedpilots.org>
**To:** aa737drvr <aa737drvr@aol.com>
**Subject:** Hail Damage at DFW
**Date:** Wed, Apr 17, 2019 4:51 pm

---



# Hail Damage at DFW

On April 13, DFW experienced a major hail event. Several aircraft were damaged, and some were still out of service on April 15, pending inspections. This Safety blast applies to all pilots — regardless of base — who were advised by Maintenance Operations Control (MOC) to void a hail entry in the AML because the hail did not meet required inspection criteria.

If you were advised by MOC to void your AML entry, file an ASAP. Please remember: If you have a discrepancy, enter it into the AML. A qualified Aircraft Maintenance Technician will then determine whether the aircraft needs maintenance, not a person sitting behind a desk in IOC who cannot look at or see your aircraft.

Pertinent portion of Saturday's weather report:

```
LTGICCCCG ALQDS TS ALQDS MOV N P0029 T01330122
131555 131553Z 05022KT 1/2SM R17C/1600VP6000FT PLUSSRAGR SCT008
OVC011CB 13/12 A2957 RMK AO2 LTG DSNT ALQDS GRB50 TSB50 SLP009
OCNL LTGICCC OHD TS OHD MOV GR 1/2 P0019 T01280117.
```

"GR" means hail, and "1/2" means it was half an inch in diameter.

This is copied from the post-storm procedures in the General Procedures Manual:

> Maintenance Manager/Supervisor/Crew Chiefs will tell the AMT in person to do hail inspections in the order that follows unless told differently by the MOD-MOC. Give all inspection findings to Maintenance Operations Control (MOC), who will give notification to Engineering as required for damage instruction.

> NOTE: For flights scheduled to depart in 2 hours, inspect the surface of primary flight controls first to see if damage is there other than damage there before recorded in the Aircraft Damage Log (ADL). Give notification to MOC if there is small or no damage. MOC will give notification to Engineering to see if it is possible to give an Engineering Authorization (EA).

At 1525 on April 13, DFW had 32 aircraft out of service (OTS) for hail inspection. At 0500 on April 14, DFW still had 25 OTS, with two having damage beyond limits. As of the morning of April 15, there were still five aircraft OTS in DFW for hail. If this were a non-event, these aircraft would have never been taken OTS.

Maintenance is not allowed to void or alter pilot discrepancies. Having the pilot void his own entry relieves maintenance from having to sign it off as within limits.

More hail is forecast at DFW today. Do not be influenced by a person who is not looking at the same aircraft that you are. If in doubt, make an entry in the AML and let a qualified Aircraft Maintenance Technician make the determination.

Dimples work great on golf balls, not on the lifting surfaces of an aircraft.

# **<u>EXHIBIT 17</u>**

# Weaponization of Mental Health



*In the Aviation Industry*

# Karlene K Petitt Ph.D.

Weaponization of Mental Health

in the Aviation Industry



*Coming Soon!*

The unspoken truth of how airlines remove pilots for reporting safety, calling in fatigued, using too much sick leave, or suggesting improvements for safer operations... As it turns out calling a pilot crazy is more effective than firing them. If a pilot is terminated unjustly, they have legal rights to return. However, if they are deemed unfit to fly, they have no rights.

It doesn't matter if these pilots never lose their medical certificates. If the airline pays a doctor to create a diagnosis, then the airline will not allow the pilot to return to flight status. Some will get jobs at other airlines at half the pay and at the bottom of the seniority list. Others spend every

penny fighting for justice. Some are forced into an alcohol rehab program, whether they are an alcoholic or not.

One would ask why *anyone* would do such a thing? That is the million dollar question. The answer could be simple as, a sociopath in power.

This book, however, is on the medical side of this retaliation of how doctors are paid for creating a false diagnoses to remove an airline pilot. Many months ago I posted a passage from a medical report created by one of these doctors. Clearly extortion is written all over this page.

> whether he has one of the diagnoses which would permanently bar
> him from aviation or whether the diagnosis offers a possibility
> of returning to active flight status.
>
> If he responds to the report by any of the following, this
> response would suggest one of the diagnoses which would be a
> permanent bar:
>
> - He would further delay the evaluation.
> - He would begin legal action against me. He would file a
>   complaint with the medical board of the state of Illinois.
> - He would rescind the releases for the FAA. He would
>   probably blame this action on advice from an unidentified
>   attorney.
> - He would continue to maintain that the evaluation has no
>   legitimacy.
> - He would continue to block the releases he signed during
>   his first interview.
> - In his messages he would continue to allude to upcoming
>   legal actions.
>
> On the other hand, if he responds in the following manner, it
> would suggest a diagnosis which is potentially resolvable.
>
> - Rapidly reschedule the appointments needed to complete the
>   evaluation, Complete all requested questionnaires and
>   essays. Permit full contact with requested sources of
>   information.
> - Discontinue his litigious/adversarial stance.
> - Take responsibility for his problematic actions.

This doctor tells the pilot that if he contacts an attorney, files a complaint with the medical board, rescinds the releases he initially signed, or continues to allude to legal action that he would be found mentally unfit. However, if he drops legal action there might be a chance of a favorable diagnosis.

I also learned that the doctor who wrote the above report for one pilot, received close to $74,000 for a mental health examination of another. To put that in perspective, the average evaluation is closer to $3,300. This doctor went as far to tell pilot on Christmas Eve they would never fly again, despite notifying the company two months earlier.  He has destroyed numerous lives over the course of his career. Sadly he is not alone, as there are other doctors just like him.

**Can we stop these doctors?**

Sometimes good news does prevail. After numerous calls to the medical board, and a half a dozen reports on the same doctor, a lengthy investigation prevailed. There was enough information identifying this doctor to have unethical behavior to send the investigatory report to the "controller."

The controller held this report for 9 months due to workload, but when he evaluated it, he too saw a problem and sent the doctor to the disciplinary board. Last week, the disciplinary board agreed with previous recommendations, and they sent him to the medical prosecution board. This next phase will take another two months, but the system is working.

While this will not get the lives back that this doctor has taken, it will prevent him from harming anyone again. The next question is, if a doctor loses his license and prosecuted for taking money with intent to do harm and fraud, what will they do with the organizations that paid these doctors for his false diagnoses? As this doctor, and others are officially prosecuted, I will post their names. If anyone has been harmed by one of them, these pilots may have recourse to open up their case to be revisited.

For those who have been subjected to a mental health evaluation for reporting safety, calling in fatigued, or being forced to fly unfit, you have rights under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, known as an Air 21, the whistle blower law. Please know that forcing someone into a mental health evaluation is considered an "adverse action" in the eyes of the law. If you need help, contact Lee Seham to learn the laws of protection, as you only have 90 days.

Stand by... this story is not over, and the book is in underway.

*Enjoy the journey!*
*XO Karlene*

David Altman MD

**Michael Protack**
Psychiatric Evaluation- Preliminary Report-Section 1
April 28, 2014

Page 12 of 12

How Captain Protack responds to this report will help clarify
whether he has one of the diagnoses which would permanently bar
him from aviation or whether the diagnosis offers a possibility
of returning to active flight status.

If he responds to the report by any of the following, this
response would suggest one of the diagnoses which would be a
permanent bar:

- He would further delay the evaluation.
- He would begin legal action against me. He would file a
  complaint with the medical board of the state of Illinois.
- He would rescind the releases for the FAA. He would
  probably blame this action on advice from an unidentified
  attorney.
- He would continue to maintain that the evaluation has no
  legitimacy.
- He would continue to block the releases he signed during
  his first interview.
- In his messages he would continue to allude to upcoming
  legal actions.

On the other hand, if he responds in the following manner, it
would suggest a diagnosis which is potentially resolvable.

- Rapidly reschedule the appointments needed to complete the
  evaluation, Complete all requested questionnaires and
  essays. Permit full contact with requested sources of
  information.
- Discontinue his litigious/adversarial stance.
- Take responsibility for his problematic actions.

Neither Dr. Young nor myself have made a definite diagnosis at
this time. However, because this symptom has such significant
negative aeromedical consequences, I would recommend that
Captain Protack not be an active flight status until the
completion of the psychiatric evaluation.

David B. Altman MD

# EXHIBIT 18

## Unsworn Declaration of Dr. Ibrahim Abi-Rafeh, MD, Pursuant to 28 U.S.C. § 1746

Dr. Ibrahim Abi-Rafeh deposes and says:

1.    I make this declaration of my own personal knowledge.

2.    I am board certified by the American Board of Neurology and Psychiatry in Psychiatry and Geriatric Psychiatry, practicing in Broward County, Florida.

  a. I have over 25 years experience with mental health, neuropsychiatric and cognitive disorders.
  b. I conduct psychiatric evaluations on a regular basis.
  c. I am a certificated pilot by the Federal Aviation Administration with advanced ratings.
  d. I hold a current Airman Medical Certificate issued by the FAA, and am familiar with the requirements for the issuance of a certificate.

3.    I have personally known Lt. Col. Scott Patterson for approximately 13 years and have flown with him in the context of the Civil Air Patrol/Air Force Auxiliary volunteer work as a mission pilot in search and rescue missions.  Patterson was a check pilot and mission check pilot and conducted mission pilot training and examinations.

4.    Patterson is an experienced and  well-respected pilot and flight instructor, whom other pilots sought for advice and counsel.

5.    I reviewed a copy of the complaint filed by  Captain Glenn Whitehouse dated September 24, 2015. It was addressed to Captain Brian Beach, Chief Pilot, MIA

6.    I reviewed a copy of the "Fitness for duty Medical Examination Request" made by Captain Brian Beach, Chief Pilot, MIA on January 14 2016 regarding "Patterson's judgment, and specifically, his mental and/or emotional stability". The request was made in response to allegations of

1

"atypical interactions with coworkers and reports that suggest a pattern of false/self-aggrandizing statements". Patterson was removed from active duty and place on paid withhold status on September 24, 2015.

7. I reviewed a copy of Patterson's FAA Medical Certificate First Class with no limitations, completed by Dr. Joseph Tordella on January 29, 2016. Dr. Tordella is a retired Air Force and TWA pilot. Dr. Tordella is an FAA Senior Aviation Medical Examiner with over 30 years of experience and a certified Medical Review Officer registered with the US Coast Guard. He certified that Patterson was fit to fly as per his First Class Medical Certificate.

8. In March, 2016 I received the March 21st report of Neuropsychological examination by Dr. John Knippa, Ph.D. on Rodney Scott Patterson.

a. It was peculiar to require Patterson to travel to California for the Neuropsychological examination, when several are available in the South Florida area and on the East Coast (see exhibit A). He had to fly nearly 2,700 miles across three time zones away to take cognitively sensitive testing. It is well known that Travelers usually experience symptoms after air travel across at least two time zones. Symptoms may include disturbed sleep, daytime fatigue, decreased ability to perform mental and physical tasks, reduced alertness, and headaches (https:/ www.ncbi.nlm.nih.gov/pmc/articles/PMC3086113).(see exhibit B) This likely affected his performance on the cognitive testing.

b. As part of the psychological testing, Dr. Knippa conducted an MMPI-2 and a PAI. He stated in his report that the basic profile was entirely within normal limits. there was no endorsement identified of significance to clinical concern for mood, anxiety, impulsiveness or problematic behavior. A personality disorder was not identified with the limited data available at that time.

c. As far as cognitive skills assessment, Dr. Knippa stated that

2

the data are consistent with an attention deficit disorder with mild impaired range performance on multiple measures of complex speeded problem solving with novel information. The overall profile of neuropsychological assessment was discrepant from that expected for Major Airline pilots of similar age. However, in the section titled  Areas of Performance Concern, "No Technical Lapses of Performance were known to have been alleged".

d. The evaluation was done the morning after a flight across three time zones, which did affect his performance on the cognitive tests, in addition to his stress about being removed from active duty. The time zone change meant that when the evaluation was started in the morning Pacific Time, it was early afternoon Eastern Time, which affects the circadian rhythm.

e. In my opinion those findings do not correlate with his real life performance as a pilot, as there have not been any complaints about his flying skills during multiple flights and recurrent flight checks. The reason for the referral was to assess his mental and/or emotional stability and not his cognitive abilities, which there were no known issues with. In my opinion, there was no sound medical basis that he suffered from a disqualifying medical condition. In addition, Dr. Knippa has no authority to make that determination since he is not an FAA designated or trained medical examiner.

f. I reviewed the Neuropsychological Evaluation conducted by Dr. Bercaw and Post-Doctoral Neuropsychology Resident Dr. Fonseca on March 21, 2016. It was done in Florida only a few days after Dr. Knippa's evaluation in California.  Again he traveled across three time zones and his performance on the cognitive testing may have been affected by fatigue as noted by the examiner. Patterson was still experiencing sleep disturbance due to jet lag and stress at the time which may take weeks to resolve.

g. Patterson was fully qualified to hold a First Class FAA Airman Medical Certificate as certified by Dr. Tordella in January and July of 2016,

3

and he posed no risk to aviation safety. He returned to flying including Beech Jet and Boeing 767 as a Captain after successfully completing the required training and FAA flight check.  That disproves Dr. Knippa's determination that he was not fit for duty on the basis of impaired performance on cognitive assessment.

9.   To my knowledge and as per his medical record, he has no history of Traumatic Brain Injury, HIV, Alcoholism, Substance Abuse, Chemotherapy, Radiation or Cerebrovascular Accident.  He held a Top Secret clearance in the military and was the subject of multiple psychological screenings throughout his career and in order to become a Federal Flight Deck Officer, affirming no history of psychological problems then or now.

a. Patterson reported that his employer had investigated a complaint filed by a senior co-worker and determined the allegations were unfounded.

b. Anyone facing termination of employment and subsequent loss of their income would experience stress, which would impact other life functions, such as trouble sleeping and difficulty concentrating. Grounding is degrading to pilot's self-esteem and also increases anxiety levels for the pilot.

c. His employer required him under "threat of termination", to fly across country and be subject to a full battery of psychological testing, which certainly increased his anxiety level and affected his ability to sleep.

d. Based upon his departure time from Florida and arrival time in California, he was not given an adequate amount of rest to allow him to acclimate before testing.

10.   I attributed the low scores on the cognitive testing to stress and fatigue due to jet lag and lack of sleep, and not an underlying medical or neuropsychological issue which would disqualify him from holding an Airman Medical Certificate.

11.   Mr. Patterson did not require medical intervention or psychological care.  In my opinion he was medically and psychologically

intact.

12.   I have reviewed the reports written subsequent to Dr. Knippa's evaluation.  I concur with the neurological findings of John Hastings, MD, who conducted an Independent Aeromedical Neurological Evaluation on May 28, 2016 and concluded that Patterson was Neurologically intact and poses no risk to aviation safety.  I concur with the June 29,  2016 report written by Dr. Gary G. Kay, Ph.D. who concluded that "Mr. Patterson appears to be psychologically and neuropsychologically fit-for-duty as and American Airlines Pilot. There is no evidence of aeromedically significant neurocognitive deficit". He concurred that poor performance vigilance testing when evaluated by Dr. Knippa was likely due to jet-lag related fatigue, on follow up testing he performed well on this measure.

13.   Mr. Patterson sought my advice in 2016 as he felt he was being railroaded out of his job on a contrived medical issue. I was aware of the pending legal matter with his employer regarding military service.

14.   I reviewed Dr. Kay's neuropsychological testing done on October 10, 2018.  In summary, "He performed well on neuropsychological screening. CogScreen results suggest against the likelihood of acquired cerebral Dysfunction". "Aviation factor scores, validated predictors of flight performance, were all in the expected range. Additional testing of vigilance, memory, and executive functions also show intact neurocognitive functioning. Mr. Patterson performed at or above average compared to pilot norms on measures of verbal learning and memory. Performance on three measures of executive functioning demonstrate intact planning, abstract reasoning, impulse control, and novel problem solving ability".

15.   As a psychiatrist, I did not find a reason for him to seek mental health treatment, and I did not find any evidence that he would pose any risk to aviation safety. The fact that he completed his military service and retired as a Lieutenant Colonel in the army,  and returned to flying as a

5

Boeing 767 Captain is a testament to the lack of any cognitive deficit or psychological issues that would make him not fit for duty.

I declare under penalty of perjury that the foregoing is true and correct.  Executed at Cooper City, Florida, on April 10, 2019.

Ibrahim Abi-Rafeh, MD

6

# FAA HIMS NEUROPSYCHOLOGISTS

(Updated 04-12-2019)

| STATE | CITY | PRACTITIONER |
|---|---|---|
| AK | Anchorage | CRAIG |
| AL | Birmingham | AZRIN |
| AL | Mobile | OGDEN |
| AR | Little Rock | FOWLER |
| AZ | Scottsdale | O'BRIEN |
| CA | Aptos | ALLOY |
| CA | Carlsbad | BASER |
| CA | Long Beach | KNIPPA |
| CA | Los Angeles | ELLIOTT |
| CA | Los Angeles | YOU |
| CA | Los Gatos | DRAG |
| CA | Los Gatos | YUTSIS |
| CA | Oceanside | BAILIE |
| CA | Pleasant Hill | IONASCU |
| CA | San Francisco | WATERWORTH |
| CA | San Diego | HAMILTON |
| CA | San Diego | SILVA |
| CO | Boulder | MANN |
| CO | Broomfield | DENISON |
| CO | Colorado Springs | RIPPETH |
| CO | Denver | GANT |
| CO | Denver | GINSBURG |
| CO | Denver | LAFOSSE |
| CO | Wheat Ridge | MIRICH |
| DC | Washington, DC | KAY |
| DE | Lewes | MAPOU |
| DE | Wilmington | KEAVENEY |
| FL | Brandon | BERCAW |
| FL | Davie | DEIDAN |
| FL | Ft. Lauderdale Palm Harbor Riverview | PECORARO |
| FL | Jacksonville | OVSON |
| FL | Orlando | PORGES |
| FL | Ormond Beach | VOIGHT |
| FL | Palm Beach Gardens | LEVINE |
| FL | Pensacola | HOLLIMON |
| FL | Sarasota | BAUM |
| FL | Sarasota | KANTER |
| FL | Tampa | DSURNEY |
| GA | Atlanta | KING |
| GA | College Park | PREWETT |

| STATE | CITY | PRACTITIONER |
|---|---|---|
| GA | Decatur | SHWARTZ |
| GA | Lawrenceville | LACY |
| ID | Boise | GAGE |
| IL | Northbrook | YOUNG |
| IL | Oak Park | HILL |
| IL | Skokie | BARRAS |
| IN | Fort Wayne | LUTZ |
| IN | Indianapolis | BUBP |
| KS | Manhattan | DURRETT |
| KS | Overland Park | ISAACSON |
| LA | New Orleans | CHAFETZ |
| LA | New Orleans | PEDERSEN |
| MA | Boston | KERVICK |
| MA | Boston Newton | SCHOENFIELD |
| MA | Brookline | STONE |
| MD | Chevy Chase | MAPOU |
| MI | Ann Arbor | MILANOVICH |
| MN | Golden Valley | ODLAND |
| MN | Rochester | TRENERRY |
| NC | Wilmington | BERG |
| NE | Omaha | GARLINGHOUSE |
| NJ | Parsippany | DASILVA |
| NY | Albany | LITCHFORD |
| OH | Beachwood | SERNA |
| OH | Westerville | BEASON-HAZEN |
| OK | Tulsa | PELLA |
| OR | Bend | SCHOCK |
| OR | Portland | BRYAN |
| PA | Exton | KEAVENEY |
| PA | Malvern | GUAY |
| PA | Pittsburgh | BECKER |
| SC | Columbia | BERG |
| TN | Memphis | ATKINS |
| TN | Nashville | WALKER |
| TN | Nashville | KENNEDY |
| TX | Houston | LARGEN |
| TX | Lewisville | JOHNSON |
| TX | San Antonio and Houston | GLYWASKY |
| VA | Fairfax | KANE |
| VA | Richmond | DUKARM |
| WA | Seattle | ASGARIAN |
| WA | Seattle | BREEN |
| WA | Spokane | GUZZARDO |
| WI | Brookfield | KENNEDY |
| WI | West Allis | GLASSMAN |
| WY | Laramie | DENISON |

# Jet Lag
## Current and Potential Therapies

### Mary Choy, PharmD; and Rebecca L. Salbu, PharmD, CGP

**Key words:** jet lag, melatonin, ramelteon, armodafinil

## INTRODUCTION

Jet lag, also known as circadian desynchrony, is a sleep disorder in which there is a mismatch with the body's natural circadian rhythm and the external environment as a result of rapid travel across multiple time zones. This common problem affects all age groups but may have more pronounced effects on the elderly, whose recovery rate is more prolonged than that in young adults.[1]

A multitude of factors, such as the number of time zones crossed and the direction and timing of flights, play a role in the severity of symptoms experienced by travelers. Individual variability accounts for the ability to adapt to a new time zone and the duration of the symptomatic period. Travelers usually experience symptoms after air travel across at least two time zones. Symptoms may include disturbed sleep, daytime fatigue, decreased ability to perform mental and physical tasks, reduced alertness, and headaches. Sleep disturbances typically last for a few days, but they can persist for as long as one week if the change in time zones is greater than eight hours. Eastward travel is associated with a longer duration of jet lag than westward travel. Although frequent desynchrony is a transient disorder, it carries the potential to lead to long-term consequences, as evidenced by epidemiological and animal studies.[2,3] Sequelae have included cognitive deficits, gastrointestinal (GI) disturbances, and an increased risk of cancer, infertility, and heart disease. As the body's internal circadian "clock" adapts to the new time zone, jet lag diminishes.

Strategies to minimize the effects of jet lag include adjusting the sleep schedule according to the new location during the days preceding the trip. This approach may be helpful for travel that lasts for more than a week, but it does not appear useful for short-term trips. Both alcohol and caffeine can adversely affect quality of sleep when they are consumed a few hours before bedtime; caffeine intake should be planned to enhance daytime alertness. When passengers are traveling, they are advised to avoid alcohol, especially while they are being treated for jet lag.

Treatment may include non-pharmacological therapy alone or non-pharmacological therapy combined with nutraceuticals or pharmacological therapy. A non-pharmacological approach, including adequate exercise, hydration, and appropriate timing of exposure to bright light, can aid in the adjustment to a new time zone. Nutraceuticals and pharmacological therapies include melatonin, melatonin receptor analogues (agonists), non-benzodiazepine hypnotic agents, caffeine, diphenhydramine (e.g., Benadryl, McNeil; Aler-Dryl, Reese), and armodafinil (Nuvigil, Cephalon).

A review of treatments and potential strategies follows.

## ROLE OF THE INTERNAL CIRCADIAN CLOCK

To appreciate the factors associated with jet lag, it is helpful to understand the basic properties of the body's internal clock. Our sleep–wake cycle is thought to be inherently determined, and the explanation for one's reactions to light and darkness lies with the suprachiasmatic nucleus (SCN). The central circadian clock is located in the SCN of the hypothalamus, where light signals from the retina are received. The SCN is responsible for adapting the circadian rhythm according to the light–dark cycles of the environment and for generating neuronal and hormonal activities that regulate various body functions in a 24-hour cycle.

The role of melatonin-mediated responses has been studied extensively in hopes of designing a novel therapeutic agent for circadian desynchrony. Some of the effects of activated melatonin type-2 receptors are phase-shift circadian rhythms of neuronal firing in the SCN, inhibiting dopamine release in the retina, inducing vasodilation and inhibition of leukocyte rolling (slowdown) in arterial beds, and enhancing immune responses.[4] It is hypothesized that neuronal clocks within the SCN form a heterogeneous network, wherein a majority of the neurons require periodic synchronization signals to be rhythmic and a small number of neurons or a low connectivity result in desynchrony.[5]

*Zeitgebers* (time-givers, or synchronizers) are rhythmic cues in the environment that synchronize the internal body clock to the earth's 24-hour light–dark cycle. Light is the strongest *Zeitgeber*; other non-photic *Zeitgebers* include temperature, social interaction, pharmacological manipulation, exercise, and meal timing.[6]

Blind people with no perception of light frequently show free-running endocrine, metabolic, behavioral, and sleep–wake cycles for their entire lifetime unless a synchronizing treatment is applied and is effective.[7] It is easiest to initiate sleep when the body temperature is at its lowest, coupled with an increase in melatonin secretion. When the body clock is inappropriately phased, sleep is difficult to initiate and maintain.

## PREVENTION AND MANAGEMENT OF JET LAG

The goal of prevention and treatment is to achieve circadian realignment in the most rapid and efficient way possible while minimizing the symptoms of jet lag. The treatment plan de-

*Dr. Choy is Assistant Professor at Touro College of Pharmacy and a Clinical Pharmacist at Metropolitan Hospital in New York, N.Y. Dr. Salbu is Assistant Professor at Touro College of Pharmacy in New York, N.Y., and an Internal Medicine Pharmacy Preceptor at North Central Bronx Hospital in Bronx, N.Y.*

*Accepted for publication January 18, 2011.*

**Disclosure:** The authors report no commercial or financial relationships in regard to this article.

# Jet Lag: Current and Potential Therapies

pends on the length of stay in the new time zone. Business travelers, pilots, and flight attendants may experience frequent shifts to changing time zones, and it may be practical for them to remain on their home-based schedule.

Table 1 highlights various agents used for jet lag (page 224).

## Light Therapy

Sunlight has a major influence on the internal circadian clock. Traveling across several time zones necessitates resetting and adjusting to a new daylight schedule. Natural light exposure is the ideal mechanism for counteracting jet lag. For those who travel frequently and are unable to have exposure to natural sunlight, light therapy may be a viable option. Light synchronizes the body clock by exposing the eyes to an artificial bright light that simulates sunlight for brief periods at planned times during the day. Various modalities include a light box, a lamp, and a light visor.

## Melatonin

In the human body, sleep is initiated during a rise in the concentration of melatonin (N-acetyl-5-methyoxytriptamine) and during the declining phase of body temperature.[8] Synthesized from serotonin in the pineal gland, melatonin helps to shift human circadian rhythms.[9] An increase in melatonin alerts the body that "biological night" is starting, whereas a decline in melatonin alerts the human body that biological night is ending.

Administering exogenous melatonin in the conventional afternoon to evening hours of a 24-hour day promotes a phase shift (an advance) in circadian rhythm, thus promoting sleep. When taken in the early morning, exogenous melatonin promotes a phase delay.[10] This promotion of a phase shift and sleep induction by administering melatonin in the afternoon and evening hours can be used to alleviate symptoms of jet lag. Correlating the administration of melatonin with the new time zone may help travelers overcome symptoms.

Melatonin's utility in the management of jet lag has been the subject of many studies.[8,10,11–22] When making travel plans, particularly over a distance of five or more time zones, travelers should take melatonin on the day of travel at the projected nighttime hour in the new time zone and on subsequent days in the new time zone. In the case of flights that cross seven to eight time zones, it may be beneficial to initiate melatonin one to three days before the intended day of travel in order to better acclimate the traveler to the new time zone.

Arendt et al.[22] conducted the first double-blind, placebo-controlled trial of melatonin in jet lag. The phase-shifting ability of melatonin was evaluated in 17 patients taking an eight-hour eastbound transmeridian flight. Travelers who were randomly assigned to the melatonin group (n = 8) were instructed to take 5 mg/day starting three days before the scheduled flight in the early evening (at 6 P.M.) and for four days post-flight at the bedtime hour of the new local time zone (from 10 P.M. to midnight). Subjects receiving melatonin experienced significantly fewer severe symptoms ($P = 0.009$) based on subjective measures, including jet lag ratings, self-recorded sleep parameters, and mood ratings. Melatonin participants also adjusted more rapidly in objective measures, such as assessments of endogenous melatonin levels and cortisol rhythms.

## Melatonin Plus Light Therapy

Combining melatonin and light therapy at appropriate times can mitigate the symptoms of jet lag. The timing of light or melatonin administration should be tailored to the individual's body clock at the time of departure to gradually shift the body clock to that of the new time zone.[9] For example, with a three-to six-hour eastward time zone change, such as from New York City to Paris, France, travelers should receive bright light on the day before and on the day of departure in order to advance (shift) rhythms. They should avoid evening light exposure, which delays circadian rhythms.

Melatonin should be administered in the mid-afternoon of the departure city (at approximately 3 P.M.) to mimic an approximate bedtime in the destination city (at approximately 9 P.M.). On the day of arrival, travelers should avoid evening light and should take melatonin at the new bedtime in the destination city. Circadian rhythms should advance by one to two hours each day with time zone changes, and melatonin can be taken one to two hours earlier each day until the traveler has adjusted.[9]

A phase delay may be easier if the time zone change is close to 12 hours. In this case, the traveler would want evening light exposure, avoiding daytime light exposure and taking melatonin in the morning to promote a phase delay.

In terms of improving symptoms of jet lag, little to no difference has been shown with various doses of melatonin ranging from 0.5 mg to 5 mg.[23]

Common adverse effects of melatonin have included daytime sleepiness, dizziness, headache, and loss of appetite. It is unclear whether these side effects are a result of the melatonin or the symptoms of jet lag itself.[23] Travelers are also at an increased risk of experiencing hypnotic effects of melatonin at higher doses; as a result, lower doses are preferred for inducing phase shifts without side effects.

## Melatonin Receptor Analogues (Ramelteon and Tasimelteon)

Melatonin receptor analogues (agonists) have not been directly compared with exogenous melatonin therapy in clinical trials. It will be interesting to see whether future studies determine which agents might be more beneficial in the improvement of jet lag symptoms.

### Ramelteon (Rozerem)

Ramelteon (Rozerem, Takeda), a sedative–hypnotic, has been approved by the FDA for insomnia characterized by difficulty in falling asleep. The dose is usually 8 mg, taken one half-hour before bedtime.[24] The selectivity of ramelteon for melatonin $MT_1$ and $MT_2$ receptors, normally acted upon by endogenous melatonin, contributes to sleep promotion and to maintenance of the circadian rhythm underlying the normal sleep–wake cycle.[24]

A randomized, double-blind, placebo-controlled, parallel-group study was conducted to evaluate ramelteon in 110 patients receiving 1 mg/day, 4 mg/day, and 8 mg/day and the drug's ability to alleviate the sleep-onset difficulties associated with jet lag following eastward transmeridian jet travel across five time zones.[25] Patients receiving ramelteon 1 mg (n = 27) experienced a statistically significant decrease in

# Jet Lag: Current and Potential Therapies

mean latency to persistent sleep (LPS) on days 2 to 4. These patients were able to achieve persistent sleep 10.64 minutes faster than the placebo group ($P = 0.030$). The additional treatment groups receiving 4 mg/day (n = 27) and 8 mg/day (n = 27) showed a tendency toward a reduction in mean LPS, but neither group reached statistical significance ($P = 0.106$ and $P = 0.067$, respectively).

Adverse effects of ramelteon are similar to those of melatonin. It does not appear that ramelteon leads to dependence or withdrawal effects after discontinuation.

### Tasimelteon

Tasimelteon (VEC-162, Vanda/BMS-214778, Bristol-Myers Squibb) is an investigational oral melatonin receptor agonist. In phase 2 and phase 3 studies, tasimelteon decreased transient insomnia that had been induced by an abrupt shift in the sleep–wake cycle.[26,27] Rajaratbam et al. conducted a double-blind, placebo-controlled phase 3 study (n = 411) in which it was concluded that tasimelteon, at doses of 20 mg/day (n = 100), 50 mg/day (n = 102), and 100 mg/day (n = 106), improved sleep latency, sleep quality, and sleep maintenance and provided a shift in circadian rhythms after an abrupt advance in sleep time ($P \leq 0.05$ for all results).[26]

On January 19, 2010, the FDA granted an orphan drug designation status for tasimelteon in non–24-hour, sleep–wake cycle disorder for blind individuals without light perception.

## Non-benzodiazepine Hypnotic Agents

### Zolpidem (Ambien)

Non-benzodiazepine hypnotics, such as zolpidem (Ambien, Sanofi-Synthelabo), bind the benzodiazepine receptor subunit of the GABA-A receptor complex. This class of medications has a strong hypnotic effect, with weak anticonvulsant and muscle-relaxant properties.

In a multicenter, double-blind, randomized, placebo-controlled, parallel-group study, Jamieson et al.[28] described the use of non-benzodiazepine hypnotic medications in 130 experienced travelers during their regular eastward transatlantic assignments. Patients receiving zolpidem 10 mg/day (n = 68) reported longer total sleep times on the first night ($P < 0.005$); fewer awakenings on the first two nights ($P < 0.003$ for each); and improved quality of sleep on the first, second, and third nights ($P < 0.004$, $P < 0.004$, and $P < 0.056$, respectively).

Although the FDA has not approved this drug class for jet lag, the use of zolpidem as a way to cope with symptoms might be suitable for those who travel often for work and who are required to be active and alert as soon as they arrive in the new time zone. In this setting, these agents are attractive because of their rapid absorption, short half-life, and inactive metabolites.

When using non-benzodiazepines for the management of jet lag, patients are at risk for experiencing common adverse effects that include dizziness, somnolence, loss of memory, headache, and nausea. When low doses recommended for initiating sleep are used, carryover effects should be minimal the next day.[26] So far, little information is available regarding other non-benzodiazepine hypnotic drugs in the management of jet lag syndrome; however, their effects are likely to mimic those of zolpidem.

### Caffeine

In a systematic review of 13 randomized trials of persons with jet lag or shift-work disorder, caffeine improved concept formation, reasoning, memory, orientation, attention, and perception when compared with placebo.[29] For these reasons, caffeine is a common remedy for treating sleepiness induced by jet lag. Two studies have reviewed its effect after eastward transmeridian travel. Slow-release formulations of caffeine at a dose of 300 mg were used in both studies.[18,30] Pierard et al.[30] demonstrated that slow-release caffeine allowed a quicker resynchronization of hormonal rhythms as a result of mean saliva cortisol concentrations, which were significantly lower than in the placebo group.

A follow-up study by the same authors found that caffeine led to an objective decrease in daytime sleepiness compared with melatonin and placebo, as assessed by multiple sleep latency tests.[18]

### Diphenhydramine (Benadryl)

To date, no studies of diphenhydramine for use in jet lag syndrome have been conducted, even though this is the most common nonprescription antihistamine prescribed for insomnia. Side effects include daytime sleepiness, cognitive impairment, dizziness, blurred vision, and dry mouth and throat. Self-medication is a common problem that can result in adverse outcomes, especially in older adults. The use of diphenhydramine should be avoided in elderly persons, who are often sensitive to its anticholinergic properties.

### Armodafinil (Nuvigil)

Armodafinil, a central nervous system (CNS) stimulant, is designed to improve wakefulness in adults who experience excessive sleepiness because of obstructive sleep apnea, shift-work disorder, and narcolepsy.[31]

Rosenberg et al. conducted a phase 3, double-blind, randomized, placebo-controlled study to evaluate armodafinil 50 mg/day and 150 mg/day for the treatment of excessive sleepiness associated with jet lag disorder resulting from eastbound travel in travelers with a history of jet lag symptoms.[32] Patients receiving armodafinil 150 mg/day (n = 143) experienced a statistically significant benefit in sleep latency on the Multiple Sleep Latency Test (days 1 to 2: mean, 11.7 vs. 4.8 minutes for placebo; $P < 0.001$). Participants' perceptions of their overall condition in relation to jet lag symptoms on the Patient Global Impression of Severity (PGI–S) were also significant (days 1 to 2: mean, 1.6 vs 1.9 for placebo; $P < 0.05$).

Sleep latency was also significantly increased in the 142 patients receiving armodafinil 50 mg/day (days 1 to 2: mean, 7.7 vs. 4.85 minutes for placebo; $P < 0.001$). However, mean PGI–S scores did not differ in the placebo group (n = 142).

Most adverse events were mild to moderate. The most frequently reported events were headache, nausea, diarrhea, circadian rhythm sleep disorder, and palpitations.

In December 2010, Cephalon withdrew its effort to win the FDA's approval to market armodafinil for the treatment of jet lag after it received a second complete response letter from the agency.[33] The company believed that it had met all safety and efficacy endpoints in a clinical study but concluded that further communications with the FDA would not result in an approval

## Jet Lag: Current and Potential Therapies

| Table I Agents Used in the Prevention and Treatment of Jet Lag | | | | | |
|---|---|---|---|---|---|
| **Drug** | **Availability** | **Class** | **How Supplied[34]** | **Dose** | **Cost*[34]** |
| Melatonin | Over the counter | Nutraceutical | 1-, 2.5-, 3-, or 5-mg tablets Sublingual tablets available | 0.5–5 mg† | $7.99 per bottle of 120 |
| Ramelteon (Rozerem) | Prescription only; brand available | Melatonin receptor analogue (agonist) | 8-mg tablets | 1,4, or 8 mg five minutes before bedtime‡ | $66.99 for 10 days |
| Zolpidem (Ambien) | Prescription only; generic available CIV | Non-benzodiazepine hypnotic agent | 5- and 10-mg tablets 5- and 10-mg sublingual tablets 5- and 10-mg oral spray 6.25- and 12.5-mg controlled-release tablets | 10 mg at bedtime‡ | $14.99 for 10 days |
| Caffeine | Over the counter | Methylxanthine | 250-mg capsules 200-mg tablets | 200 mg every three hours p.r.n. | $6.99 per box of 40 |
| Diphenhydramine (e.g., Benadryl) | Over the counter | Antihistamine | 25- and 50-mg capsules 50-mg capsule, liquid-filled 25- and 50-mg tablets | 50 mg at bedtime p.r.n. | $3.49 per box of 48 |
| Armodafinil (Nuvigil) | Prescription only; brand available CIV | Amphetamine-related CNS stimulant | 50-, 150-, and 250-mg tablets | 150 mg daily‡ | $72.99 for 10 days |

CIV = Schedule IV controlled substance; CNS = central nervous system; p.r.n. = as needed.
* Represented as the dollar amount for 10 days of the first tablet strength listed in the table for prescription-only products.
† The 5-mg dose is commonly used in clinical trials.
‡ Phase 3 clinical trial dose for jet lag; not FDA-approved for jet lag at the time of publication.
Data from Drugstore.com, February 28, 2011.[34]

of its application. The FDA's latest response reiterated concerns that had been raised in March 2010 about using armodafinil for jet lag. At the time, the FDA had questioned the robustness of Cephalon's study data.

## CONCLUSION

Jet lag is a sleep disorder common to travelers of all age groups. The disorder is caused by rapid travel across multiple time zones, in which the circadian system is not able to adjust to the rapid shift in time zones. The speed of resynchronization of circadian rhythms to the new time zone depends on multiple factors, including the number of zones crossed, the direction of travel, and the traveler's ability to adapt to the new location. Factors exacerbating jet lag symptoms include sleep deprivation, prolonged uncomfortable sitting positions, air quality and pressure, stress, and excessive caffeine and alcohol intake. Jet-lagged travelers may experience disturbed sleep, daytime fatigue, poor performance in mental and physical tasks, decreased alertness, and headache.

A wide array of prescription and over-the-counter (OTC) products have been the focus of study in the management of jet lag. These modalities include light therapy, melatonin, melatonin receptor analogues, non-benzodiazepine hypnotics, caffeine, diphenhydramine, and CNS stimulants such as armodafinil. Depending on the individual patient's sleep–wake cycle and other factors, pharmacists can aid patients in selecting an appropriate treatment. The patient's flight schedule, purpose of travel, physical condition, and individual response to treatment all play important roles. The pharmacist

can evaluate patients' needs and recommend OTC preparations and nutraceuticals or advise patients to consult their primary care physician about available prescription-only products. When making a recommendation, the pharmacist should consider cost, because OTC products are usually considerably less expensive than prescription alternatives (see Table 1).[34]

Finally, the pharmacist should promote the use of non-drug therapy and review the traveler's medication history before recommending a specific pharmacotherapeutic agent.

## REFERENCES

1. American Academy of Sleep Medicine. *Circadian Rhythm Sleep Disorders.* Darien, Ill.: 2008. Available at: www.aasmnet.org/Resources/FactSheets/CRSD.pdf. Accessed May 1, 2010.
2. Davidson AJ, Sellix MT, Daniel J, et al. Chronic jet lag increases mortality in aged mice. *Curr Biol* 2006;16(21):R914–R916.
3. Kojo K, Pukkala E, Auvinen A. Breast cancer risk among Finnish cabin attendants: A nested case–control study. *Occup Environ Med* 2005;62(7):488–493.
4. Dubocovich ML, Markowska M. Functional MT1 and MT2 melatonin receptors in mammals. *Endocrine* 2005;27(2):101–110.
5. Bernard S, Gonze, D, Cajavec B, et al. Synchronization-induced rhythmicity of circadian oscillators in the suprachiasmatic nucleus. *PLoS Computat Biol* 2007;3(4):e68 (April 13, 2007, online). Available at: www.ncbi.nlm.nih.gov/pmc/articles/PMC1851983/pdf/pcbi.0030068.pdf and www.ploscompbiol.org/article/info:doi/10.1371/journal.pcbi.0030068. Accessed May 7, 2010.
6. Toh KL. Basic science review on circadian rhythm biology and circadian sleep disorders. *Ann Acad Med Singapore* 2008;37(8):662–668.
7. Lewy AJ, Emens JS, Lefler BJ, et al. Melatonin entrains free-running blind people according to a physiological dose–response curve. *Chronobiol Int* 2005;22(6):1093–1106.

*continued on page 231*

# Jet Lag: Current and Potential Therapies

*continued from page 224*

8. Srinivasan V, Spence DW, Pandi-Perumal SR, et al. Jet lag: Therapeutic use of melatonin and possible application of melatonin analogs. *Travel Med Infect Dis* 2008;6:17–28.

9. Parry BL. Jet lag: Minimizing its effects with clinically timed bright light and melatonin administration. *J Mol Microbiol Biotechnol* 2002;4(5):463–466.

10. Takahashi T, Sasaki M, Itoh H, et al. Melatonin alleviates jet lag symptoms caused by an 11-hour eastward flight. *Psychiatry Clin Neurosci* 2002;56:301–302.

11. Petrie K, Conaglen JV, Thompson L, et al. Effect of melatonin on jet lag after long haul flights. *Br Med J* 1989;298:705–707.

12. Claustrat B, Brun J. David M, et al. Melatonin and jet lag: Confirmatory result using a simplified protocol. *Biol Psychiatry* 1992; 32:705–711.

13. Lino A, Silvy S, Condorelli L, et al. Melatonin and jet lag: Treatment schedule. *Biol Psychiatry* 1993;34:587.

14. Czeisler CA. Commentary: Evidence for melatonin as a circadian phase-shifting agent. *J Biol Rhythms* 1997;12:618–623.

15. Arendt J. Jet lag and shift work: (2). Therapeutic use of melatonin. *J R Soc Med* 1999;4:402–405.

16. Samel A. Melatonin and jet lag. *Eur J Med Res* 1999;4:385–388.

17. Edwards BJ, Atkinson G, Waterhouse J, et al. Use of melatonin in recovery from jet lag following an eastward flight across 10 time zones. *Ergonomics* 2000;43:1501–1513.

18. Beaumont M, Batejat D, Pierard C, et al. Caffeine or melatonin effects on sleep and sleepiness after rapid eastward transmeridian travel. *J Appl Physiol* 2004;96:50–58.

19. Burgess HJ, Crowley SJ, Gazda CJ, et al. Preflight adjustment to eastward travel: 3 days of advancing sleep with and without morning bright light. *J Biol Rhythms* 2003;18:318–328.

20. Eastman CI, Gazda CJ, Burgess HJ, et al. Advancing circadian rhythms before eastward flight: A strategy to prevent or reduce jet lag. *Sleep* 2005;28:33–44.

21. Nicholson AN. Sleep and intercontinental flights. *Travel Med Infect Dis* 2006;4:336–339.

22. Arendt J, Alshous, M, Marks V. Alleviation of jet lag by melatonin: Preliminary results of controlled double-blind trial. *Br Med J* 1986;292:1170.

23. Herxheimer A, Petrie KJ. Melatonin for the prevention and treatment of jet lag. *Cochrane Database Syst Rev* 2002(2):CD001520.

24. Arendt J, Rajaratnam MW. Melatonin and its agonists: An update. *Br J Psychiatry* 2008;193:267–269.

25. Zee PC, Wang-Weigand S, Wright KP, et al. Effects of ramelteon on insomnia symptoms induced by rapid, eastward travel. *Sleep Med* 2010;11:525–533.

26. Rajaratnam SMW, Polymerous MH, Fisher DM, et al. Randomized controlled trials of the melatonin agonist tasimelteon (VEC 162) for transient insomnia after sleep time shift: Two randomized controlled multicentre trials. *Lancet* 2009;373:482–491.

27. Brown GM, Pandi-Perumal SR, Trakht, I, Cardinali D. Melatonin and its relevance to jet lag. *Travel Med Infect Dis* 2009;7:69–81.

28. Jamieson AO, Zammit GK, Rosenberg RS, et al. Zolpidem reduces the sleep disturbance of jet lag. *Sleep Med* 2001;2:423–430.

29. Ker K, Edwards PJ, Felix LM, et al. Caffeine for the prevention of injuries and errors in shift workers. *Cochrane Database Syst Rev* 2010;12(5):CD008508.

30. Pierard C, Beaumont M, Enslen M, et al. Resynchronization of hormonal rhythms after an eastbound flight in humans: Effects of slow-release caffeine and melatonin. *Eur J Appl Physiol* 2001; 85(1–2):144–150.

31. Nuvigil (armodafinil) tablets, product information. Frazer, Pa.: Cephalon, Inc.; 2010.

32. Rosenberg R, Bogan R, Tiller JM, et al. A phase 3, double-blind, randomized, placebo-controlled study of armodafinil for excessive sleepiness associated with jet lag disorder. *Mayo Clin Proc* 2010;85(7):630–638.

33. Cephalon drops bid for FDA approval of jet-lag drug. *The Wall Street Journal*, December 27, 2010.

34. Drug price inquiry. Available at http://drugstore.com/pharmacy. Accessed February 28, 2011 2010. ∎

# EXHIBIT 19

**WASHINGTON NEUROPSYCHOLOGICAL INSTITUTE, LLC**
4900 MASSACHUSETTS AVE, NW   SUITE 240
WASHINGTON, DC 20016
PH. 202-686-7520  FAX 202-686-8802

Gary G. Kay, Ph.D., ABN
Clinical Neuropsychologist

## REPORT OF FOLLOW-UP NEUROPSYCHOLOGICAL ASSESSMENT

**NAME:**          **PATTERSON**, Rodney "Scott"
**TEST DATE:**     October 10, 2018
**AGE:**           50

Scott Patterson is a 50 year old, right handed, married Caucasian male, former American Airlines A319 First Officer, presently employed by a cargo carrier, 21 Air, referred for follow-up neuropsychological assessment by Dr. Glen Cady.

## RELEVANT HISTORY:

Mr. Patterson is an American Airlines A319 First Officer with 12,000 logged flight hours who was previously seen for neuropsychological assessment on June 29, 2016.

When seen in 2016 Mr. Patterson explained that his problems with American Airlines began during a trip to Paraguay in October 2014. Mr. Patterson was traveling with his family on vacation. As they were boarding the flight, Mr. Patterson helped his wife find a space (above the crew space) for a backpack that a flight attendant had said needed to be checked. This apparently created a conflict between the flight attendant and Mr. Patterson. When they landed, Mr. Patterson was informed that his family wasn't welcome to ride the shuttle bus to the hotel. The situation escalated to the point where the flight attendant made a formal complaint to the airline. Mr. Patterson was told to meet with Professional Standards upon his return. When Mr. Patterson met with Professional Standards he discovered that he had been accused by the captain who had flown the trip (Captain Whitehouse) of pointing out crew for extra screening in customs. Mr. Patterson strongly denied the allegation. In June 2015, as he was departing on a trip, Mr. Patterson was asked to undergo additional Customs screening in the jet bridge. Mr. Patterson believed that this was a retaliatory act. The next month he avoided taking a flight where Captain Whitehouse was in the jump seat. He later received a call from Professional Standards asking if he was harassing the Captain. He was also asked if he was "smuggling guns to Bolivia." Mr. Patterson denied the allegations and informed the Captain in Professional Standards that the situation was out of control. On a subsequent flight, Mr. Patterson was again stopped, prior to a flight to Bolivia, and searched. The pilot that he was flying with was involved with Professional Standards. Mr. Patterson continued to fly the line from June through September 15, 2015. He received an assignment to work at the White House during the Pope's visit. After not being able to reach his Chief Pilot, Mr. Patterson called the Duty Chief to request permission to take the assignment. He later discovered that permission wasn't granted. He was suspended by the Chief Pilot for missing his flight.

A hearing took place in November 2015 to review the incident in 2014 and the complaint made in September 2015. The hearing found no cause for discipline. In January 2016 he was informed that his case was still being investigated. In March 2016 he was sent for a fitness-for-duty evaluation to Dr. John Knippa.

Mr. Patterson's legal case with American Airlines remains unresolved. In reviewing Mr. Patterson's case with his attorney, Mr. Amlong, I was informed that Mr. Patterson had undergone testing with Dr. Bercaw on 3/21/2016 three months prior to his visit with me on 6/29/2016. I was provided a copy of Dr. Bercaw's report to review. Dr. Bercaw noted poorer

PATTERSON, Scott
Page 2

than expected performance in the areas of deductive reasoning and sustained attention. Results were also interpreted as showing "insufficient learning and poor recall of information presented verbally." These findings were not considered to be clinically significant and were attributed to possibly having resulted from the airman's fatigue. Dr. Bercaw concluded that there was nothing to indicate the presence of a disqualifying mental condition. However, due to the airman's poor performance on measures of deductive reasoning (i.e., 24 perseverative errors on WCST) Dr. Bercaw recommended "review of these data by an FAA neuropsychologist."

Prior to these work-related incidents Mr. Patterson stated that he had never been evaluated or treated by a mental health professional. He reported no history of anxiety, depression, substance abuse, or anxiety-related disorders. He has been married for over 25 years. He lives with his wife and two children. He reported that his children are home schooled in a program that also involves a private school and a certified teacher. His wife works full-time as a physical therapist. He is a devout Christian who is very active in his church. He completed and passed the screening test to become a Federal Flight Deck Officer. He continues to serve in the Reserves and holds the rank of Lieutenant Colonel. He reported that he is in good health. He indicated a desire to return to his former employment as an American Airlines pilot.

## RECORDS REVIEWED:

*Forensic Investigation Report, Dr. Glenn Ross Caddy, 7/20/16*

*Neurological Examination, John Hastings, MD, 5/28/16*

*Neuropsychological Fitness-For-Duty Examination, John Knippa, Ph.D., 3/17/16*

*Neuropsychological Evaluation, Edwin L. Bercaw, Ph.D., 3/21/16*

## TESTS ADMINISTERED:

CogScreen-Aeromedical Edition (Session 4)
D-KEFS
     Proverbs
     Tower Test
CVLT-3
NAB Mazes
Conners' Continuous Performance Test-II
Trail Making Test

## MENTAL STATUS EXAMINATION/TEST BEHAVIOR:

Mr. Patterson arrived promptly for his scheduled appointment. He was appropriately groomed and dressed in casual attire. He was fully alert, oriented and cooperative. Mr. Patterson readily re-established good rapport with the examiner. He did not appear to be particularly anxious or depressed. He was very intent upon sharing his history. There were no clinical signs of problems with attention or concentration. He readily engaged in conversation. His speech was normal in volume, rate and prosody. He had no difficulty following task instructions. He appeared to be  motivated to perform at the best of his ability. The following results are considered to accurately reflect his current level of functioning.

PATTERSON, Scott
Page 3

**TEST FINDINGS:**

*CogScreen-AE*

|  | 6/16 | 10/18 |  | 10/18 |
|---|---|---|---|---|
| SPEED: | 1 | 0 | Scores at or below the 5th percentile | >45th percentile |
|  | 2 | 3 | Scores at or below the 15th percentile | 47.5 percentile |

Mr. Patterson had no scores that were at or below the 5th percentile compared to major airline pilots his age on measures of response speed. He was relatively slow on measures of math reasoning and visual scanning and tracking. The difficulty seen with visual scanning and tracking is similar to that seen in 2016. His overall response speed places him at the 47.5 percentile compared to US Major Airline Pilot norms (ages 50-54).

|  | 6/16 | 10/18 |  | 10/18 |
|---|---|---|---|---|
| ACCURACY: | 0 | 1 | Score at or below the 5th percentile | 35th percentile |
|  | 0 | 1 | Score at or below the 15th percentile | 62.5 percentile |

Mr. Patterson had one score at or below the 15th percentile on measures of response accuracy. His weak score was on a measure of visual working memory. Overall, his response accuracy is at the 62.5 percentile compared to US Major Airline Pilots his age.

PROCESS MEASURES:

Mr. Patterson performed well on measures of response inhibition, tracking, psychomotor coordination, and deductive reasoning under time pressure.

ADDITIONAL FINDINGS:

On factor analytically derived summary scores predictive of flight performance Mr. Patterson's scores are all within the expected range. This includes measures of psychomotor coordination, processing speed, working memory, deductive reasoning, memory and tracking.

Mr. Patterson's LRPV score of 0.152 is in the Normal range and suggests against the likelihood of acquired cerebral dysfunction. There was only a minimal increase in the airman's LRPV score compared to 2016.

*Conners' Continuous Performance Test-II*
Consistent with results obtained in 2016, all of Mr. Patterson's scores, with the exception of one were in the expected range on this measure of visual sustained attention. The one weakness was again seen on a measure reflecting increased reaction time variability over the 15 minute duration of the task. Mr. Patterson demonstrated good reaction time, sensitivity to target stimuli, and ability to inhibit responses to non-targets. Results suggest against the likelihood of a clinically significant problem with vigilance or attention.

*California Verbal Learning Test - 3*
This is a test of verbal memory involving learning and recall of a 16-item word list. Following the initial presentation of the word list Mr. Patterson recalled 8 of the list words. This score falls in the mid-Average range compared to pilot norms. After 4 more repetitions of the word list he was able to recall 14 of the items. This score also falls in the mid-Average range for pilots. Similarly, his total recall score for the 5 learning trials (60) falls in the mid-Average range for pilots. Recall from an Interference list was slightly above average. Recall following presentation of the interference trial (13 words) was in the mid-Average range. Following a 20-minute delay interval Mr. Patterson recalled 15 of the list words, a score placing him nearly 1

PATTERSON, Scott
Page 4

standard deviation above the mean for pilots. He also performed well on delayed list recognition (15 correct; no false positive errors).

*Executive Functions*
The NAB Mazes test is a measure of non-verbal problem solving involving response inhibition, planning, and visual problem solving. Mr. Patterson performed at the 92nd percentile for his age and years of education.

The D-KEFS Tower Test, is a measure of rule application, planning, and non-verbal problem solving. His overall performance on this measure places him at the 90th percentile. All scale scores for this test were within the Normal range.

The D-KEFS Proverbs Test is a measure of verbal abstract reasoning. Three of Mr. Patterson's responses were considered to be mildly concrete. He correctly responded to 7 of the 8 multiple choice items demonstrating reasonably good recognition of verbal abstractions.

## SUMMARY AND RECOMMENDATIONS:

Follow-up neuropsychological assessment provides reassuring information regarding Mr. Patterson's neurocognitive functioning. He performed well on neuropsychological screening. CogScreen results suggest against the likelihood of acquired cerebral dysfunction. His performance on CogScreen measures of response speed and accuracy are largely consistent with the favorable results obtained in 2016. Aviation factor scores, validated predictors of flight performance, were all in the expected range. Additional testing of vigilance, memory, and executive functions also show intact neurocognitive functioning. Mr. Patterson performed at or above average compared to pilot norms on measures of verbal learning and memory. Performance on three measures of executive functioning demonstrate intact planning, abstract reasoning, impulse control, and novel problem solving ability.

Based upon these findings Mr. Patterson would be considered to have no aeromedically significant neurocognitive deficits and would be recommended for a Class 1 FAA airman medical certificate.

Thank you for referring Mr. Patterson for neuropsychological assessment. If you have any further questions please don't hesitate to contact me.

Gary G. Kay, Ph.D.
Clinical Neuropsychologist