UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO 17:60533-CIV-MARTINEZ-OTAZO-REYES

RODNEY SCOTT PATTERSON

    Plaintiff

v.

AMERICAN AIRLINES,

    Defendant



_____/

## PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION FOR SANCTIONS AND REQUEST FOR OTHER RELIEF

Plaintiff responds to the Defendant's motion for sanctions and other requested relief, and would respectfully request that this Court consider the following matters in opposition to those pending motions as filed by Defendant and grant the Plaintiff relief as requested. Plaintiff requests this Court grant relief from the page and word count restrictions as applicable.  Plaintiff's spouse who is familiar with the case has assisted the Plaintiff to complete this response

### 1. Factual Background/USERRA Violations by American Airlines

Plaintiff brings this action against his employer, American Airlines, alleging multiple violations of the Uniformed Services Employment and Reemployment Rights Act, title 38 U.S.C. §§ 4301, et seq ("USERRA").   As an underlying point of information the stated purpose in the enactment of USERRA by the United States Congress was to encourage non-career service in the uniformed branches of the United States Military services, while protecting employee rights so as to minimize the disruption to the lives of persons performing services on behalf of the United States military and so as to prohibit discrimination against persons because of such military service, all of which benefits the Nation as a whole. The preamble of the law calls out the Supreme

Court's affirmation of the protections and broad interpretation in all the law's iterations over 45 years, demonstrating long-term commitment to these issues: "This legislation is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need. . . . And no practice of employers or agreements between employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act." [38 U.S.C § 4302]. [1]

On September 21, 2015, Plaintiff, who holds the rank of Lt. Colonel, provided notice to his employer, the Defendant, American Airlines, through its Chief Pilot, James Bonds, that Plaintiff would perform military service from the period of 22 Sept.-25 Sept. 2015.   That although it has been acknowledged by Mr. Bonds that Plaintiff complied with the provisions of USERRA in making his request related to Plaintiff's contemplated military service, the Defendant ignored and continues to this day, the provisions of USERRA by willfully refusing to remove the Plaintiff's scheduled work and denying him the protections provided to Plaintiff, as an employee, under USERRA.   The Defendant compounded its error and USERRA violation when it later instructed its Corporate General Counsel, Lucretia Guia, Esq., to pen a letter to the Department of Labor' investigator, which indicated that Plaintiff's request for military leave was "suspicious" and alleged communications between Plaintiff and Mr. Bonds as the basis for such allegation, which allegations were in fact later shown to be a fabrication by the Defendant. [ECF 116-7]

When Plaintiff discovered that Mr. Bonds had failed to remove him from the flight schedule as required by law, he was forced to contact the Defendant's After-Hours Chief Pilot, David Tatum, who immediately removed Plaintiff from his flight schedule to allow for the Plaintiff's military service. [ECF 73-3] [127-1]  Plaintiff, as a conscientious employee of American Airlines did not want to see American's customers inconvenienced by a schedule interruption which would have occurred due to Bonds' willful failure to act in compliance with the law including the addition of prerequisites to the exercise of this right (38 U.S.C. 4302(b)).   Most military service members, out of respect and politeness, phrase notice of absence as a "request" for military leave.   It is not, in fact, a request at all.[2]   It is a right guaranteed by USERRA itself.

---

[1] **[38 U.S.C. § 4302], See *Fishgold v. Sullivan Drydock and Repair Corp.*, 328 U.S. 275, 285 (1946), cited in *Alabama Power Co. v. Davis*, 431 U.S. 581, 584-85 (1977); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 n.9 (1991).**

[2] **   *See 70 Fed. Reg. 75,246, 75256 (Dec, 19, 2005), available at 70 FR 75246-01, at *75256 (noting that "[i]mposing a prior consent requirement would improperly grant the employer veto***

Plaintiff requested time off to perform military service and vacation time to cover that service. Defendant has repeatedly and improperly asserted this was a "vacation request" despite the fact that the notice was clearly and unequivocally made under USERRA. [20 CFR § 1002.153]

So as to back pedal from David Tatum's eventual granting of Plaintiff's USERRA request, the Defendant, through communications between Mr. Bonds and Mr. Tatum, attempted to argue that Mr. Tatum was "duped" into the Plaintiff's request and that Plaintiff had an ulterior motive for not wanting to fly with a professional standards pilot that Plaintiff was scheduled to fly with the following day (American has alleged this same pilot investigated the plaintiff)(an outright Misrepresentation, Professional Standards does investigate pilots for disciplinary or other action by the AA).    On or about October 20, 2015, Mr. Bonds, threatened to discipline Plaintiff, a violation of 38 USC § 4311, alleging that Plaintiff had not produced to him documentation of uniformed service that he had requested.  Although not required by law, Plaintiff in response thereto submitted an excerpt from payroll documents showing periods of service as soon as such documents were made available on the "My Pay" section of the Defense Finance and Accounting webpage. [3]  True and correct copies of such documents have been submitted to the Court to establish USERRA protections.    Despite the proffering of such documents to the Defendant, American wrongfully continues to deny the validity of the prior supplied proof of military service of Plaintiff despite the fact that such matters fall within the purview of the types of evidence consistent with the requirements of the law.  Simply put American has, contrary to law, chosen in bad faith to reject the Plaintiff's proof of military service since the acknowledgement of same would make it clear that American has, consistent with its prior practice, failed to allow for USERRA rights to be exercised by its employees. [4]

---

*authority over the employee's ability to perform service in the uniformed services by forcing the employee to choose between service and potential loss of his or her employment position, if consent were withheld")*

[3] **20 CFR § 1002.121, 20 CFR § 1002.123**

[4] **"[D]iscrimination is seldom open or notorious,"** *Sheehan,* **240 F.3d at 1014, and "employers rarely concede an improper motivation for their employment actions,"** *McMillan v. Dep't of Justice,* **812 F.3d 1364, 1372 (Fed. Cir. 2016). Rather, discrimination tends to be "inferred" from evidence of "hostility" or "disparate treatment of certain employees compared to other employees with similar work records or offenses."** *Sheehan,* **240 F.3d at 1014.**

Rather than approach the true issue, and the basis for the Plaintiff's complaint, the Defendant seeks to use a "red herring" to question the then and now physical health and cognitive abilities of Plaintiff so as to have him deemed "unfit for duty" a pretext for its blatant violation of USERRA.   The defendant has compounded its USERRA violations by further changing the Plaintiff's employment status by placing the plaintiff on "administrative leave", while he performed military service.  The defendant failed to properly re-employ the plaintiff under § 4313 of USERRA.[5] In the case of *Thompson v. City of Beverly Hills* [C.D. Cal. 2010] the court found a "triable issue of fact, that employer's placement of [Thompson] on paid administrative leave was discharge under § 4316(c)."  *See also Petty v Metro (6th Circuit, No. 07-5649)* Unlawful Discharge is retaliation under § 4311.

## 2. The Unfounded Whitehouse Complaint

The unfounded 24 September, 2015 Whitehouse (WH) complaint comes square in the midst of military leave, likely at the urging of pilots in the flight office (Captain Bonds) who were angry with the plaintiff for costing them money (chief pilots receive a bonus and Bonds admitted they didn't have the money to allow Plaintiff to perform military service and be paid by AA,  a right guaranteed under USERRA).  Bonds facing severe consequences realized he needed a reason to justify his unlawful acts.  The complaint was a 12-page regurgitation of his stale March, 2015 complaint. WH knowing that his prior complaints were unfounded likely saw this opportunity by Bonds as a way to retaliate. Bonds emailed his supervisors on September 6, 2015 and relayed to him an allegation, that WH literally chased him down in the terminal with yet another story about Patterson.  This allegation like the others was unfounded.  Captain Brian Beach provided the March, 2015 complaint to corporate security and later advised the corporate security report was unfounded. It is no coincidence the corporate security report miraculously disappeared, as it

---

[5] **"While according a returning servicemember lower status than she or he had before leaving for military service can be a denial of a benefit of employment violative of § 4311 of USERRA [see e.g., *Reed v. City of Charleston*, D.S.C. 2012, inference of denial of benefit of employment raised by allegations that upon his return from military leave, city never restored veteran's former duties but instead placed him under internal affairs investigation, never reissued his service weapon or badge, and confiscated his identification cards.] [emphasis added], such reduced status may also constitute a failure to reemploy the servicemember in a reemployment position required under § 4313 of USERRA.""Unlike § 4311, neither § 4313 nor § 4316(c) require any showing of discriminatory intent to establish a violation."**

exonerated the Plaintiff. Whitehouse alleged he was the victim of harassment, however, American's HR was remiss in applying its own policies and could not, as the complaint was without merit and unfounded. The Allied Pilot's Association convened a special Appeals Board to review the Whitehouse allegations and that board concluded:

- Whitehouse (WH) statement used inflammatory language questioning First Officer Patterson's (FOP) employment status and questioning the mental health of (FOP), although no evidence was presented to the Board indicating that Captain (WH) is qualified to make such accusations. These actions and statements were more than just anecdotal references. They are retaliatory in nature and, when taken as a whole, constitute malice, ill-will and no justifiable reason.

The Appeals Board was unaware of the corporate security report as American did not disclose it to the Plaintiff or his union attorney and to this day has gone to great lengths to conceal that report from this Court. American seeks to justify the WH complaint to support its unlawful acts violating USERRA. It should not come as a surprise the board found the same unfounded conclusion. A further detriment to Whitehouse, were his feeble attempts to avoid service of process. His attorney submitted a letter from his doctor to excuse him from being deposed, yet while he was supposed to be at home resting, he was 150 miles north of his surgery site appearing before a Notary Public. (See Exhibit 1) Whitehouse was reported by numerous witnesses to change out of uniform and use different exits to avoid process servers. Whitehouse frangible credibility and the complaint(s)/ hearsay are not well taken by the Plaintiff as such the Court should not rely on them. Any reference to the complaint should be stricken as hearsay.

### *3. Anticipation of Litigation and Strategy*

Lt. Col Patterson was warned by the APA and other pilots in 2016, that American had egregiously applied the Section 20 process to force them onto disability and then then two years later strip them of disability thus constructively terminating them. Forcing a pilot onto disability, paid withheld or sick is disparate treatment for the pilot and strips them of benefits. It is an inferior position which amounts to discrimination under § 4311.

Given the expense of litigation and paying disabled pilots, what amounts to one quarter salary, the case of Captain Michael Dale, highlights the fact, Section 20 physical examinations are a huge cost savings for American and avoid due process obligations. Plaintiff contacted Dr. Jeff Kantor, lead psychologist for Comprehensive Med Psych, in early 2016 reference to his pending

Section 20 Exam with Dr. John Knippa. Patterson had extensive phone consultation with Dr. Kantor regarding American's plan to railroad him absent a medical diagnosis and allegations which proved false. Dr. Kantor was consulted regarding pending litigation and was fully aware that Lt. Col Patterson intended to take the matter to court to address the USERRA issue. Dr. Kantor assured Patterson that he was fully capable of conducting any neuropsychological testing.

In another case demonstrating the nature of American's conduct, Plaintiff was also made aware of the case of Captain Brian Ostrom, a pilot that American also sent to an irregular Section 20 physical exam, an exam that was fraught with error. Ostrom later sued American over the section 20 irregularities and apparently settled, as the case did not go to trial. Ostrom is currently flying for American Airlines as a captain. Dr Jeral Ahtone was questioned about a letter he sent to the Federal Air Surgeon, regarding the psychological status of Ostrom after American had agreed to settle with him and cleared him to resume flying. Dr. Ahtone states he never examined Ostrom and he was told by American management to sign the letter a pattern similar to Brian Beach. That letter confirms American's pattern of retaliation and bad faith. Ostrom retained his Airman Medical Certificate and is currently flying for American. (See Exhibit 2)

### *4. May 6, 2016 Letter*

American has deliberately given little attention to a letter written by Edwin Bercaw (CMS) to Dr. Glenn Caddy (May 6, 2016). (See attached Exhibit 3). The "smoking gun" letter belies American's assertions regarding the Plaintiff's mental health. This letter is inseparable from the underlying report and acts to further clarify the findings in that report [ECF 87, Attach 1]. Despite the statements by counsel for American, the letter from CMS expounds quite favorably for Lt. Col Patterson, who sought counsel from Dr. Kantor in anticipation of litigation. American argues that the plaintiff concealed the report issued by CMS. However, this is not a true statement. American was aware of the CMS report for nearly a year and half. The May 6, 2016 letter was mailed to Dr. Caddy as it includes Caddy's mailing address and no facsimile information. Caddy had inquired about the participation of a student psychologist, Nathaly Fonseca, who was not eligible for board certification which is an FAA requirement to conduct evaluations (See Exhibit 4). The letter states:

- "there was no substantiated history I had available to indicate he has a *personality disorder*."

- ***The findings in our evaluation were generally positive***, with a ***passing Cogscreen***. (Dr Caddy used this exact language in when questioned about the report, indicating he had seen this letter which was mailed to him. There is no evidence that Caddy saw the report nor the Plaintiff or his attorney. Despite repeated requests, Bercaw was remiss in discussing the report with the plaintiff)

- ***He exhibited high average intellectual functioning, his attention, processing speed, language, visual spatial, visual memory and motor scores were generally consistent with expectations.*** These very words do not indicate Lt. Col Patterson performed miserably on anything as American has deceitfully asserted a number of times. Again, it would be inappropriately speculative to infer a cause for the findings at this time as ***there is no known psychiatric or neurological condition identified as of now***.

There was never a mental health condition which would disqualify Lt. Col Patterson from holding an Airman Medical First Class. American Airlines conjured its red herring, and sent the Plaintiff to the discredited Dr. Knippa to develop a rationale to support its unlawful acts. Clearly the Plaintiff would have no motive for failing to provide an opinion that in its sum total is positive and supports the Plaintiff's position that he was, counter to the allegations of American, not suffering from any impairment that would prevent his active employment as an airline pilot. Therefore, in spite of the vigorous argument by the Defendant, and in light of the evidence that the Defendant had in fact previously received the May 6, 2016 letter as well as, its generally positive tone, there is no evidence that the Plaintiff has in any way attempted to hide or otherwise prevent the full presentation of documents and evidence to this Court and the Defendant and therefore any sanctions are inappropriate. There is clear evidence that American did not want the May 6, 2016 letter to be considered by this Court or anyone else.

### 5. Motive

In light of the May 6, 2016 letter to Dr. Caddy the Plaintiff's fundamental narrative is completely supported  The smoking gun is the May 6th letter which clearly supports the Plaintiff's narrative and was denied to Dr. Kay during his deposition. In short, all along Plaintiff has had no medical condition (diagnosis) which would make him ineligible for an Airman Medical Certificate. American's wishful thinking is otherwise, yet no matter how hard they try, the facts don't support American's red herring multi-tiered scheme.

It is Plaintiff's understanding that in any case Plaintiff was under no obligation to notify American of consultation with anyone at Comprehensive Med Psych, as Plaintiff anticipated

litigation with his employer to assert his rights under USERRA and was not seeking medical advice or treatment. Neither would have American accepted the results of an outside examiner as it has repeatedly stated. In fact, Lt. Col Patterson passed the Cogscreen which contradicts Fonseca's later testing.

Dr. Kay did not administer a complete battery of tests but did administer the Cogscreen, Trail Making Test and Connors Performance Test in March 2016, which is what he determined required repeating. The May 6th Bercaw letter mentions two areas, Verbal Memory and Executive Function, both he attested did not disqualify Patterson. Kay later retested these items in Oct 2018 and declared there was no aeromedically significant medical condition (as there never was), that would make Patterson ineligible for certification, neither could he identify any underlying medical condition which existed in 2016. Dr's Kay and Abi-Rafeh both agree, Fatigue and sleep deprivation are the only plausible explanation.

- Edwin Bercaw stated he did not want to conduct neuropsychological testing immediately after the plaintiff was tested with Knippa. He did it because his boss, Dr. Kantor made him do it. [ECF 132-1]

- Dr. Kay advised that the FAA would not accept the test results performed on another client within 11 days of being administered another Cogscreen.

- Dr Caddy was concerned over the involvement of Nathaly Fonseca whom Patterson did recall doing much of the testing to include the Cogscreen. Bercaw being certified by Kay to perform the test walked out of the room and left Fonseca with a copy of Aeromedical Psychology to read. In his deposition Kay commented this was in appropriate administration.

The motive could be accurately stated, Lt. Col Patterson had his right to perform service in the uniformed service violated by American with impunity. He was advised the Section 20 process was a bypass of Section 21 which had due process. American wanted him gone and had subjected him to a process rife with abuse and fraud. Caddy advised him he wasted $3,500 dollars consulting with Kantor. Caddy was correct, he confirmed with Bercaw, Nathaly Fonseca's credentials. Bercaw, admitted that he had not trained or evaluated Fonseca's ability to conduct the testing. Fonseca certainly was not qualified to administer or even monitor the Cogscreen yet plaintiff passed the Cogscreen. Plaintiff has clearly shown American's motive. James Bonds admitted that

he was out to get Lt. Col Patterson and the flight office didn't have the money to pay him for taking military leave.

### 6.  *Psychological Baseline doesn't support American's Red Herring*

Lt. Col. Patterson was employed by American in early 2000.  At the time American employed an "Astronaut Physical" for all pilots to include the administration of the Cogscreen-AE and several other psychological tests to determine fitness. American had no issues allowing him to fly as a pilot then and particularly on September 22, 2015 through September 24, 2015.  Only when he asserted his righs and defied Bonds was the stale March 2015 complaint resurrected. Given the solid baseline established since the year 2000, the psychological testing of March, 2016 should be viewed as part of American's multi-tiered scheme.  Hypothesizing absent solid medical grounds is wild speculation.  As the Plaintiff was medically and psychologically qualified for military service without waiver or limitation well before after the events of March, 2016 it should be difficult for this Court to accept American's position that its own and more subjective evaluation was correct.  Even Dr. Kay in his 2018 evaluation cannot define a diagnosis of a disqualifying condition because there never was one from the year 2000 through Oct 2018. (See Exhibit 5).


### 7.  *Dr. Ibrahim Abi-Rafeh, MD*

Dr. Abi-Rafeh, has reviewed the examinations and findings/no-diagnosis of Patterson throughout the course of this matter.  He opined, "I attributed the low scores on the cognitive testing to stress and fatigue due to jet lag and lack of sleep, and not an underlying medical or neuropsychological issue which would disqualify him from holding an airman medical certificate". He also opined on American's stated reasons for the Knippa referral, was to assess the mental and emotional stability and not the cognitive abilities, which there were no known issues. He further notes a discrepancy in Knippa's report which supports his assertions.  "No technical lapses of performance were known to have been alleged".  "Patterson's performance in the military and promotion to Boeing 767 Captain is a testament to the lack of cognitive deficiency or psychological issues ..." (See Exhibit 6). [DE 96-5].


### 8.  *Passage of Time*

Lt. Col Patterson sought the advice and counsel of Dr. Jeffrey Kantor at Comprehensive MedPsych (CMS), in anticipation of litigation (reported to be an experienced neuropsychologist and someone who could refute American's claims) in early 2016.  The Allied Pilot's Association cautioned plaintiff against using Non-Hims qualified practitioners, when Kantor was disclosed to them.  In a last-minute bait and switch, Kantor admitted he was (at that time) not HIMS qualified. (a two-day substance abuse course taught by none other than Dr. Gary Kay), Lt. Col Patterson notified Kantor he was not going any further, because of the discrepancy, Kantor then proffered, Dr. Edwin Bercaw, who was HIMS qualified as a last-minute bait and switch.  In a hurried rush, Bercaw then requested consent for Nathaly Fonseca a student to observe, on the day of the consultation.  However, Dr. Bercaw soon disappeared and was not seen until the end of the day.

Nearly a year later, Lt. Col Patterson's counsel would file a complaint against American Airlines with this court.  The court established a nine-month period of discovery in which no depositions were conducted.  Nearly a year after the filing, Lt. Col Patterson would appear at a deposition the only one scheduled by American.  Michael Holt, American Airlines attorney appeared before Judge Otazo-Reyes and declared that American had not conducted any discovery other than Lt. Col Patterson as a cost savings method.

Lt. Col Patterson was deposed in March 2018, nearly *three years* after the unfounded corporate security report and *two years* after he consulted with Dr. Kantor and Dr. Kay about pending litigation with the defendant.  Patterson was advised by his counsel not to carry personal notes or files to the deposition and to rely only on his memory.  He was further advised by his expert witness no consideration would be given to Comprehensive Med Psych and details of the very short day were soon forgotten.  Patterson was not given the opportunity to read or correct his deposition. All of the foregoing led to a series of events in which the brief discussions with Dr. Bercaw, which took place more than two years prior, were, especially in light of the fact that Dr. Bercaw was only tangentially involved in any testing, tried the Plaintiff's memory.  Most of us find recalling meeting we had weeks or months ago as a memory test, and eventually Plaintiff's memory was jogged sufficiently to recall Dr. Bercaw.  Plaintiff's failure to recall Dr. Bercaw's name or the details surrounding his activities was not the result of any attempt to be fraudulent, but rather was simply his inability to remember, having been told that if he did not remember clearly, he should, since he was under oath, say "I don't know" or words similar, which is exactly

what he did since a the time he had no recollection of Dr. Bercaw.   Dr. Gary G. Kay in his deposition, [ECF 154-4] at 165:16 states,"

- I'm not trying to be funny, but it's been hard to pronounce Bercaw.  And maybe it was the pronunciation that did not ring a bell.

### *9.   FAA 8500*

The defendant has droned ad nauseum about the FAA Form 8500.  The Federal Air Surgeon is the sole federal entity for determining a pilot's fitness for duty and issuance of the Airman Medical Certificate.  The National Transportation Safety Board can override the Air Surgeon but only in non-discretionary circumstances.  American has admitted that it cannot determine the validity of an Airman Certificate, as it sent a letter to the Federal Air Surgeon requesting review of a pilot's newly issued medical certificate, Jeral Ahtone deposition [ECF 57, Attach 3]. The letter was a bad faith attempt to further harm the pilot who had been issued his medical certificate months prior and one whom American apparently agreed to settle with and return to work.  The FAA is the sole jurisdiction for handling issuances of Airman Certificates. *Guyre v. United States Fire Insurance Co.* 97 A.D.2d 964.  Errors if any, on the FAA Forms 8500 of Lt. Col Patterson have been corrected and were submitted to the FAA during the most recent application process.  The FAA continued to issue an Airman Medical Certificate First Class to Lt. Col Patterson.

Reporting a previous medical condition will not necessarily result in the automatic revocation of a pilot or airman medical certificate by the FAA.   Neither, Drs. Knippa, Bercaw/Fonseca, Kay, Hastings, Abi Rafeh, Tordella or the U.S. Army medical department, *ever diagnosed any medical condition which would render Lt. Col Patterson ineligible for an airman medical certificate*, one of the essential job requirements at American Airlines to be a pilot. (See Exhibit 7) It would have been very difficult for Lt. Col Patterson to conceal a medical condition from the subsequent large number of evaluators who would observe him for hours performing captain duties.  Dr Kay in his deposition addresses the matter of reporting to the FAA.

- He states "the FAA tries to be very lenient.
- I find they are very understanding".
- They're pretty open minded".

Plaintiff has held a First-Class Airman Medical and none of the experts consulted have ever diagnosed a disqualifying personality disorder or mental health condition.

### 10.  *American's Culture of Retaliation and Poor Safety Record*

While American pushes its red herring on the Court, American's own record of safety with the FAA is replete with falsification and endangerment of the public.  The record is relevant since American has argued its actions in removing the Plaintiff were safety related.  As of July 10, 2018, the U.S. Department of Transportation, Office of the Inspector General issued a report which describes situations in which American, in collusion with certain FAA employees, disregarding the safe operation and testing of American Airlines aircraft and provided "dirt" to the FAA on complaining pilots to discredit them (See Exhibit 8)

More recently, on February 6, 2019, the Transportation Workers Union, which represents the American Airlines mechanics, sent a stern rebuke to Doug Parker the CEO of American Airlines regarding *retaliation over safety and maintenance concerns*.  An FAA report determined: American Airlines "pressured [mechanics] to not record discrepancies, take shortcuts with maintenance activities, or improperly sign-off on *work which was not actually completed*".    The irony of these disclosures, including the bombshell CBS report, (See Exhibit 9), is that at the very same time that American was by every objective measure taking shortcuts to programs required to keep the flying public safe, they were at the same time subjecting pilots, like the Plaintiff, to constructive termination on a claim that he posed a "risk".  (See Exhibit 10)

The culture of intimidation and lying to the FAA, apparently pervades the entire American Airlines corporation and is not limited to just upper management.   Two U.S. Senators signed a letter to the FAA administrator demanding answers over these serious safety allegations.  (See Exhibit 11)   Lt. Col Patterson cost American money, [DE 57-7] and they didn't like it.  So, when safety is convenient, the company argues and exploits it, when costly, they avoid it and lie about it.  In light of the indications of American's true motivations for their actions to discredit and besmirch the Plaintiff's reputation, it is equally important for this Court to consider that with over 28 years aviation experience and thousands of hours in the air, Plaintiff has completed every FAA certification ride successfully on the first attempt and has also successfully completed dozens of FAA proficiency checks on the first attempt with no question about judgement or memory

whatsoever. There is a large gulf between making an error on a document and not performing required safety related items which can result in loss of human lives and damage to the aircraft.

## 11. Weaponizing of the Plaintiff's Mental Health

American Airlines submitted to this court that it was concerned about the safety of its passengers and in response to that concern decided to ground Lt. Col Patterson immediately in September of 2015. American has employed a multi-tiered scheme to harm the Plaintiff. The linkage by and between the Whitehouse complaint and the grounding of the Plaintiff is specious not only because of the timing, occurring almost a year prior that action, but came immediately during the Plaintiff's military service which gives rise to the instant claims in this action under USERRA. American has continued a practice, which it uses to put pilots careers on in an unrecoverable steep dive (pun intended) without even a diagnosis of any mental disorder. Although the mental health of pilots is of great concern, American's uses the mental health process a weapon to punish employees who the Defendant finds are not willing to simply toe the line. (See Exhibit 12). It is an industry wide practice to deny a pilot of due process with a pre-determined outcome. Both the instant action, with the Plaintiff and the case involving Captain Dale are demonstrative of this type of systematic and willful treatment of American's employees in that regard. (See Exhibit 12). Lt. Col Patterson's supervisor, Sean Scialfia advised in Sept 2015 that the Whitehouse complaint should proceed through Section 21 and not Section 20. Given the veracity of the complaint was seriously in question and American could not substantiate the claims which were nothing more than an incoherent rant. The US Airways pilots who were later merged into American's pilot group, espoused a distrust for their management, which now make up a majority of the American Airlines management. This distrust was memorialized in the pilot contract, which stated a physical exam could not be used to discipline a pilot and once employed no psychological testing or examination would be required. (See Exhibit 13).

## 12.  The Project Wingman Program

American Airlines would have this Court believe that it sought to allow the Professional Standards Committee of the Allied Pilot's Association an opportunity to resolve the issues between the Plaintiff and Whitehouse. The Allied Pilot's Association Professional Standards Scope of

Work contains a specific prohibition for the APA's handling any criminal allegations or mental health issues and therefore it was outside the authority of the APA PS to resolve any such claims (See Exhibit 14).  Rather than the APA addressing those issues, any potential mental health or substance abuse issues with pilots are referred to Project Wingman.  (See Exhibit 15 and 16)

American never once referred the Plaintiff or Captain Whitehouse to Project Wingman, a program which is about helping pilots to maintain their career.  In short, by the time American had discharged the Plaintiff in 2016, that action was long after both the March 2015 Corporate Security finding of unfounded and the Section 21 allegations were found to have no basis, but came *after* American was aware that it faced pending litigation over the USERRA violation. Because of the Patterson issue,  the APA Pro Standards has fundamentally changed their scope to preclude American Airlines from misusing it in the future.  (See Exhibit 17)

### 13. **American's Attempts to Disparage Plaintiff's Professional Judgment**

After the issues with the Plaintiff's USERRA claims, American began to work diligently at disparaging the Plaintiff's professional judgment.   Specifically, American sought to disparage the Plaintiffs professional judgment regarding a diversion from a flight's destination in La Paz, Bolivia to Santa Cruz Bolivia over foul weather. American has throughout the course of this litigation repeatedly disparaged the Plaintiff based on the hearsay stemming from the Whitehouse complaint.  AA Captain Terry Eisenberg, authored a letter which was submitted to American during its section 21 investigation. (See Exhibit 5).   American simply disregarded the Eisenberg letter and chose to continue with the pretextual conclusions it reached.  American has gone to great extent to villainize Patterson since diversions cost the company money at the possible forfeiture of the crew and passengers.  Plaintiff's professional judgment and response to abnormal situations was satisfactory in further examination to Federal Aviation Administration, as demonstrated on multiple evaluations, which call into question American's assertions to the contrary. (See Exhibit 18)

### *14. Disputed Facts*

American relishes the term "doctor shopping", when referring to pilots involved in the Section 20 process.  In fact, the same could be said about American where Dr. Kay received a number of complaints about Dr. Knippa from American pilots and this concerned Kay so much that he warned American there might be a problem with using Knippa. [ ECF 154-4 ] AA Medical

department was shuttered shortly after March 2016 due to the Western Medical Evaluators debacle. American has insisted all along another doctor's opinion doesn't matter to them. It is only their own hand-picked doctors who matter. American has continued to refer to an email to Glenn Caddy as evidence of doctor shopping. Bercaw provided the reason, it was about more money. The plaintiff had just shelled out over three thousand dollars in anticipation of litigation and Bercaw was demanding an additional money and had not even reviewed the results with the Plaintiff. Additionally, tossing this rotten egg that American had conjured up, on the FAA is not exactly how things operate in the real world. A doctor will provide a verifiable diagnosis and a pilot will either seek treatment from that doctor and then approach the FAA for clearance. In this case Bercaw/Fonseca had no diagnosis. As Kay has correctly determined, fatigue was the causal factor and the plaintiff should have been invited back for repeat testing in six weeks.

Plaintiff does recall seeing the email from Bercaw during the deposition. Here again, American only provides the court part of the story. That same email said no file attached as a simple reply. Neither American nor Bercaw have shown that the plaintiff received a copy. Plaintiff downloaded a copy of the report from Pacer which American had uploaded. Plaintiff also instructed Bercaw to forward a copy of the report to his attorney, William Amlong. Plaintiff was billed for receiving that report and Bercaw was remiss in sending a copy of the report to Amlong. Dr. Kay admitted in his deposition he had no information that Caddy, Amlong or the plaintiff had a copy of the report.

### *15. Dr. John Hastings, MD, Neurologist*

Dr. Hastings conducted a thorough Neurological Exam of Lt. Col Patterson on or about May 2016. Hastings is a prominent practicing neurosurgeon and neurology consultant for the FAA. Dr. Hastings findings were clear that given the Plaintiff's history and neuropsychological examination, there was no neurological disorder evident, finding him to be neurologically intact and whole. Nor did Dr. Hastings find any indication by way of either history, examination or his review of medical records which indicated a need for further neurological testing. In conclusion Dr. Hastings stated that "It is my professional medical opinion that Mr. Patterson poses no risk to aviation safety and that he is fit to fly from a neurological standpoint." (See Exhibit 19). Hastings also conducted a cognitive assessment measuring areas such as visuo-spatial, executive, naming,

memory, attention, language, abstraction, delayed recall and orientation functions and found no areas of concern regarding memory or judgment.

### 8. Dr. John Knippa, Ph.d

Although the Defendant would have this Court believe that Dr. John Knippa is a respected and knowledgeable clinician, in fact his opinions are subject to real and genuine concern based on his past documented conduct.  As an example of that concern, in the case of *Perry Bartels vs State Compensation Insurance Fund*, 1998 MTWCC 62; WCC No. 9705-7753 a Montana Workman's Compensation Judge, Mike McCarter opined:

- "47. Many of Dr. Knippa's observations and opinions are out of line with the observations and opinions of all other medical professionals, ... *I give no weight to Dr. Knippa's opinions."* (See Exhibit 20)

Interestingly, although Plaintiff made a formal request of his supervisor at American, Brian Beach, requesting the Defendant provide him with the required return to work procedure, American neither replied to this formal request nor did it offer the Plaintiff an opportunity to re-test with another impartial examiner.  Rather, in a transparent attempt to circumvent the precarious legal position it found itself in, American instead offered the Plaintiff an opportunity to return to work but only if he dropped all of his claims, including the USERRA claims currently before this Court.

In yet another indication of the biased nature of the testing of the Plaintiff undertaken by Dr. Knippa, Dr. Knippa failed to follow the clear procedures set forth in Dr.  Kay's textbook, Aviation Psychology, which recommends that an average of one day for each westward time zone crossed should be allowed in order for a pilot to acclimate and one- and one-half days going eastward should permit acclimation to sensitive testing. (See Exhibit 21)  Further, Dr. Kay advised that certain tests such as the TOVA, a test for ADHD, should not be administered after noon on the patient's home time zone. (See Exhibit 22).  Equally as interesting is that Dr. Knippa determined that the Plaintiff, who had successfully completed 24 years flight experience without incident and nearly 29 years in the military suddenly might have developed ADHD.  Contrary to Dr. Knippa's findings, Dr. Kay subsequently administered the Connors test for ADHD to the

Plaintiff in June, 2016 and again in Oct 2018 and found, not unsurprisingly, that Dr. Knippa had hypothesized incorrectly the plaintiff might have ADHD.  It is believed that the only logical explanation for this blatant misuse of testing protocols was a transparent attempt on the part of Dr. Knippa, who, in serving his client, American, was grabbing at straws to give client something they could use to defend against the Plaintiff's pending and potential USERRA claims.   Having never been subjected to such scrutiny, Patterson was informed by his union and other pilots that the AA Fit for Duty Examination was in fact a method for American terminating his employment when the Section 21 investigation had utterly failed.  American intentionally scheduled Lt. Col Patterson with Dr. John Knippa, to induce severe fatigue even though requested by Patterson to reschedule the exam to a location more suitable to Patterson's circadian clock.

- Dr. Gary Kay in his deposition clearly states that the time of reference used should be the evaluated pilot's time and not the doctor's time.

- Dr. Knippa advises that he gave all of the sensitive neurosych assessments in the morning, however Miami and California are hardly in the same time zone.

- Sending a pilot for a sensitive evaluation which is sensitive to fatigue is much different than that of flying an airplane for a living.

- Kay also states that he relayed the complaints he was receiving about Knippa to American Airlines which were a concern to him.

Relevant to the case at bar is the defendant's blatant disregard for the rights of 84 disabled pilots, who were not covered under a strict liability clause such as those found in USERRA, but none the less the conduct appears to indicate that American engaged in rampant systemic conduct,

wherein if failed to uphold is statuary obligations and violated its employees' rights under numerous Congressional Acts.[6][7]

### *11. American's Anti-Military Animus/ Poor Record of USERRA Compliance*

American has argued that it is a veteran friendly company; however, veterans who work for American are viewed as cost centers and USERRA compliance is given little attention. Several officers are currently litigating with American Airlines over USERRA issues in federal court. It seems from the Plaintiff's perspective that American would rather litigate than comply with the law.[8]  In *Woodall v. American Airlines, Inc.* 3:06-cv-0072 (N.D. Tex.) The case involves individuals who were either current or former pilots for American and is a class action lawsuit under 38 U.S.C. § 4301, et seq (USERRA). The complaint alleged American Airlines violated USERRA by discriminating against pilots who took military leaves of absence versus pilots who had not taken military leave. American agreed to a settlement and to comply with the provisions of USERRA but as in the instant case, such promises are often broken. American admitted in *Scanlan v American Airlines* (2:18-cv-04040) that it views USERRA compliance as a debatable option for strategic policy makers, rather than a law which requires strict adherence, which

---

[6] 84 disabled AA pilots whose disability benefits were terminated by American Airlines Medical Department's, *"Pilot Disability Nurse Case Management Cost Savings"* scheme; which used reports prepared by senior budget analysts using highly-structured actuarial calculations, to improperly deny and/or terminate rightful pilot disability benefits based on cost saving alone. This scheme was done in an effort to aide with grossly underfunded pilot Pension/Disability Plans, which annual SEC 10-K reports showed to be underfunded by as much as $3.2B. This scheme was further facilitated by American's Pension Benefits Administration Committee ("PBAC"), who hired a known to be fraudulent 3rd party pilot disability claims reviewer Western Medical Evaluators ("WME"). (UDC AZ. Case No. 2:17-cv-04059-SPL, Meadows' Reply, Doc. 18, SOF 68-107).

[7] American's PBAC hired WME, as its 3rd party disability claims reviewer, but it was not a clinical source as required by the pilots contract, Instead it was an administrative claims processor housed in an industrial warehouse, that was rife with fraud and procedural irregularities, its office manager was a convicted felon, its Corporate Medical Director had his medical license revoked for 10 years and suspended twice more thereafter (while working for American), it paid subcontract doctors 120% of normal exam fee to *"deny as many claims as possible"*, when doctors didn't falsify reports when asked, then WME simply fabricated reports and forged doctors' signatures. It was involved in a fraudulent double-billing scheme. (*Id.* SOF 68-111).

[8] Harwood III v. American Airlines, Inc., (1:2017cv00484)
Hoefert v. American Airlines Incorporated, (4:18-cv-00466-A)
SCANLAN *v.* AMERICAN AIRLINES GROUP, INC. (2:18-cv-04040)

indicates an unfortunate and reckless disregard for veterans' federally protected rights.. (See Exhibit 23).

Prior to oral arguments for summary judgement, American transmitted threatening/defamatory communications to Lt Col Patterson basically stating it intended even if the court demanded Patterson's reinstatement, American intended to terminate him. (See Exhibit 24)

Lt. Col Patterson respectfully requests leave of this court to add a separate count of unlawful reprisal under 38 USC § 4311, et seq and requests the court to use its equity powers under 38 USC §4323(e) to compel American to cease this unlawful behavior. Withdrawal of the notice will not suffice, the letters indicate an unfortunate and reckless disregard for veterans' federally protected rights. Plaintiff believes that such behavior will not stop until a court compels American to strictly comply with the law.

In another case demonstrating the nature of American's conduct, Plaintiff was also made aware of the case of Captain Brian Ostrom, a pilot that American also sent to an irregular Section 20 physical exam, an exam that was fraught with error. Ostrom later sued American over the section 20 irregularities and apparently settled, as the case did not go to trial. Ostrom is currently flying for American Airlines as a captain. Dr Jeral Ahtone was questioned about a letter he sent to the Federal Air Surgeon, regarding the psychological status of Ostrom after American had agreed to settle with him and cleared him to resume flying. Dr. Ahtone states he never examined

### 21. Dr Gary G. Kay, Ph.d

Dr Kay evaluated Lt. Col Patterson twice at his Washington, D.C office. Kay unlike Knippa, ensured that fatigue was not a factor in both of his examinations. Plaintiff does not recall and there is no intake form for Kay in the record, as is common with other professionals. In fact, Dr Kay quotes in his latest report that the CMS findings were not considered to be clinically significant and were attributed to possibly having resulted from the Airman's fatigue. Dr. Bercaw concluded there was nothing to indicate the presence of a disqualifying mental condition. An honest evaluator would notify the person being evaluated of the need for adequate rest prior to testing. Dr Kay contradicts his own testimony later at his deposition by quoting the

Bercaw/Fonseca report saying, ***these findings were not considered to be clinically significant*** and were attributed to possibly having resulted from the airman's fatigue.

- Dr Kay reports that Lt. Col Patterson was referred by Dr. Caddy for follow-up neuropsychological assessment and is presently employed by a cargo carrier. (B767 Captain actively flying the same aircraft he flew for American). Kay was aware that Patterson's legal case was unresolved.

- Kay further reports that Patterson was on time, fully alert and cooperative. There were no clinical signs of problems with attention and concentration.

- Kay found that Cogscreen measures of speed were in 47.5 percentile. Well within the norm for airline pilots his age. Accuracy was in the 62.5 percentile compared to pilots his age.[9] Patterson performed well on measures of psychomotor coordination, processing speed, working memory, deductive reasoning, memory and tracking. Patterson was unlikely to have acquired cerebral dysfunction. In other words, confirming the Bercaw/Fonseca report as well as the Knippa report.

- The Connors Continuous Performance Test-II suggests against the likelihood of a clinically significant problem with vigilance or attention. The California Verbal (measures learning and long-term recall). Patterson was able to recall 8 of the list words on the first attempt. Later 14 of the items. Both scores fell in the mid-range. After a 20-minute delay, he recalled 15 of the 16 list words and was 1 standard deviation above the norm.

- NAB Mazes test, 92nd Percentile.

- D-KEFS Tower Test, 90th Percentile.

- D-KEFS Proverbs responded to 7/8 multiple choice items thereby demonstrating reasonably good recognition of verbal abstractions.

- The follow-up assessment provides reassuring information regarding Mr. Patterson's neurocognitive functioning. Performance on Cog screen measures of response speed are largely consistent with the favorable results in 2016. Additional testing of vigilance, memory and executive functions show intact neuropsychological functioning. Mr. Patterson performed at or above average on measures of verbal learning and memory. Mr. Patterson would be considered to have no aeromedically significant deficits, the same statement that Kay made when referring to the Bercaw/Fonseca report from 2016.

---

[9] As airline pilots age, judgment and experience increase. The FAA encourages pilots to follow established processes such as a checklist in all circumstances. Accuracy is more important than speed, flipping the wrong switch can prove deadly.

- " <u>Fatigue</u> was more likely in the case of Lt. Col Patterson than acquired brain dysfunction." ( See Exhibit 25)

## *22. Conclusion*

American focuses much of its argument on the Bercaw/Fonseca report giving little press to the May 6, 2016 letter, which expounds favorably for the Plaintiff.  Bercaw attributed the findings to fatigue and according to Kay they were not aeromedically significant. Kay attributed Knippa's findings to fatigue. Kay relented that Lt. Col Patterson did not have a disqualifying mental condition in Mar 2016 and doesn't have one now, there were no causal factors of acquired brain dysfunction existing then, as there are none today, therefore there is no sound medical basis to draw any conclusions that something might be wrong with the Plaintiff. Patterson holds a medical and is currently a captain on the Boeing 767. The FAA promulgated 14 CFR Part 117 to mandate Flight and Duty Limitations and Rest Requirements for flight-crew members.  The Plaintiff, under threat of termination, travelled to California and was not afforded the same protections against declaring fatigued.  The reports of Knippa and Bercaw/Fonseca are immaterial in the concept of what the Defendant is seeking to accomplish.  Fatigue is not a mental illness and there is nothing wrong with being tired. Humans spend at least 2,900 hours per year being tired. Being fatigued on any one particular or set of days will not result in the denial or revocation of an airman certificate. As previously stated, the Federal Air Surgeon and NTSB retain strict authority over airman issues to include airman medicals.   Had American given the plaintiff due process not changed the plaintiff's status while absent for military service, American would have never faced a violation of USERRA or had to conjure up a plethora of excuses as a pretext for doing so. The plaintiff was unaware of Kay's prohibition on retesting within 6 weeks, Kantor and Bercaw were aware and admitted this negligence. The FAA will reject test results within 11 days for one applicant, then it will do that for all and this court should also reject Americans desire to use those same results and preclude American from any future use.   There is everything wrong with presenting irrelevant information to the court and droning on about its relevance when in the facts don't support the assertions, generally good doesn't equate to performed miserably. "Not aeromedically" significant is Kay speak for nothing to see here move along. Based on the above, it is requested that this Court deny the Defendant's motion in its entirety, as there is no evidence of fraud or hiding of evidence on the part of the Plaintiff and that this Court is respectfully requested to grant the Plaintiff relief as sought.

Signed and dated this 24th day of May, 2019

_____

Rodney S. Patterson, Lt. Col, Pro Se
1092 NW 139th Terrace
Pembroke Pines, Florida 33028
(704) 231-0909

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on 24th day of May, 2019, I filed the foregoing with the Clerk of the Court.  I also certify that the foregoing document is being served this day on counsel of record for Defendant, American Airlines listed below.

_____

Rodney S. Patterson, Lt. Col, Pro Se
1092 NW 139th Terrace
Pembroke Pines, Florida 33028
(704) 231-0909

## SERVICE LIST

*Via* US Mail

Michael A. Holt
mholt@fisherphillips.com
Florida Bar No.: 91156
**FISHER & PHILLIPS LLP**
450 East Las Olas Boulevard
Suite 800
Fort Lauderdale, Florida 33301
Telephone: (954) 847-4709

Mark W. Robertson (*Pro Hac Vice*)
mrobertson@omm.com
**O'MELVENY & MYERS LLP**
Time Square Tower, 7 Times Square
New York, New York 10036
Telephone: (212) 326-2000

Tristan Morales (*Pro Hac Vice*)
tmorales@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, DC 20006
Telephone: (202) 383-5300

*Attorneys for American Airlines, Inc.*