# EXHIBIT 1

# EXHIBIT 2



<u>VIA FEDERAL EXPRESS</u>

April 2, 2015

James R. Fraser, M.D., Federal Air Surgeon
U.S. Department of Transportation
Office of Aerospace Medicine
Federal Aviation Administration
800 Independence Ave., S.W.
Washington, D.C.  20591
1-866-835-5322

Re:     Brian Scott Ostrom
        PI #:     2226244
        APP ID#:1999311441

Dear Dr. Fraser,

I am the Corporate Medical Director for American Airlines (AME #1319) and writing with respect to Captain Brian Scott Ostrom.

I recently received Captain Ostrom's Blue Ribbon Medical File (FOIA# 2015-004081CA) and have reviewed it, on behalf of American Airlines, in connection with the March 9, 2015, issuance of a First Class Medical Certificate to him.  In reviewing the file, I have some observations that I would like to respectfully submit for your review and consideration:

- As noted by Dr. Charles Chesanow in his memorandum to Nicholas Lomangino, M.D., dated November 7, 2014, there is disagreement between the conclusions of Dr. Anna Scherzer and other clinicians on Captain Ostrom's diagnosis.

- In March 2011, Dr. Scherzer conducted an Independent Psychiatric Evaluation and rendered the opinion that Captain Ostrom exhibits psychiatric signs and symptoms that potentially interfere with his ability to safely fulfill the functions of a commercial airline pilot and FFDO.  Further, her opinion is that Captain Ostrom's 2010 lethal use of a firearm, combined with his lack of psychological insight and diagnosis of Acute Trauma Reaction increase the risk of Captain Ostrom responding to ambivalent or threatening circumstances with the use of deadly force, placing him at an increased risk for an untoward event while functioning in a safety sensitive position.

- More recent medical opinions in the file disagree with Dr. Scherzer's conclusions. These more recent opinions indicate that Captain Ostrom has made significant progress while away from his job at American Airlines.

Occupational Health Services
4255 Amon Carter Blvd. MD 4100
Fort Worth, TX 76155
817 963 1200 Office
817 963 6378 Fax



Despite the generally favorable recent opinions,  a letter dated February 7, 2014 by Charles Green, Ph.D. states ,  "Caution: It is my professional opinion that should this "Limbo" state continue, Captain Ostrom's emotional state will predictably  deteriorate rapidly."  (Emphasis is in the original). As noted in the July 9, 2014 memorandum from Dr. Chesanow to Roger Bisson, this statement "appears to confirm Captain Ostrom's disability status." Dr. Green's statement combined with his opinion that  Captain Ostrom's difficulties were caused by an "occupational problem,"  (4/15/14 report) and  Susan L. Simmons' (M.S.) conclusion (December 8, 2011) that Captain Ostrom never suffered from PTSD, but that "his frustration, anxiety, and stress were all related to issues involving American Airlines' management staff,"  raise the concern of how Ostrom's  "occupational problem" with American Airlines might affect, if at all, Captain Ostrom's ability to perform his duties safely upon return to the work environment at American Airlines.

I'm raising these issues only to ensure that I have done what I reasonably can to ensure the safety of our passengers, employees, and Captain Ostrom himself. Obviously, American Airlines will rely upon and defer to the judgment of the FAA in this matter.

I understand that the FAA has 60 days from the time of issuance to review or modify medical certificates and/or to request additional information.  To the extent there are any such modifications or requests for information, please let me know.  If I do not receive such notice from you within the prescribed time period, by May 9, 2015, I will proceed with our process to return Captain Ostrom to active duty status.

Thank you in advance for your attention to this matter, and feel free to contact me if you have any questions.


Sincerely,

Jeral Ahtone, M.D.
Corporate Medical Director
Occupational Health Services
American Airlines




cc:      Captain Brian Ostrom

# **EXHIBIT 3**

# Comprehensive MedPsych Systems, Inc.



Geoffrey Kanter, Ph.D., ABN, ABPdN
*President*
American Board of Professional Neuropsychology
American Board of Pediatric Neuropsychology

Scott Kanter, MSA
*Chief Financial Officer*

Robert Stephenson, Psy.D.
*Chief Operating Officer*

Kathy Baum, Ph.D
*Clinical Director*

**FLORIDA- Sarasota**
*NEUROPSYCHOLOGY*

Nancy Parsons, Ph.D., ABPdN
American Board of Pediatric Neuropsychology
Paula Cooper, Ph.D., ABN
American Board of Professional Neuropsychology
Edwin L. Bercaw, Ph.D.
Kathy Baum, Ph.D.
Maryla Madura, Ph.D.
Jennifer Fleeman, Psy.D.
Hollie Dean Hill, Psy.D.
Nathaly Fonseca, Psy.D., Resident

*PSYCHIATRY* *(Board Certified)*

Diane Miller, M.D., ABPN
Steven Cohen, D.O., ABPN
Abdul Nadeem, M.D., ABPN
Kristine Vallrugo, M.D., ABPN
Jordana Hollen, M.D., ABPN
Mark Sylvester, M.D., ABPN, ABAM
Nicholas McKinnon, M.D.,ABPN

*PSYCHOLOGY*

Wendy Sims, Ph.D.
Claudia Zsigmond, Psy.D.
Linda Brant, Ph.D.
Patricia Ryan, Ph.D.

*PSYCHOTHERAPY*

Raymond Roitman, D.Psa, LCSW
Janet Carlson, LCSW
Kenton Kauffman, LCSW
Catherine Luckner, LMHC
Gerald Rivera, LCSW
Marlene Larose, LMFT
Jennifer Barmash, LCSW
Patricia Musselwhite-Weaver, LMHC
Alan Vieira, LCSW
Doug Linder, LMHC, CAP

**Florida**
Sarasota
Venice
Lakewood Ranch
Bradenton
North Port
Sun City Center
Port Charlotte
Tampa
St. Petersburg
St. Augustine
Ft. Myers

**Alabama**
Mobile
Fairhope

**Indiana**
Indianapolis

May 6, 2016

Glenn Ross Caddy Ph.. .., A.B.P.P., F.A.P.A.
Clinical, Health and Forensic Psychology
100 S.E. Third Avenue, Suite 2010
Fort Lauderdale, 33394

Dr. Caddy,

I am writing to provide further clarification based on the evaluation that Dr. Fonseca and I performed of Rodney Scott Patterson on 3/21/16. As was discussed in our telephone consultation this morning, I found no certain evidence of a disqualifying mental or neurological condition for first-class medical certification as defined by Federal Aviation Regulations Part 67.107 and 67.109. To the best of my knowledge, he has no history of flight infractions or safety violations. He has years of experience and, indeed, may be an excellent pilot, as you seem to have confirmed through collateral reports on his performance. Finally, there was no substantiated history I had available to indicate he has a personality disorder that has repeatedly manifested itself by overt acts.

The neuropsychological testing is not intended to assess piloting skills, abilities, or knowledge. The purpose of neuropsychological testing is to help determine the appropriateness of medical certification by examining underlying cognitive abilities and psychological features that may impact flight safety. This is a different kind of information than that achieved through job performance evaluations or flight simulator performance.

The findings in our evaluation were generally positive, with a passing CogScreen (which is a validated battery of tests specifically designed to evaluate cognitive functioning in pilots). He also exhibited high average intellectual functioning, and his attention, processing speed, language,

visual-spatial, visual memory, and motor scores were generally consistent with expectations. However, there were two particular areas of concern that do not necessarily disqualify him but warrant further review and possibly retesting. Specifically, his verbal learning and memory was below expectations and there was an indication of impairment in an aspect of executive functioning. The aeromedical significance of these findings was uncertain in the context of the larger evaluation and his professional and military history. Therefore, the recommendation is that there be further review by an FAA neuropsychology consultant and a comparison with his concurrent fitness-for-duty evaluation ordered by American Airlines to help determine the reliability of these results. Repeat testing of specific domains may be required, if indicated after review.

Again, it would be inappropriately speculative to infer a cause for the findings at this time, as there is no known psychiatric or neurological condition identified as of now.

Best Regards,

*Ed Bercaw, Ph.D.*

_____

Edwin L. Bercaw, Ph.D.
Neuropsychologist/Florida Licensed Psychologist PY 7991
CogScreen Provider & HIMS Trained

2

# EXHIBIT 4

# EXHIBIT 5



# PSYCHOLOGICAL BASELINE

April, 2000 Cogscreen AE
American Airlines Newhire

OCT, 2015
U.S. Army Physical
Pre-Deployment

March, 2016
Dr Knippa
AA

July, 2016
Dr. Joseph R. Tordella
Aviation Medical Examiner

October, 2018
Dr Gary Kay
Psychologist

Spring, 2004
FFDO
Psychological Screening

July, 2014
ANAM
Dept of Defense

March, 2016
Comprehensive Med Psych

June, 2016
Dr. Gary Kay
Psychologist

Fall, 2006
Top Secret Clearance/SCI
Issuance

Fall, 2006
Top Secret Clearance/SCI
Issuance

March, 2016
Dr. Ibrahim Abi-Rafeh
Cognitive

May, 2016
Dr. John Hastings
Neurologist

# EXHIBIT 6

## Unsworn Declaration of Dr. Ibrahim Abi-Rafeh, MD, Pursuant to 28 U.S.C. § 1746

Dr. Ibrahim Abi-Rafeh deposes and says:

1.    I make this declaration of my own personal knowledge.

2.    I am board certified by the American Board of Neurology and Psychiatry in Psychiatry and Geriatric Psychiatry, practicing in Broward County, Florida.

   a. I have over 25 years experience with mental health, neuropsychiatric and cognitive disorders.
   b. I conduct psychiatric evaluations on a regular basis.
   c. I am a certificated pilot by the Federal Aviation Administration with advanced ratings.
   d. I hold a current Airman Medical Certificate issued by the FAA, and am familiar with the requirements for the issuance of a certificate.

3.    I have personally known Lt. Col. Scott Patterson for approximately 13 years and have flown with him in the context of the Civil Air Patrol/Air Force Auxiliary volunteer work as a mission pilot in search and rescue missions.  Patterson was a check pilot and mission check pilot and conducted mission pilot training and examinations.

4.    Patterson is an experienced and  well-respected pilot and flight instructor, whom other pilots sought for advice and counsel.

5.    I reviewed a copy of the complaint filed by  Captain Glenn Whitehouse dated September 24, 2015. It was addressed to Captain Brian Beach, Chief Pilot, MIA

6.    I reviewed a copy of the "Fitness for duty Medical Examination Request" made by Captain Brian Beach, Chief Pilot, MIA on January 14 2016 regarding "Patterson's judgment, and specifically, his mental and/or emotional stability". The request was made in response to allegations of

1

"atypical interactions with coworkers and reports that suggest a pattern of false/self-aggrandizing statements". Patterson was removed from active duty and place on paid withhold status on September 24, 2015.

7.    I reviewed a copy of Patterson's FAA Medical Certificate First Class with no limitations, completed by Dr. Joseph Tordella on January 29, 2016. Dr. Tordella is a retired Air Force and TWA pilot. Dr. Tordella is an FAA Senior Aviation Medical Examiner with over 30 years of experience and a certified Medical Review Officer registered with the US Coast Guard. He certified that Patterson was fit to fly as per his First Class Medical Certificate.

8.    In March, 2016 I received the March 21st report of Neuropsychological examination by Dr. John Knippa, Ph.D. on Rodney Scott Patterson.

         a. It was peculiar to require Patterson to travel to California for the Neuropsychological examination, when several are available in the South Florida area and on the East Coast (see exhibit A).  He had to fly nearly 2,700 miles across three time zones away to take cognitively sensitive testing. It is well known that Travelers usually experience symptoms after air travel across at least two time zones. Symptoms may include disturbed sleep, daytime fatigue, decreased ability to perform mental and physical tasks, reduced alertness, and headaches (·  ·  :s:/  www.ncbi.nlm.nih.gov/pmc/articles/PMC3086113).(see exhibit B) This likely affected his performance on the cognitive testing.

         b. As part of the psychological testing, Dr. Knippa conducted an MMPI-2 and a PAI.  He stated in his report that the basic profile was entirely within normal limits.  there was no endorsement identified of significance to clinical concern for mood, anxiety, impulsiveness or problematic behavior. A personality disorder was not identified with the limited data available at that time.

         c. As far as cognitive skills assessment, Dr. Knippa stated that

the data are consistent with an attention deficit disorder with mild impaired range performance on multiple measures of complex speeded problem solving with novel information. The overall profile of neuropsychological assessment was discrepant from that expected for Major Airline pilots of similar age. However, in the section titled  Areas of Performance Concern, "No Technical Lapses of Performance were known to have been alleged".

     d. The evaluation was done the morning after a flight across three time zones, which did affect his performance on the cognitive tests, in addition to his stress about being removed from active duty. The time zone change meant that when the evaluation was started in the morning Pacific Time, it was early afternoon Eastern Time, which affects the circadian rhythm.

     e. In my opinion those findings do not correlate with his real life performance as a pilot, as there have not been any complaints about his flying skills during multiple flights and recurrent flight checks. The reason for the referral was to assess his mental and/or emotional stability and not his cognitive abilities, which there were no known issues with. In my opinion, there was no sound medical basis that he suffered from a disqualifying medical condition. In addition, Dr. Knippa has no authority to make that determination since he is not an FAA designated or trained medical examiner.

     f. I reviewed the Neuropsychological Evaluation conducted by Dr. Bercaw and Post-Doctoral Neuropsychology Resident Dr. Fonseca on March 21, 2016. It was done in Florida only a few days after Dr. Knippa's evaluation in California.  Again he traveled across three time zones and his performance on the cognitive testing may have been affected by fatigue as noted by the examiner. Patterson was still experiencing sleep disturbance due to jet lag and stress at the time which may take weeks to resolve.

     g. Patterson was fully qualified to hold a First Class FAA Airman Medical Certificate as certified by Dr. Tordella in January and July of 2016,

3

and he posed no risk to aviation safety. He returned to flying including Beech Jet and Boeing 767 as a Captain after successfully completing the required training and FAA flight check. That disproves Dr. Knippa's determination that he was not fit for duty on the basis of impaired performance on cognitive assessment.

     9.   To my knowledge and as per his medical record, he has no history of Traumatic Brain Injury, HIV, Alcoholism, Substance Abuse, Chemotherapy, Radiation or Cerebrovascular Accident. He held a Top Secret clearance in the military and was the subject of multiple psychological screenings throughout his career and in order to become a Federal Flight Deck Officer, affirming no history of psychological problems then or now.

     a. Patterson reported that his employer had investigated a complaint filed by a senior co-worker and determined the allegations were unfounded.

     b. Anyone facing termination of employment and subsequent loss of their income would experience stress, which would impact other life functions, such as trouble sleeping and difficulty concentrating. Grounding is degrading to pilot's self-esteem and also increases anxiety levels for the pilot.

     c. His employer required him under "threat of termination", to fly across country and be subject to a full battery of psychological testing, which certainly increased his anxiety level and affected his ability to sleep.

     d. Based upon his departure time from Florida and arrival time in California, he was not given an adequate amount of rest to allow him to acclimate before testing.

     10.  I attributed the low scores on the cognitive testing to stress and fatigue due to jet lag and lack of sleep, and not an underlying medical or neuropsychological issue which would disqualify him from holding an Airman Medical Certificate.

     11.  Mr. Patterson did not require medical intervention or psychological care. In my opinion he was medically and psychologically

intact.

12.   I have reviewed the reports written subsequent to Dr. Knippa's evaluation.  I concur with the neurological findings of John Hastings, MD, who conducted an Independent Aeromedical Neurological Evaluation on May 28, 2016 and concluded that Patterson was Neurologically intact and poses no risk to aviation safety.  I concur with the June 29, 2016 report written by Dr. Gary G. Kay, Ph.D. who concluded that "Mr. Patterson appears to be psychologically and neuropsychologically fit-for-duty as and American Airlines Pilot. There is no evidence of aeromedically significant neurocognitive deficit". He concurred that poor performance vigilance testing when evaluated by Dr. Knippa was likely due to jet-lag related fatigue, on follow up testing he performed well on this measure.

13.   Mr. Patterson sought my advice in 2016 as he felt he was being railroaded out of his job on a contrived medical issue. I was aware of the pending legal matter with his employer regarding military service.

14.   I reviewed Dr. Kay's neuropsychological testing done on October 10, 2018.  In summary, "He performed well on neuropsychological screening. CogScreen results suggest against the likelihood of acquired cerebral Dysfunction". "Aviation factor scores, validated predictors of flight performance, were all in the expected range. Additional testing of vigilance, memory, and executive functions also show intact neurocognitive functioning. Mr. Patterson performed at or above average compared to pilot norms on measures of verbal learning and memory. Performance on three measures of executive functioning demonstrate intact planning, abstract reasoning, impulse control, and novel problem solving ability".

15.   As a psychiatrist, I did not find a reason for him to seek mental health treatment, and I did not find any evidence that he would pose any risk to aviation safety. The fact that he completed his military service and retired as a Lieutenant Colonel in the army,  and returned to flying as a

Boeing 767 Captain is a testament to the lack of any cognitive deficit or psychological issues that would make him not fit for duty.

I declare under penalty of perjury that the foregoing is true and correct.  Executed at Cooper City, Florida, on April 10, 2019.

_____
Ibrahim Abi-Rafeh, MD

EXHIBIT A

# FAA HIMS NEUROPSYCHOLOGISTS

(Updated 04-12-2019)

| STATE | CITY | PRACTITIONER |
|-------|------|--------------|
| AK | Anchorage | CRAIG |
| AL | Birmingham | AZRIN |
| AL | Mobile | OGDEN |
| AR | Little Rock | FOWLER |
| AZ | Scottsdale | O'BRIEN |
| CA | Aptos | ALLOY |
| CA | Carlsbad | BASER |
| CA | Long Beach | KNIPPA |
| CA | Los Angeles | ELLIOTT |
| CA | Los Angeles | YOU |
| CA | Los Gatos | DRAG |
| CA | Los Gatos | YUTSIS |
| CA | Oceanside | BAILIE |
| CA | Pleasant Hill | IONASCU |
| CA | San Francisco | WATERWORTH |
| CA | San Diego | HAMILTON |
| CA | San Diego | SILVA |
| CO | Boulder | MANN |
| CO | Broomfield | DENISON |
| CO | Colorado Springs | RIPPETH |
| CO | Denver | GANT |
| CO | Denver | GINSBURG |
| CO | Denver | LAFOSSE |
| CO | Wheat Ridge | MIRICH |
| DC | Washington, DC | KAY |
| DE | Lewes | MAPOU |
| DE | Wilmington | KEAVENEY |
| FL | Brandon | BERCAW |
| FL | Davie | DEIDAN |
| FL | Ft. Lauderdale Palm Harbor Riverview | PECORARO |
| FL | Jacksonville | OVSON |
| FL | Orlando | PORGES |
| FL | Ormond Beach | VOIGHT |
| FL | Palm Beach Gardens | LEVINE |
| FL | Pensacola | HOLLIMON |
| FL | Sarasota | BAUM |
| FL | Sarasota | KANTER |
| FL | Tampa | DSURNEY |
| GA | Atlanta | KING |
| GA | College Park | PREWETT |

| STATE | CITY | PRACTITIONER |
|-------|------|--------------|
| GA | Decatur | SHWARTZ |
| GA | Lawrenceville | LACY |
| ID | Boise | GAGE |
| IL | Northbrook | YOUNG |
| IL | Oak Park | HILL |
| IL | Skokie | BARRAS |
| IN | Fort Wayne | LUTZ |
| IN | Indianapolis | BUBP |
| KS | Manhattan | DURRETT |
| KS | Overland Park | ISAACSON |
| LA | New Orleans | CHAFETZ |
| LA | New Orleans | PEDERSEN |
| MA | Boston | KERVICK |
| MA | Boston Newton | SCHOENFIELD |
| MA | Brookline | STONE |
| MD | Chevy Chase | MAPOU |
| MI | Ann Arbor | MILANOVICH |
| MN | Golden Valley | ODLAND |
| MN | Rochester | TRENERRY |
| NC | Wilmington | BERG |
| NE | Omaha | GARLINGHOUSE |
| NJ | Parsippany | DASILVA |
| NY | Albany | LITCHFORD |
| OH | Beachwood | SERNA |
| OH | Westerville | BEASON-HAZEN |
| OK | Tulsa | PELLA |
| OR | Bend | SCHOCK |
| OR | Portland | BRYAN |
| PA | Exton | KEAVENEY |
| PA | Malvern | GUAY |
| PA | Pittsburgh | BECKER |
| SC | Columbia | BERG |
| TN | Memphis | ATKINS |
| TN | Nashville | WALKER |
| TN | Nashville | KENNEDY |
| TX | Houston | LARGEN |
| TX | Lewisville | JOHNSON |
| TX | San Antonio and Houston | GLYWASKY |
| VA | Fairfax | KANE |
| VA | Richmond | DUKARM |
| WA | Seattle | ASGARIAN |
| WA | Seattle | BREEN |
| WA | Spokane | GUZZARDO |
| WI | Brookfield | KENNEDY |
| WI | West Allis | GLASSMAN |
| WY | Laramie | DENISON |

**EXHIBIT B**

# Jet Lag
## Current and Potential Therapies

**Mary Choy, PharmD; and Rebecca L. Salbu, PharmD, CGP**

**Key words:** jet lag, melatonin, ramelteon, armodafinil

## INTRODUCTION

Jet lag, also known as circadian desynchrony, is a sleep disorder in which there is a mismatch with the body's natural circadian rhythm and the external environment as a result of rapid travel across multiple time zones. This common problem affects all age groups but may have more pronounced effects on the elderly, whose recovery rate is more prolonged than that in young adults.[1]

A multitude of factors, such as the number of time zones crossed and the direction and timing of flights, play a role in the severity of symptoms experienced by travelers. Individual variability accounts for the ability to adapt to a new time zone and the duration of the symptomatic period. Travelers usually experience symptoms after air travel across at least two time zones. Symptoms may include disturbed sleep, daytime fatigue, decreased ability to perform mental and physical tasks, reduced alertness, and headaches. Sleep disturbances typically last for a few days, but they can persist for as long as one week if the change in time zones is greater than eight hours. Eastward travel is associated with a longer duration of jet lag than westward travel. Although frequent desynchrony is a transient disorder, it carries the potential to lead to long-term consequences, as evidenced by epidemiological and animal studies.[2,3] Sequelae have included cognitive deficits, gastrointestinal (GI) disturbances, and an increased risk of cancer, infertility, and heart disease. As the body's internal circadian "clock" adapts to the new time zone, jet lag diminishes.

Strategies to minimize the effects of jet lag include adjusting the sleep schedule according to the new location during the days preceding the trip. This approach may be helpful for travel that lasts for more than a week, but it does not appear useful for short-term trips. Both alcohol and caffeine can adversely affect quality of sleep when they are consumed a few hours before bedtime; caffeine intake should be planned to enhance daytime alertness. When passengers are traveling, they are advised to avoid alcohol, especially while they are being treated for jet lag.

Treatment may include non-pharmacological therapy alone or non-pharmacological therapy combined with nutraceuticals or pharmacological therapy. A non-pharmacological approach, including adequate exercise, hydration, and appropriate timing of exposure to bright light, can aid in the adjustment to a new time zone. Nutraceuticals and pharmacological therapies include melatonin, melatonin receptor analogues (agonists), non-benzodiazepine hypnotic agents, caffeine, diphenhydramine (e.g., Benadryl, McNeil; Aler-Dryl, Reese), and armodafinil (Nuvigil, Cephalon).

A review of treatments and potential strategies follows.

## ROLE OF THE INTERNAL CIRCADIAN CLOCK

To appreciate the factors associated with jet lag, it is helpful to understand the basic properties of the body's internal clock. Our sleep–wake cycle is thought to be inherently determined, and the explanation for one's reactions to light and darkness lies with the suprachiasmatic nucleus (SCN). The central circadian clock is located in the SCN of the hypothalamus, where light signals from the retina are received. The SCN is responsible for adapting the circadian rhythm according to the light–dark cycles of the environment and for generating neuronal and hormonal activities that regulate various body functions in a 24-hour cycle.

The role of melatonin-mediated responses has been studied extensively in hopes of designing a novel therapeutic agent for circadian desynchrony. Some of the effects of activated melatonin type-2 receptors are phase-shift circadian rhythms of neuronal firing in the SCN, inhibiting dopamine release in the retina, inducing vasodilation and inhibition of leukocyte rolling (slowdown) in arterial beds, and enhancing immune responses.[4] It is hypothesized that neuronal clocks within the SCN form a heterogeneous network, wherein a majority of the neurons require periodic synchronization signals to be rhythmic and a small number of neurons or a low connectivity result in desynchrony.[5]

*Zeitgebers* (time-givers, or synchronizers) are rhythmic cues in the environment that synchronize the internal body clock to the earth's 24-hour light–dark cycle. Light is the strongest *Zeitgeber*; other non-photic *Zeitgebers* include temperature, social interaction, pharmacological manipulation, exercise, and meal timing.[6]

Blind people with no perception of light frequently show free-running endocrine, metabolic, behavioral, and sleep–wake cycles for their entire lifetime unless a synchronizing treatment is applied and is effective.[7] It is easiest to initiate sleep when the body temperature is at its lowest, coupled with an increase in melatonin secretion. When the body clock is inappropriately phased, sleep is difficult to initiate and maintain.

## PREVENTION AND MANAGEMENT OF JET LAG

The goal of prevention and treatment is to achieve circadian realignment in the most rapid and efficient way possible while minimizing the symptoms of jet lag. The treatment plan de-

*Dr. Choy is Assistant Professor at Touro College of Pharmacy and a Clinical Pharmacist at Metropolitan Hospital in New York, N.Y. Dr. Salbu is Assistant Professor at Touro College of Pharmacy in New York, N.Y., and an Internal Medicine Pharmacy Preceptor at North Central Bronx Hospital in Bronx, N.Y.*

*Accepted for publication January 18, 2011.*

**Disclosure:** The authors report no commercial or financial relationships in regard to this article.

# Jet Lag: Current and Potential Therapies

pends on the length of stay in the new time zone. Business travelers, pilots, and flight attendants may experience frequent shifts to changing time zones, and it may be practical for them to remain on their home-based schedule.

Table 1 highlights various agents used for jet lag (page 224).

## Light Therapy

Sunlight has a major influence on the internal circadian clock. Traveling across several time zones necessitates resetting and adjusting to a new daylight schedule. Natural light exposure is the ideal mechanism for counteracting jet lag. For those who travel frequently and are unable to have exposure to natural sunlight, light therapy may be a viable option. Light synchronizes the body clock by exposing the eyes to an artificial bright light that simulates sunlight for brief periods at planned times during the day. Various modalities include a light box, a lamp, and a light visor.

## Melatonin

In the human body, sleep is initiated during a rise in the concentration of melatonin (N-acetyl-5-methyoxytriptamine) and during the declining phase of body temperature.[8] Synthesized from serotonin in the pineal gland, melatonin helps to shift human circadian rhythms.[9] An increase in melatonin alerts the body that "biological night" is starting, whereas a decline in melatonin alerts the human body that biological night is ending.

Administering exogenous melatonin in the conventional afternoon to evening hours of a 24-hour day promotes a phase shift (an advance) in circadian rhythm, thus promoting sleep. When taken in the early morning, exogenous melatonin promotes a phase delay.[10] This promotion of a phase shift and sleep induction by administering melatonin in the afternoon and evening hours can be used to alleviate symptoms of jet lag. Correlating the administration of melatonin with the new time zone may help travelers overcome symptoms.

Melatonin's utility in the management of jet lag has been the subject of many studies.[8,10,11–22] When making travel plans, particularly over a distance of five or more time zones, travelers should take melatonin on the day of travel at the projected nighttime hour in the new time zone and on subsequent days in the new time zone. In the case of flights that cross seven to eight time zones, it may be beneficial to initiate melatonin one to three days before the intended day of travel in order to better acclimate the traveler to the new time zone.

Arendt et al.[22] conducted the first double-blind, placebo-controlled trial of melatonin in jet lag. The phase-shifting ability of melatonin was evaluated in 17 patients taking an eight-hour eastbound transmeridian flight. Travelers who were randomly assigned to the melatonin group (n = 8) were instructed to take 5 mg/day starting three days before the scheduled flight in the early evening (at 6 P.M.) and for four days postflight at the bedtime hour of the new local time zone (from 10 P.M. to midnight). Subjects receiving melatonin experienced significantly fewer severe symptoms (P = 0.009) based on subjective measures, including jet lag ratings, self-recorded sleep parameters, and mood ratings. Melatonin participants also adjusted more rapidly in objective measures, such as assessments of endogenous melatonin levels and cortisol rhythms.

## Melatonin Plus Light Therapy

Combining melatonin and light therapy at appropriate times can mitigate the symptoms of jet lag. The timing of light or melatonin administration should be tailored to the individual's body clock at the time of departure to gradually shift the body clock to that of the new time zone.[9] For example, with a three- to six-hour hour eastward time zone change, such as from New York City to Paris, France, travelers should receive bright light on the day before and on the day of departure in order to advance (shift) rhythms. They should avoid evening light exposure, which delays circadian rhythms.

Melatonin should be administered in the mid-afternoon of the departure city (at approximately 3 P.M.) to mimic an approximate bedtime in the destination city (at approximately 9 P.M.). On the day of arrival, travelers should avoid evening light and should take melatonin at the new bedtime in the destination city. Circadian rhythms should advance by one to two hours each day with time zone changes, and melatonin can be taken one to two hours earlier each day until the traveler has adjusted.[9]

A phase delay may be easier if the time zone change is close to 12 hours. In this case, the traveler would want evening light exposure, avoiding daytime light exposure and taking melatonin in the morning to promote a phase delay.

In terms of improving symptoms of jet lag, little to no difference has been shown with various doses of melatonin ranging from 0.5 mg to 5 mg.[23]

Common adverse effects of melatonin have included daytime sleepiness, dizziness, headache, and loss of appetite. It is unclear whether these side effects are a result of the melatonin or the symptoms of jet lag itself.[23] Travelers are also at an increased risk of experiencing hypnotic effects of melatonin at higher doses; as a result, lower doses are preferred for inducing phase shifts without side effects.

## Melatonin Receptor Analogues
## (Ramelteon and Tasimelteon)

Melatonin receptor analogues (agonists) have not been directly compared with exogenous melatonin therapy in clinical trials. It will be interesting to see whether future studies determine which agents might be more beneficial in the improvement of jet lag symptoms.

### Ramelteon (Rozerem)

Ramelteon (Rozerem, Takeda), a sedative–hypnotic, has been approved by the FDA for insomnia characterized by difficulty in falling asleep. The dose is usually 8 mg, taken one half-hour before bedtime.[24] The selectivity of ramelteon for melatonin $MT_1$ and $MT_2$ receptors, normally acted upon by endogenous melatonin, contributes to sleep promotion and to maintenance of the circadian rhythm underlying the normal sleep–wake cycle.[24]

A randomized, double-blind, placebo-controlled, parallel-group study was conducted to evaluate ramelteon in 110 patients receiving 1 mg/day, 4 mg/day, and 8 mg/day and the drug's ability to alleviate the sleep-onset difficulties associated with jet lag following eastward transmeridian jet travel across five time zones.[25] Patients receiving ramelteon 1 mg (n = 27) experienced a statistically significant decrease in

# Jet Lag: Current and Potential Therapies

mean latency to persistent sleep (LPS) on days 2 to 4. These patients were able to achieve persistent sleep 10.64 minutes faster than the placebo group ($P = 0.030$). The additional treatment groups receiving 4 mg/day (n = 27) and 8 mg/day (n = 27) showed a tendency toward a reduction in mean LPS, but neither group reached statistical significance ($P = 0.106$ and $P = 0.067$, respectively).

Adverse effects of ramelteon are similar to those of melatonin. It does not appear that ramelteon leads to dependence or withdrawal effects after discontinuation.

## Tasimelteon

Tasimelteon (VEC-162, Vanda/BMS-214778, Bristol-Myers Squibb) is an investigational oral melatonin receptor agonist. In phase 2 and phase 3 studies, tasimelteon decreased transient insomnia that had been induced by an abrupt shift in the sleep–wake cycle.[26,27] Rajaratbam et al. conducted a double-blind, placebo-controlled phase 3 study (n = 411) in which it was concluded that tasimelteon, at doses of 20 mg/day (n = 100), 50 mg/day (n = 102), and 100 mg/day (n = 106), improved sleep latency, sleep quality, and sleep maintenance and provided a shift in circadian rhythms after an abrupt advance in sleep time ($P \le 0.05$ for all results).[26]

On January 19, 2010, the FDA granted an orphan drug designation status for tasimelteon in non–24-hour, sleep–wake cycle disorder for blind individuals without light perception.

## Non-benzodiazepine Hypnotic Agents
### Zolpidem (Ambien)

Non-benzodiazepine hypnotics, such as zolpidem (Ambien, Sanofi-Synthelabo), bind the benzodiazepine receptor subunit of the GABA-A receptor complex. This class of medications has a strong hypnotic effect, with weak anticonvulsant and muscle-relaxant properties.

In a multicenter, double-blind, randomized, placebo-controlled, parallel-group study, Jamieson et al.[28] described the use of non-benzodiazepine hypnotic medications in 130 experienced travelers during their regular eastward transatlantic assignments. Patients receiving zolpidem 10 mg/day (n = 68) reported longer total sleep times on the first night ($P < 0.005$); fewer awakenings on the first two nights ($P < 0.003$ for each); and improved quality of sleep on the first, second, and third nights ($P < 0.004$, $P < 0.004$, and $P < 0.056$, respectively).

Although the FDA has not approved this drug class for jet lag, the use of zolpidem as a way to cope with symptoms might be suitable for those who travel often for work and who are required to be active and alert as soon as they arrive in the new time zone. In this setting, these agents are attractive because of their rapid absorption, short half-life, and inactive metabolites.

When using non-benzodiazepines for the management of jet lag, patients are at risk for experiencing common adverse effects that include dizziness, somnolence, loss of memory, headache, and nausea. When low doses recommended for initiating sleep are used, carryover effects should be minimal the next day.[28] So far, little information is available regarding other non-benzodiazepine hypnotic drugs in the management of jet lag syndrome; however, their effects are likely to mimic those of zolpidem.

## Caffeine

In a systematic review of 13 randomized trials of persons with jet lag or shift-work disorder, caffeine improved concept formation, reasoning, memory, orientation, attention, and perception when compared with placebo.[29] For these reasons, caffeine is a common remedy for treating sleepiness induced by jet lag. Two studies have reviewed its effect after eastward transmeridian travel. Slow-release formulations of caffeine at a dose of 300 mg were used in both studies.[18,30] Pierard et al.[30] demonstrated that slow-release caffeine allowed a quicker resynchronization of hormonal rhythms as a result of mean saliva cortisol concentrations, which were significantly lower than in the placebo group.

A follow-up study by the same authors found that caffeine led to an objective decrease in daytime sleepiness compared with melatonin and placebo, as assessed by multiple sleep latency tests.[18]

## Diphenhydramine (Benadryl)

To date, no studies of diphenhydramine for use in jet lag syndrome have been conducted, even though this is the most common nonprescription antihistamine prescribed for insomnia. Side effects include daytime sleepiness, cognitive impairment, dizziness, blurred vision, and dry mouth and throat. Self-medication is a common problem that can result in adverse outcomes, especially in older adults. The use of diphenhydramine should be avoided in elderly persons, who are often sensitive to its anticholinergic properties.

## Armodafinil (Nuvigil)

Armodafinil, a central nervous system (CNS) stimulant, is designed to improve wakefulness in adults who experience excessive sleepiness because of obstructive sleep apnea, shift-work disorder, and narcolepsy.[31]

Rosenberg et al. conducted a phase 3, double-blind, randomized, placebo-controlled study to evaluate armodafinil 50 mg/day and 150 mg/day for the treatment of excessive sleepiness associated with jet lag disorder resulting from eastbound travel in travelers with a history of jet lag symptoms.[32] Patients receiving armodafinil 150 mg/day (n = 143) experienced a statistically significant benefit in sleep latency on the Multiple Sleep Latency Test (days 1 to 2: mean, 11.7 vs. 4.8 minutes for placebo; $P < 0.001$). Participants' perceptions of their overall condition in relation to jet lag symptoms on the Patient Global Impression of Severity (PGI–S) were also significant (days 1 to 2: mean, 1.6 vs 1.9 for placebo; $P < 0.05$).

Sleep latency was also significantly increased in the 142 patients receiving armodafinil 50 mg/day (days 1 to 2: mean, 7.7 vs. 4.85 minutes for placebo; $P < 0.001$). However, mean PGI–S scores did not differ in the placebo group (n = 142).

Most adverse events were mild to moderate. The most frequently reported events were headache, nausea, diarrhea, circadian rhythm sleep disorder, and palpitations.

In December 2010, Cephalon withdrew its effort to win the FDA's approval to market armodafinil for the treatment of jet lag after it received a second complete response letter from the agency.[33] The company believed that it had met all safety and efficacy endpoints in a clinical study but concluded that further communications with the FDA would not result in an approval

# Jet Lag: Current and Potential Therapies

| Table 1 Agents Used in the Prevention and Treatment of Jet Lag | | | | | |
|---|---|---|---|---|---|
| **Drug** | **Availability** | **Class** | **How Supplied[34]** | **Dose** | **Cost[*34]** |
| Melatonin | Over the counter | Nutraceutical | 1-, 2.5-, 3-, or 5-mg tablets Sublingual tablets available | 0.5–5 mg† | $7.99 per bottle of 120 |
| Ramelteon (Rozerem) | Prescription only; brand available | Melatonin receptor analogue (agonist) | 8-mg tablets | 1,4, or 8 mg five minutes before bedtime‡ | $66.99 for 10 days |
| Zolpidem (Ambien) | Prescription only; generic available CIV | Non-benzodiazepine hypnotic agent | 5- and 10-mg tablets 5- and 10-mg sublingual tablets 5- and 10-mg oral spray 6.25- and 12.5-mg controlled-release tablets | 10 mg at bedtime‡ | $14.99 for 10 days |
| Caffeine | Over the counter | Methylxanthine | 250-mg capsules 200-mg tablets | 200 mg every three hours p.r.n. | $6.99 per box of 40 |
| Diphenhydramine (e.g., Benadryl) | Over the counter | Antihistamine | 25- and 50-mg capsules 50-mg capsule, liquid-filled 25- and 50-mg tablets | 50 mg at bedtime p.r.n. | $3.49 per box of 48 |
| Armodafinil (Nuvigil) | Prescription only; brand available CIV | Amphetamine-related CNS stimulant | 50-, 150-, and 250-mg tablets | 150 mg daily‡ | $72.99 for 10 days |

CIV = Schedule IV controlled substance; CNS = central nervous system; p.r.n. = as needed.
* Represented as the dollar amount for 10 days of the first tablet strength listed in the table for prescription-only products.
† The 5-mg dose is commonly used in clinical trials.
‡ Phase 3 clinical trial dose for jet lag; not FDA-approved for jet lag at the time of publication.
Data from Drugstore.com, February 28, 2011.[34]

of its application. The FDA's latest response reiterated concerns that had been raised in March 2010 about using armodafinil for jet lag. At the time, the FDA had questioned the robustness of Cephalon's study data.

## CONCLUSION

Jet lag is a sleep disorder common to travelers of all age groups. The disorder is caused by rapid travel across multiple time zones, in which the circadian system is not able to adjust to the rapid shift in time zones. The speed of resynchronization of circadian rhythms to the new time zone depends on multiple factors, including the number of zones crossed, the direction of travel, and the traveler's ability to adapt to the new location. Factors exacerbating jet lag symptoms include sleep deprivation, prolonged uncomfortable sitting positions, air quality and pressure, stress, and excessive caffeine and alcohol intake. Jet-lagged travelers may experience disturbed sleep, daytime fatigue, poor performance in mental and physical tasks, decreased alertness, and headache.

A wide array of prescription and over-the-counter (OTC) products have been the focus of study in the management of jet lag. These modalities include light therapy, melatonin, melatonin receptor analogues, non-benzodiazepine hypnotics, caffeine, diphenhydramine, and CNS stimulants such as armodafinil. Depending on the individual patient's sleep–wake cycle and other factors, pharmacists can aid patients in selecting an appropriate treatment. The patient's flight schedule, purpose of travel, physical condition, and individual response to treatment all play important roles. The pharmacist can evaluate patients' needs and recommend OTC preparations and nutraceuticals or advise patients to consult their primary care physician about available prescription-only products. When making a recommendation, the pharmacist should consider cost, because OTC products are usually considerably less expensive than prescription alternatives (see Table 1).[34]

Finally, the pharmacist should promote the use of non-drug therapy and review the traveler's medication history before recommending a specific pharmacotherapeutic agent.

## REFERENCES

1. American Academy of Sleep Medicine. *Circadian Rhythm Sleep Disorders.* Darien, Ill.: 2008. Available at: www.aasmnet.org/Resources/FactSheets/CRSD.pdf. Accessed May 1, 2010.
2. Davidson AJ, Sellix MT, Daniel J, et al. Chronic jet lag increases mortality in aged mice. *Curr Biol* 2006;16(21):R914–R916.
3. Kojo K, Pukkala E, Auvinen A. Breast cancer risk among Finnish cabin attendants: A nested case–control study. *Occup Environ Med* 2005;62(7):488–493.
4. Dubocovich ML, Markowska M. Functional MT1 and MT2 melatonin receptors in mammals. *Endocrine* 2005;27(2):101–110.
5. Bernard S, Gonze, D, Cajavec B, et al. Synchronization-induced rhythmicity of circadian oscillators in the suprachiasmatic nucleus. *PLoS Comput Biol* 2007;3(4):e68 (April 13, 2007, online). Available at: www.ncbi.nlm.nih.gov/pmc/articles/PMC1851983/pdf/pcbi.0030068.pdf and www.ploscompbiol.org/article/info:doi/10.1371/journal.pcbi.0030068. Accessed May 7, 2010.
6. Toh KL. Basic science review on circadian rhythm biology and circadian sleep disorders. *Ann Acad Med Singapore* 2008;37(8):662–668.
7. Lewy AJ, Emens JS, Lefler BJ, et al. Melatonin entrains free-running blind people according to a physiological dose–response curve. *Chronobiol Int* 2005;22(6):1093–1106.

*continued on page 231*

# Jet Lag: Current and Potential Therapies

*continued from page 224*

8. Srinivasan V, Spence DW, Pandi-Perumal SR, et al. Jet lag: Therapeutic use of melatonin and possible application of melatonin analogs. *Travel Med Infect Dis* 2008;6:17–28.

9. Parry BL. Jet lag: Minimizing its effects with clinically timed bright light and melatonin administration. *J Mol Microbiol Biotechnol* 2002;4(5):463–466.

10. Takahashi T, Sasaki M, Itoh H, et al. Melatonin alleviates jet lag symptoms caused by an 11-hour eastward flight. *Psychiatry Clin Neurosci* 2002;56:301–302.

11. Petrie K, Conaglen JV, Thompson L, et al. Effect of melatonin on jet lag after long haul flights. *Br Med J* 1989;298:705–707.

12. Claustrat B, Brun J. David M, et al. Melatonin and jet lag: Confirmatory result using a simplified protocol. *Biol Psychiatry* 1992; 32:705–711.

13. Lino A, Silvy S, Condorelli L, et al. Melatonin and jet lag: Treatment schedule. *Biol Psychiatry* 1993;34:587.

14. Czeisler CA. Commentary: Evidence for melatonin as a circadian phase-shifting agent. *J Biol Rhythms* 1997;12:618–623.

15. Arendt J. Jet lag and shift work: (2). Therapeutic use of melatonin. *J R Soc Med* 1999;4:402–405.

16. Samel A. Melatonin and jet lag. *Eur J Med Res* 1999;4:385–388.

17. Edwards BJ, Atkinson G, Waterhouse J, et al. Use of melatonin in recovery from jet lag following an eastward flight across 10 time zones. *Ergonomics* 2000;43:1501–1513.

18. Beaumont M, Batejat D, Pierard C, et al. Caffeine or melatonin effects on sleep and sleepiness after rapid eastward transmeridian travel. *J Appl Physiol* 2004;96:50–58.

19. Burgess HJ, Crowley SJ, Gazda CJ, et al. Preflight adjustment to eastward travel: 3 days of advancing sleep with and without morning bright light. *J Biol Rhythms* 2003;18:318–328.

20. Eastman CI, Gazda CJ, Burgess HJ, et al. Advancing circadian rhythms before eastward flight: A strategy to prevent or reduce jet lag. *Sleep* 2005;28:33–44.

21. Nicholson AN. Sleep and intercontinental flights. *Travel Med Infect Dis* 2006;4:336–339.

22. Arendt J, Alshous, M, Marks V. Alleviation of jet lag by melatonin: Preliminary results of controlled double-blind trial. *Br Med J* 1986;292:1170.

23. Herxheimer A, Petrie KJ. Melatonin for the prevention and treatment of jet lag. *Cochrane Database Syst Rev* 2002(2):CD001520.

24. Arendt J, Rajaratnam MW. Melatonin and its agonists: An update. *Br J Psychiatry* 2008;193:267–269.

25. Zee PC, Wang-Weigand S, Wright KP, et al. Effects of ramelteon on insomnia symptoms induced by rapid, eastward travel. *Sleep Med* 2010;11:525–533.

26. Rajaratnam SMW, Polymerous MH, Fisher DM, et al. Randomized controlled trials of the melatonin agonist tasimelteon (VEC 162) for transient insomnia after sleep time shift: Two randomized controlled multicentre trials. *Lancet* 2009;373:482–491.

27. Brown GM, Pandi-Perumal SR, Trakht, I, Cardinali D. Melatonin and its relevance to jet lag. *Travel Med Infect Dis* 2009;7:69–81.

28. Jamieson AO, Zammit GK, Rosenberg RS, et al. Zolpidem reduces the sleep disturbance of jet lag. *Sleep Med* 2001;2:423–430.

29. Ker K, Edwards PJ, Felix LM, et al. Caffeine for the prevention of injuries and errors in shift workers. *Cochrane Database Syst Rev* 2010;12(5):CD008508.

30. Pierard C, Beaumont M, Enslen M, et al. Resynchronization of hormonal rhythms after an eastbound flight in humans: Effects of slow-release caffeine and melatonin. *Eur J Appl Physiol* 2001; 85(1–2):144–150.

31. Nuvigil (armodafinil) tablets, product information. Frazer, Pa.: Cephalon, Inc.; 2010.

32. Rosenberg R, Bogan R, Tiller JM, et al. A phase 3, double-blind, randomized, placebo-controlled study of armodafinil for excessive sleepiness associated with jet lag disorder. *Mayo Clin Proc* 2010;85(7):630–638.

33. Cephalon drops bid for FDA approval of jet-lag drug. *The Wall Street Journal*, December 27, 2010.

34. Drug price inquiry. Available at http://drugstore.com/pharmacy. Accessed February 28, 2011 2010. ■

# EXHIBIT 7





- Sign Up!
- Qualifications
- Q & A
- Contact Us
- Recommendations
- Home/Login

## Qualifications

**Description**

At American, we're more than just an airline. We're a global company committed to driving change and innovation in an evolving industry. Our business allows us to connect people from different cultures and communities around the world – something our more than 100,000 employees take great pride in every day. With a competitive network and strong foundation, American is continuing to build on the momentum of our merger with US Airways, and we are looking for people who want to be part of something great – the new American.

Simply put, we're looking for the best!

Safe, professional, skilled – when you think of American Airlines pilots, those are the qualities that immediately come to mind. And at American, we understand that being a pilot is about more than just the technical aspect of flying an airplane... it's also about the joy of flying and the thrill of adventure.

But it's more than just flying skills. Our pilots are not only leaders on the aircraft – they're also leaders in our operation. That requires a special type of person, someone who can anticipate a need, develop a plan and draw all the necessary players together to make it happen.

Whether you're ready to be hired now or just figuring out where you want to land, look to American because flying is more than what we do... it's who we are.

We are looking for great people that can:
- Set a high standard for providing our customers safe and reliable travel
- Handle a wide variety of situations while working with other team members and our customers
- Work independently or as part of a team with limited supervision
- Ensure the safety and comfort of our customers
- Provide leadership by responding to a variety of emergency and non-emergency situations
- Work in climates and locations across the globe and work variable shifts

**Qualifications**

Here is what it takes to be a successful pilot at American:
- Excellent communication skills and quick and accurate decision making
- Close attention to detail
- Minimum age of 23
- Ability to work varying hours of the day or night, on weekends and holidays
- Must be able to secure appropriate airport authority and/or Customs security badges
- Fulfillment of FAA criminal background checks
- Ability to learn and work with PEDs
- Distance vision corrected to 20/20 and near vision corrected to 20/40 or better in each eye
- Current Unrestricted Airline Transport Pilot (ATP) rating (multi-engine)
- Valid FCC Restricted Radio Telephone Operator permit
- Valid First Class Medical Certificate
- Flight time in accordance with all FAA requirements
- Must be able to fluently speak and understand English
- Must have the right to work in the United States
- Additionally, we require all of our pilots to have a valid passport and documentation allowing for entry into the United States after an international flight.

If you are interested in joining our team, please make sure to complete an online profile. If you already completed an online profile, you do not need to take any further action other than keeping your information updated. If, however, you would like to withdraw your application, you can do so by clicking on the Profile Summary page and selecting the Draft Mode button - your profile will then be invisible.

*American Airlines is an Equal Opportunity Employer/Disabled/Vets*

# EXHIBIT 8



# U.S. DEPARTMENT OF TRANSPORTATION
# OFFICE OF INSPECTOR GENERAL

# FAA Has Not Fully Addressed Safety Concerns Regarding the American Airlines Flight Test Program

**FAA**



Report No. AV2018060

July 10, 2018



U.S. DEPARTMENT OF TRANSPORTATION
**OFFICE OF INSPECTOR GENERAL**

# FAA Has Not Fully Addressed Safety Concerns Regarding the American Airlines Flight Test Program

*Self-initiated*

**Federal Aviation Administration | AV2018060 | July 10, 2018**

## What We Looked At

Federal regulations require U.S. air carriers to verify the airworthiness of aircraft following major repairs or maintenance. To perform these maintenance checks, American Airlines (AA), established a flight test program. In February 2017, Allied Pilots Association (APA)—which represents AA's pilots—contacted us about multiple safety issues at the AA flight test program, including the use of unqualified pilots. APA stated that concerns placed in an earlier letter to the Federal Aviation Administration (FAA) had remained "largely unaddressed for over 18 months." We initiated an audit to assess the effectiveness of FAA's actions in response to safety concerns about the AA flight test program. Specifically, we examined how (1) FAA's oversight office for American Airlines addressed concerns about the flight test program and (2) the Agency processed and responded to a letter to the Federal Aviation Administrator questioning the integrity of FAA's oversight of the flight test program.

## What We Found

FAA's oversight office for American Airlines lacked objectivity in its review. While FAA requires inspectors to provide impartial treatment, the inspector in this case seems to have been affected by his relationship with AA personnel and the 28 years he spent working with the carrier. While the Agency has a tool for assessing its relationships with carriers, the tool did not account for these risk factors. In addition, the Agency used a "best guess" method to determine who should respond to APA's written allegations, and ultimately routed the letter back to the target of the complaint for response. Due to a lack of oversight guidance, FAA also provided varying responses to APA and OIG regarding the requirements for the flight test program. As a result, APA received neither a comprehensive nor an accurate response to its concerns.

## Our Recommendations

FAA concurred with our seven recommendations to improve its oversight of the flight test program, as well as its ability to respond to safety concerns.

All OIG audit reports are available on our website at www.oig.dot.gov.

For inquiries about this report, please contact our Office of Legal, Legislative, and External Affairs at (202) 366-8751.

# Contents

Memorandum                                                                      1

Results in Brief                                                                3

Background                                                                      4

FAA's Local Oversight Office Did Not Address Concerns About the AA
   Flight Test Program                                                          5

Issues Brought to the Federal Aviation Administrator's Attention Remain
   Unresolved                                                                   8

Conclusion                                                                     10

Recommendations                                                                10

Agency Comments and OIG Response                                               11

**Exhibit A.** Scope and Methodology                                           12

**Exhibit B.** Organizations Visited or Contacted                              13

**Exhibit C.** List of Acronyms                                                14

**Exhibit D.** Major Contributors to This Report                               15

**Appendix.** Agency Comments                                                  16

AV2018060



**U.S. DEPARTMENT OF TRANSPORTATION**
**OFFICE OF INSPECTOR GENERAL**

# Memorandum

**Date:**          July 10, 2018

**Subject:**       FAA Has Not Fully Addressed Safety Concerns Regarding the American Airlines Flight Test Program | Report No. AV2018060

**From:**          Matthew E. Hampton
                   Assistant Inspector General for Aviation Audits

**To:**            Federal Aviation Administrator

Federal regulations require U.S. air carriers to verify the airworthiness of aircraft following major repairs or maintenance.[1] To accomplish this, American Airlines (AA), established a flight test program to perform these maintenance checks. In February 2017, the Allied Pilots Association (APA)—which represents AA's pilots—contacted the Office of Inspector General (OIG), concerned about multiple safety issues pertaining to the flight test program, including AA's use of unqualified pilots and a culture of suppressing safety complaints. The association previously contacted the Federal Aviation Administration (FAA) but stated its concerns had remained "largely unaddressed for over 18 months." We obtained sufficient evidence during a preliminary meeting with APA and from our review of documentation to initiate an audit to examine these concerns in greater detail.

Our objective was to assess the effectiveness of FAA's actions in response to safety concerns about the AA flight test program. Specifically, we examined how (1) FAA's Certificate Management Office (referred to as the oversight office in this report) addressed concerns about the flight test program and (2) the Agency processed and responded to a letter to the Federal Aviation Administrator questioning the integrity of FAA's oversight of the flight test program.

We conducted this audit in accordance with generally accepted Government auditing standards. Exhibit A details our scope and methodology. Exhibit B lists the entities we visited or contacted.

We appreciate the courtesies and cooperation of Department of Transportation representatives during this audit. If you have any questions concerning this

---

[1] Title 14, Code of Federal Regulations (CFR) § 91.407(b).

report, please call me at (202) 366-0500, or Tina Nysted, Program Director, at (404) 562-3770.

cc:    The Secretary
        DOT Audit Liaison, M-1
        FAA Audit Liaison, AAE-100

# Results in Brief

## FAA's local oversight office did not address concerns about the AA Flight Test Program.

FAA's oversight office for American Airlines lacked objectivity in its review and did not respond to concerns about unqualified pilots and unsafe conditions during maintenance verification flights. FAA, in line with Governmentwide standards, requires inspectors to provide impartial treatment and avoid actions that may create an appearance of preferential treatment. However, the inspector's oversight role in this case appears to have been affected by his relationship with the head of the AA flight test program and the length of time—28 years—he performed oversight of American Airlines. This potential loss of impartiality is particularly troubling considering the scope of his responsibilities, including oversight of voluntary safety programs, pilot training, and safety management systems. Additionally, as the only inspector overseeing the flight test program, he became a single point of failure for FAA. A new supervisor identified possible objectivity issues and recommended temporarily reassigning the inspector. However, Agency officials did not consider the request a priority and took nearly 4 months to reassign the individual. Additionally, FAA developed an evaluation tool that pulls data from multiple sources to assess its collaborative relationships with air carriers. However, that tool does not account for risk factors such as non-routine operations (e.g., flight test) or the length of time inspectors have been assigned to a carrier. Furthermore, the FAA oversight office lacks controls to ensure complaints are properly addressed. Neither the inspector nor office managers complied with FAA's requirements for processing complaints or provided a response to APA directly addressing the underlying issues that prompted the complaints. As a result, APA elevated its concerns to the Federal Aviation Administrator.

## Issues brought to the Federal Aviation Administrator's attention remain unresolved.

According to APA, the airline's managers and an FAA inspector warned AA's pilots that complaints could result in penalties and perhaps the end of the program. FAA, however, did not view these comments as a safety concern or consult the Agency's Office of Audit and Evaluation group, which was specifically established to address complaints. Instead, the Agency used a "best guess" method, which lacked criteria for identifying safety issues, to determine who should respond to APA's written allegations. The letter was routed through FAA Headquarters, then ultimately back to the target of the complaint, the FAA oversight office. Significantly, no one at FAA realized the Agency had not addressed APA's allegation that the oversight office was working with airline officials to suppress pilot safety concerns. In addition, representatives in the

AV2018060

3

oversight office asked the carrier to respond to many of APA's concerns and ultimately included those responses in the Agency's letter signed by the Administrator.

FAA also provided varying responses to APA and OIG regarding the requirements for the flight test program—such as whether or not the carrier must comply with established programs—due to a lack of oversight guidance. As a result, APA did not receive a comprehensive or accurate response. After we discussed our findings with FAA officials, the Agency completed an independent assessment of the program in October 2017 that verified many of APA's concerns. However, FAA's oversight office has not provided an updated response to APA or worked with the Agency's policy officials to clarify oversight responsibilities and develop corrective actions.

We made seven recommendations to help FAA improve its oversight of and address safety concerns about the flight test program.

# Background

The local FAA oversight office for American Airlines, based in Irving, TX, is responsible for overseeing AA's maintenance programs and flight operations, including the flight test program. Approximately 100 inspectors and managers within this office are responsible for certificating, surveilling, and inspecting the airline, which performs nearly 2.5 million domestic and international flights each year using more than 1,000 aircraft and 12 different fleet types.

Air carriers typically fly aircraft to test performance after major repairs or maintenance have been completed. While these flights are not performed with passengers or cargo onboard, it is important that carriers implement procedures to ensure the flights are operated safely. On December 22, 1996, three crewmembers and three technicians were killed when an Airborne Express DC-8 crashed during such a flight, which aimed to verify that recent maintenance and modifications had not changed how the aircraft operated. Following its investigation of the crash, the National Transportation Safety Board made a series of recommendations to FAA, including to establish guidance for air carriers performing non-routine operations, such as evaluation flights, and conduct appropriate surveillance of these programs.

As a result, FAA issued its Non-Routine Flight Operations (NRFO) guidance in August 2002 (updated May 2008), which recommended that carriers update manuals and develop training, reviewed and accepted by FAA, so that each NRFO is conducted with procedures consistent with safe flight. While these actions are not required, American Airlines used the recommendations to develop its flight

test program and train approximately 20 pilots to perform certain NRFO, such as maintenance verification flights and flying damaged aircraft to a repair facility.

# FAA's Local Oversight Office Did Not Address Concerns About the AA Flight Test Program

FAA staff overseeing American Airlines lacked objectivity and did not follow the Agency's guidance for addressing complaints when they received APA's letter. Specifically, the inspector, who had developed a personal relationship with the head of the AA flight test program, did not properly investigate safety complaints.

## FAA's Review of Complaints About the Flight Test Program Lacked Objectivity

The FAA inspector assigned to investigate the complaint had conversations with the head of the AA flight test program about "problem pilots," a reference to pilots who filed complaints. Rather than objectively review the basis for their complaints, as called for in FAA guidance, the inspector requested and received information from American Airlines that could have been used to discredit the pilots who voiced concerns. For example, the AA manager said of one of the pilots, "he seems more interested in litigating his way through life at AA versus doing work."

Governmentwide and FAA's ethical standards[2] require inspectors to act impartially and to avoid the appearance of preferential treatment when they perform their official duties. However, the inspector in this case had developed a personal relationship with the head of the AA flight test program, which created the appearance of diminished impartiality. For example, he made plans, using his Government-issued computer and email account, to travel abroad with the head of the program and introduce him to the inspector's family. The potential impact of the inspector's apparent lack of impartiality was compounded by the large scope of air carrier programs for which he was responsible. Managers at the FAA oversight office did not recognize the extent of his relationship with a senior airline employee or its potential impact on his oversight activities.

---

[2] 5 CFR § 2635.101, "Basic obligation of public service." *Ethical Conduct and Financial Disclosure* (FAA Order 3750.7A).

AV2018060

When we interviewed the inspector about the flight test program, he displayed little knowledge of it beyond describing how great it was. Instead, he stated that a few pilots had been causing problems for 15 years and advised us to "talk to the experts." Then, without our knowledge, he set up a meeting with us and airline officials—whom he called the "kings of the airline." Furthermore, during an interview about potential inspector impartiality, an FAA flight operations frontline manager referred to the AA flight test manager as "perfect" and someone who "could do no wrong," and to the airline as "golden." These comments raise concerns about the lack of objectivity at this FAA office.

In September 2016, a new supervisor was assigned to the office and determined that the inspector was not performing his oversight functions properly and objectively. The inspector had worked there for 28 years and was involved in many areas beyond the flight test program.  For example, he was involved in hotline complaints, multiple AA voluntary safety programs, and oversight of the carrier's safety management system, which is used to identify and mitigate safety risks across the airline. However, as the only inspector overseeing the flight test program, he became a single point of failure for FAA. The supervisor reassigned oversight of two programs to other staff, but did not adjust the inspector's role in the carrier's safety programs or the flight test group. In March 2017, the supervisor raised concerns about the inspector's role and possible lack of objectivity with local and regional office managers. However, the regional office did not see the issue as a priority and took nearly 4 months to reassign the inspector.

The supervisor's concerns regarding diminished objectivity and the lack of support from the regional office are similar to those we highlighted in our 2008 review of FAA's oversight office for Southwest Airlines.[3] In response to our recommendation, FAA developed a tool[4] to assess collaborative relationships between its oversight offices and assigned carriers; it utilizes data from multiple Agency sources to identify anomalies in inspector performance. However, the tool does not incorporate risk factors such as non-routine operations (e.g., maintenance verification flights) or the length of time an inspector has been assigned to a carrier—key factors in this review. As a result, FAA cannot be certain of the tool's ability to detect issues at other oversight offices.

FAA emphasizes the importance of a strong safety culture within the Agency and the industry. Guidance for FAA's Safety Management System—one of the programs the inspector was responsible for overseeing—identifies some

---

[3] *Review of FAA's Safety Oversight of Airlines and Use of Regulatory Partnership Programs* (OIG Report No. AV-2008-057), June 30, 2008. OIG reports are available on our website: https://www.oig.dot.gov/.
[4] Certificate Management Data Evaluation Process (CMDEP).

characteristics of a positive safety culture as valuing individuals' opinions, encouraging personnel to identify safety threats, providing a non-punitive environment for reporting safety concerns, and displaying a willingness to recognize when basic assumptions should be challenged and changes are warranted. Because management did not recognize or mitigate threats to diminished staff objectivity, the FAA oversight office's ability to promote safety and adequately respond to complaints was compromised.

## FAA Staff Did Not Follow Agency Guidance When Addressing Complaints About the Flight Test Program

FAA's oversight office staff did not address APA's concerns[5] about unqualified pilots and unsafe conditions during maintenance verification flights. National and local FAA guidance[6] provide instructions and timeframes for processing complaints. In addition, the oversight office's complaint coordinator sent numerous emails reminding staff about specific requirements for handling complaints. However, the office lacked an effective control to ensure complainants were contacted, investigations were documented, and complaints were resolved. As a result, FAA did not respond to APA's questions about how pilots are trained to conduct flight tests and whether maintenance verification flights can be performed on damaged aircraft.

The oversight office developed local guidance stating that an inspector should contact the complainant to acknowledge receipt and obtain any additional information. Instead of contacting APA, the inspector provided airline management officials with information about the complaint and the individual who had signed it. Less than a month after the inspector notified the airline, AA management held a meeting with all flight test pilots to address the "level of noise." Pilots were told they "must stay off the radar," which APA interpreted as meaning the flight test program would be shut down if the complaints continued. Prior to the meeting, the inspector notified airline management via email that FAA's position was that the flight test program operated safely and professionally, and asked them to "lead me in the right direction." Furthermore, the local guidance gives the assigned FAA inspector 2 days to contact the complainant. In this case, however, the inspector waited more than 2 months and then asked the airline to set up a meeting for him and the complainant—a

---

[5] APA's specific complaints/concerns were extremely technical in nature; as such, we have summarized them here.
[6] *Flight Standards Information Management System* (FAA Order 8900.1), volume 7, chapter 5, section 1. *Aviation Safety Quality Management System* (AFS-SW-21-403-02), "Complaints."

process typically used for pilots under FAA investigation. Although APA asked the inspector multiple times to clarify the purpose of the meeting and state whether the individual was under investigation, the inspector did not respond, and the meeting never occurred.

In addition, the inspector did not document any of the work he performed to investigate the APA complaint. The guidance requires inspectors to document complaint-related work in FAA's surveillance tracking system. Instead, when FAA's new assistant manager for the oversight office asked for an update, the inspector sent an email stating he had traveled to the flight test center to investigate the concerns. According to travel records, he only visited the flight test center once for approximately 4 hours. The inspector reported that during this time he attended a meeting regarding flight test program safety reports, and reviewed the carrier's pilot training program and the specific qualifications maintained in at least three different systems for the flight test pilots. It would be extremely difficult, if not impossible, to adequately perform these tasks in a 4-hour period.

Finally, FAA Order 8900.1 states that Flight Standards personnel should attempt to provide a final written response within 10 business days from the time of receipt. The Agency received APA's complaint in December 2015. However, the inspector did not review any documentation until April 2016, and the FAA oversight office did not respond to the complaint. Due to the lack of a response, in July 2016, APA wrote to the Federal Aviation Administrator about the Agency's oversight of the AA flight test program.

# Issues Brought to the Federal Aviation Administrator's Attention Remain Unresolved

FAA missed key safety concerns APA raised in its letter to the Administrator and did not consult the Audit and Evaluation group about the Agency's response. Instead, the letter was routed to several offices before it was returned to the FAA oversight office—the specific target of the complaint.

While APA stated that "both the CMO [Certificate Management Office] and American Airlines managers warned that additional 'complaints' and 'noise' from ASAP [Aviation Safety Action Program] reports would possibly result in penalties ... up to and including abandonment of the program," FAA Flight Standards managers at the FAA oversight office and Headquarters did not recognize this as a safety concern. When we discussed the allegation with FAA's Audit and Evaluation group, which handles complaints and internal audits, they immediately identified these concerns as a significant threat to safety. However, that group was not consulted about the response to the APA letter because FAA distributes

AV2018060

correspondence via a "best guess" method, which does not include criteria for identifying safety issues.

In the "best guess" method, letters are assigned to the Agency's subject matter experts, who review them and determine whether or not to respond. FAA officials defended this method by stating the experts are in the best position to evaluate correspondence. In this instance, APA's letter was routed to the Aviation Safety Division, then to Flight Standards, and ultimately back to the oversight office that was the target of the complaint. In addition, representatives in the oversight office asked the carrier to respond to many of APA's concerns and ultimately included those responses in the Agency's letter signed by the Administrator.

According to the FAA oversight office, the flight test program was "supplemental," and therefore the carrier did not have to follow written requirements even though FAA had formally accepted them. However, both APA and OIG received conflicting responses about the requirements from FAA. For example, an FAA maintenance policy official told us that the carrier was expected to comply with flight test policies and procedures because they supported the carrier's FAA-authorized maintenance program. We requested clarification from the Agency's Air Carrier Operations Branch but found that FAA does not have guidance on how to oversee these types of operations and programs. In addition, the FAA oversight office for American Airlines did not work with policy officials to verify the Agency's position.

Furthermore, during the complaint review process, no one at FAA realized that the allegation about the oversight office had not been addressed. After we discussed our concerns with FAA, the Agency used staff from the United Airlines oversight office to conduct a technical assessment of the flight test program, but did not review the objectivity of staff at the oversight office for American Airlines. The October 2017 assessment verified many of our and APA's technical concerns, including whether properly qualified pilots were performing maintenance verification flights and whether those flights can be performed on aircraft that have not been fully repaired. The FAA operations supervisor for American Airlines formally presented the findings to the carrier in December 2017, and established a safety analysis team with airline officials to resolve the issues. Furthermore, during our audit, the inspector at the center of the complaint retired, and the carrier began making changes to the flight test program. However, FAA has not provided an updated response to the complainant, and oversight office staff have not worked with FAA policy officials to clarify responsibilities and develop corrective actions. As a result, APA's safety concerns have yet to be fully addressed.

# Conclusion

Concerns about the impact of FAA inspector relationships with the airlines they oversee have been an issue since our 2008 review of the Agency's oversight office for Southwest Airlines. Our report spurred FAA to take a number of actions, including developing a tool that assesses its relationship with air carriers. However, the tool does not incorporate sufficient risk factors to identify diminished inspector impartiality. Additionally, weaknesses in FAA's process for identifying and handling safety complaints resulted in multiple missed opportunities to mitigate risks identified by an industry stakeholder. As a result, FAA is not in a position to respond to safety complaints about the flight test program and cannot be assured that its safety oversight is sufficient or comprehensive.

# Recommendations

To improve FAA's oversight of the American Airlines flight test program as well as its ability to respond to safety concerns, we recommend that the Federal Aviation Administrator:

1. Conduct an independent review of FAA's oversight of American Airlines' flight operations to determine whether controls are in place and effective in preventing single points of failure; develop and implement corrective actions, if necessary.

2. Modify the existing tool used to evaluate the objectivity of inspectors to incorporate risk factors such as non-routine operations and the length of time inspectors oversee the same air carrier.

3. Develop and implement controls requiring oversight office staff to resolve complaints and follow key policy requirements such as directly contacting complainants and documenting investigations.

4. Establish and implement criteria for evaluating correspondence to ensure safety complaints are routed to FAA's Office of Audit and Evaluation.

5. Develop and implement inspector guidance on FAA's oversight requirements for flight test operations.

6. Provide the Allied Pilots Association with a revised response to its complaint based on results from the October 2017 independent assessment of the American Airlines flight test program.

AV2018060

7.  Develop and implement a corrective action plan to address the recommendations made by the October 2017 independent assessment of the American Airlines flight test program.

# Agency Comments and OIG Response

We provided FAA with our draft report on May 21, 2018, and received its formal response on June 20, 2018, which is included as an appendix to this report. FAA concurred with all seven of our recommendations and provided planned implementation dates for each. We consider these recommendations resolved but open pending completion of planned actions.

# Actions Required

We consider recommendations 1–7 resolved but open pending completion of planned actions.

AV2018060

# Exhibit A. Scope and Methodology

We conducted this performance audit between April 2017 and May 2018 in accordance with generally accepted Government auditing standards as prescribed by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

We met with APA officials to better understand their concerns and the potential safety impacts. Then, to assess how APA's concerns about the AA flight test program were addressed, we met with local, regional, and national FAA Flight Standards officials responsible for oversight of AA and policies relevant to the complaint. We reviewed surveillance and travel records, as well as emails from the inspector directly responsible for overseeing the program. We also interviewed AA personnel and reviewed its program documentation. To assess how the Agency processed and responded to APA's letter to the Federal Aviation Administrator, we reviewed tracking logs associated with the complaint and interviewed FAA officials responsible for processing correspondence within Flight Standards, Aviation Safety, and the Office of the Administrator. We also met with officials in FAA's Office of Audit and Evaluation, which is responsible for addressing complaints.

# **Exhibit B.** Organizations Visited or Contacted

## FAA Facilities

**Headquarters**

Office of the Administrator

Aviation Safety

Flight Standards Service

Office of Audit and Evaluation

Air Carrier Maintenance Branch

Air Carrier Operations Branch

Evaluations Program Branch

Policy Integration Branch

**Field Offices**

Southwest Region

American Airlines Certificate Management Office

United Airlines Certificate Management Office

## Other Organizations

American Airlines, Fort Worth, TX

Allied Pilots Association, Fort Worth, TX

# **Exhibit C.** List of Acronyms

| | |
|---|---|
| AA | American Airlines |
| APA | Allied Pilots Association |
| ASAP | Aviation Safety Action Program |
| CMO | Certificate Management Office |
| DOT | Department of Transportation |
| FAA | Federal Aviation Administration |
| NRFO | Non-Routine Flight Operations |
| OIG | Office of Inspector General |

**Exhibit C.** List of Acronyms

14

# Exhibit D. Major Contributors to This Report

| | |
|---|---|
| TINA **NYSTED** | PROGRAM DIRECTOR |
| MARSHALL **ANDERSON** | PROJECT MANAGER |
| ANNE **LONGTIN** | SENIOR ANALYST |
| CURT **BOETTCHER** | SENIOR ANALYST |
| TIM **MCDOUGALL** | SENIOR AUDITOR |
| JANE **LUSAKA** | WRITER-EDITOR |
| SETH **KAUFMAN** | SENIOR COUNSEL |

# Appendix. Agency Comments

 **Federal Aviation Administration**

# Memorandum

Date:     June 20, 2018

To:       Matthew E. Hampton, Assistant Inspector General for Aviation Audits

From:     H. Clayton Foushee, Director, Office of Audit and Evaluation, AAE-1

Subject:  Federal Aviation Administration's (FAA) Response to Office of Inspector General (OIG) Draft Report: Safety Concerns Regarding the American Airlines Flight Test Program

The FAA has initiated several safety enhancements to the American Airlines Flight Test Operations Program. The use of Risk-Based Decision Making and Compliance Oversight principles have facilitated a collaborative approach to resolving the issues identified in the report. New initiatives include the establishment of a Safety Analysis Team comprised of all relevant stakeholders, and the development of a new Risk Management Process. American Airlines has been fully cooperative in communicating information about identified hazards to the Agency, and all correctives actions are tracked in the carrier's Safety Management System.

The FAA offers the following comments to the OIG's findings:

- The draft report states that it took four months from the time a supervisor raised concerns about the Aviation Safety Inspector's (ASI) role and lack of objectivity until the regional office reassigned him. The report further states that the regional office did not see the issue as a priority. However, the FAA supports a robust ethics program that focuses on identifying conflicts of interest, training and advising on conflicts, and undertaking appropriate enforcement action. Once the issues were brought to the FAA's attention, it began the necessary review process to determine the appropriate action. This ultimately resulted in a change to the ASI's responsibilities along with the initiation of formal action once the allegations were substantiated.

- The FAA did complete an independent assessment of the American Airlines Flight Test Operations Program. That assessment identified several compliance issues and other hazards. The Allied Pilots Association is participating in the resulting Safety Analysis Team, which is working to evaluate and mitigate these issues.

We concur with the recommendations, as written. We plan to implement recommendations 2, 6 and 7 by October 31 2018, recommendations 1, 3 and 4 by March 31, 2019, and recommendation 5 by June 30, 2019.

**Appendix.** Agency Comments                                                                 16

2

We appreciate this opportunity to respond to the OIG draft report. Please contact H. Clayton Foushee at (202) 267-9000 if you have any questions or require additional information about these comments.

# U.S. DOT OIG
## Fraud & Safety
# Hotline

hotline@oig.dot.gov | (800) 424-9071

https://www.oig.dot.gov/hotline

## Our Mission

OIG conducts audits and investigations on behalf of the American public to improve the performance and integrity of DOT's programs to ensure a safe, efficient, and effective national transportation system.

**OFFICE OF INSPECTOR GENERAL**
U.S. Department of Transportation
1200 New Jersey Ave SE
Washington, DC 20590



www.oig.dot.gov

# EXHIBIT 9

CBS News / CBS Evening News / CBS This Morning / 48 Hours / 60 Minutes / Sunday Morning / Face The Nation / CBSN Originals   Log In   Search

Today's Rundown   Politics & Power   Features   Pop Culture   CTM Saturday   More

CBS NEWS / *February 4, 2019, 7:39 AM*

# Airline mechanics feel pressured to overlook potential safety problems: "Accident waiting to happen"

f Share / 🐦 Tweet / 🔴 Reddit / 🔲 Flipboard / ✉ Email



## Watch CBSN Live


Missouri tornado leaves path of destruction, at least 24 people injured


NYT: Harvey Weinstein reaches $44 million settlement in sexual misconduct case


Brexit negotiations left uncertain as Prime Minister Theresa May resigns


Theresa May resigning as British prime minister after three failed attempts at Brexit deal


President Trump orders Attorney General Barr to review 2016 Russia investigation

Follow Us

Airline mechanics say they feel pressured by management to look the other way when they see potential safety problems on airplanes, an eight-month-long CBS News investigation reveals. In some of the cases, the Federal Aviation Administration (FAA) agreed with those mechanics.

The U.S. aviation system is experiencing an unparalleled period of safety, with only one death involving a passenger airline in the last decade. But in our interviews with more than two dozen airline mechanics, they speak of the pressure to turn aircraft around faster that sometimes can be too much, reports CBS News

correspondent Kris Van Cleave. They blame it on an economic reality of the airline business: a plane only makes an airline money when it's flying passengers.

Cell phone video captured a tense exchange between an American Airlines mechanic and a manager in 2017.

"We're an accident waiting to happen," the mechanic could be heard saying.

The FAA found reason to believe a Miami-based mechanic was retaliated against after reporting problems that pulled several planes out of service.

"You single out one guy because he's doing his job. What about all of us? What's going to happen to us when we do our jobs?" the mechanic can be heard saying.

Gary Santos, a long time American Airlines mechanic based in New York, described it as "a short-cut environment." He said he's risking his job by speaking on camera.

"They try to pressure the individual not to write it up," Santos said.

"They'd rather you not report a maintenance issue?" Van Cleave asked.

"Right," Santos responded.

While a sometimes tense relationship between management and mechanics is not uncommon, every one of the 26 airline mechanics we spoke to – two thirds from American and the rest from Southwest Airlines – described being pressured by managers to focus only on the work assigned.

"If you're working, say, on a landing gear, lubing it, and you notice that a flap three feet away is leaking, and you write up the flap leak, you're beyond your scope," one mechanic said.

Their claims are backed up by findings in several FAA whistleblower complaints about inappropriate pressure and retaliation since 2015 at the two airlines – and at least 32 other anonymous industry-wide reports between 2015 to 2018.

"I've seen people walked off the job, held on suspension for a month or more because they've reported problems that they supposedly were outside their scope for finding," the mechanic said.

Several American mechanics – all with decades on the job – spoke on the condition we not show their faces, saying they feared retaliation.

"You constantly have people over your shoulder questioning why it takes so long. 'Can't we skip a few steps?'" another mechanic said.

"Have you had managers use the words 'can't we skip some steps'?" Van Cleave asked.

"Absolutely," the mechanic responded. "The pressure is there and, you know, the threats of termination and walking you off the airfield, as they would say, are very real and common place."

The mechanics come from bases all over the country. One mechanic told CBS News the pressure was for "significant safety issues."

"Things that needed to be repaired. Worn tires, worn brakes, damage to the fuselage," he said.

CBS News obtained a transcript of a December 2017 Southwest employee conference call where senior VP of technical operations Landon Nitschke acknowledged: "We definitely need to repair some things with the FAA... there are

## Newsroom

A Twitter list by @CBSThisMorning

The @CBSThisMorning Newsroom on CBSNews.com

 **CBS Evening News**
@CBSEveningNews

DEVELOPING: At least seven people injured Friday after an explosion in or outside a bakery chain in Lyon, France, authorities say; the cause of the blast wasn't immediately known cbsn.ws/2KaqjCz



1m

 **CBS This Morning**
@CBSThisMorning

A bill that would mark the biggest change to the U.S. retirement system in a decade if passed has just cleared the House. cbsn.ws/2JCfMQS

Embed                    View on Twitter



## Watch CBS News Live

*Watch CBS News anytime, anywhere with the our 24/7 digital news network. Stream CBSN live or on demand for FREE on your TV, computer, tablet, or smartphone.*

Watch Now

## Popular On CBS News

**01** "Jeopardy!" champ James Holzhauer could break $2 million tonight

**02** CEO pay up 7% last year to $12 million median

**03** Explosion in French city leaves several injured

**04** HHS proposes rollback of ACA rule protecting LGBTQ people

some things there with... [mechanics] getting questioned. Supervisors certainly getting questioned...so again, compliance, compliance, compliance."

Capt. Dave Hunt is Southwest's senior director of safety management. "I think that is a good indicator of what our leadership tells our employees," Hunt said. "It is our highest priority."

"But you don't feel like your mechanics are being unduly pressured or threatened, chastised, criticized for finding issues that are out of scope?" Van Cleave asked.

"I think any issue that's brought forward to us is taken seriously, acted upon, investigated, and we act on those. So any way we hear about an instance, we carefully review those," Hunt said.

"But you're stopping short of saying that's not happening," Van Cleave pointed out.

"Whenever we become aware of a safety-related event, we take them all seriously and we act on all of them the same way," Hunt said.

Former National Transportation Safety Board member John Goglia said it's unusual for so many mechanics to speak out publicly.

"That's standing out on the top of the hill screaming at the top of your lungs," Goglia said, acknowledging "there's no question that there's a problem."

He believes the pressure to speed up repairs and get planes back in service faster is a problem for mechanics industry wide.

"You have two dozen. I've probably had over a hundred over the past three or four years that have called me with those kinds of complaints, and I'm talking about calls from every single airline," Goglia said.

David Seymour is a senior vice president at American.

"Safety is part of the culture and they know if they don't do it safely, they're not to do it at all," Seymour said.

"Does it concern you that we're hearing a different account from a number of mechanics?" Van Cleave asked.

"It's not a concern for me because I think we have programs in place to make sure that they can report them," Seymour said.

"You say it's not a concern, we talked to a former NTSB board member who said based on the number of people we have talked to... and that several went on camera isn't just a red flag, he called it a field of red flags," Van Cleave said.

"What I will tell you is allegations have been made, but almost all of them have been dismissed. There have been some issues we've had to address, but again, there's never been an allegation made that American Airlines flew an aircraft that was unsafe," Seymour said.

Both Southwest and American are locked in tense union negotiations with mechanics over pay and benefits.

"Should people be concerned about the planes they're getting on today?"

"I get on them every day so I am not concerned... it's like climbing a ladder where the top rung may be an accident or a serious incident," Goglia said. "Every time you don't do something the way it's supposed to be done, you're climbing another rung in the ladder... and it takes several rungs when you start getting up there the risk starts to get severe."

05   Fiance pleads not guilty in presumed death of Colorado mom



65 **PHOTOS**
Notable deaths in 2019

The Uplift — Stories That Inspire


Students build cars for kids with disabilities


History teacher a "hero" to the veterans he's honored


13-year-old buys his single mom a car


Teen robotics team makes wheelchair for toddler

"Do you worry that pressure is going to result in an accident? Something is not going to get fixed?" Van Cleave asked Santos.

"Those things keep me up at night," Santos responded.



Boy's lost stuffed animal found on mountain

These mechanics tell us they worry how the pressure they describe will impact the overall safety culture over time. In the Miami situation, American said it does not believe it was a case of retaliation. That mechanic is on the job today.



Homeless teen track star wins scholarship

One FAA official told us while they do see cases of undue pressure, they believe the vast majority of employees are trying to do the right thing.

*Watch more from our investigation Monday night on the "CBS Evening News."*

**Southwest Airline's full statement to CBS News:**

"Southwest is fully committed to ensuring the Safety of our Customers and Employees. We continuously work to create and foster a Culture of Safety that proactively identifies and manages risks to the operation and workplace. With a fleet of 750 planes and 4,000 flights a day, we have a rigorous and well-run program. Safety has always been our highest priority—from day one to today and always. We are absolutely confident that our maintenance policies, procedures, and programs ensure the Safety and airworthiness of our aircraft.

Maintaining a Culture of Safety Compliance is the most important thing we do and Southwest Employees are our most valuable asset in operating with the highest degree of Safety. Intimidation or bullying of any kind is not tolerated. If intimidation or bullying is reported, we have processes established to investigate and take action to address the matter. Southwest's unwavering commitment to a positive and stable work environment stretches across nearly five decades and flows across all levels of our workforce and leadership.

While we do expect our mechanics to work their assigned tasks, we do not prohibit employees from raising safety concerns at any time and, in fact, encourage the reporting of safety concerns through our 24-hour automated Safety Reporting System. Southwest is committed to promptly addressing any issues that might be raised. We work directly with our local FAA Certificate Management Office which oversees our FAA-approved maintenance program to assure that processes and procedures are followed in the interest of safety.

Southwest is hands down one of the best companies in the world to work for with an unprecedented safety record. Our friends, our families board these flights and not a single one of us would put anything above their safety – this mission unites us all.

Regarding Landon Nitschke reference during a Dec. 6, 2017 'It's Your Call' event where he references the FAA: We were continuing our work on aligning, both as a Company and as individuals, with the FAA Compliance Philosophy introduced in 2015 which shifted oversight from an enforcement-focused regulatory model to a more transparent, problem-solving approach that allows safety problems to be understood through an open exchange of information between the agency and the airline. This is a shift from how airlines have historically worked with the FAA, and it requires a mutual effort to build trust and a change in mindset. We applaud the refreshed Compliance Philosophy and agree that it's a more effective model of oversight for today's aviation system. Strengthening our relations with the FAA is a priority that, as with any valued relationship, requires dedication and an unwavering commitment by our People.

And in regards to his comment 'It's going to be our theme song for 2018': Nothing is more important in our business than Safety and, as such, compliance is always a theme. As we were continuing our work with the FAA to prepare for Extended Operations this year, sound implementation and execution of our operational

policies and procedures will be as important as ever. We asked each Leader to underscore the importance of keeping compliance top of mind in everything our Employees do."

**Aircraft Mechanics Fraternal Association's statement to CBS News:**

"The Aircraft Mechanic Fraternal Association (AMFA) – representing more than 2400 Southwest Aircraft Maintenance Technicians releases the following statement:

The FAA has found, Southwest Airlines maintenance managers engage in coercive tactics that result in a 'capitulation of airworthiness and a culture of fear and retribution.'

American law, specifically the AIR 21 whistleblower statute, has provided the necessary means to resist management pressure to turn a blind eye to corrosion, gouges, and other significant aircraft damage.

Now, however, Southwest Airlines – already the major airline with the fewest mechanics per aircraft – is demanding the right to have its aircraft maintenance work performed in foreign countries that do not safeguard the professional integrity and compliance requirements of our profession.  The interests of American workers – many who are military veterans, and the security of the traveling public – demand that this safety sensitive work be performed in our own country."

**FAA statement to CBS News:**

"The nation's aviation system is safer than ever. Commercial aviation remains the safest form of travel because multiple and redundant levels of safety are built into the system.

Safety enforcement is never static. The FAA constantly works to improve consistency, safety data collection, and risk analysis. The U.S. has the largest, most diverse, and most complex airspace system in the world. Oversight is a dynamic process that requires the FAA and the airline industry to constantly strive for safety improvements. We welcome any opportunity to enhance what already is the safest aerospace system in the world.

The FAA's enforcement is designed to identify and mitigate potential risks before they affect safety. We investigate all allegations of safety standards violations, regardless of the source. We continue to be involved in investigations related to both American and Southwest Airlines. If those safety allegations are substantiated, we will take swift and appropriate action. We cannot discuss specific details until those investigations are complete."

© 2019 CBS Interactive Inc. All Rights Reserved.

---

f Share / 🐦 Tweet / 🔴 Reddit / 🔲 Flipboard / ✉ Email

**Columbine school shooting survivor Austin Eubanks found dead in his home**
Austin Eubanks was shot in the hand and knee in the Columbine attack that killed 12 classmates and a teacher, including Eubanks' best friend
CBS News

**Hialeah, Florida Drivers Are Stunned By This New Rule**
EverQuote Insurance Quotes | Sponsored

# EXHIBIT 10



February 6, 2019

Doug Parker, CEO
American Airlines

Mr. Parker:

The Transport Workers Union of America ("TWU") has members that are employed as Line Maintenance Aircraft Maintenance Technicians across the country.  The recent series of CBS News stories has brought the nation's attention to American Airlines' unsafe, illegal, and intimidating management practices. The TWU stands with the and supports the courageous aircraft technicians who participated in these news stories. We also stand ready to defend them and any other TWU Aircraft Maintenance Technicians who suffer retaliation for working in accordance with proper maintenance manual standards. A debt of gratitude is owed to these individuals by the traveling public, their fellow technicians, and the airlines themselves.

As CEO of American Airlines, you are responsible for the pervasive practice of intimidation that exists. It is atrocious and immoral that, solely in order to improve the company's profitability, you would allow and oversee a system that potentially places air travelers at risk.  You must correct this deadly serious situation. The first step in correcting these conditions is to first recognize that your company has a problem, and thus far you've failed to do so.

American Airlines Senior Vice President David Seymour stated in the CBS report, with respect to aircraft mechanic whistleblower cases, "almost all of them have been dismissed."

That is a bold-faced lie. American Airlines has settled a mind-boggling number of whistleblower cases originating from their Miami, Dallas, and Chicago operations and, in each case, management has demanded that non-disclosure agreements be executed in order to hide the financial settlements you have entered into. These non-disclosure agreements are your tool to perpetuate the ongoing cycle of abuse.

With respect to the Chicago case involving six aircraft mechanic whistleblowers, the FAA report determined:

- American Airlines "…pressured [mechanics] to not record discrepancies, take shortcuts with maintenance activities, or improperly sign-off on work which was not actually completed."

- "An [FAA] investigation team … conducted an exemplary investigation, interviewing dozens of witnesses and gathering hundreds of documents, ultimately *substantiating all of the complainants' allegations.* "[1]

Among the specific allegations substantiated by the cited investigation was that Regional Maintenance Director Evita Rodriguez – now known as Evita Garces – instructed American Airlines technicians:

"You need to strike a balance between safety and productivity.  When I was stationed in JFK, I signed for sumping [of aircraft fuel tanks on] the Airbus, yet I never did.  I am looking for that balance."[2]

Instead of terminating Ms. Garces, on November 13, 2018, American Airlines promoted her to the new position of American Airlines Director of Maintenance (DOM).  In this role, Ms. Garces will now be working hand-in-hand with the FAA. This action sends a horrific message to the Line Maintenance Aircraft Technicians.

It is long past time for you, as CEO, to start making the leadership changes necessary to stop this harassment of TWU members. The chilling atmosphere you

---

[1] *FAA Memorandum dated March 25, 2015, by Director, Office of Audit and Evaluation, H.Clayton Foushee*

[2] *ASO CMO-67 Investigation Team Report dated February 27, 2015 at 11*

oversee is disgraceful and constitutes a clear and present danger to American Airlines' customers.

Sincerely,

John Samuelsen, President
Transport Workers Union of America

# EXHIBIT 11

# United States Senate

WASHINGTON, DC 20510

February 12, 2019

Daniel K. Elwell
Acting Administrator
Federal Aviation Administration
800 Independence Avenue, SW
Washington, DC 20591

Dear Acting Administrator Elwell,

We write to inquire about steps the Federal Aviation Administration (FAA) is taking to investigate and address reports that airlines are pressuring their mechanics to ignore safety issues and short-cut the critical work they perform.

According to an eight-month investigation by CBS News, more than two dozen aircraft maintenance workers have come forward expressing concern that pressure from airlines to rapidly return aircraft to service may be endangering aviation safety.[1] Airlines naturally have an economic incentive to keep aircraft in service as long as possible; a plane only generates revenue if it is transporting passengers. But despite the need for safety to take precedence over airline profitability, mechanics have reported that managers have instructed them to "skip a few steps" in the maintenance process or to perform only the specific work assigned and ignore other safety defects they detect. Many of these safety-critical personnel fear retribution or even termination if they fail to comply with these dangerous directives or if they bring safety concerns to light. Since 2015, through whistleblower complaints, the FAA has documented several cases of inappropriate pressure and retaliation.

Congress has given the FAA the mandate to maintain the integrity and safety of our national airspace. As a part of that charter, the FAA certifies airlines' maintenance policies, procedures, and programs, which detail how mechanics will ensure that aircraft are meeting airworthiness standards. A critical component of any effective maintenance plan is an adherence to maintenance protocols and a safety-centric environment that encourages mechanics to both identify and report safety concerns. When safety standards are violated, the FAA has the obligation to investigate allegations and require corrective action.

To better understand how the FAA is investigating and responding to these troubling reports, we respectfully request answers to the following questions by March 5, 2019:

1. Since January 1, 2017, how many complaints has the FAA received about airlines' pressuring maintenance workers to ignore safety issues or short-cut safety-related work? For each complaint, please:

---

[1] *Airline mechanics feel pressured to overlook potential safety problems: "Accident waiting to happen,"* CBS News (Feb. 4, 2019), https://www.cbsnews.com/news/airline-mechanics-feel-pressured-by-managers-to-overlook-potential-safety-problems-cbs-news-investigation/.

   a. Summarize the complaints, detailing the date, location, nature of the accusation, the type of maintenance work being performed, and the aircraft parts and systems involved. If the complaint was made or memorialized in writing, please provide a copy.

   b. State whether the FAA investigated the accusation, and if not, why not. Describe the FAA's findings, any corrective action the FAA required, and whether the airline complied.

2. In April 2018, we wrote to the FAA about reports of safety lapses at Allegiant Air. The FAA's response stated that "getting to the next level of safety requires finding and fixing hidden problems before they can cause an accident. Because everything starts with finding safety problems, compliance also requires the airline to have procedures that encourage open reporting." In light of this statement and the CBS News report, please:

   a. Explain how the FAA ensures that airlines are not putting unnecessary pressure on mechanics to expedite maintenance work or otherwise ignore safety concerns.

   b. Explain how the FAA ensures that mechanics have the unfettered ability to report safety concerns without fear of reprisal, including termination, from the airlines. Does the FAA expressly prohibit airlines from engaging in retaliatory action against employees who openly report safety concerns, or otherwise forbid the implementation of other disincentives to such reporting? If no, why not? If yes, how?

3. Is the FAA investigating the disturbing reports uncovered by CBS News. If no, why not? If yes, please describe the nature and scope of the investigation.

Thank you for your attention to this important matter. If you have any questions, please contact Daniel Greene of Senator Markey's staff at (202) 224-2742.

Sincerely,

Edward J. Markey
United States Senator

Richard Blumenthal
United States Senator

2

# EXHIBIT 12

Weaponization of Mental Health

in the Aviation Industry

# Weaponization of Mental Health



*In the Aviation Industry*

Karlene K Petitt Ph.D.

*Coming Soon!*

The unspoken truth of how airlines remove pilots for reporting safety, calling in fatigued, using too much sick leave, or suggesting improvements for safer operations... As it turns out calling a pilot crazy is more effective than firing them. If a pilot is terminated unjustly, they have legal rights to return. However, if they are deemed unfit to fly, they have no rights.

It doesn't matter if these pilots never lose their medical certificates. If the airline pays a doctor to create a diagnosis, then the airline will not allow the pilot to return to flight status. Some will get jobs at other airlines at half the pay and at the bottom of the seniority list. Others spend every

penny fighting for justice. Some are forced into an alcohol rehab program, whether they are an alcoholic or not.

One would ask why *anyone* would do such a thing? That is the million dollar question. The answer could be simple as, a sociopath in power.

This book, however, is on the medical side of this retaliation of how doctors are paid for creating a false diagnoses to remove an airline pilot. Many months ago I posted a passage from a medical report created by one of these doctors. Clearly extortion is written all over this page.

This doctor tells the pilot that if he contacts an attorney, files a complaint with the medical board, rescinds the releases he initially signed, or continues to allude to legal action that he would be found mentally unfit. However, if he drops legal action there might be a chance of a favorable diagnosis.

I also learned that the doctor who wrote the above report for one pilot, received close to $74,000 for a mental health examination of another. To put that in perspective, the average evaluation is closer to $3,300. This doctor went as far to tell pilot on Christmas Eve they would never fly again, despite notifying the company two months earlier. He has destroyed numerous lives over the course of his career. Sadly he is not alone, as there are other doctors just like him.

**Can we stop these doctors?**

Sometimes good news does prevail. After numerous calls to the medical board, and a half a dozen reports on the same doctor, a lengthy investigation prevailed. There was enough information identifying this doctor to have unethical behavior to send the investigatory report to the "controller."

The controller held this report for 9 months due to workload, but when he evaluated it, he too saw a problem and sent the doctor to the disciplinary board. Last week, the disciplinary board agreed with previous recommendations, and they sent him to the medical prosecution board. This next phase will take another two months, but the system is working.

While this will not get the lives back that this doctor has taken, it will prevent him from harming anyone again. The next question is, if a doctor loses his license and prosecuted for taking money with intent to do harm and fraud, what will they do with the organizations that paid these doctors for his false diagnoses? As this doctor, and others are officially prosecuted, I will post their names. If anyone has been harmed by one of them, these pilots may have recourse to open up their case to be revisited.

For those who have been subjected to a mental health evaluation for reporting safety, calling in fatigued, or being forced to fly unfit, you have rights under the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, known as an Air 21, the whistle blower law. Please know that forcing someone into a mental health evaluation is considered an "adverse action" in the eyes of the law. If you need help, contact Lee Seham to learn the laws of protection, as you only have 90 days.

Stand by... this story is not over, and the book is in underway.

*Enjoy the journey!*
*XO Karlene*

# EXHIBIT 13

## SECTION 15 - PHYSICAL EXAMINATIONS:

**(A)**　The physical standards required of a pilot shall be the standards established by the Federal Aviation Administration including its waiver policy.

**(B)**　The objective and purpose of any medical program established by the Company for its pilots shall be to aid and assist such pilots in maintaining their physical health and prolonging their flying career.

**(C)**　A pilot shall not be required to submit to any physical examination without the pilot's consent unless required by governmental authority or unless it is apparent that his health or physical condition is seriously impaired.  In such case, the Company may request that the pilot undergo a physical examination from an accredited physician who shall be mutually agreed upon by the Company and the pilot.  The pilot shall be furnished a copy of the physician's report.

**(D)**　Any pilot hereunder who fails to pass a physical examination may, at his option, have a review of his case in the following manner:

1.　He may employ a qualified Medical Examiner of his own choosing and at his own expense for the purpose of conducting a physical examination for the same purpose as the physical examination made by the Medical Examiner in Paragraph (C) above.

2.　A copy of the findings of the Medical Examiner chosen by the pilot shall be furnished to the Company, and in the event that such findings verify the findings of the Medical Examiner in accordance with Paragraph (C) above, no further medical review of the case shall be afforded.

3.　In the event that the findings of the Medical Examiner chosen by the pilot shall disagree with the findings of the Medical Examiner designated by the Company, the Company shall, at the written request of the pilot, ask that the two (2) Medical Examiners agree upon and appoint a third Medical Examiner for the purpose of making a further physical examination of the pilot.

4.　Such three doctors shall constitute a board of three, the majority vote of which shall decide the case.

5.　In the event that the majority vote of such doctors determines that the pilot has continuously met the physical standards established in paragraph (A) above, any sick leave credits paid to such pilot during the period of his removal from availability from flying will be credited to his sick leave credit account.

**Spilting of Expense
for Medical Examiner**

6.    The expense of employing the disinterested Medical Examiner shall be paid one-half by the pilot and one-half by the Company.  Copies of such board's report shall be furnished to the Company and to the pilot.

**(E)**    The Company shall monitor the decibel level in flight and on the ramp to determine causes for hearing damage and eliminate those causes whenever possible. The Company shall furnish acceptable ear protection, ear examination and treatment for job related hearing damage at no expense to the pilot.

**(F)**    In the event that the Federal Aviation Administration or other controlling governmental agency should change the method of medical certification or standards during the term of this Agreement, the Company and the Association will meet and confer to agree on how such change will be implemented into the Company's medical program.  Unless mutually agreed to otherwise, such meeting shall be held within thirty (30) days after being notified of the pending change and such conference(s) shall be strictly limited to the implementation of the change.

In the event that the parties are unable to agree on the methodology of the change, the Company and the Association agree to submit such dispute to the five member System Board of Adjustment in accordance with Section 21.  The neutral member selected shall be required to render his decision no later than fifteen (15) days after the date of the hearing.

**(G)    General**

1.    The Company shall bear the cost of any physical examination taken at its request.

2.    The provisions of this Section shall not be applicable nor employed in any manner for disciplinary or dismissal action against a pilot.

3.    Should a pilot be removed from flight duty as a result of any physical examination taken at Company request, he shall, from the date he is removed from flight status, receive any sick leave benefits accumulated under the provisions of this Agreement and at the expiration of such sick leave shall be reimbursed for any loss of compensation incurred at full pay until the date of the successful completion or failure of his next periodic FAA physical examination.

4.    No pilot, once employed by US Airways, Inc., and whose name appears on the US Airways Pilots' System Seniority List, shall be required to undergo any psychological testing or examination.

No pilot shall be required to attend any behavior modifying personality courses, seminars and/or clinics without the prior approval of the Master Executive Council.

**15**

**General Provisions**

**Personal Notes**

      5.    None of the provisions of this Section shall negate any of the provisions or benefits provided by this Agreement.

# **EXHIBIT 14**

*ExceRPT*

Current Articles | Archives | Search

**18**

# Important LAX Update for May 18, 2019: The Deception

posted on May 18, 2019 13:20

My Fellow LAX Pilots,

This is the second of a series of Communications Blasts over the next week or so whose purpose is to inform our Los Angeles based Pilots of some very important and critical issues that may affect your quality of life, scheduling, pay and careers as Pilots of American Airlines.

The Summer flying schedule officially kicks off this month. Pilot labor is stressed with record retirements, a training choke jam and has an unsuccessful attempt to recruit X-Type Check Airmen and Women to fill any labor shortfalls.

At the negotiating table, management has put next to zero engagement and zero effort into negotiations outside of just "showing up." I think we can confirm that they are present during negotiations; however, we are trying to confirm whether or not they are awake. Management was awake enough to give themselves healthy bonuses after announcing 2018 financial results and ignoring the established $3 Billion dollar triggering metric. I guess a $2.7 billion 2018 operating profit, which is decreasing, was good enough. Of course there's always money to buy back stock. AA management has dedicated over $1 billion for stock buy backs for 2019. That's a total of nearly $14 billion since 2015. So CEO Parker's legacy is big bonuses, big stock buy backs and enormous debt – more than twice that of its nearest comparator, UAL, at over $33 billion. All this while our pilots work under an archaic bankruptcy contract. New hire pilots are leaving the company by the dozens within days and weeks of initial indoc training for Delta, United and Southwest Airlines. Our LTD Pilots suffer under the worst LTD program in the industry while management confiscates their offsets monthly and puts the money in THEIR pocket for THEIR bonuses! I have only one word: Disgusting

The Summer flying season has begun. Your Union is telling you to fly your contract and KNOW YOUR CONTRACT. <u>DON'T LET THE COMPANY VIOLATE YOUR NOTIFICATION RIGHTS!</u>

Section 15.B – Notification

Our collective future depends on your participation in the election process. We encourage you to research all of the candidates and then make a vote for your choice. Thank you for your attention, your engagement and exercising your right to vote.

## Spike in Complaints

In recent weeks, there has been an increase in the number of complaints made against our pilots. This has demonstrated itself in a spike of Section 21 Investigative and Disciplinary Hearings just in the month of April as well as additional possible Section 21 Disciplinary Hearings for May 2019. Most of the complaints involve allegations of sexual harassment, hostile work environment, and other allegations.

As professional aviators, we have many demands made upon us, and we need to work together effectively. In the event you have a concern/complaint about the way you were treated or talked to by a fellow APA Pilot, please call APA Professional Standards or LAX Professional Standards FIRST! The first call needs to be to the Union, FIRST! Additionally, please call your LAX Domicile Reps, FO Hugh Fenwick or myself. Pro Standards and your Reps are here to listen to the issues and solve disputes to satisfaction as much as possible while keeping our pilots safeguarded from company discipline. APA Professional Standards has developed an extensively trained network of nearly 120 volunteers who are ready and willing to provide confidential assistance. If you are in need of support, would like guidance on where/how to properly address an issue, or simply want to discuss a situation confidentially with a peer – your first call should be to one of your Professional Standards volunteers. Our on-call phone number is listed below for your convenience.

I would like to remind our pilots to always maintain your usual high degree of professional demeaner with our fellow employee groups. Limiting unnecessary and extracurricular personal conversations and activities reduces the chance of a misunderstanding or conflict. Use your best judgement. Always be courteous and professional. As a technique, I say "yes ma'am, no ma'am, thank you ma'am or sir," keeping it short and professional. Staying courteous and professional at all times while avoiding unnecessary interaction will go a long way to preventing any misunderstandings or conflicts that could involve possible HR complaints and company investigations under JCBA Section 21.

APA National Professional Standards

CA Doug Wood, Chairman

817-302-2226

Please click here to go to the APA National Professional Standards webpage for a list of volunteers and their contact numbers.

LAX Professional Standards

CA Stephen Schwartz, Chairman

916-508-1005

I will be in Boston next week to attend the Spring 2019 Board of Directors Meeting. More information will be forthcoming. Thank you for your attention and engagement during this time of the beginning of the Summer 2019 flying season and management disengagement during Section 6 negotiations.

FO Paul "Pablo" Janka

APA LAX Vice Chairman

pjanka@alliedpilots.org

Posted in: Los Angeles

Actions: E-mail | Permalink |

# EXHIBIT 15

# EXHIBIT 16

# EXHIBIT 17

# **EXHIBIT 18**

# Record of Simulator Checks (STI 8410)

**NAME:** Mr. Scott Patterson  
**COMPANY:**  
**CATEGORY:** IC97  

**COURSE#:** B400A-IC-

| TYPE OF CHECK: ☐ PIC 135.293 & 297 ☒ PIC 135.297(only) ☐ SIC 135.293 | | | | |
|---|---|---|---|---|
| Ground Operations | Sim 1 | | Instrument Procedures | Sim 1 |
| Preflight (Interior) | S | | Departure | S |
| Preflight Exterior | S | | Arrival (FMS) | S |
| Start Procedures | S | | Holding | S |
| Taxiing | S | | ILS Approach (1800 RVR) | Sim 1 |
| Pre-Takeoff Checks | S | | Normal ILS | S |
| Takeoffs | Sim 1 | | Engine-Out ILS | S |
| Normal | S | | Autopilot ILS | S |
| Crosswind | S | Simulator Type: | Raw Data (If Required) | NA |
| Instrument RVR ( 600 ) | S | BE-400A | Nonprecision Approach | Sim 1 |
| With Engine Failure | S | | VOR (Without Vertical Guidance) | S |
| Rejected | S | | RNAV (GPS) (With Vertical Guidance) | S |
| In-Flight Maneuvers | Sim 1 | Simulator Level: | Circling | S |
| Steep Turns | S | D | GPS (If Required) | S |
| Stall – Takeoff | S | | Missed Approach | Sim 1 |
| Stall – Clean | S | | From an ILS | S |
| Stall – Landing | S | | Engine Out | S |
| Engine Failure /Shutdown | S | | Second Missed Approach | S |
| Engine Restart | S | | General | Sim 1 |
| Unusual Attitudes | S | | Abnormal Procedures | S |
| Specific Flt. Characteristics | NA | | Emergency Procedures | S |
| Landings | Sim 1 | | Com / Nav Procedures | S |
| Normal | S | | Use of Autopilot | S |
| Crosswind | S | | Autopilot in Lieu of Required SIC | NA |
| From an ILS | S | | Judgment | S |
| From a Circle | S | | CRM | S |
| Rejected | S | | PIC Performance as SIC | S |
| No-Flap | S | | Adherence to Checklist | S |
| 1-Engine Out | S | | Adherence to Maneuver/SOP | S |
| 2-Engines Out (If Required) | NA | | Right Seat Takeoff/Landing | NA |

| CHECK RESULTS | S/U | DATE | CHECK AIRMAN NAME AND SIGNATURE |
|---|---|---|---|
| Oral 293(a)(1) | | | |
| Oral Base Aircraft ☐293(a)(2) ☒297 | S | 06/03/2017 | Electronically signed by: Ronald Lee Welch |
| Oral 293(a)(2)   Variant-Model: | | | |
| Oral 293(a)(3) Wt. & Balance | | | |
| Oral 293(a)(4 -8) Gen Subjects | | | |
| Sim Check 1 ☐293(b) ☒297(c) | S | 06/03/2017 | Electronically signed by: Ronald Lee Welch |
| Sim Check 2 ☐293(b) ☐297(c) | | | |

| Total Sim Check 1 & 2 Pilot Flying Time: | 2.0 | Base Month: _____ ** | Expires** |
|---|---|---|---|
| **FAA ONLY** | | 12 mo 135.293(a)(2) | |
| Meets requirements of 135.339 & 340 (a)(2)   ☐ Sat ☐ Unsat | | 12 mo 135.293(b) | |
| TCE Observation  ☐ Approved ☐ Disapproved ☐ Certification Authority | | 6 mo 135.297 | |
| REGION              DISTRICT OFFICE | | REMARKS: T* - Training to proficiency required ** - To be entered by certificate holder | |
| FAA INSPECTOR'S NAME AND SIGNATURE | | | |

Approved substitute for FAA 8410-3

Version 3 – 9/21/2015

Patterson_00414



21A-OF-017
REV: 2
07/17/2017

## PILOT LINE CHECK

| PILOT'S NAME:<br>(Last, First, MI) Patterson, Rodney Scott | EMP #: 21063 | POSITION<br>■ CPT  ☐ FO | AIRCRAFT MODEL<br>B767 | DATE: 11/15/2017 |
|---|---|---|---|---|

| PILOT<br>CERT #: 2590908 | CERTIFICATE TYPE<br>■ ATP  ☐ COMM | MEDICAL<br>EXPIRATION (M/Y): 01/2018 | MEDICAL CLASS<br>■ FIRST  ☐ SECOND |
|---|---|---|---|

| AIRCRAFT<br>REG: N999YV | FROM: KMCO | TO: KMIA | NO OF<br>LANDINGS: 1 | BLOCK<br>TIME: 1:00 |
|---|---|---|---|---|

| TYPE OF CHECK:  ■ INITIAL  ☐ UPGRADE ☐ TRANSITION    ☐ RECURRENT  ☐ ROUTE  ☐ QAP  ☐ PWP |
|---|

GRADING:    S = SATISFACTORY    U = UNSATISFACTORY (REQUIRES COMMENT)    NA = NOT APPLICABLE   (W) = CAN BE WAIVED    W = WAIVED

| PERSONAL ITEMS | | 21. Route Changes | —— |
|---|---|---|---|
| 1. Uniform Appearance | S | - FMS Data Entry/Crosscheck | S |
| 2. Manuals / Flight Materials | S | -Verify Changes on Flt Plan | S |
| 3. License and Medical | S | DESCENT /APPROACH /LDG | |
| PREFLIGHT | | 22. Descent Planning | S |
| 4. Flight Planning | S | 23. Altitude/Speed Control | S |
| 5. Forms / Logbook | S | 24. Aircraft Configuration | S |
| 6. Exterior/Interior Inspection | S | 25. Altitude/Airspeed Control | S |
| 7. Performance Computations | S | 26. Holding Procedures | S |
| 8. Weight & Balance | S | 27. Approach Compliance | S |
| 9. Computer Flight Plan Checked | S | 28. Stabilized Approach | S |
| BEFORE TAKEOFF | | 29. Pilot Flying ■ PIC ☐ FO | —— |
| 10. Engine Start / Taxi Procedures | S | 30. Type Appr. ☐ IFR ■ VFR | —— |
| 11. Clearance & Briefing | S | 31. Missed Approach | NA |
| 12. Taxi, Pre T/O, RWY Awareness | S | 32. Landing | S |
| DEPARTURE | | 33. Crew Coordination | S |
| 13. Takeoff Procedures | S | 34. Use of Checklists | S |
| 14. Takeoff Profile | S | 35. Flight Management / CRM | S |
| 15. Departure / SID Compliance | S | 36. Judgment | S |
| ENROUTE / CRUISE | | MISCELLANEOUS | |
| 16. Adherence to Clearance | S | 37. *Accuracy Checks / Recording | NA |
| 17. Use of NAV Aids | S | 38. International Flight Planning | NA |
| 18. En-route Radar Procedures | S | 39. HLA Operations | NA |
| 19. Cruise Procedures | —— | 40. Overwater Operations | NA |
| - Manual Entries | S | 41. *Contingency Procedures in HLA Airspace | NA |
| - Fuel / Time Update | S | * Items may be briefed | |
| 20. Communication Procedures | s | | |

| OVERALL PERFORMANCE | ■ SATISFACTORY<br>☐ UNSATISFACTORY | STUDENT<br>SIGNATURE: | _signature_ |
|---|---|---|---|

| I CERTIFY THAT THE ABOVE TRAINING WAS ADMINISTERED AS INDICATED AND THE OVERALL PERFORMANCE WAS AS SHOWN. |
|---|

| CHECK PILOT<br>NAME (Print): Holbrook, V | EMP #: 21042 | FAA OR COMPANY<br>OBSERVER NAME: Bernhardt, T | ID #: 5890 |
|---|---|---|---|
| CHECK PILOT<br>SIGNATURE: _signature_ | | FAA OR COMPANY<br>OBSERVER SIGNATURE: _signature_ | |

**Completion Certified by the Chief Pilot/ Director of Operations**

| NAME(PRINT): Wilhoit, James R | SIGNATURE _signature_ | DATE: 11/15/2017 |
|---|---|---|



21A-OF-014
REV: 2
07/17/2017

## PILOT PROFICIENCY CHECK

| PILOT'S NAME (Last, First, MI) | Patterson, Rodney S | EMP# 21063 | POS CA | AIRCRAFT B767 |
|---|---|---|---|---|

| PILOT CERT #: 2590908 | CERTIFICATE TYPE ■ ATP ☐ COMM | MEDICAL EXPIRATION 02/28/2019 | MEDICAL CLASS ■ FIRST ☐ SECOND |
|---|---|---|---|

| SIM LOC PAIFA | SIM NO #4-031 | DATE 09/05/2018 | BLOCK TIME 02:00 |
|---|---|---|---|

| TYPE OF CHECK | ☐ INITIAL (No events can be waived) ☒ RECURRENT ☐ TRANSITION ☐ UPGRADE | ☐ RIGHT SEAT TASK ☐ REQUALIFICATION ☐ PROFICIENCY WATCH ☐ QAP |
|---|---|---|

GRADING:   S = SATISFACTORY   U = UNSATISFACTORY (REQUIRES COMMENT)   NA = NOT APPLICABLE   (W) = CAN BE WAIVED   W = WAIVED

| | | | 17. Missed Approach* (Other_____) | S |
|---|---|---|---|---|
| 1. Oral Exam | S | | 18. Steep Turns (PIC) | S |
| 2. Preflight Inspection ■ Pictorial | S | | 19. Approaches To Stalls 2 of 3(W)(one must be in a turn) | — — |
| 3. Starts Normal / Abnormal | S | | ■ Level Off | S |
| 4. Taxiing / Runway Awareness | S | | ■ Turning Base | S |
| 5. Power Plant Checks | S | | ■ ILS Final Approach | S |
| 6. Normal | S | | 20. Flight Deck Communication Procedure | S |
| 7. Instrument (RVR 500 with 100' Ceiling) | S | | 21. Engine Failure | S |
| 8. Crosswind (Note 6 & 8 May Be Combined) | S | | | |
| 9. Engine Failure After V₁ | S | | 22. Normal | S |
| 10. Rejected Take-Off | S | | 23. From ILS | S |
| | | | 24. Crosswind (may be combined with 22 or 23) | S |
| 11. Area Departure and Arrival (One Required) | | | 25. Engine Out Landing | S |
| ■ Area Departure | S | | 26. Rejected (50' AFE) | S |
| ☐ Area Arrival | S | | | |
| 12. Holding | S | | 27. Normal | S |
| 13. Precision Approaches | | | 28. Non-normal | S |
| Normal ILS (100'& RVR 1800) | S | | 29. Emergency | S |
| Engine Out ILS (Manual) | S | | | |
| 14. Non-Precision Approaches (Two Required, one using  VNAV) | | | 30. Takeoff Prior To V₁ | NA |
| ■ VOR | S | | 31. Takeoff After Vʀ | NA |
| ■ LOC | S | | 32. On Approach | NA |
| ☐ NDB | NA | | | |
| 15. Circling Approach | NA | | 33. Judgment | S |
| 16. Missed Approach (ILS)* | S | | 34. Crew Resource Management | S |

REMARKS:

| Overall Performance ■ Satisfactory  ☐ Unsatisfactory | Student Signature | |
|---|---|---|

I CERTIFY THAT THE ABOVE TRAINING WAS ADMINISTERED AS INDICATED AND THE OVERALL PERFORMANCE WAS AS SHOWN.

| CHECK PILOT NAME Wilhoit, James R | EMP # 21005 | FAA OR COMPANY OBSERVER NAME | ID # |
|---|---|---|---|

| CHECK PILOT SIGNATURE | FAA OR COMPANY OBSERVER SIGNATURE |
|---|---|

### Completion Certified by the Chief Pilot / Director of Operations

| NAME (Last, First, Mi) | SIGNATURE | DATE |
|---|---|---|

*One complete approved missed approach procedure required



21A-OF-049
REV: 2
07/17/2017

## RIGHT SEAT DEPENDENT TRAINING

| PILOT'S NAME (Last, First, MI) | **Patterson, Rodney S** | EMP # **21063** | POS **CA** | AIRCRAFT **B767** |
|---|---|---|---|---|

| PILOT CERT # **2590908** | CERTIFICATE TYPE ☑ ATP ☐ COMM | MEDICAL EXPIRATION **02/28/2019** | MEDICAL CLASS ☑ FIRST ☐ SECOND |
|---|---|---|---|

| SIM LOC **PAIFA** | SIM NO **#4-031** | DATE **10/23/2018** | BLOCK TIME **00:25** |
|---|---|---|---|

GRADING:     S = SATISFACTORY     U = UNSATISFACTORY (REQUIRES COMMENT)     NA = NOT APPLICABLE   (W) = CAN BE WAIVED     W = WAIVED

| | | |
|---|---|---|
| 1. | Preliminary Preflight Procedures | S |
| 2. | Amplified Preflight - First Officer | S |
| 3. | Normal and Abnormal engine starts | S |
| 4. | After start procedures | S |
| 5. | Taxi procedures | S |
| 6. | Before Takeoff procedures and checklist | S |
| 7. | Pre-takeoff procedures and checks | S |
| 8. | Rejected takeoff | S |
| 9. | Normal takeoff | S |
| 10. | Loss of critical engine after V1 | S |
| 11. | 1-engine ILS Approach and Landing | S |
| 12. | After landing procedure and checklist | S |
| 13. | Shutdown procedure and checklist | S |

REMARKS:

| Overall Performance  ☑ Satisfactory   ☐ Unsatisfactory | Student Signature |
|---|---|

I CERTIFY THAT THE ABOVE TRAINING WAS ADMINISTERED AS INDICATED AND THE OVERALL PERFORMANCE WAS AS SHOWN.

| CHECK PILOT NAME **Wilhoit, James R** | EMP # **21005** | FAA OBSERVER NAME | FAA ID # |
|---|---|---|---|
| CHECK PILOT SIGNATURE | | FAA OBSERVER SIGNATURE | |

### Completion Certified by the Chief Pilot/ Director of Operations

| NAME (Last, First, MI) **Nunez Juan P.** | SIGNATURE | DATE |
|---|---|---|



21A-OF-017
REV: 2
07/17/2017

## PILOT LINE CHECK

| PILOT'S NAME: (Last, First, MI) Patterson, Rodney S | EMP #: 21063 | POSITION ■ CPT ☐ FO | AIRCRAFT MODEL B767 | DATE: 11/01/2018 |
|---|---|---|---|---|

| PILOT CERT #: 2590908 | CERTIFICATE TYPE ■ ATP ☐ COMM | MEDICAL EXPIRATION (M/Y): Feb2019 | MEDICAL CLASS ■ FIRST ☐ SECOND |
|---|---|---|---|

| AIRCRAFT REG: N999YV | FROM: KPHL | TO: KMIA | NO OF LANDINGS: 1 | BLOCK TIME: 2:24 |
|---|---|---|---|---|

| TYPE OF CHECK: | ☐ INITIAL | ☐ UPGRADE | ☐ TRANSITION | ■ RECURRENT | ☐ ROUTE | ☐ QAP | ☐ PWP |
|---|---|---|---|---|---|---|---|

GRADING:   S = SATISFACTORY   U = UNSATISFACTORY (REQUIRES COMMENT)   NA = NOT APPLICABLE   (W) = CAN BE WAIVED   W = WAIVED

| PERSONAL ITEMS | | | 21. Route Changes | S |
|---|---|---|---|---|
| 1. Uniform Appearance | | S | - FMS Data Entry/Crosscheck | S |
| 2. Manuals / Flight Materials | | S | -Verify Changes on Flt Plan | S |
| 3. License and Medical | | S | DESCENT/APPROACH /LDG | |
| PREFLIGHT | | | 22. Descent Planning | S |
| 4. Flight Planning | | S | 23. Altitude/Speed Control | S |
| 5. Forms / Logbook | | S | 24. Aircraft Configuration | S |
| 6. Exterior/Interior Inspection | | S | 25. Altitude/Airspeed Control | S |
| 7. Performance Computations | | S | 26. Holding Procedures | |
| 8. Weight & Balance | | S | 27. Approach Compliance | S |
| 9. Computer Flight Plan Checked | | S | 28. Stabilized Approach | S |
| BEFORE TAKEOFF | | | 29. Pilot Flying ■ PIC ☐ FO | S |
| 10. Engine Start / Taxi Procedures | | S | 30. Type Appr. ■ IFR ☐ VFR | S |
| 11. Clearance & Briefing | | S | 31. Missed Approach | NA |
| 12. Taxi, Pre T/O, RWY Awareness | | S | 32. Landing | S |
| DEPARTURE | | | 33. Crew Coordination | S |
| 13. Takeoff Procedures | | S | 34. Use of Checklists | S |
| 14. Takeoff Profile | | S | 35. Flight Management / CRM | S |
| 15. Departure / SID Compliance | | S | 36. Judgment | S |
| ENROUTE / CRUISE | | | MISCELLANEOUS | |
| 16. Adherence to Clearance | | S | 37. *Accuracy Checks / Recording | NA |
| 17. Use of NAV Aids | | S | 38. International Flight Planning | NA |
| 18. En-route Radar Procedures | | S | 39. HLA Operations | NA |
| 19. Cruise Procedures | | S | 40. Overwater Operations | NA |
| - Manual Entries | | S | 41. *Contingency Procedures in HLA Airspace | NA |
| - Fuel / Time Update | | S | * Items may be briefed | |
| 20. Communication Procedures | | s | | |

| OVERALL PERFORMANCE | ■ SATISFACTORY ☐ UNSATISFACTORY | STUDENT SIGNATURE: | *(signature)* |
|---|---|---|---|

**I CERTIFY THAT THE ABOVE TRAINING WAS ADMINISTERED AS INDICATED AND THE OVERALL PERFORMANCE WAS AS SHOWN.**

| CHECK PILOT NAME (Print): Wilhoit, James R | EMP #: 21005 | FAA OR COMPANY OBSERVER NAME: | | ID #: |
|---|---|---|---|---|
| CHECK PILOT SIGNATURE: *(signature)* | | FAA OR COMPANY OBSERVER SIGNATURE: | | |

**Completion Certified by the Chief Pilot/ Director of Operations**

| NAME(PRINT): Nunez, Juan P | SIGNATURE *(signature)* | DATE: 11/02/2018 |
|---|---|---|

# EXHIBIT 19

Aerospace Neurology, LLC
John D. Hastings, M.D.
5563 S. Lewis Avenue, Suite 100
Tulsa, Oklahoma 74105
Phone (918) 742-4100
Fax: 918-512-4846

Board Certified:  Neurology                                              Neurological Consulting
Board Certified:  Aerospace Medicine                         Aerospace Medicine Consulting

May 28, 2016

Re:
Patterson Scott
D.O.B.: Nov.18.1967

Independent Aeromedical Neurological Evaluation

I performed an office aeromedical neurological evaluation on Mr. Scott Patterson on
May.24.2015. This report is based upon the history provided by Mr. Patterson and review of
records, which include neuropsychological assessment by Dr. John Knippa.  Mr. Patterson
stated that a neurological evaluation was requested by his airline employer for assessment of
his fitness to fly from a neurological perspective.

Mr. Patterson is a 48-year-old airline pilot who has served in the military for 28 years and
nearing mandatory military retirement at 29 years at the rank of Lieutenant Colonel He has
flown with American Airlines for 16 years.  He reports excellent general health.  He has no
history of diabetes, hypertension or heart disease.  His wisdom teeth were removed in the Army
28 years ago.  He has not had an appendectomy or tonsillectomy.  His only other surgical history
is for removal of spindle cell sarcoma of the left chest wall, which will be discussed later in this
report.  He takes no prescription medication, only supplements.  He has managed cholesterol
successfully with dietary management.  He has maintained first class FAA medical certification
at six month intervals.

On Dec.06.2014 Mr. Patterson was bathing his usually timid cat when he was deeply clawed in
the left pectoral area, causing significant bleeding.  He cleansed the area and thought it was
healing satisfactorily.  On Dec.26.2014 his wife noted a small lump in the area of the cat claw.
He saw his primary care physician on Dec.31.2014 and had serologic studies for cat scratch
fever, which were unrevealing.  He discussed the lump further with a friend, a cardiovascular
surgeon from University of Miami.  This led to referral and a punch biopsy that "looked like
fat."  However, permanent pathology sections indicated spindle cell sarcoma, and the lesion
was treated with wide excision.  Surgical margins were clear.  MRI and PET studies were
unrevealing with the exception of the PET scan showing uptake at the lesion site.  No radiation
or chemotherapy was felt indicated and none was instituted.  The FAA Aerospace Medical
Certification Division was informed, and Mr. Patterson received special issuance medical
certification.  He returned to work on May.31.2016.  Mr. Patterson is followed at intervals of
several months by his physician, Dr. Dayton.

In September 2015 Mr. Patterson stated he was called upon for military duty associated with
the visit of Pope Francis to the United States.  He called for permission to be relieved of airline
duties related to military duty.  He reported some communication difficulties in accomplishing

this, but stated he did receive approval. He states he was later notified of an issue related to problems with a flight attendant in October 2014 on a flight with his family to Paraguay. Eventually this involved a "Section 20" procedure. Mr. Patterson was referred for neuropsychological assessment to Dr. John Knippa in Long Beach, California. Dr. Knippa's report was sent to the airline, and Mr. Patterson was reported not fit for duty. Mr. Patterson stated that he was later directed to undergo repeat neuropsychological assessment, oncology evaluation and neurological evaluation. Though I do not have specific records requesting neurological evaluation, it appears that performance on neuropsychological assessment led to a recommendation for neurologic evaluation.

Mr. Patterson has no history of seizures, febrile or otherwise and there is no family history of seizures. He has no history of remote neurological insult such as significant head injury, skull fracture or traumatic brain injury. There is no history to suggest neurologic difficulty in perinatal period, infancy, childhood, adolescence or in adult life. Mr. Patterson denied any neurological symptoms on full neurologic inventory. Specifically, he denied a history of headache, nausea, vomiting, double vision, blurred vision, loss of vision, hearing loss, tinnitus, facial numbness, change in sense of smell or taste, problems with speech or swallowing, neck pain, difficulty with balance, coordination, or walking, numbness or tingling of the extremities, weakness of the extremities, or bladder or bowel symptoms. There is no history of difficulty with memory, thinking, or concentration.

Neurological examination revealed normal gait and station. Heel and toe walking, balance on either foot, and hop on either foot were normal. Alternate motion rate in the feet was normal. Arm swing was normal. Rhomberg was normal and there was no drift or pronation. Tandem walking was normal.

Cranial nerve examination revealed intact visual fields. Ocular movements were normal. The pupils were equal and reactive, and the fundi were normal. Hearing was intact and facial symmetry preserved. Uvula and tongue were midline and speech was normal. Neck motions were normal and there were no bruits.

Coordination and alternate motion rate was normal in all four extremities. The deep tendon reflexes were equal and symmetrical with no pathologic reflexes being elicited. Muscle strength was normal without atrophy or fasciculation. Sensory examination including two-point discrimination, position sense, and vibratory sensation was within normal limits.

A Montreal Cognitive Assessment (MoCA) test was performed. This includes assessment of visuospatial, executive, naming, memory, attention, language, abstraction, and delayed recall and orientation functions. Mr. Patterson scored a normal 29/30 points (normal $\geq$ 26-30 points). He recalled the word "daisy" with cued recall, with all other responses being correct.

I reviewed the Dr. Knippa's report of neuropsychological assessment, which included the FAA Core Test Battery items. CogScreen Aeromedical Edition and traditional pencil and paper assessment instruments were performed. Dr. Knippa opined that Mr. Patterson was not fit for duty. Dr. Knippa opined that some scores on test instruments were not commensurate with typical pilot normative data. I carefully reviewed Dr. Knippa's report, in which I do not find evidence to suggest neurologically based impairment in neuropsychological function including personality, behavior intellect or memory.

Based upon the history, neurologic examination and review of Dr. Knippa's report, my professional medical opinions are as follows:

- By history and neurological examination, there is no neurological disorder evident. I find him neurologically intact and whole.

2

- There is no indication by history, examination and review of medical records indicating a need for further neurological testing.  There is no sound medical indication for studies such as brain imaging studies, electroencephalogram or other neurologic studies.
- It is my professional medical opinion that Mr. Patterson poses no risk to aviation safety and that he is fit to fly from a neurological standpoint.

I am prepared to answer any questions or discuss any aspect of Mr. Patterson's neurologic status and fitness to fly.

Sincerely,

John D. Hastings, M.D.

# EXHIBIT 20

# IN THE WORKERS' COMPENSATION COURT OF THE STATE OF MONTANA

## 1998 MTWCC 62
## WCC No. 9705-7753

---

### PERRY BARTELS

**Petitioner**

**vs.**

### STATE COMPENSATION INSURANCE FUND

**Respondent/Insurer for**

### PREWITT FEEDLOT, INCORPORATED

**Employer.**

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

**Summary:** A 45-year old mill operator claimed permanent total disability. In 1992, at the age of 39, he suffered a closed head injury after being knocked unconscious by a group of cows and gate. He remained on temporary total disability benefits through December 14, 1995, when the insurer terminated benefits on the opinions of two neuropsychologists that claimant was capable of returning to his time of injury job. The record demonstrates claimant had limited intellectual and cognitive abilities as well as hysterical personality traits pre-injury. According to expert testimony, these traits makes it more difficult for him to overcome challenges and deficits following the head injury. He also displays somewhat strange behavior and statements in conflict with those of others.

**Held:** The Court finds claimant presently permanently, totally disabled. The Court is persuaded that claimant presently has no prospect of regular employment given the impact of his closed head injury on his pre-existing abilities and personality. The Court notes that claimant was able to obtain and keep employment prior to the injury, but since the injury has not worked, other than through an on the job training program, which was ultimately not successful. The Court rejects the insurer's contentions claimant is not credible

and is deliberately malingering. No credible expert has rendered that opinion. The Court's own impression of claimant through observations of his testimony at trial and review of the record is that claimant's bizarre behavior and incredible statements are a product of his personality and circumstances, including the aftereffects of the injury, and are not premeditated. Despite the PTD finding, the Court believes that with significant assistance, claimant could once more become employable, as suggested by his improvement during a 1993-1994 rehabilitation program.

**Topics:**

**Benefits: Permanent Total Benefits: Generally.** The Court finds PTD a 45-year old mill operator who suffered a closed head injury at the age of 39 and has not since worked. Given the impact of the head injury on claimant's pre-existing limited intellectual and cognitive abilities and hysterical personality tendencies, he presently has no prospect of regular employment. The Court notes that claimant was able to obtain and keep employment prior to the injury, but since the injury has not worked, other than through an on the job training program, which was ultimately not successful. The Court rejects the insurer's contentions claimant is not credible and is deliberately malingering. No credible expert has rendered that opinion. The Court's own impression of claimant through observations of his testimony at trial and review of the record is that claimant's bizarre behavior and incredible statements are a product of his personality and circumstances, including the aftereffects of the injury, and are not premeditated. Despite the PTD finding, the Court believes that with significant assistance, claimant could once more become employable, as suggested by his improvement during a 1993-1994 rehabilitation program.

**Vocational – Return to Work Matters: Employability.** The Court finds PTD a 45-year old mill operator who suffered a closed head injury at the age of 39 and has not since worked. Given the impact of the head injury on claimant's pre-existing limited intellectual and cognitive abilities and hysterical personality tendencies, he presently has no prospect of regular employment. The Court notes that claimant was able to obtain and keep employment prior to the injury, but since the injury has not worked, other than through an on the job training program, which was ultimately not successful. The Court rejects the insurer's contentions claimant is not credible and is deliberately malingering. No credible expert has rendered that opinion. The Court's own impression of claimant through observations of his testimony at trial and review of the record is that claimant's bizarre behavior and incredible statements are a product of his personality and circumstances, including the aftereffects of the injury, and are not premeditated. Despite the PTD finding,

the Court believes that with significant assistance, claimant could once more become employable, as suggested by his improvement during a 1993-1994 rehabilitation program.

¶1 The trial in this matter was held on January 12 and 13, 1998, in Great Falls, Montana. Petitioner, Perry Bartels (claimant), was present and represented by Mr. Cameron Ferguson. The respondent, State Compensation Insurance Fund (State Fund), was represented by Mr. Charles G. Adams. A partial transcript, consisting of Dr. Marion Martin's testimony, has been prepared.

¶2 <u>Witnesses</u>: Claimant, Jo Ellen Bartels (claimant's wife), Betty Wilson (claimant's mother-in-law) and Marian Martin, Ph.D. were sworn and testified. By agreement of the parties, Hal Bowles testified by telephone. No depositions were submitted.

¶3 <u>Exhibits</u>: Exhibits 1 through 10 were admitted without objection.

¶4 <u>Proposed Findings</u>: The parties submitted post-trial proposed findings of fact and conclusions of law. The matter was deemed submitted for decision on February 9, 1998.

¶5 <u>Issues</u>: The parties have set forth three issues in the Pretrial Order, which the Court combines and restates as follows:

- Is claimant presently permanently totally disabled?

- Is claimant entitled to total disability benefits retroactive to December 1995?

<u>FINDINGS OF FACT</u>

¶6 Claimant is 45 years old. He is married and lives with his wife in or near Sidney, Montana.

<u>Workers' Compensation Injuries</u>

¶7 For a number of years, the claimant was employed by Prewitt Feedlot Incorporated (Prewitt). His job duties included operation of a mill at the feedlot and helping out with cattle.

¶8 On January 23, 1991, claimant fell on ice while at Prewitt and injured his left elbow.

¶9 On August 10, 1992, claimant was helping put cattle into a pen at Prewitt when he was struck by a gate. He was knocked unconscious.

¶10 After regaining consciousness claimant was taken to the emergency room at the Community Memorial Hospital in Sidney. He was hospitalized overnight.

¶11 During his hospitalization, claimant was treated by Dr. Donald A. Cooper. (Ex. 5a at 32.) Dr. Cooper is an internist and had treated claimant on two prior occasions in 1987 and 1991.

¶12 Dr. Cooper made the following contemporaneous note concerning claimant's physical examination on August 10:

He is quite stuporous. **He does not recognize me**, he does not answer questions but seems to think about the question for several minutes, then gradually act[s] on it.

(Ex. 5a at 30, emphasis added.) In his discharge note of August 11, 1992, Dr. Cooper wrote:

This 39 year old man was admitted to the hospital on 8/10/92 and discharged on 8/11/92. He had been seen in the emergency room after being hit by a group of cows and gate and knocked an indeterminate distance and knocked unconscious. When he came in he was awake but he was unaware and his thinking was extremely slow.

(Ex. 5a at 32.) The notes raise a significant question as to whether claimant's reported preinjury recollection, and his belief that he was unconscious only briefly, are accurate.

## Workers' Compensation Claims and Benefits Paid

¶13 At the time of the claimant's injuries, Prewitt was insured by the State Compensation Insurance Fund.

¶14 Claimant submitted written claims for both injuries and the State Fund accepted liability for both.

¶15 The State Fund initiated temporary total disability benefits sometime after claimant's head injury, however, on December 14, 1995, it gave claimant a 14-day notice that it was terminating his temporary total disability benefits. The termination was based on the opinions of two neuropsychologists who opined that claimant was capable of returning to his time-of-injury job.

### The Present Petition

¶16 Claimant disputes the State Fund's termination of benefits. He seeks reinstatement of his total disability benefits retroactive to December 28, 1995, the date they were terminated.

¶17 Claimant's request for reinstatement of total disability benefits is based on his closed-head injury. He does not contend that he is totally disabled on account of his elbow injury.

### Initial Comments Concerning Factual Basis for Decision

¶18 The question presented in this case is whether claimant's closed-head injury disables him from returning to his time-of-injury employment and from any other regular employment. I have found it an extraordinarily difficult task to make that determination. Despite the large stake both sides have in the resolution of the issue, the evidence presented by both sides was less than the issue deserves.

¶19 Claimant presented his medical evidence solely through medical records. Exclusive reliance on medical records makes sense in a case where the medical opinions are not in dispute. But in this case there is a significant dispute concerning the extent and effect of any head injury.

¶20 On its part, the State Fund relied on opinions of two neuropsychologists, one of whom testified at trial, that the claimant's level of intellectual functioning was not significantly affected by any head injury and that he should be able to return to his former work. However, neither neuropsychologist provided a full explanation as to why the claimant has not returned to employment. Is he deliberately exaggerating his symptoms and disability? While there is some evidence suggesting that possibility, neither neuropsychologist specifically argued it. While the State Fund attacked claimant's credibility it did so almost entirely based on his testimony and deportment at trial. That reliance might

have been justified but for claimant's limited intelligence and his history, as documented in medical records, of bizarre and sometimes exaggerated perception and behavior.[2]

## Claimant's Preinjury Mental Status

¶21 Preinjury psychological testing placed claimant in the borderline range of intelligence and intellectual functioning. An IQ test performed in July 1983 showed a full-scale IQ of 83, which falls "within the dull normal range." (Ex. 9 at 348.) Another psychological test performed in 1983 showed "evidence of distractibility, poor attention span, and the potential for affective[3] instability." (*Id.*) An MMPI-1 administered in 1983 produced a profile which is consistent with individuals who "are often seen as introverted, unpredictable, and peculiar in action and thought." (*Id.*) The psychologist who evaluated claimant in 1983 commented that claimant "does appear to have some pervasive feelings of inadequacy regarding his intellectual abilities and past academic failures." (*Id.* at 349.)

¶22 Claimant completed highschool, however, he ranked 153rd in a class of 159 and his grade point average was 1.27. (Ex. 5e at 77.)

¶23 Claimant's medical records show that he has a long standing history of mental and emotional problems, some of which may be exacerbated by low intelligence and intellectual functioning. A December 14, 1978 medical note says:

25 year old white male with a history of mental problems over the past year or two. This young man was highly depressed to the point of psychosis, withdrawn and suicidal. He was unable to take care of daily needs in terms of living and unable to hold his job.

(Ex. 5u at 263.) In a psychological interview in 1983, claimant indicated that in 1978 he was going through a divorce and had a mental breakdown.

¶24 Other medical notes provide evidence of preexisting psychological and emotional pathology. In 1987 claimant was hospitalized for acute chest and abdominal pains. His behavior led the attending physician to diagnose an "anxiety attack" and to comment, "He really dramaticized [sic] his pains and I think was somewhat of a malingerer." (*Id.* at 259.) The attending physician further noted, "This patient has had numerous problems similar to this where he becomes quite anxious and develops different types of pains." (*Id.* at 258.)

¶25 Prior to his head injury, claimant was able to obtain and hold employment. After high school he served two years (1972-1974) in the United States Army as an infantryman. Following his military service, claimant was employed as a service station attendant, truck driver, farm worker, and, finally, as a grain mill operator.

¶26 Claimant testified that at Prewitt he ran the mill and worked as an all around handyman, fixing water tanks, electrical problems and the mill. He made it sound like a responsible job requiring many difficult skills. He claimed that he received cash bonuses for his work. One of his supervisors, however, testified that claimant's job was repetitive and routine, but that he did not always remember to do things and that his work had to be checked. After reviewing all of the exhibits and testimony, it is my distinct impression, and I find, that claimant exaggerated his preinjury abilities and responsibilities. However, the fact remains that he was able to find and hold employment and work on a long-term, consistent basis prior to his head injury. His employment with Prewitt spanned several years.

<u>Post-Head Injury Evaluation, Treatment and Retraining</u>

¶27 Since his head injury the claimant has complained of sensitivity to light (photo-phobia), headache, memory loss, loss of concentration, extreme fatigue, difficulty following directions, dizziness, irritability, and sleep difficulty. He testified that he is unable to work.

¶28 Dr. Cooper's notes document claimant's symptoms immediately following the accident. On August 17, 1992, he recorded that claimant reported headache, dizziness, inability to be outside for more than 15 minutes, and trouble sleeping. (Ex. 5g at 116.)[5] On August 19, 1992, Dr. Cooper recorded that claimant reported persistent headaches, photophobia, dizziness, and inability to sleep. He noted that claimant was unable to perform a Romberg test.[6] (Ex. 5g at 114.) Dr. Cooper's note of September 1, 1992, reported similar complaints and claimant's continued inability to perform a Romberg test. He noted "there is no way he can work at this time" and referred him to Dr. Dale Peterson, a neurologist, for further evaluation. (*Id.*)

¶29 Dr. Peterson performed a number of neurological tests, all of which were negative. (Ex. 5g.) He concluded in a letter of January 19, 1993, "We can only conclude that Mr. Bartles has a posttraumatic difficulty with cognition." (*Id.* at 102.) He recommended further psychological and occupational evaluation. (*Id.*)

¶30 Dr. Peterson referred claimant to Robert E. Tompkins, Ed.D, a licensed psychologist and practicing neuropsychologist, for evaluation of possible brain damage which might not be detected by imaging and other neurological testing. On January 18, 1993, Dr. Tompkins interviewed claimant and administered a battery of psychological and neuropsychological tests.

¶31 In interviewing claimant, Dr. Tompkins noted slow thinking, speech difficulty, and "gait difficulties typified by balance problems." (Ex. 5e at 82.) Dr. Tompkins recorded that claimant reported fatigue, sleep disturbance, irritability, memory difficulty, dizziness and difficulty concentrating.

¶32 Dr. Tompkins administered an IQ test which disclosed a full scale IQ of 78. (*Id.* at 82.) The other testing disclosed that claimant "appears to have a general impairment in most neurocognitive functions with severity ranging from mild to moderate." (*Id.* at 83.) Dr. Tompkins noted difficulties in memory (especially short-term memory), learning, speech and language, arithmetic, proverb interpretation, word association, executive and self-supervision functions, visual scanning, and certain motor skills. (*Id.* at 83-87.) His diagnostic impression was "[p]ost-concussion syndrome." (*Id.* At 87.) He recommended re-evaluation in one year.

¶33 A year later, Dr. Tompkins reexamined claimant and repeated IQ and neuropsychological tests. (Ex. 5e at 76-80.) His findings were similar to those in January of 1993. Claimant's measured full scale IQ was 74. The testing disclosed deficits in memory, learning ability, speech and language, executive and self-supervision skills, and certain motor skills. (*Id.*) Again, Dr. Tompkins's impression was that claimant was suffering from "[p]ost-concussive syndrome," which he characterized as "moderate to severe." (*Id.* at 80.) He observed that claimant "shows clear signs of actual organic brain injury." (*Id.*)

¶34 Following his 1994 testing of claimant, Dr. Tompkins wrote a letter to the vocational consultant employed by the State Fund. He reiterated his diagnosis of "concussive syndrome, moderate to severe" but added that claimant was also suffering an "adjustment disorder with depressed mood." (*Id.* at 73.) Dr. Tompkins recommended that claimant enroll in a rehabilitation program and psychotherapy and that he increase his social contacts. (*Id.*) He ruled out any future employment involving "transactions involving money, making change or dealing with other than quite routine mechanical activities." (*Id.* at 74.)

¶35 In 1994, through its vocational rehabilitation provider, the State Fund obtained a further neuropsychological evaluation of the claimant by Debra Sheppard, Ph.D, who, like Dr. Tompkins, is a clinical neuropsychologist. (Ex.

5d at 66.) Dr. Sheppard interviewed claimant and performed some testing, however, her testing was not as comprehensive as that of Dr. Tompkins. (*Id.* at 71.) Nonetheless, her testing confirmed that claimant's ability to remember new information was "significantly impaired" and that he had difficulty concentrating. (*Id.*) She further observed that "Mr. Bartels is also evidencing significant problems with initiation and cognitive flexibility." (*Id.*)

¶36 Dr. Sheppard found that, "[t]he pattern of deficits observed [in claimant] is consistent with diffuse cerebral trauma, as well as an overlay of depressive symptoms." (*Id.*) She related the "dysfunction" to his closed-head injury and recommended attention training, applied cognitive rehabilitation therapy, and further speech assessment. (*Id.*)

¶37 Speech testing was done and disclosed that claimant had difficulty in speech fluency and with "auditory comprehension for complex, abstract, material." (Ex. 5d at 63.)

¶38 In the fall of 1994, an effort was begun to provide claimant with training and gradually reintegrate him into the work force. Claimant enrolled in a welding class and was placed in a non-paying, on-the-job training (OJT) position with Ken Damm Welding (Damm) in Sidney. (Ex. 5k at 128; 7 at 314-15.) The OJT placement with Damm ended in November 1994, when Damm was killed in an explosion. (Ex. 5k at 128.)

¶39 Claimant was then placed in non-paying, OJT with Big D Muffler Shop (Big D) in Sidney, where he worked from December 13, 1994 until sometime in March or April 1995. (Ex. 7 at 330; Ex. 5k at 126.) In March 1995, two reports were made concerning his work at Big D. One was by the occupational therapist supervising his program, the other by the State Fund's vocational consultant, who monitored claimant's progress.

¶40 In a March 14, 1995 report, the occupational therapist reported that claimant was working "at least 5 to 6 hours per day" and "at least one and one-half hour at a time before he requires a rest." (Ex. 5k at 126.) The therapist further reported, "Perry spends the majority of his work time standing and working overhead on suspended vehicles." (*Id.*) The therapist reported that claimant was increasing "his activity outside of his work environment" and that he spent "one and one-half to two and one-half hours of additional activity at least 4 out of 5 days per week." (*Id.*)

¶41 In a March 1, 1995 report, the rehabilitation consultant reported that claimant was "working between four and eight hours per day" and that

claimant reported that he could work "four hours without any pain or
headaches, but after a four hour period, he begins to experience these signs
and symptoms." (Ex. 7 at 330.)

¶42 Not all was well, however. By March it appeared that the Big D job was
not going to turn into paid employment. (Exs. 7 at 330; 5k at 126.) Moreover,
claimant began to experience increasing difficulty with his elbow. The elbow
problem brought the OJT to a halt and on May 8, 1995, claimant underwent
elbow surgery. (Ex. 5f at 91.)

¶43 Claimant's convalescence from elbow surgery did not end until November
7, 1995, at which time the claimant's surgeon found him at maximum healing
with respect to the surgery. Shortly thereafter, on December 14, 1995, the
State Fund sent its 14-day notice terminating his temporary total disability
benefits with respect to his head injury.

¶44 Apparently, the December 14, 1995 State Fund letter also ended any
efforts to reintegrate claimant into the work force.

<u>The State Fund's IME Evidence</u>

¶45 In disputing liability for permanent total disability benefits, the State Fund
relies on the opinions of two neuropsychologists heretofore not mentioned.
The first is John Knippa, Ph.D., a neuropsychologist practicing in California.
The second is Marion F. Martin, Ph.D., a clinical psychologist practicing in
Billings, Montana.

¶46 Dr. Knippa rendered an opinion based on a records review; he did not
examine or test the claimant. (Ex. 5c at 55.) After reviewing approximately 200
pages of records furnished to him, he opined that there was no clear objective
evidence of a brain injury resulting from the August 10, 1992 injury; that
claimant's "current cognitive complaint's have no relationship to that incident."
(*Id.* at 57.) He further concluded that the "overriding cause of Mr. Bartels'
functional impairments appears to be long-standing reduced intellectual and
cognitive ability, long-standing social adjustment and psychiatric-related
problems and multiple prior injuries, as well as apparent subsequent injuries,"
(*id.*at 58) and that all of claimant's impairment was "related to
chronic/preexisting complaints, and with expected deteriorations as part of the
natural course of Mr. Bartels' pre-existing conditions" (*id*). With respect to
claimant's prior ability to work, Dr. Knippa commented:

Also, noted from the 9/1/94 correspondence from Prewitt Feed Lot is that prior to his injury, Mr. Bartels was apparently a marginal employee who required repeated instructions, showed poor task follow through and was reported to have "fabricated numerous injuries."

(*Id.* at 58-59.) Immediately following this last observation, Dr. Knippa went on to say, parenthetically, "(Note. The latter appears to indicate preexisting impairment.)"

¶47 Many of Dr. Knippa's observations and opinions are out of line with the observations and opinions of all other medical professionals, including those of Dr. Martin. He did not examine claimant. He relied on hearsay information concerning claimant's job performance that was not furnished to the Court. That hearsay information flies in the face of testimony of a prior supervisor of the claimant and is belied by claimant's employment history. I give no weight to Dr. Knippa's opinions.

¶48 Dr. Martin's trial testimony provided a more substantial basis for the State Fund's position in this case. She did not dispute that claimant suffered a head injury. However, she testified that he still has sufficient skills and abilities to perform regular work, including farm labor such as he had done before.

¶49 Dr. Martin characterized claimant's head injury as mild. (Ex. 5b at 49; Tr. at 65.) Her characterization of the degree of injury is immaterial to the issue of disability. The law concerning disability is indifferent to whether an injury is characterized as mild, moderate or severe. The question that the Court must address is whether the head injury further diminished claimant's abilities and skills so as to preclude him from any reasonable expectation of regular employment in the labor market.

¶50 Dr. Martin testified that prior to his head injury the claimant's cognitive abilities were probably "quite limited." (Tr. at 45.) She administered another IQ test, which yielded a full scale IQ of 82. (Ex. 5b at 42.) She testified that the differences in the IQ scores recorded in 1983, 1993, 1994 and 1995 were consistent and that the range of scores (74 to 83) was not significant. (Tr. at 19.) She tested his reading and arithmetic skills and determined his skills to be in the first and third percentile respectively. (Tr. at 20.) She performed a battery of other tests. Without question her testing and examination were thorough and professional. Overall, she found his cognitive abilities impaired. (Tr. at 20.) She characterized his impairment in the range of moderate to severe, whereas only mild impairment would be expected based solely on his intelligence scores. (Tr. at 21.)

<u>Resolution</u>

¶51 While Dr. Martin ultimately concluded that claimant should be able to return to work as a farm worker, and that it will be beneficial for him to do so (tr. at 43-44), she provided a number of additional insights that I find helpful in resolving this case.

¶52 Dr. Martin testified that a person functioning at a lower intellectual level will have a more difficult time returning to work following a head injury:

Again, Mr. Bartels actually -- well, let me back up. In some of the research that's been done when they look at people who have had head injuries who have then returned to work or not returned to work, they find that people who tend to have more pre-existing difficulties in functioning, such as possibly lower intellectual level or more difficulties in managing jobs, holding jobs, may be more difficulties in terms of personality or emotional functioning in those individuals, tend to have more difficulty in returning to work afterward; whereas people who are, say, more professional level will tend to have a very high return of returning to work which probably associated with some degree of higher intellectual function or maybe higher motivation. What you find I think with someone who is struggling to function prior to a head injury may then after the head injury find it easier to attribute their difficulties in functioning to the head injury and may tend to then attribute all of their problems after that to the head injury rather than to other existing situations.

(Tr. at 42.) Upon cross-examination, she expanded:

A. Well, I think it might have a greater impact because he would have fewer mechanisms for coping in the first place. He would have probably more difficulty compensating for any difficulties he had. Whereas a person with maybe above average intelligence would fairly quickly like figure out some ways of coping with memory problems or, you know, attention problems, they would come up with some compensating techniques. And another individual who has lower intellectual functioning would have more difficulty doing that.

Q. Do you feel that's what conceivably occurred in this case?

A. I think that could certainly be part of it, yeah.

(*Id.* at 69.) I find her testimony helpful. It focuses on the issue in this case, which is whether, given claimant's preinjury status, his head injury adversely affected his ability to return to work.

¶53 Dr. Martin's testing suggests that claimant suffers from an "attention/concentration problem and/or some emotional overlay that is affecting his test performance." (Tr. at 35, 37.) Her observation is consistent with other evaluations and indicates that claimant has a significant attention and concentration problem and that he suffers from preexisting emotional and psychological problems.

¶54 Dr. Martin observed that claimant's descriptions of physical problems were sometimes unusual and that his reactions during testing suggested an "hysterical personality." (Tr. at 15-16, 28-29.) However, she declined to label claimant a malingerer or to characterize his reactions as deliberate exaggeration. (Tr. at 41.) Her observations provide support for my own perception that claimant's bizarre reactions and exaggeration are a product of his personality, his underlying emotional and psychological problems, and his limited intelligence rather than any deliberate and calculated effort on his part to secure compensation by lying.

¶55 Dr. Martin conceded that claimant's fatigue may arise from his efforts to cope with his cognitive deficits and from his emotional reaction to his head injury. (Tr. at 66-68.) Regarding claimant's possible emotional reaction to the injury, she testified:

THE COURT: Could the emotional factors stem from the head injury?
THE WITNESS: There can be some of that. There is often some depression and some other kinds of things that go along, you know, some depression, sometimes some anxiety, that goes along with the head injury. I think, though, if you look at patterns of coping, you know, it seems that Mr. Bartels may have tended to cope with emotional stresses by maybe repressing and denying. That was one of the earlier reports. That kind of pattern leads to developing physical symptoms at times of stress.
So there again, you don't know how much some of these physical symptoms have to do with some subconscious emotional factors, and that would not have been attributable to the head injury. The hysterical kind of tendency to focus on symptoms and to develop those kind of symptoms at times of stress, that would be more of a pre-existing personality matter.
THE COURT: The method of coping with being the pre-existing pattern, but could that method of coping be invoked or potentially implied with a head injury?

THE WITNESS: Could be made worse, yes.

THE COURT: Is that what - - or at least invoked in the sense that he has a head injury and that he falls back on the pattern of cope that's already there? THE WITNESS: I think so. And he - - I think he could have, if he had a mild head injury, it would have even in the ability to - - because he would have had - - he would have had more things to deal with than prior to the head injury. . . .

Since the injury claimant has been taking Trazedone as prescribed by Dr. Cooper. Trazedone is an antidepressant. Physician's Desk Reference (52nd ed. 1998).

¶56 Dr. Martin noted that an automobile accident that occurred on March 30, 1994, and the death of Mr. Damm in November 1994, may have affected claimant's emotional state and contributed to his present disability. (Tr. at 39-40.) I am unpersuaded for two reasons. First, claimant was unable to work prior to both incidents. Second, after both incidents he participated in OJT with Big D and was making significant progress in his rehabilitation efforts.

¶57 I find that Dr. Martin's discussion of the potential effect of even a mild head injury on persons of limited intelligence and abilities best fits what has happened in this case. I find that claimant is presently permanently totally disabled as a result of his August 10, 1992 head injury.

¶58 I am persuaded that preinjury the claimant had limited intellectual and cognitive abilities and had hysterical (over reactive) personality traits. I am also persuaded that prior to his injury he was generally able to obtain and keep a job. While he may never have been an employer's ideal employee, he worked and he was paid for his work. Since his head injury, claimant has not worked.

¶59 The State Fund strenuously challenges claimant's credibility. In its proposed finding of fact 3, it proposes that the Court adopt the following finding of fact:

It is very clear that the Claimant is exaggerating any problems that he may have at this point. At trial, he displayed very dramatic pain behaviors and responses that were only at points in the testimony when he was reminded of his problems. For instance, he was asked a question about an unrelated elbow injury by his counsel, responded with a very dramatic "ouch", grasped his elbow and moved very quickly in his chair. As well, upon inquiry

concerning a supposed aversion to light, he moved his chair from the position that it had been in for over an hour and stated in very dramatic fashion that he was having a very severe reaction to the glare off either the court's computer screen or the window in the background. As well, the Court also notes that the Claimant displayed an inconsistent gait. He walked with a cane, and at times he was walking at a very slow fashion, but upon departing the witness chair was able to ambulate much more freely.

(State Fund's Proposed Findings of Fact and Conclusions at 2.) The Court does not disagree that the instances cited in the State Fund's Proposed Findings of Fact and Conclusions occurred, and finds that they in fact occurred. My own notes during the claimant's testimony regarding his elbow problems at Big D, he "grabs elbow and cries ouch." Beside my note, I made the following comment, "WEIRD."

¶60 Certainly it is possible that claimant is malingering or deliberately exaggerating his disability. However, no medical or psychological practitioner has seriously urged that he is and I am persuaded that he is not. Claimant suffers from depression, as indicated by continuous prescription for Trazedone. He is embarrassed by his intellectual deficits, and his embarrassment is compounded by his perception that his August 10, 1992 injury further eroded his intellectual and cognitive functioning. Claimant's behavior since his injury has at times been bizarre but I am persuaded that his bizarre behavior is a product of his personality and is not premeditated.

¶61 Despite my finding that claimant is presently permanently totally disabled, I further find the claimant's improvement during the rehabilitation program in late 1993 and 1994 indicate a probability that *with significant assistance* he can once more become employable and employed.

## CONCLUSIONS OF LAW
### I.

¶62 Claimant's benefits are governed by the 1991 Montana Workers' Compensation Act. *Buckman v. Montana Deaconess Hospital,* 224 Mont. 318, 321, 730 P.2d 380, 382 (1986).

### II.

¶63 In determining claimant's entitlement to disability benefits, the Court must apply the well recognized rule that the employer and insurer took claimant as he was, with all his physical and psychological infirmities and

imperfections. *Satterlee v. Lumbermen's Mut. Cas. Co.,* 280 Mont. 85, 91, 929 P.2d 212, 215 (1996). Thus, aggravation of a preexisting emotional or psychological condition is compensable, *id.*, if it is a consequence of a physical injury, *Yarborough v. MMIA,* 282 Mont. 475, 938 P.2d 679 (1997).

III.

¶64 Entitlement to permanent total disability is governed by sections 39-71-702, and 39-71-116(16), MCA (1991). Section 39-71-702 provides in relevant part:

**39-71-702. Compensation for permanent total disability.** (1) If a worker is no longer temporarily totally disabled and is permanently totally disabled, as defined in 39-71-116, the worker is eligible for permanent total disability benefits. Permanent total disability benefits must be paid for the duration of the worker's permanent total disability, subject to 39-71-710.

(2) The determination of permanent total disability must be supported by a preponderance of medical evidence.

Section 39-71-116(16) provides:

"Permanent total disability" means a condition resulting from injury as defined in this chapter, after a worker reaches maximum healing, in which a worker has no reasonable prospect of physically performing regular employment. Regular employment means work on a recurring basis performed for remuneration in a trade, business, profession, or other occupation in this state. Lack of immediate job openings is not a factor to be considered in determining if a worker is permanently totally disabled.

¶65 Although section 39-71-703(2), MCA, requires that disability be *supported* by a preponderance of medical evidence, disability is not solely a medical question. *Coles v. Seven Eleven Stores*, 217 Mont. 343, 347, 704 P.2d 1048, 1051 (1985). Rather disability concerns the effect of a medical condition on a claimant's ability to work.

¶66 In the case of permanent total disability, the claimant must demonstrate (1) that he has reached maximum medical improvement and (2) that, as a consequence of his injury, he has no reasonable prospect of physically performing regular employment. The first prong is satisfied. There are several medical opinions in this case indicating that claimant reached MMI prior to the December 1995 termination of his benefits. Indeed, MMI is not raised as an

issue in this case. "The only issue is whether claimant has reasonable prospect of physically performing regular employment."

¶67 The evidence in this case, while far from overwhelming, persuades me that without significant rehabilitation assistance the claimant has no reasonable prospect of regular employment. I am persuaded, by a preponderance of medical evidence that claimant's inability to work is due to his August 10, 1992 injury, which caused a small but significant decline in his intellectual and cognitive abilities and precipitated depression and a debilitating emotional reaction.

¶68 The State Fund is therefore liable for permanent total disability benefits retroactive to the date they were cut-off and continuing until such time as the claimant is no longer PTD. The parties have not asked the Court to determine the amount due.

IV.

¶69 The Court has noted the significant progress claimant made towards employment during an OJT program in the fall of 1994 and winter of 1995. I have found as a matter of fact that there is a significant prospect that claimant can become reemployed on a regular basis if significant rehabilitation assistance is provided to him. Whether the State Fund chooses to offer that assistance is up to it. However, should it do so, the claimant must cooperate and make a genuine effort to return to employment.

## JUDGMENT

¶70 1. Claimant is presently permanently totally disabled.

¶71 2. The State Fund is liable for permanent total disability benefits retroactive to the date total disability benefits were terminated. The parties have not requested the Court to determine the amount of benefits due and the information provided to the Court is insufficient for it to do so. If the parties are unable to agree on the amounts due, they shall inform the Court and a further hearing shall be held. The Court retains jurisdiction for that limited purpose.

¶72 3. Should the State Fund offer further rehabilitation assistance, including OJT, the claimant shall cooperate and make a genuine attempt to return to gainful employment.

¶73 4. Pursuant to ARM 24.5.348, this JUDGMENT is certified as final for purposes of appeal.

¶74 5. Any party to this dispute may have 20 days in which to request a rehearing from these Findings of Fact, Conclusions of Law and Judgment.

DATED in Helena, Montana, this 17th day of August, 1998.

(SEAL)

/s/ Mike McCarter
JUDGE

c: Mr. Cameron Ferguson
Mr. Charles G. Adams
Date Submitted: February 9, 1998

1. There is substantial and credible evidence that at times claimant tries to put himself in the best light, thus his reports concerning his amnesia and period of consciousness may understate the true facts.

2. The only witness presented by the State Fund to suggest that claimant is in fact functioning at a higher level than he claims was claimant's former supervisor, who on one occasion saw claimant at a gas station with a boat, apparently preparing to go fishing.

3. "Affective" means "relating to, arising from, or influencing feelings or emotions." Merriam-Webster Medical Dictionary (1997) found online at www.medscape.com.

4. No footnote.

5. The cited note is found in Dr. Peterson's section of the exhibits. However, this note and the one next cited (Ex. 5g at 114) appear to be from Dr. Cooper's office notes. A footer indicates that the forms on which the notes appear were from a print job entitled "24Cooper." More importantly, the note of September 1, 1992, which is at page 114, indicates that the physician making the note was going to "set up an appointment for him [claimant] to see a neurologist." Dr. Peterson is the neurologist to whom Dr. Cooper referred claimant, thus the note is more likely Dr. Cooper's note than Dr. Peterson's. In any event, whoever recorded the information, the notes document claimant's complaints immediately following the August 10, 1992 accident.

6. The Romberg test involves the placing of the feet together and closing the eyes. It is a sign of some neurological diseases. Dorland's Illustrated Medical Dictionary, Twenty-fifth ed.

7. Dr. Sheppard's report characterized the testing as "a brief screening to observed [sic] the process used in obtaining the results of the more complete battery [of Dr. Tompkins]." (Ex. 5d at 71.)

8. Vocational rehabilitation assistance was initially obtained in 1992. (Ex. 7 at 282.) The rehabilitation file was closed or pended, then reopened in the fall of 1993. At that time, Dr. Cooper wrote that claimant was not released to return to work and Dr. Peterson indicated that he would want a functional capacities examination before considering a release. (Id. at 303-304.) The report prepared at that time reflected recommendations by Drs. Peterson and Tompkins that claimant be enrolled in a rehabilitation program. (Id. at 309.) Dr. Tompkins was contacted by the provider. He disapproved the jobs for which descriptions had been sent him but thought that claimant "possibly could perform" a job as a dishwasher, cautioning that claimant's "fatiguability" [sic] could interfere with even that job. (Id. at 322.)

9. The notice indicated that the State Fund would continue TTD benefits with respect to claimant's elbow injury, at least until it received information from claimant's elbow surgeon as to whether claimant could return to his time-of-injury job based on his elbow injury. (Ex. 8.) I am unable to determine when TTD benefits with respect to the elbow injury were discontinued.

10. My judgment of claimant's credibility leads me to find that claimant was doing more at Big D than he claims but less than what he reported to his occupational therapist and vocational counselor. I am persuaded that in fact he was making substantial and significant progress in performing productive work for several hours a day and that he was increasing his outside activities. I am persuaded that there is a significant possibility that had his work trial not been interrupted by his elbow surgery and the fact that his work at Big D was a dead end with respect to a paid position, he might have ultimately been able to perform the work required of a paid employee.

# EXHIBIT 21



CRC Press
Taylor & Francis Group

# AEROMEDICAL PSYCHOLOGY



EDITED BY CARRIE H. KENNEDY AND GARY G. KAY

# Aeromedical Psychology

Edited by

**CARRIE H. KENNEDY**
*University of Virginia, USA*

&

**GARY G. KAY**
*Cognitive Research Corporation, USA*



**CRC Press**
Taylor & Francis Group
Boca Raton  London  New York

CRC Press is an imprint of the
Taylor & Francis Group, an **Informa** business

# EXHIBIT 22



**Test of Variables of Attention®**

# CLINICAL MANUAL

Lawrence M. Greenberg, MD
Chris Holder, MA, LMHC
Carol L. Kindschi, RN, MSN
Tammy R. Dupuy, MS

The TOVA Company
October 22, 2018

# T.O.V.A.® 9  Clinical Manual

Test Of Variables of Attention Continuous Performance Test

Lawrence M. Greenberg, MD
Chris Holder, MA, LMHC
Carol L. Kindschi, RN, MSN
Tammy Dupuy, MS

**The TOVA Company**

3321 Cerritos Avenue
Los Alamitos, CA 90720 USA

| | |
|---|---|
| Phone: | 800.PAY.ATTN or 800.729.2886 or 562.594.7700 |
| Fax: | 800.452.6919 or 562.594.7770 |
| Referrals: | 800.REF.TOVA or 800.733.8682 |
| Email: | info@tovatest.com |
| Web: | http://www.tovatest.com/ |

Edition Number 9.0-121-g7413481 (October 22, 2018) L5R5

T.O.V.A. release 9.0-90-g129438f

© Copyright 2007-2018 The TOVA Company, All Rights Reserved.

Test Of Variables of Attention (abbreviated T.O.V.A.) is a registered trademark of The TOVA Company.

No part of this manual may be distributed without permission of The TOVA Company.

Orders of this manual should be directed to:

> The TOVA Company
> 3321 Cerritos Avenue
> Los Alamitos, CA 90720, USA
> 800.PAY.ATTN 800.729.2886 +1. 562.594.7700
> Fax: 800.452.6919 +1. 562.594.7770
> http://www.tovatest.com/

Printed in the United States of America.

# Table of Contents

**Page**

**I   Important Information**                                                 **1**

**1   Indications**                                                          **1**

**2   Contraindications**                                                    **1**

**3   Warnings and Precautions**                                             **1**

**4   Compliance Information**                                               **2**
   4.1    European Authorized Representative Information  . . . . . . . . . . . . . . . . . . . . .    2
   4.2    Symbols . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

**5   T.O.V.A. Description**                                                 **3**


**II   Introduction**                                                        **4**

**6   Terms and Concepts Used in This Manual**                               **4**

**7   Attention-Deficit/Hyperactivity Disorder (ADHD)**                      **5**
   7.1    ADHD and the *DSM-5* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      5
       7.1.1    Sub-Types Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      5
       7.1.2    Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      6
       7.1.3    Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      7
   7.2    Causes of Off-Task Behavior . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       7
   7.3    Diagnosis of ADHD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       9

**8   Continuous Performance Tests (CPTs)**                                  **10**
   8.1    T.O.V.A. variables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      10
       8.1.1    Primary variables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10
       8.1.2    Secondary variables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11
   8.2    Significant features . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12
       8.2.1    Stimuli . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12
       8.2.2    Presentation of stimuli . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13
       8.2.3    Practice vs. novelty effects . . . . . . . . . . . . . . . . . . . . . . . . . . .    14
       8.2.4    Length of test and subtests . . . . . . . . . . . . . . . . . . . . . . . . . . .     14
       8.2.5    Distractions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

**9   The T.O.V.A.**                                                         **15**
   9.1    Construction of the T.O.V.A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      15
   9.2    T.O.V.A. Intended Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15
   9.3    Administering the T.O.V.A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      15
       9.3.1    Pre-test Preparation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      16
   9.4    Observation Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      16


**III   Interpreting T.O.V.A. Reports**                                      **17**

**10 Factors Affecting T.O.V.A. Performance**      **17**

**11 The T.O.V.A. Report**      **17**

11.1   Introduction Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
11.2   Summary Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
     11.2.1   Demographic Information . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
     11.2.2   Session, Response, and Performance Validity . . . . . . . . . . . . . . . . . 20
     11.2.3   T.O.V.A. Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
     11.2.4   Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
     11.2.5   Comparison to the Normative Sample . . . . . . . . . . . . . . . . . . . . . 22
     11.2.6   Attention Comparison Score . . . . . . . . . . . . . . . . . . . . . . . . . . 23
11.3   Interpretation Notes Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
     11.3.1   Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
     11.3.2   Notes on the Comparison to the Normative Sample: . . . . . . . . . . . . . 25
     11.3.3   Other Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
11.4   Analyzed Data Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     11.4.1   Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     11.4.2   Comparison to the Normative Sample . . . . . . . . . . . . . . . . . . . . . 27
     11.4.3   Attention Comparison Score . . . . . . . . . . . . . . . . . . . . . . . . . . 27
11.5   Tabulated Data Page . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
11.6   Raw Data Graphs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
11.7   Raw Data Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**12 Visual Pre-School Report (Short Form)**      **37**

**13 Visual Adult Report (Performance Validity)**      **39**

**14 Auditory Report**      **42**

**IV    Evaluation of Treatment**      **45**

**15 Comparing Baseline and Treatment Interpretations**      **45**

15.1   Example T.O.V.A. reports measuring baseline and treatment performances, with comparison charts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
     15.1.1   Example Subject 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
     15.1.2   Example Subject 2: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
     15.1.3   Example Subject 3: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**V    Appendix**      **69**

**16 T.O.V.A. Observation Form**      **69**

T.O.V.A. Clinical Manual

# Part I

# Important Information

## 1   Indications

The Test of Variables of Attention (T.O.V.A.) provides healthcare professionals with objective measurements of attention and inhibitory control. The visual T.O.V.A. aids in the assessment of, and evaluation of treatment for, attention deficits, including attention-deficit/hyperactivity disorder (ADHD). The auditory T.O.V.A. aids in the assessment of attention deficits, including ADHD. T.O.V.A. results should only be interpreted by qualified professionals.

**CAUTION:** Federal law restricts this device to sale by or on the order of a qualified professional.

## 2   Contraindications

The T.O.V.A. microswitch and USB device should not be used in conjunction with an MRI.

## 3   Warnings and Precautions

The T.O.V.A. provides objective measures of attention and inhibitory control. The T.O.V.A. does not diagnose any disease or disorder or make a recommendation of treatment. T.O.V.A. performance should always be considered in the context of all available clinical information and should only be interpreted by a qualified professional.

**WARNING:** Repetitive flashing of display may cause eye strain, headaches, or seizures. Please seek medical help if you experience any eye strain or headache.

T.O.V.A. results should be interpreted only by qualified professionals.

T.O.V.A. Clinical Manual

# 4   Compliance Information



## 4.1   European Authorized Representative Information

| EC | REP |
|---|---|

**EMERGO EUROPE**
Prinsessegracht 20
2514 AP The Hague
The Netherlands

For vigilance inquiries, use EmergoVigilance@ul.com

## 4.2   Symbols

| | |
|---|---|
| **SN** | Serial Number |
| | Production Date |
| | Consult instructions for use |
| ⚠ | Caution, consult accompanying documents |
| | Keep dry |
| | Do not used if damaged |
| | Not for general waste |
| CE | European Union (EU) CE Mark |
| FCC | FCC compliance |
| | Type B Applied Part |
| EC REP | Authorized representative in Europe |

Figure 1: International Symbols applicable to the T.O.V.A.

# 5   T.O.V.A. Description

The Test of Variables of Attention (T.O.V.A.) is an accurate and objective continuous performance test (CPT) that measures the key components of attention and inhibitory control. The T.O.V.A. is used by qualified healthcare professionals in the assessment of attention deficits, including attention-deficit/hyperactivity disorder (ADHD), in children and adults. In addition, the visual T.O.V.A. is used to evaluate treatment for attention deficits, including ADHD.

The T.O.V.A. is a culture- and language-free, sufficiently long computerized test that requires no left/right discrimination or sequencing. Responses to visual or auditory stimuli are recorded with a specially designed, highly accurate ($\pm 1$ ms) microswitch. The T.O.V.A. calculates response time variability (consistency), response time (speed), commissions (impulsivity), and omissions (focus and vigilance). These calculations are then compared to a large age- and gender-matched normative sample (over 1,700 individuals for the visual test, and over 2,600 individuals for the auditory test), as well as to a sample population of individuals independently diagnosed with ADHD. These comparison results are used to create an immediately available, easy-to-read report.

The T.O.V.A. system includes:

- USB flash drive with software installers for Mac and Windows PCs

- T.O.V.A. USB device

- T.O.V.A. microswitch

- Installation Guide

- User's Manual

- Clinical Manual

- Accessory cables (USB, VGA, and audio cables)

T.O.V.A. Clinical Manual

# Part II

# Introduction

## 6   Terms and Concepts Used in This Manual

**Attention,** according to Merriam-Webster's dictionary is a) the act or state of applying the mind to something, and b) a condition of readiness for such attention involving especially a selective narrowing or focusing of consciousness or receptivity.

Attention is a mainstay of life, and the ability to appropriately focus one's attention affects one's self image and success in school, at work, and in relationships.

**Inhibitory control** is defined as the capacity to voluntarily inhibit or regulate prepotent (i.e., strong or automatic) attentional or behavioral responses.

**Attention disorder** is a general term for symptoms of impaired attention and inhibitory control that are the result of many causes (e.g. ADHD, head injuries, toxic exposure, sleep apnea, and other conditions.)

**Attention-Deficit/Hyperactivity Disorder** (ADHD) refers to a specific diagnosis in the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed.; *DSM-5*; American Psychiatric Association, 2013).

T.O.V.A. Clinical Manual

# 7   Attention-Deficit/Hyperactivity Disorder (ADHD)

## 7.1   ADHD and the *DSM-5*

To gain a full understanding of attention-deficit/hyperactivity disorder (ADHD) please read and understand the description, criteria, and related disorders and comorbidities in the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed.; *DSM-5*; American Psychiatric Association, 2013).

In summary, there are currently five different diagnoses under ADHD in the *DSM-5*. These are:

- 314.01 (F90.2) Combined presentation

- 314.00 (F90.0) Predominantly inattentive presentation

- 314.01 (F90.1) Predominantly hyperactive/impulsive presentation

- 314.01 (F90.8) Other Specified Attention-Deficit/Hyperactivity Disorder

- 314.01 (F90.9) Unspecified Attention-Deficit/Hyperactivity Disorder

Clinicians need to specify if in Partial Remission. Partial Remission is defined as when full criteria were previously met but fewer than full criteria are presently met.

Clinicians also need to specify the current severity, with the choices being mild (just enough symptoms to meet criteria), moderate (between mild and severe), or severe (many symptoms in excess of the minimum needed or several symptoms that are severe or cause impairment in social or occupational functioning). It is interesting to note that educational functioning is not mentioned.

### 7.1.1   Sub-Types Criteria

**314.00 (F90.0) Predominantly inattentive presentation** – Must have six or more of the following symptoms for six months or more. If 17 or older, must have 5 or more.

- Often fails to give close attention to details or makes careless mistakes in schoolwork, work, and other activities

- Often has difficulty sustaining attention in tasks and play activities

- Often does not seem to listen when spoken to directly

- Often does not follow through on instructions and fails to finish school work, chores, or duties in the workplace (but not due to oppositional behavior and not because of a failure to understand)

- Often has difficulty organizing tasks and activities

T.O.V.A. Clinical Manual

- Often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (such as schoolwork or homework)

- Often loses things necessary for tasks or activities (e.g. toys, school assignments, pencils, books, or tools)

- Often easily distracted by extraneous stimuli

- Often forgetful in daily activities

**314.01 (F90.1) Predominantly hyperactive/impulsive presentation** – Must have six or more of the following symptoms for 6 months or more. If 17 and older must have 5 or more.

- **Hyperactivity**
  - Often fidgets with hands or feet or squirms in seat
  - Often leaves seat in classroom or in other situations in which remaining seated is expected
  - Often runs about or climbs excessively in situations in which remaining seated is expected (in adolescents and adults, may be limited to feelings of restlessness)
  - Often has difficulty playing or engaging in leisure activities quietly
  - Often "on the go" or often acts as if "driven by a motor"
  - Often talks excessively

- **Impulsivity**
  - Often blurts out answers before questions have been completed
  - Often has difficulty awaiting turn
  - Often interrupts or intrudes on others (e.g. butts into conversations or games)

**314.01 (F90.2) Combined Type**  – Must meet criteria for both inattentive and hyperactive/impulsive types for six months or more.

**314.01 (F90.8) Other Specified ADHD** – Criteria for other subtypes are not met, but symptoms are judged to cause clinically significant distress or impairment in social, occupational, or other important areas of life. Clinicians should add the reason for using "Other specified" such as "insufficient inattention symptoms".

**314.01 (F90.9) Unspecified ADHD** – Criteria are the same as ADHD Other Specified, but no reason is given to specify the reason for the diagnosis.

### 7.1.2   Requirements

To qualify for the diagnosis of ADHD, the following criteria must be met:

- Six symptoms present before 12 for children and 5 symptoms present for 17 and older.

T.O.V.A. Clinical Manual

- Symptoms present in two or more settings.

- Symptoms interfere with or reduce the quality of social, academic or occupational functioning.

- The condition can not be caused by another psychiatric illness like Schizophrenia, or other psychotic disorder of mood, anxiety, dissociative disorder, or personality disorder.

- Specify if in partial remission.

- Specify mild, moderate, or severe.

### 7.1.3   Issues

Conceptually, the diagnostic category, "ADHD", has many limitations.

- The symptoms are subjective, unreliable, and culture-bound.

- ADHD is really a symptom complex, not a disorder (that, by definition, must have a single, common etiology and a predictable natural history and response to treatment).

- The assumption that hyperactivity and attention deficits are necessarily linked is misleading and an artifact of equating symptom complexes with disorders. (This isn't the only example in psychiatry and psychology of a hypothetical construct being treated as though it had an independent existence in the real world.)

- The requirement that the onset be by twelve years of age ignores some critical factors. As examples, many non-hyperactive, inattentive children and children with strong external support systems are not symptomatic until later.

- Since behavior is situationally specific, attention deficits may not be apparent in more than one setting. Differences in setting (school, classroom, teacher, peers) may affect the presence of symptoms.

- Although the emphasis is on inattention, individuals with ADHD are highly variable in their attention over time, and can hyperfocus.

- Executive functions are not included.

- Symptoms manifest differently in girls and boys.

## 7.2   Causes of Off-Task Behavior

Differential diagnosis for off-task behavior includes the following:

- **Normal behavior**

T.O.V.A. Clinical Manual

Age-appropriate behavior that is mislabeled, e.g. "active alert" children or unrealistic adult expectations of normal development.

- **General medical problems**

  Such as anemia, hyperthyroidism, otitis media, and dietary inclusions/sensitivities.

- **Medications**

  Such as anticonvulsants, antihistamines, and antidepressants that sedate or slow the brain.

- **Toxic conditions**

  Such as environmental exposures, drugs, or an illness.

- **Sensory deficits and hypersensitivities**

  Such as unrecognized hearing and visual impairments and any sensory (including olfactory and kinesthetic) hypersensitivity.

- **Neurologic problems (other than ADHD)**

  Such as sleep disturbances (including apnea and narcolepsy), seizures, and mild and major neurocognitive disorders (such as Traumatic Brain Injury).

- **Family style and organization**

  This may include social and cultural factors.

- **School readiness**

  The younger children in primary grades have a higher incident of ADHD diagnosis due to level of development compared to the older children in the class.

- **Learning style and motivation**

  Some children (including those with ADHD) have a hands-on rather than a listen and understand learning style and may lose motivation if they aren't successful or their learning style is frustrated.

- **Stress**

  Resulting from physical, sexual or emotional trauma and overwhelming situations.

- **Intellectual impairment and precocity**

  High and low IQ and boundary testing.

- **Learning disabilities**

  One third of individuals with an attentional disorder also have a learning disability, and vice versa.

- **Psychiatric conditions**

  Such as PTSD, psychosis, bipolar disorder, obsessive-compulsive traits/disorders, depression, ODD, dementia, conduct disorder, reactive attachment disorder and/or anxiety.

- **Medication**

  Over and under dosing of medication and improper medication.

- **Substance use, abuse, and withdrawal**

  Legal and illegal substances including alcohol, caffeine, and nicotine.

- **ADHD** (see below)

**Note: These causes are not mutually exclusive. As noted above, 30% of individuals with ADHD (including adults) have a learning disability (and vice versa), and between 25-35% of substance abusers have ADHD. In addition, untreated individuals with ADHD often develop low self-esteem, depression, coping strategies and acting out which may obscure the underlying ADHD.**

## 7.3   Diagnosis of ADHD

The components of a diagnostic workup for ADHD **may** include:

- **History:** Nothing replaces a detailed personal and family history.

- **Physical exam:** A recent exam by a primary care provider is important.

- **Psychological/neuropsychological assessment:** There should be emphasis on learning style, cognitive assets and liabilities, and CNS functioning.

- **Evaluation of classroom/workplace behavior and performance:** Direct observations or telephone interview of teacher or supervisor are very helpful, especially to prepare for recommendations.

- **Mental status examination/personality assessment:** This helps identify comorbid and/or other conditions (such as depression).

- **Behavior ratings:** Rating scales are an important part of the diagnostic process. They are best used in conjunction with a good history and objective measures like the T.O.V.A. to minimize the effects of rater bias and an overemphasis on disruptive behaviors.

- *DSM-5* **Symptom checklists:** These checklists help clinicians to thoroughly review all symptoms of ADHD.

- **T.O.V.A.:** The T.O.V.A. objectively measures response time variability, response time, inhibitory control, focus and vigilance, all of which can be affected by many factors; however, **the T.O.V.A. does not make a diagnosis or make a recommendation of treatment.** The clinician needs to make use of the objective results in the context of the full clinical picture.

**Note: A comprehensive work-up that includes all or most of the components above may not be feasible or cost-effective. The clinician must decide which steps are needed and in what sequence.**

# 8  Continuous Performance Tests (CPTs)

## 8.1  T.O.V.A. variables

Historically speaking, Continuous Performance Tests (CPTs) have focused on the error rates (false positives [commission errors] and false negatives [omission errors]) to their stimuli. While response time is often measured, it is de-emphasized because of the inaccuracy of the measurement. The T.O.V.A. accurately and precisely measures *all* of the significant variables of both auditory and visual information processing, including response time and response time variability, allowing the clinician to see the full picture of CPT response.

### 8.1.1  Primary variables

The following variables are included in the T.O.V.A.:

**Response Time Variability**

Response Time Variability ("RTV") is a measure of variability (consistency) of response time. RTV is the the standard deviation of correct response times, and thus directly measures the spread of the subject's response times. Individuals with ADHD tend to have inconsistent response times on the 10 - 100 millisecond time scale, and thus have a wider RTV. RTV is the most sensitive measure of the T.O.V.A. Because changes in RTV are on the 10 - 100 millisecond time scales, timing measurements must be very accurate; hence, the need for accurate timing (the T.O.V.A. USB device), an accurate and repeatable subject input device (the T.O.V.A. microswitch), and the need to calibrate out delays and variability in the computer screen (the T.O.V.A. microswitch's calibration photodiode).

**Correct Response Time**

Correct Response Time is the processing time (in milliseconds) taken to respond correctly to a target. Counter-intuitively, persons with ADHD may respond slower than the normative sample, especially in the infrequent (boring) first half of the test.

**$d'$ or Response Sensitivity**

$d'$ or Response Sensitivity (the ratio of hit rate to false alarm rate) is a measure derived from Receiver Operating Characteristics (ROC) which is part of Signal Detection Theory. It is a measure of performance decrement, the rate of deterioration of performance over time. Most individuals tend to fatigue over time, especially with a boring task. The performance of individuals with ADHD tends to deteriorate faster than others.

**Errors of Commission**

Errors of Commission are a measure of impulsivity and/or disinhibition and occur when the subject incorrectly responds to the nontarget; that is, the subject pushes the button when they shouldn't have. In the T.O.V.A., commission errors are far more frequent in the second half (high response demand). Since excessive commission errors can affect the other variables, they are also an important measure of test validity. Generally, excessive commission errors decrease omission errors, shorten response times, and increase variability. When a report states that the results are 'invalid' because of excessive commission scores, it

means that we must interpret the results cautiously since the other variables may or may not be valid. Of course, impulsivity is a hallmark of ADHD.

### Errors of Omission

Errors of Omission are a measure of focus and vigilance and occur when the subject does not respond to a target stimulus; that is, the subject omits pressing the button when a target appears or is played. This may be due to inattention, distractibility, or hyperactivity (looking away from the computer). Omission errors are rare in adults, and long strings of omission errors should be investigated. Use the Observation Form (page 69) to record behaviors during the test to determine and record the reason(s) for Omission errors.

When evaluating omissions, always look at the absolute or raw numbers of omission errors on the Summary page and/or the Tabulated Data page. In some cases one or two errors reach statistical significance because of the lack of omission errors in especially older ages of the T.O.V.A. normative study, yet there may be little or no clinical significance to one or two errors. As an example, a single error early in quarter 1 may signify that the subject was surprised when the test began even though the practice session preceded the test. Always interpret standard score data alongside actual raw data to determine clinical significance of the results.

### 8.1.2   Secondary variables

These variables are not as sensitive for assessing attention and inhibitory control as the primary variables, but are important to understand as they describe the subject's performance.

### Anticipatory Responses

An Anticipatory Response (AR) occurs whenever a subject responds (pressing the microswitch) 200 milliseconds (ms) before and 150 ms after any stimulus (target or non-target) appears, or in the case of the Auditory T.O.V.A., any stimulus is heard. Humans need more than 150 ms to hear, distinguish, and respond to a go/no-go (target and a nontarget) stimulus; hence, the use of the word "anticipatory". ARs are considered impulsive responses, and often occur when the subject is not actually attending to the T.O.V.A. test, but rather attempting to "guess" which stimulus (target or nontarget) is going to be displayed, or trying to "hit" the target by pressing the microswitch as soon as the stimulus is displayed (without regards to which stimulus it is).

ARs are not included in the calculations of errors, response times, and variability. Since excessive anticipatory responses can affect the other variables, they are also an important measure of test validity. Generally, excessive anticipatory responses decrease omission errors, increase commission errors, shorten response times, and increase variability. The Session, Response, and Performance Validity section on T.O.V.A. Interpretation Notes page flags quarters with excessive ARs (equal or exceeding 10%) as needing to be cautiously interpreted.

### Post-Commission Response Time

Post-Commission Response Time is the correct response time when a target immediately follows a commission error. Clinical observations (but not carefully conducted research) indicate that most people (including individuals with ADHD) recognize when they make a commission error, and slow down for the next response. It is noteworthy that a group of conduct disordered youngsters (without ADHD) either did not slow down or actually responded faster than their average response time. Thus, this may be a way to distinguish individuals with ADHD only from individuals with a conduct disorder only, but not the comorbid condition. Rarely, some highly motivated individuals increase their focus, speed up after a commission error, and

become more accurate. A post T.O.V.A. interview with the subject may help to clarify the reason for fast post-commission response times and adds depth to the clinical picture.

**Multiple Responses**

Multiple Responses are considered to be a reflection of neurological status. Excessive multiple responses (>15/test) do not alter or invalidate the other variables, and they may reflect hyperactivity or neurological dysfunction.

## 8.2   Significant features

The following design features significantly influence what is being measured by a CPT as well as its "hit rate":

### 8.2.1   Stimuli

- **Visual and auditory modes**

  Both visual and auditory modalities may need to be evaluated since there can be problems with auditory and/or visual information processing. Most individuals process visual and auditory information similarly. That is, without a visual or auditory disorder, they process visual and auditory information similarly in terms of speed, variability, and accuracy.

  However, some individuals process one type of sensory input differently than the other. Thus, the Visual T.O.V.A. performance may be within normal limits, but the Auditory T.O.V.A. may not be normal and vice versa. The T.O.V.A. intentionally separates the auditory and visual tests to minimize distractions and/or stimulation so that specific auditory and visual processing strengths and difficulties can be identified.

- **Non-sequential or sequential tasks**

  In the typical CPT sequential task, the instructions are to respond whenever an A is followed by a X. Most CPTs use the A-X format which is cognitively more complex and difficult than the T.O.V.A. that uses a "go/no go" design with single non-sequential stimuli.

- **Non-language or language based**

  Non-language based stimuli (like in the T.O.V.A., see Figure 2) minimize the potential confounding of the results by language, culture, and/or a learning disability.

  The Auditory T.O.V.A. uses two single tones. The target is G above middle C (392.0 Hz), and the non-target is "middle C" (261.6 Hz).

- **Configuration**

  Simple stimuli (like in the Visual and Auditory T.O.V.A.) are easier to process than complex stimuli and have less associative value.

- **Monochromatic vs. multicolored stimuli**

  Monochromatic stimuli (like in the T.O.V.A.) are simpler and less arousing than multicolored stimuli.

T.O.V.A. Clinical Manual



Figure 2: The T.O.V.A. visual stimuli.

The T.O.V.A. is designed to minimize the number of confounding variables that may affect a person's performance.

### 8.2.2   Presentation of stimuli

- **I**nfrequent and frequent target modes

  - The infrequent target mode (or low response demand mode subtest) in quarters 1 and 2 is the more boring task and is the traditional form for measuring vigilance. Individuals with "low CNS arousal" tend to do poorly on this form.

  - The frequent target mode (or high response demand mode/high inhibition demand mode subtest) in quarters 3 and 4 is a more stimulating task during which individuals with "high CNS arousal" can become overstimulated, and individuals with "low CNS arousal" can "wake up".

  - The T.O.V.A. for children 4 and 5 is a shorter test and consists of only quarter 1 (infrequent target mode subtest) and quarter 3 (frequent target mode subtest) to more appropriately match a normal attention span for their age.

- **F**ixed or variable Inter-Stimulus Interval (ISI)

  A fixed ISI (the interval between the stimuli) minimizes stimulating/alerting changes while a variable ISI can be more arousing and/or difficult. The T.O.V.A. uses a two-second fixed ISI, which is generally accepted as the most discriminating interval.

- **A**lerting signal

  The T.O.V.A. does not use alerting signals which would make the task easier and increase false negatives.

- **S**timulus presentation time

  The shorter the time the stimulus is "on", the more difficult is the task. 100 ms (as in the T.O.V.A.) is the norm for CPTs.

- **F**ocal point

  Focal points (like in the T.O.V.A.) are frequently used in visual CPTs.

T.O.V.A. Clinical Manual

### 8.2.3   Practice vs. novelty effects

The more complex CPTs can have significant practice effects, limiting their use as repeated measures. In contrast, the Visual T.O.V.A. actually has a small novelty effect. Thus, the Visual T.O.V.A. can be repeated even in the same day.

### 8.2.4   Length of test and subtests

The longer the test, the harder it is to attend and inhibit. This is important when measuring vigilance, a key factor in attention disorders. The T.O.V.A. is a 21.6-minute test with two 10.8-minute subtests. For children ages 4 and 5, the T.O.V.A. is 10.8 minutes in length, and the two subtests are each 5.4 minutes each.

### 8.2.5   Distractions

Few commercially available CPTs have distractors at this time. It is very difficult to control the novelty (arousing) effects of so-called distractions which may actually enhance or decrease performance in some cases. Some people come with their own built-in mechanisms (foot tapping, talking, chewing gum, etc) that may act to arouse the person and help them focus. This warrants being noted on the T.O.V.A. Observation Form (page 69).

T.O.V.A. Clinical Manual

# 9   The T.O.V.A.

## 9.1   Construction of the T.O.V.A.

The T.O.V.A. consists of two subtests with no transition or warning between them.

In the **first half of the test** ( the "Infrequent" or vigilance mode), the target appears randomly and infrequently with a target : non-target ratio of 1:3.5. The person presses the microswitch infrequently and must stay on task while maintaining focus during this quickly boring half. There are 36 targets and 126 nontargets per quarter in quarters 1 and 2. Easily bored ("low arousal") persons may do poorly during this half.

In the **second half of the test** (the "Frequent" or high response demand mode) the target appears randomly and frequently with a target : non-target ratio of 3.5:1. The person is frequently pressing the microswitch and must stay on task while inhibiting the tendency to respond. (There are 126 targets and 36 nontargets per quarter in quarters 3 and 4.) Easily overstimulated ("high arousal") persons may do poorly.

Length of each subtest: 10.8 minutes.

For children **4 to 5.5 years of age**: The ratios of targets to non-targets remain the same; however, only quarters 1 and 3 are administered.

## 9.2   T.O.V.A. Intended Use

The Test of Variables of Attention (T.O.V.A.) provides healthcare professionals with objective measurements of attention and inhibitory control. The visual T.O.V.A. aids in the assessment of, and evaluation of treatment for, attention deficits, including attention-deficit/hyperactivity disorder (ADHD). The auditory T.O.V.A. aids in the assessment of attention deficits, including ADHD. T.O.V.A. results should only be interpreted by qualified professionals.

## 9.3   Administering the T.O.V.A.

**Training** to administer and monitor the test should follow the general outline of the instructions in the User's Manual and include the use of the T.O.V.A. ® Observation Form (page 69) for recording observations that may be helpful to the clinician. A thorough history and clinical interview can help determine whether to administer a Visual or Auditory T.O.V.A. session first. In general, the subject should balance speed and accuracy in order to be as fast as they can be, yet to minimize errors. Multimedia instructions are available in the T.O.V.A., and are available in eight languages. If more than one T.O.V.A. is being administered to the same person on the same day, allow at least 90 minutes from the end of the first T.O.V.A. to the beginning of the next T.O.V.A.

### 9.3.1   Pre-test Preparation

Preparing the subject is crucial, because it assures that the test is administered properly and replicates the same conditions as the T.O.V.A. norms.

1. Prior to testing, explain to the subject (or to caregivers) that no caffeinated beverages (e.g. coffee, tea, cocoa, or soft drinks) should be ingested on the day of a test. Nor should the subject have smoked within 3-4 hours.

2. Setting: Testing should be done in a quiet, softly lit room with a glare-free monitor. Clocks should not be visible or audible. It is best if the subject faces a neutral colored wall without distracting pictures. The keyboard should not be visible during the test.

3. The test administrator should be familiar with the test instructions and test administration prior to the test.

4. At test time:

   - Introduce yourself to the subject.

   - Ask if the subject needs to use the bathroom.

   - Determine whether they have glasses or hearing aid if needed.

   - Have subject remove his or her watch; mute all potential sources of noise including cell phones and place them out of line of vision.

   - Determine from subject or caregiver any and all medications taken in the last 24 hours, with dosage and interval since administered, and record them in the New Test Session window.

   - Determine whether the Auditory or Visual test is to be administered based on history and any previous test results. If in doubt, consider administering both practice tests to see which is the more challenging to the subject.

   - Position the subject and chair so he or she may sit with feet on the floor.

   - Position the monitor so the screen is at or near eye level.

## 9.4   Observation Form

The T.O.V.A. Observation Form (page 69) can be used by the test administrator to gather information before, during, and after the test. Behaviors that affect test performance can be noted to help determine the reason for test results. If the test is administered by a psychometrist or other staff member, the Observation Form should be given to the clinician along with the T.O.V.A. report.

T.O.V.A. Clinical Manual

# Part III

# Interpreting T.O.V.A. Reports

Familiarity with the scientific basis of the T.O.V.A. as well as the interpretation of the T.O.V.A. report will help establish the best use of the T.O.V.A. Clinical casework or reflections are not a recommendation for assessment, diagnosis, or treatment.

## 10   Factors Affecting T.O.V.A. Performance

The T.O.V.A. performance can be significantly improved or worsened by anything that affects attention:

- Someone with ADHD could successfully self-medicate with nicotine and/or caffeinated beverages, assuming that excessive quantities are not ingested. A person with ADHD who has coffee, an energy drink, or cigarettes before testing may very well perform within normal limits on the T.O.V.A.

- On the other hand, acute caffeine and nicotine withdrawal can have adverse effects on attention. Thus a person can do poorly on the T.O.V.A. if they do not have their habitual caffeine or nicotine.

- Any medication that can affect brain function can affect attention. Someone taking antihistamines for allergies can become sufficiently sedated so that the T.O.V.A. performance may not be within normal limits just as someone receiving lithium for a bipolar disorder may have slow response times.

- People with ADHD who have extensive video game experience and highly trained athletes may perform normally on the visual T.O.V.A. due to the hand-eye coordination training. The auditory T.O.V.A. is useful in these situations although musicians may do better on the auditory T.O.V.A.

- Sleep deprivation, anxiety, and depression, as well as a number of psychiatric conditions, can adversely affect performance whether comorbid with ADHD or not.

- Although the literature is not definitive, a person with above-average intelligence may perform better on the T.O.V.A., and someone with below-average intelligence may perform worse, when compared with the normative sample or the ADHD sample.

**It is important that the clinician obtain a good history and behavior ratings to be able to interpret T.O.V.A. results, taking the above factors into account.**

## 11   The T.O.V.A. Report

The following pages contain T.O.V.A. reports and discussion of the forms and findings. There are four types of reports: a Visual Pre-School report (ages 4-5.5), a Visual School-Age report (ages 5.5 to 17), a Visual Adult Report (ages 18 to 80+), and an Auditory report (ages 6-29). Reports are identified by the age of

T.O.V.A. Clinical Manual

the subject and the type of test administered. The example report below is a School-Age report. When printing out a report, you may select which pages you want printed. When sending a report to a clinician, we recommend sending the Introduction, Summary, Interpretation Notes, and Analyzed Data pages.

## 11.1   Introduction Page

This page provides basic information about the T.O.V.A. and its uses. It can be given to persons unfamiliar with the T.O.V.A. as an overview of the test.

 **TOVA** **Introduction**

## The Test Of Variables of Attention (T.O.V.A.®)

The **Test of Variables of Attention (T.O.V.A.)** is an FDA-cleared, state-of-the-art continuous performance test that provides healthcare professionals with objective measurements of attention and inhibitory control. The T.O.V.A. aids in the assessment of, and evaluation of treatment for, attention deficits, including attention-deficit/hyperactivity disorder (ADHD). T.O.V.A. results are available for children and adults (ages 4 - 80+) and should only be interpreted by qualified professionals.



The T.O.V.A. continuously measures performance during a 10.8-minute task or a 21.6-minute task, depending on age. It records speed, accuracy, and consistency of responses to a series of squares (in the visual T.O.V.A. test) or tones (in the auditory T.O.V.A. test) that are presented in two-second intervals. These measurements (accurate to ±1 ms) are then compared by age and gender to a large normative sample (a sample of people without attention problems). This comparison determines whether the test results are "within normal limits" or not. The T.O.V.A. also compares results to a group of people independently diagnosed with ADHD. The T.O.V.A. report is based on these two comparisons, as well as performance, session, and response validity measures.



If you have questions about this report, please contact the person who provided it to you. For more information about attention and the T.O.V.A., please visit our website at http://www.tovatest.com/. To contact us please email info@tovatest.com or call 800.PAY.ATTN (562.594.7700).

# EXHIBIT 23

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES P. SCANLAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>-vs.-<br><br>AMERICAN AIRLINES GROUP, INC., and AMERICAN AIRLINES, INC.,<br><br>Defendants. | Civil Action No. 2:18-cv-04040-HB |

**DEFENDANTS MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO TRANSFER VENUE**

O'MELVENY & MYERS LLP
Mark Robertson, Esq. (*admitted pro hac vice*)
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
mrobertson@omm.com

DRINKER BIDDLE & REATH LLP
Kenneth A. Murphy
One Logan Square, Suite 2000
Philadelphia, PA 19103
Telephone: (215) 988-2700
kenneth.murphy@dbr.com

*Attorneys for Defendants American Airlines*
*Group Inc. and American Airlines, Inc.*

Pursuant to 28 U.S.C. § 1404(a), Defendants American Airlines Group Inc. ("AAG") and American Airlines, Inc. ("American") (collectively "Defendants") respectfully request that this Court transfer this action to the United States District Court for the Northern District of Texas, Fort Worth Division ("N.D. Texas").

## **INTRODUCTION**

This is a putative class action against an airline and its parent corporation—both headquartered in Fort Worth, Texas. The putative nationwide class members include all employees of American who have taken military leaves over the last several years and did not receive certain benefits and wages during those leaves, which Plaintiff alleges he and the putative class are entitled to under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA").

Multiple courts have recognized the appropriateness of transferring putative nationwide class actions asserting USERRA claims against airlines to the district where the airline's headquarters are located. *See Carder v. Continental Airlines, Inc.*, No. 3:09-cv-01448-DMS-BLM [ECF 23] (S.D. Cal. Sept. 28, 2009); *Duffer v. United Continental Holdings, Inc.*, No. 3:13-cv-00318 [ECF No. 40] (S.D. Cal. May 2, 2013); *Hoefert v. American Airlines Inc.*, 2018 WL 2740276 (D. Ariz. June 7, 2018). In each of these cases, the plaintiffs sued the defendant airline seeking to recover benefits under USERRA on behalf of pilots who had taken military leave. And in each case, the court concluded that the convenience of the parties and witnesses and access to evidence relevant to the pilots' claims favored transfer to the district where the airline had its headquarters.

The facts and circumstances that favored transfer in the above cases, however—which only involved pilots—are magnified tenfold in this case because the proposed putative class here

includes not just pilots, but *all* employees at American—e.g., flight attendants, mechanics, baggage handlers, customer service representatives, administrative employees, and a myriad of other employee groups.

Defendants' headquarters in Fort Worth, Texas, are plainly the center of relevant events in this case. Plaintiff's claims involve the administration of a profit-sharing plan and military and other leaves for all American employees. All of the departments responsible for the administration of the profit-sharing plan and the relevant leaves are based in Fort Worth. Likewise, virtually all American employees (and at least one former American employee) responsible for overseeing the administration of the profit-sharing plan and leaves who have knowledge and information potentially relevant and necessary to resolve the dispute are located in Fort Worth. And the related documents necessary to resolve the dispute are also located in Fort Worth. Finally, the N.D. Texas is already handling the pending *Hoefert* action—transferred from the District of Arizona in 2018. *Hoefert*, a putative class action filed against American, involves similar USERRA claims on behalf of pilots and therefore involves certain of the same facts and issues regarding those pilots' military and other leaves—as well as some of the same putative class members.

When considered in light of the factors relevant to transfer under section 1404(a), these facts, as detailed below, demonstrate conclusively that this matter should be transferred to the N.D. Texas.

## STATEMENT OF RELEVANT FACTS

### The Parties

Both Defendants are incorporated in Delaware and maintain their headquarters in Fort

2

Worth, Texas.[1]  AAG is a holding company with no employees, and American (along with

certain other air carriers) is a wholly owned subsidiary of AAG.  *See* Annual Form 10-K.

Plaintiff James P. Scanlan is employed as an American pilot and has been based out of

LaGuardia Airport in New York, New York since 2009.  (Decl. of Todd F. Jewett in Support of

Defs. Mot. to Transfer Venue ("Decl.") ¶ 7.)  Plaintiff seeks to represent two putative classes:

- Current and former participants under the AAG Global Profit Sharing Plan (the "Plan")
  who did not receive credit for military service absences for awards under the Plan from
  January 1, 2016 through date of judgment of this action.  (Am. Compl. ¶ 13.)

- Current and former American employees who took "short term military leave" and were
  not paid the difference between the pay they received from the military and what they
  would have been paid by American for working from January 1, 2013 through the date of
  judgment of this action.  (*Id.* ¶ 14.)

### AAG Global Profit Sharing Plan

The Plan rewards eligible employees for their efforts in helping achieve AAG's strategic,

financial, and operating objectives by providing those employees with an opportunity to share in

AAG's profits for each Plan year.  (Decl. ¶ 4.)  American's Executive Compensation

Department, based in Fort Worth, currently administers the Plan.  (*Id.* ¶ 5.)  Employees in that

department have knowledge and information relevant to how the Plan calculates benefits and

how the Plan credits time away from work spent on military and other leaves—which forms the

basis of Plaintiff's claims related to the Plan.  (*See id.*; Am. Compl. ¶¶ 72-93.)

---

[1]  *See* Annual Form 10-K, American Airlines Group Inc. and American Airlines, Inc., at 1-2
(Feb. 16, 2018),
https://www.sec.gov/Archives/edgar/data/4515/000119312517051216/d286458d10k.htm
("Annual Form 10-K").

### American's Workforce and Leave Policies

As of December 31, 2018, American employed approximately 112,700 employees—of those, only approximately 6.6% work in Philadelphia ("PHL") and 24.3% work in Dallas/Fort Worth ("DFW"). (Decl. ¶ 6.)  Based on Defendants' preliminary investigation, over 1,000 American employees have taken military leave since January 1, 2013.  (*Id.* ¶ 10.)[2]

Over 70% of American's workforce is unionized, and those employees are covered by one of 13 collective bargaining agreements ("CBAs").  (*Id.* ¶ 11.)  These CBAs, as well as American's leave policies, govern military leaves as well as the jury duty, paid sick, and union service absences that are at issue based on Plaintiff's allegations.  The administration of American's CBAs and policies includes interpreting and applying them, which in turn requires knowledge of the union and/or company's past practices, which in certain instances may not be addressed by the plain language of a CBA or policy.  (*Id.* ¶¶ 13, 16.)  The departments and employees responsible for administering American's CBAs and policies—which vary by employee group—are virtually all based in Fort Worth.  (*See id.* ¶¶ 12-13, 16.)

### ARGUMENT

"In considering a motion to transfer a civil action to another federal district, the applicable legal standard is the convenience of the parties and witnesses, in the interest of justice." *WellPet, LLC v. Midwestern Pet Foods, Inc.*, 2009 WL 5111790, at *1 (M.D. Pa. Dec.

---

[2] While American maintains a hub in PHL, several of the employee groups included in Plaintiff's proposed class have no employees at all based in PHL.  For example, there are no dispatchers, plant maintenance mechanics, flight simulator instructors, technicians, or engineers in PHL.  (Decl. ¶ 8.)  Moreover, based on a preliminary investigation, the largest number of most employee groups is in DFW.  For example, as of December 31, 2018, of American's 19,204 non-unionized management and support staff employees, 9,840 work in DFW and only 340 work in PHL.  (*Id.* ¶ 9.)

4

16, 2009).[3]  In applying this standard, the Court must "consider all relevant factors to determine

whether on balance the litigation would more conveniently proceed, and the interests of justice

be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873,

879 (3d Cir. 1995).  The Court has discretion "to adjudicate motions for transfer according to an

individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v.

Ricoh Corp.*, 487 U.S. 22, 29 (1988).

Because it is indisputable that, under 28 U.S.C. § 1391, this action could have been

brought in the N.D. Texas where Defendants have their principal place of business, the only

issue is whether the convenience of the parties and witnesses and the interest of justice favor

transfer.

## I.    The Relevant Factors Favor Transferring This Action to the N.D. Texas.

Courts in the Third Circuit typically consider several private and public interest factors

when determining whether transfer is appropriate. *Jumara*, 55 F.3d at 879.  However, "[n]ot all

factors will apply in a given case, and the court may address other considerations if

pertinent." *Wise v. Williams*, 2011 WL 2446303, at *10 (M.D. Pa. May 18, 2011).

The public interest factors include the (1) "enforceability of the judgment;" (2) "the

relative administrative difficulty in the two fora resulting from court congestion;" (3) "the local

interest in deciding local controversies at home;" (4) "the public policies of the fora;" and (5)

"the familiarity of the trial judge with the applicable state law in diversity cases." *Blanken v.

Kentucky Highlands Inv. Corp.*, 2014 WL 4988280, at *2 (M.D. Pa. Oct. 7, 2014).  Courts also

consider judicial economy in the public interest, including whether the case to be transferred

---

[3] Unless otherwise stated, Defendants have omitted all internal quotation marks and citations
from quoted material.

"involve[s] the same or similar issues and parties" as a case in the transferee district. *In re: Howmedica Osteonics Corp.*, 867 F.3d 390, 402 (3d Cir. 2017).[4]

The private interest factors that courts consider include the (1) "plaintiff's forum preference as manifested in the original choice;" (2) "the defendant's preference;" (3) "whether the claim arose elsewhere;" (4) "the convenience of the parties as indicated by their relative physical and financial condition;" (5) "the convenience of the witnesses;" and (6) "the location of books and records." *Id.* (citing 28 U.S.C. § 1404(a).) Courts are also "required to assess all practical considerations that could make the trial easy, expeditious, or inexpensive." *Blanken*, 2014 WL 4988280, at \*3.

Transfer is appropriate here because, in a proposed nationwide class action, the plaintiff's choice of forum is entitled to minimal deference, and several other key factors favor transfer, including the convenience of the parties and witnesses and judicial economy and practical considerations. *See, e.g.*, *Huang v. Sonus Networks, Inc.*, 2016 WL 1090436, at \*3 (D.N.J. Mar.

---

[4] Because this action involves a USERRA claim under federal law, "most of the public factors are irrelevant or invalid." *See Robertson v. Pfizer Ret. Comm.*, 2018 WL 3618248, at \*9 (E.D. Pa. July 27, 2018). First, "the enforceability of the judgment" is "largely irrelevant . . . because a federal statute is at issue and because the judgment would be enforceable in either district." *Id.* Second, because there is no "appreciable difference in docket congestion between the two districts," administrative difficulty due to court congestion is a neutral factor. *See Jumara*, 55 F.3d at 879, 883; Fed. Ct. Mgmt. Statistics–Profiles, U.S. Courts (June 30, 2017), http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0331.2017.pdf (reporting that, as of March 2017, the median time from filing to disposition of a civil case was 5.7 months in this Court and 7.1 months in N.D. Texas, and the median time from filing to civil trial was 20.7 months in this Court and 20.5 months in N.D. Texas). Third, there is no "local interest" in deciding this controversy because "[t]he allegations of this case . . . are national in character and involve conduct affecting [employees] in all states." *See Stephen L. LaFrance Holding Inc. v. Nat'l Milk Producers Fed'n*, 2012 WL 3104837, at \*5 (E.D. Pa. July 31, 2012). Fourth, "since this is a [USERRA] case implicating federal law and policy . . . [the public policy] factor is largely irrelevant." *Mitek Sys., Inc. v. United Servs. Auto. Ass'n*, 2012 WL 3777423, at \*8 (D. Del. Aug. 30, 2012). Fifth, for the same reasons, "judges in both districts should be familiar with the applicable law." *See Aetna Inc. v. People's Choice Hosp., LLC*, 2018 WL 1287491, at \*4 (E.D. Pa. Mar. 13, 2018).

21, 2016) (granting transfer where "all of the private interest factors are either neutral or weigh in favor of transfer"); *see also Carder*, No. 3:09-cv-01448 [ECF No. 24] (transferring nationwide USERRA class action to airline's headquarters where plaintiff's choice of forum carried little weight and convenience of parties and witnesses and ease of access to evidence favored transfer); *Duffer*, No. 3:13-cv-00318 [ECF No. 40] (transferring nationwide USERRA class action to district where airlines' headquarters, documentary evidence, and many witnesses relevant to case were located); *Hoefert*, 2018 WL 2740276, at *3 (transferring nationwide USERRA class action to district of American's headquarters where relevant witnesses and documents were located in Texas and prior litigation meant N.D. Texas was familiar with legal and factual background of case).

### A. Plaintiff's Choice of Forum Should Be Afforded Minimal Deference, While Defendants' Preference Favors Transfer.

"[A]s dictated by the United States Supreme Court, the choice of forum of a named plaintiff in a class action suit should be given less deference since any member of the putative class could potentially bring suit in his or her own forum." *Smith v. HireRight Sols., Inc.*, 2010 WL 2270541, at *3 (E.D. Pa. June 7, 2010); *see also Hoefert*, 2018 WL 2740276, at *1 (plaintiff's choice of forum given less deference when case is filed as a putative nationwide class action). Affording Plaintiff's choice of forum minimal deference here is particularly appropriate because this is an action on behalf of a nationwide class of potentially several thousand members (the vast majority of whom are not based in Pennsylvania, while many are based in Texas), and Plaintiff's relationship with American is in New York. (*See* Decl. ¶ 7.) Thus, any claim by Plaintiff that this is the appropriate forum because it is his home state "is considerably weakened." *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947) (finding deference to plaintiff's chosen forum considerably weaken where there were "hundreds of

potential plaintiffs"); *see also Klingensmith v. Paradise Shops, Inc.*, 2007 WL 2071677, at *2 (W.D. Pa. July 17, 2007) ("[Plaintiffs'] choice of forum is entitled to even less deference here where the [Defendant's businesses] are located nationwide.  There is every expectation that there will be more plaintiffs residing outside of Pennsylvania than within and that more causes of action will have arisen outside of Pennsylvania than within.").  "In contrast . . . Defendants' preference to litigate in [Texas] weighs in favor of transfer, as all the Defendants are located in that state." *Huang*, 2016 WL 1090436, at *2.  Thus, in this case, the parties' preferences weigh in favor of transfer.

### B.  The Convenience of the Parties Favors Transfer.

Defendants' headquarters are in Fort Worth.  Virtually all American employees with knowledge and information relevant to this litigation who would potentially be needed for discovery—as well as documentary evidence subject to discovery—are in Fort Worth. (*See* Decl. ¶¶ 13-17.)  As such, "the convenience of the parties and the witnesses, weigh . . . in favor of transfer because [Defendants'] headquarters are located in the Northern District of [Texas] and the majority of operative events occurred in that district." *Jackson v. Equifax Info. Servs., LLC*, 2014 WL 808090, at *4 (M.D. Pa. Feb. 28, 2014).

In contrast, Plaintiff is only one person, and any inconvenience resulting from his involvement in the litigation would be less than the inconvenience to Defendants. *Maxtak Capital Advisors LLC v. ParkerVision, Inc.*, 2012 WL 4673244, at *5 (D.N.J. Oct. 1, 2012) (noting "although both parties would experience some level of inconvenience regardless of which forum is ultimately chosen, the greater burden would fall upon Defendants, whose directors, officers and employees with knowledge pertinent to this lawsuit are located in Florida [headquarters]").

### C. The Convenience of the Witnesses Favors Transfer.

"[T]he convenience of witnesses, perhaps the most important factor, weighs heavily in favor of transfer." *Headon v. Colorado Boys Ranch*, 2005 WL 1126962, at *7 (E.D. Pa. May 5, 2005); *see also Hoefert*, 2018 WL 2740276, at *2 (same).  Based on Defendants' preliminary investigation, virtually all American employees who are potential witnesses (other than Plaintiff)—including those whose testimony may be required to resolve this litigation—are based in Fort Worth.

Plaintiff seeks to represent all current and former Plan participants and all current and former American employees who took military leave.  Plaintiff challenges policies under the Plan and American's policies governing military and other absences for all American employees. The Executive Compensation Department responsible for administering the Plan is based in Fort Worth.  (Decl. ¶ 5.)  With respect to administering military and other leaves of absence, American's workforce includes six general categories of unionized employees (i.e., Pilots, Flight Attendants, Customer Service, Mechanics/Maintenance Technicians, Fleet Service employees, and Dispatch) covered by one of 13 CBAs, as well as non-union management and support staff. (*See id.* ¶ 11.)  The administration of military and other leaves across all of these groups involves several departments, including Labor Relations, Flight, Flight Service, Crew Planning, Workforce Administration, the Absence and Return Center, People, and Compensation.  And every single one of these departments are based in Fort Worth.  (*See id.* ¶¶ 13, 16.)  Knowledge and information from several employees across these departments may therefore be necessary to resolve Plaintiff's claims involving military and other leave policies for the last six years.  Based on a preliminary investigation, this includes Patricia Herrera (Director, Executive Compensation); Sue Kalosa (Manager, Flight Administration), Cheryl Scardis (Manager, Flight

Service Center & Field Support), Rick Carpenter (Manager, Flight Service Administration), Sophie Nwaefulu (Senior Manager, Workforce Administration), and Anthony Giandiletti (Manager, Absence and Return Center). (*See* Decl. ¶ 5, 17.)

Moreover, knowledge and information from at least four employees in American's Labor Relations Department may also be required because they are each involved in the administration of a subset of the applicable CBAs. (*See id.* ¶ 14.) Based on a preliminary investigation, this includes Todd Jewett (Managing Director, Labor Relations – Flight), Cindi Simone (Managing Director, Labor Relations – Inflight), Lynn Vaughn (Managing Director, Labor Relations – Customer Service), James B. Weel (Managing Director, Labor Relations – Technical Operations). (*Id.*)

Additionally, Scott Hansen, American's former Director, Flight Administration, who is no longer an employee, has essential knowledge on the administration of leaves of absence for pilots over the past six years. (*See id.* ¶ 18.)

All of these potential witnesses are located in the Fort Worth area and would be inconvenienced by having to appear at trial in Philadelphia. *See Headon*, 2005 WL 1126962, at *7 (convenience of witnesses favored transfer given "most, if not all, of the fact-witnesses concerning the broad array of allegations in the complaint reside in [transferee] district."); *Hoefert*, 2018 WL 2740276, at *3 (transferring action to Texas when American "identified approximately four other witnesses who . . . are based in Fort Worth, Texas"); *Duffer*, No. 3:13-cv-00318 [ECF No. 40] at 8 (location of "many of the witnesses whose testimony would be relevant" favored transfer from California to Illinois, even though specific witnesses were not yet identified).

Moreover, Plaintiff brings his claims on behalf of a nationwide class with potentially thousands of members, all of whom are also potential witnesses and have an interest in this litigation. (*See* Am. Compl. ¶¶ 1, 13, 14; Decl. ¶ 10.) While a small percentage of potential class members work in PHL, many more work in Fort Worth, making Fort Worth more easily accessible for more potential class members who may be called as witnesses. (*See* Decl. ¶¶ 6, 8-9.) The N.D. Texas is thus the more convenient forum for Plaintiff's putative class. *See Henderson v. HireRight Sols., Inc.*, 2010 WL 2349661, at *4 (E.D. Pa. June 7, 2010) ("Given that this case is brought as a nationwide class action, there could conceivably be similar local witnesses hailing from all fifty states, who could present relevant testimony. Nothing in the Complaint makes the testimony of the Pennsylvania witnesses of greater import than that of the other states' witnesses."); *Hoefert*, 2018 WL 2740276, at *3 (finding "the potential quantity and quality of the testimony of Texas-based witnesses outweighs that of the [transferor district]-based witnesses" warranted transfer).

### D. The N.D. Texas Is Familiar with the Legal Claims and Relevant Facts, which Favors Transfer.

"[P]ublic interests . . . include judicial economy considerations, [that] support having the two actions in the same district (through transfer) when the two cases are in different courts but involve the same or similar issues and parties." *Howmedica*, 867 F.3d at 402. Although federal courts in both forums "should be familiar with the applicable law," the N.D. Texas is also familiar with certain relevant facts because they are the same or similar to certain facts at issue in *Hoefert v. American Airlines. See Aetna Inc.*, 2018 WL 1287491, at *4. *Hoefert* is a USERRA class action originally filed in the District of Arizona, which that court transferred on June 7, 2018 to the N.D. Texas where it is currently pending. *Hoefert*, 2018 WL 2740276, at *1. Similar to Plaintiff here, the *Hoefert* plaintiff alleges that, under USERRA section 4316(b),

11

American employees (specifically, pilots) are entitled to certain benefits (specifically, vacation and sick accrual and certain bonus payments) while on military leave because those benefits are allegedly provided to employees during jury duty, sick, and union service absences. *Id.* Certain of the CBAs and company policies relevant to litigating the *Hoefert* claims are thus the same or similar as those relevant to litigating Plaintiff's claims with respect to American pilots. Thus, "transferring this case to the Northern District of Texas will allow for courts that already have familiarity with similar matters to address this case efficiently." *Hoefert*, 2018 WL 2740276, at *3. Additionally, as the District of Arizona found, the N.D. Texas is familiar with certain legal claims and relevant facts because they are the same or similar as in a prior USERRA class action brought on behalf of American's pilots, *Woodall v. American Airlines, Inc*, No. 3:06-cv-00072-M (N.D. Tex.). *See Hoefert*, 2018 WL 2740276, at *3. The N.D. Texas's familiarity with issues and facts in this case based on the *Hoefert* and *Woodall* litigation thus supports transfer.

### E. The Location of Books and Records.

The vast majority of relevant documents in this case are located at American's Fort Worth headquarters. For example, any hard copy notes or records related to collective bargaining negotiations are maintained by the Labor Relations Department in Fort Worth. (Decl. ¶ 15.) Moreover, even if documents can be "transmitted to the [Eastern] District of [Pennsylvania] with minimal expense . . . it will be less expensive to produce the relevant documents in the Northern District of Texas." *Hoefert*, 2018 WL 2740276, at *3. While technology has made it possible to store and transmit documents electronically, the location of American's documentary evidence is still relevant to the transfer analysis. *Id.* And "[s]ince the majority of relevant documents in this case are located at [American's] headquarters and facilities in the Northern District of [Texas], and it does not appear that such records cannot

be produced in [Pennsylvania], this factor weighs minimally in favor of transfer." *Illumina, Inc.*

*v. Complete Genomics, Inc.*, 2010 WL 4818083, at \*5 (D. Del. Nov. 9, 2010).

### F. Practical Considerations Related to Easy, Expeditious, and Inexpensive Trial Favor Transfer.

"[P]ractical considerations relating to efficiency support this action being transferred to

the Northern District of [Texas]. In particular, the witnesses and documents relevant to

[Plaintiff's] claim are likely to be located in [Texas]. As such, trial in the Northern District of

[Texas] would likely be significantly easier and less expensive." *Jackson*, 2014 WL 808090, at

\*4; *see also Hoefert*, 2018 WL 2740276, at \*3 (transferring action to the location of American's

headquarters in Texas because it would be less expensive to produce relevant documents there).

Here, Fort Worth is the center of discovery—all of American's witnesses, who will be the vast

majority of witnesses in this case, are in the N.D. Texas, as is documentary evidence that will be

subject to discovery and the personnel who will be responsible for collecting such evidence.

When "the bulk of the evidence and witnesses who would provide most relevant testimony are

located in [Texas], it would be more expensive and burdensome to direct Defendants to haul all

of their evidence and witnesses to [Pennsylvania], even if Defendants may have the resources to

do so. Rather, under this public factor, it would be less expensive and time consuming,

generally, if Plaintiff were to litigate [his] case in [Texas]." *Goldstein v. MGM Grand Hotel &

Casino*, 2015 WL 9918414, at \*5 (D.N.J. Nov. 5, 2015).

### G. Fort Worth is the Location Where Relevant Claims Arose Relating to Plaintiff's Cause of Action.

"Where plaintiff's cause of action arises from strategic policy decisions of a defendant

corporation, the defendant's headquarters can be considered the place where events giving rise to

the claim occurred." *Theresa Ayling v. Travelers Prop. Cas. Corp.*, 1999 WL 994403, at \*5

(E.D. Pa. Oct. 28, 1999). The relevant events here are the administration of the Plan and the

13

administration of military and other leaves for all American employees under the applicable CBAs and other policies.  Because American's Executive Compensation, Labor Relations, Flight, Flight Service, Crew Planning, Workforce Administration, the Absence and Return Center, People, and Compensation Department employees in Fort Worth are responsible for this administration, Fort Worth is the center of events at issue and where Plaintiffs' claims arose. (*See* Decl. ¶¶ 5, 13, 16.)

For this same reason, and because Plaintiff does not allege any specific connection between the claims and the current forum (and indeed does not even work for American in PHL but in New York), American's contacts with the N.D. Texas through the administration of the Plan and employee leaves are the predominant contacts related to Plaintiff's claims.  (*See generally* Am. Compl.); *see also Smith*, 2010 WL 2270541, at *4 (transfer warranted where "Plaintiff, in this case, alleges no facts that would place the situs of the material events within the Eastern District of Pennsylvania," and all documents that "form the basis for this suit originated from a singular source—Defendant's place of business in [the transferee district]").

## CONCLUSION

For these reasons, Defendants respectfully request that this Court transfer this action to the N.D. Texas.

By: */s/ Mark W. Robertson*

Mark W. Robertson (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
mrobertson@omm.com

Kenneth A. Murphy
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000

14

Philadelphia, PA 19103
Telephone: (215) 988-2700
kenneth.murphy@dbr.com

*Attorneys for Defendants American Airlines
Group Inc. and American Airlines, Inc.*

# EXHIBIT 24

OFFICE OF THE CHIEF PILOT

**American Airlines**

3/7/2019

FO Rodney Scott Patterson
1092 NW 139TH TER
PMBK PINES
FL  33028

<u>Notice of Section 21</u>

Dear FO Patterson,

We recently learned of certain facts that suggest that you have engaged in a pattern of serious fraudulent conduct.  This fraudulent conduct includes: (1) making potentially false statements to obtain military leave; (2) submitting incomplete and false 8500 forms to the FAA; and (3) intentionally manipulating the Section 20 process by providing incomplete and misleading information to AA in the context of seeking to return to work, including hiding a medical examination that corroborated AA's fitness for duty examination.

When you are cleared to return to work through the Section 20 process, AA will convene a Section 21 hearing to investigate these serious concerns.

Please let me know if you have questions.

Sincerely,

Captain Jeffrey Price

Director of Flight, MIA

CC:   APA/Tricia Kennedy

Miami International Airport
P.O. BOX 527300 MD 2030
Miami, FL 33152
305 526 1200 Office
305 526 1294 Fax



fisherphillips.com

**Fort Lauderdale**
450 East Las Olas Boulevard
Suite 800
Ft. Lauderdale, FL  33301

(954) 525-4800 Tel
(954) 525-8739 Fax

**Writer's Direct Dial:**
(954) 847-4709
**Writer's E-mail:**
mholt@fisherphillips.com

March 4, 2019

**Via Email**

William R. Amlong, Esq.
Amlong & Amlong, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301
wramlong@theamlongfirm.com

Re:   *Patterson v. American Airlines*, No. 17-cv-60533 (S.D. Fla.)

Dear Bill:

Pursuant to Rule 11, we write to describe additional conduct by Mr. Patterson that violates Rule 11(b) and constitutes an extensive fraud upon the Court and American. Based on this misconduct, American intends to seek terminating sanctions and all of its attorneys' fees and costs incurred in this matter.

In preparation for the hearing on American's Motion for Sanctions, we reviewed Mr. Patterson's deposition testimony regarding his purported trip to Washington D.C. on September 22–25, 2015, and American's travel records for Mr. Patterson.

As you are aware, Mr. Patterson testified in his deposition that he and his wife traveled to D.C. in September 2015 to attend Pope Francis' visit to the White House. Indeed, Mr. Patterson's entire complaint rests on the premise that he requested time off from work in order to engage in military service in Washington D.C. in connection with the Pope's visit.

Specifically, Mr. Patterson testified that he and his wife traveled on an American Airlines flight from Miami to Washington-DCA on September 22, 2015, and returned on September 25. He testified that he booked the travel on a non-revenue basis, using American's "Jetnet" system—a system that American employees use to book travel using their employee travel privileges. Mr. Patterson testified in significant detail regarding his D.C. trip, including the time of his flight from MIA to DCA (early morning), his schedule once he landed at the DCA airport, and his alleged subsequent work at the Pentagon and visit to the White House. (*See, e.g.,* Patterson Dep. at 191:14–232:22.)

American's records, however, conclusively show that neither Mr. Patterson nor Mrs. Patterson traveled anywhere on any American flight nor any legacy US Airways flight between September 22–25, 2015. Despite Mr. Patterson's specific testimony that he flew on his travel

William R. Amlong, Esq.
March 4, 2019
Page 2

privileges, American also checked to determine if Mr. Patterson purchased tickets for himself and his wife. Based on its review, American confirmed that no one with the last name Patterson flew on American out of Miami (MIA) on September 22, or out of D.C. Reagan National (DCA) on September 25. Based on American's records and Mr. Patterson's failure to produce any documents establishing that he was in D.C.—despite American's specific requests for such documents in discovery—it appears that you and Mr. Patterson have based this entire lawsuit on a fabrication.

Given the magnitude of these misrepresentations and the enormous fraud on the Court and American that this would constitute, the only way to cure this would be to dismiss the complaint with prejudice and pay the entirety of American's fees and costs since the commencement of this litigation.

If you or Mr. Patterson has any evidence supporting Mr. Patterson's testimony regarding his alleged travel to Washington D.C. from September 22–25, 2015, or evidence supporting Mr. Patterson's claim that he was actually in D.C. during that time performing military duties at the Pentagon and White House, American demands that you produce those materials immediately. Similarly, if you or Mr. Patterson have any evidence confirming that Mr. Patterson lied regarding his alleged trip to D.C. and alleged performance of military duties at the Pentagon and White House, American demands that you produce those materials immediately.

We ask that you respond as soon as possible.

Sincerely,

Michael A. Holt
For FISHER & PHILLIPS LLP

MAH:mah

cc:    Counsel of Record (via email)

# EXHIBIT 25

**WASHINGTON NEUROPSYCHOLOGICAL INSTITUTE, LLC**
**4900 MASSACHUSETTS AVE, NW   SUITE 240**
**WASHINGTON, DC 20016**
PH. 202-686-7520  FAX 202-686-8802

Gary G. Kay, Ph.D., ABN
Clinical Neuropsychologist

## REPORT OF FOLLOW-UP NEUROPSYCHOLOGICAL ASSESSMENT

**NAME:**          **PATTERSON,** Rodney "Scott"
**TEST DATE:**   October 10, 2018
**AGE:**             50

Scott Patterson is a 50 year old, right handed, married Caucasian male, former American Airlines A319 First Officer, presently employed by a cargo carrier, 21 Air, referred for follow-up neuropsychological assessment by Dr. Glen Cady.

## RELEVANT HISTORY:

Mr. Patterson is an American Airlines A319 First Officer with 12,000 logged flight hours who was previously seen for neuropsychological assessment on June 29, 2016.

When seen in 2016 Mr. Patterson explained that his problems with American Airlines began during a trip to Paraguay in October 2014. Mr. Patterson was traveling with his family on vacation. As they were boarding the flight, Mr. Patterson helped his wife find a space (above the crew space) for a backpack that a flight attendant had said needed to be checked. This apparently created a conflict between the flight attendant and Mr. Patterson. When they landed, Mr. Patterson was informed that his family wasn't welcome to ride the shuttle bus to the hotel. The situation escalated to the point where the flight attendant made a formal complaint to the airline. Mr. Patterson was told to meet with Professional Standards upon his return. When Mr. Patterson met with Professional Standards he discovered that he had been accused by the captain who had flown the trip (Captain Whitehouse) of pointing out crew for extra screening in customs. Mr. Patterson strongly denied the allegation. In June 2015, as he was departing on a trip, Mr. Patterson was asked to undergo additional Customs screening in the jet bridge. Mr. Patterson believed that this was a retaliatory act. The next month he avoided taking a flight where Captain Whitehouse was in the jump seat. He later received a call from Professional Standards asking if he was harassing the Captain. He was also asked if he was "smuggling guns to Bolivia." Mr. Patterson denied the allegations and informed the Captain in Professional Standards that the subsequent was out of control. On a subsequent flight, Mr. Patterson was again stopped, prior to a flight to Bolivia, and searched. The pilot that he was flying with was involved with Professional Standards. Mr. Patterson continued to fly the line from June through September 15, 2015. He received an assignment to work at the White House during the Pope's visit. After not being able to reach his Chief Pilot, Mr. Patterson called the Duty Chief to request permission to take the assignment. He later discovered that permission wasn't granted. He was suspended by the Chief Pilot for missing his flight.

A hearing took place in November 2015 to review the incident in 2014 and the complaint made in September 2015. The hearing found no cause for discipline. In January 2016 he was informed that his case was still being investigated. In March 2016 he was sent for a fitness-for-duty evaluation to Dr. John Knippa.

Mr. Patterson's legal case with American Airlines remains unresolved. In reviewing Mr. Patterson's case with his attorney, Mr. Amlong, I was informed that Mr. Patterson had undergone testing with Dr. Bercaw on 3/21/2016 three months prior to his visit with me on 6/29/2016. I was provided a copy of Dr. Bercaw's report to review. Dr. Bercaw noted poorer

PATTERSON, Scott
Page 2

than expected performance in the areas of deductive reasoning and sustained attention. Results were also interpreted as showing "insufficient learning and poor recall of information presented verbally." These findings were not considered to be clinically significant and were attributed to possibly having resulted from the airman's fatigue. Dr. Bercaw concluded that there was nothing to indicate the presence of a disqualifying mental condition. However, due to the airman's poor performance on measures of deductive reasoning (i.e., 24 perseverative errors on WCST) Dr. Bercaw recommended "review of these data by an FAA neuropsychologist."

Prior to these work-related incidents Mr. Patterson stated that he had never been evaluated or treated by a mental health professional. He reported no history of anxiety, depression, substance abuse, or anxiety-related disorders. He has been married for over 25 years. He lives with his wife and two children. He reported that his children are home schooled in a program that also involves a private school and a certified teacher. His wife works full-time as a physical therapist. He is a devout Christian who is very active in his church. He completed and passed the screening test to become a Federal Flight Deck Officer. He continues to serve in the Reserves and holds the rank of Lieutenant Colonel. He reported that he is in good health. He indicated a desire to return to his former employment as an American Airlines pilot.

## RECORDS REVIEWED:

*Forensic Investigation Report, Dr. Glenn Ross Caddy, 7/20/16*

*Neurological Examination, John Hastings, MD, 5/28/16*

*Neuropsychological Fitness-For-Duty Examination, John Knippa, Ph.D., 3/17/16*

*Neuropsychological Evaluation, Edwin L. Bercaw, Ph.D., 3/21/16*

## TESTS ADMINISTERED:

CogScreen-Aeromedical Edition (Session 4)
D-KEFS
      Proverbs
        Tower Test
CVLT-3
NAB Mazes
Conners' Continuous Performance Test-II
Trail Making Test

## MENTAL STATUS EXAMINATION/TEST BEHAVIOR:

Mr. Patterson arrived promptly for his scheduled appointment. He was appropriately groomed and dressed in casual attire. He was fully alert, oriented and cooperative. Mr. Patterson readily re-established good rapport with the examiner. He did not appear to be particularly anxious or depressed. He was very intent upon sharing his history. There were no clinical signs of problems with attention or concentration. He readily engaged in conversation. His speech was normal in volume, rate and prosody. He had no difficulty following task instructions. He appeared to be  motivated to perform at the best of his ability. The following results are considered to accurately reflect his current level of functioning.

PATTERSON, Scott
Page 3

## TEST FINDINGS:

*CogScreen-AE*

| | 6/16 | 10/18 | | 10/18 |
|---|---|---|---|---|
| SPEED: | 1 | 0 | Scores at or below the 5th percentile | >45th percentile |
| | 2 | 3 | Scores at or below the 15th percentile | 47.5 percentile |

Mr. Patterson had no scores that were at or below the 5th percentile compared to major airline pilots his age on measures of response speed. He was relatively slow on measures of math reasoning and visual scanning and tracking. The difficulty seen with visual scanning and tracking is similar to that seen in 2016. His overall response speed places him at the 47.5 percentile compared to US Major Airline Pilot norms (ages 50-54).

| | 6/16 | 10/18 | | 10/18 |
|---|---|---|---|---|
| ACCURACY: | 0 | 1 | Score at or below the 5th percentile | 35th percentile |
| | 0 | 1 | Score at or below the 15th percentile | 62.5 percentile |

Mr. Patterson had one score at or below the 15th percentile on measures of response accuracy. His weak score was on a measure of visual working memory. Overall, his response accuracy is at the 62.5 percentile compared to US Major Airline Pilots his age.

PROCESS MEASURES:

Mr. Patterson performed well on measures of response inhibition, tracking, psychomotor coordination, and deductive reasoning under time pressure.

ADDITIONAL FINDINGS:

On factor analytically derived summary scores predictive of flight performance Mr. Patterson's scores are all within the expected range. This includes measures of psychomotor coordination, processing speed, working memory, deductive reasoning, memory and tracking.

Mr. Patterson's LRPV score of 0.152 is in the Normal range and suggests against the likelihood of acquired cerebral dysfunction. There was only a minimal increase in the airman's LRPV score compared to 2016.

*Conners' Continuous Performance Test-II*
Consistent with results obtained in 2016, all of Mr. Patterson's scores, with the exception of one were in the expected range on this measure of visual sustained attention. The one weakness was again seen on a measure reflecting increased reaction time variability over the 15 minute duration of the task. Mr. Patterson demonstrated good reaction time, sensitivity to target stimuli, and ability to inhibit responses to non-targets. Results suggest against the likelihood of a clinically significant problem with vigilance or attention.

*California Verbal Learning Test - 3*
This is a test of verbal memory involving learning and recall of a 16-item word list. Following the initial presentation of the word list Mr. Patterson recalled 8 of the list words. This score falls in the mid-Average range compared to pilot norms. After 4 more repetitions of the word list he was able to recall 14 of the items. This score also falls in the mid-Average range for pilots. Similarly, his total recall score for the 5 learning trials (60) falls in the mid-Average range for pilots. Recall from an Interference list was slightly above average. Recall following presentation of the interference trial (13 words) was in the mid-Average range. Following a 20-minute delay interval Mr. Patterson recalled 15 of the list words, a score placing him nearly 1

PATTERSON, Scott
Page 4

standard deviation above the mean for pilots. He also performed well on delayed list recognition (15 correct; no false positive errors).

*Executive Functions*
The NAB Mazes test is a measure of non-verbal problem solving involving response inhibition, planning, and visual problem solving. Mr. Patterson performed at the 92nd percentile for his age and years of education.

The D-KEFS Tower Test, is a measure of rule application, planning, and non-verbal problem solving. His overall performance on this measure places him at the 90th percentile. All scale scores for this test were within the Normal range.

The D-KEFS Proverbs Test is a measure of verbal abstract reasoning. Three of Mr. Patterson's responses were considered to be mildly concrete. He correctly responded to 7 of the 8 multiple choice items demonstrating reasonably good recognition of verbal abstractions.

**SUMMARY AND RECOMMENDATIONS:**

Follow-up neuropsychological assessment provides reassuring information regarding Mr. Patterson's neurocognitive functioning. He performed well on neuropsychological screening. CogScreen results suggest against the likelihood of acquired cerebral dysfunction. His performance on CogScreen measures of response speed and accuracy are largely consistent with the favorable results obtained in 2016. Aviation factor scores, validated predictors of flight performance, were all in the expected range. Additional testing of vigilance, memory, and executive functions also show intact neurocognitive functioning. Mr. Patterson performed at or above average compared to pilot norms on measures of verbal learning and memory. Performance on three measures of executive functioning demonstrate intact planning, abstract reasoning, impulse control, and novel problem solving ability.

Based upon these findings Mr. Patterson would be considered to have no aeromedically significant neurocognitive deficits and would be recommended for a Class 1 FAA airman medical certificate.

Thank you for referring Mr. Patterson for neuropsychological assessment. If you have any further questions please don't hesitate to contact me.

Gary G. Kay, Ph.D.
Clinical Neuropsychologist