```
                                                                    1

 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                 FORT LAUDERDALE DIVISION

 3      Case No.:  1:17-cv-60533-MARTINEZ/OTAZO-REYES

 4   RODNEY SCOTT PATTERSON,

 5        Plaintiffs,

 6   vs.

 7   AMERICAN AIRLINES, INC., a Delaware
     Corporation,
 8
          Defendant.
 9   _____

10            V I D E O   D E P O S I T I O N

11                        o f

12              EDWIN L. BERCAW, Ph.D.

13         taken on behalf of Defendant

14
        DATE:          August 16, 2018
15
        TIME:          1:48 p.m. to 5:53 p.m.
16
        PLACE:         Shook, Hardy & Bacon, LLP
17                     100 North Tampa Street, Suite 2900
                       Tampa, Florida   33602
18
        BEFORE:        Dawn A. Hillier, RMR, CRR, CLR
19                     Notary Public - State of
                       Florida, at Large
20
        JOB NO:        2983057
21

22

23

24
                   ATTACHMENT 10
25
```

[8/16/2018 1:30 PM]  Edwin Bercaw , Ph.D.

18

1  Bates numbers, just for clarity, even though the page
2  numbers are a little different.
3      A    That's okay.
4      Q    Looking at the page Bates number 10, there
5  appear to be two signatures on this document.  Can you
6  tell me who Nathaly Fonseca, Psy.D. is?
7      A    Yes.  She was our post-doctoral resident or
8  fellow at that time.  I was involved in training the
9  post-doctoral fellows at the company.
10     Q    She was already a licensed psychologist;
11 correct?
12     A    Yes.  She was licensed and she was in her
13 second year of the fellowship.
14     Q    Did -- withdrawn.
15          Why do both your signature and Dr. Fonseca's
16 signature appear on page ten of Exhibit 2?
17     A    Because we were both involved in the
18 evaluation.  I, of course, was a supervising
19 psychologist.
20     Q    And in what ways was Dr. Fonseca involved in
21 the evaluation?
22     A    She sat in on the interview.  She took her own
23 notes.  I led the interview.  I administered the
24 CogScreen.  She administered some tests, many of them.
25 I also administered a few tests.  She -- after the

[8/16/2018 1:30 PM] Edwin Bercaw , Ph.D.

```
                                                                    19
 1    appointment, she put together a rough draft of the
 2    background history and results.  And then I edited it
 3    from there.  And we had supervision meetings to talk
 4    about cases, including this one.
 5            So, we had a lot of back and forth in terms of
 6    discussing the tests and his performance and
 7    presentation and making conclusions.
 8        Q   Is that your standard practice when
 9    supervising residents or fellows --
10        A   Yes.
11        Q   -- to have supervision meetings?
12        A   Oh, yes.  Yes.  That's required, actually, by
13    the program of the fellowship.
14            The guideline is to have two hours of
15    supervision a week.  So typically, what you do -- at
16    least what I did in that case was an hour of a meeting
17    where we would discuss the cases in our office.  And
18    then the other hour is just broken up throughout the
19    week when you're talking about cases as they're going on
20    during the day.
21        Q   Okay.  For the test performed or administered
22    by Dr. Fonseca, was she -- did she have the appropriate
23    qualifications and training to administer those tests?
24        A   Yes.
25        Q   Do you know which test -- withdrawn.  Let's do
```

[8/16/2018 1:30 PM] Edwin Bercaw , Ph.D.

```
                                                              35
 1        Q    Do you recall anything of that nature being
 2   said?
 3        A    No.
 4        Q    Looking again at Exhibit 2, which I believe
 5   you have in front of you.  Does Exhibit 2 reflect your
 6   report of the evaluation of the plaintiff in this case?
 7        A    Yes.  Yes, it does.
 8        Q    And at least some of the information --
 9   withdrawn.
10             And the phone call you had with Dr. Caddy, did
11   you ever discuss at all who administered the test to the
12   plaintiff in this case?
13        A    No, I do not recall that coming up.
14             (Exhibit 4 was marked.)
15   BY MR. HOLT:
16        Q    You've been handed Exhibit 4 to your
17   deposition which contains an email chain.  And the top
18   email appears to be from you to the plaintiff and to
19   Dr. Caddy; is that correct?
20        A    Yes, that's correct.
21        Q    Okay.  Were you responding to a longer email
22   chain in this email on Exhibit 4?
23        A    Yes.
24        Q    And your email, the one at the top of the
25   first page of Exhibit 4, what was the date of that
```

[8/16/2018 1:30 PM]  Edwin Bercaw , Ph.D.

```
                                                                    36
 1      email?
 2           A     May 4th, 2016.
 3           Q     So, this is after you administered --
 4           A     Yes.
 5           Q     -- the test?
 6                 And had you completed your report at the time
 7      of this email?
 8           A     Yes.
 9           Q     Okay.  Looking at the second page -- this is
10      part of the email chain down at the bottom, there's a
11      April 29th, 2016, email that was cc'd to you.
12                 Do you see that?
13           A     Yes.
14           Q     If you read the -- could you read the first
15      two sentences of that email, please?
16           A     [As read]:  Scott, I have already sent
17      Dr. Bercaw an authorization to release in order for me
18      to speak to me regarding the report he prepared.  My
19      sense is that it is inadequate for your purposes and it
20      does not contain a lot of critical history and thus
21      perspective.
22           Q     This was information that had been forwarded
23      to you in an email before your call with Dr. Caddy;
24      correct?
25           A     Um-hum.  Yes, because the call, I think, took
```

[8/16/2018 1:30 PM] Edwin Bercaw , Ph.D.

```
                                                                    39
 1       A    Yes.
 2       Q    Okay.  The next page of Exhibit 4 has yet
 3  another prior email in the chain.  It appears to be 459.
 4            Do you see that?
 5       A    Yes.
 6       Q    This one looks like an email from plaintiff to
 7  Dr. Caddy saying [as read]:  If Dr. Bercaw will play
 8  ball with you, fine.  I have no issues with spending the
 9  money.
10            Do you have any understanding as to what that
11  means?
12       A    This is in reference to the fee that was
13  required by my company to have a phone consultation.
14       Q    Okay.  Then he goes on to say [as read]:  I
15  personally feel he took my money, and then when I showed
16  up, had the intern do the work, which is not what I paid
17  for.
18            Do you see that?
19       A    Yes.
20       Q    I mean, did you -- withdrawn.
21            In this email, the plaintiff is saying that
22  you essentially took his money and didn't provide him
23  the service you agreed to provide.  Do you agree?
24       A    I disagree with that statement.
25       Q    Why do you disagree?
```

```
                                                                     98
 1    several years.  Practice surveys have seen -- show that
 2    about half of neuropsychologists use an assistant for
 3    test administration.
 4         Q    Did MedPsych Systems use psychometricians?
 5         A    Yes.  On occasion, when we had one.  Not
 6    always.  I've had a few in the past.
 7         Q    Did you have any in 2016?
 8         A    No.  At that time, I was working just with
 9    Dr. Fonseca.  She was doing a couple cases a week with
10    me.  And I would do some myself, but we would work
11    together on the cases.
12         Q    I see in the 2016 letterhead, that Dr. Kanter,
13    the president of Comprehensive MedPsych Systems listed
14    himself as ABN and ABPNN [sic].
15         A    Yeah.
16         Q    You don't.  Were you board-certified at that
17    time?
18         A    I was not board-certified at that time, no.
19         Q    Were you board-eligible at that time?
20         A    Yes.
21         Q    Okay.  And when did you become
22    board-certified?
23         A    March 2017.
24         Q    Had you taken the test before?
25         A    The board certification test?
```

[8/16/2018 1:30 PM] Edwin Bercaw , Ph.D.