# U.S. DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

CASE NO.: 17-60533- JEM



Lt. Col. RODNEY SCOTT PATTERSON,

     Plaintiff,

vs.

AMERICAN AIRLINES, INC

     Defendant.

_____/

## PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE
## IN SUPPORT OF ITS MOTION FOR RECUSAL

    Plaintiff Lt. Col Rodney S. Patterson, pursuant to Rule 201 of the Federal Rules of Evidence, respectfully requests leave of this Court to file and that the Court take judicial notice of the following adjudicative facts and/or public records in support of Lt. Col Rodney S. Patterson's Motion for Recusal. As grounds therefore, Patterson states as follows:

    1.    Judicial notice is a means by which adjudicative facts not seriously open to dispute are established as true without the normal requirement of proof by evidence. *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1204 (11th Cir. 2004); Fed. R. Evid. 201(a) and (b); *see also* Fed. R. Evid. 201(a). Adjudicative facts are facts that are relevant to a determination of the claims presented in a case. *Id.* One category of adjudicative facts subject to judicial notice includes facts that are "generally known within the territorial jurisdiction of the trial court." *Id.* (quoting Fed. R. Evid. 201(b)(1)). Such judicially-noticed facts have been described as being "of breathtaking variety." *Id.* (collecting cases). Another category includes

*Page 2*

facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)(1) A court also may take judicial notice of public records. *Universal Express, Inc. v. U.S. Securities and Exchange Commission*, 177 Fed. Appx. 52, 53 (11th Cir. 2006). Judicial notice of appropriate adjudicative facts may be taken at any stage in a proceeding, including at the summary judgment stage. *Dippin' Dots, Inc.*, 369 F.3d at 1204; Fed. R. Evid. 201(f). Courts have wide discretion to take judicial notice of facts. *Id.*; Fed. R. Evid. 201(c).

2.      Because the following adjudicative facts and/or public records relevant to a determination of the claims presented in this case are generally known within the territorial jurisdiction of this Court and are not subject to reasonable dispute, judicial notice should be taken of them:

•      On January 06, 2012 the United States Court of Appeals, Eleventh Circuit issued the judgment and a copy of the court's opinion as the mandate of this court regarding the Plaintiff's former counsel William R. Amlong, Esq attached hereto as Exhibit 1.

Dated:  June 20, 2019                          Respectfully submitted,

_____
Rodney S. Patterson, Lt. Col., Pro Se
E-mail:  scottpatterson247@gmail.com
1092 NW 139th Terrace
Pembroke Pines, FL  33028
(704) 231-0909 (phone)

*Page 5*

## CERTIFICATE OF SERVICE

I Lt. Col Rodney S. Patterson, Pro Se Appellant hereby certify, that a true and correct copy of the foregoing was served by U.S. Mail on June 20, 2019 on all counsel or parties of record on the Service List Below.

Signature of Filer

### Service List

### Via U.S. Mail

Michael A. Holt
mholt@fisherphillips.com
Florida Bar No.: 91156
**FISHER & PHILLIPS LLP**
450 East Las Olas Boulevard
Suite 800
Fort Lauderdale, Florida 33301
Telephone: (954) 847-4709

Mark W. Robertson (*Pro Hac Vice*)
mrobertson@omm.com
**O'MELVENY & MYERS LLP**
Time Square Tower, 7 Times Square
New York, New York 10036
Telephone: (212) 326-2000

Tristan Morales (*Pro Hac Vice*)
tmorales@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, Northwest
Washington, DC 20006
Telephone: (202) 383-5300

*Attorneys for American Airlines, Inc.*

Karen Coolman Amlong
Florida Bar No: 275565
kamlong@TheAmlongFirm.com
AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
Phone: (954) 462-1983
Fax: (954) 523-3102

William R. Amlong
WRamlong@TheAmlongFirm.com
AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Fort Lauderdale, Florida 33301-1154
Phone: (954) 462-1983
Fax: (954) 523-3102

Counsel for Amlong & Amlong, P.A.

Noel Christian Pace, Esq.
206 NW 91ST STREET
EL PORTAL, FL 33150-2259
Noel.c.pace.esq@gmail.com
(305) 219-1191

# EXHIBIT 1

# United States Court of Appeals
### Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia  30303

**John Ley**
Clerk of the Court

January 06, 2012

FILED by _H H_ FOR rules and forms visit
www.ca11.uscourts.gov

JAN 11 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

Steven M. Larimore
Clerk, U.S. District Court
400 N MIAMI AVE RM 8N09
MIAMI  FL  33128-1813

**Appeal Number: 07-14077-HH**
Case Style: Floride Norelus v. Denny's Inc.
District Court Number:  94-02680 CV-JAL

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, <u>but not a copy of the court's decision,</u> is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

John Ley, Clerk of Court

Reply To: James O. Delancy (404) 335-6113

Encl.

MDT-1 (06/2006)

# United States Court of Appeals
## For the Eleventh Circuit

No. 07-14077

District Court Docket No.
94-02680-CV-JAL

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Dec 28, 2010

JOHN LEY
CLERK

FLORIDE NORELUS,
a.k.a. Lavictore Remy,

Plaintiff,

KAREN COOLMAN AMLONG,
WILLIAM R. AMLONG,
AMLONG & AMLONG, P.A.,

Interested-Parties-Appellants,

versus

DENNY'S, INC.,
T.W. SERVICES, INC.,
MEOS CORP, INC.,
a Florida corporation,
ASIF JAWAID,
individually,
RAHEEL HAMEED,
individually,

Defendants-Appellees.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

---------------------------------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
---------------------------------------------------------------

## J U D G M E N T

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
JAN 0 6 2012
U.S. COURT OF APPEALS
ATLANTA GA

Entered:       December 28, 2010
For the Court: John Ley, Clerk
By:            Gilman, Nancy

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

```
FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 28, 2010
JOHN LEY
CLERK
```

No. 07-14077

D. C. Docket No. 94-02680-CV-JAL

FLORIDE NORELUS,
a.k.a. Lavictore Remy,

                                                                        Plaintiff,


KAREN COOLMAN AMLONG,
WILLIAM R. AMLONG,
AMLONG & AMLONG, P.A.,

                                                        Interested-Parties-Appellants,

                                        versus

DENNY'S, INC.,
T.W. SERVICES, INC.,
MEOS CORP, INC.,
a Florida corporation,
ASIF JAWAID,
individually,
RAHEEL HAMEED,
individually,

                                                        Defendants-Appellees.

---

Appeal from the United States District Court
for the Southern District of Florida

---

(December 28, 2010)

Before TJOFLAT and CARNES, Circuit Judges, and BOWEN,[*] District Judge.

CARNES, Circuit Judge:

No one's memory is perfect. People forget things or get confused, and anyone can make an innocent misstatement or two. Or maybe even three or four. But not 868 of them. In this case, the plaintiff's attorneys, William and Karen Amlong, filed a sixty-three page errata sheet containing 868 attempted changes to their client's deposition testimony, which was the sole source of evidentiary support for their client's claims. The district court exercised its authority under 28 U.S.C. § 1927 to sanction the Amlongs. This is their appeal, or more specifically their second appeal.

## I.

### A.

In May 1994, Floride Norelus, an illegal immigrant from Haiti, and two of her brothers met with Debra Valladares, a Miami attorney specializing in family

---

[*] Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

2

law and personal injury litigation. Norelus' native tongue is Haitian French Creole and she has some difficulty with English, so her brothers translated for her. At the meeting, Norelus told Valladares that she had suffered a nearly year-long ordeal of sexual abuse, including rape, inflicted by Asif Jawaid and Raheel Hameed. Those two men, who were roommates, managed separate Denny's restaurants where Norelus worked as a bus person, prep cook, and dishwasher. At the meeting one of Norelus' brothers told Valladares that Jawaid had admitted sexually abusing Norelus.

After meeting with Norelus, attorney Valladares visited the two Denny's restaurants where Norelus had told her that much of the alleged abuse occurred. During these visits, Valladares spoke with a Denny's employee, Edmond Reed, and a regular patron, John Green, about Norelus' allegations. Both denied having witnessed the kind of sexual misconduct that Norelus alleged. According to Valladares, Reed did tell her that Jawaid, in Valladares' words, "definitely had a thing for [Norelus] and that she was like his property." Green agreed, adding that he felt sorry for Norelus because Jawaid treated her, in Valladares' words, "as a slave."

At this point, Valladares got help from another attorney, Joseph Chambrot. Chambrot did not investigate Norelus' allegations, but instead agreed to involve

3

himself with the case because he believed Norelus "looked like a victim" and "looked like someone who had been raped." Neither Valladares nor Chambrot had any experience with Title VII litigation, so the pair sought the help of William and Karen Amlong and their firm, Amlong & Amlong, P.A. The Amlongs are experienced Title VII attorneys.

B.

In August 1994, months after the nearly year-long period of alleged abuse had ended, Norelus reported the alleged incidents to the police and to the owners of the Denny's restaurants. The investigation undertaken by the restaurant owners uncovered no evidence to support Norelus' claims. Following the police investigation, the State Attorney decided not to prosecute the case due to "inconsistencies and conflicts" in Norelus' account of the events and a lack of corroborating evidence. The Amlongs knew about the results of the investigation and the State Attorney's refusal to prosecute before they engaged in the conduct that led to the sanctions against them.

Valladares and Chambrot, working from a sample complaint provided by the Amlongs, filed Norelus' initial complaint on December 19, 1994 in the United States District Court for the Southern District of Florida. In January 1995, the Amlongs assumed primary responsibility for representing Norelus, although

4

Chambrot and Valladares remained minimally involved as co-counsel throughout the litigation. Norelus was deposed for the first time in the present case on August 3, 1995. The Amlongs filed amended complaints on behalf of Norelus on July 27, 1995 and February 12, 1996. The February 12 amended complaint contained claims of sexual harassment, retaliation, battery, unequal pay, invasion of privacy, intentional infliction of emotional distress, false imprisonment, and negligent hiring, training, retention, and supervision. The five defendants were Denny's, Inc., its parent company, a Denny's franchisee, and Jawaid and Hameed.

If the story underlying Norelus' complaint is true, for nearly a year, from June 1993 to May 1994, she was constantly subjected to sexual harassment and abuse by a relentless aggressor, Jawaid. He was, she alleged, occasionally joined in his gross misconduct by his roommate Hameed. In her complaint Norelus alleged that over an eleven-month period while she worked for Denny's, she was not only sexually harassed but also assaulted, battered, kidnaped, and raped. She alleged that Jawaid "repeatedly" sexually assaulted her by touching her breasts, genitalia, and buttocks. She alleged that he repeatedly forced her to have oral, vaginal, and anal intercourse with him in various areas of the restaurant, including the men's bathroom, the walk-in area in front of the freezer room, the stockroom, and in the manager's office while the office window was covered with a piece of

5

cardboard. She testified in her deposition that Jawaid forced her to have oral sex "almost every day" for eleven months.

Norelus claimed that Jawaid offered her job advantages if she went along with his sexual advances and threatened to report her to immigration authorities or to refuse to file necessary immigration paperwork if she did not. Norelus also claimed that when she refused Jawaid's sexual demands, he assigned her unpleasant duties like cleaning the men's restroom. She alleged that during one of the times when she was forced to clean the men's restroom at the restaurant Hameed managed, he forced her to have sex with him there.

Most of the conduct Norelus alleged occurred entirely at work, although some of it allegedly began at work and ended at the managers' home. For example, according to Norelus, Jawaid and Hameed made her leave work early on a few occasions to go to their house for sex. She alleged that on one occasion she was forced to leave work early and was transported to the house where Jawaid and Hameed lived. There, she alleged, the two men restrained her, raped her repeatedly, and forced a hairbrush into her vagina. Most of what allegedly went on, however, occurred at work during regular work hours.

Despite Norelus' allegations of pervasive harassment, gross abuse, and rampant criminal behavior against her, which occurred in various areas of two

6

Denny's restaurants over the course of almost a year, no one else saw or heard a thing. At least seven of Norelus' co-workers, whom the Amlongs had planned to call as witnesses in support of her allegations, actually contradicted those allegations under oath when deposed by defense counsel. Those witnesses were specifically asked if they had ever heard Jawaid make any sexual comments to Norelus, if they had ever seen Jawaid touch Norelus in a sexual way, and if they had seen Jawaid touch any female employee in a sexual way. All of them answered "No" or "Never" to those questions.

One of those witnesses was a waitress named Rose Boleda, who worked the same shift as Norelus. When asked about the interactions of Jawaid and Norelus, Boleda testified: "I never saw anything out of the ordinary to say that anything was going on."[1] After giving similar testimony, some of the other witnesses stated

---

[1] Boleda also testified that a former Denny's employee, who did not like Jawaid and "wanted to bring [Jawaid] down any way" that he could, had attempted to get her to falsely state that she had seen the sexual harassment and had told him about it. She testified that the former employee told her that he had gotten Norelus some attorneys and "apparently . . . any time Denny's Restaurant has a . . . sexual harassment suit in Florida [the lawyers] go after Denny's and they always win." (The attorneys the former employee was referring to were the ones handling this lawsuit before the Amlongs got involved.)

It gets worse. John Green, a regular customer at the Denny's location Jawaid managed, testified in a deposition that a "woman attorney" who identified herself as Norelus' counsel had offered to write him a check if he would give false testimony supporting Norelus' claim but that he had refused. The bribery attempt Green testified about happened before the Amlongs got involved in this case, but Green's deposition testimony put them on notice about it. Even though the Amlongs themselves apparently did not read the depositions, they did have an associate at Green's deposition who took notes for them about his testimony.

that they wondered why Norelus had identified them as having seen or heard something.

None of the co-worker witnesses testified to having seen or heard anything improper.  Some went further, and based on their experiences with Jawaid expressed doubt that such conduct could have occurred. Rose Boleda testified that when Jawaid would "hear[] the girls talking about something [sexual] he [would] walk[] right out.  He gets very upset.  He doesn't like that at all, so he would never [engage in the alleged conduct]."  When asked  about the allegations against Jawaid, Denny's line cook Evon Martin shook his head and said:  "It's just not him to do that . . . .  He's not the kind of guy who would talk about sex or mess with people like that."  Martin also testified that he had received a phone call from Norelus telling him that she was suing Jawaid for sexual harassment and wanted to meet with Martin to talk.  Martin noted that during their conversation Norelus had complained that "[Jawaid] made me work so hard," but she said nothing about Jawaid having sexually harassed her.

From the deposed witnesses' descriptions of the restaurants involved, it is inconceivable that gross sexual harassment and misconduct could have occurred on a near-daily basis for nearly a year, as Norelus claimed it did, without any witnesses having seen or heard anything.  According to Boleda, there is "no way

8

anything is going to happen in that little tiny restaurant and [some employees are] not going to see what's going on." Another waitress, Michele Stewart, explained that "everything is open. Employees are all over the restaurant." She agreed that "[t]here's no way" the conduct Norelus alleged could have occurred without some employee seeing something. Line cook Martin testified that it would be "impossible" for the conduct alleged to occur without people knowing because the restaurant is "too small."

Even the areas of the restaurant that seem the most private, like the restroom or the stockroom, were not completely shielded from view. When cleaning the men's restroom, which was part of Norelus' duties as an employee, the typical procedure was to prop the door open with a mop bucket. Even if that was not done, the men's restroom still did not provide total privacy. According to an employee's deposition testimony, a person using the pay phone outside the men's restroom could see inside when the door opened. Once a person could see into the restroom, he could see whether someone was in the stalls because the stall doors did not reach all the way to the ground.

Although one stockroom was locked during part of the graveyard shift, it was open during the 7:00 a.m. to 3:00 p.m. shift that Norelus worked. The restaurant stayed "[t]oo busy to keep [the stockroom] locked," with employees

9

running in and out of it to get supplies throughout the day.  The manager's office was located right beside the employees' break area and table.  When the office door was closed, someone seated at the break table could hear what was going on inside the office if she listened, although what she heard would not be perfectly clear.  The door to the walk-in area in front of the freezer had a window in it as well, and unless that window was fogged up because the door had been opened recently, it provided a clear view into the area.

And Jawaid himself had little privacy.  As manager of the restaurant he was often in demand.  One line cook explained in deposition that "[e]very single five minutes [some employee] need[s] something from the manager, where is he going to hide?"  With so little private space, if Norelus' allegations of rampant harassment, sexual misconduct, and assault were true, someone would have seen something.  Norelus' co-workers, who would have seen or heard something, testified under oath that they had not seen or heard anything.

After the witnesses the Amlongs planned to call to corroborate Norelus' allegations failed to do so, counsel for the defendants warned the Amlongs "that the case lacked merit and might result in sanctions."  The Amlongs, however, were undeterred by the complete lack of corroboration and the mountain of evidence contradicting their client's claims, which the depositions of potential fact witnesses

uniformly revealed.

No one from the Amlong firm deposed any fact witnesses in this case or ordered transcripts of any depositions that were taken by the defendants until the sanctions hearing that resulted from the submission of the sixty-three page errata sheet.  The Amlongs had, however, sent one or two associates to at least ten of the thirteen witnesses' depositions, and those associates provided the Amlongs with summaries of the testimony from their notes. The more experienced of the two associates expressed her doubts about the case to Karen Amlong who disregarded the associate's concerns.

Norelus herself was never a stable or reliable witness.  Her second deposition, which took place during January and February of 1996, spanned eight days.  At least one of the Amlongs' associates attended each session of Norelus' deposition, although neither of the Amlongs did.  During the deposition an interpreter translated the questions into Haitian French Creole for Norelus and translated her answers into English.  Throughout the course of the deposition Norelus exhibited emotional and erratic behavior.

From the first day of her deposition, Norelus lied.  For example, when asked if she knew anyone named Lavictore Remy, Norelus testified that she did not. Later she was forced to admit that Remy was her cousin and that she had falsely

11

used Remy's name in her application to work at Denny's. When asked if she had lied, Norelus responded: "Of course. What's wrong with that?"

More troubling testimony from Norelus was to come. At several points during her deposition, she directly contradicted statements she had made in her complaint. For example, in her complaint Norelus alleged that Jawaid had forced her to have oral, vaginal, and anal sex in the walk-in area in front of the freezer. But during deposition she testified that no sex had occurred there. Norelus also alleged in her complaint that Jawaid had forced her to have oral, vaginal, and anal sex in the restroom and in the stockroom and in the manager's office. But she testified at her deposition that no vaginal or anal intercourse had taken place at any of those locations.

Norelus alleged in her complaint that the managers retaliated against her at work after she complained to restaurant authorities about the sexual harassment. But she testified in her deposition that she had not complained until after she resigned from her job, which means that no retaliation could have occurred at work. Norelus also alleged in her complaint that after the managers raped her with a hairbrush, she sought medical attention. But at her deposition Norelus testified that she had not sought medical attention, and in response to other discovery requests of the defendants she was unable to name any health care provider or

12

facility she had visited.

During the time period in which Norelus' deposition was being taken, the Amlongs arranged for her to undergo a polygraph examination. According to Karen Amlong, they arranged for the polygraph in order to probe the truthfulness of Norelus' claims of abuse. Norelus underwent a second polygraph examination after the last day of her deposition. To conduct the examinations, the Amlongs hired George Slattery, a well respected polygraph examiner who had done work for various law enforcement agencies. Slattery was of the opinion that both examinations showed that, while she was lying about some things, Norelus was telling the truth about her core allegations of sexual abuse.

The Amlongs also decided to have a clinical psychologist assess Norelus' mental state. They selected Dr. Astrid Schutt-Aine, a psychologist who spoke Haitian French Creole, to perform the evaluation. She was of the opinion that Norelus' symptoms were consistent with those exhibited by people suffering from Post-Traumatic Stress Disorder. The record contains no evidence, however, that Dr. Schutt-Aine formed any opinion about the source or nature of any trauma Norelus had suffered.

At this point, the Amlongs decided to continue pursuing the lawsuit. As part of their preparation for trial, they instructed one of their associates to review

13

Norelus' deposition testimony with her. Norelus' brother, whom the Amlongs had listed as a potential fact witness in support of her allegations, served as an interpreter. During this process, the associate read aloud to Norelus the questions asked by defense counsel during the deposition. The brother interpreted those questions for Norelus and then interpreted her answers for the associate.

The Amlongs' associate then prepared an errata sheet. The finished product errata "sheet" was actually sixty-three sheets that made 868 changes to Norelus' deposition testimony. The reason given for more than 500 of the 868 changes to Norelus' deposition testimony was merely that Norelus "[d]id not understand what was being asked." The reasons given for most of the other changes in Norelus' testimony were classified into three broad categories: "poor translation by interpreter," "clarification of response," and "refreshed recollection." At the end of the lengthy errata sheet Norelus signed a sworn statement certifying that she had read the transcript of her deposition and that it "is a true and accurate recording of the proceedings had at the time and place designated with the exceptions, if any, on the ERRATA sheet." Veda Russo, the office manager for the court reporting service that had transcribed Norelus' deposition, notarized Norelus' signature and the date that she signed it, which was June 14, 1996. By creating "exceptions" to the deposition transcript being "a true and correct recording" of the Norelus'

14

answers to the deposition questions, the errata document was intended to be, and was, made a part of the deposition. Norelus did not sign the deposition, except by means of the errata document and subject to the massive number of exceptions contained in that document.

The first time the defendants heard anything about the errata document was on June 19, 1996, which was after discovery had closed and just three weeks before trial was scheduled to begin. On that date the parties had a conference call and discussed a proposed amended joint pretrial stipulation. Two days later, in a "Motion for Extension of Time to Prepare the Pretrial Stipulation," the defendants informed the district court that during the June 19 conference call, they "were told for the first time that Plaintiff had filed a 50 to 60 page Errata Sheet making extensive 'corrections' to Plaintiff's deposition" and that the defendants had not yet had an opportunity to review the errata sheet.[2] On August 1, 1996, the defendants filed a motion to dismiss the complaint, arguing that the number and nature of the changes demonstrated that Norelus had committed perjury during her deposition. The district court denied the motion, stating that dismissal was an

---

[2] The record does not indicate that the errata sheet was filed with the district court until it was attached as an exhibit to the defendants' motion to dismiss, which was filed on August 1, 1996. In their motion to dismiss, counsel for the defendants stated that they first received a copy of the errata sheet on June 20, 1996, the day after the conference call with opposing counsel. The Amlongs do not dispute that, and there is nothing in the record to indicate to the contrary.

"inappropriate remedy" at that point because dismissal is only appropriate when "the plaintiff's lie is established beyond doubt" and that it was "unclear to the Court at this juncture whether the Plaintiff's original or revised version of the facts constitutes the truth." Instead of dismissing Norelus' case, the court ordered her deposition reopened, with Norelus to pay the costs of it. The district court also ordered Norelus to file an appendix to her deposition identifying, describing, and explaining in detail each of the changes made to her testimony in the second deposition. (Apparently, that was never done.)

Norelus' third deposition occurred in September 1996 and lasted three days before it was abruptly ended. Karen Amlong attended this deposition in person. Norelus behaved much as she had in her second deposition. She again had trouble recalling facts, including those contained in the recently submitted errata sheet. Finally, after a heated exchange in which Norelus responded sarcastically to his questions, defense counsel ended the deposition.

On October 16, 1996, the district court entered an order making Norelus and the Amlongs jointly responsible for the costs of reopening the deposition. When Norelus and the Amlongs refused to pay those costs, the district court dismissed the lawsuit. Norelus appealed the resulting judgment against her, but we dismissed the appeal because she failed to prosecute it. See Amlong & Amlong, P.A. v.

Denny's, Inc., 500 F.3d 1230, 1236 (11th Cir. 2007) (Amlong I).

### C.

The procedural history of the sanctions proceedings is set out more fully in Amlong I, 500 F.3d at 1236–37, but we will summarize that history before discussing the proceedings that have taken place since we issued our opinion in Amlong I.

After the dismissal of Norelus' complaint, several of the defendants filed motions asking the district court to impose sanctions against Norelus and the Amlongs. At the direction of the district court, a magistrate judge conducted an evidentiary hearing and filed a report and recommendation containing findings of fact and conclusions of law. Id. at 1236. The recommendation was that the district court assess attorney's fees against Norelus under 42 U.S.C. § 2000e-5(k) but not against the Amlongs. Id. The magistrate judge found that the Amlongs, "from beginning to end, believed in plaintiff's credibility as to the 'core allegations' of the lawsuit [] and genuinely believed that plaintiff's claims were meritorious despite plaintiff's inability to testify completely and truthfully about several aspects of her case." On that basis he concluded "that the Amlong's conduct did not amount to bad faith conduct justifying sanctions under 28 U.S.C. § 1927." Id. at 1237.

The defendants objected to the report and recommendation and asked the district court to impose sanctions on the Amlongs. Without conducting its own evidentiary hearing, the district court sustained the defendants' objections. Rejecting the report and recommendation, the court ordered the Amlongs to pay sanctions. The order "required the Amlongs personally to pay," among other amounts not at issue here, "a total of $389,739.07 to cover attorney's fees and costs the defendants had incurred after the filing of the errata sheet." Id.

The Amlongs appealed. In Amlong I we concluded that "the district court abused its discretion and clearly erred when it squarely rejected the magistrate judge's findings of fact and credibility determinations and substituted its own, without hearing so much as a single witness at a sanctions hearing." Id. at 1251. We reversed and remanded the case to the district court with instructions that it choose one of two options: "It may accept the magistrate judge's basic findings of fact and then reach its own determination as to whether the [Amlongs'] conduct [warranted sanctions under § 1927]" or, in the alternative, "the district court may, if it so chooses, conduct its own hearing as a prelude to making a new determination." Id.

On remand the district court adopted the magistrate judge's factual findings and declined to hold its own evidentiary hearing. The court nevertheless

18

reimposed sanctions on the Amlongs, rejecting the magistrate judge's legal

conclusions as based on a flawed understanding of the standard for imposing

sanctions pursuant to § 1927. The court viewed the question before it as whether a

reasonable attorney would have filed the errata sheet and continued to pursue

Norelus' claims knowing what the Amlongs knew at the time they made and filed

the sheet and continued with the case. The court answered that question in the

negative, explaining:

> [The] numerous changes contained in the errata sheet should have
> related to the Amlongs that [Norelus] was not able to relate a
> consistent account of the events underlying her claims. Therefore, the
> Court finds that the preparation and filing of the Errata Sheet itself,
> combined with the improper methods of preparation and the factual
> content of such Errata Sheet, constituted objectively reckless conduct
> on the part of the Amlongs, which was so egregious that it was
> tantamount to bad faith. Moreover, the Amlongs[] continued to press
> forward with their case after the filing of the Errata Sheet and in spite
> of the fact that [Norelus] continued to evade reasonable inquiry
> concerning her evolving account of events alleged in this case during
> her reopened deposition. Taken together, this objectively reckless
> conduct unreasonably and vexatiously multiplied the instant
> proceedings.

(citations omitted). The district court's award of sanctions held the Amlongs

jointly and severally liable for the defendants' costs, expenses, and attorney's fees

incurred from the date the errata sheet was submitted until the initial imposition of

sanctions by the district court. The sanctions award included the costs, expenses,

and fees incurred in connection with the sanctions proceedings. The sanctions

amount imposed by the district court following remand totaled $387,738.45.

The Amlongs then brought this appeal, contending that the district court

abused its discretion in imposing sanctions against them under § 1927. They also

contend that, even if the district court did not abuse its discretion by imposing

sanctions, it did so by including in the sanctions award the costs, expenses, and

fees arising from the sanctions proceedings themselves.

## II.

We review the district court's imposition of sanctions under 28 U.S.C. §

1927 only for an abuse of discretion. Schwartz v. Millon Air, Inc., 341 F.3d 1220,

1225 (11th Cir. 2003). "The application of an abuse-of-discretion review

recognizes the range of possible conclusions the trial judge may reach." United

States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).

> By definition . . . under the abuse of discretion standard of review
> there will be occasions in which we affirm the district court even
> though we would have gone the other way had it been our call. That
> is how an abuse of discretion standard differs from a de novo standard
> of review. As we have stated previously, the abuse of discretion
> standard allows "a range of choice for the district court, so long as that
> choice does not constitute a clear error of judgment."

Id.; see also McMahan v. Toto, 256 F.3d 1120, 1129 (11th Cir. 2001) ("[U]nder an

abuse of discretion standard there will be circumstances in which we would affirm

the district court whichever way it went."); In re Rasbury, 24 F.3d 159, 168 (11th

Cir. 1994) ("Quite frankly, we would have affirmed the district court had it reached

a different result, and if we were reviewing this matter de novo, we may well have

decided it differently."). "[W]hen employing an abuse-of-discretion standard, we

must affirm unless we find that the district court has made a clear error of

judgment, or has applied the wrong legal standard." Frazier, 387 F.3d at 1259

(citing Maiz v. Virani, 253 F.3d 641, 662 (11th Cir. 2001)).

### III.

### A.

28 U.S.C. § 1927 authorizes federal courts to require any attorney "who so

multiplies the proceedings in any case unreasonably and vexatiously . . . to satisfy

personally the excess costs, expenses, and attorneys' fees reasonably incurred

because of such conduct." We have long held that "the provisions of § 1927, being

penal in nature, must be strictly construed." Peterson v. BMI Refractories, 124

F.3d 1386, 1395 (11th Cir. 1997) (citing Monk v. Roadway Express, Inc., 599 F.2d

1378, 1382 (5th Cir. 1979), aff'd sub nom., Roadway Express, Inc. v. Piper, 447

U.S. 752, 100 S.Ct. 2455 (1980). The statute's plain language sets forth three

requirements to justify an imposition of sanctions:

(1) an attorney must engage in "unreasonable and vexatious" conduct;

21

> (2) such "unreasonable and vexatious" conduct must "multipl[y] the
> proceedings;" and
> (3) the amount of the sanction cannot exceed the costs occasioned by
> the objectionable conduct.

McMahon, 256 F.3d at 1128 (citing Peterson, 124 F.3d at 1396).

The Amlongs' submission of the novella-length errata sheet making a slew

of material changes to their client's deposition testimony was improper.  See

Hambleton Bros. Lumber Co. v. Balkin Enters., Inc., 397 F.3d 1217, 1225 (9th Cir.

2005) (upholding a district court's judgment to strike an errata sheet listing twenty-

seven changes, noting that "Rule 30(e) is to be used for corrective, and not

contradictory, changes"); Garcia v. Pueblo Country Club, 299 F.3d 1233, 1242 n.5

(10th Cir. 2002) ("We do not condone counsel's allowing for material changes to

deposition testimony and certainly do not approve of the use of such altered

testimony that is controverted by the original testimony."); Thorn v. Sundstrand

Aerospace Corp., 207 F.3d 383, 388–89 (7th Cir. 2000) (explaining that an errata

sheet effecting "a change of substance which actually contradicts the transcript is

impermissible unless it can plausibly be represented as the correction of an error in

transcription, such as dropping a 'not'"); Greenway v. Int'l Paper Co., 144 F.R.D.

322, 325 (W.D. La. 1992) ("[Rule 30(e)] cannot be interpreted to allow one to alter

what was said under oath.  If that were the case, one could merely answer the

22

questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard.  A deposition is not a take home examination."); but see Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997) ("[T]he language of [Rule 30(e)] places no limitations on the type of changes that may be made, nor does [Rule 30(e)] require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes—even if those reasons are unconvincing." (quotation marks and alterations omitted)); Reilly v. TXU Corp., 230 F.R.D. 486, 487–490 (N.D. Tex. 2005) (reviewing the various approaches for interpreting the allowable scope of Rule 30(e) changes and ultimately adopting a broad interpretation "consistent with the plain language" of Rule 30(e), allowing any changes, "in form or substance" under Rule 30(e)); cf. EBC, Inc. v. Clark Bldg. Systems, Inc., 618 F.3d 253, 268 (3d Cir. 2010) ("We therefore hold that when reviewing a motion for summary judgment, a district court does not abuse its discretion under Rule 30(e) when it refuses to consider proposed substantive changes that materially contradict prior deposition testimony, if the party proffering the changes fails to provide sufficient justification. At the same time, we emphasize that courts may, in their discretion, choose to allow contradictory changes (and implement the remedial measures discussed above) as the circumstances may warrant").  One circuit has gone so far

23

as to call the creation of an errata sheet making substantive changes a "foolish tactic." Thorn, 207 F.3d at 388–89. In the present case, the magistrate judge who conducted the evidentiary hearings of the defendants' motion for sanctions found that the procedures used to prepare the errata sheet, "i.e., translating through plaintiff's brother and possible explanations of questions by plaintiff's counsel" were also improper.

As the magistrate judge found and no one (with the possible exception of the dissenting judge on this panel) seriously contests, the improper submission of the massive errata document rendered the eight days spent on Norelus' deposition a waste of time and money to say nothing of the time the attorneys were forced to spend on the issues created by the document itself. The Amlongs' decision to press on with Norelus' claims after the creation of the errata document  wasted more time and money. Together, the submission of the errata document and the continued pursuit of Norelus' claims afterwards unquestionably prolonged and multiplied the proceedings. The question is whether under the circumstances of this case the district court abused its discretion in finding that it was done "unreasonably and vexatiously." 28 U.S.C. § 1927; see Amlong I, 500 F.3d at 1242.

An attorney multiplies court proceedings "unreasonably and vexatiously,"

24

thereby justifying sanctions under 28 U.S.C. § 1927, "only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.'" Amlong I, 500 F.3d at 1239 (quoting Avirgan v. Hull, 932 F.2d 1572, 1582 (11th Cir. 1991)). The standard is an objective one turning "not on the attorney's subjective intent, but on the attorney's objective conduct." Id. In Amlong I, we said that "objectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently." Id. at 1241. We compare the conduct at issue with how a reasonable attorney would have acted under the circumstances. The Amlongs' conduct was at least objectively reckless.

The Amlongs' attempt to alter their client's deposition testimony in 868 ways was of a piece with their conduct throughout the litigation. As the magistrate judge found, they had nothing to base Norelus' claims on other than her "own changing testimony . . . which was totally or nearly totally discredited by plaintiff's numerous lapses of memory, outright lies, and outlandish comments made during her deposition."[3] As the litigation unfolded, all of the witnesses who should have

---

[3] At one point in their initial brief, the Amlongs challenge the district court's reliance on the findings of the magistrate judge contained in the part of his report recommending that Norelus be held liable for attorney's fees pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5(k). The Amlongs argue that the district court's reliance on those factual findings was improper because the legal standard for imposing attorney's fees under Title VII is less stringent than the standard required to impose sanctions on an attorney under § 1927.

That argument lacks merit. The district court did not rely on the magistrate judge's

25

seen or heard something if the claims had any basis in fact not only failed to support her incredible story but actually gave deposition testimony contradicting it.

Still, like Ahab hunting the whale, the Amlongs relentlessly pursued the claims. All the while they blinded themselves to as much of the contradictory evidence as they could. They deliberately did not obtain the deposition testimony of any of Norelus' co-workers who would have seen or heard something had anything improper occurred. They did not concern themselves with that testimony, according to Karen Amlong, because they assumed all of the witnesses, except for their client, were either lying or simply could not remember witnessing the gross sexual harassment inflicted on her.[4]

When the truth was thrust in the Amlongs' faces, they stubbornly ignored it and kept on litigating. They knew that the State Attorney's Office had refused to

---

application of the Title VII standard to Norelus, but instead relied only on the factual findings underlying the recommendation that Norelus should pay attorney's fees. The magistrate judge made those factual findings during the course of an evidentiary hearing on the combined issues of whether Norelus should be held liable for attorney's fees under Title VII and whether the Amlongs should be sanctioned under § 1927.

[4]At the sanctions hearing, Karen Amlong stated that she found depositions of fact witnesses in employment cases to be of little value. She told the judge: "In virtually every employment case we have the employees either have a lack of memory or they say that it didn't happen or they say that she was fellating a sausage or a banana. We have ceased taking depositions of most employees because it's a waste of time, we know that they are not going to say anything useful to us and we just get them on cross-examination." The Amlongs' practice was to have a junior associate attend any depositions taken by opposing counsel and make detailed notes of the testimony.

file criminal charges because it had found "inconsistencies and conflicts" in Norelus' allegations.[5] They knew, given the nature of her allegations, that if Norelus' story about the extreme and extensive crimes against her were true, there would have been a lot of corroborating evidence from others who were present at the two small restaurants during those eleven months, but there was none. They knew that the testimony of every witness who should have supported Norelus' story, if it were true, either failed to do so or in many cases actually contradicted it. They knew that the more experienced associate they had sent to monitor the depositions of other employees came back with misgivings about the validity of their case. They knew that their client had responded to a deposition question about whether she had lied with her own question: "Of course, what's wrong with that?" And they knew, or should have known, that submitting an errata document that made 868 changes in their client's deposition testimony would effectively destroy any credibility she might otherwise have had. They knew all of this in light of their significant experience as Title VII lawyers. Karen Amlong, who was admitted to practice in 1979, testified in the sanctions hearing that she personally

---

[5] Describing this case as a "swearing match between two people—one says it did happen, one says it didn't happen," Karen Amlong said in her sanctions hearing testimony that she was not surprised that criminal charges, which require a higher standard of proof, had not been pursued. She also said that in her experience police agencies and state attorney's offices usually want medical evidence to pursue rape allegations, and there was none in this case.

had handled about fifty sexual harassment cases.  She also estimated that about three-fourths of the cases handled by the Amlong law firm, in terms of both time and income, were employment cases and that half of those involved sexual harassment claims.  Under all of the circumstances, a reasonable attorney would have known that any road paved with the truth could not lead to judgment for Norelus.  Yet, in spite of everything, the Amlongs charged ahead, apparently determined to pursue the case at all costs.

At the sanctions hearing, Karen Amlong defended the decision to continue to press Norelus' claims even after her disastrous deposition performance.  She testified that her belief in the truth of Norelus' allegations was bolstered by, and consistent with, the results of two polygraph examinations and a clinical psychologist's conclusions following an examination of Norelus.  According to the Amlongs, those examinations, which they arranged, demonstrate that their continued pursuit of Norelus' claims was without the recklessness that justifies sanctions under § 1927.

We disagree.  It can be debated whether the polygraph examinations indicate that the Amlongs believed they were litigating the case in good faith.  Karen Amlong testified that they sometimes arranged for polygraph examinations of their clients for "ethical reasons" and as a form of "self-protection."  That testimony

28

suggests that the Amlongs banked the polygraph examinations for use in fending

off sanctions.  It is true that to some extent the Amlongs' subjective state of mind

is relevant to whether sanctions should be imposed because conduct is more likely

to be "unreasonable and vexatious" if it is done with a malicious purpose.  See

Amlong I, 500 F.3d at 1241 n.1 ("[A] determination of whether an attorney's

conduct was objectively reckless, or tantamount to bad faith, may be aided by an

examination of the attorney's state of mind.").  However, we have held that "for

purposes of § 1927, bad faith turns not on the attorney's subjective intent, but on

the attorney's objective conduct."  Id. at 1239; see also Braley v. Campbell, 832

F.2d 1504, 1512 (10th Cir. 1987) (en banc) ("Subjective good faith ought not to be

an infinitely expansive safe harbor to protect an attorney who brings an action that

a competent attorney could not under any conceivable justification reasonably

believe not frivolous.").

　　　Even if the polygraph results did allay the Amlongs' own well-founded fears

about whether their client was telling the truth, those results could not have

justified the belief, if they had one, that their client's case had a snowball's chance

of making it to a favorable judgment.  Opinions based on polygraph examinations

are seldom, if ever, admissible into evidence.  See United States v. Henderson, 409

F.3d 1293, 1301–04 (11th Cir. 2005) (upholding a district court's decision to

29

exclude polygraph results under Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786 (1993)). We have never held that it is an abuse of discretion to exclude the opinion of a polygraph examiner. <u>Id.</u> at 1303. To no one's great surprise, the district court ruled in this case that any evidence relating to the polygraph examinations would not be admissible at trial.[6] No reasonable attorney would base a case on the unreasonable expectation that a polygraph examiner's opinion about whether someone was telling the truth would be admitted into evidence. That is especially true where there are many witnesses who, if the client's story were true, would have seen or heard something, and all of them testified under oath that they saw and heard nothing.

Besides, even if the district court had allowed evidence about the polygraph examinations, "the only thing the polygraph examination 'proves' is that the examinee believes her own story." <u>Amlong I</u>, 500 F.3d at 1269 n.30 (Hill, J., dissenting); <u>see also</u> Julie A. Seaman, <u>Black Boxes</u>, 58 Emory L.J. 427, 475 (2008) ("A witness might believe that she is testifying truthfully but be mistaken or perhaps delusional; it is sometimes assumed that even a foolproof lie detector

---

[6]That ruling came in response to a motion in limine the Amlongs filed seeking to have the polygrapher's testimony admitted in their case-in-chief. They had wanted to call him as their first witness.

30

would not detect such untruths." (footnotes omitted)).  The same can be said for the

the psychologist's opinion that Norelus' symptoms were consistent with those

exhibited by people suffering from Post-Traumatic Stress Disorder.  At most that

opinion is evidence that Norelus believed she had been subjected to some kind of

trauma by someone at some time.  It does not prove that any of Norelus'

allegations in this case are true.  See Amlong I, 500 F.3d at 1269 n.30 (Hill, J.,

dissenting).

Following the polygraph and psychologist examinations, the Amlongs

compiled and then submitted the errata document making 868 changes to Norelus'

deposition testimony.  As we have already mentioned, the reason given for more

than 500 of the 868 changes to Norelus' deposition testimony was merely that

Norelus "[d]id not understand what was being asked."  The remaining changes

were classified mainly in three other broad categories:  "poor translation by

interpreter," "clarification of response," and "refreshed recollection."  But Norelus,

or her counsel, could have prevented any problems caused by her lack of

understanding about what was being asked or by poor translation.  They chose her

interpreter.  And at the beginning of her deposition, she was asked to listen to the

question in English and then wait for the interpreter to ask it in Haitian Creole, her

native language.  Norelus agreed to do that.  She was also instructed:  "If at any

time you don't understand my question, would you please advise me of that . . .

[a]nd I'll try and rephrase it."  Norelus agreed to do that.

The record casts serious doubt on Norelus' alleged misunderstanding of the

questions.  Several "misunderstood" questions called for yes or no answers, and

Norelus did not seem to have trouble answering those questions when they were

asked during the deposition.  To take only one of many examples, she was asked a

fairly simple question: whether a former co-worker named David Hill had ever

come to her house before she stopped working at Denny's.  Without any apparent

hesitation, she responded "yes."  In the errata changes, however, the "yes" became

a "no."

Some of the changes made by the errata document were pure additions.

Events and facts Norelus could not remember during her deposition were described

by her in vivid detail in the lengthy errata document where they were often

characterized as "refreshed recollections" without any indication as to who or what

had refreshed her memory.  A few examples will serve to illustrate.  At her

deposition, Norelus testified that she could not remember what type of car she rode

in on the way to Jawaid and Hameed's house the time they allegedly raped her and

inserted a hairbrush into her vagina.  She also testified that she could not remember

the route they had taken to get to the house, the color of the hairbrush, the material

32

out of which it was made, or whether she rode to their house in the same car that time as she had on other occasions. In the errata document, however, Norelus recalled that the car was a cream-colored, four-door Jaguar; she also recalled the route well enough to provide exact driving directions to the house, including street numbers and which direction to turn on which streets; she remembered the hairbrush was light-to-medium brown and made of wood; and she knew that on different occasions she had ridden to Jawaid and Hameed's house in three different cars.

Between her deposition and the submission of the errata sheet Norelus apparently had the chance to "remember" new information about all kinds of things. At her deposition, when asked where specifically in the men's restroom Jawaid had forced her to perform oral sex on him, Norelus answered that she did not remember. In the errata document, however, she recalled that he forced her to do it "in the stall." During her deposition Norelus testified that she did not remember anything she had told the police about being assaulted. By the time the errata document was created, she was certain that she had told the police that her managers had sexually assaulted her. When asked at her deposition why she would use the back door at work Norelus stated, "Sometimes I just use it." In the errata document, however, she changed that answer to: "I used the back door to leave the

33

restaurant only when Asif took me to his house." Similarly, during her deposition, Norelus denied that Jawaid had ever forced her to have sex "from the back," while alleging in the errata document that the sexual encounters between Jawaid and Norelus involved "always vaginal, and sometimes anal sex, too." And on and on it went.

Karen Amlong testified that the Amlongs' purpose in submitting the novella-length errata sheet was "not to hide things from people, but to make full disclosure" in order to "do the best job [they] could to present as honestly as [they] could what the truth was." This is a novel proposition: following a lengthy period of discovery and shortly before trial, after their client has given testimony, much of which harms her case as much as helps it, and after the many witnesses who could have corroborated her story have instead contradicted that story, it shows good faith for attorneys to change their client's deposition testimony in nearly nine hundred ways.[7]

Regardless of why the Amlongs created the errata document and injected it into the case, their conduct was improper. Their actions are not the result of

---

[7] When asked during the sanctions hearing how she would characterize the bulk of the changes made by the errata document, Karen Amlong stated: "As immaterial changes or as elaborations. I think that there are very few that are really significant in the course of this trial and if there are those inconsistencies, able counsel certainly can exploit them at trial."

34

ineptitude. We cannot excuse as incompetence a deliberate action of this magnitude committed by attorneys seasoned in Title VII litigation. Tellingly, the Amlongs, who have touted their expertise in litigating this type of case, have never suggested in defense of their actions that they were inept.

As the magistrate judge found, only Norelus' own testimony supported her claims, and the submission of the errata document rendered that testimony useless. The district court did not abuse its discretion when it found that "[no] reasonable attorney would have thought it proper to file such an errata sheet" with a view toward continuing to litigate this case. That is true even if that lawyer subjectively believed his client was telling the truth about her claims.

The Amlongs compounded the impropriety of submitting the errata document by continuing to pursue the litigation of Norelus' claims after submitting it. The magistrate judge found as a fact that:

> [Norelus] presented only her own changing testimony, without corroboration or support from any other witnesses or sources, which was totally or nearly totally discredited by [Norelus'] numerous lapses of memory, outright lies, and outlandish comments made during her deposition—even if made in anger or frustration. Even [Norelus'] own testimony became useless after she filed the lengthy errata sheet leaving her open to further impeachment during her reopened deposition . . . .

Adopting those findings, the district court reasoned that because Norelus' own testimony was the only evidence supporting her claims, and because the errata

35

document rendered that testimony "useless," the Amlongs' continued "vigorous[]" litigation of Norelus' claims following submission of the lengthy errata document was objectively reckless conduct that unreasonably and vexatiously multiplied the proceedings.

It was entirely reasonable for the district court to conclude that the Amlongs acted with objective recklessness when they created the errata document and then continued to pursue Norelus' claims after the creation and submission of that document had made her claims untenable.   That finding is certainly not outside "the range of possible conclusions" permitted under the abuse of discretion standard of review. <u>Frazier</u>, 387 F.3d at 1259.  We have previously explained that "[w]hen it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest." <u>Avirgan</u>, 932 F.2d at 1582 (citations omitted).  The Amlongs refused to discontinue their quest for a judgment even after the sole source of evidentiary support for their client's claims had been rendered useless by the errata document.  The district court did not abuse its discretion in concluding that the Amlongs engaged in objectively reckless conduct.

The district court's denial of the defendants' motion to dismiss following the submission of the errata document does not place that court's finding that the

36

Amlongs' conduct was objectively reckless beyond the pale of permissible conclusions it could reach. Frazier, 387 F.3d at 1259; cf. Blue v. U.S. Dep't of Army, 914 F.2d 525, 535 (4th Cir. 1990) ("As a matter of law there is no requirement that a party move for summary judgment as a precondition to the recovery of sanctions. Numerous courts have awarded sanctions to prevailing defendants in Title VII cases despite the fact that plaintiffs were allowed to present their cases."). The district court did not act inconsistently when it later decided to impose sanctions. When ruling on the motion to dismiss, the court was considering a different issue from the one the Amlongs themselves considered in deciding whether to submit the voluminous errata document and then charge ahead with Norelus' claims. The issue the motion to dismiss presented the district court was whether to dismiss Norelus' claims at that stage or instead to permit inquiry into the reasons the Amlongs and Norelus had asserted for changing her testimony. The questions the Amlongs faced were different: (1) whether it was reasonable to make 868 changes, many of them substantive, to their client's deposition testimony just three weeks before the scheduled trial in the face of a mountain of evidence that her allegations were not true and would never be believed by a factfinder; and (2) whether it was reasonable to continue litigating her claims, which had been left without any credible support due to the creation and submission of the errata

37

document.

Attorneys are charged with knowing more about their case, about their client's various stories, about the contradictions in their client's testimony, and about the testimony of all the potential witnesses than a busy district court judge with a heavy docket can be expected to know. We refuse to require district courts to dismiss a case at the earliest possible opportunity or lose their authority to impose sanctions under § 1927. We give district courts latitude in exercising their authority to manage litigation instead of looking for a chance to say "gotcha" procedurally.

In their final attempt to avoid § 1927 sanctions altogether, the Amlongs argue that two of our earlier opinions, Schwartz v. Millon Air, Inc., 341 F.3d 1220 (11th Cir. 2003), and Hudson v. Int'l Computer Negotiations, Inc., 499 F.3d 1252 (11th Cir. 2007), "lead inevitably to the conclusion that the lower court's decision must be reversed as an abuse of discretion." Neither leads inevitably or otherwise to that conclusion.

In Schwartz, we reversed the district court's imposition of § 1927 sanctions on non-Spanish speaking American attorneys who had represented Ecuadorian clients, with whom they had never met, in personal injury litigation arising out of an airplane crash in Ecuador. 341 F.3d at 1223. An Ecuadorian attorney had

38

referred the cases to the American attorneys.  Id.  After dismissing the cases, which had proved to be fraudulent, the district court sanctioned the American attorneys because it determined that they had "failed to conduct a proper investigation before filing the complaints and missed later suggestions of meritlessness." Id. at 1224. The heart of the district court's decision to impose sanctions was its conclusion that the American attorneys' "complete reliance" on the Ecuadorian attorney to investigate the facts of the case "was unreasonable and a breach of the duty to investigate." Id.  We reversed, observing that "[t]his case involves special circumstances" and concluding that, in light of those special circumstances, "we cannot conclude that Appellants acted much (if at all) outside of the range of reasonable conduct by relying upon the representations of . . . the duly licensed Ecuadorian counsel," who "was not obviously unworthy of belief." Id. at 1226.

The Amlongs contend that Norelus' case resembles Schwartz because her case also presented "special circumstances," id., including "foreign language and foreign culture difficulties."  The magistrate judge made no mention of language or cultural difficulties in his report and recommendation.  Faced with that fact, the Amlongs venture beyond that document in search of support for their position, citing portions of our decision in Amlong I, 500 F.3d at 1247–48, as establishing that "[t]he language and cultural difficulties . . . were a recurring problem

39

throughout the litigation." The Amlongs argue that <u>Amlong I</u>'s factual account

binds all proceedings in this case following that decision, including this appeal,

because that factual account is now the law of the case. We disagree.

It is true that "[u]nder the 'law of the case' doctrine, the findings of fact and

conclusions of law by an appellate court are generally binding in all subsequent

proceedings in the trial court or on a later appeal." <u>Heathcoat v. Potts</u>, 905 F.2d

367, 370 (11th Cir. 1990) (citation and quotation marks omitted); <u>see also</u> <u>Schiavo</u>

<u>ex rel. Schindler v. Schiavo</u>, 403 F.3d 1289, 1291 (11th Cir. 2005) ("The [law-of-

the-case] doctrine operates to preclude courts from revisiting issues that were

decided explicitly or by necessary implication in a prior appeal."). The doctrine

applies to those issues that were decided "either explicitly or by necessary

implication" in the earlier appeal. <u>United States v. Jordan</u>, 429 F.3d 1032, 1035

(11th Cir. 2005). At first glance, that would seem to make the <u>Amlong I</u> panel's

recitation of facts binding on the district court and on us in this appeal, but what

appears at first glance does not always withstand closer scrutiny.

The mandate rule is a "specific application of the 'law of the case' doctrine"

requiring that "[a] trial court, upon receiving the mandate of an appellate court,

may not alter, amend, or examine the mandate, or give any further relief or review,

but must enter an order in strict compliance with the mandate." <u>Piambino v.</u>

40

Bailey, 757 F.2d 1112, 1119–20 (11th Cir. 1985) (collecting cases describing

contours of the mandate rule).  In Amlong I we issued these specific instructions

mandating what the district court could and could not do when it got the case back:

> On remand, the district court need not conduct a new hearing.  It may
> accept the magistrate judge's basic findings of fact and then reach its
> own determination as to whether the [Amlongs'] conduct was
> objectively unreasonable and vexatious.  Alternatively, the district
> court may, if it so chooses, conduct its own hearing as a prelude to
> making a new determination.  Our holding is simply this: the district
> court abused its discretion and clearly erred when it squarely rejected
> the magistrate judge's findings of fact and credibility determinations
> and substituted its own, without hearing so much as a single witness at
> a sanctions hearing.

500 F.3d at 1251.  It would be passing strange for the Amlong I panel to have

made its own extensive findings of fact, intending to bind the district court under

the law of the case doctrine, while at the same time mandating that the district

court was required to either "accept the magistrate judge's basic findings of fact"

or "conduct its own hearing" before making its own findings of fact.  Id.  What

would have been the point of that mandate if our opinion had already found the

facts in a way that bound the parties and the district court?  When viewed through

the lens of Amlong I's actual instructions and mandate, the factual narrative

contained in that opinion, including its discussion of linguistic and cultural

problems, is properly viewed not as a pronouncement of findings of fact that

41

controlled the future proceedings in the case but instead as background information presented in the light most favorable to the magistrate judge's ultimate recommendations to the district court.

Seen in that light, Amlong I's factual narrative did not operate as law of the case to bind the district court on remand or us in this appeal. Our conclusion about this keeps the factfinding function in this case where it belongs—in the district court, not in this Court. Pullman-Standard v. Swint, 456 U.S. 273, 291-92, 102 S. Ct. 1781, 1791–92 (1982) ("[F]actfinding is the basic responsibility of district courts, rather than appellate courts." (alteration in original) (quotation marks omitted)); United States v. Barnette, 10 F.3d 1553, 1558 (11th Cir. 1994) ("It is not an appellate court's role to find facts.").

In any event, even accepting the Amlongs' contention that Norelus' Haitian background created serious linguistic and cultural problems, Schwartz still does not require us to reverse the district court's decision to impose § 1927 sanctions on the Amlongs. The district court in Schwartz sanctioned the attorneys in that case "based upon [their] failure to investigate more thoroughly their clients' claims." 341 F.3d at 1226. We reversed the district court's imposition of sanctions because under the "special circumstances" of that case, which included "great distances across international borders," "foreign languages and foreign cultures," "medical

42

records and a great many clients," it was not "unreasonable—to the point of willful abuse and bad faith—for American counsel to rely upon others (especially other legal counsel) who were fluent in Spanish and familiar with local customs in Equador and who were on the spot to conduct the investigation." Id. Norelus' case did not involve those special circumstances: Her case arose in Florida; the potential witnesses were located in Florida; the case involved only a single client; and it did not involve a voluminous collection of documentary evidence written in a foreign language.

Despite those key differences in the two cases, the Amlongs argue that their actions compare favorably to those of the attorneys in Schwartz because their belief in Norelus' veracity was consistent with the views of Valladares (Norelus' initial attorney), Chambrot (the second attorney to represent her), the polygrapher, and the psychologist, whereas the Schwartz attorneys had relied only on an Ecuadorian lawyer who appeared to be worthy of belief, see Schwartz, 341 F.3d at 1226. That argument fails to grasp the key distinction between the two cases, which is that Schwartz concerned primarily whether the attorneys in that case had failed to fulfill their duty to investigate when they relied on the Ecuadorian attorney to investigate the claims for them. While the Amlongs' investigatory techniques certainly left much to be desired, the district court did not sanction them

43

for inadequately investigating Norelus' claims.  Instead, it sanctioned them for improperly submitting an errata document, which obliterated the only useful source of evidentiary support for Norelus' claims, and then pressing forward with the case anyway.  The fact that the Amlongs' assessment of Norelus' veracity may have been consistent with the beliefs of four people, none of whose beliefs were admissible evidence, does not change the fact that, from the point when they submitted the massive errata document forward, the Amlongs were pursuing a case that no longer had any useful evidentiary support.

The Amlongs' reliance on Hudson is also misplaced.  In that case, we affirmed the district court's refusal to impose § 1927 sanctions on Hudson's attorneys, Hudson, 499 F.3d at 1266, stating that "while Hudson's case was weak, it was not 'so without circumstantial foundation' as to render it frivolous" and therefore sanctionable pursuant to § 1927.  Id. at 1265.  The Amlongs urge us to reverse the imposition of sanctions against them because, in their view, Norelus' case, like Hudson's, had enough "circumstantial foundation" to rule out § 1927 sanctions.  As the foundation for Norelus' claims, the Amlongs again assert  that four other people believed in her veracity.  As we have said before, "determinations regarding frivolity are to be made on a case-by-case basis."  Id. at 1262 (quoting Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1177 (11th Cir. 2005)

44

(quotation marks, emphasis, and brackets omitted).  That said, the comparison between Norelus' case and the case underlying the <u>Hudson</u> decision is not even close.

Hudson alleged that his supervisor, Auer, fired him because of his depression or because of his inquiries into the long term benefits available under International Computer Negotiation's insurance policy.  <u>Id.</u> at 1257.  Hudson and Auer agreed that about nine weeks before he was terminated they had a brief conversation about Hudson's depression.  <u>Id.</u> at 1265.  Hudson's speculation that the office manager, Rosenblum, had told Auer about his insurance inquiries, made a mere eight days before his termination, had circumstantial support based on the nature of Rosenblum's job, the small size of ICN's office, and an affidavit submitted by a former ICN employee stating that Rosenblum would have reported Hudson's inquiries to Auer.  <u>Id.</u>  Hudson's receipt of annual raises and his appointment to an executive committee three months before his termination all made it believable that  Hudson was terminated not because of performance deficiencies but due to his depression or due to his inquiries into long-term disability benefits.  <u>Id.</u>

Norelus' case stands in stark contrast to Hudson's.  To begin with, the fact that the Amlongs and two attorneys who had represented her believed that Norelus

45

was telling the truth does not qualify as admissible circumstantial evidence to support Norelus' allegations. Nor do the opinions of the polygrapher and psychologist. The magistrate judge specifically found that "plaintiff's claims were not strengthened in any manner by the polygraph examinations." As the magistrate judge also found, Norelus' claims lacked "corroboration or support from any other witnesses or sources." Not only that, but the witnesses who would have corroborated Norelus' claims if those claims had any merit uniformly contradicted her claims. The evidence simply did not provide the sort of foundational support that was present in <u>Hudson</u>. In fact, the small size and layout of the restaurants in which the alleged abuse occurred, coupled with the fact that Norelus' coworkers contradicted her claims, actually provided circumstantial evidence that those claims were not true. The only admissible evidence supporting Norelus' allegations of extreme sexual harassment was her own testimony, and it was rendered useless by the submission of the errata document. As the magistrate judge and district court found, Norelus' "own changing testimony, without corroboration or support from any other witnesses or sources" was "totally or nearly totally discredited by her numerous lapses of memory, outright lies, and outlandish comments made during her deposition," and her testimony "became useless after she filed the lengthy errata sheet leaving her open to further

46

impeachment during her reopened deposition." Still, the Amlongs pressed on with the lawsuit.

In Amlong I we explained that under § 1927 "objectively reckless conduct is enough to warrant sanctions even if the attorney does not act knowingly and malevolently." 500 F.3d at 1241. We then remanded to the district court with specific instructions that "[i]t may accept the magistrate judge's basic findings of fact and then reach its own determination as to whether the lawyers' conduct was objectively unreasonable and vexatious," or in the alternative it "may, if it so chooses, conduct its own hearing as a prelude to making a new determination." Id. at 1251. The district court followed our instructions when it adopted the magistrate judge's findings of fact and determined that the Amlongs' conduct was "objectively reckless conduct [that] unreasonably and vexatiously multiplied the instant proceedings." Because the district court neither made a clear error of judgment nor applied the wrong legal standard in coming to that conclusion, its decision to sanction the Amlongs was not an abuse of its discretion. See Frazier, 387 F.3d at 1259 (citing Maiz, 253 F.3d at 662).

B.

This is as good a point as any to address an argument made by the National Employment Lawyers Association in an amicus brief addressing the undesirability

47

of a rule requiring corroborating evidence in sexual harassment cases. Neither the district court nor the defendants have said that an attorney ought to be sanctioned for pursuing a sexual harassment claim without evidence corroborating the plaintiff's story. Still, amicus gravely warns us that:

> abuse like that alleged in the instant case—rape and coerced sexual conduct—<u>virtually always</u> occurs outside the presence of witnesses, unless by 'witnesses' one includes co-perpetrators. NELA would urge the Court to give careful consideration to the systematic chilling effect of imposing sanctions on lawyers for alleged victims of sexual violence, where the rationale for such sanctions is the lack of corroborating witnesses.

That warning is worth considering, but it has nothing to do with this case.

The district court did not sanction the Amlongs for filing and pursuing these claims without corroborating witnesses. The issue is not whether bringing the action in the first place was sanctionable. The issue is not even whether continuing to pursue the case after all of Norelus' witnesses refused to corroborate her claims was sanctionable. The issue is whether creating and submitting the sixty-three page errata document and then continuing to press forward with Norelus' claims, which had been left completely unsupported once the errata document rendered her testimony useless, constituted conduct sanctionable under § 1927.

Even if the district court had sanctioned the Amlongs simply for pursuing this case without corroborating witnesses, which it didn't, this is not a case where

48

the claimed harassment occurred only when the victim and abusers were behind closed doors or in a manner in which there likely would be no corroboration. To the contrary, Norelus claimed not only that her managers sexually harassed her virtually every day for eleven months, but also that they regularly raped her and forced her to perform oral sex on a near-daily basis. She claimed most of the abuse occurred in one of two relatively small restaurants where there were few, if any, places to hide. If the alleged acts actually happened, they happened where many of them would have been seen or heard by other employees. This is a case where the plaintiff claimed that at least seven of her co-workers witnessed at least some of sexual abuse during the eleven months it allegedly had occurred over and over again. This is not a case in which it is unreasonable to expect corroborating evidence. It is a case in which, if the plaintiff's story were true, it would be incredible not to have some corroborating evidence. Whatever relevance the amicus' warning might have in some other case, it has none in the only case we decide, which is the one before us.

C.

Up to this point, we have addressed the issues related to the errata document and the award of sanctions as those issues have been raised and defined since that document was submitted fourteen years ago. Our dissenting colleague, by contrast,

49

has hatched a brand new theory—a theory that was never raised by the parties, never considered by the district court, and never argued to this Court. The theory that he has conjured up is that the errata sheet was really nothing more than a "letter" from Karen Amlong to defense counsel. It was not, he insists, an errata sheet because he thinks it was never presented to the court reporter or affixed to Norelus' deposition as, he thinks, Federal Rule of Civil Procedure 30 requires. Dissenting Op. at 1. He is wrong on his premises and wrong in his conclusion.

The record contradicts our dissenting colleague's assertion that the errata document was never presented to the court reporter who transcribed Norelus' deposition. See Dissenting Op. at 1, 6,11, 19 n.12, 21. An affidavit in the record shows that one of Norelus' attorneys went to the court reporting company and in the presence of the court reporter, reviewed Norelus' deposition transcript before the errata document was created. More importantly, the errata document itself contains this certification by Norelus:

> I, Floride Norelus Germain, do hereby certify, I having read my foregoing deposition taken on 1/9/96; 1/22/96; 1/24/96; 1/25/96; 2/6/96; 2/7/96; & 2/9/96 & 2/14/96 that said transcript is a true and accurate recording of the proceedings had at the time and place designated, with the exceptions, if any, on the ERRATA sheet.

(emphasis added). Norelus' signature on that certification was notarized by the

50

office manager of the court reporting company. As Norelus' own certification states, the errata document was submitted as part of "the foregoing deposition." And it created, or attempted to create, "exceptions" to the deposition transcript.

Even if there were some ambiguity in the record about this matter, we would resolve it against the Amlongs because they, as the appellants, have the burden of presenting a record clear enough to show any fact necessary or helpful to their appeal. See United States v. Delancy, 502 F.3d 1297, 1313 n.10 (11th Cir. 2007) ("Because the record does not make this clear, we resolve this ambiguity in favor of . . . the party that prevailed below."). Instead of recognizing the obvious import of Norelus' own certification or following our precedent about who has the burden on appeal where there are any ambiguities, the dissenting judge would remake the case entirely along different factual lines, lines that only he sees.

The central fact that he would have us find, more than fourteen years after the actual record was made, would be that Karen Amlong did not actually "intend Norelus's later 'errata sheet'—the one at issue here—to function as a formal Rule 30 errata sheet with legal effect." Dissenting Op. at 10. Neither the magistrate judge nor the district court found that fact, which is crucial to the dissenting judge's novel theory, and as everyone knows, appellate courts may not make fact findings. See e.g., Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105

51

S.Ct. 1504, 1511 (1985) ("The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court."); see also DeMarco v. United States, 415 U.S. 449, 450 n.1, 94 S.Ct. 1185, 1186 n.1 (1974) (stating that "factfinding is the basic responsibility of district courts, rather than appellate courts"); Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 967 n.6 (11th Cir. 2007) ("Because we are not factfinders, when we need facts to resolve legal questions before us, we return the case to the district court on limited remand for the requisite factfinding or determination of specific factual issues."); Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County, 450 F.3d 1295, 1306–07 (11th Cir. 2006) ("Appellate courts must constantly have in mind that their function is not to decide factual issues de novo.") (alterations and quotation marks omitted); United States v. Banks, 347 F.3d 1266, 1271 (11th Cir. 2003) ("A court of appeals is not a fact finding body."); E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000) ("We therefore abide by the general rule of law that a remand is the proper course unless the record permits only one resolution of the factual issue.") (quotation marks omitted); Didie v. Howes, 988 F.2d 1097, 1104 (11th Cir. 1993) ("We, however, are not factfinders."); Williams v. United States, 405 F.2d 234, 239 (5th Cir.1968) ("We are not fact finders.").

Karen Amlong, along with everyone else involved in this litigation, would

52

be surprised to find out that the voluminous errata document was, after all, just a letter. From its inception, the errata document has been understood by all, except our dissenting colleague, to be a Rule 30 errata sheet. For almost a decade-and-a-half, ever since Norelus signed it on June 14, 1996, everyone has viewed the errata sheet as an errata sheet, and the errata sheet has always been considered to have been submitted as such under Rule 30.[8]

And it is no wonder that the document has been considered to be an errata sheet and not a letter. At the top of the first page of the document, the title "ERRATA SHEET" appears in bold. It does not say "LETTER." It is not on letterhead. It is not signed by Karen Amlong. It is not addressed to opposing counsel. It was executed at the court reporter's office. At that office Norelus' signature on the errata sheet was notarized by the office manager, and Norelus certified the truth and accuracy of her deposition "with the exceptions, if any, on

---

[8]And contrary to the dissenting judge's assertion, the Amlongs were not sanctioned for "failing to point out to the district court, and to this court on appeal, that the 'errata sheet' at issue was not an errata sheet. . . ." Dissenting Op. at 506 n.14. The defendants did not move for sanctions on that ground and the district court did not impose sanctions on that ground. The defendants moved for sanctions on the ground that the Amlongs submitted the errata sheet as an errata sheet, thereby altering their client's deposition testimony in 868 ways, and because they continued to litigate their client's claims thereafter. The district court imposed sanctions on that basis. Sanctions were not requested or imposed because the Amlongs were guilty of "negligence" in failing to come up with the theory that none of the lawyers and judges who have been involved with this case for the past decade and a half, except the dissenting judge, has ever come up with before. The Amlongs were sanctioned for what they did, not what they failed to argue.

the ERRATA sheet."   That certification itself and its use to assert "exceptions" to the deposition belies the dissent's far-fetched assertion that the errata sheet was nothing more than a letter from one attorney to another.   And there is more.

The defendants have contended for almost a decade-and-a-half, ever since they filed their motion to dismiss the complaint on August 1, 1996, that Norelus used the errata sheet to change the substance of her deposition testimony, and that "[t]he changes to [Norelus'] deposition indisputably exceed both the letter and spirit of Federal Rule of Civil Procedure 30(e)."   In response to that position, the Amlongs have contended that the "defendants simply do not understand Federal Rule of Civil Procedure 30(e)," and they have argued that the errata sheet made "deposition corrections" that were "proper under Rule 30(e)."   Those are the Amlongs' own words.   The defendants have argued in reply that in creating the errata sheet Norelus "abuse[d] Rule 30(e) in a patent attempt to re-write her deposition."   In its order denying the defendants' motion to dismiss and reopening Norelus' deposition, the district court stated that "[a]fter a deponent changes a deposition in accordance with Fed. R. Civ. P. 30(e), the deposition will be reopened if the deponent's changes make the deposition incomplete or useless without further testimony."   The district court found that the errata sheet did just that, which is why it ordered the deposition re-opened.

And that was not the end of it. The consideration of the errata sheet as an errata sheet in light of Rule 30 continued after the deposition was re-opened. In its first order granting the defendants' motions for sanctions, which was issued on March 21, 2000, the district court quoted Rule 30(e) and concluded that "when an Errata Sheet sixty-three pages long with 868 corrections is necessary to validate testimony, any reasonable attorney would be on notice that such testimony may be incredulous." And there is more.

In their brief filed with this Court for the appeal that we now know as Amlong I, the Amlongs cited Rule 30 and contended that they had complied with it. This is what they said:

> No dispute exists with respect to the specific instructions given to Ms. Taylor [the Amlongs' associate who attended Norelus' second deposition] as to how Ms. Taylor was to proceed with the review of Ms. Norelus' deposition and, if Ms. Norelus had any changes, how Ms. Taylor was to prepare an errata sheet in accord with Rule 30(e). The tedious and thorough process employed by Ms. Taylor has also been discussed as was the fact that all changes were those of Ms. Norelus, with neither Ms. Taylor, Ms. Amlong or anyone else having any involvement whatsoever. That was the reality surrounding the preparation and filing of the errata sheet.

Br. of Appellant in Amlong I at 41 (emphasis added) (footnotes omitted). In this Court's Amlong I decision, the majority opinion noted that Norelus' sworn testimony was changed 868 times by the Errata Sheet. Amlong I, 500 F.3d at

55

1235; see also id. at 1269 (Hill, J. dissenting) ("The Amlongs maintain that Rule 30(e) 'in no way limits the types and number of changes' that an errata sheet is permitted to make to a prior deposition.") (footnote omitted). And there is more.

After Amlong I and back in the district court on remand, when that court reimposed sanctions on the Amlongs it focused not only on the "improper methods of preparation and the factual content" of the errata sheet, but also on the fact that the Amlongs "continued to press forward with their case after the filing of the Errata Sheet and in spite of the fact that [Norelus] continued to evade reasonable inquiry concerning her evolving account of events alleged in this case during her reopened deposition." When the Amlongs appealed that decision—the appeal before us now—they once again argued to this Court that the errata sheet was intended to, and did, comply with the requirements of Rule 30. For example, they argued:

> At no point in this litigation has there been any case authority cited for the proposition that the decision [to make changes using an errata sheet] violated Rule 30(e) that simply provides that within thirty days after a deposition becomes available, the person deposed has the right to review the transcript and, 'if there are changes [made] in form or substance,' sign a statement giving the reasons for making them."

Br. of Appellant in Amlong II at 10 n.28 (quoting Fed. R. Civ. P. 30(e)) (first alteration added).

56

So for about a decade-and-a-half everyone has understood that the errata sheet is an errata sheet submitted by the Amlongs under Rule 30 for the purpose of changing their client's deposition testimony. The Amlongs, the defendants, the magistrate judge, the district court judge, all three judges of this Court in <u>Amlong I</u>, everyone in the district court after the remand, and both parties in briefing and arguing the present appeal have understood that. Everyone has understood it—except for our dissenting colleague. Now, after almost a decade-and-a-half of litigation, he has been able to discern what everyone else has overlooked: that the Rule 30 errata sheet is not really a Rule 30 errata sheet, but it is instead "a document, although entitled 'errata sheet,' [which] had no more legal efficacy than a letter." Dissenting Op. at 22. During a period of almost fifteen years of looking at the document, no one else has ever thought it was just a letter. And no wonder. Treating the errata sheet as nothing more than a letter is like arguing after Gettysburg that the warring sides had been mistaken all along about the bombardment of Fort Sumter, that it was actually nothing more than a diplomatic overture.

And the dissenting judge's extraordinary perception does not end there. He is even able to perceive that everyone else's inability to see that the errata sheet is not really an errata sheet is not the fault of the Amlongs, who designated it an

errata sheet and have been arguing for almost a decade and a half that is what it is, and not the fault of all the judges who have consistently treated it as an errata sheet, but instead is the fault of—who else is left?  Defense counsel, of course. See Dissenting Op. at 2, 19–20, 22–23.  According to the dissent, defense counsel prolonged the litigation unnecessarily by not informing the district court about something that no one knew but that defense counsel somehow should have figured out.  What defense counsel should have divined, according to the dissent, is that a document labeled "ERRATA SHEET," which was in the form of an errata sheet, was really nothing more than a letter to defense counsel—a letter without a greeting or a salutation, and without an inside or outside address, and a letter that was not sent to the party for whom it was intended but instead was taken to the court reporting company, just as an errata sheet would have been, where it was certified as a series of exceptions to the deposition transcript, just as an errata sheet would have been.  How could defense counsel, along with everyone else, have overlooked that?

Even beyond the facts, there is another problem with the dissent's attempt to inject the not-an-errata-sheet-but-just-a-letter issue into the case at this point.  The issue has been defaulted about as many times and in about as many ways as any issue can be.  The issue was not raised by the Amlongs when they served the

58

document on the defendants on June 20, 1996; it was not raised when the Amlongs responded to the defendants' motion to dismiss; it was not raised or considered by the district court when it ruled on that motion and re-opened Norelus' deposition; it was not raised or considered by the magistrate judge when he made findings on the defendants' motion for sanctions; it was not raised or considered by the district court when it granted that motion and awarded sanctions against the Amlongs on March 21, 2000; it was not raised when the Amlongs appealed that judgment to this Court; it was not raised or considered by this Court in Amlong I when we ordered a limited remand; it was not raised in the district court on remand; it was not raised or considered by the district court when it reimposed the sanctions award against the Amlongs; and it was not raised by the Amlongs in their briefs or at oral argument after the they appealed that judgment to this Court in the appeal before us now.

The first and only time this issue has been raised in the more than fourteen years since the errata document was submitted is now, by our dissenting colleague who wants us to share his novel vision and reverse the district court's award of sanctions on that basis.  Even if his vision had any factual basis, there are two walls of precedent standing against what he wants to do.  The first one is our well-established rule against reversing a district court judgment on the basis of issues

59

and theories that were never presented to that court—issues not raised in the

district court should not be considered on appeal.  See, e.g., Bryant v. Jones, 575

F.3d 1281, 1296 (11th Cir. 2009) (holding that an issue was not properly before us

where plaintiffs "failed to raise the issue before the district court") (citing Johnson

v. United States, 340 F.3d 1219, 1228 n.8 (11th Cir. 2003) ("Arguments not raised

in the district court are waived.")); Access Now, Inc. v. Southwest Airlines Co.,

385 F.3d 1324, 1331 (11th Cir. 2004) (explaining that addressing questions not

raised in the district court "would not only waste our resources, but also deviate

from the essential nature, purpose, and competence of an appellate court"); Irving

v. Mazda Motor Corp., 136 F.3d 764, 769 (11th Cir. 1998) (refusing to consider an

argument not raised in the district court and observing that "[t]oo often our

colleagues on the district courts complain that the appellate cases about which they

read were not the cases argued before them"); Stewart v. Dep't of Health and

Human Servs., 26 F.3d 115, 115 (11th Cir. 1994) ("Judicial economy is served and

prejudice is avoided by binding the parties to the facts presented and the theories

argued below.") (quotation marks omitted).

The second wall of precedent that forbids us from redesigning the issues at

the appellate stage are prior decisions that make the law "by now well settled in

this Circuit that a legal claim or argument that has not been briefed before the court

is deemed abandoned and its merits will not be addressed." Access Now, 385 F.3d

at 1330. See also Ferguson v. United States Att'y Gen., 563 F.3d 1254, 1258 n.7

(11th Cir. 2009) (petitioner who failed to dispute the Board of Immigration

Appeals' rejection of her claim as unsubstantiated by any evidence she had been

served with an Order to Show Cause had "abandoned her claim that she was

served"); Millenium Partners, L.P. v. Colmar Storage, LLC, 494 F.3d 1293, 1298

(11th Cir. 2007) ("On appeal, Colmar has not challenged the District Court's denial

of the request for an allocation instruction. Thus, that claim is forfeited."); Tanner

Adver. Group, L.L.C. v. Fayette County, Ga., 451 F.3d 777, 785 (11th Cir. 2006)

("Under the established law of this Circuit, 'issues that clearly are not designated in

the initial brief ordinarily are considered abandoned.'") (quoting Hartsfield v.

Lemacks, 50 F.3d 950, 953 (11th Cir.1995)); Sun America Corp v. Sun Life

Assurance Co. of Can., 77 F.3d 1325, 1333 (11th Cir. 1996) ("As this Court has

held repeatedly, '[a]n argument not made is waived.'" (quoting Cont'l Technical

Servs. v. Rockwell Int'l Corp., 927 F.2d 1198, 1199 (11th Cir. 1991)).  As this

Court explained in Access Now,

> If an argument is not fully briefed (let alone not presented at all) to the
> Circuit Court, evaluating its merits would be improper both because
> the appellants may control the issues they raise on appeal, and because
> the appellee would have no opportunity to respond to it.  Indeed,
> evaluating an issue on the merits that has not been raised in the initial

brief would undermine the very adversarial nature of our appellate system. As the First Circuit has stated, "[i]n preparing briefs and arguments, an appellee is entitled to rely on the content of an appellant's brief for the scope of the issues appealed."

385 F.3d at 1330 (quoting Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir.1983)).  Issues should not sprout like weeds in appellate opinions no matter how fertile the minds of the judges deciding the appeal.  We could not reverse the district court based on the dissenting opinion's new theory of the case, even if it had a factual basis, which it does not.

## IV.

We turn now to the parties' contentions about who should bear the costs, expenses, and attorney's fees incurred while pursuing a sanctions award under 28 U.S.C. § 1927.  Sanctions imposed under § 1927 "must bear a financial nexus to the excess proceedings [and] may not exceed the 'costs, expenses, and attorneys' fees reasonably incurred because of [the sanctionable] conduct.'"  Peterson, 124 F.3d at 1396 (citing 28 U.S.C. § 1927).  The Amlongs contend that the district court violated that principle, and therefore abused its discretion, making a mistake of law by including in the sanctions award against the Amlongs the costs, expenses, and attorney's fees (hereafter "costs" for short) that the defendants

62

incurred in prosecuting the sanctions proceedings.[9]

This is the first time we have addressed whether a district court may include costs arising from the sanctions proceedings themselves in an award of § 1927 sanctions. Other circuits have tackled this issue in the closely related context of rules-based sanctions. Many of those courts have held that it is within the discretion of a district court to include within a sanctions award costs incurred in obtaining that award. See In re Tutu Wells Contamination Litig., 120 F.3d 368, 387 n.21, 387–88 (3rd Cir. 1997) (affirming district court's decision to base sanctions award in part on the costs arising from sanctions proceedings and expressly stating that the "analysis . . . does not make a distinction between inherent powers sanctions and statute-based or rule-based sanctions"), overruled on other grounds by Comuso v. Nat'l R.R. Passenger Corp., 267 F.3d 331, 338 (3rd Cir. 2001); Silva v. Witschen, 19 F.3d 725, 733 n.15 (1st Cir. 1994) (rejecting

_____

[9]Although they did so before the district court, the Amlongs do not argue in this appeal that, assuming the costs incurred in prosecuting the sanctions proceedings can be recovered in the award, the amount of the sanctions is itself unreasonable. We find the Amlongs' failure to raise that issue before us notable, given that the total amount of the sanctions award was nearly $400,000. That seems like a lot, but we will not raise and decide an issue that the Amlongs themselves have abandoned. See Millennium Partners, L.P., 494 F.3d at 1298 ("On appeal, Colmar has not challenged the District Court's denial of the request for an allocation instruction. Thus, that claim is forfeited."); Tanner Adver. Group, LLC  451 F.3d at 785 ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." (alteration in original) (quotation marks and citation omitted)); Campaign for a Prosperous Ga. v. S.E.C., 149 F.3d 1282, 1287 (11th Cir. 1998) (issues not raised on appeal are abandoned).

"claim that attorney fees reasonably incurred in the sanctions phase may not be made the subject of a Rule 11 sanction"); Brandt v. Schal Assocs., Inc., 960 F.2d 640, 649–51 (7th Cir. 1992) (endorsing inclusion in sanctions award of expenses incurred by opposing party in establishing Rule 11 violation); In re Stauffer Seeds, Inc., 817 F.2d 47, 50 (8th Cir. 1987) (instructing that Rule 37 sanctions award should include expenses reasonably incurred in seeking discovery sanctions). See also Amlong I, 500 F.3d at 1273 (Hill, J., dissenting) (listing and discussing cases addressing this issue).

We begin our analysis of what the statute permits where we always should: the statute's plain language. See Nguyen v. United States, 556 F.3d 1244, 1250 (11th Cir. 2009). The plain language of 28 U.S.C. § 1927 establishes that, in making a sanctions award to a party, a court may include the "costs, expenses, and attorneys' fees" that the party victimized by the sanctionable conduct incurred in obtaining the award. 28 U.S.C. § 1927. After all, those costs are, in the statute's terms, "incurred because of such conduct." Id. If there were no sanctionable conduct there would have been no proceeding to impose sanctions. Because the costs arising from the sanctions proceedings were "occasioned by the objectionable conduct," McMahan, 256 F.3d at 1128 (citing Peterson, 124 F.3d at 1396), a district court may include costs arising from the sanctions proceedings in the

sanctions award.

Because the statutory language is unambiguous, we could end our analysis there.  See United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc). But this is another of those occasions in which we give in to the temptation to go beyond a statute's plain language and point out that there is another reason for reaching the same conclusion.  See, e.g., Harris v. Garner, 216 F.3d 970, 977 (11th Cir. 2000) (en banc); United States v. Gilbert, 198 F.3d 1293, 1299 (11th Cir. 1999).  The additional reason supporting our conclusion is the fact that a categorical rule excluding from a sanctions award the costs incurred in obtaining it would undercut the purposes of providing for sanctions.  See Tutu Wells, 120 F.3d at 387.  The time, effort, and money a party must spend to get another party sanctioned realistically is part of the harm caused by that other party's wrongful conduct.  Id. at 388.  A rule automatically excluding that type of harm from the calculation of sanctions awards would not allow courts to fully compensate the harmed party for the wrongful conduct it had suffered.  Id.

A categorical rule excluding the costs of having sanctions imposed from the award would also undermine the goal of deterrence, because it would discourage a party aggrieved by wrongful conduct from pursuing sanctions.  Id.  If an aggrieved party knows beforehand that it has no hope of recovering the costs necessary to

65

have the other party sanctioned, it will be less likely to pursue sanctions. Id. In the present case, for example, the costs arising from the sanctions proceedings may have equaled or surpassed the harm inflicted on the defendants during the period from the submission of the errata sheet until the dismissal of Norelus' claims. An economically rational party would not relish the prospects of an award that is smaller than the costs of obtaining it. The less likely that aggrieved parties are to pursue sanctions, the more sanctionable conduct will go unsanctioned, and the weaker the deterrent will be. Id. ("[P]arties who know that the likelihood of facing a sanction[s] proceeding [is] low may engage in sanctionable conduct more often.").

These policy considerations reinforce and explain the purpose or reasons behind the plain language of § 1927, although no reinforcement or explanation is needed because what a statute plainly says is the law. See, e.g., Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79, 118 S.Ct. 998, 1002 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."); Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance, 304 F.3d 1076, 1087 (11th Cir. 2002) ("[U]nambiguous language in a statute is more than mere evidence of what Congress intended the law to be—it is the law.").

66

Against what the statute itself says, and the obvious reasons behind what it says, the Amlongs present us with a holding from the Fourth Circuit and some dicta from the Tenth Circuit to support their position that the costs the moving party incurs in obtaining a sanctions award should not be included in that award.[10] The Fourth Circuit decision is <u>Blue v. U.S. Dep't of Army</u>, 914 F.2d 525 (4th Cir. 1990), a Title VII lawsuit in which the district court had imposed sanctions on the plaintiffs and their counsel by "invok[ing] a number of different yet overlapping legal theories to justify its imposition of sanctions, including Federal Rules of Civil Procedure 11 and 16, the 'bad faith' exception to the American Rule, and 28 U.S.C. § 1927." <u>Id.</u> at 530. The district court had "ordered not only that defendant be awarded payment for court costs and attorneys' fees, but also that the court itself be reimbursed for the expenses it incurred and the time it spent presiding over the litigation."[11] <u>Id.</u>

---

[10]The Amlongs also rely on <u>Tutu Wells</u>, 120 F.3d at 372, a case in which the Third Circuit actually affirmed a sanctions award that included the costs incurred in the sanction proceedings. The Amlongs attempt to use that case to argue that costs for the sanctions proceeding itself should be awarded only where the conduct that led to the proceeding was egregious. But the <u>Tutu Wells</u> opinion did not purport to impose an egregiousness standard. <u>See id.</u> at 387–88. In any event, the decision did affirm the inclusion in the award of the costs incurred in obtaining the sanctions. <u>Id.</u> at 388 ("A district court, in the exercise of its discretion, may award attorney's fees arising from sanctions proceedings."). As a result, if the <u>Tutu Wells</u> opinion had said that anything less than the egregious misconduct present in that case would have ruled out costs for the sanctions proceeding itself, it would have been only dicta.

[11]The Fourth Circuit observed that "[w]hile these legal theories approach attorney and party misconduct from different perspectives and have differing standards, all share the common

The Fourth Circuit held in <u>Blue</u> that "counsel cannot simply rely on a client's patently incredible testimony when any reasonable investigation of the factual bases for the client's claims or examination of materials obtained in discovery would reveal the paucity and implausibility of the evidence." <u>Id.</u> at 543. Because the senior partner in charge of the plaintiffs' case had not done that, the <u>Blue</u> court concluded that "the conduct of this litigation was sanctionable." <u>Id.</u> at 545. Although it set aside the sanctions imposed against the junior associate, who was working on her first case for the firm and had entered the litigation late, the court affirmed the decision to sanction the senior partner who had been in the charge of the case when it began. <u>Id.</u> at 546–47. The <u>Blue</u> decision provides strong support for the imposition of sanctions on the Amlongs. Their conduct was even worse than that of the senior partner in <u>Blue</u> when the submission of the

---

goal of the efficient litigation of meritorious suits and the deterrence of suits so patently meritless that their pursuit constitutes an abuse of the judicial system." <u>Id.</u> at 533. Because there is significant overlap among those various theories, the court concluded: "Rather than dissect the particulars of each theory as applied to each of the district court's findings of improper conduct, we think it more straightforward to examine the basic question of whether the actions of plaintiffs and their counsel in pursuit of this lawsuit in fact constituted sanctionable conduct." <u>Id.</u> at 534. Even so, the Fourth Circuit commented that "[t]he sheer breadth and magnitude of [the district court's] sanctions effort are probably unprecedented." <u>Id.</u> at 535. "[T]he district court not only invoked every conceivable legal theory on which sanctions could be imposed, but also levied every conceivable sanction, including attorneys' fees, court costs, court salaries (including that of its law clerk), and even a fine and reprimand of counsel for violation of state ethical rules." <u>Id.</u> The Fourth Circuit ultimately set aside as improper the part of award of sanctions based on court salaries. <u>Id.</u> at 548.

massive errata document is considered along with the paucity and implausibility of the evidence supporting Norelus' case.

The part of the <u>Blue</u> opinion that the Amlongs rely on deals with the court's decision to "set aside the sanctions arising out of the prosecution of the sanctions hearing with respect to counsel" because there was "no sanctionable conduct in the attorneys' opposition to the sanctions motions." <u>Id.</u> at 549.[12]   The Fourth Circuit gave as its reason for doing so that "[l]itigants should be able to defend themselves from the imposition of sanctions without incurring additional sanctions." <u>Id.</u> at 548.  Of course, one could say with equal force that parties who have been victimized by vexatious litigation should be able to have themselves made whole through a sanctions award, which is possible only if they can recover the additional costs of obtaining that award from the guilty party.

For our purposes, the more fundamental problem with the <u>Blue</u> court's curiously thin treatment of this issue is that, because it was taking a wholesale approach to the various theories under which the district court had awarded sanctions in the first place, the court apparently saw no reason to confront the plain language of § 1927.  If the court had any explanation for why costs, expenses, and

---

[12]The <u>Blue</u> court did affirm the award of sanctions for the sanction proceedings conduct of the plaintiffs themselves, because they had committed perjury during the sanctions hearing. <u>Id.</u> at 549.

attorney's fees incurred in obtaining an award because of opposing counsel's sanctionable conduct are not "costs, expenses, and attorneys' fees . . . incurred because of such conduct," 28 U.S.C. § 1927, the court did not mention it.

If the Blue court had been focusing on § 1927, instead of a smorgasbord of sanctions theories, it might have realized that its policy view could not stand in the face of the plain statutory language.  Courts may not rewrite the language of a statute in the guise of interpreting it in order to further what they deem to be a better policy than the one Congress wrote into the statute.  See Artuz v. Bennett, 531 U.S. 4, 10, 121 S.Ct. 361, 365 (2000) ("Whatever merits these and other policy arguments may have, it is not the province of this Court to rewrite the statute to accommodate them."); Albritton v. Cagle's, Inc., 508 F.3d 1012, 1017 (11th Cir. 2007) ("We are not empowered to rewrite statutes."); Wright v. Sec'y, Dep't of Corrs., 278 F.3d 1245, 1255 (11th Cir. 2002) ("Our function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to 'improve' statutes by altering them."); Harris, 216 F.3d at 976 ("We will not do to the statutory language what Congress did not do with it, because the role of the judicial branch is to apply statutory language, not to rewrite it.").

There is another problem with the Blue court's policy position.  It is inconsistent with the position universally applied in other cost- and fee-shifting

70

situations.  Like other courts, we have allowed parties to recover the cost of establishing their right to, and the amount of attorney's fees—the right to fees-on-fees.  See, e.g., Jackson v. State Bd. of Pardons & Paroles, 331 F.3d 790, 798–99 (11th Cir. 2003) (holding "that fees-on-fees are recoverable under" the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997(e)(d)(1)(A)); Jean v. Nelson, 863 F.2d 759, 780 (11th Cir. 1988) (holding "that the United States may not oppose a 'fees for fees' request [under the Equal Access to Justice Act, 28 U.S.C. § 2412,] solely on the ground that its position in the fee litigation was substantially justified"); Jonas v. Stack, 758 F.2d 567, 568 (11th Cir. 1985) ("[A] prevailing party's counsel is entitled to reasonable compensation when he litigates his own claim for entitlement to § 1988 fees.").  In allowing awards of fees-on-fees, we have relied on the language of the rule or statute at issue.  See Jackson, 331 F.3d at 798–99; see also Fed. R. Civ. P. 11(c)(2) ("If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion [for sanctions].").  We have also reasoned that not allowing fees-on-fees would undermine the congressional policies behind awarding attorney's fees.  Jean, 863 F.2d at 780.  The same reasoning supports the same rule in the present circumstances.  The Fourth Circuit also allows fees-on-fees in other circumstances, see, e.g., Trimper v. City of Norfolk, 58 F.3d 68, 77 (4th Cir. 1995), Daly v. Hill,

71

790 F.2d 1071, 1080 (4th Cir. 1986), a fact that went unremarked in the Blue

opinion.  If, as the Blue court held, a sanction award should not include the costs

the moving party incurred in the sanction proceedings, all of those decisions,

including the Fourth Circuit's own Daly decision, are wrong.

The Tenth Circuit opinion containing language that the Amlongs rely on is

Glass v. Pfeffer, 849 F.2d 1261 (10th Cir. 1988), but that language is only dicta.

The actual decision in the Glass case upheld the inclusion in a sanctions award of

attorney's fees incurred in obtaining that award, because the sanctioned lawyers

had "engage[d] in scorched earth tactics to challenge such a fee award."  Id. at

1266.  The court speculated in dicta that "a party . . . should not always be entitled

to additional attorney's fees for defending, at a due process hearing, an earlier fee

award."  Id.  The reasoning behind the dicta was that the attorney threatened with

sanctions has "a due process right to notice and hearing to contest" sanctions,

which would "be of little value if its exercise automatically results in a still larger

fee award."  Id.

Four things about those statements in the Glass opinion.  First, they are pure

dicta because the award in that case was upheld.  Second, they were not even dicta

about § 1927 or any other statute authorizing the award of sanctions, because the

award in Glass was made under the district court's inherent authority.  See id. at

72

1263 (noting that § 1927 was not involved in the case because the version of the statute in effect at that time did not allow the award of attorney's fees for any reason); id. at 1263–64 ("The award of attorney's fees in favor of [the defendant] was justified under the district court's inherent power."). Because Glass is not a § 1927 case, at least the statements of the court in that case did not go against the plain language of the statute. Third, even freed from the constraints of the language in § 1927, the reason given for the conclusion stated in Glass is not persuasive. To say that the right of an attorney to contest sanctions would "be of little value if its exercise automatically results in a still larger fee award," id. at 1266, rests on a patently false premise: that the attorney's contest will always be unsuccessful. The result of the sanctions proceeding is not automatic. If the attorney is successful in contesting a motion to award sanctions against him there will be no award against the attorney at all, much less a larger one. Fourth and finally, the Glass court's statement—in dicta and not about § 1927—is simply that fees should not always be awarded to the moving party for defending its right to attorney's fees. We do not have that question before us. The only question before us is whether a district court "may"—and that is the operative word in § 1927, not "must"—award the moving party costs, expenses, and fees for successfully litigating the sanctions proceeding. We answer only that question. And our

73

answer is yes.

## V.

The district court did not abuse its discretion by finding that the Amlongs' creation and submission of the errata document and their continued pursuit of Norelus' claims amounted to "objectively reckless conduct" that multiplied the proceedings in this case "unreasonably and vexatiously," 28 U.S.C. § 1927. The district court also acted within the scope of its discretion by including in the sanctions award the costs, expenses, and attorney's fees incurred by the defendants in obtaining the award.

**AFFIRMED.**

74

BOWEN, District Judge, concurring in part:

I decline to join in Section III.C. of the opinion.  I concur in the remainder thereof and in the result of affirmance.

TJOFLAT, Circuit Judge, dissenting:

The court states that "[t]he issue [in this appeal] is whether creating and submitting the sixty-three page errata document and then continuing to press forward with Norelus' claims, which had been left completely unsupported once the errata document rendered her testimony useless, constituted conduct sanctionable under [28 U.S.C.] § 1927." <u>Ante</u> at 485. The Amlongs[1] did prepare the sixty-three page document, which they labeled "errata sheet" ("'errata sheet'" or "errata document"), but they did not present it to the court reporter, as Rule 30(e) of the Federal Rules of Civil Procedure requires, so it could be attached to the certificate the reporter affixed to Norelus's deposition in accordance with Rule 30(f). In short, the sixty-three page errata document was not an errata sheet as contemplated by the Federal Rules of Civil Procedure. Rather, it constituted nothing but a written communication, a letter, from Karen Amlong to defense counsel, in which Karen Amlong informed defense counsel—in keeping with her obligations under the Florida Rules of Professional Responsibility—that her client had testified falsely on deposition and provided the statements she believed her client should have made when deposed. As a consequence, the communication, instead of multiplying the proceedings, informed defense counsel that Norelus had

---

[1] I refer to the Amlong & Amlong law firm as "Amlong & Amlong" or the "Amlongs."

76

made statements to her attorneys which, when compared to what she had said on deposition, cast substantial doubt on her credibility.

Had defense counsel explained all of this to the district court, the court would have disregarded the "errata sheet" and declared that the Norelus deposition transcript certified by the court reporter constituted Norelus's deposition; Denny's, Meos, and Jawaid would not have incurred $387,738 in subsequent attorneys' fees and costs; and the court would not have sanctioned the Amlongs under 28 U.S.C. § 1927 in that amount.  In essence, the Amlongs did nothing that a reasonable attorney would not have done under the circumstances.  They plainly should not be held responsible for defense counsel's errors that ultimately prolonged this litigation unnecessarily.

This dissent is organized as follows.  Part I sets out Rule 30, explains the purpose of an errata sheet, and addresses how courts enforce Rule 30's requirements pertaining to errata sheets.  Part II initially establishes that Karen Amlong fully understood how, under Rule 30, an errata sheet becomes part of a deponent's deposition and then explains that she did not intend the "errata sheet" she sent defense counsel to comply with Rule 30 and become part of Norelus's deposition.  Part III establishes that defense counsel failed to comprehend this and, thus, erroneously concluded and represented to the court that the "errata sheet" was

77

part of Norelus's deposition.  In turn, part IV shows how defense counsel's error

led to the § 1927 sanctions at issue in this appeal.  Finally, part V explains why, in

light of the foregoing, levying these sanctions was improper.

I.

A.

Rule 30 governs "Depositions by Oral Examination."  Subdivisions (e) and

(f), in relevant part, state the following:

(e) Review by the Witness; Changes.

    (1) *Review; Statement of Changes.*  On request by the deponent or a
party before the deposition is completed, the deponent must be
allowed 30 days after being notified by the officer [(i.e, court
reporter)] that the transcript or recording is available in which:

        (A) to review the transcript or recording; and
        (B) if there are changes in form or substance, to <u>sign a statement
listing the changes and the reasons for making them.</u>

    (2) *Changes Indicated in the [Court Reporter's] Certificate.*  <u>The [court
reporter] must note in the certificate prescribed by Rule 30(f)(1)
whether a review was requested and, if so, must attach any changes
the deponent makes during the 30-day period.</u>

(f) Certification and Delivery; Exhibits; Copies of the Transcript or
Recoding; Filing.

    (1) *Certification and Delivery.*  <u>The [court reporter] must certify</u> in
writing that the witness was duly sworn and <u>that the deposition
accurately records the witness's testimony.</u>  The certificate must
accompany the record of the deposition.  Unless the court orders
otherwise, the [court reporter] must seal the deposition in an envelope

78

> . . . and must promptly send it to the attorney who arranged for the
> transcript or recording.  The attorney must store it under conditions
> that will protect it against loss, destruction, tampering, or
> deterioration.

Fed. R. Civ. P. 30(e), (f) (emphasis added).

An obvious policy underlies these provisions.  They aim to ensure that a

deposition transcript accurately reflects the questions put to and the answers given

by the deponent because the outcome of the litigation may turn on what the

deponent said.  Thus, a deponent who elects to review the deposition's transcript

must submit to the court reporter, by way of an errata sheet, changes in the

transcript that the deponent wishes to make and the reasons for the changes.  This

procedure allows the reporter to compare her shorthand notes with what she

transcribed to determine whether she erred in transposing her notes.[2]  The court

reporter also can compare the deponent's proposed changes with a tape recording

of the deposition if, as in this case, a recording was made.[3]

_____

[2] The court reporter, Jody L. Warren, took Norelus's deposition by shorthand.  I cannot
determine from the record on appeal whether Warren typed the deposition transcript straight
from her notes or dictated the words (disclosed by her notes) to a recording machine from which
she or someone else then typed the transcript.

[3] It is in the court reporter's self interest to resolve the differences between the witness's
proposed changes and the deposition transcript.  Not only is the accuracy of the deposition
transcript and, perhaps, the litigation's outcome at stake, but so is the professional reputation of
the court reporter.  A reporter flooded with lengthy errata sheets is one looking for some other
job.

Thus, implicit in subdivisions (e) and (f)'s operation is this: the court reporter considers the changes indicated in the deponent's errata sheet; if she agrees with a posited change, she will make it on the deposition transcript; or, if she does not agree with the change, the errata sheet will indicate her disagreement.

### B.

The courts, too, seek to implement Rule 30's policy of accuracy by requiring strict compliance with the Rule's procedural requirements.  See, e.g., EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 265 (3d Cir. 2010) (declaring that "[t]he procedural requirements of Rule 30(e) are clear and mandatory"); Agrizap, Inc. v. Woodstream Corp., 232 F.R.D. 491, 493 (E.D. Pa. 2006) ("[T]here is no debate that the procedural requirements of Rule 30(e) must be adhered to."); Holland v. Cedar Creek Mining, Inc., 198 F.R.D. 651, 653 (S.D.W. Va. 2001) ("This court, like most courts, will insist on strict adherence to the technical requirements of Rule 30(e).").

The first obligation is that the errata sheet be submitted to the court reporter within Rule 30(e)'s thirty-day window absent a court-approved extension.  Courts uniformly disregard untimely errata sheets, treating them as a nullity; in other words, they treat the deponent as having waived her opportunity to make changes

80

to her testimony.  E.g., Welch v. Mercer Univ., 304 Fed. Appx. 834, 838 (11th Cir.

2008) (affirming the district court's decision that denied as untimely an errata sheet

not submitted to the court reporter within Rule 30(e)'s thirty-day time frame);

Hambleton Bros. Lumber Co. v. Balkin Enters., Inc., 397 F.3d 1217, 1225–26 (9th

Cir. 2005) (excluding corrections in part because the record did not show the

plaintiff's corrections were submitted within the thirty-day deadline).

From this stricture, it follows that an errata sheet that never was submitted to

the court reporter—as was the case here—likewise is a nullity.  See e.g., Reed v.

Hernandez, 114 Fed. Appx. 609, 611 (5th Cir. 2004) (affirming exclusion of errata

sheet that had been filed outside Rule 30(e)'s thirty-day window and never

submitted to the court reporter, but rather had been attached to a response to a

motion for summary judgment, because "Rule 30(e) does not provide any

exceptions to its requirements"); Fogal v. Coastal Rest. Mgmt., Inc., 452 F. Supp.

2d. 1286, 1298 (S.D. Ga. 2004) (rejecting deposition errata sheet because it failed

to comply with Rule 30(e), as it was not appended to the deposition by a certifying

court reporter).  In such cases, once the court has excluded the putative errata

document, the deponent's original, unamended transcript certified by the court

reporter serves as the deponent's deposition testimony.

A second procedural requirement provides that if the errata sheet makes

81

"changes in form or substance," the witness must "sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1)(B). "It is not enough for the witness to give general conclusory reasons for all the changes at the end of the transcript." Sanford v. CBS, Inc., 594 F. Supp. 713, 715 (N.D. Ill. 1984). Nor is it sufficient for "the witness to record no reasons at all upon the deposition but merely to claim that the reasons are 'either explicit or reasonably implied from the circumstances.'" Id. (quoting Lugtig v. Thomas, 89 F.R.D. 639, 641 (N.D. Ill. 1981)). Rather, "the witness must state the specific reason for the particular change after each modification." Id. Courts often either strike errata sheets failing to include a statement of reasons explaining corrections, or order the witness to state the reasons with the requisite specificity. See, e.g., EBC, Inc., 618 F.3d at 266 ("Courts have found that the failure to provide a statement of reasons alone suffices to strike a proposed change." (citing Holland, 198 F.R.D. at 653; Duff v. Lobdell-Emery Mfg. Co., 926 F. Supp. 799, 804 (N.D. Ind. 1996))).

Finally, if the deponent submits her errata sheet to the court reporter within Rule 30's thirty-day deadline and provides sufficient reasons for her changes, the court may order the reopening of her deposition, subjecting her to further questioning pertaining to her amended answers. Upon such an order, "'[d]eposing counsel can ask questions which were made necessary by the changed answers,

questions about the reasons the changes were made, and questions about where the changes originated, whether with the deponent or with his attorney.'" <u>Sanford</u>, 594 F. Supp. at 715 (quoting <u>Lugtig</u>, 89 F.R.D. at 642). That said, the answers the witness originally gave to deposing counsel's questions will remain part of the record and can be read at the trial. The <u>Lugtig</u> court explained this well:

> Nothing in the language of Rule 30(e) requires or implies that the original answers are to be stricken when changes are made. In fact, the Rule's instruction that the changes be made "upon the deposition" implies the original answers will remain. Policy also supports that conclusion.
>
> The witness who changes his testimony on a material matter between the giving of his deposition and his appearance at trial may be impeached by his former answers, and the cross-examiner and the jury are likely to be keenly interested in the reasons he changed his testimony. There is no apparent reason why the witness who changes his mind between the giving of the deposition and its transcription should stand in any better case.
>
> The Rule is less likely to be abused if the deponent knows that all the circumstances—the original answers as well as the changes and the reasons—will be subject to examination by the trier of fact.

89 F.R.D. at 641–42 (citations omitted).

## II.

## A.

Karen Amlong knew well the purpose behind a Rule 30(e) errata sheet. She knew that an errata sheet is meant to alert the court reporter to possible errors in

her notes or transcription of her notes, not to materially change sworn deposition testimony or to add responses that deposing counsel's questions did not elicit.

Karen Amlong exhibited her knowledge of these errata sheet objectives when she represented Norelus at Norelus's first deposition, taken on August 3, 1995. That earlier deposition was taken by Denny's attorney, Jon Stage of Holland & Knight, before court reporter Mark Silverman.[4] At the deposition's conclusion,[5] Karen Amlong invoked Norelus's Rule 30(e) right to review the testimony transcript. Subsequently, on September 27, 1995, after obtaining an extension of the Rule's thirty-day review period, Karen Amlong submitted a Rule 30 errata sheet to the court reporter, Silverman. That errata sheet was prepared after one of the Amlongs' associates,[6] accompanied by Norelus and her brother, Anthony, who acted as Norelus's interpreter,[7] visited Silverman's office and reviewed the deposition transcript.

---

[4] Averil Marcus appeared at the deposition for Meos Corp., Inc. Asif Jawaid and Raheel Hameed had been added to the case as defendants on July 27, 1995, when Norelus filed her first amended complaint. They were not served with process, however, until sometime after August 3, and therefore neither of them appeared nor was represented at the August 3 proceeding. Norelus's brother, Anthony Norelus, attended the proceeding as a spectator. A Creole language interpreter translated Stage's questions into Creole for Norelus and Norelus's answers into English.

[5] The deposition began at 11:29 a.m. and ended at 5:10 p.m. the same day.

[6] The record does not contain the associate's identity.

[7] Norelus lacked the funds to pay for a licensed Creole interpreter.

84

The transcript consisted of 153 pages. The errata sheet, however, posited corrections to only four of those pages and, itself, was less than one page in length. Further, only one of the corrections added words to an answer Norelus had given in response to a question posed by Stage.[8] Silverman, having received the errata sheet in compliance with Rule 30(e), attached it to the deposition and sent the deposition to Holland & Knight with his Rule 30(f) certificate.

As the next subpart makes clear, it appears obvious that when we take into account Karen Amlong's behavior following Norelus's first deposition, which indicated that she fully understood the operation of Rule 30, we must reach the conclusion that she did not intend Norelus's later "errata sheet"—the one at issue here—to function as a formal Rule 30 errata sheet with legal effect.

### B.

Norelus's second deposition commenced on January 9, 1996.[9] Karen Amlong assigned Lisa Stern, a new associate at Amlong & Amlong, the task of representing Norelus during the proceeding, and the deposition took all or part of

---

[8]   As transcribed, line 21 on page 53 of the deposition reported Norelus's answer as "No" to the question: "He made an unwelcomed sexual advance toward you on the third time; you didn't welcome it, you didn't invite it, it wasn't voluntary?" On the errata sheet, Norelus gave this answer: "It was not voluntary. It was unwelcomed. I did not invite it."

[9]   The deposition was taken pursuant to the notice of taking deposition that Jawaid's counsel, Conroy, Simberg & Lewis, filed on November 27, 1995. Jody L. Warren served as court reporter; Gerald Brossard functioned as Norelus's Creole language interpreter.

eight days and ended on February 14, 1996. Upon the deposition's conclusion, Stern invoked Norelus's Rule 30(e) right to review her deposition's transcripts. Stern needed more than thirty days to review the transcripts, and the district court granted her an extension, until June 20, 1996, to complete her review. Stern did so—under Karen Amlong's supervision.

When finished, Stern's review yielded the sixty-three page errata document consisting of 868 changes. Karen Amlong, however, never submitted this "errata sheet"—in the form of a signed "statement listing the changes and the reasons for making them"—to the court reporter in accordance with Rule 30(e). The errata document, as a consequence, never became part of Norelus's deposition via the reporter's Rule 30(f) certification. Instead, as defense counsel has declared, Karen Amlong presented the document to them alone.

It is obvious why Karen Amlong opted not to submit to the court reporter the errata document given to her by Stern: she knew that the court reporter could not possibly have made 868 transcription errors. Moreover, most of the errata document's changes consisted of new "testimony," that is, the document (1) materially changed answers Norelus had given to questions posed to her, and (2) contained statements unresponsive to any of the questions put to her. Amlong knew that such testimony would not qualify as "changes" under Rule 30(e).

86

In light of Norelus's multitude of amendments, however, Karen Amlong faced a serious dilemma—and she knew it.  Stern, in reviewing the deposition transcripts with Norelus and her Creole interpreters, Norelus's brothers Anthony and Luke and her friend Immaculata Charles,[10] discovered that much of what Norelus was telling her (through these interpreters) proved starkly inconsistent with her original deposition statements.  In other words, Stern learned that Norelus potentially had lied, and Karen Amlong realized this.  In light of this discovery, Karen Amlong felt ethically obligated to reveal Norelus's inconsistencies to defense counsel, and she used Stern's "errata sheet" as the vehicle to make this disclosure.[11]

Karen Amlong's sense of obligation derived from the Florida Rules of Professional Conduct.  Those rules required her to inform opposing counsel of Norelus's inconsistent statements.  For instance, Florida Rule of Professional Conduct 4-3.3(a)(4), which governs an attorney's duty of candor to a tribunal, declares:  "A lawyer shall not knowingly . . . permit any witness . . . to offer

---

[10]  Norelus lacked funds to hire a Creole interpreter.  The record suggests that all three interpreters, her brothers and Charles, were not present each time Stern and Norelus went to the court reporter's office to review the deposition transcript.

[11] As the court has observed, "Karen Amlong testified that the Amlongs' purpose in submitting the novella-length errata sheet was 'not to hide things from people, but to make full disclosure' in order to 'do the best job [they] could to present as honestly as [they] could what the truth was.'" Ante at 34.

testimony or other evidence that the lawyer knows to be false. . . . If a lawyer has offered material evidence and thereafter comes to know of its falsity, <u>the lawyer shall take reasonable remedial measures.</u>" Fla. Bar Reg. R. 4-3.3(a)(4) (emphasis added). This rule equally "applies when the lawyer is representing a client in an ancillary proceeding conducted pursuant to the tribunal's adjudicative authority, such as a deposition." Fla. Bar Reg. R. 4-3.3 cmt. 1.

Additionally, Florida Rule of Professional Conduct 4-3.4(b), which governs a lawyer's obligation of candor to her opponent, works in combination with Rule 4-3.3. Rule 4-3.3 embodies the ideal that every lawyer serves, not only as an advocate, but as an officer of the court. Thus, each lawyer owes basic duties of fairness to opposing counsel. To encourage fairness to opponents, Rule 4-3.4(b) declares that "[a] lawyer shall not . . . counsel or <u>assist</u> a witness to testify falsely." Fla. Bar Reg. R. 4-3.4(b) (emphasis added). If a client testifies falsely, and the attorney knows this, the attorney's professional obligation is to take reasonable steps to remedy the error. In other words, the lawyer owes her opponent a duty to disclose her client's truthful testimony; otherwise, the attorney wrongfully "assists" his client in testifying falsely. <u>See, e.g.</u>, <u>Harrison v. Miss. Bar</u>, 637 So. 2d 204, 225 (Miss. 1994) (finding that attorney violated Mississippi's professional responsibility rule 3.4(b), the language of which mirrors Florida's rule, because he

failed to disclose the falsity of his client's testimony).

Karen Amlong used the Stern-created "errata sheet" as a means to comply with these professional responsibility rules, notwithstanding the fact that it could prove detrimental to her client's case. The document—which amounted to nothing more than a letter between opposing counsel—armed defense counsel with advance notice of what Norelus would say when called to the witness stand and thus created a significant hurdle for Amlong to overcome at trial.[12] It proves extremely difficult to envision any strategic advantage Karen Amlong gained for Norelus by way of her disclosures.

III.

On August 1, 1996, after Karen Amlong presented the errata document to

_____

[12] The errata document, however, had dubious evidentiary value. As highlighted above, it constituted nothing more than a written communication—a letter—from Karen Amlong to defense counsel that informed them that her client had testified falsely on deposition and posited statements she thought her client should have made initially. True, Norelus signed her errata document, certifying under oath that she had "read" the deposition transcript and "that said transcript is a true and accurate recording of the proceedings had at the time and place designated, with the exceptions, if any, on the ERRATA sheet." But Norelus could not adequately read English, which is why she needed an interpreter to tell her in Creole what the transcript revealed. Nor, for that same reason, could she effectively read the "errata sheet." Stern prepared the errata document, and nothing in the record indicates that an interpreter read it to Norelus after Stern prepared it. It appears that the "errata sheet" reflects what one or more of the interpreters told Stern that Norelus had expressed in Creole. The interpreters were potential witnesses. They could relate, as party admissions, what Norelus told them, but neither Stern nor Karen Amlong could do so. All Stern could relate is what the interpreters told her; all Amlong could relate is what Stern told her.

counsel for defendants Denny's, Meos, and Jawaid, those defendants jointly moved the district court to dismiss Norelus's case on the ground that the scope and breadth of the "errata sheet" changes demonstrated that Norelus had perjured herself on deposition. Alternatively, the motion indicated that "[i]f . . . th[e] Court decides not to dismiss Plaintiff's case, Defendant's [sic] reluctantly request that this Court strike Plaintiff's errata sheet and treat Plaintiff's deposition as if she refused to sign the deposition or waived signing it." (emphasis in original). As a final alternative, the motion requested that the court reopen Norelus's deposition.

The substantive basis for defense counsel's motion to strike the "errata sheet" was, in essence, that the framers of Rule 30(e)(1)(B) did not contemplate that "changes in form or substance" included statements that directly contradict those made by the witness during her deposition or those not responsive to the questions put to the witness during her deposition. As authority for this proposition, defense counsel cited Greenway v. International Paper Co., which declared that Rule 30(e) "cannot be interpreted to allow one to alter what was said under oath" through substantive amendments in an errata sheet. 144 F.R.D. 322, 325 (W.D. La. 1992). According to the Greenway court, the rationale for this interpretation is that if a deponent could substantively amend her deposition testimony through an errata sheet, she "could merely answer the questions with no

90

thought at all then return home and plan artful responses.  Depositions differ from interrogatories in that regard.  A deposition is not a take home examination."  Id.  In Greenway, on deposing counsel's motion, the district court struck the errata sheet, which had been properly submitted to the court reporter under Rule 30(e), for attempting to substantively amend the deposition testimony; ordered that "the deposition . . . be treated as if the plaintiff refused to sign the deposition or ha[d] waived the signing of the deposition"; and directed the court reporter to certify the deposition in accordance with its order.  Id.

In the present case, defense counsel knew that the "errata sheet" had been presented only to them by Karen Amlong and not submitted to the court reporter and thereafter made part of Norelus's deposition via the reporter's certification under Rule 30.  Defense counsel, however, failed to inform the district court of this fact—in both their motion to strike or their supporting memorandum.[13]  To the contrary, they implied that the "errata sheet" had been made part of Norelus's

---

[13] In support of their motion to strike and to show Norelus had violated the Greenway principle, defense counsel provided the court with a copy of the "errata sheet" and merely "highlighted select excerpts of [Norelus's] changes which [were] directly relevant to her allegations to illustrate the length and breadth of [her] misrepresentations."  They did so, they claimed, because "detailing every change in [Norelus's] deposition would require volumes, rather than a memorandum of law."  As a result of this tactic, however, the court had no way in which to determine whether Norelus's errata document had been attached to the court reporter's Rule 30(f) certificate.

deposition under the court reporter's certification.  Their citation to <u>Greenway</u>
highlights this.  The <u>Greenway</u> errata sheet was struck for making substantive
changes.  Importantly, however, that errata sheet had been properly submitted to
the court reporter under Rule 30(e).  Logically this makes sense: in order for a
court to strike a Rule 30(e) errata sheet for making substantive amendments to
deposition testimony, <u>there first must be a Rule 30(e) errata sheet</u>—that is, one in
compliance with the Rule's procedural mandates.  In the present case, however,
none existed; yet, the district court was led to believe otherwise.

Additionally, assuming that the district court might not strike the "errata
sheet," defense counsel, citing <u>Lugtig v. Thomas</u>, 89 F.R.D. 639 (N.D. Ill. 1981),
alternatively moved the court to reopen Norelus's deposition.  <u>Lugtig</u>, like
<u>Greenway</u>, involved an errata sheet that contained numerous substantive changes.
But, as in <u>Greenway</u>, the <u>Lugtig</u> errata sheet had properly been submitted to the
court reporter under Rule 30(e).  The deposed witness was the defendant, who, in
submitting his changes to the reporter, failed to state the reasons for them, as
required by Rule 30(e)(1)(B).  The district court ordered the defendant "to have the
changes he wishe[d] to make in his deposition testimony and the reasons for the
changes written in the deposition at the point of change and after the original
answers by the reporter."  89 F.R.D. at 642.  Depending on the extent of the

92

Case 0:17-cv-60533-JEM   Document 208   Entered on FLSD Docket 06/21/2019   Page 100 of
105
Case 1:94-cv-02680-JAL   Document 626   Entered on FLSD Docket 01/12/2012   Page 95 of 100

changes, the court indicated that the witness may be required to submit to further

questioning (on deposition).  <u>Id.</u>  Once again, however, a proper Rule 30 errata

sheet remained a prerequisite to the deposition's reopening based upon the

amended answers.  And, yet again, because defense counsel, here, cited this

authority, the district court was led to believe that a legally effective document

existed when one, in fact, did not.

IV.

The district court entertained defense counsel's motion on paper—that is,

without a face-to-face meeting with the parties' attorneys.  As a consequence, and

because the motion suggested that Norelus's errata document complied with Rule

30,[14] the district court, in an August 26, 1996 order, citing <u>Lugtig v. Thomas</u>,

declared that "[a]fter a deponent changes a deposition <u>in accordance with Fed. R.</u>

<u>Civ. P. 30(e)</u>, the deposition will be reopened if the deponent's changes make the

deposition incomplete or useless without further testimony."  <u>Lugtig</u>, 89 F.R.D. at

642 (emphasis added).  The court has fully relayed the facts that occurred

thereafter that ultimately resulted in the district court's levying over $387,000 in

---

[14] As highlighted in part III, by citing <u>Greenway v. International Paper Co.</u>, 144 F.R.D. 322 (W.D. La. 1992), and <u>Lugtig v. Thomas</u>, 89 F.R.D. 639 (N.D. Ill. 1981), cases in which the errata sheet had been submitted to the court reporter under Rule 30(e) and made part of the deposition under Rule 30(f), defense counsel effectively represented that the "errata sheet" at issue had likewise been submitted to the court reporter and made part of the deposition.

93

sanctions against the Amlongs. Ante at 17–21.

Had defense counsel informed the district court that Norelus's errata document had not been submitted to the court reporter in accordance with Rule 30(e)(1)(B) and thus had not been made part of Norelus's deposition via the reporter's Rule 30(f) certification, the district court would have (1) concluded that the "errata sheet" amounted to nothing more than a letter from Karen Amlong to opposing counsel; (2) treated the "errata sheet" as a nullity, having no legal effect; (3) held that Norelus waived her right to read and sign her deposition; and (4) ordered that her deposition on record would consist of the original transcript as certified by the court reporter. Because of defense counsel's failure to inform the district court of the "errata sheet's" non-existent legal status, however, the district court never could reach the proper disposition of the defendants' August 1, 1996 motion and the litigation continued. As the next part suggests, this is no basis on which to impose sanctions.

V.

A.

In Amlong & Amlong v. Denny's, Inc. ("Amlong I"), this court said that "the plain language of [28 U.S.C. § 1927] imposes three requirements for an award of sanctions" under the statute:

94

> First, the attorney must engage in "unreasonable and vexatious"
> conduct. Second, that "unreasonable and vexatious" conduct must be
> conduct that "multiplies the proceedings." Finally, the dollar amount
> of the sanction must bear a financial nexus to the excess proceedings,
> i.e., the sanction may not exceed the "costs, expenses, and attorneys'
> fees reasonably incurred because of such conduct."

500 F.3d 1230, 1239 (11th Cir. 2007) (quoting Peterson v. BAI Refractories, 124

F.3d 1386, 1396 (11th Cir. 1997)).

"[A]n attorney multiplies proceedings 'unreasonably and vexatiously' within

the meaning of the statute only when the attorney's conduct is so egregious that it

is 'tantamount to bad faith.'" Id. (quoting Avirgan v. Hull, 932 F.2d 1572, 1582

(11th Cir. 1991)).

> [F]or purposes of § 1927, bad faith turns not on the attorney's
> subjective intent, but on the attorney's objective conduct.
> The term "unreasonably" necessarily connotes that the district court
> must compare the attorney's conduct against the conduct of a
> "reasonable" attorney and make a judgment about whether the
> conduct was acceptable according to some objective standard. The
> term "vexatiously" similarly requires an evaluation of the attorney's
> objective conduct.

Id. at 1239–40 (citations omitted).

## B.

With this objective standard in mind, I consider what a reasonable attorney

in Karen Amlong's position would have done when faced with the sixty-three page

95

errata sheet Stern prepared.[15]  As highlighted, the reasonable attorney would not

have sent it to the court reporter because it did not propose the sort of "changes"

the framers of Rule 30(e) contemplated.  To the contrary, Karen Amlong did

exactly what a reasonable—and ethical—lawyer would have done.

Karen Amlong did not take the Rule 30(e)(1)(B) step and send the court

reporter a signed statement of changes.  She, instead, provided defense counsel

with the statements Norelus had made to her interpreters and, via the interpreters,

to Stern.  She disclosed the statements in a document that, although entitled "errata

sheet," had no more legal efficacy than a letter.  In the district court's view, and the

court's today, sending the document to defense counsel multiplied the proceedings

unreasonably and vexatiously and rendered the Amlongs amenable to § 1927

sanctions.

I cannot agree.  If anything, providing defense counsel with the statements

was professionally appropriate—if not required.  Moreover, defense counsel's

own mistakes contributed equally to multiplying the proceedings that occurred

---

[15] One might be tempted to fault Karen Amlong for having Stern represent Norelus during the deposition at issue—including the litigation of motions relating to the taking of the deposition. Stern was a recent law school graduate and had not been a member of The Florida Bar for more than a couple of months when Amlong assigned her to Norelus's case. Assuming that Karen Amlong's judgment in doing this demonstrated a profound lack of professional judgment, I come to the conclusion that it is irrelevant to the resolution of the issue before the court today, the issue I laid quoted at the outset.

96

after their receipt of Norelus's errata document. Defense counsel indicated to the

district court that the errata document had, in fact, been properly submitted to the

court reporter in compliance with Rule 30(e). This error prolonged the litigation

that led to the defendants' additional expenditure of over $387,738 in attorneys'

fees and costs and, ultimately, caused the district court to impose § 1927 sanctions

against the Amlongs in that amount. Today, the court affirms the district court's

sanctions award and, in effect, requires the Amlongs, notwithstanding Karen

Amlong's objectively reasonable act in delivering the errata document to opposing

counsel, to shoulder the costs that defense counsel's own failings equally caused.

This is improper.

## VI.

For the foregoing reasons, I dissent.[16]

---

[16] The court correctly states that no one—not the attorneys for the parties, the magistrate judge, the district court judge, or the Amlong I panel—has explicitly acknowledged that the "errata sheet" did not become part of Norelus's deposition in accordance with Rule 30(e) and (f). The failure to point this out by the lawyers and the judges who have handled this case does not alter the facts, (1) that the court reporter never had the opportunity to consider the transcription errors she, the reporter, made according to the errata sheet, since the Amlongs did not present the document to her in conformance with Rule 30(e)(2); and (2) that the court reporter, did not certify the deposition and the errata sheet in conformance with Rule 30(f). The issue thus becomes whether this panel is foreclosed from considering those facts.

The court holds that we are precluded from considering the issue and these Rule 30 compliance facts because the Amlongs did not point them out to the district court or cite them in their brief on appeal to this court. Ante at 487-88. (The law-of-the-case doctrine does not preclude such consideration because Amlong I did not address either expressly or by necessary implication the question of whether the errata sheet became part of Norelus's deposition in accordance with Rule 30. See e.g., Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16,

---

19 (5th Cir. 1974) (discussing how the law of the case demands the lower court follow what has been decided at an earlier stage of the case either explicitly or by necessary implication).)

      As stated in part V.A, and acknowledged by the court, ante at 28, sanctions cannot be imposed under 28 U.S.C. § 1927 absent a finding of bad faith.  Simple inadvertence or attorney negligence does not suffice.  Saikil v. Mount Sterling Twp. Police Dep't., 458 F.3d 520, 532 (6th Cir. 2006).  In my view, the Amlongs were guilty of mere negligence—not bad faith—in failing to point out to the district court, and to this court on appeal, that the "errata sheet" at issue was not an errata sheet within the purview of Rule 30, but, instead, was an attempt—albeit, a highly unorthodox attempt—to inform opposing counsel of their client's altered factual position. Defense counsel, as stressed, proved just as negligent in this regard.  Had either side informed the court that the errata sheet had not been made part of Norelus's deposition in conformance with Rule 30, § 1927 sanctions never would have been imposed.

A True Copy - Attached
Clerk U.S. Court of Appeals,
Eleventh Circuit

By:
Deputy Clerk
Atlanta, Georgia

98