RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0131p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

JARED HICKLE,

*Plaintiff-Appellant,*

*v.*

AMERICAN MULTI-CINEMA, INC.,

*Defendant-Appellee.*

No. 18-4131

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:15-cv-03068—Edmund A. Sargus, Jr., District Judge.

Decided and Filed:  June 20, 2019

Before:  BOGGS, MOORE, and STRANCH, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Peter G. Friedmann, THE FRIEDMANN FIRM LLC, Columbus, Ohio, Gregory R. Mansell, MANSELL LAW LLC, Columbus, Ohio, for Appellant.  Rebecca J. Bennett, Russell T. Rendall, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Cleveland, Ohio, for Appellee.

_____

### OPINION

_____

KAREN NELSON MOORE, Circuit Judge.  In 2015, Jared Hickle was working for American Multi-Cinema, Inc. ("AMC") while also serving in the Ohio Army National Guard. AMC fired Hickle in April of that year.  AMC asserts that the termination was for "unprofessional behavior" and "impeding [an] investigation"; Hickle claims that it stemmed

from AMC's anti-military animus and therefore violated his rights under the Uniformed Services Employment and Reemployment Rights Act (USERRA) and analogous Ohio law. The district court granted AMC's motion for summary judgment on Hickle's wrongful-termination claims and later entered judgment in AMC's favor. This was an error. Hickle gathered evidence during discovery that would allow a reasonable jury to find that his military service was a motivating factor in AMC's termination decision. Therefore, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

The record before us is full of disputes of fact, with the parties presenting divergent, if not wholly contradictory, accounts of crucial events. Because we are reviewing a grant of summary judgment in AMC's favor, the facts presented below are described in the light most favorable to Hickle, the non-moving party, and with all reasonable inferences drawn in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Hickle's Career at AMC

Jared Hickle began working for AMC Lennox Town Center Theater in 2004, while he was still in high school. R. 29-1 (Hickle Dep. at 66) (Page ID #121). In 2006, he was promoted from crew member to Operations Coordinator at Easton Town Center Theater. *Id.* at 91 (Page ID #127). Then, in 2008, he joined the Ohio Army National Guard. *Id.* at 57 (Page ID #118). After joining the National Guard but before leaving for training, Hickle interviewed for a management position with the Easton General Manager, Tim Kalman. *Id.* at 125–27 (Page ID #135–36). During the interview, Hickle told Kalman that he was going to have to leave for military training for approximately six months; Kalman ended the interview immediately. *Id.* at 126–27 (Page ID #136). The person who got the promotion later told Hickle: "Thanks for joining the military. I just got promoted." *Id.* at 384–85 (Page ID #200).

AMC did promote Hickle to a management position when he returned from military training, and in April 2013 Hickle was promoted to Kitchen Manager at the Easton Theater. *Id.* at 112–16 (Page ID #132–33). In the interim, Hickle continued his military service, including serving for over a year in Afghanistan. *Id.* at 43–44 (Page ID #115).

Although AMC never prevented Hickle from fulfilling his military obligations or denied him time off, one Senior Manager, Jacqueline Adler, repeatedly expressed disapproval when Hickle had to take leave for military duty. First, Adler told Hickle "that [his] requesting time off was always frustrating to her," that "[i]t always put a major issue on her schedule," and "[s]he even made statements [that Hickle] should be moved to the front of house because there's more managers out there and it wouldn't be such a [headache] on her." *Id.* at 338–39 (Page ID #189).

The next negative comment from Adler happened in June 2014. *Id.* at 339 (Page ID #189). Hickle was scheduled to close on the Thursday preceding a military obligation that was set to begin on Friday. *Id.* Because closing shifts often ended well after midnight and orders could commence at midnight, Hickle could not close that Thursday. *Id.* at 102–03, 339–40 (Page ID #130, 189). When he told that to Adler, she told him that he "need[ed] to find another job, as [he] no longer met the . . . minimum qualifications for being employed at AMC."[1] *Id.* at 339–40 (Page ID #189). He reported this comment to Kalman, the General Manager, who said "he would take care of it." *Id.*

When Hickle returned from his military obligation, he requested a meeting with Kalman and Adler about Adler's comments, and during that meeting Hickle provided Kalman with a pamphlet on USERRA obligations. *Id.* at 380–82 (Page ID #199–200). Hickle wanted to ensure he would not be retaliated against for his service. *Id.* at 381 (Page ID #199). When Hickle gave Kalman the pamphlet, Kalman asked Hickle why he was giving it to Kalman, to which Hickle responded, "I just wanted you to have it"; Kalman then asked Hickle whether he had ever denied Hickle time off, to which Hickle responded "[n]o, I just want you to have it." R. 36 (Kalman Dep. at 86) (Page ID #1079). Kalman never attended any AMC training on USERRA compliance or asked for information on USERRA compliance. *Id.* at 87 (Page ID #1080). He knew that AMC "need[ed] to honor their [sic] days off," but "never . . . asked for specifics." *Id.*

---

[1]Adler denied threatening Hickle's job and claims that she told him only that he had "to figure out how to make it both work." R. 34 (Adler Dep. at 39–40) (Page ID #909). Whether to believe Adler or Hickle's version of events is, of course, a question of fact for the jury; it is worth noting, however, that Adler's version—that she told Hickle that he would have to figure out how "to make it both work"—is milder than a direct threat, but not free of discriminatory implications.

Adler continued to insinuate that Hickle could or should be fired for taking time off for military duty.  In February 2015, as Hickle was requesting time off for a military obligation, Adler commented that Hickle was "taking off the whole summer" and "[w]e just need to get [Hickle] replaced."  R. 29-1 (Hickle Dep. at 341) (Page ID #189).

## B. April 2015

Adler's final relevant statement was a direct threat to Hickle's job, made the same month he was fired.  In April 2015, Hickle was talking with Adler and a co-worker, Jeff Keeton, about upcoming movie releases.  *Id.* at 327–28 (Page ID #186).  Conversation turned to the upcoming "Avengers weekend,"[2] which was expected to draw large crowds to the theater; Hickle reminded Adler that he would be gone that weekend because of a military drill.  *Id.* at 328 (Page ID #186).  Adler told Hickle that he would be fired if he missed that weekend.  *Id.*  When Hickle said that firing him for missing work due to military obligations would be illegal, Adler responded by saying "that's okay.  We will find something else to terminate you on."[3]  *Id.*  Keeton heard Adler tell Hickle that requesting time off "would not be possible because it would be a busy weekend and [Hickle] could be terminated," and Keeton thought Adler's threat to fire Hickle was "serious."  R. 35 (Keeton Dep. at 11–12) (Page ID #956–57).

We turn next to the end of Hickle's shift that began on Friday, April 17, 2015 and ended in what the defendant refers to as the "chicken finger incident."  R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846); Appellee Br. at 4.  As Kitchen Manager, Hickle was responsible for supervising the employees who worked in the AMC kitchen.  According to Hickle, one of the employees, Dominique Washington, told him that another employee, Quinton Branham, had asked her to make extra food so that Branham could take the food home at the end of the night, but she refused.  R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846); *see also* R. 30-1 (Washington Statement) (Page ID #525).  After the kitchen closed, Hickle found a to-go

---

[2]Avengers: Age of Ultron premiered on May 1, 2015 and earned approximately $191 million in the United States in its opening weekend.  *Avengers: Age of Ultron*, IMDB, https://www.imdb.com/title/tt2395427/ (last visited May 9, 2019).

[3]AMC argues that Adler was joking, and that Hickle understood that to be so.  Appellee Br. at 16–20.  Whether Adler was joking is a question of fact that cannot be resolved as a matter of law.

container with ten chicken fingers in it (more than the amount an employee was allowed to take home for a shift meal).  Branham said it was his but that he did not make the extra chicken fingers illicitly.  R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846); *see also* R. 29-1 (Hickle Dep. at 172) (Page ID #147).  Rather, Branham claimed that the extra fingers were abandoned and otherwise would have been thrown out.  R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47).  Branham then began cursing and speaking inappropriately toward Hickle; Hickle asserts that he did not lose his temper or otherwise act unprofessionally toward Branham, although Branham reported otherwise to AMC.  *Id.*; R. 30-1 (Branham Statements) (Page ID #518–23).  Hickle then told the other employees that they could not take food home that night and instead should take a break to eat their meals at the theater.  One employee, Dwight Williams, objected to Hickle's command and started cursing at Hickle and otherwise acting disrespectfully.  R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47); *see also* R. 30-1 (Williams Statement) (Page ID #533).  Again, Hickle maintains he did not respond in kind, although Williams reported otherwise to AMC.  R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47); R. 30-1 (Williams Statement) (Page ID #533).  Hickle typed up a statement of events before he went home for the night.  R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47).  Branham and Williams were eventually terminated for their part in the incident.  R. 29-1 (Hickle Dep. at 272) (Page ID #172).

The next day, April 18, 2015, a co-worker named Ricky Jones told Hickle that Adler was trying to get Hickle fired.  R. 33-6 (Apr. 19, 2015 Hickle Statement) (Page ID #850).  Adler, as a Senior Manager, did not have the authority to terminate Hickle.  She was plotting, according to Jones, to get Hickle fired by having employees write complaints about Hickle that would be sent to AMC headquarters, eventually causing Hickle's termination.  *Id.*  Jones also mentioned a plot to have someone get into an argument with Hickle in front of other staff members so that others could "write the same statement with a story they had concocted beforehand . . . [to] ensure that [Hickle] would be terminated," but there was no suggestion that any such plan came to fruition. *Id.*  Though Jones's written statement does not mention Adler as the mastermind of the plot, R. 32-2 (Jones Statement) (Page ID #747), Hickle recalls that Jones specifically told him that "it was Jackie's plot."  R. 29-1 (Hickle Dep.) (Page ID #174).  Two other employees told Hickle about this plot as well:  Dominique Washington, whom Hickle did not prompt to write a

statement about the plot, and Steven Givens, who did write a statement for Hickle.  R. 29-1 (Hickle Dep. at 288–90) (Page ID #176–77); R. 33-7 (Givens Statement) (Page ID #852). Givens's statement attributes the plot to Adler.  R. 33-7 (Givens Statement) (Page ID #852). Hickle asked Givens for a statement because Hickle had earlier texted Adler about the plot and Adler told him that "if they are telling the truth u [sic] need all of them to write statements tonight."  R. 33-8 (Text Messages) (Page ID #857–58).

## C.  The Termination

While Hickle was investigating the Adler plot, AMC was investigating Hickle.  After the chicken-finger incident, Tim Kalman, the General Manager, contacted AMC's Compliance Manager, Mary Melton-Miller, who initiated an investigation.  R. 31-1 (Melton-Miller Dep. at 21) (Page ID #551).

To understand what followed, a brief detour into AMC's organizational structure is necessary.  Kitchen Manager, Hickle's last title at AMC, is a management position in the middle of the AMC organizational chart.  *See* R. 29-1 (Hickle Dep. at Ex. B (Page ID #272).  Because AMC Easton is a "dine-in" theater, the employees are divided between "front of house" (roughly, those employees with whom customers would interact) and "back of house" (those whose work is not customer-facing, such as kitchen staff).  *Id.* at 146–47 (Page ID #141).  Aside from "film crew"—the general employees—the lowest supervisory position on the organizational chart is front-of-house or back-of-house supervisor.  *Id.* at Ex. B (Page ID #272). Next come the managers of various sectors, of which Hickle was one.  In other words, Hickle, as a Kitchen Manager, supervised the back-of-house supervisors and crew.  *Id.*  Kitchen Managers are supervised by a Senior Manager for back-of-house, who is in turn supervised by the sole General Manager.  *Id.*  Finally, the General Manager reports to AMC corporate staff.  The General Manager has the authority to fire film crew but not to fire a manager.  R. 36 (Kalman Dep. at 11) (Page ID #1004).  As to managers, the General Manager can initiate an investigation into the employee's conduct that AMC corporate's compliance office performs, but the General Manager does not have the independent authority to fire a manager.  *Id.* at 19–20 (Page ID #1012–13).  Rather, a corporate adjudicator makes the final decision on managerial terminations. R. 30-1 (Keana Bradley Dep. at 22, 24) (Page ID #485).

Returning to Hickle and the Easton theater:  neither Adler (a Senior Manager) nor Kalman (the General Manager) had independent authority to fire Hickle.  Kalman, though, had authority to, and did, initiate an investigation into Hickle's conduct.  That investigation was performed by a Compliance Manager, Mary Melton-Miller.  Her conclusions were then passed to an adjudicator—here, Keana Bradley—who made the ultimate decision.  Although Kalman did not have decisionmaking authority, both Melton-Miller and Bradley testified to his involvement in the process.  R. 31-1 (Melton-Miller Dep. at 13) (Page ID #549) ("The general manager and myself were partnering [in the investigation.]"); R. 30-1 (Bradley Dep. at 31) (Page ID #487) ("I always ask the general manager what their recommendation is. . . . [S]ince I'm not there . . . to work with this person every day, I always get the general manager's opinion.").   Bradley testified that Kalman recommended that AMC "part ways" with Hickle; Kalman says that no one asked him about Hickle's performance.  R. 30-1 (Bradley Dep. at 31) (Page ID #487); R. 36 (Kalman Dep. at 63) (Page ID #1056).

Once Kalman initiated the investigation, Hickle was suspended pending the results of the investigation.  He received notice of the suspension on April 21 via a call from Melton-Miller.  R. 29-1 (Hickle Dep. at 319) (Page ID #184).  He requested an opportunity to speak privately with her, and they had a phone conversation the next day.  *Id.* at 276, 325–26 (Page ID #173, 185–86); R. 31-1 (Melton-Miller Dep. at 26–27) (Page ID #553).  Hickle told Melton-Miller about the various comments Adler made threatening to get him fired for taking military leave and about the plot to get him fired.  R. 31-1 (Melton-Miller Dep. at 37–50 (Page ID #555–59).  At her deposition, Melton-Miller said that such discrimination would "concern" her and that she investigated it, but also, during the phone conversation with Hickle, she asked him why he was "telling [her] about it now," because "[i]f nothing ever took place, if [AMC] never denied [Hickle] the USERRA, why are we talking about it?"  *Id.* at 40 (Page ID #556).

At the close of her investigation, Melton-Miller sent various people, including Kalman and Bradley, an e-mail with the subject line "Subject: #10704 / Hickle, Jared (KM) / Easton / Suspended / Unprofessional behavior / Impeding the investigation / Investigation Completed."  R. 33-9 (E-mails) (Page ID #863).  The e-mail contained a list of facts that were "substantiated" during the allegation.  *Id.*  These were not, Melton-Miller seems to insist, necessarily the reasons

for which Hickle was terminated. *See* R. 31-1 (Melton-Miller Dep. at 68–75) (Page ID #563–65) ("Q: I don't understand how this [item on the list] is a negative factor for Jared. Maybe you can explain to me why this is of significance? [Melton-Miller]: I didn't say it was a negative."). Bradley, who made the decision to terminate Hickle, said that her decision was based on "the entire case," and told Hickle that his termination was based on "confidentiality," "impeding the investigation," and "just his overall behavior and demeanor." R. 30-1 (Bradley Dep. at 32, 40) (Page ID #487, 489).

Hickle now claims that he was wrongfully terminated in violation of USERRA and Ohio law. R. 2 (Amended Compl. at 8–9) (Page ID #20–21). The district court granted summary judgment in favor of the defendant on the wrongful-termination claims[4] and entered judgment in favor of AMC. *Hickle v. American Multi-Cinema, Inc.*, 296 F. Supp. 3d 879, 892 (S.D. Ohio 2017); R. 52 (Oct. 12, 2018 Order) (Page ID #1208). This appeal followed.

## II. ANALYSIS

We review de novo a district court's grant of summary judgment. *Savage v. Fed. Express Corp.*, 856 F.3d 440, 446 (6th Cir. 2017). Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits accrued during discovery demonstrate "that there is no genuine dispute as to any material fact" to present to a jury. Fed. R. Civ. P. 56(a), (c). The moving party—here, AMC—has the burden of showing that no such genuine dispute of fact exists, even with evidence presented in the light most favorable to the non-moving party—here, Hickle—and with all inferences drawn in his favor. *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 748 (6th Cir. 2012). In deciding a motion for summary judgment, we do not engage in "jury functions" such as making credibility determinations and weighing the evidence. *Id.* (quoting *Anderson*, 477 U.S. at 255). If there remains any material factual disagreement as to a particular legal claim, that claim must be submitted to a jury. *Id.*

---

[4]The decision denied summary judgment regarding Hickle's failure-to-promote claims. *Hickle*, 296 F. Supp. 3d at 892. The parties later stipulated to an amendment of the complaint excising those claims, which allowed the district court to enter final judgment in favor of the defendant. R. 51 (Joint Stip. to Amend the Compl.) (Page ID #1205).

Hickle presents to the court claims of wrongful termination under USERRA, 38 U.S.C. § 4311, and Ohio law that forbids an employer to discriminate based on military status, Oh. Rev. Code § 4112.02(A). The parties do not contest the district court's use of the USERRA framework to determine the Ohio law claims. *See Hickle*, 296 F. Supp. 3d at 891–92.

USERRA protects "[a] person who is a member of . . . or has an obligation to perform service in a uniformed service" from being "denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership . . . or obligation." 38 U.S.C. § 4311(a). "An employer shall be considered to have engaged in actions prohibited [by USERRA] . . . if the person's membership . . . or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . . or obligation for service." *Id.* § 4311(c)(1).

We use a two-step process to evaluate claims of discrimination in violation of USERRA. *Savage*, 856 F.3d at 447. The plaintiff must first make out a prima facie case of discrimination "by showing, by a preponderance of the evidence, that his protected status was a substantial or motivating factor in the adverse employment action." *Id.* (quoting *Petty v. Metro Gov't of Nashville-Davidson Cty.*, 538 F.3d 431, 446 (6th Cir. 2008)). If the plaintiff establishes a prima facie case of discrimination, "the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." *Id.* (quoting *Hance v. Norfolk Southern Ry. Co.*, 571 F.3d 511, 518 (6th Cir. 2009)).

## A. Hickle's Prima Facie Case

A plaintiff can present a prima facie case of discrimination using either direct or circumstantial evidence. *Bobo*, 665 F.3d at 755. We turn first to Hickle's direct evidence.

### 1. Direct Evidence

The district court reached two incorrect conclusions that led it to hold that Hickle "has not offered any direct evidence of discrimination on the basis of his military activity." *Hickle*,

296 F. Supp. 3d at 887.  First, it erred when it concluded that, because Adler did not have the authority to fire Hickle, Hickle could have proceeded only under the cat's paw theory.  *Id.* at 886.  In fact, Hickle does have evidence that ties some people involved in the termination decision to Adler's discriminatory comments.  The decisionmaker (Bradley) and those with direct input (Kalman and Melton-Miller) knew about Adler's persistent, discriminatory comments.  Hickle repeatedly complained to Kalman, who had direct input into the termination decision, about Adler's behavior.  Furthermore, the actual decisionmaker (Bradley) knew that Hickle had heard that Adler was conspiring to get him fired, and knew that Adler told Hickle to gather employees' statements.  R. 30-1 (Bradley Dep. at 32–35, 37–38) (Page ID #487–89).  In sum, the decisionmaker knew that Hickle was told to commit a fireable offense—gathering statements and thereby impeding an investigation—by someone Hickle had repeatedly said had made discriminatory comments threatening his job.  Yet the decisionmaker chose to fire Hickle.

In *Bobo*, we found sufficient direct evidence to constitute a prima facie case in remarkably similar circumstances.  There, a direct supervisor (Morton) without the authority to terminate employees expressed disapproval of the plaintiff-employee's military obligations, including writing a memorandum saying that he "did not want [the employee] volunteering for additional military duty when he was needed at [work.]"  665 F.3d at 744.  That memorandum was read by Morton's supervisor, Wagner.  *Id.* at 755.  Bobo, the plaintiff-employee, also engaged Wagner in conversations about his military leave.  *Id.*  Wagner was present at the meeting where managers decided to terminate Bobo.  *Id.*  Replace "Morton" with "Adler" and "Wagner" with "Kalman," and the facts would match almost exactly what occurred here.  We found direct evidence of a USERRA violation in *Bobo*, and we do so here, too.

Next, the district court erred by finding that Hickle could not make out a claim under the "cat's paw" theory of liability.  *Hickle*, 296 F. Supp. 3d at 887.  The "cat's paw" theory of liability, endorsed by the Supreme Court in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), deals with the realities of highly stratified workplaces.  In *Staub*, the Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."  *Id.* at 422 (footnote omitted).

No. 18-4131                    *Hickle v. Am. Multi-Cinema, Inc.*                    Page 11

The district court held that Hickle could not proceed under the cat's-paw theory because he "has not offered any evidence that Adler issued [the direction to obtain statements relating to the conspiracy plot] with the *intention* of causing Plaintiff's termination." *Hickle*, 296 F. Supp. 3d at 886.  This was an error.

Hickle offered evidence that Adler persistently made anti-military comments, up to and including threatening to get him fired for "something else" when Hickle had to miss the Avengers weekend for military duty.  He offered evidence that she was, in fact, plotting to get him fired.  This evidence is more than sufficient for a reasonable jury to infer that Adler intended to cause Hickle's termination.  The district court cited language in Hickle's initial text to Adler to reach a different conclusion, but that was an error because the district court ignored the context of the text messages.  When Hickle was first alerting Adler to the fact that someone told him about Adler's plot, he said he didn't believe it, "but it's part of what all three people told me that supervisors told them."  R. 33-8 (Text Messages) (Page ID #853).  This does not mean, as the district court concluded, that at the time Hickle did not feel Adler was trying to get him fired; rather, it is an example of an employee trying to be diplomatic with his supervisor.  Hickle said as much in his deposition.  R. 29-1 (Hickle Dep. at 287) (Page ID #176) ("I didn't want Jackie to retaliate against me and become upset.  I did want her to know that I did hear about this plot and that I was aware of it.").  The district court ignored its mandate to construe the evidence in the light most favorable to Hickle by ignoring Hickle's deposition testimony that offers a reasonable explanation why he did not accuse Adler immediately of plotting against him.

Having shown that evidence exists that Adler intended to cause Hickle's termination, we must address whether Adler's act was the proximate cause of Hickle's termination.  The record shows that this is a question for a jury to decide.  Certainly, the chicken-finger incident and the issues of Hickle's demeanor, communication, and professionalism were part of the investigation and cited by Bradley as a reason for termination.  Bradley stated in her deposition, however, that she made her decision based on all the findings presented and singled out "impeding the investigation" as a reason.  Nevertheless, the defendant insists that it broke the chain of causation by conducting a thorough and independent investigation.

We disagree.  First, as best as we can tell[5], the investigation consisted mostly of gathering statements from a few employees, and was not necessarily thorough.  For example, Melton-Miller said she could not locate any witnesses to Adler's threat to terminate Hickle, when in fact Keeton was a party to the conversation.  R. 31-1 (Melton-Miller Dep. at 39) (Page ID #556). Hickle went so far as to email Bradley about the shortcomings of the investigation, saying it was "concerning to [him]" that [Melton-Miller] did not ask for any statements" about the USERRA issues he presented.  R. 33-10 (May 11, 2015 Email) (Page ID #865–66).   Second, the investigation was not necessarily independent; for example, Melton-Miller described Kalman as her "partner" in the investigation.  Finally, as a matter of general policy, we should bear in mind why the cat's-paw doctrine exists:   in stratified workplaces, such as AMC, biased direct supervisors who lack firing authority can easily influence those who have such authority to take adverse actions.  AMC points to its own extremely stratified termination procedure in an attempt to insulate itself from liability, when in fact its procedure demonstrates circumstances in which a biased direct supervisor can make a "cat's paw" of upper management.

### 2. Circumstantial Evidence

Even if Hickle did not have direct evidence of discriminatory intent, he also presented circumstantial evidence that suggests AMC was motivated by anti-military animus.  The district court correctly concluded that Hickle made out a prima facie case of discrimination by circumstantial evidence.  It focused, correctly also, on AMC's inability to present a cogent explanation of its "impeding the investigation" allegation.  *Hickle*, 296 F. Supp. 3d at 887. Therefore we pause only to mention that, unlike the district court, we do not consider this a "close question." *Id.* at 888.  The district court thought it strong evidence in AMC's favor that AMC had never denied Hickle's requests to take time off for military obligations.  We do not find this fact to be determinative, as there could be numerous situations in which an employer would grant requests for military leave (albeit grudgingly) for years and nevertheless finally wrongfully terminate an employee for taking such leave.  Certainly, granting Hickle's leave requests helps AMC's case, but it does not insulate AMC from charges of retaliation.

---

[5]The Melton-Miller deposition is opaque and so confusing as to verge on nonsensical.

## B. AMC's Rebuttal

Because Hickle made out a prima facie case of discrimination, AMC has the burden of showing that it would have terminated Hickle even absent his military service. It cannot do so. The district court pointed to the chicken-finger incident to conclude that "AMC has therefore carried its burden to establish that it made 'a reasonably informed and considered decision before taking an adverse employment action.'" *Id.* at 889 (quoting *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010)). As discussed above, however, it remains an open question whether the decisionmaker relied solely on the chicken-finger incident in deciding to terminate Hickle, and whether she would have reached the same conclusion in the absence of the charges of impeding the investigation.

*Escher*, which the district court cites, is inapposite; in that case, the decisionmaker did not know of the plaintiff's complaints about military leave, conducted a thorough investigation, and concluded that termination was necessary based solely on nondiscriminatory reasons. 627 F.3d at 1030–31. Here, Bradley knew of Hickle's USERRA complaints and knew that Adler told Hickle to take action that would amount to impeding the investigation; nevertheless, Bradley seems to have considered the charge of impeding the investigation relevant to the decision. Thus, the honest-belief rule does not help the defendant. The "particularized facts that were before [the employer] at the time the decision was made," *Escher*, 627 F.3d at 1030 (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006)), included Adler's anti-military comments and her text to Hickle telling him to collect statements. This was not a case in which the decisionmaker was acting on a clean record and in ignorance of lurking discriminatory motives. The decisionmaker was fully aware of the facts suggesting that the "impeding the investigation" charge was pretextual. In sum, a jury could conclude, based on this set of facts, that taking military leave, a protected act under federal and Ohio law, was a motivating factor in AMC's decision to terminate his employment.

## III. CONCLUSION

For the reasons stated above, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this decision.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0131p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JARED HICKLE,

*Plaintiff-Appellant,*

*v.*

AMERICAN MULTI-CINEMA, INC.,

*Defendant-Appellee.*

No. 18-4131

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:15-cv-03068—Edmund A. Sargus, Jr., District Judge.

Decided and Filed:  June 20, 2019

Before:  BOGGS, MOORE, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Peter G. Friedmann, THE FRIEDMANN FIRM LLC, Columbus, Ohio, Gregory R. Mansell, MANSELL LAW LLC, Columbus, Ohio, for Appellant.   Rebecca J. Bennett, Russell T. Rendall, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge.   In 2015, Jared Hickle was working for American Multi-Cinema, Inc. ("AMC") while also serving in the Ohio Army National Guard. AMC fired Hickle in April of that year.   AMC asserts that the termination was for "unprofessional behavior" and "impeding [an] investigation"; Hickle claims that it stemmed

from AMC's anti-military animus and therefore violated his rights under the Uniformed Services Employment and Reemployment Rights Act (USERRA) and analogous Ohio law.  The district court granted AMC's motion for summary judgment on Hickle's wrongful-termination claims and later entered judgment in AMC's favor.  This was an error.  Hickle gathered evidence during discovery that would allow a reasonable jury to find that his military service was a motivating factor in AMC's termination decision.  Therefore, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND

The record before us is full of disputes of fact, with the parties presenting divergent, if not wholly contradictory, accounts of crucial events.  Because we are reviewing a grant of summary judgment in AMC's favor, the facts presented below are described in the light most favorable to Hickle, the non-moving party, and with all reasonable inferences drawn in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.  Hickle's Career at AMC

Jared Hickle began working for AMC Lennox Town Center Theater in 2004, while he was still in high school.  R. 29-1 (Hickle Dep. at 66) (Page ID #121).  In 2006, he was promoted from crew member to Operations Coordinator at Easton Town Center Theater.  *Id.* at 91 (Page ID #127).  Then, in 2008, he joined the Ohio Army National Guard.  *Id.* at 57 (Page ID #118). After joining the National Guard but before leaving for training, Hickle interviewed for a management position with the Easton General Manager, Tim Kalman.  *Id.* at 125–27 (Page ID #135–36).  During the interview, Hickle told Kalman that he was going to have to leave for military training for approximately six months; Kalman ended the interview immediately.  *Id.* at 126–27 (Page ID #136).  The person who got the promotion later told Hickle:  "Thanks for joining the military.  I just got promoted."  *Id.* at 384–85 (Page ID #200).

AMC did promote Hickle to a management position when he returned from military training, and in April 2013 Hickle was promoted to Kitchen Manager at the Easton Theater.  *Id.* at 112–16 (Page ID #132–33).  In the interim, Hickle continued his military service, including serving for over a year in Afghanistan.  *Id.* at 43–44 (Page ID #115).

Although AMC never prevented Hickle from fulfilling his military obligations or denied him time off, one Senior Manager, Jacqueline Adler, repeatedly expressed disapproval when Hickle had to take leave for military duty.  First, Adler told Hickle "that [his] requesting time off was always frustrating to her," that "[i]t always put a major issue on her schedule," and "[s]he even made statements [that Hickle] should be moved to the front of house because there's more managers out there and it wouldn't be such a [headache] on her." *Id.* at 338–39 (Page ID #189).

The next negative comment from Adler happened in June 2014.  *Id.* at 339 (Page ID #189).  Hickle was scheduled to close on the Thursday preceding a military obligation that was set to begin on Friday.  *Id.*  Because closing shifts often ended well after midnight and orders could commence at midnight, Hickle could not close that Thursday.  *Id.* at 102–03, 339–40 (Page ID #130, 189).  When he told that to Adler, she told him that he "need[ed] to find another job, as [he] no longer met the . . . minimum qualifications for being employed at AMC."[1]  *Id.* at 339–40 (Page ID #189).  He reported this comment to Kalman, the General Manager, who said "he would take care of it."  *Id.*

When Hickle returned from his military obligation, he requested a meeting with Kalman and Adler about Adler's comments, and during that meeting Hickle provided Kalman with a pamphlet on USERRA obligations.  *Id.* at 380–82 (Page ID #199–200).  Hickle wanted to ensure he would not be retaliated against for his service.  *Id.* at 381 (Page ID #199).  When Hickle gave Kalman the pamphlet, Kalman asked Hickle why he was giving it to Kalman, to which Hickle responded, "I just wanted you to have it"; Kalman then asked Hickle whether he had ever denied Hickle time off, to which Hickle responded "[n]o, I just want you to have it."  R. 36 (Kalman Dep. at 86) (Page ID #1079).  Kalman never attended any AMC training on USERRA compliance or asked for information on USERRA compliance.  *Id.* at 87 (Page ID #1080).  He knew that AMC "need[ed] to honor their [sic] days off," but "never . . . asked for specifics."  *Id.*

---

[1]Adler denied threatening Hickle's job and claims that she told him only that he had "to figure out how to make it both work."  R. 34 (Adler Dep. at 39–40) (Page ID #909).  Whether to believe Adler or Hickle's version of events is, of course, a question of fact for the jury; it is worth noting, however, that Adler's version—that she told Hickle that he would have to figure out how "to make it both work"—is milder than a direct threat, but not free of discriminatory implications.

Adler continued to insinuate that Hickle could or should be fired for taking time off for military duty.  In February 2015, as Hickle was requesting time off for a military obligation, Adler commented that Hickle was "taking off the whole summer" and "[w]e just need to get [Hickle] replaced."  R. 29-1 (Hickle Dep. at 341) (Page ID #189).

## B. April 2015

Adler's final relevant statement was a direct threat to Hickle's job, made the same month he was fired.  In April 2015, Hickle was talking with Adler and a co-worker, Jeff Keeton, about upcoming movie releases.  *Id.* at 327–28 (Page ID #186).  Conversation turned to the upcoming "Avengers weekend,"[2] which was expected to draw large crowds to the theater; Hickle reminded Adler that he would be gone that weekend because of a military drill.  *Id.* at 328 (Page ID #186).  Adler told Hickle that he would be fired if he missed that weekend.  *Id.*  When Hickle said that firing him for missing work due to military obligations would be illegal, Adler responded by saying "that's okay.  We will find something else to terminate you on."[3]  *Id.*  Keeton heard Adler tell Hickle that requesting time off "would not be possible because it would be a busy weekend and [Hickle] could be terminated," and Keeton thought Adler's threat to fire Hickle was "serious."  R. 35 (Keeton Dep. at 11–12) (Page ID #956–57).

We turn next to the end of Hickle's shift that began on Friday, April 17, 2015 and ended in what the defendant refers to as the "chicken finger incident."  R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846); Appellee Br. at 4.  As Kitchen Manager, Hickle was responsible for supervising the employees who worked in the AMC kitchen.  According to Hickle, one of the employees, Dominique Washington, told him that another employee, Quinton Branham, had asked her to make extra food so that Branham could take the food home at the end of the night, but she refused.  R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846); *see also* R. 30-1 (Washington Statement) (Page ID #525).  After the kitchen closed, Hickle found a to-go

---

[2]Avengers: Age of Ultron premiered on May 1, 2015 and earned approximately $191 million in the United States in its opening weekend.  *Avengers: Age of Ultron*, IMDB, https://www.imdb.com/title/tt2395427/ (last visited May 9, 2019).

[3]AMC argues that Adler was joking, and that Hickle understood that to be so.  Appellee Br. at 16–20.  Whether Adler was joking is a question of fact that cannot be resolved as a matter of law.

container with ten chicken fingers in it (more than the amount an employee was allowed to take home for a shift meal). Branham said it was his but that he did not make the extra chicken fingers illicitly. R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846); *see also* R. 29-1 (Hickle Dep. at 172) (Page ID #147). Rather, Branham claimed that the extra fingers were abandoned and otherwise would have been thrown out. R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47). Branham then began cursing and speaking inappropriately toward Hickle; Hickle asserts that he did not lose his temper or otherwise act unprofessionally toward Branham, although Branham reported otherwise to AMC. *Id.*; R. 30-1 (Branham Statements) (Page ID #518–23). Hickle then told the other employees that they could not take food home that night and instead should take a break to eat their meals at the theater. One employee, Dwight Williams, objected to Hickle's command and started cursing at Hickle and otherwise acting disrespectfully. R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47); *see also* R. 30-1 (Williams Statement) (Page ID #533). Again, Hickle maintains he did not respond in kind, although Williams reported otherwise to AMC. R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47); R. 30-1 (Williams Statement) (Page ID #533). Hickle typed up a statement of events before he went home for the night. R. 33-3 (Apr. 17, 2015 Hickle Statement) (Page ID #846–47). Branham and Williams were eventually terminated for their part in the incident. R. 29-1 (Hickle Dep. at 272) (Page ID #172).

The next day, April 18, 2015, a co-worker named Ricky Jones told Hickle that Adler was trying to get Hickle fired. R. 33-6 (Apr. 19, 2015 Hickle Statement) (Page ID #850). Adler, as a Senior Manager, did not have the authority to terminate Hickle. She was plotting, according to Jones, to get Hickle fired by having employees write complaints about Hickle that would be sent to AMC headquarters, eventually causing Hickle's termination. *Id.* Jones also mentioned a plot to have someone get into an argument with Hickle in front of other staff members so that others could "write the same statement with a story they had concocted beforehand . . . [to] ensure that [Hickle] would be terminated," but there was no suggestion that any such plan came to fruition. *Id.* Though Jones's written statement does not mention Adler as the mastermind of the plot, R. 32-2 (Jones Statement) (Page ID #747), Hickle recalls that Jones specifically told him that "it was Jackie's plot." R. 29-1 (Hickle Dep.) (Page ID #174). Two other employees told Hickle about this plot as well: Dominique Washington, whom Hickle did not prompt to write a

statement about the plot, and Steven Givens, who did write a statement for Hickle.  R. 29-1 (Hickle Dep. at 288–90) (Page ID #176–77); R. 33-7 (Givens Statement) (Page ID #852). Givens's statement attributes the plot to Adler.  R. 33-7 (Givens Statement) (Page ID #852). Hickle asked Givens for a statement because Hickle had earlier texted Adler about the plot and Adler told him that "if they are telling the truth u [sic] need all of them to write statements tonight."  R. 33-8 (Text Messages) (Page ID #857–58).

## C.  The Termination

While Hickle was investigating the Adler plot, AMC was investigating Hickle.  After the chicken-finger incident, Tim Kalman, the General Manager, contacted AMC's Compliance Manager, Mary Melton-Miller, who initiated an investigation.  R. 31-1 (Melton-Miller Dep. at 21) (Page ID #551).

To understand what followed, a brief detour into AMC's organizational structure is necessary.  Kitchen Manager, Hickle's last title at AMC, is a management position in the middle of the AMC organizational chart.  *See* R. 29-1 (Hickle Dep. at Ex. B (Page ID #272).  Because AMC Easton is a "dine-in" theater, the employees are divided between "front of house" (roughly, those employees with whom customers would interact) and "back of house" (those whose work is not customer-facing, such as kitchen staff).  *Id.* at 146–47 (Page ID #141).  Aside from "film crew"—the general employees—the lowest supervisory position on the organizational chart is front-of-house or back-of-house supervisor.  *Id.* at Ex. B (Page ID #272). Next come the managers of various sectors, of which Hickle was one.  In other words, Hickle, as a Kitchen Manager, supervised the back-of-house supervisors and crew.  *Id.*  Kitchen Managers are supervised by a Senior Manager for back-of-house, who is in turn supervised by the sole General Manager.  *Id.*  Finally, the General Manager reports to AMC corporate staff.  The General Manager has the authority to fire film crew but not to fire a manager.  R. 36 (Kalman Dep. at 11) (Page ID #1004).  As to managers, the General Manager can initiate an investigation into the employee's conduct that AMC corporate's compliance office performs, but the General Manager does not have the independent authority to fire a manager.  *Id.* at 19–20 (Page ID #1012–13).  Rather, a corporate adjudicator makes the final decision on managerial terminations. R. 30-1 (Keana Bradley Dep. at 22, 24) (Page ID #485).

Returning to Hickle and the Easton theater: neither Adler (a Senior Manager) nor Kalman (the General Manager) had independent authority to fire Hickle. Kalman, though, had authority to, and did, initiate an investigation into Hickle's conduct. That investigation was performed by a Compliance Manager, Mary Melton-Miller. Her conclusions were then passed to an adjudicator—here, Keana Bradley—who made the ultimate decision. Although Kalman did not have decisionmaking authority, both Melton-Miller and Bradley testified to his involvement in the process. R. 31-1 (Melton-Miller Dep. at 13) (Page ID #549) ("The general manager and myself were partnering [in the investigation.]"); R. 30-1 (Bradley Dep. at 31) (Page ID #487) ("I always ask the general manager what their recommendation is. . . . [S]ince I'm not there . . . to work with this person every day, I always get the general manager's opinion."). Bradley testified that Kalman recommended that AMC "part ways" with Hickle; Kalman says that no one asked him about Hickle's performance. R. 30-1 (Bradley Dep. at 31) (Page ID #487); R. 36 (Kalman Dep. at 63) (Page ID #1056).

Once Kalman initiated the investigation, Hickle was suspended pending the results of the investigation. He received notice of the suspension on April 21 via a call from Melton-Miller. R. 29-1 (Hickle Dep. at 319) (Page ID #184). He requested an opportunity to speak privately with her, and they had a phone conversation the next day. *Id.* at 276, 325–26 (Page ID #173, 185–86); R. 31-1 (Melton-Miller Dep. at 26–27) (Page ID #553). Hickle told Melton-Miller about the various comments Adler made threatening to get him fired for taking military leave and about the plot to get him fired. R. 31-1 (Melton-Miller Dep. at 37–50 (Page ID #555–59). At her deposition, Melton-Miller said that such discrimination would "concern" her and that she investigated it, but also, during the phone conversation with Hickle, she asked him why he was "telling [her] about it now," because "[i]f nothing ever took place, if [AMC] never denied [Hickle] the USERRA, why are we talking about it?" *Id.* at 40 (Page ID #556).

At the close of her investigation, Melton-Miller sent various people, including Kalman and Bradley, an e-mail with the subject line "Subject: #10704 / Hickle, Jared (KM) / Easton / Suspended / Unprofessional behavior / Impeding the investigation / Investigation Completed." R. 33-9 (E-mails) (Page ID #863). The e-mail contained a list of facts that were "substantiated" during the allegation. *Id.* These were not, Melton-Miller seems to insist, necessarily the reasons

for which Hickle was terminated. *See* R. 31-1 (Melton-Miller Dep. at 68–75) (Page ID #563–65) ("Q: I don't understand how this [item on the list] is a negative factor for Jared. Maybe you can explain to me why this is of significance?  [Melton-Miller]: I didn't say it was a negative."). Bradley, who made the decision to terminate Hickle, said that her decision was based on "the entire case," and told Hickle that his termination was based on "confidentiality," "impeding the investigation," and "just his overall behavior and demeanor." R. 30-1 (Bradley Dep. at 32, 40) (Page ID #487, 489).

Hickle now claims that he was wrongfully terminated in violation of USERRA and Ohio law. R. 2 (Amended Compl. at 8–9) (Page ID #20–21).  The district court granted summary judgment in favor of the defendant on the wrongful-termination claims[4] and entered judgment in favor of AMC. *Hickle v. American Multi-Cinema, Inc.*, 296 F. Supp. 3d 879, 892 (S.D. Ohio 2017); R. 52 (Oct. 12, 2018 Order) (Page ID #1208).  This appeal followed.

## II. ANALYSIS

We review de novo a district court's grant of summary judgment. *Savage v. Fed. Express Corp.*, 856 F.3d 440, 446 (6th Cir. 2017).  Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits accrued during discovery demonstrate "that there is no genuine dispute as to any material fact" to present to a jury. Fed. R. Civ. P. 56(a), (c).  The moving party—here, AMC—has the burden of showing that no such genuine dispute of fact exists, even with evidence presented in the light most favorable to the non-moving party—here, Hickle—and with all inferences drawn in his favor.  *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 748 (6th Cir. 2012).  In deciding a motion for summary judgment, we do not engage in "jury functions" such as making credibility determinations and weighing the evidence. *Id.* (quoting *Anderson*, 477 U.S. at 255).  If there remains any material factual disagreement as to a particular legal claim, that claim must be submitted to a jury.  *Id.*

---

[4]The decision denied summary judgment regarding Hickle's failure-to-promote claims. *Hickle*, 296 F. Supp. 3d at 892.  The parties later stipulated to an amendment of the complaint excising those claims, which allowed the district court to enter final judgment in favor of the defendant. R. 51 (Joint Stip. to Amend the Compl.) (Page ID #1205).

Hickle presents to the court claims of wrongful termination under USERRA, 38 U.S.C. § 4311, and Ohio law that forbids an employer to discriminate based on military status, Oh. Rev. Code § 4112.02(A).   The parties do not contest the district court's use of the USERRA framework to determine the Ohio law claims. *See Hickle*, 296 F. Supp. 3d at 891–92.

USERRA protects "[a] person who is a member of . . . or has an obligation to perform service in a uniformed service" from being "denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership . . . or obligation." 38 U.S.C. § 4311(a).   "An employer shall be considered to have engaged in actions prohibited [by USERRA] . . . if the person's membership . . . or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . . or obligation for service." *Id.* § 4311(c)(1).

We use a two-step process to evaluate claims of discrimination in violation of USERRA. *Savage*, 856 F.3d at 447.   The plaintiff must first make out a prima facie case of discrimination "by showing, by a preponderance of the evidence, that his protected status was a substantial or motivating factor in the adverse employment action." *Id.* (quoting *Petty v. Metro Gov't of Nashville-Davidson Cty.*, 538 F.3d 431, 446 (6th Cir. 2008)).   If the plaintiff establishes a prima facie case of discrimination, "the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason." *Id.* (quoting *Hance v. Norfolk Southern Ry. Co.*, 571 F.3d 511, 518 (6th Cir. 2009)).

## A. Hickle's Prima Facie Case

A plaintiff can present a prima facie case of discrimination using either direct or circumstantial evidence. *Bobo*, 665 F.3d at 755.   We turn first to Hickle's direct evidence.

### 1. Direct Evidence

The district court reached two incorrect conclusions that led it to hold that Hickle "has not offered any direct evidence of discrimination on the basis of his military activity." *Hickle*,

296 F. Supp. 3d at 887.  First, it erred when it concluded that, because Adler did not have the authority to fire Hickle, Hickle could have proceeded only under the cat's paw theory.  *Id.* at 886.  In fact, Hickle does have evidence that ties some people involved in the termination decision to Adler's discriminatory comments.  The decisionmaker (Bradley) and those with direct input (Kalman and Melton-Miller) knew about Adler's persistent, discriminatory comments.  Hickle repeatedly complained to Kalman, who had direct input into the termination decision, about Adler's behavior.  Furthermore, the actual decisionmaker (Bradley) knew that Hickle had heard that Adler was conspiring to get him fired, and knew that Adler told Hickle to gather employees' statements. R. 30-1 (Bradley Dep. at 32–35, 37–38) (Page ID #487–89).  In sum, the decisionmaker knew that Hickle was told to commit a fireable offense—gathering statements and thereby impeding an investigation—by someone Hickle had repeatedly said had made discriminatory comments threatening his job.  Yet the decisionmaker chose to fire Hickle.

In *Bobo*, we found sufficient direct evidence to constitute a prima facie case in remarkably similar circumstances.  There, a direct supervisor (Morton) without the authority to terminate employees expressed disapproval of the plaintiff-employee's military obligations, including writing a memorandum saying that he "did not want [the employee] volunteering for additional military duty when he was needed at [work.]"  665 F.3d at 744.  That memorandum was read by Morton's supervisor, Wagner.  *Id.* at 755.  Bobo, the plaintiff-employee, also engaged Wagner in conversations about his military leave.  *Id.*  Wagner was present at the meeting where managers decided to terminate Bobo.  *Id.*  Replace "Morton" with "Adler" and "Wagner" with "Kalman," and the facts would match almost exactly what occurred here.  We found direct evidence of a USERRA violation in *Bobo*, and we do so here, too.

Next, the district court erred by finding that Hickle could not make out a claim under the "cat's paw" theory of liability.  *Hickle*, 296 F. Supp. 3d at 887.  The "cat's paw" theory of liability, endorsed by the Supreme Court in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), deals with the realities of highly stratified workplaces.  In *Staub*, the Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."  *Id.* at 422 (footnote omitted).

The district court held that Hickle could not proceed under the cat's-paw theory because he "has not offered any evidence that Adler issued [the direction to obtain statements relating to the conspiracy plot] with the *intention* of causing Plaintiff's termination." *Hickle*, 296 F. Supp. 3d at 886. This was an error.

Hickle offered evidence that Adler persistently made anti-military comments, up to and including threatening to get him fired for "something else" when Hickle had to miss the Avengers weekend for military duty. He offered evidence that she was, in fact, plotting to get him fired. This evidence is more than sufficient for a reasonable jury to infer that Adler intended to cause Hickle's termination. The district court cited language in Hickle's initial text to Adler to reach a different conclusion, but that was an error because the district court ignored the context of the text messages. When Hickle was first alerting Adler to the fact that someone told him about Adler's plot, he said he didn't believe it, "but it's part of what all three people told me that supervisors told them." R. 33-8 (Text Messages) (Page ID #853). This does not mean, as the district court concluded, that at the time Hickle did not feel Adler was trying to get him fired; rather, it is an example of an employee trying to be diplomatic with his supervisor. Hickle said as much in his deposition. R. 29-1 (Hickle Dep. at 287) (Page ID #176) ("I didn't want Jackie to retaliate against me and become upset. I did want her to know that I did hear about this plot and that I was aware of it."). The district court ignored its mandate to construe the evidence in the light most favorable to Hickle by ignoring Hickle's deposition testimony that offers a reasonable explanation why he did not accuse Adler immediately of plotting against him.

Having shown that evidence exists that Adler intended to cause Hickle's termination, we must address whether Adler's act was the proximate cause of Hickle's termination. The record shows that this is a question for a jury to decide. Certainly, the chicken-finger incident and the issues of Hickle's demeanor, communication, and professionalism were part of the investigation and cited by Bradley as a reason for termination. Bradley stated in her deposition, however, that she made her decision based on all the findings presented and singled out "impeding the investigation" as a reason. Nevertheless, the defendant insists that it broke the chain of causation by conducting a thorough and independent investigation.

We disagree.  First, as best as we can tell[5], the investigation consisted mostly of gathering statements from a few employees, and was not necessarily thorough.  For example, Melton-Miller said she could not locate any witnesses to Adler's threat to terminate Hickle, when in fact Keeton was a party to the conversation.  R. 31-1 (Melton-Miller Dep. at 39) (Page ID #556).  Hickle went so far as to email Bradley about the shortcomings of the investigation, saying it was "concerning to [him] that [Melton-Miller] did not ask for any statements" about the USERRA issues he presented.  R. 33-10 (May 11, 2015 Email) (Page ID #865–66).  Second, the investigation was not necessarily independent; for example, Melton-Miller described Kalman as her "partner" in the investigation.  Finally, as a matter of general policy, we should bear in mind why the cat's-paw doctrine exists:  in stratified workplaces, such as AMC, biased direct supervisors who lack firing authority can easily influence those who have such authority to take adverse actions.  AMC points to its own extremely stratified termination procedure in an attempt to insulate itself from liability, when in fact its procedure demonstrates circumstances in which a biased direct supervisor can make a "cat's paw" of upper management.

## 2. Circumstantial Evidence

Even if Hickle did not have direct evidence of discriminatory intent, he also presented circumstantial evidence that suggests AMC was motivated by anti-military animus.  The district court correctly concluded that Hickle made out a prima facie case of discrimination by circumstantial evidence.  It focused, correctly also, on AMC's inability to present a cogent explanation of its "impeding the investigation" allegation.  *Hickle*, 296 F. Supp. 3d at 887.  Therefore we pause only to mention that, unlike the district court, we do not consider this a "close question."  *Id.* at 888.  The district court thought it strong evidence in AMC's favor that AMC had never denied Hickle's requests to take time off for military obligations.  We do not find this fact to be determinative, as there could be numerous situations in which an employer would grant requests for military leave (albeit grudgingly) for years and nevertheless finally wrongfully terminate an employee for taking such leave.  Certainly, granting Hickle's leave requests helps AMC's case, but it does not insulate AMC from charges of retaliation.

---

[5]The Melton-Miller deposition is opaque and so confusing as to verge on nonsensical.

## B. AMC's Rebuttal

Because Hickle made out a prima facie case of discrimination, AMC has the burden of showing that it would have terminated Hickle even absent his military service. It cannot do so. The district court pointed to the chicken-finger incident to conclude that "AMC has therefore carried its burden to establish that it made 'a reasonably informed and considered decision before taking an adverse employment action.'" *Id.* at 889 (quoting *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010)). As discussed above, however, it remains an open question whether the decisionmaker relied solely on the chicken-finger incident in deciding to terminate Hickle, and whether she would have reached the same conclusion in the absence of the charges of impeding the investigation.

*Escher*, which the district court cites, is inapposite; in that case, the decisionmaker did not know of the plaintiff's complaints about military leave, conducted a thorough investigation, and concluded that termination was necessary based solely on nondiscriminatory reasons. 627 F.3d at 1030–31. Here, Bradley knew of Hickle's USERRA complaints and knew that Adler told Hickle to take action that would amount to impeding the investigation; nevertheless, Bradley seems to have considered the charge of impeding the investigation relevant to the decision. Thus, the honest-belief rule does not help the defendant. The "particularized facts that were before [the employer] at the time the decision was made," *Escher*, 627 F.3d at 1030 (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006)), included Adler's anti-military comments and her text to Hickle telling him to collect statements. This was not a case in which the decisionmaker was acting on a clean record and in ignorance of lurking discriminatory motives. The decisionmaker was fully aware of the facts suggesting that the "impeding the investigation" charge was pretextual. In sum, a jury could conclude, based on this set of facts, that taking military leave, a protected act under federal and Ohio law, was a motivating factor in AMC's decision to terminate his employment.

## III. CONCLUSION

For the reasons stated above, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this decision.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0226p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BRIAN PETTY,
　　　*Plaintiff-Appellee/Cross-Appellant,*

　　　*v.*

METROPOLITAN GOVERNMENT OF NASHVILLE
& DAVIDSON COUNTY,
　　　*Defendant-Appellant/Cross-Appellee.*

> Nos. 10-6013/6105

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:05-cv-680—Todd J. Campbell, Chief District Judge.

Argued: April 19, 2012

Decided and Filed: July 24, 2012

Before: BOGGS, SUHRHEINRICH, and COOK, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Kevin C. Klein, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellant/Cross-Appellee. Michael J. Wall, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellee/Cross-Appellant. **ON BRIEF:** Kevin C. Klein, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellant/Cross-Appellee. Michael J. Wall, James G. Stranch III, BRANSTETTER, STRANCH & JENNINGS, PLLC, Nashville, Tennessee, for Appellee/Cross-Appellant.

———————————

## OPINION

———————————

COOK, Circuit Judge. This Uniformed Services Employment and Reemployment Rights Act ("USERRA") case returns to the Sixth Circuit after remand to the district court. *Petty v. Metro. Gov't of Nashville-Davidson Cnty.* (*Petty I*), 538 F.3d 431 (6th Cir. 2008). USERRA guarantees returning veterans reemployment

1

with their former employers and prohibits employers from discriminating against
veterans based on their military service. 38 U.S.C. §§ 4301–4335. Appellee/Cross-
Appellant Brian Petty claims that Appellant/Cross-Appellee Metropolitan Government
of Nashville-Davidson County ("Metro") violated USERRA in its treatment of him after
he returned to Metro's police department from active duty in the United States Army.
First, Petty argues that Metro failed to restore him to his former position of patrol
sergeant in violation of §§ 4312 and 4313, USERRA's "reemployment provisions."
Second, Petty argues that Metro discriminated against him on the basis of his military
service in violation of § 4311, USERRA's "discrimination provision."

On remand, the district court granted summary judgment in favor of Petty on his
reemployment claims and ordered Metro to reinstate him to his former position as a
patrol sergeant. After a bench trial, the district court awarded Petty back pay and partial
liquidated damages on his reemployment claims and ruled in his favor on his
discrimination claim. Metro appeals, and Petty cross-appeals. We AFFIRM the district
court's rulings.

I.

*Petty I*, which remanded this matter to the district court for further proceedings,
recounts the factual background of this case in detail. 538 F.3d at 434-38. Assuming
familiarity with *Petty I*, we offer an abbreviated factual background and then review the
proceedings on remand that led to this appeal.

A. *The Factual Background*

Metro hired Petty as a police officer in 1991. By 2002, Petty achieved the rank
of patrol sergeant and supervised other officers within the police department. To
supplement his income as a police officer, Petty also moonlighted as a security guard at
two local restaurants.

In addition to these two positions, Petty served as a member of the Army
National Guard. He joined in 1986 and opted into the Army reserve in 1989. In 2003,
the Army deployed Petty for service in Operation Iraqi Freedom. Petty's military

Case: 16-6105  Document: 62-2  Filed: 07/24/2012  Page: 3  (4 of 19)

commitments forced him to stop working at Metro in November 2003, and the Army transferred Petty and his unit to Kuwait around February 2004.

After he arrived in Kuwait, Petty's commanding officer caught him brewing homemade wine and sharing it with another soldier in violation of military rules. Petty offered an innocent explanation for the wine, but ultimately resigned his commission to avoid facing court-martial proceedings. In January 2005, following Petty's resignation, the Army dismissed its charges against him and relieved him of his command. The Army issued Petty a DD-214, a document issued to soldiers upon discharge, indicating that his separation from the military was under honorable conditions. A separate box on the form, however, described Petty's reason for separation as "in lieu of trial by court martial."

In February 2005, Petty requested reinstatement as a police officer with Metro. As it did all police officers returning from an extended leave of absence, Metro subjected Petty to its return-to-work process. This includes, among other things, a drug screening, a personal-history-update questionnaire, and a meeting with a Police Department psychologist. Metro relies on this process to test returning officers' continuing fitness to serve in its police department.

This dispute stems from Petty's answer to the following question on his personal-history-update questionnaire: "During your absence were you arrested, charged, detained, or a suspect in any criminal action or military disciplinary action for any reason or do you have any action pending? If yes, explain in detail (use back if necessary)." Petty answered "yes" and attached a narrative explaining that he faced military charges in Kuwait. He did not, however, reveal the details of his abrupt exit from the military—namely, that he was accused of manufacturing alcohol and providing it to an enlisted soldier.

Apparently unsatisfied that Petty's response "explain[ed] in detail" his charges, the Metropolitan Police Department's Office of Professional Accountability ("OPA") launched an investigation into the veracity with which Petty completed his return-to-work paperwork. Metro has a "zero tolerance" policy for dishonesty, and it formally

issued a complaint charging Petty with dishonesty during the return-to-work process in April 2005. After investigating the charges against Petty, Lieutenant Gordon Howey prepared a report finding that the allegations against Petty lacked foundation. The Chief of Police, Ronal Serpas, and the Director of the OPA, Kennetha Sawyers, accepted Howey's conclusions. In July 2005, Sawyers sent Petty a letter informing him of the dismissal of the charges against him.

But Petty's case continued to trouble Sawyers. Wanting to learn more about the circumstances surrounding Petty's discharge from the Army, Sawyers contacted an Army representative for information. Through her investigation, Sawyers learned that Petty had submitted an incomplete DD-214 to Metro. Petty had enlarged the form that he provided to Metro on a copy machine, cutting off several boxes—including one describing his discharge from the military as "in lieu of trial by court martial." Sawyer's discovery sparked a second investigation into Petty's truthfulness, this one focusing on whether Petty intentionally altered his DD-214.

Metro never returned Petty to his pre-deployment position of patrol sergeant. Beginning in October 2005, Metro assigned Petty to the "bubble," where it primarily tasked him with answering telephone calls from the public. In December 2005, Metro denied Petty's request to resume moonlighting as a security guard. *See Petty I*, 538 F.3d at 434-38 (citing *Petty v. Metro. Gov't of Nashville-Davidson*, No. 3:05-0680, 2006 WL 3333509, at *1-5 (M.D. Tenn. Nov. 16, 2006)).

*B. Petty I*

Petty sued, alleging violations of the reemployment and antidiscrimination provisions of USERRA. He alleged that Metro violated his USERRA rights by (1) delaying his rehire for the purpose of subjecting him to Metro's return-to-work process; (2) failing to reinstate him to his previously held position; and (3) denying him permission to engage in extra-duty employment as a security guard. Both parties moved for summary judgment, and the district court granted Metro's motion on all claims except those arising from the denial of Petty's request for off-duty work. The off-duty-

work claim proceeded to a bench trial, after which the district court entered a judgment on partial findings in favor of Metro. *See id.* at 438. Petty appealed.

During the pendency of Petty's appeal, Metro continued its second investigation into Petty's suspected dishonesty. This investigation initially focused on Petty's submission of an incomplete DD-214, but evolved into an examination of Petty's veracity during Metro's return-to-work process and the OPA's initial investigation. In late 2007, Metro held a disciplinary hearing on whether Petty "submitted a materially false statement," "withheld information regarding [his] military investigation," and "attempt[ed] to conceal the terms of [his] discharge from military duty." After the hearing, Metro terminated Petty. Following Petty's termination, Metro notified the Peace Officer Standards Training ("POST") Commission of the circumstances of Petty's discharge, causing the Commission to suspend Petty's certification to work as a police officer in Tennessee.

Several months after Petty's termination, we heard oral argument on his appeal. In *Petty I*, we held that USERRA's reemployment provisions barred Metro from requiring Petty to comply with its return-to-work procedures. *See id.* at 442. We further held that Metro's delay of Petty's reemployment during its second investigation—which examined his alleged dishonesty during Metro's return-to-work process—violated USERRA's reemployment provision. *See id.* at 443-44. Because Petty qualified for reemployment, we held, USERRA required Metro to fully reemploy Petty, regardless of any honesty issues arising from Metro's return-to-work process. *Id.* at 444.

Accordingly, *Petty I* (1) reversed the district court's grant of summary judgment to Metro on Petty's reemployment claims; (2) vacated the district court's grant of judgment on partial findings to Metro with respect to Petty's discrimination claim; and (3) remanded the case to the district court with instructions to enter summary judgment in favor of Petty on his reemployment claims, to determine the damages, and to conduct further proceedings with regard to Petty's discrimination claim. *See id.* at 447.

The *Petty I* court first learned of Petty's termination at oral argument. *See id.* at 444 n.7. Accordingly, our decision in *Petty I* noted that Petty's termination might

prevent Metro from placing Petty in his original position as patrol sergeant, but left the issue for the district court to determine on remand. *Id.* When the case returned to the district court, Petty filed a supplemental complaint claiming that Metro's termination constituted discrimination and retaliation in violation of USERRA. Both parties conducted additional discovery and again filed cross-motions for summary judgment.

## C. Proceedings on Remand

As directed by *Petty I*, the district court granted Petty summary judgment on his reemployment claims. As a remedy for the reemployment violation, the court ordered that Metro immediately reinstate Petty to his former position as patrol sergeant. In light of Petty's reinstatement, the court dismissed his newly asserted retaliation and discrimination claims as moot.

After ruling on the summary-judgment motions, the court held a bench trial to resolve three remaining issues: (1) whether Metro discriminated against Petty by denying his request to engage in extra-duty employment; (2) the appropriate amount of damages, including back pay; and (3) whether Petty was entitled to liquidated damages. At the conclusion of this trial, the district court awarded Petty $2,500 in back pay for the initial three-week delay in reemployment and $172,058.67 in back pay from the time of his termination until his court-ordered reinstatement. Further, the district court found that Metro discriminated against Petty by refusing to allow him to engage in extra-duty employment and awarded him an additional $4,500 in damages. Finally, the district court granted Petty partial liquidated damages, awarding him $120,116.43. Metro appeals, and Petty cross-appeals.

## II.

On appeal, Metro challenges the district court's (1) award of reinstatement and back pay as remedies for Petty's termination under his reemployment claim; (2) finding that Metro discriminated against Petty by denying his request to engage in extra-duty employment; (3) grant of Petty's motion in limine, which excluded evidence of Petty's alleged untruthfulness from trial; and (4) award of liquidated damages. Petty cross-

appeals on this last point, arguing that the district court should have awarded him full—instead of partial—liquidated damages. Because all of these issues concern USERRA, we begin by describing the statute's framework and purpose.

*A. USERRA*

USERRA protects the job security of returning veterans. *Petty I*, 538 F.3d at 439. Several provisions of USERRA coordinate to provide this security: Sections 4312 and 4313, the "reemployment provisions," entitle veterans to reemployment after military service and prescribe the positions to which they are entitled upon returning. 38 U.S.C. §§ 4312, 4313. Section 4311, the "discrimination provision," prohibits employers from discriminating against veterans on the basis of their military service. 38 U.S.C. § 4311. Finally, § 4316 guarantees veterans the same benefits they would have enjoyed absent the interruption in their employment and prevents employers from terminating without "cause" any returning veteran within one year of his reemployment. 38 U.S.C. § 4316.

The reemployment and discrimination provisions protect different phases of employment. At the point of rehire, §§ 4312 and 4313 entitle a returning veteran to reemployment in either the position he would have held absent his departure for military service "or a position of like seniority, status and pay." 38 U.S.C. § 4313(a)(2)(A). After an employer rehires a veteran, § 4311 prohibits the employer from discriminating against the veteran with respect to "any benefit of employment." 38 U.S.C. § 4311; *see also Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 304 (4th Cir. 2006). USERRA's reemployment and discrimination provisions differ in another relevant way: a plaintiff seeking relief under the *discrimination* provision must show that his employer discriminated against him on account of his military service, but a plaintiff seeking relief under the *reemployment* provision does not. *Petty I*, 538 F.3d at 442. To demonstrate entitlement to reemployment, veterans need only show that they meet the reemployment provisions' four prerequisites: proper notice to his employer in advance of his departure, a service period of less than five years, a timely request for reemployment accompanied by proper documentation, and a separation from military service under "honorable

conditions." *Id.* at 440-43 (citing 38 U.S.C. § 4312). If a veteran satisfies these four prerequisites, then the reemployment provisions prohibit an employer from limiting or delaying his reemployment rights in any way. *See id.* at 442-43 (citing 38 U.S.C. §§ 4312, 4313).

B. *The District Court's Award of Reinstatement and Back Pay Under Petty's Reemployment Claim*

Metro first argues that the district court erred in awarding back pay and reinstatement as a remedy for Petty's termination under his reemployment claim. Because Metro terminated Petty long after reemploying him, Metro argues, the district court should have analyzed Petty's claim under USERRA's discrimination provision, § 4311. Metro argues that Petty cannot show that his termination violated the discrimination provision, because Metro terminated him for *dishonesty* during its return-to-work process—not for any reason related to his protected status as a veteran. (Again, Metro's second investigation focused on Petty's submission of an incomplete DD-214 and his veracity during the return-to-work process and first investigation.) From this, Metro concludes that the district court erred in "granting summary judgment to Petty on his termination claim."

By wrongly framing the issue, Metro's argument stumbles from the gate. The district court did not grant summary judgment to Petty on his "termination claim"; rather, the district court awarded Petty relief for his termination under his *reemployment* claim. Petty initially brought a separate claim alleging discrimination based on his termination, but the district court dismissed that claim as moot after ordering Metro to reinstate Petty. With respect to the grant of summary judgment on Petty's reemployment claim, the district court followed the instruction of *Petty I.* 538 F.3d at 448 ("We REMAND this matter to the district court with instructions to enter summary judgment in favor of Petty on the reemployment claims and to determine the resultant damages . . . ."). To the extent that Metro challenges the district court's decision to grant summary judgment on Petty's reemployment claims, *Petty I* forecloses its argument.

Nos. 10-6013/6105     *Petty v. Metro. Gov't of Nashville*     Page 9

Accordingly, we confine Metro's arguments on appeal to a challenge of the district court's award of back pay and reinstatement, which we review for abuse of discretion. *See Fuhr v. Sch. Dist. of Hazel Park*, 364 F.3d 753, 760 (6th Cir. 2004) (reinstatement); *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 678 (6th Cir. 2008) (back pay). We reverse only if we find that the district court committed "a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *Jones v. Ill. Cent. R.R. Co.*, 617 F.3d 843, 850 (6th Cir. 2010) (quoting *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 623 (6th Cir. 2008)).

*Petty I* found that Metro's failure to restore Petty to his previous position pending the outcome of its second investigation constituted an ongoing violation of USERRA's reemployment provisions:

> At the point at which Petty was entitled to reemployment under §§ 4312 and 4313, Metro had no basis on which to question his qualifications. Petty had satisfied the only prerequisites to § 4313—those specified in § 4312—and Metro's attempt to impose additional prerequisites through its return-to-work process was, as we have already explained, wholly impermissible. *The process, then, including Petty's alleged "dishonesty" therein, cannot serve as a basis for delaying or otherwise limiting Petty's right to reemployment.*
>
> Furthermore, Metro cannot avoid this conclusion by arguing that its second investigation into Petty's conduct during the return-to-work process had not been completed at the time of Petty's filing of this action, and Metro therefore had not been able to determine whether Petty was qualified for reemployment in his original position with the police department. First, investigations spawned by the improper application to Petty of the return-to-work process cannot serve to delay Petty's statutory right to reemployment if the prerequisites for reemployment have been met.

*Petty I*, 538 F.3d at 443-44 (emphasis added) (citation and footnote omitted).

Pointing to another passage in *Petty I*, Metro argues that the previous panel found that Metro reemployed Petty long before Metro terminated him. *See id.* at 445 ("Petty did not request permission to engage in off-duty work . . . until approximately ten

months *after he was reemployed*." (emphasis added)).    Because USERRA's reemployment provisions do not protect a veteran after his reemployment, Metro concludes from this passage that the district court should have analyzed Petty's termination claim under the discrimination provision. *See id.* (holding that USERRA's reemployment provision "only entitles a service person to immediate reemployment and does not prevent the employer from terminating him the next day or even later the same day" (quoting *Francis*, 452 F.3d at 304)).    Once a veteran is rehired, §§ 4311 and 4316 protect him from discrimination, but allow an employer to terminate a veteran so long as it can show "cause" unrelated to the veteran's military service. *See* 38 U.S.C. §§ 4311, 4316(c).  If Metro truly reemployed Petty, then, USERRA would not prevent Metro from firing him if it had proper "cause" to do so.

Metro argues that Petty's dishonesty provided such cause.  Metro terminated Petty at the end of its second investigation, which examined both Petty's allegedly untruthful answers to questions about his military discharge and his dishonesty during Metro's first investigation into his truthfulness.   Petty's mendacity during this investigation—namely, his allegedly false statements during the OPA's investigation and during the deposition and trial in this litigation—arguably provides Metro cause to terminate Petty wholly unrelated to his military service.

But this argument misreads *Petty I*.  Regardless of the court's later statement (made while discussing a separate claim) that Metro reemployed Petty, the block-quoted passage above demonstrates *Petty I*'s view that (1) Metro never fully reemployed Petty and that (2) limiting Petty's reemployment rights based on Metro's second investigation of him violated USERRA's reemployment provision.  Further, other passages in *Petty I* reject the notion that Petty's alleged dishonesty during Metro's return-to-work process constituted a permissible ground for limiting Petty's reemployment rights.  *See, e.g.*, 538 F.3d at 441 ("[I]t would be inconsistent with the goals of USERRA to prevent Petty from exercising his right to reemployment because he failed to provide forthrightly information that is statutorily unnecessary to his establishing the right in the first place.").

Nos. 10-6013/6105     *Petty v. Metro. Gov't of Nashville*          Page 11

Based on the above-quoted passage, the district court concluded that *Petty I* mandated Petty's reinstatement to his former position as patrol sergeant. After trial, the court also awarded Petty back pay from his 2007 termination. In its ruling, the district court noted that the parties did not dispute that Metro never returned Petty to his former position. The court further noted that the charges underlying Petty's termination all related to his failure to provide answers to questions and documentation relating to his military service.

We find no fault with the court's conclusions. USERRA prohibits employers from placing "additional prerequisites" on returning veterans seeking to exercise their reemployment rights. *See* 38 U.S.C. § 4302. *Petty I* found that rescreening employees before reemploying them constituted such an "additional prerequisite," and concluded that Metro's additional investigation violated this prohibition. *See Petty I*, 538 F.3d at 440-41. Though USERRA may permit Metro to terminate Petty for dishonesty after reemploying him, Metro never restored Petty to his position as patrol sergeant. Accordingly, we hold that the district court properly exercised its discretion in awarding Petty back pay and reinstatement under his reemployment claim.

*C. Petty's Extra-Duty Employment Claim*

Metro also challenges the district court's ruling in Petty's favor on his extra-duty-employment claim. The district court found that Metro discriminated against Petty by denying his request to work as a security guard at two Nashville restaurants, ruling that the denial violated USERRA's discrimination provision, § 4311. Petty moonlighted at the restaurant prior to his deployment, but Metro denied Petty's request to resume work at the restaurant after his return. Metro refused Petty's request because Metro had placed Petty on "administrative assignment" pending the outcome of its investigation into his alleged dishonesty during Metro's return-to-work process, and this probationary status barred Petty from engaging in extra-duty employment.

USERRA's discrimination provision prohibits an employer from denying "retention in employment" or any other "benefit of employment" based on a veteran's "membership [in uniformed service], application for membership, performance of

service, application for service, or obligation." 38 U.S.C. § 4311(a). *Petty I* described the burden-shifting framework that governs discrimination claims brought under § 4311:

> An individual bringing a § 4311 claim has the initial burden of proving a prima facie case of discrimination by showing, by a preponderance of the evidence, that his protected status was a substantial or motivating factor in the adverse employment action(s). The burden then shifts to the employer to prove the affirmative defense that the employment action(s) would have been taken in the absence of the employee's protected status.

*Petty I*, 538 F.3d at 446. Unlike a claim brought under USERRA's reemployment provisions, a claim brought under the discrimination provision requires a showing that an employer discriminated against a veteran based on a "status or activity protected by USERRA." *Id.* at 442. The operative question, then, is whether Petty's protected status served as a "motivating factor" for the denial of his request for off-duty employment.

We first grappled with this question in *Petty I*. Because Metro's investigation of Petty caused Metro to deny his request for extra-duty employment, *Petty I* considered Metro's motivations for launching the investigation. The discussion centered on whether concerns about Petty's conduct in service—or merely concerns about his honesty—spurred Metro to investigate Petty. In vacating the district court's judgment on partial findings, we concluded that if concerns about Petty's *conduct in service* motivated Metro's second investigation, "then it follows that the denial of benefits on the basis of the investigation's existence was also motivated, at least in part, by an improper purpose." *Id.* at 447.

The narrow question on remand, then, was whether concerns about Petty's military service motivated Metro's second investigation of Petty. Metro argues that the district court failed to make a finding that such an "improper purpose" motivated its investigation, and offers evidence disputing whether Petty's protected status motivated its denial of Petty's request for extra-duty employment. On appeal from a bench trial, we review the district court's factual findings for clear error and its conclusions of law de novo. *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 478-79 (6th Cir. 2005); *see also* Fed. R. Civ. P. 52(a)(6).

Nos. 10-6013/6105     *Petty v. Metro. Gov't of Nashville*                     Page 13

After trial on remand, the district court found that Metro's second investigation "[was] based on the improper failure to reemploy and the investigation of [Petty's] military service in violation of USERRA." The court awarded Petty $4,500 in damages for his extra-duty-work claim—the amount Petty would have received had Metro allowed him to continue working at the restaurants. Metro quotes this language and faults the district court for conflating Petty's reemployment and discrimination claims. But the quote's context reveals that the district court was making a point about the relationship between the investigation underlying Petty's reemployment claim and his discrimination claim. Elsewhere, the district court clearly makes its point regarding the improper motive behind the second investigation:

> I am finding liability on discrimination on the extra-duty work claim. The reason is that the denial of extra-duty work was based on what has now been determined to be an improper investigation in violation of USERRA by investigating Mr. Petty's military service.

A review of the record leaves us unpersuaded that the district court clearly erred in making this factual finding. Accordingly, we affirm the district court's judgment in favor of Petty on this claim.

### D. The Trial Court's Grant of Petty's Motion in Limine

Metro next challenges the district court's grant of Petty's motion in limine, which sought to exclude evidence of his alleged untruthfulness from the trial at which the district court measured the damages on his reemployment claim. Metro intended to offer this evidence in support of two affirmative defenses, unclean hands and after-acquired evidence. The court excluded the evidence for two reasons: First, the court noted that the defendant failed to cite any cases indicating that the unclean-hands or after-acquired-evidence doctrines applied to limit damages resulting from a reemployment claim under USERRA. Second, the court held that *Petty I* barred the affirmative defenses.

Metro first challenges this ruling on procedural grounds, faulting the district court for improperly ruling on its affirmative defenses through a motion in limine. The court should have required Petty to challenge these defenses through a motion to dismiss

or motion for summary judgment—so runs Metro's argument—and, because it failed to do so, the court improperly granted a motion for summary judgment "masquerading" as a motion in limine. *See, e.g.*, 75 Am. Jur. 2d Trial § 44 (2009) ("The use of motions in limine to summarily dismiss a portion of a claim has been condemned, and the trial courts are cautioned not to allow motions in limine to be used as unwritten and unnoticed motions for summary judgment or motions to dismiss.").

We reject this procedural challenge, because Metro fails to demonstrate prejudice from the purportedly improper ruling. At least one other circuit, in faulting a district court for making summary-judgment-type rulings on a motion in limine, grounded its rulings on findings that the nonmovant lacked notice and an adequate opportunity to marshal evidence. *Compare Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069-70 (3d Cir. 1990) (reversing the grant of summary judgment where nonmoving party had no notice or opportunity to present evidence), *with Howard Johnson Int'l v. Cupola Enters.*, 117 F. App'x 820, 822-23 (3d Cir. 2004) (distinguishing *Bradley* and upholding the grant of summary judgment on a motion in limine where the nonmovant had notice that the motion was dispositive). Further, a court may grant summary judgment sua sponte "so long as the losing party was on notice that she had to come forward with all of her evidence." *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 204 (6th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)); *see also* Fed. R. Civ. P. 56(e), (f). The record suggests that Metro understood that Petty's motion in limine might dispose of its affirmative defenses, and Metro fails to argue that it lacked an opportunity to present evidence in response.

In any event, we find that Metro's substantive quarrel with the district court's ruling fails under either the abuse-of-discretion standard applicable to review of a motion in limine or under the de novo standard applicable to summary-judgment rulings. *See United States v. Poulsen*, 655 F.3d 492, 508 (6th Cir. 2011) (holding that this court reviews the grant of a motion in limine for abuse of discretion). With its equitable affirmative defenses, Metro merely recasts an argument that we rejected in *Petty I*. The district court held that even if the unclean-hands or after-acquired-evidence doctrines

applied to USERRA reemployment claims, they should not apply in this case, given *Petty I*'s conclusion that Petty's alleged dishonesty "cannot serve as a basis for . . . limiting Petty's right to reemployment." Based on this holding, the district court found the doctrines inapplicable: "Given the court of appeals' rejection of [Petty]'s alleged untruthfulness as a bar to his claim for reemployment, this Court is not persuaded that such conduct should serve as a bar to *damages* on his claim for reemployment." We agree and reject Metro's challenge to the district court's grant of Petty's motion in limine.

## E.  Liquidated Damages

Finally, we address both parties' challenge to the district court's partial award of liquidated damages. Metro urges us to find that the district court abused its discretion by awarding liquidated damages on Petty's reemployment claim. Petty cross-appeals, arguing that the district court erred in awarding only *partial* damages. As with awards granted under similar statutes, we review the award of liquidated damages for a USERRA violation for an abuse of discretion. *See Thom v. Am. Standard, Inc.*, 666 F.3d 968, 973 (6th Cir. 2012) (FMLA); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 408 (6th Cir. 2003) (same).

USERRA provides for liquidated damages in an amount equal to lost wages and benefits "if the court determines that the employer's failure to comply with the provisions of this chapter was willful." 38 U.S.C. § 4323(d)(1)(C). Elsewhere, this court has held that an employer's conduct was "willful" when "'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited' by the law at issue." *Koehler v. PepsiAmericas, Inc.*, 268 F. App'x 396, 403 (6th Cir. 2008) (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985)).

The district court granted liquidated damages in part, keying on the date that the Sixth Circuit decided *Petty I*. After that date—August 18, 2008—the court held that Metro "was on notice of the need to fully restore Mr. Petty to his previous position." Regardless of *Petty I*, however, Metro refused to reinstate Petty until the district court

ordered reinstatement in its February 2010 order. In ruling on its award of liquidated damages at the conclusion of the bench trial, the district court noted the clarity of the court's decision in *Petty I* and found that Metro's failure to reemploy Petty amounted to a "willful" failure to comply with USERRA.

Metro disputes the clarity of *Petty I*'s mandate. When opposing Petty's reinstatement after remand following *Petty I*, Metro claimed that a footnote in *Petty I* supported its view that it could terminate Petty before fully reemploying him if it could show "cause" unrelated to Petty's military service.[1] The court rejected Metro's argument, but conceded that the footnote was "not entirely clear." Metro seizes on this statement to argue that the district court's "admission" forecloses a liquidated-damages award.

Though Metro identifies language in *Petty I* that arguably questions whether USERRA required Petty's reemployment, other passages clearly prohibit Metro from limiting Petty's reemployment rights based on its second investigation. *See, e.g.*, *Petty I*, 538 F.3d at 433-34 ("The [return-to-work] process, then, including Petty's alleged 'dishonesty' therein, cannot serve as a basis for delaying or otherwise limiting Petty's right to reemployment."). In light of this, we uphold as within the district court's discretion its determination that Metro "was on notice of the need to fully restore Mr. Petty to his previous position" in the wake of *Petty I*. Accordingly, we reject Metro's argument.

We also reject Petty's claim to additional liquidated damages. Petty argues that the district court abused its discretion by failing to award liquidated damages for Metro's failure to restore Petty *prior* to the decision in *Petty I*. In denying liquidated damages for Metro's failure to reemploy Petty during this period, the district court found that (1) "there was a good-faith dispute [regarding] Metro's obligations under USERRA";

---

[1] The footnote reads: "At oral argument the parties indicated that Petty is no longer employed at Metro. This may limit the type of relief available to Petty on remand (e.g., placing Petty in the position of patrol sergeant may not be possible at this time); however, we leave these issues for the district court to determine." *Petty I*, 538 F.3d at 444 n.7.

and (2) reasonable questions existed about "what can be considered about dishonesty and the risk to the public of an unqualified officer" under USERRA.

We find no error in the district court's conclusion that a good-faith dispute regarding the propriety of Metro's return-to-work process existed before *Petty I*. Prior to *Petty I*, Metro interpreted USERRA's prohibition on "additional prerequisites" as meaning "additional to the *employer's* existing prerequisites"—an interpretation plausible enough to convince the district court. *See Petty I*, 538 F.3d at 442; *see also Petty v. Metro. Gov't of Nashville-Davidson*, No. 3:05-0680, 2006 WL 3333509 (M.D. Tenn. Nov. 16, 2006). The sparse case law interpreting USERRA, combined with the reasonableness of Metro's pre-*Petty I* interpretation of USERRA, both undermine the conclusion that Metro "showed reckless disregard" toward its obligations under USERRA. *See, e.g., Lewis v. Rite of Passage, Inc.*, 217 F. App'x 785, 786 (10th Cir. 2007) ("Precedent interpreting and applying the USERRA is sparse." (internal quotation marks and citation omitted)).

### III.

Accordingly, we **AFFIRM** the district court's grant of summary judgment in Petty's favor, as well as its award of back pay and reinstatement; **AFFIRM** the district court's grant of Petty's motion in limine; **AFFIRM** the district court's judgment in Petty's favor on his extra-duty-employment claim; and **AFFIRM** the district court's award of partial liquidated damages.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 10-6013/6105

```
┌─────────────────────────────┐
│           FILED             │
│        Jul 24, 2012         │
│     LEONARD GREEN, Clerk    │
└─────────────────────────────┘
```

BRIAN PETTY,
        Plaintiff - Appellee/Cross-Appellant,

        v.

METROPOLITAN GOVERNMENT OF NASHVILLE
& DAVIDSON COUNTY,
        Defendant - Appellant/Cross-Appellee.

Before: BOGGS, SUHRHEINRICH, and COOK, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's rulings are AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____

Leonard Green, Clerk

## SUPREME COURT OF THE UNITED STATES

### 562 U.S. 411 (2011)

**STAUB**

**V.**

**PROCTOR HOSPITAL**

STAUB *v.* PROCTOR HOSPITAL

certiorari to the united states court of appeals for the seventh circuit

No. 09–400.   Argued November 2, 2010—Decided March 1, 2011

While employed as an angiography technician by respondent Proctor Hospital, petitioner Staub was a member of the United States Army Reserve. Both his immediate supervisor (Mulally) and Mulally's supervisor (Korenchuk) were hostile to his military obligations. Mulally gave Staub disciplinary warning which included a directive requiring Staub to report to her or Korenchuk when his cases were completed. After receiving a report from Korenchuk that Staub had violated the Corrective Action, Proctor's vice president of human resources (Buck) reviewed Staub's personnel file and decided to fire him. Staub filed a grievance, claiming that Mulally had fabricated the allegation underlying the warning out of hostility toward his military obligations, but Buck adhered to her decision. Staub sued Proctor under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), which forbids an employer to deny "employment, reemployment, retention in employment, promotion, or any benefit of employment" based on a person's "membership" in or "obligation to perform service in a uniformed service," 38 U. S. C. §4311(a), and provides that liability is established "if the

person's membership … is a motivating factor in the employer's action," §4311(c). He contended not that Buck was motivated by hostility to his military obligations, but that Mulally and Korenchuk were, and that their actions influenced Buck's decision. A jury found Proctor liable and awarded Staub damages, but the Seventh Circuit reversed, holding that Proctor was entitled to judgment as a matter of law because the decisionmaker had relied on more than Mulally's and Korenchuk's advice in making her decision.

*Held*:

   1. If a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA. In construing the phrase "motivating factor in the employer's action," this Court starts from the premise that when Congress creates a federal tort it adopts the background of general tort law. See, *e.g., Burlington N. & S. F. R. Co.* v. *United States,* 556 U. S. ___, ___. Intentional torts such as the one here "generally require that the actor intend 'the consequences' of an act,' not simply 'the act itself.' " *Kawaauhau* v. *Geiger,* 523 U. S. 57, 61–62. However, Proctor errs in contending that an employer is not liable unless the *de facto* decisionmaker is motivated by discriminatory animus. So long as the earlier agent intended, for discriminatory reasons, that the adverse action occur, he has the scienter required for USERRA liability. Moreover, it is axiomatic under tort law that the decisionmaker's exercise of judgment does not prevent the earlier agent's action from being the proximate cause of the harm. See *Hemi Group, LLC* v. *City of New York,* 559 U. S. 1, ___. Nor can the ultimate decisionmaker's judgment be deemed a superseding cause of the harm. See *Exxon Co., U. S. A.* v. *Sofec, Inc.,* 517 U. S. 830, 837. Proctor's approach would have an

improbable consequence: If an employer isolates a personnel official from its supervisors, vests the decision to take adverse employment actions in that official, and asks that official to review the employee's personnel file before taking the adverse action, then the employer will be effectively shielded from discriminatory acts and recommendations of supervisors that were designed and intended to produce the adverse action. Proctor also errs in arguing that a decisionmaker's independent investigation, and rejection, of an employee's discriminatory animus allegations should negate the effect of the prior discrimination. Pp. 4–10.

2. Applying this analysis here, the Seventh Circuit erred in holding that Proctor was entitled to judgment as a matter of law. Both Mulally and Korenchuk acted within the scope of their employment when they took the actions that allegedly caused Buck to fire Staub. There was also evidence that their actions were motivated by hostility toward Staub's military obligations, and that those actions were causal factors underlying Buck's decision. Finally, there was evidence that both Mulally and Korenchuk had the specific intent to cause Staub's termination. The Seventh Circuit is to consider in the first instance whether the variance between the jury instruction given at trial and the rule adopted here was harmless error or should mandate a new trial. Pp. 11–12.

560 F. 3d 647, reversed and remanded.

Scalia, J., delivered the opinion of the Court, in which Roberts, C. J., and Kennedy, Ginsburg, Breyer, and Sotomayor, JJ., joined. Alito, J., filed an opinion concurring in the judgment, in which Thomas, J., joined. Kagan, J., took no part in the consideration or decision of the case.

24 F.2d 1300

115 L.R.R.M. (BNA) 2393, 115 L.R.R.M. (BNA) 2543,
33 Empl. Prac. Dec. P 34,055, 99 Lab.Cas. P 10,681

**Samuel C. HANNA, Plaintiff-Appellant, Cross-Appellee,**
v.
**AMERICAN MOTORS CORPORATION, Defendant-Appellee, Cross-Appellant.**

Nos. 82-2931, 82-2980.

# United States Court of Appeals,
# Seventh Circuit.

Argued June 2, 1983.
Decided Jan. 9, 1984.
As Amended Jan. 13, 1984.

Robert F. Sfasciotti, Kenosha, Wis., for plaintiff-appellant, cross-appellee.

Lawrence T. Lynch, Foley & Lardner, Milwaukee, Wis., for defendant-appellee, cross-appellant.

Before BAUER and COFFEY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
COFFEY, Circuit Judge.

Appellant, cross-appellee, Samuel Hanna, appeals the judgment of the United States District Court for the Eastern District of Wisconsin, awarding him lost wages in the amount of $1,100.74 for the period between December 18, 1970, and February 28, 1971, lost wages in the amount of $8,671.50 for the period between April 24, 1973, and November 14, 1977, and interest in the amount of $408.00. Cross-appellant, American Motors Corp., appeals the district court's ruling that Ford Motor Co. v. EEOC, _____, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), is inapplicable to this case which arises under the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (prior to 1982 amendment), 38 U.S.C. Sec. 2021 et seq. (1976). We reverse the judgment of the district court as to the award of $8,671.50, and award appellant $28,905.00, plus prejudgment interest in the amount of $15,347.56, for the period between April 24, 1973, and November 14, 1977. In addition, we award the appellant prejudgment interest in the amount of $487.97 on the $1,100.74 in lost wages awarded by the district court for the period between December 18, 1970, and February 28, 1971.

2

\* This court has considered appellant Samuel Hanna's complaint against American Motors Corporation ("AMC") on two prior occasions.  We initially set out the underlying facts in Hanna v.

American Motors Corp., ░░░░░░░ (7th Cir.1977) ("Hanna I" ), thus, for the purpose of this appeal we will only summarily review the facts pertinent to this decision.

3

On September 14, 1970, Hanna commenced work as an assemblyman at AMC's Kenosha, Wisconsin plant. Hanna earned "approximately $3.75 an hour" attaching bolts, bumper guards, and brake hoses to automobiles as they moved along an assembly line. On September 17, 1970, and December 3, 4, and 7, 1970, Hanna absented himself from work in order to undergo a mandatory military service preinduction physical examination. On all four of these days work was available for Hanna at the AMC plant in Kenosha. On December 18, 1970, AMC reduced its labor force and "laid off" Hanna, who up until that date had worked fifty-six days. Pursuant to the collective bargaining agreement between AMC and the United Auto Workers Union ("UAW"), of which Hanna was a member, if Hanna had worked sixty days, he would have completed his probationary period and would have been awarded seniority from September 14, 1970, the date of his original hiring. In addition, if Hanna had attained seniority status on or before December 18, 1970, he would not have been "laid off" until February 28, 1971.

4

On March 10, 1971, Hanna was inducted into the Armed Forces and while in military service he received a letter from AMC stating that because he had failed to complete his sixty-day probationary period within one year, as provided for in the UAW-AMC collective bargaining agreement, his employment at AMC had been terminated. Following almost two years of military service, including a nine-month stay in Vietnam, Hanna received an honorable discharge from the Armed Forces on February 22, 1973.

5

Upon returning to Kenosha, Wisconsin, Hanna contacted AMC about being reinstated to his previous job but was told by company officials that he had no reemployment rights. On March 22, 1973, AMC agreed to employ Hanna as a "new hire" performing "similar work" on the assembly line. On April 23, 1973, Hanna complained to AMC officials that they were violating his veteran's reemployment rights by refusing to accord him seniority from the date of his original hiring on September 14, 1970. Due to AMC's refusal to grant seniority, Hanna left AMC the following day and was terminated by the company.

6

Hanna sought the assistance of his union, contacting UAW board members in an attempt to obtain reinstatement with seniority at AMC, but his efforts "didn't develop into anything." Hanna next contacted the Department of Labor who, in turn, transferred the matter to the Department of Justice, who filed suit, on behalf of Hanna, against AMC claiming that the company had violated Hanna's rights

under the Vietnam Era Veterans' Readjustment Assistance Act of 1974 (prior to 1982 amendment), 38 U.S.C. Sec. 2021 et seq. (1976) ("Vietnam Veterans' Readjustment Act"). The district court granted AMC's motion for summary judgment and dismissed the case. The Government appealed and this court ruled that:

7

"But for the pre-induction physicals, plaintiff would have collected his salary until February 28, 1971, and would have been reinstated upon return from active duty with a September 14, 1970, date with all attendant rights under the collective bargaining agreement. Thus under the Act plaintiff is entitled to reinstatement with a September 14, 1970, seniority date and to collect lost wages from December 18, 1970, until at least February 28, 1971, his proper lay off date.[2] 38 U.S.C. Sec. 2022; United States ex rel. Adams v. General Motors Corp., [          (6th Cir.1975) ]. Plaintiff did not waive his rights under the Act by his April 24, 1973, refusal to continue in the inferior status accorded him by the defendant. O'Mara v. Petersen Sand & Gravel Co.,          (7th Cir.1974).

8

Accordingly the district court's judgment is reversed and remanded for further proceedings consistent herewith.

9

Hanna I, 557 F.2d at 122.

10

At the subsequent trial for damages, which is the subject of this appeal, the evidence revealed that following his termination date of April 24, 1973, Hanna visited the Kenosha Job Service office four times a month between June and September of 1973. A Job Service representative gave Hanna "five to ten" referrals which "didn't pan out to anything." On September 4, 1973, Hanna enrolled as a full-time, day student at the University of Wisconsin-Parkside ("UW-Parkside") in Kenosha, Wisconsin and thus began receiving veterans benefits under the "G.I. bill." UW-Parkside is "mainly a commuter school," that is attended in significant part (31%) by students over thirty years of age, "a number of" whom are employed full time. During the fall semester of 1973, Hanna filed "five to ten" applications with various employers and continued to visit the Kenosha Job Service office.

11

Between January 1974 and the "summer" of 1974, Hanna did not attend school but continued to follow up on referrals from the Kenosha Job Service office, though "nothing panned out." In the "summer" of 1974, through a friend's suggestion, Hanna landed a seasonal job as a general laborer, cutting grass and painting fences, for the Wisconsin Natural Gas Company in Racine, Wisconsin. Hanna continued at this job for "about a month," earning $598.00, and then quit because he "felt that as a Vietnam

veteran [he] should be doing something more...." Hanna testified that in September of 1974, he returned to UW-Parkside as a full-time day student because he "didn't have a job ... and it was a means of getting some money and income and plus learning something." Between September 1974 and June 1975, Hanna filed applications at two factories in Waukegan, Illinois and one in Kenosha, Wisconsin. During this period Hanna also continued to visit the Kenosha Job Service office, and remained "ready, willing, and available to work at American Motors Corporation," or at any factory with comparable employment opportunities.  Even though Hanna did not file any application with "private employment services" during this period, he did continue to read the want-ads of the Kenosha News and drive his automobile to various factories in order to personally file job applications.

12

Hanna was unable to find employment during the "summer" of 1975, and in September he again enrolled in UW-Parkside as a full-time, day student. The testimony revealed that during the fall semester of 1975, Hanna "continued to seek full-time employment," but was unsuccessful in his efforts. Between February 1976 and January 1977, Hanna, while still attending school, filed additional employment applications at factories located in Waukegan, Illinois, Zion, Illinois, and Kenosha, Wisconsin but was offered no job. Hanna left school after the fall semester of 1976. In June 1977, after having had an application on file with the Kenosha Job Service for over four years, he obtained his first employment through the Job Service office in the "CETA" program, building campsites for the Kenosha City Parks Commission. Hanna worked at this job for "about two months" earning $1,312.00, and terminated his employment when the Government informed him of this court's decision in Hanna I. Following the decision in Hanna I on June 23, 1977, the district court issued two reinstatement orders before AMC complied and reinstated Hanna as an assemblyman, earning $4.25 an hour, on November 14, 1977. Hanna continued at this job for seven months until he was again discharged by AMC.

13

At the trial for damages, Kenneth Neill, supervisor of the Kenosha Job Service program, testified that his agency "counseled with a number of veterans" between April 24, 1973, and November 14, 1977, because the agency was "mandated by law to serve and provide priority [to] veterans," in order to help them readjust to society and overcome any effects of the then referred to "Vietnam Vet Syndrome." Neill further testified that there were five other "transportation equipment" plants in the area surrounding Kenosha but that AMC generally paid twenty to twenty-five percent more than the other employers. Neill concluded that there was "a high probability that a person [of general factory worker skills] would not be able to find a job comparable," to that of an AMC employee and that the closest comparable employer was the ⸻⸻⸻, some seventy miles away in Janesville, Wisconsin. In addition, the unemployment rate in Kenosha County ranged from 3.5 percent in 1973 to 8.5 percent in 1977, and the unemployment rate for a minority, such as Hanna, was "usually double" that of nonminorities. On cross-examination Neill initially stated that between April 24, 1973, and

November 14, 1977, an individual with skills commensurate with Hanna's "could secure employment ... within a twenty-seven mile commuting area" of Kenosha. Neill then qualified that statement on redirect examination and admitted that the probability of finding "comparable" employment was "substantially lower" and, in fact, within the same twenty-seven mile radius, there was "no comparable employment to American Motors when all factors [were] concerned [sic]." (emphasis added). Based upon this testimony, the trial judge ruled, in pertinent part:

14

"I further find that the plaintiff did not abandon his willingness to return to work by becoming a student at UW-Parkside in September of 1973. I believe his decision to return to school can more accurately be characterized as pursuing an alternative that was better than anything else Mr. Hanna had going for him at the moment. Had he been offered a job at AMC with the correct seniority date, I find that he would have either quit school and returned to the job or would have restructured his school courses so that he could return to full time employment while still remaining a student.

15

I do find, however, that Mr. Hanna's full time schooling interfered with his duty to mitigate his damages. Although he did secure some employment, it was of a seasonal nature, consistent with the kind of job that college students secure while continuing their educations.

16

Furthermore, I find that work of a somewhat comparable nature to the unskilled labor performed by Mr. Hanna at AMC was available in the Kenosha area in which Mr. Hanna lived during the period in question. Although it might have been difficult to find an unskilled laborer's job that paid as handsomely as did the one at AMC, Mr. Hanna nevertheless should have more diligently pursued work that was available. Thus, I find that to a significant extent, AMC has demonstrated that Mr. Hanna has failed to properly mitigate his damages.

17

I find no failure of a duty to mitigate between December 18, 1970 and February 28, 1971. Thus, during that period, I find that $1,100.74 is an appropriate amount to be awarded to the plaintiff. As to the remaining claim for $28,905.00, I find that a reduction should be made for failure to mitigate, the most important element of which was the plaintiff's enrollment for almost three years as a full time college student. Although, as I have said, I do not view his act as a waiver of his right to seek reinstatement at AMC, I believe it significantly cooled his ardor for job hunting. I believe a 70% reduction for failure to mitigate on this point is appropriate, and thus I award the plaintiff $8,671.50 for post-April 1973 damages. On the December 18, 1970 to February 28, 1971 award of $1,100.74, I believe a further award of post-judgment interest from June 23, 1977 (the date of the decision in Hanna I) to date is appropriate. Because of the closeness of the liability question and the good faith of AMC in reasonably

construing its collective bargaining agreement with the UAW (in other words, I do not in any way view this case as one where AMC blatantly disregarded the rights of a veteran), I will not award interest on the damages found to be due for the period of time that followed April 24, 1973." (emphasis added).

On appeal, Hanna contends that:

18

A. The district court exceeded the directive of this court in Hanna I.

19

B. The district court erred in finding that Hanna failed to mitigate damages.

20

C. The district court erred in not awarding Hanna prejudgment interest.

On cross-appeal, AMC contends that:

21

D. The United States Supreme Court's decision in Ford Motor Co. v. EEOC, ___ U.S. ___, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), precludes Hanna from recovering lost wages for the period between April 24, 1973, and November 14, 1977.

22

We shall consider these issues individually.

II

A. HANNA I

23

The appellant initially contends that this court's language in footnote 2 of Hanna I required the district court, on remand, to compensate Hanna with full lost wages from April 24, 1973, to November 14, 1977, if AMC failed to show that Hanna "abandoned his willingness" to continue in AMC's employ when he enrolled in UW-Parkside. In footnote 2 of Hanna I this court stated:

24

"[Hanna is] entitled to recover lost wages from April 24, 1973, when he left [AMC's] employ, to date unless on remand [AMC] can show that [Hanna] abandoned his willingness to continue in its employ under the conditions mandated by the [Veterans' Reemployment Rights] Act when he enrolled in the University of Wisconsin-Parkside in September 1973 as a student seeking a degree."

25

557 F.2d at 122 n. 2. The appellant reasons that he should have been fully compensated for the wages lost during this period because the district court explicitly found that Hanna "did not abandon his willingness to return to work by becoming a student at UW-Parkside in September of 1973."

26

In construing this court's language in footnote 2 of Hanna I, it is important to note that we used the words "entitled to recover lost wages" based upon our interpretation of 38 U.S.C. Sec. 2022 (1976), which provides:

27

"If any employer, who is a private employer or a State or political subdivision thereof, fails or refuses to comply with the provisions of section 2021(a), (b)(1), or (b)(3), or section 2024, the district court of the United States for any district in which such private employer maintains a place of business, or in which such State or political subdivision thereof exercises authority or carries out its functions, shall have the power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, specifically to require such employer to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action. Any such compensation shall be in addition to and shall not be deemed to diminish any of the benefits provided for in such provisions...." (emphasis added).

28

In Hanna I this court determined that AMC had failed to comply with 38 U.S.C. Sec. 2021 (1976), and that pursuant to 38 U.S.C. Sec. 2022 (1976), unless the trial court found that Hanna had abandoned his willingness to return to AMC's employ, Hanna was entitled to the wages he lost as a result of AMC's non-compliance.

29

Title 38 U.S.C. Sec. 2022 (1976) also provides, however, that the district court "shall have the power" to compensate an entitled employee with lost wages. Contrary to the appellant's position, the statute does not mandate the district court to compensate an entitled employee, rather it only affords the district court the power to do so. In Levine v. Berman, _____ (7th Cir.1949) ("Levine "), this court interpreted section 8 of the Selective Training and Service Act of 1940, 50 U.S.C.App. Sec. 308 (1946), the predecessor to 38 U.S.C. Sec. 2021 et seq.,  which provided in pertinent part:

30

"In case any private employer fails or refuses to comply with the provisions of subsection (b) ..., the district court of the United States ... shall have power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, to specifically require

such employer to comply with such provisions, and, as an incident thereto, to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action." (emphasis added).

31

178 F.2d at 444. We held in Levine that the phrase "shall have power," in the context of a veterans' reemployment statute, affords the district court discretion to compensate an entitled employee. Id. at 445. Accord O'Mara v. Petersen Sand & Gravel Co., _____, 898 (7th Cir.1974). In this instance, the district court awarded Hanna lost wages but reduced the award based upon its finding that Hanna failed to mitigate damages. The district court's actions were within its discretionary power to award damages under 38 U.S.C. Sec. 2022 (1976). See id. We next consider whether the district court abused its discretionary power by finding that Hanna failed to mitigate damages.

B. FAILURE TO MITIGATE

32

The appellant contends that AMC failed to meet its burden of proof on the affirmative defense of mitigation, and thus, the district court erred in finding that "to a significant extent, AMC has demonstrated that Mr. Hanna has failed to properly mitigate his damages." To support this contention, the appellant notes that AMC, without calling any of its own witnesses at the trial for damages, simply introduced Hanna's UW-Parkside student transcript and cross-examined Hanna's witnesses in an attempt to prove that Hanna failed to mitigate damages.

33

This court has, in the past, recognized the duty of an employee, who returns from military service and is wrongfully denied employment by his previous employer, to mitigate damages. In Levine we interpreted section 8 of the Selective Training and Service Act of 1940, 50 U.S.C.App. Sec. 308 (1946), the predecessor to 38 U.S.C. Sec. 2021 et seq., and stated, "[u]nder the general rule of damages, where one is injured or damaged by the wrongful act of another, he is bound to exercise reasonable care and diligence in mitigating the resulting damage...." 178 F.2d at 444 (citing Van Doren v. Van Doren Laundry Service, 68 F.Supp. 938, 941 (D.C.N.J.1946)). See also O'Mara v. Petersen Sand & Gravel Co., 498 F.2d at 897-98; Helton v. Mercury Freight Lines, Inc., _____, 368 (5th Cir.1971); Loeb v. Kivo, 169 F.2d 346, 350 (2nd Cir.1948). More recently, in Peel v. Florida Department of Transportation, 500 F.Supp. 526 (N.D.Fla.1980), the United States District Court for the Northern District of Florida applied this "mitigation of damages" principle standard to the Vietnam Veterans' Readjustment Act. See also Chaltry v. Ollie's Idea, Inc., 546 F.Supp. 44, 52 (W.D.Mich.1982).

34

We further note that in the area of employment discrimination, when employees seek lost wages for the period of discrimination, this court requires the employee to initially establish the amount of damages. The burden then shifts to the employer to prove, as an affirmative defense, that the employee failed to mitigate those damages. As we stated in Sprogis v. United Airlines, Inc., (7th Cir.1975) ("Sprogis" ), "once the plaintiff has proven [his] case and established what [he] contends to be [his] damages, the burden of going forward to mitigate the liability, or, to rebut the damage claim, rests with the defendant." 517 F.2d at 392. In order to satisfy its burden of proof, the employer must show that:

35

"(1) the plaintiff failed to exercise reasonable diligence to mitigate his damages, and

36

(2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence. " (emphasis added).

37

Syvock v. Milwaukee Boiler Mfg. Co., 159 (7th Cir.1981). See also Jackson v. Shell Oil Corp., 202 (9th Cir.1983); EEOC v. Sandia Corp., 627 (10th Cir.1980); Sias v. City Demonstration Agency, 696 (9th Cir.1978); Ballard v. El Dorado Tire Co., 906 (5th Cir.1975); NLRB v. Nickey Chevrolet Sales, Inc., 107-08 (7th Cir.), cert. denied, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974). Due to the factual similarity of an employment discrimination case and a case arising under the Vietnam Veterans' Readjustment Act, we apply the two-pronged mitigation test in this instance.  See, e.g., Peel v. Florida Department of Transportation, 500 F.Supp. at 528.

38

According to the first prong of the test, once Hanna established the amount of his damages, AMC was required to raise mitigation as an affirmative defense and demonstrate that Hanna failed to exercise "reasonable diligence" in obtaining comparable employment between April 24, 1973, and November 14, 1977. This court stated in Sprogis that reasonable diligence in seeking comparable employment includes "check[ing] want ads, register[ing] with employment agencies, and discuss[ing] employment opportunities with friends and acquaintances." 517 F.2d at 392. Furthermore, "[i]n Sprogis we held that an employment discrimination plaintiff's formal application for one job and her procurement of another, temporary, position during a two-year period constituted 'reasonable diligence' in attempting to find alternative employment ...." Orzel v. City of Wauwatosa Fire Dept., 756 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 484, 78 L.Ed.2d ---- (1983) ("Orzel" ). Similarly, in Orzel we held that an assistant chief of the Wauwatosa Fire Department, who, during a two-year period, worked as a temporary census taker, applied for a job with the United States Postal Service but was not hired, and

placed his name on file with the Wisconsin Job Service, did not fail to mitigate damages. Orzel, 697 F.2d at 756-57.

39

In this instance, AMC failed to introduce a scintilla of evidence to contradict or discredit Hanna's testimony that he had placed applications on file with various employers, registered with the employment office, discussed employment opportunities with others, checked the want-ads, or secured temporary employment, between April 24, 1973, and November 14, 1977. Instead, AMC introduced Hanna's UW-Parkside student transcript into evidence and relied upon the rationale of Taylor v. _____ Stores, Inc., _____, 268 (10th Cir.1975) ("Taylor "), to claim that Hanna's enrollment as a full-time, day student at UW-Parkside constituted a failure to mitigate damages. In Taylor the United States Court of Appeals for the Tenth Circuit held that the district court had not abused its discretion to award damages, under 42 U.S.C. Sec. 2000e-5(g), by not including the time of an employee's school attendance in the damage computation. The court reasoned that, "[w]hen an employee opts to attend school, curtailing present earning capacity in order to reap greater future earnings, a back pay award for the period while attending school also would be like receiving a double benefit." 524 F.2d at 268.

40

The record reveals that Hanna, who enrolled in a total of sixty-six credit hours at UW-Parkside but earned only sixteen credit hours, offered uncontradicted testimony that he obtained no employment from the skills he learned at UW-Parkside and the only reason he enrolled in school was because he "didn't have a job ... and it was a means of getting some money and income [from veterans' benefits] and plus learning something." Additionally, the parties stipulated to the amount of veterans' benefits Hanna received under the "G.I. bill" while attending school, and subtracted that amount, along with the money Hanna earned from the Wisconsin Natural Gas Company and the Kenosha County Parks Commission, from the total amount of lost wages due for the period between April 24, 1973, and November 14, 1977. Accordingly, Hanna will receive no double benefit for the period he attended UW-Parkside because of the court approved stipulation that subtracted all the veterans' benefits he received ($7,016.00), while in school, from the damage claim. Furthermore, the district court found that:

41

"[Hanna] did not abandon his willingness to return to work by becoming a student at UW-Parkside in September of 1973.... [H]is decision to return to school [was] more accurately ... characterized as ... an alternative that was better than anything else Mr. Hanna had going for him at the moment."

The court added that:

42

"Had [Hanna] been offered a job at AMC with the correct seniority date, I find that he would have either quit school and returned to the job or would have restructured his school courses so that he could return to full time employment while still remaining a student."

43

The evidence presented at the trial for damages revealed that Hanna entered school not to "reap greater future earnings" but because he "didn't have a job ... and it was a means of getting some money and income" from veterans' benefits. Thus, we agree with the district court that Hanna enrolled in school only because that "alternative ... was better than anything else [he] had going for him at the moment." Hanna's uncontradicted testimony, that while attending UW-Parkside he applied for and was at all times ready, willing, and available to accept employment comparable to that of AMC, and the district court's finding that Hanna "did not abandon his willingness to return to work by becoming a student at UW-Parkside," reveal that Hanna had not "curtail[ed] his present earning capacity." Accordingly, the rationale of Taylor, that an award of lost wages for the period in which one attends school, and thereby curtails his present earning capacity in order to reap greater future earnings, constitutes a double benefit, certainly does not apply to the facts in this instance. See, e.g., Washington v. _____, _____, 1079 (8th Cir.1982). In light of the fact that Hanna's testimony remained uncontradicted, the record is void of any other proof on AMC's behalf that Hanna "failed to exercise reasonable diligence in mitigating his damages."

44

Consequently, the district court's findings of fact that Hanna "should have more diligently pursued work that was available" and that Hanna's enrolling at UW-Parkside "significantly cooled his ardor for job hunting" find no support in the record. In addition, these unsupported findings directly conflict with the district court's finding that:

45

"Had [Hanna] been offered a job at AMC with the correct seniority date, I find that he would have either quit school and returned to the job or would have restructured his school courses so that he could return to full time employment while still remaining a student."

46

AMC offered no evidence to contradict the testimony of Hanna or Kenneth Neill, supervisor of Kenosha Job Service, and the district court found neither witnesses' testimony incredible. Moreover, we are unable to find any evidence in the record to contradict the testimony of Hanna or Neill, or to contradict our acceptance of their testimony as a verity. See, e.g., Royal Business Machines v. Lorraine Corp., _____, 47 (7th Cir.1980); Apolskis v. Concord Life Insurance Co., _____, 34 (7th Cir.1971).

47

At the trial for damages, Hanna established that he visited the Kenosha Job Service office, personally placed applications on file at factories in Waukegan, Illinois, Racine, Wisconsin, and Kenosha, Wisconsin, read the want-ads of the Kenosha News, discussed employment opportunities with friends, and worked at least two jobs between April 24, 1973, and November 14, 1977. These actions are more than sufficient to constitute "reasonable diligence" on the part of Hanna. Accord Orzel, 697 F.2d at 756-57; Sprogis, 517 F.2d at 392-93. In light of AMC's failure to introduce evidence to the contrary and in view of present case law, we hold that the district court's findings of fact that Hanna "should have more diligently pursued work that was available" and that Hanna's enrolling in UW-Parkside "significantly cooled his ardor for job hunting" are clearly erroneous.

48

In addition, AMC utterly failed to establish that "there was a reasonable likelihood [Hanna] might have found comparable work" between April 24, 1973, and November 14, 1977. The only evidence in the record on this point consists of Neill's testimony that though work was available for an unskilled laborer within a twenty-seven mile commuting area of Kenosha, there was "no comparable employment to American Motors when all factors [were] concerned [sic]." (emphasis added). AMC offered no evidence to rebut this testimony or to show that jobs existed which were comparable in "pay, status, and other factors to the position" at AMC. Marshall v. Arlene Knitwear, Inc., 454 F.Supp. 715, 730 (E.D.N.Y.1978). See also Ballard v. El Dorado Tire Co., 512 F.2d at 906. The fact that Hanna left two jobs which were not comparable to AMC is of no consequence. A veteran who has been denied reemployment in violation of the Vietnam Veterans' Readjustment Act, has no duty, under the principles of mitigation, to continue at a job which is not comparable to his previous position. As we stated in O'Mara v. Petersen Sand & Gravel Co., 498 F.2d at 897-98, a case arising under the Military Service Act of 1971, 50 U.S.C.App. Sec. 451 et seq. (Supp. I 1971), the predecessor to 38 U.S.C. Sec. 2201, et seq., "[the plaintiff] did not improperly fail to mitigate damages by quitting ... as a laborer, a position inferior to the position as scalemaster." See also Hanna I, 557 F.2d at 122 (Hanna did not waive his rights under the Act by his April 24, 1973, refusal to continue in the inferior status afforded him by the defendant). Thus the district court's finding of fact that "work of a somewhat comparable nature to the unskilled labor performed by Mr. Hanna at AMC was available in the Kenosha area in which Mr. Hanna lived during the period in question," is not supported by the record and, therefore, is clearly erroneous.

49

In light of Hanna's repeated and continuous efforts to secure employment,   and the absence of any proof by AMC concerning Hanna's lack of reasonable diligence or the availability of comparable employment, we conclude that AMC failed to meet its burden of proof on the issue of mitigation. See, e.g., NLRB v. Nickey Chevrolet Sales, Inc., 493 F.2d at 108. Accordingly, we hold the district court's findings of fact that:

50

"[w]ork of a somewhat comparable nature to the unskilled labor performed by Mr. Hanna at AMC was available in the Kenosha area in which Mr. Hanna lived during the period in question[;] ... Mr. Hanna ... should have more diligently pursued work that was available[;] ... AMC has demonstrated that Mr. Hanna has failed to properly mitigate his damages [; and]

51

* * *

52

* * *

53

[Hanna's] enrollment for almost three years as a full time college student ... significantly cooled his ardor for job hunting[,]"

54

are not supported by the record and thus are clearly erroneous. Based upon the evidence presented at the trial for damages, AMC did not demonstrate that Hanna failed to mitigate his damages. The district court's decision, therefore, to reduce the amount of lost wages awarded Hanna for the period between April 24, 1973, and November 14, 1977, due to Hanna's apparent failure to mitigate damages, rises to an abuse of discretion. Accordingly, we hold that the appellant is to receive compensation for his wages lost during the period between April 24, 1973, and November 14, 1977, less the stipulated amount received as veterans' benefits under the "G.I. bill" and the stipulated amounts earned from employment with the Wisconsin Natural Gas Co. and the Kenosha County Parks Commission. In sum, Hanna is to receive $28,905.00 rather than the $8,671.50 awarded by the district court, for the period of his wrongful discharge from April 24, 1973, until November 14, 1977.

C. PREJUDGMENT INTEREST

55

The appellant next contends that he is entitled to the interest which accrued before June 23, 1977, the date of this court's decision in Hanna I, on the damages awarded by the district court for the period between December 18, 1970, and February 28, 1971, and to the interest which accrued before October 27, 1982, the date of the district court's decision, on the damages awarded for the period between April 24, 1973, and November 14, 1977. Appellant initially refers to the district court's ruling which provided, in pertinent part:

56

"On the December 18, 1970 to February 28, 1971 award of $1,100.74, I believe a further award of post-judgment interest from June 23, 1977 (the date of the decision in Hanna I ) to date is appropriate. Because of the closeness of the liability question and the good faith of AMC in reasonably construing its collective bargaining agreement with the UAW (in other words, I do not in any way view this case as one where AMC blatantly disregarded the rights of a veteran), I will not award interest on the damages found to be due for the period of time that followed April 24, 1973."

57

Appellant asserts that "good faith is not a defense to prejudgment interest," in a case arising under the Vietnam Veterans' Readjustment Act, see Hembree v. Georgia Power Co., _____ , 429-30 (5th Cir.1981), thus, in this instance, the trial judge erred by refusing to grant Hanna prejudgment interest on the damage award.

58

Though the award of prejudgment interest in an action under the Vietnam Veterans' Readjustment Act lies within the trial judge's discretion, Hembree v. Georgia Power Co., 637 F.2d at 429; Chernoff v. Pandick Press, Inc., 440 F.Supp. 822, 827 (S.D.N.Y.1977), we note the United States Supreme Court's language in Fishgold v. Sullivan, _____, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946) that:

59

"The Act was designed to protect the veteran in several ways. He who was called to the colors was not to be penalized on his return by reason of his absence from his civilian job. He was, moreover, to gain by his service for his country an advantage which the law withheld from those who stayed behind.

60

* * *

61

* * *

62

This legislation is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need...."

63

328 U.S. at 284-85, 66 S.Ct. at 1110-1111. See also Coffy v. Republic Steel Corp., _____ , 196, 100 S.Ct. 2100, 2104, 65 L.Ed.2d 53 (1980); Alabama Power Co. v. Davis, _____ , 584-85, 97 S.Ct. 2002, 2004-2005, 52 L.Ed.2d 595 (1977); Dyer v. Hinky Dinky, Inc., _____ , 1350 (8th Cir.1983); Hanna I, 557 F.2d at 119-20. The purpose of the Vietnam Veterans' Readjustment Act "is that the veteran should be made whole, and reimbursed for the measurable wage disadvantage or

loss suffered through his incorrect reinstatement." (emphasis added). Helton v. Mercury Freight Lines, Inc., 444 F.2d at 367. Finally,

64

"[i]nterest is a proper ingredient of the instant 'make whole' remedy and should be granted. Prejudgment interest is viewed as effectuating the purposes of the Act, particularly that of encouraging reemployment of veterans ... at the earliest opportunity."

65

Peel v. Florida Department of Transportation, 500 F.Supp. at 528 (and cases cited therein).

66

In accord with the policy of the Vietnam Veterans' Readjustment Act that "one called to the colors [is] not to be penalized upon his return by reason of his absence from his civilian job," Fishgold v. Sullivan, 328 U.S. at 284, 66 S.Ct. at 1110, the trial judge's discretion in awarding prejudgment interest must be guided by the principle of "making whole" the returning veteran. Thus, the employer's denial of employment to a returning veteran, based upon an apparent "good faith" reliance on the Union bargaining agreement, is of no consequence in a case arising under the Vietnam Veterans' Readjustment Act. For as the United States Supreme Court stated in Fishgold, "no practice of employers or agreements between employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act." (emphasis added). 328 U.S. at 285, 66 S.Ct. at 1111. Furthermore, as this court stated in Hanna I, with regard to Hanna's original "lay off," "[i]t is irrelevant that [AMC] may have laid [Hanna] off in good faith." 557 F.2d at 122.

67

Applying that rationale to the facts of this instance, the district court's reliance upon "the good faith of AMC" in order to deny Hanna prejudgment interest, and thus prevent him from being "made whole," was improper. See Hembree v. Georgia Power Co., 637 F.2d at 429-30; Coffy v. Republic Steel Corp., 91 Lab.Cas. p 12,843 (N.D.Ohio 1981) (on remand from the United States Supreme Court). In addition, the district court's reliance upon the "closeness of the liability question" in order to deny Hanna prejudgment interest was also improper, in light of our holding that the liability question is well-settled and AMC owes Hanna full wages lost for the period between April 14, 1973, and November 24, 1977. Thus, in furtherance of our duty to liberally construe the Act for those "called to the colors" we hold that the district court's denial of prejudgment interest, based upon AMC's apparent "good faith" and "closeness of the liability question" without any apparent regard for the policy to "make whole" a returning veteran, rises to an abuse of discretion. Accord Hembree v. Georgia Power Co., 637 F.2d at 430. Contra, Chernoff v. Pandick Press, Inc., 440 F.Supp. at 827.

68

In order that Hanna be "made whole," we award him prejudgment interest, at the rate of 7% per annum, on the $28,905.00 awarded in lost wages for the period between April 24, 1973 and November 14, 1977.   We calculate the total amount of prejudgment interest on this award to be $15,347.56.   In addition, we award Hanna prejudgment interest, at the rate of 7% per annum, on the $1,100.74 awarded by the district court for the period between December 18, 1970, and February 28, 1971. We calculate this interest, which accrued before this court's decision in Hanna I, to be $487.97.

D. FORD MOTOR CO. v. EEOC

69

Cross-appellant, AMC, contends that the United States Supreme Court's decision in Ford Motor Co. v. EEOC, ＿＿＿＿＿＿＿, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), precludes Hanna from recovering any lost wages for the period between April 24, 1973, and November 14, 1977. AMC reasons that when it reemployed Hanna on March 22, 1973, as a "new hire," following his honorable discharge from the Armed Forces, AMC was relieved of any future duty to pay Hanna lost wages. In Ford Motor Co. v. EEOC, the United States Supreme Court held that when Ford refused to hire three qualified women for a certain position, instead hired three qualified men, later offered the same position to two of the women without seniority retroactive from their original application, and was then found liable for sex-based employment discrimination in violation of 42 U.S.C. Sec. 2000e-2(a), Ford was not required to compensate the women for lost wages which accrued after Ford's job offer without retroactive seniority.

70

Following a careful reading of Ford Motor Co. v. EEOC, we conclude that the Court's holding is inapplicable to this case which arises under the Vietnam Veterans' Readjustment Act. Title 38 U.S.C. Sec. 2021(b) requires that the veteran be "reemployed without loss of seniority" and that the veteran be given "such status in ... employment as [he] would have enjoyed if [he] had continued in such employment continuously...." Additionally, the United States Supreme Court has stated that a veteran "does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously during the war." Fishgold v. Sullivan Corp., 328 U.S. at 284-85, 66 S.Ct. at 1110-1111. If an employer adhered to the holding of Ford Motor Co. v. EEOC and offered the returning veteran his previous job but refused to grant the veteran proper seniority and status, the employer would be in direct violation of 38 U.S.C. Sec. 2021(b). Because the application of Ford Motor Co. v. EEOC to a case arising under the Vietnam Veterans' Readjustment Act would not only demean the veteran's service to his country but would also promote unlawful activity, we agree with the district court and hold that the decision in Ford Motor Co. v. EEOC is inapplicable in this case. Accord Stevens v. Tennessee Valley Authority, ＿＿＿＿＿＿, 316 (6th Cir.1983).

III

71

We reverse the judgment of the district court and award appellant $28,905.00 in lost wages, including prejudgment interest in the amount of $15,347.56, for the period between April 24, 1973, and November 14, 1977. In addition, we award appellant prejudgment interest in the amount of $487.97 on the $1,100.74 in lost wages awarded by the district court for the period between December 18, 1970, and February 28, 1971. The district court is ordered to enter judgment accordingly.

72

BAUER, Circuit Judge, concurring in part, dissenting in part. I concur with the majority's conclusion that, in the absence of any contrary evidence from the defendant, the plaintiff's evidence established that he exercised reasonable diligence in seeking comparable employment.

73

In my opinion, however, the majority has misconstrued the prejudgment interest issue. The majority's exclusive reliance on the proposition that the district court's discretion "must be guided by the principle of 'making whole' the returning veteran," is incorrect. Rather, absent an explicit statutory directive requiring an award of prejudgment interest, in exercising its discretion the district court may consider other factors, including "an assessment of the equities" presented in the case. See, e.g., Lodges 743 & 1746, International Association of Machinists v. United Aircraft Corp., , 446 (2d Cir.1975), cert. denied, 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976) (case arising under labor laws). The district court's consideration in this case of the amount of the plaintiff's recovery relative to the "closeness of the liability question" thus does not constitute an abuse of discretion. Moreover, even if the "make whole" policy of the Vietnam Veterans' Readjustment Act precludes such a consideration, nothing in the district court's opinion indicates that the award of $28,905.00 lost wages is insufficient to make the plaintiff whole, as did the lost wages in Chernoff v. Pandick Press, Inc., 440 F.Supp. 822, 827 (S.D.N.Y.1977). It is the district court's discretion that should control the result in this case. Accordingly, I dissent from that portion of the majority opinion.

The Honorable Anthony J. Celebrezze, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, is sitting by designation

The case originated in January 1975, when the Department of Justice, on behalf of Hanna, filed suit in the United States District Court for the Eastern District of Wisconsin, claiming that AMC had violated Hanna's rights under the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. Sec. 2021 et seq. (1976). In May 1976, the district court granted AMC's motion for summary judgment and dismissed the case. In June 1977, this court held that AMC had, in fact, violated 38 U.S.C. Sec. 2021 et seq. (1976), thus reversing the district court's judgment and remanding the case. See Hanna v. American Motors

Corp., 557 F.2d 115 (7th Cir.1977). In February 1979, the district court dismissed the case pursuant to Fed.R.Civ.P. 41(b) for failure to prosecute. In January 1981, this court, in an unpublished order, reversed the district court's dismissal and remanded the case for determination of damages. In October 1982, Hanna, acting through private counsel, proceeded to trial on the issue of damages in the United States District Court for the Eastern District of Wisconsin

The record fails to indicate what action, if any, was taken by UAW board members after they were contacted by Hanna

FN2

He will also be entitled to recover lost wages from April 24, 1973, when he left defendant's employ, to date unless on remand defendant can show that plaintiff abandoned his willingness to continue in its employ under the conditions mandated by the Act when he enrolled in the University of Wisconsin-Parkside in September, 1973 as a student seeking a degree. See Taylor v.         Stores, Inc., _____, 267-268 (10th Cir.1975)."

The evidence revealed that at some time between April 24, 1973, and November 14, 1977, Hanna worked for a single day at Morelli's Overseas Export Company, but left because the "loading and unloading of hundred pound boxes" was "much too difficult."

As this court stated in Hanna I:

"The original statute establishing veterans' reemployment rights was the Selective Training and Service Act of 1940, 54 Stat. 885. The name of the Act was changed in 1948 to the Selective Service Act of 1948, 62 Stat. 604, and again in 1951 to Universal Military Training and Service Act, 65 Stat. 75. In 1967 the Act was renamed the Military Selective Service Act of 1967, 81 Stat. 100, and in 1971 the name was changed to Military Selective Service Act, 85 Stat. 348, and found at 50 U.S.C.App. Sec. 459. The reemployment provisions of the Military Selective Service Act were codified in 1974 with nonsubstantive wording changes in the Vietnam Veterans' Readjustment Act of 1974, 88 Stat. 1578, 38 U.S.C. Sec. 2021 et seq. The reemployment provision of the various Acts are substantially identical. Thus the judicial precedents developed under them are largely interchangeable."

557 F.2d at 119 n. 1.

See footnote 4

In an employment discrimination case the employee seeks damages, in the form of lost wages, for the period of discrimination, and the employer attempts to show that the employee failed to mitigate those damages. An analogous situation is present in this instance, Hanna seeks damages, in the form of lost wages, for the period he was denied employment with seniority, and AMC attempts to show that Hanna failed to mitigate those damages

AMC and Hanna stipulated that Hanna received $7,016.00 in veterans' benefits under the "G.I. bill" between April 24, 1973 and November 14, 1977. In addition, Hanna earned $598.00 while employed by the Wisconsin Natural Gas Company and $1,312.00 while employed by the Kenosha County Parks Commission

In reviewing the district court's finding of fact we are bound by the finding unless it is clearly erroneous. Fed.R.Civ.P. 52(a). Thus, unless we are left with a "definite and firm conviction that a mistake has been committed," United States v. United States Gypsum Co., _____, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948), we must accept the trial court's findings. See Inwood Laboratories v. Ives Laboratories, _____, 855, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982). In this instance, AMC's failure to introduce any evidence, other than Hanna's UW-Parkside student transcript, on the issue of Hanna's "reasonable diligence," leaves us with a "definite and firm conviction" that the trial court erred in finding that Hanna "should have more diligently pursued work that was available" and that Hanna's enrolling in UW-Parkside, "significantly cooled his ardor for job hunting."

See footnote 4

According to United States Court of Appeals for the Tenth Circuit in EEOC v. Sandia Corp., ____ ___ (10th Cir.1980) "[a] claimant is required to make only reasonable exertions to mitigate damages, and is not held to the highest standard of diligence. It does not compel him to be successful in mitigation. It requires only an honest good faith effort." 639 F.2d at 627 (quoting United States v. Lee Way Motor Freight, Inc., ___ ___ ___ ___ ___, 938 (10th Cir.1979))

Appellant is entitled to $37,831.00 in lost wages, less $8,926.00 for money received as veterans' benefits under the "G.I. bill" and money earned from his employment with the Wisconsin Natural Gas Company and the Kenosha County Parks System

The district court reasoned in Chernoff v. Pandick Press that, "[b]y receiving his lost wages as a lump sum, [plaintiff] will find himself in a much better financial position than if he had been continuously employed by [defendant].... [Plaintiff] will have been at least fully 'made whole' even without an award of [prejudgment] interest." The district court failed to support this novel and unique theory with any case law and we are unable to find any case law providing that a returning veteran who is denied prejudgment interest is "made whole," within the meaning of the Vietnam Veterans' Readjustment Act, simply because he received lost wages in a lump sum payment. In fact, according to the "legislation's overall purpose ... the [returning] veteran should be made whole, and reimbursed for the loss suffered through his incorrect reinstatement, " (emphasis added) Helton v. Mercury Freight Lines, Inc., 444 F.2d at 367, including the interest that would have accrued on the lost wages unlawfully denied the veteran. Accord Hembree v. Georgia Power Co., 637 F.2d at 430; Green v. Oktibbeha County Hospital, 526 F.Supp. 49, 53 (N.D.Miss.1981); Coffy v. Republic Steel Corp., 91 Lab.Cas. p 12,843 (N.D.Ohio 1981) (on remand from the United States Supreme Court); Peel v. Florida Department of Transportation, 500 F.Supp. at 528

Pursuant to Fed.R.App.P. 37, "[i]f a judgment is modified or reversed with a direction that a judgment for money be entered in the district court, the mandate shall contain instructions with respect to allowance of interest." In this instance, we instruct the district court to apply an interest rate of 7% per annum, the statutory interest rate in Wisconsin for the majority of the time in question. See Wis.Stats. Sec. 814.04 (1977)

Due to the fact that this lawsuit originated in 1975, and has been before this court on three separate occasions, we have calculated the prejudgment interest award in order to facilitate and expedite payment of the same in the district court

According to the AMC wage schedule between April 24, 1973, and November 14, 1977, after subtracting the amount of veterans' benefits and the wages earned from the Wisconsin Natural Gas Company and the Kenosha County Parks System, Hanna would have received $3,911.81 in 1973, $5,798.00 in 1974, $6,643.64 in 1975, $5,419.72 in 1976, and $7,133.38 in 1976. The prejudgment interest accruing on this amount, between April 24, 1973, and the date of the district court's decision on October 27, 1982, is $15,347.56.

The district court has already awarded $408.00 in postjudgment (post-Hanna I ) interest on the $1,100.74 award for the period between December 18, 1970, and February 28, 1971. To that award of interest, we now add prejudgment interest, accruing between February 28, 1971, and June 23, 1977, (pre-Hanna I ) in the amount of $487.97

712 F.2d 1047

118 L.R.R.M. (BNA) 3201

**John H. STEVENS, Plaintiff-Appellant,**
**v.**
**TENNESSEE VALLEY AUTHORITY, Defendant-Appellee.**

No. 81-5355.

# United States Court of Appeals, Sixth Circuit.

Argued May 19, 1982.
Decided July 12, 1983.

Robert S. Olive (argued), McCord & Cockrill, Knoxville, Tenn., for plaintiff-appellant.

Herbert S. Sanger, Jr., Gen. Counsel, Justin M. Schwamm, Sr., Asst. Gen. Counsel, Thomas C. Doolan (argued), Tenn. Valley Authority, Knoxville, Tenn., for defendant-appellee.

Before ENGEL, Circuit Judge, BROWN, Senior Circuit Judge and GUY, District Judge.
ENGEL, Circuit Judge.

The specific issue we address in this appeal is whether any private right of action under the Veteran's Preference Act, as made applicable to United States employees in 5 U.S.C. § 3551, is subject to temporal limitations upon when suit can be brought. The trial judge, relying primarily upon Erwin v. Neal, 494 F.2d 1351 (6th Cir.1974), held the action to be time-barred by what he perceived to be Tennessee's most nearly analogous state statute of limitations, Tenn.Code Ann. § 28-3-104(a). That statute provides a one-year limitation upon actions "for injuries to the person."

2

In reversing, we borrow from what we conceive to be the most nearly applicable federal statute, that which provides identical rights to veterans returning to private, state and municipal employment. Because that statute specifically rejects state statutes of limitations, we do likewise and hold that any limitation upon a right to sue is governed by the equitable doctrine of laches. We hold that to apply state statutes of limitation to federal employees while state and private employees are expressly free of them would produce an anomalous result which Congress could not have intended.

3

Stevens was hired by the TVA in 1976 as a steamfitter. While so employed, he was ordered by the Tennessee Army National Guard to report for full-time training from November 29, 1978 through August 17, 1979. Stevens requested a leave of absence from his employment during this period of military service, but his request for that status was denied and his employee status was later terminated on December 13, 1978 because of his unavailability for work. On August 20, 1979, following completion of active duty service, Stevens made an application for restoration to his employment under 5 U.S.C. § 3551. The TVA refused to reinstate Stevens to his earlier position with his earlier seniority, but it did offer him employment as a "new hire." By letter of September 9, 1979, Stevens was advised that the offer of reemployment would remain open until September 19, 1979. Stevens chose, however, not to accept that offer, indicating that he could accept the position only upon Union referral. While the merits of Stevens' claim on entitlement to restoration are not before us, the dispute appears to center upon Stevens' status as an employee, and whether that status was entitled to protection under the Veteran's Preference Act as made applicable to United States employees in 5 U.S.C. § 3551.

4

On September 24, 1979, Stevens filed a petition with the Merits Systems Protection Board (formerly the Civil Service Commission), claiming restoration rights under both 5 U.S.C. § 3551 and 38 U.S.C. § 2024(d) and (f). The latter sections specifically give to National Guardsmen who are called into active duty for training the same reemployment rights enjoyed by other members of the Armed Forces under 38 U.S.C. § 2021. The Merit Systems

Protection Board held first that it had no jurisdiction to decide Stevens' claim under 5 U.S.C. § 3551 and, second, that because Stevens was classified as a "temporary" employee of TVA at the time he left for military duty, he was not entitled to restoration under 38 U.S.C. § 2024. See 38 U.S.C. § 2021. The Board denied Stevens' request for reconsideration of its decision on October 24, 1980. Upon appeal to this Court, the Board's decision was reversed on the single ground that the Board applied an incorrect legal standard in deciding whether Stevens was a temporary employee. That case is now on remand to the Board for decision under a correct legal standard. See Stevens v. TVA, ___ ___ ___ ___ (6th Cir.1982).

On November 26, 1980, one month after the Board's final decision rejecting his administrative appeal, Stevens filed the present action in the United States District Court for the Eastern District of Tennessee upon the theory that 5 U.S.C. § 3551 conferred upon him a private right of action where his rights thereunder were abridged. He asked for reinstatement with full seniority, damages reflecting the difference in pay between what he earned in his employment with another employer and what he would have earned at TVA, and consequential damages for various benefits associated with employment at TVA. The TVA moved for judgment on the pleadings, claiming that Stevens' action was time-barred by the one-year limitation provision of Tenn.Code Ann. § 28-3-104 and, further, that Stevens was not entitled to the benefit of section 3551. The district court denied the motion, but after a full trial on the merits it found that suit was in fact time-barred by Tennessee's one-year statute. Stevens v. Tennessee Valley Authority, 517 F.Supp. 75 (E.D.Tenn.1981). Having so found, the trial court declined to reach the merits of Stevens' claim. Id. at 77.

I.

Stevens' action against TVA in the district court is predicated upon the assumption that 5 U.S.C. § 3551, although silent on the question, creates an implied private cause of action. Ordinarily, the failure of Congress to provide an express provision creating a cause of action under 5 U.S.C. § 3551, while at the same time having specifically provided for those reemployment rights created under 38 U.S.C. §§ 2021 and 2024, would present a difficult question concerning whether Congress intended to create such an action. However, that issue

has not been raised here, and we have concluded that we are entitled to consider the issue waived. "The question of whether a cause of action exists is not a question of jurisdiction, and therefore may be assumed without being decided" in the absence of objection. Burks v. Lasker, , 475-76, 476 n. 5, 99 S.Ct. 1831, 1835-36, 1836 n. 5, 60 L.Ed.2d 404 (1979); see Herm v. Stafford, (6th Cir.1981); Fogel v. Chestnutt, (2d Cir.1981).

II.

7

After a review of the briefs originally filed in this appeal and after oral argument, we requested submission of additional briefs on whether the proper statute of limitations was to be found at 28 U.S.C. § 2401(a) or (b), which provide a limitation upon when suits "against the United States" may be brought. It appeared after a review of the language of § 2401, especially in light of Saffron v. Dept. of Navy, (D.C.Cir.1977), cert. denied, 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978), that there might be a federal statute which specifically covered such actions. In such case it would have been inappropriate to consult Tennessee law. As Justice Frankfurter observed:

8

If Congress explicitly puts a limit on the time for enforcing a right which it created, there is an end of the matter. The Congressional statute of limitation is definitive. The rub comes when Congress is silent.

9

Holmberg v. Armbrecht, , 395, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946) citation omitted; accord, Meeker & Lehigh v. Valley R.R. Co., , 423, 35 S.Ct. 328, 332-33, 59 L.Ed. 644 (1915). The period of delay here is apparently 15 months. If 28 U.S.C. § 2401 is applicable, suit was timely under either subsection (a) or (b).

10

We recognize that since the statute of limitation is an affirmative defense, the burden would have normally been upon TVA to assert the proper statute and that, therefore, it would be inappropriate to consider a statute upon which no party has relied. At the same time, the issue

of the proper statute of limitation was raised in the district court, and the case was decided on that issue. We agree with the District of Columbia Circuit it would be improper to ignore altogether a limitation if Congress has distinctly made it applicable. Thus, as did the district court in Saffron, we notice sua sponte the potential application of the statute. For the reasons which follow, however, we are satisfied that 28 U.S.C. § 2401(a) and (b) have no applicability to any actions brought in the district court against the TVA under 5 U.S.C. § 3551.

11

As the TVA points out in its brief, section 2401 was originally enacted in 1948 as a part of the codification of the judicial code entitled 28 U.S.C., and it combined two separate and pre-existing limitations for suits against the United States as an entity. Subsection 2401(b) was originally enacted in 1946 as section 420 of the Federal Tort Claims Act, 60 Stat. 845 ("F.T.C.A."). Section 421 of the F.T.C.A. provides that the act shall not apply to "any claim arising from the activities of the Tennessee Valley Authority", and further holds that the limitations sections apply only to "claim[s] against the United States cognizable under this title." In like manner, section 2401(a) is inapplicable to suits against the TVA. Although appearing to be general in its language, section 2401 derives from the provisions of the Tucker Act, which provides a comprehensive system for commencement of actions against the United States as an entity. The Tucker Act also specifically exempts the TVA from its operation, 28 U.S.C. § 1491 (1976); Supp. 5 (1948); Jackson v. Tennessee Valley Authority, 462 F.Supp. 45, 54 (M.D.Tenn.1978), aff'd, 595 F.2d 1120 (6th Cir.1979).

12

The Tucker Act exemption provision is expressly addressed to actions brought in the Court of Claims but not to those brought in district court. See 28 U.S.C. § 1491 (1976). The TVA argues, however, that it is applicable in the present case. The Tucker Act, as carefully analyzed in Saffron, supra, was designed by Congress to provide a vehicle for making claims against the United States by creating general jurisdiction to hear such claims in the United States Court of Claims while providing concurrent jurisdiction over claims of $10,000 or less in the United States District Courts. 28 U.S.C. § 1346(a)(2). As the jurisdiction of both courts

in the reach of their authority under the Act is otherwise the same, the TVA asserts that the exemption applies with equal force to actions brought in the district courts.

13

It is at first difficult to understand why the TVA would not be subject to the more general provisions of section 2401 since they do not seem specifically so limited. The answer is, we believe, found in the nature of the Tennessee Valley Authority as that entity is organized by statute. While each party cites authorities to the effect that the TVA is in fact a governmental entity, the truth is that it is somewhat of a statutory hybrid, deliberately made so by the Congress, which intended to tailor its status to its needs as Congress perceived them. The act creating the TVA divides the functions and powers of the TVA into those which are specifically proprietary in nature and those which are acts which can be performed by the TVA on behalf of the United States, 16 U.S.C. § 831c. Clearly, under section 831c(b), the TVA has power to sue and be sued in its corporate name, and, by implication at least, not in the name of the United States of America. There is a specific provision empowering the TVA to act on behalf of the United States and in the name of the United States, but that provision is confined to certain powers specifically enumerated therein, 16 U.S.C. §§ 831c(h) & (k). The plain implication is that Congress intended that, for ordinary purposes of litigation, suits against the TVA are not suits against the United States. Since the statute in question deals only with suits against the United States, it follows perforce that the TVA is correct in claiming that section 2401 is inapplicable to it. We find ourselves, therefore, wiser, but back where we started.

III.

14

In applying the one-year Tennessee personal injury statute of limitation, the district judge observed:

15

It is a well-established principle of law, which is not disputed, that if the federal statute upon which the cause of action is based does not provide a statute of limitations, the court must look to the state statute of limitations which in this case is Tennessee, for the statute which is

most appropriate. Auto Workers v. Hoosier Cardinal Corp., ___ ___, 703-04 [86 S.Ct. 1107, 1111-12, 16 L.Ed.2d 192] (1966); Warner v. Perrino, ___ ___, 174 (6th Cir.1978).

16

Two separate limitation periods were claimed to govern. Plaintiff claimed that Tenn.Code Ann. § 28-3-105 applied because his cause of action was analogous to that section, which provides:

17

a civil action based upon the alleged violation of any federal or state statute creating monetary liability for personal services rendered, or liquidated damages or other recovery therefore, when no other time of limitation is fixed by the statute creating such liability ....

18

On the other hand, the TVA argued in favor of the previously cited Tenn.Code Ann. § 28-3-104, which provides a one-year limitation for personal tort actions. Between those two cited statutes, the trial judge concluded that the most nearly analogous statute was 28-3-104, relying upon Erwin v. Neal, 494 F.2d 1351 (6th Cir.1974).

19

Erwin involved the claims of a nontenured school teacher in Tennessee whose contract was not renewed and who filed suit for reinstatement and damages upon the claim that his termination had been in violation of his civil and constitutional rights. Under such circumstances, the court treated the right of action as one basically for "injuries to the person" and, thus, subject to the one-year limitation of Section 23-3-104. Finding the facts in Erwin indistinguishable in any practical sense from those at hand, the trial judge applied the one-year statute and dismissed the complaint.

20

While the position taken by the learned trial judge is indeed plausible, review of applicable authorities convinces us that it would be error to seek to apply the most nearly analogous state statute to any actions brought or created under section 3551. Occidental Life Insurance

Company v. EEOC, _____, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), is particularly relevant to the question presented here.

21

Occidental was a Title VII action in which the Supreme Court created an exception to the general rule that federal courts must apply analogous state statutes of limitations to actions under federal statutes which do not specify their own limitation periods. The district court applied a California one-year statute of limitations to the action, but the EEOC claimed that such application unduly interfered with the statutory scheme of Title VII, which required the EEOC to engage in a process of conciliation and negotiation before any suit could be filed. In Occidental, suit was not filed within the one-year period because the EEOC conciliation efforts were not completed by then. While the Supreme Court simply could have held that the one-year statute of limitations was tolled pending the completion of EEOC conciliation efforts, it chose instead to create a potentially broad exception to the former rule of applying state statutes of limitation:

22

When Congress has created a cause of action and has not specified the period of time within which it may be asserted, the Court has frequently inferred that Congress intended that a local time limitation should apply. E.g., Runyon v. McCrary, _____, 179-182 [96 S.Ct. 2586, 2598-2600, 49 L.Ed.2d 415] (Civil Rights Act of 1866); Auto Workers v. Hoosier Cardinal Corp., _____ [86 S.Ct. 1107, 16 L.Ed.2d 192] (§ 301 of the Labor Management Relations Act); O'Sullivan v. Felix, _____ [34 S.Ct. 596, 58 L.Ed. 980] (Civil Rights Act of 1871); Chattanooga Foundry & Pipe Works v. Atlanta, _____ [27 S.Ct. 65, 51 L.Ed. 241] (Sherman Antitrust Act); Campbell v. Haverhill, _____, [15 S.Ct. 127, 39 L.Ed. 280] (Patent Act). This 'implied absorption of State statutes of limitation within the interstices of ... federal enactments is a phase of fashioning remedial detail where Congress has not spoken but left matters for judicial determination.' Holmberg v. Armbrecht, _____, 395 [66 S.Ct. 582, 584, 90 L.Ed. 743].

23

But the Court has not mechanically applied a state statute of limitations simply because a limitations period is absent from the federal statute. State legislatures do not devise their

limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of national policies. "Although state law is our primary guide in this area, it is not, to be sure, our exclusive guide." Johnson v. Railway Express Agency, ⎯⎯⎯⎯⎯, 465 [95 S.Ct. 1716, 1722, 44 L.Ed.2d 295]. State limitations periods will not be borrowed if their application would be inconsistent with the underlying policies of the federal statute. Ibid.; Auto Workers v. Hoosier Cardinal Corp., supra [383 U.S.], at 701 [86 S.Ct. at 1110-1111]; Board of County Comm'rs v. United States, ⎯⎯⎯⎯⎯, 352 [60 S.Ct. 285, 289, 84 L.Ed. 313].

24

Occidental Life Insurance Company v. EEOC, supra, 432 U.S. at 367, 97 S.Ct. at 2455 (emphasis added).

25

Three considerations persuade us that we should follow Occidental and hold that no state statute of limitation applies and that therefore the limitation upon the right of action in such actions as this is governed by the equitable doctrine of laches.

26

First, the statute under which this suit is brought, section 3551, applies exclusively to employees of government agencies and to no one else.  It does not have the type of general application which might make it desirable to meld national law to local law to accommodate various local notions of timeliness. There is no good reason why a national law applied only to national agencies and for the benefit of its employees should be differently construed for the employees of the same authority merely by virtue of their physical location in one state as contrasted to another.

27

Second, analogous federal law may also be considered when searching for a nearly analogous law. Of course, Congress' historic reticence to provide its own statute of limitations for causes of action created by it usually frustrates any frequent application of such a method. When the rule requiring application of the most nearly analogous state statute developed, it was altogether likely that the only analogous cases were to be found in state law and that, for want of a better source, state law accorded a reasonable basis for limiting actions where the federal

statute was silent. We can discern no affirmative reason to ignore the Congressional intent as expressed in another federal statute if in fact that statute is most nearly analogous to the one under scrutiny and there is no clear indication of intent to the contrary. So viewed it is then obvious that the nearly analogous statute is that which provides for the protection of veterans' benefits accorded to persons other than those in federal employ. That statute is 38 U.S.C. § 2022.

28

Congress first established veterans' reemployment rights in the Selective Training & Service Act of 1940, Pub.L. No. 76-783, 54 Stat. 885 (Sept. 16, 1940). Section 8 of the 1940 Act specifically provided a private cause of action by servicemen to enforce the reemployment provisions of the Act, but made no reference to any statute of limitations. 50 U.S.C.App. § 308(e) (1946). The Act was reenacted in 1942, 1944, and 1946, finally expiring in March 1947. See 50 U.S.C.App. at p. 7503 (1952). The Act was replaced by the Selective Service Act of 1948, Pub.L. No. 80-759, 62 Stat. 604 (June 24, 1948), section 9 of which reenacted in substantially identical form the reemployment rights earlier granted in the 1940 Act. Section 9(d) of the 1948 Act carried forward the veteran's right of action in federal court against private employers and was itself codified at 50 U.S.C.App. § 459(d). In 1974 the section authorizing suit was amended and recodified and now appears at 38 U.S.C. § 2022. See generally Vietnam Era Veteran's Readjustment Assistance Act of 1974, § 404(a), Pub.L. No. 93-508, 88 Stat. 1578, 1596 (Dec. 3, 1974).

29

Before the 1974 Act was passed, it was the practice generally for federal courts in considering any temporal limitations upon the right of actions created to enforce veterans' reemployment rights to categorize claims for backpay and money damages by veterans as legal claims and apply thereto the most nearly analogous state statute of limitations. At the same time, courts classified claims for reinstatement and seniority as equitable and subject only to the defense of laches. See Gruca v. U.S. Steel Corp., , 1257 (3rd Cir.1974); Bell v. Aerodex, Inc., , 872 (5th Cir.1973) (dictum) and cases cited therein; Delman v. Federal Products Corp., , 126, 127 (1st Cir.1958); Armstrong v. Baker, 394

F.Supp. 1380, 1384-85 (N.D.W.Va.1974); Hicks v. U.S. Radiator Co., 127 F.Supp. 429, 430 (E.D.Mich.1955); Walsh v. Chicago Bridge & Iron Co., 90 F.Supp. 322, 326 (N.D.Ill.1949).

30

Not all federal courts have agreed with the distinction between claims for reinstatements and claims for backpay. At one extreme the Second Circuit characterized all claims for relief as equitable and thus not subject to state statutes of limitation under the 1940 and 1948 Acts. Ufland v. Buffalo Courier Express, Inc., 394 F.Supp. 199, (W.D.N.Y.1974). On the other hand, a Fifth Circuit case explicitly rejected the equity/law distinction to hold that an Alabama statute of limitations applied under the 1948 Act whether the relief sought was equitable or legal or both. Blair v. Page Aircraft Maintenance, Inc., 467 F.2d 815, 819 (5th Cir.1972).

31

In 1974 the 1948 Act, as codified and reenacted from time to time, was recodified as 38 U.S.C. § 2021 et seq. It was amended in two particulars which are significant here. For the first time section 2022 permitted suits by veterans against not only private employers but also state and local governments. Also, there was added to section 2022 the following language: "no state statute of limitations shall apply to any proceedings under this chapter." 38 U.S.C. § 2022 (1979).

32

It is therefore seen that, in explicitly providing that state statutes of limitations were not to apply to veterans' reemployment actions, Congress overruled all of the preceding cases which applied state statutes to legal or equitable claims by veterans under the preexisting Act, including among those cases one relied upon by the district judge here. Hire v. E.I. DuPont v. DeNemours & Co., 324 F.2d 546, 549 (6th Cir.1963) (applying the Tennessee statute to a veteran's claim for severance pay based upon the forerunner of the present section).

33

The legislative history accompanying the amendments makes it clear that Congress specifically intended to overrule cases like Blair v. Page Aircraft, supra; Bell v. Aerodex, Inc., supra, and Gruca v. U.S. Steel Corp., supra, as inconsistent with the original intent of Congress; that Congress did not intend that state statutes of limitations should apply to

reemployment actions but that they should be subject only to the doctrine of laches; and that this was true whether historically the particular remedy sought was legal or equitable. See S.Rep. No. 907, 93d Cong., 2nd Sess. 111 (1974), reprinted in 120 Cong.Rec. 2022 (1974).

34

Federal courts have uniformly held section 2022 to be retroactive, and have applied it to cases commenced before the date of the amendment, see e.g., Hirschberg v. Braniff Airways, Inc., 404 F.Supp. 869, 873-74 (E.D.N.Y.1975); Letson v. Liberty Mutual Ins. Co., 523 F.Supp. 1221, 1224 (N.D.Ga.1981) and cases cited therein. One of the principle reasons given for retroactive application relied upon in Hirschberg, supra, was that the legislative history of the 1974 amendment indicated that Congress had merely clarified its original intent; it had not in any way considered that the amendments were a departure from existing laws:

35

The Senate Report says unmistakably that the amendment "reaffirms and reflects more clearly" the original intent of Congress; in other words that its purpose was to clarify the law.

36

404 F.Supp. at 872.

37

If, therefore, by its 1974 amendments to the veteran's reemployment actions against private employers and against state and local government employers, the Congress clearly intended that state statute of limitations not be applied, it would be at the very least incongruous to hold that state statute of limitations should be applied to limit a federal employee's actions in a federal court against a federal agency and specifically asserting a federally-created statutory right when similar actions by employees of private employers are not so limited. It is true, of course, that in 1974 Congress did not also amend 5 U.S.C. § 3551 and that it clearly could have done so had it wished to make the amendment applicable to that section of the law. While normally we would be inclined to believe that the omission was as significant with respect to section 3551 as was its inclusion with respect to section 2022, on further reflection we conclude to the contrary. The short and proper answer, we believe, is that Congress did

not think to amend section 3551 because to that time no court had thought to apply any state statute of limitations to actions brought under that section. In other words, since it did not appear that this particular section had ever been misconstrued, there seemed no particular reason to apply any corrective legislative therapy to it.

38

A third reason that Occidental is relevant here is that, although we recognize Congress has not specifically created a cause of action on the part of the government employee under section 3551 as it did in section 2022, it is nonetheless true that if there is such a cause of action, the borrowing of any state limitation period would be inconsistent with the underlying policies expressed by Congress with respect to the rights of veterans to reemployment generally. We discern no Congressional notion to impose upon federal employees the restrictions of varying state laws when it has so clearly rejected that concept with respect to those to whom it would more logically be expected to have been willing to apply it.

39

We therefore conclude section 2022 is most nearly analogous to the statute at issue and that no state or federal statute of limitations applies to implied causes of action arising under 5 U.S.C. § 3551. Instead, Stevens' claim for relief, whether it normally would be equitable or legal, is governed by the traditional equitable doctrine of laches: "In its traditional equitable form, laches comprises two elements: inexcusable delay by the plaintiff in bringing suit and prejudice to the defendant resulting from that delay." Note, Limitation Borrowing in Federal Courts, 77 Mich.L.Rev. 1127, 1141 (1979). As Justice Frankfurter wrote in Holmberg v. Armbrecht, supra, , 396, 66 S.Ct. 582, 584, 90 L.Ed. 743:

40

Equity eschews mechanical rules; it depends on flexibility. Equity has acted on the principle that "laches is not like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced--an inequity founded upon some change in the condition or relations of the property or the parties."

IV.

41

In applying laches many courts, our own included, have held that laches is rebuttably presumed if suit is commenced after the time period specified in the most nearly analogous state or federal statute of limitations, thus shifting the burden to the plaintiff of proving excusable delay and the absence of prejudice to the defendant by the passage of time. See, e.g., TWM Mfg. Co. v. Dura Corp., ⸻, 348 (6th Cir.1979); Greathouse v. Babcock & Wilcox Co., supra, 381 F.Supp. 156, 163 (N.D.Ohio 1974).

42

Whatever may be the wisdom of that rule generally, it is in our view one which ought not be applied rigidly here where Congress has so clearly eschewed any reliance on state statutes of limitations with respect to claims of veterans for reemployment. We do not have a comparable or analogous statute of limitations for the simple reason that Congress has said that there shall be none in that cause of action which is most nearly analogous to the one involved here.

43

In an appeal involving section 2022, the Eighth Circuit specifically refused to apply any presumption of laches based upon an arguably analogous state statute and set out its flexible approach to laches in considerable detail:

44

The doctrine of laches is premised upon the same principles that underlie statutes of limitation: the desire to avoid unfairness that can result from the prosecution of stale claims. Costello v. United States, ⸻, 282-83, 81 S.Ct. 534 [543-44], 5 L.Ed.2d 551 (1961); Brown v. County of Buena Vista, ⸻, 161, 24 L.Ed. 422 (1877). However, the operation of laches departs from that of statutes of limitation in that laches is more flexible. The Supreme Court has repeatedly emphasized "[t]hat no arbitrary or fixed period of time has been, or will be, established as an inflexible rule, but that the delay which will defeat such a suit must in every case depend on the peculiar equitable circumstances of that case." The Key City, 81 U.S. (14 Wall.) 653, 660, 20 L.Ed. 896 (1871). While courts may benefit from legislative determinations of when delay becomes unreasonable and prejudice may be presumed, undue deference to this judgment may result in a dereliction of the duty to examine all aspects of the equities affecting each case.... Mechanical rules creating presumptions based

upon legislative determinations also may divert a court's attention from the real considerations involved in a determination of laches. A court should focus upon the length of the delay, the reasons therefor, how the delay affected the defendant, and the overall fairness of permitting the assertion of the claim.

45

Furthermore, congressional amendment, in 1974, of the statutes dealing with veterans' reemployment rights expressly prohibited the use of statutes of limitations to preclude actions to enforce the reemployment rights. This clarification of congressional intent suggests that Congress did not consider the differing state legislative determinations regarding stale claims to be an appropriate guide for courts confronted with veteran reemployment actions. Application of laches furthers a policy of ensuring that the rights available to returned veterans remain as uniform as possible throughout the country. Over-reliance on state statutes of limitation would detract from this goal. As stated in Occidental Life Insurance Co. v. EEOC, 432 U.S. 355, 367, 97 S.Ct. 2447, 2445, 53 L.Ed.2d 402 (1977): "State legislatures do not devise their limitations period with national interest in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implemention of national policies."

46

Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 804-06 (8th Cir.1979) (footnotes omitted).

47

Upon careful consideration we are of the opinion that the advice of the Eighth Circuit in Goodman is well taken and in accord with the principles set forth in Occidental Life Insurance Co. v. EEOC, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). The activities of the Tennessee Valley Authority extend throughout several states. Each of these states has statutes which might apply to limit or extend the length of time within which suit might be brought. But section 3551 is not, of course, to be applied only to employees of the Tennessee Valley Authority. It applies to federal employees generally throughout the United States. The dilemma in trying, even by analogy, to define laches in terms of state law is therefore made manifestly more difficult and less meaningful. If this is to be the first case in which

limitations are to be considered with respect to actions brought under section 3551, we are convinced that it is important to keep the scope of the statute in mind in order to apply the doctrine properly.

48

Reversed and remanded for further proceedings consistent herewith.

Honorable Ralph B. Guy, Jr., District Judge, United States District Court for the Eastern District of Michigan, sitting by designation

5 U.S.C. § 3551 provides:

An employee as defined by section 2105 of this title or an individual employed by the government of the District of Columbia, permanent or temporary indefinite, who is ordered to active duty or to duty under sections 502-505 of title 32 as a Reserve of the armed forces or member of the National Guard is entitled, on release from duty within the time limits specified in section 9(g) of the Military Selective Service Act of 1967 (50 U.S.C.App. 459(g)), to be restored to the position held by him when ordered to duty....

Tenn.Code Ann. § 28-3-104(a) provides:

Personal tort actions.--(a) Actions for libel, for injuries to the person, false imprisonment, malicious prosecution, criminal conversation, seduction, breach of marriage promise, actions and suits against attorneys for malpractice whether said actions are grounded or based in contract or tort, civil actions for compensatory or punitive damages, or both, brought under the federal civil rights statutes, and actions for statutory penalties shall be commenced within one (1) year after cause of action accrued.

28 U.S.C. § 2401 provides:

Time for commencing action against United States

(a) Every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases.

(b) A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

Those powers relate to the acquisition and conveyance of lands. See 16 U.S.C. §§ 831c(h) & (k)

There can be no doubt that the TVA is an agency of the United States. The TVA was described by our court in 1944:

The Tennessee Valley Authority exercises an executive or administrative function in its activities, which, prior to its establishment, rested with the divisions of the executive branch of the Government. (citation omitted) Its great functions are governmental in nature, and might have been performed directly by officers of the Government. It is plainly a governmental agency or instrumentality of the United States. (citation omitted).... (T)he Tennessee Valley Authority, as a governmentality, is free from a state's regulation or control and subject to suit only as permitted by the federal statute creating it.

Tennessee Valley Authority v. Kinzer, 142 F.2d 833, 837 (6th Cir.1944).

While we have shown that Congress intended the TVA sue or be sued as a corporation, it is clear that this characteristic is due to Congressional intent regarding the operation of a governmental instrumentality; the status of the TVA as a governmental unit has been carefully maintained by the Congress.

Two cases arising in the Sixth Circuit make no mention of the distinction between legal and equitable issues, although they do involve claims for monetary relief only. See Hire v. E.I. DeNemours & Co., 324 F.2d 546, 549 (6th Cir.1963) (severance pay); Marshall v. Chrysler Corp., 378 F.Supp. 94, 96 (E.D.Mich.1974) (damages)

Applying a borrowing principle to the most nearly analogous federal statute is especially preferable where an implied cause of action is involved:

Borrowing an analogous federal limitations period [instead of a state period] is appropriate for some causes of action created by judicial implication. In such claims, one cannot infer that Congressional creation of an unlimited right of action reveals an intent to conform to the historical practice of borrowing limitations from state laws; in these cases Congress has had no opportunity to consider enacting its own explicit limitation period. Therefore, courts should not rush to apply the general rule of state limitation borrowing to implied causes of action.

Note, Limitation Borrowing in Federal Courts, 77 Mich.L.Rev. 1127, 1133 (1979) (emphasis added, footnote omitted).

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division
**Case Number: 10-61299-CIV-MARTINEZ-MCALILEY**

CYNTHIA BAGNALL and FORREST
GREGORY BAGNALL,
     Plaintiffs,

vs.

CITY OF SUNRISE, FLORIDA,
     Defendant.

_____/

## ORDER GRANTING PLAINTIFFS' MOTION FOR REVISION

THIS CAUSE came before the Court upon Plaintiffs' Motion for Revision (D.E. No. 75).

In this motion, Plaintiffs ask the Court to reconsider in part the Court's Order Granting in part

and Denying in part Defendant's Motion for Summary Judgment (D.E. No. 74). Specifically,

Plaintiffs ask the Court to reconsider its ruling granting summary judgment in Defendant's favor

on Plaintiff Forrest Bagnall's ("Plaintiff" or "Mr. Bagnall") claims relating to his alleged required

use of his paid leave. After careful consideration, the Court grants Plaintiff's Motion for

Revision.

In ruling on this claim on the motion for summary judgment, the Court found that the

facts in this case did not give rise to a USERRA violation.

Section 4316(d) provides:

> (d) Any person whose employment with an employer is interrupted by a period of
> service in the uniformed services shall be permitted, upon request of that person,
> to use during such period of service any vacation, annual, or similar leave with
> pay accrued by the person before the commencement of such service. No
> employer may require any such person to use vacation, annual, or similar leave
> during such period of service.

Thus, under section 4316(d), an employer may not require an employee in the uniformed services

to use their leave "during such period of service." The USERRA defines "service in the uniformed services" as

> the performance of duty on a voluntary or involuntary basis in a uniformed service under competent authority and includes active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty, a period for which a person is absent from a position of employment for the purpose of an examination to determine the fitness of the person to perform any such duty, and a period for which a person is absent from employment for the purpose of performing funeral honors . . . .

38 U.S.C. § 4303(13). In the summary judgment order, the Court found that "[i]t was undisputed that on May 4, 2008, Mr. Bagnall's period of active military duty ended. (D.E. No. 63, Joint Pretrial Stip. at ¶ 5(d)). All of the leave Mr. Bagnall was allegedly forced to use was used after May 4, 2008. *See* (D.E. No. 49-2, Pl.'s Exh. 3 at 2-7)." (D.E. No. 74 at 13). The Court also found that Mr. Bagnall did not present any evidence that he was performing any other service in the uniformed services as the term is defined in section 4303(13) and granted summary judgment on this claim. *Id.*

Plaintiffs have now moved for reconsideration citing evidence in the record that shows Mr. Bagnall participated in inactive duty training. *See* (Mr. Bagnall's Depo. at 146-47, 162-63, 181).[1] Specifically, Mr. Bagnall testified that in May and June of 2008 he participated in

---

[1]Defendant argues that this argument is an impermissable attempt by Plaintiffs to amend their complaint after summary judgment has been entered. The Court disagrees. Mr. Bagnall's claim relating to being forced to take paid leave is clearly made in Mr. Bagnall's complaint. *See* (D.E. No. 1, Compl. at ¶ 19 in Case No. 10-cv-61298). The Court would generally not reconsider evidence not cited in the original briefs as the Court is not required to "scour the record" looking for evidence to support Defendants' arguments. *Powell v. Carey Intern., Inc.*, 483 F. Supp. 2d 1168, 1185 (S.D. Fla. 2007) (citing *Coggin v. Longview Indep. Sch. Dist.*, 337 F.3d 459, 469 (5th Cir. 2003)). In this case, however, the Court finds that while Defendant argued in its original motion that the "USERRA does not provide for any such prohobition on the use of accrued leave" (D.E. No. 38 at 16), it was not until the Reply brief that Defendant specified that it was arguing that section 4316(d) did not cover Mr. Bagnall's claim for unpaid

-2-

voluntary Reserve training or drilling for approximately 20 days. *Id*. The Court finds that a genuine issue of material fact remains as to whether there was a violation of section 38 U.S.C. § 4316(d) with regard to any leave Mr. Bagnall was allegedly forced to take on these days that he was training.[2]  *See Rogers v. City of San Antonio*, 392 F. 3d 758, 770-71 (5th Cir. 2004) (finding that service in the uniformed services encompasses Reserve training and drilling).  Accordingly, it is hereby:

**ORDERED AND ADJUDGED** that

1.     Plaintiffs' Motion for Revision (D.E. No. 75) is **GRANTED**.

2.     The Court's Order Granting in part and Denying in part Defendant's Motion for Summary Judgment (D.E. No. 74) is **VACATED** to the extent the Court granted summary judgment on Plaintiff Mr. Bagnall's claim relating to his paid leave.  This claim proceeds to trial. The Court's order on summary judgment otherwise remains in full force and effect.

DONE AND ORDERED in Chambers at Miami, Florida, this 31 day of August, 2011.

JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge McAliley
All Counsel of Record

----

leave because his active military duty ended on May 4, 2008.  As this clarification took place in the Reply brief, Plaintiff never had an opportunity to respond to this argument.  Thus, the Court finds it appropriate to consider Plaintiff's motion for revision.

[2]The Court acknowledges that Defendant made other arguments for summary judgment on this claim.  The Court, however, finds that there is a definite dispute of fact regarding Mr. Fischer's version of events and Mr. Bagnall's version of events with regard to whether or not Mr. Bagnall requested or was forced to use his leave.  *Compare* (D.E. No. 40-12, Def. Exh. 3 at 7); (Fischer's Depo. at 24-25, 38) *with* (Mr. Bagnall Depo. at 147-149).  Defendant has also argued that they have effectively attempted to resolve this claim with Mr. Bagnall by telling him that they would restore his leave if he would give back the monies paid to him for the leave.  This offer of settlement, however, is not a basis for granting summary judgment.

-3-

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 10-61299-CIV-MARTINEZ-MCALILEY**

CYNTHIA BAGNALL and FORREST
GREGORY BAGNALL,

      Plaintiffs,

vs.

CITY OF SUNRISE, FLORIDA,

      Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendant City of Sunrise's Motion for Summary Judgment (D.E. No. 38). Plaintiffs Forrest Gregory Bagnall and Cynthia Bagnall (collectively "Plaintiffs" individually "Mr. Bagnall" and "Mrs. Bagnall" respectively) have filed suit against Defendants the City of Sunrise, Florida ("Defendant" or "the City"), alleging violations of the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301, *et seq*. ("USERRA"). After careful consideration and for the reasons set forth below, the Court grants in part and denies in part Defendant's motion.

**I.    Relevant Factual and Procedural Background**

**A.    Mr. Bagnall**

Mr. Bagnall joined the military in 1984 and has been a commissioned officer in the United States Army Reserve since 1987. (Mr. Bagnall's Depo. at 19);[1] (D.E. No. 63, Joint Pretrial

_____

[1] Both Plaintiffs and Defendant have submitted copies of Mr. Bagnall's deposition. See (D.E. Nos. 40-1, 40-2, 40-3, 40-4, and 49-9).

Stipulation at ¶ 5(a)). Mr. Bagnall began working for Defendant the City on August 22, 1988 as a utility operator. (Mr. Bagnall's Depo. at 19); (D.E. No. 63, Joint Pretrial Stip. at ¶ 5(b)). Mr. Bagnall held several different positions with the City, but in 1995, he became a Project Engineer/Fleet Manager in the Planning and Development Department. (Mr. Bagnall's Depo. at 23-24). This was the position he held in 2003 when he went on active military duty. (Mr. Bagnall's Depo. at 76); (D.E. No. 40-12, Def. Exh. 3 at 4); (D.E. No. 63, Joint Pretrial Stip. at ¶ 5(c)). On Mr. Bagnall's last day of full-time employment before he went on active duty, Mr. Bagnall's position of Project Engineer/Fleet Manager was in pay grade steps 49 through 62. (D.E. No. 40-12, Exh. 3 at 4). In actuality, Mr. Bagnall was placed in pay grade step 63 because he was awarded an extra step based on his length of service. *Id.* at 5. Right before he left for active duty, Mr. Bagnall's salary was $64,689.25. *Id.*

Mr. Bagnall went on active military duty with the Office of Chief Engineers beginning on August 10, 2003. (Mr. Bagnall's Depo. at 76); (D.E. No. 63, Joint Pretrial Stip at ¶ 5(c)). Thereafter, Mr. Bagnall remained an employee of the City but was on extended military leave. (Mr. Bagnall's Depo. at 76). While he was on extended military leave, Mr. Bagnall received a number of benefits from the City, including that he continued to accrue annual leave and sick leave, that he was able to use some of this leave to make contributions to his City pension, he received insurance, and he was awarded cost of living increases and an additional pay grade step for his length of service with the City.[2] (Mr. Bagnall's Depo. at 76-78, 79-80); (D.E. No. 40-12, Exh. 3 at 5). It is, however, undisputed that certain payments were not made into Mr. Bagnall's

_____

[2]This placed Mr. Bagnall at pay grade step 64, and in June 2008 Mr. Bagnall's salary was $79,131.10. (D.E. No. 40-12, Def. Exh. 3 at 5).

401(a) account. (D.E. No. 39 at ¶¶ 22, 23); (Mr. Bagnall's Depo. at 69-70); (D.E. No. 40-18, Def. Exh. 9); (D.E. No. 49-3, Pl. Exh. 9).

In a letter dated April 16, 2008 to Personal Director Robert Fischer ("Fischer"), Mr. Bagnall informed the City that on May 4, 2008 his term of active duty would be complete and that he was applying for reemployment and requested to meet with Fischer before his return. (D.E. No. 40-5, Def. Exh. 17); (D.E. No. 49-7, Pl. Exh. 6). Mr. Bagnall states in this letter that he wanted to discuss with Fischer his "qualifications, the job vacancies that are available . . . [to him] and the employment implementation procedures during the transition period." *Id.* On May 2, 2008, Mr. Bagnall met with Fischer to discuss his return to full-time employment with the City. (Mr. Bagnall's Depo. at 134-35).

At the time of this meeting, Mr. Bagnall's previous position with the City, Project Engineer/Fleet Manager, was no longer available. While Mr. Bagnall was on active military leave, his position of Project Engineer/Fleet Manager remained unfilled, and on April 11, 2006, the City created a new position titled Solid Waste Coordinator. (D.E. No. 40-12, Def. Exh 3 at 4-5). This new position was created to fulfill a portion of the duties previously provided by the Project Engineer/Fleet Manager. *Id.* at 5.

At the meeting, Fischer informed Mr. Bagnall that he would be returning as a Project Engineer, a position in the Central Services Department. (Fischer's Depo. at 35).[3] In this position, Mr. Bagnall would mainly be dealing with fleet management. *Id.* This included managing the City's fleet of vehicles and monitoring the City's contracts with a vehicle maintenance provider. (D.E. No. 40-12, Def. Exh. 3 at 6). Such duties were a part of Mr.

---

[3]Both parties have filed copies of Fischer's deposition. See (D.E. Nos. 40-15 & 49-15).

Bagnall's former position as Project Engineer/Fleet Manager. *Id.* Specifically, in his prior position, Mr. Bagnall's job functions included "fleet management, solid waste management and construction and other project management assignments." (D.E. No. 49-19, Mr. Bagnall Decl. at ¶ 4); (Mr. Bagnall's Depo. at 26-36). Mr. Bagnall states that his other duties attached to his prior position were not "going to exist anymore" and that he would not be responsible for solid waste and project management. *Id.* at 135-136. In this old position, Mr. Bagnall also supervised at least two city employees. *Id.* at 16, 34-35, 225. In his reemployment position, he had no subordinates. (Mr. Bagnall Decl. at 5).

Mr. Bagnall was also informed that he was not going to get a take-home vehicle anymore. (Mr. Bagnall's Depo. at 135-136). Fischer stated with regard to the take-home vehicle that he was simply passing on a decision made by his superiors. (Mr. Bagnall Depo. at 145-146). It is also undisputed that the position created out of Mr. Bagnall's old position, Solid Waste Coordinator, paid two and a half percent more than the position of Project Engineer offered to Mr. Bagnall. (Fischer's Depo. at 54-55).

Mr. Bagnall testified that the new position offered him as Project Engineer in the Central Services Department was a "career breaker" because the Central Services Department was not a department where you put someone like him with an engineering background. (Mr. Bagnall Depo. at 137-139). Mr. Bagnall testified that the Central Services Department handles "information systems or computer systems, it only does the mailroom, it does some facility management, and it does the fleet management" and none of these functions "apply to an engineer or anybody in the engineering field." *Id.* at 138-139.

At the time of this May 2, 2008 meeting, there were two Project Manager positions

-4-

posted on the City's website. (Mr. Bagnall Depo. at 140-141); (D.E. No. 40-13, Fischer Decl. at ¶¶ 6-7). Mr. Bagnall discussed these positions with Fischer at the May 2, 2008 meeting and asked that he be considered for these positions. (Mr. Bagnall Depo. at 140-145). One position was a Project Manager in the Planning and Development Department and another was a Project Manager in the Utilities Department. (D.E. No. 40-13, Exh 4., Fischer Decl. at ¶¶ 6-7). Fischer indicated at the meeting that the Project Manager Position in the Planning and Development Department would probably be eliminated due to budget cuts. (Mr. Bagnall's Depo. at 143). This position along with two other positions in that department were in fact eliminated in the 2008-2009 budget "as part of the ongoing annual budget review process and based on the City's need for budget related reductions." (D.E. No. 40-13, Def. Exh. 4, Fischer Decl. at ¶ 6). With regard to the Project Manager position in the Utilities Department, Fischer stated at the meeting that Mr. Bagnall was ineligible for this position because it would violate the City's nepotism policy as Mr. Bagnall's wife was working in that department. (Mr. Bagnall's Depo. at 142-43). Fischer states that the City has a nepotism policy "which prohibits one family member from supervising another family member." (D.E. No. 40-13, Def. Exh. 4, Fischer Decl. at ¶ 8). He states that if Mr. Bagnall had been made Project Manager in the Utilities Department this "would have made him a direct supervisor over his wife, who is a City employee in the position of Secretary II and was assigned to the Engineering Division of the Utilities Department." *Id.*[4] Fischer also states that this Project Manager position has not been filled and that the City "does not currently intend to fill it." *Id.* at ¶ 7.

_____

[4]In his deposition, Mr. Bagnall states he disagrees that his appointment to this position would have violated the nepotism policy because he does not think he would have been in his wife's direct chain of command. (Mr. Bagnall Depo. at 142).

Case 0:10-cv-61259-JEM Document 74 Entered on FLSD Docket 08/24/2011 Page 6 of 20

At this meeting, Mr. Bagnall also discussed the position of Public Works Director with Fischer. (Mr. Bagnall Depo. at 143-44). Fischer indicated to him that he only had the authority to offer Mr. Bagnall the position of Project Engineer and that he was not being considered for other positions. *Id*. The City Manager eventually filled this position with another city employee. (D.E. No. 40-13, Def. Exh. 4, Fischer Decl. at ¶¶ 9, 10 , 14-20). It is "common practice" at the City that "when a director leaves his or her position with the City . . . for one of the highest ranking management level employees from the same department to be appointed as the acting director to fill the vacated director position." *Id*. at ¶ 10. "It is further common practice at the City . . . for an acting director to be appointed director if he or she satisfactorily fulfills the duties and responsibilities of the director position during the period of time he or she is acting director. *Id*. On October 6, 2008, the City promoted, Charles Meeks ("Meeks"), then a drainage superintendent, to act as acting public works director. *Id*. at ¶¶ 16, 17. On July 27, 2009, the City promoted Meeks to public works director. *Id*. at ¶ 18.

At this May 2, 2008 meeting Mr. Bagnall and Fischer also discussed Mr. Bagnall's pay during the period he was transitioning from active military duty back to full-time employment with the City. (Mr. Bagnall's Depo. at 146-149). After the meeting, Fischer directed payroll to place Mr. Bagnall on full pay status with the City and instructed payroll to use his accrued leave. (D.E. No. 40-12, Def. Exh. 3 at 7); (Fischer's Depo. at 24-25, 38). Fischer believed this is how Mr. Bagnall wanted the transition period handled. *Id*. Mr. Bagnall states that he was improperly forced to use his accrued leave and that he never agreed to using his leave in this manner. (Mr. Bagnall Depo. at 147-149). All of the leave Mr. Bagnall was allegedly forced to use was used after May 4, 2008. *See* (D.E. No. 49-2, Pl.'s Exh. 3 at 2-7).

On May 4, 2008, Mr. Bagnall's period of active military duty ended. (D.E. No. 63, Joint Pretrial Stip. at ¶ 5(d)). On July 31, 2008, Mr. Bagnall returned to full-time employment with the City as a Project Engineer. *Id.* at ¶ 5(e). On August 16, 2008, Mr. Bagnall again went on active military duty. *Id.* at ¶ 5(f).

## B.    Mrs. Bagnall

Mrs. Bagnall has been employed with the City since 1988. (D.E. No. 63, Joint Pretrial Stip. at ¶ 5(g)). Based on an agreement when Mrs. Bagnall was hired, Mrs. Bagnall was hired as a Secretary III and later reclassified as a Secretary II. (Mrs. Bagnall's Depo. at 6).[5] She, however, still remained at a Secretary III pay grade. *Id.* In 1995, Mrs. Bagnall was transferred to the Utilities Department as a Secretary II. *Id.* at 7. She performed secretarial work for the Director of Engineering regardless of who filled this position until the latter part of 2009. (Mrs. Bagnall's Depo. at 11); (D.E. No. 40-12, Exh. 3 at 10). When she started in this position, her hours were from 8:30 a.m. to 4:30 p.m., Monday through Friday. (Mrs. Bagnall's Depo. at 14). At some point, however, the City asked her to change her hours to 8:00 a.m. to 4:00 p.m. to coincide with the hours the rest of the engineering department worked. *Id.*

In August 2008, Mrs. Bagnall assisted her husband with his USERRA claim by acting as a witness before the Department of Labor. (Mrs. Bagnall's Depo. at 62).

In October 2009, Mrs. Bagnall's duties and responsibilities changed. (D.E. No. 40-10, Exh. 2, Mrs. Bagnall Depo. at 19, 30-31). Mrs. Bagnall's office was moved and her hours were changed again. *Id.* at 24. Mrs. Bagnall had to share her new office and it was half the size of her

_____

[5]Both parties have filed copies of Mrs. Bagnall's deposition. *See* (D.E. No. 40-10, 40-11, & 49-16).

old office. *Id.* at 19, 27.   She states that she did not have any actual duties that she did some

filing and that she did some proofreading once or twice. *Id.* at 30-31.  Mrs. Bagnall testifies that

she was told that she needed to attend meetings, but when she showed up at the meetings, she

was told that she was not needed. *Id.* at 31.

The City has offered evidence that Mrs. Bagnall's job changed because they reorganized

the administrate staff in August of 2009 to better utilize the secretarial staff.  (D.E. No. 40-12,

Exh. 3 at 10).  Mrs. Bagnall states, however, that although she was aware of this reorganization

that no one else's job responsibilities changed as a result of this reorganization.   (Mrs. Bagnall

Depo. at 22-23).

Mrs. Bagnall has also testified that she received at least six verbal reprimands in a one-

month period from September to October 2009.  (Mrs. Bagnall Depo. at 39, 63).

On May 16, 2011, Mrs. Bagnall's duties and her office location changed again. (Mrs.

Bagnall Depo. at 32).  Her office was moved to the lobby, and Mrs. Bagnall was asked to act as a

receptionist. *Id.*  Mrs. Bagnall testified that if her career was a ladder, this change in her position

to a receptionist is at least four steps down. *Id.* at 68.  Mrs. Bagnall, however, acknowledges that

since her participation in her husband's USERRA claim she has not been suspended from work

nor has she had her pay decreased. *Id.* at 49.

**C.      This Action**

Plaintiffs filed suit against Defendant on July 26, 2010.  Plaintiffs have alleged that

Defendant violated the USERRA.  Specifically, Mr. Bagnall has alleged that Defendant violated

38 U.S.C. § 4316 by charging Mr. Bagnall with leave time during the period he was in the

uniformed services and by failing to properly reemploy Mr. Bagnall after he returned from

-8-

serving in the uniformed services. Mr. Bagnall also alleges that Defendant violated 38 U.S.C. § 4313 by failing to properly reemploy him. In addition, he alleges discrimination in violation of 38 U.S.C. § 4311. Finally, Mr. Bagnall also alleges that Defendant violated 38 U.S.C. § 4318 by denying him the right to increase his pension benefits and by denying him the right to purchase pension credits. Mrs. Bagnall alleges that Defendant improperly retaliated and discriminated against her in violation of 38 U.S.C. § 4311.[6]

## II.    Legal Standard

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, this standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find

---

[6]Plaintiffs filed two separate complaints; however, the Court consolidated their actions. All of the claims described above are encompassed in these complaints. The Court acknowledges that the complaints are not a model of organization with regard to the separate claims Plaintiffs are asserting. The Court notes, however, that Defendant never filed a motion for a more definite statement. The above description of Plaintiffs' claims in this action is taken from Plaintiffs' response to Defendant's motion for summary judgment where Plaintiffs define the issues in this case. *See* (D.E. No. 49 at 2). This is the same summary of Plaintiffs' claims in the Joint Pretrial Stipulation. *See* (D.E. No. 63 at 1-2). Moreover, both parties have agreed to this "summary of claims" in their submission of proposed jury instructions. *See* (D.E. No. 69 at 15).

for the non-moving party. *Anderson*, 477 U.S. at 248; *Matsushita Electric Indus. Co.*, 475 U.S.

at 586. It is "material" if it might affect the outcome of the case under the governing law.

*Anderson*, 477 U.S. at 248. In addition, in considering a motion for summary judgment, the

Court is required to view the evidence in the light most favorable to the non-moving party. *Id.* at

255.

     If the moving party bears the burden of proof at trial, the moving party must establish all

essential elements of the claim or defense in order to obtain summary judgment. *See United*

*States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 2d 1428, 1438

(11th Cir. 1991). The moving party "'must support its motion with credible evidence . . . that

would entitle it to a directed verdict if not controverted at trial.'" *Id.* (quoting *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)). "If the moving party makes such an

affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response,

'come[s] forward with significant, probative evidence demonstrating the existence of a triable

issue of fact.'" *Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 3d at 1438

(quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.3d 1472, 1477 (11th Cir. 1991)).

*See also* Fed. R. Civ. P. 56(e).

     In contrast, if the non-moving party bears the burden of proof at trial, the moving party

may obtain summary judgment simply by establishing the nonexistence of a genuine issue of

material fact as to any essential element of a non-moving party's claim or affirmative defense.

*Celotex*, 477 U.S. at 324. When the non-moving party bears the burden of proof, the moving party

does not have to "support its motion with affidavits or other similar material *negating* the

opponent's claim." *Id.* at 323 (emphasis in original). The moving party may discharge its burden

-10-

in this situation by showing the Court that "there is an absence of evidence to support the nonmoving party's case." *Id*. at 324. Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must "go beyond the pleadings and by [its] own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting Fed. R. Civ. P. 56(e)). A non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### III. Analysis

Defendant has moved for summary judgment, arguing that summary judgment is appropriate on Mr. Bagnall's claims relating to his alleged required use of his paid leave. The City also argues that summary judgment is appropriate on Mr. Bagnall's claims under sections 4313 and 4316 that he was not properly reemployed because Mr. Bagnall was in fact promptly reemployed in a position of equivalent status, salary and benefits to the position he would have held had he not left for military duty. In addition, the City argues that it is entitled to judgment as a matter of law on Mr. Bagnall's claims of discrimination under section 4311 because Mr. Bagnall cannot identify any adverse employment benefit denied by the City and because Mr. Bagnall cannot make an initial showing that his military status was a motivating factor in any alleged denials. Defendant also argues that it is entitled to summary judgment on the claims for discrimination under 4311 asserted by Mrs. Bagnall because she has been unable to identify any adverse employment actions since she participated in Mr. Bagnall's USERRA claim, because any alleged adverse employment actions were simply part of a larger reorganization of the secretarial

-11-

staff in the utilities department that applied equally to all secretaries, and because any alleged

adverse employment actions were unrelated to Mrs. Bagnell's participation in Mr. Bagnall's

USERRA claim.[7]  The Court grants Defendant's motion as to Mr. Bagnall's claims relating to paid

leave and discrimination and as to Mrs. Bagnell's claims of discrimination.  Defendant's motion is

denied in all other respects.

### A.  Mr. Bagnall's Claims Relating to Use of Paid Leave

First, Defendant has moved for summary judgment, arguing that summary judgment is

appropriate on Mr. Bagnall's claims relating to his alleged required use of his paid leave.

---

[7]Defendant has also moved for summary judgment on Mr. Bagnall's claim that he was improperly denied a promotion.  The Court, however, disagrees that this is actually Mr. Bagnall's claim; rather, Mr. Bagnall claims that he was not properly reemployed under sections 4313 and 4316.  The Court agrees that Mr. Bagnall discusses other positions that were available at the time he was reemployed and such positions may be relevant to his argument that he was not properly reemployed in that he may argue that these positions were available and more appropriate for him to be placed in.  Mr. Bagnall, however, does not make a simple claim that he was not promoted.  Thus, the Court does not discuss Defendant's arguments regarding any claim relating to a denied promotion.  If, however, at trial Plaintiff Mr. Bagnall attempts to assert a simple claim that he was denied a promotion, Defendant may make an appropriate motion.

Defendant also did not move for summary judgment on Mr. Bagnall's claims relating to his pension benefits under section 4318.  Defendant did argue in its motion for summary judgment that with regard to Mr. Bagnall's 401(a) account that it has remedied any deficiencies in the account "by making lump sum payments into the account including any interest which would have been earned."  (D.E. No. 38 at 8).  Thus, Defendant argues that "even if the Court where [sic] to find that these past alleged deficiencies constituted a USERRA violation there remains no relief for the Court to grant because the City has remedied any issues" *Id.*  The Court, however, disagrees that Defendant has demonstrated that summary judgment is appropriate on this issue.  Even if, since the filing of this lawsuit, the City has put certain monies into Plaintiff's 401(a) account, this does not necessarily mean that Mr. Bagnall no longer has a claim.  If a violation of the USERRA occurred, Defendant may also be entitled to liquidated damages.  *See* 38 U.S.C. § 4323(d)(1)(C); (D.E. No.1 in Case No. 10-cv-61298-Martinez, Mr. Bagnall Compl. at ¶ 27) (claiming that Mr. Bagnall is entitled to liquidated damages).  The Court does not consider or address any new arguments made by Defendant regarding this claim in its reply brief.  *See Sharpe v. Global Sec. Intern.*, 766 F. Supp. 2d 1272, 1294 n.26 (S.D. Ala. 2011) (collecting cases stating that it is inappropriate to raise new issues and arguments in a reply brief and stating that courts generally do not consider these arguments).

Defendant argues that summary judgment is appropriate because the USERRA does not prohibit the use of accrued leave and because the facts in this case do not give rise to a USERRA violation. Plaintiffs have responded that requiring Mr. Bagnall to use his paid leave was a violation of 38 U.S.C. § 4316(d) and that there is a genuine issue of material fact regarding this issue.[8]

> Section 4316(d) provides:
>
> (d) Any person whose employment with an employer is interrupted by a period of service in the uniformed services shall be permitted, upon request of that person, to use during such period of service any vacation, annual, or similar leave with pay accrued by the person before the commencement of such service. No employer may require any such person to use vacation, annual, or similar leave during such period of service.

Thus, under section 4316(d), an employer may not require an employee in the uniformed services to use their leave "during such period of service." The USERRA defines "service in the uniformed services" as

> the performance of duty on a voluntary or involuntary basis in a uniformed service under competent authority and includes active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty, a period for which a person is absent from a position of employment for the purpose of an examination to determine the fitness of the person to perform any such duty, and a period for which a person is absent from employment for the purpose of performing funeral honors . . . .

38 U.S.C. § 4303(13). It is undisputed that on May 4, 2008, Mr. Bagnall's period of active military duty ended. (D.E. No. 63, Joint Pretrial Stip. at ¶ 5(d)). All of the leave Mr. Bagnall was allegedly forced to use was used after May 4, 2008. *See* (D.E. No. 49-2, Pl.'s Exh. 3 at 2-7). There is no evidence that Mr. Bagnall was performing any other service in the uniformed services, as that term is defined above, during the time he was allegedly forced to use his leave.

---

[8]Plaintiffs actually cite section 4316(b), but it is clear that Plaintiff meant subsection(d) as Plaintiff quotes subsection (d). See (D.E. No. 49 at 7).

Accordingly, Mr. Bagnall is not protected under section 4316(d), and summary judgment is granted in Defendant's favor on this claim.

**B.      Mr. Bagnall's Reemployment Claims under Sections 4313 and 4316**

Next, Defendant has sought summary judgment on Mr. Bagnall's claims that he was not properly reemployed under sections 4313 and 4316.  Section 4312 of the USERRA provides that "any person whose absence from a position of employment is necessitated by reason of service in the uniformed services shall be entitled to the reemployment rights and benefits and other employment benefits" if certain conditions are met.  38 U.S.C. § 4312(a).  Defendant has not disputed that these conditions were met.  Section 4313 provides that "a person entitled to reemployment under section 4312, upon completion of a period of service in the uniformed services, shall be promptly reemployed in a position of employment . . . ."  38 U.S.C. § 4313(a). Section 4313(a)(2) provides in relevant part that "a person whose period of service in the uniformed service was for more than 90 days" shall be reemployed  "in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform." 38 U.S.C. § 4313(a)(2)(A).  Furthermore, section 4316 provides that

> [a] person who is reemployed under this chapter is entitled to the seniority and other rights and benefits determined by seniority that the person had on the date of the commencement of service in the uniformed services plus the additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed.

38 U.S.C. § 4316(a).  This is often referred to as the "escalator principle," which provides that a returning service member does not step back on the seniority escalator at the point he stepped off.

-14-

He steps back on at the precise point he would have occupied had he kept his position
continuously." *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 284-85 (1946).

Mr. Bagnall claims that Defendant violated the requirements of 4313 and 4316 because the
position he was placed in upon his return, Project Engineer, was not equivalent to his prior
employment as Project Engineer/ Fleet Manager if he had remained continuously employed.
Defendant has moved for summary judgment on this issue arguing there are no genuine issues of
material fact and that Mr. Bagnall's prior position and his reemployment position were equivalent.
The regulations require an employer to consider seven factors in determining the status of an
employee's prior position if he or she had remained continuously employed: (1) the employee's
opportunities for advancement, (2) working conditions, (3) job location, (4) shift assignment, (5)
rank, (6) responsibility, and (7) geographical location. 20 C.F.R. §§ 1002.193, 1002.194. Courts
have also considered these factors in comparing the status of a prior position and a reemployment
position. *See Fannin v. United Space Alliance*, No. 6:07-cv-1315-Orl-DAB, 2009 WL 928302, at
*6 (M.D. Fla. April 3, 2009) (applying six of these factors to determine whether a position offered
to a returning service member was of like status to his prior position and finding it was not); *Long
v. Ellis Environmental Group, LC*, No. 3:05cv227 MCR/EMT, 2007 WL 1020005, at *6 (N.D.
Fla. March 30, 2007) (applying six of these factors and determining that a reemployment position
was of like status or possibly higher in status than a returning service member's prior
employment).   Here, the Court applies these factors in determining whether the position of
Project Engineer was of like status to Mr. Bagnall's prior position as Project Engineer/Fleet
Manager if he had remained continuously employed and finds that Mr. Bagnall has submitted
sufficient evidence in response to the motion for summary judgment that such positions were not

-15-

equivalent.

The Court acknowledges that with regard to a number of the factors, such as the job location, the shift assignment, the working conditions, and the geographical location, the positions appear to be in equipoise or the Court lacks sufficient information regarding such factors. With regard to the other factors, however, Plaintiff Mr. Bagnall has submitted evidence that the positions were not equivalent. First, with regard to the employee's opportunities for advancement, Mr. Bagnall testified in his deposition that the new position offered him as Project Engineer in the Central Services Department was a "career breaker" because the Central Services Department was not a department where you put someone like him with an engineering background. (D.E. No. 49-9, Mr. Bagnall Depo. at 137-139). Mr. Bagnall testified that the Central Services Department handles "information systems or computer systems, it only does the mailroom, it does some facility management, and it does the fleet management" and none of these functions "apply to an engineer or anybody in the engineering field." *Id*. at 138-139. Thus, Mr. Bagnall's opportunities for advancement from this position as opposed to his prior position which was in the Planning and Development Department, where he states there were other engineers working and jobs for engineers, was necessarily more limited. *Id*. at 137. The City disputes Mr. Bagnall's ability to testify as to his opportunities for advancement or his status in general regarding his new position as they state that he only reported for work for four days in this new position. *See* (D.E. No. 51 at 5). This, however, is a matter that goes to the weight of Mr. Bagnall's testimony and not its admissibility.

Mr. Bagnall has also presented evidence that there were differences in the two positions with regard to rank and responsibility. Specifically, in his prior position, Mr. Bagnall's job

-16-

functions included "fleet management, solid waste management and construction and other

project management assignments." (D.E. No. 49-19, Mr. Bagnall Decl. at 4); (D.E. No. 49-9, Mr.

Bagnall Depo. At 26-36). In this position, Mr. Bagnall also supervised at least two city

employees. (D.E. No. 49-9 at 16, 34-35, 225). In his reemployment position, he had no

subordinates. (D.E. No. 49-19, Mr. Bagnall Decl. at 5). There was no job description for his new

position but the primary duty was fleet management. (D.E. No. 49-9, Mr. Bagnall Depo. at 151).

He states that his other duties attached to his prior position were not "going to exist anymore." *Id.*

at 136. It is also clear that Mr. Bagnall would no longer be responsible for solid waste

management as another position had been created with regard to this duty. *Id.* at 152-53. It is also

undisputed that the position created out of Mr. Bagnall's old position, Solid Waste Coordinator,

paid two and a half percent more than the position of Project Engineer offered to Mr. Bagnall.

(Fischer's Depo. at 54-55). Thus, the Court finds that Mr. Bagnall has presented sufficient

evidence to defeat Defendant's motion for summary judgment on this claim. *See Duarte v.*

*Agilent Technologies, Inc.*, 366 F. Supp. 2d 1039, 1045-1046 (D. Colo. 2005) (finding that

although a returning service member's "title, pay, and benefits upon his return from active duty . .

. were the same as they had been when he was called-up . . . the duties of his job . . . were

significantly different" and concluding that the service member's new position was of a

diminished status and finding a violation of section 4313 of the USERRA).[9]

---

[9]Defendant has also argued that Plaintiff Mr. Bagnall lacks standing to assert this
reemployment claim because there is no relief for this Court to award. Defendant argues that
there are no lost benefits or wages associated with this claim and that the Court cannot order it to
reinstate Mr. Bagnall because Mr. Bagnall is on active military duty and intends to be for at least
another year. The Court acknowledges that Mr. Bagnall has also filed a Declaration with the
Court stating that he does "not work at the City of Sunrise at present." (D.E. No. 49-9, Exh. 18,
Mr. Bagnall Decl. at ¶ 1). The City, however, disputes this fact in reliance on Mr. Bagnall's

### C. Discrimination Claims Under 4311

Next, the City has also sought summary judgment on Mr. Bagnall and Mrs. Bagnall's

claims of discrimination under section 4311 of the USERRA. Section 4311 provides in relevant

part that

> (a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

> (b) An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter. The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

38 U.S.C. §§ 4311(a) & (b). In order to establish a prima facie case of discrimination, Plaintiffs

must show with regard to Mr. Bagnall that he was denied a benefit of employment and that his

protected status was a "motivating factor" in the denial. *Coffman v. Chugach Support Servs.*, Inc.,

---

deposition. *See* (D.E. No. 52 at ¶ 3); (D.E. No. 49-9, Mr. Bagnall Depo. at ¶¶ 5-6). It is unclear to the Court if Mr. Bagnall is simply on leave from the City or if he has quit. Thus, there is a dispute of fact regarding this issue.

    The "USERRA provides that a court may award three kinds of relief: (1) an injunction requiring an employer to comply with USERRA's provisions; (2) compensation for lost wages or benefits suffered by reason of the employer's failure to comply with USERRA, and (3) liquidated damages in an amount equal to lost wages or benefits if the employer's failure to comply with USERRA was willful." *Dees v. Hyundai Motor Mfg. Alabama, LLC*, 368 Fed. Appx. 49, 52-53 (11th Cir. 2010). If Mr. Bagnall is only on military leave, the Court can award relief. The Court can still enter an injunction that the City comply with USERRA's provisions even if Mr. Bagnall does not return from leave for a year. In addition, it is unclear but Mr. Bagnall also may be entitled to lost wages as it is not clear from the record what the salary of an equivalent position was or should be.

411 F.3d 1231, 1238 (11th Cir. 2005). With regard to Mrs. Bagnall, Plaintiffs must show that

Mrs. Bagnall's involvement in Mr. Bagnall's USERRA claim was a motivating factor in an

adverse employment action taken by the City against her. *Id.*

"A motivating factor does not mean that it had to be the sole cause of the employment

action." *Coffman*, 411 F. 3d at 1238. It is enough if "it is one of the factors that a truthful

employer would list if asked for the reasons for its decision." *Id.* (internal quotations marks

omitted). The Eleventh Circuit has stated that

> [t]he court can infer discriminatory motivation under the USERRA from a variety of
> considerations, such as: "proximity in time between the employee's military activity and
> the adverse employment action, inconsistencies between the proffered reason and other
> actions of the employer, an employer's expressed hostility towards members protected by
> the statute together with knowledge of the employee's military activity, and disparate
> treatment of certain employees compared to other employees with similar work records or
> offenses."

*Coffman*, 411 F.3d at 1238 (quoting *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1014 (Fed.Cir.

2001)).

After the employee meets his or her burden and establishes a prima facie case of

discrimination, "'the burden shifts to the employer to prove the affirmative defense that legitimate

reasons, standing alone, would have induced the employer to take the same adverse action.'" *Id.* at

1238-39. "'Thus in USERRA actions there must be an initial showing by the employee that

military status was at least a motivating or substantial factor in the agency action, upon which the

agency must prove, by a preponderance of evidence, that the action would have been taken despite

the protected status.'" *Id.* at 1239. Here, the Court finds summary judgment in Defendant's favor

is appropriate on both Plaintiffs' claims of discrimination.

-19-

### 1.    Mr. Bagnall

Mr. Bagnall argues that Defendant discriminated against him in violation of section 4311 when Defendant denied him a take-home vehicle as a benefit of employment after his reemployment.[10] As discussed above, to prove his prima facie case of discrimination under section 4311, Mr. Bagnall must show that his protected status as a uniformed serviceman was a motivating factor in the City's failure to allow him a take-home vehicle upon his reemployment. Mr. Bagnall attempts to prove this by arguing that the City offered inconsistent reasons for the denial of a take-home vehicle and by pointing to other employees who were able to retain their take-home vehicle. The Court finds, however, that Mr. Bagnall has failed to demonstrate or even create a genuine issue of material fact with regard to his prima facie case. The Court also finds that Defendant has met its burden of providing an independent reason for their denial of the take-home vehicle.

First, the Court finds as a matter of law that providing an employee with a take-home vehicle can be a benefit of employment as defined under section 4311(a).[11] The term "benefit of

---

[10]Mr. Bagnall does not argue that the City discriminated against him under the USERRA for any other reasons. The Court is not required to "scour the record" looking for evidence to support Mr. Bagnall's claims. *Powell v. Carey Intern., Inc.*, 483 F. Supp. 2d 1168, 1185 (S.D. Fla. 2007) (citing *Coggin v. Longview Indep. Sch. Dist.*, 337 F.3d 459, 469 (5th Cir. 2003)).

[11]The Court acknowledges that Mr. Bagnall has testified and Plaintiffs argue in their response that the take-home vehicle was originally provided as part of a 1995 Settlement Agreement entered into between the parties regarding another action. (D.E. No. 49 at 15-16); *see also* (Mr. Bagnall's Depo. at 204-205). Defendant disputes that this benefit was provided as part of the 1995 agreement and references the plain language of the agreement, which in fact does not specifically reference a take-home vehicle. *See* (D.E. No. 40-9, Exhs. 23 at ¶ 13 to Mr. Bagnall Depo); *see also* (D.E. No. 40-9, Exh. 24 to Mr. Bagnall Depo). The Court, however, finds this issue is irrelevant. There are no claims in this action for breach of contract or more specifically for breach of the prior settlement agreement.

employment" is defined in the USERRA as

> any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment.

38 U.S.C. § 4303(2). Providing someone with a take-home vehicle is a privilege, an advantage, and a profit as the employee who has the use of such a vehicle may forego purchasing his own vehicle or at least save some wear and tear on his own vehicle. Here, it is undisputed that the new position offered to Mr. Bagnall when he was rehired did not include the use of a take-home vehicle. (Mr. Bagnall's Depo. at 135-36).

The Court, however, finds Mr. Bagnall's arguments that such a denial was discriminatory because inconsistent reasons were given for the denial and other employees were treated differently are without merit. First, the record does not support Plaintiff's argument that inconsistent reasons were given for the denial of a take-home vehicle. Plaintiff relies on Mr. Bagnall's testimony regarding the reason given by Fischer at the May 2, 2008 meeting for the denial of the take-home vehicle. Mr. Bagnall, however, testifies only that Fischer stated that he was simply passing on a decision made by his superiors. (Mr. Bagnall Depo. at 145-146). The entire exchange in Mr. Bagnall's deposition went as follows:

Q.      Okay Did Mr. Fischer tell you why you wouldn't be getting a take-home vehicle?

A.      He indicated that again, that all of this was--this decision to put me in this position was done at a higher level and he was just conveying, he was a messenger, and that this is-all of this had been reviewed, and I assume that that means since the next higher person is the city manager, it was reviewed by the city manager, I'm sure

> that the counsel was involved to indicate they did not need to comply with the
> settlement agreement.

*Id.* Thus, in Mr. Bagnall's retelling of this conversation, Fischer does not specify a reason for the

denial of the take-home vehicle. Accordingly, it cannot be said that this testimony demonstrates

any sort of inconsistency. Mr. Bagnall also relies on his testimony regarding a July 31, 2008

meeting with the personnel director and his new supervisor wherein Mr. Bagnall states in relevant

part that "[t[he conversation was pretty blunt. Both of them told me I was not getting a take-home

vehicle. . . ." (Mr. Bagnall Depo. at 186). This, however, again shows only that he was denied the

vehicle and doesn't provide any reason as to why. Thus, this also does not demonstrate any

inconsistency.

The Court also finds that Mr. Bagnall has not demonstrated that other employees similar to

him were given take-home vehicles. Mr. Bagnall relies on an unauthenticated memorandum dated

December 18, 2009, purporting to be from Hector Castro, Director of Utilities to Payroll. (D.E.

No. 49-13, Exh. 12). In this memorandum there are five columns. One column lists the

employee's name while another lists the date a vehicle was issued. The next column provides a

brief description of the vehicle (i.e. Jeep or Ford 150). Another column lists the vehicle number,

and the last column states "[i]f Exempt Reply Yes." *Id.* It is unclear what is meant by the last

column. It may refer to whether the employee is exempt from the provisions of the Fair Labor

Standard Act.[12] It is unclear. Even if the Court were to consider this memorandum as evidence, it

is vague, and it is impossible to ascertain if the employees who do have a vehicle are similarly

---

[12]The Court notes that as a matter of law there are a number of different reasons that an
employee may be considered exempt under the Fair Labor Standards Act.

Case 0:17-cv-60533-JEM Document 219-1 Entered on FLSD Docket 06/27/2019 Page 111 of
120
Case 0:10-cv-61293-JEM Document 74 Entered on FLSD Docket 08/24/2011 Page 23 of 32

situated to Mr. Bagnall.[13] *See Dominguez v. Miami-Dade County*, 416 Fed. Appx. 884, 885 (11th Cir. 2011) (finding in reviewing a district court's entry of summary judgment on a plaintiff's claims, including those under USERRA, that the plaintiff "has not met his burden showing that there any similarly-situated employees, not in the military, who received more favorable treatment than he did regarding the discipline imposed"). Moreover, the memorandum is dated December 18, 2009 almost a year after the relevant time period in this case. Thus, this evidence also does not establish a genuine issue of material fact.

Even if Mr. Bagnall had demonstrated a prima facie case, the City has presented evidence that a take-home vehicle would not have been provided to Mr. Bagnall regardless of his protected status because the privilege of a take-home vehicle was withdrawn from several employees in the City's attempts to reduce its budget. (D.E. No. 40-12, Def. Exh. 3 at 6); (Fischer's Depo. at 77-79). Plaintiff has not pointed to any evidence to dispute this reason given by the City for not offering Mr. Bagnall a take-home vehicle. Accordingly, for both of these reasons, the Court grants summary judgment in Defendant's favor on Mr. Bagnall's claims of discrimination under section 4311.

### 2. Mrs. Bagnall

To demonstrate a prima facie case of discrimination Mrs. Bagnall must show that her involvement in Mr. Bagnall's USERRA claim was a motivating factor in an adverse employment action taken by the City against her. Mrs. Bagnall argues that Defendant discriminated against her

-----

[13]Mr. Bagnall also references the deposition testimony of another employee, Mr. Moeller. In this testimony, Mr. Moeller acknowledges that he has a take-home vehicle. (D.E. No. 49-17, Excerpts of Moeller's Depo. at 50). This, however, is just one employee, and the Court lacks sufficient information regarding this employee to determine if he is similarly situated to Mr. Bagnall.

in violation of section 4311 when she was subjected to six reprimands at work, when she was stripped of all of her duties as a Secretary II and not assigned any significant task, and then when all of her duties were completely removed and she was assigned to a reception desk "with no opportunity for advancement or professional work." (D.E. No. 49 at 17). Mrs. Bagnall argues that the proximity in time between her serving as a witness before the National Labor Relations Board for her husband's USERRA claim in August 2008 and these incidents is circumstantial evidence that her participation in Mr. Bagnall's USERRA claim was a motivating factor in the alleged discrimination. This Court, however, finds that Plaintiff has not demonstrated that her participation in Mr. Bagnall's USERRA claim was a motivating factor in the alleged adverse employment actions because there is no temporal proximity between her protected activity and the alleged harms.[14]

In August 2008, Mrs. Bagnall assisted her husband with his USERRA claim by acting as a witness before the Department of Labor. (Mrs. Bagnall's Depo. at 62). All of the alleged adverse employment actions occurred over a year after this protected activity. From September to October 2009, Mrs. Bagnall testified that she received at least six reprimands. *Id*. at 39, 63. In October 2009, Mrs. Bagnall testified that her duties and responsibilities changed significantly. *Id*. at 19, 30-31.[15] Finally on May 16, 2011 Mrs. Bagnall's duties changed again, and she was asked to act

_____

[14]The Court finds it unnecessary to address Defendant's other arguments as to why this claim fails.

[15]She states that she did not have any actual duties that she did some filing and that she did some proofreading once or twice. (Mrs. Bagnall's Depo. at 30-31). Mrs. Bagnall testifies that she was told that she needed to attend meetings, but when she showed up at the meetings, she was told that she was not needed. *Id*. at 31.

as a receptionist. *Id.* at 32. The Eleventh Circuit has stated in the context of Title VII that where a plaintiff relies on temporal proximity between the protected activity and the adverse employment action to show causation, this temporal proximity must be "very close." *Thomas v. Cooper Lighting, Inc.*, 506 F. 3d 1361, 1364 (11th Cir. 2007) (internal quotations omitted). The Eleventh Circuit has stated that "[a] three to four month disparity between the statutorily protected expression and the adverse employment action is not enough" and found that "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id.* The Court finds this logic is equally applicable where a plaintiff relies on temporal proximity as the sole evidence to show that her protected activity under the USERRA was a motivating factor for the adverse employment actions. Here, Plaintiff Mrs. Bagnall's alleged adverse employment actions all occurred over a year after her protected activity. The last adverse employment action cited by Plaintiff, her move to the reception desk, occurred almost three years after the protected activity occurred. Thus, the Court finds Plaintiff has not demonstrated her prima facie case or even created a genuine issue of material fact with regard to her prima facie case.[16] Accordingly, summary judgment is also appropriate on Mrs. Bagnall's claim for discrimination. Therefore, it is hereby:

### ORDERED AND ADJUDGED that

Defendant City of Sunrise's Motion for Summary Judgment (D.E. No. 38) is **GRANTED in part** and **DENIED in part**. The motion is granted as to Mr. Bagnall's claims relating to paid

_____

[16]Mrs. Bagnall did not cite any other ways in which she could demonstrate her prima facie case other than temporal proximity.

leave and discrimination and as to Mrs. Bagnall's claims of discrimination.[17]  Defendant's motion

is denied in all other respects.  A final judgment shall be entered by separate order.

DONE AND ORDERED in Chambers at Miami, Florida, this 24 day of August, 2011.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge McAliley
All Counsel of Record

_____

[17]Mrs. Bagnall only claimed discrimination and thus none of her claims proceed to trial.

-26-

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 16, 2010
JOHN LEY
CLERK

No. 09-15609
Non-Argument Calendar

D. C. Docket No. 07-01315-CV-ORL-DAB

GLENN SCOTT FANNIN,

Plaintiff-Appellant,

versus

UNITED SPACE ALLIANCE, LLC,
d.b.a. USA,
ZARAH P. SHAW,
Individually,

Defendants-Appellees.

Appeal from the United States District Court
for the Middle District of Florida

(August 16, 2010)

Before BARKETT, HULL and MARCUS, Circuit Judges.

PER CURIAM:

Glenn Scott Fannin appeals the district court's grant of summary judgment to United Space Alliance, LLC ("USA") and Zarah P. Shaw as to his complaint alleging that he was denied a merit pay increase in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA").   On appeal, Fannin argues that the magistrate improperly granted summary judgment by misinterpreting USERRA.  After thorough review, we affirm.

We review an order granting summary judgment de novo, viewing all of the facts in a light most favorable to the non-movant, and drawing all inferences in his favor.  Frederick v. Spring/United Mgmt. Co., 246 F.3d 1305, 1311 (11th Cir. 2001).  "Summary judgment is only proper if there are no genuine disputed issues of material fact, and the moving party is entitled to judgment as a matter of law." Id.  "Mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  Ellis v. England, 432 F.3d 1321, 1326 (2005).   Generally, we do not consider issues not raised in the district court. Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004).

USERRA provides that a member of the Armed Services "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership." 38 U.S.C. § 4311(a).  Congress enacted USERRA "to encourage noncareer service in

2

the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service" and "to minimize the disruption to the lives of the persons performing service in the uniformed services as well as to their employers." 38 U.S.C. § 4301(a)(1), (a)(2).

USERRA further provides that "[a] person who is reemployed under this chapter is entitled to the seniority and other rights and benefits determined by seniority that the person had on the date of the commencement of service in the uniformed services plus the additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed." 38 U.S.C. § 4316(a).  In addition, a person who is absent from the workplace while in uniformed service shall be entitled "to such other rights and benefits <u>not determined by seniority</u> as are generally provided by the employer . . . to employees having similar seniority, status, and pay who are on furlough or leave of absence . . . ." 38 U.S.C. § 4316(b)(1)(B) (emphasis added).

The Code of Federal Regulations provides that "[i]f the employee is reemployed in the pre-service position or another position, the employer must compensate him or her at the rate of pay associated with the position in which he or she is reemployed.  As with the escalator position, the rate of pay must be determined by taking into account any pay increases, differentials, step increases,

3

merit increases, or periodic increases that the employee would have attained with reasonable certainty had he or she remained continuously employed during the period of service." 20 C.F.R. § 1002.236(b).

Here, Fannin has clarified that he is only appealing the analysis employed by the magistrate judge in the summary judgment order on Fannin's merit pay claim. USA is correct that Fannin never advanced the legal argument below that he now raises on appeal.  USA and Shaw argued in their motion for summary judgment that Fannin was not entitled to a merit pay increase, because, at USA, merit pay increases are not seniority-based benefits.  In his opposition, Fannin did not argue that USA misstated the law with regard to merit pay increases under USERRA.  He did not argue about the code section and regulation that he now espouses, and he did not even frame his response as a legal argument about merit pay increases. Likewise, in his motion for a new trial, Fannin did not advance an argument that the district court improperly analyzed his merit pay increase claim.  Therefore, Fannin now relies on an argument that he did not raise before the district court, and we decline to consider its merits.[1]

**AFFIRMED.**

---

[1] But even if we were to address the merits of the claim, we are unpersuaded.  Because Fannin did not present evidence supporting his claim, the magistrate judge properly granted summary judgment.  Moreover, because the remainder of Fannin's claims are based on the magistrate judge's alleged error at summary judgment, we do not address those claims.

4

# United States Court of Appeals
## For the First Circuit

Nos.  10-2047; 11-1021

_____

STEPHEN F. FRYER,

Plaintiff, Appellee,

v.

A.S.A.P. FIRE & SAFETY CORPORATION, INC.; JOSEPH SHEEDY; BRIAN COTE,

Defendants, Appellants.

_____

Before

Boudin, Selya, and Dyk,[*]
Circuit Judges.

_____

### ORDER OF COURT

Entered: November 23, 2011

Stephen F. Fryer applies for attorney fees under the fee-shifting provisions of the Uniformed Services Employment and Reemployment Rights Act (hereinafter "USERRA"), 38 U.S.C. § 4323(h)(2); the Massachusetts anti-discrimination law, Mass. Gen. Laws ch. 151B, § 9 (2004); the Massachusetts Wage Act [Commissions], Mass. Gen. Laws ch. 149, § 150 (2004); and the Massachusetts Wage Act [Overtime], Mass. Gen. Laws ch. 151, § 1B (2004).  His application follows our decision affirming the district court's award of damages and attorney fees against A.S.A.P. Fire & Safety Corporation and its owners Joseph Sheedy and Brian Cote (collectively "A.S.A.P.").  Fryer v. A.S.A.P. Fire & Safety Corp., 658 F.3d 85 (1st Cir. 2011).

There is no question that Fryer, as the prevailing party on appeal, is entitled to attorney's fees under the above statutes.  See New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 68

_____

[*]        Of the Federal Circuit, sitting by designation.

(1980) ("[T]he court's discretion to deny a fee award to a prevailing plaintiff is narrow. Absent 'special circumstances,' fees should be awarded." (internal citation omitted)). He seeks fees in the amount of $65,159.50 to compensate him for attorney fees incurred after the district court's award of fees.[1] Accompanying Fryer's fee application are the affidavits of Attorney Nancy Richards-Stower, who served as trial and appellate counsel, Attorney Jon Meyer, who served as co-counsel with Attorney Richards-Stower, and Attorney Kathryn Piscitelli, who was engaged by Attorney Richards-Stower as an appellate consultant. Additionally, Fryer includes billing invoices detailing the number of hours expended and a brief explanation for each entry. Attorney Richards-Stower seeks reimbursement for 141.53 hours of work, which includes 4 hours relating to post-trial motions in the district court, 4.72 hours on client and attorney communications, 5.5 hours for mediation, 72.23 hours for researching, drafting and editing the briefs and record on appeal, 39.23 hours relating to oral argument, and 15.85 hours relating to this fee application. Attorney Meyer seeks reimbursement for 40.5 hours of work, which includes 3.2 hours relating to post-trial motions in the district court, 9.7 hours on client and attorney communications, 6 hours for mediation, 18.6 hours for researching, drafting and editing the briefs and record on appeal, 0.6 hours for motions on appeal, and 2.4 hours relating to oral argument. Finally, Attorney Piscitelli requests reimbursement for 10.5 hours for her work in assisting Attorney Richards-Stower with preparation for oral argument.

A.S.A.P. opposes Fryer's application for attorney fees on the ground that the amount requested is excessive, and requests that we limit any award of attorney fees to $28,800.00 to reflect an amount reasonably related to the briefing and argument of this matter on appeal. Specifically, A.S.A.P. contends that it is inappropriate to award attorney fees for trial court matters unrelated to the appeal. A.S.A.P. also argues that the hours expended relating to oral argument greatly exceed those necessary to adequately prepare for argument in this case, and that the hours expended on legal research are excessive given that the issues on appeal were nearly identical to those raised in the district court. Finally, A.S.A.P. urges this court not to award attorney fees for hours spent on mandatory mediation and on work relating to this fee application.

We first note that "we can award fees incurred on appeal where . . . the prevailing party has submitted records that establish the reasonableness of the award." Latin Am. Music Co. v. Am. Soc'y Of Composers Authors & Publishers, 629 F.3d 262, 264 (1st Cir. 2010) (emphasis added); see also Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 44 (1st Cir. 2006) ("A request for attorneys' fees in this court should be presented by separate motion to us following our decision, stating the basis for the claim, the amount sought, supporting it through conventional records, and providing the legal basis for the award—to all of which the opponent may respond."). We find that the 7.2 hours[2] spent on work related to counsel's motion to correct the incorrect interest

---

[1] Following the district court's assessment of damages against A.S.A.P., the court awarded Fryer attorney fees in the amount of $199,204.28 plus post-judgment interest at the rate of 0.31 percent.

[2] Of the 7.2 hours spent on matters before the district court, 2.1 hours are attributable to Attorney Meyer's paralegal at a rate of $85.00 per hour. See Richlin Sec. Serv. Co. v. Chertoff, 553 U.S.