# **PLAINTIFF'S EXHIBITS**

# EXHIBIT 1

10/27/2015                                                          MyPay

| Text Version | myPay | | Help | Main | Exit |

**Printer Friendly Version**                    View other LESs   CHK DT 151104 ▼   **Go**

## DEFENSE FINANCE AND ACCOUNTING SERVICE MILITARY LEAVE AND EARNINGS STATEMENT

| ID | NAME (Last, First, MI)<br>PATTERSON RODNEY SCOTT | SOC. SEC. NO.<br>****9922 | GRADE<br>OO | PAY DATE<br>871030 | YRS SVC<br>28 | ETS<br>000000 | BRANCH<br>USAR | ADSN/DSSN | PERIOD COVERED<br>CHK DT 151104 |

| | ENTITLEMENTS | | DEDUCTIONS | | ALLOTMENTS | | SUMMARY | |
|---|---|---|---|---|---|---|---|---|
| | Type | Amount | Type | Amount | Type | Amount | *Amt Fwd | |
| A | BASIC PAY | 4089.12 | FED INC TAX | | | | +Tot Ent | 4089.12 |
| B | | | FICA TAX | | | | -Tot Ded | |
| C | | | SGLI | | | | -Tot Allt | |
| D | | | DEBT PAYMENT | | | | =Net Amt | |
| E | | | SGLI FAM/SPOUSE | | | | -Cr Fwd | |
| F | | | | | | | =EOM Pay | |
| G | | | | | | | | |
| H | | | | | | | | |
| I | | | | | | | | |
| J | | | | | | | | |
| K | | | | | | | | |
| L | | | | | | | | |
| M | | | | | | | | |
| N | | | | | | | | |
| O | | | | | | | | |
| | TOTAL | 4089.12 | | | | | | |

| LEAVE | BF Bal<br>.0 | Ernd<br>.0 | Used<br>.0 | Cr Bal<br>.0 | ETS Bal<br>.0 | Lv Lost<br>.0 | Lv Paid<br>.0 | Use/Lose.<br>.0 |
|---|---|---|---|---|---|---|---|---|

| FED<br>TAXES | Wage Period<br>.0 | Wage YTD | M/S<br>M | Ex | Add'l Tax<br>.00 | Tax YTD |
|---|---|---|---|---|---|---|

| FICA<br>TAXES | Wage Period | Soc Wage YTD | Soc Tax YTD | Med Wage YTD | Med Tax YTD |
|---|---|---|---|---|---|

| STATE<br>TAXES | St<br>FL | Wage Period | Wage YTD | M/S<br>M | Ex | Tax YTD |
|---|---|---|---|---|---|---|

| PAY<br>DATA | BAQ Type<br>W DEP | BAQ Depn<br>SPOUSE | VHA Zip<br>00000 | Rent Amt | Share | Stat | JFTR | Depns | 2D JFTR | BAS Type | Charity YTD | TPC | PACIDN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| TRADITIONAL<br>PLAN (TSP) | Base Pay Rate<br>0 | Base Pay Current<br>.00 | Spec Pay Rate<br>0 | Spec Pay Current<br>.00 | Inc Pay Rate<br>0 | Inc Pay Current<br>.00 | Bonus Pay Rate<br>0 | Bonus Pay Current<br>.00 |
|---|---|---|---|---|---|---|---|---|
| ROTH PLAN | Base Pay Rate<br>0 | Base Pay Current<br>.00 | Spec Pay Rate<br>0 | Spec Pay Current<br>.00 | Inc Pay Rate<br>0 | Inc Pay Current<br>.00 | Bonus Pay Rate<br>0 | Bonus Pay Current<br>.00 |

| CONTRIBUTION<br>TOTALS | YTD Deductions<br>.00 | YTD TSP Deferred<br>.00 | YTD TSP Exempt<br>.00 | YTD ROTH<br>.00 |
|---|---|---|---|---|

**REMARKS:**          YTD ENTITLE _____          YTD DEDUCT _____

YOUR CHECK WAS SENT TO: USAA FEDERAL SAVINGS BANK

DIRECT DEPOSIT DATE: 11/04/15 AMOUNT

* AS OF 22 SEP 05    HIGH TEMPO DEPLOYMENT DAYS ACCRUED

SINCE 1 OCT 00 (OR SINCE ENTERING MILITARY SERVICE)

SERV GP LIFE INSURANCE DEBT BALANCE $.

FAM SER GROUP LIFE INSUR DEBT BALANCE $

FAM SER GROUP LIFE INSUR DEBT BALANCE $
ORIGINAL DEBT ?        SEP 15 01 SEP 15

FAM SER GROUP LIFE INSUR DEBT BALANCE !
ORIGINAL DEBT        OCT 15 01 OCT 15

UNPAID DEBT BALANCE "TOTAL": $

← DATES PERFORMING duty

INACTIVE DUTY TRAINING        22 SEP 15 1 22 SEP 15 2        22    24
INACTIVE DUTY TRAINING 23 SEP 15 1 23 SEP 15 2 24 SEP 15 1        22    24
INACTIVE DUTY TRAINING 24 SEP 15 2 25 SEP 15 1 25 SEP 15 2        23    25

YOUR CURRENT STATE CLAIMED IS: FLORIDA        23    25

SERVICEMEMBER GROUP LIFE INSURANCE COVERAGE:

YOUR SGLI DEDUCTION INCLUDES TRAUMATIC INJURY PROTECTION (TSGLI)

SPOUSE SGLI COVERAGE:

AA-Patterson-0000228

| ARMY RESERVE<br>**RECORD OF INDIVIDUAL PERFORMANCE OF RESERVE DUTY TRAINING**<br>For use of this form see AR 140-185; the proponent agency is CAR. | | 1. DATE<br><br>20150925 |
|---|---|---|
| 2. FROM: *(Reporting Agency) (Include ZIP Code)*<br>Office of the Chief of Public Affairs, 1500 Army Pentagon, Washington, DC 20310 | | 3. RETIREMENT YEAR ENDING DATE<br><br>20170601 |

4. TO: *(Custodian of reservists' field 201 file) (Include ZIP Code)*
Department of the Army
U.S. Army Human Resources Command
Attn: AHRC-RMP
1600 Spearhead Division Ave
Ft. Knox, KY 40122

| 5. LAST NAME - FIRST NAME - MIDDLE INITIAL<br>PATTERSON, RODNEY S., ▮▮▮▮9922 | 6. GRADE<br>O5 | 7. BRANCH<br>FA |
|---|---|---|

8. INDIVIDUAL'S ASSIGNED ORGANIZATION *(If different from office of addressee)*

9. THE ABOVE NAMED RESERVIST PERFORMED   [X] EQUIVALENT   [ ] APPROPRIATE   [ ] SUITABLE   [ ] OTHER

*(Check applicable box)*   DUTIES, TRAINING OR INSTRUCTION ON THE DATES AND FOR THE HOURS INDICATED AS AUTHORIZED BY
*(Cite authorization):*   IAW AR 140-185, Table 2-1, Rule 1

| a. DATE | | | HOURS<br>b | RETIREMENT POINTS<br>c | NATURE OF DUTIES, TRAINING OR INSTRUCTION<br>d |
|---|---|---|---|---|---|
| DAY | MONTH | YEAR | | | |
| 22 | 09 | 15 | 8 | P2 | Soldier performed duties of IMA position. |
| 23 | 09 | 15 | 8 | P2 | Soldier performed duties of IMA position. |
| 24 | 09 | 15 | 8 | P2 | Soldier performed duties of IMA position. |
| 25 | 09 | 15 | 8 | P2 | Soldier performed duties of IMA position. |
| ------ | ------ | ----- | | -------- | ------------------------NOTHING FOLLOWS------------------------ |

| 10. TYPED NAME, GRADE AND POSITION OF OFFICER HAVING KNOWLEDGE OF DUTIES PERFORMED<br>Sherryl A. Munroe, Deputy Chief Resource Management Division, IMA Coordinator | 11. SIGNATURE OF OFFICER *(Item 11)*<br>MUNROE.SHERRYL.ANNE.1<br>025939430   Digitally signed by MUNROE.SHERRYL.ANNE.1025939430<br>DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA<br>cn=MUNROE.SHERRYL.ANNE.1025939430<br>Date: 2015.10.07 17:44:31 -04'00' |
|---|---|
| 12.   FOR CUSTODIAN OF INDIVIDUAL RESERVIST'S RECORDS | |

| [ ] REPORTED TO SERVICING DATA PROCESSING UNIT. | PAY DATA | [X] EXTRACTED | [ ] NOT APPLICABLE |
|---|---|---|---|

**DA FORM 1380, JUL 2010**   PREVIOUS EDITIONS ARE OBSOLETE.   APD LC v1 00ES

# <u>EXHIBIT 2</u>

# EXHIBIT 3

STATE OF FLORIDA

COUNTY OF BROWARD

My current legal name is, Rodney Scott Patterson, and my current occupation is Pilot, American Airlines, Employee number 576006.  I am 48 years old and my current address of residence is 1092 NW 139th Terrace, Pembroke Pines, FL  33028-2340

The following is a transcript of a voice recording left on my telephone answering device by Captain James Bonds, Chief Pilot, Miami Flight Office, American Airlines on or about the 21st of SEPT, 2015 at approximately 1510 hours local time.

TRANSCRIPT OF MESSAGE

*Hey Scott, Jim Bonds it is three ten (1510, Local Inserted for clarity).  Uhh, Trish gave me the message saying you (unintelligible), an EO for tomorrow because of some military work at the Pentagon.  Dude we're really, really, really short and I see that you, you probably see that by your trip that's going out tomorrow, everybody is on reserve and we are really tight on manning so, uhhm, obviously we are going to give you the time off, if you can produce some uhhm, orders. Can you have them fax us the uhh, the orders and the fax number is 305-526-1294.  We're leaving you on the trip til we get that fax ok.  Thanks /////Nothing Follows////////*

I hereby state that the information above is true, to the best of my knowledge .  I also confirm that the information here is both accurate and complete and relevant information has not been omitted.

_Rodney Scott Patterson_

Signature of Individual

Sworn to (or affirmed) and subscribed before me this _25_ day of _FEB_, 2016, by _Rodney S. Patterson_

```
ANDREW P. REITZ
MY COMMISSION # FF 929156
EXPIRES: October 20, 2019
Bonded Thru Notary Public Underwriters
```

Personally Known _____ Or Produced Identification ____✓____

Type of Identification Produced _FL DL # P362 - 737 - 67 - 408 - 0_

# EXHIBIT 4

STATE OF FLORIDA

COUNTY OF BROWARD


My current legal name is, Rodney Scott Patterson, and my current occupation is Pilot, American Airlines, Employee number 576006. I am 48 years old and my current address of residence is 1092 NW 139th Terrace, Pembroke Pines, FL  33028-2340

The following is a transcript of a voice recording left on my telephone answering device by Captain James Bonds, Chief Pilot, Miami Flight Office,  American Airlines on or about the 7th of OCT, 2015 at approximately 1600 hours local time.

TRANSCRIPT OF MESSAGE

Jim Bonds from the flight office calling, 4 O'clock on the 7th.  Hope all is well with you guys, Hey Uhhh, I was hoping to have gotten those orders or the LES or something.  Little bit, you know, it's just a lot of confusion on our part to, you know, the circumstances around those orders.  So how bout, Uhmm, doing this if you will,  would you please, you know, if you can provide those to us, by the 13th, uhmm, then we'll be good, but you know anything after that then we may have to get a little more formal in asking you to provide those in the form of a Section 21 or something.  So if you can if you can get those to us, we would really appreciate it.  Uhmm, You know our number here in the flight office and take care and hope to hear from you soon.  //////Nothing Follows////////

I hereby state that the information above is true, to the best of my knowledge .  I also confirm that the information here is both accurate and complete and relevant information has not been omitted.


_Rodney Scott Patterson_

Signature of Individual

Sworn to (or affirmed) and subscribed before me this _25_ day of _FEB_, 2016, by _Rodney S. Patterson_

> ANDREW P. REITZ
> MY COMMISSION # FF 929156
> EXPIRES: October 20, 2019
> Bonded Thru Notary Public Underwriters

Personally Known _____ Or Produced Identification ___✓___

Type of Identification Produced _FL Driv Lic # P362 - 737 - 67 - 409 - 0_

# EXHIBIT 5



# U.S. DEPARTMENT OF TRANSPORTATION
# OFFICE OF INSPECTOR GENERAL

## FAA Has Not Fully Addressed Safety Concerns Regarding the American Airlines Flight Test Program

**FAA**



Report No. AV2018060

July 10, 2018



U.S. DEPARTMENT OF TRANSPORTATION
**OFFICE OF INSPECTOR GENERAL**

## FAA Has Not Fully Addressed Safety Concerns Regarding the American Airlines Flight Test Program

*Self-initiated*

**Federal Aviation Administration | AV2018060 | July 10, 2018**

### What We Looked At

Federal regulations require U.S. air carriers to verify the airworthiness of aircraft following major repairs or maintenance. To perform these maintenance checks, American Airlines (AA), established a flight test program. In February 2017, Allied Pilots Association (APA)—which represents AA's pilots—contacted us about multiple safety issues at the AA flight test program, including the use of unqualified pilots. APA stated that concerns placed in an earlier letter to the Federal Aviation Administration (FAA) had remained "largely unaddressed for over 18 months." We initiated an audit to assess the effectiveness of FAA's actions in response to safety concerns about the AA flight test program. Specifically, we examined how (1) FAA's oversight office for American Airlines addressed concerns about the flight test program and (2) the Agency processed and responded to a letter to the Federal Aviation Administrator questioning the integrity of FAA's oversight of the flight test program.

### What We Found

FAA's oversight office for American Airlines lacked objectivity in its review. While FAA requires inspectors to provide impartial treatment, the inspector in this case seems to have been affected by his relationship with AA personnel and the 28 years he spent working with the carrier. While the Agency has a tool for assessing its relationships with carriers, the tool did not account for these risk factors. In addition, the Agency used a "best guess" method to determine who should respond to APA's written allegations, and ultimately routed the letter back to the target of the complaint for response. Due to a lack of oversight guidance, FAA also provided varying responses to APA and OIG regarding the requirements for the flight test program. As a result, APA received neither a comprehensive nor an accurate response to its concerns.

### Our Recommendations

FAA concurred with our seven recommendations to improve its oversight of the flight test program, as well as its ability to respond to safety concerns.

All OIG audit reports are available on our website at

For inquiries about this report, please contact our Office of Legal, Legislative, and External Affairs at (202) 366-8751.

# Contents

Memorandum                                                                          1

Results in Brief                                                                    3

Background                                                                          4

FAA's Local Oversight Office Did Not Address Concerns About the AA
    Flight Test Program                                                             5

Issues Brought to the Federal Aviation Administrator's Attention Remain
    Unresolved                                                                      8

Conclusion                                                                         10

Recommendations                                                                    10

Agency Comments and OIG Response                                                   11

**Exhibit A.** Scope and Methodology                                               12

**Exhibit B.** Organizations Visited or Contacted                                  13

**Exhibit C.** List of Acronyms                                                    14

**Exhibit D.** Major Contributors to This Report                                   15

**Appendix.** Agency Comments                                                      16

AV2018060



**U.S. DEPARTMENT OF TRANSPORTATION**
**OFFICE OF INSPECTOR GENERAL**

# Memorandum

Date:       July 10, 2018

Subject:    FAA Has Not Fully Addressed Safety Concerns Regarding the American Airlines
            Flight Test Program | Report No. AV2018060

From:       Matthew E. Hampton
            Assistant Inspector General for Aviation Audits

To:         Federal Aviation Administrator

Federal regulations require U.S. air carriers to verify the airworthiness of aircraft following major repairs or maintenance.[1] To accomplish this, American Airlines (AA), established a flight test program to perform these maintenance checks. In February 2017, the Allied Pilots Association (APA)—which represents AA's pilots—contacted the Office of Inspector General (OIG), concerned about multiple safety issues pertaining to the flight test program, including AA's use of unqualified pilots and a culture of suppressing safety complaints. The association previously contacted the Federal Aviation Administration (FAA) but stated its concerns had remained "largely unaddressed for over 18 months." We obtained sufficient evidence during a preliminary meeting with APA and from our review of documentation to initiate an audit to examine these concerns in greater detail.

Our objective was to assess the effectiveness of FAA's actions in response to safety concerns about the AA flight test program. Specifically, we examined how (1) FAA's Certificate Management Office (referred to as the oversight office in this report) addressed concerns about the flight test program and (2) the Agency processed and responded to a letter to the Federal Aviation Administrator questioning the integrity of FAA's oversight of the flight test program.

We conducted this audit in accordance with generally accepted Government auditing standards. Exhibit A details our scope and methodology. Exhibit B lists the entities we visited or contacted.

We appreciate the courtesies and cooperation of Department of Transportation representatives during this audit. If you have any questions concerning this

---

[1] Title 14, Code of Federal Regulations (CFR) § 91.407(b).

report, please call me at (202) 366-0500, or Tina Nysted, Program Director, at (404) 562-3770.

cc:    The Secretary
        DOT Audit Liaison, M-1
        FAA Audit Liaison, AAE-100

# Results in Brief

FAA's oversight office for American Airlines lacked objectivity in its review and did not respond to concerns about unqualified pilots and unsafe conditions during maintenance verification flights. FAA, in line with Governmentwide standards, requires inspectors to provide impartial treatment and avoid actions that may create an appearance of preferential treatment. However, the inspector's oversight role in this case appears to have been affected by his relationship with the head of the AA flight test program and the length of time—28 years—he performed oversight of American Airlines. This potential loss of impartiality is particularly troubling considering the scope of his responsibilities, including oversight of voluntary safety programs, pilot training, and safety management systems. Additionally, as the only inspector overseeing the flight test program, he became a single point of failure for FAA. A new supervisor identified possible objectivity issues and recommended temporarily reassigning the inspector. However, Agency officials did not consider the request a priority and took nearly 4 months to reassign the individual. Additionally, FAA developed an evaluation tool that pulls data from multiple sources to assess its collaborative relationships with air carriers. However, that tool does not account for risk factors such as non-routine operations (e.g., flight test) or the length of time inspectors have been assigned to a carrier. Furthermore, the FAA oversight office lacks controls to ensure complaints are properly addressed. Neither the inspector nor office managers complied with FAA's requirements for processing complaints or provided a response to APA directly addressing the underlying issues that prompted the complaints. As a result, APA elevated its concerns to the Federal Aviation Administrator.

According to APA, the airline's managers and an FAA inspector warned AA's pilots that complaints could result in penalties and perhaps the end of the program. FAA, however, did not view these comments as a safety concern or consult the Agency's Office of Audit and Evaluation group, which was specifically established to address complaints. Instead, the Agency used a "best guess" method, which lacked criteria for identifying safety issues, to determine who should respond to APA's written allegations. The letter was routed through FAA Headquarters, then ultimately back to the target of the complaint, the FAA oversight office. Significantly, no one at FAA realized the Agency had not addressed APA's allegation that the oversight office was working with airline officials to suppress pilot safety concerns. In addition, representatives in the

oversight office asked the carrier to respond to many of APA's concerns and ultimately included those responses in the Agency's letter signed by the Administrator.

FAA also provided varying responses to APA and OIG regarding the requirements for the flight test program—such as whether or not the carrier must comply with established programs—due to a lack of oversight guidance. As a result, APA did not receive a comprehensive or accurate response. After we discussed our findings with FAA officials, the Agency completed an independent assessment of the program in October 2017 that verified many of APA's concerns. However, FAA's oversight office has not provided an updated response to APA or worked with the Agency's policy officials to clarify oversight responsibilities and develop corrective actions.

We made seven recommendations to help FAA improve its oversight of and address safety concerns about the flight test program.

# Background

The local FAA oversight office for American Airlines, based in Irving, TX, is responsible for overseeing AA's maintenance programs and flight operations, including the flight test program. Approximately 100 inspectors and managers within this office are responsible for certificating, surveilling, and inspecting the airline, which performs nearly 2.5 million domestic and international flights each year using more than 1,000 aircraft and 12 different fleet types.

Air carriers typically fly aircraft to test performance after major repairs or maintenance have been completed. While these flights are not performed with passengers or cargo onboard, it is important that carriers implement procedures to ensure the flights are operated safely. On December 22, 1996, three crewmembers and three technicians were killed when an Airborne Express DC-8 crashed during such a flight, which aimed to verify that recent maintenance and modifications had not changed how the aircraft operated. Following its investigation of the crash, the National Transportation Safety Board made a series of recommendations to FAA, including to establish guidance for air carriers performing non-routine operations, such as evaluation flights, and conduct appropriate surveillance of these programs.

As a result, FAA issued its Non-Routine Flight Operations (NRFO) guidance in August 2002 (updated May 2008), which recommended that carriers update manuals and develop training, reviewed and accepted by FAA, so that each NRFO is conducted with procedures consistent with safe flight. While these actions are not required, American Airlines used the recommendations to develop its flight

test program and train approximately 20 pilots to perform certain NRFO, such as maintenance verification flights and flying damaged aircraft to a repair facility.

# FAA's Local Oversight Office Did Not Address Concerns About the AA Flight Test Program

FAA staff overseeing American Airlines lacked objectivity and did not follow the Agency's guidance for addressing complaints when they received APA's letter. Specifically, the inspector, who had developed a personal relationship with the head of the AA flight test program, did not properly investigate safety complaints.

## FAA's Review of Complaints About the Flight Test Program Lacked Objectivity

The FAA inspector assigned to investigate the complaint had conversations with the head of the AA flight test program about "problem pilots," a reference to pilots who filed complaints. Rather than objectively review the basis for their complaints, as called for in FAA guidance, the inspector requested and received information from American Airlines that could have been used to discredit the pilots who voiced concerns. For example, the AA manager said of one of the pilots, "he seems more interested in litigating his way through life at AA versus doing work."

Governmentwide and FAA's ethical standards[2] require inspectors to act impartially and to avoid the appearance of preferential treatment when they perform their official duties. However, the inspector in this case had developed a personal relationship with the head of the AA flight test program, which created the appearance of diminished impartiality. For example, he made plans, using his Government-issued computer and email account, to travel abroad with the head of the program and introduce him to the inspector's family. The potential impact of the inspector's apparent lack of impartiality was compounded by the large scope of air carrier programs for which he was responsible. Managers at the FAA oversight office did not recognize the extent of his relationship with a senior airline employee or its potential impact on his oversight activities.

---

[2] 5 CFR § 2635.101, "Basic obligation of public service." *Ethical Conduct and Financial Disclosure* (FAA Order 3750.7A).

When we interviewed the inspector about the flight test program, he displayed little knowledge of it beyond describing how great it was. Instead, he stated that a few pilots had been causing problems for 15 years and advised us to "talk to the experts." Then, without our knowledge, he set up a meeting with us and airline officials—whom he called the "kings of the airline." Furthermore, during an interview about potential inspector impartiality, an FAA flight operations frontline manager referred to the AA flight test manager as "perfect" and someone who "could do no wrong," and to the airline as "golden." These comments raise concerns about the lack of objectivity at this FAA office.

In September 2016, a new supervisor was assigned to the office and determined that the inspector was not performing his oversight functions properly and objectively. The inspector had worked there for 28 years and was involved in many areas beyond the flight test program.  For example, he was involved in hotline complaints, multiple AA voluntary safety programs, and oversight of the carrier's safety management system, which is used to identify and mitigate safety risks across the airline. However, as the only inspector overseeing the flight test program, he became a single point of failure for FAA. The supervisor reassigned oversight of two programs to other staff, but did not adjust the inspector's role in the carrier's safety programs or the flight test group. In March 2017, the supervisor raised concerns about the inspector's role and possible lack of objectivity with local and regional office managers. However, the regional office did not see the issue as a priority and took nearly 4 months to reassign the inspector.

The supervisor's concerns regarding diminished objectivity and the lack of support from the regional office are similar to those we highlighted in our 2008 review of FAA's oversight office for Southwest Airlines.[3] In response to our recommendation, FAA developed a tool[4] to assess collaborative relationships between its oversight offices and assigned carriers; it utilizes data from multiple Agency sources to identify anomalies in inspector performance. However, the tool does not incorporate risk factors such as non-routine operations (e.g., maintenance verification flights) or the length of time an inspector has been assigned to a carrier—key factors in this review. As a result, FAA cannot be certain of the tool's ability to detect issues at other oversight offices.

FAA emphasizes the importance of a strong safety culture within the Agency and the industry. Guidance for FAA's Safety Management System—one of the programs the inspector was responsible for overseeing—identifies some

---

[3] *Review of FAA's Safety Oversight of Airlines and Use of Regulatory Partnership Programs* (OIG Report No. AV-2008-057), June 30, 2008. OIG reports are available on our website:
[4] Certificate Management Data Evaluation Process (CMDEP).

characteristics of a positive safety culture as valuing individuals' opinions, encouraging personnel to identify safety threats, providing a non-punitive environment for reporting safety concerns, and displaying a willingness to recognize when basic assumptions should be challenged and changes are warranted. Because management did not recognize or mitigate threats to diminished staff objectivity, the FAA oversight office's ability to promote safety and adequately respond to complaints was compromised.

# FAA Staff Did Not Follow Agency Guidance When Addressing Complaints About the Flight Test Program

FAA's oversight office staff did not address APA's concerns[5] about unqualified pilots and unsafe conditions during maintenance verification flights. National and local FAA guidance[6] provide instructions and timeframes for processing complaints. In addition, the oversight office's complaint coordinator sent numerous emails reminding staff about specific requirements for handling complaints. However, the office lacked an effective control to ensure complainants were contacted, investigations were documented, and complaints were resolved. As a result, FAA did not respond to APA's questions about how pilots are trained to conduct flight tests and whether maintenance verification flights can be performed on damaged aircraft.

The oversight office developed local guidance stating that an inspector should contact the complainant to acknowledge receipt and obtain any additional information. Instead of contacting APA, the inspector provided airline management officials with information about the complaint and the individual who had signed it. Less than a month after the inspector notified the airline, AA management held a meeting with all flight test pilots to address the "level of noise." Pilots were told they "must stay off the radar," which APA interpreted as meaning the flight test program would be shut down if the complaints continued. Prior to the meeting, the inspector notified airline management via email that FAA's position was that the flight test program operated safely and professionally, and asked them to "lead me in the right direction." Furthermore, the local guidance gives the assigned FAA inspector 2 days to contact the complainant. In this case, however, the inspector waited more than 2 months and then asked the airline to set up a meeting for him and the complainant—a

---

[5] APA's specific complaints/concerns were extremely technical in nature; as such, we have summarized them here.
[6] *Flight Standards Information Management System* (FAA Order 8900.1), volume 7, chapter 5, section 1. *Aviation Safety Quality Management System* (AFS-SW-21-403-02), "Complaints."

process typically used for pilots under FAA investigation. Although APA asked the inspector multiple times to clarify the purpose of the meeting and state whether the individual was under investigation, the inspector did not respond, and the meeting never occurred.

In addition, the inspector did not document any of the work he performed to investigate the APA complaint. The guidance requires inspectors to document complaint-related work in FAA's surveillance tracking system. Instead, when FAA's new assistant manager for the oversight office asked for an update, the inspector sent an email stating he had traveled to the flight test center to investigate the concerns. According to travel records, he only visited the flight test center once for approximately 4 hours. The inspector reported that during this time he attended a meeting regarding flight test program safety reports, and reviewed the carrier's pilot training program and the specific qualifications maintained in at least three different systems for the flight test pilots. It would be extremely difficult, if not impossible, to adequately perform these tasks in a 4-hour period.

Finally, FAA Order 8900.1 states that Flight Standards personnel should attempt to provide a final written response within 10 business days from the time of receipt. The Agency received APA's complaint in December 2015. However, the inspector did not review any documentation until April 2016, and the FAA oversight office did not respond to the complaint. Due to the lack of a response, in July 2016, APA wrote to the Federal Aviation Administrator about the Agency's oversight of the AA flight test program.

# Issues Brought to the Federal Aviation Administrator's Attention Remain Unresolved

FAA missed key safety concerns APA raised in its letter to the Administrator and did not consult the Audit and Evaluation group about the Agency's response. Instead, the letter was routed to several offices before it was returned to the FAA oversight office—the specific target of the complaint.

While APA stated that "both the CMO [Certificate Management Office] and American Airlines managers warned that additional 'complaints' and 'noise' from ASAP [Aviation Safety Action Program] reports would possibly result in penalties ... up to and including abandonment of the program," FAA Flight Standards managers at the FAA oversight office and Headquarters did not recognize this as a safety concern. When we discussed the allegation with FAA's Audit and Evaluation group, which handles complaints and internal audits, they immediately identified these concerns as a significant threat to safety. However, that group was not consulted about the response to the APA letter because FAA distributes

correspondence via a "best guess" method, which does not include criteria for identifying safety issues.

In the "best guess" method, letters are assigned to the Agency's subject matter experts, who review them and determine whether or not to respond. FAA officials defended this method by stating the experts are in the best position to evaluate correspondence. In this instance, APA's letter was routed to the Aviation Safety Division, then to Flight Standards, and ultimately back to the oversight office that was the target of the complaint. In addition, representatives in the oversight office asked the carrier to respond to many of APA's concerns and ultimately included those responses in the Agency's letter signed by the Administrator.

According to the FAA oversight office, the flight test program was "supplemental," and therefore the carrier did not have to follow written requirements even though FAA had formally accepted them. However, both APA and OIG received conflicting responses about the requirements from FAA. For example, an FAA maintenance policy official told us that the carrier was expected to comply with flight test policies and procedures because they supported the carrier's FAA-authorized maintenance program. We requested clarification from the Agency's Air Carrier Operations Branch but found that FAA does not have guidance on how to oversee these types of operations and programs. In addition, the FAA oversight office for American Airlines did not work with policy officials to verify the Agency's position.

Furthermore, during the complaint review process, no one at FAA realized that the allegation about the oversight office had not been addressed. After we discussed our concerns with FAA, the Agency used staff from the United Airlines oversight office to conduct a technical assessment of the flight test program, but did not review the objectivity of staff at the oversight office for American Airlines. The October 2017 assessment verified many of our and APA's technical concerns, including whether properly qualified pilots were performing maintenance verification flights and whether those flights can be performed on aircraft that have not been fully repaired. The FAA operations supervisor for American Airlines formally presented the findings to the carrier in December 2017, and established a safety analysis team with airline officials to resolve the issues. Furthermore, during our audit, the inspector at the center of the complaint retired, and the carrier began making changes to the flight test program. However, FAA has not provided an updated response to the complainant, and oversight office staff have not worked with FAA policy officials to clarify responsibilities and develop corrective actions. As a result, APA's safety concerns have yet to be fully addressed.

# Conclusion

Concerns about the impact of FAA inspector relationships with the airlines they oversee have been an issue since our 2008 review of the Agency's oversight office for Southwest Airlines. Our report spurred FAA to take a number of actions, including developing a tool that assesses its relationship with air carriers. However, the tool does not incorporate sufficient risk factors to identify diminished inspector impartiality. Additionally, weaknesses in FAA's process for identifying and handling safety complaints resulted in multiple missed opportunities to mitigate risks identified by an industry stakeholder. As a result, FAA is not in a position to respond to safety complaints about the flight test program and cannot be assured that its safety oversight is sufficient or comprehensive.

# Recommendations

To improve FAA's oversight of the American Airlines flight test program as well as its ability to respond to safety concerns, we recommend that the Federal Aviation Administrator:

1. Conduct an independent review of FAA's oversight of American Airlines' flight operations to determine whether controls are in place and effective in preventing single points of failure; develop and implement corrective actions, if necessary.

2. Modify the existing tool used to evaluate the objectivity of inspectors to incorporate risk factors such as non-routine operations and the length of time inspectors oversee the same air carrier.

3. Develop and implement controls requiring oversight office staff to resolve complaints and follow key policy requirements such as directly contacting complainants and documenting investigations.

4. Establish and implement criteria for evaluating correspondence to ensure safety complaints are routed to FAA's Office of Audit and Evaluation.

5. Develop and implement inspector guidance on FAA's oversight requirements for flight test operations.

6. Provide the Allied Pilots Association with a revised response to its complaint based on results from the October 2017 independent assessment of the American Airlines flight test program.

7. Develop and implement a corrective action plan to address the recommendations made by the October 2017 independent assessment of the American Airlines flight test program.

# Agency Comments and OIG Response

We provided FAA with our draft report on May 21, 2018, and received its formal response on June 20, 2018, which is included as an appendix to this report. FAA concurred with all seven of our recommendations and provided planned implementation dates for each. We consider these recommendations resolved but open pending completion of planned actions.

# Actions Required

We consider recommendations 1–7 resolved but open pending completion of planned actions.

# Exhibit A. Scope and Methodology

We conducted this performance audit between April 2017 and May 2018 in accordance with generally accepted Government auditing standards as prescribed by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

We met with APA officials to better understand their concerns and the potential safety impacts. Then, to assess how APA's concerns about the AA flight test program were addressed, we met with local, regional, and national FAA Flight Standards officials responsible for oversight of AA and policies relevant to the complaint. We reviewed surveillance and travel records, as well as emails from the inspector directly responsible for overseeing the program. We also interviewed AA personnel and reviewed its program documentation. To assess how the Agency processed and responded to APA's letter to the Federal Aviation Administrator, we reviewed tracking logs associated with the complaint and interviewed FAA officials responsible for processing correspondence within Flight Standards, Aviation Safety, and the Office of the Administrator. We also met with officials in FAA's Office of Audit and Evaluation, which is responsible for addressing complaints.

# Exhibit B. Organizations Visited or Contacted

## FAA Facilities

Headquarters

Office of the Administrator

Aviation Safety

Flight Standards Service

Office of Audit and Evaluation

Air Carrier Maintenance Branch

Air Carrier Operations Branch

Evaluations Program Branch

Policy Integration Branch

Field Offices

Southwest Region

American Airlines Certificate Management Office

United Airlines Certificate Management Office

## Other Organizations

American Airlines, Fort Worth, TX

Allied Pilots Association, Fort Worth, TX

# Exhibit C. List of Acronyms

| | |
|---|---|
| AA | American Airlines |
| APA | Allied Pilots Association |
| ASAP | Aviation Safety Action Program |
| CMO | Certificate Management Office |
| DOT | Department of Transportation |
| FAA | Federal Aviation Administration |
| NRFO | Non-Routine Flight Operations |
| OIG | Office of Inspector General |

Exhibit C. List of Acronyms                                          14

# Exhibit D. Major Contributors to This Report

| | |
|---|---|
| TINA **NYSTED** | PROGRAM DIRECTOR |
| MARSHALL **ANDERSON** | PROJECT MANAGER |
| ANNE **LONGTIN** | SENIOR ANALYST |
| CURT **BOETTCHER** | SENIOR ANALYST |
| TIM **MCDOUGALL** | SENIOR AUDITOR |
| JANE **LUSAKA** | WRITER-EDITOR |
| SETH **KAUFMAN** | SENIOR COUNSEL |

# Appendix. Agency Comments



# Federal Aviation Administration

# Memorandum

Date:      June 20, 2018

To:        Matthew E. Hampton, Assistant Inspector General for Aviation Audits

From:      H. Clayton Foushee, Director, Office of Audit and Evaluation, AAE-1

Subject:   Federal Aviation Administration's (FAA) Response to Office of Inspector General (OIG) Draft Report: Safety Concerns Regarding the American Airlines Flight Test Program

The FAA has initiated several safety enhancements to the American Airlines Flight Test Operations Program. The use of Risk-Based Decision Making and Compliance Oversight principles have facilitated a collaborative approach to resolving the issues identified in the report. New initiatives include the establishment of a Safety Analysis Team comprised of all relevant stakeholders, and the development of a new Risk Management Process. American Airlines has been fully cooperative in communicating information about identified hazards to the Agency, and all correctives actions are tracked in the carrier's Safety Management System.

The FAA offers the following comments to the OIG's findings:

- The draft report states that it took four months from the time a supervisor raised concerns about the Aviation Safety Inspector's (ASI) role and lack of objectivity until the regional office reassigned him. The report further states that the regional office did not see the issue as a priority. However, the FAA supports a robust ethics program that focuses on identifying conflicts of interest, training and advising on conflicts, and undertaking appropriate enforcement action. Once the issues were brought to the FAA's attention, it began the necessary review process to determine the appropriate action. This ultimately resulted in a change to the ASI's responsibilities along with the initiation of formal action once the allegations were substantiated.

- The FAA did complete an independent assessment of the American Airlines Flight Test Operations Program. That assessment identified several compliance issues and other hazards. The Allied Pilots Association is participating in the resulting Safety Analysis Team, which is working to evaluate and mitigate these issues.

We concur with the recommendations, as written. We plan to implement recommendations 2, 6 and 7 by October 31 2018, recommendations 1, 3 and 4 by March 31, 2019, and recommendation 5 by June 30, 2019.

2

We appreciate this opportunity to respond to the OIG draft report. Please contact H. Clayton Foushee at (202) 267-9000 if you have any questions or require additional information about these comments.

# U.S. DOT ⊘IG
# Fraud & Safety
# ℂHotline

hotline@oig.dot.gov | (800) 424-9071

https://www.oig.dot.gov/hotline

## Our Mission

OIG conducts audits and investigations on behalf of the American public to improve the performance and integrity of DOT's programs to ensure a safe, efficient, and effective national transportation system.



# EXHIBIT 6

STATEMENT



To Whom It May Concern,

 I, the undersigned, am a Captain with American Airlines on the Boeing 767, based in Miami, FL. I currently have over 25 years of service with American and have served as a Captain on four aircraft types for well over 12 years. I am familiar with operations in Europe, Hawaii, South America and the continental US.

 I have personally known First Officer Rodney Scott Patterson for well over 12 years both in the context of the cockpit and with his service to the Allied Pilots Association.

 In September, 2015, FO Patterson contacted me for advice on how to be relieved for a military assignment from his AA duties. He had contacted the flight office the same day and not received a clearance. I instructed him to call the Chief Pilot on duty since it was after duty hours. A few minutes later he called me back to inform me that he had been released by the after hour Duty Chief Pilot. While he was away on military duty, he called me to inform me that MIA Chief Pilot Captain Jim Bonds had suspended him from work with pay (PW) while FO Patterson was performing military duty. I advised him I would speak to the flight office on his behalf when I returned the following week to work.

 On or about 28 September, 2015, I approached MIA Chief Pilot CA Jim Bonds and MIA Director of Flight CA Brian Beach in the Miami Flight Office. I advised both of them that the PW was inappropriate and a violation of Federal Law on several counts. Both replied that it wasn't military, even though the suspension occurred on 22 September (and we learned the complaint from CA Whitehouse was filed on 24 SEP). CA Beach's first response was Scott diverted an aircraft into Bolivia. I then asked him, where was the Captain when the plane landed? CA Beach responded in his seat. I replied in that case, "did Scott have a gun to his head?" CA Beach replied to me no. Then I advised CA Beach the co-pilots were just deviating and only a captain can divert the airplane. I advised both Chiefs we are all captains and you both know that co-pilots cannot divert an aircraft. At that point CA Beach informed me that it was multiple captains and multiple departments were involved. I stated that I hardly believe that FO Patterson would be involved with multiple departments when that is captain's responsibility.

 I stated to both chiefs that their actions were a violation of federal law, changing an employee's employment status while performing military duty. I believe that both chiefs resurrected a stale incident from almost a year prior that involved CA Whitehouse complaint about FO Patterson. The issue was resolved through professional standards and now is being used to divert attention for their violation of federal law.

 I have flown with FO Scott Patterson on a number of occasions both inside AA and outside. FO Patterson strikes me as a consummate professional pilot who will one day make a great captain for American. I have entrusted him with the lives of my family and never once doubted the successful outcome of the flight. On one such flight to South America, I observed FO Patterson to exercise good judgement in conducting the flight, when one of the other crew members was unable to return to the cockpit and presumed ill. Never did I feel threatened or over powered by FO Patterson who was acting in a professional manner. Patterson remained calm and composed the entire time and the aircraft landed safely without incident.

# ATTACHMENT 3

Patterson_00350

In closing, I am appalled at the behavior of a CA Whitehouse who has gone to great lengths to destroy the career and livelihood of FO Patterson. I believe that CA Whitehouse contacted the Miami Flight Office to assist them with covering up their violation of Federal Law, contacted US Customs with false allegations of smuggling contraband to a foreign country without one shred of proof to the contrary. This Captain's actions caused several delays for our customers and inconvenienced crewmembers being searched prior to boarding their flights. APA pilots are now labeled as smugglers over this. I am deeply disturbed to learn that he has allegedly contacted other pilots to generate false rumor and innuendo to support his erroneous actions against another APA member.

Does the Allied Pilots Association condone this course of action by a pilot?
Article 7 is the appropriate venue to address this matter.

Captain Brian Vitale
MIA/767/CA/I
Former MIA Base Administrator

STATE OF FLORIDA
COUNTY OF _Lee_

Sworn to (or affirmed) and subscribed before me this _16th_ day of _June_, 20_17_ by

_Brian Nicholas Vitale_

Signature of Notary, Title

Personally Known ✓    OR Produced Identification _____ Type of Identification Produced

JACQUES ANDRE GONZALEZ
Notary Public - State of Florida
My Comm. Expires Nov 14, 2018
Commission # FF 168347

# EXHIBIT 7

**From:** sammy odeh <sammy.odeh@hotmail.com>
**Date:** October 13, 2014 at 9:48:01 AM EDT
**To:** "Bonds, James" <James.Bonds@aa.com>
**Subject: Re: AA217/7OCT MIA-ASU**


Thank you Jim. We will talk to him again.
Regards.
Sammy Odeh

Sent from my iPhone


NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this in error, please notify me immediately by return email and promptly delete this message and its attachments from your computer.

On Oct 13, 2014, at 8:48 AM, Bonds, James <James.Bonds@aa.com> wrote:


More info for Patterson.  Thanks for what you do

Captain Jim Bonds
Chief Pilot-MIA
James.Bonds@aa.com
305-526-1282 office
786-473-1968 cell


Begin forwarded message:


**From:** "Roig, Eric" <Eric.Roig@aa.com>
**Date:** October 13, 2014 at 8:31:31 AM EDT
**To:** "Scialfa, Sean" <Sean.Scialfa@aa.com>, "Bonds, James"

<James.Bonds@aa.com>, "Beach, Brian" <Brian.Beach@aa.com>
**Cc:** "Rodriguez, Sylvia" <Sylvia.Rodriguez@aa.com>, "Roig, Eric"
<Eric.Roig@aa.com>
**Subject: AA217/7OCT MIA-ASU**


FYI - we received this additional report regarding the incident with the FO
on flight 217/7Oct MIA-ASU for your handling.  Thanks


On Oct 11, 2014, at 5:20 PM, "cesar bujedo"
<cesarbujedo@gmail.com> wrote:


Hi Eric....


Thank you for your quick actions. We got home without any
major inconveniences. During the layover and the flight back
home, I made sure to stay away from first officer Patterson.
However, he took the time to look for the crew in a restaurant
near the hotel and sat with us without being invited.


He has begun spreading lies about me and the rest of the crew;
like saying we were stealing food and alcohol from the aircraft
( by the way, I don't drink ). He claimed to have videos from
the hotel security cameras and also "Intel" of my personal
company file. Also, he claimes he payed the van driver to take
pictures of us drinking on our way to the hotel ( both claims
proved to be lies)


He even told such things to the airport agents in ASU.


This morning while we were deplaning  and I was giving the
thanks and good byes to people, he stood outside the plane and
I saw him taking pictures of me.


This kind of harassment and intimidation is not acceptable and
violates company policies. Please tell me what to do to have
this documented and if necessary,  to file a formal complain.
Furthermore, I request to be remove from any flight that
includes his name on the crew list; I do not feel safe being near
him.

Thank you for your time,


Cesar Bujedo


518963 IMA




NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this in error, please notify me immediately by return email and promptly delete this message and its attachments from your computer.

# **EXHIBIT 8**

Lucretia D. Guia
Associate General Counsel
Legal



Via Email: fuentes.oscar@dol.gov

February 29, 2016

Oscar G. Fuentes
Assistant Director/Investigator
U.S. Department of Labor
Veterans Employment and Training Service
2550 West Oakland Park Boulevard – Room 133
Fort Lauderdale, Florida  33311

Re:     Patterson, Rodney S.
        File #:  FL-2016-00016-10-R

Dear Mr. Fuentes:

        This letter and the enclosed information responds, on behalf of American Airlines, to First Officer Rodney Patterson's complaint to your office that he has been subjected to disparate treatment and that his rights under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 et seq. were violated.  FO Patterson's complaint is specious.  AA has not deprived him of any rights protected by USERRA and has not discriminated against him in any manner whatsoever.

I.      Introduction

        AA is a commercial air carrier that provides scheduled service to destinations throughout the United States and abroad.  Many employees of the Company are military veterans, and many employees continue to serve in active, guard, or reserve status.  The Company has the highest regard for those who serve (or served) our country in the armed services.  AA is committed to providing military leave to its employees as required by USERRA, prohibits discrimination based on covered veteran status and uniformed military service, and affords all rights, privileges, and benefits to employees as required by USERRA.   The Company's general military leave policies are available to employees on its intranet (Exh. A) and specific military leave procedures for pilots are set forth in Section 11 of the collective bargaining agreement between APA and AA.  (Exh. B)

II.     Factual Background and Response to Requests for Information

        As I indicated during our brief telephone conversation regarding this matter, the Company has not denied FO Patterson military leave or discriminated against him in any manner.  On or about September 29, 2015, the Company requested that FO Patterson substantiate his request for military leave for September 21, 2015.  It did so because FO Patterson's request for the leave raised questions.  Specifically, on the day before a scheduled trip, FO Patterson contacted one of the Chief Pilots in MIA and asked for an "EO" – which is effectively a code used for unanticipated personal absences.  He told Captain Bonds

4333 Amon Carter Blvd., MD 5675
Fort Worth, TX  76155
817-931-3929 Office
817-963-4959 FAX
lucretia.guia@aa.com

that he wanted the EO because the captain on his trip the following day was a representative from APA's Professional Standards and that he and the captain did not get along. Captain Bond denied the EO for that purpose. Then, later in same day, after Captain Bond had left, FO Patterson called the duty chief and asked again for the EO. In this telephone call, he told the duty chief that he needed the day off because he had been assigned duty in relation to the "Pope's visit." The duty chief removed FO Patterson from his trip, as he requested.

Typically, AA does not require verification of military service and, specifically, pilots are not typically required to provide uniformed service orders to substantiate military service. AA requested verification of FO Patterson's service for September 22 in this case because of the specific circumstances. FO Patterson initially cited personal differences with the captain as the reason he wanted off the trip and later, after being denied an EO for that purposes, called a different person and indicated that he needed time off for military leave, the Company requested that FO Patterson substantiate his military leave. It did not specify the type of verification, i.e., it did not demand military orders. On or about October 28, 2015, FO Patterson provided his LES to the Company, which appeared to show that FO Patterson had been paid for military service for the relevant dates, September 22-24, 2015. (Exh. C) Upon receipt of that information, the Company took no further action relative to this military leave. It took no disciplinary action and no reprisals related to this leave.

In addition to inquiring about the circumstances that led AA to request verification of FO Patterson's military service, you asked whether there has been any "disciplinary actions" discussed with FO Patterson concerning "job performance issues/attendance problems." There has been no disciplinary action for "attendance problems." On or about September 24, 2015, however, a pilot co-worker lodged a formal complaint regarding FO Patterson's conduct. (Exh. D) Because of the serious nature of the complaint, the Company immediately removed FO Patterson from service and launched an investigation. (Exh. E) He was placed on "PW" status (which is the code used when the Company withholds a pilot from duty with pay). During the course of the investigation, which did not lead to discipline, the Company discovered information which placed in question FO Patterson's fitness for duty. And, consistent with its duty to ensure the safety of its employees and passengers, the Company initiated a fitness for duty examination, which is pending. Throughout this process, FO Patterson has remained on a paid status. He has not been placed on a "Leave Without Pay" status either before or after this Company launched this investigation.

Last, you requested that the Company provide a list of uniformed service members who work out of the South Florida airports who have "similar issues as Mr. Patterson." Although numerous pilots based in MIA frequently take military leave, none have demonstrated "similar issues." None have been the subject of a similar complaint by a co-worker and none have exhibited conduct during an investigation that cast concerns about his/her fitness to fly. Moreover, none have provided contradictory reasons for a last minute request for military leave.

In closing, AA has done nothing relative to FO Patterson which was discriminatory or in any manner violated his USERRA rights. It simply requested verification of his military service because of circumstances which raised legitimate questions regarding that service. Once he provided that verification, the issue was resolved.

AA-Patterson-0000010

Please let me know if you have further questions.

Sincerely,

Lucretia D. Guia

Enclosures:  Exhibits A-E

3

AA-Patterson-0000011

# **<u>EXHIBIT 9</u>**

**Beach, Brian**

| | |
|---|---|
| **From:** | Garcia, Ricardo |
| **Sent:** | Tuesday, March 24, 2015 4:15 PM |
| **To:** | Beach, Brian |
| **Cc:** | Ronda, Fred |
| **Subject:** | RE: Patterson |

Brian,

Pls reference the below e-mails from Captain Glenn Whitehouse.

Pls be advised that today Fred Ronda and I discussed the below case with Larry McLauglin, Director of AA Global Investigations.  It was decided that Corporate Security would look into this matter.   I will get back to you on this, Ric........

-----Original Message-----
From: Beach, Brian
Sent: Friday, March 20, 2015 10:55 AM
To: Garcia, Ricardo
Subject: FW: Patterson

The big one

-----Original Message-----
From: Whitehouse, Glenn
Sent: Thursday, March 19, 2015 5:01 PM
To: Beach, Brian
Subject: Patterson

First officer Patterson contacted me about going to the Iguazu falls via what's app, I told him I would consider it. He asked if his family could ride the van and I had no issue with it but at this time I did not know I had a dead head crew riding with us.
I was informed by the purser Heidi after arrival in ASU that FB Patterson was rude to her and Lisa and never introduced himself and took the pillows from 2EF in first class for his family. She also informed me of an issue during boarding with his wife and children with bag storage. He apparently took passengers bags out of the overhead near door 2L to be checked and put his family bags there.
FB Patterson complained often during flight about the dead head flight attendants in first class as not being fair and his family having to sit in coach.
Prior to taxi, FB Patterson was moving switches and the flaps from the jump seat when he was not the FO and interfering with the FO normal flow of duties.
I told him if he wants to be FO, then bid it, otherwise keep your hands off.
He constantly acts as if he is the captain and wants to make the decisions.
After his break when he returned to the flight deck, he informed me his daughter would be watching a video in the rest seat next to me. I told him no. It was not acceptable under 117 rules and he needed to move her back to coach. He was not happy about my decision. Told me if he was captain he would allow it. I told him it's against FARS to have a person in the seat. I never allow anyone next to us during rest.

I was informed by crew his wife was rude and demanding during flight.

1

AA-Patterson-0000077

When I arrived at the hotel van for pickup, Patterson told the FAs on the bus to double up and then told his kids and wife to take a seat. The FAs refused and this left no seats available for his wife and children. He then told his wife to take a seat and told his children to sit on the floor of the bus at the front. I got off the bus and told him no. I informed him this was not safe and to take a taxi. I offered to pay for the taxi. He refused my offer and got mad telling me the bus driver said it was ok for his children to sit on the floor. I told him no, in the interest of safety for his children I would not allow it. I told him I was in a few crew van accidents and I want them in a seat or no ride. He then demanded his bags be removed from the van. I told him not to worry about the bags. I would have them at the hotel. He said no. So now the crew had to wait more as the driver had to unload almost all the bags to find his.

During the ride to the hotel, FA Caesar said he was writing First Officer Patterson up. I told the FA if he felt he needed to do this then to call professional standards.

FB Patterson arrived about 10 minutes after us at the hotel and said " dude we were robbed by street people in the taxi", I looked at him and said you are full of BS, and I looked at his child and asked him if that was true and his child just looked away. Knowing his dad was lying. FA s heard this claim of being robbed also.

Later that night while I was at dinner with the crew, FB Patterson found us at a restaurant and wanted to speak with me. He clearly made a great effort to search and find me.

I went to the restroom and he followed me. He told me he was written up and was going to have the entire crew fired. I asked why, he said he had video evidence from the hotel showing all the crew drinking on the bus with stolen alcohol and he had paid the bus driver $100 to take video. I told him no one was drinking to my knowledge. He said " the entire crew is your responsibility and if one is drinking then I deserve to be terminated". I told Patterson I'm not a baby sitter for the entire crew.

He then threatened me and said "my mother is the corporate counsel with US airways, and captain since you are in charge of the crew you will be fired." I told him do not threaten me. He then said "I have friends in management and you and the FO  and everyone will lose your job. " I told him again to stop threatening me. He then informed me FAs we're smuggling food into the country and because he has a diplomatic passport he would see to it that the crew was banned from coming here for 3-5 years.

I told him to get lost.

The next day, I arranged a meeting with the hotel manager. I told him my first officer Patterson was telling me the hotel gave him video of the crew drinking alcohol while exiting the crew van. The hotel manager said this is not true and he was never asked.

I later found out FB Paterson told the front desk in ASU  he was the captain and not myself. Flight attendants also heard this.

At breakfast the next morning, he informed me and Captain Chip Worthington the inbound crew of the presence of a ghost rider on the inbound flight that Captain Worthington had flown in. He told us he arranged to have this ghost rider observe the crew tonight and we were all on notice. I again told him BS and informed him I did not believe him and he lacked of any credibility.

He again started threatening me about termination because his mom is head counsel at USAir and told me our jobs will be terminated.

Capt Worthington was a witness.

I called Capt. Mark Mondrich APA professional standards after breakfast.

Captain Mark Mondrich said he had spoken with Patterson already but his story was far different from what the flight attendants had written. I asked Capt. Mondrich to read the FA write up to me. I informed him the FA write up was factually correct.

Captain Mondrich said the FA write up had reached Captain Scialfa's desk and was kicked back to professional standards. Patterson then made allegations against me telling Captain Mondrich I had the purser sit next to me and had sexual relations in the rest seat during my break which is false. No one slept next to me and broke 117 rules.

During the bus ride back to the airport for our night departure, the Spanish speaking FA talked with the van driver and asked him about the $100 for video and pictures. The driver informed the FA this was not true.

That evening before departure, FB Patterson came on the flight deck and said "dude! my corporate intelligence tells me the FA Caesar has had 3 termination hearings this year and I will have his ass fired."

I told FB Patterson he was digging himself a hole and to stop making things up. I informed Patterson not only could he be terminated for illegally using ones personal file against them, but whomever gave him this information will also lose their job for disclosing it if this is true. I just did not find this to be factual and dismissed it as more rhetoric.

2

AA-Patterson-0000078

I was informed by the station personal in ASU the paper work was delayed due to a bad printer.

Once again FB Patterson sprang into a action. He went out along with FO Flanigan and yelled at the agent and told the agent would lose their job, Paterson also told the agent to get a good attorney.

FO Flannigan witnessed this entire conversation. FO Flannigan informed me Patterson was acting very bad and seemed delusional.

FB Patterson then threatened to have the flight cancelled if I did not support him in this matter about the paperwork as if he is the captain and it's his responsibility.

During the 2.5 hours in flight while FO Flannigan was on break, I heard FB Patterson say this about FA Caesar "I will get that faggot fired" I heard him say the N word on many occasions about African American FOs I had flown with to VVI. He then out of the blue he thanked me for paying for his taxi. I told FB Patterson," I had offered, but you declined"he said " oh no Captain, you paid my taxi bill, I have a hotel receipt showing you put a $30 credit to my room." I said "Scott your are full of shit and what are you insinuating?" He said "looks like bribe a to me captain." I then asked him to show me all the evidence he claimed to have. And he said, "AA corporate security and his mom at USAirways told him he can't show it and will used at the hearing. I told him he was lying. He told me he was friends of the flight office in MIA and would get me, the FO, and all of the crew fired.

I told him he needed to back off.

I told Patterson there was no way he will destroy the careers of many over a stupid bus ride issue that he started.

I then told him he has no concern for his children's safety and it was his fault for being an ungracious ass in the first place.

I asked him why he was concerned about his bags on the crew bus, he said it gets robbed all the time and did not want his bags robbed without himself being there to defend the crew. I said "then if this is true Scott and the hotel van gets robbed often, are you not safer in a taxi, he contradicted himself with that statement.

He then went on and on in the the flight deck non stop for 2 hours assaulting me with termination. At one point I wanted to kick him out of the cockpit but FO Flannigan needed his rest.

He eventually stopped and said this would leave it all alone.

When I went back on my break, he told the FO Flannigan he had me shaking in my boots.

He told FO Flanigan he needed to support him or he would be terminated due to his association with the crew.

Now that sounds like a comment to create fear and intimidation in me breaking company policy.

I asked FA Caesar while on break if he was ever in trouble with the company. He said no just a few late sign ins. So once again FB Patterson was making stuff up.

When leaving the aircraft, FB Patterson stopped at the door and took pictures of the FAs and told them "I got you! , I got your picture." I witnessed this from the first class cabin but could not hear him say those words.

I was later waiting for my commuter flight to Chicago and 2 FAs from the flight looked for and found me to inform me they were behind FB Patterson in the customs line and FB Patterson told the customs inspector to check the crew for illegal stuff and was pointing at them.

This I did not witness.

I called professional standards next day and told him I thought I had diffused the situation but FB Patterson decided to go nuclear on the crew at the end and to please find out how I can avoid flying with him.

Professional Standards told me he would tell FB Paterson to put me on his do not pair list.

Capt. Mondrich said he knows Patterson and knows how he can be. I did not like this statement because it appears he is covering for him. This behavior is totally uncalled for, against company policy and should not be brushed under the rug. What the hell is a person of this character doing in an AA cockpit? I would hate to never have anyone I know on his flights.

Below are other comments FB Patterson has said to me that makes me believe he is in need of serious physiological help.


Patterson was telling me he is the popular go to guy the flight office in a Miami calls anytime someone is in trouble and a hearing is called to defend. I asked him if he is with Professional Standards. He says no. Somehow I find the hard to believe he is the Miami go to guy the union calls.

I know of many captains who will not fly with him, so I'm assured that FB is the problem.

He does seem delusional, making up his own facts and telling stories that I think he really believes but are obviously not true.

3

AA-Patterson-0000079

I asked him about the rumor of the first officer led diversion into Santa Cruz he was a part of. Instead of telling me the facts, he went on a rampage and was going to get the FO terminated under company rules for spreading false rumors. I informed him I did not hear it from the crew and he needed to calm down.

A few weeks after this, I was in Rio with a gate delay due to maintenance. I over heard the flight attendents speaking about an asshole captain who kicks crew members families off crew vans. I let the conversation continue then chimed in telling them I was the ass hole and maybe they need to know the facts before believing what they heard. I asked them where they heard this and they told me a first officer got on the parking lot bus at MIA and was telling everyone he could my name and what an ass hole I am for kicking his family off the van.

He was telling everyone in Santa Cruz he is a captain for AA but dresses as a first officer. He told Los Tojibos personal he works for AA corporate security looking to bust crew members.

He tells many he is a police officer, but I found out through reliable sources this is not true.

I was complaining about my back being sore, he then jumped out of his seat and tells me he is a chiropractor and wanted to adjust me. I told him don't touch me.

He tells many stories about owning a Sabre jet and is flying government missions on the side. I thought this is not allowed unless it's official military flying? Does he have company permission?

He informed the crew AA called him to make sure he has his standing bid list ready because they wanted him to be captain soon.

Looking at his seniority number, 7100+ it just seems to be another delusional lie.

He said when he is captain, things will be different. He will demand respect and FAs will fear him.

I told him many times you can not demand respect, you earn it, he tells me I'm wrong, because in the military he is a king. I don't see it this way and god help AA when he does make captain, just my opinion.


Capt. Whitehouse

4

AA-Patterson-0000080

# **EXHIBIT 10**

## Unsworn Declaration of Guy Dalton Shellhouse,
## Pursuant to 28 U.S.C. § 1746

Guy Dalton Shellhouse deposes and says:

1.      I make this declaration of my own personal knowledge.

2.      I am a Senior Boeing 767, Captain for American Airlines.

   a.  I have served American for well over 30 years of service.

   b.  I have personally flown with First Officer Rodney Scott Patterson to very difficult mountainous terrain airports and never questioned his (Patterson's) ability to operate safely as a pilot for American Airlines.

3.      I have extensive personal knowledge of the issue involving Lt. Col. Patterson before this Court.

4.      On or about September, 2015 I was appointed the union representative of First Rodney Scott Patterson, in the Section 21 matter (an internal company hearing which is a pre-cursor to the imposition of company discipline).

   a.  During the Section 21 hearing, conducted by Ana Burke-Leon, (AA Human Resources) I specifically questioned her, "Before we get started I would like to ask you a few questions", "#1 have you investigated this complaint for fact (truthfulness)?",  to which she replied "I have not".  This was witnessed by Captain Mark Modrich, (now retired) who was also familiar with the facts surrounding the case.

1

b. I conducted an extensive investigation while representing First Officer Patterson, in what were apparently false unsupported allegations made by Whitehouse who sought revenge on Patterson for a flight the two had taken in October, 2014.

c. Captain Modrich, who at the time was APA Professional Standards, provided many facts from his inquiry into the matter, which further substantiated my impressions that the allegations were false.

d. I also specifically questioned Burke-Leon at the hearing, "have you provided me all of the witness statements and information relevant to this matter?", to which she replied, "I have", also witnessed by Captain Mark Modrich.  So did American hide the results of the Corporate Security Investigation from Burke-Leon?  Likely they did because, had we known of those results, which Captain Beach states exonerated Patterson, we would have proceeded that American was acting in "Bad Faith" by conducting a second investigation of the same statements.

5. Since beginning my investigation and subsequent thereof, I assert the following facts:

a. Ana Burke-Leon did not conduct a thorough investigation into the facts surrounding the Whitehouse Complaint, rather a cursory investigation, which glossed over many exculpatory facts in favor of Patterson and disregarded facts which clearly showed the complaint was false.  It appears she was attempting to reverse-engineer the complaint against Patterson regardless of the facts.

b. She did not disclose to Patterson or me, the existence of a Corporate Security Investigation which was begun on or about March of 2015

2

with a finding of no fact, (a fact that the statement was passed on for more investigations by Corporate Security), in response to what appeared to be an exact duplicate of Whitehouse's complaint filed in September, 2015 while Patterson was performing military duties in Washington, D.C.

      c.   Not disclosing the Corporate Security Investigation to Patterson was a "bad faith act" by American Airlines to harm him.

      d.  Whitehouse's allegations I found out of some 320 lines of his complaint over half, were false and unsupported.  He even made one allegation that he could see Patterson through a "steel jet bridge" while standing in the middle of the business class section of a 757.    In another allegation, Whitehouse alleges an act by Patterson which couldn't have occurred because he was over 3,500 miles away.  These two statements alone point out the questionable veracity of the entire complaint.

      e.  It is apparent that Whitehouse knew in March 2015, his complaint failed the scrutiny of truthfulness and he sought out to collect statements from whomever he could. In fact, if proven to be false, Whitehouse himself could be terminated.

      f. On September 6, 2015, Whitehouse "literally chased" Captain James Bonds down in the terminal to tell another third hand story about First Officer Patterson, this account was later determined to be absolutely false and one which neither Bonds nor Whitehouse agree that they met in the terminal.

      g.  Whitehouse alleges that Patterson pointed him out to Bolivian Customs, sometime in January or February of 2015 for extra screening.  This allegation was so preposterous, because Whitehouse admitted in his

statement that he had a large number of electronic devices, which would draw the scrutiny of any customs officer who might be suspicious that Whitehouse was engaged in a business or attempting to avoid the duties on such items.

6.  On one occasion following the Whitehouse Complaint, I flew with a First Officer who advised me, he had just flown with Captain Whitehouse, who in his words "seemed to be a strange character".  Whitehouse had brought up First Officer Patterson and asked my First Officer to write a statement on his behalf.  I replied to the first officer, whatever you write should be truthful and you should make sure that you have flown with him before you write that statement.  The statement was never written and this wasn't an isolated incident as I spoke to others in the same situation.  Whitehouse likely was acting on behalf of the flight office at their direction.

7.  I spoke with another First Officer who advised me that the alleged conversation between the Mechanic "Pepe" in Bolivia and Whitehouse was fabricated.  Whitehouse and Pepe had a conversation on the flight deck, but Pepe never stated that Patterson was involved in any illegal activity while in Bolivia.  Yet, Whitehouse apparently stated emphatically that Patterson was, without statements of facts.

8.  After Patterson filed his USERRA complaint, I began to hear from first officers, who thought it odd that Whitehouse was changing out of uniform while in U.S. Customs.  First Officers advised me that Whitehouse would meet them in a restaurant before each flight leaving to arrive at the gate after boarding.

9.  In my experience at American Airlines, Corporate Security reports/investigations are detailed and usually conducted by former law enforcement officers or investigators.  The death of an investigator would not

4

shut down an investigation, another person would be appointed and continue. This is a dubious argument by American, the death of one employee, while sad, will not shut the airline down.

10.   Detailed notes and records of interviews are kept, it is AA policy. There are also emails which are sent and should be available. So the investigator never forwarded his findings to a supervisor or otherwise?

11.   First Officer Patterson is entitled to full disclosure with the Corporate Security report/investigation.   Corporate Security reports don't necessarily come packaged in a form such as a police report, but include emails, statements and other information.

12.   Captain Whitehouse's complaint was reviewed by an independent board, the APA Appeals Board, the union which represents both pilots.  This board consisted of Senior Captains at American, one of which was an attorney.   This board determined that American Airlines was remiss at applying its own policies to Patterson.  AA couldn't because the only two allegations that rose to level of harassment were proven false.

13.   Given that AA's Corporate Security Investigation and flawed HR investigation returned nothing to discipline Patterson for, AA turned to a process which has existed since 1939 in order to effect discipline on Patterson.

14.   In my investigation, I have discovered that changing Patterson's status on Sept 24, 2015, was probably a violation of USERRA.  In fact, he was still performing military service when that removal occurred.  Not to mention, Bonds harassed Patterson and imposed additional pre-requisites on his military service which was probably another violation of USERRA.  Bonds likely wanted revenge and even stated he was trying to teach Patterson a lesson.

5

15. The sudden loss of the Corporate Security Investigation and wealth of evidence against the Whitehouse complaint give me great pause. As Patterson's representative, we could have submitted several hundred letters of reference but that didn't matter to AA. Not one pilot I interviewed, ever mentioned a lack of proficiency as a safe pilot on Patterson's part.

16. AA's plan was to send Patterson off into disability for two years at one half his salary. He wasn't disabled. Patterson was told to get a flying job. He did, and as a Boeing 767 Captain. The best determiner of cognitive ability is a pilot's performance, not some research version of a test. (See Exhibit) The 767 proficiency check is nearly impossible for a pilot with cognitive impairment. (See Exhibit)

17. By making this statement, I assert the following protections afforded me by statute, 38 U.S.C. § 4311 (b), 20 C.F.R. § 1002.311 & 18 U.S.C. § 1512.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Dallas, Texas on June 27, 2019.

Captain Guy "Danny" Shelihouse
305-587-4795

6

# EXHIBIT 11

## Burke-leon, Ana

| | |
|---|---|
| **From:** | Burke-leon, Ana |
| **Sent:** | Friday, January 15, 2016 9:55 AM |
| **To:** | 'glenn.whitehouse@windstream.net' |
| **Cc:** | Beach, Brian |
| **Subject:** | RE: On-going investigation |

Good morning Captain Whitehouse, I trust you are well. After reading your email I contacted Captain Beach who will respond to you accordingly.
Best regards,
Ana

-----Original Message-----
From: glenn.whitehouse@windstream.net [mailto:glenn.whitehouse@windstream.net]
Sent: Thursday, January 14, 2016 5:59 PM
To: Burke-leon, Ana
Subject: Re: On-going investigation

Hi Ana,

I wanted to bring to your attention a concern that I have.

On the APA union web site, there is a way for pilots to look up other pilots info. This is used primarily for contacting another pilots for trip trades and such. We also have a feature that allows us to see who is looking up our personal address and info. Its called a reverse look up.
On January 6th, FO Patterson looked up my personal data.

This is of great concern to my wife and myself. We feel he is looking to find me and make good on his threats.
I contacted the flight office sand relayed my concerns to Jim Bonds.

I also spoke with Eric Sitcher APA Miami vice chairman. He was going to discuss this with the base chair as well.

Do you think I should be concerned?

I look forward to putting this all behind us and moving forward.

Thank you,

Captain Glenn Whitehouse


---- "Burke-leon wrote:
> Hello Glenn,
> I trust you are well. I want you to know the investigation is still on-going. I will advise accordingly.
> Best regards,
> Ana
>
> [Description: Description: Description: cid:49F8CA06-65F7-457B-9DC0-8251F696295B]
> Ana Burke- Léon
> Sr. Specialist | Investigations

1

AA-Patterson-0000052

# EXHIBIT 12

August 21, 2017

**ALLIED PILOTS ASSOCIATION APPEAL BOARD RULING**

**IN RE:**

**ARTICLE VII CHARGES**

**FIRST OFFICER RODNEY "SCOTT" PATTERSON**

**v.**

**CAPTAIN GLENN WHITEHOUSE**

Attached is the APA Appeal Board ruling regarding the Article VII charges by First Officer Rodney "Scott" Patterson against Captain Glenn Whitehouse.

For the Appeal Board,

First Officer Rob Sproc
Appeal Board Chair

Captain Joe Bazo
Appeal Board Member

Captain Jeff Koontz
Appeal Board Member

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

BACKGROUND .......................................................................................................................2

DISCUSSION ...........................................................................................................................3

CHARGES .................................................................................................................................5

DECISION ...............................................................................................................................10

## INTRODUCTION

The Allied Pilots Association's ("APA") Constitution and Bylaws ("C&B") Article VII sets forth the internal process and rules governing intra-union hearing and disciplinary procedures. Charges may be brought by a member in good standing against any other APA member under Article VII for:

1.  Willfully acting as a strike-breaker pilot during any duly authorized pilot strike;

2.  Willful violation of the APA Constitution and Bylaws;

3.  Willful neglect in paying dues, assessments, or fines levied by the Association;

4.  Misappropriating money or property of the Association;

5.  Willful violation of the pilots' working agreement;

6.  Initiating and/or prosecuting charges under this article in bad faith;

7.  Any act contrary to the best interests of the APA as an institution or its membership as a whole;

8.  Any act motivated by malice or political animus that exposes another member to company discipline, up to an including termination.

Article VII further directs that charges must be submitted to the APA Secretary-Treasurer by certified mail within one (1) year after the alleged offense. The Appeal Board is tasked with hearing or reviewing cases referred to it in accordance with Article VII.

First Officer Rodney "Scott" Patterson filed Article VII charges against Captain Glenn Whitehouse in December 2016.[1] In a letter dated March 13, 2017, Captain William Read, MIA Domicile Chair, denied First Officer Paterson's complaint, finding that the one-year statute of limitations had been exceeded and, therefore, First Officer Patterson's complaint was not cognizable.[2] First Officer Patterson filed an appeal of Captain Read's decision on April 6, 2017.[3] The APA Appeal Board convened a three-member panel (hereinafter, "Panel") to hear First Officer Patterson's appeal. Panel members were First Officer Robert Sproc, Captain Joe Bazo, and Captain Jeff Koontz. The hearing took place on June 8 and 9, 2017, in Miami, FL. First Officer Patterson,

---

[1] See Accuser's Complaint.
[2] Captain Read letter dated March 13, 2017.
[3] Patterson letter to Torell dated April 6, 2017.

1

through his pilot advocate Captain Danny Shellhouse, presented his case to the Panel, proffering 26 exhibits and one written motion. The Accused, Captain Glenn Whitehouse, declined to attend the hearing both in person and electronically via Skype, Facetime or other electronic means. He did not designate a pilot representative. Instead, Captain Whitehouse proffered emails dated June 2, 2017, and June 6, 2017, for consideration of this Panel.

## BACKGROUND

First Officer Scott Patterson is a pilot for American Airlines currently on medical disability.[4] The basis for First Officer Patterson's complaint originated from a MIA-ASU trip in October 2014. Captain Glenn Whitehouse ("Accused") was the Captain, and First Officer Scott Patterson ("Accuser") was one of two first officers. A dispute erupted between the Accuser and Accused, each alleging the other exhibited offensive conduct during the trip and well after the trip ended. It is unclear exactly how APA Professional Standards became involved, but it is clear from Exhibit 5 that APA Professional Standards member Captain Mark Modrich was directly involved in mediating the dispute. At some later point, at least one more unnamed APA Professional Standards member became involved. (See Exhibits 3 and 4.) Specifically, the unnamed APA Professional Standards captain presciently warned First Officer Patterson that both he and Captain Whitehouse need to "move on" because "…if it continues and escalates – it will be out of Professional Standards [sic] hands and then get ugly." [5]

Eventually, First Officer Patterson was subject to discipline under Section 21 of the APA-AA Joint Collective Bargaining Agreement. The Section 21 Hearing took place on November 23, 2015, and a PEH entry was made into First Officer Patterson's file on February 1, 2016. [6] The PEH entry admonished First Officer Patterson to "maintain good working relationships with his coworkers."[7] First Officer Patterson thereafter crafted a complaint against Captain Whitehouse under Article VII of the APA C&B, dated December 4th but mailed certified on December 5, 2016.[8] Eight allegations were leveled against Captain Whitehouse.

---

[4] Hearing Transcripts, June 8, 2017, pg. 17, lines 7-10.
[5] Exhibit 3, pg. 9.
[6] Exhibit 1.
[7] *Id.*
[8] Accuser's Complaint.

2

The chairman of the Miami domicile, Captain William Read, did not reach a determination on the merits of First Officer Patterson's Article VII complaint, but instead found that the complaint was "not cognizable" since more than one year had elapsed between the occurrence of the events upon which the complaint was based and the filing of the complaint.[9] Captain Read confuses timeliness as a cognizable issue. Whether or not charges are cognizable pertains to the eight enumerated actions listed in Article VII Section A, 1-8. Deadlines for filing of charges and appeals are covered separately and distinctly in Article VII. First Officer Patterson timely filed his appeal of the Miami Domicile Chairman's decision.[10]

As a threshold matter, the Panel must first resolve whether the Miami Domicile Chairman was correct in finding that First Officer Patterson's Article VII complaint (hereinafter "Complaint") was untimely. If the Panel finds that the Complaint is timely, then a determination would have to be made as to the disposition of the merits of the Complaint.

## DISCUSSION

### Jurisdiction

Before a Domicile Officer can hear the merits of a complaint under Article VII of the C&B, the officer must first determine whether jurisdiction exists. To establish jurisdiction, four elements must be satisfied:

(1)     The accuser is a Member in Good Standing;

(2)     The claim is filed within the Statute of Limitations period;

(3)     The claim alleges liability under Article VII (cognizable charges);

(4)     The accuser has suffered some level harm as a result of the accused's action(s).[11]

In this matter, Captain Read declared that the Complaint was not filed within the one-year period called for under Article VII.B.2, and therefore the Complaint was not cognizable. Captain Read identified the date of First Officer Patterson's Section 21 Hearing (November 23, 2015) as being the latest point in which the one-year limitations period commenced. The Panel finds this to be in error. Under the plain language of Section 21 of the APA – AA JCBA, the first step in the disciplinary process is a written advisory.[12] In this case, a PEH entered into First Officer

---

[9] Patterson v. Whitehouse Transcript, Vol. 1, pp. 32-33
[10] Patterson letter to Torell dated April 6, 2017.
[11] See *Meadows v. AAPSIC*
[12] APA-AA JCBA, Sec 21, A.1.h.(1).

Patterson's personnel file on February 1, 2016.[13] The Complaint was filed by First Officer Patterson on December 5, 2016, – 308 days after the PEH. Therefore, this Panel finds that First Officer Patterson's Article VII was timely.

## Merits Determination

Next, the Panel turned to adjudicating the merits of the Complaint. First Officer Patterson lodged 10 charges against Captain Whitehouse.[14] Charges 1 through 5 allege acts in violation of Article VII.A.8. Charges 6, 7 and 8 do not identify a particular section under Article VII.A that was violated by the alleged acts. Charges 9 and 10 do not allege specific acts or identify specific section(s) under Article VII.A that were violated. The second sentence in Paragraph B of Article VII reads: "The charges shall be specific as to the alleged acts that constitute the basis for the charges **with citations to the <u>particular</u> provision of the Constitution and Bylaws that have been violated**." (Emphasis added.) Since Charges 9 and 10 allege neither specific acts nor particular provision(s) of the C&B which were violated, Charges 9 and 10 fail. Charges 6, 7, and 8 do allege specific acts but lack identification of specific provision(s) of the C&B that were violated.[15] Hence, Charges 6, 7 and 8 likewise fail. This leaves Charges 1 through 5 for the Panel's consideration.

## Article VII.A.8

Article VII.A.8 reads: "Any act motivated by malice or political animus that exposes another member to company discipline, up to and including termination." Hence, there are two components which must be proven: an act plus the requisite intent, either malice or political animus. In this case, no acts have been alleged which correspond to a political endeavor or to achieving a political goal. Therefore, for his Complaint to be successful, First Officer Patterson must show that Captain Whitehouse's were committed with malicious intent and that Captain Whitehouse possessed the knowledge that his actions would lead to First Officer Patterson being subjected to company discipline. According to Black's Law Dictionary, "Malice does not simply mean ill will towards the person, but signifies a wrongful act, done intentionally, without just cause

---

[13] Exhibit 1.
[14] The Complaint labels each charge as "COUNT", numbered sequentially 1 through 10. The Panel will identify each allegation as a "Charge" and not as a "Count".
[15] Charges 7 and 8 do state that the alleged acts violated Article VII, but the Panel believes that the plain language of VII.B requires greater specificity.

4

or excuse."[16]  Thus, proof of a violation of Article VII.A.8 requires that First Officer Patterson show: (1) an act, which (2) knowingly would cause First Officer Patterson to be subjected to discipline, (3) done intentionally with ill will by Captain Whitehouse, and (4) without just cause or excuse.

## Exhibit 3

First Officer Patterson, through his pilot advocate Captain Shellhouse, offered into evidence a twelve-page document that was written by Captain Whitehouse and delivered to MIA Domicile Chief Pilot Captain Brian Beach.[17] The Panel later admitted the document into evidence as Exhibit 3. The document contained numerous redactions, and it was explained that the redactions were made by American Airlines to protect the privacy of its employees and that the redacted document was central to the company's Section 21 disciplinary against First Officer Patterson.[18] Throughout First Officer Patterson's case in chief, the Panel was urged to accept the statements made in Exhibit 3 for their plain meanings, albeit not necessarily for their truths. The Panel is the fact finder and hence it is solely up to the Panel to judge truthfulness. Nevertheless, Exhibit 3 is significant in that although Captain Whitehouse did not participate in the hearing and although two email communications from Captain Whitehouse have been considered by the Panel, Exhibit 3 essentially tells Captain Whitehouse's version of events.

## CHARGES

## Charge 1

First Officer Patterson alleges that Captain Whitehouse violated Article VII.A.8 by colluding with another employee to subject First Officer Patterson to company discipline. [19] The crux of this allegation is that a protracted dispute which originated with the MIA-ASU flight in October of 2014 and continued well into 2015, and because a resolution through APA Professional Standards could not be achieved, the company ultimately became involved by instigating a Section 21 disciplinary proceeding against First Officer Patterson.  Much reliance was placed by First Officer Patterson on Exhibit 3, and the Panel agrees with him that it does establish a causal

---

[16] Black's Law Dictionary, 2nd Ed.
[17] Patterson v. Whitehouse Transcript, Vol. 1, pp 37-52.
[18] *Id.*
[19] See "Count 1" of Complaint.

connection between his Section 21 discipline and Captain Whitehouse's actions. To prevail under Article VII.A.8 requires more than just proving a causal connection; First Officer Patterson must show that Captain Whitehouse acted with ill will and without just cause. To demonstrate ill will, it would have to be shown that Captain Whitehouse "desired to see another experience pain, injury, or distress."[20]

**Ill Will:** The Panel believes that Exhibit 3, considered in its entirety, does support a finding that Captain Whitehouse desired to see First Officer Patterson "experience pain, injury or distress." The opening paragraph of Captain Whitehouse's letter to MIA Chief Pilot Captain Beach directly asks that American Airlines, through its manager Captain Beach, "...declare that I have been a target of **workplace harassment** by First Officer Scott Patterson."  (Emphasis added.) American Airlines' policies regarding workplace harassment are clear:

> No one wants to work for a company where harassment, intimidation or violence lives. To be absolutely clear, American prohibits threats and workplace violence toward our employees, vendors, customers or property. In no shape or form will the following be tolerated:
> - Physically or verbally threatening or intimidating another individual while at work, including acts of bullying;
> - The intentional destruction or threat of destruction of company or another's property;
> - Harassing or threatening an employee while at work, including phone calls or written communications;
> - Stalking at work; and
> - Advocating illegal use of firearms, bombs, or weapons while at work.
>
> This applies to everyone working on behalf of the company, including, but not limited to, American employees, contract workers, temporary workers, and non-employees on American's property. If you witness or are aware of any violent or potentially violent conduct, do the right thing and report it to your local management as quickly as possible. They'll take it from there, making an initial assessment of the situation and contacting Human Resources.[21]

It is common knowledge that termination is a likely consequence for the employee who violates the company's "Zero Tolerance" workplace harassment policy. Captain Whitehouse, as a veteran captain at American Airlines, likely knew this when he drafted a twelve-page letter to the Company

---

[20] Black's Law Dictionary, 10th Ed., definition of the term "ill will".
[21] AA Policies, U.S. Domestic, "Keep It Fair".

and formally charged First Officer Patterson with workplace harassment.[22]   The Section 21 disciplinary process was initiated against First Officer Patterson following Captain Whitehouse's letter (Exhibit 3), and this letter was the centerpiece of the Company's case against First Officer Patterson. Discipline was issued against First Officer Patterson in the form of a PEH.[23]

**Just Cause:** It is ok to be wrong, provided a reasonable explanation exists for being wrong. Captain Whitehouse's letter (Exhibit 3) is single-spaced and twelve pages long. It makes numerous inferences that First Officer Patterson is a bad pilot, a bad person, a person of unsavory character, a person whose family is annoying, and overall is a person with whom Captain Whitehouse would not choose to associate. The Panel found two instances alleged by Captain Whitehouse which potentially could constitute harassment, and both were mentioned on page 6: the finger pointing in the second paragraph, and the extra scrutiny Captain Whitehouse experienced in VVI mentioned in the third paragraph. If either of these allegations had any credibility, the Company would have been remiss in not applying its own Harassment Policy against First Officer Patterson – something the Company clearly did not do in the Section 21 Hearing. Therefore, no just cause existed for Captain Whitehouse to file workplace harassment charges against First Officer Patterson. Specifically, in Captain Whitehouse's opening paragraph, he does not simply request Captain Beach resolve the dispute at his level as an immediate supervisor, but rather requests that Captain Beach "take the below statements to American airlines [sic] corporate human resources for review and action" clearly putting First Officer Patterson's employment at risk.   Additionally, Captain Whitehouse uses repeated inflammatory language questioning First Officer Patterson's employment status and questioning the mental health of First Officer Patterson, although no evidence was presented to the Board indicating that Captain Whitehouse is qualified to make such accusations: "What the hell is a person of this character doing in an AA cockpit?" (Exhibit 3, lines 164-165); "seemed delusional" (Exhibit 3, line 117); "delusional lie" (Exhibit 3, line 206); "he is not a stable person" (Exhibit 3, line 262); "pathological liar" (Exhibit 3, line 336); "Patterson needs to be evaluated for physiological (sic) evaluation." (Exhibit 3, line 387). These actions and statements are more than just anecdotal references. They are retaliatory in nature and, when taken as a whole, constitute malice.

---

[22] Exhibit 3, p.1.
[23] Exhibit 1.

Captain Whitehouse acted to intentionally expose First Officer Patterson to Company discipline, did so with malice, ill will and no justifiable reason; therefore, First Officer Patterson prevails on Charge 1.

## Charge 2

First Officer Patterson alleges in Charge 2 that Captain Whitehouse violated Article VII.8.A by lying to APA Professional Standards.[24] To prevail on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum.  As we stated above, the first element is the act and here, the act complained of was Captain Whitehouse's "lying" to APA Professional Standards member Captain Mark Modrich. Exhibit 5 is a sworn affidavit by Captain Mark Modrich that was admitted into evidence.[25] First Officer Patterson argues that the gist of Captain Modrich's affidavit supports a conclusion that Captain Whitehouse lied to APA Professional Standards. The Panel disagrees.

If the Panel were to take Captain Modrich's statements in the light most favorable to First Officer Patterson, the closest the Panel can come to First Officer Patterson's argument is that Captain Whitehouse perhaps made statements to Captain Modrich which were untrue. Making false statements, however, is not the same as lying.[26] Lying is making a statement known to be false, which is different from making a statement, which one believes to be true, but in fact is not. Contrary to First Officer Patterson's characterization that Exhibit 5 supports the conclusion that Captain Whitehouse lied, the Panel reads Captain Modrich's affidavit as offering an opinion as to the credibility of Captain Whitehouse versus First Officer Patterson. Ultimately, credibility is for the Panel to judge but we will note here our great discomfort in seeing a member of the APA Professional Standards Committee offering credibility opinions in an Article VII dispute. Since it cannot be shown that Captain Whitehouse's statements to Captain Modrich constituted lies, First Officer Patterson fails to prove that the act complained of had occurred. Charge 2 therefore fails.

---

[24] Charge 2 of Complaint, referred to as "COUNT 2" in Complaint.

[25] Patterson v. Whitehouse Transcript, Vol. 1, pp 53-54.

[26] The Panel IS NOT concluding or even inferring that Captain Whitehouse made false statements or lied to Captain Modrich. Rather, the Panel is engaging in a hypothetical assumption that even if the Panel were to assume that Captain Whitehouse did make statements that could perhaps be proven to be inaccurate, Claim 2 nevertheless fails.

## Charge 3

First Officer Patterson alleges in Charge 3 that Captain Whitehouse violated Article VII.8.A by making false statements to American Airlines Human Resources.[27]  To prevail on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum, the first being that the act complained of actually occurred. Here, the only encounter the Panel knows of in which Captain Whitehouse could possibly be communicating to American Airlines Human Resources would be through the communication entered into evidence as Exhibit 3. The Panel notes that nowhere in Exhibit 3 does it appear that Captain Whitehouse is intending to speak to anyone at American Airlines management other than his Chief Pilot, Captain Brian Beach. Nevertheless, for the sake of evaluating Charge 3 in a light most favorable to First Officer Patterson, the Panel will hypothetically assume that when Captain Whitehouse proffered his communication to Captain Beach, he reasonably knew or should have known that his communication would also reach Human Resources. The Panel will also assume momentarily that First Officer Patterson identified factually incorrect statements in Exhibit 3. All this does for First Officer Patterson is hypothetically establish that a pilot made an incorrect statement or statements to Human Resources, to which First Officer Patterson had the opportunity to refute at his Section 21 Hearing. Charge 3 therefore fails.

It may seem contradictory that First Officer Patterson can prevail on Charge 1 and not Charge 3; however, Charge 1 focuses on what Captain Whitehouse knew he was doing by creating and submitting Exhibit 3 to the Company, and Charge 3 focuses on the truthfulness of the statements made in Exhibit 3. Charge 1 did not require a determination by the Panel on the veracity of the statements made in Exhibit 3 by Captain Whitehouse, but Charge 3 does require such a determination. Here, we find that First Officer Patterson fails to meet his burden of proof for Charge 3. Note, this does not mean that the Panel finds that the statements made by Captain Beach in Exhibit 3 are true – it only means that First Officer Patterson failed to prove Charge 3.

## Charge 4

First Officer Patterson alleges in Charge 4 that Captain Whitehouse violated Article VII.8.A by making false statements to U.S. government agents and corporate security.[28]  To prevail

---

[27] Charge 3 of Complaint, referred to as "COUNT 3" in Complaint.
[28] Charge 4 of Complaint, referred to as "COUNT 4" in Complaint.

on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum, the first being that the act complained of actually occurred. From the record, the Panel is not aware of any statements which Captain Whitehouse made to "U.S. Government agents" or "Corporate Security". Charge 4 fails.

## Charge 5

First Officer Patterson alleges in Charge 5 that Captain Whitehouse violated Article VII.8.A by transmitting privileged APA communications to management for political animus reasons and that Captain Whitehouse's aim was the termination of First Officer Patterson's employment.[29] To prevail on this allegation, First Officer Patterson must establish all four elements of the Article VII.8.A proof quantum, the first being that the act complained of actually occurred. From the record, the Panel is not aware of any communications from the APA, much less communications which could be construed as being "privileged", being in the possession of Captain Whitehouse or being transmitted by Captain Whitehouse. The Panel concludes that the act complained of has not been established by First Officer Patterson and therefore Charge 5 fails.

## Accuser Motion 1

First Officer Patterson, through his advocate Captain Shellhouse, proffered a motion for sanctions against Captain Whitehouse.[30] The Panel will not sanction Captain Whitehouse for nonappearance nor will the Panel assess any fees upon Captain Whitehouse. Although participation in the Article VII process is clearly favorable for the Association, its membership, and most especially for the accused, the C&B do not mandate participation by the accused. In this case, First Officer Patterson, did not claim to be prejudiced by the absence of Captain Whitehouse. Similarly, Captain Whitehouse's absence did not burden the Panel. Furthermore, the Panel will not assess any fees or costs on Captain Whitehouse. Accuser Motion 1 is denied.

**DECISION**

First Officer Patterson prevails on Charge 1. Captain Whitehouse is assessed a fine of one hundred dollars ($100.00). This fine is due on December 31, 2017, or immediately upon a concurring ruling by an arbitrator should this decision be appealed, whichever occurs first.

---

[29] Charge 5 of Complaint, referred to as "COUNT 5" in Complaint.
[30] Patterson v. Whitehouse Transcript, Vol. 2, pp 112.

# **<u>EXHIBIT 14</u>**

## Unsworn Declaration of Kathy Emery, Pursuant to 28 U.S.C. § 1746

Kathy Emery deposes and says:

1.   I make this declaration of my own personal knowledge.

2.   I am a retired American Airlines pilot as of October 19, 2017.

3.   I have knowledge of the American Airlines Corporate reporting system namely the Corporate Security Report.

4.   Based on my experience I am providing the following information:

a.  Corporate Complaints are generally initiated by an individual employee and allege misconduct, a violation American Airlines rules or other act.

b.  It has been my experience, that American Airlines legal assigns an investigator via email, usually to look into the specific allegations, wherein a case is opened and a case number assigned.

c.  The investigator is charged with the duty to investigate the allegations, to interview potential witnesses and take statements.

d.  At the conclusion of the investigation the investigator will report back to the assignor with his or her findings.

5.  Based on my own experience, American Airlines has attempted to conceal these reports and the findings of the investigator.

6.  If a report were to contain actionable information about the subject American could use that report and the findings for discipline, up to and including termination of the subject employee/s.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Miami, Florida on June 12, 2018.

*Kathy E. Emery*

Kathy E. Emery
(305) 758 9650

# EXHIBIT 15



**Fort Lauderdale**
450 East Las Olas Boulevard
Suite 800
Ft. Lauderdale, FL  33301

(954) 525-4800 Tel
(954) 525-8739 Fax

**Writer's Direct Dial:**
(954) 847-4709

**Writer's E-mail:**
mholt@fisherphillips.com

fisherphillips.com

March 4, 2019

**Via Email**

William R. Amlong, Esq.
Amlong & Amlong, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301
wramlong@theamlongfirm.com

      Re:    *Patterson v. American Airlines*, No. 17-cv-60533 (S.D. Fla.)

Dear Bill:

      Pursuant to Rule 11, we write to describe additional conduct by Mr. Patterson that violates Rule 11(b) and constitutes an extensive fraud upon the Court and American. Based on this misconduct, American intends to seek terminating sanctions and all of its attorneys' fees and costs incurred in this matter.

      In preparation for the hearing on American's Motion for Sanctions, we reviewed Mr. Patterson's deposition testimony regarding his purported trip to Washington D.C. on September 22–25, 2015, and American's travel records for Mr. Patterson.

      As you are aware, Mr. Patterson testified in his deposition that he and his wife traveled to D.C. in September 2015 to attend Pope Francis' visit to the White House. Indeed, Mr. Patterson's entire complaint rests on the premise that he requested time off from work in order to engage in military service in Washington D.C. in connection with the Pope's visit.

      Specifically, Mr. Patterson testified that he and his wife traveled on an American Airlines flight from Miami to Washington-DCA on September 22, 2015, and returned on September 25. He testified that he booked the travel on a non-revenue basis, using American's "Jetnet" system—a system that American employees use to book travel using their employee travel privileges. Mr. Patterson testified in significant detail regarding his D.C. trip, including the time of his flight from MIA to DCA (early morning), his schedule once he landed at the DCA airport, and his alleged subsequent work at the Pentagon and visit to the White House. (*See, e.g.*, Patterson Dep. at 191:14–232:22.)

      American's records, however, conclusively show that neither Mr. Patterson nor Mrs. Patterson traveled anywhere on any American flight nor any legacy US Airways flight between September 22–25, 2015. Despite Mr. Patterson's specific testimony that he flew on his travel

William R. Amlong, Esq.
March 4, 2019
Page 2

privileges, American also checked to determine if Mr. Patterson purchased tickets for himself and his wife. Based on its review, American confirmed that no one with the last name Patterson flew on American out of Miami (MIA) on September 22, or out of D.C. Reagan National (DCA) on September 25. Based on American's records and Mr. Patterson's failure to produce any documents establishing that he was in D.C.—despite American's specific requests for such documents in discovery—it appears that you and Mr. Patterson have based this entire lawsuit on a fabrication.

Given the magnitude of these misrepresentations and the enormous fraud on the Court and American that this would constitute, the only way to cure this would be to dismiss the complaint with prejudice and pay the entirety of American's fees and costs since the commencement of this litigation.

If you or Mr. Patterson has any evidence supporting Mr. Patterson's testimony regarding his alleged travel to Washington D.C. from September 22–25, 2015, or evidence supporting Mr. Patterson's claim that he was actually in D.C. during that time performing military duties at the Pentagon and White House, American demands that you produce those materials immediately. Similarly, if you or Mr. Patterson have any evidence confirming that Mr. Patterson lied regarding his alleged trip to D.C. and alleged performance of military duties at the Pentagon and White House, American demands that you produce those materials immediately.

We ask that you respond as soon as possible.

Sincerely,

Michael A. Holt
For FISHER & PHILLIPS LLP

MAH:mah

cc:     Counsel of Record (via email)

# **<u>EXHIBIT 16</u>**

**From:** Gogo Customer Care <customercare@c.gogoair.com>
**To:** aa737drvr <aa737drvr@aol.com>
**Subject:** Gogo Customer Care [Incident: 190307-000436]
**Date:** Thu, Mar 7, 2019 11:45 am



03/07/2019 10:45 AM - Giselle says
Hello Scott,

Thank you for contacting Gogo.  I was about to mention that, there was not flight for September 22nd. Only for September 23rd.

If you have any further questions, we can be reached 24/7 at 877-350-0038.  You can also contact us via Live Chat by clicking https://custhelp.gogoinflight.com while you're in the air or on the ground.

Thank you,
Your Friends at Gogo Customer Care

03/07/2019 10:37 AM - Scott Patterson says
Giselle

Thanks so much for the quick reply.  Can you please confirm this was AAL 1870 on September 23, 2015?

03/07/2019 09:35 AM - Giselle says
Hello Scott,

Thank you for contacting Gogo.  No problem, this was the flight number: AAL1870 from Washington, DC to Charlotte, NC

If you have any further questions, we can be reached 24/7 at 877-350-0038.  You can also contact us via Live Chat by clicking https://custhelp.gogoinflight.com while you're in the air or on the ground.

Thank you,
Your Friends at Gogo Customer Care

03/07/2019 09:32 AM - Scott Patterson says
Thank you for the receipt .  Any way of determining the flight number or time of day.

Sent from my Verizon, Samsung Galaxy smartphone

# **<u>EXHIBIT 17</u>**

Metropolitan Washington Airports Authority       Dulles International Airport    Dulles Toll Road    Business    About the Authority

FAQ

🔍 EN ▾

**Flight**
Information

**Travel**
Information

**Parking**
& Transportation

**Shopping**
& Dining

**Customer**
Service

**About**
the Airport

**Contact**
Us

Shopping & Dining        Shopping & Dining Directory        Say Si Bon!

# Say Si Bon!
## Terminal B/C Gates 23-34

   



A Grab and Go kiosk offering all-day breakfast and lunch/dinner sandwiches, soups, salads and dessert items; news, magazines and sundries; and gift/retail items.

**STORE HOURS**
5:00am-9:00pm

**LOCATION**
Post-Security

**PHONE NUMBER**
703-417-0602

View Larger Map 🗺







**From:** Montgomery, Michelle [mailto:Michelle.Montgomery@aa.com]
**Sent:** Thursday, March 07, 2019 3:55 PM
**To:** Kennedy, Tricia <tkennedy@alliedpilots.org>
**Cc:** Price, Jeffrey <Jeffrey.Price@aa.com>
**Subject:** Scott Patterson Section 21 Notice


Attached please find a Notice of Section 21 for Scott Patterson.


American Airlines 


Michelle Montgom...

Senior Manager Labor Relations - Fl...


817 963 7811 Office | 817 967 2287 Fax


NOTICE: This email and any attachments are for the exclusive and confidential use of the intended recipient(s). If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message. If you have received this in error, please notify me immediately by return email and promptly delete this message and its attachments from your computer.

Hi Scott,


I hope you and your family enjoyed happy holidays.  I am following up on my email below.  I did not get a response about which 2019 arbitration slots you prefer.  An updated list is provided immediately below.  Please let me know which dates you prefer and I will approach AA to try to lock in an arbitration slot for Grievance P-09-17 (16-013). Keep in mind that the parties must mutually agree to a date and arbitrator.


On a related note, we would like to obtain and review the documents and depositions produced in your USERRA litigation as you have indicated that very relevant evidence was produced by your team, the Company, and third parties.  When we approached you about copying the documents before, you indicated that your private counsel