# BYUM CAMPBELL

# AIR OF INJUSTICE

**With A Foreword
By F. Lee Bailey**

The True Story of
an Injustice Done
To One of Aviation's
Most Honored
Legends...

Afterword By AOPA President Phil Boyer

# AIR OF INJUSTICE

4

Yo
those ru
tunate f
odds, too
ally won.
few and
Avia
In 1992,
legendar
Hoover,
much-be
hero wit
hind him
fans that
claim. Th
imprecis
do somet
world se
To
Hoover
ANYON
some in
pilot jus
the pinn
field— a
to size
thought
when th
that wa
they wer
good old
tice".

## Some Other Books By Jim Campbell

Flyer's Guide to Ultralights
The Powered Hang-Gliding Manual
The Ultralight Flight Training Handbook
Flyer's Guide to Night Flying
Affordable Flyers: Aircraft YOU Can Afford to Fly!
Kindred Spirit: A Journey Across America
Way Too Far From Home
SportPlane Resource Guide 1st Ed.
SportPlane Resource Guide 2nd Ed.
Air Of Injustice
The Ultralight Resource Guide (late '99)
Bailout! The Emergency Parachute Resource Guide ('00)

## Some Other Books By Kindred Spirit Press

SportPlane Resource Guide 1st Ed.
SportPlane Resource Guide 2nd Ed.
Violation: The Aero-Legal Resource Guide
Air Of Injustice
The GPS Resource Guide (late '99)
The Rotax Resource Guide–Two Stroke Edition (late '99)
The Rotax Resource Guide–Four Stroke Edition (late '99)
The Ultralight Resource Guide (late '99)
Bailout! The Emergency Parachute Resource Guide ('00)
Flight Training Resource Guide (Late '00)

Copyright 1999 by Kindred Spirit Press, Inc.

Library of Congress Catalog Card Number 99-63050

ISBN 1-886743-15-0

All rights reserved. No part of this work may be reproduced, transmitted, or used in any form or by any means-electronic, or mechanical, including photo-copying, recording, taping, or information storage and retrieval systems-without express written permission of the publisher.

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

Graphics by: Elizabeth Tolle
Cover by: Mark Potter, Elizabeth Tolle
Editors: Amy Sumerlin, Jim Campbell, Howard Fried

Published by:



Kindred Spirit Press, Inc.
P.O. Box 9132
Winter Haven, FL 33883-9132



# AIR OF INJUSTICE

120

varying conditions do affect their outcome from day to day. More important, wh[...] established the validity of these tests and how well did they do so? In the case of the [...] of Dr. Elliott, that job appears to have been botched.

One major embarrassment that occurred in the Hoover matter was the re[...] tion that Dr. Elliott used a research version of the Wisconsin Card Sort test—thou[...] first denied that any such thing occurred. It was only after Dr. Antoinette Appel calle[...] company that published the test, that Dr. Elliott was convinced that the test he use[...] a research version. In other words... it was a non-certified test that other medical p[...] sionals insist should never have been used until it had been accepted for professiona[...]

Appel stated that the computer version of the Wisconsin Card Sort test us[...] Elliott had been released only as a research version, and went on to say that this vers[...] worthless for diagnostic purposes. She reported that it even took *her* 10 times long[...] complete the test. Mind you, this was the test series in which Hoover had been pro[...] that nothing he was asked or tested on would be utilized or have any bearing on his a[...] to fly, and was conducted during an appointment that was far longer than he had be[...] to expect. Appel testified that a number of studies demonstrate a marked drop-off in [...] ing performance after 90 minutes — referring to Elliott's lengthy testing environ[...] She said this drop-off also occurs if the patient does not eat (Hoover did not) or if th[...] tension between examiner and patient (Hoover *knew* his neck on was on the block [...] admitted, later, that he did not feel he could trust Elliott). Appel also felt that pra[...] effect did not account for Hoover's improvement in subsequent testings.

Finally.... as to the actual relevance of this testing: Appel mentioned readi[...] article by none other than Dr. Kay, which essentially said that there had been no st[...] regarding the relationship between testing performance and actual aviator perform[...] Mind you, this article was written in 1990 and Kay had since written other articles [...] seemed to contradict his earlier writings...

So which was it? Good test? Bad test? Relevant test? Irrelevant test? One thing's for sure... there seemed to be plenty of room for doubt throughout the who[...] scenario, and this so-called "exact" science sure seemed to be open to a lot of inter[...] tation. Additionally, research version or not, much of Elliott's results certainly mu[...] called into question... and all the data gathered therein considered suspect.

One final note: Dr. Appel, who is certainly as learned and respected as any [...] the FAA's consultants, stated that *"...the best test for determining cognitive functi[...] performance."* The FAA *hated* that concept and fought it throughout the three-year ordeal.

Bob Hoover repeatedly stated that the tests he performed for them seemed [...] be "weird" and bore little relation to the skills he used while flying... and that if the[...] really wanted to see if he was impaired in any way, all that they had to do was *"sad[...] up,"* fly along with him (ostensibly in a simulator) and let them see him *in action.* [...]

Bob admitted to frustration with the testing process and wondered whethe[...] *"any of it really amounted to anything... Jim, they can throw whatever they want [...] me (in terms of emergency or unusual conditions) ...but for God's sake, test my flying... not my drawing, or whether I can remember silly numbers, or how I do on some computer. Just watch me fly!"*

*The*

And so[...]
[...]tive informa[...]
[...]s so supporti[...]
[...] fighter pilo[...]
[...]s could not [...]
[...]o, the almi[...]
[...]ger fly... by t[...]

The gr[...]
[...]s, the first o[...]
[...] Susan Caro[...]
[...] through Dr[...]
[...]n forced to g[...]
[...]crete, way of[...]
[...]ries of powe[...]
[...]ting that t[...]
[...]tion safety, [...]
[...]ortunity to [...]
Dated [...]
[...] Revocation" i[...]
[...]ally reitera[...]

[...] Administra[...]

[...] On February [...]
[...]e examined [...]
[...]held issuan[...]

[...] On March 2.[...]
[...] Division, is[...]



# AIR OF INJUSTICE

280

imagines that they would have let him date their daughter... He was sufficiently board certified, had done aviation and psychology-related research, and he held a pilot certificate with glider and instrument ratings. Additionally, he had evaluated between 11,000 and 12,000 pilots over 20 years, and conducted neuropsychological testing on pilots for many airlines. More importantly, he had been a consultant to the FAA for 10 to 12 years... i.e., he was on "the team"... you know what I mean? (Of course, the FAA appeal didn't put it quite that way...)

Gaines testified that there are several published task analyses of piloting skills, and these functions, which included perceptual motor abilities, attention, processing flexibility, and several others. These functions, Gaines said, were tested in Hoover through his neuropsychological evaluations. He also agreed that any improvement in subsequent testing would only be due to practice effect. Basically, it seemed that he said whatever the FAA wanted him to say.... which included saying that Hoover was not medically qualified for a medical certificate. Big surprise, that.

## Dr. Pincus

Dr. Pincus, a professor and Chairman of the Department of Neurology at Georgetown University, also testified for the FAA. But guess what! He's on the team, too... Georgetown, even the appeal had to admit, has a grant from the FAA for the development of the CogScreen testing program (under Dr. Gary Kay). Remember that line about not biting the hand that feeds you?

His curriculum vitae, detailed as the others were in the appeal, was equally impressive. Dr. Pincus took Dr. Elliott's and Dr. O'Connor's neurological examinations, in conjunction with Hoover's MRI and brain SPECT scans, into account when he concurred that *"He was convinced of the presence of cognitive dysfunction,"* and that Hoover was unable to safely pilot an aircraft.

## The FAA's Version of Hoover's Case

The FAA appeal said that Hoover testified in detail about his early background in aviation, as well as his days as a military and civilian test pilot. Hoover testified that he did not believe his piloting skills had diminished, and that he had even helped save eight pilots during the 1993 Reno Air Races (*after* the so-called "bad" performance at Aerospace America... remarkable "recovery", that).

The FAA appeal discussed Hoover's testimony about his accidents that had occurred in his career and how he had lost consciousness on some occasions. Hoover, the appeal said, also testified that he had performed his airshow maneuvers thousands of times and had encountered and handled in-flight emergencies and problems on many occasions. He also explained that he frequently had problems with his aircraft's hydraulic system.

On the second day of the airshow in question, this hydraulic pump cavitation problem surfaced (as it had done before), and he took extra time to complete his maneuvers because of it. Hoover *"denied the FAA Inspectors' allegations, adding that at no time did anyone with the FAA approach him to discuss any problems."*

When confronted about his ability to handle an emergency, Hoover testified regarding an emergency he had encountered just one week before this hearing when flying

# JUSTICE

**By Jim Campbell**

_ He was sufficiently board
and he held a pilot certificate
aluated between 11,000 and
al testing on pilots for many
IA for 10 to 12 years... i.e., he
'AA appeal didn't put it quite

ik analyses of piloting skills,
ilities, attention, processing
ere tested in Hoover through
improvement in subsequent
ned that he said whatever the
r was not medically qualified

epartment of Neurology at
what! He's on the team, too...
the FAA for the development
member that line about not

: in the appeal, was equally
eurological examinations, in
account when he concurred
ction," and that Hoover was

## er's Case

bout his early background in
t. Hoover testified that he did
even helped save eight pilots
" performance at Aerospace

bout his accidents that had
some occasions. Hoover, the
maneuvers thousands of times
problems on many occasions.
aircraft's hydraulic system.
s hydraulic pump cavitation
extra time to complete his
s' allegations, adding that at
my problems."
emergency, Hoover testified
afore this hearing when flying

in a T-28 with Ray Hughes. During flight, a chip warning light came on, indicating imminent engine failure. Hoover successfully landed the aircraft, which suffered a catastrophic engine seizure on roll out, resulting in devastating damage.

Another snide footnote admitted that Ray Hughes' testimony (which was taken by way of a deposition in California) generally corroborated Hoover's story about the incident, but the Administrator was not given adequate notice of the deposition. Ultimately, the deposition was not offered.

When discussing his neurological examinations, Hoover testified that he had nothing to do with the selection of Drs. O'Connor, Gold, Salcedo, or Elliott. He testified that O'Connor told him he was "clean" and only recommended further testing so that no one would ever question his ability. Elliott, Hoover testified, told him that his testing would take no more than four hours, and that it would not affect his medical certificate. The testing lasted all day, Hoover said, and he was not able to get a drink or go to the bathroom until 5:00 p.m., when the testing finally ended.

During the hearing, Hoover recounted the conference call between himself, Dr. Puskas, Dr. Jordan, Dr. Hark, and Dr. Pakull. According to the appeal, Pakull told him he was not fit to fly, whereas Dr. Davis had given him a clean bill of health, and advised him to accept contracts for the 1993 season.

Hoover also testified that Dr. Pakull said the other doctors were just his "tools" — at which point Hoover asked to see other doctors. Jordan agreed, and Hoover consulted Dr. Satz, who also gave Hoover a clean bill of health. The appeal continued with their version of Hoover's testimony, discussing Hoover's explanation of the ACE program. Basically, he explained that the airshow performers generally police themselves, and an ACE has the ability to ground a pilot. He also affirmed that if he ever felt his piloting skills had become impaired, he would stop flying.

Hoover met Dr. Hisey at the 1993 Reno Air Races, and Hisey agreed to examine Hoover. He subsequently referred Hoover to Dr. Johnsen, who did additional neuropsychological tests. Hoover also testified that his airshow performance does not change unless conditions dictate, and that he feels more comfortable in his Shrike than he does in some automobiles. During the airshow for the hearing, Leo Loudenslager, a world famous airshow and champion aerobatic pilot, operated the radios and he operated the controls. He agreed that quick reaction time can be critical to properly handle an emergency. Finally, the appeal said, Hoover explained his FAA write-ups, and asserted that one of the incidents was motivated by FAA counsel's desire to prosecute a celebrity.

The appeal then set to discredit Dr. Johnsen — first by saying that he is not a neuropsychologist, not board certified, and not a member of any neuropsychological associations. The FAA also did not like Johnsen's opinion that the best predictor of behavior was past behavior.

After this, it was time to discredit Dr. Hisey, who had interpreted Hoover's physical and neurological testing as normal. In particular, they did not like Hisey's testimony that he relied on Johnsen's neuropsychological evaluation (earlier discredited, of course) when he came to his conclusions.

It was then time to bring up the touchy subject of Norbert Nester, the FAA Aviation Safety Inspector who was subpoenaed to testify on behalf of Hoover. First, Nester testified that he was on duty during the airshow in question, and never saw anything unusual about Hoover's performances.



# AIR OF INJUSTICE

On the other hand, Boehler, another Inspector, had claimed Hoover's performance was substandard and it was time *"he stand accountable like everyone else."* A few days later, Nester testified, he heard Boehler and Kelln, yet another Inspector, talking about writing reports on Hoover... and they were to make sure that they looked different so it would seem as if they had been written independently. The appeal mentioned that Nester testified that he expected retaliation for his testimony, and that his life was already becoming difficult there. The FAA had recently, in an unrelated manner, suspended him for five days for *"accepting favors."* He also testified that he had not contacted anyone within the FAA regarding his allegations against Boehler and Kelln.

World Aerobatic Champion Leo Loudenslager was the next subject within the appeal. It mentioned, in a very direct manner, that Loudenslager had never undergone neuropsychological testing. It also said that he had known Hoover for 20 years and had watched his performance at the airshow in question.

Loudenslager also testified that an ACE is the most qualified to judge an airshow performance, and, as an ACE, had never seen a deficit in Hoover's flying — including during the performance flown for Judge Mullins (where Hoover easily dealt with an *unexpected* cowl flap problem). Loudenslager also testified that he would not hesitate to ground Hoover if he felt his age was affecting his performance. Here, the FAA was quick to note that Loudenslager had no medical training and therefore could not offer an opinion as to Hoover's neurological testing.

Sean Tucker, also a top airshow performer and an ACE, testified for Hoover as well. He testified that he had known Hoover personally for over a decade, and had never noticed any deterioration in his flying. He did not agree with the FAA Inspectors' statements concerning Hoover's performance at the airshow in question. He too testified that he would not hesitate to ground Hoover if he felt he was unfit to fly.

To knock his testimony, the FAA appeal noted that Tucker did not have a degree in physiology and that he had agreed that timing, effective decision-making, and an ability to divide attention are critical to an airshow performer. The appeal also said that Tucker, *"when shown Dr. Uchiyama's conclusion that Respondent was impaired in divided attention and tasks that require speeded information delivery, expressed concern for the safety..."* (Funny, I don't remember Tucker's testimony quite that way...)

Yet another top airshow performer and ACE, Steven Oliver, was next. He had also known Hoover since the mid-1980's, and had observed him many times. He had never seen any sort of deterioration, and he hadn't noticed anything out of the ordinary with regards to Hoover at the airshow in question. He too would approach Hoover if he were concerned about his safety.

Dr. Simon, whose testimony was offered by way of videotaped deposition, is a specialist in nuclear medicine who reviewed, in addition to other documents, the SPECT scans and reports generated by Dr. Salcedo and Dr. Mena (he, however, never examined Hoover). He testified that many processes, such as strokes, can be visualized through these scans. He also testified that Hoover's scans did not show areas of decreased activity that would suggest degeneration, stroke, or dementia; rather, he said, any abnormalities seen were consistent with trauma. Simon's testimony never was placed into evidence, primarily because the FAA allegedly received late notice of the deposition. The FAA also alleged that Simon used several exhibits that had not been provided to them.

Dr. Antoinette Appel, a neuropsychologist, testified on behalf of Hoover. She

asserted that there
scan data. She also
been released onl
disapproval, I am s
even took her 10 t

She furth
testing performan
said this drop-off
examiner and pat
improvement in s

When ask
quoted an article
regarding the rela
Here, the appeal m
that additional res
had written subse
Appel, on behalf o
been told that nor
you may guess, di

Appel fur
performance, and
hours, and had no
quote, which wen
Appel was firm in
the next two year

Dr. Harv
a curriculum vita
Medicine and p
Georgetown)... ar

He rou
perfusion imagin
(and had contact
by Dr. Mena) sho
and temporal lob

The app
status. The appe
*Respondent's co*
*in realms that e*

The app
were translated

1. They believed
2. They believed
witness testimo
3. They believes
4. They believed

# AIR OF INJUSTICE

dangerous acts that, by implication, at this time are going unreported. Failure in their primary duty of care both to individual and to the public is implicit in their case. Either way, whether Mr. Hoover was at risk or not, they admit that they were negligent both of his and the public's safety and interest. All the more so if, as they allege, Mr. Hoover IS a menace. Sadly, as an admirer of the FAA, they have placed themselves in a "heads they (the FAA) lose, tails he (Mr. Hoover) he wins" situation.

### 2. What do the observers at the subsequent shows indicate?

At worst Mr. Hoover may have been "off form" at Oklahoma. If so he needed immediate advice to this effect (which at the very least would have demonstrated the FAA as an efficient, caring organization). In the event they have allowed him to confirm his competence in the subsequent series of Airshows before the most expert, critical and outspoken audience and jury in the world—the American Aerobatic and Airshow Circuit (as is remembered only too well). This constituency has effectively advised the Good and Great in the past when it was time for them to bow out.

3. Detailed clinical history and neurological examination by clinically experienced, practiced aviation neurologists have found Mr. Hoover fit to fly.

### 4. Neuropsychological review is at best unreliable as a test.

A useful tool in the right context, it is less than useless as a test of pilot competence (to our universal disappointment), and in practice may actually be misleading. Its specificity and sensitivity are such that it is inappropriate to use or represent such an assessment as a test. Sadly the FAA has sought to do just that.

5. Neuro-imaging is designed to be coordinated with, and is dependent for its interpretation on, clinical assessment.

6. There are no normals. If one is human one is abnormal to a greater or lesser degree.

### 7. There are also no absolutes.

Aviation, like life itself, is a risky business. If absolutes are required, no one should fly. It is always easier to say "no." The business of aviation neurology in this context is to accept that an individual can fail at any time (like any other component of the aviation system), but rather than stop all aviation, to logically establish the risk status of each component, here Mr. Hoover. No one has a crystal ball. Our responsibility is to provide reasoned opinion, not summary proscription.

8. If a pilot of demonstrated ability such as Mr. Hoover is to be grounded then by analogy no pilot over 45 years of age should be allowed to fly.

9. The problem is firstly to establish pilot competence (which the FAA accepted in allowing him to fly after Oklahoma and confirmed by their observation of his competence at the 33 subsequent Airshows) and then to relate the individual to some arbitrary level of acceptable future risk, attempting to establish whether the individual satisfies that requirement or not.