Page 1

1

2                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
3                  FORT LAUDERDALE DIVISION

4    _____
                                        :
5    RODNEY SCOTT PATTERSON,            :
                                        :
6                 Plaintiff,            :
                                        :
7         vs.                           :   Case No.:
                                        :   10-CV-02034-RLW
8    AMERICAN AIRLINES, INC., a         :
     Delaware Corporation,              :
9                                       :
                  Defendant.            :
10   _____:

11

                 VIDEOTAPED DEPOSITION OF:
12

                    Dr. Gary G. Kay, Ph.D.,
13

14   DATE:           November 28, 2018
15   TIME:           4:39 p.m.
16   LOCATION:       1625 I Street Northwest
                     Washington, D.C. 20006
17

     REPORTED BY:    Trinity Pomar, Notary Public
18
19
20
21             Veritext Legal Solutions
             1250 I Street, NW, Suite 350
22               Washington, D.C. 20005

Page 2

1      A P P E A R A N C E S
2  On behalf of Plaintiff telephonically:
3      WILLIAM R. AMLONG, ESQUIRE
       Amlong & Amlong, P.A.
4      500 Northeast Fourth Street
       Fort Lauderdale, Florida 33301
5      (954) 462-1983
       wramlong@theamlongfirm.com
6
7  On behalf of Defendant:
8      TRISTAN MORALES, ESQUIRE
       O'Melveny & Myers LLP
9      1625 I Street Northwest
       Washington, D.C. 20006
10     (202) 383-5300
       tmorales@omm.com
11
12  Also present:
13     Solomon Francis, Videographer
14
15
16
17
18
19
20
21
22

Page 3

1      C O N T E N T S
2  EXAMINATION BY:                    PAGE
3     Counsel for Defendant          6, 245
4     Counsel for Plaintiff        198, 248
5
6  KAY EXHIBITS:  *                   PAGE
7  1  Notice of Videotaped Deposition        7
8  2  Plaintiff's Notice of Expert Disclosure     11
9  3  Report of Neuropsychological Assessment    21
10 4  John Knippa, Ph.D., ABN Report          84
11 5  John Knippa, Ph.D., March 21, 2016 Letter   93
12 6  Deposition of John Knippa, Ph.D.         96
13 7  Glenn Ross Caddy, Ph.D., P.A. Document    111
14 8  Plaintiff's Objections         117
15 9  Captain Brian Beach Letter        123
16 10 Edwin L. Bercaw, Ph.D. Report        127
17 11 Scott Patterson E-mail, April 22, 2016    142
18 12 Deposition of Edwin L. Bercaw, Ph.D.     157
19 13 Ed Bercaw E-mail, May 4, 2016        159
20 14 Scott Patterson E-mail, April 26, 2016    163
21 15 Deposition of Rodney Scott Patterson     164
22

Page 4

1      C O N T E N T S   C O N T I N U E D
2  16 FAA Form 8500, July 18, 2017        171
3  16A David M. O'Brien, MD, MPH Letter        176
4  17 William Amlong E-mail, September 12, 2018   186
5  18 Gary G. Kay, Ph.D., E-mail        188
6  19 Gary G. Kay, Ph.D. Report         189
7  20 Gary G. Kay, Ph.D., E-mail        197
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22  (*Exhibits attached to transcript.)

Page 5

1      P R O C E E D I N G S
2      THE VIDEOGRAPHER:  Good evening.  We're
3  going on the record at 4:39 a.m. [sic] on November
4  28, 2018.  This begins Media Unit Number 1 of the
5  video-recorded deposition of Dr. Gary G. Kay taken
6  by counsel for the defendant in the matter of
7  Rodney Scott Patterson, plaintiff, versus American
8  Airlines, Inc., a Delaware Corporation, defendant,
9  filed in the United States District Court for the
10 District of Florida -- United States District Court
11 Southern District of Florida, Fort Lauderdale
12 Division.  Excuse me.  Case Number
13 1:17-cv-60533-JEM.
14     This deposition is being held at the law
15 offices of O'Melveny & Myers, LLP, located at 1625
16 I Street Northwest, Washington, D.C.
17     My name is Solomon Francis from the firm of
18 Veritext Legal Solutions and I'm the videographer.
19 The court reporter is Trinity Pomar of Veritext
20 Legal Solutions.
21     At this time, will counsel present in the
22 room and everyone attending remotely please state

Page 6

1 their appearances and affiliations for the record.

2      MR. AMLONG:  This is William R. Amlong on

3 behalf of Mr. Patterson, who's here with me.

4      MR. MORALES:  Tristan Morales on behalf of

5 American Airlines.

6      THE VIDEOGRAPHER:  At this time, will the

7 court reporter please swear in the witness and we

8 can proceed.

9 WHEREUPON,

10     Dr. Gary G. Kay, Ph.D.,

11 called as a witness, and having been sworn by the

12 notary public, was examined and testified as

13 follows:

14      EXAMINATION BY COUNSEL FOR DEFENDANT

15 BY MR. MORALES:

16 Q.  Good afternoon, Dr. Kay.

17 A.  Good afternoon.

18 Q.  And just to clarify, it's 4:41 p.m., not

19 the a.m.

20    My name is Tristan Morales and I represent

21 American Airlines.  Would you kindly introduce

22 yourself and give us a brief recap of your

Page 7

1 professional background?

2     A.  Sure.  My name is Gary G. Kay, Ph.D.  I'm a

3 clinical neuropsychologist.  President of

4 Washington Neuropsychological Institute, which is a

5 clinical practice based here in Washington, D.C.

6 And I have seen Mr. Scott Patterson for two

7 evaluations.

8     Q.  And you mentioned Mr. Patterson.  Is that

9 the -- that's the plaintiff in this case, is that

10 correct?

11     A.  Yes.

12     Q.  And if you recall, when did you first come

13 to meet Mr. Patterson?

14     A.  I can look -- I can reference back to my

15 materials.

16     Q.  Okay.

17     A.  First visit was on June 29, 2016.

18 Q.  Okay.  And you have some materials in front

19 of you.  While you're looking at those, I'd like to

20 hand you a document, which I'd like to ask to be

21 marked Exhibit 1.

22      (Kay Exhibit Number 1 marked for

Page 8

1 identification.)

2 A.  Thank you.

3 Q.  If you'd take a look at that document.

4 It's American Airline, Inc.'s, notice of taking

5 videotaped deposition.  Have you reviewed this or

6 seen this document before, Dr. Kay?

7 A.  Yes, I have.

8 Q.  Okay.  And what is this document?

9 A.  This is the notice of deposition, I

10 believe.

11 Q.  Okay.  And if you would flip to the third

12 page there --

13 A.  Yes.

14 Q.  -- labeled Attachment A at the top.  It

15 says, "Please have with you at the time of your

16 deposition the following."

17     Have you had a chance to review that?

18 A.  I did.

19 Q.  Okay.  And are there any materials that are

20 requested here that you have not thus far provided?

21 A.  No.  I don't believe so.

22 Q.  Okay.  The materials that you have in front

Page 9

1 of you today that -- it looks like a blue folder

2 with some materials -- are those materials that

3 have all been provided to American Airlines in this

4 case?

5 A.  All but the actual raw test data, which was

6 sent to -- to experts only.

7 Q.  Okay.  But other than that, what you have

8 in front of you has all been previously produced to

9 American Airlines in this case?

10 A.  I believe so.  I think I sent -- I couldn't

11 recall if I sent a copy of the e-mail.  There's

12 only correspondence between Dr. Edwin Bercaw and

13 myself related to Rodney Scott Patterson.  I think

14 I sent that to you guys.

15 Q.  I think so, yeah.

16 A.  Okay.

17 Q.  I think we'll -- I think we've included

18 that in our exhibits.

19 A.  All right.  I just brought an extra copy

20 just in case.

21 Q.  Okay.  And so all reports or opinions that

22 have been prepared by you in this case have been

3 (Pages 6 - 9)

Page 18

1  in a second, so it may be easier to go through
2  these at that point.  But I'd ask -- the fifth
3  paragraph there, it says, "Fifth, that it appeared
4  that though plaintiff may have interpersonal
5  characteristics that may prove problematic" -- do
6  you have an understanding of what interpersonal
7  characteristics are being referenced in that fifth
8  paragraph?
9      A.  Since I wrote those words, yes.
10     Q.  And -- I'm sorry.  You wrote the words in
11 this document that we're looking at?
12     A.  No, no.  I wrote the word -- that's
13 basically kind of quoting from my report from the
14 June 29th exam.
15     Q.  Okay.  And what is your recollection of the
16 interpersonal characteristics that are being
17 referred to there?
18     A.  So I was referring to some of the boundary
19 violation, kind of, you know, issues.  And probably
20 the -- kind of the moral kind of nature that he
21 has.  And some people may have trouble and conflict
22 with that.

Page 19

1      Q.  So just to break those apart --
2      A.  Yes.
3      Q.  -- you're referring to characteristics of
4  Mr. Patterson, is that correct?
5      A.  That's correct.
6      Q.  And on what basis are you opining on these
7  interpersonal characteristics?
8      A.  My clinical interactions and interview with
9  him.
10     Q.  Okay.  And you mentioned boundary violation
11 issues?
12     A.  Yes.  That was actually from Knippa.  I
13 didn't actually notice that.  So thank you for
14 clarifying that.
15         But Dr. Knippa, from his description,
16 described, you know, Mr. Patterson as kind of
17 stepping over boundaries, you could say, socially.
18     Q.  Okay.  And did you have an understanding of
19 why that characteristic may prove problematic?
20     A.  Oh, it just could be -- it can run you in
21 conflict with some people.
22     Q.  Okay.  And then I believe you'd mentioned a

Page 20

1  second; moral nature.  Is that what you referred
2  to?
3      A.  He's a guy with very strong kind of moral
4  feelings.  And, you know, his judgments, he let's
5  it be known, so --
6      Q.  And why --
7      A.  And that can cause -- you know, be
8  offensive to some other people or cause a conflict.
9      Q.  And that observation is based on your own
10 observation, is that correct?
11     A.  My observation and his presentation of his
12 history.
13     Q.  Okay.  And is it accurate -- just looking
14 at that sixth paragraph there -- that as November
15 1, 2017 -- in your, you know --
16     A.  Where is this?
17     Q.  Sorry.  The sixth paragraph of Page 2.
18     A.  Sure.
19     Q.  It says that "There is no evidence of a
20 mental health condition that would cause plaintiff
21 to be unfit for duty."
22         Is that consistent with your understanding

Page 21

1  of plaintiff, Mr. Patterson, as of November 2017?
2      A.  Yes.
3      Q.  Okay.  And then it says, "or which would be
4  disqualifying for an airman medical certificate."
5         Is that also consistent with your
6  understanding of Mr. Patterson as of November 1,
7  2017?
8      A.  It is.
9      Q.  And that's based on your November -- or on
10 your June 2016 testing and review of the
11 accompanying evaluation of Dr. Knippa and Dr.
12 Caddy, is that correct?
13     A.  Correct.
14     Q.  Okay.  I'm now going to hand you what I'd
15 asked to be marked as Exhibit 3.  And I believe
16 this is the June 29, 2016 report that you have here
17 with you today, but if you'd just take a look at
18 that and confirm.
19         (Kay Exhibit Number 3 marked for
20 identification.)
21     A.  It is.
22     Q.  Okay.  How did Mr. Patterson come to be

Page 22

1 examined by you in June of 2016?

2    A.  He was referred to me by an aviation

3 medical -- a senior aviation medical examiner by

4 the name of Dr. Joseph Tordella who practices in

5 Florida and New Jersey.

6    MR. AMLONG:  Sorry.  Mr. Morales, Number 3

7 is Dr. Kay's report?

8    MR. MORALES:  Correct.

9 BY MR. MORALES:

10    Q.  Do you recall approximately when Dr.

11 Tordella reached out to you with this referral?

12    A.  No.  I can make an estimate in terms of my

13 schedule.  Typically people wait, you know, four to

14 eight weeks to get an appointment.

15    Q.  And do you recall the manner in which Dr.

16 Tordella reached out to you?  Was it by phone?

17    A.  Most often he gets me by phone.

18    Q.  And have you had prior referrals, patients,

19 by Dr. Tordella?

20    A.  Yes.

21    Q.  Okay.  And is Dr. Tordella an AME, an

22 examiner for the FAA, if you know?

Page 23

1    A.  He's an aviation -- a senior aviation

2 medical examiner.

3    Q.  Okay.  And what do you recall about the

4 conversation with Dr. Tordella referring Mr.

5 Patterson to you?

6    A.  I have -- I don't recall the conversation.

7    Q.  Okay.  So looking at the opening section

8 here, Relevant History, I'd just ask if you could

9 inform us the basis for this material in the

10 relevant history section?

11    A.  Well, a lot of it would come from -- or a

12 majority probably came from my interview with Mr.

13 Patterson.  And I also had at that point reviewed

14 his records; basically the report from Dr. Caddy

15 and the report from Dr. Knippa.  And so that's -- I

16 kind of pull that together in writing the relevant

17 history section.  But the majority of it would come

18 from my clinical interview.

19    Q.  Okay.  And so if we were to look, for

20 example, at the last paragraph on Page 1 that

21 starts, "Mr. Patterson continued to fly the

22 line" -- if you just take a look at that paragraph

Page 24

1 for one second and let me know when you've had a

2 chance to read it.

3    A.  Yes.  I recall reading that.

4    Q.  Okay.  And do you recall the basis for the

5 information that's in this paragraph of the

6 relevant history section?

7    A.  That would from my history that I obtained.

8    Q.  Okay.  And so do you have any -- or did you

9 have any first-hand knowledge, for example, of the

10 "assignment to work at the White House during the

11 Pope's visit"?

12    A.  Yeah.  He told me about that.

13    Q.  So that information was relayed to you by

14 Mr. Patterson?

15    A.  That's correct.

16    Q.  Okay.  And was there any source of

17 knowledge you had about that pope visit referred to

18 in that sentence?

19    A.  No.  I kind of vaguely recall that maybe

20 there had been a visit.

21    Q.  Okay.  But that was based -- oh --

22    A.  By the Pope to the White House.

Page 25

1    Q.  Okay.  Right, right, right.  But not with

2 respect to Mr. Patterson in particular?

3    A.  No.

4    Q.  No other source of information?  If you'd

5 just flip to the second page there.  And just

6 briefly, the second paragraph says, "Mr. Patterson

7 successfully completed transition training."

8    Do you see that?

9    A.  Yes.

10    Q.  And the last sentence of that paragraph

11 says, "In March he was sent for a fitness for duty

12 evaluation to Dr. John Knippa."

13    Why was Mr. Patterson sent for a fitness

14 for duty evaluation to Dr. John Knippa?

15    MR. AMLONG:  Objection.  Foundation.

16    A.  Well, I think there's -- I'm not sure if

17 I'm using the right term.  Something like a Section

18 20, if that's what it's called by American Airlines

19 when they can send somebody for a fitness for duty.

20 And he was being sent to Dr. Knippa by American

21 Airlines.

22 BY MR. MORALES:

7 (Pages 22 - 25)

1   Q.  And does that represent the full extent of
2   your understanding as to what went into that
3   sentence of your report?
4       A.  Well, he had explained and discovered in
5   prior paragraphs about the conflict between him and
6   Captain Whitehouse.  And then there was this second
7   issue of him not being available for duty where he
8   had not been excused on that Pope/White House
9   visit.
10      Q.  And did you have any knowledge of those
11  items you just described other than from Mr.
12  Patterson's communications to you?
13      A.  Yeah.  I had the report from -- I think, I
14  believe I had the report from Dr. Caddy.
15      Q.  Okay.  So you had two sources of
16  information; Mr. Patterson's communications and Dr.
17  Caddy's report, is that correct?
18      A.  Correct.
19      Q.  Did you have any first-hand knowledge of
20  those interactions, for example with Captain
21  Whitehouse?
22      A.  No, sir.

1       Q.  Okay.  If you would, flip to the -- Page 3
2   there.  And there's a section called Records
3   Reviewed.  And I'd like to talk about that.  But
4   before we get into the details, if you could just
5   give some context on how you typically go about
6   gathering information for an examination, that
7   would be helpful.
8       A.  Certainly.  So in my role in aviation
9   neuropsychology, we, you know, have procedures we
10  like to follow and records that are important to
11  review.  So we like -- if I'm doing an FAA
12  evaluation, I get the airman's medical record from
13  the FAA directly from the FAA.  And that will
14  contain their various applications they've made for
15  medical certifications in your reports of
16  healthcare providers that are relevant to special
17  issuance that may have been granted by the FAA.  I
18  usually ask the airman to provide any other records
19  of -- you know, if it's a -- you know, we do -- we
20  see a lot of airman who have problems with alcohol
21  and drugs and who are in recovery, so we get their
22  arrest records, their treatment records, the

1   treatment facilities.  We get records from any
2   psychological, neuropsychological examinations that
3   have been previously conducted.  That's really
4   crucial.  And those -- we obtain -- if there's been
5   arrests, the actual arrest record is very important
6   to review.
7       Q.  Okay.  And I want to ask you about two
8   things that you just mentioned.  One, I believe you
9   said that the FAA has a role in gathering
10  information that you typically rely on in your
11  examinations, is that correct?
12      A.  Correct.
13      Q.  What exactly is the role of the FAA in
14  gathering information from pilots, for example?
15      A.  Well, when you make an application for
16  medical certification, if you indicate that you
17  have a disqualifying disorder -- and there's a
18  Block 18 on the Form 8500 where you would indicate
19  a range of different kinds of health conditions,
20  which would raise concern.  And so if you've marked
21  one of those, then there's an explanation.  You
22  would list the healthcare providers who provided

1   care.  And the FAA would want to see those actual
2   records.
3       And so -- so, for example, if somebody
4   says, I was treated for depression, we would
5   actually get records from the treating doctor and
6   be able to look at what medications were
7   prescribed, the course of that treatment, and all
8   that.  All that would be under review.  That's
9   really critically important.
10      Q.  And you mentioned it was critically
11  important.  Why is that?
12      A.  Because we basically -- we don't get to
13  necessarily -- if I'm an FAA reviewer for cases,
14  which I do routinely, I don't get to meet face to
15  face with the airmen and conduct an examination.
16  We're basically doing a records review.  We're
17  making recommendations and determinations about
18  medical certifications based upon those records.
19  So the records need to be complete.  They need to
20  be the source documents where they've not
21  been -- there's not some selective choosing of what
22  things we're going to look at.  It's very crucial

Page 30

1  that we get -- for example, if the person has had
2  PTSD and been treated in the VA system, we want the
3  actual VA record.  We don't want the record to be
4  brought to us from a second source.
5      Q.  And is the -- you mentioned the Form 8500.
6  Is that part of that information-gathering process?
7      A.  That's included in the airman's medical
8  record.  And every time the airman applies to renew
9  their medical certificate, they complete this
10  medical history form.  And on that history form
11  they're required to indicate any kind of changes in
12  their medical condition, or any medical condition
13  that they have that may be disqualifying.  They're
14  required to indicate any healthcare providers
15  they've seen.
16      Q.  And is that Form 8500, is that optional for
17  pilots?
18      A.  No, sir.
19      Q.  Do you have an understanding as to how
20  frequently pilots are required to submit the Form
21  8500?
22      A.  I do.

Page 31

1      Q.  And how frequently is that?
2      A.  So it depends on the type of medical
3  certificate that you're applying for and your age.
4      Q.  So a commercial aviation pilot, for
5  example, how often would they apply or submit a
6  Form 8500?
7      A.  I think it's every six months.
8      Q.  Okay.
9      A.  But that might be age dependent.  I'm not
10  certain about that.
11      Q.  Are you aware of any consequences for
12  pilots that fail to submit a Form 8500?
13      A.  Your medical certificate would expire.  And
14  you can't fly without a medical certificate.
15      Q.  Are you aware of any consequences for
16  pilots that submit an incomplete Form 8500?
17      A.  Well, the Form 8500 is reviewed by an AME,
18  an aviation medical examiner, who signs off on it.
19  And he's actually the individual who issues,
20  denies, or defers action on your application for
21  medical certification.  So an incomplete 8500 is
22  not going to lead to a medical certificate.

Page 32

1      Q.  What about false information on a Form
2  8500?  Is there any consequence that you're aware
3  of for pilots that submit false information on a
4  Form 8500?
5      A.  Yes.
6      Q.  And what is the consequence?
7      A.  Well, the legal department within the FAA
8  will review the case and decide what they're going
9  to do about it.  And they kind of deal with those
10  on a case-by-case basis.  So it's a range of things
11  that they do.
12      Q.  And have you ever experienced a
13  circumstance where a pilot was determined to have
14  submitted false information on a Form 8500?
15      A.  Certainly.
16      Q.  And what range of consequence have you seen
17  in those cases?
18      A.  I've seen where the FAA has cancelled all
19  of their flight certificates, which is very
20  extreme.  And, I mean, I'm not sure if anybody has
21  been charged with criminal activity on those, but
22  they can go after them at that level.

Page 33

1      Q.  They, meaning the FAA?
2      A.  The FAA.
3      Q.  Okay.  And I believe you mentioned that
4  health professionals are part of the information
5  requested on the Form 8500, is that correct?
6      A.  Yes.  A list of anybody you've seen who's a
7  healthcare professional.
8      Q.  Okay.  And what is a healthcare
9  professional in your understanding of that Form
10  8500?
11      A.  So that would be if you've seen a
12  psychologist, psychiatrist, any other physician.
13  It might include -- I'm not sure if it includes
14  chiropractors or eye doctors, but --
15      Q.  Are neuropsychologists healthcare
16  professionals, for example?
17      A.  Yes, sir.
18      Q.  So if someone visits you, typically they
19  would be required to submit your name as a health
20  professional on their Form 8500 --
21      A.  Absolutely.
22      Q.  -- is that correct?  Okay.  Do you recall

9 (Pages 30 - 33)

Page 74

1 There's no violation of test security. In fact,
2 it's crucial that we get this data in order to
3 review a case. I'm not going to accept records
4 from the FAA that don't included this CogScreen
5 printout.
6    Q. Understood. What benefit, if any, would a
7 pilot have from undergoing CogScreen testing within
8 a short time frame after another session of
9 CogScreen testing?
10    A. Well, there would be a practice effect.
11 And that is a term that we use to refer
12 specifically to what you said, the benefit from
13 simple familiarity with the test and the test
14 procedure and the test content. And that can lead
15 to higher scores, or what we call better scores,
16 for an individual.
17    Now, CogScreen was specifically designed to
18 be repeated. And that was a very important
19 objective of the Federal Aviation Administration.
20 By that, it meant that if a pilot needed to be
21 seen, you know, after they had been through
22 alcohol-dependence recovery, they could be

Page 75

1 reevaluated and we could make an effective true
2 determination of how the pilot was functioning
3 compared to their prior time. It could be used to
4 look at pilots who are HIV positive or get screened
5 every year. Or pilots who are taking
6 antidepressants, they're seen every year.
7    And so our normative data that we collected
8 for CogScreen was based on an interval of six
9 months. And so we have data on pilots at six
10 months, 12 months, and I think 24 months. Those
11 were the intervals, at which we did -- primarily
12 six months and 12 months that we did the retesting
13 of CogScreen.
14    We tried to protect CogScreen from practice
15 effects in clinical use. I actually used CogScreen
16 for other uses other than clinical. I used it in
17 clinical drug research trials for submissions to
18 the Food and Drug Administration indicating the
19 safety of medications in foods. And CogScreen in
20 those cases is repeated many, many times in short
21 intervals. Okay.
22    But the way that we control for that is

Page 76

1 that we actually administer it two or three times
2 to get your baseline, so that you've already had
3 the benefit of the familiarity, your performance is
4 already leveled out. The biggest improvement in
5 CogScreen is between the first and the second time
6 that it's administered. And after that it's
7 incremental and also related -- kind of the
8 point -- if you think of your original question,
9 after a brief time internal, it's related to the
10 amount of time between the exams. So there's less
11 of an impact if there's more time between the
12 exams.
13    When you take CogScreen a second time or a
14 third time or a fourth time, you don't see the same
15 items. You get different items each time. And the
16 items for Session Number 2 are always going to
17 be -- everybody is going to get the same items for
18 Session 2, but they're different from Session 1.
19 Session 3 is different items again than Session 2
20 or Session 1. But Session 3 is always the same.
21 That's how the test is designed.
22    Q. And how do you know which session to

Page 77

1 administer?
2    A. So the way you know is partly you have to
3 ask the pilot, when were you last -- how many times
4 have you taken CogScreen. That's question number
5 one. And when did you last take CogScreen,
6 question number two.
7    Q. Okay. And did you ask Mr. Patterson that?
8    A. I may not have asked him. I assumed that
9 the last time that he took it was the only time
10 that I knew that he had taken it, which was with
11 Dr. Knippa. So he had taken it, according to what
12 I knew, on March 17, 2016. So it had been three
13 months, which is okay.
14    Q. And so --
15    A. And that's why -- as you can see, if you
16 look at the printout that you just had, it says on
17 the title page of CogScreen what session number I
18 used. I used Session Number 2.
19    Q. And what -- just so I know which page
20 you're looking at.
21    A. It's Patterson_00157.
22    Q. Okay. Oh, I see. So the middle of the

Page 78

1  page there it says the subject name and then the
2  session number is 02?
3      A.  Yeah.  Because he had told me he had taken
4  it before.
5      Q.  Okay.  And why did you use a different
6  session number than Session Number 1?
7      A.  So he would get different items.  He
8  wouldn't get the same math problems.  So if he saw
9  the same question about a train leaving the
10  station, it would be -- it wouldn't be as good of a
11  question, would it?  So we actually change all the
12  questions that you're going to get.
13      Q.  And when you say it wouldn't be as good of
14  a question, would it impact the results if the
15  questions were the same that the pilot had already
16  seen?
17      A.  Fairly obviously the answer would be yes.
18      Q.  Okay.  And I take it, it would have a
19  material impact typically?
20      A.  It can.  You know, if somebody basically
21  has had that familiarity, there are certain
22  subtests that are affected more than others.

Page 79

1      Q.  And is that true even if it's been two
2  months or three months?
3      A.  I'm not sure how long it lasts.  We don't
4  actually have data on that.  The data that I do
5  have is at six months.  I have some other data from
6  a copyright case that we're just now settling where
7  a guy was offering a CogScreen gouge version
8  basically violating our copyright.
9          And so we were able to obtain data from an
10  airline that uses CogScreen for hiring.  And we did
11  show that pilots who've been customers of this
12  website actually showed improvement on CogScreen,
13  which is potentially dangerous for aviation safety
14  because somebody could get a higher -- get a better
15  score on CogScreen than they would actually be
16  truly entitled to.  And that would lead to
17  basically somebody getting certified that shouldn't
18  be.
19      Q.  So it looks like you administered Session 2
20  here on 6/29/2016.  How long would you have wanted
21  to wait if you were going to administer Session
22  Number 2 again in order to feel comfortable with

Page 80

1  the results?
2      A.  Oh, actually at that three months I felt
3  comfortable at that duration using the proper
4  different session number.  That was fine.
5      Q.  And I understand that.  But if you were
6  going to administer Session Number 2 again --
7      A.  I'm not going to administer Session 2
8  again, unless by accident.  I'm never going to give
9  him Session 2 again.  He doesn't have to take
10  Session 2 again.
11      Q.  I'm sorry.  What was the last --
12      A.  He'll never have to take Session 2 again.
13      Q.  Is there any time period to elapse where
14  you would feel comfortable giving Mr. Patterson,
15  for example, Session Number 2 again after having
16  given it to him in June of 2016?
17      A.  I would not intentionally give him Session
18  2 again.
19      Q.  Okay.
20      A.  I would give him Session 3, Session 4,
21  Session 5.  But why would I ever give him Session 2
22  again?  He's already taken it.  So you're supposed

Page 81

1  to find out how many times the pilot has taken the
2  test --
3      Q.  Okay.
4      A.  -- and give the proper session number.
5      Q.  Would you feel comfortable in the results
6  if Mr. Patterson took Session Number 2 again after
7  you had already administered it to him in June
8  2016?
9      A.  Well, it happens.  Sometimes it happens by
10  accident.  Somebody doesn't know.  And it basically
11  makes it -- you can rely less upon the CogScreen
12  result if it's administered, you know, with a very
13  short time interval between.
14          I just reviewed a case for the FAA where a
15  psychologist said actually the pilot had flown
16  across country and taking the test.  He
17  was completely fatigued.  And I told him I didn't
18  want to test him, but he insisted on doing it.  And
19  then that same psychologist had the pilot come back
20  11 days later and take CogScreen again.  It
21  immediately got kicked back by the FAA.  So the FAA
22  sent it -- you know, basically said is this okay?

21 (Pages 78 - 81)

Page 126

1    Q.  Is there anything in that sentence that
2  raises a concern for you about a
3  neuropsychologist's ability to conduct a fair
4  examination?
5    A.  None.  I mean, certainly when you -- I
6  think before I was focusing on emotional stability.
7  But when you say judgment, then you start to enter
8  the realm of what neuropsychologists are very good
9  at measuring.
10    Q.  And then the last sentence in that
11  paragraph, same question.  Anything in that
12  sentence, that starts "this office," that raises
13  concerns for you?
14    A.  Well, if you have a pattern of false
15  self-aggrandizing statements, one would want to
16  rule out things which cause that, either
17  pathological narcissim, which unless it's
18  manifested in maladaptive behavior, it's not an FAA
19  concern.  If you're just narcissistic, that's --
20  you can still fly.  We have a lot of narcissism in
21  the cockpit.  But -- which is a good thing if it's
22  healthy narcissism.

Page 127

1    Q.  Okay.
2    A.  Feeling you're confident to do things.  But
3  the part which would cause concern would be whether
4  there was mania because mania is something where
5  people exaggerate their -- you know, what they're
6  capable of doing.  They have unrealistic beliefs
7  about their capabilities.
8    Q.  Okay.  I'm now going to hand --
9        MR. MORALES:  Exhibit 10, is that correct?
10        THE COURT REPORTER:  Yes.
11  BY MR. MORALES:
12    Q.  And this at the top says Comprehensive
13  MedPsych Systems, Inc.
14        (Kay Exhibit Number 10 marked for
15  identification.)
16    A.  Yes.
17    Q.  I'm going to ask if you've ever seen this
18  document before?
19    A.  I have.
20    Q.  Okay.  And what is this document?
21    A.  This is the report of a neuropsychological
22  evaluation conducted by Dr. Edwin Bercaw on -- date

Page 128

1  of evaluation March 21, 2016.
2    Q.  And was this report referenced in your June
3  2016 report that we reviewed earlier?
4    A.  No, sir.
5    Q.  Why is that?
6    A.  I didn't know it existed.
7    Q.  It says at the top Neuropsychological
8  Evaluation.  Does this report contain information
9  that is relevant to the report from you that we
10  reviewed earlier?
11    A.  Yes.
12    Q.  Okay.  And in what manner is it relevant to
13  your report?
14    A.  Well, it's a neuropsychological evaluation.
15  It's data that goes over tests that I may or may
16  not administer if I'm going to see him
17  subsequently.  It would -- it completely applies to
18  how is the person performing on neuropsychological
19  testing.  If I'm seeing somebody for testing, I
20  want to see all their prior neuropsychological
21  evaluations.
22    Q.  And you had not seen this at the time of

Page 129

1  your June 2016 report, is that correct?
2    A.  Correct.
3    Q.  Okay.  If you look at Page 3, it says
4  Procedures Administered.  And I believe your name
5  is referenced there again.  Kay, 2002, is that
6  correct?
7    A.  Correct.
8    Q.  How does this list -- let me ask it this
9  way, under Procedures Administered, there are a
10  list of variety of, what appear to be, tests.  Some
11  that we've seen before.  Are there more tests here
12  then were included in your examination in 2016?
13    A.  Yes.
14    Q.  Okay.  Are each of the tests that you
15  performed in June 2016 also listed here?
16    A.  Two of the three.  There's a different
17  version of the Continuous Performance, but
18  otherwise the same.
19    Q.  Okay.  And CogScreen, it looks like it's
20  listed there, is that correct?
21    A.  Correct.
22    Q.  And that's the CogScreen that you

33 (Pages 126 - 129)

Page 130

1  administered as well?

2    A.  Yes.

3    Q.  And Dr. Knippa administered as well?

4    A.  Right.

5    Q.  And what is your understanding of

6  the -- you noted the date of March 21, 2016.  If

7  you need to flip back to Dr. Knippa's report --

8  I'll represent that the report date on that Exhibit

9  4 is also March 21, 2016, is that correct?

10    A.  Right.  And the date of exam March 17th.

11    Q.  Okay.  And so it looks like this evaluation

12  was conducted four days after Dr. Knippa's

13  evaluation, is that correct?

14    A.  Apparently.

15    Q.  Okay.  Does that time frame raise any

16  concerns with you in terms of the

17  neuropsychological examination that Dr. Bercaw

18  would have been able to perform?

19    A.  Yes.

20    Q.  Why is that?

21    A.  It's extraordinarily unusual that a

22  neuropsychological exam would be repeated after

Page 131

1  four days.  I mean, six months maybe.  A year.  But

2  not four days later.

3      I mean, about the earliest

4  sometimes -- like, for example, pilots who are in

5  the HIMS Program, at about Week 3 of their

6  in-patient treatment, they take CogScreen.  And

7  CogScreen is used to look and see how -- where

8  they're at in their recovery and the likelihood

9  that they're going to do okay when they have to

10  undergo the full FAA neuropsychological test

11  battery.  But they don't actually take CogScreen

12  again or undergo neuropsychological testing for the

13  FAA for four months, three to four months later.

14      So that would be an acceptable kind of

15  interval.  But repeating these tests after four

16  days, the norms don't necessarily apply.  So how do

17  you interpret the test results when there's that

18  short of an interval?  It basically would raise

19  questions as to the validity of the data from this

20  examination.

21    Q.  Would the short time frame tend to help the

22  pilot or hurt the pilot in terms of the results?

Page 132

1    A.  Help the pilot.

2    Q.  And why is that?

3    A.  Because of just over-familiarity and recent

4  practice of the test.

5    Q.  And that's even if they were to take a

6  different version, for example, of the CogScreen

7  test --

8    A.  Yes.

9    Q.  -- is that correct?  Okay.  What if the

10  test -- let me ask it this way, what if the

11  CogScreen test that the pilot took was the same

12  CogScreen session that they had taken four days

13  earlier?

14    A.  That would even add to the practice of that

15  test.

16    Q.  And why is that?

17    A.  Because they would be getting the same

18  items, particularly -- the math items and symbol

19  digit test would, in particular -- and the memory

20  test, would all be even less valid on repetition

21  because those are -- there's content that would be

22  recalled from those.

Page 133

1    Q.  And do you know what CogScreen session Dr.

2  Bercaw administered?  Let me ask it this way, if

3  you look at Page 4 of the report, _00007, do you

4  see Effort and Validity at the top?

5    A.  Yes.  CogScreen Session 2.

6    Q.  Is that the same CogScreen session that you

7  administered in June of 2016?

8    A.  Yes.

9    Q.  Did you know that Mr. Patterson had taken

10  CogScreen Session 2 at the time you administered

11  CogScreen --

12    A.  No, sir.

13    Q.  -- CogScreen Session 2?

14    A.  No, sir.

15    Q.  Would you have administered CogScreen

16  Session 2 if you had known he had taken Session 2?

17    A.  Not intentionally.

18    Q.  And why is that?

19    A.  Because I would give Session Number 3,

20  which is how we train people to give CogScreen.

21    Q.  And had Mr. Patterson informed you at the

22  time you administered your exam that he had taken

34 (Pages 130 - 133)

Page 134

1  CogScreen Session 2?
2      A.  No, sir.
3      Q.  Did he mention it after he took CogScreen
4  Session 2?
5      A.  When he came to see me for the examination
6  in October of 2018.
7      Q.  So prior to October of 2018, did you know
8  that Mr. Patterson had taken CogScreen Session 2
9  before you administered CogScreen Session 2?
10     A.  Yes.
11     Q.  You did?
12     A.  Before October 2018, yes.
13     Q.  Prior to October 2018?
14     A.  I just said yes.
15     Q.  When is that?  When did you learn of that
16  fact?
17     A.  I think that might be protected by
18  attorney/client privilege.
19     Q.  Well, I'll ask you, when did you learn of
20  that fact?
21     A.  Mr. Ambrose informed me.
22     Q.  Ambrose?  Amlong?

Page 135

1      A.  Amlong.  Sorry.  Sorry.
2      Q.  And when was that?
3      A.  I don't remember the date.
4      Q.  Was it in 2018?
5      A.  Yes.
6      Q.  Okay.
7      A.  I mean, should Mr. Amlong be objecting to
8  questions about my conversations with him?
9          MR. AMLONG:  No.  I'm not objecting to it.
10         THE WITNESS:  Okay.  Sorry.  I'm not a
11  lawyer, so I don't know.
12         MR. MORALES:  Sure.
13  BY MR. MORALES:
14     Q.  Would a pilot that took CogScreen Session 2
15  once know that they were taking the same session if
16  they took it again a few months later?
17     A.  Not that likely.
18     Q.  Okay.  Would there be similarities in terms
19  of what they would see during the exam?
20     A.  Well, I mean, there's similarities in
21  Session 1 and Session 2 and Session 3.  They are an
22  experienced CogScreen, you know, person.  We do

Page 136

1  administer CogScreen repeatedly to people who are
2  under various protocols with the FAA.  And our data
3  shows that that's a very stable and reliable test,
4  so it's designed to be repeated.
5          It would be more familiar and there would
6  be an advantage of taking it a third time, and
7  perhaps a tiny bit of extra advantage by repeating
8  the same items.  So he's getting the same math
9  problems that he took with Mr. -- with Dr. Bercaw.
10  The identical items.
11     Q.  When he takes your exam?
12     A.  When he took Number 2 with me he's getting
13  the same items.
14     Q.  Okay.  And if you'd just look at that
15  paragraph, the Effort & Validity paragraph.  Did
16  Dr. Bercaw note the possibility of practice effects
17  even as compared to Dr. Knippa's examination?
18     A.  You're saying he noted this somewhere?
19     Q.  Page 4, the top paragraph, Effort &
20  Validity --
21     A.  Sorry.
22     Q.  Yeah.  Sorry about that.

Page 137

1      A.  I was on the wrong page.
2      Q.  Is there any reference to practice effects
3  by Dr. Bercaw?
4      A.  He makes mention that "Mr. Patterson
5  completed a similar neuropsychological evaluation
6  within a week of this evaluation; hence, there is
7  the possibility of practice effects on some of the
8  tests administered.  However, alternate forms were
9  used when possible."
10         For example, on the Auditory Verbal
11  Learning Test, he gave a different list of words,
12  he gave a different figure for the complex figure
13  test, and he did Session 2 of CogScreen.
14     Q.  Okay.  If you look at Page 7, the last
15  paragraph.  It starts, "With respect to his airman
16  medical certificate."  If you would just take a
17  second to review that.  And I'd ask you what you
18  understand Dr. Bercaw's report to be communicating
19  there.
20     A.  Okay.
21     Q.  Are these Dr. Bercaw's conclusions as you
22  understand them in his report?

35 (Pages 134 - 137)

Page 138

1    A.  That's what I understand to be his
2  conclusions.
3    Q.  And what were his conclusions?
4    A.  Mostly it appeared that Mr. Patterson
5  performed well on neuropsychological testing, with
6  the exception of -- basically, he saw mild to
7  moderate impaired deductive reasoning.  And then he
8  basically raises a -- basically this is a concern
9  to Dr. Bercaw and he questions whether this would
10  impact flight -- potentially impact flight
11  performance.  And suggests that it be reviewed by a
12  FAA neuropsychologist.  He said that he didn't have
13  available the prior results from Dr. Knippa.
14    Q.  And do know why he didn't have those
15  available?
16    A.  No.
17    Q.  Okay.  For purposes of the report that you
18  issued in, I guess, June of 2016, would you have
19  expected a pilot to provide a report of this sort
20  from Dr. Bercaw to you for purposes of your
21  analysis?
22    A.  I would have demanded it.  I wouldn't have

Page 139

1  actually performed my evaluation or written my
2  report without it.
3    Q.  And knowing that you didn't -- knowing now
4  that did not receive Dr. Bercaw's report, would you
5  stand on the accuracy of your June 2016 report?
6    A.  I would.  I mean, what we found in June of
7  2016 is what we found.  And what we found was that
8  on the test that I gave, I didn't see any basis for
9  him to be not considered fit for duty, or to have
10  anything that would be disqualifying for an airman
11  medical certificate.
12    So it doesn't change what I found here.
13  However, I'm seeing results on other measures that
14  were not administered by me in June, which cause me
15  concern, and which, in fact, would have led to a
16  different opinion.
17    Q.  As we sit here today, is your June 2016
18  report complete and accurate with respect to Mr.
19  Patterson's neuropsychological evaluation?
20    A.  It is not complete in that it unfortunately
21  does not contain information about his March 2016
22  neuropsychological test findings.

Page 140

1    Q.  Would it be appropriate for the FAA to rely
2  on the June 2016 report from you in analyzing Mr.
3  Patterson's fitness for duty?
4    A.  No.
5    Q.  And why is that?
6    A.  Because there had been an evaluation which
7  include other neurocognitive findings that should
8  be part of his airman medical record and which
9  would be under consideration by an FAA
10  neuropsychology consultant in making a
11  determination about medical certification.
12    Q.  And would Mr. Patterson have been expected
13  to provide this report to the FAA?
14    A.  He would be required to.
15    Q.  Required by what?
16    A.  Required by FAA regulation.
17    Q.  Okay.  And do you know if Mr. Patterson did
18  provide Dr. Bercaw's report to the FAA in 2016?
19    A.  I don't know when or if he provided it to
20  the FAA.
21    Q.  Okay.  And do you know why you didn't
22  receive a copy of Dr. -- or Mr. Patterson's report

Page 141

1  from Dr. Bercaw in 2016?
2    A.  No.
3    Q.  Okay.  Has Mr. Patterson told you why you
4  didn't receive Dr. Bercaw's report in 2016?
5    A.  He may have.  I don't remember him telling
6  me.  But if I put it in this report in 2018 -- let
7  me see if he explained it.
8    Q.  Well, I think we'll get to that in a
9  second.
10    A.  Okay.
11    Q.  But as of --
12    A.  He may have explained it to me because I'm
13  sure I asked --
14    Q.  Okay.
15    A.  -- why didn't you give me the report?
16    Q.  Were you told a reason in 2016?
17    A.  No.
18    Q.  Okay.  In 2017?
19    A.  No. But I didn't see him in 2017.
20    Q.  Okay.  I'm going to hand you now Exhibit
21  11.  And this is another -- it has a case number at
22  the top.  It has Yasmin Harris's e-mail line at the

Page 142

1 top.  Do you see that?  Dated Friday, April 22,
2 2016.
3     (Kay Exhibit Number 11 marked for
4 identification.)
5     A.  Oh, okay.  Yes.
6     Q.  Have you ever seen this document before?
7     A.  No, sir.
8     Q.  Okay.  I'd actually ask you to look at the
9 bottom document there, so it's the underlying
10 e-mail first.
11     A.  Okay.
12     Q.  And it says from Ed Bercaw.
13     A.  It's Bercaw, by the way.
14     Q.  Oh, sorry.  Bercaw.
15     A.  Bercaw.
16     Q.  Thank you.  That's very helpful.  Bercaw to
17 aa737drvr.  Do you have any understanding of who
18 aa737 is?  It looks like the e-mail is addressed,
19 Good Morning, Mr. Patterson.
20     A.  So Mr. Patterson's --
21     Q.  Okay.
22     A.  I mean, I don't know that for sure.

Page 143

1     Q.  And then I guess --
2     A.  It makes sense that it would be Mr.
3 Patterson.
4     Q.  At then at the top there the e-mail is from
5 Scott signed Scott Patterson with that e-mail
6 address?
7     A.  Yes.
8     Q.  Okay.  Have you ever seen this e-mail, the
9 e-mail from Dr. Bercaw?
10     A.  Uh-huh.
11     Q.  You have seen this?
12     A.  No.  I have not seen it before.
13     Q.  Okay.  If you'd take a second to read that.
14     A.  Okay.  Should I read the top part?
15     Q.  Read the bottom part first, if you would.
16     A.  Okay.  This should go to review by the FAA.
17     Q.  And I believe you just noted it says, "this
18 should go to review by the FAA," is that correct?
19     A.  Yes.
20     Q.  Okay.  And the date on this is April 22,
21 2016, is that correct?
22     A.  Yes.

Page 144

1     Q.  And the subject is neuropsych evaluation?
2     A.  Yes.
3     Q.  And the first sentence is, "Sorry for the
4 delay on this report."  The third sentence is, "A
5 PDF is attached."
6     Is that correct?
7     A.  That's correct.
8     Q.  It looks like -- as you noted -- the sixth
9 sentence says, "Ultimately, the recommendation is
10 that this should go to review by the FAA, who has a
11 few in-house neuropsychologist consultants who
12 render an opinion."
13     Do you have any understanding of what Dr.
14 Bercaw -- and please correct me if I'm
15 mispronouncing it --
16     A.  Bercaw.
17     Q.  Bercaw -- was referring to there?
18     A.  Well, the FAA has neuropsychology
19 consultants.  We're not in-house.  I'm one of the
20 two most senior FAA neuropsychology consultants
21 they now have as of about a month ago or two months
22 ago.  They have an actual FAA neuropsychologist who

Page 145

1 has recently been hired.
2     But prior to that, a case like this would
3 have been sent to somebody like myself.  And there
4 are about a half dozen of these consultants.  And
5 I've played a role in training those consultants.
6 And they've been taught how to, you know,
7 understand the FAA regulations.  And they're
8 sufficiently expert to represent the FAA at
9 hearings, if necessary.  And they are the folks who
10 assist the Federal Air Surgeon in making a
11 determination about issuance of medical
12 certificates.  So that's what that means.
13     Q.  And would the FAA expect a pilot who
14 receives this e-mail to inform them of the e-mail?
15     MR. AMLONG:  Objection.  Foundation.
16 BY MR. MORALES:
17     Q.  You can answer.  Let me ask you, if a pilot
18 receives a neuropsych evaluation from Dr. Bercaw
19 and a recommendation that this should go to review
20 by the FAA, in your view, does the pilot have a
21 responsibility to inform the FAA of that
22 recommendation?

37 (Pages 142 - 145)

Page 146

1    A.  The pilot has a responsibility to list on
2    his Form 8500-8 that he was evaluated by -- he's
3    required by law to indicate that he was evaluated
4    by Ed Bercaw, in this case, and that the evaluation
5    took place.
6        Now, the FAA's responsibility would be to
7    say, gee, I don't see that here in our files.  And
8    before I issue you your next medical certificate,
9    please submit the data from that evaluation in a
10   format so required by the FAA for their
11   neuropsychology consultants.
12       So his responsibility -- I mean, he
13   would -- if -- Ed Bercaw, basically -- it would
14   have been helpful for him to let Mr. Patterson know
15   that, well, you know, whether you submit it now or
16   later, at some point the FAA is going to obtain
17   this.  And, you know, if you don't want to -- and
18   as Scott says at the top, you know, you can't
19   release information without my specific approval,
20   that's true.  And guess what?  If he doesn't want
21   to release the information to the FAA, and I'm
22   working as an FAA consultant, that's his

Page 147

1    prerogative and he can just not get a medical
2    certificate.  That's his choice.  If he wants a
3    medical certificate, we're going to demand that he
4    submit that data.  He's not going to get a medical
5    certificate until we get that data.
6        Q.  And you said the FAA will get the
7    information one way or another, is that --
8        A.  Well, they don't know.  If you don't want
9    to give it to me and I'm working with the FAA and
10   you said, no, I'm not releasing that data to you,
11   well, fine.  We're not going to give you a medical
12   certificate.
13       Q.  What if the FAA didn't know about the data?
14       A.  They didn't apparently.  Well, I don't know
15   if they knew.  So let's say it that way.  I didn't
16   know.  I don't know to this moment if they know.  I
17   have no idea.
18       Q.  How would the FAA typically find out about
19   a report such as this?
20       A.  Well, generally pilots are referred to us
21   by an AME and the AME knows who they've seen.
22       Q.  And how does the AME know who they've seen?

Page 148

1    A.  The AME has referred them usually.
2    Q.  Okay.
3    A.  How did they get to a neuropsychologist?
4    The AME -- you know, basically the pilot reads the
5    Form 8500-8, which says list the healthcare
6    professionals that you've seen.  That's pretty
7    clear.  I mean, if you've seen anybody, list it
8    here.
9        The FAA, Aviation Medical Certificate
10   Division in Oklahoma City, would say there's a
11   psychologist listed here.  We need to know about
12   this.
13       Q.  So --
14       A.  Well, I underwent an evaluation.  Fine.
15   Send us the data.
16       Q.  Is it fair to say the FAA relies on Form
17   8500 to determine whether or not a pilot has seen a
18   neuropsychologist, for example?
19       A.  Not unless data has been submitted by the
20   airman.
21       Q.  Okay.  I'll now ask you to look at the
22   e-mail up top there.  And it looks like this one is

Page 149

1    from Mr. Patterson, is that correct?
2    A.  That appears to be correct.
3    Q.  And it says April 2016.  Is that the same
4    date as the e-mail we were just looking at?
5    A.  Yes.
6    Q.  And it looks like it's 12:49 p.m.  The
7    earlier e-mail was 11:38 a.m.  There's no time zone,
8    but those are the times listed, is that correct?
9    A.  That's correct.  That's what it says.
10   Q.  Okay.  And who is Mr. Patterson writing to,
11   if you can tell, in this e-mail?
12   A.  It's addressed to Dr. Bercaw.
13   Q.  Okay.  Is there anyone else included in the
14   cc?
15   A.  Yes.
16   Q.  And who is that?
17   A.  Dr. Fonseca, whoever that is.  Oh, that's
18   the doctor at MedPsych.net, so that's a
19   psychologist who works in that same practice as Dr.
20   Bercaw.  And then Glenn Caddy and Dr. -- Mr.
21   Amlong.
22   Q.  Okay.  And I'd ask you to look at the last

38 (Pages 146 - 149)

Page 158

1    A. Yes.
2    Q. And I'd ask you just to read basically
3 through Line 19 of that Page 116.
4    A. Okay.
5    Q. Line 15 says, "Well, Dr. Kay didn't do the
6 same evaluation.  And by omission of my evaluation,
7 he's done Session Number 2, which means that three
8 months later he got the exact same items from that
9 test, so that would strengthen the practice
10 effect."
11       Is that a reference to the CogScreen
12 Session 2?
13    A. Yes, sir.
14    Q. And do you agree that your evaluation
15 omitted a reference to Dr. Bercaw's evaluation?
16    A. Yeah.
17    Q. Did it intentionally omit a reference to
18 that evaluation?
19    A. It omitted it because I didn't know about
20 it.
21    Q. Okay.  And do you agree with Dr.
22 Bercaw's --

Page 159

1    A. Bercaw.
2    Q. -- Bercaw's statement regarding the
3 potential impact on the practice effect?
4    A. Yes.
5    Q. Okay.  All right.  I'm going to hand you
6 13.  This is an e-mail thread.  At the top is an
7 e-mail from Dr. Bercaw.
8       (Kay Exhibit Number 13 marked for
9 identification.)
10    A. Yes.
11    Q. Did I get that correct?
12    A. Uh-huh.
13    Q. And it looks like the date is May 4, 2016
14 addressed to Scott.  Is that Mr. Patterson?  And
15 Dr. Caddy?  Is that correct?
16    A. Regarding consultation with Dr. Caddy.
17    Q. Okay.
18    A. Oh, Dr. Caddy is included on the e-mail.
19    Q. And this is prior to your examination of
20 Mr. Patterson, is that correct, in June of 2016?
21    A. Yes.
22    Q. Okay.  I'd just ask you to look at the

Page 160

1 bottom -- the last e-mail in this chain.
2       MR. AMLONG:  What day is that?
3       MR. MORALES:  What date?  It's May 4, 2016.
4 It was Bercaw Exhibit 4.  It's now our Exhibit 12.
5       THE WITNESS:  13.
6       MR. MORALES:  Or I'm sorry.  13.  Thank
7 you.
8    A. And you're saying the last e-mail?
9 BY MR. MORALES:
10    Q. The last e-mail is Friday, April 29, 2016.
11    A. Yes.
12    Q. Do you see that?  I'd just ask you to read
13 that e-mail.  Do you have an understanding of who
14 that e-mail is from?
15    A. I don't get it, but okay.
16    Q. This is an e-mail from Mr. Patterson, is
17 that correct?
18    A. Yes.
19    Q. To Dr. Caddy?
20    A. Yes.
21    Q. Have you ever seen that -- the first line
22 there before, "If Dr. Bercaw will play ball with

Page 161

1 you, fine"?  Have you ever seen that reference
2 before?
3    A. This e-mail?  No.  I've never seen this
4 e-mail.
5    Q. And then the last sentence there says, "If
6 he won't play ball we will cut bait and go fish
7 elsewhere."
8       You ever seen that before?
9    A. Have I ever seen that sentence?  No.
10    Q. Okay.  Are you familiar with the concept of
11 doctor-shopping in the fitness for duty concept?
12    A. It's frightening.  Yes.
13    Q. And what is it?
14    A. Well, a doctor doesn't -- I mean, a patient
15 doesn't like the result and they go elsewhere to
16 find an opinion that would be more to their liking.
17 And that's of concern to doctors.
18    Q. In your experience, is that concept of
19 doctor-shopping a concern to air carriers?
20       MR. AMLONG:  Objection.  Foundation.
21    A. I don't know about air carriers expressing
22 that concern.

41 (Pages 158 - 161)

Page 162

1  BY MR. MORALES:
2      Q.  Okay.
3      A.  I would hope that they would be concerned
4  about that.
5      Q.  And why is that?
6      A.  Because basically if you shop around, you
7  may get an opinion that may sound -- may not be
8  valid, but it sounds okay, giving you incorrect
9  information.  It may not be valid.
10     Q.  Does that raise any concerns for airline
11  pilots?
12     A.  Sure.
13     Q.  And what are those concerns broadly
14  speaking?
15     A.  That somebody who really has a
16  disqualifying --
17     MR. AMLONG:  Objection.  Foundation.
18     THE WITNESS:  Certainly.
19     A.  That somebody who has a disqualifying
20  condition is actually, you know, flying and has an
21  illicit medical certificate.
22  BY MR. MORALES:

Page 163

1      Q.  In your training and experience with the
2  FAA, are you trained to attempt to mitigate those
3  vulnerabilities and concerns?
4      A.  I'm trained as the reviewer of records to
5  be able to find where in the records I see areas of
6  concern that are raised, suspicious areas that I
7  suggest have further evaluation.
8      Q.  Okay.  I'm going to hand you now 14.  I'm
9  going to ask you to take a quick look at this.
10     (Kay Exhibit Number 14 marked for
11  identification.)
12     MR. AMLONG:  Can you tell me what 14 is?
13     MR. MORALES:  14 is an e-mail from Scott to
14  Glenn Caddy.  Date, April 26, 2016.
15  BY MR. MORALES:
16     Q.  Have you ever seen this e-mail before?
17     A.  No.
18     Q.  The second paragraph says, "I have asked a
19  couple of times when the report was going to be
20  complete.  And a couple more days was the answer.
21  I feel I have provided adequate information to
22  complete an evaluation, even putting it into copy

Page 164

1  so you could copy and paste."
2      Has Mr. Patterson ever provided you
3  copy-and-paste material for either of your reports
4  in this case?
5      A.  No, sir.
6      Q.  Okay.  I'm going to hand you 15.  And this
7  is a videotaped deposition transcript for Mr.
8  Patterson.  I'd ask you to take a look at that.
9  Have you reviewed this before?
10     (Kay Exhibit Number 15 marked for
11  identification.)
12     A.  No, sir.
13     Q.  Okay.  Look at Page 337.  The hard copy
14  Page 85 marked at the bottom, I believe.
15     A.  Yes.
16     Q.  Line 14.  There's a reference to Dr. Gary
17  Kay.  Do you see that?
18     A.  Yep.
19     Q.  And Line 17 says, "And did Dr. Kay review
20  Dr. Knippa's report?"  "Yes, he did."  "Did he
21  provide his own report?"  And then Mr. Patterson
22  says, "There was an issue with Dr. Kay in that he

Page 165

1  had Dr. Knippa's report.  I didn't provide it to
2  him."
3      Do you know what Mr. Patterson is referring
4  to there?
5      A.  No.
6      Q.  Page 341, Line 13.  The question is,
7  "There's a reference in some of the documents to a
8  Bercaw report.  Does that jog your memory?"  And
9  the answer from Mr. Patterson is, "Dr. Bercaw does
10  not."
11     The date on this is March 6, 2018.  Are you
12  surprised that the name Dr. Bercaw did not jog Mr.
13  Patterson's memory in March 2018?
14     A.  I'm not trying to be funny, but --
15     MR. AMLONG:  Objection.
16     A.  I'm not trying to be funny, but it's been
17  hard to pronounce Bercaw.  And maybe it was the
18  pronunciation that did not ring a bell.
19  BY MR. MORALES:
20     Q.  Okay.  Page 342, it says -- the question,
21  Line 2, "Do any of the names we just talked
22  about -- Abi-Rafeh, Kay, Hastings, Caddy,

42 (Pages 162 - 165)

Page 166

1 Bercaw -- would any of those individuals not appear
2 on FAA Form 8500 for you listing health
3 professionals you visited in the last three years?"
4 Are you familiar with all of those names?
5 A. I am.
6 Q. Okay. And is this Form 8500, that's the
7 form we've been discussing today?
8 A. Specifically it's the 8500-8 --
9 Q. -8.
10 A. -- but yeah.
11 Q. Right. Okay. Line 22 says, "Dr. Kay,
12 would Dr. Kay appear on your FAA form?" It says,
13 "Dr. Kay did."
14 Have you ever reviewed Mr. Patterson's FAA
15 Form 8500-8?
16 A. I don't believe that I did.
17 Q. Okay.
18 A. I did see that Dr. Bercaw received a copy
19 of Mr. Patterson's FAA medical record. He would
20 have had the 8500.
21 Q. Okay. And then line -- sorry. Page 343,
22 Line 3. It says, "Dr. Bercaw." Question. And

Page 167

1 then the answer is, "He did not."
2 Do you understand that to be a response to
3 whether Dr. Bercaw appeared on Mr. Patterson's FAA
4 form? So -- sorry. That's a confusing question.
5 Let me restate it.
6 A. Yes.
7 Q. So Line 22 on Page 342 says, "Dr. Kay,
8 would Dr. Kay appear on your FAA form?" And then
9 it says -- "Dr. Kay did," is the answer.
10 A. Right. Yes.
11 Q. "Dr. Hastings?" "Dr. Hastings did." "Dr.
12 Caddy?" "Dr. Caddy did." And then Line 3 of Page
13 343. The question was "Dr. Bercaw?" And the
14 answer is, "He did not."
15 What do you understand that answer to mean?
16 A. That he did not write Dr. --
17 MR. AMLONG: Objection. It speaks for
18 itself.
19 BY MR. MORALES:
20 Q. You can continue.
21 A. He did not write Dr. Bercaw's name on the
22 FAA Form --

Page 168

1 Q. Okay.
2 A. -- 8500-8.
3 Q. Line 8 there says, "Is Dr. Bercaw a health
4 professional?" And the answer is, "He is." And
5 Line 10. The question is, "Have you visited him in
6 the last three years?" Asked on March 6, 2018.
7 And the answer from Mr. Patterson is, "Not in the
8 last three years."
9 Is that consistent with your understanding
10 today?
11 A. No, sir.
12 MR. AMLONG: Objection.
13 BY MR. MORALES:
14 Q. Page 343 still, Line 21 says, "So there may
15 or may not be a report that Dr. Bercaw created
16 about your medical history?" And the answer from
17 Mr. Patterson is, "I'm pretty familiar. If he
18 created a report, I should have seen it, but I have
19 not seen it."
20 Is that a credible answer from Mr.
21 Patterson in your view knowing what you know today?
22 MR. AMLONG: Objection. Foundation.

Page 169

1 A. If we can look back at that e-mail
2 that -- between Dr. Bercaw and Mr. Patterson. Did
3 Mr. Patterson indicate that he -- when he rescinded
4 the, you know, authorization to release records to
5 FAA, does Mr. Patterson indicate in that e-mail
6 that he's read the report? He may have indicated.
7 Can I take a look at that?
8 BY MR. MORALES:
9 Q. Sure. You can take a look at that.
10 A. Which of these --
11 Q. Exhibit 11.
12 A. Thank you. Well, it says very clearly in
13 this e-mail on Exhibit 11 on the bottom that he
14 attached a copy of the PDF report in his e-mail at
15 11:38. And now we're at 11 minutes later -- Dr.
16 Bercaw receives an e-mail from Mr. Patterson saying
17 that he rescinds authorization to send his records.
18 I can't say -- I can't testify that Scott
19 has read the report, Mr. Patterson has read the
20 report, but one could infer that.
21 Q. While we have this Exhibit 11, the bottom
22 e-mail there, as we read earlier, says,

43 (Pages 166 - 169)

Page 170

1 "Ultimately, the recommendation is that this should
2 go to review by the FAA who has a few in-house
3 neuropsychologist consultants who render an
4 opinion."
5      Do you recall that?
6 A. Yes. Yes.
7 Q. And that's written on April 22, 2016?
8 A. Yes.
9 Q. If you'll keep that in mind. Look at Page
10 349 of Mr. Patterson's deposition transcript, Line
11 10. It says, "Did you ever follow up?"
12      Do you see that?
13 A. Yes.
14 Q. It says, "Did you ever follow up with Dr.
15 Bercaw about his" -- and then it says as
16 read -- "recommendation that this should go to
17 review by the FAA, who has a few in-house
18 neuropsychologist consultants who render an
19 opinion?" And then the answer from Mr. Patterson
20 is, "I actually went to Dr. Kay, who is the -- who
21 is the FAA's resident expert. This is who this is
22 referring to."

Page 171

1      Did you understand Dr. Bercaw's e-mail to
2 be referring to you?
3 A. Well, when he says to one of the in-house
4 consultants -- although we're not really
5 in-house -- he's actually referring to the FAA
6 neuropsychology consultants, of which I'm one of
7 the two seniors members. So it's a pretty good
8 interpretation by Mr. Patterson.
9 Q. And did Mr. Patterson provide you Dr.
10 Bercaw's report at the time he reached out to you
11 in 2016?
12 A. I think I testified to that.
13 Q. He did not, correct?
14 A. He did not.
15 Q. Okay. All right. I now have 16. This is
16 Patterson_Tordella_00002 is at the bottom here.
17 And it says FAA Form 8500 on the bottom left. Are
18 you able to identify this document?
19      (Kay Exhibit Number 16 marked for
20 identification.)
21 A. Yes.
22 Q. What is this?

Page 172

1 A. This is a Form 8500-8. It was the version
2 of it signed by Mr. Patterson on July 18, 2017.
3 Q. Okay. Bottom of the page, Question 19
4 says, "Visits to Health Professionals Within the
5 Last 3 Years."
6      What is your understanding of what Mr.
7 Patterson was being asked to provide there as a
8 response to Question 19?
9 A. Any health professionals he's seen, as
10 we've described earlier today. Healthcare
11 professional within the last three years.
12 Q. Okay. Does that include
13 neuropsychologists?
14 A. It certainly does.
15 Q. Does that include psychologists?
16 A. It certainly does.
17 Q. Okay. So if you'll help me, do you see any
18 names in response to Question 19?
19 A. I do. It continues on, by the way. If you
20 look --
21      MR. AMLONG: Objection. The document
22 speaks for itself.

Page 173

1 BY MR. MORALES:
2 Q. Okay. It looks like there are three names
3 on the first page, is that correct?
4 A. Right. And then if you turn to Page 3 of
5 your document --
6 Q. Okay.
7 A. -- it says 19 visits to health
8 professionals in the last three years from Page 1.
9 It lists other people.
10 Q. Do you see your name listed there?
11 A. I don't see my name.
12 Q. Do you see Dr. Bercaw's name listed there?
13 A. No.
14 Q. Do you see Dr. Caddy's name listed there?
15 A. No.
16 Q. Do you see Dr. Hastings' name listed there?
17 A. No.
18 Q. Okay. Are any of those people that I just
19 mentioned not health professionals? Let me ask it
20 this way --
21 A. They are -- no. They are all health
22 professionals.

44 (Pages 170 - 173)

Page 174

1 Q. Okay. Were each of them visited by Mr.
2 Patterson within the three years preceding July of
3 2017?
4 A. Yes.
5 Q. Okay. Is there any basis that you're aware
6 of for not listing those individuals in response to
7 Item 19?
8 A. Not that I'm aware of.
9 MR. AMLONG: Objection. Foundation.
10 BY MR. MORALES:
11 Q. Okay. Item 18 here back on the first page.
12 What is Item 18? I believe we talked about this
13 earlier.
14 MR. AMLONG: You're skipping 17 and going
15 to 18?
16 MR. MORALES: Oh, I'm sorry. I'm still on
17 the Form 8500. I'm just on the Box 18, Medical
18 History. That's -- my apologies.
19 A. So Box 18 is medical history and you check
20 yes or no for the conditions from A through W. And
21 he is -- what you do is you provide an explanation
22 for anything which has been checked. And if it's

Page 175

1 something which has been previously checked and
2 explained, then you -- you're allowed to say
3 previously reported because -- like, when I get
4 your medical record, I have all of your 8500s that
5 you've submitted since the first one. And I can
6 look and say, oh, okay, this is what -- this is
7 when it was first reported and this is what's it's
8 dealing with.
9 As you can see, 18 specifically says, "Have
10 you ever in your life been diagnosed with, had, or
11 do you presently have any of the following?"
12 BY MR. MORALES:
13 Q. Let me ask you, your report from 2016, we
14 talked about a reference, Dr. Caddy's DSM-5
15 diagnosis.
16 A. Yes.
17 Q. Is that something that would be reported in
18 response to Item 18?
19 A. No. This is not a disorder. Those are
20 administrative codes.
21 Q. Okay.
22 MR. MORALES: I'm going to actually

Page 176

1 mark -- ask that this be marked 16.A. Or 16A.
2 Let's do 16A.
3 And, Bill, this is -- I'm handing out the
4 Form 8500 materials that Yasmin sent this
5 afternoon. Marking as 16B.
6 MR. MORALES: So you're making 16 16A and
7 you're marking this new -- the new one as the
8 October 2018 one?
9 MR. MORALES: Yes. November '18, let's do
10 that one as 16A.
11 (Kay Exhibit Number 16A marked for
12 identification.)
13 MR. AMLONG: I'm sorry. What's 16A and
14 what's 16B?
15 MR. MORALES: Okay. So 16 is the July 18,
16 2017 Form 8500.
17 MR. AMLONG: Right.
18 MR. MORALES: And then 16 -- 16A is the
19 compilation from November 15, 2018.
20 MR. AMLONG: Okay.
21 MR. MORALES: Okay. You got it?
22 MR. AMLONG: Yes.

Page 177

1 A. Do you guys understand why you have one
2 that's handwritten and one that's printed?
3 BY MR. MORALES:
4 Q. Please explain.
5 A. I was asking if you guys understood. If
6 you already understand, I'm not going to testify to
7 why.
8 Q. Dr. Kay, you've noted that Exhibit 16 has
9 handwritten material. For example, in response to
10 Item 12, Employer, there's handwriting there. Do
11 you know whose handwriting that would be?
12 A. Most likely the airman. But you can
13 complete a handwritten one. But it all has to be
14 submitted electronically through MedExpress. And
15 that actually is the one you should kind of be
16 relying on because that's the one that actually
17 goes to the FAA. This one here.
18 Q. And you're referring to 16A?
19 A. I'm talking about 16A.
20 Q. So 16A, you're saying is the one that goes
21 to the FAA?
22 A. That's the important one. Because that's

Page 178

1 kind of the official version of it.
2   Q. So 16 -- 16 --
3   A. They're basically from the same time --
4   Q. I see.
5   A. -- time frame. So once it's dated when he
6 starts the exam and he goes to see Dr. Tordella in
7 July, and then, you know, five weeks later, maybe
8 six weeks later on -- oh, this is '18. So you
9 don't have -- the 2017 one, you don't have the
10 computer printout. Okay. This is different. This
11 is a totally different 8500. I thought it was from
12 the same year.
13   Q. So --
14   A. These are different years.
15   Q. Let me look and -- we just got these
16 materials this afternoon. But I believe, if you
17 look at 16A --
18   A. Oh, here we go. Here's your 2017.
19   Q. -- Item 13.
20   A. Here's what I'm showing to you.
21   Q. Yeah. Yeah.
22   A. If you turn to --

Page 179

1   Q. Right.
2   A. -- page --
3   Q. Page 13?
4   A. -- 8500 records, Page 11, then you're going
5 to see the 7/18/2017.
6   Q. Right. Page 11.
7   A. The MedExpress version of it --
8   Q. Right.
9   A. -- is there. Okay. Sorry about that.
10 Sorry about the confusion.
11   Q. No, no, no. It's helpful. Thank you.
12   A. Like, I don't rely on this paper version.
13 That's kind of, like, maybe a draft where he's
14 talking to the doctor.
15   Q. I see. Okay. So let's just -- to close
16 the loop on that Item 16, which is the July 18,
17 2017 Form 8500. If you look at the response to
18 Item 19, would you agree that it looks like it's
19 the same on both the 16 and 16A copies? In other
20 words, it doesn't look like there are any changes
21 in the doctors listed or health professionals
22 listed.

Page 180

1   A. I'm checking that now.
2   Q. Okay.
3   A. So that one starts on Page 11 of what you
4 have as today's printout. And under 19, yeah, I
5 don't see anybody else listed there.
6   Q. Okay. So it looks like if we go
7 back -- let's look at -- I guess it's Records Page
8 24, which is dated -- FAA Form 8500 dated 7/1/2016.
9 Do you see that?
10   A. Yes.
11   Q. Okay. And there, response to Item 19 it
12 looks like Dr. Caddy and then Dr. Kay and then Dr.
13 Dayton are listed, is that correct? And then there
14 are additional names on that.
15   A. I see Caddy, Kay, Hastings. Caddy, yeah.
16   Q. Okay. Do you see Dr. Bercaw?
17   A. No. He's listed the visit with Dr. Knippa
18 as AA IME FFD.
19   Q. Where do you see that?
20   A. I see it. The next to the last doctor he's
21 listed where he says March 2016 AA IME FFD.
22   Q. Oh, without the name?

Page 181

1   A. Without the doctor's name.
2   Q. So you're noting that on FAA Records_00026,
3 that there is a reference to 3/2016, Long Beach,
4 California, which is where Dr. Knippa is based, but
5 it doesn't list Dr. Knippa's name, is that correct?
6   A. Or the kind of doctor. It just says Ph.D.
7 It doesn't say psychologist or neuropsychologist.
8   Q. Okay. Would an FAA examiner have any way
9 of knowing if that was Dr. Knippa if you reviewed
10 this response?
11   A. No.
12   Q. Okay. Is there any reason that you're
13 aware of that Dr. Bercaw would not be listed on
14 this report?
15     MR. AMLONG: Objection. Foundation.
16   A. I'm not aware of the reason.
17 BY MR. MORALES:
18   Q. Okay. Is Dr. Bercaw a health professional
19 that Mr. Patterson had visited within the last
20 three years --
21   A. Yes.
22   Q. -- of July 2016?

46 (Pages 178 - 181)

Page 182

1   A.  Yes.

2   Q.  Okay.  Let me ask you, we see on this July

3   2016 report your name, for example, is listed.  On

4   the July 2017 report that we just reviewed, your

5   name was not listed.  Had the three-year time

6   period since Mr. Patterson's visit with you, had it

7   elapsed during that time period?

8   A.  No.

9   Q.  Okay.  So the 2017 July report, July 2017,

10  you had been visited by Mr. Patterson within three

11  years of that report?

12  A.  I had been, yes.

13  Q.  Okay.  And is there any reason you're aware

14  of that your name would be removed between the 2016

15  and 2017 report if your visit was within the last

16  three years?

17  A.  No.

18  Q.  Okay.  And maybe --

19  A.  Unless there's -- if you look at the

20  instructions page, it says something about if

21  you've already listed the doctor's visit.  I don't

22  know if there's some kind of exclusion that I'm not

Page 183

1   aware of.

2       I mean, I get all their visit and all

3   their -- when I do one of these, so I actually have

4   all of them like we have here.

5   Q.  When you say you get all of them, how do

6   you --

7   A.  When I'm doing a review for FAA, it comes

8   with all their 8500s since the very first one as a

9   student pilot.  So I see what they've listed

10  previously.  I'm probably not as concerned

11  with -- if that name is carried over from visit to

12  visit, but they have to list it, that they saw

13  somebody.

14      Now, I don't know if the instructions page

15  gives you some kind of waiver for not having to

16  re-list a doctor you saw in the last three years.

17  We could take a quick look at the --

18  Q.  And presumably --

19  A.  -- instructions list.

20  Q.  -- the instructions -- there would be

21  instructions that provide --

22  A.  There are.

Page 184

1   Q.  -- an answer to that?

2   A.  There are.

3   Q.  And do AMEs have instructions on the

4   answers that they're expecting to receive in

5   response to a question like Item 19?

6   A.  They get very specific training in the 8500

7   more so -- they're actually responsibile for it.

8   They're the one who has to sign it, not the

9   psychologist.

10      Just because I'm the reviewer, I'm fairly

11  familiar, but I'm not familiar with some details of

12  the rules, such as maybe there's some kind of an

13  exclusion or not having to write it over again.

14  Q.  Okay.  If you would -- the last one I

15  think -- look at FAA_4, if you would.  And I guess

16  actually it's 2, which is the August 27, 2018 --

17  A.  Yes.

18  Q.  -- report.

19  A.  Yes.

20  Q.  And it looks like Item 19 lists Dayton

21  twice and Quintana, is that accurate?

22  A.  He goes back to 2016.

Page 185

1   Q.  Right.  And then on Page 4, there are

2   additional names listed, is that correct?

3   A.  Yes.

4   Q.  And if you look near the bottom -- I guess

5   near the middle, your name appears again, Kay, is

6   that correct, for June 2016?

7   A.  Well, he does list Dr. --

8   Q.  Right.

9   A.  -- Bercaw as Dr. B-e-r-c.

10  Q.  Right.  Right.  So two below that, you note

11  that it says --

12  A.  Yes.

13  Q.  -- 3/2016, Berc, B-e-r-c, and /Fonsec --

14  A.  Right.

15  Q.  -- listed as an expert with pending

16  lawsuit?  Is that the first time you'd seen Dr.

17  Bercaw's name in this report?

18  A.  Yes.

19  Q.  And I'd just ask you -- it may take a

20  second.  But if you would just flip through these

21  records, and if you could, confirm whether you see

22  Dr. Bercaw's name in any of the other responses to

47 (Pages 182 - 185)

Page 186

1  Item 19.
2      MR. AMLONG:  Objection.  The document
3  speaks for itself.
4      A.  Apparently not.
5  BY MR. MORALES:
6      Q.  And what is the earliest date in this
7  packet of materials?  May -- I see one for May 28,
8  2015.  On Bates number 37, is that the earliest
9  date you see?
10     A.  May 27, 2015.
11     Q.  Okay.
12     A.  It's actually Page 35.
13     Q.  Okay.  Yeah.  It looks like the -- Page 36,
14 the date changes to May 28th, but I think we're
15 looking at the same one, so -- okay.
16     Now I'm going to hand you 17.  And if you
17 could identify -- this is an e-mail from William
18 Amlong to WNIMail.  Is that you?
19     (Kay Exhibit Number 17 marked for
20 identification.)
21     A.  Yes.
22     Q.  Okay.  And what is this?

Page 187

1      A.  It says that it's an excerpt from Dr.
2  Bercaw's deposition.
3      Q.  Okay.  And do you recall -- do you recall
4  receiving this?
5      A.  Right now, no.
6      Q.  Do you recall corresponding with Mr. Amlong
7  in September of 2018 about the Bercaw deposition?
8  Bercaw.
9      A.  We had a phone call back around that time.
10     Q.  And what was the context for that phone
11 call?
12     A.  He called to talk to me about Mr.
13 Patterson.
14     Q.  And is that where you learned of the Bercaw
15 report?
16     A.  That seems about right.
17     Q.  Okay.  Did you review the deposition
18 transcript that Mr. Amlong sent here?
19     A.  I'm sure I looked at it if he sent it to
20 me.
21     Q.  And I'll hand you 18.  If you could
22 identify this.  It looks like an e-mail from you to

Page 188

1  Mr. Amlong, is that correct?
2      (Kay Exhibit Number 18 marked for
3  identification.)
4      A.  Yeah.
5      Q.  Okay.  And what is this e-mail?
6      A.  This actually says that the -- "good luck
7  with your case."  This is an invoice for the time I
8  spoke to him, which would have been on September
9  12th, so that does narrow it down.
10     Q.  Spoke to --
11     A.  And the date is September 12th.  We talked
12 for an hour and a half.
13     Q.  Okay.  And do you recall the discussions,
14 what was said in those discussions with Mr. Amlong?
15     A.  No more than as it says here; review of
16 Bercaw, Knippa, and Kay reports.
17     Q.  Did you opine on the Bercaw report during
18 that phone call?
19     A.  Most likely.
20     Q.  Do you remember what you communicated to
21 Mr. Amlong?
22     A.  I don't remember exactly what I said.

Page 189

1      Q.  Were you -- did communicate surprised at
2  the existence of the Bercaw report?
3      A.  That would be easy to infer, yes.  Most
4  likely.
5      Q.  Okay.  At some point, did you determine
6  that you needed to update your 2016 report in light
7  of the Bercaw report?  Let me ask you this, at some
8  point in 2018, did you issue a follow-up
9  neuropsychological assessment of Mr. Patterson?
10     A.  I did.
11     Q.  And why did you do that?
12     A.  It was, I think, at the request of his
13 counsel.
14     Q.  And why did his counsel request the
15 follow-up report?  I'm handing you 19.
16     (Kay Exhibit Number 19 marked for
17 identification.)
18     A.  I assume it's part of his litigation.
19     Q.  In the absence of that request, would you
20 have -- scratch that.
21     From your perspective, did you see any need
22 to do a follow up of your 2016 report in light of

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 190

1 the Bercaw report?
2     A. I did.
3     Q. And why is that?
4     A. As I previously testified, there were areas
5 in Dr. Bercaw's evaluation that would raise concern
6 about Mr. Patterson's fitness, his suitability for
7 an aeromedical certificate, areas of
8 neuropsychological testing that I had not done in
9 my evaluation that if the case was to be reviewed
10 by the FAA, it would likely require further
11 evaluation. And I think I let that be known and
12 Mr. Patterson called me for an appointment.
13     Q. And did you conduct another round of
14 testing on Mr. Patterson?
15     A. I did.
16     Q. Okay. And it looks like if you look at, I
17 guess, the first page of your test results section,
18 it says Session 4.
19     A. Yes.
20     Q. Am I correct that you administered
21 CogScreen Session 4?
22     A. Yes.

Page 191

1     Q. And why not Session 3?
2     A. I wasn't sure --
3        MR. AMLONG: Okay. Which --
4        MR. MORALES: Sorry.
5        MR. MORALES: -- exhibit is this?
6        MR. MORALES: We're looking at 19. Dr.
7 Kay's October -- October 10, 2018 report.
8        MR. AMLONG: Okay.
9        MR. MORALES: And then it's, you know, Page
10 5, I guess. It's the test results of CogScreen.
11 And then in the middle of the page it says Session
12 Number 4.
13 BY MR. MORALES:
14     Q. So, Dr. Kay, the question was, why you
15 administered Session Number 4 as opposed to Number
16 3?
17     A. It was the fourth time he was taking
18 CogScreen.
19     Q. To your understanding, has Mr. Patterson
20 ever taken Session 3?
21     A. No.
22     Q. Okay. But he's taking Session 2 twice, is

Page 192

1 that correct?
2     A. Correct.
3     Q. Okay. Is it your understanding that this
4 report was going to the FAA? Let me ask it this
5 way, at the time that you prepared this follow-up
6 report, what was your understanding of the audience
7 for the report?
8     A. I figured eventually it's going to get its
9 way to the FAA and be part of his medical record.
10 I mean, it has to be.
11     Q. Why does it have to be?
12     A. Because if he indicates that he's been seen
13 by me, some astute person's at the FAA job is to
14 say, I'd like to see Dr. Kay's record.
15     Q. On the -- Page 4 of the Summary and
16 Recommendations, it says, "Based upon these
17 findings, Mr. Patterson would be considered to have
18 no aeromedically significant neurocognitive
19 deficits and would be recommended for a Class 1 FAA
20 airman medical certificate."
21     A. Yes.
22     Q. Can you discuss the manner in which you

Page 193

1 assessed Dr. Bercaw's report once you gained
2 knowledge of that report? How that factored into
3 this conclusion?
4     A. Oh, when I -- I think I've testified to
5 this. But I believe that when I reviewed Dr.
6 Bercaw's report, I had -- would have significant
7 concerns. We would probably not recommend issuance
8 of a medical certificate based upon performance
9 that I'm seeing. So Dr. Bercaw was quite right,
10 that, in fact, if it was reviewed by one of the FAA
11 neuropsychology consultants we would probably not
12 issue. We'd probably require additional testing to
13 see if we could confirm or disconfirm the presence
14 of an aeromedically significant deficit.
15        And so, in fact, I did specifically the
16 testing that -- if I had written a review for the
17 FAA based on Dr. Bercaw's report, I did the test
18 that would be so indicated. And Mr. Patterson
19 performed quite well on the test that I
20 administered looking at issues such as his
21 reasoning abilities. And I gave him a completely
22 novel test.

49 (Pages 190 - 193)

Page 194

1    He had done miserably on those tests
2 previously.  But he did perfectly fine.  And these
3 are tests that he could not have -- there's no
4 pilot gouge he could have looked at or a discussion
5 with other guys who had been through evaluations to
6 pass these.  I gave him things he would not have
7 been familiar with.  And he did fine on measures of
8 executive functioning.  I gave him a test of
9 vigilance.  There was one -- just one score out of
10 all the scores that generate that was poor.  But
11 all the other scores were very good.  I think he's
12 a guy who, you know, on a very boring monotonous
13 task, will lose a little bit of his alertness and
14 arousal if you keep him on it for a long time.  But
15 he keeps himself occupied.  And so it doesn't seem
16 to be, and it's not manifested itself as a problem.
17    So that kind of showed up for him, that he
18 still had that one.  But I would not call that, nor
19 would my colleagues call that, aeromedically
20 significant.
21    He did surprisingly well compared to -- he
22 had done very poorly when tested by Dr. Bercaw on

Page 195

1 memory testing where it had actually concerned me
2 about him.  Fortunately, Dr. Hastings did not find
3 anything neurological.  So I'm not sure what the
4 basis was for why Mr. Patterson had so many
5 problems back in March 2016.  But I didn't know
6 about the memory problem.  But he did very poorly.
7 And we would not grant an airman a certificate who
8 had performed that poorly on memory testing.  When
9 I tested him, him memory was excellent on
10 every -- every criteria we would look at compared
11 to major pilots and the norms that I've developed
12 for major pilots.
13    Q.  And you're referring to October 2018, is
14 that correct --
15    A.  Yes, sir.
16    Q.  -- for your examination?
17    A.  October 2018.  His memory was solid.  So he
18 did very well on memory testing.  Very well on
19 novel problem solving.  And while he wasn't perfect
20 on vigilance, that might be kind of a
21 characteristic of him.  So he's not perfect on
22 that, but he would be okay.

Page 196

1    Q.  Let me ask you, setting aside the cognitive
2 testing components of Dr. Bercaw's report when
3 issuing your October 2018 analysis, what
4 significance, if any, did you assign to the
5 withholding of Dr. Bercaw's report from you in June
6 2016?
7    A.  Well, I don't think -- it wasn't something
8 which helps Mr. Patterson.  So it's kind of
9 self-defeating.  I think that -- I don't know what
10 counsel he received that told him that he should do
11 that or why he thought that was okay.  You'd have
12 to ask Mr. Patterson.  It obviously is not in his
13 interest to have done that.  He's not helping
14 himself by doing that.
15    He undermined, you know, my examination,
16 which if I had done further testing, maybe he would
17 have been found fine and we wouldn't be actually
18 asking these questions today about, you know, why
19 did you not give this report to Mr. Kay.  I don't
20 know why he didn't give it to me.  That was a
21 mistake, a terrible mistake.  You know, that's not
22 what we want pilots to do.  And it certainly

Page 197

1 doesn't look good.  But I don't know.  You'd have
2 to ask Mr. Patterson.  I don't know what he
3 testified to as to why he thought he didn't have to
4 do it.
5    Q.  Okay.  One last document for you here,
6 which is Number 20.  And I believe you referred to
7 this e-mail earlier today.  This appears to be an
8 e-mail from you.
9    (Kay Exhibit Number 20 marked for
10 identification.)
11    A.  Sure.
12    Q.  September 27, 2018 to Dr. Bercaw.  Can you
13 tell us what this e-mail is?
14    A.  So back in September of this year, Dr.
15 Bercaw wrote me.  He didn't mention the Patterson
16 case at all, but he goes -- he goes -- he asked a
17 question about the novel reasoning subtest in
18 CogScreen.  And he wondered about the extent to
19 which -- when you give a different session, is
20 there a difference in the way the test runs the
21 answer.  I let him know it was yes, that the number
22 of items per category differs by session.  So that,

50 (Pages 194 - 197)