UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division

Case Number: 17-cv-60533-MARTINEZ/OTAZO-REYES

RODNEY SCOTT PATTERSON,

    Plaintiff,

vs.

AMERICAN AIRLINES, INC.,

    Defendant.

_____/

## The Amlong Firm's Rule 11 Motion re:
## American Airlines, Inc.'s Motion for Sanctions

### Introduction and Summary

Amlong & Amlong, P.A., d/b/a The Amlong Firm, moves pursuant to Federal Rules of Civil Procedure 11(b) and (c) for the imposition of sanctions against the defendant, American Airlines, Inc., and its counsel, Michael Holt, Esquire, of Fisher & Phillips, LLP, for having filed American Airlines, Inc.'s Motion for Sanctions, DE 154, against not only the plaintiff, Rodney Scott Patteson, but also against The Amlong Firm, and its constituent lawyers, notwithstanding that:

    ***First***, it was brought for an improper purpose;

**Second**, its claims and other legal contentions are not warranted by existing law or by a nonfrivolous argument for extending, modifying or reversing existing law or for establishing new law, and

**Third**, its factual contentions do not have evidentiary support.

### Statement of Facts

This is an action brought pursuant to the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. §4301, <u>et seq</u>. ("USERRA") in which defendant, American Airlines, Inc., and its counsel, Michael Holt, Esquire, of Fisher & Phillips, L.L.P., have filed a motion for discovery sanctions against not only the plaintiff, Rodney Scott Patterson, but also his counsel.

Although American and Mr. Holt state in the opening paragraph of the motion that

> Plaintiff Rodney Scott Patterson should be sanctioned for lying to American and this Court and for flagrantly disregarding basic discovery rules and obligations in an attempt to hide evidence. Plaintiff sought to prevent American and this Court (as well as the Federal Aviation Administration) from learning of Dr. Edwin Bercaw's March 2016 neuropsychological examination of Plaintiff and Dr. Bercaw's subsequent report because it undermines the fundamental narrative that Plaintiff has presented in this litigation[,]

it states in the body of the motion that

> American further requests that this Court award monetary relief jointly against Plaintiff **and his counsel** to reimburse American for the needless attorneys' fees and costs it incurred because of Plaintiff's prevarications and discovery abuses, specifically for: (1) obtaining the Bercaw report and accompanying materials; (2) the deposition of Dr.

> Caddy and the Daubert motion to exclude Dr. Caddy's opinion
> testimony; and (3) the deposition of Dr. Kay. . . .

Id. at 4 (emphasis supplied).

The lynchpin of American's argument is its assertion that following a

visit to Edwin Bercaw, Ph.D., for a second opinion that would contradict that

of John Knippa, Ph.D., a Long Beach, California, neuropsychologist,

> One month later, Dr. Bercaw sent Plaintiff his report, in which Dr.
> Bercaw raised concerns "potentially critical to flight performance" and
> recommended further review of Plaintiff by the Federal Aviation
> Administration.  Dr. Bercaw's report echoed the nearly identical
> concerns that led Dr. Knippa to conclude that Plaintiff was not fit to fly.

DE 154, at 1-2.

The primary evidence that "Dr. Bercaw sent Plaintiff his report" is an

April 22, 2016 e-mail string, disclosed during discovery by Isha Kochhar,

Esquire, an associate of The Amlong Firm, in which Dr. Bercaw said he was

forwarding the report to Lt. Col. Patterson, but to which Lt. Col. Patterson

responded with an e-mail stating to Dr. Bercaw that "[t]he file was not

attached."[1]

Lt. Col. Patterson testified at his deposition that he had never gotten a

copy of the report.   Patterson Deposition, at 343:13-344:2, 345:19-348:1.

The Amlong Firm has been unable to find any evidence that Lt. Col.

---

[1]The e-mail string is appended as Attachment 1.  Defendant's motion
incorrectly states that Dr. Bercaw sent the e-mail "to Plaintiff, Mr. Amlong
and Dr. Caddy."  DE 154, at 7.  The e-mail was sent only to Lt. Col.
Patterson, who forwarded it to Glenn R. Caddy, Ph.D., and the undersigned.

Patterson ever actually saw the report until American obtained it from Dr. Bercaw by subpoena and filed it with the Court DE 53-3.

Miss Kochhar will testify at the hearing that she disclosed the April 22 e-mail, *One*, based in what she understood as a firm policy of disclosing everything, and, *Two*, without discussing it with the undersigned. The undersigned will testify that The Amlong Firm never received the report via e-mail,[2] and that The Amlong Firm's staff made repeated inquiries of Comprehensive MedPsych Systems, Inc., Dr. Bercaw's former employer, in an unsuccessful attempt to locate any e-mails transmitting the report.[3] Glenn R. Caddy, Ph.D., the plaintiff's testifying expert, stated in a June 7, 2018 deposition that he had never seen a copy up until the time of that deposition. Caddy Depo,[4] at 6:23-7:2. Kristie Caddy, Dr. Caddy's wife and

---

[2]The likelihood that The Amlong Firm would not have gotten a copy from Dr. Bercaw is enhanced by Lt. Col. Patterson's having instructed Dr. Bercaw, as the defendant's motion points out, DE 154, at 2, that he was "rescinding any authorization for you to send my records to anywhere other than to Dr. Caddy. . . ." See April 22, 2016 e-mail, which plaintiff's counsel produced to defendant September 25, 2018. DE 136-3, a copy of which is appended as Attachment 1 . That explicit directive by Lt. Col. Patterson to Dr. Bercaw about not sending any information to American (as his employer, as opposed to being a defendant in a USERRA suit that would not be filed March 14, 2017) or the Federal Aviation Administration is external to this litigation.

[3]See September 26, 2017 e-mail string between Dr. Geoffrey Kanter, the president of MedPsych, and Karen Coolman Amlong, Attorney at Law, which is appended as Attachment 2 .

[4]The cover page and relevant testimonial pages of the deposition of

(continued...)

office manager, will testify that she did not retrieve the telecopied report from her husband's office's digital telecopier system until August 31, 2018, when the undersigned—who had made repeated inquiries of both Dr. and Ms. Caddy concerning the whereabouts of the April 25, 2016 report, a copy of which is appended as Attachment 3—asked her (after learning from a subpoenaed copy of the report that it had been faxed) to check the generally untended telecopier.[5]

What Dr. Caddy did receive from Dr. Bercaw via e-mail was a May 6, 2016 letter[6] that characterized the examination of Lt. Col. Patterson by

---

[4](...continued)
Glenn R. Caddy, Ph.D., are appended as Attachment 4 .

[5]The fax has a time legend of April 25, 2016.  There is no "cc" notation and no copy was e-mailed or telecopied to The Amlong Firm.  Lt. Col. Patterson states that he never received it, and the undersigned has been unable to prove otherwise, despite challenging him on the issue. However, Lt. Col. Patterson did forward the undersigned on April 26 an e-mail to Dr. Caddy that stated, in pertinent part,

> Dr. Bercaw's report which is lacking and very weak needs to be re-done, but he is HIMS certified.  I didn't compensate him for a report and work to be done by a resident.  Although we might succeed in Federal Court with the nature of your report which is the goal.

The e-mail, which is appended as Attachment 5 , was provided to defendant as an attachment to Plaintiff's Supplemental Notice of Production of Documents dated September 25, 2018.

[6]See May 6, 2016 letter from Dr. Bercaw to Dr. Caddy, which is appended as Attachment 6 .

himself and a newly licensed resident psychologist who actually drafted the report,[7] as:

- having "found no certain evidence of a disqualifying mental or neurological condition for first-class medical certification as defined by Federal Aviation Regulations Part 67.107 and 67.109";

- documenting "findings in our evaluation [that] were generally positive, **with a passing CogScreen** (which is a validated battery of tests specifically designed to evaluate cognitive functioning in pilots)," (emphasis supplied) and

- acknowledging as to some less-than-clearly-acceptable results, that "[t]he aeromedical significance of these findings was uncertain in the context of the larger evaluation and his professional and military history."

Although the undersigned's contemporaneous billing records show that on April 23, 2016 he "[r]eceived and reviewed correspondence from Ed Bercaw, Ph.D., re: he will send records, underlying data to WRA and Dr. Caddy," there is no billing entry concerning actual receipt or review of any such records,[8] although such entries are (and were) a routine practice.

Lt. Col. Patterson's <u>pro se</u> Plaintiff's Response to Defendants (sic) Motion for Sanctions and Request for Other Relief, DE 194, contains a bizarre and untrue (at least as to Lt. Col. Patterson's having been "billed for receiving that report") passage on Page 15:

---

[7]The licensing information on Francy Nathaly Fonseca, Psy.D., downloaded from Florida Department of Health License Verification website, https://appsmqa.doh.state.fl.us/MQASearchServices/HealthCareProviders/LicenseVerification?LicInd=8430&ProCde=2701&org=%20, last visited May 26, 2019, is appended as Attachment 7 .

[8]<u>See</u> May 16, 2016 billing statement, appended as Attachment 8.

Plaintiff does recall seeing the email from Bercaw during the deposition.  Here again, American only provides the court part of the story. That same email said no file attached as a simple reply.  Neither American nor Bercaw have shown that the plaintiff received a copy. Plaintiff downloaded a copy of the report from Pacer which American had uploaded.  Plaintiff also instructed Bercaw to forward a copy of the report to his attorney, William Amlong.  Plaintiff was billed for receiving that report and Bercaw was remiss in sending a copy of the report to Amlong.  Dr. Kay admitted in his deposition he had no information that Caddy, Amlong or the plaintiff had a copy of the report.

As is clear from the billing statement, Lt. Col. Patterson was not billed for The Amlong Firm's receipt of the Bercaw/Fonseca report.

Although plaintiff did "testif[y] at his March 2018 deposition that he had never visited Dr. Bercaw, [which p]laintiff's counsel indisputably knew that to be false," DE 154, at 18, Patterson corrected his testimony during that same deposition to admit that he had consulted with Dr. Bercaw —obviating any need to plaintiff's counsel to correct him during the deposition.  See Deposition of Rodney Scott Patterson, at 341:17-21, the cover page and relevant testimonial pages of which are appended as Attachment 9  .  Because no one from The Amlong Firm had ever spoken to Dr. Bercaw, no one within the firm had any idea at the time about the truth or falsity of Patterson's representations about Dr. Bercaw's willingness to be involved in litigation.

Although Ms. Kochhar neither held back production of the e-mail that Lt. Col. Patterson forwarded to The Amlong Firm, nor conferred with the undersigned as to whether Dr. Bercaw's report would have been privileged

under Fed.R.Civ.P 26(b)(4)(D), the undersigned had an objectively good faith belief that the report was privileged based on Dr. Caddy's repeated representations that he had never seen it nor considered it in formulating his expert opinion.  Although the objection to producing the report was belated, that is because the undersigned, *One*, had never worked with Rule 26(b)(4)(D) consulting expert before; *Two*, had never worked with a neuropsychologist before; *Three*, had nothing to do with commissioning Dr. Bercaw's examination of Lt. Col. Patterson, and, *Four*, had no idea what the report said (beyond the generally positive two page letter that Dr. Bercaw had sent to Dr. Caddy) until American subpoenaed it from Dr. Bercaw.

Following Dr. Bercaw's deposition, it was the undersigned who, *First*, furnished Dr. Bercaw's report to Gary Kay, Ph.D., the leading neuropsychologist whom Lt. Col. Patterson had visited without disclosing that he had been examined and tested by Dr. Bercaw, and, *Second*, withdrew Dr. Kay's report based on his initial examination as an exhibit in opposition to American's motion for summary judgment following Dr. Kay's deposition.

### Governing Legal Principles

Mr. Holt brought American's sanctions motion pursuant to the inherent powers of the Court, see DE 154, at 4 ("For the reasons detailed in this Motion, American now respectfully requests that this court, pursuant to its inherent powers, sanction Plaintiff for his conduct"), under which "[c]ourts

have the inherent power to police those appearing before them." Purchasing Power, LLC v. Bluestem Brands, Inc., 851 F.3d 1218, 1223 (11th Cir. 2017), citing Chambers v. NASCO, Inc. , 501 U.S. 32, 46.  As the Purchasing Power court noted, "[t]his power 'must be exercised with restraint and discretion' . . . ." Id.

"A court may exercise this power 'to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Id., quoting Marx v. Gen. Revenue Corp., 568 U.S. 371, 382 (2013) (citing Chambers, 501 U.S. at 45–46).  "The key to unlocking a court's inherent power is a finding of bad faith." Id., citing Sciarretta v. Lincoln Nat'l Life Ins. Co., 778 F.3d 1205, 1212 (11th Cir. 2015).  "A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent. A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." Thomas v. Tenneco Packaging Co., Inc., 293 F.3d 1306, 1320 (11th Cir. 2002), quoting Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998).  This distinguishes the grounds for exercise of a court's inherent powers from "other mechanisms," e.g., Federal Rule of Civil Procedure 11, which "impose[] an objective standard of reasonable inquiry which does not mandate a finding of bad faith." Chambers, 501 U.S. at 47 (footnote and citation omitted).

An "inherent powers" movant bears the burden of showing either "direct evidence of subjective bad faith," i.e., "an attorney's conduct [that] is so egregious that it could only be  be committed in bad faith, <u>Purchasing Power</u>, 851 F.3d at 1224, citing <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 766 (1980) as "stating that inherent powers require a finding that "counsel's conduct . . . constituted or was <u>tantamount to bad faith</u>" (emphasis added by <u>Purchase Power</u> court).  Not even recklessness alone, without frivolousness or particular egregiousness, unlocks the "inherent powers" remedy.

Federal Rule of Civil Procedure 11(b), under which The Amlong Firm is moving, however, deems any attorney who "present[s] to the court a pleading, written motion, or other paper" to be "certif[ying] that to the best of the person's knowledge, information, and belief, formed after an inquiry, reasonable under the circumstances" that

(1) it is not being presented for any improper purpose …;

(2) the claims … and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law[, and]

(3) the factual contentions have evidentiary support . . . .

<u>Id</u>.

Although generally, "[i]f . . . the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the

violation," Rule 11(c)(1), there is a safe-harbor provision that renders the offense a nullity "if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets."  Rule 11(c)(2).

Rule 11 sanctions may also be imposed against a party "if she knew or should have known that the allegations in the complaint were frivolous." Byrne v. Nezhat, 261 F.3d 1075, 1117 (11th Cir. 2001), citing Worldwide Primates, Inc. v. McGreal, 26 F.3d 1089, 1093 (11th Cir. 1994).

Sanctions under the rule "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," and may include "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."

"Improper purpose" can include a lawyer or a party's putting forth fanciful claims "to shake down his opponent and, given the expense of defending [any federal civil litigation], to extort a settlement."  Pelletier v. Zweifel, 921 F.2d 1465, 1522 (11th Cir. 1991) (referring to the expense of defending actions brought pursuant to the Racketeering Influenced Corrupt Organization Act).

### Applying the Law to the Facts in the Case at Bar

Although Lt. Col. Patterson did lie at his deposition, his lies were not sanctioned by his counsel, who would have had the duty (and had the

intention to) correct the untruths if Lt. Col. Patterson had not done so himself.

Regardless of what the Federal Aviation Administration requirements are, Lt. Col. Patterson had the right under Rule 26(b)(4)(D) to seek out a consulting expert (even if he did so without telling his lawyer in advance), whose report could have remained confidential.  Lt. Col. Patterson, once again without input from his counsel, chose to infect the expert report of Dr. Caddy, a clinical psychologist with no expertise in neuropsychology, by having Dr. Bercaw send Dr. Caddy a copy of the report in 2016—even though Dr. Caddy did not actually see the actual report until his deposition in 2018 and did not retrieve from his telecopier until August of 2018.  This Court held that Dr. Bercaw's report was discoverable, at which time The Amlong Firm ceased any resistance to American's obtaining it.  Up until that time, however, The Amlong Firm had an objectively reasonable, good faith belief that the report was protected by Rule 26(b)(4)(D), based on Dr. Caddy's representation that he did not consider it.

The Amlong Firm had nothing to do with Lt. Col. Patterson's contacting Dr. Kay (although it was supportive of his having done so once it found out), or failing to reveal Dr. Bercaw's testing of him to Dr. Kay.  It was The Amlong Firm that sent Dr. Kay the Bercaw report, and which withdrew Dr. Kay's earlier report as a summary-judgment exhibit.

None of The Amlong Firm's behavior can qualify as being in subjective bad faith, or so reckless *and* frivolous, as to qualify as sanctionable under the Court's inherent powers.

As it relates to The Amlong Firm:

*One*, Mr. Holt's motion on behalf of American is for the improper purpose of harassing Lt. Col. Patterson's lawyers;

*Two*, it does not comport with either current 11th Circuit law concerning a court's exercise of its "inherent powers," and

*Three*, there is no evidentiary basis for arguing that The Amlong Firm or any of its lawyers have operated in subjective bad faith, or in such a way that their behavior has been tantamount to bad faith.

## Conclusion

Based on the evidence proffered, the authorities cited and the arguments presented, The Amlong Firm and its constituent lawyers respectfully requests that this Court grant him an evidentiary hearing into this matter and, following such a hearing, award sanctions (i.e., the fees and costs that the have been expended to defend against this motion, jointly and severally against American Airlines, Inc., Michael A. Holt, Esquire, and Fisher & Phillips, LLP.

Respectfully Submitted,

/s/ William R. Amlong
WILLIAM R. AMLONG

Florida Bar No: 470228
WRAmlong@TheAmlongFirm.com
AMLONG & AMLONG, P.A.

Attorneys for Defendant
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida  33301-1154
(954) 462-1983

### Certificate of Service

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by Electronic Delivery this 2nd  day of August, 2019, to all counsel of record and via U.S.Mail to Scott Patterson, 1092 NW 139th Terrace, Pembroke Pines, Florida 33028.

/s/ William R. Amlong
WILLIAM R. AMLONG

C:\Users\yharris\Desktop\__Client Folders\190802 Rule 11 Motion.wpd

**Yasmin Harris**

| | |
|---|---|
| **From:** | Scott <aa737drvr@aol.com> |
| **Sent:** | Friday, April 22, 2016 12:59 PM |
| **To:** | edb@medpsych.net |
| **Cc:** | drfonseca@medpsych.net. glenncaddy@gmail.com; wramlong@theamlongfirm.com |
| **Subject:** | Re: Neuropsych Evaluation |

The file was not attached.


-----Original Message-----
From: Ed Bercaw <edb@medpsych.net>
To: aa737drvr <aa737drvr@aol.com>
Cc: Nathaly Fonseca, Psy.D. <drfonseca@medpsych.net>
Sent: Fri, Apr 22, 2016 11:38 am
Subject: Neuropsych Evaluation

Good Morning Mr. Patterson,

Sorry for the delay on this report.  We did get the medical records this week and wrapped up the report just today.  A PDF is attached.  I will be available to answer any questions you might have after reviewing this.  I received the authorization to send this to your attorney, which I can do after you have had a chance to read this.  Ultimately, the recommendation is that this should go to review by the FAA, who has a few "in house" neuropsychologist consultants who render an opinion.  They will have the data they need from us, but we are willing to do any follow-up or additional testing that may be required later, which is sometimes the case.

Thank you and best regards,

Ed Bercaw


Edwin Bercaw, Ph.D.
Neuropsychologist
Comprehensive MedPsych Systems, Inc.
(941) 363-0878, ext 2101
(941) 363-0527 fax

Email Confidentiality Notice: This e-mail message (including any attachments) may be confidential and subject to protection under the law, including the Health Insurance Portability and Accountability Act (HIPAA), the Electronic Communications Privacy Act, 18 U.S.C. Statute 2510-2521, and/or the Federal confidentiality rules (42CFR Part 2). This e-mail, and any attachment, is intended solely for the individual or entity to whom it is addressed. If you are not the intended recipient, you are notified that any unauthorized review, dissemination, use, disclosure, distribution, and/or copying of the message(s) is strictly prohibited and may subject you to criminal and/or civil penalties. If you received this transmission in error, please contact the sender immediately by replying to this email and delete all received information (including attachments) from your computer and/or portable electronic device.

# ATTACHMENT 1

**Yasmin Harris**

| | |
|---|---|
| **From:** | Geoffrey Kanter <drk@medpsych.net> |
| **Sent:** | Wednesday, September 26, 2018 5:55 PM |
| **To:** | Kamlong@TheAmlongFirm.com |
| **Cc:** | Lisa Golden; wramlong@theamlongfirm.com; jdaley@theamlongfirm.com; mholt@fisherphillips.com; Ed Bercaw |
| **Subject:** | Re: 2219-00000 PATTERSON, SCOTT vs. American Airlines (WRA/KCA): Registered: Dr. Bercaw email search for Patterson v. American Airlines, Inc. |

NO!! For the last time, we do not have any such emails in our system nor are any emails accessible by my IT staff; I have checked. I am praying that this will be the last communication on this matter. Please cease and desist.

Dr. Geoffrey Kanter
President, CMPS

On Sep 26, 2018, at 5:48 PM, Karen Coolman Amlong <Kamlong@TheAmlongFirm.com> wrote:

 

This is a Registered Email™ message from **Karen Coolman Amlong**.

Dr. Kanter and Ms. Golden:

I am one of the attorneys working on the case about which Yasmin Harris has been communicating with Ms. Kanter.  The emails at issue all were sent and received by Dr. Bercaw using a medpsych.net email address in 2016 (not 2017 or 2018 as stated by Ms. Harris; I just caught the mistake).  Dr. Bercaw has told my partner he has no emails with Mr. Patterson because he no longer is employed by CMPS.  Is it possible that emails from that period are still on your server or some ba[ck] up medium?

We very much appreciate your efforts to try to assist us.  I will contact someone with your IT department directly if you c[an] point me in the right direction and have no objection to me doing so.  Both parties to the litigation (Mr. Patterson and American Airlines) are very eager to establish whether Dr. Bercaw sent Mr. Patterson a copy of his report after forgetting [to] attach it to his initial email sent April 22, 2016.

Thank you.

*Karen Coolman Amlong*

Karen Coolman Amlong
THE AMLONG FIRM
Phone:  (954)-462-1983
eFax: (954)212-8040
kamlong@theamlongfirm.com
<image001.jpg>

# ATTACHMENT 2

500 Northeast Fourth Street, Fort Lauderdale, Fl 33301

Confidentiality Notice:  This e-mail and/or any attachment to it contains, or may contain, privileged and confidential information intended only for the use of the individual(s) named in the e-mail.  If you are not the intended recipient, or th person responsible for delivering it to the intended recipient, please permanently delete it from your computer system a promptly notify me.



# Fax Transmission

**To:**  Amlong & Amlong / Attn. Yasmin

**Fax:**  19544635008

**RE:**  Rodney Scott Patterson

**From:**  Comprehensive MedPsych Systems

**Date:**  7/9/2018 12:27:10 PM PDT

**Pages:**  11

---

**Comments:**

Here is the previous fax sent to Dr. Caddy.

Lisa Golden / Comprehensive MedPsych Systems, Inc.
Medical Records Director
PH: 941/363-0878, ext. 2071
FX: 716/242-3360
Email: lisagolden@medpsych.net

NOTICE: The information contained in this transmission may be privileged and confidential, possibly including patien
t information protected by federal and state privacy laws.  It is intended only for the use of the person(s) named abov
e.  If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or dupli
cation of this communication is strictly prohibited.  Please contact the sender by reply email or telephone at (941) 36
3-0878 and destroy all copies of the original message.  Nothing in this communication represents legal advice or opin
ion unless attributed to an attorney with his or her permission.



EXHIBIT 5
WIT: Bercaw
DATE: 8-16-18
DAWN HILLIER, RMR, CRR

# ATTACHMENT 3

PATTERSON-BERCAW_00142

# - Fax Transmission

**To:**   Glenn Caddy, Ph.D.          **From:**   CMPS - Medical Records

**Fax:**   19547590020              **Date:**   4/25/2016

**RE:**   Rodney Scott Patterson       **Pages:**   9

---

**Comments:**

Please find attached the report requested for the above noted patient.

Lisa Golden / Comprehensive MedPsych Systems, Inc.
Medical Records Director
PH: 941/363-0878, ext. 2071
FX: 941/363-0527
Email: lisagolden@medpsych.net

NOTICE: The information contained in this transmission may be privileged and confidential, possibly including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. Please contact the sender by reply email or telephone at (941) 363-0878 and destroy all copies of the original message. Nothing in this communication represents legal advice or opinion unless attributed to an attorney with his or her permission.

PATTERSON-BERCAW_00143

## Lisa Golden

| | |
|---|---|
| **From:** | Nextiva vFax [notifications@nextivafax.com] |
| **Sent:** | Monday, April 25, 2016 3:56 PM |
| **To:** | SRQ-Fax |
| **Subject:** | Message Sent: 237640599 | 4/25/2016 12:47:25 PM PDT |
| **Attachments:** | 237640599.PDF |

**Delivery Information:**

| | |
|---|---|
| Message #: | 237640599 |
| Status: | Success |
| Sender Name: | CMPS |
| Sender Company: | CMPS |
| Sender Phone: | 941-363-0878 |
| Remote CSID: | 0 |
| Total Pages: | 9 |
| Start Time: | 4/25/2016 12:47:25 PM PDT |
| End Time: | 4/25/2016 12:55:33 PM PDT |
| Duration: | 7 min 35.549 sec |
| Delivery Count: | 1 |

**Recipient List:**
Glenn Caddy, Ph.D. - 19547590020

Click here to view this message online

Delivered by Nextiva vFax...                                   *"When Every Fax is Mission Critical"*

1

PATTERSON-BERCAW_00144

**GLENN R. CADDY, Ph.D., & Associates**

One Financial Plaza, Suite 2010 – 100 Southeast Third Avenue
Fort Lauderdale, FL 33394 - Phone: 954-565-8850 ▪ Fax: 954-759-0020

## AUTHORIZATION FOR RELEASE OF CONFIDENTIAL INFORMATION

The signature below authorizes the physician, hospital, psychologist or any other provider of medical or mental health related services or the provider of other specifically identified services to release the medical or health or other related records of myself or those of my minor child, or ward to Dr. Glenn Ross Caddy & Associates whose address is listed above.

PATIENT NAME: _Rodney Scott Patterson_ DOB: _11/8/67_ SSN ___

PROVIDER OR FACILITY NAME: _Dr Edwin Bercaw_ _Dr Kaufor_

PROVIDER ADDRESS: _Sarasota, FL_

PROVIDER/FACILITY PHONE: ( _941_ )-_363-0878_ FAX:( _941_ ) _363-0527_ — _716-242-33_

I understand that the above patient medical, mental health, school or other record may contain information concerning me or my child's or ward's psychiatric, psychological, drug or alcohol abuse, HIV/Acquired Immune Deficiency Syndrome and/or other related or unrelated conditions or information about school or other functioning. I further understand that with my explicit authorization this information may be further released upon request to any insurance company, health maintenance organization, preferred provider organization, the Federal Medicare, or any other health care payment agency. This information may also be released to any facility to which I am transferred if I so authorize. This authorization will automatically expire one (1) year from the date of my signature. I also may revoke this authorization at any time upon written notice to Glenn R. Caddy, Ph.D. and Associates Records Department. I acknowledge that such revocation will not be effective if Glenn R. Caddy Ph.D. and Associates has already acted in reliance upon this authorization. I hereby release Glenn R. Caddy, Ph.D, and Associates from any liability that may arise as a result of the use of the information released in accordance with this authorization.

DATA REQUESTED: _X_ Entire File; ___ Intake & Discharge Summaries; ___ Testing/Raw Data
_X_ Telephone Consult; ___ School Records; ___ Other (Specify):

_Rodney S Patt_ _4-20-2016_ _____ _____
Patient's Signature          Date          Guardian's Signature          Date

_____ _____ _____ _____
Witness Signature          Date          Released By          Date

TO RECEIVING AGENCY: This information has been disclosed to you from records whose confidentiality is protected. Any further re-disclosure is strictly prohibited. Florida Statutes, Chapter 455, Medical Practice Act, Section 455.241 Provides: "Any health care practitioner licensed pursuant to Chapter 458, 459, 460, 461, 462, 463, 464, 466, or 474 who makes a physical or mental examination of, or administers treatment to, any person shall, upon request of such person or his legal representative, furnish copies of all reports made of such examination or treatment ... The furnishing of such copies shall not be conditioned upon payment of a disputed fee for services rendered. Such records shall not be furnished to any person other than the patient or his legal representative, except upon written authorization of the patient. However, such records may be furnished without written authorization to any person, firm, or corporation which has procured or furnished such examination or treatment with the patient's consent or when compulsory physical examination is made pursuant to rule 1.360, Florida Rules of Civil Procedure, in which case copies of the medical records shall be furnished to both the defendant and the plaintiff."

PATTERSON-BERCAW_00145

# Comprehensive MedPsych Systems, Inc.

## Neuropsychological Evaluation

Geoffrey Kanter, Ph.D., ABN, ABPdN
President
American Board of Professional Neuropsychology
American Board of Pediatric Neuropsychology

Scott Kanter, MSA
Chief Financial Officer

Robert Stephenson, Psy.D.
Chief Operating Officer

John Meyers, Psy.D., ABN, ABPdN
Clinical Director
American Board of Professional Neuropsychology
American Board of Pediatric Neuropsychology

FLORIDA- Sarasota

NEUROPSYCHOLOGY

Nancy Parsons, Ph.D., ABPdN
American Board of Pediatric Neuropsychology
Paula Cooper, Ph.D., ABN
American Board of Professional Neuropsychology
Edwin L. Bercaw, Ph.D.
Kathy Baum, Ph.D.
Maryla Madura, Ph.D.
Jennifer Fleeman, Psy.D.
Hollie Dean Hill, Psy.D.
Nathaly Fonseca, Psy.D., Resident
Viviana Figueroa Bernier, Psy.D., Resident
Casey Dawson, Ph.D., Resident

PSYCHIATRY (Board Certified)

Diane Miller, M.D., ABPN
Steven Cohen, D.O., ABPN
Abdul Nadeem, M.D., ABPN
Kristine Vallrugo, M.D., ABPN
Jordana Holler, M.D., ABPN
Mark Sylvester, M.D., ABPN, ABAM
Nicholas McKinnon, M.D., ABPN

PSYCHOLOGY

Wendy Sims, Ph.D.
Claudia Zeigmond, Psy.D.
Linda Brant, Ph.D.
Patricia Ryan, Ph.D.

PSYCHOTHERAPY

Raymond Rottman, D.Pss, LCSW
Janet Carbon, LCSW
Kenton Kauffman, LCSW
Catherine Luckner, LMHC
Gerald Rivera, LCSW
Marlene Larose, LMFT
Jennifer Barmush, LCSW
Patricia Musselwhite-Weaver, LMHC
Alan Vieira, LCSW
Doug Lindor, LMHC, CAP

Florida
Sarasota
Venice
Lakewood Ranch
Bradenton
North Port
Sun City Center
Port Charlotte
Tampa
St. Petersburg
St. Augustine
Ft. Myers

Alabama
Mobile
Fairhope

Indiana
Indianapolis

**Name: Rodney Scott Patterson**
Date of Birth (Age): 11/08/1967 (48)
PI# 2242312
APP ID# 1995161311
Date of Evaluation: 3/21/2016

## Reason for Referral

Rodney Scott Patterson is a 48-year-old, right-handed, Caucasian man self-referred for a second opinion neuropsychological evaluation after he was mandated by his employer, American Airlines, to undergo a fitness for duty evaluation with Dr. John Knippa. Background information and history of presenting problems were obtained from a clinical interview with Mr. Patterson, as well as a review of FAA medical records received directly from the Aerospace Medical Certification Division.

## History of Presenting Problems

Mr. Patterson is a first officer pilot for American Airlines where he has worked for 16 years. He also serves as a Lieutenant Colonel in the U.S. Army Reserve and has 28 years of military experience. In September 2015, he requested to be released from employment for a military obligation. Rather than simply releasing him as required by federal law, Mr. Patterson reported he was suspended from American on 9/22/15 and was placed on paid but withheld status on 9/25/15 due to work-related complaints.

There was a Section 21 disciplinary hearing on 11/23/15 after complaints about his behavior surfaced following the request for military leave. Mr. Patterson explained he was accused of using derogatory terms towards a coworker; however, this accusation was reportedly not corroborated by the other pilot. Mr. Patterson also reported a work-related incident in 2014 during a flight to Paraguay. He reported having a disagreement with one of the flight attendants regarding placement of his wife's luggage, which he finally placed in the cabinet himself. The captain ordered Mr. Patterson off the bus when they landed because of the altercation earlier, and he had to take a taxi. Mr. Patterson was later accused of taking a picture of the flight attendant. The flight attendant reportedly wrote a letter to his

1090 South Tamiami Trail, Sarasota, Florida 34236
941.363.0878 (office) • 941.363.0527 (fax)
www.medpsych.net

PATTERSON-BERCAW_00146

supervisor regarding these incidents and Mr. Patterson believed the captain allowed the flight attendant to complain. There were also allegations that Mr. Patterson had attempted to smuggle illegal items. In response to these allegations of misconduct, Mr. Patterson met with the captain of professional standards to discuss this issue and agreed to be on a "do not pair" list with that captain. There were reportedly no grounds for action against him in the Section 21 hearing.

In January 2016, there was a Section 20 interrogatory hearing. According to Mr. Patterson, despite there being no issues raised by the Section 21 hearing, he was ordered to have a mental health exam, which he recently completed with Dr. John Knippa on 3/15/16 and 3/16/16. Mr. Patterson denied experiencing any cognitive changes or psychological problems. With respect to his mood, he denied experiencing significant emotional distress; however, he identified his recent suspension from work as a source of stress. He also reported waking up at night with racing thoughts regarding his job and noted getting approximately seven hours of sleep. He denied appetite changes and described his energy level as appropriate. At this point, he would like to put this situation to rest and return to work.

Per FAA medical records, Dr. Martin Dayton found Mr. Patterson capable of flying as a commercial airline pilot on 1/12/16 and noted his medical treatment should in no way affect his mental or cognitive abilities. Per records, on 3/2/16, he was granted authorization for special issuance of a medical certificate, which expires 1/31/17.

## Background Information

**Medical History**: He reported relatively good health. He had a previous diagnosis of sarcoma for which he underwent surgery in February 2015. Following this surgery he participated in alternative care for a couple of weeks in Mexico. His cancer is currently in remission. He also had a foot fracture in 2015 that healed normally. There is no known history of brain injury, stroke, or seizure disorder.

**Medications**: He is prescribed melatonin, which he takes as needed.

**Psychiatric & Substance Abuse History**: He denied history of psychiatric treatment or psychotherapy. He reported that given his involvement with the military he has undergone several psychological evaluations, all of which have been unremarkable. He endorsed only minimal alcohol use currently. He noted that following his cancer diagnosis he became more conscientious of his diet and refrains from alcohol consumption. History of substance abuse or drug use was denied.

**Developmental, Educational & Vocational History**: Mr. Patterson was born and raised in Charleston, North Carolina. He was mainly raised by his mother, until the age of nine, when she remarried. He then moved in with his maternal grandmother and lived there until he left for college. He denied history of developmental delays or learning disabilities. His school performance was described as average to above average according to the subject area. He earned a bachelor's degree with a double major in business administration and psychology and a master's degree in strategic studies. He joined the Army in 1987 and initially worked in artillery and as a paratrooper and later became a Lieutenant Colonel. He was in active duty for six years and has been in the Army Reserve since then. He worked as a police officer for three years

PATTERSON-BERCAW_00147

immediately after college. Subsequently, he trained as a pilot and worked at Mesa Airlines (1997-2000) where he was the director of pilot recruiting. He has worked for American Airlines for 16 years. Mr. Patterson denied any work-related infractions or issues in the military.

**Social & Family History**: Mr. Patterson has been married for 26 years and has two children. He reported good support consisting of family and friends. Familial medical history was unremarkable.

## Behavioral Observations

Mr. Patterson arrived 45 minutes late to the appointment. He flew himself into a local airport with his two children. He was apologetic and explained there was a delay in landing at the airport. Grooming, dress, and overall appearance were appropriate. He had a pleasant demeanor and was cooperative. There were no abnormalities of gait observed. His vision was adequate with prescription glasses and his hearing was also appropriate. He was fully oriented and his general mental status appeared normal. His speech was fluent and normal in rate, tone, and prosody. Comprehension was intact. He was alert and his thought processes were clear, without any evidence of disorganized or delusional thinking, and reflective of normal judgment, insight, and recall of personal history. His affect was euthymic and congruent with reported mood. He appeared to put forth good effort. He denied pain or discomfort; however, he reported mild fatigue towards the end of day.

## Procedures Administered
*indicates pilot norms were used from Kay, 2002

Clinical Interview
CogScreen-Aeromedical Edition
Integrated Visual and Auditory Continuous Performance Test (IVA+)
Wechsler Adult Intelligence Scale-IV (WAIS-IV)
Meyers Neuropsychological Battery (MNB) Selected Tests
    Taylor Complex Figure Test, Animal Naming, Controlled Oral Word Association Test,
    Auditory Verbal Learning Test, Finger Tapping Test*, Trail Making Test (TMT)*
Wisconsin Card Sorting test (WCST)*
Grooved Pegboard Test (Heaton et al., 2004 norms)
Paced Auditory Serial Addition Test-100 (PASAT)*
Stroop Color and Word Test (Golden, 1978)
Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

## Assessment Results

*__T-Scores__ are reported using the following descriptors, with the exception of WAIS-IV Index scores where conventional Wechsler ranges are used and capitalized (e.g., 90-109: Average).*

| | |
|---|---|
| *55 or higher: above average* | *30-34: mildly-to-moderately impaired* |
| *45-54: average* | *25-29: moderately impaired* |
| *40-44: below average* | *20-24: moderately-to-severely impaired* |
| *35-39: mildly impaired* | *19 or lower: severely impaired* |

3

PATTERSON-BERCAW_00148

**Effort & Validity**: Embedded validity checks within the test battery were passed, consistent with full effort on cognitive tests. However, his performance on the verbal memory domain may have been affected by fatigue, such as he noted feeling tired towards the end of the day. Additionally, it should be noted that Mr. Patterson completed a similar neuropsychological evaluation within a week of this evaluation; hence, there is the possibility of practice effects on some of the tests administered. However, alternate forms were used when possible (e.g., AVLT Form B, Taylor Figure, and CogScreen Session 2). There were no indications of overreporting; however, there was evidence of moderate defensiveness of personal shortcomings on the MMPI-2. Results were considered interpretable with caution.

**CogScreen**: The LRPV (Logistic Regression Estimated Probability of Brain Dysfunction) was 0.0432. This classifies him as having a low probability of brain dysfunction.

In comparison to a major U.S. carrier pilot group (ages 45-49), his speed of performance appeared average with three scores falling at or below the 15th percentile and two scores falling at or below the 5th percentile.

In terms of accuracy, his performance was average, with two scores falling at or below the 15th percentile. There were no scores falling at or below the 5th percentile.

Thruput scores (i.e., balance of speed and accuracy) appeared average with three scores falling at or below the 15th percentile and one score at or below the 5th percentile. Process scores were also average with two scores falling at or below the 15th percentile and one score falling at or below the 5th percentile.

Individual scores showed a weakness in math speed (but with above average accuracy), letter sequencing speed (but above average accuracy), visual attention and working memory, deductive reasoning, and mental flexibility.

The Taylor Aviation Factor Scores represent CogScreen factors identified as relevant to pilot-related tasks and validated with simulator performance. Mr. Patterson showed mildly-to-moderately impaired deductive reasoning, but above average motor coordination and visual learning and recall. Visual and psychomotor tracking accuracy was average. Cognitive speed and working memory, the most powerful predictor of overall flight performance, was average.

| Factor | T-Score |
|---|---|
| Attribute Identification | 33.02 |
| Motor Coordination | 55.69 |
| Visual Association Memory | 58.92 |
| Speed/Working Memory | 48.44 |
| Tracking | 53.84 |

**Global Cognitive Functioning**: Performance across all conventional neuropsychological tests (i.e., excluding CogScreen) was in the average range overall (Overall Test Battery Mean= 49), which is below his expected level based on his estimated premorbid level of functioning.

**Intellectual Functioning**: Intellectual aptitude as assessed by the WAIS-IV was in the High Average range (FSIQ = 116). There were no differences between his verbal comprehension,

4

PATTERSON-BERCAW_00149

perceptual reasoning, working memory, or processing speed, all of which were in the High Average range.

**Attention & Working Memory**: Performance in the domain of attention and working memory was in the average range (Domain T= 51). Performance on measures of working memory was High Average (WAIS-IV Working Memory Index= 117).

Maximum digit span was within expectations (8 digits). Initial recall of a 15-item word list was average (6 words). Focused attention in generating words that belong to a category (i.e., animals) was average. Sequencing of digits in forward, backward, and numerical sequence was above average. WAIS-IV mental arithmetic was also above average. Working memory on a paced serial addition task was above average.

Sustained attention on the IVA+ continuous performance test was below average for auditory attention to auditory targets and mildly impaired for visual targets. He displayed difficulty with sustained attention particularly to auditory stimuli and distractibility for both visual and auditory modalities. His response control throughout the test was mildly impaired for auditory targets and average for visual targets. In addition to variable reaction times, he also exhibited mildly impulsive responding to auditory foils.

**Processing Speed & Cognitive Flexibility**: The domain of processing speed and cognitive flexibility was significantly variable (Domain T= 46). The WAIS-IV Processing Speed Index was High Average (PSI= 111).

Information processing speed on a digit-symbol substitution task was in the average range. Symbol search was in the above average range. Resistance to the effects of interference on the Stroop task was above average. Visual scanning and sequencing on a visual-motor task (TMT Part A) was in the above average range. Cognitive flexibility in shifting between two sequences on TMT Part B (i.e., numbers and letters) was also above average in time to completion. In contrast to these normal range scores, the number of perseverative responses made during the WCST was severely impaired compared to pilot norms.

**Language & Verbal Reasoning**: The domain of language and verbal reasoning was average (Domain T= 52). The WAIS-IV Verbal Comprehension Index was High Average (VCI= 110).

Naming of visual objects on the Boston Naming Test was average. Fluency on a test of generating words beginning with a certain letter (i.e., F-A-S) was below average. Vocabulary was found to be average. His fund of general declarative knowledge was above average. Verbal reasoning on the Similarities test was average.

**Visual Reasoning**: Visual reasoning was average (Domain T= 52). The WAIS-IV Perceptual Reasoning Index was High Average (PRI= 115).

Construction of match-to-sample block designs was above average. Nonverbal logical reasoning of patterns on Matrix Reasoning was average. Visual synthesis and mental rotation on the Visual Puzzles test was above average. Copy of a complex figure was average. Total errors made during the WCST was mildly-to-moderately impaired, though he completed all 6 categories.

PATTERSON-BERCAW_00150

**Verbal Memory**: Verbal memory performance was mildly-to-moderately impaired (Domain T= 33).

Acquisition of a 15-item word list across five trials was mildly-to-moderately impaired in total number of words recalled. He recalled 6, 6, 6, 7, and 7 words each trial. His recall of the list after a brief delay with interference was also mildly-to-moderately impaired (5 words recalled). Recall after a 30-minute delay was moderately impaired (4 words recalled). Discrimination of list words from non-list words on the recognition trial was below average (13 words correctly recognized; 5 false positive errors).

**Visual Memory**: Visual memory performance was above average (Domain T= 61).

Free recall of the complex figure was above average after a short delay. His reproduction of the figure after a 30-minute delay was also in the above average range. Recognition performance was average (21/24 correct).

**Motor**: Manual motor skills were within normal limits (Dominant Hand T= 53; Non-Dominant T= 50), with no lateralized differences.

Finger tapping speed was in the average range using both his dominant (right) and nondominant hand. Manual motor speed and dexterity on the Grooved Pegboard Test was average, bilaterally.

**Executive Functions**: Performance was average on measures within the battery tapping executive functions (Domain T= 49). He exhibited above average visual-spatial reasoning and mental flexibility and average verbal reasoning, visual response control, and visuoconstructional planning/organization. However, he demonstrated impaired problem-solving in response to feedback and inconsistent response times on the continuous performance task.

**Psychological Assessment**: Mr. Patterson completed the MMPI-2, an objective measure of psychological and personality functioning. He responded consistently to item content and there was no evidence of exaggeration of problems. There was however, an indication of an overly positive self-presentation and moderate defensiveness of personal shortcomings, such as he may have minimized psychological and behavioral difficulties. There was no denial of moral flaws and the pattern of validity scales did not provide strong evidence of response bias given the context of the evaluation. The resulting MMPI-2 profile was deemed interpretable, but with caution, as potential difficulties may be underestimated or go undetected.

On the MMPI-2, his response pattern indicated he is sociable and extroverted. He appears to be psychologically well adjusted and capable of coping with problems. There were no indications of personality disorder, mood disorder, or substance abuse problems.

## Interpretation & Recommendations

Mr. Patterson's neuropsychological profile indicates high average intellectual functioning but with overall performance within the average range. He scored well on the CogScreen and produced a low LRPV (consistent with a low likelihood of brain dysfunction). Although his cognitive profile was predominantly within normal limits, there were a few areas of lower than

PATTERSON-BERCAW_00151

expected performance that may be of aeromedical significance, in the areas of deductive reasoning and sustained attention. His scores also suggested insufficient learning and poor recall of information presented verbally. It is possible that he is experiencing difficulties with verbal memory; however, his scores may have also been affected by fatigue. He specifically noted feeling tired when this test was administered towards the end of the long evaluation day.

The findings are not necessarily clinically significant at this time, in the context of his otherwise average to above average performance on tests of visual memory, auditory attention, working memory, language, psychomotor processing speed, motor functioning, and visual-spatial reasoning. The clinical recommendation is that he have neuropsychological testing in six months to help determine the reliability and significance of the aforementioned findings.

Assessment of his psychological functioning indicated he is not reporting emotional distress or other indications of psychopathology. He appears well adjusted and to have high self-efficacy. He was motivated to present himself favorably. This is not unexpected given the employment context prompting this self-referral. There was nothing in his medical records to indicate the presence of a disqualifying mental condition, and no records of formal complaints about his behavior were included for review.

With respect to his airman medical certification, there are several positive cognitive and psychological attributes identified by the testing, as indicated above. His overall performance on the CogScreen was within normal limits, which is favorable; however, his scores evidenced mildly-to-moderately impaired deductive reasoning in comparison to aviators. The deductive reasoning finding was later replicated with the WCST, a similar task. These findings raise concern about how adaptable or flexible he is to feedback about his performance. This quality is potentially critical to flight performance, particularly in non-routine situations. Therefore, further review of these data by an FAA neuropsychologist is recommended to determine the aeromedical significance to piloting skills. A comparison of these results with his previous fitness-for-duty neuropsychological evaluation may also be helpful, as this was not available to us.

It has been a pleasure to provide this evaluation for Mr. Patterson. We may be reached at (941) 363-0878 for further consultation on this case.

_Ed Bercaw, PH.D._

_____
Edwin L. Bercaw, Ph.D.
Licensed Psychologist/Neuropsychologist
FL License Number: PY 7991
CogScreen Provider & HIMS Trained

_N Fonseca, Psy.D._

_____
Nathaly Fonseca, Psy.D.
Post-Doctoral Neuropsychology Resident
FL License Number: PY 9471

7

PATTERSON-BERCAW_00152

Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
            CASE NO.:  1:17-cv-60533-MARTINEZ/OTAZO-REYES
3

4

5    RODNEY SCOTT PATTERSON,
6             Plaintiff,
7    vs.
8    AMERICAN AIRLINES, INC., a Delaware
     Corporation,
9
              Defendant.
10   _____/
11
12                        Amlong & Amlong, P.A.
                          500 Northeast 4th Street
13                        Second Floor
                          Fort Lauderdale, Florida 33301
14                        Thursday, June 7, 2018
                          1:19 p.m. - 3:48 p.m.
15
16
17        VIDEOTAPED DEPOSITION OF GLENN R. CADDY, Ph.D.
18
19
20
21           Taken on behalf of the Defendant before
22   Christine Savoureux-Mariner, Florida Professional
23   Reporter and Notary Public in and for the State
24   of Florida at Large, pursuant to Notice of Taking
25   Deposition in the above cause.

ATTACHMENT 4

1          reporter to mark the Notice of Deposition as

2          Exhibit 1, and I'll hand a copy to counsel.

3               (The referred-to document was marked for

4     identification as Defendant's Exhibit 1.)

5     BY MR. HOLT:

6          Q    Dr. Caddy, have you seen Exhibit 1 before?

7          A    No.

8          Q    I'd like you to take a look page 3 of

9     Exhibit 1, which identifies documents to bring with you

10    to this deposition.  Have you brought any documents

11    today in response to page 3 of Exhibit 1?

12         A    "Any and all reports and opinions prepared by

13    you in this case."  Essentially, in my head, and there

14    are some documents that address that, but I haven't

15    prepared a specific forensic report.

16         Q    We do have a copy of the expert disclosures,

17    so just to be clear, I'm only looking for documents

18    outside of the expert disclosures.

19         A    Okay.  "Any and all materials relied on" -- I

20    brought materials.  "Any and all materials considered in

21    any manner, whether or not you relied on objective" --

22    yes, number 3.

23               Number 4, "all communications with Edwin

24    Bercaw, including any persons, and Dr. Bercaw's office

25    regarding Plaintiff Rodney Scott Patterson."  As to

1    number 4, there is no document that I have.  I do have a

2    memory of communicating with Dr. Bercaw.

3         Q    Okay.  And we will talk a little bit about

4    that --

5         A    Okay.

6         Q    -- a little bit later.

7              MR. HOLT:  For the documents that you did

8         bring with you, in addition to the experts

9         disclosures in this case, Counsel, can we arrange,

10        after this deposition is over, for me to get a copy

11        of those?

12             MR. AMLONG:  Sure.

13             MR. HOLT:  Rather than taking the deposition

14        time, and your valuable time, Dr. Caddy.

15             THE WITNESS:  Just for clarity's sake, are we

16        including this?

17             MR. HOLT:  I have a copy of that and I'm about

18        to show you a copy of that right now --

19             THE WITNESS:  Okay, fine.

20             MR. HOLT:  -- so I think you've --

21             THE WITNESS:  Yes.

22             MR. HOLT:  -- pre-anticipated -- that's

23        redundant.  You've anticipated my line of

24        questioning.

25             Madame Court Reporter, I would like to mark

**Yasmin Harris**

| | |
|---|---|
| **From:** | Scott <aa737drvr@aol.com> |
| **Sent:** | Friday, April 22, 2016 12:49 PM |
| **To:** | edb@medpsych.net |
| **Cc:** | drfonseca@medpsych.net; glenncaddy@gmail.com; wramlong@theamlongfirm.com |
| **Subject:** | Re: Neuropsych Evaluation |

Dr. Bercaw

Per our conversation on 21 MAR, you advised me that you would not release any information without my specific approval.
I am having a conflict with American Airlines that has required me to retain counsel and all communications with American Airlines or the Federal Aviation Administration should go through my attorney, Mr. William Amlong, Esq cc line.

Mr Amlong has hired Dr Glenn Caddy to undertake a comprehensive examination of all of the matters dealing with my case. I have authorized Dr. Caddy to both speak with you and obtain a copy of your report together with a copy of your entire file in this matter. I have also requested Dr. Caddy to set up a time to speak with you telephonically and was speaking with Dr. Caddy only a half hour ago. He advised he left a message with your company and would like for you to call him to discuss all of your findings.

Dr. Caddy will arrange to pay you for your time in this matter. Please discuss your fee with him.

At the moment I am rescinding any authorization for you to send my records anywhere other than to Dr. Caddy, specifically those authorizations entitled Federal Aviation Administration or Aviation Medical Examiner are at this time rescinded.

v/r

Scott Patterson
704-231-0909


-----Original Message-----
From: Ed Bercaw <edb@medpsych.net>
To: aa737drvr <aa737drvr@aol.com>
Cc: Nathaly Fonseca, Psy.D. <drfonseca@medpsych.net>
Sent: Fri, Apr 22, 2016 11:38 am
Subject: Neuropsych Evaluation

Good Morning Mr. Patterson,

Sorry for the delay on this report. We did get the medical records this week and wrapped up the report just today. A PDF is attached. I will be available to answer any questions you might have after reviewing this. I received the authorization to send this to your attorney, which I can do after you have had a chance to read this. Ultimately, the recommendation is that this should go to review by the FAA, who has a few "in house" neuropsychologist consultants who render an opinion. They will have the data they need from us, but we are willing to do any follow-up or additional testing that may be required later, which is sometimes the case.

Thank you and best regards,

Ed Bercaw

# ATTACHMENT 5

Edwin Bercaw, Ph.D.
Neuropsychologist
Comprehensive MedPsych Systems, Inc.
(941) 363-0878, ext 2101
(941) 363-0527 fax

Email Confidentiality Notice: This e-mail message (including any attachments) may be confidential and subject to protection under the law, including the Health Insurance Portability and Accountability Act (HIPAA), the Electronic Communications Privacy Act, 18 U.S.C. Statute 2510-2521, and/or the Federal confidentiality rules (42CFR Part 2). This e-mail, and any attachment, is intended solely for the individual or entity to whom it is addressed. If you are not the intended recipient, you are notified that any unauthorized review, dissemination, use, disclosure, distribution, and/or copying of the message(s) is strictly prohibited and may subject you to criminal and/or civil penalties. If you received this transmission in error, please contact the sender immediately by replying to this email and delete all received information (including attachments) from your computer and/or portable electronic device.

Patterson00665

Scott Patterson

-----Original Message-----
From: Scott <aa737drvr@aol.com>
To: glenncaddy <glenncaddy@gmail.com>
Sent: Tue, Apr 26, 2016 10:52 pm
Subject: Re: Invoice

I just popped open the invoice,  after reviewing the invoice I wasn't aware we were going to be running into this much expense.

I have asked a couple times when the report was going to be complete and a couple more days was the answer. I feel I have provided adequate information to complete an evaluation even putting it into copy so you could copy and paste.

I am genuinely concerned that American Airlines is going balk at your lack of HIMS certification. The FAA will also not accept your report without HIMS certification.  Trisha Kennedy asked this specific question the other day on the phone before we disconnected.

Dr. Bercaw's report which is lacking and very weak needs to be re-done, but he is HIMS certified.  I didn't compensate him for a report and work to be done by a resident.  Although we might succeed in Federal Court with the nature of your report which is the goal.

I still haven't even gotten you to testify in court and I may not be reimbursed by American for this expense either.

I need to carefully evaluate the planned course of action here.  Can you provide me a timeframe of what you need to complete this report.  I am limited by how much I can spend.  I am going to have to to secure funds from my my mortgage if this goes on much further.

v/r

Patterson00666

SP

-----Original Message-----
From: Glenn Ross Caddy Ph.D. <glenn.caddy@gmail.com>
To: Rodney Scott Patterson <aa737drvr@aol.com>
Sent: Tue, Apr 26, 2016 2:52 pm
Subject: Invoice

Patterson00667

**Yasmin Harris**

| | |
|---|---|
| **From:** | Scott <aa737drvr@aol.com> |
| **Sent:** | Wednesday, April 27, 2016 12:33 AM |
| **To:** | wramlong@theamlongfirm.com; glenncaddy@gmail.com |
| **Subject:** | My concern |

Bill/Dr. Caddy

Please find the copy and paste from the FAA regarding Neuropsychological Evaluations.  Getting paid will be only one facet keeping my medical is another area with the FAA.

I am deeply concerned that American's defense will be.  Dr. Caddy is not HIMS trained and therefore is not qualified to render an evaluation on this particular case.

I am confident that Dr. Caddy has done some great work,  I would not want to see our star witness impeached by a weekend class.  I feel strongly that we need to include a HIMS trained neuro psychologist in our process.

**THE NEUROPSYCHOLOGICAL EVALUATION**

**Who may perform a neuropsychological evaluation?** Neuropsychological evaluations must be conducted by a licensed clinical psychologist who is either board certified or board eligible in clinical neuropsychology. Board eligible means that the clinical neuropsychologist has the education, training, and clinical practice experience that would qualify him or her to sit for board certification with the American Board of Clinical Neuropsychology, the American Board of Professional Neuropsychology, and/or the American Board of Pediatric Neuropsychology. *The clinical neuropsychologist also must have completed HIMS training*.

1

# Comprehensive MedPsych Systems, Inc.

Geoffrey Kanter, Ph.D., ABN, ABPdN
*President*
American Board of Professional Neuropsychology
American Board of Pediatric Neuropsychology

Scott Kanter, MSA
*Chief Financial Officer*

Robert Stephenson, Psy.D.
*Chief Operating Officer*

John Meyers, Psy.D., ABN, ABPdN
*Clinical Director*
American Board of Professional Neuropsychology
American Board of Pediatric Neuropsychology

## FLORIDA- Sarasota

### NEUROPSYCHOLOGY

Nancy Parsons, Ph.D., ABPdN
American Board of Pediatric Neuropsychology
Paula Cooper, Ph.D., ABN
American Board of Professional Neuropsychology
Edwin L. Bercaw, Ph.D.
Kathy Baum, Ph.D.
Maryla Madura, Ph.D.
Jennifer Fleeman, Psy.D.
Hollie Dean Hill, Psy.D.
Nathaly Fonseca, Psy.D., Resident
Viviana Figueroa Bernier, Psy.D., Resident
Casey Dawson, Ph.D., Resident

### PSYCHIATRY *(Board Certified)*

Diane Miller, M.D., ABPN
Steven Cohen, D.O., ABPN
Abdul Nadeem, M.D., ABPN
Kristine Vallrugo, M.D., ABPN
Jordana Hollon, M.D., ABPN
Mark Sylvester, M.D., ABPN, ABAM
Nicholas McKinnon, M.D.,ABPN

### PSYCHOLOGY

Wendy Sims, Ph.D.
Claudia Zeigmond, Psy.D.
Linda Brant, Ph.D.
Patricia Ryan, Ph.D.

### PSYCHOTHERAPY

Raymond Roitman, D.Psa, LCSW
Janet Carlson, LCSW
Kenton Kauffman, LCSW
Catherine Luckner, LMHC
Gerald Rivera, LCSW
Marlene Larose, LMFT
Jennifer Barnash, LCSW
Patricia Musselwhite-Weaver, LMHC
Alan Vieira, LCSW
Doug Linder, LMHC, CAP

Florida
Sarasota
Venice
Lakewood Ranch
Bradenton
North Port
Sun City Center
Port Charlotte
Tampa
St. Petersburg
St. Augustine
Ft. Myers

Alabama
Mobile
Fairhope

Indiana
Indianapolis

May 6, 2016

Glenn Ross Caddy Ph.D., A.B.P.P., F.A.P.A.
Clinical, Health and Forensic Psychology
100 S.E. Third Avenue, Suite 2010
Fort Lauderdale, 33394

Dr. Caddy,

I am writing to provide further clarification based on the evaluation that Dr. Fonseca and I performed of Rodney Scott Patterson on 3/21/16. As was discussed in our telephone consultation this morning, I found no certain evidence of a disqualifying mental or neurological condition for first-class medical certification as defined by Federal Aviation Regulations Part 67.107 and 67.109. To the best of my knowledge, he has no history of flight infractions or safety violations. He has years of experience and, indeed, may be an excellent pilot, as you seem to have confirmed through collateral reports on his performance. Finally, there was no substantiated history I had available to indicate he has a personality disorder that has repeatedly manifested itself by overt acts.

The neuropsychological testing is not intended to assess piloting skills, abilities, or knowledge. The purpose of neuropsychological testing is to help determine the appropriateness of medical certification by examining underlying cognitive abilities and psychological features that may impact flight safety. This is a different kind of information than that achieved through job performance evaluations or flight simulator performance.

The findings in our evaluation were generally positive, with a passing CogScreen (which is a validated battery of tests specifically designed to evaluate cognitive functioning in pilots). He also exhibited high average intellectual functioning, and his attention, processing speed, language,

# ATTACHMENT 6

PATTERSON-BERCAW_00153

visual-spatial, visual memory, and motor scores were generally consistent with expectations. However, there were two particular areas of concern that do not necessarily disqualify him but warrant further review and possibly retesting.  Specifically, his verbal learning and memory was below expectations and there was an indication of impairment in an aspect of executive functioning.  The aeromedical significance of these findings was uncertain in the context of the larger evaluation and his professional and military history.  Therefore, the recommendation is that there be further review by an FAA neuropsychology consultant and a comparison with his concurrent fitness-for-duty evaluation ordered by American Airlines to help determine the reliability of these results.  Repeat testing of specific domains may be required, if indicated after review.

Again, it would be inappropriately speculative to infer a cause for the findings at this time, as there is no known psychiatric or neurological condition identified as of now.


Best Regards,

*Ed Bercaw, PH.D.*

_____
Edwin L. Bercaw, Ph.D.
Neuropsychologist/Florida Licensed Psychologist PY 7991
CogScreen Provider & HIMS Trained

2

PATTERSON-BERCAW_00154

# Comprehensive MedPsych Systems, Inc.



## Neuropsychological Evaluation

Geoffrey Kanter, Ph.D., ABN, ABPdN
*President*
American Board of Professional Neuropsychology
American Board of Pediatric Neuropsychology

Scott Kanter, MSA
*Chief Financial Officer*

Robert Stephenson, Psy.D.
*Chief Operating Officer*

John Meyers, Psy.D., ABN, ABPdN
*Clinical Director*
American Board of Professional Neuropsychology
American Board of Pediatric Neuropsychology

FLORIDA- Sarasota

*NEUROPSYCHOLOGY*

Nancy Parsons, Ph.D., ABPdN
American Board of Pediatric Neuropsychology
Paula Cooper, Ph.D., ABN
American Board of Professional Neuropsychology
Edwin L. Bercaw, Ph.D.
Kathy Baum, Ph.D.
Maryla Madura, Ph.D.
Jennifer Fleeman, Psy.D.
Hollie Dean Hill, Psy.D.
Nathaly Fonseca, Psy.D., Resident
Viviana Figueroa Bernier, Psy.D., Resident
Casey Dawson, Ph.D., Resident

*PSYCHIATRY* (*Board Certified*)

Diane Miller, M.D., ABPN
Steven Cohen, D.O., ABPN
Abdul Nadeem, M.D., ABPN
Kristine Vallrugo, M.D., ABPN
Jordana Hollen, M.D., ABPN
Mark Sylvester, M.D., ABPN, ABAM
Nicholas McKinnon, M.D.,ABPN

*PSYCHOLOGY*

Wendy Sims, Ph.D.
Claudia Zsigmond, Psy.D.
Linda Brant, Ph.D.
Patricia Ryan, Ph.D.

*PSYCHOTHERAPY*

Raymond Roitman, D.Psa, LCSW
Janet Carlson, LCSW
Kenton Kauffman, LCSW
Catherine Luckner, LMHC
Gerald Rivera, LCSW
Marlene Larose, LMFT
Jennifer Barmash, LCSW
Patricia Musselwhite-Weaver, LMHC
Alan Vieira, LCSW
Doug Linder, LMHC, CAP

Florida
Sarasota
Venice
Lakewood Ranch
Bradenton
North Port
Sun City Center
Port Charlotte
Tampa
St. Petersburg
St. Augustine
Ft. Myers

Alabama
Mobile
Fairhope

Indiana
Indianapolis

Name: **Rodney Scott Patterson**
Date of Birth (Age): 11/08/1967 (48)
PI# 2242312
APP ID# 1995161311
Date of Evaluation: 3/21/2016

## Reason for Referral

Rodney Scott Patterson is a 48-year-old, right-handed, Caucasian man self-referred for a second opinion neuropsychological evaluation after he was mandated by his employer, American Airlines, to undergo a fitness for duty evaluation with Dr. John Knippa. Background information and history of presenting problems were obtained from a clinical interview with Mr. Patterson, as well as a review of FAA medical records received directly from the Aerospace Medical Certification Division.

## History of Presenting Problems

Mr. Patterson is a first officer pilot for American Airlines where he has worked for 16 years. He also serves as a Lieutenant Colonel in the U.S. Army Reserve and has 28 years of military experience. In September 2015, he requested to be released from employment for a military obligation. Rather than simply releasing him as required by federal law, Mr. Patterson reported he was suspended from American on 9/22/15 and was placed on paid but withheld status on 9/25/15 due to work-related complaints.

There was a Section 21 disciplinary hearing on 11/23/15 after complaints about his behavior surfaced following the request for military leave. Mr. Patterson explained he was accused of using derogatory terms towards a coworker; however, this accusation was reportedly not corroborated by the other pilot. Mr. Patterson also reported a work-related incident in 2014 during a flight to Paraguay. He reported having a disagreement with one of the flight attendants regarding placement of his wife's luggage, which he finally placed in the cabinet himself. The captain ordered Mr. Patterson off the bus when they landed because of the altercation earlier, and he had to take a taxi. Mr. Patterson was later accused of taking a picture of the flight attendant. The flight attendant reportedly wrote a letter to his

PATTERSON-BERCAW_00155

supervisor regarding these incidents and Mr. Patterson believed the captain allowed the flight attendant to complain. There were also allegations that Mr. Patterson had attempted to smuggle illegal items. In response to these allegations of misconduct, Mr. Patterson met with the captain of professional standards to discuss this issue and agreed to be on a "do not pair" list with that captain. There were reportedly no grounds for action against him in the Section 21 hearing.

In January 2016, there was a Section 20 interrogatory hearing. According to Mr. Patterson, despite there being no issues raised by the Section 21 hearing, he was ordered to have a mental health exam, which he recently completed with Dr. John Knippa on 3/15/16 and 3/16/16. Mr. Patterson denied experiencing any cognitive changes or psychological problems. With respect to his mood, he denied experiencing significant emotional distress; however, he identified his recent suspension from work as a source of stress. He also reported waking up at night with racing thoughts regarding his job and noted getting approximately seven hours of sleep. He denied appetite changes and described his energy level as appropriate. At this point, he would like to put this situation to rest and return to work.

Per FAA medical records, Dr. Martin Dayton found Mr. Patterson capable of flying as a commercial airline pilot on 1/12/16 and noted his medical treatment should in no way affect his mental or cognitive abilities. Per records, on 3/2/16, he was granted authorization for special issuance of a medical certificate, which expires 1/31/17.

## Background Information

**Medical History**: He reported relatively good health. He had a previous diagnosis of sarcoma for which he underwent surgery in February 2015. Following this surgery he participated in alternative care for a couple of weeks in Mexico. His cancer is currently in remission. He also had a foot fracture in 2015 that healed normally. There is no known history of brain injury, stroke, or seizure disorder.

**Medications**: He is prescribed melatonin, which he takes as needed.

**Psychiatric & Substance Abuse History**: He denied history of psychiatric treatment or psychotherapy. He reported that given his involvement with the military he has undergone several psychological evaluations, all of which have been unremarkable. He endorsed only minimal alcohol use currently. He noted that following his cancer diagnosis he became more conscientious of his diet and refrains from alcohol consumption. History of substance abuse or drug use was denied.

**Developmental, Educational & Vocational History**: Mr. Patterson was born and raised in Charleston, North Carolina. He was mainly raised by his mother, until the age of nine, when she remarried. He then moved in with his maternal grandmother and lived there until he left for college. He denied history of developmental delays or learning disabilities. His school performance was described as average to above average according to the subject area. He earned a bachelor's degree with a double major in business administration and psychology and a master's degree in strategic studies. He joined the Army in 1987 and initially worked in artillery and as a paratrooper and later became a Lieutenant Colonel. He was in active duty for six years and has been in the Army Reserve since then. He worked as a police officer for three years

2

immediately after college. Subsequently, he trained as a pilot and worked at Mesa Airlines (1997-2000) where he was the director of pilot recruiting. He has worked for American Airlines for 16 years. Mr. Patterson denied any work-related infractions or issues in the military.

**Social & Family History**: Mr. Patterson has been married for 26 years and has two children. He reported good support consisting of family and friends. Familial medical history was unremarkable.

## Behavioral Observations

Mr. Patterson arrived 45 minutes late to the appointment. He flew himself into a local airport with his two children. He was apologetic and explained there was a delay in landing at the airport. Grooming, dress, and overall appearance were appropriate. He had a pleasant demeanor and was cooperative. There were no abnormalities of gait observed. His vision was adequate with prescription glasses and his hearing was also appropriate. He was fully oriented and his general mental status appeared normal. His speech was fluent and normal in rate, tone, and prosody. Comprehension was intact. He was alert and his thought processes were clear, without any evidence of disorganized or delusional thinking, and reflective of normal judgment, insight, and recall of personal history. His affect was euthymic and congruent with reported mood. He appeared to put forth good effort. He denied pain or discomfort; however, he reported mild fatigue towards the end of day.

## Procedures Administered
*indicates pilot norms were used from Kay, 2002

Clinical Interview
CogScreen-Aeromedical Edition
Integrated Visual and Auditory Continuous Performance Test (IVA+)
Wechsler Adult Intelligence Scale-IV (WAIS-IV)
Meyers Neuropsychological Battery (MNB) Selected Tests
    Taylor Complex Figure Test, Animal Naming, Controlled Oral Word Association Test,
    Auditory Verbal Learning Test, Finger Tapping Test*, Trail Making Test (TMT)*
Wisconsin Card Sorting test (WCST)*
Grooved Pegboard Test (Heaton et al., 2004 norms)
Paced Auditory Serial Addition Test-100 (PASAT)*
Stroop Color and Word Test (Golden, 1978)
Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

## Assessment Results

**_T-Scores_** _are reported using the following descriptors, with the exception of WAIS-IV Index scores where conventional Wechsler ranges are used and capitalized (e.g., 90-109: Average)._

| | |
|---|---|
| _55 or higher: above average_ | _30-34: mildly-to-moderately impaired_ |
| _45-54: average_ | _25-29: moderately impaired_ |
| _40-44: below average_ | _20-24: moderately-to-severely impaired_ |
| _35-39: mildly impaired_ | _19 or lower: severely impaired_ |

3

PATTERSON-BERCAW_00157

**Effort & Validity**: Embedded validity checks within the test battery were passed, consistent with full effort on cognitive tests. However, his performance on the verbal memory domain may have been affected by fatigue, such as he noted feeling tired towards the end of the day. Additionally, it should be noted that Mr. Patterson completed a similar neuropsychological evaluation within a week of this evaluation; hence, there is the possibility of practice effects on some of the tests administered. However, alternate forms were used when possible (e.g., AVLT Form B, Taylor Figure, and CogScreen Session 2). There were no indications of overreporting; however, there was evidence of moderate defensiveness of personal shortcomings on the MMPI-2. Results were considered interpretable with caution.

**CogScreen**: The LRPV (Logistic Regression Estimated Probability of Brain Dysfunction) was 0.0432. This classifies him as having a low probability of brain dysfunction.

In comparison to a major U.S. carrier pilot group (ages 45-49), his speed of performance appeared average with three scores falling at or below the 15th percentile and two scores falling at or below the 5th percentile.

In terms of accuracy, his performance was average, with two scores falling at or below the 15th percentile. There were no scores falling at or below the 5th percentile.

Thruput scores (i.e., balance of speed and accuracy) appeared average with three scores falling at or below the 15th percentile and one score at or below the 5th percentile. Process scores were also average with two scores falling at or below the 15th percentile and one score falling at or below the 5th percentile.

Individual scores showed a weakness in math speed (but with above average accuracy), letter sequencing speed (but above average accuracy), visual attention and working memory, deductive reasoning, and mental flexibility.

The Taylor Aviation Factor Scores represent CogScreen factors identified as relevant to pilot-related tasks and validated with simulator performance. Mr. Patterson showed mildly-to-moderately impaired deductive reasoning, but above average motor coordination and visual learning and recall. Visual and psychomotor tracking accuracy was average. Cognitive speed and working memory, the most powerful predictor of overall flight performance, was average.

| Factor | T-Score |
|---|---|
| Attribute Identification | 33.02 |
| Motor Coordination | 55.69 |
| Visual Association Memory | 58.92 |
| Speed/Working Memory | 48.44 |
| Tracking | 53.84 |

**Global Cognitive Functioning**: Performance across all conventional neuropsychological tests (i.e., excluding CogScreen) was in the average range overall (Overall Test Battery Mean= 49), which is below his expected level based on his estimated premorbid level of functioning.

**Intellectual Functioning**: Intellectual aptitude as assessed by the WAIS-IV was in the High Average range (FSIQ = 116). There were no differences between his verbal comprehension,

4

perceptual reasoning, working memory, or processing speed, all of which were in the High Average range.

**Attention & Working Memory**: Performance in the domain of attention and working memory was in the average range (Domain T= 51). Performance on measures of working memory was High Average (WAIS-IV Working Memory Index= 117).

Maximum digit span was within expectations (8 digits). Initial recall of a 15-item word list was average (6 words). Focused attention in generating words that belong to a category (i.e., animals) was average. Sequencing of digits in forward, backward, and numerical sequence was above average. WAIS-IV mental arithmetic was also above average. Working memory on a paced serial addition task was above average.

Sustained attention on the IVA+ continuous performance test was below average for auditory attention to auditory targets and mildly impaired for visual targets. He displayed difficulty with sustained attention particularly to auditory stimuli and distractibility for both visual and auditory modalities. His response control throughout the test was mildly impaired for auditory targets and average for visual targets. In addition to variable reaction times, he also exhibited mildly impulsive responding to auditory foils.

**Processing Speed & Cognitive Flexibility**: The domain of processing speed and cognitive flexibility was significantly variable (Domain T= 46). The WAIS-IV Processing Speed Index was High Average (PSI= 111).

Information processing speed on a digit-symbol substitution task was in the average range. Symbol search was in the above average range. Resistance to the effects of interference on the Stroop task was above average. Visual scanning and sequencing on a visual-motor task (TMT Part A) was in the above average range. Cognitive flexibility in shifting between two sequences on TMT Part B (i.e., numbers and letters) was also above average in time to completion. In contrast to these normal range scores, the number of perseverative responses made during the WCST was severely impaired compared to pilot norms.

**Language & Verbal Reasoning**: The domain of language and verbal reasoning was average (Domain T= 52). The WAIS-IV Verbal Comprehension Index was High Average (VCI= 110).

Naming of visual objects on the Boston Naming Test was average. Fluency on a test of generating words beginning with a certain letter (i.e., F-A-S) was below average. Vocabulary was found to be average. His fund of general declarative knowledge was above average. Verbal reasoning on the Similarities test was average.

**Visual Reasoning**: Visual reasoning was average (Domain T= 52). The WAIS-IV Perceptual Reasoning Index was High Average (PRI= 115).

Construction of match-to-sample block designs was above average. Nonverbal logical reasoning of patterns on Matrix Reasoning was average. Visual synthesis and mental rotation on the Visual Puzzles test was above average. Copy of a complex figure was average. Total errors made during the WCST was mildly-to-moderately impaired, though he completed all 6 categories.

5

**Verbal Memory**: Verbal memory performance was mildly-to-moderately impaired (Domain T= 33).

Acquisition of a 15-item word list across five trials was mildly-to-moderately impaired in total number of words recalled. He recalled 6, 6, 6, 7, and 7 words each trial. His recall of the list after a brief delay with interference was also mildly-to-moderately impaired (5 words recalled). Recall after a 30-minute delay was moderately impaired (4 words recalled). Discrimination of list words from non-list words on the recognition trial was below average (13 words correctly recognized; 5 false positive errors).

**Visual Memory**: Visual memory performance was above average (Domain T= 61).

Free recall of the complex figure was above average after a short delay. His reproduction of the figure after a 30-minute delay was also in the above average range. Recognition performance was average (21/24 correct).

**Motor**: Manual motor skills were within normal limits (Dominant Hand T= 53; Non-Dominant T= 50), with no lateralized differences.

Finger tapping speed was in the average range using both his dominant (right) and nondominant hand. Manual motor speed and dexterity on the Grooved Pegboard Test was average, bilaterally.

**Executive Functions**: Performance was average on measures within the battery tapping executive functions (Domain T= 49). He exhibited above average visual-spatial reasoning and mental flexibility and average verbal reasoning, visual response control, and visuoconstructional planning/organization. However, he demonstrated impaired problem-solving in response to feedback and inconsistent response times on the continuous performance task.

**Psychological Assessment**: Mr. Patterson completed the MMPI-2, an objective measure of psychological and personality functioning. He responded consistently to item content and there was no evidence of exaggeration of problems. There was however, an indication of an overly positive self-presentation and moderate defensiveness of personal shortcomings, such as he may have minimized psychological and behavioral difficulties. There was no denial of moral flaws and the pattern of validity scales did not provide strong evidence of response bias given the context of the evaluation. The resulting MMPI-2 profile was deemed interpretable, but with caution, as potential difficulties may be underestimated or go undetected.

On the MMPI-2, his response pattern indicated he is sociable and extroverted. He appears to be psychologically well adjusted and capable of coping with problems. There were no indications of personality disorder, mood disorder, or substance abuse problems.

## Interpretation & Recommendations

Mr. Patterson's neuropsychological profile indicates high average intellectual functioning but with overall performance within the average range. He scored well on the CogScreen and produced a low LRPV (consistent with a low likelihood of brain dysfunction). Although his cognitive profile was predominantly within normal limits, there were a few areas of lower than

6

PATTERSON-BERCAW_00160

expected performance that may be of aeromedical significance, in the areas of deductive reasoning and sustained attention. His scores also suggested insufficient learning and poor recall of information presented verbally. It is possible that he is experiencing difficulties with verbal memory; however, his scores may have also been affected by fatigue. He specifically noted feeling tired when this test was administered towards the end of the long evaluation day.

The findings are not necessarily clinically significant at this time, in the context of his otherwise average to above average performance on tests of visual memory, auditory attention, working memory, language, psychomotor processing speed, motor functioning, and visual-spatial reasoning. The clinical recommendation is that he have neuropsychological testing in six months to help determine the reliability and significance of the aforementioned findings.

Assessment of his psychological functioning indicated he is not reporting emotional distress or other indications of psychopathology. He appears well adjusted and to have high self-efficacy. He was motivated to present himself favorably. This is not unexpected given the employment context prompting this self-referral. There was nothing in his medical records to indicate the presence of a disqualifying mental condition, and no records of formal complaints about his behavior were included for review.

With respect to his airman medical certification, there are several positive cognitive and psychological attributes identified by the testing, as indicated above. His overall performance on the CogScreen was within normal limits, which is favorable; however, his scores evidenced mildly-to-moderately impaired deductive reasoning in comparison to aviators. The deductive reasoning finding was later replicated with the WCST, a similar task. These findings raise concern about how adaptable or flexible he is to feedback about his performance. This quality is potentially critical to flight performance, particularly in non-routine situations. Therefore, further review of these data by an FAA neuropsychologist is recommended to determine the aeromedical significance to piloting skills. A comparison of these results with his previous fitness-for-duty neuropsychological evaluation may also be helpful, as this was not available to us.

It has been a pleasure to provide this evaluation for Mr. Patterson. We may be reached at (941) 363-0878 for further consultation on this case.

_Ed Bercaw, PH.D._                                              _Nathaly_ Psy.D.

_____                    _____
Edwin L. Bercaw, Ph.D.                                  Nathaly Fonseca, Psy.D.
Licensed Psychologist/Neuropsychologist         Post-Doctoral Neuropsychology Resident
FL License Number: PY 7991                           FL License Number: PY 9471
CogScreen Provider & HIMS Trained

PATTERSON-BERCAW_00161

 Department of Health

# License Verification

**FRANCY NATHALY FONSECA**

🖶 Printer Friendly Version

License Number: PY9471

*Data As Of 7/15/2018*

| License Information | Secondary Locations | Discipline/Admin Action |
|---|---|---|

| | |
|---|---|
| Profession | Psychologist |
| License | PY9471 |
| ❓ License Status | CLEAR/ACTIVE |
| License Expiration Date | 5/31/2020 |
| License Original Issue Date | 01/11/2016 |
| Address of Record | 12 Cortez Way Florida DAVIE, FL 33324 UNITED STATES |
| Discipline on File | No |
| ❓ Public Complaint | No |

Back

For instructions on how to request a license certification of your Florida license to be sent to another state from the Florida Department of Health, please visit the License Certifications web page.



# ATTACHMENT 7

Privacy Statement  |  Disclaimer  |  Email Advisory  |  Accessibility

© 2015 FL HealthSource, All Rights Reserved Florida Department of Health | Division of Medical Quality Assurance Search Services

# AMLONG & AMLONG, P.A.

500 Northeast Fourth Street
Fort Lauderdale, FL 33301-1154
(954)462-1983 Telephone
(954)523-3192 Facsimile

May 16, 2016

|  |  |  |
|---|---|---|
|  | Billed through | 05/16/2016 |
| Patterson, Scott | Invoice Number | 21813 |

## PATTERSON, SCOTT vs. American Airline (WRA)(HOUR)(T/E)
## 002219   00000    HOUR

| | | | |
|---|---|---|---|
| Balance forward as of bill dated | 01/01/1900 | $0.00 | |
| Payments received since last bill | | $0.00 | |
| | | ---------------- | |
| Net balance forward | | $0.00 | |

### FOR PROFESSIONAL SERVICES RENDERED

| Date | | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 01/14/16 | WRA | Phone conference with client re: need for expedited USSERA complaint, FAA clernance | 0.30 hrs | 550 /hr | $165.00 |
| 03/29/16 | WRA | Conference with Scott , FIrst Officer with American Airlines (referred by Cindy Beyer) re: USERRA and ADA discrimination | 0.70 hrs | 550 /hr | $385.00 |
| 04/12/16 | WRA | Phone conference with Glenn R. Caddy, Ph.D., re: American Airline Pilot's neuropsychologist's evaluation of client | 0.30 hrs | 550 /hr | $165.00 |
| 04/13/16 | WRA | Receive and review correspondence from Dr. Caddy re: e-mail he propose to send to California neuropsychologist (Patterson) | 0.20 hrs | 550 /hr | $110.00 |
| 04/13/16 | WRA | Phone conference with Glenn R. Caddy re: Scott Patterson re: clinical interview | 0.50 hrs | 550 /hr | $275.00 |
| 04/22/16 | WRA | Receive and review correspondence from client, from his union lawyer to client and between the client and the AA psychologist | 0.50 hrs | 550 /hr | $275.00 |
| 04/22/16 | WRA | Phone conference with Glenn R. Caddy, Ph.D., re: obtaining records from California neuropsychologist | 0.30 hrs | 550 /hr | $165.00 |
| 04/23/16 | WRA | Receive and review correspondence from Ed Bercaw, Ph.D., re: he will send records, underlying data to WRA and Dr. Caddy | 0.10 hrs | 550 /hr | $55.00 |
| 04/27/16 | WRA | Receive and review correspondence from client re: neuropsychological evaluation; phone call with client | 0.40 hrs | 550 /hr | $220.00 |
| 05/01/16 | WRA | Phone conference with Glenn r. Caddy, Ph.D. and client re: Dr. Caddy's psychological report | 0.20 hrs | 550 /hr | $110.00 |
| 05/03/16 | WRA | Phone conference with client re:;  AA's neuro-psychology | 0.40 hrs | 550 /hr | $220.00 |
| 05/04/16 | WRA | Phone conference with Glenn R. Caddy, Ph.D. re: his evaluation of client | 0.40 hrs | 550 /hr | $220.00 |
| 05/12/16 | WRA | Receive and review correspondence from | 0.60 hrs | 550 /hr | $330.00 |

# ATTACHMENT 8

*PATTERSON vs. American Airline*                      *Invoice No.  21813*                      *Page 2*

client re: his correspondence, conversations
with Union, Capt. Stillhouse and termination
/ demotions of his antagonists

--------------------

Total fees for this matter                                                        $2,695.00


--------------------


**BILLING SUMMARY**

Amlong, William R.                            4.90 hrs       550.00 /hr        $2,695.00


TOTAL FEES          4.90 hrs                     $2,695.00
TOTAL DISBURSEMENTS                                  $0.00
LESS PREPAID AMOUNT                            $2,695.00 CR
--------------------
TOTAL CHARGES FOR THIS BILL                          $0.00
NET BALANCE FORWARD                                  $0.00
--------------------
**PLEASE PAY THIS AMOUNT**                          **$0.00**

PREPAID BALANCE  $2,305.00
TRUST BALANCE  $1,000.00


**Please notify us within 10 days of any questions or dispute with this bill. Otherwise, we will
assume you agree that these charges are fair and correct.**
=================================================================================================
**Additional costs, if any, will be billed separately.
We now accept MasterCard, Visa, Discover and American Express as form of payment.
To make a payment, please visit our website, www.TheAmlongFirm.com and click on the
"Contact Us" in the lower right hand corner of the homepage. The "CLICK TO PAY" option will
appear at the bottom of the resulting window.**

# AMLONG & AMLONG, P.A.

500 Northeast Fourth Street
Fort Lauderdale, FL 33301-1154
(954)462-1983 Telephone
(954)523-3192 Facsimile

May 16, 2016

Billed through  05/16/2016

Patterson, Scott                                          Invoice Number       21813

## PATTERSON, SCOTT vs. American Airline (WRA)(HOUR)(T/E)
## 002219   00000    HOUR

| | | |
|---|---|---|
| Balance forward as of bill dated | 01/01/1900 | $0.00 |
| Payments received since last bill | | $0.00 |

-----------------

Net balance forward                                                           $0.00

### FOR PROFESSIONAL SERVICES RENDERED

| | | |
|---|---|---|
| 01/14/16 | WRA | Phone conference with client re: need for expedited USSERA complaint, FAA clernance |
| 03/29/16 | WRA | Conference with Scott , FIrst Officer with American Airlines (referred by Cindy Beyer) re: USERRA and ADA discrimination |
| 04/12/16 | WRA | Phone conference with Glenn R. Caddy, Ph.D., re: American Airline Pilot's neuropsychologist's evaluation of client |
| 04/13/16 | WRA | Receive and review correspondence from Dr. Caddy re: e-mail he propose to send to California neuropsychologist (Patterson) |
| 04/13/16 | WRA | Phone conference with Glenn R. Caddy re: Scott Patterson re: clinical interview |
| 04/22/16 | WRA | Receive and review correspondence from client, from his union lawyer to client and between the client and the AA psychologist |
| 04/22/16 | WRA | Phone conference with Glenn R. Caddy, Ph.D., re: obtaining records from California neuropsychologist |
| 04/23/16 | WRA | Receive and review correspondence from Ed Bercaw, Ph.D., re: he will send records, underlying data to WRA and Dr. Caddy |
| 04/27/16 | WRA | Receive and review correspondence from client re: neuropsychological evaluation; phone call with client |
| 05/01/16 | WRA | Phone conference with Glenn r. Caddy, Ph.D. and client re: Dr. Caddy's psychological report |
| 05/03/16 | WRA | Phone conference with client re:;  AA's neuro-psychology |
| 05/04/16 | WRA | Phone conference with Glenn R. Caddy, Ph.D. re: his evaluation of client |
| 05/12/16 | WRA | Receive and review correspondence from |

# ATTACHMENT 8

client re: his correspondence, conversations
with Union, Capt. Stillhouse and termination
/ demotions of his antagonists

Total fees for this matter

**<u>BILLING SUMMARY</u>**

Amlong, William R.

TOTAL FEES
TOTAL DISBURSEMENTS
LESS PREPAID AMOUNT

TOTAL CHARGES FOR THIS BILL
NET BALANCE FORWARD

**PLEASE PAY THIS AMOUNT**

**Please notify us within 10 days of any questions or dispute with this bill. Otherwise, we will
assume you agree that these charges are fair and correct.**
======================================================================================
**Additional costs, if any, will be billed separately.
We now accept MasterCard, Visa, Discover and American Express as form of payment.
To make a payment, please visit our website, www.TheAmlongFirm.com and click on the
"Contact Us" in the lower right hand corner of the homepage. The "CLICK TO PAY" option will
appear at the bottom of the resulting window.**

1

```
 1                 UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                    FORT LAUDERDALE DIVISION

 3        CASE NO:  1:17-cv-60533-MARTINEZ/OTAZO-REYES

 4

 5    RODNEY SCOTT PATTERSON,

 6            Plaintiff,

 7   vs.

 8    AMERICAN AIRLINES, INC., a
     Delaware  Corporation,
 9
             Defendant.
10   _____/

11

12                         SHOOK, HARDY & BACON, L.L.P.
                           201 S. BISCAYNE BOULEVARD
13                         SUITE 3200
                           MIAMI, FL 33131
14                         Tuesday, March 6, 2018
                           10:09 a.m. - 7:42 p.m.
15

16

17        VIDEOTAPED DEPOSITION OF RODNEY SCOTT PATTERSON

18

19

20            Taken on behalf of the Defendant before

21        Elizabeth Cordoba, RMR, CRR, FPR, Notary Public in

22        and for the State of Florida at Large, pursuant to

23        Defendant's Notice of Taking Deposition in the above

24        cause.
```

# ATTACHMENT 9

341

```
1        A.    I said I've spent over hundreds of hours with

2    him, sir.

3        Q.    Okay.  There's another reference in --

4              MR. AMLONG:  What is the time?

5              THE VIDEOGRAPHER:  6:40.

6    BY MR. MORALES:

7        Q.    There's a reference -- all right.

8              Let me ask you:  Is there anything in

9    Dr. Caddy's report that has been submitted here that you

10   disagree with or that you have a dispute with Dr. Caddy

11   about?

12       A.    I've no disputes with Dr. Caddy.

13       Q.    Okay.  There's a reference in some of the

14   documents to a -- a Bercaw report, B-E-R-C-A-W.

15             Does that jog your memory?

16       A.    Dr. Bercaw does not.

17       Q.    You never -- you're not familiar with the

18   Bercaw report?

19       A.    Dr. Bercaw -- Dr. Bercaw was -- was consulted

20   to basically draw forth -- draw forth conclusions or

21   whatnot.  And Dr. Bercaw --

22       Q.    Consulted by you?

23       A.    Well, consulted by me.  And doctor -- Dr. Caddy

24   contacted Dr. Bercaw and doctor -- Dr. Bercaw had -- had

25   insinuated that this was going to go to a lawsuit and he
```

343

```
1        Q.    Dr. Caddy?

2        A.    Dr. Caddy.

3        Q.    Dr. Bercaw?

4        A.    He did not.

5        Q.    And why is that?

6        A.    Dr. Bercaw said that he didn't want to be

7   involved in the lawsuit.

8        Q.    Is Dr. Bercaw a health professional?

9        A.    He is.

10       Q.    Have you visited him in the last three years?

11       A.    Not in the last three years.  I've spoken with

12  him.

13       Q.    Did Dr. Bercaw prepare a report about your

14  medical history?

15       A.    Dr. Bercaw, basically, in -- in -- in speaking

16  with him, Dr. Bercaw didn't want to be involved with

17  American Airlines as far as the procedure.

18       Q.    Did Dr. Bercaw prepare a report about your

19  medical history?

20       A.    If he did, I didn't see it.

21       Q.    So there may or may not be a report that

22  Dr. Bercaw created about your medical history?

23       A.    I'm pretty familiar -- if -- if he created a

24  report, I -- I should have seen it, but I have not seen

25  it.  And Dr. Bercaw advised Dr. Caddy that -- that he
```

344

1    didn't want to be involved in the lawsuit and, you know,

2    wanted a lot of money to participate and come onboard as a

3    witness.

4         Q.    Are there other doctors here that are receiving

5    money to come onboard as a witness?

6         A.    Dr. Caddy has been compensated for his time.

7    However, his opinion -- and he has been very clear -- his

8    opinion is not for sale.

9         Q.    Okay.  I would like you --

10        A.    Dr. Hastings, I compensated him for his time.

11   I have no influence over his opinion.

12        Q.    And are those compensation arrangements ongoing

13   or have you completed --

14        A.    I paid Dr. Hastings for his time and -- at the

15   conclusion of the report -- and Dr. Hastings told me

16   his -- his -- the visit with him was not a -- it -- it was

17   not as a medical doctor.  It was as a consultant to

18   review --

19        Q.    So you visited Dr. Hastings but not as a

20   medical doctor, but then you submitted --

21        A.    Dr. Hastings --

22        Q.    -- you submitted him as an expert regarding

23   your medical status in this case; is that correct?

24        A.    Dr. Hastings -- Dr. Hastings advised me that my

25   visit with him was not covered under my insurance.

345

```
 1        Q.    Will Dr. Hastings testify regarding your
 2   medical records and medical history?
 3        A.    Absolutely.
 4              MR. MORALES:  Okay.  I believe this is Exhibit
 5         20.  Is that right?
 6              THE REPORTER:  Exhibit 21.
 7              MR. MORALES:  Exhibit 21.  I'm off one
 8         document.
 9                   (Exhibit 21, E-mail, was marked for
10              Identification.)
11   BY MR. MORALES:
12        Q.    I'll have you look at this document,
13   Mr. Patterson.  Are you familiar with this document,
14   Colonel Patterson?
15        A.    Appears to be an e-mail.
16        Q.    Okay.  So is it -- is it accurate to say there
17   are two e-mails on document Exhibit 21, which is Bates
18   Patterson_00434?
19              Do you see an e-mail from Ed Bercaw --
20        A.    I do.
21        Q.    -- to A-A-7-3-7-D-R-V-R?
22        A.    Yes, I do.
23        Q.    Are you A-A-7-3-7- --
24        A.    I am.
25        Q.    -- D-R-V-R?
```

346

```
 1          A.     Yeah.   That's correct.

 2          Q.     And the e-mail shows Friday, April 22, 2016; is

 3     that correct?

 4          A.     That's correct.

 5          Q.     And the subject is neuropsych evaluation?

 6          A.     It is.

 7          Q.     And it starts "Good morning, Mr. Patterson."

 8     Do you see that?

 9          A.     That's correct.

10          Q.     I'd just like to -- apologies for quoting at

11     length here, but I just want to see if I can jog your

12     memory on this Bercaw report.

13              It says [as read]:  Sorry for the delay on this

14     report.  We did get the medical records this week and

15     wrapped up the report just today.  A PDF is attached.  I

16     will be available to answer any questions you might have

17     after reviewing this.  I received this authorization to

18     send this to your attorney which I can do after you have

19     had a chance to read this.  Ultimately, the recommendation

20     is that this should go to review by the FAA, who has a

21     few, quote, "in-house," unquote, neuropsychologist

22     consultants who render opinions -- render an opinion.

23     They will have the data they need from us but we are

24     willing to do any follow-up or additional testing that may

25     be required later, which is sometimes the case.
```

347

1          Does this now jog your memory of an e-mail from

2    Dr. Bercaw?

3          A.    It does.

4          Q.    Does it jog your memory of a report from

5    Dr. Bercaw?

6          A.    I had not seen the report from Dr. Cow --

7    Bercaw.

8          Q.    When you received this e-mail from Dr. Bercaw,

9    did you not receive the PDF that was attached?

10         A.    I did not.

11         Q.    Did you -- did you respond to Dr. Bercaw asking

12   for the PDF report of your medical records that he had

13   just told you he was attaching?

14         A.    I asked Dr. Bercaw to consult with Dr. Caddy.

15   So doc --

16         Q.    Did you -- did you respond to this e-mail from

17   Dr. Bercaw?

18         A.    I did not respond to it.

19         Q.    Did you -- as far as the --

20         A.    I sent it to -- I sent it to Dr. Caddy, from my

21   best recollection.

22         Q.    Did Dr. Caddy or anyone else ask you to provide

23   the report?

24         A.    Dr. Caddy had conversations with Dr. Bercaw.

25         Q.    So have you ever seen a report from Dr. Bercaw?

348

```
 1        A.    I have not.
 2        Q.    Have you ever discussed with Dr. Caddy a report
 3   from Dr. Bercaw?
 4        A.    I would have sent it to Dr. Caddy and Dr. Caddy
 5   was basically reviewing all of the documentation or
 6   anything that came in, and also coordinating with my AME.
 7        Q.    Have you ever had a discussion with Dr. Caddy
 8   about a report prepared by Dr. Bercaw?
 9        A.    I have asked Dr. Caddy to professionally deal
10   with this issue.  And, you know, I can't go back and --
11   and say what's occurred three years ago.
12        Q.    As -- as -- as part -- August -- April 2016 is
13   the date of the e-mail.
14              As part of this -- this litigation, have you
15   search your records for a PDF of the report from
16   Dr. Bercaw?
17        A.    If I had it, I would have produced it for you,
18   sir.
19        Q.    Have you searched your records?
20        A.    I have.
21        Q.    Have you asked Dr. Caddy for the Bercaw report?
22        A.    I was unaware of this e-mail, so, you know,
23   I -- I didn't --
24        Q.    So when you say you were unaware of it, I
25   guess, just to note, you first received it from Dr. Bercaw
```