# TextMap Annotation Digest Report

**Case Name:** Patterson
**Transcript:** [11/28/2018 4:30 PM] Kay, Dr. Gary G., Ph.D. - 181128

**Pg: 51 Ln: 6 - Pg: 52 Ln: 13**

**Annotation:**
```
51: 6      Q.  And in your view, did Dr. Knippa properly
     7  administer the testing that he performed?
     8      A.  Mr. Patterson had a lot of complaints about
     9  how he was examined.  And was very concerned about,
    10  you know, how fatigued he was, whether the results
    11  were really valid.  He said that the administration
    12  of CogScreen was not done the way that it was done
    13  in my office, which would mean that it wasn't done
    14  standard.  He contributed some of his poor
    15  performance to that.  So that would raise concerns.
    16      Q.  And I just want to stop you.  You had
    17  mentioned something about that it wasn't standard.
    18  Can you explain what you mean by that?
    19      A.  Well, standard means that whether you see
    20  me or another neuropsychologist, whatever state
    21  you're in, whichever of, you know,
    22  neuropsychologist who you're examined by, you're
52: 1   given the same test, which means the same
     2  materials, the same forms, the questions are
     3  presented in an identical manner, that the scoring
     4  is done using the same criteria.  And so there's no
     5  impact of the examiner, to the best that that can
     6  be controlled, on your test scores on your
     7  performance on the test. Very important to testing.
     8      Q.  And did Dr. Knippa administer the CogScreen
     9  testing in accordance with the standardization as
    10  you've just described it?
    11      A.  Well, according to Mr. Patterson, he
    12  claimed that it was not.  You know, I don't have
    13  any other basis for knowing.
```

**Pg: 54 Ln: 16 - Pg: 56 Ln: 20**

**Annotation:**
```
54:16      Q.  Okay.  Going back to this paragraph.  It
    17  says, "Dr. Knippa interpreted the cognitive test
    18  data."
    19          Did you have any reason to conclude that
    20  Dr. Knippa had wrongly interpreted the cognitive
    21  test data from his own examination?
    22      A.  Well, again, we have to go to what Mr.
55: 1   Patterson had said, that the attention test that
     2  was the basis for Dr. Knippa's interpretation was
     3  administrated in the late afternoon and that he was
     4  fatigued.  And so the test is sensitive to
     5  sleepiness and drowsiness.  And, in fact, as I
     6  think I mentioned with Dr. Caddy above, that there
     7  was a concern that maybe this could really be due
     8  just to his sleepiness.  It may not be a true
     9  finding of an actual clinical attention disorder.
    10          It may have been a true finding that, in
```

# TextMap Annotation Digest Report

**Case Name:** Patterson
**Transcript:** [11/28/2018 4:30 PM] Kay, Dr. Gary G., Ph.D. - 181128

**Pg: 54 Ln: 16 - Pg: 56 Ln: 20** continued...

**Annotation:**

```
55:11   fact, he wasn't very attentive when you gave him a
   12   measure of sustained attention, which we call
   13   vigilance.  The test is sensitive.  It picked up
   14   that he wasn't, you know, able to be vigilant.  But
   15   it may not have been due to anything other than
   16   being sleepy.
   17        Q.  And what was your understanding of why Mr.
   18   Patterson might have been sleepy during Dr.
   19   Knippa's examination?
   20        A.  According, again, to what Mr. Patterson
   21   told me, the testing -- this test was administered
   22   late in the day.  And he had also flown across the
56: 1   U.S. for this exam.  And so I think he was jet
    2   lagged -- I think he said -- and it was late.
    3           Actually, the specific instructions for
    4   the -- I'm not sure if it's -- I think the TOVA has
    5   the instruction.  Not to administer the test after
    6   2:00.
    7        Q.  Was it significant to your own report that
    8   Mr. Patterson had represented to you that he had
    9   taken the test in the afternoon?
   10        A.  It would be something to explain in terms
   11   of him explaining why he'd performed poorly on this
   12   attention measure.
   13        Q.  Was that fact, as you understood it,
   14   significant to your own analysis of his fitness for
   15   duty?
   16        A.  In my evaluation and considering all of
   17   what I read and my report and my data, yes.
   18   Because basically when I tested him, I saw really
   19   no evidence of an impairment of vigilance or
   20   sustained attention.
```

**Pg: 66 Ln: 18 - Pg: 68 Ln: 10**

**Annotation:**

```
66:18        Q.  Okay.  The next sentence there says, "Mr.
   19   Patterson's description of Dr. Knippa's CogScreen
   20   administration, if correct, also raises concerns."
   21           Do you recall what the administration-based
   22   concerns were?
67: 1        A.  Well, my concern there would be that -- in
    2   particular, there's one subtest that Mr. Patterson
    3   really performed poorly on on CogScreen.  And for
    4   that particular subtest, it's important that the
    5   person had received prior to taking the test, the
    6   standard oral instruction, which is that for this
    7   subtest there are no practice items.  And so after
    8   you've read the instructions, if you have any
    9   questions, please let me know before you proceed.
   10   And usually we make a very big point of that
```

# TextMap Annotation Digest Report

**Case Name:** Patterson
**Transcript:** [11/28/2018 4:30 PM] Kay, Dr. Gary G., Ph.D. - 181128

**Pg: 66 Ln: 18 - Pg: 68 Ln: 10** continued...

**Annotation:**
```
67:11   particular oral instruction because otherwise the
   12   guys goes ahead and figures, oh, I'll try and
   13   figure it out once it starts.  You're not going to
   14   figure it once it starts.  You're going to do very
   15   poorly, as Mr. Patterson had done.  Mr. Patterson
   16   claimed that he hadn't gotten that instruction.
   17       Q.  And did you have --
   18       A.  And he's not unique in that.  I will tell
   19   you that even at American Airlines in the medical
   20   clinic, people would say, oh, the nurse didn't tell
   21   that to me.  The nurses would tell me, no, I did
   22   tell that to them, and -- but the pilot wouldn't
68: 1   remember.  I mean, the nurses would also tell them,
    2   don't start the Tracking Test until I come back in
    3   the room and show you how to do the Tracking.  And
    4   they would say, no.  The guy -- you know, actually,
    5   he just took the keyboard and starting doing it
    6   himself.  I told him that.
    7         So sometimes people tell me that the person
    8   administering the test didn't do it.  But, in fact,
    9   the person administering says, oh, I'm sure I did
   10   it, so --
```

**Pg: 68 Ln: 20 - Pg: 69 Ln: 20**

**Annotation:**
```
68:20       Q.  Right.  You're aware of other cases, it
   21   sounds like, where a pilot has suggested that
   22   the -- that there was a failure to follow standard
69: 1   administration procedures and the person that
    2   administered the test, nurse or otherwise,
    3   confirmed that that was inaccurate, is that
    4   correct?
    5       A.  Correct.
    6       Q.  Okay.
    7       A.  And I think that -- I'm recalling Mr.
    8   Patterson kind of pointing out that -- like, I kind
    9   of hung out -- I'm in the room sitting behind him,
   10   which most neuropsychologists do.  They kind of
   11   hang out while the person is doing the test.  It
   12   gives me an opportunity to look through his records
   13   and, you know, check things out and score things
   14   from before.  And I'm kind of sitting there kind of
   15   watching what's going on.  He said, ah, I was just
   16   in the room by myself and there was nobody around
   17   and nobody gave me these instructions.  And that's
   18   what he said.
   19       Q.  During Dr. Knippa's examination?
   20       A.  Yes.
```

# TextMap Annotation Digest Report

**Case Name:** Patterson
**Transcript:** [11/28/2018 4:30 PM] Kay, Dr. Gary G., Ph.D. - 181128

### Pg: 89 Ln: 16 - Pg: 90 Ln: 14

**Annotation:**
```
89:16       Q.  Okay.  Flip to page -- it's Page 12 in his
    17  document.  It's Bates stamp 15.
    18       A.  Yes.
    19       Q.  It says Findings Regarding Cognitive
    20  Skills.  So it's Page 12 in his original document
    21  numbered at the top, if you see that.
    22       A.  Okay.  Yes.  I found that.
90: 1       Q.  The end of paragraph -- first of all, do
     2  you have a general understanding of what Dr. Knippa
     3  is setting out in this section that's labeled
     4  Findings Regarding Cognitive Skills?
     5       A.  Yes.
     6       Q.  And what is that?
     7       A.  He's basically kind of summarizing what he
     8  is -- his interpretation of the cognitive test
     9  data.
    10       Q.  Okay.  And that's the -- what's known as
    11  the neuropsychological component?
    12       A.  The test of attention --
    13       Q.  Okay.
    14       A.  -- language, memory, problem solving.
```

### Pg: 92 Ln: 2 - 19

**Annotation:**
```
92: 2       Q.  Okay.  The last full paragraph on that
     3  section -- or on that page -- sorry.  It says,
     4  "First, there is no basis identified for
     5  considering assessment findings unreliable due to
     6  identifiable anxiety, fatigue, or misunderstanding
     7  of instructions or expectations.  Mr. Patterson
     8  reported having had a good night's rest prior to
     9  major testing and reported no problems of
    10  significance on the second day.  He was afforded
    11  two days and multiple breaks at his choice
    12  throughout testing, also ample time for
    13  interview/discussion, as would reasonably
    14  correspond to appropriate testing conditions."
    15           Does that align with Mr. Patterson's
    16  description of his testing experience with Dr.
    17  Knippa?
    18       A.  No.  I think there' some real conflict
    19  there.
```

### Pg: 112 Ln: 10 - Pg: 113 Ln: 9

**Annotation:**
```
112:10      Q.  Okay.  Page 2 at the bottom -- and this is
    11  Dr. Caddy writing, is that correct?
    12       A.  This is Dr. Caddy's report.
    13       Q.  Okay.  The bottom of Page 2, it says, "With
```

# TextMap Annotation Digest Report

**Case Name:** Patterson
**Transcript:** [11/28/2018 4:30 PM] Kay, Dr. Gary G., Ph.D. - 181128

**Pg: 112 Ln: 10 - Pg: 113 Ln: 9** continued...

**Annotation:**
```
112:14  this professional compromise not cleanly done away
    15  with, Dr. Knippa then turns the neuropsychological
    16  realm and finally develops some very weak
    17  compromised data [creating a rationale] for a
    18  recommendation to terminate FO Patterson."
    19        Do you agree with that interpretation of
    20  Dr. Knippa's report?  And if you need to take a
    21  second to review the preceding paragraphs, please
    22  do.
113: 1     A.  I kind of remember what Caddy's kind of
     2  view was.  I think he's expressing it here.  He
     3  felt that Mr. Patterson had been sent to Dr. Knippa
     4  for a psychological evaluation, which Dr. Knippa
     5  turned into a neuropsychological evaluation.  And
     6  then he's saying "very weak and compromised data."
     7  I think he's talking about the fatigue.  It was his
     8  compromise for the recommendation determining FO
     9  Patterson.
```

**Pg: 114 Ln: 14 - Pg: 116 Ln: 1**

**Annotation:**
```
114:14     Q.  The next sentence there says, "In fact, Dr.
    15  Knippa administered the test of sustained attention
    16  at a time of day [given Scott's circadian status]
    17  that appears to have been entirely inappropriate
    18  for such testing."
    19        In light of the materials we reviewed from
    20  Dr. Knippa today, do you agree with that statement?
    21     A.  Well, Dr. Knippa said he did it in the
    22  morning.  Now, we could say, using Dr. Caddy's
115: 1  statement here, taken at the circadian time of day,
     2  that if you administered it past 11:00 a.m. Long
     3  Beach time -- I think Knippa is in, like, the
     4  Southern California, L.A. area.  If you gave it at
     5  that time of day, that would 2:00 Dr. Patterson
     6  [sic] time.  And that would not be really a great
     7  time for him to be taking it.  I'm not sure that
     8  that's what -- I don't know what time Dr. Knippa
     9  gave the test. I think that's what Dr. Caddy is
    10  pointing out.  He's saying it was unfair because,
    11  in fact, even if it was 11:00 a.m., that was 2:00
    12  p.m. for Mr. Patterson, and that might be the basis
    13  for why he did so poorly.
    14        Now, I'm taking consideration -- this was
    15  actually on Day 2.  And the results that I have of
    16  not east to west, but west to east -- and even
    17  applying to London -- the research that I've done
    18  on jet lag shows that by 24 hours most of it is
    19  gone.  It's pretty substantial, right, when you
    20  first get there, believe it or not, but it does
```

# TextMap Annotation Digest Report

**Case Name:** Patterson
**Transcript:** [11/28/2018 4:30 PM] Kay, Dr. Gary G., Ph.D. - 181128

**Pg: 114 Ln: 14 - Pg: 116 Ln: 1** continued...

**Annotation:**
```
115:21  dissipate.  And so this is actually more than 24
    22  hours after he's landed.  I'm not so sure that it
116: 1  would be as much of a factor.
```

**Pg: 119 Ln: 1 - 13**

**Annotation:**
```
119: 1      Q.  Okay.  And in your experience prior or
     2  aside from this case, have you ever known Dr.
     3  Knippa to engage in biased, hired-gun behavior?
     4      A.  I've heard that complaint before from other
     5  American Airlines pilots who felt that they were
     6  being railroaded and felt that this is -- it's just
     7  a way for the company to get rid of them.  And so I
     8  had heard that several times.  When I say
     9  "several," like, maybe three times, four times.
    10  Specifically, people were feeling that that was the
    11  kiss of death, if you were an American Airlines
    12  pilot and the folks in Dallas decided to send you
    13  for a Section 20 to Knippa, you were going.
```

**Pg: 190 Ln: 13 - 22**

**Annotation:**
```
190:13      Q.  And did you conduct another round of
    14  testing on Mr. Patterson?
    15      A.  I did.
    16      Q.  Okay.  And it looks like if you look at, I
    17  guess, the first page of your test results section,
    18  it says Session 4.
    19      A.  Yes.
    20      Q.  Am I correct that you administered
    21  CogScreen Session 4?
    22      A.  Yes.
```

**Pg: 191 Ln: 14 - Pg: 195 Ln: 22**

**Annotation:**
```
191:14      Q.  So, Dr. Kay, the question was, why you
    15  administered Session Number 4 as opposed to Number
    16  3?
    17      A.  It was the fourth time he was taking
    18  CogScreen.
    19      Q.  To your understanding, has Mr. Patterson
    20  ever taken Session 3?
    21      A.  No.
    22      Q.  Okay.  But he's taking Session 2 twice, is
192: 1  that correct?
     2      A.  Correct.
     3      Q.  Okay.  Is it your understanding that this
     4  report was going to the FAA?  Let me ask it this
```

# TextMap Annotation Digest Report

**Case Name:** Patterson
**Transcript:** [11/28/2018 4:30 PM] Kay, Dr. Gary G., Ph.D. - 181128

**Pg: 191 Ln: 14 - Pg: 195 Ln: 22** continued...

**Annotation:**

```
192:  5  way, at the time that you prepared this follow-up
      6  report, what was your understanding of the audience
      7  for the report?
      8      A.  I figured eventually it's going to get its
      9  way to the FAA and be part of his medical record.
     10  I mean, it has to be.
     11      Q.  Why does it have to be?
     12      A.  Because if he indicates that he's been seen
     13  by me, some astute person's at the FAA job is to
     14  say, I'd like to see Dr. Kay's record.
     15      Q.  On the -- Page 4 of the Summary and
     16  Recommendations, it says, "Based upon these
     17  findings, Mr. Patterson would be considered to have
     18  no aeromedically significant neurocognitive
     19  deficits and would be recommended for a Class 1 FAA
     20  airman medical certificate."
     21      A.  Yes.
     22      Q.  Can you discuss the manner in which you
193:  1  assessed Dr. Bercaw's report once you gained
      2  knowledge of that report?  How that factored into
      3  this conclusion?
      4      A.  Oh, when I -- I think I've testified to
      5  this.  But I believe that when I reviewed Dr.
      6  Bercaw's report, I had -- would have significant
      7  concerns.  We would probably not recommend issuance
      8  of a medical certificate based upon performance
      9  that I'm seeing.  So Dr. Bercaw was quite right,
     10  that, in fact, if it was reviewed by one of the FAA
     11  neuropsychology consultants we would probably not
     12  issue.  We'd probably require additional testing to
     13  see if we could confirm or disconfirm the presence
     14  of an aeromedically significant deficit.
     15          And so, in fact, I did specifically the
     16  testing that -- if I had written a review for the
     17  FAA based on Dr. Bercaw's report, I did the test
     18  that would be so indicated.  And Mr. Patterson
     19  performed quite well on the test that I
     20  administered looking at issues such as his
     21  reasoning abilities.  And I gave him a completely
     22  novel test.
194:  1          He had done miserably on those tests
      2  previously.  But he did perfectly fine.  And these
      3  are tests that he could not have -- there's no
      4  pilot gouge he could have looked at or a discussion
      5  with other guys who had been through evaluations to
      6  pass these.  I gave him things he would not have
      7  been familiar with.  And he did fine on measures of
      8  executive functioning.  I gave him a test of
      9  vigilance.  There was one -- just one score out of
     10  all the scores that generate that was poor.  But
     11  all the other scores were very good.  I think he's
```

# TextMap Annotation Digest Report

**Case Name:** Patterson
**Transcript:** [11/28/2018 4:30 PM] Kay, Dr. Gary G., Ph.D. - 181128

**Pg: 191 Ln: 14 - Pg: 195 Ln: 22** continued...

**Annotation:**
```
194:12   a guy who, you know, on a very boring monotonous
    13   task, will lose a little bit of his alertness and
    14   arousal if you keep him on it for a long time.  But
    15   he keeps himself occupied.  And so it doesn't seem
    16   to be, and it's not manifested itself as a problem.
    17          So that kind of showed up for him, that he
    18   still had that one.  But I would not call that, nor
    19   would my colleagues call that, aeromedically
    20   significant.
    21          He did surprisingly well compared to -- he
    22   had done very poorly when tested by Dr. Bercaw on
195: 1   memory testing where it had actually concerned me
     2   about him.  Fortunately, Dr. Hastings did not find
     3   anything neurological.  So I'm not sure what the
     4   basis was for why Mr. Patterson had so many
     5   problems back in March 2016.  But I didn't know
     6   about the memory problem.  But he did very poorly.
     7   And we would not grant an airman a certificate who
     8   had performed that poorly on memory testing.  When
     9   I tested him, him memory was excellent on
    10   every -- every criteria we would look at compared
    11   to major pilots and the norms that I've developed
    12   for major pilots.
    13      Q.  And you're referring to October 2018, is
    14   that correct --
    15      A.  Yes, sir.
    16      Q.  -- for your examination?
    17      A.  October 2018.  His memory was solid.  So he
    18   did very well on memory testing.  Very well on
    19   novel problem solving.  And while he wasn't perfect
    20   on vigilance, that might be kind of a
    21   characteristic of him.  So he's not perfect on
    22   that, but he would be okay.
```

**Pg: 198 Ln: 21 - Pg: 199 Ln: 10**

**Annotation:**
```
198:21      Q.  Hello, Dr. Kay.
    22      A.  Hello, Mr. Amlong.
199: 1      Q.  You said that you don't know why Mr.
     2   Patterson never gave you a copy of Dr. Bercaw's
     3   report.  You have no personal knowledge, do you,
     4   sir, that Mr. Patterson, Dr. Caddy, or I have ever
     5   seen Dr. Bercaw's report until shortly before his
     6   deposition, do you?
     7      A.  You're correct.
     8      Q.  And if none of us had it, none of us could
     9   give it to you, right?
    10      A.  That would be correct.
```

## TextMap Annotation Digest Report

**Case Name:** Patterson
**Transcript:** [11/28/2018 4:30 PM] Kay, Dr. Gary G., Ph.D. - 181128

**Pg: 242 Ln: 3 - Pg: 243 Ln: 3**

**Annotation:**

```
242: 3      Q.  Have you spoken to -- have you spoken to
      4  any of the management personnel at American about
      5  Dr. Knippa being regarded as a hired gun by pilots
      6  who have spoken to you?
      7         MR. MORALES:  Objection.  Foundation.
      8      A.  I did voice a concern to a nurse, I think
      9  it was, who seems to play a big role in how these
     10  get referred out, telling her nothing about hired
     11  gun, but I've said that I'd heard a lot of anger
     12  and complaints about specifically Dr. Knippa from
     13  airmen who had come to see me.  So I had heard, you
     14  know, first-hand these complaints.  And I just let
     15  them know that.  I know that that was received very
     16  well, is my impression.  I wasn't necessarily
     17  delivering what somebody wanted to hear.  But I
     18  felt that I had heard, you know, like probably four
     19  or so airmen making complaints.
     20         If you look on the web, there are pilots
     21  who say I'm a hired gun.  You know, they're
     22  unhappy.  You know, he's -- he's the company guy.
243: 1  It's not true.  But if -- you know, people don't
      2  get a -- you know, the response they were hoping
      3  for, then they shoot the messenger.
```