UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division

Case Number: 17-cv-60533-MARTINEZ/OTAZO-REYES

RODNEY SCOTT PATTERSON,

Plaintiff,

vs.

AMERICAN AIRLINES, INC.,

Defendant.

_____/

## Plaintiff's Response to American Airlines, Inc.'s Motion to Exclude Opinion Testimony by Dr. Caddy

Plaintiff, Rodney Scott Patterson, responds as follows to American Airlines, Inc.'s Motion to Exclude Opinion Testimony by Dr. Caddy (DE 132):

### Introduction and Summary

American Airlines, Inc. ("American") seeks pursuant to Rule 702 and Daubert v. Merrell Down Pharmaceuticals, Inc., 509 U.S. 579 (1993) to prohibit Glenn Ross Caddy, Ph.D., plaintiff's testifying expert psychologist, from offering **any** opinions at trial "because they are inherently unreliable and thus inadmissible." Defendant's Motion, at 1.

Contrary to the American's assertions, Dr. Caddy would not unscientifically offer opinions concerning matters on which Edwin Bercaw, Ph.D., offered a contrary opinion that Dr. Caddy simply disregarded: this is because Dr. Caddy is a clinical psychologist, and a former Professor of Clinical Psychology who has expertise in psychometrics (i.e., psychological



DEFENDANT'S
EXHIBIT
20
0:17-cv-60533-JEM



**The Amlong Firm** • 500 Northeast Fourth Street • Fort Lauderdale, FL 33301 • 954.462.1983

testing),[1] who would testify only about the psychological health of the plaintiff, irregularities in testing methods employed by John Knippa, Ph.D., and the pro-American bias displayed in the clinical-psychology portion of Dr. Knippa's evaluation of Lt. Col. Rodney Scott Peterson (USAR Ret.)—all of which was covered in Dr. Caddy's expert report.

Dr. Bercaw is a neuropsychologist whose differences, if any, with Dr. Caddy are outside Dr. Caddy's areas of expertise and, therefore, outside Dr. Caddy's permissible testimony or the legitimate scope of Dr. Caddy's expert's report.  Any neuropsychological testimony at trial would come from Gary Kay, Ph.D., whom Lt. Col. Patterson timely disclosed as his treating neuropsychologist, with whom Dr. Bercaw has had no contact, but whom he identified as being the author of the CogScreen Aeromedical Edition who "put a lot of work into it" and "knows everything there is to know about it."[2]

## Statement of the Facts

American Airlines placed Lt. Col. Patterson on no-fly status on September 24, 2015, two days after he disobeyed a chief pilot's request that he fly a scheduled trip to South American on September 22 rather than going on duty in Washington, D.C., with the Army Reserve.[3]  Lt. Col. Patterson's grounding was based on the opening of a Human Resources investigation into allegations of misconduct that were identical to those made known six months earlier, to a another chief pilot, to Corporate

---

[1]Deposition of Glenn R. Caddy, Ph.D., DE 57-27, at 17:17-18:19, 57:4-13.

[2]Deposition of Edwin Bercaw, Ph.D., DE 132-1, at 110:5-11.

[3]Plaintiff's Local Rule 56.1(a) Statement of Material Facts In Support of Motion for Summary Judgment, DE 61, at 1-3, ¶¶ 1-8.

Security, to Labor Relations and to Human Resources; none of which initiated any action against Lt. Col. Patterson.[4]

Following September-November Human Resources Investigation that produced no evidence justifying discipline, Labor Relations mandated a fitness-for-duty exam by a Long Beach, California, neuropsychologist, John Knippa, Ph.D.[5]  Notwithstanding that the examination produced, according to American's corporate medical director, no evidence of neuropsychological deficit, psychopathology or personality disorder, the Long Beach practitioner pronounced Lt. Col. Patterson "NOT FIT FOR DUTY."

In addition to the neuropsychological issues asserted, Dr. Knippa also addressed a number of clinical psychological issues.  These inquiries were based on American's having forwarded to Dr. Knippa a memo purportedly written by former Captain Brian Beach—who at the time was a chief pilot, but said that he was simply ordered to sign the memo, which he did not write[6]—asserting that Dr. Knippa characterized as "outlin[ing] general but not specific performance relevant concerns for: Mental and/or emotional stability, unspecified 'multiple reports of atypical interactions with coworkers' and unspecified reports 'that suggest a patten of false/self-aggrandizing statements.'"[7]

Dr. Knippa then went on to assess Lt. Col. Patterson's fitness for such functions as Crew Resource Management, including interpersonal and

---

[4] Id. at 3-5, ¶¶ 9-11.

[5] Id. at 7-8, ¶ 15-16.

[6] Id. at 7, ¶ 14.

[7] See DE 57-6 ("Knippa report"), dated March 21, 2016, at 10.

communication skills;[8] the possibility of a personality disorder with narcissistic and immature features and the benefits that Lt. Col. Patterson could reap from "personal counseling to discuss how his interpersonal style may be perceived by others in a manner different from what he perceives or intends" and how "others may perceive well intended and benign behavior as presumptuous, arrogant or narcissistic..."[9]   Among the instruments Dr. Knippa used to arrive at these inferences were the MMPI-2[10] and the Personality Assessment Inventory  ("PAI"), Lt. Col. Patterson's performance on which instruments Dr. Knippa characterized as "particularly cautious and deliberate," "reflect[ing] a pattern of defensiveness," "as sometimes seen with pilots and others presenting for assessment of duty fitness"—but with "no elevations above the usual interpretive level" and "entirely within normal limits."[11]

Glenn Ross Caddy, Ph.D., is a board-certified psychologist licensed to practice in Florida.[12]  He was a Professor of Clinical Psychology for some 15 years, teaching, among other things, psychometrics, which relates to testing and measuring, at both the undergraduate and graduate level.[13]  He has extensive experience dealing with airline pilots from, among other things, having been the principal psychologist to whom United Airlines

---

[8]Id. at 11.

[9]Id. at 14.

[10]Minnesota Multiphasic Personality Inventory-2d Edition.

[11]Id. at 9-10.

[12]Caddy Deposition, at 18:17-19.

[13]Id. at 57:4-17.

referred its personnel when it had a base in Miami.[14]  He has experience

doing fitness-for-duty examinations, albeit not for pilots but including police

departments and the Secret Service.[15]

Dr. Caddy—to whose expertise in clinical psychology no challenge has

been raised and to whose clinical psychological conclusions no discrepancies

with the conclusions of Drs. Bercaw and Fonseca have been cited—points

out in his expert report that:

**One**, as to the standardized testing results on which Dr. Knippa
relied:

It should be noted, as a general principle, that all too often
psychologists take the data from these so called "tests of personality",
or "tests of psychopathology", and treat the data as if they reflects
definitive indices of the functioning of the examinee.  While this may
be more likely true than not when the instruments reflect significant
or gross psychopathology [which is not the case here], one can risk
over-interpreting such everyday non-revealing data...,[16]

elaborating that "[i]t is noteworthy that when finally I was able to get to

see the results of Dr. Knippa's work with Scott Patterson I noted that on the

computerized MMPI...[Lt. Col. Patterson's] statements appear both very

honest and very reasonable.  They make sense and reflect nothing

pathological at all."

Dr. Caddy's psychological assessment of how Dr. Knippa should have

found Lt. Col. Patterson to be functioning psychologically, i.e., normally, is

consistent with Dr. Caddy's conclusions after not only "the rigorous

collection of collateral source data, ... through the collateral examination of

---

[14]Id. at 57:16-58:12.

[15]Id. at 58:18-22, 62:3-5.

[16]Confidential Communiqué to William Amlong, Esquire RE: Rodney
Scott Patterson ("Caddy Expert Report"), DE 57-28, at 36 (punctuation and
brackets in original).

others who know him well, both at home and at work, and in his various capacities and roles, and especially in his role as a First Officer with American Airlines,"[17] but also a mental status examination and "multi-dimensional clinical psychological testing."[18]

> The integration of the data from all these sources proved critical and ultimately offered a cohesive comprehensive perspective on multiple aspects of Scott's functioning from a clinical and statistical perspective in relationship to normative psychological data. But most critically, what came to the fore was really a description and understanding of the everyday life of this man.[19]

**Two**, concerning the soto voce, but lengthy (17-line) suggestion that Lt. Col. Patterson may suffer a narcissistic or immature personality disorder, Dr. Caddy points out that, Dr. Knippa's "various meandering inferences and/or conjectures notwithstanding," Dr. Knippa concludes that "a personality disorder is not identified with the limited data available at this time" because "[o]ther than the unspecified complaints outlined by Captain Beach, no concrete examples of performance problems are identified..."[20] Dr. Caddy characterizes this as "put[ting] the matter of Scott Patterson's inferred 'mental illness' or at least his inferred 'personality disorder', to rest, or almost so, but not really!"[21]

**Three**, concerning Dr. Knippa's proposal of a "'possible linkage' ... between the possibility of "certain narcissistic and immature features" and

---

[17]Id. at 65.

[18]Id. at 66.

[19]Id. at 67.

[20]Id. at 37.

[21]Id. at 37.

Attention Deficit Disorder/Hyperactivity Disorder and also "subtle spectrum features," Dr. Caddy opined in his Expert Report that:

>    Bluntly, at this point Dr. Knippa's speculations are way beyond the bounds of science and into fantasy. Such weak and unsupportable inferences [vague data void speculation] have no place in a scientifically based investigation, and especially so, when this report is being read and comprehended by non-specialists whose workplace political agenda may play a role in the decision making process.  Such speculation by a psychologist who really does not know this man at all, risks compromising his own ethical obligation to speak only the truth and not to speculate in a manner to compromise his professional responsibilities; and certainly, not to suck up [throw a bone to] the people who hired him.

>    Dr. Knippa could have conducted a comprehensive collateral source investigation [interviewing people who know Scott Patterson really well in his workplace and beyond], if he had requested to do so, and if he determined that he really wanted to get to the bottom of [make sense of] all these inferences that he was speculating about. But he did not undertake any such an investigation! And yet he leaves these possible inferences [of personality impairment] hanging, yet without valid data support. I do not consider this an appropriate application within the discipline of psychology![22]

***Four***, as to the Dr. Knippa's "subtle spectrum" allusion:

>    Further, when Dr. Knippa remarks [as noted above] on what he calls subtle "Spectrum" features I can only presume that he is referring to either the "Attention Deficit Disorder" spectrum or the "Autistic Disorder" spectrum.  And though I presume the former, this speculation appears to have been presented to offer or infer a theoretical mechanism [a bridge if you like] to get the naive reader back into the notion that there is something wrong with Scott Patterson. [That is, the creation of an inference that although it may not be a real "personality disorder" and Dr. Knippa cannot "find it", there is otherwise, or still maybe, something wrong with FO Patterson]. Dr. Knippa persists with the speculation, of the possibility, of the inference, that just such a "personality problem" could exist; and just below the surface. The inference from these speculations is that while this is not "evidence" for a personality disorder, it might, [and I emphasize "might"] still reflect a low grade personality limitation, or it may even be indirect evidence of a limitation of an organic nature in Scott Patterson's brain functioning. I consider this level of speculation beyond lacking any scientific basis and to have no place in this work, or in any other! It is building a fragile structure without foundation and the lack of a scientific base make the exercise unethical.

---

[22]Id. at 38 (brackets in original).

Dr. Caddy's conclusion as to the clinical psychological portion of Dr. Knippa's report is that:  "It is obvious from looking at all the effort that Dr. Knippa made to find and infer something wrong with Scott's personality functioning that he was trying too hard only to not quite be able to get there, while nevertheless leaving a trail of inference."

On the same day as Dr. Knippa issued his fitness-for-duty report, March 21, 2016, Lt. Col. Patterson visited Edwin Bercaw, Ph.D., a neuropsychologist in Sarasota, Florida, who is qualified under Federal Aviation Administration to evaluate pilots, saying that he wanted a second-opinion because he suspected that Dr. Knippa was a "hired gun" that American was going to use to ground him.[23]

Lt. Col. Patterson began immediately after his visit to Dr. Bercaw to complain that Dr. Bercaw had not personally administered the entire series of tests, but rather had delegated most of them to Francy Nathaly Fonseca, Psy.D., a resident who had been licensed 70 days at the time.[24] Dr. Bercaw

---

[23]Bercaw Deposition, at 101:23-102:16.  The undersigned mistakenly represented to the Court that Dr. Caddy had sent Lt. Col. Patterson to Dr. Bercaw, based on how the undersigned had understood Lt. Col. Patterson's deposition testimony, see DE 57-1, at 341:23-24 ("Dr. Caddy contacted Dr. Bercaw..."), and on Lt. Col. Patterson's having signed an amended interrogatory answer, see DE 54-1, Plaintiff's Notice of Service of Amended Answers and Objections to Interrogatory No. 4 of Defendant's First Set of Interrogatories ("Edward L. Bercaw, Ph.D., of Sarasota, who holds himself out to be a 'CogScreen Provider & HIMS Trained,' was located by Dr. Caddy, my testifying expert"), without pointing out any error.  Dr. Caddy did not actually see Lt. Col. Patterson until April 6, 2016.  Deposition of Glenn Ross Caddy, Ph.D., DE 57-27, at 15:25-16:2.

[24]See, e.g., Plaintiff's Reply re: Motion in Limine re: Reports of Knippa, Bercaw/Fonseca, DE 128, at 6, n. 6 and Attachment 2; see also May 3, 2016 e-mail from Patterson to Caddy, DE 79, at 4:

When I went into Dr. Bercaw's office to meet him I was introduced to Dr. Fonseca. He asked me if I minded her observing the testing. She also showed up in his office with a copy of Dr. Gary Kay's book

(continued...)

admitted during his deposition that Dr. Fonseca had drafted the original Neuropsychological Evaluation report, which Dr. Bercaw said he then edited and both signed.[25]  Dr. Caddy testified at his deposition that Dr. Bercaw had acknowledged Lt. Col. Patterson's allegations during a phone call[26] that appears to have occurred May 6 —based on a letter dated May 6 summarizing Dr. Bercaw's recollection of that phone call,[27] which letter appears in the files of neither Dr. Caddy nor Comprehensive MedPsych Systems, Inc. (Dr. Bercaw's former employer at the time of the tests), but which letter Dr. Caddy nonetheless testified he most likely received[28] and a copy of which letter plaintiff's counsel obtained from Capt. Danny Shellhouse, Lt. Col. Patterson's union representative in a grievance over the compelled examination.

Dr. Bercaw's recollection of that May 6 phone conversation is the polar opposite of Dr. Caddy's:

Here is how Dr. Bercaw described it:

> Q    What was the substance of the phone call you had with Dr. Caddy?

---

[24](...continued)
Aviation Psychology. I did not realize until after leaving that his tests would not be accepted by the FAA. She administered the tests and although she is a post doctoral graduate student, I didn't pay for that....

[25]Bercaw Deposition, at 18:04-19:7.

[26]See Deposition of Glenn R. Caddy, Ph.D., DE 57-27, at 35:5-36:5, 38:19-39:19.

[27]A copy of the letter, which was produced to defendant, is appended as Attachment 1.

[28]Caddy Deposition, at 43:19-44:7.

A      Well, the substance, I believe, was to discuss the history, things that were going on.  He asked me for some information.  I believe I told him a summary of the evaluation.  I followed that up with a letter that basically reexpressed my thoughts about the evaluation in writing.

I recall him saying that my evaluation was either inadequate or insufficient....

And I tried to remind him that my scope of the—the evaluation was to look at neurocognitive and psychological qualities that are important for the medical certificate.

*      *      *

Q      Did Dr. Caddy ever tell you why he thought your evaluation was insufficient?

A      Maybe not specifically, no.

Q      Did he tell you anything to suggest what he—what you could have done to make your evaluation sufficient, in his view?

A      Based on what I recall from that conversation, I felt that he was critiquing my evaluation, as not looking at the whole picture, as Lieutenant Colonel Patterson as a pilot, and all the sources of information that I could have reviewed.  That was my impression from talking with him.

Q      Did you talk to Dr. Caddy about who, as between you and Dr. Fonseca, performed each of the tests?

A      I don't recall.  I don't recall that coming up.

Q      Did he express to you in that phone call anything suggesting that it was inappropriate for Dr. Fonseca to assist you with the evaluation?

A      No, I don't recall that being said.

Q      Do you recall anything of that nature being said?

A      No.[29]

This is Dr. Caddy's recollection:

Q      What did you speak about with him regarding Mr. Patterson?

A      About—in general, about his findings, or more to the point, I was told by Captain Whitehouse—excuse me, by Captain

_____

[29]Bercaw Depostion, at 33:10-35:3

Patterson—that Dr. Bercaw, he went to see Dr. Bercaw very soon after he'd been to see Dr. Knippa, and he also indicated to me that the assessment that was done, was done not by Dr. Bercaw, but by a woman trainee.  And I called Dr. Bercaw to ask him about that.

Q    And what did he say?

A    He said that was true, that she did do the work. And so I pretty much said thank you, and I contacted Captain Patterson and I said, in essence, you just wasted a couple thousand dollars.

Q    What were the findings from Dr. Bercaw's office regarding Mr. Patterson?

A    I don't know.  I don't know the details.

Q    Well, you said that you called to discuss the findings?

A    Well, yeah, but when I found out that—when I found out that he actually didn't do the testing, it didn't really matter to me what the findings were going to be because she wouldn't have been qualified to administer the instruments. And he went to see Dr. Bercaw, not this lady who was in training.[30]

The May 6 phone call took place subsequent to Dr. Bercaw's receiving from Dr. Caddy an e-mail string initiated by Lt. Col. Patterson in which Lt. Col. Patterson complained that he "personally fe[lt Dr. Bercaw] took [his] money, and then when [Lt. Col. Patterson] showed up[,] had the intern do the work, which is not what [Lt. Col. Patterson had] paid for."  Lt. Col. Patterson complained about Dr. Bercaw's refusal to "play ball" after Dr. Bercaw demanded an additional fee to discuss with Dr. Caddy his testing of Lt. Col. Patterson, which is the context in which Dr. Bercaw understood the remark to have been made.[31]

---

[30]Caddy Deposition, at 35:5-36:5.

[31]Bercaw Deposition, DE 132-1, at 38:21-39:13.  Compare Dr. Bercaw's testimony about the "play ball" reference,

Q    Do you have any understanding as to what that means?

(continued...)

Dr. Bercaw testified at deposition that during the approximately two hours that he spent with Lt. Col. Patterson March 21, he did a clinical interview that took about an hour and then personally performed all of the CogScreen portions of the testing.[32]  He testified that he "read the instructions and set him up to take the CogScreen on the computer," which test "is administered on the computer," takes approximately an hour, and "also did the Boston Naming Test, finger-tapping test, Grooved Pegboard [the] PASAT, or Paced Serial Addition Test, and the Stroop Color Word Test."[33]  He testified that he has never observed Dr. Fonseca administer an MMPI test, the Wechsler Adult Intelligence Scale-4 or the Wisconsin Card Sorting Test ("WCST"), and was not in the room when she administered it or certain parts of the Meyers Neurological Battery.[34]  Dr. Bercaw did not recall who administered the Integrated Visual and Auditory Continuous

_____

[31](...continued)
        A        This is in reference to the fee that was required by my company to have a phone consultation[,]

with Defendant's Motion, DE 132, at 7 ("But, as Plaintiff previously instructed Dr. Caddy, if Dr. Bercaw 'won't play ball with you . . . we will cut bait and go fish elsewhere.' (ECF No. 79 at 2.) That is precisely what Plaintiff and Dr. Caddy did."), footnoting to an allegations that Lt. Col. Patterson and Dr. Caddy were "looking for doctors who were willing to 'play ball'...."

[32]Id. at 86:9-17.

[33]Id. at 20:18-21:9, 24:22-25:4, 87:13-21, 97:18-20.

[34]Id. at 23:19-24:5; 94:15-17, 95:10-12, 95:15-23, 96:8-22

Performance test ("IVA").[35]  The IVA and WCST were two of the tests on which Dr. Bercaw rated Lt. Col. Patterson as scoring poorly.[36]

As to Drs. Bercaw and Fonseca's Neuropsychogical Evaluation, which defendant filed as an attachment to its Reply in Support of American Airlines, Inc.'s Motion for Summary Judgment, DE 87-1, Dr. Caddy never received it—and, therefore, could not have disregarded it, either.  Although documents obtained from Comprehensive MedPsych Systems show that a copy of the evaluation was telecopied April 25 to a facsimile machine shared by Dr. Caddy's psychology practice with other businesses operating in the same suite, pursuant to a HIPPA release filled out in Lt. Col. Patterson's handwriting.  The facsimile device, however, does not automatically print a fax, but sends an e-mail to Kristie Caddy, who is Dr. Caddy's office manager (and wife) that a fax has arrived.[37]  Because of the prevalence of unsolicited "junk faxes," it is the office's routine practice to not even open any of the incoming messages unless either Dr. or Ms. Caddy is alerted in advance that someone is sending the office something that it is necessary to retrieve and print.[38]  Ms. Caddy did not open the e-mail until August 31 when requested to search her e-mail queue for any incoming faxes on April 25,

---

[35]Id. at 22:13-19.

[36]Id. at 55:18-56:23 and 58:9-59:3, respectively.

[37]Unsworn Declaration of Glenn Ross Caddy, Ph.D., Under Penalty of Perjury, Pursuant to 28 U.S.C. § 1746, which is appended as Attachment 2, at 1, ¶¶ 1-4.

[38]Id. at ¶ 5.

2016.[39]  She never printed it.[40]  If it had been printed, it would have been in
Dr. Caddy's file; he searched for it, but did not find it.[41]  The only support in
the cited portion of Dr. Bercaw's deposition, 33:2-35:2, for American's
assertion that "Dr. Bercaw faxed copies of his report to Dr. Caddy and
discussed the results with Dr. Caddy in a 30-minute telephone call,"
Defendant's Motion, DE 132, at 7, is that Dr. Bercaw testified that the
phone call "may have been about a half an hour," and that Dr. Bercaw
"believes [he] told [Dr. Caddy] a summary of the evaluation," and "followed
that up with a letter that basically expressed [Dr. Bercaw's] thoughts about
the evaluation in writing"[42]—which would have been superfluous if Dr.
Caddy had actually received the telecopied report April 25.[43]

 Dr. Caddy recalled, however, being forwarded (and most likely
reading) the April 22 e-mail from Dr. Bercaw to Lt. Col. Patterson;[44] likely
reading the May 6 letter (even though he was unable to locate it in his
file),[45] and discussing on May 6 Drs. Bercaw and Dr. Fonseca's examination

---

[39]Id. at 1-2, ¶¶ 6-7.

[40]Id. at 2, ¶ 9.

[41]Caddy Deposition, at 49:17-50:6.

[42]Bercaw Deposition, at 33:8-17.

[43]Nor did plaintiff's counsel receive a copy of the report, most likely
because Lt. Col. Patterson on April 22, 2016, in a previously undisclosed e-
mail to Dr. Bercaw, discovered during the preparation of this response,
"rescind[ed] any authorization for you to send my records anywhere other
than to Dr. Caddy, specifically those authorizations entitled Federal Aviation
Administration or Aviation Medical Examiner are at this time rescinded."  A
printout of the e-mail is appended as Attachment 3.

[44]Caddy Deposition, at 37:15-17, 38:2-11, and 43:8-18.

[45]Id. at 43:24-44:6.

of Lt. Col. Patterson—which information he acknowledged that the could not "unlearn."[46]  Based on that, the magistrate judge ruled that Dr. Caddy had sufficiently "considered" Dr. Bercaw and Fonseca's findings concerning Mr. Patterson so as to elevate them above non-testifying experts, to have required them to be disclosed in his expert report and to make their materials discoverable.  Although there is no transcript, the undersigned recalls no finding that Dr. Caddy had actually received the written report. The written HIPPA Qualified Protective Order and Order to Disclose Health Information, DE 84, includes no such finding.

American's counsel brought to Dr. Bercaw's attention during the deposition the assertion in Plaintiff's Response to American Airlines, Inc.'s Motion for Extension of Time to Take Depositions and File Daubert Motion and To Continue Trial And Request for Expedited Briefing, DE 92, that "[i]t was illegal and ethically inappropriate for Dr. Bercaw to issue any opinion about Lieutenant Colonel Patterson based on the testing done, unsupervised, by Dr. Fonseca."[47]

Dr. Bercaw—who acknowledged having read plaintiff's counsel's assertions prior to the deposition by downloading the response memo from the internet[48]—insisted during his deposition, however, that "in [his]

---

[46]Id. at 47:17-21, 48:1-49:10.

[47]Id. at 27:20-29:9, and Exhibit 3, quoting DE 92, at 5.

[48]Id. at 124:3-125:10.

opinion, none of it was unsupervised because I reviewed all of her work,"[49] and that he had been "there, available, the whole day."[50]

In addition to quoting Lt. Col. Patterson's e-mails to Dr. Caddy complaining about Dr. Fonseca's doing the testing instead of Dr. Bercaw, plaintiff cited, based on Lt. Col. Patterson's complaints and Dr. Caddy's testimony that Dr. Bercaw had admitted allowing the resident to conduct the tests, to:

- the Federal Aviation Administration's experience requirements for psychologists doing aeromedical examination of pilots ("Neuropsycholog-ical evaluations must be conducted by a licensed clinical psychologist who is either board certified or board eligible in clinical neuropsychology...."),[51]

- Florida's Psychological Services Act, § 790.009(1)(s), FLA. STAT.,[52] as well as

- the Florida Board of Psychology's Rule 64B19-18.004(5), FLA. ADMIN. CODE ("Use of Test Instruments"), and

- the American Psychological Association's Ethical Principles of Psychologists and Code of Conduct, http://www.apa.org/ethics/code/, last

---

[49]Id. at 28:10-14.

[50]Id. at 41:2-4.

[51]Federal Aviation Administration Guide for Aviation Medical Examiners, Specifications for Neuropsychological Evaluations for Potential Neurocognitive Impairment, https://www.faa.gov/about/office_org/headquarters_offices/avs/offices/aam/ame/guide/media/npevalspecs.pdf, last visited July 17.

[52]The statute provides that "[t]he following acts constitute grounds for denial of a license or disciplinary action, as specified in § 456.072(2): ... (s) Delegating professional responsibilities to a person whom the licensee knows or has reason to know is not qualified by training or experience to perform such responsibilities."

visited Monday, July 16, Rules 2.05 ("Delegation of Work to Others") and
9.1 ("Bases for Assessments"),
as each being implicated if one were to accept Lt. Col. Patterson's allegation
as true.

Although Dr. Bercaw acknowledged that he had received from Dr.
Caddy an e-mail string that began with Lt. Col. Patterson's stating that he
felt he had been cheated by being shunted off to the far less experienced
Dr. Fonseca, he testified that he never "fe[lt] the need" to address that
complaint.[53] Dr. Caddy, however, testified that Dr. Bercaw "should not
have" issued any opinion about the results of tests that were performed in
his absence by a Psy.D. resident.[54]

However, other than Dr. Caddy and Dr. Bercaw's disagreement over
the ethics and legality of permitting Dr. Fonseca to participate to the extent
that she did, neither's testimony would agree or disagree on anything within
the other's discipline:  Any concerns that Dr. Bercaw had about Lt. Col.
Patterson were purely neuropsychological—not psychological, i.e.,
psychopathology- or personality- disorder-based,[55] which is Dr. Caddy's area
of expertise; while Dr. Caddy commented somewhat in his report on Dr.
Knippa's findings, he stated that since he was "intent on remaining
forensically focused" that he would recommend and defer to "a certified and
highly experienced Aeromedical Clinical and Neuropsychologist..."[56]

---

[53]Id. at 99:19-100:10.

[54]Caddy Deposition, DE 57:27, at 81:24-82:12.

[55]Id. at 119:7-25.

[56]Caddy Report, at 39.

Dr. Bercaw characterized Lt. Col. Patterson's "overall performance on the CogScreen" as being "within normal limits, which is favorable."[57] He further testified that while there were "a few concerns," that "required further investigation," that he could not say definitively in March 2016 that Lt. Col. Patterson was not fit for duty.[58]  However, he acknowledged that there was nothing in the results of a CogScreen test administered by Dr. Kay that would indicate at the end of June, beginning of July 2016, Lt. Col. Patterson was "unfit for duty."  Dr. Caddy had not forwarded Dr. Bercaw's report to Dr. Kay because Dr. Caddy had never received the report.

## Applicable Legal Principles

In Daubert, the Supreme Court held that "[f]aced with a proffer of expert scientific testimony," a district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  509 U.S. at 592-93.

In its role as "gatekeeper," the district court must enable the parties to develop the facts necessary to make a particularized determination of reliability of proffered evidence under Federal Rule of Evidence 702.[59]  See

---

[57]Bercaw Deposition, at 108:2-19.

[58]Id. at 108:20-24.

[59]Rule 702, which governs the admission of expert testimony, states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(continued...)

<u>Kumho Tire v. Carmichael</u>, 526 U.S. 137, 150 (1999) (citing <u>Daubert</u>, 509 U.S. at 591).

Trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

<u>U.S. v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004), quoting <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998) (citing <u>Daubert</u>, 509 U.S. at 589).  "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion..." <u>Id</u>.

However, "[a] review of the caselaw after <u>Daubert</u> shows that the rejection of expert testimony is the exception rather than the rule." 2000 Committee Note to Rule 702, quoting <u>U.S. v. 14.38 Acres of Land Situated in Leflore County, Mississippi</u>, 80 F.3d 1074, 1078 (5th Cir. 1996), for the proposition that "<u>Daubert</u> did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system,'" and <u>Daubert</u>, 509 U.S. at 595, for its exhortation that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

Concerning such generalized testimony as an explanation of standardized psychological testing and its application to a particular case, to

---

[59](...continued)

which the Committee Note refers as "the venerable practice of using expert
testimony to educate the fact finder on general principles," Rule 702
"simply requires that: (1) the expert be qualified; (2) the testimony address
a subject matter on which the factfinder can be assisted by an expert; (3)
the testimony be reliable; and (4) the testimony 'fit' the facts of the case."

Rule 703 permits "[a]n expert [to] base an opinion on facts or data in
the case that the expert has been made aware of or personally observed,"
he can only do so "[i]f experts in the particular field would reasonably rely
on those kinds of facts or data in forming an opinion on the subject...."  See
U.S. v. Scrima, 819 F.2d 996, 1002 (11th Cir. 1987).  However, "Rule 703
applies only when an expert witness testifies about matters within the
scope of his expertise." U.S. v. Garcia, 447 F.3d 1327, 1336 (11th Cir.
2006).

**Applying the Law to the Facts in the Case at Bar**

**Point 1:**     **Dr. Caddy would not be repeating Dr. Kay's findings while ignoring contrary data, because Dr. Caddy, a clinical psychologist, would not be testifying about neuropsychology.**

Although Dr. Caddy did review an e-mail from Dr. Bercaw that raised some issues concerning Lt. Col. Patterson's neuropsychological test results, which results are contrary to those produced by Dr. Kay, and did not mention Dr. Bercaw's concerns in his expert report, Dr. Caddy is not going to testify about Dr. Kay's test results because:

*One*, Dr. Caddy, unlike Drs. Kay and Bercaw, is not a neuropsychologist and, therefore, is not competent to testify about such test results, and

*Two*, Dr. Caddy cannot testify what Dr. Kay found because neuropsychology is not within Dr. Caddy's expertise, and a clinical psychologist would not typically rely on a neuropsychologist 's findings to form opinions on matters of clinical psychology.

One cannot accuse Dr. Caddy of cherry-picking data on which to base opinion testimony when he does not intend to provide such testimony and, even if he would wish to do so, it is unlikely because of the limitations of Rule 703 that plaintiff's counsel would ask him to do so, or that the Court would allow it.

Dr. Bercaw's report—assuming that the court finds it to be trustworthy, considering the disputed issues of facts about who actually administered the tests—is available for any cross-examination of Dr. Kay. But Dr. Caddy's failure to disclose his contacts with Dr. Bercaw, or to forward to Dr. Kay a written report that Dr. Caddy never got until last month—provides no grounds to bar him from giving opinion testimony in his areas of expertise.

## Conclusion

Based on the facts marshaled, the authorities cited and the arguments presented, plaintiff, Rodney Scott Patterson, respectfully requests this Court to deny American Airlines, Inc.'s Motion to Exclude Opinion Testimony by Dr. Caddy.

Respectfully Submitted,

*/s/    William R. Amlong*
WILLIAM R. AMLONG
Florida Bar No.: 470228
WRAmlong@TheAmlongFirm.com
KAREN COOLMAN AMLONG
Florida Bar No.: 275565
KAmlong@TheAmlongFirm.com

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301
Telephone: (954) 462-1983
Facsimile: (954) 463-5008

NOEL C. PACE
noel.c.pace.esq@gmail.com
Confidential Communiqué to
William Amlong, Esquire

*Admitted Pro Hac Vice*
206 NW 91st Street
El Portal, FL
(305) 710-3713

**Attorneys for Plaintiff,**
**Rodney Scott Patterson**

## Certificate of Service

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been filed using the ECF function of United States District Court for the Southern District of Florida and thereby has been distributed to all of the parties and counsel of record in this matter.

*/s/    William R. Amlong*
WILLIAM R. AMLONG

\\amlong3\cpshare\CPWin\HISTORY\180912_0001\1538.215