PLAINTIFF'S EXHIBIT 27

| | |
|---|---|
| From: | William Amlong |
| To: | "Scott" |
| Cc: | "Karen Coolman Amlong"; noel.c.pace.esq@gmail.com; "Yasmin Harris" |
| Subject: | 2219-00000 PATTERSON, SCOTT vs. American Airlines (WRA/KCA): |
| Date: | Tuesday, September 04, 2018 9:49:13 PM |
| Attachments: | Re Neuropsych Evaluation (8.91 KB).msg |
| | Pages from 180306 Client"s Testimony about Bercaw-2.pdf |

Scott –

Please explain to us hos the following excerpts from your deposition, pp. 341-350, a PDF of which I am attaching, are not untrue statements of fact made under oath during your deposition concerning the report from Dr. Bercaw that was in Danny Shellhouse's file but which was not given to me until after the magistrate judge ordered it produced—even though Dr. Bercaw actually sent it to you April 22,

The reason I am asking as because Karen, Noel and I are officers of the court, who are all bound by Florida Bar Rule of Professional Conduct 4-3.3 ("Candor towards the tribunal"), a no-wiggle-room commandment that provides in pertinent part:

> **(a) False Evidence; Duty to Disclose.** A lawyer shall not knowingly:
>
> > (4) offer evidence that the lawyer knows to be false…. If a lawyer, the lawyer's client, or a witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer **shall** take reasonable remedial measures including, if necessary, disclosure to the tribunal….

The commentary to the rule notes that

> The rule generally recognized is that, if necessary to rectify the situation, an advocate must disclose the existence of the client's deception to the court. Such a disclosure can result in grave consequences to the client,

including not only a sense of betrayal but also loss of the case and perhaps a prosecution for perjury….

* * *

Here are the excerpts that I find troublesome and that will need to be corrected unless you can **convince** at least Karen and me that they are true, notwithstanding the existence of not only Dr. Bercaw's testimony but documentary evidence to the contrary.

    Q.    You never -- you're not familiar with the Bercaw report?
    A.    Dr. Bercaw -- Dr. Bercaw was -- was consulted to basically draw forth -- draw forth conclusions or whatnot. And Dr. Bercaw --
    Q.    Consulted by you?
    A.    Well, consulted by me. And doctor -- Dr. Caddy contacted Dr. Bercaw and doctor -- Dr. Bercaw had – had insinuated that this was going to go to a lawsuit and he was not interested in -- in -- in pursuing the lawsuit.
341:17-342:1

    Q.    [Did] Dr. Bercaw [appear on your FAA form]?
    A.    He did not.
    Q.    And why is that?
    A.    Dr. Bercaw said that he didn't want to be involved in the lawsuit.
343:3-7

    Q.    Have you visited him in the last three years?
    A.    Not in the last three years. I've spoken with him.
343:10-12

    Q.    Did Dr. Bercaw prepare a report about your medical history?
    A.    Dr. Bercaw, basically, in -- in -- in speaking with him,

Dr. Bercaw didn't want to be involved with American Airlines as far as the procedure.
343:13-17

Q. Did Dr. Bercaw prepare a report about your medical history?
A. If he did, I didn't see it.
343:18-20
Q. So there may or may not be a report that Dr. Bercaw created about your medical history?
A. I'm pretty familiar -- if -- if he created a report, I -- I should have seen it, but I have not seen it. And Dr. Bercaw advised Dr. Caddy that -- that he didn't want to be involved in the lawsuit and, you know, wanted a lot of money to participate and come onboard as a witness.
343:21-344:3

Q. Did you -- did you respond to this [April 22] e-mail from Dr. Bercaw?
A. I did not respond to it.
347:16-18. See the April 22, 2016 e-mail from you to Bercaw, Fonseca, Caddy and me, which I am attaching.

Q. So have you ever seen a report from Dr. Bercaw?
A. I have not.
347:25-348:1

Q. As -- as -- as part -- August -- April 2016 is the date of the e-mail.
As part of this -- this litigation, have you search your records for a PDF of the report from Dr. Bercaw?
A. If I had it, I would have produced it for you, sir.
Q. Have you searched your records?
A. I have.
348:12-20

As you can see, as your lawyers, whether you wish to correct a false statement is immaterial. Our duty to do so is

unconditional. Karen and I have no intention of jeopardizing our licenses (and livelihood) by not doing so.

Bill

William R. Amlong, Esquire



500 Northeast Fourth Street, Fort Lauderdale, Fl 33301

Confidentiality Notice: This e-mail and/or any attachment to it contains, or may contain, privileged and confidential information intended only for the use of the individual(s) named in the e-mail. If you are not the intended recipient, or the person responsible for delivering it to the intended recipient, please permanently delete it from your computer system and promptly notify me.

| | |
|---|---|
| From: | William Amlong |
| To: | "Scott" |
| Cc: | "Karen Coolman Amlong"; noel.c.pace.esq@gmail.com; "Yasmin Harris" |
| Subject: | FW: 2219-00000 PATTERSON, SCOTT vs. American Airlines (WRA/KCA): (earlier draft was mistakenly sent too soon) |
| Date: | Tuesday, September 04, 2018 11:13:50 PM |
| Attachments: | Re Neuropsych Evaluation (8.91 KB).msg |
| | Pages from 180306 Client"s Testimony about Bercaw-2.pdf |

Scott –

Please explain to us how the following excerpts from your deposition, pp. 341-350, a PDF of which I am attaching, are not untrue statements of fact made under oath during your deposition concerning the report from Dr. Bercaw that was in Danny Shellhouse's file but was not given to me until after the magistrate judge ordered it produced—even though Dr. Bercaw appears to have actually sent it to you April 22, and you appear to have forwarded that copy to Danny Shellhouse, which is obvious from the absence on the copy of the report that you produced from me, after the magistrate judge ordered its production, of any fax legend across the top, see PATTERSON-BERCAW_00155-00161, in contrast to the copy that Dr. Bercaw's office faxed to Dr. Caddy's office April 25. See PATTERSON-BERCAW_00142-00152. (Although 142-152 was faxed in July to our office, now that we finally had a date, I had Kristi Caddy check the fax server that they share with several other entities, and the document that came up had the same type of fax legend). I believe you already have a copy of the production, since it is Yasmin's routine practice to forward such documents to clients.

The reason I am raising these issues is because Karen, Noel and I are officers of the court, who are all bound by Florida Bar Rule of Professional Conduct 4-3.3 ("Candor towards the tribunal"), a no-wiggle-room commandment that provides in pertinent part:

    **(a) False Evidence; Duty to Disclose.** A lawyer shall not knowingly:

> (4) offer evidence that the lawyer knows to be false…. If a lawyer, the lawyer's client, or a witness called by the lawyer has offered material evidence and the lawyer comes to know of its falsity, the lawyer **shall** take reasonable remedial measures including, if necessary, disclosure to the tribunal….

The commentary to the rule notes that

> The rule generally recognized is that, if necessary to rectify the situation, an advocate must disclose the existence of the client's deception to the court. Such a disclosure can result in grave consequences to the client, including not only a sense of betrayal but also loss of the case and perhaps a prosecution for perjury….

\*   \*   \*

Here are the excerpts that I find troublesome and that will need to be corrected unless you can **convince** at least Karen and me that they are true, notwithstanding the existence of not only Dr. Bercaw's testimony but documentary evidence to the contrary.

    Q.  You never -- you're not familiar with the Bercaw report?
    A.  Dr. Bercaw -- Dr. Bercaw was -- was consulted to basically draw forth -- draw forth conclusions or whatnot. And Dr. Bercaw --
    Q.  Consulted by you?
    A.  Well, consulted by me. And doctor -- Dr. Caddy contacted Dr. Bercaw and doctor -- ==Dr. Bercaw had – had insinuated that this was going to go to a lawsuit and he was not interested in -- in -- in pursuing the lawsuit.==

341:17-342:1. No other testimony or documentary evidence supports this rationale for Dr. Bercaw's disinterest in continuing as an hourly-compensated expert witness.

> Q. [Did] Dr. Bercaw [appear on your FAA form]?
> A. He did not.
> Q. And why is that?
> A. Dr. Bercaw said that he didn't want to be involved in the lawsuit.

343:3-7. See above.

> Q. Have you visited him in the last three years?
> A. Not in the last three years. I've spoken with him.

343:10-12. March 2016 to March 2018 is two years.

> Q. Did Dr. Bercaw prepare a report about your medical history?
> A. Dr. Bercaw, basically, in -- in -- in speaking with him, Dr. Bercaw didn't want to be involved with American Airlines as far as the procedure.

343:13-17. He obviously did; you gave a copy to Danny Shellhouse.

> Q. Did Dr. Bercaw prepare a report about your medical history?
> A. If he did, I didn't see it.

343:18-20. Given the date on the report, and your reaction to it in the April 22 e-mail, this is not believable.

> Q. So there may or may not be a report that Dr. Bercaw created about your medical history?
> A. I'm pretty familiar -- if -- if he created a report, I -- I should have seen it, but I have not seen it. And Dr. Bercaw advised Dr. Caddy that -- that he didn't want to be involved in the lawsuit and, you know, wanted a lot of money to participate and come onboard as a witness.

343:21-344:3. No other evidence supports this, plus which, Danny Shellhouse had the report.

> Q. Did you -- did you respond to this [April 22] e-mail from Dr. Bercaw?
> A. I did not respond to it.

347:16-18. See the April 22, 2016 e-mail from you to Bercaw, Fonseca, Caddy and me, which I am attaching.

> Q. So have you ever seen a report from Dr. Bercaw?
> A. I have not.

347:25-348:1. In which case, why did you have the reaction that you expressed in the April 22 e-mail? How did Danny get it?

> Q. As -- as -- as part -- August -- April 2016 is the date of the e-mail.
> As part of this -- this litigation, have you search your records for a PDF of the report from Dr. Bercaw?
> A. If I had it, I would have produced it for you, sir.
> Q. Have you searched your records?
> A. I have.

348:12-20. Then how come when you searched the records after the magistrate judge ordered you to do so, you found it.

As you can see, as your lawyers, whether you wish to correct a false statement is immaterial. Our duty to do so is unconditional. Karen and I have no intention of jeopardizing our licenses (and livelihood) by not doing so. Nor does Noel based on my conversation with him tonight.

I have not practiced criminal law in approximately 25 years, and neither Karen nor I will advise you on the criminal implications of your correcting/not correcting your testimony. Nor can I predict how Judge Martinez is going to react,

although I think it would be less volatilely if it appeared to be voluntarily on your part, as opposed to Karen, Noel and my coming forward and saying that we finally figured it out.

On the brighter side, assuming Judge Martinez does not strike your pleadings, Karen and I do not think that your changing your testimony would necessarily tube your case (although it might). We can make out a prima facie case—i.e., that they grounded you two days after you went on duty, which is pretty strong evidence of that your Reserve activity was a motivating factor, particularly when coupled with the rather intemperate e-mail traffic on the other side. Once we get past that, it is AA's burden to prove that it would have taken the same action regardless of your going on military duty.

I have done no research and express no opinion on whether AA would be able to amend its pleadings to claim that this "after-acquired evidence" of your having given untruthful answers during deposition would be grounds for firing you.

On another front, if you still wish to pursue the position that Dr. Fonseca performed critical portions of the aeromedical exam, I have located one of the most respected private investigators in South Florida, Wayne Black (an old friend from my days at The Miami Herald), who said that he could do the interview, or have one of his top operatives do it, for $200-a-hour. We would need a HIPPA release from you to his firm. In light of the credibility issues that are going to be raised by the disclosures that we **must** make, and such evidence as Dr. Bercaw's handwriting on the aeromedical portions of the examination materials, I am unwilling to continue to press that point unless Dr. Fonseca backs you up.

Please let us know as soon as possible how you want to proceed. Keep in mind, however, that even if you do not wish to inform the court that the answers you gave are not correct, Karen, Noel and I—absent what I believe would be the impossible task of your convincing us that your answers were

at least plausible—have no choice but to inform the court that we believe the testimony cited above was perjured.

If you wish to obtain new counsel, we would understand. That would not alter Karen's, Noel's nor my obligations as officers of the court.

Bill

William R. Amlong, Esquire



500 Northeast Fourth Street, Fort Lauderdale, Fl 33301

Confidentiality Notice: This e-mail and/or any attachment to it contains, or may contain, privileged and confidential information intended only for the use of the individual(s) named in the e-mail. If you are not the intended recipient, or the person responsible for delivering it to the intended recipient, please permanently delete it from your computer system and promptly notify me.

| | |
|---|---|
| From: | Scott |
| To: | wramlong@theamlongfirm.com; kamlong@theamlongfirm.com; jdaley@aol.com; noel.c.pace.esq@gmail.com; ypharris@theamlongfirm.com |
| Subject: | Emails |
| Date: | Wednesday, September 05, 2018 11:40:17 AM |

-----Original Message-----
From: William Amlong <wramlong@theamlongfirm.com>
To: 'Scott' <aa737drvr@aol.com>
Cc: 'Karen Coolman Amlong' <kamlong@theamlongfirm.com>; noel.c.pace.esq <noel.c.pace.esq@gmail.com>; 'Yasmin Harris' <ypharris@theamlongfirm.com>
Sent: Tue, Sep 4, 2018 9:49 pm
Subject: 2219-00000 PATTERSON, SCOTT vs. American Airlines (WRA/KCA):

Bill

Per the emails between Bercaw and my self attached.

1. It is clear Bercaw's office was a bad experience. The Allied Pilots Association Attorney was also well aware that I was going to Dr. Jeffrey Kantor (Bercaw's boss). Marsha Reekie, RN a nurse advisor with the Allied Pilot's Association Aeromedical Office advised me not to see Kantor as he was not HIMMS qualified. Thus in the course of my canceling Kantor he proffered Dr. Bercaw who was HIMMS qualified to keep the business.

In fact I wanted to see Kantor before Knippa, but he did not have time beforehand. (pilots never take a checkride without a warmup),(APA has now gotten doctors to do just that for Section 20 Victims)

I also had a conference with Dr. Gary Kay via telephone which Kantor made before going to see Knippa. I told both of them my story. Kantor and Kay both knew Dr. Knippa. I told Kay that I was concerned and exactly why. Even the concealed/missing Corporate Security investigation was brought up at that time. both knew It was a military reason and AA was using it as a pretext to fire me. I was not aware of the specifics on cognitive testing and felt Kantor's office should have advised me better to be well rested. In fact Tordella says you have to stay in a local hotel and not travel long distances.

**Bercaw states in his Depo it was not ideal but Kantor, a non HIMMS qualified doctor, his boss told him to go ahead with the evaluation.**

2. If you will recall, Isha submitted a string of privileged emails between myself and APA to American regarding preparation beforehand and that is why the Allied Pilots Association went ape shit over those documents and demanded they be pulled back. I also sent you and Karen a number of emails about what was being disclosed to American with the concern that American would twist whatever to suit them. I was not advised by Isha of the nature of this discovery hearing and certainly was shocked

when I heard APA sent 3 attorneys to that hearing. Shortly thereafter came the email from Dan Carey through Danny and my subsequent ouster from good graces with the union.

3. As I have stated, before, I showed up at Bercaws office on Monday AM MAR 21 2016 not even three full days after leaving Knippa thoroughly exhausted. I was late getting to Bercaw because of air traffic at the airport. when I got to his office, they wanted the $3,200.00 up front. I wanted to speak to Bercaw, first not pay money. Perhaps had he done that, I would have not done anything with him. He had my money so I was captive with no refunds.

Afterward, The Mayo Clinic, who Paul Schneider spoke to said basically we can't see you for six months due to full appointments schedule. There were three reasons behind this, one they are too busy, two they wanted some time to go by before re administering the tests done at Knippa's. three, they knew this was going to litigation and didn't want to get involved (it's a company policy). I felt the same way with Bercaw and since I already paid him it was a bit too late to back out he had my money.

4. Speaking to the email below. Bercaw's report was not attached to the email that I received on APR 22, 2016, just like I said in the deposition. However, from just reading the email and not the report. It is obvious the report could have negative consequences.

   1. I had a Bad experience with Bercaw that was identified to Caddy and sent to Bercaw also in an email..

     I also had a number of conversations with Caddy about being ripped off by Bercaw.

   2. Bercaw mentions sending this report, which was not attached but, could have negative connotations, which I never intended to have happen.  Which is why I said in my response to Bercaw:

**_I am having a conflict with American Airlines that has required me to retain counsel and all communications with American Airlines or the Federal Aviation Administration should go through my attorney, Mr. William Amlong, Esq cc line_**.

(which means this is about a lawsuit)(which is what I said in my deposition, this is about a lawsuit)(Specifically directing Bercaw to communicate with you! )(Bercaw was not my regular doctor or a medical doctor).  (The FAA did not mandate me to see Bercaw and wouldn't be looking for anything from him)(Looking at this conversely, going to Bercaw so soon was not the right thing to do.  American would have played this as practice. As I said they argue to suit them.

3. It is clear that Bercaw was just out to take my money, as he made himself available to do additional testing and he recommended additional testing in his letter about the report to Doctor Caddy.

**Ultimately, the recommendation is that this should go to review by the FAA, who has a few "in house" neuropsychologist consultants who render an opinion. They will have the data they need from us, but we are willing to do any follow-up or additional testing that may be required later, which is sometimes the case.**

Data which was obviously not valid per Dr. Caddy's assessment of my visit.

4. Again, as soon as I read the email from Bercaw (again where the report was not attached), I immediately pulled the authorization for him to release it because I could tell there were going to be some issues with it. ( I want to be very clear, If Bercaw thought I was a danger to the flying public, then he had an immediate obligation to notify the FAA irregardless of my authorizations. Which he did not do. I had an FAA Airman Medical and could operate and aircraft. And if he was concerned, he knew I flew an airplane with my kids over to Sarasota. He should have never let me fly home if there were concerns.

5. I downloaded Bercaw's report from Pacer in the Summer. 2018 and it was missing the letter.

6. I was never asked in the Deposition about the Letter from Dr. Bercaw that was sent to Dr. Caddy and was likely given to me by Dr. Caddy in Summer 2016. Over those 2 years, I must have misplaced the letter. but again I was never asked about the letter in the deposition.

7. In 2018, I got the copy of the letter back from Shellhouse. In fact he didn't have the report until I pulled from Pacer and sent to him. He thankfully had the letter about the report.

8. The letter and the report are two different things.

9. Bottomline, I didn't need to see the report because from the text in his email, Bercaw mentions he would like to send the report to the FAA to opine, I knew I had to shut the whole thing down. Again the report was not attached to the email Bercaw sent me I didn't have it until American posted it. Knippa hadn't gone to the FAA so why would Bercaw? This didn't make sense to me.

10. Bercaw says in his email to me he had an authorization to send his report to you which clearly indicates he was aware this case was heading to litigation. Bercaw cleared up the play ball comment in his deposition in which he states it was because he was charging me a forensic fee to speak with Caddy.

11. I never called Bercaw and got a consultation from him about the report. Caddy wanted to talk to Bercaw regarding the intern doing the testing. Bercaw refused and

instead wanted a fee if Caddy was involved in any fashion.

***Bercaw now admits he did some but didn't do all of the testing and also admitted that he supervising Fonseca, had not observed her give the testing as a validation***

| | |
|---|---|
| **Attached Message** | |
| From | Scott <aa737drvr@aol.com> |
| To | edb@medpsych.net |
| Cc | drfonseca@medpsych.net; glenncaddy@gmail.com; wramlong@theamlongfirm.com |
| Subject | Re: Neuropsych Evaluation |
| Date | Fri, 22 Apr 2016 12:49:19 -0400 |

Dr. Bercaw

Per our conversation on 21 MAR, you advised me that you would not release any information without my specific approval.
I am having a conflict with American Airlines that has required me to retain counsel and all communications with American Airlines or the Federal Aviation Administration should go through my attorney, Mr. William Amlong, Esq cc line.

Mr Amlong has hired Dr Glenn Caddy to undertake a comprehensive examination of all of the matters dealing with my case. I have authorized Dr. Caddy to both speak with you and obtain a copy of your report together with a copy of your entire file in this matter. I have also requested Dr. Caddy to set up a time to speak with you telephonically and was speaking with Dr. Caddy only a half hour ago. He advised he left a message with your company and would like for you to call him to discuss all of your findings.

Dr. Caddy will arrange to pay you for your time in this matter. Please discuss your fee with him.

At the moment I am rescinding any authorization for you to send my records anywhere other than to Dr. Caddy, specifically those authorizations entitled Federal Aviation Administration or Aviation Medical Examiner are at this time rescinded.

v/r

Scott Patterson
704-231-0909


-----Original Message-----
From: Ed Bercaw <edb@medpsych.net>
To: aa737drvr <aa737drvr@aol.com>
Cc: Nathaly Fonseca, Psy.D. <drfonseca@medpsych.net>
Sent: Fri, Apr 22, 2016 11:38 am
Subject: Neuropsych Evaluation

Good Morning Mr. Patterson,

Sorry for the delay on this report. We did get the medical records this week and wrapped up the report just today. A PDF is attached. I will be available to answer any

questions you might have after reviewing this. I received the authorization to send this to your attorney, which I can do after you have had a chance to read this. Ultimately, the recommendation is that this should go to review by the FAA, who has a few "in house" neuropsychologist consultants who render an opinion. They will have the data they need from us, but we are willing to do any follow-up or additional testing that may be required later, which is sometimes the case.

Thank you and best regards,

Ed Bercaw


Edwin Bercaw, Ph.D.
Neuropsychologist
Comprehensive MedPsych Systems, Inc.
(941) 363-0878, ext 2101
(941) 363-0527 fax

Email Confidentiality Notice: This e-mail message (including any attachments) may be confidential and subject to protection under the law, including the Health Insurance Portability and Accountability Act (HIPAA), the Electronic Communications Privacy Act, 18 U.S.C. Statute 2510-2521, and/or the Federal confidentiality rules (42CFR Part 2). This e-mail, and any attachment, is intended solely for the individual or entity to whom it is addressed. If you are not the intended recipient, you are notified that any unauthorized review, dissemination, use, disclosure, distribution, and/or copying of the message(s) is strictly prohibited and may subject you to criminal and/or civil penalties. If you received this transmission in error, please contact the sender immediately by replying to this email and delete all received information (including attachments) from your computer and/or portable electronic device.