**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 17-60533-CIV-MARTINEZ/AOR**

RODNEY SCOTT PATTERSON,

      Plaintiff,

v.

AMERICAN AIRLINES,
a Delaware corporation,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE came before the Court upon Defendant American Airlines' ("Defendant" or "American") Motion for Sanctions [D.E. 154]. Therein, Defendant seeks sanctions pursuant to the Court's inherent authority and requests monetary relief, including attorneys' fees and costs, assessed jointly against Plaintiff and his counsel. Id. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636 by the Honorable Jose E. Martinez, United States District Judge [D.E. 155]. The undersigned held an Evidentiary Hearing on this matter on August 29, 2019 [D.E. 242]. For the reasons stated below, the undersigned respectfully recommends that Defendant's Motion for Sanctions be DENIED.

## PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff Rodney Scott Patterson ("Plaintiff" or "Patterson"), a Lieutenant Colonel in the United States Army Reserve, worked as a First Officer Pilot for American. See Compl. [D.E. 1]. In March 2016, Patterson underwent a fitness-for-duty evaluation conducted by a neuropsychologist, John Knippa, Ph.D. ("Dr. Knippa"), which resulted in a report that Patterson was not fit for duty as a pilot on the basis of impaired performances on cognitive assessment.

See Dr. Knippa's Neuropsychological Aeromedical Assessment Fitness For Duty (FFD) Report [D.E. 57-6 at 13]. On March 21, 2016, Patterson voluntarily underwent a second assessment with Edwin Bercaw, Ph.D. ("Dr. Bercaw") of Comprehensive MedPsych Systems ("MedPsych"). See Report of Dr. Bercaw (hereafter, "Bercaw Report") [D.E. 87-1]. On June 29, 2016, Plaintiff was examined by Gary Kay, Ph.D. ("Dr. Kay"). See D.E. 61-20, D.E. 160.

On March 14, 2017, Patterson brought this action against American pursuant to the Uniform Services Employment and Reemployment Rights Act ("USERRA"). See Compl. [D.E. 1]. Patterson asserted two claims against American: one for substantive violation of the law; and one for retaliation. Id.

On July 5, 2017, American issued to Plaintiff its First Set of Interrogatories, including the following:

> Identify any medical practitioner (including, without limitation, psychologists or neuropsychologists), by whom you have been evaluated or treated since January 1, 2014.

See Motion for Sanctions [D.E. 154-1 at 4]. Plaintiff's response did not identify Dr. Bercaw. Id.

Also on July 5, 2017, American issued to Plaintiff its First Requests for Production, including the following request:

> All documents that reference or relate to any consultation, evaluation, or treatment from a medical practitioner (including, without limitation, psychologists or neurologists) that you have received since January 1, 2014.

Id. [D.E. 154-2 at 4]. Plaintiff did not produce the Bercaw Report in response to this request. Id. [D.E. 154 at 7]. However, Plaintiff did produce e-mail correspondence, dated April 22, 2016, between Dr. Bercaw and Plaintiff that was copied to his attorney, William Amlong ("Mr. Amlong") of The Amlong Firm, and Glenn R. Caddy, Ph.D. ("Dr. Caddy"). See D.E. 53-1. In one of the April 22, 2016 e-mails, Dr. Bercaw states to Plaintiff, in part:

> Sorry for the delay on this report. We did get the medical records this week and wrapped up the report just today. A PDF is attached . . . Ultimately, the recommendation is that this should go to review by the FAA, who has a few "in house" neuropsychologist consultants who render an opinion. They will have the data they need from us, but we are willing to do any follow-up or additional testing that may be required later, which is sometimes the case.

Id. The same day, Plaintiff responded in an e-mail, "The file was not attached." Id.

On March 6, 2018, American conducted the deposition of Plaintiff. See Videotaped Deposition of Rodney Scott Patterson [D.E. 57-1]. During his deposition, Plaintiff initially denied knowing Dr. Bercaw, but then admitted that he had consulted Dr. Bercaw and that Dr. Caddy had contacted Dr. Bercaw. Id. at 341. Plaintiff then stated that he had not visited Dr. Bercaw in the last three years, but had spoken with him; and that he had never seen any report by Dr. Bercaw. Id. at 343. Plaintiff proceeded to say that he was "pretty familiar" and should have seen any report by Dr. Bercaw, but he had not. Id. Upon being shown the April 22, 2016 e-mail from Dr. Bercaw to Plaintiff at the deposition, Plaintiff stated: that the e-mail jogged his memory; that he had not seen a report by Dr. Bercaw; that Plaintiff had asked Dr. Bercaw to consult with Dr. Caddy; and that Plaintiff did not respond to Dr. Bercaw's e-mail. Id. at 347.

On June 27, 2018, the undersigned issued an Order requiring Plaintiff to produce discovery related to Dr. Bercaw, including: a letter dated May 6, 2016 from Dr. Bercaw to Plaintiff's testifying expert Dr. Caddy; the Bercaw Report; and any written communications between Dr. Bercaw and Dr. Caddy regarding Plaintiff (hereafter, "June 27, 2018 Order"). See Order [D.E. 80]. The undersigned found that Dr. Caddy had considered but rejected the Bercaw Report for purposes of his own expert report and opinions. Id. The Order also permitted Dr. Bercaw to produce any documents in his possession, custody or control that were responsive to Defendant's outstanding subpoena. Id.

On June 29, 2018, American obtained the Bercaw report from Dr. Bercaw's office. See

Motion for Sanctions [D.E. 154 at 3]; Bercaw Report [D.E. 87-1]. On July 30, 2018, the Court granted American's Motion for Extension of Time to Take Depositions and File *Daubert* Motion and to Continue Trial, finding that Plaintiff had failed to timely comply with Fed. R. Civ. P. 26(a)(2)(B)(ii). See Order Revising Scheduling Order [D.E. 108].

On September 28, 2018, the undersigned held an evidentiary hearing to address Defendant's Motion to Exclude Opinion Testimony by Dr. Caddy (hereafter, "*Daubert* Motion") [D.E. 132]. See Paperless Minute Entry [D.E. 143]. The undersigned then issued a Report and Recommendation, recommending that Defendant's *Daubert* Motion be granted in part and denied in part as follows: Dr. Caddy's expert opinion should be limited to Plaintiff's psychological health, but could only be adduced if that issue were presented to the jury by Dr. Knippa; and that Dr. Caddy could not opine regarding alleged irregularities in Dr. Knippa's psychological testing methods that allegedly reflected a pro-American bias. See Report and Recommendation [D.E. 149].[1]

On November 28, 2018, Defendant deposed Gary Kay, Ph.D. ("Dr. Kay"). See Motion for Sanctions [D.E. 154 at 3]; Excerpts of Dr. Kay's Deposition [D.E. 223-1]. On March 3, 2019, Plaintiff withdrew Dr. Kay's report. See Plaintiff's Withdrawal Notice re: Report of Neuropsychological Assessment 06/29/2106 (sic) Dr. Kay as Positive Summary Judgment Evidence of Plaintiff's Fitness for Duty [D.E. 160].

On March 29, 2019, the Court granted summary judgment in favor of American [D.E. 169]. On April 29, 2019, Plaintiff filed a Notice of Appeal [D.E. 180].

On April 24, 2019, Plaintiff's primary counsel, The Amlong Firm, filed a motion to withdraw from further representation due to Plaintiff's desire to proceed *pro se* and to file a Rule

---

[1] Defendant's *Daubert* Motion was later denied as moot in light of the Court's Order granting Defendant's Motion for Summary Judgment. See [D.E. 171] Paperless Order denying as moot [132] Defendant's Motion to Exclude Opinion Testimony by Dr. Caddy.

59 motion directed at the order granting summary judgment in favor of American [D.E. 174]. On April 26, 2019, the motion to withdraw was denied [D.E. 178]. On June 6, 2019, Plaintiff's counsel filed a renewed motion to withdraw, arguing as additional grounds the existence of conflict due to the pendency of the Motion for Sanctions against both Plaintiff and his counsel [D.E. 202]. The renewed motion to withdraw is pending ruling.

On February 11, 2019, Defendant filed the Motion for Sanctions [D.E. 154]. On May 29, 2019, acting *pro se*, Plaintiff filed his Response to Defendant's Motion for Sanctions and Request for Other Relief (hereafter, "Plaintiff's Response") [D.E. 194]; Noel C. Pace, Esq., Pro Hac Vice ("Attorney Pace") filed his Response to Defendant's Motion for Sanctions (hereafter, "Attorney Pace's Response") [D.E. 195]; and The Amlong Firm filed its Response to Defendant's Motion for Sanctions (hereafter, "The Amlong Firm's Response") [D.E. 197]. On June 5, 2019, American filed its Omnibus Reply in Support of Motion for Sanctions [D.E. 203].[2]

## APPLICABLE LAW

Courts have the inherent authority to sanction parties who have willfully disobeyed a court order or who have acted in bad faith, vexatiously, wantonly, or for oppressive reasons. See Chambers v. NASCO, 501 U.S. 32, 45-46 (1991). A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Id. at 43 (citation omitted). This authority "must be exercised with restraint and discretion" and be used "to fashion an appropriate sanction for conduct which abuses the judicial process." Id. at 44-45. Such sanctions may include the dismissal of a lawsuit or an assessment of attorney's fees. Id. at 45.

---

[2] In a subsequent filing, Attorney Pace's Memorandum in Opposition to American's Motion For Sanctions Due to Impossibility [D.E. 239], Attorney Pace notified the Court that American's counsel "would agree to [Attorney Pace's] withdrawal with no sanctions or opposition if William Amlong, Esq. would not attempt to lay blame or attribute costs to this counsel for any of the alleged sanction-able conduct that American alleges was perpetrated by the Plaintiff and his Counsel." See D.E. 239 at 3-4.

"The key to unlocking a court's inherent power is a finding of bad faith." Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998). To find bad faith, the court must "focus primarily on the conduct and motive of a party, rather than on the validity of the case." Barash v. Kates, 585 F. Supp. 2d 1347, 1362 (S.D. Fla. 2006). A court may find bad faith when a party has committed a fraud on the court, delayed or disrupted the litigation, or hampered the enforcement of a court order. Tarasewicz v. Royal Caribbean Cruises Ltd., No. 14-CIV-60885, 2016 WL 3944176, at *4 (S.D. Fla. Feb. 9, 2016), report and recommendation adopted, No. 14-CIV-60885, 2016 WL 3944178 (S.D. Fla. Mar. 17, 2016). See also, Barnes, 158 F.3d at 1214 ("A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order."). Proving a fraud on the court requires more than inconsistencies, but rather "clear and convincing evidence of an unconscionable plan designed to improperly influence the court in its decision." Tarasewicz, 2016 WL 3944176 at *4 (finding that a pattern of inconsistent statements by the plaintiff and his wife did not amount to fraud on the court) (citations omitted). Such sanctions are generally reserved for only the most egregious misconduct. Id. at *5.

## EVIDENCE

The following witnesses testified at the August 29, 2019 Evidentiary Hearing: Plaintiff, Dr. Bercaw, Kristie Caddy ("Ms. Caddy"), Dr. Caddy, and Mr. Amlong. The following documents were admitted into evidence: Plaintiff's Exhibits 1-7, Defendant's Exhibits 1, 3-5, and 7-23, and The Amlong Firm's Exhibits 2c, 4, 6-10, 14-34, and 36. See Exhibit and Witness List [D.E. 243].

I.    Plaintiff's Testimony

1. Plaintiff visited Dr. Bercaw, a psychologist, at Dr. Bercaw's office, but could not remember the date of the visit.

6

2. Plaintiff was required to identify visits to health professionals in his capacity as an Army officer and as a pilot upon visiting an aviation medical examiner.

3. In early 2018, Plaintiff was deposed in Miami. He was represented by The Amlong Firm.

4. Plaintiff acknowledged that, during his deposition, he might have misspoken, but denied that he provided intentionally false testimony.

5. At the time of the deposition, Mr. Amlong had been copied on an e-mail from Dr. Bercaw.

6. Nathaly Fonseca, Psy.D. ("Dr. Fonseca") was a neuropsychologist that Dr. Bercaw had examine Plaintiff.

7. Plaintiff's e-mail address is ScottAA737DRVR@aol.com.

8. Dr. Caddy was an expert witness who Mr. Amlong had Plaintiff speak with.

9. Mr. Amlong's e-mail address is WRAmlong@TheAmlongFirm.com.

10. Dr. Bercaw's e-mail address is EDB@MedPsych.net.

11. There is an e-mail dated April 22, 2016 at 11:38 a.m. from Dr. Bercaw to Plaintiff (hereafter, "11:38 a.m. e-mail"). It could have been referencing a report, but there was no file attached. See Def. Ex. 3.

12. Plaintiff asked Dr. Bercaw to send that report to his attorney; and, to Plaintiff's knowledge, that was never done.

13. Plaintiff never provided any medical records to Dr. Bercaw. Plaintiff was not aware whether Dr. Bercaw received any of Plaintiff's medical records.

14. Plaintiff never received a report from Dr. Bercaw in April 2016.

15. Plaintiff understood that his consultation with Dr. Bercaw would be sent only to Plaintiff's attorney because Plaintiff wanted to exert attorney-client privilege.

16. Plaintiff did not understand what Dr. Bercaw was communicating to him in the April 22, 2016 e-mail and that is why Plaintiff involved his attorney.

17. There is an e-mail dated April 22, 2016 at 12:49 p.m. sent by Plaintiff to Dr. Bercaw in response to the 11:38 a.m. e-mail (hereafter, "12:49 p.m. e-mail"). Id. Dr. Caddy and Mr. Amlong are copied on the e-mail.

18. Plaintiff visited Dr. Bercaw's office in Sarasota, Florida sometime in mid-March 2016.

19. In the 12:49 p.m. e-mail, Plaintiff authorized Dr. Caddy to obtain whatever Dr. Bercaw had for him. Plaintiff did not know what it was.

20. In the 12:49 p.m. e-mail, Plaintiff was referring to a $500 forensic fee when he wrote, "Dr. Caddy will arrange to pay you for your time in this matter." Plaintiff paid the fee.

21. Plaintiff rescinded any authorization for Dr. Bercaw to send Plaintiff's records to the FAA or Aviation Medical Examiner because Plaintiff had retained an attorney. Plaintiff only wanted Dr. Bercaw to communicate with his attorney.

22. Plaintiff asked Dr. Bercaw to discuss the report with him but did not get an answer.

23. There is an e-mail dated April 22, 2016 at 12:59 p.m. sent by Plaintiff to Dr. Bercaw (hereafter, "12:59 p.m. e-mail") that states, "The file was not attached." See Def. Ex. 4. Copied on the 12:59 p.m. e-mail are Dr. Fonseca, Dr. Caddy and Mr. Amlong. Plaintiff was unaware whether Dr. Caddy ever asked Dr. Bercaw for the file. Plaintiff was more interested in his attorney, Mr. Amlong, getting the report. Plaintiff intended for Mr. Amlong to deal with any issue Dr. Bercaw was referencing.

24. The Bercaw Report is dated March 21, 2016 and is a written report entitled, "Comprehensive MedPsych Systems, Inc. Neurological Examination," that is authored by Dr.

Bercaw and Dr. Fonseca.  See Def. Ex. 5.  The Bercaw Report is a neurological evaluation of Plaintiff.  Plaintiff was evaluated in anticipation of litigation with Defendant.

25. Plaintiff's interest in being evaluated by Dr. Bercaw was in protecting his rights.

26. Plaintiff did not see Geoffrey Kanter, Ph.D. ("Dr. Kanter") on March 21, 2016.

27. There is an e-mail dated April 26, 2016 at 10:52 p.m. sent by Plaintiff to Dr. Caddy.  See Def. Ex. 7.  It is referencing an invoice for Dr. Caddy's time.  Plaintiff states in the e-mail, in part: "Dr. Bercaw's report which is lacking and very weak needs to be re-done."  Id.  Plaintiff had not seen Dr. Bercaw's report at the time and was referring to the qualifications of Dr. Fonseca.

28. On March 21, 2016, Plaintiff had communicated to Dr. Bercaw that he had an issue with Dr. Fonseca's qualifications.  Plaintiff was there on his own volition and proceeded with the evaluation.  Plaintiff paid several thousand dollars for the evaluation.

29. There is an e-mail dated April 29, 2016 at 4:59 p.m. sent by Plaintiff to Dr. Caddy (hereafter, "4:59 p.m. e-mail").  See Def. Ex. 8 at 2.  Plaintiff states in the 4:59 p.m. e-mail, in part: "If Dr. Bercaw will play ball with you, fine.  I have no issues with spending the money . . . If he won't play ball we will cut bait and go fish elsewhere."  Id.  Plaintiff's understanding was that he was referring to Dr. Bercaw's fees and compensation.

30. There is an e-mail dated April 29, 2106 at 4:24 p.m. sent by Dr. Bercaw to Plaintiff (hereafter, "4:24 p.m. e-mail").  Id.  In the e-mail, Dr. Bercaw references a $225 fee required for Dr. Bercaw to speak with Dr. Caddy.  Id.

31. Dr. Bercaw was assessing additional fees which Plaintiff did not feel were just.

32. There is an e-mail dated Mary 3, 2016 at 5:27 p.m. sent by Plaintiff to Dr. Caddy (hereafter, "5:27 p.m. e-mail"). Id. at 4. The 5:27 p.m. e-mail is confirmation that Plaintiff paid Dr. Bercaw for the consultation with Dr. Caddy.

33. There is an e-mail dated May 4, 2016 at 9:32 a.m. sent by Dr. Bercaw to Plaintiff (hereafter, "9:32 a.m. e-mail"). Id. at 6. In the 9:32 a.m. e-mail, Dr. Bercaw states, in part: "I can review the results with you over the phone for no extra charge." Id. Plaintiff does not recall whether this happened.

34. There is an e-mail dated April 29, 2016 at 7:38 p.m. sent by Dr. Caddy to Plaintiff, with copy to Dr. Bercaw (hereafter, "7:38 p.m. e-mail"). Id. at 7. In the 7:38 p.m. e-mail, Dr. Caddy states, in part: "I have already sent Dr. Bercaw an Authorization to Release in order for [him] to speak to me regarding the report he prepared." Id. Plaintiff did not know whether Dr. Caddy had reviewed the Bercaw Report at this time.

35. In Plaintiff's mind, Plaintiff was evaluated by Dr. Fonseca since January 1, 2014. However, Plaintiff's response to Defendant's Interrogatory No. 4, "Identify any medical practitioner (including, without limitation, psychologists or neurologists) by whom you have been evaluated or treated since January 1, 2014," did not include Dr. Bercaw or Dr. Fonseca. See Def. Ex. 10 at 4.

36. Defendant's Request for Production included a request for, "All documents that reference or relate to any consultation, evaluation, or treatment from a medical practitioner (including, without limitation, psychologists or neurologists) that you have received since January 1, 2014." See Def. Ex. 11 at 4. Plaintiff did not know whether the Bercaw Report, or any of Dr. Bercaw's materials, were produced to Defendant.

37. On May 7, 2018, Plaintiff signed an unsworn declaration accompanying "Plaintiff's Notice of Service of Amended Answers and Objections to Interrogatory No. 4 of Defendant's First Set of Interrogatories" that amended his answer to Interrogatory No. 4 to include Dr. Bercaw. See Def. Ex. 12.

38. Plaintiff recognized the Plaintiff's Privilege Log re: Tests Administered by/and Communications From Dr. Bercaw and Dr. Fonseca. See Def. Ex. 13.

39. Plaintiff recognized the FAA Form 8500-8. See Def. Ex. 14. It is an airmen medical application dated July 15, 2017 and has Plaintiff's signature on the bottom.

40. Plaintiff recognized documents attached to a letter addressed to Mr. Amlong from the FAA to be Plaintiff's FAA form 8500-8s from 2015 though 2018. See Def. Ex. 15.

41. At the time of his March 2018 deposition, Plaintiff believed that the Bercaw Report was privileged because Plaintiff had asked Dr. Bercaw to send the Bercaw Report to Plaintiff's attorney.

42. Plaintiff considered Dr. Caddy to be an agent of Mr. Amlong, and therefore that anything related to him would also be privileged.

43. Plaintiff believed any consultation with an outside expert that Plaintiff initially went to would be privileged.

44. Plaintiff did not inform Dr. Kay in June 2016 that he had been evaluated by Dr. Bercaw or MedPsych.

45. Regarding his March 2018 deposition, Plaintiff stated that he may have misspoke in some things, but he did not intentionally provide false testimony.

46. Plaintiff was upset that he was "pushed" from Dr. Kanter to Dr. Bercaw to Dr. Fonseca. He felt that he had been ripped off.

47. Plaintiff was informed by Dr. Caddy that Dr. Fonseca was not a professional and had improperly conducted the examination. This upset Plaintiff.

48. When Plaintiff was evaluated by Dr. Knippa in March 2016, he was tired. Plaintiff believed the evaluation by Dr. Knippa would be "fixed." A few days after the Knippa evaluation, Plaintiff spoke to Dr. Kanter, who sent Plaintiff to see Dr. Bercaw.

49. When Plaintiff had his evaluation at Dr. Bercaw's office, it was primarily administered, in Plaintiff's opinion, by Dr. Fonseca.

50. Plaintiff's understanding of "the practice effect" is that, every time someone takes a test, he or she will perform better or have a heads up.

51. At his deposition, Plaintiff at first stated that he did not remember who Dr. Bercaw was.

52. Plaintiff claimed to have downloaded the Bercaw Report from the Public Access to Court Electronic Records ("PACER") website and that he had access to the PI number and the application identification number. Plaintiff "corrected" this information and sent it to "Yasmin" at The Amlong Firm.[3]

53. Mr. Amlong asked Plaintiff to explain how Plaintiff got the information off the document. Subsequently, Mr. Amlong modified and filed an amended disclosure withdrawing the representation that the Bercaw Report had been obtained from a union representative named Danny Shellhouse.

54. Plaintiff and Mr. Amlong had exchanged e-mails in connection with the reviewing of Plaintiff's amended answers to interrogatories. See Amlong Exs. 7, 8.

II.     Mr. Amlong's Testimony

1.   Mr. Amlong is an attorney who has been practicing law for thirty-four years.

---

[3] Yasmin Harris is a legal assistant at The Amlong Firm.

2.   Plaintiff was Mr. Amlong's client starting on April 12, 2016. Prior to that date, they had had some phone communications during which Mr. Amlong had recommended Dr. Caddy to Plaintiff. Plaintiff never mentioned Dr. Bercaw to Mr. Amlong as of April 12, 2016.

3.   When Defendant made its Motion for Sanctions, Mr. Amlong moved to withdraw due to conflict of interest, and Plaintiff also decided to discharge Mr. Amlong as his attorney. When these things happened, the attorney-client relationship with Plaintiff terminated in Mr. Amlong's mind.

4.   There is an e-mail sent on April 22, 2016 at 1:00 p.m. by Dr. Bercaw to Plaintiff in which Mr. Amlong is copied. See Amlong Ex. 2C. The e-mail states, "I will forward the report only to your attorney." In response, Mr. Amlong sent a 3:20 p.m. e-mail to Dr. Bercaw, asking Dr. Bercaw if he was sending the report to him, and if so, if Dr. Bercaw could include the underlying data; or, alternatively, for Dr. Bercaw to send it to Dr. Caddy who Mr. Amlong had copied on the e-mail. Id. Mr. Amlong did not receive any report from Dr. Bercaw at that time.

5.   Mr. Amlong first received the Bercaw Report from Dr. Bercaw on July 9 after the Court ordered its production.

6.   On January 5, 2018, The Amlong Firm through associate Isha Kochhar ("Ms. Kochhar") served Plaintiff's Supplemental Responses to Defendant's Request for Production via e-mail. See Amlong Ex. 4. Included in this production was the April 26, 2016 at 10:52 p.m. e-mail from Plaintiff to Dr. Caddy, which first revealed to Defendant the existence of Dr. Bercaw and his report. Id. It had been inadvertently attached by Ms. Kochhar.

7.   When Plaintiff found out that the April 26, 2016 at 10:52 p.m. e-mail had been inadvertently provided to Defendant, he was not happy and felt that it should have been

13

privileged because Plaintiff had only consulted with Dr. Bercaw and did not intend to use him as a witness.

8.   At Plaintiff's March 2018 deposition by Defendant, Mr. Amlong was shocked when Plaintiff denied knowing about Dr. Bercaw or his report.   At some point, Mr. Amlong spoke to Plaintiff outside of the deposition room to ask him why he was responding in that manner and to tell him that he could not do that.

9.   Plaintiff informed Mr. Amlong that he was afraid Defendant would seek discipline against Plaintiff for not reporting Dr. Bercaw on his FAA Form 8500 and this was the reason he responded as he did in the deposition.

10. Back in the deposition, Plaintiff testified that he had seen Dr. Bercaw for a consultation, and Mr. Amlong felt that there was nothing further that needed to be corrected.   The cross-examination was thorough, and Mr. Amlong felt that the record had been set straight.

11. On April 20, 2018, Defendant sent a letter to Mr. Amlong indicating that it had not yet received the Bercaw Report, which Plaintiff had agreed to produce, and stating that they were considering issuing a subpoena or seeking an order to compel.  See Amlong Ex. 6.

12. Upon receipt of the April 20, 2018 letter, Mr. Amlong made inquiries to Dr. Caddy, Plaintiff and Ms. Caddy in an attempt to locate the Bercaw Report.   They each responded that they did not have it.

13. Mr. Amlong did not receive the Bercaw Report until MedPsych sent it to Dr. Caddy's office in response to the June 27, 2018 Order, after which Mr. Amlong obtained it from them. MedPsych also faxed the Bercaw Report to The Amlong Firm that same day.

14. A privilege log was filed by Mr. Amlong in reference to tests administered by and communications from Dr. Bercaw and Dr. Fonseca.  See Amlong Ex. 10.   Mr. Amlong filed this

document because Plaintiff insisted that this was a non-discoverable event and that Drs. Bercaw and Fonseca were consulting experts. Mr. Amlong had never dealt with a consulting expert before in terms of discovery and thought it was best to do a privilege log to "get it out there."

15. Mr. Amlong prepared the privilege log, asserting a consulting expert objection, based on a good faith basis to believe the privilege existed.

16. After the June 27, 2018 Order, Mr. Amlong made efforts to find the required documents.

17. On July 5, 2018, Plaintiff e-mailed to The Amlong Firm a copy of the Bercaw Report and the May 6, 2016 letter from Dr. Bercaw to Dr. Caddy. See Amlong Ex. 15. The Bercaw Report did not look the same as the one that Mr. Amlong eventually received from MedPsych, which version was clean and had no extraneous markings on it.

18. On July 9, 2018, Mr. Amlong e-mailed Plaintiff, stating that Plaintiff had lied to him about not having the Bercaw Report and that if he should do so again, Mr. Amlong would move to withdraw. See Amlong Ex. 20.

19. On July 9, 2018, The Amlong Firm sent discovery related to Dr. Bercaw to Defendant. See Amlong Ex. 24. There were two pages that Plaintiff had informed Mr. Amlong had come from Danny Shellhouse, and Mr. Amlong produced them with that representation.

20. Plaintiff informed Mr. Amlong that Plaintiff had downloaded the Bercaw Report from PACER and manipulated it to remove the legends and redactions and re-type in the redacted numbers. The Bercaw Report had been attached to Defendant's Summary Judgment Reply. See Reply in Support of Defendant's Motion for Summary Judgment [D.E. 87].

21. In response to this information, Mr. Amlong served to Defendant Plaintiff's Amended Notice of Production of Documents in order to correct the record. See Amlong Ex. 36.

22. Mr. Amlong discussed Dr. Bercaw's deposition with Dr. Kay and provided Dr. Kay with a copy of the Bercaw Report and excerpts of Dr. Bercaw's deposition testimony. As a result of those communications, Mr. Amlong filed Plaintiff's Withdrawal Notice Re: Report of Neuropsychological Assessment 06/29/2106 (sic) Dr. Kay as Positive Summary Judgment Evidence of Plaintiff's Fitness for Duty, thus withdrawing Dr. Kay's report. See Amlong Ex. 30, 34.

23. On September 18, 2018, Mr. Amlong sent an e-mail to Plaintiff confronting Plaintiff with Mr. Amlong's concerns and doubts about the case. See Amlong Ex. 31. Plaintiff sent an e-mail in response. See Amlong Ex. 32.

24. Mr. Amlong then had a forensic consultant examine Plaintiff's computer in order to determine whether Plaintiff had been truthful regarding his non-possession of the Bercaw Report. See Amlong Ex. 33. The results did not indicate that Plaintiff had been untruthful.

25. Mr. Amlong did not know anything about Plaintiff's visit to Dr. Bercaw when it occurred during March of 2016 and was not involved in the preparation of the Bercaw Report.

26. Mr. Amlong did not know about Plaintiff's visit to Dr. Kay in 2016 until Mr. Amlong received Dr. Kay's report.

27. Mr. Amlong disclosed all the documents related to Dr. Bercaw that were in his possession as soon as he had them.

28. In September 2018, Mr. Amlong believed that he had thwarted whatever Plaintiff wanted to do that might have caused him to have to withdraw Mr. Amlong's representation.

29. Plaintiff corrected himself during Plaintiff's deposition regarding whether he knew Dr. Bercaw; if he had not, then Mr. Amlong would have done so.

30. In his testimony, Mr. Amlong did not impute any misconduct on Attorney Pace.

III.    <u>Dr. Bercaw's Testimony</u>

1.  Dr. Bercaw is a clinical neuropsychologist.

2.  Dr. Bercaw met with Plaintiff to provide an unbiased second evaluation following Plaintiff's fitness for duty evaluation.

3.  Dr. Bercaw evaluated Plaintiff on March 21, 2016.

4.  Dr. Bercaw performed a clinical interview of Plaintiff, during which he took handwritten notes.  <u>See</u> Def. Ex. 17.  The last two pages of notes may be from a phone call Dr. Bercaw had with Plaintiff before their interview.

5.  Dr. Bercaw recognized the Bercaw Report as the report he prepared.  <u>See</u> Def. Ex. 5. Plaintiff had flown in to a local airport, as the aircraft pilot, and was forty-five minutes late to their appointment.  Plaintiff was at the office the entire day because it takes a full day to do the evaluation.

6.  The evaluation consisted of a core battery of tests that are specified by the FAA for medical certification, including: the CogScreen; an IQ test; various cognitive tests that looked at attention, processing speed, language, visual spatial abilities, and problem solving; and the Minnesota Multiphasic Personality Inventory-2 ("MMPI II"), which was an inventory that assessed psychopathology and personality.  Before the tests were administered, Dr. Bercaw conducted a clinical interview of Plaintiff.

7.  Dr. Fonseca is a licensed neuropsychologist.  At the time of Plaintiff's evaluation, she was a postdoctoral fellow.  She was present during the testing and clinical interview of Plaintiff.

8.  Dr. Bercaw administered several of the tests to Plaintiff, including the CogScreen.

9.  The CogScreen has different versions because it is designed to be repeatable; one would want to minimize practice effects by not administering the same session repeatedly.

10. Dr. Fonseca did not do all of the testing; however, she did do most of it. Dr. Bercaw was in the room with Plaintiff for at least three hours.

11. Plaintiff asked Dr. Bercaw to sign a letter stating that Dr. Fonseca "conducted the entire battery of testing, without any direct supervision," and Dr. Bercaw did not agree to sign it. See Def. Ex. 16.

12. Dr. Bercaw and Dr. Fonseca wrote the Bercaw Report together. Dr. Bercaw provided to Dr. Fonseca a great deal of supervision and put quite a bit of material into the report as his own.

13. Dr. Bercaw did not find any certain evidence of an FAA disqualifying mental or neurological condition during the evaluation of Plaintiff.

14. Dr. Bercaw was required to review the data in its entirety before reaching a conclusion on Plaintiff's assessment, and that was not done the same day as the assessment.

15. Plaintiff's performance on the CogScreen was generally passing, but it was low on several factors.

16. In the Bercaw Report, Dr. Bercaw recommended further review by an FAA neuropsychologist because Dr. Bercaw identified potential pilot safety risks in the results of Plaintiff's evaluation.

IV.    Ms. Caddy's Testimony

1. Ms. Caddy is married to Dr. Caddy and is the office administrator and manager of Dr. Caddy's clinical and forensic psychologist office.

2. Ms. Caddy is neighbors and friends with Mr. Amlong and Mrs. Amlong.

3. Ms. Caddy knows Plaintiff as a former patient of Dr. Caddy who had come into the office several times.

4. Ms. Caddy is familiar with the various filing systems used to transmit information from people outside Dr. Caddy's office to people inside the office.

5. Under these systems, any communication relevant to a patient's case is put into the patient's file.

6. In May of 2018, there came a time when Mr. Amlong was attempting to locate the Bercaw Report and Ms. Caddy was first asked to look for it. Ms. Caddy looked for the report in Plaintiff's file; however, she did not find it.

7. During the summer of 2018, both Ms. Caddy and Dr. Caddy were in Wyoming when they received a request from Mr. Amlong for them to attempt to find the Bercaw Report again. Ms. Caddy contacted an employee at the office, Cassandra, who searched Plaintiff's file, but she was unable to find the Bercaw Report.

8. Several weeks afterwards, Ms. Caddy located the Bercaw Report in the office's cloud-based fax system.

9. The office's fax system uses a program called RingCentral to e-mail faxes through to the office. Most of the faxes are robocalls or scam calls, therefore Ms. Caddy does not usually open an e-mail for the fax system unless she is expecting something.

10. In September 2018, Mr. Amlong gave Ms. Caddy a specific day to look for a fax from Dr. Bercaw, and Ms. Caddy did so. She had never before had any reason to expect a fax from Dr. Bercaw on that day.

11. Ms. Caddy located the fax, which contained the Bercaw Report, and she e-mailed it to Mr. Amlong on September 5, 2018. See Amlong Firm Ex. 28. The fax had been received by Dr. Caddy's office fax system through RingCentral on April 25, 2016. Id. The fax included the

Bercaw Report and an authorization for release of confidential information requesting Plaintiff's entire file.  There was nothing else in the fax or e-mail attachment.

12. Ms. Caddy had never seen the Bercaw Report prior to September 5, 2018.

V.    Dr. Caddy's Testimony

1.  Dr. Caddy is a clinical forensic and health psychologist.

2.  Dr. Caddy has a professional and social relationship with Mr. Amlong and they have known each other for forty years.

3.  Mr. Amlong referred Plaintiff to Dr. Caddy in April of 2016.

4.  Dr. Caddy is not aero-medically qualified; and he became aware at some point that Plaintiff was looking for a second evaluation by someone who was aero-medically qualified.

5.  Dr. Caddy knew that Plaintiff had been evaluated by Dr. Knippa.  Dr. Caddy believed that Plaintiff had been evaluated by Dr. Bercaw shortly thereafter; and before Plaintiff first met with Dr. Caddy.

6.  Dr. Caddy spoke with Dr. Bercaw some weeks after Dr. Bercaw's testing of Plaintiff in 2016 and Dr. Caddy asked Dr. Bercaw if he could have a copy of Dr. Bercaw's report.  Dr. Caddy sent an authorization by Plaintiff to Dr. Bercaw.

7.  Dr. Bercaw informed Dr. Caddy that he would send him a summary or overview of the Bercaw Report but not the actual report.  Dr. Bercaw did send the summary in a letter form.  See Def. Ex. 9.  The content of the letter was consistent with their conversation.

8.  Dr. Caddy did not receive a copy of the Bercaw Report at that time.

9.  In mid-2018, Mr. Amlong contacted Dr. Caddy asking for a copy of the Bercaw Report. Dr. Caddy did not have it.

10. A month, or a little longer than a month later, Ms. Caddy found the Bercaw Report.  Dr. Caddy was with her when she found it on the internet as a fax transmission among several thousand other documents.  Dr. Caddy had never seen it before that day.

## VI.   Deposition Testimony of Dr. Kay[4]

1. Dr. Kay is a clinical neuropsychologist.  He saw Patterson for two evaluations.  The first evaluation was on June 29, 2016.

2. Dr. Kay prepared a report based on his assessment of Patterson at the June 29, 2016 visit.

3. A senior aviation medical examiner referred Patterson to Dr. Kay.

4. In Dr. Kay's role in aviation neuropsychology, if Dr. Kay were doing an evaluation for the Federal Aviation Administration ("FAA"), he would follow a procedure whereby he would obtain the airman's medical record directly from the FAA.  The record would contain various records and reports related to the airman's medical certifications, healthcare treatment, and any criminal history.

5. There is a form called the Form 8500 that airmen must fill out to receive a medical certification.  The form requires an airman to indicate any healthcare professionals he or she has seen, including psychologists, psychiatrists, neuropsychologists, and any other physicians.

6. A "practice effect" is a term that refers to the benefit from familiarity with a test's procedure and content that can lead to better scores for an individual.

7. Dr. Kay believed that, prior to Dr. Kay's administration of the CogScreen test to Patterson on June 29, 2016, the most recent time Patterson had taken the CogScreen was with Dr. Knippa on March 17, 2016, three months earlier.  That amount of time was acceptable in order for Dr. Kay to proceed with his administration of the CogScreen.

---

[4] See Deposition of Dr. Kay [D.E. 154-4]; American's Notice of Deposition Designations [D.E. 223]; The Amlong Firm's Cross-designation and Objections to American's Designation of Dr. Kay's Deposition [D.E. 241].

8.  Dr. Kay had seen the Bercaw Report before his deposition.  The Bercaw Report was not referenced in Dr. Kay's June 2016 report because Dr. Kay did not know that the Bercaw Report existed at the time he produced his June 2016 report.

9.  Dr. Kay found the timeframe of four days between the Dr. Knippa March 17, 2016 assessment and the Dr. Bercaw March 21, 2016 assessment to be extraordinarily unusual.  That short of an interval raised questions as to the validity of the data.

10. Dr. Kay administered CogScreen Session 2 to Patterson on June 29, 2016.  He would not have done so intentionally had he known that Patterson had previously been administered CogScreen Session 2 by Dr. Bercaw, which is what the Bercaw Report indicated.  Dr. Kay would have instead administered CogScreen Session 3 because that is the way people are trained on how to give the CogScreen.

11. Patterson saw Dr. Kay again in October 2018.  Prior to October 2018, Mr. Amlong had informed Dr. Kay that Patterson had taken the CogScreen Session 2.

12. If Dr. Kay had known about the Bercaw Report prior to his June 2016 assessment, Dr. Kay would have demanded to see the Bercaw Report and would not have performed his evaluation or written his report without it.

13. Dr. Kay stood by the accuracy of his June 2016 report; however, based on Patterson's results on other measures that were not administered by Dr. Kay, Dr. Kay would have had a different opinion.

14. Dr. Kay believed that his June 2016 report was not complete and that it would not be appropriate for the FAA to rely on it for that reason.

15. If a pilot received a neuropsychological evaluation by Dr. Bercaw, the pilot had a responsibility to list the evaluation on the pilot's Form 8500-8.

16. Dr. Kay believed that he learned about the Bercaw Report from a phone conversation with Mr. Amlong in September 2018.

17. Dr. Kay saw a need to follow-up on his June 2016 report after seeing the Bercaw Report because the Bercaw Report raised concerns about Patterson's fitness, suitability for an aeromedical certificate and areas of neuropsychological testing that Dr. Kay had not done but that would be required if the case were to be reviewed by the FAA. Dr. Kay let Patterson know this and Patterson called him for an appointment.

18. Dr. Kay believed that Dr. Bercaw was correct in that, if the Bercaw Report were reviewed by an FAA neuropsychology consultant, a medical certificate would probably not be issued for Patterson. Additional testing would probably be required.

19. Dr. Kay then did the test that would have been required based on the Bercaw Report's findings, and Patterson did quite well on that test. Patterson had done miserably on those tests previously, but this time he did them perfectly fine.

20. Patterson had done very poorly on memory testing with Dr. Bercaw; however, when Dr. Kay tested Patterson in October 2018, Patterson had excellent memory.

## FACTUAL FINDINGS

1. Plaintiff's testimony was at times evasive and inconsistent. Plaintiff repeatedly failed to directly answer questions and often responded that he did not know or could not recall information. However, Plaintiff ultimately admitted many of the questions posed to him and admitted that he "misspoke" at his deposition. He believed he was following the law based on his understanding that he had an expert consultant privilege. Based on Plaintiff's testimony, the undersigned concludes that Plaintiff's initial denials at his deposition regarding Dr. Bercaw appear to have been based on the idea that the consultation with Dr. Bercaw was privileged and

confidential. Ultimately, Plaintiff appeared to accept responsibility for his lack of knowledge and improper testimony.

2. Mr. Amlong appears to have attempted to correct the record regarding his client's interactions with Dr. Bercaw.

3. Based on Ms. Caddy and Dr. Caddy's credible testimony the undersigned concludes that the Bercaw Report was "lost in the cloud" until located by Ms. Caddy on September 5, 2018.

4. Dr. Bercaw testified credibly regarding his consultation and testing of Plaintiff.

5. Dr. Kay testified credibly in his deposition regarding his assessment of Plaintiff and the lack of validity of his testing due to incomplete information provided by Plaintiff.

6. Attorney Pace had no involvement in the foregoing events.

**CONCLUSIONS OF LAW**

Defendant seeks sanctions pursuant to the Court's inherent authority. <u>See</u> Motion for Sanctions [D.E. 154]. Defendant requests monetary relief, including attorneys' fees and costs, to be assessed jointly against Plaintiff and The Amlong Firm. <u>Id.</u> Defendant argues that it should be awarded attorneys' fees and costs for: obtaining Dr. Bercaw's report and accompanying materials; conducting the deposition of Dr. Caddy; filing the *Daubert* motion to exclude Dr. Caddy's opinion testimony; and conducting the deposition of Dr. Kay. <u>Id.</u> at 19.

However, the undersigned has found that Plaintiff appeared to be operating under the belief that confidentiality and privilege protected his interactions with Dr. Bercaw. Because he was acting on this belief, Plaintiff's conduct does not rise to the level of willful disobedience of a court order, bad faith or fraud on the court required for the imposition of sanctions. <u>Chambers v. NASCO</u>, 501 U.S. at 45-46.

Similarly, The Amlong Firm attempted to both serve its client and correct the record by: producing a privilege log related to all materials relevant to Dr. Bercaw that The Amlong Firm was aware of as those materials became available to it; producing all discovery related to Dr. Bercaw immediately upon order from the court after the determination that said discovery was not privileged; withdrawing Dr. Kay's original report; continuing to search for discovery materials that were yet to be produced; and advising Plaintiff on the need for truthfulness and full disclosure, including by conducting a forensic exam of Plaintiff's computer.   Thus, the undersigned concludes that The Amlong Firm's conduct did not rise to the level of willful disobedience of a court order, bad faith or fraud on the court required for the imposition of sanctions. Id.

Finally, given Attorney Pace's lack of involvement and American's counsel's concession [D.E. 239 at 3-4], there is no basis for the imposition of sanctions on Attorney Pace.

## RECOMMENDATION

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that the Motion for Sanctions [D.E. 154] be DENIED.

The parties have **seven days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez, United States District Judge; and **seven days** thereafter to file responses to those objections.  Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida this *10th* day of September, 2019.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:    United States District Judge Jose E. Martinez
        Counsel of Record